1  **SPIRO JANNINGS**
   1304 Shortridge Ave. Unit C
2  San Jose, CA 95116
   408-292-0646
3  Spiro@redlineracingcams.com

4  CREDITOR/CLAIMANT, *In Propria Persona*

5

6              **UNITED STATES BANKRUPTCY COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
7                  **SAN FRANCISCO DIVISION**

8  In re:                                  )   Bankruptcy Case No.: **19-30088 (DM)**
                                           )
9  PG&E CORPORATION,                       )   Chapter 11
                                           )
10     - and -                             )   (Lead Case) (Jointly Administered)
                                           )
11 PACIFIC GAS AND ELECTIC                 )   <u>**DECLARATION OF**</u>
   COMPANY,                                )   <u>**SPIRO JANNINGS IN SUPPORT OF**</u>
12                                         )   <u>**MOTION FOR RELIEF FROM STAY,**</u>
       Debtors.                            )   <u>**AND RESPONSE TO REORGANIZED**</u>
13                                         )   <u>**DEBTOR'S OBJECTION TO CLAIM**</u>
                                           )   <u>**NO. 58462, FILED OCTOBER 17, 2019**</u>
14 Affects both Debtors                    )
                                           )   Response Deadline:
15     *\* All papers shall be filed in the* )   February 1, 2023, 4:00 PM, Pacific
       *Lead Case, No. 19-30088 (DM)*      )
16                                         )   Hearing Information (Upon a Timely
                                           )   Response):
17                                         )   Date:  TBD
                                           )   Time:  TBD
18                                         )   Place:  Tele/Video-conference Only
                                           )   United States Bankruptcy Court
19                                         )   Courtroom 17, 16th Floor
   _____    )   San Francisco, CA 94102
20

21

22

23

24

1

I, Spiro G. Jannings, hereby declare and state:

1.     I am over the age of 18, a natural born U.S. Citizen, and resident of Santa Clara County, California, and of sound mind and health. I have personal knowledge of the facts stated herein, and will testify under oath upon being called to do so.

2.     I am the plaintiff in a still active civil law suit against Pacific Gas and Electric Company; a.k.a. PG&E, filed on August 24, 2017, in Santa Clara County Superior Court, case number 17CV315033, alleging several cause of actions for unlawful termination.

3.     Following PG&E's filing of Chapter 11 bankruptcy in U.S. Bankruptcy Court, Northern District of California on January 29, 2019, under case number 19-30088-DM, I filed a claim against PG&E on October 17, 2019, as claim number 58462, citing 17CV315033.

4.     Prior to PG&E's filing of Chapter 11 Bankruptcy on January 29, 2019, I gave a deposition to PG&E on January 8, 2019, in good faith, with my attorney present.

5.     I retained my attorney on December 6, 2018, Scott Furstman, and prior to that I represented myself pro se, after the sudden illness of my original attorney, Mr. Gerald A. Emanuel, who became gravely ill in early 2018 and succumbed in February of 2022.

6.     On April 11, 2018 at 1:49 PM, I notified the offices of PG&E's legal counsel by email that I was now representing myself pro se, and sought extensions of time to get acquainted with the discovery my attorney had been working on; I requested that all matters be memorialized through email, and asked they acknowledge accordingly.

7.     Over the following eight months, I was engaged in considerable discourse with Ms. Elisa Nadeau (CBN: 199000), of the law firm, Littler Mendelson P.C., in San Jose, California, who represented PG&E in my case. I found her to be professional in her approach, but abrasive in her demands, and intimidating in her threats. I also found her to be deceptive in her actions to take advantage of my in-between attorney status, while still pursing discovery.

2

1    8.    By December of 2018, I had acquired enough compelling evidence through

2    discovery, personal interviews of PG&E personnel, and other investigation, including FOIA

3    requests, that I was ready to amend my complaint for the core issue my unlawful termination

4    was based upon: "retaliation" by my supervisor for filing a just grievance through my Union for

5    her changing my field work time cards without my knowledge or approval, and denying me the

6    pay upgrades that were provided per PG&E scale. My first amended complaint was curtailed

7    from imminent filing only by PG&E's refuge under Chapter 11 protection **(See Ex. "X")**.

8    9.    My declaration herein attests to having attached a correct, complete and accurate

9    draft of my first amended complaint, with exhibits, and a copy of the motion for leave to amend,

10   assembled as **EXHIBIT X**, each to be filed in Santa Clara County Superior Court, upon relief

11   being granted by this Court, or as soon thereafter as practicable in the face of a substitution of

12   counsel that is required following Mr. Furstman's being dismissed from this case.

13   10.    I further declare herein that my prior employment with PG&E was based on my

14   being hired as an employee under a guaranteed contract assured to me by superintendent,

15   Mitchell Kirk, which I enjoyed for nearly three years before my unlawful discharge; prior to

16   that, I had worked for fifteen years in all PG&E gas and electric divisions under contract from

17   the Union Hall, without ever having had a complaint related to my personal or professional

18   conduct; I enjoyed a reputation for high skill, efficiency and safety.

19   11.    During my discourse with PG&E attorney, Ms. Nadeau, while representing

20   myself, there were numerous communications from her that I found troubling, and beyond the

21   scope of her professional representation of PG&E, including her attempt to dissuade me from

22   hiring Mr. Furstman by berating his reputation, then suggesting an attorney of her choice, guised

23   in a benign pretense with intimidating hints, that I learned in my deposition she is gifted at. See

24   email **EXHIBIT Y**, attached hereto.

3

12.     Ms. Elisa Nadeau, has attested (Dkt. 11391, ¶ 6) to the fact I was "sanctioned" in state court, and added that I still have "not paid." As noted in the Motion, this sanction was statutory, for technical errors I made in proper attachment of POS 040 filings, and discovery disputes for setting mutual deadlines that resulted in motions to compel. This technical point of sanctions in Ms. Nadeau's Declaration offers nothing material to the Objection it's intended to support; and as such, is intended only for suggesting it impugn the merits of my cause against PG&E in the eyes of this Court. This style of bias-generating suggestions are rife throughout the Objection. Lastly, I have not paid because at one point I was advised by counsel not to, as it will be offset, and to my knowledge, PG&E has made no attempt or demands to collect same.

13.     Mr. James Leonard, as investigator for PG&E, has attested (Dkt. 11390, ¶ 4) his "evidence" had yielded the below evidence, and bullet points his four alleged incursions by me; namely, (1) Mr. Jannings had previously used inappropriate language regarding Ms. Doe, such as calling her a bitch and yelling obscenities at her; (2) Mr. Pierce, who hardly knew Mr. Jannings, had no reason to lie and, further, told Ms. Doe about the threat because he genuinely feared for her safety; (3) Other employees observed Mr. Jannings speaking with Mr. Pierce and Mr. Jannings made a statement "They are treating you surveyors like shit" and recalled that Mr. Jannings was "an angry guy" who had been " upset and aggressive" in previous encounters with them; and, (4) Ms. Doe also feared for her own safety and accordingly filed a police report to document the incident.

14.     I have repeatedly stated in all interviews, and given sworn testimony in a judicial proceeding, that I never said anything threatening or sexual against Ms. Doe. I did converse with Mr. Pierce early on July 13, 2015, verified by my gas fill up records, gate entry scan card and cell phone's GPS; but it was an entirely civil conversation. By contrast, Mr. Pierce alleges my threats were made on July 15, but records show I was miles away, and no card swipe all day.

4

15.     What Mr. Leonard fails to include in the foregoing, is: (1) Mr. Pierce has no witnesses that heard me tell him the obscene things alleged, because I never said them; (2) Mr. Pierce does not recall what day or even time of day the alleged conversation of my obscene statements occurred because it was July 23, 2015, eight days after we spoke that he fabricated this lie and as far as I know, conceived it with Ms. Doe herself; (3) Mr. Pierce was not too fearful for Ms. Doe's safety, since he waited eight (8) days to convey them to "Ms. Doe" after the actual day that I did speak with Pierce and my GPS and swipe card mentioned above can verify it; (4) Ms. Doe wasn't too concerned for her safety either, since she was in constant communication during this week between July 13 and July 23, and had me do an overtime job for her on Saturday, July 18, 2015, the day that Pierce lied about her being on vacation, as an excuse for why he waited so long to inform her about his alleged threats I made; (5) "Other employees" are omitted, but their "characterizations" of my being an "angry guy" who was "upset and aggressive" is certainly not conclusive proof in a road crew shop yard that I am guilty of making the threatening sexual comments that no one heard, but Pierce; and none of the field crew personnel that were around the day I did speak with Pierce found anything angry about how they exchanged greetings with me in the PG&E yard; (6) Mr. Pierce's employee history of being reprimanded for "falsifying company documents" (Ex. "B", ¶ 14) is not mentioned by Mr. Leonard, which he would have access to as head of security; nor is does Mr. Leonard mention my "spotless" record of eighteen (18) years, free of any reprimands before this incident; (7) Pierce's being the sole office occupant with Ms. Doe, which have mutual and overlapping duties as supervisors doesn't seem to be germane to Mr. Leonard's analysis of "motive", when he surmises a negative that can't be proven is proof of motive (i.e., Pierce "had no reason to lie"). This might be a valid conclusion if you ignored their intimate office relationship, and if you ignored my Union grievance against Ms. Doe, which is grounds for her

5

being discharged, since changing time cards is forbidden; and if you ignored that Pierce would be privy to Ms. Doe's investigation plight over said Union Grievance and feel he could help, but alleging "something" — eight days after the fact — against me.

16.     Best of all is (8) the fabricated inference of witness testimony, apparently carefully crafted by PG&E counselor, Ms. Nadeau, for Leonard's declaration's third bullet point: " Other employees observed Mr. Jannings speaking with Mr. Pierce and Mr. Jannings made a statement "They are treating you surveyors like shit" and recalled that Mr. Jannings was "an angry guy" who had been " upset and aggressive" in previous encounters with them.

17.     The above is clearly an example of out-of-context facts extrapolated into two or more elements to fabricate a false conclusion, a tactic Ms. Nadeau repeats over and over. By conjoining the simple observation of fact on July 13, 2015, that "other employees observed [me] speaking with Mr. Pierce"... then interjecting a benign, and joking statement that I did make earlier ("They are treating you surveyors like shit,") Ms. Nadeau implies the other employees were witnesses to what Pierce alleged eight days later on July 23, when they witnessed nothing. This is **deceptive, misleading, and misrepresentative of facts** which Ms. Nadeau, an officer of the court, has fabricated for the signature of her witness, James Leonard, and client, PG&E.

18.     Ms. Kathy Ledbetter, as Labor Relations Manager for PG&E, has attested (Dkt. 11389, ¶¶ 3–5), to Collective Bargaining Agreements (CBAs) requirements, and procedures; and that she has access grievance members` grievance files; and further, that she "recently reviewed" my grievance file and "determined" that the grievance involving my termination on August 27, 2015, under file number 23334, "advanced to Step 4 of the grievance process "Review Committee." Ms. Ledbetter then attests: "The parties (the Union and the Utility) agreed to settle the case at the Review Committee Step." In support of this agreement she avers, she attests to a "true and correct copy of the letter containing that agreement" attached as Exhibit B.

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 6 of 224

19.    Ms. Ledbetter then closes the introduction of Exhibit B, by adding: "Because the parties settled the grievance, grievance 23334 did not advance to Step 5, Arbitration." Ms. Ledbetter, no doubt relying on the craftsmanship of counsel, then executes her declaration under the penalty of perjury.

20.    Exhibit B of Ms. Ledbetter's declaration, grievance 23334 does not represent what she has executed a sworn statement to attest of. Grievance 23334, upon examination by the Court or by any reasonable review, will construe that the "Union and Utility" parties, cited, are not represented; and no agreement of same between the parties has been agreed to. What 23334 shows, is the mutual signatures of Claire Landloli, Chairperson, "Review Committee," and Kit Stice, Secretary, "Review Committee," each showing 11/16/16 alongside their respective signatures, beneath the document's "Decision" that ends with "The Committee agreed the discipline was issued for just cause. This case is closed without adjustment."

21.    The "Review Committee" is PG&E. A vague reference to the Union's opined rebuttal of facts, noting the GPS records for my location show I was not in the PG&E yard when alleged, so the Union argued for a reduction in penalty, while "The Company" admitted the male Supervisor (Pierce) did not report the incident as quickly as he should have, that it "does not negate the fact that the conversation took place." Adding, "Even the Grievant (me) admitted the conversation took place, but denies making the vulgar comments." In other words, by PG&E's Review Committee logic, my having had any conversation means that I am guilty of whatever that Supervisor wants to allege I said in the conversation.

22.    Irrespective of PG&E's misrepresentations to put words in my mouth to facilitate a pre-ordained conclusion three PG&E departments worked together to achieve, Ms. Ledbetter's Review Committee Grievance, Number 23334 is not what she has sworn to; nor is it what Ms. Nadeau, an officer of the court, has proffered to be in support of the Objection. There is no

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 7 of 224

agreement between "the Union and the Utility", and there is no agreement on the disposition
reached by the one sided argument which Ms. Landoli and Ms. Stice signed in disposing of.

23.     I further attest that during the entire proceedings of my Claim in PG&E's Ch-11
bankruptcy case, I have been unaware and left in the dark as to any events, motions, deadlines,
or communications between my attorney and any other counsel, including Mr. St. James. I had
made numerous calls, emails and text message attempts with Mr. Furstman, always leaving a
message, and rarely getting a response. On the few occasions I did receive a response, I was told
everything was the same, and nothing was going on. Had I known about any of the events at the
core of these proceedings in my Claim, I would have retained new counsel or did whatever I
needed to rectify the matter.

24.     Since these events I now move to vacate, I and Mr. Furstman have been harassed
by PG&E's counselor, Jane Kim (CBN: 298192) threatening me with suit and costs if I don't
drop my suit in Santa Clara County Superior Court; attempting to intimidate me. A copy of that
letter is attached as **EXHIBIT Y.**

I declare under the penalty of perjury under the laws of the United States and the State of
California that the foregoing is true and correct.

Executed at San Jose, California, this 13th Day of January, 2023.

Date:__1/13/2023_____                    **SPIRO JANNINGS**, *Claimant*

                                         SPIRO JANNINGS
                                         *Pro Se*

# EXHIBIT

# "X"

1
**SPIRO JANNINGS**
1304 Shortridge Ave. Unit C
2
San Jose, CA 95116
408-292-0646
3
Spiro@redlineracingcams.com

4
Appearing *In Propria Persona*

5

6
# SUPERIOR COURT OF CALIFORNIA

7
## COUNTY OF SANTA CLARA

8
SPIRO JANNINGS,      )    <u>Case No.</u>:   **17CV315033**
                     )
9
      Plaintiff;      )
vs.                  )
10
                     )
PACIFIC GAS & ELECTRIC CO., and  )    **<u>PLAINTIFF'S MOTION FOR LEAVE</u>**
11
Joel Dixon, Managing Superintendant;  )
Jeff Carroll, Superintendant;     )    **<u>TO AMEND THE COMPLAINT</u>**
12
Stephanie Douglas, Dir., Corp. Security;  )
James Leonard, Agent, Corp. Security;  )
13
William Pierce, Supervisor;    )
Bobbie Weeck, Supervisor;    )
14
Kathy Ledbetter, Managing Agent, H.R.;  )
Claire Landoli, Chair, Review Committee; )
15
and DOES-50;          )
                     )
16
     Defendants.      )

17
    **PLAINTIFF**, Spiro Jannings, by and through counsel, pursuant to California Code Civil

18
Procedure §473(a) and §576 moves for leave to amend the complaint in this cause with the First

19
Amended Complaint, and in support of such relief so states:

20
    **1**.    Plaintiff filed the original complaint ("the Complaint") August 24, 2017.

21
    **2**.    The Complaint sought damages for unlawful termination against Pacific Gas &

22
Electric Company ("PG&E") and yet unknown defendants "Does 1-50".

23
    **3**.    All requisite elements in support of the Complaint were made, and the Defendant

24
PG&E timely responded; with this cause being deemed by the Court to move forward.

**4**.     Discovery by all parties has been ongoing and Plaintiff intends to continue with further pre-trial discovery.

**5**.     In the process of Plaintiff's discovery and further investigation resulting from said discovery, the identity of other individuals and their complicity as agents of PG&E in the wrongful termination of Plaintiff requires the Complaint to specify each and their wrongful acts.

**6**.     In the process of Plaintiff's discovery and further investigation resulting from said discovery, the wrongful acts being alleged against specific agents of PG&E in the wrongful termination of Plaintiff is primarily rooted in, but is not limited to, RETALIATION.

**7**.     In the process of Plaintiff's discovery and further investigation, the wrongful acts being alleged by specific agents specific agents of PG&E in Plaintiff's wrongful termination for retaliatory purposes was based from conspired conduct by at least two or more individuals.

**8**.     The facts alleged and evidence in support, as filed herewith in the First Amended Complaint are of such overwhelming merit that a denial of this cause being Amended and continuing to move forward would *not be in the interest of justice*.

**9**.     A court may, in the furtherance of justice, allow a party to amend any pleading on any terms as may be proper. California Code Civil Procedure §473(a) and §576.

**10**.     The Amended Complaint is not to delay the trial or intended to add additional preparation costs (*Hirsa v. Superior Court* (1981) 118 Cal.App.3d 486, 490.).

**11**.     The Defendants are not prejudiced by the proposed amendments.

**12**.     **Pursuant to the Relation Back Doctrine – Fictitious Defendants**:

> Where a complaint sets forth, or attempts to set forth, a cause of action against a defendant designated by a fictitious name and his true name is thereafter discovered and substituted by amendment, he is considered a party to the action from its commencement so that the statute of limitations stops running as of the date of the earlier pleading. *Austin v. Massachusetts Bonding and Insurance Co.* (1961) 56 Cal.2d 596, 599.

**13**.    **Pursuant to the Relation Back Doctrine – New Causes of Action:**

If plaintiff seeks to add new legal theories or causes of action, the amended complaint relates back to the date of the filing of the original complaint and thus avoids the bar of the Statute of Limitations so long as recovery sought in both pleadings is based upon the same general set of facts. *Smeltzley v. Nicholson Manufacturing Co.* (1977) 18 Cal.3d 932, 939‑940; See also *Kittredge Sports Co. v. Superior Court* (Marker, U.S.A.) (1989) 213 Cal. App. 3d 1045, 1048; *Hirsa v. Superior Court* (Vickers) (1981) 118 Cal. App. 3d 486, 489; and in the California Supreme Court: *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575.

**14**.    This state has held generous liberality to allow amendment of pleadings at any stage to be decided on their merits. (*Desny v. Wilder* (1956) 46 Cal.2d 715, 751.) See also *Klopstock v. Superior Court.* (1941) 17 Cal.2d 13, 19; *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 939; *Hirsa v. Superior Court* (1981) 118 Cal.App.3d 486, 488-489.

**15**.    Pursuant to California Rules of Court, Rule 3.1324(a): (1) a copy of the Amended Complaint accompanies this motion and so states it's the First Amended to differentiate it from previous pleadings or amendments, pending the Court's granting leave to accept as such; (2) the allegations of the previous [original] complaint have been deleted or substituted with specificity, pending the Court's acceptance as such; and (3) the specific new allegations to be added have been proposed, with original allegations applied in the construct required to clarify and inform the facts, pending the Court's acceptance.

WHEREFORE, for the reasons set for herein, Plaintiff respectfully asks this Honorable Court to GRANT leave to Amend Plaintiff's original Complaint with the First Amended Complaint co-filed herewith.

Date:                                    **SPIRO JANNINGS**


_____

SPIRO JANNINGS
*Pro Se*

1  **SPIRO JANNINGS**
   1304 Shortridge Ave. Unit C
2  San Jose, CA 95116
   408-292-0646
3  Spiro@redlineracingcams.com

4  Appearing *In Propria Persona*

5

6                     **SUPERIOR COURT OF CALIFORNIA**

7                        **COUNTY OF SANTA CLARA**

8  SPIRO JANNINGS,                    )        Case No.:      **17CV315033**
                                      )
9          Plaintiff;                 )
   vs.                                )
10                                     )
   PACIFIC GAS & ELECTRIC CO., and    )        **FIRST AMENDED**
11 Joel Dixon, Managing Superintendent; )
   Jeff Carroll, Superintendant;      )        **COMPLAINT  FOR WAGES**
12 Stephanie Douglas, Dir., Corp. Security; )
   James Leonard, Agent, Corp. Security; )     **AND DEMAND FOR JURY TRIAL**
13 William Pierce, Supervisor;        )
   Bobbie Weeck, Supervisor;          )
14 Kathy Ledbetter, Managing Agent, H.R.; )
   Claire Landoli, Chair, Review Committee; )
15 and DOES-50;                       )
                                      )
16 _____Defendants._____  )

17        **PLAINTIFF**, Spiro Jannings, by and through counsel, hereby AMENDS the original

18 Complaint pursuant to Cal. CCP §§472(a) and 576, to specify additional Defendants and their

19 official capacities as they have become known since the original filing, and to supplement the

20 pleadings in accordance with facts and evidence known to Plaintiff which is not prejudicial to

21 the Defendants, PACIFIC GAS & ELECTRIC COMPANY, *et al*; and in so doing hereby states:

22        **1**.      Plaintiff, SPIRO JANNINGS ("**Jannings**") is an individual over the age of 18,

23 and at all times relevant herein a California resident living in the County of Santa Clara.

24

---

PLAINTIFF'S FIRST AMENDED COMPLAINT                                              1

**2**.      Defendant, PACIFIC GAS & ELECTRIC COMPANY ("**PG&E**"), is an investor owned utility (IOU) with publicly traded stock, headquartered in San Francisco, CA., and at all times relevant to this action was and is doing business in the County of Santa Clara, California; while the acts and omissions giving rise to liability occurred in the County of Alameda, CA.

**3**.      Defendant, <u>Joel Dixon</u> ("**Dixon**"), as Managing Superintendant, was at all times relevant to this action an employee and managing agent of PG&E who oversaw and/or engaged singularly or collectively in concert with other parties, in the willfully prejudicial actions, that directly contributed to the malicious and retaliatory, wrongful termination of Plaintiff.

**4**.      Defendant, <u>Jeff Carroll</u> ("**Carroll**"), as Superintendant, was at all times relevant to this action an employee and managing agent of PG&E, and oversaw and/or engaged singularly or collectively in concert with other parties, in the willfully prejudicial actions, that directly contributed to the malicious and retaliatory, wrongful termination of Plaintiff.

**5**.      Defendant, <u>Stephanie Douglas</u> ("**Douglas**"), as Director of Corporate Security, was at all times relevant to this action an employee and managing agent of PG&E, who was responsible for affirming the erroneous conclusions reached in concert with other parties that directly contributed to the malicious and retaliatory, wrongful termination of Plaintiff.

**6**.      Defendant, <u>James Leonard</u> ("**Leonard**"), as Supervisor of Security, was at all times relevant to this action an employee and agent of PG&E, and was directly responsible for creating the erroneous conclusions from a prejudiced, embellished misrepresentation of facts, which directly contributed to the malicious and retaliatory, wrongful termination of Plaintiff.

**7**.      Defendant, <u>William Pierce</u> ("**Pierce**"), was at all times relevant to this action an employee and agent of PG&E, acting in a Supervisor capacity, did singularly or collectively in concert with other parties, fabricate with *malo animo* the erroneous allegations for retaliatory purposes that directly contributed to the malicious and wrongful termination of Plaintiff.

**8**.     Defendant, <u>Bobbie Weeck</u> ("**Weeck**"), was at all times relevant to this action an employee and agent of PG&E, acting in a Supervisor capacity, who singularly or collectively acted in concert with other parties to contribute to the erroneous allegations for retaliatory purposes that directly contributed to the malicious, wrongful termination of Plaintiff.

**9**.     Defendant, <u>Kathy Ledbetter</u> ("**Ledbetter**"), was at all times relevant to this action an employee and managing agent of PG&E's Human Resources department, who was responsible for affirming the erroneous conclusions reached in concert with other parties that directly contributed to the malicious and retaliatory, wrongful termination of Plaintiff.

**10**.     Defendant, <u>Claire Landoli</u> ("**Landoli**"), as Chairperson of PG&E's Review Committee, was at all times relevant to this action an employee and managing agent, who was responsible for affirming the erroneous conclusions reached in concert with other parties that directly contributed to the malicious and retaliatory, wrongful termination of Plaintiff.

**11**.     Defendant(s) "**DOES-50**", inclusive, are fictitiously named Defendants, as yet unknown, which are complicit in some manner, whether singularly or collectively with actions of one or more known parties and the allegations as set forth herein.

**12**.     Each Defendant cited herein, knew or should have known, the erroneous allegations used to justify Plaintiff's unlawful termination were unsupported and without merit, rooted in retaliation for a Plaintiff's justified Union grievance filed against Weeck.

**13**.     Each Defendant cited herein had a professional, fiduciary and legal responsibility to act in good faith in their roles investigating the erroneous allegations against Plaintiff, and each had the ability to reverse the unlawful termination, but for their retaliatory prejudice.

**14**.     Employees at large of PG&E are represented by the International Brotherhood Of Electrical Workers, Local Union No. 1245 ("**IBEW**"). Plaintiff was a member in good standing.

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 15 of 224

**15**.     Plaintiff is informed; has first person knowledge; believes and herein alleges that at all times relevant to this cause each Defendant ratified, authorized, knew or should have known of the wrongful acts committed against Plaintiff by one or more other Defendants; and whereas each were privy to facts and thereby in a position and obligated to correct, mitigate and end the unjust actions Plaintiff suffered, but for their <u>collective, deceptive acts and practices</u>.

**16**.     Plaintiff's unblemished twenty (20) years of loyal, exemplary service for and to PG&E were disregarded while his employee rights, professional standing, reputation, emotional and financial security were all irreparably damaged as a direct or proximate result of the Defendants` individual and collective, prejudicial actions or inactions each knew or should have known were unjustified and unlawful, and for which Jannings now <u>seeks just compensation</u>.

**17**.     The facts indicate the actions and events giving rise to the case at bar were not only unlawful and avoidable, but were in fact deliberate, malicious, and conspired by at least two or more supervising parties motivated by retaliation, compounded by other PG&E agents to misrepresent and cover up their deceptive wrongful actions in total disregard of the facts and truth solely to cause harm to Jannings, who <u>seeks punitive damages</u>.

## BACKGROUND

**18**.     Plaintiff is a highly experienced and diversely qualified utilities company field person who worked approximately seventeen (17) years as an IBEW contractor for PG&E, beginning August 9, 1995 in PG&E's San Jose's Edenvale Division, then expanding to Salinas, San Carlos, and Cinnabar by 2005. Plaintiff's duties covered power line Transmission and Distribution (T&D) above and below ground, Locate and Mark (L&M), and eventually Compliance Inspector (gas and electric), working directly for numerous supervisors where he earned high reviews from each, including construction supervisor: Mitchell Kirk ("Kirk").

---

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    4

**19**.     In October of 2007, Superintendent Mitchell Kirk specifically sought Jannings for L&M assignments in the San Carlos Division under Supervisors Tim Bellinghousen, Ms. Valerie Lawson and Dean Churchwell; where he earned top producer ratings from all. Never, was there any personal or professional incursions of proper conduct alleged against Plaintiff.

**20**.     In September of 2009, Plaintiff was contracted to work PG&E's Cinnabar Division in San Jose until November of 2010, working for <u>Dana Micholson</u>; who also provided Plaintiff Jannings with excellent job reviews and recommendations.

**21**.     On July 1, 2011, Plaintiff transferred to PG&E's Concord Division, overseen by Superintendent John Little, and worked directly under supervisor <u>Ms. Bobbi Weeck</u> until August of 2012; accruing thirteen (13) months of excellent job reviews from all Division supervisors, including Weeck, who expressed to Plaintiff she was sorry to lose him from her crew. Weeck and Plaintiff worked well together, and never was any improper conduct alleged.

**22**.     On or about August 15, 2012, Plaintiff transferred to PG&E's Cupertino Division at the request of Superintendant Kirk and reported to supervisor John Kemp, where Plaintiff worked for his last four (4) months as a contractor hired through the IBEW.

**23**.     On or about January 27, 2013, Plaintiff accepted a PG&E employee position after Kirk reassured him his permanent status was secure; and was directly thereafter assigned to the San Carlos Division under Supervisor, Ron Abolana, then Franko Massario in September. Both supervisors gave Plaintiff high reviews, and never was there any incursions of his conduct.

**24**.     On or about June 16, 2014, Plaintiff reported to prior supervisor Weeck for L&M assignments at PG&E's Hayward Division, who assigned him to work out of the Freemont Division, which was closer to Jannings` home. Jannings continued his exemplary performance.

**25**.     On **March 27, 2015**, Plaintiff filed a grievance against Weeck through Union Rep, Lou Mennel ("**Mennel**"), who wrote: "Grievant has done work of higher classification on

several occasions since the clarifications of his duties on 02/17/2015. He has not received the upgrade. In addition, the <u>timecards have been changed without his knowledge</u>." (Ex. "**C**")

**26**. On **Thursday, <u>May 7, 2015</u>**, Plaintiff was called by Weeck into Pierce's office ("**the meeting**") and directed to have his Union Shop Steward, Ben Nordson ("**Nordson**") appear; where Weeck presented Jannings with a formal Written Reminder (Ex. "**D**"), orally alleging numerous performance infractions, that *inter alia* included sloppy time cards; arriving late to transmission standby jobs; being late turning in documentation; and leaving jobs early.

**27**. When Plaintiff refuted Weeck's allegations in the meeting with a non-party's testimony by phone, Weeck escalated the Written Reminder to a Positive Disciplinary Action ("PD"), having more dire consequences to Jannings` employee record and career. Weeck then commented in the presence of Nordson that she "**[w]ouldn't have taken this action if [Jannings] hadn't filed the [March 27th] grievance against [her].**" (Ex. "**A**", ¶ 24, p.5:22)

**28**. Following Weeck's comments in the meeting on May 7, 2015, and based on the recommendations of Union representatives, Nordson and Mennel, Plaintiff filed Grievance #23183 later that day against Weeck for harassment. (Ex. "**E**")

**29**. On June 11, 2015, Plaintiff reported Weeck's retaliatory actions to PG&E's Ethics & Compliance Department, recorded as #PGE-15-06-0020, PIN8561. (Ex. "**A**", ¶ 26)

**30**. On Friday, July 17, 2015, following a harassing call to Jannings by Weeck alleging another erroneous on-job infraction, Weeck asked Plaintiff to work overtime for the next day to complete a critical job for HP Communications; Jannings agreed. (Ex. "**A**", ¶ 31)

**31**. On July 23, 2015, unbeknownst to Plaintiff, a PG&E Corporate Security Investigation ("**CSI**") was initiated against Jannings regarding a threat of sexual assault he was alleged by Pierce to have made against Weeck in a conversation with Pierce a week earlier.

**32**.     On July 24, 2015, at approximately 6:30 AM, Jannings reported to the Fremont Yard and turned in time cards by e-Mail to Weeck. Directly thereafter, Plaintiff was called into the office of manager, Dave Lane ("**Lane**"), where in the presence of PG&E gas crew foreman and Union shop steward, Hector Sanchez ("**Sanchez**"), Plaintiff was introduced to Superintendent Jeff Carroll and Salinas Yard Supervisor, John Camera, who notified Plaintiff without explanation he was being placed on administrative leave with pay. Plaintiff was directed to surrender his company truck keys, security card and company credit card to Lane, forthwith.

**33**.     On July 27, 2015, at approximately 2:20 PM, Week arrived at the Fremont Police Department ("FPD"), to initiate a complaint with FPD officer, Craig Perry, stating she was informed by Pierce of sexual threats against her made by Plaintiff. Officer Perry followed up with a call to Pierce's cell phone, who stated Jannings made the threats about Weeck to him on 7/15/15 at approximately 3:30 PM, allegedly stating Jannings called her a "fucking bitch" and added, "Just wait, she will feel my dick in her ass, she is going to feel my pain and I'm going to get her fired." Pierce told officer Perry he tried to call Weeck the next morning but she did not answer, and explained Weeck "was out of town," but he later told her of the incident on 7/23/15. *See* Ex. "**H**", FPD report number 150727029.

**34**.     On July 28, 2015, Carroll called Plaintiff to inform him to meet Corporate Security at the Freemont Meter Plant at 1:00 PM ("**the interrogation**") and his shop steward, Sanchez, will meet him. Plaintiff arrived to the interrogation at approximately 1:00 PM and was met by James Leonard and Kevin Griswald of PG&E corporate security, and Sanchez.

**35**.     The interrogation was the first time Plaintiff was made aware of Pierce's allegations he made threats toward his supervisor Weeck during a conversation with Pierce; specifically, that Jannings told Pierce he was "[g]oing to stick [his] dick in Bobbi's ass," and "[s]he was going to feel [his] pain, and [he was] going to get her fired." (Ex. "**A**", ¶ 37)

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 19 of 224

**36**.     Plaintiff, repeatedly denied all interrogation allegations. (Ex. "**A**", ¶¶ 37–40)

**37**.     On August 6, 2015, PG&E's <u>Stephanie Douglas</u> disseminated PG&E Memorandum #15-1225 of <u>Joel Dickson</u>'s <u>SUMMARY OF INVESTIGATIVE FINDINGS</u> of Jannings` "Disrespectful Actions and Threat Of Violence Toward a Supervisor". (Ex. "**I**")

**38**.     On August 27, 2015, at approximately 8:00 AM, Jeff Carroll called Plaintiff and instructed him to "Come on in, and be ready to go to work," adding: "Meet me at the Fremont Meter Plant at 11:00 AM and be prepared to go to work." (Ex. "**A**", ¶ 45)

**39**.     On August 27, 2015, at approximately 11:00 AM, Plaintiff showed up at PG&E's Fremont Meter Plant to return to work as instructed, where in the presence of his Union representative, Eugene Sanchez, Carroll presented Jannings and Sanchez with the corporate security report; had both men read it; presenting Plaintiff with a letter of termination. (Ex. "**J**")

**40**.     On August 31, 2015, through his representative of the IBEW Local #1245 Plaintiff filed Grievance: #23334 for wrongful termination. (Ex. "**K**")

**41**.     On October 5, 2015, Plaintiff was denied unemployment insurance based on PG&E's allegations of threatening a coworker; Plaintiff appealed. (Ex. "**A**", ¶ 51)

**42**.     On October 15, 2015, PG&E held a Local Investigation Committee ("LIC") hearing on Plaintiff's grievance of wrongful termination. Attending for PG&E was Parker, Carroll, Pierce and Leonard; representing Plaintiff was Mennel and Sanchez. (Ex. "**A**", ¶ 52.)

**43**.     On October 16, 2015, Plaintiff attended the second day of PG&E's LIC hearing, attended by PG&E's Ledbetter, lasting all morning and concluding at or about 1:30 PM with an oral disposition denying the Union's request Plaintiff be returned to work. (Ex. "**A**", ¶ 55.)

**44**.     On February 23, 2016, Plaintiff attended the San Jose Office of Appeals and appeared before the Honorable Robert M. Lofgren, Administrative Law Judge of the California Unemployment Insurance Appeals Board; PG&E's Carroll, and its legal rep. Ms. Turner; and

therein Plaintiff gave sworn testimony denying all allegations of any improper conduct or statements to Pierce about Weeck, or any other improprieties. (Ex. "**A**", ¶¶ 56–57.)

45. In the February 23, 2016 Appeals hearing, PG&E failed to produce witnesses Pierce, Weeck, or Leonard; with Carroll admitting under oath he had no direct knowledge of the allegations, and no good reason for PG&E's failure to produce any witnesses. (Ex. "**N**")

46. On February 24, 2016, a five (5) page decision was rendered by Judge Lofgren: "The Notice of Determination and Ruling is reversed." <u>Findings of Fact</u> found: "*The claimant did not threaten the coworker or make the profane statement attributed to him.*" (Ex. "**O**")

47. PG&E failed to appeal the decision and the findings of fact by Judge Lofgren; the Administrative Law Court's decision is therefore *res judicata; collateral estoppel*.

48. On November 16, 2016, <u>Claire Landoli</u>, Chairman; and <u>Kit Stice</u>, Secretary, of PG&E's Review Committee, rendered a final disposition on Plaintiff's Grievance #23334, that terminating his employment was justified; the case was closed without adjustment. (Ex. "**S**")

49. The facts show: three (3) PG&E departments: <u>Administration</u>; <u>Corp. Security</u>; and <u>Human Resources</u>, with their managing agents, each, individually and collectively knew, or should have known, the unsworn allegations of Pierce were unsupported hearsay, contradicted by the sworn testimony of Jannings, and PG&E's own location and time records of Plaintiff of the matter alleged; yet, each individually and collectively ignored blatantly obvious and contradicting facts; weight of evidence and Pierce's prior employee record of falsifying documents; and ignored the Administrative Law Court's final disposition of Plaintiff's innocence, to each, individually and collectively, conspire to terminate Jannings.

## CAUSATION

50. Defendant <u>Dixon</u>, is directly or indirectly complicit in PG&E's unlawful termination and breach of contract with Plaintiff in that, as Managing Superintendent, he

authorized Carroll's decision to terminate Jannings, when he knew, or should have known, Pierce had a history of falsifying company records, while Jannings had no incursions in conduct or veracity; and PG&E's own Security Investigation report of Jannings` GPS times and locations contradicted Pierce's unsworn, unsupported allegations, as being merely hearsay. The Administrative Law Court's finding of fact determined Plaintiff did not commit the acts alleged, and therefore Plaintiff's termination was unwarranted and unjust, which Dixon should have and would have concluded, but for his personal prejudice and malicious intent to harm on Jannings.

**51**.     Defendant <u>Carroll</u> is directly or indirectly complicit in PG&E's unlawful termination and breach of contract with Plaintiff, by and through the prejudicial, unsupported and unsworn allegations of Pierce, for whom Carroll was a direct or indirect supervisor of, and knew, or should have known the refuted allegations against Plaintiff did not constitute the humiliating and disparaging slander of Plaintiff's professional and personal reputation, which Carroll was directly involved in promoting and concluding against Jannings.

**52**.     Defendant <u>Douglas</u> is directly or indirectly complicit in PG&E's unlawful termination and breach of contract with Plaintiff, by and through the prejudicial and unsupported allegations of Pierce, for whom Douglas had direct or indirect oversight and support of Leonard's reprehensible negligence and prejudice, and as such, ignored her obligations as Leonard's manager to abate and correct his egregious and erroneous allegations that irreparably harmed Plaintiff, but for Douglas` negligent failure to intercede.

**53**.     Defendant <u>Leonard</u> is directly or indirectly complicit in PG&E's unlawful termination and breach of contract with Plaintiff, by and through the prejudicial and unsupported allegations Pierce willfully averred against Jannings, for whom Leonard was a direct investigator of, and knew, or should have known Plaintiff's refuted allegations by Pierce

1  did not constitute the humiliating, disparaging slander of Plaintiff's professional and personal
2  reputation used by Leonard, in concert with: Moss, Douglas, and Carroll to ruin Jannings.

3  **54**.  Defendant <u>Pierce</u>, who was previously disciplined for falsifying records, is
4  directly complicit in PG&E's unlawful termination and breach of contract with Plaintiff, through
5  his contemptuous averments of Jannings` alleged heinous sexual threats against Weeck, he
6  repeated to Weeck; then Leonard; then the Fremont Police Department; to bolster his fabricated
7  allegations, after-the-fact, solely to retaliate in concert with or for the benefit of his peer, Weeck.

8  **55**.  Defendant <u>Weeck</u> is directly complicit in PG&E's unlawful termination and
9  subsequent breach of contract of Plaintiff, in that Weeck, as a direct supervisor of Plaintiff,
10  conspired with Pierce against Jannings by using Pierce's false allegations, she knew, or should
11  have known to be false, for her own retaliation of Jannings` Union complaint against her for
12  withholding pay upgrades he was due, and for changing his time slips without his authorization
13  or knowledge, and whereby, her complicit reinforcement of Pierce's fabricated falsehoods
14  against Plaintiff, and her unjustified slanderous complaint to the Fremont Police Dept., were
15  malicious retaliation solely to harm Jannings in deflecting her own problems arising from his
16  justified, properly filed complaint against Weeck that would be grounds for her dismissal.

17  **56**.  Defendants Pierce and Weeck were equal, peer level supervisors of overlapping
18  duties who worked from the same office, sharing tasks and responsibilities in kind over their
19  similar but separate divisions; whereby the merits or demerits of one affected the other, and
20  whereby any reasonable person in the trade would expect a dependence, if not a personal
21  relationship of mutual interests and cooperation to exist between both Pierce and Weeck;
22  therefore, Pierce had the opportunity to be privy to the threat of termination Weeck faced from
23  Jannings` complaint, and the motive to repeat his record of fabricating facts to save her career.

24

1      **57**.    Defendant <u>Ledbetter</u> is directly or indirectly complicit in PG&E's unlawful

2   termination and breach of contract with Plaintiff, through unsupported allegations by Pierce, for

3   whom Ledbetter, as the senior decision maker of PG&E Human Resources, had direct oversight

4   of Leonard's investigation, and was in a position to know, or should have known the refuted

5   allegations against Plaintiff did not constitute the humiliating, slanderous disparaging of

6   Plaintiff's professional and personal reputation, nor the disposition PG&E reached to breach its

7   contract with Plaintiff. Ledbetter, as a supervising Human Resources officer of PG&E was

8   willfully negligent in performing her duties to protect PG&E's employee, the Plaintiff, from the

9   unjust prosecution Leonard's incompetence alleged, and was directly complicit in the collective

10  prejudice reached by Carroll in a conspired, predetermined consensus to terminate Plaintiff.

11     **58**.    Defendant <u>Landoli</u> as the supervising final arbitrator of PG&E's Review

12  Committee, charged with rendering a final disposition of Jannings` Grievance #23334 which

13  challenged the findings of PG&E's corporate security investigation and Plaintiff's unlawful

14  termination, are complicit in the breach of PG&E's employment contract with Plaintiff, in that

15  they each knew, or should have known, the unsworn and unsupported allegations made by

16  Pierce were hearsay and in contradiction to equal or greater evidence presented by Jannings`

17  sworn testimony and the findings of fact by Judge Lofgren of the Administrative Law Court's

18  decision, which stand in complete contradiction to the conclusions reached by Landoli to deny

19  Grievance #23334 and uphold PG&E's unjust and unlawful termination of Plaintiff, and right a

20  wrong, but for the conspired, prejudiced unlawful conduct of Landoli.

21

22

23

24

## **FIRST CAUSE OF ACTION**

### **(Unlawful Termination for Retaliatory Purposes)**

**59**.　　Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 58.

**60**.　　As a second, separate, and distinct cause of action, Plaintiff complains against Defendants and alleges that, on or about August 27, 2015, Defendant breached the employment contract by terminating Plaintiff's employment based solely on false allegations contrived for retaliatory purposes, in that Pierce and/or Weeck, sought individually or collectively, to silence Jannings' proper, Union filed grievance against Weeck for her professional misconduct.

**61**.　　On March 27, 2015, Plaintiff filed a grievance against Weeck through Union Rep, Lou Mennel ("Mennel"), who wrote: "Grievant has done work of higher classification on several occasions since the clarifications of his duties on 02/17/2015. He has not received the upgrade. In addition, the <u>timecards have been changed without his knowledge</u>." (Ex. "**C**")

**62**.　　On May 7, 2015, Plaintiff was called by Weeck into Pierce's office and directed to have his Union Shop Steward, Ben Nordson ("Nordson") appear; where Weeck presented Jannings with a formal Written Reminder  (Ex. "**D**"), then orally alleged in the presence of Nordson, numerous performance infractions, that *inter alia* included sloppy time cards; arriving late to transmission standby jobs; being late turning in documentation; and leaving jobs early.

**63**.　　Weeck escalated the Written Reminder to a Positive Disciplinary Action when Plaintiff refuted Weeck's allegations in the meeting with a non-party's testimony by phone.

**64**.　　Weeck commented in the presence of Nordson she "**[w]ouldn't have taken this action if [Jannings] hadn't filed the [March 27th] grievance against [her].**" (Ex. "**A**", ¶ 24)

**65**.　　Following Weeck's comments on May 7, 2015, Nordson and Mennel filed Grievance #23183 on Plaintiff's behalf later that day against Weeck for harassment. (Ex. "**E**")

66. On June 11, 2015, Plaintiff reported Weeck's retaliatory actions to PG&E's Ethics & Compliance Department, recorded as #PGE-15-06-0020, PIN8561. (Ex. "**A**", ¶ 26)

67. On Friday, July 17, 2015, Weeck called Jannings alleging more erroneous on-job infractions, then asked Plaintiff to work overtime for the next day to complete a critical job for HP Communications; substantiating she worked on that day. (Ex. "**A**", ¶ 31)

68. On July 23, 2015, Pierce informed Weeck that Plaintiff made the alleged threatening statements against her purportedly on July 15, 2015; which led to the security investigation by Leonard, and an ultimate disposition by all Defendants to terminate Plaintiff's employment and breach his contract based solely on the unsupported, hearsay testimony of Pierce, which was later determined by a judicial proceeding, and not appealed, Plaintiff did not commit the acts alleged which was the basis for his unlawful termination.

69. The blatant timing of such malicious and unsupported allegations by Pierce, a coworker and office sharing peer to Weeck, and for which Weeck directly or indirectly sought and benefited from Plaintiff's termination, in that Plaintiff's grievance and complaint against her would be dismissed, was in violation of the Whistle Blower laws of California under §1102.5.

70. As a direct or proximate result of the actions of the Defendants, collectively and individually, Plaintiff was damaged and seeks monetary relief as allowed by law, including but not limited to all costs and fees of counsel associated with this and each cause of action herein.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith And Fair Dealing)

71. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 70.

72. The employment agreement referred to above contained an implied covenant of good faith and fair dealing, which obligated Defendant(s) to perform the terms and conditions of

---

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    14

the agreement fairly and in good faith and to refrain from doing any act that would prevent or impede Plaintiff from performing any or all of the conditions of the contract that he agreed to perform, or any act that would deprive Plaintiff of the benefits of the contract.

**73**. Plaintiff was employed by Defendant for three (3) years and reasonably relied on the representation from Defendant that he would not be terminated without just and fair cause.

**74**. Plaintiff performed all the duties and conditions of the employment agreement.

**75**. Defendant knew that Plaintiff had fulfilled all his duties and conditions under the contract.

**76**. Defendant breached the implied covenant of good faith and fair dealing under the employment agreement by wrongfully discharging Plaintiff based on false allegations.

**77**. Defendant further breached the implied covenant of good faith and fair dealing, by violating and failing to follow its own agreement, when Defendant terminated Plaintiff without Cause.

**78**. As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits, and is entitled to recover for damages in an amount to be established at trial. As a further proximate result of the Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has incurred reasonable attorney's fees in attempting to secure the benefits owed him under the employment contract. Plaintiff is entitled to recover these reasonable attorney's fees.

## THIRD CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress v. All Defendants)

**79**. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 78.

80.     Defendant's conduct in terminating Plaintiff was extreme, outrageous, and beyond all bounds of human decency recognized in a civilized society. Defendant terminated Plaintiff's employment in the presence of Plaintiff's co-workers, verbally abused Plaintiff with epithets and personal remarks, denigrated Plaintiff's character and professional competence.

81.     In committing the acts herein alleged, Defendant intended to inflect several emotional distress on Plaintiff.

82.     As a proximate result of the Defendant's extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress.

83.     Plaintiff alleges punitive damages, if the Trier of fact so justifies.

## FOURTH CAUSE OF ACTION

### (Unfair Business Practices v. All Defendants)

84.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 83.

85.     California Business and Professions Code §17200, et seq., prohibits any unlawful, unfair, or fraudulent business practices. An "unlawful" business practice includes any violation of the law.

86.     Defendants` acts constitute unlawful, unfair, and fraudulent competition, as defined by California Business and Professions Code §17200,et seq., all for Defendants` own commercial gain and in connection with business activities, as alleged *supra*.

87.     By and through the acts alleged herein, Defendants` conduct was unlawful in that they knew, or should have known they violated the California Labor Code.

88.     Plaintiff is informed and believes and thereupon alleges that the Defendants named herein, and those identified to date as DOES 1 through 50, inclusive: aided, abetted, incited, compelled, coerced, and/or conspired to commit one or more of the acts alleged herein.

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    16

**89**.    The Defendants named herein, and those identified to date as DOES 1 through 50, by and through unfair business practices they committed as agents of PG&E, were directly or indirectly responsible for Jannings` unlawful and unjust termination, for which each had knowledge of the others` actions, whereby they orchestrated a conspiracy based on a pattern of disregard to facts, fairness and due process to reach a decision to irreparably harm Jannings, through unfair business practices and in violation of the California Labor Code.

**90**.    Plaintiff seeks relief necessitated by Defendants` conduct, including but not limited to: (1) unpaid wages, (2) earned pay out of class pay for underground electric; upgrades and penalties due, (3) overtime, (4) medical benefits, as presented by Plaintiff in this Complaint.

**91**.    The conduct of each Defendant was negligent, unreasonable, unlawful and despicable; and each Defendant acted with malice, prejudice, oppression, fraud, and a willful conscious disregard of Plaintiff's rights. Each of these Defendants ratified, authorized and condoned the conduct of each and every other Defendant and managing agent, entitling Plaintiff to an award of punitive and exemplary damages pursuant to Cal. Civil Code §3294.

### FIFTH CAUSE OF ACTION

#### (Breach of Contract of Continued Employment)

**92**.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 91.

**93**.    As a first, separate, and distinct cause of action, Plaintiff complains against Defendants and alleges that, on or about August 27, 2015, Defendant breached the employment contract by terminating Plaintiff's employment based on false allegations by Pierce. Defendant at all times knew the allegations were false.

**94**.    Plaintiff was employed by Defendant for three (3) years, consistently received either good or excellent performance evaluations and merit raises, was assured on numerous

occasions that he would not be terminated arbitrarily, and Plaintiff and Defendant had entered into an contract that Plaintiff would not be discharged unless there was good cause to do so.

95. Based on oral representations and promises and/or conduct of Defendant, as set forth above, Plaintiff had an employment contract with Defendant whereby Plaintiff would be employed by Defendant so long as his performance was satisfactory and Defendant would not discharge him without good and just cause.

96. Plaintiff at all times fulfilled his duties and conditions under the contract and has been ready, willing and able to continue performing them in competent and satisfactory manner.

97. Notwithstanding the promise to terminate the employment contract only for good cause, on or about August 27, 2015, Defendant terminated Plaintiff's employment based on false allegations by Pierce. Defendant at all times knew the allegations were false.

98. As a proximate result of Defendant's breach of the employment contract, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits, and is entitled to recover for damages in an amount to be established at trial.

PG&E's willful, reprehensible conduct toward Jannings follows a historical pattern of disregard for the rights of its employees and its customers, where unqualified people are unjustly promoted to positions of responsibility based on political, personal or other unprofessional relationships, whereby the incompetence or malice of unqualified PG&E personnel directly affects the lives and safety of PG&E employees, PG&E customers, and the public at large. As a direct or proximate result of PG&E's unjust, prejudicial policies: talented, experienced, necessary personnel such as Jannings are summarily dismissed on unreasonable and unlawful grounds by malicious PG&E agents who abuse their authority and exercise unjust retaliatory, personal vendettas in PG&E's name, for which PG&E must be held accountable.

Because PG&E has a systemic problem that permeates and ferments within its ranks, which PG&E has allowed to exist completely unchecked, PG&E not only took away the security Jannings expected, was promised, and had earned as a company team member after eighteen (18) years as a qualified loyal contractor, PG&E also deprived Jannings of all future achievements, promotions, and earned rise within the PG&E organization he was destined to ascend to; but not for the egregious, malicious retaliatory and conspired actions, perpetrated and covered-up by a collective of PG&E agents officially representing PG&E in form and fact; then compounded their egregious acts by "black listing" him from working at any other companies.

**WHEREFORE**, Plaintiff prays this Honorable Court grant a judgment against Defendants for:

a.    Monetary compensatory damages including: lost wages, earnings, unpaid overtime, unpaid double-time, retirement benefits, other employee benefits, penalties, and all other sums of money, together with interest on these amounts according to proof;

b.    Monetary restitution to compensate Plaintiff for his wages, including overtime, benefits, and interest lost for the relevant time period, according to proof;

c.    Monetary judgment for the mental pain, anguish, and emotional distress, according to proof;

d.    All costs of suit and attorney(s) fees associated with prosecuting this action;

e.    All Pre-judgment and post-judgment interest;

f.    All applicable monetary award of exemplary and punitive damages, based on a multiple of damages as is just and according to proof;

g.    Any and all additional compensation or multiple thereof; and

h.    All other such further relief as the Court deems just and proper.

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 31 of 224

## DEMAND FOR TRIAL

Plaintiff reaffirms his demand for trial by jury on all issues in this case.

Date:                                                    **SPIRO JANNINGS**

                                                    _____

                                                    SPIRO JANNINGS
                                                    *Pro Se*

| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "A"

<u>**AFFIDAVIT OF SPIRO JANNINGS**</u>

<u>**FOR COMPLAINT AGAINST PACIFIC GAS & ELECTRIC, CO.**</u>


**STATE OF CALIFORNIA**            )
                                    ) **ss:**
**COUNTY OF SANTA CLARA**        )

    **BEFORE ME**, the undersigned authority, duly authorized to take acknowledgements and administer oaths in the State and County aforesaid, personally appeared Spiro Jannings, who after being first duly sworn on oath, deposes and says:

    **1**.    **I, SPIRO JANNINGS**, am a natural born U.S. Citizen; resident of Santa Clara County, California; over the age of 18 years and of sound mind and health. I am single, self employed; and Plaintiff in a civil suit against Pacific Gas & Electric, Co., also known as PG&E.

    **2**.    I was born and raised in San Jose where I have lived and worked my entire life. My employment with utilities began with the City of Santa Clara Water Department in August of 1992. I worked as an entry level utility worker until July 1995; acquired my commercial driver's license; and worked laying main line, hydro repair, changing out water meters, and working on reclaim water lines for the city's parks and recreations, working full time while attending night classes at Deanza Junior College to further my education in the trades.

    **3**.    In all my employment and education with the City of Santa Clara, there was never any complaints by superiors, peers or individuals against me for any form of improper personal or professional conduct, and I never received a reprimand. I developed an excellent work record with the City of Santa Clara that continued to my subsequent employer, PG&E.

    **4**.    On or about July 31, 1995, I joined the International Brotherhood of Electrical Workers ("IBEW") (Card #5049703), and reported to the IBEW Local Union 1245; where my legal address was then and continues to be: 1304 Shortridge Ave., Unit C, San Jose, CA 95116.

PLAINTIFF'S AFFIDAVIT IN SUPPORT OF THE FIRST AMENDED COMPLAINT    1

5.     On this same date I began what would be a long and diverse job history with Pacific Gas & Electric Company ("**PG&E**"), where I applied my long term aspirations and continuing studies in equipment handling, inspection and other construction and maintenance tasks as a "contracted" employee hired out from IBEW to PG&E's Oakland G.C. Electric Line Dept., as a Miscellaneous Equipment Operator ("**MEO**") working for Gary Tognozzi, where I established his respect as a proficient worker and team player. I remained an MEO at this location until November 16, 1995. My responsibilities included operating the line truck with five (5) man crews setting poles and transformers; pulling overhead and underground cable; stringing miles of wire, and assisting the installation and assembly of transmission towers we assembled on the ground and then elevated into position with an industrial helicopter.

6.     On or about December 3, 1996, I was contracted to work out of PG&E's Edenvale Division in San Jose, CA, doing Locate and Mark ("**L&M**") on Underground Service Alert assignments ("**USA**") until March 11, 1998 working for Mike McBride. I received high marks for my work performance and developed a good rapport with Mr. McBride.

7.     On or about March 20, 2000, I was contracted to work out of PG&E's Salinas Division, Salinas, CA, until approximately October 22, 2000. My duties there was Leak Survey ("**LS**"), using a hand-held analyzer to detect underground gas leaks, which is a critical, dedicated department within PG&E solely for maintaining safety and avoiding damage.

8.     On or about November 20, 2000, I was contracted to work PG&E's San Carlos Division ("Div."), San Carlos, CA., working until approximately August 10, 2003 as a Transmission and Distribution ("**T&D**") assistant in their electrical department.

9.     On or about October 15, 2003, I was contracted to return to PG&E's Edenvale Division in San Jose, also as a T&D assistant working for Lee Kirk until approximately June 3, 2005. I know Mr. Kirk considered my job performance excellent and highly recommended me.

**10**.     On or about August 11, 2005, I was contracted to work PG&E's Cinnabar Division in San Jose, and assigned to the gas division's general foreman, <u>Mitchell Kirk</u>, doing L&M, until approximately October 12, 2007, and received excellent job reviews by Mr. Kirk.

**11**.     On October 19, 2007, Mitchell Kirk, now promoted to Superintendent, sought me out for PG&E's San Carlos Division doing L&M for Supervisors, Tim Bellinghousen, Valerie Lawson and later <u>Dean Churchwell</u>. I remained there until September 8, 2009. Tim Bellinghousen, Dean Churchwell and Mitchell Kirk all complimented me as their top producer by completing twice the work tickets over any of the division's other employees.

**12**.     On or about September 12, 2009, I was contracted to work PG&E's Cinnabar Division in San Jose as an L&M until approximately November 13, 2010; working for <u>Dana Micholson</u>, who I know also gave me excellent job reviews and recommendations.

**13**.     On or about July 1, 2011, I was contracted to work for PG&E's Concord Division, doing L&M until August 2, 2012, working directly for Supervisor <u>Ms. Bobbi Weeck</u>. She also gave me excellent reviews and came to depend on my high work efficiency.

**14**.     On or about August 15, 2012, I left Ms. Weeck to accept a contract in PG&E's Cupertino Division; she was not happy about losing me. I did L&M until January 25, 2013, when Mr. Kirk asked me to accept full time employment with PG&E working for him, which he guaranteed me based on his personal knowledge of my long history of excellent reviews.

**15**.     On or about January 27, 2013, I began work as a full employee for PG&E and had company orientation on the first day. I was then assigned to the San Carlos Division, where I began work for L&M Supervisor, <u>Ron Abolana</u>, who liked my work and I got along with well.

**16**.     In September of 2013, Mr. Abolana was replaced by <u>Franko Massario</u>, who reassigned me to the "South Folder," an understaffed division which had longer drive time, so I accepted an opportunity in June of 2014 to work closer to home for Ms. Weeck's division.

**17**.     On or about June 16, 2014, I reported to Ms. Weeck at PG&E's Hayward Division. She assigned me to work out of Freemont, but still report to Hayward. In 2012, Ms. Weeck was supervisor of both L&M and LS assignments, but solely for PG&E's Antioch and Concord Divisions. Later, PG&E consolidated the five (5) divisions for each, L&M and LS, then assigned one supervisor for each of these assignment departments. Ms. Weeck oversaw the L&M crews for the five (5) divisions: Antioch, Concord, Freemont, Hayward, and Livermore.

**18**.     Supervisor <u>Bill Pierce</u>, who had previously oversaw L&M and LS for the two divisions of Colma and San Carlos, now oversaw solely LS work assignments for the same five territory divisions as Ms. Weeck. Accordingly, Mr. Pierce and Ms. Weeck were supervising peers who worked closely together to coordinate L&M and LS duties for these five divisions.

**19**.     Prior to Mr. Pierce becoming supervisor of Colma and San Carlos Divisions he worked under Superintendant Mitchell Kirk around 2011, when I worked for Ms. Weeck the first time. It became known to me that Mr. Pierce was issued a Positive Discipline ("**PD**") action by Superintendant Kirk for falsifying LS documents. I'd heard his uncle, <u>Bill Hayes</u> was a PG&E Vice President, who saved his job from an otherwise mandatory firing for anyone else.

**20**.     Prior to Ms. Weeck becoming supervisor of Antioch and Concord Divisions, she was a meter reader in the Diablo region, which at that time was overseen by Mitchell Kirk. She petitioned upper management for an upgrade to a supervisor position; but when Mr. Kirk heard about her request he put the brakes on Ms. Weeck's promotion with a bad review of poor job performance, and she was denied the upgrade. This was confirmed to me later by Mr. Kirk.

**21**.     The fact that Superintendant Mitchell Kirk had personally penalized both Bill Pierce and Bobbi Weeck, while later being responsible for my transfer out of Ms. Weeck's division in 2012 to work for him, then hiring me as a guaranteed full time PG&E employee, makes it reasonable both had animosity towards Mr. Kirk and me which I never considered.

**22**.     When I reported to Ms. Weeck in June of 2014, I had no reason to believe we would not have the same good working relationship we ended with in 2012. However, Ms. Weeck was now argumentative, confrontational, critical and suspicious; sub-managing routine matters with chaotic complaints that were not justified; then changed my time slips and denied me pay upgrades for those jobs. When I confronted her she told me to take it to the Union.

**23**.     On March 27, 2015, I filed grievance #23090, against Ms. Weeck, whereby Union #1245 Rep, <u>Lou Mennel</u> stated: "Grievant has done work of higher classification on several occasions since the clarifications of his duties on 02/17/2015. He has not received the upgrade. In addition, the timecards have been changed without his knowledge."

**24**.     On May 7, 2015, following the usual Thursday morning Hayward Yard safety meeting, Ms. Weeck called me into Bill Pierce's office and directed me to have Ben Nordson, my Union Shop Steward to appear with me. In that meeting Ms. Weeck presented me with a formal Written Reminder after orally citing me for (1) sloppy time cards; (2) arriving late to transmission standby jobs; (3) failing to show up at transmission standby jobs; (4) being late turning in my transmission jobs documentation; and (5) leaving jobs early. The first was Flat Iron Electric Group, which I challenged by calling the job foreman of Flat Iron on my personal phone while Ms. Weeck listened on our company phones. The job foreman then called me back and said he followed up by calling Ms. Weeck directly, and corrected her that I did not leave the job at 1:00 PM as she alleged, but that I had left at 2:30 PM as stated in my time card and report. Ms. Weeck threatened to escalate the Written Reminder to a Positive Disciplinary Action (PD), and had the consequence of a one year probation period where PG&E could fire me at any time for any perceived infraction. Then, she audaciously admitted in the presence of Mr. Nordson she would have never taken this action if I hadn't filed my March 27th grievance against her.

<>

25. On the recommendations of my shop steward, Ben Nordson, and my Union Representative, Lou Mennel, I immediately filed a second grievance on May 7, 2015, #23183, against Ms. Weeck for harassment by issuing a Written Reminder that was clearly retaliation for my first grievance of denying my justified pay upgrade. Each of the four issues Ms. Weeck cited in her Written Reminder were embellished out of context or completely fabricated.

26. On June 11, 2015, I called PG&E's Ethics & Compliance Department and reported Ms. Weeck for harassment and retaliatory actions; Report No. PGE-15-06-0020, PIN 8561. In the weeks following my second grievance and call to Ethics & Compliance, Ms. Weeck's personal disposition towards me became even more hostile; creating a contentious on the job rapport that included *impromptu* calls alleging mistakes in my paperwork she later conceded was wrong; sending me on late Friday afternoon job assignments she knew were untenable due to their distance and traffic, and not even necessary because she had other field crew on location for the same job. Ms. Weeck continued to escalate various job assignments in such an unprofessional manner it was adding unnecessary costs to the company in time and productivity; it was also harassing so I informed my Union reps, Mr. Nordson and Mr. Mennel.

27. On Friday, July 10, 2015 at 7:00 AM, I attended a Local Investigating Committee ("**LIC**") meeting at the Hayward Yard offices with Ms. Bobbi Weeck, my Shop Steward, Ben Nordson, and Union Rep, Lou Mennel, which he scheduled to quash the May 6, 2015 Written Reminder and resolve my Grievance #23183. Weeck was confronted for five hours and failed to support any of her allegations with facts. Nordson gave her notice of escalating this for retaliation, and the meeting was adjourned at 12:30 PM without resolution.

28. On Monday, July 13, 2015 at approximately 6:45 AM, I appeared at the PG&E Fremont Yard as usual to pick up my truck for the week, gas up and get my supplies after checking e-Mail assignments and doing other paperwork. Afterward, at approximately 7:15

1 AM, I stopped at the yard recycling center on the way out to discard expended supplies and

2 trash left over from the truck's prior work week, and saw superintendent Bill Pierce smoking a

3 cigarette about ten feet away while his crew was preparing to get their job assignments.

4     **29**. I knew Mr. Pierce from prior safety meetings, and he'd called me on the

5 overtime's "212 list" for various jobs in the past, so I said hello from my cab. He walked over

6 and offered me a cigarette. I reminded him I was still working L&M for the South Folder in

7 Fremont and gave him my company phone number, and told him I'd like to help his guys out.

8 Since Mr. Pierce was in charge of the Super Crews for LS, I admitted I was interested in a

9 change to LS assignments, but Mr. Pierce said that wasn't going to happen because the L&M

10 department was going to keep me for operational needs and since they were short handed they

11 "needed me where I was at." I told him I understood, and he thanked me for the offer and left.

12 Our conversation was cordial and lasted no more than five or six minutes. It was also the last

13 time I saw Mr. Pierce until he was testifying falsely against me on October 15, 2015.

14     **30**. On July 16, 2015, I reported to the Hayward Yard at approximately 7:00 AM,

15 and sat in the safety meeting presented by Dean Churchwell, which lasted about an hour; then

16 fueled up my truck and returned back to the Freemont area to resume the day's assignments.

17     **31**. On July 17, 2015, my day began with a big job I'd been on for at least three days

18 for HP Communications, routing fiber optics for a Hospital on a deadline. At approximately

19 9:00 AM, I received a direct call from another of PG&E's contractors, ARB, in Fremont,

20 requesting my urgent attendance for an L&M at a dig site they were doing. The HP job was

21 running smoothly so I spoke with the HP contractor and advised him of my need to deal with an

22 urgent call from ARB, and I should only be gone 30 or 40 minutes, and I then left the HP job

23 and headed over to assist ARB. I returned to HP about 45 minutes later with no problems.

24                                                  <>

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 40 of 224

**32**.     At approximately 10:48 AM, I received a vexed call from Ms. Weeck inquiring on my location after accusing me of leaving the HP job. I explained ARB's urgency and I was already back at the HP job. She accused the HP contractor of telling her I was absent even after I'd already returned. I knew better and told her bluntly she needed to get her facts straight and she needed to speak with her assistant, Kathy, who was apparently lying to her, and she needed "to put a stop to that crap." I ended the call and walked about 100 feet down the road to ask the HP contractor if Ms. Weeck was in fact told I was absent. As I expected he said no, and he would clear it up right away. So I gave him Ms. Weeck's cell number. Apparently he set her straight because not long afterward, Ms. Weeck called me back with a placating tone and asked me to work overtime the following day, emphasizing the HP job "had to be done." I told her no problem; and on Saturday, July 18, 2015 I met Matt and Oscar at the HP job site at 7:30 AM, and worked nonstop to finish at 2:30 PM, which was earlier than Ms. Weeck expected it to take.

**33**.     On Friday, July 24, 2015, I reported to work in the Fremont Yard as usual at approximately 6:30 AM, and began e-Mailing my prior day's time cards to Ms. Weeck. Around 7:00 AM Dave Lane, the gas construction supervisor of the Fremont Yard came up to me and asked me to report to his office. When I arrived with Mr. Lane at his office I was met by John Camera, the gas construction supervisor of the Salinas Yard, whom I knew and had worked for. He handed me a written notice as he told me I was placed on administrative leave. I asked, "John, what's this all about?", and he replied, "I don't know, but they're doing an investigation about something, so keep your company cell phone and they'll call you when they're ready to bring you back to work." He added, "Don't shoot the messenger, I was just told to drop this off and give it to you." Mr. Camera acted apologetic, not happy and very nervous, which was even more confusing since he had to drive an hour and a half from Salinas apparently just to give me this notice. Mr. Camera left and Mr. Lane said, "Wow, I didn't see that coming." Then added he

didn't know what was going on, but apologized and informed me that I needed to surrender the keys to my company truck and my access card to the yard, which I did. We then went out to the truck and I retrieved my journal and lunch box along with some loose change I had in the console. As we left, David said "I'll keep in touch with you." I thanked him.

**34**.    On July 28, 2015 around 8:30 AM, I received a call on my PG&E cell phone from <u>Jeff Carroll</u>, the L&M Superintendant, who said: "You need to meet Corporate Security at the Freemont Meter Plant at 1:00 PM, and <u>Eugene Sanchez</u>, your shop steward will be there."

**35**.    I arrived at the Freemont Meter Plant at 12:55 PM and a lady clerk at the counter directed me to the back room at the end of a hall where I found two men sitting in the middle of the long conference table and appeared to be in their fifties. One handed me a business card identifying himself as <u>James P. Leonard</u>, from PG&E Corporate Security; and a business card from the second gentleman was <u>Kevin Griswald</u>, also from PG&E Corporate Security. Mr. Leonard reached to shake my hand and stated: "I like to do a background check on the person I'm going to be investigating, and I understand you own Redline Racing Cams."

**36**.    At about this time, my shop steward, Eugene Sanchez came in and interrupted to ask Mr. Leonard if we were here to discuss my personal affairs or the problem at hand. Mr. Leonard then became testy and jumped directly to asking me: "Do you know an individual by the name of Bill Pierce, and have you ever worked for him?" I said yes, but I never worked directly for him. Mr. Leonard then asked me how I knew Mr. Pierce, and I replied I knew him to be a supervisor, who'd called me a few times to work overtime from the 212 list.

**37**.    Mr. Leonard asked if I remembered talking to Bill Pierce in the morning or afternoon of July 17th, and making disrespectful comments about my supervisor Bobbi Weeck. I said, "No, never." Then Mr. Leonard directly accused me of saying: "You told Bill that you were going to stick your dick in Bobbi's ass, and she was going to feel your pain, and you were

going to get her fired." Then added: "You're going to the Bar-BQ with the CEO in the gas department, Nick Stavropoulos on the weekend, and you're going to bring to his attention that they need to get rid of Bobbi Weeck, and fire her." I pushed back and said, "Wow; I never said anything like that."

**38**.     Then Leonard became more aggressive and alleged: "You saw him on the seventeenth." I replied: "I never saw Mr. Pierce on the seventeenth, but I did on the thirteenth." Mr. Leonard asked: "Why the thirteenth?" I explained, "That was a Monday. I come in every Monday to pick up the company truck. I saw Bill in the yard and said hello while I was sitting in my truck. He walked over and I offered to work on his super crew to help out."

**39**.     Not satisfied with that, Mr. Leonard kept asking if I wasn't sure I said something disrespectful about Bobbi to Bill; and I continued to deny ever saying anything derogatory about Bobbi Weeck. Mr. Leonard's tone and questions became more offensive each time, until Eugene interrupted to call a caucus and we stepped out in the hall to talk. Eugene admitted he never saw anything like this before, and warned me they were trying to force something to happen from anything they can get me to admit. We returned to the meeting and Mr. Leonard resumed asking me if I didn't say some kind of variation of the threat Mr. Pierce alleged, defiantly repeating himself for another fifteen or twenty minutes despite my patience repeatedly denying it.

**40**.     Toward the end of the interrogation, Mr. Leonard threatened me with: "Jannings, if I catch you lying, it's over for you." I said nothing; then he advised the other corporate security officer wanted to ask me a question. Mr. Griswald spoke up and asked the same question with an accusing tone, "Are you sure you didn't say it like this?" I repeated, "I never said anything like that to Bill." Then Mr. Leonard jumped in, "We're done. The meeting's over."

<>

<>

**41**.     At approximately 1:50 PM, Eugene and I walked out of the conference room and spoke in the parking lot for about ten or fifteen minutes. Eugene repeated he'd never seen anything like this; and for some reason and said they were "obviously really out to get you."

**42**.     On August 6, 2015, PG&E's Senior Director of Corporate Security, <u>Stephanie Douglas</u>, through <u>Desiree Ferguson</u>, disseminated PG&E Memorandum File #15-1225, of <u>Joel Dickson</u>'s <u>SUMMARY OF INVESTIGATIVE FINDINGS</u> to: Barry Anderson, Nickolas Stavropoulos, Albert Torres, Robert Joga, Jesus Soto, Stacy Campos, Jeffrey Neeley, Terri Winnie, <u>Kathy Ledbetter</u>, Robin Wix, Doug Veader, Margaret Franklin and Phillip Balistrieri, on their allegation of "Disrespectful Actions and Threat Of Violence Toward a Supervisor".

**43**.     In that document numerous conclusions are reached from erroneous allegations as the basis for my termination; none of which are accurate; and all of which are predicated on statements I made to James Leonard during interviews with me that have been mischaracterized, contorted, embellished, and taken out-of-context by Mr. Leonard to fabricate his own facts. I'm alleged to have had a conversation with William Pierce on July 15, 2015. It never happened. I never saw nor spoke with Mr. Pierce after July 13, 2015. Bobbi Weeck was never mentioned in any context of obscenity and threats as alleged by Mr. Pierce. It's my firm belief Mr. Pierce has chosen to use our short July 13, 2015 discussion to fabricate an erroneous statement I never made at a time that never happened to retaliate against me for my complaint against Ms. Weeck.

**44**.     None of the interviews, which included Joseph Gonzalez, Chris Plummer, and Bobbi Weeck, provided any corroboration to Mr. Pierce's obscene allegations. The Summary of Investigative Findings is empty of anything factual or accurate. The Fremont Police Report, #150727029 at 2:20 PM on July 27, 2015 of Bobbi Weeck and Bill Pierce's allegations, was three hours after I was terminated by Jeff Carroll, apparently to manufacture more evidence.

<>

**45**.     On August 27, 2015, I received a call from Jeff Carroll at around 8:00 AM on my company cell phone, who said, "Come on in, and be ready to go to work," then added: "Meet me at the Fremont Meter Plant at 11:00 AM and be prepared to go to work; Eugene Sanchez will be there." This call was a deceptive and punitive lie that was totally unnecessary.

**46**.     At approximately 10:50, I arrived at the PG&E Fremont Meter Plant, just as Eugene Sanchez showed up in his company car. We both went into the office lobby and waited for about five minutes. At 11:00 AM, Mr. Carroll appeared to escort Eugene and I into a conference room where I found another gentlemen I didn't really know, except that he was an L&M supervisor at the San Jose Division. We all sat down as Mr. Carroll handed me PG&E's corporate security report, and gave a copy to Mr. Sanchez and the other supervisor. Jeff Carroll instructed me to read it. Although the report was only a few pages long, it was single spaced and long, and I was shocked at the statements it said were made by Bill Piece, Bobbi Weeck, and a couple of other people; plus location information on my cell phone and my company truck GPS which contradicted everything Mr. Leonard's report came to in its conclusions, which were reached by contorted and erroneous allegations not supported by any facts; just hearsay.

**47**.     At approximately 11:15 AM, we finished reading Mr. Leonard's PG&E Security Report, when Mr. Carroll handed me another document as he said, "Mr. Jannings, this is your termination letter." Then he read my termination letter verbatim out loud for all to hear, at which time I learned PG&E had also blacklisted me from any future work as an independent contractor for any related company. Mr. Carroll, punctuated the letter by stating: "We won't be needing your services. You do not work here anymore," then added: "We fired you because of your rude, disrespectful comments toward your supervisor." I reminded him I wasn't even in the yard, and Carroll's reply was: "You were one-point-three, to three-point-three miles from the yard, so that makes you in the yard. Whatever company property you have, you need to relinquish it now." I

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 45 of 224

handed over the company credit card and the company cell phone. Mr. Carroll then asked if I had the company security card, which I informed him was given to David Lane when I was placed on Administrative Leave. Mr. Sanchez also asked, "How can you fire him on hearsay?" Mr. Carroll told Mr. Sanchez: "This doesn't pertain to you."

**48**. My discharge from PG&E at the Fremont Meter Plant was over at approximately 11:20 AM on August 27, 2015 after twenty years of service to PG&E. Only three hours earlier Mr. Carroll's phone call led me to believe I would be returning back to work. Mr. Sanchez and I spoke in the Plant parking lot for about fifteen minutes discussing my options. Eugene indicated he was going to have my Union Rep, Lou Mennel, file a wrongful termination grievance when he returned from vacation. We were never given a copy of those documents at that time.

**49**. Attached to my amended complaint as Exhibit "G", is my personal contemporaneous log entry journal for Friday July 10, 2015 through Tuesday, July 28, 2015, the day of my interrogation with Corporate Security after being placed on suspension July 24, 2015. The next entry admitted therein, is August 27, 2015, the day I was misled into believing I was to return to work. All entries contained in journal, Exhibit "G" are contemporaneous, and accurate.

**50**. On August 31, 2015, IBEW Local #1245 filed a Grievance: #23334 for my wrongful termination. About a week later, Lou Mennel sent me a copy of the Corporate Security Report and Termination Letter Jeff Carroll failed to provide during my August 27th meeting.

**51**. In September, 2015, I filed for unemployment insurance; and on October 5, 2015 it was denied on PG&E's allegations of my misconduct threatening a coworker. I appealed.

**52**. On October 15, 2015, I attended PG&E's Local Investigation Committee for the first of a two day Hearing, headed up by <u>Vanessa Parker</u> of PG&E's Human Resources (HR); also attended by Jeff Carroll, Bill Pierce and Jim Leonard. My Union Rep., Lou Mennel, and my shop steward, Eugene Sanchez.

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 46 of 224

53. Bill Pierce responded to questions Ms. Parker asked from the Corporate Security Report prepared by Jim Leonard. Mr. Pierce testified that I never worked for him, but he knew of me from safety meetings and the 212 overtime lists; then he testified to Ms. Parker he did not recall the exact day, nor the time of day that he had a conversation with me regarding my alleged threats toward supervisor Bobbi Weeck. When Mr. Pierce was asked to state exactly what threats I allegedly made, he gave no testimony from memory; but rather, Mr. Pierce's entire testimony was read from Mr. Leonard's Corporate Security Report he held in his hands.

54. Jim Leonard testified in response to questions asked by Ms. Parker; and confirmed he did the corporate security investigation and authored the report used to terminate my employment. Mr. Mennel argued everything was hearsay and asked Mr. Leonard how he determined I should be terminated. His reply was that I had "too many negative answers by not admitting to anything," based on my "demeanor and body language" in the July 28th meeting.

55. On October 16, 2015, I attended day two of PG&E's Local Investigation Committee. Ms. Ledbetter appeared for PG&E's HR. After two hours of Ms. Parker recapping the prior day's testimony, she spent the next three hours repeatedly going over the questions in the same fashion as Mr. Leonard, trying to get me to admit to Mr. Pierce's allegations, which I repeatedly denied. Around 1:30 PM the meeting ended. As I was leaving I forgot my cell phone and returned to get it. I overheard Mr. Mennel stating to Ms. Parker that they did not have anything for a reason to fire me and I should be returned back to work immediately. Ms. Parker replied, "Absolutely not. He's never coming back here. We don't hire people like that to work here." At that time she saw me appear to pick up my phone and said nothing further.

56. On February 23, 2016, I attended the San Jose Office of Appeals for a Hearing before the Honorable Robert M. Lofgren, Administrative Law Judge of the California Unemployment Insurance Appeals Board, on my appeal from a Notice of Determination and

Ruling that disqualified me for unemployment benefits. My appeal was initially scheduled for hearing on November 18, 2015 under case #5596690, but I had mistakenly recorded the wrong date in my cell phone, and had to submit an application to reopen, which was case #5640330.

57. In addition to myself, appearing at my appeals hearing for the Respondent, PG&E, was a Ms. Turner; and Superintendent, Jeff Carroll. Not appearing was James Leonard to give sworn testimony in defense of his Corporate Security Report used to justify my employment termination; and also not appearing, was Bill Pierce, to give sworn testimony as to the alleged threats I made about Bobbi Weeck to him; and also not appearing, was Bobbi Weeck, to give sworn testimony of her actions against me preceding Bill Pierce's allegations. The Court was not satisfied with the answers Ms. Turner and Mr. Carroll gave to its direct inquiry of why these three (3) witnesses were not present; where they were at now; and Mr. Carroll admitting he had no personal knowledge of the allegations to testify to; merely hearsay.

58. On February 24, 2016, a five (5) page decision was rendered by Judge Lofgren in my appeal: "The Notice of Determination and Ruling is reversed." The <u>Findings of Fact</u> found: "*The claimant did not threaten the coworker or make the profane statement attributed to him.*"

59. On November 16, 2016, <u>Claire Landoli</u>, Chairman, and <u>Kit Stice</u>, Secretary, of the Review Committee, on my Grievance #23334 closed without adjustment the review rendering a final disposition that the terminating discipline of my employment was justified; despite an administrative law judge ruled otherwise on 02/24/16, and PG&E never appealed it.

60. Never in all my years have I been accused of any professional or personal misconduct on the job or in my personal life. The obscene allegations levied by Mr. Pierce against me were malicious, unwarranted, untrue and I categorically deny they ever happened.

61. After my decades long employment with PG&E, I enjoyed being one of the employees management turned to whenever an exorbitant amount of work needed to be done

1   properly, efficiently and quickly. From locating and marking underground electrical lines, or gas
2   distribution and transmission lines for other departments; before any contract underground work
3   was approved, I oversaw that safe digging practices were employed by all contractors. I assisted
4   Linemen setting in place major power poles; pulling overhead and underground electrical cable;
5   setting overhead and underground transformers; bringing downed power lines back online, and
6   even assisted in traffic control when needed. In all cases, my primary focus was the safety of the
7   job; the well being of the workers, the public and all surrounding neighborhoods.

8       **62**.    Prior to my second assignment with supervisor Weeck in 2014, I had established
9   a solid reputation over eighteen (18) years of hard work and professional conduct with every
10  department and division I worked in. To the best of my knowledge I earned the respect of each
11  superintendant and supervisor; many of whom specifically asked for me whenever they needed
12  a tough job done right without being sub-managed or late. The only exceptions were Ms. Weeck
13  and Mr. Pierce, from what appears to be animosity each harbored against Superintendant
14  Mitchell Kirk; and now me; presumably because I had Mr. Kirk's personal respect and support.

15      **63**.    Mr. Pierce, a close friend besides working peer of Ms. Weeck, chose to fabricate
16  these erroneous statements; and numerous PG&E managing agents could have acted to stop my
17  unjust termination. Each chose to ignore facts, accept Pierce's hearsay allegations and cover up
18  for the time cards Ms. Weeck falsified, per my grievance they dismissed after I was terminated.

19      **64**.    I was denied a fair hearing. I was disparaged among my peers and I was black
20  listed by PG&E from ever working within the utility field again, even as a contractor for third
21  party entities. I've suffered loss of sleep; loss of self confidence; loss of self respect; loss of
22  income; loss of self worth and loss of physical health in a variety of ways that continues to this
23  day as a direct or proximate result of what I feel was PG&E's malicious, conspired, retaliatory
24  actions to terminate my employment and breach the implied contract I lived up to.

1   **FURTHER AFFIANT SAYETH NAUGHT.**

2

3                                                    **Spiro G. Jannings,**

4       **SWORN TO AND SUBSCRIBED** before me this _18_ day of January, 2021, by

5 Spiro Jannings, who presented identification and did so take an oath.

6 My Commission Expires: _July 26, 2022_

7              NOTARY PUBLIC

8              LOOSE CERTIFICATE                   **NOTARY PUBLIC**

9               ATTACHED         RIC LOUIE

                                              Stamped, typed or printed name.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF'S AFFIDAVIT IN SUPPORT OF THE FIRST AMENDED COMPLAINT    17

**CALIFORNIA JURAT**

GOVERNMENT CODE § 8202

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _SANTA CLARA_

Subscribed and sworn to (or affirmed) before me on

this _18th_ day of _JANUARY_, 20_21_, by
   Date          Month          Year

(1) _SPIRO JANNINGS_

RIC LOUIE
Notary Public - California
Santa Clara County
Commission # 2248218
My Comm. Expires Jul 26, 2022

(and (2) _____ ),
                    Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____
                    Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

------------------------------ OPTIONAL ------------------------------

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _AFIDAVIT of Spiro JANNINGS For Complaint_
_AGAINST PACIFIC GAS & Electric, Co._

Document Date: _____   Number of Pages: _18_

Signer(s) Other Than Named Above: _____

©2019 National Notary Association

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "B"

**AFFIDAVIT OF MITCHELL KIRK**

**PACIFIC GAS & ELECRTIC SUPERINTENDENT, RETIRED**

**STATE OF CALIFORNIA**     )
                        ) ss:

**COUNTY OF SANTA CLARA**   )

    **BEFORE ME**, the undersigned authority, duly authorized to take acknowledgements and administer oaths in the State and County aforesaid, personally appeared Mitchell Kirk, who after being first duly sworn on oath, deposes and says:

    **1.**     **I, MITCHELL KIRK**, am a natural born U.S. Citizen and resident of California, over the age of 18 years and of sound mind and health. I was a superintendent of Pacific Gas & Electric, Co., also referred to as PG&E, where I had over four (4) decades of service before my retirement in July of 2015.

    **2.**     I have first person knowledge to the events and individuals as mentioned herein; I am privy to the record of other events, individuals, policies and practices of PG&E where my duties required my direct or indirect involvement over supervisors, jobs and crews.

    **3.**     My position at PG&E also required my accepting or denying various employment upgrades and/or work assignments; approving contractors; and hiring or dismissing various individuals within the company's guidelines as needed that was directly or indirectly involved in keeping with my PG&E duties. The dates I assert herein with specificity have been confirmed by various records I'm privy to; all others are asserted to the best of my knowledge.

    **4.**     I have personally known Spiro Jannings since 1995 when I was a construction supervisor at Cinnabar. Spiro was self reliant and versatile; knew his work, whether it was locate and mark, gas lines or electrical. Spiro required little or no supervision and got the job done. I believe he enjoyed working in my division. Because he was a contract employee, we

AFFIDAVIT OF MITCHELL KIRK                          1

stayed in touch so when I had openings available either myself or one of my supervisors would request him through the Union. In all the time I knew Spiro, I never knew of any complaints about Spiro's professionalism or conduct from any of his coworkers or supervisors.

5. On or about October 19, 2007, as Superintendant of the San Carlos Peninsula Division Spiro began working for me almost exclusively, reporting to supervisor Valerie Lawson or my gas foreman and crew supervisor, Tim Bellinghousen. Both were impressed with Spiro's performance. Within a few months Valerie recommended Spiro be put on permanent status. I agreed. Then Valerie was temporarily replaced by Dennis Golding, and Spiro was assigned to Dean Churchwell to handle jobs for him until a position opened up to qualify Spiro changing to permanent employee status; which was always an availability and bidding process.

6. When finally a job opportunity came up for Spiro to get placed on permanent status, David Jolly also put in a bid for it, and because he was already an employee the bidding procedures required Dean to give that particular job to Dave over any other contract worker, as Spiro still was; so we had to wait and Spiro was released to the Union Hall again.

7. A few months after Dave Jolly took over Spiro's position under my supervisor Dean Churchwell, Dean was promoted to construction supervisor of the Hayward Yard, and his old position in my division was filled by Bill Pierce. Mr. Pierce was brought in by PG&E from the outside as what we called "non-traditional." PG&E had a policy of hiring people as managers and supervisors who had no prior PG&E working experience on a sink or swim basis. Our experienced talent often refused managerial positions because once they became full company supervisors their Union status would change to "out-of-class," and they lost the Union's protection. Bill Pierce was one of these outside replacements. At one point I issued a Positive Discipline (PD) action against Bill Pierce for falsifying leak surveys documents; which is normally fatal for continued employment, and remains for life in his personnel record.

AFFIDAVIT OF MITCHELL KIRK                                              2

8.    Spiro stayed in touch with me while working in different divisions until another opportunity came up for him to be hired on a permanent status. In 2012 Spiro was working out of the Concord Division for supervisor Bobbi Weeck, whom I knew before her promotion to that position. Spiro was driving a lot of miles from home each day, so when I heard about an opening in the Cupertino Division, so I sent Spiro an email to call me on Friday, August 3, 2012. That afternoon I received a call from Spiro and I told him to quit his job in Concord and I'd have him reassigned to Cupertino. Spiro asked if I was sure about quitting on such short notice. I specifically told him: "Spiro, today's Friday, and next Thursday is the end of the pay period. Monday you tell Bobbi you're quitting on Thursday." I explained I'd already put his name in with the Union Hall and made it clear he was who I wanted, but first Spiro had to be free from his current job. The following Monday I learned the Union Hall had him available.

9.    On Wednesday, August 15th, I received a call from Spiro that John Kemp, the supervisor Spiro was to report to informed him that Human Resources couldn't qualify him for rehire to my division because Bobbi Weeck reported his company rental truck had too many miles. Spiro told me he'd just spoken with Bobbi, and reminded her she was with him when they got the truck, and the lease was for unlimited mileage. Spiro told me he felt she was upset about losing her bonus pay from his high rate work completion, and was trying to block his move.

10.    On August 16, 2012, Spiro reported to John Kemp, my supervisor in Cupertino. John knew Spiro's work and was giving me good reports on him during the next five months before the opening I expected finally came up for Spiro to qualify as a permanent hire.

11.    On January 27, 2013, Spiro was hired as a permanent employee and assigned to my San Carlos Division, reporting to me and supervisor Ron Abolana. About eight or ten months later, Ron was replaced by Franco Massario. I communicated with Spiro on a regular basis, checking how various jobs and issues were moving along while he worked for Franco; but

AFFIDAVIT OF MITCHELL KIRK                                          3

1  after nearly a year or so Franco changed Spiro's assignments to the south folder, so

2  unbeknownst to me at the time Spiro asked to get something closer to home and put in a bid for

3  the Hayward division, which he received working again for supervisor Bobbi Weeck under Jeff

4  Carroll. Bobbi had him reporting to the Hayward yard, but actually he worked out of Fremont.

5      **12.**    After 2015 rolled around we only spoke a couple times until I called him on June

6  10, 2015, just before my retirement to see how things were going. Spiro said he didn't want to

7  bother me with his problems but he had to file a grievance against Bobbi Weeck in March for

8  shortchanging his pay upgrade, and also changing his timecards without his knowledge. Not

9  long after that he received a written reminder for a work performance issue. I knew whatever

10  this was about it couldn't be Spiro's work performance, and I asked him if Ms. Weeck wrote him

11  up before or after his grievance. Sure enough, she had written him up more than a month

12  afterward. PG&E has strict guidelines against such actions by a supervisor once an employee

13  has filed a grievance, and I advised Spiro that she should know better, regardless of whatever

14  she's claiming. I told him to go to ethics and compliance and report this right away.

15      **13.**    In July of 2015 I retired from PG&E after forty-one years, but still remained in

16  touch with people I worked with or mentored, including Spiro. I am aware of the specific

17  allegations made against him by Bill Pierce concerning Bobbi Weeck; the investigation that

18  followed and his subsequent dismissal, which he appealed to recover his unemployment; and I

19  have read the reports and final disposition rendered by the judiciary in his unemployment

20  appeal. I hired Spiro into the company to see he got a permanent position after several years of

21  waiting for that long overdue opportunity to present itself within the bidding and job availability

22  timing, because Spiro had worked for me for many years and proven himself. I assured him in

23  my official capacity hiring him that he had a permanent job with the company. Never once, to

24  the best of my knowledge or any records I had at my disposal, was there ever any bad

AFFIDAVIT OF MITCHELL KIRK                                                                    4

1 performance of Spiro Jannings in his duties, nor was there any complaints of his conduct with
2 his peers, supervisors or the public. Spiro never received a reprimand of any kind prior to the
3 written reminder Bobbi Weeck issued him on May 6, 2015, which I've read. Such documents
4 stand as a blemish on any PG&E employee's record that can inhibit their advancement; and its
5 timing was completely out of bounds following Spiro's grievance for back-pay Bobbi owed him.

6 **14.** The Positive Discipline Notice I filed against Bill Pierce for falsifying Leak
7 Survey maps years before Spiro's termination would remain in his personnel file for life.
8 Because of this fact, any competent and fair investigation would have immediately dismissed
9 Bill Pierce's credibility for his allegations against Spiro that resulted in Spiro's termination.

10 **15.** Spiro Jannings had every right to a fair hearing for keeping a job I assured him
11 he had as a permanent employee, which I expressed as a contract of employment with PG&E as
12 a team member; no more Union Hall contracting; something he was long overdue for. In nearly
13 fifteen years of knowing Spiro, he has never shown the kind of conduct he was accused of and
14 fired for. His integrity and work ethic are top grade. His accusers cannot make the same claim.

15 **FURTHER AFFIANT SAYETH NAUGHT.**

16

17 **Mitchell Kirk**

18 **SWORN TO AND SUBSCRIBED** before me this _____ day of ~~October~~ November, 2019, by

19 Mitchell Kirk, who presented identification and did so take an oath.

20 My Commission Expires: _10/15/23_

21
22 See attached **NOTARY PUBLIC**
   Certificate
23 Rigoberto Perez
   Stamped, typed or printed name.
24

AFFIDAVIT OF MITCHELL KIRK                                                              5

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**  GOVERNMENT CODE § 8202

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____
*Signature of Document Signer No. 1*

_____
*Signature of Document Signer No. 2 (if any)*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of ___Santa Clara___

Subscribed and sworn to (or affirmed) before me

on this __1__ day of __November__, 20_19_,
    *Date*   *Month*   *Year*

by

(1) __Mitchell Kirk__

(and (2)_____ ),
     *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature _____
   *Signature of Notary Public*

RIGOBERTO PEREZ
Notary Public - California
Santa Clara County
Commission # 2306515
My Comm. Expires Oct 15, 2023

*Seal*
*Place Notary Seal Above*

──────────────── **OPTIONAL** ────────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: __Affidavit__    Document Date: __11/1/19__

Number of Pages: __5__ Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827) Item #5910

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | <u>Case No.</u>: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **<u>FIRST AMENDED COMPLAINT</u>** | |

# EXHIBIT "C"



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23090

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Hayward

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
204.3

PHONE NO.(S):

EMPLOYEE NUMBER:

DISCUSSED BY:
Supervisor: Bobbie Weecks          and Steward: Ben Nordson          on 3/27/2015
Human Resources Dept.: Vanessa Parker          and Bus. Rep.: Lou Mennel          on 3/27/2015

GRIEVANCE ISSUE:     ☐ Continuation Sheet Attached
Grievant has done work of higher classification on several occasions since the clarification of duties on 2/17/2015.
He has not received the upgrade, in addition the timecards have been changed without his knowledge.

CORRECTION ASKED FOR:     ☐ Continuation Sheet Attached
Pay for past upgrades, cease and desist changing of timecards without informing employee.

Submitted by: Lou Mennel          Under Section: 102          on 3/27/2015
Received for Co. HR Grv. Filing by: Ann Sabwa          on 3/30/2015

COMPANY ANSWER:     ☐ Continuation Sheet Attached

For Company:          on

SETTLED:
Closed at the Local Level

For Union:          on 03/2017

REFERRED TO:                                        FOR OFFICE USE ONLY
☐ L.I.C. on _____ Meeting scheduled for _____          ☐ SETTLED ON          03/2017
☐ Fact Finding Committee on _____                         ☐ WITHDRAWN ON
☐ Pre-Review Committee on _____                           Co. referred FF on
☐ Review Committee on _____                               Union received FF ref. on
☐ Ad-Hoc Committee on _____                               Co. referred P-RC on
☐ Arbitration on _____                                     Union received P-RC ref. on
                                                            Co. referred RC on
                                                            Union received RC ref. on
                                                            Co. referred ARB on
                                                            Union received ARB ref. on
                                                            ARB. CASE NO.:

E-mail to:     Company at hrgrievancefiling@pge.com
cc to:          Local Union 1245 at cxcx@ibew1245.com

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

SPIRO JANNINGS,                          )       <u>Case No.</u>:       **17CV315033**
                                         )
      Plaintiff;               )
                                         )
vs.                                      )
                                         )
PACIFIC GAS & ELECTRIC CO., *et al*.     )       **<u>FIRST AMENDED COMPLAINT</u>**

# EXHIBIT "D"



**Pacific Gas and
Electric Company**

**Date:** May 6, 2015                                   Employee File

**To:** Spiro Jannings

**From:** Bobbi Weeck

**Subject:** Written Reminder -- Work Performance

Spiro:

This memo is to confirm our conversation of May 6, 2015, when you were told that you would be issued a Written Reminder in the Work Performance category.   Also present at this meeting was Shop Steward, Ben Nordson.

On several dates including but not limited to 3/9, 3/10, 3/24, 3/26, 3/27, 3/31 and 4/9/2015 , you were provided job assignments to perform stand-by work with start and end times. You arrived late to job assignments, which causes a delay in the overall work being performed by the contractors and the crews.   Arriving to job assignments on time as well as filling out time cards correctly are expectations of your overall work performance.

We discussed the impact of your performance on your co-workers and the Company, and reviewed the 2015 Locate and Mark Employee Expectations and the Employee Code of Conduct.  You indicated that you understood the expectations of your performance

It is important that you understand that this Written Reminder will remain active in accordance with Positive Discipline Guidelines and that any future incidents in any category of Positive Discipline may result in further disciplinary action up to and including termination.

The Employee Assistance Program is available to you if you desire their services.  A Counselor can be reached at (888) 445-4436.  I am also available to assist you in anyway I can to ensure your success.

Sincerely,


Bobbi Weeck
*Supervisor, Locate and Mark*

cc:     Joel Dickson Director
        Jeff Carroll Superintendent
        Vanessa Parker Labor Relations

Exhibit 4

# EMPLOYEE PERFORMANCE RECORD

EMPLOYEE'S NAME: SPIRO JANNINGS

*Instructions:* After every employee contact, write the date, the supervisor's name, the performance category, the action taken and a summary of the discussion that took place. When you determine that the problem has been solved or is deactivated, advise the employee and enter the date deactivated or resolved.

PERFORMANCE CATEGORY
Work Performance
Conduct
Attendance

ACTION
Positive Contact
Coaching/Counseling
Oral
Written
DML
Termination

| DATE SUPERVISOR | CATEGORY ACTION | SUMMARY OF DISCUSSION | DATE DEACTIVATED/ RESOLVED |
|---|---|---|---|
| 4/15/14 FXMU | Work performance C/C | Moving ticket out of Assigned folder w/o permission. Previously discussed & Tailboarded | Deactivated |
| 9/16/2014 B. WEECK | SAFETY DRIVING C/C | Sept 16, 2014 spoke with Spiro Jannings regarding talking on a cell phone while driving a co. vehicle. Spiro said he didn't recall talking on the phone, but could not say he wasn't on the phone while driving. He said he was never given a hands free device. Explained if he gets another complaint (driver check) there will be more severe action that will be taken. | Deactivated |
| 4/21/15 | Driving cc | Spoke with Spiro regarding a driver check. Spiro just received a ticket violation for running a red light. Needs to follow rules | |
| 5/8/15 B. Weeck | Work performance Written | Not showing up at standby's at the scheduled start times. Incorrectly filled out his timecard. Timecards do not match standby times. | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "E"



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23183

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Hayward

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca. 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
Positive Discipline Guidelines and any relevant
precedent setting case.

PHONE NO.(S):

EMPLOYEE NUMBER: 00049709

DISCUSSED BY:
Supervisor: Bobbie Weeck          and Steward: Ben Nordson          on 5-6-2015
Human Resources Dept.: Vanessa Parker     and Bus. Rep.: Lou Mennel     on 5-7-2015

GRIEVANCE ISSUE:     ☐ Continuation Sheet Attached
Grievant was issued a written reminder in work performance

CORRECTION ASKED FOR:     ☐ Continuation Sheet Attached
Remove or reduce discipline

Submitted by: Lou Mennel          Under Section: 102          on 5-7-2015
Received for Co. HR Grv. Filing by: Ann Sabwa          on 5/8/2015

COMPANY ANSWER:     ☐ Continuation Sheet Attached

For Company:                                        on

SETTLED:
COMMITTEE AGREED THE DISCIPLINE WAS FOR JUST CAUSE

For Union:                              on 05/31/2016

REFERRED TO:

| | FOR OFFICE USE ONLY | |
| --- | --- | --- |
| ☐ L.I.C. on _____ Meeting scheduled for _____ | ☒ SETTLED ON | 05/31/2016 |
| ☐ Fact Finding Committee on _____ | ☐ WITHDRAWN ON | |
| ☐ Pre-Review Committee on _____ | Co. referred FF on | 12/15/2015 |
| ☐ Review Committee on _____ | Union received FF ref. on | 12/15/2015 |
| ☐ Ad-Hoc Committee on _____ | Co. referred P-RC on | 03/18/2016 |
| ☐ Arbitration on _____ | Union received P-RC ref. on | 03/18/2016 |
| | Co. referred RC on | |
| | Union received RC ref. on | |
| | Co. referred ARB on | |
| | Union received ARB ref. on | |
| | ARB. CASE NO.: | |

E-mail to:  Company at hrgrievancefiling@pge.com
cc to:      Local Union 1245 at cxcx@ibew1245.com

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 65 of 224

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | <u>Case No.</u>: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **<u>FIRST AMENDED COMPLAINT</u>** | |

# EXHIBIT "F"

# Local Investigating Committee Report

## Subject of the Grievance

| | | | |
|---|---|---|---|
| Grievance No.: | 23183 | Department: | Gas |
| Date Grievance Filed: | May 8, 2015 | Headquarters: | Hayward |
| Grievance Issue: | Spiro Jannings | | |
| Correction Requested: | Reduce or remove the discipline | | |
| Company Answer: | The Company contends the grievant was issued the appropriate level of discipline for just and sufficient cause. Request respectfully declined. | | |

## Exhibits:

| | |
|---|---|
| Exhibit 1 | Grievance 23183 |
| Exhibit 2 | Career History |
| Exhibit 3 | Employee Performance Log |
| Exhibit 4 | Written Reminder Letter |
| Exhibit 5 a-e | Training History |
| Exhibit 6 a-d | 2015 Locate and Mark Meeting Agenda Documents |
| Exhibit 7 a-b | Damage Prevention Handbook Roles and Responsibilities (excerpts) |
| Exhibit 8 a-d | March 9, 2015 Documents (Time Card, Standby Form, USA Ticket) |
| Exhibit 9 a-d | March 24, 2015 Documents (Time Card, Standby Form, USA Ticket) |
| Exhibit 10 a-i | March 26, 2015 Documents (Time Card, Standby Form, USA Ticket, DOT email) |
| Exhibit 11 a-d | March 27, 2015 Documents (Time Card, Standby Form, USA Ticket) |
| Exhibit 12 a-n | March 31, 2015 Documents (Time Card, Standby Form, USA Tickets) |
| Exhibit 13 a-d | April 9, 2015 Documents (Time Card, Standby Form) |
| Exhibit 14 | PRC 1468 |
| Exhibit 15 a-b | PRC 1529 |
| Exhibit 16 a-1 | Positive Discipline Guidelines |
| Exhibit 17 a-s | Arbitration Case #293 |

## Investigation Procedures

A Local Investigating Committee comprised of Lou Mennel, Union Business Representative; Ben Nordstrom Shop Steward; Bobbi Weeck, Gas Supervisor; and Vanessa Parker, Labor Relations Specialist, met on 7/10/15 at Hayward Service Center. The Grievant, Spiro Jannings was also present

## Facts of the Case

1. The Grievant, Spiro Jannings, has a recent hire date of date of Jan. 28, 2013; his current title: Fieldperson;, headquartered in Hayward; schedule Monday through Friday 7-3:30. He was formerly hired in 1997 – 2000 holding positions in the in the Electric Department, with Hiring Hall experience in GC and Division.

2. The supervisor is Bobbi Weeck, with 35 years of service, 22 years in management. Her current title is Locate and Mark Supervisor for Mission and Diablo; offices in Concord and Hayward.

3. As a Fieldperson in order be considered Operator Qualified (OQ'd) to perform Standby work, employees attend a two day school where they learn the standby procedures and the various forms to be completed. The Grievant completed the training, Standby Pipeline on December 18, 2014.

4. Supervisor Weeck explained the purpose of the standby; a free service provided to contractors; contractors are not allowed to excavate / break soil within 5 feet of Transmission lines without a standby; the standby is a PG&E employee who observes the contractor while they excavate, protect our facilities and the safety of our transmission lines.

5. During a field meet if the contractor will be excavating within the 5 feet, the contact information of the standby coordinator is provided.

6. Supervisor Weeck provided the process for scheduling a standby:
   - Locator notates in the USA ticket stand- by is required, using the term "critical facilities."
   - Contractor contacts standby coordinator, Kathy Rocha
   - Company requires a 48 hour notice to schedule a standby with the contactors.
   - Kathy Rocha is notified in the USA ticket and contacts the contractor directly , if they haven't already contacted her

7. Exhibit 10e is an example of "Critical Facility" entered into the ticket; the automatic response "Excavator Positive Response Notes" is created which notifies the contractor and coordinator to schedule a standby.

8. Once the standby is scheduled, the Grievant is notified via email through a calendar invitation created by Kathy Rocha, standby coordinator. The invite provides the following information:
   - Date of Standby
   - Start / End Time
   - USA Ticket Number
   - Contact of Contractor
   - Various standby forms / attachments

9. The Grievant is required to print and fill out the "Standby Form" while on site.  This form is a company document and is used to capture the work being performed by the contractors.

10. The Grievant concurs that upon arrival to the standby, he is required to verify the accuracy of the marks. This verification procedure is described in the Damage Prevention Handbook (Exhibit 7 a-b), item B #1 and is also discussed at the training. This verification process may take 15 to 30 minutes.

11. The Grievant contacts the Load Center in San Ramon to inform them "Man on Line" which signifies that work is being performed near a transmission line.

12. The contractor is required to contact the coordinator when the standby has been completed or needs to be extended.

13. Documentation for March 9, 2015 – Flat Iron Electric Group (Exhibit 8 a-d):
    - Time Card: standby 7 am – 3:30 pm
    - Standby form: 8 am – 1:30 pm
    - Grievant was released at 11:30 am per the onsite contractor
    - Grievant contacted dispatch and went off line at 1:30 pm

14. On March 10, 2015, the Flat Iron Electric Group onsite contractor stated he needed to amend the end time for March 9, 2015 to 2:30 pm. The overall concern was that none of the documents lined up.

15. Documentation for March 24, 2015 Platinum Pipeline (Exhibit 9 a-d):
    - Time Card: standby 7 am – 3:30 pm
    - Standby scheduled: 7:30 – 3:30 pm
    - Standby form: 7:30 am – 3 pm
    - Grievant arrived at 10:30 am; left approximately 11:45 am per on site contractor

16. Supervisor Weeck's concerns on March 24, 2015, were inconsistencies with the times communicated from the contractor verse the times the Grievant documented he was at the standby.

17. Documentation for March 26, 2015 Mountain Cascade Day 1 (Exhibit 10a-i)
    - Time card: standby 7 am – 3:30 pm
    - Standby: scheduled 8 am – 1 pm

18. Company records confirmed the Grievant had a DOT appointment on March 26, 2015.

19. Documentation for March 27, 2015 Mountain Cascade Day 2 (Exhibit 11 a-d)
    - Time Card: standby 7 am – 3:30 pm
    - Standby scheduled: 8 am – 3 pm
    - Standby form: 8 am – 3:30 pm
    - Job was shut down at 1 pm due to a problem

20. The Grievant stated that the standby form submitted was a duplicate of the previous day because it was a two day job and he was using one form. Further, the Grievant stated that his DOT appointment was scheduled for March 27, 2015.

21. Supervisor Weeck stated the contractor advised the job was shut down at 1 pm. The concern she had was the various discrepancies of times between the contractor and the Grievant.

22. During the LIC, the Grievant disputed the date of his DOT appointment; alleging the appointment was on March 27, 2015, day 2 of the Cascade Mountain job. The DOT department confirmed the appointment was on March 26, 2015.

23. Documentation for March 31, 2015 Sanco Pipelines (Exhibit 12 a-n):
    - Standby scheduled: 8 am – 1 pm
    - Grievant did not arrive until 11:30 am
    - Standby form: 8 am – 3:45 pm

24. Supervisor Weeck stated that on March 31, 2015, at approximately 10:15 am she answered a phone call from the onsite contractor, who was upset that the Grievant had not arrived.

25. Supervisor Weeck called the Grievant to inquire on his whereabouts; the Grievant indicated he was unaware that he was scheduled for standby work because he never received a calendar invite. At the time he was in Fremont working on tickets.

26. The Grievant arrived at 11:30 am and concluded at 4 pm; the standby was prolonged due to the delay in his arrival.

27. Supervisor Weeck later confirmed that the standby was on the calendar.

28. Documentation for April 9, 2015 Attending a Tailboard (TB) (Exhibit 13 a-d):
    - Time card: Hayward 7:00 am to 8:00 am / Dublin 8 am

29. Supervisor Weeck stated the concern was the Grievant did not accurately account for the time he attended the TB, he should not put a blanket time on his time card.

30. The Grievant responded that he did not show up late to the April 9th job; he made an error and is trying to be diligent in attending the TB on every Thursday.

31. The Grievant realizes his paperwork is not perfect. His understanding was to use the scheduled times on the standby forms verse the actual times of the job.

32. The Grievant said he has improved with using his Locator Journal to help manage daily tasks due to the number of jobs that he encounters. Using the journal is not required, but recommended.

33. The Grievant acknowledges that he did attend the Standby school in December, 2014 and was trained on the use of the standby forms, but use of specific times was not addressed.

34. At the onset of this pilot program, the standby form was an excel spreadsheet, but through the Oversight Committee has evolved to a more informative document, which accounts for his confusion in submission of the forms.

35. The Grievant is not required to call Kathy Rocha, the standby coordinator when he arrives / leaves the scheduled standby jobs.

36. Supervisor Weeck stated that she has not attended the Locate and Mark school, nor did she discuss standby responsibilities or expectations directly with the Grievant because it was covered in the class. Through various trainings, the Grievant is aware that accurate documentation is imperative to the Company's operation. If there is an incident, and the documentation from the Grievant is inaccurate, there may be financial liabilities placed on the Company.

**Statement and Referral**

Union Position

The grievant was inexperienced at standbys. The procedures and paperwork had changed several times with no instruction from his supervisor. The shop steward had experienced confusion with the paperwork as well. This is a clear lack of communication and lack of training. The Employee performance records shows no Coaching and Counseling in regards to paperwork issues. A note of interest the employee had filed a bypass grievance 6 days before this investigation began.

Company Position

The company contends that it is imperative that company records need to be accurate. Company records includes but is not limited to time cards, inspection records and standby sheets. As Supervisor Weeck testified too, the intent of the standby is a free service offered to contractors to protect our facilities and the safety of our transmission lines. The standby forms are to ensure that the Company accurately documents our involvement with Contractors. It is understandable that with new programs and processes a learning curve may be present while the process is more streamlined, however, there were several inconsistencies provided in the Grievant's paperwork along with inaccuracies on his time card. The Company contends the Written Reminder was issued for just and sufficient cause.

The Committee could not reach agreement.  This case is referred to Fact Finding.


_____ (concur/dissent)        _____
**Lou Mennel**                                                          Date
For the Union


_____ (concur/dissent)        _____
**Ben Nordson**                                                         Date
For the Union


_____ (concur/dissent)        _____
**Vanessa Parker**                                                      Date
For the Company


_____ (concur/dissent)        _____
**Bobbi Weeck**                                                         Date
For the Company

The Committee could not reach agreement.  This case is referred to Fact Finding.

_____  (concur/dissent)     11-11-15
Lou Mennel                                       Date
For the Union

_____  (concur/dissent)     _____
Ben Nordson                                      Date
For the Union

_____  (concur/dissent)     _____
Vanessa Parker                                   Date
For the Company

_____  (concur/dissent)     _____
Bobbi Weeck                                      Date
For the Company

The Committee could not reach agreement.  This case is referred to Fact Finding.

_____   (concur/dissent)    _____
Lou Mennel                                      Date
For the Union

_____   (concur/dissent)    _____11/24/2015_____
Ben Nordson                                     Date
For the Union

_____   (concur/dissent)    _____
Vanessa Parker                                  Date
For the Company

_____   (concur/dissent)    _____
Bobbi Weeck                                     Date
For the Company

The Committee could not reach agreement.  This case is referred to Fact Finding.

_____  (concur/dissent)     _____
Lou Mennel                                                            Date
For the Union

_____  (concur/dissent)     _____
Ben Nordson                                                           Date
For the Union

_____  (concur/dissent)     11/30/15
Vanessa Parker                                                        Date
For the Company

_____  (concur/dissent)     12/6/15
for: Bobbi Weeck                                                      Date
For the Company



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23183

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Hayward

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca. 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
Positive Discipline Guidelines and any relevant
precedent setting case.

PHONE NO.(S):

EMPLOYEE NUMBER: 00049709

DISCUSSED BY:
Supervisor: Bobbie Weeck          and Steward: Ben Nordson          on 5-6-2015
Human Resources Dept.: Vanessa Parker          and Bus. Rep.: Lou Mennel          on 5-7-2015

GRIEVANCE ISSUE: ☐ Continuation Sheet Attached
Grievant was issued a written reminder in work performance

CORRECTION ASKED FOR: ☐ Continuation Sheet Attached
Remove or reduce discipline

Submitted by: Lou Mennel          Under Section: 102          on 5-7-2015
Received for Co. HR Grv. Filing by: Ann Sabwa          on 5/8/2015

COMPANY ANSWER: ☐ Continuation Sheet Attached
The Grievant was issued a Written Reminder for just and sufficient cause. Request respectfully denied.

For Company: Vanessa Parker          on

SETTLED:

For Union:          on

| REFERRED TO: | | FOR OFFICE USE ONLY | |
|---|---|---|---|
| ☐ L.I.C. on | Meeting scheduled for | ☐ SETTLED ON | |
| ☐ Fact Finding Committee on | | ☐ WITHDRAWN ON | |
| ☐ Pre-Review Committee on | | Co. referred FF on | |
| ☐ Review Committee on | | Union received FF ref. on | |
| ☐ Ad-Hoc Committee on | | Co. referred P-RC on | |
| ☐ Arbitration on | | Union received P-RC ref. on | |
| | | Co. referred RC on | |
| | | Union received RC ref. on | |
| | | Co. referred ARB on | |
| | | Union received ARB ref. on | |
| | | ARB. CASE NO.: | |

E-mail to: Company at hrgrievancefiling@pge.com
cc to:          Local Union 1245 at cxcx@ibew1245.com

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 77
of 224
Exhibit

Spiro Jannings – Career History

Grievance # 23183

SAP Data:

Pers.No. | 49709 | Spiro G Jannings

PA | 2000 | Utility | EEGrp | 3 | Hourly | CoCd | PGE1 | Active
PSubarea | 8010 | IBEW T200 | ESgrp | 01 | Regular | Fieldperson
Start | 01/28/2013 | to | 12/31/9999 | Chng 01/30/2013 ECM3

### 0041 Date Specifications

| Date type | Date | Date type | Date |
|---|---|---|---|
| 01 Original Hire | 01/02/1997 | 02 Most Recent Hire | 01/28/2013 |
| 08 Adj Service | 01/28/2013 | 13 Ret Med Cred Svc | 01/28/2013 |
| 14 401K Adj. Service | 01/28/2013 | 22 Vac Accr Seniority | 01/01/2013 |
| 23 Pens Cred Svc | 01/28/2013 | | |

Employee History Report
RPLEHSU0

Personnel area : 2000 Utility
Company : PGE1 Pacific Gas & Electric Co
00049709 Spiro G Jannings
Department : S0271879 Locate & Mark Diablo-Miss
Employee group : 3 Hourly
Employee Subgroup : 01 Regular

| Start Date | End Date | CoCd | PA | Org.unit | Org.Unit Short Text | Job key | Job Title | Position | Position (Short Text) |
|---|---|---|---|---|---|---|---|---|---|
| 01/28/2015 | 07/09/2015 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 50029309 | Fieldperson |
| 07/28/2014 | 01/27/2015 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 50029309 | Fieldperson |
| 06/16/2014 | 07/27/2014 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 50029309 | Fieldperson |
| 01/28/2014 | 06/15/2014 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 01/05/2014 | 01/27/2014 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 11/01/2013 | 01/04/2014 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 02/11/2013 | 07/27/2013 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 01/28/2013 | 02/10/2013 | PGE1 | 2000 | 50012193 | M&C - Gas Constr - San Ca | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 01/27/2013 | 01/27/2013 | PGE1 | 2000 | 50382328 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 01/26/2013 | 01/26/2013 | PGE1 | 2000 | 50382328 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 08/27/2012 | 01/25/2013 | PGE1 | 2000 | 50382328 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 50461802 | HH Fieldperson - Exper |
| 08/15/2012 | 08/26/2012 | PGE1 | 2000 | 50012240 | M&C - GC Gas Constr - Oak | 50010081 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 12/12/2011 | 08/14/2012 | PGE1 | 2000 | 50012240 | M&C - GC Gas Constr - Oak | 50010081 | Hiring Hall Fieldperson - | 50403977 | HH Fieldperson - Exp |
| 09/21/2011 | 12/11/2011 | PGE1 | 2000 | 50012238 | M&C - GC Gas Constr - Dia | 50010081 | Hiring Hall Fieldperson - | 50403977 | HH Fieldperson - Exp |
| 09/02/2011 | 09/20/2011 | PGE1 | 2000 | 50271879 | M&C - M&L/Leak Survey - S | 50010081 | Hiring Hall Fieldperson - | 50403977 | HH Fieldperson - Exp |
| 09/19/2009 | 09/01/2011 | PGE1 | 2000 | 50012194 | M&C - M&L/Leak Survey - S | 50070869 | Hiring Hall Fieldperson | 99999999 | Integration: default posi |
| 10/08/2007 | 09/18/2009 | PGE1 | 2000 | 50012194 | M&C Area 1 Gas Constr - P | 50070869 | Hiring Hall Fieldperson | 50190961 | Hiring Hall Fieldperson |
| 09/30/2007 | 10/07/2007 | PGE1 | 2000 | 00000000 | | 00000000 | | 99999999 | Integration: default posi |
| 06/30/2008 | 09/29/2007 | PGE1 | 2000 | 00000000 | | 00000000 | | 99999999 | Integration: default posi |

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "G"

2015 191st day – 174 days follow

FRIDAY **10** JULY

7:00 - 12:30 PM    12:30 - 1:00 L

LIC MEETING
    Locates ҺЦİ

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 80 of 224

Greenleaf Locate
37930    Newark
2:00 Pm  3:00  Travel 1
3:00 Pm  5:00   2. Locate
5:00 pm  6:00   1 Travel

JULY **13** MONDAY

Locates ||||| |||||

7:00 7:15 Gas Truck
worked on HP Connection 10:30 to 1:30

Locatos ||||| |||||

locates ~~THII IHI II~~

Electric USA 33001   Pm 31168201
Telks   USA 334629 PM 31016103
     6C 6T Fremont  Christy nwD Brandon Ct.
8:00 Pm 9:00 Pm  Travel     1.5  Pm 30888836
9:00  11:00 Pm  Locate Time
11:00 12:00   Travel Home

700: 10:30 late ||| ||| |||

Drew     49064 Milmont Dr

Bull room meeting   7:00 Am - 9:00

Drew Investation  10:30 - 11:30  Newark ||| |||

Elector  USA 336254  PM 31126775

Gold meet with Brian on Walnut 12:00 to 12:45

Locates TKK

USA# 334629   Pm 31016103

AFB USA  338554

Gas Trans  338393

Worked on Hp Compliant JOB
From Civic Center to Fremont Ave
6:00 Am to 7:00 Am TRAVEL
7:00 Am to 2:30 pm
2:30 to 3:30 Travel Home

MONDAY | 20 | JULY

Locates ↑↑ H ?Rd

GASTmAN
↓ USA 342707 Pm 3060418b
↓ USA 342742 Pm 3060418b
Spent ?tme nt WALNut witH HP
Gas Emerbany USA# 343879 Westbury ct/
Gas 344073 ACACIA ct Pavot a Blvd /LAKG Blv

JULY **21** TUESDAY

40697132

Scates ||||||||
Super Crew   USA 346627  Fremont
11 "   USA 347034
          347087
~~34137~~ 347320 (344675
GC TRANS   8.00  12.00

Locate 7/11 HHH 11

GASTnumb, 342742   USA   RM# 30004186
super CREW   ## 350752 USA

Locates #||||||-|
PO. Super Crew 352732
Meeting At Hayward BofA 100 9:30
Talked Morris White About
My problem with Bobby

FRIDAY **24** JULY

OFF ON ABMISTIVE LEAUE WITH PAY
FOR TItrenty BOSS.

First Meeting CorPSecrcty on
Threats mnDe.

JEFF CALLED @ 8:30 AM
AND SAID TO COME IN TO THE METER
SHOP IN FOR MEETING AND BE DRESSED
FOR WORK @ 11:00 AM WENT TO METER SHOP
WAS TALKED TO GIVE A PIECE OF
PAPER TO READ AND FIRED LAST DAY

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "H"



**150727029**  Supplement No ORIG

# Fremont Police Department

2000 Stevenson Blvd

Fremont, CA 94538

510-790-6800 Main Phone

510-790-6831 Fax

Reported Date
07/27/2015
Nature of Call
1061
Officer
PERRY, CRAIG

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | | Reported Time | CAO Call No |
|---|---|---|---|---|---|---|---|---|
| Fremont Police Department | | | 150727029 | ORIG | 07/27/2015 | | 14:20 | 150075314 |

| Status | | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | | MISC PUBLIC SERVICE | | | | | | |

| Location | | | | | | City | Rep Dist | Area | Beat |
|---|---|---|---|---|---|---|---|---|---|
| 42105 BOYCE RD | | | | | | Fremont | 1061 | 3 | 3 3 |

| From Date | From Time | To Date | To Time | Officer | | | |
|---|---|---|---|---|---|---|---|
| 07/15/2015 | 15:30 | 07/15/2015 | 15:30 | 13048/PERRY, CRAIG | | | |

| Assignment | | Entered by | RMS Transfer | Approved By | Approving Officer |
|---|---|---|---|---|---|
| Swing Shift, A Team, Zone 3 | | 13048 | Successful | 11864 | 11864 |

| Approval Date | Approval Time | |
|---|---|---|
| 07/28/2015 | 16:57:51 | |

| Arrest/Exceptional Clearance | Digital Evidence |
|---|---|
| Yes | Yes |

## Person Summary

| Invl | Invl No | Type | Name | | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|---|
| PER | 1 | I | WEECK, BOBBIE | | MNI | Race | Sex | DOB |
| PER | 2 | I | PIERCE, WILLIAM | | MNI | Race | Sex | DOB |
| PER | 3 | I | JANNINGS, SPIRO GEORGE | | 1688843 | W | M | 04/23/1968 |

## Summary Narrative

**NARRATIVE:**

On 7/27/15, at approximately 1456 hours, I was dispatched to the Fremont Police Department Lobby on a report of a disturbance between two co-workers at PG&E. I arrived and contacted the reporting party (Weeck) who provided me the following digitally recorded statement in summary:

**WEECK'S STATEMENT:**

Weeck said she is the supervisor for another employee (Spiro Jannings) at the PG&E facility located on Boyce Rd. Weeck said she issued Jannings a "written reminder" which she explained is documentation showing he had been verbally counseled. Weeck said Jannings had been having work performance issues in the past several weeks regarding time card issues and leaving job sites early. Weeck said Jannings has always had issues about her being his supervisor.

Weeck said on 7/23/15, she received a call from another superintendent (Pierce) that Jannings made some comments regarding her and he was concerned that Jannings might try to do something to her. Pierce told her that Jannings was talking to him on 7/15/15 about Weeck and said how she turned in a "written reminder" on him. Pierce then told Weeck that Jannings told him that she was going to feel his pain by sticking his dick in her ass. Pierce told Jannings to just do his job and to not worry about Weeck.

Weeck said Pierce left her a voice message and she was unable to call him back till 7/23/15, due to being out of town. Weeck said after speaking with Pierce and learning about what Jannings said, she then notified her boss who then contacted Human Resources. Weeck said Jannings was placed on leave and PG&E Corporate Security advised her to contact the police for any further advice. Weeck said she has not had any further contact with Jannings and he had never made any verbal threats to her in person.

Weeck requested this incident be documented and would seek a restraining order through her company. Weeck also requested I not contact Jannings regarding this incident so that she could speak with her company lawyers. I provided Weeck my business card that contained the case number to this incident. Weeck requested no further

| Report Officer | Printed At | Page |
|---|---|---|
| 13048/PERRY, CRAIG | 12/10/2015 11:27 | 1 of 4 |

# Fremont Police Department
## Summary Narrative
police action.

### PIERCE STATEMENT:

I called Pierce's cell phone and he provided me the following digitally recorded statement in summary:

Pierce said on 7/15/15, at approximately 1530 hours, He was at the PG&E yard located on Boyce Rd. Pierce said Jannings was telling him that Weeck is trying to get him fired and called her a "fucking bitch". Jannings then told him: "Just wait, she will feel my dick in her ass, she is going to feel my pain and I'm going to get her fired.

Pierce told Jannings to stop worrying about her and to just do his job. Pierce said later in the night he started thinking of the comments that Jannings made and said he would feel guilty if Jannings tried to harm Weeck. Pierce then called Weeck the next morning. Pierce said she did not answer and that he left her a message. Pierce said Weeck was out of town and later contacted him on 7/23/15 and he told her what Jannings told him. Pierce said he also notified his supervisors about the incident.

Pierce said since Jannings has been placed on leave he has not heard or seen him.

### RECOMMENDATIONS:

This case is for documentation purposes only.

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "I"

**Ferguson, Desiree**

| | |
|---|---|
| **From:** | Corporate Security Department |
| **Sent:** | Thursday, August 06, 2015 12:42 PM |
| **To:** | Dickson, Joel |
| **Cc:** | Anderson, Barry; Stavropoulos, Nickolas; Torres, Albert; Kane, Julie; Joga, Robert; Soto Jr., Jesus; Campos, Stacy (Law); Neeley, Jeffrey; Winnie, Terri; Ledbetter, Kathy; Wix, Robin; Veader, Doug; Franklin, Margaret; Balistrieri, Phillip; Leonard, Jim; Moss, Joel (Corporate Security); Douglas, Stephanie (Corporate Security) |
| **Subject:** | Employee Conduct - Spiro Jannings |
| **Attachments:** | 15-1225.pdf |

## Confidential Personnel Document Attached

```
STEPHANIE DOUGLAS, SENIOR DIRECTOR
CORPORATE SECURITY
EMERGENCY PREPAREDNESS AND OPERATIONS
```

**Security Operations & Investigations**
Joel A. Moss, Manager

http://pgeatwork/corporatesecurity/Pages/default.aspx

1

**Memorandum**

Date: AUGUST 6, 2015                    File #: 15-1225

To: DIRECTOR – T&D OPS COMPLIANCE

From: CORPORATE SECURITY DEPARTMENT

Subject    Investigation Title:    Spiro Jannings
DOH: 1/28/2013
Fieldperson - Locate & Mark
Hayward ,

Employee Conduct:    Disrespectful Actions and Threat
Of Violence Toward a Supervisor



**Pacific Gas and Electric Company**

JOEL DICKSON:

## SUMMARY OF INVESTIGATIVE FINDINGS

**INVESTIGATIVE SUMMARY:**

The Corporate Security Department (CSD) initiated an investigation on July 23, 2015, concerning an allegation of disrespectful conduct and a threat of sexual assault made by Spiro Jannings toward his supervisor. The threat was allegedly made to Superintendent William Pierce regarding Spiro's supervisor, Bobbie Weeck. An investigation which encompassed six interviews and a review of relevant documents was conducted. The investigation substantiated the allegation and determined Jannings' actions violated the Employee Code of Conduct.

**PREDICATION:**

On July 23, 2015, Labor Relations Specialist Vanessa Parker notified CSD of workplace violence concerns regarding a threat of sexual assault and the use of profanity by Jannings, toward his supervisor Bobbie Weeck. An investigation was initiated by Corporate Security Investigator James Leonard.

**INTERVIEWS CONDUCTED:**

Manager, Gas Transmission & Distribution, William Pierce was interviewed by Leonard on July 24 and July 28, 2015. Pierce explained on July 15, 2015, shortly after 7:30 AM he was in the parking lot of the Fremont Service Center at 41800 Boscell Road, Fremont, after he provided

breakfast burritos to his crew. While in the lot, between the buildings and east of the center gate, he was contacted by Jannings. Jannings, aware Pierce was a superintendent, inquired about getting a "Super Crew" assignment. Jannings told him, "I've got to get out of this department." Jannings also made a contention about Weeck's direction regarding USA tickets.

Later the same day, during the afternoon, Pierce was in the Fremont Service Center yard, near the rear gate. Pierce was uncertain of the time, but estimated approximately 2:30 PM. There Pierce encountered Jannings, as Jannings drove his white company pick-up truck in the yard. Jannings stopped and Pierce spoke to Jannings as Jannings sat in the driver seat and Pierce stood at the open passenger window.

Pierce, who was smoking, gave Jannings a cigarette which Jannings smoked in the truck. Jannings began to discuss his supervisor Bobbie Weeck and stated, "F-cking Bobbie, she's trying to put me on a DML. Just wait, I'll get her. She's going to feel my d-ck in her a-s. She's going to feel the pressure. She's going to feel me." While saying these words Jannings appeared angry and raised his voice. Jannings also jabbed his index finger toward Pierce in emphasis as he made the statements. Pierce confirmed to Leonard he was confident in his quotes of what Jannings said. After Jannings said these things, Pierce continued to speak with him to attempt to de-escalate his anger. Pierce told Jannings he needed to work through the situations to understand and meet his supervisor's expectations. Jannings contended he cleared 15 events a day. Pierce spoke to Jannings about "locate and mark" events verses "no conflict" events. Jannings said he was going to "tell Nick" about his unhappiness with his supervisor. Pierce understood that to mean Jannings contended he had a relationship with Gas Operations Executive Vice President Nick Stavropoulos. Pierce noted employees Chris Plummer and Joe Gonzalez were seated in a car nearby doing paperwork while Pierce spoke with Jannings. Pierce did not know if they noticed him speak with Jannings.

Pierce was questioned specifically as to how he interpreted Janning's threat to sexually assault Weeck. Pierce said the statement worried him, so during the afternoon of Thursday, July 16, 2015 he called Weeck to tell her about it. Weeck did not answer the phone call and Pierce opted not to leave a voice message. Pierce told his wife about Janning's threat but did not speak to anyone else in the company about it at that time. Pierce contemplated and struggled with the content of the threat for a day, and Janning's demeanor and anger as he said the words influenced Pierce not to discount them as figurative language. Pierce said in hindsight he should have escalated the statement immediately. During a telephone conversation with Weeck on Thursday, July 23, 2015, Pierce informed her of Spiro's threat and urged her not to meet with Jannings alone in the future. Weeck seemed disturbed when Pierce told her of Jannings' statements.

Locate and Mark Supervisor Bobbie Weeck was interviewed by Leonard on July 24, 2015. Weeck recalled she had received a telephone call earlier from William Pierce but was unable to answer. Pierce supervised surveyors and Weeck intended to return the call on the assumption it concerned response to tickets. Weeck ultimately spoke with Pierce on July 23, 2015, by telephone, and at that time Pierce informed her of threatening statements about her, made to Pierce by Jannings. Weeck recalled Pierce seemed uncomfortable and hesitant to quote Jannings' statements, and initially just said they were disgusting and vulgar. Weeck pressed Pierce to fully explain the statements. Pierce then reluctantly said Jannings had stated, "That bitch is trying to put me on a DML; she's going to feel my pain, I'm going to stick my d-ck in her a-s and make her feel it."
Pierce told Weeck to be careful with Jannings and suggested she have another supervisor present whenever she spoke with him in the course of business; Pierce offered to accompany Weeck himself during any such meetings.

Weeck explained in the past she had learned from other employees about an allegation Jannings had referred to her as a "bitch." She confronted Jannings about the comment in the past months. He acknowledged the accuracy of it, and explained he was sorry and was "venting." Weeck told Jannings his actions were not acceptable, however, she did not document the incident. She recalled the event occurred early in 2015, but she could not recall the specific date. Referring to her having learned of Jannings' characterization of her, Weeck admonished Jannings that if he was going to say disrespectful things about her, he should make sure the people he said them to didn't know her.

As an example of what she meant by that admonishment, Weeck displayed for Leonard a text message on Weeck's telephone from July 21, 2015, 9:42 AM, from Edwin Morataya. The message stated, "I just met Spearow finally...What a character...This is Edwin by the way...Good Luck with this one."

Weeck also described a telephone conversation she had with Jannings on July 17, 2015, when she called to offer Jannings overtime on the weekend. She was unaware at the time of any conversation between Jannings and Pierce. When Jannings answered the phone and recognized Weeck, he started "screaming" at her. He stated he did his best on the job and, "You're always on my a-s." Weeck interjected and explained the overtime opportunity she had called about. On learning that, Jannings calmed down and agreed to the job, which was staffed with two other employees.

Weeck became emotional several times during the interview with Leonard, to include when she explained she had to confide Jannings' threat to her husband for safety reasons. Weeck noted she was a witness in a recent local investigating committee (LIC) meeting regarding a performance issue with Jannings.

Weeck made a report to the Fremont Police Department regarding Jannings' threat to sexually assault her (Fremont Police Report # 150727029 ). Weeck explained she made the police report because, "I can't trust him, I feel very uneasy, I don't know what he might do." Fieldperson Chris Plummer was interviewed by Leonard on July 29, 2015. Plummer worked on the Super Crew supervised by William Pierce. Plummer was questioned about any observations he may have had regarding Pierce speaking to Jannings on July 15, 2015. Plummer said he could not recall a specific date but did recall he was in proximity to Pierce in the past couple of weeks and had observed Jannings speak to Pierce. Plummer could not be certain if it was in the morning or afternoon but recalled it was the first time he had seen Jannings. He recalled Jannings arrived at the Fremont Service Center in his white F-250 locate truck. Plummer was in need of a "hook knife" at that time and asked Jannings if he had an extra knife. Jannings replied, "They treat you guys like dog sh-t around here." Plummer was surprised by Jannings' comment, having never met him before. He recalled Jannings sat in his truck when he made the statement. Jannings' voice was loud and he sounded angry and disgruntled. Plummer recalled his interaction with Jannings took place in the vicinity of the yellow crosswalk in the yard, just east of the gate. Moments later Plummer spoke to his partner, Joe Gonzalez, about the comments by Jannings. Gonzalez explained to Plummer he had past experience with Jannings and many people disliked Jannings due to his negativity. Leonard asked Plummer if he had been coached in any way prior to the interview and he said, "No."

Fieldperson Joseph Gonzalez was interviewed by Leonard on July 29, 2015. Gonzalez worked for Pierce on the Super Crew. Gonzalez was questioned about any observations of Jannings speaking with Pierce on July 15, 2015. Gonzalez said he could not recall a specific date but recalled Jannings spoke to Pierce in the Fremont Service Center yard in the last two or three weeks. Gonzalez knew it was not the week of July 20th. The event he recalled may have been

in the morning or afternoon. Jannings drove into the Fremont yard in a work truck and stopped near the middle of the lot. Pierce spoke to him there as Jannings remained seated in the truck. Gonzalez never overheard any of the conversation between Jannings and Pierce. Gonzalez recalled his partner Chris Plummer told him Jannings made a statement, "They are treating you surveyors like sh-t." Gonzalez explained to Plummer his past observations and experience with Jannings from San Mateo and Foster City assignments in 2012 and 2013, when Gonzalez experienced Jannings' complaining nature. Gonzalez used the words "upset" and "aggressive" to describe his past experiences with Jannings. Gonzalez said based upon his experiences with Jannings, "He seems like kinda an angry guy." Gonzalez was asked if he was coached by Pierce or Plummer prior to the interview with Leonard. He responded, "No, not at all."

Apprentice Fitter Edwin Morataya was interviewed by Leonard on July 30, 2015. Morataya explained he had previously worked for Weeck and was now on a Super Crew. He was interviewed about a text he sent to Weeck concerning Jannings. Edwin said approximately two weeks ago he was on a job at Fremont Boulevard and Central Avenue in Fremont, when he encountered Jannings on a locate and mark assignment. He had never met Jannings before. Jannings discussed with Morataya discipline Jannings was involved in due to Weeck's actions as his supervisor. Jannings described Weeck's allegations of his job performance and his belief Weeck was checking up on him. Jannings complained Weeck was asking contractors about his departure times from jobs. He further described her review of his time cards. Morataya recalled Jannings said, "She doesn't know what she's talking about." Jannings also said, "She's out to get me." Morataya informed Jannings he had worked for Weeck and felt her expectations were easy to manage as long as one does their job. Morataya recalled Jannings was "very negative." Jannings made it very clear to Morataya that Jannings didn't like Weeck.

## SUBJECT STATEMENT:

Locate and Mark Field Person Spiro Jannings was interviewed on July 28, 2015, by Leonard and CSD Senior Investigator Kevin Griswold. Jannings was represented by Shop Steward Eugene Sanchez. Both were allowed to discuss the general aspects of the case prior to the interview and took several breaks during the interview.

Jannings explained he had been with PG&E since 2013 and recalled he received compliance and ethics training when he was hired. When asked about Employee Code of Conduct expectations relative to treatment of others at PG&E he replied, "With the utmost respect." When asked about any conversation he had with Bill Pierce on July 15, 2015, at the Fremont Service Center, Jannings explained he spoke to Pierce in the morning about Super Crew opportunities. Asked if he spoke to Pierce that day regarding his supervisor, Bobbie Weeck, Jannings replied, "Just said we had a little bit of a problem, that was about it, didn't elaborate on anything." Jannings contended nothing more was said about Weeck. Regarding his inquiry about a position in the Super Crew, Pierce told Jannings he was not a team player and a transfer was not going to happen.

Jannings was asked specifically about statements regarding Weeck allegedly made by him to Pierce. Asked if he said, "F-cking Bobbie, she's trying to put me on a DML," Jannings said, "No never said that." Asked if he said, "Just wait, I'll get her," he said, "No, never said that, I know better than that." Asked if he said, "She's going to feel my d-ck in her a-s," Jannings said, "No way, not even." Asked if he said, "She's going to feel the pressure," Jannings said, "Never." Asked if he said, "She's going to feel me," he said, "No, never, she's my supervisor, you don't do stupid stuff like that." Asked if he ever said anything to Pierce similar to those alleged statements, Jannings replied, "Never said any of that stuff ever, that's fabricated." Jannings

said he only spoke with Pierce on July 15, 2015 in the morning; he did not speak to Pierce in the afternoon. In fact, Jannings stated, he was not even at the Fremont Service Center the afternoon of July 15, 2015. He recalled he arrived there at approximately 7:00 AM that day, was in the bull room, was with his truck in the lot, later fueled his truck, worked on his tablet, conducted locates and then went directly home from the field.

The shop steward questioned the time line of events in this investigation and commented training required immediate action by a supervisor for statements such as those alleged to have been made by Jannings.

Jannings was asked if Pierce was lying about what he claimed Jannings said about Weeck. Jannings responded, "Heck yeah he is, that's serious stuff, instant termination!" Jannings was asked what would motivate Pierce to lie about what Jannings said. Jannings responded, "I don't know, everything has been kosher, looks like he turned on me." He explained he had never been reprimanded by Pierce, did not work for him, and always responded when Pierce called him in the past while on call.

Jannings was asked if he ever told Pierce he cleared 15 tags a day. Jannings said he recalled he made that statement. Asked the context of that statement given his assertion he did not speak about Weeck, Jannings explained he believed Pierce asked him about his work ethic relative to Super Crew.

Jannings added he only spoke to Pierce the morning of July 15, 2015 while he was seated in his truck. Asked if there was any possible way he made any form of statement similar to the allegations in this matter, Jannings elected to take a break and consult his steward. Upon return he recalled the question and said he never made any similar statements. He added Pierce had provided him a cigarette which he smoked in front of Pierce while in his work truck. Concerning his meeting on July 24, 2015, with Supervisor John Camera and direction to be off duty with pay due to an investigation, Jannings recalled the admonishment to keep the investigation confidential. The interview was concluded with an admonition to Jannings the investigation was on-going and information remained confidential with the exception of his shop steward or business agent. He said he understood.


## ADDITIONAL INVESTIGATION

Available company documentation was reviewed with regard to Jannings' assertion he fueled his truck on July 15, 2015 and was not at the Fremont Service Center that afternoon.

A review of cell phone activity for the company phone assigned to Weeck, REDACTED revealed a nine minute phone call to Jannings' phone, 650-242-7030, at 11:48 AM on July 17, 2015 at 11:48 AM. Additionally, on July 27, 2015, 3:18 PM, a 27 minute phone call was noted between Pierce and Weeck. Those calls correlated with information from Pierce and Weeck about Weeck's overtime offer conversation with Jannings, and Pierce's discussion with Weeck about Jannings' alleged threats against her.

A review of cell phone activity for the company phone assigned to Jannings, 650-242-7030, revealed 30 calls on July 15, 2015. Calls which indicated a Fremont origination occurred that afternoon at 1:30 (1 minute), 1:34 (2 minutes), 1:39 (1 minute), 2:42 (24 minutes), 3:07 (5 minutes) and 3:22 (12 minutes). A call at 3:37 PM (9 minutes) indicated a Santa Clara origination.

Locate and Mark ticket locations for Jannings on the afternoon of July 15, 2015, indicated he was from 1.5 to 3.13 miles away from the Fremont Service Center. Time frames from ticket information revealed an overlap in documentation. A review of Locate and Mark tickets and cell calls for the afternoon of July 15, 2015 for Jannings showed:

| Cell Call | Locate Time Arrived: | Locate Time Departed: | Locate Time: | Location: | Number Called |
|---|---|---|---|---|---|
| 1:30 (1 Min) | | | | Fremont | 510-516-5929 |
| 1:34 (2 Min) | | | | Fremont | 510-516-5929 |
| Locate & Mark | 1:34:00 | 2:15:26 | 2:13:00 | Grimmer @ Lopes, Fremont | |
| 1:39 (1 Min) | | | | Fremont | 916-591-0590 |
| Locate & Mark | 2:15:00 | 2:44:18 | 2:43:00 | 4046 Glenwood St. Fremont | |
| 2:42 (24 Min) | | | | Fremont | 650-622-6533 |
| Locate & Mark | 2:37:00 | 3:06:42 | 3:05:00 | 4817 Hanover PL. Fremont | |
| 3:07 (5 Min) | | | | Fremont | 951-285-0703 |
| 3:22 (12 Min) | | | | Fremont | 925-278-4374 |
| 3:37 | | | | Santa Clara | 916-591-0590 |

A review of fuel records for Spiro Jannings and vehicle B22853 showed Jannings fueled his truck on July 13, 2015, with 24.9 gallons and on July 16, 2015, with 33.3 gallons. No fuel was obtained on July 15, 2015.

There were no recorded access card swipes at the Fremont Service Center for Jannings on July 15, 2015. The Fremont Service Center is not equipped with security cameras.


BENEFIT/LOSS STATEMENT

Not applicable.


DOCUMENTS PERTINENT TO THE INVESTIGATION
- Locate & Mark Tickets for July 15, 2015
- Daily Individual Time Card for Spiro Jannings
- Cell Phone Records
- Text from Edwin Morataya


MITIGATING OR AGGRAVATING FACTORS

Jannings was cordial during his CSD interview. Jannings was previously counseled by Weeck concerning his making of disparaging remarks about her to other employees.


CONCLUSION

The Employee Code of Conduct requires employees to "Treat fellow employees and customers with respect." Additionally, employees are prohibited from acts or threats of physical violence or intimidation. Though Pierce's report of Jannings' threat toward Weeck was not submitted with the timeliness expected of a person in Pierce's position, CSD found no basis to support Jannings' assertion the report was a fabrication. To the contrary, Jannings had a history of

antagonism toward Weeck, witnesses confirmed Jannings and Pierce spoke together at about the time in question, records indicated Jannings was in Fremont the afternoon he and Pierce allegedly spoke, and no logical foundation was revealed for why Pierce should be disbelieved or would be motivated to invent an allegation of such detail and magnitude concerning Jannings. CSD therefore concluded a violation of the Employee Code of Conduct was committed by Jannings with respect to disrespectful treatment of and a threat of violence toward his supervisor.

All policies, standards, and admonitions relating to employee conduct investigations were followed during this investigation. Please advise this department of any action taken in connection with this matter. Please refer any questions to Corporate Security Investigator, James Leonard at ████████.

STEPHANIE DOUGLAS

SD/JL/df

cc:    BAnderson        TWinnie
        NStavropoulos   KLedbetter
        ATorres           RWix
        RJoga             DVeader
        JSoto             MFranklin
        SCampos        PBalistrieri
        JNeeley

INTERVIEWS CONDUCTED:

Manager, Gas Transmission & Distribution, William Pierce was interviewed on July 24, and July 28, 2015, by Leonard. Pierce explained on July 15, 2015, shortly after 7:30 AM he was in the parking lot of the Customer Service Center at 41800 Bocell after providing breakfast burritos to his crew. While in the lot, between the buildings and east of the center gate, he was contacted by Jannings who inquired about getting a super crew assignment. He recalled Jannings stating, "I've got to get out of this department." Additionally, he made a contention about Bobbi's direction regarding USA tickets.

Later during the day during the afternoon he was in the Fremont Customer Service Center yard, near the rear gate. Pierce was uncertain of the time, but estimated approximately 2:30 PM. He encountered Jannings as Jannings was driving his white company pick-up truck. Pierce spoke to Jannings as Jannings sat in the driver seat and Pierce stood at the open passenger window. Pierce said he is aware Janning's knows he is a superintendent as Jannings had inquired with him about "Super Crew" positions.

Pierce recalled he gave Jannings a cigarette which Jannings smoked in the truck, Pierce was smoking also. Jannings started to discuss his supervisor Bobbi Weeck and stated, "F-cking Bobbi, she's trying to put me on a DML." "Just wait, I'll get her." "She's going to feel my D-ck in her –ss." "She's going to feel the pressure." "She's going to feel me." Pierce described that while speaking to Jannings he appeared angry, raising his voice. He described how Jannings jabbed his index finger toward him in emphasis as he made the profane statements. Leonard read the statements back to Pierce. He confirmed the statements and explained he was confident in the quotes. He continued to speak with Jannings attempting to de-escalate him and

1  explained he needed to work through the situations to understand and meet his supervisor's

2  expectations.  He recalled Jannings contending he cleared 15 events a day.  Pierce recalled

3  speaking to Jannings about locate and mark events verses no conflict events.

4

5  Pierce explained Jannings said he was going to tell "Nick".  Pierce explained he was aware

6  Jannings contended a relationship with Nick Stavropoulos.

7

8  Pierce was questioned as to how he interpreted Janning's statement.  Pierce said the statement

9  worried him and during the afternoon of Thursday, July 16, 2015 he called Weeck.  She did not

10  answer and he opted not to leave a voice mail.   Pierce said he told his wife about the incident

11  but did not speak to anyone else in the Company.   Pierce said in hindsight he should have

12  escalated the statement immediately.  Later during a telephone conversation with Weeck on

13  Thursday, July 23, he informed her of Spiro's statement and warned her, urging her not to meet

14  with Jannings alone in the future.  Pierce said Weeck seemed disturbed when she heard of

15  Spiro's statement on the telephone.  Pierce said he contemplated and struggled with the content

16  of the statement for a day and Janning's demeanor and anger during the statement influenced

17  him not to discount the statement as figurative language.  Pierce recalled employees Chris

18  Plumber and Joe Gonzalez we seated in their car nearby doing paper work while he spoke to

19  Jannings in the afternoon.  He did not know if they noticed him speaking to Spiro.

20

21

Internal
2

PGE000157

1

2   Locate and Mark Supervisor Bobbi Weeck was interviewed by Leonard on July 24, 2015.

3   Weeck recalled she received a telephone call from Pierce but was unable to answer. She

4   explained Pierce supervises surveyors and she intended to return the call assuming its content

5   was regarding response to tickets. She ultimately spoke with Pierce on July 23, 2015, and

6   Pierce informed her of threatening statements made to him by Jannings. Weeck recalled Pierce

7   seem uncomfortable and hesitant to quote the statements and initially said they were disgusting

8   and vulgar. She pressed Pierce to explain the statements. She recalled Pierce reluctantly said

9   Jannings had stated, "That bitch is trying to put me on a DML, she's going to feel my pain, I'm

10   going to stick my d-ck in her a-s and make her feel it."

11   Weeck said Pierce told her to be careful with Jannings and suggested she have another

12   supervisor with her when she spoke with him in the course of business; he offered to

13   accompany her during any meetings.

14   Weeck explained in the past she has learned from other employees the allegation Jannings had

15   referred to her as a B-tch. She said she confronted Jannings about the comment in the past

16   months and he explained he was sorry and was venting. She explained she told him his actions

17   were not acceptable. She said she did not document the incident. She recalled the event

18   occurred early in 2015, she could not recall the specific date. Weeck said she admonished

19   Jannings that if he was going to say disrespectful things about her, he should make sure they

20   don't know her.

21   As an example she showed me a text message on her telephone from July 21, 2015, 9:42 AM,

22   from Edwin Morataya which stated, "I just met Spearow finally...What a character...This is

23   Edwin by the way...Good Luck with this one."

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 109 of 224

PGE000158

1   Additionally Weeck explained a telephone call she had with Jannings on July 17, 2015, when

2   she called to offer Janning's overtime on the weekend. She was unaware of any conversation

3   between Jannings and Pierce.  Upon his initial answering the phone and recognizing Weeck, he

4   started "screaming" at her stating he does his best on the job and stating, "You're always on my

5   ass."  She interjected explaining the overtime opportunity and explained Jannings calmed down,

6   agreeing to the job which was staffed with two other employees.

7   Weeck became emotional several times during the interview including when she explained she

8   had to confide the threatening statement to her husband for safety reasons.  Weeck explained

9   she was a witness in a recent local investigating committee regarding a performance issue with

10  Jannings.

11  Weeck later made a report to the Fremont Police Department regarding the threat made by

12  Jannings to Pierce (Fremont Police Report # 150727029 ).  Weeck explained, "I can't trust him, I

13  feel very uneasy, I don't know what he might do."

14

PGE000159

1

2  Field Person Chris Plummer was interviewed as a witness by Leonard on July 29, 2015.

3  Plumber works on the supercrew supervised by Pierce.  Plumber was questioned about any

4  observations he may have had regarding Pierce speaking to Jannings on July 15, 2015.

5  Plumber said he could not recall a specific date but did recall speaking with Jannings and

6  observing Jannings speaking to Pierce and being in proximity to Pierce in the past couple of

7  weeks.  He could not be certain if it was the morning or afternoon but recalled it was the first

8  time he had seen Jannings.  He recalled Jannings arriving in his white F-250 locate truck.

9  Plummer was in need of a "hook knife" and asked Jannings if he had an extra knife.  He recalled

10  Jannings replied, "They treat you guys like dog Sh-t around here."  Plummer described he was

11  surprised by Janning's comment, having never met him before.  He recalled Jannings was

12  sitting in his vehicle when he made the statement.  Plummer said Jannings voice was loud and

13  sounded angry and disgruntled.   He recalled the comments took place in the vicinity of the

14  yellow crosswalk in the yard, just east of the gate.  Moments later he spoke to his partner, Joe

15  Gonzalez about the comments from Jannings.  Plummer said Gonzalez explained to him he had

16  past experience with Jannings and said many people dislike Jannings due to his negativity.

17  Leonard asked Plummer if he had been coached in any way prior to the interview; he said, "No."

18

1

2

3    Field Person Joseph Gonzalez was interviewed by Leonard on July 29, 2015. Gonzalez works

4    for Pierce on the supercrew. Gonzalez was questioned about any observations of Jannings

5    speaking with Pierce on July 15, 2015. Gonzalez explained he could not recall a specific date

6    but recalled Jannings speaking to Pierce in the Fremont yard in the last 2 or 3 weeks. He knew

7    it was not the week of July 20th. He recalled the event may have been in the morning or

8    afternoon. He recalled Jannings driving into the Fremont yard in a work truck and stopping near

9    the middle of the lot. He recalled Jannings seated in his truck and Pierce speaking to him.

10    Gonzalez never overheard any conversation between Jannings and Pierce. Gonzalez recalled

11    his partner Chris Plummer telling him that Jannings made a statement, "They are treating you

12    surveyors like Sh-t." Gonzalez recalled he explained to Plummer his past observations and

13    experience with Jannings from San Mateo and Foster City assignments in 2012 and 2013 when

14    he experienced the complaining nature of Janning's comments. Gonzalez said based upon his

15    experience with Jannings, "He seems like kinda an angry guy." Gonzalez used the words

16    "upset" and "aggressive" to describe his past experience with Jannings. Gonzalez was asked if

17    he was coached by Pierce or Plummer prior to the interview; he responded, "No, not at all."

18

Internal
6

PGE000161

1

2    Apprentice Fitter Edwin Morataya was interviewed by Leonard on July 30, 2015. Morataya

3    explained he had previously worked for Weeck and is now on a supercrew. He was interviewed

4    about a text he sent to Weeck concerning Jannings. Edwin said approximately two weeks ago

5    he was on a job at Fremont Blvd and Central Ave, in Fremont when he encountered Jannings

6    on a locate and mark assignment. He had never met Jannings before. Jannings discussed

7    discipline he was involved in due Weeck's actions as his supervisor. He described to Morataya

8    Weeck's allegations of his job performance and his belief that Weeck is checking up on him. He

9    complained she was asking contractors about his departure times from jobs. He further

10    described her review of his time cards. Moratoaya recalled Jannings said, "She doesn't know

11    what she's talking about." He also recalled Janning's saying, "She's out to get me." Morataya

12    informed Jannings he had worked for Weeck and felt her expectations were easy to manage as

13    long as one does their job. He recalled Jannings being "very negative." Morataya explained he

14    believed Janning's made it very clear that he didn't like Weeck.

15

16

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 113
of 224    PG&000162

1

2

3 **SUBJECT STATEMENT:**

4

5 Locate and Mark Field Person Spiro Jannings was interviewed on July 28, 2015, by Leonard

6 and Senior Investigator Kevin Griswold. Jannings was represented by Shop Steward Eugene

7 Sanchez. Both were allowed to discuss the general aspects of the case prior to questioning and

8 took several breaks during the interview.

9

10 Jannings explained he has been with PG&E since 2013 and recalls compliance and ethics

11 training when he was hired. When asked about Employee Code of Conduct expectations

12 relative to treating others at PG&E he replied, "With the utmost respect." When he was asked

13 about any conversation with Bill Pierce on July 15, 2015, at the Fremont Service Center, he

14 explained he spoke to Pierce about supercrew opportunities in the morning. When asked if he

15 spoke to Pierce regarding his supervisor, Bobbie Weeck he said, "Just said we had a little bit of

16 a problem, that was about it, didn't elaborate on anything." He contended nothing more was

17 said about Weeck. He explained that regarding his inquiry about a position in the supercrew,

18 Pierce explained Weeck was not a team player and a transfer was not going to happen.

19

20 Jannings was asked questions about the following alleged statements:

21 When asked if he ever said, "F-cking Bobbi, she's trying to put me on a DML", Jannings said,

22 "No never said that." When asked if he ever said, "Just wait, I'll get her.", he said, "No, never

23 said that, I know better than that." When asked if he ever said, "She's going to feel my D-ck in

24 her –ss", he said, "No way, not even." When asked if he ever said, "She's going to feel the

25 pressure." he said, "Never." When asked if he ever said, "She's going to feel Me.", he said, "No,

1    never, she's my supervisor, you don't do stupid stuff like that." When asked if he ever said

2    anything similar to the alleged statements to Pierce he said, "Never said any of that stuff ever,

3    that's fabricated." He continued to explain he only spoke with pierce on the 15th in the morning;

4    he did not speak to him in the afternoon. He explained he was not at the Fremont Service

5    Center in the afternoon. He described he arrived there at approximately 7:00 AM, was in the

6    bull room, was with his truck in the lot, later fueled, worked on his tablet, conducted locates and

7    went directly home from the field.

8    The shop steward questioned the time line of events and commented training required

9    immediate action by a supervisor if such statements had been made.

10   Griswold asked Jannings if Pierce was lying; Jannings responded, "Heck yeah he is, that's

11   serious stuff, instant termination!" Leonard asked Jannings what would motivate Pierce to lie

12   about the statement. Jannings responded, "I don't know, everything has been kosher, looks like

13   he turned on me." He explained he had never been reprimanded by Pierce, he does not work

14   for him, and always responded when Pierce called him in the past while on call.

15   Leonard asked Jannings if he every explained to Pierce that he cleared 15 tags a day.

16   Jannings explained he recalled making that statement. When asked the context of his statement

17   given his assertion he did not speak about Weeck, he explained he believed Pierce asked him

18   about his work ethic relative to supercrew.

19   Jannings added he only spoke to Pierce in the morning while he was seated in his truck. When

20   asked if there was any possible way he made any form of statement similar to the allegations

21   Jannings elected to take a break and consult his steward. Upon return he recalled the question

22   and said he never made any similar statements. He added Pierce had provided him a cigarette

23   which he smoked in front of Pierce while in his work truck.

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 115 of 224

PGE000164

1    In response to questions about his meeting on July 24, 2015, with Supervisor John Camera and

2    direction to be off duty with pay due to an investigation Jannings recalled the admonishment to

3    keep the investigation confidential. The interview was concluded with an admonition to

4    Jannings the investigation was on-going and information remained confidential with the

5    exception of his shop steward or business agent. He said he understood.

6

Internal
10

PGE000165



SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

SPIRO JANNINGS,                    )    Case No.:      **17CV315033**
                                   )
        Plaintiff;                 )
                                   )
vs.                                )
                                   )
PACIFIC GAS & ELECTRIC CO., *et al*.  )    **FIRST AMENDED COMPLAINT**


# EXHIBIT "J"



**Pacific Gas and Electric Company**™

August 27, 2015

Spiro Jannings
1304 Shortridge Ave. Unit C
San Jose, CA 95116

Spiro Jannings:

Effective today Aug. 27, 2015, your employment with Pacific Gas And Electric Company is being terminated.

Your termination of employment is based on the findings of a Corporate Security Investigation into your conduct. It has been concluded that you're your actions of disrespectful treatment and threat of violence towards your supervisor is in violation of the Employee Code of Conduct. Based on the severity of your behavior, your employment has been terminated.

You will be ineligible for rehire as a regular employee or hiring hall employee, agency worker or contractor assigned to work on PG&E facilities.

All Company property including keys, ID card, gate entry card and Company tools in your possession are to be returned immediately.

Your final paycheck is enclosed. You will receive benefit information from the HR Service Center in approximately two weeks. In the meantime, you may contact the HR Service Center directly at (415) 973-2363 or at (800) 788-2363.

Sincerely,

Jeff Carroll
Superintendent

cc: Labor Relations

SPIRO JANNINGS,                          )          Case No.:        **17CV315033**
                                         )
            Plaintiff;                   )
                                         )
vs.                                      )
                                         )
PACIFIC GAS & ELECTRIC CO., *et al*.     )          **FIRST AMENDED COMPLAINT**

# EXHIBIT "K"



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23334

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Fremont

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
Positive Discipline Guidelines and any other
relevant document.

PHONE NO.(S):

EMPLOYEE NUMBER:

DISCUSSED BY:
Supervisor: Bobbie Weeck                and Steward: Eugene Sanchez          on 8-27-2015
Human Resources Dept.: Vanessa Parker          and Bus. Rep.: Lou Mennel          on 8-31-2015

GRIEVANCE ISSUE:     ☐ Continuation Sheet Attached
The grievant was terminated unjustly on or about 8-27-2015.

CORRECTION ASKED FOR:     ☐ Continuation Sheet Attached
Reinstate the grievant, make whole in all ways, including, but not limited to lost wages, benefits and overtime.

Submitted by: Lou Mennel                Under Section: 102                on 8-31-2015
Received for Co. HR Grv. Filing by: Rachel Wilson                on 9/1/2015

COMPANY ANSWER:     ☐ Continuation Sheet Attached
The Grievant was discharged as a result of disrespectful treatment and threat of violence towards his supervisor
in violation of the Employee Code of Conduct. Request respectfully denied.

For Company: Vanessa Parker                on 09/15/15

SETTLED:
Committee agreed the discipline was issued for just cause

For Union: Kit Stice                on 11/16/2016

| REFERRED TO: | | FOR OFFICE USE ONLY | |
|---|---|---|---|
| ☐ L.I.C. on _____ Meeting scheduled for _____ | | ☒ SETTLED ON | 11/16/2016 |
| ☐ Fact Finding Committee on _____ | | ☐ WITHDRAWN ON | |
| ☐ Pre-Review Committee on _____ | | Co. referred FF on | 02/23/2016 |
| ☐ Review Committee on _____ | | Union received FF ref. on | 02/23/2016 |
| ☐ Ad-Hoc Committee on _____ | | Co. referred P-RC on | |
| ☐ Arbitration on _____ | | Union received P-RC ref. on | |
| | | Co. referred RC on | |
| | | Union received RC ref. on | |
| | | Co. referred ARB on | |
| | | Union received ARB ref. on | |
| | | ARB. CASE NO.: | |

E-mail to: Company at hrgrievancefiling@pge.com
cc to: Local Union 1245 at cxcx@ibew1245.com

SPIRO JANNINGS,       )   <u>Case No.</u>:   **17CV315033**
                     )
     Plaintiff;     )
                     )
vs.                 )
                     )
PACIFIC GAS & ELECTRIC CO., *et al*.  )   **<u>FIRST AMENDED COMPLAINT</u>**

# EXHIBIT "L"

# Local Investigating Committee Report

## Subject of the Grievance

| | | | |
|---|---|---|---|
| Grievance No.: | 23334 | Department: | Gas – Locate and Mark |
| Date Grievance Filed: | August 31, 2015 | Headquarters: | Hayward |

Grievance Issue: The grievant was terminated unjustly on or about 8-27-2015.

Correction Requested: Reinstate the grievant, make whole in all ways, including, but not limited to lost wages, benefits and overtime.

Company Answer: The Grievant was discharged as a result of disrespectful treatment and threat of violence towards his supervisor in violation of the Employee Code of Conduct. Request respectfully denied.

## Exhibits:

| | |
|---|---|
| Exhibit 1 | Grievance 23334 |
| Exhibit 2 | Career History |
| Exhibit 3 | Discharge Letter   (Dated Aug. 27, 2015) |
| Exhibit 4 | Employee Performance Log |
| Exhibit 5 a-e | Code of Conduct (excerpts) |
| Exhibit 6 a-g | Corporate Security Report (Dated Aug. 6, 2015) |
| Exhibit 7 a-e | Training History |
| Exhibit 8 a-d | PRC 12913 |
| Exhibit 9 a-b | PRC 14169 |
| Exhibit 10 a-b | PRC 18746 |
| Exhibit 11 a-b | PRC 19150 |
| Exhibit 12 a-b | PRC 20560 |
| Exhibit 13 a-c | RC 14765 |
| Exhibit 14 a-q | Arbitration 241 |
| Exhibit 15 a-r | Arbitration 246 |
| Exhibit 16 a-w | Arbitration 305 |
| Exhibit 17 a-h | US Department of Labor – Workplace Violence Program |
| Exhibit 18 | PD Guidelines (excerpt) |
| Exhibit 19 a-k | Time Card / FAS Tickets – 7/15/15 |
| Exhibit 20 a-c | Phone Records |
| Exhibit 21 a-b | Character Emails |

## Investigation Procedures

A Local Investigating Committee comprised of Lou Mennel, Union Business Representative; Eugene Sanchez, Shop Steward; Jeff Carroll - Superintendent; and Vanessa Parker, Labor Relations Specialist, met on 10/15/15 and 10/16/15 at the Hayward Service Center.   The Grievant, Spiro Jannings was also present.

**Facts of the Case**

1. The Grievant, Spiro Jannings, has a recent hire date of date of Jan. 28, 2013; title: Fieldperson; headquartered in Hayward, schedule Monday through Friday 7-3:30.

2. Grievants' prior history (dates are approximate; Exhibit 2)

   a. 1996 – 2000 (regular status) worked Edenvale as T&D assistant and Fieldperson – was trained by a female on Fieldperson duties

   b. 2000 – 2013 (Hiring Hall various time periods / positions) across the region – San Carlos, Salinas, Monterey, Watsonville

   c. 2011 – 2013 (Hiring Hall – Fieldperson) Oakland and Diablo Division working for Bobbi Weeck and Katherine Mack (then Supervisor)

3. A Corporate Security investigation initiated on July 23, 2015 concerning vulgar and inappropriate comments made by the Grievant about the Grievants' female supervisor, Bobbi Weeck (Exhibit 6 a-g). The Grievant was placed on Crisis Suspension with pay beginning on July 24, 2015 pending the outcome of the investigation.

4. The investigation concluded that the Grievant made inappropriate remarks of a sexual nature about his female supervisor. As a result, the Grievant was terminated on August 27, 2015 (Exhibit 3).

5. At the time he was on an active Written Reminder in the Work Performance category.

**Testimony of Bill Pierce – Field Superintendent**

6. Bill Pierce, Field Superintendent of Supercrews has been with the Company for five years, all in management. Prior to PG&E he had 20 years in management.

7. Pierce is familiar with the Locate and Mark duties, 3 years ago he supervised locators in Mission and Peninsula Divisions. Supervisor Bobbi Weeck is his counterpart in Diablo Division.

8. Collectively Pierce and Weeck have five yards, and throughout a normal work day / month there are times they are in need of help with an employee in a yard that the other supervisor may be in. With both being from dual Damage Prevention before the split, they are familiar with each other's' jobs and responsibilities.

9. They support each other for employee requests, these may include calling out an employee for a locate, helping with a field meet or assist with a stand-by.

10. Supervisors are managed to reports and at times they would discuss employee issues. They provide each other with guidance, for example if she previously supervised someone he saw had struggles, he would ask her how she may have managed them.

11. Despite having large areas to cover each handled their own investigations. Pierce was aware Weeck had work performance concerns with the Grievant; that the Grievant was not completing 15 jobs a day (paint on the ground), that he was completing 15-19 with 50-60% being no conflict (i.e. no paint on the ground)

12. Pierce had never supervised the Grievant, did not know him on a personal level and his interaction was limited to the 212 call-out process. The first face to face interaction was at the Fremont Service Center on July 15, 2015.

13. At the time of the LIC, Pierce could not recall the time of day when the conversation concerning the vulgar comments took place. However, in the CS Report (Exhibit 6 a-g), Pierce states the conversation took place in the afternoon. The Grievant was driving through the Fremont Service Center parking lot and stopped by Pierce.

14. Pierce described their interaction from 7/15/15.

    a. Grievant remained in the vehicle; Pierce was on the passenger side

    b. Grievant reached out and shook hands with Pierce

    c. Grievant initiated conversation inquiring whether or not there was room on SuperCrew

    d. Grievant began discussing the issues he was experiencing with his supervisor, Bobbi Weeck

    e. Grievant disclosed she was giving him a bad time about the number of tickets being closed out and she's trying to put him on a DML.

    f. Grievant mentioned he was going to a BBQ with Nick Stavropoulos (VP – Gas Ops) and intended to tell Nick about Weeck's management practices.

    g. Pierce counseled the Grievant and offered the advice that as long as he was performing well he didn't have anything to worry about, and to ensure if the ask is for 15 tags a day, and he could only do 9, make sure to explain why 15 didn't get completed.

    h. Grievant brought up again the topic of Weeck trying to put him on a DML.

    i. Grievant then said, "it's about time she feels some Fuckin pressure I am tired of feeling the pain she's going to feel my dick in her ass"

15. Pierce described the Grievants' demeanor:

    a. During performance and DML discussion, the Grievant looked angry and disturbed

    b. When the sexual comments were made, the Grievant seemed mad about the situation

16. The conversation began to cease after the comments about Weeck were made and the Grievant asked for a cigarette.

17. The Grievant did not share current positive discipline status that he was on a Written Reminder.

18. Pierce acknowledged that when he heard the comments he was shocked and was trying to process what he had just heard. The car was on and no music was playing during their conversation.

19. He acknowledged he was not sure what to do with what had been said. Part of him felt he should call someone and say something while the other grappled with whether or not the Grievant was just blowing off steam.

20. He felt it was a very fine line as to the true intent behind the comments. Pierce clarified his perception of "fine line" and it meant trying to define the nature / intent of the remarks.

21. Pierce had a two hour commute home and when he arrived home that evening the conversation continued to bother him.

    a. He spoke with his wife about the conversation to get her opinion. Her only comment was, 'what if someone said this about me? What would you do?

    b. At that point, Pierce knew he needed to reach out to Weeck and made the decision to call her the following day rather than that evening.

    c. He had an 18 hour day, arrived home at approximately 8 pm and would leave the following day at 4 am.

22. July 16, 2015, Pierce contacted Weeck but did not speak with her directly, he recalled her voicemail may have mentioned she was on vacation and listed a back-up. He elected not to leave her a message.

23. It was not until July 23, 2015, that Weeck and Pierce finally connected. The conversation was business as usual and then Pierce informed her of the conversation between him and the Grievant. Pierce described their conversation:

    a. Weeck pleaded with Pierce to tell her everything

    b. Advised not to meet with the grievant one-on-one at any given time.

    c. He struggled with disclosing the details and tried to avoid telling her verbatim

    d. He eventually told her the comments

    e. Weeck became upset and admonished Pierce for not having contacted her sooner on her personal phone to discuss the incident

24. Records show that it took 8 days for the Company to be officially notified and launch an investigation. When asked once it is determined that statements have crossed the line, how soon notification should be made, Pierce responded immediately.

25. Pierce wholeheartedly acknowledged that he should have acted in a more expedient fashion after these comments were made to him. He realizes the mistakes he made by not contacting Joel Dickson or Jeff Carrol once he could not get in touch with Weeck on his first call to her.

26. Pierce provided the time line of the events:

    a. July 15, 2015 (Wednesday) – Vulgar comments made by Grievant

    b. July 16, 2015 (Thursday) – Call to Weeck – rec'd voicemail, did not leave a message

    c. July 17, 2015 (Friday) – Does not recall calling her, recollects voicemail from previous day said she'd be out of the office

    d. July 18 and July 19, 2015 (Weekend)

    e. July 20, 2015 (Monday) – Left Weeck a voicemail to call, needed to talk about something

    f. July 23, 2015 (Wednesday) – Pierce and Weeck connected on a different issue, Pierce informed Weeck of the incident

27. Pierce has received instructor led harassment training; however this was the first time in his 15 years of supervisory experience that he'd never encountered a situation such as this.

28. Pierce described his previous phone interactions with the Grievant on a 212 call-out

    a. Typical 212 call-out would take 5 – 10 minutes to gather relevant information

    b. One of the first times he spoke with the Grievant, he talked to Pierce for about 25-30 minutes.

    c. Doesn't recall exact verbiage but recalls he was unhappy with PGE supervision and wasn't thrilled to be called

    d. Total 212 call-outs approximately 3-5 times

29. Pierce unequivocally denied the accusations that lied and/or fabricated these allegations about the conversation concerning the vulgar comments made to him by the Grievant about the Grievants' direct supervisor, Bobbi Weeck. Pierce has no reason to lie and has nothing to gain by the Grievants discharge.

## Testimony Jim Leonard – Corporate Security Department

30. Jim Leonard was the Corporate Security Investigator. He has four years with the Company, 25 years with the California Highway Patrol and five years with the Pleasant Hill Police Department.

31. Leonard walked us through the process:

    a. July 23, 2015 – Contacted by Labor Relations

    b. Allegations involved very specific terms with a threatening sexual assault nature

    c. Conducted multiple interviews

32. Leonard walked us through interview details of Bill Pierce that took place on July 24, 2015:

    a. Informed two conversations occurred between Grievant and Pierce, one in the morning the other in the afternoon

    b. Pierce recalled he provided breakfast for his crews

    c. Grievant spoke to Pierce about a potential Supercrew assignment

    d. Grievant said he needed to get out of his department

    e. Later that afternoon same yard about 2:30 Pierce encountered Grievant driving company vehicle

    f. Grievant was in the driver seat

    g. Pierce recalled they were smoking, Grievant began to discuss supervisor Weeck

    .h. Pierce recalled the statements made by the Grievant, "F****** Bobbi she's trying to put me on a DML; "it's about time she feels some f***** pressure I am tired of feeling the pain she's going to feel my d*** in her a**"

    i. Pierce recounted Grievant was pointing his finger, tried to de-escalate the anger.

    j. Discussed the tags per day

    k. Pierce was asked why did he not escalate this situation more rapidly

    l. Response received was he was trying to figure out if Grievant was really trying to make a threat

33. Given the nature of the comments described, Leonard explained that this was a very serious sexual threat. Leonard confirmed with Pierce if he was sure he heard these comments correctly. He was very resolute. Had he not been, the interview would've gone down a different path.

34. Leonard reiterated that Pierce struggled with saying verbatim the sexual comments made and that Pierce was worried.

35. Leonard concluded by stating he is not a lie detector, but Pierce did not display characteristics of being untruthful during their interview. He seemed authoritative and it was as though he was recalling the actual conversation.

36. Leonard walked us through interview details of Bobbi Weeck that took place on July 24, 2015:

    a. Weeck recalled she received a call from Pierce earlier that week

    b. Intended to call back but didn't; figured it involved job tickets they were working on.

    c. When they did connect Pierce informed her of the comments.

    d. Pierce seemed uncomfortable because they were vulgar and disgusting.

    e. He reluctantly said it. "That bitch is trying to put me on a DML. . . going to stick . . ."

    f. Pierce suggested she should be careful and not be alone when interacting with the Grievant

    g. Weeck broke down and became emotional when quoting the comments

    h. Weeck informed her supervisor and husband about the incident

37. Weeck shared with Leonard previous circumstances concerning comments the Grievant had made about her to other employees that she became aware of:

    a. Grievant expressed displeasure about her management skills to Edwin Moratoya

    b. Showed her work phone with a text from Edwin saying "what a character"

    c. Weeck previously confronted Grievant for calling her a "b****" (early 2015)

    d. Weeck admonished Grievant but didn't document the incident

38. Weeck described to Leonard a phone conversation on 7/17/15 with the Grievant:

    a. Grievant answered, knew it was Weeck

    b. Weeck said Grievant began to scream saying he does his best and she's always on his ass.

    c. Weeck interjected that it was about OT

    d. He then became pleasant and anger de-escalated.

39. Leonard informed Weeck that with this type of allegation it is at her discretion if she wanted to pursue filing a formal police report with Law Enforcement.

40. Weeck did file the police report because she felt uneasy and not safe. The local police department where she resides was also contacted as a safety precaution to increase patrols near her residence.

41. Leonard walked us through interview details for Joe Gonzalez and Chris Plummer:

    a. Interviewed these individuals because Pierce recalled their presence at the Fremont Service Center on 7/15/15

    b. Both Plummer and Gonzalez work for Pierce

    c. Plummer claimed he did not know the Grievant very well

    d. Recalled speaking with the Grievant and seeing Pierce speak with the Grievant but could not confirm it occurred on 7/15/15

    e. Plummer recalled Pierce and Grievant speaking mid-way through the yard, Grievant remained in vehicle

    f.   Plummer asked for a hook knife, recalled the Grievant commented "they're treating you like dog s****"

    g.   Grievant appeared disgruntled; Plummer felt the comments were odd

    h.   Gonzales described Grievant as an angry guy

    i.   Gonzales and Plummer stated they were not coached by Pierce

42. Leonard walked us through interview details of Edwin Moratoya, on July 30, 2015:

    a.   Moratoya previously worked for Weeck

    b.   Moratoya was on a job a few weeks beforehand and met the Grievant for the first time

    c.   Grievant told Moratoya Weeck is always checking up on him

    d.   Moratoya confirmed he sent the text to Weeck about the character of the Grievant

    e.   Moratoya got the impression the Grievant disliked Weeck

43. The Grievant was interviewed by Jim Leonard and Kevin Griswold on July 30, 2015. The interview lasted about an hour with breaks. Leonard described the Grievant as polite and professional.

44. Leonard walked us through interview details of the Grievant:

    a.   Provided Grievant overview of what the interview was going to be about

    b.   Leonard asked each allegation as provided by Pierce, Grievant responded in the negative

    c.   Grievant states on 7/15/15 only spoke to Pierce in the morning and never in the afternoon

    d.   Grievant denied being in the Fremont yard in the afternoon on 7/15/15

    e.   Griswold asked if Pierce was lying about the allegations, Grievant responded yes he is lying but could not produce a reason as to why

45. Leonard pulled phone records for the Grievant and Weeck. Cell phone records provide cell sites and proximity but are not accurate to geography.

46. Weeck cell records confirm:

    a.   9 minute call to the Grievant on 7/17/15 -- which correlated with her call to the Grievant about OT

    b.   27 minute call between Pierce and Weeck --

    c.   CS reports shows date of July 27, 2015 for this call, however, Leonard believes that was a typo, call occurred on July 23, 2015

47. Grievant cell records contain the following (Exhibit 20 a-c):

    a.   7/15/15 calls originated in the Fremont area

    b.   Suggests the Grievant was in the Fremont vicinity

    c.   3:37 pm call came in shows Grievant was in the Santa Clara area

48. Leonard reviewed time cards and FAS documents for 7/15/15 (Exhibit 19 a-k), to triangulate a location of whether or not the Grievant was in the yard. The documents show that he was within a 1.5 to 3 mile driving distance of the Fremont Service Center during the afternoon.

49. Swipe card data did not show that he used his access card to open the Fremont Service Center gates on July 15, 2015. However, in Leonard's observations, employees often follow each other into the yard.

50. Leonard is not a medical doctor; as such a Fitness for duty evaluation is not his decision. Leonard's observation objective was to determine if he was able to make good decisions. The day of the interview, Leonard's assessment was that the Grievant was not suffering any mental health issues.

51. Confirming any history of violence was applicable to the investigation. Leonard did a search of a public records database and did not find any history of criminal or violent behavior.

52. The allegations that prompted this investigation do not deal with weapons. Generally Corporate Security does not pat individuals down prior to interviews; typically they look for imprinting of weapons. None was observed.

53. It is difficult to assign a percentage to the number of delayed reporting instances, typically there is a delay. In many cases it is because individuals are not sure, don't want to be wrong and/or don't want to get someone in trouble.

54. Leonard was asked to discuss the conclusion of the investigation and the reasonableness to which the Grievant made these statements:

    a. This is a serious allegation about a very violent statement, which was denied by the Grievant

    b. Look at the totality of the information, what does or does not corroborate it

    c. Reviewed with the supervisor who claims this statement was made

    d. Have to look at the fact that the company made him a supervisor and that he has to hold others accountable

    e. Weeck's statements of what Pierce told her was consistent with Pierces' statements in our interview

    f. Previous incidents displayed by the Grievant shows frustration with Weeck

    g. Text serendipitous about his behavior

    h. Speaking to the guys, who speak to the interactions of the grievant

    i. Grievant never worked for Pierce, no reason why Pierce would fabricate a story of this nature

    j. Collectively everything cannot disprove the allegations

    k. Corporate Security leadership provides case analysis on the report and did not question the conduct in this instance

## Testimony of Jeff Carroll – Superintendent

55. Jeff Carroll – Superintendent Locate and Mark – North for 10 years, with 30 years of service. Carroll has supervised Weeck since January 2014 and has never supervised the Grievant.

56. Carroll received a call from Weeck on July 23, 2015 and provided the following details:

    a. Weeck described in detail the conversation between her and Pierce

    b. He could hear her crying, voice shaking

    c. Explained she didn't know what to do

    d. Carroll began to make the notifications to launch the investigation

57. Carroll does not supervise Pierce, but interacts with Pierces' supervisor, which was Kevin Armada at the time.

58. Carroll was aware Weeck had work performance concerns with the Grievant. Prior to formal positive discipline action taken, it is discussed with Carroll.

59. Weeck did share with Carroll an incident of inappropriate language by the Grievant when it first occurred but did not have any documents related to it.

60. Carroll supported Weeck in admonishing the Grievant, but did not follow-up whether or not this was documented on the Grievants Employee Performance log.

## Testimony of Spiro Jannings – Grievant

61. Weeck respected his work-life balance 100%. Grievant resides in the San Jose area so to help alleviate a longer commute she placed him the in the Fremont area. Grievants area of responsibility was from the North side of Dixon Rd. in Fremont all the way to Central Newark (commonly referred to as the South folder).

62. Grievant did not report to the Fremont yard on a daily basis, only when time cards were due, re-stock or clean out the Company vehicle. Grievant claims his peers informed him that he had no business coming into the yard in the afternoons. As such, the only time he was in the yard in the afternoon was on Fridays around 2:45 – 3 pm when he would drop the Company truck off prior to the weekend.

63. Occasionally he attended tailboards at his headquarters (Hayward).

64. Grievant was in the yard on Monday, July 13, 2015 to get his Company vehicle, put gas in it and gather the necessary supplies needed for the week. Grievant concurs that he did speak to Pierce about moving to Supercrews, but that the conversation occurred on July 13, 2015, not July 15, 2015 and it was on the Grievant's way out of the Fremont yard.

65. Grievant provided his recollection of their conversation:

    a. Recalls talking to Pierce through the window of the truck

    b. Did get a cigarette from him

    c. Grievant offered locating help to Pierce

    d. Wanted to try out Supercrew; needed a break from what he was currently doing

    e. Pierce informed Grievant moving to Supercrew wasn't going to happen because of operational need in the Grievants' current department

    f. Does not recall others around

    g. Recalls informing Pierce he was on active PD

    h. Pierce responded to work through it, they (PD) go away

66. The Grievant wanted a break from his current position / duties and try something new. He did not like the predicament that he was currently in and felt that it would be easier to get work done.

67. Grievant contends that in his Locate and Mark Journal, for July 13, 2015 he was in Fremont getting paint and spoke to Pierce. His location for July 15, 2015 according to his journal was that he never went to the Fremont yard because he was on a big job. At the time of the LIC, the Grievant could not recall the name of the job, location and/or the contractor.

68. The Grievant agrees that on July 15, 2015 he was in the Fremont area working tags and that in the evening time he received a 212 call-out to a GC job on Automall Parkway and Christy Street.

69. On Thursday, July 16, 2015 the Grievant traveled to his headquarters (Hayward) to share his learning from the issue he encountered the night before on the 212 call-out.

70. The Grievant stated that he has never had any disrespectful words to say about Weeck to other employees, much less calling her a b****. Further, that he did not have an issue with her management skills. The Grievant was disappointed with how things were going and that he was going to wind up on a DML.

71. Grievant stated that he did not know Nick Stavropoulos, President Gas Operations on a personal level and was not going to a BBQ that upcoming weekend where he would have the opportunity to talk with Nick about Weeck. Grievant did not know why Pierce said what he said about the BBQ

72. Grievant has never reported to Pierce, but agrees that Pierce when needed would contact the Grievant for 212 call-outs.

73. Grievant does recall the conversation between him and Pierce several months earlier when contacted for a 212 assignment; and that the conversation consisted of the Grievant wanting to move to Supercrews.

74. The Grievant responded to the interview of Chris Plummer in the Corporate Security Report:
    a. Grievant does not know Plummer
    b. Does not recall Plummer asking for a hook knife
    c. Never worked with Plummer on a job

75. The Grievant stated that Chris Plummer was not truthful in his interview with Jim Leonard.

76. The Grievant responded to the interview of Joe Gonzalez in the Corporate Security Report:
    a. Grievant does not recall working with Joe Gonzalez in 2012/2013 in San Mateo / Foster City area.
    b. Grievant stated he was in Cupertino and moved to San Carlos in 2013.
    c. (Exhibit 2 shows Jan. 2013)

77. The Grievant was asked whether or not it was likely he could have worked with Joe Gonzalez because he was in the San Carlos area in 2013, Grievant's response was he did not recall.

78. The Grievant stated that Joe Gonzalez was not being truthful in his interview with Jim Leonard. However, could not provide any reason as to why Gonzalez would lie.

79. The Grievant recalls speaking with Edwin Morataya only one time, but was unable to recall when the conversation took place.

80. Grievant provided his recollection of their conversation while at a job site:
    a. Nature of the conversation was discussing hooking up service
    b. Moratoya asked the Grievant if he had the South folder
    c. Moratoya asked the Grievant if things have been busy and things can be trying at times (in the South Folder)

    d.   Grievant concured with this statement about the South Folder

    e.   Grievant informed Moratoya that he would be moving on to do something else.

    f.   Grievant did not discuss Weeck's allegations of work performance issues

    g.   Grievant did not discuss Weeck as a supervisor in general.

    h.   Grievant did not discuss any positive discipline issues and/or disclose he was on a level of discipline at the time.

    i.   Grievant did not comment that she (Weeck) was out to get him

81. In the Corporate Security report during the Moratoya interview, he states that the Grievant shared with him he was on an active level of discipline during this one time conversation.

82. During the LIC, the Grievant was unable to explain how or why Moratoya was aware of such a fact.

83. The Grievant was unsure whether or not Weeck was out to get him, but felt that Weeck was making it difficult for him to perform his work. He was unaware as to why she was making things difficult considering he had not had any dig-ins.

84. The Grievant provided his recollection of the July 17, 2015 conversation and stated that this is an example of Weeck was making it difficult for him to perform his job;

    a.   Weeck called and questioned the Grievant why he left a jobsite he was scheduled to be at all-day.

    b.   Grievant informed Weeck he received a call from ARB and he had to leave for 45 min.

    c.   Weeck responded and gave him additional help

    d.   Grievant denies telling Weeck she was always on his a**

    e.   Grievant contends he told Weeck she's on top of me all the time and I was trying to deal with the situation at hand

    f.   Grievant concurs that Weeck did ask him to work OT, but at the end of their conversation

85. Grievant acknowledges that his voice was raised during this conversation because he was aggravated. But that this was the first time he had ever raised his voice to Weeck. He also concedes that a raised voice when talking to a supervisor is inappropriate.

86. Another example of Weeck making it difficult for the Grievant to perform his work was that she would call to see what he was doing and confirm he was taking and uploading pictures. The Grievant never asked his co-workers if Weeck called them as much as he claims she called him.

87. Weeck's office was in Concord so their interactions were primarily by phone and email. The Grievant did not initially take the increase in calls personal. However, two weeks after he filed a grievance concerning upgrades he felt he was on a fine line and was subsequently issued PD for sloppy time cards.

88. The upgrade grievance was filed on March 27, 2015; Grievant was issued a Written Reminder in the Work Performance category on May 6, 2015. The LIC convened on July 10, 2015 to hear the facts of the Written Reminder. Weeck was the LIC Committee member for the Company.

89. Grievant was not upset at the issuance of the Written Reminder just disappointed because he worked for many years and now all of a sudden he began to have a problem. The Grievant enjoyed working for the Company and did his best to pay attention and not blow through jobs.

90. After the issuance of the Written the Grievant did not resent Weeck, but felt he needed to move on.

91. The Grievant has no idea why Pierce turned on him or why he would do this, but characterized his story of these comments as a fabrication. The Grievant has no relationship with Pierce other than the limited conversations during 212 call-outs and has no idea what Pierce would gain.

92. The Grievant does not know Plummer or Gonzalez and that their story is also fabricated.

93. The Grievant theorizes that he has been set-up, but doesn't know by whom, but that it's interesting as to the chain of events.

**Statement and Referral**
Union Position

This alleged conversation was not reported to anyone at PGE for 8 days. The supervisor with 20 years' experience surely would have taken such action sooner if he felt this were a credible threat.

The Grievant never made the alleged remarks. He was not in the yard that afternoon, even the company records show him no closer than 1.5 miles to the yard that afternoon. There were no witnesses that place him in the yard on that afternoon.

The problems began for the Grievant soon after he filed a grievance on March 27, 2015 to be paid at appropriate rate when performing duties in higher classification.

The Union asks that the Grievant be returned to work immediately and made whole in all ways.

Company Position

The statements this employee made are reprehensible and a threat directed towards his supervisor. Although the employee denies making any such remarks, through the investigation, statements to the contrary have been documented.

In the witness statement of Edwin Moratoya, he indicates that the Grievant told him he was on an active Written Reminder. The Grievant denies making any such statement to the witness (#82). However, how does an employee who is not in the same work group and never met the Grievant prior aware of discipline issued, if not made by the Grievant himself.

During the interview conducted by Corporate Security, the Grievant states that he spoke to Bill Pierce the morning of July 15, 2015 at the Fremont Service Center, while seated in his truck. However, during the LIC, the Grievant changed his version of the events, stating that he spoke to Bill Pierce on July 13, 2015, two days prior (#64).

The investigation established that this employee on more than one occasion spoke negative about his immediate supervisor to various individuals. There is no basis to support that these comments were a fabrication concocted by Supervisor Weeck or Supervisor Pierce.

It is unfortunate that Supervisor Pierce did not act more expeditiously when the comments were made and he fully acknowledged that he failed to act quickly, both during the investigation and the LIC. As testified by Jim Leonard, in his experience there is often a delay in reporting because the individual may not be sure (#53). However, this does not excuse the behavior of the Grievant. Arbitration case #305 cited that "whether a specific statement is truly a threat depends on the context in which the statement was made, the way the words are used and the overall circumstances existing at the time the words are used." Further, PRC 14169 stated that threatening a supervisor could be a dischargeable offense.

Due to the nature of the disrespectful conduct and threat instigating sexual assault toward his female supervisor, discharge is appropriate.

The Committee could not reach agreement. This case is referred to Fact Finding.

_____ (concur/dissent)    _____
**Lou Mennel**                                **Date**
For the Union

_____ (concur/dissent)    _____
**Eugene Sanchez**                            **Date**
For the Union

_____ (concur/dissent)    _____
**Vanessa Parker**                            **Date**
For the Company

_____ (concur/dissent)    _____
**Jeff Carroll**                              **Date**
For the Company

The Committee could not reach agreement.  This case is referred to Fact Finding.

_____     (concur/dissent)      _____
Lou Mennel                                                              Date
For the Union

_____     (concur/dissent)      _____
Eugene Sanchez                                                          Date
For the Union

_____     (concur/dissent)      _____
Vanessa Parker                                                          Date
For the Company

_____     (concur/dissent)      2/9/16
Jeff Carroll                                                            Date
For the Company



Local Investigating Committee Grievance #23334
Joint Statement of Facts - Page 1

The Committee could not reach agreement.  This case is referred to Fact Finding.

_____ (concur/dissent)          2-22-16
Lou Mennel                                          _____
For the Union                                            Date

_____ (concur/dissent)          2/18/16
Eugene Sanchez                                      _____
                                                         Date
For the Union

_____ (concur/dissent)          2/22/16
Vanessa Parker                                      _____
For the Company                                          Date

_____ (concur/dissent)          _____
Jeff Carroll                                             Date
For the Company



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23334

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Fremont

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
Positive Discipline Guidelines and any other relevant document.

PHONE NO.(S):

EMPLOYEE NUMBER:

DISCUSSED BY:
Supervisor: Bobbie Weeck  and Steward: Eugene Sanchez  on 8-27-2015
Human Resources Dept.: Vanessa Parker  and Bus. Rep.: Lou Mennel  on 8-31-2015

GRIEVANCE ISSUE: ☐ Continuation Sheet Attached
The grievant was terminated unjustly on or about 8-27-2015.

CORRECTION ASKED FOR: ☐ Continuation Sheet Attached
Reinstate the grievant, make whole in all ways, including, but not limited to lost wages, benefits and overtime.

Submitted by: Lou Mennel  Under Section: 102  on 8-31-2015
Received for Co. HR Grv. Filing by: Rachel Wilson  on 9/1/2015

COMPANY ANSWER: ☐ Continuation Sheet Attached
The Grievant was discharged as a result of disrespectful treatment and threat of violence towards his supervisor in violation of the Employee Code of Conduct. Request respectfully denied.

For Company: Vanessa Parker  on 9/15/15

SETTLED:

For Union: _____  on _____

REFERRED TO:
☐ L.I.C. on  Meeting scheduled for _____
☐ Fact Finding Committee on _____
☐ Pre-Review Committee on _____
☐ Review Committee on _____
☐ Ad-Hoc Committee on _____
☐ Arbitration on _____

FOR OFFICE USE ONLY
☐ SETTLED ON _____
☐ WITHDRAWN ON _____
Co. referred FF on _____
Union received FF ref. on _____
Co. referred P-RC on _____
Union received P-RC ref. on _____
Co. referred RC on _____
Union received RC ref. on _____
Co. referred ARB on _____
Union received ARB ref. on _____
ARB. CASE NO.: _____

E-mail to: Company at hrgrievancefiling@pge.com
cc to: Local Union 1245 at cxcx@ibew1245.com

Exhibit 1

Grievance #23334

## Career History – Spiro Jannings

Pers.No. 49709 Spiro G Jannings

| PA | 2000 Utility | EEGrp | 3 | Hourly | CoCd | PGE1 | Withdrawn |
| PSubarea | 8010 IBEW T200 | ESgrp | 01 | Regular | | | Integration: default posi... |
| Start | 08/28/2015 | to | 12/31/9999 | Chng | 08/25/2015 | WF-BATCH |

### 0041 Date Specifications

| Date type | Date | Date type | Date |
|-----------|------|-----------|------|
| 01 Original Hire | 01/02/1997 | 02 Most Recent Hire | 01/28/2013 |
| 04 Last Day Worked | 08/27/2015 | 08 Adj Service | 01/28/2013 |
| 13 Ret Med Cred Svc | 01/28/2013 | 14 401K Adj. Service | 01/28/2013 |
| 22 Vac Accr Seniority | 01/01/2013 | 23 Pens Cred Svc | 01/28/2013 |

Personnel area : 2000 Utility
Company : PGE1 Pacific Gas & Electric Co
00049709 Spiro G Jannings
Department : 50271879 Locate & Mark Diablo-Miss
Employee group : 3 Hourly
Employee Subgroup : 01 Regular

| Start Date | End Date | CoCd | PA | Org.unit | Org.Unit Short Text | Job key | Job Title | Position | Position (Short Text) |
|------------|----------|------|----|----------|---------------------|---------|-----------|----------|----------------------|
| 08/28/2015 | 10/14/2015 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 99999999 | Integration: default posi |
| 01/28/2015 | 08/27/2015 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 50029309 | Fieldperson |
| 07/28/2014 | 01/27/2015 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 50029309 | Fieldperson |
| 06/16/2014 | 07/27/2014 | PGE1 | 2000 | 50271879 | Locate & Mark Diablo-Miss | 50010161 | Fieldperson | 50029309 | Fieldperson |
| 01/28/2014 | 06/15/2014 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 01/08/2014 | 01/27/2014 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 07/28/2013 | 01/07/2014 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 02/11/2013 | 07/27/2013 | PGE1 | 2000 | 50012194 | M&C Gas Damage Prevention | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 01/28/2013 | 02/10/2013 | PGE1 | 2000 | 50012193 | M&C - Gas Constr - San Ca | 50010161 | Fieldperson | 51480014 | Fieldperson |
| 01/27/2013 | 01/27/2013 | PGE1 | 2000 | 50382328 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 01/26/2013 | 01/26/2013 | PGE1 | 2000 | 50382328 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 08/27/2012 | 01/25/2013 | PGE1 | 2000 | 50382328 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 50481802 | HH Fieldperson - Exper |
| 08/15/2012 | 08/26/2012 | PGE1 | 2000 | 50012240 | M&C - GC Gas Constr - Oak | 50010081 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 12/12/2011 | 08/14/2012 | PGE1 | 2000 | 50012240 | M&C - GC Gas Constr - Oak | 50010081 | Hiring Hall Fieldperson - | 50403977 | HH Fieldperson - Exp |
| 09/21/2011 | 12/11/2011 | PGE1 | 2000 | 50012238 | M&C - GC Gas Constr - Dia | 50010081 | Hiring Hall Fieldperson - | 50403977 | HH Fieldperson - Exp |
| 09/02/2011 | 09/20/2011 | PGE1 | 2000 | 50012194 | M&C - M&L/Leak Survey - C | 50010081 | Hiring Hall Fieldperson - | 50403977 | HH Fieldperson - Exp |
| 09/19/2009 | 09/01/2011 | PGE1 | 2000 | 50012194 | M&C - M&L/Leak Survey - P | 50070869 | Hiring Hall Fieldperson - | 99999999 | Integration: default posi |
| 10/08/2007 | 09/18/2009 | PGE1 | 2000 | 50012194 | M&C Area 1 Gas Constr - C | 50070869 | Hiring Hall Fieldperson | 50198861 | Hiring Hall Fieldperson |
| 09/30/2007 | 10/07/2007 | PGE1 | 2000 | 00000000 | | 00000000 | | 99999999 | Integration: default posi |

Exhibit ___2___


**Pacific Gas and Electric Company**™

August 27, 2015

Spiro Jannings
1304 Shortridge Ave. Unit C
San Jose, CA 95116

Spiro Jannings:

Effective today Aug. 27, 2015, your employment with Pacific Gas And Electric Company is being terminated.

Your termination of employment is based on the findings of a Corporate Security Investigation into your conduct. It has been concluded that you're your actions of disrespectful treatment and threat of violence towards your supervisor is in violation of the Employee Code of Conduct. Based on the severity of your behavior, your employment has been terminated.

You will be ineligible for rehire as a regular employee or hiring hall employee, agency worker or contractor assigned to work on PG&E facilities.

All Company property including keys, ID card, gate entry card and Company tools in your possession are to be returned immediately.

Your final paycheck is enclosed. You will receive benefit information from the HR Service Center in approximately two weeks. In the meantime, you may contact the HR Service Center directly at (415) 973-2363 or at (800) 788-2363.

Sincerely,

Jeff Carroll
Superintendent

cc: Labor Relations

Exhibit ___3___

# EMPLOYEE PERFORMANCE RECORD

EMPLOYEE'S NAME: SPIRO JANNINGS

*Instructions:* After every employee contact, write the date, the supervisor's name, the performance category, the action taken and a summary of the discussion that took place. When you determine that the problem has been solved or is deactivated, advise the employee and enter the date deactivated or resolved.

|  PERFORMANCE CATEGORY | ACTION |
|---|---|
| Work Performance | Positive Contact |
| Conduct | Coaching/Counseling |
| Attendance | Oral |
|  | Written |
|  | DML |
|  | Termination |

| DATE SUPERVISOR | CATEGORY ACTION | SUMMARY OF DISCUSSION | DATE DEACTIVATED/ RESOLVED |
|---|---|---|---|
| 4/15/14 FXMU | Work performance c/c | Moving ticket out of Assigned folder w/o permission. Previously discussed & Tailboarded | Deactivated |
| 9/16/2014 B.WEECK | SAFETY DRIVING c/c | Sept 16, 2014 spoke with Spiro Jannings regarding talking on a cell phone while driving a co. vehicle. Spiro said he didn't recall talking on the phone, but could not say he wasn't on the phone while driving. He said he was never given a hands free device. Explained if he gets another complaint (driver check) there will be more severe action that will be taken. | Deactivated |
| 4/21/15 | Driving cc | Spoke with spiro regarding a driver check. Spiro just received a ticket violation for running a red light. Needs to follow rules | |
| 5/6/15 B. Weeck | Work performance Written | Not showing up at standby's at the scheduled start times. Incorrectly filled out his timecard. Timecards do not match stand-by times. | |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Exhibit 4

Page 144

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 144 of 224

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | <u>Case No.:</u> | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "M"

# Grievance Tracking System

Home         FeedBack         PaGE ONE         WWWHR         Help
My Grievances  |  Create A Grievance  |  Create A Grievance For More Than 1 Person  |  Find A Grievance  |
Reports  |  Admin

# Grievance Number: 23334

**Status: Closed**

| | | | |
|---|---|---|---|
| Grievant: | Jannings | Incident Date: | 8/27/2015 |
| Union: | IBEW - Physical | File Date: | 8/31/2015 |
| Job Description: | Fieldperson | Settle Date: | 11/16/2016 |
| Location: | Hayward Service Center | Outcome: | Company Favor |
| Labor Agreement Department: | T200 Gas Transmission and Distribution | Reference Number: | |
| Org Unit: | Gas Operations | Area: | 2 |
| HR Contact: | Vanessa Parker | | |
| Business Representative: | Mennel, Lou | | |
| Contract Title: | Management of Company | | |
| Type: | Discharge | | |
| SubType: | Work Performance | | |
| Discipline: | Discharge | | |
| Final Discipline: | Discharge | | |
| Issue: | The grievant was terminated unjustly on or about 8-27-2015. | | |
| Asked For: | Reinstate the grievant, make whole in all ways, including, but not limited to lost wages, benefits and overtime. | | |

Back to Top

# Step Information

| Step Name | Step Date | Step Result | Result Date | Days In Step | Total Days |
|---|---|---|---|---|---|
| Filed | 8/31/2015 | FF | 2/22/2016 | 175 | 175 |
| Details: Referred to FF | | | | | |
| Fact Finding | 2/22/2016 | P-RC | 3/17/2016 | 24 | 199 |

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 146
of 224

| | | | | | |
|---|---|---|---|---|---|
| **Details:** Referred to P-RC | | | | | |
| **Pre Review Committee** | 3/17/2016 | RC | 6/22/2016 | 97 | 296 |
| **Details:** Referred to RC. | | | | | |
| **Review Committee** | 6/23/2016 | Closed | 11/16/2016 | 146 | 442 |
| **Details:** This is not the first case that has come before the Review Committee involving threats made to a Supervisor. Pre-Review Committee Decision Nos. 18746, 12913, 12884, 12694, and 20560 also support discharge. The Committee agreed the discipline was issued for just cause. This case is closed without adjustment. | | | | | |

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 147
of 224

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| SPIRO JANNINGS, | ) | <u>Case No.:</u>   **17CV315033** |
| | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **<u>FIRST AMENDED COMPLAINT</u>** |

# EXHIBIT "N"

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD

SAN JOSE OFFICE OF APPEALS

ROBERT LOFGREN, ADMINISTRATIVE LAW JUDGE

SPIRO GEORGE JANNINGS,          )
                                )
      Claimant-Appellant        )  NO. 5640330
                                )
  and                           )
                                )
  PG&E,                         )
                                )
      Employer.                 )
_____)


REPORTER'S TRANSCRIPT OF AUDIO PROCEEDINGS

February 23, 2016


APPEARANCES:

For the Claimant:  SPIRO GEORGE JANNINGS, In Pro Per

For the Employer:  MS. TURNER

                   JEFF CARROLL

```
 1

 2   TRANSCRIBED BY:

 3                    PATRICIA L. DAVIS, RPR
                      Certified Shorthand Reporter No. 11521
 4                    37333 Jerome Ln
                      Murrieta CA  92562
 5                    (831) 998-4275

 6

 7                         -o0o-

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          I N D E X   O F   E X A M I N A T I O N S

 2

 3   WITNESS

 4   JEFF CARROL                                    Page:

 5        By The Court                              11

 6        By Ms. Turner                             31

 7

 8   SPIRO GEORGE JANNINGS

 9        By The Court                              17

10        By Ms. Turner                             23

11

12                          -o0o-

13

14

15          I N D E X   O F   E X H I B I T S

16

17   Exhibits:                                      Page:

18     1-17         Admitted (not attached)         11

19      18          Admitted (not attached)         14

20

21                          -o0o-

22

23

24

25
```

```
 1   SAN JOSE, CALIFORNIA                    FEBRUARY 23, 2016

 2

 3                          PROCEEDINGS

 4             THE COURT:  We're on the record in Case

 5   No. 5640330.  Today's appeal hearing is being conducted

 6   in the San Jose hearing facility of the California

 7   Unemployment Insurance Appeals Board.

 8             The hearing is being conducted on Tuesday,

 9   February 23, 2016.  It's currently 1:53 p.m., and the

10   matter is being heard before Administrative Law Judge

11   Robert Lofgren.

12             Appearing this afternoon is the claimant Spiro

13   George Jannings.  Appearing on behalf the respondent

14   employer PG&E are its witness Jeff Carroll and the

15   employer's representative (inaudible) Turner.  Before I

16   turned on the recorder, I confirmed the addresses of

17   both parties.

18             Are there any additional witnesses this

19   afternoon?

20             MS. TURNER:  No.

21             THE COURT:  And, Mr. Jannings, is it correct

22   you don't have a representative for the hearing?

23             MR. JANNINGS:  No, I don't.

24             THE COURT:  All right.  You've appealed the

25   Notice of Determination and Ruling which issued on
```

October 5, 2015.  In the decision, the EDD determined
that you were discharged for reasons of misconduct
connected with your most recent work as a result of
threatening a coworker.

The department accordingly determined that you
were disqualified for benefits under Section 1256 of the
Unemployment Insurance Code beginning August 23, 2015.
The employer's reserve account was relieved of benefit
charges under Sections 1030 and 1032 of the Unemployment
Insurance Code.

The issue to be resolved is whether
Mr. Jannings was discharged for reasons of misconduct
connected with his most recent work or whether he
voluntarily quit his most recent work without good cause
and whether the employer's reserve account should be
relieved of benefit charges.

The additional issues this afternoon are under
Section 5067, Title 22, California Code of Regulations,
and that is whether or not that Mr. Jannings had good
cause for his failure to appear at a previously
scheduled hearing on October 18, 2015.

The additional issue under Section 5005 of
Title 22, California Code of Regulations, is whether
Mr. Jannings had good cause for his late application to
reopen the dismissed appeal.  In order for the

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 153
of 224

application to reopen the dismissed appeal to be timely it was to be submitted on or before November 8, 2015. However, the application was not submitted until more than one month later on December 11, 2015.

The issue of the failure to appear and the late application are jurisdictional issues. If it's determined that good cause does not exist for either the failure to appear or the late application, I will (inaudible) jurisdiction to alter or amend the previously issued department determination.

In a moment I'm going to swear in both witnesses and then proceed to take the testimony initially of Mr. Carroll as the EDD determined that the employer was the (inaudible) party to the separation from employment.

And, Mr. Carroll, when I get through asking questions of you, if you have any -- strike that.

When I get through asking questions, if your representative has any additional questions, I'll afford her the opportunity to ask you those questions before giving Mr. Jannings the opportunity to ask you questions.

And when all the testimony and questioning of Mr. Carroll is concluded, I'll then ask questions of you, Mr. Jannings. And when I'm through asking

questions, if you think there's something else which is
important that I haven't inquired about, I'll give you
the opportunity to provide that additional information.
And when you're through testifying, Ms. Turner will have
the opportunity to ask you questions.

     And when all the testimony is finished, I will
give both Ms. Turner and Mr. Jannings the opportunity to
make a brief closing statement.  I'll then take the
matter under submission and I'll be issuing a written
decision to both parties soon after the hearing.

     All right.  Do both parties understand how the
hearing is going to be conducted this afternoon?

          MR. JANNINGS:  Yes.

          MR. CARROLL:  Yes.

          THE COURT:  And before I take the testimony,
I'm going to first identify for the record the exhibits
in the claim file.  When I'm through doing that, I'm
going to propose that these various exhibits be admitted
into evidence so that I can consider them in addition to
the other evidence received in the course of this
afternoon's hearing.

     The first exhibit is a series of six pages of
internal user documents submitted by the EDD.  The
second exhibit is a two-page series of claim notes.  The
third exhibit is a two-page claim information document.

7

1           The fourth exhibit is the employee's 13-page
2    response to Notice of Unemployment Insurance Claim
3    Filed.  The next Exhibit 5 is a three-page record of
4    claim status interview for misconduct.  The sixth
5    exhibit is the two-page Notice of Determination and
6    Ruling mailed to the employer's agent.
7           The seventh exhibit is the two-page Notice of
8    Determination and Ruling which Mr. Jannings has
9    appealed.  The eighth exhibit is the envelope used to
10   transmit the timely appeal.  Exhibit 9 is the appeal.
11   Exhibit 10 is the appeal transmittal.
12          Exhibit 11 is the two-page Notice of Hearing
13   for the hearing scheduled November 18, 2015 before
14   Judge Miner.  Exhibit 12 is the two-page dismissing the
15   appeal for nonappearance.  Exhibit 13 is an envelope
16   submitted -- excuse me, continuing the application to --
17   strike that.  Exhibit 13 is a letter used to transmit a
18   subsequent appeal, which was construed to be the request
19   to reopen the dismissed appeal.
20          Exhibit 15 is the internal office of appeal
21   document regarding the reopening issue.  Exhibit 16 is
22   the acknowledgment of the request to reopen the
23   dismissed appeal.  Exhibit 17 is a three-page notice of
24   this afternoon's hearing.
25          And is it correct that before the hearing, both

```
 1   parties had a brief opportunity to review the 17

 2   exhibits?

 3            UNIDENTIFIED SPEAKER:  Yes.

 4            MS. TURNER:  Judge, I do have a question about

 5   those -- that 13 that you were looking at.  I do see

 6   that there were two appeal letters in that file.

 7            THE COURT:  This is a -- Exhibit 14 is an

 8   appeal document, but that was what was used by the

 9   Office of Appeal to determine that Mr. Jannings wished

10   to file an application to reopen the dismissed appeal.

11            MS. TURNER:  Well, I'm -- from when I looked at

12   that, it looks to me like -- I'm not sure.  I just want

13   to get the dates right on these, if you don't mind.

14            THE COURT:  It was received in the Office of

15   Appeal on December 11th.

16            MS. TURNER:  On December 11th?  But it appears

17   to me from the envelope it was mailed in September.

18            THE COURT:  That was the transmittal envelope

19   on the appeal which was transmitted in September.  That

20   was the initial appeal of the adverse determination.

21            MS. TURNER:  Okay.  And then the second --

22            THE COURT:  The actual date was -- it doesn't

23   have a cancellation date on it.

24            MS. TURNER:  I see the stamp at the bottom,

25   there's that 9/24, those numbers.
```

```
  1              THE COURT:  Yeah, I don't believe that's a --
  2              MS. TURNER:  That's identical to the other
  3   envelope.
  4              THE COURT:  I'm sorry.
  5              MS. TURNER:  That is identical to the other
  6   envelope.
  7              So just for my clarification, I know there are
  8   two letters of appeal and there are two envelopes.  But
  9   I think that one envelope probably goes with one letter
 10   of appeal that's dated 9/19, and I think the other
 11   envelope, the other is dated nine something.
 12              THE COURT:  It's not dated.
 13              MS. TURNER:  Oh, the other one is not dated?
 14              THE COURT:  The initial appeal is dated
 15   September 19, 2015, which in and of itself is somewhat
 16   interesting because the determination didn't issue until
 17   October 5.
 18              MS. TURNER:  Right.  I'm totally confused with
 19   these dates.  The second appeal, I don't know about why
 20   that -- when I look at the two envelopes, those stamps
 21   at the bottom, it looks like those are dates stamps at
 22   the bottom, and they both look like September 9 -- do
 23   you see the numbers at the bottom of the envelope?
 24              THE COURT:  I see that, but I also see a
 25   handwritten note (inaudible) by the presiding judge at
```

1   the bottom indicating received 12/11/15.

2          MS. TURNER:  I do see that handwritten note

3   there.  Thank you.

4          THE COURT:  Is there any objection by the

5   employer to admit the documents into the record?

6          MS. TURNER:  No.  Thank you.

7          THE COURT:  Without objection, Exhibits 1 to 17

8   are admitted into the record in Case 5640330.

9          (Exhibits 1-17 admitted into evidence.)

10          THE COURT:  Will both witnesses please raise

11   your right hand.

12          Do you swear or affirm under penalty of perjury

13   the testimony you'll give this afternoon will be the

14   truth, the whole truth, and nothing but the truth?

15          MR. CARROLL:  Yes.

16          MR. JANNINGS:  Yes.

17          THE COURT:  Both witnesses have affirmed the

18   oath.

19                         JEFF CARROLL,

20   having been first duly sworn by the Administrative Law

21   Judge testified as follows:

22

23                  EXAMINATION BY THE COURT

24     Q.   And, Mr. Carroll, what's your position at PG&E?

25     A.   Superintendent (inaudible).

1      Q.   And was Mr. Jannings employed in that

2   department?

3      A.   Yes.

4      Q.   And how long was he employed there?

5      A.   There were multiple hires.  The most recent was

6   since January 28, 2013.

7      Q.   And why were there multiple hire dates?

8      A.   He had held various positions prior to that and

9   left for various reasons --

10     Q.   Um-hum.

11     A.   -- over a number of years.

12     Q.   All right.  And was he continuously employed

13  from January 26, 2013 until his discharge?

14     A.   January 28, 2013, yes, continuously.

15     Q.   And when was his last day of work?

16     A.   Last day worked was August 27, 2015.

17     Q.   And was he employed on a full-time basis?

18     A.   Yes.

19     Q.   And what was his rate of pay?

20     A.   I've got that in here.

21     Q.   (Inaudible) represented by the employer that

22  the rate of pay is (inaudible) per hour; is that

23  correct?

24     A.   That's correct.

25     Q.   And what was -- let me confirm, is it correct

1  Mr. Jannings was discharged?

2     A.   Yes.

3     Q.   And who discharged him?

4     A.   I did.

5     Q.   And what date?

6     A.   August 27th.

7     Q.   Does that coincide with his last day of work?

8     A.   Yes.

9     Q.   And how did you let him know he was being

10 discharged?

11    A.   We brought him into the office, and I shared

12 the discharge letter with him.

13    Q.   And what was the reason provided to him for his

14 discharge?

15    A.   As stated in the letter, Termination of

16 employment is based on the findings of the corporate

17 security investigation into your conduct.  It concludes

18 your actions of disrespectful treatment and threat of

19 violence towards your supervisor is in violation of our

20 employee code of conduct.

21    Q.   Do you have the letter?

22    A.   I do.

23    Q.   Was the letter transmitted to Mr. Jannings?

24         MS. TURNER:  Oh, no, not this letter, I

25 believe.

1         MR. JANNINGS:  Oh, no.  Mr. Carroll gave that
2    to me the day of terminating me.  I have a copy of it.
3         THE COURT:  Do you have any objection to it
4    being admitted into the record?
5         MR. JANNINGS:  No, I have no objection.
6         THE COURT:  All right.  It will be entered as
7    Exhibit 18.
8         (Exhibit 18 admitted into evidence.)
9    BY THE COURT:
10   Q.   Who was the supervisor that was allegedly
11   threatened by Mr. Jannings?
12   A.   Her name is Bobbie Weeck, W-E-E-C-K.
13   Q.   And is Bobbie Weeck still employed there?
14   A.   She is.
15   Q.   And why isn't she here today?
16   A.   Because the nature of the statements were
17   troubling to her, and she works for me and so I stepped
18   in in this situation to handle the termination so that
19   she would not have to face Mr. Jannings.
20   Q.   What was it that Mr. Jannings allegedly did
21   which constituted the threat?
22   A.   There were statements made to a separate
23   supervisor that does not work for me regarding Bobbie
24   Weeck, his supervisor.  And those statements were
25   recorded by the other supervisor and provided to Bobbie

Weeck and subsequently came out in the corporate
security investigation, a rather crude -- I'm not real
comfortable stating them.  I can provide you the
documents to read them, if you'd like.

        Q.   Mr. Jannings has an opportunity and a right to
be aware of any allegations raised against him by any
person.

        A.   Understood.

        Q.   So I'm not going to redact the names.

        A.   It's not names I'm concerned about.  It's the
nature of the words that are used.  They're pretty
crude.

        Q.   Well, we're all adults here.

                MS. TURNER:  Just say it.

                THE WITNESS:  Okay.  I'm most concerned about
saying --

                MS. TURNER:  I read them, so don't worry.

                THE WITNESS:  Okay.  Thank you.

                I'm reading from the corporate security
investigation where our investigator spoke with
Mr. Pierce, the supervisor that heard the words from
Mr. Jannings.

                Pierce said that Jannings has stated that, That
bitch is trying to put me on a DML.  In PG&E that's a
Decision Making Leave.  It's a disciplinary process.

She's going to feel my pain.  I'm going to stick my dick

in her ass and make her feel it.

BY THE COURT:

    Q.  And when was that allegedly made, that comment?

    A.  July 15, 2015.

    Q.  And why isn't Mr. Pierce here today?

    A.  Mr. Pierce does not work for me.  He's in a

different department.

    Q.  He works for PG&E.  Why isn't he here?

    A.  He was not available today.

    Q.  Why wasn't he available?

    A.  Had a critical assignment to --

    Q.  What critical assignment?

    A.  I did not ask.  His supervisor would not

release him.

    Q.  Is that the only statement attributed to

Mr. Jannings which resulted in his discharge?

    A.  No, there are other statements that were --

turned up in the corporate security report as they spoke

with other employees.

    Q.  Who investigated it from corporate security?

    A.  The investigator's name is James Leonard.

    Q.  Why isn't Mr. Leonard here since he performed

the investigation?

    A.  I spoke with Mr. Leonard.  He is involved in

16

```
 1   another investigation today and was unable to be here.

 2       Q.  Did you personally hear any of the remarks

 3   attributed to Mr. Jannings?

 4       A.  I did not.

 5       Q.  Other than the alleged profane statements, what

 6   other reasons did the employer consider for wanting to

 7   discharge him?

 8       A.  Those profane statements were.

 9       Q.  Is that the only reason he was discharged?

10       A.  Yes.

11           THE COURT:  Any additional questions of your

12   witness, Ms. Turner?

13           MS. TURNER:  No.  Thank you.

14           THE COURT:  Mr. Jannings, any questions you'd

15   like to ask Mr. Carroll?

16           MR. JANNINGS:  No.  I have no questions to ask

17   Mr. Carroll.

18                       SPIRO GEORGE JANNINGS,

19   having been first duly sworn by the Administrative Law

20   Judge, testified as follows:

21

22                   EXAMINATION BY THE COURT

23       Q.  Is it correct that you were discharged by

24   Mr. Carroll on August 27th?

25       A.  Yes, I was.
```

1     Q.  And at the time did he share with you the

2  contents of the investigative report performed by PG&E?

3     A.  Yes, he did.  He -- I got to read the corporate

4  security report with my shop steward present.  I read

5  it, and then he basically handed me my last check and a

6  copy of the termination paper and said we will be no

7  longer needing your services here at PG&E again.

8     Q.  Did he ask you whether or not you admitted or

9  denied making the statement?

10     A.  No, I don't recall it.  It was pretty much cut

11  and dry.

12     Q.  Did you make the statement attributed to you by

13  Mr. Pierce?

14     A.  No, sir, I did not.  And I have a copy of that

15  corporate security report.  And the interesting thing of

16  all these allegations made against me is -- second to

17  last page, I highlighted it -- it shows by the company's

18  GPS triangulation (inaudible) closing tags out by

19  Mr. Leonard, it says locate and mark ticket's locations

20  of Jannings on afternoon July 15, 2015, indicating he

21  was 1.5 to 3.3 miles away from Fremont Service Center.

22  The time frames and ticket information revealed

23  (inaudible) documentation (inaudible) locate marked

24  ticket, cell calls on afternoon of July 15, 2015.  It's

25  all there.

1          I was 1.5 to 3.3 miles away from the yard.
2     Their cell phone and my GPS on the truck and on that
3     company tablet would show me in that yard from 2:15 to
4     2:30 as they stated.
5          It says, The review of the fuel records of
6     Mr. Jannings' vehicle showed that he fuelled the truck
7     up on the 13th -- which I wasn't in the yard that day --
8     with 24.9 gallons in July 16th.  I was in the Hayward
9     yard at a meeting, which I filled up 33.3 gallons.  No
10    fuel was obtained on the 15th.  There was no record of
11    access card swipes of Fremont Service Center of Jannings
12    on July 2015.  The Fremont Service Center is not
13    equipped with security cameras.
14         So it's really difficult for me to be somewhere
15    saying allegations about my boss when I wasn't there,
16    and then they went ahead and fired me on it on hearsay.
17    Q.   All right.  Mr. Pierce reported that the
18    incident occurred in the back of his truck on July 15th.
19    A.   Right.  But if you look, it says here 2:15 to
20    2:30 I was in the yard talking to him.  And the last
21    page, it says from 1:30 -- 1:34 to 2:15 I was at Grimmer
22    and Lopes in Fremont and then after that I was at 4046
23    Glenwood in Fremont from two -- 2:44 to 2:43 and then
24    from 2:37 to 3:06 I was at Hannover Place in Fremont.
25    Q.   According to the investigation report,

```
 1  (inaudible) morning of July 15, which is before the days
 2  identified in the report.
 3           Were you with Mr. Pierce that morning?
 4      A.   No, sir.  I never even went in the yard that
 5  day.  It shows --
 6      Q.   Were you in his truck that day?
 7      A.   No, sir.
 8      Q.   (Inaudible) discharge?
 9      A.   Oh, yes.
10      Q.   And what's the substance of discharge, the
11  grievance?
12      A.   I don't know.  I mean, it's in limbo.  I have a
13  lawyer now, so we're going to proceed with that.
14      Q.   Were you contacted by the investigator during
15  the investigation?
16      A.   Yes, sir, I was.
17      Q.   Did you give a statement?
18      A.   Yes, I did.  They called me in, let's see, the
19  24th.  I was put on administrative leave in July for
20  five weeks.  On the 27th was the day of my first
21  grievance for my boss for being mispaid, and they fired
22  me on that day that grievance was supposed to come to
23  fact finding.
24           And that's when Mr. Carroll had given me this
25  notice, and -- let's see, the 24th, 25th, 26th, 27th,
```

20

the 28th I met with corporate security at the meter plant with Mr. Leonard and -- I forget who the other individual was.  And they went through the whole process, you know, I said this, I did that, you know, it was rather entertaining.

Q.  Now, there was a previous hearing scheduled on October 18, 2015.  You were not in attendance at that hearing.  Why not?

A.  That was my mistake.

Q.  What was your mistake?

A.  I typed the wrong date in my phone, and I missed the date.

Q.  Did you receive the decision dismissing the appeal?

A.  Someone called me.  Some lawyer called me, and I was what was this about.  And then I realized later on, uh-oh, I missed the date.

Q.  Who was the lawyer?

A.  I don't know, some lawyer saying, you know, you got X amount of money coming from you.  We can help fight you.  I said no, I don't want that.

So then I realized, oh, I missed the date.  I don't know -- I got a call from someone.  It was some law office.  I guess they wait when these things don't go through or whatever it is.  I have no idea.

```
 1        Q.   (Inaudible) procedures.

 2        A.   Okay.  Well, I realized that I --

 3        Q.   Do you know the name of the person who

 4   allegedly called you?

 5        A.   No, sir.

 6        Q.   Did you receive the decision that was mailed to

 7   your home address dismissing your appeal?

 8        A.   Yes, I got it.

 9        Q.   And did you note that if you wished to reopen

10   the appeal, you had to do so within 20 calendar days

11   from the date of the notice?

12        A.   Yes.

13        Q.   And --

14        A.   That's why that other envelope is sent.  And I

15   didn't hear nothing for a long time.  And then --

16        Q.   Just a moment.

17        A.   Okay.  Sorry.

18        Q.   This decision issued on November 18.  Twenty

19   days from that is on or about (inaudible).  And this

20   document here, I'm just curious what this document is --

21        A.   Yeah, that's correct.  I filled that out.

22        Q.   Is this the document you sent in to try to

23   reopen the appeal?

24        A.   Yes.  I went down to the office on Brokaw.

25        Q.   Have you ever worked somewhere else?
```

```
1        A.   (No audible response.)

2        Q.   I need a verbal response.

3        A.   Oh.  No.

4        Q.   All right.  I have no further questions to ask

5   you.  Is there anything more you would like to add

6   before I give Ms. Turner the opportunity to ask you

7   questions?

8        A.   I have no questions to ask.

9        Q.   None?

10       A.   No.

11       Q.   Is there anything you'd like to add before she

12  asks you questions?

13       A.   No.

14            THE COURT:  Any questions for him?

15            MS. TURNER:  Just a couple on the reopening

16  first.

17                 EXAMINATION BY MS. TURNER

18       Q.   So when you said you delivered that to -- I

19  don't know if you delivered.  You said you went to

20  Brokaw?

21       A.   Yeah.  I went to the EDS, and I told them that

22  I had missed my date by accident.

23       Q.   Um-hum.

24       A.   So they gave me paperwork and they told me to

25  wait two weeks and turn it in.  To re-file for a new
```

1  appeal.

2      Q.  Oh.  And so did you mail it in?

3      A.  Yeah, I mailed it in.

4      Q.  So how did you --

5          THE COURT:  I'm going to interject for a

6  moment.  I misidentified the date of the previous

7  hearing.  Your actual date, I misrepresented it as

8  October 18, was actually November 18th.

9          MS. TURNER:  Right.

10         THE COURT:  So a timely reopening would have

11  been December 8.

12         MS. TURNER:  Right.

13         THE COURT:  So this date of received appears to

14  be three days later.

15         MS. TURNER:  Right.

16  BY MS. TURNER:

17      Q.  So you mailed it.  They told you to wait for

18  two weeks, you said?

19      A.  Yeah.

20      Q.  So do you remember about when you went into the

21  Brokaw office or whatever office that was?

22      A.  That was four or five days later.

23      Q.  After you got the dismissal notice?

24      A.  Yes.

25      Q.  Okay.  So the dismissal notice was mailed out

on the 18th, so you probably got it just before
Thanksgiving?

    A.  Yes, I did.  I remember mailing it out the week
after Thanksgiving.

    Q.  So did you know why they told you to wait a
couple of weeks?

    A.  To reopen the file, you have to wait a couple
weeks.

    Q.  No, to file the appeal --

    A.  To file the appeal.

    Q.  Who told you that you had to wait a couple of
weeks?

    A.  The lady in the EDS office.

    Q.  Okay.  And you said you got a call from the
lawyer?

    A.  Yeah, after -- the day -- the day that I was
supposed to be here, I got a call from some lawyer.  I
don't know who it was.

    Q.  So the day you were supposed to be here was the
18th, which was a Wednesday, it looks like, and you got
a --

    A.  At 11 o'clock, I think it was.

    Q.  And you got a call like the next day?

    A.  No, the afternoon at 1 o'clock.

    Q.  Oh, the same day?

```
 1        A.   Yeah.
 2        Q.   And then did that person tell you that you
 3   missed the hearing?
 4        A.   Yes.
 5        Q.   So that day you knew that you had?
 6        A.   Yes.
 7        Q.   So then why did you wait until the next week to
 8   go down to the EDD office?
 9        A.   Because I wasn't in the area.
10        Q.   Oh, you were out of town?
11        A.   Yeah.  I was up north.
12        Q.   Okay.  In where?
13        A.   Does it matter where?  At my folks' property.
14        Q.   Okay.
15             THE COURT:  What was your purpose of being up
16   north?
17             THE WITNESS:  Some individual took out about
18   300 feet of fence at our property, so my brother went up
19   there putting it back up.
20             THE COURT:  How long did it take you?
21             THE WITNESS:  Four days.
22             THE COURT:  And what days were you up there, do
23   you recall?
24             THE WITNESS:  I would say I was up there on a
25   Wednesday and didn't come home until about Tuesday.
```

```
 1            THE COURT:  What days though?  (Inaudible.)
 2   2015 calendar.
 3            THE WITNESS:  Let's see where we are.  January,
 4   February -- I was -- the 11th, I think, to the 16th.  I
 5   can't be positive.
 6            THE COURT:  That's a period of six days.  So it
 7   took six days to mend the fence or four days?
 8            THE WITNESS:  Four days to mend the fence.
 9            THE COURT:  No more questions for him.
10   BY MS. TURNER:
11        Q.  So you did get the hearing notice, but you put
12   the wrong date in your phone?
13        A.  Yes.
14        Q.  Do you remember what date in your phone you
15   put?
16        A.  The 12th or whatever date it was.  The hearing
17   was on --
18            THE COURT:  November 18th.
19            THE WITNESS:  The 18th?  I think I put down the
20   19th.
21   BY MS. TURNER:
22        Q.  Okay.  So there was a -- you said you were
23   interviewed by the security officer; is that correct?
24        A.  Yes.  Two of them, Mr. Leonard and Mr. -- I
25   don't see it now.  Mr. Leonard did all the speaking.
```

1      Q.   Okay.  And did you have your union steward
2   present with you?
3      A.   Yes, I did, Eugene Sanchez, my shop steward.
4      Q.   And are you a coworker of Mr. Pierce or a
5   friend of Mr. Pierce?
6      A.   Nope.  He was -- he would call me every once in
7   a while to go out on overtime.  I've never worked for
8   him personally.  When they had the 212 list to go out
9   and do overtime when something got -- needed to be dug
10  up for a water break or a sewer problem or gas.
11     Q.   So is there any reason he would lie about what
12  you said?
13     A.   That I have no idea.
14     Q.   So you had no argument or fight with him about
15  anything?
16     A.   (No audible response.)
17     Q.   Now, you said these logs prove something, and I
18  didn't totally follow what you said they proved.  So
19  what is it?  Just briefly.  I'm sorry, I didn't follow
20  your argument.
21     A.   The dates, they're saying I was in at the
22  time --
23     Q.   On the 15th?
24     A.   -- on the 15th.  It shows from 1:30 to -- from
25  1:34 to 2:15 -- to 2:13 I was at --

```
 1           THE COURT:  -- the document we all have.
 2           MS. TURNER:  Right.
 3   BY MS. TURNER:
 4      Q.  So I'm not sure what you're saying.  I mean,
 5   did they go over this log with you when they interviewed
 6   you?
 7      A.  Yes.
 8      Q.  So it shows that you were on a cell phone, I
 9   guess, at certain specific times?
10      A.  Correct.  And it shows locate times, too, when
11   I closed tickets out.
12      Q.  So what does that mean, locate time?
13      A.  So when you pull up to the job and you start
14   your job and when you close the ticket at these
15   addresses.
16      Q.  So the conversation that you allegedly had with
17   Mr. Pierce, was that in the Fremont yard itself?
18      A.  That's what it claims here.
19      Q.  So I'm not sure I'm understanding.  Are you
20   saying that you were not in the Fremont yard at all that
21   day?
22      A.  No, ma'am, I wasn't.  My timecard even reflects
23   it.  In the morning I was working a job for almost three
24   and a half hours for CableCom.
25      Q.  And do you know what three and a half hours
```

that they were?

A.   Yeah, it was on Fremont Boulevard.  I forget
the -- Fremont and -- I don't know what the cross street
is.

Q.   Well, what hours were they that you were at
CableCom?

A.   It was a ticket I was doing for CableCom.  I
wasn't at CableCom.

THE COURT:  She's asking what time you were
there.

THE WITNESS:  I was there from about 8:45 until
about one -- 12:45, 1:10.

BY MS. TURNER:

Q.   Okay.  And that's on the 15th?

A.   Yes.

Q.   So is it that this log doesn't cover that
period of time otherwise there would be a location for
that on here?

A.   Correct.

Q.   Okay.

MS. TURNER:  That's all the questions I have.
Thank you.

THE COURT:  All right.  (Inaudible) would you
like to make a brief closing statement or does the
testimony suffice?

1    MS. TURNER:  I do have a redirect with

2  Mr. Carroll.

3                    JEFF CARROLL,

4  having been previously duly sworn by the Administrative

5  Law Judge testified as follows:

6

7                 EXAMINATION BY MS. TURNER

8    Q.  Mr. Carroll, regarding the log, how does the

9  log establish that Mr. Jannings was in the Fremont

10  Center or in the Fremont Center location at the time

11  that Mr. Pierce said that he was having a conversation

12  with him?

13    A.  The log itself includes times that have seconds

14  associated with them that are odd seconds clearly date

15  stamped by the system.  It also has times that have

16  zeros in the seconds column.  Those obviously are not a

17  date stamped time.  It couldn't come out on the minute

18  each time.  Those times are actually entered by the

19  locator; in this case, it would be Mr. Jannings.  They

20  can be manipulated and often they are.

21         Corporate security included this document to

22  show that, as in the paragraph above the chart states,

23  he was within one and a half to three miles of the

24  Fremont Service Center during the time frame in

25  question.

Q.  And what is the time frame in question?  That
hasn't been established.

        A.  Between 1:30 and 3:30, which this call logs and
these time stamps indicate.  And --

        THE COURT:  I don't understand that last
response since the investigation report indicates that
Mr. Pierce indicated (inaudible) in the morning.

        THE WITNESS:  The second page of the
investigation report, it states on the first page at the
bottom, Pierce explained shortly after 7:30 a.m. he was
in the parking lot in Fremont.  While in the lot between
the buildings, he was contacted by Jannings and there
was one conversation then.  And then the next paragraph
down, it says, Later the same day during the afternoon.

        So there were two interactions.  The one during
the afternoon is when Mr. Pierce states that
Mr. Jannings made the comments about Bobbie Weeck,
approximately 2:30 p.m. as it says in the second
paragraph at the top of the second page.

        MS. TURNER:  The pages aren't numbered.  That's
unfortunate.

        THE WITNESS:  Yeah.

        THE COURT:  Continue.

BY MS. TURNER:

        Q.  Can you help explain how we can identify what

```
 1  page you're on?
 2       A.   If you start at the bottom of the first page.
 3       Q.   Uh-huh.
 4       A.   And read that paragraph, continue on the next
 5  page while reading the second paragraph.
 6       Q.   At the top of the second page, how does that --
 7  what's the first word?
 8       A.   Breakfast burritos to his crew.
 9            MS. TURNER:  You see, Judge?
10  BY MS. TURNER:
11       Q.   And then what paragraph are you referring to,
12  the second paragraph?
13       A.   The second paragraph.
14       Q.   The first --
15       A.   Starting -- the first full paragraph on that
16  page starting, Later the same day.
17       Q.   Okay.  So during the afternoon?
18       A.   Yes.
19       Q.   Okay.  Is there any reason that you had to --
20  that, to your knowledge, you believe Mr. Jannings would
21  have made these comments?
22       A.   Ask me again.
23       Q.   Is there any reason that you might have, to
24  your knowledge, that you would believe that Mr. Jannings
25  might have made these comments?
```

```
 1        A.   No.

 2        Q.   Okay.

 3             MS. TURNER:  Those are all the questions I

 4   have.

 5             THE COURT:  Any questions you want to ask him

 6   about the last testimony?

 7             MR. JANNINGS:  No, I don't have any.  It's

 8   pretty much cut and dry on this piece of paper.

 9             THE JUDGE:  All right.  Final statements.

10             MS. TURNER:  (Inaudible) on the record.  Thank

11   you.

12             MR. JANNINGS:  No, I have no final statements.

13             THE COURT:  All right.  I'll take the matter

14   into submission.  It's 2:30.

15             (End of audio record.)

16

17

18

19

20

21

22

23

24

25
```

34

```
 1   STATE OF CALIFORNIA            )

 2   COUNTY OF RIVERSIDE            )

 3

 4             I, Patricia L. Davis, CSR No. 11521, in and for

 5   the County of Riverside, State of California, hereby

 6   certify that the foregoing audio recording was

 7   transcribed by me, a Certified Shorthand Reporter and a

 8   disinterested person, to the best of my ability.

 9             IN WITNESS WHEREOF, I have hereunto set my

10   hand.

11

12

13   Date:  April 21, 2018.

14

15

16

17

18   _____
     PATRICIA L. DAVIS, RPR
19   CSR No. 11521

20

21

22

23

24

25
```

SPIRO JANNINGS,                    )    <u>Case No.</u>:    **17CV315033**
                                   )
          Plaintiff;               )
                                   )
vs.                                )
                                   )
PACIFIC GAS & ELECTRIC CO., *et al*.  )    **<u>FIRST AMENDED COMPLAINT</u>**

# EXHIBIT "O"



CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD

**SAN JOSE OFFICE OF APPEALS**
**2665 N FIRST ST STE 100**
**SAN JOSE CA 95134**

(408) 232-3036

| | |
|---|---|
| SPIRO G JANNINGS<br>  Claimant-Appellant<br><br>PACIFIC GAS & ELECTRIC<br>c/o EQUIFAX WORKFORCE SOLUTIONS<br>  Account No: 002-2199<br>  Employer | Case No. **5640330 - Reopened**<br>**(Formerly Case No. 5596690)**<br><br>Issue(s): 1030/32, 5067, 5005, 1256<br><br>Date of Application to Reopen: 12/11/2015<br><br><br>EDD: 0410  BYB: 09/13/2015 |

**Date and Place of Hearing(s):**
(1) 02/23/2016  SAN JOSE

**Parties Appearing:**
Claimant, Employer

---

# DECISION

The decision in the above-captioned case appears on the following page(s).

The decision is final unless appealed within 30 calendar days from the date of mailing shown below. See the attached "Notice to Parties" for further information on how to file an appeal. If you are entitled to benefits and have a question regarding the payment of benefits, call EDD at 1-800-300-5616.

**Robert M. Lofgren**, Administrative Law Judge

SPIRO G JANNINGS
1304 SHORTRIDGE AVE STE C
SAN JOSE, CA 95116-2375

Date Mailed: FEB 2 4 2016

CLT/PET: Spiro G. Jannings                ALJ: Robert M. Lofgren
Parties Appearing: Claimant, Employer
Parties Appearing by Written Statement: None

---

REV

## ISSUE STATEMENT

The claimant appealed from a Notice of Determination and Ruling which disqualified him for unemployment benefits under Unemployment Insurance Code section 1256. A ruling held the employer's reserve account was not subject to charges. The issue in this case is whether the claimant was discharged for misconduct connected with the most recent work.

A further issue is whether there is good cause for failure to attend a previously scheduled hearing.

## FINDINGS OF FACT

The claimant's appeal was initially scheduled to be heard November 18, 2015. The claimant did not appear at the scheduled hearing because he entered the date of the hearing incorrectly on his cell phone memo. The claimant received the decision dismissing his appeal for nonappearance and submitted an application to reopen the dismissed appeal which was received in the Office of Appeal on December 11, 2015. To be timely, the application to reopen the dismissed appeal was to be found on, or before, December 8, 2015. The claimant mailed his application to reopen the dismissed appeal during the first week of December 2015. The application to reopen the dismissed appeal was timely.

The claimant established a benefit year claim beginning September 13, 2015. Prior to filing his claim, he was most recently employed by the respondent employer, Pacific Gas & Electric Company, on August 27, 2015 when he was discharged as a consequence of allegedly making a profane threatening remark about a coworker.

The employer conducted an investigation which included securing statements from the alleged percipient witnesses to the statement, and also by cross-referencing electronic data regarding the claimant's actions on the date of the alleged incident.

The claimant did not threaten the coworker or make the profane statement attributed to him.

REASONS FOR DECISION

An appeal dismissed for nonappearance may be reopened if the appellant shows good cause for failing to appear at the hearing. (California Code of Regulations, title 22, section 5067(e).)

The application to reopen an appeal shall be filed within 20 days after service of the decision dismissing the appeal. (California Code of Regulations, title 22, section 5067(a).)

"Good cause" means a substantial reason under the circumstances, considering the diligence of the proponent and any burden or prejudice to any person involved. Good cause includes, but is not limited to, mistake, surprise, inadvertence, or excusable neglect. (California Code of Regulations, title 22, section 5000(hh).)

Based upon the evidence received herein, it is found that the claimant's application to reopen the dismissed appeal was untimely received by the Office of Appeal on December 11, 2015, but that the application was mailed the preceding week and was timely.

The claimant's sworn testimony regarding the time sequence of events subsequent to receiving the decision dismissing his appeal for nonappearance was provided in a manner which caused the administrative law judge to determine his testimony credible.

The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact. (Evidence Code, section 411.)

The reason the claimant missed the previous scheduled hearing, as a result of his inadvertent mistake entering the appeal hearing date and time information onto his cell phone memo, is determined to constitute good cause for his failure to appear at the previously scheduled hearing.

An individual is disqualified for benefits if he or she has been discharged for misconduct connected with his or her most recent work. (Unemployment Insurance Code, section 1256.)

The employer's reserve account may be relieved of benefit charges if the claimant was discharged for misconduct. (Unemployment Insurance Code, sections 1030 and 1032.)

The entirety of the evidence presented by the employer is hearsay. The employer had the opportunity to present the alleged percipient witnesses to the incident

and the individual who conducted the detailed investigation on behalf of the employer, yet neglected to do so. As the entirety of the testimony offered by the employer witness was predicated upon such hearsay evidence, such testimony is accorded diminished evidentiary weight relative to the sworn direct testimony of the claimant.

If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust. (Evidence Code, section 412.)

As the claimant unequivocally testified he did not make the threatening profane remark allegedly made by him, his sworn testimony will be adopted to resolve the conflict in the evidence herein.

Testimony given at the hearing under oath and subject to cross-examination is generally entitled to greater weight than hearsay statements, whether or not such statements are signed under penalty of perjury. (Precedent Decisions P-B-218, P-B-293, and P-B-378.)

The appeals board and its administrative law judges are not bound by common law or statutory rules of evidence or by technical or formal rules of procedure but may conduct hearings and appeals in such manner as to ascertain the substantial rights of the parties. (Unemployment Insurance Code, section 1952.)

Hearsay evidence is admissible for whatever weight the administrative law judge deems it to be worth. (Precedent Decision P-B-235.)

As the employer witness unequivocally testified that the sole basis for the employer's decision to discharge the claimant was the alleged profane, threatening remark, and based upon the evidence received herein it is found that the claimant did not make the alleged profane remark, it is accordingly found that the employer has failed to sustain its burden of proof on the issue.

Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence. (Evidence Code, section 115.) Preponderance of the evidence simply requires proof that a matter in question is more likely to be true than not true. (Precedent Decision P-T-493.)

The employer has the burden of proving misconduct. (*Prescod v. California Unemployment Insurance Appeals Board* (1976) 57 Cal.App.3d 29.)

Based on the foregoing, the Notice of Determination and Ruling will be reversed.

Case: 19-30088    Doc# 13456    Filed: 01/13/23    Entered: 01/17/23 14:14:35    Page 188
of 224

## DECISION

The Notice of Determination and Ruling is reversed.

The claimant was discharged for reasons not constituting misconduct connected with his most recent work. The claimant is not disqualified for benefits under section 1256 of the Unemployment Insurance Code. Benefits are payable, provided the claimant is otherwise eligible.

The employers reserve account is not relieved of benefit charge under sections 1030 and 1032 of the Unemployment Insurance Code.

The claimant's timely application to reopen the dismissed appeal is granted. The previously issued decision dismissing his appeal for nonappearance is vacated.

RML
(1/2)

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

SPIRO JANNINGS,                              )      <u>Case No.</u>:        **17CV315033**
                                             )
      Plaintiff;                     )
                                             )
vs.                                          )
                                             )
PACIFIC GAS & ELECTRIC CO., *et al*.         )      **<u>FIRST AMENDED COMPLAINT</u>**

# EXHIBIT "P"

# Grievance Tracking System

Home
FeedBack      PaGE ONE      WWWHR      Help
My Grievances | Create A Grievance | Create A Grievance For More Than 1 Person | Find A Grievance |
Reports | Admin

# Grievance Number: 23183

**Status: Closed**

| | |
|---|---|
| **Grievant:** Jannings | **Incident Date:** 5/6/2015 |
| **Union:** IBEW - Physical | **File Date:** 5/7/2015 |
| **Job Description:** Fieldperson | **Settle Date:** 5/26/2016 |
| **Location:** Hayward Service Center | **Outcome:** Company Favor |
| **Labor Agreement Department:** T200 Gas Transmission and Distribution | **Reference Number:** |
| **Org Unit:** Gas Operations | **Area:** 2 |
| **HR Contact:** Vanessa Parker | |
| **Business Representative:** Mennel, Lou | |
| **Contract Title:** Management of Company | |
| **Type:** Positive Discipline | |
| **SubType:** Work Performance | |
| **Discipline:** Written Reminder | |
| **Final Discipline:** Written Reminder | |
| **Issue:** Grievant was issued a written reminder in work performance | |
| **Asked For:** Remove or reduce discipline | |

Back to Top

# Step Information

| Step Name | Step Date | Step Result | Result Date | Days In Step | Total Days |
|---|---|---|---|---|---|
| Filed | 5/7/2015 | FF | 12/11/2015 | 218 | 218 |
| **Details:** LIC scheduled for 7/10/15. Supervisor was on vacation May 22 - 6/16; HR on vacation 6/22-6/26 Sent LIC Report to BR 9/21/15; called on 10/6 to f/u, f/u 10/15, f/u 11/6, rec'd signature from BR 11/11 (no company position) rec'd LIC report from BR on 11/24 along with SS signature (LR on vacation) sent to LOB on 12/4, rec'd signature back on 12/7. 1/17. Referred to FF | | | | | |

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 191 of 224

| | | | | | |
|---|---|---|---|---|---|
| **Fact Finding** | **12/11/2015** | **P-RC** | **3/17/2016** | **97** | **315** |
| **Details:** Referred to P-RC | | | | | |
| **Pre Review Committee** | **3/17/2016** | **Closed** | **5/26/2016** | **70** | **385** |
| **Details:** The Committee agreed the discipline was for just cause. This case is closed without adjustment. | | | | | |

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 192 of 224

| | | | |
|---|---|---|---|
| SPIRO JANNINGS, | ) | <u>Case No.</u>: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **<u>FIRST AMENDED COMPLAINT</u>** |

# EXHIBIT "Q"

 **PRE-REVIEW COMMITTEE**  **IBEW**

PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
375 N. WIGET LANE, SUITE 130
WALNUT CREEK, CA 94598
(415) 973-8599

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

CLAIRE IANDOLI, CHAIRPERSON

KIT STICE, SECRETARY

☐ DECISION
☐ LETTER DECISION
☐ PRE-REVIEW REFERRAL

### Pre-Review Committee Number 23183
### Gas – Locate & Mark – Hayward

Vanessa Parker                                    Lou Mennel
Company Member                                    Union Member
Local Investigating Committee                     Local Investigating Committee

#### Subject of the Grievance
This case concerns a Written Reminder issued to a Fieldperson at the Hayward Service Center for work performance issues including arriving late to assignments, delayed assignments, leaving the work site early, and failing to record his hours accurately on timecards.

#### Facts of the Case
The Grievant is a Fieldperson with 3 years of service. The Grievant reports to the Locate and Mark Supervisor who has offices in Concord and Hayward. He had no active discipline at the time of the incidents.

The Grievant was performing Standby work when these incidents arose. Standby work requires the Fieldperson to observe the contractor while they excavate and/or break soil within 5 feet of the Company's gas transmission lines in order to ensure safe excavation practices.

In order to obtain a Standby, the contractor must put the request in writing with the time requested and contact the Stand by Coordinator to schedule the appointment.

The Grievant was assigned 5 Standby assignments on 3/9/15, 3/24/15, 3/26/15, 3/27/15 and 3/31/15.

- On 3/9/15, the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:30 p.m. The contractor released the grievant at 11:30 a.m. The grievant contacted the dispatcher at 1:30 p.m. and filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/24/15 the Standby form requested PG&E excavation oversight from 7:30 a.m.-3:00 p.m. The grievant arrived at the job at 10:30 a.m. and left the worksite at approximately

11:45 a.m. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/26/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:00 p.m. The grievant had a DOT appointment on this day at 1:00 p.m. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/27/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-3:30 p.m. The job was shut down at 1:00 p.m. due to a problem. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/31/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:00 p.m. The grievant's supervisor received a call from a contractor at approximately 10:15 a.m. stating the grievant was not at the jobsite. Grievant did not arrive on the job until 11:30 a.m.

Discussion

The Union argued that this case was merely one related to training the grievant on paperwork. According to the Union, the supervisor should have advised the grievant to correct his timecard in early March rather than waiting a month to address the inconsistencies. The Union argued that no discipline was appropriate in this case.

The Company argued that the grievant submitted inaccurate timecards, reflecting he was working at the jobsite when he clearly was not present, and his late reporting on at least two occasions demonstrate substandard work performance at minimum and potential falsification of records. Given the scrutiny after San Bruno, the Company's records, especially excavating records, must be completed accurately to account for actual work performed. Based on his late reporting to assignments, leaving the worksite early on other occasions, and the multiple inconsistencies and inaccuracies in his record-keeping and timecards, the Written Reminder was issued for just cause.

Decision

The Committee agreed the discipline was for just cause. This case is closed without adjustment.

| _Clair I_ | 5/26/16 | _Kit Stice_ | 5/26/16 |
|---|---|---|---|
| Claire Iandoli, Chairperson | Date | Kit Stice, Secretary | Date |
| Review Committee | | Review Committee | |

SPIRO JANNINGS,                    )    Case No.:    **17CV315033**
                                   )
        Plaintiff;                 )
                                   )
vs.                                )
                                   )
PACIFIC GAS & ELECTRIC CO., *et al*.   )    **FIRST AMENDED COMPLAINT**

# EXHIBIT "R"



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23183

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Hayward

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca. 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
Positive Discipline Guidelines and any relevant
precedent setting case.

PHONE NO.(S):

EMPLOYEE NUMBER: 00049709

DISCUSSED BY:
Supervisor: Bobbie Weeck          and Steward: Ben Nordson          on 5-6-2015
Human Resources Dept.: Vanessa Parker          and Bus. Rep.: Lou Mennel          on 5-7-2015

GRIEVANCE ISSUE:     ☐ Continuation Sheet Attached
Grievant was issued a written reminder in work performance

CORRECTION ASKED FOR:     ☐ Continuation Sheet Attached
Remove or reduce discipline

Submitted by: Lou Mennel          Under Section: 102          on 5-7-2015
Received for Co. HR Grv. Filing by: Ann Sabwa          on 5/8/2015

COMPANY ANSWER:     ☐ Continuation Sheet Attached

For Company:          on

SETTLED:
COMMITTEE AGREED THE DISCIPLINE WAS FOR JUST CAUSE

For Union:          on 05/31/2016

REFERRED TO:

| | FOR OFFICE USE ONLY | |
|---|---|---|
| ☐ L.I.C. on ___ Meeting scheduled for ___ | ☒ SETTLED ON | 05/31/2016 |
| ☐ Fact Finding Committee on ___ | ☐ WITHDRAWN ON | |
| ☐ Pre-Review Committee on ___ | Co. referred FF on | 12/15/2015 |
| ☐ Review Committee on ___ | Union received FF ref. on | 12/15/2015 |
| ☐ Ad-Hoc Committee on ___ | Co. referred P-RC on | 03/18/2016 |
| ☐ Arbitration on ___ | Union received P-RC ref. on | 03/18/2016 |
| | Co. referred RC on | |
| | Union received RC ref. on | |
| | Co. referred ARB on | |
| | Union received ARB ref. on | |
| | ARB. CASE NO.: | |

E-mail to:   Company at hrgrievancefiling@pge.com
cc to:   Local Union 1245 at cxcx@ibew1245.com



**PRE-REVIEW COMMITTEE**



IBEW

PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
375 N. WIGET LANE, SUITE 130
WALNUT CREEK, CA 94598
(415) 973-8599

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

CLAIRE IANDOLI, CHAIRPERSON

☐ DECISION
☐ LETTER DECISION
☐ PRE-REVIEW REFERRAL

KIT STICE, SECRETARY

## Pre-Review Committee Number 23183
## Gas – Locate & Mark – Hayward

Vanessa Parker
Company Member
Local Investigating Committee

Lou Mennel
Union Member
Local Investigating Committee

### Subject of the Grievance

This case concerns a Written Reminder issued to a Fieldperson at the Hayward Service Center for work performance issues including arriving late to assignments, delayed assignments, leaving the work site early, and failing to record his hours accurately on timecards.

### Facts of the Case

The Grievant is a Fieldperson with 3 years of service. The Grievant reports to the Locate and Mark Supervisor who has offices in Concord and Hayward. He had no active discipline at the time of the incidents.

The Grievant was performing Standby work when these incidents arose. Standby work requires the Fieldperson to observe the contractor while they excavate and/or break soil within 5 feet of the Company's gas transmission lines in order to ensure safe excavation practices.

In order to obtain a Standby, the contractor must put the request in writing with the time requested and contact the Stand by Coordinator to schedule the appointment.

The Grievant was assigned 5 Standby assignments on 3/9/15, 3/24/15, 3/26/15, 3/27/15 and 3/31/15.

- On 3/9/15, the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:30 p.m. The contractor released the grievant at 11:30 a.m. The grievant contacted the dispatcher at 1:30 p.m. and filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/24/15 the Standby form requested PG&E excavation oversight from 7:30 a.m.-3:00 p.m. The grievant arrived at the job at 10:30 a.m. and left the worksite at approximately

11:45 a.m. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/26/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:00 p.m. The grievant had a DOT appointment on this day at 1:00 p.m. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/27/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-3:30 p.m. The job was shut down at 1:00 p.m. due to a problem. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/31/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:00 p.m. The grievant's supervisor received a call from a contractor at approximately 10:15 a.m. stating the grievant was not at the jobsite. Grievant did not arrive on the job until 11:30 a.m.

<u>Discussion</u>

The Union argued that this case was merely one related to training the grievant on paperwork. According to the Union, the supervisor should have advised the grievant to correct his timecard in early March rather than waiting a month to address the inconsistencies. The Union argued that no discipline was appropriate in this case.

The Company argued that the grievant submitted inaccurate timecards, reflecting he was working at the jobsite when he clearly was not present, and his late reporting on at least two occasions demonstrate substandard work performance at minimum and potential falsification of records.    Given the scrutiny after San Bruno, the Company's records, especially excavating records, must be completed accurately to account for actual work performed.  Based on his late reporting to assignments, leaving the worksite early on other occasions, and the multiple inconsistencies and inaccuracies in his record-keeping and timecards, the Written Reminder was issued for just cause.

<u>Decision</u>

The Committee agreed the discipline was for just cause.   This case is closed without adjustment.

| Claire I ___ | 5/26/16 | Kit Stice | 5/26/16 |
|---|---|---|---|
| Claire Iandoli, Chairperson | Date | Kit Stice, Secretary | Date |
| Review Committee | | Review Committee | |

SPIRO JANNINGS,                      )      <u>Case No.</u>:      **17CV315033**
                                     )
      Plaintiff;                  )
                                     )
vs.                                  )
                                     )
PACIFIC GAS & ELECTRIC CO., *et al*.  )      **<u>FIRST AMENDED COMPLAINT</u>**

# EXHIBIT "S"



# GRIEVANCE
## IBEW, LOCAL UNION 1245

GR. NO.: 23334

☒ Physical
☐ Clerical

DIVISION: Mission
DEPARTMENT: Gas Compliance
HEADQUARTERS: Fremont

GRIEVANT(S): Spiro Jannings
CLASSIFICATION(S): Fieldperson
ADDRESS(ES): 1304 Shortridge Ave
San Jose, Ca 95116

APPLICABLE CONTRACT SECTION(S) and/or SUPPLEMENT(S):
Positive Discipline Guidelines and any other
relevant document.

PHONE NO.(S):

EMPLOYEE NUMBER:

DISCUSSED BY:
Supervisor: Bobbie Weeck          and Steward: Eugene Sanchez          on  8-27-2015
Human Resources Dept.: Vanessa Parker          and Bus. Rep.: Lou Mennel          on  8-31-2015

GRIEVANCE ISSUE:     ☐ Continuation Sheet Attached
The grievant was terminated unjustly on or about 8-27-2015.

CORRECTION ASKED FOR:     ☐ Continuation Sheet Attached
Reinstate the grievant, make whole in all ways, including, but not limited to lost wages, benefits and overtime.

Submitted by: Lou Mennel          Under Section: 102          on  8-31-2015
Received for Co. HR Grv. Filing by:     Rachel Wilson          on  9/1/2015

COMPANY ANSWER:     ☐ Continuation Sheet Attached
The Grievant was discharged as a result of disrespectful treatment and threat of violence towards his supervisor
in violation of the Employee Code of Conduct.  Request respectfully denied.

For Company: Vanessa Parker          on  09/15/15

SETTLED:
Committee agreed the discipline was issued for just cause

For Union: Kit Stice          on  11/16/2016

| REFERRED TO: | FOR OFFICE USE ONLY | |
|---|---|---|
| ☐ L.I.C. on _____  Meeting scheduled for _____ | ☒ SETTLED ON | 11/16/2016 |
| ☐ Fact Finding Committee on _____ | ☐ WITHDRAWN ON | |
| ☐ Pre-Review Committee on _____ | Co. referred FF on | 02/23/2016 |
| ☐ Review Committee on _____ | Union received FF ref. on | 02/23/2016 |
| ☐ Ad-Hoc Committee on _____ | Co. referred P-RC on | |
| ☐ Arbitration on _____ | Union received P-RC ref. on | |
| | Co. referred RC on | |
| | Union received RC ref. on | |
| | Co. referred ARB on | |
| | Union received ARB ref. on | |
| | ARB. CASE NO.: | |

E-mail to:   Company at hrgrievancefiling@pge.com
cc to:        Local Union 1245 at cxcx@ibew1245.com



# PRE-REVIEW COMMITTEE



**IBEW**

PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
375 N. WIGET LANE, SUITE 130
WALNUT CREEK, CA 94598
(415) 973-8599

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

CLAIRE IANDOLI, CHAIRPERSON
☐   DECISION
☐   LETTER DECISION
☐   PRE-REVIEW REFERRAL

KIT STICE, SECRETARY

## Pre-Review Committee Number 23183
## Gas – Locate & Mark – Hayward

Vanessa Parker
Company Member
Local Investigating Committee

Lou Mennel
Union Member
Local Investigating Committee

### Subject of the Grievance
This case concerns a Written Reminder issued to a Fieldperson at the Hayward Service Center for work performance issues including arriving late to assignments, delayed assignments, leaving the work site early, and failing to record his hours accurately on timecards.

### Facts of the Case
The Grievant is a Fieldperson with 3 years of service. The Grievant reports to the Locate and Mark Supervisor who has offices in Concord and Hayward. He had no active discipline at the time of the incidents.

The Grievant was performing Standby work when these incidents arose. Standby work requires the Fieldperson to observe the contractor while they excavate and/or break soil within 5 feet of the Company's gas transmission lines in order to ensure safe excavation practices.

In order to obtain a Standby, the contractor must put the request in writing with the time requested and contact the Stand by Coordinator to schedule the appointment.

The Grievant was assigned 5 Standby assignments on 3/9/15, 3/24/15, 3/26/15, 3/27/15 and 3/31/15.

- On 3/9/15, the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:30 p.m. The contractor released the grievant at 11:30 a.m. The grievant contacted the dispatcher at 1:30 p.m. and filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/24/15 the Standby form requested PG&E excavation oversight from 7:30 a.m.-3:00 p.m. The grievant arrived at the job at 10:30 a.m. and left the worksite at approximately

Case: 19-30088   Doc# 13456   Filed: 01/13/23   Entered: 01/17/23 14:14:35   Page 202
of 224

11:45 a.m. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/26/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:00 p.m. The grievant had a DOT appointment on this day at 1:00 p.m. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/27/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-3:30 p.m. The job was shut down at 1:00 p.m. due to a problem. The grievant filled out his timecard indicating he was on Standby from 7:00 a.m. - 3:30 p.m.

- On 3/31/15 the Standby form requested PG&E excavation oversight from 8:00 a.m.-1:00 p.m. The grievant's supervisor received a call from a contractor at approximately 10:15 a.m. stating the grievant was not at the jobsite. Grievant did not arrive on the job until 11:30 a.m.

Discussion

The Union argued that this case was merely one related to training the grievant on paperwork. According to the Union, the supervisor should have advised the grievant to correct his timecard in early March rather than waiting a month to address the inconsistencies. The Union argued that no discipline was appropriate in this case.

The Company argued that the grievant submitted inaccurate timecards, reflecting he was working at the jobsite when he clearly was not present, and his late reporting on at least two occasions demonstrate substandard work performance at minimum and potential falsification of records.    Given the scrutiny after San Bruno, the Company's records, especially excavating records, must be completed accurately to account for actual work performed.  Based on his late reporting to assignments, leaving the worksite early on other occasions, and the multiple inconsistencies and inaccuracies in his record-keeping and timecards, the Written Reminder was issued for just cause.

Decision

The Committee agreed the discipline was for just cause.    This case is closed without adjustment.

Claire Iandoli, Chairperson          Date
Review Committee

Kit Stice, Secretary          Date
Review Committee

| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "T"



# REVIEW COMMITTEE



**IBEW**

PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
375 N. WIGET LANE, SUITE 130
WALNUT CREEK, CA 94598
(415) 973-8599

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

CLAIRE IANDOLI, CHAIRPERSON
☐ DECISION
☐ LETTER DECISION
☐ PRE-REVIEW REFERRAL

KIT STICE, SECRETARY

## Review Committee Number 23334
## Gas – Locate & Mark – Hayward

Vanessa Parker
Company Member
Local Investigating Committee

Lou Mennel
Union Member
Local Investigating Committee

### Subject of the Grievance

This case concerns the termination of a Field Person at the Hayward Service Center for Code of Conduct violations including disrespectful treatment and threats of sexual violence toward his supervisor.

### Facts of the Case

The Grievant is a Field Person with 3 years of service. Grievant was on an active Written Reminder at the time of his discharge for issues relating to arriving late to assignments, leaving the work site early, and failing to record his hours accurately on timecards.

Prior to his dismissal, the Grievant reported to a female Locate and Mark Supervisor who had issued the Written Reminder.

A Corporate Security Investigation initiated on July 23, 2015 found that Grievant had made vulgar and inappropriate comments of a sexual nature about his female Supervisor to another male Supervisor. As a result, Grievant was terminated on August 27, 2015.

Although Grievant denied the specific threats of sexual assault, he did not deny that he had a conversation with the male Supervisor regarding his female Supervisor and admitted that he told the male Supervisor, "… we had a little bit of a problem." Grievant also spoke to another co-worker about his Supervisor and said, "She's out to get me."

### Discussion

The Union argued two points: 1) The male Supervisor who heard these comments did not act on the comments immediately and waited 6 days before telling the female Supervisor of

Grievant's threats. The Union opined this was "shop talk" and had these been credible threats, he would have reported them immediately. 2. The Union argued the GPS records did not indicate that Grievant was in the yard later in the day when the male Supervisor said the conversation took place. Accordingly, the Union argued for a reduction in the penalty.

The Company acknowledged the male Supervisor did not report the incident as quickly as he should have, but that does not negate the fact that the conversation took place. Even the Grievant admitted the conversation took place but denies making the vulgar comments. Further, in the interest of protecting his job, Grievant had a motive to lie but he could not provide a motive as to why the male Supervisor or any of his co-workers would fabricate these stories against him. Finally, GPS is only triggered for Locate and Mark employees when they are entering information into the computer. Therefore, when Grievant was in the yard speaking to the male Supervisor, GPS was not tracking him because he was not inputting data into the computer.

Decision

This is not the first case that has come before the Review Committee involving threats made to a Supervisor. Pre-Review Committee Decision Nos. 18746, 12913, 12884, 12694, and 20560 also support discharge. The Committee agreed the discipline was issued for just cause. This case is closed without adjustment.

Claire I~        11/16/16                    Kit Stice    11-16-16

Claire Iandoli, Chairperson     Date         Kit Stice, Secretary      Date
Review Committee                              Review Committee

**PACIFIC GAS & ELECTRIC COMPANY**
**Referral to Pre-Review Committee**
**GRIEVANCE NO. 23334**

**SUBJECT:**

This case concerns the termination of a Hayward Fieldperson. The termination was based upon the Company's investigation into the Grievant's behavior in July, 2015. A Corporate Security Investigation found that the Grievant had made threatening and inappropriate sexual remarks towards his supervisor.

**POSITION OF THE PARTIES:**

The Company opined that there is no question that the Grievant made highly inappropriate and threatening remarks to a PG&E Supervisor about his own supervisor. While there is concern as to why the remarks were not reported for several days, that person has publicly acknowledged he made a mistake. This admission adds to his credibility. In fact, there is also additional witness statements that support the facts of this case. The Company noted that the prior cases noted in the LIC are clear that threatening a supervisor could be a dischargeable offense. Finally, in accordance with our standards and policies, PG&E will in no way tolerate this behavior. Given all of the above, the termination is appropriate and for just cause.

The Union maintained that this is a case of an employee versus another supervisor's testimony and that the Company cannot prove these statements occurred. Given the lack of facts and the lack of credibility of the witnesses in this case, the Grievant should not have been terminated. The Union opined that the Grievant should be returned to his position immediately.

As a resolution could not be reached, the case is referred to the Pre-Review Committee.

For Union                                                                03/17/2016
                                                                         Date

For Company                                                              3/17/2016
                                                                         Date

| SPIRO JANNINGS, | ) | Case No.: | **17CV315033** |
| | ) | | |
| Plaintiff; | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| PACIFIC GAS & ELECTRIC CO., *et al*. | ) | **FIRST AMENDED COMPLAINT** | |

# EXHIBIT "U"



# REVIEW COMMITTEE

 **IBEW**

PACIFIC GAS AND ELECTRIC COMPANY
2850 SHADELANDS DRIVE, SUITE 100
WALNUT CREEK, CALIFORNIA 94598
(925) 974-4282

MARGARET A. SHORT, CHAIRMAN

DECISION
LETTER DECISION
PRE-REVIEW REFERRAL

RECEIVED by LU 1245
FEB. 13, 2002

**CASE CLOSED**
FILED & LOGGED

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 4790
WALNUT CREEK, CALIFORNIA 94596
(925) 933-6060
SALIM A. TAMIMI, SECRETARY

### Pre-Review Committee Nos. 12913, 12884, 12694

Deanna Radford
Company Member
Local Investigating Committee

Larry Pierce
Union Member
Local Investigating Committee

### Subject of the Grievance

This case concerns the termination of a lineman with 22 years of service for making a death threat against his supervisor after being told about his DML. Concurrent grievances were also referred to the Pre-Review Committee for the Grievant's Decision Making Leave and Written Reminder (#122884 and #12694 respectively).

### Facts of the Case

**Termination #12913**

The Grievant was terminated on Monday, August 13, 2001 for multiple acts of misconduct during and after he was placed on a DML. At the time of termination, the Grievant was on an active Decision Making Leave (DML), a Written Reminder, an Oral Reminder and received two coaching and counselings subsequent to the Written Reminder for unavailability.

Based on the totality of misconduct while on the Decision Making Leave, the Grievant was terminated effective August 13, 2001.

The Grievant was instructed by the Electric Crew Foreman to meet with his Supervisor on the morning of July 25, 2001, at which time, the Grievant was placed on a DML for unavailability. During the DML meeting, the grievant was uncooperative and verbally abusive. During this meeting, the grievant sat with his back to the Supervisor. When told to turn around, he called the Supervisor "an a_ _hole." The following day, July 26, 2001, the Grievant was instructed to take the DML day off to consider the terms and commitment of employment with Pacific Gas and Electric Company.

Exhibit _8a_

The Electric Crew Foreman stated on July 25, 2001 the crew was waiting in the yard for the Grievant to return from the meeting with the Supervisor. When the Grievant returned from the meeting, he appeared to be very upset and stated, "I'm going to my car and get my gun and fill the Supervisor with holes..." The Electric Crew Foreman stated two Linemen were nearby when the Grievant made the threat. The Electric Crew Foreman informed management of the Grievant's threatening remarks later that day when the crew returned from the job sites.

The crew, including the Grievant proceeded to several job sites. Upon arriving at the third job site, the Electric Crew Foreman observed the Grievant sitting in his truck writing. The Grievant informed the Electric Crew Foreman he was writing down the events that occurred on a prior day when the Crew Foreman took him to a hospital. The Grievant also asked the Electric Crew Foreman to write down what he recalled from that day. The Electric Crew Foreman told the Grievant this was not the time and there was work to do and to get to work with the crew. The Grievant refused to go to work and continued to write. The Electric Crew Foreman instructed the Grievant to return to the yard if he was not going to work with the crew. The Grievant and the Electric Crew Foreman got upset and yelled at each other; during which the Electric Crew Foreman, again, instructed the Grievant to return to the yard. The Grievant left the job site and returned to the yard.

When the Electric Crew Foreman returned to the yard, he learned the Grievant's Supervisor was not available. He contacted another Supervisor and reported the threatening remarks the Grievant made earlier that morning, i.e. shooting his Supervisor.

When interviewed by Corporate Security, the Grievant denied making the threatening statement regarding the Supervisor or anyone else. The Grievant denied that he has ever brought a firearm onto company property. The Grievant further informed Corporate Security on the day he was given the DML, he was very upset after speaking with the Supervisor and was talking loudly to the Electric Crew Foreman in the yard about what took place during the meeting with the Supervisor. The Grievant stated he did not recall exactly what he said to the Electric Crew Foreman, however, maintains he did not make threatening remarks. The Grievant declined to provide a signed statement from the Corporate Security interview.

Corporate Security also interviewed the two Linemen the Electric Crew Foreman stated were nearby when the Grievant made the threatening remarks. Both employees stated the Grievant appeared to be upset, was talking loudly to the Electric Crew Foreman, however, did not hear him make threatening remarks.

Corporate Security concluded although the two employees did not overhear the Grievant make threatening remarks directed toward the Supervisor, the Electric Crew Foreman had no apparent motive to be untruthful when he reported the threat to management. Corporate Security further concluded the Grievant violated standard practice 735.6-1, Employee Conduct Policy by threatening to shoot the Supervisor.

Exhibit   86

**Decision Making Leave #12884**
On July 26, 2001 the Grievant was placed on a DML for unavailability. The Grievant's availability for work had not improved since he received a Written Reminder. Prior to the DML, the Grievant was placed on a Written Reminder on April 20, 2001 and two subsequent coaching and counselings; May 14, 2001 and June 18, 2001. When the Grievant was issued the DML, he had no accumulated sick leave.

On May 1, 2001 the Grievant requested sick leave stating his truck broke down. The Grievant was denied sick time, however, was granted vacation. On the same day, the Supervisor warned the Grievant about his availability problem and that the issue would be addressed when he returned to work.

On May 22, 2001, the Grievant requested and was granted vacation stating his dog ran away.

On June 12, 2001, the Grievant requested and was denied vacation, again, stating his dog had gotten away. When denied vacation, the Grievant changed his story and stated he needed time off due to his mother's illness while traveling somewhere in a mobile home. The Grievant was informed he needed to return to work, however, was granted the use of Family Medical Leave. The Grievant called the following day, June 13, 2001 stating his mother was still ill and needed time off. The Supervisor requested proof of illness for his absence during this time; which took weeks and multiple requests for the Grievant to provide. The final time off prior to the DML occurred on July 19, 2001 when the Grievant experienced chest pains. The Grievant was treated at the hospital and released, without restrictions. The following day, he was a no call, no show until part way into his shift stating he needed more time off for further medical test. The Grievant also requested vacation the following Monday, however, was denied.

Throughout the Grievant's excessive use of sick leave, he was advised of the availability of EAP several times. Since the Grievant was placed on a WR he continued to have excessive sick leave usage and was issued a DML.

**Written Reminder #12694**
The Grievant was placed on a Written Reminder on April 20, 2001. At the time of the Written Reminder, the Grievant had used 64 hours of sick leave. The Grievant was off work ill a number of days. The Supervisor contacted the Grievant by telephone to request proof of illness upon his return to work. The Grievant provided proof of illness but states he would not have been off ill one of the days if he was not required to provide proof of illness prior to returning to work. There was no proof of illness requirement prior to the Supervisor's telephone message on April 10, 2001.

Since the Grievant's Oral Reminder on February 20, 2001 the Supervisor had on-going discussions and two coaching and counselings sessions regarding his availability. Due to the Grievant's on-going unavailability within the first four months of the year, he was given a Written Reminder.

Exhibit ___8C___

PGE600047

<u>Discussion</u>
The Committee discussed and agreed to the appropriateness of the WR but the Union questioned whether the DML was appropriate.

However, the Pre-Review Committee agreed the Grievant's behavior while on the DML was inappropriate. During the DML meeting, the Grievant called his Supervisor an "a_ _hole" and turned his chair to face the corner.   The Grievant made serious threatening remarks directed toward his Supervisor and while on one of the job sites refused to work, all of which are unacceptable behavior in the work place.

The Company takes threats to do harm very seriously and has an obligation to act on each and every one. Although, the Grievant's threatening remarks were not substantiated by the two Linemen, the Pre-Review Committee agreed the Electric Crew Foreman had no reason to fabricate a story that the Grievant made threatening remarks. However, it was substantiated the Grievant was in a very angry frame of mind after receiving the DML and acted and spoke inappropriately throughout the day.

The termination of the Grievant is supported by Arbitration 228 in which the discharge of an employee with no active discipline for placing bullets outside of his Supervisor's office was upheld.

<u>Decision</u>
Based on the multiple acts of misconduct during and after the Grievant was placed on a DML, the Pre-Review Committee agreed, the Grievant was terminated for just and sufficient cause.

The case is considered closed without adjustment.

Margaret A. Short, Chairman
Review Committee

Date 2/13/02

Sam Tamimi, Secretary
Review Committee

Date 2-13-02

Exhibit 8d



# REVIEW COMMITTEE

 **IBEW**

PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
MAIL CODE N2Z
P.O. BOX 770000
SAN FRANCISCO, CA 94177
(415) 973-6725

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

JOHN MOFFAT, CHAIRMAN

BOB CHOATE, SECRETARY

☐ DECISION
☐ LETTER DECISION
☐ PRE-REVIEW REFERRAL

## Pre-Review Committee No. 18746
## Energy Delivery – Support Services – Richmond

Joe Cerruti
Company Member
Local investigating Committee

Lula Washington
Union Member
Local Investigating Committee

Subject of the Grievance:

Termination of an Operating Clerk for inappropriate behavior, insubordination and conduct.

Facts of the Case:

On November 6, 2008 the grievant was terminated for inappropriate behavior, insubordination and conduct. The grievant had 28 years of service.

On July 21, 2008, the grievant had returned to work and was assigned to perform operating clerical work related to service planning work and street lights. September 2008 the supervisor began performance discussions with the grievant due to her poor performance.

October 8th the grievant was told to attend a meeting following a safety celebration. She showed up 10 minutes late and was disruptive in the meeting and would not listen. She was told several times by the supervisor to stop being disruptive but refused.

On October 18th the grievant's street light work was reviewed and was unsatisfactory. On October 21st the same issues was present. The supervisor continued to monitor the grievant's performance on street lights.

On October 22, 2008, the supervisor met with the grievant to discuss her behavior, conduct and work performance. The outcome of this disciplinary meeting was to issue an Oral Reminder in both conduct and Work Performance. During this meeting the grievant became very aggressive and argumentative and disruptive. The supervisor recommended that EAP was available to her. The grievant then stated that she was not going to any "f...... EAP". The shop Steward made an effort to calm the grievant down but to no avail. The grievant asked to be excused and told the supervisor to "fire" her. The grievant left work and was off October 23 and 24.

On October 27 the grievant returned to work and a meeting was set up with her supervisor along with a shop steward and Service Planning Supervisor. The grievant was offered a "pink slip" to complete because she complained of job stress. The grievant refused to complete the form. During the meeting the Company told the grievant that she was being sent for a "fitness for duty". The grievant upon hearing she was being sent for a "fitness for duty" she called her supervisor a "f........ liar". The supervisor told the

Exhibit __ IDa __

PGE600051

grievant to stop but the grievant continued calling the her a "f...... liar" , "f...... w.... and also a "f...... b....". The grievant went on to say that "God is going to kill you". She also blurted out that "cameras were watching her and her husband having sex". Employees in the area were concern about their safety to due the outburst.

Corporate Security was called and heard some of the above outburst and arrived at the headquarters within 45 minutes. The grievant was told by Corporate Security Representative to take her personal belongings and leave the Company property and leave immediately. The grievant then told the representative that "I am not leaving the property, you white m..... f..... and don't touch me." The grievant then proceeded to pick up the computer monitor and keyboard and slammed them down on the desk. At this point the police were called. After about ten minutes before the police arrived the grievant was walked to her car by the Corporate Security representative. As they walked to the car the grievant continued to call the representative a "white m...... f......" The grievant sat in her car for another ten minutes during which time the police arrived. She was informed by the officer if she returned she would be arrested for trespassing.

The grievant denied any performance problem, calling anyone names; that she was being harassed, did not use profanity. Subsequent to the discharge and the LIC the grievant sought professional help and is now under the care of a psychiatrist and is receiving State Disability. She has also expressed remorse for her actions on October 27 and asked the Union to confer her apology to the Company

Discussion

The Union argued that the grievant is a long service employee who simply lost control of her emotions. The Union does not believe that the discharge is appropriate and if anything the grievant should be placed on long term disability (LTD). The grievant has sought professional care and is currently on State disability.

The Company argues that the grievant's discharged is based on multiple incidents of her outbursts. She was insubordinate, threatening and used profanity and racial slurs. Her behavior clearly warranted discharge. In regard to the assertion that she should be placed on LTD, the Company position is that eligibility for LTD is not a proper subject for the grievance procedure.

Decision:

Based on the facts presented in this case the case is closed without adjustment.

| _s/John Moffat_ | _s/Bob Choate_ |
|---|---|
| John A. Moffat, Chairman | Bob Choate, Secretary |
| Review Committee | Review Committee |
| 9/4/09 | 9/4/09 |
| Date | Date |

Exhibit___ 10b

PGE000052



# REVIEW COMMITTEE



PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
MAIL CODE N2Z
P.O. BOX 770000
SAN FRANCISCO, CA 94177
(650) 598-7567

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

DOUG VEADER, CHAIRMAN
☐  DECISION
☐  LETTER DECISION
☐  PRE-REVIEW REFERRAL

F.E. (ED) DWYER Jr, SECRETARY

## Pre-Review Committee Number 20560
## Electric Operations – GC Station – San Francisco

Michelle Lee
Company Member
Local Investigating Committee

Landis Marttila
Union Member
Local Investigating Committee

Subject of the Grievance
This case concerns a discharge for sending threatening text messages and making inappropriate and threatening comments directed at co-workers.

Facts of the Case
The grievant was a Utility Worker with 3 years of service and an active coaching and counseling at the time of discharge.

The grievant's supervisor was contacted by an employee who expressed concerns over threats made by the grievant. A Security Department investigation was initiated and determined that the grievant sent threatening text messages and made inappropriate and threatening comments.

The grievant admitted sending the text messages, but denied making the comments. He indicated that he tries to control his mouth and that he may have made threatening comments before entering a chemical dependency program in 2008, but has not made any since then. The grievant received training on the Code of Conduct on August 10, 2010.

Discussion
The Company pointed out that multiple witnesses stated that the grievant made threats of violence towards another individual. The grievant's text messages also clearly threaten this same individual. The witness statements paint a consistent picture that the grievant regularly used profanity, made inappropriate comments regarding national origin and sexual orientation, bragged over his weapons expertise, and openly expressed his dislike for the individual he threatened to harm.

Exhibit 12a

The Union stated that it does not agree that an employee who makes a threat of violence may be automatically terminated.   In this case, however, the grievant is a short service employee who made multiple threats confirmed by multiple employees.

Decision
The Committee agrees the discharge was for just cause and closes this case without adjustment.   This settlement is made without prejudice to the positions of the parties regarding whether a threat of violence is grounds for automatic discharge.


*Doug Veader*                                      *F.E. (Ed) Dwyer, Jr.*
Doug Veader, Chairman                       F.E. (Ed) Dwyer Jr, Secretary
Review Committee                                Review Committee

September 28, 2011                            September 28, 2011
                              Date                                            Date


Exhibit____12b____

PGE000056

SPIRO JANNINGS,            )     <u>Case No.</u>:     **17CV315033**
                                    )
       Plaintiff;            )
                                    )
vs.                               )
                                    )
PACIFIC GAS & ELECTRIC CO., *et al*.     )     <u>**FIRST AMENDED COMPLAINT**</u>

# EXHIBIT "V"

# Grievance Tracking System

Home          FeedBack          PaGE ONE          WWWHR          Help
My Grievances | Create A Grievance | Create A Grievance For More Than 1 Person | Find A Grievance | Reports | Admin

## Grievance Number: 23090

**Status: Closed**

| | |
|---|---|
| **Grievant:** Jannings | **Incident Date:** 2/17/2015 |
| **Union:** IBEW - Physical | **File Date:** 3/27/2015 |
| **Job Description:** Fieldperson | **Settle Date:** 6/22/2017 |
| **Location:** Hayward Service Center | **Outcome:** Company Favor |
| **Labor Agreement Department:** T200 Gas Transmission and Distribution | **Reference Number:** |
| **Org Unit:** Gas Operations | **Area:** 2 |
| **HR Contact:** Vanessa Parker | |
| **Business Representative:** Mennel, Lou | |
| **Contract Title:** Wages and Classification | |
| **Type:** Contractual | |
| **SubType:** | |
| **Discipline:** | |
| **Final Discipline:** | |

**Issue:** Grievant has done work of higher classification on several occasions since the clarification of duties on 2/17/2015. He has not received the upgrade, in addition the timecards have been changed without his knowledge.

**Asked For:** Pay for past upgrades, cease and desist changing of timecards without informing employee.

Back to Top

## Step Information

| Step Name | Step Date | Step Result | Result Date | Days In Step | Total Days |
|---|---|---|---|---|---|
| Filed | 3/27/2015 | Withdrawn | 6/22/2017 | 818 | 818 |

**Details:** 6/15/17 - Union will look to withdraw this case given the Grievant is no longer with the company. Per email from Lou Mennel dated 6/22/17 - the Uniom withdraws this grievance.

Case: 19-30088     Doc# 13456     Filed: 01/13/23     Entered: 01/17/23 14:14:35     Page 218 of 224

# EXHIBIT

## "Y"

| Subject: | Scott Furstman |
|---|---|
| From: | ENadeau@littler.com |
| To: | jannings1@att.net |
| Cc: | RHulteng@littler.com |
| Date: | Monday, October 1, 2018, 5:56:50 PM PDT |

This message contains blocked images.  Show images  or  Always show images

Mr. Jannings,

Are you still considering hiring Scott Furstman?  He has a history of discipline- I found the below online:

**SCOTT SMITH FURSTMAN [#76476], 61, of San Jose** was suspended for one year, stayed, placed on two years of probation with an actual nine-month suspension and he was ordered to take the MPRE within one year and comply with rule 9.20 of the California Rules of Court. The order took effect April 29, 2011. Although Furstman was admitted to the bar's Alternative Discipline Program in 2005 after establishing a connection between his mental health issues and his misconduct, he later was terminated from the program. As a result, he received a higher level of discipline.
He had stipulated to multiple acts of misconduct in six matters, including failures to perform legal services competently, communicate with clients, obey court orders and refund unearned fees, and he abandoned clients. In mitigation, Furstman practiced law for more than 24 years without any discipline, he cooperated with the bar's investigation, his family had serious health problems and he had financial and emotional problems as a result of commuting between his family home in northern California and his law practice in southern California. In addition, he paid court-ordered sanctions and refunded advanced attorney fees to two clients.

You can also see his discipline history on the state bar website: http://members.calbar.ca.gov/fal/Licensee/Detail/76476

- Elisa

**Elisa Nadeau,** Attorney At Law

408.961.7119 direct   408.516.8313 fax   ENadeau@littler.com
50 West San Fernando Street, 7th Floor | San Jose, CA 95113-2434



October 3, 2022

VIA ELECTRONIC MAIL

Scott Furstman, Esq.
1190 S Bascom Ave, Suite 213
San Jose, CA 95128-3512

Michael St. James, Esq.
22 Battery Street, Suite 810
San Francisco, CA. 94111

       Re:    *Spiro Jannings v. Pacific Gas & Electric, Inc.,* Case No. 17CV315033

Dear Messrs. Furstman and St. James:

      I write to you in your capacity as counsel of record for Spiro Jannings in either the above-referenced litigation before the Honorable Peter Kirwan in the Superior Court of California, Santa Clara County (the "State Court Litigation") or the chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (together, "PG&E," the "Debtors," or the "Reorganized Debtors," as applicable).

      As I informed Mr. Furstman in my letter dated June 14, 2022[1], a copy of which is attached to the e-mail transmitting this letter (the "June 14 Letter"), Mr. Jannings is barred from pursuing the State Court Litigation against PG&E by the Bankruptcy Court's Disallowance Order, which disallowed Mr. Jannings' Proof of Claim, and the Reconsideration Order, which denied Mr. Jannings' motion to vacate the Disallowance Order. Furthermore, as I explained in the July 14 Letter, prosecuting the State Court Litigation is a violation of the injunction imposed by the Plan (the "Plan Injunction") and the Confirmation Order.

      To date, you have failed to dismiss the State Court Litigation. In fact, I am informed by Elisa Nadeau, PG&E's counsel in the State Court Litigation, that at a recent hearing before the Superior Court on September 22, 2022, Mr. Furstman again represented to the court that Mr. Jannings intends to retain bankruptcy counsel to seek relief from the Disallowance Order before the Bankruptcy Court.

---

[1] Capitalized words not otherwise defined herein shall have the meaning ascribed to the in my letter to you dated June 14, 2022.

Jane Kim
Direct: 415.364.6793
Cell: 917.637.0290
Email: jkim@kbkllp.com

650 California Street, Suite 1900
San Francisco, CA 94108

The Disallowance Order disallowed Mr. Jannings' prepetition claim against PG&E's bankruptcy estate – the same cause of action that is the subject of the State Court Litigation. The Reconsideration Order denied Mr. Jannings' request to overturn the Disallowance Order. Finally, upon the expiration of the time to appeal the Reconsideration Order, all avenues for relief available to Mr. Jannings were exhausted, and any obligation owed to Mr. Jannings was discharged permanently pursuant to the Plan Injunction. Any attempt to prosecute the disallowed and discharged causes of action is a violation of the Plan Injunction. Despite being aware of the Disallowance Order, Reconsideration Order, and Plan Injunction, Mr. Jannings continues to pursue the State Court Litigation against PG&E. This intentional and willful disregard of the Bankruptcy Court's authority has subjected Mr. Jannings and you, as his counsel, to sanctions.

Unless the State Court Litigation is dismissed by October 17, 2022, PG&E will file a motion with the Bankruptcy Court seeking to enforce the Plan Injunction and impose sanctions against Mr. Jannings and you, as counsel of record in the State Court Litigation and/or PG&E's chapter 11 cases. Your failure to dismiss, and insistence on continuing to pursue, the State Court Litigation, in violation of the Bankruptcy Court's orders, has forced PG&E to incur unnecessary legal fees and expenses. The Bankruptcy Court has the authority to impose monetary sanctions against a party who knowingly violates the Plan Injunction pursuant to Bankruptcy Code section 105(a). "Section 524 of the bankruptcy code provides that discharge 'operates as an injunction against the commencement or continuation of an action . . . to collect, recover or offset any [discharged] debt as a personal liability of the debtor.' 11 U.S.C. § 524(a)(2). A party who knowingly violates the discharge injunction can be held in contempt under section 105(a) of the bankruptcy code." *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006).

In light of the foregoing, we demand that Mr. Furstman immediately dismiss the State Court Litigation with prejudice. PG&E reserves all of its rights, claims, defenses, and arguments.

Very truly yours,

Jane Kim

Attachments

Copy to: Elisa Nadeau, Esq.



June 14, 2022

<u>VIA ELECTRONIC MAIL</u>

Scott Furstman, Esq.
1190 S Bascom Ave, Suite 213
San Jose, CA 95128-3512

   Re: *Spiro Jannings v. Pacific Gas & Electric, Inc.,* Case No. 17CV315033

Dear Mr. Furstman:

   I am chapter 11 counsel for PG&E Corporation and Pacific Gas and Electric Company (collectively "PG&E" or the "Debtors" or "Reorganized Debtors", as applicable). I write to you in your capacity as counsel for Spiro Jannings in the above-referenced litigation before the Honorable Peter Kirwan in the Superior Court of California, Santa Clara County (the "State Court Litigation").

   As you know, Mr. Jannings' claims in the State Court Litigation are pre-petition bankruptcy claims that were stayed as a result of the filing of PG&E's chapter 11 cases. Mr. Jannings filed a proof of claim on October 17, 2019, asserting the same claims that are the subject of the State Court Litigation [Claim No. 58462] (the "Proof of Claim"). On January 13, 2022, the Bankruptcy Court signed an order disallowing and expunging the Proof of Claim [Dkt. No. 11829] (the "Disallowance Order"). On March 14, 2022, the Bankruptcy Court denied Mr. Jannings' motion seeking to vacate the Disallowance Order pursuant to Rules 60(b) or 59(e) of the Federal Rules of Civil Procedure [Dkt No. 12009] (the "Reconsideration Order"). A copy of the Disallowance Order and Reconsideration Order are attached to the email transmitting this letter. The time to appeal the Reconsideration Order ran on March 29, 2022, without Mr. Jannings filing an appeal.

   By Order dated June 20, 2020 [Dkt. No. 8053] (the "Confirmation Order"), the Bankruptcy Court confirmed the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated Date June 19, 2020 [Dkt. No. 8048] (the "Plan").[1] The Effective Date of the Plan occurred on July 1, 2020, and as a result, the Plan has been substantially consummated.

   On and as of the Effective Date, the Debtors have been reorganized, revested with their property, and discharged from their debts, all as provided in the Plan and the Confirmation Order. The Plan and all provisions of the Plan (including, without limitation, all discharge, injunction, exculpation, and release provisions contained in the Plan and in the Confirmation Order) are

---

[1] The Plan, the Confirmation Order, and all other pleadings filed in PG&E's Chapter 11 Cases may be viewed and downloaded on-line, free of charge, at: https://restructuring.primeclerk.com/pge/Home-DocketInfo .

Jane Kim
Direct: 415.364.6793
Cell: 917.637.0290
Email: jkim@kbkllp.com

650 California Street, Suite 1900
San Francisco, CA 94108

Scott Furstman, Esq.
June 14, 2022
Page 2

binding on all holders of Claims (as defined in the Plan) against the Debtors, whether or not the
Claims of any such holder are impaired under the Plan and whether or not any such holder voted to
accept the Plan.

Plan section 10.6 and paragraph 52 of the Confirmation Order provide for a permanent
injunction that applies to "all Entities who have held, hold, or may hold Claims" and prohibits,
"with respect to such Claims, " the enjoined Entities from (among other things) "commencing,
conducting, or continuing in any manner [any proceeding or action] of any kind . . . against or
affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any
of the foregoing . . . ," "[e]xcept as otherwise provided in this Plan or in the Confirmation Order."

In other words, the Bankruptcy Court disallowed the claims asserted by Mr. Jannings in the
State Court Litigation and denied Mr. Jannings' subsequent request for reconsideration pursuant to
Rule 60(b) of the Federal Rules of Civil Procedure. Pursuant to the Plan and the Confirmation
Order, Mr. Jannings is prohibited from pursuing his claims in any other forum, including in front of
the Superior Court of California. Moreover, the Disallowance Order and Reconsideration Order are
*res judicata* against Mr. Jannings, disallowing his claims against PG&E and barring him from further
litigation of those claims.

Notwithstanding the above, I understand from Elisa Nadeau, PG&E's counsel in the above-
referenced litigation, that you represented to the state court at a hearing on May 5, 2022, that Mr.
Jannings' bankruptcy counsel intends to bring a motion for reconsideration in the Bankruptcy Court
on the Disallowance Order, and to seek a writ. All avenues available to Mr. Jannings to seek relief
from the Disallowance Order have been exhausted. He already sought – and was denied –
reconsideration from the Disallowance Order. He failed to appeal either the Disallowance Order or
Reconsideration Order within the time prescribed by the Federal Rules of Bankruptcy Procedure.
He is barred from seeking any further relief from the Disallowance Order and the Reconsideration
Order, and his claims are disallowed and barred.

We ask that you dismiss the State Court Litigation promptly in light of the Bankruptcy
Court's Disallowance Order and Reconsideration Order. If you fail to do so, PG&E reserves all of
its rights, claims, defenses, and arguments, including the right to seek sanctions, including the
recovery of all legal fees and expenses that PG&E incurs to enforce the Disallowance Order and
Reconsideration Order as a result of Mr. Jannings' failure to comply with those Bankruptcy Court
orders.

Very truly yours,

Jane Kim

Enclosures

Copy to: Elisa Nadeau, Esq.
Michael St. James, Esq.