# ADDINGTON MOTION

## 12 PAGES

David P. Addington
298 Saint James Drive
Piedmont, CA  94611
415-606-6552
dpapiedmont@gmail.com

In Pro Per Claim No 108715

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>Affects both Debtors.<br><br>*\* All papers shall be filled in the Lead Case, No 19-90088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case) (Jointly Administered)<br><br>**CREDITOR DAVID P. ADDINGTON'S MOTION FOR QUIET TITLE, DECLARATORY RELIEF AND TO AMEND CLAIM NO. 108715** |

David P. Addington ("Addington") files these motions for Quiet Title and Declaratory Relief and to amend Proof of Claim No. 108715, in the above captioned chapter 11 cases of DEBTORS Corporation ("DEBTORS Corp.") and Pacific Gas and Electric Company (the "Utility"), as DEBTORS and reorganized DEBTORS (collectively, "DEBTORS" or the "DEBTORS," or as reorganized pursuant to the Plan (as defined below), the "Reorganized DEBTORS").

Amendments to proofs of claim should be liberally allowed and freely granted. In re Orion Ref. Corp., 317 B.R. 660, 664 (Bankr. D. Del. 2004); In re Contreras, 571 B.R. 789, 793 (Bankr. N.D. Ill. 2017)

This amended pleading arose out of the conduct, the transaction, or an occurrence set forth or attempted to be set forth in the original pleading. This amendment corrects a defect of form in the original claim, describes the original claim with greater particularity, and pleads new theories of recovery on the facts contained in the original claim. In re McLean Industries, Inc., 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990).

This amended pleading will create no undue prejudice to the DEBTORS or other creditors.

This amended pleading was drafted and filled in good faith.

This amended pleading will not harm other creditors.

The amended pleading is being filed timely based on recent discovery.

Mr. Addington's requested amendment states the following:

I.    PRELIMINARY STATEMENT

This Court permitted Addington to amend his proof of claim "to state a claim for damages *stemming from damage that occurred after the date* of payment following Addington's signed release of claims arising from DEBTORS' revised work agreement." Order Sustaining DEBTORS' Objection and Granting David Addington Leave to Amend Proof of Claim #3093 [Docket No. 12392] on May 16, 2022 (the "May 16 Order") (emphasis added).

Addington filed an amended Proof of Claim (No. 108715). Addington and DEBTORS exchanged some limited discovery under Claim 108715. This information unveiled in this discovery, while incomplete, requires that Addington further amend claim 108715 to adhere more closely to the facts as now known to Addington.

As the Bankruptcy Code imposes an automatic stay upon the filing of the Chapter 11 cases, which, among other things, prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C.

§362(a)(3), Addington request this Court hear Addington's Quiet Title and Declaratory Relief actions or give leave to have these actions heard in Alameda County, as such actions being necessary to resolve conflicting claims of Addington and DEBTORS and being necessary to determine the amount of damages warranted, such as an accurate estimate of the costs to landscape Addington's property. Lastly, the resolution of these conflicting claims is essential to avoid future litigation between Grantor and Grantee.

## II.    BACKGROUND

DEBTORS built two metal towers on ADDINGTON'S property as part of a chain of similar towers to facilitate the distribution of electricity.   The towers hold aloft the cables that conduct the electricity which is sold by the DEBTORS.  The towers at 298 Saint James each hold six cables that cross  high off the ground.  (Lights Declaration)

The DEBTORS' rights to construct the towers and run the cables across Addington's property were established in an easement recorded in 1909.  (Easement Declaration)

## III.    QUIET TITLE ACTIONS

The property subject to this action is at 298 Saint James Drive, Piedmont, California.  Addington is the owner of that real property as of November 2, 2015 and at all times since. Addington and DEBTORS have different and incompatible claims based on Easement interpretation; A) Tower Ownership and B) Improvement Approvals. Addington is seeking a determination of these issues as of the date of his purchase. (Cal Code Civ Proc § 761.020)

A)    Tower Ownership     The difference in the claims are foundational - literally.  The towers have foundations that go deep into the earth – we don't have an engineering report to verify how deep- but sufficiently buried into the earth to qualify them as real property. Real Property being land and those thing permanently affixed thereto.   Addington and only Addington owns the real property at 298 Saint James. DEBTORS own only personal property at

298 Saint James such as the wires, insulators and hooks that are not attached permanently to the ground. (Easement Declaration)

It is clear that one may have a right to use a fixture such as a telephone pole without owning any interest in the land to which it is attached. In the case of Balestra v. Button, 54 Cal.App.2d 192, the court stated at pages 196 to 197 [128 P.2d 816]: "We are of the opinion that the right to maintain such a line [a telephone line] or to own an interest therein, does not necessarily depend upon the ownership of any lands. The owner of such right may or may not own lands. The right to cross over the lands of another is an easement, but no dominant tenement is necessary to support it. . . ."  Again in Rothschild v. Wolf, 20 Cal.2d 17, 22 [123 P.2d 483, 154 A.L.R. 75], a case which involved a right granted to the owner of one building to use a stairway in an adjoining building of the other, it was held that "such a grant of the use of a stairway constitutes an easement and does not necessarily attach to the underlying soil." And in the same case, Mr. Chief Justice Gibson, in a dissenting opinion, based on the ground that no distinction should be made between a case where the building to which the easement attaches is destroyed voluntarily and one where it is destroyed involuntarily, stated (p. 23): "The right to use a stairway on the property of another constitutes a grant in the nature of an easement. The easement, however, is in the building rather than in the land upon which the building is located." Sacramento Municipal Utility Dist. v. Pacific Gas & Electric Co., 72 Cal. App. 2d 638

The difference between these two positions is not insignificant as the "owner" holds the rights not expressly granted to the non-owner. The Easement grants DEBTORS the rights to build, maintain and patrol the towers on which rights Addington can not unreasonably impinge.  But Addington owns the towers and can use the towers as he sees fit for any and all purposes up to and including the right to move the towers if his land use requires it.

Addington requests a determination that Addington owns the Towers.

B.      Rights of Approval – Real Property

DEBTORS have claimed a right to approve certain real property improvements at 298 Saint James.  The City of Piedmont believes DEBTORS have some role in approval. (EXHIBIT S)

The Easement grants no such rights. Quite the opposite, the Easement makes clear that the rights granted are limited to building, maintaining and patrolling the towers and that all other rights are reserved. The easement acknowledges the Grantee's use of personal property to accomplish its objectives but provides no grant of rights for their use as they are personal property.

Addington requests a determination that DEBTORS have no rights of approval of any kind over Addington's property.

## IV.    DECLARATORY RELIEF ACTIONS

Under the provisions of the California Declaratory Judgment Act, CCP §§ 1060 et seq., a declaratory judgment action may be brought to establish rights once a conflict has arisen, or a party may request declaratory relief as a prophylactic measure before a breach occurs. To further the purpose of providing a rapid means of resolving a dispute or a potential dispute, declaratory actions are given precedence in setting trial dates under CCP § 1062.3. Mycogen Corp. v. Monsanto Co. (Cal. 2002), 28 Cal. 4th 888, 123 Cal. Rptr. 2d 432, 51 P.3d 297, 2002 Cal. LEXIS 5025.

Court has no discretion to refuse to give judgment declaring a right which is properly pleaded and well established by evidence; where good ground exists for granting of legal or equitable relief, judgment is given to party entitled thereto as matter of right, not of grace. Collins v. Collins (Cal. 1957), 48 Cal. 2d 325, 309 P.2d 420, 1957 Cal. LEXIS 185.

If it is found that the DEBTOR has an approval right or right(s) over Addington's real property use and/or improvements, Addington requests under CCP §§ 1060 a written description of the rights in sufficient detail to make clear the process for obtaining such approvals.   Termination and Extinguishment Form

Addington requests under CCP §§ 1060 a determination of the rights and obligations arising out of the Easement's termination clause.

This clause states "Any violation of the conditions of this grant shall terminate and extinguish the easement hereby granted."

The courts have found that when an easement contains a clause that ends an easement on the occurrence of specific events, nothing forestalls or limits that clauses operation.

Federal: A Flock of Seagirls LLC v. Walton Cty., 7 F.4th 1072 (11th Cir. 2021) ("The easement specifies that it shall be for the purpose of 'a way of passage, on or by foot only.' Importantly for our purposes, the easement also contains an abandonment clause, which provides in relevant part that the County will be deemed to have abandoned the easement if it 'attempt[s] to use' the easement 'for a purpose not specified [t]herein.' In 2017, the County enacted an ordinance purporting to establish the public's right to use the dry-sand area of all beaches for 'recreational' purposes—including, among others, 'sunbathing,' 'picnicking,' 'fishing,' 'swimming or surfing off the beach,' and 'building sand creations.' Two beachfront property owners sued the County, alleging that the ordinance triggered the easement's abandonment clause. ... *[W]e hold (1) that the ordinance triggered the abandonment clause and (2) that no other source of law—Florida common law, separate provisions in the easement, a Walton County resolution, or a consent judgment—forestalls or limits the abandonment clause's operation.*").

Addington requests a determination of the methods and standards to determine if a violation of the easement has occurred.

Addington requests a determination of the proper form of public notice in the event the Easement's self-termination and extinguishment clause is triggered. (Easement Declaration)

## V.    INTERFERENCE POST RELEASE

Once the Court resolves the conflicting positions outlined above, these duties owed by the parties to one another will become clear.  Likewise, Addington's claims against DEBTORS will become clear as well and thereafter dismissed, pursued or further amended. These determinations will determine the lens through which to view the interactions between Addington and Debtor.

The interactions between Addington and DEBTOR and the fact surrounding them will not change. But the facts must be viewed through the lens the Court will provide on the areas that are today in dispute. As such, Addington below introduces a summary of the most significant interferences of DEBTORS in Addington's land use in roughly chronological order. Each of these interferences with Addington's land use, separately or in combination, could give rise to a claim for damages and/or result in the Easement's Termination. The lens of the Court determinations above will determine the legal significance of these interactions, of any.

Regardless of their current legal significance, Addington presents this summary of his interactions with DEBTOR for consideration once the lenses requested have been ground and polished.

### A. Easement Maintenance Work

#### 1. Discrepancy between Agreed and Actual Work Done

After DEBTORS left Addington's property, Addington worked to figure out what had been done by DEBTORS. Addington's signed release of claims referenced in May 16 Order was conditioned on his verification that the dump logs matched the reported soil removal. (Exhibit A) The actions of both parties after November 4, 2016, evidence their understanding that the release was conditional. Addington and DEBTORS exchange dozens of emails attempting to quantify the amount of soil removed from Addington's property. (Exhibit B) On December 13, 2016, Addington sent an email (Exhibit C) summarizing the gathered information which concluded that the off-haul was approximately thirty yards – far less than the 280 yards in the MWSRA attachment or in the Arcadis report. Addington asks DEBTORS for a response to his calculations. Addington to date has never received a response. (Exhibit D)

#### 2. Attempts to Landscape New Contours

The steep grades that were left when DEBTORS completed it is work required a complete redesign of Addington's landscaping plan. In January 2017, Addington met at the DEBTORS' offices to present his case. At the meeting, Addington agreed to accept a payment of an additional $100,000 to cover additional landscaping costs. At DEBTORS' request but Addington's cost, hires a landscape architect to develop a landscaping plan that would work with

DEBTORS' newly created topographic contours. (Exhibit E) At DEBTORS' request, Addington solicits and receives a landscaping bid from GJR. (Exhibit F) DEBTORS requests drawings which Addington forwards. (Exhibit G). After weeks of review, DEBTORS decided to offer no additional financial assistance to cover additional landscaping costs. Addington has never received an explanation of why the requested additional assistance was denied.

### 3. Undoing Work Done Without Agreement

Despite DEBTORS' change to Addington's topography such that more expensive landscaping is required, DEBTORS refuses to fund any of the added landscaping costs. Given the higher costs of landscaping the new topography and Addington's preference for the original topography, Addington decides to restore the topography himself. In preparation to restore the topography to its original condition, Addington requested DEBTORS' analysis that determined that the topography required the changes it implemented. The MWSRA had no mention of any topographic changes. Addington wanted to understand why DEBTORS made the topographic changes it made so as to understand what was needed to reverse those changes.

### 4. Requirements Only Known by Debtor And Only Applied to Addington

Instead of an engineering report explaining why the original conditions required change, DEBTORS sent Addington the ASEC, Inc. report dated March 3, 2017. (Exhibit H) The DEBTORS, without irony, produces this "engineering report" that offers no engineering but dictates that an engineering report must be done before doing such work as it had just done.

The ASEC, Inc. report is "worse than worthless." (MWA Declaration)

Neither DEBTORS OR ASEC has ever answered repeated questions regarding the engineering standards, procedures for approval or who Addington could contact to discuss these issues with. After many discussions with experts, it has become clear that the work needed to restore (or even improve) Addington's property will require a Quiet Title action. (Experts and Landscaping Declaration)

### B. Lights

On April 5, 2017, DEBTORS wrote to Addington telling Addington to remove a light rested on one of the tower legs. (Exhibit I) DEBTORS position seemed ludicrous to

Addington given the attachments to the tower closest to the one in question. (Lights Declaration)
DEBTORS' agents entered Addington's yard, under cover of darkness, unannounced, and
uninvited and removed the light. Addington returns the light and DEBTORS' agents again enter
Addington's yard, unannounced, and uninvited and remove the light.

Recent production has revealed that the motivation for DEBTORS' repeated
trespass and interference with Addington's land use was spurred by the City of Piedmont.
(Exhibit J) The City of Piedmont was responding to neighbor complaints. (Lights Declaration)
When the City of Piedmont could not find a codified rationale to require the light be removed,
they called DEBTORS who removed the light. (Exhibit J)

### C. Debtor Refuses Further Discussion

In May 2017, Addington sends an email to DEBTORS laying out his position.
(Exhibit K)

DEBTORS responds that DEBTORS will do **nothing** to assist Addington.
(Exhibit L)

Addington files the notice of termination. (Exhibit M)

Addington acknowledges notice of termination is void.

### D. DEBTOR Call Police on Addington

### 1. January 29, 2019

On August 10, 2017, Addington sends email to the DEBTORS asking that
DEBTORS request permission before entering the property. (Exhibit N)

On returning home on January 29, 2019, Addington finds eight or so men in his
yard on and about tower thirty. Addington asks who they are and what they are doing and is told
that the "lady of the house" agreed to allow them to work on the tower. The "lady of the house"
was Addington's 21-year-old non-English-speaking nanny. Addington asks the crew to leave. A
member of the crew threatens to return to kick Addington's ass. (Stress Declaration) The
prospective ass-kicker establishes his credentials by loudly claiming to have been shot and
stabbed several times in several different fights. After leaving Addington's property, DEBTORS
reports the incident to the police. Piedmont Police arrive at Addington's home where the Police

interview Addington regarding the incident. Addington declines to file a complaint against the worker making the threats.(Exhibit O)

2. December 2, 2022

Two insulators on tower thirty are scheduled for replacement on a Sunday. During a phone call with DEBTORS, Addington was informed that the work had to be done on Sunday because the de-energizing of the lines required coordination with CA DOT. Work is canceled, for some reason not related to Addington. (Exhibit P). Addington makes DEBTORS aware that the scheduled day is highly inconvenient for Addington and requests the work be rescheduled. The DEBTORS says it is doing the work that day and time despite Addington's protest. (Exhibit Q) Despite Addington's clear indication that the work was inconveniently scheduled, DEBTORS showed up anyway with many vehicles and people. Addington refuses to allow entry. DEBTORS calls the police to force Addington to allow access to his property. As Addington's wife took their three children to school, the Police were questioning Addington. (Exhibit R)

This incident and others have caused significant stress and emotional distress for Addington, his wife and his children. (Stress Declaration)

**VI. CAUSES OF ACTION**

Based on the Judicial Determinations requested, these facts may give rise to the following causes of action which will be plead in full after the Judicial Determinations are issued.

1. Slander of Title
2. Loss of Business Opportunity
3. Misuse of Easement Rights
4. Misuse of Secondary Easement Rights
5. Trespass
6. Quiet Title

## VII.   PRAYER FOR RELIEF

WHEREFORE, Addington prays for judgment against DEBTORS as follows:

On the FIRST CAUSE OF ACTION:

1. A COURT ORDER AS TO DEBTORS' CLAIMS NOT COVERED BY THE QUIET TITLE AND DECLARATORY RELIEF

2. For such other and further relief as the court may deem proper.

On the SECOND CAUSE OF ACTION:

FOR A PENALTY IN AMOUNT EQUAL TO THE PROFITS LOST FOR 2280 DAYS AT $250 PER DAY.

For interest on the DAMAGES at the legal rate from and after the date of judgment.

On the THIRD CAUSE OF ACTION

1. For costs of suit herein incurred; and

2. For such other and further relief as the court may deem proper.

On the FORTH CAUSE OF ACTION

1. For costs of suit herein incurred; and

For such other and further relief as the court may deem proper.

On the FIFTH CAUSE OF ACTION

1. For DISGORGEMENT UNDER CIVIL CODE SECTION 3334(b) OF THE BENEFITS OBTAINED BY DEBTORS THROUGH A WRONGFUL OCCUPATION OF ADDINGTON'S PROPERTY ACCORDING TO PROOF.

For DEFENDANT'S ACTS IN TRESPASSING ON PLAINTIFF'S PROPERTY WERE MADE WITH MALICIOUS INTENT AND THUS WARRANT THE AWARD OF EXEMPLARY DAMAGES ACCORDING TO PROOF.

For DEFENDANT'S ACTS IN TRESPASSING ON PLAINTIFF'S PROPERTY WERE MADE WITH MALICIOUS INTENT AND THUS WARRANT THE AWARD OF DAMAGES for EMOTIONAL DISTRESS ACCORDING TO PROOF.

For interest on the DAMAGES at the legal rate from and after the date the damages were determined to have been incurred or the date of judgment.

On the SIXTH CAUSE OF ACTION:

A determination of tower ownership.

A determination of rights of approval, if any.

A determination of the form and process for easement termination.

On ALL CAUSES OF ACTION AND COUNTS:

1. For costs of suit herein incurred; and

For such other and further relief as the court may deem proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 30th day of January 2023, in Piedmont, California.

*/s/ David Preston Addington*

By:    David Preston Addington

# EXHIBIT 1

## EASEMENT

### DECLARATION

## 5 PAGES

I, David Preston Addington, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the fee owner of the property known as 298 Saint James, Piedmont California 94611 and a Creditor in the above captioned Chapter 11 Cases. I submit this Declaration in support of the Motion for leave to Amend Amended Proof of Claim No. 108715 Filed by David P. Addington (the "Leave to Amend"), filed contemporaneously herewith.

2.      If called upon to testify, I would testify competently to the facts set forth in this declaration.

I read the Easement recorded on 298 Saint James before purchasing the property. The easement's terms gave me confidence that the Grantee would not be an irritation. I relied on the protection the Easement provided. I continue to rely that the Easement's words are empowered to have the effect they clearly intend.

The Easement makes doubly sure that no one mistakenly assumes additional rights are granted. First, the grant is qualified for "the purpose *only*" to erect and maintain steel towers. The "only" does not change the plain meaning of the statement. "The purpose is xyz." and "The purpose only is xyz." have the same meaning broadly, but the added "only" eliminates any doubt that this grant intends these limitations literally. Secondly, the Grantor expressly reserves his rights to use the land for all purposes. This reservation is unnecessary as the easement's granted rights do not alter the Grantor's land use rights. But this wise Grantor wanted everyone to be keenly aware that the land was his to do with it what he wanted and the easement in no way detracted from his rights to do so.

Having made doubly certain that any third party that may ever encounter this easement knew that Grantor had retained the rights to do with his property as he saw fit, the Grantor put the Grantee on notice of the same. The Grantee is sternly warned, "Interfere in my property use and this easement turns to ash, automatically and without appeal." The Grantor makes clear that should the Grantor's land use require it, the Grantor can move the towers as suits the Grantors land use.

The Grantee can do what must be done to carry out the maintenance and patrolling of the towers, but nothing else. If, over the course of many years, the Grantee loses sight of these clear guidelines and due to excessive familiarity or arrogance or both envisions itself more the owner than the guest, the invitation to use the Grantor's property is revoked.

The Grantor knew that the Grantee would be prone to attempt expansion of the easement's grant. This Grantor seemingly predicted that in the distant future, the Grantee would be massively powerful and rich and the Real Property owner, Grantor's legal heir, would be just a regular guy trying to raise his family without interference. Foreseeing the damage his real property heirs could suffer from a domineering Grantee's unrestrained easement assertions, the Easement plainly serves to guard the real property owner's rights in his real property from an unmoored Grantee.

The Grantor chose a single, fatal remedy should the Grantee become an unrepentant miscreant. In making this choice, the Grantor made certain that the Grantee's behavior would always be exemplary. The Grantor's choice of a single fatal remedy, delivered swiftly and without appeal, should have served as a constant **r**eminder to the Grantee of the privileged position he had been granted. The Grantor knew as well that the property that he subordinated to the Easement would soon be divided into much smaller pieces. These small owners would never be in a position to battle a giant Grantee if the easement terms were vague or the spoils small. The Grantor knew his heirs would need a cudgel.

The Grantor had, and his heirs continues to have, every right to expect the Grantee to do everything possible to respect the Grantor's use of his property. The desired Grantee is keenly aware that *any* violation of the conditions, so *any* interference that is not unquestionably necessary, triggers the easements termination. There cannot be a second violation under this easement. There cannot be a lesser violation. If there is *any* violation the easement turns to dust.

This sort of language gave me the assurance to buy the property and to allow the Grantee to maintain the easement as the Grantee needed to do. Because the Grantee is certainly not going to screw around with my property, with my family, with honesty because doing so has singular consequences.

*ANY VIOLATION = CERTAIN TERMINATION*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 30th day of January 2023, in Piedmont, California.

/s/ *David Preston Addington*

By:    David Preston Addington

**THIS INDENTURE**, Made by and between David Preston Addington, a married man, residing at 298 Saint James Drive, in the City of Piedmont, County of Alameda, in the State of California, the party of the first part, and PG&E CORPORATION, and PACIFIC GAS AND ELECTRIC COMPANY, the party of the second part, WITNESSETH:

That the party of the first part, for and in consideration of _____

_____ in hand paid by the said party of the second part, the receipt of whereof is hereby acknowledged, does hereby grant unto the said party of the second part, its successors and assigns, upon the conditions and for the purposes hereinafter set forth, an easement of a tract of land of uniform width of sixty(60) feet situated in the County of Alameda, State of California, the center line of which said strip of land sixty (60) feet in width, over which said easement is hereby granted, being more particularly described as follows, to wit:

APN: 051-4813-017

This grant is made upon the following express conditions and reservations, to wit:

**First.**        Said easement is here by granted for the purpose only of enabling said party of the second part to erect and maintain upon said strip of ground, sixty feet in width two lines of steel towers, which said steel towers shall be located upon said strip of land, not less than 350 feet apart for the purposes of suspending and stringing wires thereon and supported thereby for the transmission and distribution of electricity, with all necessary and proper cross arms, braces, connections, fastenings, and other appliances for use in the connection therewith provided that no wire shall be suspended or strung upon or between said towers, at a distance of less than 30 feet from the surface of said 60 foot strip of ground hereinbefore described; and provided further that where said, wires cross, where it said wires cross any railroad hereafter constructed across said strip of ground 60 feet in width, then in that case, said party of the second part shall maintain, said wires, at least 40 feet above the rails of said railroad at said crossing.

**Second.**        Said party of the first part hereby reserves the right to cross said sixty foot strip of ground hereinbefore described at any point or points with such streets, avenues and highways and railroad lines as it may desire, provided that in case of the opening of any street,

highway or avenue, of construction of any railroad line, across said sixty foot strip, it shall become necessary to move any tower erected under the terms of this grant by the party of the second part, then in that case the actual cost of moving said tower shall be borne by the party of the first part.

**Third.**        Intentionally left blank.

**Fourth.**        Said party of the first part hereby reserves the right to use said strip of land sixty feet in width for all purposes including that of mining and agriculture, and said party of the second part, in the enjoyment of the rights hereby granted, shall avoid so far as it reasonably can interfering with the use by the party of the first part of said strip of land for any and all purposes. The party of the second part shall have the right of patrolling said towers and wires located upon said sixty foot strip of ground, and shall have the right to erect, maintain and use gates in all fences which now cross or which shall hereafter cross said sixty foot strip of ground, but said party of the second part shall not have the right to fence or enclose said strip of ground sixty feet in width owner which said easement is hereby granted.

**Any violation of the conditions of this grant shall terminate and extinguish the easement hereby granted.**

IN WITNESS WHEREOF, said party of the first part has executed these presents this _____ day of _____, 20____.

_____

David Preston Addington

# EXHIBIT 2

# MAINTENANCE WORK AGREEMENT

DECLARATION

## 3 PAGES

I, David Preston Addington, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the fee owner of the property known as 298 Saint James, Piedmont California 94611, and a Creditor in the above captioned Chapter 11 Cases. I submit this Maintenance Work Agreement Declaration in support of the Motion for leave to Amend Amended Proof of Claim No. 108715 Filed by David P. Addington (the "Leave to Amend"), filed contemporaneously herewith.

2.    If called upon to testify, I would testify competently to the facts set forth in this declaration.

3.    The Easement requires the Grantor to facilitate PG&E's duty to maintain its equipment and operations across the real property.

4.    PG&E requested my agreement on the schedule for the work they determined was necessary. The last line of the Agreement makes plain that PG&E believes that they could do the work required with or without my agreement. "We will not move forward with any soil removal work on your property until we have received your written agreement."

5.    I have never seen similar language in any contract for services I have ever seen.

6.    The easement requires my accommodation of PG&E's maintenance request.

7.    When PG&E told me they finished the maintenance work, I agreed to release them from any further obligation under the Maintenance Work Agreement.

8.    Although I qualified this release, I believe my rights to bring suit under the MWA have tolled.

9.    The MWA and my release do not change or modify the terms of the recorded easement.

10.    The MWA and my release arose out of the easement agreement. My agreement and release were obligations of the Grantor to facilitate Grantee's utilization of the easement.

11.     The ASEC, Inc. report is worse than worthless.  Worthless because the engineers admit they have never visited the site to verify any of the information contained. Worse because it calls for an "engineered solution" for disturbance within thirteen feet of the tower legs but provides no standards for such a solution.

12.     The report provides no explanation as to why the Debtor's disturbance was done without the report's mandated "engineered solution."

13.     I have requested the standard for the engineered solution but got no response.

14.     I have requested a contract person at DEBTOR to discuss the standard for the engineered solution but got no response.

15.     I have left messages at the ASEC, Inc. offices in Miami Florida asking to speak with the engineer or engineers that created the report and have gotten no response.

16.     DEBTOR had changed my properties' topography without my agreement.

17.     The MWA did not cover changes in topography.

18.     DEBTOR has refused to cover any additional landscaping costs due to their topography changes.

19.     DEBTORS' engineers have issued a report that states I will need an engineering report to restore the topography, but DEBTOR will not commit to a standard for that report.

20.     Recent production reveals that DEBTOR did its work at 298 Saint James without any plans, reports, designs, or descriptions.

21.     DEBTOR has no topographical information related to the conditions prior to its work or after its work.

22.     The conditions resulting from Debtors work make my use of the easement untenable

23.     Debtor has admitted that these conditions are undocumented but, according to the March 3, ASEC report, they are also sacrosanct.  This makes me mad as hell.

Case: 19-30088    Doc# 13481    Filed: 01/31/23    Entered: 02/01/23 10:22:28    Page 22 of 39

24.     Debtors' work was reasonable and necessary for the maintenance of the easement, or it was not.

25.     If the changes were necessary, then show me what was done and why.

26.     If the changes were not necessary, then the Debtor has unreasonably interfered with my property.

27.     PG&E has now confessed that it did the work without a plan, without design, and therefore it can be deduced without necessity. Just mucking about spending the rate payer's money because they could. Such behavior is despicable.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 30th day of January 2023, in Piedmont, California.

                                    _/s/ David Preston Addington_
                          By:     David Preston Addington

# EXHIBIT 3

# LIGHTS

### DECLARATION

## 6 PAGES

I, David Preston Addington, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the fee owner of the property known as 298 Saint James, Piedmont California 94611 and a Creditor in the above captioned Chapter 11 Cases. I submit this Declaration in support of the Motion for leave to Amend Amended Proof of Claim No. 108715 Filed by David P. Addington (the "Leave to Amend"), filed contemporaneously herewith.

2.      If called upon to testify, I would testify competently to the facts set forth in this declaration.

3.      I put a light on the tower leg.   Exhibit A and B are photos I took recently but of the light as it was in 2016.

4.      PG&E sent its agents into my yard to remove my light, twice.   PG&E claimed my light was an unmitigated risk.  By implication, PG&E position was that the attachments on their tower were not a risk.  This position is complete and udder malarky. It makes me mad as hell thinking about it 6 years later.  Exhibit C and D are photos I took of the tower immediately to the east of my tower with the light.

5.      One of my neighbors runs a successful residential real estate brokerage firm.  Not long after I bought 298 Saint James, I cleared a large number of trees, mainly Acacia Melanoxylon, which had previously blocked this neighbors view of the power transmission towers.  This neighbor told me that my actions- by creating a view from his home of the towers - had devalued his property by some significant percentage.  My recollection was he said 10% to 20%.

Case: 19-30088   Doc# 13481   Filed: 01/31/23   Entered: 02/01/23 10:22:28   Page 25
of 39

6.      This neighbor is a friend of Piedmont Planning and Building staff, especially Kevin Jackson.

7.      Neither Mr. Jackson nor my neighbor will admit or deny that he called Mr. Jackson about my lights.  But I would wager 10 to 1 that it was him.

8.      The discovery that the PG&E's actions were in service to my powerful neighbor, made me livid.

9.      I had spent hours trying to get PG&E to explain its position.   And, PG&E has never apologized.

10.      PG&E considered, then decided against, telling me that Mr. Jackson motivated their actions.

11.      PG&E actions have precluded me from renting the towers for use as a base for cell phone antenna or other uses.

12.      My towers have better coverage than the towers shown in Exhibits C and D.

13.      I estimate that my towers could generate $5,000 to $10,000 a month from cellular antenna customers.

14.      PG&E can provide the data as to what they are paid for their tower as a comparable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed this 30th day of January 2023, in Piedmont, California.

                                                        _/s/ David Preston Addington_
                                         By:     David Preston Addington



EXHIBIT A



Exhibit B

Exhibit C

/

.



.



Exhibit D

Case: 19-30088   Doc# 13481   Filed: 01/31/23   Entered: 02/01/23 10:22:28
of 39

# EXHIBIT 4
# EXPERTS AND LANDSCAPING

DECLARATION

3 PAGES

I, David Preston Addington, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the fee owner of the property known as 298 Saint James, Piedmont California 94611 and a Creditor in the above captioned Chapter 11 Cases. I submit this Declaration in support of the Motion for leave to Amend Amended Proof of Claim No. 108715 Filed by David P. Addington (the "Leave to Amend"), filed contemporaneously herewith.

2.      If called upon to testify, I would testify competently to the facts set forth in this declaration.

3.      I spoke with several real estate valuation professionals and construction professionals to gather the data I based my amended claim on.

4.      After filing my amended claim, I spoke with three of the initial real estate valuation professionals again. None of this group had changed their initial opinion of the negative impact on real property value caused by PG&E's work at 298 Saint James.

5.      None of these real estate valuation professionals was willing to take a public position in opposition to PG&E without compensation. Who could blame them? PG&E is a litigious monster. Has any company spent more money on lawyers than PG&E? In California? In the Country? Last year? Ever in history?

6.      The construction professionals I spoke with had similar concerns regarding taking sides against PG&E.

7.      Moreover, they were unwilling to commit to a cost to do work on my property, because of the uncertainty regarding the easement requirements. Does PG&E have a right of approval for work within thirteen feet of the towers? Will such work require an engineered plan? What liability does the contractor assume if they work within the restricted area? Even if the work is flawless, could PG&E sue them?

8. For those contractors and engineers with experience working with transmission towers, working with me would be financial suicide. I have two towers and one single family project.

9. PG&E, I have been told, has 99,000 towers like the two in my yard. As a professional in the transmission towers niche, taking a position adverse to PG&E would undermine your credibility as your decision would be insane.

10. I will act as my own expert on the matters relevant to my claim.

11. I have been active in commercial and residential real estate since 1986.

12. Within the easement areas at 298 Saint James the existing topography and soils make traditional landscaping choices unworkable. The rocky clay soil needs to be deeply tilled with topsoil and amendments to sustain traditional plantings. Tilling soil requires disturbing it. PG&E has stated that you need an engineered plan to do this.

13. The steep slopes that PG&E created in my yard leave few viable planting options.

14. When I sodded my backyard outside of the easements restricted areas, I put about thirty square feet in the most modestly sloped area. Even in the least steep area, the sod did not survive. If sod will not hold, there is extraordinarily little hope for any plants other than those that survive on a cliff side.

15. Hiring a contractor, if any were found willing, would be impractically expensive, given the unknown liability they would be assuming.

16. Estimating the costs to landscape my yard is impossible because it is not clear what work the towers might require.

17. The costs for the work the towers might require are impossible to estimate because it is unknown what standards are demanded and what process approvals might take.

18. Hiring the engineers, if any were found willing, would be impractically expensive given the risks they would be assuming in working with me.

19. Even if I could hire the right team of professionals, what would I task them to do?

20.     The City of Piedmont does not have a grading permit and is not equipped to review transmission tower work.

21.     Lastly, if PG&E has some set of undocumented rights that emanate out of the easement, seemingly anything I might do could run afoul of those rights and create significant liability for me.

22.     PG&E has repeatedly warned me that my actions are creating legal liability for me.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed this 30th day of January 2023, in Piedmont, California.

                                                          */s/ David Preston Addington*

                                          By:     David Preston Addington

# EXHIBIT 5

# STRESS

### DECLARATION

## 4 PAGES

I, David Preston Addington, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the fee owner of the property known as 298 Saint James, Piedmont California 94611 and a Creditor in the above captioned Chapter 11 Cases. I submit this Declaration in support of the Motion for leave to Amend Amended Proof of Claim No. 108715 Filed by David P. Addington (the "Leave to Amend"), filed contemporaneously herewith.

2.     If called upon to testify, I would testify competently to the facts set forth in this declaration.

3.     My wife, my children and I have all suffered great stress and emotional distress due to Debtor's trespass into our home.

4.     The thought that the Debtor can and has shown up and come into our yard at all hours of the day and night is very scary and stress producing.

5.     The possibility that Debtor might come tonight is real and highly agitating to me and my entire family.

6.     My wife and I moved to a rented house in Piedmont the day before my daughter started first grade in 2014.  We bought 298 Saint James on November 2, 2015, one day before our twin boys' first birthday.  Our timing could not have been better.

7.     Saint James is the first house I ever owned and initially a source of considerable pride and excitement.  The house is a mid-century modern on a large lot with a view of Oakland and San Francisco.  The house was designed with large entertaining spaces separate from the living area.  Having recently lived on top of the Warfield Theater, we had a sense that Saint James could be a great spot for entertaining.  We started work updating the interior and dreaming about what the property could become.

8. A neighbor mentioned to me that he had gotten PG&E to clean up the area around the power transmission towers that were closest to those on our property and suggested our property might also need lead abatement.

9. I reached out to PG&E with my concern.

10. PG&E responded that their easement did need significant maintenance – including removing all the topsoil. PG&E proposed that they would do the maintenance required and provide me with a payment to restore my landscaping.

11. I agreed and everything went to shit.

12. My yard has been a wreck ever since.

13. We nailed down used artificial turf in our yard in the easement area as a temporary measure. I was certain that we would find a way, with PG&E or around them, to properly landscape our yard.

14. I was wrong.

15. And the turfed yard is a constant reminder of my mistake.

16. Every visitor to our house asks what happened.

17. The yard is a source of great stress in my relationship with my wife.

18. The embarrassment caused by the unfinished yard causes has resulted in our cessation of entertainment in our home.

19. It is a constant irritation that cannot be escaped.

20. PG&E is the direct cause of this stress.

21. Instead of acting to avoid unnecessary interference at 298 Saint James, PG&E has made interference a priority.

22. Having crews of people in my yard, uninvited and unannounced, is a nightmare.

23. Having those crews threaten to kill me creates significant stress.

24. Being questioned by the police, in front of my children and wife, was permanently scaring.

25.   My daughter, a high school freshman, is embarrassed at the state of our yard. Her embarrassment is a dagger in my heart.

26.   We hoped to have the yard ready for her eighth birthday.

27.   If the court rules in my favor and PG&E does not further muck up the works, we might have the landscaping ready for her sixteenth birthday – for her a lifetime has passed. And my time with my child has been forever marred by PG&E's pointless behaviors.

28.   My twin boys do not know of a time when their yard was not covered in used high school turf. Where they could have had a level court to recreate, today, like every day in their memory, they have to chase every missed ball down the hill hoping to grab it before it rolls into traffic.

29.   For all of this time, PG&E could have helped and not hindered, but instead they chose to remain silent, answer no questions, offer no assistance, and now endeavor to bury me in legal paperwork.

30.   In trying to force PG&E to respect my rights as Grantor, I find myself in litigation against a giant.

31.   I can only imagine how many tens or even hundreds of millions of dollars PG&E has spent during its bankruptcy in legal fees.

32.   I have been forced to spent 100s of hours and thousands of dollars over the past 6 years trying to find a pathway to landscape my yard but have gotten nothing but threats and peril.

33.   PG&E has used its customer's money to make my life far worse than it could have otherwise been.

34.   It is reasonable to assume that PG&E will continue to do so if it is not called to task.

35.   I did not pick this fight and I did not choose this forum.

36.   PG&E is a powerful, vindictive monopoly but I am committed to do all I can to force them to follow the law and respect its agreements.

37.   Only by forcing their compliance, will I be able to restore my property.

38.     Only By paying a meaningful penalty, PG&E will compensate me for the stress and duress they willfully caused and hopefully modify their behavior when dealing with others similarly situated so they can avoid the anguish of dealing with an unrepentant beast. and hopefully force better behavior from PG&E going forward.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed this 30th day of January 2023, in Piedmont, California.

_/s/ David Preston Addington_

By:     David Preston Addington