William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

     -and-

PACIFIC GAS AND ELECTRIC COMPANY,

          Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☒ Affects both Debtors

\* *All papers shall be filed in the lead case, No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administrated)

**MOTION FOR ORDER DEEMING WILLIAM B. ABRAMS SUPPLEMENT TO DAMAGE CLAIMS TIMELY**

**Response Deadline:**
March 3, 2023 (Pacific Time)

**Hearing If Order Granted:**
March 10, 2023 (Pacific Time) or as determined by the Court

William B. Abrams ("**Abrams**") as a PG&E victim, ratepayer and Northern California resident, submits this "Motion for Order Deeming William B. Abrams Supplement to Damage Claims Timely" (the "**Motion**") for an order substantially in the form attached as **Exhibit A** hereto that approves, as timely, the supplement to Damage Claims Nos. 20057, 16425 and 54799 which were valid and timely filed through the Fire Victim Trust (the "**FVT**" or "**Trust**"). As of the date of this Motion, Abrams has still not received a claims determination from the FVT Trustee despite prior representations regarding the timeliness of claims processing. However, given the supplemental injuries and related damages as filed contemporaneously with this Motion, Abrams is setting forth additional categories of claim supplements and requesting approval from the Court for related relief. Furthermore, this Motion is being put forward in keeping with the direction set by the Court through the "Order Granting Stipulation Resolving Motion of Baupost Group Securities, L.L.C. for Order Deeming Supplement to its Proofs of Rescission or Damage Claims Timely" [Dkt. 13467] where within the "Attachment to Order Granting Baupost – PG&E Stipulation," the Court indicated that "*if he believes he has a claim to assert against the Reorganized Debtors notwithstanding the confirmed Plan of Reorganization, he has not expressed it.*" This Motion is put forward to explicitly express these valid claim supplements for Abrams in an effort to provide an equitable judicial pathway for other similarly situated victims, residents and ratepayers.

**These claim supplements are direct claims against the Debtor's estate and will not affect the corpus of the Fire Victim Trust** or the processing of claims in accordance with the existing victim Claims Resolution Procedures (the **"CRP"**). Out of an abundance of caution and as a pro se claimant, Abrams is filing this Motion similar in form and function as the December 28, 2022 "Motion for Order Deeming Baupost Group Securities, LLC's Supplement to Its Proofs of Rescission or Damage Claims Timely" (the **"Baupost Motion"**) [Dkt. 13392]. However, unlike the Baupost Motion, Abrams' does not intend to carve out special inequitable procedures given the fact that these Debtor driven damages are not unique to Abrams or Baupost. Instead, Abrams through this Motion and in response to the Court's Order regarding Abrams standing is requesting that the Court approve these valid claims supplements so that other victims, ratepayers and residents that similarly file claim supplements and have incurred these damages will be able to motion the Court for similar relief. Given these objectives and in support of this Motion, Abrams respectfully states as follows:

# PRELIMINARY STATEMENT

Abrams is a holder of Damage Claims under the Debtors' confirmed "Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020" [Dkt. 8048] (the "**Plan**") and through the administration of the Fire Victim Trust. Abrams like Baupost and many Pacific Gas and Electric Company (**"PG&E"**) victims, residents and ratepayers relied upon the material misstatements, misrepresentations and falsehoods leading up to the victim vote and eventual plan confirmation. However, unlike Baupost's late expressed concerns regarding the PG&E safety record, Abrams consistently and repeatedly requested safety related disclosures and was denied that material information from the Debtor at every turn within the case. In response to Abrams repeated requests and formal motions for disclosures, The Debtor falsely asserted that safety related disclosures and related witness testimony was immaterial to the victims' settlement and vote within this case. Indeed, the Debtors' unwillingness to be forthcoming, forced Abrams and other victims to rely upon the later proven to be false proclamations of a safety focus in high-fire threat areas and other safety related distractions including those put forward within the victim disclosure statement. The nondisclosures and misrepresentations prior to the victim vote, followed by the late release of material safety related information AFTER Abrams and other victims could account for these facts within their damage claims, compounded the financial injuries to victims and necessitates the addition of the following categories of claim supplements through this Motion:

1. **PG&E Victim Damage Claim Supplements –** Abrams and other victims were duped by the Debtors' artificially inflated $13.5B valuation and the associated registration rights agreement because the Debtor withheld material safety related information that if disclosed would have required more PCG shares or perhaps drove victims to accept the competing all-cash offer. Later released reports exposing the fallacies of the Debtors' safety related rhetoric caused the value of the FVT stock to drop and allowed backstop parties to capitalize on the victims' position holding 25% of PCG.

2. **Northern California Resident Damages -** As a Sonoma County resident who moved from New York in 2010, Abrams purchased a home and moved with his family in part based upon the Debtors' deceptions, misstatements and misleading representations regarding their wildfire mitigation activities and the associated safety, security and insurability of his home. After the falsity of the Debtors' public statements became

apparent through independent audits and associated reports referenced herein, the insurability of homes like Abrams' within High Fire Threat Districts ("**HFTDs**") became problematic and in some cases impossible. The injuries associated with the aforementioned insurance scarcity and the related effects would have been accounted for within Abrams original and timely filed damage claims if the Debtor had accurately represented their wildfire mitigation activities.

3. **PG&E Customer Damages -** As a Pacific Gas and Electric Company (**"PG&E"**) ratepayer, Abrams paid energy bills based upon the Debtors' deceptions, misstatements and misrepresentations regarding their wildfire mitigation activities. PG&E cost recovery through rates has been artificially inflated as demonstrated by the reports referenced herein that show a lack of wildfire mitigation activities and general deferred maintenance particularly within PG&E designated HFTDs. This over-billing was unknown to Abrams and other victims when timely filing their damage claims. However, this over-billing became apparent through the subsequent reports that were released after victims voted upon the Plan necessitating a supplement to these damage claims. The injuries associated with the aforementioned insurance overbilling and the related effects would have been accounted for within Abrams original and timely filed damage claims if the Debtor had accurately represented their wildfire mitigation activities.

    **Indeed, these three categories of valid claim supplements are responsive and proportionate remedies given the Debtors' acts of commission (i.e. repeated misstatements and false representations pertaining to PG&E safety record) and acts of omission (i.e. the willful and wanton exclusion of material safety related disclosures).** These actions and related injuries subjugated public interests (victims, residents and ratepayers) and prevented the inclusion of these damage supplements within timely filed valid claims. The Debtors' misinformation campaign was strategically leveraged to prioritize the interests of the Debtor and certain shareholder proponents at key turning points within the case including but not limited to (1) the exclusion of resident and ratepayer claimant committees (2) driving victim negotiators away from cash settlements and towards the misrepresented stock-infused $13.5B settlement deal (3) the deliberate exclusion of material safety related disclosures from the victim disclosure statement (4) ensuring that victims would vote without relevant safety related disclosures and prior to the establishment of the registration rights

agreement and (5) when shares was sold by the FVT well-below the Debtors' represented stock value.

It is important to note that in order to maintain the façade of PG&E safety orientation, the Baupost Motion correctly asserts that the Debtors' stock valuation was "*artificially inflated because of the Debtors' material misstatements and nondisclosures concerning their safety practice*" and that Baupost "*later suffered significant losses when the value of those securities fell as the falsity of Debtors' earlier misstatements came to light…*" Unfortunately, after the "Response of William B. Abrams to Motion for Order Deeming Baupost Group Securities, LLC's Supplement to its Proofs of Rescission or Damage Claims Timely" [Dkt. 13440] made it clear that these claim supplements for "significant losses" should not exclude similar relief and remedies for victims, ratepayers and residents, Baupost and the Debtor mutually agreed to withdraw their Motion. This strategic effort to drive this evidence and related arguments into confidential negotiations instead of through a public hearing is a seeming attempt to otherwise alienate, exclude and disadvantage Abrams as well as other victims, residents and ratepayers from similar claim supplements. This withdrawal of the Baupost Motion and subsequent confidential negotiations followed the "Notice of Hearing on Motion for Order Deeming Baupost Group Securities, LLC's Supplement to its Proofs of Rescission or Damage Claims Timely" [Dkt. 13394] which made the Courts' willingness to approve these supplements clear by stating:

> "*If there is no timely Response, the Bankruptcy Court may enter an order granting the Motion. If a timely Response is filed, the Hearing will be held at the date and time shown above.*"

Here, Abrams seeks to exercise the same rights and remedies as put forward by Baupost and to provide a procedural pathway for other similar situated creditors. Through pulling these negotiations out of public view, Baupost is attempting to maintain exclusive rights and remedies for their claim supplements to the detriment of victims (represented by attorneys bound and limited by certain agreements) as well as residents and ratepayers who were excluded from having committee representation. This unjust and inequitable treatment was made possible through the Debtors' withholding of safety related information that should have been publicly and timely disclosed well before victims voted upon the Plan.

The Court should not permit the Debtor and Baupost to unfairly subjugate the claims of Abrams and other less-resourced creditors. The Court approving remedies for claim supplements for claimants like Abrams will serve to ensure that the Plan is not placed in jeopardy by the Debtors through violating the Absolute Priority Rule and related defaults on the Plan itself. Certainly, without equitable treatment relative to the type of claim supplements asserted by Baupost, it would be reasonable for victims, residents and ratepayers to have a basis for the repeal of the Plan as "persons aggrieved." Abrams was stunned to see the allegations of widespread fraud put forward by Baupost and reiterated by the Trustee through the "Fire Victim Trustee's Statement and Reservation of Rights to Response of William B. Abrams to Motion for Order Deeming Baupost Group Securities, LLC's Supplement to its Proofs of Rescission or Damage Claims Timely" [Dkt. 13461] (the **"Trustee Statement"**). Within the Trustee Statement, the Trustee rightly states their concerns about this evidence of fraud by stating:

> *"...based on allegedly **newly disclosed evidence of fraudulent statements and misrepresentations by the Debtors (pre-petition) that Baupost identified** as supporting further sale or recission securities claims... **fraudulently higher rates** that were paid by ratepayers; **fraud by PG&E** which has led to insurance scarcity pre-petition..."* (emphasis added)

It is important for the Court to note that these characterizations of the Debtors' misstatements and incomplete disclosures as "fraud" or "fraudulent" were put forward by the Trustee in reference to the evidence put forward by Baupost. In contrast and despite these conclusions drawn by the Trustee regarding their interpretation of the Baupost Motion, Abrams puts forward this Motion as a good-faith effort to seek equitable rights and remedies relative to claims and claim supplements. The approval of this Motion will help to avoid exactly these types of fraud allegations from aggrieved persons like Abrams that could jeopardize the Plan itself. As discussed below, the Ninth Circuit liberally allows post-bar date amendments to proofs of claim for the purpose of describing existing claims in greater detail and are in keeping with the relief sought through this Motion. For the reasons discussed herein, the Motion should be approved and should authorize Abrams to file claim supplements to his timely-filed proofs of claim directly against the Debtors' estate. This approval by the Court would serve as a procedural pathway for other victims, residents and ratepayers to file similar claim supplements.

# **BACKGROUND**

1.      On February 8, 2020, Mr. Jason Wells, Chief Financial Officer testified before the Public Utilities Commission under the cross examination of Mr. Abrams and engaged in the following exchange:

> Mr. Abrams: *"Would you say that the PG&E wildfires are a significant contributor to those insurance rates? Mr. Wells: "I'm not aware." Mr. Abrams: "You are not aware? Do you have active communications with the insurance industry to understand those implications?* Mr. Wells: *"Yes, we do." Mr. Abrams: "And from that dialogue, what are -- what is your understanding regarding your impacts on those rates?"* Mr. Wells: *"We regularly engage with the insurance markets. The focus the insurance markets have had sort of more broadly is fire risk generally. Obviously, given the 2015,'17 and '18 wildfires, insurers want to understand the programs we are undertaking to mitigate fire risk. They point to a multitude of factors that are impacting the availability of insurance."* Continued on pg. 591… Mr. Abrams: *"Who have you provided your calculations to?"* Mr. Wells: *"Liability insurance companies that provide the company insurance for future events, as opposed to insurance companies that underwrite insurance for homeowners themselves."* Mr. Abrams: *"Are those publicly available numbers?"* Mr. Wells: *"The quantification of our wildfire risk is included as part of our Enterprise Risk Management Program and part of the SMAP process here at this Commission."* Mr. Abrams: *"Are those the same numbers, or are they different numbers or different level of detail that you provide to those insurance companies versus what you provide to the Commission?"* Mr. Wells: *"It is the same."* Continued on pg. 594… Mr. Abrams: *"On the next page it states that this bankruptcy tethers the victims' financial futures to the performance of the company. Do you agree with that statement?"* Mr. Wells: *"Yes."*[1]

Here, we see that it is clear that the Debtor understood the impact of their poor safety practices and lack of effective wildfire mitigation had on resident insurance rates. However, they still misrepresented their safety record and provided incomplete disclosures leading up to Plan confirmation. This lack of disclosures and misrepresentation of the safety record clearly contributed to spikes in insurance rates and a denial of insurance for residents when reports made it clear that the Debtor withheld information that could have led to more accurate insurance risk analysis and rating particularly within PG&E's High Fire Threat Districts. The Debtor clearly understood this relationship between their lack of disclosure regarding their wildfire mitigation activities and insurance rates as PG&E struggled to secure corporate insurance.[2] The nondisclosures and misinformation from the Debtor may reasonably be seen as a strategic effort to limit damage claims

---

[1] See California Public Utilities Commission, Proceeding I.19-09-016, February 28, 2020 Hearing Transcript, Pg. 589 to 594, https://docs.cpuc.ca.gov/SearchRes.aspx?DocFormat=ALL&DocID=328691064
[2] See "PG&E Fire Insurance Costs Skyrocket After Bankruptcy, Fires", Bloomberg News, July 30, 2020, https://news.bloomberglaw.com/environment-and-energy/pg-e-fire-insurance-costs-skyrocket-after-bankruptcy-wildfires

relative to these clearly evident injuries to families residing within PG&E service territory. Notably, the only catastrophic wildfires over recent years within the area of Abrams home have been caused by the Debtors. The Debtors' convenient notion that their poor safety record has little impact on homeowner insurance rates is a demonstrable fallacy.

2.      On March 6, 2020, Abrams filed the "William B. Abrams Objection Pursuant to 11 U.S.C §§ 1129(A) and U.S.C. §§ 1125 to Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6151]. Within this objection, Abrams proposed revisions to the language to ensure disclosures relative to the PG&E safety record and wildfire mitigation activities. This objection made it clear that the "*Debtors have not articulated how they will address Pacific Gas and Electric Company's neglected infrastructure, business process issues, lack of safety orientation and growing wildfire/climate change risks…*" In response to the Debtors unwillingness to disclose their safety record and wildfire mitigation actions, Abrams proposed added language which would state that "*the Debtors have provided no evidence how through this plan of restructuring that they have reoriented their company to provide safe and reliable service…*" Also, within this objection Abrams stated a number of objections to the Claims Resolution Procedures based on the summary referenced therein.

3.      On March 26, 2020, Abrams filed the "Motion of William B. Abrams for Reconsideration and Relief from the Orders Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Bankruptcy Rule 9024 Approving Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6488] where he stated "*if victims will be asked to hold stock while others sell, these risks need to be clearly defined in the disclosure statement… Describing a claims resolution process without dates, dollars or a registration rights agreement is ineffectual and largely irrelevant.*" Here, we see that Abrams again called for increased disclosures regarding the Debtors' safety record but again the Debtors deliberately withheld critical information which negatively affected the recovery for victims, residents and ratepayers.

4.      On May 22, 2020 Abrams filed the "Amended Witness and Exhibit List of William B. Abrams" [Dkt. 7500]. The list of exhibits included information related to the PG&E safety record including transcripts from the California Public Utilities Commission. The related witness list was to allow for an examination of the PG&E safety record and included Andrew Vesey, CEO PG&E Utility, Deborah Powell, Asset and Risk Management Community Wildfire Safety and Julie Kane,

SVP and Chief Ethics and Compliance Officer. These exhibits and witnesses were opposed by the Debtor and therefore excluded by the Court as evidence during Plan confirmation hearings.

5. On May 25, 2020 the Debtor filed the "Debtors' and Shareholder Proponents' Joint Objections to Plan Objectors' Confirmation Hearing Exhibits" [Dkt. 7570] which objected to all the witnesses proposed by Abrams that could shed light on the Debtors' safety record and related wildfire mitigation activities. Subsequently, on May 28, 2020, Mr. Wells testified that he "*didn't know*" the number of C-hooks, reclosures or other pertinent information relative to wildfire mitigation activities. In response, Abrams asked "*Would Ms. Powell, as the - - who's in charge of the Community Wildfire Safety Program, be more apt to be able to answer those specific questions?*" and Mr. Wells responded "*She would, yes.*"[3] Despite this response, The Debtor successfully blocked any witnesses from being cross-examined during plan confirmation that could provide added disclosures regarding the PG&E safety record.

6. On June 16, 2020 Abrams filed the "William B. Abrams Motion for Reconsideration and Relief from the Orders Pursuant to U.S.C. §§ 363(b) and 105(a) and Bankruptcy Rule 9024 Approving the Parties' Joint Stipulation Regarding the Registration Rights Agreement and Related Agreements of the Fire Victim Trust*"* [Dkt. 7974]. Within this motion for reconsideration Abrams stated "*the Debtors continued statements that they are safe operators and have prepared for wildfire season are unsubstantiated by any facts or measurable outcomes.*" Here, we see that Abrams continually pushed for added safety disclosures for victims but these disclosures were not supported by certain parties like Baupost that were using victims as a shield for their investments. Despite these repeated calls for the Debtor to substantiate their miscommunications of safety rhetoric, the Debtor refused to do so over and over again. These misstatements and nondisclosures have now been demonstrated to have harmed victims, residents and ratepayers.

7. On June 19, 2020, Abrams filed the "William B. Abrams Opposition to the Notice of Filing of Second Revised Draft Proposed Findings of Fact, Conclusions of Law, and Order Confirming Debtors' and Shareholder Proponents' Join Chapter 11 Plan of Reorganization Given June 16 Summary of the Camp Fire Investigation by the Butte County District Attorney Referencing Material Issues for Plan Confirmation" [Dkt. 8045]. Within this opposition, Abrams demonstrated

---

[3] See "Transcript of Proceedings Before the Honorable Dennis Montali United States Bankruptcy Judge", May 28, 2020, pg. 87

that "*the findings of this investigation illustrate the underlying foundational problems of the Debtors' structure which includes a strategy of deferring maintenance and strategic neglect to increase short-term return for investors.*" This statement and others were opposed by the Debtor as false allegations and repeatedly rejected by the Debtor throughout the case including during Plan confirmation hearings.

8.     On November 23, 2021, Kirkland and Ellis LLP through case 3:14-cr-00175-WHA issued the "PG&E Independent Monitor Report of November 19, 2021." This report, among other findings, demonstrated many inconsistencies between PG&E's public-facing corporate communications rhetoric regarding their safety performance and the actual internal performance of the company including an acknowledgement that "*despite all of the emphasis the Company places on EVM, 90% (or more) of PG&E's HFTD territory annually is left untouched by the EVM program.*"[4] These facts were not disclosed by the Debtor at any time prior to victims vote upon the Plan and were not reflected anywhere within the Victim Disclosure Statement.

9.     On March 24, 2022 the California State Auditor issued a report entitled "Electrical System Safety: California's Oversight of the Efforts by Investor-Owned Utilities to Mitigate the Risk of Wildfires Needs Improvement."[5] Within this report the auditors noted that "*PG&E's 2020 mitigation plan in June 2020 even though it found that **PG&E had not described where vegetation management – trimming trees and vegetation from around power lines – was most necessary**. Further, a court-established Federal Monitor found that PG&E had conducted a certain type of vegetation management in relatively low-risk portions of its power grid instead of in high fire-threat areas and **had not conducted planned inspections of some equipment in its highest threat areas**… 80 percent of PG&E's power lines in high fire-threat areas are bare.*" (emphasis added). The Court and victims can see from this report that PG&E did NOT timely disclose that the highest risk areas of their service territory were NOT prioritized for vegetation management. Never during the bankruptcy proceeding were these material disclosures made to creditors. This post-confirmation report also indicated that the Debtor had the worst track record when it came to having the most bare/uninsulated power lines which are a significant safety and financial risk to PG&E as a going

---

[4] See Kirkland and Ellis LLP "PG&E Independent Monitor Report of November 19, 2021", November 23, 2021, pg. 25, Case 3:14-cr-00175-WHA, https://s1.q4cdn.com/880135780/files/doc_downloads/wildfire_updates/2021/11/1524-1.Exhibit-Monitor-Report.pdf

[5] See "Electrical System Safety, California's Oversight of the Efforts by Investor-Owned Utilities to Mitigate the Risk of Wildfires Needs Improvement", March 24, 2022, https://www.auditor.ca.gov/pdfs/reports/2021-117.pdf

concern. Of course, the Debtor NOT disclosing these material facts (1) prior to dissuading the Court from assigning resident and ratepayer committees (2) prior to misrepresenting the value of the stock-infused settlement offer (3) prior to the victims vote on the plan and (4) prior to the registration rights agreement being executed was egregious and rightly pointed to by Baupost as solid grounds for supplemental damages. The motivation of the Debtor for not disclosing this information and otherwise misrepresenting their safety record was also noted within this report by the auditors by stating "*In 2020 a federal judge found that PG&E had diverted funds from work projects, including vegetation management, for bigger employee bonuses, shareholder dividends, and political contributions, among other things.*"[6] The Court should have no doubt that PG&E victims were once again victimized by these "diverted funds" that benefited institutional investors like Baupost within this bankruptcy case and to the detriment of victims to whom none of this was disclosed. Moreover, resident financial interests were significantly undermined by these too-late-disclosures given that they now needed to face homeowner insurance scarcity due to insurance companies dramatically raising rates and otherwise choosing not to insure within PG&E High-Fire Threat Districts when it became apparent that PG&E misappropriated and misapplied ratepayer dollars avoiding risk mitigation in these high-risk areas.

10.     On July 6, 2022 the "Envista Forensics: Root Cause Analysis" report was released and once again demonstrated that PG&E's prior representations that they had focused their wildfire mitigation activities within High Fire Threat Districts was false.[7] The beneficiaries of these misrepresentations were the shareholders and bondholders that were able to capitalize on their investment positions through the bankruptcy processes and those that were able to secure backstop agreements on the "backs" of victims, residents and ratepayers. While investors sold stock and cashed out directly after plan confirmation, victims were forced to hold their stock due to the misguided registration rights provisions that were negotiated AFTER victims voted upon the Plan. This victim claim subjugation and leveraging of the victim's stock position (25% of PCG) was extremely advantageous to the Debtor and well-represented institutional investors. The Court should understand that this subjugation of victim claims could not have occurred without the Debtor

---

[6] See "Electrical System Safety, California's Oversight of the Efforts by Investor-Owned Utilities to Mitigate the Risk of Wildfires Needs Improvement", March 24, 2022, https://www.auditor.ca.gov/pdfs/reports/2021-117.pdf
[7] See "Envista Forensics: Root Cause Analysis", July 6, 2022, https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-policy-division/reports/root-cause-analyses-of-the-2017-18-wildfires.pdf

withholding information and otherwise distorting their safety record. Moreover, and more specific to this Motion, these Debtor driven false assertions and nondisclosures caused significant damages to Abrams as a victim, resident and ratepayer.

11. On December 28, 2022 Baupost filed the "Motion for Order Deeming Baupost Group Securities LLC's Supplement to Its Proofs of Rescission or Damage Claims Timely" [Dkt. 13393]. Within this motion and related supplement Baupost recognized that "*This Addendum details seven additional misstatements by Debtors—all of which occurred during the Relevant Period—in which Debtors made public materially false statements about their safety practices concerning, and their investment in, their electrical transmission and distribution system, including but not limited to the inspection, maintenance, hardening, and replacement of high-voltage transmission lines and other equipment in their electrical infrastructure, as well as their compliance with regulatory requirements concerning the safe operation of their electrical transmission and distribution system… these additional "materially false and misleading statements assuring investors of the Company's compliance with California safety regulations" concealed "the true risks leading to the Camp Fire," including that Debtors were "not sufficiently prioritizing safety.*" TAC ¶¶ 37-38.[8] This Motion went onto describe over 30 "material false statements" and "omitted facts" by the Debtors (see **Exhibit B**) that were not disclosed to victims, residents or ratepayers. This miscommunication pattern was similarly presented within the victim disclosure statement to misinform victims regarding the likelihood of "made whole" 100% payments for their valid claims. This Motion asserted that the Camp Fire Report exposed new "*wrongful acts and omissions*" and caused significant supplemental injuries to Baupost when the "*falsity of Debtors' earlier misstatements came to light.*" Of course, the exposure of these same wrongful acts and omissions caused significant supplemental injuries to Abrams as well as other victims, residents and ratepayers. However, Baupost decided to withdraw their motion to seemingly prevent these less-resourced creditors from being able to benefit from the motion, claim supplements and associated arguments.

---

[8] The Additional Misstatements—are drawn from public statements on Debtors' website, transcripts of Debtors' earnings calls, and various regulatory filings, including Debtors' submissions to the California Public Utilities Commission ("CPUC") and the Federal Energy Regulatory Commission ("FERC").

## ARGUMENT

Proofs of claims that are "*executed and filed in accordance with*" the Federal Rules of Bankruptcy Procedure "*constitute prima facie evidence of the validity and amount of the claim*" and will be "*deemed allowed*" unless a party in interest objects.[9] A properly filed proof of claim constitutes "*evidence as to its validity and amount*" that is "*strong enough to carry over a mere formal objection without more.*"[10] Only if the objector produces some evidence that is of probative value at least as weighty as that supplied by the proof of claim will the burden shift to the claimant to establish a valid claim by a preponderance of the evidence.[11] In accordance with the Court's prior orders and the Fire Victim Trust Claims Resolutions Procedures, Abrams timely filed his Damage Claim Proofs of Claim in the form prescribed by the Court. Thus, Abrams already holds claims that are *prima facie* valid and able to be supplemented based upon the additional damage categories described herein and asserted as a matter of law.

The Baupost POC Supplement Addendum (see **Exhibit B**), the PG&E Independent Monitor Report, the Camp Fire Report, the California State Auditor Report and the Envista Forensics Root Cause Analysis cited above describe the evidence outlined within this Motion with greater specificity and with enhanced evidentiary effect. Therefore, these well-substantiated reports should be permitted as further grounds for claims and claims supplements by the Court. This supplemental evidence should be deemed timely under the Ninth Circuit's liberal policy in favor of allowing amendments to timely-filed proofs of claim and the acceptance of additional claims when new evidence of Debtor misrepresentations and incomplete disclosures are brought to light.

*Roberts Farms* is often cited as the leading Ninth Circuit decision on amendments to timely-filed proofs of claim.[12] In that case, a law firm filed a timely proof of claim in the debtor's chapter 11 case for unpaid legal fees arising from services provided to the debtor prepetition.[13] The debtor subsequently confirmed a plan of reorganization and the reorganized debtor then (twenty months

---

[9] FED. R. BANKR. P. 3001(f); *see* 11 U.S.C. § 502(a) (claim deemed allowed absent objection).
[10] *See Lundell v. Anchor Constr. Spec., Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (citing *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)).
[11] *Holm*, 931 F.2d at 623.
[12] *See, e.g., Rose v. Med Equity, LLC (In re Med Equity, LLC)*, 2022 Bankr. LEXIS 1924, *16 (9th Cir. BAP July 13, 2022); *Wall St. Plaza, LLC v. JSJF Corp. (In re JSJF Corp.)*, 344 B.R. 94, 102 (9th Cir. BAP 2006); *In re Edwards Theatres Circuit, Inc.*, 281 B.R. 675, 681 (Bankr. C.D. Cal. 2002).
[13] *Roberts Farms*, 980 F.2d at 1250.

after the proof of claim was filed) filed an objection to the law firm's proof of claim, in which it alleged that the claim was barred by the statutes of limitations and laches.[14]  In response, the law firm sought to amend the claim to describe the claim as an "open account," which, pursuant to California law, was subject to a longer statute of limitations, and to attach supporting documentation.[15]  The bankruptcy court allowed the law firm to file the amended claim and ultimately allowed the claim, upon finding that the claim was not time-barred because the claim was based on an open book account.[16]  The bankruptcy court's ruling was affirmed on appeal to the Bankruptcy Appellate Panel.

Here, the Debtor is clearly aware of the misstatements, lack of material disclosures and subsequent detrimental effects of the aforementioned reports which are evidenced.  Therefore, Abrams asserts that this precedent supports his claim supplements for damages arising from the Debtors' erroneously represented safety record, the Debtors' deliberate misrepresentation of the $13.5B "Fire Victim Equity Value" to make victims whole and the direct effects on the value of Abrams' claims.  Although *Roberts Farms* defined the standard for courts in the Ninth Circuit to apply when considering amendments to proofs of claim, some courts have sought guidance from the "relation back" standard that is generally applicable to amendments to pleadings under Federal Rule of Civil Procedure 15(c).  Under that standard, "[a] new claim must be based upon a common core of operative facts.  It is the operative facts that control the question of relation back, not the theory of liability applied to those facts."[17]  In determining whether an amended claim relates back to the original, the court must determine "whether the claim to be added will likely be proved by the same kind of evidence offered in support of the original pleading."[18]  In short, "there must be facts alleged in the [o]riginal [c]laims that would reasonably alert [the debtor] to the possibility of [the] assertion

---

[14] *Id.*
[15] *Id.*
[16] *Id.* at 1251.
[17] *In re Pacific Gas & Elec. Co.*, 311 B.R. 84, 88 (Bankr. N.D. Cal. 2004) (new claims based entirely on evidence that fell outside the core of operative facts supporting the claimant's original claims did not relate back); *see also In re Jackson*, 541 B.R. 887, 891 (B.A.P. 9th Cir. 2015) (permitting claim amendment and holding: "It has long been established in the Ninth Circuit that an amendment to a timely proof of claim 'relates back' to a timely filed claim when the original claim provided 'fair notice of the conduct, transaction, or occurrence that forms the basis of the claim asserted in the amendment.'") (citation omitted); *In re Circle K Corp.*, 165 B.R. 649, 652 (Bankr. D. Ariz. 1994) (Rule 15(c) provides "useful analogy" for proof of claim amendments).
[18] *In re Pacific Gas & Elec. Co.*, 311 B.R. at 88 (citing *Percy v. San Francisco General Hospital*, 841 F.2d 975, 978 (9th Cir.1988)).

of new theories based upon those facts to support the Amended Claims, whether or not those facts or events were foreseeable."[19]

Here, Abrams and other victims have timely filed valid claims relative to the value of their homes and their property. These valuations and related claims were in fact undermined by the Debtors' misstatements and material nondisclosures as evidenced by the many reports cited within this Motion. Specifically, these reports concern PG&E's misstatements relating to its alleged "*leadership and commitment on safety*"[20] and its alleged "*improvements . . . in safety and reliability.*"[21] The Debtor certainly understood the relationship between the false representations of their safety record and homeowner insurance rates as evidenced through Mr. Wells testimony before the California Public Utilities Commission and PG&E's ongoing struggle to maintain insurance for their infrastructure and related business operations. The Debtor may ask the Court to believe that they only foresaw the relationship between their safety record and their corporate insurance but did not foresee negative effects on homeowner insurance rates but those arguments if supplied would simply be beyond credulity given the obvious direct causal relationship. After all, victims' homes are situated among the Debtors' lines and exposed to the same risks and same liabilities when the Debtors' safety record is distorted for the purposes of supporting "*bigger employee bonuses, shareholder dividends, and political contributions.*"[22]

///

---

[19] *Id.* at 88-89; *see also In re Med Equity, LLC*, BAP No. CC-22-1247-GFS (B.A.P. 9th Cir. July 13, 2022) (finding no prejudice from amendment to describe claim as derivative in nature, because debtor was aware of the operative facts giving rise to the claim).

[20] *See, e.g., In re Avista Corp. Sec. Litig.*, 2006 WL 8429610, at *5 (E.D. Wash. June 2, 2006) (amendment "detailing new instances of Avista's alleged involvement in high-risk energy trading activities" related back to an original pleading alleging more broadly that the defendants "made a number of representations that Avista was ending its high-risk activities."); *In re Digital Microwave Corp. Sec. Litig.*, 1992 WL 465486, at *2-3 (N.D. Cal. Oct. 19, 1992) (new allegations that defendants engaged in a "host of improper revenue recognition practices and improper sales transactions" related back to allegations in original complaint that defendants engaged in a "broad scheme" relating to the issuance of "false financial statements" because they merely "elaborate[d] upon plaintiffs' original claims and d[id] not constitute an entirely new legal theory based upon a different set of facts").

[21] *Id.* ¶ 237.

[22] See Auditor of the State of California, "Electrical System Safety: California's Oversight of the Efforts by Investor-Owned Utilities to Mitigate the Risk of Wildfires Needs Improvement", March 24, 2022

## RELIEF REQUESTED

The Baupost Motion correctly asserts that the Debtors' "*wrongful acts and omissions*" prior to plan confirmation did cause a "*precipitous decline in the market value of the Debtors' securities*" when the "*falsity of Debtors' earlier misstatements came to light.*" This "light" also prevented the Fire Victim Trust from monetizing victim stock, drove insurance scarcity for homeowners across PG&E service territory and exposed the over-billing practices of the Debtor. Without a doubt, the Debtors' false statements and lack of material disclosures caused supplemental injuries to victims, residents and ratepayers. The fact of these injuries and relevance to damage claim supplements is evidence through (1) the Baupost Motion and POC Supplement (2) the July 6, 2022 "Envista Forensics: Root Cause Analysis" (3) the November 23, 2021, Kirkland and Ellis LLP "PG&E Independent Monitor Report of November 19, 2021." and (4) the March 24, 2022 report entitled "Electrical System Safety: California's Oversight of the Efforts by Investor-Owned Utilities to Mitigate the Risk of Wildfires Needs Improvement" issued by the California State Auditor.

The Debtors' willful and wanton exclusion of material safety related disclosures during the bankruptcy case to lessen their culpability and liability regarding damage claims compels Abrams to request the following relief:

1. **Approve Victim Damage Claim Supplement (**the **"Victim Claim Supplement")** – The overinflated and fanciful stock valuation provided by the Debtor to victims misinformed their vote on the Plan and was exposed as a ruse as evidenced through the Baupost Motion outlining the "*pattern of misstatements and incomplete disclosures*" as well as through the independent reports referenced herein. The Baupost Motion correctly describes "*stock prices that were artificially inflated by the Debtors' misleading statements.*" However, the Court must consider that this "artificially inflated" stock price described by Baupost also led to material misrepresentations of the "Fire Victim Equity Value" relied upon by Abrams and other victims. **Given that these damage claim supplements were not envisioned with the formation of the Fire Victim Trust, they should be satisfied through direct claims against the Debtors' estate. Specifically, the "made whole" balance plus damages associated with the "time value of money" should be paid directly by the Debtor to Abrams and other claimants that may seek similar relief.** Abrams still has not received a

determination for his claims but for illustrative purposes let's assume that Abrams determination will be paid at 75% of "made whole" through the FVT. Following, the Remaining Claim Value (the **"RCV"**) would be 25% of his damage claims. Based upon this determination assumption, the valid supplemental claim would be the remaining claim value plus damages due to the elapsed time with a reasonable rate of interest. For the purposes of determining a reasonable timeframe for the assessment of these supplemental damages, Abrams suggests the use of the date that Appaloosa Management LP and other backstop parties exercised their backstop agreements which was described as "*the hedge funds that left wildfire victims holding the bag on PG&E stock*"[23] up to the future claim payment date to Abrams (the **"Victim Supplemental Relevant Period"**). This Victim Supplemental Relevant Period is the difference between when victims should have been able to be "made whole" based upon the Debtors' misrepresentations and when actual payment occurred. Based upon this reasonable assessment of supplemental damages, Abrams Victim Claim Supplement would be calculated based upon a reasonable "time value of money" calculation. Given these facts and reasonably assessed damages, the Court should permit Abrams and other victims to file Victim Claim Supplements directly against the Debtors' estate.

2. **Approve Ratepayer Damage Claim Supplement (**the **"Ratepayer Claim Supplement"**) – It is now apparent that Abrams and other customers of PG&E paid for the Debtors' misrepresented and misdirected wildfire mitigation activities as well as other Debtor falsehoods through increased rates over a substantial period of time. Certainly, these damages were incurred by ratepayers at least as far back as the Baupost identified relevant period (April, 2015 through November, 2018). Therefore, the timeframe for these damage claim supplements could be reasonably assessed from April, 2015 to the date when Abrams receives payment for his valid claims (the **"Ratepayer Supplemental Relevant Period"**). The Camp Fire Report referenced within the Baupost Motion combined with the other evidence provided herein leave little room to doubt that Debtor falsehoods and misstatements led to erroneously billing and associated costs incurred by Abrams and other residents in PG&E service territory. Based upon the combined misrepresentations as identified within the Baupost Motion and the

---

[23] See MarketWatch, "The Hedge Funds that Left Wildfire Victims Holding the Bag on PG&E Stock", October 12, 2021, https://www.marketwatch.com/story/the-hedge-funds-that-left-wildfire-victims-holding-the-bag-on-pg-e-stock-11634076168

other independent reports referenced herein, it is reasonable to assess that at least 10% of charged rates over this period were erroneous overcharges during the Ratepayer Relevant Period. It is also important to note that these damages were unknown to the Court before the "Memorandum Decision on Motion to Appoint a Ratepayers' Committee" [Dkt. 2245] which stated that "*ratepayers do not have a "claim" for which separate representation by a committee is necessary and will enter therefore an order denying the TURN Motion.*" If the Debtor had accurately represented their safety record and associated wildfire mitigation activities, Abrams is confident that the Court would have recognized and concluded that a committee was indeed necessary to represent ratepayers asserting these damage claims. Therefore, the Ratepayer Claim Supplement should be calculated as 10% of billed electric charges during the Ratepayer Relevant Period with additional consideration based upon a reasonable "time value of money" calculation. Given these facts and conservatively assessed damages, the Court should permit Abrams and other ratepayers that may follow to file Ratepayer Claim Supplements directly against the Debtors' estate.

3. **Approve Resident Damage Claim Supplement (**the **"Resident Claim Supplement") –** The clearly evident effects of the Debtors' falsehoods, misrepresentations and incomplete disclosures during the Baupost described "Relevant Period" have driven hikes in resident insurance rates and general insurance scarcity across PG&E territory and particularly within the PG&E defined High Fire Threat Districts (the "**HFTDs**") which include the area where Abrams' home was destroyed by the Debtors' negligence and mismanagement. Despite the Debtors' false statements as identified within the Baupost Motion, it is clear from the Camp Fire Report and the other reports referenced herein that later disclosed and more accurate representations regarding a lack of wildfire mitigation in HFTD areas drove homeowner insurance rates substantially higher for residents. Indeed, many of Abrams neighbors were dropped by their insurance providers and had to seek much more costly alternatives after the "*falsity of Debtors' earlier misstatements came to light."* Abrams projects at least 50% higher insurance rates over the next 20 years and therefore should receive a Resident Claim Supplement based upon these projections. Residents are now subjected to a lack of insurance as carriers increasingly deny insurance to those who rebuild within these PG&E service areas. Baupost correctly indicates within their Motion that these "*misstatements*" and "*incomplete disclosures*" were not known at the time they filed their claim but neglect to mention that

these misstatements about the PG&E safety practices were also not known to insurance carriers who subsequently denied or increased rates for residents residing within PG&E territory when the lack of PG&E wildfire mitigation became apparent due to the release of the Camp Fire Report referenced by Baupost as well as the subsequent reports referenced herein including the Envista Forensics Root Cause Analyses which was issued on July 6, 2022.[24] Due to PG&E "misrepresentations" and a lack of disclosure, residents bought and built homes under the false impression that they would have reasonable insurance rates.  When the PG&E veil of nondisclosures and material misstatements was lifted through these outside reports, insurance carriers began to rerate and otherwise deny insurance within certain communities where homes were now recognized as riskier due to newly revealed evidence of PG&E's poor wildfire mitigation practices.  The Debtor knew of these material issues regarding their safety record and chose to either not disclose them or misrepresent them to residents.  Now that the Court and the public are aware of the evidence provided within these reports and the reasonable assessment of damages, the Court should permit Abrams and other residents that may follow to file Resident Claim Supplements directly against the Debtors' estate.

4. **Affirm Judicial Review Rights Reserved –** In accordance with section 18(k) on page 26 of the "Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Date June 19, 2020" [Dkt. 8053] (the "**Confirmation Order**"), the Court should approve an order for the aforementioned claims supplements noting that Abrams has reserved his rights to judicial review.  The ordering paragraph and section 18(k) entitled "Court Review of Claims" states "*Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or the Fire Victim Trust Documents, only the parties who timely submitted an objection to the Fire Victim Trust Documents as noted herein shall have the right to seek court review in accordance with Section IX of the Fire Victim Claims Resolution Procedures.*"  As the Court is aware, Abrams, perhaps more than any other party within this case, objected to the Fire Victim Trust Documents including but not limited to the Registration Rights Agreement [Dkt. 7913, 7914, 7919], Victim Disclosure Statement (Dkt. 5700] and the Claims Resolutions Procedures [Dkt. 5873-1].  Not only did Abrams strenuously object to the Fire Victim Trust Documents both through his papers and within the

[24] See July 6, 2022, Envista Forensics "Root Cause Analyses", https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-policy-division/reports/root-cause-analyses-of-the-2017-18-wildfires_070622.pdf

hearing room, Abrams also filed a number of motions for reconsideration after orders were issued denying his objections. These ardently argued objections to these Fire Victim Trust Documents included the "William B. Abrams Motion for Reconsideration and Relief from the Orders Pursuant to U.S.C. §§ 363(b) and 105(a) and Bankruptcy Rule 9024 Approving the Parties' Joint Stipulation Regarding the Registration Rights Agreement and Related Agreements of the Fire Victim Trust" [Dkt. 7974] and the "Motion of William B. Abrams for Reconsideration and Relief from the Orders Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Bankruptcy Rule 9024 Approving Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6488]. Here, we see that Abrams not only filed timely objections to the Trust Documents but also filed motions for reconsideration when the objections were denied by the Court. The fact that Abrams objected to these Trust documents and argued for equitable treatment for all victims while others like Adventist Health Systems chose to object only for their benefit should not prevent Abrams from having these rights and remedies. The Court has repeated across many hearings and related orders that judicial review was equitably and fairly considered based solely upon which parties objected to The Trust Documents. Therefore, Abrams respectfully requests that the Court make clear that Abrams is in fact one of these parties and should be afforded the rights of judicial review in accordance with the Confirmation Order and relative to his valid claims and/or claim supplements referenced herein.

### **CONCLUSION**

Earlier this week the Debtor was arraigned on new criminal charges including felony manslaughter charges in relation to the 2020 PG&E Zogg Fire.[25] Abrams is confident that like the 2019 PG&E Kincade Fire, the Debtor will successfully negotiate a settlement to avoid accountability for their executives and to avoid liability for their shareholders.[26] The Debtor is counting on victims like Abrams to support this type of settlement because as unwitting shareholders through the Fire Victim Trust, we need to get paid to rebuild our homes and our lives. This heartless calculation by

---

[25] See "PG&E Pleads Not Guilty to Manslaughter Charges in the 2020 Zogg Fire", ABC10, February 15, 2023, https://www.abc10.com/article/news/local/abc10-originals/fire-power-money/pge-shasta-county-wildfire-zogg-fire/103-ef6502cf-f359-425a-bad3-118aa9497412
[26] See "As PG&E Negotiates Kincade Fire Settlement, Sonoma County Residents Who Lost Everything Go Unpaid", Press Democrat, April 11, 2022, https://www.pressdemocrat.com/article/news/as-pge-negotiates-kincade-fire-settlement-sonoma-county-residents-who-los/

the Debtor to withhold and otherwise misrepresent safety related information to subordinate the interests of the unwashed masses and to favor their institutional investors and large hedge funds like Baupost should not be tolerated by this Court or any other court.

Baupost certainly is correct that the Debtor "artificially inflated" their stock price by providing pre-confirmation "*misleading statements regarding their safety practices.*" The evidence put forward by Baupost (see **Exhibit B**) was so clear and compelling that the Court issued an order stating that "*if there is no timely Response, the Bankruptcy Court may enter an order granting the Motion. If a timely Response is filed, the Hearing will be held*" [Dkt. 13394]. Should Abrams and other victims be denied these same due process rights and associated remedies? Beyond the evidence put forward through the Baupost Motion, Abrams has laid out additional evidence of the Debtors strategic misstatements and nondisclosures regarding their safety record and related wildfire mitigation activities. This includes evidence of critical safety-related nondisclosures and misrepresentations as cited within (1) the July 6, 2022 "Envista Forensics: Root Cause Analysis" (2) the November 23, 2021, Kirkland and Ellis LLP "PG&E Independent Monitor Report of November 19, 2021." (3) the March 24, 2022 report entitled "Electrical System Safety: California's Oversight of the Efforts by Investor-Owned Utilities to Mitigate the Risk of Wildfires Needs Improvement" issued by the California State Auditor and (4) the Abrams cross examination of PG&E witnesses within California Public Utilities Commission proceeding I.19-09-016. The Debtor may want to argue that this information only pertains to the regulator and Baupost may want to argue that this evidence should only be leveraged for their financial benefit but these arguments that intentionally exclude the impacts on vulnerable victims, residents and ratepayers should not be tolerated within any judicial proceeding.

Within this Motion, Abrams lays a strong foundation for claim supplements including (1) **victim-based claim supplements** based upon damages attributed to the misrepresented "Fire Victim Equity Value" (2) **resident-based claim supplements** due to increases in homeowner insurance rates reasonably attributed to the Debtors' misrepresentations and (3) **ratepayer-based claim supplements** given PG&E's erroneous rate recovery and subsequent billing for misstated wildfire mitigation activities. **This motion provides just and valid damage claim supplements directly against the Debtors' estate while providing a procedural pathway for other victims, residents and ratepayers to seek similar claim supplements directly against the Debtors' estate.**

In conclusion, Abrams respectfully requests that the Court approve these claim supplements and preserve Abrams rights and remedies to judicial review in accordance with applicable law and section 18(k) of the "Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020", [Dkt. 8053].

Executed on February 16, 2023, at Santa Rosa, CA.

Respectfully submitted,

William B. Abrams
Pro Se Claimant

## EXHIBIT A

**Proposed Order**

1
William B. Abrams
end2endconsulting@gmail.com
2
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
3
Tel: 707 397 5727
4

5
*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities*
*Commission and the California Office of Energy Infrastructure Safety*
6

7

8

9
**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
10
**SAN FRANCISCO DIVISION**
11

12

13
In re:
Bankr. Case No. 19-30088 (DM)
Chapter 11
14
PG&E CORPORATION,
(Lead Case)
(Jointly Administrated)
15

16
        -and-

17
PACIFIC GAS AND ELECTRIC
COMPANY,
18
                Debtors.
**ORDER DEEMING WILLIAM B.**
19
**ABRAMS SUPPLEMENT TO**
**DAMAGE CLAIMS TIMELY**
20
☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
21
☒ Affects both Debtors
22
23
*  All papers shall be filed in the lead case,*
*No. 19-30088 (DM)*
24
25
26
27
28

Upon the *Motion for Order Deeming William B. Abrams Supplement to Damage Claims Timely* (the "**Motion**");[1] and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that good cause exists to grant the Motion; and William B. Abrams ("**Abrams**") having provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances and no other or further notice need be provided; and the Court having considered the Motion, all pleadings and papers filed in connection with the Motion, and the arguments of counsel and evidence proffered at the hearing on the Motion; after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1) The Motion is Granted.

2) The Victim Damage Claim Supplement is approved as a timely-filed amendment to the Abrams Proof of Claim against the Debtors' estate

3) The Resident Damage Claim Supplement is approved as a timely-filed amendment to the Abrams Proof of Claim against the Debtors' estate

4) The Ratepayer Damage Claim Supplement is approved as a timely-filed amendment to the Abrams Proof of Claim against the Debtors' estate

5) The Court acknowledges and affirms that Abrams consistent with the "Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020" [Dkt. 8053] "timely submitted an objection to the Fire Victim Trust Documents and shall have the right to seek court review in accordance with Section IX of the Fire Victim Claims Resolution Procedures for his Damage Claims and the aforementioned Damage Claim Supplements.

# # #

---

[1] Capitalized terms not defined herein shall have the meanings used in the Motion.

# EXHIBIT B

**Baupost POC Supplement Addendum**

II.     **Debtors Made Multiple Misstatements—As Alleged in Both
        the TAC and This Addendum—Concerning Their Safety
        Practices with Respect to Powerlines Prior to the Camp Fire**

        16.     The TAC alleges that Debtors made numerous materially false and

misleading statements amount their safety practices, including their inspection of powerlines and

compliance with regulatory standards, including:

   a.   <u>Misstatement No. 2</u>:  An October 6, 2015 Corporate Responsibility and
        Sustainability Report, which states:  "Each year, PG&E's Vegetation
        Management department . . . inspects every mile of power line in our service
        area for public safety. . . . We do so in compliance with relevant laws."  TAC
        ¶ 197.

   b.   <u>Misstatement No. 11</u>:  A November 2, 2017 conference call with analysts to
        discuss Debtors' financial results for the third quarter of 2017, in which
        Debtors' then-President and COO, Nickolas Stavropoulos, stated:  "We
        inspect all of our overhead lines every year, and we do second patrols in high
        fire danger areas at least twice a year. In some areas, we do as often as 4x a
        year."  *Id*. ¶ 264.

   c.   <u>Misstatement No. 13</u>:  A May 25, 2018 press release, which stated that
        Debtors "[i]ncreased foot and aerial patrols along power lines in high fire-risk
        areas."  *Id*. ¶ 280.

   d.   <u>Misstatement No. 14</u>:  A June 8, 2018 press release, which stated that "under
        PG&E's industry-leading Vegetation Management Program, we inspect and
        monitor every PG&E overhead electric transmission and distribution line each
        year, with some locations patrolled multiple times."  *Id*. ¶ 287.

   e.   <u>Misstatement No. 17</u>:  An October 9, 2018 press release, which stated that
        Debtors "are continuing to focus on implementing additional precautionary
        measures intended to further reduce wildfire threats, such as working to
        remove and reduce dangerous vegetation, improving weather forecasting,
        upgrading emergency response warnings, [and] making lines and poles
        stronger in high fire threat areas[.]"  *Id*. ¶ 303.

        17.     Defendants made additional materially false statements during the

Relevant Period concerning their power line safety practices.  These seven Additional

Misstatements are set forth below.

### A. The Additional Misstatements

#### 1. *January 8, 2018 – Misstatement No. 12-A[9]*

18.     In August 2015, the CPUC issued an Order Instituting Investigation ("OII") into whether Debtors' organizational culture and governance adequately prioritized safety.  On January 8, 2018 Debtors submitted prepared testimony as part of the OII proceedings. In his written testimony, Nickolas Stavropoulos, the Utility's then-President and COO, stated:

> On the electric system, infrastructure investment has also been extensive over the last five years, including replacement of over 700 miles of overhead distribution conductor, 49 miles of underground distribution cable, 40 miles of network cable, and over 4,300 manhole cover replacements with venting covers, as well as installing or replacing over 700 miles of transmission line.

#### 2. *March 22, 2018 – Misstatement No. 12-B*

19.     On March 22, 2018, Debtors issued a press release announcing their Community Wildfire Safety Program.[10]  Among other things, the press release stated that the program focused on "doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe," including by "investing in stronger, coated power lines, spacing lines farther apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years."

20.     The press released also stated that Debtors were "[a]ugmenting [their] already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission."

---

[9]  The numbering of the Additional Misstatements set forth in this Addendum is intended to organize and present such misstatements in chronological order relative to the misstatements alleged in paragraphs 194 through 316 of the TAC.

[10]  The press release is available at:  https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/In-Advance-of-2018-Wildfire-Season-PGE-Takes-Action-with-Comprehensive-Community-Wildfire-Safety-Program/default.aspx.

15

### 3. March 27, 2018 – Misstatement No. 12-C

21.     On March 27, 2018, Debtors issued a press release concerning their

supposed efforts to mitigate wildfire risks.[11]  The press release stated the following:

> Under PG&E's industry-leading Vegetation Management Program, the
> company **inspects and monitors every PG&E overhead electric
> transmission and distribution line each year, with some locations
> patrolled multiple times**.

(Emphasis added.)

### 4. May 3, 2018 – Misstatement No. 12-D

22.     During a May 3, 2018 conference call with analysts concerning Debtors'

financial results for the first quarter of 2018,[12] Debtor's then-CEO, Geisha Williams, stated the

following:

> We have more than doubled our annual spend to manage vegetation
> from roughly $190 million in 2013 to $440 million in 2017 and **we
> increased the frequency of our patrols, particularly in high fire
> threat areas**, but the new normal needs new solutions. To that end, we
> recently announced our Community Wildfire Safety Program.

(Emphasis added.)

### 5. October 1, 2018 – Misstatement No. 16-A

23.     On October 1, 2018, Debtors submitted an application to FERC for

revisions to their "Transmission Owner Tariff."  Exhibit 3 to that filing was written testimony (in

question and answer form) by David P. Gabbard, who was the Utility's Senior Director of

Transmission Asset Management, concerning Transmission Risk Management and Project

Management Improvements."  Gabbard's testimony states:

---

[11] The press release is available at:  https://investor.pgecorp.com/news-events/press-
releases/press-release-details/2018/PGE-Working-to-Reduce-Wildfire-Risks-by-Increasing-
Distances-Between-Trees-and-Power-Lines-and-Reducing-Fuels/default.aspx.

[12]  The transcript of this call is available at:  https://seekingalpha.com/article/4169513-pg-and-e-
pcg-q1-2018-results-earnings-call-transcript.

Case: 19-30088   Doc# 13518   Filed: 02/16/23   Entered: 02/17/23 09:09:08   Page 29
of 39

Q.      How is PG&E reducing transmission overhead conductor risk?

A.      PG&E is currently implementing four mitigations to reduce overhead conductor risk.  The first two mitigations revolve around equipment replacement work: additional overhead conductor replacement and additional insulator replacement.  Replacing additional conductors and insulators reduces the likelihood that those conductors and insulators will fail, therefore reducing the likelihood that those failures will lead to transmission wires down.

. . .

Q.      Describe the Tower Replacement Program and how that will address the Transmission Risk.

A.      The Tower Replacement Program is established to manage the replacement of steel structures that have reached the end of their useful lives.  The program targets replacement of deteriorated structures where repair is either less cost effective or not feasible.

**6.      *October 1, 2018 – Misstatement No. 16-B***

24.      As part of the same FERC application, Jessica Tsang, a Principal Regulatory Analyst at the Utility, submitted written testimony concerning Debtors' Transmission and Maintenance Operation Expenses.  Her testimony states:

Q.      Please describe the allocation of expenses in Account 561 – Load Dispatching.

A.      This account includes expenses incurred for operating the transmission system safely, reliably, and ***in compliance with all applicable rules, standards and regulations***.  Some examples of activities for which expenses are incurred include:

> • Monitoring, assessing, and operating the power system and individual facilities in real-time to maintain safe and reliable operation of the transmission system;

. . .

Q.      Please describe the allocation of expenses in Account 563 – Overhead Line Expenses.

A.      This account includes expenses incurred for operating overhead transmission lines. Some examples of activities for which expenses are incurred include:

17

> • Patrolling and inspecting assets to identify any potential
> safety and reliability issues;

. . .

> Q.    Please describe the allocation of expenses in Account 571 –
> Maintenance of Overhead Lines.
>
> A.    This account includes expenses incurred for maintaining
> overhead transmission plant.  Some examples of activities for which
> expenses are incurred include:
>
>> • Preventative and corrective maintenance of steel and wood
>> support structures;

(Emphasis added.)

### 7.    *November 5, 2018 – Misstatement No. 18-A*

25.    During a November 5, 2018 conference call concerning Debtors' financial

performance for the third quarter of 2018l,[13] which occurred just days before the ignition of the

Camp Fire, PG&E's then-CEO Geisha Williams stated the following:

> We also have our public safety power shut off program that I
> mentioned earlier, and we'll of course only utilize this as a last
> resort in the most extreme forecasted weather conditions.  *All of
> these efforts are in addition to our ongoing pole maintenance
> and visual and infrared inspections of our assets*.  We plan to
> continue patrolling our poles at frequencies within high fire threat
> areas beyond the compliance requirements in place in California.
> Collectively, this is an integrated comprehensive program to
> further reduce risk across our high fire threat areas.

(Emphasis added.)

### B.    The Additional Misstatements Were
### Materially False and Misleading When Made

26.    The Additional Misstatements were materially false and misleading when

Debtors made them for several reasons.

---

[13] The transcript of this call is available at:  https://www.nasdaq.com/articles/pge-corp-pcg-q3-2018-earnings-conference-call-transcript-2018-11-05.

27.    ***First***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors were sufficiently investing in their electrical system infrastructure, including by replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life.  *See* Additional Misstatement Nos. 12-A, 12-B, 16-A, and 16-B.  But, as the Butte Report concluded, Debtors were "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line" at the time the statement was made.  Butte Report at 60.  Further, (i) Debtors had known, since at least 1987, that C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" and that the hanger plates were approaching the end of their useful lives, *id*. at 24, 78, 83-84; (ii) Debtors were aware of the advanced age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program, *id.* at 33; (iii) Debtors approved (albeit at reduced funding) a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" because "[t]he probability of . . . failure ***is imminent*** due to the age of both the towers and the conductor," but canceled the project in 2009, *id*. at 34-35; (iv) Debtors reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire, *id*. at 50; (v) after five towers on the Caribou-Palermo line fell in 2012, Debtors proposed replacing the collapsed towers, and one additional tower, but did not replace the remaining towers despite their age and acknowledgements in internal documents that "the likelihood of failed structures happening is high," TAC ¶¶ 131-32, 136; and (vi) internal documents from prior to the Camp Fire, including in 2016, "detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line," warned that at least one tower was over a quarter-century past its useful life, and acknowledged that "the Caribou-Palermo lines were in need of repair and posed a significant risk

19

of collapse," but Debtors did not replace the tower or otherwise adequately repair the equipment on the line, *id*. ¶¶ 134, 137-39.

28.     ***Second***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors employed robust vegetation management practices that complied with applicable regulations. *See* Additional Misstatement Nos. 12-B, 12-C, and 12-D. On the contrary, as alleged in the TAC, (i) "[i]nvestigations into the causes of the Camp Fire . . . uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations," which, among other things, mandate the safe operation of electrical utilities and prescribe clearances between powerlines and vegetation and the removal of dead and decadent trees that might contact powerlines, *id*. ¶¶ 56, 59, 288; and (ii) it "has been documented that PG&E actually knew that it was not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before U.S. District Judge Alsup "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle,'" *id*. ¶ 292.

29.     ***Third***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors were performing frequent and rigorous inspections of powerlines in areas prone to fire. *See* Additional Misstatement Nos. 12-C, 12-D, 16-B, and 18-A. On the contrary, at the time the statement was made, Debtors had not inspected Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point." TAC ¶¶ 203, 268.

Case: 19-30088   Doc# 13518   Filed: 02/16/23   Entered: 02/17/23 09:09:08   Page 33 of 39

30. Moreover, these Additional Misstatements materially omitted the facts that:

    a. over the preceding decades Debtors changed their policies to decrease the frequency and thoroughness of powerline inspections and patrols;

    b. Debtors' actual inspections and patrols of the Caribou-Palermo line and other lines "in low population density mountainous areas" did not comply with their ETPM policy;

    c. Debtors reduced the time budgeted for inspections and patrols;

    d. Debtors eliminated formal training on inspections and patrols;

    e. Debtors reduced the flight time of aerial patrols, so that they were mere "fly bys" that could "only confirm[] the structures and components were 'standing upright;'"

    f. transmission line inspections and patrols were conducted by employees who "could not have been expected to identify the wear" on C hooks and hanger holes;

    g. the aerial patrols and ground inspections that Debtors conducted on the century-old Caribou-Palermo line could not assess wear on C hooks and hanger holes;

    h. climbing inspections were, contrary to Debtors' policy, treated as discretionary;

    i. despite the fact that towers on the Caribou-Palermo line were subject to high wind, Debtors never inspected them for wind damage,

    j. Debtors did not conduct inspections of similar equipment following failures of transmission line components on Caribou-Palermo line towers; and

    k. after five towers on the Caribou-Palermo line fell in 2012, Debtors failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses.

*See* Butte Report at 23-30, 35-37, 40-43, 50, 72.

31. Because of the foregoing deficiencies in Debtors' inspection practices, these Additional Misstatements were also materially false and/or misleading because they

Case: 19-30088   Doc# 13518   Filed: 02/16/23   Entered: 02/17/23 09:09:08   Page 34 of 39

created a false impression that Debtors' transmission line inspection regime complied with their ETPM, *id*. at 37, and with CPUC regulations, such as General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which details safety standards for powerlines and infrastructure, including requirements intended to guard against corrosion on towers. *See* TAC ¶¶ 164-65.

32. When the falsity of Debtors' statements came to light—including through the corrective disclosures described in the TAC—and the undisclosed and under-disclosed risks associated with Debtors' woefully inadequate practices with respect to maintaining and replacing equipment on their high-voltage transmission lines, managing vegetation around powerlines, and inspecting equipment on their high-voltage transmission lines materialized, including in the form of the Camp Fire, there was a dramatic drop in the market value of PCG's common stock from almost $48 per share on November 8, 2018 to $17.74 on November 16, 2018, *see id*. ¶¶ 355, 387.

### III. Debtors Made the Additional Misstatements with Scienter

33. As alleged in the TAC, Debtors "either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality" and, consequently, made those misstatements with scienter. *Id*. ¶ 391.

34. Debtors claimed that safety is their "core business," and as such, was the "focus" of their senior officers. *Id*. ¶ 397; *see also id*. ¶¶ 398-403 (noting representations by Debtors' senior officers that "they closely monitored PG&E's critically important safety and compliance"). Indeed, Debtors stated that they "maintained a database of inspection data to document the condition of [PG&E's] power lines, which provided [PG&E] personnel with ready access to information about instances of noncompliance with state safety regulations," and they

22

"repeatedly touted the culture among [PG&E's] lower-level employees that encouraged reporting safety problems up the chain of management." *Id*. ¶¶ 420, 426-29.

35. Accordingly, "the persistence of [Debtors'] safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what [Debtors] did—or failed to do—to mitigate safety problems once they were reported." *Id*. ¶ 430.

36. With respect to Debtors' materially false statements concerning their transmission line inspection and patrol regime, at the times those misstatements were made, Debtors either knew, or were culpably reckless in not knowing, that:

    a. Their actual inspections and patrols of the Caribou-Palermo line and other lines "in low population density mountainous areas" did not comply with their ETPM policy;

    b. They had reduced the frequency, thoroughness, and time budgeted for inspections and patrols of transmission lines;

    c. They had eliminated formal training on inspections and patrols of transmission lines;

    d. Their transmission lines were being inspected or patrolled using methods that "could not have been expected to identify the wear" on C hooks and hanger holes despite the advanced aged and known wear on such equipment; and

    e. Their inspections of transmission lines could not have complied with CPUC regulations, such as General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which details safety standards for powerlines and infrastructure, including requirements intended to guard against corrosion on towers.

*See* TAC ¶¶ 164-65; Butte Report at 23-30, 35-37, 40-43, 50, 72.

37. With respect to Debtors' materially false statements concerning their maintenance, repair, and replacement practices for their high voltage transmission line equipment, at the times those misstatements were made, Debtors either knew, or were culpably reckless in not knowing, that:

23

a. They were "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line;"

b. C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" that the hanger plates were approaching the end of their useful lives;

c. They never funded the "Deteriorated Transmission Equipment Replacement Program," despite knowledge of the advanced age of the equipment on the Caribou-Palermo line;

d. They cancelled a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" despite "[t]he probability of . . . failure [being] *imminent* due to the age of both the towers and the conductor;"

e. They reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire; and

f. They did not replace towers or make adequate repairs to the Caribou-Palermo line despite acknowledgements in internal documents that "the likelihood of failed structures happening is high," and that "the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse."

*See* TAC ¶¶ 131-32, 134, 136-39; Butte Report at 24, 33-35, 50, 60, 78, 83-84.

38.     And, with respect to Debtors' materially false statements concerning their vegetation management practices, as alleged in the TAC, at the times those misstatements were made, Debtors "actually knew that [they] [were] not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before the Honorable William Alsup of the U.S. District Court for the Northern District of California "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle,'" TAC ¶ 292.

## IV.     Reservation of Rights

39.     Claimant reserves the right to further amend and/or supplement its Supplemental Proof of Claim (including this Addendum) at any time, including after any bar date, in any manner, and/or to file additional proofs of claim for any additional claims which

may be based on the same or additional documents or grounds of liability, or based on additional facts learned following further investigation.

40.     Except to the extent the 2020 POC is amended hereby, the filing of this Supplemental Proof of Claim (including this Addendum) shall be without prejudice to any previous, contemporaneous, or future claims made by or on behalf of Claimant against Debtors or any of their officers, directors, employees, agents, affiliates, or successors in this or any other proceeding.  In executing and filing this Supplemental Proof of Claim (including this Addendum), Claimant does not waive (and this Supplemental Proof of Claim and Addendum shall not be deemed or construed to waive) any claims or right to assert any claims, or preserve any remedies, including setoff and recoupment, that Claimant has against Debtors or any of their officers, directors, employees, agents, affiliates, or successors, whether arising from or related to the matters described herein or otherwise.

41.     The filing of this Supplemental Proof of Claim (including this Addendum) is not and shall not be deemed or construed as: (a) a waiver or release of Claimant's rights against any person, entity, or property; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (d) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's

25

right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge or, if applicable, the U.S. Court of Appeals for the Ninth Circuit; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Supplemental Proof of Claim (including this Addendum), any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

42.     All notices regarding this Proof of Claim should be sent to:

The Baupost Group, L.L.C.
10 St. James Avenue, 17th Floor
Boston, Massachusetts 02116
Attn: Frederick H. Fogel, Esq.
Phone:  (617) 210-8300
Email:  pcgpublicteam@baupost.com