## **EXHIBIT B**

**(Response to Information Request)**





**INFORMATION REQUEST FORM**

1. **Contact Information**

The section below has fields relating to your contact information (name, address, email, etc.). If any part of that information is incorrect, please provide correct details below. The Reorganized Debtors will use this contact information for any further communications and correspondence regarding your proof of claim(s).

Please reflect any updates below:

Address: Krausse, Howard
PO BOX 1339
Willow Creek CA 95573-1339

Phone:
Email: anneandhoward@hotmail.com

2. **Claim-Related Information**

The section below relates to information relevant to your filed proof of claim(s). You must provide the following information:

(a) incident date (if applicable);

> Ongoing

(b) a description of the general nature of the claim (e.g., contract, personal injury, cessation of service, etc.);

> 1) Damage to personal property
> 2) Break-in by PG&E employee
> 3) Payment for power monitoring performed at request of PG&E
> 4) Theft of electricity
> 5) Loss of use and value of real property

(c) a statement of, and supporting documents indicating, the underlying basis for the claim;

> See attached.

**(d) a statement of the liquidated amount allegedly owing on the Claim, including documentation as available;**

1) Damage to personal property *and*
   See attachments 2 to 5; 27 to 28

2) Damage from break-in
   See attachments 7.1 to 7.4; 12 to 19

3) Monitoring of power issues by Mr. Krausse
   See attachments 9.1 to 11.4; 24 to 25

4) Theft of electricity
   See attachments 21 to 23

5) Loss of use and value of real property
   See attachment 26

**(e) any additional information you believe is necessary or appropriate to allow the Reorganized Debtors to evaluate the claim.**

There is a dangerous ongoing health and safety situation at the property that needs to be addressed by PG&E. We truly fear for our safety and the neighborhood.

Please note that providing a response to this letter does not mean that your claim will be allowed. PG&E will review the information you provide and reserves all its rights with respect thereto. If you have any questions about your proof of claim, you should consult an attorney.

☒ I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. I UNDERSTAND THAT A PERSON WHO FILES A FRAUDULENT CLAIM COULD BE FINED UP TO $500,000, IMPRISONED FOR UP TO 5 YEARS, OR BOTH. 18 U.S.C. §§ 152, 157, AND 3571.

_____
Signature

If you have questions about this notice, please contact the Debtors' Claims and Noticing Agent, Prime Clerk LLC, at 844-339-4217 (toll-free), +1 929-333-8977(international), or by email at pgeinfo@primeclerk.com.

**Regarding appliance failures.**

The refrigerator compressor broke after a PG&E scheduled power shutoff. When the power came back on, the refrigerator did not. The compressor did not run and became extremely hot. Howard had been given an opinion by two appliance repairmen that a broken compressor was too expensive to be replaced, and that the unit had to be replaced. We had already previously replaced the control board and also the compressor relay from previous power shutoff events. We then decided that since outages and surges were such frequent occurrences and since we were not present much of the time, it would be prudent to purchase a unit with a "soft start" which would mitigate the power surges. We therefore imported a unit with that feature from New Zealand. We paid $1799.99 for our Fisher & Paykel refrigerator in 2016 (attachment #3).

Regarding the washer, the control board electronics broke and the unit would not start. The opinion of the repairman was that it was not economical to repair, as the cost of a new washer was probably only a little more than the repair would be. This occurred at a time when we had been observing large voltage variations from the standard 120 volts. See attached documentation (attachment #4). We paid $849.99 for the replacement washer on May 12, 2018 (attachment #5).



**Poletski Appliance Cent**

B.E.A.R. REGIS. NO. A 38973
341 W. Harris St.
Eureka, CA 95503
Phone:  (707) 445-3138
Fax:    (707) 445-3383

Bill To:  8261421
          KRAUSSE, HOWARD/ANNE
          640 FORREST VIEW DR
          WILLOW CREEK, CA   9557

Phone:   826-1421          (530) (

POLETSKI'S APPLIANCE CENTER
341 W HARRIS ST.
EUREKA, CA 95693
(707)445-3138

Merchant ID: 1704081698
Term ID: 0310

**Sale**

Application Label: MasterCard
MASTERCARD
XXXXXXXXXXXX8413
AID: A0000000041010
Entry Method: Chip
Apprvd: Online
09/09/16

Batch#: 000001
12:45:04

Inv#: 00000004           Appr Code: 58313P

Total: $        3,487.56

TVR: 0800908000
TSI: E800

**INVOICE #:**    ☆ 3    211756

| | |
|---|---|
| Date Ordered: | 9/9/2016 |
| Date Finished: | |
| Date Purchased: | refrigerator 2 |
| Reference #: | |
| PO #: | |
| Job #: | ASAP |
| Page: | 1    MPP |
| Date Printed: | Sep 09, 2016 |

PY

21
JSSE, HOWARD/ANNE
ORREST VIEW DR
OW CREEK, CA   95573

:21          (530) 629-2617

Tax Exemption #'s:  H:

| | |
|---|---|
| Delivery Date: | Friday, September 30, 2 |
| Payment Type: | COD |
| Salesperson: | MATT P |

Custo...        ...ne:
n...        Type:        MAIN STORE SLS
        Tax Code:        HUMBOLDT COUNTY

| Description | | Qty | Unit Cost | Extended Cost |
|---|---|---|---|---|
| | | | | *= H Exempt |
| ES22BRX5 | 33" BOTTOM MOUNT FRIDGE SINGLE DOOR | 1 | 1,799.99 | 1,799.99 |
| FISCHER & PAYKEL, | | | | |
| REFRIGERATOR | | | | |
| SHIPPING & HANDLING | | 1 | 40.00 | 40.00 * |
| HAULAWAY/FREON RECOV | | 1 | 30.00 | 30.00 * |
| AER6303MFS | AMANA ELEC RANGE | 1 | 649.99 | 649.99 |
| AMANA, ELECTRIC RANGE | | | | |
| RC4-3-40A | CORD RANGE 4' 3 WIRE 40AMP | 1 | 19.99 | 19.99 |
| 60 MONTH SXS/BM REFER UNDER $1500 | September 30, 2016 | | 399.99 | 399.99 * |
| ES22BRX5 | September 29, 2021 | | | |
| Labor | TO BE UPDATED | .00 | 350.00 | 350.00 * |
| HAUL AWAY RANGE AT NO CHARGE. | | | | |
| Payment | Visa | 9/9/2016 | 3,487.56 | 3,487.56 |

|  |  | |
|---|---|---|
| **Sub Total** | | **3,289.96** |
| 8%  **II tax on** | 2,469.97 | **197.60** |
| | | |
| **Invoice Total** | | **3,487.56** |
| **Payment** | | **3,487.56** |
| **Balance** | | **0.00** |

WE APPRECIATE YOUR BUSINESS.          1.5% PER MONTH ON OVERDUE ACCOUNTS

Case: 19-30088    Doc# 13609-2    Filed: 03/10/23    Entered: 03/10/23 13:31:24    Page 5 of 34



## AC LINE VOLTAGE READINGS WILLOW CREEK

| DATE | FILE | AC LINE VOLTAGE READING |
|------|------|-------------------------|
| 8/7/2018 | 9789 | 124.2 Highest Voltage |
| 8/29/2018 | 9848 | 115.9 |
| 10/23/2018 | 0031 | 113.7 |
| 2/24/2019 | 0231 | 113.0 |
| 2/24/2019 | 0232 | 110.9 |
| 2/26/2019 | 0237 | 109.8 |
| 3/1/2019 | 0239 | 108.9 Lowest Voltage |



*Cost of Replacement Washer #3*

**Poletski's Appliance Center**
B.E.A.R. REGIS. NO. A 38973
341 W. Harris St.
Eureka, CA 95503
Phone: (707) 445-3138
Fax: (707) 445-3383

**--Invoice--**

**INVOICE #:** 227803

Date Ordered: 05/07/2018
Date Finished: 05/12/2018
Date Purchased:
Reference #:
PO #:
Job #: COMP
Page: 1 CM
Date Printed: Mar 25, 2021

| Bill To: | 8261421 | | Ship To: | 8261421 |
|---|---|---|---|---|
| | KRAUSSE, HOWARD/ANNE | | | KRAUSSE, HOWARD/ANNE |
| | 640 FORREST VIEW DR | | | 640 FORREST VIEW DR |
| | WILLOW CREEK, CA 95573 | | | WILLOW CREEK, CA 95573 |

| Phone: | 826-1421 | (530) 629-2617 | Phone: | 826-1421 | (530) 629-2617 |
|---|---|---|---|---|---|

**Tax Exemption #'s: H:**

| Delivery Date: | Saturday, May 12, 2018 | | Map/Zone: | MG / MG |
|---|---|---|---|---|
| Payment Type: | COD | | Inv Type: | MAIN STORE SLS |
| Salesperson: | CARY | | Tax Code: | HUMBOLDT COUNTY |

| Description | | | Qty | Unit Cost | Extended Cost |
|---|---|---|---|---|---|
| | | | | | *= H Exempt |
| MVWC565FW | 4.2 CU FT, SS WASH BASKET, POWER WASH AGITATOR, DE | | 1 | 849.99 | 849.99 |
| MAYTAG, WASHER | C81441380 DEL | | | | |
| MEDC465HW | 29" WOD - ELEC | | 1 | 799.99 | 799.99 |
| MAYTAG, ELECTRIC DRYER | M81007917 DEL | | | | |
| Labor | MIGUEL | | .00 | 195.00 | 195.00 * |
| 60 MONTH H.F. FL/CAB/BRAV UNDER $1500 | | May 12, 2018 | | 249.99 | 249.99 * |
| MVWC565FW, C81441380 | | May 11, 2023 | | | |
| 60 MONTH H.E. DRYER UNDER $1500 | | May 12, 2018 | | 209.99 | 209.99 * |
| MEDC465HW, M81007917 | | May 11, 2023 | | | |
| 9WM48 | S/S WATER LINE 48" PET124818 | | 2 | 9.99 | 19.98 |
| Package | ELEC DRYER KIT 3 PRONG 4FT | | | 39.99 | 39.99 |
| VC4WT | 4 INCH CORBAN CLAMP | | 2 | | |
| DC4-3-30A | CORD DRYER 4' 3 WIRE 30AMP | | 1 | | |
| BTD48 | DUCTING | | 1 | | |
| HAUL AWAY | | | 2 | 10.00 | 20.00 * |
| Payment | CHECK 1873 | 5/12/2018 | | 2,517.45 | 2,517.45 |

| | | Sub Total | | | 2,384.93 |
|---|---|---|---|---|---|
| | 7.75% | H tax on | 1,709.95 | | 132.52 |
| | | **Invoice Total** | | | **2,517.45** |
| | | **Payment** | | | **2,517.45** |
| | | **Balance** | | | **0.00** |

WE APPRECIATE YOUR BUSINESS.

1.5% PER MONTH ON OVERDUE ACCOUNTS

6.

**Regarding phone conversation with Mr. Bear and subsequent break-in**

On June 13, 2017, a PG&E technician was dispatched to the Krausse residence at 640 Forest View Drive, Willow Creek, CA due to a power interruption. See Service Report (attachment #8). At that time, Technician Scha wished to install an "RVM" on the Krausse residence. Krausse believing that he had located a tap on the electricity service, a wire leading off of the property, for the purpose of electricity theft, refused. Hence, a note was included on the report and the RVM was not installed at that time.

On July 11, 2017, Krausse spoke with PG&E's agent in Eureka, Mr. Bear for over one hour about multiple power interruptions, suspected electricity theft, unacceptable voltage and frequency variations in power ostensibly supplied by PG&E and certainly billed for by PG&E. Although Bear acknowledged that PG&E had recorded 22 outages in Willow Creek year to date, PG&E phone records will demonstrate that Krausse had placed several phone calls to PG&E regarding outages at the Krausse residence that were not included in the official record.

During this conversation Howard and Mr. Bear discussed an unsafe electrical situation. An approximately 3' bolt of lightning had appeared in our kitchen a few inches in front of Anne. Also, we suspected that electricity was being stolen and that the miswiring might account for the electrical hazard. Howard reacted immediately after the lightning bolt happened and ran out to the deck facing the Stockel residence. Howard announced that lightning had appeared in the kitchen and demanded that Marvin Stockel "turn it off" (whatever it was that created the hazard). Mr. Stockel appeared immediately as Howard watched, and did not speak. He opened the garage door facing the lot, moved quickly to an electrical panel in the garage, and flipped several switches. Howard went back into the kitchen, where everything then seemed OK. Subsequent investigation revealed "lifted" grounds.

In the course of this conversation, Mr. Bear again suggested the installation of a RVM device on the Krausse property. Krausse again refused, stating that the issue of electricity theft could not be resolved in this way. Krausse and Bear then agreed that the RVM would be installed on PG&E's utility box. There is a large green utility box opposite the Krausse residence which the Krausses had witnessed non-PG&E employees regularly accessing. Mr. Bear denied that this was the property of PG&E. Krausse had put up a security camera on his driveway aimed at this box, which he mentioned to Mr. Bear. Subsequently, a label was put on the green box indicating that it is the property of PG&E. They further agreed that Krausse would monitor future power interruptions as well as voltage and frequency deviations from standard.

Mr. Bear further asserted that the AC line frequency was tightly controlled robotically in Eureka, CA, indicating that voltage and frequency variations of the sort Krausse described and subsequently documented were improbable. Pursuant to this agreement, Krausse monitored power interruptions, voltages, and frequencies of supplied power at two locations: 1595 Beverly Drive, Arcata, CA and 640 Forest View Drive, Willow Creek, CA. (attachments #9 and #10).

What Krausse discovered was that it was indeed true that voltage and frequency were "tightly controlled" at the Arcata residence, and for several weeks at the Willow Creek address(attachment #9.1 and #9.2). However, by October 7, 2017, there was a frequency deviation as measured by a frequency derived AC clock, of 30 seconds. On August 7, 2018, the deviation of the clock was 3 minutes 31 seconds. The deviation recorded in Arcata through this period ranged from 0:00 seconds to -0:13 seconds. This suggested to Krausse that the power supplied to the Willow Creek address came from alternative energy source(s). It also suggested that the frequent power interruptions at the Willow Creek address might be due to the transfer from one power source to another illegal source.

PG&E Electric Rule #2 (attachment #11.1, #11.2, #11.3, and #11.4) states in part that: PG&E will exercise reasonable diligence and care to regulate and maintain its frequency within reasonable limits... In addition, Electric Rule #2 specifies Minimum and Maximum voltages to All Services as follows: Minimum voltage to All Services of 114 volts and Maximum voltages to Class A Residential Distribution Circuits of 120 volts (attachment #3).

Pursuant to his conversation with Bear, Krausse documented and assembled spreadsheets of variations subsequent to July 11, 2017. An example of what Krausse documented is 113.7 volts on October 23, 2018, 124.2 volts on August 7, 2018, and 108.9 volts (attachment #10). Krausse believes that this is not due diligence but, in fact, negligence and possible gross negligence.

On Saturday, August 12, 2017, Krausse returned to his home in Willow Creek and retrieved an answering machine message from Dan LeFawnd (spelling uncertain), a PG&E Troubleman (attachment #12). In the message, LeFawnd acknowledges having entered the Krausse residence with the stated intention of installing a RVM meter, per instructions that he received as a result of our agreements with Mr. Bear. He further states the need to "get into" the meter boxes-panels which were locked. Note that the PG&E meter was and is only locked by PG&E, and that the padlock secured the electric panel only, which is the homeowner, Krausse's property. Permission to install an RVM on the Krausse meter had been explicitly denied on two previous occasions. A review of surveillance videos reveals that no one during this event ever approached the PG&E electric meter or the Krausse electric panel. However, several boards were subsequently found to be removed from the residence. One board was modified, with only the top of the board secured to the structure. Krausse repaired the damage to the house (attachments #13, #14, #15, #16, and #17 substantiating forced entry coinciding with PG&E Troubleman's visit).

Krausse believed the PG&E Troubleman's entry into the Krausse residence constituted a trespass as well as a burglary, the intent appearing to be to access house wiring accessible from under the decking surrounding the house. See also attachments #13, #14, #15, #16, #17, #18, and #19 destruction of evidence (photo of blown hard drive data, etc.)

According to PG&E's procedure for handling Voltage Complaints (attachments #20.1, and #20.2), PG&E was supposed to dispatch a PG&E Troubleman to investigate. PG&E states that they call in advance to give an estimated time of arrival. The Troubleman did not do this. If the area is not accessible, they leave a card requesting the customer to reschedule. This did not happen. Instead, he left a message on our answering machine which is attached, and apparently broke into our residence.

So, not only did PG&E not follow their own procedures but to our knowledge the voltage and frequency variations have not been addressed by PG&E to date. We have and are in the process of protecting ourselves by turning off circuits and remaining disconnected from PG&E as much as possible.



SERVICE REPORT
PG&E Visited your Property Today
to Service Your Account

| CLOCK | AC Frequency Derived Clock Showing Difference from Normal | | | |
|---|---|---|---|---|
| DATE | FILE | WC CLOCK DIFFERENCE SECONDS | ARCATA CLOCK DIFFERENCE SECONDS | NOTES |
| 6/26/2017 | 8371 | +0:02 | | "Good repair!" |
| 7/8/2017 | 8430 | -0:21 | | |
| 7/10/2017 | 8433 | -0:25 | | power off today briefly |
| 7/11/2017 | 8435 | -0:13 | | talked to Mr. Bear |
| 7/13/2017 | 8448 | -0:18 | | |
| 7/22/2017 | 8517 | -0:27 | | |
| 7/22/2017 | 8526 | -0:29 | | |
| 7/25/2017 | 8550 | -0:21 | | |
| 8/15/2017 | 8647 | +0:08 | | |
| 8/15/2017 | 8650 | +0:09 | | |
| 8/15/2017 | 8651 | +0:12 | | |
| 8/16/2017 | 8656 | +0:14 | | |
| 8/17/2017 | 8663 | +0:11 | | |
| 8/17/2017 | 8669 | +0:14 | | |
| 8/18/2017 | 8670 | +0:17 | | |
| 8/19/2017 | 8675 | +0:23 | | |
| 8/19/2017 | 8679 | +0:24 | | |
| 8/20/2017 | 8681 | +0:27 | | |
| 8/20/2017 | 8682 | +0:25 | | |
| 8/23/2017 | 8706 | +0:15 | | |
| 8/25/2017 | 8707 | +0:17 | | |
| 9/2/2017 | 8723 | +0:10 | | |
| 9/9/2017 | 8821 | +0:01 | | |
| 9/15/2017 | 8840 | +0:15 | | |
| 10/6/2017 | 8946 | +0:25 | | |
| 10/7/2017 | 8950 | +0:30 | | brief power outage |
| 7/8/2018 | 9638 | +0:24 | | |
| 7/13/2018 | 9650 | -0:55 | | |
| 7/21/2018 | 9687 | -0:44 | | |
| 7/22/2018 | 9691 | -0:18 | | |
| 7/23/2018 | 9696 | -0:50 | | |
| 7/24/2018 | 9703 | +0:02 | | |
| 7/29/2018 | 9735 | 0:00 | | |
| 7/30/2018 | 9747 | +0:00 | +0:00 | 9749,9750 BUT, AMM |
| 8/4/2018 | 9755 | -0:14 | -0:07 | 9053 BUT, HYD |
| 8/5/2018 | 9766 | +0:16 | | |
| 8/5/2018 | 9761 | -0:14 | | |
| 8/5/2018 | 9766 | +0:16 | | |
| 8/6/2018 | 9771 | | -0:13 | |
| 8/6/2018 | 9773 | -0:38 | | |
| 8/7/2018 | 9792 | +3:31 | | |
| 8/8/2018 | 9794 | +3:29 | | |
| 8/8/2018 | 9798 | | -0:19 | |
| 8/14/2018 | 9800 | | -0:40 | |
| 8/18/2018 | 9806 | | -0:33 | 9809 BUT, AMM |
| 9/6/2018 | 9918 | +3:16 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8/19/2018 | 9828 | +3:12 | | | | |
| 8/19/2018 | 9830 | | -0:36 | | 9832 BUT, AMM | |
| 8/28/2018 | 9842 | | -0:16 | | | |
| 8/29/2018 | 9851 | +0:27 | | | | |
| 8/29/2018 | 9852 | | -0:43 | | | |
| 9/1/2018 | 9858 | | -0:33 | | | |
| 9/29/2018 | 9966 | +2:00 | | | | |
| 9/6/2018 | 9876 | | -0:38 | | | |
| 9/6/2018 | 9893 | +3:08 | | | | |
| 9/13/2018 | 9898 | | -0:17 | | 9897 BUT, HYD, AMM | |
| 9/13/2018 | 9902 | +3:27 | | | | |
| 9/17/2018 | 9920 | | -0:31 | | | |
| 9/18/2018 | 9975 | | -0:51 | | | |
| 10/19/2018 | 0021 | | -0:40 | | 0023 BUT, HYD, AMM | |
| 11/20/2018 | 0079 | | -0:43 | | 0083 BUT, HYD, AMM | |

12.

| AC LINE VOLTAGE READINGS WILLOW CREEK | | | |
|---|---|---|---|
| DATE | FILE | AC LINE VOLTAGE READING | |
| 8/7/2018 | 9789 | 124.2 | Highest Voltage |
| 8/29/2018 | 9848 | 115.9 | |
| 10/23/2018 | 0031 | 113.7 | |
| 2/24/2019 | 0231 | 113.0 | |
| 2/24/2019 | 0232 | 110.9 | |
| 2/26/2019 | 0237 | 109.8 | |
| 3/1/2019 | 0239 | 108.9 | Lowest Voltage |

13.



**Pacific Gas and
Electric Company**

San Francisco, California

U 39

Cancelling   Revised

Revised

# 11.1
Cal. P.U.C. Sheet No.   14079-E
Cal. P.U.C. Sheet No.   13081-E

**ELECTRIC RULE NO. 2**
**DESCRIPTION OF SERVICE**

Sheet 4

## C.  VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

### 1.  CUSTOMER SERVICE VOLTAGES (Cont'd.)

#### a.  (Cont'd.)

| Nominal Two-Wire And Multi-Wire Service Voltage | Minimum Voltage To All Services | Maximum Service Voltage On Residential And Commercial Distribution Circuits | | Maximum Service Voltage On Agricultural And Industrial Distribution Circuits |
|---|---|---|---|---|
| | | Class A | Class B | |
| 120 | 114 | 120 | 126 | 126 |
| 208 | 197 | 208 | 218 | 218 |
| 240 | 228 | 240 | 252 | 252 |
| 277 | 263 | 277 | 291 | 291 |
| 480 | 456 | 480 | 504 | 504 |

1)  For purposes of energy conservation, PG&E's distribution voltage will   (N)
be regulated to the extent practicable to maintain service voltage on
residential and commercial distribution circuits within the minimum
and maximum voltages specified above for Class A circuits.

2)  The residential and commercial distribution circuits that cannot be
operated within the minimum and maximum voltages for Class A
circuits shall be regulated to the extent practicable to maintain
service voltage within the minimum and maximum voltages for
Class B circuits and, whenever possible, within the minimum and
maximum voltages for Class A circuits.   (N)

(Continued)

| Advice | 1588-E | Issued by | Date Filed | July 2, 1998 |
|---|---|---|---|---|
| Decision | | Robert S. Kenney | Effective | August 11, 1998 |
| | | Vice President, Regulatory Affairs | Resolution | |

14,

Case: 19-30088   Doc# 13609-2   Filed: 03/10/23   Entered: 03/10/23 13:31:24   Page
15 of 34

**Pacific Gas and
Electric Company**

U 39   San Francisco, California

Revised       Cal. P.U.C. Sheet No.   11261-E
Cancelling  Revised       Cal. P.U.C. Sheet No.   7682-E

#11,2

**ELECTRIC RULE NO. 2
DESCRIPTION OF SERVICE**

Sheet 5

C.  VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

1.  CUSTOMER SERVICE VOLTAGES (Cont'd.)

b.  Exceptions to Voltage Limits

Voltage may be outside the limits specified when the variations:

1)  Arise from the temporary action of the elements.

2)  Are infrequent momentary fluctuations of a short duration.

3)  Arise from service interruptions.

4)  Arise from temporary separation of parts of the system from the main system.

5)  Are from causes beyond the control of PG&E.

c.  It must be recognized that, because of conditions beyond the control of PG&E or customer, or both, there will be infrequent and limited periods when sustained voltages outside of the service voltage ranges will occur. Utilization equipment may not operate satisfactorily under these conditions, and protective devices may operate to protect the equipment.

d.  The sustained service delivery voltages are subject to minor momentary and transient voltage excursions which may occur in the normal operation of PG&E's system.  Subject to the limitations of C.1.a. above, the voltage balance between phases will be maintained by PG&E as close as practicable to 2½ percent maximum deviation from the average voltage between the three phases.

(Continued)

| Advice | 1303-E | Issued by | Date Filed | June 21, 1990 |
| Decision | | Robert S. Kenney | Effective | July 31, 1990 |
| | | Vice President, Regulatory Affairs | Resolution | |

15.



**Pacific Gas and Electric Company**

San Francisco, California

U 39

| | Revised | Cal. P.U.C. Sheet No. | 11262-E |
|---|---|---|---|
| Cancelling | Revised | Cal. P.U.C. Sheet No. | 9313-E |

# 11.3

**ELECTRIC RULE NO. 2**
**DESCRIPTION OF SERVICE**

Sheet 6

C. **VOLTAGE AND FREQUENCY CONTROL (Cont'd.)**

1. **CUSTOMER SERVICE VOLTAGES (Cont'd.)**

   e. Where the operation of the applicant's equipment requires unusually stable voltage regulation or other stringent voltage control beyond that supplied by PG&E in the normal operation of its system, the applicant, at his own expense, is responsible for installing, owning, operating, and maintaining any special or auxiliary equipment on the load side of the service delivery point as deemed necessary by the applicant.

   f. The applicant shall be responsible for designing and operating his service facilities between the service delivery point and the utilization equipment to maintain proper utilization voltage at the line terminals of the utilization equipment.

2. **CUSTOMER UTILIZATION VOLTAGES**

   a. All customer-owned utilization equipment must be designed and rated in accordance with the following utilization voltages specified by the American National Standard C84.1 if customer equipment is to give fully satisfactory performance:

| Nominal Utilization Voltage | Minimum Utilization Voltage | Maximum Utilization Voltage |
|---|---|---|
| 120 | 110 | 125 |
| 208 | 191 | 218 |
| 240 | 220 | 250 |
| 277 | 254 | 289 |
| 480 | 440 | 500 |

(Continued)

| Advice | 1303-E | Issued by | Date Filed | June 21, 1990 |
|---|---|---|---|---|
| Decision | | Robert S. Kenney | Effective | July 31, 1990 |
| | | Vice President, Regulatory Affairs | Resolution | |

16.

Case: 19-30088    Doc# 13609-2    Filed: 03/10/23    Entered: 03/10/23 13:31:24    Page 17 of 34

**Pacific Gas and
Electric Company**

U 39   San Francisco, California

Revised    Cal. P.U.C. Sheet No.    11263-E
Cancelling   Revised    Cal. P.U.C. Sheet No.    9313-E

# 11.4

**ELECTRIC RULE NO. 2
DESCRIPTION OF SERVICE**

Sheet 7

C.  VOLTAGE AND FREQUENCY CONTROL (Cont'd.)

   2.  CUSTOMER UTILIZATION VOLTAGES (Cont'd.)

      b.  The differences between service and utilization voltages are allowances for
          voltage drop in customer wiring. The maximum allowance is 4 volts (120 volt
          base) for secondary service.

      c.  Minimum utilization voltages from American National Standard C84.1 are
          shown for customer information only as PG&E has no control over voltage
          drop in customer's wiring.

      d.  The minimum utilization voltages shown in a. above, apply for circuits
          supplying lighting loads. The minimum secondary utilization voltages
          specified by American National Standard C84.1 for circuits not supplying
          lighting loads are 90 percent of nominal voltages (108 volts on 120 volt base)
          for normal service.

      e.  Motors used on 208 volt systems should be rated 200 volts or (for small
          single-phase motors) 115 volts. Motors rated 230 volts will not perform
          satisfactorily on these systems and should not be used. Motors rated
          220 volts are no longer standard, but many of them were installed on
          existing 208 volt systems on the assumption that the utilization voltage would
          not be less than 187 volts (90 percent of 208 volts).

   3.  FREQUENCY

      PG&E will exercise reasonable diligence and care to regulate and maintain its
      frequency within reasonable limits but does not guarantee same.

(Continued)

| Advice | 1303-E | Issued by | Date Filed | June 21, 1990 |
| Decision | | Robert S. Kenney | Effective | July 31, 1990 |
| | | Vice President, Regulatory Affairs | Resolution | |

17.

Case: 19-30088   Doc# 13609-2   Filed: 03/10/23   Entered: 03/10/23 13:31:24   Page
18 of 34

*Substantiation of PG&E approved burglary. Caller had conspired with PG&E agent Bear to commit burglary. He knew details of the situation which he could only have gotten from PG&E.*

#12

Saturday, August 12, 2017

Howard, standing at the answering machine says, "Yeah."

The answering machine does not have time and date entered, because AC power goes off so frequently, and the machine then forgets.

Machine robot says, "Thursday, 8 si"

"Yeah, I'm looking for Howard Krausse, umm, this is Dan Lafawnd with PG&E. I'm a troubleman in Willow Creek and I have a <u>tag to put a RVM meter, electric RVM</u>. It goes on your wires, to uh gauge your uh, usage. Sooo, ...I don't know if you know anything about this, but if you could just give me a call, I'm trying to get in -- actually, <u>I was into your residence, at 640 Forest View Drive</u>, ummm, but you have a lock on both of the meter uh boxes-panels where I need to get into.

Uhmmm, otherwise, uh, I really-really -- do not think there is anything goin' on as far as somebody uh uh, I'm not sure what-what we're putting this on there for, um, but maybe there's somethin' wrong with the meter and you could'n get a digital meter put in, which is also a non-smart digital meter, or just go ahead an' go with the smart meter like everybody else does.

Sooo...give me a call back Howard...Krausse...uh..Dan Lafawnd here -- <u>530-902-6529.</u> Thanks bye."

Anne says, "Beautiful piece of evidence!
Machine says, "End..."

*Krausses possess recording of message.*

## GATE UNLOCKED AND LEFT OPEN BY NEIGHBOR
8/12/2017



**NAIL PULLED AND BENT OVER**
8/20/2017



# NAIL PULLED FROM DECK NEAR DOOR
8/12/2017




NAIL PULLED FROM DECK NEAR DOOR
8/12/2017



Case: 19-30088    Doc# 13609-2    Filed: 03/10/23    Entered: 03/10/23 13:31:24    Page 23 of 34

BOARD REMOVED FROM DECK SIDE TO GAIN ENTRY INTO RESIDENCE.
THE BOARD SPLIT WHEN IT WAS REATTACHED BY CRIMINALS
8/12/2017





**Blown Hard Drive on August 12, 2017 Transcript of CIMG 8952 video**

This is the screen of uh the uh, I'll just call the "other um Zmodo" system, the one that I documented the PGE man's arrival. that hard drive is fine. but on this one. which is . as you see here, the one that would show the power outage on 8/12, and that hard drive was uh "zapped" I'll call it. and this (referring to the rightmost part of the screen) blue line here is where it started working again on the next day, August 13 (2017). so that hard drive was tampered with. as part of the burglary.

# Report a voltage problem



**If you're experiencing an emergency or life-threating situation, call 9-1-1.**

## We're here to help

PG&E works to deliver safe, reliable and affordable energy to our customers. We are required to provide electric service under Electric Rule No. 2 (PDF, 719 KB)PDF. Opens in new Window.. Upon receipt of a voltage investigation request, PG&E's first responder (Troubleman) determines if the service voltage complies with Electric Rule No. 2.

- If the service voltage is outside the Rule 2 guidelines, we notify the customer of our findings and then take appropriate steps to comply with Electric Rule No. 2.
- If the service voltage is within the Rule 2 guidelines, we notify the customer that PG&E is within compliance and that the voltage issue potentially resides on the customer side.
- If the service voltage is outside the Rule 2 guidelines but the high voltage is due to generation on the customer side, we notify the customer of our findings and assist with resolving the issue.

**Voltage problems**

If you're experiencing a voltage issue, call PG&E Customer Service at 1-800-743-5000. Voltage issues include the following:

- High or low voltage
- Partial power
- Flickering lights

25.

Please let our customer service representative know if your complaint involves a PV (solar) system and also describe the problem.

## How we respond to voltage complaints

- Once we receive a customer's call, we dispatch a PG&E Troubleman from the local office.
- We call in advance to give our estimated time of arrival. If the customer does not answer, we leave a voice message.
- Upon arrival, the Troubleman performs the initial investigation. If the area is not accessible, we leave a card with contact information requesting the customer to reschedule the visit.
- If the voltage issue is resolved, we'll let the customer know in person or leave a Service Report.
- If we don't find a problem, we may install a Recording Volt Meter (RVM) and leave it for a few days to collect voltage data for investigation.
- The RVM is removed and the data sent to PG&E Voltage Reliability Team.
- The Voltage Reliability Team contacts the customer with their findings. They let the customer know of any actions required to correct and resolve the problem.
- The Voltage Reliability Team responds to an inquiry within 48 hours after receiving an RVM data file.

If you have specific voltage questions, email the Voltage Reliability Team at VRT@pge.com.

26.

## Comparison of PG&E Billing with Actual Electric Usage by the Krausses

We believe that at least half of the kW hours billed for electrical use in Willow Creek during our entire residency there was due to theft. This number was calculated as follows:

We have compared our audited electrical usage from 2020 with the historical PG&E billing from prior years to determine our true electricity use (attachments #1 and #2). The historical electrical usage is presented on the "PGE Billing & Analysis 2010-2018" spreadsheet which shows the billing from 2010 through 2018, Exhibit F-1. Our true usage is shown on the spreadsheet "Actual Electrical Use by Meter Reading", Exhibit F-2. We began to uncover the true scope of electrical theft in 2017 when we documented the finding of the buried AC cables. Prior to that, we had only suspicions. After that time, we took many defensive actions to deter theft. The result of going off-grid and auditing our own electricity use is an approximate average monthly cost of $102.90 per month. The annual amount is estimated as ($102.90*12 = $1234.80). The average cost without remediation (going off-grid) for the years 2010 - 2018 was $314.24 per month (subtotal on spreadsheet "Average per month PG&E billing $314.24"). The annual amount was $314.24*12 = 3770.88. The amount of theft was $3770.88-$1234.80 = $2536.08 per year. Therefore, the total dollar value of the theft over the relevant period was $ 2536.08 * 9 yrs. = $ 22, 824.72. This is grand theft.

## PG&E BILLING & ANALYSIS 2010-2018

| Billing Month Due Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

TOTAL BILLING

Average per month PG&E billing

Average annual PG&E billing

Note: 2018/1 move to Assets

# ACTUAL ELECTRICAL USE BY METER READING

**MAY – AUGUST 2020**

| MONTH | BEGIN | END | TOTAL KWH |
|---|---|---|---|
| 5 | 36982 | 37716 | 754 |
| 6 | 37716 | 38202 | 486 |
| 7 | 38202 | 38545 | 343 |
| 8 | 38545 | 38922 | 377 |
| TOTAL KWH 4 MONTHS | | | 1960 |

**AVERAGE USE PER MONTH**            490 kWh per month

at .21/kWh correct rate per month is            $102.90 cost per month
                                                                    (D10*.21)

**ANNUAL AMOUNT**            $1,234.80

29.

Evidence of EMP

Included is a screen shot of the security system, which did not function during the PG&E break-in, but started working again the next day (attachment #18 and transcript of video documenting same #19). Also included is a description of EMP devices from the Internet (attachment #25).

We believe that the device used to disarm our security hard drive was EMP due to many assaults on our electronics from outside of our house. We have documented several of these that we believe are sufficient to prove that EMP was used, and what sort of damage was caused by the EMP device. In some of these events, similar damage was caused to our security systems. Because we have redundancy in our system, and also for other technical reasons, other parts of are system did function through the PG&E break in and during other EMP events, which provided video details mentioned in the narrative.

For instance, there is good video evidence of the action during the erasing of a hard drive in a recent EMP attack, taken by a redundant camera. So we can show that the attack was by EMP, how it was done, and what sorts of results follow.

This is a very important part of our case because we cannot possibly live at our home while the threat of EMP attack is ever present. What we have had to do to accomplish the documentation of EMP, anyone would think was heroic.

The information we have on the use of EMP has great importance to all people everywhere. We cannot simply hand over the information, and it will have to be handled appropriately. We believe this will necessitate expert testimony. Further, a demonstration of an EMP device in the presence of our security system by the expert may be appropriate.

# General Information on Electromagnetic Pulses (EMP)

An EMP pulse is generated by any type of electrical disturbance. This can be the result of a computer changing states, to a bolt of lightning, up to a nuclear detonation, and obviously any discharge energy in between those extremes. Now the effect of the EMP pulse on adjacent electronic equipment will be the result of several functions: the power of the pulse, the dynamics of the pulse being rise time and frequency ranges, and the sensitivity of the target to the particular EMP pulse will dictate the amount of interference or damage.

An example of a reasonably low level, low-power EMP pulse is the effect of the igniting of the spark plug on a lawn mower or other gas powered machines causing interference on a television set and the static ticking sound on a radio. This seldom occurs in today's world as preventive measures have been taken in the design of the equipment to eliminate this effect.

Lightning can be heard on the radio and is often called static crashes. An AM radio is particularly susceptible due to the method of modulation responcing to signal amplitude, where FM radio modulation is a function of shifting frequency and is much less prone as is television. However, a "close by" bolt will cause an interference effect and possibly damage the equipment. This is why it is a good idea to disconnect sensitive computers completely from power lines and other leads and wires that could pick up the energy of the lightning pulse and cause problems.

Now a lightning strike is really not the "ideal" type of pulse to intentionally damage equipment, as the rise time is too slow, and any effect from the discharge is mainly due to the brute force large amount of energy contained within the lightning discharge. If the rise time of a lightning pulse was significantly faster, than all hell would break loose as there are about 8 million lightning strikes per day on our planet.

Man-made high-energy EMP pulses can take on many forms, from a nuclear detonation to a flux compression bomb to a specialized low inductance capacitor discharging a fast rise time current impulse through a fast acting switch into a radiating object such as a coil of wire. There are several methods of converting this energy into the proper pulse shape for highly effective applications. These are usually in the form of virtual cathode oscillators, vircators, gyrotrons, explosives compressing current seeded pulsed inductors known as flux compression generators, and other complicated methods.

The EMP generators on our website range from low-power, limited range devices that will demonstrate proof of concept, to higher-power generators that can be set up in a normal laboratory for testing certain strategic electronic components to the susceptibility of damage. Military and LEO testing will of course be interested in examining the effects on multiple targets, power line grids using flux compression devices, communications systems using virtual cathode oscillators, pulsed high-powered microwave and similar systems, ways to develop a practical disabling of speeding vehicles without collateral damage, etc. These studies usually require special laboratory equipment, funding, and classified expertise that is not available to the average person.

However small devices can be made to show proof of concept and to be used for short range disruption of sensitive electronic equipment for demonstration of damage susceptibility purposes only.

We suggest checking Wikipedia for more detailed data and consider sending them a small donation as there is no charge for this highly informative data.

Case: 19-30088    Doc# 13609-2    Filed: 03/10/23    Entered: 03/10/23 13:31:24    Page 33 of 34

## Loss of the Use of Willow Creek Home as a Residence

When we (the Krausses) realized in 2011 that our living situation was perilous, we obtained a short term rental in Arcata, CA. We imagined at that time that we would resolve the situation legally but realized that this would necessitate investigation, documentation, and mitigation of whatever dangers we discovered. In the meantime we needed a safe refuge. Our intention all along was to do whatever was necessary to regain the safe beneficial use of our Willow Creek home as a residence.

This process took much longer than we hoped and we finally purchased the four room rental home in Arcata in 2015 for $235,000 to use as a refuge and base of operations. Thereafter, we continued to occupy our Willow Creek residence intermittently but for shorter periods as the dangers became clear. We spent many thousands of dollars on security equipment which Krausse installed, maintained, and replaced as necessary.

During the period 2015-2019 we came to understand that the dangers were truly life-threatening. We were concerned about the risk of electrocution, fire in a wildfire area caused by unregulated power, and threats of physical violence. We also worried about control of our electricity off of our property as evidenced by outages coinciding with gunfire. During that time we began isolating the tapped circuits and defending ourselves from the hazards they created by turning off circuits at the electric panel on the exterior of the house. From then on, we left any circuits off that were not in use.

Krausse sought to regain safety and control of our property by gradually installing solar panels not tied to PG&E. However, this was arduous and expensive. We continued to run outside to turn on circuits when we needed to operate high draw appliances such as the water heater, range, and dryer. We were harassed often with gunfire when accessing our electric panel.

The solar project has enabled us to disconnect from the neighbors taps sufficiently to gauge our true electrical use. It has also limited exposure to PG&E's unregulated power for increasing amounts of time. This has mitigated the dangers both to us and our appliances.

Our Willow Creek property was valued at $420,957 in 2019.