# EXHIBIT 2

1              UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                   -oOo-

4  In Re:             ) Case No. 19-30088
                     ) Chapter 11
5  PG&E CORPORATION      )
                     ) San Francisco, California
6      Reorganized Debtor.  ) Tuesday, March 7, 2023
  _____ ) 10:00 AM
7                    )
                      CLAIMANT'S AMENDED OMNIBUS
8                      MOTION FOR RELIEF FROM FINAL
                      ORDER, MOTION FOR RELIEF FROM
9                      STAY AND RESPONSE TO
                      REORGANIZED DEBTOR'S
10                   OBJECTION TO CLAIM NO. 58462,
                    FILED OCTOBER 17, 2019. FILED
11                   BY SPIRO JANNINGS [13455]

12                   MOTION FOR RELIEF FROM STAY
                    AND NOTICE OF MOTION. FILED
13                   BY CHARLES MAIER [13509]

14                   THE RKS CLAIMANTS' MOTION TO
                    ENFORCE THE ADR PROCEDURES
15                   ORDER AND ESTABLISH A MARCH
                    20, 2023 DEADLINE TO OBJECT
16                   TO THE RKS CLAIMANTS' CLAIMS
                    [13492]

17

18             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DENNIS MONTALI
19           UNITED STATES BANKRUPTCY JUDGE

20  APPEARANCES (All present by video or telephone):
  For the Reorganized      GAYLE L. GOUGH, ESQ.
  Debtor:              Gough & Hancock LLP
21                     50 California Street
                     Suite 1500
22                     San Francisco, CA 94111
                     (415)848-8900
23

24

25

```
 1                              THOMAS B. RUPP, ESQ.
                                GABRIELLE ALBERT, ESQ.
 2                              Keller Benvenutti Kim LLP
                                650 California Street
 3                              Suite 1900
                                San Francisco, CA 94108
 4                              (415)636-9015

 5                              RICHARD W. SLACK, ESQ.
                                Weil, Gotshal & Manges LLP
 6                              767 Fifth Avenue
                                New York, NY 10153
 7                              (212)310-8000

 8   For Charles Maier:        AARON J. MOHAMED, ESQ.
                                Brereton, Mohamed, & Terrazas LLP
 9                              1362 Pacific Avenue
                                Santa Cruz, CA 95060
10                              (831)429-6391

11   For the RKS Claimants:    FRANK T. M. CATALINA, ESQ.
                                Rolnick Kramer Sadighi LLP
12                              1251 Avenue of the Americas
                                New York, NY 10020
13                              (212)597-2800

14   Also Present:             Spiro Jannings
                                Individual Claimant
15

16

17

18   Court Recorder:           LORENA PARADA/ANKEY THOMAS
                                United States Bankruptcy Court
19                              450 Golden Gate Avenue
                                San Francisco, CA 94102
20

21   Transcriber:              RIVER WOLFE
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (800) 257-0885
24
     Proceedings recorded by electronic sound recording;
25   transcript provided by transcription service.
```

1    SAN FRANCISCO, CALIFORNIA, TUESDAY, MARCH 7, 2023, 10:00 AM

2                            -oOo-

3      (Call to order of the Court.)

4          THE CLERK:  Court is now in session, the Honorable

5  Dennis Montali presiding.  Calling the matter of PG&E

6  Corporation.

7          I will bring counsel in on the Maier matter first,

8  Your Honor.

9          THE COURT:  All right.  Thank you.

10          THE CLERK:  One moment.  I have several hands going

11  up.

12          THE COURT:  All right.  Appearances, please.  Mr.

13  Mohamed, and then Ms. Gough.

14          Mr. Mohamed, are you there?

15          No.  Ms. Gough, want to make your appearance, please,

16  and then Mr. Rupp.

17          MS. GOUGH:  Good morning, Your Honor.  Gayle Gough for

18  Pacific Gas and Electric Company, and I have represented PG&E

19  in the state court action.

20          THE COURT:  All right.  Mr. Rupp.

21          MR. RUPP:  Good morning, Your Honor.  Thomas Rupp of

22  Keller Benvenutti Kim on behalf of the reorganized debtors.

23          THE COURT:  So Mr. Mohamed, are you with us this

24  morning?

25          MR. MOHAMED:  I am.  Can the Court hear me?

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page 4
of 95

1          THE COURT:  Barely.

2          MR. MOHAMED:  Okay.  Let me try to get my headphones

3  on.  And I'm not sure what I (indiscernible) --

4          THE COURT:  All right.  And you can turn your camera

5  on if you wish or leave it off.  Your choice.

6          MR. MOHAMED:  I would love to turn it on, and it says

7  that it's working.  But it is not letting me turn video on.

8          THE COURT:  Well --

9          MR. MOHAMED:  So that's what we're dealing with, one

10  way or another.

11          THE COURT:  Well, one other thing, one thing that some

12  people do is log off and log back on.  And we'll wait a minute.

13  We can wait if you want to try that.  That might work.

14          We don't have any control at this end to turn your

15  camera on, so you want to try that?

16          I think he took my offer.  Okay.

17          And Ms. Gough, you're going to make the argument or

18  Mr. Rupp?  I'm not sure which of you.  I assume you are?

19          MS. GOUGH:  Mr. Rupp will probably start, and then I'm

20  here if there are questions about the underlying facts or

21  issues.

22          THE COURT:  All right.  Thank you.

23          MR. RUPP:  That's right, Your Honor.

24          THE COURT:  Can you tell if Mr. Mohamed is logging in

25  back in, Ms. Parada?

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page 5
of 95

1          THE CLERK:  He's joining now, Your Honor.

2          THE COURT:  Okay.  Okay.  Mr. Mohamed, let's try the

3   audio first.  See if that works.

4          MR. MOHAMED:  Can you hear me, Your Honor?

5          THE COURT:  I can, but --

6          MR. MOHAMED:  Okay.  Thank you.

7          THE COURT:  -- I don't know what to do other than find

8   a teenager in your house to turn your camera on for you.

9          MR. MOHAMED:  Love to do so.  I'm actually in my

10  office, unfortunately.  But I guess, the Court's indulgence, I

11  would gladly proceed audio-only as (indiscernible).

12         THE COURT:  Okay.  So you have fifteen minutes.  How

13  much time do you want to reserve for your reply, Mr. Mohamed?

14         MR. MOHAMED:  Five minutes, please, Your Honor.

15         THE COURT:  Okay.  So go ahead, and please go ahead

16  with your argument, please.  But one of the things you have

17  to -- you have to satisfy me is in your motion, on the third

18  page, you acknowledge that Mr. Maier's claim was objected to

19  and disallowed, and you never say anything more about it.  So

20  that strikes me as end of the story, but maybe you've got a

21  workaround.

22         So go ahead and include that in whatever argument you

23  wish to make.  And you have ten minutes, then I'll give you a

24  heads-up for five to reply.

25         MR. MOHAMED:  Thank you, Your Honor.  And I would just

1  note that first of all, the Court has the power to grant the

2  relief, and plus, Your Honor --

3          THE COURT:  Where did I -- where did I get this power

4  if the debt's been discharged?

5          MR. MOHAMED:  Well, even when the -- first of all,

6  because we're not seeking to collect a debt.  We're seeking a

7  right continuing to use this driveway.

8          THE COURT:  Your voice is almost nonexistent again, so

9  got to get closer to the microphone.

10          MR. MOHAMED:  Is that better, Your Honor?

11          THE COURT:  Yes.

12          MR. MOHAMED:  Okay.  Great.  There we go.  Technology

13  is wonderful.

14          So I mean, the first thing is that my client isn't

15  seeking to collect a debt.  My client is seeking to vindicate a

16  right to use, basically, a driveway that's next to his property

17  that he's been using for fifteen, twenty years.  It's a state

18  court claim, and it was wrapped up in a bankruptcy, which has

19  to do with, obviously, the liability and concern for pending

20  liability arising out of the various fires that the debtor was

21  seeking to forestall.  And so --

22          THE COURT:  That's true.  That's true, but I've spent

23  the most of the last two years dealing with claims that have

24  nothing to do with fires, including this one.

25          MR. MOHAMED:  I understand.  But this claim, again, so

1 this claim is not seeking to collect a debt. I understand the
2 Court's saying, hey, we disallowed the debt claim on
3 conversion. That's fine. I understand that. We're not
4 seeking to collect a debt.
5           I mean, frankly, Your Honor, we'd be satisfied with
6 Your Honor continuing jurisdiction and hearing our easement
7 claim on the merits. We think that it's --
8           THE COURT: And what would be an outcome? What if I
9 ruled against you?
10          MR. MOHAMED: Well, then, if you ruled against us,
11 then that would be adjudicated. We would actually have an
12 adjudication, which is what we --
13          THE COURT: What if I -- what if I ruled that your
14 client had a right to an easement, but it can be compensated
15 for in economic terms?
16          MR. MOHAMED: Well, I mean, first of all, I think that
17 it actually is sort of a nuanced and interesting point of state
18 law that bears adjudication, because there's a question as to
19 whether public utility is barred from any prescriptive claim,
20 as the debtor asserts, or whether there is a claim if that is
21 not dedicated public utility. So it's actually a nuanced point
22 of state law that could use for adjudication. And I think it
23 would be proper to do so.
24          If Your Honor heard the case, if Your Honor considered
25 that there's dueling motions for summary judgment, if Your

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page 8
of 95

1  Honor considered those, considered argument and said, nope, I
2  find against your client on that, obviously, Your Honor has the
3  power to do that.  If you find -- if Your Honor were to find,
4  well -- I mean, again, Your Honor has the power to say, no,
5  I've disallowed this, and that's done.  I fully understand
6  that.
7          PG&E argues in their motion, we acknowledge the claim
8  has been disallowed, and we don't even seek to avoid the
9  disallowance or set that aside.  Well, I --
10         THE COURT:  Are you familiar with the very broad
11  definition of claim in the Bankruptcy Code?
12         MR. MOHAMED:  I am, Your Honor.  I am.
13         THE COURT:  They have a right to relief.
14         MR. MOHAMED:  Correct.  I understand that, Your Honor.
15         Look, this is obviously a very arcane and nuanced
16  process.  The bankruptcy court has a wide level of power.
17  Okay.  My client is trying to seek to get his easement rights
18  reinstated.  He obviously cannot go and hire sophisticated
19  bankruptcy counsel to navigate a situation where you have the
20  governor of California being represented by law firms across in
21  the state to --
22         THE COURT:  I'm going to interrupt you.  That is
23  irrelevant.  There are no bankruptcy issues here.  The
24  bankruptcy issue is whether the claim was tossed, but
25  underlying it, whether your client has a claim at all and if

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page 9
of 95

1  so, what the remedy is.  That's not a bankruptcy question.

2  MR. MOHAMED:  Well, the idea of whether the claim is

3  disallowed or not is a bankruptcy question.  The idea of --

4  THE COURT:  But that's not even in doubt.  It was

5  disallowed by final --

6  MR. MOHAMED:  I understand.  I understand that.

7  But --

8  THE COURT:  Okay.

9  MR. MOHAMED:  -- what was disallowed, right, the

10  monetary portion of conversion or -- and conversion obviously,

11  as a state court matter, runs through the time that it's been

12  converted, so there is a monetary damage there.  It's a

13  separate issue --

14  THE COURT:  Okay.  But I want to -- I want to reframe

15  my question.  I know that the company believes that there isn't

16  even a right to an easement on --

17  MR. MOHAMED:  Right.

18  THE COURT:  -- public utility land, but let's put that

19  aside.  You seem to concede that courts, whether they're

20  bankruptcy or state courts, have the discretion to give someone

21  such as your client a monetary recovery in lieu of an easement.

22  So if there's a monetary recovery that's been discharged, then

23  it's kind of, you never get there, right?

24  MR. MOHAMED:  Well, no, I don't believe that if -- I

25  mean, I suppose if the matter was adjudicated, a court could

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
10 of 95

1  say, we do not find that the easement claim succeeds, but we
2  somehow do find that there's a monetary component that
3  succeeds.  I suppose that could happen.
4       But in this case, the fact of whether my client has
5  the right to use this easement or not has never been
6  adjudicated.  And that's simply what we're asking for.  And
7  obviously, the Court has the power to allow this, whether by
8  sending it back to state court with admonitions that no debt
9  shall be enforced and there's no monetary component or by
10 taking it on in Your Honor's court.
11      The Court has the power to do this.  And indeed, the
12 debtors, in their response, they don't even argue that the
13 Court doesn't have the power.  They simply baldly assert, no,
14 this is decided; you can't get it now.  They don't cite any
15 law.  They don't cite anything in terms of a deadline.  They
16 don't say that -- they just say, oh, it's too late now.
17      don't say any law for why it's too late.  They don't
18 say why Your Honor's power -- Your Honor's right.  They say,
19 you've submitted to the jurisdiction.  Of course we submitted
20 to the jurisdiction.  We are here before Your Honor.  Likewise,
21 they've submitted to the jurisdiction.
22      What my client is asking for is just fundamental
23 fairness in the context that he has -- it's his home.  He's a
24 local restaurant owner with a home and this driveway that he's
25 used for years.  And it got wrapped up into very sophisticated

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
11 of 95

1  bankruptcy counsel about these fires and liabilities.  And he's
2  just asking for actually someone to weigh in on the substance
3  of that law.
4       It's fundamentally fair.  The Court can do it, and the
5  Court should grant this relief because it's fundamentally fair.
6  And there's no prejudice to either side.  The delay does not
7  count as a prejudice.
8       And this is a -- this is a nuanced issue.  And there
9  should be a process for my client.  I understand the argument
10 can be taken that, well, he could have -- I mean, I did speak
11 with Ms. Gough about it, and she just basically said, no, we're
12 not going to negotiate anything.  So when those claims --
13      I mean, I guess the question I would ask is, if was is
14 the answer that we should have -- we should have asserted this
15 relief earlier, and if that's the question, then, well, what is
16 preventing us from asserting it now.  They've not offered any
17 argument as to why.  They just assert it.
18      And so my position is that the Court has the power to
19 hear this matter out itself or to send us back to state court
20 to have them hear this nuanced issue of easement under state
21 court law, which is actually a pretty interesting issue and
22 might make new law.  The Court has the power for it.  It can --
23      THE COURT:  Well, I realize that prescriptive
24 easements are rare, and by coincidence, I had occasion to learn
25 about them recently on another matter unrelated to this

1   bankruptcy. And so I am familiar with the fundamental

2   principles.

3           But what's nuanced about it? You either have an

4   easement or you don't. If there's a public utility exemption,

5   then that's either they have it or they don't.

6           MR. MOHAMED: Correct.

7           THE COURT: And so you establish that the length of

8   time and the balancing the equities and all those other things,

9   and it's done. I mean, it doesn't sound very nuanced to me.

10  It sounds more unusual and rare.

11          MR. MOHAMED: The nuance that I'm pointing to, Your

12  Honor, specifically is that there is not a complete bar on

13  public utilities from having prescriptive easement rights

14  against them. They must have dedicated the land in question to

15  a public purpose.

16          THE COURT: Okay.

17          MR. MOHAMED: And so they assert that they've done

18  that by the virtue that part of the land was used for a

19  substation. But there is no formal dedication, dedication as

20  defined under state law. And so our argument is simply they

21  have not dedicated it, and there's very little law and that the

22  cases they cite in their summary judgment motion go back to,

23  like, the '20s '30s.

24          THE COURT: Okay.

25          MR. MOHAMED: There's really no -- so -- yes.

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
13 of 95

1      THE COURT:  One more question before I call on the

2  other side.  You do acknowledge, don't you, that PG&E attempted

3  through the claims process to invite a colloquy with your

4  client about a resolution, and he didn't even respond to that

5  so --

6      MR. MOHAMED:  Well --

7      THE COURT:  -- the objection was sustained based upon

8  nonresponse to an invitation to try to resolve the matter;

9  isn't that correct?

10      MR. MOHAMED:  Well, I would say that in terms of

11  formally responding to those forms that were sent out, that is

12  accurate.  However, I did speak to Ms. Gough multiple times

13  about potentially resolving it, and we could not come -- so we

14  did engage with it.  We weren't just absent.

15      And again, I would just ask, just on fundamental

16  fairness grounds.  Look, I'm not a bankruptcy attorney, okay.

17  I've done a little bit.  I tried to submit his claim because I

18  know you have to do that.  I tried to look at the law.  I

19  wasn't clear.  And I don't think it's clear, even in their

20  papers, that every single claim that exists was going to be

21  wiped out by me saying, hey, there's a damage claim here.

22      THE COURT:  Okay.

23      MR. MOHAMED:  And so I believe that the Court can

24  still allow us to proceed forward.

25      And just, the one final thing I would say is that this

1   is an issue that will not prejudice anybody, and my client

2   stands to be prejudiced greatly.  So in the balance of harms

3   here, I ask the Court to allow this claim to move forward.

4   Thank you, Your Honor.

5           THE COURT:  Okay.  And I'm going to keep five minutes

6   for you for reply.

7           MR. MOHAMED:  Appreciate it.

8           THE COURT:  Mr. Rupp.

9           MR. RUPP:  Thank you, Your Honor.  Thomas Rupp, Keller

10  Benvenutti Kim, for the reorganized debtors.

11          Just to back up here, what we have, what's before the

12  Court was styled as a motion for relief from stay, which we can

13  interpret that as a motion to modify the plan injunction.  And

14  the beginning and end of that is the claim was disallowed.

15  There's no claim remaining.  There's no cause to modify the

16  plan injunction because --

17          THE COURT:  Well, it was not only disallowed, it was

18  discharged, wasn't it?

19          MR. RUPP:  Correct, Your Honor.

20          THE COURT:  Okay.

21          MR. RUPP:  It was disallowed and discharged.

22          Just to back up, Mr. Maier filed a proof of claim.  A

23  proof of claim exists, at least $100,000 in damages, so there

24  is a monetary component to it.  And the complaint was attached

25  to the proof of claim.  So the claim with its complaint was all

1    submitted before this Court.  Mr. Maier entered the claims

2    resolution process under bankruptcy law, and necessary to

3    finding any kind of damage relief or to adjudicate, the proof

4    of claim would have required this Court or any court to

5    investigate all the issues presented in the complaint, which

6    again, were filed with the proof of claim.

7            PG&E attempted to resolve the claim through the formal

8    ADR procedures.  No response was received.  More importantly,

9    PG&E filed a claim objection as part of an omnibus objection.

10   Mr. Maier was served on his counsel as he was the person listed

11   on the proof of claim for service, and there was no response.

12   And the claim was disallowed.  Time passed, and now nearly two

13   years have passed.

14           So to us, in terms of, should this Court grant relief

15   from stay or modify the plan injunction to allow the state

16   court to just resume this action as if nothing transpired over

17   the last two years strikes us as unfair and doesn't make sense

18   and doesn't seem to comport with the law.

19           THE COURT:  What would have happened -- this is

20   hypothetical, but if Mr. Mohamed had filed a motion for relief

21   from stay two months into the bankruptcy and said, I will

22   enforce my rights under state law under an easement theory.

23   I'm not seeking money.  I'm seeking an easement.  Would you

24   actually agree that that might have been a motion granted way

25   back then?

1      MR. RUPP:  Your Honor, I don't know about way back

2  then in March of 2019, since there was much more going on at

3  that time but --

4      THE COURT:  Well, that's right.  You and I were both

5  very busy.  I understand that.

6      MR. RUPP:  But --

7      THE COURT:  The point is, it was a discrete question

8  that had nothing to do with what the circumstances that forced

9  PG&E into bankruptcy.

10      MR. RUPP:  But Your Honor, I don't think that

11  hypothetical is exactly on point here because I don't think

12  that Mr. Maier would have made the argument of all I want is

13  the easement, all I want is the state court to determine the

14  ether, because that was before his claim was disallowed.  Of

15  course his claim asserts money damages.

16      And if he had filed a motion for relief from stay at

17  that time, it wouldn't have made any sense to just say, let's

18  have the state court decide the easement part and then decide

19  damages -- or the complaint asks for punitive damages and

20  nuisance damages and all that at another time.  It would have

21  been best for one court, either state court or Your Honor, to

22  decide everything in one stop.  And again --

23      THE COURT:  Okay.

24      MR. RUPP:  -- Your Honor, that was -- once more, that

25  was four years ago from just today -- or not from today, but

1  from this month, March of 2019.  So a lot has passed, and

2  things are -- the debtors and any other party has had some

3  reliability to rely on finality of the Court's orders,

4  including for claims.

5          THE COURT:  All right.  Ms. Gough, do you want to join

6  the fray or sit on the sidelines?

7          MS. GOUGH:  I would only -- I can absolutely answer

8  your questions about the Arana substation, which is the

9  property at issue.  The Arana substation serves the community.

10  So we have said consistently to Mr. Mohamed since this piece

11  came to our attention in 2018, we cannot allow the public to

12  use the Arana substation property.  It's not safe.  And that

13  serves the community.  This is not a landlocked property.

14          So yes, we have consistently said now for five years,

15  that's why we fenced it.  We cannot have people on the

16  substation.

17          THE COURT:  Okay.  But you would have made that same

18  pitch if there had never been a bankruptcy or if I grant relief

19  from stay.  In other words, if I take Mr. Mohamed's suggestion

20  and say, he can go try to prove his case for the easement and

21  you've got a -- if you've got a winning argument, you win the

22  argument.

23          MS. GOUGH:  He's had many opportunities to do that.

24  At some point, we have to get past this case and his claim has

25  been discharged.  There is a Civil Code directly on point,

1  1007, and at some point, we have to stop trying to usurp the

2  Arana substation.

3          THE COURT:  Well, again, you're going to the merits,

4  and I'm going to the process.  In other words, if there had

5  never been a bankruptcy, presumably the superior court would

6  have listened to both sides on that issue.  And if court ruled

7  in your favor, that would have been the end of it.  Mr. Maier

8  would have been out of luck.  He wouldn't be able to collect

9  any money.  He wouldn't have been able to do anything except

10 park in his own property.

11         But the bankruptcy just changed things only in terms

12 of where we should focus until we decide to go somewhere else.

13 So Mr. Mohamed says, well, I could just keep the matter here.

14 If I kept the matter here and said, file your motion for

15 summary judgment, if you're right on the law, you'll win on

16 that point here, right?

17         MS. GOUGH:  Your Honor is correct.  However, the case

18 was discharged, and we can't keep reopening it and relitigating

19 it.  So I would say that there would be prejudice to setting

20 aside a discharge of the claim.

21         THE COURT:  Okay.  Understood.

22         Mr. Mohamed, go ahead and use up your five minutes, if

23 you wish, or not.  It's up to you.

24         MR. MOHAMED:  Briefly, Your Honor.  And I appreciate

25 the consideration that Your Honor is listening to both sides

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
19 of 95

1    and clearly weighing this.

2            I just focused on Counsel's argument basically said if

3    I had asked for a relief of stay even at the beginning of the

4    bankruptcy, he doesn't think it would have been granted either.

5    So what Counsel essentially is arguing is that I just have no

6    rights to assert this at all.

7            And I will just represent to the Court, this is about

8    the easement.  And I'm a civil practitioner in state court, and

9    you always add a damage claim and you always say, I want

10   punitive damages and I want attorney's fees or whatever.  This

11   is about this gentleman's easement.

12           To Ms. Gough's point about that substation, that

13   substation has been open and the public -- not just my client,

14   other people.  There was a person who was leasing it for a

15   number of years.  That substation has been opened and being

16   used by the public at large.

17           There's swing sets in it.  There's tire swings.

18   There's vehicles parked for decades before they decided for

19   whatever reason -- my information is that someone complained

20   to -- a neighbor complained to a county supervisor and he made

21   a call and that's why they fenced it off.  But the point is, it

22   is an interpretation of Civil Code 1007, whether they satisfy

23   that it's a benefit of the public.

24           And again, not to get into the merits, it's just

25   fundamentally fair.  Call it even a mistake on my part not

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
20 of 95

1   understanding the law. I did not understand that the entire

2   claim, even the state court easement claim, was being

3   adjudicated by putting that proof of claim in for some monetary

4   thing. I just understood that you need to preserve your

5   rights, so you file something. So I didn't understand that,

6   and I'm being completely transparent.

7           And so in those situations, the Court is empowered to

8   say, okay, well, there is some confusion here. And really

9   there's no prejudice to having -- motions are literally already

10  filed, the motions for summary judgment. They're already filed

11  in state court. Depositions have been taken.

12          There's no prejudice to anybody say, yeah, go hear

13  that. Let's hear it. Let's have the law work out. Let's give

14  process. Let's not do an arbitrary technical deadline against

15  someone and forestall them of their rights because their

16  attorney wasn't sophisticated as he might have been in

17  bankruptcy court.

18          And I will just note that Counsel's argument about why

19  this is barred is it's done now. Well, he doesn't cite law.

20  He doesn't say anything that says the Court can't afford this

21  relief. He doesn't cite any, like, overt statutory deadline or

22  time limit.

23          And quite honestly, the reason that we're bringing

24  this now is because there is a five-year time period. And so I

25  will just represent to the Court, this is a claim about the

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
21 of 95

1  property rights.  Any damage claim that was either filed in the

2  complaint or with the bankruptcy court is incidental and merely

3  because that's part of the process that a civil attorney goes

4  through is filing and asserting your claims.

5         I did not understand and was not aware that the

6  underlying easement claim that would be a state court claim was

7  going to be swept up in my client's erstwhile proof of claim

8  that was filed.  I did not understand it.  If I had understood

9  that, I would have brought this motion much sooner.  The reason

10 I'm bringing this motion now is because I have a five-year

11 deadline to bring this case to trial in state court, which

12 runs --

13        THE COURT:  No, I understand that.  I know that.

14        MR. MOHAMED:  Okay.  So that is my argument.  Thank

15 you, Your Honor, for considering this, and I submit on that.

16        THE COURT:  Mr. Mohamed, a couple times in your

17 argument, you referred to the fires and the governor and the

18 big law firms, and I have lived with this case for three years,

19 and I presided over the prior PG&E too.  So I probably have

20 more time PG&E bankruptcy than anyone even at the current law

21 firm representing the company.

22        MR. MOHAMED:  Fair enough.

23        THE COURT:  And the fact of the matter is, the fires

24 of -- what we call the wildfires of 2015, '17, and '18 were

25 tragic, but they were what precipitated the bankruptcy.  But

1    life goes on, and there are literally thousands of claims that

2    have nothing to do with the fires, many of which are unopposed,

3    many of which are settled, some of which, including on the next

4    calendar this morning, I'm still dealing with because it's my

5    job to do it.

6           And so it's my hypothetical that if there had -- well,

7    hold on.  This isn't hypothetical.  If the fires hadn't

8    happened or PG&E hadn't been forced into bankruptcy because of

9    the fires, Mr. Maier and you and Ms. Gough and PG&E would have

10   duked it out in the superior court.  And you would have won it

11   or lost it, and that would be the end of it.

12          The bankruptcy simply changed the forum for a while.

13   And it has been my philosophy that some of the things that are

14   only swept up into the bankruptcy but have nothing to do with

15   the cause of the bankruptcy, such as an easement, and as I say,

16   such as the hundreds of other claims, including many of which

17   are fire claims, I might add.  They're just not the wildfire

18   claims.  They either get sent back to state court or get

19   resolved through our process.

20          The fact of the matter is, and this is -- I don't want

21   to make a decision based upon what you stay you're familiar

22   with or not familiar with.  The claims bar date is essentially

23   a statute of limitations that's unforgiving.  And I mentioned

24   in my earlier questions to you if you're familiar with the

25   definition of claim.  And the word "claim" is defined in

Short

1  Section 101 of the Bankruptcy Code, and it's very, very broad.

2         And I believe that the remedy that Mr. Maier sought

3  fits the definition of claim, and therefore it can't be

4  ignored.  And the fact of the matter is, like it or not,

5  certain things happened, most important of which is two things.

6  The plan got confirmed, and therefore the company got

7  discharged of debts.

8         And the bankruptcy law says if you're discharge of

9  debts, the debts are dealt with however the plan deals with

10  them.  And the plan, in effect, said, put up your claims, and

11  if your claims survive the preliminary examination, they will

12  then be adjudicated in some fashion.  Your claim, like it or

13  not, got bounced because there was no timely response either to

14  the mediation attempt or the objection.

15         So fundamental fairness is a great term, but there's a

16  fundamental fairness in the statute of limitations and the

17  imposition of the consequences of statutory deadlines.  And I'm

18  not sure that I really do have the discretion to get around

19  that.  If I do, I think the company simply got the better

20  argument here that it might have been a different situation had

21  there been a motion by Mr. Maier earlier in the case, but not

22  before the claims process played out, the objection process

23  played out, and went unattended to.

24         If there's anything that I think I wish you had done

25  is have done something in response to the disallowance of the

1    claim.  You might have come in and said at that point, wait a

2    minute.  You can't throw me out of here.  I still have this

3    other easement thing.  But I can't unring the -- well, that's a

4    bad metaphor.  It wasn't an unringing of the bell.  It's the

5    bell that didn't get rung.

6          So on balance, I think I have to -- or I don't think I

7    have to.  On balance, I have to sustain PG&E's argument here.

8    And it's kind of a two-step process.  I have to and will deny

9    the motion for relief from stay because the debt has been

10   discharged, and in my opinion, so does any claim that Mr. Maier

11   had for something other than money damages, such as the

12   imposition of an easement, oh, and over this record.

13         So Mr. Rupp will serve you with a form of order, it's

14   a boilerplate form of order, that says for the reasons stated

15   on the record, and it's my oral briefing, the motion for

16   release from stay is denied.  And I have to leave it at that.

17   If an appellate court wishes to revisit my decision, that's not

18   for me to be concerned about.

19         So appreciate your time.  I'm sorry for your client's

20   disappointment.

21         MR. RUPP:  Your Honor.

22         THE COURT:  That's it.  I'm going to conclude the

23   matter.

24         Yes, Mr. Rupp.

25         MR. RUPP:  Your Honor, just one more thing.  In our

1 opposition, we also asked that any order contain language

2 directing Mr. Maier to dismiss the state court action with

3 prejudice. Would that be appropriate to include --

4 THE COURT: Well, Mr. Mohamed, I think that's what has

5 to happen. I mean, you have a right to appeal my decision, but

6 this bankruptcy law that you're not familiar with is somehow

7 pretty, pretty unforgiving for people that don't comply with

8 the consequences of a discharge. And there are many, many

9 state court lawyers who learn the hard way that they have to

10 dismiss a case that's been discharged.

11 So I would urge you to just take a lesson from what

12 I'm telling you and voluntarily withdraw the matter. I mean,

13 there's no way that I can imagine that you could seek an

14 appellate review in time to beat your five-year thing, but

15 that's for you to decide. I hope that we don't have some

16 enforcement effort by the company to get you to do what I think

17 the law requires you to do. And certainly, I won't ask you to

18 respond. I just, I'll say that I think you'd be well advised

19 to follow that instruction and voluntarily dismiss it. But

20 I'll leave it at that.

21 So Mr. Rupp, I don't recall. In the opposition, did

22 you affirmatively ask that I direct Mr. Maier to dismiss his

23 case?

24 MR. RUPP: It's in the opening paragraph and in the

25 conclusion, Your Honor.

1          THE COURT:  Well, Mr. Mohamed, are you willing to

2    accept that and just make this a nonissue and --

3          MR. MOHAMED:  Yeah, Your Honor, I'll be checking with

4    my client if he wants to seek appellate relief.  And if he

5    decides not to, I'd certainly be dismissing the claim.

6          THE COURT:  Yes, it's true.  I agree.  Mr. Rupp is

7    correct.  The prior says, "the reorganized debtor requests that

8    the Court denied the motion and order Maier to dismiss the

9    matter with prejudice".  All right.

10          So I'll tell you what, Mr. Mohamed, why don't you talk

11    to your client promptly.  And if it's a nonissue and he accepts

12    this outcome, you can notify Mr. Rupp and the order can just

13    affirmatively stated and you guys can take care of it in the

14    normal course.  I mean, it's probably something Ms. Gough would

15    do, but it's just a simple stipulation with the state court.

16    So I hope that it doesn't turn into a contentious, contested

17    matter.  But let's hope we can do it that way.

18          So Mr. Rupp, the answer is yes, but let Mr. Mohamed

19    confirm back to you if he's willing to do it voluntarily.

20          MR. RUPP:  Very good, Your Honor.

21          THE COURT:  Okay.  All right.  Thank you, all, for

22    your time.

23          MR. MOHAMED:  Thank you, Your Honor.

24          MR. RUPP:  Thank you, Your Honor.

25          MS. GOUGH:  Thank you.

1          THE COURT:  Thank you, Ms. Gough.

2          THE CLERK:  Your Honor, I'll bring in the parties in

3   the Jannings matter.

4          THE COURT:  All right.  Ms. Albert, would you state

5   your appearance, please?

6          MS. ALBERT:  Good morning, Your Honor.  Gabrielle

7   Albert, Keller Benvenutti Kim, on behalf of the reorganized

8   debtor.

9          THE COURT:  Okay.

10          MR. SLACK:  And I'll just note that Ms. Kim is in the

11   gallery and can be called if necessary.

12          THE COURT:  Okay.  She knows how to get in if she

13   wants to.

14          Mr. Jannings, good morning.  You need to turn on your

15   microphone and your camera if you wish, but I need the

16   microphone at least.

17          Well, you had it on there for a minute.  So now it

18   looks like you muted again.  There you go.  Now, Mr. Jannings,

19   can you hear me?

20          MR. JANNINGS:  Yes, I can hear you --

21          THE COURT:  Okay.

22          MR. JANNINGS:  -- Judge Montali.

23          THE COURT:  Okay.  Good morning.  Do you want to turn

24   your camera on, or would you rather not?

25          MR. JANNINGS:  No, I'll turn it on.  Just trying to

**PG&E Corporation**

28

1  figure out how to turn it on here.

2          THE COURT:  Okay.

3          MR. JANNINGS:  Okay.  Here I am.

4          THE COURT:  Well, you're not here yet.

5          MR. JANNINGS:  Okay.  Let's see here.

6          THE COURT:  Do you have a little -- do you have a

7  little camera icon in the lower left-hand side of your screen?

8          MR. JANNINGS:  Yes.  It says blur none.  Okay.

9          THE COURT:  No, but don't go into the blur none.  Go

10 back to the little icon of the camera.  Does it show a little

11 red line through it?  Click on --

12         MR. JANNINGS:  No, sir.

13         THE COURT:  Okay.

14         MR. JANNINGS:  No, it does not.

15         THE COURT:  Does not?  Well --

16         MR. JANNINGS:  Hold on, here.  Hold on, here.  Let

17 me --

18         THE COURT:  Well, I can say to you like I said in the

19 last case, if you have a teenager in the house, call that

20 teenager right away to turn the camera on for you.

21         MR. JANNINGS:  Added -- oh, plus.  Let me see here.

22 No, cancel.

23         THE COURT:  Now, if you don't see a little red line

24 through the outline of the camera, then I don't have a

25 solution.  Maybe it's not plugged in correctly or something.

**eScribers, LLC**

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page 29 of 95

1　But I can't wait.  I'm going to --

2　　　　　MR. JANNINGS:  Okay.

3　　　　　THE COURT:  -- have to just skip with the camera.  And

4　I can hear you well so --

5　　　　　MR. JANNINGS:  Okay.  Okay.

6　　　　　THE COURT:  All right.  Under my pre-trial order, you

7　have fifteen minutes to make your argument.  And I'll assume

8　you want to reserve a portion of it until Ms. Albert makes her

9　pitch; is that right?

10　　　　MR. JANNINGS:  So Your Honor, I'd like to thank you,

11　Your Honor, for opportunity addressing the Court.  I'm not an

12　attorney, and I'm not a very good speaker.  I would like my

13　pleadings to speak for themselves, but I would be happy to

14　answer any question the Court might have.

15　　　　THE COURT:  Well, no, Mr. Jannings, I've read the

16　submissions, and I don't believe you sound to me like you have

17　trouble speaking, but it's your choice.  If you wish to make an

18　argument, you're welcome to.  And under my procedures for a

19　case like this, I typically ask the person who's making the

20　motion if he or she wishes to reserve a portion until you hear

21　from the other side.

22　　　　If you don't want to say anything, then I will ask Ms.

23　Albert if she wants to say anything.  If she doesn't want to

24　say anything, the matter will be submitted on the papers.  If

25　she wants to say something, she's entitled to, and then you can

Case: 19-30088　Doc# 13786-2　Filed: 05/31/23　Entered: 05/31/23 14:14:57　Page
30 of 95

1    respond.

2            So again, I don't want to overly complicate this.  I

3    know you're not an attorney, but you expressed yourself very

4    thoroughly in the writings.  So do you wish to say anything at

5    this point, or do you want to wait until you hear from Ms.

6    Albert?

7            MR. JANNINGS:  Reserve.

8            THE COURT:  Okay.  Okay.  Ms. Albert, it's your

9    choice.  You can submit on the papers, in which case we're

10   done, or you can make an argument.  As you wish.

11           MS. ALBERT:  Thank you, Your Honor.  I will keep it

12   brief.

13           Your Honor, this is yet another instance of a claimant

14   trying to undo the effect of an order that was entered a long

15   time ago and that the debtors are entitled to rely on.  In

16   fact, this one is more egregious because it was intentionally

17   done.  It was a tactical decision by Mr. Jannings' former

18   counsel that led to his claim being denied, and he's bound by

19   that decision.

20           Mr. Jannings had the opportunity to defend his claim

21   when PG&E filed its objection way back in October 2021, and he

22   failed to do so.  Now, instead, he argues that he should not be

23   bound by his attorney's decisions and tactics.  At this point,

24   he's terminated his counsel, which he has every right to do,

25   but he doesn't get to redo the argument just because he fired

1    his attorney.  It cannot be the rule that if you're
2    dissatisfied with the court's ruling, you can fire your
3    attorney and have the action reheard.
4          To the extent he might have claims against his former
5    counsel regarding the way his bankruptcy claim was handled is
6    not before the Court.  Whether he has a claim against them does
7    not revive his claim against the debtors.  To prevail in this
8    motion, he must still prove that he met the standard of Rule
9    60.
10          The fact that he couldn't find a lawyer to file a
11   motion because all the lawyers he interviewed said that there
12   was no chance of prevailing because given what his previous
13   counsel had done, filing a motion would not equate to excusable
14   neglect.  In fact, nothing that Mr. Jannings argues in the
15   motion or the reply supports reversing the Court's denial of
16   his proof of claim.  The Court already determined that order
17   denying the proof of claim was properly entered for all of the
18   reasons that were stated in the order on the first
19   reconsideration motion.
20          There comes a point when the debtors have the right to
21   rely on the Court's decisions.  Now, even though Mr. Jannings
22   is pro se, he's still bound under Rule 9011 to only file
23   nonfrivolous arguments and claims and defenses warranted by
24   existing law.  He spoke to numerous lawyers, by his own
25   admission in his declaration, who wouldn't take the case

1   because he's bound to what his original counsel did.  But he
2   disregarded every single lawyer who turned him down because it
3   was frivolous and filed the motion anyway.
4           It's time for this to end.  Your Honor, the debtors
5   respectfully request that the Court deny the motion and direct
6   Mr. Jannings to dismiss his state court action.
7           THE COURT:  Okay.  Thank you, Ms. Albert.
8           Mr. Jannings, as I said to you at the outset, if you
9   wanted to wait to see what your opposing counsel has to say,
10  you did so, and you can have up to the same fifteen minutes if
11  you wish to make any argument or you can submit it or you can
12  take anywhere in between, so really, it's your choice.
13          MR. JANNINGS:  Okay.  So Your Honor, I wasn't aware of
14  what my lawyers were doing, and I would send phone calls and
15  texts.  And I talked to quite a few lawyers and they wouldn't
16  take my case.
17          And then I talked to another lawyer in Oakland, and he
18  said he would take the case.  And then for some reason, he
19  didn't want to do it anymore or deal with the case.  And so I
20  filed the Rule 60(b) for myself as pro se because I couldn't
21  get any other lawyers to take this case.
22          And all I want is my fair share to have a court
23  hearing.  I mean, I still haven't gotten a court hearing at
24  all.  No one knows my side, but all my motions speak for
25  itself.  The company is trying hard to not let me go to court.

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
33 of 95

1    THE COURT:  Okay.  I understand your point.  Anything
2  further?

3    MR. JANNINGS:  No, sir.  Nothing else further.

4    THE COURT:  All right.  I'm going to take the matter
5  under advisement.

6    So Mr. Jannings, that means I'm not going to make a
7  ruling.  If you were listening on the last case, I heard the
8  argument, and I made a ruling, and that was the end of it.  But
9  in this case, I want to give some more thought to the arguments
10 you've set forth and what Ms. Albert said in response.

11    So sometime in the near future, I can't tell you
12 exactly when, it wouldn't be very long, I will issue a written
13 decision either granting your motion or denying it or somehow
14 disposing of it, and you'll get that in the normal course.

15    Thank you very much for your time, and I appreciate
16 your effort.  And yours, too, Ms. Albert.  The matter stands
17 submitted.

18    MR. JANNINGS:  Thank you, Your Honor.  Appreciate it.

19    THE COURT:  Okay.  You're welcome.  Thank you.

20    Thank you, Ms. Albert.

21    THE CLERK:  Your Honor, I'll bring the parties in on
22 the RKS matter.

23    THE COURT:  All right.  Let's start to get
24 appearances.

25    Mr. Catalina.

1          MR. CATALINA:  Good morning, Your Honor.  Frank
2   Catalina with Rolnick Kramer Sadighi on behalf of the RKS
3   claimants.
4          THE COURT:  Thank you.  Good morning.
5          Mr. Slack, good morning.
6          MR. SLACK:  Good morning, Your Honor.  Afternoon here
7   in New York, but good morning to you.  Richard Slack from Weil,
8   Gotshal for PG&E.
9          THE COURT:  I don't see your usual baseball uniform
10  behind you.  You've given up on baseball because of the new
11  rules?
12         MR. SLACK:  No, that was my -- that was my home
13  office.  During COVID, you had the opportunity to see me
14  working from the home office.
15         THE COURT:  All right.  Mr. Catalina, you have to go
16  first, and you want to reserve a portion of your twenty
17  minutes?
18         MR. CATALINA:  I would, Your Honor.  I think I'll ask
19  for five minutes to be reserved of the twenty.
20         THE COURT:  Okay.  Well, you're a new face for me.
21  Mr. Slack and I have met and talked to each other for three
22  years.  So for three years, I've lived with this issue.  It
23  seems to -- it seems to just keep popping back up again.
24         So go ahead and make your pitch.  I understand what
25  you want, but let's hear it again.

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
35 of 95

**PG&E Corporation**

35

1        MR. CATALINA:  Well, I think that's a good starting

2   point, Your Honor.  And actually, even the remark about the new

3   pitch-clock rules in baseball is also a good starting point --

4        THE COURT:  You know how to get to a baseball fan,

5   right?

6        MR. CATALINA:  Right.  The situation, what we're

7   asking for here, Your Honor, we've had years of delay and

8   inaction by the debtors.  And as we put in our papers and we'll

9   discuss here today, in January, we had a mediation that failed

10  and was utterly unsuccessful, in our opinion, because of the

11  bad-faith imposition of just unbeatable conditions by the

12  debtors at that mediation.

13       So what are we asking for?  We're asking to move

14  forward with these claims after this failed mediation, and

15  we're asking for the debtors to finally object to or allow our

16  claims and to put their objections in the record.  So the

17  question then is, why now?  Why is March 20 an appropriate

18  deadline?  And there are a number of answers to that.

19       The first, we refer in our papers to the ADR

20  procedures and the provision in the ADR procedures stating that

21  there would be a sixty-day --

22       THE COURT:  Right.

23       MR. CATALINA:  -- deadline after a failed mediation --

24       THE COURT:  And you counted the sixty days from the

25  failed mediation, right?

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
36 of 95

1          MR. CATALINA:  That's correct, Your Honor.

2          THE COURT:  Yeah, right.  Okay.

3          MR. CATALINA:  That's correct.  I understand that the

4    debtors -- debtor's counsel, who authored the ADR procedures,

5    disputes our reading of those provisions.  But I'll just

6    recount, and it's in the papers, Your Honor.

7          But at the last hearing on the fifth objection

8    deadline motion, Your Honor asked the question, what is the

9    deadline when the mediation has ended unsuccessfully, and the

10   response of debtor's counsel was, "so sixty days after the

11   termination of the mediation procedures", for example --

12         THE COURT:  Well, he didn't tell -- he didn't tell me

13   that was his mediation procedure, rather than your mediation

14   procedure.

15         MR. CATALINA:  Well --

16         THE COURT:  You give Mr. Slack credit for authoring

17   those ADR procedures.  I have a little piece of it, too.  For a

18   long time, I think back of the hours of slaving.  He did all

19   the heavy lifting, and I did the editing and oh, man.  The fact

20   that we're still dealing with is enough to comment on.

21         MR. CATALINA:  I understand there was a back-and-forth

22   on the editing of the order.  But I guess the bottom line for

23   us is that even the debtor's counsel himself, in response to

24   Your Honor's question just recently in November, responded that

25   that the failed mediation will "trigger the obligation to

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
37 of 95

1    object", right, and that it would be a sixty-day deadline.

2          Even setting aside the ADR procedures order, though,

3    Your Honor, I think there are good reasons why equity requires

4    that a March 20 deadline be set.

5          The first is that we, the RKS claimants, we were only

6    induced to withdraw our objection to their fifth request for an

7    extension of the objection deadline by an offer to mediate in

8    good faith.  And we thought that the deal was that we were

9    getting a good-faith mediation in exchange for dropping our

10   objection.  But that turned out to be a farce.

11         And as we explained in our papers, the debtors, we

12   believe, acted in bad faith, using that mediation as a way to

13   continue delaying.  And --

14         THE COURT:  Well, I understand your point, and I know

15   that both of you have been faithful to maintaining as much as

16   the mediation privilege as appropriate.

17         But so let me not go into the mediation, but ask what

18   would have happened.  I mean, I take you had the ability to

19   demonstrate, at least you think adequately, why you had

20   authority to act for all of your 699 people, right?

21         Is it 699?  What's the number of claims?

22         MR. CATALINA:  I believe it's 699 claimants right now.

23         THE COURT:  699, and so you wouldn't have --

24         MR. CATALINA:  Yeah.

25         THE COURT:  -- 699 folks in the room, but presumably

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
38 of 95

1  you could deliver the consent of all 699, or at least some

2  requisite minimum percentage of it; is that your

3  representation?

4          MR. CATALINA:  Certainly, Your Honor.  And we made the

5  representation that we had the authority to negotiate on behalf

6  of our clients.  Our clients have actually retained us, right?

7  They've actually retained --

8          THE COURT:  Right.  No, I understand.  I understand.

9  Well, what if you had only had two of them?  You could have had

10  them both in the room and done something with the mediator,

11  right?

12         MR. CATALINA:  Certainly 699 claimants creates a kind

13  of a logistical issue, right, with having people in the room.

14  We see right now, there's five of us on this Zoom screen here,

15  right, and I can only imagine what 699-plus would look like on

16  the Zoom screen.

17         What I'll say Your Honor too is, every settlement

18  agreement that's ever been executed in the history of complex

19  commercial litigation includes a provision in there saying, we

20  have authority to execute this settlement agreement --

21         THE COURT:  Well, wouldn't it also been proper that

22  whatever the company offered could have been conditioned upon

23  some high percentage of that 699 agreeing to it?

24         MR. CATALINA:  Absolutely, Your Honor.

25         THE COURT:  Yeah.

1           MR. CATALINA:  There are a million ways, right --

2           THE COURT:  Right.

3           MR. CATALINA:  -- to deal with the fact that we happen

4    to represent 699 individual claimants.  The fact of the matter

5    is, the fact that we represent 699 individual claimants is an

6    artifact of what the debtors have asked the Court to do here in

7    setting up an individual claims resolution process.

8           THE COURT:  No, I know that.  I know.  But my point,

9    to go back to my silly hypothetical, if you only had two of

10   them, you could have had the two of them with you.  699 is not

11   workable.

12          But the point is, if the company makes an offer that

13   is conditioned upon some acceptance level, there are ways to do

14   it.  And if you could deliver 600 clients, PG&E could say,

15   we'll settle with those 600 or not at all.  They could make the

16   choice.

17          But I think your point is you never had a choice, an

18   option to get to that point.

19          MR. CATALINA:  That's absolutely correct, Your Honor.

20   I mean, when you show up to a mediation and your counterparty

21   says, we don't believe you represent your clients and we won't

22   take your representation that you have authority to negotiate

23   on their behalf, there isn't much you can do after that.

24          And as Your Honor pointed out, one of myriad ways,

25   right, that the logistical issues around representing a large

1   number of clients could have been worked through in a good-
2   faith mediation, the fact of the matter is that that never
3   occurred and the mediation ended because we didn't have a
4   counterparty to negotiate with.  So the practical result was
5   that this rendered the mediation impossible.
6           And just to get back to my earlier point, Your Honor,
7   of course, we never would have dropped our objection if we
8   thought that we're going to show up to a mediation and be told
9   we can't negotiate with you; we don't believe you have the
10  authority to negotiate on behalf of your clients.  Had we not
11  withdrawn, it's entirely possible that a different objection
12  deadline would have been set --
13          THE COURT:  But again, protecting the mediation
14  privilege, as I must, were you warned ahead of time before you
15  actually showed up in the mediation that you had to prove
16  authority for the 699?
17          MR. CATALINA:  I think there were discussions ahead of
18  time about that.  This would create some kind of, like,
19  logistical problems, as Your Honor is referring to.
20          I can tell you that I'm not aware to date that we've
21  ever been told what we could do to actually prove that
22  authority to the satisfaction of the debtors.  That hasn't
23  occurred to this day.  And in fact, you know, if we'd been told
24  what we could do to satisfy the debtors that we actually were
25  retained by our clients and could negotiate on their behalves,

1 I don't think that the mediation would have ended that

2 afternoon.

3         THE COURT:  Well, I mean, it sounds a little silly,

4 but I guess you could have 699 written powers of attorney that

5 says, I yield to Mr. Catalina to represent my interests at a

6 mediation, or alternatively, the 699 could select a working

7 group of two or three or four people to sit at the table with

8 you.  I mean, that seemed to me would be one way to do it.

9         MR. CATALINA:  If Your Honor was in a different line

10 of work and was representing the debtors at the mediation, I

11 think that Your Honor has come up with some good ideas about

12 what could have satisfied the debtors or satisfied their

13 concerns.  But the fact of the matter is that nothing was

14 communicated to us about what would be sufficient to satisfy

15 these, in our view, pretextual concerns.  And we were unable to

16 even get into how can we address these matters, that ultimately

17 there could be no discussion of substance.  And that's where it

18 ended up.

19         THE COURT:  So you want to be practical.  Now, be

20 practical from my point of view.  Whether it's March 20th,

21 or how cynical would it be if I said April Fool's Day, or some

22 other date, if nothing happens between now and that deadline,

23 then come that deadline, I might be greeted on my docket with

24 699 objections to claims.

25         MR. CATALINA:  You may be.  You may be, Your Honor.

1  But what I'll say is, as a practical matter, I mean, at risk of
2  being kind of trite or stating the obvious here, right, the
3  best way to resolve these claims is to move forward with the
4  claims resolution process.
5          THE COURT:  No, I agree.  I agree.  I understand your
6  point.  And I'm waiting to hear why Mr. Slack has to say to
7  tell me that it's not the right way to go, since, again, the
8  two of us have the history of cobbling out that ADR procedure.
9          But realistically, that's what happens, right?  Either
10  there is an attempt at a mediation that is substantive, which
11  may resolve some issues or may not.  The next step, again,
12  leaving aside this whole question of whether there's going to
13  be a district court class action and whether that solves the
14  problem, in any event, if there isn't a mediated solution for
15  your clients, particularly, then I'm looking at objections on
16  our docket for 699 or whatever the bigger number is for all the
17  other claimants out there.
18          I'm not complaining.  I mean, that's the process.
19  That's what we're up against; isn't that true?
20          MR. CATALINA:  Right, Your Honor.  But I'll make the
21  point that they're not mutually exclusive, right.
22          And I think what the point I was trying to convey
23  earlier, right, by saying that the way to resolve claims is to
24  move forward with claims resolution is that, yes, it may result
25  in 699 objections on Your Honor's docket.  That doesn't mean

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
43 of 95

1    that now we're locked into a path where we have to fully

2    litigate the claims to completion.  Sometimes that happens, and

3    that's certainly the right of any particular claimant to do if

4    that's what they want to do.

5          But oftentimes by moving forward in the process, that

6    also spurs things along, right?  Maybe if there's a future

7    discussions about settlements, suddenly we're finding ways to

8    get over the hump with some of the issues, which again, in our

9    view, were pretextual and were raised at the mediation.  So I

10   don't view them as mutually exclusive.

11         But what I will point out is that what the debtors

12   have said in their objection and what they propose to do is

13   really to just put us on a merry-go-round, where they have this

14   idea that they're -- we've mediated the claims now, right.

15         THE COURT:  Um-hum.

16         MR. CATALINA:  We've been waiting for several years.

17   We've mediated the claims.  Now, they're going to make offers.

18         And in fact, last night, as I understand, debtors sent

19   several offers across the method laid out in the ADR

20   procedures.  They made several offers to certain of our

21   clients.  And then, according to their papers, once that offer

22   process goes on, they can choose at a time and place of their

23   choosing to put us back into mediation, in a mandatory

24   mediation --

25         THE COURT:  Well, but let's be glass-half-full.  If

1  offers went out and some of your clients accepted it, then

2  we've knocked off a few more ducks in the shooting gallery,

3  right?

4           MR. CATALINA:  Certainly, sure, Your Honor.  But I

5  think the point that I'm trying to make is that moving forward

6  with claims resolution does not preclude offers or settlement

7  discussions or any of those things.  And in fact, is likely --

8  we're here, as Your Honor made reference to, years after the

9  fact, and because these processes haven't moved forward.

10          And just recalling last -- what we learned in the

11  fifth objection motion was that for years debtors were, as Your

12  Honor said at the last hearing, picking off the low hanging

13  fruit.  Right.  And then they spent something like two-thirds

14  of the year 2022 secretly negotiating with the class that they

15  told the Court was conflicted, that they told the Court could

16  not substitute its judgment for the judgment of individual

17  claimants.

18          I would submit that if we want to move forward and

19  start resolving some of these claims, the way to do it is to

20  put them on the pitch clock and say, it's time to just object

21  to the claims.  Tell us what your objections to the claims are,

22  and let's move forward.  And we'll have more information with

23  which to evaluate and weigh our claims.

24          THE COURT:  If I'm not mistaken, there's not only a

25  pitch clock, there's a batter's clock too.  The batter has to

1  get in there and swing at the --

2          MR. CATALINA:  That's right.  The batter has to be

3  ready with -- right.

4          THE COURT:  Right.

5          MR. CATALINA:  Both parties have to be ready.  We're

6  ready.  And now we're standing in the batter's box --

7          THE COURT:  And they made the bases larger too so --

8          MR. CATALINA:  That's right.  Well --

9          THE COURT:  Okay.

10          MR. CATALINA:  -- we'll (indiscernible) it's over.

11  But I just want to also -- I'm sorry, where am I in time, Your

12  Honor?

13          THE COURT:  Well, no.  Go ahead and take a minute.  I

14  was going to say, I'm going to tell you to -- ask you to

15  reserve some time, and you certainly may.  But I had a -- I

16  want Mr. Slack to give me his thoughts, and I had a question

17  for him too.

18          MR. CATALINA:  I do just -- oh, I'm sorry.  Were you

19  going to ask a question?

20          THE COURT:  No, go ahead.

21          MR. CATALINA:  I did just want to raise the issue of

22  the unauthorized and potential class settlement that we keep

23  hearing about in the papers and we keep seeing a reference to.

24          But I think I just wanted to make the point that the

25  fact that they're negotiating now with the class is not a

1   reason to delay moving forward with the claims resolution

2   process.  The class negotiations that are going on, to the

3   extent that there's any class settlement offered up for

4   approval, this is going to be a very lengthy and difficult

5   process.

6           THE COURT:  Well, if I understand your argument, it's

7   not only lengthy and difficult, but it may not solve the

8   problem because your claims against the company and that action

9   shouldn't be against the company, but only the carriers, right?

10          MR. CATALINA:  Well, the class action is no longer

11  pending against the company because those claims that

12  (indiscernible) --

13          THE COURT:  Right.  No, I know that.  That's my point.

14  My point is, if the company spends money dealing with the class

15  action, that's money that it could be spending dealing with

16  your clients' claims and all the other, by the way -- all the

17  other securities claimants beyond the 699 that you represent.

18          MR. CATALINA:  Correct.  And more to the point,

19  resolving the claims of claimants that have actually showed up

20  in the bankruptcy and filed their claims, right, the pending

21  class action is now pending against directors, officers,

22  underwriters --

23          THE COURT:  Right.  Right.

24          MR. CATALINA:  -- and the class would include people

25  who haven't filed claims.  So it's taking --

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
47 of 95

1          THE COURT:  No, I'm aware of that.  Right.

2          MR. CATALINA:  Yeah, it's taking the company's assets,

3     using them to settle claims against nondebtors.

4          I'll also note that two courts, not only this court

5     but the district court too, also at the urging of debtors,

6     right, stayed that case in favor of resolving the claims

7     against the company first.

8          THE COURT:  No, you made that point, and I understand

9     that that's the point.  Okay.

10         MR. CATALINA:  Okay.

11         THE COURT:  Why don't you reserve after Mr. Slack's.

12         And Mr. Slack, I have to say, if I'm giving out

13    awards, I think Mr. Catalina, or maybe it's his partner, Mr.

14    Bodnar, gets the award for a line that's directed to your

15    client on the last page of his reply -- I circled this line to

16    remember it -- "the RKS claimants on a never-ending merry-go-

17    round to nowhere."

18         So here we are.  You've got them on a never-ending

19    merry-go-round to nowhere.  So what are we doing?  And can I

20    just look forward to 699 claims objections that I try, and my

21    term only lasts another twelve years.  I probably could finish

22    all 699 trials by then.

23         But why aren't we getting this case moving the way

24    it's supposed to, the way you promised it two years ago?

25         MR. SLACK:  So I think we are, Your Honor.  And so I

1     want to -- there are three topics that I think the objection

2     touches on, and I want to talk about each of them.

3            And the first one is the objection deadline because we

4     were in front of the Court to get the deadline extended, and it

5     was clear that the Court wanted us to move aggressively to use

6     the procedures to settle the cases. And what we did was we sat

7     with the Court, we discussed it with the Court, that we were

8     going to have an aggressive schedule to send out 3,000

9     additional offers in the first four months of this year.

10    Discussed that with the Court specifically that that would be

11    about 750 offers made every month --

12            THE COURT: Right.

13            MR. SLACK: -- which is a very substantial number.

14            And you also wanted us, Your Honor, to make offers to

15    the objectors, which includes, obviously, very large and

16    sophisticated parties, by the end of February.

17            And what I can tell you is there's nothing in the RKS

18    papers that can detract from the fact that we've done precisely

19    what Your Honor has asked us to over these last months. In

20    these past two months, we've already made offers to more than

21    1,700 claims. That's well meeting the aggressive schedule that

22    Your Honor and I discussed back in December on this motion.

23            That means that we've got another 1,300 to make over

24    the next two months. We're well on our way of doing that.

25    Moreover, I think, as --

1      THE COURT:  So excuse me, does that include what he

2  mentioned last night?  Is that another batch that went out last

3  night?  Is that what I'm to assume?

4      MR. SLACK:  We did have a batch that went out

5  yesterday.  I don't know what the precise number is.

6      THE COURT:  Okay.  That's all right.

7      MR. SLACK:  But we're over 1,700 right now.

8      And we intend to -- Your Honor, just so it's very

9  clear, we did make a number of offers to a number of the

10  claimants.  We plan on making offers to the individual

11  claimants on a claimant-by-claimant basis under the procedures.

12      And so the bottom line here, Your Honor, is that Mr.

13  Catalina's client filed an objection to the extension order.

14  That was resolved.  And they agreed to the 180 days.

15  Interestingly enough, Your Honor, as you may remember, they

16  filed an objection that was joined by the objectors.  So even

17  though they withdrew it, Your Honor considered that objection

18  because some of the ongoing objectors had actually continued --

19      THE COURT:  No, I know.  I recall it.  No, I recall

20  much of that.  Indeed, not the gory details of it, but I

21  remember it.  And yes, I understand.

22      MR. SLACK:  Yes.

23      THE COURT:  By the way, are you at liberty to tell me

24  of the 1,700 offers that go out, any number of them that have

25  been accepted?

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
50 of 95

1          MR. SLACK:  Yeah.  So I think the -- I think the last

2    number I saw -- I remember these have gone out and parties have

3    a lot of time to --

4          THE COURT:  Yes.  No, I know that.

5          MR. SLACK:  -- address that.  So a bunch of them, we

6    don't have the -- the time hasn't expired.  But that the key

7    is, Your Honor, we've gotten -- I think the last number was

8    over 500 acceptances out of the -- out of the offers that we

9    sent out.

10          And what we're finding is we get a very high

11   percentage of acceptances for people who engage with us.  So if

12   they look at the offer, they engage, we actually have a very,

13   very high percentage of those.  And some of our -- some of our

14   outreach afterwards helps us increase that number so --

15          THE COURT:  Well, that's encouraging.  I guess that

16   means the low hanging fruit there, whatever the next level of

17   fruit is, maybe you're up the tree a bit, but if you've wrapped

18   up 500 of them out of 1,700, I guess that -- well, let's see.

19   Is that a good batting average in baseball?  I guess that's not

20   such a bad average in baseball, right?  About a 280?

21          MR. SLACK:  Yeah.  And look what we found, Your Honor,

22   in that first batch, the 1,200 batches, that out of the -- out

23   of the folks who actually looked at the offers and engaged with

24   us, we were getting over eighty percent acceptances.

25          I don't know if we'll get that high in this next

1   batch, but we certainly take this and take what Your Honor said
2   at that hearing very seriously.  And we've been very, very
3   aggressive in using the procedures to get settlements.  And
4   so --
5           THE COURT:  Well, Mr. Slack, in the years that I've
6   known you, I've never heard you pull a fast one on me.  And so
7   you -- and I appreciate that.
8           But what troubles me about what I'm hearing in this
9   motion is sort of taking this great mediation alternative in
10  place, distorting it, going to an alternative mediation that
11  you could have -- I don't know who initiated it, but that was
12  attempted.  And then the thing fails miserably.  And then you
13  say, well, now let's go back to the timetable for our original
14  mediation.
15          That's what troubles me about the strategy from your
16  point of view and makes me think that it's time to take Mr.
17  Catalina's suggestion and say, start that new pitch clock
18  running with the claims objection, which doesn't rule out
19  mediation, obviously.
20          MR. SLACK:  So Your Honor, I have to say in the
21  strongest words I can that what you heard about the mediation
22  was not true.  It's not accurate.  And the mediation privilege,
23  I think, prevents me from saying what really happened.  But
24  having somebody say you acted in bad faith is not evidence of
25  it.

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
52 of 95

1          THE COURT:  No.

2          MR. SLACK:  And what Mr. Catalina put in his

3    declaration about the reason that it was terminated may have

4    been from his zone.

5          But we were talking through a mediator.  And I can

6    promise you, Your Honor, that that is not accurate.  What I

7    was -- what you were told is not accurate from our point.

8          THE COURT:  Well, just tell me -- just tell me this.

9    Is it true that you needed and didn't get to your satisfaction

10   proof that he had authority on behalf of those 699 people to

11   act for them?

12         MR. SLACK:  So I think what our position was -- and

13   again, I don't know how to do this without somewhat disclosing,

14   because our communications were with a mediator who then --

15         THE COURT:  Okay.

16         MR. SLACK:  -- talked to them.  What I can tell Your

17   Honor is that we remain willing right now to work through that

18   issue.  We do think there are issues, and we think there are

19   important issues.

20         It kind of reminds me of -- as we're going through,

21   we're talking about pitch clocks and everything else, this kind

22   of reminds me of the situation that we have with a famous quote

23   from Ronald Reagan, which is trust but verify.  What we needed

24   going into the mediation, and Mr. Catiline is right, we raised

25   this issue going into the mediation, and we said we are willing

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
53 of 95

1    to work with you to resolve it.  And we were willing to

2    continue to work with them to resolve it during that mediation

3    and after the mediation was terminated by them without talking

4    to us with no good reason.

5         And what I can tell you is that there were a number of

6    ways that we were willing to talk through and try to resolve

7    it.  We never got there because they terminated the mediation.

8    And so the only reason --

9         THE COURT:  Okay.

10        MR. SLACK:  -- that those issues weren't --

11        THE COURT:  I gotcha.

12        MR. SLACK:  -- resolved was because they terminated,

13   not because of anything we did.

14        THE COURT:  I'll be mindful and appreciate the efforts

15   of the mediator.  I assume the mediator was getting paid for a

16   terminated mediation.

17        But my question to you, though, is still, was my

18   suggestion oversimplified?  Why can't you get 699

19   authorizations to say Mr. Catalina and his firm have authority

20   to represent us, and we will speak through a subcommittee of

21   two or three representatives?

22        MR. SLACK:  Yeah.  So we are entirely okay with some

23   procedure.  Here's the issue, Your Honor, and I want to -- I

24   want to just say that again, it's not something we said, hey,

25   the mediation has to end.  We said we need to -- we need to

1    make sure we're getting the releases and for what we want to
2    do.
3           So let's say we have a pot of money.  Let's say we
4    say, we're going to give your clients a million dollars, and
5    there's a pot of money.  They've got clients that only bought
6    equity.  They've got clients that only bought debt.  They've
7    got clients who have both.  They've got clients who bought at
8    the beginning of the period.  They've got clients who bought at
9    the end of the period.
10          And for an example, just one example, is that there's
11   a number of securities claims who bought after the North Bay
12   fires, for example, and after they should have perfectly been
13   aware of what's happened in the world.  And they did it because
14   they were speculating.  And the fact is that we've heard from
15   some claimants, hey, you PG&E shouldn't be paying claimants who
16   bought late and were speculating the same way you're paying us.
17   We have real damages.  These guys bought late.
18          So what we needed going into the mediation was we
19   wanted to understand, if we were going to negotiate on a pot
20   number, how it is that that was going to be allocated by the
21   plaintiffs such that we were going to get our releases.
22   Because here's what we weren't willing to do.  We weren't
23   willing to say, okay, we're going to give you a million
24   dollars, and they figure out who's going to get what.  And the
25   half of the claimants who are getting more of that pot say,

1    yes, we'll take more of that pot and agree, and the other ones

2    don't.

3         So we wanted to make sure we understood how we were

4    going to get the releases.  It's not that we don't trust that

5    they represent them.  It's not that we don't trust that they

6    were authorized to come to the mediation.  We wanted to

7    understand how the process was going to work.

8         And I'm not trying to talk about the mediation because

9    this was before --

10         THE COURT:  But what I don't understand is, what's so

11    difficult about that?  You know who they are, so you can know

12    who are the speculators, who are the debt people, who are

13    the --

14         MR. SLACK:  Right.

15         THE COURT:  -- equity people.  And if you say, okay,

16    to use your hypothetical, here's a million dollars, figure out

17    how to divide it, but just give us the releases, why do you

18    need to get into the details of how they divide up the funds if

19    they deliver the releases to you?

20         MR. SLACK:  I think that would require us to go into

21    the mediation because we were --

22         THE COURT:  Okay.

23         MR. SLACK:  -- because the idea, Your Honor, is that

24    would be perfectly fine if we had a deal that would say, okay,

25    you're going to guarantee that every single party is going to

1    take it.  Because again, what you can't have is some people who

2    are being allocated more funds say, okay, I'll accept, and

3    people who are being allocated less funds say, no, I want to

4    prosecute my claims.

5           And here's the point, Your Honor, and this is why --

6    this is why we have to let the procedures go forward, because

7    the procedures will do this on a claim-by-claim basis.  And so

8    individual claimants are going to now get offers, and those --

9           THE COURT:  No, look, again, Mr. Stack, I want to -- I

10   want to repeat again -- each time you keep repeating it, I keep

11   repeating it -- I don't want to invade that mediation

12   privilege, but I guess I'm still not persuaded if you could

13   settle with two people, why you couldn't settle with 699 people

14   if you make the rules as to how many people have to sign up.

15          And if you say, here's a million dollars, and it has

16   to go to no fewer than 600 people or 610 or 620 or some number,

17   then it seems to me, it's none of your business how those 600

18   people divide up the pot.  And it's their problem.  It's like

19   any other kind of working out.

20          I mean, lookit, think of this as a typical bankruptcy

21   plan.  The debtor says, here's a million dollars, creditors

22   committee, figure out how to divide it up.  Just don't bother

23   me.  Just deliver the releases.

24          MR. SLACK:  If you get it -- I think the -- I think

25   the point, Your Honor, and I'm sorry I'm not being really clear

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
57 of 95

1  about this, is we don't have a problem and have never had a

2  problem with the idea of, we'll give you the pot of money; you

3  give us -- you give us all the releases.

4         What you can't have, Your Honor, and again, this is

5  what I'm -- unless you sort of see the example, if you have --

6  if you have ten claimants -- let's say it's ten and not the

7  700.

8         THE COURT:  Okay.

9         MR. SLACK:  And you're giving -- and you're giving

10 people a million dollars, so they've got 100,000 each.  The

11 problem is, is that's not the way it really works because some

12 of those may have, depending on what damage formula you have,

13 may have 500,000 in damages, and some of them may have 50,000.

14        THE COURT:  Right.

15        MR. SLACK:  So what you can't -- what you can't have,

16 though, is we can't have somebody say, okay, we'll give you a

17 million and it gets divvied up and only five of those people

18 take the million dollars.  Now, you've got -- and maybe not

19 even the person who's got the 500,000-dollar claim.  So now the

20 other five are all getting a huge settlement, and we still have

21 to -- we still have to defend that 500,000-dolalr claim.  And

22 so --

23        THE COURT:  Well, again, I don't know.  You and I can

24 debate this all day long.  You can make the rules about the

25 minimums.  This isn't like a plan where Congress said it's

1  fifty percent, plus two-thirds.  You can say, I want ninety

2  percent, and I want ninety percent of the dollar claims

3  involved, or there's no deal.

4          And so if they are ten people and they got one big

5  hog --

6          MR. SLACK:  Yeah.

7          THE COURT:  -- and that hog says, I want ninety

8  percent of the money, then the other nine people aren't going

9  to go along with it.  And the dynamics will work itself out for

10  the people to divide up the pot.

11          MR. SLACK:  We are completely open to having those

12  discussions.  We never said no to those discussions.  We never

13  said no to any of that, period.  It just never happened.

14          THE COURT:  Okay.

15          MR. SLACK:  And so the fact is that we are perfectly

16  willing to have those types of negotiations, and we're

17  perfectly willing to do claim-by-claim.  There's a lot of ways

18  to solve this.

19          But the fact is, is that where we left the mediation

20  was, okay, we're willing to work on this.  Let's talk through

21  what the ideas are.  And the ideas that you're raising, those

22  are the kinds of things that we should have been talking about

23  in mediation --

24          THE COURT:  Okay.  Okay.  I gotcha.

25          MR. SLACK:  -- not terminating the mediation.

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
59 of 95

1        THE COURT:  Okay.  So it really comes down to, when do

2   I throw in the towel and give up and say, we're going to the

3   thing we designed two years ago?  Mr. Catalina says, I'd give

4   you till March 20th.  What do you suggest?

5        Because I'll tell you what I don't like.  I don't like

6   the notion that there was an attempt to mediate.  Whether you

7   blame them for killing it or they blame you for killing it, it

8   happened, and it failed.  But so now we go to the second round

9   of mediation.

10       And from my point of view, having spent so much time

11  and working with you and others -- and I'm not taking credit

12  for it.  It's just a process that, frankly, I didn't think was

13  going to take two years to ever get off the ground.  And that's

14  a misstatement.  It's gotten off the ground, but it's only been

15  dealing with the low-hanging fruit, to use my quote.

16       And it seems to me that I can't say, okay, Mr. Slack,

17  Catalina goes out, and you get to start the whole process all

18  over again.  I'm more inclined to say, I'll pick a date and

19  say, for these 699, it's fish or cut bait by a deadline.  And I

20  want a suggestion from you about what you think is realistic

21  there.  Because I think they -- you complain that they're

22  trying to get in front of the line, and they correctly say

23  there is no line.  You haven't opened up the gate yet.

24       MR. SLACK:  I don't understand that, Your Honor.  I

25  will tell you that I think that what makes the most sense here,

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
60 of 95

1  their motion is entitled "Enforce the Securities Procedures".
2  That's what they said.

3  THE COURT: Um-hum.

4  MR. SLACK: And you know what? That is exactly what
5  Your Honor should do, is enforce the securities procedures.
6  And the entirety of that would mean -- and here's the point. I
7  don't know what they are scared about to have the securities
8  procedures go forward, because here's what -- nobody denies
9  this. There have not been claim-by-claim negotiations with any
10 particular claimant that they represent.

11 And look, we were willing to try to do a one-number
12 thing, and we still are. But if not, let's try on a claim-by-
13 claim -- we will commit to getting offers out on a claim-by-
14 claim basis to their 700 over the next two months. They're on
15 a claim-by-claim basis. Their folks can decide whether to
16 accept it, not accept it, make a counteroffer, and we'll see
17 how many claims we can resolve that way.

18 And then what I would say, Your Honor, is that
19 certainly for some of the bigger claimants in that pot, there
20 may be some utility -- if they don't get resolved in the first
21 offer process, there may be some utility in having a mediation
22 with respect to some of their big claimants on a claim-by-claim
23 basis where you have a person at the mediation who's authorized
24 as the securities procedures require it.

25 And what I would tell Your Honor is, is you can

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
61 of 95

1   monitor that process, and we can come back and report to you.

2   But the way to resolve these and enforce the securities

3   procedures is to allow the securities procedures to actually

4   have a chance to work.  And what we found is, one of the things

5   about low-hanging fruit, what I could tell Your Honor is that

6   in these first two months, we've made offers in the six

7   figures, in the five figures.  We've made significant offers to

8   significant players.

9           And you can keep talking about low-hanging fruit, but

10  the fact is, is that this offer procedure is in the process

11  where we have done exactly what we promise, Your Honor we would

12  do, and Your Honor should give these procedures a chance to

13  work.

14          THE COURT:  No, but again, I'll rephrase my question.

15          If there never had been this failed mediation and you

16  had implemented what we'll call the "authorized mediation

17  procedure" and that had then ended, then next would come claim

18  objection time, right?

19          MR. SLACK:  Sure.

20          THE COURT:  Okay.  So what I'm suggesting is, what I

21  don't feel comfortable about is both sides have agreed to a

22  mediation procedure that failed, without saying who's at fault,

23  but let's go back to another mediation procedure as the next

24  step.  That seems, for these 699 people, to be inappropriate.

25          I might very well take your suggestion as to put a

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
62 of 95

deadline that's maybe two months out, rather than eleven day or thirteen days. But that means, if I picked some time -- and I wasn't being completely facetious when I said April Fool's Day, but whatever date I pick, then it seems to me that's time for offers to go out. Whether they be one-on-one or group or subgroup, doesn't matter. It's whatever the parties work on.

And if that's successful, fine. And if it's not successful, then it seems to me that PG&E, for those claimants at least, has to fish or cut bait and either not object to their claim or file an objection to their claim.

And as I say, I joke about do I want to try 699 claim objections? No. But if I have to, I will. And obviously, I am more optimistic that even if that claim procedure begins, they'll still be either one-on-one -- one-to-one negotiations or some sort of group process that will work.

So again, I'm coming back to you to say, what you're saying to me now is give us two months to make offers to this 699 folks. Failing which, are you willing to accept that for that same group, you have to then object to claims?

MR. SLACK: So I would say, Your Honor, that that's not workable in a couple of different respects.

One of the things is, is that the whole idea of the procedures, and I think this is really important, is that the procedures were designed to allow a claim-by-claim attempt to settle, and that has not happened here. And I think that it's

1    really important that it does.

2           The second thing, Your Honor, is -- and by the way,

3    it's not a mediation.  You keep saying mediation.  The first

4    offer process is not a mediation process.  It's an offer

5    process.

6           THE COURT:  That's right.  Okay.

7           MR. SLACK:  There then is a -- there then is a

8    potential mediation process.  And look, the hope is if people

9    are coming to this in good faith that there's a bunch of claims

10   that are going to get resolved and a bunch of claims that then,

11   maybe mediation on a claim-by-claim basis that hasn't occurred

12   will also be successful.

13          The other thing, Your Honor, and this is -- the

14   procedures were designed to have a uniform objection deadline

15   for these claims because you can't have -- it would be -- if

16   you think about what an objection means here is that all of a

17   sudden the debtor, with just these 700 claims, are going to be

18   engaged in discovery and active litigation on the same claims

19   that there are thousands of other claimants who are not going

20   to want to just sit by.

21          And so what I told Your Honor when we did the

22   procedures is that what you need to do is you need to allow the

23   procedures to go forward, and then see what claims are left.

24   And then we're going to have to work out a procedure as to

25   what's the fair way of getting those claims resolved on the

1  merits in front of you.

2       If you go ahead and say, okay, you got to start

3  litigating discovery and everything with these 700 claims,

4  you're going to completely chill the ability to settle with

5  claimants throughout the process.  It needs to be uniform.

6       And I would say, Your Honor, there's no authority here

7  for reducing your objection deadline that you put in the plan

8  that has now been extended.  There is not one shred of

9  authority.  I'm not saying, Your Honor, you can't do what you

10 want to do, but I'm just saying there is no basis, either in

11 the securities procedures or in the law, there's not a single

12 case cited where some claimants get the ability to have claims

13 prosecuted earlier -- in objections earlier than the plan

14 deadline that's been extended for everybody.

15      So Your Honor, I think it would be a mistake to

16 basically give up on the securities procedures because that's

17 what's going to happen.  If you do an order which says, we have

18 to object to these claims before the objection deadline, you

19 will have killed the procedures in the process.

20      THE COURT:  So refresh me, again, as to the current

21 deadline is, what, June 30th?

22      MR. SLACK:  It's in June.  I'll get it.

23      THE COURT:  Well, then it's no later than June 30th.

24 Okay.

25      MR. SLACK:  Yeah.

1    THE COURT:  So if I were to take your advice and tell

2  Mr. Catalina I'm not going to do anything for you, it is now

3  the first week of March, so April, May, June, and then we're

4  back to the same problem.  And you either do file objections,

5  or you ask for a further extension.

6    MR. SLACK:  That's correct, Your Honor.

7    THE COURT:  Okay.  Okay.

8    MR. SLACK:  And the point is, is that the parties will

9  be able to report to you as this process goes because we agree,

10  there needs to be a aggressive effort to continue to use the

11  procedures to resolve these claims.  And that's what we're

12  doing consistent with --

13    THE COURT:  But Mr. Slack, you've got the sky falling.

14  If I take that latest advice and fix a deadline, you tell me

15  the next thing's going to happen is great big rounds and rounds

16  of discovery.  That's not necessarily true.

17    It doesn't mean that if I order a deadline for the

18  claims objection for his group -- or all of them, but I mean,

19  the point is we're debating a deadline or another deadline

20  that's three months out.  And if you tell me they're going to

21  you're going to extend it again, then I'm wondering, well, then

22  why did we waste our time with this mediation process when it

23  hasn't happened so --

24    MR. SLACK:  Your Honor, I'm not sure you say that,

25  because the fact is, is that there's a mediation that has a

1   mediation privilege.  And I'm troubled, Your Honor, that you're

2   taking what people have said about the mediation and why it

3   failed because the fact is, Your Honor, that that mediation

4   wasn't given the opportunity to work, and it wasn't our fault.

5           And it seems to me that what you have here is you have

6   a party who wants to jump the line and is using this failed

7   mediation to essentially renegotiate the deal that they made,

8   because they made a deal, 180 days.  Remember, when we made our

9   deal with them, they said they were going to support 180 --

10          THE COURT:  Yeah, I know.  I know.  But listen, I --

11          MR. SLACK:  So now, you have to have some basis for

12  reneging on that and saying, okay, even though they agreed to

13  it, we're going to shorten that.  And I don't think that's

14  appropriate.

15          THE COURT:  But you agreed to -- you agreed to depart

16  from the mediation process that you designed with a hybrid

17  version that failed.

18          Again, I will take your view that you think they

19  killed it, and they say you killed that.  And I'm not saying

20  who killed it, but you agreed to it.  If you hadn't agreed to

21  it and said, no, we're not going to do it any way except our

22  Court-approved mediation process, we're going to stick with

23  that, then so what.  Nothing would have -- this wouldn't have

24  happened.

25          And so again, I don't want to get into this he-said-

1  she-said, you're-right-he's-right.  The fact is there was an

2  attempt to mediate with a departure from a mediation procedure

3  that was in place, and it failed.  And you want to then go back

4  to the mediation procedure that you designed so it can happen.

5        And I'm saying, I wish that the original would have

6  happened.  But I don't think it's fair to agree to a process

7  that then fails and say, now we're going to go back to a second

8  round that maybe should have been the first round.

9        Anyway, let me let Mr. Catalina be heard, and then I'm

10  not going to shut you off.  I just want to get his views on

11  where we are on this.

12        Mr. Catalina.

13        MR. CATALINA:  Thank you, Your Honor.  I find myself

14  in agreement with what Your Honor's saying.

15        The fact of the matter is here, right, debtors are

16  kind of complaining that we've got thousands of more offers to

17  make to all of these claimants, and we can't move the claims

18  allowance process forward because of that.  They've had years

19  to make those offers, I mean, not only to us, but to the other

20  claimants.

21        And what do we know about how they spent last year?

22  They spent last year putting these procedures on hold and

23  negotiating with the class.  We've been writing them letters

24  for years asking them to deal with us, and here's what we know

25  about the debtors in these cases.  The debtors only move when

1  they're forced to move.  Okay.

2          And that's why we had our mediation in January.  They

3  were forced to come to the table and agree to mediate.  That's

4  turned out to be --

5          THE COURT:  They didn't have to go, right?

6          MR. CATALINA:  No, they could have litigated our

7  objection.

8          THE COURT:  Well, no, no.  But they didn't have to do

9  anything.  They were operating under that -- was there an

10 agreement that you and Mr. Slack made about trying this

11 alternative mediation procedure?

12         MR. CATALINA:  The agreement was, we will withdraw our

13 objection in exchange for your agreement to mediate with us,

14 and --

15         THE COURT:  Okay.

16         MR. CATALINA:  -- the alternative to that was to come

17 to court in November and litigate over what the objection

18 deadline should be.

19         THE COURT:  Okay.  Okay.

20         MR. CATALINA:  And that never happened.

21         THE COURT:  Okay.  But the point is that the company

22 agreed to go to this variation of mediation?

23         MR. CATALINA:  Yes.  And the point is, they have to be

24 pushed to do anything, right?  We --

25         THE COURT:  No, no.  But the point is -- the point is

1  it was a consensual effort on both sides to try this
2  alternative mediation.
3         MR. CATALINA:  It was a consensual effort on both
4  sides.
5         THE COURT:  Which failed for reasons that you two
6  counsel differ on.
7         MR. CATALINA:  Yeah, I mean --
8         THE COURT:  And now Mr. Slack is saying, let's go back
9  to the mediation procedure that we designed on our timetable,
10 and you're resisting that.  That's all.
11        MR. CATALINA:  Yes, Your Honor.  This is the merry-go-
12 round, right.
13        THE COURT:  Right.
14        MR. CATALINA:  Because now we go we go back around,
15 and we go through this again.  It turns to the agreement to
16 mediate in the first place into a Trojan horse, right.  We
17 actually end up worse off having --
18        THE COURT:  What's going to -- what's going to happen
19 if I forced the deadline?  Whether it's March 20th or some
20 other date that's  sooner, what do you think is going to
21 happen?  Mr. Slack said it's going to screw up the whole
22 process.  Everybody's going to want to do it.
23        MR. CATALINA:  Well, I can't predict the future.  What
24 I would say is that they've had time to send out offers to
25 other parties, and they chose to use that time negotiating with

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
70 of 95

**PG&E Corporation**

1    the class and/or picking off low-hanging fruit for the last few

2    years.  I'll tell you what will happen --

3           THE COURT:  You keep going back to your complaint

4    about their negotiating with the class.  They can multitask.  I

5    mean, I don't think hearing that over and over again changes.

6    We have to deal with this problem, not the other problem.

7           MR. CATALINA:  No, no, no.  The point on that, Your

8    Honor, is that what we learned is that they actually put the

9    ADR procedures on halt last year while they were doing that.

10   Right.

11          THE COURT:  Okay.  Okay.

12          MR. CATALINA:  So they could multitask.  They chose

13   not to.  Right.

14          THE COURT:  Okay.

15          MR. CATALINA:  And now they're saying there's this

16   sword of Damocles hanging over where the Court is constrained

17   in what it can do until they spend -- here's the problem with

18   sending out all of these individual offers.  Their process is

19   going to take, what, another year, another two years, right.

20   After they send out the individual offers, there's no

21   requirement in the ADR procedures order that they then move on

22   to a mediation process.  They can put it totally on hold during

23   that time period.

24          I think what we've learned is that when the debtors

25   have deadlines and they're pushed, they do things.  And that's

1  why we got a very small number of offers last night, the night
2  before this hearing, for a very tiny amount of claims, right,
3  because they were pushed and they wanted to be able to come and
4  say they were doing something.

5          I think that if the Court enters a real order saying
6  that they're going to have to object or allow claims by a given
7  date, that it's going to incentivize them to negotiate.  And
8  when we get to that point, we'll get our objections.  When they
9  object to our claims, we'll see what the objections are.  And
10 as Your Honor pointed out, it doesn't preclude settlement
11 discussions.  Right.

12         But the point is that, as Your Honor pointed out
13 astutely, we've been through a mediation.  It failed.  There's
14 nothing left to be done but to move through the resolution
15 process with these claims.  Otherwise, they'll continue to not
16 be resolved.

17         THE COURT:  Okay.  Mr. Slack, one more from you.

18         MR. SLACK:  Yeah.  Look, I would just say this, Your
19 Honor, is I haven't heard a good reason why the claims process
20 as set out might not be effective with respect to these claims
21 and these claimants.

22         And I know, Your Honor, you're saying that we
23 mediated, but what I can tell you is, is that, again, without
24 going into the mediation, the mediation never did what the
25 procedures said, and I think we need to give the procedures

1  time.

2         The other thing, Your Honor, which is really very

3  important, is the deal was they would agree to the 180 days if

4  we mediated.  I'm not sure what Your Honor would have done

5  absent that, other than to say that their objection was

6  actually before the Court, and the Court extended it by 180

7  days.  This is a reneging of that deal.  And unless there's a

8  basis for it, which there isn't, they've got no right to come

9  back in here, Your Honor, after we did what we said we were

10 going to do is mediate -- and quite frankly, that mediation

11 didn't end because of us -- and now renege on their agreement

12 of 180 days.

13        I think the right way of going, Your Honor, quite

14 frankly, is your procedures that we helped put in place should

15 be allowed to work.  If you go and you do this and you

16 accelerate the objection deadline, you're going to start active

17 litigation, which is, of course, what they want.  But it's not

18 good for the estate.  It's not good for the settlement of

19 claims.  It's not good for allowing the procedures to go

20 forward.

21        The best way, again, Your Honor, is hold our feet to

22 the fire, make us do what we talked about doing, which we're

23 doing, and stick to the plan.

24        THE COURT:  Now, again, I can go back, and I may go

25 back and listen to the transcript of the last hearing.  But

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
73 of 95

1  your view, Mr. Slack, was that they withdrew their objections.

2  They agreed to a June 30th deadline.  You agreed to mediate.

3  You didn't say what happens if that mediation was unsuccessful

4  so --

5          MR. CATALINA:  Well, the idea is that mediation

6  sometimes are successful, and sometimes they're not.

7          THE COURT:  Okay.  No, no.

8          MR. CATALINA:  It wasn't that -- there wasn't a --

9  okay.  I'm sorry.  Go ahead.  Sorry.

10          THE COURT:  What I'm getting at is, the mediation was

11  unsuccessful.  I think we can say that without saying why.  And

12  so the question then is, well, what do I do next?  And Mr.

13  Catalina says you shouldn't get to initiate your mediation

14  procedure when the alternative mediation procedure failed.  You

15  should be forced to object by a deadline, failing which the

16  claims are deemed allowed.

17          You and I know you're not going to allow those claims,

18  except, again, minimal ones, to be allowed without objection.

19  So you then paint a pretty dismal picture on what if all these

20  things that will happen.  The fact is, if you have a deadline

21  to object, you still can have one-on-one mediation or group

22  mediation.  And whether it's just with Mr. Catalina and his 699

23  folks or broader, there's nothing that says you can't do that.

24          I mean, the first order of business is just my

25  procedure.  If there's a claims objection deadline and you file

**PG&E Corporation**

1   an objection, there'll be a status conference out sometime into
2   the future.  At which point, the first thing I might say at the
3   status conference is, well, have you talked about any
4   discovery, and you might say what we're trying to resolve it.
5        So I guess I don't quite believe that the sky is going
6   to fall if the deadline occurs.  And you seem to imply that it
7   is, and I don't know that I agree with that.  So I guess this
8   is a long way of saying I understand it's not that simple, and
9   I understand that both of you feel very strongly about what
10  should have happened.  I'm going to take the matter under
11  advisement, and I'm going to either fix a new deadline for
12  claims objections or let that June 30th one sit there unacted
13  upon.
14       What I am not inclined to do is, at least for this
15  group of claimants, extend it beyond June 30th in any event.
16  Whether I take Mr. Catalina's suggestion and do it in thirteen
17  days, that might be a little bit more aggressive than I would
18  consider under any circumstances.  But I just want to reflect
19  on whether it's as horrible as you think it might happen.
20       I do have to say I agree with him in this regard.  I
21  think back on the two class-action motions and the effort on
22  all -- a number of people, not just you and me, but a lot of
23  people to put in place a mediation procedure that I thought was
24  going to be much more active and robust in the two years that
25  have gone by for these security claims.  And I watched, for

example, what PG&E's San Francisco counsel have been doing

with -- and some of your colleagues in New York that have been

doing with some of the nonsecurity, nonfire objections.  And

they've gone in a lot of variations.  Some tried, some

negotiated, some mediated.

And it struck me as disappointing from my point of

view that a mediation procedure that was supposed to supplement

the class-action option that was so heavily opposed by the

debtors hasn't appeared to have worked the way I hoped it would

work.  And I'm troubled by that fact, and yet I don't know

whether I should blame somebody or just assume that it's just

the magnitude of the problem.

Again, Mr. Slack, you and I were here at the

beginning.  I can remember early in the case believing that

that there's a 800-pound gorilla in the securities claims

problem that people aren't focusing on because there was so

much attention to things like the fire victims and some of the

other issues that are behind us now.

And here we are, in March of 2023, with literally

billions of dollars of securities claims sitting out there, not

on the road to nowhere, to use Mr. Catalina's word, the merry-

go-round to nowhere.  But it's starting to feel like a merry-

go-round to nowhere.

So anyway, that's a speech that I don't intend to give

again.  I'm going to take the matter under advisement.  I will

1  either summon you for a hearing or just issue some sort of a

2  brief ruling.  But that's the best I can do for now.  I just

3  want to give it some more thought.

4          Any closing comments from either of you?

5          Okay.  Well, you're also free to renegotiate a

6  resumption of a mediation right now under some procedures that

7  you work on to get me just to back off.  But you'd have to do

8  that quickly and see if you're willing to try it again and get

9  this whole question of participation and vote counts and

10 numbers and so on in place, with the help of a mediator or not.

11 That's up to you.

12         I'm not going to sit on this for too long.  I'm just

13 going to reflect on it.  So unless either of you want to add

14 any further, I'm going to call it a day and thank you for your

15 time.

16         MR. SLACK:  Your Honor, if you give me one second, I

17 guess I would say this, though.  And I know you're going to

18 take all this into consideration, but when you have a mediation

19 like we did and it was -- and the deal was, we'll agree to 180

20 days, we mediate, obviously, if it's a successful mediation,

21 all right, you never need the 180 days.

22         So the only time that 180 days that they agreed to

23 would come into play would be if it was unsuccessful.  And so

24 that was really the bargain that was made.  And I think, Your

25 Honor, there's no basis to reconsider your prior ruling,

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
77 of 95

1  especially given that the debtors have done everything that
2  they said they would do, that we said we would do in response
3  to that.

4          So I would leave you with that, Your Honor, is that is
5  that we really think the deadline should remain.  And we'll
6  probably be back in front of you, hopefully with a positive
7  report as to status over the next month or two, both with these
8  claimants and generally.

9          THE COURT:  How about hopefully without a motion to
10  extend it again?

11          MR. SLACK:  Well, I can't guarantee that, Your
12  Honor --

13          THE COURT:  Okay.  That's fine.

14          MR. SLACK:  -- but I can tell you that -- I can tell
15  you that if there's progress like we have been making and like
16  we expect to make, hopefully you'll be in a position where
17  you'll recognize that these procedures make
18  sense (indiscernible) --

19          THE COURT:  Okay.  Look, I'm going to repeat again
20  something that I just said, and this is an invitation to Mr.
21  Catalina and Mr. Slack.  If in the next few days, you can come
22  up with a short-term fix to get this group of people back to
23  the table under circumstances that can end up with a
24  substantive mediation occurring, rather than a procedural hang-
25  up about who's eligible to speak for whom or what we're going

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
78 of 95

1 to do about requisite acceptances, then I would welcome that,

2 and I will withhold any kind of a ruling.

3       But I'm going to issue a ruling. I just don't know

4 what to do. So with that, I will urge you both to consider.

5 And if in the next -- literally, the next day or two or three,

6 you have a consultation with one another and your clients that

7 says you're going to go back and try this resumption of

8 something here, you can tell me or notify me with a joint

9 filing or something, and I won't make a ruling.

10      All right. Thank you, both, for your time and --

11      MR. SLACK: We certainly will. We'll start those

12 discussions. We'll see what --

13      THE COURT: Okay. All right. Thank you, Mr.

14 Carolina, for your time, also, and I'll conclude the hearing.

15      MR. CATALINA: Thank you, Your Honor.

16     (Whereupon these proceedings were concluded at 11:46 AM)

17

18

19

20

21

22

23

24

25

                      I N D E X

RULINGS:                                    PAGE LINE

Motion for relief from stay is denied        24    16

eScribers, LLC

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
80 of 95

1          C E R T I F I C A T I O N

2

3    I, River Wolfe, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ RIVER WOLFE, CDLT-265

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  March 8, 2023

16

17

18

19

20

21

22

23

24

25

**$**

**$100,000 (1)**
14:23

**A**

**ability (3)**
37:18;64:4,12
**able (4)**
18:8,9;65:9;71:3
**absent (2)**
13:14;72:5
**absolutely (3)**
17:7;38:24;39:19
**accelerate (1)**
72:16
**accept (5)**
26:2;56:2;60:16,16;
62:18
**acceptance (1)**
39:13
**acceptances (4)**
50:8,11,24;78:1
**accepted (2)**
44:1;49:25
**accepts (1)**
26:11
**according (1)**
43:21
**accurate (4)**
13:12;51:22;52:6,7
**acknowledge (3)**
5:18;8:7;13:2
**across (2)**
8:20;43:19
**act (2)**
37:20;52:11
**acted (2)**
37:12;51:24
**action (10)**
3:19;15:16;25:2;
31:3;32:6;42:13;46:8,
10,15,21
**active (3)**
63:18;72:16;74:24
**actually (21)**
5:9;7:11,17,21;
11:2,21;15:24;35:2;
38:6,7;40:15,21,24;
46:19;49:18;50:12,
23;61:3;69:17;70:8;
72:6
**add (3)**
19:9;22:17;76:13
**Added (1)**
28:21
**additional (1)**
48:9
**address (2)**
41:16;50:5
**addressing (1)**

29:11
**adequately (1)**
37:19
**adjudicate (1)**
15:3
**adjudicated (5)**
7:11;9:25;10:6;
20:3;23:12
**adjudication (3)**
7:12,18,22
**admission (1)**
31:25
**admonitions (1)**
10:8
**ADR (10)**
15:8;35:19,20;36:4,
17;37:2;42:8;43:19;
70:9,21
**advice (2)**
65:1,14
**advised (1)**
25:18
**advisement (3)**
33:5;74:11;75:25
**affirmatively (2)**
25:22;26:13
**afford (1)**
20:20
**Afternoon (2)**
34:6;41:2
**afterwards (1)**
50:14
**again (41)**
6:8,25;8:4;13:15;
15:6;16:22;18:3;
19:24;27:18;30:2;
34:23,25;40:13;42:7,
11;43:8;52:13;53:24;
56:1,9,10;57:4,23;
59:18;61:14;62:16;
64:20;65:21;66:18,
25;69:15;70:5;71:23;
72:21,24;73:18;
75:13,25;76:8;77:10,
19
**against (15)**
7:9,10;8:2;12:14;
20:14;31:4,6,7;42:19;
46:8,9,11,21;47:3,7
**aggressive (5)**
48:8,21;51:3;65:10;
74:17
**aggressively (1)**
48:5
**ago (4)**
16:25;30:15;47:24;
59:3
**agree (12)**
15:24;26:6;42:5,5;
55:1;65:9;67:6;68:3;
72:3;74:7,20;76:19
**agreed (11)**
49:14;61:21;66:12,

15,15,20,20;68:22;
73:2,2;76:22
**agreeing (1)**
38:23
**agreement (8)**
38:18,20;67:14;
68:10,12,13;69:15;
72:11
**ahead (11)**
5:15,15,22;18:22;
34:24;40:14,17;
45:13,20;64:2;73:9
**Albert (12)**
27:4,6,7;29:8,23;
30:6,8,11;32:7;33:10,
16,20
**allocated (3)**
54:20;56:2,3
**allow (11)**
10:7;13:24;14:3;
15:15;17:11;35:15;
61:3;62:24;63:22;
71:6;73:17
**allowance (1)**
67:18
**allowed (3)**
72:15;73:16,18
**allowing (1)**
72:19
**almost (1)**
6:8
**along (2)**
43:6;58:9
**alternative (6)**
51:9,10;68:11,16;
69:2;73:14
**alternatively (1)**
41:6
**always (2)**
19:9,9
**amount (1)**
71:2
**and/or (1)**
70:1
**anymore (1)**
32:19
**appeal (1)**
25:5
**appearance (2)**
3:15;27:5
**Appearances (2)**
3:12;33:24
**appeared (1)**
75:9
**appellate (3)**
24:17;25:14;26:4
**Appreciate (7)**
14:7;18:24;24:19;
33:15,18;51:7;53:14
**appropriate (4)**
25:3;35:17;37:16;
66:14
**approval (1)**

15,15,20,20;68:22;
73:2,2;76:22
**April (3)**
41:21;62:3;65:3
**Arana (4)**
17:8,9,12;18:2
**arbitrary (1)**
20:14
**arcane (1)**
8:15
**argue (1)**
10:12
**argues (3)**
8:7;30:22;31:14
**arguing (1)**
19:5
**argument (23)**
4:17;5:16,22;8:1;
11:9,17;12:20;16:12;
17:21,22;19:2;20:18;
21:14,17;23:20;24:7;
29:7,18;30:10,25;
32:11;33:8;46:6
**arguments (2)**
31:23;33:9
**arising (1)**
6:20
**around (3)**
23:18;39:25;69:14
**artifact (1)**
39:6
**aside (5)**
8:9;9:19;18:20;
37:2;42:12
**assert (4)**
10:13;11:17;12:17;
19:6
**asserted (1)**
11:14
**asserting (2)**
11:16;21:4
**asserts (2)**
7:20;16:15
**assets (1)**
47:2
**assume (5)**
4:18;29:7;49:3;
53:15;75:11
**astutely (1)**
71:13
**attached (1)**
14:24
**attempt (5)**
23:14;42:10;59:6;
62:24;67:2
**attempted (3)**
13:2;15:7;51:12
**attention (2)**
17:11;75:17
**attorney (8)**
13:16;20:16;21:3;
29:12;30:3;31:1,3;
41:4
**attorney's (2)**

46:4

19:10;30:23
**audio (1)**
5:3
**audio-only (1)**
5:11
**authored (1)**
36:4
**authoring (1)**
36:16
**authority (11)**
37:20;38:5,20;
39:22;40:10,16,22;
52:10;53:19;64:6,9
**authorizations (1)**
53:19
**authorized (3)**
55:6;60:23;61:16
**average (2)**
50:19,20
**avoid (1)**
8:8
**award (1)**
47:14
**awards (1)**
47:13
**aware (3)**
21:5;32:13;40:20;
47:1;54:13
**away (1)**
28:20

**B**

**back (37)**
4:12,25;10:8;11:19;
12:22;14:11,22;
15:25;16:1;22:18;
26:19;28:10;30:21;
34:23;36:18;39:9;
40:6;43:23;48:22;
51:13;61:1,23;62:16;
65:4;67:3,7;69:8,14;
70:3;72:9,24,25;
74:21;76:7;77:6,22;
78:7
**back-and-forth (1)**
36:21
**bad (4)**
24:4;37:12;50:20;
51:24
**bad-faith (1)**
35:11
**bait (2)**
59:19;62:9
**balance (3)**
14:2;24:6,7
**balancing (1)**
12:8
**baldly (1)**
10:13
**bankruptcy (33)**
6:18;8:11,16,19,23,
24;9:1,3,20;11:1;

11:9;13:4;14:1;19:13;
26:4,11;47:15;49:13
**clients (17)**
38:6,6;39:14,21;
40:1,10,25;42:15;
43:21;44:1;54:4,5,6,7,
7,8;78:6
**clients' (1)**
46:16
**client's (2)**
21:7;24:19
**clock (4)**
44:20,25,25;51:17
**clocks (1)**
52:21
**closer (1)**
6:9
**closing (1)**
76:4
**cobbling (1)**
42:8
**Code (4)**
8:11;17:25;19:22;
23:1
**coincidence (1)**
11:24
**colleagues (1)**
75:2
**collect (5)**
6:6,15;7:1,4;18:8
**colloquy (1)**
13:3
**comfortable (1)**
61:21
**coming (2)**
62:16;63:9
**comment (1)**
36:20
**comments (1)**
76:4
**commercial (1)**
38:19
**commit (1)**
60:13
**committee (1)**
56:22
**communicated (1)**
41:14
**communications (1)**
52:14
**community (2)**
17:9,13
**Company (15)**
3:18;9:15;21:21;
23:6,19;25:16;32:25;
38:22;39:12;46:8,9,
11,14;47:7;68:21
**company's (1)**
47:2
**compensated (1)**
7:14
**complain (1)**
59:21

**complained (2)**
19:19,20
**complaining (2)**
42:18;67:16
**complaint (6)**
14:24,25;15:5;
16:19;21:2;70:3
**complete (1)**
12:12
**completely (4)**
20:6;58:11;62:3;
64:4
**completion (1)**
43:2
**complex (1)**
38:18
**complicate (1)**
30:2
**comply (1)**
25:7
**component (3)**
10:2,9;14:24
**comport (1)**
15:18
**concede (1)**
9:19
**concern (1)**
6:19
**concerned (1)**
24:18
**concerns (2)**
41:13,15
**conclude (2)**
24:22;78:14
**concluded (1)**
78:16
**conclusion (1)**
25:25
**conditioned (2)**
38:22;39:13
**conditions (1)**
35:11
**conference (2)**
74:1,3
**confirm (1)**
26:19
**confirmed (1)**
23:6
**conflicted (1)**
44:15
**confusion (1)**
20:8
**Congress (1)**
57:25
**consensual (2)**
69:1,3
**consent (1)**
38:1
**consequences (2)**
23:17;25:8
**consider (2)**
74:18;78:4
**consideration (2)**

18:25;76:18
**considered (4)**
7:24;8:1,1;49:17
**considering (1)**
21:15
**consistent (1)**
65:12
**consistently (2)**
17:10,14
**constrained (1)**
70:16
**consultation (1)**
78:6
**contain (1)**
25:1
**contentious (1)**
26:16
**contested (1)**
26:16
**context (1)**
10:23
**continue (4)**
37:13;53:2;65:10;
71:15
**continued (1)**
49:18
**continuing (2)**
6:7;7:6
**control (1)**
4:14
**conversion (3)**
7:3;9:10,10
**converted (1)**
9:12
**convey (1)**
42:22
**Corporation (1)**
3:6
**correctly (2)**
28:25;59:22
**counsel (16)**
3:7;8:19;11:1;
15:10;19:5;30:18,24;
31:5,13;32:1,9;36:4,
10,23;69:6;75:1
**Counsel's (2)**
19:2;20:18
**count (1)**
11:7
**counted (1)**
35:24
**counteroffer (1)**
60:16
**counterparty (2)**
39:20;40:4
**counts (1)**
76:9
**county (1)**
19:20
**couple (2)**
21:16;62:21
**course (6)**
10:19;16:15;26:14;

33:14;40:7;72:17
**Court (248)**
3:3,4,9,12,19,20,23,
25;4:1,4,8,11,22,24;
5:2,5,7,12,15;6:1,3,8,
11,18,22;7:8,13;8:10,
13,16,22;9:4,8,11,14,
18,25;10:7,8,10,11,
13;11:4,5,18,19,21,
22,23;12:7,16,24;
13:1,7,22,23;14:3,5,8,
12,17,20;15:1,4,4,14,
16,19;16:4,7,13,18,
21,21,23;17:5,17;
18:3,5,6,21;19:7,8;
20:2,7,11,17,20,25;
21:2,6,11,13,16,23;
22:10,18;24:17,22;
25:2,4,9;26:1,6,8,15,
21;27:1,4,9,12,21,23;
28:2,4,6,9,13,15,18,
23;29:3,6,11,14,15;
30:8;31:6,16;32:5,6,7,
22,23,25;33:1,4,19,
23;34:4,9,15,20;35:4,
22,24;36:2,12,16;
37:14,23,25;38:8,21,
25;39:2,6,8;40:13;
41:3,19;42:5,13;
43:15,25;44:15,15,24;
45:4,7,9,13,20;46:6,
13,23;47:1,4,5,8,11;
48:4,5,7,7,10,12;49:1,
6,19,23;50:4,15;51:5;
52:1,8,15;53:9,11,14;
55:10,15,22;56:9;
57:8,14,23;58:7,14,
24;59:1;60:3;61:14,
20;63:6;64:20,23;
65:1,7,13;66:10,15;
68:5,8,15,17,19,21,
25;69:5,8,13,18;70:3,
11,14,16;71:5,17;
72:6,6,24;73:7,10;
77:9,13,19;78:13
**Court-approved (1)**
66:22
**courts (3)**
9:19,20;47:4
**Court's (6)**
5:10;7:2;17:3;31:2,
15,21
**COVID (1)**
34:13
**create (1)**
40:18
**creates (1)**
38:12
**credit (2)**
36:16;59:11
**creditors (1)**
56:21
**current (2)**

21:20;64:20
**cut (2)**
59:19;62:9
**cynical (1)**
41:21

**D**

**damage (6)**
9:12;13:21;15:3;
19:9;21:1;57:12
**damages (9)**
14:23;16:15,19,19,
20;19:10;24:11;
54:17;57:13
**Damocles (1)**
70:16
**date (7)**
22:22;40:20;41:22;
59:18;62:4;69:20;
71:7
**day (7)**
40:23;41:21;57:24;
62:1,3;76:14;78:5
**days (13)**
35:24;36:10;49:14;
62:2;66:8;72:3,7,12;
74:17;76:20,21,22;
77:21
**deadline (37)**
10:15;20:14,21;
21:11;35:18,23;36:8,
9;37:1,4,7;40:12;
41:22,23;48:3,4;
59:19;62:1;63:14;
64:7,14,18,21;65:14,
17,19,19;68:18;
69:19;72:16;73:2,15,
20,25;74:6,11;77:5
**deadlines (2)**
23:17;70:25
**deal (13)**
32:19;37:8;39:3;
55:24;58:3;66:7,8,9;
67:24;70:6;72:3,7;
76:19
**dealing (7)**
4:9;6:23;22:4;
36:20;46:14,15;59:15
**deals (1)**
23:9
**dealt (1)**
23:9
**debate (1)**
57:24
**debating (1)**
65:19
**debt (9)**
6:6,15;7:1,2,4;10:8;
24:9;54:6;55:12
**debtor (6)**
6:20;7:20;26:7;
27:8;56:21;63:17

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
84 of 95

**debtors (28)**
3:22;10:12;14:10;
17:2;30:15;31:7,20;
32:4;35:8,12,15;36:4;
37:11;39:6;40:22,24;
41:10,12;43:11,18;
44:11;47:5;67:15,25,
25;70:24;75:9;77:1
**debtor's (3)**
36:4,10,23
**debts (3)**
23:7,9,9
**debt's (1)**
6:4
**decades (1)**
19:18
**December (1)**
48:22
**decide (6)**
16:18,18,22;18:12;
25:15;60:15
**decided (2)**
10:14;19:18
**decides (1)**
26:5
**decision (6)**
22:21;24:17;25:5;
30:17,19;33:13
**decisions (2)**
30:23;31:21
**declaration (2)**
31:25;52:3
**dedicated (3)**
7:21;12:14,21
**dedication (2)**
12:19,19
**deemed (1)**
73:16
**defend (2)**
30:20;57:21
**defenses (1)**
31:23
**defined (2)**
12:20;22:25
**definition (3)**
8:11;22:25;23:3
**delay (3)**
11:6;35:7;46:1
**delaying (1)**
37:13
**deliver (2)**
38:1;39:14;55:19;
56:23
**demonstrate (1)**
37:19
**denial (1)**
31:15
**denied (3)**
24:16;26:8;30:18
**denies (1)**
60:8
**Dennis (1)**
3:5

**deny (2)**
24:8;32:5
**denying (2)**
31:17;33:13
**depart (1)**
66:15
**departure (1)**
67:2
**depending (1)**
57:12
**Depositions (1)**
20:11
**designed (6)**
59:3;62:24;63:14;
66:16;67:4;69:9
**details (2)**
49:20;55:18
**determine (1)**
16:13
**determined (1)**
31:16
**detract (1)**
48:18
**differ (1)**
69:6
**different (4)**
23:20;40:11;41:9;
62:21
**difficult (3)**
46:4,7;55:11
**direct (2)**
25:22;32:5
**directed (1)**
47:14
**directing (1)**
25:2
**directly (1)**
17:25
**directors (1)**
46:21
**disallowance (2)**
8:9;23:25
**disallowed (12)**
5:19;7:2;8:5,8;9:3,
5,9;14:14,17,21;
15:12;16:14
**disappointing (1)**
75:6
**disappointment (1)**
24:20
**discharge (3)**
18:20;23:8;25:8
**discharged (9)**
6:4;9:22;14:18,21;
17:25;18:18;23:7;
24:10;25:10
**disclosing (1)**
52:13
**discovery (4)**
63:18;64:3;65:16;
74:4
**discrete (1)**
16:7

**discretion (2)**
9:20;23:18
**discuss (1)**
35:9
**discussed (3)**
48:7;10,22
**discussion (1)**
41:17
**discussions (7)**
40:17;43:7;44:7;
58:12,12;71:11;78:12
**dismal (1)**
73:19
**dismiss (6)**
25:2,10,19,22;26:8;
32:6
**dismissing (1)**
26:5
**disposing (1)**
33:14
**disputes (1)**
36:5
**disregarded (1)**
32:2
**dissatisfied (1)**
31:2
**distorting (1)**
51:10
**district (2)**
42:13;47:5
**divide (5)**
55:17,18;56:18,22;
58:10
**divvied (1)**
57:17
**docket (3)**
41:23;42:16,25
**dollar (1)**
58:2
**dollars (8)**
54:4,24;55:16;
56:15,21;57:10,18;
75:20
**done (16)**
8:5;12:9,17;13:17;
20:19;23:24,25;
30:10,17;31:13;
38:10;48:18;61:11;
71:14;72:4;77:1
**doubt (1)**
9:4
**down (2)**
32:2;59:1
**driveway (3)**
6:7,16;10:24
**dropped (1)**
40:7
**dropping (1)**
37:9
**ducks (1)**
44:2
**dueling (1)**
7:25

**duked (1)**
22:10
**During (3)**
34:13;53:2;70:22
**dynamics (1)**
58:9

# E

**earlier (7)**
11:15;22:24;23:21;
40:6;42:23;64:13,13
**early (1)**
75:14
**easement (22)**
7:6,14;8:17;9:16,
21;10:1,5;11:20;12:4,
13;15:22,23;16:13,
18;17:20;19:8,11;
20:2;21:6;22:15;24:3,
12
**easements (1)**
11:24
**economic (1)**
7:15
**editing (2)**
36:19,22
**effect (2)**
23:10;30:14
**effective (1)**
71:20
**effort (6)**
25:16;33:16;65:10;
69:1,3;74:21
**efforts (1)**
53:14
**egregious (1)**
30:16
**eighty (1)**
50:24
**either (18)**
11:6;12:3,5;16:21;
19:4;21:1;22:18;
23:13;33:13;42:9;
62:9,14;64:10;65:4;
74:11;76:1,4,13
**Electric (1)**
3:18
**eleven (1)**
62:1
**eligible (1)**
77:25
**else (3)**
18:12;33:3;52:21
**empowered (1)**
20:7
**encouraging (1)**
50:15
**end (13)**
4:14;5:20;14:14;
18:7;22:11;32:4;33:8;
48:16;53:25;54:9;
69:17;72:11;77:23

**ended (5)**
36:9;40:3;41:1,18;
61:17
**enforce (4)**
15:22;60:1,5;61:2
**enforced (1)**
10:9
**enforcement (1)**
25:16
**engage (3)**
13:14;50:11,12
**engaged (2)**
50:23;63:18
**enough (3)**
21:22;36:20;49:15
**entered (3)**
15:1;30:14;31:17
**enters (1)**
71:5
**entire (1)**
20:1
**entirely (2)**
40:11;53:22
**entirety (1)**
60:6
**entitled (3)**
29:25;30:15;60:1
**equate (1)**
31:13
**equities (1)**
12:8
**equity (3)**
37:3;54:6;55:15
**erstwhile (1)**
21:7
**especially (1)**
77:1
**essentially (3)**
19:5;22:22;66:7
**establish (1)**
12:7
**estate (1)**
72:18
**ether (1)**
16:14
**evaluate (1)**
44:23
**even (20)**
6:5;8:8;9:4,16;
10:12;13:4,19;19:3,
25;20:2;21:20;31:21;
35:2;36:23;37:2;
41:16;49:16;57:19;
62:13;66:12
**event (2)**
42:14;74:15
**everybody (1)**
64:14
**Everybody's (1)**
69:22
**evidence (1)**
51:24
**exactly (4)**

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
85 of 95

16:11;33:12;60:4;
61:11
**examination (1)**
23:11
**example (6)**
36:11;54:10,10,12;
57:5;75:1
**except (3)**
18:9;66:21;73:18
**exchange (2)**
37:9;68:13
**exclusive (2)**
42:21;43:10
**excusable (1)**
31:13
**excuse (1)**
49:1
**execute (1)**
38:20
**executed (1)**
38:18
**exemption (1)**
12:4
**existing (1)**
31:24
**exists (2)**
13:20;14:23
**expect (1)**
77:16
**expired (1)**
50:6
**explained (1)**
37:11
**expressed (1)**
30:3
**extend (3)**
65:21;74:15;77:10
**extended (4)**
48:4;64:8,14;72:6
**extension (3)**
37:7;49:13;65:5
**extent (2)**
31:4;46:3

## F

**face (1)**
34:20
**facetious (1)**
62:3
**fact (29)**
10:4;21:23;22:20;
23:4;30:16;31:10,14;
36:19;39:3,4,5;40:2,
23;41:13;43:18;44:7,
9;45:25;48:18;54:14;
58:15,19;61:10;
65:25;66:3;67:1,15;
73:20;75:10
**facts (1)**
4:20
**failed (16)**
30:22;35:9,14,23,

25;36:25;59:8;61:15,
22;66:3,6,17;67:3;
69:5;71:13;73:14
**Failing (2)**
62:18;73:15
**fails (2)**
51:12;67:7
**fair (7)**
11:4,5;19:25;21:22;
32:22;63:25;67:6
**fairness (4)**
10:23;13:16;23:15,
16
**faith (5)**
37:8,12;40:2;51:24;
63:9
**faithful (1)**
37:15
**fall (1)**
74:6
**falling (1)**
65:13
**familiar (6)**
8:10;12:1;22:21,22,
24;25:6
**famous (1)**
52:22
**fan (1)**
35:4
**farce (1)**
37:10
**fashion (1)**
23:12
**fast (1)**
51:6
**fault (2)**
61:22;66:4
**favor (2)**
18:7;47:6
**February (1)**
48:16
**feel (3)**
61:21;74:9;75:22
**fees (1)**
19:10
**feet (1)**
72:21
**fenced (2)**
17:15;19:21
**few (4)**
32:15;44:2;70:1;
77:21
**fewer (1)**
56:16
**fifteen (4)**
5:12;6:17;29:7;
32:10
**fifth (3)**
36:7;37:6;44:11
**fifty (1)**
58:1
**figure (4)**
28:1;54:24;55:16;

56:22
**figures (2)**
61:7,7
**file (7)**
18:14;20:5;31:10,
22;62:10;65:4;73:25
**filed (16)**
14:22;15:6,9,20;
16:16;20:10,10;21:1,
8;30:21;32:3,20;
46:20,25;49:13,16
**filing (3)**
21:4;31:13;78:9
**final (2)**
9:5;13:25
**finality (1)**
17:3
**finally (1)**
35:15
**find (8)**
5:7;8:2,3,3;10:1,2;
31:10;67:13
**finding (3)**
15:3;43:7;50:10
**fine (4)**
7:3;55:24;62:7;
77:13
**finish (1)**
47:21
**fire (4)**
22:17;31:2;72:22;
75:17
**fired (1)**
30:25
**fires (9)**
6:20,24;11:1;21:17,
23;22:2,7,9;54:12
**firm (2)**
21:21;53:19
**firms (2)**
8:20;21:18
**first (22)**
3:7;5:3;6:1,5,14;
7:16;31:18;34:16;
35:19;37:5;47:7;48:3,
9;50:22;60:20;61:6;
63:3;65:3;67:8;69:16;
73:24;74:2
**fish (2)**
59:19;62:9
**fits (1)**
23:3
**Five (10)**
5:14,24;14:5;17:14;
18:22;34:19;38:14;
57:17,20;61:7
**five-year (3)**
20:24;21:10;25:14
**fix (3)**
65:14;74:11;77:22
**focus (1)**
18:12
**focused (1)**

19:2
**focusing (1)**
75:16
**folks (5)**
37:25;50:23;60:15;
62:18;73:23
**follow (1)**
25:19
**Fool's (2)**
41:21;62:3
**forced (6)**
16:8;22:8;68:1,3;
69:19;73:15
**forestall (2)**
6:21;20:15
**form (2)**
24:13,14
**formal (2)**
12:19;15:7
**formally (1)**
13:11
**former (2)**
30:17;31:4
**forms (1)**
13:11
**formula (1)**
57:12
**forth (1)**
33:10
**forum (1)**
22:12
**forward (17)**
13:24;14:3;35:14;
42:3,24;43:5;44:5,9,
18,22;46:1;47:20;
56:6;60:8;63:23;
67:18;72:20
**found (2)**
50:21;61:4
**four (3)**
16:25;41:7;48:9
**FRANCISCO (2)**
3:1;75:1
**Frank (1)**
34:1
**frankly (4)**
7:5;59:12;72:10,14
**fray (1)**
17:6
**free (1)**
76:5
**frivolous (1)**
32:3
**front (4)**
48:4;59:22;64:1;
77:6
**fruit (7)**
44:13;50:16,17;
59:15;61:5,9;70:1
**fully (2)**
8:5;43:1
**fundamental (5)**
10:22;12:1;13:15;

23:15,16
**fundamentally (3)**
11:4,5;19:25
**funds (3)**
55:18;56:2,3
**further (4)**
33:2,3;65:5;76:14
**future (4)**
33:11;43:6;69:23;
74:2

## G

**Gabrielle (1)**
27:6
**gallery (2)**
27:11;44:2
**Gas (1)**
3:18
**gate (1)**
59:23
**Gayle (1)**
3:17
**generally (1)**
77:8
**gentleman's (1)**
19:11
**gets (2)**
47:14;57:17
**given (5)**
31:12;34:10;66:4;
71:6;77:1
**giving (3)**
47:12;57:9,9
**gladly (1)**
5:11
**glass-half-full (1)**
43:25
**goes (5)**
21:3;22:1;43:22;
59:17;65:9
**Good (24)**
3:17,21;26:20;27:6,
14,23;29:12;34:1,4,5,
6,7;35:1,3;37:3,8;
41:11;50:19;53:4;
63:9;71:19;72:18,18,
19
**good- (1)**
40:1
**good-faith (1)**
37:9
**gorilla (1)**
75:15
**go-round (2)**
75:22,23
**gory (1)**
49:20
**gotcha (2)**
53:11;58:24
**Gotshal (1)**
34:8
**Gough (16)**

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
86 of 95

3:13,15,17,17;4:17,
19;11:11;13:12;17:5,
7,23;18:17;22:9;
26:14,25;27:1
**Gough's (1)**
19:12
**governor (2)**
8:20;21:17
**grant (4)**
6:1;11:5;15:14;
17:18
**granted (2)**
15:24;19:4
**granting (1)**
33:13
**Great (4)**
6:12;23:15;51:9;
65:15
**greatly (1)**
14:2
**greeted (1)**
41:23
**ground (2)**
59:13,14
**grounds (1)**
13:16
**group (8)**
41:7;62:5,15,19;
65:18;73:21;74:15;
77:22
**guarantee (2)**
55:25;77:11
**guess (11)**
5:10;11:13;36:22;
41:4;50:15,18,19;
56:12;74:5,7;76:17
**guys (2)**
26:13;54:17

## H

**half (1)**
54:25
**halt (1)**
70:9
**handled (1)**
31:5
**hands (1)**
3:10
**hang- (1)**
77:24
**hanging (3)**
44:12;50:16;70:16
**happen (11)**
10:3;25:5;39:3;
64:17;65:15;67:4;
69:18,21;70:2;73:20;
74:19
**happened (14)**
15:19;22:8;23:5;
37:18;51:13;54:13;
58:13;59:8;62:25;
65:23;66:24;67:6;

68:20;74:10
**happens (4)**
41:22;42:9;43:2;
73:3
**happy (1)**
29:13
**hard (2)**
25:9;32:25
**harms (1)**
14:2
**headphones (1)**
4:2
**heads-up (1)**
5:24
**hear (13)**
3:25;5:4;11:19,20;
20:12,13;27:19,20;
29:4,20;30:5;34:25;
42:6
**heard (7)**
7:24;33:7;51:6,21;
54:14;67:9;71:19
**hearing (13)**
7:6;32:23,23;36:7;
44:12;45:23;51:2,8;
70:5;71:2;72:25;76:1;
78:14
**heavily (1)**
75:8
**heavy (1)**
36:19
**help (1)**
76:10
**helped (1)**
72:14
**helps (1)**
50:14
**Here's (10)**
53:23;54:22;55:16;
56:5,15,21;60:6,8;
67:24;70:17
**he-said- (1)**
66:25
**hey (4)**
7:2;13:21;53:24;
54:15
**high (4)**
38:23;50:10,13,25
**himself (1)**
36:23
**hire (1)**
8:18
**history (2)**
38:18;42:8
**hog (2)**
58:5,7
**hold (6)**
22:7;28:16,16;
67:22;70:22;72:21
**home (4)**
10:23,24;34:12,14
**honestly (1)**
20:23

**Honor (128)**
3:8,17,21;4:23;5:1,
4,14,25;6:2,10;7:5,6,
24,24;8:1,2,3,4,12,14;
10:20;12:12;14:4,9,
19;16:1,10,21,24;
18:17,24,25;21:15;
24:21,25;25:25;26:3,
20,23,24;27:2,6;
29:10,11;30:11,13;
32:4,13;33:18,21;
34:1,6,18;35:2,7;36:1,
6,8;37:3;38:4,17,24;
39:19,24;40:6,19;
41:9,11,25;42:20;
44:4,8,12;45:12;
47:25;48:14,19,22;
49:8,12,15,17;50:7,
21;51:1,20;52:6,17;
53:23;55:23;56:5,25;
57:4;59:24;60:5,18,
25;61:5,11,12;62:20;
63:2,13,21;64:6,9,15;
65:6,24;66:1,3;67:13;
69:11;70:8;71:10,12,
19,22;72:2,4,9,13,21;
76:16,25;77:4,12;
78:15
**Honorable (1)**
3:4
**Honor's (6)**
10:10,18,18;36:24;
42:25;67:14
**hope (4)**
25:15;26:16,17;
63:8
**hoped (1)**
75:9
**hopefully (3)**
77:6,9,16
**horrible (1)**
74:19
**horse (1)**
69:16
**hours (1)**
36:18
**house (2)**
5:8;28:19
**huge (1)**
57:20
**hump (1)**
43:8
**hundreds (1)**
22:16
**hybrid (1)**
66:16
**hypothetical (6)**
15:20;16:11;22:6,7;
39:9;55:16

## I

**icon (2)**

28:7,10
**idea (7)**
9:2,3;43:14;55:23;
57:2;62:22;73:5
**ideas (3)**
41:11;58:21,21
**ignored (1)**
23:4
**imagine (2)**
25:13;38:15
**implemented (1)**
61:16
**imply (1)**
74:6
**important (5)**
23:5;52:19;62:23;
63:1;72:3
**importantly (1)**
15:8
**imposition (3)**
23:17;24:12;35:11
**impossible (1)**
40:5
**inaction (1)**
35:8
**inappropriate (1)**
61:24
**incentivize (1)**
71:7
**incidental (1)**
21:2
**inclined (2)**
59:18;74:14
**include (4)**
5:22;25:3;46:24;
49:1
**includes (2)**
38:19;48:15
**including (4)**
6:24;17:4;22:3,16
**increase (1)**
50:14
**indeed (2)**
10:11;49:20
**indiscernible (5)**
4:3;5:11;45:10;
46:12;77:18
**individual (8)**
39:4,5,7;44:16;
49:10;56:8;70:18,20
**induced (1)**
37:6
**indulgence (1)**
5:10
**information (2)**
19:19;44:22
**initiate (1)**
73:13
**initiated (1)**
51:11
**injunction (3)**
14:13,16;15:15
**instance (1)**

30:13
**instead (1)**
30:22
**instruction (1)**
25:19
**intend (2)**
49:8;75:24
**intentionally (1)**
30:16
**interesting (2)**
7:17;11:21
**Interestingly (1)**
49:15
**interests (1)**
41:5
**interpret (1)**
14:13
**interpretation (1)**
19:22
**interrupt (1)**
8:22
**interviewed (1)**
31:11
**into (23)**
10:25;15:21;16:9;
19:24;22:8,14;26:16;
28:9;37:17;41:16;
43:1,23;52:24,25;
54:18;55:18,20;
66:25;69:16;71:24;
74:1;76:18,23
**invade (1)**
56:11
**investigate (1)**
15:5
**invitation (2)**
13:8;77:20
**invite (1)**
13:3
**involved (1)**
58:3
**irrelevant (1)**
8:23
**issue (17)**
8:24;9:13;11:8,20,
21;14:1;17:9;18:6;
33:12;34:22;38:13;
45:21;52:18,25;
53:23;76:1;78:3
**issues (10)**
4:21;8:23;15:5;
39:25;42:11;43:8;
52:18,19;53:10;75:18

## J

**Jannings (27)**
27:3,14,18,20,22,
25;28:3,5,8,12,14,16,
21;29:2,5,10,15;30:7,
20;31:14,21;32:6,8,
13;33:3,6,18
**Jannings' (1)**

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
87 of 95

30:17
**January (2)**
  35:9;68:2
**job (1)**
  22:5
**join (1)**
  17:5
**joined (1)**
  49:16
**joining (1)**
  5:1
**joint (1)**
  78:8
**joke (1)**
  62:11
**Judge (1)**
  27:22
**judgment (6)**
  7:25;12:22;18:15;
  20:10;44:16,16
**jump (1)**
  66:6
**June (7)**
  64:21,22,23;65:3;
  73:2;74:12,15
**jurisdiction (4)**
  7:6;10:19,20,21

## K

**keep (12)**
  14:5;18:13,18;
  30:11;34:23;45:22,
  23;56:10,10;61:9;
  63:3;70:3
**Keller (3)**
  3:22;14:9;27:7
**kept (1)**
  18:14
**key (1)**
  50:6
**killed (4)**
  64:19;66:19,19,20
**killing (2)**
  59:7,7
**Kim (4)**
  3:22;14:10;27:7,10
**kind (11)**
  9:23;15:3;24:8;
  38:12;40:18;42:2;
  52:20,21;56:19;
  67:16;78:2
**kinds (1)**
  58:22
**knocked (1)**
  44:2
**known (1)**
  51:6
**knows (2)**
  27:12;32:24
**Kramer (1)**
  34:2

## L

**laid (1)**
  43:19
**land (3)**
  9:18;12:14,18
**landlocked (1)**
  17:13
**language (1)**
  25:1
**large (3)**
  19:16;39:25;48:15
**larger (1)**
  45:7
**last (20)**
  6:23;15:17;28:19;
  33:7;36:7;43:18;
  44:10,12;47:15;
  48:19;49:2,2;50:1,7;
  67:21,22;70:1,9;71:1;
  72:25
**lasts (1)**
  47:21
**late (4)**
  10:16,17;54:16,17
**later (1)**
  64:23
**latest (1)**
  65:14
**law (25)**
  7:18,22;8:20;10:15,
  17;11:3,21,22;12:20,
  21;13:18;15:2,18,22;
  18:15;20:1,13,19;
  21:18,20;23:8;25:6,
  17;31:24;64:11
**lawyer (3)**
  31:10;32:2,17
**lawyers (6)**
  25:9;31:11,24;
  32:14,15,21
**learn (2)**
  11:24;25:9
**learned (3)**
  44:10;70:8,24
**leasing (1)**
  19:14
**least (6)**
  14:23;27:16;37:19;
  38:1;62:9;74:14
**leave (4)**
  4:5;24:16;25:20;
  77:4
**leaving (1)**
  42:12
**led (1)**
  30:18
**left (3)**
  58:19;63:23;71:14
**left-hand (1)**
  28:7
**length (1)**

12:7
**lengthy (2)**
  46:4,7
**less (1)**
  56:3
**lesson (1)**
  25:11
**letters (1)**
  67:23
**letting (1)**
  4:7
**level (3)**
  8:16;39:13;50:16
**liabilities (1)**
  11:1
**liability (2)**
  6:19,20
**liberty (1)**
  49:23
**lieu (1)**
  9:21
**life (1)**
  22:1
**lifting (1)**
  36:19
**likely (1)**
  44:7
**Likewise (1)**
  10:20
**limit (1)**
  20:22
**limitations (2)**
  22:23;23:16
**line (10)**
  28:11,23;36:22;
  41:9;47:14,15;49:12;
  59:22,23;66:6
**listed (1)**
  15:10
**listen (2)**
  66:10;72:25
**listened (1)**
  18:6
**listening (2)**
  18:25;33:7
**literally (4)**
  20:9;22:1;75:19;
  78:5
**litigate (2)**
  43:2;68:17
**litigated (1)**
  68:6
**litigating (1)**
  64:3
**litigation (3)**
  38:19;63:18;72:17
**little (10)**
  12:21;13:17;28:6,7,
  10,10,23;36:17;41:3;
  74:17
**lived (2)**
  21:18;34:22
**local (1)**

10:24
**locked (1)**
  43:1
**log (2)**
  4:12,12
**logging (1)**
  4:24
**logistical (3)**
  38:13;39:25;40:19
**long (6)**
  30:14;33:12;36:18;
  57:24;74:8;76:12
**longer (1)**
  46:10
**Look (12)**
  8:15;13:16,18;
  38:15;47:20;50:12,
  21;56:9;60:11;63:8;
  71:18;77:19
**looked (1)**
  50:23
**looking (1)**
  42:15
**lookit (1)**
  56:20
**looks (1)**
  27:18
**lost (1)**
  22:11
**lot (5)**
  17:1;50:3;58:17;
  74:22;75:4
**love (2)**
  4:6;5:9
**low (2)**
  44:12;50:16
**lower (1)**
  28:7
**low-hanging (4)**
  59:15;61:5,9;70:1
**luck (1)**
  18:8

## M

**magnitude (1)**
  75:12
**Maier (13)**
  3:7;14:22;15:1,10;
  16:12;18:7;22:9;23:2,
  21;24:10;25:2,22;
  26:8
**Maier's (1)**
  5:18
**maintaining (1)**
  37:15
**makes (4)**
  29:8;39:12;51:16;
  59:25
**making (3)**
  29:19;49:10;77:15
**man (1)**
  36:19

**mandatory (1)**
  43:23
**many (8)**
  17:23;22:2,3,16;
  25:8,8;56:14;60:17
**MARCH (10)**
  3:1;16:2;17:1;
  35:17;37:4;41:20;
  59:4;65:3;69:19;
  75:19
**matter (29)**
  3:5,7;9:11,25;
  11:19,25;13:8;18:13,
  14;21:23;22:20;23:4;
  24:23;25:12;26:9,17;
  27:3;29:24;33:4,16,
  22;39:4;40:2;41:13;
  42:1;62:6;67:15;
  74:10;75:25
**matters (1)**
  41:16
**may (16)**
  41:25,25;42:11,11,
  24;45:15;46:7;49:15;
  52:3;57:12,13,13;
  60:20,21;65:3;72:24
**maybe (9)**
  5:20;28:25;43:6;
  47:13;50:17;57:18;
  62:1;63:11;67:8
**mean (27)**
  6:14;7:5,16;8:4;
  9:25;11:10,13;12:9;
  25:5,12;26:14;32:23;
  37:18;39:20;41:3,8;
  42:1,18,25;56:20;
  60:6;65:17;18;67:19;
  69:7;70:5;73:24
**means (5)**
  33:6;48:23;50:16;
  62:2;63:16
**mediate (9)**
  37:7;59:6;67:2;
  68:3,13;69:16;72:10;
  73:2;76:20
**mediated (6)**
  42:14;43:14,17;
  71:23;72:4;75:5
**mediation (95)**
  23:14;35:9,12,14,
  23,25;36:9,11,13,13,
  25;37:9,12,16,17;
  39:20;40:2,3,5,8,13,
  15;41:1,6,10;42:10;
  43:9,23,24;51:9,10,
  14,19,21,22;52:24,25;
  53:2,3,7,16,25;54:18;
  55:6,8,21;56:11;
  58:19,23,25;59:9;
  60:21,23;61:15,16,22,
  23;63:3,3,4,8,11;
  65:22,25;66:1,2,3,7,
  16,22;67:2,4;68:2,11,

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page 88 of 95

22;69:2,9;70:22;
71:13,24,24;72:10;
73:3,5,10,13,14,21,
22;74:23;75:7;76:6,
18,20;77:24
**mediator (6)**
38:10;52:5,14;
53:15,15;76:10
**meeting (1)**
48:21
**mentioned (2)**
22:23;49:2
**merely (1)**
21:2
**merits (4)**
7:7;18:3;19:24;
64:1
**merry- (2)**
75:21,22
**merry-go- (2)**
47:16;69:11
**merry-go-round (2)**
43:13;47:19
**met (2)**
31:8;34:21
**metaphor (1)**
24:4
**method (1)**
43:19
**microphone (3)**
6:9;27:15,16
**might (16)**
4:13;11:22;15:24;
20:16;22:17;23:20;
24:1;29:14;31:4;
41:23;61:25;71:20;
74:2,4,17,19
**million (9)**
39:1;54:4,23;55:16;
56:15,21;57:10,17,18
**mindful (1)**
53:14
**minimal (1)**
73:18
**minimum (1)**
38:2
**minimums (1)**
57:25
**minute (4)**
4:12;24:2;27:17;
45:13
**minutes (9)**
5:12,14,23;14:5;
18:22;29:7;32:10;
34:17,19
**miserably (1)**
51:12
**misstatement (1)**
59:14
**mistake (2)**
19:25;64:15
**mistaken (1)**
44:24

**modify (3)**
14:13,15;15:15
**Mohamed (50)**
3:13,14,23,25;4:2,6,
9,24;5:2,4,6,9,13,14,
25;6:5,10,12,25;7:10,
16;8:12,14;9:2,6,9,17,
24;12:6,11,17,25;
13:6,10,23;14:7;
15:20;17:10;18:13,
22,24;21:14,16,22;
25:4;26:1,3,10,18,23
**Mohamed's (1)**
17:19
**moment (1)**
3:10
**monetary (8)**
9:10,12,21,22;10:2,
9;14:24;20:3
**money (10)**
15:23;16:15;18:9;
24:11;46:14,15;54:3,
5;57:2;58:8
**monitor (1)**
61:1
**Montali (2)**
3:5;27:22
**month (3)**
17:1;48:11;77:7
**months (10)**
15:21;48:9,19,20,
24;60:14;61:6;62:1,
17;65:20
**more (24)**
5:19;12:10;13:1;
15:8;16:2,24;21:20;
24:25;30:16;33:9;
44:2,22;46:18;48:20;
54:25;55:1;56:2;
59:18;62:13;67:16;
71:17;74:17,24;76:3
**Moreover (1)**
48:25
**morning (12)**
3:17,21,24;22:4;
27:6,14,23;34:1,4,5,6,
7
**most (3)**
6:23;23:5;59:25
**motion (30)**
5:17;8:7;12:22;
14:12,13;15:20,24;
16:16;18:14;21:9,10;
23:21;24:9,15;26:8;
29:20;31:8,11,13,15,
19;32:3,5;33:13;36:8;
44:11;48:22;51:9;
60:1;77:9
**motions (5)**
7:25;20:9,10;32:24;
74:21
**move (12)**
14:3;35:13;42:3,24;

44:18,22;48:5;67:17,
25;68:1;70:21;71:14
**moved (1)**
44:9
**moving (4)**
43:5;44:5;46:1;
47:23
**much (10)**
5:13;16:2;21:9;
33:15;37:15;39:23;
49:20;59:10;74:24;
75:17
**multiple (1)**
13:12
**multitask (2)**
70:4,12
**must (3)**
12:14;31:8;40:14
**muted (1)**
27:18
**mutually (2)**
42:21;43:10
**myriad (1)**
39:24
**myself (2)**
32:20;67:13

**N**

**navigate (1)**
8:19
**near (1)**
33:11
**nearly (1)**
15:12
**necessarily (1)**
65:16
**necessary (2)**
15:2;27:11
**need (10)**
20:4;27:14,15;
53:25,25;55:18;
63:22,22;71:25;76:21
**needed (3)**
52:9,23;54:18
**needs (2)**
64:5;65:10
**neglect (1)**
31:14
**negotiate (9)**
11:12;38:5;39:22;
40:4,9,10,25;54:19;
71:7
**negotiated (1)**
75:5
**negotiating (5)**
44:14;45:25;67:23;
69:25;70:4
**negotiations (4)**
46:2;58:16;60:9;
62:14
**neighbor (1)**
19:20

**never-ending (2)**
47:16,18
**new (8)**
11:22;34:7,10,20;
35:2;51:17;74:11;
75:2
**next (15)**
6:16;22:3;42:11;
48:24;50:16,25;
60:14;61:17,23;
65:15;73:12;77:7,21;
78:5,5
**night (5)**
43:18;49:2,3;71:1,1
**nine (1)**
58:8
**ninety (3)**
58:1,2,7
**nobody (1)**
60:8
**nondebtors (1)**
47:3
**none (3)**
28:8,9;56:17
**nonexistent (1)**
6:8
**nonfire (1)**
75:3
**nonfrivolous (1)**
31:23
**nonissue (2)**
26:2,11
**nonresponse (1)**
13:8
**nonsecurity (1)**
75:3
**nope (1)**
8:1
**normal (2)**
26:14;33:14
**North (1)**
54:11
**note (4)**
6:1;20:18;27:10;
47:4
**notify (2)**
26:12;78:8
**notion (1)**
59:6
**November (2)**
36:24;68:17
**nowhere (5)**
47:17,19;75:21,22,
23
**nuance (1)**
12:11
**nuanced (7)**
7:17,21;8:15;11:8,
20;12:3,9
**nuisance (1)**
16:20
**number (19)**
19:15;35:18;37:21;

40:1;42:16;48:13;
49:5,9,9,24;50:2,7,14;
53:5;54:11,20;56:16;
71:1;74:22
**numbers (1)**
76:10
**numerous (1)**
31:24

**O**

**Oakland (1)**
32:17
**object (10)**
35:15;37:1;44:20;
62:9,19;64:18;71:6,9;
73:15,21
**objected (1)**
5:18
**objection (35)**
13:7;15:9,9;23:14,
22;30:21;36:7;37:6,7,
10;40:7,11,14;43:12;
44:11;48:1,3;49:13,
16,17;51:18;61:18;
62:10;63:14,16;64:7,
18;65:18;68:7,13,17;
72:5,16;73:18,25;
74:1
**objections (14)**
35:16;41:24;42:15,
25;44:21;47:20;
62:12;64:13;65:4;
71:8,9;73:1;74:12;
75:3
**objectors (3)**
48:15;49:16,18
**obligation (1)**
36:25
**obvious (1)**
42:2
**obviously (10)**
6:19;8:2,15,18;
9:10;10:7;48:15;
51:19;62:12;76:20
**occasion (1)**
11:24
**occurred (3)**
40:3,23;63:11
**occurring (1)**
77:24
**occurs (1)**
74:6
**October (1)**
30:21
**off (11)**
4:5,12;19:21;44:2,
12;59:13,14;67:10;
69:17;70:1;76:7
**offer (9)**
4:16;37:7;39:12;
43:21;50:12;60:21;
61:10;63:4,4

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
89 of 95

**offered (3)**
  11:16;38:22;46:3
**offers (26)**
  43:17,19,20;44:1,6;
  48:9,11,14,20;49:9,
  10,24;50:8,23;56:8;
  60:13;61:6,7;62:5,17;
  67:16,19;69:24;
  70:18,20;71:1
**office (3)**
  5:10;34:13,14
**officers (1)**
  46:21
**oftentimes (1)**
  43:5
**omnibus (1)**
  15:9
**once (2)**
  16:24;43:21
**One (26)**
  3:10;4:9,11,11;
  5:16;6:24;13:1,25;
  16:21,22;24:25;
  30:16;32:24;39:24;
  41:8;48:3;51:6;54:10;
  58:4;61:4;62:22;64:8;
  71:17;74:12;76:16;
  78:6
**one-number (1)**
  60:11
**one-on-one (3)**
  62:5,14;73:21
**ones (2)**
  55:1;73:18
**one-to-one (1)**
  62:14
**ongoing (1)**
  49:18
**only (22)**
  14:17;17:7;18:11;
  22:14;31:22;37:5;
  38:9,15;39:9;44:24;
  46:7,9;47:4,21;53:8;
  54:5,6;57:17;59:14;
  67:19,25;76:22
**oOo- (1)**
  3:2
**open (2)**
  19:13;58:11
**opened (2)**
  19:15;59:23
**opening (1)**
  25:24
**operating (1)**
  68:9
**opinion (2)**
  24:10;35:10
**opportunities (1)**
  17:23
**opportunity (4)**
  29:11;30:20;34:13;
  66:4
**opposed (1)**

  75:8
**opposing (1)**
  32:9
**opposition (2)**
  25:1,21
**optimistic (1)**
  62:13
**option (2)**
  39:18;75:8
**oral (1)**
  24:15
**order (18)**
  3:3;24:13,14;25:1;
  26:8,12;29:6;30:14;
  31:16,18;36:22;37:2;
  49:13;64:17;65:17;
  70:21;71:5;73:24
**orders (1)**
  17:3
**original (3)**
  32:1;51:13;67:5
**others (1)**
  59:11
**Otherwise (1)**
  71:15
**out (51)**
  6:20;11:19;13:11,
  21;18:8;20:13;22:10;
  23:22,23;24:2;28:1;
  37:10;39:24;42:8,17;
  43:11,19;44:1;47:12;
  48:8;49:2,4,24;50:2,8,
  8,9,18,22,22;51:18;
  54:24;55:16;56:19,
  22;58:9;59:17;60:13;
  62:1,5;63:24;65:20;
  68:4;69:24;70:18,20;
  71:10,12,20;74:1;
  75:20
**outcome (2)**
  7:8;26:12
**outline (1)**
  28:24
**outreach (1)**
  50:14
**outset (1)**
  32:8
**over (17)**
  15:16;21:19;24:12;
  43:8;45:10;48:19,23;
  49:7;50:8,24;59:18;
  60:14;68:17;70:5,5,
  16;77:7
**overly (1)**
  30:2
**oversimplified (1)**
  53:18
**overt (1)**
  20:21
**own (2)**
  18:10;31:24
**owner (1)**
  10:24

## P

**Pacific (1)**
  3:18
**page (2)**
  5:18;47:15
**paid (1)**
  53:15
**paint (1)**
  73:19
**papers (10)**
  13:20;29:24;30:9;
  35:8,19;36:6;37:11;
  43:21;45:23;48:18
**Parada (1)**
  4:25
**paragraph (1)**
  25:24
**park (1)**
  18:10
**parked (1)**
  19:18
**part (5)**
  12:18;15:9;16:18;
  19:25;21:3
**participation (1)**
  76:9
**particular (2)**
  43:3;60:10
**particularly (1)**
  42:15
**parties (8)**
  27:2;33:21;45:5;
  48:16;50:2;62:6;65:8;
  69:25
**partner (1)**
  47:13
**party (3)**
  17:2;55:25;66:6
**passed (3)**
  15:12,13;17:1
**past (2)**
  17:24;48:20
**path (1)**
  43:1
**paying (2)**
  54:15,16
**pending (4)**
  6:19;46:11,20,21
**people (31)**
  4:12;17:15;19:14;
  25:7;37:20;38:13;
  41:7;46:24;50:11;
  52:10;55:12,15;56:1,
  3,13,13,14,16,18;
  57:10,17;58:4,8,10;
  61:24;63:8;66:2;
  74:22,23;75:16;77:22
**percent (5)**
  50:24;58:1,2,2,8
**percentage (4)**
  38:2,23;50:11,13

**perfectly (4)**
  54:12;55:24;58:15,
  17
**period (5)**
  20:24;54:8,9;58:13;
  70:23
**person (5)**
  15:10;19:14;29:19;
  57:19;60:23
**persuaded (1)**
  56:12
**PG&E (16)**
  3:5,18;8:7;13:2;
  15:7,9;16:9;21:19,20;
  22:8;8,9;30:21;34:8;
  39:14;54:15;62:8
**PG&E's (2)**
  24:7;75:1
**philosophy (1)**
  22:13
**phone (1)**
  32:14
**pick (2)**
  59:18;62:4
**picked (1)**
  62:2
**picking (2)**
  44:12;70:1
**picture (1)**
  73:19
**piece (2)**
  17:10;36:17
**pitch (7)**
  17:18;29:9;34:24;
  44:20,25;51:17;52:21
**pitch-clock (1)**
  35:3
**place (7)**
  43:22;51:10;67:3;
  69:16;72:14;74:23;
  76:10
**plaintiffs (1)**
  54:21
**plan (12)**
  14:13,16;15:15;
  23:6,9,10;49:10;
  56:21;57:25;64:7,13;
  72:23
**play (1)**
  76:23
**played (2)**
  23:22,23
**players (1)**
  61:8
**pleadings (1)**
  29:13
**please (6)**
  3:12,15;5:14,15,16;
  27:5
**plugged (1)**
  28:25
**plus (3)**
  6:2;28:21;58:1

**point (52)**
  7:17,21;16:7,11;
  17:24,25;18:1,16;
  19:12,21;24:1;30:5,
  23;31:20;33:1;35:2,3;
  37:14;39:8,12,17,18;
  40:6;41:20;42:6,21,
  22;43:11;44:5;45:24;
  46:13,14,18;47:8,9;
  51:16;52:7;56:5,25;
  59:10;60:6;65:8,19;
  68:21,23,25,25;70:7;
  71:8,12;74:2;75:6
**pointed (1)**
  39:24;71:10,12
**pointing (1)**
  12:11
**popping (1)**
  34:23
**portion (4)**
  9:10;29:8,20;34:16
**position (3)**
  11:18;52:12;77:16
**positive (1)**
  77:6
**possible (1)**
  40:11
**pot (9)**
  54:3,5,19,25;55:1;
  56:18;57:2;58:10;
  60:19
**potential (2)**
  45:22;63:8
**potentially (1)**
  13:13
**power (11)**
  6:1,3;8:3,4,16;10:7,
  11,13,18;11:18,22
**powers (1)**
  41:4
**practical (4)**
  40:4;41:19,20;42:1
**practitioner (1)**
  19:8
**precipitated (1)**
  21:25
**precise (1)**
  49:5
**precisely (1)**
  48:18
**preclude (2)**
  44:6;71:10
**predict (1)**
  69:23
**prejudice (8)**
  11:6,7;14:1;18:19;
  20:9,12;25:3;26:9
**prejudiced (1)**
  14:2
**preliminary (1)**
  23:11
**prescriptive (3)**
  7:19;11:23;12:13

Case: 19-30088   Doc# 13786-2   Filed: 05/31/23   Entered: 05/31/23 14:14:57   Page
90 of 95

**presented (1)**
15:5
**preserve (1)**
20:4
**presided (1)**
21:19
**presiding (1)**
3:5
**presumably (2)**
18:5;37:25
**pretextual (2)**
41:15;43:9
**pre-trial (1)**
29:6
**pretty (4)**
11:21;25:7,7;73:19
**prevail (1)**
31:7
**prevailing (1)**
31:12
**preventing (1)**
11:16
**prevents (1)**
51:23
**previous (1)**
31:12
**principles (1)**
12:2
**prior (3)**
21:19;26:7;76:25
**privilege (5)**
37:16;40:14;51:22;
56:12;66:1
**pro (2)**
31:22;32:20
**probably (5)**
4:19;21:19;26:14;
47:21;77:6
**problem (12)**
42:14;46:8;56:18;
57:1,2,11;65:4;70:6,6,
17;75:12,16
**problems (1)**
40:19
**procedural (1)**
77:24
**procedure (19)**
36:13,14;42:8;
53:23;61:10,17,22,23;
62:13;63:24;67:2,4;
68:11;69:9;73:14,14,
25;74:23;75:7
**procedures (39)**
15:8;29:18;35:20,
20;36:4,11,17;37:2;
43:20;48:6;49:11;
51:3;56:6,7;60:1,5,8,
24;61:3,3,12;62:23,
24;63:14,22,23;64:11,
16,19;65:11;67:22;
70:9,21;71:25,25;
72:14,19;76:6;77:17
**proceed (2)**

5:11;13:24
**proceedings (1)**
78:16
**process (42)**
8:16;11:9;13:3;
15:2;18:4;20:14;21:3;
22:19;23:22,22;24:8;
39:7;42:4,18;43:5,22;
46:2,5;55:7;59:12,17;
60:21;61:1,10;62:15;
63:4,4,5,8;64:5,19;
65:9,22;66:16,22;
67:6,18;69:22;70:18,
22;71:15,19
**processes (1)**
44:9
**progress (1)**
77:15
**promise (2)**
52:6;61:11
**promised (1)**
47:24
**promptly (1)**
26:11
**proof (11)**
14:22,23,25;15:3,6,
11;20:3;21:7;31:16,
17;52:10
**proper (2)**
7:23;38:21
**properly (1)**
31:17
**property (6)**
6:16;17:9,12,13;
18:10;21:1
**propose (1)**
43:12
**prosecute (1)**
56:4
**prosecuted (1)**
64:13
**protecting (1)**
40:13
**prove (4)**
17:20;31:8;40:15,
21
**provision (2)**
35:20;38:19
**provisions (1)**
36:5
**public (10)**
7:19,21;9:18;12:4,
13,15;17:11;19:13,16,
23
**pull (1)**
51:6
**punitive (2)**
16:19;19:10
**purpose (1)**
12:15
**pushed (3)**
68:24;70:25;71:3
**put (14)**

9:18;23:10;35:8,16;
43:13,23;44:20;52:2;
61:25;64:7;70:8,22;
72:14;74:23
**putting (2)**
20:3;67:22

## Q

**quickly (1)**
76:8
**quite (5)**
20:23;32:15;72:10,
13;74:5
**quote (2)**
52:22;59:15

## R

**raise (1)**
45:21
**raised (2)**
43:9;52:24
**raising (1)**
58:21
**rare (2)**
11:24;12:10
**rather (4)**
27:24;36:13;62:1;
77:24
**read (1)**
29:15
**reading (1)**
36:5
**ready (3)**
45:3,5,6
**Reagan (1)**
52:23
**real (2)**
54:17;71:5
**realistic (1)**
59:20
**realistically (1)**
42:9
**realize (1)**
11:23
**really (14)**
12:25;20:8;23:18;
32:12;43:13;51:23;
56:25;57:11;59:1;
62:23;63:1;72:2;
76:24;77:5
**reason (9)**
19:19;20:23;21:9;
32:18;46:1;52:3;53:4,
8;71:19
**reasons (4)**
24:14;31:18;37:3;
69:5
**recall (3)**
25:21;49:19,19
**recalling (1)**
44:10

**received (1)**
15:8
**recently (2)**
11:25;36:24
**recognize (1)**
77:17
**reconsider (1)**
76:25
**reconsideration (1)**
31:19
**record (3)**
24:12,15;35:16
**recount (1)**
36:6
**recovery (2)**
9:21,22
**red (2)**
28:11,23
**redo (1)**
30:25
**reducing (1)**
64:7
**refer (1)**
35:19
**reference (2)**
44:8;45:23
**referred (1)**
21:17
**referring (1)**
40:19
**reflect (2)**
74:18;76:13
**reframe (1)**
9:14
**refresh (1)**
64:20
**regard (1)**
74:20
**regarding (1)**
31:5
**reheard (1)**
31:3
**reinstated (1)**
8:18
**release (1)**
24:16
**releases (7)**
54:1,21;55:4,17,19;
56:23;57:3
**reliability (1)**
17:3
**relief (14)**
6:2;8:13;11:5,15;
14:12;15:3,14,20;
16:16;17:18;19:3;
20:21;24:9;26:4
**relitigating (1)**
18:18
**rely (3)**
17:3;30:15;31:21
**remain (2)**
52:17;77:5
**remaining (1)**

14:15
**remark (1)**
35:2
**remedy (2)**
9:1;23:2
**remember (6)**
47:16;49:15,21;
50:2;66:8;75:14
**reminds (2)**
52:20,22
**rendered (1)**
40:5
**renege (1)**
72:11
**reneging (2)**
66:12;72:7
**renegotiate (2)**
66:7;76:5
**reopening (1)**
18:18
**reorganized (4)**
3:22;14:10;26:7;
27:7
**repeat (2)**
56:10;77:19
**repeating (2)**
56:10,11
**rephrase (1)**
61:14
**reply (5)**
5:13,24;14:6;31:15;
47:15
**report (3)**
61:1;65:9;77:7
**represent (10)**
19:7;20:25;39:4,5,
21;41:5;46:17;53:20;
55:5;60:10
**representation (3)**
38:3,5;39:22
**representatives (1)**
53:21
**represented (2)**
3:18;8:20
**representing (3)**
21:21;39:25;41:10
**request (2)**
32:5;37:6
**requests (1)**
26:7
**require (2)**
55:20;60:24
**required (1)**
15:4
**requirement (1)**
70:21
**requires (2)**
25:17;37:3
**requisite (2)**
38:2;78:1
**reserve (2)**
5:13;29:8,20;30:7;
34:16;45:15;47:11

reserved (1)
34:19
resisting (1)
69:10
resolution (8)
13:4;15:2;39:7;
42:4,24;44:6;46:1;
71:14
resolve (12)
13:8;15:7;42:3,11,
23;53:1,2,6;60:17;
61:2;65:11;74:4
resolved (7)
22:19;49:14;53:12;
60:20;63:10,25;71:16
resolving (4)
13:13;44:19;46:19;
47:6
respect (2)
60:22;71:20
respectfully (1)
32:5
respects (1)
62:21
respond (3)
13:4;25:18;30:1
responded (1)
36:24
responding (1)
13:11
response (9)
10:12;15:8,11;
23:13,25;33:10;
36:10,23;77:2
restaurant (1)
10:24
result (2)
40:4;42:24
resume (1)
15:16
resumption (2)
76:6;78:7
retained (3)
38:6,7;40:25
reversing (1)
31:15
review (1)
25:14
revisit (1)
24:17
revive (1)
31:7
Richard (1)
34:7
right (98)
3:9,12,20;4:4,22,
23;6:7,16;7:14;8:13;
9:9,16,17,23;10:5,18;
16:4;17:5;18:15,16;
25:5;26:9,21;27:4;
28:20;29:6,9;30:24;
31:20;33:4,23;34:15;
35:5,6,22,25;36:2;

37:1,20,22;38:6,8,11,
13,14,15;39:1,2,25;
42:2,7,9,20,21,23;
43:3,6,14;44:3,13;
45:2,3,4,8;46:9,13,20,
23,23;47:1,6;48:12;
49:6,7;50:20;52:17,
24;55:14;57:14;
61:18;63:6;67:15;
68:5,24;69:12,13,16;
70:10,13,19;71:2,11;
72:8,13;76:6,21;
78:10,13
rights (7)
8:17;12:13;15:22;
19:6;20:5,15;21:1
risk (1)
42:1
RKS (5)
33:22;34:2;37:5;
47:16;48:17
road (1)
75:21
robust (1)
74:24
Rolnick (1)
34:2
Ronald (1)
52:23
room (3)
37:25;38:10,13
round (5)
47:17;59:8;67:8,8;
69:12
rounds (2)
65:15,15
rule (5)
31:1,8,22;32:20;
51:18
ruled (4)
7:9,10,13;18:6
rules (4)
34:11;35:3;56:14;
57:24
ruling (8)
31:2;33:7,8;76:2,
25;78:2,3,9
rung (1)
24:5
running (1)
51:18
runs (2)
9:11;21:12
Rupp (27)
3:16,20,21,21;4:18,
19,23;14:8,9,9,19,21;
16:1,6,10,24;24:13,
21,24,25;25:21,24;
26:6,12,18,20,24

S

Sadighi (1)

34:2
safe (1)
17:12
same (6)
17:17;32:10;54:16;
62:19;63:18;65:4
SAN (2)
3:1;75:1
sat (1)
48:6
satisfaction (2)
40:22;52:9
satisfied (3)
7:5;41:12,12
satisfy (4)
5:17;19:22;40:24;
41:14
saw (1)
50:2
saying (20)
7:2;13:21;38:19;
42:23;51:23;61:22;
62:17;63:3;64:9,10;
66:12,19;67:5,14;
69:8;70:15;71:5,22;
73:11;74:8
scared (1)
60:7
schedule (2)
48:8,21
screen (3)
28:7;38:14,16
screw (1)
69:21
se (2)
31:22;32:20
second (4)
59:8;63:2;67:7;
76:16
secretly (1)
44:14
Section (1)
23:1
securities (12)
46:17;54:11;60:1,5,
7,24;61:2,3;64:11,16;
75:15,20
security (1)
74:25
seeing (1)
45:23
seek (4)
8:8,17;25:13;26:4
seeking (5)
6:6,6,15,15,21;7:1,
4;15:23,23
seem (3)
9:19;15:18;74:6
seemed (1)
41:8
seems (8)
34:23,23;56:17;
59:16;61:24;62:4,8;

66:5
select (1)
41:6
send (5)
11:19;32:14;48:8;
69:24;70:20
sending (2)
10:8;70:18
sense (4)
15:17;16:17;59:25;
77:18
sent (4)
13:11;22:18;43:18;
50:9
separate (1)
9:13
seriously (1)
51:2
serve (1)
24:13
served (1)
15:10
serves (2)
17:9,13
service (1)
15:11
session (1)
3:4
set (5)
8:9;33:10;37:4;
40:12;71:20
sets (1)
19:17
setting (3)
18:19;37:2;39:7
settle (7)
39:15;47:3;48:6;
56:13,13;62:25;64:4
settled (1)
22:3
settlement (8)
38:17,20;44:6;
45:22;46:3;57:20;
71:10;72:18
settlements (2)
43:7;51:3
several (4)
3:10;43:16,19,20
shall (1)
10:9
share (1)
32:22
she-said (1)
67:1
shooting (1)
44:2
shorten (1)
66:13
short-term (1)
77:22
show (3)
28:10;39:20;40:8
showed (2)

40:15;46:19
shred (1)
64:8
shut (1)
67:10
side (5)
11:6;13:2;28:7;
29:21;32:24
sidelines (1)
17:6
sides (5)
18:6,25;61:21;69:1,
4
sign (1)
56:14
significant (2)
61:7,8
silly (2)
39:9;41:3
simple (2)
26:15;74:8
simply (5)
10:6,13;12:20;
22:12;23:19
single (4)
13:20;32:2;55:25;
64:11
sit (5)
17:6;41:7;63:20;
74:12;76:12
sitting (1)
75:20
situation (4)
8:19;23:20;35:6;
52:22
situations (1)
20:7
six (1)
61:6
sixty (2)
35:24;36:10
sixty-day (2)
35:21;37:1
skip (1)
29:3
sky (2)
65:13;74:5
SLACK (61)
27:10;34:5,6,7,12,
21;36:16;42:6;45:16;
47:12,25;48:13;49:4,
7,22;50:1,5,21;51:5,
20;52:2,12,16;53:10,
12,22;55:14,20,23;
56:24;57:9,15;58:6,
11,15,25;59:16,24;
60:4;61:19;62:20;
63:7;64:22,25;65:6,8,
13,24;66:11;68:10;
69:8,21;71:17,18;
73:1;75:13;76:16;
77:11,14,21;78:11
Slack's (1)

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
92 of 95

47:11
**slaving (1)**
36:18
**small (1)**
71:1
**solution (2)**
28:25;42:14
**solve (2)**
46:7;58:18
**solves (1)**
42:13
**somebody (3)**
51:24;57:16;75:11
**somehow (3)**
10:2;25:6;33:13
**someone (4)**
9:20;11:2;19:19;
20:15
**sometime (2)**
33:11;74:1
**Sometimes (3)**
43:2;73:6,6
**somewhat (1)**
52:13
**somewhere (1)**
18:12
**sooner (2)**
21:9;69:20
**sophisticated (4)**
8:18;10:25;20:16;
48:16
**sorry (6)**
24:19;45:11,18;
56:25;73:9,9
**sort (5)**
7:17;51:9;57:5;
62:15;76:1
**sought (1)**
23:2
**sound (2)**
12:9;29:16
**sounds (2)**
12:10;41:3
**speak (6)**
11:10;13:12;29:13;
32:24;53:20;77:25
**speaker (1)**
29:12
**speaking (1)**
29:17
**specifically (2)**
12:12;48:10
**speculating (2)**
54:14,16
**speculators (1)**
55:12
**speech (1)**
75:24
**spend (1)**
70:17
**spending (1)**
46:15
**spends (1)**

46:14
**spent (5)**
6:22;44:13;59:10;
67:21,22
**spoke (1)**
31:24
**spurs (1)**
43:6
**Stack (1)**
56:9
**standard (1)**
31:8
**standing (1)**
45:6
**stands (2)**
14:2;33:16
**start (8)**
4:19;33:23;44:19;
51:17;59:17;64:2;
72:16;78:11
**starting (1)**
35:1,3;75:22
**state (27)**
3:19;6:17;7:17,22;
8:21;9:11,20;10:8;
11:19,20;12:20;
15:15,22;16:13,18,21;
19:8;20:2,11;21:6,11;
22:18;25:2,9;26:15;
27:4;32:6
**stated (3)**
24:14;26:13;31:18
**stating (2)**
35:20;42:2
**status (3)**
74:1,3;77:7
**statute (2)**
22:23;23:16
**statutory (2)**
20:21;23:17
**stay (9)**
14:12;15:15,21;
16:16;17:19;19:3;
22:21;24:9,16
**stayed (1)**
47:6
**step (2)**
42:11;61:24
**stick (2)**
66:22;72:23
**still (14)**
13:24;22:4;24:2;
31:8,22;32:23;36:20;
53:17;56:12;57:20,
21;60:12;62:14;73:21
**stipulation (1)**
26:15
**stop (2)**
16:22;18:1
**story (1)**
5:20
**strategy (1)**
51:15

strikes (2)
5:20;15:17
**strongest (1)**
51:21
**strongly (1)**
74:9
**struck (1)**
75:6
**styled (1)**
14:12
**subcommittee (1)**
53:20
**subgroup (1)**
62:6
**submissions (1)**
29:16
**submit (5)**
13:17;21:15;30:9;
32:11;44:18
**submitted (6)**
10:19,19,21;15:1;
29:24;33:17
**substance (2)**
11:2;41:17
**substantial (1)**
48:13
**substantive (2)**
42:10;77:24
**substation (9)**
12:19;17:8,9,12,16;
18:2;19:12,13,15
**substitute (1)**
44:16
**succeeds (2)**
10:1,3
**successful (5)**
62:7,8;63:12;73:6;
76:20
**sudden (1)**
63:17
**suddenly (1)**
43:7
**sufficient (1)**
41:14
**suggest (1)**
59:4
**suggesting (1)**
61:20
**suggestion (6)**
17:19;51:17;53:18;
59:20;61:25;74:16
**summary (4)**
7:25;12:22;18:15;
20:10
**summon (1)**
76:1
**superior (2)**
18:5;22:10
**supervisor (1)**
19:20
**supplement (1)**
75:7
**support (1)**

66:9
**supports (1)**
31:15
**suppose (2)**
9:25;10:3
**supposed (2)**
47:24;75:7
**sure (9)**
4:3,18;23:18;44:4;
54:1;55:3;61:19;
65:24;72:4
**survive (1)**
23:11
**sustain (1)**
24:7
**sustained (1)**
13:7
**swept (2)**
21:7;22:14
**swing (2)**
19:17;45:1
**swings (1)**
19:17
**sword (1)**
70:16

**T**

**table (3)**
41:7;68:3;77:23
**tactical (1)**
30:17
**tactics (1)**
30:23
**talk (5)**
26:10;48:2;53:6;
55:8;58:20
**talked (6)**
32:15,17;34:21;
52:16;72:22;74:3
**talking (5)**
52:5,21;53:3;58:22;
61:9
**technical (1)**
20:14
**Technology (1)**
6:12
**teenager (3)**
5:8;28:19,20
**telling (1)**
25:12
**ten (4)**
5:23;57:6,6;58:4
**term (2)**
23:15;47:21
**terminated (6)**
30:24;52:3;53:3,7,
12,16
**terminating (1)**
58:25
**termination (1)**
36:11
**terms (5)**

7:15;10:15;13:10;
15:14;18:11
**texts (1)**
32:15
**theory (1)**
15:22
**therefore (2)**
23:3,6
**there'll (1)**
74:1
**thing's (1)**
65:15
**third (1)**
5:17
**thirteen (2)**
62:2;74:16
**Thomas (2)**
3:21;14:9
**thoroughly (1)**
30:4
**though (7)**
31:21;37:2;49:17;
53:17;57:16;66:12;
76:17
**thought (5)**
33:9;37:8;40:8;
74:23;76:3
**thoughts (1)**
45:16
**thousands (3)**
22:1;63:19;67:16
**three (8)**
21:18;34:21,22;
41:7;48:1;53:21;
65:20;78:5
**throughout (1)**
64:5
**throw (2)**
24:2;59:2
**till (1)**
59:4
**timely (1)**
23:13
**times (2)**
13:12;21:16
**timetable (2)**
51:13;69:9
**tiny (1)**
71:2
**tire (1)**
19:17
**today (3)**
16:25,25;35:9
**told (7)**
40:8,21,23;44:15,
15;52:7;63:21
**took (1)**
4:16
**topics (1)**
48:1
**tossed (1)**
8:24
**totally (1)**

Case: 19-30088    Doc# 13786-2    Filed: 05/31/23    Entered: 05/31/23 14:14:57    Page
93 of 95

70:22
**touches (1)**
48:2
**towel (1)**
59:2
**tragic (1)**
21:25
**transcript (1)**
72:25
**transparent (1)**
20:6
**transpired (1)**
15:16
**tree (1)**
50:17
**trial (1)**
21:11
**trials (1)**
47:22
**tried (3)**
13:17,18;75:4
**trigger (1)**
36:25
**trite (1)**
42:2
**Trojan (1)**
69:16
**trouble (1)**
29:17
**troubled (2)**
66:1;75:10
**troubles (2)**
51:8,15
**true (7)**
6:22,22;26:6;42:19;
51:22;52:9;65:16
**trust (3)**
52:23;55:4,5
**try (14)**
4:2,13,15;5:2;13:8;
17:20;47:20;53:6;
60:11,12;62:11;69:1;
76:8;78:7
**trying (11)**
8:17;18:1;27:25;
30:14;32:25;42:22;
44:5;55:8;59:22;
68:10;74:4
**TUESDAY (1)**
3:1
**turn (11)**
4:4,6,7,14;5:8;
26:16;27:14,23,25;
28:1,20
**turned (3)**
32:2;37:10;68:4
**turns (1)**
69:15
**twelve (1)**
47:21
**twenty (3)**
6:17;34:16,19
**two (28)**

6:23;15:12,17,21;
23:5;38:9;39:9,10;
41:7;42:8;47:4,24;
48:20,24;53:21;
56:13;59:3,13;60:14;
61:6;62:1,17;69:5;
70:19;74:21,24;77:7;
78:5
**two-step (1)**
24:8
**two-thirds (2)**
44:13;58:1
**types (1)**
58:16
**typical (1)**
56:20
**typically (1)**
29:19

# U

**ultimately (1)**
41:16
**Um-hum (2)**
43:15;60:3
**unable (1)**
41:15
**unacted (1)**
74:12
**unattended (1)**
23:23
**unauthorized (1)**
45:22
**unbeatable (1)**
35:11
**under (16)**
11:20;12:20;15:2,
22,22;29:6,18;31:22;
33:5;49:11;68:9;
74:10,18;75:25;76:6;
77:23
**underlying (3)**
4:20;8:25;21:6
**Understood (4)**
18:21;20:4;21:8;
55:3
**underwriters (1)**
46:22
**undo (1)**
30:14
**unfair (1)**
15:17
**unforgiving (2)**
22:23;25:7
**unfortunately (1)**
5:10
**uniform (3)**
34:9;63:14;64:5
**unless (3)**
57:5;72:7;76:13
**unopposed (1)**
22:2
**unrelated (1)**

11:25
**unring (1)**
24:3
**unringing (1)**
24:4
**unsuccessful (4)**
35:10;73:3,11;
76:23
**unsuccessfully (1)**
36:9
**unusual (1)**
12:10
**up (39)**
3:11;6:18;10:25;
14:11,22;18:22,23;
21:7;22:14;23:10;
32:10;34:10,23;39:7,
20;40:8,15;41:11,18;
42:19;46:3,19;50:17,
18;55:18;56:14,18,
22;57:17;58:10;59:2,
23;64:16;69:17,21;
76:11;77:22,23,25
**upon (5)**
13:7;22:21;38:22;
39:13;74:13
**urge (2)**
25:11;78:4
**urging (1)**
47:5
**use (12)**
6:7,16;7:22;10:5;
17:12;18:22;48:5;
55:16;59:15;65:10;
69:25;75:21
**used (3)**
10:25;12:18;19:16
**using (5)**
6:17;37:12;47:3;
51:3;66:6
**usual (1)**
34:9
**usurp (1)**
18:1
**utilities (1)**
12:13
**utility (6)**
7:19,21;9:18;12:4;
60:20,21
**utterly (1)**
35:10

# V

**variation (1)**
68:22
**variations (1)**
75:4
**various (1)**
6:20
**vehicles (1)**
19:18
**verify (1)**

52:23
**version (1)**
66:17
**victims (1)**
75:17
**video (1)**
4:7
**view (9)**
41:15,20;43:9,10;
51:16;59:10;66:18;
73:1;75:7
**views (1)**
67:10
**vindicate (1)**
6:15
**virtue (1)**
12:18
**voice (1)**
6:8
**voluntarily (3)**
25:12,19;26:19
**vote (1)**
76:9

# W

**wait (6)**
4:12,13;24:1;29:1;
30:5;32:9
**waiting (2)**
42:6;43:16
**wants (5)**
26:4;27:13;29:23,
25;66:6
**warned (1)**
40:14
**warranted (1)**
31:23
**waste (1)**
65:22
**watched (1)**
74:25
**way (30)**
4:10;15:24;16:1;
25:9,13;26:17;30:21;
31:5;37:12;41:8;42:3,
7,23;44:19;46:16;
47:23,24;48:24;
49:23;54:16;57:11;
60:17;61:2;63:2,25;
66:21;72:13,21;74:8;
75:9
**ways (6)**
39:1,13,24;43:7;
53:6;58:17
**week (1)**
65:3
**weigh (2)**
11:2;44:23
**weighing (1)**
19:1
**Weil (1)**
34:7

**welcome (3)**
29:18;33:19;78:1
**weren't (1)**
13:14;53:10;54:22,
22
**what's (9)**
12:3;14:11;37:21;
54:13;55:10;63:25;
64:17;69:18,18
**Whereupon (1)**
78:16
**whole (5)**
42:12;59:17;62:22;
69:21;76:9
**who's (6)**
29:19;54:24;57:19;
60:23;61:22;77:25
**wide (1)**
8:16
**wildfire (1)**
22:17
**wildfires (1)**
21:24
**willing (14)**
26:1,19;52:17,25;
53:1,6;54:22,23;
58:16,17,20;60:11;
62:18;76:8
**win (2)**
17:21;18:15
**winning (1)**
17:21
**wiped (1)**
13:21
**wish (10)**
4:5;5:23;18:23;
23:24;27:15;29:17;
30:4,10;32:11;67:5
**wishes (2)**
24:17;29:20
**withdraw (3)**
25:12;37:6;68:12
**withdrawn (1)**
40:11
**withdrew (2)**
49:17;73:1
**withhold (1)**
78:2
**without (7)**
52:13;53:3;61:22;
71:23;73:11,18;77:9
**won (1)**
22:10
**wonderful (1)**
6:13
**wondering (1)**
65:21
**word (2)**
22:25;75:21
**words (3)**
17:19;18:4;51:21
**work (18)**
4:13;20:13;41:10;

Case: 19-30088     Doc# 13786-2     Filed: 05/31/23     Entered: 05/31/23 14:14:57     Page
94 of 95

52:17;53:1,2;55:7;
58:9,20;61:4,13;62:6,
15;63:24;66:4;72:15;
75:10;76:7
**workable (2)**
39:11;62:21
**workaround (1)**
5:21
**worked (2)**
40:1;75:9
**working (5)**
4:7;34:14;41:6;
56:19;59:11
**works (2)**
5:3;57:11
**world (1)**
54:13
**worse (1)**
69:17
**wrapped (3)**
6:18;10:25;50:17
**writing (1)**
67:23
**writings (1)**
30:4
**written (2)**
33:12;41:4

**Y**

**year (6)**
44:14;48:9;67:21,
22;70:9,19
**years (25)**
6:17,23;10:25;
15:13,17;16:25;
17:14;19:15;21:18;
34:22,22;35:7;43:16;
44:8,11;47:21,24;
51:5;59:3,13;67:18,
24;70:2,19;74:24
**yesterday (1)**
49:5
**yield (1)**
41:5
**York (2)**
34:7;75:2
**you're-right-he's-right (1)**
67:1

**Z**

**zone (1)**
52:4
**Zoom (2)**
38:14,16

**1**

**1,200 (1)**
50:22
**1,300 (1)**
48:23

**1,700 (4)**
48:21;49:7,24;
50:18
**10:00 (1)**
3:1
**100,000 (1)**
57:10
**1007 (2)**
18:1;19:22
**101 (1)**
23:1
**11:46 (1)**
78:16
**17 (1)**
21:24
**18 (1)**
21:24
**180 (9)**
49:14;66:8,9;72:3,
6,12;76:19,21,22

**2**

**20 (2)**
35:17;37:4
**2015 (1)**
21:24
**2018 (1)**
17:11
**2019 (2)**
16:2;17:1
**2021 (1)**
30:21
**2022 (1)**
44:14
**2023 (2)**
3:1;75:19
**20s (1)**
12:23
**20th (3)**
41:20;59:4;69:19
**280 (1)**
50:20

**3**

**3,000 (1)**
48:8
**30s (1)**
12:23
**30th (5)**
64:21,23;73:2;
74:12,15

**5**

**50,000 (1)**
57:13
**500 (2)**
50:8,18
**500,000 (1)**
57:13
**500,000-dolalr (1)**

57:21
**500,000-dollar (1)**
57:19

**6**

**60 (1)**
31:9
**600 (4)**
39:14,15;56:16,17
**60b (1)**
32:20
**610 (1)**
56:16
**620 (1)**
56:16
**699 (28)**
37:20,21,22,23,25;
38:1,12,23;39:4,5,10;
40:16;41:4,6,24;
42:16,25;46:17;
47:20,22;52:10;
53:18;56:13;59:19;
61:24;62:11,18;73:22
**699-plus (1)**
38:15

**7**

**7 (1)**
3:1
**700 (4)**
57:7;60:14;63:17;
64:3
**750 (1)**
48:11

**8**

**800-pound (1)**
75:15

**9**

**9011 (1)**
31:22