**WEIL, GOTSHAL & MANGES LLP**
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel:    (212) 310-8000
Fax:    (212) 310-8007

**KELLER BENVENUTTI KIM LLP**
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
Gabrielle L. Albert (#190895)
(galbert@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: (415) 496-6723
Fax: (650) 636 9251

*Attorneys for the Debtors and Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *ALL PAPERS SHALL BE FILED IN THE LEAD CASE, NO. 19-30088 (DM).* | Case No. 19-30088 (DM) (Lead Case)<br>(Jointly Administered)<br><br>**CORRECTED[1] REORGANIZED DEBTORS' OMNIBUS REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY OF AN ORDER FURTHER EXTENDING DEADLINE FOR THE REORGANIZED DEBTORS TO OBJECT TO CLAIMS AND FOR RELATED RELIEF**<br><br>**[Related to Docket No. 13745]**<br><br>Date:   June 7, 2023<br>Time: 10:00 a.m. (Pacific Time)<br>Place:  **(Videoconference Only)**<br>      United States Bankruptcy Court<br>      Courtroom 17, 16th Floor<br>      San Francisco, CA 94102 |

---

[1] This version is identical to the version filed at Dkt. No. 13809, except that page references in the Table of Contents have been corrected.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................1

ARGUMENT ..........................................................................................4

I.      THE SIXTH EXTENSION REQUEST WILL ALLOW THE REORGANIZED
        DEBTORS TO CONTINUE THE SUBSTANTIAL PROGRESS ACHIEVED IN
        RESOLVING SECURITIES CLAIMS ........................................4

II.     THE OBJECTIONS ARE WITHOUT MERIT AND SHOULD BE OVERRULED .......7

        A.      The RKS Claimants' Proposal Would Deprive the Reorganized Debtors and
                Other Securities Claimants of the Benefits of the Securities Procedures and
                Reward RKS' Attempt to Avoid Them. ....................................7

                1.      The Alternative Process Proposed by the RKS Claimants Would
                        Upend the Securities Procedures and Prejudice the Reorganized
                        Debtors and Remaining Securities Claimants.............................7

                2.      RKS Should not be Rewarded for Its Refusal to Participate in the
                        Securities Procedures ..........................................9

        B.      PERA's Due Process Arguments Are Without Merit............................11

                1.      The Merits Litigation Procedures Do Not Violate Due Process...............11

                2.      The Rubenstein Declaration Does Not Support PERA's Argument and
                        Should be Stricken ..........................................14

                3.      The Merits Litigation Procedures Maximize Flexibility ..........................15

        C.      The Merits Litigation Procedures Provide the Most Efficient and Equitable
                First Steps in Litigating the Securities Claims......................................16

                1.      Federal Civil Pleading Requirements Apply to the Securities Proofs of
                        Claim..............................................17

                2.      The Merits Litigation Procedures Provide the Opportunity for all
                        Securities Claimants to Meet the Requisite Pleading Standards ...............19

                3.      A Stay of Discovery Must Continue..........................................21

CONCLUSION………………………………………………………………..22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbe v. City of San Diego, Cal.*,
    444 F. App'x 189 (9th Cir. 2011) ................................................................12

*In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*,
    720 F. Supp. 1505 (D. Colo. 1989), *rev'd sub nom. Johnson v. Cont'l Airlines*
    *Corp.*, 964 F.2d 1059 (10th Cir. 1992) ................................................................15

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    193 F.3d 415 (6th Cir. 1999) ................................................................15

*California v. Texas*,
    459 U.S. 1096 (1983) ................................................................12

*In re DJK Residential LLC*,
    416 B.R. 100 (Bankr. S.D.N.Y. 2009) ................................................................18

*Doherty v. Bress*,
    262 F.2d 20 (D.C. Cir. 1958) ................................................................15

*Gordon v. E. Air Lines, Inc.* (*In re Air Crash Disaster at Fla. Everglades on Dec. 29,*
    *1972*),
    549 F.2d 1006 (5th Cir. 1977) ................................................................15

*McQuillion v. Schwarzenegger*,
    369 F.3d 1091 (9th Cir. 2004) ................................................................14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................19

*Pub. Emps. Ret. Ass'n of N.M. v. PG&E Corp. (In re PG&E Corp.)*,
    No. 21-16507, 2023 WL 3478411 (9th Cir. May 16, 2023) ................................................................14

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004) ................................................................19

*Reed v. Carecentric Nat'l, LLC (In re Soporex Inc.)*,
    446 B.R. 750 (Bankr. N.D. Tex. 2011) ................................................................18

*In re Residential Cap., LLC*,
    518 B.R. 720 (Bankr. S.D.N.Y. 2014) ................................................................18

*Romero v. Allstate Ins. Co.*,
    52 F. Supp. 3d 715 (E.D. Pa. 2014) ................................................................14

ii

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ................................................................12, 15

*United States v. Cnty. of Maricopa, Ariz.,*
    889 F.3d 648 (9th Cir. 2018) ...............................................12

*United States v. Tamman,*
    782 F.3d 543 (9th Cir. 2015) ...............................................14

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ...........................................................19

15 U.S.C. § 78u-4(b)(3)(B) ...........................................................21

**Other Authorities**

Fed. R. Bankr. P. 2004 ...................................................................19

Fed. R. Bankr. P. 3001(f) ..............................................................18

Fed. R. Bankr. P. 7023 ...................................................................16

Fed. R. Civ. P. 8 .............................................................................18

Fed. R. Civ. P. 9 .............................................................................18

Fed. R. Civ. P. 12(b)(6) .................................................................18

Fed. R. Civ. P. 23 ...........................................................................21

Restatement (Second) of Judgments § 40 (1980) .........................12

S. Rep. No. 104-98 (1995) .............................................................21

iii

PG&E Corporation ("**PG&E**") and Pacific Gas and Electric Company, as debtors and reorganized debtors (collectively, the "**Debtors**" or the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this omnibus reply in further support of the Reorganized Debtors' *Motion for Entry of an Order Further Extending Deadline for the Reorganized Debtors to Object to Claims and for Related Relief*, dated May 17, 2023 [Dkt. No. 13745] (the "**Motion**").[2] In support of the Reply, the Reorganized Debtors submit the Supplemental Declaration of Robb McWilliams, filed concurrently herewith.[3]

## PRELIMINARY STATEMENT

The Securities Procedures are working exactly as they were designed and for the precise reasons they were adopted by the Bankruptcy Court. As of June 2, 2023, the Reorganized Debtors have resolved approximately 55%, or 4,841, of the 8,849 Securities Claims submitted and have settled nearly 2,800 Securities Claims. The Reorganized Debtors have made settlement offers to all but approximately 1,500 of the unresolved Securities Claims, meaning that nearly 83% of the Securities Claims have received settlement offers or have otherwise been resolved. The remaining outstanding Securities Claims will either receive settlement offers in the first months of the additional extension period requested or will be the subject of an omnibus objection.

The success of the Securities Procedures can be measured in many ways, but a few data points are especially telling. Excluding the RKS-represented claimants, nearly 91% of the claimants that have reviewed their settlement offers have entered into settlements. Moreover, even in the short period between the time the Reorganized Debtors filed the Motion and filed this reply, nearly 200

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3] This Reply responds to the objections filed by: (i) the RKS Claimants [Dkt. No. 13785] (the "**RKS Objection**"), (ii) the BLA Schwartz Clients [Dkt. No. 13787] (the "**BLA Objection**"), (iii) Chevron [Dkt. No. 13788] (the "**Chevron Objection**"), (iv) PERA [Dkt. No. 13791] (the "**PERA Objection**"), and (v) the State of Oregon [Dkt. No. 13794] (the "**Oregon Objection**") (together, the "**Objections**"). The Reorganized Debtors refer to each objector as they are defined in their respective Objections.

1

Securities Claims have been settled, meaning that Securities Claims are currently being settled at a pace of about 70 claims per week. The Securities Procedures continue to work.

In addition, the Securities Procedures have materially narrowed the number of disputing parties and, in certain circumstances, the disputed amounts at issue between a claimant and the Reorganized Debtors. As a result, nearly 98% of the total potential damages with respect to the *unresolved* Securities Claims reside with only approximately 78 individuals or related or affiliated groups. The Reorganized Debtors expect that they will be able to resolve many of the remaining claims pursuant to the Offer Procedures in the Securities Procedures or, if necessary, through mediations with experienced and well-regarded mediators, recently approved by this Court. The Reorganized Debtors' proposed modest further extension of the objection deadline will allow the Reorganized Debtors time to make offers to resolve the remaining Securities Claims and narrow and shape any process for substantive merits litigation for unresolved Securities Claims, if any, once the Securities Procedures have been exhausted.

Other than the objection from PERA, which does not oppose the extension of the objection deadline, all of the objections are made by the same claimants or counsel that opposed the previous extension of the objection deadline. And all largely rehash the same general complaints about supposed lack of progress on the resolution of their *specific* claims as a basis to halt broader settlement progress with the vast majority of other Securities Claimants. They all, once again, assert that the process has taken too long, that the Court should make exceptions for their clients, and should compel expensive and time-consuming merits litigation right now. Instead, the Reorganized Debtors submit that having considered these same arguments and having extended the objection deadline previously, the Court should properly focus on whether the Reorganized Debtors have met the goals set out in obtaining the last extension, which they have, and whether the Securities Procedures continue to work effectively, which they do. Indeed, the Reorganized Debtors have settled on average approximately 300 claims per month during the past six months.

Given the progress the Reorganized Debtors have made under the Securities Procedures, the objectors' attempt to characterize the Motion as a delay tactic is frivolous. And the emphasis by the

2

objectors on the size of their claims just puts the shoe on the wrong foot. It is true that many, but not all, of the settlements that the Reorganized Debtors have reached were with claimants holding more modest claims than certain institutional claimants. But why is that bad? If the larger, well-heeled objectors ultimately want to hold out and litigate even after mediation under the Securities Procedures, so be it. They have the means and counsel to do so. Meanwhile, claimants with less at stake can accept the option of a prompt and economical resolution.

Despite the significant progress that has been made under the Securities Procedures, the Reorganized Debtors recognize the possibility that not all claims will be settled, and that some Securities Claims may require a determination on the merits through litigation. Accordingly, through the Motion, the Reorganized Debtors have proposed the Securities Claims Merits Litigation Procedures – Part I ("**Merits Litigation Procedures**"), by which the Securities Claimants must identify and state the bases for their claims.

The objectors either misunderstand or intentionally misconstrue the proposed Merits Litigation Procedures. The objectors largely complain of the supposed burden the Merits Litigation Procedures would impose on them. In reality, the proposed procedures do no such thing. Absent the Merits Litigation Procedures, the Reorganized Debtors would object to the claims on the basis that none of the proofs of claim state a claim upon which relief can be granted because they do not assert any cognizable cause of action. The objectors would then, in turn, risk having their Securities Claims disallowed and expunged, unless the Court grants them an additional opportunity to respond with the legal and factual bases that support their claims. The Merits Litigation Procedures streamline the process by asking the claimants (in a simplified way) to identify the basis for their claims.[4]

The RKS Claimants' objection is particularly disingenuous. They do not oppose an extension of the objection deadline generally, but instead seek to move up their own schedule and impose an alternative to the Merits Litigation Procedures for their claimants that would allow them to avoid complying with the settlement provisions of the Securities Procedures entirely. Although they assert

---

[4] As just one example, the vast majority of the Securities Claims do not even identify a specific supposedly false statement, the gravamen of a securities claim.

3

that the Securities Procedures have been "exhausted" as to their clients, that assertion is false. After the Court required that the Reorganized Debtors make offers to all of the RKS Claimants, and the Reorganized Debtors complied, nearly all of the RKS Claimants rejected these offers without making any counteroffers. Moreover, the RKS Claimants are trying to avoid claimant-by-claimant mediations with the mediation panels just approved by the Court. In short, the RKS Claimants have made no attempt to use the Securities Procedures to settle claims and now simply want to sidestep them. They should not be rewarded for this behavior through the grant of expedited merits litigation.

Worse yet, the alternative provided by the RKS Claimants would almost certainly derail the Securities Procedures' offer-and-mediation process globally, as a practical matter. Large claimants (at least) are not going to permit a litigation to proceed with the RKS Claimants without seeking to participate given the likely significant overlap in legal and factual issues. As the Baupost Statement (as defined below) makes clear, the large claimants will all likely seek to jump in. Accordingly, if actual litigation commences with respect to any of the large claimants, the consensual settlement process provided for by the Court in the Securities Procedures, and which is working so well, will come to a screeching halt. The Court just approved the appointment of mediators. It is premature for merits litigation with the RKS Claimants, even if that litigation is inevitable (though we shall see if it is).

For the foregoing reasons, the Court should grant the extension and overrule the objections.

## ARGUMENT

## I. THE SIXTH EXTENSION REQUEST WILL ALLOW THE REORGANIZED DEBTORS TO CONTINUE THE SUBSTANTIAL PROGRESS ACHIEVED IN RESOLVING SECURITIES CLAIMS

The Reorganized Debtors have made substantial progress in resolving the outstanding claims and have met, and even exceeded, the goals set in connection with the Fifth Extension Motion. In granting that motion, this Court necessarily determined that there was good cause to extend the objection deadline. In doing so, the Court overruled all remaining objections that were not consensually resolved. *See* Dkt. No. 13363 at 2. Nonetheless, many of those same objectors now rehash the same general complaints about supposed lack of progress as to their specific claims in the

4

time since this Court approved the Securities Procedures and ignore the substantial progress the Reorganized Debtors have made over the past six months in resolving the Securities Claims. That progress, and the Reorganized Debtors' reasonable good faith judgment that significant progress will continue to be made as to the remaining claims should the Court grant the requested extension is good cause for the requested extension of the current objection deadline. The objectors have not demonstrated otherwise.

As of June 2, 2023, the Reorganized Debtors have resolved more than 19,900 Claims, including over 4,800 Securities Claims. Approximately 2,763 of the Securities Claims have been settled through the offer and negotiation process.[5] During the six months of the Fifth Extension Period alone, the Reorganized Debtors made settlement offers on 3,837 Securities Claims and settled 1,735 Securities Claims. Indeed, in the two and-a-half weeks since the Motion was filed on May 17, 2023, the Reorganized Debtors have issued settlement offers on an additional 240 Securities Claims and settled 183 Securities Claims. The Reorganized Debtors have made settlement offers to, or otherwise resolved, approximately 83% of Securities Claims; there are only approximately 1,500 claims that have not yet received settlement offers. Of those that have received offers, nearly 2,800 have agreed to settle, 141 have declined (when excluding RKS Claimants), and 1,700 remain outstanding. But, over 90% of those claimants (when excluding RKS Claimants) that have actually reviewed their offers on the settlement portal have agreed to settle. The Reorganized Debtors are committed to making settlement offers to the unresolved Securities Claims which have not yet received offers and that are not subject to omnibus objections during the requested additional extension period.

---

[5] The BLA Objection erroneously alleges that only 147 of the 4,200 outstanding Securities Claims have been settled through offer or negotiation. BLA Objection at 2 [Dkt. No. 13787]. This is wrong and is a substantial and egregious error – repeated multiple times in the objection as a significant reason that the Motion should be denied – that entirely undermines the BLA Objection. As of May 12, 2023, settlement offers as to 141 Securities Claims (the number is 141, excluding the RKS Claimants who had declined their offers as of May 12, 2023) had been ***declined***. *See* McWilliams Declaration in Support of Motion ¶ 12 [Dkt No. 13747]; Mot. at 2. As described above, the Reorganized Debtors have resolved approximately 2,763 Securities Claims through the offer and negotiation process – approximately 20 times greater than the number asserted in the BLA Objection.

5

The Reorganized Debtors are also now in the position to begin initiating both Abbreviated and Standard Mediations, which will aid in the resolution of many of the outstanding Securities Claims. On May 17, 2023, the Court approved the Reorganized Debtors' proposed panel of Mediators for both the Panel of Mediators for Abbreviated Mediations and the Panel of Mediators for Standard Mediations. The approved Mediators are all well-respected independent mediators and the Reorganized Debtors expect that mediation will be effective in resolving additional outstanding Securities Claims. And over 98% of the unresolved potential damage amount resides in approximately just 78 individual claimants or affiliated groups of claimants.[6] Because such a small group of Securities Claimants holds the bulk of outstanding potential damages, and given the experience and credibility of these mediators, the Reorganized Debtors believe that mediation could be a particularly effective process for resolving a significant number of the outstanding claims. The requested six-month extension period is critical to allow time for the Mediators to hold their mediations.

The Reorganized Debtors require additional time to finish resolving the outstanding Securities Claims in an efficient and practical manner without the cost and expense of undue litigation. The Reorganized Debtors were transparent with the Court that, even under the aggressive standards set, the Securities Procedures would not be fully implemented by the end of the Fifth Extension Period and a further extension would be warranted. *See* Nov. 30, 2022 Hr'g Tr. at 43:1–5("[W]e're proposing to make offers to about 3,000 of these remaining 5,800 claims in the first four months of 2023, if there's no global class settlement. Which will be the vast majority of claims with complete information and not subject in whole or in part to an omnibus objection."). The proposed extension is justified and warranted by the success of the Securities Procedures and the significant progress in resolving claims during the prior extension period.

---

[6] In the Motion, the Reorganized Debtors stated that over 97% of the unresolved potential damage amount resided in approximately 94 individual claimants or affiliated groups of claimants. Since the Motion was filed, the Reorganized Debtors have continued to make offers and refine the identification of Securities Claimants in affiliated groups. This accounts for the change.

6

## II. THE OBJECTIONS ARE WITHOUT MERIT AND SHOULD BE OVERRULED

### A. The RKS Claimants' Proposal Would Deprive the Reorganized Debtors and Other Securities Claimants of the Benefits of the Securities Procedures and Reward the RKS Claimants' Attempt to Avoid Them.

The RKS Claimants' proposed alternative actually recognizes the underlying basis for the new procedures proposed by the Reorganized Debtors: they concede that they have not submitted a proof of claim that would withstand an objection and acknowledge that they need to file such a pleading as a first step in any claims resolution process—just like practically every other Securities Claimant. But they nevertheless propose an expedited schedule to resolve their clients' claims that is unwarranted, that is practically unworkable, and that would gut the overall Securities Claims resolution process. Further, given the RKS Claimants' refusal to engage in the Securities Procedures, this Court should encourage parties to engage in the offer and mediation process under the Securities Procedures instead of rewarding non-compliance and encouraging parties to refuse to engage in those procedures in order to move to the front of the line in merits litigation.

#### 1. The Alternative Process Proposed by the RKS Claimants Would Upend the Securities Procedures and Prejudice the Reorganized Debtors and Remaining Securities Claimants

The RKS Claimants propose that they file an omnibus amendment to the proof of claim, as opposed to individual amendments that allow each RKS Claimant to assert and pursue their individual rights. *See* RKS Objection at 5. Such proposal would prevent the Reorganized Debtors from being able to assess the strengths and weaknesses of *each* RKS Claimants' claim with the goal of reaching individualized settlements. The Reorganized Debtors agree with this Court that Securities Claimants should have the "opportunity to determine their own outcomes." Dec. 4, 2020 Hr'g Tr. at 6:18–20. Indeed, a few RKS Claimants have already settled their individual claims with the Reorganized Debtors, *see* RKS Objection at 13, demonstrating the RKS Claimants should not be viewed—or treated—in the aggregate as one claimant with uniform desired outcomes or uniform individual claims.

The Securities Procedures require individualized settlement offers. This Court ordered compliance with the same in connection with the Fifth Extension Order, establishing a deadline by which the Reorganized Debtors were to make settlement offers to each of the RKS Claimants. Indeed,

7

the Reorganized Debtors made individualized settlement offers to the RKS Claimants within the prescribed time period. The RKS Claimants should now be required to participate in the Securities Procedures, including mediation on a claimant-by-claimant basis, just like the other Securities Claimants. They have not provided any evidence to support a factual or legal basis as to why their claims should be subject to any different or special treatment.

Additionally, adopting the RKS Claimants' proposal would effectively terminate the Securities Claims Procedures and would force outstanding Securities Claimants into immediate litigation, including merits discovery, without first reducing the amount of remaining Securities Claims through mediations and addressing the common legal issues in dispute, as the Reorganized Debtors propose. Simply stated, other Securities Claimants will likely conclude that they are unwilling to take the risk of not seeking to participate in discovery and merits litigation that may impact their claims. The Court will no doubt be flooded with intervention motions. Baupost, for example, has already announced it intends to do exactly that. *See Statement and Reservation of Rights of Baupost Group Securities, L.L.C. Concerning the Reorganized Debtors' Motion for Entry of an Order Further Extending Deadline for the Reorganized Debtors to Object to Claims and for Related Relief* (the "**Baupost Statement**") [Dkt. No. 13792] at 2 (noting Baupost will seek to intervene in proceedings where "the legal sufficiency of PERA Complaint's claims or other complaints filed by Securities Claimants that assert common claims or allegations" is at issue). The net effect of the RKS Claimants' proposal would be that in two months, this Court would be presiding over active litigation, including expensive and time-consuming discovery with motions to intervene, involving who knows how many Securities Claimants who would have not yet even been required to submit their own pleading. The RKS Claimants' desire to litigate should not force the hands of the Reorganized Debtors, other Securities Claimants, or this Court. *See* Dec. 4, 2020 Hr'g Tr. at 6:16–18 ("[M]ost [courts], again including [this Court], really like consensual resolutions before asking for binding -- or excuse me, before issuing binding and final decisions.").

Rather than allow the RKS Claimants to unilaterally instigate a race to the courthouse and active and expensive merits litigation, this Court should preserve the window of opportunity for all Securities Claimants to resolve their claims consensually and inexpensively. Simply put, the

8

Reorganized Debtors propose allowing the Court-appointed mediators to help the parties to continue to achieve successful, consensual resolutions of remaining Securities Claims and thoughtfully and orderly crystallize any legal and factual issues that would remain in dispute over the next several months.

Finally, in the event merits litigation is necessary, the Reorganized Debtors propose a coordinated effort—seeking input from *all* remaining Securities Claimants, not just the RKS Claimants, as well as this Court—on how to litigate common issues. The Reorganized Debtors respectfully submit that the advantages of a streamlined litigation process—limited to those who are left standing six months from now—far outweighs the inconvenience of a finite delay to a handful of claimants who have not yet even participated in the individuated mediations called for by the Securities Procedures.

2. *RKS Should not be Rewarded for Its Refusal to Participate in the Securities Procedures*

The RKS Claimants have failed to engage in the Securities Procedures and this Court should not reward the RKS Claimants' failure by allowing them to litigate their claims ahead of other Securities Claimants.

Earlier this year, the Reorganized Debtors and the RKS Claimants engaged in a mediation that was outside of the mediation process contemplated by the Securities Procedures. That mediation was unilaterally terminated by the RKS Claimants after just one day even though the parties exchanged settlement offers.[7] The RKS Claimants now seek to use their unilateral termination of that mediation process as justification for why they should be excused from any further mediation under the Securities

---

[7] The RKS Claimants repeat their flawed understanding that the Securities Procedures require an objection 60 days after the termination of a mediation. As previously demonstrated, the Securities Procedures unambiguously state that the claim objection deadline applies unless there is an ongoing mediation, in which case the claim objection deadline is extended until 60 days after the termination of the mediation. The Securities Procedures do not provide that the Reorganized Debtors must object to a claim 60 days after the termination of a mediation under the Securities ADR Procedures, regardless of when that mediation occurs. *See Reorganized Debtors' Opposition to the RKS Claimants' Motion to Enforce the ADR Procedures Order and Establish a March 20, 2023 Deadline to Object to the RKS Claimants' Claims*, at 1-2 [Dkt. No. 13528]; Securities Mediation Procedures § III.C.

9

Procedures. But mediation under the Securities Procedures would be subject to different processes and requirements that sharply increase the likelihood of achieving a resolution with at least some number of the RKS Claimants.

Under the Securities Procedures, in both Abbreviated and Standard Mediations, the Securities Claimant (or Authorized Representative if the Securities Claimant is not a natural person) is required to appear at the mediation. The Securities Claimant and Authorized Representative must have complete authority to settle the claim at issue without consultation with others not attending the mediation. *See* Securities Mediation Procedures, Section III.A and Section III.B. The presence of the Securities Claimant or Authorized Representative at the mediation will allow for party-to-party or party-to-mediator discussions that were not possible during the prior mediation with the RKS Claimants. As stated above, only RKS attorneys attended the mediation. No RKS Claimants or other Authorized Representative with any settlement authority attended the mediation as would be required under the Securities Procedures. Under these circumstances, it is not surprising that no settlement was achieved. The process required by the Securities Procedures will increase the likelihood of resolution and the Reorganized Debtors are hopeful that many of the claims held by RKS Claimants can be resolved through mediations under the Securities Procedures. In addition, no mediation can be terminated unilaterally by a Securities Claimant or by the Reorganized Debtors. A mediation pursuant to the Securities Procedures can only be terminated by the Mediators. Lastly, the mediation procedures require that each individual Securities Claimant make an offer, which the RKS Claimants have not done yet.

In addition, the RKS Claimants have not actively or meaningfully negotiated settlement offers pursuant to the Offer Procedures of the Securities Procedures. Only five of the RKS Claimants accepted the settlement offers they received, and only five additional RKS Claimants responded to the settlement offers with counteroffers. RKS Objection at 13. The RKS Claimants have simply rejected the other 580 settlement offers they received. These numbers stand in stark contrast to the very few outright rejections (141) of the more than 5,000 claims that received settlement offers. Excluding the RKS Claimants, only approximately 3% of settlement offers have been declined. The RKS Claimants,

10

on the other hand, have declined (without counteroffer) approximately 97% of the settlement offers they received. The success the Reorganized Debtors have had in negotiating settlements with other Securities Claimants demonstrates that the Reorganized Debtors have made reasonable settlement offers to Securities Claimants and are willing and prepared to settle at reasonable settlement amounts. It also demonstrates that, should the RKS Claimants continue to engage in the Securities Claims resolution process without the prospect of being propelled to the front of the merits litigation line, a consensual resolution with them is similarly possible.

The RKS Claimants, through their representations to the District Court overseeing the Securities Litigation, have stated that the Securities Procedures are the "superior and most efficient method of adjudicating these claims[.]" Motion to Intervene at 2, and that they should have "their claims adjudicated in accordance with the Court-ordered ADR procedures that both the Bankruptcy Court and this [District] Court determined would be most efficient in resolving the securities claims." *Id*. at 11. These representations are in sharp contrast to the relief that the RKS Claimants now seek through their objection. The RKS Claimants' insistence that their positions are not inconsistent (*see* RKS Objection at 18 n.8) is simply flat out wrong. As demonstrated above, a claimant-by-claimant mediation is the next step in resolving the claims held by the RKS Claimants according to the Securities Procedures and the RKS Claimants should, if their statements to the District Court concerning the Securities Procedures are genuine, support the Reorganized Debtors' efforts to complete the procedures as they were intended on a claimant-by-claimant basis.

### B. PERA's Due Process Arguments Are Without Merit

#### 1. *The Merits Litigation Procedures Do Not Violate Due Process*

This Court should reject as meritless PERA's objection that a claimant's ability to consent under the Merits Litigation Procedures to be bound to the outcome of another litigation violates due

11

process.[8] PERA Objection at 7–10.[9] It is hornbook law that litigants can **consent** to be bound by the outcome of another litigation. *See* Restatement (Second) of Judgments § 40 cmt. a (1980) ("A person having a claim or defense paralleling or related to other litigation *may agree* that the *outcome of the other litigation will be determinative of the issues in his case*.") (emphasis added).[10] Indeed, as proposed here, "[t]he motivation for such an agreement may be *to realize economy and convenience*, as where two or more persons have parallel claims against a third." *Id.* (emphasis added). Further, such agreements may be reached "not only through bilateral agreement of the parties *but also through agreement involving the court itself*, often as a concomitant of a ruling by the court concerning consolidation or severance of cases or trial schedules." *Id.* § 40, § 84, Tent. Draft. No. 2. (1980) (emphasis added).

That is precisely what the Reorganized Debtors' Motion proposes. *See* Mot. at 4. But for the avoidance of doubt, the Reorganized Debtors have revised the language of the Merits Litigation Procedures to include the bolded language below:

> To promote efficiency, the Pleading Notice will inform Subordinated Securities Claimants that by electing to adopt the PERA Complaint **without further amendment or supplement**, they will be subject to any motions, objections, or filings made by the Reorganized Debtors relating to the PERA Complaint, regardless of the claimant who makes or opposes the motion, objection, or filing. The Pleading Notice will further provide that any Subordinated Securities Claimant who adopts the PERA Complaint **without further amendment or supplement** will

---

[8] PERA has made this argument before, and this Court rightly rejected it. Dec. 4, 2020 Hr'g Tr. at 6:1–3 ("I would add that the pleas by the securities lead plaintiffs that somehow due process is being denied are simply not persuasive."). Nothing has changed.

[9] Chevron makes a similar objection without any authority. *See* Chevron Objection at 3–4.

[10] *Accord Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) ("A person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement.'") (quoting 1 Restatement (Second) of Judgments § 40, p. 390 (1980)); *California v. Texas*, 459 U.S. 1096, 1096 (1983) (dismissing certain defendants from a suit based on a stipulation "that each of said Defendants . . . will be bound by a final judgment of this Court" on a specified issue); *United States v. Cnty. of Maricopa, Ariz.*, 889 F.3d 648, 653 (9th Cir. 2018) (applying issue preclusion where "the County agreed to delegate responsibility for defense of the action to Arpaio and MCSO, knowing that it could be bound by the judgment later despite its formal absence as a party."); *Abbe v. City of San Diego, Cal.*, 444 F. App'x 189 (9th Cir. 2011) ("[T]he plaintiffs' agreement to be bound by the liability issues decided at trial established their privity with the test plaintiffs…").

Case: 19-30088    Doc# 13813    Filed: 06/05/23    Entered: 06/05/23 18:36:09    Page 16 of 26

> **agree to** be bound by any determination by the Bankruptcy Court of the law or facts with respect to the resolution of any merits issues relating to the PERA Complaint.

Ex. A (Revised Merits Litigation Procedures) § A. In other words, every single Securities Claimant—none of whom is an "innocent babe[] in the woods who can't make their own decisions" (Dec. 4, 2020 Hr'g Tr. at 7:19–8:6)—who elects to adopt the PERA Complaint will be *affirmatively agreeing* to be bound by this Courts resolution of any merits issues relating to the PERA Complaint.[11]

Contrary to PERA's claim, none of the Securities Claimants can claim a lack of notice or inadequate representation. The Pleading Notice (as defined in Exhibit C to the Motion) that the Reorganized Debtors will send in connection with the Merits Litigation Procedures will expressly inform them of the possible consequences of adopting the PERA Complaint, just as it will inform them of the possible consequences of making no election at all. *See id.* ("The Pleading Notice will inform the Subordinated Securities Claimants that failure to respond to the Pleading Notice will likely result in a motion by the Reorganized Debtors to disallow and expunge their claims on the basis that such claims do not meet the pleading standard required to properly plead or otherwise assert such claims."). The Reorganized Debtors are willing, should the Court request it, to submit the Pleading Notice to the Court for approval as adequate prior to mailing it to the Securities Claimants – although any such process might require some further adjustment to the proposed schedule. Upon an objection to, or motion against, the PERA Complaint, PERA and its competent counsel would litigate that issue. The goal of the Merits Litigation Procedures is to *avoid* forcing Securities Claimants who are "unversed in complex federal securities litigation[,]" (PERA Objection at 8) to bear the burden and expense of retaining counsel to draft a complaint, oppose objections, and litigate those claims.

Furthermore, PERA's completely unfounded accusations and inappropriate insinuations about the Reorganized Debtors' motivations and desired outcomes should be ignored. *See* PERA Objection

---

[11] Such choice is as simple as filling out a form, not the "enormous and unjustified burden[]" that PERA claims. PERA Objection at 6.

13

at 7–8.[12] This Court has once before rejected PERA's cynical argument that "somehow the [R]eorganized [D]ebtors will pickoff unrepresented parties, like shooting fish in a barrel." Dec. 4, 2020 Hr'g Tr. at 7:11–18. It should reject that argument once again here.

### 2. The Rubenstein Declaration Does Not Support PERA's Argument and Should be Stricken

The declaration submitted by PERA's purported expert does not alter the above analysis and should be stricken.[13] In fact, each of the cases cited by Mr. Rubenstein fully support the adoption of the Merits Litigation Procedures. *See* Rubenstein Decl. ¶¶ 15–24 [Dkt. No. 13791-1]. *First*, in *Taylor*, 553 U.S. at 893, the Supreme Court of the United States explicitly stated that "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with

---

[12] Separately, should the Reorganized Debtors succeed in any of their motions against the PERA Complaint, it would not be—as PERA Claims—the Merits Litigation Procedures that "will prejudice Securities Claimants/Class members with respect to their claims against the Non-Debtor Defendants. PERA Objection 6, 9–12. Rather, it would be the common law doctrine of collateral estoppel that would "prejudice" such claims being brought by claimants bound by that determination by the Bankruptcy Court, including PERA itself. *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004) ("Three factors must be considered before applying collateral estoppel: '(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.'") (quoting *Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir. 1993)). Furthermore, as this Court has previously held and as was recently affirmed by the Ninth Circuit, a claimant who litigates their claim in the bankruptcy to conclusion and received an allowed claim will be fully paid through the conversion formula in the Plan. *See Pub. Emps. Ret. Ass'n of N.M. v. PG&E Corp. (In re PG&E Corp.)*, No. 21-16507, 2023 WL 3478411, at *1 (9th Cir. May 16, 2023). As a result, were this Court to allow PERA's claims, after being compensated pursuant to the conversion formula in the Plan, PERA would be paid in full pursuant to the Plan and not entitled to further recovery from any third party, including the Non-Debtor Defendants. *Id.* ("Section 1.109 sets forth a conversion formula that fully compensates a Class 10A-II claimant for their Allowed Claim, and PERA agreed to this conversion formula.").

[13] *See, e.g., United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) ("[A]n expert cannot testify to a matter of law amounting to a legal conclusion.") (citing Fed. R. Evid. 702(a)); *See Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 723 (E.D. Pa. 2014) (striking an expert declaration that was "nothing more than a legal opinion" because it was "based in case law and citation of law reviews and treatises" and reasoning that if the declaration were "to be given weight as an 'expert' opinion," the court "would essentially be abdicating its duties and permitting [the law professor] to usurp the Court's role as the legal expert.").

Case: 19-30088    Doc# 13813    Filed: 06/05/23    Entered: 06/05/23 18:36:09    Page 18 of 26

the terms of his agreement," and while it cites bellwether cases as *an example* of such an agreement, the opinion does not in any way *limit* the exception to such cases.

*Second*, none of the three airplane crash cases cited by Mr. Rubenstein support the proposition that the Merits Litigation Procedures violate Due Process. In two of those cases, the courts did not address the constitutionality of the agreement to be bound by the outcome of a "test case." *See Doherty v. Bress*, 262 F.2d 20, 22 (D.C. Cir. 1958); *Gordon v. E. Air Lines, Inc.* (*In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*), 549 F.2d 1006, 1012 (5th Cir. 1977). In the third case, the Court simply held that plaintiffs whose cases were not consolidated for adjudication by the "test case" were not bound by the result. *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1505, 1522 (D. Colo. 1989), *rev'd sub nom. Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059 (10th Cir. 1992). In other words, all three cases endorse the use of agreements to expeditiously resolve complex multi-party litigation. *See e.g.*, *In re Air Crash at Fla. Everglades* at 1012.

*Third*, Mr. Rubenstein cites *Becherer v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 193 F.3d 415, 426 (6th Cir. 1999), for the proposition that courts have rejected "thin notions of consent" Rubenstein Decl. ¶ 24. But there, the court simply held that plaintiffs who expressly opted out of a class action were not bound by its outcome. In stark contrast, the Merits Litigation Procedures do not purport to bind claimants to the outcome of litigation concerning the PERA Complaint unless those litigants *expressly agree* to be bound.

### 3. The Merits Litigation Procedures Maximize Flexibility

The Merits Litigation Procedures will streamline the legal and factual issues this Court will be required to decide, while placing minimal burden on the Securities Claimants. They are also completely consistent with what the Reorganized Debtors envisioned when proposing the Securities Procedures. *See* Dkt. No. 8964 at 4 ("[A]fter implementation of these procedures, the Reorganized Debtors will then propose an appropriate method to resolve any remaining claims in an efficient and coordinated manner."). The goal, as always, has been to litigate common issues in an efficient fashion. That is only practical.

15

But the Reorganized Debtors offer now something PERA could not when seeking to certify a class under Bankruptcy Rule 7023: individual choice. As this Court will recall, the PERA Complaint, and PERA's first 7023 Motion prompted the Rescission or Damage Proof of Claim Form. *See* Dkt. Nos. 5887, 5943. Now, the Reorganized Debtors are providing the Securities Claimants with the opportunity to either adopt the alleged misrepresentations and other factual allegations in the PERA Complaint, at no cost, or assert and pursue their own allegations. *See* Mot. at 4. Regardless of which choice a Securities Claimant makes—or for what reason—consensual resolution always remains available to each and every one of them. For example, a Securities Claimant who adopts the PERA Complaint might decide to settle with the Reorganized Debtors while a motion to dismiss the PERA Complaint is pending. That is an outcome that has eluded the Securities Litigation class members for years. Alternatively, a Securities Claimant who declined to respond to the Pleading Notice might choose to accept a settlement offer on the deadline to respond to an objection to their claim. Some number of Securities Claimants may choose to litigate to a final judgment. Under the Reorganized Debtors' proposal, each Securities Claimant will be afforded the opportunity to assess those risks for themselves and, ultimately, determine their own outcome.

## C. The Merits Litigation Procedures Provide the Most Efficient and Equitable First Steps in Litigating the Securities Claims

Though each of the Objections take issue with the proposed Merits Litigation Procedures, the Reorganized Debtors are the only ones that have proposed a clear and efficient path towards litigation of any claims that may remain once the Securities Procedures have been exhausted while placing minimal burden on the Securities Claimants.[14] The Objections each allege the Merits Litigation

---

[14] Oregon admits in its objection that Oregon "continues to negotiate with the Reorganized Debtors" under the Securities Procedures. Oregon Objection ¶ 15 [Dkt. No. 13794]. Despite these ongoing negotiations under the Securities Procedures, Oregon has proposed revisions to the Securities Procedures that would allow Securities Claimants to terminate the Securities Procedures and force the Reorganized Debtors to file an objection to the claim within 90 days of the effective date of the termination. This proposal is unfair. This proposal would suffer from all of the problems of the RKS Claimants' proposal by improperly forcing the Reorganized Debtors to file objections prior to the expiration of the requested additional extension period. *See supra* § II.A. Further, Oregon's claim would be subject to an objection on the basis that the proof of claim does not adequately state a claim

16

Procedures impose burdensome and unwarranted pleading standards on the Securities Claimants. In fact, the Merits Litigation Procedures simply seek to formalize pleading standards already relied upon by Bankruptcy Courts and to avoid the inevitable motion practice that would occur if the Reorganized Debtors were forced to object to the remaining Securities Claims at this point in time. As demonstrated below, contrary to the various Objections, the Merits Litigation Procedures are drafted to streamline the process and provide a choice for Securities Claimants, especially for those with smaller financial interests and fewer resources.

1. *Federal Civil Pleading Requirements Apply to the Securities Proofs of Claim*

The Merits Litigation Procedures proposed by the Reorganized Debtors are entirely voluntary. The Securities Claimants are presented with several options: (i) Securities Claimants may adopt the PERA Complaint, (ii) Securities Claimants may adopt the PERA Complaint with amendments, (iii) Securities Claimants may provide the Reorganized Debtors with an entirely separate complaint or other similar disclosure, or (iv) Securities Claimants may choose to not respond to the Reorganized Debtors' notice. If, as the BLA Objection, RKS Objection, Chevron Objection,[15] and Oregon Objection contend, a Securities Claimant believes that their existing proof of claim sufficiently sets out a claim, then that claimant need do nothing in response to the notice to amend. As detailed in the

---

because they have not asserted any factual allegations or causes of action. Oregon has no pleading on file that could possibly allow the Reorganized Debtors to object in other than a generalized way.

Oregon also proposed revisions to the Securities Procedures that would allow Securities Claimants to initiate voluntary, nonbinding mediation. Under the current Securities Procedures, mediation may only be initiated at the Reorganized Debtors' request. The Oregon proposal is simply unworkable. The Reorganized Debtors have to manage and schedule mediations for potentially hundreds of Securities Claimants and groups of affiliated claimants. Only the Reorganized Debtors are in a position to do that efficiently. Oregon's proposal would open the door to dozens or perhaps hundreds of Securities Claimants to initiate mediation procedures at the same time. Moreover, the Reorganized Debtors pay for the Mediators and therefore should be allowed to use their business judgment as to which claimants have significant enough claims to mediate or which claimants are "in the ballpark" to allow for potentially successful mediations. Oregon's proposal would thus impose an enormous economic and administrative burden on the Reorganized Debtors.

[15] Chevron asks this Court to deny the Reorganized Debtors additional time to consensually resolve the Securities Claims, but Chevron itself had requested (and been granted) multiple extensions to respond to the Reorganized Debtors' settlement offer made pursuant to the Securities Procedures.

17

Motion, the Reorganized Debtors will file a motion to dismiss the claims of any Securities Claimant who fails to respond to the notice. Any Securities Claimant who chooses not to respond to the notice may then litigate the sufficiency of the proof of claim and this Court will determine whether or not the information provided by the proofs of claim are sufficient to state a claim for securities fraud.

Case law does dictate, however, that the pleading standards of the Federal Rules of Civil Procedure and the PSLRA do apply to the Securities Claimants' proofs of claim. It is true that a proof of claim filed in accordance with the Bankruptcy Rules is considered *prima facie* valid until it is objected to. Fed. R. Bankr. P. 3001(f). However, once an objection has been filed, the burden of proof shifts back to the claimant. In evaluating whether a claimant has met their burden in connection with a proof of claim, Bankruptcy Courts apply the pleading standards set forth in Rules 8 and 9 of the Federal Rules of Civil Procedure to assess whether there is a valid claim at all. *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure."); *see also Reed v. Carecentric Nat'l, LLC (In re Soporex Inc.)*, 446 B.R. 750, 790 (Bankr. N.D. Tex. 2011) (stating that the sufficiency of claimant's proof of claim was subject to evaluation under Rule 12(b)(6)). As the Securities Claims all sound in fraud, each of the Securities Claims are subject to the heightened pleading standard applicable to allegations of fraud under Rule 9(b) of the Federal Rules of Civil Procedure. *In re Residential Cap., LLC*, 518 B.R. 720, 731–32 (Bankr. S.D.N.Y. 2014) (holding that "[f]ederal pleading standards apply when assessing the validity of a proof of claim" and applying FRCP 9(b) to claims grounded in fraud asserted in a proof of claim). This means that, to state a viable claim, each Securities Claimant must allege, among other things, the time, place, and content of the misrepresentations on which they relied, the fraudulent scheme, fraudulent intent, and the injury resulting from the fraud. *Id*. It is not sufficient for the Securities Claimants to identify the general subject matter of the alleged misrepresentation or point to certain statements "and others" as allegedly misleading as the BLA Schwartz Clients have done. *See* BLA Objection at 6–8. Instead, a claimant must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" with particularity and must

18

allege facts supporting a plausible theory that "the statements were false or misleading at the time they were made." 15 U.S.C. § 78u-4(b)(1)(B); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Each Securities Claimant must also "demonstrate causation between the purported misrepresentation and the holders' losses." *Order Overruling PERA's Opposition to Debtors' First Securities Claims Omnibus Objection* at 5 [Dkt. No. 10769]. This level of specificity is required for there to be a claim to damages at all, and for the Reorganized Debtors to be able to assess and respond to allegations of securities fraud. Almost none of the proofs of claim filed by the Securities Claimants meet this standard.

The BLA Objection asserts that the pleading requirements of the PSLRA are inapplicable to the sufficiency of proofs of claim. The case they cite for this proposition makes no such assertion. *In re Recoton Corp.* considered the question of whether the PSLRA's automatic stay of discovery applied to a Bankruptcy Rule 2004 motion for document requests and witness examinations. 307 B.R. 751, 754 (Bankr. S.D.N.Y. 2004). The discovery sought under the Rule 2004 motion was not premised under the securities laws. *Id.* at 759. Accordingly, the court determined that the PSLRA mandatory stay of discovery did not purport to govern proceedings outside of actions brought under the federal securities law and that the considerations animating the PSLRA stay of discovery were not applicable in that case. *Id.* at 757–59. *In re Recoton Corp.* does not analyze the pleading standards applicable to proofs of claim generally or proofs of claim with securities fraud allegations. As discussed above, Bankruptcy Courts have indeed applied the heightened pleading standards of Rule 9(b) to test the sufficiency of proofs of claim. Further, as discussed in detail below, *see infra* § II.C.3, the considerations animating the PSLRA automatic stay of discovery apply with equal force here.

2.   *The Merits Litigation Procedures Provide an Opportunity for all Securities Claimants to Set Forth the Basis of Their Securities Claims*

As discussed above in Section II.C.1, any litigation on the merits of the Securities Claims will require the claimant to specify the factual and legal basis for their claim, including the specific alleged misrepresentations. The Merits Litigation Procedures allow Securities Claimants, including those with

more modest financial interests and means, for whom preparing an individual complaint or other filing may be overly burdensome and costly, to adopt the allegations contained in the PERA Complaint.[16]

Were the Court to sustain the Objections as to the Merits Litigation Procedures, this would force every holder of an unresolved Securities Claim to file its own separate complaint or filing in response to the Reorganized Debtors' objections. This, of course, would not be a problem for the objectors, all of whom are large, institutional claimants with ample resources and expensive counsel. Instead, it is the Securities Claimants with more modest financial interests that would be significantly prejudiced by such requirements.

PERA's assertion that it is unreasonable for the Reorganized Debtors to expect individual Securities Claimants to understand the allegations in the PERA Complaint and ramifications of adopting them is not well taken. First, this Court has already rejected the notion that investors, whether individuals or institutions, are "so unsophisticated, innocent babes in the woods who can't make their own decisions now" after having made their own investment decisions to purchase company stock or debt. Dec. 4, 2020 Hr'g Tr. at 7:19–8:6. This Court has already determined that the Securities Claimants are capable of assessing the offers presented by the Reorganized Debtors under the Securities Procedures and whether or not their claim would benefit from mediation. The Securities Claimants are similarly capable of determining whether it is in their best interest to adopt the PERA Complaint or file a separate pleading.

Second, PERA initially sought to *impose* its complaint and the allegations contained therein on the Securities Claimants. This Court created the Extended Bar Date in response to PERA's motion to apply Federal Rule of Civil Procedure 23 to their class proofs of claim. Although ultimately denying PERA's motion, the Court extended the bar date specifically for members of the putative class encompassed by the PERA Complaint. *See Memorandum Decision Regarding Motion to Apply Rule 7023* at 3–5 [Dkt. No. 5887]. The Merits Litigation Procedures now give these claimants a formal opportunity to adopt the PERA Complaint that was the basis of the Extended Bar Date.

---

[16] Obviously, the Reorganized Debtors do not concede that the PERA Complaint states a viable cause of action.

20

### 3. *A Stay of Discovery Must Continue*

A stay of discovery is absolutely required until the Reorganized Debtors (along with any remaining Securities Claimants and the Court) can determine the most efficient way to litigate any remaining claims once the Securities Procedures have been exhausted. The PSLRA mandates a stay of discovery in all federal securities class actions during the pendency of any motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(B). Although the BLA Schwartz Clients are correct that the PSLRA does not automatically apply to litigation in Bankruptcy Courts, the purpose and reasoning behind the enactment of the PSLRA, and in particular the provision on the stay of discovery, is as applicable here as it is in the context of federal securities class actions.

The PSLRA mandates a stay of discovery in federal securities class actions because the cost of discovery often forces defendants to settle abusive and unmeritorious actions simply to avoid the burdens associated with civil discovery. A Senate report accompanying the passage of the PSLRA discussed the purpose of the PSLRA's discovery stay and noted that "[t]he cost of discovery often forces defendants to settle abusive securities class actions. According to the general counsel of an investment bank, 'discovery costs account for roughly 80% of total litigation costs in securities fraud cases.' In addition, the threat that the time of key employees will be spent responding to discovery requests, such as providing deposition testimony, may force coercive settlements." S. Rep. No. 104-98, at 14 (1995). These same considerations exist here where, without a stay of discovery, the Reorganized Debtors may find themselves on the receiving end of document requests seeking millions of pages of documents and subpoenas and notices for many dozens of witnesses all in an effort to extract more favorable settlement terms. Such an exercise would consume valuable estate resources. The Court should allow the Securities Procedures to be exhausted before merits litigation, including discovery, commences.

21

## <u>CONCLUSION</u>

For the foregoing reasons, the Reorganized Debtors respectfully request that the Court grant the relief requested in the Motion, including the extension of the Current Objection Deadline to December 18, 2023, without prejudice to the right of the Reorganized Debtors to seek additional extensions thereof, and approve the Merits Litigation Procedures, and grant the Reorganized Debtors such other relief as the Court deems just and proper.

Dated:  June 5, 2023

**WEIL, GOTSHAL & MANGES LLP**
**KELLER BENVENUTTI KIM LLP**

*/s/ Richard W. Slack*
Richard W. Slack
*Attorneys for the Debtors and Reorganized Debtors*

22