UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

In Re: ) Case No. 19-30088
) Chapter 11
PG&E CORPORATION )
) San Francisco, California
Debtor. ) Wednesday, June 7, 2023
) 10:00 AM

MOTION FOR ENTRY OF AN ORDER FURTHER EXTENDING DEADLINE FOR THE REORGANIZED DEBTORS TO OBJECT TO CLAIMS AND FOR RELATED RELIEF FILED BY PG&E CORPORATION [13745]

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENNIS MONTALI T
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (All present by video or telephone):

For the Reorganized Debtor: RICHARD W. SLACK, ESQ.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212)310-8000

For RKS Claimants: JEFFREY RITHOLTZ, ESQ.
Rolnick Kramer Sadighi LLP
1251 Avenue of the Americas
New York, NY 10020
(212)597-2800

For CalSTRS et al.: IRWIN B. SCHWARTZ, ESQ.
BLA Schwartz, P.C.
515 South Flower Street
18th Floor
Los Angeles, CA 90071
(213)785-3683

For The State of Oregon: SUSAN F. DICICCO, ESQ.
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 1 of 98

(650)843-4000

For PERA: MICHAEL S. ETKIN, ESQ.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
(973)597-2500

For Chevron Master Pension Trust and Chevron UK Pension Plan: JONATHAN DOOLITTLE, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center
22nd Floor
San Francisco, CA 94111
(415)983-1000

Court Recorder: LORENA PARADA/ANKEY THOMAS
United States Bankruptcy Court
450 Golden Gate Avenue
San Francisco, CA 94102

Transcriber: CATHY L. KLEINBART
eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

Proceedings recorded by electronic sound recording; transcript provided by transcription service.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 2 of 98

SAN FRANCISCO, CALIFORNIA, WEDNESDAY, JUNE 7, 2023, 10:00 AM

-oOo-

(Call to order of the Court.)

THE CLERK: Court is now in session. The Honorable Dennis Montali presiding. Calling the matter of PG&E Corporation.

THE COURT: Ms. Parada, you gave me the names of several who are going to appear, but I didn't see counsel for Oregon. I think that's Ms. Polivey. (phonetic) Have you heard from her?

THE CLERK: I'll check, Your Honor. It's a long list.

THE COURT: Well, if counsel for the Oregon entities expects to appear, just raise your hand so we can bring you in. There we go. Ms. DiCicco.

Okay. Why don't we start with appearances. I see Mr. Schwartz, would you -- and then Mr. Doolittle, please state your appearances.

MR. SCHWARTZ: Good morning, Your Honor. Irwin Schwartz on behalf of California State Teachers Retirement System and a couple of other public (indiscernible) plans and --

THE COURT: All right.

MR. SCHWARTZ: -- and thirty-six entities related to the Hartford.

THE COURT: Mr. Doolittle?

MR. DOOLITTLE: Good morning, Your Honor. Jonathan Doolittle for Chevron.

THE COURT: Mr. Slack?

MR. SLACK: Good morning, Your Honor. Richard Slack, Weil, Gotshal & Manges for PG&E.

THE COURT: Okay. We have some more people coming in, I believe, I assume.

Ms. Parada, no one else is trying to get in?

THE CLERK: Yes. I'm bringing people in now, Your Honor.

THE COURT: Okay.

Ms. DiCicco?

MS. DICICCO: Good morning, Your Honor. Susan DiCicco from Morgan, Lewis & Bockius for the Oregon claimants.

THE COURT: Good morning.

Mr. Etkin?

And it's Mr. Ritholtz, I don't see -- recognize your name. You state your appearance and your client?

MR. RITHOLTZ: Yes. Jeffrey Ritholtz from Rolnick Kramer Sadighi for the RKS claimants.

THE COURT: Oh, I'm sorry. RKS. Excuse me. I expected somebody else. Are you presenting the argument or Mr. Bodnar?

MR. RITHOLTZ: Yes, I am.

THE COURT: Okay. Mr. Etkin, I was waiting for your

appearance, sir.

MR. ETKIN: Yes, Your Honor. I apologize.

THE COURT: Okay.

MR. ETKIN: Michael Etkin on behalf of the Public Employees Retirement Association of New Mexico.

THE COURT: Okay. I think I got everybody.

Mr. Slack, you are up to bat first, and you want to reserve some time, I presume?

MR. SLACK: I'd like to reserve ten minutes for rebuttal, Your Honor.

THE COURT: Fine. Thank you.

MR. SLACK: So Your Honor, this motion seeks to extend the objection deadline for six months until December 18th, 2023. And putting aside the PERA objection, which doesn't object to the extension, there are only four filed objections to the extension, and these objections are from the same parties and/or counsel who objected to the last extension motion, and each of them makes essentially the exact same argument that they made six months ago in connection with the prior extension.

And this Court granted the last extension, notwithstanding the objections, and PG&E set out an aggressive schedule under the Court's securities procedures with it being clear that a further extension would be necessary. And that's the sole issue on the extension motion should be whether PG&E

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 5 of 98

met the goals set out under the last extension motion and whether the procedures are working to resolve claims, and the answer to both of those is a resounding yes.

And although there are a number of ways to look at the success of the securities procedures, a few statistics make the point. The reorganized debtors have resolved approximately fifty-five percent or 4,800 of the 8,800 securities claims submitted and have settled nearly 2,800 securities claims.

The reorganized debtors have made settlement offers to all but approximately 1,500 of the unresolved securities claims, meaning that nearly eighty-three percent of the securities claims have received settlement offers or have otherwise been resolved. And --

THE COURT: I don't mean to interrupt your statistics --

MR. SLACK: Yes.

THE COURT: -- because your statistics are in your papers. What about the four objecting counsel and their clients, where do they fit in the numbers? Are they in that 1,500? I think there are a couple of them that -- the RKS folks have settled, but a vast number, it's a very high percentage, isn't it?

MR. SLACK: Yeah. So out of --

THE COURT: Okay.

MR. SLACK: -- the objectors, Your Honor, we've given

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 6 of 98

I think settlement offers to all but a couple of Mr. Schwartz's clients. So Oregon, RKS, Chevron have all received offers. We're in negotiations with Oregon, and we've obviously have gotten responses from some of the other folks.

So what's important, Your Honor, is also is that excluding the RKS claimants, nearly ninety-one percent of the claimants that have reviewed their settlement offers have entered into settlements. And what this means is where parties have been willing to engage with PG&E, we've been able -- largely to be able to settle claims.

Now, during the last extension period, PG&E made offers with respect to about 3,800 securities claims and entered into 1,800 settlements or nearly 300 per month. I mean, that's fifteen each business day. And even in the few weeks since making the motion, PG&E made offers to an additional 240 claimants and settled 183 securities claims. So there's really --

THE COURT: 180 -- excuse me.

MR. SLACK: 183.

THE COURT: 180 of the 240?

MR. SLACK: No, not of the 240, but just because there's a lag, but we've --

THE COURT: Yeah.

MR. SLACK: -- actually had 183 new settlements since the motion was filed.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 7 of 98

THE COURT: Okay, okay.

MR. SLACK: So Your Honor, where does that leave us? There's only about, as I said, 1,500 claims that have not received offers, and we expect to make omnibus objections with respect to a couple hundred of those, and that means that there will be about 1,200 claims that we will expect to make offers to in the first few months of a new extension period, and at that time, everybody will either be the subject of an omnibus objection or will have received offers.

And we anticipate that negotiations will continue with a number of claimants obviously who've received over the next month and that we'll be successful in continuing to settle a significant number of these claims.

THE COURT: Well, shouldn't I be a half-full person and say then if I deny your motion, the dialog will continue, and there will be some more settlements, right? I assume --

MR. SLACK: I'm sorry. What --

THE COURT: I assume. Pardon?

MR. SLACK: What is that, Your Honor.

THE COURT: No. I said I'm going to be a little glass half empty --

MR. SLACK: Oh, okay.

THE COURT: -- perhaps here, and say if I deny your motion today, you're still going to negotiate with lots of folks -- and maybe not RKS, they seem to be on your bad guy

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 8 of 98

list -- but you might still be settling of 150 every couple weeks going forward, right? Nothing says the settlements can't continue.

MR. SLACK: Yeah. I think, Your Honor, what of course we're missing there is that we're not in a position to object to 4,000 claims. As we've said, we don't have -- we actually don't have -- we don't have any pleadings that we can object to other than a handful in more than a general way of saying they don't meet the pleadings standards. So look, it makes sense to extend it. It makes sense to let the procedures go forward and see how many we can settle, and then we'll talk about the merits procedures that we're trying to put into place.

But one very important point here about letting these procedures go forward is of course if the Court has now approved a mediation panel of experienced and independent mediators to help us settle, and it makes sense to allow the mediators the time to try to settle more claims before we figure out who's left, how many complaints do we have, and what do we do. So in --

THE COURT: One of the things that troubled me to some extent -- I don't want to use the word trouble. That's a negative, but amazed me is why it took so long to get the panel of mediators approved? I mean, I could have approved that a year ago.

MR. SLACK: Yeah. So that's a good point, and Your

Honor, that's a good question. Here's the answer: When we went with the -- the first thing you do is you go with the offers. We were settling. Remember, we still have others before RKS. We've actually gotten settlements with over ninety percent of the people we've negotiated with. So that --

THE COURT: No, I understand that. I got that.

MR. SLACK: So we had very, very few people who outright rejected who would be really subject to mediation. So we're now at the point where we have a critical mass of people who we can start mediating with. And even now, most of those folks are really, when you look collectively, are going to be RKS claimants in the first instance and then a handful of others that have rejected. So we really are only in the position to start mediating now, and we set the panel. So it makes perfect sense the timing that we did that.

THE COURT: But Mr. Slack, again, I'll use my glass half empty hat, and say, you've been at odds with RKS for months, and you've been critical of RKS more than once in saying, they're getting -- they want to be at the head of the line, and what you're telling me really is they're going to go to the back of the line because if I deny the motion -- excuse me, if I grant your motion today, maybe RKS sees this again six months from now when you're asking for more time, and maybe they're still at odds, and maybe it's time to force that matter to either binding mediation or more importantly, a claims

objection to see what happens.

MR. SLACK: Yeah. So --

THE COURT: I mean, you don't have to answer that, but you ought to -- from my point of view, squeaky wheels sometimes get oiled, but if they just are left in the back room to squeak, they aren't happy.

MR. SLACK: Yeah. I would say this, Your Honor, is that our procedures don't put RKS in the back of the line. They put RKS completely on the same level as every other securities claimant --

THE COURT: No. But realistically --

MR. SLACK: And --

THE COURT: But realistically, they're hanging tough, and they're not settling at the rate that you would like, and again, I don't want to get into why they are or why they aren't. That's not appropriate. But the fact of the matter is RKS is not alone in opposing this motion. The other four groups are -- or three groups.

But my point is that you want me to maintain the status quo as though the squeaky wheels are going to get resolved, and they can get resolved even if I deny your motion. You can cut a group with Mr. -- the RKS Group tomorrow if the parties come to an agreement. So what is so bad about getting back to what was contemplated in the -- when I implemented this procedure over your persuasive arguments and over PERA's

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 11 of 98

opposition three years ago?

MR. SLACK: Yeah. So let me say this, Your Honor, I think there's a couple of layers there. So let's talk about RKS first. I think you should deny the RKS and overrule the RKS motion for four reasons. First, I think that the RKS proposal would undermine the securities procedures for everybody else.

Holders of unresolved claims are not going to sit idly by while RKS races forward with merits litigation. These people are going to be compelled to intervene and be involved, including in discovery. In other words, it's not going to be that RKS is going to be doing this, and everybody else is going to sit back and watch them and say, great. Go ahead and litigate these issues. That's just not going to happen, and how do we know that --

THE COURT: Hold on --

MR. SLACK: We --

THE COURT: Hold on. RKS has claims on file, and there's no objection pending. So they're deemed allowed. So RKS doesn't necessarily get to turn loose. You have to object. So --

MR. SLACK: Well, we have to objection deadline, but once --

THE COURT: Oh, I understand. I understand. But --

MR. SLACK: The point is that --

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 12 of 98

THE COURT: But what I'm --

MR. SLACK: The point is that what they want, Your Honor, is they want to expedite litigation here, and I think all our point is is that if we expedite litigation with RKS according to their procedures, you're going to have everybody coming in and trying to intervene because nobody is going to let RKS go jump ahead --

THE COURT: Well, when you say --

MR. SLACK: Everybody wants to be on the same line.

THE COURT: Mr. Slack, when you say "intervene", there are a quantity of claims in file in round numbers. I suspect, whether it's 1,200 or a higher number, I mean, you gave me the statistics a few minutes ago about the number that had been resolved. So I can't keep track of it exactly.

But the point is these lawyers representing these four groups know the number of claims involved. So if I deny your motion, they don't have to do anything until you object. So let's assume you filed an objection to one claim in the RKS category --

MR. SLACK: Right.

THE COURT: -- what is there to intervene on? The other claims are deemed allowed until you object. So now, let's assume you object to one claim of RKS, one claim of Oregon, and one claim of Chevron -- or Mr. Schwartz's clients, so four. So we have a status conference, and I say, okay. We

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 13 of 98

got four objections to claims. Do I resolve them by law argument, or do we set it for trial? What is this stampede that's come in with people joining the fray when they haven't even had their claims put at issue yet?

MR. SLACK: Well, I guess, I would say this, Your Honor, ultimately it's going to be you're the gatekeeper of that, but I can tell you we know from the Bail Post statement that was filed, they don't want to sit back and let RKS or somebody else litigate the same issues or related issues to what they want, what they have in theirs, and there's going to be a lot of claimants who aren't going to want to sit back and let litigation or discovery take place.

And Your Honor, discovery is exactly the point here, too, is that PG&E shouldn't be required at different stages to have four sets of -- ten sets, twenty sets of documents requests and depositions. The way this should be done is that all of the merits work. Everything in the merits should be coordinated, and that's what we're suggesting.

Let everybody go file a complaint or not file a complaint or do whatever they're going to do. RKS agrees that they need to file an amended complaint. Everybody really is in that same boat. All we've said is let's let everybody do it at the same time, let's see who we settle with over the next six months. We're going to have fewer people in the next six months than we do now substantially, and now the question --

then the question is going to be how do we resolve all of these somewhat related claims? They're different, but they're somewhat related in a coordinated fashion. And it's a very finite --

THE COURT: Okay. RKS said that they're going to take you up on your proposal that they're going to amend. I don't know that the other groups are going to amend, but they have a right to. I mean, they can amend today if they want to. Their claims are on file --

MR. SLACK: Right.

THE COURT: -- and they can amend their claims. There's no issue on that, is there?

MR. SLACK: Well, they -- I mean, there are some amendments that are proper and some that aren't. We'll reserve our rights --

THE COURT: No, no --

MR. SLACK: But you're right --

THE COURT: No --

MR. SLACK: -- you can effectively amend as long as it's an appropriate amendment. I --

THE COURT: Mr. Slack, I'm assuming they're not going to file inappropriate amendments. So if they've blown a statute of limitations or something. But if they're trying to fill in the blanks, we have a very liberal policy of amending. So what I'm saying is that whether it's RKS or the other

creditors, if anyone want to, they can amend any time they want.

It's difficult. I agree with you. If suddenly, PG&E is hit with ten different document requests, that's burdensome, but there are ways to do that, too. There are bellwether trials (audio interference) the Court can conduct a bellwether claim objection, too, can't it? And can limit and control the discovery so there is a consolidation.

In other words, whether I go with their proposal or some other proposal, if at some point there are multiple claims that are still objected to by PG&E, I don't think you have to defend four depositions, if you can defend one deposition with four people on the other side of the table. We can control it from a case management point of view.

What's different about this, except the numbers?

MR. SLACK: Well, when you say what's different, except for the numbers, the numbers are important. I mean, we have again very significant claimants who still have to go through the settlement process. And what I would say is this is you don't want to force those people into, again, trying to intervene or whatever while their claims are getting attempted to settle.

The way to do this is for the Court quite frankly to be encouraging people to settle and encouraging people to use all the tools of the securities procedures, and what's really

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 16 of 98

important here is that RKS, while they paid lip service to exhausting the securities procedures, it's clear that they haven't.

At the last extension hearing, the Court ordered the reorganized debtors to make offers to the RKS claimants on a claimant-by-claimant basis. And presumably, that was to have the parties engage with each other on the securities procedures. Instead, what happened is that RKS rejected ninety-eight percent of those offers --

THE COURT: No, I understand.

MR. SLACK: -- and so --

THE COURT: I understand it happened. Go ahead.

MR. SLACK: And so the other thing, Your Honor, really important is they also haven't used and they're trying to avoid the mediation procedures because they have not mediated on a claimant-by-claimant basis, and they haven't done it in front of the panel of mediators that you've --

THE COURT: But hold on, Mr. Slack. Again, I give you a time limit, and then I interrupt you. But I don't want to get back into who blew the failed mediation. It was inconsistent with the procedures to begin with, and you're blaming them, and they might blame you. But the point is if I deny today's motion, the mediation procedures are still in place. They can sit and sulk at the mediation, if you want, or leaving aside whether they can veto anything further. I don't

know that the Court (audio interference) suggested something like that, and you don't like that.

But my point is that if I give you six more months and we have this same discussion and you're still pointing at RKS and blaming them for being difficult, it's going to be the same problem, and in between now and then, of course if you get more settled, that's good. I do encourage mediation. I already complained about why weren't these mediators appointed a year ago. They're in place now. I hope that are fast at work trying to resolve cases.

But anyway, go ahead and make whatever argument you want to make -- well, one more question for you, and then I'll be --

MR. SLACK: Okay.

THE COURT: -- quiet for the rest. Your litigation procedures -- and I looked them again this morning -- they're not really mandatory, right? In other words, if I'm a creditor with a securities claim and I get this litigation thing that says I can join the PERA complaint or I can file my own, I can also just do nothing, right, and show up at the first hearing on the claim objection; isn't that true?

MR. SLACK: That is true. And that was the point, Your Honor. They're meant to be entirely voluntary, but what it does is -- and this was really the point of that. We wanted -- while the settlement procedures were still working

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 18 of 98

and still in place, we wanted to have some procedures that would allow sort of a first step to take place because as we see it, Your Honor, if people don't do this, our first objection is going to be your proof of claim doesn't state a claim, and --

THE COURT: Okay.

MR. SLACK: And I would think --

THE COURT: Good.

MR. SLACK: -- Your Honor is going to do one of two things. He's either going to say to them, well, you can go and amend it or adopt a PERA, whatever you're going to do, but we're trying to take that step out of it. And it's very clear that none of these claims actually meet the pleading standard once we object. So we were actually trying to --

THE COURT: Well, I know, but Mr. Slack, you --

MR. SLACK: -- move along the process.

THE COURT: You've made that point that it doesn't meet your definition of the pleading standards.

Excuse me. I have to avoid a phone call on my phone here. Sorry. One sec. It's another judge calling me, but I'm not going to answer the phone. Excuse me.

So the point is that -- look, let's pick somebody other than RKS, let's say Mr. Schwartz. Are you calling Mr. Schwartz and say, you know, I think your claim is going to be knocked out because you didn't state a case. He says, all

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 19 of 98

right. I'll amend it, or I'll see you in court because I think it's a good claim --

MR. SLACK: Right.

THE COURT: But maybe he says, okay. I'll amend, and he just amends, and then you have a merits objection or you negotiate. What is different? I mean, what are we accomplishing by implementing a voluntary amendment process that Mr. Schwartz could take advantage of or decline or file something else, and then when it's time -- leaving aside mediation -- so we go through the mediation efforts -- and then it's the first status conference on the claims objection. I say, okay. What's at issue? And I realize that I don't particularly look forward to having 1,000 trials on securities claims, but my job is to decide decisions, and if Mr. Schwartz says, I think I got a valid claim and you say, no, and I rule in your favor, Mr. Schwartz is sent packing. His claim is disallowed. He should have amended.

Or alternatively, I say, well, I'm going to give you a chance to amend or to have some discovery. What's different about this from any other claims procedure?

MR. SLACK: Yeah. So I, by the way, completely agree with everything you just said, and what's different is that because -- look, because of the way the extended bar date was done here by all of us, Your Honor, us included, the folks that filed claims just filed the form and didn't put in there any

kind of the facts or basis that you would need typically for a valid claim.

So what we were doing at this point was trying to put in place a procedure that quite frankly we think is going to expedite and speed up the process, not slow it down. But we completely agree with you. Everybody can do this anyway, and if they don't, we'll just come back to you, and we will make those objections to whether it's 100, 500, or 1,000, and if the people like Mr. Schwartz say, look, I don't think I have to do anything, we'll disagree, and Your Honor will decide. We get that. That's fine. But we thought that these procedures actually had the advantage of speeding that up and removing the process --

THE COURT: Well, they are. They do as long -- they do as long as they're voluntary.

MR. SLACK: Yes.

THE COURT: And there's a deadline or a consequence, not to punish the claimant that doesn't do anything, but to say, well, we're going to go to the next step. In other words, using Mr. Schwartz as an example in comparing him to the RKS, RKS takes advantage of the suggestion, and it amends its claim in the next thirty days. Mr. Schwartz says, no. We're standing on our claim as is. Then you try the mediation. It doesn't work. You object to the claim. It comes to a status conference, and maybe Mr. Schwartz is sent packing; maybe, he

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 21 of 98

isn't. It doesn't matter.

The fact of the matter is the procedures in place did work because you only had 7,000 claims to begin with. You might have had 10,000 if the claims process was more robust or more extensive. And I'm not faulting that. I mean, I approved it with your support, and we ended up with 7,000 claims. Okay. Now, you're down to below 4,000. Fine.

MR. SLACK: Well, we had 8,800, and we've now resolved approximately 5,000. So I think we're -- and a lot of that progress again has been because of the procedures. And because there hasn't been this duality, the procedures have been allowed to work without having a merits litigation overlay because as I think we all know, one of the big advantages, both for PG&E and for other claimants who aren't sitting here, is settling rather than spending money on merits litigation is attractive, and that is attractive for the reorganized debtor --

THE COURT: Well, the simple solution is save money by accepting your -- you're accepting their counterproposal rather than their accepting yours. So that's for the mediator.

Okay. Mr. Slack, I'm going to save at least ten minutes for you and --

MR. SLACK: Okay. Very good.

THE COURT: And --

MR. SLACK: Thank you, Your Honor.

THE COURT: And as you know, two more if we have to. Now, the other four counsel, have you agreed to share the time?

MR. SCHWARTZ: Yes, Your Honor. It's Irwin Schwartz. We do have an agreement about how to allocate time.

THE COURT: Okay. And what should I expect?

MR. SCHWARTZ: I'm sorry, Your Honor. I didn't hear what you just said.

THE COURT: No, just tell me the sequence. Who's going to go first.

MR. SCHWARTZ: So it will be me starting with a very short introduction, Mr. Etkin for fifteen minutes on behalf of New Mexico, Mr. Ritholtz for ten minutes on behalf of RKS, and the balance of time to Ms. DiCicco.

THE COURT: Okay. Okay.

MR. SCHWARTZ: Thank you, Your Honor. I'm going to -- very short. I would note that I've spoken with Mr. Doolittle. He's agreed -- Chevron has agreed to adopt our few comments. And what I would say, Your Honor, is we don't have much to add to add to our papers or Chevron's papers, other than to note that we're pleased to see that it appears that the debtor is agreeing with us as to where we are in the posture of the case, that claimants have not settled, and Your Honor just said that, the debtors must either accept the proofs or object based on evidence, and that's what provided in the Code.

Nowhere in there reply, Your Honor, did the debtors

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 23 of 98

actually assert that they don't understand the bases of the claims, asserted by any of the claimants. In fact, it's pretty obvious that those claim forms that Your Honor approved were approved in contemplation of the New Mexico complaint, and so --

THE COURT: Mr. Schwartz, hold just one second. I have to close the door. Just one sec. Okay. Sorry. Go ahead.

MR. SCHWARTZ: Okay. I don't think there's any plausible argument that the debtors don't understand what the claims are that are submitted under the claim form that Your Honor approved, but nevertheless, they're asking -- although it's a bit of a moving target, they're asking you to adopt extraordinary procedures here under the false premise that they don't understand what the claim is that is being brought against --

THE COURT: Now, Mr. Schwartz, let's try a hypothetical. Suppose we're past mediation for your clients and there's a claim objection based upon your claim as filed. Just pick one (audio interference).

MR. SCHWARTZ: Okay.

THE COURT: And we're now at the first steps conference, and I say, well, Mr. Schwartz, you have the burden of going forward. How long are your going to take, and what do you want to do to present your case? Do you need discovery, or

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 24 of 98

are you ready to present your case?

MR. SCHWARTZ: We would want discovery, Your Honor.

THE COURT: Okay. You would want discovery.

MR. SCHWARTZ: Right.

THE COURT: So isn't that exactly what Mr. Slack is concerned about that everybody will want discovery and we have a -- run a bank again.

MR. SCHWARTZ: Well, Your Honor, I have to say that's exactly what Mr. Slack should have expected at the time he proposed these procedures. In other words, he's asking -- instead of going forward with a class action style -- and I'm not going to -- I wasn't even there, Your Honor, for those arguments. He's asked that each of us be treated separately. Each of our clients did submit the claim form with the trading information, been responsive to all of the requests put on by Mr. Slack's agent, who is dealing with the technology side, and therefore, we're in a position where we've stated a proof of claim. That's now the burden on the debtors to object with evidence based on whatever objection they said with evidence, we will likely seek discovery.

Your Honor just said you're going to be able to coordinate discovery because we won't be the only one looking for discovery and then --l

THE COURT: Is your claim presumably is going to say this particular claim made this much of an investment at this

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 25 of 98

period of time, and presumably, you're going to say something like, and relied on representations by a debtor or the debtor's officers and directors or other people.

MR. SCHWARTZ: Yes.

THE COURT: And then I'll say, well, who will your witness be? And you say, I don't know. We haven't take discovery yet. So we are back to the whole process where maybe you don't amend, but maybe the RKS claimants do amend or somebody else adopts PERA. I mean, we're at the same break down, right, where there's a lot -- there's still a lot of facts to develop by the claimants, right?

MR. SCHWARTZ: That's exactly --

THE COURT: Okay.

MR. SCHWARTZ: -- right, Your Honor, and so -- and I have to say, I think there's been a slight shift because I think originally, the litigation proposal was that the claimants had to adopt either the Mexico complaint, draft their own, or subject themselves to risk of dismissal for failure to state a claim.

THE COURT: I don't think the debtor on its own can impose the dismissal. I think what I read the litigation procedures is if you don't do anything, you might be on the receiving end of an objection because you don't state a claim, but again, that's what we do all the time. I mean, we don't -- we can have this debate about Rule 12(b)(6) applies under a

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 26 of 98

Bankruptcy setting, but the fact of the matter is if somebody comes into my court for a status conference, and I say, it looks like your claim was passed the statute of limitations, and the lawyer says, well, I concede that point, then your claim is disallowed.

But if you said, no. We have a defense because the debtor did such and such. We just need to prove that there was a (audio interference) okay. We'll set it for trial. So for you, you're in there, and there's no facial objection on the face like statute of limitations, but there's essentially what a 12(b)(6) motion would say if the claimant hasn't stated a basis for relief. And you'd say, well, I just need to develop the facts to prove my case, and I'd say, okay, go do it. That's what Mr. Slack is complaining about.

MR. SCHWARTZ: I understand, and that's what would be expected dealt with on a case-by-case basis as the securities procedures proposed. What I would say, Your Honor -- and I've now gone way beyond the time that we agreed to --

THE COURT: Yes, sir. I'm the one that asked. I asked you the question.

MR. SCHWARTZ: Yeah. It's that we and Chevron actually adopt and agree with the reasoning that was put forth by New Mexico in its opposition, especially with respect to the procedural and fairness and the constitutional concerns of the requested merits procedures. So I'd like at this point, Your

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 27 of 98

Honor, to turn it over to Mr. Etkin who will address those issues.

THE COURT: Okay. Good morning, Mr. Etkin. Good to see you again. Mr. Etkin, you need to turn on your mic. You're muted.

MR. ETKIN: My technical expertise in full view, Your Honor.

THE COURT: I know. That's true. Mr. Etkin, I have a couple of preliminary questions for you, just two questions. I'm aware and you're aware of the recent Ninth Circuit ruling that go your way, but my only question is there another PG&E appeal that you're involved in that's still pending at the Ninth Circuit, or is that it, that circuit?

MR. ETKIN: Not on the bankruptcy side, as I understand it, Your Honor. But --

THE COURT: Okay. Because there was something in the briefs about a conversation that you or someone on your side and someone on the debtor's side had with the appellate -- I mean, the mediation panel at the circuit and so on, and I didn't know whether that's still a live dispute. And it's not that I'd do anything. I just wanted a status report. That's okay.

MR. ETKIN: No. I understand, and some of my colleagues are I think on the Zoom call, and they can correct me if I'm wrong by raising their hand, but I don't believe that

there are other bankruptcy-related appeals pending.

THE COURT: Okay. And I don't need to take --

MR. ETKIN: There are appeals pending in connection with the district court proceeding.

THE COURT: Okay. Fine. And I have -- no. I don't want to take your colleagues time.

The other just sort of important threshold question, you've made the point in your papers that the district point has not acted on a motion to dismiss as far as the nondebtor defendants, but is that -- did the judge not issue -- or his stay order that's tied to the bankruptcy, does that not cover the pending motion to dismiss?

MR. ETKIN: It unfortunately does, Your Honor, and that's --

THE COURT: It does. Okay, okay.

MR. ETKIN: That's what's currently on appeal to the Ninth Circuit is the --

THE COURT: Okay.

MR. ETKIN: -- stay that Judge Dalia (phonetic) issued.

THE COURT: So my point is that -- and maybe I didn't phrase it correctly, I understood that he stayed things before him until the bankruptcy is resolved, but I didn't know if that included the motion to dismiss by the officers and directors.

MR. ETKIN: As I understand, Your Honor, it includes

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 29 of 98

everything --

THE COURT: Okay.

MR. ETKIN: -- and Judge Dalia didn't make any exceptions, which again, is part of the problem, but I won't get into that.

THE COURT: No. I don't want you to get into that. My point is -- I'll leave it that. You've answered my question. Okay.

Go ahead with your scheduled presentation.

MR. ETKIN: Thank you, Your Honor. And I'd like to start off with some reference to the district court, and what the debtors originally around two-and-a-half years ago regarding the ADR procedures and that they would work separate and apart from the class action pending in the district in the district court, and in fact, Your Honor, they touted and emphasized that the resolution of those pending motions to dismiss at that time, and they're still pending, would have a salutary impact on the securities claims asserted against the debtor in this court. If the debtor unfortunately didn't follow through on that approach when it effectively threw silence at the very least, supported the issue, and sort of stayed by Judge Davila. So that's kind of where we are.

But despite those prior representations, Your Honor, now, and what really concerns us, and what even has become more apparent to me in listening to Mr. Slack's presentation today

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 30 of 98

and some of the colloquy, is that PG&E through these merits procedures, they are really seeking to impact not only the claims before Your Honor that are asserted solely against the debtor, but the claims against the non-debtor parties in the District Court case. And these non-debtors, there are over 40 of them, they're not before Your Honor, those claims are not before Your Honor.

But if it's really a global resolution that the debtors are looking for and they allude to that, especially in their reply, there's really only one appropriate way of handling this on a global basis without trampling on the due process rights of securities claimants, who, as Your Honor knows, are also members of the class in connection with the claims and the case that's before Judge Davila. And that is really what Bankruptcy Rule 7023 is all about; it's there for a reason.

Now, the debtors in their reply talk about narrowing and shaping the process. What the debtors clearly want to do through this merits procedure that they outlined, is to extract the benefits of a binding determination under some hybrid collective process where they're pulling the strings by providing what they insist is a choice in adopting the PERA complaint or filing their own complaint and undergoing that significant cost and that significant effort of drafting their own complaint.

We don't view that really is a choice, your Honor, and it's the consent that the debtor talks about is really engineer consent to a process that we believe will severely prejudice securities claimants in this court, in your court, and before Judge Davila in connection with those separate claims against non-debtors.

THE COURT: But Mr. Etkin, Mr. Slack conceded, which I understood the case, it's completely voluntary. If a creditor doesn't either clone the PERA complaint or file essentially the equivalent of a new one, the creditor has the option to stand on its existing proof of claim. Why is that violating anybody's due process?

MR. ETKIN: Well, Your Honor, the problem really is when you when you focus on the so-called voluntariness of it. You're looking at a situation where it's not such a subtle threat by the debtor that if you don't do either of those things, your complaint is going to -- your claim is going to be subject to being expunged or dismissed.

THE COURT: But Etkin, we do that all the time. If a claim is defective and somebody objects, I toss it out.

MR. ETKIN: Well, you do that all the time, Your Honor, but not with a court-endorsed merits procedure that effectively is being thrown out in front of all these claimants.

THE COURT: No, no, but I gave -- you say court

endorsed, but Mr. Slack concedes it's voluntary. So if I don't -- look tight and away. If I deny the motion today, any of the existing securities claims can amend its claim and clone the PERA complaint or clone its own version of the complaint or make up a new theory. They all have their day to amend their claim. You take it in terms of filing an amended claim. I take it in bankruptcy words as amending your proof of claim. But it's the same result. It's taking an outcome before the forum and it's up to the other side then to object.

MR. ETKIN: Well, I think, Your Honor, that you actually laid it out pretty well that, what do you need these merits procedures for, if not to -- pardon me -- tip the playing field. If somebody wants to amend, they can amend. If through discussions with Mr. Slack, they think that they're best off amending in order to avoid dismissal, or if they think, as most of us practitioners normally think, is that a proof of claim, as you indicated, is deemed allowed until it's objected to.

And at that point, perhaps things happen. Things happen with respect to the 4000 unresolved claims out there that we'll all want discovery and we'll all want depositions. And again that takes me back to the point that I think is really important to make. And that is, that at one point previously, Your Honor, when we first made our 7023 motion early on in the case, based upon the benefit of hindsight and

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 33 of 98

what's happened, if the debtor would have consented to that motion, these claims would be gone; they'd be resolved in my humble opinion. You wouldn't even have to be dealing with them at this point.

Then after the extension of the bar date and the claims process -- of the filing of the claims process there, we again moved under 7023. And if the debtors had consented to that process, you wouldn't have the issues that are being raised before you now.

THE COURT: Or if I had consented to it. I mean, I'll take blame.

MR. ETKIN: I'm not blaming -- well, Your Honor, you call balls and strikes, Your Honor. That's the way it works. But again, I'm talking about this with the benefit of hindsight. If that would have happened, there would have been a resolution already with respect to everyone except those who decide to opt out of that process and go it alone.

THE COURT: I understand. And you're speaking like a seasoned class action specialist, and you are that way. And believe me, Mr. Etkin, in reading these papers and thinking about, we are almost at the three year anniversary of the confirmation order, thinking, well, maybe I should have granted that motion the first time, because that's where we are. Mr. Slack is almost coming full circle with this adopt the PERA; it's like class action revisited.

MR. ETKIN: Your Honor, that's precisely the way that that we see it at this point.

THE COURT: Okay. But what do you want me to do? What do you want me to do?

MR. ETKIN: Maybe it's buyer's -- well, you don't have a 7023 motion in front of you.

THE COURT: Right.

MR. ETKIN: I don't think what I -- and I don't think I need to remind the Court that with respect to the denial of the 7023 motion, the second one, the Court was clear that that denial was without prejudice.

THE COURT: Right.

MR. ETKIN: And what the Court commented on at that point was, well, we'll see where it stands and we'll see how many of these claims remain outstanding. And I understand that that Mr. Slack believes that they've been successful; and that's in the eye of the beholder somewhat. But the bottom line is that there are 4000 unresolved claims out there. That's a lot.

THE COURT: So what do you want me to do?

MR. ETKIN: It's not on you.

THE COURT: But you didn't you didn't oppose today's motion with a cross motion to --

MR. ETKIN: I did not. And I'll tell you -- I'll be candid with you, Your Honor. I think hopefully you know me by

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 35 of 98

now that I respect this Court and I respect the hints, sometimes subtle, sometimes not so subtle that the Court has laid out. And I don't think that -- I didn't think at the time, and in preparation for today, and in dealing with the merits procedures aspect of the of the motion. I would prefer to get some indication from the Court that the Court would entertain that motion.

THE COURT: You just quoted me from the prior hearing. But Mr. Etkin, for today's purposes, if you could make the order for today, what would the order say?

MR. ETKIN: The order would deny the merits procedures that are being requested.

THE COURT: Okay.

MR. ETKIN: And the order would say that you have X days or X weeks to file a renewed 7023 motion in order to get this all under control; the discovery aspect of it, the adequate representation aspect of it, the notice aspects of it, to get that all taken care of, giving folks, whoever they might be, the opportunity to opt out and go it alone if they want.

Frankly, it would be salutary to flush that out in any event for the debtor. And if you're going to use the PERA complaint, a class action complaint of over 200 pages, which required an enormous amount of work, and if there's already a court appointed lead plaintiff and lead counsel in the district court, wouldn't it make sense to proceed, not have people worry

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 36 of 98

about who's representing them and who's representing their interests; have only one deposition except for those who want to proceed on their own; have only one set of document requests handle it all through that process.

And frankly, Your Honor, that's how most securities litigation is handled, even in a bankruptcy context. And I think, again, unfortunately, this case has been pending a long time. We all have the benefit of hindsight. And as we all know, hindsight is often 20/20. But now that we know where we are, that would really solve all of these issues that the debtor is attempting to solve through what we believe is a half-baked kind of elective process.

THE COURT: Okay. Well, I have to tell you that with these very capable lawyers who are opposing the motion today, like RKS, and Oregon, and Mr. Schwartz's clients, and not diminishing Doolittle and Chevron, but it's a smaller quantity of people, not a single one of them have indicated that they want to join you and do this. And even Mr. Slack, who was your fierce opponent when you wanted Rule 23, now when he's facing this opposition, didn't make this concession that will flip it over to a 23.

So my question to you is, if I denied today's motion and I said, okay, Mr. Aitken, if you want to file a 23 motion, do it, just give me a preview in what decade that would ever get resolved, come to fruition, starting with two, three years

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 37 of 98

into the confirmation. When would it show up and start to produce some results for people? Because you can't start paying members of the class when you have a class action, right?

MR. ETKIN: You can't start the paying members of the class until you have a settlement with respect to those --

THE COURT: Right.

MR. ETKIN: -- who want to participate.

THE COURT: Right. But when you allow a claim under the bankruptcy rules, you can pay them the next day, right?

MR. ETKIN: Your Honor, my guess is that there's a reason why 4000 claims still remain outstanding. There's a reason -- why I forget the number, 1500, 1800 haven't even received offers yet. My guess, Your Honor, is that this could happen very quickly. All of the sophisticated people involved in this case and even those who are unsophisticated that are still involved with their claims would have the opportunity to say I don't want to be a part of a class action, so I want to go it alone.

But then at least you'll have plenty of people. And I'm not presupposing what counsel for Oregon or counsel for CalSTRS would ultimately do with respect to that. But my guess would be that some would want to participate because they don't want to spend the money, they don't want to draft their own complaint. They would be comfortable proceeding in the fashion

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 38 of 98

that I've outlined at this stage. And you may be left without outliers, Your Honor, at the end of the day, people who opt out.

But at the very least, you're going to whittle down 4000 much more easily than through a process as the debtor indicates is intended to be a dealing with individual claims.

THE COURT: Okay.

MR. ETKIN: But they're saying something different.

THE COURT: Let me say something in advance of when RKS and Oregon speak, and that is nobody has to waste time worrying that I'm suddenly going to flip this into a Rule 23 motion. I'm either going to grant or deny the pending motion today or with some modification. And if, as a result of my ruling, Mr. Atkin and his clients or somebody else decides to make a motion to activate a Rule 23 process, we'll deal with it. But please don't waste time doing that today.

Mr. Etkin, I would tell you one war story if I could be given 15 seconds. Since I've last seen you, I actually have presided over a real class action, and I've issued a nationwide injunction and certified a nationwide class. So I've actually had some experience in your field in another area having nothing to do with PG&E. Anyway.

MR. ETKIN: Your Honor, even with this experience that I've gained -- and at the risk of saying something differently than Your Honor assumes, I'm a bankruptcy lawyer that happens

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 39 of 98

to know a little bit about class actions. And my colleagues (indiscernible) are the class action lawyers. But I've been doing this kind of work for a long time. So the interplay between the two is something that I've obviously had a fair amount of experience with.

One last point, Your Honor. And that is the concern, this whole idea of consent and the concern that we have, in a class action context, even in a test case context that you identified, people get the chance to decide as to who the test case is going to be, what the facts are in their case, who the lawyer is going to be. They get to weigh in on all of that.

Under the circumstances that the debtors have put in front of you, they're the ones who get to choose which case they're going to file a motion to dismiss and which claim they're going to object to and how sophisticated or unsophisticated that claimant might be. That's what really triggers our are our due process concerns and our fundamental fairness concerns.

And that's why a Rule 23 process really prevents those concerns from surfacing and deals with those issues so that people are comfortable with who's representing them, that who's representing them owes a fiduciary duty to those class members. That's a big deal. Whoever is going --

THE COURT: Okay. I know. Listen, I'm going to cut you off. I know those things.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 40 of 98

MR. ETKIN: Okay.

THE COURT: And I'm going to say, I'm going to deal with today's motion, not some hypothetical motion that you or someone else might choose to file at some point in the future. So I don't want to waste time on that subject.

MR. ETKIN: Enough said, Your Honor. Thank you. Thank you for indulging me.

THE COURT: So Mr. Ritholtz, you're up next; is that right?

MR. RITHOLTZ: Thank you, Your Honor.

THE COURT: And I'm going to stick with -- I gave whatever time you agreed. I think you were promised 15 minutes, you can have it.

MR. RITHOLTZ: Yeah, ten minutes. Thank you. As Your Honor correctly observed, RKS claimants are differently situated than the other objectors. We're not actively negotiating with reorganized debtors at this point. We've rejected the vast majority of the individualized offers we've received, and we've mediated.

However reorganized there is want to put us in the back of the line and have us move as slow as the slowest claimant. Reorganized debtors say that we're trying to expedite the procedures for ourselves, but that's not what we're being asked to -- that's not what we're asking to do. We're being asked to slow down to the reorganized debtors pace.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 41 of 98

And to be clear, we've offered to amend our proofs of claim only on condition that reorganized debtors will timely object because they've represented in their papers that doing so will move the process forward more quickly --

THE COURT: Well, they'd have to under the under the under the normal case management orders in place. They'd have to object. Maybe not on your timeline, but on my timeline, right?

MR. RITHOLTZ: Yes. Yes, absolutely. June 30th, technically, at the moment, yes.

THE COURT: Yes, I understand.

MR. RITHOLTZ: But we're trying to prevent the extra step that reorganized debtors have said that will occur, which is that they'll object saying the proofs of claim are insufficient and then we'll have to amend in any event. So we're just trying to skip that step and move the process forward more quickly.

The RKS claimants and the reorganized debtors do not disagree on many things with respect to the procedures. We agree that the procedures can work when followed. And unlike Mr. Etkin, we agree that they are the better alternative to class treatment when followed. The problem is that the reorganized debtors have at every stage chosen delay over complying with the ADR procedures, except when the RKS claimants have forced them to do so.

They refuse to engage at all with the RKS claimants for two years after the procedures were put in place. Instead, deciding, as Your Honor put it, to pick off the low hanging fruit. Then they acknowledged that they had secretly paused the procedures to negotiate with Mr. Etkin's client.

They first made settlement offers to any of the RKS claimants only after the RKS claimants had objected to the fifth extension motion. And then they only agreed to mediate with the RKS claimants in exchange for the RKS claimants agreement to withdraw their objection to the fifth extension motion.

Now the reorganized debtors accused the RKS claimants of refusing to engage in the ADR procedures. But that couldn't be farther from the truth. The RKS claimants have done everything in their power to resolve the claims as quickly as possible. They submitted proofs of claim and trading information as required. They survived omnibus objections. When offers were made, they promptly responded. Now reorganized debtors suggest that those responses should have included counteroffers. But the ADR procedures explicitly don't require counteroffers.

THE COURT: Well, they don't require it. They could have included it, but they didn't. Okay.

MR. RITHOLTZ: Yeah. And the rate of reject --

THE COURT: What would happen next if I denied the

motion and either a take your alternative or a variation of it? In your mind, that's the end of the mediation option between your client and the debtors, right?

MR. RITHOLTZ: Well, not necessarily, Your Honor, because the debtors could still offer to mediate with any of our clients individually. And our position is that if objections are on the table, we're more likely to have a successful mediation because then everybody's positions will be on the table, everyone will understand where each other is. And that's a more useful way to come back to the table than being in the same place that we are right now, which is only having our position on the table without knowing what reorganized debtors' objections are.

THE COURT: Okay. So if I take Mr. Slack offer, I might see you in six months. If I take your proposal -- keep in mind my colloquy with Mr. Schwartz a few minutes ago. Let's assume that you amend your proof of claim as you see fit, leaving aside whether it's 760 claims or just one. Let's just assume one claim in your bundle of clients, and that one claim gets amended and debtor objects.

So we have a status conference and I say, okay, what are we going to do? Are you ready to prove your case? Are you going to be ready to prove your case or are you going to have to take discovery from the debtor?

MR. RITHOLTZ: Well, I believe we'll have to take

discovery on certain issues. There may be issues that could be resolved as a matter of law. And I think in our proposal, we've suggested that we'll meet and confer with the debtors to figure out which issues we agree can be resolved as a matter of law, which would require discovery. And then we'll have the initial status conference as the --

THE COURT: Okay. ADR standard procedures have been in place as long as I've been on the bench, the first status conference on a claim objection can be dispositive on legal questions. Now, so again, let's take the simple example, the hypothetical statute of limitations here, or your client's claim was out of the period of time, or just missed the bar date. You'd tell me it's a legal question. I'd say, fine, your claim's disallowed. End of story.

But if it's not, if you've got to find out what was said, who said, what the proof was, I mean, I presume your client proves what he or she did in reliance on things. But we'll also try to prove what you were relying on were false, right?

MR. RITHOLTZ: Yeah, that's correct.

THE COURT: Okay.

MR. RITHOLTZ: What we're asking for essentially, is to proceed by the ordinary bankruptcy procedures. We're not asking for any deviation from.

THE COURT: Okay. So what's going to happen when Mr.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 45 of 98

Slack worries about incomes, Oregon incomes, CalSTRS income, Chevron incomes, all the other outposts, and they say we got to -- we're all joining the fight here; they all show up at the status conference and say, I want in too. Then what do I do?

MR. RITHOLTZ: Well, I think we can discuss case management at that point. It shouldn't preclude the first step, which is an objection. That's really what we're asking for, is let's have the objections on the table and then we can decide who wants to litigate, and we can manage the case at that stage.

THE COURT: But an objection might just be almost a general denial. Again, we know that bankruptcy rules aren't the same as civil rules, and certainly not in class action. But much of what I do by way of first screening out claims objection is the same as a 12(b)(6) motion. And so the debtor says this proof of claim fails to state a claim. And I say, yeah, you know, you're right, I'm going to give you 20 days to amend. So you amend some stuff that then we set it for trial, right? Again, that's what happens.

MR. RITHOLTZ: I'm not disagreeing with that, Your Honor. I'm just saying that we should -- it's time to proceed to that stage. How we manage the case going forward from there is a question that we can resolve with the Court and all the parties and figure out what the best way to move forward is. But right now on the reorganized debtors' proposal, we're going

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 46 of 98

to be in that place in six months and not having progressed at all.

THE COURT: Okay. So whether it's all 760 of your clients or only a handful of them, and if some of Mr. Schwartz's clients -- again, I'm oversimplifying here. We might end up with a whole bunch or we might not. But your point is the debtors had plenty of time to implement its procedure and now it's time to go to the next phase, which is called claim objection.

MR. RITHOLTZ: Yes, exactly.

THE COURT: Okay.

MR. RITHOLTZ: Exactly.

THE COURT: That's fine.

MR. RITHOLTZ: And it doesn't preclude -- to be clear, it doesn't preclude further mediation, further negotiation. That all can happen within that framework. But not if we --

THE COURT: But what if I follow a procedure -- well, what if I denied today's motion, but Mr. Slack calls you up and says we've selected so-and-so to be the mediator, you need to have your client at the table next week. Are you going to participate?

MR. RITHOLTZ: Well, I think we disagree that we would be mandated by the procedure to do that, but that doesn't mean we wouldn't. And certain of our clients may very well be willing to do that. We'd have to ask them.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 47 of 98

THE COURT: Okay. Clarify for something that was a little confusing to me in your papers. Again, recognizing you don't have just one client and you have 700 and some number of them. But it's really a smaller number because I can see that there are a number of entities that probably have the same management. But my point is that I don't know -- what do you mean when you're going to do an omnibus amendment? You're essentially going to amended proof of claim, right? Or group of proof of claim?

MR. RITHOLTZ: Well, what we would intend to do is file one proof of claim on behalf of all. If it means we have to do it as a formal process where we submit them separately for each client, it would be the same document but submitted on behalf all of them.

THE COURT: Well, whether it's one document or 760 documents, there is one writing or there's one expression of the desires and the positions taken by each claimant who you're speaking for, right?

MR. RITHOLTZ: Correct.

THE COURT: Yeah.

MR. RITHOLTZ: Correct.

THE COURT: I have to tell you that, again, and this goes back to some prior experience. I was involved at the rulemaking level, at the judicial conference for the creation of the bankruptcy omnibus rule. And the omnibus objection rule

has kind of taken many shapes and forms, but I've never had an omnibus amendment to a claim. So I mean essentially it's like -- I got it now. I mean, my point is, you clarified that the rights of client A are going to be asserted as well as the rights of client B and client C. You're not going to do some boilerplate that just sort of --

MR. RITHOLTZ: No.

THE COURT: Okay. I got it.

MR. RITHOLTZ: That's correct.

THE COURT: All right. Anything else?

MR. RITHOLTZ: Yes. So I just want to make the point that reorganized debtors have criticized the rate at which we've rejected offers. But I think it's important to understand that obviously not all claims are created equal. And reorganized debtors have not told the court what percentage of the potential damages exposure they've resolved, they've only given numbers of claims. A $1 claim is not the same as a $1 million claim; and I think we all know that. And as we know, and as Your Honor mentioned at a prior hearing, they picked off the low hanging fruit for a long time. And they may still be continuing to do that, we just don't know.

THE COURT: Well, there's nothing wrong with that. I mean, that's perfectly okay. Those little people that got small amounts of money, or shares, or whatever they got; that's a good thing.

MR. RITHOLTZ: Sure. There's nothing wrong with it; we agree. It goes to the point that criticizing us for rejecting offers when we could have large claims -- and obviously we're not at liberty to talk about the offers, when we could have very large claims and getting very lowball offers, it's not a fair criticism.

THE COURT: Well, you could criticize them for not making better offers.

MR. RITHOLTZ: Yes, exactly. Exactly.

THE COURT: Fair. What's new?

MR. RITHOLTZ: So I want to talk a little bit about the actual merits procedures that reorganized debtors are proposing. It goes beyond asking us to wait in the back of the line; they're actually extending the line to some extent because they're adding procedural elements to a litigation that are not found in the bankruptcy code. And they're not providing any objection deadline. They're not telling the court at what point this process will actually end.

Under both tracks in their proposed procedures, they're saying either you're going to adopt PERA's complaint and then there's going to be a motion to dismiss procedure, which is not found in the bankruptcy code for contested matters or they're saying --

THE COURT: Come one, you know that there could be, though. I mean, I just got through saying it's essentially a

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 50 of 98

12(b)(6) process. It can be done.

MR. RITHOLTZ: No, I understand. But they're saying 45 days before the extended objection deadline, there's first going to be a motion to dismiss filed, which is unlikely to be resolved by the time of the objection deadline, and only then will decide when they need to object, because there's going to have to be inevitably another motion to extend.

And then if you don't adopt the PERA complaint, then we'll decide basically contemporaneously with a further motion to extend what the procedures are. So we're just not getting any firm objection deadline and we're getting additional procedural elements. It's a merry go round to nowhere, which I think we've said in papers before.

And in addition, they're saying in their procedures that there will be a PSLRA stay, which does not apply in bankruptcy. There's no adoption in the bankruptcy code of the PSLRA.

THE COURT: No, that's true. I agree that that's true. Somebody can ask the court to stay it if they want to.

MR. RITHOLTZ: Yeah. But the logic underlying the PSLRA doesn't really apply here. I mean, if reorganized debtors were -- the PSLRA was built so that frivolous claims would not result in ruinous discovery for defendants. But if the reorganized debtors really thought these were frivolous claims, they could have let the district court decide the

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 51 of 98

motion to dismiss PERA's claim, and they chose not to in favor of the bankruptcy. It's another case where they're trying to have their cake and eat it, too. They want the civil litigation procedures, but they want the bankruptcy protections at the same time.

And just lastly, I'll just say and reiterate that the RKS claimants' proposal to proceed to objections and claim reconciliation is not going to add time and expense to claim resolution here, which reorganized debtors claim it will. It's going to enhance the possibility of resolution and avoid potentially the claims having to be resolved on the merits because it will ensure that the parties' positions are out in the open.

The equivalent in civil litigation would be if we were trying to resolve these claims just based on a complaint being filed without an answer. We just don't know what the position of the reorganized debtors is on our claims. And so our view is this will facilitate -- having them object will facilitate future mediation and negotiations rather than discourage them, and that the Court should therefore deny the debtors' motion and adopt the RKS proposed procedures and end this merry go round to nowhere. Thank you, Your Honor.

THE COURT: Thank you. Ms. DiCicco, I'm sorry to keep you waiting all this time, but

MS. DICICCO: No worries.

THE COURT: -- I forget what you've asked for. But you're up.

MS. DICICCO: Thank you, Your Honor. I'll try to be as brief as possible. I want to address --

THE COURT: Take your time.

MS. DICICCO: -- a few points. Thank you. I want to address a few points that the parties have been talking about. First, there's been a lot of emphasis by the debtors, and Your Honor, that this is a voluntary process and that there's lots of choice here. There really isn't. And I want to explain that in more detail. The three choices are you can adopt -- my client can adopt the PERA complaint.

If we do that, he says there's no cost for that. Well, sure, there might be no cost for that, except it assumes that we as a council can just willy nilly adopt all of the allegations in a 200-page complaint under Rule 11 purposes. But let's put that part aside. Then, no matter what, they said they will move to dismiss for all the various reasons they want to move to dismiss the complaint, just as there are pending motions to dismiss in the district court. We would then have to oppose that motion to dismiss. So that would be a substantial cost on the legal claims based on a complaint that we didn't even draft, right? So there's cost to that.

THE COURT: What if I got that objection and I decided to use Judge Davila's rule of thumb, and I'd say, well, I'll

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 53 of 98

wait until he decides.

MS. DICICCO: And then we're waiting -- and then we have -- no one's deciding, right?

THE COURT: Then he and I, we'll both retire and you will be old enough to retire by then. Okay.

MS. DICICCO: No, you can't do that to us. We cannot handle that. That will be too much, more delay. So the issue will be, there'll be cost -- even if it's cost free to accept the PERA complaint, you then have to deal with the motion to dismiss. And the debtors, in their papers on page thirteen, seem to imply that PERA will be the one opposing that motion to dismiss. Almost as if they are class counsel in this matter, which going back to where we were a few minutes ago, they're currently not. And so, that's a little odd. And so, I want to give the Court a quick hypothetical.

Let's say we adopt and then there's a motion to dismiss briefing, which by the way, is a very expensive and circuitous class action. And it will take a long time. And then the Court addresses it and let's say, hypothetically, you grant the motion to dismiss and I haven't appeared and the PERA counsel has argued the motion. Can I appeal? My claim has now been denied but do I have a right to appeal the decision on that? And so I think it would then force people to have to also appear in order to preserve the right to appeal and so it makes a procedural mess. So that's the first thing I wanted to

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 54 of 98

address.

The second part -- option is file your own complaint. I don't have to then be bound. I would just have my own complaint. But that causes tremendous expense for the claimants, who after three years, after filing the form the debtors asked us to file which didn't ask us to allege which misrepresentations were in there, didn't ask us to allege anything other than the treating data and based on the class period that were set forth in the complaint in the District Court. So we've done everything they had asked and now, three years later, they want to change the process. So now that would be additional cost to develop, investigate, prepare that complaint, which frankly if we were going to do, we'd have to start doing it now in order to comply with the schedule the debtors' are proposing. Then we then have to deal with all the costs of the motion to dismiss there and potential appeals, etc. So those two processes are very -- are much more expensive than the claims objection process, which is supposed to be speedy and inexpensive.

And then the third option is you're going to say, "Ms. DiCicco, you don't have to do any of that, just don't do anything. Stand on your original proof of claim." But they've made clear that they are going to move to dismiss on that. So they aren't planned to make an objection. They claim to file an omnibus motion to dismiss for everybody who doesn't do that.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 55 of 98

THE COURT: Oh now, come on. Wait, I got to stop you. You're just playing with terminology here. The motion to dismiss is no different from an objection to the claim. The claim is my reported decisions and lots of literature -- I mean the scholarship says, "a proof of claim is analogist to a complaint" and so a proof of claim is like a complaint and you respond to a complaint by an answer or a 12(b)(6) motion in the Federal Court. So if they object to the claim, it's because the proof of claim fails to state a claim. So what's new about that? That's something -- if Mr. Slack calls it a motion to dismiss by say, "Mr. Slack we're going to call it an objection to claim." Now what happens at the hearing?

MS. DICICCO: Well with an objection to claim, it's their burden. This is part of the burden shifting that we're --

THE COURT: No it's not their burden. It's your burden until you have a prima facie case.

MS. DICICCO: It's their burden to demonstrate why my claim is lacking.

THE COURT: Okay.

MS. DICICCO: And they have to bring forth those arguments. Now, he'd say, "Well I'm just going to argue that since you filed the form that I asked you to file, that wasn't sufficient." So it seems rather unfair, now three years later after doing what they asked us to do on the form that was put

forth by them, that now we now have to have an actual full-blown complaint in order to assert these claims.

THE COURT: Okay, so if Mr. Slack doesn't object, he shows up at the status conference and says, "We're ready to go to trial." And I say to you, "Ms. DiCicco, when are you ready to put on your prima -- prove your case." You have the burden to prove your case.

MS. DICICCO: And then --

THE COURT: And you're going to say, "Oh, well we have to take some discovery," right?

MS. DICICCO: Correct.

THE COURT: So guess what? Aren't we right back into the same situation?

MS. DICICCO: We are. But Your Honor, that might point -- first, two things. One is the choice issue is this isn't really voluntary because by forcing this process earlier, we're shifting that back to us and those costs to us and it's really designed to get all of these parties to go away by way of a settlement.

THE COURT: But look, if I were to deny Mr. Slack's motion today, Mr. Ritholtz says he's going to amend. You don't have to tell me what you're going to do. But let's just assume that I deny Slack's motion and he then -- you either amend your proof of claim because you think that's the right thing to do or he objects. So let's assume he objects saying there's no

basis for liability. So now aren't we in the -- where are we now? He has challenged there's no -- on the face of it, you haven't established a basis for liability.

MS. DICICCO: Well Your Honor, now we're to my next point. That was a perfect segway. The answer to your question is, this is short circuiting the process. So as Mr. Slack noted, my clients are currently negotiating. The process should be renegotiated until we're not negotiating. We do a mediation and then he files an objection. What the schedule that the debtors have proposed under these merits procedures would cut that short, because it's now June 7. We're not done with the negotiating. There has been no attempt to schedule a mediation yet and so we'll never have that mediation.

THE COURT: Well it's going to happen if I deny is motion. Period. Then what happens?

MS. DICICCO: Then we would continue. We're prepared to continue under the ADR procedures.

THE COURT: You know, keep in mind, I don't want to have --

MS. DICICCO: Sorry.

THE COURT: -- catastrophe on June 7th by having a June 30th deadline. So let's assume that at least I extend the deadline to object.

MS. DICICCO: Right.

THE COURT: But even if I don't. Even if he's forced

to object, you can still negotiate. You can still mediate. You can do all those things and you don't have to plate anything.

MS. DICICCO: Your Honor, my concern is this.

THE COURT: I heard what you're saying. Look, you told me that Mr. Slack's choices are do PERA, or clone PERA, or file your own. Those are both acceptable from your point of view and I get it. And so my response then is, okay if I tell Mr. Slack good-bye, we're going with the claims process the way it's written, again leaving aside the June 30 deadline, which may be a little bit too tight for everybody.

MS. DICICCO: Uh-huh.

THE COURT: You're going to mediate. You're going to negotiate and if that's successful, fine. If it's unsuccessful, we have to -- he has to object and you have to be ready to figure out what you want to do next.

MS. DICICCO: Your Honor, I agree with everything you're saying relating to the ADR procedures that are currently in place. But our main objection is to these litigation procedures, which attempt to graph in some kind of hybrid class action --

THE COURT: Okay.

MS. DICICCO: And adversary proceeding that isn't part of the process and we think --

THE COURT: Okay, I got it.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 59 of 98

MS. DICICCO: -- hurts and harms us. So that's our main concern.

THE COURT: So you, Oregon, is willing and can live with, the current procedure, right? I take it you don't -- well didn't ask you, you don't object to us continuing an extension of as is, do you?

MS. DICICCO: An extension of the period, no?

THE COURT: Just to the deadline. I mean June 30th --

THE COURT: The deadline, no. But we're opposed to -- we're very much opposed to the procedures that he wants to put in place.

THE COURT: Okay.

MS. DICICCO: In our papers we actually proposed a few modest modifications to the ADR procedures, which are designed to give us the off ramp.

THE COURT: No, I know you object and I didn't ask Mr. Slack. I'm not sure I'm persuaded that you -- I should change the options under the mediation. Again, the company is paying for the mediators and you're getting -- anyway, I don't want to get into that. Your point is in the papers and I understand it. I understand from our colloquy here what's the major concern for your clients. So go ahead and add anything else you want to add.

MS. DICICCO: Yes, the only thing I wanted to finish with is I think the process that this will come to at the end

of the ADR procedures, may very well call for this sort of class process that we're talking about. So I think the idea of whether we have a 723 motion, I'd favor that. I think that's a welcome -- I think that would be a good solution to try and bring all these things together. That's the efficiency of a class action that you would have. And now that is perfectly fine now that the claims have been reduced. But there's still a lot of claims to be managed and I think, in terms of the resources of the parties and the Court, we would be better off if we went down that road. But today, the main concern is that these other procedures, which sort of morph the process, should be denied.

THE COURT: Okay. I got it. Thank you very much.

MS. DICICCO: Thank you.

THE COURT: Mr. Slack. Oh wait, Mr. Schwartz, did we cover everybody? Got all your colleagues? Will you counter for everybody? Well if there's a lawyer who expected to make a --

MR. SCHWARTZ: We got everybody, Your Honor, I'm sorry.

THE COURT: Oh, okay. Will you -- I'm sorry to take so much time here. You were nice enough to coordinate with your fellow opponents here and I just want to make sure we got everybody accounted for.

MR. SCHWARTZ: Yes, Your Honor. We do.

THE COURT: All right, Mr. Slack, you have time to

reply.

MR. SLACK: Thank you, Your Honor. So let me start with the extension as opposed to the merit procedures. I'll deal with those a little separate even though they come together at some point.

The first is, is that it's certainly our position, and I think the Court recognizes, that the objection deadline should be extended for at least everyone who didn't object. And the Court's not going to want thousands of these objections filed in the next two weeks or even in the next month to people who haven't objected and who are willing, and quite frankly able, to go through the securities process. So then the question becomes what to do with the objectors and the issue of what to do with the objection deadline for them. And I think Your Honor recognized an important point, which was even under sort of the RKS model, their proposing that they do sort of a modified version of what we did and then we would have some time, obviously to object after that. So there's going to need to be, no matter how you view these procedures, some amount of time and some amount of extension. And what we would say, Your Honor, is that there's a real advantage we believe, and we still believe having heard everybody, to allowing two things that are very critical. One is to allow the securities procedures to be exhausted and second, Your Honor, and this I think is really important, is to put every claimant on the same

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 62 of 98

footing. So it doesn't matter if you're like RKS and you say, "We're done. We were early whether we pushed forward, or whatever. We're done." But there are claimants who aren't done yet and the fact is, is that when you asked counsel for RKS, "Well what's going to happen when everybody comes in?" I think there was a real recognition that, that's going to happen and the answer was, "Well we're all going to sit down and figure it out then." And here's the point, Your Honor, that I think is very clear from our procedures, okay? Is that, that's what we're saying. What we're saying, let's put everybody on the same schedule, okay? And then let's figure out how we deal with this. And I think the difference between what we're suggesting and what RKS is suggesting is a finite matter of months. And I would tell you the other big advantage to what the debtors are proposing is that from our perspective, and I don't think there's any question about this, if we continue to let the procedures work, they've been working pretty dramatically and I don't think anybody said anything else. I mean, when you're talking about 300 settlements a month, this is all working. It's working the way it was intended to work. We're going to get to a whole lot more settlements and now that the mediation procedures are in place, what that's going to mean if we actually resolve a bunch of players, is that when we sit down and talk, we're not going to be forcing people to come in and try and intervene and the like early. What you're going

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 63 of 98

to do is those people who are resolved are going to be resolved and quite frankly, we're willing and that's the whole point here. To turn to litigation and work out a process collectively with RKS. We're willing to meet with them and work with RKS. But the point is that our procedures actually do what RKS has said, to some degree, but they do it in a more coordinated fashion that's not going to force people to come in and litigate before the procedures are exhausted.

Now with respect to a couple of other points before we go to the couple of things from Oregon. With respect to the new procedures, there are two real points in responding to PERA. Number one, Your Honor, is there are no due process concerns for PERA. PERA doesn't have to make any choice under these procedures. In fact, they're excluded from the procedures. They've already in their proof of claim adopted -- they've said specifically they're adopting their own complaint. So there are no due process concerns for PERA at all. So what PERA is really saying if you look at their pleading, their pleading is securities claimants and what they're essentially saying is they're making this objection on behalf of other people, not themselves. And the Court's already told PERA that they don't represent these other folks in the bankruptcy. But fine, let's turn to the due process argument that PERA's counsel talked about.

THE COURT: Before we talk of due process, what if

Judge Dablow decides he's going to -- he's not going to stip any -- and tomorrow as I implement your procedure to PERA complaint in the bankruptcy court and tomorrow Judge Dablow grants the motion to dismiss as to the non-debtor defendants, what happens to the PERA bankruptcy version before me? Do I get to deny a motion to dismiss or do I have to file them? What is the outcome from a case -- from appearance of due process?

MR. SLACK: Well sir, there's two different issues because there's no class certified in that case, there's just (indiscernible) it's certainly going to be collateral estoppel as to PERA itself.

THE COURT: Okay, but it's more importantly, it means a bunch of officers and directors are out of the lawsuit. But --

MR. SLACK: Well at least for those particular claims, there are --

THE COURT: Yes, I understand.

MR. SLACK: -- a motion to dismiss in the District Court is not a complete motion. But there are particular claims and particular securities that it applies to. And so --

THE COURT: But those defendants aren't before the bankruptcy court even if we adopt the PERA complaint so what's weird about this proposal is that last time I checked, PG-E is not an active defendant in the PERA complaint. And the

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 65 of 98

officer/directors are not players in the bankruptcy that you want me to import the PERA complaint into the bankruptcy court and make rulings on the merits of it. I found that to be strange.

MR. SLACK: Well let me just -- let me say this, Your Honor, and I think if you listen to Mr. Schwartz, where he started it was really telling. What he said was that he anticipated based on the process that folks were adopting the PERA complaint as a result of the process that was put in place. I think, Your Honor, the idea is that what we're saying is, is that people need the ability to choose to do that if that's what Mr. Schwartz and his clients want to do, that's fine. They can put in a pleading that just says, "Look, we adopt PERA." Right? They can always do that. So all we're saying, Your Honor, is cause if you do remember, which I know you do, Your Honor, when we did the extended bar date, that was based on the class in the PERA complaint.

THE COURT: No, I know. I know it was.

MR. SLACK: And so --

THE COURT: And as for malpractice purposes, we created a class for -- our claims were old and people who fell outside that time limit and they're out. They're out of the money, right?

MR. SLACK: That's right. That's right, Your Honor. So the only point that we're making is, we wanted to put an

option, again it's purely voluntary, where somebody can adopt the -- which, again, I think they could do now. They could say look there's this complaint filed, we adopt it and it gives folks that don't want to spend the money, the ability to settle, right --on their own. And look, one huge advantage for the -- everybody who has settled up till now, without having a class, is they haven't had to pay class counsel, right? They're getting their money. They're getting it early and they're not paying class counsel. And so --

THE COURT: Presuming their -- they may be paying their own counsel.

MR. SLACK: And maybe they are and maybe they are. That's exactly right, but maybe they're not. Maybe they don't have counsel. Maybe they have a financial advisor. Maybe they are paying their own counsel but they're not paying him the equivalent of twenty or twenty-five or thirty percent. So --

THE COURT: Well Mr. Slack, in my world low hanging fruit is usually in small lousy apples anyway. It's not the big tasty ones that are up on the higher branches. So low hanging fruit has a practical aspect to it also.

MR. SLACK: Yes, well, I'm going to say this, Your Honor. I think it's really unfair to keep talking about low hanging fruit. I will tell you, Your Honor, we've made offers to people who have potentially one-hundred-dollar damages 100,000-dollar damages and over 1,000,000 dollars in damages

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 67 of 98

and we settled with people in each of those categories.

THE COURT: Good. Keep up the good work.

MR. SLACK: This isn't -- yes, and we're going to try Your Honor. And the fact that we think it will be successful. But the point is, is that this process has worked and will continue to work if it's given the time to work.

THE COURT: Okay, I got it. I know. I understand.

MR. SLACK: You know a couple of other points that I think are important here about the PERA complaint, about -- with respect to the

THE COURT: I'll tell you what I -- you've appeared before me many times and you always put on excellent arguments but I'm going to cut you off.

MR. SLACK: Okay.

THE COURT: I'm simply not going to take your recommendation here today and I'd be misleading you if the next ten minutes could change my mind. I've given lots and lots of thought to this and so have you and so have all these other counsel and you've given me a lot of stuff. But I think in fairness to you and in fairness to the process I don't want to give you a false sense of security. So I'm going to cut off the argument and tell you a portion of my decision and a portion of that I'm going to leave out. I do feel strongly that it's almost ironic that we're at this days away from the third anniversary of the confirmation order and I don't

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 68 of 98

remember the actual date. We have the first of the --

(sound lost)

MS. DICICCO: Am I the only one who lost sound?

UNIDENTIFIED VOICE: No, I lost it too.

MS. DICICCO: Your Honor, We couldn't hear what you said after the anniversary date, you went -- you froze.

THE COURT: Oh, yes, okay. Now my connection is unstable. Hold on. Okay, Ms. Parada, can you hear me now?

THE CLERK: Yes, I can hear you now, Your Honor.

THE COURT: Okay, thank you for catching me up, Ms. DiCicco. I've reflected on the fact that we have coming up to the third-year anniversary and I'm gratified that although the securities case administration is completely different from the fire case, that the fire victims, although they're unhappy with the amount they've been paid, the numbers of them that have been paid are a much better percentage and I think about the complexities that have been done there and the question is well why isn't this moving at a better pace?

And I reflect on lots of things, and I go back, did I make a mistake by not taking PERA's example or request to invoke the class action the first time or the second time, and again, I'm not gloating or crying over spilled milk or blaming anybody, but Mr. Slack, you were very much a proponent of what I was persuaded to do, and I sort of feel that to change courses back to this procedure or your version of it is a

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 69 of 98

disservice to the process that implicated and caused a number of these creditors to engage counsel and do what they've been doing as late as today. So I think that -- and I wasn't kidding, if Mr. Etkin wants to make a motion to reactivate Rule 23 7023, he can free to do so.

But I believed then, and I still believe that for a lot of reasons, the bankruptcy claims process is preferable to the class action process, particularly in the situation where the plan in the PG&E case got confirmed so -- I won't say easily or quickly, but relatively easily compared to others mega cases of this nature. And as I stated during the argument, one of the things that makes me feel better about the process is the fact that people (audio interference), and these securities settlements can be implemented immediately.

And I think we have the tools in the toolbox under the claims objection process to work. Now, is it perfect, and is it perfect if there are still 1,000 disputed claims that are large and hotly contested? No, it's not perfect. But I'd like to think I and the debtors, over the objections of PERA and its counsel, chose a procedure that was more suited to the bankruptcy world, and I still believe that's true.

Now, should there have been a pause? It's not for me to say there should have been or shouldn't have been, but there was, and that slowed the thing up. Should there have been a delay appointing the mediators? Again, not going to say it

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 70 of 98

should or shouldn't have been. It may have slowed the process down. But obviously to the extent that PG&E is able to negotiate settlements without incurring the expense of its own counsel, perhaps more so or the mediators, those are legitimate goals, but what I like about the process that has worked is that whether they are little apples low on the tree or big apples higher on the tree, that thousands of creditors have -- securities creditors have at least some closure by having their claims allowed.

And I think to go back and go back and kind of circle almost 360 degrees to something that sounds like and acts like a class action in disguise is a bad choice, and I'm not prepared to adopt it. So I'm simply go -- for that reason, I'm going to deny the debtor's motion insofar as implementing those procedures.

Now, I've already stated in an order that I'm certainly agreeing over because there are no objections to implementing the modification to the mediation (audio interference) in the two ways that was suggested, and I'm extending by the six month as requested, the bar date, for the general claims.

In terms of what's left there for in terms of what we have on today's motion, I appreciate RKS's suggestions, but I think they're just too tight and too confining, and I think Ms. DiCicco has a better way in the way she expressed it, and I

think to lock people into a pleading that may get dismissed doesn't actually involve the debtor, but involves people who aren't before the Court is just an invitation to confusion and disaster. And Mr. Ritholtz's suggestions are good, but perhaps a little bit too confining.

So what I'm going to do -- and finally, Ms. DiCicco makes the suggestion that I implement a change in the mediation so that the claimants can cancel or call off the mediation rather than the way it's designed. I'm going to stick with what the debtor designed because that aspect of the procedure has been -- seems to be working.

And frankly, with the mediators now engaged -- and maybe there will be an expansion of the mediation board panel -- I'm hoping that numbers of these things will pick up promptly, but I'm not going to tie the debtor up in the next seventeen days to file crazy objections or anybody else to start worrying about things, and therefore, I'm not going to adopt the RKS alternatives at this point.

What I'm going to do at this point is -- is -- and by the way, Mr. Slack, I'm going to make a decision that affects all the securities claimants, not just the objectors, at least for the short term. Whether there should be a different procedure just for these parties who formally objected or something less for people that haven't, I'm not going to make a decision on that today.

But I'm going to suggest for example that I will, today, on this record, extend the bar date for the debtor to file objections by sixty days, and in the next perhaps -- so that means, at the end of August, rather than the end of June, if I'm doing the math correctly. And I want Mr. Slack and the principal lawyers, like all of you around this call today and others who wish to be involved, to put your heads together and come up with a procedure that will deal with the kinds of concerns that Ms. DiCicco was describing.

I don't want to have a situation where -- let's assume further that between now and that deadline there are some successful mediations and successful settlements, even without the mediators, but I still anticipate there will be a number of claims that are at issue, and any claimant between now and whatever that date is who wishes to amend its proof of claim can amend its claims just because the Rule is permitted and there's no objections pending.

And I want the principal lawyers to meet and confer and see if there is a consensus that -- and Mr. Ritholtz was talking about this, too -- about an agreement as to what is a reasonable period of time for the debtor to -- or any amendments that the debtor -- excuse me -- for any amendments that the claimants wish to make, not to file new complaints, but simply to amend their proofs of claim as they see fit, and for the debtors to have a meet and confer with counsel to come

up with a procedure that if the debtor chooses to object, we then have a meet and confer among counsel to talk about a well-organized case management session to have the first hearing.

So at that first hearing, I would hope there's already been perhaps some protocols and discussions agreed to about how we don't turn it into a crazy mayhem. And I haven't thought through what this would be like, and I want you, Mr. Slack, to take the lead to use your good brain to think through reasonable things, and let these other counsel work with you to come up with something that might makes sense.

I hope that's clear. But I suggest that we have just a status conference on this issue, let's say, in three weeks, three or four weeks from now, so that the order today would be the motion is granted to the extent that it extends the noncontroversial things we've talked about. It's denied to the extent that the debtor wishes to implement the procedures that we've talked about, and that the deadline for the debtor to object to securities claims is extended at least for sixty days and -- sixty days more. So it's essentially eighty days, and that roughly in twenty or thirty days -- I'm jumping around here -- four-weeks' range, something like that, we have a conference to talk about whether there's been an agreement on how best to make sure the debtor doesn't have to go crazy with objections and people have to respond to lengthy objections on a crazy basis. In other words, a status conference to flesh

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 74 of 98

things out.

And I hope that's clear. If it's not completely clear it's because I've been making this up as I've been going through it and thinking about it. So I don't think it would be constructive to have a huge debate now. I am welcome to have a further -- I won't say off the record. I don't mean off the record, but on the record, but a -- conference among you, as the principal lawyers, and me to talk about how best to implement these various things if that's your wish.

And Mr. Slack, I'm going to let you be the tour guide to figure out when that should happen, and you can meet with these counsel and talk about what's good. So whether we have an informal conference -- again, I say informal. I don't mean to imply anything other than on the record like we do everything else, but it doesn't have to be something that a bunch of pleadings get filed. It can just be a conversation like this as to what you think to do.

To the extent that you feel I should formally issue orders because people may seek appellate review, I'm happy to do what people want, if everybody is willing just to sit tight for the next few weeks and let you all work together in a constructive, collaborative manner, then I can sign an order at some other date. I'll leave that to you, Mr. Slack, to think what's best so that the public at large and the thousands of people that are following this case will know what we're doing.

Okay? Is that clear enough for starters, Mr. Slack?

MR. SLACK: Well, I think we have some marching orders. I do want to make -- I do want to say two things, which is I completely understand what Your Honor is saying. I would suggest for two reasons that I'd like the Court to at least consider after this hearing making that sixty-day time frame a little longer, and here's the two reasons why:

The mediation procedures allow a significant amount of time, like forty-five days -- maybe forty-two, but forty-two, forty-five to even implement a mediation, or you have to give a lot of notice. And so with respect to getting mediation started and the like, two months is not going to be enough time to have any progress with respect to the mediations at this point.

The second thing, Your Honor, is -- and I think no matter whether you make it an extra amount of time or not when you go back and think about it, what I would say it's going to take some time to develop this and work with folks, and we're perfectly willing to do that, but I think given the amount of people and the issues we have, I think it's going to take a little more time than that. So anyway, I leave you with that, Your Honor, and I know that you'll think about that before the order, but that would be our request.

THE COURT: Well, I could ask for a show of hands, but I'd rather what all of you do is talk to your colleagues or

whoever you want, and there can be an agreement that the sixty could become some other number, but Mr. Slack, 60 does not mean 180, and Mr. Ritholtz might want 60 to be 30, and I'm just trying to come up with something that will give the debtor and the whole system in the bankruptcy context, not what I'll call the 723 light PERA version, but the traditional bankruptcy claims process to stay in place.

And it seems to me that if you discuss even extending sixty to some other time among these principal counsel and we have a status conference in four weeks, that solves the problem. I mean, it gives you -- that should be an easier thing to talk about. I've tried to make it clear, I'm trying to stick with the process that we put in place and not let it get changed too much. Okay. So but I'm also not saying, see you in six months --

MR. SLACK: Right. And we understand --

THE COURT: I'm accepting the argument that Mr. Ritholtz and Mr. Schwartz made that -- again, if this isn't obvious, I was impressed before and I'm impressed again about the enormous amount of effort that these claimants and their counsel have been put to also. And it seems like to say, well, we're going to go all back and toss all that and you're part of a new class action -- or the debtor's version of it -- is not the right way to go.

So I'm going around in circles, but for now, I'm not

going to issue a written order, but if there's a consensus among all of you about it, I will.

Ms. DiCicco?

MS. DICICCO: Yes. Thank you, Your Honor. On the point of whether you enter an order now or later, I would request that you enter it sooner, just because there are a lot of people following the docket who think these procedures may be put in place, and I think they should know that they won't be because it may impact their negotiations with the debtors in terms of pending offers and settlements.

THE COURT: Well, would it be satisfactory -- again, I'm -- and if somebody wishes to take an appeal, I would like the appellate court have a better understanding of my thinking other than the oral transcript. But would you be satisfied if I just issued something that said, for the reasons stated on the record, the debtor's deadline of June 30th is extended to August 30th for purposes of the securities claims objections. Is something that simple, is that clear enough?

MS. DICICCO: I think it can be short and sweet that way, Your Honor. I guess, the point I'm making is the requested litigation procedures in the motion, the request for that part has been denied.

THE COURT: Mr. Slack, can you propose an order that satisfies the notion of the public record reflecting what we're doing without going into any detail, and circulate it with

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 78 of 98

these counsel anyway, and get their consent as to the form of it.

MR. SLACK: Yeah. We'll do that. And look, Your Honor, I know this is not a -- either this procedure, there's no sort of no precedent for it, and we'll do it.

I'm just going to say that from the debtor's standpoint, we're going to go, we'll try to work out procedures, but until we actually have that discussion and meet with Your Honor, figuring out what we're going to have to draft in terms of objections and how those are going to look like, again, I think that sixty-day period is just not going to be sufficient because we're not going to be able to really start that work until we get -- we meet an confer and then we get Your Honor's -- we meet with Your Honor and get your input. So again, we --

THE COURT: What if I just denied it today without a (indiscernible), what would happen?

MR. SLACK: Well, then you'd get 4,000 objections that you -- that --

THE COURT: Well, I'm not trying to --

MR. SLACK: -- we'd all have to deal with I a very short period of time, and then most likely would be, as we said, they would be these just are simply insufficient, and I don't think that's going to move the ball at all. So I think Your Honor realizes that.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 79 of 98

THE COURT: Okay. Look, your assignment is to circulate with these counsel a simple order. I'm going to have Ms. Parada make the minute order reflect that the debtor's motion is denied as to the litigation procedures.

It's granted as to the extension of the securities -- excuse me, as to the deadline for objections to securities claims, and a formal order will follow, and then I'm going to -- so that will just be a short docket entry, and then I'll expect you to take the lead with these counsel for an order that memorializes it for purposes of the public record beyond the docket entry. And I'll expect that you will circulate your suggestion among counsel for a date that's convenient for everybody in the four-week time period just to have the conversation. And believe me, I'm available. Okay.

Anybody else want to be heard? Okay. Thank you all for your time. I appreciate the hard work on all sides, and look forward to -- well, I guess I look forward to another session with you.

MS. DICICCO: Thank you, Your Honor.

THE COURT: Ms. Parada, did you have a question?

THE CLERK: Did you want to set a continued hearing, Your Honor, or a status conference now?

THE COURT: Well, Mr. Slack, do you want me to pin down a date now, or do you want to discuss it with your colleagues and other counsel and come back to Ms. Parada?

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 80 of 98

MR. SLACK: Yeah. I mean, we'll come back. We'll come back in sort of very short, short order.

THE COURT: I mean, are regular PG&E calendar date there on the Court's website, and I'd like to leave them on there, but we can do it for -- we can set it specially if that works.

MR. SLACK: Yeah. Okay.

THE COURT: Thank you all for your time and participation.

IN UNSION: Thank you, Your Honor.

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 81 of 98

INDEX

| RULINGS: | PAGE | LINE |
| --- | --- | --- |
| Motion denied as to litigation procedures; motion granted for extension deadline for objections to securities claims | 80 | 4 |

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 82 of 98

C E R T I F I C A T I O N

I, Cathy L. Kleinbart, certify that the foregoing transcript is a true and accurate record of the proceedings.

/s/ CATHY L. KLEINBART

eScribers
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020

Date: June 8, 2023

#

**#207 (1)** 83:12

$

**$1 (2)** 49:17,18

/

**/s/ (1)** 83:9

A

**ability (2)** 66:11;67:4
**able (6)** 7:9,10;25:21;62:12;71:2;79:12
**absolutely (1)** 42:9
**accept (2)** 23:23;54:8
**acceptable (1)** 59:7
**accepting (4)** 22:19,19,20;77:17
**accomplishing (1)** 20:7
**according (1)** 13:5
**accounted (1)** 61:23
**accurate (1)** 83:4
**accused (1)** 43:12
**acknowledged (1)** 43:4
**acted (1)** 29:9
**action (18)** 25:11;30:14;34:19,25;36:22;38:3,18;39:19;40:2,8;46:13;54:18;59:21;61:6;69:21;70:8;71:12;77:23
**actions (1)** 40:1
**activate (1)** 39:15
**active (1)** 65:25
**actively (1)** 41:16
**acts (1)** 71:11
**actual (3)** 50:12;57:1;69:1
**actually (18)** 7:24;9:6;10:4;19:13,14;21:12;24:1;27:22;33:11;39:18,20;50:14,18;60:13;63:23;64:5;72:2;79:8
**add (5)** 23:18,19;52:8;60:22,23
**adding (1)** 50:15
**addition (1)** 51:14
**additional (3)** 7:16;51:11;55:12
**address (4)** 28:1;53:4,7;55:1
**addresses (1)** 54:19
**adequate (1)** 36:17
**administration (1)** 69:13
**adopt (19)** 19:11;23:17;24:13;26:17;27:22;34:24;50:20;51:8;52:21;53:11,12,15;54:16;65:23;66:14;67:1,3;71:13;72:18
**adopted (1)** 64:15
**adopting (3)** 31:22;64:16;66:8
**adoption (1)** 51:16
**adopts (1)** 26:9
**ADR (9)** 30:13;42:24;43:13,20;45:7;58:17;59:18;60:14;61:1
**advance (1)** 39:9
**advantage (6)** 20:8;21:12,21;62:21;63:14;67:5
**advantages (1)** 22:13
**adversary (1)** 59:23
**advisor (1)** 67:14
**affects (1)** 72:20
**again (34)** 10:16,22;11:15;16:18,20;17:18;18:16;22:10;25:7;26:24;28:4;30:4;33:22;34:7,14;37:7;45:10;46:12,19;47:5;48:2,22;59:10;60:18;67:1,2;69:22;70:25;75:13;77:18,19;78:11;79:11,15
**against (5)** 24:16;30:18;31:3,4;32:5
**agent (1)** 25:16
**aggressive (1)** 5:22
**ago (8)** 5:19;9:24;12:1;13:13;18:9;30:12;44:16;54:13
**agree (10)** 16:3;20:21;21:6;27:22;42:20,21;45:4;50:2;51:18;59:17
**agreed (7)** 23:2,17,17;27:18;41:12;43:8;74:5
**agreeing (2)** 23:21;71:17
**agreement (6)** 11:23;23:4;43:10;73:20;74:22;77:1
**agrees (1)** 14:20
**ahead (7)** 12:13;13:7;17:12;18:11;24:8;30:9;60:22
**Aitken (1)** 37:23
**allegations (1)** 53:16
**allege (2)** 55:6,7
**allocate (1)** 23:4
**allow (5)** 9:16;19:2;38:9;62:23;76:8
**allowed (5)** 12:19;13:22;22:12;33:17;71:9
**allowing (1)** 62:22
**allude (1)** 31:9
**almost (6)** 34:21,24;46:11;54:12;68:24;71:11
**alone (4)** 11:17;34:17;36:19;38:19
**along (1)** 19:16
**alternative (2)** 42:21;44:1
**alternatively (1)** 20:18
**alternatives (1)** 72:18
**although (4)** 6:4;24:12;69:12,14
**always (2)** 66:14;68:12
**amazed (1)** 9:22
**amend (26)** 15:6,7,8,11,19;16:1;19:11;20:1,4,19;26:8,8;33:3,5,13,13;42:1,15;44:17;46:18,18;57:21,23;73:15,16,24
**amended (5)** 14:21;20:17;33:6;44:20;48:8
**amending (3)** 15:24;33:7,15
**amendment (4)** 15:20;20:7;48:7;49:2
**amendments (4)** 15:14,22;73:22,22
**amends (2)** 20:5;21:21
**among (5)** 74:2;75:7;77:9;78:2;80:12
**amount (9)** 36:23;40:5;62:19,20;69:15;76:8,16,19;77:20
**amounts (1)** 49:24
**analogist (1)** 56:5
**and/or (1)** 5:17
**anniversary (4)** 34:21;68:25;69:6,12
**answered (1)** 30:7
**anticipate (2)** 8:10;73:13
**anticipated (1)** 66:8
**apart (1)** 30:14
**apologize (1)** 5:2
**apparent (1)** 30:25
**appeal (6)** 28:12;29:16;54:21,22,24;78:12
**appeals (3)** 29:1,3;55:16
**appear (3)** 3:8,13;54:24
**appearance (3)** 4:18;5:1;65:7
**appearances (2)** 3:15,17
**appeared (2)** 54:20;68:11
**appears (1)** 23:20
**appellate (3)** 28:18;75:19;78:13
**apples (3)** 67:18;71:6,7
**applies (2)** 26:25;65:21
**apply (2)** 51:15,21
**appointed (2)** 18:8;36:24
**appointing (1)** 70:25
**appreciate (2)** 71:23;80:16
**approach (1)** 30:20
**appropriate (3)** 11:16;15:20;31:10
**approved (7)** 9:15,23,23;22:5;24:3,4,12
**approximately (3)** 6:6,10;22:9
**area (1)** 39:21
**argue (1)** 56:22
**argued (1)** 54:21
**argument (9)** 4:22;5:19;14:2;18:11;24:10;64:23;68:22;70:12;77:17
**arguments (4)** 11:25;25:13;56:22;68:12
**around (4)** 30:12;73:6;74:20;77:25
**aside (6)** 5:14;17:25;20:9;44:18;53:17;59:10
**aspect (5)** 36:5,16,17;67:20;72:10
**aspects (1)** 36:17
**assert (2)** 24:1;57:2
**asserted (4)** 24:2;30:18;31:3;49:4
**assignment (1)** 80:1
**Association (1)** 5:5

**assume (11)** 4:7;8:16,18;13:18, 23;44:17,19;57:22, 25;58:22;73:10
**assumes (2)** 39:25;53:14
**assuming (1)** 15:21
**Atkin (1)** 39:14
**attempt (2)** 58:12;59:20
**attempted (1)** 16:21
**attempting (1)** 37:11
**attractive (2)** 22:16,16
**audio (6)** 16:6;18:1;24:20; 27:8;70:13;71:18
**August (2)** 73:4;78:17
**available (1)** 80:14
**avoid (4)** 17:14;19:19;33:15; 52:10
**aware (2)** 28:10,10
**away (3)** 33:2;57:18;68:24
**AZ (1)** 83:13

## B

**back (27)** 10:21;11:5,8,24; 12:13;14:8,11;17:20; 21:7;26:7;33:22; 41:21;44:10;48:23; 50:13;54:13;57:12, 17;69:19,25;71:10, 10;76:17;77:22; 80:25;81:1,2
**bad (3)** 8:25;11:23;71:12
**Bail (1)** 14:7
**balance (1)** 23:13
**ball (1)** 79:24
**balls (1)** 34:13
**bank (1)** 25:7
**Bankruptcy (28)** 27:1;28:14;29:11, 23;31:15;33:7;37:6; 38:10;39:25;45:23; 46:12;48:25;50:16, 22;51:16,16;52:2,4; 64:22;65:3,5,23;66:1, 2;70:7,21;77:5,6
**bankruptcy-related (1)** 29:1
**bar (6)** 20:23;34:5;45:12; 66:16;71:20;73:2
**based (9)** 23:23;24:19;25:19; 33:25;52:15;53:22; 55:8;66:8,17
**bases (1)** 24:1
**basically (1)** 51:9
**basis (9)** 17:6,16;21:1;27:12, 16;31:11;58:1,3; 74:25
**bat (1)** 5:7
**become (2)** 30:24;77:2
**becomes (1)** 62:13
**begin (2)** 17:21;22:3
**behalf (7)** 3:19;5:4;23:11,12; 48:11,14;64:20
**beholder (1)** 35:17
**believes (1)** 35:16
**bellwether (2)** 16:5,6
**below (1)** 22:7
**bench (1)** 45:8
**benefit (3)** 33:25;34:14;37:8
**benefits (1)** 31:20
**best (5)** 33:15;46:24;74:23; 75:8,24
**better (8)** 42:21;50:8;61:9; 69:16,18;70:12; 71:25;78:13
**beyond (3)** 27:18;50:13;80:10
**big (5)** 22:13;40:23;63:14; 67:19;71:6
**binding (2)** 10:25;31:20
**bit (5)** 24:13;40:1;50:11; 59:11;72:5
**blame (2)** 17:22;34:11
**blaming (4)** 17:22;18:5;34:12; 69:22
**blanks (1)** 15:24
**blew (1)** 17:20
**blown (2)** 15:22;57:2
**board (1)** 72:13
**boat (1)** 14:22
**Bockius (1)** 4:14
**Bodnar (1)** 4:23
**boilerplate (1)** 49:6
**both (5)** 6:3;22:13;50:19; 54:4;59:7
**bottom (1)** 35:17
**bound (1)** 55:3
**brain (1)** 74:8
**branches (1)** 67:19
**break (1)** 26:9
**brief (1)** 53:4
**briefing (1)** 54:17
**briefs (1)** 28:17
**bring (3)** 3:13;56:21;61:5
**bringing (1)** 4:9
**brought (1)** 24:15
**built (1)** 51:22
**bunch (4)** 47:6;63:23;65:14; 75:16
**bundle (1)** 44:19
**burden (8)** 24:23;25:18;56:14, 14,16,17,18;57:6
**burdensome (1)** 16:4
**business (1)** 7:14
**buyer's (1)** 35:5

## C

**cake (1)** 52:3
**calendar (1)** 81:3
**CALIFORNIA (2)** 3:1,19
**Call (9)** 3:3;19:19;28:24; 34:13;56:11;61:1; 72:8;73:6;77:5
**called (1)** 47:9
**Calling (3)** 3:5;19:20,23
**calls (2)** 47:18;56:10
**CalSTRS (2)** 38:22;46:1
**can (65)** 3:13;9:7,11;10:10; 11:21,22;14:7;15:8, 11,19;16:1,6,7,12,13; 17:24,25;18:19,19,19; 19:10;21:6;26:20,25; 28:24;33:3,13;38:10; 41:13;42:20;45:4,9; 46:5,8,9,23;47:16; 48:4;51:1,19;53:11, 12,15;54:21;59:1,1,2; 60:3;66:13,14;67:1; 69:8,9;70:5,14;72:8; 73:16;75:11,16,22; 77:1;78:19,23;81:5,5
**cancel (1)** 72:8
**candid (1)** 35:25
**capable (1)** 37:14
**care (1)** 36:18
**case (33)** 16:14;19:25;23:21; 24:25;25:1;27:13; 31:5,14;32:8;33:25; 37:7;38:16;40:8,10, 10,13;42:6;44:22,23; 46:5,9,22;52:2;56:17; 57:6,7;65:7,10;69:13, 14;70:9;74:3;75:25
**case-by-case (1)** 27:16
**cases (2)** 18:10;70:11
**catastrophe (1)** 58:21
**catching (1)** 69:10
**categories (1)** 68:1
**category (1)** 13:19
**Cathy (2)** 83:3,9
**cause (1)** 66:15
**caused (1)** 70:1
**causes (1)** 55:4
**certain (2)** 45:1;47:24
**certainly (4)** 46:13;62:6;65:11; 71:17
**certified (2)** 39:20;65:10
**certify (1)** 83:3
**challenged (1)** 58:2
**chance (2)** 20:19;40:9
**change (5)** 55:11;60:17;68:17; 69:24;72:7
**changed (1)** 77:14
**check (1)** 3:11
**checked (1)** 65:24
**Chevron (7)** 4:2;7:2;13:24; 23:17;27:21;37:16; 46:2
**Chevron's (1)** 23:19
**choice (6)** 31:22;32:1;53:10; 57:15;64:13;71:12
**choices (2)** 53:11;59:6
**choose (3)** 40:13;41:4;66:11
**chooses (1)** 74:1
**chose (2)** 52:1;70:20
**chosen (1)** 42:23
**circle (2)** 34:24;71:10
**circles (1)** 77:25
**Circuit (5)** 28:10,13,13,19; 29:17
**circuiting (1)** 58:6
**circuitous (1)** 54:18
**circulate (3)**

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 85 of 98

78:25;80:2,11
**circumstances (1)**
40:12
**civil (3)**
46:13;52:3,14
**claim (78)**
13:18,23,23,24;16:7;18:18,21;19:4,5,24;20:2,15,16;21:2,21,23,24;24:3,11,15,19,19;25:14,18,24,25;26:19,23;27:3,5;32:11,17,20;33:3,6,6,7,17;38:9;40:14;42:2,14;43:16;44:17,19,19;45:9,12;46:16,16;47:9;48:8,9,11;49:2,17,18;52:1,7,8,9;54:21;55:22,24;56:3,4,5,6,8,9,9,12,13,19;57:24;64:15;73:15,24
**claimant (8)**
11:10;21:18;27:11;40:16;41:22;48:17;62:25;73:14
**claimant-by-claimant (2)**
17:6,16
**claimants (36)**
4:14,20;7:6,7,16;8:11;10:12;14:11;16:18;17:5;22:14;23:22;24:2;26:8,11,17;31:12;32:4,24;41:15;42:18,25;43:1,7,7,9,9,12,14;55:5;63:3;64:19;72:8,21;73:23;77:20
**claimants' (1)**
52:7
**claims (85)**
6:2,7,8,11,12;7:10,12,16;8:3,6,13;9:6,17;10:25;12:8,18;13:11,16,22;14:1,4;15:2,9,11;16:10,21;19:13;20:11,14,20,25;22:3,4,6;24:2,11;30:18;31:3,4,6,14;32:5;33:3,20;34:2,6,6;35:15,18;38:12,17;39:6;43:15;44:18;46:14;49:14,17;50:3,5;51:22,25;52:11,15,17;53:22;55:18;57:2;59:9;61:7,8;65:16,21;66:21;70:7,16,17;71:9,21;73:14,16;74:18;77:7;78:17;80:7;82:5
**claim's (1)**
45:14
**clarified (1)**
49:3
**Clarify (1)**
48:1
**class (34)**
25:11;30:14;31:13;34:19,25;36:22;38:3,3,6,18;39:19,20;40:1,2,8,22;42:22;46:13;54:12,18;55:8;59:20;61:2,6;65:10;66:17,21;67:7,7,9;69:21;70:8;71:12;77:23
**clear (14)**
5:24;17:2;19:12;35:10;42:1;47:14;55:23;63:9;74:11;75:2,2;76:1;77:12;78:18
**clearly (1)**
31:18
**CLERK (5)**
3:4,11;4:9;69:9;80:21
**client (11)**
4:18;43:5;44:3;45:17;47:20;48:3,13;49:4,5,5;53:12
**clients (15)**
6:19;7:2;13:24;24:18;25:14;37:15;39:14;44:6,19;47:4,5,24;58:7;60:22;66:12
**client's (1)**
45:11
**clone (4)**
32:9;33:3,4;59:6
**close (1)**
24:7
**closure (1)**
71:8
**Code (4)**
23:24;50:16,22;51:16
**collaborative (1)**
75:22
**collateral (1)**
65:11
**colleagues (6)**
28:24;29:6;40:1;61:16;76:25;80:25
**collective (1)**
31:21
**collectively (2)**
10:11;64:4
**colloquy (3)**
31:1;44:16;60:21
**comfortable (2)**
38:25;40:21
**coming (4)**
4:6;13:6;34:24;69:11
**commented (1)**
35:13
**comments (1)**
23:17
**company (1)**
60:18
**compared (1)**
70:10
**comparing (1)**
21:20
**compelled (1)**
12:10
**complained (1)**
18:8
**complaining (1)**
27:14
**complaint (41)**
14:19,20,21;18:19;24:4;26:17;31:23,23,25;32:9,17;33:4,4;36:22,22;38:25;50:20;51:8;52:15;53:12,16,19,22;54:9;55:2,4,9,13;56:6,6,7;57:2;64:16;65:3,23,25;66:2,9,17;67:3;68:9
**complaints (2)**
9:18;73:23
**complete (1)**
65:20
**completely (7)**
11:9;20:21;21:6;32:8;69:13;75:2;76:4
**complexities (1)**
69:17
**comply (1)**
55:14
**complying (1)**
42:24
**concede (1)**
27:4
**conceded (1)**
32:7
**concedes (1)**
33:1
**concern (6)**
40:6,7;59:4;60:2,22;61:10
**concerned (1)**
25:6
**concerns (8)**
27:24;30:24;40:17,18,20;64:13,17;73:9
**concession (1)**
37:20
**condition (1)**
42:2
**conduct (1)**
16:6
**confer (5)**
45:3;73:18,25;74:2;79:13
**conference (18)**
13:25;20:11;21:25;24:23;27:2;44:21;45:6,9;46:4;48:24;57:4;74:12,22,25;75:7,13;77:10;80:22
**confining (2)**
71:24;72:5
**confirmation (3)**
34:22;38:1;68:25
**confirmed (1)**
70:9
**confusing (1)**
48:2
**confusion (1)**
72:3
**connection (5)**
5:19;29:3;31:13;32:5;69:7
**consensus (2)**
73:19;78:1
**consent (4)**
32:2,3;40:7;79:1
**consented (3)**
34:1,7,10
**consequence (1)**
21:17
**consider (1)**
76:6
**consolidation (1)**
16:8
**constitutional (1)**
27:24
**constructive (2)**
75:5,22
**contemplated (1)**
11:24
**contemplation (1)**
24:4
**contemporaneously (1)**
51:9
**contested (2)**
50:22;70:18
**context (4)**
37:6;40:8,8;77:5
**continue (7)**
8:10,15;9:3;58:16,17;63:16;68:6
**continued (1)**
80:21
**continuing (3)**
8:12;49:21;60:5
**control (3)**
16:7,13;36:16
**convenient (1)**
80:12
**conversation (3)**
28:17;75:16;80:14
**coordinate (2)**
25:22;61:21
**coordinated (3)**
14:18;15:3;64:7
**Corporation (1)**
3:6
**correctly (3)**
29:22;41:15;73:5
**cost (8)**
31:24;53:13,14,22,23;54:8,8;55:12
**costs (2)**
55:16;57:17
**council (1)**
53:15
**counsel (32)**
3:8,12;5:17;6:18;23:2;36:24;38:21,21;54:12,21;63:4;64:24;67:7,9,11,14,15;68:19;70:2,20;71:4;73:25;74:2,9;75:12;77:9,21;79:1;80:2,9,12,25
**counter (1)**
61:16
**counteroffers (2)**
43:20,21
**counterproposal (1)**
22:19
**couple (10)**
3:20;6:20;7:1;8:5;9:1;12:3;28:9;64:9,10;68:8
**course (3)**
9:4,14;18:6
**courses (1)**
69:25
**Court (225)**
3:3,4,7,12,22,25;4:3,6,11,15,21,25;5:3,6,11,21;6:14,17,24;7:18,20,23;8:1,14,18,20,23;9:14,20;10:6,16;11:3,11,13;12:16,18,24;13:1,8,10,21;15:5,11,16,18,21;16:6,23;17:4,10,12,18;18:1,15;19:6,8,15,17;20:1,4;21:14,17;22:18,24;23:1,5,8,14;24:6,17,22;25:3,5,24;26:5,13,20;27:2,19;28:3,8,16;29:2,4,5,15,18,21;30:2,6,11,15,19;31:5;32:4,4,7,19,25,25;34:10,18;35:3,7,9,10,12,13,20,22;36:1,2,6,6,8,13,24,25;37:13;38:7,9;39:7,9;40:24;41:2,8,11;42:5,11;43:22,25;44:14;45:7,21,25;46:11,23;47:3,11,13,17;48:1,15,20,22;49:8,10,15,22;50:7,10,18,24;51:18,19,25;52:20,23;53:1,5,20,24;54:4,15,19;55:10;56:1,8,16,20;57:3,9,12,20;58:14,18,21,25;59:5,13,22,25;60:3,8,9,12,

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 86 of 98

16;61:9,13,15,20,25;62:7;64:25;65:3,13,18,20,22,23;66:2,18,20;67:10,17;68:2,7,11,15;69:7,10;72:3;76:5,24;77:17;78:11,13,23;79:16,20;80:1,20,23;81:3,8
**court-endorsed (1)** 32:22
**Court's (4)** 5:23;62:9;64:21;81:4
**cover (2)** 29:11;61:16
**crazy (4)** 72:16;74:6,23,25
**created (2)** 49:14;66:21
**creation (1)** 48:24
**creditor (3)** 18:17;32:8,10
**creditors (4)** 16:1;70:2;71:7,8
**critical (3)** 10:9,18;62:23
**criticism (1)** 50:6
**criticize (1)** 50:7
**criticized (1)** 49:12
**criticizing (1)** 50:2
**cross (1)** 35:23
**crying (1)** 69:22
**current (1)** 60:4
**currently (4)** 29:16;54:14;58:7;59:18
**cut (5)** 11:22;40:24;58:11;68:13,21

## D

**Dablow (2)** 65:1,3
**Dalia (2)** 29:19;30:3
**damages (4)** 49:16;67:24,25,25
**data (1)** 55:8
**date (14)** 20:23;34:5;45:13;66:16;69:1,6;71:20;73:2,15;75:23;80:12,24;81:3;83:15
**Davila (3)** 30:22;31:14;32:5
**Davila's (1)** 53:25
**day (4)** 7:14;33:5;38:10;39:2
**days (12)** 21:22;36:15;46:17;51:3;68:24;72:16;73:3;74:18,19,19,20;76:9
**deadline (19)** 5:13;12:22;21:17;50:17;51:3,5,11;58:22,23;59:10;60:8,9;62:7,14;73:11;74:17;78:16;80:6;82:4
**deal (9)** 39:15;40:23;41:2;54:9;55:15;62:4;63:11;73:8;79:21
**dealing (4)** 25:16;34:3;36:4;39:6
**deals (1)** 40:20
**dealt (1)** 27:16
**debate (2)** 26:25;75:5
**debtor (28)** 22:17;23:20;26:2,20;27:7;30:19,19;31:4;32:2,16;34:1;36:21;37:11;39:5;44:20,24;46:15;72:2,10,15;73:2,21,22;74:1,16,17,23;77:4
**debtors (41)** 6:6,9;17:5;23:23,25;24:10;25:18;30:12;31:9,17,18;34:7;40:12;41:17,22,25;42:2,13,18,23;43:12,19;44:3,5;45:3;47:7;49:12,15;50:12;51:22,24;52:9,17;53:8;54:10;55:6;58:10;63:15;70:19;73:25;78:9
**debtors' (4)** 44:13;46:25;52:20;55:15
**debtor's (7)** 26:2;28:18;71:14;77:23;78:16;79:6;80:3
**decade (1)** 37:24
**December (1)** 5:13
**decide (8)** 20:14;21:10;34:17;40:9;46:9;51:6,9,25
**decided (1)** 53:24
**decides (3)** 39:14;54:1;65:1
**deciding (2)** 43:3;54:3
**decision (4)** 54:22;68:22;72:20,25
**decisions (2)** 20:14;56:4
**decline (1)** 20:8
**deemed (3)** 12:19;13:22;33:17
**defective (1)** 32:20
**defend (2)** 16:12,12
**defendant (1)** 65:25
**defendants (4)** 29:10;51:23;65:4,22
**defense (1)** 27:6
**definition (1)** 19:18
**degree (1)** 64:6
**degrees (1)** 71:11
**delay (3)** 42:23;54:7;70:25
**demonstrate (1)** 56:18
**denial (3)** 35:9,11;46:12
**denied (10)** 37:22;43:25;47:18;54:22;61:12;74:15;78:22;79:16;80:4;82:3
**Dennis (1)** 3:5
**deny (16)** 8:15,23;10:21;11:21;12:4;13:16;17:23;33:2;36:11;39:12;52:20;57:20,23;58:14;65:6;71:14
**deposition (2)** 16:12;37:2
**depositions (3)** 14:16;16:12;33:21
**describing (1)** 73:9
**designed (4)** 57:18;60:14;72:9,10
**desires (1)** 48:17
**despite (1)** 30:23
**detail (2)** 53:11;78:25
**determination (1)** 31:20
**develop (4)** 26:11;27:12;55:12;76:18
**deviation (1)** 45:24
**dialog (1)** 8:15
**DiCicco (42)** 3:14;4:12,13,13;23:13;52:23,25;53:3,6;54:2,6;55:21;56:13,18,21;57:5,8,11,14;58:4,16,20,24;59:4,12,17,23;60:1,7,13,24;61:14;69:3,5,11;71:25;72:6;73:9;78:3,4,19;80:19
**difference (1)** 63:12
**different (13)** 14:14;15:2;16:4,15,16;20:6,19,22;39:8;56:3;65:9;69:13;72:22
**differently (2)** 39:24;41:15
**difficult (2)** 16:3;18:5
**diminishing (1)** 37:16
**directors (3)** 26:3;29:24;65:14
**disagree (3)** 21:10;42:19;47:22
**disagreeing (1)** 46:20
**disallowed (3)** 20:17;27:5;45:14
**disaster (1)** 72:4
**discourage (1)** 52:19
**discovery (20)** 12:11;14:12,13;16:8;20:19;24:25;25:2,3,6,20,22,23;26:7;33:21;36:16;44:24;45:1,5;51:23;57:10
**discuss (3)** 46:5;77:8;80:24
**discussion (2)** 18:4;79:8
**discussions (2)** 33:14;74:5
**disguise (1)** 71:12
**dismiss (24)** 29:9,12,24;30:17;40:14;50:21;51:4;52:1;53:18,19,20,21;54:10,12,17,20;55:16,23,25;56:3,11;65:4,6,19
**dismissal (3)** 26:18,21;33:15
**dismissed (2)** 32:18;72:1
**dispositive (1)** 45:9
**dispute (1)** 28:20
**disputed (1)** 70:17
**disservice (1)** 70:1
**district (11)** 29:4,8;30:11,14,15;31:5;36:24;51:25;53:20;55:9;65:19
**docket (3)** 78:7;80:8,11
**document (4)** 16:4;37:3;48:13,15
**documents (2)** 14:15;48:16
**dollars (1)** 67:25
**done (11)** 14:16;17:16;20:24;43:14;51:1;55:10;58:11;63:2,3,4;69:17
**Doolittle (6)** 3:16,25;4:1,2;23:16;37:16
**door (1)** 24:7
**down (10)** 21:5;22:7;26:10;39:4;41:25;61:10;63:7,24;71:2;80:24
**draft (4)** 26:17;38:24;53:23;79:9
**drafting (1)** 31:24
**dramatically (1)** 63:18
**duality (1)** 22:11
**due (8)** 31:11;32:12;40:17;64:12,17,23,25;65:7
**during (2)** 7:11;70:11
**duty (1)** 40:22

## E

**earlier (1)** 57:16
**early (4)** 33:25;63:2,25;67:8
**easier (1)** 77:11
**easily (3)** 39:5;70:10,10
**eat (1)** 52:3
**effectively (3)** 15:19;30:20;32:23
**efficiency (1)** 61:5
**effort (2)** 31:24;77:20
**efforts (1)** 20:10
**eighty (1)** 74:19
**eighty-three (1)** 6:11
**either (12)** 8:8;10:25;19:10;23:23;26:17;32:9,16;39:12;44:1;50:20;57:23;79:4
**elective (1)** 37:12
**elements (2)** 50:15;51:12
**else (15)** 4:8,22;12:7,12;14:9;20:9;26:9;39:14;41:4;49:10;60:22;63:18;72:16;75:15;80:15
**emphasis (1)** 53:8
**emphasized (1)** 30:16
**Employees (1)** 5:5
**empty (2)** 8:21;10:17
**encourage (1)** 18:7
**encouraging (2)** 16:24,24
**end (10)** 26:23;39:2;44:2;45:14;47:6;50:18;52:21;60:25;73:4,4
**ended (1)** 22:6
**endorsed (1)** 33:1
**engage (5)** 7:9;17:7;43:1,13;70:2
**engaged (1)** 72:12
**engineer (1)** 32:2
**enhance (1)** 52:10
**enormous (2)** 36:23;77:20
**Enough (6)** 41:6;54:5;61:21;76:1,12;78:18
**ensure (1)** 52:12
**enter (2)** 78:5,6
**entered (2)** 7:8,13
**entertain (1)** 36:7
**entirely (1)** 18:23
**entities (3)** 3:12,23;48:5
**entry (2)** 80:8,11
**equal (1)** 49:14
**equivalent (3)** 32:10;52:14;67:16
**eScribers (1)** 83:11
**especially (2)** 27:23;31:9
**essentially (9)** 5:18;27:10;32:9;45:22;48:8;49:2;50:25;64:19;74:19
**established (1)** 58:3
**estoppel (1)** 65:11
**etc (1)** 55:17
**Etkin (46)** 4:16,25;5:2,4,4;23:11;28:1,3,4,6,8,14,23;29:3,13,16,19,25;30:3,10;32:7,13,19,21;33:10;34:12,20;35:1,5,8,13,21,24;36:9,11,14;38:5,8,11;39:8,17,23;41:1,6;42:21;70:4
**Etkin's (1)** 43:5
**even (24)** 7:14;10:10;11:21;14:4;25:12;30:24;34:3;37:6,18;38:13,16;39:23;40:8;53:23;54:8;58:25,25;62:4,10,15;65:23;73:12;76:10;77:8
**event (2)** 36:21;42:15
**everybody (23)** 5:6;8:8;12:7,12;13:5,9;14:19,21,22;21:6;25:6;55:25;59:11;61:16,17,19,23;62:22;63:5,10;67:6;75:20;80:13
**everybody's (1)** 44:8
**everyone (3)** 34:16;44:9;62:8
**evidence (3)** 23:24;25:19,19
**exact (1)** 5:18
**exactly (10)** 13:14;14:13;25:5,9;26:12;47:10,12;50:9,9;67:13
**example (4)** 21:20;45:10;69:20;73:1
**excellent (1)** 68:12
**except (6)** 16:15,17;34:16;37:2;42:24;53:14
**exceptions (1)** 30:4
**exchange (1)** 43:9
**excluded (1)** 64:14
**excluding (1)** 7:6
**Excuse (7)** 4:21;7:18;10:21;19:19,21;73:22;80:6
**exhausted (2)** 62:24;64:8
**exhausting (1)** 17:2
**existing (2)** 32:11;33:3
**expansion (1)** 72:13
**expect (5)** 8:4,6;23:5;80:9,11
**expected (4)** 4:22;25:9;27:16;61:17
**expects (1)** 3:13
**expedite (4)** 13:3,4;21:5;41:23
**expense (3)** 52:8;55:4;71:3
**expensive (2)** 54:17;55:18
**experience (4)** 39:21,23;40:5;48:23
**experienced (1)** 9:15
**expertise (1)** 28:6
**explain (1)** 53:10
**explicitly (1)** 43:20
**exposure (1)** 49:16
**expressed (1)** 71:25
**expression (1)** 48:16
**expunged (1)** 32:18
**extend (6)** 5:12;9:10;51:7,10;58:22;73:2
**extended (6)** 20:23;51:3;62:8;66:16;74:18;78:16
**extending (3)** 50:14;71:20;77:8
**extends (1)** 74:14
**extension (20)** 5:15,16,17,20,21,24,25;6:1;7:11;8:7;17:4;34:5;43:8,10;60:6,7;62:3,20;80:5;82:4
**extensive (1)** 22:5
**extent (6)** 9:21;50:14;71:2;74:14,16;75:18
**extra (2)** 42:12;76:16
**extract (1)** 31:19
**extraordinary (1)** 24:14
**eye (1)** 35:17

## F

**face (2)** 27:10;58:2
**facial (1)** 27:9
**facie (1)** 56:17
**facilitate (2)** 52:18,18
**facing (1)** 37:19
**fact (10)** 11:16;22:2;24:2;27:1;30:15;63:4;64:14;68:4;69:11;70:13
**facts (4)** 21:1;26:11;27:13;40:10
**failed (1)** 17:20
**fails (2)** 46:16;56:9
**failure (1)** 26:18
**fair (3)** 40:4;50:6,10
**fairness (4)** 27:24;40:18;68:20,20
**false (3)** 24:14;45:18;68:21
**far (1)** 29:9
**farther (1)** 43:14
**fashion (3)** 15:3;38:25;64:7
**fast (1)** 18:9
**faulting (1)** 22:5
**favor (3)** 20:16;52:1;61:3
**Federal (1)** 56:8
**feel (4)** 68:23;69:24;70:12;75:18
**fell (1)** 66:21
**fellow (1)** 61:22
**few (12)** 6:5;7:14;8:7;10:7;13:13;23:17;44:16;53:6,7;54:13;60:13;75:21
**fewer (1)** 14:24
**fiduciary (1)** 40:22
**field (2)** 33:13;39:21
**fierce (1)** 37:19
**fifteen (2)** 7:14;23:11
**fifth (2)** 43:8,10
**fifty-five (1)** 6:7
**fight (1)** 46:3
**figure (7)** 9:18;45:4;46:24;59:16;63:8,11;75:11
**figuring (1)**

79:9
**file (24)**
12:18;13:11;14:19, 19,21;15:9,22;18:19; 20:8;32:9;36:15; 37:23;40:14;41:4; 48:11;55:2,6,24; 56:23;59:7;65:6; 72:16;73:3,23
**filed (13)**
5:15;7:25;13:18; 14:8;20:25,25;24:19; 51:4;52:16;56:23; 62:10;67:3;75:16
**files (1)**
58:9
**filing (4)**
31:23;33:6;34:6; 55:5
**fill (1)**
15:24
**finally (1)**
72:6
**financial (1)**
67:14
**find (1)**
45:15
**Fine (10)**
5:11;21:11;22:7; 29:5;45:13;47:13; 59:14;61:7;64:23; 66:13
**finish (1)**
60:24
**finite (2)**
15:4;63:13
**fire (2)**
69:14,14
**firm (1)**
51:11
**first (27)**
5:7;8:7;10:2,12; 12:4,5;18:20;19:2,3; 20:11;23:9;24:22; 33:24;34:23;43:6; 45:8;46:6,14;51:3; 53:8;54:25;57:15; 62:6;69:1,21;74:3,4
**fit (3)**
6:19;44:17;73:24
**flesh (1)**
74:25
**flip (2)**
37:20;39:11
**flush (1)**
36:20
**focus (1)**
32:14
**folks (10)**
6:21;7:4;8:25; 10:11;20:24;36:18; 64:22;66:8;67:4; 76:18
**follow (3)**
30:20;47:17;80:7
**followed (2)**
42:20,22
**following (2)**
75:25;78:7
**footing (1)**
63:1
**force (4)**
10:24;16:20;54:23; 64:7
**forced (2)**
42:25;58:25
**forcing (2)**
57:16;63:24
**foregoing (1)**
83:3
**forget (2)**
38:13;53:1
**form (7)**
20:25;24:11;25:14; 55:5;56:23,25;79:1
**formal (2)**
48:12;80:7
**formally (2)**
72:23;75:18
**forms (2)**
24:3;49:1
**forth (4)**
27:22;55:9;56:21; 57:1
**forty-five (2)**
76:9,10
**forty-two (2)**
76:9,9
**forum (1)**
33:9
**forward (14)**
9:2,10,14;12:9; 20:13;24:24;25:11; 42:4,17;46:22,24; 63:2;80:17,17
**found (3)**
50:16,22;66:3
**four (13)**
5:15;6:18;11:17; 12:5;13:15,25;14:1, 15;16:12,13;23:2; 74:13;77:10
**four-week (1)**
80:13
**four-weeks' (1)**
74:21
**frame (1)**
76:7
**framework (1)**
47:16
**FRANCISCO (1)**
3:1
**frankly (8)**
16:23;21:4;36:20; 37:5;55:13;62:11; 64:2;72:12
**fray (1)**
14:3
**free (2)**
54:8;70:5
**frivolous (2)**
51:22,24
**front (4)**
17:16;32:23;35:6; 40:13
**froze (1)**
69:6
**fruit (5)**
43:4;49:20;67:18, 20,23
**fruition (1)**
37:25
**full (2)**
28:6;34:24
**full- (1)**
57:1
**fundamental (1)**
40:17
**further (7)**
5:24;17:25;47:15, 15;51:9;73:11;75:6
**future (2)**
41:4;52:19

**G**

**gained (1)**
39:24
**gatekeeper (1)**
14:6
**gave (4)**
3:7;13:12;32:25; 41:11
**general (3)**
9:8;46:12;71:21
**gets (1)**
44:20
**given (7)**
6:25;39:18;49:17; 68:6,17,19;76:19
**gives (2)**
67:3;77:11
**giving (1)**
36:18
**glass (2)**
8:20;10:16
**gloating (1)**
69:22
**global (2)**
31:8,11
**goals (2)**
6:1;71:5
**goes (3)**
48:23;50:2,13
**Good (20)**
3:18;4:1,4,13,15; 9:25;10:1;18:7;19:8; 20:2;22:23;28:3,3; 49:25;61:4;68:2,2; 72:4;74:8;75:12
**good-bye (1)**
59:9
**Gotshal (1)**
4:5
**grant (3)**
10:22;39:12;54:20
**granted (5)**
5:21;34:22;74:14; 80:5;82:4
**grants (1)**
65:4
**graph (1)**
59:20
**gratified (1)**
69:12
**great (1)**
12:13
**Group (3)**
11:22,22;48:8
**groups (4)**
11:18,18;13:16; 15:7
**guess (7)**
14:5;38:11,14,22; 57:12;78:20;80:17
**guide (1)**
75:10
**guy (1)**
8:25

**H**

**half (2)**
8:21;10:17
**half-baked (1)**
37:12
**half-full (1)**
8:14
**hand (2)**
3:13;28:25
**handful (3)**
9:8;10:12;47:4
**handle (2)**
37:4;54:7
**handled (1)**
37:6
**handling (1)**
31:11
**hands (1)**
76:24
**hanging (6)**
11:13;43:3;49:20; 67:17,20,23
**happen (12)**
12:14;33:19,20; 38:15;43:25;45:25; 47:16;58:14;63:5,6; 75:11;79:17
**happened (4)**
17:8,12;34:1,15
**happens (6)**
11:1;39:25;46:19; 56:12;58:15;65:5
**happy (2)**
11:6;75:19
**hard (1)**
80:16
**harms (1)**
60:1
**Hartford (1)**
3:24
**hat (1)**
10:17
**head (1)**
10:19
**heads (1)**
73:7
**hear (4)**
23:6;69:5,8,9
**heard (4)**
3:9;59:5;62:22; 80:15
**hearing (9)**
17:4;18:20;36:8; 49:19;56:12;74:3,4; 76:6;80:21
**help (1)**
9:16
**Here's (3)**
10:1;63:8;76:7
**high (1)**
6:21
**higher (3)**
13:12;67:19;71:7
**hindsight (4)**
33:25;34:15;37:8,9
**hints (1)**
36:1
**hit (1)**
16:4
**Hold (5)**
12:16,18;17:18; 24:6;69:8
**Holders (1)**
12:8
**Honor (113)**
3:11,18;4:1,4,10, 13;5:2,10,12;6:25; 7:5;8:2,19;9:4;10:1; 11:7;12:2;13:3;14:6, 13;17:13;18:23;19:3, 9;20:24;21:10;22:25; 23:3,6,15,18,22,25; 24:3,12;25:2,8,12,21; 26:14;27:17;28:1,7, 15;29:13,25;30:10,15, 23;31:3,6,7,12;32:1, 13,22;33:10,24;34:12, 13;35:1,25;37:5; 38:11,14;39:2,23,25; 40:6;41:6,10,15;43:3; 44:4;46:21;49:19; 52:22;53:3,9;57:14; 58:4;59:4,17;61:19, 24;62:2,15,21,24;

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 89 of 98

63:8;64:12;66:6,10, 15,16,24;67:22,23; 68:4;69:5,9;76:4,15, 22;78:4,20;79:4,9,14, 25;80:19,22;81:10
**Honorable (1)** 3:4
**Honor's (1)** 79:14
**hope (4)** 18:9;74:4,11;75:2
**hopefully (1)** 35:25
**hoping (1)** 72:14
**hotly (1)** 70:18
**huge (2)** 67:5;75:5
**humble (1)** 34:3
**hundred (1)** 8:5
**hurts (1)** 60:1
**hybrid (2)** 31:20;59:20
**hypothetical (4)** 24:18;41:3;45:11; 54:15
**hypothetically (1)** 54:19

**I**

**idea (3)** 40:7;61:2;66:10
**identified (1)** 40:9
**idly (1)** 12:8
**immediately (1)** 70:14
**impact (3)** 30:18;31:2;78:9
**implement (6)** 47:7;65:2;72:7; 74:16;75:9;76:10
**implemented (2)** 11:24;70:14
**implementing (3)** 20:7;71:14,18
**implicated (1)** 70:1
**imply (2)** 54:11;75:14
**import (1)** 66:2
**important (11)** 7:5;9:13;16:17; 17:1,14;29:7;33:23; 49:13;62:15,25;68:9
**importantly (2)** 10:25;65:13
**impose (1)** 26:21
**impressed (2)** 77:19,19
**inappropriate (1)** 15:22
**included (4)** 20:24;29:24;43:20, 23
**includes (1)** 29:25
**including (1)** 12:11
**income (1)** 46:1
**incomes (3)** 46:1,1,2
**inconsistent (1)** 17:21
**incurring (1)** 71:3
**independent (1)** 9:15
**indicated (2)** 33:17;37:17
**indicates (1)** 39:6
**indication (1)** 36:6
**indiscernible (4)** 3:20;40:2;65:11; 79:17
**individual (1)** 39:6
**individualized (1)** 41:18
**individually (1)** 44:6
**indulging (1)** 41:7
**inevitably (1)** 51:7
**inexpensive (1)** 55:19
**informal (2)** 75:13,13
**information (2)** 25:15;43:17
**initial (1)** 45:6
**injunction (1)** 39:20
**input (1)** 79:14
**insist (1)** 31:22
**insofar (1)** 71:14
**instance (1)** 10:12
**Instead (3)** 17:8;25:11;43:2
**insufficient (2)** 42:15;79:23
**intend (1)** 48:10
**intended (2)** 39:6;63:20
**interests (1)** 37:2
**interference (6)** 16:6;18:1;24:20; 27:8;70:13;71:19
**interplay (1)** 40:3
**interrupt (2)** 6:14;17:19
**intervene (6)** 12:10;13:6,10,21; 16:21;63:25
**into (17)** 7:8,13;9:12;11:15; 16:20;17:20;27:2; 30:5,6;38:1;39:11; 57:12;60:20;66:2; 72:1;74:6;78:25
**introduction (1)** 23:11
**investigate (1)** 55:12
**investment (1)** 25:25
**invitation (1)** 72:3
**invoke (1)** 69:21
**involve (1)** 72:2
**involved (7)** 12:10;13:16;28:12; 38:15,17;48:23;73:7
**involves (1)** 72:2
**ironic (1)** 68:24
**Irwin (2)** 3:18;23:3
**issue (13)** 5:25;14:4;15:12; 20:12;29:10;30:21; 54:7;57:15;62:13; 73:14;74:12;75:18; 78:1
**issued (3)** 29:20;39:19;78:15
**issues (12)** 12:14;14:9,9;28:2; 34:8;37:10;40:20; 45:1,1,4;65:9;76:20

**J**

**Jeffrey (1)** 4:19
**job (1)** 20:14
**join (2)** 18:19;37:18
**joining (2)** 14:3;46:3
**Jonathan (1)** 4:1
**judge (10)** 19:20;29:10,19; 30:3,22;31:14;32:5; 53:25;65:1,3
**judicial (1)** 48:24
**jump (1)** 13:7
**jumping (1)** 74:20
**JUNE (10)** 3:1;42:9;58:11,21, 22;59:10;60:8;73:4; 78:16;83:15

**K**

**keep (6)** 13:14;44:15;52:23; 58:18;67:22;68:2
**kidding (1)** 70:4
**kind (7)** 21:1;30:22;37:12; 40:3;49:1;59:20; 71:10
**kinds (1)** 73:8
**Kleinbart (2)** 83:3,9
**knocked (1)** 19:25
**knowing (1)** 44:12
**knows (1)** 31:13
**Kramer (1)** 4:20

**L**

**lacking (1)** 56:19
**lag (1)** 7:22
**laid (2)** 33:11;36:3
**large (4)** 50:3,5;70:18;75:24
**largely (1)** 7:10
**last (8)** 5:17,21;6:1;7:11; 17:4;39:18;40:6; 65:24
**lastly (1)** 52:6
**late (1)** 70:3
**later (3)** 55:11;56:24;78:5
**law (3)** 14:1;45:2,5
**lawsuit (1)** 65:14
**lawyer (4)** 27:4;39:25;40:11; 61:17
**lawyers (6)** 13:15;37:14;40:2; 73:6,18;75:8
**layers (1)** 12:3
**lead (4)** 36:24,24;74:8;80:9
**least (11)** 22:21;30:21;38:20; 39:4;58:22;62:8; 65:16;71:8;72:21; 74:18;76:6
**leave (6)** 8:2;30:7;68:23; 75:23;76:21;81:4
**leaving (4)** 17:25;20:9;44:18; 59:10
**left (4)** 9:18;11:5;39:1; 71:22
**legal (3)** 45:9,13;53:22
**legitimate (1)** 71:4
**lengthy (1)** 74:24
**less (1)** 72:24
**letting (1)** 9:13
**level (2)** 11:9;48:24
**Lewis (1)** 4:14
**liability (2)** 58:1,3
**liberal (1)** 15:24
**liberty (1)** 50:4
**light (1)** 77:6
**likely (3)** 25:20;44:7;79:22
**limit (3)** 16:7;17:19;66:22
**limitations (4)** 15:23;27:3,10; 45:11
**line (9)**

10:20,21;11:8;13:9;35:18;41:21;50:14,14;82:2
**lip (1)** 17:1
**list (2)** 3:11;9:1
**Listen (2)** 40:24;66:6
**listening (1)** 30:25
**literature (1)** 56:4
**litigate (4)** 12:14;14:9;46:9;64:8
**litigation (19)** 12:9;13:3,4;14:12;18:15,18;22:12,15;26:16,21;37:6;50:15;52:4,14;59:19;64:3;78:21;80:4;82:3
**little (12)** 8:20;40:1;48:2;49:23;50:11;54:14;59:11;62:4;71:6;72:5;76:7,21
**live (2)** 28:20;60:3
**lock (1)** 72:1
**logic (1)** 51:20
**long (11)** 3:11;9:22;15:19;21:14,15;24:24;37:7;40:3;45:8;49:20;54:18
**longer (1)** 76:7
**look (19)** 6:4;9:9;10:11;19:22;20:13,23;21:9;33:2;57:20;59:5;64:18;66:13;67:3,5;79:3,10;80:1,17,17
**looked (1)** 18:16
**looking (3)** 25:22;31:9;32:15
**looks (1)** 27:3
**loose (1)** 12:20
**lost (3)** 69:2,3,4
**lot (12)** 14:11;22:9;26:10,10;35:19;53:8;61:8;63:21;68:19;70:7;76:11;78:6
**lots (6)** 8:24;53:9;56:4;68:17,17;69:19
**lousy (1)** 67:18
**low (6)** 43:3;49:20;67:17,19,22;71:6
**lowball (1)** 50:5

## M

**main (3)** 59:19;60:2;61:10
**maintain (1)** 11:19
**major (1)** 60:21
**majority (1)** 41:18
**makes (9)** 5:18;9:9,10,16;10:15;54:25;70:12;72:7;74:10
**making (7)** 7:15;50:8;64:20;66:25;75:3;76:6;78:20
**malpractice (1)** 66:20
**manage (2)** 46:9,22
**managed (1)** 61:8
**management (5)** 16:14;42:6;46:6;48:6;74:3
**mandated (1)** 47:23
**mandatory (1)** 18:17
**Manges (1)** 4:5
**manner (1)** 75:22
**many (6)** 9:11,18;35:15;42:19;49:1;68:12
**marching (1)** 76:2
**mass (1)** 10:9
**math (1)** 73:5
**matter (14)** 3:5;10:24;11:16;22:1,2;27:1;45:2,4;53:17;54:12;62:19;63:1,13;76:16
**matters (1)** 50:22
**may (12)** 39:1;45:1;47:24;49:20;59:11;61:1;67:10;71:1;72:1;75:19;78:7,9
**maybe (21)** 8:25;10:22,23,24;20:4;21:25,25;26:7,8;29:21;34:22;35:5;42:7;67:12,12,13,13,14,14;72:13;76:9
**mayhem (1)** 74:6
**mean (32)** 6:14;7:14;9:23;11:3;13:12;15:8,13;16:17;20:6;22:5;26:9,24;28:19;34:10;45:16;47:23;48:7;49:2,3,23;50:25;51:21;56:5;60:8;63:19,23;75:6,13;77:2,11;81:1,3
**meaning (1)** 6:11
**means (5)** 7:8;8:5;48:11;65:13;73:4
**meant (1)** 18:23
**mediate (4)** 43:8;44:5;59:1,13
**mediated (2)** 17:15;41:19
**mediating (2)** 10:10,14
**mediation (29)** 9:15;10:8,25;17:15,20,23,24;18:7;20:10,10;21:23;24:18;28:19;44:2,8;47:15;52:19;58:9,13,13;60:18;63:22;71:18;72:7,8,13;76:8,10,11
**mediations (2)** 73:12;76:13
**mediator (2)** 22:20;47:19
**mediators (10)** 9:16,17,23;17:17;18:8;60:19;70:25;71:4;72:12;73:13
**meet (12)** 9:9;19:13,18;45:3;64:4;73:18,25;74:2;75:11;79:8,13,14
**mega (1)** 70:11
**members (4)** 31:13;38:3,5;40:22
**memorializes (1)** 80:10
**mentioned (1)** 49:19
**merit (1)** 62:3
**merits (18)** 9:12;12:9;14:17,17;20:5;22:12,15;27:25;31:1,19;32:22;33:12;36:5,11;50:12;52:11;58:10;66:3
**merry (2)** 51:12;52:21
**mess (1)** 54:25
**met (1)** 6:1
**Mexico (5)** 5:5;23:12;24:4;26:17;27:23
**mic (1)** 28:4
**Michael (1)** 5:4
**might (15)** 9:1;17:22;22:4;26:22;36:18;40:16;41:4;44:15;46:11;47:6,6;53:14;57:14;74:10;77:3
**milk (1)** 69:22
**million (1)** 49:18
**mind (4)** 44:2,16;58:18;68:17
**minute (1)** 80:3
**minutes (10)** 5:9;13:13;22:22;23:11,12;41:13,14;44:16;54:13;68:17
**misleading (1)** 68:16
**misrepresentations (1)** 55:7
**missed (1)** 45:12
**missing (1)** 9:5
**mistake (1)** 69:20
**model (1)** 62:16
**modest (1)** 60:14
**modification (2)** 39:13;71:18
**modifications (1)** 60:14
**modified (1)** 62:17
**moment (1)** 42:10
**money (7)** 22:15,18;38:24;49:24;66:23;67:4,8
**Montali (1)** 3:5
**month (5)** 7:13;8:12;62:10;63:19;71:20
**months (13)** 5:13,19;8:7;10:18,23;14:24,25;18:3;44:15;47:1;63:14;76:12;77:15
**more (29)** 4:6;8:16;9:8,17;10:18,23,25;18:3,6,12;22:4,5;23:1;30:24;39:5;42:4,17;44:7,10;53:11;54:7;55:17;63:21;64:6;65:13;70:20;71:4;74:19;76:21
**Morgan (1)** 4:14
**morning (7)** 3:18;4:1,4,13,15;18:16;28:3
**morph (1)** 61:11
**most (4)** 10:10;33:16;37:5;79:22
**motion (77)** 5:12,18,25;6:1;7:15,25;8:15,24;10:21,22;11:17,21;12:5;13:17;17:23;27:11;29:9,12,24;33:2,24;34:2,23;35:6,10,23,23;36:5,7,15;37:14,22,23;39:12,12,15;40:14;41:3,3;43:8,11;44:1;46:15;47:18;50:21;51:4,7,9;52:1,20;53:21;54:9,11,16,20,21;55:16,25;56:2,7,10;57:21,23;58:15;61:3;65:4,6,19,20;70:4;71:14,23;74:14;78:21;80:4;82:3,4
**motions (2)** 30:16;53:20
**move (9)** 19:16;41:21;42:4,16;46:24;53:18,19;55:23;79:24
**moved (1)** 34:7
**moving (2)** 24:13;69:18
**much (12)** 23:18;25:25;39:5;46:14;54:7;55:17;60:10;61:13,21;69:16,23;77:14
**multiple (1)**

16:10
**must (1)**
23:23
**muted (1)**
28:5

## N

**name (1)**
4:18
**names (1)**
3:7
**narrowing (1)**
31:17
**nationwide (2)**
39:19,20
**nature (1)**
70:11
**nearly (4)**
6:8,11;7:6,13
**necessarily (2)**
12:20;44:4
**necessary (1)**
5:24
**need (13)**
14:21;21:1;24:25;27:7,12;28:4;29:2;33:11;35:9;47:19;51:6;62:18;66:11
**negative (1)**
9:22
**negotiate (6)**
8:24;20:6;43:5;59:1,14;71:3
**negotiated (1)**
10:5
**negotiating (4)**
41:17;58:7,8,12
**negotiation (1)**
47:15
**negotiations (4)**
7:3;8:10;52:19;78:9
**nevertheless (1)**
24:12
**New (13)**
5:5;7:24;8:7;23:12;24:4;27:23;32:10;33:5;50:10;56:9;64:11;73:23;77:23
**next (18)**
8:11;14:23,24;21:19,22;38:10;41:8;43:25;47:8,20;58:4;59:16;62:10,10;68:16;72:15;73:3;75:21
**nice (1)**
61:21
**nilly (1)**
53:15
**ninety (1)**
10:4
**ninety-eight (1)**
17:9
**ninety-one (1)**
7:6
**Ninth (3)**
28:10,13;29:17
**nobody (2)**
13:6;39:10
**noncontroversial (1)**
74:15
**nondebtor (1)**
29:9
**non-debtor (2)**
31:4;65:4
**non-debtors (2)**
31:5;32:6
**none (1)**
19:13
**normal (1)**
42:6
**normally (1)**
33:16
**note (2)**
23:16,19
**noted (1)**
58:7
**notice (2)**
36:17;76:11
**notion (1)**
78:24
**notwithstanding (1)**
5:22
**Nowhere (3)**
23:25;51:12;52:22
**number (15)**
6:4,21;8:11,13;13:12,13,16;38:13;48:3,4,5;64:12;70:1;73:13;77:2
**numbers (8)**
6:19;13:11;16:15,17,17;49:17;69:15;72:14

## O

**object (29)**
5:15;9:5,7;12:20;13:17,22,23;19:14;21:24;23:23;25:18;33:9;40:15;42:3,7,14;51:6;52:18;56:8;57:3;58:23;59:1,15;60:5,16;62:8,18;74:1,18
**objected (6)**
5:17;16:11;33:18;43:7;62:11;72:23
**objecting (1)**
6:18
**objection (39)**
5:13,14;8:9;11:1;12:19,22;13:18;16:7;18:21;19:4;20:5,11;24:19;25:19;26:23;27:9;43:10;45:9;46:7,11,15;47:9;48:25;50:17;51:3,5,11;53:24;55:18,24;56:3,11,13;58:9;59:19;62:7,14;64:20;70:16
**objections (24)**
5:15,16,22;8:4;14:1;21:8;43:17;44:7,13;46:8;52:7;62:9;70:19;71:17;72:16;73:3,17;74:24,24;78:17;79:10,18;80:6;82:5
**objectors (4)**
6:25;41:16;62:13;72:21
**objects (4)**
32:20;44:20;57:25,25
**observed (1)**
41:15
**obvious (2)**
24:3;77:19
**obviously (7)**
7:3;8:11;40:4;49:14;50:4;62:18;71:2
**occur (1)**
42:13
**odd (1)**
54:14
**odds (2)**
10:17,24
**off (12)**
30:11;33:15;40:25;43:3;49:20;60:15;61:9;68:13,21;72:8;75:6,6
**offer (2)**
44:5,14
**offered (1)**
42:1
**offers (24)**
6:9,12;7:1,2,7,12,15;8:4,6,9;10:3;17:5,9;38:14;41:18;43:6,18;49:13;50:3,4,6,8;67:23;78:10
**officer/directors (1)**
66:1
**officers (3)**
26:3;29:24;65:14
**often (1)**
37:9
**oiled (1)**
11:5
**old (2)**
54:5;66:21
**omnibus (8)**
8:4,8;43:17;48:7,25,25;49:2;55:25
**once (3)**
10:18;12:23;19:14
**one (42)**
4:8;9:13,20;13:18,23,23,24;16:12;18:12;19:9,20;22:13;24:6,7,20;25:22;27:19;31:10;32:10;33:23;35:10;37:2,3,17;39:17;40:6;44:18,19,19;48:3,11,15,16,16;50:24;54:11;57:15;62:23;64:12;67:5;69:3;70:12
**one-hundred-dollar (1)**
67:24
**ones (2)**
40:13;67:19
**one's (1)**
54:3
**only (20)**
5:15;8:3;10:13;22:3;25:22;28:11;31:2,10;37:2,3;42:2;43:7,8;44:11;47:4;49:17;51:5;60:24;66:25;69:3
**oOo- (1)**
3:2
**open (1)**
52:13
**opinion (1)**
34:3
**opponent (1)**
37:19
**opponents (1)**
61:22
**opportunity (2)**
36:19;38:17
**oppose (2)**
35:22;53:21
**opposed (3)**
60:9,10;62:3
**opposing (3)**
11:17;37:14;54:11
**opposition (3)**
12:1;27:23;37:20
**opt (3)**
34:17;36:19;39:2
**option (5)**
32:10;44:2;55:2,20;67:1
**options (1)**
60:18
**oral (1)**
78:14
**order (25)**
3:3;29:11;33:15;34:22;36:10,10,11,14,15;54:24;55:14;57:2;68:25;71:16;74:13;75:22;76:23;78:1,5,23;80:2,3,7,9;81:2
**ordered (1)**
17:4
**orders (3)**
42:6;75:19;76:3
**ordinary (1)**
45:23
**Oregon (12)**
3:9,12;4:14;7:2,3;13:24;37:15;38:21;39:10;46:1;60:3;64:10
**organized (1)**
74:3
**original (1)**
55:22
**originally (2)**
26:16;30:12
**others (4)**
10:3,13;70:10;73:7
**otherwise (1)**
6:13
**ought (1)**
11:4
**ourselves (1)**
41:23
**out (34)**
5:22;6:1,23;9:18;19:12,25;32:20,23;33:11,20;34:17;35:18;36:3,19,20;39:3;45:4,12,15;46:14,24;52:12;59:16;63:8,11;64:3;65:14;66:22,22;68:23;75:1,11;79:7,9
**outcome (2)**
33:8;65:7
**outliers (1)**
39:2
**outlined (2)**
31:19;39:1
**outposts (1)**
46:2
**outright (1)**
10:8
**outside (1)**
66:22
**outstanding (2)**
35:15;38:12
**over (15)**
8:11;10:4;11:25,25;14:23;28:1;31:5;36:22;37:21;39:19;42:23;67:25;69:22;70:19;71:17
**overlay (1)**
22:12
**overrule (1)**
12:4
**oversimplifying (1)**
47:5
**owes (1)**
40:22

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 92 of 98

**own (16)**
18:19;26:18,20;31:23,25;33:4;37:3;38:24;55:2,3;59:7;64:16;67:5,11,15;71:3

## P

**pace (2)**
41:25;69:18
**packing (2)**
20:16;21:25
**page (2)**
54:10;82:2
**pages (1)**
36:22
**paid (3)**
17:1;69:15,16
**panel (6)**
9:15,22;10:14;17:17;28:19;72:14
**papers (11)**
6:18;23:19,19;29:8;34:20;42:3;48:2;51:13;54:10;60:13,20
**Parada (6)**
3:7;4:8;69:8;80:3,20,25
**Pardon (2)**
8:18;33:12
**part (8)**
30:4;38:18;53:17;55:2;56:14;59:23;77:22;78:22
**participate (3)**
38:8,23;47:21
**participation (1)**
81:9
**particular (4)**
25:25;65:16,20,21
**particularly (2)**
20:13;70:8
**parties (10)**
5:17;7:8;11:23;17:7;31:4;46:24;53:7;57:18;61:9;72:23
**parties' (1)**
52:12
**passed (1)**
27:3
**past (1)**
24:18
**pause (1)**
70:22
**paused (1)**
43:4
**pay (2)**
38:10;67:7
**paying (7)**
38:3,5;60:18;67:9,10,15,15
**pending (13)**
12:19;28:12;29:1,3,12;30:14,16,17;37:7;39:12;53:19;73:17;78:10
**people (44)**
4:6,9;10:5,7,9;12:10;14:3,24;16:13,20,24,24;19:3;21:9;26:3;36:25;37:17;38:2,15,20;39:2;40:9,21;49:23;54:23;62:10;63:24;64:1,7,21;66:11,21;67:24;68:1;70:13;72:1,2,24;74:24;75:19,20,25;76:20;78:7
**per (1)**
7:13
**PERA (34)**
5:14;18:19;19:11;26:9;31:22;32:9;33:4;34:24;36:21;51:8;53:12;54:9,11,20;59:6,6;64:12,13,13,17,18,21;65:2,5,12,23,25;66:2,9,14,17;68:9;70:19;77:6
**PERA's (5)**
11:25;50:20;52:1;64:23;69:20
**percent (6)**
6:7,11;7:6;10:5;17:9;67:16
**percentage (3)**
6:22;49:15;69:16
**perfect (5)**
10:15;58:5;70:16,17,18
**perfectly (3)**
49:23;61:6;76:19
**perhaps (6)**
8:23;33:19;71:4;72:4;73:3;74:5
**period (11)**
7:11;8:7;26:1;45:12;55:9;58:15;60:7;73:21;79:11,22;80:13
**permitted (1)**
73:16
**person (1)**
8:14
**perspective (1)**
63:15
**persuaded (2)**
60:17;69:24
**persuasive (1)**
11:25
**PG&E (17)**
3:5;4:5;5:22,25;7:9,11,15;14:14;16:3,11;22:14;28:11;31:1;39:22;70:9;71:2;81:3
**PG-E (1)**
65:24
**phase (1)**
47:8
**Phoenix (1)**
83:13
**phone (3)**
19:19,19,21
**phonetic (2)**
3:9;29:19
**phrase (1)**
29:22
**pick (4)**
19:22;24:20;43:3;72:14
**picked (1)**
49:20
**pin (1)**
80:23
**place (20)**
9:12;14:12;17:24;18:9;19:1,2;21:4;22:2;42:6;43:2;44:11;45:8;47:1;59:19;60:11;63:22;66:10;77:7,13;78:8
**plaintiff (1)**
36:24
**plan (1)**
70:9
**planned (1)**
55:24
**plans (1)**
3:20
**plate (1)**
59:2
**plausible (1)**
24:10
**players (2)**
63:23;66:1
**playing (2)**
33:13;56:2
**pleading (6)**
19:13,18;64:18,19;66:13;72:1
**pleadings (3)**
9:7,9;75:16
**please (2)**
3:16;39:16
**pleased (1)**
23:20
**plenty (2)**
38:20;47:7
**point (58)**
6:6;9:13,25;10:9;11:4,19;12:25;13:2,4,15;14:13;16:10,14;17:22;18:3,22,24;19:17,22;21:3;27:4,25;29:8,8,21;30:7;33:19,22,23;34:4;35:2,14;40:6;41:4,17;46:6;47:7;48:6;49:3,11;50:2,18;57:15;58:5;59:7;60:20;62:5,15;63:8;64:2,5;66:25;68:5;72:18,19;76:14;78:5,20
**pointing (1)**
18:4
**points (5)**
53:6,7;64:9,11;68:8
**policy (1)**
15:24
**Polivey (1)**
3:9
**portion (2)**
68:22,23
**position (7)**
9:5;10:14;25:17;44:6,12;52:16;62:6
**positions (3)**
44:8;48:17;52:12
**possibility (1)**
52:10
**possible (2)**
43:16;53:4
**Post (1)**
14:7
**posture (1)**
23:21
**potential (2)**
49:16;55:16
**potentially (2)**
52:11;67:24
**power (1)**
43:15
**practical (1)**
67:20
**practitioners (1)**
33:16
**precedent (1)**
79:5
**precisely (1)**
35:1
**preclude (3)**
46:6;47:14,15
**prefer (1)**
36:5
**preferable (1)**
70:7
**prejudice (2)**
32:3;35:11
**preliminary (1)**
28:9
**premise (1)**
24:14
**preparation (1)**
36:4
**prepare (1)**
55:12
**prepared (2)**
58:16;71:13
**present (2)**
24:25;25:1
**presentation (2)**
30:9,25
**presenting (1)**
4:22
**preserve (1)**
54:24
**presided (1)**
39:19
**presiding (1)**
3:5
**presumably (3)**
17:6;25:24;26:1
**presume (2)**
5:8;45:16
**Presuming (1)**
67:10
**presupposing (1)**
38:21
**pretty (3)**
24:2;33:11;63:17
**prevent (1)**
42:12
**prevents (1)**
40:19
**preview (1)**
37:24
**previously (1)**
33:24
**prima (2)**
56:17;57:6
**principal (4)**
73:6,18;75:8;77:9
**prior (5)**
5:20;30:23;36:8;48:23;49:19
**probably (1)**
48:5
**problem (5)**
18:6;30:4;32:13;42:22;77:11
**procedural (4)**
27:24;50:15;51:12;54:25
**procedure (18)**
11:25;20:20;21:4;31:19;32:22;47:8,17,23;50:21;60:4;65:2;69:25;70:20;72:10,23;73:8;74:1;79:4
**procedures (75)**
5:23;6:2,5;9:10,12,14;11:8;12:6;13:5;16:25;17:2,8,15,21,23;18:16,25;19:1;21:11;22:2,10,11;24:14;25:10;26:22;27:17,25;30:13;31:2;33:12;36:5,11;41:23;42:19,20,24;43:2,5,13,20;45:7,23;50:12,19;51:10,14;52:4,21;58:10,17;59:18,20;60:10,14;61:1,11;62:3,19,24;63:9,17,

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 93 of 98

22;64:5,8,11,14,15;71:15;74:16;76:8;78:7,21;79:8;80:4;82:3
**proceed (5)** 36:25;37:3;45:23;46:21;52:7
**proceeding (3)** 29:4;38:25;59:23
**proceedings (1)** 83:4
**process (58)** 16:19;19:16;20:7;21:5,13;22:4;26:7;31:12,18,21;32:3,12;34:6,6,8,17;37:4,12;39:5,15;40:17,19;42:4,16;48:12;50:18;51:1;53:9;55:11,18;57:16;58:6,7;59:9,24;60:25;61:2,11;62:12;64:3,12,17,23,25;65:8;66:8,9;68:5,20;70:1,7,8,13,16;71:1,5;77:7,13
**processes (1)** 55:17
**produce (1)** 38:2
**progress (2)** 22:10;76:13
**progressed (1)** 47:1
**promised (1)** 41:12
**promptly (2)** 43:18;72:15
**proof (18)** 19:4;25:17;32:11;33:7,17;44:17;45:16;46:16;48:8,9,11;55:22;56:5,6,9;57:24;64:15;73:15
**proofs (5)** 23:23;42:1,14;43:16;73:24
**proper (1)** 15:14
**proponent (1)** 69:23
**proposal (10)** 12:6;15:6;16:9,10;26:16;44:15;45:2;46:25;52:7;65:24
**propose (1)** 78:23
**proposed (6)** 25:10;27:17;50:19;52:21;58:10;60:13
**proposing (4)** 50:13;55:15;62:16;63:15
**protections (1)** 52:4
**protocols (1)** 74:5
**prove (7)** 27:7,13;44:22,23;45:18;57:6,7
**proves (1)** 45:17
**provided (1)** 23:24
**providing (2)** 31:22;50:17
**PSLRA (4)** 51:15,17,21,22
**public (5)** 3:20;5:4;75:24;78:24;80:10
**pulling (1)** 31:21
**punish (1)** 21:18
**purely (1)** 67:1
**purposes (5)** 36:9;53:16;66:20;78:17;80:10
**pushed (1)** 63:2
**put (26)** 9:12;11:8,9;14:4;20:25;21:3;25:15;27:22;40:12;41:20;43:2,3;53:17;56:25;57:6;60:10;62:25;63:10;66:9,13,25;68:12;73:7;77:13,21;78:8
**putting (1)** 5:14

**Q**

**quantity (2)** 13:11;37:16
**quick (1)** 54:15
**quickly (5)** 38:15;42:4,17;43:15;70:10
**quiet (1)** 18:15
**quite (4)** 16:23;21:4;62:11;64:2
**quo (1)** 11:20
**quoted (1)** 36:8

**R**

**races (1)** 12:9
**raise (1)** 3:13
**raised (1)** 34:9
**raising (1)** 28:25
**ramp (1)** 60:15
**range (1)** 74:21
**rate (3)** 11:14;43:24;49:12
**rather (7)** 22:15,19;52:19;56:24;72:9;73:4;76:25
**reactivate (1)** 70:4
**read (1)** 26:21
**reading (1)** 34:20
**ready (6)** 25:1;44:22,23;57:4,5;59:16
**real (4)** 39:19;62:21;63:6;64:11
**realistically (2)** 11:11,13
**realize (1)** 20:12
**realizes (1)** 79:25
**really (34)** 7:17;10:8,11,13,20;14:21;16:25;17:13;18:17,24;30:24;31:2,8,10,15;32:1,2,13;33:23;37:10;40:16,19;46:7;48:4;51:21,24;53:10;57:16,18;62:25;64:18;66:7;67:22;79:12
**reason (4)** 31:16;38:12,13;71:13
**reasonable (2)** 73:21;74:9
**reasoning (1)** 27:22
**reasons (6)** 12:5;53:18;70:7;76:5,7;78:15
**rebuttal (1)** 5:10
**received (7)** 6:12;7:2;8:4,9,11;38:14;41:19
**receiving (1)** 26:23
**recent (1)** 28:10
**recognition (1)** 63:6
**recognize (1)** 4:17
**recognized (1)** 62:15
**recognizes (1)** 62:7
**recognizing (1)** 48:2
**recommendation (1)** 68:16
**reconciliation (1)** 52:8
**record (9)** 73:2;75:6,7,7,14;78:16,24;80:10;83:4
**reduced (1)** 61:7
**reference (1)** 30:11
**reflect (2)** 69:19;80:3
**reflected (1)** 69:11
**reflecting (1)** 78:24
**refuse (1)** 43:1
**refusing (1)** 43:13
**regarding (1)** 30:13
**regular (1)** 81:3
**reiterate (1)** 52:6
**reject (1)** 43:24
**rejected (5)** 10:8,13;17:8;41:18;49:13
**rejecting (1)** 50:3
**related (4)** 3:23;14:9;15:2,3
**relating (1)** 59:18
**relatively (1)** 70:10
**reliance (1)** 45:17
**relied (1)** 26:2
**relief (1)** 27:12
**relying (1)** 45:18
**remain (2)** 35:15;38:12
**Remember (3)** 10:3;66:15;69:1
**remind (1)** 35:9
**removing (1)** 21:12
**renegotiated (1)** 58:8
**renewed (1)** 36:15
**reorganized (23)** 6:6,9;17:5;22:16;41:17,20,22,25;42:2,13,18,23;43:12,19;44:13;46:25;49:12,15;50:12;51:21,24;52:9,17
**reply (4)** 23:25;31:10,17;62:1
**report (1)** 28:21
**reported (1)** 56:4
**represent (1)** 64:22
**representation (1)** 36:17
**representations (2)** 26:2;30:23
**represented (1)** 42:3
**representing (5)** 13:15;37:1,1;40:21,22
**request (4)** 69:20;76:23;78:6,21
**requested (4)** 27:25;36:12;71:20;78:21
**requests (4)** 14:16;16:4;25:15;37:3
**require (3)** 43:21,22;45:5
**required (3)** 14:14;36:23;43:17
**reserve (3)** 5:8,9;15:14
**resolution (5)** 30:16;31:8;34:16;52:9,10
**resolve (8)** 6:2;14:1;15:1;18:10;43:15;46:23;52:15;63:23
**resolved (16)** 6:6,13;11:21,21;13:14;22:8;29:23;34:2;37:25;45:2,4;49:16;51:5;52:11;64:1,1
**resounding (1)** 6:3
**resources (1)**

61:9
**respect (16)** 7:12;8:5;27:23;33:20;34:16;35:9;36:1,1;38:6,22;42:19;64:9,10;68:10;76:11,13
**respond (2)** 56:7;74:24
**responded (1)** 43:18
**responding (1)** 64:11
**response (1)** 59:8
**responses (2)** 7:4;43:19
**responsive (1)** 25:15
**rest (1)** 18:15
**result (4)** 33:8;39:13;51:23;66:9
**results (1)** 38:2
**retire (2)** 54:4,5
**Retirement (2)** 3:19;5:5
**review (1)** 75:19
**reviewed (1)** 7:7
**revisited (1)** 34:25
**Richard (1)** 4:4
**right (51)** 3:22;8:16;9:2;13:20;15:8,10,17;18:17,20;20:1,3;25:4;26:10,11,14;35:7,12;38:4,7,9,10;41:9;42:8;44:3,11;45:19;46:17,19,25;48:8,18;49:10;53:23;54:3,22,24;57:10,12,24;58:24;60:4;61:25;66:14,23,24,24;67:5,7,13;77:16,24
**rights (4)** 15:15;31:12;49:4,5
**risk (2)** 26:18;39:24
**Ritholtz (36)** 4:17,19,19,24;23:12;41:8,10,14;42:9,12;43:24;44:4,25;45:20,22;46:5,20;47:10,12,14,22;48:10,19,21;49:7,9,11;50:1,9,11;51:2,20;57:21;73:19;77:3,18
**Ritholtz's (1)** 72:4
**RKS (62)** 4:20,21;6:20;7:2,6;8:25;10:4,12,17,18,22;11:8,9,17,22;12:4,4,5,5,9,12,18,20;13:4,7,18,23;14:8,20;15:5,25;17:1,5,8;18:4;19:23;21:20,21;23:12;26:8;37:15;39:10;41:15;42:18,24;43:1,6,7,9,9,12,14;52:7,21;62:16;63:1,5,13;64:4,5,6;72:18
**RKS's (1)** 71:23
**road (1)** 61:10
**robust (1)** 22:4
**Rolnick (1)** 4:19
**room (1)** 11:5
**roughly (1)** 74:20
**round (3)** 13:11;51:12;52:22
**ruinous (1)** 51:23
**rule (13)** 20:15;26:25;31:15;37:19;39:11,15;40:19;48:25,25;53:16,25;70:4;73:16
**rulemaking (1)** 48:24
**rules (3)** 38:10;46:12,13
**ruling (2)** 28:10;39:14
**rulings (2)** 66:3;82:2
**run (1)** 25:7

## S

**Sadighi (1)** 4:20
**salutary (2)** 30:18;36:20
**same (21)** 5:16,18;11:9;13:9;14:9,22,23;18:4,5;26:9;33:8;44:11;46:13,15;48:5,13;49:17;52:5;57:13;62:25;63:11
**SAN (1)** 3:1
**satisfactory (1)** 78:11
**satisfied (1)** 78:14
**satisfies (1)** 78:24
**save (2)** 22:18,21
**saying (23)** 9:8;10:19;15:25;39:8,24;42:14;46:21;50:20,23,25;51:2,14;57:25;59:5,18;63:10,10;64:18,20;66:10,15;76:4;77:14
**schedule (5)** 5:23;55:14;58:9,12;63:11
**scheduled (1)** 30:9
**scholarship (1)** 56:5
**Schwartz (38)** 3:16,18,19,23;19:23,24;20:8,14,16;21:9,20,22,25;23:3,3,6,10,15;24:6,9,17,21,23;25:2,4,8;26:4,12,14;27:15,21;44:16;61:15,19,24;66:6,12;77:18
**Schwartz's (4)** 7:1;13:24;37:15;47:5
**screening (1)** 46:14
**seasoned (1)** 34:19
**sec (2)** 19:20;24:7
**second (6)** 24:6;35:10;55:2;62:24;69:21;76:15
**seconds (1)** 39:18
**secretly (1)** 43:4
**securities (34)** 5:23;6:5,7,8,10,12;7:12,16;11:10;12:6;16:25;17:2,7;18:18;20:13;27:16;30:18;31:12;32:4;33:3;37:5;62:12,23;64:19;65:21;69:13;70:14;71:8;72:21;74:18;78:17;80:5,6;82:5
**security (1)** 68:21
**seek (2)** 25:20;75:19
**seeking (1)** 31:2
**seeks (1)** 5:12
**seem (2)** 8:25;54:11
**seems (4)** 56:24;72:11;77:8,21
**sees (1)** 10:22
**segway (1)** 58:5
**selected (1)** 47:19
**sense (7)** 9:9,10,16;10:15;36:25;68:21;74:10
**sent (2)** 20:16;21:25
**separate (3)** 30:13;32:5;62:4
**separately (2)** 25:13;48:12
**sequence (1)** 23:8
**service (1)** 17:1
**session (3)** 3:4;74:3;80:18
**set (10)** 5:22;6:1;10:14;14:2;27:8;37:3;46:18;55:9;80:21;81:5
**sets (3)** 14:15,15,15
**setting (1)** 27:1
**settle (9)** 7:10;8:12;9:11,16,17;14:23;16:22,24;67:5
**settled (7)** 6:8,21;7:16;18:7;23:22;67:6;68:1
**settlement (9)** 6:9,12;7:1,7;16:19;18:25;38:6;43:6;57:19
**settlements (12)** 7:8,13,24;8:16;9:2;10:4;63:19,21;70:14;71:3;73:12;78:10
**settling (4)** 9:1;10:3;11:14;22:15
**seventeen (1)** 72:16
**several (1)** 3:8
**severely (1)** 32:3
**shapes (1)** 49:1
**shaping (1)** 31:18
**share (1)** 23:2
**shares (1)** 49:24
**shift (1)** 26:15
**shifting (2)** 56:14;57:17
**short (10)** 23:11,16;58:6,11;72:22;78:19;79:22;80:8;81:2,2
**show (4)** 18:20;38:1;46:3;76:24
**shows (1)** 57:4
**side (6)** 16:13;25:16;28:14,17,18;33:9
**sides (1)** 80:16
**sign (1)** 75:22
**significant (5)** 8:13;16:18;31:24,24;76:8
**silence (1)** 30:21
**simple (4)** 22:18;45:10;78:18;80:2
**simply (4)** 68:15;71:13;73:24;79:23
**single (1)** 37:17
**sit (8)** 12:8,13;14:8,11;17:24;63:7,24;75:20
**sitting (1)** 22:14
**situated (1)** 41:16
**situation (4)** 32:15;57:13;70:8;73:10
**six (10)** 5:13,19;10:22;14:23,24;18:3;44:15;47:1;71:20;77:15
**sixty (5)** 73:3;74:18,19;77:1,9
**sixty-day (2)** 76:6;79:11
**skip (1)** 42:16
**Slack (104)** 4:3,4,4;5:7,9,12;6:16,23,25;7:19,21,24;8:2,17,19,22;9:4,

25;10:7,16;11:2,7,12;12:2,17,22,25;13:2,9,10,20;14:5;15:10,13,17,19,21;16:16;17:11,13,18;18:14,22;19:7,9,15,16;20:3,21;21:16;22:8,21,23,25;25:5,9;27:14;32:7;33:1,14;34:24;35:16;37:18;44:14;46:1;47:18;56:10,11;57:3;58:6;59:9;60:17;61:15,25;62:2;65:9,16,19;66:5,19,24;67:12,17,21;68:3,8,14;69:23;72:20;73:5;74:7;75:10,23;76:1,2;77:2,16;78:23;79:3,18,21;80:23;81:1,7
**Slack's (5)** 25:16;30:25;57:20,23;59:6
**slight (1)** 26:15
**slow (3)** 21:5;41:21,25
**slowed (2)** 70:24;71:1
**slowest (1)** 41:21
**small (2)** 49:24;67:18
**smaller (2)** 37:16;48:4
**so-and-so (1)** 47:19
**so-called (1)** 32:14
**sole (1)** 5:25
**solely (1)** 31:3
**solution (2)** 22:18;61:4
**solve (2)** 37:10,11
**solves (1)** 77:10
**somebody (11)** 4:22;14:9;19:22;26:9;27:1;32:20;33:13;39:14;51:19;67:1;78:12
**someone (3)** 28:17,18;41:4
**sometimes (3)** 11:4;36:2,2
**somewhat (3)** 15:2,3;35:17
**sooner (1)** 78:6
**sophisticated (2)** 38:15;40:15
**sorry (9)** 4:21;8:17;19:20;23:6;24:7;52:23;58:20;61:19,20
**sort (11)** 19:2;29:7;30:21;49:6;61:1,11;62:16,16;69:24;79:5;81:2
**sound (2)** 69:2,3
**sounds (1)** 71:11
**speak (1)** 39:10
**speaking (2)** 34:18;48:18
**specialist (1)** 34:19
**specially (1)** 81:5
**specifically (1)** 64:16
**speed (1)** 21:5
**speeding (1)** 21:12
**speedy (1)** 55:19
**spend (2)** 38:24;67:4
**spending (1)** 22:15
**spilled (1)** 69:22
**spoken (1)** 23:16
**squeak (1)** 11:6
**squeaky (2)** 11:4,20
**stage (4)** 39:1;42:23;46:10,22
**stages (1)** 14:14
**stampede (1)** 14:2
**stand (2)** 32:10;55:22
**standard (2)** 19:13;45:7
**standards (2)** 9:9;19:18
**standing (1)** 21:23
**standpoint (1)** 79:7
**stands (1)** 35:14
**start (11)** 3:15;10:10,14;30:11;38:1,2,5;55:14;62:2;72:17;79:12
**started (2)** 66:7;76:12
**starters (1)** 76:1
**starting (2)** 23:10;37:25
**state (9)** 3:16,19;4:18;19:4,25;26:19,23;46:16;56:9
**stated (5)** 25:17;27:11;70:11;71:16;78:15
**statement (1)** 14:7
**statistics (4)** 6:5,15,17;13:13
**status (15)** 11:20;13:25;20:11;21:24;27:2;28:21;44:21;45:6,8;46:4;57:4;74:12,25;77:10;80:22
**statute (4)** 15:23;27:3,10;45:11
**stay (5)** 29:11,19;51:15,19;77:7
**stayed (2)** 29:22;30:22
**step (6)** 19:2,12;21:19;42:13,16;46:7
**steps (1)** 24:22
**stick (3)** 41:11;72:9;77:13
**still (26)** 8:24;9:1;10:3,24;16:11,18;17:23;18:4,25;19:1;26:10;28:12,20;30:17;38:12,17;44:5;49:21;59:1,1;61:7;62:22;70:6,17,21;73:13
**stip (1)** 65:1
**stop (1)** 56:1
**story (2)** 39:17;45:14
**strange (1)** 66:4
**Street (1)** 83:12
**strikes (1)** 34:13
**strings (1)** 31:21
**strongly (1)** 68:23
**stuff (2)** 46:18;68:19
**style (1)** 25:11
**subject (5)** 8:8;10:8;26:18;32:18;41:5
**submit (2)** 25:14;48:12
**submitted (4)** 6:8;24:11;43:16;48:13
**substantial (1)** 53:22
**substantially (1)** 14:25
**subtle (3)** 32:15;36:2,2
**success (1)** 6:5
**successful (7)** 8:12;35:16;44:8;59:14;68:4;73:12,12
**suddenly (2)** 16:3;39:11
**sufficient (2)** 56:24;79:12
**suggest (4)** 43:19;73:1;74:11;76:5
**suggested (3)** 18:1;45:3;71:19
**suggesting (3)** 14:18;63:13,13
**suggestion (3)** 21:21;72:7;80:12
**suggestions (2)** 71:23;72:4
**Suite (1)** 83:12
**suited (1)** 70:20
**sulk (1)** 17:24
**support (1)** 22:6
**supported (1)** 30:21
**Suppose (1)** 24:18
**supposed (1)** 55:18
**Sure (5)** 50:1;53:14;60:17;61:22;74:23
**surfacing (1)** 40:20
**survived (1)** 43:17
**Susan (1)** 4:13
**suspect (1)** 13:11
**sweet (1)** 78:19
**System (2)** 3:20;77:5

## T

**table (7)** 16:13;44:7,9,10,12;46:8;47:20
**talk (13)** 9:11;12:3;31:17;50:4,11;63:24;64:25;74:2,22;75:8,12;76:25;77:12
**talked (3)** 64:24;74:15,17
**talking (6)** 34:14;53:7;61:2;63:19;67:22;73:20
**talks (1)** 32:2
**target (1)** 24:13
**tasty (1)** 67:19
**Teachers (1)** 3:19
**technical (1)** 28:6
**technically (1)** 42:10
**technology (1)** 25:16
**telling (3)** 10:20;50:17;66:7
**ten (7)** 5:9;14:15;16:4;22:21;23:12;41:14;68:17
**term (1)** 72:22
**terminology (1)** 56:2
**terms (6)** 33:6;61:8;71:22,22;78:10;79:10
**test (2)** 40:8,9
**theirs (1)** 14:10
**theory (1)** 33:5
**therefore (3)** 25:17;52:20;72:17
**there'll (1)** 54:8
**thinking (4)** 34:20,22;75:4;78:13
**third (2)** 55:20;68:25
**third-year (1)** 69:12

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 96 of 98

**thirteen (1)**
54:10
**thirty (3)**
21:22;67:16;74:20
**thirty-six (1)**
3:23
**though (3)**
11:20;50:25;62:4
**thought (4)**
21:11;51:24;68:18;74:6
**thousands (3)**
62:9;71:7;75:24
**threat (1)**
32:16
**three (10)**
11:18;12:1;34:21;37:25;53:11;55:5,10;56:24;74:12,13
**threshold (1)**
29:7
**threw (1)**
30:20
**thrown (1)**
32:23
**thumb (1)**
53:25
**tie (1)**
72:15
**tied (1)**
29:11
**tight (4)**
33:2;59:11;71:24;75:20
**till (1)**
67:6
**timeline (2)**
42:7,7
**timely (1)**
42:2
**times (1)**
68:12
**timing (1)**
10:15
**tip (1)**
33:12
**today (19)**
8:24;10:22;15:8;30:25;33:2;36:4,10;37:14;39:13,16;57:21;61:10;68:16;70:3;72:25;73:2,6;74:13;79:16
**today's (7)**
17:23;35:22;36:9;37:22;41:3;47:18;71:23
**together (4)**
61:5;62:5;73:7;75:21
**told (3)**
49:15;59:6;64:21
**tomorrow (3)**
11:22;65:2,3
**took (1)**
9:22
**toolbox (1)**
70:15
**tools (2)**
16:25;70:15
**toss (2)**
32:20;77:22
**tough (1)**
11:13
**tour (1)**
75:10
**touted (1)**
30:15
**track (1)**
13:14
**tracks (1)**
50:19
**trading (2)**
25:14;43:16
**traditional (1)**
77:6
**trampling (1)**
31:11
**transcript (2)**
78:14;83:3
**treated (1)**
25:13
**treating (1)**
55:8
**treatment (1)**
42:22
**tree (2)**
71:6,7
**tremendous (1)**
55:4
**trial (4)**
14:2;27:8;46:18;57:5
**trials (2)**
16:6;20:13
**tried (1)**
77:12
**triggers (1)**
40:17
**trouble (1)**
9:21
**troubled (1)**
9:20
**true (7)**
18:21,22;28:8;51:18,19;70:21;83:4
**truth (1)**
43:14
**try (9)**
9:17;21:23;24:17;45:18;53:3;61:4;63:25;68:3;79:7
**trying (18)**
4:8;9:12;13:6;15:23;16:20;17:14;18:10;19:12,14;21:3;41:22;42:12,16;52:2,15;77:4,12;79:20
**turn (6)**
12:20;28:1,4;64:3,23;74:6
**twenty (3)**
14:15;67:16;74:20
**twenty-five (1)**
67:16
**two (17)**
19:9;23:1;28:9;37:25;40:4;43:2;55:17;57:15;62:10,22;64:11;65:9;71:19;76:3,5,7,12
**two-and-a-half (1)**
30:12
**typically (1)**
21:1

## U

**ultimately (2)**
14:6;38:22
**under (21)**
5:23;6:1;24:11,14;26:25;31:20;34:7;36:16;38:9;40:12;42:5,5,6;50:19;53:16;58:10,17;60:18;62:15;64:13;70:15
**undergoing (1)**
31:23
**underlying (1)**
51:20
**undermine (1)**
12:6
**understood (2)**
29:22;32:8
**unfair (2)**
56:24;67:22
**unfortunately (3)**
29:13;30:19;37:7
**unhappy (1)**
69:14
**UNIDENTIFIED (1)**
69:4
**unlike (1)**
42:20
**unlikely (1)**
51:4
**unresolved (4)**
6:10;12:8;33:20;35:18
**UNSION (1)**
81:10
**unsophisticated (2)**
38:16;40:16
**unstable (1)**
69:8
**unsuccessful (1)**
59:15
**up (28)**
5:7;15:6;18:20;21:5,12;22:6;33:5,9;38:1;41:8;46:3;47:6,18;53:2;57:4;67:6,19;68:2;69:10,11;70:24;72:14,15;73:8;74:1,10;75:3;77:4
**upon (2)**
24:19;33:25
**use (6)**
9:21;10:16;16:24;36:21;53:25;74:8
**used (1)**
17:14
**useful (1)**
44:10
**using (1)**
21:20
**usually (1)**
67:18

## V

**valid (2)**
20:15;21:2
**variation (1)**
44:1
**various (2)**
53:18;75:9
**vast (2)**
6:21;41:18
**version (6)**
33:4;62:17;65:5;69:25;77:6,23
**veto (1)**
17:25
**victims (1)**
69:14
**view (7)**
11:4;16:14;28:6;32:1;52:17;59:8;62:19
**violating (1)**
32:11
**VOICE (1)**
69:4
**voluntariness (1)**
32:14
**voluntary (8)**
18:23;20:7;21:15;32:8;33:1;53:9;57:16;67:1

## W

**wait (4)**
50:13;54:1;56:1;61:15
**waiting (3)**
4:25;52:24;54:2
**wants (5)**
13:9;33:13;46:9;60:10;70:4
**war (1)**
39:17
**waste (3)**
39:10,16;41:5
**watch (1)**
12:13
**way (24)**
9:8;14:16;16:23;20:21,23;27:18;28:11;31:10;34:13,19;35:1;44:10;46:14,24;54:17;57:18;59:9;63:20;71:25,25;72:9,20;77:24;78:20
**ways (3)**
6:4;16:5;71:19
**website (1)**
81:4
**WEDNESDAY (1)**
3:1
**week (1)**
47:20
**weeks (8)**
7:15;9:2;36:15;62:10;74:12,13;75:21;77:10
**weigh (1)**
40:11
**Weil (1)**
4:5
**weird (1)**
65:24
**welcome (2)**
61:4;75:5
**well- (1)**
74:2
**weren't (1)**
18:8
**what's (18)**
7:5;16:15,16,25;20:12,19,22;29:16;34:1;45:25;50:10;56:9;60:21;63:5;65:23;71:22;75:12,24
**wheels (2)**
11:4,20
**whittle (1)**
39:4
**whole (6)**
26:7;40:7;47:6;63:21;64:2;77:5
**who's (6)**
9:18;23:8;37:1,1;40:21,21
**who've (1)**
8:11
**willing (8)**
7:9;47:25;60:3;62:11;64:2,4;75:20;76:19
**willy (1)**
53:15
**wish (3)**

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 97 of 98

73:7,23;75:9
**wishes (3)**
73:15;74:16;78:12
**withdraw (1)**
43:10
**within (1)**
47:16
**without (11)**
22:12;31:11;35:11;39:1;44:12;52:16;67:6;71:3;73:12;78:25;79:16
**witness (1)**
26:6
**word (1)**
9:21
**words (7)**
12:11;16:9;18:17;21:19;25:10;33:7;74:25
**work (23)**
14:17;18:9;21:24;22:3,12;30:13;36:23;40:3;42:20;63:17,20;64:3,5;68:2,6,6;70:16;74:9;75:21;76:18;79:7,13;80:16
**worked (2)**
68:5;71:5
**working (6)**
6:2;18:25;63:17,20,20;72:11
**works (2)**
34:13;81:6
**world (2)**
67:17;70:21
**worries (2)**
46:1;52:25
**worry (1)**
36:25
**worrying (2)**
39:11;72:17
**writing (1)**
48:16
**written (2)**
59:10;78:1
**wrong (3)**
28:25;49:22;50:1

## Y

**year (3)**
9:24;18:8;34:21
**years (7)**
12:1;30:12;37:25;43:2;55:5,11;56:24

## Z

**Zoom (1)**
28:24

## 1

**1,000 (3)**
20:13;21:8;70:17
**1,000,000 (1)**
67:25
**1,200 (2)**
8:6;13:12
**1,500 (3)**
6:10,20;8:3
**1,800 (1)**
7:13
**10,000 (1)**
22:4
**10:00 (1)**
3:1
**100 (1)**
21:8
**100,000-dollar (1)**
67:25
**11 (1)**
53:16
**12b6 (5)**
26:25;27:11;46:15;51:1;56:7
**15 (2)**
39:18;41:12
**150 (1)**
9:1
**1500 (1)**
38:13
**16th (1)**
83:12
**180 (3)**
7:18,20;77:3
**1800 (1)**
38:13
**183 (3)**
7:16,19,24
**18th (1)**
5:13

## 2

**2,800 (1)**
6:8
**20 (1)**
46:17
**20/20 (1)**
37:9
**200 (1)**
36:22
**200-page (1)**
53:16
**2023 (3)**
3:1;5:14;83:15
**23 (7)**
37:19,21,23;39:11,15;40:19;70:5
**240 (3)**
7:16,20,21

## 3

**3,800 (1)**
7:12
**30 (2)**
59:10;77:3
**300 (2)**
7:13;63:19
**30th (5)**
42:9;58:22;60:8;78:16,17
**360 (1)**
71:11

## 4

**4 (1)**
82:3
**4,000 (3)**
9:6;22:7;79:18
**4,800 (1)**
6:7
**40 (1)**
31:5
**4000 (4)**
33:20;35:18;38:12;39:5
**45 (1)**
51:3

## 5

**5,000 (1)**
22:9
**500 (1)**
21:8

## 6

**60 (2)**
77:2,3

## 7

**7 (2)**
3:1;58:11
**7,000 (2)**
22:3,6
**700 (1)**
48:3
**7023 (7)**
31:15;33:24;34:7;35:6,10;36:15;70:5
**7227 (1)**
83:12
**723 (2)**
61:3;77:6
**760 (3)**
44:18;47:3;48:15
**7th (1)**
58:21

## 8

**8 (1)**
83:15
**8,800 (2)**
6:7;22:8
**80 (1)**
82:3
**85020 (1)**
83:13

Case: 19-30088 Doc# 13830 Filed: 06/09/23 Entered: 06/09/23 05:26:17 Page 98 of 98