1        UNITED STATES BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3                  -oOo-

4   In Re:                      ) Case No. 19-30088
                                ) Chapter 11
5   PG&E CORPORATION AND PACIFIC )
    GAS AND ELECTRIC COMPANY     ) San Francisco, California
6                                ) Wednesday, August 23, 2023
            Reorganized Debtors. ) 10:30 AM
7   _____ )
                                SECURITIES PLAINTIFFS' MOTION
8                               FOR THE APPLICATION OF
                                BANKRUPTCY RULE 7023 AND THE
9                               CERTIFICATION OF A CLASS OF
                                SECURITIES CLAIMANTS FILED BY
10                              SECURITIES LEAD PLAINTIFF AND
                                THE PROPOSED CLASS [13865]

11

12                TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE DENNIS MONTALI
              UNITED STATES BANKRUPTCY JUDGE

13

    APPEARANCES (All present by video or telephone):
14  For the Reorganized        RICHARD W. SLACK, ESQ.
    Debtors:                   Weil, Gotshal & Manges LLP
15                             767 Fifth Avenue
                               New York, NY 10153
16                             (212)310-8000

17  For PERA:                  THOMAS A. DUBBS, ESQ.
                                MICHAEL P. CANTY, ESQ.
18                             Labaton Sucharow LLP
                               140 Broadway
19                             New York, NY 10005
                               (212)907-0700

20
                               MICHAEL S. ETKIN, ESQ.
21                             Lowenstein Sandler LLP
                               One Lowenstein Drive
22                             Roseland, NY 07068
                               (973)597-2500

23

24

25

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 1 of 85

```
 1   For CalSTRS et al:           IRWIN B. SCHWARTZ, ESQ.
                                   BLA Schwartz, P.C.
 2                                 515 South Flower Street
                                   18th Floor
 3                                 Los Angeles, CA 90071
                                   (213)785-3683
 4
     For The State of Oregon:     SUSAN F. DICICCO, ESQ.
 5                                 Morgan, Lewis & Brockius LLP
                                   1400 Page Mill Road
 6                                 Palo Alto, CA 94304
                                   (650)843-4000
 7
     For MML Investment           STACY DASARO, ESQ.
 8   Advisers LLC:                Goodwin Procter LLP
                                   620 8th Avenue
 9                                 New York, NY 10018
                                   (212)813-8800
10
     For RKS Claimants:           JEFFREY RITHOLTZ, ESQ.
11                                 Rolnick Kramer Sadighi LLP
                                   1251 Avenue of the Americas
12                                 New York, NY 10020
                                   (212)597-2800
13

14

15

16

17

18   Court Recorder:             LORENA PARADA/ANKEY THOMAS
                                   United States Bankruptcy Court
19                                 450 Golden Gate Avenue
                                   San Francisco, CA 94102
20

21   Transcriber:                MICHAEL DRAKE
                                   eScribers, LLC
22                                 7227 N. 16th Street
                                   Suite #207
23                                 Phoenix, AZ 85020
                                   (800) 257-0885
24
     Proceedings recorded by electronic sound recording;
25   transcript provided by transcription service.
```

**eScribers LLC**

1   SAN FRANCISCO, CALIFORNIA, WEDNESDAY, AUGUST 23, 2023, 10:30 AM

2                          -oOo-

3      (Call to order of the Court.)

4          THE CLERK:  Calling the matter of PG&E Corporation.

5   And I'll bring counsel into the courtroom now, Your Honor.

6          THE COURT:  Thank you.  All right.  Why don't you make

7   your appearing when you come on?  Mr. Slack, good morning.

8          MR. SLACK:  Good morning, Your Honor.  Richard Slack

9   from Weil, Gotshal & Manges for reorganize debtors.

10          THE COURT:  Mr. Ritholtz?

11          MR. RITHOLTZ:  Good morning, Your Honor.  Jeffrey

12   Ritholtz for the claimants.

13          THE COURT:  Ms. DiCicco, you're up next.

14          MS. DICICCO:  Good afternoon -- or good morning, Your

15   Honor.  Susan DiCicco from Morgan Lewis for the Oregon claims.

16          THE COURT:  All right.  Is Mr. Etkin signing in, Ms.

17   Parada?

18          THE CLERK:  I will bring him in now, Your Honor.

19          THE COURT:  All right.  Ms. Dasaro?

20          MS. DASARO:  Good morning, Your Honor.  Stacy Dasaro

21   for MML Advisers, investment advisor to the MassMutual funds.

22          THE COURT:  I think -- there we go.  There's Mr.

23   Etkin.  Good morning, Mr. Etkin.

24          MR. ETKIN:  Good morning, Your Honor.  Michael Etkin,

25   Lowenstein Sandler, for PERA.  I would also ask Your Honor

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 3
of 85

1  that -- I think Mr. Dubbs is on.

2         THE COURT:  I'm sorry.  Who?

3         MR. ETKIN:  Mr. Dubbs from Labaton.

4         THE COURT:  Yes.  Well, he needs to check in.

5         MR. ETKIN:  Hopefully he's checked in in there and Ms.

6  Parada can bring him in as a --

7         THE COURT:  Okay.

8         MR. ETKIN:  Because he's --

9         THE COURT:  You're going to make the principal

10  argument, or is he?

11         MR. ETKIN:  He is, Your Honor.

12         THE COURT:  Oh, okay.  All right.

13         THE CLERK:  I don't see a Mr. Dubbs that signed in,

14  but I do someone --  see someone that's raised a hand with the

15  number 281914.  Would you like me to --

16         THE COURT:  All right.  Well, do you recognize that

17  number, Mr. Etkin?

18         MR. ETKIN:  I don't.  Is there an area code with

19  respect --

20         THE CLERK:  No, no.  Those are the only numbers.

21         THE COURT:  Well, I see someone from PG&E, a Mr.

22  Cummings.  And I see Mr. Schwartz and Mr. Canty.

23         Number 281914, I need to know who you are.

24         THE CLERK:  Would you like me to allow the person to

25  speak, Your Honor?

1          THE COURT:  Well, let's do this.  281913, if you're

2    Mr. Dubbs, put down your hand and then put it back up again.

3          THE CLERK:  Mr. Canty also has his hand up.  He's from

4    the same firm.

5          THE COURT:  Okay.  Let's bring him in then.

6          MR. CANTY:  Your Honor, this is Michael Canty from

7    Labaton.  That number is the password.  I am assuming that Mr.

8    Dubbs put that in where his name was supposed to go.  That's

9    just an assumption I'm making.  So I would suggest that we let

10   that person in to determine whether or not that is Mr. Dubbs.

11         THE COURT:  Okay.  Is he going to make the argument or

12   are you, Mr. Canty?

13         MR. CANTY:  He is.  But I just wanted to make sure

14   that -- that number sounded familiar and I looked at the

15   password.

16         THE COURT:  Okay.

17         MR. CANTY:  And I believe that's the password for this

18   meeting.  So he might have inadvertently put that in where his

19   name was supposed to go.

20         THE COURT:  Well, Mr. Dubbs has appeared in this Court

21   before, and he's a known player, so I assume he's not a Zoom

22   bomber.  If he is or --

23         MR. CANTY:  There he is.

24         THE COURT:  So we're all going to be embarrassed here

25   and upset.  I hear his laugh.  So 281914 is Mr. Dubbs.  I think

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 5
of 85

1 he can change that to his name if he'd like.

2         THE CLERK:  We can take care of that now that we know.

3         THE COURT:  Mr. Dubbs, you're apparently one of the

4 star attractions here, so you need to turn your camera on and

5 make your appearance.

6         MR. DUBBS:  How's that?

7         THE COURT:  You're going to make the appearance for

8 the moving party, right?

9         MR. DUBBS:  That's correct, Your Honor.

10         THE COURT:  Okay.  Well, just state your name for the

11 record.

12         MR. DUBBS:  My name is Thomas Dubbs from the Labaton

13 firm on behalf of New Mexico, PERA.

14         THE COURT:  Okay.  And Mr. Dubbs, I recall your name

15 and your appearance.  How are you dividing up your forty

16 minutes for rebuttal and primary argument?  And then how are

17 you going to share with other counsel?

18         MR. DUBBS:  We're going to take the forty minutes.

19 And it's going to be divided as follows:  I'm going to speak

20 for ten to fifteen minutes.  Then we're going to have three

21 institutional investors who've requested a short amount of

22 time:  Mr. Irwin Schwartz, who represents CalSTRS for five

23 minutes, Ms. DiCicco who represents Oregon from Morgan Lewis

24 for two minutes, and Stacy Dasaro who has just appeared for one

25 minute who represents the MassMutual clients.

1        THE COURT: Okay. That's fine. Then I'll assume that

2 the four of you will be a little passe here twenty minutes or

3 so.

4        Why don't you go ahead and start your presentation?

5        MR. DUBBS: Thank you very much, Your Honor. May it

6 please the Court?

7        First, let us thank the Court for giving us some time

8 to explain these -- our position. I think we all believe that

9 this is a matter that should be expeditiously handled in a fair

10 manner. And even though we have different approaches to it, I

11 think we share that in common.

12        At the outset, let me begin by saying that what I want

13 to do in general is do a compare and contrast in my time as

14 between the different approaches.

15        Before I do that, I have one comment to make, which is

16 that I think that we've all been experiencing a bit of a

17 natural experiment the last few weeks. And if I can quote from

18 my colleague's briefs, which I'm sure they're familiar with,

19 this is their first brief on this issue. Line 13, page 1,

20 "Since PARA filed its third 7023 motion securities claimants

21 and the reorganized debtors have settled an additional 571

22 claims."

23        The 571 in that relatively short period is indeed

24 impressive. And I did some simple arithmetic, which I may have

25 gotten wrong, that if you screen out the cases settled or

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 7
of 85

1    disposed of by virtue of omnibus motions or otherwise, in terms

2    of real settlements, that's about sixteen percent of the total,

3    which in a short period of time is somewhat impressive and

4    leads to the question, since we have been told by PG&E that

5    this process has been computerized and they're sending out

6    offers of settlement on a regular basis, why the big sort of

7    rush at the end.

8         Now there's some procedural things in terms of timing

9    that may have led to this, but I think it's an equally

10   compelling inference that -- and it's been made clear that one

11   thing that PG&E does not want and does not want tremendously is

12   a competing class action.  And they don't want to compete in

13   class action for a couple of reasons which I think are obvious

14   but need to be stated.

15        Number 1, they have to share control of the whole

16   process and they don't want to do that.  And they've had from

17   the beginning of these proceedings of very tight control of the

18   proceedings, subject, of course, to the supervision of the

19   Court.

20        The other thing that they've had is they've had

21   secrecy, and secrecy, not in the invidious sense necessarily,

22   but in the sense that there's no price discovery.  There's no

23   way that these people, when they get an offering, basically an

24   email off of a computer, that they have any idea of how the

25   offer is computed or what the baseline is that PG&E is using.

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 8
of 85

1  Whatever that may be, the point is that they like it that way.

2  And it's in their economic interest to like it that way, if

3  only because the longer that this drags on, the more tempted

4  claimants will be, particularly fiduciaries, that they have to

5  take something because after all, it may go away and they've

6  waited a long time and they want to wrap it up just like

7  everyone else wants to wrap it up?

8       So there are a number of reasons why they don't like

9  the idea of a class action, putting aside whatever procedural

10  hoops there may or may not be.  And I think that's something

11  that the Court should keep in mind.

12       THE COURT:  Now, Mr. Dubbs, what do I -- I mean, I

13  can't ignore that fifteen percent of the claimants have

14  settled.  Whether it's out of fear or otherwise, they're still

15  settling consensually.  What's wrong with that?

16       MR. DUBBS:  There's nothing wrong with it.  And I'm

17  not suggesting that they did anything wrong.  I'm just

18  suggesting that the increase in speed may be due to many

19  features.  And one of the features may be that, Your Honor, and

20  we are all here today talking about a potential class action,

21  and they are, to put it mildly, unhappy about that.

22       THE COURT:  No, I understand that.  And I'm going to

23  talk to you about the timeline that's in the reply brief, but

24  I'll let you go ahead and make your preliminary --

25       MR. DUBBS:  Fine.  No, I look forward to that.  And

1  I'll get to that in a minute.

2          Let's talk first about -- because there's been a lot

3  of back and forth about opt-outs, opt-ins that that cluster of

4  issues.

5          Under our scheme, no one would have to, quote, opt out

6  until February and maybe later.  So that gives --

7          THE COURT:  Excuse me.  That's what your brief says.

8  And if I take that as given, that's obviously the shortest time

9  you envision.  So PG&E would obviously prefer later one.  But

10 that means six more months of settlements that either they

11 might dwindle but they also might kick the fifteen percent

12 success rate which we all agree would not be bad.

13         MR. DUBBS:  No, we don't.  We don't disagree with that

14 at all.  And that's sort of the risk that we are prepared to

15 take because we are betting, because it's historically been

16 accurate, they were never going to get one hundred percent of

17 these people to settle either due to the lassitude or the

18 People are doing other things or what have you.  So there's

19 going to be a clean-up operation at the very least at the end.

20 And so we can offer to do that.

21         But that's not why we're in this.  We're in this in

22 order to represent people who do not necessarily want a process

23 that's totally blind like this and would like some

24 representation that offers some hope of not only protecting

25 their rights, giving them a procedure they can put faith in,

1 and hopefully getting them more than what a email of off a
2 computer will give them.

3       So we think that -- and the rationale which we put in
4 our papers, which I'm sure the Court is focused on, is we
5 believe that it's necessary for PG&E to get some handle on the
6 opt-outs before they make their last and best and final offer
7 so they can have some handle on the contingent liabilities from
8 the opt-outs.  Now, we can --

9       THE COURT:  Mr. Dubbs, whether it's a computer or Mr.
10 Slack sits there at his desk with this New York Yankees poster
11 behind him or Chicago Cubs poster, let's assume whether it's
12 either Slack or a computer, somebody will turn down the last
13 offer and that'll be the end of that process.  And then it'll
14 perhaps go to a mediator, and that might get rid of a few more.
15 But then there'll be another group.  Let's assume that the RKS
16 group, which is represented by experienced counsel and
17 represents a huge chunk -- let's assume they don't settle and
18 they don't want that -- they'll opt out.  So what have we done
19 for that group?  They don't this procedure.  And they're not
20 likely to opt in, at least I doubt -- I mean, excuse me,
21 they're more likely to opt out.  Right?  It's that all correct?

22       MR. DUBBS:  Those assumptions are correct.  And I
23 think the answer to the implicit question is what happens to
24 RKS and how does RKS dovetail in with what we have planned?
25 And the answer to that is if we go on and take the next step,

1 which is to motion practice and preparing for trial, they would

2 be part of that that structure. And that's been happened --

3 that happens in other cases with substantial opt-outs. I mean,

4 I had the largest opt out in the WorldCom case, which is a huge

5 bank that had a several hundred million dollar position. And

6 they didn't allow --

7         THE COURT: I understand. I understand. But again,

8 mam I correct -- correct me on this. And I don't -- I think

9 both sides have convinced me that I have to make a decision on

10 if I grant this procedure at all, I have to do, do we go

11 opt-out, opt-in? And I think perhaps the more persuasive

12 argument is opt-out.

13         So let's assume according to your outline the opt-out

14 deadline is February 19th. But some hypothetical person may

15 functionally opt out tomorrow, right?

16         MR. DUBBS: That's correct.

17         THE COURT: Okay. And based upon at least the way the

18 briefs have been suggested, that person can't come back in.

19 Correct?

20         MR. DUBBS: They can't come back in unless there's

21 exigent circumstances which is something more than I don't like

22 the bargain on the table.

23         THE COURT: No, I understand. I understand. That's

24 right. So you and your colleagues go through this procedure.

25 And come February or March or whatever, there is a negotiated

1    settlement to produce a certain recovery to the class members.

2    And if somebody who is a member of the RKS group hasn't opted

3    out, then that person has an option to take that settlement or

4    opt out by the deadline.  But if someone has already opted out,

5    they can't get back in.  They're excluded from the party,

6    right?

7          MR. DUBBS:  Well, they've excluded from the party, but

8    they've had an invitation to the other team's party for six

9    months.  And so, you know, they know what they're doing.

10          THE COURT:  No, that's right.

11          MR. DUBBS:  And they're going to be -- they're going

12    to be part of The ADR mechanism.  And presumably they'll then

13    have been through one, if not multiple mediations, before they

14    have to opt out.  Though Your Honor is quite right.  You can

15    have in effect an informal opt out before then, at which point

16    they are sort of writing both horses.

17          THE COURT:  Well, no, but I -- look, I like to think

18    that regardless of what a computer does, if we get -- for any

19    particular claimant we get to the mediation stage, it will be a

20    real live mediator, not a computer.  And that mediator will

21    suggest an outcome.  And it will be perhaps not accepted and

22    then that's the end of it.  Then I believe that claimant is in

23    what Mr. Slack will call the pool for testing this thing on the

24    merits, the so-called substantive objection.

25          MR. DUBBS:  That's true.

1          THE COURT:  Okay.

2          MR. DUBBS:  That's true.  But that's where the -- just

3   to footnote that point, because I think it's important, that's

4   where the schedule and in terms of Mr. Slack's scheduling of

5   procedural motions and the schedule in terms of opting out

6   somehow somewhat coalesce in that you're going to opt out in

7   about the same time frame as he's going to start filing the

8   motions and before you have to answer the motions.  So you

9   don't have -- so he can be -- Mr. Slack will probably have a

10  pretty good idea by that time who's in and who's out.

11         THE COURT:  That's right.  And I think unless Mr.

12  Ritholtz's 900-and-some-odd clients have a change of heart,

13  they've made their position pretty clear.  They're not going

14  to -- they're going to be opting out again.  I'm not

15  committing.  They can all change their mind.  But at least at

16  the moment, their public statement is that they are not in

17  interested in your class approach.  Right?

18         MR. DUBBS:  That's fair.  They have made it fairly

19  clear they're sailing their own boat, their own direction.

20         THE COURT:  Okay.  So they will -- any one of them,

21  there's hundreds of them, but they will go through the offer

22  and encounter procedure.  If that doesn't solve it, they will

23  go through the mediation procedure.  If that doesn't solve it,

24  then they're in for the long haul for the fight.

25         MR. DUBBS:  They're in for the long haul.  And we'll

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 14
of 85

1  see what happens.

2      And just apropos of that, as Your Honor may have

3  noticed, and it's a bit unorthodox, but we have put into

4  towards the tail end of this process a compulsory mediation

5  where the class or the putative class and Jeanie Mediate under

6  the under the umbrella of one of the mediators that you've

7  picked.

8      Now, we've had multiple mediators in other large cases

9  and it tends to work.  Een though some people think it's

10  counterintuitive, it works for whatever reason.

11      THE COURT:  But That's true.  But that's true even

12  outside of bankruptcy.  I'm sure you know better than I.  Most

13  class actions end up in a mediated settlement, don't they?

14      MR. DUBBS:  Absolutely.  And my only point is that a

15  lot of -- I take back a lot.  A substantial number of them end

16  up there with multiple mediators at that point.  That's the

17  only point I'm going to make.

18      THE COURT:  Okay.  Okay.  Okay.  But my point is

19  whether it's multiple mediators or one magic mediator, a lot of

20  them get solved around the table, not in the courtroom.  And

21  maybe some class actions go to trial, but am I correct, not a

22  great number?

23      MR. DUBBS:  An infinitesimal number get tried.

24      THE COURT:  Okay.  Got it.  All right.  Go ahead with

25  whatever you address.  I have a couple more specific questions,

1   but I don't want to cut into your time.

2           MR. DUBBS: Fine. And now I would --

3           THE COURT: Too much.

4           MR. DUBBS: Well, that's okay.

5       I have a couple of other compare-and-contrast that I

6   note. And we can get into it in more detail based upon any

7   questions the Court may have or anything else.

8       Mr. Slack's criticism of our structure has as one of

9   its pillars the fact that a motion to dismiss has to be made

10   before you can certify the class. And that's simply not true.

11       Now, on Mr. Slack's side of the table, it is true that

12   current class action process often does it that way, but that

13   doesn't -- that's not holy writ that comes down from anyone.

14   And indeed, some of us have been doing this for a while

15   remember when the class was done before the motions to dismiss

16   because the clients were saying let's get the class certified,

17   we may not like it, but if it gets certified, that's not so bad

18   because we're going to win the motion to dismiss, and that's

19   going to be raised to all these people, not just a few, but all

20   of them. And that's a good thing. So there's nothing written

21   that you have to do the motion to dismiss process before you

22   can do the class process, number 1.

23       And number 2, there are -- Mr. Slack is going to raise

24   some has raised his papers a parade of horribles about all the

25   problems that have to go through before you can certify class.

1    And I'd just like to address a couple of those off the top, and

2    we can get into the details of that if we want to or need to.

3          As Your Honor is aware, the class action process has

4    as one of its key pivot points of dealing with the issue of the

5    efficient market hypothesis and whether there's a presumption

6    that there was reliance by the class.

7          THE COURT:  Right, right.

8          MR. DUBBS:  Because -- and the comeback to that is the

9    presumption gets rebutted under a theory that has now been

10   enshrined by the Supreme Court called price impact which is a

11   bit of a misnomer and really is two concepts folded into one

12   label.  And one concept is basically a materiality, though it's

13   not called that. and are the statements material.  And if

14   there's a question as to whether the material, then the recent

15   case law presents a balancing test for the Court.

16         So it ends up being, as it almost always has been in

17   common law fraud, a bench question as to whether the statement

18   is material or is puffery or something else.

19         THE COURT:  It sounds like a 12(b)(6) issue.

20         MR. DUBBS:  Well, it could be a 12(b)(6) issue.  And

21   that's one of the things about it.  But it comes up more

22   frequently in the class action context.

23         THE COURT:  Oh, I understand that.  But we have an

24   anomaly here.  We have a very, very robust procedure that's

25   been in place for three years.  And you want me to depart from

1 it and add the second one. And I'm just trying to figure,

2 okay, what does that do? And it seems to me that what Mr.

3 Slack calls his sufficiency hearings, you call your price

4 impacts, whatever you call them. And I say sounds like a

5 12(b)(6). Maybe I'm wrong, and I apologize to the class

6 action --

7       MR. DUBBS: No. I mean, there's an overlap between

8 the two. There's no question about it. But if it's in the

9 class action format, it applies to everyone's. That's a res

10 adjudicata point which may be too technical for these things.

11 And yes, the same analysis comes up in the 12(b)(6).

12       THE COURT: Well, let me rephrase my question. In

13 looking at the timeline I use, your timeline begins with -- or

14 I'm sorry, yeah, discovery requests to you. And the next thing

15 is experts from the debtor and so on. I don't see -- I don't

16 see where something is briefed before the certification

17 hearing.

18       So in other words, you're telling me now that the law

19 would permit what I'm going to call this price impact motion,

20 whether it's correctly at 12(b)(6), it's a something, it's a

21 legal ruling that that the Court could issue before we get to

22 the question of whether there's certification. Is that --

23 again, am I correct or have I got that backwards?

24       MR. DUBBS: No, you have it essentially correct. It's

25 necessary a prelude to certification.

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 18
of 85

1          THE COURT:  Okay.  So with that in mind, Mr. Slack

2    from his from his point of view, says we like to have these

3    sufficiency hearings which, again I think is code for 12(b)(6),

4    but I could be wrong.

5          So if I adopt your procedure promptly, it's still

6    going to be several months.  So we've all agreed and you've

7    conceded that in the several months between now and looking at

8    your timeline now and certainly before it gets to a mediator,

9    there's plenty of time for more folks to settle without ever

10   coming to the class table.  But that the end of that process,

11   the certificate -- excuse me, the ADR procedure will likely

12   peter out.  Some say it'll be the end if I even grant this

13   motion.  I don't know that I believe that.  But at some point,

14   it seems to me that I have to preside over a contest over the

15   sufficiency that Mr. Slack would argue and the issues that

16   you've identified.  And they seem to be so similar that they

17   ought to be somehow consolidated.

18         So if you're a -- if you're a class proponent -- or

19   let's -- I seem to have enshrined in the culture and the lore

20   of this case my, 10,000-dollar claimant from Peoria, and I'll

21   use Mr. Ritholtz as representing a hedge fund who's got a

22   five-million-dollar claim.  It seems to me that whether I'm

23   listening to the sufficiency of a five-million-dollar hedge

24   fund claim or Joe's 10,000-dollar claim, I have to still deal

25   with the same legal issues.  Again, am I right in saying that?

1        MR. DUBBS:  You're partly right, but you have

2   something wrong which is that --

3        THE COURT:  Okay.

4        MR. DUBBS:  -- which is that price impact does bear

5   resemblance certainly in terms of its ultimate question or

6   ultimate answer to a 12(b)(6) motion to dismiss a claim on the

7   basis of lack of materiality.  However, there are two tests

8   under the price impact case law.  And one of them is

9   fact-intensive and expert-intensive.  So the standard that one

10  addresses a 12(b)(6) motion which is a statement has to be such

11  puffery that you can dismiss it out of hand forever and ever is

12  a lot different than a statement where the question is did this

13  statement have market impact, did this statement, the

14  revelation of which the truth underlying it, made a stock drop

15  of potentially hundreds of millions of dollars.

16       THE COURT:  Okay.  I understand.

17       MR. DUBBS:  But the latter is a lot more

18  fact-intensive than a 12(b)(6) motion that goes to, you know,

19  is this puffery?  And you know, if besides this is a great use

20  car, it's hard to say what would really, truly be puffery in

21  these circumstances.

22       THE COURT:  So what you're conceding and you're

23  correcting me politely that if we all learned in first year

24  civil procedure that a 12(b)(6) motion takes the facts as true,

25  we can't take the facts as true when there's a fact question

1 because of experts. And I concede that I wasn't clear on that

2 or I didn't fully understand that.

3       But you also seem to say that I can hear the testimony

4 of the experts and make essentially a determination of the

5 impact and then proceed to what's -- what I'll call the more

6 traditional 12(b)(6) analysis. Right?

7       MR. DUBBS: Well, yes. I think it's a practical

8 matter in the real world. If you say there's no price impact,

9 then in the real world, unless we all go back to the drawing

10 board, the odds of certification diminish rapidly.

11       THE COURT: Okay. So if there were --

12       MR. DUBBS: And that --

13       THE COURT: If there were never a bankruptcy and you

14 were -- and you'll have to you'll have to face this market

15 impact issue if this matter is litigated in the District court

16 anyway, correct?

17       MR. DUBBS: Yes, if we ever get to the District court,

18       THE COURT: Okay. Well, don't blame me for that. I

19 got it. Mr. Dubbs, let me let your colleagues have their share

20 of the time. And then I promise you you'll have a full time

21 when it's your turn to respond for what's left. I'm going to

22 stick with close to the time, but I am taking some of it away

23 from you so I promise to give it back.

24       MR. DUBBS: All right. Well, why don't we go to Mr.

25 Schwartz first?

1          THE COURT:  Mr. Schwartz, good morning.

2          MR. SCHWARTZ:  Good morning, Your Honor.  Irwin

3    Schwartz on behalf of CalSTRS, New York Common Access Teachers,

4    Pension Reserves Investment Management Board of Massachusetts,

5    and a number of Hartford entities.  I would like to reserve my

6    time and use it in a rebuttal.

7          THE COURT:  Okay.  I think have, Ms. DiCicco, you're

8    going to speak.

9          MS. DICICCO:  I would like to, Your Honor.  Thank you.

10         I agree with Mr. Schwartz.  My intention was to --

11   since I only have a couple of minutes, literally a couple of

12   minutes, I wanted to reserve my time to the end after Your

13   Honor has asked all your questions and the parties have all

14   addressed the issue.  So my --

15         THE COURT:  Okay.

16         MS. DICICCO:  If it's okay with you, I'd prefer to do

17   that.

18         THE COURT:  Ms. Dasaro?

19         MS. DASARO:  Hi.  Stacy Dasaro for MML Adviser.

20         I share the sentiments of Mr. Schwartz and Ms. DiCicco

21   and would like to reserve my time for rebuttal.

22         THE COURT:  I was in a BAP panel one time where

23   everybody said they agreed their time for rebuttal and the

24   other side said that we don't have any argument to present.

25   And I'm guessing that got ignored.  So Mr. Slack, here's the

1  chance to shut up the opposition, just submit.

2         Okay. Mr. Slack, you're up. And you're going to

3  share some time with Mr. Ritholtz, I believe.

4         MR. SLACK: We're going to we're going to share thirty

5  minutes to ten minutes, Your Honor, and I'll start first.

6         THE COURT: Okay.

7         MR. SLACK: So, Your Honor, when the Court implemented

8  the security procedures two and a half years ago, it rejected a

9  class-based resolution in favor of individual securities

10  claimants prosecuting their own claims. The Court decided that

11  the securities claimants were capable of making their own

12  decisions, including filing claims, deciding when to settle

13  with reorganized debtors. And that decision was right then and

14  remains right today.

15         Your Honor, just two months ago, Your Honor said --

16  and I think it was right then, Your Honor said, I believe and

17  still believe that for a lot of reasons, the bankruptcy claims

18  process is preferable to the class action process. And I'd

19  like to think that I and the debtors, over the objections of

20  PARA and counsel, chose a procedure that was more suited to the

21  bankruptcy world. And I still believe that's true.

22         And class certification right now is an even worse

23  idea now that we know that the procedures that Your Honor put

24  in place are working and the new amendment and objection

25  procedures will work to resolve whatever's remaining.

1       And, Your Honor, just upfront, there's been a lot of
2   discussion about Rule 23 in class certification.  And I think
3   even from the argument that Mr. Dubbs made, it's absolutely
4   clear that the decision today is not whether to certify a
5   class, because if the Court were to decide let's start this
6   process in motion, there's going to need to be a process for
7   class certification.  And constitutionally that's going to be
8   an evidentiary type of hearing.  And I'm going to get to that.
9       And so what the parties don't really agree on is the
10  length of time that's going to be required for this class
11  overlay because there's no question that there's --
12      THE COURT:  Mr. Slack, I'm on board with you.  And Mr.
13  Dubbs virtually conceded that there's probably a minimum six
14  months, six months of the current ADR options before his
15  proposal kicks in.  But the point is, if I don't start it,
16  it'll -- it won't start.
17      MR. SLACK:  Yeah.  Let me just say, Your Honor, it's
18  not six months.  It's going to be to do this correctly
19  somewhere between a year and a year and a half.  And I'll get
20  to that because --
21      THE COURT:  I understand that.  I understand that you
22  and he differ about the time frame, but my guess is, under your
23  procedure, whether it's six months or eighteen months, it
24  doesn't start yet.  And his procedure, it starts.  Okay.  I got
25  you.

1          MR. SLACK:  It is true that it would start.  And let

2    me just say, Your Honor, I think that the two things that that

3    are critical here, number 1, it's important to note that the

4    procedures are absolutely working.  And Mr. Cummings can put

5    on -- I just want to -- even since Friday, if Mr. Cummings can

6    put on the new statistics, we have -- the reorganized attorneys

7    have now successfully resolved 5,883 claims or two-thirds of

8    the securities claims.  In over the last three months, there's

9    been over 1,000 securities settlements.  That's more than ten a

10   day.  And since Friday, since we put in our submission, there's

11   been an additional sixty-eight claims settled and 176 claims

12   resolved through the Court's granting of an omnibus objection.

13          And in addition, Your Honor, there's been fifteen

14   mediations that have been -- that have been put in place, that

15   have been noticed, and those cover 300 -- or more than 300

16   claims.

17          And, Your Honor, so the key is this, is that the Court

18   has recently adopted the amendment and objection procedures.

19   And those procedures were already sent out to every single

20   securities claim.  And these were heavily negotiated.  And in

21   addition to setting a deadline for the organized debtors to

22   object to securities claims, they also provide a framework for

23   resolving everything.

24          And let me tell you how things get resolved and why

25   you don't need a class action here by any stretch.  The plan to

1 resolve the remaining 2,900 claims under the procedures is

2 straightforward. First, let's take out the 700 claims of the

3 RKS Group because those are already collectively being done.

4 So there are about 2,200 unresolved claims. All of them have

5 now received offers.

6       Here's an important statistic, Your Honor. And this

7 isn't a new statistic. It's been consistent, and we've told

8 you this before. When you take out RKS, approximately ninety

9 percent of the claimants who review their offers end up

10 settling. That's been consistent since the very beginning of

11 this process, Your Honor. We're getting approximately ninety

12 percent of everybody who reviews their offers to end up

13 settling with us.

14       THE COURT: We agree that -- let's just take your

15 chart and just do a linear projection. And I don't want

16 another chart. I'm just taking your word for the moment

17 they're settling at ten a day. So if we go ten a day for the

18 rest of the year, maybe that's optimistic, but there'll be a

19 lot fewer obviously, the pure math. But there will be some

20 little guys. My Joe from Peoria might not accept the

21 500-dollar offer that you made hypothetically. And he may not

22 accept the 1,000-dollar offer that the mediator might try to

23 twist his arm on. And then he will be stranded in Neverland

24 unless he has some recourse to the class action.

25       but on the other hand, I'll say it -- I'll

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 26
of 85

1 acknowledge. on the other hand, Mr. Dubbs and Mr. Etkin will

2 be out of work if we end up with such an infinitesimal number

3 of people left that it simply doesn't make economic sense to

4 invoke the class procedure.

5        So why should I strand the little guys without at

6 least A hope that they're going to be protected under the

7 alternative that the class suggests?

8        MR. SLACK: Yeah. So two things, Your Honor. There

9 are no -- you say there are little guys. but the fact is, Your

10 Honor, as Your Honor is recognized from the very beginning of

11 this process, we are dealing here with no absent class members.

12 Everybody here has filed a proof of claim, has provided

13 information. At least most of them have provided information.

14 And so we're not dealing here with absent class members.

15        And the fact is, Your Honor, there is not a single

16 class, a single class ever certified of people who have

17 actually filed claims, not a single one, zero. Okay?

18        THE COURT: I understand.

19        MR. SLACK: And the fact is, the reason for that is

20 the class mechanism is designed to deal with absent class

21 members, not class members who have already filed claims

22 potentially with their own counsel.

23        And so the point, Your Honor, is, is that the

24 procedures that we set up, the amendment procedures, actually

25 deal with this, because what's going to happen, Your Honor, is

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 27
of 85

1  that we've told folks, we've already sent this out, you don't

2  settle, that's fine.  You can now amend your claim.  If you

3  don't amend your claim, you're likely to get a sufficiency

4  objection.  If you do, you're likely to get a sufficiency

5  objection.

6       THE COURT:  Well, I understand that.  I understand

7  that, Mr. Slack.

8       MR. SLACK:  And so the point is, is that we're going

9  to be filing these sufficiency objections.  And we think that

10 people who don't amend, we think we're going to win those.

11      THE COURT:  But this the sufficiency objection what I

12 call the 12(b)(6) motion?

13      MR. SLACK:  It is.  Exactly, Your Honor.

14      THE COURT:  Okay.  Okay.  So --

15      MR. SLACK:  That's exactly the case.

16      THE COURT:  So again, I want to take my claimant who

17 filed a claim -- we have a closed universe.  I understand.  And

18 this is not the District Court.  This is a closed universe.

19 And I take your word for it, the finite number of claims.  And

20 I take your word for it because I thought so too.  This hasn't

21 been done before in a bankruptcy context.

22      But my concern here is not that Mr. Ritholtz and his

23 sophisticated clients will need his services and can duke it

24 out with you around a mediation or in a courtroom.  It's the

25 guy who is the little guy who doesn't have a counsel.  And his

1  only recourse to judgment here is to fight off your motion that

2  he's not even a lawyer to defend.  And it seems to me that that

3  remedy is an alternative that isn't such a bad thing for the

4  little guys who might be the beneficiaries of the class

5  procedure.  So tell me what's wrong with that thinking.

6          MR. SLACK:  Well, I think what's wrong with that

7  thinking is that it's directly opposite what the claims process

8  and bankruptcy does, which is -- and Your Honor has said this

9  himself.  I wish I knew you were going to say that because I

10  would go back and quote Your Honor to yourself which is --

11          THE COURT:  That's okay.  You can do that.  I believe

12  you.

13          MR. SLACK:  -- these folks are not -- in the

14  bankruptcy process are not considered little guys.  Everybody

15  who files a claim is presumed to be able to deal with their

16  claim and prosecute it.  And that's the way it is.  And so yes,

17  people will have to deal with their sufficiency objections.

18  And what they can do of course, any one of them, can hire Mr.

19  Dubbs and Mr. Etkin or hire any other counsel and they can --

20  nothing is stopping them.  So the point is, is that the

21  bankruptcy process allows everybody to prosecute their own

22  claims.

23          THE COURT:  What would happen if I told the U.S.

24  Trustee to appoint a securities claimant committee now?  And

25  that's --

1          MR. SLACK:  But the --

2          THE COURT:  Pardon me?

3          MR. SLACK:  I'm not even sure I understand how that

4    would work, given that you've got claimants who are clearly

5    prosecuting their own claims, settling their own claims.

6          THE COURT:  Wait a minute.  Wait a minute.  I didn't

7    ask you -- I didn't ask you whether it was good idea.  I ask

8    you do you think it's legally a permissive idea.  In other

9    words, I took a check of the Bankruptcy Code today.  And the

10   Bankruptcy Code says that the Court can direct the appointment

11   of a committee.  And I don't know -- it doesn't seem to say,

12   but not until confirmation.  I don't know that.

13         But whether if we have 2,000 securities claimants --

14   and one of these things that we keep hearing, they can hire

15   lawyers.  If the Bankruptcy Code lets me direct the appointment

16   of an official committee of securities fraud claimants, is that

17   legally an option that's available?  Which, by the way, Mr.

18   Slack, might be an easy way to end run the class action.  It's

19   just have a committee at the table, I must say, paid for by

20   your client but representing the little guys who --

21         MR. SLACK:  Yeah, I --

22         THE COURT:  -- who filed a claim.

23         MR. SLACK:  I don't think it's --

24         THE COURT:  Pardon me?

25         MR. SLACK:  I don't think, Your Honor, that it

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 30
of 85

1 would -- given the success of the procedures Your Honor has put

2 in, I don't think that it would be either appropriate or

3 efficient to do that. And it's a little bit of a head

4 scratcher.

5 And here's the thing, Your Honor. There's some idea I

6 think Your Honor is proposing that somehow the class --

7 starting this class process can sit side by side with Your

8 Honor's procedures. And there are four reasons why that just

9 simply is not the case.

10 And first, Your Honor, the existence of the

11 possibility of a 7023 class will almost certainly chill the

12 settlement process. And there's that.

13 THE COURT: How do I know that? But you keep saying

14 that. But why do I understand that's true?

15 MR. SLACK: Well, let me give you two pieces of

16 information, Your Honor. And I'm happy to put in a declaration

17 if Your Honor needs it. But we've heard from multiple

18 claimants who have pushed off their response to our offers

19 because of the existence of the 7023. And we received a letter

20 from one claimant who was noticed for mediation who said they

21 wanted to postpone the mediation specifically because of the

22 existence of the 7023 and said specifically that they -- that

23 if the 7023 were granted, it would alter their approach to the

24 mediations. There is absolutely no question that the existence

25 of the 7023 will grind this to a halt.

1          The second thing, Your Honor, is it relates to the

2    confidentiality.  The whole point of the procedures here was

3    that settlements are confidential.  And what that means is that

4    fiduciaries and pension funds and the like, they can settle

5    without the risk that there's going to be a public settlement

6    later on that somebody's going to be able to measure their

7    settlement against.  And if we --

8          THE COURT:  That's true -- Mr. Dubbs, come on.  Don't

9    laugh.

10          That's true in any settlement.  Right?

11          MR. SLACK:  But no.  But it is.  And so the point,

12    Your Honor, is that here you had a specific confidential

13    process.  And again, we've heard from the pension funds and

14    other types of fiduciaries that that they need to -- they don't

15    want to answer even our offers while this is on the table.  So

16    the fact is, is that given the success -- and here's really the

17    point, Your Honor.  Given the success of the ADR procedures, it

18    makes no sense to put this overlay if it in the slightest way

19    risks derailing a process which is clearly working.  The

20    second --

21          THE COURT:  Well, Mr. -- I have to question the

22    following.  Again, I'm sorry to always go back to my

23    hypotheticals, but I like my hypotheticals.

24          So if our friend from Peoria said PG&E offered me

25    1,000 dollars and I don't want to settle for 1,000 dollars, so

1  I think I'll wait six months or Slack says eighteen months

2  until Mr. Dubbs brings in a more favorable settlement proposal,

3  and my first response to that guy is fine, you'll get nothing

4  for eighteen months no matter what.  But if you accept PG&E's

5  offer, admittedly it's smaller than you want, you'll get it

6  tomorrow.  So make your choice.  So that's my communication

7  with that hypothetical guy.

8       And the other hypothetical guy is not hypothetical.

9  It's Mr. Ritholtz.  And Mr. Ritholtz I don't believe -- he can

10  tell me in a moment -- that if I grant today's motion, that his

11  clients will shut down any further discussion with you about a

12  mediated settlement or a litigation because I just don't

13  believe it.  And if he tells me they will, I guess I'll believe

14  him because he's not going to lie to me.  But I don't think he

15  will say that.

16       So anyway, go ahead with the rest of your time.  And

17  then I wanted you to share your time with Mr. Ritholtz on --

18       MR. SLACK:  I mean, Your Honor, I don't think the

19  issues with what RKS is going to do.  And if you look at the

20  People who are supporting the 7023, it sort of goes to the

21  point that these, in fact, are the people who are fiduciaries

22  who are not going to settle with us while these are in place.

23  And so --

24       THE COURT:  But that's their choice.  That's their

25  choice.  And if my hypothetical guy says, yeah, I'll settle,

1    I'll take $1,000 and you say, yeah, but you can't tell anybody.

2    And he says, fine, I won't tell anybody -- so my settling

3    claimant won't tell anybody.  So how does that impact the

4    fiduciary obligations of all these other counsel that represent

5    pension funds?

6              MR. SLACK:  So here's the way --

7              THE COURT:  they don't know what Joe settled for.

8              MR. SLACK:  Yeah, here's the point, is that if you

9    have a class and you ultimately have a class settlement, that's

10   going to be public.  And they're not going to be willing to

11   settle if they're going to get -- if they're going to get

12   criticized for they don't know.  The point is, they don't know.

13   And until they know what that class settlement is, they're not

14   going to settle.  And you're going to take a process that's

15   working and you're going to risk grinding it to a halt.  And

16   that's not -- that's not a good thing.

17             THE COURT:  At least three experience counsel here in

18   this hearing have stated in record that they want the class

19   action.  One experienced counsel, RKS counsel, said, no, we

20   don't want it.  So that tells me that at least if the lawyers

21   speak for their clients, that the RKS clients will still sit

22   down at the table with you or at the computer with your

23   computer and attempt to settle this case.  And maybe Ms.

24   DiCicco and Ms. Dasaro and the other counsel, maybe they will

25   settle, maybe they won't.  But at least their stated view is I

1  want to have the option of doing the class. I can't ignore

2  those realities.

3       But go ahead and finish your presentation. And then I

4  will shut up till Mr. Ritholtz has his chance.

5       MR. SLACK: Yeah, well, I've got a couple of things

6  that are really important, Your Honor.

7       But what I'll say is this, Your Honor. If these folks

8  want to hire PARE's counsel, they can. Go do it. Let's act

9  collectively and do it. There's nothing that stops them.

10      But look, here's the other thing, Your Honor. There's

11  four reasons why this is inconsistent. I've gotten to one.

12      The second one is the class process introduces

13  immediate and extensive merits litigation and discovery into a

14  process that will this is going to be messy. It's going to be

15  intensive. And it's going to divert the attention away from

16  settlement. And it's not an accident --

17      THE COURT: Okay. I understand.

18      MR. SLACK: Let me just say, it's not an accident,

19  Your Honor, that the amendment and objection procedures start

20  by saying the objectors of guidepost support the reorganized

21  debtor's efforts to continue to resolve as many securities

22  claims as possible through the ADR procedures. And therefore,

23  there is no discovery, no discovery until a court decides the

24  sufficiency objections. And that won't happen until the

25  beginning of next year. And that's to allow this process to go

1 forward without extensive discovery and litigation. And what I

2 can tell you, Your Honor, is that -- this process that they're

3 seeking is going to be extraordinarily intensive in terms of

4 the amount of discovery and time it's going to take. And

5 that's the third --

6        THE COURT: Mr. Slack, if I had granted the original

7 motion, you could have made the same argument and it would be

8 true. And it's true in any class action I presume. And if the

9 if the class action resumes in the District Court, it will

10 happen there. So I don't know why it's different here except

11 that you and your client are getting a lot of these things out

12 of the way. So every one of those ten people that settled,

13 maybe somebody settled during this hearing. And so that's a

14 little cheaper for PG&E to worry about it. And it's one less

15 member that Mr. Dubbs will never get to represent.

16        But I don't -- so what if it's expensive? Class

17 action litigation is expensive, duh.

18        MR. SLACK: It's not the expense, Your Honor. What

19 you're doing is that you're going to take a process where I

20 think the parties, even the negotiated parties, said we're not

21 going to have discovery or any kind of merits litigation while

22 the procedures are going in place. And that is a fundamental

23 part of these procedures. And what's going to happen here is

24 exactly the opposite.

25        So let's talk about the schedule, because there was a

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 36
of 85

1   lot of discussion with Mr. Dubbs about the schedule.  And that

2   schedule just doesn't work in any stretch of the imagination.

3   We talked about -- Your Honor talked about and Mr. Dubbs talked

4   about the fact that class certification takes place after a

5   sufficiency hearing -- or after a motion to dismiss.  Mr. Dubbs

6   says it's not required.

7           Here's what I'm going to tell you, Your Honor.  It is

8   required.  And the reason that it's required after the PSRA is

9   that what you do after the Supreme Court decisions that say

10  this is all an evidentiary hearing is the sufficiency hearing

11  tells you what securities and what claims survive.  And until

12  you know that, until you know that and it's on a claim-by-claim

13  basis, until you know that you can't deal with the issue of

14  price impact or any of the basic issues.  When I say Basic

15  issues, -- when I say Basic, Basic v. Levinson issues, because

16  those are done on a security-by-security and claim-by-claim

17  basis.  So we cite, Your Honor, in our papers the Goldman case,

18  which is a Supreme Court case.

19          THE COURT:  I'm aware of it.

20          MR. SLACK:  And what they say, what the Supreme Court

21  has said is that the defendant has an absolute right to rebut

22  the presumption of reliance by showing that an alleged

23  misrepresentation did not actually affect the market price in

24  the stock.  That is not a legal issue.  That is a factual

25  issue.  And, Your Honor, what we put in on page eighteen of our

1   supplemental submission is a series of bullets of the type of

2   evidentiary issues that are going to come up.

3           In the Goldman case, for example, there were three

4   experts by the defendants on different issues and one expert

5   for the plaintiffs.  So this is not a hypothetical issue where

6   you're just going to say we can have two months of discovery

7   and get this out of the way.

8           In fact, Your Honor, if you take a look at other

9   cases, and I'd like Mr. Cummings to put a chart up, each of

10  these cases is a recent case.  And it shows you what is the

11  amount of discovery, class briefing, and then time for decision

12  in securities cases.  Each one of these, the earliest -- and

13  this has nothing to do with the class notice or sending out the

14  class notice or letting people opt out.  The shortest time

15  frame here is eleven months.

16          THE COURT:  Is that document in the record?  Is that

17  on the docket?

18          MR. SLACK:  It's just reciting, just as if I were

19  reciting this and I went to the docket, Your Honor, in oral

20  argument.  The fact is, is that this is a rebuttal to what we

21  heard in Mr. Dubbs's -- both in his argument and in their

22  submission.  And we're happy to put this on the docket, Your

23  Honor.  But we have the citations to all of this.  And it's

24  just -- it's all public record because it's all orders.

25          THE COURT:  No.  I believe -- Mr. Slack, slow down.  I

1  believe everything you said.  I just want to know if I should

2  try to print a copy here in my home or should I get it from the

3  docket.  That's all.  Maybe I just --

4          MR. SLACK:  We haven't put it on the docket yet Your

5  Honor, but we can do that.  The point, Your Honor, is --

6          THE COURT:  Put it on the docket after the hearing.

7          MR. SLACK:  We will do that, Your Honor.

8          THE COURT:  Okay.

9          MR. SLACK:  The point is, is that the shortest time,

10  the shortest time is eleven months from discovery to the time

11  of decision.  And that doesn't include -- that doesn't include

12  the notice that's going to have to go out.  That's going to be

13  hotly disputed.

14          And here's the other thing, Your Honor.  After this

15  period, what we think is going to happen is you're going to

16  have an eleven-month period where you're going to have

17  discovery certification, spend a ton of money and time and

18  effort that's going to -- that's going to disturb the

19  settlement process.  And you're going to deny the motion for

20  class certification.  That's what we think is going to happen

21  because when we look at these claims, these claims shouldn't be

22  certified under the Supreme Court law.

23          And again, on page 18 of our submission that we gave

24  to you, we gave you the five elements that we -- we're going to

25  challenge each submission.

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 39
of 85

1        THE COURT:   No.  I just said that.  And I understand

2    that.  But Mr. Slack, I have to assume that you're going to do

3    the same thing perhaps in a different procedural setting

4    without the class action procedure.  In other words, to the

5    extent that the ADR mediation process doesn't work for some,

6    the same issues will be presented.  If you're making this

7    argument to me to stop the class action, I believe you have

8    to -- you will make the same argument to stop the RKS claimants

9    or any other claimant who doesn't settle.  It's the same legal

10   issue, right?

11       MR. SLACK:  No, it's not.

12       THE COURT:  No?

13       MR. SLACK:  And here's why.

14       THE COURT:  What's different?

15       MR. SLACK:  Here's why.  It's a good question, Your

16   Honor, because the way the procedures work is you'll decide a

17   sufficiency hearing first.  That is as a matter of law.  And

18   the truth is we think we're going to win those.  And so you may

19   never get to this issue.  You may never, ever get to this

20   issue.  And the truth is, Your Honor, that if you do get to the

21   issue, it'll be after you decide the sufficiency hearing and

22   after we then know whether there are going to be people who

23   settle.

24       So look, what I would say is, Your Honor, we should go

25   through the procedures.  Let them work.  This motion doesn't

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 40
of 85

1   have to be decided today.  And quite frankly, the class

2   certification piece is not going to be decided for eleven

3   months.  And that's at the earliest under what a bunch of cases

4   said.

5           THE COURT:  I want to let Mr. Ritholtz had his ten

6   minutes, please.  Thank you, Mr. Slack.  I appreciate your

7   fervor and your argument.

8           MR. RITHOLTZ:  Thank you, Your Honor.

9           THE COURT:  In that order.  No.  In reverse order.

10          Go ahead, Mr. Ritholtz.

11          MR. RITHOLTZ:  Thank you, Your Honor.  Jeffrey

12  Ritholtz for the RKS claimants.

13          So I just want to start by addressing one point

14  about -- because the RKS claimants have come up a lot in the

15  discussion back and forth so far.

16          The RKS claimants are not a monolith in the sense that

17  we represent both large claimants, including claimants who have

18  over 100 million dollars in claims, and small claimants,

19  including those who have under 10,000 in claims.  So there are

20  a number of Joes from Peoria that we represent already.  So in

21  our view, there is no reason why those other Joes from Peoria

22  who may not have hired counsel yet can't hire us or other

23  counsel to represent them.  They're not stranded at this

24  moment.

25          Secondly, we've already heard -- to address a

1   discussion that just occurred, we've already heard from certain

2   of our clients that they won't engage further on the mediation

3   notices or the offers or counteroffers that have been presented

4   until they have clarity on the class action because they're

5   confused as to what the process is going forward, who's going

6   to be their counsel. Is it RKS? Is it Leviton? And they want

7   clarity before they're willing to proceed with respect to

8   negotiation.

9        THE COURT: Well, why can't you provide them clarity?

10   If Mr. Slack is right, they won't have Dubbs and Etkin for at

11   least a year. And they have a year with you and your advice to

12   settle or not settle. What's wrong with that?

13        MR. RITHOLTZ: Well, we certainly could provide them

14   that advice, Your Honor, but they may not -- they may still not

15   be willing t do so if they want that --

16        THE COURT: That's fine. But that's their -- don't

17   tell me that they don't have the benefit of your advice. And

18   so it would seem to me that when you get an offer from PG&E,

19   you will confer with each and every one of them. I will assume

20   you confer one-on-one. You don't do a computerized thing. And

21   you say PG&E is offered you X dollars, Joe. They'll offer you

22   1,000 dollars for your 10,000-dollar claim. Do you want it or

23   not? And Joe will say yes or no. And if Joe says no, I want

24   5,000, then presumably you'll communicate back and Mr. Slack

25   will tell you to stuff it. And then you'll go into the fight.

1  That's the way it happens.

2         MR. RITHOLTZ:  Sure.  I completely agree with that,

3  Your Honor.  But that's also an opportunity that every single

4  claimant has.  Each one has the ability to hire counsel.

5  They've filed their claims, so they have some -- they're

6  certainly sophisticated enough to do that.  So they're

7  sophisticated enough to hire counsel and have the very same

8  opportunity that all of the RKS claimants have.

9         THE COURT:  But I'm talking about your clients.  And

10 your clients were sophisticated enough to hire you in the first

11 place.  And so if your advice is take the settlement, they

12 either accept your advice or not.  And if your advice is don't

13 take the settlement, they can agree with you or disagree.  And

14 that's the way it works.  You know as well as I that's the way

15 it works.  And so if they -- if the client says thanks for your

16 advice, I'm not going to settle with that unreasonable offer

17 Mr. Slack gave me, then you will tell that client what comes

18 next for that client.  And what comes next is you'll be

19 defending a sufficiency motion.

20        MR. RITHOLTZ:  No, absolutely, Your Honor.  The

21 question is only the timing.

22        THE COURT:  Okay.

23        MR. RITHOLTZ:  Because we're dealing with a scenario

24 now where the ultimate decision on class certification is going

25 to be likely pushed out a year, if not more.  And so by the --

1    we're going to end up with an additional overlay of a year

2    delay when we already have procedures in place that are meant

3    to push this -- push the claims forward.  By December of this

4    year, we're meant to have objections to all the claims and then

5    proceed to discovery and sufficiency hearings and all of that.

6    So just --

7              THE COURT:  Okay.  So let's assume that you've got

8    some -- of your several hundred clients, let's assume that some

9    of them -- and it's none of my business whether that's two or

10   500.  Some of them are confused.  Well, the other ones can

11   still make a rational decision on whether to accept this deal

12   or not.  So it's not -- all of them are going to scrap the

13   whole ADR process, right?

14             MR. RITHOLTZ:  No, I'm not suggesting they're going to

15   scrap the ADR process necessarily.  But --

16             THE COURT:  But I'm trying to find out what tale of

17   horribles are.  How do your clients -- are they impacted if I

18   grant today's motion?  And the only answer I've gotten is some

19   of them will be confused and won't do anything for the next

20   year because they will wait.  Okay, that's the choice.  But

21   that's part of the component of deciding whether to accept an

22   offer or not.

23             MR. RITHOLTZ:  But there's also inevitably going to be

24   a delay, because if we act -- for all of our clients, because

25   yes, some might settle out, but the ones that don't, there's

1    going to be a year before class certification is heard.

2    They're going to want to be heard on that potentially, as Mr.

3    Mr. Dubbs admitted that materiality may be part of that

4    discussion, that goes to the merits of our client's case as

5    well.  So they're going to want to be heard on that issue.  So

6    it adds additional burden and additional delay on their

7    litigation of the case even though they're not going to

8    necessarily classified.

9         THE COURT:  But they might lose too and regret they

10   didn't take the settlement.

11        MR. DUBBS:  That's true.

12        THE COURT:  In other words, I'll take -- one your

13   clients says I don't like Slack's last offer, let's see them in

14   court.  So you come to court.  And you call up the guy and say,

15   we just lost the sufficiency argument, you're out of court.

16   And the client says, God, I should have taken that settlement

17   offer.  And you say --

18        MR. RITHOLTZ:  Well, that could --

19        THE COURT:  -- yeah, you could have.

20        MR. RITHOLTZ:  That can certainly happen, Your Honor.

21   What I'm suggesting is there's two potential alternatives here.

22   One is you have the procedures that are in place right now, the

23   amendment and objection procedures, where there will -- there's

24   a built in sufficiency, sufficiency objection process that will

25   occur after December of this year.  And there will be --

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 45
of 85

1   whoever is litigating will litigate those sufficiency

2   objections.

3        If, on the other hand, there's a class action in place

4   first, now you have an additional overlay of a class

5   certification procedure that our clients will want to be part

6   of.  And that's inevitably going to delay and add burden to our

7   clients to litigate their claims.

8        THE COURT:  Okay.  I got it.  Do you agree with Mr.

9   Slack's timeline or do you think Mr. Dubbs is closer to a

10   realistic timeline?

11        MR. RITHOLTZ:  We agree with Mr. Slack.  In our

12   experience, these types of class certification motions require

13   significant amount of discovery, including expert discovery.

14   And it will take at least a year, in our view, to resolve

15   these -- to resolve the class certification motion here, which

16   is complex.

17        THE COURT:  No, I understand it's complex.  I mean,

18   it's complex.  But I can think of a couple of things that are

19   different about this case.  1, we have this closed universe of

20   the number of claims.  And secondly, there was a -- I think

21   before you were active in the case, there was a negotiated

22   determination of the -- as I recall, Mr. Slack will remember

23   this -- I think nine critical dates where the price changed

24   (audio interference) for the fraud, right?

25        MR. RITHOLTZ:  Yes, Your Honor.  You froze for a

1    second, so I didn't catch all of that.

2         But I would just add that that there's also -- this

3    case has sixty-seven different securities at issue.  Right?

4         THE COURT:  I know that.  I'm not convinced that

5    that's a difference.  To me, whether it's this series bond or

6    that series bond, it's all the subject of the public disclosure

7    or nondisclosure.  We don't have to debate that.  I understand

8    that that that's a position that you and Mr. Slack believe.

9    I'm just telling you that I'm not persuaded that that is quite

10   as terrible as you believe.

11        But go ahead with anything else you wish to say.

12        MR. RITHOLTZ:  Sure, Your Honor.  So I think it's just

13   important to recognize that we already have the procedures in

14   place that don't have a lot of the downsides and drawbacks of

15   the 7023 procedure and accomplish a lot of the same goals,

16   because we have -- the amendment objection procedures don't

17   have a class certification requirement.  They don't have a

18   notice requirement.  They don't have a court approval of

19   settlement requirement.  All of those things will add time and

20   expense to this case and will increase the role that the Court

21   has to have in supervising this.  We already have procedures in

22   place to deal with these issues that will move things along

23   more efficiently.

24        In addition, so let's take the notice here for

25   example.  That's going to need to do -- in a 7023 context,

1   that's going to need to do a lot of work to explain to putative

2   class members what the requirements are for opting out, for

3   example. Do I need an amended claim form? What's the scope of

4   the class? Which securities are in? Which securities are out?

5   Which omissions and misstatements are in and which are out?

6   What if I'm a claimant who traded in some securities that are

7   in the class but some that are out of the class? Am I a class

8   member? Am I -- what if I opt out? Am I half opt out, half

9   class member? There's a lot of complications here that will

10   have to be heavily negotiated and will probably be hotly

11   contested in terms of the notice. So that's a significant

12   issue and a burden. And that's going to add time and expense

13   again to resolution of these claims.

14        You also have in the 7023 procedure, once a class is

15   set, even once the class settles, it could take one to two

16   years for class members to receive their money after the

17   settlement because there's a notice process. There's an

18   allocation procedure that has to get resolved. Class counsel

19   fees have to get resolved, all of which has to be supervised by

20   the Court. And that's going to take a substantial amount of

21   time.

22        Whereas in the amendment of objection procedures, as

23   claimants continue to negotiate with the debtors, the

24   payments -- if they settle individually, the payments get made

25   within fourteen days.

1        THE COURT: All the more reason to settle. You made a

2  very persuasive argument --

3        MR. RITHOLTZ: -- Well, sure, but it's --

4        THE COURT: -- for why not settle. Okay. I got it.

5  I understand your point. I mean, look, you just had it in the

6  briefs. And it helps to put some meat on the bones. And I

7  appreciate your position on it.

8        I want to I want to hear from the other side now and

9  particularly the other opponents of your side. So thank you,

10  Mr. Ritholtz.

11        MR. RITHOLTZ: Okay.

12        THE COURT: Appreciate it.

13        MR. RITHOLTZ: Understood. Thank you, Your Honor.

14        THE COURT: Okay.

15        So Mr. Dubbs, you have given up some time to the other

16  three counsel. So let's go in the order that I talk to them.

17  So Ms. DiCicco and then -- well, we lost somebody I think, and

18  then Ms. Dasaro. Oh, Mr. Schwartz, excuse me. Okay.

19        MR. SCHWARTZ: Your Honor, if you want me to start.

20        THE COURT: I'm sorry. You're right. You're right.

21  You're right. Mr. Schwartz. I am keeping track of my

22  scorecard here, and I turned the page and I forgot you. You're

23  up, Mr. Schwartz.

24        MR. SCHWARTZ: Thank you, Your Honor. And I will try

25  to be brief hopefully --

1          THE COURT:  NO, take your time.

2          MR. SCHWARTZ:  -- with my time.

3          I think, Your Honor, the most important question I

4    wanted to answer that I expect Your Honor is thinking is why

5    would our clients, who are some of the biggest public pension

6    funds in the country, want to have a class action process?

7    Because unlike the 10,000-dollar claimant in Peoria, obviously

8    our clients are sophisticated and they have at least thus far

9    hired us to deal with this issue.

10         And the answer, Your Honor, is because they are

11   fiduciaries, their mandate is to try to maximize return,

12   minimize costs with an acceptable margin of risk.  That's

13   across all assets in the fund.  And what that means in the

14   context of a case like this is that the costs associated with

15   having to prosecute their claims on an individual basis make

16   you question the prudence of continuing the case or at least

17   not settling cheap.

18         I can tell Your Honor that based on the offers our

19   clients have received, that I'm not going to say anything Mr.

20   Slack said, our clients will never settle.  Yet it is required

21   that they release the claims in the case in the PRSA.  That

22   means --

23         THE COURT:  I misunderstood what you said.

24         MR. SCHWARTZ:  Yeah.  I'll say it again.  I apologize.

25   You cannot expect that our clients will accept the settlement

1    offer if, in fact, it's conditioned upon releasing of claims

2    outside the state.  And therefore, you can expect that our

3    clients will have to find a way to go through the procedures

4    that are currently being articulated although they are

5    extraordinarily burdensome.

6              And I would remind Your Honor your comment at the end

7    of a hearing in June where you said recognize that the

8    claimants, security claimants, have already incurred

9    significant burdens in preparing the forms and hiring me or the

10   others.

11             Let's just walk through what happens if the vaunted

12   ADR procedures don't work.  Right?  There is this so-called

13   sufficiency objection which I expect will be fifty pages of

14   legal briefing about why none of the claims in this case

15   survived.  That's going to require us to respond to that.

16   There will be a reply to that.  And I don't think Your Honor

17   will grant all of the theories.  And so something will survive.

18   And then you get into discovery.  And then you get into summary

19   judgment motions.  And then you get into trial most likely.

20   And not only is that for us, but that is for all of -- could be

21   thousand-plus claimants who are not willing to forfeit their

22   claims on the minimalistic offers that have been made so far.

23             And I will tell you, Your Honor, that the letter Mr.

24   Slack quoted was from me.  And what I said in that letter was

25   we are not prepared to mediate until we understand what the

1    court's going to rule on the 723, and then we're going to be

2    delighted to mediate and we're going to be delighted to try to

3    settle this case regardless of the 723.

4         The difference, Your Honor, and you probably already

5    perceived this, is if we have the safety net of a class action

6    that's being run by Mr. Dubbs and his team who are quite

7    competent, then if a lowball offer is made us, we are confident

8    we can say we're not interested, we're going to stay in the

9    class.  If, on the other hand, a very rich offer is made, then

10   my clients and I -- I can tell you CalSTRS because that letter

11   was from CalSTRS -- is delighted to mediate, is delighted to

12   show up in person and negotiate directly with PG&E f they're

13   willing to do that.  But it is not exclusive one to the other.

14        Your Honor, I don't want to belabor this much more,

15   but I would suggest that the economics is what's really driving

16   PG&E's position.  It's what's driving ARK's position.

17        THE COURT:  I mean, I saw Jerry Malone a long time --

18   or Jerry Maguire.  I know it's called show me the money.  But

19   Mr. Schwartz, are you saying that if I grant the motion, that

20   PG&E will increase the settlement offer?

21        MR. SCHWARTZ:  I would if I were them.  I would if I

22   were them.

23        THE COURT:  So would I actually.

24        MR. SCHWARTZ:  But then it may be enough or it may not

25   be enough.  But the point is that the -- and I don't mean to

1    quote Jerry Malone.  That wasn't where I was going, Your Honor.

2    But the point is that when you have a case, whether it's these

3    3,200 claimants or it's hundreds of thousand, the reason that

4    the collective redress is so important is because it allows a

5    mechanism to get a judicial relief for a broad spectrum, your

6    Peoria people, our people.  And it is an efficient mechanism.

7    It helps the Court avoid hundreds, if not thousands, of

8    separately litigated claims that by themselves are unduly

9    burdensome on the claimants that have to try to process.

10           So I would recommend to Your Honor, you're probably

11   already aware of it, but the American Reserve case that we

12   cited, which is Judge Easterbrook out of the Seventh Circuit,

13   has a very thoughtful analysis of why class actions are

14   appropriate for cases in this nature.  It's also been cited

15   with approval in the Mortgage Realty Trust case which --

16           THE COURT:  But neither of those cases came out of

17   bankruptcy yet, right?  I mean --

18           MR. SCHWARTZ:  Yes, they both did.

19           THE COURT:  Well, but did they come after two years of

20   an attempt that you've been living with for two years.  In

21   other words --

22           MR. SCHWARTZ:  No.

23           THE COURT:  -- I thought I put out in my question

24   somebody tell me if this has ever been dealt with in any known

25   bankruptcy case before.  And I thought the answer was across

1    the board, no, it hasn't been.  I mean, I understand your

2    point, but your point -- the point that you made is you wanted

3    judicial involvement for relief in an efficient manner.  But it

4    doesn't sound very efficient.  But frankly, neither does the

5    other one.  Neither does having whatever number of claims

6    survive the mediation process and that become the sufficiency

7    motions.  That sounds a little overwhelming also.  So the

8    appeal from my point of view is to come up with an alternative.

9         But again, that's for me to decide.  And I appreciate

10   your explanation.  Okay.  Let me hear --

11        MR. SCHWARTZ:  May I touch on --

12        THE COURT:  Go ahead.

13        MR. SCHWARTZ:  -- one more thing, Your Honor?

14        THE COURT:  One more thing?  Yes.

15        MR. SCHWARTZ:  There have been some issues raised

16   about the conflict of interest and questions of that nature.  I

17   can share with you that, Your Honor, we don't believe that to

18   be a significant issue.  And I can tell you for two reasons

19   why.  1, and this comes out of -- resolution of the equity

20   claims are supposed to be paid in equity.  And the resolution

21   of the PSLRA claims must be paid in dollars.  So I don't see

22   that as a potential conflict.

23        But on top of that, we know -- New Mexico PARA, we

24   know Greg Trujillo, who is the executive director there, an

25   ethical hard-working fund that is going to do the right thing

1 for themselves and for their peer funds like us. So on that

2 basis, we'd ask, Your Honor allow the 723.

3        THE COURT: Okay. Thank you. All right. Ms.

4 DiCicco?

5        MS. DICICCO: Thank you, Your Honor.

6        I will just second everything Mr. Schwartz said in

7 terms of the merits of the process that we're talking about in

8 terms of the Rule 7023 motion. But I have a few other points I

9 just want to add as an aside.

10        My client did not take the position, as Mr. Slack

11 suggested even suggest my client did but suggested that some

12 claimants did, that they would not negotiate or proceed with

13 the ADR procedures while this motion was pending or even if it

14 had been granted. And our position is -- my client's position

15 is that it is prepared to have been -- in fact, we have a

16 mediation scheduled -- I know that you had asked for how many

17 were scheduled. I don't think the debtors provided that. But

18 we actually do have a mediation scheduled, and we're prepared

19 to go forward with the mediation. I can't tell you I'm

20 terribly hopeful, but we're going to go to it in good faith and

21 try to see what we can get accomplished.

22        But again, the idea is, if that doesn't -- the

23 mediation does not work and we wind up in the bucket of

24 unresolved claimants, which we suspect we may be because we got

25 an offer at your urging in February and we are still not far

1   from where we were in February, then we need this -- we need

2   this other path.  And we think this other path via the class

3   process is the most efficient way to get not just our claim but

4   all the claims resolved for all the reasons the parties have

5   noted and Mr. Schwartz has noted.

6           One thing -- although the rate of recent settlements

7   that the debtors have pointed out may be impressive,

8   particularly for the last quarter, the fact that so many have

9   settled when the 7023 motion is pending sort of belies Mr.

10  Slack's argument that the fact that the motion is pending is

11  going to stop people from negotiating.  They have actually

12  settled.  The settlements are happening.  And now, thankfully,

13  finally in late 2023, all claimants have received offers.  And

14  we expect that to continue.

15          And whether -- and we have through the end of the

16  year, right?  From August -- it's now August 23rd.  And from

17  August 23rd even just through December 31st, we're going to be

18  in the same process no matter what.  In other words, this

19  process can continue unabated for the little guys, the big

20  guys, and everybody in between.  And the settlements can

21  continue to go forward.  And if the pace continues, then more

22  claims will be resolved.  And that's a good thing.  Nobody has

23  a problem with that.  And that's going to be regardless of what

24  process we have in place, because under the -- under the

25  amended procedures, nothing's going to happen before December

1  13th.  And then we're going to negotiate a briefing schedule.

2  We're going to have a motion -- the sufficiency objection.  And

3  that's going to go on for several months through next year

4  anyway.

5          So either way, if there's not a settlement, for

6  example, if my client doesn't mediate to a settlement, we're

7  looking at at least a year away anyway because some portion of

8  this process is going to go forward.  And we're fine with that.

9          If the process went only as is with just the

10  procedures, even if the debtors were able to achieve the pace

11  that they've had in the last quarter, they would need another

12  year to whittle those claims down.  And that assumes that all

13  of the claims could be resolved, which we know just from the

14  number of joiners that's highly unlikely.  So I think we all

15  agree that having another year of just trying to resolve claims

16  through this process is not the right way to go.  So we

17  appreciate Your Honor's focus on having an alternative to

18  accomplish that.

19          And unless you have any questions for me, I think

20  that's -- I'll pause there.

21          THE COURT:  No.  I appreciate your argument on that

22  and the issues you raised.

23          Ms. Dasaro?

24          MS. DASARO:  Good afternoon, Your Honor.  I echo the

25  sentiments once again of Mr. Schwartz, Mr. DiCicco, and I'll

1   just keep my remarks brief.

2           MassMutual is just slightly farther behind in the

3   process.  We only received our initial settlement offer on

4   August 15th, so there's no way we could be set up for mediation

5   at this juncture.  We have until September 18th to respond,

6   although as we set forth in our supplemental joinder, the

7   MassMutual funds are likewise willing to and want to try to

8   mediate and/or resolve these claims in advance of costly

9   litigation.  But again, in the absence of that, for all the

10  reasons stated by my colleagues, we respectfully submit that

11  the 723 process would be the most efficient and cost effective.

12          And I'll add that MassMutual, much like my colleagues,

13  probably has spent quite a great deal of funds to still be very

14  much in the beginning of a process three years, three years

15  after we filed the claims.  And would look forward to the 7023

16  as a backup.  And with that, I would request Your Honor,

17  approve the motion.

18          THE COURT:  Okay.  Thank you.

19          Mr. Dubbs, you're going to be the closer here.  And

20  let me just switch positions.  One second.

21          Okay.  I think you have about fifteen minutes under

22  our discussion before.

23          MR. DUBBS:  Thank you, Your Honor.  Well, we've heard

24  a lot, and a lot of it is wrong.  But the one thing that is

25  important and transcends the back-and-forth among the parties

1 is there's a factor here that is, I would say, almost unique in
2 securities litigation, be it in Bankruptcy Court, District
3 Court or wherever. And that's you have some of the major
4 financial institutions in the United States coming here saying
5 they want a class action. And just as a matter of politics,
6 Most of these institutions are not the wildest fans of class
7 actions. And a lot of them like to go on their own. And when
8 they don't think they can go on their own, and they obviously
9 here don't and they're not so enamored by the process as laid
10 out by Mr. Slack and his colleagues, they look for another
11 process. And so they have gone with the class action with
12 people they know, that's true, in order to get themselves a
13 backup.

14 Now it's a backup as they said. And the idea that
15 CalSTRS is not going to negotiate with someone if they get the
16 right number is frivolous. That the procedure itself and the
17 existence of a class procedure is going to somehow chill all
18 these sophisticated people, that's ridiculous. And if they're
19 going to be confused, be unconfused by all your lawyers. And
20 we'll send them an information thing, which I think we should
21 just so that there's -- nobody can down the road say that they
22 didn't know what was going on because they should know what's
23 going on.

24 So you have a bunch of institutions who basically
25 said -- and some of the largest financial institutions in the

1  United States that they will negotiate with these people.

2  They're not saying they're going to walk away.  And the one

3  caveat, which important as it is, and it's come up in a prior

4  hearing and I think -- I was looking at the transcript, it's a

5  bit muddled, is what happens in the relationship between the

6  bankruptcy case against PG&E and the District Court case,

7  against the officers and directors and the underwriters.

8         And to be clear, PG&E EA has demanded before they give

9  you a penny, you must have a release of all your claims in the

10  District Court against the Ds and Os and their large insurance

11  policy and against the underwriters.  That's a quid pro quo of

12  pulling in those people into this problem which should not be .

13  It should be separate.  But you should know that because that's

14  part of the whole deal.  And there's some people who are

15  reacting very negatively to that in part because it's

16  overreaching, in part the numbers aren't right.  So it's both

17  things.

18         A few technical points.  As to the length of this,

19  since Mr. Slack has put a lot of things in the record, which is

20  fine, I would like to submit after this, and I'll just put it

21  in the record without any rhetoric, a pre-trial order dealing

22  with discovery of all issues, both class issues and merits

23  issues, where the whole class is done in a year or less than my

24  firm was involved in Issued by Judge Rakoff in the Southern

25  District in the World Wrestling case.  So it can -- depending

1  upon the judge, surprise, surprise. It can depend upon a lot
2  of things. And it can depend upon how long it takes.
3        Now, as to some of the other issues. Mr. Slack is
4  saying that the PSLA requires that a 12(b)(6) motion be decided
5  before class issues. I want him to send me a case because it's
6  not true.
7        Likewise, the idea that all these different
8  securities, and there are potentially a lot of securities in
9  play, are going to have to be litigated one by one under
10  Goldman, nonsense. It's not there. It's not in the opinion.
11  I defy him to send me something that says it is. I spent nine
12  years on the case. I think I know what's there and that ain't
13  there.
14        What is there and the heart of it is, or one of the
15  hearts of it, is that the Court has to examine drop. And
16  indeed, if there was a message from the Supreme Court, it's
17  that you've got to focus intently on the drops, what happened
18  at the same time as the drops, what can be inferred or not
19  inferred from what people were saying about the drops. So it's
20  drop by drop, not stock by stock. So you find what the drops
21  are. The jury or the trier of fact finds out whether those
22  drops are actionable and what the percentage decline is that's
23  attributable to the fraud. And from those findings, everything
24  else can be deduced. And there are no other issues that have
25  to be decided by the Court. And the rest of it is done by

1   claims administrators with yes, computers, thank goodness.

2        So there has been a lot of misstatements about what

3 the world is like and how complicated this stuff is or is not.

4 And we're not saying it's simple. Let's be clear. But we're

5 not saying it's the burdensome thing that they say it is and

6 that all the parade of horribles that you've heard today and

7 the insinuation that all of these huge pension funds are just

8 going to say we have to wait for the class action when they're

9 presented as fiduciaries with a compensation number that fits

10 what they think it's worth after discussion and what after a

11 mediator decides to bless it.

12        If there are any further questions, I'll be happy to

13 answer them. Thank you so much for your time.

14        THE COURT: No. I have no questions. I want to thank

15 all counsel for --

16        MR. SLACK: Your Honor, can I just take a couple of

17 minutes? I mean, there are a lot of new stuff there. And I

18 can respond to it very quickly. But if you give me a couple of

19 minutes.

20        MS. DICICCO: Before you do -- actually, Your Honor,

21 may I just say one timing issue that I'd like to address in

22 light of what you were saying about --

23        THE COURT: Ms. DiCicco one minute, Slack three

24 minutes. Okay. Go, Ms. DiCicco.

25        MS. DICICCO: Thank you. Thank you. I'll be very

1  quick.

2       On the timing question, we do have under the current

3  procedures a deadline in October for the unresolved claimants

4  to amend their complaint.  So the process we have is both that

5  we're going forward with the procedures in terms of the

6  mediation.  But if the mediation fails, we then have to go

7  through this other process with that October deadline.  That

8  October deadline is important because the parties will have to

9  incur the expense of developing their claims and amending their

10 complaint and their claim to be able to put forth which Mr.

11 Slack would then object to in December.

12      So from a timing perspective on this motion, it's

13 important for the parties to know where the Court ends up on

14 this 7023 motion in time for us to then prepare or not prepare

15 to do that amendment, because I think if we were -- although we

16 go forward to mediation, we may not want to incur the expense

17 if we're then going to be joining into the class to have to

18 amend the claim.  So I'm just -- from a time -- I just want to

19 emphasize that timing distinction between the mediation and the

20 amending of the claim and the cost imposed on the result.

21      THE COURT:  Is just a polite way of saying would I

22 make sure I rule?

23      MS. DICICCO:  Yes, Your Honor, it is.  To be frank, it

24 is because it does matter for us the timing because I think

25 otherwise I don't want --

1           THE COURT:  What if I do it --

2           MS. DICICCO:  -- Your Honor to think that we have

3   to --

4           THE COURT:  -- at the conclusion -- what if I do it at

5   the conclusion of the hearing?

6           MS. DICICCO:  That would be fabulous.  Yes, we'd like

7   that.

8           THE COURT:  Really?

9           Mr. Slack, you have three minutes.

10          MR. SLACK:  So a couple of things, Your Honor.  The

11  first thing is, is that Mr. Dubbs says at the very end, let's

12  take that first, that securities don't matter, the drops

13  matter.  But of course, but drops only happen on a

14  security-by-security basis.  What happens with an equity

15  security?  And that drop is different than what happens with

16  every other security.  So what you need to look at, Your Honor,

17  because you have all these debt securities, is what happens to

18  each of those securities which are different.  They're all --

19  they all have different -- a debt security has different

20  payment obligations at different timing.  And the fact is, is

21  that you're not going to look at an equity drop to decide what

22  is what with a -- with a debt security.

23          And so Mr. Dubbs is just flat-out wrong and he can't

24  show you a case that's going to say that that securities don't

25  matter when you're dealing with this.  They do matter.  And

1  that's just a matter of fact.  The second thing, Your Honor --

2         THE COURT:  But wouldn't the expert addressed that.

3         MR. SLACK:  Sure.  But here's -- well, here's the

4  point, Your Honor, is that if you don't decide the sufficiency

5  hearing and the motion to dismiss first, that expert is going

6  to have to go through each of those sixty-seven securities.

7  What's likely to happen if you do a sufficiency hearing, and

8  that's why the PSRA requires it first, is that Your Honor is

9  going to go and either dismiss the claims as a whole or, if

10  anything's left, it narrows what you have to do in class

11  certification.  And that's why there's a staging.

12         And Mr. Dubbs says it's not required.  He can't show

13  you a single case in recent memory since the PSRA where that's

14  happened, not one, because it just doesn't happen the way he

15  wants you to do it.

16         Now, Your Honor, the other thing is that everybody's

17  talking about it's taken a long time and we're in a long time.

18  Things are working right now, but that long time, it's really

19  ironic.  And sitting here and listening to this -- because

20  you'll remember, Your Honor, you gave me a little bit of a hard

21  time.  Some of the claimants have certainly given me a hard

22  time on the fact that we spent a year negotiating with PARA.

23  It's actually the delay that PARA caused by negotiating for a

24  year that's taken this time.  And so it's really ironic, Your

25  Honor, that the same people who are complaining about delay and

1  the timing are now supporting hey, we put PARA in there, this

2  is all going to be better when we've negotiated with them for a

3  year.

4         So the last thing I want to say, Your Honor, in my

5  short time is I think there's a better solution in the

6  following respect. I think what should happen, Your Honor, is

7  you let the procedures play out. And if you decide the

8  sufficiency hearing and those issues get narrowed for class

9  cert, this Court can always revisit a class certification issue

10  at that time. And we'll know information. We'll know, number

11  1, how many claims are remaining. We'll know what proofs of

12  claim are remaining, and I don't think there's going to be that

13  many.

14         And the third thing, Your Honor, is I don't think it's

15  going to delay the process a great deal, because the advantage

16  we have is once you decide whether these claims even survive

17  and certainly narrow down both the misrepresentations and the

18  number of securities, that's going to lessen the amount of

19  discovery that's required. And so that is the most efficient

20  way because it doesn't disturb the procedures. It lets those

21  go forward. And then and it -- and then after you've decided

22  the motions to dismiss and have the sufficiency hearing, you

23  can revisit this issue. And I don't think there'll be a

24  tremendous amount of delay because of the advantages you get

25  when you decide that motion first.

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 66
of 85

1          Anyhow, thank you, Your Honor.

2          THE COURT:  Now, Mr. Slack, if it's January and I've

3    deferred or denied the motion for class action without

4    prejudice to renewing it and I deny your -- whether we call it

5    a motion to dismiss or deny your position on the sufficiency

6    hearing, then what?  Then when Mr. Dubbs and Mr. Etkin make

7    their fourth class motion, you come in swinging and tell me

8    it's fine but it's going to take another eighteen months?

9          MR. SLACK:  Well, here's what I'm going to tell Your

10   Honor, is certainly that is a possibility.  But I think it's a

11   small possibility.  I think what's more likely, Your Honor, is

12   that you're going to find that the procedures have worked.

13   You're also going to find that, again, more likely that even if

14   Your Honor doesn't grant the motions to dismiss in whole, that

15   you grant them in part and narrow.  So it's very rare that what

16   you're going to find is that that is that we haven't settled a

17   lot of these and that you're going to make you're not going to

18   narrow this at the very least or dismiss it as a whole.

19         THE COURT:  Okay.  The point is some -- again, I

20   didn't fault and you didn't complain if any of the lawyers on

21   the other side made any reference to terms that have been

22   negotiated -- have been part of the mediation process.  But my

23   point is that there's reason to believe that, although the ADR

24   procedures do appear to be making progress, that there are

25   going to be some that just aren't going to get settled in the

1  near term. So I believe that what Ms. DiCicco described as

2  likely that has to happen late at the end of the year might

3  happen. And then it seems to me we're back to the question of

4  I denied the first motion for class because it was way too late

5  in the process and about AB1540 was looming and for all the

6  other reasons. But I divide the second one because we -- for a

7  variety of reasons.

8        But then a long time went by. And I don't want to

9  hear who caused the delay. There was a delay. This is

10 no-fault judge here today. I don't want this criticism of

11 perilous lawyers about they caused the delay because they're

12 not complaining that you didn't -- you caused the delay because

13 you didn't accept their offer. It's just a delay.

14       And so the question is, if I take serious -- I take

15 all the arguments seriously. But if I am persuaded by the

16 lawyers this morning who make the pitch for the alternate,

17 well, then it's such a great alternative that it's going to be

18 delayed by several more months.

19       And that's not very conducive to a case that I, by the

20 way, join a number of people that take a great deal of pleasure

21 in realizing how, despite all odds, so much has gone out the

22 door to the fire victims. But nothing has nothing has gone out

23 the door to the fraud victims except the ones who compromised.

24 And that's okay if they all compromise. But if they don't

25 compromise, I personally regret the thought that people who

1    have a legitimate claim for being defrauded in 2015 in 2023 are

2    still listening to an argument that says you might get

3    something that you can be satisfied with in eighteen months.

4           So I just want to say -- I don't want any more

5    argument.  I want you just to be mindful of the fact that that

6    weighs heavily on my shoulders in terms of something that I

7    want to facilitate rather than slow down.

8           So Ms. DiCicco,I am not going to take this matter

9    under advisement for three months.  I'm not going to rule this

10   morning.  I probably will make a ruling very quickly, just an

11   oral ruling, and just set of hearing.  I don't -- obviously, I

12   need to reflect on everything we've talked about today and go

13   back and look some more again.  But you've all briefed it so

14   thoroughly.  And it sounds like it's an easy choice.  All I

15   have to do is say granted or denied.  But I take it a little

16   more seriously about that.  And I intend to do that fairly

17   promptly.

18          And if I deny it, I guess it's a -- it's easy.  If I

19   grant it, then the question is what comes next.  And I promise

20   you all that I have not made up my mind.  I have not made up my

21   mind at the start of the hearing.  I haven't made up my mind

22   after the hearing.  But I'm not going to sit on this thing for

23   more than a very short period of time.

24          So thank you all for your time and effort.  And (audio

25   interference) conclude the hearing.

1          IN UNISON:  Thank you, Your Honor.

2          THE COURT:  All right.  Bye, everybody.

3     (Whereupon these proceedings were concluded)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3     I, Michael Drake, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5

6

7

8     _____

9     /s/ MICHAEL DRAKE, CER-513, CET-513

10

11    eScribers

12    7227 N. 16th Street, Suite #207

13    Phoenix, AZ 85020

14

15    Date:  August 25, 2023

16

17

18

19

20

21

22

23

24

25

**$**

**$1,000 (1)**
34:1

**A**

**AB1540 (1)**
68:5
**ability (1)**
43:4
**able (4)**
29:15;32:6;57:10;
63:10
**absence (1)**
58:9
**absent (3)**
27:11,14,20
**absolute (1)**
37:21
**Absolutely (5)**
15:14;24:3;25:4;
31:24;43:20
**accept (8)**
26:20,22;33:4;
43:12;44:11,21;
50:25;68:13
**acceptable (1)**
50:12
**accepted (1)**
13:21
**Access (1)**
22:3
**accident (2)**
35:16,18
**accomplish (2)**
47:15;57:18
**accomplished (1)**
55:21
**according (1)**
12:13
**accurate (1)**
10:16
**achieve (1)**
57:10
**acknowledge (1)**
27:1
**across (2)**
50:13;53:25
**act (2)**
35:8;44:24
**action (27)**
8:12,13;9:9,20;
16:12;17:3,22;18:6,9;
23:18;25:25;26:24;
30:18;34:19;36:8,9,
17;40:4;7;42:4;46:3;
50:6;52:5;59:5,11;
62:8;67:3
**actionable (1)**
61:22
**actions (4)**

15:13,21;53:13;
59:7
**active (1)**
46:21
**actually (8)**
27:17,24;37:23;
52:23;55:18;56:11;
62:20;65:23
**add (7)**
18:1;46:6;47:2,19;
48:12;55:9;58:12
**addition (3)**
25:13,21;47:24
**additional (7)**
7:21;25:11;44:1;
45:6,6;46:4
**address (4)**
15:25;17:1;41:25;
62:21
**addressed (2)**
22:14;65:2
**addresses (1)**
20:10
**addressing (1)**
41:13
**adds (1)**
45:6
**adjudicata (1)**
18:10
**administrators (1)**
62:1
**admitted (1)**
45:3
**admittedly (1)**
33:5
**adopt (1)**
19:5
**adopted (1)**
25:18
**ADR (11)**
13:12;19:11;24:14;
32:17;35:22;40:5;
44:13,15;51:12;
55:13;67:23
**advance (1)**
58:8
**advantage (1)**
66:15
**advantages (1)**
66:24
**advice (7)**
42:11,14,17;43:11,
12,12,16
**advisement (1)**
69:9
**Adviser (1)**
22:19
**Advisers (1)**
3:21
**advisor (1)**
3:21
**affect (1)**
37:23

afternoon (2)
3:14;57:24
again (19)
5:2;12:7;14:14;
18:23;19:3,25;28:16;
32:13,22;39:23;
48:13;50:24;54:9;
55:22;57:25;58:9;
67:13,19;69:13
against (5)
32:7;60:6,7,10,11
ago (2)
23:8,15
agree (9)
10:12;22:10;24:9;
26:14;43:2,13;46:8,
11;57:15
agreed (2)
19:6;22:23
ahead (8)
7:4;9:24;15:24;
33:16;35:3;41:10;
47:11;54:12
ain't (1)
61:12
alleged (1)
37:22
allocation (1)
48:18
allow (4)
4:24;12:6;35:25;
55:2
allows (2)
29:21;53:4
almost (3)
17:16;31:11;59:1
along (1)
47:22
alter (1)
31:23
alternate (1)
68:16
alternative (5)
27:7;29:3;54:8;
57:17;68:17
alternatives (1)
45:21
although (5)
51:4;56:6;58:6;
63:15;67:23
always (7)
17:16;32:22;66:9
amend (5)
28:2,3,10;63:4,18
amended (2)
48:3;56:25
amending (2)
63:9,20
amendment (8)
23:24;25:18;27:24;
35:19;45:23;47:16;
48:22;63:15
American (1)

53:11
among (1)
58:25
amount (7)
6:21;36:4;38:11;
46:13;48:20;66:18,24
analysis (3)
18:11;21:6;53:13
and/or (1)
58:8
anomaly (1)
17:24
anything's (1)
65:10
apologize (2)
18:5;50:24
apparently (1)
6:3
appeal (1)
54:8
appear (1)
67:24
appearance (3)
6:5,7,15
appeared (2)
5:20;6:24
appearing (1)
3:7
applies (1)
18:9
appoint (1)
29:24
appointment (2)
30:10,15
appreciate (6)
41:6;49:7,12;54:9;
57:17,21
approach (1)
14:17;31:23
approaches (2)
7:10,14
appropriate (2)
31:2;53:14
approval (2)
47:18;53:15
approve (1)
58:17
approximately (2)
26:8,11
apropos (1)
15:2
area (1)
4:18
argue (1)
19:15
argument (18)
4:10;5:11;6:16;
12:12;22:24;24:3;
36:7;38:20,21;40:7,8;
41:7;45:15;49:2;
56:10;57:21;69:2,5
arguments (1)
68:15

arithmetic (1)
7:24
ARK's (1)
52:16
arm (1)
26:23
around (2)
15:20;28:24
articulated (1)
51:4
aside (2)
9:9;55:9
assets (1)
50:13
associated (1)
50:14
assume (10)
5:21;7:1;11:11,15,
17;12:13;40:2;42:19;
44:7,8
assumes (1)
57:12
assuming (1)
5:7
assumption (1)
5:9
assumptions (1)
11:22
attempt (2)
34:23;53:20
attention (1)
35:15
attorneys (1)
25:6
attractions (1)
6:4
attributable (1)
61:23
audio (2)
46:24;69:24
AUGUST (5)
3:1;56:16,16,17;
58:4
available (1)
30:17
avoid (1)
53:7
aware (3)
17:3;37:19;53:11
away (5)
9:5;21:22;35:15;
57:7;60:2

**B**

back (14)
5:2;10:3;12:18,20;
13:5;15:15;21:9,23;
29:10;32:22;41:15;
42:24;68:3;69:13
back-and-forth (1)
58:25
backup (3)

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 72
of 85

58:16;59:13,14

**backwards (1)**
18:23

**bad (3)**
10:12;16:17;29:3

**balancing (1)**
17:15

**bank (1)**
12:5

**bankruptcy (15)**
15:12;21:13;23:17,
21;28:21;29:8,14,21;
30:9,10,15;53:17,25;
59:2;60:6

**BAP (1)**
22:22

**bargain (1)**
12:22

**based (3)**
12:17;16:6;50:18

**baseline (1)**
8:25

**basic (4)**
37:14,14,15,15

**basically (3)**
8:23;17:12;59:24

**basis (7)**
8:6;20:7;37:13,17;
50:15;55:2;64:14

**bear (1)**
20:4

**become (1)**
54:6

**begin (1)**
7:12

**beginning (5)**
8:17;26:10;27:10;
35:25;58:14

**begins (1)**
18:13

**behalf (2)**
6:13;22:3

**behind (2)**
11:11;58:2

**belabor (1)**
52:14

**belies (1)**
56:9

**bench (1)**
17:17

**beneficiaries (1)**
29:4

**benefit (1)**
42:17

**besides (1)**
20:19

**best (1)**
11:6

**better (3)**
15:12;66:2,5

**betting (1)**
10:15

**big (2)**

8:6;56:19

**biggest (1)**
50:5

**bit (6)**
7:16;15:3;17:11;
31:3;60:5;65:20

**blame (1)**
21:18

**bless (1)**
62:11

**blind (1)**
10:23

**board (4)**
21:10;22:4;24:12;
54:1

**boat (1)**
14:19

**bomber (1)**
5:22

**bond (2)**
47:5,6

**bones (1)**
49:6

**both (9)**
12:9;13:16;38:21;
41:17;53:18;60:16,
22;63:4;66:17

**brief (5)**
7:19;9:23;10:7;
49:25;58:1

**briefed (2)**
18:16;69:13

**briefing (3)**
38:11;51:14;57:1

**briefs (3)**
7:18;12:18;49:6

**bring (4)**
3:5,18;4:6;5:5

**brings (1)**
33:2

**broad (1)**
53:5

**bucket (1)**
55:23

**built (1)**
45:24

**bullets (1)**
38:1

**bunch (2)**
41:3;59:24

**burden (3)**
45:6;46:6;48:12

**burdens (1)**
51:9

**burdensome (3)**
51:5;53:9;62:5

**business (1)**
44:9

**Bye (1)**
70:2

---

**C**

**CALIFORNIA (1)**
3:1

**Call (9)**
3:3;13:23;18:3,4,
19;21:5;28:12;45:14;
67:4

**called (3)**
17:10,13;52:18

**Calling (1)**
3:4

**calls (1)**
18:3

**CalSTRS (5)**
6:22;22:3;52:10,11;
59:15

**came (1)**
53:16

**camera (1)**
6:4

**can (60)**
4:6;6:1,2;7:17;
10:20,25;11:7,8;
13:14;14:9,15;16:6,
10,22,25;17:2;20:11;
21:3;25:4,5;28:2,23;
29:11,18,18,19;30:10,
14;31:7;32:4;33:9;
35:8;36:2;38:6;39:5;
43:13;44:10;45:20;
46:18;50:18;51:2;
52:8,10;54:17,18;
55:21;56:19,20;59:8,
21;60:25;61:1,2,18,
24;62:16,18;66:9,23;
69:3

**Canty (8)**
4:22;5:3,6,6,12,13,
17,23

**capable (1)**
23:11

**car (1)**
20:20

**care (1)**
6:2

**case (34)**
12:4;17:15;19:20;
20:8;28:15;31:9;
34:23;37:17,18;38:3,
10;45:4,7;46:19,21;
47:3,20;50:14,16,21;
51:14;52:3;53:2,11,
15,25;60:6,6,25;61:5,
12;64:24;65:13;68:19

**cases (9)**
7:25;12:3;15:8;
38:9,10,12;41:3;
53:14,16

**catch (1)**
47:1

**caused (4)**
65:23;68:9,11,12

**caveat (1)**
60:3

**cert (1)**
66:9

**certain (2)**
13:1;42:1

**certainly (9)**
19:8;20:5;31:11;
42:13;43:6;45:20;
65:21;66:17;67:10

**certificate (1)**
19:11

**certification (19)**
18:16,22,25;21:10;
23:22;24:2,7;37:4;
39:17,20;41:2;43:24;
45:1;46:5,12,15;
47:17;65:11;66:9

**certified (4)**
16:16,17;27:16;
39:22

**certify (3)**
16:10,25;24:4

**challenge (1)**
39:25

**chance (2)**
23:1;35:4

**change (3)**
6:1;14:12,15

**changed (1)**
46:23

**chart (3)**
26:15,16;38:9

**cheap (1)**
50:17

**cheaper (1)**
36:14

**check (2)**
4:4;30:9

**checked (1)**
4:5

**Chicago (1)**
11:11

**chill (2)**
31:11;59:17

**choice (5)**
33:6,24,25;44:20;
69:14

**chose (1)**
23:20

**chunk (1)**
11:17

**Circuit (1)**
53:12

**circumstances (2)**
12:21;20:21

**citations (1)**
38:23

**cite (1)**
37:17

**cited (2)**
53:12,14

**civil (1)**
20:24

**claim (20)**

19:22,24,24;20:6;
25:20;27:12;28:2,3,
17;29:15,16;30:22;
42:22;48:3;56:3;
63:10,18,20;66:12;
69:1

**claimant (11)**
13:19,22;19:20;
28:16;29:24;31:20;
34:3;40:9;43:4;48:6;
50:7

**claimants (30)**
3:12;7:20;9:4,13;
12:20;11;26:9;30:4,
13,16;31:18;40:8;
41:12,14,16,17,17,18;
43:8;48:23;51:8,8,21;
53:3,9;55:12,24;
56:13;63:3;65:21

**claim-by-claim (2)**
37:12,16

**claims (55)**
3:15;7:22;23:10,12,
17;25:7,8,11,11,16,
22;26:1,2,4;27:17,21;
28:19;29:7,22;30:5,5;
35:22;37:11;39:21,
21;41:18,19;43:5;
44:3,4;46:7,20;48:13;
50:15,21;51:1,14,22;
53:8;54:5,20,21;56:4,
22;57:12,13,15;58:8,
15;60:9;62:1;63:9;
65:9;66:11,16

**clarity (3)**
42:4,7,9

**class (100)**
8:12,13;9:9,20;
13:1;14:17;15:5,5,13,
21;16:10,12,15,16,22,
25;17:3,6,22;18:5,9;
19:10,18;23:18,22;
24:2,5,7,10;25:25;
26:24;27:4,7,11,14,
16,16,20,20,21;29:4;
30:18;31:6,7,11;34:9,
9,13,18;35:1;12;36:8,
9,16;37:4;38:11,13,
14;39:20;40:4,7;41:1;
42:4;43:24;45:1;46:3,
4,12,15;47:17;48:2,4,
7,7,7,9,14,15,16,18;
50:6;52:5,9;53:13;
56:2;59:5,6,11,17;
60:22,23;61:5;62:8;
63:17;65:10;66:8,9;
67:3,7;68:4

**class-based (1)**
23:9

**classified (1)**
45:8

**clean-up (1)**
10:19

**clear (7)**
8:10;14:13,19;21:1;
24:4;60:8;62:4
**clearly (2)**
30:4;32:19
**CLERK (7)**
3:4,18;4:13,20,24;
5:3;6:2
**client (9)**
30:20;36:11;43:15,
17,18;45:16;55:10,
11;57:6
**clients (23)**
6:25;14:12;16:16;
28:23;33:11;34:21,
21;42:2;43:9,10;44:8,
17,24;45:13;46:5,7;
50:5,8,19,20,25;51:3;
52:10
**client's (2)**
45:4;55:14
**close (1)**
21:22
**closed (3)**
28:17,18;46:19
**closer (2)**
46:9;58:19
**cluster (1)**
10:3
**coalesce (1)**
14:6
**code (5)**
4:18;19:3;30:9,10,
15
**colleagues (5)**
12:24;21:19;58:10,
12;59:10
**colleague's (1)**
7:18
**collective (1)**
53:4
**collectively (2)**
26:3;35:9
**comeback (1)**
17:8
**coming (2)**
19:10;59:4
**comment (2)**
7:15;51:6
**committee (4)**
29:24;30:11,16,19
**committing (1)**
14:15
**common (3)**
7:11;17:17;22:3
**communicate (1)**
42:24
**communication (1)**
33:6
**compare (1)**
7:13
**compare-and-contrast (1)**
16:5

**compelling (1)**
8:10
**compensation (1)**
62:9
**compete (1)**
8:12
**competent (1)**
52:7
**competing (1)**
8:12
**complain (1)**
67:20
**complaining (2)**
65:25;68:12
**complaint (2)**
63:4,10
**completely (1)**
43:2
**complex (3)**
46:16,17,18
**complicated (1)**
62:3
**complications (1)**
48:9
**component (1)**
44:21
**compromise (2)**
68:24,25
**compromised (1)**
68:23
**compulsory (1)**
15:4
**computed (1)**
8:25
**computer (8)**
8:24;11:2,9,12;
13:18,20;34:22,23
**computerized (2)**
8:5;42:20
**computers (1)**
62:1
**concede (1)**
21:1
**conceded (2)**
19:7;24:13
**conceding (1)**
20:22
**concept (1)**
17:12
**concepts (1)**
17:11
**concern (1)**
28:22
**conclude (1)**
69:25
**concluded (1)**
70:3
**conclusion (2)**
64:4,5
**conditioned (1)**
51:1
**conducive (1)**
68:19

**confer (2)**
42:19,20
**confident (1)**
52:7
**confidential (2)**
32:3,12
**confidentiality (1)**
32:2
**confirmation (1)**
30:12
**conflict (2)**
54:16,22
**confused (4)**
42:5;44:10,19;
59:19
**consensually (1)**
9:15
**considered (1)**
29:14
**consistent (2)**
26:7;10
**consolidated (1)**
19:17
**constitutionally (1)**
24:7
**contest (1)**
19:14
**contested (1)**
48:11
**context (4)**
17:22;28:21;47:25;
50:14
**contingent (1)**
11:7
**continue (5)**
35:21;48:23;56:14,
19,21
**continues (1)**
56:21
**continuing (1)**
50:16
**contrast (1)**
7:13
**control (2)**
8:15,17
**convinced (2)**
12:9;47:4
**copy (1)**
39:2
**Corporation (1)**
3:4
**correcting (1)**
20:23
**correctly (2)**
18:20;24:18
**cost (2)**
58:11;63:20
**costly (1)**
58:8
**costs (2)**
50:12,14
**counsel (21)**
3:5;6:17;11:16;

23:20;27:22;28:25;
29:19;34:4,17,19,19,
24;35:8;41:22,23;
42:6;43:4,7;48:18;
49:16;62:15
**counterintuitive (1)**
15:10
**counteroffers (1)**
42:3
**country (1)**
50:6
**couple (11)**
8:13;15:25;16:5;
17:1;22:11,11;35:5;
46:18;62:16,18;64:10
**course (3)**
8:18;29:18;64:13
**Court (169)**
3:3,6,10,13,16,19,
22;4:2,4,7,9,12,16,21;
5:1,5,11,16,20,20,24;
6:3,7,10,14;7:1,6,7;
8:19;9:11,12,22;10:7;
11:4,9;12:7,17,23;
13:10,17;14:1,11,20;
15:11,18,24;16:3,7;
17:7,10,15,19,23;
18:12,21;19:1;20:3,
16,22;21:11,13,15,17,
18;22:1,7,15,18,22;
23:6,7,10;24:5,12,21;
25:17;26:14;27:18;
28:6,11,14,16,18;
29:11,23;30:2,6,10,
22,24;31:13;32:8,21;
33:24;34:7,17;35:17,
23;36:6,9;37:9,18,19,
20;38:16,25;39:6,8,
22;40:1,12,14;41:5,9;
42:9,16;43:9,22;44:7,
16;45:9,12,14,14,15,
19;46:8,17;47:4,18,
20;48:20;49:1,4,12,
14,20;50:1,23;52:17,
23;53:7,16,19,23;
54:12,14;55:3;57:21;
58:18;59:2,3;60:6,10;
61:15,16,25;62:14,23;
63:13,21;64:1,4,8;
65:2;66:9;67:2,19;
70:2
**courtroom (3)**
3:5;15:20;28:24
**Court's (2)**
25:12;52:1
**cover (1)**
25:15
**critical (2)**
25:3;46:23
**criticism (2)**
16:8;68:10
**criticized (1)**
34:12

**Cubs (1)**
11:11
**culture (1)**
19:19
**Cummings (4)**
4:22;25:4,5;38:9
**current (3)**
16:12;24:14;63:2
**currently (1)**
51:4
**cut (1)**
16:1

**D**

**Dasaro (11)**
3:19,20,20;6:24;
22:18,19,19;34:24;
49:18;57:23,24
**dates (1)**
46:23
**day (3)**
25:10;26:17,17
**days (1)**
48:25
**deadline (6)**
12:14;13:4;25:21;
63:3,7,8
**deal (3)**
19:24;27:20,25;
29:15,17;37:13;
44:11;47:22;50:9;
58:13;60:14;66:15;
68:20
**dealing (6)**
17:4;27:11,14;
43:23;60:21;64:25
**dealt (1)**
53:24
**debate (1)**
47:7
**debt (3)**
64:17,19,22
**debtor (1)**
18:15
**debtors (9)**
3:9;7:21;23:13,19;
25:21;48:23;55:17;
56:7;57:10
**debtor's (1)**
35:21
**December (5)**
44:3;45:25;56:17,
25;63:11
**decide (9)**
24:5;40:16,21;54:9;
64:21;65:4;66:7,16,
25
**decided (6)**
23:10;41:1,2;61:4,
25;66:21
**decides (2)**
35:23;62:11

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 74
of 85

**deciding (2)**
23:12;44:21
**decision (7)**
12:9;23:13;24:4;
38:11;39:11;43:24;
44:11
**decisions (2)**
23:12;37:9
**declaration (1)**
31:16
**decline (1)**
61:22
**deduced (1)**
61:24
**defend (1)**
29:2
**defendant (1)**
37:21
**defendants (1)**
38:4
**defending (1)**
43:19
**deferred (1)**
67:3
**defrauded (1)**
69:1
**defy (1)**
61:11
**delay (13)**
44:2,24;45:6;46:6;
65:23,25;66:15,24;
68:9,11,12,13
**delayed (1)**
68:18
**delighted (4)**
52:2,2,11,11
**demanded (1)**
60:8
**denied (3)**
67:3;68:4;69:15
**deny (4)**
39:19;67:4,5;69:18
**depart (1)**
17:25
**depend (2)**
61:1,2
**depending (1)**
60:25
**derailing (1)**
32:19
**described (1)**
68:1
**designed (1)**
27:20
**desk (1)**
11:10
**despite (1)**
68:21
**detail (1)**
16:6
**details (1)**
17:2
**determination (2)**

21:4;46:22
**determine (1)**
5:10
**developing (1)**
63:9
**DiCicco (21)**
3:13,14,15;6:23;
22:7,9,16,20;34:24;
49:17;55:4,5;57:25;
62:20,23,24,25;63:23;
64:2,6;68:1
**DiCiccoI (1)**
69:8
**differ (1)**
24:22
**difference (2)**
47:5;52:4
**different (15)**
7:10,14;20:12;
36:10;38:4;40:3,14;
46:19;47:3;61:7;
64:15,18,19,19,20
**diminish (1)**
21:10
**direct (2)**
30:10,15
**direction (1)**
14:19
**directly (2)**
29:7;52:12
**director (1)**
54:24
**directors (1)**
60:7
**disagree (2)**
10:13;43:13
**disclosure (1)**
47:6
**discovery (18)**
8:22;18:14;35:13,
23,23;36:1,4,21;38:6,
11;39:10,17;44:5;
46:13,13;51:18;
60:22;66:19
**discussion (8)**
24:2;33:11;37:1;
41:15;42:1;45:4;
58:22;62:10
**dismiss (13)**
16:9,15,18,21;20:6,
11;37:5;65:5,9;66:22;
67:5,14,18
**disposed (1)**
8:1
**disputed (1)**
39:13
**distinction (1)**
63:19
**District (8)**
21:15,17;28:18;
36:9;59:2;60:6,10,25
**disturb (2)**
39:18;66:20

divert (1)
35:15
**divide (1)**
68:6
**divided (1)**
6:19
**dividing (1)**
6:15
**docket (6)**
38:17,19,22;39:3,4,
6
**document (1)**
38:16
**dollar (1)**
12:5
**dollars (7)**
20:15;32:25,25;
41:18;42:21,22;54:21
**done (7)**
11:18;16:15;26:3;
28:21;37:16;60:23;
61:25
**door (2)**
68:22,23
**doubt (1)**
11:20
**dovetail (1)**
11:24
**down (10)**
5:2;11:12;16:13;
33:11;34:22;38:25;
57:12;59:21;66:17;
69:7
**downsides (1)**
47:14
**drags (1)**
9:3
**drawbacks (1)**
47:14
**drawing (1)**
21:9
**driving (2)**
52:15,16
**drop (6)**
20:14;61:15,20,20;
64:15,21
**drops (7)**
61:17,18,19,20,22;
64:12,13
**Ds (1)**
60:10
**Dubbs (68)**
4:1,3,13;5:2,8,10,
20,25;6:3,6,9,12,12,
14,18;7:5;9:12,16,25;
10:13;11:9,22;12:16,
20;13:7,11,25;14:2,
18,25;15:14,23;16:2,
4;17:8,20;18:7,24;
20:1,4,17;21:7,12,17,
19,24;24:3,13;27:1;
29:19;32:8;33:2;
36:15;37:1,3,5;42:10;

45:3,11;46:9;49:15;
52:6;58:19,23;64:11,
23;65:12;67:6
**Dubbs's (1)**
38:21
**due (2)**
9:18;10:17
**duh (1)**
36:17
**duke (1)**
28:23
**during (1)**
36:13
**dwindle (1)**
10:11

**E**

**EA (1)**
60:8
**earliest (2)**
38:12;41:3
**Easterbrook (1)**
53:12
**easy (3)**
30:18;69:14,18
**echo (1)**
57:24
**economic (2)**
9:2;27:3
**economics (1)**
52:15
**Een (1)**
15:9
**effect (1)**
13:15
**effective (1)**
58:11
**efficient (8)**
17:5;31:3;53:6;
54:3,4;56:3;58:11;
66:19
**efficiently (1)**
47:23
**effort (2)**
39:18;69:24
**efforts (1)**
35:21
**eighteen (6)**
24:23;33:1,4;37:25;
67:8;69:3
**either (7)**
10:10,17;11:12;
31:2;43:12;57:5;65:9
**elements (1)**
39:24
**eleven (3)**
38:15;39:10;41:2
**eleven-month (1)**
39:16
**else (5)**
9:7;16:7;17:18;
47:11;61:24

**email (2)**
8:24;11:1
**embarrassed (1)**
5:24
**emphasize (1)**
63:19
**enamored (1)**
59:9
**encounter (1)**
14:22
**end (9)**
8:7;10:19;11:13;
13:22;15:4,13,15;
19:10,12;22:12;26:9,
12;27:2;30:18;44:1;
51:6;56:15;64:11;
68:2
**ends (2)**
17:16;63:13
**engage (1)**
42:2
**enough (5)**
43:6,7,10;52:24,25
**enshrined (2)**
17:10;19:19
**entities (1)**
22:5
**envision (1)**
10:9
**equally (1)**
8:9
**equity (4)**
54:19,20;64:14,21
**essentially (2)**
18:24;21:4
**ethical (1)**
54:25
**Etkin (15)**
3:16,23,23,24,24;
4:3,5,8,11,17,18;27:1;
29:19;42:10;67:6
**even (18)**
7:10;15:11;19:12;
23:22;24:3;25:5;29:2;
30:3;32:15;36:20;
45:7;48:15;55:11,13;
56:17;57:10;66:16;
67:13
**everybody (7)**
22:23;26:12;27:12;
29:14,21;56:20;70:2
**everybody's (1)**
65:16
**everyone (1)**
9:7
**everyone's (1)**
18:9
**evidentiary (3)**
24:8;37:10;38:2
**Exactly (3)**
28:13,15;36:24
**examine (1)**
61:15

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 75
of 85

**example (4)**
38:3;47:25;48:3;
57:6
**except (2)**
36:10;68:23
**excluded (2)**
13:5,7
**exclusive (1)**
52:13
**Excuse (4)**
10:7;11:20;19:11;
49:18
**executive (1)**
54:24
**exigent (1)**
12:21
**existence (5)**
31:10,19,22,24;
59:17
**expect (5)**
50:4,25;51:2,13;
56:14
**expeditiously (1)**
7:9
**expense (5)**
36:18;47:20;48:12;
63:9,16
**expensive (2)**
36:16,17
**experience (2)**
34:17;46:12
**experienced (2)**
11:16;34:19
**experiencing (1)**
7:16
**experiment (1)**
7:17
**expert (4)**
38:4;46:13;65:2,5
**expert-intensive (1)**
20:9
**experts (4)**
18:15;21:1,4;38:4
**explain (2)**
7:8;48:1
**explanation (1)**
54:10
**extensive (2)**
35:13;36:1
**extent (1)**
40:5
**extraordinarily (2)**
36:3;51:5

---

**F**

---

**fabulous (1)**
64:6
**face (1)**
21:14
**facilitate (1)**
69:7
**fact (19)**

16:9;20:25;27:9,15,
19;32:16;33:21;37:4;
38:8;20;51:1;55:15;
56:8,10;61:21;64:20;
65:1,22;69:5
**fact-intensive (2)**
20:9,18
**factor (1)**
59:1
**facts (2)**
20:24,25
**factual (1)**
37:24
**fails (1)**
63:6
**fair (2)**
7:9;14:18
**fairly (2)**
14:18;69:16
**faith (2)**
10:25;55:20
**familiar (2)**
5:14;7:18
**fans (1)**
59:6
**far (4)**
41:15;50:8;51:22;
55:25
**farther (1)**
58:2
**fault (1)**
67:20
**favor (1)**
23:9
**favorable (1)**
33:2
**fear (1)**
9:14
**features (2)**
9:19,19
**February (5)**
10:6;12:14,25;
55:25;56:1
**fees (1)**
48:19
**fervor (1)**
41:7
**few (5)**
7:17;11:14;16:19;
55:8;60:18
**fewer (1)**
26:19
**fiduciaries (6)**
9:4;32:4,14;33:21;
50:11;62:9
**fiduciary (1)**
34:4
**fifteen (5)**
6:20;9:13;10:11;
25:13;58:21
**fifty (1)**
51:13
**fight (3)**

14:24;29:1;42:25
**figure (1)**
18:1
**filed (8)**
7:20;27:12,17,21;
28:17;30:22;43:5;
58:15
**files (1)**
29:15
**filing (3)**
14:7;23:12;28:9
**final (1)**
11:6
**finally (1)**
56:13
**financial (2)**
59:4,25
**find (6)**
44:16;51:3;61:20;
67:12,13,16
**findings (1)**
61:23
**finds (1)**
61:21
**fine (10)**
7:1;9:25;16:2;28:2;
33:3;34:2;42:16;57:8;
60:20;67:8
**finish (1)**
35:3
**finite (1)**
28:19
**fire (1)**
68:22
**firm (3)**
5:4;6:13;60:24
**First (18)**
7:7,19;10:2;20:23;
21:25;23:5;26:2;
31:10;33:3;40:17;
43:10;46:4;64:11,12;
65:5,8;66:25;68:4
**fits (1)**
62:9
**five (2)**
6:22;39:24
**five-million-dollar (2)**
19:22,23
**flat-out (1)**
64:23
**focus (2)**
57:17;61:17
**focused (1)**
11:4
**folded (1)**
17:11
**folks (4)**
19:9;28:1;29:13;
35:7
**following (2)**
32:22;66:6
**follows (1)**
6:19

**footnote (1)**
14:3
**forever (1)**
20:11
**forfeit (1)**
51:21
**forgot (1)**
49:22
**form (1)**
48:3
**format (1)**
18:9
**forms (1)**
51:9
**forth (4)**
10:3;41:15;58:6;
63:10
**forty (2)**
6:15,18
**forward (11)**
9:25;36:1;42:5;
44:3;55:19;56:21;
57:8;58:15;63:5,16;
66:21
**four (3)**
7:2;31:8;35:11
**fourteen (1)**
48:25
**fourth (1)**
67:7
**frame (3)**
14:7;24:22;38:15
**framework (1)**
25:22
**FRANCISCO (1)**
3:1
**frank (1)**
63:23
**frankly (2)**
41:1;54:4
**fraud (5)**
17:17;30:16;46:24;
61:23;68:23
**frequently (1)**
17:22
**Friday (2)**
25:5,10
**friend (1)**
32:24
**frivolous (1)**
59:16
**froze (1)**
46:25
**full (1)**
21:20
**fully (1)**
21:2
**functionally (1)**
12:15
**fund (4)**
19:21,24;50:13;
54:25
**fundamental (1)**

36:22
**funds (9)**
3:21;32:4,13;34:5;
50:6;55:1;58:7,13;
62:7
**further (1)**
33:11;42:2;62:12

---

**G**

---

**gave (4)**
39:23,24;43:17;
65:20
**general (1)**
7:13
**gets (3)**
16:17;17:9;19:8
**given (7)**
10:8;30:4;31:1;
32:16,17;49:15;65:21
**gives (1)**
10:6
**giving (2)**
7:7;10:25
**goals (1)**
47:15
**God (1)**
45:16
**goes (3)**
20:18;33:20;45:4
**Goldman (3)**
37:17;38:3;61:10
**good (18)**
3:7,8,11,14,14,20,
23,24;14:10;16:20;
22:1,2;30:7;34:16;
40:15;55:20;56:22;
57:24
**goodness (1)**
62:1
**Gotshal (1)**
3:9
**grant (9)**
12:10;19:12;33:10;
44:18;51:17;52:19;
67:14,15;69:19
**granted (4)**
31:23;36:6;55:14;
69:15
**granting (1)**
25:12
**great (6)**
15:22;20:19;58:13;
66:15;68:17,20
**Greg (1)**
54:24
**grind (1)**
31:25
**grinding (1)**
34:15
**group (5)**
11:15,16,19;13:2;
26:3

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 76
of 85

**guess (3)**
24:22;33:13;69:18
**guessing (1)**
22:25
**guidepost (1)**
35:20
**guy (7)**
28:25,25;33:3,7,8,
25;45:14
**guys (8)**
26:20;27:5,9;29:4,
14;30:20;56:19,20

**H**

**half (4)**
23:8;24:19;48:8,8
**halt (2)**
31:25;34:15
**hand (8)**
4:14;5:2,3;20:11;
26:25;27:1;46:3;52:9
**handle (2)**
11:5,7
**handled (1)**
7:9
**happen (15)**
27:25;29:23;35:24;
36:10,23;39:15,20;
45:20;56:25;64:13;
65:7,14;66:6;68:2,3
**happened (3)**
12:2;61:17;65:14
**happening (1)**
56:12
**happens (9)**
11:23;12:3;15:1;
43:1;51:11;60:5;
64:14,15,17
**happy (3)**
31:16;38:22;62:12
**hard (3)**
20:20;65:20,21
**hard-working (1)**
54:25
**Hartford (1)**
22:5
**haul (2)**
14:24,25
**head (1)**
31:3
**hear (5)**
5:25;21:3;49:8;
54:10;68:9
**heard (10)**
31:17;32:13;38:21;
41:25;42:1;45:1,2,5;
58:23;62:6
**hearing (23)**
18:17;24:8;30:14;
34:18;36:13;37:5,10,
10;39:6;40:17,21;
51:7;60:4;64:5;65:5,

7;66:8,22;67:6;69:11,
21,22,25
**hearings (3)**
18:3;19:3;44:5
**heart (2)**
14:12;61:14
**hearts (1)**
61:15
**heavily (3)**
25:20;48:10;69:6
**hedge (2)**
19:21,23
**helps (2)**
49:6;53:7
**here's (14)**
22:25;26:6;31:5;
32:16;34:6,8;35:10;
37:7;39:14;40:13,15;
65:3,3;67:9
**hey (1)**
66:1
**Hi (1)**
22:19
**highly (1)**
57:14
**himself (1)**
29:9
**hire (8)**
29:18,19;30:14;
35:8;41:22;43:4,7,10
**hired (2)**
41:22;50:9
**hiring (1)**
51:9
**historically (1)**
10:15
**holy (1)**
16:13
**home (1)**
39:2
**Honor (122)**
3:5,8,11,15,18,20,
24,25;4:11,25;5:6;
6:9;7:5;9:19;13:14;
15:2;17:3;22:2,9,13;
23:5,7,15,15,16,23;
24:1,17;25:2,13,17;
26:6,11;27:8,10,10,
15,23,25;28:13;29:8,
10;30:25;31:1,5,6,10,
16,17;32:1,12,17;
33:18;35:6,7,10,19;
36:2,18;37:3,7,17,25;
38:8,19,23;39:5,5,7,
14;40:16,20,24;41:8,
11;42:14;43:3,20;
45:20;46:25;47:12;
49:13,19,24;50:3,4,
10,18;51:6,16,23;
52:4,14;53:1,10;
54:13,17;55:2,5;
57:24;58:16,23;
62:16,20;63:23;64:2,

10,16;65:1,4,8,16,20,
25;66:4,6,14;67:1,10,
11,14;70:1
**Honor's (2)**
31:8;57:17
**hoops (1)**
9:10
**hope (2)**
10:24;27:6
**hopeful (1)**
55:20
**Hopefully (3)**
4:5;11:1;49:25
**horribles (3)**
16:24;44:17;62:6
**horses (1)**
13:16
**hotly (2)**
39:13;48:10
**How's (1)**
6:6
**huge (3)**
11:17;12:4;62:7
**hundred (3)**
10:16;12:5;44:8
**hundreds (4)**
14:21;20:15;53:3,7
**hypothesis (1)**
17:5
**hypothetical (6)**
12:14;33:7,8,8,25;
38:5
**hypothetically (1)**
26:21
**hypotheticals (2)**
32:23,23

**I**

**idea (10)**
8:24;9:9;14:10;
23:23;30:7,8;31:5;
55:22;59:14;61:7
**identified (1)**
19:16
**ignore (2)**
9:13;35:1
**ignored (1)**
22:25
**imagination (1)**
37:2
**immediate (1)**
35:13
**impact (10)**
17:10;18:19;20:4,8,
13;21:5,8,15;34:3;
37:14
**impacted (1)**
44:17
**impacts (1)**
18:4
**implemented (1)**
23:7

**implicit (1)**
11:23
**important (11)**
14:3;25:3;26:6;
35:6;47:13;50:3;53:4;
58:25;60:3;63:8,13
**imposed (1)**
63:20
**impressive (3)**
7:24;8:3;56:7
**inadvertently (1)**
5:18
**include (2)**
39:11,11
**including (4)**
23:12;41:17,19;
46:13
**inconsistent (1)**
35:11
**increase (3)**
9:18;47:20;52:20
**incur (1)**
63:9,16
**incurred (1)**
51:8
**indeed (3)**
7:23;16:14;61:16
**individual (2)**
23:9;50:15
**individually (1)**
48:24
**inevitably (2)**
44:23;46:6
**inference (1)**
8:10
**inferred (2)**
61:18,19
**infinitesimal (2)**
15:23;27:2
**informal (1)**
13:15
**information (5)**
27:13,13;31:16;
59:20;66:10
**initial (1)**
58:3
**insinuation (1)**
62:7
**institutional (1)**
6:21
**institutions (4)**
59:4,6,24,25
**insurance (1)**
60:10
**intend (1)**
69:16
**intensive (2)**
35:15;36:3
**intention (1)**
22:10
**intently (1)**
61:17
**interest (2)**

9:2;54:16
**interested (2)**
14:17;52:8
**interference (2)**
46:24;69:25
**into (13)**
3:5;15:3;16:1,6;
17:2,11;35:13;42:25;
51:18,18,19;60:12;
63:17
**introduces (1)**
35:12
**investment (2)**
3:21;22:4
**investors (1)**
6:21
**invidious (1)**
8:21
**invitation (1)**
13:8
**invoke (1)**
27:4
**involved (1)**
60:24
**involvement (1)**
54:3
**ironic (2)**
65:19,24
**Irwin (2)**
6:22;22:2
**issue (23)**
7:19;17:4,19,20;
18:21;21:15;22:14;
37:13,24,25;38:5;
40:10,19,20,21;45:5;
47:3;48:12;50:9;
54:18;62:21;66:9,23
**Issued (1)**
60:24
**issues (20)**
10:4;19:15,25;
33:19;37:14,15,15;
38:2,4;40:6;47:22;
54:15;57:22;60:22,
22,23;61:3,5,24;66:8

**J**

**January (1)**
67:2
**Jeanie (1)**
15:5
**Jeffrey (2)**
3:11;41:11
**Jerry (3)**
52:17,18;53:1
**Joe (5)**
26:20;34:7;42:21,
23,23
**Joes (2)**
41:20,21
**Joe's (1)**
19:24

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 77
of 85

**join (1)**
68:20

**joinder (1)**
58:6

**joiners (1)**
57:14

**joining (1)**
63:17

**Judge (4)**
53:12;60:24;61:1;
68:10

**judgment (2)**
29:1;51:19

**judicial (2)**
53:5;54:3

**juncture (1)**
58:5

**June (1)**
51:7

**jury (1)**
61:21

**K**

**keep (4)**
9:11;30:14;31:13;
58:1

**keeping (1)**
49:21

**key (2)**
17:4;25:17

**kick (1)**
10:11

**kicks (1)**
24:15

**kind (1)**
36:21

**knew (1)**
29:9

**known (2)**
5:21;53:24

**L**

**Labaton (3)**
4:3;5:7;6:12

**label (1)**
17:12

**lack (1)**
20:7

**laid (1)**
59:9

**large (3)**
15:8;41:17;60:10

**largest (2)**
12:4;59:25

**lassitude (1)**
10:17

**last (8)**
7:17;11:6,12;25:8;
45:13;56:8;57:11;
66:4

**late (3)**

56:13;68:2,4

**later (3)**
10:6,9;32:6

**latter (1)**
20:17

**laugh (2)**
5:25;32:9

**law (6)**
17:15,17;18:18;
20:8;39:22;40:17

**lawyer (1)**
29:2

**lawyers (6)**
30:15;34:20;59:19;
67:20;68:11,16

**leads (1)**
8:4

**learned (1)**
20:23

**least (15)**
10:19;11:20;12:17;
14:15;27:6,13;34:17,
20,25;42:11;46:14;
50:8,16;57:7;67:18

**led (1)**
8:9

**left (3)**
21:21;27:3;65:10

**legal (5)**
18:21;19:25;37:24;
40:9;51:14

**legally (2)**
30:8,17

**legitimate (1)**
69:1

**length (2)**
24:10;60:18

**less (2)**
36:14;60:23

**lessen (1)**
66:18

**lets (2)**
30:15;66:20

**letter (4)**
31:19;51:23,24;
52:10

**letting (1)**
38:14

**Levinson (1)**
37:15

**Leviton (1)**
42:6

**Lewis (2)**
3:15;6:23

**liabilities (1)**
11:7

**lie (1)**
33:14

**light (1)**
62:22

**likely (11)**
11:20,21;19:11;
28:3,4;43:25;51:19;

65:7;67:11,13;68:2

**likewise (2)**
58:7;61:7

**Line (1)**
7:19

**linear (1)**
26:15

**listening (3)**
19:23;65:19;69:2

**literally (1)**
22:11

**litigate (2)**
46:1,7

**litigated (3)**
21:15;53:8;61:9

**litigating (1)**
46:1

**litigation (8)**
33:12;35:13;36:1,
17,21;45:7;58:9;59:2

**little (14)**
7:2;26:20;27:5,9;
28:25;29:4,14;30:20;
31:3;36:14;54:7;
56:19;65:20;69:15

**live (1)**
13:20

**living (1)**
53:20

**long (9)**
9:6;14:24,25;52:17;
61:2;65:17,17,18;
68:8

**longer (1)**
9:3

**look (13)**
9:25;13:17;33:19;
35:10;38:8;39:21;
40:24;49:5;58:15;
59:10;64:16,21;69:13

**looked (1)**
5:14

**looking (4)**
18:13;19:7;57:7;
60:4

**looming (1)**
68:5

**lore (1)**
19:19

**lose (1)**
45:9

**lost (2)**
45:15;49:17

**lot (25)**
10:2;15:15,15,19;
20:12,17;23:17;24:1;
26:19;36:11;37:1;
41:14;47:14,15;48:1,
9;58:24,24;59:7;
60:19;61:1,8;62:2,17;
67:17

**lowball (1)**
52:7

**Lowenstein (1)**
3:25

**M**

**magic (1)**
15:19

**Maguire (1)**
52:18

**major (1)**
59:3

**makes (1)**
32:18

**making (4)**
5:9;23:11;40:6;
67:24

**Malone (2)**
52:17;53:1

**mam (1)**
12:8

**Management (1)**
22:4

**mandate (1)**
50:11

**Manges (1)**
3:9

**manner (2)**
7:10;54:3

**many (6)**
9:18;35:21;55:16;
56:8;66:11,13

**March (1)**
12:25

**margin (1)**
50:12

**market (4)**
17:5;20:13;21:14;
37:23

**Massachusetts (1)**
22:4

**MassMutual (5)**
3:21;6:25;58:2,7,12

**material (3)**
17:13,14,18

**materiality (3)**
17:12;20:7;45:3

**math (1)**
26:19

**matter (15)**
3:4;7:9;21:8,15;
33:4;40:17;56:18;
59:5;63:24;64:12,13,
25,25;65:1;69:8

**maximize (1)**
50:11

**May (28)**
7:5,24;8:9;9:1,5,10,
10,18,19;12:14;15:2;
16:7,17;18:10;26:21;
40:18,19;41:22;
42:14,14;45:3;52:24,
24;54:11;55:24;56:7;
62:21;63:16

**maybe (9)**
10:6;15:21;18:5;
26:18;34:23,24,25;
36:13;39:3

**mean (12)**
9:12;11:20;12:3;
18:7;33:18;46:17;
49:5;52:17,25;53:17;
54:1;62:17

**means (4)**
10:10;32:3;50:13,
22

**meant (2)**
44:2,4

**measure (1)**
32:6

**meat (1)**
49:6

**mechanism (4)**
13:12;27:20;53:5,6

**Mediate (1)**
15:5;51:25;52:2,11;
57:6;58:8

**mediated (2)**
15:13;33:12

**mediation (19)**
13:19;14:23;15:4;
28:24;31:20,21;40:5;
42:2;54:6;55:16,18,
19,23;58:4;63:6,6,16,
19;67:22

**mediations (3)**
13:13;25:14;31:24

**mediator (7)**
11:14;13:20,20;
15:19;19:8;26:22;
62:11

**mediators (4)**
15:6,8,16,19

**meeting (1)**
5:18

**member (4)**
13:2;36:15;48:8,9

**members (7)**
13:1;27:11,14,21,
21;48:2,16

**memory (1)**
65:13

**merits (6)**
13:24;35:13;36:21;
45:4;55:7;60:22

**message (1)**
61:16

**messy (1)**
35:14

**Mexico (2)**
6:13;54:23

**Michael (2)**
3:24;5:6

**might (12)**
5:18;10:11,11;
11:14;26:20,22;29:4;
30:18;44:25;45:9;

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 78
of 85

68:2;69:2
**mildly (1)**
  9:21
**million (2)**
  12:5;41:18
**millions (1)**
  20:15
**mind (6)**
  9:11;14:15;19:1;
  69:20,21,21
**mindful (1)**
  69:5
**minimalistic (1)**
  51:22
**minimize (1)**
  50:12
**minimum (1)**
  24:13
**minute (5)**
  6:25;10:1;30:6,6;
  62:23
**minutes (16)**
  6:16,18,20,23,24;
  7:2;22:11,12;23:5,5;
  41:6;58:21;62:17,19,
  24;64:9
**misnomer (1)**
  17:11
**misrepresentation (1)**
  37:23
**misrepresentations (1)**
  66:17
**misstatements (2)**
  48:5;62:2
**misunderstood (1)**
  50:23
**MML (2)**
  3:21;22:19
**moment (4)**
  14:16;26:16;33:10;
  41:24
**money (3)**
  39:17;48:16;52:18
**monolith (1)**
  41:16
**months (23)**
  10:10;13:9;19:6,7;
  23:15;24:14,14,18,23,
  23;25:8;33:1,1,4;
  38:6,15;39:10;41:3;
  57:3;67:8;68:18;69:3,
  9
**more (31)**
  9:3;10:10;11:1,14,
  21;12:11,21;15:25;
  16:6;17:21;19:9;
  20:17;21:5;23:20;
  25:9,15;33:2;43:25;
  47:23;49:1;52:14;
  54:13,14;56:21;
  67:11,13;68:18;69:4,
  13,16,23
**Morgan (2)**

3:15;6:23
**morning (11)**
  3:7,8,11,14,20,23,
  24;22:1,2;68:16;
  69:10
**Mortgage (1)**
  53:15
**Most (8)**
  15:12;27:13;50:3;
  51:19;56:3;58:11;
  59:6;66:19
**motion (38)**
  7:20;12:1;16:9,18,
  21;18:19;19:13;20:6,
  10,18,24;24:6;28:12;
  29:1;33:10;36:7;37:5;
  39:19;40:25;43:19;
  44:18;46:15;52:19;
  55:8,13;56:9,10;57:2;
  58:17;61:4;63:12,14;
  65:5;66:25;67:3,5,7;
  68:4
**motions (10)**
  8:1;14:5,8,8;16:15;
  46:12;51:19;54:7;
  66:22;67:14
**move (1)**
  47:22
**moving (1)**
  6:8
**much (7)**
  7:5;16:3;52:14;
  58:12,14;62:13;68:21
**muddled (1)**
  60:5
**multiple (5)**
  13:13;15:8,16,19;
  31:17
**must (3)**
  30:19;54:21;60:9

**N**

**name (6)**
  5:8,19;6:1,10,12,14
**narrow (3)**
  66:17;67:15,18
**narrowed (1)**
  66:8
**narrows (1)**
  65:10
**natural (1)**
  7:17
**nature (2)**
  53:14;54:16
**near (1)**
  68:1
**necessarily (4)**
  8:21;10:22;44:15;
  45:8
**necessary (2)**
  11:5;18:25
**need (16)**

4:23;6:4;8:14;17:2;
  24:6;25:25;28:23;
  32:14;47:25;48:1,3;
  56:1,1;57:11;64:16;
  69:12
**needs (2)**
  4:4;31:17
**negatively (1)**
  60:15
**negotiate (6)**
  48:23;52:12;55:12;
  57:1;59:15;60:1
**negotiated (7)**
  12:25;25:20;36:20;
  46:21;48:10;66:2;
  67:22
**negotiating (3)**
  56:11;65:22,23
**negotiation (1)**
  42:8
**neither (3)**
  53:16;54:4,5
**net (1)**
  52:5
**Neverland (1)**
  26:23
**New (8)**
  6:13;11:10;22:3;
  23:24;25:6;26:7;
  54:23;62:17
**next (9)**
  3:13;11:25;18:14;
  35:25;43:18,18;
  44:19;57:3;69:19
**nine (2)**
  46:23;61:11
**ninety (2)**
  26:8,11
**Nobody (2)**
  56:22;59:21
**no-fault (1)**
  68:10
**nondisclosure (1)**
  47:7
**none (2)**
  44:9;51:14
**nonsense (1)**
  61:10
**note (2)**
  16:6;25:3
**noted (2)**
  56:5,5
**nothing's (1)**
  56:25
**notice (7)**
  38:13,14;39:12;
  47:18,24;48:11,17
**noticed (3)**
  15:3;25:15;31:20
**notices (1)**
  42:3
**number (25)**
  4:15,17,23;5:7,14;

8:15;9:8;15:15,22,23;
  16:22,23;22:5;25:3;
  27:2;28:19;41:20;
  46:20;54:5;57:14;
  59:16;62:9;66:10,18;
  68:20
**numbers (2)**
  4:20;60:16

**O**

**object (2)**
  25:22;63:11
**objection (14)**
  13:24;23:24;25:12,
  18;28:4,5,11;35:19;
  45:23,24;47:16;
  48:22;51:13;57:2
**objections (6)**
  23:19;28:9;29:17;
  35:24;44:4;46:2
**objectors (1)**
  35:20
**obligations (2)**
  34:4;64:20
**obvious (1)**
  8:13
**obviously (6)**
  10:8,9;26:19;50:7;
  59:8;69:11
**occur (1)**
  45:25
**occurred (1)**
  42:1
**October (3)**
  63:3,7,8
**odds (2)**
  21:10;68:21
**off (5)**
  8:24;11:1;17:1;
  29:1;31:18
**offer (21)**
  8:25;10:20;11:6,13;
  14:21;26:21,22;33:5;
  42:18,21;43:16;
  44:22;45:13,17;51:1;
  52:7,9,20;55:25;58:3;
  68:13
**offered (2)**
  32:24;42:21
**offering (1)**
  8:23
**offers (11)**
  8:6;10:24;26:5,9,
  12;31:18;32:15;42:3;
  50:18;51:22;56:13
**officers (1)**
  60:7
**official (1)**
  30:16
**often (1)**
  16:12
**omissions (1)**

48:5
**omnibus (2)**
  8:1;25:12
**once (4)**
  48:14,15;57:25;
  66:16
**one (53)**
  6:3,24;7:15;8:10;
  9:19;10:5,9,16;13:13;
  14:20;15:6,19;16:8;
  17:4,11,12,21;18:1;
  20:8,9;22:22;27:17;
  29:18;30:14;31:20;
  34:19;35:11,12;
  36:12,14;38:4,12;
  41:13;42:19;43:4;
  45:12,22;48:15;
  52:13;54:5,13,14;
  56:6;58:20,24;60:2;
  61:9,14;62:21,23;
  65:14;68:6
**one-on-one (1)**
  42:20
**ones (3)**
  44:10,25;68:23
**only (13)**
  4:20;9:3;10:24;
  15:14,17;22:11;29:1;
  43:21;44:18;51:20;
  57:9;58:3;64:13
**oOo- (1)**
  3:2
**operation (1)**
  10:19
**opinion (1)**
  61:10
**opponents (1)**
  49:9
**opportunity (2)**
  43:3,8
**opposite (2)**
  29:7;36:24
**opposition (1)**
  23:1
**opt (13)**
  10:5;11:18,20,21;
  12:4,15;13:4,14,15;
  14:6;38:14;48:8,8
**opted (2)**
  13:2,4
**optimistic (1)**
  26:18
**opt-in (1)**
  12:11
**opting (3)**
  14:5,14;48:2
**opt-ins (1)**
  10:3
**option (3)**
  13:3;30:17;35:1
**options (1)**
  24:14
**opt-out (3)**

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 79
of 85

12:11,12,13
**opt-outs (4)**
10:3;11:6,8;12:3
**oral (2)**
38:19;69:11
**order (7)**
3:3;10:22;41:9,9;
49:16;59:12;60:21
**orders (1)**
38:24
**Oregon (2)**
3:15;6:23
**organized (1)**
25:21
**original (1)**
36:6
**Os (1)**
60:10
**others (1)**
51:10
**otherwise (3)**
8:1;9:14;63:25
**ought (1)**
19:17
**out (50)**
7:25;8:5;9:14;10:5;
11:18,21;12:4,15;
13:3,4,4,14,15;14:5,6,
10,14;19:12;20:11;
25:19;26:2,8;27:2;
28:1,24;36:11;38:7,
13,14;39:12;43:25;
44:16,25;45:15;48:2,
4,5,7,8,8;53:12,16,23;
54:19;56:7;59:10;
61:21;66:7;68:21,22
**outcome (1)**
13:21
**outline (1)**
12:13
**outset (1)**
7:12
**outside (2)**
15:12;51:2
**over (6)**
19:14,14;23:19;
25:8,9;41:18
**overlap (1)**
18:7
**overlay (4)**
24:11;32:18;44:1;
46:4
**overreaching (1)**
60:16
**overwhelming (1)**
54:7
**own (10)**
14:19,19;23:10,11;
27:22;29:21;30:5,5;
59:7,8

**P**

**pace (2)**
56:21;57:10
**page (4)**
7:19;37:25;39:23;
49:22
**pages (1)**
51:13
**paid (2)**
30:19;54:20,21
**panel (1)**
22:22
**papers (3)**
11:4;16:24;37:17
**PARA (6)**
7:20;23:20;54:23;
65:22,23;66:1
**Parada (2)**
3:17;4:6
**parade (2)**
16:24;62:6
**Pardon (2)**
30:2,24
**PARE's (1)**
35:8
**part (11)**
12:2;13:12;36:23;
44:21;45:3;46:5;
60:14,15,16;67:15,22
**particular (1)**
13:19
**particularly (3)**
9:4;49:9;56:8
**parties (8)**
22:13;24:9;36:20,
20;56:4;58:25;63:8,
13
**partly (1)**
20:1
**party (4)**
6:8;13:5,7,8
**passe (1)**
7:2
**password (3)**
5:7,15,17
**path (2)**
56:2,2
**pause (1)**
57:20
**payment (1)**
64:20
**payments (2)**
48:24,24
**peer (1)**
55:1
**pending (3)**
55:13;56:9,10
**penny (1)**
60:9
**Pension (6)**
22:4;32:4,13;34:5;
50:5;62:7
**people (27)**
8:23;10:17,18,22;

15:9;16:19;27:3,16;
28:10;29:17;33:20,
21;36:12;38:14;
40:22;53:6,6;56:11;
59:12,18;60:1,12,14;
61:19;65:25;68:20,25
**Peoria (7)**
19:20;26:20;32:24;
41:20,21;50:7;53:6
**PERA (2)**
3:25;6:13
**perceived (1)**
52:5
**percent (6)**
8:2;9:13;10:11,16;
26:9,12
**percentage (1)**
61:22
**perhaps (4)**
11:14;12:11;13:21;
40:3
**perilous (1)**
68:11
**period (5)**
7:23;8:3;39:15,16;
69:23
**permissive (1)**
30:8
**permit (1)**
18:19
**person (6)**
4:24;5:10;12:14,18;
13:3;52:12
**personally (1)**
68:25
**perspective (1)**
63:12
**persuaded (2)**
47:9;68:15
**persuasive (2)**
12:11;49:2
**peter (1)**
19:12
**PG&E (15)**
3:4;4:21;8:4,11,25;
10:9;11:5;32:24;
36:14;42:18,21;
52:12,20;60:6,8
**PG&E's (2)**
33:4;52:16
**picked (1)**
15:7
**piece (1)**
41:2
**pieces (1)**
31:15
**pillars (1)**
16:9
**pitch (1)**
68:16
**pivot (1)**
17:4
**place (13)**

17:25;23:24;25:14;
33:22;36:22;37:4;
43:11;44:2;45:22;
46:3;47:14,22;56:24
**plaintiffs (1)**
38:5
**plan (1)**
25:25
**planned (1)**
11:24
**play (2)**
61:9;66:7
**player (1)**
5:21
**please (2)**
7:6;41:6
**pleasure (1)**
68:20
**plenty (1)**
19:9
**point (33)**
9:1;13:15;14:3;
15:14,16,17,18;18:10;
19:2,13;24:15;27:23;
28:8;29:20;32:2,11,
17;33:21;34:8,12;
39:5;9;41:13;49:5;
52:25;53:2;54:2,2,2,
8;65:4;67:19,23
**pointed (1)**
56:7
**points (3)**
17:4;55:8;60:18
**policy (1)**
60:11
**polite (1)**
63:21
**politely (1)**
20:23
**politics (1)**
59:5
**pool (1)**
13:23
**portion (1)**
57:7
**position (11)**
7:8;12:5;14:13;
47:8;49:7;52:16,16;
55:10,14,14;67:5
**positions (1)**
58:20
**possibility (3)**
31:11;67:10,11
**possible (1)**
35:22
**poster (2)**
11:10,11
**postpone (1)**
31:21
**potential (3)**
9:20;45:21;54:22
**potentially (4)**
20:15;27:22;45:2;

61:8
**practical (1)**
21:7
**practice (1)**
12:1
**prefer (2)**
10:9;22:16
**preferable (1)**
23:18
**prejudice (1)**
67:4
**preliminary (1)**
9:24
**prelude (1)**
18:25
**prepare (2)**
63:14,14
**prepared (4)**
10:14;51:25;55:15,
18
**preparing (2)**
12:1;51:9
**present (1)**
22:24
**presentation (2)**
7:4;35:3
**presented (3)**
40:6;42:3;62:9
**presents (1)**
17:15
**preside (1)**
19:14
**presumably (2)**
13:12;42:24
**presume (1)**
36:8
**presumed (1)**
29:15
**presumption (3)**
17:5,9;37:22
**pre-trial (1)**
60:21
**pretty (2)**
14:10,13
**price (10)**
8:22;17:10;18:3,19;
20:4;8;21:8;37:14,23;
46:23
**primary (1)**
6:16
**principal (1)**
4:9
**print (1)**
39:2
**prior (1)**
60:3
**pro (1)**
60:11
**probably (7)**
14:9;24:13;48:10;
52:4;53:10;58:13;
69:10
**problem (2)**

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 80
of 85

56:23;60:12
**problems (1)**
  16:25
**procedural (4)**
  8:8;9:9;14:5;40:3
**procedure (22)**
  10:25;11:19;12:10,
  24;14:22,23;17:24;
  19:5,11;20:24;23:20;
  24:23,24;27:4;29:5;
  40:4;46:5;47:15;
  48:14,18;59:16,17
**procedures (37)**
  23:8,23,25;25:4,18,
  19;26:1;27:24,24;
  31:1,8;32:2,17;35:19,
  22;36:22,23;40:16,
  25;44:2;45:22,23;
  47:13,16,21;48:22;
  51:3,12;55:13;56:25;
  57:10;63:3,5;66:7,20;
  67:12,24
**proceed (4)**
  21:5;42:7;44:5;
  55:12
**proceedings (3)**
  8:17,18;70:3
**process (57)**
  8:5,16;10:22;11:13;
  15:4;16:12,21,22;
  17:3;19:10;23:18,18;
  24:6,6;26:11;27:11;
  29:7,14,21;31:7,12;
  32:13,19;34:14;
  35:12,14,25;36:2,19;
  39:19;40:5;42:5;
  44:13,15;45:24;
  48:17;50:6;53:9;54:6;
  55:7;56:3,18,19,24;
  57:8,9,16;58:3,11,14;
  59:9,11;63:4,7;66:15;
  67:22;68:5
**produce (1)**
  13:1
**progress (1)**
  67:24
**projection (1)**
  26:15
**promise (3)**
  21:20,23;69:19
**promptly (2)**
  19:5;69:17
**proof (1)**
  27:12
**proofs (1)**
  66:11
**proponent (1)**
  19:18
**proposal (2)**
  24:15;33:2
**proposing (1)**
  31:6
**prosecute (3)**

29:16,21;50:15
**prosecuting (2)**
  23:10;30:5
**protected (1)**
  27:6
**protecting (1)**
  10:24
**provide (3)**
  25:22;42:9,13
**provided (3)**
  27:12,13;55:17
**PRSA (1)**
  50:21
**prudence (1)**
  50:16
**PSLA (1)**
  61:4
**PSLRA (1)**
  54:21
**PSRA (3)**
  37:8;65:8,13
**public (6)**
  14:16;32:5;34:10;
  38:24;47:6;50:5
**puffery (4)**
  17:18;20:11,19,20
**pulling (1)**
  60:12
**pure (1)**
  26:19
**push (2)**
  44:3,3
**pushed (2)**
  31:18;43:25
**put (27)**
  5:2,2,8,18;9:21;
  10:25;11:3;15:3;
  23:23;25:4,6,10,14;
  31:1,16;32:18;37:25;
  38:9,22;39:4,6;49:6;
  53:23;60:19,20;
  63:10;66:1
**putative (2)**
  15:5;48:1
**putting (1)**
  9:9

**Q**

**quarter (2)**
  56:8;57:11
**quick (1)**
  63:1
**quickly (2)**
  62:18;69:10
**quid (1)**
  60:11
**quite (5)**
  13:14;41:1;47:9;
  52:6;58:13
**quo (1)**
  60:11
**quote (4)**

7:17;10:5;29:10;
53:1
**quoted (1)**
  51:24

**R**

**raise (1)**
  16:23
**raised (5)**
  4:14;16:19,24;
  54:15;57:22
**Rakoff (1)**
  60:24
**rapidly (1)**
  21:10
**rare (1)**
  67:15
**rate (2)**
  10:12;56:6
**rather (1)**
  69:7
**rational (1)**
  44:11
**rationale (1)**
  11:3
**reacting (1)**
  60:15
**real (4)**
  8:2;13:20;21:8,9
**realistic (1)**
  46:10
**realities (1)**
  35:2
**realizing (1)**
  68:21
**really (9)**
  17:11;20:20;24:9;
  32:16;35:6;52:15;
  64:8;65:18,24
**Realty (1)**
  53:15
**reason (7)**
  15:10;27:19;37:8;
  41:21;49:1;53:3;
  67:23
**reasons (10)**
  8:13;9:8;23:17;
  31:8;35:11;54:18;
  56:4;58:10;68:6,7
**rebut (1)**
  37:21
**rebuttal (5)**
  6:16;22:6,21,23;
  38:20
**rebutted (1)**
  17:9
**recall (2)**
  6:14;46:22
**receive (1)**
  48:16
**received (5)**
  26:5;31:19;50:19;

56:13;58:3
**recent (4)**
  17:14;38:10;56:6;
  65:13
**recently (1)**
  25:18
**reciting (2)**
  38:18,19
**recognize (3)**
  4:16;47:13;51:7
**recognized (1)**
  27:10
**recommend (1)**
  53:10
**record (6)**
  6:11;34:18;38:16,
  24;60:19,21
**recourse (2)**
  26:24;29:1
**recovery (1)**
  13:1
**redress (1)**
  53:4
**reference (1)**
  67:21
**reflect (1)**
  69:12
**regardless (3)**
  13:18;52:3;56:23
**regret (2)**
  45:9;68:25
**regular (1)**
  8:6
**rejected (1)**
  23:8
**relates (1)**
  32:1
**relationship (1)**
  60:5
**relatively (1)**
  7:23
**release (2)**
  50:21;60:9
**releasing (1)**
  51:1
**reliance (2)**
  17:6;37:22
**relief (2)**
  53:5;54:3
**remaining (4)**
  23:25;26:1;66:11,
  12
**remains (1)**
  23:14
**remarks (1)**
  58:1
**remedy (1)**
  29:3
**remember (3)**
  16:15;46:22;65:20
**remind (1)**
  51:6
**renewing (1)**

67:4
**reorganize (1)**
  3:9
**reorganized (4)**
  7:21;23:13;25:6;
  35:20
**rephrase (1)**
  18:12
**reply (2)**
  9:23;51:16
**represent (6)**
  10:22;34:4;36:15;
  41:17,20,23
**representation (1)**
  10:24
**represented (1)**
  11:16
**representing (2)**
  19:21;30:20
**represents (4)**
  6:22,23,25;11:17
**request (1)**
  58:16
**requested (1)**
  6:21
**requests (1)**
  18:14
**require (2)**
  46:12;51:15
**required (7)**
  24:10;37:6,8,8;
  50:20;65:12;66:19
**requirement (3)**
  47:17,18,19
**requirements (1)**
  48:2
**requires (2)**
  61:4;65:8
**res (1)**
  18:9
**resemblance (1)**
  20:5
**reserve (4)**
  22:5,12,21;53:11
**Reserves (1)**
  22:4
**resolution (4)**
  23:9;48:13;54:19,
  20
**resolve (7)**
  23:25;26:1;35:21;
  46:14,15;57:15;58:8
**resolved (8)**
  25:7,12,24;48:18,
  19;56:4,22;57:13
**resolving (1)**
  25:23
**respect (3)**
  4:19;42:7;66:6
**respectfully (1)**
  58:10
**respond (4)**
  21:21;51:15;58:5;

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 81
of 85

62:18
**response (2)**
31:18;33:3
**rest (3)**
26:18;33:16;61:25
**result (1)**
63:20
**resumes (1)**
36:9
**return (1)**
50:11
**revelation (1)**
20:14
**reverse (1)**
41:9
**review (1)**
26:9
**reviews (1)**
26:12
**revisit (2)**
66:9,23
**rhetoric (1)**
60:21
**rich (1)**
52:9
**Richard (1)**
3:8
**rid (1)**
11:14
**ridiculous (1)**
59:18
**right (46)**
3:6,16,19;4:12,16;
6:8;11:21;12:15,24;
13:6,10,14;14:11,17;
15:24;17:7,7;19:25;
20:1;21:6,24;23:13,
14,16,22;32:10;
37:21;40:10;42:10;
44:13;45:22;46:24;
47:3;49:20,20,21;
51:12;53:17;54:25;
55:3;56:16;57:16;
59:16;60:16;65:18;
70:2
**rights (1)**
10:25
**risk (4)**
10:14;32:5;34:15;
50:12
**risks (1)**
32:19
**Ritholtz (30)**
3:10,11,12;19:21;
23:3;28:22;33:9,9,17;
35:4;41:5,8,10,11,12;
42:13;43:2,20,23;
44:14,23;45:18,20;
46:11,25;47:12;49:3,
10,11,13
**Ritholtz's (1)**
14:12
**RKS (15)**

11:15,24,24;13:2;
26:3,8;33:19;34:19,
21;40:8;41:12,14,16;
42:6;43:8
**road (1)**
59:21
**robust (1)**
17:24
**role (1)**
47:20
**Rule (5)**
24:2;52:1;55:8;
63:22;69:9
**ruling (3)**
18:21;69:10,11
**run (2)**
30:18;52:6
**rush (1)**
8:7

**S**

**safety (1)**
52:5
**sailing (1)**
14:19
**same (14)**
5:4;14:7;18:11;
19:25;36:7;40:3,6,8,
9;43:7;47:15;56:18;
61:18;65:25
**SAN (1)**
3:1
**Sandler (1)**
3:25
**satisfied (1)**
69:3
**saw (1)**
52:17
**saying (14)**
7:12;16:16;19:25;
31:13;35:20;52:19;
59:4;60:2;61:4,19;
62:4,5,22;63:21
**scenario (1)**
43:23
**schedule (6)**
14:4,5;36:25;37:1,
2;57:1
**scheduled (3)**
55:16,17,18
**scheduling (1)**
14:4
**scheme (1)**
10:5
**Schwartz (26)**
4:22;6:22;21:25;
22:1,2,3,10,20;49:18,
19,21,23,24;50:2,24;
52:19,21,24;53:18,22;
54:11,13,15;55:6;
56:5;57:25
**scope (1)**

48:3
**scorecard (1)**
49:22
**scrap (2)**
44:12,15
**scratcher (1)**
31:4
**screen (1)**
7:25
**second (9)**
18:1;32:1,20;35:12;
47:1;55:6;58:20;65:1;
68:6
**Secondly (2)**
41:25;46:20
**secrecy (1)**
8:21,21
**securities (26)**
7:20;23:9,11;25:8,
9,20,22;29:24;30:13,
16;35:21;37:11;
38:12;47:3;48:4,4,6;
59:2;61:8,8;64:12,17,
18,24;65:6;66:18
**security (6)**
23:8;51:8;64:15,16,
19,22
**security-by-security (2)**
37:16;64:14
**seeking (1)**
36:3
**seem (5)**
19:16,19;21:3;
30:11;42:18
**seems (5)**
18:2;19:14,22;29:2;
68:3
**send (3)**
59:20;61:5,11
**sending (2)**
8:5;38:13
**sense (5)**
8:21,22;27:3;32:18;
41:16
**sent (2)**
25:19;28:1
**sentiments (2)**
22:20;57:25
**separate (1)**
60:13
**separately (1)**
53:8
**September (1)**
58:5
**series (3)**
38:1;47:5,6
**serious (1)**
68:14
**seriously (2)**
68:15;69:16
**services (1)**
28:23
**set (5)**

27:24;48:15;58:4,6;
69:11
**setting (2)**
25:21;40:3
**settle (24)**
10:17;11:17;19:9;
23:12;28:2;32:4,25;
33:22,25;34:11,14,23,
25;40:9,23;42:12,12;
43:16;44:25;48:24;
49:1,4;50:20;52:3
**settled (11)**
7:21,25;9:14;25:11;
34:7;36:12,13;56:9,
12;67:16,25
**settlement (25)**
8:6;13:1,3;15:13;
31:12;32:5,7,10;33:2,
12;34:9,13;35:16;
39:19;43:11,13;
45:10,16;47:19;
48:17;50:25;52:20;
57:5,6;58:3
**settlements (7)**
8:2;10:10;25:9;
32:3;56:6,12,20
**settles (1)**
48:15
**settling (7)**
9:15;26:10,13,17;
30:5;34:2;50:17
**Seventh (1)**
53:12
**several (6)**
12:5;19:6,7;44:8;
57:3;68:18
**share (9)**
6:17;7:11;8:15;
21:19;22:20;23:3,4;
33:17;54:17
**short (5)**
6:21;7:23;8:3;66:5;
69:23
**shortest (4)**
10:8;38:14;39:9,10
**shoulders (1)**
69:6
**show (4)**
52:12,18;64:24;
65:12
**showing (1)**
37:22
**shows (1)**
38:10
**shut (3)**
23:1;33:11;35:4
**side (7)**
16:11;22:24;31:7,7;
49:8,9;67:21
**sides (1)**
12:9
**signed (1)**
4:13

**significant (4)**
46:13;48:11;51:9;
54:18
**signing (1)**
3:16
**similar (1)**
19:16
**simple (2)**
7:24;62:4
**simply (3)**
16:10;27:3;31:9
**single (6)**
25:19;27:15,16,17;
43:3;65:13
**sit (3)**
31:7;34:21;69:22
**sits (1)**
11:10
**sitting (1)**
65:19
**six (7)**
10:10;13:8;24:13,
14,18,23;33:1
**sixteen (1)**
8:2
**sixty-eight (1)**
25:11
**sixty-seven (2)**
47:3;65:6
**Slack (73)**
3:7,8,8;11:10,12;
13:23;14:9;16:23;
18:3;19:1,15;22:25;
23:2,4,7;24:12,17;
25:1;27:8,19;28:7,8,
13,15;29:6,13;30:1,3,
18,21,23,25;31:15;
32:11;33:1,18;34:6,8;
35:5,18;36:6,18;
37:20;38:18,25;39:4,
7,9;40:2,11,13,15;
41:6;42:10,24;43:17;
46:11,22;47:8;50:20;
51:24;55:10;59:10;
60:19;61:3;62:16,23;
63:11;64:9,10;65:3;
67:2,9
**Slack's (6)**
14:4;16:8,11;45:13;
46:9;56:10
**slightest (1)**
32:18
**slightly (1)**
58:2
**slow (2)**
38:25;69:7
**small (2)**
41:18;67:11
**smaller (1)**
33:5
**so-called (2)**
13:24;51:12
**solution (1)**

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37
of 85

66:5
**solve (2)**
14:22,23
**solved (1)**
15:20
**somebody (5)**
11:12;13:2;36:13;
49:17;53:24
**somebody's (1)**
32:6
**somehow (4)**
14:6;19:17;31:6;
59:17
**someone (5)**
4:14,14,21;13:4;
59:15
**somewhat (2)**
8:3;14:6
**somewhere (1)**
24:19
**sophisticated (6)**
28:23;43:6,7,10;
50:8;59:18
**sorry (4)**
4:2;18:14;32:22;
49:20
**sort (5)**
8:6;10:14;13:16;
33:20;56:9
**sound (1)**
54:4
**sounded (1)**
5:14
**sounds (4)**
17:19;18:4;54:7;
69:14
**Southern (1)**
60:24
**speak (4)**
4:25;6:19;22:8;
34:21
**specific (2)**
15:25;32:12
**specifically (2)**
31:21,22
**spectrum (1)**
53:5
**speed (1)**
9:18
**spend (1)**
39:17
**spent (3)**
58:13;61:11;65:22
**Stacy (3)**
3:20;6:24;22:19
**stage (1)**
13:19
**staging (1)**
65:11
**standard (1)**
20:9
**star (1)**
6:4

**start (12)**
7:4;14:7;23:5;24:5,
15,16,24;25:1;35:19;
41:13;49:19;69:21
**starting (1)**
31:7
**starts (1)**
24:24
**state (2)**
6:10;51:2
**stated (4)**
8:14;34:18,25;
58:10
**statement (6)**
14:16;17:17;20:10,
12,13,13
**statements (1)**
17:13
**States (2)**
59:4;60:1
**statistic (2)**
26:6,7
**statistics (1)**
25:6
**stay (1)**
52:8
**step (1)**
11:25
**stick (1)**
21:22
**still (11)**
9:14;19:5,24;23:17,
21;34:21;42:14;
44:11;55:25;58:13;
69:2
**stock (4)**
20:14;37:24;61:20,
20
**stop (3)**
40:7,8;56:11
**stopping (1)**
29:20
**stops (1)**
35:9
**straightforward (1)**
26:2
**strand (1)**
27:5
**stranded (2)**
26:23;41:23
**stretch (2)**
25:25;37:2
**structure (2)**
12:2;16:8
**stuff (3)**
42:25;62:3,17
**subject (2)**
8:18;47:6
**submission (5)**
25:10;38:1,22;
39:23,25
**submit (3)**
23:1;58:10;60:20

**substantial (3)**
12:3;15:15;48:20
**substantive (1)**
13:24
**success (4)**
10:12;31:1;32:16,
17
**successfully (1)**
25:7
**sufficiency (28)**
18:3;19:3,15,23;
28:3,4,9,11;29:17;
35:24;37:5,10;40:17,
21;43:19;44:5;45:15,
24,24;46:1;51:13;
54:6;57:2;65:4,7;
66:8,22;67:5
**suggest (4)**
5:9;13:21;52:15;
55:11
**suggested (3)**
12:18;55:11,11
**suggesting (4)**
9:17,18;44:14;
45:21
**suggests (1)**
27:7
**suited (1)**
23:20
**summary (1)**
51:18
**supervised (1)**
48:19
**supervising (1)**
47:21
**supervision (1)**
8:18
**supplemental (2)**
38:1;58:6
**support (1)**
35:20
**supporting (2)**
33:20;66:1
**supposed (3)**
5:8,19;54:20
**Supreme (6)**
17:10;37:9,18,20;
39:22;61:16
**sure (10)**
5:13;7:18;11:4;
15:12;30:3;43:2;
47:12;49:3;63:22;
65:3
**surprise (2)**
61:1,1
**survive (4)**
37:11;51:17;54:6;
66:16
**survived (1)**
51:15
**Susan (1)**
3:15
**suspect (1)**

55:24
**swinging (1)**
67:7
**switch (1)**
58:20

**T**

**table (7)**
12:22;15:20;16:11;
19:10;30:19;32:15;
34:22
**tail (1)**
15:4
**tale (1)**
44:16
**talk (4)**
9:23;10:2;36:25;
49:16
**talked (4)**
37:3,3,3;69:12
**talking (4)**
9:20;43:9;55:7;
65:17
**Teachers (1)**
22:3
**team (1)**
52:6
**team's (1)**
13:8
**technical (2)**
18:10;60:18
**telling (2)**
18:18;47:9
**tells (3)**
33:13;34:20;37:11
**tempted (1)**
9:3
**ten (7)**
6:20;23:5;25:9;
26:17,17;36:12;41:5
**tends (1)**
15:9
**term (1)**
68:1
**terms (12)**
8:1,8;14:4,5;20:5;
36:3;48:11;55:7,8;
63:5;67:21;69:6
**terrible (1)**
47:10
**terribly (1)**
55:20
**test (1)**
17:15
**testimony (1)**
21:3
**testing (1)**
13:23
**tests (1)**
20:7
**thankfully (1)**
56:12

**thanks (1)**
43:15
**that'll (1)**
11:13
**theories (1)**
51:17
**theory (1)**
17:9
**therefore (2)**
35:22;51:2
**there'll (3)**
11:15;26:18;66:23
**thinking (3)**
29:5,7;50:4
**third (3)**
7:20;36:5;66:14
**thirty (1)**
23:4
**Thomas (1)**
6:12
**thoroughly (1)**
69:14
**though (5)**
7:10;13:14;15:9;
17:12;45:7
**thought (4)**
28:20;53:23,25;
68:25
**thoughtful (1)**
53:13
**thousand (1)**
53:3
**thousand-plus (1)**
51:21
**thousands (1)**
53:7
**three (11)**
6:20;17:25;25:8;
34:17;38:3;49:16;
58:14,14;62:23;64:9;
69:9
**thus (1)**
50:8
**tight (1)**
8:17
**till (1)**
35:4
**timeline (6)**
9:23;18:13,13;19:8;
46:9,10
**timing (9)**
8:8;43:21;62:21;
63:2,12,19,24;64:20;
66:1
**today (8)**
9:20;23:14;24:4;
30:9;41:1;62:6;68:10;
69:12
**today's (2)**
33:10;44:18
**told (4)**
8:4;26:7;28:1;
29:23

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 83
of 85

**tomorrow (2)**
12:15;33:6
**ton (1)**
39:17
**took (1)**
30:9
**top (2)**
17:1;54:23
**total (1)**
8:2
**totally (1)**
10:23
**touch (1)**
54:11
**towards (1)**
15:4
**track (1)**
49:21
**traded (1)**
48:6
**traditional (1)**
21:6
**transcends (1)**
58:25
**transcript (1)**
60:4
**tremendous (1)**
66:24
**tremendously (1)**
8:11
**trial (3)**
12:1;15:21;51:19
**tried (1)**
15:23
**trier (1)**
61:21
**true (18)**
13:25;14:2;15:11,
11;16:10,11;20:24,
25;23:21;25:1;31:14;
32:8,10;36:8,8;45:11;
59:12;61:6
**Trujillo (1)**
54:24
**truly (1)**
20:20
**Trust (1)**
53:15
**Trustee (1)**
29:24
**truth (3)**
20:14;40:18,20
**try (8)**
26:22;39:2;49:24;
50:11;52:2;53:9;
55:21;58:7
**trying (3)**
18:1;44:16;57:15
**turn (3)**
6:4;11:12;21:21
**turned (1)**
49:22
**twenty (1)**

7:2
**twist (1)**
26:23
**two (16)**
6:24;17:11;18:8;
20:7;23:8,15;25:2;
27:8;31:15;38:6;44:9;
45:21;48:15;53:19,
20;54:18
**two-thirds (1)**
25:7
**type (2)**
24:8;38:1
**types (2)**
32:14;46:12

## U

**ultimate (3)**
20:5,6;43:24
**ultimately (1)**
34:9
**umbrella (1)**
15:6
**unabated (1)**
56:19
**unconfused (1)**
59:19
**Under (17)**
10:5;15:5,6;17:9;
20:8;24:22;26:1;27:6;
39:22;41:3,19;56:24,
24;58:21;61:9;63:2;
69:9
**underlying (1)**
20:14
**Understood (1)**
49:13
**underwriters (2)**
60:7,11
**unduly (1)**
53:8
**unhappy (1)**
9:21
**unique (1)**
59:1
**UNISON (1)**
70:1
**United (2)**
59:4;60:1
**universe (3)**
28:17,18;46:19
**unless (5)**
12:20;14:11;21:9;
26:24;57:19
**unlike (1)**
50:7
**unlikely (1)**
57:14
**unorthodox (1)**
15:3
**unreasonable (1)**
43:16

**unresolved (3)**
26:4;55:24;63:3
**up (34)**
3:13;5:2,3;6:15;9:6,
7;15:13,16;17:16,21;
18:11;23:1,2;26:9,12;
27:2,24;35:4;38:2,9;
41:14;44:1;45:14;
49:15,23;52:12;54:8;
55:23;58:4;60:3;
63:13;69:20,20,21
**upfront (1)**
24:1
**upon (6)**
12:17;16:6;51:1;
61:1,1,2
**upset (1)**
5:25
**urging (1)**
55:25
**use (4)**
18:13;19:21;20:19;
22:6
**using (1)**
8:25

## V

**variety (1)**
68:7
**vaunted (1)**
51:11
**via (1)**
56:2
**victims (2)**
68:22,23
**view (5)**
19:2;34:25;41:21;
46:14;54:8
**virtually (1)**
24:13
**virtue (1)**
8:1

## W

**Wait (5)**
30:6,6;33:1;44:20;
62:8
**waited (1)**
9:6
**walk (2)**
51:11;60:2
**wants (2)**
9:7;65:15
**way (26)**
8:23;9:1,2;12:17;
16:12;29:16;30:17,
18;32:18;34:6;36:12;
38:7;40:16;43:1,14,
14;51:3;56:3;57:5,16;
58:4;63:21;65:14;
66:20;68:4,20

**WEDNESDAY (1)**
3:1
**weeks (1)**
7:17
**weighs (1)**
69:6
**Weil (1)**
3:9
**whatever's (1)**
23:25
**What's (16)**
9:15;21:5,21;27:25;
29:5,6;36:23;40:14;
42:12;48:3;52:15,16;
59:22;61:12;65:7;
67:11
**Whereas (1)**
48:22
**Whereupon (1)**
70:3
**wherever (1)**
59:3
**whittle (1)**
57:12
**whole (8)**
8:15;32:2;44:13;
60:14,23;65:9;67:14,
18
**who's (4)**
14:10,10;19:21;
42:5
**who've (1)**
6:21
**wildest (1)**
59:6
**willing (6)**
34:10;42:7,15;
51:21;52:13;58:7
**win (3)**
16:18;28:10;40:18
**wind (1)**
55:23
**wish (2)**
29:9;47:11
**within (1)**
48:25
**without (7)**
19:9;27:5;32:5;
36:1;40:4;60:21;67:3
**word (3)**
26:16;28:19,20
**words (6)**
18:18;30:9;40:4;
45:12;53:21;56:18
**work (11)**
15:9;23:25;27:2;
30:4;37:2;40:5,16,25;
48:1;51:12;55:23
**worked (1)**
67:12
**working (5)**
23:24;25:4;32:19;
34:15;65:18

**works (3)**
15:10;43:14,15
**world (5)**
21:8,9;23:21;60:25;
62:3
**WorldCom (1)**
12:4
**worry (1)**
36:14
**worse (1)**
23:22
**worth (1)**
62:10
**wrap (2)**
9:6,7
**Wrestling (1)**
60:25
**writ (1)**
16:13
**writing (1)**
13:16
**written (1)**
16:20
**wrong (12)**
7:25;9:15,16,17;
18:5;19:4;20:2;29:5,
6;42:12;58:24;64:23

## Y

**Yankees (1)**
11:10
**year (24)**
20:23;24:19,19;
26:18;35:25;42:11,
11;43:25;44:1,4,20;
45:1,25;46:14;56:16;
57:3,7,12,15;60:23;
65:22,24;66:3;68:2
**years (8)**
17:25;23:8;48:16;
53:19,20;58:14,14;
61:12
**York (2)**
11:10;22:3

## Z

**zero (1)**
27:17
**Zoom (1)**
5:21

## 1

**1 (7)**
7:19;8:15;16:22;
25:3;46:19;54:19;
66:11
**1,000 (4)**
25:9;32:25,25;
42:22
**1,000-dollar (1)**

Case: 19-30088    Doc# 13996    Filed: 08/28/23    Entered: 08/28/23 07:59:37    Page 84 of 85

26:22
**10,000 (1)**
  41:19
**10,000-dollar (4)**
  19:20,24;42:22;
  50:7
**10:30 (1)**
  3:1
**100 (1)**
  41:18
**12b6 (13)**
  17:19,20;18:5,11,
  20;19:3;20:6,10,18,
  24;21:6;28:12;61:4
**13 (1)**
  7:19
**13th (1)**
  57:1
**15th (1)**
  58:4
**176 (1)**
  25:11
**18 (1)**
  39:23
**18th (1)**
  58:5
**19th (1)**
  12:14

**2**

**2 (1)**
  16:23
**2,000 (1)**
  30:13
**2,200 (1)**
  26:4
**2,900 (1)**
  26:1
**2015 (1)**
  69:1
**2023 (3)**
  3:1;56:13;69:1
**23 (2)**
  3:1;24:2
**23rd (2)**
  56:16,17
**281913 (1)**
  5:1
**281914 (3)**
  4:15,23;5:25

**3**

**3,200 (1)**
  53:3
**300 (2)**
  25:15,15
**31st (1)**
  56:17

**5**

**5,000 (1)**
  42:24
**5,883 (1)**
  25:7
**500 (1)**
  44:10
**500-dollar (1)**
  26:21
**571 (2)**
  7:21,23

**7**

**700 (1)**
  26:2
**7023 (14)**
  7:20;31:11,19,22,
  23,25;33:20;47:15,
  25;48:14;55:8;56:9;
  58:15;63:14
**723 (4)**
  52:1,3;55:2;58:11

**9**

**900-and-some-odd (1)**
  14:12

Case: 19-30088   Doc# 13996   Filed: 08/28/23   Entered: 08/28/23 07:59:37   Page 85 of 85