KELLER BENVENUTTI KIM LLP
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
Dara L. Silveira (#274923)
(dsilveira@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| **- and -** | (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REORGANIZED DEBTORS' REPLY IN SUPPORT OF ONE HUNDRED TWENTIETH OMNIBUS OBJECTION (NO LIABILITY CLAIMS) SOLELY WITH RESPECT TO CLAIM NO. 72390 (SYNERGY PROJECT MANAGEMENT, INC.)** |
| **Debtors.** | |
| ☐ Affects PG&E Corporation ☐ Affects Pacific Gas and Electric Company ☒ Affects both Debtors | **[Re: Docket Nos. 13670, 13719]** |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |

PG&E Corporation and Pacific Gas and Electric Company, as debtors and reorganized debtors (collectively, "**PG&E**" or the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby request that the Court take judicial notice pursuant to Federal Rule of Evidence 201 of the contents and information contained in the documents identified below. These documents may be judicially noticed because they are not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Further, the Court may take judicial notice of pleadings, orders, and other papers contained in the court files of another action. *See Mullis v. United States Bankr. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987).

1. The *Fourth Amended Complaint*, electronically filed in Case No. CGC-17-560034 (the "**Superior Court Case**") before the Superior Court of the State of California, County of San Francisco, on April 20, 2022, a true and correct copy of which is attached as **Exhibit A**.

2. A January 13, 2016 article published by KQED titled "S.F. Officials Upheld in Firing of Construction Firm Involved in Gas Line Breaks," available online at https://www.kqed.org/news/10829492/s-f-officials-upheld-in-firing-of-construction-firm-involved-in-gas-line-breaks (last accessed August 9, 2023), a true and correct copy of which is attached as **Exhibit B**.

3. Statement of Hearing Officer Findings dated January 8, 2016, entered in *In the Matter of Synergy Project Management, Inc.'s Objections to Notice of Substitution for San Francisco Department of Public Works Project No. PCE15018/2264J(R), Pavement Renovation, Sewer Replacement and Water Main Installation – Haight and Hayes Streets*, a true and correct copy of which is attached as **Exhibit C**.

4. The Complaint filed by Synergy Project Management, Inc. ("SPM") against the City and County of San Francisco (the "**City**"), on July 10, 2017 commencing the Superior Court Case, a true and correct copy of which is attached as **Exhibit D**.

5. The *Notice of Removal of Action Under 28 U.S.C. §§ 1441(a) (Federal Question)* filed by the City on November 24, 2017, commencing Case No. 17-cv-06763 (N.D. Cal.) (the "**District Court Case**"), a true and correct excerpted copy of which is attached as **Exhibit E**.

6.      Second Amended Complaint, electronically filed in the District Court Case on June 5, 2018 as Docket No. 50, a true and correct excerpted copy of which is attached as **Exhibit F**.

7.      The *Order Granting Motion to Dismiss*, entered in the District Court Case on December 31, 2018 as Docket No. 58, a true and correct copy of which is attached as **Exhibit G**.

8.      The *Third Amended Complaint*, electronically filed in the District Court Case on May 26, 2019 as Docket No. 77, a true and correct copy of which is attached as **Exhibit H**.

9.      The *Order Granting City Defendants' Motion to Dismiss and Remanding Case*, entered in the District Court Case on November 21, 2019 as Docket No. 128, a true and correct copy of which is attached as **Exhibit I**.

10.     SPM's *Notice of Appeal*, electronically filed in the District Court Case on December 19, 2019 as Docket No. 132, a true and correct copy of which is attached as **Exhibit J**.

11.     The *Order Remanding Case*, entered in the District Court Case on August 4, 2021 as Docket No. 181, a true and correct copy of which is attached as **Exhibit K**.

12.     The *Order Sustaining Defendant City and County of San Francisco's Demurrer to Synergy Project Management Inc.'s Fourth Amended Complaint*, entered in the Superior Court Case on June 27, 2022, a true and correct copy of which is attached as **Exhibit L**.

13.     The *Judgment for Defendant City and County of San Francisco*, entered in the Superior Court Case on July 7, 2022, a true and correct copy of which is attached as **Exhibit M**.

Dated: September 5, 2023                    **KELLER BENVENUTTI KIM LLP**

                                            By:  */s/ Dara L. Silveira*
                                            Dara L. Silveira

                                            *Attorneys for Debtors and Reorganized Debtors*

1

**Exhibit A**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | RANDOLPH E. DAAR (SBN 88195)
BEN ROSENFELD (SBN 203845)
2 | ATTORNEYS AT LAW
3 | 3330 Geary Blvd., 3rd Floor East
San Francisco, CA 94118
4 | Tel:    (415) 986-5591
Fax:    (415) 421-1331
5 | randolphdaar@yahoo.com
ben.rosenfeld@comcast.net
6

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**04/20/2022**
**Clerk of the Court**
BY: SANDRA SCHIRO
Deputy Clerk

7 | Attorneys for Plaintiff Synergy Project Management, Inc.

8

9 | SUPERIOR COURT FOR THE STATE OF CALIFORNIA

10 | COUNTY OF SAN FRANCISCO

11

12 | SYNERGY PROJECT MANAGEMENT, INC.,

13 |                    Plaintiff,

14 |                    v.

15

16 | CITY AND COUNTY OF SAN FRANCISCO, GHILOTTI BROS., INC, and
17 | DOES 2-100, et al.,

18 |                    Defendants.

19

Case Nos. CGC-17-560034

FOURTH AMENDED COMPLAINT

Jury Trial Demanded

20 |        Plaintiff Synergy Project Management, Inc. hereby complains against the City and

21 | County of San Francisco, a municipal corporation and subdivision of the State of California,

22 | including the San Francisco Public Utilities Commission (SFPUC), the San Francisco Municipal

23 | Transportation Agency (SFMTA), San Francisco Department of Public Works (SFDPW); and;

24 | Ghilotti Bros., Inc, and DOES 2 through 100, alleges as follows:[1]

25

26

27 |        [1] Plaintiff has amended this complaint in compliance with the Court's March 24, 2022
Order, reserving all rights of appeal to challenge the Court's dismissal and/or denial of other
28 | claims and defendants sought by Synergy to be included over the history of this case.

1

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 5
of 253

# PARTIES

1. Synergy Project Management, Inc. (hereinafter "Synergy") is now, and at all times relevant hereto, a California corporation, qualified to do business in California, and located in San Francisco, California.

2. Defendant City and County of San Francisco (hereinafter the "City") is a municipal corporation existing under the laws of the State of California, and is both a Charter City and a County under the Constitution of the State of California. Defendant City and County of San Francisco is responsible for the San Francisco Public Utilities Commission ("SFPUC") which provides drinking water, wastewater collection, and municipal power services to the residents of San Francisco and other customers. The City also oversees and is responsible for the San Francisco Municipal Transit Agency ("SFMTA"), a semi-independent agency established by an amendment to San Francisco's charter in 1999. SFMTA oversees and runs the San Francisco Municipal Railway (Muni), the Department of Parking and Traffic ("DPT"), and the Taxicab Commission. The City is also responsible for the Department of Public Works ("DPW") which is the City department responsible for the care and maintenance of San Francisco's streets and infrastructure.

3. Former defendant London Breed is and at all times relevant to this action was an elected member of the City's Board of Supervisors, and is presently the City's Mayor.

4. Defendant Ghilotti Brothers, Inc. ("GBI") is a corporation organized and doing business in California, based in Marin County, California.

5. Former defendant Mohammed Nuru was at all times relevant to this action employed by the City as the Director of Public Works, until his resignation on or about February 11, 2020;

6. Harlan Kelly (whom Synergy sought to name in place of Doe #1) was at all times relevant to this action employed by the City as the General Manager of the SFPUC, a position he was appointed to in 2012, until his resignation on or about November 30, 2020. Prior to his appointment to head the public utilities agency, Kelly was the Assistant General Manager, Infrastructure, responsible for implementing over $10 billion in capital improvements for water, sewer, and power.

7.     Harlan Kelly is married to Naomi Kelly, formerly San Francisco's City Administrator, the highest non-elected position in the City, which oversees the General Services Agency, consisting of 25 departments, divisions and programs. Synergy is informed, and on that basis alleges, that Naomi Kelly resigned her position as San Francisco City Administrator on or about January 12, 2020.

8.     Synergy is ignorant of the true names and capacities of DOEs 2 through 100, inclusive, as it is anticipated that additional City agents and employees were involved in the actions described herein, and that such additional City agents and employees may be discovered through this action, and therefore Synergy sues such defendants by these names. If and when each defendant's true name and capacity is ascertained, Synergy will seek to amend this Complaint by naming each defendant sued fictitiously herein by its, his or her true name and capacity.

9.     Defendants, and each of them are public entities and individuals who, upon information and belief, acted in concert and active participation with each other in committing the acts alleged herein.

10.     Synergy is informed and believes, and on that basis alleges, the each of the fictitiously-named defendants acted willfully or in conscious disregard of Synergy's rights and/or was negligent, careless, liable, or otherwise legally responsible in some manner for the events and occurrences alleged herein and that Synergy's damages were proximately caused by each of the defendants' acts.

**JURISDICTION AND VENUE**

11.     Jurisdiction is proper because the events underlying this case occurred in California, and each of the parties is located or resides in California.

12.     Venue in this Court is proper pursuant to California Code of Civil Procedure Section 395 because this complaint concerns construction projects located in San Francisco County, contracts and agreements alleged by Synergy were entered into in San Francisco County and to be performed here, and the other injuries Plaintiff alleges in this complaint all occurred in this County.

13.     Additionally, venue is proper in this Court because Defendants include the City and

3

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 7 of 253

County of San Francisco the San Francisco Public Utilities Commission, and officials and employees of these entities.

14.    Plaintiff filed tort claims against the City and County of San Francisco and its officials on January 5, 2017, April 12, 2018 and February 8, 2021, in compliance with the Tort Claims Act (Govt. Code§§810-996.6) for the Van Ness Project. The first two of the above-listed claims were rejected on January 10, 2017 and May 15, 2018, respectively. The last claim, filed February 8, 2021, received no response.

<strong>FACTS COMMON TO ALL CAUSES OF ACTION</strong>

15.    Synergy is owned, managed and operated by Javad Mirsaidi, a Licensed Engineer, Licensed Contractor, and who serves as Synergy's Principal and President. Founded in 2003, Synergy maintained a long, successful and growing business providing services including construction management, demolition, utilities, mass excavation and shoring, grading and paving, architectural and structural management. Synergy developed a long and successful relationship with the City, including extensive work on numerous projects involving the City's streets and underground construction projects. Within one year of the commencement of this action, Synergy was assessed and liable for, and/or has paid, a tax that funds the City and County of San Francisco.

16.    Following its 2003 formation, Synergy grew from a small contracting company to a successful general contractor and subcontractor, employing over 100 employees, with annual gross revenue growing from $119,000, in 2004, to $35,893,508, in fiscal year 2012/13. Synergy successfully completed over 50 underground projects in the City – projects covering virtually every area in San Francisco including the City's most congested and utility-dense areas such as Union Square and Moscone Center. Synergy consistently completed complex projects ahead of schedule, and was frequently recognized by the City and its neighborhoods for its excellence and professionalism. Synergy also successfully bid and completed projects across California and Utah, including the counties of San Mateo, Marin, Santa Clara, Contra Costa and Bakersfield.

17.    Because of the City's wrongful and unconstitutional actions described herein, Synergy is now effectively shut down.

4

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 8 of 253

**The Pre-2015 Litigation**

18. Prior to 2015, Synergy was compelled to bring successive suits to compel the City's payment for construction Synergy performed pursuant to contracts with the City (the "pre-2015 litigation"). These lawsuits were brought in connection with Synergy's effort, on behalf of itself and other companies doing business with the City, over a decade, to obtain the City and County of San Francisco's compliance with California's prompt payment policies. California's "Prompt Policy Act" provides, *inter alia*, that State and local agencies must pay a direct contractor within specified periods of time (typically based on progress payment agreements or completion). Cal. Pub. Contracts Code § 10261.5. et seq. The California legislature enacted the prompt payment act to address the problem of delayed payments to contractors—which has the effect of turning contractors into unwitting financiers—and causes delayed payments to subcontractors, employees and suppliers. The need for prompt payment is a well-settled matter of great public concern in California.

19. The City and County of San Francisco has a long, well-documented record of chronic noncompliance with the Prompt Payment policy.

20. Synergy experienced the City and County's noncompliance with California's Prompt Payment Policy early on as it began performing San Francisco construction projects after the company's 2003 formation. As Synergy grew and took on contracts in greater numbers and scope, it developed greater awareness of the chronic nature of the problem. Through communications with other public contractors and participation in trade associations, Synergy grew to understand that the problem was not unique to Synergy, but pervasive, so much so that companies generally understood and accepted it as endemic and irreversible. Within the public contracting community, it was generally understood and accepted that as far as the City and County of San Francisco was concerned, Prompt Payment laws, as with other public contracting laws, were honored only it their breach.

21. San Francisco's noncompliance with California's Prompt Payment Policy caused companies doing business with the City to experience the problems the California Legislature tried to address in enacting the Prompt Payment Act. Small businesses—which generally lack the

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 9 of 253

financial wherewithal to themselves finance major construction projects in advance—were especially vulnerable to the harm by the City's noncompliance.

22. The harm caused by non-compliance with the Prompt Payment Policy statutes was especially acute in San Francisco, because such noncompliance directly contributed to the City's pervasive "pay- to-play" and "bribe/kickback/shakedown" environment of government corruption—an environment maintained by officials at the highest government levels. This group is sometimes described as the City Family.

**The City Family**

23. Corruption in municipal contracts is a matter of statewide concern. In enacting California's public contracting laws, including the provisions requiring competitive bidding and prompt payment, the California Legislature recognized that public contracts present a high potential for favoritism, fraud, corruption and the misuse of public funds and that without such rules, the policy goals of fair and prudent public contracting can be easily and surreptitiously undercut.

24. One characteristic that distinguishes San Francisco from other major United States cities is the peculiarly close, and often intimate, relationships that exist between the heads of government. The executive branch of San Francisco is dominated at the top by a circle of officials that share decades-long friendships, both platonic and romantic, and in some cases marital relationships, and who have used their control over the public fisc to enrich themselves personally.

25. This circle was ominously, but nonetheless aptly, described by former mayor Ed Lee (now deceased) as the "City Family." The City Family includes (but is not limited to) Mohammed Nuru, Harlan Kelly, and Naomi Kelly, each of whom has recently resigned from their respective positions as DPW Director, SFPUC General Manager, and City Administrator, respectively, in the wake of a widening federal corruption investigation. Lee himself, who was posthumously implicated in the fraud scheme in the federal complaint against Harlan Kelly.

26. Mayor London Breed, along with Nuru, Harlan Kelly and Naomi Kelly, and the rest of the "City Family" each trace their political careers back to former mayor Willie Brown, and are

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 10 of 253

1  tied by variegated friendships, romantic and marital relationships.

2      27.   For example, (recently-resigned) DPW director Nuru counts current mayor London

3  Breed as his former romantic partner and close friend for decades, and Sandra Zuniga, the

4  (recently-resigned) Director of the Mayor's Office of Neighborhood Services as his current

5  romantic partner. Harlan Kelly, the (now-resigned) head of the SFPUC is married to Naomi Lee,

6  the (now on-leave) City Administrator.

7      28.   These relationships potentiate unlawful, norm-breaking financial dealings amongst City

8  Family members, and, at the same time, are used by Family members to justify said dealings. For

9  example, Breed admits accepting $5,600 from Nuru in 2019, but justified the payment as merely

10  a "car repair loan" from a long-time friend. The notion that Breed—who was at a time was

11  earning over $400,000 in salary and other perks, including a police-driven car provided to Breed

12  for her personal use for free—would need money for a car repair loan is dubious, if not

13  preposterous. In any case, acceptance of the loan was a direct violation of San Francisco and

14  California law prohibiting the acceptance of gifts from subordinates. But in San Francisco, such

15  transactions are so routine that traditional principles of conflicts of interest and ethics seem not

16  obtain.

17      29.   Following public disclosure of this "loan," neither the City, nor any of the City officials

18  charged with enforcement of City officials' compliance with California and San Francisco law

19  took any action against Breed.

20      30.   These close relationships and financial dealings also create serious challenges to public

21  governance and scrutiny. While California and San Francisco both recognize that "access to

22  information concerning the conduct of the people's business is a fundamental and necessary right

23  of every person in this state," ensuring such access is exceedingly difficult when the information

24  is communicated during overseas "vacations" jointly taken by high-level government officials, or

25  communicated by government officials figuratively, and in some cases literally, sharing the same

26  bed.

27      31.   At the same time, great deference is accorded to these government heads, in whom the

28  City vests inordinate, nearly unfettered discretion to make decisions dictating government

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 11 of 253

operations and impacting the public fisc.

32. San Francisco utilizes the "strong mayor" form of mayoral/council government, composed of the mayor, Board of Supervisors, several elected officers, and numerous other entities. The Mayor of San Francisco is the head of the executive branch of the city and county government. The mayor has the responsibility to enforce all city laws, administer and coordinate city departments and intergovernmental activities, set forth policies and agendas to the Board of Supervisors, and prepare and submit the city budget at the end of each fiscal year.

33. The endogamous nature of San Francisco's government impacts public contracts particularly. Within the business community, it is widely known, and generally accepted, that success in obtaining, or being compensated, for work on public contracts is dependent on the ability of public contractors to curry favor with those in power.

34. San Francisco's chronic noncompliance with the laws governing payments to contractors and subcontractors placed enormous power in the hands of government officials positioned to hold up payments. These officials used (and continue to use) this power for their personal benefit, essentially by extorting money from contractors via bribes, kickbacks and shakedowns, collectively described as a "pay-to-play" scheme.

35. San Francisco is not the only California municipality to confront "pay-to- play" politics. What distinguishes San Francisco is the duration and extent of the government corruption. Where in other cities contractors typically engage in kickback schemes in order to obtain unfair advantage in winning or performing contracts, in San Francisco, it is generally understood, and accepted, that contractors must establish and foster personal relationships with government officials in order merely to obtain government compliance with basic payment laws, and in order to not be subject to arbitrary adverse treatment meted out by government officials to contractors who are not perceived as "friends."

36. City officials repeatedly pressured Synergy to donate to non-governmental organizations controlled by City officials, including the San Francisco Park Alliance, an organization controlled by Department of Public Works General Manager Mohammed Nuru.

37. Synergy nevertheless did not participate in these schemes despite repeated pressure

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 12 of 253

1  from government officials.

2     38.   Instead, in response to this, Synergy and its principal, Javad Mirsaidi, engaged in a

3  public effort, on behalf of Synergy and all companies who do business with the City, and small

4  businesses in particular, to bring the City and County of San Francisco into compliance with

5  California Prompt Payment Policy and other state and local contracting laws. This effort

6  included direct appeals by Synergy to City officials, and public presentations to City

7  commissions by Mr. Mirsaidi (on behalf of contractors and other companies doing business with

8  the City), and service on City Commission advisory boards predating and postdating the lawsuits.

9     39.   For example, Mr. Mirsaidi gave an hour-and a half power-point presentation to

10  Mohammed Nuru and Naomi Kelly explaining how construction payments work, and how late

11  and non-payment by the City affected contractors performing City contracts. Mr. Mirsaidi then

12  made the same presentation to multiple additional city officials, including former Mayor Gavin

13  Newsom, and members of the Board of Supervisors, the entire Human Rights Commission.

14  However, Mr. Mirsaidi was unaware at the time that Nuru himself was accepting bribes from

15  contractors in exchange for his assistance in obtaining contracts and payment on contracts.

16     40.   Synergy's effort to combat such official corruption has been publicly recognized by the

17  construction industry media, which has cited Synergy's 2015 litigation for the widespread impact

18  it could hold for companies across the state that seek timely payment from government awarding

19  authorities.

20     41.   Although Synergy ultimately prevailed in this litigation, Synergy suffered financial

21  consequences as a result of the City's delayed performance of its obligations on these contracts.

22     42.   In 2009, Synergy and the City entered into a written contract wherein Synergy agreed to

23  perform construction on a public works improvement project commonly known as the Third

24  Street Light Rail Program Moscone Station and Portal Utilities Relocation – Contract 1250 (the

25  "1250 Contract"). Synergy completed the project and performed its obligations under the 1250

26  Contract. The City failed to pay Synergy as it promised to do under the 1250 Contract, ultimately

27  forcing Synergy to sue the City. In 2013, Synergy successfully sued the City for its breach of the

28  1250 Contract, ultimately receiving $787,500 in 2015 after Synergy had to bear the financing

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 13
of 253

costs, interest and other expenses for three years.

43. In 2010, Synergy and the City entered into a written contract wherein Synergy agreed to perform construction on a subsequent public works improvement project commonly known as the Third Street Light Rail Project Phase 2, Union Square/Market Street Station Utilities Relocation Project – Contract 1251 (the "1251 Contract"). But the City failed to pay Synergy as promised under the 1251 Contract, ultimately forcing Synergy to sue the City in 2013. Synergy prevailed and ultimately received $660,000—but again after suffering financial hardships of nonpayment and bearing the costs of litigation for years.

44. In 2012, Synergy and the City entered into a written contract wherein Synergy agreed to perform construction on a public works improvement project commonly known as the San Jose Avenue Pavement Renovation and Sewer Replacement, San Bruno Avenue and Bay Shore Boulevard – Contract 1921J (the "1921J Contract") and the Pavement Renovation and Sewer Replacement – Contract 1931J (the "the 1931 Contract.") The City failed to pay Synergy as promised under the 1921J Contract and the 1931 Contract, ultimately forcing Synergy to sue the City. Synergy prevailed and ultimately received—but again after suffering financial hardships of nonpayment and bearing the costs of litigation for years.

45. Although Synergy ultimately recovered partial damages in the above-described lawsuits, these monies were paid years after they were due. The delay in payment financially choked Synergy, which not only lost needed and earned funding, but incurred substantial attorney's fees, interest expenses, and other unrecovered costs. The City's failure to make obligated payments also forced Synergy to lay off employees and field personnel and, notably, severely restricted the company's access to bonding capacity, which, Synergy needed as a prerequisite to its ability to bid on projects as a general contractor. With the lack of cash and assets created by the long outstanding claims, sureties would no longer provide Synergy with the bonds necessary for Synergy to bid work as a prime contractor.

46. Defendants were aware of the financial hardships the City's actions imposed on Synergy, including the adverse impact on Synergy's access to bonding for future projects. In December , Synergy's President, Javad Mirsaidi, informed Mohammed Nuru and several other

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 14 of 253

City and SFMTA officials and employees that by holding onto payments for work already performed, and by burdening Synergy with interest expense and attorney's fees, the City had caused Synergy to lose its bonding, forced layoffs, and brought the company to the brink of collapse.

47.    Despite these setbacks, Synergy managed to continue to do business. One way that Synergy overcame the bonding problems the City created was to take on work as a subcontractor on projects where another company acted as the general contractor. General contractors which were awarded major City projects sought out Synergy, which continued to benefit from the reputation it established as a company capable of completing complex projects timely and efficiently.

**The Haight Street Project**

48.    On February 10, 2015, the City and general contractor Ghilotti Brothers, Inc. ("GBI") entered into a contract to replace the sewer line, install new water lines, and renovate the pavement on Haight Street and Hayes Street (the Haight Street Prime Contract), known as DPW Project No. PCE 15018/2264J(R), "Pavement Renovation, Sewer Replacement, and Water Main Installation – Haight Street and Hayes Street" (the "Haight Street Project"). The Contract required detailed and meticulous qualification for the underground subcontractor. Synergy met and exceeded all requirements, and it was selected and approved as a subcontractor by GBI and the City.

49.    In GBI's bid for the Haight Street Project, GBI selected and listed Synergy as a subcontractor on GBI's contract with the City, performing more than 50% of contract work on a project estimated to cost a minimum of $13.5 million. Synergy, as a part of its contract with GBI, agreed to permit GBI to include Synergy as a listed subcontractor.

50.    Synergy's role was to perform the underground excavation and utilities work on the Haight Street Project.

51.    GBI and Synergy entered into a Subcontract Agreement on April 17, 2015. The City was not a party to the Subcontract or an agent of a party to the Subcontract.

52.    Once GBI listed Synergy as a subcontractor on GBI's bid to the City, and the City

11

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 15 of 253

accepted the bid and signed a contract with GBI, Synergy had the right to complete its work on the Haight Street Project unless it was removed pursuant to the provisions of the Subletting and Subcontracting Fair Practices Act, California Public Contract Code §§ 4100 *et seq.* (hereinafter the "Subletting and Subcontracting Fair Practices Act"), which establishes a detailed, mandatory framework for competitive bids on public works projects.

53. Additionally, the Subcontract Agreement between Synergy and GBI gave Synergy the right to perform work on the Haight Street Project. It further provided that GBI would "pay [Synergy] for the satisfactory performance of this Agreement. . ."

54. The Subcontract Agreement between Synergy and GBI explicitly delineated the manner in which GBI could terminate Synergy as subcontractor on the Haight Street Project. If "at any time [Synergy] breach[ed] this Agreement or failed[ed] to prosecute the said work with promptness, diligence and efficiency or fail[ed] to perform any of the requirements hereof, [GBI] may. . . terminate the employment of [Synergy]." The Agreement further provided that, "In its sole discretion and to the extent permitted by law, [GBI] may terminate this Agreement without cause."

55. The Subcontract Agreement between Synergy and GBI expressly referenced and acknowledged GBI's contract with the City ("City-Ghilotti contract"), and bound Synergy to the terms of the City-Ghilotti contract. In relevant part, the Subcontract Agreement between Synergy and GBI stated:

> [Synergy] shall furnish all labor, material, supplies and equipment, and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of [Ghilotti], and all work incidental thereto, all in accordance with the terms and conditions of the General Contract including the General Conditions, Drawings, Specifications and other Documents, which by Reference, are made part of said General Contract, all of which shall be considered part of the AGREEMENT by this Reference thereto, and [Synergy] agrees to be bound to [Ghilotti] and OWNER [San Francisco] by the terms and Provisions thereof.

56. The terms of the City-Ghilotti contract, to which Synergy agreed in the Subcontract Agreement to be bound, expressly precluded the establishment of any contractual or quasi-contractual relationship between the City and Synergy. Section 102(B) of the City-Ghilotti

12

contract expressly prohibits any provision in that document from being construed to create a contractual relationship with a subcontractor (i.e. Synergy). Section 102(B) states:

> Nothing in the [City-Ghilotti contract] shall be construed to create a contractual relationship between the City and a Subcontractor… or a person or entity other than the City and the Contractor. Exhibit 5., sect. 1.02(B), p. 1929.

57. Synergy was thus strictly a "Subcontractor" for the purposes of Section 102(B) of the City-Ghilotti contract. Section 1303.B.3 of the City-Ghilotti contract expressly provides that no subcontractor is a third-party beneficiary of the City-Ghilotti contract.

58. Consequently, sections 102(B) and 1303.B.3 of the City-Ghilotti subcontract expressly precluded any contractual relationship or quasi-contractual relationship between the City and Synergy from being established by the City-Ghilotti contract.

59. The Subletting and Subcontracting Fair Practices Act contains mandatory and comprehensive requirements for when and how a listed subcontractor on a public works project may be removed or replaced. The City has adopted the provisions of the Subletting and Subcontracting Fair Practices Act as an ordinance applying to its public works projects.

60. Nothing in the Subcontract Agreement or the Subletting and Subcontracting Fair Practices Act gave any party, other than GBI, the right to terminate Synergy from the Haight Street Project

61. As a part of the Haight Street Project, Synergy, general contractor GBI, the City, SFMTA, SPUC and other project stakeholders also entered into an agreement which identified agreed-upon goals and established procedures designed to facilitate the successful completion of the Haight Street Project (the "Partnering Agreement"). The Partnering Agreement identified several potential challenges foreseen by the parties to that agreement based on their experience with complex construction projects like the Haight Street Project, and established the parties' agreement as to how to meet these challenges. This included, notably, the parties' agreement to an "Issue Resolution Ladder," which established the parties' agreed-upon process for dispute resolution. The Issue Resolution Ladder was comprised of a five-level structure, pursuant to which disputes between the parties would be addressed at gradually-elevated levels, beginning

13

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 17 of 253

with on-site City and contractor personnel and, failing resolution, submission to higher authority levels, culminating with a dispute resolution process involving Mike Ghilotti of Ghilotti Bros., Javad Mirsaidi, and John Thomas, the then-deputy City Engineer.

62. GBI and Synergy began work on the Haight Street Project in April 2015, starting with the main sewer trunk (receiving flow from many tributaries) on Haight Street from Masonic to Buchanan Streets. Synergy then continued to install a water line on Haight Street at Asbury.

63. The Haight Street Project was a particularly difficult one, due to many unknown subsurface structures not disclosed to Synergy in the plans provided to it by the City, which grossly understated the number of underground utilities present in the project area. Throughout its excavation work, Synergy encountered 798 underground utilities. Of those, the project plans had only identified 357. More than 400 of the underground utilities were unknown to Synergy and therefore unanticipated. Further, as excavation proceeded, Synergy found, and notified the City of, unknown voids, gaps, and sinkholes existing under the street and under buried concrete, such that as Synergy performed excavation, existing underground concrete structures unexpectedly collapsed into voids beyond the work which could not be seen from the work face of the trench.

64. Even as to the underground facilities that the utility companies *had* identified, many did not comply with industry standards for placement, and critical information about those utilities was incorrect. As a result, Synergy encountered additional unprecedented obstacles.

65. Of the almost 800 underground utilities ultimately revealed within the project area, Synergy damaged five PG&E gas lines during the course of the project when it encountered underground utilities which the City had not marked in its plans, or which it had erroneously identified.

66. Synergy was informed and believes that DPW initially agreed that poor mapping for the project area was responsible for the struck gas mains.

67. The damaged gas lines drew significant public attention and criticism from neighborhood residents and businesses disrupted by the corrective measures necessitated by the damaged gas lines.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 18 of 253

68. The gas line problems represented precisely the kind of issue the Partnering Agreement anticipated, and for which the Agreement's Issue Resolution Ladder provisions were designed. But the City did not comply with the process established in the Issue Resolution Ladder, or employ any other reasonable or fair analysis or process, before assigning blame to Synergy and taking summary action against it.

69. Instead, the City purported to conclude, immediately and summarily, that Synergy was to blame for the leaks, even though officials knew that the City (1) lacked a sufficient basis to reach this conclusion, (2) had not in fact reached this conclusion, and (3) had not taken reasonable or prudent steps to determine whether Synergy was at fault.

70. On or about October 7, 2015, the City suspended work on the Haight Street Project.

71. On October 8, 2015, purportedly as a result of the gas line accidents, DPW Director Nuru wrote a letter to GBI instructing all work on the project to stop and further stating: "You are hereby directed . . . to remove [Synergy] immediately."

72. In support of its October 8, 2016 order to GBI to "terminate" Synergy, the City erroneously and unlawfully cited California Public Contract Code Sections 4100, *et seq*., and a clause in Synergy's contract with GBI.

73. GBI objected to the substitution but began soliciting proposals from other qualified bidders because it needed a subcontractor to finish the project.

74. On October 14, 2015, GBI informed Synergy that the City had "directed Ghilotti to remove Synergy and to substitute a replacement contractor." The letter cited Section 4107(a)(7) as support for the City's action.

75. Synergy submitted a formal objection to the removal five days later.

76. On October 26, 2015, Department of Public Works spokeswoman Rachel Gordon admitted that "[The City doesn't] know what caused the breaks at this point. . . [t]here is **still an investigation going on.**" But Ms. Gordon's admission came two weeks after the City summarily ordered Synergy's termination.

77. The City responded approximately one month later on November 16, 2015, reiterating its reliance on Section 4107(a)(7) for its removal of Synergy.

15

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 19 of 253

78. On December 9, 2015, Synergy and the City participated in an administrative hearing before a City-appointed hearing officer, who was an employee of the City.

79. The City undertook to prove at the hearing that it had the right to remove Synergy from the Haight Street Project without the consent or request of the prime contractor, GBI.

80. GBI testified at the hearing on behalf of Synergy and in opposition to the City's actions. Specifically, GBI President Michael Ghilotti testified that:

- GBI objected to Synergy's substitution, because the substitution was not based on unsatisfactory performance by Synergy;

- Synergy installed the work in accordance with plans and specifications and the GBI-Synergy Subcontract, and that rather than delay the project, Synergy was ahead of schedule;

- A replacement subcontractor would experience the same problems Synergy experienced on the project, because there was no effort to meet as a project team to discuss the root cause;

- The root cause was a "yoke" in the streets where the construction was being conducted, which caused PG&E to install substandard gas lines that were irregular and unmarked, and in ways that the next contractor would encounter the same problems which Synergy had experienced;

- Synergy had not been provided a proper design that showed the true conditions on the street, a problem the next subcontractor would also encounter; and

- The problems encountered on the Haight Street Project were primarily caused by PG&E, which had mismarked gas lines and utilities, as confirmed by a study conducted by UCON, as association of general engineering contractors.

81. On January 8, 2015, the hearing officer issued a Statement of Findings, which rejected Synergy's arguments about the propriety and legality of the City's use of Section 4107(a)(7) to hold the hearing, and instead adopted the City's theory that it could use the section to unilaterally remove Synergy as a subcontractor on the project, without the prime contractor requesting that Synergy be removed.

82. On or around January 29, 2016, GBI proposed other subcontractors to replace Synergy. On or about February 1, 2016, the DPW approved GBI's replacement of Synergy with the new subcontractors.

83. Synergy is informed and believes, and on that basis alleges, that on a date in 2016 after

16

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 20 of 253

February 1, 2016, a subcontractor began performing work assigned to Synergy under its subcontract with GBI.

84. Prior to its termination, Synergy performed work for which GBI had not, and still has not, paid Synergy. GBI was obligated under its Subcontract with Synergy and California law to pay Synergy for this work, which GBI certified before submitting to the City for payment.

85. In or about December 2018, GBI reached a final settlement with the City which provided payment to GBI but failed to provide payment to Synergy for work Synergy performed and which GBI certified was performed in compliance with project specifications and requirements. In that final settlement, GBI received $20,121074.23, which represented more than 46% more than the original contract.

86. On information and belief, GBI and the City thereafter undertook to manipulate and mischaracterize the Haight Street Project plans and records so as to allow GBI to reverse course, so that GBI could receive payment for Synergy's work, and the City could avoid paying Synergy for its work.

87. This effort to manipulate and mischaracterize the Haight Street Project plans and records necessarily required the agreement and participation of DPW Director Mohammed Nuru, who exercised complete, personal and unreviewed control over DPW decisions, and SFPUc Director Harlan Kelly, whose agency was also significantly responsible for the Haight Street Project.

88. This agreement enabled GBI to accept a lower amount than GBI demanded for GBI from the City in settlement, while recouping the losses by receiving compensation for work Synergy performed.

89. Synergy is informed and believes, and on that basis alleges, that GBI received payment from the City for work done by Synergy, but GBI did not turnover payment for that work to Synergy. Further, Synergy is informed and believes, and on that basis alleges, that GBI concealed its receipt of payment for work done by Synergy within GBI's records.

90. The City's unlawful acts against Synergy were not limited to the above-described unlawful proceedings. City officials concurrently embarked on a campaign to publicly and

erroneously depict Synergy as a bad contractor, and to constructively debar Synergy from participation in City projects. Separately, the City took arbitrary and capricious steps to block Synergy's participation in City projects and to remove Synergy from projects for which Synergy had already committed substantial and critical resources, and for which Synergy was not only qualified, but also the most cost-effective bidder by any reasonable measure.

91.    The City's public campaign against Synergy took the form of express retaliation against the company for exercising its constitutional right to access to the courts and for participating in California's competitive bidding process, by submitting successful bids on City contracts. City officials used bids Synergy submitted to win City contracts and the lawsuits *successfully* brought by Synergy against the City concerning City contracting projects as evidence that Synergy should be prevented from participating in future City projects.

92.    On or about October 10, 2015, then Supervisor London Breed, whose district encompassed the Haight Street Project, publicly denounced Synergy and announced the City's intent to use Synergy as a scapegoat for problems with the Haight Street Project in retaliation against Synergy for its exercise of its constitutional right to petition the courts for redress of grievances. In a public speech given before representatives of several City neighborhood associations on Haight Street and broadcast by local television, Breed (1) flatly, erroneously and without basis blamed Synergy for cutting corners in its performance of the Haight Street Project because it submitted the winning bid for the contract; (2) cited Synergy's successful lawsuits against the City as proof of Synergy's incompetence; (3) signaled the City's intent to "hold [Synergy] accountable;" (4) blamed Synergy for undisclosed sinkholes that were preexisting and/or outside of Synergy's work area; and (5) acknowledged that she had asked DPW Director Nuru, to terminate Synergy:

> When it was London Breed's turn, she emphasized that Synergy, the subcontractor for the job, bid $1 million lower than its next competitor. By bidding low, the company cut corners, and the job doesn't get done properly. **"Not only is low-bid** a real problem, but the fact that this same contractor just settled three **lawsuits with the city and county of San Francisco but still continues to get contracts with the city and county of San Francisco is insane."**

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 22 of 253

She added, "We have to hold contractors who are incompetent and can't do quality work for the city and county of San Francisco accountable." She confirmed that she reached out to Mohammed Nuru and specifically asked that the subcontractor, Synergy, be taken off the job.

93.　Synergy therefore is informed and believes, and on that basis alleges, that Nuru, acting at the behest of Breed and on behalf of the City, unlawfully and improperly interfered in Synergy's subcontract with GBI on the Haight Street Project and thereby unlawfully terminated Synergy from that project.

94.　Breed was aware of Synergy's successful lawsuits against and settlements with the City based on past nonpayment for work completed by Synergy, not least because as a member of the City's Board of Supervisors, Breed voted to approve them.

95.　Breed had no basis for her assertion that Synergy had cut corners by submitting the lowest responsible bid. Breed knew, or should have known, that this assertion was false.

96.　Breed also knew, or should have known, that her attack on Synergy implicated matters of public interest. California's competitive bidding rules are an essential component of the state's public contract process. The purpose of requiring governmental entities to open the contracts process to public bidding is to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition. (See Cal Pub. Contract Code, §§ 20100 *et seq*.; *Miller v. McKinnon* 20 Cal.2d 83, 88 (1942).) The requirement that municipal contracts be awarded to the lowest responsible bidder is an essential component of the state's public contract process, which the California Legislature has recognized is a matter of significant public interest.

97.　At **the same event**, Breed admitted that the City had not conducted any hearings to justify its conclusion that Synergy was at fault, or provided Synergy any meaningful opportunity to confront any such conclusion:

A question was asked about the incorrect maps supplied to Synergy by PG&E, and Breed explained that even though faulty maps might have been blamed for the first gas leak, that's not a good enough excuse for the subsequent ones. "This impacts public safety ... We need to understand whether we have qualified people to do this job," said Breed. She explained that **she would be holding a hearing within the next few weeks to determine whether Synergy is at fault**, or if there is more

19

Case: 19-30088　Doc# 14006　Filed: 09/05/23　Entered: 09/05/23 16:13:15　Page 23 of 253

blame to go around.

98.  Breed again cited Synergy's prior litigation against the City at a public hearing called by Breed and other City Supervisors, at which Breed repeated her denunciation.

99.  At the same time, Breed was working behind the scenes to generate smears against Synergy through the media. For example, on October 9, 2019, Breed's assistant, Conor Johnston, contacted Nuala Sawyer, of the online magazine Hoodline, stating:

> Pres Breed would like to speak with a Hoodline reporter re the gas main
> contractor I realized we don't have a phone number for you though What's
> the best #?

100.  Breed, who was then contemplating mounting a campaign for mayor, sought to use Synergy as a scapegoat in order to ensure that blame for the Haight Street gas leaks did not fall on her as Supervisor, and to promote herself as an effective, "take-action" official.

101.  Breed had a willing ally in this effort in Mohammed Nuru, her long-time friend, former boyfriend, and co-member of the "City Family."

102.  Breed, Nuru and other City Family members considered Synergy not to be a "friend" of the City Family. Unlike PG&E and GBI, Synergy did not have close ties to Breed and Nuru, and had not contributed to the "friends of" organizations that Nuru and other City Family members used to launder bribe/kickback/shakedown payments, or to City Family members' election and re-election campaigns. Scapegoating Synergy served the purposes of shielding Breed from criticism that could adversely affect her political ambitions, and of signaling to businesses hoping to do business with the City that failing to support the City Family, i.e. by suing the City and/or failing to pay bribes/kickbacks/shakedowns to City Family members, would be punished severely.

103.  Synergy is informed and believes, and thereon alleges, that: in order to conceal their agreement to scapegoat Synergy in order to aid Breed's political ambitions and the City Family's unlawful activities, Breed, Nuru and other officials communicated their agreement and efforts in furtherance of this agreement covertly, via telephonic text messages and private email accounts, rather than their official San Francisco government email accounts. By using these non-official,

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 24
of 253

"off the books" means of communications, Breed, Nuru and other officials knew and intended that such communications would escape detection and preservation required by law. Breed, Nuru and other officials subsequently deleted, destroyed, and failed to preserve these communications.

104. Communications by government officials about public officials are public records, which Breed, Nuru and other officials were required to disclose and preserve under the California Public Records Act, Government Code § 6250 *et seq.*, and San Francisco Administrative Code, S.F. Admin. Code § 8.1 *et seq.*, and the rules of the San Francisco Ethics Commission, Rules 3.200, *et seq.*

105. Pursuant to these rules, government officials are prohibited from using electronic mail systems as a repository for public records. Instead, electronic mail that qualifies as a public record must be removed from an employee's electronic mail system and placed in a paper or electronic file where it is properly labeled and easily accessible for future public records searches. Pursuant to these rules, public employee and official communications regarding public business must be preserved for a number of years, and in any case for a minimum of two years.

106. Synergy is informed and believes, and thereon alleges, that City Family members have nevertheless persistently disregarded these rules, using "off the books" communications as a principle tool to negotiate, arrange and implement schemes to defraud.

107. The City, by and through other officials, knew of Breed's, Nuru's, and other City Family members' use of "off the books" communications to flout California and San Francisco laws governing governmental conduct and public records, but responded with deliberate indifference and refusal to enforce California open government and public record laws and regulations. By so doing, the City ratified City Family members' use of covert means to conceal their efforts to further the City Family's unlawful activities, and to scapegoat Synergy.

108. Synergy is informed and believes, and thereon alleges, that some of the gas leaks for which City officials publicly faulted Synergy were caused by inaccurate and faulty identification of utility lines, and below-surface land gaps commonly called "voids," which were caused by old and broken utility work and which pre-existed Synergy's work. These voids were unforeseen, were not disclosed by the City (which had a duty to provide Synergy with accurate maps) and

21

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 25 of 253

made construction substantially more difficult and unpredictable. One of the gas breaks was caused because of a void. Synergy was directed to safely fill up the voids and was paid for this work.

109. While blaming Synergy for the gas line problems may have succeeded in shifting public perception regarding responsibility for the gas line leaks, this did nothing to solve the underlying problems of inaccurate maps and unknown subsurface voids which remained after Synergy's termination, or resulting gas line breaks, which also continued.

110. In June 2016, the contractor that replaced Synergy hit a gas line in the area of Haight and Steiner Streets. In July 2017, a construction crew hit a gas line at the intersection of Peirce and Page Streets, forcing an order to residents to "shelter in place."

111. The City later determined that the Project, as originally designed, could not be performed, that work on major portions of the Contract (8" and 24" water lines) have been abandoned, and that the entire project was consequently redesigned.

112. On January 5, 2017, Synergy submitted a claim to the City of San Francisco in compliance with the Tort Claims Act (Govt. Code §§ 905 et seq.) regarding the foregoing. On January 10, 2017, the City denied that claim.

**The Van Ness Street Project**

113. The City's retaliation against Synergy did not end with the Haight Street Project. Instead, the City continued to use false and pretextual grounds to constructively debar Synergy from participating in any City project. Synergy's status as a subcontractor, however, required the City to employ protean, contract-specific (but equally bogus) means to bar Synergy.

114. On or about May 2016, general contractor Walsh Construction Company II, LLC ("Walsh") selected Synergy as a Small Business Enterprise ("SBE") to participate as a subcontractor in the Core Work on the San Francisco Municipal Transportation Agency ("SFMTA") Van Ness Corridor Improvement Project (the "Van Ness Project")—an extensive renovation project for a major San Francisco north/south arterial commissioned by SFMTA in conjunction with SFPUC. Synergy's participation in the Van Ness Project (City Contract No. 1289), included sewer/water replacement Core Work.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 26 of 253

115. Walsh is a limited liability corporation based in Chicago Illinois. On information and belief, at all times relevant, Walsh's Northern California operations, including the Van Ness Street Project, were overseen by Walsh Vice President J. William Heathcott, also based in Chicago.

116. Synergy's work was defined as "core subcontracting work" in the agreement between Walsh and the SFMTA, which was the general contract for which Synergy was selected as Walsh's subcontractor (the "Walsh/SFMTA Agreement"). Pursuant to the Walsh/SFMTA Agreement, the replacement of sewer and water lines under Van Ness Avenue was to be performed by a subcontractor pre-selected by Walsh. Synergy was that pre-selected subcontractor. Two individuals from Synergy were identified in the Walsh/SFMTA Agreement as "Key Personnel" on the Van Ness Project.

117. The SFMTA expressly acknowledged Synergy's expertise in the Walsh/SFMTA Agreement, which the SFMTA determined was critical to its selection of Walsh as the general contractor for the Van Ness Project. The Walsh/SFMTA Agreement states, at section 4.5.4, that "Contractor acknowledges that the SFMTA's selection of Contractor [Walsh] was based, in part, on the expertise and experience of Contractor's proposed Key Personnel as submitted in the proposal. The Contractor acknowledges and agrees that the replacement of Key Personnel during the course of the Project would be extremely disruptive and damaging to the City. . ."

118. For Synergy, participation in the Van Ness Project Core Work represented a substantial commitment and extensive advance planning. Walsh asked, and Synergy agreed, to be a subcontractor for the Core Work on the Van Ness Street Project in late 2015; Synergy spent approximately 10 months supporting Walsh in the development of project scope and parameters, culminating in a Walsh-Synergy subcontract agreement in May 2016, which enabled Walsh to list Synergy as a Core Work subcontractor in its proposal. In order to ensure Synergy's ability to timely perform this commitment, Synergy was required set aside substantial resources and remove major equipment and employees from availability for other projects and opportunities for over 10 months.

119. Synergy's position as a major subcontractor on the Van Ness project presented a

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 27 of 253

problem for Breed. The Van Ness project was a huge project, that would occupy significant portions of a major City thoroughfare for years. Synergy, as a major subcontractor on the project, would be highly visible to the public as a part of its participation. Breed, then planning a run for re-election for supervisor (and anticipating a future bid for mayor of the city), could not afford to allow Synergy, a company she had denounced as an irresponsible bidder who should not receive City contracts, so visible a position on a major City contract. In May of 2016, Breed was already receiving inquiries from the press asking her to explain why Synergy was being hired to work on the Van Ness project. Thus, for example, But on May 11, 2016, Vallie Brown, assistant to London Breed, received an inquiry from Ted Goldberg, of KQED, the local public radio station, as follows:

> [Vallie:] Hope you're well. Not sure if you remember but you and I were in touch a few months about the Haight Street public works project and the problems associated with Synergy Project Management. The Chronicle – in their preview piece today on a hearing that looks into how the City rewards contracts – reports that Synergy was also hired to do work on the upcoming Van Ness Rapid Transit Project. Is this true? Ted.

120. KQED's inquiry illustrates the problem Synergy's Van Ness Project subcontract presented in May 2016 for London Breed, who would face San Francisco voters in her re-election bid that fall. If Synergy was a dangerous subcontractor who "cut corners" to receive City contracts, as Breed asserted, why was Synergy poised to take over major work on the City's then biggest construction project?

121. Days later, other members of the "City Family" stepped in to resolve this predicament by causing Synergy's removal. "Family members" Mohammed Nuru and Harlan Kelly also sought to profit personally from Synergy's removal by adding the work assigned to Synergy on the Van Ness Project as assets in a long-running bribery scheme revealed by the FBI in 2020.

122. The DPW is charged with design, construction, cleanliness, and improvement of the City's infrastructure, public rights of way, and facilities, among other responsibilities. In 2011, then-mayor Ed Lee appointed Mohammed Nuru as head of DPW. City Attorney Dennis Herrera, who was at the time campaigning for mayor in the forthcoming election, responded that Nuru's appointment was the result of "cronyism, politics and poor judgment," and charged that Nuru had

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 28 of 253

participated in "misappropriating public funds for personal uses; retaliatory threats against whistleblowers; and directing city contractors to engage in illegal political activities while they were being paid with public funds." Herrera's concern would prove prescient.

123. Simultaneous with Nuru's appointment, Lee granted Nuru extraordinary authority over major City construction contracts. Lee designated Nuru (as DPW director) to act on the Mayor's behalf in the award of various aspects of the contracting process, including to award all public work, professional service, and construction contracts in excess of a designated threshold, which is currently set at $706, 000. This designation effectively made Nuru a "policymaker" for City construction projects. By virtue of his position as DPW director, combined with his status as "policymaker," Nuru's influence extended to all construction projects undertaken by the City, not just those directly awarded by DPW, including the Van Ness Project, which was not directly under DPW auspices.

124. Unlike the DPW, the SFPUC was directly involved in the Van Ness Project, and the work Synergy was to perform on the project in particular.

125. In May of 2016, SFMTA and Walsh were in the process of negotiating the Guaranteed Maximum Price (GMP) for sewer, water and AWSS work on the Van Ness Project. "AWSS" is an SFPUC term that means Auxiliary Water Supply System, a system providing water for firefighting capabilities especially critical for earthquake areas like San Francisco. While SFMTA was the lead San Francisco agency for the Van Ness Project, the sewer, water, and AWSS work fell under the jurisdiction and was paid for by the SFPUC. The SFPUC alleged that its in-house estimate of the cost of the work was approximately $18, when in truth its consultant's expert's (HNTB's) estimate was much higher. Synergy bid the sewer, water, and AWSS subcontract work at approximately $19 million to be included in the GMP.

126. SFPUC General Manager Harlan Kelly directly ordered Synergy's removal from the Van Ness Street Project. Kelly ordered SFPUC personnel to instruct Walsh to replace Synergy on the grounds that Synergy's price greatly exceeded the SFPUC's estimate for Synergy's work on the Van Ness Project.

127. In June 1, 2016 the City, acting with and through the SFMTA, wrote to Walsh, and

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 29 of 253

alleged that "[the SFPUC was] not agreeable with the price submitted by your Core
Subcontractor, Synergy." The SFMTA further stated that it had determined to remove the work
Synergy was to perform as an item of Core Work under the Walsh contract with the City on the
Van Ness Project, and bid out the work as a Non-Core Subcontract Trade Package.

128. This claim was false: the SFPUC had not determined that Synergy's bid was too high.
In fact, Synergy's bid price was lower than Walsh's internal estimate—**and also the estimate of
the City's own consultant, HTNB.** Instead, the City, SFMTA, and the SFPUC had determined
to exclude Synergy from the Van Ness Project and falsely claimed that Synergy's bid was too
high as a pretext to force Synergy's removal from that project.

129. The City, SFMTA, and the SFPUC had unique and exclusive knowledge of the San
Francisco construction bid market environment, including the number of utility projects being
put out by all San Francisco entities (SFMTA, DPW, and SFPUC). As a result of this knowledge,
Defendants and City officials knew that Synergy's bid for the Van Ness Project was not "too
high," but concealed this knowledge in order to perpetuate the City's pretextual grounds for
removing Synergy.

130. On June 3, 2016 Walsh removed Synergy as a Subcontractor on the Van Ness Project.

131. At the City's direction, Walsh later invited bids for the sewer/water main replacement
work Synergy had been assigned as Core Work, which the City re-designated as Non-Core work.
Designating the work as Non-Core work enabled the City to market the work to a larger pool of
contractors. The City knew that because of the harm the City had caused to Synergy's bond
capacity, Synergy would not be able to bid on the work as so re-designated. After aggressive
marketing of the now-Non-Core work by the City **only one bid** was received. That single bid
was $39,559, 963, **more than twice Synergy's price, and did not include the AWSS work
that was included in Synergy's original estimate**. Ultimately, Defendants' removal of Synergy
caused the City to incur additional expenses that amounted to millions more for the same scope
of work. In 2021, a San Francisco Civil Jury concluded that these actions cost the City $10
millio.

132. In 2021, that San Francisco Grand Jury issued a report titled "Van Ness Avenue -What

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 30
of 253

Lies Beneath", regarding the Van Ness Street Project. In that report, the Grand Jury noted that the City's claim that Synergy's bid was too high "backfired," because it resulted in a rebid that resulted in only one proposal, by Ranger Pipelines, for $30 million, ten million dollars more than Synergy's bid.

133. Worse, Ranger Pipeline's $30 million bid covered only a portion of the scope of work Synergy agreed to perform for $20 million.

134. On information and belief, Synergy alleges that the remainder of the work included in Synergy's original scope of work was assigned to other contractors yet to be identified.

135. In its report, the Grand Jury found that "Synergy became ineligible to rebid due to its inability to obtain sufficient bonding. Walsh covered the bonding in the initial bid but not in the rebid."

136. Breed, Nuru, and Kelly, who had prior knowledge of Synergy's inability to obtain independent bonding, knew that by redesignating Synergy's work as "non-Core" work it could render Synergy unable to bid on the project when it was re-bid.

137. Adding or increasing bonding requirements is a tactic the City and City Family members have repeatedly used to prevent disfavored businesses from participating in City projects.

138. Removing Synergy from the Van Ness Project furthered the City Family scheme, by (1) protecting Breed's political ambitions, (2) freeing up work which City Family members could dole out to different "friendly" contractors, and (3) further alerting companies seeking to do business with the City of the long-term consequences of crossing City Family members.

139. On information and belief, Breed, Nuru ,and Kelly concealed their efforts to remove Synergy by using private emails and text messages to covertly communicate regarding Synergy's removal, and by failing to preserve these communications, and by destroying evidence of these communications.

140. The City ratified these efforts by refusing to enforce California and San Francisco laws governing public records, despite knowledge of City Family members' violation of these laws. The officials charged with enforcing these rules, including the City Controller and the City

Attorney's Office, have declined to enforce these rules or to take reasonable steps to ensure that public records are disclosed and preserved. The City thus has adopted a de facto policy of permitting, encouraging, and defending City Family members' concealment and destruction of records.

141. Over the course of 2020 and 2021, the FBI and the United States Attorney's Office issued criminal charges and obtained guilty pleas revealing long-running bribery schemes in which City officials would accept bribes from private individuals in exchange for official acts benefitting these individuals, thereby defrauding the public of its right to honest services. These charges and related disclosures demonstrate that the Mohammed Nuru and Harlan Kelly, as members of the "City Family," participated in an association-in-fact enterprise affecting interstate commerce, and conspired to participate in the conduct of the affairs of the enterprise by agreeing that they and other co-conspirators would commit a pattern of racketeering activity.

142. In January 2020, Mohammed Nuru was charged with honest services wire fraud in a federal criminal complaint (the "Nuru Complaint"). The Nuru Complaint revealed an elaborate kickback scheme through which Nuru accepted money and services from Azul Works principal, Balmore Hernandez, in exchange for Nuru's efforts to funnel contracts to Azul Works. The Nuru Complaint, together with the November 30, 2020 Complaint against SFPUC Director Harlan Kelly, disclose a pattern of racketeering in violation of subdivisions (c) and (d) of 18 U.S.C. §§ 1962.

143. The SFPUC's head at the time, General Manager Harlan Kelly, was an integral member of the "City Family." Later, in November 2020, the US Attorney's Office charged Kelly with participating in a scheme with Nuru to defraud the City by awarding public contracts based on official acts and influence exercised by Nuru and Kelly in exchange for free or subsidized travel and covered expenses, and other bribes. Nuru himself had already been charged, in February 2020, with accepting bribes and kickbacks from Balmore Hernandez, the head of a company called Azul Works, Inc., in exchange for Nuru's exercise of his power and influence as a City official, in order to benefit Azul Works in its efforts to obtain City contracts. The federal charges against Nuru disclose how, over the course of over a decade, Nuru and Kelly engaged in scheme

28

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 32 of 253

to enrich themselves through bribes and kickbacks. Nuru and Kelly shared practices and information regarding bribes and kickbacks, and facilitated each other's receipt of bribes and kickbacks. For example, the federal Kelly and Nuru criminal complaints reveal that they both accepted bribes in the form of paid travel expenses from the same individual, permit expediter Walter Wong. Both Kelly and Nuru provided Wong with internal documents and confidential information in order to give Wong an unfair advantage.

144. In at least one case, in 2016, Nuru instructed Wong to abandon efforts to win an LED lights contract with SFPUC, because someone else had already bribed Kelly with a much larger sum, and Wong was not going to win the Request for Proposals ("RFP"). This incident shows how Kelly and Nuru monitored, coordinated, and reached agreement to facilitate each other's respective bribe/kickback-taking activities. It is also an anecdotal example of the corrupt atmosphere that businesses competing for contracts in the City have been forced to accept: despite the rules California has enacted to ensure competitive bidding for public contracts, in San Francisco, the process is frequently rigged, and for those who did not participate in Kelly's, Nuru's, and other "City Family" members' corrupt schemes, bidding on public contracts is a futile endeavor.

145. The Nuru Complaint also details Breed's admission to accepting the $5,600 "car repair loan" from Nuru.

146. In June 2020, Walter Wong pled guilty, *inter alia*, to committing, as a part of the scheme, a RICO "predicate act," namely Conspiracy to Commit Honest Services Fraud in violation of 18 U.S.C. §§ 1343 and 1346, by conspiring with Nuru and other public officials. In his partially sealed plea agreement, Wong admits:

> The elements of conspiracy to engage in honest services wire fraud in violation of U.S.C. § 1349 (Count One) are: (1) I agreed with one or more people to engage in a scheme or plan to deprive the people of San Francisco of the honest services of San Francisco public officials, including Mohammed NURU and other public officials; and (2) I joined in that agreement knowing of at least one of its objects and intending to help achieve it. The elements of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, are as follows: (1) I knowingly devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery or kickbacks in breach of the

29

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 33 of 253

official's fiduciary duty; (2) I did so knowingly and with an intent to defraud, that is, the intent to deceive or cheat the public of honest services; (3) The scheme or artifice to defraud involved a deception, misrepresentation, false statement, false pretense, or concealment that was material; and (4) I used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

147. The Kelly and Nuru federal complaints detail multiple instances of wire fraud committed by these former officials in the Northern District of California and elsewhere, for the purpose of executing their schemes and ruse to defraud City taxpayers and attempting to do so, as well as how these acts form part of a greater pattern of racketeering, and how Kelly, Nuru, and other co-conspirators would commit a pattern of racketeering.

148. The Nuru Complaint details how he engaged in schemes involving City contracts related to the San Francisco Airport, the Transbay Transit Center, and other contracts. These schemes, and the schemes identified in the Kelly complaint, share the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics.

149. The Nuru complaint also identifies acts committed in furtherance of Nuru and Kelly's schemes to defraud the taxpayer that constitute "predicate acts" within the meaning of RICO =. One of the principal individuals involved in Nuru's scheme is James Bovis, who sought Nuru's aid in securing a lease for a restaurant at the San Francisco Airport. The purposes of the scheme were to get Nuru to persuade an airport commissioner (identified in the Complaint as "AIRPORT COMMISSIONER 1") to select Bovis' restaurant for the lease, and to have that airport commissioner persuade two other members of the five-member commission to do the same. Nuru directed Bovis to provide AIRPORT COMMISSIONER 1 with $5,000 and a free trip in exchange. The Nuru complaint states:

> On about March 22, 2018, in the Northern District of California did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically, a recorded telephone conversation that was transmitted in interstate commerce between a source confidential to the Federal Bureau of Investigation and Bovis – a contractor a San Francisco Airport contract in exchange for bribes, in violation of Title

30

CASE No. CGC-17-560034

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 34 of 253

official's fiduciary duty; (2) I did so knowingly and with an intent to defraud, that is, the intent to deceive or cheat the public of honest services; (3) The scheme or artifice to defraud involved a deception, misrepresentation, false statement, false pretense, or concealment that was material; and (4) I used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

147. The Kelly and Nuru federal complaints detail multiple instances of wire fraud committed by these former officials in the Northern District of California and elsewhere, for the purpose of executing their schemes and ruse to defraud City taxpayers and attempting to do so, as well as how these acts form part of a greater pattern of racketeering, and how Kelly, Nuru, and other co-conspirators would commit a pattern of racketeering.

148. The Nuru Complaint details how he engaged in schemes involving City contracts related to the San Francisco Airport, the Transbay Transit Center, and other contracts. These schemes, and the schemes identified in the Kelly complaint, share the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics.

149. The Nuru complaint also identifies acts committed in furtherance of Nuru and Kelly's schemes to defraud the taxpayer that constitute "predicate acts" within the meaning of RICO =. One of the principal individuals involved in Nuru's scheme is James Bovis, who sought Nuru's aid in securing a lease for a restaurant at the San Francisco Airport. The purposes of the scheme were to get Nuru to persuade an airport commissioner (identified in the Complaint as "AIRPORT COMMISSIONER 1") to select Bovis' restaurant for the lease, and to have that airport commissioner persuade two other members of the five-member commission to do the same. Nuru directed Bovis to provide AIRPORT COMMISSIONER 1 with $5,000 and a free trip in exchange. The Nuru complaint states:

> On about March 22, 2018, in the Northern District of California did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically, a recorded telephone conversation that was transmitted in interstate commerce between a source confidential to the Federal Bureau of Investigation and Bovis – a contractor a San Francisco Airport contract in exchange for bribes, in violation of Title

30

18, United States Code, Sections 3 and 1346.

150. During this conversation, Bovis and the confidential source discussed Bovis' planned meeting with AIRPORT COMMISSIONER 1 during the trip Bovis had paid for, AIRPORT COMMISSIONER 1's expectations, and Bovis' belief that AIRPORT COMMISSIONER 1 might help him on other projects. ' next call was to Nuru, a few hours later.

151. Nuru and Kelly used Synergy's removal from the Van Ness Project as a "two-fer": Synergy's termination from the Van Ness Project would (1) remove the potential negative publicity Breed might have suffered based on Synergy's continued participation in highly-visible public contracts, and (2) open up lucrative City work that Kelly and Nuru could dole out to other subcontractors, such as Azul Works, whom Nuru and Kelly would solicit bribes or kickbacks from, or subject to their shakedown efforts.

152. The Nuru complaint also details how as a part of the scheme, Nuru took bribes from "CONTRACTOR 1" in exchange, *inter alia*, for Nuru's illicit assistance with the Van Ness Project. Synergy is informed and believe, and on that basis alleges, that CONTRACTOR 1 is Balmore Hernandez, CEO of Azul Works, Inc., which received a contract for sidewalk paving work under Van Ness Avenue Project, where Synergy's work on the Van Ness Project included sidewalk paving prior to Synergy's termination.

153. The Nuru and Kelly complaint explain how Nuru leveraged his position as director of DPW to influence not only DPW, but other city agencies and officials. The Kelly complaint explains how Kelly and Nuru knew of and facilitated each other's acts in furtherance of the scheme, including the award of SFPUC contracts. The Nuru and Kelly Complaints also explain how Nuru used his influence to assist Azul Works in winning its contract to perform work previously assigned to Synergy on the Van Ness project and/or to free up the work assigned to Synergy on the Van Ness Contract for use in Nuru and Kelly's bribe/kickback/shakedown scheme.

154. Nuru and Kelly intended and caused their communications, including to Walsh, (1) falsely asserting that Synergy's bid for the Van Ness Project was too high, and (2) awarding some of Synergy's work on the Van Ness Street Project to other contractors to be communicated

31

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 35 of 253

to Walsh Construction in Chicago.

155. In July 2020, the City Attorney of San Francisco moved to debar Azul Works from bidding on City contracts. The City Attorney stated that "[t]he people of San Francisco deserve clean contracting and a level playing field now. Contractors that cheat the system and break the law have no place doing business in San Francisco." The uneven playing field the City Attorney decried in its statement is in significant part the project of the corrupt, crony-filled environment long tolerated in the City, an environment furthered by the inordinate power vested in government officials as a by-product of the City's chronic non-compliance with the Prompt Payment statutes and other statutory safeguards designed to stem government corruption and undue influence.

156. In its statement, the City Attorney acknowledged that Azul Works and Hernandez broke San Francisco law by giving thousands of dollars in unlawful gifts to Nuru, who not oversaw the awarding of contracts at Public Works, but also handled construction projects for other City departments, like the SFPUC, ultimately receiving more than $20 million from 16 direct contracts with San Francisco, and more as a subcontractor on City projects, including the paving work on Van Ness.

157. On September 24, 2020, the City Attorney's Public Integrity unit issued a Public Integrity Preliminary Assessment titled, "Gifts to Departments Through Non-City Organizations Lack Transparency and Create "Pay-to-Play" Risk." In this preliminary assessment, the City Attorney "summarizes gifts and support benefitting city departments from city contractors and building permit applicants and holders through **non-city organizations**, including ***Friends of organizations***, and focuses on San Francisco Parks Alliance (the Parks Alliance), a nonprofit organization." (Emphasis added.) The report found that Mohammed Nuru and others would direct staff to procure goods and services for staff appreciation, volunteer programs, merchandise, community support, and events from specific vendors, circumventing city purchasing controls. These purchases would then be reimbursed through Public Works subaccounts held by the Parks Alliance, a non-city organization, again outside of city purchasing rules. Mr. Nuru solicited funds for these purchases from interested parties, including businesses

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 36 of 253

that had contracts with the department or city building permits. The gifts, which were not accepted or disclosed by the City, create a perceived "pay-to-play" relationship.

158. Synergy was familiar with the abuses and risks created by the use by Nuru and others of non-profit organizations as vehicles to squeeze unethical contributions from companies doing business from the City. As a City contractor and subcontractor, Synergy was repeatedly pressured to donate to the San Francisco Park Alliance. Although Synergy did not do so, Synergy was aware, as virtually every company that does business with the City is aware, that failing to do so could put a company on the list of disfavored companies who were not "friends of the City Family," companies that could expect as a result to experience difficulty winning or obtaining payment on City contracts.

159. The City Attorney's report also contained an excerpt highlighting what it called the rotten "Tone at the top:"

> "Tone at the top" refers to the ethical atmosphere that is created in the workplace by the organization's leadership. Failure to maintain such a workplace culture can result in the pressure, rationalization, and ability to carry out ethical violations.

160. Synergy is informed and believes, and on that basis alleges, that Synergy was singled out for disfavorable treatment by Nuur, Kelly, and other officials and members of the City Family acting on behalf and the behest of the City, in part because Synergy had not paid kickbacks, bribes, or "donations" to City Family members directly or through their "friends of" organizations, and because doing so opened up contracts which Nuru, Kelly, and other City Family members could then dole out to "friendly" businesses. And, in part because of the "tone at the top" established by Breed, Nuru, Kelly and others, the City ratified these City Family decisions, and effectively blacklisted Synergy from receiving City contracts.

161. But while the City Attorney's report focused on the problem of unmonitored donations to non-profits and "friends of" organizations, it could as easily have been describing the "tone at the top" problem created by the City Family, which has resulted in an environment permeated by pressure, rationalization, and the ability to carry out virtually unfettered ethical and legal violations.

162. Breeed's attack on Synergy based on the 2015 Litigation illustrates how the "tone at the top" established in San Francisco government by the City Family permeates City attitudes and conduct particularly in the context of public contracting. While the notion of penalizing Synergy for engaging in litigation against the City might seem outlandish if endorsed by a government official elsewhere, in San Francisco, this is simply a feature of the generally accepted understanding that businesses that do business with the City must fall into one of two categories: those who are "friends" of the "City Family," and those who are not. "Friendly" companies do not sue the City to obtain payment on contracts. Friends pay bribes, kickbacks, and donations so that they do not need to do so.

163. On or about September 17, 2020, Azul Works' owner, Balmore Hernandez, pled guilty to one count of Conspiracy to Commit Honest Services Wire Fraud in violation of 18 U.S.C. §§1343, 1346 and 1349.

164. On or about November 30, 2020, Harlan Kelly was arrested by the FBI on charges arising out of the FBI's investigation of the Nuru kickback scheme. An affidavit filed by the United States Attorney's Office with the complaint against Kelly alleges that Kelly, together with Nuru, engaged in a kickback scheme from 2014-2019, in which Kelly accepted bribes in exchange for Kelly's assistance in awarding City contracts to businesses that paid the bribes.

165. Nuru and Kelly concealed their above-described schemes to defraud from the public and from Synergy, who did not, and could not, learn of the facts establishing their City Family scheme, including the RICO predicate acts detailed in the Nuru and Kelly complaints and the Hernandez and Wong pleas, until these documents were disclosed in 2020. As a consequence of Nuru and Kelly's acts of intentional concealment, the statutes of limitations for Synergy's claims arising out of Nuru and Kelly's acts is tolled.

166. Synergy suffered harm and damages from being unable to bid on the project on April 13, 2017 because the City had improperly directed Walsh to remove Synergy as a subcontractor from the Van Ness work. Further, when the City changed the sewer work from Core Work to Non-Core work, it effectively removed Synergy from the other work on the project.

167. On April 12, 2018, Synergy timely submitted a claim against the City of San Francisco

34

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 38 of 253

in compliance with the Tort Claims Act (Govt. Code §§ 905 et seq.) for the Van Ness Project. On May 15, 2018, the City denied that claim.

168.  On February 8, 2021, Synergy timely submitted a claim against the City of San Francisco in compliance with the Tort Claims Act (Govt. Code §§ 905 et seq.) based on Synergy's discovery of Nuru and Kelly's conspiracy to interfere with Synergy's participation in the Van Ness Street Project as revealed by the disclosures accompanying their federal prosecutions. The City has not responded to this claim.

169.  The City's interference with and termination of Synergy's participation in the Van Ness Street Project had a devastating effect on Synergy, a small business that had committed substantial resources to the project.

170.  As a result, Synergy has suffered at least all of the following damage:

    a.  Damage to Synergy's working capital through late payments thereby preventing Synergy from growing as Synergy did not have sufficient working capital to influence future projects and Synergy was losing money paying interest fees on funds borrowed to make up gaps created by the City's failure to pay funds due.

    b.  Damage to Synergy's contractual relationship with sureties, which provide bonds necessary to bid and perform work for public and private entities. Defendants' acts and omissions, as alleged above, have severely limited or eliminated Synergy's access to bonding capacity, which, in turn, has limited or prevented Synergy from bidding on new work as a general contractor.

    c.  Damage to Synergy's existing and prospective contractual relationship with general contractors and vendors. Based on Defendants' acts and omissions, as alleged above, Synergy's relationships with these entities has been interfered with, damaging Synergy's reputation with this parties, depriving Synergy of access to favorable contract terms, and causing parties with whom Synergy previously enjoyed long-term business relationships to refuse to include Synergy as a subcontractor in bids submitted for City projects, to perform work for Synergy or provide supplies.

    d.  Damage to Synergy's ability to obtain work from other entities.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 39 of 253

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Intentional Interference with Contractual Relations**
**Against Defendants CITY AND COUNTY OF SAN FRANCISCO and DOES 1-100**

155.  Plaintiff Synergy incorporates by reference each and every allegation in each preceding paragraph as if fully set forth here again.

156.  A valid contract existed between Synergy and GBI.

157.  The City had knowledge of the contract between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew a subcontract had been entered between GBI and Synergy.

158.  Consequently, the City also knew that Synergy had a right to perform the work on the Project.

159.  The City also knew that Synergy had a right to be compensated for work it performed under its subcontract for the Project.

160.  The City's actions as described above deprived Synergy of the right to perform the work under its contract with GBI.

161.  The City's actions above deprived Synergy of the right to be compensated for work it performed on the contract.

162.  The City, acting through Breed, Nuru, and other officials, acted against Synergy in order to further Breed's political interests, to further the City Family fraud scheme, and to punish Synergy for not participating as a "friend of" the City Family in the City Family bribe/kickback/shakedown scheme.

163.  The City further acted against Synergy by ratifying, and showing deliberate indifference to, acts by Breed, Nuru, and other City Family members to perpetuate the bribe/kickback/shakedown scheme, and to conceal, fail to disclose, fail to preserve, and destroy public communications regarding Synergy and the Haight Street project, including communications preceding Synergy's removal, communications regarding the City's knowledge of PG&E's faulty maps, communications regarding the unfeasibility of the Haight Street plan

36

1  design, and communications regarding efforts by Nuru and others to avoid paying Synergy for
2  work Synergy performed on the Haight Street Project.

3  164. Defendants' acts caused a breach or disruption in the contractual relationship between
4  Synergy and GBI because they deprived Synergy of the rights afforded to it in the contract
5  between Synergy and GBI, namely performing work on the Project and being compensated for
6  the work it performed.

7  165. Synergy was damaged by Defendants' acts because: (1) they caused Synergy to be
8  removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project
9  and be compensated for that work; (3) Synergy was left with unabsorbed overhead and
10  unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the contract
11  between Synergy and GBI, including the right to be compensated for work it had already
12  performed.

13  166. The City had knowledge of the agreement between Synergy and Walsh because, in the
14  proposal Walsh submitted to the City for the Van Ness Project, Walsh listed Synergy as a SBE
15  subcontractor to perform work on the Project. Therefore, the City knew an agreement had been
16  entered between Walsh and Synergy. Consequently, the City also knew that Synergy had a right
17  to perform the work on the Project unless Walsh removed Synergy or agreed to the re-
18  designation of the work Synergy from Core Work to Non-Core Work.

19  167. The City is not the agent of the general contractor in Synergy's subcontract for the Van
20  Ness Project; neither is the general contractor the City's agent in Synergy's subcontract for the
21  Van Ness Project.

22  168. The SFMTA's issuance of a letter directing the removal of the work Synergy was to
23  perform on the Van Ness Project as Core Work and re-designation of this work as Non-Core
24  Work was the official and final act that forced Synergy's removal from the Project. The issuance
25  was an intentional act to induce a breach or disruption in the agreement between Synergy and
26  Walsh.

27  169. The sole design and purpose of the City's issuance of the letter removing Synergy's
28  work as Core Work for the Van Ness Project was to disrupt the agreement between Synergy and

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 41 of 253

GBI by unilaterally removing Synergy from the Project and depriving Synergy of the right to perform the work under its agreement with Walsh.

170. The intent of the City, acting through Nuru, Kelly, and Breed in removing Synergy, was to further Breed's political interests, to further the City Family fraud scheme, and to punish Synergy for not participating as a "friend of" the City Family in the City Family bribe/kickback/shakedown scheme.

171. The City further acted against Synergy by ratifying, and showing deliberate indifference to, acts by Breed, Nuru and other City Family members to perpetrate and further the bribe/kickback/shakedown scheme, and to conceal, fail to disclose, fail to preserve, and destroy public communications regarding Synergy and the Van Ness Project, including communications, showing Breed, Nuru and Kelly's illicit interests in removing Synergy from the Van Ness Project, and revealing Breed, Nuru and Kelly's knowledge that Synergy's bid for the Van Ness Project was not "too high."

172. The issuance of the letter removing Synergy's work as Core Work for the Van Ness Project caused a breach or disruption in the contractual relationship between Synergy and Walsh because its issuance deprived Synergy of the rights afforded to it in the contract between Synergy and Walsh, namely performing work on the Project.

173. Synergy was damaged by the City's intentional act of issuing the letter removing Synergy's work as Core Work for the Van Ness Project because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to perform its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the agreement between Synergy and Walsh.

174. Defendants' interference was wrongful, not just because the City interfered with an existing economic relationship, but also because City officials' actions in causing the interference were committed in violation of California's Prompt Payment laws, California and San Francisco laws, regulations and ordinances governing official conduct, federal and state racketeering laws, and because the City Family's continuing acts of fraud impose immense costs

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 42 of 253

1    on the public.

2    175.  WHEREFORE, Synergy prays for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**Intentional Interference with Prospective Economic Advantage**
**Against Defendants CITY AND COUNTY OF SAN FRANCISCO, and DOES 1-100**

176.  Plaintiff Synergy incorporates by reference each and every allegation in each preceding paragraph as if fully set forth here again.

177.  An economic relationship existed between Synergy and GBI, with the probability of economic benefit to Synergy.

178.  The City had knowledge of the relationship between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew a subcontract had been entered between GBI and Synergy. Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act, and the right to be compensated for work it performed under the contract.

179.  Defendants' acts constituted an intentional act to disrupt the economic relationship between Synergy and GBI, which actually disrupted the economic relationship between Synergy and GBI because the acts deprived Synergy of the rights afforded to it in the contract between Synergy and GBI, and the right to be compensated for work it performed under the contract.

180.  Defendants' acts also disrupted the economic relationship between Synergy and GBI because the issuance disrupted the contract provisions that provided only GBI could terminate Synergy from the Project in compliance with the Subcontracting and Subletting Fair Practices Act.

181.  Synergy incurred economic harm from the City's intentional act of issuing the Statement of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was not compensated for work it performed on the Project.

182.  The City's actions above deprived Synergy of the right to be compensated for work it

39

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 43 of 253

performed on the contract.

183. The City, acting through Breed, Nuru, and other officials, acted against Synergy in order to further Breed's political interests, to further the City Family fraud scheme, and to punish Synergy for not participating as a "friend of" the City Family in the City Family bribe/kickback/shakedown scheme.

184. The City further acted against Synergy by ratifying, and showing deliberate indifference to, acts by Breed, Nuru and other City Family members to perpetuate the bribe/kickback/shakedown scheme, and to conceal, fail to disclose, fail to preserve, and destroy public communications regarding Synergy and the Haight Street project, including communications preceding Synergy's removal, communications regarding the City's knowledge of PG&E's faulty maps, communications regarding the unfeasibility of the Haight Street plan design, and communications regarding efforts by Nuru and others to avoid paying Synergy for work Synergy performed on the Haight Street Project.

185. At the time the City issued its letter removing Synergy's work as Core Work for the Van Ness, an economic relationship existed between Synergy and Walsh, with the probability of economic benefit to Synergy.

186. The City had knowledge of the relationship between Synergy and Walsh because, in the bid Walsh submitted to the City, Walsh listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew an agreement had been reached between Walsh and Synergy. Consequently, the City also knew that Synergy had a right to perform the work on the Project unless Walsh removed Synergy or agreed to remove the work Synergy was to perform as Core Work on the Van Ness Project and re-designate that work as Non-Core Work.

187. The City's issuance of a letter removing Synergy's work as Core Work for the Van Ness was the official and final act that forced Synergy's removal from the Van Ness Project. The issuance was an intentional act to disrupt the economic relationship between Synergy and Walsh.

188. The issuance of the letter removing Synergy's work as Core Work for the Van Ness actually disrupted the economic relationship between Synergy and Walsh because the issuance deprived Synergy of the rights afforded to it in the agreement between Synergy and Walsh.

40

189. Synergy incurred economic harm from the City's intentional act of issuing letter removing Synergy's work as Core Work for the Van Ness Project because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to perform its work on the Van Ness Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the agreement between Synergy and Walsh.

190. The intent of the City, acting through Nuru, Kelly, and Breed in removing Synergy, was to further Breed's political interests, to further the City Family fraud scheme, to punish Synergy for not participating as a "friend of" the City Family in the City Family bribe/kickback/shakedown scheme, and to free up the work awarded to Synergy for use by City Family members to dole out to "friends of" the City Family.

191. The City further acted against Synergy by ratifying, and showing deliberate indifference to, acts by Breed, Nuru, Kelly, and other City Family members to perpetrate and further the bribe/kickback/shakedown scheme, and to conceal, fail to disclose, fail to preserve, and destroy public communications regarding Synergy and the Van Ness Project, including communications, showing Breed, Nuru, and Kelly's illicit interests in removing Synergy from the Van Ness Project, and revealing Breed, Nuru, and Kelly's knowledge that Synergy's bid for the Van Ness Project was not "too high.

192. Defendants' interference was wrongful, not just because the City interfered with an existing economic relationship, but also because City officials' actions in causing the interference were committed in violation of California's Prompt Payment laws, California and San Francisco laws, regulations and ordinances governing official conduct, federal and state racketeering laws and because the City Family's continuing acts of fraud impose immense costs on the public. The City's continuing disregard and ratification of the City Family officials' unlawful conduct, refusal to enforce laws prohibiting this conduct, and failure to implement safeguards necessary to prevent the repetition of these acts leaves contractors and the public vulnerable to continuing malfeasance and fraud.

193. WHEREFORE, Synergy prays for relief as hereinafter set forth.

41

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 45 of 253

## THIRD CAUSE OF ACTION
### Breach of Contract
### Against GBI and DOES 2-100

194.  Plaintiff Synergy incorporates by reference each and every allegation in each preceding paragraph as if fully set forth here again.

195.  GBI and Synergy entered into a contract on April 17, 2015 (Subcontract Agreement). Whereby Synergy agreed, and was entitled to, complete certain construction tasks for the Haight Street Project, and to receive compensation for such work.

196.  Synergy performed its obligations under the Subcontract Agreement.

197.   GBI breached the Subcontract Agreement by (1) improperly and unlawfully substituting another subcontractor in place of Synergy for the Haight Street Project, to perform Synergy's scope of work as listing in GBI's bid to the City and as defined in the Subcontract Agreement, and (2) by failing to pay Synergy for work Synergy performed as required under the Subcontract Agreement.

198.   Synergy suffered significant damages as a result of GBI's breach of the Subcontract Agreement, in an amount in excess of $ 19 million.

199.  WHEREFORE, Synergy prays for relief as hereinafter set forth.

### PRAYER

a.     WHEREFORE, Plaintiff prays for relief as follows:

b.     For damages in an amount to be proven at trial;

c.     For monetary damages against the City and GBI;

d.   For declaratory relief, in the form of an order declaring that conditioning, basing, or affecting of the award of a City contract or subcontract upon or because of any political reason or factor including, without limitation, any prospective contractor's or subcontractor's political affiliation, political support or activity, political financial contributions, promises of such political support, activity or financial contributions, or such prospective contractor's or subcontractor's political sponsorship or recommendation is prohibited;

e.   For injunctive and equitable relief, in the form of an order requiring the City to establish and enforce policies complying with the California laws governing contracting, government operation and public records and California  and federal laws prohibiting racketeering, and precluding the continuation of the law violations

42

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 46 of 253

described herein; and enjoining the City and any City contractor from directly or indirectly conditioning, basing or knowingly prejudicing or affecting the award of any City contract or subcontract, upon or because of any political reason or factor including, without limitation, any prospective contractor's or subcontractor's political affiliation, political support or activity, political financial contributions, promises of such political support, activity or financial contributions, or such prospective contractor's or subcontractor's political sponsorship or recommendation;

f.    For costs of suit; and

g.    For such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

200.  Plaintiff Synergy demands trial by jury as to each and every cause of action and claim in this complaint.

Respectfully Submitted,

RANDOLPH E. DAAR
BEN ROSENFELD

Dated: April 20, 2022    By:    Ben Rosenfeld
        Attorneys for Plaintiff Synergy

43

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 47 of 253

**Exhibit B**

Sign In

**News**   **Politics**   **Science**   **Education**   **Housing**   **Immigration**   **Criminal Justice**   S

Two workers from Synergy Project Management hold a foreman by his ankles as he works in a Haight Street manhole on July 21, 2015.   *(San Francisco Public Works)*

**NEWS FIX**

# S.F. Officials Upheld in Firing of Construction Firm Involved in Gas Line Breaks

By Ted Goldberg 🐦     Jan 13, 2016

🔖 **Save Article**

   

*This article is more than 7 years old.*

San Francisco has succeeded in firing a subcontractor whose workers repeatedly breached natural gas lines and disrupted a major infrastructure project in the city's Haight neighborhood.

The company, Synergy Project Management, was also involved in several episodes that raised questions about its safety practices -- including one in which workers dangled a foreman head first into a Haight Street manhole.

Last Friday, a city administrative hearing officer rejected an appeal by Synergy months after San Francisco Public Works halted a $13.7 million job involving sewage replacement, street repaving and water main installations.

When the agency first tried to remove Synergy from the project, the company appealed, leading to a hearing in early December.

Firing a company working on a public works job is rare, the city says. "I'm not aware of this happening on a street excavation project [in the past]," Public Works spokeswoman Rachel Gordon said.

Sponsored

"It's about freakin' time," Board of Supervisors President London Breed, who represents the Haight, said in an email after learning of the hearing officer's decision.

Synergy's president reacted angrily to the city's move and said he's contemplating a lawsuit against the city and PG&E.

The company contends the repeated breaches of gas distribution lines -- five in all -- happened because PG&E had not provided accurate information about their locations.

"Synergy is being made a scapegoat for PG&E's inaccurate and incomplete information about where the gas lines are," Javad Mirsaidi said in an email to KQED. "It's not fair to blame Synergy for all of the problems on the job."

PG&E has disputed that claim.



Workers at Haight Street construction site on July 21, 2015. (San Francisco Public Works)

Work on the Haight Street project began late last April. Two days into the work, Synergy employees hit a 2-inch plastic gas line at Haight Street and Masonic Avenue as they dug into the pavement. The resulting leak led the Fire Department to evacuate nearby businesses.

By early October, Synergy crews hit gas lines four more times, prompting street closures, shelter-in-place orders for local businesses and gas outages for some customers.

S.F. Public Works stopped work on the project in mid-September after the third gas leak and again after the fifth leak.

The hearing officer, Tim Leung, found that at least four of the leaks were the result of Synergy's unsafe practices.

Leung also found that the company "improperly shored trenches on multiple occasions, which could have led to street collapse, trench collapse, and the injury or death of workers or members to the public."

One incident, city officials said, put Synergy workers in grave danger.

That episode occurred around 8:30 p.m. last July 21, when Synergy employees decided they needed to remove a plug that had been left in a sewer line. Several company employees opened up a manhole at Haight and Pierce streets. Then two of them dangled a project foreman into the manhole by holding onto his ankles. That scene is shown in a picture provided to Public Works by Muni.

The incident took place just after sunset, and Public Works says workers didn't attempt to provide traffic control.

"That one incident was extremely disturbing on a number of fronts," department spokeswoman Gordon said.

Cal/OSHA did not investigate the incident because no one filed a complaint or referred the case, agency spokesman Julia Bernstein said in an email.

The state workplace regulator did cite Synergy last year when an employee was hurt in an incident involving an excavator at a project at Fourth and Harrison streets.  Cal/OSHA issued a $5,150 fine that's been appealed, Bernstein said.

Less than a week later a pedestrian slipped and fell on a forklift that Synergy left sitting on a wheelchair ramp at Haight Street and Buena Vista Avenue.

The main contractor on the project is Ghilotti Bros., a century-old firm based in San Rafael.

Michael Ghilotti, the company's president and co-owner, supported Synergy during the city's administrative hearing and argued that the city had no right to kick the subcontractor off the job and that the firm did its work exactly as the city instructed.

Ghilotti noted that the city must have been happy with the work because it made a progress payment to the company three days before it asked that Synergy be fired.

Synergy's Mirsaidi testified that his company provided extra training and safety communication to its workers. But he described the episode involving a worker being dangled inside a manhole as "unexcusable" and said he took full responsibility for the pedestrian tripping.

Mirsaidi says he believes the hearing officer, a city employee, was biased. Public Works spokeswoman Gordon describes the officer as "independent."

On Monday, the department sent a letter to Ghilotti Bros. asking the firm to submit a list of potential new subcontractors to replace Synergy by this Friday.

Gordon said the department wants the project restarted soon and emphasized the new subcontractor would need to follow stringent safety rules.

A spokeswoman for Ghilotti Bros. said the company has no comment at this time.

Public Works wants the rest of the industry to take notice of the firing. "Is it a message to the contracting community? It is indeed," Gordon said.

The hearing officer's decision comes as a Board of Supervisors committee prepares for a hearing looking into whether the city needs to do a better job of making sure underground work for public agencies is being done safely enough.

Supervisor Breed, who represents the district where the infrastructure project is taking place, called for the hearing before the Government Audit and Oversight Committee on Thursday.

Breed has asked Public Works, PG&E, Ghilotti Bros and Synergy, among others, to appear. Two Haight neighborhood groups are also expected to speak.

Breed said she called for the hearing because of worries from merchants and residents in her district stemming from the repeated gas leaks.

"People were concerned. They were scared and rightfully so," Breed said in an earlier interview.

# KQED

**Stay in touch. Sign up for our daily newsletter.**

Email Address:

Sign Up

To learn more about how we use your information, please read our privacy policy.

Copyright © 2023 KQED Inc. All Rights Reserved.

Terms of Service  Privacy Policy  Contact Us

**MORNING REPORT**

# Months After Slaughterhouse Shuts Down, Former Farmer John Workers Struggle To Start Over

 **LISTEN**

By KQED News Staff    Aug 7

🔖 **Save Article**

   



Rina Chavarria, who worked at Farmer John for nine years, has yet to find employment after the slaughterhouse closed earlier this year. (Samanta Helou Hernandez /LAist)

## Lawmakers Already Have More Than A Dozen Bond Proposals

In Sacramento, a budget deficit limited what California state lawmakers could fund in this year's budget. Now, lawmakers are looking to bonds as a different strategy to pay for things like climate infrastructure, mental health beds and affordable housing.
*Reporter: Nicole Nixon, CapRadio*

## What's Next For Community Of Former Farmer John Workers

A controversial Farmer John slaughterhouse in the L.A. County community of Vernon closed earlier this year after nearly a century of operations. More than 2,000 people, mostly immigrants, worked there. Months later, laid-off workers are still struggling to adjust.
*Reporter: Leslie Berestein Rojas, LAist*

Sponsored

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 55
of 253

# KQED

## Stay in touch. Sign up for our daily newsletter.

Email Address:

Sign Up

To learn more about how we use your information, please read our privacy policy.

Copyright © 2023 KQED Inc. All Rights Reserved.

Terms of Service  Privacy Policy  Contact Us

TV

Radio

Podcasts

Events

Newsletters

Mobile Apps

For Educators

News

Science

Arts & Culture

Donate

Help Center

About

Staff DEI Report

Careers

Accessibility

Corporate Sponsorship

Contact Us

Copyright © 2023 KQED Inc. All Rights Reserved.

Terms of Service    Privacy Policy

Contest Rules    FCC Public Files

1

**Exhibit C**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HEARING OFFICER ADMINISTRATIVE HEARING**

**CITY AND COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| IN THE MATTER OF )<br>)<br>SYNERGY PROJECT MANAGEMENT, INC.'S )<br>OBJECTIONS TO NOTICE OF SUBSTITUTION )<br>FOR SAN FRANCISCO DEPARTMENT OF PUBLIC )<br>WORKS PROJECT NO. PCE15018/2264J(R), )<br>PAVEMENT RENOVATION, SEWER )<br>REPLACEMENT AND WATER MAIN )<br>INSTALLATION – HAIGHT AND HAYES STREETS ) | STATEMENT OF HEARING<br>OFFICER FINDINGS<br><br>HEARING: Dec. 9, 2015<br>RECORD CLOSED: Dec. 16, 2015 |

_____

## INTRODUCTION

This case involves San Francisco Department of Public Works Project No. PCE15018/2264J(R), the pavement renovation, sewer replacement, and water main installation of Haight and Hayes Streets in San Francisco ("the Project"). The prime contractor on the Project is Ghilotti Brothers, Inc. ("GBI"). GBI's primary subcontractor on the Project is Synergy Project Management, Inc. ("Synergy"). Work on the Project began on April 27, 2015.

Based on a variety of safety issues and other problems, on October 9, 2015, the San Francisco Department of Public Works ("Public Works") invoked Article 4, Section 4.04 of the contract with GBI to demand that GBI substitute another subcontractor for Synergy pursuant to Section 4107(a)(7) of the Public Contract Code. (Exh. 70.) Public Works informed Synergy of its demand to GBI by letter dated October 14, 2015, stating that for "multiple safety violations" the City determined "the work performed by Synergy is substantially unsatisfactory and not in substantial accordance with the plans and specifications . . . ." (Exh. 71.) Public Works provided Synergy the opportunity to submit objections to the substitution demand and request a hearing on the objections. Synergy submitted objections. The undersigned agreed to serve as hearing officer and held a public hearing on December 9, 2015, in Room 263 at San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, San Francisco, California. Public Works and the undersigned apprised GBI of the proceeding. Public Works and

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*

*Page 1 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 59 of 253

2472

1  Synergy appeared and were represented by counsel.  The parties presented witnesses and evidence

2  regarding Public Works' substitution demand.

3      Synergy and GBI object to this proceeding, contending that it is unlawful under Section 4107

4  of the Public Contract Code, because only a prime contractor may invoke Section 4107 to request

5  substitution of a subcontractor, and GBI has not sought to substitute Synergy.[1]  Synergy and GBI

6  contend that Public Works improperly commenced this proceeding, and the undersigned lacks

7  jurisdiction to proceed and issue a decision.  The undersigned disagrees.  Section 4107(a)(7)

8  anticipates that a public entity may initiate a proceeding based on its determination that a

9  subcontractor's work was substantially unsatisfactory.  Interpreting Section 4107(a)(7) in the manner

10  proposed by Synergy and GBI leads to an absurd result: a public entity having no control over the

11  subcontractors working on its project.  This interpretation does not comport with the language or intent

12  of the statute.  Moreover, the contract between GBI and Public Works incorporates the Section 4107

13  procedure, which separately provides a basis for this proceeding.  And finally, even if Section 4107 is

14  not directly applicable and is not applied by virtue of the contract, Section 4107 does not prohibit an

15  administrative proceeding offered for a subcontractor to object to a public entity's removal

16  determination.

17      As explained herein, the undersigned finds that Public Works established by a preponderance

18  of the evidence[2] that Synergy's work on the project was "substantially unsatisfactory and not in

19  substantial accordance with the plans and specifications."  Public Works established, among other

20  things, that Synergy caused five gas line breaks, at least four of which resulted from Synergy's unsafe

21  practices.  Public Works also established that Synergy improperly shored trenches on multiple

22  occasions, which could have led to street collapse, trench collapse, and the injury or death of workers

23  or members of the public.  Indeed, shoring problems caused one of the gas line breaks.  Synergy's

24

---

25      [1]  GBI submitted an objection dated December 2, 2015.  On December 16, 2015, the parties
    and GBI submitted further briefing on this issue at the request of the hearing officer, which the
26  undersigned considered.

27      [2]  *See* Evid. Code § 115 ("Except as otherwise provided by law, the burden of proof requires
    proof by a preponderance of the evidence.)  The undersigned has located no law requiring a higher
28  standard of proof for this proceeding.

---

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of*          *Page 2 of 23*
*Substitution – Hearing Officer's Findings*

1  failure to properly store equipment led to a pedestrian trip and fall. Its workers also engaged in highly
2  dangerous conduct when they dangled the Synergy foreman by his ankles into an open manhole with
3  no safety equipment or traffic control. And there were many other safety problems, as discussed fully
4  below. All of this occurred within little more than five months.

5       The undersigned is persuaded that Public Works' substitution determination is supported by
6  sufficient evidence.

7  **ISSUES BEFORE THE HEARING OFFICER**

8       1.     Does the hearing officer have jurisdiction to determine whether Public Works has
9  presented sufficient evidence to support its substitution demand?

10       2.     Did Public Works prove that Synergy's work on the Haight and Hayes Street Project
11  was "substantially unsatisfactory and not in substantial accordance with the plans and specifications"?

12  **JURISDICTION FOR THIS PROCEEDING**

13       Synergy and GBI contend that the undersigned lacks jurisdiction to proceed, because Public
14  Works improperly invoked Section 4107 of the Public Contract Code to initiate this proceeding. They
15  assert that the only entity permitted to request a substitution of Synergy under Section 4107 is GBI, the
16  prime contractor. Synergy and GBI also argue that Section 4.04 of the contract between the City and
17  GBI, which states the City may demand substitution of a subcontractor, is unlawful. Consequently,
18  Synergy and GBI assert that the undersigned did not have jurisdiction to hold a hearing and that the
19  only proper decision is to dismiss this case. Indeed, on December 21, 2015, after participating in the
20  hearing, Synergy belatedly filed a motion to dismiss.

21       The undersigned finds that jurisdiction exists for this proceeding and rejects the position taken
22  by Synergy and GBI for three reasons.

23       First, the interpretation of Section 4107 of the Public Contract Code proposed by Synergy and
24  GBI does not comport with the language of subsection (a)(7), and it would lead to the absurd result
25  that the awarding authority lacks control over the subcontractors working on its project, irrespective of
26  their performance. The language of the statute and the intent of the statutory scheme do not support
27  this result. Section 4107 of the Public Contract Code provides:

28       A prime contractor whose bid is accepted may not:

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 61
of 253

2474

(a) Substitute a person as subcontractor in place of the subcontractor listed in the original bid, except that the awarding authority, or its duly authorized officer, may, except as otherwise provided in Section 4107.5, consent to the substitution of another person as a subcontractor in any of the following situations

    *        *        *        *

(7) When the awarding authority, or its duly authorized officer, determines that the work performed by the listed subcontractor is substantially unsatisfactory and not in substantial accordance with the plans and specifications, or that the subcontractor is substantially delaying or disrupting the progress of the work.

    *        *        *        *

Prior to approval of the prime contractor's request for the substitution, the awarding authority, or its duly authorized officer, shall give notice in writing to the listed subcontractor of the prime contractor's request to substitute and of the reasons for the request. The notice shall be served by certified or registered mail to the last known address of the subcontractor. The listed subcontractor who has been so notified has five working days within which to submit written objections to the substitution to the awarding authority. Failure to file these written objections constitutes the listed subcontractor's consent to the substitution.

If written objections are filed, the awarding authority shall give notice in writing of at least five working days to the listed subcontractor of a hearing by the awarding authority on the prime contractor's request for substitution.

Synergy and GBI interpret the provision "[p]rior to approval of the prime contractor's request . . ." as jurisdictional in nature. According to Synergy and GBI, absent a prime contractor's request for substitution, there can be no proceeding under Section 4107, and that any such proceeding would be unlawful. They contend that Public Works cannot invoke Section 4107 to provide a subcontractor a procedure to object to Public Works' determination under subsection (a)(7) that a subcontractor's work on a project is "substantially unsatisfactory and not in substantial accordance with the plans and specifications . . . ."

The undersigned rejects this interpretation of the statute. Under Section 4107, a contractor may not substitute a subcontractor absent the approval of the awarding authority. While it is clear that this approval is ordinarily preceded by a request from the prime contractor, subsection (a)(7) anticipates a substitution dependent on the awarding authority's determination that the subcontractor's work is unsatisfactory. To require the contractor to request a substitution in order for the substitution to be proper under Section 4107, when the awarding authority makes a determination that the subcontractor's work is unsatisfactory, could lead to the exact result that Synergy and GBI propose

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*        *Page 4 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 62 of 253

2475

1  here: the awarding authority having no control over the subcontractor working on its project, no matter
2  how deficient the subcontractor's performance.  A prime contractor could disregard an awarding
3  authority's determination that a substitution is necessary on the basis provided by subsection (a)(7).
4  Had the Legislature intended to leave this determination up to the prime contractor, it would have
5  stated so.

6      Denying the awarding authority the ability to demand a substitution when it determines there
7  are serious safety problems is not reasonable and would lead to the absurd result of the prime
8  contractor having the power to veto the awarding authority's decision regarding the subcontractor's
9  work on the project.  In construing Section 4107, the undersigned cannot ignore this absurd result.
10 *Upland Police Officers Ass'n v. City of Upland* (2003) 111 Cal. App. 4th 1294, 1303-04 ("Even
11 unambiguous statutes must be construed to avoid absurd results which do not advance the legislative
12 purpose . . . .").  This absurd result does not advance the legislative purpose of the Subletting and
13 Subcontracting Fair Practices Act, which was passed, in part, "to address perceived problems with
14 subcontractor financial solvency *and the quality of subcontractor work on public projects*.  In
15 particular, the Legislature wanted to (1) ensure the awarding authority would have the 'opportunity to .
16 . . investigate and approve the initial subcontractors and *any proposed substitutions*' . . . ."  *E.F. Brady
17 Co. v. M.H. Golden Co.* (1997) Cal. App. 4th 182, 189 (quoting *Southern Cal. Acoustics Co. v. C.V.
18 Holder, Inc.* (1969) 71 Cal.2d 719, 725) (first emphasis added; second emphasis in original).  The
19 statutory scheme reflects the public interest in ensuring the quality of public works projects and
20 protecting subcontractors from arbitrary or improper substitutions.  *See* Public Contract Code § 4101
21 (expressing concern with public detriment of "poor quality of material and workmanship" caused by
22 bid shopping and peddling).  Denying the ability of the awarding authority to demand substitution
23 when it determines the subcontractor's performance is unacceptable and removing the subcontractor's
24 right to object and have its objections heard does not comport with the purpose of the statutory
25 scheme.

26     Second, even if Section 4107 is not directly applicable to this proceeding on the theory that
27 GBI has not made a substitution request, the procedure is applicable by virtue of Section 4.04 of the
28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of
Substitution – Hearing Officer's Findings*                                    *Page 5 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 63
of 253

2476

contract between GBI and Public Works, which incorporates the procedures of the Subletting and

Subcontracting Fair Practices Act. Section 4.04 provides as follows:

> When a Subcontractor fails to prosecute a portion of the Work in a manner
> satisfactory to the City, Contractor *shall* remove such Subcontractor
> immediately upon written request of the City, and *shall* request approval
> of a replacement Subcontractor to perform the Work in accordance with
> Administrative Code section 6.21(A)(9) and the Subletting and
> Subcontracting Fair Practices Act, Cal. Public Contract Code section 4100
> et seq., at no added cost to the City.

(Exh. 3, Section 4.04 (emphasis added).)[3] As with the interpretation of Section 4107 discussed above,

reading Section 4.04 to allow the prime contractor to veto Public Works' demand that a subcontractor

be replaced would lead to the absurd result of the City having no control over who is working on its

public works project. Further, it would contradict the language of Section 4.04, which makes the

contractor's request a mandatory contractual duty. GBI agreed when it signed the contract that it

would remove a subcontractor upon written request of the City and request a substitution. It has a duty

to do so. Public Works' decision to provide Synergy a procedure to object to Public Works'

substitution determination is entirely consistent with the contract. GBI's position is not.

Third, even assuming Section 4107 does not directly apply, and assuming further that the

contract does not require this procedure – two assumptions with which the undersigned disagrees –

Section 4107 does not preclude Public Works from creating an administrative procedure for Synergy

to have its objections heard, nor does it preclude the undersigned from reaching a decision on the

merits.

Section 4107 restricts a prime contractor from substituting a new subcontractor for one that

was listed in the prime contractor's bid. The prime may request a substitution under any of the

circumstances listed in Section 4107(a). It is clear that the procedures of Section 4107 apply to a

prime's substitution request and restrict the circumstances under which the awarding authority may

grant such a request. But Section 4107 does not constrain the awarding authority from demanding the

---

[3] Section 6.21(A)(9) of the San Francisco Administrative Code provides: "All Bidders shall designate their subcontractors in accordance with and shall be subject to the Subletting and Subcontracting Fair Practices Act, at California Public Contract Code Section 4100 et seq., as amended from time-to-time. In addition to the penalties provided by Public Contract Code Section 4100 et seq., violation of this subsection 6.21(a)(9) may be grounds for a determination of nonresponsibility under Article V of this Chapter 6."

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of
Substitution – Hearing Officer's Findings*                                    Page 6 of 23

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 64
of 253

2477

substitution of a subcontractor. Section 4107 contains no language that limits the awarding authority's contractual rights against the prime contractor or prohibits the awarding authority from demanding a substitution. Indeed, Section 4103 of the Public Contract Code provides that nothing in the Subletting and Subcontracting Fair Practices Act "limits or diminishes any rights or remedies, either legal or equitable . . . any county [or] city . . . may have against the prime contractor . . . including the right to take over and complete the contract." And as discussed above, it would be inconsistent with the intent of the statute to find that an awarding authority lacks the power to demand substitution of a subcontractor that it finds has performed inadequately. Section 4107 does not require such a result, nor prevent Public Works from adopting a hearing procedure to consider whether a subcontractor's performance has been unsatisfactory to the point of warranting a substitution.

For the reasons discussed above, jurisdiction exists for this proceeding to determine whether Public Works has presented sufficient evidence to support its determination that Synergy's work on the project was "substantially unsatisfactory and not in substantial accordance with the plans and specifications." Accordingly Synergy's belated motion to dismiss is **DENIED**.

## SUMMARY OF EVIDENCE

Public Works' Case Presentation

Public Works called John P. Lynch ("Lynch") and Stacey Camillo ("Camillo") as witnesses in its case. Public Works and Synergy stipulated to the admission of Public Works Exhibits 1-77 to the administrative record.

Lynch is employed as a construction inspector at Public Works. He is the lead inspector on the Project. He has worked in the construction industry for over 28 years. Lynch has worked for Public Works for nearly eight years. Prior to his employment with the City, he owned a contracting business and held a general contractor's license. He worked in construction on the contractor's side for approximately 21 years. (Rough Reporter's Transcript ("RT") 21:15-23:9.)

During his employment with Public Works, Lynch has worked as an inspector on four other projects. He was the inspector on a project on Gough Street. That project involved installing underground utilities on 31 city blocks. There were no gas line breaks. Lynch was the inspector on a

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*     *Page 7 of 23*

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 65 of 253

2478

1   project on Clay Street that involved excavating and installing underground utilities on 23 city blocks.

2   There were no gas line breaks on the Clay Street project. (RT 23:20-24:21.) Lynch testified that these

3   other projects had concrete structures under the street left over from cable car or railways systems.

4   (RT 50:1-4.)

5       Between April 27, 2015 and when work stopped on October 8, 2015, Lynch was at the Project

6   site almost every day. He completed daily reports regarding the Project and is very familiar with the

7   events that occurred at the Project. (RT 25:15-23.)

8       Lynch reviewed the Statement of Facts submitted by Public Works with its pre-hearing brief.

9   He testified that the statement was true and correct. (RT 25:24-26:4.)

10      Lynch reviewed Public Works' Exhibit 2, a chronology of incidents during the Project between

11  April 27, 2015 and October 9, 2015. He testified that Exhibit 2 was true and accurate. (RT 26:5-10.)

12      Lynch agrees with Public Works' determination that Synergy's work on the Project was

13  substantially unsatisfactory, and he agrees with Public Works' decision to remove Synergy. Lynch

14  testified that his agreement with the decision to remove Synergy is based on the incidents described in

15  Public Works' statement of facts and the chronology of incidents outlined in Exhibit 2. (RT 26:11-

16  22.)

17      Safety awareness was a priority for the Project, as mentioned in the May 18, 2015 partnering

18  workshop, because Haight Street is unique in that there are many tourists, busses, parks, a bicycle

19  route, traffic, pedestrians and a homeless problem. (RT 31:7-32:10; Exh. 17.) The goal was no lost

20  time and no public accidents. (Exh. 17.) Lynch testified that GBI did not assign a safety key person to

21  the Project site until September 28 or 29, 2015 (Paul Schram), and did not assign its own

22  superintendent to the site until September 29, 2015 (Dave Fotti). As a result, Synergy was in charge of

23  the Project site until September 29, 2015. (RT 32:20-33:14.) Lynch testified that Synergy did not

24  achieve the goal of no public accidents. (RT 34:21-23.)

25      Camillo is the division manager for contract administration at Public Works. She has held this

26  position for two and a half years. (RT 54:20-55:2.) She administers the procurement of construction

27  and professional services for Public Works and handles post-award change orders. (RT 56:2-9.)

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*                    *Page 8 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 66
of 253

2479

1  Camillo testified that she is familiar with the standard for substituting a subcontractor under Section

2  4107(a)(7) of the Public Contract Code.  (RT 56:15-57:1.)

3  With respect to the Project, Camillo's department handled the advertisement for bids through

4  the issuance of the notice to proceed on the contract.  (RT 57:5-14.)  After issuance of the notice to

5  proceed, Camillo played a further role in addressing issues with Synergy's performance.  (RT 57:15-

6  25.)  Camillo drafted the October 14, 2015, letter to Synergy informing them that Public Works had

7  directed GBI to remove Synergy as a subcontractor.  Public safety concerns were the basis for the

8  October 14 letter.  (RT 58:1-13; Exh. 71.)

9  Camillo testified that she was involved in Public Works' decision to direct GBI to remove and

10  substitute Synergy.  (RT 58:24-60:16.)  Camillo understood that public safety was the principal motive

11  for Public Works' decision to demand the substitution.  Camillo testified that her evaluation of the

12  appropriateness of Public Works' decision to remove Synergy had nothing to do with actions by

13  Supervisor London Breed or any other Supervisor.  (RT 60:17-61:5.)

14  Camillo testified that at a meeting between Public Works staff and Mike Ghilotti on October

15  13, 2015, Mr. Ghilotti stated that he was looking into finding another subcontractor to replace

16  Synergy; he did not object to Synergy's removal.  (RT 61:6-62:14.)  There was another meeting on

17  October 27, 2015, between Public Works staff and GBI.  At that meeting the parties discussed the

18  replacement of Synergy; GBI did not object to Synergy's removal at that time.  (RT 69:22-71:2.)

19  Camillo testified that Public Works and the Port of San Francisco are separate departments

20  with separate chains of command.  The Director of the Port, Monique Moyer, reports to the Port

21  Commission.  The Director of Public Works reports to the City Administrator.  (RT 55:13-56:1.)

22  ***Gas Line Breaks***

23  The first gas line break occurred on April 29, 2015, at Haight and Masonic.  (Exh. 11.)

24  Lynch's daily report from that day states that Synergy hit a gas line while excavating.  Lynch attached

25  photos to his daily report.  One of the photos shows "2-inch PL" written on the street.  PG&E wrote

26  this.  It indicates a 2-inch underground plastic gas line. (RT 26:23-28:3; Exh. 11.)

27

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of*
*Substitution – Hearing Officer's Findings*

*Page 9 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 67
of 253

2480

1    Lynch was at the scene on April 29, when Synergy broke the gas line. Lynch testified that

2    Synergy hit the gas line when they were potholing. Synergy found a steel pipe and determined that it

3    was the live gas line indicated by PG&E's marking. Synergy then started digging with a John Deere

4    excavator and hit the 2-inch plastic line. Synergy's superintendent, Terry Ayyad ("Ayyad"), and its

5    foreman, Alejandro Hernandez ("Hernandez"), informed Lynch of how the gas line broke. (RT 28:4-

6    29:3.) The San Francisco Fire Department ("SFFD") responded and evacuated nearby businesses, and

7    Public Works cleared the area of pedestrians. (Exh. 11, 21.) The gas line was repaired approximately

8    3 hours later. (Exh. 11.)

9    Synergy completed an incident report regarding the April 29 gas line break. (Exh. 12.)

10   Synergy's report states that they encountered a line while potholing. When they were trying to release

11   rock from below the steel line, the bucket teeth hit a plastic line and caused the break. The photos

12   attached to Synergy's report show that PG&E's mark on the street was less than 2 feet from the

13   damaged gas line. (Exh. 12.)

14   Pete Urrutia ("Urrutia"), a Damage Investigator for PG&E, completed a report called a "Dig-In

15   Investigation" regarding the April 29 gas line break. (Exh. 13.) He also investigated the subsequent

16   four gas line breaks. Lynch testified that he agrees with Urrutia's report. (RT 29:4-25.) Urrutia

17   concluded that Synergy was liable for the April 29 break, because they failed to hand dig in the area of

18   the subsurface facility, as required by Sections 4216.3 and 4216.4 of the Government Code. (Exh.

19   13.)

20   The California Public Utilities Commission ("CPUC") also investigated the April 29, 2015 gas

21   line break. (RT 30:15-18; Exh. 21.) The CPUC concluded that the underground facility was properly

22   marked and that Synergy "failed to hand dig to expose the underground facilities prior to using power

23   equipment and damaged the line causing a release of gas." (Exh. 21.) Lynch testified that he agreed

24   with this conclusion. (RT 30:22-31:4.)

25   The second gas line break occurred on August 27, 2015, when Nicholas Sawcutting, a

26   subcontractor of Synergy responsible for cutting through the asphalt and concrete road surface before

27   excavation, cut a gas line on Haight Street between Ashbury and Masonic. (Exhs. 28, 29.) Urrutia

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*                    *Page 10 of 23*

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 68
of 253

2481

stated in his Dig-in Investigation report that the line was appropriately marked.  The worker used a saw equipped with a 32-inch blade, which penetrated not only through the asphalt and concrete but also into the soil below and cut the line.  (Exh. 30.)  PG&E determined Synergy's subcontractor at fault for the break.  (Exh. 30.)  The San Francisco Police Department and SFFD responded, and "[p]erformed a shelter in place for businesses, and stopped through ped and vehicle traffic."  (Exh. 28.)  Approximately two and a half hours later, service was restored and the traffic lanes reopened.  (Exh. 28.)  Five gas customers lost service during the outage.  (Exh. 30.)

The third gas line break occurred on September 16, 2015, when Synergy workers broke a gas line at 1451 Haight Street.  (Exh. 34.)  A Synergy worker used an excavator bucket to dig a trench in the vicinity of a properly marked gas service line that was approximately 21 inches below the surface. (Exhs. 34-36.)  Urrutia found Synergy at fault for failing to use only hand tools to excavate within 24 inches of the marked gas line.  (Exh. 36.)  After this gas line break, GBI shut down work at the project. (Exh. 37 ("GBI is shutting the job down until we address both today's gas service incident and the gas line issues previously discussed in last week's merchant meeting.").)  The break interrupted gas service at four addresses.  (Exh. 36.)

On September 16, 2015, Public Works sent GBI a stop work letter.  (Exh. 38.)  The letter discussed the September 16 gas line break, and noted, among other things that, "[a]s has been discussed with the community on September 9, 2015 and at numerous progress meetings, the City and neighborhood are very concerned about the on-site safety of this project."  (Exh. 38.)  Public Works stated that GBI is required to have on-site supervision during all work activities, as discussed in a progress meeting on August 20, 2015.  (Exh. 38.)

On September 24, 2015, Public Works sent a letter to GBI permitting GBI and Synergy to continue work on the Project.  (Exh. 45.)

The fourth gas line break occurred on October 6, 2015, in the area of 1419-1427 Haight Street. (Exhs. 56, 59.)  Urrutia indicated in his Dig-In Investigation report that when he arrived, there was an excavator bucket on top of the broken gas line.  Urrutia noted that the PG&E employee who marked lines in the area noted that he was unable to use the tracing wires to find lines for 1401 and 1419

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*          *Page 11 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 69 of 253

2482

Haight Street. That employee made notations in the USA ticket and sent an email to Synergy superintendent Ayyad and left a phone message for Synergy indicating that the specific area should be exposed by "daylight," meaning the area should be excavated by hand. (Exh. 59.) "Daylight" was also marked on the roadway in the area. (Exh. 59.) Nonetheless, Synergy used an excavator in this area. (Exh. 59.) SFFD responded, closed the street to vehicle and pedestrian traffic, and performed a shelter in place for the effected businesses. (Exh. 56.) While the worksite was closed and blocked from the public and the gas line was still pressurized, Ayyad escorted a member of the public past the taped-off area to the edge of the excavation. (Exhs. 56, 60.)

The fifth and final gas line break occurred on October 8, 2015, in the same location as the fourth break. (Exh. 63.) Indeed, Synergy cut the same service line that it had cut two days earlier. Lynch testified that this occurred because the trench walls were not properly shored, and materials fell onto the line and severed it. (RT 43:23-44:4.) Lynch took photos of the trench where the break occurred. Lynch testified that, as seen in the photos, there were voids behind the shoring. (RT 46:16-25.) Urrutia stated in his investigation report that "a portion of the concrete broke away from the side of the trench, landing and severing the 1/2 inch service line, resulting in the release of natural gas." (Exh. 64.) When he arrived after the break, Urrutia observed Synergy laborers in the process of shoring the trench. (Exh. 64.) Urrutia concluded that Synergy was liable for the damaged gas line. (Exh. 64.) Synergy's incident report regarding this gas line break indicates that the cause of the break was soil and concrete falling on the line. (Exh. 74.) Public Works sent GBI a stop work letter. (Exh. 65.) Public Works and the San Francisco Public Utilities Commission ("SFPUC") issued Notices of Non-Compliance. (Exh. 66, 68.)

***Trench Shoring Issues***

On June 23, 2015, Lynch voiced concern to Synergy foreman Hernandez and superintendent Ayyad regarding a problem with the shoring system Synergy used (or failed to use) while excavating a five-foot trench. Lynch personally measured the depth of the trench. The shoring method Synergy used to excavate in sand did not comply with Public Works Standard Specification 700.04. Lynch

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 70 of 253

2483

1   testified that this could lead to collapse of the street or trench and that the street was sagging. Synergy
2   did not implement the shoring fix that Lynch requested. (RT 40:14-43:1, 52:25-53:10; Exh. 18.)

3       On September 15, 2015, Synergy workers were in a five-foot deep trench without shoring at
4   Haight and Ashbury. (RT 43:7-12; Exh. 2.) Timothy Cotter, a Construction Inspector with SFPUC,
5   issued a Warning Letter for Safety Non-Compliance regarding the violation. Cotter sent the letter to
6   GBI and Synergy along with photos of the trench. (Exh. 39.) On September 22, 2015, GBI responded
7   to Public Works, stating the incidents were "entirely unacceptable . . . ." (Exh. 44.) Synergy
8   completed an incident report acknowledging that a laborer had entered an unshored trench. (Exh. 44;
9   Exh. 49 at 7 (acknowledging incorrect date on incident report).)

10      On September 16, 2015, Public Works observed a Synergy worker in an eight-foot deep trench
11  without shoring at Haight and Steiner. (RT 43:7-14; Exh. 2; Exh. 32.) Lynch testified that he
12  observed laborers in the trench, soil mounded on each side of the trench, and no shoring whatsoever.
13  (RT 44:5-18.) Lynch testified that the failure to shore the trench caused him concern for the workers'
14  lives. Lynch told the workers to get out of the trench and notified the superintendent that the situation
15  needed to be corrected. (RT 44:19-45:8; Exh. 34.) Public Works sent a Notice of Non-Compliance to
16  GBI regarding this incident. (Exh. 33.) Synergy completed an incident report in which it
17  acknowledged a laborer entered an unshored trench. (Exhs. 40, 44.) GBI responded to Public Works'
18  stop work letter on September 17, 2015, stating that it "finds these incidents entirely unacceptable . . .
19  ." GBI further stated that it "will monitor our subcontractor and take appropriate steps to ensure
20  compliance." (Exh. 40.)

21      On September 18, 2015, Public Works issued a Notice of Non-Compliance for failing to shore
22  the walls of 5-foot deep, 24-foot long trench. (Exhs. 41, 2.)

23      On September 30, 2015, Lynch communicated to GBI his concern for the structural integrity of
24  the roadway due to the shoring and constant tracking back and forth of equipment. (Exh. 47.) Public
25  Works issued a Field Memo to GBI that day stating that the City "has observed roadway failures
26  adjacent to the water trench . . . . It appears that soil is being undermined due to gaps in the trench

27
28

2484

1  shoring system along with heavy loads from equipment operating on the edge of the trench."  (Exh.
2  48.)

3      On the morning of October 8, 2015, there was another shoring problem.  Synergy had created a
4  five-foot deep trench with unshored walls.  (RT 45:9-46:2; Exh. 62; Exh. 63.)  Lynch issued a Notice
5  of Non-Compliance and discussed the issue with GBI and Synergy.  (Exh. 62, Exh. 63.)  The fifth gas
6  line break occurred later the same day.

7      ***Other Issues***

8      On May 1, 2015, Public Works issued a notice of non-compliance to Synergy for failing to
9  open the roadway at the intersection of Masonic and Haight by 4:00 p.m., as required by the contract.
10 (Exhs. 15, 16.)

11     On July 21, 2015, Synergy employees returned to the Project site near Haight and Pierce
12 around 8:30 p.m. after work had concluded for the day.  The workers opened up the sewer manhole.
13 Two workers dangled a third worker into the manhole by holding onto his ankles.  Lynch received an
14 email from SFMTA regarding this incident, which included photographs of the workers engaging in
15 the conduct.  (Exh. 23; RT 37:7-12.)  Lynch testified that the worker being dangled into the manhole
16 was Synergy foreman Hernandez.  Lynch testified that from a safety perspective, there were many
17 problems with this conduct: there was no traffic control; it was dark; the workers opened the manhole
18 without air monitoring; there was a risk from oncoming traffic.  (RT 37:7-39:5.)  Lynch spoke to
19 Hernandez about this incident.  Hernandez said that Synergy had left a plug in the sewer line and they
20 had to come take it out.  The sewer was not actually backing up at the time.  (RT 39:7-19.)  Public
21 Works notified GBI of this incident by letter dated July 27, 2015.  (Exh. 23.)

22     Synergy's report regarding the July 21 incident states that Synergy employees, including
23 foreman Hernandez, removed the plug from the manhole without traffic control, accessed the manhole
24 without proper equipment and tools, and dropped a worker into the manhole unsafely. (Exh. 25.)

25     On July 27, 2015, a pedestrian slipped and fell on a fork lift that Synergy left sitting in the
26 wheelchair ramp at the corner of Haight and Buena Vista West.  (Exhs. 22, 24; RT 35:5-20.)  Lynch
27 testified that he was at the scene shortly after the incident.  Three pedestrians were walking east on
28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of
Substitution – Hearing Officer's Findings*                    *Page 14 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 72
of 253

2485

1  Haight Street, and they approached the crosswalk and tripped on the forks, which were perpendicular

2  to the path of travel.  Synergy had not created a pedestrian detour around the fork or created a clear

3  separation of the construction zone from the public zone.  (RT 36:8-37:1.)  Synergy's photos of this

4  incident show paramedics attending to a man sitting on the ground wearing a neck brace.  (Exh. 22.)

5     On August 7, 2015, Public Works sent a letter to GBI regarding the July 27 trip-and-fall

6  incident.  The letter lists eight safety issues that had occurred during the course of the Project.[4]  (Exh.

7  26.)

8     On September 18, 2015, Public Works issued a Notice of Non-Compliance for improper

9  fueling of equipment.  Lynch observed a laborer fueling a generator while the generator was running.

10  (Exh. 42.)

11     On September 28, 2015, Public Works issued a Notice of Non-Compliance for using the

12  "wrong traffic control sign."  The Notice states that the "left lane is closed, but the sign says 'Right

13  Lane Closed Ahead.'"  (Exh. 46.)

14     On October 2, 2015, Public Works issued a Notice of Non-Compliance regarding an equipment

15  operator not wearing a seat belt.  (Exh. 51.)  Public Works issued a separate Notice of Non-

16  Compliance that day to remove "unused trucks, materials and trash on Ashbury at Haight," and stating

17  that "[n]o private vehicles of the contractor & employees shall be parked in construction area."  (Exh.

18  52.)

19     On October 5, 2015, Public Works issued a Notice of Non-Compliance regarding the lack of

20  non-skid coating on steel road plates.  (Exhs. 53, 54.)

21     On October 6, 2015, Public Works issued a Notice of Non-Compliance regarding employee

22  parking restrictions.  (Exh. 55.)

23     On October 8, 2015, Public Works issued a second Notice of Non-Compliance regarding

24  Synergy's placement of heavy equipment on the side of the five-foot trench for which Lynch had issue

25  _____

26  [4]  The other safety issues identified in Public Works' letter are: (1) April 29, 2015, gas line break, (2) May 4, 2015, marked traffic signal conduit hit, (3) May 7, 2015, trench failure and sink holes, (4) May 29, 2015, end dump touched a Muni overhead wire and de-energized it, (5) June 1,

27  2015, truck hit a tree branch, (6) June 2, 2015, end dump hit a Muni overhead wire and damaged it, (7) July 21, 2015, incident involving Synergy workers entry into manhole after hours, and (8) July 31,

28  2015, workers not wearing required protective equipment.  (Exh. 26.)

1 a Notice of Non-Compliance earlier in the day. (RT 47:1-25; Exh. 66.) Lynch testified that placing

2 heavy equipment on the street next to the trench may overload the street, making it more likely that the

3 trench could collapse. (RT 48:1-10.)

4 Synergy Case Presentation

5      Synergy called Michael Ghilotti and Javad Mirsaidi as witnesses. Synergy exhibits A-M, O, P,

6 S-Y, and AA-AI, were admitted to the administrative record by stipulation of the parties.

7      Michael Ghilotti ("Ghilotti") is the president and owner of GBI. Ghilotti was involved in the

8 Project on the bid process and with the partnering meeting. (RT 78:23-79:8.)

9      Ghilotti testified that GBI has objected to the City's substitution of Synergy, because they

10 believe it is not based on issues of unsatisfactory performance. According to Ghilotti, Synergy has

11 installed the work in accordance with the plans and specifications. (RT 85:9-21.)

12      Ghilotti testified that he does not agree that Synergy's work was substantially unsatisfactory

13 and not in substantial accordance with the plans and specifications. He believes the City did not

14 communicate that to GBI and that the City must be happy with the work because the City made a

15 progress payment to GBI three days before requesting termination of Synergy. (RT 87:2-17.)

16      Ghilotti testified that UCON, an association of general contractors that promotes and supports

17 general contractors, conducted a study in which it concluded that PG&E was the biggest offender in

18 mismarking and failing to mark their gas lines and utilities. UCON also concluded that PG&E has a

19 culture of shifting blame and denying responsibility. (RT 89:1-90:4.)

20      Before September 29, 2015, GBI did not have a site safety representative assigned to the

21 Project site every day. Prior to that, GBI had a safety key person who would visit the site two to three

22 days a week. (RT 93:11-94:24.)

23      Ghilotti testified that GBI, through its subcontractor Synergy, did not achieve the goal of no

24 public accidents, as stated in the Kickoff Partnering Workshop Report. (RT 95:4-12; Exh. 17.)

25      Ghilotti did not research the July 27, 2015 pedestrian injury incident enough to form an

26 opinion regarding fault for that incident and has no personal knowledge of the facts of that incident.

27 (RT 95:20-13.) Ghilotti was not present at the site when the first gas line break occurred on April 29,

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*     *Page 16 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 74 of 253

2487

2015. (RT 97:2-4.) Ghilotti testified that his knowledge about all of the incidents that have caused Public Works concern is based on his review of documents. He did not work at the Project site and visited it a couple times a month. (RT 97:22-98:8.)

On September 16, 2015, GBI shut down work at the Project to address the gas line break that had occurred that day and the "gas line issues previously discussed in" the merchant meeting the week before. (Exh. 37.) Ghilotti testified that after that work stoppage, GBI did not replace the Synergy superintendent. (RT 101:19-102:1.)

Ghilotti testified that the safety problems at the Project were the result of the City's failure to follow the partnering process outlined in the Partnering Kickoff meeting. (RT 81:6-84:2.)

Javad Mirsaidi ("Mirsaidi") is the president of Synergy. (RT 103:25-104:2.) Synergy has performed pipeline work for the City for 15 years. (RT 111:4-7.)

Between April 27, 2015 and late August or early September 2015, Mirsaidi visited the Project site once a day or so. Starting in late August or early September, he was at the Project site full time. (RT 104:3-104:15.)

Synergy's superintendent on the project was Ayyad; he served as superintendent from the beginning of the project on April 27, 2015, until the work stop letter on October 8, 2015, despite all the safety issues that Public Works had with the project. (RT 138:6-18.)

The foreman on the project was Hernandez; he stayed on as foreman until a week or two before the October 8 work stop letter. (RT 138:19-141:11.) Mirsaidi testified that Hernandez did not do a bad job with safety as foreman. (RT 142:18-22.)

Joe Ramirez began overseeing excavation near the end of September. (RT 148:10-17.) Synergy also brought on Juan Ochoa as an additional foreman in mid-September, but Mirsaidi testified that his decision to bring in Ochoa was because Synergy began to install the waterline at that time. He did not hire Ochoa in response to any gas line breaks. (RT 143:12-15, 146:7-147:12.)

Mirsaidi testified that the scope of work on this project was to install water, sewer, and associated laterals and surfaces on portions of Haight and Hayes Streets. (RT 105:7-22.) Mirsaidi

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 75 of 253

2488

1 calculated in September 2015 that Synergy was 20 percent ahead of schedule at that time. (RT
2 105:22-106:1.)

3 Mirsaidi testified that any time there was a safety incident, Synergy immediately initiated
4 reactive responses, trained, and asked for Cal/OSHA to come for a site visit and consultation. (RT
5 106:14-21.) Synergy provided additional training and safety communication to workers regarding
6 excavation for utility, traffic signs, preventing cave-ins, soil types, first aid, safety vests, how to call
7 911, backhoe and loader safety, rebar safety, reinforcing bars, etc. (RT 108:1-22.)

8 Mirsaidi testified that he requested a safety consultant from Cal/OSHA to visit the worksite
9 and provide an evaluation. The safety consultant visited the site on June 30, 2015. Cal/OSHA did not
10 issue any citations arising out of this visit. (RT 109:13-110:5.) Nonetheless, the safety consultant
11 indicated in his report that he found a "serious" hazard with an equipment truck located next to a
12 trench that had no shoring. The consultant recommended providing shoring to prevent collapse of the
13 trench. The consultant also found seven other violations that he categorized as "other than serious."
14 (Exh. P.)

15 Mirsaidi testified that the plans for the Project that the City provided indicated 357 utility
16 crossings, but by last count Synergy encountered 798 utility crossings. Synergy had received
17 $350,000 in change orders for unforeseen lines. (RT 114:17-115:4.) Not all of the 798 utilities that
18 Synergy located were marked on the street by the utilities. (RT 115:12-15.)

19 Mirsaidi testified that Synergy had done less than one block of a waterline on Haight Street.
20 (RT 118:17-19.) All of the gas line breaks that occurred were in that one block. (119:2-10.) One gas
21 line break occurred when Synergy worked on the sewer line, and four occurred when Synergy worked
22 on the waterline. (RT 119:11-17.) Originally, the waterlines were supposed to go on the sides of the
23 street, close to the curb and the gutter, but there were too many obstructions in that area. Public
24 Works directed Synergy to remove a concrete yoke structure under the street that used to support a
25 cable car line and install the waterlines in place of the yoke. (RT 119:18-123:3.) Mirsaidi testified
26 that when PG&E put their gas lines in the area of the concrete yoke structure, they either placed them

27
28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*     *Page 18 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 76 of 253

2489

1  too shallow, over the top of the structure, or drilled through the concrete structure at a depth that was
2  too shallow.  (RT 124:10-16.)

3      Regarding the April 29, 2015 gas line break, Mirsaidi testified that Synergy workers were
4  potholing in the area of the line.  The line was marked within 20 inches of where it was supposed to
5  be.  They exposed a steel gas line, not a plastic line.  Then they hit a second line in that location that
6  was plastic.  (RT 131:11-133:5.)

7      Regarding the August 27, 2015 gas line break, Mirsaidi testified that Synergy cut it when they
8  were saw cutting the surface of the street.  The gas line was improperly installed at only nine and a
9  half inches deep.  (RT 125:6-17.)  Mirsaidi believes Synergy is not responsible for this break, because
10  the gas line was not properly installed.  (RT 125:21-25.)

11      Regarding the September 16, 2015 gas line break, Mirsaidi testified that Synergy saw cut the
12  surface of the street and then began hand digging until they got to the concrete yoke structure.  Then
13  Synergy used mechanical equipment, which exposed the gas line.  Mirsaidi testified that the gas line
14  was improperly installed, cored through solid concrete, and there was no way of exposing it without
15  damaging it.  (RT 126:17-127:20.)

16      Regarding the October 6, 2015 gas line break, Mirsaidi testified that they were excavating six
17  feet away from a marking on the street indicating a gas line, and they hit the line.  The line was
18  improperly marked.  Synergy expected the line to be within two feet of the markings on the street, but
19  it was not.  (RT 128:17-129:19.)

20      Regarding the October 8, 2015 gas line break, Mirsaidi testified that Synergy workers cut or
21  chiseled through the concrete yoke structure, and "this portion of the solid line caved in and with that
22  cave-in, it brings the gas line with it and cuts it."  In hindsight, he sees a void behind where the cave-in
23  happened.  (RT 129:23-131:7.)

24      Regarding the June 23, 2015 incident where Lynch found an improperly shored trench,
25  Mirsaidi testified that he was not made aware of it "until this process started."  He looked at
26  photographs and he saw "very good shoring actually."  (RT 133:14-134:9.)

27
28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*                    *Page 19 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 77
of 253

2490

1  Regarding the July 21, 2015 incident in which a Synergy worker dangled foreman Hernandez

2  into a manhole after work had ended for the day, Mirsaidi testified that it "was un-excusable."  (RT

3  134:10-135:5.)

4      Regarding the July 27, 2015 incident in which a pedestrian tripped on a forklift that Synergy

5  left in a wheelchair ramp, Mirsaidi testified that he takes "responsibility for that, although we had

6  permission to store construction material in the sidewalk for three weeks. . . ."  (RT 135:6-18.)

7      Regarding a problem with road failures due to inadequate shoring on September 30, 2015,

8  Mirsaidi testified that he was not aware of that allegation.  (RT 150:11-19.)  He did not recall doing

9  anything to address road failures from inadequate shoring on September 30, 2015.  (RT 151:17-23.)

10

11                              **HEARING OFFICER'S FINDINGS**

12      Public Works presented sufficient evidence to establish by a preponderance of the evidence

13  that Synergy's work on the Project was substantially unsatisfactory and not in substantial compliance

14  with the plans and specifications.  There is no question that five gas line breaks, multiple violations for

15  unsafe shoring, a pedestrian trip and fall, and the other safety violations substantiated during this

16  proceeding were not in "substantial compliance with the plans and specifications" for this project.

17  Moreover, many of these safety violations – particularly the gas line breaks – presented a dangerous

18  situation and inconvenience to the public.  Thus, the undersigned finds that Public Works clearly

19  established that Synergy's work on the project was "substantially unsatisfactory."

20      Synergy and Mr. Ghilotti contend that nearly all the safety issues on this project resulted from

21  Public Works' failure to "partner" the project, or PG&E's failure to properly install or mark the gas

22  lines.  (RT 81:6-84:2, 171:9-172:4.)  The undersigned is not persuaded that these explanations mitigate

23  the serious safety violations substantiated by Public Works.

24      With respect to the April 29 gas line break, the undersigned finds that Synergy violated Section

25  4216.4 of the Government Code when it failed to hand dig around the area of the gas line.  Synergy's

26  explanation for this break is that it located a steel line and believed that the steel line was the active

27  gas line, and then began to excavate with power-driven excavation equipment.  It is undisputed that

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*                    *Page 20 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 78 of 253

**2491**

1  PG&E properly marked the line as a 1/2-inch plastic line. Synergy should have continued to hand dig

2  until it located the plastic line indicated by PG&E.

3       Regarding the August 27 gas line break, Synergy contends that PG&E improperly installed the

4  line at a depth that was too shallow. Public Works and PG&E contend that Synergy's saw cutter used

5  a blade that was too large to cut only the road surface, and that the blade cut past the asphalt and into

6  the soil below, severing the line. The undersigned agrees that this particular line was not installed at

7  the proper depth, but that Synergy should have nonetheless ensured that the saw blade used did not

8  protrude into the soil beneath the road surface. If this were the only gas line break and absent the other

9  serious safety problems, this gas line break alone would not likely support Public Works'

10  determination. Yet, there were four other breaks and many other safety problems.

11       Regarding the September 16 gas line break, Public Works contends the line was installed in

12  soil. Synergy contends the line was improperly cored through the concrete yoke structure and there

13  was no way of exposing it without cutting it. There is no dispute that the line was properly marked

14  and that Synergy workers used a machine-powered excavator to excavate within 24 inches of a marked

15  line and cut the line. The undersigned is troubled that Synergy's proffered explanation for this gas line

16  break is that they knew they were going to break the gas line, but because it was in concrete, they

17  proceeded anyhow. The undersigned finds that Synergy violated Section 4216.4 of the Government

18  Code when it failed to hand dig around the area of the gas line. Even assuming that the line was cored

19  through the concrete structure – which is not necessarily supported by the photographic evidence – this

20  does not make it reasonable for Synergy to use an excavator in the vicinity of the line. Before placing

21  the public at risk by knowingly excavating in an area of a marked gas line, Synergy should have

22  contacted PG&E for further information regarding the line or should have otherwise developed a plan

23  to safety excavate the area. *See* Gov't Code § 4216.4(b) ("If the exact location of the subsurface

24  installation cannot be determined by hand excavation . . . the excavator shall request the operator to

25  provide additional information . . . .")

26       With respect to the October 6 gas line break, Synergy contends that PG&E improperly marked

27  the line, because the markings on the street were not within 24 inches of the line. Public Works

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*                    *Page 21 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 79
of 253

2492

1  contends that PG&E informed Synergy that it was to "daylight" the area of the gas line, because the
2  PG&E line locator could not pinpoint the exact location of the line.  Synergy offers no explanation for
3  why it did not hand dig in the area PG&E instructed it to "daylight."  The undersigned finds that it was
4  not reasonable for Synergy to disregard the instruction provided by PG&E and use excavation
5  equipment in the area PG&E stated should be dug with hand tools.

6       Regarding the October 8 gas line break, the undersigned is persuaded that Synergy did not
7  properly shore the area of the gas line after exposing it and breaking it on October 6, as it was required
8  to do by regulation.  *See* 8 Cal. Code Reg. § 1541(b)(4).  Synergy offers no coherent explanation for
9  why it did not make better efforts to protect the line from further damage.  In light of the other shoring
10 deficiencies during the course of the project, it is not surprising that a shoring issue would cause
11 concrete to fall onto the line and sever it.

12      With respect to the shoring problems, Public Works presented sufficient evidence to establish
13 that Synergy improperly shored trenches on June 23, September 15, September 16, September 18,
14 September 30, and October 8.  *See* Cal. Code Reg. § 1541(i)(3), (j)(1).  The undersigned is troubled
15 that Synergy repeatedly engaged in improper shoring techniques after being advised of the issue on
16 multiple occasions.  Synergy and GBI have recognized the importance of proper shoring and the
17 danger associated with allowing work in inadequately shored trenches.  (Exh. 31, OSHA Fact Sheet
18 regarding trenching attached to emails from GBI and Synergy.)

19      Regarding the July 21 incident in which Synergy workers returned to the worksite after hours
20 and dangled foreman Hernandez into a manhole by his ankles, the facts of the incident are undisputed.
21 The undersigned finds this conduct extremely dangerous and unacceptable and a violation of
22 California regulation.  8 Cal Code Reg. § 5158(d)(3), (e)(1).  The fact that Hernandez continued as the
23 Synergy foreman for two months following this incident is an additional indication that Synergy did
24 not properly respond to safety issues.  Indeed, in light of this incident alone, it is astonishing that
25 Synergy president Mirsaidi testified Hernandez did not do a bad job with safety issues as foreman for
26 the Project.

27

28

*In the Matter of Synergy Project Management Inc.'s Objections to DPW Notice of Substitution – Hearing Officer's Findings*                    *Page 22 of 23*

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 80 of 253

2493

1       Regarding the July 27 trip and fall incident, Public Works presented sufficient evidence to

2   establish that Synergy placed the forklift in the pedestrian right of way, causing a hazard that resulted

3   in the pedestrian injury.  Synergy did not properly separate the pedestrian right of way from the

4   construction site and should not have left the fork on a wheelchair ramp.

5       The undersigned also finds sufficient evidence that Synergy (1) failed to open the roadway by

6   4:00 p.m. on May 1, 2015, (2) improperly fueled a generator on September 18, 2015, (3) placed

7   inaccurate traffic control signs on September 28, 2015, (4) did not ensure its equipment operator wore

8   a seat belt on October 2, 2015, (5) failed to properly store unused trucks, materials, and employee

9   vehicles on October 2, 2015, (6) failed to put non-skid coating on steel road plates on October 5, 2015,

10  and (7) committed violations regarding employee parking on October 6, 2015.

11      Finally, the undersigned is not convinced that all the safety problems discussed above were the

12  result of the City's failure to "partner" the project, as Synergy and Mr. Ghilotti have suggested.  It is

13  clear from the evidence presented by Public Works that the problems on this project were no secret to

14  GBI or Synergy.  Public Works consistently communicated Synergy's safety issues to both Synergy

15  and GBI.  Even after Public Works shut down work on the project in September, two more gas line

16  breaks occurred and Public Works issued multiple safety violations for a variety of problems.  Synergy

17  and Mr. Ghilotti's desire for more communication is no excuse for the serious public safety problems

18  caused by Synergy's work on this project.

19                                      **CONCLUSION**

20      Based on the foregoing, the undersigned **FINDS** that Public Works has established by a

21  preponderance of the evidence that Synergy's work on the project was "substantially unsatisfactory

22  and not in substantial compliance with the plans and specifications."  Accordingly, the undersigned

23  **UPHOLDS** Public Works' determination to remove Synergy as a subcontractor on Project

24  PCE15018/2264J(R).

25
26  Date: 1/8/2016

27                                      TIM LEUNG
                                        HEARING OFFICER
28

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 81
of 253

2494

**Exhibit D**



**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

# Document Scanning Lead Sheet

Jul-10-2017 2:32 pm

Case Number: CGC-17-560034

Filing Date: Jul-10-2017 2:12

Filed by: NEYL WEBB

Image: 05938491

COMPLAINT

SYNERGY PROJECT MANAGEMENT, INC. VS. CITY AND COUNTY OF SAN FRANCISCO

001C05938491

**Instructions:**
Please place this sheet on top of the document to be scanned.



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CITY AND COUNTY OF SAN FRANCISCO

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SYNERGY PROJECT MANAGEMENT, INC.

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | **CASE NUMBER:** *(Número del Caso):* **17-560034** |
|---|---|
| San Francisco County Superior Court-Civic Center Courthouse 400 McAllister Street, San Francisco, CA 94102 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kris A. Cox, 220 Montgomery Street, Suite 2100, San Francisco, CA 94104, Phone: 415-362-3599

| DATE: *(Fecha)* **JUL 1 0 2017** | **Clerk of the Court** Clerk, by *(Secretario)* Neyl Webb | Deputy *(Adjunto)* |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons *(form POS-010)*.)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**[SEAL]**

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify):* City and County of San Francisco

| under: ☐ CCP 416.10 (corporation) | ☐ CCP 416.60 (minor) |
|---|---|
| ☐ CCP 416.20 (defunct corporation) | ☐ CCP 416.70 (conservatee) |
| ☐ CCP 416.40 (association or partnership) | ☐ CCP 416.90 (authorized person) |
| ☒ other *(specify):* As a public entity | |

4. ☐ by personal delivery on *(date):*

**BY FAX**
**ONE LEGAL LLC**

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Page 1 of 1 Code of Civil Procedure §§ 412.20, 465 *www.courtinfo.ca.gov* |
|---|---|---|

MATTHEW K. YAN, State Bar No. 257918
KRIS A. COX, State Bar No. 136504
ERIN H. REDING, State Bar No. 252691
MOSCONE EMBLIDGE & OTIS LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone:     (415) 362-3599
Facsimile:     (415) 362-2006
Email: cox@mosconelaw.com
         reding@mosconelaw.com

Attorneys for Plaintiff
SYNERGY PROJECT MANAGEMENT, INC.

**FILED**
San Francisco County Superior Court

JUL 10 2017

CLERK OF THE COURT
BY: _____
                    Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN FRANCISCO – UNLIMITED CIVIL JURISDICTION

SYNERGY PROJECT MANAGEMENT, INC.,

    Plaintiff,

vs.

CITY AND COUNTY OF SAN FRANCISCO,

    Defendant.

Case No. **CGC-17-560034**

**COMPLAINT**

1. **Intentional Interference with Contractual Relations**
2. **Intentional Interference with Prospective Economic Advantage**
3. **Negligent Interference with Prospective Economic Advantage**

**BY FAX**
ONE LEGAL LLC

## PRELIMINARY ALLEGATIONS

1. In January 2015, after an improperly held hearing, an employee of the City and County of San Francisco ("City") issued a statement of findings ("Statement of Findings") related to a dispute about the City's public works project located on Haight and Hayes Streets.

2. The City's issuance of the Statement of Findings interfered with the contract between subcontractor Synergy Project Management, Inc. ("Synergy") and general contractor Ghilotti Brothers, Inc. ("GBI").

3. The City's issuance of the Statement of Findings also interfered with Synergy's prospective economic advantage.

---

COMPLAINT             1             Case No. _____

**PARTIES**

4.  Synergy Project Management, Inc. is a California corporation, qualified to do business in California, and located in San Francisco, California.

5.  Defendant City and County of San Francisco is a municipal corporation existing under the laws of the State of California, and is both a Charter City and a County under the Constitution of the State of California.

**JURISDICTION AND VENUE**

6.  This Court has jurisdiction of the subject matter for each of the causes of action in this Complaint because the total amount of damages claimed herein exceeds the minimum jurisdictional limit of this Court.

7.  Venue in this Court is proper pursuant to California Code of Civil Procedure Section 395 because this complaint concerns a construction project located in San Francisco County, the contract alleged by Synergy was entered into in San Francisco County and to be performed here, and the other injuries Plaintiff alleges in this complaint all occurred in this County.

8.  Additionally, venue is proper in this Court because Defendant is the City and County of San Francisco.

**FACTS**

9.  On February 10, 2015, the City and GBI entered into a contract to replace the sewer line, install new water lines, and renovate the pavement on Haight Street and Hayes Street, referred to as DPW Project No. PCE 15018/2264J(R), "Pavement Renovation, Sewer Replacement, and Water Main Installation – Haight Street and Hayes Street" (the "Project").

10. In GBI's bid for the Project, GBI selected and listed Synergy as a subcontractor on GBI's contract with the City .

11. Synergy's role was to perform the underground excavation and utilities work on the Project.

---

COMPLAINT                              2                    Case No. _____

1    12. GBI and Synergy entered into a Subcontract Agreement on April 17, 2015. Attached

2   hereto as **Exhibit A** is a true and correct copy of the Subcontract Agreement.

3    13. Once GBI listed Synergy as a subcontractor on GBI's bid to the City, and the City

4   accepted the bid and signed a contract with GBI, Synergy had the right to complete its work on

5   the Project unless it was removed pursuant to the provisions of the Subletting and Subcontracting

6   Fair Practices Act, California Public Contract Code Sections 4100 *et seq.*, (hereinafter the

7   "Subletting and Subcontracting Fair Practices Act") which establishes a detailed, mandatory

8   framework for competitive bids on public works projects.

9    14. Additionally, the Subcontract Agreement between Synergy and GBI gave Synergy the

10   right to perform work on the Project. It further provided that GBI would "pay [Synergy] for the

11   satisfactory performance of this Agreement. . ." (Exhibit A, p. 1.)

12    15. The Subcontract Agreement between Synergy and GBI explicitly provided for how GBI

13   could terminate Synergy as subcontractor on the Project. If "at any time [Synergy] breach[ed]

14   this Agreement or failed[ed] to prosecute the said work with promptness, diligence and

15   efficiency or fail[ed] to perform any of the requirements hereof, [GBI] may. . . terminate the

16   employment of [Synergy]." (Exhibit A, pp. 11-12.) The Agreement further provided that, "In its

17   sole discretion and to the extent permitted by law, [GBI] may terminate this Agreement without

18   cause." (Exhibit A, p. 12.)

19    16. The Subletting and Subcontracting Fair Practices Act contains mandatory and

20   comprehensive requirements for when and how a listed subcontractor on a public works project

21   can be removed or replaced. The City has adopted the provisions of the Subletting and

22   Subcontracting Fair Practices Act as an ordinance applying to its public works projects.

23    17. Nothing in the Subcontract Agreement or the Subletting and Subcontracting Fair

24   Practices Act gave any party, other than GBI, the right to terminate Synergy from the Project.

25   (Exhibit A.)

26    18. GBI and Synergy began work on the Project in April 2015.

27

28

COMPLAINT                                    3                    Case No. _____

1    19. The Project was a particularly difficult one. Throughout its excavation work, Synergy

2    encountered 798 underground utilities. Of those, the project plans had only identified 357. More

3    than 400 of the underground utilities were unknown to Synergy and therefore unanticipated.

4    20. Even for the underground facilities that the utility companies *had* identified, many did not

5    comply with industry standards for placement, and critical information about those utilities was

6    incorrect. As a result, Synergy encountered unprecedented obstacles.

7    21. Of the almost 800 underground utilities, Synergy damaged five PG&E gas lines during

8    the course of the project.

9    22. On October 8, 2015, purportedly because of the gas line accidents, the Director of Public

10   Works wrote a letter to GBI instructing all work on the project to stop and further stating: "You

11   are hereby directed . . . to remove [Synergy] immediately."

12   23. The City cited section California Public Contract Code Sections 4100, *et seq.*, and a

13   clause in its contract with GBI, as support for the direction.

14   24. GBI objected to the substitution but began soliciting proposals from other qualified

15   bidders because it needed a subcontractor to finish the project.

16   25. On October 14, 2015, the City informed Synergy that the City had "directed Ghilotti to

17   remove Synergy and to substitute a replacement contractor." The letter cited Section 4107(a)(7)

18   as support for the City's action.

19   26. Synergy submitted a formal objection to the removal five days later.

20   27. The City responded approximately one month later on November 16, 2015, reiterating its

21   reliance on Section 4107(a)(7) for its removal of Synergy.

22   28. On December 9, 2015, Synergy and the City participated in an administrative hearing

23   before a City-appointed hearing officer, who was an employee of the City.

24   29. The City undertook to prove at the hearing that it had the right to remove Synergy from

25   the Project without the consent or request of the prime contractor, GBI.

26   30. GBI testified at the hearing on behalf of Synergy and in opposition to the City's actions.

27   31. On January 8, 2015, the hearing officer issued a Statement of Findings, which rejected

28   Synergy's arguments about the propriety and legality of the City's use of Section 4107(a)(7) to

---

COMPLAINT                              4                          Case No. _____

1   hold the hearing, and instead adopted the City's theory that it could use the section to unilaterally

2   remove Synergy as a subcontractor on the project, without the prime contractor requesting that

3   Synergy be removed.

4       32. While the City wrote three previous letters regarding removing Synergy from the Project

5   (*see* ¶¶ 20, 23, 25), the removal was not official or final until the hearing officer issued his

6   Statement of Findings on January 8, 2015.  The prior letters asserting the City's desire to remove

7   Synergy from the project did not carry the necessary authority to remove Synergy from the

8   Project.  The only way Synergy could have been properly removed from the Project was under

9   the authority of a hearing that complied with the relevant sections of the Subletting and

10  Subcontracting Fair Practices Act.

11      33. Synergy brought a Petition for Writ of Mandate to review the Hearing Officer's ruling. In

12  its Writ of Mandate, Synergy argued that the City failed to act as required by law because, while

13  the City claimed that it had authority under Public Contract Code Section 4107 to unilaterally

14  remove Synergy from the Project, Section 4107 did not provide the City with any such authority.

15  Synergy further argued that the City had no other legal authority to remove a subcontractor from

16  a public works project without the request of the prime contractor.  Therefore, Synergy argued,

17  the hearing that resulted in the City's Statement of Findings, was improperly held and without

18  legal authority.  As a result, the resulting Statement of Findings was equally improper and had no

19  authority.

20      34. On November 10, 2016, the San Francisco Superior Court granted Synergy's Writ and

21  ordered the Hearing Officer's Determination to be vacated, finding that the City's actions were

22  not supported by the law.  Attached hereto as **Exhibit B** is a true and correct copy of the court's

23  order.

24

25                          **FIRST CAUSE OF ACTION**
                    **Intentional Interference with Contractual Relations**

26      35. Plaintiff incorporates by reference each and every allegation in each preceding paragraph

27  as if fully set forth herein.

28

---

COMPLAINT                              5                    Case No. _____

1    36. At the time the City issued its Statement of Findings related to the dispute about the
2    Project, a valid contract existed between Synergy and GBI. (*See* Exhibit A.)

3    37. The City had knowledge of the contract between Synergy and GBI because, in the bid
4    GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project.
5    Therefore, the City knew a subcontract had been entered between GBI and Synergy.
6    Consequently, the City also knew that Synergy had a right to perform the work on the Project
7    unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting
8    Fair Practices Act.

9    38. The City's issuance of a Statement of Findings was the official and final act that removed
10   Synergy from the Project. The issuance was an intentional act to induce a breach or disruption in
11   the contract between Synergy and GBI. The January 8, 2016 Statement of Findings adopted the
12   City's theory that it could use Section 4107(a) to unilaterally remove Synergy as a subcontractor
13   on the project, without GBI requesting that Synergy be removed.

14   39. The sole design and purpose of the City's issuance of the Statement of Findings was to
15   disrupt the contract between Synergy and GBI by unliterally removing Synergy from the Project
16   and depriving Synergy of the right to perform the work under its contract with GBI.

17   40. The issuance of the Statement of Findings caused a breach or disruption in the contractual
18   relationship between Synergy and GBI because the issuance deprived Synergy of the rights
19   afforded to it in the contract between Synergy and GBI, specifically performing work on the
20   Project.

21   41. The issuance of the Statement of Findings also caused a breach or disruption in the
22   contractual relationship between Synergy and GBI because the issuance breached and disrupted
23   the contract provisions that provided only GBI could terminate Synergy from the Project in
24   compliance with the Subcontracting and Subletting Fair Practices Act.

25   42. Synergy was damaged by the City's intentional act of issuing the Statement of Findings
26   because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete
27   its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed
28

---

COMPLAINT                                    6                    Case No. _____

1  overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the
2  contract between Synergy and GBI.

3      WHEREFORE, Synergy prays for relief as hereinafter set forth.

4

5                           **SECOND CAUSE OF ACTION**
         **Intentional Interference with Prospective Economic Advantage**

6      43. Plaintiff incorporated by reference each and every allegation in each preceding paragraph
7  as if fully set forth herein.

8      44. At the time the City issued its Statement of Findings related to the dispute about the
9  Project, an economic relationship existed between Synergy and GBI, with the probability of
10  economic benefit to Synergy.  (*See* Exhibit A.)

11      45. The City had knowledge of the relationship between Synergy and GBI because, in the bid
12  GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project.
13  Therefore, the City knew a subcontract had been entered between GBI and Synergy.
14  Consequently, the City also knew that Synergy had a right to perform the work on the Project
15  unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting
16  Fair Practices Act.

17      46. The City's issuance of a Statement of Findings was the official and final act that removed
18  Synergy from the Project.  The issuance was an intentional act to disrupt the economic
19  relationship between Synergy and GBI.  The January 8, 2016 Statement of Findings adopted the
20  City's theory that it could use Section 4107(a) to unilaterally remove Synergy as a subcontractor
21  on the project, without GBI requesting that Synergy be removed.

22      47. The issuance of the Statement of Findings actually disrupted the economic relationship
23  between Synergy and GBI because the issuance deprived Synergy of the rights afforded to it in
24  the contract between Synergy and GBI.

25      48. The issuance of the Statement of Findings also disrupted the economic relationship
26  between Synergy and GBI because the issuance disrupted the contract provisions that provided
27  only GBI could terminate Synergy from the Project in compliance with the Subcontracting and
28  Subletting Fair Practices Act.

COMPLAINT                              7                 Case No. _____

1    49. The City's interference was wrongful, not just because the City interfered with an

2    existing economic relationship, but also because the City's actions were proscribed by statute

3    and contravened Section 4107 of the Public Contract Code. (*See* Exhibit B.) The San Francisco

4    County Superior Court confirmed that the City's actions contravened Section 4107 in its

5    November 10, 2016 order granting Synergy's Writ and ordering the Hearing Officer's

6    Determination to be vacated because the City's actions were not supported by the law. (*Id.*)

7    50. Synergy incurred economic harm from the City's intentional act of issuing the Statement

8    of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable

9    to complete its work on the Project and be compensated for that work; (3) Synergy was left with

10   unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded

11   to it by the contract between Synergy and GBI.

12       WHEREFORE, Synergy prays for relief as hereinafter set forth.

13

14                          **THIRD CAUSE OF ACTION**
                **Negligent Interference with Prospective Economic Advantage**

15   51. Plaintiff incorporated by reference each and every allegation in each preceding paragraph

16   as if fully set forth herein.

17   52. Synergy and GBI were in an economic relationship that would have resulted in future

18   economic benefit to Synergy because the subcontract agreement entered into by Synergy and

19   GBI gave Synergy a right to work on the Project, and a right to be compensated for its work on

20   the Project.

21   53. The City knew or should have known of the relationship between Synergy and GBI

22   because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform

23   work on the Project. Therefore, the City knew a subcontract had been entered between GBI and

24   Synergy. Consequently, the City also knew that Synergy had a right to perform the work on the

25   Project unless GBI removed Synergy under the relevant provisions of the Subletting and

26   Subcontracting Fair Practices Act

27   54. The City knew or should have known that this relationship between Synergy and GBI

28   would be disrupted if the City failed to act with reasonable care. The harm to Synergy, resulting

---

COMPLAINT                                8                    Case No. _____

1   from the issuance of the Statement of Findings, was foreseeable. It was obvious and undeniable

2   that removing Synergy from the Project would harm Synergy by preventing it from completing

3   work on the Project, preventing Synergy from being compensated for that work, leaving Synergy

4   with unabsorbed overhead and unrealized profit, and depriving Synergy of the rights afforded to

5   it by the contract between Synergy and GBI.

6       55. The City failed to act with reasonable care because it engaged in wrongful conduct that

7   was proscribed by statute and contravened Section 4107 of the Public Contracting Code. (*See*

8   Exhibit B.) The San Francisco County Superior Court confirmed that the City's actions

9   contravened Section 4107 in its November 10, 2016 order granting Synergy's Writ and ordering

10  the Hearing Officer's Determination to be vacated because the City's actions were not supported

11  by the law. (*Id.*)

12      56. The relationship between Synergy and GBI was disrupted because the City's issuance of

13  the Statement of Findings removed Synergy from the Project and caused a breach or disruption

14  in the subcontract agreement between GBI and Synergy.

15      57. Synergy was harmed and the City's wrongful conduct was a substantial factor in causing

16  Synergy's harm. Synergy suffered injury by the City's issuance of the Statement of Findings

17  because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete

18  its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed

19  overhead; and (4) Synergy was deprived of the rights afforded to it by the contract between

20  Synergy and GBI.

21      58. Furthermore there was a sufficiently close connection between the City's issuance of the

22  Statement of Findings and the removal of Synergy from the Project because the issuance was the

23  direct and immediate cause of the removal of Synergy from the Project. While the City wrote

24  three previous letters regarding removing Synergy from the Project (*see* ¶¶ 20, 23, 25), the

25  removal was not official or final until the hearing officer issued his Statement of Findings on

26  January 8, 2015. (*See* ¶ 30.)

27      59. The City's issuance of its Statement of Findings, removing Synergy from the Project, was

28  intended to affect Synergy because the sole purpose of the issuance was to remove Synergy from

COMPLAINT                              9                    Case No. _____

the Project, or the City should have known that its actions would have this effect and the City negligently undertook its course of action.

60. For all of these reasons, the City owed Synergy a duty of care, which it breached when it issued a Statement of Findings that was designed to remove Synergy from the Project.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

## PRAYER

WHEREFORE, Plaintiff prays for relief as follows:

1. For damages in an amount to be proven at trial;

2. For costs of suit; and

3. For such other relief as the Court may deem just and proper.

Dated: July 10, 2017

Respectfully Submitted,

MOSCONE EMBLIDGE & OTIS LLP

By: _____
        Kris A. Cox

Attorneys for Plaintiff SYNERGY
PROJECT MANAGEMENT, INC.

COMPLAINT                                        10                        Case No. _____

# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333





Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

### I.     SCOPE OF WORK

a)  SUBCONTRACTOR shall furnish all labor, material, supplies and equipment, and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of the CONTRACTOR, and all work incidental thereto, all in accordance with the terms and conditions of the General Contract including the General Conditions, Drawings, Specifications and other Documents, which by Reference, are made part of said General Contract, all of which shall be considered part of the AGREEMENT by this Reference thereto, and SUBCONTRACTOR agrees to be bound to CONTRACTOR and OWNER by the terms and Provisions thereof.

b)  CONTRACTOR shall have the same rights and privileges as against the SUBCONTRACTOR herein as the OWNER in the General Contract has against CONTRACTOR.

c)  It is agreed that the materials to be furnished and/or work to be done by the Subcontractor are as stated on page 1 of the attached Job Specific Scope of Work line items.

### II.     AGREEMENT PRICE AND PAYMENT



a)  CONTRACTOR will pay SUBCONTRACTOR for the satisfactory performance of this AGREEMENT, the sum as PER PRICES SET FORTH ABOVE IN THE ATTACHED JOB SPECIFIC SCOPE OF WORK LINE ITEMS, subject to additions and deductions provided for herein.

CONTRACTOR agrees to pay SUBCONTRACTOR for said work subject to additions and deductions as herein provided, payable as work progresses, on estimates made and approved by CONTRACTOR and within three (3) days after CONTRACTOR actually receives payment from OWNER on account of SUBCONTRACTOR's work. CONTRACTOR may withhold retention from SUBCONTRACTOR progress payment. The percentage of retention withheld shall not exceed the percentage withheld under CONTRACTOR's contract with the OWNER. SUBCONTRACTOR agrees to furnish, if and when required by CONTRACTOR, payroll affidavits (including statements of non-performance for CONTRACTOR records), receipts, vouchers, releases of claims of labor, and material, and agrees to furnish same from its subcontractors, suppliers and/or materialmen in form satisfactory to CONTRACTOR prior to receipt of any payment. CONTRACTOR may, at its option, make any payment or portion thereof by joint check payable to SUBCONTRACTOR and any of its subcontractors, suppliers and/or materialmen. Nothing herein shall waive or impair any rights of either party, at law or in equity, to setoff.   Upon reasonable written notice, CONTRACTOR shall have the right to pay union benefit trust funds, employees, subcontractors, suppliers, taxing authorities, apprenticeship councils, and any other creditors of SUBCONTRACTOR, or creditors of SUBCONTRACTOR's lower tier subcontractors or suppliers for the 2264J project, if SUBCONTRACTOR fails to do so, and satisfaction of the obligations owed by SUBCONTRACTOR to such persons shall constitute payment for purposes of this Agreement, with the amounts otherwise owed under this Agreement to be adjusted accordingly. **Notwithstanding the foregoing requirements of this Article II, Subcontractor expressly does not waive any statutory right to collect prompt payment penalties.**



b)  CONTRACTOR may in addition withhold from any payment or retention up to 150% of the amount of any disputed item, including without limitation, amounts CONTRACTOR believes may be necessary to withhold to protect CONTRACTOR from any potential claims which may result from SUBCONTRACTOR failing to furnish appropriate waivers and releases for itself or any lower tier subcontractors or suppliers.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 97
of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333





**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

# Subcontract General Terms & Conditions – Long Form

c) On public works projects with the State of California or any subdivision thereof, the amounts (if any) which CONTRACTOR is obligated by this AGREEMENT to pay as retention shall be paid within three (3) days after receipt of retention by CONTRACTOR; additionally, on such state or local projects, the percentage of retention withheld (when there are no additional reasons for withholding) shall not exceed the percentage required to be withheld under CONTRACTOR's contract with the OWNER. On such a state or local public works project, a SUBCONTRACTOR with a contract of 5% or more of the project price also may have the right under applicable law and depending on the circumstances either to post securities in lieu of retention or to receive interest on certain sums when the CONTRACTOR has posted securities in lieu of retention.

d) Notwithstanding any other term of this AGREEMENT, CONTRACTOR shall be permitted a reasonable period of time to pursue remedies and collect from OWNER or other persons for progress payments, final payments or other payments on account of SUBCONTRACTOR's work or claims, before payment shall become due to SUBCONTRACTOR. What is a "reasonable time" shall be decided based upon all relevant circumstances, but shall in no event be less than the amount of time needed to pursue to conclusion (including collection) available remedies against OWNER, insurers, other subcontractors, or any other party responsible for payment. Notwithstanding any provision of this AGREEMENT, if the reason that a payment by OWNER to CONTRACTOR has failed to come due is not because of an act or omission of SUBCONTRACTOR (including, without limitation, a deficiency in SUBCONTRACTOR's work) then the payment shall become due no later than ten (10) days after it would otherwise have become due in the absence of a failure by OWNER to have made payment."



## III. SUBCONTRACTOR'S OBLIGATIONS

a) SUBCONTRACTOR acknowledges that he has read the GENERAL CONTRACT and all plans and specifications and is familiar therewith and agrees to comply with and perform all provisions thereof applicable to SUBCONTRACTOR.

b) The SUBCONTRACTOR shall conform in all respects to the provisions and regulations of any general or local act or ordinance, or any local authority which may be applicable to the work, hold harmless, defend, and indemnify the CONTRACTOR against all penalties by reason of nonobservance of any such provisions or regulations. SUBCONTRACTOR will abide by and comply with all OSHA standards and regulations. If SUBCONTRACTOR's conduct results in an OSHA violation or citation, they will be held responsible for the resulting fines against themselves and the CONTRACTOR, as well as any resulting legal fees.

c) SUBCONTRACTOR agrees to obtain and pay for all licenses and official inspections made necessary by its work and to comply with all codes, laws, ordinances and regulations bearing on its work and the conduct thereof.

d) SUBCONTRACTOR shall remove from the premises, as often as directed by the CONTRACTOR, all rubbish and surplus material which may accumulate from the prosecution of said work and should SUBCONTRACTOR fail to do so, CONTRACTOR may, at his option, remove same without further notice at SUBCONTRACTOR'S expense.

e) SUBCONTRACTOR shall submit six (6) copies of submittal data. Reference to the applicable sections of the contract documents for those items is required. Submittal shall reference the project title, number and specification section. All submittals must be submitted to the CONTRACTOR within twenty (20) working days of Subcontract NTP date.



f) On all projects subject to state or local prevailing wage requirements, SUBCONTRACTOR shall comply with any applicable California prevailing wage laws. The provisions of California Labor Code Sections 1771, 1775, 1776, 1777.5, 1813 and 1815 shall apply. On all such projects, as a condition precedent to final payment,

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 98
of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333




Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions — Long Form

SUBCONTRACTOR agrees to provide an affidavit that complies with the terms of Labor Code Section 1775(b)(4). SUBCONTRACTOR acknowledges and agrees that it has performed its own investigation as to the applicability of California prevailing wage laws, the federal Davis-Bacon Act, or any similar laws, regulations, or contract requirements; SUBCONTRACTOR shall comply with all applicable laws, regulations, or other requirements concerning payment of wages and conditions of employment, and record keeping in accordance therewith. SUBCONTRACTOR agrees to furnish certified payrolls promptly upon demand and further agrees to cooperate fully in any effort by CONTRACTOR to verify compliance with labor laws and regulations, including requirements under the Davis-Bacon Act or the California Labor Code. Such cooperation shall include, without limitation, furnishing copies and originals of records and providing access to employees or witnesses for interviews and statements. In addition to and without derogation to any other rights that Contractor may enjoy, CONTRACTOR may withhold sufficient funds to protect Contractor against any claims related to labor requirements, including without limitation, requirements under the Davis-Bacon Act or the California Labor Code. SUBCONTRACTOR agrees that the amounts set forth as the Agreement Price shall be deemed to be full compensation for compliance with such laws, regulations, or requirements, including payment of all applicable wage rates, and that no additional compensation will be owed to SUBCONTRACTOR in the event that SUBCONTRACTOR is required thereunder to pay higher wages or incur additional costs that SUBCONTRACTOR contends that it did not anticipate.



g) The SUBCONTRACTOR, as a part of the obligations assumed by him in this AGREEMENT, accepts exclusive liability for all taxes and contributions required of the CONTRACTOR or SUBCONTRACTOR by the Federal Social Security Act and the Unemployment Compensation Law or similar law in any state in respect to the employees of SUBCONTRACTOR in the performance of the work herein provided for, and agrees to furnish CONTRACTOR with suitable written evidence that he has been authorized to accept such liability. The SUBCONTRACTOR further agrees that if he cannot furnish said evidence or should fail to do so prior to beginning his work, the CONTRACTOR may, at his option, pay or reserve for payment said taxes and contributions and deduct the amount paid or reserved from payments due, or to become due, the SUBCONTRACTOR. The SUBCONTRACTOR agrees to hold harmless, defend and indemnify the CONTRACTOR against all liability in respect to said employees under said act or law.

h) The SUBCONTRACTOR accepts exclusive liability for any and all sales tax or use tax which may be assessed against materials, equipment or labor used in this part of the work.

i) SUBCONTRACTOR shall provide safe and sufficient facilities to OWNER, ENGINEER, CONTRACTOR, or their duly authorized representatives for inspection of the work by SUBCONTRACTOR.

j) SUBCONTRACTOR shall provide safe and sufficient facilities for SUBCONTRACTOR'S own workmen, suppliers, and any other individuals for whom SUBCONTRACTOR is responsible.

k) SUBCONTRACTOR shall within one (1) working day after receiving written notice from CONTRACTOR proceed promptly to remove from the site all materials and work which the ENGINEER has condemned or failed to approve and shall promptly make good all such work and all other work damaged or destroyed in removing or making good said condemned work.

l) SUBCONTRACTOR shall warrantee and guarantee all work done by him under this AGREEMENT against deficiencies and defects in materials and/or workmanship for the period of time of CONTRACTOR'S warrantee and guarantees to OWNER, but in no event for less than one year after notice of completion is recorded.

m) SUBCONTRACTOR shall at all times supply adequate tools, appliances and equipment, a sufficient number of properly skilled workmen and a sufficient amount of materials and supplies of proper quality to efficiently and


Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 99 of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333




**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

promptly prosecute said work and shall promptly pay for all materials purchased and shall pay all workmen each week and obtain and furnish CONTRACTOR weekly with two (2) copies of certified payroll upon request.

n) The SUBCONTRACTOR shall give his personal superintendence to the work or have a competent foreman or superintendent satisfactory to CONTRACTOR on the work at all times during progress with authority to act for him.

o) In the event of a dispute, SUBCONTRACTOR shall comply with CONTRACTOR'S written directives and shall continue performance in accordance with V(e).

### IV. ENTIRE AGREEMENT

This Agreement represents the entire agreement between CONTRACTOR and the SUBCONTRACTOR and supersedes any prior written or oral representations. SUBCONTRACTOR, its subcontractors, suppliers and/or materialmen are bound by the prime contract and any contract documents incorporated therein insofar as they relate in any way, directly or indirectly, to the work covered by this Agreement.

### V. PERFORMANCE OF WORK (TIME & SCHEDULE)

a) On Caltrans A+B projects, or on other projects where the CONTRACTOR'S bid proposal to the OWNER includes not only price(s), but also durations and/or dates for performance, SUBCONTRACTOR agrees that at no additional cost it shall conform to the CONTRACTOR'S baseline schedule and all revisions thereto, and the activities and durations therein, which the CONTRACTOR has designated in order to meet milestones, completion dates and durations based on the CONTRACTOR'S bid, notwithstanding that the OWNER'S solicitation for bid proposals may have permitted the submission of a bid proposal that includes completion or milestone dates and/or greater durations.

b) Time is of the essence of this AGREEMENT. SUBCONTRACTOR shall commence work promptly on notice by the CONTRACTOR and shall prosecute the same diligently **in accordance with the mutually agreed Work Schedule**, continuously and at a speed that will not cause delay in the progress of CONTRACTOR'S work or the work carried on by other subcontractors or OWNER. CONTRACTOR may require SUBCONTRACTOR to prosecute in preference to other parts of the work such part or parts as CONTRACTOR may specify.

c) SUBCONTRACTOR at CONTRACTOR'S request and at the time specified in such request shall submit to CONTRACTOR progress, procurement, and man-hour completion schedules, satisfactory in form and content to CONTRACTOR and upon CONTRACTOR'S acceptance of the schedules shall prosecute the work in accordance therewith.

d) To secure performance by SUBCONTRACTOR and any funds expended by CONTRACTOR hereunder, CONTRACTOR shall have a lien upon all materials, tools, appliances and equipment of the SUBCONTRACTOR on the premises or used in connection with said work.

e) The SUBCONTRACTOR shall not deviate from the plans and specifications except on written order from the CONTRACTOR. SUBCONTRACTOR shall be responsible for any damage, inconvenience, or increase of costs arising directly or indirectly from failure of SUBCONTRACTOR to observe the same. CONTRACTOR shall have the right to make changes in the plans and specifications, and the SUBCONTRACTOR on notice thereof shall be governed thereby. Allowance for extra work and deductions for omissions shall be by mutual AGREEMENT between the CONTRACTOR and the SUBCONTRACTOR or determined in accordance with procedures specified in the GENERAL CONTRACT. No changes are to be made however except upon a prior written order from

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 100 of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333



**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

CONTRACTOR and CONTRACTOR shall not be held liable to SUBCONTRACTOR for any extra labor, materials, or equipment furnished without such written order.

f) In the event a dispute arises between SUBCONTRACTOR and CONTRACTOR, SUBCONTRACTOR expressly agrees that it will continue to perform its work for reasonable time and during dispute resolution process.

### VI. DELAYS

a) Any damages for delay caused by SUBCONTRACTOR shall be deducted by CONTRACTOR from the agreed price, subject, however, to the options of the CONTRACTOR to terminate said AGREEMENT for default as herein elsewhere provided.

b) Except as provided in subparagraph (e) and (f), CONTRACTOR shall not be liable to the SUBCONTRACTOR for delay to SUBCONTRACTOR'S work by the act, neglect or default of the OWNER, its ARCHITECTS and/or ENGINEERS, or by reason of strikes, lockouts, or on account of any acts of God, or any other cause beyond the CONTRACTOR'S control; but CONTRACTOR will cooperate with SUBCONTRACTOR to enforce any just claim against the OWNER, its ARCHITECTS and/or ENGINEERS for delay.

c) Should SUBCONTRACTOR be delayed in his work by CONTRACTOR, then CONTRACTOR shall owe SUBCONTRACTOR therefore an extension of time and reasonable cost for delay for completion equal to the delay caused and then only if a written claim for delay is made to CONTRACTOR within forty-eight (48) hours from the time of the beginning of the delay.

d) To secure performance by SUBCONTRACTOR, and any funds expended by CONTRACTOR hereunder, CONTRACTOR shall have a lien upon all materials, of the SUBCONTRACTOR on the premises or used in connection with said work.

e) In the event that CONTRACTOR in its sole discretion shall seek compensation from the OWNER as a result of any delay, SUBCONTRACTOR shall be entitled to an equitable portion of any amount recovered by CONTRACTOR plus an aliquot share of the cost of pursuing said claim. This provision shall not be construed to require the CONTRACTOR to pursue any claim against the OWNER or any other party.

f) To the greatest extent permitted by law, the remedies set forth at paragraphs (b), (c) and (e) hereof shall constitute SUBCONTRACTOR'S exclusive remedies for delay, disruption, acceleration, or similar issues relating to schedule or timely performance ("DELAY CLAIMS"), regardless of cause; notwithstanding the foregoing, however, to the extent that the contract between OWNER and CONTRACTOR expressly authorizes CONTRACTOR to recover from OWNER for DELAY CLAIMS, then SUBCONTRACTOR shall have the same rights and ability, but only to the same extent and no greater, to recover from CONTRACTOR for such DELAY CLAIMS.

### VII. CHANGES IN WORK

SUBCONTRACTOR shall make no changes in the work covered by this Agreement without written direction from the CONTRACTOR. SUBCONTRACTOR shall not be compensated for any change which is made without such written direction. No changes in the work covered by this Agreement shall exonerate any surety or any bond given in connection with the Agreement.

### VIII. INSPECTION AND PROTECTION OF WORK

SUBCONTRACTOR shall make the work accessible at all reasonable times for inspection by the CONTRACTOR. SUBCONTRACTOR shall, at the first opportunity, inspect all material and equipment delivered to the job site by

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 101 of 253

DocuSigd Envelope ID: 9CD66350-1CD0-4971-87F7-CADAD6F00333

 

Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

others to be used or incorporated in the SUBCONTRACTOR's work and give prompt notice of any defect therein. SUBCONTRACTOR assumes full responsibility to protect the work done hereunder until final acceptance by the Architect, Owner and CONTRACTOR.

### IX.  INDEMNIFICATION

a) To the greatest extent permitted by law, SUBCONTRACTOR shall defend, indemnify and hold harmless CONTRACTOR, OWNER, and OWNER's architect or engineer, and any of their respective directors, officers, agents, employees, parents, affiliates, subsidiaries, partners, and representatives, and any other persons or entities designated by any of them (collectively, the "INDEMNITEES") from and against all actions, penalties, assessments, fines, actions by governmental authorities, demands, liabilities, claims, damages, costs, losses, and expenses, including but not limited to attorney's fees and costs(all collectively referred to as "Liabilities"), which arise out of or are in any way related (i) to actual or alleged actions or omissions by SUBCONTRACTOR or any of its subcontractors, suppliers, vendors, employees, or persons for whom it is responsible; (ii) to SUBCONTRACTOR's presence on the site; or (iii) to this Agreement.  The obligations hereunder shall apply regardless of whether or not the INDEMNITEE and/or the SUBCONTRACTOR, its directors, officers, employees, agents, and/or subcontractors or suppliers of any tier, are actively or passively negligent, are in contractual breach or otherwise at fault, except that there shall be no obligation to defend or indemnify to the extent that such an obligation would violate Section 2782 of the Civil Code, or any other statute or law, as it applies to the specific circumstances of the project; for example, there shall be no obligation to indemnify an indemnitee against the indemnitees' willful misconduct or sole negligence.  Upon tender, SUBCONTRACTOR shall immediately provide and shall continue to provide a complete defense to indemnitee. The defense obligations of this provision are separate and independent covenants from the duty to indemnify.  The obligations of this Section VII are in no way limited or relieved by SUBCONTRACTOR having obtained insurance, by the provisions of Section VIII, and/or, and to the extent permitted by law, by the provisions of any workers compensation law, regulation, or arrangement.  This **Section IX. Indemnification** shall apply regardless of whether SUBCONTRACTOR has completed its work or this Agreement has been terminated.

b) If hazardous substance of a type of which an employer is required by law to notify its employees are being used on the site by the SUBCONTRACTOR, its subcontractors or anyone directly or indirectly employed by them, the SUBCONTRACTOR shall, prior to exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the CONTRACTOR in sufficient detail and time to permit compliance with such laws by the CONTRACTOR, other subcontractors and employers on the site.

### X. INSURANCE

Prior to commencement of construction, SUBCONTRACTOR shall deliver to CONTRACTOR Job Specific Certificates of Insurance and  required endorsements evidencing the existence and amounts of insurance required herein. No policy shall be canceled or subject to reduction of coverage except after thirty (30) days prior written notice to CONTRACTOR. SUBCONTRACTOR shall procure and maintain at its own cost and expense, at all times during the terms of this AGREEMENT and through all applicable statute of limitation periods following completion of the work, the following insurance coverage and endorsements in insurance companies and forms acceptable to CONTRACTOR.

a) Workers' Compensation and Employers' liability: Workers' Compensation insurance shall be provided in amounts prescribed by law, including U.S. Longshoremen's and Harbor Workers'

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 102 of 253

. DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333





Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

Compensation Act, the Jones Act or any other Federal, State or local employment regulations.. Employers' Liability limits should be provided at limits not less than: $1,000,00 each accident for bodily Injury by accident; $1,000,000 policy limit for bodily injury be disease; $1,000,000 each employee for bodily injury by disease. A waiver of Subrogation endorsement shall be provided in favor of Owner and CONTRACTOR and their respective officers, directors and employees, and any other parties required by Owner on NCCI form WC 00 03 13, or its equivalent. If Subcontractor leases any employees through another company then they will provide evidence of coverage in the form of an alternative employer/leased employee endorsement. Risk Retention Groups and Self Insured Groups are not acceptable.

b) **General liability:** Commercial General Liability and Personal Injury insurance covering OWNER, CONTRACTOR, and SUBCONTRACTOR for bodily injury, property damage and personal injury. Said insurance shall cover all operations performed by or on behalf of SUBCONTRACTOR in a coverage form no less restrictive than Insurance Services Office's Commercial Liability Form CG0001.

The limits of liability shall not be less than:
$1,000,000 each occurrence (combined single limit for bodily injury and property damage)
$1,000,000 for personal injury liability
$2,000,000 aggregate for products/completed operations
$2,000,000 general aggregate
If higher limits are required by the Owner, the SUBCONTRACTOR will comply with such limits by providing evidence of an umbrella or excess liability policy. If Excess or Umbrella Liability policies are used to meet the required limits of liability, then said policies shall be "following" form of the underlying policy and shall meet all of the insurance requirements stated herein including the additional insured and primary insurance requirements.

Other General Liability Insurance Requirements –

    A.  Premises and Operations Coverage
    B.  Products and Completed Operations, which shall be maintained through the expiration of all applicable statutes of limitation following completion of the work
    C.  Personal and Advertising Injury Liability
    D.  Contractual Liability insuring the obligations assumed by Subcontractor in this Agreement
    E.  Broad Form Property Damage, including Completed Operations
    F.  CONTRACTOR, its officers, directors, and employees, and OWNER shall be endorsed as additional insureds under the Occurrence form Commercial General Liability policy and said endorsement shall be on a form CG 2010 1185 or equivalent (to be reviewed), and shall not contain any additional exclusions. The additional insured provisions shall include products and completed operations coverage, and shall be maintained on all subsequent policy renewals through all applicable statute of limitation periods following completion of the work.
    G.  The policy shall stipulate that the insurance afforded the additional insureds shall apply as primary insurance and that any other insurance carrier by CONTRACTOR, his officers, directors, and employees or OWNER will be excess only and will not contribute with the insurance.
    H.  Coverage shall apply on an "occurrence" basis. Claims made or modified occurrence policies are not allowed.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 103 of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333



Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

I. The General Aggregate Limit shall apply separately to this project.

J. Any "Overall or Total Policy Aggregate Limit" shall be submitted to Contractor for approval prior to commencing work.

K. Defense Costs shall be in addition to the policy limits.

L. The policy shall provide a Waiver of Subrogation to all Additional Insured parties.

M. Any "cross suits" exclusions shall not apply to any additional insureds.

N. There shall be no provision which excludes or limits coverage for claims brought by employees of any subcontractor or claims by any lower tier subcontractors, such as an independent subcontractor exclusion

O. There shall be no coverage exclusions or restrictions for subsidence, earth movement, explosion, collapse or underground hazards.

P. If Subcontractor of any tier performs any work or conducts any operations within fifty feet of any railroad, Subcontractor shall obtain an endorsement to its General Liability policy to delete any exclusion, including the "Contractual Liability" exclusion, for work performed within fifty feet of a railroad. A copy of such endorsement shall be provided to Contractor prior to any work or operations by Subcontractor within fifty feet of any railroad.

Q. For residential projects, there shall be no coverage exclusions or restrictions for any residential construction, including, but not limited to, apartments or other types of multi-family housing.

R. Deductibles or Self Insured Retentions greater than $25,000 shall be submitted to Contractor for approval prior to commencing work. All Self Insured Retentions shall be disclosed on the certificates of insurance and a copy of the Self Insured Retention endorsement or policy provision shall be provided along with the certificate of insurance. All Self Insured Retention provisions must state that retention amounts may be satisfied by either the Named Insured(s) or any Additional Insured(s). Self Insured Retentions that can be satisfied by only the Named Insured(s) are not acceptable.

c) **Automobile liability:** SUBCONTRACTOR shall carry automobile liability insurance, including owned, non-owned and hired coverage with limits of liability of not less than $1,000,000 per occurrence (Combined single limit for bodily injury and property damage). If the Subcontractor or its Subcontractors transport hazardous materials, regulated substances or wastes, the policy shall include Endorsement MCS-90. The Contractor, the Owner and their respective officers, directors and employees, and any other parties required by Owner shall be additional insureds.

d) **Hazardous Materials.** If SUBCONTRACTOR and/or its SUBCONTRACTORs or suppliers, regardless of tier, perform remediation of hazardous materials or if their operations create an exposure to hazardous materials as those terms are defined in federal, state or local law (including, but not limited to, asbestos, lead, silica, PCB's, contaminated soil, etc.), SUBCONTRACTOR and its SUBCONTRACTORs and suppliers must obtain a "CONTRACTOR's Pollution Liability" policy with limits not less than $2,000,000 per occurrence and not less than $2,000,000 aggregate for Bodily Injury, Property Damage, Environmental Damage or Clean-up Costs, including coverage for Non-Owned Disposal Sites. The Contractor, the Owner and their respective officers, directors and employees, and any other parties required by Owner shall be additional insureds during the term of the Subcontract agreement and through all applicable statute of limitation periods following completion of the work. The policy shall stipulate the insurance afforded to the additional insureds applies as primary insurance and that any other insurance carried by the

, DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333



Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

additional insureds will be excess only and will not contribute with the Subcontractor's insurance. If SUBCONTRACTOR or its SUBCONTRACTORs or suppliers haul hazardous material (including, without limitation, waste), the policy must extend pollution coverage to the transportation of hazardous materials or pollutants by waste hauling vehicles. If SUBCONTRACTOR is Subject to the Motor Carrier Act of 1980, the Motor Carrier Act endorsement MCS-90 must be obtained and attached to the policy. Whether written on an "Occurrence" basis or on a "Claims Made" basis, coverage shall either be renewed continuously or shall provide an extended claims reporting period through all applicable statute of limitation periods following completion of the work.

e) **Professional liability.** Any SUBCONTRACTOR performing work that includes any design/build work or services shall obtain a Professional Liability Insurance Policy with limits not less than $1,000,000. Design/build work includes, without limitation, design/build work with respect to mechanical, electrical, structural, plumbing and fire sprinkler systems. Evidence of coverage in the form of a Certificate of Insurance shall be provided prior to the start of the project. SUBCONTRACTOR shall obtain coverage for a minimum of three years following completion of the project, either through continued purchase of policies for such years or through purchase of an extended reporting period. If OWNER or CONTRACTOR elects to purchase a project design policy, SUBCONTRACTOR's policy shall be endorsed to indicate that SUBCONTRACTOR's policy shall provide coverage once the project design policy has been exhausted.

f) **Riggers liability.** Should SUBCONTRACTOR's work involve the moving, lifting, lowering, rigging or hoisting of property or equipment, SUBCONTRACTOR shall carry adequate Rigger's Liability Insurance to insure against physical loss or damage to the property or equipment.

g) **Aircraft Liability.** If SUBCONTRACTOR (or its SUBCONTRACTORs or suppliers, regardless of tier) use any owned, leased, chartered or hired aircraft of any type in the performance of this contract, they shall maintain aircraft liability insurance in an amount of not less than $10,000,000 per occurrence, including Passenger Liability. Evidence of coverage in the form of a certificate of insurance shall be provided prior to the start of the Project. The Contractor, the Owner and their respective officers, directors and employees, and any other parties required by Owner shall be additional insureds.

h) ~~Protection of Work/Materials and Builders Risk Insurance. SUBCONTRACTOR shall obtain and maintain an installation floater or builders risk policy. SUBCONTRACTOR shall pay for all deductibles and waives any right to reimbursement or subrogation with respect to such insurance. SUBCONTRACTOR shall secure and protect its work and materials from damage or loss until final acceptance by OWNER.~~

i) **Work Near Railroads.** If SUBCONTRACTOR (including any lower tier SUBCONTRACTOR or supplier) performs any work or conducts any operations within fifty feet of any railroad (including any light rail, fixed rail or other rail system), SUBCONTRACTOR shall obtain an endorsement of its Commercial General Liability Policy to delete any exclusion, including the "Contractual Liability" exclusion, for work performed within fifty feet of a railroad. A copy of such endorsement shall be provided to CONTRACTOR prior to any work or operations by SUBCONTRACTOR within fifty feet of any railroad.

j) **Waiver of Subrogation.** CONTRACTOR and SUBCONTRACTOR waive all rights against each other for loss or damage to the extent reimbursed by any property or equipment insurance applicable to the work, except such rights as they may have to the proceeds of such insurance. If any applicable policies of

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 105
of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333

 

Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

insurance referred to in this Section require an endorsement or consent of the insurance company to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed or obtain such consent.

**k) Requirements for SUB-SUBCONTRACTORs, Truckers, Trucking Brokers, Sub-haulers, Vendors, and Suppliers.** SUBCONTRACTOR shall ensure that all tiers of its SUBCONTRACTORs, Truckers, Trucking Brokers, Sub-haulers, vendors and suppliers shall maintain insurance in like form and amounts, shall comply with the additional insured requirements as set forth above, and shall provide CONTRACTOR with evidence of insurance prior to commencing work.

**Requirements for all insurance.** All insurance shall be provided from a carrier with A.M. Best's Rating of A-:VIII or better, unless more stringent requirements are imposed by OWNER or the terms of the contract between OWNER and CONTRACTOR, including any specifications, conditions, or other provisions. CONTRACTOR reserves the right, in its sole and subjective discretion, to reject an insurer and require SUBCONTRACTOR to obtain policies from another insurer. An exception is allowed for Workers' Compensation insurance provided by California State Compensation Insurance Fund.



**Certificates of Insurance.** SUBCONTRACTOR shall provide acceptable job Specific certificates of insurance along with all required policy forms or endorsements to Contractor before commencing any work under this Subcontract Agreement. Full copies of policies shall be furnished upon request. The Certificates of Insurance and required endorsements shall provide that there will be no cancellation or reduction of coverage without thirty (30) days prior written notice to the Contractor. Subcontractor shall continue to provide certificates of insurance and required policy endorsements, including the required additional insured endorsements, for a period of three (3) years following completion of the work.

**Insurance Greater than the Minimum Requirements.** The insurance limits and coverages stated in this Addendum are minimum required limits and coverages. To the extent Subcontractor maintains insurance policies with limits greater or coverage broader than any of the minimums established herein, then Subcontractor agrees that such higher limits and broader coverage shall be deemed to be the required minimum and shall be available to the Additional Insureds with respects to any of Subcontractor's insurance obligations hereunder.

**Non-Compliance.** In the event Subcontractor does not comply with the requirements of this Addendum, Contractor may, at its option, provide insurance coverage to protect the Contractor and charge the Subcontractor for the cost of that insurance, hold the Subcontractor responsible for all costs incurred by Contractor as a result of Subcontractor's failure to maintain the proper insurance, and/or terminate this Subcontract Agreement. Contractor, at its option, may withhold payment until acceptable certificates have been furnished, or if upon receipt of a cancellation notice on a policy, until withdrawal of the notice or the reinstatement of the canceled policy. Contractor's acceptance of insurance certificates shall in no way limit or relieve the Subcontractor of the duties and responsibilities stated in this Subcontract Agreement. Neither the forbearance nor omission by Contractor to require proof of all provisions of this insurance from Subcontractor will be deemed as a waiver of Contractor's rights or Subcontractor's obligations regarding the provisions of this Subcontract Agreement.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 106 of 253

DocuSign Envelope ID: 9CD66350-7CB64971-87F7-CADAD6F00333



Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

**Controlled Insurance Program.** If the Contract Documents require participation in an Owner Controlled Insurance Program (OCIP) or Contractor Controlled Insurance Program (CCIP), Subcontractor shall fully participate and cooperate with Contractor and Insurance Program Administrator in compliance of the program requirements.

### XI.  LIENS

SUBCONTRACTOR shall at all times maintain the project in a good condition, free and clear of all claims, encumbrances or liens and shall protect and save harmless CONTRACTOR and OWNER from all claims, encumbrances, and liens growing out of the performance of this AGREEMENT, and SUBCONTRACTOR shall, at his own cost and expense (including attorneys' fees), defend all suits to establish such claims, pay any such claim or lien so established. In the event that a lien or claim is made against the project or the OWNER or general CONTRACTOR, SUBCONTRACTOR agrees that within forty-eight (48) hours of written notice, to have such claim, lien or encumbrance removed from the job and to place with OWNER and Prime CONTRACTOR adequate security to insure compliance with this provision.

### XII.  BONDS

The SUBCONTRACTOR, upon request, shall furnish to the CONTRACTOR a performance bond and a labor and a materials payment bond in amount, form and substance and with a surety or sureties satisfactory to the CONTRACTOR. CONTRACTOR will pay the cost of such bond, up to two percent (2%) of the total AGREEMENT amount.

### XIII.  TERMINATION

a)  Should SUBCONTRACTOR at any time breach this AGREEMENT or fail to prosecute the said work with promptness, diligence and efficiency or fail to perform any of the requirements hereof, CONTRACTOR may after forty-eight (48) hours written notice, proceed as follows:

    1.  Provide such materials, supplies, equipment and labor as may be necessary to complete said work, pay for same and deduct the amount so paid from any money then or thereafter due SUBCONTRACTOR or

    2.  Withhold payment of any estimate in the event SUBCONTRACTOR be in default under this AGREEMENT or any provision hereof, other provisions of this AGREEMENT notwithstanding.

    3.  Terminate the employment of SUBCONTRACTOR, enter upon the premises and take possession, for use in completing the work, of all the materials, supplies, tools, equipment and appliances of the SUBCONTRACTOR thereon and complete the work or have same completed by others and be liable to SUBCONTRACTOR for no further payment under the AGREEMENT until final payment is due and then only if and to the extent that the unpaid balance of the amount to be paid under this AGREEMENT exceeds the expense of the CONTRACTOR in finishing the work.

b)  If the amount expended by CONTRACTOR under (1) above or the cost of completing the work under (3) above exceeds the unpaid balance of the AGREEMENT price herein stated, SUBCONTRACTOR shall pay CONTRACTOR such excess within seven (7) calendar days of issuance of invoice.

c)  Should SUBCONTRACTOR at any time fail to pay for all labor, materials or supplies used by SUBCONTRACTOR in said work when due, CONTRACTOR at his option may pay for same and charge to SUBCONTRACTORS or

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333

 

**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

may, at his discretion and with the consent of SUBCONTRACTOR, pay at any time claims for labor, material and supplies used in the work.

d) Should SUBCONTRACTOR default in any of the provisions of this AGREEMENT and should CONTRACTOR employ an attorney to enforce any provision hereof, or to collect damages for breach of the AGREEMENT, or to recover on the bond mentioned in Article X above, SUBCONTRACTOR and his surety agree to pay CONTRACTOR such reasonable Attorneys' fees as he may expend therein. As against the obligations here contained, SUBCONTRACTOR and his surety waive all rights of exoneration.

e) In its sole discretion and to the extent permitted by law, CONTRACTOR may terminate this AGREEMENT without cause. In the event of such a termination, SUBCONTRACTOR shall be paid only for its actual out-of-pocket direct costs in connection with the project to the extent that these have not already been paid for by CONTRACTOR. In no event shall the total amount paid to SUBCONTRACTOR after a termination without cause (including all prior payments) exceed the price as set forth in III(a) as multiplied by the percentage of completion of SUBCONTRACTOR'S work. Upon a termination for convenience, SUBCONTRACTOR shall not be entitled to any lost profits or consequential damages, or any recovery other than that set forth previously in this subsection (e). If CONTRACTOR is found to have terminated this AGREEMENT improperly under any other section, such as subsection (a), then the termination shall be deemed to have been a termination without cause, and SUBCONTRACTOR'S remedies shall be limited accordingly.

f) The rights and remedies granted to CONTRACTOR under this article and pursuant to the other provisions of this AGREEMENT shall be cumulative and are not intended to be in lieu of any legal right or remedy which CONTRACTOR may have against SUBCONTRACTOR for breach of this AGREEMENT or default hereunder, afforded by state or federal law.

### XIV. COMPLIANCE WITH LAW AND PERMITS

a) SUBCONTRACTOR shall obtain and pay for all necessary permits and licenses pertaining to the work and shall comply with all federal, state, municipal and local laws, ordinances, codes, rules, regulations, standards, and requirements including but not limited to those relating to state contractor license requirements, safety, discrimination in employment, fair employment practices or equal employment opportunity, applicable local, disadvantaged, or minority preference or hiring programs, and with the requirements of the American Insurance Association whether or not provided for by the plans, specifications, general conditions or other contract documents without additional charge or expense to CONTRACTOR. The SUBCONTRACTOR agrees to hold harmless and indemnify the CONTRACTOR from and against any and all fees, including attorneys' fees, occasioned directly or indirectly by SUBCONTRACTOR'S failure to comply with any said laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct said violations.

b) Compliance with Proposition 65: SUBCONTRACTOR will comply with all provisions of "Proposition 65" (California State Drinking Water Act of 1986, California statutes) which shall include, but not be limited to, posting with the prior written submission to, at the time submittals are made and with the written permission of CONTRACTOR, any required notices. SUBCONTRACTOR shall not use or bring on to the project any of the chemicals or compounds listed by the California State Attorney General from time to time under the provisions of Proposition 65 (the List) without delivering a clear written notice, at the time submittals are written, to CONTRACTOR and OWNER informing them of the dates and locations where such items shall be delivered, used, or stored. Notwithstanding anything to the contrary contained or indicated herein or in any of the contract documents or purchase orders or anywhere else, SUBCONTRACTOR shall not incorporate into the work, or allow to be incorporated into the work, any of the items on such list without specific advanced

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 108 of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333




**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

written notice having first been delivered to CONTRACTOR prior to SUBCONTRACTOR becoming actually contractually obligated to purchase or take delivery thereof from its suppliers, and then only to the extent the CONTRACTOR gives clear written approval of the uses proposed in the notice. The notice shall contain clear descriptions of the type, amount, uses, locations and content of such items incorporated into or used in said work. SUBCONTRACTOR expressly acknowledges and agrees that it shall indemnify and hold harmless CONTRACTOR and the OWNER from any and all claims, demands, suits, or liability of whatsoever nature by reason of the use or possession of the items set forth on the list on the subject project.

### XV. CLAIMS

a) If any dispute arises between the CONTRACTOR and SUBCONTRACTOR involving performance of this work or any alleged change in the work, SUBCONTRACTOR shall timely perform the disputed work and shall give written notice of a claim for additional compensation for the work within ten (10) days after commencement of the disputed work. SUBCONTRACTOR'S failure to give written notice within ten (10) days constitutes an AGREEMENT by SUBCONTRACTOR that it will receive no extra compensation for the disputed work.

b) Notwithstanding the foregoing, if the General Contract contains notice provisions that are more stringent than those contained in this AGREEMENT, then SUBCONTRACTOR shall comply with the provisions of the General Contract and, in addition, shall give CONTRACTOR to comply with the provisions of the General Contract.

c) With regard to claims arising from differing conditions, changes directed by the OWNER or others, or which otherwise are not solely the fault of CONTRACTOR, SUBCONTRACTOR shall be entitled to such portion of the additional compensation received by CONTRACTOR from OWNER on account of such matters as is equitable under all of the circumstances. SUBCONTRACTOR agrees to be bound by OWNER'S determination and by the determination in any proceeding in which OWNER is involved, regardless of whether SUBCONTRACTOR was a party to such proceeding. SUBCONTRACTOR and CONTRACTOR shall cooperate in the prosecution of such claims, and SUBCONTRACTOR shall pay a pro rata share of the costs and expenses incurred in connection therewith, to the extent that said claim is made by CONTRACTOR on behalf of SUBCONTRACTOR. Nothing herein shall require CONTRACTOR to pursue such a claim on behalf of SUBCONTRACTOR. Payment of any and all claims shall be subject to the terms of Section III of this AGREEMENT.

### XVI. DISPUTE RESOLUTION

SUBCONTRACTOR and CONTRACTOR agree that in the event that CONTRACTOR and OWNER or other third party, select a form of the resolution of disputes arising out of the project that SUBCONTRACTOR agrees to participate and be bound by any decision or award given in such forum. The option to arbitrate or use other alternative dispute resolution procedure is mutual agreement.

### XVII. LABOR RELATIONS

SUBCONTRACTOR acknowledges that CONTRACTOR is a signatory to collective bargaining agreement(s) with the Operating Engineers, Teamsters, Laborers and Cement Finishers & Carpenters. SUBCONTRACTOR and all lower tier subcontractors shall perform all work covered by CONTRACTOR'S master labor agreement under the terms of said agreement and shall become signatory to the applicable agreement(s) as a condition of performing work as required by CONTRACTOR'S collective bargaining agreement. Should CONTRACTOR at its sole discretion establish a reserve gate system on the project, SUBCONTRACTOR warrants that its employees and suppliers will use the reserve gate(s) designated for their use by CONTRACTOR. SUBCONTRACTOR further agrees to perform notwithstanding the presence of pickets at gate(s) reserved for SUBCONTRACTOR'S

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 109 of 253


DocuSign Envelope ID: CD66350-7CD0-4971-87F7-CADAD6F00333





**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 13212

## Subcontract General Terms & Conditions – Long Form

employees and suppliers. Failure to perform in accordance with this provision shall constitute a material breach of contract.

### XVIII. WATER POLLUTION CONTROL

SUBCONTRACTOR acknowledges that the EPA and California regulatory authorities, including without limitation, the State and Regional Water Quality Control Boards, have mandated certain requirements for permits under the National Pollutant Discharge Elimination System (NPDES), including Storm Water Pollution Prevention Plan (SWPPP) requirements. SUBCONTRACTOR has undertaken its own independent and thorough investigation of all such matters, including without limitation, a thorough review of all requirements under the Contract Documents and/or that are imposed by any permits that apply to the Project, and SUBCONTRACTOR warrants that it is not relying upon any statements or representations by CONTRACTOR or OWNER with respect to such matters. SUBCONTRACTOR agrees, at its sole cost, to conform to any and all requirements of any environmental, air and water pollution statutes, regulations and measures, and/or permits, including NPDES permits, and SUBCONTRACTOR also shall conform to any and all SWPPP requirements applicable to the Project. For example, and without limitation, on projects subject to the California Standard Specifications, such as Caltrans projects, SUBCONTRACTOR 'S attention is directed to **California Standard Specifications Sections 13.1.01 through 13-10.03, "Water Pollution", and Sections 14-1.01 through 14.204, "Environmental Stewardship",** and to any special provisions or other contract provisions concerning NPDES, Department of Fish & Game, and other permits, air and water pollution statutes, regulations, and measures, and SWPPP requirements, and SUBCONTRACTOR at its own cost agrees to comply fully therewith.

### XIX. MISCELLANEOUS PROVISIONS

a) SUBCONTRACTOR shall not sublet, assign or transfer this AGREEMENT, or any part thereof, without the prior written consent of the CONTRACTOR.

b) This AGREEMENT contains the entire AGREEMENT between the parties and supersedes all prior or contemporaneous written or oral communications between the parties. Any additions thereto or changes thereafter shall be in writing and shall not be binding unless the same are in writing.

c) If any term of this AGREEMENT is held by a court of competent jurisdiction to be void or unenforceable, the remainder of the AGREEMENT'S terms shall remain in full force and effect and shall not be affected.

**CONTRACTORS are required by law to be licensed and regulated by the Contractors State License Board, which has jurisdiction to investigate complaints against contractors if a complaint is filed within three (3) years of the date of the alleged violation. Any questions concerning a contractor may be referred to the Registrar, Contractors State License Board, P.O. Box 26000, Sacramento, California 95826**

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 110 of 253

DocSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333



Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 132128

# Subcontract Agreement

| Date: | 02/09/15 | GBI Job No. | 14431 | Subcontract No. | 14431-976-LF |
|---|---|---|---|---|---|

GBI Job Number and Subcontract Number shall appear on all submitted documents.

**TO:** Synergy Construction
Management, Inc.
150 Executive Park Blvd. Suite 4100
San Francisco, CA 94134

**Job:** Haight and Hayes Street Rehab
San Francisco

**Contact:** Terry Ayyad
**Phone:** 415-467-3000
**Fax:** 415-467-3001
**Email:** estimating@synergypm.com

**Bill To:** Accounts Payable
Ghilotti Bros., Inc.
525 Jacoby Street
San Rafael, CA 94901

**TERMS:** Progress Pay – 5% Retention  **FOB:** Jobsite

| Cost Code | Item No. DESCRIPTION | QTY | UNIT | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|
| 290-976-01 | SW-01 TRAFFIC ROUTING FOR SS AND SD WORK | 1.00 | LS | 80,000.00 | $ 80,000.00 |
| 290-976-01 | SW-02 TRENCH & EXC SUPPORT FOR SS & SD WORK | 1.00 | LS | 80,000.00 | $ 80,000.00 |
| 290-976-01 | SW-03 SS/SDMH ON 12" to 24" PIPE (STP 87, 181) | 44.00 | EA | 5,000.00 | $ 220,000.00 |
| 290-976-01 | SW-04 CB W/NEW Fr & Gr (STP 87, 188) | 15.00 | EA | 3,000.00 | $ 45,000.00 |
| 290-976-01 | SW-05 12" VCP SS on CRUSHED ROCK BASE | 5,817.00 | LF | 215.00 | $ 1,250,655.00 |
| 290-976-01 | SW-06 15" VCP SS on CRUSHED ROCK BASE | 950.00 | LF | 250.00 | $ 237,500.00 |
| 290-976-01 | SW-07C 10" VCP CULVERT (CONTINGENCY) | 580.00 | LF | 170.00 | $ 98,600.00 |
| 290-976-01 | SW-08C TELE-INSPCT 6" & 8" SSS OR 10" PIPE-IN LIMT | 277.00 | EA | 50.00 | $ 13,850.00 |
| 290-976-01 | SW-09C TELE-INSPCT 6" & 8" SSS OR 10" PIPE-OT LIMT | 3.00 | EA | 100.00 | $ 300.00 |
| 290-976-01 | SW-10 STD SSS AIR VENT & TRAP (STP 87, 196) | 9.00 | EA | 250.00 | $ 2,250.00 |
| 290-976-01 | SW-11 4" CIP SIDE SEWER | 45.00 | LF | 200.00 | $ 9,000.00 |
| 290-976-01 | SW-12C 6" or 8" SIDE SS CONNECTION (CONTNG) | 303.00 | EA | 250.00 | $ 75,750.00 |
| 290-976-01 | SW-13C 6" or 8" SIDE SS REPLACE/REPAIR IN-LIMITS | 3,500.00 | LF | 190.00 | $ 665,000.00 |
| 290-976-01 | SW-14C 6" or 8" SIDE SS- REPLACE/REPAIR OUT-LIMTS | 70.00 | LF | 200.00 | $ 14,000.00 |
| 290-976-01 | SW-15 POST CNSTRCTIN TELE INSPECTN of (N) SS MAIN | 1.00 | LS | 15,000.00 | $ 15,000.00 |

**LBE $7,478,799.00**

Page 1 of 4




DocuSign Envelope ID: 9CD66350-7C20-4971-87F7-CADAD6F00333





**Ghilotti Bros., Inc.**

525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 132128

| Cost Code | Item No. | DESCRIPTION | QTY | UNIT | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|---|
| 290-976-01 | SW-1C | POST CNSTRCTN TELE INSPECTN of (N) SS SIDE | 110.00 | EA | 50.00 | $ 5,500.00 |
| 290-976-01 | SW-13C | CI WATER TRAP IN CB's (CONTI) | 25.00 | EA | 4,500.00 | $ 112,500.00 |
| 290-976-01 | SW-13C | EXPLORATORY HOLES (POTHOLE?) (CONT) | 20.00 | CY | 150.00 | $ 3,000.00 |
| 290-976-01 | SW-13 | PLUG & FILL SS WITH SLURRY GROUT | 24.00 | CY | 100.00 | $ 2,400.00 |
| 290-976-01 | SW-2C | 10" RECNSTR BASE O/S OF WORK AREA (CONT) | 13,000.00 | SF | 15.00 | $ 195,000.00 |
| 290-976-01 | SW-2C | RECNST PCC PARKG STRIP BY SSS WORK (CONT) | 3,500.00 | SF | 10.00 | $ 35,000.00 |
| 290-976-01 | SW-2C | CDF BEDDG for WAT MAIN IN SS TRENCH (CONTI) | 30.00 | CY | 100.00 | $ 3,000.00 |
| 290-976-01 | SW-2E | AWSS SETTLMT REF & MONITORING POINS | 1.00 | LS | 157,500.00 | $ 157,500.00 |
| 290-976-01 | SW-2B | STRUCTURAL SUPPORT FOR WATER IN SS TRENCH | 1.00 | LS | 60,000.00 | $ 60,000.00 |
| 290-976-01 | SW-25 | 5% max MOB/DEMOBE FOR SS & DRAINAGE WORK | 1.00 | LS | 180,000.00 | $ 180,000.00 |
| | | | | | **SW Total** | $ 3,560,805.00 |
| 290-976-01 | WD-0C | TRAFFIC ROUTING FOR WATER WORK | 1.00 | LS | 90,000.00 | $ 90,000.00 |
| 290-976-01 | WD-0E | EXC & BKFL FOR 4", 6", 8" WATER (18" X 36") | 3,900.00 | LF | 60.00 | $ 234,000.00 |
| 290-976-01 | WD-0E | EXC & BACKFILL FOR 12" WATER (24" X 48") | 700.00 | LF | 75.00 | $ 52,500.00 |
| 290-976-01 | WD-0E | EXC & BACKFILL FOR 16" WATER (30" X 48") | 200.00 | LF | 89.00 | $ 17,800.00 |
| 290-976-01 | WD-0E | EXC & BACKFILL FOR 24" WATER (48" X 58") | 4,900.00 | LF | 95.00 | $ 465,500.00 |
| 290-976-01 | WD-0E | ADDITIONAL EXC & BACKFILL for WATER | 2,500.00 | CY | 5.00 | $ 12,500.00 |
| 290-976-01 | WD-0F | REMOVAL & INSTALL WATER METER BOX | 40.00 | EA | 10.00 | $ 400.00 |
| 290-976-01 | WD-0E | INSTALL CITY-FURN & POLYCASED 4", 6", & 8" | 2,600.00 | LF | 25.00 | $ 65,000.00 |
| 290-976-01 | WD-0E | INSTALL CITY-FURN & POLYCASED 12" DI PIPE | 700.00 | LF | 30.00 | $ 21,000.00 |
| 290-976-01 | WD-1I | INSTALL CITY-FURN & POLYCASED 16" DI PIPE | 200.00 | LF | 40.00 | $ 8,000.00 |
| 290-976-01 | WD-1E | INSTALL K-FURNISHED & POLCASED 24" DI | 4,900.00 | LF | 250.00 | $ 1,225,000.00 |
| 290-976-01 | WD-1I | INSTAL CITY-FURN & POLY-ENCASED 4", 6", & 8" | 41,100.00 | LB | 0.10 | $ 4,110.00 |

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 112 of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F7-CADAD6F00333



Ghilotti Bros., Inc.
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 132128

| Cost Code | Item No. DESCRIPTION | QTY | UNIT | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|
| 290-976-01 | WD-13 INSTAL CITY-FURN & POLY-ENCASED 12" DI FITGS | 21,000.00 | LB | 0.10 | $ 2,100.00 |
| 290-976-01 | WD-14 INSTAL CITY-FURN & POLY-ENCASED 16" DI FITGS | 12,940.00 | LB | 0.10 | $ 1,294.00 |
| 290-976-01 | WD-15 INSTAL K-FURN & POLY-ENCASED 24" DI | 138,200.00 | LB | 2.50 | $ 345,500.00 |
| 290-976-01 | WD-16C WATER TRENCH SHORING/BRACING per ALL SO's | 10,600.00 | SF | 1.00 | $ 10,600.00 |
| 290-976-01 | WD-17 PAVEMENT RESTORATION (for water) | 48,800.00 | SF | 1.00 | $ 48,800.00 |
| 290-976-01 | WD-18 AC MILLING (for water) | 49,000.00 | SF | 0.50 | $ 24,500.00 |
| 290-976-01 | WD-19 AC FILLING (for water) | 49,000.00 | SF | 1.00 | $ 49,000.00 |
| 290-976-01 | WD-20 INSTALL SCREW-TAPS (61-EA 1" & 33-EA X 2") | 138.00 | EA | 300.00 | $ 41,400.00 |
| 290-976-01 | WD-21 RENEW 1" PLASTIC SERVICE-TRENCHLESS INSTALL | 1,140.00 | LF | 100.00 | $ 114,000.00 |
| 290-976-01 | WD-22 INST OPEN-CUT WATER SVC 390 X 1" & 210 X 2" | 590.00 | LF | 220.00 | $ 129,800.00 |
| 290-976-01 | WD-23 REMOVE SFWD VALVE BOX & COVER | 45.00 | EA | 10.00 | $ 450.00 |
| 290-976-01 | WD-24C REPAIR-REPLACE SSS for WATER WK (CONT) | 20.00 | LF | 250.00 | $ 5,000.00 |
| 290-976-01 | WD-25 1.2% max MOB FOR WATERWORK | 1.00 | LS | 190,800.00 | $ 190,800.00 |
| 290-976-01 | WD-26 0.8% DEMOB FOR WATER WORK | 1.00 | LS | 27,200.00 | $ 27,200.00 |
| 290-976-01 | WD-27 F&I 24" B-FLY VALVE WITH BSMTLG JTS | 7.00 | EA | 30,000.00 | $ 210,000.00 |
| 290-976-01 | WD-28 FURN ALL 24" DI TAP MATLS to SFWD PERSNL | 11,572.00 | LB | 10.00 | $ 115,720.00 |
| 290-976-01 | WD-29 F&I 4" AIR VALVE | 4.00 | EA | 14,000.00 | $ 56,000.00 |
| 290-976-01 | MA-01 AWSS WORK | 1.00 | LS | 350,000.00 | $ 350,000.00 |
| | | | | WD Total | $ 3,917,974.00 |
| | | | | SW Total | $ 3,560,805.00 |
| | | | | Total | $ 7,478,779.00 |

SCOPE OF WORK: SUBCONTRACTOR shall perform the work complete and in place per plans and specification for the listed bid items, noted above. Work shall be performed in accordance with the job schedule mutually agreeable to both parties.

SPECIAL CONDITIONS:
- SUBCONTRACTOR agrees to comply with CONTRACTOR Code of Safe Practices, dated June 2012.
- *Allowance Items (SW-26 through -29 and WD-30 through -31) are to be awarded to Subcontractor as Subcontract Change Order Work as the work is authorized by the Owner.*
- SUBCONTRACTOR'S work shall adhere to San Francisco Public Works Project Manual volume 2 of 2 Section 01 57 13 TEMPORARY EROSION AND SEDIMENT CONTROLS and the approved SWPPP as it relates to SUBCONTRACTOR's work.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 113 of 253

DocuSign Envelope ID: 9CD66350-7CD0-4971-87F3-CADAD6F00333



**Ghilotti Bros., Inc.**
525 JACOBY STREET • SAN RAFAEL, CA 94901
P 415.454.7011 • F 415.454.8376
STATE CONTRACTORS LICENSE # 132128

- SUBCONTRACTOR work associated with SW-1 to SW-25 and WD-1 to WD-29 & MA-1 per plans dated 09/05/14 & 08/13/14.

BY ATTACHMENT, GHILOTTI BROS, INC. SUBCONTRACT GENERAL TERMS AND CONDITIONS ARE HEREBY INCORPORATED INTO THIS SUBCONTRACT AGREEMENT.

JOB SPECIFIC TERMS AND CONDITIONS NOTED ABOVE SUPERSEDE GHILOTTI BROS., INC. SUBCONTRACT GENERAL TERMS AND CONDITIONS WHERE IN CONFLICT.

NOTE: THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS. A SIGNED COPY OF THIS AGREEMENT TRANSMITTED ELECTRONICALLY, SUCH AS BY EMAIL OR FACSIMILE, IS ENFORCEABLE AS AN ORIGINAL; AN ACCEPTANCE BY SUBCONTRACTOR OF THE TERMS OF THIS AGREEMENT IS VALID IF COMMUNICATED BY ANY REASONABLE MEANS, INCLUDING WITHOUT LIMITATION, BY EMAIL OR FACSIMILE.

Contracted By: Synergy

Signed: _Terry Ayyad_
Terry Ayyad

Date: 4/19/2015

Contracted By: Ghilotti Bros, Inc.

Signed: _Thomas G. Barr, P.E._
Thomas G. Barr, P.E.

Date: 4/19/2015

| Contractor's License No. | 644102 |
|---|---|
| Expiration Date: | 4/30/2017 |
| Tax Payer ID Number: | 20-5857591 |

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 114 of 253

# EXHIBIT B

# EXHIBIT B

# EXHIBIT B

1  MATTHEW K. YAN, State Bar No. 257918
   KRIS A. COX, State Bar No. 136504
2  ERIN H. REDING, State Bar No. 252691
   MOSCONE EMBLIDGE & OTIS LLP
3  220 Montgomery Street, Suite 2100
   San Francisco, CA 94104
4  Telephone:    (415) 362-3599
   Facsimile:    (415) 362-2006
5
   Attorneys for Petitioner
6  SYNERGY PROJECT MANAGEMENT, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN FRANCISCO

10

11 SYNERGY PROJECT MANAGEMENT,          Case No. CPF-16-514783
   INC.
12                                      **ORDER GRANTING PETITIONER**
              Petitioner,               **SYNERGY PROJECT MANAGEMENT,**
13                                      **INC.'S MOTION FOR ISSUANCE OF**
        vs.                             **WRIT**
14
   CITY AND COUNTY OF SAN               Date:  November 10, 2016
15 FRANCISCO,                           Time:  9:30 am
                                        Dept.: 302
16            Respondent.               Judge: Hon. Harold E. Kahn

17                                      Action filed:  February 19, 2016

18

19

20

21

22

23

24

25

26

27

28
   ─────────────────────────────────
   ORDER GRANTING MOTION FOR ISSUANCE            Case No. CPF-16-514783
   OF WRIT

1    On November 10, 2016, Petitioner Synergy Project Management, Inc.'s Motion For

2    Issuance Of Writ Of Mandate came before the Honorable Harold Kahn for hearing in

3    Department 302 of the above-. Kris A. Cox, Moscone Emblidge & Otis LLP appeared for

4    Petitioner Synergy Project Management, Inc., and S. Anne Johnson, Deputy City Attorney, San

5    Francisco City Attorneys Office, appeared for Respondent City and County of San Francisco.

6        The Court having reviewed and considered the parties' papers and oral argument; and

7    good cause appearing:

8        Petitioner Synergy Project Management, Inc.'s petition for writ of mandate is GRANTED

9    and the January 8, 2016 Statement of Hearing Officer Findings is VACATED. The hearing

10   officer erred in determining that he had jurisdiction to determine whether the Department of

11   Public Works presented sufficient evidence to support its substitution demand. All three bases

12   that the hearing officer offered for his exercise of jurisdiction are erroneous as a matter of law.

13   The parties agree that section 4107of the Public Contract Code by itself is not a basis for

14   jurisdiction where, as here, the proposed substitution of a subcontractor is initiated by the

15   awarding authority, not prime contractor. The parties also agree that, per section 4.04 of the

16   contract between the Department of Public Works and Ghilotti, a hearing to determine the

17   propriety of substituting the subcontractor can only occur if Ghilotti requested the replacement of

18   Synergy. None of the evidence cited by the City to show that Ghilotti made such a request shows

19   that Ghilotti did in fact make such a request. A review of the relevant portions of the

20   Administrative Record fails to disclose any instance where prior to the hearing held by the

21   hearing officer Ghilotti requested that the Department of Public Works replace Synergy as a

22   subcontractor. While Ghilotti investigated potential replacement subcontractors to avoid

23   breaching its contract after the City directed Ghilotti to remove Synergy (AR Tab 83; Hearing

24   Transcript 89:7-16), that is not the same as Ghilotti making a request to the City that Synergy be

25   removed. Nor was there any jurisdiction to hold the hearing simply because such a hearing is not

26   precluded by section 4107. For the hearing officer to have jurisdiction to address the substantive

27   issue he addressed there must be some statute, ordinance, contract or other legal authority

28   providing the hearing officer with such jurisdiction. Because there is none, the hearing officer

ORDER GRANTING MOTION FOR ISSUANCE          1          Case No. CPF-16-514783
OF WRIT

1   lacked jurisdiction and thus, per CCP 1094.5, he prejudicially abused his discretion by

2   proceeding in a manner not authorized by law by addressing the issue of whether the Department

3   of Public Works presented sufficient evidence to support its substitution demand.

4   IT IS SO ORDERED.

5   Dated:  November 10, 2016

6

7                                              HAROLD KAHN

8                              _____
                              THE HONORABLE HAROLD E. KAHN
9                             JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING MOTION FOR ISSUANCE          2               Case No. CPF-16-514783
OF WRIT

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address)*:
Matthew K. Yan (SBN 257918); Kris A. Cox (SBN 136504)
MOSCONE EMBLIDGE & OTIS LLP
220 Montgomery Street, Suite 2100, San Francisco, California 94104

TELEPHONE NO.: 415-362-3599       FAX NO.: 415-362-2006
ATTORNEY FOR *(Name)*: Plaintiff Synergy Project Management, Inc.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Synergy Project Management, Inc. v. City and County of San Francisco

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|

**FILED**
San Francisco County Superior Court
JUL 10 2017
CLERK OF THE COURT
BY: _____
Deputy Clerk

CGC - 17 - 560034

| CIVIL CASE COVER SHEET | | Complex Case Designation |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder |

Filed with first appearance by defendant
(Cal. Rules of Court, rule 3.402)

JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[✓] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify)*:
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 10, 2017

Kris A. Cox
*(TYPE OR PRINT NAME)*

BY FAX
ONE LEGAL LLC

*(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
    Auto (22)–Personal Injury/Property
        Damage/Wrongful Death
    Uninsured Motorist (46) *(if the
        case involves an uninsured
        motorist claim subject to
        arbitration, check this item
        instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
    Asbestos (04)
        Asbestos Property Damage
        Asbestos Personal Injury/
            Wrongful Death
    Product Liability *(not asbestos or
        toxic/environmental)* (24)
    Medical Malpractice (45)
        Medical Malpractice–
            Physicians & Surgeons
        Other Professional Health Care
            Malpractice
    Other PI/PD/WD (23)
        Premises Liability (e.g., slip
            and fall)
        Intentional Bodily Injury/PD/WD
            (e.g., assault, vandalism)
        Intentional Infliction of
            Emotional Distress
        Negligent Infliction of
            Emotional Distress
        Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
    Business Tort/Unfair Business
        Practice (07)
    Civil Rights (e.g., discrimination,
        false arrest) *(not civil
        harassment)* (08)
    Defamation (e.g., slander, libel)
        (13)
    Fraud (16)
    Intellectual Property (19)
    Professional Negligence (25)
        Legal Malpractice
        Other Professional Malpractice
            *(not medical or legal)*
    Other Non-PI/PD/WD Tort (35)
**Employment**
    Wrongful Termination (36)
    Other Employment (15)

**Contract**
    Breach of Contract/Warranty (06)
        Breach of Rental/Lease
            Contract *(not unlawful detainer
            or wrongful eviction)*
        Contract/Warranty Breach–Seller
            Plaintiff *(not fraud or negligence)*
        Negligent Breach of Contract/
            Warranty
        Other Breach of Contract/Warranty
    Collections (e.g., money owed, open
        book accounts) (09)
        Collection Case–Seller Plaintiff
        Other Promissory Note/Collections
            Case
    Insurance Coverage *(not provisionally
        complex)* (18)
        Auto Subrogation
        Other Coverage
    Other Contract (37)
        Contractual Fraud
        Other Contract Dispute
**Real Property**
    Eminent Domain/Inverse
        Condemnation (14)
    Wrongful Eviction (33)
    Other Real Property (e.g., quiet title) (26)
        Writ of Possession of Real Property
        Mortgage Foreclosure
        Quiet Title
        Other Real Property *(not eminent
            domain, landlord/tenant, or
            foreclosure)*
**Unlawful Detainer**
    Commercial (31)
    Residential (32)
    Drugs (38) *(if the case involves illegal
        drugs, check this item; otherwise,
        report as Commercial or Residential)*
**Judicial Review**
    Asset Forfeiture (05)
    Petition Re: Arbitration Award (11)
    Writ of Mandate (02)
        Writ–Administrative Mandamus
        Writ–Mandamus on Limited Court
            Case Matter
        Writ–Other Limited Court Case
            Review
    Other Judicial Review (39)
        Review of Health Officer Order
        Notice of Appeal–Labor
            Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
    Antitrust/Trade Regulation (03)
    Construction Defect (10)
    Claims Involving Mass Tort (40)
    Securities Litigation (28)
    Environmental/Toxic Tort (30)
    Insurance Coverage Claims
        *(arising from provisionally complex
        case type listed above)* (41)
**Enforcement of Judgment**
    Enforcement of Judgment (20)
        Abstract of Judgment (Out of
            County)
        Confession of Judgment *(non-
            domestic relations)*
        Sister State Judgment
        Administrative Agency Award
            *(not unpaid taxes)*
        Petition/Certification of Entry of
            Judgment on Unpaid Taxes
        Other Enforcement of Judgment
            Case
**Miscellaneous Civil Complaint**
    RICO (27)
    Other Complaint *(not specified
        above)* (42)
        Declaratory Relief Only
        Injunctive Relief Only *(non-
            harassment)*
        Mechanics Lien
        Other Commercial Complaint
            Case *(non-tort/non-complex)*
        Other Civil Complaint
            *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
    Partnership and Corporate
        Governance (21)
    Other Petition *(not specified
        above)* (43)
        Civil Harassment
        Workplace Violence
        Elder/Dependent Adult
            Abuse
        Election Contest
        Petition for Name Change
        Petition for Relief From Late
            Claim
        Other Civil Petition

**CIVIL CASE COVER SHEET**

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 121
of 253

1

**Exhibit E**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  RONALD P. FLYNN, State Bar #184186
   Chief Deputy City Attorney
3  ELAINE M. O'NEIL, State Bar #142234
   Deputy City Attorney
4  Fox Plaza
   1390 Market Street, Suite 425
5  San Francisco, CA  94102-5408
   Telephone:    (415) 554-4708
6  Facsimile:    (415) 255-0733
   E-Mail:        Ronald.Flynn@sfgov.org
7
   Attorneys for Defendants
8  CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO PUBLIC UTILITIES
   COMMISSION, SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, SAN
9  FRANCISCO DEPARTMENT OF PUBLIC WORKS, LONDON BREED, MOHAMMED NURU

10

11                        UNITED STATES DISTRICT COURT

12                      NORTHERN DISTRICT OF CALIFORNIA

13  SYNERGY PROJECT MANAGEMENT,          Case No. 3:17-cv-06763
    INC.,
14                                       **NOTICE OF REMOVAL OF ACTION UNDER**
              Plaintiff(s),              **28 U.S.C. §§ 1441(a) (Federal Question)**
15
          vs.
16                                       Trial Date:          Not Set
    CITY AND COUNTY OF SAN
17  FRANCISCO, SAN FRANCISCO PUBLIC
    UTILITIES COMMISSION, SAN
18  FRANCISCO MUNICIPAL
    TRANSPORTATION AGENCY, SAN
19  FRANCISCO DEPARTMENT OF PUBLIC
    WORKS, LONDON BREED, MOHAMMED
20  NURU, and DOES 1-100,

21            Defendant(s).

22

23

24  TO THE CLERK OF THE COURT OF THE NORTHERN DISTRICT OF CALIFORNIA:

25          PLEASE TAKE NOTICE that Defendant CITY AND COUNTY OF SAN FRANCISCO, SAN

26  FRANCISCO PUBLIC UTILITIES COMMISSION, SAN FRANCISCO MUNICIPAL

27  TRANSPORTATION AGENCY, SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS,

28  LONDON BREED, MOHAMMED NURU (collectively, "Defendants") hereby removes to this Court

1    the state court action described below:

2        1.      On July 10, 2017, an action was commenced in the Superior Court of the State of

3    California in and for the County of San Francisco, entitled *Synergy Project Management, Inc. v. City*

4    *and County of San Francisco*, as Case Number CGC-17-560034 ("Complaint").  The Complaint was

5    not served on defendants.

6        2.      On October 19, 2017, Plaintiff filed an Amended Complaint ("FAC").  A true and

7    correct copy of the FAC is attached hereto as Exhibit "1", filed in three parts.

8        3.      On October 24, 2017, Plaintiff served the FAC on CCSF.  A true and correct copy of

9    the summons to CCSF is attached hereto as Exhibit "2".

10       4.      The FAC includes allegations brought under 42 U.S.C. § 1983 that the named

11   Defendants violated the civil rights of Plaintiff.

12       5.      This action may properly be removed to this Court pursuant to 28 U.S.C. §1441, for the

13   reason that Plaintiff's complaint alleges a violation of laws of the United States.

14       6.      This action is timely removed purusant to 28 U.S.C. § 1446.

15       7.      Plaintiff's FAC also asserts three state-law causes of action, said causes of action may

16   be removed and adjudicated by this Court pursuant to 28 U.S.C. § 1367.

17       8.      All other process, pleadings and other orders served upon Defendant in this action will

18   be forwarded forthwith when they are retrieved from the Superior Court docket.

19       9.      Venue in this district is proper under 28 U.S.C. § 1441 because this District includes

20   the California Superior Court for San Francisco County, the forum in which the removed action was

21   pending.

22       10.     Defendants will promptly file a Notice of this Removal with the Clerk of the Superior

23   Court for San Francisco County and serve the Notice on all parties.

24

25

26

27

28

Synergy Project Mgmt, Inc. v. CCSF, et al
Case No.  3:17-cv-06763
2
m\compli2017\18043S\0123246l.docx

Case 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:15:15   Page 124 of 253

1

WHEREFORE, Defendants pray that the above action now pending in the Superior Court of

2 the State of California in and for the City and County of San Francisco be removed in its entirety to

3 this Court for all further proceedings, pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1367, *et. seq.*

4

5 Dated:  November 24, 2017

6                                                    DENNIS J. HERRERA
                                                     City Attorney
7                                                    RONALD P. FLYNN
                                                     Chief Deputy
8                                                    ELAINE M. O'NEIL
                                                     Deputy City Attorney
9

10                                          By:  */s/ RONALD P. FLYNN*
                                                     RONALD P. FLYNN
11
                                                     AttorneysAttorneys for Defendants
12                                                   CITY AND COUNTY OF SAN FRANCISCO, SAN
                                                     FRANCISCO PUBLIC UTILITIES COMMISSION,
13                                                   SAN FRANCISCO MUNICIPAL TRANSPORTATION
                                                     AGENCY, SAN FRANCISCO DEPARTMENT OF
14                                                   PUBLIC WORKS, LONDON BREED, MOHAMMED
                                                     NURU
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, RONALD P. FLYNN, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the above-entitled action.  I am employed at the City Attorney's Office of San Francisco, Fox Plaza Building, 1390 Market Street, Suite 425, San Francisco, CA  94102.

On November 24, 2017, I served the following document(s):

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1441(a) (Federal Question)**

on the following persons at the locations specified:

G. Whitney Leigh
Law Office of Whitney Leigh
1 Sansome Street, 35th Floor
San Francisco, CA  94104
Tel:  (415) 470-4055
E-mail:  leigh1sansome@gmail.com
*Attorneys for Plaintiff Synergy Project Management, Inc.*

in the manner indicated below:

☒        **BY UNITED STATES MAIL**:  Following ordinary business practices, I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and mailing with the United States Postal Service.  I am readily familiar with the practices of the San Francisco City Attorney's Office for collecting and processing mail.  In the ordinary course of business, the sealed envelope(s) that I placed for collection would be deposited, postage prepaid, with the United States Postal Service that same day.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed November 24, 2017, at Sonoma, California.


            */S/ RONALD P. FLYNN*
            RONALD P. FLYNN

# EXHIBIT 1
# PART 1 OF 3

1   G. WHITNEY LEIGH (SBN 153457)
    LAW OFFICES OF WHITNEY LEIGH
2   One Sansome Street, 35th Floor
    San Francisco, CA 94104
3   Telephone: (415) 470-4055

4
    Attorneys for Plaintiff
5   SYNERGY PROJECT MANAGEMENT, INC.

6

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                     COUNTY OF SAN FRANCISCO

11                   UNLIMITED CIVIL JURISDICTION

12

13   SYNERGY PROJECT MANAGEMENT,          Case No. CGC-17-560034
     INC.,
14                                         **FIRST AMENDED COMPLAINT**
              Plaintiff,
15                                         1.  **Intentional Interference with**
         vs.                                   **Contractual Relations**
16                                         2.  **Intentional Interference with**
     CITY AND COUNTY OF SAN                    **Prospective Economic Advantage**
17   FRANCISCO, SAN FRANCISCO PUBLIC      3.  **Negligent Interference with**
     UTILITIES COMMISSION, SAN               **Prospective Economic Advantage**
     FRANCISCO MUNICIPAL                   4.  **Violation of Federal Civil Rights Act**
18   TRANSPORTATION AGENCY, SAN              **[42 U.S.C. § 1983]**
     FRANCISCO DEPARTMENT OF PUBLIC       5.  **Violation of Federal Civil Rights Act**
19   WORKS, LONDON BREED, MOHAMMED          **[42 U.S.C. § 1983 Stigma-Plus]**
     NURU, and DOES 1-100, ~~XXIX XX~~    6.  **Retaliation**
20                                            **[42 U.S.C. §§ 1981, 1983]**
              Defendants.
21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT**
**Case No. CGC-17-560034**

Plaintiff Synergy Project Management, Inc., for its complaint against the City and County of San Francisco, a municipal corporation and subdivision of the State of California, the San Francisco Public Utilities Commission (SFPUC), the San Francisco Municipal Transportation Agency (SFMTA), San Francisco Department of Public Works (SFDPW), London Breed, in her individual capacity and, alternatively in her capacity as a member of the San Francisco Board of Supervisors, and Mohammed Nuru, in his individual capacity and, alternatively, in his capacity as the Director of Public Works for the City of San Francisco, alleges as follows:

## PARTIES

1.      Synergy Project Management, Inc. (hereinafter "Synergy") is now, and at all times relevant hereto, a California corporation, qualified to do business in California, and located in San Francisco, California.

2.      Defendant City and County of San Francisco (hereinafter the "City") is a municipal corporation existing under the laws of the State of California, and is both a Charter City and a County under the Constitution of the State of California.

3.      Defendant San Francisco Public Utilities Commission ("SFPUC") is a Commission of the City that provides drinking water, wastewater collection, and municipal power services to the residents of San Francisco and other customers.

4.      SFPUC is organized into several bureaus or departments, which are responsible for engineering, design, and construction management in connection with the construction of water treatment and delivery systems for the City and other regional water districts.

5.      Defendant SFMTA is a semi-independent agency established by an amendment to San Francisco's charter in 1999. SFMTA oversees and runs the San Francisco Municipal Railway (Muni), the Department of Parking and Traffic (DPT), and the Taxicab Commission.

6.      Defendant Department of Public Works is a City department responsible for the care and maintenance of San Francisco's streets and infrastructure.

7.      Defendant London Breed is and at all times relevant to this action was an elected member of the City's Board of Supervisors.

1

8.      Defendant Mohammed Nuru is and was at all times relevant to this action employed by the City as the Director of Public Works.

9.      Synergy is ignorant of the true names and capacities of DOES 1 through 100, inclusive as it is anticipated that additional City agents and employees were involved in the actions described herein, and that such additional City agents and employees may be discovered through this action, and therefore Synergy sues such defendants by these fictitious names. When each defendant's true name and capacity is ascertained, Synergy will amend this Complaint by naming each defendant sued fictitiously herein by its, his or her true name and capacity.

10.     Defendants, and each of them are public entities and individuals who, upon information and belief, acted in concert and active participation with each other in committing the acts alleged herein.

11.     Synergy is informed and believes, and on that basis alleges, the each of the fictitiously-named defendants acted willfully or in conscious disregard of Synergy's rights and/or was negligent, careless, liable, or otherwise legally responsible in some manner for the events and occurrences alleged herein and that Synergy's damages were proximately caused by each of the defendants' acts.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction of the subject matter for each of the causes of action in this Complaint because the total amount of damages claimed herein exceeds the minimum jurisdictional limit of this Court.

13.     This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331, as a civil action arising under the Constitution, laws, or treaties of the United States, specifically 42 U.S.C. § 1983, and this Court's concurrent jurisdiction over Section 1983 claims.

14.     Venue in this Court is proper pursuant to California Code of Civil Procedure Section 395 because this complaint concerns construction projects located in San Francisco County, contracts and agreements alleged by Synergy were entered into in San Francisco County and to be performed here, and the other injuries Plaintiff alleges in this complaint all occurred in this County.

2

15.     Additionally, venue is proper in this Court because Defendants include the City and County of San Francisco the San Francisco Public Utilities Commission, and officials and employees of these entities.

## FACTS

16.     Synergy is owned, managed and operated by Javad Marsaidi, a Licensed Engineer, Licensed Contractor, and Certified Construction Manager who serves as Synergy's Principal and President.  Founded in 2003, Synergy maintained a long, successful and growing business providing services including construction management, demolition, utilities, mass excavation and shoring, grading and paving, architectural and structural management. Synergy developed a long and successful relationship with the City, including extensive work on numerous projects involving the City's streets and underground construction projects.

17.     Following its 2003 formation, Synergy grew from a small contracting company to a successful general contractor and subcontractor, employing over 100 employees, with annual gross revenue growing from $119,000, in 2004, to $35,893,508, in fiscal year 2012/13.  Synergy successfully completed over 50 underground projects in the City – projects covering virtually every area in San Francisco including the City's most congested and utility-dense areas such as Union Square and Moscone Center. Synergy consistently completed complex projects ahead of schedule, and was frequently recognized by the City and its neighborhoods for its excellence and professionalism. Synergy also successfully bid and completed projects across California, including the counties of San Mateo, Marin, Santa Clara, Contra Costa and Bakersfield.

18.     Because of the City's wrongful and unconstitutional actions described herein, Synergy is now effectively shut down.

## THE PRE-2015 LITIGATION

19.     Prior to 2015, Synergy was compelled to bring successive suits to compel the City's payment for construction Synergy performed pursuant to contracts with the City (the "pre-2015 litigation"). Although Synergy ultimately prevailed in this litigation, Synergy suffered financial consequences as a result of the City's delayed performance of its obligations on these contracts.

3

20.     In 2009, Synergy and the City entered into a written contract wherein Synergy agreed to perform construction on a public work of improvement commonly known as the Third Street Light Rail Program Moscone Station and Portal Utilities Relocation – Contract 1250 (the "1250 Contract"). Synergy completed the project and performed its obligations under the 1250 project.  The City failed to pay Synergy as it promised to do under the 1250 contract, ultimately forcing Synergy to sue the City, in 2013, Synergy successfully sued the City for its breach of the 1250 Contract, ultimately receiving $787,500 in 2015, after requiring Synergy to bear financing costs, interest and other expenses for three years.

21.     In 2010, Synergy and the City entered into a written contract wherein Synergy agreed to perform construction on a public work of improvement commonly known as the Third Street Light Rail Project Phase 2, Union Square/Market Street Station Utilities Relocation Project – Contract 1251 (the "1251 Contract").  The City failed to pay Synergy as it promised to do under the 1251 contract, ultimately forcing Synergy to sue the City, in 2013.   Synergy successfully sued the City for its breach of the 1251 Contract, ultimately receiving $660,000.  But that payment was not received until 2017, by that time Synergy had financed these costs for more than two years.

22.     In 2012, Synergy and the City entered into a written contracts wherein Synergy agreed to perform construction on public works of improvement commonly known as the San Jose Avenue Pavement Renovation and Sewer Replacement, San Bruno Avenue and Bay Shore Boulevard – Contract 1921J (the "1921J Contract") and the Pavement Renovation and Sewer Replacement – Contract 1931J (the "the 1931 Contract".  The City failed to pay Synergy as it promised to do under the 1921J Contract and the 1931 Contract, ultimately forcing Synergy to sue the City, in 2014, Synergy successfully sued the City for its breach of the 1912J Contract and the 1931 Contract, ultimately receiving $1,082,476; But that payment was not received until 2015, by that time Synergy had financed these costs for more than five years.

23.     Although Synergy ultimately recovered damages in the above-described lawsuits, these monies were paid years after they were due.  The delay in payment financially choked Synergy, which not only lost needed and earned funding, but also incurred substantial attorney's fees, interest expense and other unrecovered costs. The City's failure to make obligated payments also forced Synergy to lay

4

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

off employees and field personnel and, notably, severely restricted the company's access to bonding capacity, which, Synergy needed as a prerequisite to its ability to bid on projects as a general contractor. With the lack of cash and assets created by the long outstanding claims, sureties would no longer provide Synergy with the bonds necessary for Synergy to bid work as a prime contractor.

24.     Defendants were aware of the financial hardships the City's actions imposed on Synergy, including the adverse impact on Synergy's access to bonding for future projects.  In December 2013, Synergy's President, Javad Marsaidi, informed Mohammed Nuru and several other City and SFMTA officials and employees that by holding onto payments for work already performed, and by burdening Synergy with interest expense and attorney's fees, the City had caused Synergy to lose its bonding, forced layoffs, and brought the company to the brink of collapse.

25.     Despite these setbacks, Synergy managed to continue to do business.  One way Synergy overcame the bonding problems the City created was to take on work as a subcontractor on projects where another company acted as the general contractor.  General contractors awarded major City projects sought out Synergy, which continued to benefit from the reputation it established as a company capable of completing complex projects timely and efficiently.

**THE HAIGHT STREET PROJECT**

26.     On February 10, 2015, the City and contractor Ghilotti Brothers, Inc. ("GBI") entered into a contract to replace the sewer line, install new water lines, and renovate the pavement on Haight Street and Hayes Street, referred to as DPW Project No. PCE 15018/2264J(R), "Pavement Renovation, Sewer Replacement, and Water Main Installation – Haight Street and Hayes Street" (the "Haight Street Project").  Detailed and meticulous qualification was required for the underground subcontractor by the Contract. Synergy met and exceeded all requirements was selected as a subcontractor by GBI.

27.     In GBI's bid for the Haight Street Project, GBI selected and listed Synergy as a subcontractor on GBI's contract with the City.

28.     Synergy's role was to perform the underground excavation and utilities work on the Haight Street Project.

1    29.    GBI and Synergy entered into a Subcontract Agreement on April 17, 2015.  Attached

2    hereto as **Exhibit A** is a true and correct copy of the Subcontract Agreement.

3    30.    Once GBI listed Synergy as a subcontractor on GBI's bid to the City, and the City

4    accepted the bid and signed a contract with GBI, Synergy had the right to complete its work on the

5    Haight Street Project unless it was removed pursuant to the provisions of the Subletting and

6    Subcontracting Fair Practices Act, California Public Contract Code Sections 4100 *et seq.*, (hereinafter

7    the "Subletting and Subcontracting Fair Practices Act") which establishes a detailed, mandatory

8    framework for competitive bids on public works projects.

9    31.    Additionally, the Subcontract Agreement between Synergy and GBI gave Synergy the

10   right to perform work on the Haight Street Project.  It further provided that GBI would "pay [Synergy]

11   for the satisfactory performance of this Agreement. . ." (Exhibit A, p. 1.)

12   32.    The Subcontract Agreement between Synergy and GBI explicitly provided for how

13   GBI could terminate Synergy as subcontractor on the Haight Street Project.  If "at any time [Synergy]

14   breach[ed] this Agreement or failed[ed] to prosecute the said work with promptness, diligence and

15   efficiency or fail[ed] to perform any of the requirements hereof, [GBI] may. . . terminate the

16   employment of [Synergy]." (Exhibit A, pp. 11-12.)  The Agreement further provided that, "In its sole

17   discretion and to the extent permitted by law, [GBI] may terminate this Agreement without cause."

18   (Exhibit A, p. 12.)

19   33.    The Subletting and Subcontracting Fair Practices Act contains mandatory and

20   comprehensive requirements for when and how a listed subcontractor on a public works project can be

21   removed or replaced.  The City has adopted the provisions of the Subletting and Subcontracting Fair

22   Practices Act as an ordinance applying to its public works projects.

23   34.    Nothing in the Subcontract Agreement or the Subletting and Subcontracting Fair

24   Practices Act gave any party, other than GBI, the right to terminate Synergy from the Haight Street

25   Project.  (Exhibit A.)

26   35.    As a part of the Haight Street Project, Synergy, general contractor GBI., the City,

27   SFMTA, SPUC and other project stakeholders also entered into an agreement, which identified

28   agreed-upon goals for the projects, and established procedures designed to facilitate the successful

6

completion of the Haight Street Project (the "Partnering Agreement"). Attached hereto as **Exhibit B** is a true and correct copy of the Partnering Agreement. The Partnering Agreement identified several potential challenges foreseen by the parties to that agreement based on their experience with complex construction projects like the Haight Street Project, and established the parties' agreement as to how to meet these challenges. This included, notably, the parties' agreement to an "Issue Resolution Ladder," which established the parties' agreed-upon process for dispute resolution. (Exhibit B, p. 10). The Issue Resolution Ladder was comprised of a five-level structure, pursuant to which dispute between the parties would be addressed at gradually-elevated levels, beginning with on-site City and contractor personnel and, failing resolution, submission to higher authority levels, culminating with Mike Ghillotti of Ghillotti Bros., Javad Marsaidi, and John Thomas, the then-deputy City Engineer, at the top level for dispute resolution.

36.     GBI and Synergy began work on the Haight Street Project in April 2015, starting with the main sewer trunk (receiving flow from many tributaries) on Haight Street from Masonic to Buchanan Streets. Synergy then continued to install water line on Haight Street at Asbury.

37.     The Haight Street Project was a particularly difficult one, due to many unknown subsurface structures not disclosed to Synergy in the plans provided to it by the City, which grossly understated the number of underground utilities present in the project area. Throughout its excavation work, Synergy encountered 798 underground utilities. Of those, the project plans had only identified 357. More than 400 of the underground utilities were unknown to Synergy and therefore unanticipated. Further, as excavation proceeded Synergy found, and notified the City of, unknown voids, gaps, sinkholes existing under the street and under buried concrete such that as Synergy excavated existing underground concrete structures unexpectedly collapsed into voids beyond the work which could not be seen from the work face of the trench.

38.     Even for the underground facilities that the utility companies *had* identified, many did not comply with industry standards for placement, and critical information about those utilities was incorrect. As a result, Synergy encountered additional unprecedented obstacles.

7

**FIRST AMENDED COMPLAINT**
**Case No. CGC-17-560034**

39.     Of the almost 800 underground utilities ultimately revealed within the project area, Synergy damaged five PG&E gas lines during the course of the project, when it encountered underground utilities that the City had not shown in its plans or erroneously identified.

40.     The damaged gas lines drew significant public attention, and criticism from neighborhood residents and businesses disrupted by the corrective measures necessitated by the damaged gas lines.

41.     The gas line problems represented precisely the kind of issue the Partnering Agreement anticipated, and for which the Agreement's Issue Resolution Ladder provisions were designed.  But the City did not comply with the process established in the Issue Resolution Ladder, or employ any other reasonable or fair analysis or process, before assigning blame to Synergy and taking summary action against the Company.

42.     Instead, the City purported to conclude, immediately and summarily, that Synergy was to blame for the leaks, even though the City knew that the City (1) lacked a sufficient basis to reach this conclusion, (2) had not in fact reached this conclusion, and (3) had not taken reasonable or prudent steps to determine whether Synergy was at fault.

43.     On October 8, 2015, purportedly because of the gas line accidents, Mohammed Nuru, the Director of Public Works wrote a letter to GBI instructing all work on the project to stop and further stating: "You are hereby directed . . . to remove [Synergy] immediately." In so doing, Nuru acted in his policy-making authority as Director of Public Works, pursuant to San Francisco Administrative Code Chapter 6.

44.     In support of its October 8, 2016 order to GBI to "terminate" Synergy, the City cited section California Public Contract Code Sections 4100, *et seq.*, and a clause in its contract with GBI.

45.     GBI objected to the substitution but began soliciting proposals from other qualified bidders because it needed a subcontractor to finish the project.

46.     On October 14, 2015, the City informed Synergy that the City had "directed Ghilotti to remove Synergy and to substitute a replacement contractor." The letter cited Section 4107(a)(7) as support for the City's action. But Section 4107(a)(7) does not authorize government awarding authorities (in this instance the City) to order a subcontractor's removal and replacement. Instead, that

8

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

provision authorizes a general contractor to substitute a subcontractor for a listed contractor under certain circumstances. It provides no such authority to the City.

47.  Synergy submitted a formal objection to the removal five days later.

48.  On October 26, 2016, Department of Public Works spokeswoman Rachel Gordon admitted that **"[The City doesn't] know what caused the breaks at this point. . . [t]here is still an investigation going on."** But Ms. Gordon's admission came two weeks after the City summarily ordered Synergy's termination.

49.  The City responded approximately one month later on November 16, 2015, reiterating its reliance on Section 4107(a)(7) for its removal of Synergy.

50.  On December 9, 2015, Synergy and the City participated in an administrative hearing before a City-appointed hearing officer, who was an employee of the City.

51.  The City undertook to prove at the hearing that it had the right to remove Synergy from the Haight Street Project without the consent or request of the prime contractor, GBI.

52.  GBI testified at the hearing on behalf of Synergy and in opposition to the City's actions.

53.  On January 8, 2015, the hearing officer issued a Statement of Findings, which rejected Synergy's arguments about the propriety and legality of the City's use of Section 4107(a)(7) to hold the hearing, and instead adopted the City's theory that it could use the section to unilaterally remove Synergy as a subcontractor on the project, without the prime contractor requesting that Synergy be removed.

54.  While the City wrote three previous letters regarding removing Synergy from the Haight Street Project (*see* ¶¶ 42, 45, 48), the removal was not official or final until the hearing officer issued his Statement of Findings on January 8, 2015.  The prior letters asserting the City's desire to remove Synergy from the project did not carry the necessary authority to remove Synergy from the Haight Street Project.  The only way Synergy could have been properly removed from the Haight Street Project was under the authority of a hearing that complied with the relevant sections of the Subletting and Subcontracting Fair Practices Act.

9

Case: 19-30088   Doc# 14006   Filed 09/05/23   Entered 09/05/23 16:13:15   Page 137 of 253

55.     Synergy brought a Petition for Writ of Mandate to review the Hearing Officer's ruling. In its Writ of Mandate, Synergy argued that the City failed to act as required by law because, while the City claimed that it had authority under Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project, Section 4107 did not provide the City with any such authority. Synergy further argued that the City had no other legal authority to remove a subcontractor from a public works project without the request of the prime contractor.  Therefore, Synergy argued, the hearing that resulted in the City's Statement of Findings, was improperly held and without legal authority.  As a result, the resulting Statement of Findings was equally improper and had no authority.

56.     On November 10, 2016, the San Francisco Superior Court granted Synergy's Writ and ordered the Hearing Officer's Determination to be vacated, finding that the City's actions were not supported by the law.  Attached hereto as **Exhibit C** is a true and correct copy of the court's order.

57.     The City's unlawful acts against Synergy were not limited to the above-described unlawful proceedings. City officials concurrently embarked on a campaign to publicly and erroneously depict Synergy as a bad contractor, and to constructively debar Synergy from participation in City projects. Separately, the City took arbitrary and capricious steps to block Synergy's participation in City projects and to remove Synergy from projects Synergy for which Synergy had already committed substantial and critical resources – projects for which Synergy was not only qualified, but also the most cost-effective bidder by any reasonable measure.

58.     The City's public campaign against Synergy took the form of express retaliation against the company for exercising its constitutional right to access to the courts.  City officials used the lawsuits *successfully* brought by Synergy against the City concerning City contracting projects as evidence that Synergy should be prevented from participating in future City projects.

59.     On or about October 10, 2015, Supervisor London Breed, whose City district includes areas in which the Haight Street Project was conducted, publicly denounced Synergy, and announced the City's intent to use Synergy as a scapegoat to blame for problems with the Haight Street Project in retaliation against Synergy for its exercise of its constitutional right to petition the courts for redress of grievances.  In a public speech given before representatives of several City neighborhood associations on Haight Street and broadcast by local television, Breed (1) flatly, erroneously and without basis

10

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

blamed Synergy for cutting corners in its performance of the Haight Street Project; (2) cited Synergy's successful lawsuits against the City as proof of Synergy's incompetence; (3) signaled the City's intent to "hold [Synergy] accountable"; (4) blamed Synergy for undisclosed sinkholes that were preexisting and/or outside of Synergy's work area; and (5) acknowledged that she had asked City Director of Public Works, Mohammed Nuru, to terminate Synergy:

> When it was London Breed's turn, she emphasized that Synergy, the subcontractor for the job, bid $1 million lower than it next competitor. By bidding low, the company cut corners, and the job doesn't get done properly. "Not only is low-bid a real problem, but **the fact that this same contractor just settled three lawsuits with the city and county of San Francisco but still continues to get contracts with the city and county of San Francisco is insane.**" She added, "We have to hold contractors who are incompetent and can't do quality work for the city and county of San Francisco accountable."

She confirmed that she reached out to Mohammed Nuru and specifically asked that the subcontractor, Synergy, be taken off the job.

60.    Breed was aware of the settlements – and the fact that the City had agreed to pay Synergy's claims – because as a member of the City's Board of Supervisors, Breed voted to approve them.

61.    At *the same event*, Breed admitted that the City had not conducted any hearings to justify its conclusion that Synergy was at fault, or provided Synergy any meaningful opportunity to confront any such conclusion:

> A question was asked about the incorrect maps supplied to Synergy by PG&E, and Breed explained that even though faulty maps might have been blamed for the first gas leak, that's not a good enough excuse for the subsequent ones. "This impacts public safety ... We need to understand whether we have qualified people to do this job," said Breed.

She explained that **she would be holding a hearing within the next few weeks to determine whether Synergy is at fault**, or if there is more blame to go around.

62.    Breed repeated her citation of Synergy's past litigation with the City at a public hearing called by Breed and other City Supervisors, at which Breed repeated her denunciation.

63.    Synergy is informed and believes, and on that basis alleges, that some of the gas leaks for which City officials publicly faulted Synergy, were caused by inaccurate and faulty identification

1   of utility lines, and below-surface land gaps – commonly called "voids", which were caused by old

2   and broken utility work and which pre-existed Synergy's work. These voids were unforeseen, were

3   not disclosed by the City (which had a duty to provide Synergy with accurate maps) and made

4   construction substantially more difficult and unpredictable. One of the gas breaks was caused because

5   of a void. Synergy was directed to safely fill up the voids and was paid for this work.

6          64.    While blaming Synergy for the gas line problem may have succeeded in shifting public

7   perception regarding responsibility for the gas line leaks, this did nothing to solve the underlying

8   problems of inaccurate maps and unknown subsurface voids, which remained after Synergy's

9   termination, or resulting gas line breaks, which also continued.

10         65.    In June 2016, the contractor that replaced Synergy hit a gas line in the area of Haight

11  and Steiner Streets.  In July 2017, a construction crew hit a gas line at the intersection of Peirce and

12  Page Streets, forcing an order to residents to "shelter in place".

13         66.    Synergy is informed and believes and on that basis alleges that the City has determined

14  that the Project, as originally designed, cannot be performed, that work on major portions of the

15  Contract (8" and 24" water lines) have been abandoned, and that a redesign by the City Water

16  Department is in underway.

17         67.    On January 5, 2017, Synergy submitted a claim to the City of San Francisco in

18  compliance with the Tort Claims Act (Govt. Code§§810-996.6).  On January 10, 2017, the City

19  denied that claim.

20                        **THE VAN NESS STREET PROJECT**

21         68.    The City's misuse of the provisions provided under Public Contract Code Section 4107

22  to unilaterally remove Synergy from the Haight Street Project were in furtherance of the City's

23  imposition of a custom and policy to scapegoat Synergy, retaliate against the company for its

24  successful exercise of its right to petition the courts in past litigation, to create an after-the-fact

25  justification for its termination of Synergy from the Haight Street Project without due process, and to

26  preclude Synergy from obtaining work performing on City contract.

27         69.    The City's unusual resort to an inapplicable provision of the Public Contract Code to

28  remove Synergy was, ironically, the product of Synergy's status as a subcontractor. Because Synergy

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

1    was a subcontractor on the Haight Street project, the City had no direct means of barring Synergy

2    from work on the Haight Street Project or other City projects.  And general contractors, for their part,

3    would continue to select Synergy to perform the high-quality work the company was known to

4    perform.

5        70.    The City's retaliation against Synergy did not end with the Haight Street Project.

6    Instead, the City continued to use false and pretextual grounds to constructively debar Synergy from

7    participating in any City project.  Synergy's status as a subcontractor, however, required the City to

8    employ protean, contract-specific (but equally bogus) means to bar Synergy.

9        71.    On or about May 2016, general contractor Walsh Construction Company II, LLC

10   ("Walsh") identified Synergy as a Small Business Enterprise ("SBE") as to participate as a

11   subcontractor in the Core Work on the San Francisco Municipal Transportation Agency ("SFMTA")

12   Van Ness Corridor Improvement Project (the "Van Ness Project"), an extensive renovation project for

13   a major San Francisco north/south arterial commissioned by SFMTA in conjunction with SFPUC.

14   Synergy's participation in the Van Ness Project (City Contract No. 1289), included sewer/water

15   replacement Core Work. Attached hereto as **Exhibit D** is a true and correct copy of Walsh's proposal

16   identifying Synergy as subcontractor.

17       72.    For Synergy, participation in the Van Ness Project Core Work represented a substantial

18   commitment and extensive advance planning.  Walsh asked, and Synergy agreed, to be a

19   subcontractor for the Core Work on the Van Ness Street Project in late 2015; Synergy spent

20   approximately 10 months supporting Walsh in the development of project scope and parameters,

21   culminating in a Walsh - Synergy subcontract agreement in May 2016, which enabled Walsh to list

22   Synergy as a Core Work subcontractor in its proposal. (Exhibit D.) In order to ensure Synergy's

23   ability to timely perform this commitment, Synergy was required set aside substantial resources and

24   remove major equipment and employees from availability for other projects and opportunities for over

25   10 months.

26       73.    The City and SFPUC used pretextual grounds to force Synergy's removal from the Van

27   Ness Project, falsely claiming that Synergy's bid was too high.  Incredibly, less than a year earlier, *the*

28

*City had cited the lowness of Synergy's bid on the Haight Street Project as grounds to remove Synergy from that project.*

74.     In June 1, 2016 the City, acting with and through the SFMTA, wrote to Walsh, and alleged that "[the SFPUC was] not agreeable with the price submitted by your Core Subcontractor, Synergy." The SFMTA further stated that it had determined to remove the work Synergy was to do as an item of Core Work under Walsh's contract with the City for the Van Ness Project, and bid out the work as a Non-Core Subcontract Trade Package.

75.     This claim was false: the SFPUC had not determined that Synergy's bid was too high. In fact, Synergy's bid price was lower than Walsh's internal estimate – *and also the estimate of the City's own consultant, HTNB*. Instead, the City, SFMTA and the SFPUC had determined to exclude Synergy from the Van Ness Project and falsely claimed that Synergy's bid was too high as a pretext to force Synergy's removal from that project.

76.     On June 3, 2016 Walsh removed Synergy as a Subcontractor on the Van Ness Project.

77.     At the City's direction, Walsh later invited bids for the sewer/water main replacement work Synergy had been assigned as Core Work, which the City re-designated as Non-Core work. Designating the work as Non-Core work enabled the City to market the work to a larger pool of contractors.  The City knew that because of the harm the City had caused to Synergy's bond capacity, Synergy would not be able to bid on the work as so re-designated.  After aggressive marketing of the now-Non-Core work by the City **only one bid** was received.  That single bid was **more than twice Synergy's price**.

78.     Cancellation of Synergy's participation in the Van Ness Project had a devastating effect on Synergy, a small business that had committed substantial resources to the project.

79.     Synergy has suffered damages due to Defendants' acts based on, *inter alia*:

>        a.      Damage to Synergy's working capital through late payments thereby preventing Synergy from growing as Synergy did not have sufficient working capital to influence future projects and Synergy was losing money paying interest fees on funds borrowed to make up gaps created by the City's failure to pay funds due.

>        b.      Damage to Synergy's contractual relationship with sureties, which provide bonds necessary to bid and perform work for public and

14

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

private entities. Defendants' acts and omissions, as alleged above, have severely limited or eliminated Synergy's access to bonding capacity, which, in turn, has limited or prevented Synergy from bidding on new work as a general contractor.

        c.     Damage to Synergy's existing and prospective contractual relationship with general contractors and vendors.  Based on Defendants' acts and omissions, as alleged above, Synergy's relationships with these entities has been interfered with, damaging Synergy's reputation with this parties, depriving Synergy of access to favorable contract terms, and causing parties with whom Synergy previously enjoyed long-term business relationships to refuse to include Synergy as a subcontractor in bids submitted for City projects, to perform work for Synergy or provide supplies.

        d.     Damage to Synergy's ability to obtain work from other entities.

### FIRST CAUSE OF ACTION
### Intentional Interference with Contractual Relations

80.    Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

81.    At the time the City issued its Statement of Findings related to the dispute about the Haight Street Project, a valid contract existed between Synergy and GBI.  (*See* Exhibit A.)

82.    The City had knowledge of the contract between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew a subcontract had been entered between GBI and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act.

83.    The City's issuance of a Statement of Findings was the official and final act that removed Synergy from the Project. The issuance was an intentional act to induce a breach or disruption in the contract between Synergy and GBI.  The January 8, 2016 Statement of Findings adopted the City's theory that it could use Section 4107(a) to unilaterally remove Synergy as a subcontractor on the project, without GBI requesting that Synergy be removed.

15

Case: 19-30088   Doc# 14006   Filed 09/05/23   Entered 09/05/23 16:13:15   Page 143 of 253

84.     The sole design and purpose of the City's issuance of the Statement of Findings was to disrupt the contract between Synergy and GBI by unilaterally removing Synergy from the Project and depriving Synergy of the right to perform the work under its contract with GBI.

85.     The issuance of the Statement of Findings caused a breach or disruption in the contractual relationship between Synergy and GBI because the issuance deprived Synergy of the rights afforded to it in the contract between Synergy and GBI, specifically performing work on the Project.

86.     The issuance of the Statement of Findings also caused a breach or disruption in the contractual relationship between Synergy and GBI because the issuance breached and disrupted the contract provisions that provided only GBI could terminate Synergy from the Project in compliance with the Subcontracting and Subletting Fair Practices Act.

87.     Synergy was damaged by the City's intentional act of issuing the Statement of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the contract between Synergy and GBI.   At the time the City issued its Statement of Findings related to the dispute about the Haight Street Project, a valid contract existed between Synergy and GBI.  (*See* Exhibit A.)

88.     The City had knowledge of the agreement between Synergy and Walsh because, in the proposal Walsh submitted to the City for the Van Ness Project, Walsh listed Synergy as a SBE subcontractor to perform work on the Project.  Therefore, the City knew an agreement had been entered between Walsh and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless Walsh removed Synergy or agreed to the re-designation of the work Synergy from Core Work to Non-Core Work.

89.     The SFMTA's issuance of a letter directing the removal of the work Synergy was to perform on the Van Ness Project as Core Work and re-designation of this work as Non-Core Work was the official and final act that forced Synergy's removal from the Project.  The issuance was an intentional act to induce a breach or disruption in the agreement between Synergy and Walsh.

16

90.     The sole design and purpose of the City's issuance of the letter removing Synergy's work as Core Work for the Van Ness Project was to disrupt the agreement between Synergy and GBI by unilaterally removing Synergy from the Project and depriving Synergy of the right to perform the work under its agreement with Walsh.

91.     The issuance of the letter removing Synergy's work as Core Work for the Van Ness Project caused a breach or disruption in the contractual relationship between Synergy and Walsh because the issuance deprived Synergy of the rights afforded to it in the contract between Synergy and Walsh, specifically performing work on the Project.

92.     Synergy was damaged by the City's intentional act of issuing the letter removing Synergy's work as Core Work for the Van Ness Project because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to perform its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the agreement between Synergy and Walsh.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### Intentional Interference with Prospective Economic Advantage

93.     Plaintiff incorporated by reference each and every allegation in each preceding paragraph as if fully set forth herein.

94.     At the time the City issued its Statement of Findings related to the dispute about the Project, an economic relationship existed between Synergy and GBI, with the probability of economic benefit to Synergy.  (*See* Exhibit A.)

95.     The City had knowledge of the relationship between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew a subcontract had been entered between GBI and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act.

96.     The City's issuance of a Statement of Findings was the official and final act that removed Synergy from the Project.  The issuance was an intentional act to disrupt the economic

17

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

relationship between Synergy and GBI.  The January 8, 2016 Statement of Findings adopted the City's theory that it could use Section 4107(a) to unilaterally remove Synergy as a subcontractor on the project, without GBI requesting that Synergy be removed.

97.     The issuance of the Statement of Findings actually disrupted the economic relationship between Synergy and GBI because the issuance deprived Synergy of the rights afforded to it in the contract between Synergy and GBI.

98.     The issuance of the Statement of Findings also disrupted the economic relationship between Synergy and GBI because the issuance disrupted the contract provisions that provided only GBI could terminate Synergy from the Project in compliance with the Subcontracting and Subletting Fair Practices Act.

99.     The City's interference was wrongful, not just because the City interfered with an existing economic relationship, but also because the City's actions were proscribed by statute and contravened Section 4107 of the Public Contract Code.  (*See* Exhibit C.)  The San Francisco County Superior Court confirmed that the City's actions contravened Section 4107 in its November 10, 2016 order granting Synergy's Writ and ordering the Hearing Officer's Determination to be vacated because the City's actions were not supported by the law.  (*Id.*)

100.    Synergy incurred economic harm from the City's intentional act of issuing the Statement of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the contract between Synergy and GBI.

101.    At the time the City issued its letter removing Synergy's work as Core Work for the Van Ness, an economic relationship existed between Synergy and Walsh, with the probability of economic benefit to Synergy.  (*See* Exhibit D.)

102.    The City had knowledge of the relationship between Synergy and Walsh because, in the bid Walsh submitted to the City, Walsh listed Synergy as a subcontractor to perform work on the Project.  Therefore, the City knew an agreement had been reached between Walsh and Synergy. Consequently, the City also knew that Synergy had a right to perform the work on the Project unless

18

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

Walsh removed Synergy or agreed to remove the work Synergy was to perform as Core Work on the Van Ness Project and re-designate that work as Non-Core Work.

103.   The City's issuance of a letter removing Synergy's work as Core Work for the Van Ness was the official and final act that forced Synergy's removal from the Van Ness Project. The issuance was an intentional act to disrupt the economic relationship between Synergy and Walsh.

104.   The issuance of the letter removing Synergy's work as Core Work for the Van Ness actually disrupted the economic relationship between Synergy and Walsh because the issuance deprived Synergy of the rights afforded to it in the agreement between Synergy and Walsh.

105.   Synergy incurred economic harm from the City's intentional act of issuing letter removing Synergy's work as Core Work for the Van Ness Project because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to perform its work on the Van Ness Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the agreement between Synergy and Walsh.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
### Negligent Interference with Prospective Economic Advantage

106.   Plaintiff incorporated by reference each and every allegation in each preceding paragraph as if fully set forth herein.

107.   Synergy and GBI were in an economic relationship that would have resulted in future economic benefit to Synergy because the subcontract agreement entered into by Synergy and GBI gave Synergy a right to work on the Project, and a right to be compensated for its work on the Project.

108.   The City knew or should have known of the relationship between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew a subcontract had been entered between GBI and Synergy. Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act.

19

109.    The City knew or should have known that this relationship between Synergy and GBI would be disrupted if the City failed to act with reasonable care.  The harm to Synergy, resulting from the issuance of the Statement of Findings, was foreseeable.  It was obvious and undeniable that removing Synergy from the Project would harm Synergy by preventing it from completing work on the Project, preventing Synergy from being compensated for that work, leaving Synergy with unabsorbed overhead and unrealized profit, and depriving Synergy of the rights afforded to it by the contract between Synergy and GBI.

110.    The City failed to act with reasonable care because it engaged in wrongful conduct that was proscribed by statute and contravened Section 4107 of the Public Contracting Code.  (*See* Exhibit C.)  The San Francisco County Superior Court confirmed that the City's actions contravened Section 4107 in its November 10, 2016 order granting Synergy's Writ and ordering the Hearing Officer's Determination to be vacated because the City's actions were not supported by the law.  (*Id.*)

111.    The relationship between Synergy and GBI was disrupted because the City's issuance of the Statement of Findings removed Synergy from the Project and caused a breach or disruption in the subcontract agreement between GBI and Synergy.

112.    Synergy was harmed and the City's wrongful conduct was a substantial factor in causing Synergy's harm.  Synergy suffered injury by the City's issuance of the Statement of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead; and (4) Synergy was deprived of the rights afforded to it by the contract between Synergy and GBI.

113.    Furthermore, there was a sufficiently close connection between the City's issuance of the Statement of Findings and the removal of Synergy from the Project because the issuance was the direct and immediate cause of the removal of Synergy from the Project.  While the City wrote three previous letters regarding removing Synergy from the Project (*see* ¶¶ 42, 45, 48), the removal was not official or final until the hearing officer issued his Statement of Findings on January 8, 2015.  (*See* ¶ 53.)

114.    The City's issuance of its Statement of Findings, removing Synergy from the Project, was intended to affect Synergy because the sole purpose of the issuance was to remove Synergy from the Project, or the City should have known that its actions would have this effect and the City negligently undertook its course of action.

115.    For all of these reasons, the City owed Synergy a duty of care, which it breached when it issued a Statement of Findings that was designed to remove Synergy from the Project.

### FOURTH CAUSE OF ACTION
### [Violation of Civil Rights 42 U.S.C. §1983]
### Against All Defendants

116.    Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

117.    Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

118.    Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the Van Ness Project, the bidding process for City contracts, and in its good reputation.

119.    Synergy alleges that the pattern of consistently damaging treatment by Defendants and other City, SFMTA, SFPUC and SFDPW employees and personnel, designed to interfere with, or prevent Synergy's work on projects with the City, SFPUC or other entities, comprised a custom and policy implemented, supported and endorsed by Defendants.

120.    Defendants' act and omissions, as alleged above, constitute a violation of Synergy's right to prosecute its contracts with the City, the SFMTA and other City departments, the SFPUC, without undue, unfair an inappropriate government interference.

121.    Defendants' acts and omissions, as alleged above, also constitute a violation of Synergy's right to pursue its occupation and business without undue, unfair and inappropriate government interference.

122.    Defendants' acts and omissions, as alleged above, constituted a deprivation of Synergy's liberty and property without due process under the Fifth and Fourteenth Amendments to the United States Constitution, in that:

21

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

a.      Synergy was denied due process of law based on the facts above, including the City's wrongful use of Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project.

b.      Synergy was further denied due process based on the Defendants' retaliation against Synergy for its exercise of its constitutionally protected right to access to courts and its right to petition the courts for redress of its grievances, and to exercise its right of free speech, without being subject to retaliation by Defendants.

c.      Synergy was further denied due process under law due to the City's use of pretexual grounds to force Synergy's removal from the Van Ness Project, which grounds were unreasonable, capricious, and without any rational basis or relation to a legitimate governmental objective.

d.      Synergy had a right to do business with the City and the City's *de facto* debarment of Synergy deprived Synergy of that interest.

123.    Each of the interests above described the in the preceding paragraphs is a cognizable and protected interest under 42 U.S.C. §1983.

124.    Synergy is informed and believes, and on that basis alleges, that Defendants' acts and omissions, as alleged above, were each taken under color of state law, including Defendants' acts of consistently damaging treatment and removal from City projects, designed to interfere with Synergy's prosecution of its work on other Projects, with the intent to run Synergy out of the City and out of business.

125.    Defendants' acts and omissions were the actual and proximate cause of the deprivation of Synergy's interests described in above.

126.    As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

**FIFTH CAUSE OF ACTION**
**[Violation of Civil Rights 42 U.S.C. §1983]**
**Stigma-Plus Due Process**
**Against All Defendants**

127.    Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

128.    Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

22

FIRST AMENDED COMPLAINT
Case No. CGC-17-560034

129.    Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the Van Ness Project, the bidding process for City contracts, and in its good reputation.

130.    Synergy suffered reputational harm when Defendants publicly issued false statements wrongfully blaming Synergy for problems that occurred with the Haight Street project, concurrent with the City's removal of Synergy from that project.

131.    The reputational harm imposed upon Synergy by these acts foreclosed Synergy's freedom to take advantage of other economic and business opportunities.

132.    As an actual and proximate result of the conduct described above, Synergy has suffered damages in an in excess of $19 million.

### SIXTH CAUSE OF ACTION
### [Violation of Civil Rights 42 U.S.C. §1983]
### Retaliation
### Against All Defendants

133.    Synergy engaged in an activity protected under federal law, that is, the right to petition the government for redress of grievances under the First, Fifth and Fourteenth Amendments to the United States Constitution.

134.    Defendants, acting under color of law, subjected Synergy to adverse action, that is, removal from the Haight Street Project and the Van Ness Project.

135.    Defendants subjected Synergy to adverse action because of Synergy's exercise of its right to petition the government for redress of grievances and right to access to courts;

136.    Defendants' acts and omissions were the actual and proximate cause of the deprivation of Synergy's constitutional rights.

137.    As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

1

**PRAYER**

2      WHEREFORE, Plaintiff prays for relief as follows:

3      1.     For damages in an amount to be proven at trial;

4      2.     For injunctive and equitable relief;

5      3.     For attorney's fees incurred, pursuant to 42 U.S.C. §§1983 and 1988, and any other

6 laws, regulations, agreements or provisions establishing grounds thereto;

7      4.     For costs of suit; and

8      5.     For such other relief as the Court may deem just and proper.

9

10 Dated:  October 10, 2017           Respectfully submitted,

11                  LAW OFFICES OF WHITNEY LEIGH

12

13                  By:   /s/ G. Whitney Leigh_____
                    G. Whitney Leigh

14                     Attorneys for Plaintiff
                    SYNERGY PROJECT MANAGEMENT, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

**FIRST AMENDED COMPLAINT**
**Case No. CGC-17-560034**

**Exhibit F**

JOHNNY D. KNADLER (SBN 220942)
LAW OFFICE OF JOHNNY D. KNADLER
1527-E Pershing Drive
San Francisco, CA  94129
Telephone:  (310) 564-6695
Facsimile:  (888) 323-0611
Email:  jdknadler@gmail.com

Attorneys for Plaintiff
SYNERGY PROJECT MANAGEMENT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNERGY PROJECT MANAGEMENT, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO PUBLIC UTILITIES COMMISSION, SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS, LONDON BREED, MOHAMMED NURU, and DOES 1-100, et al., <br><br> Defendants. | Case No. 3:17-cv-06763 <br><br> **SECOND AMENDED COMPLAINT** <br><br> 1. **Intentional Interference with Contractual Relations** <br> 2. **Intentional Interference with Prospective Economic Advantage** <br> 3. **Negligent Interference with Prospective Economic Advantage** <br> 4. **Breach of Contract** <br> 5. **Breach of the Covenant of Good Faith and Fair Dealing** <br> 6. **Violation of Federal Civil Rights Act [42 U.S.C. § 1983][Substantive Due Process]** <br> 7. **Violation of Federal Civil Rights Act [42 U.S.C. § 1983][[Procedural Due Process** <br> 8. **Violation of Federal Civil Rights Act [42 U.S.C. § 1983 Stigma-Plus]** <br> 9. **Retaliation [42 U.S.C. §§ 1981, 1983]** |

Plaintiff Synergy Project Management, Inc., for its complaint against the City and County of San Francisco, a municipal corporation and subdivision of the State of California, the San Francisco Public Utilities Commission (SFPUC), the San Francisco Municipal Transportation Agency (SFMTA), San Francisco Department of Public Works (SFDPW), London Breed, in her

1   individual capacity and, alternatively in her capacity as a member of the San Francisco Board of

2   Supervisors,  and Mohammed Nuru, in his individual capacity and, alternatively, in his capacity

3   as the Director of Public Works for the City of San Francisco, alleges as follows:

4                                                      **PARTIES**

5          1.   Synergy Project Management, Inc. (hereinafter "Synergy") is now, and at all times

6   relevant hereto, a California corporation, qualified to do business in California, and located in

7   San Francisco, California.

8          2.   Defendant City and County of San Francisco (hereinafter the "City") is a municipal

9   corporation existing under the laws of the State of California, and is both a Charter City and a

10   County under the Constitution of the State of California.

11          3.   Defendant San Francisco Public Utilities Commission ("SFPUC") is a Commission of the

12   City that provides drinking water, wastewater collection, and municipal power services to the

13   residents of San Francisco and other customers.

14          4.   SFPUC is organized into several bureaus or departments, which are responsible for

15   engineering, design, and construction management in connection with the construction of water

16   treatment and delivery systems for the City and other regional water districts.

17          5.   Defendant SFMTA is a semi-independent agency established by an amendment to San

18   Francisco's charter in 1999. SFMTA oversees and runs the San Francisco Municipal Railway

19   (Muni), the Department of Parking and Traffic (DPT), and the Taxicab Commission.

20          6.   Defendant Department of Public Works is a City department responsible for the care and

21   maintenance of San Francisco's streets and infrastructure.

22          7.   Defendant London Breed is and at all times relevant to this action was an elected member

23   of the City's Board of Supervisors.

24          8.   Defendant Mohammed Nuru is and was at all times relevant to this action employed by

25   the City as the Director of Public Works.

26          9.   Synergy is ignorant of the true names and capacities of DOES 1 through 100, inclusive as

27   it is anticipated that additional City agents and employees were involved in the actions described

28   herein, and that such additional City agents and employees may be discovered through this

action, and therefore Synergy sues such defendants by these fictitious names. When each defendant's true name and capacity is ascertained, Synergy will amend this Complaint by naming each defendant sued fictitiously herein by its, his or her true name and capacity.

10. Defendants, and each of them are public entities and individuals who, upon information and belief, acted in concert and active participation with each other in committing the acts alleged herein.

11. Synergy is informed and believes, and on that basis alleges, the each of the fictitiously-named defendants acted willfully or in conscious disregard of Synergy's rights and/or was negligent, careless, liable, or otherwise legally responsible in some manner for the events and occurrences alleged herein and that Synergy's damages were proximately caused by each of the defendants' acts.

## JURISDICTION AND VENUE

12. This Court has jurisdiction of the subject matter for each of the causes of action in this Complaint because the total amount of damages claimed herein exceeds the minimum jurisdictional limit of this Court.

13. This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331, as a civil action arising under the Constitution, laws, or treaties of the United States, specifically 42 U.S.C. § 1983, and this Court's concurrent jurisdiction over Section 1983 claims.

14. Venue in this Court is proper pursuant to California Code of Civil Procedure Section 395 because this complaint concerns construction projects located in San Francisco County, contracts and agreements alleged by Synergy were entered into in San Francisco County and to be performed here, and the other injuries Plaintiff alleges in this complaint all occurred in this County.

15. Additionally, venue is proper in this Court because Defendants include the City and County of San Francisco the San Francisco Public Utilities Commission, and officials and employees of these entities.

1

2
## FACTS

3    16. Synergy is owned, managed and operated by Javad Mirsaidi, a Licensed Engineer,

4 Licensed Contractor, and Certified Construction Manager who serves as Synergy's Principal and

5 President.  Founded in 2003, Synergy maintained a long, successful and growing business

6 providing services including construction management, demolition, utilities, mass excavation

7 and shoring, grading and paving, architectural and structural management. Synergy developed a

8 long and successful relationship with the City, including extensive work on numerous projects

9 involving the City's streets and underground construction projects.

10    17. Following its 2003 formation, Synergy grew from a small contracting company to a

11 successful general contractor and subcontractor, employing over 100 employees, with annual

12 gross revenue growing from $119,000, in 2004, to $35,893,508, in fiscal year 2012/13.  Synergy

13 successfully completed over 50 underground projects in the City – projects covering virtually

14 every area in San Francisco including the City's most congested and utility-dense areas such as

15 Union Square and Moscone Center. Synergy consistently completed complex projects ahead of

16 schedule, and was frequently recognized by the City and its neighborhoods for its excellence and

17 professionalism.  Synergy also successfully bid and completed projects across California,

18 including the counties of San Mateo, Marin, Santa Clara, Contra Costa and Bakersfield.

19    18. Because of the City's wrongful and unconstitutional actions described herein, Synergy is

20 now effectively shut down.

21
## THE PRE-2015 LITIGATION

22    19. Prior to 2015, Synergy was compelled to bring successive suits to compel the City's

23 payment for construction Synergy performed pursuant to contracts with the City (the "pre-2015

24 litigation"). Although Synergy ultimately prevailed in this litigation, Synergy suffered financial

25 consequences as a result of the City's delayed performance of its obligations on these contracts.

26    20. In 2009, Synergy and the City entered into a written contract wherein Synergy agreed to

27 perform construction on a public work of improvement commonly known as the Third Street

28 Light Rail Program Moscone Station and Portal Utilities Relocation  – Contract 1250 (the "1250

---

SECOND AMENDED COMPLAINT                    4                    Case No. 3:17-cv-06763

Contract").  Synergy completed the project and performed its obligations under the 1250 project. The City failed to pay Synergy as it promised to do under the 1250 contract, ultimately forcing Synergy to sue the City.  In 2013, Synergy successfully sued the City for its breach of the 1250 Contract, ultimately receiving $787,500 in 2015, after requiring Synergy to bear financing costs, interest and other expenses for three years.

21. In 2010, Synergy and the City entered into a written contract wherein Synergy agreed to perform construction on a public work of improvement commonly known as the Third Street Light Rail Project Phase 2, Union Square/Market Street Station Utilities Relocation Project – Contract 1251 (the "1251 Contract").  The City failed to pay Synergy as it promised to do under the 1251 contract, ultimately forcing Synergy to sue the City, in 2013.   Synergy successfully sued the City for its breach of the 1251 Contract, ultimately receiving $660,000.  But that payment was not received until 2017, by that time Synergy had financed these costs for more than two years.

22. In 2012, Synergy and the City entered into a written contracts wherein Synergy agreed to perform construction on public works of improvement commonly known as the San Jose Avenue Pavement Renovation and Sewer Replacement, San Bruno Avenue and Bay Shore Boulevard  – Contract 1921J (the "1921J Contract") and the Pavement Renovation and Sewer Replacement  – Contract 1931J (the "the 1931 Contract".  The City failed to pay Synergy as it promised to do under the 1921J Contract and the 1931 Contract, ultimately forcing Synergy to sue the City, in 2014, Synergy successfully sued the City for its breach of the 1912J Contract and the 1931 Contract, ultimately receiving $1,082,476; But that payment was not received until 2015, by that time Synergy had financed these costs for more than five years.

23. Although Synergy ultimately recovered damages in the above-described lawsuits, these monies were paid years after they were due.  The delay in payment financially choked Synergy, which not only lost needed and earned funding, but also incurred substantial attorney's fees, interest expense and other unrecovered costs. The City's failure to make obligated payments also forced Synergy to lay off employees and field personnel and, notably, severely restricted the company's access to bonding capacity, which, Synergy needed as a prerequisite to its ability to

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 158 of 253

bid on projects as a general contractor. With the lack of cash and assets created by the long outstanding claims, sureties would no longer provide Synergy with the bonds necessary for Synergy to bid work as a prime contractor.

24. Defendants were aware of the financial hardships the City's actions imposed on Synergy, including the adverse impact on Synergy's access to bonding for future projects.  In December 2013, Synergy's President, Javad Mirsaidi, informed Mohammed Nuru and several other City and SFMTA officials and employees that by holding onto payments for work already performed, and by burdening Synergy with interest expense and attorney's fees, the City had caused Synergy to lose its bonding, forced layoffs, and brought the company to the brink of collapse.

25. Despite these setbacks, Synergy managed to continue to do business. One way Synergy overcame the bonding problems the City created was to take on work as a subcontractor on projects where another company acted as the general contractor.  General contractors awarded major City projects sought out Synergy, which continued to benefit from the reputation it established as a company capable of completing complex projects timely and efficiently.

## THE HAIGHT STREET PROJECT

26. On February 10, 2015, the City and contractor Ghilotti Brothers, Inc. ("GBI") entered into a contract to replace the sewer line, install new water lines, and renovate the pavement on Haight Street and Hayes Street, referred to as DPW Project No. PCE 15018/2264J(R), "Pavement Renovation, Sewer Replacement, and Water Main Installation – Haight Street and Hayes Street" (the "Haight Street Project").  Detailed and meticulous qualification was required for the underground subcontractor by the Contract. Synergy met and exceeded all requirements was selected as a subcontractor by GBI.

27. In GBI's bid for the Haight Street Project, GBI selected and listed Synergy as a subcontractor on GBI's contract with the City.

28. Synergy's role was to perform the underground excavation and utilities work on the Haight Street Project.

29. GBI and Synergy entered into a Subcontract Agreement on April 17, 2015. Attached hereto as **Exhibit A** is a true and correct copy of the Subcontract Agreement. The City was not a party to the Subcontract or an agent of a party to the Subcontract.

30. Once GBI listed Synergy as a subcontractor on GBI's bid to the City, and the City accepted the bid and signed a contract with GBI, Synergy had the right to complete its work on the Haight Street Project unless it was removed pursuant to the provisions of the Subletting and Subcontracting Fair Practices Act, California Public Contract Code Sections 4100 *et seq.*, (hereinafter the "Subletting and Subcontracting Fair Practices Act") which establishes a detailed, mandatory framework for competitive bids on public works projects.

31. Additionally, the Subcontract Agreement between Synergy and GBI gave Synergy the right to perform work on the Haight Street Project. It further provided that GBI would "pay [Synergy] for the satisfactory performance of this Agreement. . ." (Exhibit A, p. 1.)

32. The Subcontract Agreement between Synergy and GBI explicitly provided for how GBI could terminate Synergy as subcontractor on the Haight Street Project. If "at any time [Synergy] breach[ed] this Agreement or failed[ed] to prosecute the said work with promptness, diligence and efficiency or fail[ed] to perform any of the requirements hereof, [GBI] may. . . terminate the employment of [Synergy]." (Exhibit A, pp. 11-12.) The Agreement further provided that, "In its sole discretion and to the extent permitted by law, [GBI] may terminate this Agreement without cause." (Exhibit A, p. 12.)

33. The Subcontract Agreement between Synergy and GBI expressly referenced and acknowledged GBI's contract with the City ("City-Ghilotti contract"), and bound Synergy to the **terms** of the City-Ghilotti contract. A true and correct copy of the relevant portions of the City-Ghilotti contract is attached hereto as **Exhibit E**. In relevant part, the Subcontract Agreement between Synergy and GBI stated:

> [Synergy] shall furnish all labor, material, supplies and equipment, and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of [Ghilotti], and all work incidental thereto, all in accordance with the terms and conditions of the General Contract including the General Conditions, Drawings, Specifications and other Documents, which by Reference, are made part of said General Contract, all of which shall be considered part of the AGREEMENT by this Reference

thereto, and [Synergy] agrees to be bound to [Ghilotti] and OWNER [San Francisco] by the terms and Provisions thereof.

34. The terms of the City-Ghilotti contract, to which Synergy agreed in the Subcontract Agreement to be bound, expressly precluded the establishment of any contractual or quasi-contractual relationship between the City and Synergy.  Section 102(B) of the City-Ghilotti contract expressly prohibits any provision in that document from being construed to create a contractual relationship with a subcontractor (i.e. Synergy). Section 102(B) states:

> Nothing in the [City-Ghilotti contract] shall be construed to create a contractual relationship between the City and a Subcontractor… or a person or entity other than the City and the Contractor.

Exhibit E., sect. 1.02(B), p. 1929.

35. Synergy was a "Subcontractor", for the purposes of Section 102(B) of the City-Ghilotti contract. Section 1303.B.3 of the City-Ghilotti expressly provides that no subcontractor is a third-party beneficiary of the City-Ghilotti contract.

36. Consequently, sections 102(B) and 1303.B.3 of the City-Ghilotti subcontract expressly precluded any contractual relationship or quasi-contractual relationship between the City and Synergy from being established by the City-Ghilotti contract.

37. The Subletting and Subcontracting Fair Practices Act contains mandatory and comprehensive requirements for when and how a listed subcontractor on a public works project can be removed or replaced.  The City has adopted the provisions of the Subletting and Subcontracting Fair Practices Act as an ordinance applying to its public works projects.

38. Nothing in the Subcontract Agreement or the Subletting and Subcontracting Fair Practices Act gave any party, other than GBI, the right to terminate Synergy from the Haight Street Project.  (Exhibit A.)

39. As a part of the Haight Street Project, Synergy, general contractor GBI., the City, SFMTA , SPUC and other project stakeholders also entered into an agreement, which identified agreed-upon goals for the projects, and established procedures designed to facilitate the successful completion of the Haight Street Project (the "Partnering Agreement"). Attached hereto as **Exhibit B** is a true and correct copy of the Partnering Agreement. The Partnering

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 161 of 253

Agreement identified several potential challenges foreseen by the parties to that agreement based on their experience with complex construction projects like the Haight Street Project, and established the parties' agreement as to how to meet these challenges. This included, notably, the parties' agreement to an "Issue Resolution Ladder," which established the parties' agreed-upon process for dispute resolution. (Exhibit B, p. 10). The Issue Resolution Ladder was comprised of a five-level structure, pursuant to which dispute between the parties would be addressed at gradually-elevated levels, beginning with on-site City and contractor personnel and, failing resolution, submission to higher authority levels, culminating with Mike Ghilotti of Ghilotti Bros., Javad Mirsaidi, and John Thomas, the then-deputy City Engineer, at the top level for dispute resolution.

40. GBI and Synergy began work on the Haight Street Project in April 2015, starting with the main sewer trunk (receiving flow from many tributaries) on Haight Street from Masonic to Buchanan Streets.  Synergy then continued to install water line on Haight Street at Asbury.

41. The Haight Street Project was a particularly difficult one, due to many unknown subsurface structures not disclosed to Synergy in the plans provided to it by the City, which grossly understated the number of underground utilities present in the project area.  Throughout its excavation work, Synergy encountered 798 underground utilities.  Of those, the project plans had only identified 357.  More than 400 of the underground utilities were unknown to Synergy and therefore unanticipated.  Further, as excavation proceeded Synergy found, and notified the City of, unknown voids, gaps, sinkholes existing under the street and under buried concrete such that as Synergy excavated existing underground concrete structures unexpectedly collapsed into voids beyond the work which could not be seen from the work face of the trench.

42. Even for the underground facilities that the utility companies *had* identified, many did not comply with industry standards for placement, and critical information about those utilities was incorrect.  As a result, Synergy encountered additional unprecedented obstacles.

43. Of the almost 800 underground utilities ultimately revealed within the project area, Synergy damaged five PG&E gas lines during the course of the project, when it encountered underground utilities that the City had not shown in its plans or erroneously identified.

44. Synergy was informed and believes that DPW initially agreed that poor mapping for the project area was responsible for the struck gas mains.

45. The damaged gas lines drew significant public attention, and criticism from neighborhood residents and businesses disrupted by the corrective measures necessitated by the damaged gas lines.

46. The gas line problems represented precisely the kind of issue the Partnering Agreement anticipated, and for which the Agreement's Issue Resolution Ladder provisions were designed. But the City did not comply with the process established in the Issue Resolution Ladder, or employ any other reasonable or fair analysis or process, before assigning blame to Synergy and taking summary action against the Company.

47. Instead, the City purported to conclude, immediately and summarily, that Synergy was to blame for the leaks, even though the City knew that the City (1) lacked a sufficient basis to reach this conclusion, (2) had not in fact reached this conclusion, and (3) had not taken reasonable or prudent steps to determine whether Synergy was at fault.

48. On October 8, 2015, purportedly because of the gas line accidents, the Director of Public Works wrote a letter to GBI instructing all work on the project to stop and further stating: "You are hereby directed . . . to remove [Synergy] immediately."

49. In support of its October 8, 2016 order to GBI to "terminate" Synergy, the City cited section California Public Contract Code Sections 4100, *et seq*., and a clause in its contract with GBI.

50. GBI objected to the substitution but began soliciting proposals from other qualified bidders because it needed a subcontractor to finish the project.

51. On October 14, 2015, the City informed Synergy that the City had "directed Ghilotti to remove Synergy and to substitute a replacement contractor." The letter cited Section 4107(a)(7) as support for the City's action. But Section 4107(a)(7) does not authorize government awarding authorities (in this instance the City) to order a subcontractor's removal and replacement. Instead, that provision authorizes a general contractor to substitute a subcontractor for a listed contractor under certain circumstances. It provides no such authority to the City.

52. Synergy submitted a formal objection to the removal five days later.

53. On October 26, 2016, Department of Public Works spokeswoman Rachel Gordon admitted that **"[The City doesn't] know what caused the breaks at this point. . . [t]here is still an investigation going on."** But Ms. Gordon's admission came two weeks after the City summarily ordered Synergy's termination.

54. The City responded approximately one month later on November 16, 2015, reiterating its reliance on Section 4107(a)(7) for its removal of Synergy.

55. Section 4107 provides that, where a subcontractor objects to a *prime contractor's* request for removal, the awarding authority must give notice in writing within at least five working days to the listed subcontractor of a hearing by the awarding authority on the *prime contractor's* request for substitution.

56. By (wrongfully) invoking Section 4107 as authority to remove Synergy from the Haight Street project, the City took the position that its termination of Synergy would not take effect until after a hearing by the awarding authority (the City).

57. The City knew that none of these provisions, nor any other document or authority provided the City with the authority or power to terminate Synergy.  Nevertheless, the City arbitrarily asserted the authority to terminate Synergy based on statutory provisions that the City knew did not apply.

58. On December 9, 2015, Synergy and the City participated in an administrative hearing before a City-appointed hearing officer, who was an employee of the City.

59. The City undertook to prove at the hearing that it had the right to remove Synergy from the Haight Street Project without the consent or request of the prime contractor, GBI.

60. GBI testified at the hearing on behalf of Synergy and in opposition to the City's actions.

61. On January 8, 2015, the hearing officer issued a Statement of Findings, which rejected Synergy's arguments about the propriety and legality of the City's use of Section 4107(a)(7) to hold the hearing, and instead adopted the City's theory that it could use the section to unilaterally remove Synergy as a subcontractor on the project, without the prime contractor requesting that Synergy be removed.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 164 of 253

62. While the City wrote three previous letters regarding removing Synergy from the Haight Street Project (*see* ¶¶ 48, 51, 53), the removal was not official or final until the hearing officer issued his Statement of Findings on January 8, 2015.  The prior letters asserting the City's desire to remove Synergy from the project did not carry the necessary authority to remove Synergy from the Haight Street Project.  The only way Synergy could have been properly removed from the Haight Street Project was under the authority of a hearing that complied with the relevant sections of the Subletting and Subcontracting Fair Practices Act.

63. Synergy brought a Petition for Writ of Mandate to review the Hearing Officer's ruling. In its Writ of Mandate, Synergy argued that the City failed to act as required by law because, while the City claimed that it had authority under Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project, Section 4107 did not provide the City with any such authority.  Synergy further argued that the City had no other legal authority to remove a subcontractor from a public works project without the request of the prime contractor. Therefore, Synergy argued, the hearing that resulted in the City's Statement of Findings, was improperly held and without legal authority.  As a result, the resulting Statement of Findings was equally improper and had no authority.

64. On November 10, 2016, the San Francisco Superior Court granted Synergy's Writ and ordered the Hearing Officer's Determination to be vacated, finding that the City's actions were not supported by the law.  Attached hereto as **Exhibit C** is a true and correct copy of the court's order.

65. The City's unlawful acts against Synergy were not limited to the above-described unlawful proceedings. City officials concurrently embarked on a campaign to publicly and erroneously depict Synergy as a bad contractor, and to constructively debar Synergy from participation in City projects. Separately, the City took arbitrary and capricious steps to block Synergy's participation in City projects and to remove Synergy from projects Synergy for which Synergy had already committed substantial and critical resources – projects for which Synergy was not only qualified, but also the most cost-effective bidder by any reasonable measure.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 165 of 253

66. The City's public campaign against Synergy took the form of express retaliation against the company for exercising its constitutional right to access to the courts. City officials used the lawsuits *successfully* brought by Synergy against the City concerning City contracting projects as evidence that Synergy should be prevented from participating in future City projects.

67. On or about October 10, 2015, Supervisor London Breed, whose City district includes areas in which the Haight Street Project was conducted, publicly denounced Synergy, and announced the City's intent to use Synergy as a scapegoat to blame for problems with the Haight Street Project in retaliation against Synergy for its exercise of its constitutional right to petition the courts for redress of grievances. In a public speech given before representatives of several City neighborhood associations on Haight Street and broadcast by local television, Breed (1) flatly, erroneously and without basis blamed Synergy for cutting corners in its performance of the Haight Street Project; (2) cited Synergy's successful lawsuits against the City as proof of Synergy's incompetence; (3) signaled the City's intent to "hold [Synergy] accountable"; (4) blamed Synergy for undisclosed sinkholes that were preexisting and/or outside of Synergy's work area; and (5) acknowledged that she had asked City Director of Public Works, Mohammed Nuru, to terminate Synergy:

> When it was London Breed's turn, she emphasized that Synergy, the subcontractor for the job, bid $1 million lower than it next competitor. By bidding low, the company cut corners, and the job doesn't get done properly. "Not only is low-bid a real problem, but **the fact that this same contractor just settled three lawsuits with the city and county of San Francisco but still continues to get contracts with the city and county of San Francisco is insane**." She added, "We have to hold contractors who are incompetent and can't do quality work for the city and county of San Francisco accountable."
>
> She confirmed that she reached out to Mohammed Nuru and specifically asked that the subcontractor, Synergy, be taken off the job.

68. Breed was aware of the settlements – and the fact that the City had agreed to pay Synergy's claims – because, as a member of the City's Board of Supervisors, Breed voted to approve them.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 166 of 253

69. At **the same event**, Breed admitted that the City had not conducted any hearings to justify its conclusion that Synergy was at fault, or provided Synergy any meaningful opportunity to confront any such conclusion:

> A question was asked about the incorrect maps supplied to Synergy by PG&E, and Breed explained that even though faulty maps might have been blamed for the first gas leak, that's not a good enough excuse for the subsequent ones. "This impacts public safety ... We need to understand whether we have qualified people to do this job," said Breed.
> She explained that **she would be holding a hearing within the next few weeks to determine whether Synergy is at fault**, or if there is more blame to go around.

70. Breed repeated her citation of Synergy's past litigation with the City at a public hearing called by Breed and other City Supervisors, at which Breed repeated her denunciation.

71. Synergy is informed and believes, and on that basis alleges, that some of the gas leaks for which City officials publicly faulted Synergy, were caused by inaccurate and faulty identification of utility lines, and below-surface land gaps – commonly called "voids", which were caused by old and broken utility work and which pre-existed Synergy's work. These voids were unforeseen, were not disclosed by the City (which had a duty to provide Synergy with accurate maps) and made construction substantially more difficult and unpredictable. One of the gas breaks was caused because of a void. Synergy was directed to safely fill up the voids and was paid for this work.

72. While blaming Synergy for the gas line problem may have succeeded in shifting public perception regarding responsibility for the gas line leaks, this did nothing to solve the underlying problems of inaccurate maps and unknown subsurface voids, which remained after Synergy's termination, or resulting gas line breaks, which also continued.

73. In June 2016, the contractor that replaced Synergy hit a gas line in the area of Haight and Steiner Streets.  In July 2017, a construction crew hit a gas line at the intersection of Peirce and Page Streets, forcing an order to residents to "shelter in place".

74. Synergy is informed and believes and, on that basis, alleges that the City has determined that the Project, as originally designed, cannot be performed, that work on major portions of the

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 167 of 253

1   Contract (8" and 24" water lines) have been abandoned, and that a redesign by the City Water

2   Department is in underway.

3      75. On January 5, 2017, Synergy submitted a claim to the City of San Francisco in

4   compliance with the Tort Claims Act (Govt. Code§§810-996.6).  On January 10, 2017, the City

5   denied that claim.

6   **THE VAN NESS STREET PROJECT**

7      76. The City's misuse of the provisions provided under Public Contract Code Section 4107 to

8   unilaterally remove Synergy from the Haight Street Project were in furtherance of the City's

9   imposition of a policy to scapegoat Synergy, retaliate against the company for its successful

10  exercise of its right to petition the courts in past litigation, to create an after-the-fact justification

11  for its termination of Synergy from the Haight Street Project without due process, and to

12  preclude Synergy from obtaining work performing on City contract.

13     77. The City's unusual resort to an inapplicable provision of the Public Contract Code to

14  remove Synergy was, ironically, the product of Synergy's status as a subcontractor. Because

15  Synergy was a subcontractor on the Haight Street project, the City had no direct means of

16  barring Synergy from work on the Haight Street Project or other City projects.  And general

17  contractors, for their part, would continue to select Synergy to perform the high-quality work the

18  company was known to perform.

19     78. The City's retaliation against Synergy did not end with the Haight Street Project.  Instead,

20  the City continued to use false and pretextual grounds to constructively debar Synergy from

21  participating in any City project.  Synergy's status as a subcontractor, however, required the City

22  to employ protean, contract-specific (but equally bogus) means to bar Synergy.

23     79. On or about May 2016, general contractor Walsh Construction Company II, LLC

24  ("Walsh") selected Synergy as a Small Business Enterprise ("SBE") as to participate as a

25  subcontractor in the Core Work on the San Francisco Municipal Transportation Agency

26  ("SFMTA") Van Ness Corridor Improvement Project (the "Van Ness Project"), an extensive

27  renovation project for a major San Francisco north/south arterial commissioned by SFMTA in

28  conjunction with SFPUC. Synergy's participation in the Van Ness Project (City Contract No.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 168 of 253

1289), included sewer/water replacement Core Work. Attached hereto as **Exhibit D** is a true and correct copy of Walsh's proposal identifying Synergy as subcontractor.

80. Synergy's work was defined as "core subcontracting work" in the agreement between Walsh and the SFMTA, which was the general contract for which Synergy was selected as Walsh's subcontractor (the "Walsh/SFMTA Agreement"). Pursuant to the Walsh/SFMTA Agreement, the replacement of sewer and water lines under Van Ness Avenue was to be performed by a subcontractor pre-selected by Walsh.  Synergy was that pre-selected subcontractor. Two individuals from Synergy were identified in the Walsh/SFMTA Agreement as "Key Personnel" on the Van Ness Project.

81. The SFMTA expressly acknowledged Synergy's expertise in the Walsh/SFMTA Agreement, which the SFMTA determined was critical to its selection of Walsh as the general contractor for the Van Ness Project.  The Walsh/SFMTA Agreement states, at section 4.5.4, that "Contractor acknowledges that the SFMTA's selection of Contractor [Walsh] was based, in part, on the expertise and experience of Contractor's proposed Key Personnel as submitted in the proposal. The Contractor acknowledges and agrees that the replacement of Key Personnel during the course of the Project would be extremely disruptive and damaging to the City. . ."

82. For Synergy, participation in the Van Ness Project Core Work represented a substantial commitment and extensive advance planning.  Walsh asked, and Synergy agreed, to be a subcontractor for the Core Work on the Van Ness Street Project in late 2015; Synergy spent approximately 10 months supporting Walsh in the development of project scope and parameters, culminating in a Walsh - Synergy subcontract agreement in May 2016, which enabled Walsh to list Synergy as a Core Work subcontractor in its proposal. (Exhibit D.) In order to ensure Synergy's ability to timely perform this commitment, Synergy was required set aside substantial resources and remove major equipment and employees from availability for other projects and opportunities for over 10 months.

83. The City and SFPUC used pretextual grounds to force Synergy's removal from the Van Ness Project, falsely claiming that Synergy's bid was too high.  Incredibly, less than a year

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 169 of 253

1   earlier, **the City had cited the lowness of Synergy's bid on the Haight Street Project as**
2   **grounds to remove Synergy from that project**.

3       84. In May of 2016, SFMTA and Walsh were in the process of negotiating the Guaranteed
4   Maximum Price (GMP) for sewer, water and AWSS work on the Van Ness Project. "AWSS" is
5   an SFPUC term that means Auxiliary Water Supply System, a system providing water for
6   firefighting capabilities especially critical for earthquake areas like San Francisco.  While
7   SFMTA was the lead San Francisco agency for the Van Ness Project, the sewer, water and
8   AWSS work was under the jurisdiction and paid for by the SFPUC.  The SFPUC had an estimate
9   of approximately $18 million for the work. Synergy provided a price of approximately $19
10  million for sewer, water and AWSS work to be included in the GMP.

11      85. In June 1, 2016 the City, acting with and through the SFMTA, wrote to Walsh, and
12  alleged that "[the SFPUC was] not agreeable with the price submitted by your Core
13  Subcontractor, Synergy." The SFMTA further stated that it had determined to remove the work
14  Synergy was to do as an item of Core Work under Walsh's contract with the City for the Van
15  Ness Project, and bid out the work as a Non-Core Subcontract Trade Package.

16      86. This claim was false: the SFPUC had not determined that Synergy's bid was too high. In
17  fact, Synergy's bid price was lower than Walsh's internal estimate – **and also the estimate of**
18  **the City's own consultant, HTNB.** Instead, the City, SFMTA and the SFPUC had determined
19  to exclude Synergy from the Van Ness Project and falsely claimed that Synergy's bid was too
20  high as a pretext to force Synergy's removal from that project.

21      87. The City, SFMTA and the SFPUC had unique and exclusive knowledge of the San
22  Francisco construction bid market environment, including the number of utility projects being
23  put out by all San Francisco entities (SFMTA, DPW, and SFPUC).  As a result of this
24  knowledge, Defendants knew that Synergy's bid for the Van Ness Project was not "too high",
25  but concealed this knowledge in order to perpetuate Defendants' pretextual grounds to remove
26  Synergy.

27      88. On June 3, 2016 Walsh removed Synergy as a Subcontractor on the Van Ness Project.

28

89. At the City's direction, Walsh later invited bids for the sewer/water main replacement work Synergy had been assigned as Core Work, which the City re-designated as Non-Core work. Designating the work as Non-Core work enabled the City to market the work to a larger pool of contractors.  The City knew that because of the harm the City had caused to Synergy's bond capacity, Synergy would not be able to bid on the work as so re-designated.  After aggressive marketing of the now-Non-Core work by the City **only one bid** was received.  That single bid was $39,559, 963, **more than twice Synergy's price, and did not include the AWSS work that was included in Synergy's original estimate**. Ultimately, Defendants' removal of Synergy caused the City to incur additional expenses that amounted to tens of millions more for the same scope of work.

90. Synergy suffered harm and damages from being unable to bid on the project on April 13, 2017 because the City had improperly directed Walsh to remove Synergy as a subcontractor from the Van Ness work.  Further, when the City changed the sewer work from Core Work to Non-Core work, it effectively removed Synergy from the other work on the project.

91. On April 12, 2018, Synergy timely submitted a claim to the City of San Francisco in compliance with the Tort Claims Act (Govt. Code§§810-996.6) for the Van Ness Project.  A true and correct copy of the claim is attached as **Exhibit F**.  On May 15, 2018, the City denied that claim.

92. Cancellation of Synergy's participation in the Van Ness Project had a devastating effect on Synergy, a small business that had committed substantial resources to the project.

93.  Synergy has suffered damages due to Defendants' acts based on, *inter alia*:

    a.  Damage to Synergy's working capital through late payments thereby preventing Synergy from growing as Synergy did not have sufficient working capital to influence future projects and Synergy was losing money paying interest fees on funds borrowed to make up gaps created by the City's failure to pay funds due.

    b.  Damage to Synergy's contractual relationship with sureties, which provide bonds necessary to bid and perform work for public and private entities. Defendants' acts and omissions, as alleged above, have severely limited or eliminated

Synergy's access to bonding capacity, which, in turn, has limited or prevented Synergy from bidding on new work as a general contractor.

c. Damage to Synergy's existing and prospective contractual relationship with general contractors and vendors. Based on Defendants' acts and omissions, as alleged above, Synergy's relationships with these entities has been interfered with, damaging Synergy's reputation with this parties, depriving Synergy of access to favorable contract terms, and causing parties with whom Synergy previously enjoyed long-term business relationships to refuse to include Synergy as a subcontractor in bids submitted for City projects, to perform work for Synergy or provide supplies.

d. Damage to Synergy's ability to obtain work from other entities.

## FIRST CAUSE OF ACTION
### Intentional Interference with Contractual Relations

**Against Defendants City and County of San Francisco, San Francisco Public Utilities Commission, San Francisco Municipal Transportation Agency, San Francisco Department of Public Works, and Does 1-100**

94. Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

95. At the time the City issued its Statement of Findings related to the dispute about the Haight Street Project, a valid contract existed between Synergy and GBI. (*See* Exhibit A.)

96. The City had knowledge of the contract between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project. Therefore, the City knew a subcontract had been entered between GBI and Synergy.

97. Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act.

98. The City is not the agent of the general contractor in Synergy's subcontract for the Haight Street Project; neither is the general contractor the City's agent in Synergy's subcontract for the

Haight Street Project. The contract between the City and Ghilotti states that it does not create a contractual relationship between the City and a Subcontractor.

99. The City's issuance of a Statement of Findings was the official and final act that removed Synergy from the Project. The issuance was an intentional act to induce a breach or disruption in the contract between Synergy and GBI. The January 8, 2016 Statement of Findings adopted the City's theory that it could use Section 4107(a) to unilaterally remove Synergy as a subcontractor on the project, without GBI requesting that Synergy be removed.

100.       The sole design and purpose of the City's issuance of the Statement of Findings was to disrupt the contract between Synergy and GBI by unilaterally removing Synergy from the Project and depriving Synergy of the right to perform the work under its contract with GBI.

101.       The issuance of the Statement of Findings caused a breach or disruption in the contractual relationship between Synergy and GBI because the issuance deprived Synergy of the rights afforded to it in the contract between Synergy and GBI, specifically performing work on the Project.

102.       The issuance of the Statement of Findings also caused a breach or disruption in the contractual relationship between Synergy and GBI because the issuance breached and disrupted the contract provisions that provided only GBI could terminate Synergy from the Project in compliance with the Subcontracting and Subletting Fair Practices Act.

103.       Synergy was damaged by the City's intentional act of issuing the Statement of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the contract between Synergy and GBI.   At the time the City issued its Statement of Findings related to the dispute about the Haight Street Project, a valid contract existed between Synergy and GBI.  (*See* Exhibit A.)

104.       The City had knowledge of the agreement between Synergy and Walsh because, in the proposal Walsh submitted to the City for the Van Ness Project, Walsh listed Synergy as a SBE subcontractor to perform work on the Project.  Therefore, the City knew an agreement had

been entered between Walsh and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless Walsh removed Synergy or agreed to the re-designation of the work Synergy from Core Work to Non-Core Work.

105.     The City is not the agent of the general contractor in Synergy's subcontract for the Van Ness Project; neither is the general contractor the City's agent in Synergy's subcontract for the Van Ness

106.     The SFMTA's issuance of a letter directing the removal of the work Synergy was to perform on the Van Ness Project as Core Work and re-designation of this work as Non-Core Work was the official and final act that forced Synergy's removal from the Project.  The issuance was an intentional act to induce a breach or disruption in the agreement between Synergy and Walsh.

107.     The sole design and purpose of the City's issuance of the letter removing Synergy's work as Core Work for the Van Ness Project was to disrupt the agreement between Synergy and GBI by unilaterally removing Synergy from the Project and depriving Synergy of the right to perform the work under its agreement with Walsh.

108.     The issuance of the letter removing Synergy's work as Core Work for the Van Ness Project caused a breach or disruption in the contractual relationship between Synergy and Walsh because the issuance deprived Synergy of the rights afforded to it in the contract between Synergy and Walsh, specifically performing work on the Project.

109.     Synergy was damaged by the City's intentional act of issuing the letter removing Synergy's work as Core Work for the Van Ness Project because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to perform its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the agreement between Synergy and Walsh.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
### Intentional Interference with Prospective Economic Advantage

**Against Defendants City and County of San Francisco, San Francisco Public Utilities Commission, San Francisco Municipal Transportation Agency, San Francisco Department of Public Works, and Does 1-100**

110.     Plaintiff incorporated by reference each and every allegation in each preceding paragraph as if fully set forth herein.

111.     At the time the City issued its Statement of Findings related to the dispute about the Project, an economic relationship existed between Synergy and GBI, with the probability of economic benefit to Synergy.  (*See* Exhibit A.)

112.     The City had knowledge of the relationship between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project.  Therefore, the City knew a subcontract had been entered between GBI and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act.

113.     The City's issuance of a Statement of Findings was the official and final act that removed Synergy from the Project.  The issuance was an intentional act to disrupt the economic relationship between Synergy and GBI.  The January 8, 2016 Statement of Findings adopted the City's theory that it could use Section 4107(a) to unilaterally remove Synergy as a subcontractor on the project, without GBI requesting that Synergy be removed.

114.     The issuance of the Statement of Findings actually disrupted the economic relationship between Synergy and GBI because the issuance deprived Synergy of the rights afforded to it in the contract between Synergy and GBI.

115.     The issuance of the Statement of Findings also disrupted the economic relationship between Synergy and GBI because the issuance disrupted the contract provisions that provided only GBI could terminate Synergy from the Project in compliance with the Subcontracting and Subletting Fair Practices Act.

116.      The City's interference was wrongful, not just because the City interfered with an existing economic relationship, but also because the City's actions were proscribed by statute and contravened Section 4107 of the Public Contract Code. (*See* Exhibit C.)  The San Francisco County Superior Court confirmed that the City's actions contravened Section 4107 in its November 10, 2016 order granting Synergy's Writ and ordering the Hearing Officer's Determination to be vacated because the City's actions were not supported by the law. (*Id.*)

117.      Synergy incurred economic harm from the City's intentional act of issuing the Statement of Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to complete its work on the Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the contract between Synergy and GBI.

118.      At the time the City issued its letter removing Synergy's work as Core Work for the Van Ness, an economic relationship existed between Synergy and Walsh, with the probability of economic benefit to Synergy. (*See* Exhibit D.)

119.      The City had knowledge of the relationship between Synergy and Walsh because, in the bid Walsh submitted to the City, Walsh listed Synergy as a subcontractor to perform work on the Project.  Therefore, the City knew an agreement had been reached between Walsh and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless Walsh removed Synergy or agreed to remove the work Synergy was to perform as Core Work on the Van Ness Project and re-designate that work as Non-Core Work.

120.      The City's issuance of a letter removing Synergy's work as Core Work for the Van Ness was the official and final act that forced Synergy's removal from the Van Ness Project. The issuance was an intentional act to disrupt the economic relationship between Synergy and Walsh.

121.      The issuance of the letter removing Synergy's work as Core Work for the Van Ness actually disrupted the economic relationship between Synergy and Walsh because the issuance deprived Synergy of the rights afforded to it in the agreement between Synergy and Walsh.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 176 of 253

122.     Synergy incurred economic harm from the City's intentional act of issuing letter removing Synergy's work as Core Work for the Van Ness Project because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to perform its work on the Van Ness Project and be compensated for that work; (3) Synergy was left with unabsorbed overhead and unrealized profit; and (4) Synergy was deprived of the rights afforded to it by the agreement between Synergy and Walsh.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Negligent Interference with Prospective Economic Advantage**

**Against Defendants City and County of San Francisco, San Francisco Public Utilities Commission, San Francisco Municipal Transportation Agency, San Francisco Department of Public Works, and Does 1-100**

123.     Plaintiff incorporated by reference each and every allegation in each preceding paragraph as if fully set forth herein.

124.     Synergy and GBI were in an economic relationship that would have resulted in future economic benefit to Synergy because the subcontract agreement entered into by Synergy and GBI gave Synergy a right to work on the Project, and a right to be compensated for its work on the Project.

125.     The City knew or should have known of the relationship between Synergy and GBI because, in the bid GBI submitted to the City, GBI listed Synergy as a subcontractor to perform work on the Project.  Therefore, the City knew a subcontract had been entered between GBI and Synergy.  Consequently, the City also knew that Synergy had a right to perform the work on the Project unless GBI removed Synergy under the relevant provisions of the Subletting and Subcontracting Fair Practices Act.

126.     The City knew or should have known that this relationship between Synergy and GBI would be disrupted if the City failed to act with reasonable care.  The harm to Synergy, resulting from the issuance of the Statement of Findings, was foreseeable.  It was obvious and undeniable that removing Synergy from the Project would harm Synergy by preventing it from

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 177 of 253

1  completing work on the Project, preventing Synergy from being compensated for that work,

2  leaving Synergy with unabsorbed overhead and unrealized profit, and depriving Synergy of the

3  rights afforded to it by the contract between Synergy and GBI.

4       127.     The City failed to act with reasonable care because it engaged in wrongful

5  conduct that was proscribed by statute and contravened Section 4107 of the Public Contracting

6  Code.  (*See* Exhibit C.)  The San Francisco County Superior Court confirmed that the City's

7  actions contravened Section 4107 in its November 10, 2016 order granting Synergy's Writ and

8  ordering the Hearing Officer's Determination to be vacated because the City's actions were not

9  supported by the law.  (*Id.*)

10       128.     The relationship between Synergy and GBI was disrupted because the City's

11  issuance of the Statement of Findings removed Synergy from the Project and caused a breach or

12  disruption in the subcontract agreement between GBI and Synergy.

13       129.     Synergy was harmed and the City's wrongful conduct was a substantial factor in

14  causing Synergy's harm.  Synergy suffered injury by the City's issuance of the Statement of

15  Findings because the issuance: (1) removed Synergy from the Project; (2) Synergy was unable to

16  complete its work on the Project and be compensated for that work; (3) Synergy was left with

17  unabsorbed overhead; and (4) Synergy was deprived of the rights afforded to it by the contract

18  between Synergy and GBI.

19       130.     Furthermore there was a sufficiently close connection between the City's issuance

20  of the Statement of Findings and the removal of Synergy from the Project because the issuance

21  was the direct and immediate cause of the removal of Synergy from the Project.  While the City

22  wrote three previous letters regarding removing Synergy from the Project (*see* ¶¶ 42, 45, 48), the

23  removal was not official or final until the hearing officer issued his Statement of Findings on

24  January 8, 2015.  (*See* ¶ 53.)

25       131.     The City's issuance of its Statement of Findings, removing Synergy from the

26  Project, was intended to affect Synergy because the sole purpose of the issuance was to remove

27  Synergy from the Project, or the City should have known that its actions would have this effect

28  and the City negligently undertook its course of action.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 178 of 253

132.     For all of these reasons, the City owed Synergy a duty of care, which it breached when it issued a Statement of Findings that was designed to remove Synergy from the Project.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

### FOURTH CAUSE OF ACTION
### Breach of Contract

**Against Defendants City and County of San Francisco, San Francisco Public Utilities Commission, San Francisco Municipal Transportation Agency, San Francisco Department of Public Works, and Does 1-100**

133.    Plaintiff incorporated by reference each and every allegation in each preceding paragraph as if fully set forth herein.

134.    Upon information and belief, in the alternative, and pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure allowing for alternative pleadings, Synergy and the City were in a contractual relationship that was created when Synergy was accepted as a Subcontractor on the Haight Street Contract.  The City entered into a contract with Synergy by the terms of the subcontract between GBI and Synergy which incorporated all of the terms of the contract between GBI and the City.

135.    Synergy did all, or substantially all, of the significant things that the contract between Synergy and GBI and the City required Synergy to do up to the point where the City breached the agreement and improperly removed Synergy from the Haigh Street Project.

136.    The contract specifically required the City to adhere to Section 4107.  In breach of the contract and applicable state law, the City violated Section 4107 and improperly removed Synergy from the Project.  Furthermore, the City breached the contract when it failed to pay Synergy for the work it had performed and when it refused to allow Synergy to continue its work under the contract.

137.    As a result of the breach, Synergy was harmed.  Synergy was not paid for the work it had performed under the contract; Synergy lost future revenue from the contract because it was unable to complete its work; Synergy was left with unabsorbed overhead; Synergy lost future opportunities due to the damage and harm suffered by the improper removal including the ability

to bid on other contracts; and Synergy was deprived of the rights afforded to it by the contract between Synergy and the City.

138.   The City had no legal authority to remove Synergy from the contract because the removal was not authorized by any law, and the removal was in violation of applicable state law.  The removal also prevented Synergy from receiving payment or completing the contract.  The City also withheld payments in violation of the contract which resulted in a substantial loss to Synergy.  Therefore, the City's breach of the contract was a substantial factor in causing the harm to Synergy.   As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**Breach of the Covenant of Good Faith and Fair Dealing**
**[Haight Street Project]**

**Against Defendants City and County of San Francisco, San Francisco Public Utilities Commission, San Francisco Municipal Transportation Agency, San Francisco Department of Public Works, and Does 1-100**

139.   Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

140.   California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California. This includes contractual parties' agreement not to do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

141.   Upon information and belief, in the alternative, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, Synergy and the City were in a contractual relationship that was created when Synergy was accepted as a Subcontractor on the Haight Street Contract.  The City entered into a contract with Synergy by the terms of the subcontract between GBI and Synergy which incorporated all of the terms of the contract between GBI and the City.

142.     Defendants unlawfully interfered with Synergy's right to receive the benefits of its Subcontract, by baselessly asserting the right to terminate Synergy pursuant to section 4107, a statutory provision that Defendants knew did not apply.

143.     As a result of the actions of Defendants, and each of them, set forth herein above, have violated the implied covenant of good faith and fair dealing.  Furthermore, as a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION
**[Violation of Civil Rights 42 U.S.C. §1983]**
**[Substantive Due Process]**
**Against All Defendants**

144.     Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

145.     Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

146.     Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the bidding process for City contracts, and in its good reputation.

147.     Defendants had no power to terminate Synergy's subcontract for the Haight Street Project under Public Contracting Code Section 4107 or any other authority.  Defendants' actions, in purporting to terminate Synergy's Haight Street Project subcontract pursuant to section 4107 was *ultra vires*, and taken in the absence of substantive jurisdiction or authority.

148.     By arbitrarily assuming the authority to terminate Synergy's subcontract based on fictional authority the City did not have, and which it knew it did not have, the City violated Synergy's right to substantive due process.

149.     In addition, the City did not act properly in changing the conditions of the Van Ness Project which removed Synergy as a subcontractor and precluded Synergy from bidding on the project.  This action interfered with Synergy's relations with the general contractor on the project and effectively ended Synergy's involvement with the project.  Thus, the City's unreasonable,

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 181 of 253

1   unnecessary and arbitrary interference with the right and liberty to contract constituted an

2   impermissible violation of Synergy's Due Process Rights

3   150.   Defendants' acts and omissions, by terminating Synergy's Haight Street subcontract as

4   alleged above, constituted a deprivation of Synergy's liberty and property without due process

5   under the Fifth and Fourteenth Amendments to the United States Constitution, in that:

6       a.   Synergy was denied due process of law based on the facts above, including the

7           City's wrongful use of Public Contract Code Section 4107 to unilaterally remove

8           Synergy from the Haight Street Project.

9       b.   Synergy was further denied due process based on the Defendants' retaliation

10          against Synergy for its exercise of its constitutionally protected right to access to

11          courts and its right to petition the courts for redress of its grievances, and to

12          exercise its right of free speech, without being subject to retaliation by

13          Defendants.

14      c.   Synergy was further denied due process under law due to the City's use of

15          pretextual grounds to force Synergy's removal from the Van Ness Project, which

16          grounds were unreasonable, capricious, and without any rational basis or relation

17          to a legitimate governmental objective.

18      d.   Synergy had a right to do business with the City and the City's *de facto*

19          debarment of Synergy deprived Synergy of that interest.

20  Defendants' acts and omissions were the actual and proximate cause of the deprivation of

21  Synergy's interests described above.

22  151.   As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered

23  damages in excess of $19 million.

24      WHEREFORE, Synergy prays for relief as hereinafter set forth.

25              **SEVENTH CAUSE OF ACTION**

26      **[Violation of Civil Rights 42 U.S.C. §1983][Procedural Due Process]**
                   **Against All Defendants**

27  152.   Plaintiff incorporates by reference each and every allegation in each preceding paragraph

28  as if fully set forth herein.

153.    Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

154.    Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the Van Ness Project, the bidding process for City contracts, and in its good reputation.

155.    Although Defendants had no authority to terminate Synergy absent a request for removal by the prime contractor on the Haight Street project, the City, Synergy and GBI did agree to a procedure for the resolution of disputes. This procedure is set forth in the Partnering Agreement (Exhibit B).

156.    In terminating Synergy's subcontract, the City disregarded the procedure to which it agreed for the resolution of Haight Street project disputes.

157.    Synergy alleges that the pattern of consistently damaging treatment by Defendants and other City, SFMTA, SFPUC and SFDPW employees and personnel, designed to interfere with, or prevent Synergy's work on projects with the City, SFPUC or other entities, comprised a policy implemented, supported and endorsed by Defendants.

158.    Defendants' act and omissions, as alleged above, constitute a violation of Synergy's right to prosecute its contracts with the City, the SFMTA and other City departments, the SFPUC, without undue, unfair an inappropriate government interference.

159.    Defendants' acts and omissions, as alleged above, also constitute a violation of Synergy's right to pursue its occupation and business without undue, unfair and inappropriate government interference.

160.    Defendants' acts and omissions, as alleged above, constituted a deprivation of Synergy's liberty and property without due process under the Fifth and Fourteenth Amendments to the United States Constitution, in that:

      a.    Synergy was denied due process of law based on the facts above, including the City's wrongful use of Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 183 of 253

b.  Synergy was further denied due process based on the Defendants' retaliation against Synergy for its exercise of its constitutionally protected right to access to courts and its right to petition the courts for redress of its grievances, and to exercise its right of free speech, without being subject to retaliation by Defendants.

c.  Synergy was further denied due process under law due to the City's use of pretextual grounds to force Synergy's removal from the Van Ness Project, which grounds were unreasonable, capricious, and without any rational basis or relation to a legitimate governmental objective.

d.  Synergy had a right to do business with the City and the City's *de facto* debarment of Synergy deprived Synergy of that interest.

161.   Each of the interests above described the in the preceding paragraphs is a cognizable and protected interest under 42 U.S.C. §1983.

162.   Synergy is informed and believes, and on that basis alleges, that Defendants' acts and omissions, as alleged above, were each taken under color of state law, including Defendants' acts of consistently damaging treatment and removal from City projects, designed to interfere with Synergy's prosecution of its work on other Projects, with the intent to run Synergy out of the City and out of business.

163.   Defendants' acts and omissions were the actual and proximate cause of the deprivation of Synergy's interests described in above.

164.   As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

**EIGHTH CAUSE OF ACTION**
**[Violation of Civil Rights 42 U.S.C. §1983]**
**Stigma-Plus Due Process**
**Against All Defendants**

165.   Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

166.    Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

167.    Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the Van Ness Project, the bidding process for City contracts, and in its good reputation.

168.    Synergy suffered reputational harm when Defendants publicly issued false statements wrongfully blaming Synergy for problems that occurred with the Haight Street project, concurrent with the City's removal of Synergy from that project.

169.    The reputational harm imposed upon Synergy by these acts foreclosed Synergy's freedom to take advantage of other economic and business opportunities.

170.    As an actual and proximate result of the conduct described above, Synergy has suffered damages in an in excess of $19 million.

**NINTH CAUSE OF ACTION**
**[Violation of Civil Rights 42 U.S.C. §1983]**
**Retaliation**
**Against All Defendants**

171.    Synergy engaged in an activity protected under federal law, that is, the right to petition the government for redress of grievances under the First, Fifth and Fourteenth Amendments to the United States Constitution.

172.    Defendants, acting under color of law, subjected Synergy to adverse action, that is, removal from the Haight Street Project and the Van Ness Project.

173.    Defendants subjected Synergy to adverse action because of Synergy's exercise of its right to petition the government for redress of grievances and right to access to courts;

174.    Defendants' acts and omissions were the actual and proximate cause of the deprivation of Synergy's constitutional rights.

175.    As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 185 of 253

**PRAYER**

WHEREFORE, Plaintiff prays for relief as follows:

1. For damages in an amount to be proven at trial;

2. For injunctive and equitable relief;

3. For attorney's fees incurred, pursuant to 42 U.S.C. §§1983 and 1988, and any other laws, regulations, agreements or provisions establishing grounds thereto;

4. For costs of suit; and

5. For such other relief as the Court may deem just and proper.

Dated:                                    Respectfully Submitted,

LAW OFFICE OF JOHNNY D. KNADLER

By:   *Johnny Knadler*
         JOHNNY D. KNADLER

Attorney for Plaintiff
SYNERGY PROJECT
MANAGEMENT, INC.

**Exhibit G**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNERGY PROJECT MANAGEMENT, INC., | Case No. 17-cv-06763-JST |
| Plaintiff, | **ORDER GRANTING MOTION TO DISMISS** |
| v. | Re: ECF No. 51 |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | |

Before the Court is Defendants City and County of San Francisco, San Francisco Public Utilities Commission, San Francisco Municipal Transportation Agency, San Francisco Department of Public Works, London Breed, and Mohammed Nuru's (collectively, "the City") motion to dismiss  portions of Plaintiff Synergy Project Management, Inc. ("Synergy")'s second amended complaint ("SAC").  ECF No. 51.  The Court will grant the motion.

## I.     BACKGROUND

The facts are discussed in greater detail in the Court's order granting in part and denying in part the City's motion to dismiss Synergy's first amended complaint, ECF No. 49, and are summarized briefly here.[1]

On February 10, 2015, the City and contractor Ghilotti Brothers, Inc. ("Ghilotti") entered into a contract to replace the sewer line, install new water lines, and renovate the pavement on Haight and Hayes Streets (the "Haight Street Project").  SAC ¶ 26.  Synergy was selected as a subcontractor on the project:  Ghilotti and the City entered into a prime contract, and Synergy and

---

[1] The Court takes the facts as true from the SAC, ECF No. 50.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

United States District Court
Northern District of California

1   Ghilotti entered into a subcontract.  Id. ¶¶ 26-27.

2       The Synergy-Ghilotti contract explicitly incorporated the terms of Ghilotti's contract with

3   the City.  Id. ¶ 134.  The City-Ghilotti contract, in turn, "expressly precluded the establishment of

4   any contractual or quasicontractual relationship between the City and Synergy."  Id. ¶ 34, Exh. E.

5   Section 102(B) of the City-Ghilotti contract states:  "Nothing in the [City-Ghilotti contract] shall

6   be construed to create a contractual relationship between the City and a Subcontractor . . . or a

7   person or entity other than the City and the Contractor."  SAC, Exh. E, Exhibit E., sect. 1.02(B), p.

8   1929 (ECF No. 50-2 at 10).  The terms of the City-Ghilotti contract imposed certain obligations on

9   the City, including making available "survey information, such as monuments, property lines, and

10   reports describing physical characteristics, legal limitations and utility locations," and "apply[ing]

11   and pay[ing] for the building permit if required for the Work and . . . pay[ing] all permanent utility

12   service connection fees."  ECF No. 25-1 at 12.

13       The project "was a particularly difficult one, due to many unknown subsurface structures

14   not disclosed to Synergy in the plans provided to it by the City."  SAC ¶¶ 41.  During the course of

15   the project, Synergy damaged five PG&E gas lines.  Id. ¶ 43.  "The damaged gas lines drew

16   significant public attention, and criticism from neighborhood residents and businesses disrupted

17   by the corrective measures necessitated by the damaged gas lines."  Id. ¶ 45.  The City concluded

18   that Synergy was responsible for the gas line damage, and instructed Ghilotti to terminate

19   Synergy.  Id. ¶¶ 47-49.

20       In addition to its claims regarding the Haight Street Project, Synergy also complains that

21   the City blocked its proposal to serve as a subcontractor under a different prime contractor, Walsh

22   Contruction Company II, "in the Core Work on the San Francisco Municipal Transportation

23   Agency ('SFMTA') Van Ness Corridor Improvement Project (the 'Van Ness Project'), an

24   extensive renovation project for a major San Francisco north/south arterial commissioned by

25   SFMTA in conjunction with SFPUC."  Id. ¶ 79.  Synergy claims the City removed claimed

26   Synergy from the Van Ness project on the pretext that its bid was too high, when in fact its bid

27   was lower than Walsh's internal estimate and the estimate of the City's own consultant.  Id. ¶¶ 83-

28   86.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    On November 24, 2017, Synergy filed a complaint in this Court, ECF No. 1, portions of

2  which the City moved to dismiss on December 1, 2017.  ECF No. 8.  On May 16, 2018, the Court

3  granted the motion in part and denied it in part.  ECF No. 49.  The Court dismissed without

4  prejudice Synergy's claims for intentional interference with contractual relations, intentional

5  interference with prospective economic advantage, and negligent interference with prospective

6  economic advantage because Defendants were not "strangers" to the Synergy/Ghilotti contract.

7  The Court dismissed the same three claims without prejudice as to the Van Ness Project for failure

8  to comply with the Government Tort Claims Act.  The Court also dismissed without prejudice

9  Synergy's fourth cause of action for violation of Section 1983 on due process grounds.  The Court

10  denied the motion to dismiss in all other respects.

11    On June 5, 2018, Synergy filed its SAC.  ECF No. 50.  The City now moves to dismiss

12  Synergy's first, second, third, fourth, and fifth claims for intentional interference with contractual

13  relations, intentional interference with prospective economic advantage, negligent interference

14  with prospective economic advantage, breach of contract, and breach of the covenant of good faith

15  and fair dealing.  ECF No. 51.

## II.    JURISDICTION

17    The Court has jurisdiction over Synergy's § 1983 claims under 28 U.S.C. § 1331.  The

18  Court exercises supplemental jurisdiction over Synergy's related state-law claims pursuant to 28

19  U.S.C. § 1367(a).

## III.    LEGAL STANDARD

21    To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual

22  matter that, when accepted as true, states a claim that is plausible on its face.  *Ashcroft v. Iqbal*,

23  556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual

24  content that allows the court to draw the reasonable inference that the defendant is liable for the

25  misconduct alleged."  *Id.*  While this standard is not a probability requirement, "[w]here a

26  complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

27  line between possibility and plausibility of entitlement to relief."  *Id.* (internal citation omitted).  In

28  determining whether a plaintiff has met this plausibility standard, a court must accept all factual

1   allegations in the complaint as true and construe the pleadings in the light most favorable to the

2   plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

3   **IV.    DISCUSSION**

4         **A.    Tortious Interference Claims**

5         Synergy alleges that the City intentionally interfered with contractual relations, SAC ¶¶ 95-

6   109, intentionally interfered with prospective economic advantage, *id.* ¶¶ 111-22, and negligently

7   interfered with prospective economic advantage, *id.* ¶¶ 124-32.  The Court dismisses these claims

8   for the same reason it dismissed them in its prior order – the City is not a stranger to the contracts.

9   ECF No. 49 at 9.

10        Synergy argues that the City *is* a stranger to the subcontract because the City-Ghilotti

11  contract, which was incorporated by reference into the Synergy-Ghilotti contract, precludes any

12  contractual relationship between Synergy and the City.  ECF No. 55 at 8 (citing ECF No. 50-2

13  § 1.02(B) (providing that nothing in the prime contract "shall be construed to create a contractual

14  relationship between the City and a Subcontractor")).  This provision does not change the result,

15  because the test for whether an entity is a "stranger" to a contract is not whether it is a party to that

16  contract.  Rather, the relevant question is whether the City was an "interested party whose

17  performance was . . . required under the" Synergy-Ghilotti contract, *Maritz Inc. v. Carlson Mktg.

18  Grp., Inc.*, No. C 07-05585 JSW, 2009 WL 3561521, at *4 (N.D. Cal. Oct. 30, 2009) (citing *PM

19  Grp., Inc. v. Stewart*, 154 Cal. App. 4th 55, 57-58 (2007), or whether that contract "contemplated"

20  the City's performance.  *Hamilton San Diego Apartments v. RBC Capital Markets Corp.*, No.

21  312CV2259JMBLM, 2013 WL 12090313, at *3 (S.D. Cal. Mar. 5, 2013).  For the reasons

22  explained in the Court's earlier order, the City meets this test and is therefore not a stranger to the

23  Synergy-Ghilotti contract.  ECF No. 49.  Although the prime contract clarifies that the City has no

24  contract with Synergy, it also describes the City's performance in Synergy's subcontract.  *See*

25  ECF No. 25-1 § 2.02 (providing the City would make available survey information and pay for the

26  building permit); ECF No. 56 at 4 ("[I]f San Francisco had not performed its contractual duty to

27  pay its prime contractor Ghilotti, Ghilotti could not in turn have performed its duty to pay its

28  subcontractor Synergy."); *see also c.f.*, ECF No. 50-2 § 4.04(c) (providing the subcontractor must

United States District Court
Northern District of California

4

1  prosecute work "in a manner satisfactory to the City" or face removal at the written request of the

2  City).

3  Synergy argues that granting the City's motion to dismiss would be unfair because "[t]o

4  shield parties with an economic interest in the contract from potential liability would create an

5  undesirable lacuna in the law between the respective domains of tort and contract." ECF No. 55 at

6  6, 11, 17, 20, 22 (citing *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d

7  1002, 1007 (9th Cir. 2014)). This argument is unpersuasive. First, as the foregoing discussion

8  makes clear, and whether it seems fair or not, the California courts *do* shield parties with an

9  economic interest in a contract from liability in at least some instances, as the Ninth Circuit has

10  acknowledged. *See United Nat. Maint.*, 766 F.3d at 1008. Second, Synergy is not without a

11  remedy. Synergy may pursue a claim against Ghilotti directly, ECF No. 50-1 at 114 (describing

12  the claims and dispute resolution procedures Synergy has against Ghilotti), or submit a claim

13  against the City through Ghilotti, ECF No. 25-1 at 47 (similar). Lastly, Synergy – a large,

14  sophisticated business with long prior experience doing work for the City – chose to enter a

15  contract whose terms precluded the claims it now seeks to bring. If it thought those terms were

16  unfair, it could have either bargained for better terms or rejected the contract.[2] *See Cont'l Heller*

17  *Corp. v. Amtech Mech. Servs., Inc.*, 53 Cal. App. 4th 500, 507 (1997) (stating that "two large,

18  sophisticated construction enterprises . . . could be expected to review, understand and bargain

19  over their" contract). It did neither.

20  Finally, Synergy argues that the City fails to point to any provision requiring the City's

21  performance in the Van Ness Project. ECF No. 55 at 18. As the Court held in its prior order,

22  "[f]or both the Haight Street Project and the Van Ness Project, the primary contract was between

23  the City and a general contractor, and that general contractor in turn entered or sought to enter a

24  subcontract with Synergy. Each of the subcontracts envisioned San Francisco's performance as

25

26  [2] "The sophisticated business entity is more likely . . . to be able to bargain effectively for
   balanced terms." Harry G. Prince, <u>Unconscionability in California: A Need for Restraint and</u>
27  <u>Consistency</u>, 46 Hastings L.J. 459, 481 (1995).

28

United States District Court
Northern District of California

5

1   the owner of the contract." ECF No. 49 at 9. The allegations and exhibits demonstrate that any

2   subcontract Synergy would have formed with Walsh for the Van Ness Project would have

3   provided for the City's performance. *See, e.g.*, SAC ¶ 79 (explaining that the project included

4   renovating the City's public transportation); ECF No. 50-1 at 67 (proposing a personnel chart with

5   two City officials as the head project managers); *id.* at 80-82 (describing the specific steps the City

6   would perform on the prime contract, such as developing budgets and cost estimates, and

7   relocating bus stops).[3]  Synergy cites cases which hold that a subcontractor cannot sue the owner

8   on a prime contract for breach of contract, ECF No. 55 at 18, but since Synergy's cause of action

9   lies in tort, these cases are unhelpful.

    **B.    Contract Claims**

11      Synergy alleges that the City breached its contract when it terminated Synergy in violation

12  of Section 4107 of the Public Contract Code. SAC ¶¶ 135-38. Similarly, Synergy alleges that the

13  City breached the covenant of good faith and fair dealing when it interfered with its rights to

14  receive the benefit of the subcontract. *Id.* ¶¶ 140-43. Although there was no formal contract

15  between Synergy and the City, Synergy alleges it formed a contractual relationship with the City

16  when it "was accepted as a Subcontractor" because its subcontract with Ghilotti "incorporates all

17  of the terms of the contract between" Ghilotti and the City. *Id.* ¶¶ 34-35.

18      As previously noted, one of the terms in Ghilotti's contract with the City provides that

19  "[n]othing in the [contract] shall be construed to create a contractual relationship between the City

20  and a Subcontractor." *Id.* ¶ 34 (quoting ECF No. 50-2 § 1.02(B)). This term, which was imported

21  into Synergy's contract with Ghilotti, ends the discussion. Synergy's contract claims fail because

22  the written instrument itself "expressly disavows" the contractual relationship that Synergy alleges

23  exists. *See Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015)

24  (disregarding an allegation that was a "legal conclusion, not a fact, and was belied" by the written

25  contract).[4]  Synergy's argument that it may plead in the alternative, ECF No. 55 at 19, does not

---

[3] Additionally, Walsh's prime contract with the City would have incorporated the same general conditions which governed the Haight Street Project. *See* https://www.sfpublicworks.org/sites/default/files/007200-General-Conditions-SFPW-08-2015.pdf

[4] Synergy argues that because the City is not a stranger to the contract, it must be a party. ECF

United States District Court
Northern District of California

6

1  save these claims.  The issue is not whether Synergy may allege the existence of a contractual

2  relationship for the purposes of some claims but not others; the issue is whether its contract claims

3  can plausibly be reconciled with the language of the agreements themselves.  They cannot.

### CONCLUSION

5       For the reasons set forth above, the motion to dismiss is granted.  The interference claims

6  are dismissed with prejudice, and the contract claims are dismissed without prejudice.  An

7  amended complaint is due within 21 days of the issuance of this order.  Unless Synergy obtains

8  prior leave of Court for good cause shown, any amendment must be limited to the causes of

9  actions alleged in the SAC.  If no amended complaint is filed, the case will proceed only on the

10 remaining claims.

11       **IT IS SO ORDERED.**

12 Dated:  December 31, 2018



                                                    _____
                                                    JON S. TIGAR
                                                    United States District Judge

United States District Court
Northern District of California

---

No. 55 at 21 (citing *Popescu v. Apple Equipment*, 1 Cal. App. 5th 39, 54 (2016)).  Synergy's
argument relies on the narrow view of the stranger to the contract doctrine which the Court
rejected in its prior order and again in this order.  ECF No. 49 at 9.

7

1

**Exhibit H**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHNNY D. KNADLER (SBN 220942)
LAW OFFICE OF JOHNNY D. KNADLER
1527-E Pershing Drive
San Francisco, CA 94129
Telephone: (310) 564-6695
Facsimile: (888) 323-0611
Email: jdknadler@gmail.com

Attorneys for Plaintiff
SYNERGY PROJECT MANAGEMENT, INC.

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

SYNERGY PROJECT MANAGEMENT, INC.,

Plaintiff,

vs.

CITY AND COUNTY OF SAN FRANCISCO, LONDON BREED, MOHAMMED NURU, GHILOTTI BROS., INC and DOES 1-100, et al.,

Defendants.

Case No. 3:17-cv-06763

**THIRD AMENDED COMPLAINT**

1. **Violation of Federal Civil Rights Act [42 U.S.C. § 1983][Substantive Due Process]**
2. **Violation of Federal Civil Rights Act [42 U.S.C. § 1983][[Procedural Due Process**
3. **Violation of Federal Civil Rights Act [42 U.S.C. § 1983 Stigma-Plus]**
4. **Retaliation [42 U.S.C. §§ 1981, 1983]**
5. **Breach of Contract**
6. **Unlawful Removal and Substitution of Listed Subcontractor (Cal. Pub. Contracts Code § 4107)**

Plaintiff Synergy Project Management, Inc., for its complaint against the City and County of San Francisco, a municipal corporation and subdivision of the State of California, including the San Francisco Public Utilities Commission (SFPUC), the San Francisco Municipal Transportation Agency (SFMTA), San Francisco Department of Public Works (SFDPW); London Breed, in her individual capacity and, alternatively in her capacity as a member of the San Francisco Board of Supervisors; and Mohammed Nuru, in his individual capacity and,

1  alternatively, in his capacity as the Director of Public Works for the City of San Francisco; and

2  Ghilotti Bros., Inc, alleges as follows:

3  **PARTIES**

4  1.   Synergy Project Management, Inc. (hereinafter "Synergy") is now, and at all times

5  relevant hereto, a California corporation, qualified to do business in California, and located in

6  San Francisco, California.

7  2.   Defendant City and County of San Francisco (hereinafter the "City") is a municipal

8  corporation existing under the laws of the State of California, and is both a Charter City and a

9  County under the Constitution of the State of California.  Defendant City and County of San

10  Francisco is responsible for the San Francisco Public Utilities Commission ("SFPUC") which

11  provides drinking water, wastewater collection, and municipal power services to the residents of

12  San Francisco and other customers.  The City also oversees and is responsible for the San

13  Francisco Municipal Transit Agency ("SFMTA"), a semi-independent agency established by an

14  amendment to San Francisco's charter in 1999.  SFMTA oversees and runs the San Francisco

15  Municipal Railway (Muni), the Department of Parking and Traffic ("DPT"), and the Taxicab

16  Commission.  The City is also responsible for the Department of Public Works ("DPW") which

17  is the City department responsible for the care and maintenance of San Francisco's streets and

18  infrastructure.

19  3.   Defendant London Breed is and at all times relevant to this action was an elected member

20  of the City's Board of Supervisors.

21  4.   Defendant Ghilotti Brothers, Inc. ("GBI") is a corporation organized and doing business

22  in California, located in Marin County, California.

23  5.   Defendant Mohammed Nuru is and was at all times relevant to this action employed by

24  the City as the Director of Public Works.

25  6.   Synergy is ignorant of the true names and capacities of DOES 1 through 100, inclusive as

26  it is anticipated that additional City agents and employees were involved in the actions described

27  herein, and that such additional City agents and employees may be discovered through this

28  action, and therefore Synergy sues such defendants by these fictitious names. When each

---

THIRD AMENDED COMPLAINT                                    2                        Case No. 3:17-cv-06763

defendant's true name and capacity is ascertained, Synergy will amend this Complaint by naming each defendant sued fictitiously herein by its, his or her true name and capacity.

7.   Defendants, and each of them are public entities and individuals who, upon information and belief, acted in concert and active participation with each other in committing the acts alleged herein.

8.   Synergy is informed and believes, and on that basis alleges, the each of the fictitiously-named defendants acted willfully or in conscious disregard of Synergy's rights and/or was negligent, careless, liable, or otherwise legally responsible in some manner for the events and occurrences alleged herein and that Synergy's damages were proximately caused by each of the defendants' acts.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction of the subject matter for each of the causes of action in this Complaint because the total amount of damages claimed herein exceeds the minimum jurisdictional limit of this Court.

10. This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331, as a civil action arising under the Constitution, laws, or treaties of the United States, specifically 42 U.S.C. § 1983, and this Court's concurrent jurisdiction over Section 1983 claims.

11. Venue in this Court is proper pursuant to California Code of Civil Procedure Section 395 because this complaint concerns construction projects located in San Francisco County, contracts and agreements alleged by Synergy were entered into in San Francisco County and to be performed here, and the other injuries Plaintiff alleges in this complaint all occurred in this County.

12. Additionally, venue is proper in this Court because Defendants include the City and County of San Francisco the San Francisco Public Utilities Commission, and officials and employees of these entities.

1

2                                           **FACTS**

3      13. Synergy is owned, managed and operated by Javad Mirsaidi, a Licensed Engineer,

4    Licensed Contractor, and Certified Construction Manager who serves as Synergy's Principal and

5    President.  Founded in 2003, Synergy maintained a long, successful and growing business

6    providing services including construction management, demolition, utilities, mass excavation

7    and shoring, grading and paving, architectural and structural management. Synergy developed a

8    long and successful relationship with the City, including extensive work on numerous projects

9    involving the City's streets and underground construction projects.

10     14. Following its 2003 formation, Synergy grew from a small contracting company to a

11   successful general contractor and subcontractor, employing over 100 employees, with annual

12   gross revenue growing from $119,000, in 2004, to $35,893,508, in fiscal year 2012/13.  Synergy

13   successfully completed over 50 underground projects in the City – projects covering virtually

14   every area in San Francisco including the City's most congested and utility-dense areas such as

15   Union Square and Moscone Center. Synergy consistently completed complex projects ahead of

16   schedule, and was frequently recognized by the City and its neighborhoods for its excellence and

17   professionalism.  Synergy also successfully bid and completed projects across California and

18   Utah, including the counties of San Mateo, Marin, Santa Clara, Contra Costa and Bakersfield.

19     15. Because of the City's wrongful and unconstitutional actions described herein, Synergy is

20   now effectively shut down.

21                                 **THE PRE-2015 LITIGATION**

22     16. Prior to 2015, Synergy was compelled to bring successive suits to compel the City's

23   payment for construction Synergy performed pursuant to contracts with the City (the "pre-2015

24   litigation"). Although Synergy ultimately prevailed in this litigation, Synergy suffered financial

25   consequences as a result of the City's delayed performance of its obligations on these contracts.

26     17. In 2009, Synergy and the City entered into a written contract wherein Synergy agreed to

27   perform construction on a public work of improvement commonly known as the Third Street

28   Light Rail Program Moscone Station and Portal Utilities Relocation  – Contract 1250 (the "1250

Contract"). Synergy completed the project and performed its obligations under the 1250 project. The City failed to pay Synergy as it promised to do under the 1250 contract, ultimately forcing Synergy to sue the City. In 2013, Synergy successfully sued the City for its breach of the 1250 Contract, ultimately receiving $787,500 in 2015, after requiring Synergy to bear financing costs, interest and other expenses for three years.

18. In 2010, Synergy and the City entered into a written contract wherein Synergy agreed to perform construction on a public work of improvement commonly known as the Third Street Light Rail Project Phase 2, Union Square/Market Street Station Utilities Relocation Project – Contract 1251 (the "1251 Contract"). The City failed to pay Synergy as it promised to do under the 1251 contract, ultimately forcing Synergy to sue the City, in 2013. Synergy successfully sued the City for its breach of the 1251 Contract, ultimately receiving $660,000. But that payment was not received until 2017, by that time Synergy had financed these costs for more than two years.

19. In 2012, Synergy and the City entered into a written contracts wherein Synergy agreed to perform construction on public works of improvement commonly known as the San Jose Avenue Pavement Renovation and Sewer Replacement, San Bruno Avenue and Bay Shore Boulevard – Contract 1921J (the "1921J Contract") and the Pavement Renovation and Sewer Replacement – Contract 1931J (the "the 1931 Contract". The City failed to pay Synergy as it promised to do under the 1921J Contract and the 1931 Contract, ultimately forcing Synergy to sue the City, in 2014, Synergy successfully sued the City for its breach of the 1912J Contract and the 1931 Contract, ultimately receiving $1,082,476; But that payment was not received until 2015, by that time Synergy had financed these costs for more than five years.

20. Although Synergy ultimately recovered partial damages in the above-described lawsuits, these monies were paid years after they were due. The delay in payment financially choked Synergy, which not only lost needed and earned funding, but also incurred substantial attorney's fees, interest expense and other unrecovered costs. The City's failure to make obligated payments also forced Synergy to lay off employees and field personnel and, notably, severely restricted the company's access to bonding capacity, which, Synergy needed as a prerequisite to

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 200 of 253

1    its ability to bid on projects as a general contractor. With the lack of cash and assets created by

2    the long outstanding claims, sureties would no longer provide Synergy with the bonds necessary

3    for Synergy to bid work as a prime contractor.

4         21. Defendants were aware of the financial hardships the City's actions imposed on Synergy,

5    including the adverse impact on Synergy's access to bonding for future projects.  In December

6    2013, Synergy's President, Javad Mirsaidi, informed Mohammed Nuru and several other City

7    and SFMTA officials and employees that by holding onto payments for work already performed,

8    and by burdening Synergy with interest expense and attorney's fees, the City had caused

9    Synergy to lose its bonding, forced layoffs, and brought the company to the brink of collapse.

10        22. Despite these setbacks, Synergy managed to continue to do business. One way Synergy

11   overcame the bonding problems the City created was to take on work as a subcontractor on

12   projects where another company acted as the general contractor.  General contractors awarded

13   major City projects sought out Synergy, which continued to benefit from the reputation it

14   established as a company capable of completing complex projects timely and efficiently.

15

16                            **THE HAIGHT STREET PROJECT**

17        23. On February 10, 2015, the City and contractor Ghilotti Brothers, Inc. ("GBI") entered

18   into a contract to replace the sewer line, install new water lines, and renovate the pavement on

19   Haight Street and Hayes Street (the Haight Street Prime Contract), referred to as DPW Project

20   No. PCE 15018/2264J(R), "Pavement Renovation, Sewer Replacement, and Water Main

21   Installation – Haight Street and Hayes Street" (the "Haight Street Project").  Detailed and

22   meticulous qualification was required for the underground subcontractor by the Contract.

23   Synergy met and exceeded all requirements was selected and approved as a subcontractor by

24   GBI and the City, respectively.

25        24. In GBI's bid for the Haight Street Project, GBI selected and listed Synergy as a

26   subcontractor on GBI's contract with the City.

27        25. Synergy's role was to perform the underground excavation and utilities work on the

28   Haight Street Project.

THIRD AMENDED COMPLAINT                              6                              Case No. 3:17-cv-06763

26. GBI and Synergy entered into a Subcontract Agreement on April 17, 2015.  Attached hereto as **Exhibit A** is a true and correct copy of the Subcontract Agreement.  The City was not a party to the Subcontract or an agent of a party to the Subcontract.

27. Once GBI listed Synergy as a subcontractor on GBI's bid to the City, and the City accepted the bid and signed a contract with GBI, Synergy had the right to complete its work on the Haight Street Project unless it was removed pursuant to the provisions of the Subletting and Subcontracting Fair Practices Act, California Public Contract Code Sections 4100 *et seq.*, (hereinafter the "Subletting and Subcontracting Fair Practices Act") which establishes a detailed, mandatory framework for competitive bids on public works projects.

28. Additionally, the Subcontract Agreement between Synergy and GBI gave Synergy the right to perform work on the Haight Street Project.  It further provided that GBI would "pay [Synergy] for the satisfactory performance of this Agreement. . ." (Exhibit A, p. 1.)

29. The Subcontract Agreement between Synergy and GBI explicitly provided for how GBI could terminate Synergy as subcontractor on the Haight Street Project.  If "at any time [Synergy] breach[ed] this Agreement or failed[ed] to prosecute the said work with promptness, diligence and efficiency or fail[ed] to perform any of the requirements hereof, [GBI] may. . . terminate the employment of [Synergy]." (Exhibit A, pp. 11-12.)  The Agreement further provided that, "In its sole discretion and to the extent permitted by law, [GBI] may terminate this Agreement without cause." (Exhibit A, p. 12.)

30. The Subcontract Agreement between Synergy and GBI expressly referenced and acknowledged GBI's contract with the City ("City-Ghilotti contract"), and bound Synergy to the **terms** of the City-Ghilotti contract. A true and correct copy of the relevant portions of the City-Ghilotti contract is attached hereto as **Exhibit E**.  In relevant part, the Subcontract Agreement between Synergy and GBI stated:

> [Synergy] shall furnish all labor, material, supplies and equipment, and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of [Ghilotti], and all work incidental thereto, all in accordance with the terms and conditions of the General Contract including the General Conditions, Drawings, Specifications and other Documents, which by Reference, are made part of said General Contract, all of which shall be considered part of the AGREEMENT by this Reference

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 202 of 253

thereto, and [Synergy] agrees to be bound to [Ghilotti] and OWNER [San Francisco] by the terms and Provisions thereof.

31. The terms of the City-Ghilotti contract, to which Synergy agreed in the Subcontract Agreement to be bound, expressly precluded the establishment of any contractual or quasi-contractual relationship between the City and Synergy.  Section 102(B) of the City-Ghilotti contract expressly prohibits any provision in that document from being construed to create a contractual relationship with a subcontractor (i.e. Synergy). Section 102(B) states:

Nothing in the [City-Ghilotti contract] shall be construed to create a contractual relationship between the City and a Subcontractor… or a person or entity other than the City and the Contractor.

Exhibit E., sect. 1.02(B), p. 1929.

32. Synergy was a "Subcontractor", for the purposes of Section 102(B) of the City-Ghilotti contract. Section 1303.B.3 of the City-Ghilotti expressly provides that no subcontractor is a third-party beneficiary of the City-Ghilotti contract.

33. Consequently, sections 102(B) and 1303.B.3 of the City-Ghilotti subcontract expressly precluded any contractual relationship or quasi-contractual relationship between the City and Synergy from being established by the City-Ghilotti contract.

34. The Subletting and Subcontracting Fair Practices Act contains mandatory and comprehensive requirements for when and how a listed subcontractor on a public works project can be removed or replaced.  The City has adopted the provisions of the Subletting and Subcontracting Fair Practices Act as an ordinance applying to its public works projects.

35. Nothing in the Subcontract Agreement or the Subletting and Subcontracting Fair Practices Act gave any party, other than GBI, the right to terminate Synergy from the Haight Street Project.  (Exhibit A.)

36. As a part of the Haight Street Project, Synergy, general contractor GBI., the City, SFMTA , SPUC and other project stakeholders also entered into an agreement, which identified agreed-upon goals for the projects, and established procedures designed to facilitate the successful completion of the Haight Street Project (the "Partnering Agreement"). Attached hereto as **Exhibit B** is a true and correct copy of the Partnering Agreement. The Partnering

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 203 of 253

1   Agreement identified several potential challenges foreseen by the parties to that agreement based

2   on their experience with complex construction projects like the Haight Street Project, and

3   established the parties' agreement as to how to meet these challenges. This included, notably, the

4   parties' agreement to an "Issue Resolution Ladder," which established the parties' agreed-upon

5   process for dispute resolution. (Exhibit B, p. 10). The Issue Resolution Ladder was comprised of

6   a five-level structure, pursuant to which dispute between the parties would be addressed at

7   gradually-elevated levels, beginning with on-site City and contractor personnel and, failing

8   resolution, submission to higher authority levels, culminating with Mike Ghilotti of Ghilotti

9   Bros., Javad Mirsaidi, and John Thomas, the then-deputy City Engineer, at the top level for

10  dispute resolution.

11      37. GBI and Synergy began work on the Haight Street Project in April 2015, starting with the

12  main sewer trunk (receiving flow from many tributaries) on Haight Street from Masonic to

13  Buchanan Streets.  Synergy then continued to install water line on Haight Street at Asbury.

14      38. The Haight Street Project was a particularly difficult one, due to many unknown

15  subsurface structures not disclosed to Synergy in the plans provided to it by the City, which

16  grossly understated the number of underground utilities present in the project area.  Throughout

17  its excavation work, Synergy encountered 798 underground utilities.  Of those, the project plans

18  had only identified 357.  More than 400 of the underground utilities were unknown to Synergy

19  and therefore unanticipated.  Further, as excavation proceeded Synergy found, and notified the

20  City of, unknown voids, gaps, sinkholes existing under the street and under buried concrete such

21  that as Synergy excavated existing underground concrete structures unexpectedly collapsed into

22  voids beyond the work which could not be seen from the work face of the trench.

23      39. Even for the underground facilities that the utility companies *had* identified, many did not

24  comply with industry standards for placement, and critical information about those utilities was

25  incorrect.  As a result, Synergy encountered additional unprecedented obstacles.

26      40.  Of the almost 800 underground utilities ultimately revealed within the project area,

27  Synergy damaged five PG&E gas lines during the course of the project, when it encountered

28  underground utilities that the City had not shown in its plans or erroneously identified.

THIRD AMENDED COMPLAINT                          9                          Case No. 3:17-cv-06763

41. Synergy was informed and believes that DPW initially agreed that poor mapping for the project area was responsible for the struck gas mains.

42. The damaged gas lines drew significant public attention, and criticism from neighborhood residents and businesses disrupted by the corrective measures necessitated by the damaged gas lines.

43. The gas line problems represented precisely the kind of issue the Partnering Agreement anticipated, and for which the Agreement's Issue Resolution Ladder provisions were designed. But the City did not comply with the process established in the Issue Resolution Ladder, or employ any other reasonable or fair analysis or process, before assigning blame to Synergy and taking summary action against the Company.

44. Instead, the City purported to conclude, immediately and summarily, that Synergy was to blame for the leaks, even though the City knew that the City (1) lacked a sufficient basis to reach this conclusion, (2) had not in fact reached this conclusion, and (3) had not taken reasonable or prudent steps to determine whether Synergy was at fault.

45. On or about October 7, 2015, the City suspended work on the Haight Street Project.

46. On October 8, 2015, purportedly because of the gas line accidents, the Director of Public Works wrote a letter to GBI instructing all work on the project to stop and further stating: "You are hereby directed . . . to remove [Synergy] immediately."

47. In support of its October 8, 2016 order to GBI to "terminate" Synergy, the City erroneously and unlawfully cited section California Public Contract Code Sections 4100, *et seq*., and a clause in its contract with GBI.

48. GBI objected to the substitution but began soliciting proposals from other qualified bidders because it needed a subcontractor to finish the project.

49. On October 14, 2015, the City informed Synergy that the City had "directed Ghilotti to remove Synergy and to substitute a replacement contractor." The letter cited Section 4107(a)(7) as support for the City's action. But Section 4107(a)(7) does not authorize government awarding authorities (in this instance the City) to order a subcontractor's removal and replacement.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 205 of 253

Instead, that provision authorizes a general contractor to substitute a subcontractor for a listed contractor under certain circumstances. It provides no such authority to the City.

50. Synergy submitted a formal objection to the removal five days later.

51. On October 26, 201, Department of Public Works spokeswoman Rachel Gordon admitted that **"[The City doesn't] know what caused the breaks at this point. . . [t]here is still an investigation going on."** But Ms. Gordon's admission came two weeks after the City summarily ordered Synergy's termination.

52. The City responded approximately one month later on November 16, 2015, reiterating its reliance on Section 4107(a)(7) for its removal of Synergy.

53. Section 4107 provides that, where a subcontractor objects to a *prime contractor's* request for removal, the awarding authority must give notice in writing within at least five working days to the listed subcontractor of a hearing by the awarding authority on the *prime contractor's* request for substitution.

54. By (wrongfully) invoking Section 4107 as authority to remove Synergy from the Haight Street project, the City took the position that its termination of Synergy would not take effect until after a hearing by the awarding authority (the City).

55. The City knew that none of these provisions, nor any other document or authority provided the City with the authority or power to terminate Synergy.  Nevertheless, the City arbitrarily asserted the authority to terminate Synergy based on statutory provisions that the City knew did not apply.

56. On December 9, 2015, Synergy and the City participated in an administrative hearing before a City-appointed hearing officer, who was an employee of the City.

57. The City undertook to prove at the hearing that it had the right to remove Synergy from the Haight Street Project without the consent or request of the prime contractor, GBI.

58. GBI testified at the hearing on behalf of Synergy and in opposition to the City's actions.

59. On January 8, 2015, the hearing officer issued a Statement of Findings, which rejected Synergy's arguments about the propriety and legality of the City's use of Section 4107(a)(7) to hold the hearing, and instead adopted the City's theory that it could use the section to unilaterally

1  remove Synergy as a subcontractor on the project, without the prime contractor requesting that

2  Synergy be removed.

3      60. While the City wrote three previous letters regarding removing Synergy from the Haight

4  Street Project (*see* ¶¶ 48, 51, 53), the removal was not official or final until the hearing officer

5  issued his Statement of Findings on January 8, 2015.  The prior letters asserting the City's desire

6  to remove Synergy from the project did not carry the necessary authority to remove Synergy

7  from the Haight Street Project.  The only way Synergy could have been properly removed from

8  the Haight Street Project was under the authority of a hearing that complied with the relevant

9  sections of the Subletting and Subcontracting Fair Practices Act.

10      61. On or around January 29, 2016, GBI proposed substituted contractors to replace Synergy.

11  On or about February 1, 2016, the Department of Public Works approved GBI's replacement of

12  Synergy with the new subcontractors.

13      62. Synergy is informed and believes, and on that basis alleges, that on a date in 2016 after

14  February 1, 2016, a subcontractor began performing work assigned to Synergy under its

15  subcontract with GBI.

16      63. Synergy brought a Petition for Writ of Mandate to review the Hearing Officer's ruling. In

17  its Writ of Mandate, Synergy argued that the City failed to act as required by law because, while

18  the City claimed that it had authority under Public Contract Code Section 4107 to unilaterally

19  remove Synergy from the Haight Street Project, Section 4107 did not provide the City with any

20  such authority.  Synergy further argued that the City had no other legal authority to remove a

21  subcontractor from a public works project without the request of the prime contractor.

22  Therefore, Synergy argued, the hearing that resulted in the City's Statement of Findings, was

23  improperly held and without legal authority.  As a result, the resulting Statement of Findings was

24  equally improper and had no authority.

25      64. On November 10, 2016, the San Francisco Superior Court granted Synergy's Writ and

26  ordered the Hearing Officer's Determination to be vacated, finding that the City's actions were

27  not supported by the law.  Attached hereto as **Exhibit C** is a true and correct copy of the court's

28  order.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 207 of 253

65. The City's unlawful acts against Synergy were not limited to the above-described unlawful proceedings. City officials concurrently embarked on a campaign to publicly and erroneously depict Synergy as a bad contractor, and to constructively debar Synergy from participation in City projects. Separately, the City took arbitrary and capricious steps to block Synergy's participation in City projects and to remove Synergy from projects Synergy for which Synergy had already committed substantial and critical resources – projects for which Synergy was not only qualified, but also the most cost-effective bidder by any reasonable measure.

66. The City's public campaign against Synergy took the form of express retaliation against the company for exercising its constitutional right to access to the courts.  City officials used the lawsuits *successfully* brought by Synergy against the City concerning City contracting projects as evidence that Synergy should be prevented from participating in future City projects.

67. On or about October 10, 2015, Supervisor London Breed, whose City district includes areas in which the Haight Street Project was conducted, publicly denounced Synergy, and announced the City's intent to use Synergy as a scapegoat to blame for problems with the Haight Street Project in retaliation against Synergy for its exercise of its constitutional right to petition the courts for redress of grievances.  In a public speech given before representatives of several City neighborhood associations on Haight Street and broadcast by local television, Breed (1) flatly, erroneously and without basis blamed Synergy for cutting corners in its performance of the Haight Street Project; (2) cited Synergy's successful lawsuits against the City as proof of Synergy's incompetence; (3) signaled the City's intent to "hold [Synergy] accountable"; (4) blamed Synergy for undisclosed sinkholes that were preexisting and/or outside of Synergy's work area; and (5) acknowledged that she had asked City Director of Public Works, Mohammed Nuru, to terminate Synergy:

> When it was London Breed's turn, she emphasized that Synergy, the subcontractor for the job, bid $1 million lower than it next competitor. By bidding low, the company cut corners, and the job doesn't get done properly. "Not only is low-bid a real problem, but **the fact that this same contractor just settled three lawsuits with the city and county of San Francisco but still continues to get contracts with the city and county of San Francisco is insane**." She added, "We have to hold contractors who are incompetent and can't do quality work for the city and county of San Francisco accountable."

She confirmed that she reached out to Mohammed Nuru and specifically asked that the subcontractor, Synergy, be taken off the job.

68. Breed was aware of the settlements – and the fact that the City had agreed to pay Synergy's claims – because, as a member of the City's Board of Supervisors, Breed voted to approve them.

69. At **the same event**, Breed admitted that the City had not conducted any hearings to justify its conclusion that Synergy was at fault, or provided Synergy any meaningful opportunity to confront any such conclusion:

> A question was asked about the incorrect maps supplied to Synergy by PG&E, and Breed explained that even though faulty maps might have been blamed for the first gas leak, that's not a good enough excuse for the subsequent ones. "This impacts public safety ... We need to understand whether we have qualified people to do this job," said Breed.
> She explained that **she would be holding a hearing within the next few weeks to determine whether Synergy is at fault**, or if there is more blame to go around.

70. Breed repeated her citation of Synergy's past litigation with the City at a public hearing called by Breed and other City Supervisors, at which Breed repeated her denunciation.

71. Synergy is informed and believes, and on that basis alleges, that some of the gas leaks for which City officials publicly faulted Synergy, were caused by inaccurate and faulty identification of utility lines, and below-surface land gaps – commonly called "voids", which were caused by old and broken utility work and which pre-existed Synergy's work. These voids were unforeseen, were not disclosed by the City (which had a duty to provide Synergy with accurate maps) and made construction substantially more difficult and unpredictable. One of the gas breaks was caused because of a void. Synergy was directed to safely fill up the voids and was paid for this work.

72. While blaming Synergy for the gas line problem may have succeeded in shifting public perception regarding responsibility for the gas line leaks, this did nothing to solve the underlying problems of inaccurate maps and unknown subsurface voids, which remained after Synergy's termination, or resulting gas line breaks, which also continued.

73. In June 2016, the contractor that replaced Synergy hit a gas line in the area of Haight and Steiner Streets.  In July 2017, a construction crew hit a gas line at the intersection of Peirce and Page Streets, forcing an order to residents to "shelter in place".

74. Synergy is informed and believes and, on that basis, alleges that the City has determined that the Project, as originally designed, cannot be performed, that work on major portions of the Contract (8" and 24" water lines) have been abandoned, and that a redesign by the City Water Department is in underway.

75. On January 5, 2017, Synergy submitted a claim to the City of San Francisco in compliance with the Tort Claims Act (Govt. Code§§810-996.6).  On January 10, 2017, the City denied that claim.

## THE VAN NESS STREET PROJECT

76. The City's misuse of the provisions provided under Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project were in furtherance of the City's imposition of a policy to scapegoat Synergy, retaliate against the company for its successful exercise of its right to petition the courts in past litigation, to create an after-the-fact justification for its termination of Synergy from the Haight Street Project without due process, and to preclude Synergy from obtaining work performing on City contract.

77. The City's unusual resort to an inapplicable provision of the Public Contract Code to remove Synergy was, ironically, the product of Synergy's status as a subcontractor. Because Synergy was a subcontractor on the Haight Street project, the City had no direct means of barring Synergy from work on the Haight Street Project or other City projects.  And general contractors, for their part, would continue to select Synergy to perform the high-quality work the company was known to perform.

78. The City's retaliation against Synergy did not end with the Haight Street Project.  Instead, the City continued to use false and pretextual grounds to constructively debar Synergy from participating in any City project.  Synergy's status as a subcontractor, however, required the City to employ protean, contract-specific (but equally bogus) means to bar Synergy.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 210 of 253

1      79. On or about May 2016, general contractor Walsh Construction Company II, LLC

2   ("Walsh") selected Synergy as a Small Business Enterprise ("SBE") as to participate as a

3   subcontractor in the Core Work on the San Francisco Municipal Transportation Agency

4   ("SFMTA") Van Ness Corridor Improvement Project (the "Van Ness Project"), an extensive

5   renovation project for a major San Francisco north/south arterial commissioned by SFMTA in

6   conjunction with SFPUC. Synergy's participation in the Van Ness Project (City Contract No.

7   1289), included sewer/water replacement Core Work. Attached hereto as **Exhibit D** is a true and

8   correct copy of Walsh's proposal identifying Synergy as subcontractor.

9      80. Synergy's work was defined as "core subcontracting work" in the agreement between

10   Walsh and the SFMTA, which was the general contract for which Synergy was selected as

11   Walsh's subcontractor (the "Walsh/SFMTA Agreement"). Pursuant to the Walsh/SFMTA

12   Agreement, the replacement of sewer and water lines under Van Ness Avenue was to be

13   performed by a subcontractor pre-selected by Walsh.  Synergy was that pre-selected

14   subcontractor. Two individuals from Synergy were identified in the Walsh/SFMTA Agreement

15   as "Key Personnel" on the Van Ness Project.

16      81. The SFMTA expressly acknowledged Synergy's expertise in the Walsh/SFMTA

17   Agreement, which the SFMTA determined was critical to its selection of Walsh as the general

18   contractor for the Van Ness Project.  The Walsh/SFMTA Agreement states, at section 4.5.4, that

19   "Contractor acknowledges that the SFMTA's selection of Contractor [Walsh] was based, in part,

20   on the expertise and experience of Contractor's proposed Key Personnel as submitted in the

21   proposal. The Contractor acknowledges and agrees that the replacement of Key Personnel during

22   the course of the Project would be extremely disruptive and damaging to the City. . ."

23      82. For Synergy, participation in the Van Ness Project Core Work represented a substantial

24   commitment and extensive advance planning.  Walsh asked, and Synergy agreed, to be a

25   subcontractor for the Core Work on the Van Ness Street Project in late 2015; Synergy spent

26   approximately 10 months supporting Walsh in the development of project scope and parameters,

27   culminating in a Walsh - Synergy subcontract agreement in May 2016, which enabled Walsh to

28   list Synergy as a Core Work subcontractor in its proposal. (Exhibit D.) In order to ensure

1   Synergy's ability to timely perform this commitment, Synergy was required set aside substantial

2   resources and remove major equipment and employees from availability for other projects and

3   opportunities for over 10 months.

4       83. The City and SFPUC used pretextual grounds to force Synergy's removal from the Van

5   Ness Project, falsely claiming that Synergy's bid was too high.  Incredibly, less than a year

6   earlier, **the City had cited the lowness of Synergy's bid on the Haight Street Project as**

7   **grounds to remove Synergy from that project**.

8       84. In May of 2016, SFMTA and Walsh were in the process of negotiating the Guaranteed

9   Maximum Price (GMP) for sewer, water and AWSS work on the Van Ness Project. "AWSS" is

10  an SFPUC term that means Auxiliary Water Supply System, a system providing water for

11  firefighting capabilities especially critical for earthquake areas like San Francisco.  While

12  SFMTA was the lead San Francisco agency for the Van Ness Project, the sewer, water and

13  AWSS work was under the jurisdiction and paid for by the SFPUC.  The SFPUC had an estimate

14  of approximately $18 million for the work. Synergy provided a price of approximately $19

15  million for sewer, water and AWSS work to be included in the GMP.

16      85. In June 1, 2016 the City, acting with and through the SFMTA, wrote to Walsh, and

17  alleged that "[the SFPUC was] not agreeable with the price submitted by your Core

18  Subcontractor, Synergy." The SFMTA further stated that it had determined to remove the work

19  Synergy was to do as an item of Core Work under Walsh's contract with the City for the Van

20  Ness Project, and bid out the work as a Non-Core Subcontract Trade Package.

21      86. This claim was false: the SFPUC had not determined that Synergy's bid was too high. In

22  fact, Synergy's bid price was lower than Walsh's internal estimate – **and also the estimate of**

23  **the City's own consultant, HTNB.** Instead, the City, SFMTA and the SFPUC had determined

24  to exclude Synergy from the Van Ness Project and falsely claimed that Synergy's bid was too

25  high as a pretext to force Synergy's removal from that project.

26      87. The City, SFMTA and the SFPUC had unique and exclusive knowledge of the San

27  Francisco construction bid market environment, including the number of utility projects being

28  put out by all San Francisco entities (SFMTA, DPW, and SFPUC).  As a result of this

1  knowledge, Defendants knew that Synergy's bid for the Van Ness Project was not "too high",

2  but concealed this knowledge in order to perpetuate Defendants' pretextual grounds to remove

3  Synergy.

4      88. On June 3, 2016 Walsh removed Synergy as a Subcontractor on the Van Ness Project.

5      89. At the City's direction, Walsh later invited bids for the sewer/water main replacement

6  work Synergy had been assigned as Core Work, which the City re-designated as Non-Core work.

7  Designating the work as Non-Core work enabled the City to market the work to a larger pool of

8  contractors.  The City knew that because of the harm the City had caused to Synergy's bond

9  capacity, Synergy would not be able to bid on the work as so re-designated.  After aggressive

10 marketing of the now-Non-Core work by the City **only one bid** was received.  That single bid

11 was $39,559, 963, **more than twice Synergy's price, and did not include the AWSS work**

12 **that was included in Synergy's original estimate**. Ultimately, Defendants' removal of Synergy

13 caused the City to incur additional expenses that amounted to tens of millions more for the same

14 scope of work.

15     90. Synergy suffered harm and damages from being unable to bid on the project on April 13,

16 2017 because the City had improperly directed Walsh to remove Synergy as a subcontractor

17 from the Van Ness work.  Further, when the City changed the sewer work from Core Work to

18 Non-Core work, it effectively removed Synergy from the other work on the project.

19     91. On April 12, 2018, Synergy timely submitted a claim to the City of San Francisco in

20 compliance with the Tort Claims Act (Govt. Code§§810-996.6) for the Van Ness Project.  A true

21 and correct copy of the claim is attached as **Exhibit F**.  On May 15, 2018, the City denied that

22 claim.

23     92. Cancellation of Synergy's participation in the Van Ness Project had a devastating effect

24 on Synergy, a small business that had committed substantial resources to the project.

25     93.  Synergy has suffered damages due to Defendants' acts based on, *inter alia*:

26         a.  Damage to Synergy's working capital through late payments thereby preventing

27             Synergy from growing as Synergy did not have sufficient working capital to

28

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 213 of 253

influence future projects and Synergy was losing money paying interest fees on

funds borrowed to make up gaps created by the City's failure to pay funds due.

b.  Damage to Synergy's contractual relationship with sureties, which provide bonds

necessary to bid and perform work for public and private entities. Defendants'

acts and omissions, as alleged above, have severely limited or eliminated

Synergy's access to bonding capacity, which, in turn, has limited or prevented

Synergy from bidding on new work as a general contractor.

c.  Damage to Synergy's existing and prospective contractual relationship with

general contractors and vendors.  Based on Defendants' acts and omissions, as

alleged above, Synergy's relationships with these entities has been interfered

with, damaging Synergy's reputation with this parties, depriving Synergy of

access to favorable contract terms, and causing parties with whom Synergy

previously enjoyed long-term business relationships to refuse to include Synergy

as a subcontractor in bids submitted for City projects, to perform work for

Synergy or provide supplies.

d.  Damage to Synergy's ability to obtain work from other entities.

## FIRST CAUSE OF ACTION
### [Violation of Civil Rights 42 U.S.C. §1983]
### [Substantive Due Process]
### Against CITY AND COUNTY OF SAN FRANCISCO, LONDON BREED, MOHAMMED NURU

94.   Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

95.   Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

96.   Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the bidding process for City contracts, and in its good reputation.

97.   Defendants had no power to terminate Synergy's subcontract for the Haight Street Project under Public Contracting Code Section 4107 or any other authority.  Defendants' actions, in

purporting to terminate Synergy's Haight Street Project subcontract pursuant to section 4107 was *ultra vires*, and taken in the absence of substantive jurisdiction or authority.

98.     By arbitrarily assuming the authority to terminate Synergy's subcontract based on fictional authority the City did not have, and which it knew it did not have, the City violated Synergy's right to substantive due process.

99.     In addition, the City did not act properly in changing the conditions of the Van Ness Project which removed Synergy as a subcontractor and precluded Synergy from bidding on the project.  This action interfered with Synergy's relations with the general contractor on the project and effectively ended Synergy's involvement with the project.  Thus, the City's unreasonable, unnecessary and arbitrary interference with the right and liberty to contract constituted an impermissible violation of Synergy's Due Process Rights

100.    Defendants' acts and omissions, by terminating Synergy's Haight Street subcontract as alleged above, constituted a deprivation of Synergy's liberty and property without due process under the Fifth and Fourteenth Amendments to the United States Constitution, in that:

      a.  Synergy was denied due process of law based on the facts above, including the City's wrongful use of Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project.

      b.  Synergy was further denied due process based on the Defendants' retaliation against Synergy for its exercise of its constitutionally protected right to access to courts and its right to petition the courts for redress of its grievances, and to exercise its right of free speech, without being subject to retaliation by Defendants.

      c.  Synergy was further denied due process under law due to the City's use of pretextual grounds to force Synergy's removal from the Van Ness Project, which grounds were unreasonable, capricious, and without any rational basis or relation to a legitimate governmental objective.

      d.  Synergy had a right to do business with the City and the City's *de facto* debarment of Synergy deprived Synergy of that interest.

Defendants' acts and omissions were the actual and proximate cause of the deprivation of Synergy's interests described above.

101.    As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### [Violation of Civil Rights 42 U.S.C. §1983][Procedural Due Process]
### Against CITY AND COUNTY OF SAN FRANCISCO, LONDON BREED, MOHAMMED NURU

102.    Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

103.    Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

104.    Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the Van Ness Project, the bidding process for City contracts, and in its good reputation.

105.    Although Defendants had no authority to terminate Synergy absent a request for removal by the prime contractor on the Haight Street project, the City, Synergy and GBI did agree to a procedure for the resolution of disputes. This procedure is set forth in the Partnering Agreement (Exhibit B).

106.    In terminating Synergy's subcontract, the City disregarded the procedure to which it agreed for the resolution of Haight Street project disputes.

107.    Synergy alleges that the pattern of consistently damaging treatment by Defendants and other City, SFMTA, SFPUC and SFDPW employees and personnel, designed to interfere with, or prevent Synergy's work on projects with the City, SFPUC or other entities, comprised a policy implemented, supported and endorsed by Defendants.

108.    Defendants' act and omissions, as alleged above, constitute a violation of Synergy's right to prosecute its contracts with the City, the SFMTA and other City departments, the SFPUC, without undue, unfair an inappropriate government interference.

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 216 of 253

109.    Defendants' acts and omissions, as alleged above, also constitute a violation of Synergy's right to pursue its occupation and business without undue, unfair and inappropriate government interference.

110.    Defendants' acts and omissions, as alleged above, constituted a deprivation of Synergy's liberty and property without due process under the Fifth and Fourteenth Amendments to the United States Constitution, in that:

a.    Synergy was denied due process of law based on the facts above, including the City's wrongful use of Public Contract Code Section 4107 to unilaterally remove Synergy from the Haight Street Project.

b.    Synergy was further denied due process based on the Defendants' retaliation against Synergy for its exercise of its constitutionally protected right to access to courts and its right to petition the courts for redress of its grievances, and to exercise its right of free speech, without being subject to retaliation by Defendants.

c.    Synergy was further denied due process under law due to the City's use of pretextual grounds to force Synergy's removal from the Van Ness Project, which grounds were unreasonable, capricious, and without any rational basis or relation to a legitimate governmental objective.

d.    Synergy had a right to do business with the City and the City's *de facto* debarment of Synergy deprived Synergy of that interest.

111.    Each of the interests above described the in the preceding paragraphs is a cognizable and protected interest under 42 U.S.C. §1983.

112.    Synergy is informed and believes, and on that basis alleges, that Defendants' acts and omissions, as alleged above, were each taken under color of state law, including Defendants' acts of consistently damaging treatment and removal from City projects, designed to interfere with Synergy's prosecution of its work on other Projects, with the intent to run Synergy out of the City and out of business.

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 217 of 253

113.    Defendants' acts and omissions were the actual and proximate cause of the deprivation of Synergy's interests described in above.

114.    As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered damages in excess of $19 million.

WHEREFORE, Synergy prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION
### [Violation of Civil Rights 42 U.S.C. §1983]
### Stigma-Plus Due Process
### Against CITY AND COUNTY OF SAN FRANCISCO, LONDON BREED, MOHAMMED NURU

115.    Plaintiff incorporates by reference each and every allegation in each preceding paragraph as if fully set forth herein.

116.    Synergy has an established history as a government contractor and subcontractor working on San Francisco construction projects.

117.    Synergy had a protectable liberty and property interest in the work it was to perform on the Haight Street Project, the Van Ness Project, the bidding process for City contracts, and in its good reputation.

118.    Synergy suffered reputational harm when Defendants publicly issued false statements wrongfully blaming Synergy for problems that occurred with the Haight Street project, concurrent with the City's removal of Synergy from that project.

119.    The reputational harm imposed upon Synergy by these acts foreclosed Synergy's freedom to take advantage of other economic and business opportunities.

120.    As an actual and proximate result of the conduct described above, Synergy has suffered damages in an in excess of $19 million.

## FOURTH CAUSE OF ACTION
### [Violation of Civil Rights 42 U.S.C. §1983]
### Retaliation
### Against CITY AND COUNTY OF SAN FRANCISCO, LONDON BREED, MOHAMMED NURU

1   121.    Plaintiff incorporates by reference each and every allegation in each preceding paragraph

2   as if fully set forth herein.

3   122.    Synergy engaged in an activity protected under federal law, that is, the right to petition

4   the government for redress of grievances under the First, Fifth and Fourteenth Amendments to

5   the United States Constitution.

6   123.    Defendants, acting under color of law, subjected Synergy to adverse action, that is,

7   removal from the Haight Street Project and the Van Ness Project.

8   124.    Defendants subjected Synergy to adverse action because of Synergy's exercise of its right

9   to petition the government for redress of grievances and right to access to courts;

10  125.    Defendants' acts and omissions were the actual and proximate cause of the deprivation of

11  Synergy's constitutional rights.

12  126.    As a result of Defendants' above-mentioned acts and omissions, Synergy has suffered

13  damages in excess of $19 million.

14

15                          **FIFTH CAUSE OF ACTION**
                            **Breach of Contract**
16                          **(Against GBI)**

17  127.    Synergy hereby re-alleges and incorporates by reference the foregoing paragraphs, as if

18  set forth in full herein.

19  128.    GBI and Synergy entered into a contract on April 17, 2015 (Subcontract Agreement).

20  Whereby Synergy agreed, and was entitled to, complete certain construction tasks for the Haight

21  Street Project, and to receive compensation for such work.

22  129.    Synergy performed its obligations under the Subcontract Agreement, attached hereto as

23  Exhibit A.

24  130.    GBI breached the Subcontract Agreement by improperly and unlawfully substituting

25  another subcontractor in place of Synergy for the Haight Street Project, to perform Synergy's

26  scope of work as listing in GBI's bid to the City and as defined in the Subcontract Agreement,

27  and by failing to pay Synergy for work Synergy performed as required under the Subcontract

28  Agreement.

THIRD AMENDED COMPLAINT                          24                          Case No. 3:17-cv-06763

131.     Synergy suffered significant damages as a result of GBI's breach of the Subcontract

Agreement, in an amount in excess of $ 19 million.

### SIXTH CAUSE OF ACTION
**Unlawful Removal and Substitution of Listed Subcontractor**
**(Cal. Pub. Contracts Code § 4107)**
**(Against GBI)**

132.     Synergy hereby re-alleges and incorporates by reference the foregoing paragraphs, as if

set forth in full herein.

133.     California Public Contracts Code §4107 provides that no prime contractor whose bid is

accepted may substitute another subcontractor in place of the subcontractor listed in the original

bid.  Section 4107 provides exclusive exceptions to this general rule; these exceptions delimit the

exclusive grounds upon which a prime contractor may substituted another contractor in place of

the subcontractor listed on the original bid, "to have another contractor perform any part of the

scope of work listed in GBI's bid to the City to be performed by Synergy.

134.     Synergy was listed as a subcontractor on GBI's original bid for the Haight Street Project.

135.     On a date in 2016 after February 1, 2016, GBI substituted another contractor for Synergy

on that project. On a later date in 2016 GBI caused the substitute subcontractor to perform work

listed in GBI's bid to the City to be performed by Synergy.GBI did not have grounds to lawfully

substitute Synergy, or to cause or allow another contractor to perform work  listed in GBI's bid

to the City to be performed by Synergy , as none of the exclusive grounds allowed for such

substitution under Section 4107 existed.

136.     Synergy suffered damages as a result of GBI's action, in excess of $ 19 million

 and, , is entitled to receive  penalties, including, but not limited to, penalties at a rate of two

percent (2%) per month to be assessed pursuant to Sections 7107 and 7108.5 of the Public

Contracting Code,  in addition to compensatory damages, in an amount to be determined.

/

/

Case: 19-30088    Doc# 14006    Filed: 09/05/23    Entered: 09/05/23 16:13:15    Page 220
of 253

WHEREFORE, Synergy prays for relief as hereinafter set forth.

**PRAYER**

WHEREFORE, Plaintiff prays for relief as follows:

1. For damages in an amount to be proven at trial;

2. For exemplary monetary damages against GBI;

3. For injunctive and equitable relief;

4. Penalties against GBI, pursuant to Sections 7107 and 7108.5 of the Public Contracting Code;

5. For attorney's fees incurred, pursuant to 42 U.S.C. §§ 1983 and 1988, and any other laws, regulations, agreements or provisions establishing grounds thereto;

6. For costs of suit; and

7. For such other relief as the Court may deem just and proper.

Dated:  February 19, 2019                Respectfully Submitted,

LAW OFFICE OF JOHNNY D. KNADLER

By: _____
          *Johnny Knadler*
          JOHNNY D. KNADLER

Attorney for Plaintiff
SYNERGY PROJECT
MANAGEMENT, INC.

**Exhibit I**

1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   SYNERGY PROJECT MANAGEMENT,          Case No. 17-cv-06763-JST
    INC.,
8                                        **ORDER GRANTING CITY**
                  Plaintiff,             **DEFENDANTS' MOTION TO DISMISS**
9                                        **AND REMANDING CASE**
            v.
10                                       Re: ECF No. 82, 92
    CITY AND COUNTY OF SAN
11  FRANCISCO, et al.,

12                Defendants.

13

14          In its third amended complaint ("TAC"), Plaintiff Synergy Project Management, Inc.

15  asserts four federal claims against Defendants City and County of San Francisco, London Breed,

16  and Mohammed Nuru (collectively, "the City") and two state claims against Defendant Ghilotti

17  Bros., Inc. ("GBI").  ECF No. 77 ¶¶ 94-136.  Defendants have filed separate motions to dismiss all

18  claims against them.  ECF Nos. 82, 92.  The Court will grant the City's motion, ECF No. 82, and

19  remand the claims against GBI to state court without considering the merits of GBI's motion, ECF

20  No. 92.

21  **I.     BACKGROUND**[1]

22          Synergy is a general contractor and subcontractor providing services that include

23  construction management, demolition, utilities, mass excavation and shoring, grading and paving,

24  and architectural and structural management.  ECF No. 77 ¶¶ 13-14.  Synergy and the City have a

25  protracted litigation history related to payment on several of their contracts.  *Id.* ¶¶ 16-19.

26  Although Synergy prevailed in those lawsuits, the City's significant delay in paying damages

27  _____

28  [1] The Court accepts as true the facts pleaded in Synergy's TAC, ECF No. 77.  *See Navarro v.*
    *Block*, 250 F.3d 729, 732 (9th Cir. 2001).

United States District Court
Northern District of California

1    "financially choked Synergy," "forced Synergy to lay off employees and field personnel," and

2    "severely restricted the company's access to bonding capacity," which it needed to bid on projects

3    as a general contractor. *Id.* ¶ 20. Because it no longer had the financial wherewithal to act as a

4    general contractor, Synergy turned to subcontractor work. *Id.* ¶ 22.

5         **A.**     **Haight Street Project**

6         On February 10, 2015, the City and GBI "entered into a contract to replace the sewer line,

7    install new water lines, and renovate the pavement on Haight and Hayes Streets" (the "Haight

8    Street Project"). *Id.* ¶ 23. Synergy was selected by GBI as a subcontractor on the project. *Id.*

9    ¶¶ 23-24. The Synergy-GBI contract was entered into on April 17, 2015, and "bound Synergy to

10   the terms" of the City-GBI contract. *Id.* ¶¶ 26, 30 (emphasis omitted). The City-GBI contract

11   "expressly precluded the establishment of any contractual or quasi-contractual relationship

12   between the City and Synergy." *Id.* ¶ 31. The Synergy-GBI contract provided that GBI would

13   "pay [Synergy] for the satisfactory performance" of the agreement and permitted GBI to terminate

14   Synergy as subcontractor on the Haight Street Project for breach of the agreement, failure to

15   "prosecute the said work with promptness, diligence and efficiency," or failure to perform any of

16   the requirements of the contract. *Id.* ¶¶ 28, 29. The Synergy-GBI contract also permitted GBI, in

17   its sole discretion, to terminate the agreement without cause. *Id.* ¶ 29.

18        GBI and Synergy began work on the Haight Street Project in April 2015. *Id.* ¶ 37. The

19   project "was a particularly difficult one, due to many unknown subsurface structures not disclosed

20   to Synergy in the plans provided to it by the City." *Id.* ¶ 38. During the course of the project,

21   Synergy damaged five PG&E gas lines. *Id.* ¶ 40. "The damaged gas lines drew significant public

22   attention, and criticism from neighborhood residents and businesses disrupted by the corrective

23   measures necessitated by the damaged gas lines." *Id.* ¶ 42. The City concluded that Synergy was

24   responsible for the gas line damage. *Id.* ¶ 44.

25        On October 8, 2015, "purportedly because of the gas line incidents," Mohammed Nuru, the

26   City's Director of Public Works, wrote a letter to GBI instructing it to stop work on the project

27   and to "remove [Synergy] immediately." *Id.* ¶¶ 5, 46 (alteration in original). Six days later, the

28   City informed Synergy that it had "directed Ghilotti to remove Synergy and to substitute a

*United States District Court*
*Northern District of California*

2

1    replacement contractor." *Id.* ¶ 49.  Both GBI and Synergy opposed Synergy's removal, and

2    Synergy "submitted a formal objection" to the City.  *Id.* ¶¶ 48, 50.

3             On December 9, 2015, an administrative hearing took place before a City-appointed

4    officer.  *Id.* ¶ 56.  The purpose of the hearing was to consider Synergy's objection that its

5    termination by the City was improper because GBI had neither requested nor consented to

6    Synergy's termination.  *Id.* ¶ 57.  GBI testified in favor of Synergy at the hearing.  *Id.* ¶ 58.  On

7    January 8, 2016, the hearing officer issued a ruling in favor of the City.[2]  *Id.* ¶ 59.

8             Synergy appealed the hearing officer's decision through a writ of mandate to the San

9    Francisco Superior Court, which vacated the decision on November 10, 2016.  *Id.* ¶¶ 63-64.  The

10   California Court of Appeal reversed the trial court and held that "the hearing officer had

11   jurisdiction to issue a decision under [California Public Contract Code] section 4107(a)."  *Synergy*

12   *Project Mgmt., Inc. v. City & Cty. of San Francisco*, 33 Cal. App. 5th 21, 37 (2019), *reh'g denied*

13   (Mar. 29, 2019), *review denied* (June 26, 2019).

14            City officials also "embarked on a campaign to publicly and erroneously depict Synergy as

15   a bad contractor, and to constructively debar Synergy from participation in City projects."  ECF

16   No. 77 ¶ 65.  "Separately, the City took arbitrary and capricious steps to block Synergy's

17   participation in City projects and to remove Synergy from projects for which Synergy had already

18   committed substantial and critical resources" and was the most qualified and cost-effective bidder.

19   *Id.*  For example, on or about October 10, 2015, then-Supervisor London Breed "publicly

20   denounced Synergy, and announced the City's intent to use Synergy as a scapegoat to blame for

21   problems with the Haight Street Project in retaliation against Synergy for its exercise of its

22   constitutional right to petition the courts for redress of grievances."  *Id.* ¶ 67.  In a public speech

23   broadcast by local television, Breed "blamed Synergy for cutting corners in its performance of the

24   Haight Street Project"; "cited Synergy's successful lawsuits against the City as proof of Synergy's

25   incompetence"; "signaled the City's intent to 'hold [Synergy] accountable'"; "blamed Synergy for

26   undisclosed sinkholes"; and "acknowledged that she had asked City Director of Public Works,

27

28   _____

[2] The TAC alleges that the date of the hearing officer's decision was January 8, 2015, but this is an obvious typographical error.

1   Mohammed Nuru, to terminate Synergy." *Id.* (alteration in original).  At the same event, Breed

2   answered a question regarding the incorrect maps provided to Synergy by "explain[ing] that even

3   though faulty maps might have been blamed for the first gas leak, that's not a good enough excuse

4   for the subsequent ones," and that "[the City] need[s] to understand whether [it has] qualified

5   people to do the job." *Id.* ¶ 69.  Breed later "repeated her denunciation" of Synergy "at a public

6   hearing called by Breed and other City Supervisors." *Id.* ¶ 70.

7       "On or around January 29, 2016, GBI proposed substituted contractors to replace

8   Synergy," and the Department of Public Works approved the replacement a few days later. *Id.*

9   ¶ 61.  The new subcontractor encountered difficulties similar to those experienced by Synergy,

10  "hit[ting] a gas line in the area of Haight and Steiner streets in June 2016" and another one "at the

11  intersection of Pierce and Page Streets" in July 2017. *Id.* ¶ 73.  The City has since determined that

12  "the Project, as originally designed, cannot be performed," and has abandoned "major portions" of

13  the Project. *Id.* ¶ 74.

14      Synergy submitted a Government Tort Claims Act claim regarding the Haight Street

15  Project to the City on January 5, 2017, and the City denied the claim on January 10, 2017. *Id.*

16  ¶ 75.

17      **B.      Van Ness Project**

18      In addition to its claims regarding the Haight Street Project, Synergy also alleges that the

19  City blocked its proposal to serve as a subcontractor under a different prime contractor, Walsh

20  Construction Company II, LLC. *Id.* ¶¶ 78-79.  In May 2016, Walsh selected Synergy as a

21  subcontractor in the "Core Work on the San Francisco Municipal Transportation Agency

22  ('SFMTA') Van Ness Corridor Improvement Project (the 'Van Ness Project'), an extensive

23  renovation project for a major San Francisco north/south arterial commissioned by SFMTA in

24  conjunction with SFPUC." *Id.* ¶ 79.  "Synergy's work was defined as 'core subcontracting work'

25  in the agreement between Walsh and the SFMTA." *Id.* ¶ 80.  Synergy set aside significant

26  resources for about ten months to prepare for this subcontract, "culminating in a Walsh-Synergy

27  subcontract agreement in May 2016, which enabled Walsh to list Synergy as a Core Work

28  subcontractor in [Walsh's] proposal" to the City. *Id.* ¶ 82.  The City, acting through the SFMTA,

4

United States District Court
Northern District of California

1   rejected Synergy as a subcontractor in a June 2016 letter by "falsely claiming that Synergy's bid

2   was too high," when, in actuality, Synergy's bid "was lower than Walsh's internal estimate" and

3   that of the City's consultant.  *Id.* ¶ 83, 85-86.

4        Walsh removed Synergy as a subcontractor on the Van Ness Project on June 3, 2016.  *Id.*

5   ¶ 88.  The City later re-designated the "Core Work" previously assigned to Synergy as "Non-Core

6   work," which "enabled the City to market the work to a larger pool of contractors."  *Id.* ¶ 89.

7   After the City re-designated the work, only one bid was received, and that bid was more than

8   twice as high as Synergy's bid.  *Id.*  Synergy claims it "suffered harm and damages from being

9   unable to bid on the project," and that the re-designation of the work from "Core" to "Non-Core"

10  "effectively removed Synergy from the other work" on the Van Ness Project.  *Id.* ¶ 90.  Synergy

11  submitted a Government Tort Claims Act claim regarding the Van Ness Project to the City on

12  April 12, 2018, and the City denied the claim on May 15, 2018.  *Id.* ¶ 91.

13      **C.**    **Procedural History**

14       Synergy initiated this case and filed a first amended complaint in the Superior Court of

15  California for the County of San Francisco.  ECF No. 1-1.  The City removed the case to this

16  Court.  ECF No. 1.  The Court subsequently granted in part and denied in part the City's motion to

17  dismiss the first amended complaint, ECF No. 49, and the City's motion to dismiss certain claims

18  from the second amended complaint, ECF No. 58.

19       The Court granted Synergy's unopposed motion for leave to file a third amended

20  complaint, ECF No. 76, which, for the first time, named GBI as a defendant, ECF No. 77.  The

21  TAC alleges four federal claims against the City, all under 42 U.S.C. § 1983: (1) violation of

22  substantive due process, (2) violation of procedural due process, (3) "stigma-plus" violation of due

23  process, and (4) First Amendment retaliation.  *Id.* ¶¶ 94-126.  It alleges two state-law claims

24  against GBI: (1) breach of contract and (2) unlawful removal and substitution of listed contractor

25  under California Public Contract Code section 4107.  *Id.* ¶¶ 127-36.  The City and GBI move to

26  dismiss all claims against them.  ECF Nos. 82, 92.

27  **II.**    **JURISDICTION**

28       The Court has jurisdiction over Synergy's federal claims under 28 U.S.C. § 1331.  For the

5

1   reasons discussed at the end of this order, the Court does not reach the question, raised by GBI, of

2   whether the Court has supplemental jurisdiction over Synergy's state-law claims.

3   **III.   REQUESTS FOR JUDICIAL NOTICE**

4           Before turning to the merits of Defendants' motions to dismiss, the Court addresses the

5   parties' requests for judicial notice.  "Generally, district courts may not consider material outside

6   the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal

7   Rules of Civil Procedure."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir.

8   2018).  Judicial notice provides an exception to this rule.  *Id.*

9           Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that

10  is not subject to reasonable dispute because it: (1) is generally known within the trial court's

11  territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

12  accuracy cannot reasonably be questioned."  If a fact is not subject to reasonable dispute, the court

13  "must take judicial notice if a party requests it and the court is supplied with the necessary

14  information."  Fed. R. Evid. 201(c)(2).  The Ninth Circuit has cautioned, however, that courts

15  must be wary that the "use of extrinsic documents to resolve competing theories against the

16  complaint risks premature dismissals of plausible claims that may turn out to be valid after

17  discovery."  *Khoja*, 899 F.3d at 998.  Accordingly, "a court cannot take judicial notice of disputed

18  facts contained in . . . public records," when, for instance, "there is a reasonable dispute as to what

19  the [record] establishes."  *Id.* at 999, 1001.

20          Both the City and GBI filed multiple requests for judicial notice in support of their

21  motions.[3]  ECF Nos. 84, 93, 95, 99, 102.  All of the documents for which Defendants request

22  judicial notice were either publicly recorded in San Francisco County or are court records.  These

23  are proper subjects of judicial notice.  *E.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.

24  2001) ("*undisputed* matters of public record," but not "*disputed* facts stated in public records," are

25

26  _____

27  [3] Plaintiffs filed late objections to the requests for judicial notice, ECF Nos. 105-07, which the
    City moved to strike, ECF No. 108.  Although the objections were late, the Court nonetheless
    considered them, and the motion to strike is denied.  In addition, the purported stipulation filed at
28  ECF No. 109 is denied, as it is a stipulation only between the two sets of Defendants and does not
    include Synergy's consent.

6

proper subjects of judicial notice (emphasis in original)); *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (citation omitted)).  Moreover, these documents set forth the proceedings described in the TAC, and "[t]he Ninth Circuit has accepted that 'if a plaintiff's claims are predicated upon a document, the defendant may attach the document to his Rule 12(b)(6) motion, even if the [plaintiff's] complaint does not explicitly refer to it.'"  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1159 (C.D. Cal. 2007) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as stated in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681-82 (9th Cir. 2006)).  Accordingly, the Court grants Defendants' requests for judicial notice in their entirety.  Plaintiff's objections to these requests are overruled.

## IV.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Dismissal under Federal Rule of Civil Procedure 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint need not contain detailed factual allegations, but facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks and citation omitted).  In determining whether a plaintiff has met this plausibility standard, a court must "accept all factual

United States District Court
Northern District of California

1    allegations in the complaint as true and construe the pleadings in the light most favorable" to the

2    plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

3    **V.     DISCUSSION**

4          **A.     Timeliness of the City's Motion**

5          Synergy first asserts that the City is barred from filing this motion under Federal Rule of

6    Civil Procedure 12(b) because the "City Defendants filed an answer to Plaintiff's Second

7    Amended Complaint [("SAC")] on February 5, 2019."  ECF No. 90 at 9.  According to Synergy,

8    "[a]s Defendants have already filed a responsive pleading, they cannot now file a motion to

9    dismiss under Rule 12(b)."  *Id.*  While Synergy correctly states the legal principle that a 12(b)(6)

10   motion "must be made before pleading if a responsive pleading is allowed," Fed. R. Civ. P. 12(b),

11   it ignores the simple fact that an amended pleading requires a new response, Fed. R. Civ. P.

12   15(a)(3).  The City's answer to the SAC was not a responsive pleading to the TAC, and there is

13   nothing untimely about the current motion to dismiss.

14         Synergy further argues that Rule 12(g) bars the City's motion because the City could have

15   raised the same arguments in its prior motion to dismiss but failed to do so.  However, as this

16   Court previously explained, "[t]he Ninth Circuit has made clear that a district court may consider a

17   motion to dismiss even when it raises a defense omitted from a prior motion."  ECF No. 91 at 1-2

18   (citing *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017), *aff'd sub nom. Apple*

19   *Inc. v. Pepper*, 139 S. Ct. 1514 (2019)).  The Court will do so here.

20         **B.     First Amendment Retaliation Claim**

21         Synergy alleges that the City violated its First Amendment rights by removing it from the

22   Haight Street and Van Ness Projects in retaliation for its constitutionally protected petitioning

23   activity of filing successive suits against Defendants.  "When a business vendor operates under a

24   contract with a public agency, we analyze its First Amendment retaliation claim under § 1983

25   using the same basic approach that we would use if the claim had been raised by an employee of

26   the agency."  *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004).  To

27   determine whether a plaintiff has stated a claim for First Amendment retaliation, a court must

28   consider:

United States District Court
Northern District of California

8

1

2

3

4

5

> a sequential five-step series of questions: (1) whether the plaintiff
> spoke on a matter of public concern; (2) whether the plaintiff spoke
> as a private citizen or public employee; (3) whether the plaintiff's
> protected speech was a substantial or motivating factor in the
> adverse employment action; (4) whether the state had an adequate
> justification for treating the employee differently from other
> members of the general public; and (5) whether the state would have
> taken the adverse employment action even absent the protected
> speech.

6 *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  The plaintiff bears the burden on the first

7 three questions, but the burden shifts to the defendant on the last two.  *Id.* at 1070-71.  All five

8 "factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's

9 case."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013)

10        Synergy has failed to satisfy its burden on the first requirement: that it spoke on a matter of

11 public concern.  This requirement applies with equal measure whether the conduct at issue is

12 characterized as petitioning activity or speech.  *See Rendish v. City of Tacoma*, 123 F.3d 1216,

13 1223 (9th Cir. 1997) ("Regardless of whether the right to grieve an employment dispute is

14 characterized as the exercise of the right to petition or the right to free speech, the same public

15 concern requirement applies.").  "Whether an employee's speech addresses a matter of public

16 concern must be determined by the content, form, and context of a given statement, as revealed by

17 the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  "Speech involves a matter of

18 public concern when it can fairly be considered to relate to 'any matter of political, social, or other

19 concern to the community.'"  *Johnson v. Multnomah Cty.*, 48 F.3d 420, 422 (9th Cir. 1995)

20 (quoting *Connick*, 461 U.S. at 146).  For example, speech that "seek[s] to bring to light actual or

21 potential wrongdoing or breach of public trust" is protected, *Connick*, 461 U.S. at 148, as is speech

22 that involves "'issues about which information is needed or appropriate to enable the members of

23 society' to make informed decisions about the operation of their government," *McKinley v. City of*

24 *Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940)

25 (footnote omitted)).  But "speech that deals with individual personnel disputes and grievances and

26 that would be of no relevance to the public's evaluation of the performance of governmental

27 agencies is generally not of public concern."  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th

28 Cir. 2003) (internal quotation marks and citation omitted).  Synergy's alleged activity, which

1   relates only to a private contractual dispute, falls into the latter category and is not protected.  This

2   is dispositive of its First Amendment retaliation claim.  Because there is no set of facts under

3   which Synergy could plausibly allege that its prior lawsuits touched on matters of public concern,

4   dismissal is without leave to amend.  *See Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*

5   *Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) ("[I]n dismissals for failure to state a claim, a district court

6   should grant leave to amend even if no request to amend the pleading was made, unless it

7   determines that the pleading could not possibly be cured by the allegation of other facts.").

8       **C.      Due Process Claims**

9       Synergy also asserts that the City violated its procedural and substantive due process rights

10  in four ways: (1) by the City's "wrongful use of Public Contract Code Section 4107 to unilaterally

11  remove Synergy from the Haight Street Project"; (2) by "Defendants' retaliation against Synergy

12  for its exercise of its constitutionally protected right to access to courts and its right to petition the

13  courts . . . and to exercise its right of free speech, without being subject to retaliation"; (3) by "the

14  City's use of pretextual grounds to force Synergy's removal from the Van Ness Project"; and

15  (4) by "the City's *de facto* debarment of Synergy," which deprived Synergy of its "right to do

16  business with the City."  ECF No. 77 ¶ 100 (substantive due process); *id.* ¶ 110 (procedural due

17  process).

18      To state a procedural due process claim under § 1983, plaintiffs must allege that the

19  government deprived them of a constitutionally protected liberty or property interest without

20  adequate procedural protections.  *E.g.*, *Fed. Home Loan Mortg. Corp. v. SFR Investments Pool 1,*

21  *LLC*, 893 F.3d 1136, 1147 (9th Cir. 2018).  "The Due Process Clause does not create substantive

22  rights in property; the property rights are defined by reference to state law."  *Portman v. Cty. of*

23  *Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  Synergy alleges that it had protectable liberty and

24  property interests in completing the Haight Street Project, in being awarded the Van Ness Project,

25  in the bidding process for City contracts, and in its good reputation.  ECF No. 77 ¶ 104.

26      Substantive due process protects against "the exercise of power without any reasonable

27  justification in the service of a legitimate governmental objective."  *Cty. of Sacramento v. Lewis*,

28  523 U.S. 833, 846 (1998).  Where, as here, a plaintiff "challenge[s] governmental action that does

United States District Court
Northern District of California

Case: 19-30088   Doc# 14006   Filed: 09/05/23   Entered: 09/05/23 16:13:15   Page 232
of 253

1    not impinge on a fundamental right, courts 'do not require that the government's action actually

2    advance its stated purposes, but merely look to see whether the government could have had a

3    legitimate reason for acting as it did.'"  *Tyson v. City of Sunnyvale*, 920 F. Supp. 1054, 1063 (N.D.

4    Cal. 1996) (quoting *Halverson v. Skagit County*, 42 F.3d 1257, 1262 (9th Cir. 1994)).  To establish

5    a substantive due process violation based on the City's procedures, Synergy must show the

6    procedures are "clearly arbitrary and unreasonable, having no substantial relation to the public

7    health, safety, morals or general welfare."  *Yagman v. Garcetti*, 852 F.3d 859, 867 (9th Cir. 2017)

8    (quoting *Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1058 (9th Cir. 2012)).  "The City's

9    procedures, however, are 'presumed valid, and this presumption is overcome only by a clear

10   showing of arbitrariness and irrationality.'"  *See id.* (quoting *Samson*, 683 F.3d at 1058).

11          Each of Synergy's due process theories fails.  First, its theory as to Public Contract Code

12   section 4107 is precluded by the California Court of Appeal's decision in *Synergy Project*

13   *Management, Inc. v. City and County of San Francisco*, 33 Cal. App. 5th 21 (2019).  Synergy

14   alleges that the "only way [it] could have been properly removed from the Haight Street Project

15   was under the authority of a hearing that complied with the relevant sections of the Subletting and

16   Subcontracting Fair Practices Act" ("SSFPA").  ECF No. 77 ¶ 60.  But the California Court of

17   Appeal has already decided that the City's procedures – i.e., holding a hearing pursuant to section

18   4107 – "substantially complied" with the SSFPA, *Synergy*, Cal. App. 5th at 37; "complied in

19   substance with every reasonable objective of the statute," *id.* at 27 (citation omitted); and

20   "furthered the statutory objective of protecting public safety," *id.* at 35.  These are the same issues

21   that Synergy seeks to litigate in its due process claims here, and Synergy was a party to the prior

22   proceeding that resulted in a final judgment on the merits.  The California Court of Appeal's

23   decision is therefore entitled to preclusive effect in this Court.  *Kay v. City of Rancho Palos*

24   *Verdes*, 504 F.3d 803, 808-09 (9th Cir. 2007) (discussing criteria used "to determine the

25   preclusive effect of [a] California state court decision" in federal court).

26          Synergy's second theory, based on the City's alleged retaliation against Synergy for

27   exercising its First Amendment rights, also fails.  Synergy cannot rely on "the more generalized

28   notion of substantive due process" where, as here, the First Amendment "provides an explicit

United States District Court
Northern District of California

1    textual source of constitutional protection against a particular sort of government behavior."

2    *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks and citation omitted).[4]  As

3    to procedural due process, Synergy fails to articulate a viable legal theory and cites only to

4    *Blackledge v. Perry*, 417 U.S. 21 (1974), and *North Carolina v. Pearce*, 395 U.S. 711 (1969), for

5    the proposition that "government retaliation against a person for exercising a constitutional right

6    can violate procedural due process."  ECF No. 90 at 17-18.  Those cases held, respectively, that it

7    violates due process for the government to file a more severe charge against or impose a higher

8    sentence upon a defendant who successfully challenged his original conviction.  *Blackledge*, 417

9    U.S. at 28-29; *Pearce*, 395 U.S. at 725.  *Blackledge* and *Pearce* shed no light on the present

10   controversy.  The Court can only conclude that this theory is simply a reassertion of Synergy's

11   First Amendment retaliation claim, which the Court has already rejected.

12          Synergy's third theory is also insufficient to state a claim.  In its tort claim submitted to the

13   City, Synergy notes that it received a hearing at which evidence was presented through both

14   documents and witness testimony.  ECF No. 77 ¶ 91; ECF No. 77-2 at 17.  Synergy has not

15   alleged any additional procedural safeguards it contends it was due, and its procedural due process

16   claim therefore fails.  Likewise, Synergy does not state a substantive due process claim based on

17   its removal from the Van Ness Project because it acknowledges that the re-designation of the work

18   from "Core" to "Non-Core" – which Synergy contends was a pretextual grounds for its removal –

19   "enabled the City to market the work to a larger pool of contractors."  ECF No. 77 ¶¶ 85, 89.  This

20   is not an objective having "no substantial relation to the public health, safety, morals or general

21   welfare," as required to support a substantive due process claim.  *Yagman*, 852 F.3d at 867

22   (quoting *Samson*, 683 F.3d at 1058).

23          Finally, Synergy's fourth theory, which alleges that the City has de facto debarred Synergy

24   from doing business with it, also fails to allege a due process violation.  Synergy does not allege

25   sufficient facts to show that it has been prevented from engaging in any additional projects beyond

26   the Haight Street and Van Ness Projects.  As discussed above, Synergy received adequate process

27

28   _____

[4] The Court's ruling on the motions to dismiss Synergy's first amended complaint was insufficiently clear on this point.  ECF No. 49 at 13-14.

United States District Court
Northern District of California

12

1    as to those two projects, and neither process was "clearly arbitrary and unreasonable." *Yagman*,

2    852 F.3d at 867 (quoting *Samson*, 683 F.3d at 1058).

3          Accordingly, Synergy's procedural and substantive due process claims are dismissed.

4    Because it does not appear that Synergy could cure the deficiencies discussed above, dismissal is

5    without leave to amend.

6          **D.**      **"Stigma-Plus Due Process" Claim**

7          Synergy also alleges a "Stigma-Plus Due Process" claim against the City.  ECF No. 77 at

8    23.  Synergy alleges that it "suffered reputational harm when Defendants publicly issued false

9    statements wrongfully blaming Synergy for problems that occurred with the Haight Street

10   Project," and that this harm "foreclosed Synergy's freedom to take advantage of other economic

11   and business opportunities."  ECF No. 77 ¶¶ 118-19.

12         "[P]rocedural due process protections apply to reputational harm only when a plaintiff

13   suffers stigma from governmental action plus alteration or extinguishment of 'a right or status

14   previously recognized by state law.'"  *Humphries v. Cty. of Los Angeles*, 554 F.3d 1170, 1185 (9th

15   Cir. 2009), *rev'd and remanded on other grounds sub nom. Los Angeles Cty. v. Humphries*, 562

16   U.S. 29 (2010) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)).  "The stigma imposed must be

17   severe and genuinely debilitating before the discharge can rise to a level of constitutional concern.

18   In other words, the stigma must seriously damage a person's reputation or significantly foreclose

19   his freedom to take advantage of other employment opportunities."  *Hyland v. Wonder*, 972 F.2d

20   1129, 1141 (9th Cir. 1992) (internal quotation marks, alteration marks, and citation omitted).

21   Thus, "[a]ccusations that an employee is incompetent, unable to get along with others, lacks

22   judgment, or is untrustworthy fail to rise to a level that implicates a liberty interest."  *Murphy v.*

23   *Goss*, 103 F. Supp. 3d 1234, 1241 (D. Or. 2015), *aff'd*, 693 F. App'x 636 (9th Cir. 2017).  "The

24   accusations must also be substantially false."  *Id.* (citing *Siegert v. Gilley*, 500 U.S. 226, 234

25   (1991)).

26         Synergy's allegations do not rise to the level of legally actionable stigma.  Allegations of

27   shoddy workmanship or even incompetence are not sufficient to meet the "severe and genuinely

28   debilitating" bar imposed by this claim.  *Hyland*, 972 F.2d at 1141; *see also Gray v. Union Cty.*

United States District Court
Northern District of California

13

*Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975) (allegations of "incompetence, hostility toward authority, and aggressive behavior . . . certainly are not complimentary," but these "are simply not the kinds of accusations which warrant a hearing"). The City raised this issue in its motion, ECF No. 82 at 27, and Synergy failed to respond, ECF No. 90 at 23-24 (arguing only that Synergy has a protectable property interest in its goodwill). Nor does it appear to the Court that Synergy could cure this deficiency. Synergy's stigma-plus claim is therefore dismissed without leave to amend.

### E.    State-Law Claims

The Court has now dismissed all federal claims, leaving only Synergy's two state-law claims against GBI. The Court lacks original jurisdiction over these claims because Synergy and GBI are not diverse. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (explaining that diversity jurisdiction requires that "each of the plaintiffs must be a citizen of a different state than each of the defendants"); 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business. . . ."); ECF No. 77 ¶¶ 1, 4 (alleging that both Synergy and GBI are California corporations).

Synergy and GBI dispute whether the claims against GBI meet the criteria for supplemental jurisdiction under 28 U.S.C. § 1367(a). The Court does not decide that question because it "has dismissed all claims over which it has original jurisdiction" and would decline to exercise supplemental jurisdiction even if it existed. 28 U.S.C. § 1367(c); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").

The Court must now decide how to "best accommodate the values of economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988). The Court has the power to dismiss the state-law claims, but it also has "wide discretion" to remand the case. *Id.* at 351-57. As the Supreme Court has explained:

> [A] remand may best promote the values of economy, convenience,

> fairness, and comity.  Both litigants and States have an interest in
> the prompt and efficient resolution of controversies based on state
> law.  Any time a district court dismisses, rather than remands, a
> removed case involving pendent claims, the parties will have to
> refile their papers in state court, at some expense of time and money.
> Moreover, the state court will have to reprocess the case, and this
> procedure will involve similar costs.  Dismissal of the claim
> therefore will increase both the expense and the time involved in
> enforcing state law.

*Id.* at 353.  The Court finds that to be the case here.

GBI argues that the Court should dismiss rather than remand this case because GBI was not named as a defendant in the original state-court proceedings.  However, this fact is not dispositive; claims that were filed in federal court after a case has been removed from state court may be remanded even though those claims "had never been filed in State court."  *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001).  As the Fourth Circuit has explained:

> Even though parties to a "case" (or an "action") may change during
> its prosecution in court through dismissal or joinder, the case
> remains the same case that was opened when the complaint was
> filed.  And remand concepts apply to the "case" or "action," not to
> the parties.  Indeed, § 1447(e) explicitly recognizes the subject of
> remand as the "case" or "action" and not the parties to it.  Thus, the
> question is not whether these particular plaintiffs were previously
> before the State court, but whether the case was previously before
> that court.

*Id.* (citations omitted).  GBI attempts to distinguish *Hinson* by observing that the claims at issue there were brought by new *plaintiffs* against the same defendant who removed the case, whereas GBI is a new *defendant*.  But the court's reasoning applies equally to all parties added to a case after removal, regardless of whether the newly joined party is a plaintiff or a defendant.  Additionally, in this case, the factual allegations in the state-court complaint and the TAC substantially overlap, including as to allegations concerning GBI's actions, and the Court does not find remand to be unfair.  To the contrary, remand, rather than dismissal, would "best accommodate the values of economy, convenience, fairness, and comity."  *Carnegie-Mellon Univ.*, 484 U.S. at 351.

## CONCLUSION

The City's motion to dismiss all federal claims is granted without leave to amend.[5]  The

---

[5] In light of this conclusion, the Court need not reach the individual City defendants' qualified

remaining state-law claims against GBI are remanded to the Superior Court of California for the County of San Francisco.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  November 21, 2019

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

immunity arguments.

16

1

**Exhibit J**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHNNY D. KNADLER, State Bar   220942
Law Office of Johnny D. Knadler
1345-E Pershing Drive
San Francisco, CA 94129
Telephone:     (310) 564-6695
Email:         jdknadler@yahoo.com

Attorneys for Plaintiff
SYNERGY PROJECT MANAGEMENT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNERGY PROJECT MANAGEMENT, INC., | Case No. 4:17-cv-06763-JST |
| Plaintiff, | NOTICE OF APPEAL |
| vs. | |
| CITY AND COUNTY OF SAN FRANCISCO, LONDON BREED, MOHAMMED NURU, GHILOTTI BROS. INC., and DOES 1-100, | |
| Defendants. | |

To the Court, all parties and parties' counsel:

Notice is hereby given that Synergy Project Management, Inc., plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final judgment entered by this Court in this matter on November 21, 2019 (ECF 129) and from the following orders: the Court's order, entered May 16, 2018, granting in part and denying in part the Defendants' motion to dismiss (ECF 49); the Court's Order, entered December 31, 2018, granting Defendant's motion to dismiss (ECF 58); the Court's order, entered August 14, 2019, denying Synergy's motion for leave to amend (ECF 116), and the Court's order, entered November 21, 2019, /

/

/

/

/

/

Notice of Appeal
Case No. 4:17-cv-06763-JST

1

1  granting Defendants' motion to dismiss and remanding the case (ECF 128).

2

3           Respectfully Submitted,

4                               JOHNNY D. KNADLER

5                           By: _Johnny Knadler_____
6                               JOHNNY D. KNADLER
                                LAW OFFICE OF JOHNNY D. KNADLER
7                               Attorneys for Plaintiff
                                SYNERGY PROJECT MANAGEMENT, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Synergy Project Management, Inc.

Name(s) of counsel (if any):

Johnny D. Knadler

Address: | 1527-E Pershing Drive San Francisco, CA  94129

Telephone number(s): | Telephone:  (310) 564-6695

Email(s): | jdknadler@yahoo.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ⊙ Yes   ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

City and County of San Francisco, ) London Breed, Mohammed Nuru

Name(s) of counsel (if any):

RONALD P. FLYNN, ELAINE M. O'NEIL, JAIME M. HULING DELAYE,

Address: | Fox Plaza 1390 Market Street, Suite 425 San Francisco, CA  94102-5408

Telephone number(s): | (415) 554-4708

Email(s): |

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 6**

*New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

## Appellants

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ◉ Yes   ○ No

## Appellees

Name(s) of party/parties:

Ghilotti Bros., Inc,

Name(s) of counsel (if any):

James P. Dwick, Ryan A. Lewis

Address:  Troutman Sanders LLP, Three Embarcadero Center, SF 94111

Telephone number(s):  (415) 477-5700

Email(s):  james.dwick@troutman.com, Ryan.lewis@troutman.com

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                                                                              *New 12/01/2018*

1

**Exhibit K**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNERGY PROJECT MANAGEMENT, INC., | Case No. 17-cv-06763-JST |
| Plaintiff, | **ORDER REMANDING CASE** |
| v. | Re: ECF No. 179 |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | |

On June 7, 2021, the Ninth Circuit affirmed in part and vacated in part the Court's orders granting Defendants' motions to dismiss, denying leave to amend, and entering final judgment. *Synergy Project Mgmt., Inc. v. City and County of San Francisco*, No. 19-17558, -- Fed. Appx --, 2021 WL 2311946, at *1 (9th Cir. June 7, 2021).  The Ninth Circuit affirmed this Court's dismissal of Plaintiff Synergy Project Management, Inc.'s federal claims without leave to amend. *Id.* at *1-2.  As to Synergy's state law intentional interference claim, the Ninth Circuit acknowledged an intervening California court decision under which Defendant City and County of San Francisco "could potentially be liable under a tortious interference theory," although "only if Synergy alleged an independently wrongful act" by the City.  *Id.* at *1.  It was left to this Court's discretion "to either address this issue on remand or, because no federal claims will remain, to remand the claim to state court for resolution."  *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988); 28 U.S.C. § 1367(c)(3)).  Synergy filed a petition for rehearing and rehearing en banc, which the Ninth Circuit denied, and the mandate issued on July 28, 2021.  ECF No. 179.

Since no federal claims in this case remain, the Court declines to exercise jurisdiction over

United States District Court
Northern District of California

1    Synergy's state law intentional interference claim.  The case is hereby remanded to San Francisco

2    County Superior Court.

3         **IT IS SO ORDERED.**

4    Dated:  August 4, 2021



5                                                              _____

6                                                                        JON S. TIGAR
                                                                   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

2

# **Exhibit L**

1 | DAVID CHIU, SBN #189542
City Attorney
2 | YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
3 | ELAINE M. O'NEIL, SBN142234
JAIME M. HULING DELAYE, SBN 270784
4 | KRISTINE A. POPLAWSKI, SBN 160758
ARI A. BARUTH, SBN 258418
5 | Deputy City Attorneys
1390 Market Street, 6th Floor
6 | San Francisco, CA  94102-5408
Telephone:     (415) 554-3957
7 | Facsimile:      (415) 437-4644
Email: Jaime.HulingDelaye@sfcityatty.org
8 |
Attorneys for Defendant
9 | CITY AND COUNTY OF SAN FRANCISCO

**FILED**

San Francisco County Superior Court

**JUN 27 2022**

CLERK OF THE COURT

BY: _____
Deputy Clerk

10 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

11 | COUNTY OF SAN FRANCISCO

12 | UNLIMITED JURISDICTION

---

13 | SYNERGY PROJECT MANAGEMENT, INC.,

14 | Plaintiff,

15 | v.

16 | CITY AND COUNTY OF SAN FRANCISCO,

17 | Defendant.

18 | GHILOTTI BROS., INC., a California Corporation,

19 | Plaintiff,

20 | v.

21 | SYNERGY PROJECT MANAGEMENT, INC., a
California Corporation, and DOES 1-30,

22 |

23 | Defendants.

24 | SYNERGY PROJECT MANAGEMENT, a
California Corporation, Cross-Complainant,

25 | v.

26 | GHILOTTI BROS, INC., a California Corporation,
and ROES 1-20,

27 |

28 | Cross-Defendants.

Case No. CGC-17-560034
(Consolidated with Case No. CGC-19-576488)

[PROPOSED] ORDER SUSTAINING
DEFENDANT CITY AND COUNTY OF
SAN FRANCISCO'S DEMURRER TO
SYNERGY PROJECT MANAGEMENT
INC.'S FOURTH AMENDED
COMPLAINT

Hearing Date:          June 27, 2022
Hearing Judge:        Hon. Richard Ulmer, Jr.
Time:                       9:30 a.m.
Place:                      Dept. 302

Date Action Filed:    July 10, 2017
Trial Date:               February 6, 2023

1

1    This matter came before the Court on defendant the City and County of San Francisco's

2    ("Defendant") Demurrer to Synergy Project Management Inc.'s ("Plaintiff") Fourth Amended

3    Complaint. The Court, having considered the City's moving papers, the oral argument at the hearing,

4    and all other filings from the parties in response to the City's moving papers,

5        Defendant's demurrers to causes of action one and two in the Fourth Amended Complaint are

6    sustained without leave to amend.  (See CCP 430.10(e).)

7        Plaintiff alleges that it was removed from working on a public works project on Haight Street

8    and prevented from working on a Van Ness Avenue project due to a corrupt kickback

9    scheme.  Plaintiff concedes its claims as to the Van Ness Avenue project.  (Opposition, fn.

10   1.)  Therefore, the court addresses whether its interference claims can be based on the Haight Street

11   project.

12       When it was contemplated that plaintiff would be removed from the Haight Street project,

13   plaintiff objected and sought relief pursuant to The Subletting and Subcontracting Fair Practices Act

14   (Pub. Contract Code, § 4100 et seq.)  Under section 4107(a) of that scheme, a hearing officer

15   determined that substitution of plaintiff was warranted because plaintiff's work was "substantially

16   unsatisfactory and not in substantial accordance with the plans and specifications." (*Synergy Project*

17   *Management, Inc. v. City and County of San Francisco* (2019) 33 Cal.App.5th 21, 29.)

18       In *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, plaintiff's hospital

19   privileges were revoked and she exhausted all of her internal remedies.  Plaintiff failed to seek judicial

20   review by mandamus to compel reinstatement.  Rather, she sued in tort for damages.  The court held

21   that a successful mandamus proceeding was an essential condition for the tort action. "[W]e believe

22   that so long as such a quasi-judicial decision is not set aside through appropriate review procedures the

23   decision has the effect of establishing the propriety of the hospital's action."  (*Id.* at 484.)

24       The *Westlake* rule, which is based on principles of judicial exhaustion and collateral estoppel,

25   applies to section 4107(a) determinations.  (See *Knickerbocker v. City of Stockton* (1988) 199

26   Cal.App.3d 235, 241-242 [explaining *Westlake* rule]; *Interior Systems, Inc. v. Del E. Webb Corp.*

27   (1981) 121 Cal.App.3d 312, 315 [sustaining demurrer and holding that findings made in a section

28   4107(a) hearing barred a subsequent court action].)  "[I]n creating the procedure in section 4107, the

                                                    2

1 Legislature intended that the results thereof should be binding on the parties unless found to be

2 erroneous and set aside by a court of review." (*Interior Systems, Inc. v. Del E. Webb Corp.* (1981) 121

3 Cal.App.3d 312, 318.) "When the general contractor and the awarding authority have followed the

4 provisions of the act resulting in substitution, the substituted subcontractor must overturn the decision

5 of Hospital by the established method of review of administrative orders, i.e. by writ of mandate under

6 Code of Civil Procedure section 1094.5. It may not ignore the administrative decision by filing a

7 separate action at law." (*Id.* at 320.)

8       In this case, the Court of Appeal already determined that plaintiff's substitution on the Haight

9 Street project was proper and plaintiff has not successfully challenged those findings. (See *Synergy*

10 *Project Management, Inc. v. City and County of San Francisco* (2019) 33 Cal.App.5th 21.) Those

11 findings undermine plaintiff's claims and therefore, the demurrer is sustained without leave to amend.

12

13

14

15 **IT IS SO ORDERED.**

16

17 DATED:     6/27/22        LU (Ulmer)

                            JUDGE OF THE SUPERIOR COURT

18                                 RICHARD B. ULMER

19

20

21

22

23

24

25

26

27

28

[Proposed] Order, Case No. CGC-17-560503          G:\const\H2021\180435\01598602.docx

**Exhibit M**

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
ELAINE M. O'NEIL, SBN 142234
JAIME M. HULING DELAYE, SBN 270784
KRISTINE A. POPLAWSKI, SBN 160758
ARI A. BARUTH, SBN 258418
Deputy City Attorneys
1390 Market Street, 6th Floor
San Francisco, CA 94102-5408
Telephone:     (415) 554-3878
Facsimile:      (415) 437-4644
Email:  kristine.poplawski@sfcityatty.org

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

F I L E D
Superior Court of California
County of San Francisco

JUL   7 2022

CLERK OF THE COURT
BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO
UNLIMITED JURISDICTION

SYNERGY PROJECT MANAGEMENT, INC.,

Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO,

Defendant.

GHILOTTI BROS., INC., a California Corporation,

Plaintiff,

v.

SYNERGY PROJECT MANAGEMENT, INC., a
California Corporation, and DOES 1-30,

Defendants.

SYNERGY PROJECT MANAGEMENT, INC., a
California Corporation,

Cross-Complainant,

v.

GHILOTTI BROS, INC., a California Corporation,
and ROES 1-20,

Cross-Defendants.

Case No. CGC-17-560034
(Consolidated with Case No. CGC-19-576488)

Judgment for Defendant

[PROPOSED] ORDER DISMISSING
COMPLAINT AS TO CITY AND
COUNTY OF SAN FRANCISCO

Date Action Filed:     July 10, 2017
Trial Date:              February 6, 2023

1

[Proposed] Order Dismissing Complaint as to CCSF, Case No. CGC-17-560034        n:\constr\li2021\180435\01611820.docx

Judgment for Defendant

Plaintiff Synergy Project Management, Inc's. ("Synergy") Fourth Amended Complaint ("Complaint") asserts two causes of action against Defendant City and County of San Francisco ("City"). On June 27, 2022, the Court sustained the City's demurrer with respect to these two causes of action, without leave to amend. Pursuant to California Code of Civil Procedure section 581(f)(1), the Court now enters this order dismissing the Complaint as to the City.

It is ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Complaint filed in this action is dismissed as to Defendant City.

2.      Plaintiff shall take nothing from Defendant City by virtue of its Complaint in this matter.

3.      Judgment is entered in favor of Defendant City and against Plaintiff Synergy.

4.      Defendant City is the prevailing party in this matter for purposes of California Code of Civil Procedure section 1032 *et seq.*

**IT IS SO ORDERED.**

DATED:      7/7/22

JUDGE OF THE SUPERIOR COURT

**RICHARD ULMER**

Approved as to form only.

Ben Rosenfeld
Attorney for Plaintiff Synergy Project
Management, Inc.

July 5, 2022
Dated