Exhibit A to Lamb Declaration
Deposition Transcript of Amir Shamirza and
Komir, Inc. with Exhibits 6-8 and 15

# Deposition Transcript

Case Number: 19-30088 (DM)

Date: October 12, 2023

In the matter of:

# IN RE: PG&E CORP and PACIFIC GAS AND ELECTRIC COMPANY

## AMIR SHAHMIRZA - 30(b)(6) AND INDIVIDUAL CAPACITY

**CERTIFIED COPY**

Reported by:

Chynna Barbosa
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1              UNITED STATES BANKRUPTCY COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2                SAN FRANCISCO DIVISION
            BANKRUPTCY CASE NO:  19-30088 (DM)
 3                      CHAPTER 11

 4    IN RE:

 5    PG&E CORPORATION,

 6               - AND -

 7    PACIFIC GAS AND ELECTRIC COMPANY,

 8    _____/

 9

10         DEPOSITION OF AMIR SHAHMIRZA KOMIR, INC.

11    TAKEN ON BEHALF OF THE DEBTORS/REORGANIZED DEBTORS

12         OCTOBER 12, 2023 10:00 A.M. TO 1:39 P.M.

13              ALL PARTIES APPEARED REMOTELY

14

15

16      "PORTIONS OF THIS TRANSCRIPT HAVE BEEN DECLARED

17     CONFIDENTIAL AND ARE SEALED UNDER SEPARATE COVER"

18

19

20

21

22

23

24    REPORTED BY: CHYNNA BARBOSA, COURT REPORTER
                  NOTARY PUBLIC, STATE OF FLORIDA
25
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 3
of 139

```
 1              APPEARANCES OF COUNSEL

 2
     ON BEHALF OF THE DEPONENT/KOMIR, INC:
 3
                 LAWRENCE A. JACOBSON, ESQUIRE
 4               COHEN AND JACOBSON, LLP
                 BOVET ROAD, SUITE 285
 5               SAN MATEO, CALIFORNIA 94402
                 PH: 650-261-6280
 6               Laj@cohenandjacobson.com
                 (Remotely via video conference.)
 7

 8   ON BEHALF OF THE DEBTORS/REORGANIZED DEBTORS:

 9               STEVEN A. LAMB, ESQUIRE
                 ROVENS & LAMB, LLP
10               2601 AIRPORT DRIVE, SUITE 370
                 TORRANCE, CALIFORNIA 90505
11               PH: 310-536-7830
                 Slamb@rovenslamb.com
12               (Remotely via video conference.)

13
     ON BEHALF OF PACIFIC GAS & ELECTRIC COMPANY:
14
                 DELIA GUEVARA, ESQUIRE
15               PACIFIC GAS & ELECTRIC COMPANY
                 BEALE STREET, SUITE B30A.
16               SAN FRANCISCO, CALIFORNIA 94105
                 PH: 415-973-5180
17               D2gu@pge.com
                 (Remotely via video conference.)
18

19

20

21

22

23

24

25
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 4
of 139

1                    INDEX TO EXAMINATIONS

2     WITNESS:  AMIR SHAHMIRZA                          PAGE

3     EXAMINATION
         By Steven Lamb, Esquire                        6
4
      CERTIFICATE OF OATH                               130
5
      CERTIFICATE OF REPORTER                           131
6

7                      INDEX OF EXHIBITS

8     NO.                  DESCRIPTION                   PAGE

9     Exhibit 1                                         7
         Deposition Notice of Amir Shahmirza
10
      Exhibit 2                                         7
11       Deposition Notice of Komir, Inc.

12    Exhibit 3                                         33
         Declaration
13
      Exhibit 3(B)
14       Photograph

15    Exhibit 3(C)
         Email Dated September 18, 2018
16
      Exhibit 3(D)
17       Complaint

18    Exhibit 4                                         51
         Request For Admissions
19
      Exhibit 5                                         53
20       Discovery Response

21    Exhibit 6                                         63
         Response to Interrogatories (Set one)
22
      Exhibit 6 - D(1)
23       Building Plans

24    Exhibit 7                                         66
         Record of Survey
25

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 5
of 139

1                  INDEX OF EXHIBITS CONTINUED

2   NO.                    DESCRIPTION                    PAGE

3   Exhibit 8                                            73

4     Design Drawings

5   Exhibit 8 C(3)
      Computer Rendering of Building
6
    Exhibit 8 C(4)
7     Diagram

8   Exhibit 15                                           81
      Statement of Decision and Judgment
9
    Exhibit 16                                           86
10    Notice of Violation Building Code

11  Exhibit 17                                           88
      **MARKED CONFIDENTIAL PURSUANT TO STIPULATED
12       PROTECTIVE ORDER**

13  Exhibit 18                                           51
      Responses

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 6
of 139

```
 1        DEPOSITION OF AMIR SHAHMIRZA

 2             OCTOBER 12, 2023

 3        THE COURT REPORTER:  The parties and their

 4   counsel further agree that while I am a

 5   licensed notary, the parties may be in a state

 6   where I am not licensed.  The parties stipulate

 7   that this deposition may be taken before me.

 8   If any party does have an objection to this

 9   manner of reporting or anything stated above,

10   please state so now.

11        MR. JACOBSON:  I didn't follow that.  You

12   are licensed in California or not?

13        THE COURT REPORTER:  I am a Florida

14   notary/court reporter.

15        MR. JACOBSON:  Okay.

16        THE COURT REPORTER:  Are you willing to

17   proceed with me reporting the deposition

18   remotely?

19        MR. JACOBSON:  Yes, thank you.

20        THE COURT REPORTER:  Thank you.  All

21   right.  May I have Counsels' appearances for

22   the record, please?

23        MR. LAMB:  My name is Steve Lamb for PG&E,

24   the Debtor.

25        MR. JACOBSON:  Lawrence Jacobson for
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 7
of 139

1          Komir, Inc., and Amir Shahmirza, the witnesses

2          today.

3                    THE COURT REPORTER:  Thank you.  And Sir,

4          would you please raise your right hand and

5          state your name for the record?

6                    THE WITNESS:  Amir Shahmirza.

7                    THE COURT REPORTER:  Do you solemnly swear

8          or affirm the testimony that you will give in

9          this case will be the truth, the whole truth,

10         and nothing but the truth?

11                   THE WITNESS:  I do.

12                   THE COURT REPORTER:  Thank you.  Counsel,

13         you may proceed.

14     Thereupon:

15                         AMIR SHAHMIRZA

16     was called as a witness, and after having been first

17     duly sworn, testified as follows:

18                         DIRECT EXAMINATION

19     BY MR. LAMB:

20          Q.    Thank you.  Mr. Shahmirza, you've been

21     provided with Exhibits 1 and 2, which are the

22     deposition notices for you, individually, and for

23     Komir as a corporate entity.  Have you seen those,

24     sir?

25          A.    Yes.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 8
of 139

```
 1              (Thereupon, Debtor's/Reorganized Debtor's
 2          Exhibits 1 and 2, Deposition notices, were
 3          entered into the record.)
 4   BY MR. LAMB:
 5          Q.   And you understand that you are testifying
 6   both in your individual capacity and in your -- and
 7   in the capacity as the company, Komir, Inc.?
 8          A.   Yes.
 9          Q.   And you understand that you're testifying
10   under penalty of perjury today, sir?
11          A.   Yes.
12          Q.   And you have been provided with some
13   discovery responses recently that are also under
14   penalty of perjury.  Correct?
15          A.   Yes.
16          Q.   Is there any reason today that you can
17   foresee that you are not going to be able to go
18   forward today?
19          A.   No.
20          Q.   Any type of medical condition or
21   medication that you're taking that might impact your
22   ability to testify truthfully or accurately?
23          A.   No.
24          Q.   Thank you, sir.  If at any time you want
25   to take a break, just let me know and we'll do that.
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 9
of 139

1  This is, you know, not a marathon session by any

2  stretch of the imagination, and we want to make sure

3  that you're comfortable.  Also, if you can't see

4  anything, I believe that Mr. Jacobson, your Counsel,

5  has been provided with copies so you should be able

6  to see everything, but if you have any difficulty,

7  let me know, please.  Okay?

8       A.   Will do, thank you.

9            MR. JACOBSON:  To facilitate this

10       deposition, Counsel, I did make copies of all

11       of the exhibits that you sent to me yesterday,

12       a copy for me and a copy for the witness so we

13       have those at hand.

14            MR. LAMB:  Thank you.

15  BY MR. LAMB:

16       Q.   Sir, Komir Inc., is that owned solely by

17  you?

18       A.   Currently, yes.

19       Q.   I'm sorry, I didn't hear that.

20       A.   Yes.

21       Q.   Okay.  So there are no other owners for

22  Komir Inc.?

23       A.   Yes.  No other owners.

24       Q.   When was Komir, Inc. formed, sir?

25       A.   In approximately year 2000.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
10 of 139

1      Q.   And what was the purpose that Komir was

2  formed for, Sir?

3      A.   Komir was formed for development purposes,

4  for real estate development purpose.

5      Q.   Any other reasons?

6      A.   No other reasons.

7      Q.   And the property that is at issue today,

8  you understand that that's located at approximately

9  800 Walnut Street in San Bruno.   Correct?

10     A.   Yes.

11     Q.   Okay.   Is any other property owned by

12  Komir?

13     A.   No.

14     Q.   And would it be okay to refer to that as

15  the Komir property?

16     A.   Yes.

17     Q.   Okay.   Are there any other assets that are

18  owned by Komir other than the Komir property?

19          MR. JACOBSON:   Object.   Financial privacy.

20          THE WITNESS:   Should I go ahead and

21      answer?

22          MR. LAMB:   You can answer unless you're

23      instructed not to answer.

24          MR. JACOBSON:   I instruct him not to

25      answer, unless you can explain why the

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
11 of 139

1          financial condition of Komir, Inc., relates to

2          the issue of whether PG&E has a prescriptive

3          easement or any prescriptive easement rights on

4          this property.

5   BY MR. LAMB:

6          Q.   Are there any other projects that are in

7   development for Komir, Inc., other than Komir

8   property?

9          A.   No.

10         Q.   When Komir, Inc., was formed in 2000,

11  between then and now, had there been any other

12  projects in development other than the Komir

13  property?

14         A.   No.

15         Q.   Who is Shaheen, S-H-A-H-E-E-N, Shahmirza?

16         A.   My son.

17         Q.   And what role, if any, does he have in

18  relation to Komir property?

19         A.   He just helped me out from time to time.

20         Q.   Doing what?

21         A.   He paid leases and dealing with tenants,

22  issues like that.

23         Q.   Is your son a real estate agent?

24         A.   Yes.

25         Q.   Is he a broker?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
12 of 139

1        A.    Yes.

2        Q.    What's the name of his company if he has a

3    company?

4        A.    Shah Realty.

5        Q.    Say that again, sir.

6        A.    Shah Realty.

7        Q.    S-H-A-H?

8        A.    Yes.

9        Q.    And where is that located, sir?

10       A.    In San Mateo.

11       Q.    Okay.  And my understanding is that you

12   are a civil engineer.  Right, sir?

13       A.    Yes.

14       Q.    When did you become a civil engineer?

15       A.    I got my license in 1987.

16             MR. JACOBSON:  Counsel, I see that Ms.

17       Guevara has connected.  Could we have her

18       appearance for the record?

19             MR. LAMB:  I already stated who she was.

20             MR. JACOBSON:  Would she announce her

21       appearance?

22             MS. GUEVARA:  Yes, I can announce my

23       appearance.  This is Delia Guevara; I am with

24       Pacific Gas and Electric Company.

25             MR. JACOBSON:  You are counsel?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
13 of 139

1          MS. GUEVARA:  I am in-house counsel for

2     PG&E.  I am -- the company is represented by

3     Mr. Lamb in this matter.

4          MR. JACOBSON:  Thank you.

5          MR. LAMB:  As I explained Counsel, Ms.

6     Guevara may come in or out at some time during

7     the course of it.  She's been provided the link

8     from the Court Reporter.

9          MR. JACOBSON:  I just wanted her

10    appearance on the record, Counsel.

11         MR. LAMB:  Sure.

12  BY MR. LAMB:

13    Q.    Are you a licensed civil engineer?

14    A.    Yes.

15    Q.    When did you obtain your license?

16    A.    1987.

17    Q.    And do you have your license under a

18  particular company?

19    A.    ASI Consulting Engineers.

20    Q.    Does ASI stand for anything in particular?

21    A.    No.  It is a, A is the first name -- is

22  the first letter of my first name, and S is the

23  first letter of my last name.

24    Q.    Does anyone else work for ASI Consulting?

25    A.    From time to time, yes.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
14 of 139

1     Q.   Okay.  Currently?

2     A.   Yes.

3     Q.   Who?

4     A.   Giovanni Del Moral.

5     Q.   Can you spell that, sir?

6     A.   D-E-L M-O-R-A-L.

7     Q.   And what -- I'm sorry?

8     A.   Shaheen Shahmirza.

9     Q.   Anybody else?

10    A.   This is it.

11    Q.   And what is the position with the other

12    individual with ASI?  What do they do?

13    A.   They just help me out for accounting and

14    billing.

15    Q.   Are you the only engineer at ASI?

16    A.   Yes.

17    Q.   Does ASI consulting do any other work

18    other than for Komir?

19    A.   Yes.

20    Q.   What other work does it do in a general

21    way?

22    A.   Engineering work.  Civil engineering work.

23    Q.   What types of projects?

24    A.   Mostly buildings.

25    Q.   You are not an architect.  Are you, sir?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
15 of 139

1     A.   I do not have a license as an architect.

2     Q.   And is it your position as a civil

3   engineer that you design these particular buildings?

4     A.   Yes.

5     Q.   Are these commercial buildings?

6     A.   Yes.

7     Q.   And these are for other companies?

8     A.   Yes.

9     Q.   How many commercial buildings have you

10   designed?

11     A.   A lot.

12     Q.   More than 10?

13     A.   Yes.

14     Q.   More than 100?

15     A.   Maybe not.

16     Q.   So somewhere between 10 and 100?

17     A.   Yes.

18     Q.   Okay.  And these commercial buildings --

19   of those commercial buildings, how many of those

20   were office space buildings?

21     A.   I don't know the exact number, but a lot

22   of them.

23     Q.   Can you approximate?

24     A.   I don't have the number, approximately.

25     Q.   More than 10?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
16 of 139

1          A.    Most likely.

2          Q.    More than 20?

3          A.    I don't know.  I'm not going to get into

4    this number business.

5          Q.    When you have been in the process of

6    designing commercial buildings for office space

7    prior to those being built, was there a requirement

8    that the city or county approve the plans?

9          A.    Of course.

10         Q.    And were those plans also done in

11   conjunction with an architect?

12         A.    No.

13         Q.    In relation to the Komir property, you've

14   -- and we'll talk about this in more detail, you've

15   prepared what you've referred to as plans for

16   buildings.  Correct?

17         A.    Yes.

18         Q.    When did you first start developing and

19   drawing plans for buildings?

20         A.    It was back maybe five, six years ago,

21   seven years ago, approximately.

22         Q.    Have you produced all the plans that you

23   have developed and designed for the buildings that

24   relate to Komir property?

25         A.    Yes.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
17 of 139

1     Q.   When you purchased Komir property in 2000,

2  you purchased it from the Hildebrands.  Right?

3     A.   Yes.

4     Q.   And how did you find and locate that

5  property?

6     A.   I had a partner, he was a commercial real

7  estate broker, and he's the one who found the

8  property.

9     Q.   Who is that?

10    A.   John Kokos.

11    Q.   Can you spell that?

12    A.   John, K-O-K-O-S, John Kokos.

13    Q.   Have you purchased other property other

14  than the Komir property?

15         MR. JACOBSON:  Object.  Vague.  Without

16    Foundation.

17         THE WITNESS:  Did who do what?  I

18    personally have Komir, that's the only

19    property.  I have -- I have purchased a lot of

20    property for development myself, but as the

21    entity Komir, Komir lot is the only property

22    under the Komir, but me as an individual, I

23    have purchased many, many, properties for

24    development.

25  BY MR. LAMB:

1     Q.   Okay.  And when you purchased those

2   properties, did you purchase them as single purchase

3   entities?  Like the Komir property is a -- Komir

4   Inc., is a single property, single property entity

5   for your purchase of Komir property.  Right?

6     A.   Yes.

7     Q.   And when you buy those properties

8   individually, do you -- are these all single purpose

9   entities?

10    A.   Yes.

11    Q.   How many have you purchased individually?

12    A.   I don't have a number.

13    Q.   More than 10?

14    A.   Yes.

15    Q.   More than 20?

16    A.   Yes.

17    Q.   More than 30?

18    A.   Probably not.

19    Q.   Did you negotiate with the Hildebrands for

20   the purchase of the Komir property?

21    A.   I did not.

22    Q.   Was it offered for sale by the

23   Hildebrands?

24    A.   I do not remember.  I was not involved in

25   that.  My partner came up with this deal.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
19 of 139

1      Q.   Okay.  When you say your partner, John

2  Kokos, was he a partner of Komir, Inc?

3      A.   Yes.  He was a shareholder.

4      Q.   And he is no longer a shareholder?

5      A.   That's correct.

6      Q.   When did he stop being a shareholder?

7      A.   Many years ago, maybe 10 years ago or

8  more.

9      Q.   And was Mr. Kokos involved in negotiating

10  for the purchase of the Komir property?

11      A.   Yes.

12      Q.   And where is he located now, Mr. Kokos?

13      A.   He's deceased.

14      Q.   I'm sorry.  You said he's deceased?

15      A.   Yes.

16      Q.   When did he pass away?

17      A.   2015, I believe.

18      Q.   Did you have any conversations with the

19  Hildebrands about the purchase of the Komir property

20  before the purchase of the Komir property?

21      A.   I did not.

22      Q.   Did Mr. Kokos tell you whether or not he

23  had any discussions with the Hildebrands about

24  negotiating for the Komir property before Komir,

25  Inc., purchased the property?

Case:  19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
20 of 139

1        A.    I have no recollection.

2        Q.    For what purpose did you purchase the

3    Komir property?

4            MR. JACOBSON:  Object.  Vague.  I assume

5        when you're using in your line of questions,

6        you're referring to Komir, Inc.

7            MR. LAMB:  Well, it doesn't matter whether

8        he bought -- he bought it -- he's a single

9        purpose entity, so whether it's Komir, Inc., or

10       him.

11   BY MR. LAMB:

12       Q.    Why did you buy the property?

13       A.    We bought the property for development

14   purposes.

15       Q.    In what manner?

16       A.    I'm sorry, what?

17       Q.    For what purpose?  To develop in what way?

18       A.    We were exploring for any -- any other

19   possible way, you know, that's -- we were not very

20   specific, but the purpose was for -- to the

21   development.

22       Q.    Did you view the property before you

23   purchased the property in 2000?

24       A.    Yes.

25       Q.    When you viewed the property in 2000, did

Case:  19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
21 of 139

1    you see the overhead transmission lines that were

2    over the Komir property?

3        A.    Yes.

4        Q.    Did Mr. Hildebrand or Mrs. Hildebrand tell

5    you anything about the overhead transmission lines

6    that were over the Komir property?

7        A.    I had no conversation with them.

8        Q.    Before you purchased the Komir property,

9    did you perform or have a title search performed?

10       A.    I have no recollection.  We did not -- I

11   did not.

12       Q.    Okay.  When you purchased the Komir

13   property, you saw the deed from the Hildebrands.

14   Right?

15       A.    Yes.

16       Q.    Okay.  And the deed from the Hildebrands

17   did not include any reference to an easement for

18   overhead transmission lines.  Correct?

19       A.    Correct.

20       Q.    And you were aware of that.  Right?

21       A.    Yes.

22       Q.    How long before you purchased the Komir

23   property were the overhead transmission lines over

24   the Komir property?

25       A.    I'm sorry, what's the question?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
22 of 139

1     Q.   You purchased the Komir property in 2000.

2     Right?

3     A.   Yes.

4     Q.   Okay.  How long prior to the purchase of

5     the Komir property were the overhead transmission

6     lines over the Komir property?

7     A.   I did not know.

8     Q.   In 2018, you became aware that there was

9     some work being done on the towers that relate to

10    the Komir property.  Right?

11    A.   Yes.

12    Q.   Okay.  And those towers are not physically

13    on the Komir property.  Right?

14    A.   Correct.

15    Q.   Was that in 2018, sir?

16    A.   Yes.

17    Q.   And would it be correct that prior to

18    2018, you never said anything in writing to PG&E

19    objecting to the existence of the overhead

20    transmission lines over the Komir property.  Is that

21    correct, sir?

22    A.   Can you repeat the question, please?

23    Q.   Sure.  Would it be correct that prior to

24    2018 when the towers removed, prior to that you

25    didn't do anything, you didn't send PG&E anything in

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
23 of 139

1  writing objecting to the existence of the overhead

2  transmission lines?

3          A.    No.  I consented to those power line to be

4  there.

5          Q.    Okay.

6          A.    I had no problem with that.

7          Q.    My question is, prior to 2018, you never

8  sent anything in writing to Mr. Shahmirza -- to PG&E

9  objecting to the existence of the overhead

10  transmission lines.  Correct?

11          A.    Like what I said, it was with my consent,

12  I had no objection to that prior to that.

13          Q.    Sir, that's not my question.  My question

14  is, prior to 2018, is it true that you provided no

15  written objection to PG&E as to the existence of the

16  overhead transmission lines?

17               MR. JACOBSON:  Object.  It's asked and

18          answered.  It is a harassing question at this

19          point.

20               MR. LAMB:  It's a yes or no question.

21               MR. JACOBSON:  Every question does not

22          have to be answered with yes or no, that's

23          absolutely incorrect.  He answered with a full

24          explanation.

25  BY MR. LAMB:

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
24 of 139

1     Q.    Okay.  Mr. Shahmirza, prior to 2018, is it

2  true that you did not object in writing to the

3  existence of the overhead transmission lines?

4          MR. JACOBSON:  Object.  Asked and

5          answered.  Harassment.

6          THE WITNESS:  Like I said, it was with my

7          consent therefore I did not object to PG&E in

8          writing or any other way.

9  BY MR. LAMB:

10     Q.    So prior to 2018, you didn't object in

11  writing or in any other way to PG&E correct, to the

12  existence of the overhead transmission lines?

13     A.    I had consented for the lines to be there;

14  therefore, I did not object it in writing or any

15  other way to PG&E.

16     Q.    Okay.  You didn't consent in writing

17  either.  Did you?

18     A.    Not at that time.

19     Q.    Okay.  So prior to 2018, you didn't

20  consent to the existence of the overhead

21  transmission lines and you didn't object to the

22  overhead transmission lines in writing or otherwise.

23  Correct?

24          MR. JACOBSON:  I'm sorry.  Wait, wait.

25          It's compounded and argumentative.  It's an

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
25 of 139

1       objectionable question and it assumes facts not

2       in evidence.  And it contradicts his testimony.

3       Ask him a single --

4  BY MR. LAMB:

5       Q.   Prior to 2018 -- prior to 2018, you did

6  not consent in writing to the existence of the

7  transmission -- the overhead transmission lines to

8  PG&E.  Correct?

9       A.   So the lines being there was with -- with

10  my consent, I had no objection.

11       Q.   Sir, prior to 2018, you did not consent in

12  writing to the existence of the overhead

13  transmission lines to PG&E.  Correct?

14       A.   Well, like I said, the lines -- in my

15  opinion, you know, there was -- the lines were there

16  and it was with my consent, I had no objection to

17  that.

18       Q.   Mr. Shahmirza, prior to 2018, you did not

19  consent in writing to the existence of the overhead

20  transmission lines to PG&E.  Correct?

21       A.   I did not object to that for the lines to

22  be there.  It was not hurting me, it was -- it was

23  with my consent that the lines to be there.

24       Q.   Okay.  You did not provide PG&E with any

25  written consent as to the existence of the overhead

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
26 of 139

1    transmission lines prior to 2018.  Correct?

2              MR. JACOBSON:  His question isn't clear,

3         but I think he's asking if you sent a piece of

4         paper to them.

5              THE WITNESS:  I did not send a piece of

6         paper.

7    BY MR. LAMB:

8         Q.   And you didn't send a piece of paper to

9    PG&E prior to 2018 objecting to the existence of the

10   overhead transmission lines.  Correct?

11        A.   Not at all.  Right.  Right.

12        Q.   Okay.  The towers have never been on Komir

13   property.  Right?

14        A.   Correct.

15        Q.   In 2018, the towers were moved north from

16   their position.  Correct?

17        A.   Yes.

18        Q.   Okay.  And when the towers were moved

19   north from their position, they did not wind up on

20   the Komir property.  Right?

21        A.   The towers did not wind up in Komir's

22   property, they got close to the property, closer to

23   the property line between the Komir and PG&E but

24   they did not encroach -- the tower itself did not

25   encroach into the Komir's property.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
27 of 139

```
 1          Q.   And when those towers were moved north,
 2    they were in the same alignment as the transmission
 3    lines.  Correct?
 4              MR. JACOBSON:  Object.  Is vague and
 5         incomprehensible.
 6              THE WITNESS:  That's correct, they're not
 7         in the same alignment.  When they moved the
 8         towers to the north, the crossing wires
 9         position also changed.
10    BY MR. LAMB:
11          Q.   Okay.  Did you ever measure the height of
12    the towers?
13          A.   I did not.
14          Q.   Did you ever measure the height of the
15    transmission lines?
16          A.   I did not measure, but the construction
17    folks --
18              MR. JACOBSON:  You just answer the
19         questions he puts to you.
20              THE WITNESS:  Okay.
21              MR. JACOBSON:  He makes those choices.
22              THE WITNESS:  Okay.  Can you please repeat
23         the question?
24    BY MR. LAMB:
25          Q.   Okay.  You never measured the height of
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
28 of 139

1    the transmission lines.   Correct?

2         A.    Correct.

3         Q.    Okay.   And you didn't measure the height

4    of the transmission lines before or after the towers

5    were moved in 2018.   Correct?

6         A.    Correct.

7         Q.    Since 2000, what has been the use that has

8    been used for the Komir property?  What did you do

9    with the property in 2000?

10        A.    Bought the -- it's been rented to people

11   for parking purpose.

12        Q.    Okay.   When you bought the property in

13   2000, was there any use being used of the property

14   that you're aware of?

15        A.    Yeah, it was pretty much the same.   Pretty

16   much the -- we had some tenants there and they had

17   some cars and trucks that they were renting to.

18        Q.    And has that been since 2000 to the

19   present, the same type of use, renting or leasing

20   the cars and trucks to be able to be on the

21   property?

22        A.    Pretty much, yes.

23        Q.    How many different entities have rental or

24   leasehold interests for cars or trucks on the Komir

25   property present?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
29 of 139

 1  lines, do you know whether the transmission lines,

 2  the actual conductors, were changed?

 3      A.   Excuse me, I don't see that line 14, maybe

 4  you said or you said line --

 5      Q.   I'm sorry.  Paragraph 14 which is on line

 6  22.

 7      A.   Okay.  Yes.

 8      Q.   Okay.  There's a capital N, New, capital

 9  T, Transmission, capital L, Lines.  Do you see that?

10  New Transmission Lines?

11      A.   Yes.

12      Q.   Do you see that?

13      A.   Yes.

14      Q.   Do you have any knowledge as to whether

15  the transmission lines themselves, the actual

16  conductors, were physically removed and changed with

17  different conductors or whether they were just

18  placed on a different tower?

19      A.   The towers were removed and that I know

20  of.  The other pieces of that, I'm not familiar with

21  those.

22      Q.   Okay.  So the actual conductors, the lines

23  themselves, you don't know if those were replaced.

24  Right?

25      A.   Oh, you're talking about the lines, the

1   transmission line itself.  Right?

2        Q.    Yes.

3        A.    The wires that are crossing the Komir's

4   property.  Right?

5        Q.    Right.

6        A.    Yeah, they were -- my recollection is that

7   they were replaced too.

8        Q.    Okay.  Did you see that they were

9   replaced?

10       A.    No.  I didn't -- I do not have any

11  recollection, but --

12       Q.    Okay.  So you don't know whether they were

13  replaced.  Right?

14       A.    You mean the wire itself?

15       Q.    Yes.

16       A.    I don't know if they were replaced or not.

17       Q.    Okay.  Thank you, sir.  Now, you say on

18  Paragraph 14, "Lowest height of approximately 62

19  feet."  Do you see that?

20       A.    Yes.

21       Q.    Okay.  When you say lowest height, where?

22            MR. JACOBSON:  Objection.  Vague.

23  BY MR. LAMB:

24       Q.    What did you mean when you said lowest

25  height?

 1  Michael S.  Mahoney, PLS?

 2       A.   Yes.

 3       Q.   Okay.

 4       A.   He's a licensed surveyor.

 5       Q.   That's stamped by him, but the document

 6  says prepared for ASI Consulting Engineers?

 7       A.   Yes.

 8       Q.   So it was prepared by the surveyor for

 9  you?

10       A.   Yes.

11       Q.   Okay.  All right.  That's what I'm just

12  trying to figure out.  And you believe that that's

13  true and accurate, correct, Exhibit B to Exhibit 3?

14       A.   Yes.

15       Q.   Do you see there under the notes it says

16  the flood control channel and pump house items one

17  and two are maintained by the city of San Bruno

18  through an agreement with county of San Mateo flood

19  control department.  Do you see that, sir?

20       A.   That's on the ledger somewhere.  Is that

21  -- what item on ledger is this?  Yeah, I think the

22  -- yeah.  The item number N on the notes?

23       Q.   It's note six, N(6).

24       A.   The note N 6.  Okay.  Yes, I see that.

25       Q.   Do you see that?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
32 of 139

1      A.   Yes.

2      Q.   Okay.  And that there's a photograph of

3  the San Bruno creek flood control North channel.  Do

4  you see that?

5      A.   I see the, what, the control channel, yes.

6      Q.   Okay.  And that's got water in it.  Right?

7      A.   It is a flood channel, yes.

8           MR. JACOBSON:  His question was whether it

9      has water.

10 BY MR. LAMB:

11     Q.   It has water.  Right?

12     A.   It's a flood channel.  It has water in it.

13     Q.   Okay.  Have you ever done any seismic

14 testing of the Komir property?

15     A.   Seismic testing?

16     Q.   Seismic testing, yes, sir.

17     A.   No, I have not.

18     Q.   Okay.  Have you ever done an environmental

19 study of the Komir property?

20     A.   No, I have not.

21     Q.   Have you ever taken any soil samples of

22 the Komir property?

23     A.   No, I have not.

24     Q.   Have you ever done any work as an engineer

25 to ascertain whether there's been any subsidence of

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
33 of 139

1  the soil within the flood control channel?

2       A.   What do you mean by subsidence?

3       Q.   Subsidence.  You don't know what

4  subsidence means, sir?

5       A.   I do not know.

6       Q.   It means decreasing in elevation over

7  time.  Has it settled?  Has it gone down?

8       A.   You're telling me that the soil in Komir's

9  property has settled?

10       Q.   I'm asking you if it has or if you know.

11       A.   I'm not aware of anything like that.

12       Q.   Okay.  And you have done no testing to

13  determine that.  Right?

14       A.   No, I have not.

15       Q.   Okay.  Now, one of the items that's listed

16  on this document, Exhibit B to Exhibit 3, to the

17  left of the substation, it says, "PG&E easement for

18  landscape and access."  Do you see that?

19       A.   Yes, I do.

20       Q.   Okay.  And you believe that that's

21  accurate.  Right?

22       A.   I believe that this is -- in our -- in the

23  Komir's deed, there is 7,800 square feet for PG&E's

24  landscaping, and the access relates to the

25  landscaping.  So if PG&E wants to do landscaping on

1   the north side of the Komir's lot, and that's 7,800

2   square feet, the access relates to that, nothing

3   else.  That's what the -- that's what in our deed.

4   That's what was in the Hildebrand deed.

5        Q.   So PG&E as you understand it has a right

6   to access to landscape but if it so chooses.  Right?

7        A.   If PG&E wanted to do landscaping in that

8   7,800 square feet, then they could access the land

9   to do the landscaping, that's what the deed says

10  very clearly.

11       Q.   Okay.  And it also lists an easement to

12  the right of that, a Pac Bell Communications

13  easement with access rights.  Do you see that?

14       A.   Yes.

15       Q.   And then to the right of that adjacent to

16  the channel, it says, "City of San Bruno sewer

17  easement, 24- inch RCP sanitary sewer."  Do you see

18  that?

19       A.   Yes.  That easement has been abandoned,

20  there's no sewer lines there anymore.

21       Q.   Okay.  But this document refers to an

22  easement for the sewer line.  Right?

23       A.   There used to be an easement for the sewer

24  line.

25       Q.   Okay.  Well, this document says there is

```
 1   BY MR. LAMB:

 2        Q.   So the building plans that you prepared

 3   include removal of the flood control channel?

 4        A.   No, it does not.

 5             MR. JACOBSON:  That's only a question.

 6   BY MR. LAMB:

 7        Q.   Okay.  So the flood control channel is

 8   going to remain underneath the building.  Right?

 9        A.   Yes.

10        Q.   Okay.  The plans that you developed do not

11   include any reference to any pillars or support

12   mechanism that would hold up the building over the

13   channel.  Correct?

14        A.   Not correct.

15        Q.   And you have not requested permission by

16   the city or the county to build over the flood

17   control channel.  Correct?

18        A.   I have not submitted those to the city

19   yet.

20        Q.   And you understand that you are required

21   to provide access to the flood control channel

22   alongside of it, which goes to and from the pump

23   station.  Correct?

24             MR. JACOBSON:  Object as compound and

25        without foundation and assuming facts not in
```

1            evidence.  If you can answer all that.

2                  THE WITNESS:  Yeah, yeah, yeah.  The plans

3            consider all that.  The plans provide access to

4            the pump station, it is elevated way above the

5            flood channel, so all those elements can remain

6            where they are and the plans that have been

7            developed consider all those issues and they

8            can all remain in place and it does not

9            interrupt any of those functions, existing

10           functions.

11    BY MR. LAMB:

12        Q.   Okay.  So you'll have to continue to

13    provide access to the city and county to the pump

14    station.  Correct?

15                  MR. JACOBSON:  Object.  Object without

16           foundation.  Assumes facts not in evidence.

17                  MR. LAMB:  Is that correct?

18                  THE WITNESS:  The plans that we have

19           developed does not interfere with any of the

20           access issues to the pumper station or the

21           flood channel.

22    BY MR. LAMB:

23        Q.   Okay.  So your intention is to continue to

24    provide access by the city and the county to the

25    pump station.  Correct?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
37 of 139

```
 1   authority.  Of course.  There's no building that
 2   cannot be done without local jurisdiction approval.
 3        Q.   And you have not submitted any plans to
 4   the city or county for approval for building on
 5   Komir property.  Correct?
 6             MR. JACOBSON:  Objection.  That's asked
 7        and answered.
 8             MR. LAMB:  I'm sorry.  Is that correct?
 9             THE WITNESS:  We have not submitted any
10        plans to the building -- to the building
11        department yet.
12   BY MR. LAMB:
13        Q.   If you go to Exhibit 6, sir, which is your
14   response to interrogatories.
15        A.   Exhibit 6?  Okay.
16        Q.   If you can go to Page 11 in response to
17   interrogatory number nine.
18        A.   Okay.
19             (Thereupon, Debtor's/Reorganized Debtor's
20        Exhibit 6, Response to interrogatories, was
21        entered into the record.)
22   BY MR. LAMB:
23        Q.   You can look on Page 11, Line 24, this
24   lists the gross revenue that Komir is claiming for
25   the property in 2018 of $259,594.  Correct?
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
38 of 139

```
 1          A.    Yes.   That's what it says.

 2          Q.    Okay.   And some of that was payment made

 3     by PG&E.   Correct?

 4          A.    Yes.

 5          Q.    How much of that was from PG&E?   Do you

 6     know?

 7          A.    I do not know.

 8          Q.    Do you know approximately?

 9          A.    I do not know at this time.

10          Q.    I'm sorry, sir?

11          A.    Right now I do not know how much PG&E --

12          Q.    Okay.   All right.   Then the 20 -- were you

13     done?

14          A.    Yes.

15          Q.    Okay.   Then the 2019 revenue was $79,800.

16     Right?

17          A.    Right.

18          Q.    And then the 2020 revenue was $78,022.

19     Right?

20          A.    Right.

21          Q.    And then the 2021 revenue was $148,962.

22     Do you see that?

23          A.    Yes.

24          Q.    And did that include payment from PG&E in

25     2021?
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
39 of 139

1     A.    Yes.

2     Q.    Do you know how much?

3     A.    I don't know how much.

4     Q.    And then the 2022 revenue was $134,925.

5  Correct?

6     A.    Yes.

7     Q.    And did that also include revenue from

8  PG&E?

9     A.    Yes.

10     Q.    Do you know how much?

11     A.    I do not know how much.

12     Q.    And then if you'll look at Exhibit 6,

13  which is your response to interrogatories, you

14  attach Exhibit 7, and that is a copy of the record

15  of survey that we referred to earlier.  Correct?

16     A.    That copy of the survey?

17     Q.    If you go to Exhibit 6 and then Exhibit C

18  within that.

19          MR. JACOBSON:  The copy I printed does not

20      have the Exhibit C attached to it.

21          THE WITNESS:  There's one here, one

22      exhibit over here.

23          MR. JACOBSON:  There we go.

24          THE WITNESS:  Yeah, we got it on -- on

25      Exhibit 4, there is a record of survey.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
40 of 139

```
 1              (Thereupon, Debtor's/Reorganized Debtor's

 2         Exhibit 7 was entered into the record.)

 3   BY MR. LAMB:

 4         Q.   Okay.

 5         A.   Okay.

 6         Q.   And can you turn to Exhibit D, 1?

 7              MR. JACOBSON:  Exhibit D-1?  As I say, I

 8         don't think we have that printed on Exhibit 6,

 9         but we can probably find the document.

10              THE WITNESS:  What is Exhibit D-1?

11              MR. LAMB:  Exhibit 6 is the response to

12         interrogatories set one.

13              MR. JACOBSON:  Okay.  That's Exhibit 6.

14         Right?

15              MR. LAMB:  Yes, sir.

16              MR. JACOBSON:  And what do you want him to

17         look at?

18              MR. LAMB:  D-1.

19              MR. JACOBSON:  So as I just said, we don't

20         have the exhibits to Exhibit 6.  Would you do a

21         screen share.

22              MR. LAMB:  Well, you gave them to me.

23         Right?

24              MR. JACOBSON:  But you used exhibits

25         yesterday and I printed them and some of them
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
41 of 139

1       had so many pages, like 80 pages, that I

2       printed the text, but not the attached exhibits

3       on the ones that were really long.  So if you

4       could just do a screen share of what you want

5       him to look at, that takes care of it.  I could

6       go on my computer and find it and try to turn

7       it around to him.

8            MR. LAMB:  I think that would probably be

9       easier.  I just want to confirm --

10           MR. JACOBSON:  C one?

11           MR. LAMB:  D, as in delta.  Delta one.

12           MR. JACOBSON:  On Exhibit 6?

13           MR. LAMB:  Yes.

14           MR. JACOBSON:  D-1.  All right.  We have

15      Exhibit D-1.

16           (Thereupon, Exhibit 6 - D(1) was entered

17      into the record.)

18  BY MR. LAMB:

19      Q.   Sir that's one of the building plans that

20  you developed by ASI.  Right?

21      A.   Yes.

22      Q.   And that shows under project data that

23  it's, "Zoned M-1, light industrial."  Right?

24      A.   Yes.

25      Q.   Okay.  So in order to put a commercial

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
42 of 139

1  building that's an office building, in that

2  location, the zoning would have to be changed.

3  Correct?

4       A.   No.  Research and development is included

5  in the M-1 zone, research and development office.

6       Q.   M-1 is light industrial?

7       A.   Yes.  M-1 zoning allows for research and

8  development office building.

9       Q.   Okay.  I thought you said it was going to

10  be an office building?

11       A.   It is an office building for research and

12  development, yes, and it's allowed under the M-1

13  zoning.  If you look at the planning zoning,

14  description of M-1, it indicates offices for

15  research and development, yes.

16       Q.   And it's your belief that the building

17  plan on D-1 includes plans that specify that there

18  would be some type of peer or columnar support of

19  the building over the flood control channel?

20       A.   As I indicated before, the foundation

21  design is the last stage of construction document

22  that we provided.  This is usually done when the

23  planning department and so on approve the project.

24           MR. JACOBSON:  I think he is just asking

25       you if that's on this plan.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
43 of 139

1          record.

2                    (Brief recess.)

3                    (Deposition resumed.)

4                    THE COURT REPORTER:  Back on the record.

5      BY MR. LAMB:

6          Q.    Okay, Mr. Shahmirza, if you could turn to

7      Exhibit 8, please.  Are you ready, sir?

8          A.    Yes, sir.

9          Q.    These are alternative design drawings

10     according to you.  Right?

11         A.    Yes.

12                    (Thereupon, Debtor's/Reorganized Debtor's

13         Exhibit 8, Design Drawings, was entered into

14         the record.)

15     BY MR. LAMB:

16         Q.    Okay, so if you go to C-3.

17         A.    Yes.  Another one where we don't have the

18     exhibits preprinted.  I can bring it up.  You show

19     me on the screen, I can probably -- I can discuss

20     that.

21         Q.    I'm sorry.

22         A.    If you show the exhibit on the screen, I

23     probably would know what it is and I can speak to

24     it.

25         Q.    Well, I think your Counsel is pulling it

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
44 of 139

1    up right now.

2          A.    Okay.  I am on C-3.  Is that what you

3    said?

4          Q.    Yes.  C-3.  And it looks to me like a

5    computer rendering of a building.  It's -- it's I

6    don't think it's a photograph, but I'm trying to

7    figure out what this is.

8          A.    Yes.

9          Q.    What is that, Mr. Shahmirza?

10         A.    That is a portion of the elevation of the

11   building.  Looking at the first page.

12         Q.    Now the first page looks like it's not a

13   photograph.  It looks like a computer rendering of a

14   building?

15         A.    Yes.

16         Q.    Who prepared that?

17         A.    We prepared that, ASI.

18         Q.    ASI.  Is that supposed to be the building

19   that you're looking to build?

20         A.    A portion of that would -- elevation that

21   would be looking like that we will try to make it

22   like that.

23         Q.    But this is -- this has got people in it

24   and it's -- I'm trying to figure out what is it

25   you're doing here.  How did you create this?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
45 of 139

1       A.    This is a computer rendering.  Okay.  This

2   is --

3       Q.    Is that supposed to be the building that

4   you're looking to build or is that just

5   representative of a building?

6       A.    This is the representing portion of the

7   building that we are trying to build.

8       Q.    What portion?

9       A.    The front lobby portion of the building.

10      Q.    Okay.  How many stories is it going to be?

11      A.    It shows on the plan.  Do you have plans

12  for six story building?

13      Q.    Six story building.

14      A.    Okay.

15      Q.    And these plans -- the C3 or the six-story

16  building, these aren't the construction drawings, so

17  this does not include any reference to columnar or

18  pier support over the flood control channel.

19  Correct?

20      A.    It does not include any construction

21  documents.

22      Q.    Okay.  And then C-4, that's another

23  alternative building?

24      A.    C-4.

25      Q.    Is that correct?

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
46 of 139

1    and put asphalt.  There is no landscaping and that's

2    a fact.

3          Q.   You could turn to page -- Exhibit 15,

4    please.

5               (Thereupon, Debtor's/Reorganized Debtor's

6          Exhibit 15 was entered into the record.)

7               MR. JACOBSON:  So which one is that --

8          that was an -- I think we going to take a

9          minute to find it.  Is 15 the statement of

10         decision and judgment?

11              MR. LAMB:  Yes.

12              THE WITNESS:  Yes, sir.

13   BY MR. LAMB:

14         Q.   Do you recognize this document, sir?

15         A.   Yes.

16         Q.   What is it?

17         A.   It is a statement of -- it's a proposed --

18   a statement of the decision and judgment.  It's a

19   proposed statement of decision and judgment.

20         Q.   Well, you understand that that statement

21   of decision and judgment was actually filed and

22   entered.  Right?

23         A.   Correct.

24         Q.   Okay.  And that related to a lawsuit that

25   you filed on behalf of Komir against the County of

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
47 of 139

1    San Mateo and the San Mateo County Flood Control

2    District.  Correct?

3           A.    Correct.

4           Q.    Okay.  And what was your understanding of

5    your purpose for this lawsuit?

6           A.    Well, we were trying to collect rent for a

7    pumping station that is there, where the attorney

8    did not follow up.  And in your case, he did not

9    respond.  And the Counsel for the county wrote this

10   proposal statement and the Court never heard from

11   our attorney.  And finally Judge had signed it and

12   we were not aware of that, and we learned about it

13   when it was all done and over.

14          Q.    Okay.  So when you look at this document

15   on Page 6, Line 5, according to the Court document,

16   it says, "Based on the foregoing evidence, the Court

17   finds that the district has obtained a prescriptive

18   easement to utilize both the north and south access

19   routes to the pump station as well as the area

20   surrounding the pump station."  Do you see that?

21          A.    Yes.

22          Q.    And then it says the easement area and the

23   north and south access routes are generally depicted

24   in Exhibit A, and that's attached.  Correct?

25          A.    Yes.

```
 1          Q.   And it looks like you testified as to the
 2   value of a strip of land enclosed by a fence in
 3   relation to this case.  Right?
 4          A.   Yes.  It says that, yes.
 5          Q.   Okay.  Now, on this case, was this a
 6   trial?
 7          A.   Yes.
 8          Q.   Okay.  So you appeared and testified at
 9   trial in that case.  Right?
10          A.   Yes.
11          Q.   How many times have you appeared and
12   testified at trial, sir?
13          A.   At the trial -- testified at trials.
14   Besides that was the first time.
15          Q.   Okay.  Have you testified at trial since
16   then?
17          A.   I don't think so.  No.  No, I have not.
18          Q.   Have you testified before in a deposition?
19          A.   Deposition?  Yes.
20          Q.   How many times?
21          A.   Maybe a couple times.  One or two times.
22          Q.   Regarding what matters?
23          A.   Something like insurance matters.
24          Q.   How many times has that you -- are you
25   aware of has Komir been involved in a lawsuit?
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
49 of 139

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF BROWARD

 4

 5            I, CHYNNA BARBOSA, the undersigned

 6    authority, certify that AMIR SHAHMIRZA, appeared

 7    before me remotely and was duly sworn on the 12th

 8    day of October, 2023.

 9              Witness my hand this 15th day of October,

10        2023.

11

12

13

14

15

16    _____
      CHYNNA BARBOSA, COURT REPORTER
17    NOTARY PUBLIC, STATE OF FLORIDA
      Notary Commission No:  HH 79585
18    Notary Commission Exp:  01/08/2025

19

20

21

22

23

24

25
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
50 of 139

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF BROWARD

 4

 5         I, CHYNNA BARBOSA, Court Reporter and

 6   Notary Public for the State of Florida, do hereby

 7   certify that I was authorized to and did report and

 8   transcribe the foregoing proceedings, and that the

 9   transcript is a true and complete record of my

10   notes.

11         I further certify that I am not a

12   relative, employee, attorney or Counsel of any of

13   the parties, nor am I a relative or employee of any

14   of the parties' attorneys or Counsel connected with

15   the action, nor am I financially interested in the

16   action.

17         Witness my hand this 15th day of October,

18   2023.

19

20

21

22   _____

23   CHYNNA BARBOSA, COURT REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
24   Notary Commission No:  HH 79585
     Notary Commission Exp:  01/08/2025
25
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
51 of 139

```
                    ERRATA SHEET
                    CHANGES IN TESTIMONY
                    IN RE: PG&E CORP and PACIFIC GAS AND ELECTRIC COMPANY
                    AMIR SHAHMIRZA - 30(B)(6) AND INDIVIDUAL CAPACITY
                    October 12, 2023
         Page  Line  From                    To
 1       _____

 2       _____

 3       _____

 4       _____

 5       _____

 6       _____

 7       _____

 8       _____

 9       _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23

24       SIGNATURE:_____DATE:_____

25              AMIR SHAHMIRZA - 30(B)(6) AND INDIVIDUAL CAPACITY
```

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
52 of 139


A. SHAHMIRZA
10.12.23
**Exhibit 6**
CHYNNA BARBOSA

1  LAWRENCE A. JACOBSON, SBN 057393
   SEAN M. JACOBSON, SBN 227241
2  COHEN AND JACOBSON, LLP
   66 Bovet Road, Suite 285
3  San Mateo, CA 94402
   Telephone: (650) 261-6280
4  *laj@cohenandjacobson.com*

5  Attorneys for Amir Shahmirza
   (Agent for Komir, Inc.) and Komir, Inc.
6

7                   UNITED STATES BANKRUPTCY COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                      SAN FRANCISCO DIVISION

10  In re                                Case No. 19-30088 (DM)

11  PG&E CORPORATION,                    Chapter 11

12      - and -                          (Lead Case) (Jointly Administered)

13  PACIFIC GAS AND ELECTRIC             **RESPONSE BY CLAIMANT KOMIR,**
    COMPANY,                             **INC. TO DEBTORS'**
14                                       **INTERROGATORIES, SET NO. ONE**
            Debtors.
15
    ☐ Affects PG&E Corporation
16  ☐ Affects Pacific Gas and Electric Company
    ■ Affects both Debtors
17

18

19

20  ─────────────────────────────
21

22

23

24

25

26

**RESPONSE BY CLAIMANT KOMIR, INC. TO DEBTORS' INTERROGATORIES, SET NO. ONE**                    1

Claimant Komir, Inc., and its agent Amir Shahmirza ("Responding Party") respond to the Interrogatories, Set No. One, propounded by Debtors to Claimant Amir Shahmirza as agent for Komir, Inc. as defined as "YOU" in the Interrogatories.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Is YOUR response to each Request for Admission served with these interrogatories an unqualified admission?

The terms "YOU" or "YOUR" or "CLAIMANT" or "SHAHMIRZA") shall mean Claimant Amir Shahmirza and Komir, Inc. in the present action including their officers, directors, agents, employees, representatives, attorneys, or other "person" acting on their behalf.

**RESPONSE TO INTERROGATORY NO. 1:**

No.

**INTERROGATORY NO. 2:**

If YOUR answer to Interrogatory No. 1 is no, for each of YOUR responses to a Request for Admission served with these Interrogatories that is not an unqualified admission, state the number of the Request *(sic)* state all facts upon which You base YOUR response.

**RESPONSE TO INTERROGATORY NO. 2:**

Responding Party responds below with respect to each Response to Requests for Admission.

<u>Request for Admission No. 1</u>

The response is a qualified admission that admits the basic statement and provides a further statement of fact responsive to the request, i.e., that "Shahmirza understood that PG&E did not have rights under recorded documents to place the transmission lines across the property as the Director's Deed to Komir's predecessor in interest did not specify any easements being reserved."

<u>Request for Admission No. 3</u>

Responding Party could not respond to this Request with a categorical admission or denial in that the Request is vague and ambiguous as the request contains undefined terms that are the

1  predicate to the Request, i.e., that "the ALIGNMENT of the TRANSMISSION LINES that cross the

2  PROPERTY has not materially changed" without any definition of "materially."

3       With respect to the fact of the alignment of the transmission lines, Responding Party answers

4  that any change of alignment to which Responding Party did not consent is "material" and

5  Responding Party did not consent to the alignment or realignment from differently located towers or

6  differently positioned lines as PG&E effectuated unilaterally and over the objection of Responding

7  Party .

8       With respect to the repositioning of the towers and alteration of the lines, Responding Party

9  further answers that PG&E representatives who were on site implementing such repositioning and

10  alteration stated to Responding Party that the repositioning of the towers and altered position of the

11  lines resulted in an eleven (11) foot reduction in the height of the lines.  As stated above, whether the

12  repositioning and alteration resulted in a reduction of eleven (11) feet or any other amount, the

13  repositioning and alteration were material as being without Responding Party's consent and being

14  effectuated over Responding Party's contemporaneous objection.

15       <u>Request for Admission No. 4</u>

16       Responding Party could not respond to this Request with a categorical admission or denial in

17  that the Request is vague and ambiguous as the request contains undefined terms that are the

18  predicate to the Request, i.e., that "the vertical height of the TRANSMISSION LINES that cross the

19  PROPERTY has not materially changed" without any definition of "materially."

20       Without waiving the objection, Responding Party answers with respect to the vertical height

21  of the transmission lines, that any change of vertical height to which Responding Party did not

22  consent is "material" and Responding Party did not consent to the alignment or realignment, or

23  height adjustment, from differently located towers or differently positioned lines as PG&E

24  effectuated unilaterally and over the objection of Responding Party.

25       Without waiving the objection, Responding Party further answers with respect to the

26  repositioning of the towers and alteration of the lines, that PG&E representatives who were on site

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
55 of 139

implementing such repositioning and alteration stated to Responding Party that the repositioning of the towers and altered position of the lines resulted in an eleven (11) foot reduction in the height of the lines. As stated above, whether the repositioning and alteration resulted in a reduction of eleven (11) feet or any other amount, the repositioning and alteration were material as being without Responding Party's consent and being effectuated over Responding Party's contemporaneous objection.

Request for Admission No. 5

Responding Party could not respond to this Request with a categorical admission or denial in that the Request is vague and ambiguous as the request contains undefined terms that are the predicate to the Request, i.e., that "the Relocation of the Transmission Lines ...did not materially change the ALIGNMENT OF THE TRANSMISSION LINES" without any definition of "materially."

Without waiving the objection, Responding Party answers that with respect to the alignment of the transmission lines, any change of alignment to which Responding Party did not consent is "material" and Responding Party did not consent to the alignment or realignment from differently located towers or differently positioned lines that PG&E unilaterally effectuated over the objection of Responding Party.

Without waiving the objection, Responding Party further answers with respect to the repositioning of the towers and alteration of the lines, that PG&E representatives who were on site implementing such repositioning and alteration stated to Responding Party that the repositioning of the towers and altered position of the lines resulted in an eleven (11) foot reduction in the height of the lines. As stated above, whether the repositioning and alteration resulted in a reduction of eleven (11) feet or any other amount, the repositioning and alteration were material as being without Responding Party's consent and being unilaterally effectuated over Responding Party's contemporaneous objection.

　　　Request for Admission No. 6

2　　　Responding Party could not respond to this Request with a categorical admission or denial in

3　that the Request is vague and ambiguous as the request contains undefined terms that are the

4　predicate to the Request, i.e., that "relocation of the TRANSMISSION LINES ... did not materially

5　change the height of the TRANSMISSION LINES" without any definition of "materially."

6　　　Without waiving the objection, Responding Party further answers with respect to the vertical

7　height of the transmission lines, any change of vertical height to which Responding Party did not

8　consent is "material" and Responding Party did not consent to the alignment or realignment, or

9　height adjustment, from differently located towers or differently positioned lines as PG&E

10　unilaterally effectuated over the objection of Responding Party.

11　　　Without waiving the objection, Responding Party further answers with respect to the

12　repositioning of the towers and alteration of the lines, that PG&E representatives who were on site

13　implementing such repositioning and alteration stated to Responding Party that the repositioning of

14　the towers and altered position of the lines resulted in an eleven (11) foot reduction in the height of

15　the lines. As stated above, whether the repositioning and alteration resulted in a reduction of eleven

16　(11) feet or any other amount, the repositioning and alteration were material as being without

17　Responding Party's consent and being effectuated over Responding Party's contemporaneous

18　objection.

19　　　Request for Admission No. 7

20　　　Responding Party objected to this request and objects to this corresponding special

21　interrogatory as being irrelevant to the subject matter of whether PG&E has any prescriptive right to

22　place transmission lines across the Property.

23　　　Responding Party could not respond to this Request with a categorical admission or denial in

24　that the Request is vague and ambiguous as the request contains undefined terms that are the

25　predicate to the Request, i.e., that an "intermittent creek" "crosses" the Property without any

26　definition of "intermittent creek" or the means, manner, or location of any water feature that

Case: 19-30088　　Doc# 14117-1　　Filed: 11/03/23　　Entered: 11/03/23 17:39:14　　Page
57 of 139

"crosses" the property.

Without waiving the objection, with respect to the factual substance that Responding Party infers from the Request, Responding Party further answers that a flood control channel is situated on the Property at a location and in a manner that does not affect the development of the Property as contemplated by Responding Party.

Request for Admission No. 8

Responding Party objected to this request and objects to this corresponding special interrogatory as being irrelevant to the subject matter of whether PG&E has any prescriptive right to place transmission lines across the Property.

Responding Party could not respond to this Request with a categorical admission or denial in that the Request is vague and ambiguous as the request contains undefined terms that are the predicate to the Request, i.e., that an "intermittent creek" "crosses" the Property without any definition of "intermittent creek" or the means, manner, or location of any water feature that "crosses" the property.

Without waiving the objection, with respect to the factual substance that Responding Party infers from the Request, Responding Party further answers that a flood control channel is situated on the Property at a location and in a manner that does not affect the development of the Property as contemplated by Responding Party.

Without waiving the objection, Responding Party further answers that a structure can be designed and constructed in a manner such that the statement that "YOU cannot build a structure" is not correct. Responding Party, a civil engineer, has designed a building that can be constructed on the Property.

Request for Admission No. 9

Responding Party objected to this request and objects to this corresponding special interrogatory as being irrelevant to the subject matter of whether PG&E has any prescriptive right to place transmission lines across the Property.

1  Responding Party objected to this Request as vague and ambiguous with respect to locations
2  described in the Request.

3  Without waiving the foregoing objections, Responding Party answers further that
4  Responding Party has access to the easterly side of the Property as reflected on the recorded Record
5  of Survey No. 3259-A.

6  Request for Admission No. 10

7  Responding Party objected to this request and objects to this corresponding special
8  interrogatory as being irrelevant to the subject matter of whether PG&E has any prescriptive right to
9  place transmission lines across the Property.

10  Without waiving the foregoing objection, Responding Party answers further that all property
11  is stored within the fence separating the properties on Responding Party's side of the fence.

12  Request No. 11

13  Responding Party objected to this request and objects to this corresponding special
14  interrogatory as being irrelevant to the subject matter of whether PG&E has any prescriptive right to
15  place transmission lines across the Property.

16  Without waiving the objection, as stated in the Response to Requests for Admission,
17  Responding Party answers further that, to date, no building plans have been submitted to an
18  governmental agency.

19  **INTERROGATORY NO. 3:**

20  If YOUR answer to Interrogatory No. 1 is no, for each of YOUR responses to a Request for
21  Admission served with these Interrogatories that is not an unqualified admission, identify all
22  DOCUMENTS that support YOUR response.

23  **RESPONSE TO INTERROGATORY NO. 3:**

24  Responding Party responds below with respect to each Response to Requests for Admission.

25  Request No. 1

26  See Director's Deed, copy attached as Exhibit A.

Request No. 3

See Photographs, copies attached collectively as Exhibit B.

Request No. 4

See Photographs, copies attached collectively as Exhibit B.

Request No. 5

See Photographs, copies attached collectively as Exhibit B.

Request No. 6

See Photographs, copies attached collectively as Exhibit B.

Request No. 7

See Record of Survey, copy attached as Exhibit C.

Request No. 8

See Building Plans, copy attached as Exhibit D.

Request No. 9

See Record of Survey, copy attached as Exhibit C.

Request No. 11

See Building Plans, copy attached as Exhibit D.

**INTERROGATORY NO. 4:**

State all facts that support YOUR assertion that, "[a]t the Acquisition Date, and continuing until dates in 2018, on behalf of Komir Inc., I consented to, and did not object to, the Original Transmission Lines crossing the Property," as set forth in the Declaration of Amir Shahmirza at paragraph 5, dated April 3, 2023 (Docket No. 13654-1).

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party did not express, either verbally, in writing, or otherwise any objection to the Original Transmission Lines crossing the Property, and did not take any action with respect thereto until the events that occurred in 2018.

**INTERROGATORY NO. 5:**

State all facts that support YOUR assertion that, "[a]t the Acquisition Date, and continuing until dates in 2018, on behalf of Komir Inc., the existing height of the transmission lines were movable and could be relocated," as set forth in the Declaration of Amir Shahmirza at paragraph 5, dated April 3, 2023 (Docket No. 13654-1).

**RESPONSE TO INTERROGATORY NO. 5:**

The towers can be relocated as demonstrated by the construction of new towers and in connection therewith the repositioning of the towers in 2018.

During Shahmirza's career as a licensed civil engineer involved in the design and construction of various types of building structures, Shahmirza observed the relocation of power poles.

**INTERROGATORY NO. 6:**

State all facts that support YOUR assertion that, "[t]he Relocation of the Transmission Lines caused the lines to cross the Property at a different location than the Original Transmission Lines," as set forth in the Declaration of Amir Shahmirza at paragraph 18, dated April 3, 2023 (Docket No. 13654-1).

**RESPONSE TO INTERROGATORY NO. 6:**

PG&E removed the old, existing towers and constructed new and different towers at different locations.

PG&E then connected the Transmission Lines to the new towers at their new locations thereby moving the lines from their prior points of detachment from the old towers to the new locations of the new attachments to the new towers.

**INTERROGATORY NO. 7:**

State all facts that support YOUR assertion that YOU have suffered a "significant loss of value in the Property," as set forth in the Declaration of Amir Shahmirza at paragraph 23, dated April 3, 2023 (Docket No. 13654-1).

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 61 of 139

**RESPONSE TO INTERROGATORY NO. 7:**

Responding Party objected to this request as being irrelevant to the subject matter of whether PG&E has any prescriptive right to place transmission lines across the Property.

Without waiving the foregoing objection, Responding Party answers further that Responding Party has been unable to develop the Property to its highest and best use, i.e., the construction of a commercial building or other income producing structure as contemplated.

The amount of the loss will be determined in the damages and remedy phase of this litigation.

**INTERROGATORY NO. 8:**

State all facts that support YOUR assertion that "Komir cannot occupy the space through which PG&E placed its high voltage transmission lines in any manner or for any purpose," as set forth in the Declaration of Amir Shahmirza at paragraph 28, dated April 3, 2023 (Docket No. 13654-1).

**RESPONSE TO INTERROGATORY NO. 8:**

Responding Party answers this interrogatory stating the fact that is apparent without explanation, i.e., a structure cannot occupy the space in which PG&E has placed transmission lines and Responding Party cannot otherwise perform any activity within the space occupied by the TRANSMISSION LINES or create any structure that would be situated within the space occupied by the TRANSMISSION LINES.

**INTERROGATORY NO. 9:**

Identify all funds you received from any PERSON CONCERNING OR RELATED TO YOUR, receipt of income for the use of the property located at 800 Walnut Street, San Bruno California, (the "Property") as identified by the Declaration of Amir Shahmirza at paragraph 1, dated April 3, 2023(Docket No. 13654-1) from and after December 18, 2000.

The term "PERSON" (and/or any form thereof) shall mean natural persons, business entities, public entities, or other associations, to include corporations, limited liability companies, general partnerships, joint ventures, limited partnerships, sole proprietorships, trusts, estates, organizations,

1  trade groups, labor unions, or any other form of association or form of doing business within or

2  outside of the United States.

3        The term "CONCERNING" or "RELATING TO" (and/or any form thereof) means and

4  includes, without limitation, concerning, relating to, referring to, summarizing, reflecting,

5  constituting, comprising, stating, containing, embodying, pertaining to, identifying, involved with,

6  mentioning, discussing, consisting of, showing, commenting upon, evidencing, supporting,

7  responding to, dealing with, describing, analyzing, contradicting, or is in any way pertinent to the

8  requested subject matter, directly or indirectly, in whole or in part.

9  **RESPONSE TO INTERROGATORY NO. 9:**

10        Responding Party objects to this request as being irrelevant to the subject matter of whether

11  PG&E has any prescriptive right to place transmission lines across the Property.

12        Responding Party further objects to this interrogatory, and refuses to answer or provide

13  financial information from December 18, 2000, to January 1, 2018, on the grounds that the specified

14  time period would require responsive information that is not relevant to the subject matter of the

15  pending litigation that now concerns the issue of whether PG&E holds any prescriptive rights

16  acquired in or after 2018, i.e., after the termination of consent, whereas the interrogatory seeks

17  financial information from date of acquisition in 2000 to and past 2018.

18        Responding Party further objects to the production of such documents for the period prior to

19  2018 on the grounds that doing so would be burdensome and oppressive without any correlative

20  benefit.

21        Without waiving the foregoing objections, Responding Party answers further that

22  Responding Party received the following amounts of gross revenue relating to use of the Property in

23  and after 2018 as follows:

24       2018:  $259,594

25       2019:  $79,800

26       2020:  $78,022

1    2021:  $148,962

2    2022:  $134,925

3    **INTERROGATORY NO. 10:**

4        State all facts supporting YOUR assertion in paragraph 13 of the COMPLAINT that "[t]he

5    powerlines that Defendant constructed over the Property were lower by at least eleven (11) feet from

6    where they were previously."

7        The term "COMPLAINT" shall mean the Complaint entitled AMIR SHAHMIRZA, KOMIR,

8    INC. v. PG&E Corporation, San Mateo Superior Court Case No. 18CIV06064, filed November 9,

9    2018.

10   **RESPONSE TO INTERROGATORY NO. 10:**

11       PG&E representatives who were on site implementing such repositioning and

12   alteration stated to Responding Party that the repositioning of the towers and altered position of the

13   lines resulted in an eleven (11) foot reduction in the height of the lines.

14   **INTERROGATORY NO. 11:**

15       State all facts supporting YOUR assertion in paragraph 13 of the COMPLAINT that "the

16   powerlines were previously, as well as at the time Plaintiffs acquired the Property, approximately

17   seventy-three (73) feet above the ground, but around late September or early October of this year,

18   Defendant lowered the powerlines to around sixty-two (62) feet above the ground from the base of

19   the new towers."

20   **RESPONSE TO INTERROGATORY NO. 11:**

21       PG&E representatives who were on site implementing such repositioning and

22   alteration stated to Responding Party that the repositioning of the towers and altered position of the

23   lines resulted in an eleven (11) foot reduction in the height of the lines.  In that conversation, the

24   representative of PG&E stated that the eleven (11) foot reduction occurred as a result of lowering the

25   lines from  approximately seventy-three (73) feet above the ground to approximately sixty-two (62)

26   feet above the ground from the base of the new towers.

Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page
64 of 139

**INTERROGATORY NO. 12:**

       State all facts that CONCERN OR RELATE TO any plans YOU have to build any structure on the property located at 800 Walnut Street, San Bruno California, (the "Property") as identified by the Declaration of Amir Shahmirza at paragraph 1, dated April 3, 2023 (Docket No. 13654-1) from and after December 18, 2000.

**RESPONSE TO INTERROGATORY NO. 12:**

       Responding Party has been developing plans for a structure, copy attached as Exhibit D.

Dated: August 16, 2023               COHEN AND JACOBSON, LLP

                                   By: /s/ Lawrence A. Jacobson
                                     Lawrence A. Jacobson
                                     Attorneys for Claimant and Respondent

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 65 of 139

<div align="center">**VERIFICATION**</div>

I, Amir Shahmirza, am an officer of Komir, Inc., and I am authorized to make this verification on its behalf and for myself individually.

I have read the foregoing Response to Interrogatories, Set One, and know the contents thereof and declare that the same are true of my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

Executed at San Mateo, California, on the 16th day of August, 2023.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Amir Shahmirza

Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 66 of 139

# EXHIBIT A

Return to:
Mr. Neil F. Hildebrand Jr.
100 Skyline Plaza
Daly City, Ca. 94015

87101925

| RF | 7 |
| CD | |
| LN | |
| MF | 1 |
| AF | 3 |
| BR | 13 |

RECORDED AT REQUEST OF

**FOUNDERS TITLE COMPANY**

Jun 30   11 01 AM '87

WARREN SLOCUM RECORDER
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
O~~~~~~~~~~~~~~~~~~~~

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Documentary Stamp Tax: $72.05

| DISTRICT | COUNTY | ROUTE | POST MILE | NUMBER |
|---|---|---|---|---|
| 4 | SM | 101 | 20.6 | DD-038103-01-01 |

## DIRECTOR'S DEED
### JUN 1987 15

The STATE OF CALIFORNIA, acting by and through its Director of Transportation, does hereby grant to

NIEL F. HILDEBRAND JR. and MELANIE M. HILDEBRAND, as community property

all that real property ~~XXXXx~~ partly in the City of San Bruno and all of the

County of __San Mateo__ , State of California, described as

PARCEL 038103-01-01:

    COMMENCING at the northeasterly terminus of the course
described as "N. 84°25'53" E., 0.81 of a foot" in that
0.377-acre parcel of land conveyed to the City of San Bruno
by Director's Deed No. DD-038619-01-01, recorded April 20,
1977 in Volume 7448 at page 455, Official Records of
San Mateo County; said terminus being also on the San Bruno
City Limits Line; thence along the easterly prolongation of
said course N. 84°25'53" E., 114.19 feet; thence
N. 47°43'02" E., 36.80 feet; thence N. 30°41'14" E.,
9.30 feet; thence S. 54°44'20" E., 122.08 feet; thence from a
tangent that bears S. 2°45'48" E., along a curve to the
right with a radius of 499.96 feet, through an angle of
30°28'30", an arc length of 265.92 feet; thence
S. 27°42'42" W., 308.26 feet to the southeasterly line of
that certain parcel of land, described as PARCEL II, conveyed
to City and County of San Francisco, a municipal corporation,
by Director's Deed No. 2293-DD, recorded October 28, 1953,

MAIL TAX
STATEMENTS TO
Mr. Niel F. Hildebrand Jr
100 Skyline Plaza
Daly City, CA 94015
FORM RW 02-19 (REV 8-82)

DOCUMENTARY TRANSFER TAX $ 72.05
☒ COMPUTED ON FULL VALUE OF PROPERTY CONVEYED, OR
☐ COMPUTED ON FULL VALUE LESS LIENS & ENCUMBRANCES
REMAINING THEREON AS TIME OF SALE

CITY OF San Bruno     ☐ Unincorporated

Documentary Transfer Tax
• • • PAID • •
San Mateo County
Rec'd By_____ Deputy Recorder

87101925

92-01-010-30

in Volume 2467, at page 443, Official Records of San Mateo County; thence along last said line and the general westerly line of last said Parcel II (2293-DD) S. 24°50'32" W., 101.57 feet, N. 4°38'43" W., 190.93 feet, N. 85°21'17" E., 15.33 feet and N. 10°51'17" E., 129.71 feet to said San Bruno City Limits Line; thence along last said line N. 4°38'43" W., 330.46 feet to the point of commencement.

CONTAINING 2.214 acres, more or less.

There shall be no abutter's rights of access appurtenant to the above-described real property in and to the adjacent State freeway.

(a) Subject to AN EASEMENT, granted or to be granted to the City of San Bruno, for the maintenance of the existing 24-inch diameter sewer line, said easement described as follows:

COMMENCING at the northwesterly corner of that 2.214-acre parcel of land described above; thence along the northerly line of said 2.214-acre parcel N. 84°25'53" E., 10.00 feet to a line parallel with and 10.00 feet easterly, at right angles, from said San Bruno City Limits Line; thence along said parallel line S. 4°38'43" E., 542.34 feet to the southeasterly line of said 2.214-acre parcel; thence along last said line S. 27°42'42" W., 18.69 feet to said San Bruno City Limits Line; thence along last said line N. 4°38'43" W., 557.97 feet to the point of commencement.

CONTAINING 0.126 of an acre, more or less.

(b) Subject to AN EASEMENT, granted or to be granted to Pacific Gas and Electric Company, a California corporation, for the right to landscape and access and in connection therewith to plant, grow and care for shrubs and trees, not to exceed fifteen (15) feet in height, within the following described parcel of land:

COMMENCING at the northwesterly corner of that 2.214-acre parcel of land described above; thence along the northerly line of said 2.214-acre parcel, N. 84°25'53" E., 114.19 feet; thence S. 17°58'05" W., 68.46 feet; thence S. 85°13'30" W., 80.16 feet to the westerly line of said 2.214-acre parcel; thence along last said line N. 4°38'43" W., 80.00 feet to the point of commencement.

CONTAINING 0.180 of an acre, more or less.

(c)  Subject to AN EASEMENT, granted or to be granted to the PACIFIC BELL, a corporation, for the right from time to time to construct, place, inspect, maintain and replace communication facilities, consisting of aerial and underground wires, cables and other electrical conductors with associated poles, crossarms, anchors, guys, fixtures, conduits, manholes, marker posts and other appurtenances, together with a right of way therefor and the right of ingress thereto and egress therefrom, across, upon, in and under, the following described parcel of land:

A strip of land, 10.00 feet wide, bounded on the east by the easterly line of that 2.214-acre parcel described above and bounded on the west by the westerly line of said 2.214-acre parcel, lying 5.00 feet on each side of the following described center line:

COMMENCING at a point on the westerly line of that 2.214-acre parcel described above, distant thereon S. 4°38'43" E., 75.00 feet from the northwesterly corner of said 2.214-acre parcel; thence N. 85°13'30" E., 240.67 feet to the easterly line of said 2.214-acre parcel.

CONTAINING 0.055 of an acre, more or less.

Grantor further grants to grantee the right of ingress to and egress from said strip over and across said lands by means of roads and lanes thereon, if such there be, otherwise by such route or routes as shall occasion the least practicable damage and inconvenience to grantor, provided that such right of ingress and egress shall not extend to any portion of said lands which is isolated from said strip by any public road or highway, now crossing or hereafter crossing said lands.

Grantor shall have the right to use said strip for purposes not inconsistent with grantee's full enjoyment of the rights hereby granted, provided that grantor shall not erect or construct any building or other structure, or drill or operate any well, within said strip.

Grantee shall have the further right to install, maintain and use gates in all fences which now cross or shall hereafter cross said strip.

Grantee shall also have the right to mark the location of said strip by suitable markers, but said markers when set in the ground shall be placed in fences or other location

87101925

which will not interfere with any reasonable use grantor shall make of said strip.

Grantee shall indemnify grantor against any loss and damage which shall be caused by the exercise of said ingress and egress, or by any wrongful or negligent act or omission of grantee or its agents or employees in the course of their employment.

The provisions hereof shall inure to the benefit of and bind the successors and assigns of the respective parties hereto.

The bearings and distances used in the above descriptions are on the California Coordinate System, Zone 3. Multiply the above distances by 1.0000790 to obtain ground level distances.

APN 092-020-100 Ptn.    JPN 92-01-010-30 Ptn.

87101925

Subject to special assessments if any, restrictions, reservations, and easements of record.

This conveyance is executed pursuant to the authority vested in the Director of Transportation by law and, in particular, by the Streets and Highways Code.

WITNESS my hand and the seal of the Department of Transportation of the State of California, this _____ 25th _____ day of _____ June _____ 19 27.

STATE OF CALIFORNIA
DEPARTMENT OF TRANSPORTATION

LEO J. TROMBATORE
Director of Transportation

By _____

HARRY L. KAGAN

Attorney in Fact

STATE OF CALIFORNIA } ss
COUNTY OF SACRAMENTO }

On this _____ 25th _____ day of _____ June _____ in the year 1927 before me AGNES M. BOJORQUES a Notary Public in and for the State of California, residing therein, duly commissioned and sworn, personally appeared _____ HARRY L. KAGAN _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to this instrument as the Attorney in Fact of _____ LEO J. TROMBATORE _____ Director of Transportation of the State of California, and that he (she) subscribed the name of _____ LEO J. TROMBATORE _____ as Director of Transportation, and his (her) own name as Attorney in Fact, and that the State of California executed the same.

WITNESS my hand and official seal.

_____

OFFICIAL SEAL
AGNES M BOJORQUES
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
My comm. expires JUN 21, 1988

THIS IS TO CERTIFY That the California Transportation Commission has authorized the Director of Transportation to execute the foregoing deed at its meeting regularly called and held on the _____ 25th _____

day of _____ June _____ 1987 in

the City of _____ Sacramento _____

Dated this _____ day of _____ June _____ 1987

_____
ROBERT I. REMEN
Chief Deputy Director



# EXHIBIT B-1



# EXHIBIT B-2



# EXHIBIT B-3



# EXHIBIT B-4



# EXHIBIT B-5



Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 83 of 139

# EXHIBIT B-6



# EXHIBIT B-7



# EXHIBIT B-8



Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 89 of 139

# EXHIBIT B-9





Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 92 of 139

# EXHIBIT B-10



Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 94 of 139

# EXHIBIT C

**PURPOSE & BASIS OF SURVEY**

THE PURPOSE OF THIS SURVEY IS TO SET MONUMENTS ALONG THE BOUNDARY LINE OF DEED HAVING DOCUMENT #2000-160010.

THE MONUMENTS SET BY RECORD OF SURVEY NO. 3206 REPRESENT THE BEST EVIDENCE OF THE LOCATION OF THE SUBJECT PARCEL BECAUSE SAID RECORD OF SURVEY RETRACED THE ADJOINING SUBDIVISION INCLUDING THE TERMINUS OF WALNUT STREET AND THE CITY PARK DESCRIBED IN THE DIRECTOR'S DEED BEING RECORDED IN VOLUME 7440 AT PAGE 456, OFFICIAL RECORDS OF SAN MATEO COUNTY. SAID RECORD OF SURVEY USED RECORD BEARINGS AND DISTANCES WITH THE HEREIN DESCRIBED ROTATION, AND SAID DIRECTOR'S DEED ALSO BEING RECORDED IN THE DEED FOR THE SUBJECT PARCEL BEING DOC #2000-160010, OFFICIAL RECORDS OF SAN MATEO COUNTY AS THE POINT OF COMMENCEMENT.

**REFERENCES:**

(R1) RECORD OF SURVEY MAP NO. 3206, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO IN BOOK 46 OF MAPS AT PAGE 3, ON JUNE 25, 2018

(R2) GRANT DEED, DOCUMENT #2000-160010, RECORDED IN THE OFFICE OF THE RECORDER OF SAN MATEO COUNTY ON DECEMBER 18, 2000

**NOTES - CONTINUED**

(N7) THE JURISDICTIONAL BOUNDARY IS SHOWN AS AN OFFSET TO DIFFERENTIATE BETWEEN THE PROPERTY BOUNDARY. THE LINE COINCIDES WITH THE EASTERLY MOST BOUNDARY OF BLOCKS 32 AND 33 IN 5MAPS10.

(N8) THIS IS AN AMENDED MAP, ADDING NOTE 7 TO CLARIFY THE JURISDICTIONAL BOUNDARY.



**BASIS OF BEARINGS**

THE BEARING OF N5°48'00"E BETWEEN TWO MONUMENTS ON THE MONUMENT LINE ON SEVENTH AVE HAVING A DISTANCE BETWEEN THEM OF 574.58', AS SHOWN ON THE RECORD OF SURVEY MAP NO. 3206, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO IN BOOK 46 OF MAPS AT PAGE 3, ON JUNE 25, 2018

---

**RECORD OF SURVEY NO. _____ 3259-A**

A PARCEL OF LAND BEING THE LANDS OF KOMIR, INC. DESCRIBED IN DEED HAVING DOCUMENT NO. 2000-160010 RECORDED DECEMBER 18, 2000 IN THE OFFICIAL RECORDS SAN MATEO COUNTY, CALIFORNIA

**UNINCORPORATED COUNTY OF SAN MATEO          CALIFORNIA**

SCALE: 1" = 50'                                   MAY 2022

**SURVEYOR'S STATEMENT**

THIS MAP CORRECTLY REPRESENTS A SURVEY MADE BY ME OR UNDER MY DIRECTION IN CONFORMANCE WITH REQUIREMENTS OF THE PROFESSIONAL LAND SURVEYORS ACT AT THE REQUEST OF AMIR SHAMIRZA IN 2018

BY: _____
JAMES O'CONNELL
LS NO. 9392

**COUNTY SURVEYOR'S STATEMENT**

THIS MAP HAS BEEN EXAMINED IN ACCORDANCE WITH SECTION 8766 OF THE PROFESSIONAL LAND SURVEYORS' ACT THIS 13th DAY OF MAY, 2022.

_____
D. IAN WILSON, ADRIAN VERHAGEN
SAN MATEO COUNTY SURVEYOR
L.S. NO. 7010  9189

**COUNTY RECORDER'S STATEMENT**

FILED THIS 19th DAY OF MAY, 2022, AT 2:03 Pm, IN VOLUME 53 OF LLS MAPS, AT PAGE 33 AT THE REQUEST OF JAMES K. O'CONNELL.

FILE NO. 2022-900124  FEE $84.00

MARK CHURCH, COUNTY RECORDER

BY: _____
DEPUTY

---



**STATE OF CALIFORNIA BAYSHORE FREEWAY**

N1) S86°04'55"W

R=499.96(R2)  L=265.92(R2)  Δ=30°28'30"(R2)

**STATE OF CALIFORNIA BAYSHORE FREEWAY**

**KOMIR, INC.**
DOC. 2000-160010

Lot 22    Lot 23

(R1) FOUND CUT "T"

DETAIL A
NO SCALE

(N1) N29°31'57"E (R2)(N30°41'14"E) (R2) 9.30'

(N1) N46°33'45"E (R2)(N47°43'02"E) (R2) 36.80'

**STATE OF CALIFORNIA HWY 380 INTERCHANGE**

PG&E EASEMENT FOR LANDSCAPE AND ACCESS PER 87101925 O.R.

10' PACBELL COMMUNICATIONS EASEMENT WITH ACCESS RIGHTS, PER 87101925 O.R.

**SAN BRUNO CREEK FLOOD CONTROL NORTH CHANNEL (N3)**

10' CITY OF SAN BRUNO SEWER EASEMENT 24" RCP SANITARY SEWER PER 87101925 O.R.

S26°33'20"W(N1) (S27°42'32"W(R2))126.57'(R2)

ACCESS ROAD (N2)

PUMP STATION (N4)

UNINCORPORATED COUNTY OF SAN MATEO(N7)

55.48' (R1)    50.00' (R1)    N05°48'00"W(N1)(N04°38'43"W) 330.46' TOTAL (R2)

0.75" IRON PIPE WITH PLASTIC PLUG

"BELLE AIRE PARK"
5 MAPS 10
BLOCK 33
CITY PARK
7448 OR 456

TACK & TAG IN CONCRETE SIDEWALK

"BELLE AIRE PARK"
5 MAPS 10
BLOCK 32

S84°12'00"W 100.00'(R1)
S84°12'00"W 100.00'(R1)

WALNUT ST.
(50' WIDE)

LOT 33 LOT 34 LOT 35 LOT 36 LOT 37 LOT 38

0.75" IRON PIPE WITH PLASTIC PLUG
TACK & TAG

0.75" IRON PIPE WITH PLASTIC PLUG

8.00' OS(R1)

MAG NAIL 1.5" ALUMINUM WASHER
TACK & TAG IN CONCRETE SIDEWALK

**7th AVENUE (60.00' WIDE)**

PORTION OF LOT 32

PORTION OF LOT 1  LOT 2  LOT 3  LOT 4  LOT 5  LOT 6  LOT 7  LOT 8  LOT 9

PORTION OF LOT 10
PORTION OF LOT 11
PORTION OF LOT 12
PORTION OF LOT 13
PORTION OF LOT 14
PORTION OF LOT 15
PORTION OF LOT 16
PORTION OF LOT 17
PORTION OF LOT 18
PORTION OF LOT 19
PORTION OF LOT 20
PORTION OF LOT 21
PORTION OF LOT 22

(N10°51'17"E)(R2)
(N85°21'17"E)(R2) 15.33'(R2)

N84°12'00"E(N1)
(N84°12'00"E)(R2)128.71'(R2)

N05°48'00"W(N1)(N04°38'43"W)(R2)290.93'(R2)

SAN BRUNO CITY LIMITS(N7)

N05°38'43"W 574.98'(R1) MONUMENT LINE(R1)
**BASIS OF BEARINGS**

PORTION OF LOT 23

SEE DETAIL A

TACK & TAG IN CONCRETE SIDEWALK

---

**NOTES**

(N1) THE DIRECTOR'S DEED FROM THE STATE OF CALIFORNIA TO THE CITY OF SAN BRUNO PER VOL. 7448, PAGE 456 INDICATES THE BEARINGS & DISTANCES ARE ON THE CALIFORNIA COORDINATE SYSTEM, ZONE 3 AND HAVE BEEN ROTATED TO TRUE BEARING OF N5°49'00"W. THE BASIS OF BEARINGS OF THIS SURVEY, THE ROTATION FROM TRUE BEARING TO GRID BEARING IS + 1°09'17". THE DEED FOR THE SUBJECT PROPERTY COMMENCES WITH A CALL TO THAT DEED, AND IS SO SAID ROTATION IS USED TO ORIENT THE PROPERTY. THE DISTANCES ARE GROUND DISTANCES SHOWN ON THIS MAP, MULTIPLY GROUND DISTANCE BY 0.999921006 TO OBTAIN GRID DISTANCE.

(N2) THE SHOWN ACCESS ROAD ACROSS THE LANDS OF THE STATE OF CALIFORNIA IS SHOWN BASED ON THE LIMITS OF THE DRIVEN AREA, AND CONNECTS THE LAND LOCKED PORTION OF THE KOMIR, INC. PROPERTY WITH THE ONSITE ACCESS ROAD AND THE CITY RIGHT OF WAY ON SEVENTH AVENUE AT THE EXISTING CONCRETE DRIVEWAY.

(N3) NO RECORD DOCUMENTATION FOUND FOR THE RIGHT-OF-WAY FOR THE SAN BRUNO FLOOD CONTROL NORTH CHANNEL.(N5)

(N4) NO RECORD DOCUMENTATION FOUND FOR THE LANDS COMPRISING OF THE EXISTING PUMP STATION.(N5)

(N5) DEED FROM THE STATE OF CALIFORNIA TO NEIL & MELANIE HILDEBRAND PROVIDES ACCESS FROM THE GRANTOR (STATE OF CALIFORNIA) WHO OWNS THE ADJACENT LANDS TO THE GRANTEE (NEIL & MELANIE HILDEBRAND).

(N6) THE FLOOD CONTROL CHANNELL AND PUMP HOUSE (ITEMS 1 & 2) ARE MAINTAINED BY THE CITY OF SAN BRUNO THROUGH AN AGREEMENT WITH COUNTY OF SAN MATEO FLOOD CONTROL DEPARTMENT.

**LEGEND**

——— BOUNDARY LINE/PROPERTY LINE (P/L)
——— LINE OF SURVEY/MONUMENT LINE(P/L)
——— LOT LINES PER ORIGINAL SUBDIVISION
EASEMENT AS NOTED
⊙ SET TACK & 0.75" TAG, STAMPED "L.S. 9392" IN CONCRETE FENCE POST
△ SET ALUMINUM STAKE & 1.5" ALUMINUM TAG, STAMPED "L.S. 9392"
⊠ SET 0.75" IRON PIPE AND PLASTIC PLUG, STAMPED "L.S. 9392"
● FOUND MONUMENT AS NOTED STAMPED "LS 5577" PER 46 LLS 3
OS OFF SET FROM PROPERTY LINE
▷ TOP AND BOTTOM OF CREEK WITH DIRECTION OF SLOPE
BEW BACK EDGE OF SIDEWALK



**Professional Land Services**
James K. O'Connell, P.L.S.
California License Number : 9392
901 Sneath Lane, #117
San Bruno, CA 94066
Phone/FAX 650-244-9657
• Site Planning        • Title Investigations
• Legal Descriptions   • Surveying & Mapping

DOC. 2000-160010, PROPERTY AT EASTERLY TERMINUS OF WALNUT STR...

SHEET

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 96 of 139

# EXHIBIT D-1

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 98 of 139

**CONSULTING ENGINEERS**

**KEY MAP**
SCALE : N.T.S.



**APPLICABLE CODES:**
2016 CALIFORNIA BUILDING CODE
2016 CALIFORNIA ELECTRICAL CODE
2016 CALIFORNIA MECHANICAL CODE
2016 CALIFORNIA PLUMBING CODE
2016 CALIFORNIA FIRE CODE
2016 CALIFORNIA ENERGY CODE
2016 CALIFORNIA GREEN BUILDING STANDARDS CODE
ALL OTHER STATE AND LOCAL ORDINANCES
AND REGULATIONS INCLUDING CURRENT MUNICIPAL
CODE.

**SCOPE OF WORK:**
SCOPE OF WORK INCLUDE THE CONSTRUCTION
OF A NEW OFFICE BUILDING CORE AND SHELL
AS WELL AS SITE IMPROVEMENTS SUCH AS
PARKING SPACES.

**SHEET INDEX:**
A0  SITE PLAN
A1  1ST FLOOR PLAN
A2  2ND FLOOR PLAN
A3  ELEVATIONS
A4  SECTIONS

**PROJECT DATA:**
ZONING: M-1 (LIGHT INDUSTRIAL)
OCCUPANCY: S2 (OPEN PARKING)
            B (OFFICE)
TYPE OF CONSTRUCTION: TYPE I
NUMBER OF STORIES: 2
BUILDING HEIGHT ALLOWED:  75'-0" MAX.
BUILDING HEIGHT PROPOSED: 25'-0"

SPRINKLERED: YES

LOT AREA: 96,441 SF
PROPOSED FLOOR AREA: 268,050 SF
FLOOR AREA BREAKDOWN:
1ST FLOOR  = 3,024 SF
2ND FLOOR = 53,095 SF
            56,119 SF

**REVISIONS**

**PROJECT TITLE:**
COMMERCIAL
BUILDING
800 WALNUT STREET
SAN BRUNO, CA 94066

**SHEET TITLE:**
SITE PLAN

**A0**



NEW COMMERCIAL BUILDING

DRIVEWAY

OPEN PARKING

PUMP STATION (N4)

UNINCORPORATED
COUNTY OF SAN MATEO

SAN BRUNO
CITY LIMITS

ACCESS ROAD (N2)

PG&E TOWERS

PG&E EASEMENT
FOR LANDSCAPE
AND ACCESS PER
8710/1625 O.R.

ZERO (0') SETBACK

40'
SETBACK

40'
SETBACK

**A**  **SITE PLAN**
      SCALE : 1 1/16" = 1'-0"



Case: 19-30088 Doc# 14117-1 Filed: 11/03/23 Entered: 11/03/23 17:39:14 Page 99 of 139



FLOOR AREA:

| SPACE DESIGNATION | AREA |
|---|---|
| OPEN OFFICE & LOBBIES | 50809 SF |
| RESTROOMS | 758 SF |
| STAIR #1 | 385 SF |
| STAIR #2 | 385 SF |
| JANITOR | 62 SF |
| ELECTRICAL/MECHANICAL | 588 SF |
| TRASH CHUTE | 108 SF |
| TOTAL | 53,095 SF |

OPEN OFFICE

OPEN OFFICE

A 2ND FLOOR PLAN
SCALE: 1/16" = 1'-0"

A2

SHEET TITLE:
2ND FLOOR PLAN

PROJECT TITLE:
COMMERCIAL BUILDING

800 WALNUT STREET
SAN BRUNO, CA 94066



Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 101 of 139



Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 102 of 139

# EXHIBIT D-2



# COMMERCIAL BUILDING AT
# 800 WALNUT ST. SAN BRUNO, CA.

CONSULTING ENGINEERS

PROJECT TITLE:
COMMERCIAL
BUILDING

800 WALNUT STREET
SAN BRUNO, CA. 94066

SHEET TITLE:

A0

COVER SHEET

REVISIONS

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 105 of 139

# A1

**SHEET TITLE:** SITE PLAN

**PROJECT TITLE:**
COMMERCIAL BUILDING

800 WALNUT STREET
SAN BRUNO, CA 94066

CONSULTING ENGINEERS

REVISIONS
△ PRELIM SKETCH
△ DESIGN DEVELOPMENT
△ DESIGN DEVELOPMENT



KEY MAP
SCALE: N.T.S.

## APPLICABLE CODES:

2016 CALIFORNIA BUILDING CODE
2016 CALIFORNIA ELECTRICAL CODE
2016 CALIFORNIA MECHANICAL CODE
2016 CALIFORNIA PLUMBING CODE
2016 CALIFORNIA FIRE CODE
2016 CALIFORNIA ENERGY CODE
2016 CALIFORNIA GREEN BUILDING STANDARDS CODE

ALL OTHER STATE AND LOCAL ORDINANCES
AND REGULATIONS INCLUDING CURRENT MUNICIPAL
CODE.

## SCOPE OF WORK:

SCOPE OF WORK INCLUDE THE CONSTRUCTION
OF A NEW OFFICE BUILDING CORE AND SHELL
AS WELL AS SITE IMPROVEMENTS SUCH AS
PARKING SPACES.

## SHEET INDEX:

A0   COVER SHEET
A1   SITE PLAN
A2   1ST FLOOR PLAN
A3   2ND FLOOR PLAN
A4   3RD FLOOR PLAN
A5   4TH–6TH FLOOR PLAN
A6   ELEVATIONS
A7   SECTIONS

## PROJECT DATA:

ZONING: M-1 (LIGHT INDUSTRIAL)
OCCUPANCY: S2 (OPEN PARKING)
          B (OFFICE)
NUMBER OF STORIES: 6
TYPE OF CONSTRUCTION: TYPE I
BUILDING HEIGHT ALLOWED: 75'-0" MAX.
BUILDING HEIGHT PROPOSED: 70'-0"

SPRINKLERED: YES

LOT AREA: 96,441 SF
PROPOSED FLOOR AREA: 268,050 SF
FLOOR AREA BREAKDOWN:
1ST FLOOR = 3,570 SF
2ND FLOOR = 53,028 SF
3TH FLOOR = 52,863 SF
4TH FLOOR = 52,863 SF
5TH FLOOR = 52,863 SF
6TH FLOOR = 52,863 SF
                268,050 SF



## NEW COMMERCIAL BUILDING

A  SITE PLAN
   SCALE: 1/16" = 1'-0"

20'-0" (0') SETBACK

40' SETBACK

DRIVEWAY

PG&E TOWERS

PG&E EASEMENT
FOR LANDSCAPE
AND ACCESS PER
8710/1625 O.R.

OPEN PARKING

PUMP STATION (N4)

UNINCORPORATED
COUNTY OF SAN MATEO

SAN BRUNO
CITY LIMITS

ACCESS ROAD (N2)



Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 106 of 139



Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 107 of 139



FLOOR AREA:

| SPACE DESIGNATION | AREA |
|---|---|
| OPEN OFFICE & LOBBIES | 49797 SF |
| RESTROOMS | 788 SF |
| STAIR #1 | 385 SF |
| STAIR #2 | 385 SF |
| STAIR #3 | 385 SF |
| STAIR #4 | 385 SF |
| JANITOR | 62 SF |
| ELECTRICAL/MECHANICAL | 568 SF |
| TRASH CHUTE | 108 SF |
| TOTAL | 52,863 SF |

OPEN OFFICE

OPEN OFFICE

FUTURE DEMISING WALL

MECH

ELECT

LOBBY

BALCONY

A  3RD FLOOR PLAN
SCALE : 1/16" = 1'-0"

Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 108 of 139

CONSULTING ENGINEERS

PROJECT TITLE:
COMMERCIAL BUILDING
800 WALNUT STREET
SAN BRUNO, CA  94066

SHEET TITLE:
A4
3RD FLOOR PLAN



**FLOOR AREA:**

| SPACE DESIGNATION | AREA |
|---|---|
| OPEN OFFICE & LOBBIES | 49,797 SF |
| RESTROOMS | 768 SF |
| STAIR #1 | 385 SF |
| STAIR #2 | 385 SF |
| STAIR #3 | 385 SF |
| STAIR #4 | 385 SF |
| JANITOR | 62 SF |
| ELECTRICAL/MECHANICAL | 568 SF |
| TRASH CHUTE | 108 SF |
| **TOTAL** | **52,863 SF** |

OPEN OFFICE

OPEN OFFICE

FUTURE DEMISING WALL

MECH

ELECT

LOBBY

STAIR 1

STAIR 2

STAIR 3

STAIR 4

A. 4TH-6TH FLOOR PLAN
SCALE: 1/16" = 1'-0"

CONSULTING ENGINEERS

REVISIONS

PROJECT TITLE:
COMMERCIAL
BUILDING

800 WALNUT STREET
SAN BRUNO, CA 94066

SHEET TITLE:
A5

4TH–6TH FLOOR PLAN





Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
111 of 139

A. SHAHMIRZA
10.12.23
**Exhibit 8**
CHYNNA BARBOSA



LAWRENCE A. JACOBSON, SBN 057393
SEAN M. JACOBSON, SBN 227241
COHEN AND JACOBSON, LLP
66 Bovet Road, Suite 285
San Mateo, CA 94402
Telephone: (650) 261-6280
*laj@cohenandjacobson.com*

Attorneys for Amir Shahmirza
(Agent for Komir, Inc.) and Komir, Inc.

5

6

7                    UNITED STATES BANKRUPTCY COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9                         SAN FRANCISCO DIVISION

10   In re                                 Case No. 19-30088 (DM)

11   PG&E CORPORATION,                     Chapter 11

12        - and -                          (Lead Case) (Jointly Administered)

13   PACIFIC GAS AND ELECTRIC              **FIRST SUPPLEMENTAL RESPONSE BY**
     COMPANY,                              **CLAIMANT KOMIR, INC. TO**
14                                         **DEBTORS' REQUESTS FOR**
              Debtors.                     **PRODUCTION OF DOCUMENTS, SET**
15                                         **NO. ONE**
     G Affects PG&E Corporation
16   G Affects Pacific Gas and Electric Company
     O Affects both Debtors
17

18

19

20

21

22

23

24

25

26

**FIRST SUPPLEMENTAL RESPONSE BY CLAIMANT KOMIR, INC. TO DEBTORS'
REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. ONE**                    1

Claimant Komir, Inc. and its agent Amir Shahmirza ("Responding Party") further respond to the Requests for Production of Documents, Set No. One, propounded by Debtors to Claimant Amir Shahmirza as agent for Komir, Inc. as defined as "YOU" in the Requests for Production of Documents as set forth below.

**SUPPLEMENTAL RESPONSE TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 12(A)[1]:**

All DOCUMENTS CONCERNING OR RELATED TO any plans YOU have to build any structure on the property located at 800 Walnut Street, San Bruno California, (the "Property") as identified by the Declaration of Amir Shahmirza at paragraph 1, dated April 3, 2023 (Docket No. 13654-1) from and after December 18, 2000.

**RESPONSE TO REQUEST NO. 12(A):**

Responding Party produces herewith its alternative design drawings of the building that Responding Party intends to construct on the Property, copy attached as Exhibit C-3 and C-4 hereto.

Dated: September 11, 2023               COHEN AND JACOBSON, LLP

By: /s/ Lawrence A. Jacobson
Lawrence A. Jacobson
Attorneys for Claimant and Respondent

---

[1] Inasmuch as the Requests for Production of Documents includes two Requests No. 12, Responding Party distinguishes those two Requests as 12A and 12B.

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 113 of 139

| | |
|---|---|
| 1 | |

# VERIFICATION

I, Amir Shahmirza, am an officer of Komir, Inc., and I am authorized to make this verification on its behalf and for myself individually.

I have read the foregoing First Supplemental Response to Requests for Production of Documents, Set One, and know the contents thereof and declare that the same are true of my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

Executed at San Mateo, California, on the 11th day of September, 2023.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Amir Shahmirza

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 114 of 139

# EXHIBIT C-3



# COMMERCIAL BUILDING AT
# 800 WALNUT ST. SAN BRUNO, CA.

CONSULTING ENGINEERS

REVISIONS

| | BY |
|---|---|
| PRELIM SKETCH | |
| DESIGN DEVELOPMENT | |
| DESIGN DEVELOPMENT | |

PROJECT TITLE:
COMMERCIAL
BUILDING

800 WALNUT STREET
SAN BRUNO, CA. 94066

SHEET TITLE:

A0

COVER SHEET

CONSULTING ENGINEERS

**KEY MAP**
SCALE: N.T.S.



## APPLICABLE CODES:

2016 CALIFORNIA BUILDING CODE
2016 CALIFORNIA ELECTRICAL CODE
2016 CALIFORNIA MECHANICAL CODE
2016 CALIFORNIA PLUMBING CODE
2016 CALIFORNIA FIRE CODE
2016 CALIFORNIA ENERGY CODE
2016 CALIFORNIA GREEN BUILDING STANDARDS CODE

ALL OTHER STATE AND LOCAL ORDINANCES AND REGULATIONS INCLUDING CURRENT MUNICIPAL CODE.

## PROJECT DATA:

ZONING: M-1 (LIGHT INDUSTRIAL)
OCCUPANCY: S2 (OPEN PARKING)
                            B (OFFICE)
TYPE OF CONSTRUCTION: TYPE I
NUMBER OF STORIES: 6
BUILDING HEIGHT ALLOWED: 75'-0" MAX.
BUILDING HEIGHT PROPOSED: 70'-0"

SPRINKLERED: YES

LOT AREA: 96,441 SF
PROPOSED FLOOR AREA: 268,050 SF
FLOOR AREA BREAKDOWN:
1ST FLOOR = 3,608 SF
2ND FLOOR = 41,529 SF
3TH FLOOR = 41,698 SF
4TH FLOOR = 41,698 SF
5TH FLOOR = 41,698 SF
6TH FLOOR = 41,698 SF
                            212,329 SF

## SCOPE OF WORK:

SCOPE OF WORK INCLUDE THE CONSTRUCTION OF A NEW OFFICE BUILDING CORE AND SHELL AS WELL AS SITE IMPROVEMENTS SUCH AS PARKING SPACES.

## SHEET INDEX:

A0   COVER SHEET
A1   SITE PLAN
A2   1ST FLOOR PLAN
A3   2ND FLOOR PLAN
A4   3RD FLOOR PLAN
A5   4TH-6TH FLOOR PLAN
A6   ELEVATIONS
A7   SECTIONS



**A  SITE PLAN**
SCALE: 1/16" = 1'-0"

PROJECT TITLE
COMMERCIAL BUILDING
800 WALNUT STREET
SAN BRUNO, CA 94066

SHEET TITLE
A1
SITE PLAN



Case: 19-30088 Doc# 14117-1 Filed: 11/03/23 Entered: 11/03/23 17:39:14 Page 118 of 139

## FLOOR AREA:

| SPACE DESIGNATION | AREA |
|---|---|
| MAIN LOBBY | 2041 SF |
| RESTROOMS | 408 SF |
| STAIR #1 | 385 SF |
| STAIR #2 | 273 SF |
| STAIR #3 | 273 SF |
| JANITOR | 60 SF |
| MACHINE ROOM | 168 SF |
| | |
| TOTAL | 3,608 SF |

A 1ST FLOOR PLAN
SCALE : 1/16" = 1'-0"

ASI
CONSULTING ENGINEERS
615 E. 3RD AVE, SUITE F
SAN MATEO CA 94401
TEL. # (650) 444-5374
EMAIL: ASIENGR@GMAIL.COM

THE DRAWINGS ON THIS SHEET, SPECIFICATION, IDEAS, DESIGNS, AND ARRANGEMENTS REPRESENTED THEREBY ARE AND SHALL BE THE PROPERTY OF ASI CONSULTING ENGINEERS AND NO PART OF THEREOF SHALL BE COPIED DISCLOSED TO OTHERS OR USED IN CONNECTION WITH ANY WORK OR PROJECT WITHOUT THE WRITTEN CONSENT OF ASI CONSULTING ENGINEERS. VISUAL CONTACT WITH THESE PLANS CONSTITUTE CONCLUSIVE EVIDENCE OR ACCEPTANCE

| REVISIONS | BY |
|---|---|
| PRELIM SKETCH 08.01.2017 | AS |
| DESIGN DEVELOPMENT 05.27.2022 | AS |
| DESIGN DEVELOPMENT 12.05.2022 | AS |

PROJECT TITLE:

COMMERCIAL BUILDING

800 WALNUT STREET
SAN BRUNO, CA. 94066

SHEET TITLE:

A2

1ST FLOOR PLAN

DRAWN: AS
CHECKED: AS
DATE: 02.17.2018
SCALE: AS SHOWN
JOB #: –

9/2/2023 3:02:39 PM



Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 119 of 139



Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 120 of 139



Case: 19-30088     Doc# 14117-1     Filed: 11/03/23     Entered: 11/03/23 17:39:14     Page
121 of 139



Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 122 of 139



B SECTION
SCALE : 1/16" = 1'-0"

A SECTION
SCALE : 1/16" = 1'-0"

ASI
CONSULTING ENGINEERS
615 E. 3RD AVE, SUITE F
SAN MATEO CA 94401
TEL. # (650) 444-5374
EMAIL: ASIENGR@GMAIL.COM

THE DRAWINGS ON THIS SHEET, SPECIFICATION, IDEAS, DESIGNS, AND ARRANGEMENTS REPRESENTED THEREBY ARE AND SHALL BE THE PROPERTY OF ASI CONSULTING ENGINEERS AND NO PART OF THEREOF SHALL BE COPIED DISCLOSED TO OTHERS OR USED IN CONNECTION WITH ANY WORK OR PROJECT WITHOUT THE WRITTEN CONSENT OF ASI CONSULTING ENGINEERS. VISUAL CONTACT WITH THESE PLANS CONSTITUTE CONCLUSIVE EVIDENCE OR ACCEPTANCE

| REVISIONS | BY |
|---|---|
| △ PRELIM SKETCH 08.01.2017 | AS |
| △ DESIGN DEVELOPMENT 05.27.2022 | AS |
| △ DESIGN DEVELOPMENT 12.05.2022 | AS |

PROJECT TITLE:

COMMERCIAL BUILDING

800 WALNUT STREET
SAN BRUNO, CA. 94066

SHEET TITLE:

A7

SECTIONS

DRAWN AS
CHECKED AS
DATE 02.17.2018
SCALE AS SHOWN
JOB # --

9/2/2023 3:02:42 PM

# EXHIBIT C-4



Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page 125 of 139

**CONSULTING ENGINEERS**

REVISIONS
| | BY |
| PRELIM SKETCH | A5 |
| DESIGN DEVELOPMENT | A5 |
| DESIGN DEVELOPMENT | A5 |

PROJECT TITLE:
**COMMERCIAL BUILDING**

800 WALNUT STREET
SAN BRUNO, CA 94066

SHEET TITLE:
SITE PLAN

SHEET NO:
**A1**

**KEY MAP**
SCALE: N.T.S.

## PROJECT DATA:

ZONING: M-1 (LIGHT INDUSTRIAL)
OCCUPANCY: S2 (OPEN PARKING)
 B (OFFICE)
TYPE OF CONSTRUCTION: TYPE 1
NUMBER OF STORIES: 2
BUILDING HEIGHT ALLOWED: 75'-0" MAX.
BUILDING HEIGHT PROPOSED: 25'-0"

SPRINKLERED: YES

LOT AREA: 96,441 SF
PROPOSED FLOOR AREA: 268,050 SF
FLOOR AREA BREAKDOWN:
1ST FLOOR = 3,335 SF
2ND FLOOR = 41,994 SF
 45,329 SF

## SCOPE OF WORK:

SCOPE OF WORK INCLUDE THE CONSTRUCTION
OF A NEW OFFICE BUILDING CORE AND SHELL
AS WELL AS SITE IMPROVEMENTS SUCH AS
PARKING SPACES.

## SHEET INDEX:

A1  SITE PLAN
A2  1ST FLOOR PLAN
A3  2ND FLOOR PLAN
A4  ELEVATIONS
A5  SECTIONS

## APPLICABLE CODES:

2016 CALIFORNIA BUILDING CODE
2016 CALIFORNIA ELECTRICAL CODE
2016 CALIFORNIA MECHANICAL CODE
2016 CALIFORNIA PLUMBING CODE
2016 CALIFORNIA FIRE CODE
2016 CALIFORNIA ENERGY CODE
2016 CALIFORNIA GREEN BUILDING STANDARDS CODE

ALL OTHER STATE AND LOCAL ORDINANCES
AND REGULATIONS INCLUDING CURRENT MUNICIPAL
CODE.

**NEW COMMERCIAL BUILDING**

OPEN PARKING

DRIVEWAY

PG&E TOWERS

SAN BRUNO CITY LIMITS

UNINCORPORATED COUNTY OF SAN MATEO

PUMP STATION (N4)

ACCESS ROAD (N2)

PGE EASEMENT
FOR LANDSCAPE
AND ACCESS PER
87101825 O.R.

**A  SITE PLAN**
SCALE: 1/16" = 1'-0"



FLOOR AREA:

| SPACE DESIGNATION | AREA |
|---|---|
| MAIN LOBBY | 2041 SF |
| RESTROOMS | 408 SF |
| STAIR #1 | 385 SF |
| STAIR #2 | 273 SF |
| JANITOR | 60 SF |
| MACHINE ROOM | 168 SF |
| | |
| TOTAL | 3,335 SF |

## A 1ST FLOOR PLAN
SCALE : 1/16" = 1'-0"

ASI
CONSULTING ENGINEERS
615 E. 3RD AVE, SUITE F
SAN MATEO CA 94401
TEL. # (650) 444-5374
EMAIL: ASIENGR@GMAIL.COM

THE DRAWINGS ON THIS SHEET, SPECIFICATION, IDEAS, DESIGNS, AND ARRANGEMENTS REPRESENTED THEREBY ARE AND SHALL BE THE PROPERTY OF ASI CONSULTING ENGINEERS AND NO PART OF THEREOF SHALL BE COPIED DISCLOSED TO OTHERS OR USED IN CONNECTION WITH ANY WORK OR PROJECT WITHOUT THE WRITTEN CONSENT OF ASI CONSULTING ENGINEERS. VISUAL CONTACT WITH THESE PLANS CONSTITUTE CONCLUSIVE EVIDENCE OR ACCEPTANCE

| REVISIONS | BY |
|---|---|
| PRELIM SKETCH 08.01.2017 | AS |
| DESIGN DEVELOPMENT 05.27.2022 | AS |
| DESIGN DEVELOPMENT 12.05.2022 | AS |

PROJECT TITLE:

COMMERCIAL BUILDING

800 WALNUT STREET
SAN BRUNO, CA. 94066

SHEET TITLE:

A2

1ST FLOOR PLAN

DRAWN: AS
CHECKED: AS
DATE: 02.17.2018
SCALE: AS SHOWN
JOB #: --

9/2/2023 3:01:31 PM



Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 127 of 139



B NORTH ELEVATION
SCALE: 1/16" = 1'-0"

A WEST ELEVATION
SCALE: 1/16" = 1'-0"



Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.



A. SHAHMIRZA
10.12.23
**Exhibit 15**
CHYNNA BARBOSA

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

JOHN C. BEIERS, COUNTY COUNSEL
By:  Brian J. Wong, Deputy
400 County Center - Sixth Floor
Redwood City, CA 94063-1662

[via County mail CCO111]

**2015-010528**
County
11:03 am 02/05/15 JU Fee: NO FEE
Count of Pages 10
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder



* R 0 0 0 1 9 7 2 3 2 0 *

Pursuant to Government Code § 27383, a state or political subdivision is exempt from a recording fee.

# STATEMENT OF DECISION AND JUDGMENT

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

FILED
SAN MATEO COUNTY
MAY - 7 2014
Clerk of the Superior Court
DEPUTY CLERK

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF SAN MATEO

3

4    KOMIR, INC.,                                     Case No. CIV 494192

5              Plaintiff,                             **[PROPOSED] STATEMENT OF DECISION
                                                      AND JUDGMENT**
6         vs.

7    COUNTY OF SAN MATEO, SAN MATEO
     COUNTY FLOOD CONTROL DISTRICT, and
8    DOES 1 to 50,

9              Defendants.

10

11   **I.    INTRODUCTION**

12        Plaintiff Komir, Inc.'s (the "Plaintiff") Second Amended Complaint (the "Complaint") seeks

13   damages for trespass and nuisance in connection with the presence, operation and maintenance of a pump

14   station operated by the San Mateo County Flood Control District (the "Flood Control District"),

15   maintained, in part, by the County of San Mateo (the "County") (along with the Flood Control District,

16   collectively referenced as "Defendants") and the City of San Bruno on behalf of the Flood Control

17   District, and located on real property owned by Plaintiff corporation at 800 Walnut Street, San Bruno,

18   California. This matter was heard before this Court on April 11, 12, 13 and 16, 2012.

19        Pursuant to both the First Cause of Action for Trespass and the Second Cause of Action for

20   Nuisance, Plaintiff seeks money damages and injunctive relief with the presence, operation and

21   maintenance of the pump station.

22   **II.   DISCUSSION**

23        **A.    Applicable Statutes of Limitations Bar Plaintiff's Trespass and Nuisance Claims as
                  They Relate to the Presence of Pump Station on the Property.**

24

25        In order to maintain its trespass and nuisance claims against the Defendants, Plaintiff must

26   establish that his claims are timely in light of applicable statutes of limitation. For permanent structures,

27   the applicable statute of limitations for either a trespass or a nuisance action is three years. With respect

28   to the pump station in question, the Court considers first whether it is permanent or temporary, and if

Case No. CIV 494192

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.




1    permanent, whether it has been present on Plaintiff's property longer than the requisite three years.

2          Where there is a permanent trespass to land, the statute of limitations as to the entire cause of

3    action begins to run upon creation of the trespass. *Bertram v. Orlando*, 102 Cal. App. 2d 506, 507-8

4    (1951). "[T]he encroachment of a building obviously intended to be permanent upon the soil of another

5    is permanent trespass and … the cause of action based thereon is barred by Code Civ. Proc., sec. 338,

6    Subd.2, in three years." *Id.*, 102 Cal. App. 2d at 509.   The court in *Bertram* discusses permanent

7    trespass:

8                   Where a trespass consists of a physical entry upon the lands of another and
                   taking possession thereof under such circumstances as to indicate an
9                   intention that the trespass shall be permanent, the law may regard the
                   wrong done in such case as complete at the time of the entry, and allow
10                  recovering in a single action of all damages resulting there from, including
                   prospective as well as past damages.  This is particularly true where the
11                  entry and taking possession are for a public use….  In such a case the
                   statute of limitations runs from  the time of the original entry.  *Id.* at 507-
12                  508.

13         The encroachment of a building intended to be permanent is a permanent trespass, and an action

14   for damages must be commenced within three years of the when the building was built. *Id.*; Cal. Civ.

15   Proc. Code § 338(b).

16         Similarly, if a nuisance is permanent, a plaintiff must bring a single action for past, present and

17   future damage within three years after the creation of the nuisance. *Shamsian v. Atlantic Richfield Co.*,

18   107 Cal. App. 4th 967, 979 (2003).   A nuisance may either be permanent or continuing, and

19   distinguishing between the two types of nuisance requires an analysis of whether the offensive condition

20   can be discontinued or abated at any time.  If the offensive condition can be discontinued or abated at any

21   time, the nuisance is considered a continuing nuisance.  In contrast, a permanent nuisance is one where a

22   single occurrence causes permanent injury. *Id.*  Notably, as the Supreme Court noted in *Spaulding v.*

23   *Cameron*, 38 Cal.2d 265, 267 (1952), "[t]he clearest case of a permanent nuisance or trespass is the one

24   where the offending structure or condition is maintained as a necessary part of the operations of a public

25   utility."

26         Defendants have introduced evidence regarding the pump station demonstrating that it is a

27   permanent structure.  Ann Stillman testified that the pump station is a solid building made of reinforced

28   concrete masonry that was intended to be permanent.  (Exhibits G-J.) She also testified that there is a 12-

Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page
132 of 139

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

1   foot wet well beneath the structure made of reinforced concrete, and a network of pipes, pumps and other

2   machinery inside the building. Ms. Stillman also explained that moving the structure would not be

3   possible and that relocation would require demolition of the building and reconstruction at another site.

4   She also described the costs associated with such relocation, with demolition costing in excess of

5   $100,000 and reconstruction costing in excess of $4,000,000. Further, her undisputed testimony was that

6   the pump station is a necessary part of the Flood Control District's operations. Plaintiff offered

7   testimony from Amir Shahmirza that the pump station could be removed for $5,000. Mr. Shahmirza's

8   testimony was not credible. He admitted that he had never been inside the pump station, that he had no

9   expertise or experience in pumping mechanics or hydrology, and that he did not know any details

10  regarding the purpose or function of the pump station. The pump station is a solid structure, intended to

11  be permanent, which is serving an important public function and could not be removed short of

12  destruction. The pump station building is neither a temporary structure, nor can it be "abated" for a

13  reasonable cost or by reasonable means. The bare fact that the pump station is theoretically removable

14  (through destruction) does not require that it be considered a continuous, as opposed to permanent,

15  trespass or nuisance. In *Mangini v. Aerojet General Corporation*, the Supreme Court held that solid

16  structures such as the pump station building should be treated as permanent for purposes to statute of

17  limitations consideration:

18      [I]n a strictly literal sense even a nuisance represented by an encroaching
        building or an underlying public utility pipeline might be discontinued or
19      abated, 'at any time,' by tearing down the building or digging up the
        pipeline. **But as *Spaulding* makes clear, it was for just such situations
20      that the concept of permanent nuisance, as an exception to the
        preexisting rule that all nuisances should be treated as abatable and
21      thus continuing, was developed.** (Emphasis added) 12 Cal. 4th 1087,
        1100 (1996.)

22

23      In light of the evidence, the Court finds that the pump station is a permanent structure for

24  purposes of considering the applicable three-year statutes of limitation for trespass and nuisance.

25      There is no dispute that Plaintiff has owned the property containing the pump station since 2000

26  and has been aware of the pump station's presence for at least that long. Plaintiff introduced evidence

27  regarding the transaction in which it obtained the property from the prior owner, and a request to request

28  approval of the vacant lot to store recreational vehicles in December 1999, and the evidence included a

_____

Case No. CIV 494192                                 3

[PROPOSED] STATEMENT OF DECISION AND JUDGMENT

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

1  site map of the property which showed the pump station in its present location. Further, Defendants

2  introduced evidence indicating that the pump station has been on the property since at least 1969 and

3  Defendants' witness Ann Stillman testified that the pump station existed on the property when she began

4  her employment with the County in 1987, which was corroborated by San Bruno Public Works employee

5  Dennis Bosch, who recalled seeing the pump station in approximately 1992. In light of this evidence, it

6  is clear that the pump station has been present on Plaintiff's property far longer than the three year statute

7  of limitations that applies to trespass and nuisance claims.

8       Based on the foregoing evidence, Plaintiff's First and Second Causes of Action are barred with

9  respect to the presence of the pump station on the Plaintiff's property located at 800 Walnut Ave., San

10  Bruno, CA.

11       **B.    With Respect to Entry Onto the Property, Defendants Have Obtained a Prescriptive Easement That Is a Complete Defense to Both Causes of Action.**

12

13       While the Second Amended Complaint does not appear to allege facts related to Defendants'

14  entry onto the property for monitoring and maintenance of the pump station as a basis for trespass and

15  nuisance claims, the Second Amended Complaint does make general references to maintenance and

16  operation of the pump station without consent. Based on the evidence presented at trial, Defendants'

17  entry on to the property is not actionable because the District has obtained a prescriptive easement.

18       The elements necessary to establish a prescriptive easement are: (1) open and notorious use or

19  possession that is, (2) continuous and uninterrupted, (3) hostile to the true owner, and (4) under a claim

20  of right. *Taormino v. Denny*, 1 Cal. 3d 679, 716 (1970). Such use for a five-year period confers a title

21  by prescription. *Id*. The evidence supports a conclusion that the District obtained an easement through

22  Plaintiff's property by prescription.

23       First, the use of Plaintiff's property has been open and notorious. Defendants presented evidence

24  that personnel entering Plaintiff's property on the District's behalf have made no attempt to hide their

25  activity at any point since 1969 when the District's obligations regarding the pump station arose.

26  Defendants' evidence also established that when entering the property, these personnel utilize the same

27  two entrances (one located on the northern portion of the property and the other located at the south end

28  of the property) to the property and travel the same route between the entrance utilized and the pump

Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 134 of 139

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

1  station. In addition, Defendants introduced evidence regarding the District's regular use of space in the

2  immediate vicinity of the pump station to accommodate vehicles and equipment necessary to complete

3  maintenance. Further evidencing the open nature of the entry, Plaintiff admitted that it has been aware of

4  Defendants' entry on the property during Plaintiff's time of ownership and that entry has been through

5  both the northern and the southern entrances. There was no evidence that Defendants have strayed from

6  the routes used to access the pump station or have otherwise lingered unnecessarily on the property.

7       Second, Defendants' entrance on the property has been continuous and uninterrupted since the

8  time the District took responsibility for the pump station in or about 1969. Defendants' presented

9  evidence indicating that personnel acting on behalf of the District enter the property to either monitor or

10  maintain the pump station at least monthly, and more often if necessary. Defendants' evidence also

11  showed that this level and type of activity has continued uninterrupted since the District took control of

12  the pump station in or about 1969. Plaintiff offered no evidence to the contrary.

13       Third, the use was hostile to Plaintiff's ownership interest and under a claim of right. A claim of

14  right "simply means that the property was used without permission of the owner of the land."

15  *Felgenhauer v. Soni*, 121 Cal. App. 4th 445, 450 (2004). Defendants offered unrebutted evidence that

16  while the District (as well as those acting on its behalf) were entering the property prior to Plaintiff's

17  time of ownership, the District never obtained permission to do so from the prior property owner who

18  sold the property to the Plaintiff. The District entered the property without permission from the prior

19  property owner. According to the testimony of Ann Stillman, this prior owner owned the property from

20  at least as early as 1987 through Plaintiff's purchase of the property in 2000. Plaintiff claims that

21  Defendants' acts have injured its rights with respect to the property (*see* Complaint, generally), but

22  offered testimony that Plaintiff gave the District permission to enter the property to operate and maintain

23  the pump station. Even if the District had not already entered the property without permission for more

24  than five years prior to Plaintiff's ownership of the property, the evidence relating to purported

25  permission granted by Plaintiff since Plaintiff obtained the property in 2000 is extremely limited, was not

26  credible and would be insufficient to establish that Plaintiff had in fact granted the District permission to

27  enter the property.

28       Finally, Defendants' use has more than met the five-year period requirement. The entry onto the

Case: 19-30088   Doc# 14117-1   Filed: 11/03/23   Entered: 11/03/23 17:39:14   Page
135 of 139

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.



1   property to access the pump station has been going on since 1969. Plaintiff filed his government claim in

2   2009 and filed this action in 2010. Given the time period the District entered the property without

3   permission while the property was owned by the previous private party owners, the District obtained its

4   prescriptive easement before Plaintiff purchased the property.

5       Based on the foregoing evidence, the Court finds that the District has obtained a prescriptive

6   easement to utilize both the north and south access routes to the pump station as well as the area

7   surrounding the pump station. The easement area and the north and south access routes are generally

8   depicted in Exhibit A, attached hereto. Personnel enter the property only on behalf of the District's right

9   to maintain the pump station and building, and personnel do not enter onto the lot for unrelated purposes,

10   nor do they go outside the area needed to enter or to maintain the pumping station pursuant to the

11   prescriptive easement. The District has met the requirements to establish a prescriptive easement that

12   allows personnel acting on its behalf, including County personnel, to enter and pass through Plaintiff's

13   property in connection with monitoring and maintaining the pump station. The prescriptive easement

14   forecloses Plaintiff's trespass and nuisance claims as the District and its maintenance personnel are

15   entitled to enter the property and access the pump station for monitoring and maintenance purposes. As a

16   result, Plaintiff's First and Second Causes of Action are barred as to Defendants' entry onto the property

17   for operating and maintaining the pump station.

18       **C.    The 2009 Fence Installation On the Northern and Eastern Sides of the Pump Station**

                   **Is An Unlawful Expansion of the District's Easement.**

19

20       The Flood Control District introduced evidence of two lengths of chain link fence installed in

21   September 2009 on the northern and eastern sides of the pump station. These two lengths of fence are

22   approximately two feet away from the exterior wall of the pump station and, with existing fencing on the

23   western and southern sides of the pump station, enclose a space about two feet away from the pump

24   station on all sides.

25       The Court finds that the fence is an unlawful expansion of the District's Easement rights and that

26   said fence encloses 100 square feet of Plaintiff's property. The Court further finds that the damages for

27   the loss of use of this small strip of land enclosed by the fence to be $25.00 per month, with this payment

28   calculation applying to the time period from when the fence was installed (September 2009) until such

Case: 19-30088    Doc# 14117-1    Filed: 11/03/23    Entered: 11/03/23 17:39:14    Page 136 of 139

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.




1    time the fence is removed.  This monthly payment amount is calculated by taking the 100 square feet

2    enclosed by the fence and multiplying it by the $0.25 per square foot value testified to by Plaintiff's

3    president, Amir Shahmirza.

4    **III.    CONCLUSION**

5         Based on the foregoing, this Court enters judgment consistent with the findings set forth above

6    and finds that there is no prevailing party.  Each side is directed to pay, and be responsible for, their own

7    expenses, fees and costs.

8

9    Dated: _____May 6, 2014_____

10

11   By: _____

12        **JOSEPH C. SCOTT**
          **JUDGE OF THE SUPERIOR COURT**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CIV 494192           7

[PROPOSED] STATEMENT OF DECISION AND JUDGMENT

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.



EXHIBIT "A"

DETAIL
ACCESS AREA

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.



**STATE OF CALIFORNIA** } SS.
**COUNTY OF SAN MATEO**

I, John C. Fitton, the Clerk of the Superior Court of the above entitled County. do hereby certify that the foregoing is a full, true and correct copy of the original on file in my office, and that I have carefully compared same with the original.
    Witness my hand and seal of said Superior Court

This __5th__ day of February 2015
Clerk of the Superior Court of California, County of San Mateo

By _Alanna Hanman_
                                    Deputy Clerk