David Edward Martin, In Pro Se

3108 Aloha Lane

Chico, California 95973

# UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION

Case No. 19 -30088 (DM) Chapter 11 (Lead Case) (Jointly Administered)

| | |
|---|---|
| In re: PG&E CORPORATION, <br><br> - and - <br><br> PACIFIC GAS AND ELECTRIC COMPANY, Bankruptcy <br><br> Debtors. | Case No.: 19 -30088 (DM) Chapter 11 (Lead Case) (Jointly Administered) . <br><br> [Assigned to: Judge Dennis Montali] <br><br> REQUEST FOR JUDICIAL NOTICE: Breach of fiduciary Duty by Bankruptcy Trustee Cathy Yanni; Breach of Fiduciary Duty by Claims Administrator Brown/Greer PLC. Notice of environmental contamination of Chico, California. Severe health injury by P G and E contamination from the Camp Fire. Unlawful legal determinations by Trustee yanni and Brown/Greer. Failure of P G and E to comply with California Proposition 65 notice of carcinogen contamination of Chico, California. <br><br> Appearance by affidavit. Motion by written filing. <br> Date: 3 November, 2023 |

Affects PG&E Corporation  Affects Pacific

Gas and Electric Company  Affects both Debtors

* All papers shall be filed in the Lead Case, No.

19-30088 (DM)


Served electronically on:

Cathy Yanni, Bankruptcy Trustee
Fire, Fire Victim Trust
Two Embarcadero Center, Suite 1500,
San Francisco, CA 94111
info@firevictimtrust.com


Fire Victim Trust
P.O. Box 25936
Richmond, VA 23260
info@firevictimtrust.com

Fire Victims Trust
Claims Processor
P.O Box 25936
Richmond, Va 23260
info@firevictimtrust.com

**BrownGreer PLC,** 250 Rocketts Way, Richmond, VA 23231

David Abbondanza, Bethany Anderson, John Applin, William Atkinson, John Bates, Jaclyn Billups, Barry Broach, Orran Brown, Orran Brown, Jr., Dennis Carter Jr., Joshua Cheatha, Rae Cousin, Dustin Davis, Dennis Delmott, Ilze DuPlessis, Brian Earman, Kalena Ek, Emily Engle, Addie Fromholz, Lynn Crowder Greer, Sydney Gustafson, Matthew Hazzard, Ashley Hipps, Andrew Hunt, Robert Lawson, W. Grey Ligon II, Christina Llames, Kyle Martin, Erin Maruskin, Keith McKinell, Kerry L. McLaughlin, Morgan Meador, Jay Mense, Janet Selph Moyers, Kristene Mullins, Tom Nash, Julie Newton, Sionne D. Olson, Jennifer Owens, Jennifer Owren, Andrew Oxenreiter, Sri Panyala, Roma Petkauskas, Randall Pinkleton, Kevin Plasse, Srikanth Regula, Cherie

L. Rickards, David Smith, Jessica Stankus Smith, Bob Staneart, Philip Strunk, Sarah Thompson, Frank Trani, Russ Turner, Coles McBrayer Warren, Breanna West, Benjamin Wilcher, Justin Wind, Jacob Woody. info@firevictimtrust.com

I am fire victim claimant David Edward Martin, 3108 Aloha Lane, Chico, California, 95973. I filed a timely claim against the Pacific Gas and Electric Company, I was then required to file another claim by the Fire Victims Trust and the bankruptcy Court. I did this in a timely manner.

I received the claim form in the mail from P G and E/Fire Victims Trust. I filed this claim based on the toxic poisoning of Chico, my property and my body by P G and E and their negligence for causing the Camp Fire. I also have requested from the bankruptcy court and Fire victims Trust ,compliance from P G and E for Proposition 65 carcinogen exposure notice. This has been ignored. I believe that Chico and other area residents have a legal statutory right to know from P G and E what cancer causing agents their property and negligence exposed human beings to.

My claim was for exposure to toxic elements that were the result of the Camp Fire and P G and Es criminal Conduct. I provided over 200 pages of documentation of the hazards of toxic exposure from fires with my claim. The toxic contamination of Chico and surrounding areas is being ignored and it appears to be an intentional coverup to just resolve the Bankruptcy as quickly as possible while ignoring people and property exposed to heavy toxic carcinogens. This toxic exposure continues since no cleanup or recognition of injury has been allowed. Chico is an environmental contamination zone. During the Camp Fire there was a constant layer of ash on cars and property. We the residents of Chico were forced to breathe this toxic stew. The stew remains in chico, there has been no clean up or studies of risk.

I believe that the Fire Victims Trust and BrownGreer PLC have breached their fiduciary duty in this matter and are engaged in a coverup to take the law into their own hands.

Cathay Yanni, the Fire Victims Trust and BrownGreer PLC have created their own law that any claim outside the "Burn Zone" is a nuisance claim and nothing more. It is their position that bankruptcy is for their determination and that the carcinogenic contamination of Chico and its residents are a nuisance and do not merit equitable injury compensation.

Bankruptcy Claim in this matter has nothing to do with an arbitrary and capricious ruling from Cathey Yanni that a claim is only of any significance if the claimant resided in the mythical "Burn Zone"

The Federal code defines what is a claim under Chapter 11 bankruptcy:

11 U.S. Code § 101 - Definitions:

**5)**The term "claim" means—

(A)right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B)right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Chico residents spent many days being contaminated with the ash, smoke and particulates that rained down on us from the Camp Fire and P G and E's criminal behavior.

The bankruptcy has barred Chico residents from pursuing civil legal action against P G and E for this environmental contamination. Now Comes Cathey Yanni and The Fire Victims Trust to create their own fiction of what is a claim and what is not a claim.

Recently, a law firm has filed a civil class action lawsuit against P G and E for environmental contamination of Butte County and the resulting injuries caused by P G and E. While the law Firm has filed on many of P G and Es environmental crimes, they did not file on the Camp Fire because those crimes are under Bankruptcy protection as well as the protection of the Fire Victims Trust.

This is the local news report on the lawsuit:

Singleton Schreiber files lawsuit against PG&E over impacts of Dixie, Fly fire

By: Matt Wreden Aug 2, 2023

SAN FRANCISCO, Calif. - Attorneys for the people impacted by the Dixie Fire and Fly Fire have filed a class action lawsuit against PG&E in San Francisco Superior Court.

The suit alleged that PG&E cause the fire that produced airborne pollutants which have long-lasting impacts on the residents' health and well-being.

The lawsuit was filed on behalf of people living in Plumas, Butte, Lassen, Tehama, Shasta, Sierra, Nevada, Yuba, Place and El Dorado Counties at the time of the fire.

According to the complaint, wildfire smoke from the fire reached over 40,000 feet in the air, covering those communities with thick, heavy smoke for three months.

The lawsuit targets the substances found inside the wildfire smoke, which was a mixture of air pollutants, carbon monoxide, carbon dioxide, nitrogen oxides, and other volatile compounds.

"The levels of particulate matter and other pollutants in the air these people were breathing is unimaginable," said lead attorney Paul Starita, of Singleton Schreiber in a press release. "The substances they were inhaling breath after breath will continue to have long-term health impacts that will take years to fully realize. These people will show the aftereffects of PG&E's failure to maintain their equipment over the next several decades, and we are seeking to hold the utility accountable for what they've done here."

This is the information on the lawsuit:

Gerald Singleton (SBN 208783)

gsingleton@singletonschreiber.com

Paul Starita (SBN 219573)

pstarita@singletonschreiber.com

SINGLETON SCHREIBER, LLP

591 Camino de la Reina, Suite 1025

San Diego, CA 92108

Tel. (619) 771-3473

Counsel for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

LARA WHEELER and JULIE PETERSON, on behalf of themselves and all other similarly

situated individuals,

Plaintiffs,

v.

PG&E CORPORATION, a California

Corporation; PACIFIC GAS AND ELECTRIC

COMPANY, a California Corporation; DOES

1-200 inclusive,

Defendants.

Case No.

CLASS ACTION COMPLAINT

(1) NEGLIGENCE (2) MEDICAL

MONITORING

COMES NOW PLAINTIFFS, Lara Wheeler, and Julie Peterson ("Plaintiffs") on behalf of

themselves and all others similarly situated ("Class Members"), and by and through Plaintiffs' undersigned counsel, hereby submit this Complaint and jury demand against Defendants PG&E

CORPORATION and PACIFIC GAS & ELECTRIC COMPANY and DOES 1 through 200,

inclusive (collectively "PG&E") upon information and belief and based upon the investigation of counsel, thereby Plaintiffs' state and allege as follows:

INTRODUCTION

1. This is class action seeking redress for all individuals who at all relevant times,

owned or rented property, or otherwise resided in Plumas County, Butte County, Lassen County, Tehama County, Shasta County, Sierra County, Nevada County, Yuba County, Placer County and

ELECTRONICALLY

F I L E D

Superior Court of California,

County of San Francisco

07/13/2023

Clerk of the Court

BY: MARK UDAN

Deputy Clerk

CGC-23-607657

This is the lawsuit that would have been filed on behalf of Chico residents had P G and E not sought Bankruptcy Protection. Now Cathey Yanni, the Fire Victims Trust, BrownGreer PLC have determined that these injuries to property and Person have no merit compared with owning or renting property inside the :Burn Zone" whether the Burn Zone occupant was in Paradise during the fire or not (many Paradise residents work outside of Paradise and were not evacuated as they were not in Paradise at the time of the fire). Cathay Yanni, the Fire Victim Trust and BrownGreer PLC have also made law regarding property loss by fire has more significance than environmental contamination of person and property of Chico Residents. The environmental Contamination of Chico lives on whereas Paradise had extensive environmental contamination cleanup. We the residents of Chico are still being exposed to the environmental contamination daily.

I previously submitted to the Fire Victim's Trust and Brown/Greer PLC, the California Air Resources Board report regarding just a fraction of the toxins Chico Residents were exposed to by P G and Es criminality for the Camp Fire. This was ignored.

This is a link to the full report:

https://ww2.arb.ca.gov/sites/default/files/2021-07/Camp_Fire_report_July2021.pdf

This is from the Executive Summary of the CARB report:

Executive Summary

The 2018 Camp Fire was the deadliest wildfire in California history. At least 85 people died as the catastrophic wildfire burned through Butte County, destroying nearly 19,000 buildings and most of the town of Paradise. The fire generated a large plume of heavy smoke that traveled thousands of miles. The smoke caused dangerously high levels of air pollution in the Sacramento Valley and Bay Area in particular, for a period of about two weeks.

Staff at the California Air Resources Board (CARB) compared air quality data from the Camp Fire with three other large wildfires in 2018 that burned mostly vegetation. When wildfires burn structures, they produce a range of harmful and toxic substances. CARB's analysis shows this was indeed the case during the Camp Fire, when elevated levels of lead and zinc were detected, as well as calcium, iron and manganese. Some of these metals traveled more than 150 miles, and were detected in the air as far away as San Jose and Modesto.

Particulate matter (PM) is typically the biggest health concern from wildfire smoke. Particles from smoke tend to be very small (with diameters of 2.5 micrometers [μm] and

smaller), and can be inhaled into the deepest recesses of the lung. This size of particulate matter is often referred to as PM2.5. The tiniest, ultrafine particles in PM2.5 can pass directly into the bloodstream where they can affect the heart and other organs. During the 2018 Camp Fire, maximum PM2.5 levels for the period from November 8 through November 22

were more than three times the average levels seen during the same time period from 2010 to 2017.

The number of buildings burned during this fire was significant, and not something traditionally seen in California wildfires. The Carr Fire, which burned over 50 percent more acreage in the Shasta-Trinity National Forest in late July and August of 2018, destroyed about 1,600 buildings. The Mendocino Complex Fire, occurring during the same time period, burned almost three times the acreage of the Camp Fire, but destroyed only about 250 buildings. CARB staff used data from these wildfires, as well as that collected during the Ferguson Fire in Mariposa County, which burned mostly inaccessible wildland areas during the same basic time period (late summer 2018). The goal was to better understand the air quality differences that might occur between wildfires that burn primarily vegetation, such as the Ferguson Fire, and those that burn more structures. Staff also examined potential additional health impacts that could arise from structure-burning wildfires in more populated areas.

The health impacts of air pollutants produced by wildfires can be significant. While the elevated levels of lead detected in Chico during the Camp Fire only lasted for about a day, these numbers are still concerning, since lead is considered a toxic air contaminant and any increased exposure can be harmful. Lead exposure has been linked to high blood pressure, reproductive effects and cancer in adults. Infants and young children are especially sensitive to low levels of lead that are known to cause behavioral changes and learning deficits.

The short-term spikes in particulate matter from the Camp Fire and other wildfires included in this analysis were comparable to industrial and mobile source pollution levels seen in countries like China and India. Both countries show subsequent increases in respiratory diseases and infections, and chronic heart and lung disease, resulting in increased medical visits, hospital admissions, and risk of death.

In general, short-term exposure (days or weeks) to PM2.5 and wildfire smoke has been strongly linked to increasing severity of asthma; other respiratory disease, such as chronic obstructive pulmonary disease (COPD); inflammation or infections, including bronchitis and pneumonia; emergency department visits; and hospital admissions. Long-term exposure to PM2.5 is linked to a wide range of human health effects, such as respiratory and heart-related illnesses and hospitalizations, adverse brain effects,

Case: 19-30088   Doc# 14126   Filed: 11/09/23   Entered: 11/09/23 11:50:59   Page 8 of 33

depression, memory loss, learning disorders, reduced lung function growth in children and premature death.

The Singleton Schreiber LLP lawsuit covers the type of injury and damage done to people and property of Chico residents who were exposed by the Camp Fire toxins.

Here are some excerpts from their lawsuit, if you insert Camp Fire with Dixie fire you can reach the same conclusions:

8. The wildfire smoke from the Dixie Fire consisted of a complex mixture of air pollutants, including particulate matter ("PM"), carbon monoxide, carbon dioxide, nitrogen oxides, volatile organic compounds, and polycyclic aromatic hydrocarbons, amongst other dangerous air pollutants ("air pollutants").

9. These air pollutants, when inhaled, are known to cause a number of health complications including but not limited to heart disease, lung disease, increased respiratory morbidity, including respiratory infections, asthma, chronic obstructive pulmonary disease, and even cancer.

10. According to the United States Environmental Protection Agency's Air Quality index ("AQI") scale, which measures air quality across the country, the air quality for the Counties during the Dixie Fire reached and remained at hazardous and very unhealthy levels for extended periods of time.

D. WILDFIRE SMOKE & AIR POLLUTANTS FROM THE DIXIE FIRE

55. As a result of Defendants' acts and/or omissions that caused the Dixie Fire, Plaintiffs and all Class Members were adversely affected in that they were exposed to wildfire smoke consisting of dangerous levels of air pollutants.

56. Wildfire smoke is a complex, physical and chemical composition that is determined by the type of fuel (trees, shrubbery, grass, etc.) and combustion conditions. Wildfire smoke is composed of various air pollutants known to be harmful to human health including particulate matter, carbon monoxide, carbon dioxide, nitrogen oxides, volatile organic compounds, and polycyclic aromatic hydrocarbons, amongst other dangerous air pollutants.

57. The initial release of such air pollutants is not the end of the damage that may result from a wildfire. Instead, the toxicity of such air pollutants appears to increase the further they travel from the fire ignition site, as smoke particles will undergo chemical reactions—typically, oxidation—which converts particles into highly reactive compounds that have even greater capacity to damage cells and tissue.

58. The oxidation process can double the toxicity of smoke compounds in the first few hours after they are first emitted and may even quadruple the smoke toxicity over the following days.

59. Toxic smoke compounds may linger in the atmosphere for days, weeks, or even months depending on the length of the wildfire and the amount it burns.12 Accordingly, the negative health effects of smoke inhalation may persist even months after a wildfire has been extinguished.

60. Globally, wildfire smoke has been estimated to cause over 339,000 premature deaths a year—a number far greater than the deaths caused directly from fires.

13 Particulate Matter

61. Particle matter ("PM") is one of the leading sources of danger to human health from wildfire smoke. PM is contained in the air we breathe indoors and outdoors; however, the quantity of PM substantially increases during wildfire activity.14 Unlike other pollutants in wildfire smoke, PM is the only pollutant that is not a gas. Instead, PM particles are microscopic solid- or liquidstate particles that are suspended in the air.

62. PM is typically composed of a mixture of compounds, usually present as soot or oily substances high in elemental and organic carbon, black carbon, minerals, dissolved gasses, and/or metallic compounds.15,16

63. PM air particles are characterized by their diameter and typically grouped into two categories: course particles ("PM10") and fine particles ("PM2.5").

64. PM10 are smaller than or equal to 10 µm and make up a small percentage of particles present in wildfires. PM10 particles may be inhaled into the lungs and cause local and systemic inflammation of the respiratory system. Exposure to PM10 may cause respiratory diseases such as asthma and bronchitis.17

65. In comparison, PM2.5 consists of particles smaller than 2.5 µm and is the main pollutant in wildfire smoke, making up approximately 90% of the total particle mass of wildfire smoke. These particles are of particular concern because they are smaller than the width of human hair, typically 50 to 70 µm, or a particle of beach sand, typically about 90 µm wide.



HUMAN HAIR
50-70μm
(microns) in diameter

PM2.5
Combustion particles, organic
compounds, metals, etc.
< 2.5 μm (microns) in diameter

PM10
Dust, pollen, mold, etc.
<10 μm (microns) in diameter

90 μm (microns) in diameter
FINE BEACH SAND

Photograph from: https://www.epa.gov/wildfire-smoke-course/why-wildfire-smoke-health-concern

66. The size of PM2.5 makes it almost invisible to the human eye and allows these particles to seep indoors. The size of PM2.5 also enables these particles to lodge in the lungs and travel into the bloodstream.

67. At baseline, PM2.5 indoors is equivalent to 25-33% of the PM2.5 outdoors. However, a wildfire can abruptly increase ambient levels of PM2.5 to more than 2000 μg/m3. Accordingly, studies have shown that wildfire activity may cause indoor PM2.5 pollution to increase by 77-78% of that found outdoors during wildfire activity.[21]

68. Other studies have revealed that PM2.5 levels increased to the 90th percentile and correlated with increased levels of ambient carbon monoxide (CO), ozone (O3), and nitric oxide (NO) during wildfires.

69. Not all PM2.5 particles are made equally, as PM2.5 emanating wildfires can be up to ten (10) times more harmful than the same type of air pollution coming from combustion activity. Accordingly, prolonged exposure to PM2.5 from wildfires results in more adverse effects than everyday PM2.5 particles suspended in the air.

70. For instance, PM2.5 from wildfire smoke can affect the cardiovascular system by causing pulmonary and oxidative stress and inflammation, triggering the autonomic nervous system.[24] PM2.5 may also enter the bloodstream, where the tiny particles can cause cardiovascular diseases or enter organs beyond the respiratory and cardiovascular systems. This poses a range of long and short-term health threats.

71. Various studies have shown that long-term PM2.5 may lead to various types of cancer. Long-term exposure to such particles has also been associated with an increased likelihood of developing severe COVID-19 symptoms.25 Furthermore, long term effects of PM2.5 may result in cardiac arrhythmias, worsening heart failure, and triggering atherosclerotic/ischemic cardiovascular complications, particularly in certain high-risk subpopulations.

72. The health effects and risks of PM2.5 exposure and inhalation vary by age. Exposure to PM2.5 is more dangerous for children and those in middle to old age compared to those in young adulthood. For instance, children under eighteen (18) years of age are considered "sensitive" to wildfire smoke—even if they do not have a pre-existing illness or chronic condition.

73. For those with pre-existing respiratory issues and cardiovascular disease like asthma or other respiratory diseases, wildfire smoke and exposure to PM2.5 may lead to breathing difficulties and exacerbate such symptoms and diseases. Accordingly, inhalation of wildfire smoke may affect developing lungs, result in or exacerbate asthma symptoms and/or trigger asthma attacks, result in increased respiratory symptoms and decreased lung function, and induce symptoms like coughing, wheezing, difficulty breathing, and chest tightness.

74. Those with cardiovascular disease may be particularly prone to increased risks of heart attacks and sudden death from cardiac arrhythmia, heart failure, or stroke.

75. Increased levels of air pollutants like PM have also been shown to be associated with cardiovascular disease—the leading cause of death worldwide—including ischemic heart disease and stroke.

Carbon Monoxide

76. Carbon monoxide (CO) is a colorless, odorless gas that is most present and concentrated during a fire's smoldering stages (typically at the end of a fire). Carbon monoxide particles are also almost invisible to the naked eye.

77. Carbon monoxide is deadly, even in small amounts. Concentrated exposure to carbon monoxide may result in red blood cell poisoning, cell death, and interference with oxygen update. Furthermore, carbon monoxide exposure has been tied to headaches, reduce alertness, and aggravation of a heart condition known as angina. Exposure has also been tied to the worsening of pre-existing conditions such as asthma and heart disease.

Carbon Dioxide

78. Carbon dioxide ($CO_2$) is a colorless, odorless, non-flammable gas that may bereleased through the burning of gasoline, coal, oil, and wood. Carbon dioxide acts as a simple asphyxiant, a gas that reduces or displaces the normal oxygen in breathing air.

79. Extreme carbon dioxide concentrations may cause oxygen-depleted air. Extreme exposure to such air may lead to suffocation and death. Exposure to high levels of carbon dioxide may result in rapid breathing, confusion, increased cardiac output, elevated blood pressure, and increased arrhythmias. Mild exposure may cause headaches and drowsiness.

Nitrogen Oxides

80. Nitrogen oxides (NOx) consists of a group of related gases. Nitrogen oxide exposure may result in changes to the pulmonary system, including pulmonary edema, pneumonitis, bronchitis, bronchiolitis, emphysema, and methemoglobinemia. Symptoms like cough, hyperpnea, and dyspnea may also result.

81. Nitrogen dioxide ($NO_2$), one type of nitrogen oxide, can form when fossil fuels like wood or natural gas are burned in wildfires. Nitrogen dioxide dissolves the airway lining fluid and creates a powerful acid that damages small airways in the lungs and may damage structural and functional lung cells. Nitrogen dioxide can also initiate free radical generation, causing protein oxidation, lipid peroxidation, and cell membrane damage, and reduce resistance to infection by altering macrophage and immune function.

82. Nitrogen dioxide exposure may also cause increased inflammation of the airways, worsened cough and wheezing, reduced lung function, increased asthma attacks, and a greater likelihood of emergency department and hospital admissions. For children, exposure to nitrogen dioxide has been found to cause asthma.

Volatile Organic Compounds

83. Volatile organic compounds (VOCs) are a class of chemicals that vaporize into air Typically colorless, these compounds may be released through gasoline, burning wood, and/or other fuels.

84. Because VOCs consists of a class of chemicals, exposure to VOCs has varying health effects. At the most extreme, exposure to VOCs may be hazardous, as some have been proven to be carcinogenic, such as benzene (leukemia), formaldehyde (nose and throat, leukemia), TCE (kidney cancer), chloroform (bladder, intestine, liver and kidney cancer), and naphthalene (throat cancer).

85. Low levels of exposure to VOCs may cause eye, nose, and throat irritation, headaches, nosebleeds, fatigue, nausea, and dizziness. Higher exposure may cause liver, kidney, or central nervous system damage, along with possible vision and memory problems. Polycyclic Aromatic Hydrocarbons

86. Polycyclic aromatic hydrocarbons (PAHs) are a class of chemicals that may be released from the burning of coal, oil, gas, wood, garbage, and tobacco. PAHs can bind to or form small particles in the air.

87. Scientists consider several of the PAHs to be carcinogenic. Long-term health effects of exposure to PAHs may include cancer, cataracts, kidney and liver damage, and jaundice. Repeated skin contact may result in redness and inflammation the skin, and when exposed to sunlight, skin that has come into contract with PAHs may peel and blister. Health Effects on Populations Most at Risk

88. Even for otherwise healthy individuals without pre-existing conditions, brief exposure to wildfire smoke can lead to stinging eyes, irritated sinuses, wheezing, shortness of breath, headaches, itchy skin, and coughing.

89. However, for populations such as children, pregnant woman, the elderly, people with pre-existing lung or heart diseases and respiratory infections, those suffering from COVID19, and stroke survivors, the adverse health effects of wildfire smoke inhalation are more acute, as these populations are more likely to suffer chronic symptoms.

90. Children are at risk for exposure to wildfire smoke because they tend to breathe faster, are more active outdoors, and breathe in more air per pound of body weight in comparison to adults. Additionally, their lungs are still developing, meaning that any exposure children have to poor air quality from wildfires may result in negative impacts on their long-term health.

91. Adults older than 60 can be at a higher risk of harmful effects from wildfire smoke due to the frequency of pre-existing respiratory and heart conditions, as well as a decline in natural physiological defense systems. Individuals with chronic respiratory or cardiovascular disease, such as those living with heart or lung diseases like coronary artery disease, asthma or chronic obstructive pulmonary disease (COPD), are also more likely to be affected when fine particle pollution reaches an unhealthy level.

93. Pregnant women are more at risk to wildfire exposure, as exposure has been associated with pregnancy loss, low birth weight, and preterm delivery. Some studies have also indicated that wildfire exposure may cause cellular damage in first- and second-trimester placentas.

Health Effects on the General Population

94. In the short term, exposure to wildfire smoke has been linked to increased hospitalization and emergency department visits for visits for respiratory symptoms, exacerbation of asthma, and chronic obstructive pulmonary disease (COPD).

95. Long term health effects from wildfire exposure include eye and respiratory tract irritation, respiratory infection, asthma, COPD, reduced lung function, bronchitis, exacerbation of asthma, heart failure, increased risk of all-cause mortality, premature death, and respiratory morbidity, and cancer.

CAUSES OF ACTION

COUNT I

NEGLIGENCE

(Against all Defendants)

96. Plaintiffs and Class Members, hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

97. Plaintiffs and Class Members bring this cause of action for negligence against all Defendants, and/or each of them.

98. Defendants, and/or each of them, as owners and/or controllers of the Electrical System, were under a duty codified in Civil Code § 1714(a), which states, in pertinent part:

Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself.

99. Specifically, Defendants, and/or each of them, were under a duty to maintain the Electrical System in their possession in a reasonably safe condition.

100. At all relevant times, Defendants, and/or each of them, operated, controlled, and/or maintained the Electrical System.

101. At all times relevant, Defendants, and/or each of them, were required to own, design, control, possess, operate, install, construct, inspect, maintain, and manage the Electrical System, including the real estate, rights-of-way, vegetation, easements, fixtures, conductors, devices, poles, conduits, apparatus, parts, and equipment in accordance with all standards, laws, rules, regulations, and orders pertaining thereto.

Case: 19-30088   Doc# 14126   Filed: 11/09/23   Entered: 11/09/23 11:50:59   Page 15 of 33

102. Defendants, and/or each of them, in connection with the production, sale, transmission, and distribution of electricity have a non-delegable duty, commensurate with and proportionate to the danger of transmitting power, to own, design, control, possess, construct, operate, install, inspect, maintain, and/or manage the Electrical System in a proper, reasonable, careful, and safe manner.

103. The Dixie and Fly Fires were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendants, and/or each of them. Defendants, and/or each of them, breached their respective duties owed individually and/or collectively to Plaintiff by, including but not limited to:

(a) Failing to comply with the applicable statutory, regulatory, and/or professional standards of care;

(b) Failing to timely and properly maintain, manage, inspect, and/or monitor the Electrical System, and/or adjacent vegetation;

(c) Failing to make the power lines in the Electrical System safe under all the exigencies created by surrounding circumstances and conditions;

(d) Failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections of the Electrical System and adjacent vegetation;

(e) Failing to design, construct, monitor, and/or maintain the Electrical System in a manner that avoids the potential to ignite a fire or fires during long, dry seasons;

(f) Failing to install the equipment necessary and/or to inspect and repair the equipment installed, to prevent the power lines in the Electrical System from improperly sagging, operating, and/or making contact with other power lines placed on its poles or vegetation and igniting fires;

(g) Failing to keep electrical equipment in its Electrical System in a safe condition and/or manage electrical equipment in its Electrical to prevent fire at all times;

(h) Failing to de-energize power lines in its Electrical System during fire-prone conditions;

(i) Failing to de-energize power lines in its Electrical System after the fire(s)' ignition;

(j) Failing to properly train and to supervise employees and agents responsible for maintenance and inspection of the Electrical System and/or vegetation areas nearby that Electrical System;

(k) Failing to remove leaning trees in danger of contacting the Electrical System;

(l) Violating Health & Safety Code § 13007 by allowing fire to be set to the property of another;

(m) Violating Public Resources Code § 4293; and/or

(n) Failing to maintain its Electrical Equipment in accordance with the requirements of PUC General Orders 95 and 165.

104. Further, CAL FIRE's Investigation Report directly found that PG&E's prolonged response to the initial outage and fault that occurred at 6:48 a.m., was a direct factor in the ignition of the Dixie Fire. Had PG&E arrived on scene earlier, they could have detected the fault (subject tree in conductors) and opened the third fuse before it had time to ignite a receptive fuel bed. The supervisory control and data acquisition data shows the fault and subsequent outage occurred at approximately 6:48 a.m. According to witness statements from Butte County Public Works employees, the bridge work did not commence until 9:00-9:30 a.m. This provided several hours for PG&E to respond to the location of the fault prior to the bridge work.

105. CAL FIRE determined that when PG&E could not access the fault because of the bridge work, they could have opened the 941 switch and de-energized that portion of the Bucks 1101 circuit related to the Dixie Fire. It is common and historic knowledge that the Highway 70 corridor is known for extreme fire danger and poor access. Several large and devastating fires including the Camp Fire, (a PG&E caused fire) have ignited over the last several years in that geographical area. It is also common knowledge that the month of July in Butte County and surrounding areas is peak fire season, yet no sense of urgency was demonstrated by PG&E to determine the cause of the fault in a fire-prone area during a severe time of year.

106. CAL FIRE determined through vegetative inspections required of PG&E that the subject [Douglas-Fir] tree (approximately 65 feet tall and located approximately 50 feet from the conductors) should have been discovered and removed between 2008 and 2021. Had the subject tree have been removed as required by Public Resource Code § 4293, the Dixie Fire would not have ignited on July 13, 2021.

107. Plaintiffs and Class Members are informed and believe, and on that basis allege, that the White Fir tree which fell on the Gansner 1101 Circuit should have also been tagged and removed prior to the start of the Fly Fire.

108. As a direct and legal result of Defendants' actions and/or omissions causing the Dixie Fire, Plaintiffs and Class Members were exposed to air pollutants and have an increased or significantly increased risk in health, strength, and/or activity in amount according to proof of trial.

109. As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs and Class Members all presently require and will continue to require the employment of physicians and other healthcare providers to examine and treat injuries suffered as a result of the Dixie Fire.

110. The Dixie Fire was a result of Defendants' continued practice of prioritizing profits over safety, wherein they failed to properly maintain and/or inspect their electrical equipment knowing that the likely outcome was a fire that could result in injury to members of the public and destruction of structures and property.

111. Defendants, including one or more PG&E officers, directors, and/or managers have deliberately, have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Dixie Fire. This is despicable and oppressive conduct. Plaintiffs and the Class thus seek punitive damages in an amount sufficient to punish Defendants' and deter such conduct in the future.

COUNT II

MEDICAL MONITORING

(Against all Defendants)

112. Plaintiffs and Class Members hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

113. Defendants were fully aware of the danger of exposing citizens to wildfires when they failed to properly design, construct, operate, maintain, inspect, and manage its electrical infrastructure.

114. As a proximate result of Defendants' acts and/or omissions, Plaintiffs and Class Members experienced significant exposure to wildfire smoke and other toxic, carcinogenic substances at levels that are far higher than normal. These toxic substances, including PM, carbon monoxide, carbon dioxide, nitrogen oxides, volatile organic compounds, and polycyclic aromatic hydrocarbons are dangerous and have been proven to cause cancer and other serious diseases and illnesses in humans.

115. As a proximate result of Defendants acts and/or omissions, Plaintiffs and Class Members have an increased risk of developing a variety of wildfire exposure-related illnesses, including, but not limited to eye and respiratory tract irritation, respiratory infection, asthma, COPD, reduced lung function, bronchitis, exacerbation of asthma, heart failure, all-cause mortality, premature death, respiratory morbidity, and cancer. The increased risk of such illnesses, diseases, and/or cancer makes periodic diagnostic medical examinations reasonably necessary.

116. This increased risk will warrant a reasonable physician to order monitoring. Early diagnosis of these diseases and/or cancers has significant value for Plaintiffs and Class Members because diagnoses will help them monitor and minimize the harm therefrom.

117. Diagnostic and/or monitoring procedures exist that comport with contemporary scientific principles and the standard of care and make possible early detection of potential injury to Plaintiffs and Class Members, which would not be possible without such diagnostic and/or monitoring procedures. The proposed Court-supervised diagnostic and/or monitoring program includes, but is not limited to, anatomical baseline exams and diagnostic exams. This program is necessary and includes more monitoring than will be typically provided to Class Members to detect, prevent, and mitigate injury that may occur if the treatment is delayed, and enable prompt treatment of the adverse consequences of the Dixie Fire.

118. As a result of toxic exposure to the wildfire smoke emanating from the Dixie Fire, the need for Plaintiffs' and Class Members' future monitoring is reasonably certain, and the monitoring is reasonable.

119. By monitoring and testing Plaintiffs and Class Members who are at increased risk of injury from the Dixie Fire, the risk of Plaintiffs and Class Members suffering injury and disease may be significantly reduced, as the physicians of Plaintiffs and Class Members will have gained the information necessary to choose appropriate interventions and treatments.

120. A Court-supervised monitoring procedure is reasonably necessary according to contemporary scientific principles to enable Plaintiffs to obtain early detection and diagnosis of the potential injury and increased risk of injury as a result of the Dixie Fire.

121. Plaintiffs therefore seek an injunction creating a Court-supervised, Defendantfunded medical monitoring regime for Plaintiffs and Class Members, which will facilitate the early diagnoses and adequate treatment in the event a Dixie Fire related injury is discovered. 122. Accordingly, Defendants should be required to establish a Court-supervised and Court-administered trust fund, in an amount to be determined, to pay for the medical monitoring for protocol for all Class Members, which includes, among other things: (1) a notice campaign to all Class Members informing them of the availability and necessity of the medical monitoring protocol (2) a baseline and diagnostic exam related to, including, but not limited to, smoke inhalation problems and/or carcinogenic and/or other toxic effects.

123. Defendants' negligent conduct has caused significant increased risk, as described above, that the law recognizes as an injury to legally protected rights, giving rise to claims for injunctive/equitable relief. The distribution of damages to individual Class Members without programmatic relief as described above is inadequate, inefficient, and/or inferior to a judicial injunctive, declaratory, or equitable degree, establishing and supervising class-wide medical monitoring services as described and sought herein. Plaintiffs and Class Members have no adequate remedy at law, in that monetary

damages cannot compensate them for the increased risks of disease or illness in relation to the Dixie Fire.

124. Without a Court-supervised comprehensive medical monitoring fund as described herein, Plaintiffs and Class Members will continue to face increased risks of injury without proper diagnosis and opportunity for rehabilitation.

PRAYER FOR RELIEF

125. For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class.

126. For an order granting an injunction for the requested medical monitoring relief to provide Plaintiffs and Class Members with periodic medical examinations and such other medical procedures as are reasonably necessary and designed to facilitate early detection and treatment of conditions related to the Dixie Fire. In addition, for the establishment of a Court-supervised medical monitoring program/fund to gather and forward to treating physicians of Plaintiffs and the Class Members information relating to the prevention, detection, and treatment of conditions related to the exposure to the Dixie Fire.

127. For an award of attorneys' fees, costs, and litigation expenses, to extent permitted by law.

128. For pre-judgment and post-judgment interest to Plaintiffs and Class Members.

129. For punitive and exemplary damages against PG&E, according to proof.

130. For such further relief this Court may deem just and proper.

DEMAND FOR JURY TRIAL

131. Plaintiffs and Class Members hereby demand a jury trial, on all issues and causes of action.

Dated: July 13, 2023 SINGLETON SCHRIBER, LLP

By: _____

Gerald Singleton

Paul Starita

Attorneys for Plaintiffs, LARA WHEELER and

JULIE PETERSON, on behalf of themselves and all other similarly situated individuals

## CATHY YANNI AND BROWN/GREER ARE ENGAGED IN MAKING BANKRUPTCY LAW AND BREACHING THEIR FIDUCIARY DUTY TO BANKRUPTCY CLAIMANTS.

Cathay Yanni and Brown/Greer are engaged in a scheme to make bankruptcy law and declare that only fire victims in their arbitrary burn zone merit a proper settlement. Other claimants are considered nuisance claims by Trustee Yanni and Brown/Greer PLC.

In my claim I provided over 200 documents as evidence of the injuries to both person and property that occurred from the Camp Fire to the contamination zone in Chico. With the very well researched lawsuit of Wheeler/Peterson, this is further proof that the Chico contamination by P G and e is not mere nuisance as Yanni and Brown/Greer have characterized it. In fact, Chico's contamination from the Camp Fire is far worse than the Dixie Fire. Cars were covered in toxic ash. Chico residents were forced to breathe toxic smoke and ash for over a week.

My claim in the P G and E bankruptcy was abundantly fair and conservative. Trustee Yani and Brown/Greer are now engaged in a coverup of the environmental contamination of Chico and the medical injuries suffered by Chico residents. Furthermore, they are engaged in an even worse coverup on behalf of P G and E to ignore the long term injuries that will continue to harm Chico residents exposed to the Camp Fire toxins.

Were it not for the Bankruptcy, the law firm of SINGLETON SCHREIBER, LLP and many other law firms would currently be engaged in litigation against P G and E for environmental contamination of Chico and the injuries to Chico residents. What is being perpetrated is a scheme to protect P G and E from their liability for this environmental disaster.

As proof of Trustee Yanni's and Brown/Greer's conspiracy to defraud claimants, I would point out that they are protecting P G and E by completely ignoring the environmental contamination of Chico. Have they set aside any funds for medical monitoring? Have they requested testing of the soil in Chico for contamination?

How did Trustee Yanni and Brown/Greer determine that all other claims outside their designated Burn Zone will only constitute a nuisance? What bankruptcy law did they employ to make this determination?

I have noticed that Trustee Yanni and Brown/Greer utilize a take it or leave it form of extortion. I have notified them multiple times that I disagree with their determination regarding the Chico environmental contamination and Chico Claimants damages. I notified them that I was in the process of obtaining soil samples analysis to prove the

environmental contamination of Chico and its reoccurring hazards to the human health of Chico residents. Chico is a contamination zone and this is being completely ignored by Trustee Yanni and Brown/Greer. They don't live here and don't care.

I am still in the process of obtaining soil samples but this is complicated since I need to first locate areas without previous contamination.

## PRAYER FOR RELIEF

I request that Judge Montalli intervene. I request that Judge Montalli determine if Chico Claims for the Environmental Contamination of Chico has no merit in the Bankruptcy process above nuisance claims. I further request that Judge Montalli make a determination that the Chico Claimants do not have a significant claim in Bankruptcy for the serious health injuries that were done by the Camp Fire and that further there is no future injury/illness damages entitled to consideration in the Bankruptcy.

I request that Judge Montalli intervene and grant the status of Chico residents in Bankruptcy that is being requested by SINGLETON SCHREIBER, LLP in the aforementioned lawsuit.

## EXHIBITS:

### (1) ENVIRONMENTAL PROTECTION AGENCY'S AIR QUALITY INDEX FOR THE DAYS OF THE CAMP FIRE.

Served Electronically.

David Edward Martin, In Pro Se.

3108 Aloha Lane

Chico, California 95973

1
2

**EXHIBIT 1**


CAMP FIRE 8
NOVEMBER,
2018.PNG


CAMP FIRE 9
NOVEMBER,
2018.PNG


CAMP FIRE 10
NOVEMBER,
2018.PNG


CAMP FIRE 11
NOVEMBER,
2018.PNG

10 II


CAMP FIRE 12
NOVEMBER,
2018.PNG


CAMP FIRE 13
NOVEMBER,
2018.PNG


CAMP FIRE 14
NOVEMBER,
2018.PNG


CAMP FIRE 15
NOVEMBER,
2018.PNG

II


CAMP FIRE 12
NOVEMBER,
2018.PNG


CAMP FIRE 13
NOVEMBER,
2018.PNG


CAMP FIRE 14
NOVEMBER,
2018.PNG


CAMP FIRE 15
NOVEMBER,
2018.PNG

23
24
25
26
27
28

1



CAMP FIRE 16
NOVEMBER,
2018.PNG



CAMP FIRE 17
NOVEMBER,
2018.PNG



CAMP FIRE 18
NOVEMBER,
2018.PNG



CAMP FIRE 19
NOVEMBER,
2018.PNG

8



CAMP FIRE 20
NOVEMBER,
2018.PNG



CAMP FIRE 21
NOVEMBER,
2018.PNG



CAMP FIRE 22
NOVEMBER,
2018.PNG

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Legend ▼

U.S. Air Quality Index

- ● Good (0-50)
- ○ Moderate (51-100)
- ● Unhealthy for Sensitive Groups (101-150)
- ● Unhealthy (151-200)
- ● Very Unhealthy (201-300)
- ● Hazardous (301-500)
- ○ No Data

*Note: Values above 500 are considered Beyond the AQI. Follow recommendations for the Hazardous category. Additional information on reducing exposure to extremely high levels of particle pollution is available here here.*

## AIR QUALITY PERSPECTIVE
## NOVEMBER 8, 2018



## NOVEMBER 9, 2018



Case: 19-30088    Doc# 14126    Filed: 11/09/23    Entered: 11/09/23 11:50:59    Page 26 of 33

1

2

## **NOVEMBER 10, 2018**



14

15

## **NOVEMBER 11, 2018**



26

27

28

1

2

## **NOVEMBER 12, 2018**

3



14

## **NOVEMBER 13, 2018**

15



26

27

28

Case: 19-30088   Doc# 14126   Filed: 11/09/23   Entered: 11/09/23 11:50:59   Page 28 of 33

## NOVEMBER 14, 2018



## NOVEMBER 15, 2018



Case: 19-30088   Doc# 14126   Filed: 11/09/23   Entered: 11/09/23 11:50:59   Page 29 of 33

1

## NOVEMBER 16, 2018

2



13

14

## NOVEMBER 17, 2018



25

26

27

28

Case: 19-30088    Doc# 14126    Filed: 11/09/23    Entered: 11/09/23 11:50:59    Page 30 of 33

## NOVEMBER 18, 2018



## NOVEMBER 19, 2018



Case: 19-30088   Doc# 14126   Filed: 11/09/23   Entered: 11/09/23 11:50:59   Page 31 of 33

## NOVEMBER 20, 2018



## NOVEMBER 21, 2018



1

2 **NOVEMBER 22, 2018**



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case: 19-30088    Doc# 14126    Filed: 11/09/23    Entered: 11/09/23 11:50:59    Page 33 of 33