1  LAWRENCE A. JACOBSON, SBN 057393
   SEAN M. JACOBSON, SBN 227241
2  COHEN AND JACOBSON, LLP
   66 Bovet Road, Suite 285
3  San Mateo, CA 94402
   Telephone: (650) 261-6280
4  *laj@cohenandjacobson.com*

5  Attorneys for Amir Shahmirza
   (Agent for Komir, Inc.) and Komir, Inc.
6

7              UNITED STATES BANKRUPTCY COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9                 SAN FRANCISCO DIVISION

10  In re                              Case No. 19-30088 (DM)

11  PG&E CORPORATION,                  Chapter 11

12        - and -                      (Lead Case) (Jointly Administered)

13  PACIFIC GAS AND ELECTRIC
    COMPANY,                           **CLAIMANT'S REPLY TO PG&E'S**
14                                     **OPPOSITION TO CLAIMANT'S**
          Debtors.                     **SECOND MOTION FOR PARTIAL**
15                                     **SUMMARY JUDGMENT**

    G Affects PG&E Corporation
16  G Affects Pacific Gas and Electric Company   **Date:  December 19, 2023**
    O Affects both Debtors                        **Time:  10:00 a.m.**
17                                                 **Place: (Tele/Videoconference**
                                                   **Appearances Only)**
18                                                 **United States Bankruptcy Court**
                                                   **Courtroom 17, 16th Floor**
19                                                 **San Francisco, CA 94102**

20

21  _____

22

23

24

25

26

27

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PG&E'S PURPORTED ADDITIONAL "UNDISPUTED MATERIAL FACTS" DO
        NOT PRESENT ANY GENUINE ISSUES OF DISPUTED FACTS.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      Summary of, and Response to, PG&E's Purported Additional Facts. . . . . . . 1

        B.      Mr. Shahmirza's Testimony By Declaration Concerning the Lowering of the
                Lines by Eleven Feet (11') Remains Uncontradicted. . . . . . . . . . . . . . . . . . . 3

        C.      In Deposition, Mr. Shahmirza Testified in Further Detail Concerning His
                Percipient Observation of the Lowered Lines and the Axiomatic Geometric
                Alterations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        D.      The Realtime Emails and Correspondence Corroborate PG&E's Making the
                Statement of Line Height Reduction and its Failure to Dispute. . . . . . . . . . . 5

        E.      The Failure to Express Disagreement with the Multiple Repetitive
                Statements of the Lowering of the Height of the Lines Constitutes an
                Adoptive Admission Binding PG&E to Agreement with the Statements. . . . . 6

III.    LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      Due to its Non-Payment of Real Property Taxes, PG&E Cannot Establish,
                and Has Not Established, Prescriptive Rights Against Any Owner of the
                Komir Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      PG&E's Possession of the Space Occupied by the New High Voltage
                        Transmission Lines is Exclusive of any Other Use. . . . . . . . . . . . . . . . 7

                        (a)     PG&E's Description of the High Voltage Transmission Lines
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                        (b)     PG&E's Contention That its Use Is Non-Exclusive Because
                                Komir Can Use the Surface and Subterranean Portions of the
                                Property Actually Proves the Exclusivity. . . . . . . . . . . . . . . . 7

                2.      PG&E's Fiction That its Use Is Non-Exclusive Comports with the
                        Aberrational Practice of Mis-characterization to Avoid the
                        Requirement of Tax Payment That *Hansen* Rejected as An Improper
                        Avoidance of the Prerequisite for Exclusive Use Prescription. . . . . . 8

                3.      PG&E Confuses the Requirement for Payment of Property Taxes to
                        Acquire an Exclusive Use Prescriptive Right with the Differing
                        Requirement for a Non-Exclusive Easement. . . . . . . . . . . . . . . . . . . . 9

        B.      No Statute of Limitations Has Caused any Grant of Prescriptive Easement to
                Arise if Favor of PG&E as the Trespass Has Been and Is Continuing with a
                New and Different Form of Trespass Having Commenced in 2018. . . . . . . . 10

CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT                                                    i

Case: 19-30088    Doc# 14157    Filed: 12/01/23    Entered: 12/01/23 14:46:13    Page 2
                                        of 19

|     |     | (1) | Continuing Trespass Occurs When the Damage Continues, Not When the Act of Initially Committing the Trespass Occurs. . . . . . . . . . . . . . . 11 |
|     |     | (2) | A Trespass Is Also Continuing in the Event That it Can Be Abated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 |
|     |     | (3) | To Avoid Unfairness to the Landowner, the Courts Grant the Landowner an Election to Treat a Trespass as Continuing or Permanent and Komir Has Elected Continuing Trespass. . . . . . . . . . 11 |
|     | C. | | PG&E Installed the Transmission Lines and Continued its Use of the Space Occupied by Them with Permission Granted in Recorded Easements, and That Consent Continued in Practical Effect After the Extinguishment. . . . . 12 |
|     |     | (1) | Prior to the Sale to Komir, i.e., Pre-2000 . . . . . . . . . . . . . . . . . . . . . . 12 |
|     |     | (2) | After the Sale to Komir Prior to Destruction of the Towers and Reconfiguration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13 |
|     |     | (3) | Komir Terminated its Consent to the Transmission Lines and Filed its Lawsuit Within Less than One Year after the Dispute Regarding Them Arose Rendering Prescription Temporally Impossible. . . . . . . 13 |
|     | D. | | While PG&E Had No Prescriptive Rights Prior to 2018, Any Such Rights Were Extinguished When PG&E Destroyed the Pre-existing Towers and Totally Reconfigured its Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13 |

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

ii

Case: 19-30088    Doc# 14157    Filed: 12/01/23    Entered: 12/01/23 14:46:13    Page 3 of 19

**TABLE OF AUTHORITIES**

Cases

*Glatts v. Henson*, 31 Cal.2d 368 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cleary v. Trimble, 229 Cal.App.2d 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gilardi v Hallman*, (1981) 30 Cal.3d 317. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Guerra v Packard* (1965) 236 CA2d 272 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hansen v Sandridge Partners, L.P.* (2018) 22 CA 5th 1020 . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Int'l Union, United Auto., etc. v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972) . . . . . . . . . . . . . . . 4

*Jiminez v All Am Rathskeller Inc.*, 503 F3d 247 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 14

*Kapner v. Meadowlark Ranch Assn. (2004) 116 Cal.App.4th 1182* . . . . . . . . . . . . . . . . . . . . 8

*Lyle v State of California* (2007) 153 CA4th 281. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mangini v. Aerojet-General Corp.* (1991) 230 Cal. App. 3d 1125. . . . . . . . . . . . . . . . . . . . . 11

*McLear-Gary v Scott*, (2018) 25 CA5th 145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*O'Banion v. Borba* (1948) 32 Cal.2d 145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Otay Water Dist. vs Beckwith* (1991) 11 Cal.App.4th 1296 . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Smith v Skrbek* (1945) 71 CA2d 351. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 CA4th 583 . . . . . . . . . . . . 11

*Zimmer v Dykstra* (1974) 39 Cal.App. 3d 422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Statutes

Federal Rules of Evidence, Rule 80. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

California Civil Code §829 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Federal Rules of Civil Procedure, Rule 56(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Texts

McCormick § 246, p. 527, n. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Corpus Juris Secundum*, 28 C.J.S. 668, § 18 (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Amir Shahmirza, as agent of, and acting on behalf of, Komir, Inc. ("Komir" or

2    "Claimant"), submits the following points and authorities in reply to PG&E's Opposition to

3    Claimant's Second Motion for Partial Summary Judgment ("PG&E Opposition").

4    **I.      INTRODUCTION**

5           In its prior Counter-Motion for Summary Judgment (Docket # 13567, the "Counter-

6    Motion"), PG&E attempted, unsuccessfully, to persuade the Court that there existed no facts that

7    would preclude the establishment of prescriptive rights in its favor, i.e., PG&E urged that the

8    facts were undisputed with regard to this issue.  PG&E now attempts to urge the precise opposite,

9    with the PG&E Opposition attempting to manufacture disputed "facts" and presents confused

10   legal arguments to avoid the converse ruling, i.e., that PG&E has no prescriptive rights.

11          The PG&E Opposition does not contain any new factual or legal basis for any different

12   ruling than the Court has already determined in denying PG&E's Counter-Motion for

13   determination that it had any prescriptive easement rights.  Komir therefore requests that its

14   Motion be granted.

15   **II.     PG&E'S PURPORTED ADDITIONAL "UNDISPUTED MATERIAL FACTS" DO
            NOT PRESENT ANY GENUINE ISSUES OF DISPUTED FACTS.**
16

17          **A.      Summary of, and Response to, PG&E's Purported Additional Facts.**

18          PG&E presents, as purported missing "material facts critical to the outcome of [MSJ#

19   2],[1]" the contentions discussed below.

20          1.      "PG&E has maintained the Transmission Lines over the Komir Property for
                    decades, since long before Claimant acquired the Property in 2000"
21
             Response:
22
             The existence of the Old Transmission Lines[2] prior to 2018 is not disputed but
23           that fact is not relevant to the determination of MSJ #2.

24           The recorded easements under which those lines were constructed were

25   _____

26          [1] Komir refers herein to Claimant's Second Motion for Partial Summary Judgment of Issues
     in Reorganized Debtors Objection to Claim #2090 and to Claimant's Response Thereto as "MSJ #2."

27          [2] Komir utilizes the same definitions as appear in the moving papers.

28

1    extinguished by condemnation – as determined in Komir's initial Motion For
     Partial Summary Judgment that challenged the effectiveness of those documents.
2
     PG&E's Old Transmission Lines remained in place after the extinguishment by
3    consent as discussed below until PG&E removed the Old Transmission Lines and
     the towers to which they were connected, constructed totally New Transmission
4    Towers at locations that were laterally different and 15' to 20' closer to the Komir
     Property, and then attached the New Transmission Lines to the New Transmission
5    Towers at the new locations and at different heights.

6        2.    "The Transmission Lines are part of PG&E's critical electric infrastructure."

7              Response:

8              The fact that the Transmission Lines are a significant component of PG&E's
               operations is not relevant to whether PG&E has any legal right to maintain the
9              New Transmission Lines across Komir's Property.

10       3.    The Transmission Lines cannot be relocated off the Komir Property.  To do so is
               infeasible as it would require PG&E to obtain new land rights and involve
11             substantial cost and effort.

12             Response:

13             The second sentence in the statement of this contention defeats the claim
               presented in the first sentence.
14
               PG&E states only that the relocation would be "infeasible," not impossible, and
15             would require payment of the relocation costs – i.e., it *can* be done.

16             The fact of the matter regarding reconfiguration of the lines is that in 2018 PG&E
               destroyed the pre-existing towers, necessarily detached all the lines as the towers
17             to which they had been connected no longer existed, and then attached the lines to
               new towers at new locations.  PG&E has proven that it can relocate the lines as it
18             did so in 2018.

19             Moreover, this statement is not relevant to whether PG&E has any legal right to
               maintain the New Transmission Lines across Komir's Property.
20
         4.    "In 2018, the Transmission Towers to the north of the Komir Property were
21             relocated with the PG&E Transition Station, aligned just as they had always
               been."
22
               Response:
23
               PG&E does not define "aligned," a term used frequently throughout PG&E's
24             opposing papers, that is meaningless.  "Aligned" does not negate the fact that the
               New Transmission Lines are in different locations at different heights.
25
               Komir agrees that the New Transmission Lines directionally run in a generally
26             norther westerly/south easterly direction.  However, the general locational
               direction of the New Transmission Lines does not create any "alignment" that
27             would give rise to any prescriptive rights for the New Transmission Lines to

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**                    2

1    occupy the new space at their new locations and new heights.

2    5.    "At the lowest elevation over the Komir Property the Transmission Lines were not
           lowered."

3
           Response:

4
           This statement has no evidentiary foundation, does not accord with ordinary
5          human experience including the laws of physics and geometry, is inconsistent
           with prior statements by PG&E, and is inconsistent with Mr. Shahmirza's realtime
6          observation of the lowering of the lines as discussed in his deposition testimony
           quoted below.

7
           The only purported evidence of this conclusion is the Declaration of John Raines
8          who does not claim to have ever visited the Komir Property, who was not even
           employed by PG&E until March, 2020 when he began work as a field engineer,
9          and whose only means of attempting to establish height comparisons was to
           utilize some form of computer comparisons of a 2012 "scan" and a 2020 "scan."
10         Mr. Raines does not present any testimony that any of his conclusions were based
           upon an actual field measurement that involved a physical on-site calculation of
11         the distances.

12   **B.    Mr. Shahmirza's Testimony By Declaration Concerning the Lowering of the
             Lines by Eleven Feet (11') Remains Uncontradicted.**

13

14        PG&E seeks to discredit Mr. Shahmirza's testimony in the Declaration of Amir

15   Shahmirza in Support of Claimant's Second Motion for Partial Summary Judgment of Issues in

16   Reorganized Debtors Objection to Claim #2090 and Claimant's Response Thereto ("Shahmirza

17   Declaration-MSJ 2") Docket # 14007-2) regarding the statements made to him with respect to the

18   11' differential by arguing that (a) Mr. Shahmirza recounted the admission by the PG&E

19   representative "with the benefit of hindsight"; and (b) Mr. Shahmirza referred only to

20   "unspecified 'PG&E representatives.'"

21        Remarkably, however, in PG&E's Opposition, PG&E chose not to tell the Court that

22   PG&E had conducted the deposition of Mr. Shahmirza on October 12, 2023, i.e., 22 days prior to

23   filing its opposition, examined Mr. Shahmirza regarding the conversation, and Mr. Shahmirza

24   identified the person not only by first name but also by specific job title.

25        Mr. Shahmirza testified as follows:

26   Q.    What did you mean when you said lowest height?
     A.    Well, the information was given to me by PG&E's contractor.
27   Q.    Who?

28

| | | |
|---|---|---|
| 1 | A. | One of the construction managers there. |
| | Q. | You don't know his name? |
| 2 | A. | *I believe his name was Jason.* I don't have a recollection.  Maybe his name was Jason or so. |
| 3 | Q. | Okay. |
| | A. | *He was the top guy, he was a manager, and he told me that the lowest height of* |
| 4 | | *the wires were 73 feet before, the new ones are 62 feet, that's the information he gave me.* And it appears -- |
| 5 | Q. | When did he -- when did he tell you this? |
| | A. | During -- sometimes in 2018. (Emphasis Added; See copy of relevant pages of |
| 6 | | the transcript, Exhibit A to Shahmirza Declaration in Support of Reply ("Shahmirza Reply Declaration") at page 38, line 24 to 39, line 15) |
| 7 | | |

8   A construction manager named "Jason" is also identified in the emails between the

9   parties in 2018 See Exhibit B to Shahmirza Reply Declaration.

10   PG&E chose to not obtain, or to withhold, any testimony from Construction Manager

11   "Jason."  Per Federal Rule 56(e), the Court may conclude that any evidence from Jason would

12   corroborate Mr. Shahmirza's testimony.  *See also Int'l Union, United Auto., etc. v. NLRB*, 459

13   F.2d 1329 (D.C. Cir. 1972) ("Simply stated, the rule provides that when a party has relevant

14   evidence within his control which he fails to produce, that failure gives rise to an inference that

15   the evidence is unfavorable to him").

16   **C.    In Deposition, Mr. Shahmirza Testified in Further Detail Concerning His**
**Percipient Observation of the Lowered Lines and the Axiomatic Geometric**
17   **Alterations.**

18   In examination by counsel for PG&E at deposition on October 12, 2023, notwithstanding

19   continual interruption by PG&E's counsel, Mr. Shahmirza testified further concerning both his

20   visual observation of the lowered lines and the geometric alteration as follows:

| | | |
|---|---|---|
| 21 | Q. | Did anyone ever tell you that the horizontal placement of the towers within the transition station, the orientation east-west had changed? |
| 22 | A. | No, no one told me. That's a simple geometry. If the lot -- |
| | Q. | This is just based on your physical observation? |
| 23 | A. | No, it's not based on – |
| | ... | |
| 24 | | It's not based on my observation; it is a simple geometry. If you sit down and put it on a paper with the location of the lot and the location of the existing towers and |
| 25 | | then you move this -- this one closer, so the line changes. It's mathematically proven. There's no -- you know, if you sit down and draw it on a piece of paper, |
| 26 | | you'll see that for yourself that it cannot be in the same place, it changes. That's one. |
| 27 | ... | |
| 28 | | |

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**                    4

Case: 19-30088   Doc# 14157   Filed: 12/01/23   Entered: 12/01/23 14:46:13   Page 8
of 19

| | |
|---|---|
| 1 | Q.    But you don't know how far they moved, east to west. Right? |
| | A.    I don't know how far -- how far, but definitely they changed. *And if you are me, as* |
| 2 | *an owner, physically you will realize, you will notice that these lines are not in the* |
| | *same place as they were before.* |
| 3 | Q.    That's based on your observation though. |
| |       Right? |
| 4 | A.    *It is based on the observation, and it is also based on the mathematical fact that* |
| | *any --* |
| 5 | Q.    Okay.· When you say the mathematical fact, you didn't measure anything? |
| | A.    *No, it is not measurement, it's just the drawing.· If you just draw the existing* |
| 6 | *location of the towers and the orientation of the lot, and then you move line* |
| | *number three where the -- where those things move, you see everything moves. All* |
| 7 | *the projection of the overhead wires moves. It's a simple geometry, it's not just the* |
| | *observation, it's a factual thing that can be proven on paper.*" (Emphasis added, |
| 8 | See Exhibit C to Shahmirza Reply Declaration at page 54, line 5 to 55, line 23) |

**D.    The Realtime Emails and Correspondence Corroborate PG&E's Making the Statement of Line Height Reduction and its Failure to Dispute.**

The real-time emails and correspondence between Mr. Shahmirza and PG&E's "land agent," Scott Brady, confirm the statement without dispute by PG&E.

On September 18, 2018, Mr. Shahmirza wrote to Brady as follows:

"Mr. Scott Brady
*Please stop work on overhead lines over 800 walnut San Bruno. New tower installed without Komir's permission is closer to Komir's lot line and the overhead wires are lower to ground than previous lines.*
As previously discussed PG&E does not have any easement for overhead lines and existing lines shall not be modified without written permission from Komir Inc. *Please stop work on overhead lines over 800 walnut San Bruno until PG&E obtains a written agreement from Komir.*
Pictures are attached.
Best regards,
Amir Shahmirza
Komir Inc." (Emphasis added, See Exhibit D to Shahmirza Reply Declaration.)

Mr. Shahmirza sent a further email to Brady on October 4, 2018, stating:

"Mr. Scott Brady
The height at top of the new towers are 85 feet and bottom Bars at new towers are 62 feet above ground.
The height at top of the old towers are 75 feet and the Bars at old towers are 73 feet above ground.
*The wires across Komir's land are now 11 feet lower without Komir's permission.*
I look forward to hear from PG&E soon .
Best regards,
Amir Shahmirza
Komir Inc." (Emphasis added, See Exhibit E to the Shahmirza Reply Declaration)

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**      5

Case: 19-30088   Doc# 14157   Filed: 12/01/23   Entered: 12/01/23 14:46:13   Page 9 of 19

1    On October 10, 2018, Brady sent a responsive letter to Mr. Shahmirza stating that

2 PG&E's position was unchanged, namely, that PG&E would rely on its recorded easements to

3 continue the reconstruction and replacement of the transmission lines. (See Exhibit F to the

4 Shahmirza Reply Declaration).  No email from Brady or anyone else at PG&E, nor the extensive

5 letter of October 10, 2018, expressed any dispute or disagreement with Mr. Shahmirza's

6 statements regarding the height of the Old Transmission Lines, the lowered height of the New

7 Transmission Lines, or the fact that the height had been lowered by eleven feet.

8       **E.      The Failure to Express Disagreement with the Multiple Repetitive
                 Statements of the Lowering of the Height of the Lines Constitutes an**
9               **Adoptive Admission Binding PG&E to Agreement with the Statements.**

10      The failure to respond and to dispute constitutes an adoptive admission. Federal Rule of

11 Evidence Rule 801.  As explained in the Notes of Advisory Committee under FRE 801:

12      "(B)   **Under established principles an admission may be made by adopting or
              acquiescing in the statement of another.** While knowledge of contents would
13            ordinarily be essential, this is not inevitably so: "X is a reliable person and knows
              what he is talking about." See McCormick § 246, p. 527, n. 15. **Adoption or**
14            **acquiescence may be manifested in any appropriate manner. When silence is
              relied upon, the theory is that the person would, under the circumstances,**
15            **protest the statement made in his presence, if untrue. The decision in each
              case calls for an evaluation in terms of probable human behavior**. In civil
16            cases, the results have generally been satisfactory."  (Emphasis added)

17      If Brady, or any of his superiors who were reviewing the issue and formulating PG&E's

18 response considered that the predicate facts of relocation and height adjustment were incorrect,

19 the "probable human behavior" would have been an immediate and emphatic statement of

20 dispute.

21      By its silence regarding these facts, PG&E admitted them to be true.

22 **III.    LEGAL ARGUMENT**

23      **A.      Due to its Non-Payment of Real Property Taxes, PG&E Cannot Establish,
                 and Has Not Established, Prescriptive Rights Against Any Owner of the**
24               **Komir Property.**

25      As discussed extensively in Komir's opening memorandum, payment of real property

26 taxes is the *sine qua non* for establishing prescriptive rights for exclusive use of the property of

27 another.  *See*  Komir's Opening Memorandum (Docket # 14007-1) for analysis of the property

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

6

Case: 19-30088   Doc# 14157   Filed: 12/01/23   Entered: 12/01/23 14:46:13   Page 10
of 19

1  tax requirement.

2        This failure establishes a total preclusion.  As a result of the non-payment of taxes, PG&E

3  has been and remains precluded, as a matter of law, from establishing any prescriptive rights

4  against any owner at any time.  PG&E has not held any such rights at any time – not prior to

5  2000, not during the pre-destruction period of 2000-2018, and not after the destruction and

6  reconfiguration in 2018.

7        Komir further reviews below this requirement in the context of PG&E's Opposition.

8              **1.    PG&E's Possession of the Space Occupied by the New High Voltage**
                      **Transmission Lines is Exclusive of any Other Use.**
9
                    **(a)    PG&E's Description of the High Voltage Transmission Lines**
10

11       The unremarkable conclusion stated above is self evident based upon the location and

12  characteristics of the lines.

13       In its pleadings, PG&E describes the High Voltage Transmission Lines as follows:

14    •      "The project involved the reconstruction of six poles that supported six separate
             115 kV circuits in the Transition Station. These poles were replaced with three
15           new tubular steel poles within the Transition Station, with each tubular steel pole
             supporting two 115 kV circuits."  (Declaration of Mark Galicia at paragraph 4,
16           page 1, lines 18-21, Docket # 14112)

17    •      In addition, the values identified represent when the Transmission Line would be
             operating at its highest operating temperature of 392°F, under which conditions
18           the lines would sag to their lowest point. Although the Transmission Lines would
             operate at such high temperatures infrequently, during periods when electrical
19           load on the lines is at its maximum allowable level, it's under these conditions
             that the Transmission Lines would have maximum sag and the lowest ground
20           clearance.  (Declaration of John Raines, paragraph 14, page 4, lines 2-4)

21       The contention by PG&E that its use of the space occupied by the High Voltage

22  Transmission Lines as described by PG&E itself above is "non-exclusive" and that Komir can

23  share the space defies common sense and ordinary human experience, and reflects PG&E's

24  desperation in attempting to avoid the determination that it holds no prescriptive rights.

25                    **(b)    PG&E's Contention That its Use Is Non-Exclusive Because**
                            **Komir Can Use the Surface and Subterranean Portions of the**
26                          **Property Actually Proves the Exclusivity.**

27       The impossibility of PG&E's use being "non-exclusive" is negated by its own statement

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**                                      7

1    that the use is non-exclusive because Komir can use other space on the property, namely, the land

2    and subterranean areas but not the airspace occupied by the High Voltage Transmission Lines.

3        Pursuant to California Civil Code §829 Komir is entitled to occupy the airspace:

4        "The owner of land in fee has the right to the surface and to everything permanently
         situated beneath or above it."

5

6        The airspace exclusively occupied by the High Voltage Transmission Lines is

7    "permanently situated" above Komir's property.  PG&E's use is exclusive and in violation of

8    Civil Code §829.

9                    **2.    PG&E's Fiction That its Use Is Non-Exclusive Comports with the
                            Aberrational Practice of Mis-characterization to Avoid the**
10                  **Requirement of Tax Payment That *Hansen* Rejected as An Improper
                            Avoidance of the Prerequisite for Exclusive Use Prescription.**
11

12       Komir refers again to *Hansen v Sandridge Partners, L.P.* (2018) 22 CA 5th 1020, that

13   recognizes and renders ineffectual the common practice of mis-characterizing an exclusive

14   easement tantamount to fee acquisition as being non-exclusive as follows:

15       **"Unsurprisingly, claimants have often tried to obtain the fruits of adverse possession
         under the guise of a prescriptive easement to avoid having to satisfy the tax element.**
16       **(*Kapner v. Meadowlark Ranch Assn. (2004) 116 Cal.App.4th 1182, 1187 [11 Cal. Rptr.
         3d 138].*) That is, they seek judgments 'employing the nomenclature of easement but**
17       **… creat[ing] the practical equivalent of an estate.' (*Raab, supra, 51 Cal.App.3d at p.
         877.*) Such judgments "pervert[] the classical distinction in real property law**
18       **between ownership and use**." (*Silacci, supra, 45 Cal.App.4th at p. 564.*) *The law
         prevents this sophistry with the following rule: If the prescriptive interest sought by a*
19       *claimant is so comprehensive as to supply the equivalent of an estate, the claimant must
         establish the elements of adverse possession, not those of a prescriptive easement.* (*Raab,*
20       *at pp. 876–877.*) In other words, the law simply "does not allow parties who have
         possessed land to ignore the statutory requirement for paying taxes by claiming a
21       prescriptive easement." (*Kapner, at p. 1187*.)" (Emphasis supplied)

22       PG&E's effort to mis-characterize its use as non-exclusive constitutes precisely the

23   "sophistry" described in *Hansen*.

24       PG&E refers to *Otay Water Dist. vs Beckwith* (1991) 11 Cal.App.4th 1296 to support its

25   contention that its use for High Voltage Transmission Lines is not exclusive.  However, *Otay*

26   involved an action by a governmental agency and not by a private utility, and the issue involved

27   the use of 1.68 acres of an owner's 10 acre parcel for part of a reservoir.  In seeking a result that

28

1 would avoid the owner's pollution of the waterway, the Court found that under the facts of that

2 case, the use could stop and any right to use the owner's property would terminate. *Otay* did not

3 create a public utility exception to the requirement of payment of taxes and no other case or

4 statute so provides.

3. **PG&E Confuses the Requirement for Payment of Property Taxes to Acquire an Exclusive Use Prescriptive Right with the Differing Requirement for a Non-Exclusive Easement.**

7 PG&E refers to the opinion in *Gilardi v Hallman*, 30 Cal.3d 317, 321(1981), for its

8 contention that PG&E is not required to have paid the real property taxes in order to gain

9 exclusive prescriptive rights.

10 The Court in *Gilardi* did not hold that a claimant seeking to establish exclusive

11 prescriptive occupancy rights need not pay real property taxes unless the taxes have been

12 "separately assessed" against the occupied space.

13 Rather, the Court in *Gilardi* carefully noted the distinction between the requirements for

14 prescriptive adverse possession for establishment of an exclusive use (which must be met per

15 *Hansen, supra*) and the differing requirements for establishment of a non-exclusive simple

16 prescriptive easement.

17 The holding of the Court in *Gilardi* with respect to payment of real property taxes for the

18 non-exclusive easement (i.e., a circumstance not tantamount to adverse possession) requires

19 payment of the real property taxes to establish the non-exclusive easement if "separately

20 assessed."

21 PG&E similarly refers to the opinion in *Zimmer v Dykstra* (1974) 39 Cal.App. 3d 422 for

22 the proposition that "the fact that plaintiff did not pay taxes on disputed land did not preclude

23 acquisition of prescriptive easement by plaintiff and the burden of demonstrating that the

24 easement was separately assessed was on the owner of the servient estate." PG&E Opposition,

25 page 11, lines 7-9. This citation and attribution of the opinion to support of the quoted statement

26 is, at best, misleading.

27 The fact pattern in *Zimmer* involved the use of a common alleyway, with some useage

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 19-30088    Doc# 14157    Filed: 12/01/23    Entered: 12/01/23 14:46:13    Page 13 of 19

9

1    over the property of defendant Dykstra. Dykstra began construction of a fence to block the area

2    of common use, which would preclude Zimmer's continuing use. Zimmer sued Dykstra and

3    contested the attempt to terminate continuing use of the area of common usage.

4            The citation and argument in the PG&E Opposition are misleading, first, because the

5    *Zimmer* case did not involve any dispute regarding the use being non-exclusive and, secondly,

6    the issue of payment of the real property taxes was not litigated in the case.

7            Rather, in its opinion the Court provided a footnote that distinguishes the real property

8    tax payment required in simple non-exclusive shared use prescriptive easement issues as follows:

9            "An additional element listed by Witkin is that 'if any taxes are separately assessed
              against the easement, these must be paid.' (P. 2059.) In the case at bench this issue was
10           never raised in the pleadings or proof offered at the trial as to who paid the taxes.
              Accordingly, the fact that plaintiffs did not pay the taxes on the disputed portion of the
11           alley, if that be the fact, does not preclude their acquisition of a prescriptive easement
              'absent a showing that the easement was separately assessed, burden of proof of which is
12           upon the owner of the servient estate' [Dykstra]. (See Cleary v. Trimble, 229 Cal.App.2d
              1, 11 [39 Cal.Rptr. 776]; Glatts v. Henson, 31 Cal.2d 368 [188 P.2d 745].)"
13

14           Thus, the case did not involve any issue of taxes. The issue was "never raised" so the

15    Court simply observed that in the non-exclusive easement situation the claimant must pay the

16    property taxes if they are separately assessed against the easement area.

17           PG&E confuses the respective requirements for exclusive prescriptive easement/adverse

18    possession that requires payment of the real property taxes (i.e., the situation with the High

19    Voltage Transmission Lines) and for non-exclusive prescriptive easements that have a more

20    limited property tax requirement (e.g., common mutual use of roadways for access).

21           **B.    No Statute of Limitations Has Caused any Grant of Prescriptive Easement to
                      Arise if Favor of PG&E as the Trespass Has Been and Is Continuing with a
22                    New and Different Form of Trespass Having Commenced in 2018.**

23           PG&E made the same argument in MSJ #1 regarding the statute of limitations that it

24    presents in its opposition to MSJ #2. No other or different facts would warrant the recognition of

25    that argument that was rejected in the disposition of MSJ #1.

26

27

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**                                    10

1

        **(1)**     **Continuing Trespass Occurs When the Damage Continues, Not When the Act of Initially Committing the Trespass Occurs.**

2

3    In *Lyle v State of California* (2007) 153 CA4th 281 the Court explained as follows:

4    "In any event, the 'continuing' nature of a nuisance refers to the **continuing damage** caused by the offensive condition, **not to the acts causing the offensive condition to**

5    **occur**." (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal. App. 3d 1125, 1147 [281 Cal. Rptr. 827].) (Emphasis supplied)

6

7    The damage in the form of the loss of the disputed space was continuing as to the Old

8    Transmission Lines and continues with respect to the New Transmission Lines.

9            **(2)**     **A Trespass Is Also Continuing in the Event That it Can Be Abated.**

10    In *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 CA4th 583 the Court

11    held that another means of classifying a continuing trespass is by the potential abatement.

12    While PG&E attempts to create a disputed fact regarding this issue, PG&E recognizes

13    that removal would only be "infeasible" in a business sense of involving acquisition of other

14    property and cost of relocation. PG&E does not argue that abatement is impossible.

15    However, PG&E cannot manufacture such a "factual" dispute since, in 2018, PG&E did

16    precisely what it now claims would be "infeasible."

17            **(3)**     **To Avoid Unfairness to the Landowner, the Courts Grant the Landowner an Election to Treat a Trespass as Continuing or**

18                    **Permanent and Komir Has Elected Continuing Trespass.**

19    The Court in *Starrah* discussed the conundrum faced by landowners in terms of

20    characterizing a trespass as continuing or permanent as follows:

21    "As aptly stated in *Beck*: 'These distinctions can create particular problems for the parties. For example, if the defendant is willing and able to abate the [trespass] it may be unfair to

22    award prospective damages on the presumption that the [trespass] will continue. On the other hand, if it appears improbable that the [trespass] can or will be abated, or the

23    plaintiff is willing that the [trespass] continue provided compensation is paid for past and prospective injuries, then it may be unreasonable to leave the plaintiff to the troublesome

24    remedy of successive actions. And a too rigid   distinction between permanent and continuing [trespass] may constitute a trap for the unwary plaintiff who guesses wrong.'

25
    The Court in *Starrah* concluded its analysis with the following statement of policy:

26    "**For these reasons it is held that in doubtful cases the plaintiff has an election to treat a [trespass] as permanent or continuing**. [Citations.]' *(Beck, supra*, 44

27    Cal.App.4th at p. 1217.)" (Emphasis supplied)

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

11

Case: 19-30088   Doc# 14157   Filed: 12/01/23   Entered: 12/01/23 14:46:13   Page 15 of 19

1     Komir elected to treat the trespass as continuing, which it is.

2         **C.**     **PG&E Installed the Transmission Lines and Continued its Use of the Space Occupied by Them with Permission Granted in Recorded Easements, and**

3               **That Consent Continued in Practical Effect After the Extinguishment.**

4     One fact is clear without equivocation: PG&E considered that its use was consensual and

5 with permission under recorded easements. PG&E continued to advocate that position until this

6 Court's Order Granting Summary Judgment on June 12, 2023 (Docket # 13833).

7     Just as clearly, PG&E never urged that it was occupying the space of the transmission

8 lines under any prescriptive right arising from hostile possession.

9         **(1)**     **Prior to the Sale to Komir, i.e., Pre-2000**

10     The only purported evidence submitted by PG&E relative to the period prior to Komir's

11 acquisition is the Declaration of Melanie M. Brayton (Docket # 14114).

12     Declarant Brayton, also known as Melanie Hildebrand, states only that "I did not consent,

13 verbally or in writing, to the use of overhead electrical lines because there were recorded

14 easements and the lines existed."

15     Ms. Brayton's comment is unremarkable since PG&E admits in PG&E's Opposition that

16 it never requested consent from the Hildebrands[3] that coincides (a) with Ms. Brayton's statement

17 that she never overtly expressed consent, and (b) with PG&E's view that it occupied the space by

18 consent under the recorded documents.

19     Ms. Brayton refers to negotiations for acquisition of the property but does not present any

20 foundation for personal knowledge of anything other than that she and her husband bought the

21 property for $60,000, intended to develop it, engaged a construction designer, decided not to

22 develop, and sold to Komir for $300,000 thereby making a profit of $240,000.

23     As discussed in Komir's initial Memorandum, no prescriptive rights arise when

24 occupancy is permissive. Memorandum, 9:23-10:23; *Smith v Skrbek* (1945) 71 CA2d 351, 358;

25 *Corpus Juris Secundum*, 28 C.J.S. 668, § 18 (2); *Guerra v Packard* (1965) 236 CA2d 272.

26 _____

27     [3] At page 7, lines 11-13 PG&E states: "PG&E did not seek consent from the prior owners because it believed it had a right to occupy the Komir Property pursuant to its easements."

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**    12

Case: 19-30088   Doc# 14157   Filed: 12/01/23   Entered: 12/01/23 14:46:13   Page 16 of 19

1
               **(2)**       **After the Sale to Komir Prior to Destruction of the Towers and Reconfiguration.**

2

3
       As discussed above, the evidence regarding Komir's consent and PG&E's permissive use

4
prior to 2018 remains unchallenged. *See* Shahmirza Reply Declaration and the Declaration of

5
Amir Shahmirza in Support of Opposition to Counter-Motion for Summary Judgment by PG&E

6
filed on April 3, 2023 (Docket # 13654-1)

7
               **(3)**       **Komir Terminated its Consent to the Transmission Lines and Filed its Lawsuit Within Less than One Year after the Dispute Regarding**

8
                                  **Them Arose Rendering Prescription Temporally Impossible.**

9
       The critical fact regarding the alterations that occurred in 2018 is that those changes

10
caused Komir to terminate its consent to PG&E's occupation of the Property for Transmission

11
Lines.

12
       The measurement or characterization of the alterations is not relevant to the determination

13
on this Summary Judgment #2.

14
       PG&E cannot establish a five (5) year period of hostile possession, not only as matter of

15
fact as to whether occupation was hostile, but also because no five (5) year period elapsed

16
between the commencement of any adverse possession and the filing of the lawsuit.

17
           **D.**       **While PG&E Had No Prescriptive Rights Prior to 2018, Any Such Rights Were Extinguished When PG&E Destroyed the Pre-existing Towers and**

18
                      **Totally Reconfigured its Use.**

19
       As discussed regarding material facts above, the towers and lines that pre-existed the

20
reconfiguration in 2018 simply no longer exist. As stated in *McLear-Gary v Scott*, (2018) 25

21
CA5th 145, a change of existing use extinguishes any pre-existing easement:

22
          **"Prescriptive rights 'are limited to the uses which were made of the easements during the prescriptive period. [Citations.] Therefore, no different or greater use**

23
          **can be made of the easements without defendants' consent.'** (*O'Banion v. Borba* (1948) 32 Cal.2d 145, 155 [195 P.2d 10].)

24

25
       While PG&E attempts to posit a factual dispute as to a matter of degree, such is not the

26
case. By its own description of the "project," PG&E itself rebuts the notion of "minor

27
alterations." The undisputed facts before the Court demonstrate the total removal of the pre-

28

1    existing use that resulted in both termination of Komir's consent and extinguishment of any prior

2    (but non-existing) prescriptive rights.

3        **E.    The "Sham Affidavit Rule" Precludes a Party Responding to a Motion for Summary Judgment from Artificially Attempting to Create Matters of Factual Dispute.**

4

5        The doctrine referred to generally as the "Sham Affidavit Rule" precludes the contrivance

6    of asserting contradictory or unfounded factual contentions, or attempting to utilize declarations

7    that contradict objective evidence, to avoid summary judgment.

8        While the Sham Affidavit Rule is most frequently applied to declarations that contradict

9    prior deposition testimony, the underlying concept is that a responding party cannot avoid

10    summary judgment by presenting declarations that do not reflect genuine issues of fact.

11        In *Jiminez v All Am Rathskeller Inc*., 503 F3d 247, 251-252 (3rd Cir. 2007) the Court

12    described the nature and effect of the Sham Affidavit Rule as follows:

13        "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of

14    defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no

15    reasonable jury could rely on it to find for the nonmovant. See id. at 252. *Liberty Lobby* specifically recognizes the trial judge's power to grant summary judgment on disputed

16    records. See id. at 251. Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that

17    no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate."

18

19        As discussed in the Evidentiary Objections to the Declarations of John Raines, Michael

20    Sosinski and Mark Galicia, none of those declarants provide any competent or relevant facts but

21    are interposed to attempt to create the appearance of factual issues and to present a parade of

22    horribles to attempt to subjectively influence the decision making.

23        Those Declarations should be disregarded and afforded no weight or persuasion.

24                                **Conclusion**

25        PG&E cannot have any prescriptive right for its exclusive use of the space occupied by its

26    6 circuits of 115kV High Voltage Transmission Lines (operating sometimes at 392º F) because

27    PG&E never paid the real property taxes.  That fact defeats every argument presented by PG&E.

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

14

1    The notion that PG&E's use is non-exclusive is a fiction for summary judgment purposes.

2    Issues concerning remedies and damages, whether the lines must be relocated or whether

3    an alternative monetary award be formulated, are not relevant to this Motion for Summary

4    Adjudication as to whether PG&E has any prescriptive rights to occupy the space in which the

5    New Transmission Lines are located.  The remedies and damages issues are matters to be

6    determined at trial.

7            Respectfully submitted.

8    Dated: December 1, 2023                           COHEN AND JACOBSON LLP

9
                                                        By:  /s/ Lawrence A. Jacobson
10                                                            Lawrence A. Jacobson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIMANT'S REPLY TO PG&E'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**    15

Case: 19-30088    Doc# 14157    Filed: 12/01/23    Entered: 12/01/23 14:46:13    Page 19 of 19