1  **WEIL, GOTSHAL & MANGES LLP**
   Richard W. Slack (*pro hac vice*)
2  (richard.slack@weil.com)
   Jessica Liou (*pro hac vice*)
3  (jessica.liou@weil.com)
   Matthew Goren (*pro hac vice*)
4  (matthew.goren@weil.com)
   767 Fifth Avenue
5  New York, NY 10153-0119
   Tel:    (212) 310-8000
6  Fax:    (212) 310-8007

7  **KELLER BENVENUTTI KIM LLP**
   Jane Kim (#298192)
8  (jkim@kbkllp.com)
   David A. Taylor (#247433)
9  (dtaylor@kbkllp.com)
   Thomas B. Rupp (#278041)
10 (trupp@kbkllp.com)
   425 Market Street, 26th Floor
11 San Francisco, CA 94105
   Tel: (415) 496-6723
12 Fax: (650) 636 9251

13 *Attorneys for the Debtors and Reorganized Debtors*

**LATHAM & WATKINS LLP**
Joshua G. Hamilton (#199610)
(joshua.hamilton@lw.com)
Michael J. Reiss (#275021)
(michael.reiss@lw.com)
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel: 424 653 5500

**LATHAM & WATKINS LLP**
James E. Brandt (*pro hac vice*)
(james.brandt@lw.com)
1271 Avenue of the Americas
New York, NY 10020
Tel: 212 906 1200

14                **UNITED STATES BANKRUPTCY COURT**
15                **NORTHERN DISTRICT OF CALIFORNIA**
                  **SAN FRANCISCO DIVISION**

16

17                                              Bankruptcy Case No. 19-30088 (DM)

18 In re:                                       Chapter 11
                                                (Lead Case) (Jointly Administered)
19 **PG&E CORPORATION,**
                                                **REORGANIZED DEBTORS' THIRTY-**
20       - and -                                **THIRD SECURITIES OMNIBUS CLAIMS**
                                                **OBJECTION TO PERA AND SECURITIES**
21 **PACIFIC GAS AND ELECTRIC**                 **ACT PLAINTIFFS' TAC, INCLUDING TO**
   **COMPANY,**                                 **CERTAIN CLAIMANTS THAT ADOPTED**
                                                **THE TAC**
22                              **Debtors.**

23 ☐ Affects PG&E Corporation
   ☐ Affects Pacific Gas and Electric
24 Company
   ☑ Affects both Debtors
25
   * *All papers shall be filed in the Lead*
26 *Case, No. 19-30088 (DM).*

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ..................................................................................1

II. THIS CLAIMS OBJECTION IS AKIN TO A MOTION TO DISMISS UNDER 12(B)(6) OF THE FRCP ......................................................................................7

III. PERA FAILS TO PLEAD A CLAIM UNDER THE EXCHANGE ACT..........................9

    A.    Background ...........................................................................................9

        1.    Factual Background ...............................................................9

            a.    PG&E's Operations ...............................................9

            b.    As The Wildfire Risk In California Increased, The CPUC Heightened Corresponding Regulations On Utilities' Safety Practices ...................................................................13

            c.    After Its Equipment Caused The Butte Fire In 2015, PG&E Warned Investors Of Increased Risks Of Wildfire Liability ........13

            d.    The 2017 North Bay Fires.........................................16

            e.    Post-North Bay Fires Efforts To Mitigate Wildfire Risks.............19

            f.    By Mid-2018, PG&E Faced Massive Potential Liability And Regulatory Scrutiny ...................................................19

            g.    The 2018 Camp Fire ................................................21

         2.    Procedural Background..............................................................22

            a.    The District Court Action .............................................22

            b.    PERA's Securities Claims In The Bankruptcy .............................24

    B.    Legal Standard:  Congress Enacted Specific Higher Pleading Standards For Investors To Bring Claims For Securities Fraud Under The Exchange Act.....................................................................................25

    C.    Argument:  PERA Fails To Meet Its Burden To Plead Exchange Act Claims.................................................................................................27

        1.    PERA's TAC Fails To Plead Any False Or Misleading Statement Or Omission....................................................................28

            a.    PERA Bears The High Burden Of Pleading That Each Alleged Misstatement Is False Or Misleading...............................28

b.	The Court Should Follow Recent Decisions Dismissing Securities Claims Against Edison And Dismiss The Claims Here ............................................................................... 29

c.	PERA Fails To Plead That PG&E's Statements Related To Its Wildfire Safety Practices Were Materially False Or Misleading (Stmts. 1–11, and 13–19) ............................ 32

d.	PG&E's Statements That PERA Alleges Concern Compliance With Federal And State Wildfire Safety Laws Were Not Materially False Or Misleading (Stmts. 2, 4–5, 9, 12–19) ...................................................................... 41

2.	PERA's Exchange Act Claims Fail To Plead The Required Strong Inference of Scienter ................................................. 54

a.	PERA Fails To Sufficiently Plead Scienter As To Any Individual Responsible For Making Disclosures To Investors ............................................................................. 55

b.	PERA Cannot Allege Facts To Support The "Core Operations Doctrine" To Establish Scienter ...................... 56

c.	Conduct After The Butte Fire Does Not Support A Strong Inference Of Scienter ............................................. 58

d.	PERA's Allegations Of Later "Uncovered Facts" And Comments From Another Court Do Not Support Scienter ........... 59

e.	Corporate Resignations Do Not Give Rise To A Strong Inference Of Scienter ............................................. 60

3.	PERA Has Not Sufficiently Pled Loss Causation ...................................... 61

a.	Disclosures After The North Bay Fires Cannot Support Loss Causation ............................................................... 62

b.	Disclosures After The Camp Fire Fail To Support Loss Causation ................................................................... 64

4.	PERA's Exchange Act Claims Fail For Failure To Plead Reliance For Any Stock Purchases After The North Bay Fires ............................. 67

a.	The TAC And Judicially Noticed Facts Demonstrate That PERA Is Not Entitled To Rely On The Fraud On The Market Presumption ............................................................ 67

b.	PERA's Attempt To Plead Presumption Of Reliance Recognized In The Affiliated Ute Line Of Cases Fails ............... 71

| | | D. | PERA's Section 20(a) Claims Fail For Failure To Plead A Primary Violation | 72 |

IV. THE SECURITIES ACT PLAINTIFFS FAIL TO PLEAD THEIR CLAIMS ................73

    A. Background ................................................................................................73

        1. Overview Of Notes Offerings .......................................................73

        2. March 2016 Offering ....................................................................74

        3. The December 2016 Offering ........................................................75

        4. The March 2017 Offering ..............................................................75

        5. The April 2018 Exchange Offer .....................................................76

        6. Procedural Background...................................................................76

    B. Legal Standard For Section 11 Claims ......................................................77

    C. Argument: The Securities Act Plaintiffs Fail To Plead A Securities Act Claim.........................................................................................................77

        1. The Section 11 Claims Based On The 2016 And 2017 Notes Offerings Are Time Barred........................................................77

        2. The Securities Act Plaintiffs Fail To Allege An Actionable Material Misstatement Or Omission In The Offering Documents ...........80

            a. Like PERA, The Securities Act Plaintiffs Have Failed To Plead Falsity With The Requisite Particularity.............................81

            b. The Securities Act Plaintiffs Cannot Recast Their Claims As Violations Of Item 303 Or Item 503 ........................84

        3. The Securities Act Plaintiffs Cannot Establish Economic Loss ...............85

        4. The Securities Act Plaintiffs Have No Damages.....................................87

        5. The Securities Act Plaintiffs Have Failed To Plead Reliance As Required For Certain Aftermarket Purchases Related To The March 2016 Notes.......................................................89

        6. Claims Based On The 2018 Offerings Fail As A Matter Of Law Because Section 11 Does Not Provide Liability For Private Offerings ........................................................................90

    D. The Securities Act Plaintiffs' Derivative Section 15 Claims Must Also Be Dismissed................................................................................................91

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

V.   THE CLAIMANTS WHO HOLD UTILITY SENIOR NOTES CLAIMS
     RELEASED THEIR SECURITIES CLAIMS UNDER THE PLAN AND
     CONFIRMATION ORDER ............................................................................91

     A.   The Releasing Securities Act Plaintiffs Are "Releasing Parties" Under The
          Plan ...........................................................................................................92

     B.   The Plan Release Expressly Covers Securities Claims...........................92

VI.  CONCLUSION..........................................................................................95

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ..................................................................................................71

*Allen v. City of Beverly Hills*,
911 F.2d 367 (9th Cir. 1990) ....................................................................................94

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..............................................................................31, 33

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ....................................................................27

*Anderson v. Clow*,
No. CIV. 92-1120-R, 1993 WL 497212 (S.D. Cal. Sept. 17, 1993) .........................84

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................81

*Barnes v. Edison Int'l*, (*Edison II*)
No. 21-55589, 2022 WL 822191 (9th Cir. 2022) ............................................ *passim*

*Barnes v. Edison Int'l*, (*Edison I*)
No. CV 18-09690 CBM, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021)........................ *passim*

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ..........................................................................62

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................67, 68

*Beecher v. Able*,
435 F. Supp. 397 (S.D.N.Y. 1975) .....................................................................87, 88

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................25, 81

*Belodoff v. Netlist, Inc.*,
No. SACV 07–00677, 2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ......................83

*Bien v. LifeLock, Inc.*,
2015 WL 12819154 (D. Ariz. July 21, 2015), *aff'd*, 690 F. App'x 947 (9th Cir. 2017) .........52

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ..................................................................................71

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)...................................................................................77

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F. 3d 781 (9th Cir. 2020) ...............................................................51, 65

*In re BofI Holding, Inc. Sec. Litig.*,
   No. 3:15-CV-02324, 2017 WL 2257980 (S.D. Cal. May 23, 2017) ....................39

*In re BP p.l.c. Sec. Litig.*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012) ....................................................35, 49

*Brody v. Transnat'l Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) .................................................................81

*In re Brosio*,
   505 B.R. 903 (B.A.P. 9th Cir. 2014)............................................................7

*In re Cisco Sys.*,
   No. C 11-1568, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013).........................28

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ............................................................51, 52

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ............................................................68, 70

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   932 F. Supp. 2d 1095 (C.D. Cal. 2013) ...................................................74

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   No. 11-2265, 2013 WL 12314509 (C.D. Cal. June 6, 2013)...........................79

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017) ......................................................56, 57, 64

*Curry v. Yelp Inc.*,
   No. 14-cv-03547, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th
   Cir. 2017)...........................................................................................35

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) .................................................................32

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) .................................................................67

*Desaigoudar v. Meyercord*,
   223 F.3d 1020 (9th Cir. 2000) ..............................................................26

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................25, 26, 61, 87

*F.D.I.C. v. Countrywide Fin. Corp.*,
    No. 2:12–CV–4354, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)......................................78

*In re G.I. Indus.*,
    204 F.3d 1276 (9th Cir. 2000) ......................................................................7

*Gaines v. Haughton*,
    645 F.2d 761 (9th Cir. 1981) ......................................................................60

*Gavish, v. Revlon, Inc.*,
    No. 00 Civ. 7291, 2004 WL 2210269 (S.D.N.Y. Sep. 29, 2004).....................................56, 57

*GIA-GMI, LLC v. Michener*,
    No. C-06-7949, 2007 WL 2070280 (N.D. Cal. July 16, 2007) .............................................42

*Glazer Cap. Mgmt., L.P. v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ......................................................................44, 55, 56

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ......................................................................6

*Greenberg v. Sunrun, Inc.*,
    233 F. Supp. 3d 764 (N.D. Cal 2017) .............................................................80, 81, 84, 90

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ......................................................................65

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)......................................................................77

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)......................................................................67, 68

*Howard v. Arconic Inc.*,
    395 F. Supp. 3d 516 (W.D. Pa. 2019)......................................................................35

*Ikeda v. Baidu, Inc.*,
    2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ......................................................................52

*J. Edwards Jewelry Distrib., LLC. v. Wells Fargo & Co.*,
    No. 18-cv-03886, 2019 WL 2329248 (N.D. Cal. May 31, 2019).........................................64

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) ......................................................................77

*In re Kalobious Pharm., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) ......................................................................67, 68

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ........................................................................29

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ....................................................................28, 31

*LC Capital Partners, LP v. Frontier Ins. Grp.*,
  318 F.3d 148 (2d Cir. 2003) ..........................................................................80

*Lee v. Ernst & Young, LLP*,
  294 F.3d 969 (8th Cir. 2002) .........................................................................89

*Lentell, v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ....................................................................62, 86

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) ......................................................89, 90

*Lifeline LegacyHoldings, LLC v. OZY Media, Inc.*,
  No. 21-cv-07751, 2022 WL 2119122 (N.D. Cal. June 13, 2022) .......................72

*In re LifeLock, Inc. Sec. Litig.*,
  690 F. App'x 947 (9th Cir. 2017) ...................................................................60

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ..................................................................29, 33

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) .........................................................................64

*In re MacGibbon*,
  No. BAP WW-05-1411, 2006 WL 6810964 (B.A.P. 9th Cir. Oct. 4, 2006) ...........7

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd, Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec
  Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) ............................................83

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) .....................................29

*McCloskey v. Match Grp., Inc.*,
  No. 3:16-CV-549, 2018 WL 4053362 (N.D. Tex. Aug. 24, 2018) ......................85

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  65 F.3d 1044 (2d Cir. 1995) ..........................................................................87

*In re MetawaveCommc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003) .......................................................59

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*In re Metro. Sec. Litig.*,
    532 F.Supp.2d 1260 (E.D. Wash. 2007) ........................................................................89

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    40 F.3d 1049 (9th Cir. 2008) ..........................................................27, 31, 54, 61

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..................................................................................65

*Miller v. PCM, Inc.*,
    No. LACV 17-3364, 2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) ........................65

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
    881 F.3d 750 (9th Cir. 2018) ......................................................................................61

*Morse v. ResCap Borrower Claims Tr.*,
    No. 1:14-cv-5800, 2015 WL 353931 (Bankr. S.D.N.Y. Jan 26, 2015) ..................8

*Mosco v. Motricity, Inc.*,
    649 F. App'x 526 (9th Cir. 2016) ..............................................................................85

*Mucha v. Volkswagen AG*,
    540 F. Supp. 3d 269 (E.D.N.Y. 2021) ......................................................................35

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ................................................................................61, 62

*In re Nimble Storage, Inc.*,
    No. 15-cv-05803, 2016 WL 7209826 (N.D. Cal. Dec. 9, 2016)............................82

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
    No.15-cv-02938, 2016 WL 7475555 (N.D. Cal. Dec. 29, 2016)........................37, 81

*Nuveen Mun. High Income Opp'y Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) ....................................................................................86

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).............................................................................................51, 52

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)........................................................................................63

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018)........................................................................35

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
    774 F.3d 598 (9th Cir. 2014) ........................................................................ *passim*

*In re Oracle Corp. Secs. Litig.*,
    627 F.3d 376 (9th Cir. 2010)................................................................................58, 61

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ...................................................................................57

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................................80

*In re Pac. Gateway Exch., Inc. Sec. Litig.*,
   No. C–00–1211, 2002 WL 851066 (N.D. Cal. Apr. 30, 2002), *aff'd sub nom. Winick v. Pac. Gateway Exch., Inc.*, 73 F. App'x 250 (9th Cir. 2003), *withdrawn pursuant to settlement*, 80 F. App'x 1 (9th Cir. 2003) ...................................................................................46

*Palm Harbor Special Fire Control & Rescue District Firefighters Penson Plan v. First Solar Inc.*,
   2013 WL 4161355 (D. Ariz. June 23, 2023) ......................................................54, 61

*Paskowitz v. Pac. Cap. Bancorp*,
   No. CV 09-6449 ODW, 2009 WL 4911850 (C.D. Cal Nov. 6, 2009) ...................49

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................................89

*In re PG&E Corp.*,
   No. 19-30088, 2020 WL 9211213 (Bankr. N.D. Cal. Oct. 22, 2020), *aff'd sub nom.*, No. 20-CV-07865-HSG, 2022 WL 794815 (N.D. Cal. Mar. 15, 2022), *aff'd sub nom.*, No. 22-15560, 2023 WL 2064520 (9th Cir. Feb. 17, 2023) ...................................................91, 93

*In re PG&E Corp.*,
   No. 20-CV-07865-HSG, 2022 WL 794815 (N.D. Cal. Mar. 15, 2022) ................93

*In re PG&E Corp.*,
   No. 22-15560, 2023 WL 2064520 (9th Cir. Feb. 17, 2023) .............................93, 94

*Plumley v. Sempra Energy*,
   No. 3:16-cv-00512, 2017 WL 2712297 (S.D. Cal. June 20, 2017) ........................34

*Police & Fire Retirement System v. Plains All American Pipeline, L.P.*,
   777 F. App'x 726 (5th Cir. 2019) ......................................................................35, 49

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ......................................................................... *passim*

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
   898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013)...............62, 86

*Primo v. Pac. Biosciences of Cal., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013)...................................................................90

*Provenz v. Miller*,
   102 F. 3d 1478 (9th Cir. 1996) ................................................................................68

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ........................................................................65

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003), *abrogated on other grounds by Glazer Cap. Mgmt., LP v.*
    *Magistri*, 549 F.3d 736 (9th Cir. 2008)........................................................28

*Reese v. Malone*,
    747 F. 3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act*
    *345 Police & Fire Ret. Sys. v. Align Tech, Inc.*, 856 F.3d 605 (9th Cir. 2017) ......................44

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................90

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ....................................................................32

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015)............................................................78

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 764 (9th Cir. 2012) ...............................................................26, 81

*In re Rocket Fuel, Inc. Sec. Litig.*,
    No. 14-cv-3998, 2015 WL 9311921 (N.D. Cal. Dec. 23, 2015)........................85

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .............................................28, 49, 81, 82

*In re Safety–Kleen Corp.*,
    No. C/A 3:00–1145–17, 2002 WL 32349819 (D.S.C. Mar. 27, 2002) ..................90

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)................................................................................60

*In re Shoretel Inc. Sec. Litig.*,
    No. C 08–00271, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009)..........................86

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
    707 F.3d 95 (1st Cir. 2013)......................................................................85

*Sivertson v. Citibank, N.A.*,
    390 F. Supp. 3d 769 (E.D. Tex. 2019)........................................................80

*Slack Techs., LLC v. Pirani*,
    598 U.S. 759 (2023)................................................................................76

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ..........................................27, 46, 81, 82

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1
2
*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ...............................................................................27, 82, 84

3
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................... *passim*

4
5
*Textainer P'ship Sec. Litig.*,
  No. C-05-0969 MMC, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005)....................................49

6
7
*Thomas v. Magnachip Semiconductor Corp*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................................79

8
*Toombs v. Leone*,
  777 F.2d 465 (9th Cir. 1985) ...............................................................................................77

9
10
*United States v. Corinthian Colls.*,
  655 F.3d 984 (9th Cir. 2011) ...............................................................................................26

11
12
*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) .............................................................................................29

13
*In re Verifone Sec. Litig.*,
  No. 5:13-CV-01038, 2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) ......................................34

14
15
*In Re Violin Memory Sec. Litig.*,
  No. 13-5486, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ..................................................82

16
17
*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  2 F.4th 1199 (9th Cir. 2021) ...........................................................................................71, 72

18
*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018) ...............................................................................................55

19
20
*Welgus v. TriNet Grp., Inc.*,
  No. 15-CV-03625, 2017 WL 167708 (N.D. Cal. Jan. 17, 2017)............................................80

21
22
*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ................................................................................... *passim*

23
*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .............................................................................................34

24
25
*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994), *superseded by statute on other grounds,* Private Securities
  Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2) .......................................................40, 57, 82

26
27
*In re YogaWorks, Inc. Sec. Litig.*,
  No. CV 18-10696, 2019 WL 13399628 (C.D. Cal. Feb. 3, 2019)....................................77, 78

28

*In re Yogaworks, Inc. Sec. Litig.*,
  No. CV 18-10696, 2020 WL 2549920 (C.D. Cal. April 23, 2020) ........................................64

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009)............................................ *passim*

**STATUTES**

11 U.S.C.
  § 101(49) ..........................................................................................................................93
  § 502(b)(1) ..........................................................................................................................7

15 U.S.C.
  § 77a *et seq.*........................................................................................................................3
  § 77k..................................................................................................................................85
  § 77k(a) ..............................................................................................................6, 80, 84, 89
  § 77k(e) ..............................................................................................................................87
  § 77m ..............................................................................................................................5, 77
  § 77o(a) ..............................................................................................................................90
  § 78a *et seq.*........................................................................................................................2
  § 78j(b) ..............................................................................................................................25
  § 78t(a) ..............................................................................................................................72
  § 78u-4 ................................................................................................................................8
  § 78u-4(b) ..........................................................................................................................26
  § 78u-4(b)(1) ......................................................................................................................29
  § 78u-4(b)(1)(A)-(B) ..........................................................................................................28
  § 78u-4(b)(1)(B) ................................................................................................................26
  § 78u-4(b)(2) ......................................................................................................................54
  § 78u-4(b)(2)(A) ................................................................................................................26
  § 78u-4(b)(4) ......................................................................................................................61

28 U.S.C.
  § 157....................................................................................................................................7
  § 157(b) ..............................................................................................................................7
  § 1334..................................................................................................................................7
  § 1408..................................................................................................................................7
  § 1409..................................................................................................................................7

Cal. Pub. Util. Code
  § 451..................................................................................................................................45
  § 454(a) ..............................................................................................................................36
  § 454.9(a) ..........................................................................................................................36
  § 541..................................................................................................................................45
  § 2106................................................................................................................................11
  § 4421................................................................................................................................11

**RULES**

B.L.R. 5011-1(a) ..........................................................................................................................7

Fed. R. Bankr. P.
    3007(d)......................................................................................................8
    9014(c).......................................................................................................8

Fed. R. Civ. P.
    9(b)...................................................................................8, 26, 29, 81
    12(b)(6)..........................................................................8, 25, 26, 54

## REGULATIONS

17 C.F.R.
    § 229.105..................................................................................................85
    § 229.303(a)(3)(ii)....................................................................................84
    § 229.303(b)(2)(ii)....................................................................................84
    § 229.503...........................................................................................84, 85
    § 229.503(c)..............................................................................................84
    § 240.10b–5 (2004)........................................................................ *passim*

## CONSTITUTIONAL PROVISIONS

Cal. Const. art. 19 .............................................................................................11

## OTHER AUTHORITIES

General Order 95
    Rule 12.....................................................................................................45
    Rule 44.3..................................................................................................45

Jeffrey J. Haas, *Corporate Finance* 66 (2d ed. 2021)....................................88

Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24
    (N.D. Cal.)..................................................................................................7

## GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| Alleged Relevant Period | April 29, 2015, through November 15, 2018 |
| Baupost | Baupost Group Securities, L.L.C. |
| Cal Fire | California Department of Forestry and Fire Protection |
| CEMA | Catastrophic Event Memorandum Account |
| CPUC | California Public Utilities Commission |
| District Court Action | *In re PG&E Corporation Securities Litigation*, No. 5:18-cv-03509 (N.D. Cal.) |
| *Edison I* | *Barnes v. Edison Int'l*, No. CV 18-09690 CBM, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) |
| *Edison II* | *Barnes v. Edison Int'l*, No. 21-55589, 2022 WL 822191 (9th Cir. 2022) |
| Edison or SCE | Southern California Edison |
| ESRB | Electric Safety and Reliability Branch of the CPUC's Safety and Enforcement Division |
| ESRB-4 | A June 2014 resolution promulgated by the ESRB |
| ESRB-8 | A July 2018 resolution promulgated by the ESRB |
| Exchange Act | Securities Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Exchange Offer | PG&E's April 2018 exchange offer |
| FAC | Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed by PERA in the District Court Action on November 9, 2018 |
| FERC | Federal Energy Regulatory Commission |
| GRC | General Rate Case |
| Mid-Jersey | Mid-Jersey Trucking & Local 701 Pension Fund |
| Notes Offerings | PG&E's note offerings in March 2016, December 2016, and March 2017 |
| Offering Documents | Registration statements, prospectuses and prospectus supplements filed with the SEC in connection with the Notes Offerings and Exchange Offer |

| Defined Term | Definition |
|---|---|
| PERA | Public Employees Retirement Association of New Mexico |
| PERA Objection or PERA Obj. | Reorganized Debtors' 33rd Securities Omnibus Claims Objections To PERA's TAC, Including to Certain Claimants that Adopted the TAC |
| PG&E | PG&E Corporation and Pacific Gas and Electric Company (the "Utility") are referred to as "PG&E" solely for purposes of the Objections |
| Plan | Joint Chapter 11 Plan of Reorganization |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| RKS | The law firm of Rolnick Kramer Sadighi LLP |
| RKS Amendment or RKS Am. | The Amended Statement of Claim on Behalf of the RKS Claimants |
| RKS Claimants | Claimants represented by RKS in this matter, and also any non-RKS-represented claimants that adopted, in whole or in part, the allegations in the RKS Amendment |
| RKS Objection or RKS Obj. | Reorganized Debtors' 34th Securities Omnibus Claims Objections To RKS Amendment, Including to Certain Claimants that Adopted the RKS Amendment |
| SAC | Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed by PERA in the District Court Action on December 14, 2018 |
| SEC | Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |
| Securities Act Plaintiffs | County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking & Local 701 Pension Fund |
| SED | CPUC's Safety Enforcement Division |
| Supplemental Baupost Obj. | Reorganized Debtors' 35th Securities Omnibus Claims Objections To Baupost's Supplemental Proof Of Claim |
| Supplemental POC or Supp. POC | The Supplemental Proofs of Claim filed by Baupost as Claim Nos. 109847 and 109848, which adopted and incorporated the allegations in the TAC and added additional substantive allegations, attached as Exhibit 113 to the accompanying Request for Judicial Notice |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

| Defined Term | Definition |
|---|---|
| TAC | Third Amended Complaint filed by PERA and the Securities Act Plaintiffs in the District Court Action, attached as Exhibit 92 to the accompanying Request for Judicial Notice |
| Warren | City of Warren Police and Fire Retirement System |
| York | County of York Retirement Fund |

## I.  PRELIMINARY STATEMENT

Before the Court is PG&E's[1] motion to dismiss a complaint that has been colloquially referred to in this case as the "PERA Complaint," which is actually a Third Amended Complaint ("**TAC**") filed in 2019 in the United States District Court of the Northern District of California by two sets of former securities holders in PG&E—PERA,[2] which owned stock in the publicly traded company, and three entities that held notes (debt) issued by PG&E pursuant to various public offerings from 2016–2018 (the "**Securities Act Plaintiffs**").[3]  PERA and the Securities Act Plaintiffs have incorporated the TAC into their proofs of claim, and certain other securities claimants as identified on Exhibit A hereto have adopted the TAC as well (collectively, the "**Claimants**").

Context for evaluating these claims is important.  PERA was an owner of PG&E when the fires that led to this Bankruptcy Case occurred.  Moreover, all of these Claimants purchased securities in PG&E before, during, and/or after the devastating wildfires that swept through California from 2015 through 2018.  Federal securities laws are designed to protect innocent investors from fraud in connection with their purchase and sale of securities.  But investment comes with risk, and the securities laws are not "heads I win, tails you lose" insurance policies for investors to hold a company and its subsequent owners responsible for declines in the value of their investments when a company they own suffers losses caused by disclosed and known risks. The Claimants bringing securities litigation claims in this Bankruptcy Case are asking the Court to ignore the disclosed and obvious risks they bore in investing in a utility company in the middle of historic droughts and wildfires, and to have PG&E and its current owners compensate them for

---

[1] PG&E Corporation is a publicly traded corporation and the issuer of the securities at issue in this case.  Pacific Gas and Electric Company is a wholly-owned subsidiary of PG&E Corporation, and referred to as the "Utility" in PG&E Corporation's disclosures with the Securities and Exchange Commission ("**SEC**").  PG&E Corporation and Pacific Gas and Electric Company are the Debtors and Reorganized Debtors in the above-captioned chapter 11 cases.  Solely for the purpose of addressing the arguments in this Objection, they are referred to together as "**PG&E**."

[2] PERA is the Public Employees Retirement Association of New Mexico.

[3] The Securities Act Plaintiffs are County of York Retirement Fund ("**York**"), City of Warren Police and Fire Retirement System ("**Warren**") and Mid-Jersey Trucking & Local 701 Pension Fund ("**Mid-Jersey**").

the declines in the value of their stock and notes (particularly because of the limited Director & Officer liability insurance proceeds remaining and available to respond to these claims). PERA and the Securities Act Plaintiffs are sophisticated institutional investors that bet a known risk would not materialize; they are in a radically different place than the fire victims who tragically lost their property or lives in the fires. The Court should dismiss these claims because they are not cognizable under the strict pleading rubric of the federal securities laws.

Droughts, beetle infestations, climate change, millions of dead trees—all of these were factors widely known from 2013 through 2018 to be prevalent in California, contributing to the known and substantial risk of wildfires. Indeed, in 2013, California experienced more wildfires than it experienced collectively in the prior six years, and in both 2014 and 2015, the State of California publicly declared states of emergency because of fire danger. In each year through 2018, the conditions grew worse, with more trees dying and each fire being more catastrophic and "historic." Pacific Gas and Electric Company provides electrical services to millions of customers in the face of these inherently risky conditions, and PG&E Corporation regularly disclosed those risks, including wildfires, to its investors.

The securities claims asserted in this Bankruptcy Case are not about whether PG&E was liable or responsible for causing wildfires. These claims are about whether PG&E made material false statements, with intent to defraud (*i.e.*, scienter), that caused these investors to suffer damages. When the alleged statements are put in their proper context and the information already available and known to the public is taken into account, it is clear no securities claimant can satisfy its burden of pleading a viable securities claim.

Here, the TAC asserts claims by PERA under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "**Exchange Act**"), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2004).[4] The Securities Act Plaintiffs bring claims under Sections 11 and 15

---

[4] The TAC is attached to the RJN as Exhibit 92. In the TAC, PERA and the Securities Act Plaintiffs purport to bring claims on behalf of a putative class and subclass of persons and entities who acquired publicly traded PG&E securities during the period from April 29, 2015, through November 15, 2018 (the "**Alleged Relevant Period**"). As this Court is aware, there is no class in this Bankruptcy Case. Accordingly, for the purpose of framing the time period for this Objection, PG&E refers to the "Alleged Relevant Period" instead of the "Class Period."

of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (the "**Securities Act**"), based on their purchase of securities in certain public offerings by PG&E.  No court has determined whether the TAC is sufficient to state a claim.

This Court should follow recent Ninth Circuit authority on almost identical claims against a different utility, Southern California Edison ("**Edison**" or "**SCE**"), to dismiss the claims here. In the *Edison* case, investors brought securities law claims against Edison for allegedly making false and misleading statements and omissions about its vegetation management and wildfire prevention practices in the months and years before wildfires swept through Southern California, imposing billions of dollars in damages to Edison after its equipment caused those fires.  The Ninth Circuit affirmed a California district court's dismissal with prejudice in favor of Edison of the same securities law claims brought here.  *See Barnes v. Edison Int'l*, No. 21-55589, 2022 WL 822191 (9th Cir. Mar. 18, 2022) (*Edison II*), *affirming Barnes v. Edison Int'l*, No. CV 18-09690, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) (*Edison I*).  This precedent dictates the same result of dismissal of all of the claims in this case.

## The Exchange Act Claims

While PERA alleges that PG&E made 19 materially false or misleading statements or omissions between April 29, 2015, and November 8, 2018, these statements really boil down to two categories:  (1) wildfire safety practices and (2) compliance with law.  PERA claims the truth of PG&E's alleged misstatements was revealed in the wake of the North Bay Fires, over a nearly eight-month period, culminating in the California Department of Forestry and Fire Protection ("**Cal Fire**") reports concluding PG&E's equipment caused certain fires and finding evidence that PG&E violated state law.  PERA further claims that after the North Bay Fires, PG&E continued to conceal the risk of wildfires and the potential liability for wildfire ignition.  PERA also seeks to recover for losses based on four separate alleged corrective disclosures spanning the first seven days of the Camp Fire—from when the Camp Fire started to when Cal Fire announced that it had determined a second ignition point.

PERA's Exchange Act claims fail for four independent reasons.  First, PERA has not alleged an actionable materially false statement or omission.  And given PG&E's repeated

disclosures and the wealth of public information available to investors, no reasonable investor would have been misled by PG&E's statements in any event. Moreover, many of the statements that PERA challenges are inactionable as a matter of securities law because they amount to corporate puffery—*e.g.*, general statements of corporate optimism or inactionable opinion. The Court must examine PERA's allegations on a statement-by-statement basis to determine if each one is actionable under the securities laws. The Court must then dismiss from the case any statement that is not actionable.

Second, PERA has not satisfied its high burden of pleading a cogent and compelling inference of scienter for any challenged statement, which requires at this stage a strong inference that each challenged statement was knowingly (or recklessly) false or misleading at the time it was made. PERA offers no evidence that, at the time each statement was made, PG&E (or any individual speaker) made a knowing or deliberately reckless false statement about its wildfire safety practices or compliance efforts. Instead, PERA attempts to manufacture fraud by assuming, in hindsight, that PG&E "must have known" that these statements were materially false.

Third, PERA has failed to plead loss causation. PERA has not adequately pled that on the nine days PERA alleges corrective disclosures occurred, the market learned of and reacted to the alleged fraudulent statements, as opposed to reacting to negative information about PG&E generally, and specifically the potential financial impact in light of the scope and scale of the North Bay and Camp Fires.

Fourth, PERA does not adequately plead reliance for any statement or omission after the North Bay Fires because it cannot rely on any presumption of reliance after that time, and it has not pled facts showing reliance on any alleged misstatement. Moreover, it is indisputable based on public information that the market was made aware of the risk of wildfires and the attendant liability at least as of the North Bay Fires. It is precisely under these circumstances that courts apply the "truth-on-the-market" doctrine at the pleading stage to find that a plaintiff has failed to plead the requisite reliance.

1    The Court must dismiss each and every Exchange Act claim where PERA fails to

2 sufficiently plead any of these required elements, which in this case is all of the alleged

3 misrepresentations or omissions (*i.e.*, claims) at issue.

4                                    **The Securities Act Claims**

5        Separate from the claims by PERA based on its ownership of PG&E stock, three Securities

6 Act Plaintiffs bring claims based on their purchase of debt securities, here note offerings, issued

7 by PG&E pursuant to written registration statements, prospectuses and prospectus supplements

8 filed with the SEC (the "**Offering Documents**"). The Securities Act was designed to regulate the

9 initial distribution of securities, and Section 11 of the Securities Act prohibits an issuer from

10 making materially false or misleading statements or omissions in the securities offering. The

11 Securities Act Plaintiffs contend that the Offering Documents PG&E issued in connection with

12 note offerings in March 2016, December 2016, and March 2017 (the "**Notes Offerings**") and an

13 exchange offer in April 2018 (the "**Exchange Offer**") contain the same categories of materially

14 false or misleading statements as those PERA challenges in the Exchange Act claims. The

15 Securities Act Plaintiffs cannot state a claim under the Securities Act for several reasons.

16       First, Plaintiffs' Securities Act claims based on the Notes Offerings are time barred.

17 Securities Act claims are time barred unless they are brought within one year after "the untrue

18 statement or the omission, or after such discovery should have been made by the exercise of

19 reasonable diligence." 15 U.S.C. § 77m. Here, PERA alleges that the "truth" first emerged when

20 the North Bay Fires swept through Northern California in October 2017. Therefore, Securities

21 Act claims must have been brought by October 2018 to be timely. But the Securities Act Plaintiffs

22 did not file Securities Act claims by October 2018, and instead asserted those claims for the first

23 time in the District Court Action on February 22, 2019 (three weeks after PG&E filed for

24 bankruptcy on January 29, 2019). Accordingly, these claims are untimely as a matter of law.

25       Second, like the Exchange Act claims, a plaintiff alleging a claim under the Securities Act

26 must plead a material misstatement or omission with particularity. The Securities Act Plaintiffs

27 have failed to so plead with respect to any of the Offering Documents.

28

Third, Section 11 requires that if a person acquires the notes after the issuer has made an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement, the purchaser must demonstrate reliance upon the alleged misstatement or omission. *See* 15 U.S.C. § 77k(a). These "aftermarket purchasers" have not pled the additional facts required by Section 11 to establish that those purchases were connected to any alleged misstatement. The Securities Act Plaintiffs do not and cannot plead that they relied on the alleged misstatements, as required for purchases made after the next annual financial report is filed.

Fourth, any remaining claims based on the April 2018 Exchange Offer are inactionable as a matter of law. The Exchange Offer was not an independent offering of notes, but rather an exchange of one note (a restricted, privately placed note) for another (equivalent publicly traded note). Plaintiffs that exchanged previously owned notes cannot renew their claims by privately exchanging notes. Because there is no purchase of a security "pursuant to a registration statement," there is no claim under Section 11.

Fifth, the Securities Act Claims fail as a matter of law because the pleadings and judicially noticeable facts establish that the claimed losses were not caused by any alleged misrepresentation under the doctrine of "negative causation." The Securities Act Plaintiffs cannot claim that the price of notes reacted to the allegedly corrective disclosures, as opposed to PG&E's declining financial health generally, or the materialization of a significant known and disclosed risk.

Sixth, the Securities Act Plaintiffs cannot plead facts establishing that they are entitled to Section 11 statutory damages because they cannot show that the "value" of the notes dropped, even if the "price" did. Here, as this Court is aware, the notes at issue were reinstated or paid in full, and were never at risk. A securities plaintiff cannot seize on the market's panic selling of the notes at lower prices to force the issuer to both pay the notes in full and cover investors' losses for their bad decisions to sell. The Section 11 claims thus fail on this basis as well.

In sum, with the benefit of hindsight, PERA and the Securities Act Plaintiffs may wish they did not invest in a company that incurred losses following some of the worst fires in California history. But "fraud by hindsight" federal securities claims such as these are regularly dismissed with prejudice, as these should be here. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)

1    (dismissing claims with prejudice and admonishing "abusive and opportunistic securities litigation

2    and . . . the practice of pleading fraud by hindsight").[5]

3    **II.**      **THIS CLAIMS OBJECTION IS AKIN TO A MOTION TO DISMISS UNDER**

4         **12(B)(6) OF THE FRCP**

5    This Court has jurisdiction over this Objection under 28 U.S.C. §§ 157 and 1334; the Order

6    Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.);

7    and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the

8    Northern District of California (the "**Bankruptcy Local Rules**"). This matter is a core proceeding

9    pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

10    and 1409. The statutory predicates for the relief requested are section 502 of title 11 of the United

11    States Code (the "**Bankruptcy Code**") and Rules 3003 and 3007 of the Federal Rules of

12    Bankruptcy Procedure (the "**Bankruptcy Rules**").

13    PG&E files this Objection pursuant to section 502 of the Bankruptcy Code, Bankruptcy

14    Rule 3007, and Bankruptcy Local Rule 3007-1, and the Securities ADR Procedures Order, seeking

15    entry of an order disallowing and/or expunging the proofs of claims identified in the column

16    headed "Claim(s) to be Disallowed and Expunged" on <u>**Exhibit A**</u> annexed hereto.

17    Section 502(b)(1) of the Bankruptcy Code provides that a claim shall not be allowed if it

18    is "unenforceable against the debtor" under applicable non-bankruptcy law. Thus, where a proof

19    of claim—the functional equivalent of a complaint—fails to state a cause of action under

20    applicable non-bankruptcy law, it is disallowed. *See id.*; *see also In re G.I. Indus*., 204 F.3d 1276,

21    1281 (9th Cir. 2000) (claim was unenforceable and disallowed due to valid defense under

22    applicable state law); *In re Brosio*, 505 B.R. 903, 912 (B.A.P. 9th Cir. 2014) ("The filing of a proof

23    of claim is analogous to filing a complaint in the bankruptcy case."); *In re MacGibbon*, No. BAP

24    WW-05-1411, 2006 WL 6810964, at *11 (B.A.P. 9th Cir. Oct. 4, 2006) ("The claimant must allege

25    facts sufficient to support a legal liability to the claimant in the proof of claim . . . [and] [f]or a

26

27

28

---

[5] PERA conceded that the Securities Act claims are limited to only the specific Notes Offerings identified in the PERA Complaint. *See* ECF No. 14074 at n.4. Therefore, securities claims based on any other notes should be dismissed as a matter of law; there are no allegations to support them.

1  proof of claim to have prima facie validity, it must comply with the rules and set forth all the

2  necessary facts to establish the claim.").

3      Under Bankruptcy Rule 9014(c), a court may direct that Bankruptcy Rule 7012 (which

4  incorporates the applicable provisions of Federal Rule of Civil Procedure 12(b)) may apply to a

5  contested matter in a bankruptcy case.  Here, this Court has already recognized that PG&E will

6  file sufficiency objections "akin to a motion to dismiss" against all unresolved securities proofs of

7  claim.  *See* ECF No. 13934-1 (Amendment and Objection Procedures) at 3.

8      PERA alleges securities fraud claims under the Exchange Act and SEC Rule 10b-5 (which

9  is promulgated pursuant to the Exchange Act and provides complementary anti-fraud regulations).

10 Separately, the Securities Act Plaintiffs bring claims under the Securities Act, which is narrowly

11 targeted only to regulate statements made in securities offering documents and may only be

12 brought by investors who participated in those offerings.  Therefore, as further explained below,

13 the federal securities laws, the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-

14 4 ("PSLRA"), and Federal Rules of Civil Procedure 9(b) and 12(b)(6) constitute the applicable

15 non-bankruptcy law against which PERA's and the Securities Act Plaintiffs' proofs of claim must

16 be measured in the first instance.  A Claimant's proof of claim that fails to satisfy the demanding

17 pleading standards for federal securities fraud claims must be disallowed and expunged.  *See* Fed.

18 R. Bankr. P. 9014(c) (applying Bankruptcy Rule 7009, which incorporates Civil Rule 9(b), to

19 contested matters, and permitting courts to apply any other Bankruptcy Rules from Part VII); *see*

20 *also Morse v. ResCap Borrower Claims Tr*., No. 1:14-cv-5800, 2015 WL 353931, at *4–6 (Bankr.

21 S.D.N.Y. Jan 26, 2015) (applying Rule 8 and Rule 9 to proof of claim and dismissing as

22 insufficiently pled pursuant to governing substantive law).

23     Bankruptcy Rule 3007(d) and the Securities Omnibus Objection Procedures govern

24 omnibus objections to Securities Claims in these Chapter 11 Cases.  *See* Order Approving

25 Securities ADR Procedures, ECF No. 10016, Ex. A-3 ¶ I.C (incorporating Bankruptcy Rule

26 3007(d)).  Pursuant to Paragraph I.C.4 of the Securities Omnibus Objection Procedures (as well as

27 Bankruptcy Rule 3007(d)), objections to more than one claim may be joined if the objections are

28

1    based on the grounds that the claims should be disallowed on some common basis under applicable

2    bankruptcy or non-bankruptcy law.

3        In accordance with Paragraph I.E of the Securities Omnibus Objection Procedures,

4    **Exhibit A** hereto provides the following information: (i) an alphabetized list of the Claimants

5    whose claims are subject to this Objection; (ii) the claim numbers of the claims that are the subject

6    of this Objection; (iii) the amount of the claim asserted in each claim, or a statement that the claim

7    seeks an unliquidated amount; and (iv) the grounds for this Objection.  Upon the establishment of

8    a hearing date and briefing schedule for this Objection, PG&E will provide notice to the claimants,

9    the form of which will satisfy the requirements set forth in Paragraph I.F of the Securities Omnibus

10    Objection Procedures.

11    **III.**      **PERA FAILS TO PLEAD A CLAIM UNDER THE EXCHANGE ACT**

12        **A.**      **Background**

13          **1.**      **Factual Background**

14            *a.*      *PG&E's Operations*

15        PG&E has been in business for one hundred years and is one of the largest public utility

16    companies in the United States.  During the relevant time period and currently, PG&E provides

17    natural gas and electricity to approximately 16 million people across a 70,000 square mile service

18    area in Northern and Central California.  *See, e.g.*, Ex. 104 (PG&E, Company Profile); Ex. 13

19    (Nov. 2, 2017 Form 8-K) at 99.1.  PG&E operates more than 81,000 circuit miles of electric

20    distribution lines and almost 18,000 circuit miles of interconnected transmission lines to provide

21    electricity to its customers.  TAC ¶¶ 258, 412, 636.  As of 2017, there were 123 million trees

22    around those transmission lines under PG&E's responsibility, creating an inherent and disclosed

23    risk of the ignition of wildfire from a tree striking those lines.  TAC ¶ 109 (citing Ex. 68 (PG&E's

24    Oct. 17, 2017 Response to SED's Questions)).

25        Aside from other aspects of its business, PG&E's electric utility business is heavily

26    regulated under both state and federal law and monitored by numerous government agencies who

27    set other legal requirements through administrative orders.  Appx. 3 (Regulatory Agencies); TAC

28    ¶¶ 53–76.  Before, during, and after the period of time PERA alleges PG&E concealed information,

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

1    PG&E publicly described its financial condition and the significant inherent risks in its business.

2    *See, e.g.*, Ex. 5 (2016 Form 10-K) at 32 (describing the "numerous risks" facing PG&E including

3    the "failure . . . to mitigate operating conditions," for "identified," "unsafe" equipment, "which

4    failure then leads to a catastrophic event," including a "[wild]fire").  With respect to its electricity

5    business, PG&E warned investors (1) that PG&E is heavily regulated, and that its failure to comply

6    with applicable law could materially and adversely impact its financial condition; (2) that operating

7    electrical facilities is inherently dangerous, involves significant risks, and may cause a catastrophic

8    event that could result in financial losses that may not be recoverable through rate increases or

9    insurance; and (3) that one such catastrophic event could be a wildfire caused by the unsafe

10   operation of its electric facilities.  *E.g.*, Ex. 1 (2012 Form 10-K) at 38-47; Ex. 2 (2013 Form 10-

11   K) at 31–38; Ex. 3 (2014 Form 10–K) at 19–27; Ex. 4 (2015 Form 10-K) at 24–33; Ex. 5 (2016

12   Form 10-K) at 26-37; Ex. 6 (2017 Form 10-K) at 26–43.

13          Since 2012, PG&E has also publicly disclosed and described to investors the various

14   agencies and regulations that govern its utility business.  *E.g.*, Ex. 1 (2012 Form 10-K) at 2–6;

15   Ex. 3 (2014 Form 10-K) at 7–10; Ex. 4 (2015 Form 10-K) at 7–10, 63, 64; Ex. 5 (2016 Form 10-

16   K) at 8–11, 36; Ex. 6 (2017 Form 10-K) at 8–11, 37–38, 42–43.[6]  These agencies include Cal Fire,

17   the California Public Utilities Commission ("**CPUC**") and its Safety and Enforcement Division

18   ("**SED**"), the Federal Energy Regulatory Commission ("**FERC**"), and others whose purpose and

19   authority are set forth in Appendix 3 (Regulatory Agencies).  The laws governing utilities impose

20   specific requirements for safety practices related to wildfire risk, including requirements for

21   vegetation management inspections followed by clearance and tree removals, and inspection and

22   maintenance requirements for poles and transmission lines.  TAC ¶¶ 55–70; Appx. 2 (Excerpts of

23   Relevant Regulations).  Other regulations set governing standards, without specific metrics.  *E.g.*,

24   TAC ¶¶ 68–70.

25          As PG&E also transparently disclosed to investors, California law provides for significant

26   liability for utilities that fail to heed any regulation, even beyond set penalties.  *E.g.*, TAC ¶¶ 69–

27   

---

28   [6] As discussed in Section IV, *infra*, the Offering Documents specifically incorporate by reference
     SEC filings that are also relevant to the Exchange Act claims.

70; Ex. 5 (2016 Form 10-K) at 26–27, 33; Ex. 6 (2017 Form 10-K) at 26–43. Utilities such as PG&E are liable for "all loss, damages, or injury" resulting from their failure to comply with agency orders, decisions, regulations or law. Cal. Pub. Util. Code § 2106. California law imposes liability where a fire is "set" or "caused" to any "forest, brush, or other flammable material." *Id.* § 4421. Article 19 of the California Constitution provides for significant and unpredictable strict liability amounts, under the doctrine of "inverse condemnation," whereby public utilities such as PG&E are required to compensate individuals whose real property has been damaged by the utility. However, the CPUC permits utilities such as PG&E to recover some or all of those costs by increasing consumer rates if the utility can "affirmatively prove that it reasonably and prudently operated and managed its system." TAC ¶ 73.

PG&E's disclosures around these regulations and risks were, at all relevant times, robust. For example, in February 2015, before PERA alleges any false statements occurred, PG&E filed its 2014 annual report, disclosing that:

> ***The operations of the Utility's electricity . . . facilities is inherently dangerous and involves significant risks which, if they materialize, can adversely affect [PG&E's] financial results****. . . .*
>
> The Utility's ability to safely and reliably operate [and] maintain . . . its facilities is subject to numerous risks, many of which are beyond the Utility's control, including those that arise from:
>
> > • the breakdown or failure of equipment, electric transmission or distribution lines . . . that can cause explosions, fires, or other catastrophic events …;
> >
> > • the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire ….)[.]

Ex. 3 (2014 Form 10-K) at 27 (emphasis in original). PG&E further disclosed that climate conditions in California "could increase the occurrence of wildfires in the Utility's service territory." *Id.* at 30.

Then, on February 18, 2016, in the middle of the period PERA claims that investors were misled, PG&E's disclosures went much further:

> ***The Utility's electricity and natural gas operations are inherently hazardous and involve significant risks which, if they materialize,***

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*can adversely affect [PG&E's] financial results. The Utility's insurance may not be sufficient to cover losses covered by an operating failure or catastrophic event.*

Ex. 4 (2015 Form 10-K) at 28 (emphasis in original).

PG&E then went on to disclose the increased risk of catastrophic wildfires and the increased risk of liability from those wildfires—neither of which it could fully mitigate:

> The Utility's ability to safely and reliably operate, maintain, construct and decommission its facilities is subject to numerous risks, many of which are beyond the Utility's control, including those that arise from:
>
> - the breakdown or failure of equipment, electric transmission or distribution lines . . . that can cause explosions, fires, or other catastrophic events; . . .
>
> - the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire or natural gas explosion), and the failure to respond effectively to a catastrophic event; [and] . . .
>
> - an ineffective records management program that results in the failure to construct, operate and maintain a utility system safely and prudently[.]

Ex. 4 (2015 Form 10-K) at 28–29; *see also* Ex. 3 (2014 Form 10-K) at 27; Ex. 5 (2016 Form 10-K) at 32; Ex. 6 (2017 Form 10-K) at 37–38, 42–43.

And, as PERA's own allegations demonstrate, PG&E updated investors as it learned of information that had the potential to increase those risks and materially affect its financial condition. *E.g.*, TAC ¶¶ 328–35 (alleging PG&E filed a Form 8-K disclosing the "possible role of powerlines and other facilities of Pacific Gas and Electric Company" in causing the North Bay Fires, the day after PG&E first received a litigation hold letter from the CPUC regarding evidence related to the North Bay Fires. These disclosures were made alongside the same statements PERA alleges misled investors regarding PG&E's safety practices and were made in the context of the events set forth below.

b.       **As The Wildfire Risk In California Increased, The CPUC**
         **Heightened Corresponding Regulations On Utilities' Safety**
         **Practices**

In 2013, California experienced more wildfires in a single year than it had collectively experienced in the previous six years. Ex. 81 (2016 Cal Fire Redbook) at 43.  In January 2014, in response to the growing and widespread risk of wildfires, California declared a state of emergency related to drought conditions, and the governor of California ordered Cal Fire to hire additional seasonal firefighters to suppress wildfires due to the elevated fire risk.  TAC ¶ 77; Ex. 84 (Press Release, State of California, *Governor Brown Declares Drought State of Emergency* (Jan. 17, 2014)).  By June 2014, the Association of California Water Agencies had concluded that "[b]y nearly any measure, California is in extreme drought . . . and wildfires already are causing major destruction even before the dry summer months begin."  Ex. 85 (2014 Drought Report) at 1.  As a result, in June 2014, the Electric Safety and Reliability Branch ("**ESRB**") of the SED promulgated resolution ESRB-4 directing electric utilities to take additional measures to reduce wildfire risk, including "increasing" vegetation management activities, and directing utilities to use a process for requesting and prospectively setting aside funds in a Catastrophic Event Memorandum Account ("**CEMA**") to help with the costs of additional wildfire risk mitigation activities like vegetation management.  Ex. 24 (ESRB-4) at 2–4, 15–16.  ESRB-4 added to the already extensive state and federal regulations governing utilities' safety practices.  TAC ¶¶ 55–70.

c.       **After Its Equipment Caused The Butte Fire In 2015, PG&E**
         **Warned Investors Of Increased Risks Of Wildfire Liability**

Prior to and throughout the Alleged Relevant Period, PG&E provided the consistent message of the challenges in vegetation management, including in April 2015 (the beginning of the Alleged Relevant Period), when PG&E announced that it was "stepping up its vegetation management activities to mitigate fire risk and improve access for firefighters."  TAC ¶ 194.

In September 2015, the Butte Fire ignited in Northern California and burned nearly 71,000 acres, destroyed more than 920 buildings, and caused two deaths.  *Id.* ¶¶ 21, 100–02; Ex. 5 (2016 Form 10-K) at 27, 43.  When it ignited, the Butte Fire was the seventh most destructive wildfire in

California history. TAC ¶ 21. Investors soon became well aware that PG&E's equipment and failures in its vegetation management practices were faulted for the Butte Fire, and that PG&E could be liable for damages in the series of disclosures that followed. *See id*. ¶ 101–02. On September 16, 2015, PG&E announced that Cal Fire was "investigating the source of the Butte Fire," and, in particular, "whether a live tree may have contacted a power line owned and operated by the Utility." Ex. 10 (Sept. 16, 2015 Form 8-K). Before investigations of the Butte Fire were complete, PG&E's annual report for 2015 (dated February 2016) disclosed that PG&E may incur "material liability" in connection with the Butte Fire and that its financial condition could be "materially affected" if insurance did not cover those losses. Ex. 4 (2015 Form 10-K) at 29, 123.

Shortly thereafter, in October 2015, the State of California publicly declared another state of emergency as a result of millions of trees dying each year due to drought conditions and massive beetle infestations. TAC ¶ 77. On April 28, 2016, Cal Fire issued a press release announcing that it had identified evidence of safety violations by PG&E in connection with its investigation of the Butte Fire, and "referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned." TAC ¶ 101; Ex. 75 (News Release, Cal Fire, CAL FIRE Investigators Determine Cause of Destructive Butte Fire (Apr. 28, 2016)).

PG&E updated investors accordingly. For example, PG&E reported again in its annual report for 2016 (dated February 2017) that it could be strictly liable for "damages and takings as a result of the design, construction and maintenance of utility functions, including its electrical transmission lines" and that such liability could be imposed "without having been found negligent, through the theory of inverse condemnation." Ex. 5 (2016 Form 10-K) at 33, 41. PG&E also reported that its liability for the Butte Fire could exceed $750 million, in part because Cal Fire determined that the fire was the result of "the failure by PG&E and/or its vegetation management contractors . . . to identify certain potential hazards during its vegetation management program." *Id.* at 27. Still more, PG&E reported that the increasing risk of wildfires meant more potential liability for PG&E as it might not be able to purchase insurance coverage that would sufficiently cover future liability. *Id.* at 33 (discussing impacts of "the risk of increase of wildfires . . . as a result of the ongoing drought"); *see also* Ex. 76 (News Release, Cal Fire, CAL FIRE Investigators

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Determine Cause of Four Wildfires in Butte and Nevada Counties (May 25, 2018)); Ex. 77 (News Release, Cal Fire, CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties (June 8, 2018)); Ex. 79 (News Release, Cal Fire, CAL FIRE Investigators Determine the Cause of the Tubbs Fire (Jan. 24, 2019)); TAC ¶¶ 346, 353, 599 n.167.

Notably, these warnings appear throughout PG&E's periodic filings, alongside descriptions of PG&E's increased safety efforts and the standards applicable to its vegetation management programs. *See* Stmts. 2, 4 ("Each year, PG&E's Vegetation Management department and its contracting arborists and foresters inspect miles of power lines in our service area for public safety and electric reliability. We do so in compliance with relevant laws . . . ."); *see also* Stmts. 9 ("PG&E follows all applicable federal and state vegetation clearance requirements . . . ."), 12 ("PG&E meets or exceeds all applicable federal and state vegetation clearance requirements.").[7]

In March 2017, the CPUC issued a public investigation report on findings from the Butte Fire, concluding that PG&E failed to identify a hazardous tree created by its previous removal of trees that sheltered it, and reporting audit results indicating such vegetation management failures were not uncommon. Ex. 70 (SED Butte Fire Report) at 11; *id.* at 6 (same contractor failed to identify nearly 60 trees for removal in 2014 inspection). In addition to the previously reported fatalities of two people, SED reported the property damage caused by the Butte Fire to be $108 million. *Id.* at 1.

A month later, the CPUC publicly fined PG&E $8 million for PG&E's delay in removing the gray pine that caused the Butte Fire. Ex. 53 (Apr. 2017 $8 Million Fine). This was the largest fine listed on the CPUC's website. Ex. 30 (CPUC Citations List). PG&E's stock price did not react at all to these disclosures, just as the stock price did not react significantly to the Butte Fire. Ex. 103 (PCG Historical Price). On April 13, 2017, "Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting [the Butte Fire]. Cal Fire's lawsuit allege[d] that PG&E caused the Butte Fire by maintaining an inadequate vegetation management system,"

---

[7] **Stmts.**" refers to the alleged misstatements in the TAC, which are listed in Appendix 1.

1  TAC ¶ 102, and the lawsuit was resolved in the present bankruptcy proceedings, ECF No. 7399-

2  2.

3          PERA does not allege that any of these disclosures caused losses to investors, presumably

4  because there was no significant drop in stock price on any of the dates when PG&E and others

5  reported on PG&E's fault.  Ex. 103 (PCG Historical Price).  This is despite the fact that Cal Fire

6  concluded that PG&E's safety violations caused the Butte Fire (TAC ¶ 101), and like PERA's

7  allegations with respect to the North Bay Fires and the Camp Fire, supposedly "revealed" PG&E's

8  purportedly deficient fire safety practices.



**Butte Fire and Alleged Misstatements in Third Amended Complaint**
**April 1, 2015 - May 30, 2017**

* Vertical line denotes start of the putative Class Period on April 29, 2015.

### d.      The 2017 North Bay Fires

25          On October 8 and 9, 2017, numerous wildfires ignited across nine counties in the North

26  Bay region of California.  TAC ¶¶ 19, 246, 327.  The North Bay Fires began on a dry and windy

27  night.  *Id.* ¶ 23.  Tragically, the North Bay Fires burned more than 245,000 acres, destroyed almost

28  8,900 buildings, and killed 43 people.  *Id.* ¶ 19.

1       On October 13, 2017, before any agency or investigation had determined a cause for the

2 North Bay Fires, PG&E issued a press release to give investors transparency on the potential for

3 liability associated with these fires that could materially impact its business. The press release

4 stated that "[i]t is currently unknown whether the Utility would have any liability associated with

5 these fires" and that PG&E could suffer material losses for which its $800 million in liability

6 insurance may be "insufficient" or "otherwise unavailable" (which could occur with a certain level

7 of fault or exhaustion of the policy from previous liabilities). Ex. 12 (Oct. 13, 2017 Form 8-K).

8 The stock price went from a $63.95 opening price to a $57.72 closing price. Ex. 103 (PCG

9 Historical Price).

10       More disclosures on potential liability came in December 2017, when PG&E reversed

11 course from its announcement that it was increasing the stockholder dividend based on "progress

12 on safety." Ex. 11 (May 31, 2017 Form 8-K) at 99.1. PG&E informed investors that it was

13 suspending the dividend based on "uncertainty related to causes and potential liabilities associated

14 with . . . Northern California Wildfires." Ex. 15 (Dec. 20, 2017 Form 8-K) at 99.1; TAC ¶ 339.

15 While "[n]o causes ha[d] yet been identified for any of the unprecedented wildfires," PG&E told

16 investors it could be liable regardless of whether it followed inspection and safety rules. Ex. 15

17 (Dec. 20, 2017 Form 8-K) at 99.1. In addition to the fact itself that shareholders would no longer

18 be receiving a dividend, eliminating the dividend signaled to the market the enormous potential

19 liability, as dividends paid to common shareholders by PG&E Corporation during 2016 and 2017

20 amounted to roughly $921 million and $1 billion, respectively. Ex. 6 (2017 Form 10-K) at 64.

21 PG&E's stock price fell $6.62 or 12.95% on the next trading day. TAC ¶¶ 344–47. PG&E's next

22 periodic filing updated investors on what it knew while the investigation continued, telling

23 investors that lawsuits had been filed, more could be filed, and that it had provided "22 electric

24 incident reports to the CPUC" related to the North Bay Fires, where PG&E's equipment may have

25 been involved. Ex. 6 (2017 Form 10-K) at 27.

26       In a criminal proceeding related to the San Bruno explosion, the public record reflects that

27 before Cal Fire published any reports, a federal court-appointed monitor, the federal prosecutor,

28 and PG&E agreed that the monitor would begin to evaluate aspects of PG&E's electric distribution

operations, including PG&E's vegetation management plan, electric pole and equipment maintenance and inspection programs, and emergency response and restoration practices. Ex. 95 (Order Instituting Monitor).

In May and June 2018, Cal Fire publicly announced the results of its investigation into the North Bay Fires. TAC ¶¶ 579–80. On May 25, 2018, Cal Fire announced that four fires had started as a result of downed vegetation hitting PG&E's powerlines and that it had referred evidence of violations of state law to the relevant district attorneys. TAC ¶ 579; Ex. 76 (News Release, Cal Fire, CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties (May 25, 2018)). PG&E's share price fell $2.32, or 5.19%, on May 29, 2018, the following trading day. TAC ¶ 348. Less than a month later, on June 8, 2018, Cal Fire concluded that 12 of the 17 North Bay Fires were ignited by contact between vegetation and PG&E's electrical distribution lines. TAC ¶¶ 346, 353; Ex. 77 (News Release, Cal Fire, CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake and Napa Counties (June 8, 2018)). Out of those 12 wildfires, Cal Fire stated that it referred eight of its investigations to law enforcement due to evidence of alleged violations. *Id*; TAC ¶ 353. Ultimately, Cal Fire determined that 11 of the North Bay Fires may have involved violations of state law by PG&E. Exs. 76–77. But Cal Fire also concluded that some of the other North Bay Fires did not involve violations. TAC ¶¶ 289, 353.[8] On June 11, 2018, PG&E announced it expected to "record a significant liability" for losses associated with at least fourteen of the fires, and its stock price fell by $1.69, or 4.08%. Ex. 16 (June 11, 2018 Form 8-K); TAC ¶ 357.

Immediately after these Cal Fire reports, on June 12 and June 14, 2018, investors initiated class action lawsuits claiming that deficiencies in PG&E's vegetation management were fully "revealed" when Cal Fire confirmed PG&E caused several of the North Bay Fires and referred

---

[8] On October 10, 2018, Cal Fire reported that, even though PG&E caused the Cascade Fire, it did not identify any violations of law. Ex. 78 (News Release, Cal Fire, CAL FIRE Investigators Determine the Cause of the Cascade Fire (Oct. 9, 2018)). Later, on January 24, 2019, Cal Fire reported that it did not identify any violations of law related to the cause of the Tubbs Fire, the largest of the North Bay Fires. Ex. 79 (Release, Cal Fire, CAL FIRE Investigators Determine the Cause of the Tubbs Fire (Jan. 24, 2019)); TAC ¶ 599 n.167.

1  evidence to the district attorneys (with the implication being that PG&E could be criminally at

2  fault).  Ex. 88 (Moretti Complaint) ¶¶ 29–38; Ex. 89 (Weston Complaint) ¶¶ 24–36.

3        *e.*      ***Post-North Bay Fires Efforts To Mitigate Wildfire Risks***

4       As California faced another year of drought, regulators sought to balance California's new

5  wildfire realities.  In July 2018, the CPUC issued resolution ESRB-8, which required utilities to

6  prepare a protocol for de-energizing powerlines when extreme fire danger conditions exist, in an

7  attempt to ensure California communities would have reliable power or be prepared when they

8  might not.  TAC ¶¶ 141–143.  Specifically, ESRB-8 required utilities (1) to report to the SED

9  when they decide to shut off power, and (2) to engage in consumer outreach and provide notice

10  and mitigation to their consumers when they decide to shut off power.  Ex. 25 (ESRB-8) at 5–6.

11  ESRB-8 does not require de-energization in any particular circumstances, instead deferring to the

12  utility to make that decision so long as it is communicated.  TAC ¶ 446 ("Utilities can de-energize

13  whatever lines and voltage they deem appropriate.").

14       PG&E fulfilled its responsibilities by creating a protocol and using a multifactor analysis

15  to weigh the competing concerns of wildfire risk and public safety implications of a power shutoff.

16  Ex. 108 (Shutoff Protocol).  That protocol makes clear that "no single factor will drive a Public

17  Safety Shutoff" and that PG&E would "take a combination of many criteria into consideration,"

18  when determining whether to de-energize powerlines.  TAC ¶¶ 143, 300.  Prior to the Camp Fire,

19  PG&E had used the protocol to de-energize 41 different powerlines.  *Id.* ¶ 145.

20        *f.*      ***By Mid-2018, PG&E Faced Massive Potential Liability And***

21                 ***Regulatory Scrutiny***

22       Throughout 2018, lawsuits were filed, and publicly available reports of deficiencies in

23  PG&E's safety practices, regulatory scrutiny, and publications of audit and investigation results,

24  increased.  *E.g.*, Exs. 31–63 (collecting audit reports and citations).  PG&E was faulted for a "run

25  to failure" approach.  Ex. 100 (Lore OLDS Complaint) at ¶¶ 124–25.  The CPUC and ESRB

26  reported failures to timely conduct inspections, outstanding work orders, and deficiencies in

27  PG&E's inspection and vegetation management practices themselves.  *E.g.*, Exs. 31–63.

28

LATHAM&WATKINS_LLP_
ATTORNEYS AT LAW

According to PERA's own allegations, the public was well aware of the difficulties in PG&E's wildfire mitigation efforts in light of this regulatory scrutiny and the accompanying public reports of deficiencies. TAC ¶¶ 575–85. Government agencies identified violations from vegetation management practices, delayed work orders, failing poles, and more. *See, e.g.*, *id.* ¶¶ 580–85; Exs. 31–63. For example, the CPUC released information supplied by PG&E under its "Fire Incident Data Collection Plan" showing that "PG&E equipment caused a total of 1,486 vegetation fires between June 10, 2014, and December 29, 2017. Among those vegetation fires, 69 were caused by transmission lines like the transmission line implicated in causing the Camp Fire, including 26 fires caused by lines of the exact same high voltage, 115 kilovolts." TAC ¶ 106; *see* Ex. 66 (Fire Incident Data Report). All signs pointed to massive liability from the North Bay Fires, which PG&E itself disclosed after the Cal Fire report when it stated that it would take an estimated pre-tax charge (a reserve) of $2.5 billion for the quarter ending June 30, 2018, for claims related to the North Bay Fires. TAC ¶ 583; Ex. 17 (June 21, 2018 Form 8-K). And, as alleged, by June 10, 2018, investors had already determined that there was no doubt that PG&E would be liable for damages from the North Bay Fires under the doctrine of inverse condemnation and ineligible for rate recovery because it would not be able to demonstrate that it was a prudent operator. TAC ¶ 582 (citing to research report: "At this point, we question whether the applicability of inverse condemnation even matters when ***all signs seem to point to [PG&E] being imprudent operators in the majority of instances, which would therefore mean it should assume liability***." (emphasis in original)).

In fact, in September 2018, California enacted Senate Bill ("S.B.") 901, which "rescued PG&E from the threat of bankruptcy based on liabilities from the 2017 fires." *See id.* ¶ 27. Under that bill, PG&E was permitted to raise capital to pay for liability resulting from the North Bay Fires if its financial health fell below a certain level. *Id.* Despite the existence of S.B. 901, which allegedly informed the market that PG&E's wildfire safety programs could "drive the Company to [financial] ruin," PERA claims investors were still being misled about the massive scope of PG&E's potential liability for future wildfires. *Id.* ¶ 29.

1

                              ***g.      The 2018 Camp Fire***

2         On November 8, 2018, a fire ignited in Butte County that ultimately became "the most

3  destructive and fatal wildfire in California history," tragically causing at least 85 fatalities and

4  $16.5 billion in damages.  TAC ¶ 587.

5         The Camp Fire started in PG&E's service territory, and as later revealed, ignited when a

6  PG&E electrical tower carrying a high-voltage transmission line failed.  *Id.* ¶ 37.  Unfortunately,

7  as PG&E stated in a public tweet on November 8, 2018, PG&E did not go forward with a power

8  shutoff that day, believing the conditions did not warrant a power shutoff's adverse impact on the

9  community.  Ex. 106 (Nov. 8, 2018 Tweet); *see also* TAC ¶ 146.  PERA alleges that this

10  information "undermin[ed]" PG&E's statements about compliance and prioritizing safety during

11  the Alleged Relevant Period, and was reported by major news outlets on November 9, 2018.  The

12  stock price fell to close at $39.92, a drop of $7.88, on November 9, 2018.  TAC ¶ 365.

13         Just as it had for the North Bay Fires and the Butte Fire, shortly after the Camp Fire started,

14  PG&E disclosed an electric incident that occurred shortly before the Camp Fire ignited.  *Id.* ¶ 365.

15  Specifically, after the markets closed on November 8, 2018, PG&E informed the CPUC that "'on

16  November 8, 2018, at approximately 0615 hours, PG&E experienced an outage on the Caribou-

17  Palermo 115 kV Transmission line in Butte County.  In the afternoon of November 8, PG&E

18  observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV

19  Transmission line, approximately one mile north-east of the town of Pulga, in the area of the Camp

20  Fire.'"  Ex. 18 (Nov. 13, 2018 Form 8-K) (quoting PGE's electric incident report submitted to the

21  CPUC on November 8, 2018).  This information was reported publicly the next day, November 9,

22  2018.  TAC ¶¶ 365, 368 n.108.  That same day, PG&E's share price fell $7.88, approximately

23  20%.  *Id.* ¶ 366.

24         On November 12, 2018, it was reported that a property owner near the origin point of the

25  Camp Fire had emailed PG&E about a sparking transmission line the day before the Camp Fire

26  ignited.  TAC ¶ 375.  That day, PG&E's share price fell $6.94, approximately 17%.  *Id.* ¶ 376.

27         On November 13, 2018, after the close of market, PG&E gave investors a "much bleaker

28  picture of PG&E's deteriorating financial condition."  TAC ¶ 381.  At that time, the Camp Fire

1    continued to burn, without a determination of its cause, and PG&E continuously updated investors
2    about the potential "material" financial impact of liability from the fire.  PG&E informed investors
3    that it had drawn on its credit facilities for "greater financial flexibility," with "aggregate
4    borrowings outstanding" of $3.3 billion, and that no additional amounts were available.  Ex. 18
5    (Nov. 13, 2018 Form 8-K) at 2; *see* TAC ¶¶ 381, 385.  PG&E also reminded investors that "if the
6    Utility's equipment is determined to be the cause [of the Camp Fire], the Utility could be subject
7    to significant liability in excess of insurance coverage."  Ex. 18 (November 13, 2018 Form 8-K).
8    And these liabilities "would be expected to have a material impact on [PG&E's] financial
9    condition, results of operations, liquidity, and cash flows."  *Id.*  The next day, PG&E's share price
10   fell $7.13, nearly 22%.  TAC ¶ 382.

11         On November 15, 2018, Cal Fire announced that it had identified a second ignition point
12   for the Camp Fire, "under high tension power lines."  TAC ¶ 115.  PG&E's share price fell $7.85,
13   approximately 30%.  *Id.* ¶ 387.

14         Over the next seven days, the fire tragically burned more than 153,000 acres.  Ex. 80 (News
15   Release, Cal Fire, CAL FIRE Investigators Determine Cause of the Camp Fire (May 15, 2019)).
16   Cal Fire later determined that the Camp Fire ignited when a component on the cross-arm of a
17   115,000-volt (115kV) steel tower on the Caribou-Palermo transmission line broke, fell to the
18   ground, and caused a spark that ignited vegetation underneath the tower.  TAC ¶ 132.

19         Less than three months later, in light of its mounting potential wildfire liability, which
20   PG&E estimated could be in excess of $30 billion, PG&E filed for Chapter 11 bankruptcy
21   protection on January 29, 2019.  *Id.* ¶ 179.

22                    **2.      Procedural Background**

23                        ***a.      The District Court Action***

24         In June 2018, two securities class action complaints related to the North Bay Fires were
25   filed in the United States District Court for the Northern District of California against PG&E and
26   certain of its officers (the "District Court Action").  *See* Ex. 88 (Moretti Complaint); Ex. 89
27   (Weston Complaint).  The matters were consolidated, and in September 2018, following an
28

1    application process required under the PSLRA, the District Court appointed PERA as the lead

2    plaintiff and Labaton Sucharow LLP as lead counsel.  District Court Action, ECF No. 62.

3         On November 9, 2018—the day after the Camp Fire started—PERA filed a consolidated

4    class action complaint on behalf of a putative class of PG&E shareholders. Ex. 90 (FAC).  PERA

5    alleged that between April 29, 2015, and June 8, 2018, PG&E made thirteen statements that were

6    knowingly false when made and caused investor losses, in violation of Section 10(b) of the

7    Exchange Act and SEC Rule 10b-5.  *Id.* ¶¶ 74–112.  The statements that PERA claimed were false

8    concerned PG&E's efforts to mitigate wildfire risk and statements that its vegetation management

9    activities complied with applicable regulations.  *Id.* ¶ 1.  PERA alleged that PG&E's fraud was

10   revealed in the wake of the North Bay Fires, on five different dates starting with the North Bay

11   Fires themselves and spanning nearly eight more months.  *Id.* ¶¶ 124–31.  PERA further alleged

12   that the truth regarding PG&E's safety practices and wildfire risk was revealed in disclosures that

13   PG&E's equipment may have been involved in igniting those fires; disclosures that PG&E was

14   being investigated by the CPUC; the announcement that PG&E was suspending its dividend based

15   on potential liability; and two Cal Fire reports concluding that PG&E's equipment caused certain

16   of the North Bay Fires, and that Cal Fire sent evidence of regulatory violations to certain district

17   attorneys' offices.  *Id.* ¶¶ 135–56.

18        On December 14, 2018, PERA filed its Second Amended Complaint ("**SAC**").  Ex. 91.

19   The SAC challenged the same thirteen statements as the previous complaint, but added claims

20   based on six additional alleged misrepresentations regarding the risk of wildfires and liability,

21   pivoted to focus on safety efforts applicable to the pole and transmission line that ignited the Camp

22   Fire, and extended the alleged class period to November 15, 2018. *Id.* ¶¶ 226–51.  Notwithstanding

23   PERA's claims in the prior complaint—that the "truth" about PG&E's deficient safety practices,

24   compliance issues, and potential liability was fully revealed by June 8, 2018—PERA's SAC now

25   alleged those risks remained concealed even after the Cal Fire reports in May and June 2018.  *E.g.*,

26   *id.* ¶¶ 301, 306, 322.  Without explanation, PERA's SAC alleged that PG&E's public statements

27   (which largely repeated what it said before and shortly after the North Bay Fires) somehow misled

28   investors by concealing the material risk of wildfires and the corresponding liability.  *Id.*  PG&E's

stock price dropped as the Camp Fire spread; PERA now claimed that investors did not learn the full "truth" about the risk of wildfires and the associated liability until the destruction of the Camp Fire was realized and rumors of PG&E's bankruptcy surfaced. *Id.* ¶ 17.

When PG&E filed for bankruptcy on January 29, 2019, the District Court Action was stayed and then enjoined with respect to PG&E. On February 22, 2019, the Securities Act Plaintiffs filed a lawsuit against certain PG&E officers, directors, and underwriters for alleged Section 11 violations related to the Offerings, and on May 28, 2019, PERA and the Securities Act Plaintiffs filed the TAC, which is an amalgamation of the SAC and the Securities Act Plaintiffs' February 2019 complaint. *See generally* District Court Action, ECF Nos. 103, 113, 121.

The District Court Action then proceeded in the District Court against the non-PG&E defendants, who filed motions to dismiss the TAC that were fully briefed. Before determining whether PERA's claims survived the motions, the District Court issued an order staying the District Court Action pending resolution of the securities proofs of claim filed in the Bankruptcy Case. PERA appealed the stay order, but the Ninth Circuit has not yet issued a decision about whether to lift the stay. *See generally* District Court Action, ECF Nos. 149, 155, 217.

***b. PERA's Securities Claims In The Bankruptcy***

PERA (and the Securities Act Plaintiffs) filed proofs of claim on October 21, 2019, and included Addendums that incorporated the TAC. *See* Claim Nos. 69105, 71345 (PERA); 61556, 68009 (York); 72200, 72620 (Warren); 69202, 71310 (Mid-Jersey). As the Court is aware, no class of securities claimants—inside or outside the Bankruptcy Case—has ever been certified, and the Court has not yet addressed whether PERA or any other claimant has actually stated a claim. Pursuant to this Court's July 28, 2023 Order Authorizing Amendment and Objection Procedures for Securities Claims (ECF No. 13934) and the November 15, 2023 Order Modifying Amendment and Objection Procedures for Securities Claims (ECF No. 14139), PG&E was ordered to "make sufficiency objections akin to a motion to dismiss" by December 13, 2023, for certain securities claimants, including PERA and the Securities Act Plaintiffs.

PERA itself is an investment manager and financial administrator that bought stock in PG&E from June 3, 2015 through October 11, 2018. Seeking to recover damages because its risky

Case: 19-30088 Doc# 14200 Filed: 12/13/23 Entered: 12/13/23 21:40:39 Page 42 of 113

1    investments in PG&E stock declined in value, PERA advances securities claims against PG&E

2    based on its purported trading throughout this period. *See, e.g.*, TAC, Attachment A. PERA

3    alleges that, after the first alleged misrepresentation and prior to the Butte Fire in September 2015,

4    it purchased 5,500 shares of PG&E stock. *Id.* After the Butte Fire and before the North Bay Fires

5    in October 2017, PERA purchased 304,737 shares of PG&E stock. *Id.* Shortly after the North

6    Bay Fires, on October 30, 2017, PERA purchased 4,180 more shares of PG&E stock, followed by

7    49,740 additional shares in April 2018. *Id.*

8        **B.**      **Legal Standard: Congress Enacted Specific Higher Pleading Standards For**

9               **Investors To Bring Claims For Securities Fraud Under The Exchange Act**

10    Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] . . . [of] any . . .

11   deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in

12   contravention of" SEC "rules and regulations." 15 U.S.C. § 78j(b); *see Dura Pharms., Inc. v.*

13   *Broudo*, 544 U.S. 336, 341 (2005). The SEC has also promulgated Rule 10b-5, which forbids,

14   among other things, the making of any "untrue statement of a material fact" or the omission of any

15   material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R.

16   § 240.10b–5 (2004). Congress has, however, "imposed statutory requirements on that private

17   action." *Dura Pharms.*, 544 U.S. at 341.

18    Ordinarily, to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

19   Procedure, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its

20   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Congress recognized that "[p]rivate

21   securities fraud actions, however, if not adequately contained, can be employed abusively to

22   impose substantial costs on companies and individuals whose conduct conforms to the law."

23   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Therefore, "[s]etting a

24   uniform pleading standard for § 10(b) actions was among Congress' objectives when it enacted

25   the PSLRA." *Id.* at 320. Congress ensured that "[a]s a check against abusive litigation by private

26   parties," the PSLRA includes "[e]xacting pleading requirements." *Id.* at 313.

27    As required by the PSLRA and the United States Supreme Court, to survive a motion to

28   dismiss under Section 10(b) and Rule 10b-5, a plaintiff must plead each of the following with the

1   requisite particularity: (1) a material misrepresentation or omission; (2) scienter; (3) a connection

2   with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See*

3   *Dura Pharms.*, 544 U.S. at 341–42. PERA's Section 10(b) claims of securities fraud are subject

4   to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA.[9] *See*

5   *Tellabs*, 551 U.S. at 318–21 (Section 10(b) and Rule 10b-5 claims are subject to PSLRA). Taken

6   together, Rule 9(b) and the PSLRA require plaintiffs to plead their case "with a high degree of

7   meticulousness." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).

8           Under Rule 9(b), every element of a securities fraud claim must be pleaded with

9   particularity. *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014)

10  ("Rule 9(b) applies to all elements of a securities fraud action . . . ."); *In re Rigel Pharm., Inc. Sec.*

11  *Litig.*, 697 F.3d 764, 876 (9th Cir. 2012) (Rule 9(b) requires Plaintiffs to "state with particularity

12  the circumstances constituting fraud," and to explain "why the statements were false or misleading

13  at the time they were made"). Under the PSLRA, a plaintiff must "specify each statement alleged

14  to have been misleading [and] the reason or reasons why the statement is misleading" (falsity) and

15  "state with particularity facts giving rise to a strong inference that the defendant" acted with

16  scienter. 15 U.S.C. § 78u-4(b)(1)(B), (2)(A).

17          Because claims under the Exchange Act are based on a defendant's disclosures, "courts

18  must consider the complaint in its entirety, as well as other sources courts ordinarily examine when

19  ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

20  complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S.

21  at 322; *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) ("[A court] may also

22  consider unattached evidence on which the complaint necessarily relies if: (1) the complaint refers

23  to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the

24  authenticity of the document." (citation and internal quotations omitted)). Where a plaintiff asserts

25  securities fraud claims, such documents include a defendant's filings with the SEC and other public

26

27  ---

[9] The pleading standards under the PSLRA apply to any private action alleging securities fraud
28  under Section 10(b) of the Exchange Act; the fact that this claim is being brought in this Court
    does not affect the uniform pleading requirements Congress mandated. *See* 15 U.S.C. § 78u-4(b).

agencies. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 40 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings subject to judicial notice on motion to dismiss); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1060–62 (C.D. Cal. 2012) (considering, on a motion to dismiss, documents referenced and relied upon in plaintiffs' complaint, SEC filings, earnings call transcripts, news reports, and press releases). In a case alleging misleading statements in a securities filing, the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996)).

### C.     Argument:  PERA Fails To Meet Its Burden To Plead Exchange Act Claims

PERA's Exchange Act claims fail for four independent reasons. First, PERA has failed to sufficiently plead that PG&E made a materially false statement or omitted a material fact that was required to be disclosed at the time. Second, PERA has failed to adequately allege a strong inference of scienter for any of the challenged statements. Third, PERA cannot establish loss causation for its claims. Fourth, with respect to any stock purchases PERA made after the first North Bay Fires ignited on October 8, 2017, PERA has failed to plead reliance. In each of these situations, PERA's attempts to allege one element actually cannibalize their ability to plead other requirements. Thus, when the Court views PERA's allegations in their totality, it will see not only that PG&E is correct that PERA has failed to plead each of these requirements, but also that PERA's conflicting theories are not reconcilable. For each of these reasons, PERA's claims must be dismissed.

1.   **PERA's TAC Fails To Plead Any False Or Misleading Statement Or Omission**[10]

   a.   *PERA Bears The High Burden Of Pleading That Each Alleged Misstatement Is False Or Misleading*

To survive a motion to dismiss, PERA bears the burden to adequately plead that each statement it challenges was false or misleading. 15 U.S.C. § 78u-4(b)(1)(A)–(B); *see also Tellabs*, 551 U.S. at 321; *In re Cisco Sys.*, No. C 11-1568, 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013) ("[I]t is Plaintiffs', not Defendants' burden, to identify the misleading statement and link each one to the facts that establish that the statement was false or misleading when made."). The TAC must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.5 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citation omitted). Accordingly, the Court must review each alleged materially false or misleading statement, and determine whether, on a statement-by-statement basis, each should be dismissed. *Id.* The Court must then dismiss each alleged misstatement that is not actionable under the securities laws. *Id.*

This pleading requirement means that a plaintiff must demonstrate that each alleged statement "directly contradict[ed] what the defendant knew at that time" in a material way. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018)); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (requiring contemporaneous facts that contradicted statement); *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogated on other grounds by Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (a plaintiff must allege, with the requisite specificity, "contemporaneous statements or conditions" that are "inconsistent" with

---

[10] To facilitate the Court's review, PG&E has prepared a chart, attached hereto as Appendix 1, that groups the nineteen alleged misstatements and lists the various reasons why each is insufficient to state a claim under the securities laws.

the challenged statement so as to demonstrate that it was false when made (internal quotations omitted)). In *Twitter,* the Ninth Circuit recently explained the significant hurdles a private plaintiff faces to plead falsity in order to survive a motion to dismiss a 10(b) claim:

> First, under the PSLRA's particularity requirements and Federal Rule of Civil Procedure 9(b), allegations of "fraud must be accompanied by the who, what, when, where, and how of the misconduct charged. *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up); *see also* 15 U.S.C. § 78u-4(b)(1). Second, an allegedly misleading statement must be "capable of objective verification." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 606 (9th Cir. 2014). For example, "puffing"—expressing an opinion rather than a knowingly false statement of fact—is not misleading. *Id.*; *see also Lloyd v. CVB Fin. Corp*., 811 F.3d 1200, 1206–07 (9th Cir. 2016). Third, a statement is not actionable just because it is incomplete. *In re Vantive Corp. Sec. Litig*., 283 F.3d 1079, 1085 (9th Cir. 2002). Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information. Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

*Twitter,* 29 F.4th at 619–20 (alterations in original).

Here, PERA advances multiple theories to allege securities fraud in connection with the wildfires in 2017 and 2018, based principally on the notion that PG&E misrepresented its wildfire safety processes and programs, and the resulting liability it could face for wildfires. As these authorities make clear, the Court may not blindly accept PERA's characterizations (or mischaracterizations) of PG&E's statements. When viewed in context of when and how these statements were made and without PERA's spin, none of these allegations reveal statements that directly contradict what the defendants knew at that time in a material way to rise to the level of a materially false statement under the securities laws. These claims should all be dismissed.

### b. The Court Should Follow Recent Decisions Dismissing Securities Claims Against Edison And Dismiss The Claims Here

The District Court for the Central District of California and the Ninth Circuit recently analyzed—and soundly rejected—very similar investor claims against a Southern California utility based on allegedly deficient fire safety practices and compliance issues, and the purported

concealed risk of wildfires and liability. *Edison I*, 2021 WL 2325060, at \*10; *Edison II*, 2022 WL 822191, at \*1. Like PG&E, Edison is a California public utility responsible for safety maintenance concerning its electrical transmission lines. California regulators found Edison responsible for two fires in Southern California in 2017 and 2018: the Thomas Fire and the Woolsey Fire. The Thomas Fire was caused when multiple Edison conductors fell over, igniting the vegetation below. Ex. 64 (SED Investigation Report of the Thomas Fire) at 3. From December 2017 to March 2018, the Thomas Fire burned through 281,893 acres and caused two deaths. *Id.* The Woolsey Fire started on November 8, 2018—the same day the Camp Fire started—and burned until November 21, 2018. The cause of the Woolsey Fire was a failed circuit owned and operated by Edison. Ex. 65 (SED Investigation Report of the Woolsey Fire) at 1, 15–16. Between the two fires, SED cited Edison for more than thirty violations of CPUC General Order 95. *Id.* at 3; Ex. 64 at 4.

Like PERA, the *Edison* plaintiffs challenged numerous statements in Edison's SEC disclosures and public statements regarding Edison's "focus on safety and risk mitigation," theorizing that the "Edison Defendants must have fabricated [Edison's] focus on safety and risk mitigation, given purported deficiencies in its infrastructure maintenance and alleged responsibility for the Thomas and Woolsey Fires." *Edison I*, 2021 WL 2325060, at \*3–4 (noting allegations of safety and compliance issues nearly identical to those alleged by PERA, including (1) failing to inspect and repair electrical poles; (2) pole loading issues; (3) vegetation management issues; (4) down wires; and (5) a "run to failure approach," which resulted in two wildfires caused by Edison's equipment).

The California district court held, and the Ninth Circuit affirmed, that Edison's statements endorsing its safety programs, efforts to improve, increasing investments, and progress on safety (which largely mirror the alleged statements in the TAC) were not actionable for several reasons. First, "the market was aware of the safety failures in the Edison Defendant's infrastructure" and "would be aware of [Edison's] previous disclosures to the CPUC," such that Edison's "general statements related to prioritization of safety would not mislead a reasonable investor." *Id.* at \*10; *see also Edison II*, at \*1 ("Nor were the challenged statements misleading by omission due to Edison's failure to disclose publicly available information regarding its safety practices and prior

safety violations."). Second, these statements were not misleading "because they were not literally false" or "were not capable of objective verification" and therefore "constituted mere corporate puffery." *Edison II*, 2022 WL 822191, at *1 (citing *Metzler*, 540 F.3d at 1070; *Khoja*, 899 F.3d at 1008; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021)).

The *Edison* courts also held that the alleged omissions of the risks of wildfires and liability were inactionable as a matter of law. The *Edison* plaintiffs offered two theories of liability for such omissions, depending on when the statements that allegedly omitted information were made. Plaintiffs claimed that, before the fires, Edison concealed the true risk that it would be liable for damage from the wildfires (as a result of its undisclosed deficient safety practices and "run to failure" approach). *Edison I*, 2021 WL 2325060, at *3. The Edison plaintiffs further claimed that Edison's post-fires statements that Edison was "being investigated" and "may not be authorized to recover its uninsured damages through customer rates" were misleading because Edison knew that it would be liable based on its deficient safety practices. *Id.* at *5. The district court similarly rejected the theory that statements regarding the potential for liability were false because the plaintiffs failed to plead any contemporaneous, undisclosed facts that suggested Edison knew about *actual* liability: "Plaintiffs do not plead facts that SCE had already been found liable for the two wildfires or denied recovery rates at the time they made statements related to liability." *Id.* at *11; *see also id.* at *12 ("Edison Defendants could not have known, at the time the statements were made, that CPUC would determine in a future proceeding that their conduct would not meet the standard required to avail themselves of rate recovery.").

As further described below, PERA's argument that PG&E misrepresented the risk of wildfires or liability fails, just like it did in *Edison*. When the challenged statements are examined in context, at the time they were made, it is clear that "the market already knew" and "was aware" of PG&E's potential for wildfire liability. PERA cannot plead that the statements were false or that any reasonable investor would be misled.

1    **c.    PERA Fails To Plead That PG&E's Statements Related To Its**

2    **Wildfire Safety Practices Were Materially False Or Misleading**

3    **_(Stmts. 1–11, and 13–19)_**

4    PERA's TAC first claims that PG&E falsely represented its wildfire safety practices over

5    a more than three-year period during historic droughts and wildfire risks—18 of the 19 alleged

6    "misrepresentations" involve such statements.  Appx. 1 (Stmts. 1–11, 13–19).  The statements

7    concern  four  subcategories  of  wildfire-related  programs:  (1) statements  concerning  PG&E's

8    vegetation management program (Stmts. 1–2, 4–5, 9–11, 14, and 17); (2) statements concerning

9    PG&E's pole integrity management program (Stmts. 13–14, and 17); (3) statements concerning

10   PG&E's ESRB-8 shutoff protocol (Stmts. 15–16, 18–19); and (4) a statement concerning PG&E's

11   recloser pilot program (Stmt. 3).  PERA's challenge is based principally on a theory that PG&E

12   was not doing what it said, or was not doing enough because it did not prevent the 2017 and 2018

13   fires.  _E.g._ TAC ¶¶ 111–24, 319.  But PERA cannot point to facts that contradict any of these

14   statements, and therefore cannot claim that PG&E misrepresented its wildfire safety programs.

15   (1)    General Statements About Safety And Risk Mitigation Are

16   Not Actionable (Stmts. 1, 5–8, 10–11, 13–14, And 17)

17   As an initial matter, several of PERA's challenged statements are inactionable, generic

18   statements endorsing PG&E's efforts to mitigate wildfire risk.  (Stmts. 1, 5–8, 10–11, 13–14, and

19   17).  "To be misleading, a statement must be 'capable of objective verification.'"  _Retail Wholesale_

20   _& Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co._, 845 F.3d 1268, 1275 (9th Cir.

21   2017) (citation omitted).  "[G]eneral terms" that "provide[] nothing concrete" are not actionable,

22   _Apollo_, 774 F.3d at 606, and a mere "'optimistic, subjective assessment hardly amounts to a

23   securities violation,'" _Intuitive Surgical_, 759 F.3d at 1060 (quoting _In re Cutera Sec. Litig._, 610

24   F.3d 1103, 1111 (9th Cir. 2010)).  "Statements of mere corporate puffery, vague statements of

25   optimism . . . are not actionable because professional investors, and most amateur investors as

26   well, know how to devalue the optimism of corporate executives."  _Id._ (internal quotation marks

27   omitted).  Moreover, similar "'subjective assessments' which vaguely refer to [] prioritization,

28

improvement, and funding of safety procedures'" were found to be inactionable in *Edison I*. 2021 WL 2325060, at \*9.

In *Alphabet*, the Ninth Circuit affirmed the dismissal of claims challenging Google's statements about its "commitment to user privacy," explaining that the statements "do not rise to the level of 'concrete description of the past and present,'" but rather "amount to vague and generalized corporate commitments, aspirations, or puffery that cannot support statement liability." 1 F.4th at 708 (citations omitted); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("strong credit culture and underwriting integrity remain paramount" is not an actionable statement).

As in *Alphabet* and *Edison*, PERA cannot claim that statements generally touting PG&E's efforts are actionable. Like in those cases, no reasonable investor could have been misled by such puffery or generic statements. PG&E's statements convey no measurable facts regarding its safety practices—*e.g.*, the details of the programs, date of completion, or any measure of how they might impact wildfire risk—that investors would consider misleading. Importantly, the purportedly false statements that the *Edison* courts held were not actionable as a matter of law are substantively identical to the types of statements challenged in the TAC. Below are a few examples:

| PG&E's Allegedly False Statement | Edison's Allegedly False Statement |
|---|---|
| PG&E is "***stepping up*** [its] vegetation management activities to ***mitigate wildfire risk*** and improve access for firefighters." Stmt. 1 (emphasis altered). | "[Edison] is investing in and ***strengthening*** its electric grid and driving operational and service excellence in ***improving system safety***, reliability, and service." *Edison I*, 2021 WL 2325060, at \*9 (emphasis added). |
| "[O]ver the last 2 years, [PG&E has] ***doubled the amount*** that [it has] *invested* in veg[etation] management." Stmt. 11 (emphasis altered). | "[Edison] is engaged in a ***significant and ongoing*** infrastructure investment program . . . [and] [i]n addition to operating practices designed to reduce the risk of wildfires, [Edison] also ***invests significant amounts of capital to reduce wildfire risk***." *Edison I*, 2021 WL 2325060, at \*9 (emphasis added). |

| | |
|---|---|
| PG&E's CEO "highlighted the companies' progress on safety . . . . She reaffirmed PG&E's **commitment to safety** and operational excellence." Stmt. 8 (emphasis altered). | "[Edison has] **elevated safety** to one of our company's **core values** and dedicated additional senior leadership in this area." *Edison I*, 2021 WL 2325060, at *9 (emphasis added). |
| PG&E is "continuing to focus on **implementing additional precautionary measures** intended to further reduce wildfire threats." Stmt. 17. | "[Edison has] long **taken substantial steps to reduce the risk of wildfires** in our service territory and continue to look for ways to enhance our operational practices and infrastructure." *Edison I*, 2021 WL 2325060, at *9 (emphasis added). |

These statements generally endorse PG&E's efforts to mitigate wildfire risk (including "we're stepping up our vegetation management activities to mitigate wildfire risk," describing its vegetation management program as "well-established and innovative" and "one of , if not the most, comprehensive vegetation management programs in the country"), and its "progress," "improvements" and "commitment to safety and operational excellence." Stmts. 1, 5–8, 10–11, 13–14 & 17. However, general statements of efforts and corporate optimism like these are not actionable under the securities laws. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) ("[A] statement that 'great progress' was being made on battery production would potentially be an actionable false statement only if, as the district court put it, Tesla had been 'making no progress at all.'"); *In re Verifone Sec. Litig.*, No. 5:13-CV-01038, 2016 WL 1213666, at *6–7 (N.D. Cal. Mar. 29, 2016) (statements that company "made significant progress" and was "making great strides" not actionable).

Courts have repeatedly rejected similar claims challenging general statements about safety practices after an incident occurs. In *Plumley v. Sempra Energy*, the court held that statements about Southern California Gas Company's "commitment to or prioritization of safety" were "too nonspecific and unmeasurable to state a claim for securities fraud," in the aftermath of the Aliso Canyon gas leak. No. 3:16-cv-00512, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017). In *Police & Fire Retirement System v. Plains All American Pipeline, L.P.*, the Fifth Circuit affirmed dismissal of claims based on "affirmations of Plains' commitment to safety, goals it was seeking to reach, and outlines of procedures," because "emphasiz[ing] Plains' commitment to proper

systems and their intention to comply with regulations . . . were generalized positive goals rather than specific promises." 777 F. App'x 726, 731 (5th Cir. 2019); *see also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 757 (S.D. Tex. 2012) ("[G]eneralized statements about BP's 'commitment to safety,' prioritization of 'process safety performance,' [and] headway in making 'real progress'" were "too squishy, too untethered to anything measurable."). To the extent that PERA's theory is that PG&E's stated initiatives to "step up" vegetation management were a guarantee to fully mitigate wildfire risk, that is an illogical leap. *See* Stmt. 1. Of course, it would impossible in the face of a historic drought and bark beetle infestations, which together resulted in a years-long state of emergency, to eliminate wildfire risk, and would also be inconsistent with PG&E's repeated risk disclosures. Courts routinely reject securities fraud claims premised on allegations that, in a plaintiff's view, a corporate defendant "failed to live up to" its objectives or general promises or commitments to comply with law and policies because statements about a defendant's efforts or goals are not guarantees. *See, e.g.*, *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements that company is "committed to serving safe, high quality food to [its] customers' and that its 'food safety programs are also designed to ensure that [the Company] compl[ies] with applicable federal, state and local food safety regulations'" were "inactionable puffery")); *Mucha v. Volkswagen AG*, 540 F. Supp. 3d 269, 296–97 (E.D.N.Y. 2021) (rejecting claims based on stated "goals" or what company "aims to do"); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 548 (W.D. Pa. 2019) (statements inactionable because "[a]t most, the allegations demonstrate that Arconic 'failed to live up to its own . . . safety standards'"). In any event, no reasonable investor would be misled into reading PG&E's vague statements that it was "stepping up" vegetation management as a promise or guarantee to eliminate the risk of vegetation-caused wildfires altogether. *See Curry v. Yelp Inc.*, No. 14-cv-03547, 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015) (*Curry I*), *aff'd*, 875 F.3d 1219 (9th Cir. 2017) (*Curry II*) (dismissing claims based in part on "common-sense understanding" that reasonable investors would know not "all Yelp reviews were authentic").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

            (2)    PG&E's Statements About Its Vegetation Management Programs Were True (Stmts. 1–2, 4–5, 9–11, 14, And 17)

The majority of the challenged statements concern PG&E's vegetation management program, and additional efforts to combat the bark beetle infestation and drought that devastated California. These statements should be dismissed because PERA offers no facts that contradict the existence or descriptions of this program. Stmts. 1–2, 4–5, 9, 14, and 17. For example, PERA challenges the statement that "PG&E prunes and removes trees growing too close to power lines." Stmt. 5. But PERA does not allege that this statement was actually false, *i.e.*, that PG&E did not have programs to, as it said, prune or remove trees that had grown too close to a power line. Similarly, PERA cannot overcome judicially noticeable facts showing that PG&E made these efforts. PG&E *did* "ste[p] up" its vegetation management activities, Stmt. 1, both by increasing spending and undertaking "five major initiatives" in response to a CPUC resolution (ESRB-4) directing California utilities to take additional measures to reduce wildfire risk, *see* Ex. 71 (Aug. 5, 2019 Report to CPUC); *see also* Ex. 86 (Hogan Senate Hearing Statement). PERA cannot claim fraud by alleging that these statements said more than they did, or that these statements assured investors that these efforts would be enough to prevent any fire.

PERA also challenges PG&E's specific assertions that it spent an "additional $200 million" on vegetation management in 2016 and "doubled the amount [it had] invested in veg[etation] management" in 2017. Stmts. 10, 11. (emphasis omitted). But this challenge fundamentally ignores the way that utilities receive funding for vegetation management expenditures, which is publicly disclosed. A utility can receive funding for vegetation management activities under the CPUC framework in two ways: (1) the General Rate Case ("**GRC**") process fixes what a utility can *prospectively* charge customers for vegetation management, while (2) the CEMA process allows a utility to recoup *retroactively* the costs it actually spent, over and above the GRC-approved spending amount. *See* Cal. Pub. Util. Code §§ 454(a), 454.9(a).

PERA cherry-picks data by alleging that PG&E's spending of approximately $194 million in 2015, $199 million in 2016, and $201 million in 2017 only increased by 2.4% and 1.4% in 2016 and 2017, respectively. TAC ¶¶ 78–79. But PERA conveniently omits that in 2016 and 2017,

1    PG&E was prospectively approved through the GRC process for approximately **$400 million** in

2    spending on vegetation management activities; and through the CEMA process, PG&E applied for

3    retroactive recovery of **$394.5 million** in costs of vegetation management work that it performed

4    over and above the pre-approved spending.  Ex. 67 (CEMA Application) at 6–8.  Thus, through

5    the CEMA process, PG&E did in fact approximately "double" the spending that it was approved

6    to apply toward vegetation management for 2016 and 2017.  TAC ¶¶ 79–80.  PERA cannot plead

7    fraud by omitting or mischaracterizing these critical facts.  *See Norfolk Cnty. Ret. Sys. v. Solazyme,*

8    *Inc.*, No.15-cv-02938, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (dismissing Exchange

9    Act claims because "[t]he allegations omit contemporaneous facts that would establish a

10    contradiction between the alleged misleading facts and reality").  When PG&E's statements are

11    understood with the benefit of the appropriate "context"—as they must be—they are demonstrably

12    true.  *Intuitive Surgical*, 759 F.3d at 1060 ("[T]he context in which the statements were made is

13    key.").

14                  (3)      <u>Statements Regarding PG&E's Pole And Line Inspection</u>

15                                <u>Programs Were True (Stmts. 13–14 And 17)</u>

16    PERA pleads no facts to suggest that investors were misled about PG&E's statements

17    regarding the programs to increase pole integrity management in high fire threat areas, or the

18    "inspection schedules for [PG&E's] over two million poles."  Stmts. 13–14, 17.  The frequency of

19    those inspections—annually for visual inspections, and once every five years for detailed

20    inspections—were disclosed.  *See* TAC ¶¶ 211, 261, 266.  None of the pled facts are inconsistent

21    with PG&E's own descriptions of its inspections, and PERA's conclusory allegation that "PG&E

22    was 'not making lines and poles stronger'" is insufficient to plead falsity.  *See id.* ¶ 306.

23    Ultimately, PERA's complaints about inspections is little more than a post-hoc argument that

24    maintenance on the Caribou-Palermo line should have been performed sooner and better, not that

25    investors were misled into believing that this specific maintenance issue did not exist or would be

26    remedied on any specific schedule.  Such hindsight-based allegations fail.

27

28

(4)    Statements Regarding ESRB-8 And The Community Wildfire Safety Program Were True (Stmts. 15–16 And 18–19)

PERA's challenges to PG&E's statements about ESRB-8 and the Community Wildfire Safety Program likewise fail. PERA challenges three statements announcing the development and launch of PG&E's ESRB-8 shutoff protocol, and a fourth on the day of the Camp Fire that PG&E would "not proceed with plans" to shut off power in certain areas "as weather conditions did not warrant this safety measure." TAC ¶¶ 296–316 (Stmts. 15–16, 18–19).[11] According to PERA, each of these statements was false or misleading because if PG&E had actually "launched" and "implemented" a legally compliant, non-"illusory" shutoff protocol, it would have de-energized the exact transmission line that was involved in the Camp Fire. *Id.* ¶¶ 141–76.

First, contrary to PERA's characterization, none of the challenged statements was a guarantee that PG&E would shut off power under any particular circumstances, much less a guarantee that any shutoff would definitively prevent a wildfire. *Edison I*, 2021 WL 2325060, at *10 (because of Edison defendants' previous disclosures to CPUC, general statements related to prioritization of safety would not mislead a reasonable investor). PERA has alleged no facts that PG&E did not actually "implement[] additional precautionary measures" or "launch[] . . . a program to proactively turn off . . . power for safety when extreme fire danger conditions occur." TAC ¶ 30. Rather, PG&E's statements and the requirements of ESRB-8 made clear that power shutoffs would be discretionary and rare. PG&E stated that "no single factor will drive a Public Safety Shutoff" and that it would "take a combination of many criteria into consideration,"

---

[11] *See* Stmt. 15 ("PG&E has launched the Community Wildfire Safety Program . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur."); Stmt. 16 ("[The Program] includes executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring. . . . PG&E has created a set of procedures for . . . determining what combination of conditions necessitates turning off lines for safety."); Stmt. 18 ("PG&E has launched the Community Wildfire Safety Program . . . [PG&E is] implementing additional precautionary measures . . . [and also implementing Public Safety Power Shutoff] a program to proactively turn off electric power for safety when extreme fire danger conditions occur."); Stmt. 19 ("PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as weather conditions did not warrant this safety measure.").

including the seven weather-related criteria that PERA identifies. Ex. 108 (Shutoff Protocol) at 3; TAC ¶¶ 143, 300.

Likewise, no reasonable investor would read PG&E's statements as a guarantee that PG&E would shut off power under any specific circumstances. Nothing in ESRB-8 requires a utility to de-energize its powerlines.[12] In fact, ESRB-8 was primarily concerned with the consequences of *de-energizing* on public safety from the lack of electricity, not the mitigation of wildfire risk. *See* Ex. 25 (ESRB-8) ("[ESRB-8] provides guidelines that [utilities] must follow and strengthens public safety requirements when a[] [utility] *decides to de-energize* its facilities during dangerous conditions.") (emphasis added); *see also id.* at 8 (it was up to a utility "to use its best judgment on a case-by-case basis"). And, as the CPUC itself made clear, because of the safety risks resulting from power shutoffs, the decision to shut off power involved "a nuanced and multi-dimensional analysis" that "should be reserved as a last line of defense . . . not . . . a first step." Ex. 97 (CPUC Response to Order to Show Cause) at 11; *see also* TAC ¶ 446. PERA cannot allege that PG&E did not publish its procedures or implement them; that is all that PG&E told investors it would do, and all that ESRB-8 required. Ex. 108 (Shutoff Protocol).

*Second*, there are no well-pled allegations to support PERA's theory that PG&E's ESRB-8 Protocol was illusory. TAC ¶ 297. Indeed, PERA's own allegations contradict their claim that the program was illusory—PERA admits that PG&E used the protocol to de-energize 41 different powerlines in October 2018. TAC ¶ 145. The fact that PG&E decided not to shut off power based on the circumstances that existed on the specific day of the Camp Fire does not render the entire program illusory, or any statement describing it false.

At most, PERA's claim is based on its own hindsight judgment that the power should have been shut off. But the securities laws do not permit claims based on a "judgment that, in hindsight, proved to be unwise or imprudent or negligent." *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324, 2017 WL 2257980, at *16 (S.D. Cal. May 23, 2017) ("In order to allege the circumstances

---

[12] ESRB-8 required utilities (1) to report to the Safety and Enforcement Division of CPUC when it decides to shut off power, and (2) to engage in consumer outreach and provide notice and mitigation to its consumers when a utility decides to shut off power. Ex. 25 (ESRB-8) at 5-6.

1    constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier

2    and the later statements is not merely the difference between two permissible judgments, but rather

3    the result of a falsehood." (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir.

4    1994)); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994), *superseded by*

5    *statute on other grounds*, Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), *as*

6    *recognized in Copperstone v. TCSI Corp.,* No. C 97-3495, 1999 WL 33295869, at *14 n.13

7    (N.D.Cal. Jan. 14, 1999)) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn

8    management's business judgment into securities fraud." (citations omitted))).

9                    (5)    PG&E's Statement Regarding Its Recloser Pilot Program
                           Was True (Stmt. 3)

10

11         *Finally*, PERA's challenge to the statement that PG&E was "just about done" with a pilot

12    program "to take [its] reclosers out of service remotely" and "focus on the wildfire areas" fails for

13    similar reasons.  Stmt. 3.  Again, PERA has not pleaded any facts to directly contradict this

14    statement of what PG&E knew at the time to suggest that this statement was false or misleading

15    when made.  Nor can it.  In 2015, PG&E announced and developed the Recloser Disabling Pilot

16    Program, which aimed to develop the ability for PG&E to remotely disable automatic "reclosing"

17    of powerlines for certain reclosers in high-risk wildfire areas.[13]  Ex. 71 (Aug. 5, 2019 Report to

18    CPUC) at 31.  PG&E formally launched the pilot program in 2017, disclosed the program's limits,

19    and made clear that it had not completed the program.  *Id.*  And PG&E never made any promises

20    about how and when it was going to use the recloser program in conditions like those that caused

21    the North Bay Fires.  As these facts and the context of PG&E's statement make clear, PG&E's

22    statement merely described its plans to implement and complete a pilot program that would enable

23    PG&E to remotely disable some but not all reclosers.  TAC ¶ 208.  That statement was true, and

24    ───────────────────

25    [13] Reclosers act like a circuit-breaker, shutting off the flow of electricity in the event of a problem
     on the line.  But unlike a normal circuit breaker, which shuts off the flow of electricity until the

26    circuit is manually closed again, reclosers (as their name suggests) automatically "test" the line to
     determine whether the problem has resolved, the circuit should be "reclosed," and electricity flow

27    should be restored.  Automatic reclosers generally cycle through several rapid on-off cycles to test
     whether a problem on the line has been resolved.  That can result in greater risk of ignition in high-

28    risk wildfire scenarios if a powerline has been downed, because of the sparks generated by the
     automatic reclosing process.  *See generally* Ex. 71 (Aug. 5, 2019 Report to CPUC).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

at a minimum PERA does not plead any contemporaneous facts that are inconsistent with PG&E's statement. That is fatal to these claims.

d.       **PG&E's Statements That PERA Alleges Concern Compliance With Federal And State Wildfire Safety Laws Were Not Materially False Or Misleading (Stmts. 2, 4–5, 9, 12–19)**

PERA alleges that PG&E's compliance-related statements, including that it carried out annual inspections "in compliance with relevant laws" and "follows all applicable federal and state vegetation clearance requirements," constituted materially false or misleading statements of material fact. *See, e.g.*, TAC ¶¶ 197, 249. To adopt PERA's implausible interpretation of these statements to mean that PG&E was guaranteeing to its investors that it was in complete compliance with all state and federal laws and regulations at all times, the Court would have to not only disregard the context in which these statements were made and all of PG&E's other public disclosures explaining the risks of wildfire and compliance challenges, but also ignore common sense.

Just as the Ninth Circuit held in *Edison*, PERA fails to meet this fundamental requirement to plead a material false statement because PERA has not adequately alleged that any of PG&E's statements, when placed in context, were actionable. *Edison II*, 2022 WL 822191, at *1 (affirming district court order finding that defendants did not make any false or misleading statements); *Edison I*, 2021 WL 2325060 at *10 (where plaintiff's own allegations reveal that the market was aware of safety failures in its infrastructure, in context general statements relating to prioritization of safety would not mislead a reasonable investor). Of course, trees constantly grow and change, and rapidly so in Northern California where PG&E's service area was greatly impacted by drought and beetle infestations. Regular inspections are mandated *because of these constantly changing conditions*; indeed, if conditions were static and no tree grew or decayed, regular inspections would not be necessary to identify non-compliant trees that previously did not need to be addressed. Consequently, just as environmental challenges mounted, so too did PG&E's compliance challenges. In any event, a statement that PG&E is in complete compliance would conflict with

PG&E's repeated risk disclosures that PG&E could be found liable for causing wildfires as well as the CPUC's concurrent public findings of non-compliance.

(1)    Certain Of PERA's Misclassified "Compliant" Statements Fail To Allege Falsity (Stmts. 15–19)

Despite PERA calling them "compliance statements," Statements 15–19, do not even mention compliance.  *Compare* Stmt. 15 ("PG&E has launched the Community Wildfire Safety Program . . . [which is] a program to proactively turn off electric power for safety when extreme fire danger conditions occur."), *with* TAC ¶ 298 (describing this statement as a "press release regarding compliance"); *compare* Stmt. 16 ("PG&E has created a set of procedures for. . . [d]etermining what combination of conditions necessitates turning off lines for safety."), *with* TAC ¶ 302; *compare* Stmt. 17 ("[We are] implementing additional precautionary measures,"), *with* TAC ¶ 308; *compare* Stmt. 18 ("PG&E has launched the Community Wildfire Safety Program"), *with* TAC ¶ 313; *compare* Stmt. 19 ("weather conditions did not warrant [a power shutoff] safety measure"), *with* TAC ¶ 316.  "The Court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations . . . Plaintiff cannot sidestep the heightened pleading requirements for fraud by simply mischaracterizing documents it attaches to the FAC."  *GIA-GMI, LLC v. Michener,* No. C-06-7949, 2007 WL 2070280 at *9 (N.D. Cal. July 16, 2007).[14]  These claims fail at the outset.

(2)    Compliance Statements Before The North Bay Fires (Stmts. 2, 4–5)

Before the North Bay Fires, PG&E informed investors in 2015 and 2016 that "[e]ach year, PG&E's Vegetation Management department, in consultation with utility arborists and foresters, ***inspects every mile of power line in our service area for public safety*** and electric reliability.  ***We do so in compliance with relevant laws***."  Stmts. 2, 4.  In August 2017, PG&E stated even more generally that, "[t]hrough a well-established and innovative vegetation management program, ***PG&E balances the need to maintain a vast system of trees growing along power lines while***

---

[14] To the extent the Court finds that these statements make representations about PG&E's compliance, they are inactionable for the additional reasons discussed *infra* §§ III.C.d(4)-(6).

1    *complying with state and federal regulations and delivering safe*, reliable and affordable *electric*

2    *service*."  Stmt. 5.

3           As noted above, PERA asks the Court to read these statements as a guarantee that

4    vegetation management clearance requirements were never breached—*e.g.*, that PG&E

5    represented that no tree in PG&E's vast service area was ever within less than a few feet of a

6    powerline, despite the fact that those millions of trees were, of course, constantly growing.

7           That is not a reasonable reading of these statements, as these statements can only be

8    interpreted as conveying that the Utility designed its vegetation management program pursuant to,

9    and as required by, applicable law.  Stmts. 2, 4–5.  Those laws govern clearance requirements

10   during inspections and the frequency of inspections.  *See supra* § III.1.d.  Reasonable investors

11   (and especially sophisticated investors like PERA) understand that PG&E could not and would not

12   promise 100% compliance across its entire service area.  *See Edison I*, 2021 WL 2325060, at *10.

13                        (3)    Compliance Statements Shortly After The North Bay Fires
14                               (Stmts. 9, 12)

15          The two compliance statements made three weeks after the North Bay Fires started—on

16   October 31, 2017 and November 5, 2017—on which PERA relies are not actionable.

17          The context for the statements themselves supports that conclusion.  PERA alleges that on

18   October 31, 2017, PG&E issued a press release stating that it "*follows* all applicable federal and

19   state vegetation clearance requirements . . . in accordance with industry standards, guidelines, and

20   acceptable procedures that help to reduce outages or fires caused by trees or other vegetation."

21   Stmt. 9 (emphasis added).  PERA asks the Court to believe that PG&E, without the benefit of a

22   full investigation, would and did promise investors that it was in full compliance across its entire

23   service area despite the fact that one of the largest wildfires in California history had just finished

24   burning; PG&E had just disclosed that $800 million in insurance may not be enough to cover its

25   liability (TAC ¶ 335); there were public articles detailing that the drop in the price of PG&E stock

26   was caused by PG&E's negligence (TAC ¶ 331); and the CPUC had issued a legal hold letter to

27   PG&E (TAC ¶ 328).  PERA's theory is simply not plausible.  In addition, this statement is fully

28   consistent with PG&E's pre-North Bay Fires statements—*i.e.*, that PG&E had a program in place,

as required by applicable law and regulations, that provided for its vegetation management to be inspected and trimmed in a manner consistent with industry standards.

The November 5, 2017 statement that "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements," is no different when viewed in context. TAC ¶ 271; Ex. 105 (Facts About PG&E's Wildfire and Prevention Safety Efforts). In the cited article, PG&E provides details about PG&E's wildfire prevention and vegetation management efforts, listing out ways that PG&E "follows" applicable law and regulations and has employed "enhanced measures to address areas particularly affected by drought and bark beetles," restating the fundamental fact that PG&E was attempting "to reduce outages or fires caused by trees or other vegetation"; it was in no way *guaranteeing* that PG&E was compliant everywhere all the time. *Id*.[15]

To the extent that PERA argues that PG&E guaranteed 100% compliance, it has failed to satisfy its obligation to plead specific violations that existed or were determined at the time the statements were made. *Reese v. Malone,* 747 F. 3d 557, 578 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (citing *Glazer Cap. Mgmt., L.P. v. Magistri,* 549 F.3d 736, 741–42 (9th Cir. 2008)); TAC ¶¶ 197, 211, 222. Moreover, PG&E's own previous disclosures told investors about the increasing risk of wildfires started by its equipment. Ex. 5 (2016 Form 10-K) at 33, 36–37. There is no reasonable reading of these statements that suggests PG&E promised full compliance across its entire service area.

---

[15] The article PERA identifies in a footnote of the TAC—from an NBC Connecticut website—fares no better. The article also attributes a quote to Geisha Williams that PG&E "aspire[s] to have absolutely no wildfires, obviously at all, or especially any wildfires that are somehow caused or somehow as a result of operations in forests or everything else." TAC ¶ 271 n.99; Ex. 110 (Nov. 14, 2017 NBC Article). And the article further discusses "mitigation," not perfection, and quotes another PG&E employee as stating that "additional investment in managing wildfire risk requires that customers either pay more or accept higher risk in another area." *Id*. In other words, PG&E informed the public that its vegetation management program strove toward compliance and full mitigation of fires, but it could offer no guarantees.

1

2
(4)     Compliance Statements On Or After May 25, 2018 (Stmts. 13–14)

3      PERA's challenge to statements made after the Cal Fire reports are even less persuasive

4 than the prior ones.  *See* Stmts. 13–14.  To exploit the Camp Fire stock drops and extend the

5 Alleged Relevant Period, PERA argues that PG&E continued to conceal its compliance issues by

6 reiterating similar information.  *See* Stmts. 13 (May 25, 2018), 14 (June 8, 2018).

7      The fact that PG&E continued to make similar "compliance" statements after PERA

8 alleges that Cal Fire found instances of non-compliance is itself the best evidence that PERA's

9 interpretation of those statements is implausible.  PG&E continued to update the market as to the

10 status of the investigations.  *See, e.g.* TAC ¶¶ 347, 357.  Moreover, and in any event, with the

11 market aware of PG&E's non-compliance at the time, as PERA alleges, there can be no reasonable

12 assertion that these "new" statements altered the total mix of information available to investors

13 such that the statements could plausibly have been materially misleading.  Stmts. 13–14.

14      Unsurprisingly, PERA pivots to a *different* type of allegedly false compliance statement

15 that has some connection to the Camp Fire:  PG&E's statements that it "meets or exceeds

16 regulatory requirements for pole integrity management."  Stmts. 14, 17; TAC ¶ 136.[16]  PERA relies

17 on hindsight in the form of the CPUC's later investigation and findings regarding inspections of a

18 single transmission line.  That investigation confirmed that the Caribou-Palermo Transmission

19 Line, including Tower :27/221, was inspected aerially on September 11, 2018, and that, after this

20 inspection, PG&E did not identify any problems in need of immediate remediation."  *See* Ex. 69

21 (SED Investigation Report of the Camp Fire) at 14–15 ("During an aerial patrol inspection of the

22 Caribou-Palermo Transmission Line on September 11, 2018, a PG&E crew observed that an

23 insulator hold-down anchor on Tower :27/221 had disconnected from a suspension insulator.

24 PG&E assigned the condition a Priority Code E . . . [which] is for conditions which must receive

25

26
[16] PERA never identifies what it means by "pole integrity" regulations, which pole integrity regulations were violated in connection with the Camp Fires, or what specific conditions gave rise

27 to those supposed violations.  Notably, the applicable regulations for pole integrity—Cal. Pub. Util. Code § 451 and General Order 95—amorphously require that poles, like all equipment, be

28 removed if they pose an unsafe danger to the public.  *See* General Order 95, Rules 12, 44.3; Cal. Pub. Util. Code § 541.  PERA does not identify a known or immediate risk before the Camp Fire.

corrective action *within 12 months*." (emphasis added)).  Even assuming that Tower :27/221
needed immediate remediation at the time a challenged statement was made (PERA does not even
attempt to suggest this), PERA offers no plausible explanation of how the need for maintenance at
an individual pole on a single transmission line, out of about two million poles on 114,000 miles
of distribution line and more than 18,000 miles of transmission lines in PG&E's service area,
would have been material to investors.  *See* Ex. 86 (Hogan Senate Hearing Statement).  PG&E
informed the public that it conducted "annual infrared inspection[s] of all overhead conductors in
wildfire areas," and conducted detailed ground inspections every five years (Caribou failed four
years after its last detailed inspection).  *Id.* at 3; *see* Ex. 87 (Butte County DA Report) at 37; *see
also* Ex. 29 (GO 165) (mandating detailed inspections of overhead equipment in rural areas, like
Caribou-Palermo, every 5 years).  Under these circumstances, PERA has not alleged sufficient
facts to show that, at the time these statements were made, documents or other contradictory facts
existed to show that these statements were false.  *Twitter, Inc.*, 29 F.4th at 619; *Edison I,* 2021 WL
2325060, at *10.

(5)    PERA's Attempt To Classify The Alleged Compliance
Statements As Material Omissions Does Not Save Its
Claims (Stmts. 2, 4–5, 9, And 12–14)

PERA's claims that PG&E's compliance statements were misleading, even if not literally
false, fare no better.  Stmts. 2, 4, 5, 9, and 12–14.  PERA's assertion that the majority of the
challenged statements "materially omitted the true risk that PG&E would cause wildfires serious
enough to imperil the Company's financial condition" is wrong.  TAC ¶ 18.  A company cannot
be found to fraudulently conceal information that has already been publicly disclosed.  *See Intuitive
Surgical*, 759 F.3d at 1060 (holding that "any reasonable investor would have understood [a
company's] statements as mere corporate optimism" where "'the market already knew' of the
difficulties facing [the company] through . . . other sources" (quoting *In re Stac*, 89 F.3d at 1407));
*In re Pac. Gateway Exch., Inc. Sec. Litig.*, No. C–00–1211, 2002 WL 851066, at *16–17 (N.D.
Cal. Apr. 30, 2002), *aff'd sub nom. Winick v. Pac. Gateway Exch., Inc.*, 73 F. App'x 250 (9th Cir.
2003), *withdrawn pursuant to settlement*, 80 F. App'x 1 (9th Cir. 2003) (company did not conceal

that it was delinquent in payments to vendors and exhausted its financing options because securities filings disclosed that the company did not have sufficient cash to meets its financial commitments); *Edison II*, 2022 WL 822191, at *1 ("Nor were the challenged statements misleading by omission due to Edison's failure to disclose publicly available information regarding its safety practices and prior safety violations. There is no 'rule of completeness for securities disclosures' requiring the disclosure of all such publicly available information . . . ." (citation omitted)).

The rising, unprecedented wildfire risk in California was publicized and disclosed by PG&E (and others) both before and during the Alleged Relevant Period. *See* TAC ¶ 77; Ex. 84 (Press Release, State of California, *Governor Brown Declares Drought State of Emergency* (Jan. 17, 2014)); Ex. 85 (2014 Drought Report) at 1; Ex. 24 (ESRB-4) at 2–4. Indeed, while PERA alleges PG&E concealed the risks relating to its potential liability for wildfires, this risk was realized early in the Alleged Relevant Period, and there can be no credible basis to allege that PG&E should have been able to predict the specifics of a particular fire that may occur in the future.[17] When the Butte Fire occurred in 2015, Cal Fire faulted PG&E for causing the fire and found regulatory compliance issues, and PG&E disclosed its significant financial liability arising out of the Butte Fire. TAC ¶ 101; Ex. 4 (2015 Form 10-K) at 29, 36, 123; Ex. 6 (2017 Form 10-K) at 27–30, 35–36, 40, 59–65, 137–39. Throughout the Alleged Relevant Period, PG&E's public disclosures, combined with other materials in the public record (as identified herein), further informed investors about the risks of investing in PG&E. Indeed, PERA's own TAC is rife with facts that show that PG&E made no guarantees that its safety practices were fail-safe, and that the

---

[17] PG&E publicly disclosed the potentially significant financial impact from the realization of that risk to investors well before and throughout the Alleged Relevant Period. In its annual reports for 2012-2017, PG&E disclosed: (1) that PG&E is heavily regulated, and that its failure to comply with applicable law could materially and adversely impact its financial condition; (2) that operating electrical facilities is inherently dangerous, involves significant risks, and may cause a catastrophic event that could result in financial losses that may not be recoverable through rates or insurance; and (3) that one such catastrophic event is wildfire caused by the unsafe operation of its electric facilities. *See supra* § III.A.1(a). PG&E also disclosed that it is subject to strict liability for damages caused by wildfires ignited by PG&E's electrical equipment under an inverse condemnation theory. Ex. 5 (2016 Form 10-K) at 26, 32-33, 41, 61, 136, 144-145.

risk of wildfires and the possibility PG&E could be financially responsible was reflected in public regulatory documents, news articles, and analyst reports—and of course PG&E's own disclosures.

In *Edison*, the district court concluded that reasonable investors would have understood the risk of liability faced by a California utility, based on publicly available information about the regulatory landscape. *See Edison I*, 2021 WL 2325060, at *11–12. Here, PG&E investors had even more information regarding the regulatory landscape than the investors in *Edison*, including (1) PG&E's own warnings, (2) its history of causing wildfires and the associated Cal Fire findings, (3) its service areas, (4) the unprecedented and highly publicized wildfire risk and, most importantly, (5) the fact that the exact risk PERA claims was concealed happened at the beginning of the Alleged Relevant Period. In 2015, PG&E's equipment caused the Butte Fire, Cal Fire then determined that PG&E was responsible for this fire, and PG&E paid significant amounts under inverse condemnation laws, all of which was disclosed. Ex. 4 (2015 Form 10-K) at 29, 36, 123; Ex. 6 (2017 Form 10-K) at 27–30, 35–36, 40, 59–65, 137–39. All but one of PG&E's alleged misstatements were made after the Butte Fire started. Ex. 74 (Cal Fire, Investigation Report: Butte Incident (Apr. 28, 2016)) at 4; Ex. 6 (2017 Form 10-K) at 29–30; Ex. 70 (SED Butte Fire Report); Ex. 53 (Apr. 2017 $8 Million Fine).[18]

And if there were any doubt about the significance of the risk of wildfires and liability after the North Bay Fires, PG&E disclosed the severity of the risk expressly when it eliminated its annual shareholder dividend in December 2017, conveying to investors the serious likelihood of significant liability regardless of its wildfire mitigation efforts. TAC ¶ 277. As in *Edison*, PERA fails to state a claim because the challenged omissions here did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."

---

[18] Investors were also made aware of similar disclosures through both Cal Fire's reports and PG&E's own disclosures—for example, Cal Fire's report that "12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles," and it had referred its investigations for "eight of the 12 fires" to the appropriate district attorney's offices based on "evidence of alleged violations of state law," that were not specified. Ex. 77 (News Release, Cal Fire, CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake and Napa Counties (June 8, 2018)) (noting "alleged violations" but not saying which regulations were violated or when).

1   *Edison II*, 2022 WL 822191, at *1 (quotations and citations omitted). Moreover,"[s]imply citing

2   prior examples of safety failures does not render false or misleading" generalized statements about

3   PG&E's compliance or operations. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. at 762; *see Plains*, 777

4   F. App'x at 728 (affirming dismissal despite alleged "229 safety and maintenance 'incidents'");

5   *Rubke*, 551 F.3d at 1162–63 (concluding that the defendant did not need to disclose information

6   that was publicly available because "[i]t is pointless and costly to compel firms to reprint

7   information already in the public domain" (citation omitted)). Because the specific details of

8   previous alleged violations on which PERA relies were a matter of public record, PG&E was not

9   required to disclose them in every broad reference it made about a commitment to safety. *Edison*

10  *II*, 2022 WL 822191, at *1 ("Nor were the challenged statements misleading by omission due to

11  Edison's failure to disclose publicly available information regarding its safety practices and prior

12  safety violations. There is no 'rule of completeness for securities disclosures' requiring the

13  disclosure of all such publicly available information . . . ." (citation omitted)); *Intuitive Surgical*,

14  759 F.3d at 1060–61 ("where 'the market already knew' of the difficulties facing [a company]

15  through [a third-party report] and other sources," "[t]he securities laws do not demand" that the

16  company disclose such "known trends") (citation omitted); *Paskowitz v. Pac. Cap. Bancorp*, No.

17  CV 09-6449 ODW (JCx), 2009 WL 4911850, at *6 (C.D. Cal Nov. 6, 2009) ("Securities laws do

18  not require disclosure of information that is readily available in the public domain."); *Textainer*

19  *P'ship Sec. Litig.*, No. C-05-0969 MMC, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005)

20  ("[T]he securities laws do not require disclosure of information that is readily available in the

21  public domain.").

22      In its annual reports for 2012–2018, PG&E clearly disclosed: (1) that PG&E is heavily

23  regulated, and that its failure to comply with applicable law could materially and adversely impact

24  its financial condition; (2) that operating electrical facilities is inherently dangerous, involves

25  significant risks, and may cause a catastrophic event that could result in financial losses that may

26  not be recoverable through rates or insurance; and (3) that one such catastrophic event is a wildfire

27  caused by the unsafe operation of its electric facilities. *See supra* § III.A.1(a).

28

In addition, PERA's allegations based on these alleged omissions fail for the independent reason that any omission was not material—*i.e.*, sufficient to support a claim that any reasonable investor would have been misled—in the context of publicly available information. Again, *Edison* decided this issue and is fatal to PERA's claims. As the district court explained in *Edison I*, "the context in which [allegedly misleading] statements were made is key." 2021 WL 2325060, at *10 (quoting *Intuitive Surgical*, 759 F.3d at 1060). And when a plaintiff's "own allegations reveal that the market was aware of" the evidence that the plaintiff contends made the challenged statement misleading, those claims fail because the defendant's statement "would not mislead a reasonable investor, who would be aware of the [public disclosures]." *Id.*

Here, the alleged "omissions" about compliance could not have been material in light of the public reports by Cal Fire, the CPUC, and the ESRB detailing their investigation of PG&E's compliance issues. *E.g.*, Exs. 31–63, 66, 70, 74–79. If, as PERA claims, the market was aware and reacted to compliance issues in the Cal Fire reports, that confirms that PG&E's subsequent statements could not have been materially misleading regarding compliance issues, because PG&E's statements would not have altered the total mix of information available to investors given Cal Fire's reports. To the contrary, investors had been informed of fires that had been caused by failures in vegetation management, and those disclosures only increased throughout the Alleged Relevant Period. *E.g.*, Ex. 4 (2015 Form 10-K) at 36; Ex. 5 (2016 Form 10-K) at 26; Ex. 6 (2017 Form 10-K) at 27–29. And investors had been informed that PG&E would be liable for damage from the Butte Fire and potentially the North Bay Fires as well. *E.g.*, TAC ¶ 101; Ex. 4 (2015 Form 10-K) at 123; Ex. 6 (2017 Form 10-K) at 29–37, 40, 50, 55–56, 135–41. In light of all these disclosures, any generic statements by PG&E about its compliance with vegetation management requirements would not mislead a reasonable investor.

(6)   <u>The Statements Regarding Compliance With The Law Are Opinion Statements That Are Not Actionable (Stmts. 2, 4– 5, 9, 12–14)</u>

PERA does not allege that PG&E made any statements that reference its compliance with laws after the Camp Fire. Moreover, as described above, PG&E's statements that reference

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

compliance are reasonably interpreted to mean that PG&E's programs were designed to comply with the law, and not a warranty that at all times PG&E was compliant. Within this context, to the extent that the alleged false statements made "compliance" representations at all (*see supra* § III.C.1.d(1)), they should be understood as statements of PG&E's *opinion that its vegetation management program was designed to comply with the law*. The Supreme Court has set forth even more stringent pleading requirements when an investor alleges an opinion statement is false or misleading. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (applying *Omnicare* to Exchange Act claims). To challenge an opinion statement, a securities plaintiff must allege: (1) that the speaker subjectively did not hold the stated opinion at the time the statement was made; (2) that the statement contained an imbedded statement of fact that was false; or (3) the statement omitted a material fact necessary not to make the opinion statement misleading. *Omnicare*, 575 U.S. at 186–91. This is "no small task for an investor." *Omnicare, Inc*. 575 U.S. at 194.

The Ninth Circuit's decision in *In re BofI Holding, Inc. Securities Litigation* illustrates why PG&E's statements are not actionable. 977 F. 3d 781 (9th Cir. 2020). In that case, the CEO told investors that regulatory review of the company "is beyond a nonissue" and that "[we] have great regulatory relations." *Id.* at 978. However, at the time those statements were made, the SEC was investigating the company, and it was later revealed that the company had regulatory compliance issues that existed at the time the CEO made those statements. The Ninth Circuit held, however, that the CEO's statements constituted nonactionable statements of opinion. *Id.* PG&E's compliance statements are likewise best understood as statements of opinion. For example, PG&E's statement from November 2017 ("[w]e [carry out inspections] in compliance with relevant laws"), TAC ¶ 271, is no different from the challenged statement in *Omnicare* ("we

1 believe we are obeying the law"), 575 U.S. at 186. And the Supreme Court held the statement in

2 *Omnicare* was a "pure statement[] of opinion." 575 U.S. at 186.[19]

3     Given that these statements are opinions, PERA may only challenge these statements if

4 they are able to demonstrate: (1) that the speaker subjectively did not hold the stated opinion at the

5 time the statement was made; (2) that the statement contained an imbedded statement of fact that

6 was false; or (3) the statement omitted a material fact necessary not to make the opinion statement

7 misleading. *Omnicare*, 575 U.S. at 186–91; *Align Tech.*, 856 F.3d at 615–16. PERA has not

8 adequately alleged that PG&E did not subjectively believe its compliance statements, as PG&E

9 had every reason to in light of its vegetation management program. Nor can PERA demonstrate

10 that there was any imbedded fact in these statements that was false. *See supra* § III.C.1.c. And

11 there is no material fact omitted that makes the statement misleading. Importantly, opinion

12 statements are "not necessarily misleading when an issuer knows, but fails to disclose, some fact

13 cutting the other way." *Omnicare*, 575 U.S. at 189. As the Supreme Court explained in *Omnicare*,

14 "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts;

15 indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion

16 . . . ." *Id.* at 189–90. So too here, where PERA has merely quibbled with the degree to which

17 PG&E was required to disclose information that (purportedly) "cut[s] the other way."

18     When viewed in context, the Court should properly determine that these alleged

19 "compliance" statements are inactionable statements of opinion. *See Align Tech.*, 856 F.3d at 615

20 (quoting *Omnicare*, 575 U.S. at 1330 ("'[W]hether an omission makes an expression of opinion

21 misleading always depends on the context,' which includes 'all its surrounding text, including

22 hedges, disclaimers, and apparently conflicting information.'"). For example, when PG&E stated

23

24     [19] *See, also Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *8-10 (N.D. Cal. Apr. 7, 2021) (concluding

25 that defendants' statements that "the business operations of our consolidated affiliated entities, as
described herein, comply with current PRC laws and regulations in all material respects" were

26 opinion statements and not actionable under *Omnicare*); *Bien v. LifeLock, Inc.*, 2015 WL
12819154, at *3-5 (D. Ariz. July 21, 2015), *aff'd*, 690 F. App'x 947 (9th Cir. 2017) (concluding

27 that statements that the company "endeavor[s] to comply with all applicable laws and believe we

28 are in compliance with the requirements of the FTC order" was an opinion statement not actionable
under *Omnicare*).

that it "meets or exceeds all applicable federal and state vegetation clearance requirements," PG&E

went on to say that its efforts were to "reduce" (not eliminate) "fires caused by trees and other

vegetation." *See* Ex. 105 (Facts About PG&E's Wildfire and Prevention Safety Efforts); Ex. 110

(Nov. 14, 2017 NBC Article). At the time PG&E made this statement, it was only a few weeks

after the North Bay Fires, and there is no allegation that PG&E had been found to have violated a

federal or state regulation, or that it had knowledge that it certainly would be. Further, PG&E also

disclosed in its 2016 Form 10-K, filed on February 16, 2017, and before the press release, that it

is the target of a number of investigations and government requests for information. Ex. 5 (2016

Form 10-K) at 27. The Form 10-K went on further to explain:

> The Utility could be subject to additional regulatory or governmental enforcement action in the future with respect to compliance with federal, state or local laws, regulations or orders that could result in additional fines, penalties or customer refunds, including those regarding . . . ***vegetation management***; . . . compliance with CPUC general orders or other applicable CPUC decisions or regulations; . . . CPUC staff could impose penalties on the Utility in the future in accordance with its authority under the gas and electric safety citation programs. The amount of such fines, penalties, or customer refunds could have a material effect on PG&E Corporation's and the Utility's financial results.

Ex. 5 (2016 Form 10-K) at 27 (emphasis added).

As information developed, PG&E modified its risk disclosures for its 2017 Form 10-K,

issued on February 7, 2018, to also include a statement that:

> For example, despite the Utility's system- wide survey of its transmission pipelines, carried out in an effort to address a self- reported violation whereby the Utility did not properly identify encroachments (such as building structures and vegetation overgrowth) on the Utility's pipeline rights- of- way, the SED could impose fines on the Utility in the future based on the Utility's failure to continuously survey its system and remove encroachments.

Ex. 6 (2017 Form 10-K) at 31. PERA cannot plausibly allege that PG&E's opinion statements

were false when read in the full context of its disclosures, and PERA has failed to allege any facts

suggesting that PERA's compliance statement was not a protected statement of opinion.

PERA has failed to allege falsity. Like the court in *Edison*, this Court can and should

dismiss all claims for that reason alone.

2. **PERA's Exchange Act Claims Fail To Plead The Required Strong Inference of Scienter**

Notwithstanding PERA's failure to plead an actionable false statement or omission, PERA's Exchange Act claims fail for the independent reason that it has not met its burden to plead particular facts giving rise to a "***strong inference***" of scienter, *i.e.*, intent to defraud, tied to any of PERA's alleged misstatements. *See* 15 U.S.C. §78u-4(b)(2) (emphasis added). In an effort to cobble together facts showing knowing conduct, PERA alleges eight general categories of conduct without specifically ascribing knowledge to any officer or director of PG&E. TAC ¶¶ 397–403. Each category is bereft of specific facts to satisfy the significant burden of pleading scienter under the Exchange Act.

The Court conducts a two-part inquiry to determine whether scienter has been adequately pled: first, the Court determines whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, the Court will conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness. *Zucco*, 552 F.3d at 991–92 (holding plaintiff failed to sufficiently plead scienter by individual allegations or holistically); *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Penson Plan v. First Solar Inc.*, No. CV-22-00036-PHX, 2023 WL 4161355 at *3 (D. Ariz. June 23, 2023) (dismissing for failure to plead scienter and noting that the Ninth Circuit looks at both individual allegations and the entire complaint holistically). To survive a motion to dismiss, it is not sufficient that "any individual allegation, scrutinized in isolation" meets this standard. *Tellabs*, 551 U.S. at 322–23. Rather, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice[,] . . . [and inquire] whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original); *Id.* (citations omitted); *see also Metzler*, 540 F.3d at 1069 (Though one statement "is susceptible to Metzler's

1  characterization," it is "not so indicative of fraudulent intent that it carries the weight of the entire

2  181-page complaint for purposes of establishing a 'strong inference' of scienter.").

3      To sufficiently plead scienter, PERA must allege "in great detail, facts that constitute strong

4  circumstantial evidence" that PG&E made false or misleading statements either intentionally or

5  with deliberate recklessness. *Glazer*, 549 F.3d at 745 (citation omitted). The inference of fraud

6  must be "cogent" and "at least as compelling as any opposing inference," and requires the Court

7  to consider "plausible, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S.

8  at 323–24 (footnote omitted). Further, as the Ninth Circuit has stressed, "[t]he bar set by *Tellabs*

9  is not easy to satisfy." *Webb v. SolarCity Corp.*, 884 F.3d 844, 855 (9th Cir. 2018).

10      *a.*      ***PERA Fails To Sufficiently Plead Scienter As To Any Individual***

11              ***Responsible For Making Disclosures To Investors***

12      Because corporations act through their management, a plaintiff cannot generally allege that

13  a corporation had knowledge, but instead must allege specific facts as to the scienter of those

14  responsible for making disclosures to investors. *See Glazer*, 549 F.3d at 744 ("'[C]orporate

15  scienter relies heavily on the awareness of the directors and officers,' and . . . on the facts of the

16  case, 'we see no way that the defendant could show that the corporation, but not any individual

17  director or officer, had the requisite intent to defraud.'" (citation and alterations omitted)). PERA

18  has failed to allege a cogent and compelling inference of scienter as to any officer, director, or

19  other senior executive to impute corporate knowledge, and therefore has failed to satisfy its

20  pleading burden to plead scienter against PG&E.

21      PERA has not alleged that specific facts to show that any particular officer or director

22  knew, or was deliberately reckless in not knowing, that any of the alleged statements PG&E made

23  about its operational details related to wildfire safety were false. *Cf.* TAC ¶¶ 391-458.[20] Instead,

24  PERA relies almost exclusively on conclusory allegations that seem to assume the defendants

25  possessed an omniscient awareness of operational details; such allegations are insufficient as a

26

27  ――――――――――――

28  [20] The officer defendants in the District Court Action filed a motion to dismiss in that action on these same claims setting forth their position that PERA failed to allege scienter. *See* Ex. 94 (Officer Defendants' Opening Brief).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

1   matter of law. Indeed, "the rule is settled that [a]s a general matter, 'corporate management's

2   general awareness of the day-to-day workings of the company's business does not establish

3   scienter—at least absent some additional allegation of specific information conveyed to

4   management and related to the fraud' or other allegations supporting scienter." *Curry II*, 875 F.

5   3d at 1227 (internal citations omitted); *see also Zucco*, 552 F.3d at 1000 (requiring plaintiff to

6   plead "detailed and specific allegations about management's exposure to factual information

7   within the company" to tag knowledge of operational details to defendants (citation omitted));

8   *Gavish*, *v. Revlon, Inc.*, No. 00 Civ. 7291, 2004 WL 2210269, at *19 (S.D.N.Y. Sep. 29, 2004)

9   ("[T]he complaint's totally conclusory allegations regarding defendants' omniscient awareness of

10  [operational details] are insufficiently particularized to support a strong inference of defendants'

11  scienter."). Accordingly, PERA's general allegations of corporate intent fail to meet is burden to

12  plead a strong inference of scienter.

13             **b.**     **PERA Cannot Allege Facts To Support The "Core Operations**

14                      **Doctrine" To Establish Scienter**

15        In an attempt to save its scienter allegations, PERA falls back on the "core operations"

16  doctrine. *See* TAC ¶¶ 397–403. The core operations theory of scienter "relies on the principle

17  that 'corporate officers have knowledge of the critical core operation of their companies.'"

18  *Intuitive Surgical*, 759 F.3d at 1062 (citation omitted). But Ninth Circuit precedent makes clear

19  that succeeding on a core operations theory "is not easy" and requires "either specific admissions

20  by one or more corporate executives of detailed involvement in the minutia of a company's

21  operations, such as data monitoring . . . or witness accounts demonstrating that executives had

22  actual involvement in creating false reports." *Id.* PERA generally alleges that PG&E's senior

23  management "should have known" that PG&E's statements concerning its wildfire safety practices

24  allegedly violated the law. Simply stating that a company's executive "should have" discovered

25  alleged violations of law, not that the executive actually knew of alleged violations of law, is

26  insufficient "to meet the stringent scienter pleading requirements of the PSLRA." *Glazer*, 549

27  F.3d at 748. Instead, PERA's allegations must rise to the level of showing that it was "so obvious"

28

1    that PG&E's safety practices were deficient that PG&E "must have been aware of it."  *Zucco*, 552

2    F.3d at 991.  PERA's allegations simply do not rise to that level.

3            Here, there are no allegations about management, officers, or directors, other than their

4    corporate positions, responsibilities, reporting hierarchy, tenure with PG&E, and conclusory "easy

5    access" to databases.  *See* TAC ¶ 422.  Under these circumstances, PERA has not pled sufficient

6    facts to invoke the core operations theory.  *See Zucco*, 552 F.3d at 1000–01 (requiring "specific

7    admissions from top executives that they are involved in every detail of the company and that they

8    monitored portions of the company's database" or that "the information misrepresented is readily

9    apparent to the defendant corporation's senior management"); *Curry II,* 875 F.3d at 1227–28

10   ("[C]omplaints regarding such a small portion of Yelp's business do not support a strong inference

11   of scienter.").  Allegations that certain persons had the *ability to access* information—rather than

12   allegations that an officer *actually accessed* such information—are insufficient to establish liability

13   under the core operations theory.  *See Gavish*, 2004 WL 2210269, at *24.  But this is exactly what

14   PERA pleads:  "PG&E maintained a database of inspection data . . . which provided its personnel

15   with *ready access* to information about instances of noncompliance."  TAC ¶ 420 (emphasis

16   added).

17           In an effort to suggest that PG&E knew of the vegetation management deficiencies prior

18   to the North Bay Fires, PERA points to PG&E's alleged "admission" that as of June 2017, there

19   were "3,962 unworked trees" that PG&E identified as "hazardous" in 2016 and in need of removal

20   "before the next inspection cycle."  TAC ¶¶ 3, 104, 202, 216, 227, 239, 244, 254, 276, 284, 292,

21   394, 424.  But PERA misses the key point that the presence of unworked trees was public

22   knowledge, which wholly undermines an inference of scienter.  *See In re Worlds of Wonder Sec.*

23   *Litig.*, 35 F.3d at 1425 ("The detailed risk disclosure in the Debenture Prospectus negates an

24   inference of scienter."); *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015) ("Even as to those

25   alleged misstatements that occurred after the 'red flags' were apparent, the red flags were disclosed

26   to the public, which negates the inference that defendants acted with scienter."); *see, e.g.*, Exs. 31–

27   63.  Moreover, in the same paragraph where PG&E "admitted" to these 3,962 unworked trees,

28   PG&E testified that by October 8, 2017 (when the North Bay Fires ignited), only 131 of those

trees remained pending, and none of those trees were at the ignition points of any North Bay Fires. Ex. 96 (PG&E Response to Request for Information) at 24. Rather than indicate that PG&E made knowing or deliberately reckless false statements, these facts demonstrate that PG&E's conduct was consistent with its representations that it was "continuing to focus on implementing additional precautionary measures," stmt. 17, by identifying hazardous trees and scheduling them for removal, and that PG&E was transparent about its actions, which further undermines any inference of scienter. To the extent PERA insinuates that PG&E did not remove these trees according to its own internal schedule, this too does not support a strong inference of scienter. Failure to meet targets is a matter of business performance, and cannot support any logical inference that statements about compliance with CPUC regulations were knowingly false. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 389 (9th Cir. 2010) ("[T]he fact that [the corporation's] forecast turned out to be incorrect does not retroactively make it a misrepresentation.").

### c. Conduct After The Butte Fire Does Not Support A Strong Inference Of Scienter

PERA alleges that, following the Butte Fire, PG&E made "no changes at all" to improve its vegetation management system in compliance with safety regulations. TAC ¶ 393. This broad, conclusory contention is contradicted by PERA's own allegations and the relevant regulatory findings. Indeed, PERA does not allege that either Cal Fire or the CPUC determined that PG&E made "no changes at all." To the contrary, publicly available information about the GRC and CEMA processes for raising funds for vegetation management expenditures demonstrate that PG&E did make "changes" in the year immediately following the Butte Fire. *See supra* § III.C.1.c(2).

Moreover, the allegations in the TAC do not support the conclusion that PG&E made "no changes" to its vegetation management programs after the Butte Fire. PERA supports this alleged "fact" by pointing to a single sentence from the testimony of Richard Yarnell, one of PG&E's vegetation program managers: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." TAC ¶ 393. This cannot be fairly characterized as a statement of PG&E's corporate policies. Rather it is a statement from a low- to mid-level employee that

1    indicates his own personal awareness of PG&E's policy changes. Case law provides clear

2    guidance regarding the standard that corporate witness allegations, like those PERA alleges from

3    Mr. Yarnell, must meet to survive a motion to dismiss. The information "must pass two hurdles

4    to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995 (citations omitted)

5    (describing pleadings standards for confidential witness statements). First, the TAC must describe

6    Mr. Yarnell "with sufficient particularity to establish [his] reliability and personal knowledge."

7    *Id.* Second, the information provided by Mr. Yarnell "must [itself] be indicative of scienter." *Id.*

8    Neither requirement is satisfied here. First, the TAC contains no allegations regarding Mr.

9    Yarnell's reliability or his personal knowledge of PG&E's overall vegetation management policies

10   in the aftermath of the Butte Fire. *See In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp.

11   2d 1056, 1068 (W.D. Wash. 2003) ("The Court must be able to tell whether a confidential witness

12   is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'" (citations

13   omitted)). Second, Mr. Yarnell's statement says nothing about the knowledge of PG&E's officers

14   and directors. To the contrary, Mr. Yarnell expressly limited his testimony to, "the best of ***my***

15   knowledge." TAC ¶ 393 (emphasis added). The single alleged statement by Mr. Yarnell falls far

16   below the threshold to establish—or even contribute to—a strong inference of scienter, especially

17   when weighed against regulatory submissions demonstrating PG&E's increased vegetation

18   management budget requests. Accordingly, PERA's TAC does not sufficiently plead scienter

19   against PG&E concerning its vegetation management practices.

20                    **d.    *PERA's Allegations Of Later "Uncovered Facts" And Comments***

21                            ***From Another Court Do Not Support Scienter***

22          PERA also relies on criticisms from the Honorable William Alsup in connection with

23   probation hearings in a criminal case related to the 2010 San Bruno pipeline explosion in the

24   United States District Court for the Central District of California. TAC ¶¶ 404–19. But Judge

25   Alsup's comments were made after the alleged false statements, and do not appear to address the

26   relevant issue here as to whether specific PG&E officers intentionally or deliberately made the

27   statements PERA alleges were false. *See Id.* And while Judge Alsup had harsh words for PG&E,

28   and PG&E takes his comments seriously, PERA does not allege facts to support that he determined

1    that anyone at PG&E intentionally, or with deliberate recklessness, made a specific false statement

2    alleged in the TAC.

3              e.    *Corporate Resignations Do Not Give Rise To A Strong Inference*

4                    *Of Scienter*

5         PERA alleges that certain resignations of PG&E officers support a strong inference of

6    scienter.  TAC ¶¶ 455–58.  This too is insufficient.  *See Zucco*, 552 F.3d at 1002 ("Absent

7    allegations that the resignation at issue was uncharacteristic . . . the inference that the defendant

8    corporation forced certain employees to resign because of its knowledge of the employee's role in

9    the fraudulent representations will never be as cogent or as compelling" as the nonculpable

10   inference.).  PERA notes the departures of PG&E's former Chief Executive Officer and Board

11   Chairman, Anthony Earley, Jr., in December 2017, its President and Chief Operating Officer,

12   Nikolas Stavropoulus, in September 2018, its Senior Vice President of Electric Operations, Patrick

13   Hogan, in January 2019, and its Chief Executive Officer and President, Geisha Williams, in

14   January 2019.  However, there is no factual allegation that could support the inference that these

15   resignations were the result of fraud.  Even crediting PERA's speculation that the resignations

16   resulted from PG&E's "widespread dissatisfaction with its officers' and directors' commitment

17   and expertise," such allegations of mismanagement do not support a strong inference of scienter.

18   *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) (adhering to the position that Congress

19   "did not seek to regulate transactions which constitute no more than internal corporate

20   mismanagement" in enacting Section 10(b) of the Exchange Act); *In re LifeLock, Inc. Sec. Litig.*,

21   690 F. App'x 947, 955 (9th Cir. 2017) ("Federal securities laws do not protect investors from

22   quality control problems, service lapses, or management miscues." (citing *Gaines v. Haughton*,

23   645 F.2d 761, 799 n.33 (9th Cir. 1981)).

24                                        * * *

25        PERA has failed to plead any allegation that, standing alone, is sufficient to create a strong

26   inference of scienter.  When viewed holistically, the allegations are likewise insufficient to

27   demonstrate a strong inference of scienter that is at least as cogent and compelling as any

28   competing inference.  The facts alleged and the matters incorporated into the TAC or otherwise

1   subject to judicial notice provide instead a far more compelling inference that PG&E consistently

2   warned of the great risk of wildfires and PG&E's significant potential liability, and that wildfires

3   exacerbated by windy and dry conditions created historic and catastrophic damages. There are no

4   facts to support an inference that PG&E made knowing or deliberate statements to mislead its

5   investors. Accordingly, PERA has failed to sufficiently allege scienter as required to plead an

6   Exchange Act claim. *See Tellabs*, 551 U.S. at 321; *Palm Harbor*, 2023 WL 4161355 at *3 (holding

7   plaintiff failed to sufficiently plead scienter). This is a second, independent reason to dismiss the

8   Exchange Act claims against PG&E.

9                   **3.      PERA Has Not Sufficiently Pled Loss Causation**

10          PERA's claims here also fail for the additional and independent reason that PERA cannot

11  meet its burden of pleading loss causation—*i.e.*, "that the act or omission . . . alleged to violate

12  [the securities laws] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.

13  § 78u-4(b)(4); *see also Dura Pharms.*, 544 U.S. at 342. The Court need only address the separate

14  requirement of loss causation should it determine in the first instance that PERA has alleged an

15  actionable false statement or omission. In order to establish loss causation, courts then look at the

16  specific alleged false statements and omissions, and must determine if PERA has met its burden

17  to allege that the market "learn[ed] and react[ed] to the those practices themselves. This reaction,

18  in turn, must be the cause of a plaintiff's loss." *In re Oracle*, 627 F.3d at 392; *In re Nektar

19  Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (a plaintiff must "show a 'causal

20  connection between the fraud and the loss by tracing the loss back to *the very facts* about which

21  the defendant lied.'" (quoting *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750,

22  753 (9th Cir. 2018) (per curiam)). It is not enough to simply point to a stock price decline; instead,

23  a plaintiff must allege that the market "learned of and reacted to th[e] fraud, as opposed to merely

24  reacting to reports of the defendant's poor financial health generally" or other negative

25  information. *Metzler*, 540 F.3d at 1063. Loss causation cannot be pleaded through "euphemism"

26  or through claims that the disclosure was "a coded message revealing the fraud." *Id.* at 1064.

27          PERA alleges that over a 13-month period between October 12, 2017, and November 2018,

28  there were nine instances when PG&E's stock price dropped in response to disclosures that it

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

1   claims generally were either "corrective" of fraud or a "materialization of concealed risk."  TAC

2   ¶¶ 327–390.   PERA claims each disclosure revealed "the extent and effects of PG&E's

3   responsibility" for the North Bay Fires and the Camp Fire.  *Id.*  Either way, PERA's loss causation

4   allegations fail because none of the identified corrective disclosures demonstrate that the market

5   learned and reacted to "very facts" allegedly misrepresented in any of the challenged statements.

6                   ***a.***       ***Disclosures After The North Bay Fires Cannot Support Loss***

7                            ***Causation***

8          The disclosures in the wake of the North Bay Fires at most reveal the materialization of a

9   disclosed risk of wildfire, which is not sufficient to plead loss causation.  *See, e.g.*, *Bartesch v.*

10  *Cook*, 941 F. Supp. 2d 501, 513 (D. Del. 2013) ("[P]laintiff's theory under the materialization of

11  risk test fails because 'substantial indicia of the risk that materialized are unambiguously apparent

12  on the face of the disclosures alleged to conceal the very same risk.'" (quoting *Lentell*, *v. Merrill*

13  *Lynch & Co.*, 396 F.3d 161, 1777 (2d Cir. 2005))); *Prime Mover Cap. Partners L.P. v. Elixir*

14  *Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 685–86 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d

15  Cir. 2013) (same).  PG&E has long disclosed the risk of wildfire and the corresponding risk of

16  liability if it causes wildfires, including that it could be held liable for fires caused by its equipment.

17  *See* Ex. 2 (2013 Form 10-K) at 31–38; Ex. 3 (2014 Form 10-K) at 19–27; Ex. 4 (2015 Form 10-

18  K) at 24–33; Ex. 5 (2016 Form 10-K) at 26–37; Ex. 6 (2017 Form 10-K) at 27–43.  And the wealth

19  of information that was available to the market regarding wildfire risk, previous compliance issues,

20  and PG&E's liability for previous fires before the Alleged Relevant Period started undermines any

21  claim that there was a "concealed risk."  *See supra* III.A.1.(c)–(g).

22         In addition, PERA has not and cannot plead that any of the information it claims caused

23  the stock price on October 12, 2017, or thereafter to drop even existed, much less could have been

24  disclosed, at the time the challenged statements were made.  *See Nektar*, 34 F.4th at 839 (finding

25  no loss causation where the announcement "did not correct or revise previous patient data," but

26  "merely integrated newly collected data . . . into its reporting").  The TAC does not plead that any

27  market participant, analyst, or commentator attributed any of the stock price declines to any

28  *concealed* wildfire risk.  Rather, PG&E's stock price fell upon the disclosure that PG&E faced the

potential liability that it previously disclosed as possible—*i.e.*, the disclosed risk came to pass. But that does not establish loss causation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (loss causation not supported when the market reacts to materialization of known risks).

PG&E is not alleged to have misled investors about possibly having caused the North Bay Fires or to have falsely promised investors that such a catastrophic event was not a possible risk. Disclosures that merely report that PG&E's equipment may have been involved in starting the North Bay Fires do not reveal anything about legal violations or widespread failures in its safety practices. As an example, on October 12, 2017, PERA alleges that a letter from the CPUC was made public which ordered PG&E to preserve evidence "related to potential causes of the [North Bay Fires], vegetation management, maintenance and/or tree-trimming." TAC ¶ 329 (emphasis omitted). PERA alleges that "[o]n this news that PG&E would bear *some responsibility* for the fires, PG&E's stock dropped by $4.65 per share." TAC ¶ 330 (emphasis added). But the TAC does not allege that the CPUC's evidence preservation letter says anything about legal violations, or even the cause of the fire. Rather, as PERA's allegations concede, the disclosure was "the first indication" that PG&E's equipment had any role in the North Bay Fires. *Id.* ¶ 329. The news that PG&E would bear responsibility for a fire is a materialization of a disclosed risk, which cannot support loss causation. PERA's TAC consistently conflates materialization of known risks with allegations of corrective disclosures:

- **October 13, 2017:** In an SEC filing, PG&E confirmed "the possible role of power lines and other facilities" in causing the North Bay Fires. TAC ¶ 335. Nothing in that SEC filing says anything about "inadequate safety practices and violations"; instead, it reported only that "any liability associated with these fires" is currently "unknown." *Id.* ¶ 338.

- **December 20, 2017:** In a press release, PG&E disclosed that it was suspending its quarterly cash dividend because of "uncertainty related to causes and potential liability associated with" the North Bay Fires. TAC ¶ 339; Ex. 15 (Dec. 20, 2017 Form 8-K) at 99.1. PG&E also reminded investors that under California's inverse condemnation law, "even if the utility has followed inspection and safety rules–the utility may still be liable for property damages and attorneys' fees associated with that event." TAC ¶ 339. While an analyst allegedly pointed out that decision "suggests greater risk than we assumed surrounding regulatory treatment of the October 2017 wildfire," this suggests that the market understood that there was still risk of regulatory treatment. *Id.* ¶ 343. A dividend suspension, regardless of cause, often results in a company's stock price dropping.

1        Many of the alleged corrective disclosures relating to the North Bay Fires provided updates

2  and confirmation of the causes of the North Bay Fires, and disclosed the continuing investigation

3  of potential violations.  But the existence or continuation of investigations or that PG&E may have

4  violated certain tree clearance statutes does not correct any specific PG&E statement that PERA

5  alleges was false.  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The

6  announcement of an investigation does not 'reveal' fraudulent practices" as "the market cannot

7  possibly know what the investigation will ultimately reveal."); *see also Curry II*, 875 F.3d at 1225

8  ("[L]oss causation cannot be adequately made out merely by resting on a number of customer

9  complaints and asserting that that were there is smoke, there must be fire."); *Apollo*, 774 F.3d at 608.

10               **b.**      **Disclosures After The Camp Fire Fail To Support Loss**

11                       **Causation**

12        PERA's post-Camp Fire disclosures cannot show any causal causation between the alleged

13  misstatements alleged by PERA and any loss.  Indeed, PERA's own pleading preclude any such

14  contention because PERA alleged that the disclosures concerning the North Bay Fires revealed to

15  the market that PG&E misrepresented its safety practices and liability.  *See* TAC ¶ 361 ("[T]he

16  new information contained in these June 8 and 11 disclosures, including the severity of PG&E's

17  conduct, the role of its violations of California safety laws causing the North Bay fires, and the

18  'significant liability' it would incur as a result, proximately caused PG&E's share price

19  decline.").[21]

20

---

21  [21] PERA has previously alleged that the market knew the "true" risk of wildfire on or before June
8, 2018.  Indeed, PERA's prior complaint alleged that the "Market Learned the Truth" based on

22  the same statements and same disclosures.  Tellingly, PERA acknowledged that "[o]n August 16,
2018, PG&E released its 2018 'Corporate Responsibility and Sustainability Report,' and that

23  report "no longer represents to investors that PG&E's vegetation management is in 'compliance
with relevant laws,' or that its vegetation management 'complies with state and federal

24  regulations.'"  Ex. 90 (FAC) ¶ 161.  While these later in time developments have no impact on
whether prior statements were actionable, PERA's own allegation undermines its position that

25  investors did not have sufficient information concerning the risks at the very latest as of June 8,
2018, when Cal Fire issued its report.  See *In re Yogaworks, Inc. Sec. Litig.,* No. CV 18-10696,

26  2020 WL 2549920 (C.D. Cal. April 23, 2020) (citing *J. Edwards Jewelry Distrib., LLC. v. Wells
Fargo & Co*., No. 18-cv-03886, 2019 WL 2329248, at *4 (N.D. Cal. May 31, 2019)) (collecting

27  authority that courts may consider prior allegations in determining the plausibility of later

28  pleadings).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PERA's theory of the case has no credibility because as of June 8, 2018, the market was aware of investigations concerning PG&E, the occurrence of and risk of wildfires from PG&E's equipment, and the risk that PG&E would be financially liable for the damages from the wildfires. PERA also alleges that the price of PG&E stock was affected as a result. TAC ¶ 361. Any disclosure after June 8, therefore, could only be confirmatory of these risks, which serves to cut off any losses from similar disclosures because "the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price." *In re BofI Holding*, 977 F.3d 781 at 794 (finding no loss causation where allegedly corrective facts were not new because "all publicly available information about the company, both positive and negative, is quickly incorporated into the stock price."); *Miller v. PCM, Inc.*, No. LACV 17-3364, 2018 WL 5099722, at *11–12 (C.D. Cal. Jan. 3, 2018) (loss causation allegations failed given "the well-established 'efficient market theory'" (citation omitted)).[22]

PERA's claimed losses based on four disclosures after the ignition of the Camp Fire fly in the face of logic, law, and fact. PERA does not allege that PG&E misled investors about possibly having caused the Camp Fire or that such a catastrophic event was not possible. Indeed, PG&E long disclosed this risk, *see, e.g.*, Ex. 4 (2015 Form 10-K) at 24–33, and no later than May 2018 PERA alleges numerous disclosures in analyst reports noting that PG&E could be liable under inverse condemnation for the North Bay Fires, including that it may "be barred from recovering from ratepayers because it would be 'tough to meet' the 'prudent manager' standard that is necessary for such a recovery." TAC ¶ 350. PERA's own theory cuts off any potential loss causation based on post-Camp Fire disclosures. In the first two instances PERA claims losses after the Camp Fire, but all that was disclosed was the possible involvement of PG&E's equipment in the ignition of the Camp Fire:

---

[22] PERA admits as much by alleging that the market for PG&E's stock was efficient, such that this information would have been immediately incorporated into the stock price. *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) (Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside . . . for purposes of loss causation."), cited in *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020); *see, e.g.*, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("[T]he presumption that the market price has internalized all publicly available information cuts both ways.").

- **November 8, 2018:** On the afternoon the Camp Fire started, PG&E tweeted that the Utility did not proactively de-energize transmission lines pursuant to its ESRB-8 protocol because of its belief that "weather conditions did not warrant this safety measure." TAC ¶ 364; Ex. 106 (Nov. 2018 Tweet). PERA alleges that this tweet "was the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire" and undermined "assurances to investors that it would comply with safety regulations." *Id.*

- **November 9–12, 2018:** PERA alleges that between November 9 and 12, 2018, news outlets began reporting that the Utility's electrical equipment may have been involved in starting the Camp Fire based on an incident report filed by PG&E with the CPUC. TAC ¶¶ 372–374; *id.* ¶ 376 (alleging PG&E's stock dropped by 17.385%).

By PERA's logic, any disclosure that a wildfire was linked to PG&E's equipment—regardless of how the equipment was involved, or how inconsequential or vastly destructive the fire was— would reveal the same "reckless disregard of safety" that PERA alleged manifested in the North Bay Fires. *Edison I*, 2021 WL 2325060, at *5.

PG&E even updated the market when it had information regarding the destruction caused by the Camp Fire, but that was not—and could not have been—a fact misrepresented or concealed by any of the challenged statements. None of the alleged misrepresentations say anything about the *extent* of destruction or liability; yet that is the only new information in the final two disclosures. Specifically:

- **November 13–14, 2018:** In an SEC filing, PG&E disclosed that "[w]hile the cause of the Camp Fire is still under investigation, if the Utility's equipment is determined to be the cause, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows." TAC ¶ 381; Ex. 18 (Nov. 13, 2018 Form 8-K). PERA alleges that PG&E's stock price fell 21.791% following this disclosure because it "call[ed] into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire." TAC ¶¶ 381–82.

- **November 15, 2018:** In a press release, Cal Fire announced that the Camp Fire may have had a second ignition point that occurred near the Utility's electrical equipment. TAC ¶ 386. PERA alleges that PG&E's stock dropped 30.676% following this announcement because it supposedly "further evidenced the extent of PG&E's responsibility for the Camp Fire" and undermined "assurances" of "compl[iance] with safety regulations and prioritiz[ing] safety."

In sum, none of the alleged corrective disclosures reveal any specific allegedly concealed facts. Even if PERA could make out a claim that PG&E understated the risk of wildfire, investors were well aware of California regulations for inverse condemnation, and aware that PG&E was facing significant liability for the Camp Fire. PERA cannot extend any concealed risk to

disclosures after the Camp Fire, where the only new information is the extent of potential liability based on the size of the fire.

<div align="center">*     *     *</div>

For all of these reasons, PERA fails to allege loss causation here.  This is a third, independent reason to dismiss PERA's claims.

### 4.    PERA's Exchange Act Claims Fail For Failure To Plead Reliance For Any Stock Purchases After The North Bay Fires

"Reliance establishes the causal connection between the alleged fraud and the securities transaction."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009).  PERA's allegations and judicially noticeable facts demonstrate that PERA cannot satisfy the "reliance upon the misrepresentation or omission" requirement to plead a claim under the Exchange Act.  *In re Kalobious Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007 (N.D. Cal. 2017) (Davila, J.) (granting motion to dismiss Exchange Act claims for failing to plead reliance).

### a.    The TAC And Judicially Noticed Facts Demonstrate That PERA Is Not Entitled To Rely On The Fraud On The Market Presumption

A plaintiff can typically satisfy the requirement to plead reliance in a securities fraud case by relying on the "fraud on the market" presumption in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  This "presumption is based on the theory that the market was deceived by a defendant's misleading statements or omissions."  *In re Kalobious*, 258 F. Supp. 3d at 1008..  This "presumption is based on the theory that the market was deceived by a defendant's misleading statements or omissions."  *Id.* at 1008.  A plaintiff relying on the fraud-on-the-market theory must plead and prove the following, in order to invoke the presumption of reliance: "(1) that the alleged misrepresentations were publicly known; (2) that they were material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 268 (2014).  The first three prerequisites "are directed at price impact— 'whether the alleged misrepresentations affected the market price in the first place.'"  *Id.* at 278;

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

1   *Basic*, 485 U.S. at 249 (not applicable where "market price would not have been affected by

2   their misrepresentations").  If the alleged misrepresentation did not distort the stock's market

3   price, or "if the plaintiff did not buy or sell the stock after the misrepresentation was made but

4   before the truth was revealed," then the presumption does not apply.  *Halliburton*, 572 U.S. at 278.

5   In the latter example, courts recognize that the "fraud on the market" presumption cannot apply

6   where a defendant shows "truth on the market"—*i.e.*, "where a defendant can show that the truth

7   had actually been made available to the market through a different source."  *In re Kalobios*, 258

8   F. Supp. 3d at 1008 (citing *Provenz v. Miller,* 102 F. 3d 1478, 1492 (9th Cir. 1996) ("In a 'fraud

9   on the market' case an omission is materially misleading only if the information has not already

10  entered the market."); *In re Convergent Techs. Sec. Litig*., 948 F.2d 507, 513 (9th Cir. 1991) ("[A]n

11  omission is materially misleading only if the information has not already entered the market.  If

12  the market has become aware of the allegedly concealed information, the facts allegedly omitted

13  by the defendant would already be reflected in the stock's price and the market will not be misled.")

14  (internal quotations omitted)); *Basic,* 485 U.S. at 249 (presumption does not apply where truth

15  "credibly entered the market and dissipated the effects of the misstatements . . . [because] those

16  who traded [] shares after the corrective statements would have no direct or indirect connection

17  with the fraud").  PERA's conclusory assertions regarding reliance are not sufficient to

18  establish the requisite causal connection, even at this stage.

19      PERA cannot avoid the "truth on the market" here reflected in its own allegations, PG&E's

20  statements, and judicially noticeable facts.  In the Ninth Circuit, the "truth-on-the-market" doctrine

21  requires the defendant to "prove that the information that was withheld or misrepresented was

22  'transmitted to the public with a degree of intensity and credibility sufficient to effectively

23  counterbalance any misleading impression created by the insider's one-sided representations.'"  *In*

24  *re Kalobious*, 258 F. Supp. 3d at 1007 (quoting *Provenz*, 102 F.3d at 1492–93).

25      The North Bay Fires started on October 8, 2017.  TAC ¶ 246.  On October 9, 2017, PG&E

26  stock price closed at $68.65.  Ex. 103 (PCG Historical Price).  PERA almost immediately began

27  selling off its holdings on October 10, 2017, selling 14,574 shares at a value of $1,006.853.51,

28  TAC Attachment A, two days before PERA even alleges the first corrective disclosure occurred

on October 12, 2017. *Id.* ¶ 246 ("[I]t was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a major cause [of the North Bay fires].").  PERA's TAC then alleges that beginning on October 31, 2017, PG&E "attempted to reassure investors, falsely" regarding its wildfire-related safety compliance.  TAC ¶¶ 248–49.  But none of those statements suggested the risk of wildfire had been eliminated; instead, PG&E repeatedly disclosed that risk, and the risk of liability from the North Bay Fires that could have a material impact on PG&E's financial position.  *See, e.g.*, Ex. 4 (2015 Form 10-K) at 24–33; Ex. 5 (2016 Form 10-K) at 26–37; Ex. 6 (2017 Form 10-K) at 27–43.  And PERA's trading history tells a different story.  From November 20, 2017 to February 21, 2018 (*i.e.*, the time after PERA admits the markets knowledge of PG&E's violations), PERA made only sales of PG&E stock (not buys), selling off a total of 114,394 shares at a value of $6,149,953.53.  TAC, Attachment A.

Indeed, it is indisputable that from the time of the North Bay Fires through February 2018, the public was aware that, among other things, (1) the CPUC disclosed that it issued a litigation hold letter to PG&E about its safety practices (TAC ¶ 246), (2) Cal Fire announced that it was investigating PG&E's role in the fires (TAC ¶ 247), (3) PG&E was cooperating with Cal Fire's investigation and suspending its dividend because of uncertainty from its potential liability associated with the North Bay Fires (TAC ¶ 339), and (4) numerous lawsuits were filed seeking damages against PG&E alleging it caused the North Bay Fires. *See, e.g.*, Ex. 88 (Moretti Complaint); Ex. 89 (Weston Complaint); Ex. 100 (Lore OLDS Complaint); Ex. 101 (Lentine Complaint); Ex. 102 (Firemen's Ret. Sys. Complaint).  Moreover, during the period after the North Bay Fires, but before the Camp Fire, there were regular news articles reporting that PG&E could face "more than $15 billion in damage liabilities" from the North Bay Fires and that "investigators concluded that PG&E's power lines caused 16 of the wildfires that torched hundreds of thousands of acres . . . , which killed 44 people and burned down nearly 9,000 structures." Ex. 112 (Aug. 17,

2018 Law360 Article).[23]  In addition, Cal Fire issued updates on its investigations.  Ex. 76 (News Release, Cal Fire, CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties (May 25, 2018)); Ex. 77 (News Release, Cal Fire, CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake and Napa Counties (June 8, 2018)).  After all of this information was revealed and PERA had sold more than $6 million in PG&E's stock, and after PG&E's stock had dropped from $68.65 when the North Bay Fires started to $45.08 on April 16, 2018, PERA started to purchase PG&E stock again.  But PERA does not even allege any misrepresentation between December 2017—when it admits that PG&E disclosed the potential significant wildfire liability—and these purchases such that it could establish reliance.  TAC ¶ 339, Ex. 17.  PERA's new purchases were an obvious attempt to capitalize on a decreased stock price after the North Bay Fires, and not in reliance on any purported efforts by PG&E to falsely reassure investors about its safety practices.  *See* TAC, Attachment A; Ex. 103 (PCG Historical Price).

Based on the historic nature of the North Bay Fires, the prolific news articles that followed, and the significance of the CPUC and Cal Fire reports, there can be no doubt that the market had "become aware of the allegedly concealed information," *In re Convergent Techs.*, 948 F.2d at 513—*i.e.*, the risk of catastrophic wildfire and significant liability.  This is also consistent with PG&E's own detailed risk disclosures in its SEC filings.  *See, e.g.*, Ex. 4 (2015 Form 10-K) at 24–33; Ex. 5 (2016 Form 10-K) at 26–37; Ex. 6 (2017 Form 10-K) at 27–43.

The fact that the market was aware of the "truth" after the North Bay Fires—*i.e.*, that PG&E's safety efforts may be deficient and its equipment could cause catastrophic wildfires for which PG&E would be held liable—is underscored by PERA's own pleadings in the District Court Action.  After PERA was appointed Lead Plaintiff in the District Court Action, which at that point was *only about the North Bay Fires*, PERA filed its Consolidated Class Action Complaint on

---

[23] *See also* Ex. 109 (Nov. 14, 2017 Sacramento Bee Article) ("Law firms from across the country have begun preparing and filing suits against Pacific Gas & Electric Co., blaming the utility for October's massive firestorms and paving the way for what may result in billions of dollars in payouts if the company is found responsible."); Ex. 111 (June 12, 2018 Sonoma Index-Tribune Article) ("The investor-owned utility is facing more than 100 lawsuits . . . . PG&E has $800 million in liability insurance, but insurance claims from the fires exceed $9.7 billion."); TAC ¶¶ 331, 356.

1    November 9, 2018, one day after the Camp Fire started, and asserted that the "truth" about PG&E's

2    deficient safety practices and the attendant risks had already been fully revealed in connection with

3    the North Bay Fires.  *See generally* Ex. 91 (SAC).   PERA's allegations in the TAC confirm that

4    investors were aware of the wildfire risk and associated liability well before the Camp Fire; PERA

5    references investor reports well before that date where investors concluded for the North Bay Fires

6    that "all signs seem to point to [PG&E] being imprudent operators in the majority of instances,

7    which would therefore mean it should assume liability."   TAC   ¶¶ 359–360.   PERA also

8    acknowledges that even before PG&E's equipment was connected to the Camp Fire, investors were

9    concerned that PG&E's liability for those fires would threaten its financial state (and the wildfire

10   liability rescue bill SB901 only applied liability for fires in 2017).  TAC ¶¶ 369–70.

11          Against this backdrop, PERA can hardly argue that it was misled by PG&E's statements

12   regarding legal compliance and PG&E's purported assurances that it was "taking steps" to improve

13   its safety practices.  Investors, including PERA, were fully aware of the risks of buying PG&E

14   stock after the North Bay Fires.

15                    ***b.***        ***PERA's Attempt To Plead Presumption Of Reliance Recognized***

16                                 ***In The* Affiliated Ute *Line Of Cases Fails***

17          In another misplaced attempt to avoid their obligation to plead reliance as to each alleged

18   misrepresentation as required under the Exchange Act, PERA invokes a separate judicially created

19   presumption of reliance under the case *Affiliated Ute Citizens of Utah v. United States* and its

20   progeny that applies only to cases where a plaintiff's claims are based on alleged omissions, as

21   opposed to affirmative misrepresentations.  406 U.S. 128 (1972).  PERA invokes this exception in

22   a single conclusory allegation that "Defendants misstatements throughout the Class Period

23   included omissions, in that they failed to inform investors of PG&E's safety and regulatory

24   failures."  TAC ¶ 642.  However, "the Affiliated Ute presumption is limited to cases that ***primarily***

25   allege omissions and present plaintiffs with the difficult task of proving a speculative negative."

26   *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig*., 2 F.4th 1199, 1208–

27   09 (9th Cir. 2021) (emphasis added).  In *Volkswagen,* the Court held that in a "mixed" case

28   involving both affirmative misrepresentations and omissions, courts in the Ninth Circuit must limit

the *Affiliated Ute* presumption to "situations in which a plaintiff would be forced to prove a speculative negative:' that the plaintiff relief on what was not said." *Id.* at 1206 (*quoting Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999)) (quotation marks omitted). The Court held that the presumption did not apply because throughout the complaint, "Plaintiff alleges much was said, and importantly, that it relied on what was said." *Id.* Here, PERA's entire TAC is based on alleged "false statements" that it contends extended through the entire Alleged Relevant Period. TAC ¶ 1. While none of them is actionable, as explained above, PERA has labeled 19 separate alleged "Misstatements" in bold and italics throughout the TAC, alleging that some were "repeatedly represented to investors." *See, e.g.*, TAC ¶ 17. Moreover, while deficient for pleading purposes, PERA generally alleged that it "relied on" PG&E's statements alleged in the TAC. *See* TAC ¶ 477. In sum, just like in *Volkswagen*, PERA alleges "pages of affirmative misrepresentations that it… relied upon when purchasing" PG&E securities. 2 F.4th at 1209. Therefore, PERA cannot invoke the *Affiliated Ute* presumption to escape its obligation to plead facts supporting reliance. PERA's failure to specifically plead reliance requires dismissal. *See Lifeline LegacyHoldings, LLC v. OZY Media, Inc.*, No. 21-cv-07751, 2022 WL 2119122, at *4–5 (N.D. Cal. June 13, 2022) (granting motion to dismiss Exchange Act claims and holding that Affiliated Ute presumption did not apply to mixed case where plaintiff failed to allege facts showing that it relied on the misrepresentation that the company was not in violation of any statute, rule or regulation).

<p style="text-align:center">*　　*　　*</p>

PERA has failed to plead any facts to sufficiently allege it relied on any alleged misstatement in the TAC. Instead, it relies entirely on the fraud on the market and *Affilited Ute* presumptions. Because the allegations in the TAC and other material properly considered by the Court on a motion to dismiss demonstrate that neither presumption applies, PERA has failed to plead reliance and its Exchange Act claims should be dismissed. This is a fourth independent reason to dismiss PERA's claims.

### D. PERA's Section 20(a) Claims Fail For Failure To Plead A Primary Violation

Section 20(a) of the Exchange Act imposes liability on certain "controlling" individuals or entities for violations of Section 10(b) and its underlying regulations. 15 U.S.C. § 78t(a); *Twitter*,

29 F.4th at 623.  Section 20(a) claims are derivative.  *Twitter*, 29 F.4th at 623.  PERA has alleged that PG&E Corporation is liable as a controller of Pacific Gas and Electric Company.  But in light of PERA's failure to plead a primary violation of the Exchange Act against any defendant, its Section 20(a) claim must be dismissed.

<div align="center">*     *     *</div>

PERA has failed to state any claim under the Exchange Act.  The Court should follow the precedent in *Edison* and dismiss PERA's Section 10(b) and Section 20(a) claims in their entirety and with prejudice.

## IV.     THE SECURITIES ACT PLAINTIFFS FAIL TO PLEAD THEIR CLAIMS

### A.     Background

#### 1.     Overview Of Notes Offerings

The Securities Act Plaintiffs are investors in the 2016 and 2017 Notes Offerings and the 2018 Exchange Offer.  In connection with each Notes Offering, PG&E issued prospectuses and registration statements, which contained detailed information and risk disclosures concerning the investments, and also incorporated other PG&E SEC filings by reference.  Exs. 19–22.  PG&E sold debt securities pursuant to these Offering Documents, each of which promised repayment of principal, plus interest.  *Id.*  For the Exchange Offer in April 2018, PG&E filed a Form S-3 registration statement offering to exchange restricted notes that were issued in a November 2017 private placement for equivalent, publicly traded notes.  The notes in the Offerings were issued with the below terms:

| Offering | Securities Description | CUSIP Number |
|---|---|---|
| April 2018 Offering | 3.95% due 12/01/2047 | 694308HY6 |
| April 2018 Offering | 3.3% due 12/01/2027 | 694308HW0 |
| December 2016 and March 2017 Offerings | 4% due 12/01/2046 | 694308HR1 |
| March 2017 Offering | 3.3% due 03/15/2027 | 694308HS9 |
| March 2016 Offering | 2.95% due 03/01/2026 | 694308HP5 |

The Securities Act Plaintiffs allege that they purchased securities in the following Offerings:

- York acquired PG&E senior notes issued in the March 2016 Notes Offering on May 3, 2018, and May 30, 2018.  York also acquired notes issued in the March 2017 offering on November 27, 2017, which it then exchanged in the April 2018 Exchange Offer.  It

subsequently purchased notes from the Exchange Offer on May 14, 2018. TAC ¶ 506 and Attachment B.

- Mid-Jersey acquired PG&E senior notes issued in the December 2016 Notes Offering on January 31, 2018, and the March 2017 Notes Offering on December 22, 2017. TAC ¶ 508 and Attachment D.

- Warren acquired PG&E senior notes on December 21, 2017, and then exchanged those notes in the April 2018 Notes Offering and purchased more notes from the April 2018 Notes Offering on May 1, 2018, and May 14, 2018. TAC ¶ 507 and Attachment C.

### 2.  March 2016 Offering

In connection with its March 2016 Offering, PG&E conducted what is referred to as a "shelf registration," which entitles it to issue notes at a later date. These notes would then issue after the "prospectus," which provides the disclosures and explains the structure of the investment, and any "prospectus supplement," which includes the detailed descriptions of the specific notes being offered, were filed with the SEC. "Investors could learn detailed information about the characteristics of their [notes] through reading all of the documents filed with the SEC, which were the shelf registration statements, prospectuses and prospectus supplements." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1104 (C.D. Cal. 2013) (explaining mechanics of shelf registrations). On February 24, 2016, PG&E filed a Rule 424(b)(2) prospectus supplement to a Form S-3 dated February 11, 2014 (the "**2014 Shelf Registration**") and issued $600 million of senior notes in the March 2016 Offering. Ex. 19 (Feb. 24, 2016 Pro. Supp). The prospectus supplement included both detailed disclosures concerning the risk to PG&E's financial results from wildfires and other inherently hazardous operations, and also incorporated by reference its 2015 annual Form 10-K. Ex. 19.

PG&E's 2015 Form 10-K, filed on February 18, 2016, devoted ten pages specifically to "Risk Factors." Ex. 4 (2015 Form 10-K) at 24-33. As discussed in Section III.A.1, *supra,* these disclosures included, among many other risks, that:

> ***The Utility's electricity and natural gas operations are inherently dangerous and involve significant risks which, if they materialize, can adversely affect PG&E Corporation's and the Utility's financial results.***
>
> The Utility's ability to safely and reliably operate, maintain, construct and decommission its facilities is subject to numerous risks, many of which are beyond the Utility's control, including those that arise from:

- the breakdown or failure of equipment . . . that can cause explosions, fires, or other catastrophic events;

- the failure to fully identify, evaluate, and control workplace hazards that result in serious injury or loss of life for employees or the public, environmental damage, or reputational damage;

- the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (**such as a wild land fire** or a natural gas explosion), and the failure to respond effectively to a catastrophic event.

*Id.* at 29 (emphasis added).

### 3. The December 2016 Offering

On November 28, 2016, PG&E filed a new Rule 424(b) prospectus supplement to the 2014 Shelf Registration and issued $650 million of senior notes in the December 2016 Offering. The prospectus supplement incorporated by reference PG&E's 2015 Form 10-K and its Form 10-Qs for the first and third quarters of 2016. Ex. 20 (Nov. 29, 2016 Pro Supp.) at S-1-3.

Therefore, in addition to the risk factors and other disclosures included in the 2015 Form 10-K, the first quarter Form 10-Q 2016, filed on May 4, 2016, informed investors in the December 2016 Offering that Cal Fire had concluded that PG&E's vegetation management practices were responsible for the Butte Fire. Ex. 8 (Q1 2016 Form 10-Q) at 35, TAC ¶¶ 101, 564, 566. Further, PG&E's 2016 third-quarter Form 10-Q, filed on November 4, 2016, informed investors that PG&E had been convicted in connection with the 2010 San Bruno gas line explosion. Ex. 9 (Q3 2016 Form 10-Q) at 36.

### 4. The March 2017 Offering

On March 7, 2017, PG&E filed a Rule 424(b) prospectus supplement to a new Form S-3 registration statement dated January 25, 2017, and issued $600 million of senior notes. Ex. 21 (Mar. 7, 2017 Pro. Supp.). The prospectus supplement incorporated by reference the 2015 Form 10-K, the first-quarter and third-quarter 2016 10-Qs, and PG&E's annual Form 10-K for 2016, filed on February 16, 2017. Ex. 21 at S-103, at 20.

As discussed in more detail in Section III.A.1, *supra,*, in addition to including the same robust disclosures from the 2015 Form 10-K, the 2016 Form 10-K also notified investors that:

- Damages attributed to PG&E for the Butte Fire had increased to $750 million.

- Financial conditions, results of operations, and cash flows could be materially affected by the ultimate amount of third-party liability that the Utility incurs in connection with the Butte Fire.

- "As a result of the strict liability standard applied to wildfires, . . . the risk of increase in wildfires including as a result of the ongoing drought, and the Butte fire, the Utility may not be able to obtain sufficient insurance coverage in the future" and "is unable to predict whether it would be allowed to recover in rates the increased costs of insurance or the costs of any uninsured losses."

- If the potential wildfire liability exceeded available insurance and was not recoverable in rates, its "financial condition, results of operations, or cash flows could be materially affected."

Ex. 5 at 26–36, 71, 137.

### 5. The April 2018 Exchange Offer

On April 13, 2018, PG&E filed a Form S-3 registration statement offering to exchange restricted notes that were issued in a November 2017 private placement for equivalent, publicly traded notes. Ex. 22 (Apr. 13, 2018 S-3). The April 2018 registration statement incorporated by reference PG&E's Form 10-K for 2017 filed on February 9, 2018, which again contained detailed disclosures discussed *supra* § III.A.1. In addition to repeating PG&E's warnings and risks from its prior disclosures, PG&E's 2017 Form 10-K identified its liability for the North Bay Fires as the first of the "Key Factors Affecting Financial Results" and the first of the Risk Factors. Ex. 6 (2017 Form 10-K) at 27, 55. Among the many other disclosures, PG&E disclosed that it could be liable for more than $10 billion in losses from the North Bay Fires. *Id.* at 28.

### 6. Procedural Background

On February 22, 2019, the Securities Act Plaintiffs filed a new securities class action (the "York County Action") asserting Section 11 and Section 15 claims against certain of PG&E's officers, directors, and underwriters, based on alleged misrepresentations related to the Notes Offerings. *See* District Court Action, ECF No. 117. Because the automatic stay was already in

1    effect, the Securities Act Plaintiffs did not name PG&E as a defendant. On May 28, 2019, PERA

2    and the Securities Act Plaintiffs consolidated their actions and filed the TAC.

3          **B.**     <u>**Legal Standard For Section 11 Claims**</u>

4          As the Supreme Court recently confirmed, liability under Section 11 of the Securities Act

5    is "narrower" than the Exchange Act and is "focused primarily on the regulation of new offerings."

6    *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 762 (2023) (internal citations omitted) (quoting

7    *Gustafson v. Alloyd Co.*, 513 U.S. 561, 572 (1995)); *see also Blue Chip Stamps v. Manor Drug*

8    *Stores,* 421 U.S. 723, 752 (1975) ("The 1933 Act is a far narrower statute [than the 1934 Act,]

9    chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily

10    . . . initial distributions of newly issued stock from corporate issuers."). Section 11 places strict

11    limits on the purchasers who can bring claims and the time for bringing such claims. Outside those

12    limits, Section 11 provides no right to recover losses.

13          **C.**     <u>**Argument: The Securities Act Plaintiffs Fail To Plead A Securities Act**</u>

14               <u>**Claim**</u>

15             **1.**     **The Section 11 Claims Based On The 2016 And 2017 Notes Offerings**

16                    **Are Time Barred**

17          Claims under Section 11 of the Securities Act must be brought "within one year after the

18    discovery of the untrue statement or the omission, or after such discovery should have been made

19    by the exercise of reasonable diligence," or they are time barred. 15 U.S.C. § 77m. "This means

20    that the statute of limitations begins 'when the plaintiff did or should have actually discovered that

21    the defendant made an untrue statement or omission.'" *In re YogaWorks, Inc. Sec. Litig.*, No. CV

22    18-10696, 2019 WL 13399628, at *2 (C.D. Cal. Feb. 3, 2019) (citations omitted). Plaintiffs

23    advancing claims under the Securities Act must "affirmatively plead sufficient facts in [the]

24    complaint to demonstrate conformity" with this statute of limitations. *Toombs v. Leone*, 777 F.2d

25    465, 468 (9th Cir. 1985). When it is "apparent on the face of the complaint," or from other

26    evidence that courts may consider on a motion to dismiss, that a plaintiff's claims are barred by the

27    statute of limitations, the plaintiff's claims are properly dismissed. *Jablon v. Dean Witter &*

28    *Co.*, 614 F.2d 677, 682 (9th Cir. 1980). Here, the Securities Act Plaintiffs' Section 11 claims

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

relating to the 2016 and 2017 Notes Offerings must be dismissed as time barred. The TAC not only lacks sufficient facts demonstrating compliance with the statute of limitations, but also pleads facts that show the statute of limitations expired before the Securities Act Plaintiffs filed their claims under Section 11. *See* 15 U.S.C. § 77m.

The TAC alleges that "the truth started to emerge"—*i.e.*, that the market started to become aware of PG&E's alleged misrepresentations—on October 12, 2017, when the CPUC sent PG&E a litigation hold letter as the North Bay Fires spread. TAC ¶ 321. Investors allegedly "began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires" on this date. *Id*. ¶¶ 328–30. PG&E's stock price dropped 6.7% on the news, and market analysts confirmed the drop "reflected investors' understanding that PG&E was financially responsible for the North Bay Fires." *Id*. ¶¶ 330–34. Analysts further concluded that the contemporaneous "drop in [PG&E's] stock price reflected . . . assumptions" that "the fires were caused by [PG&E's] negligence" and "material fines and penalties will be assessed." *Id.* ¶ 331. The next day, PG&E filed a Form 8-K disclosing that regulators were investigating its role in the North Bay Fires and warning that its insurance coverage may be insufficient to cover its potential liability. *Id.* ¶ 335. The filing caused PG&E's stock price to drop another 16.5%, as PG&E's "discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse." *Id.* ¶¶ 336–38.

When the "truth emerged" in October 2017, the statute of limitations on the Securities Act Plaintiffs' Section 11 claims started to run. *See YogaWorks*, 2019 WL 13399628, at *3 ("[T]he cause of action accrues whenever the plaintiff discovered or should have discovered the untrue statement or omission." (quoting *F.D.I.C. v. Countrywide Fin. Corp*., No. 2:12–CV–4354, 2012 WL 5900973, at *3 (C.D. Cal. Nov. 21, 2012))). Taking the allegations in the TAC as true, a reasonable investor would have had all the facts necessary to file Section 11 claims based on the 2016 and 2017 Notes Offerings by October 13, 2017, or, at the very latest, the end of 2017.[24]

---

[24] For example, on November 27, 2017, PG&E disclosed that 32 lawsuits had been filed blaming the North Bay Fires on PG&E's alleged safety violations, including two lawsuits alleging that the North Bay Fires were "caused by: (i) the defendants' improper and negligent operation of the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1    Because the Securities Act Plaintiffs waited more than a year—until February 22, 2019—to file

2    the Securities Act Claims (and even then, against only the non-PG&E defendants in the District

3    Court Action), their claims are time barred as a matter of law.  *Rieckborn v. Jefferies LLC*, 81 F.

4    Supp. 3d 902, 916 (N.D. Cal. 2015) (dismissing Securities Act claims as time barred because

5    disclosures alleged in complaint "provided precisely the information that plaintiff[] claim[s]

6    should have been disclosed earlier"); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig*., No.

7    11-2265, 2013 WL 12314509, at *1–2 (C.D. Cal. June 6, 2013) (dismissing claims where

8    "numerous media sources" disclosed company's misrepresentations over a year before action was

9    filed); *Thomas v. Magnachip Semiconductor Corp*, 167 F. Supp. 3d 1029, 1054 (N.D. Cal. 2016)

10   (concluding "that the combination of" the company's announcement, a complaint, and "other

11   coverage" "would have put a reasonably diligent investor on notice of potential Securities Act

12   claims").

13        The Ninth Circuit's decision in *Edison II* is on point.  In *Edison II*, the Ninth Circuit

14   affirmed the dismissal of Section 11 claims on statute of limitations grounds where, as here, the

15   "face of the complaint establishe[d] that those claims [were] barred by the one-year statute of

16   limitations."  *Edison II*, 2022 WL 822191 at *1; *see also Edison I*, 2021 WL 2325060, at *7

17   (dismissing Section 11 claims because the market understood that Edison caused a fire more than

18   one year before the claims were asserted).  The *Edison* plaintiffs "alleged that the purportedly

19   concealed risks of Edison's safety practices materialized on December 5, 2017, when the market

20   understood that Edison caused the [first of two fires]," but the plaintiffs did not bring claims under

21   the Securities Act until April 2019.  *Edison II*, 2022 WL 822191 at *1.  As the district court

22   explained, if the earlier offerings "concealed the risk that [PG&E] could recklessly cause a material

23   wildfire . . . then Plaintiffs should have discovered facts constituting the violation . . . when the

24   markets purportedly understood" that the utility caused the first fire.  *Edison I*, 2021 WL 2325060,

25

26   Company's power lines and related equipment; (ii) the failure of equipment . . . that w[as] operated
     . . . by the defendants or the Company (under the defendants' direction and on their watch); and/or
27   (iii) the defendants' utter failure to maintain vegetation with prescribed California law and
     regulations."  Ex. 14 (Nov. 27, 2017 Form 8-K) at 2; Ex. 101 (Lentine Complaint) at 1; Ex. 102
28   (Firemen's Ret. Sys. Complaint).

1    at \*7 (also rejecting argument that Edison's statements tolled the claims). So too here. Like the

2    *Edison* plaintiffs, the Securities Act Plaintiffs allege that the market first discovered the "truth"

3    close to when the North Bay Fires started in October 2017, yet they failed to bring Section 11

4    claims until well over a year later. Thus, *Edison II* mandates the dismissal of these claims.

5        Indeed, the admission in the TAC that the market first became aware of the "truth" close

6    to when the North Bay Fires started, on October 12, 2017, forecloses any attempt to avoid the time

7    bar. The Securities Act Plaintiffs cannot simultaneously claim that the market reacted to

8    disclosures in 2017 in order to seek damages for the Section 10(b) claims, and feign ignorance of

9    those same facts in order to seek additional damages under Section 11. *Welgus v. TriNet Grp.,*

10    *Inc.*, No. 15-CV-03625, 2017 WL 167708, at \*22 (N.D. Cal. Jan. 17, 2017) (allegations of

11    corrective disclosures triggered statute of limitations). And there is no plausible reason they could

12    not have brought their claims against PG&E at any time after the North Bay Fires—as numerous

13    other plaintiffs did; their failure to do so bars claims based on the 2016 and 2017 offerings. *Cf.*

14    *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 365–67 (S.D.N.Y. 2012)

15    (concluding that previously filed lawsuits about similar misrepresentations, combined with

16    defendant's disclosures, were sufficient for a reasonable investor to have discovered claims);

17    *Sivertson v. Citibank, N.A.*, 390 F. Supp. 3d 769, 786 (E.D. Tex. 2019) (dismissing as time barred

18    claims in a second lawsuit that were "substantively identical" to those pled in a first lawsuit).

19        This Court should follow the numerous courts—including the Ninth Circuit in *Edison II*—

20    that have rejected similar delayed claims from opportunistic plaintiffs seeking to take advantage

21    of Section 11. *See LC Capital Partners, LP v. Frontier Ins. Grp.*, 318 F.3d 148, 156 (2d Cir. 2003)

22    (noting "a vast number of cases" where Securities Act claims are dismissed on limitations grounds

23    at the pleadings stage).

24        **2.**      **The Securities Act Plaintiffs Fail To Allege An Actionable Material**

25              **Misstatement Or Omission In The Offering Documents**

26        To state a Section 11 claim, the Securities Act Plaintiffs must allege that the offering

27    documents pursuant to which the notes were offered either "contained an untrue statement of a

28    material fact or omitted to state a material fact required to be stated therein or necessary to make

the statements therein not misleading." 15 U.S.C. § 77k(a). "So for the former, a statement must be both (1) false and (2) material to investors. . . . And for the latter, it is not enough that the [offering documents] omitted relevant facts, or even material facts." *Greenberg v. Sunrun, Inc*., 233 F. Supp. 3d 764, 772 (N.D. Cal 2017) (citing *In re Rigel Pharm., Inc. Sec. Litig*., 697 F.3d 764, 880 n.8 (9th Cir. 2012)).[25]

### a.     Like PERA, The Securities Act Plaintiffs Have Failed To Plead Falsity With The Requisite Particularity

Like the Exchange Act claims, to be actionable, any misrepresentation "'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Greenberg*, 233 F. Supp. 3d at 772 (quoting *Brody v. Transnat'l Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Here, because the Securities Act Plaintiffs' claims "sound in fraud" and "allege[] a unified course of fraudulent conduct" with the Exchange Act claims, the Court must also apply Rule 9(b) to the Securities Act claims. *Rubke*, 551 F.3d at1161. Each of the Offering Documents on which the Securities Act claims rely specifically incorporates by reference many of the same SEC filings that form the basis of a subset of the Exchange Act claims. *See* TAC ¶¶ 630(a)–(d), 631. Axiomatically, as no materially false statement is pled with specificity as to the Exchange Act claims, the Securities Act claims fail as well. *See Rigel*, 697 F.3d at 886 ("For the same reasons discussed above regarding the section 10(b) claim, we hold that, for the section 11 claim, Plaintiff has failed to meet Rule 9(b)'s pleading requirements [as] to pleading a false or misleading statement.").[26]

---

[25] The Securities Act Plaintiffs must meet the heightened pleading standard for their Securities Act claims, which sound in fraud. *See In re Rigel Pharms.*, 697 F.3d at 886 (applying Rule 9(b) to Section 11 claims that "relie[d] on the same alleged misrepresentations" because "nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud").

[26] The Securities Act Plaintiffs fail to plead a material misstatement or omission even if the Court provides the more lenient pleading standard under Rule 8(a) of the FRCP. A complaint still must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). The Court is not required to "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Norfolk*, 2016 WL 7475555, at *2. Here, the alleged misstatements are inactionable under any standard.

In order to determine whether any misrepresentation is material, it must be read in context of the "total mix" of information available to investors. *In re Stac*, 89 F.3d at 1408. The Court must consider the "full text of the [offering materials], including portions which were not mentioned in the complaint." *Id.* at 1405 n.4. And plaintiffs cannot plead a claim based on an omission where the allegedly omitted facts were disclosed. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). In a case alleging misleading statements in a securities filing, the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc*., 143 F.3d 1293, 1295–96 (9th Cir. 1998) (citing *In re Stac Elecs. Sec. Litig*., 89 F.3d 1399, 1403 (9th Cir. 1996)).

As with the Exchange Act claims, falsity cannot be pled by hindsight. *In re Worlds of Wonder Sec. Litig*., 35 F.3d at 1419 (a plaintiff "cannot use the benefit of 20-20 hindsight to turn management's business judgment into" a securities violation). Rather, "[a] claim under Section 11 based on the omission of information must demonstrate that the omitted information existed at the time the registration statement became effective." *In Re Violin Memory Sec. Litig*., No. 13-5486, 2014 WL 5525946, at *9 (N.D. Cal. Oct. 31, 2014); *In re Stac*, 89 F.3d at 1403–04, 1409; *Rubke*, 551 F.3d at 1164.

Specifically, the Securities Act Plaintiffs contend that the Offering Documents were false because PG&E represented it was "making substantial investments to build a more modern and resilient system" and PG&E's "vegetation management activities also reduce the risk of wildfire impacts on electric and gas facilities." TAC ¶ 640. As explained in Section III.C.1.c, *supra,* none of those statements is false or actionable. The record is clear that PG&E made substantial investments in its wildfire safety programs. Ex. 67 (CEMA Application) at 6, 8. Moreover, the Securities Act Plaintiffs nowhere point to any representation from PG&E that it could ever eliminate the risk of wildfires. To the contrary, investors were well aware of the potential risk of wildfires and wildfire liability. *See supra* § III.A.1. Indeed, the Offering Documents themselves used the Butte Fire in 2015 as an example of wildfire risks and the impact of wildfires on PG&E's operations and financial health. *Id.* Given the amount of information publicly available to

investors, no additional disclosure was required.  *See, e.g.*, *Intuitive Surgical, Inc.*, 759 F.3d at 1060–61 (concluding statement was not misleading given information "the market already knew"); *In re Nimble Storage, Inc.*, No. 15-cv-05803, 2016 WL 7209826, at *9 n.10 (N.D. Cal. Dec. 9, 2016) (similar).  That is precisely what the Ninth Circuit concluded in *Edison II* when presented with virtually identical allegations.  *See Edison II*, 2022 WL 822191, at *1.

The Securities Act Plaintiffs allege that the Offering Documents were misleading because while they included risk factors related to wildfires, they "did not disclose the already existing negative impact on PG&E as a result of PG&E's subpar safety practices."  TAC ¶ 633.  Specifically, the Securities Act Plaintiffs allege that the Offering Documents were materially misleading because they did not disclose that PG&E's safety deficiencies and violations had already increased the risk of wildfires (*Id.* ¶¶ 499, 610, 621, 625) and the real risk of wildfires was a result of PG&E not sufficiently investing in or providing its services in a safe manner (*Id.* ¶¶ 608, 619).  The Securities Act Plaintiffs' arguments here all fail, as they are premised entirely on conclusions reached in December 2018 and later in 2019 that PG&E's equipment was the cause of the North Bay and Camp Fires, and fail to provide facts that PG&E's disclosures were false when made.  Indeed, at the time of the Notes Offerings, PG&E disclosed the risk of wildfires; its lack of clairvoyance to predict that a major wildfire would later occur and the damages would be greater than expected is not a basis for liability under the federal securities laws.  *See Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1127 (S.D. Cal. 2012), *aff'd*, *Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) (dismissing Section 11 claim where "apart from conclusory statements that these delays existed, Plaintiffs fail to allege any facts to show that such delays were known at that time or that they could reasonably be expected to have a material impact" (emphasis omitted)).

Moreover, like PG&E's other disclosures that were incorporated by reference into the Offering Documents, the Offering Documents that began in 2016 provided a detailed discussion of regulatory conclusions about PG&E's fault and potential liability from the 2015 Butte Fire, including noting in December 2016 that PG&E had a probable tort liability of $750 million to 1,950 distinct parties.  *See, e.g.*, Exs. 19–21 (Offering Documents which incorporate SEC filings

and risk disclosures).  Where, as here, "the prospectus warned against the risks that Plaintiffs claim materialized," a Section 11 claim is inappropriate and should be dismissed.  *Belodoff v. Netlist, Inc.*, No. SACV 07–00677, 2009 WL 1293690, at \*7 (C.D. Cal. Apr. 17, 2009); *see also Greenberg*, 233 F. Supp. 3d at 773 (no misstatement where allegedly omitted risk was disclosed in the next sentence in the prospectus); *Anderson v. Clow*, No. CIV. 92-1120-R, 1993 WL 497212, at \*7 (S.D. Cal. Sept. 17, 1993) (holding complaint failed to allege Section 11 claim that sounded in fraud because "the purported omissions were actually disclosed" and "other statements . . . rendered the Prospectus as a whole not misleading").

In short, just as the Ninth Circuit found in *Edison II* regarding the Section 11 claims there, the Securities Act Plaintiffs' Section 11 claims "fail for the same reason [its] Exchange Act claim fails, namely, a failure to plead particularized facts showing false or misleading statements or omissions."  2022 WL 822191, at \*1.  The Securities Act Plaintiffs' Section 11 claims should therefore be dismissed.

### b.     The Securities Act Plaintiffs Cannot Recast Their Claims As Violations Of Item 303 Or Item 503

Unable to establish a material misstatement or omission under the basic provisions of Section 11 alleging that any omitted fact rendered a statement materially misleading, the Securities Act Plaintiffs attempt to plead a claim by bootstrapping an alleged violation of other SEC Rules. Specifically, the Securities Act Plaintiffs claim that the Offering Documents omitted facts "required to be stated therein," 15 U.S.C. 77k(a), based on Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) (currently, § 229.303(b)(2)(ii)) ("Item 303"), which requires issuers to disclose "known trends and uncertainties," or Item 503 of Regulation S-K, 17 C.F.R. § 229.503 ("Item 503"), which requires issuers to include the most "significant factors that ma[ke] [the offering] speculative or risky."  *See* TAC ¶¶ 674–82.  Both attempts fail.

Under Item 303, a company is required to disclose "known trends or uncertainties that . . . will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  This theory requires a plaintiff to allege that defendants had "knowledge of an adverse trend" and that "the future material impacts are

reasonably likely to occur from the present-day perspective." *Steckman,* 143 F.3d at 1297 (emphasis omitted). Similarly, at the time of the Notes Offerings, Item 503 required "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (current version at 17 C.F.R. § 229.105); *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) ("[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item 503 risks needs to allege . . . the offering documents failed to disclose the risk factor.").

Here, PG&E diligently disclosed the worsening trend of conditions contributing to the risks of California wildfires in both its Offering Documents and the SEC filings incorporated therein. *See supra* § III.A.1; Exs. 19–21 (Offering Documents). Further, PG&E disclosed its own liability for the wildfires, as well as its potential risks in the future. *Id.* Under these circumstances, the Securities Act Plaintiffs cannot sustain a claim under Item 303 or 503. *See Mosco v. Motricity, Inc.*, 649 F. App'x 526, 528 (9th Cir. 2016) (rejecting Item 303 claim when "the Registration Statement disclosed the very trend that Plaintiffs claim [the issuer] hid from the market, adequately warning investors"); *In re Rocket Fuel*, *Inc. Sec. Litig.*, No. 14-cv-3998, 2015 WL 9311921, at *9 (N.D. Cal. Dec. 23, 2015) (dismissing Item 303 claims where allegedly adverse trend was "extensively discussed in the registration statements"); *McCloskey v. Match Grp., Inc.*, No. 3:16-CV-549, 2018 WL 4053362, at *7 (N.D. Tex. Aug. 24, 2018) (dismissing claim under Item 503 because the actual risk that occurred was a "stock price decline following [defendants'] underperformance relative to analyst estimates"—a risk that was "expressly disclosed to investors" in the offering documents).

### 3. The Securities Act Plaintiffs Cannot Establish Economic Loss

Section 11 provides statutory damages, which serve as a starting point for maximum economic losses recoverable by any purchaser of securities issued pursuant to a registration statement. But it restricts those damages, including by allowing defendants to limit or defeat claims for damages that are not caused by any alleged misstatement or omission in the registration statement, also known as a "negative causation" defense. 15 U.S.C. § 77k (limiting statutory damages "if the defendant proves that any portion or all of such damages represents other than the

depreciation in value of such security resulting from [the alleged misstatement or omission] such portion of or all such damages shall not be recoverable"). Like other affirmative defenses, negative causation can supply a basis for dismissal as a matter of law where, as here, it can be established on the face of the complaint itself. *See In re Shoretel Inc. Sec. Litig.*, No. C 08–00271, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009) (negative causation defense can be resolved on a motion to dismiss "if the facts as alleged by plaintiffs, and documents which the court may take judicial notice of, establish the affirmative defense as a matter of law").

As set forth above, the TAC makes clear that investors' reactions to news of the North Bay Fires and the Camp Fire (and the attendant losses) were informed by PG&E's own warnings about its wildfire risk, rather than by the revelation of a concealed risk. The Ninth Circuit has not adopted this "zone of risk" approach, which "recognizes loss causation where a plaintiff shows that 'misstatements and omission[s] concealed the price volatility risk (or some other risk) that materialized and played some part in diminishing the market value' of a security." *Nuveen Mun. High Income Opp'y Fund v. City of Alameda*, 730 F.3d 1111, 1120, 122 n.5 (9th Cir. 2013) (quoting *Lentell*, 396 F.3d at 176–77). Under this theory, "a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Id.* at 1120 (quoting *Lentell*, 396 F.3d at 173) (internal quotation marks and citations omitted). The TAC negates any inference of loss causation because the risk that materialized was not "concealed." *See id.* Indeed, PG&E fully disclosed its wildfire risk, and the market was so well conditioned by these warnings that, according to the TAC, news that the CPUC had simply sent a preservation notice to PG&E purportedly triggered a "drop in [its] stock reflect[ing] the following assumptions: 1) the fire was caused by [PG&E's] negligence, . . . and 4) material fines and penalties will be assessed." TAC ¶ 331 (citation omitted); *see also id.* ("We appreciate the severity of the fires and the legal challenges of operating in California, but estimate this loss of value as approaching a worse-case scenario for [PG&E] shares.'" (citation omitted)). There can be no loss causation where, like here, investors were warned about the very risk that later materialized. *See, e.g.*, *Bartesch v. Cook*, 941 F. Supp. 2d 501, 513 (D. Del. 2013) ("[P]laintiff's theory under the

1   materialization of risk test fails because 'substantial indicia of the risk that materialized are

2   unambiguously apparent on the face of the disclosures alleged to conceal the very same risk.'"

3   (quoting *Lentell*, 396 F.3d at 177)); *Prime Mover*, 898 F. Supp. 2d at 685–86  (same).

4                   **4.      The Securities Act Plaintiffs Have No Damages**

5          The Securities Act Plaintiffs are also not able to plead damages or economic losses.  Courts

6   across the nation follow the principle that the securities laws exist "not to provide investors with

7   broad insurance against market losses, but to protect them against those economic losses that

8   misrepresentations actually cause."  *Dura Pharms.*, 544 U.S. at 345.

9          The operation of Section 11's statutory damages provides specific limits that prevent any

10  overcompensation of purchasers of registered securities and reflect Congress's intention that

11  liability under the statute should be narrow and limited.  Under Section 11 of the Securities Act,

12  damages are typically calculated as "the difference between the amount paid for the security (not

13  exceeding the price at which the security was offered to the public) and "the ***value*** thereof as of

14  the time such suit was brought."[27]  If the security is sold before the suit was brought, the maximum

15  statutory damages allowed would be the difference between the purchase price and sale price,

16  which is then limited by defenses that separate any alleged misstatement from those damages—

17  *e.g.*, negative causation, lack of reliance, or proof that the purchaser had knowledge of the

18  misstatement or omission at the time of their purchase.  Section 11 does not permit recovery of

19  any measure of statutory damages where there is no "depreciation in value of such security"

20  attributable to the alleged misstatements, regardless of whether the security is held or sold.  15

21  U.S.C. § 77k(e).  The Securities Act Plaintiffs are not entitled to statutory damages here.

22         It is axiomatic that under Section 11(e), "the value of a security may not be equivalent" to

23  the price at which it is sold.  *See McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048

24  (2d Cir. 1995).  "Congress' use of the term 'value,' as distinguished from the terms 'amount paid'

25  and 'price' indicates that, under certain circumstances, the market price may not adequately reflect

26

27  [27] 15 U.S.C. § 77k(e) (emphasis added).  Damages may be further limited if the security is sold

28  after a suit is filed but before judgment, in the event the sale price is greater than the value at the
    time the suit was brought—*i.e.*, using the sale price would result in less damages.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

the security's value." *Id.* at 1048–49. Where, as here, the "market price of the debenture was temporarily depressed by panic selling in response to" an event, courts will use the actual value of the security at the time of the lawsuit—and not some sale price—to calculate damages. *Beecher v. Able*, 435 F. Supp. 397, 403 (S.D.N.Y. 1975). In *Beecher*, the defendant argued that the market price of the debentures did not reflect their actual value because the plaintiffs engaged in panic selling after the defendant's disappointing earnings were released. *Id.* As evidence of panic selling, the defendant pointed to the fact that the market price of the debentures was temporarily depressed for months while debtholders overreacted to the news, and then the debentures recovered and remained at or above par throughout the next calendar year. *Id.* The court agreed with the defendant, finding "that the market price on the day of suit was characterized by panic selling," and that the market price was "artificially lowered" as a result. *Id.* at 405. To calculate damages, therefore, the court added 9.5 points to the market price of the debentures to reach the "fair value" of the debentures. *Id.* at 406.

The Securities Act Plaintiffs do not plead any facts that could establish that the *value* of their debt securities changed, nor can they. As the Court is aware, pursuant to the Plan, all the notes at issue were either paid in full or reinstated. *See* Plan §§ 1.228, 1.240, 1.246, 4.19 (defining the at-issue notes as "Utility Reinstated Senior Note[s]," which are "unimpaired"); *see also id.* § 6.13(a) ("[N]one of the . . . Utility Reinstated Senior Note Documents . . . shall be cancelled pursuant to the Plan."); Jeffrey J. Haas, *Corporate Finance* 66 (2d ed. 2021) (explaining method for calculating value of bonds in secondary market). Therefore, the value of those notes to the holder—in the form of the right to future payments—never changed. *Id.* And if the value of the notes never changed, there can be no economic loss. Consequently, there are no damages here under Section 11's statutory calculations, and the Securities Act Plaintiffs cannot state a claim for relief.

**5.** **The Securities Act Plaintiffs Have Failed To Plead Reliance As Required For Certain Aftermarket Purchases Related To The March 2016 Notes**

Section 11 limits liability for "after-market" purchases—i.e., purchases of notes in the secondary market—because it no longer makes sense to presume the purchase was based on the content of the registration statement. Specifically, there is no right of recovery for purchases made "after the issuer"—here, PG&E—has published "an earning statement covering a period of at least twelve months after the effective date of the registration statement," unless plaintiffs plead and prove that they relied on any alleged "untrue statement." 15 U.S.C. 77k(a); *see also In re Metro. Sec. Litig.*, 532 F.Supp.2d 1260 (E.D. Wash. 2007); ); *Lee v. Ernst & Young, LLP,* 294 F.3d 969, 977 (8th Cir. 2002) (explaining that alleging reliance is "a requirement for certain aftermarket purchasers").

None of the Securities Act Plaintiffs purchased notes in any of the offerings themselves; they are aftermarket purchasers. The Securities Act Plaintiffs each challenge the alleged representations in each of "PG&E's Prospectuses filed on February 24, 2016, November 29, 2016, March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration statement" as well as other documents incorporated by reference. TAC ¶ 630. Under SEC Rule 430(B), the "effective date" of the registration statement is the date on which the prospectus is filed. Plaintiff York purchased notes from the March 2016 Offering, which has an effective date of February 24, 2016. *Id.* PG&E issued its earnings covering the twelve-month period from January 1, 2017, through January 1, 2018, in its 2017 10-K filed with the SEC on February 9, 2018. Ex. 6 (2017 Form 10-K). York bought the March 2016 Notes after this, in May 2018. *See* TAC, Attachment B. Because the TAC fails to plead that any of the Securities Act Plaintiffs relied on any of the registration statements pursuant to which those securities were issued, York's claims relating to the 2016 Notes Offering must be dismissed. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 386 (S.D.N.Y. 2015) (dismissing Section 11 claims "based on Notes purchased after the original registration statements").

6.      **Claims Based On The 2018 Offerings Fail As A Matter Of Law**
        **Because Section 11 Does Not Provide Liability For Private Offerings**

Notes acquired in the April 2018 Exchange Offer are the only notes at issue that are not time barred.  But claims based on the Exchange Offer fail as a matter of law because it was not an independent offering of PG&E notes, and the law is clear that "Section 11 liability, which applies to misstatements or omissions in registration statements, is not available for [private] offerings." *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 975 (N.D. Cal. 2007).

Indeed, PG&E offered to "exchange equal principal amounts of . . . Exchange Notes [for] Restricted Notes," which "Exchange Notes are identical in all material respects to those of the outstanding Restricted Notes, except that the transfer restrictions, registration rights and additional interest provisions relating to the Restricted Notes do not apply to the Exchange Notes."  Ex. 22 (Apr. 13, 2018 S-3) at 1.18.  Plaintiffs York and Warren are alleged to have purchased PG&E 2017 Restricted Notes in private placements and exchanged their notes in the Exchange Offer.  *See* TAC, Attachments B & C.  Claimants that exchanged previously owned notes cannot renew their claims by trading in notes in private placements.  *See, e.g.*, *In re Levi Strauss*, 527 F. Supp. 2d at 975. Nor can York and Warren assert a Section 11 claim based on purported misrepresentations in connection with the Exchange Offer's Offering Documents:  "Because the unregistered bondholders had already invested in [unregistered] bonds through the [private] offerings, they were not presented with the decision of whether or not to purchase [registered] bonds pursuant to the registration statement."  *Id.* at 978 (dismissing Section 11 claims related to exchanged notes because "alleged misstatements and omissions would not have been material to the unregistered bondholders' decision whether to exchange unregistered notes they had already chosen to purchase"); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 619 (S.D.N.Y. 2007) (dismissing exchange offer Section 11 claims as non-actionable due to either a lack of materiality or a lack of reliance); *In re Safety–Kleen Corp.*, No. C/A 3:00–1145–17, 2002 WL 32349819, at *1 (D.S.C. Mar. 27, 2002) (dismissing exchange offer Section 11 claims for lack of reliance and damages).

**D.** **The Securities Act Plaintiffs' Derivative Section 15 Claims Must Also Be Dismissed**

The Securities Act Plaintiffs also assert a claim against PG&E Corporation under Section 15 of the Securities Act. "[T]o state a claim against a control person under Section 15, the Securities Act Plaintiffs must plausibly allege (1) an underlying violation of Section 11 and (2) control." *Greenberg*, 233 F. Supp. 3d at 772 (dismissing claims under both Section 11 and Section 15); *see also* 15 U.S.C. § 77o(a). Because the Securities Act Plaintiffs have failed to plead an underlying violation of Section 11, their Section 15 claim also fails. *See Primo v. Pac. Biosciences of Cal., Inc.,* 940 F. Supp. 2d 1105, 1130–31 (N.D. Cal. 2013) (dismissing Section 15 claims).

**V.** **THE CLAIMANTS WHO HOLD UTILITY SENIOR NOTES CLAIMS RELEASED THEIR SECURITIES CLAIMS UNDER THE PLAN AND CONFIRMATION ORDER**

Section 10.9(b) of the Joint Chapter 11 Plan of Reorganization, ECF No. 8048 (the "**Plan**"), and ¶ 56 of the Confirmation Order, ECF No. 8053, bar certain of the Securities Act Plaintiffs (identified in **Exhibit A** (the "**Releasing Securities Act Plaintiffs**")) from recovering on their Securities Claims. To reach this conclusion, the Court need only consider two questions, both of which are answered by the plain language of the Plan and the Confirmation Order. First, are the Releasing Securities Act Plaintiffs "Releasing Parties" under the Plan? Second, does the scope of the release in Section 10.9(b) of the Plan and ¶ 56 of the Confirmation Order cover their Securities Claims? The answer to both questions is "yes" for the same reasons articulated by this Court and the appellate courts with respect to other claims asserted by Releasing Parties. *See In re PG&E Corp.*, No. 19-30088, 2020 WL 9211213, at *3 (Bankr. N.D. Cal. Oct. 22, 2020) ("*Elliott I*"), *aff'd sub nom.*, No. 20-CV-07865-HSG, 2022 WL 794815 (N.D. Cal. Mar. 15, 2022 (N.D. Cal. Mar. 15, 2022) ("*Elliott II*"), *aff'd sub nom.*, No. 22-15560, 2023 WL 2064520 (9th Cir. Feb. 17, 2023) ("*Elliott III*").

**A.** **The Releasing Securities Act Plaintiffs Are "Releasing Parties" Under The Plan**

Section 1.180 of the Plan defines the term "Releasing Parties" to include "the holders of Utility Senior Note Claims." Utility Senior Note Claims are defined by the Plan as, "collectively, Utility Impaired Senior Note Claims, Utility Reinstated Senior Note Claims, and Utility Short-Term Senior Note Claims." Plan § 1.245. Each of these is in turn very broadly defined as "any Claim arising under, or related to" the specific senior debt instrument under which the specific type of note (Utility Impaired Senior Note, Utility Reinstated Senior Note and Utility Short-Term Senior Notes) was issued and which governs that note. Plan §§ 1.227, 1.238, 1.250.

The Releasing Securities Act Plaintiffs are holders of Utility Senior Notes as defined in Section 1.246 of the Plan. McWilliams Decl. ¶ 4; Ferrante Decl. ¶¶ 7-8. Each such claimant, therefore, was provided the treatment of the Utility Senior Note Claims under the Plan. Notably, all Utility Senior Note Claims either have been reinstated or are otherwise being paid in full, with pre- and post-petition interest, pursuant to the Plan.

Because the Releasing Securities Act Plaintiffs are all "holders of Utility Senior Note Claims," they are "Releasing Parties" under the Plan.

**B.** **The Plan Release Expressly Covers Securities Claims**

Section 10.9(b) of the Plan provides, in relevant part, that:

> As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents . . . and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties, are deemed **forever released and discharged**, to the maximum extent permitted by law and unless barred by law, by the Releasing Parties **from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever** . . . that such holders . . . would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, **based on or relating to, or in any manner arising from** . . . the **purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors,** the subject matter of, or the transactions or events giving rise to, **any Claim or Interest that is treated in the Plan** . . . .

1    Plan § 10.9(b) (emphasis added).[28]

2           Section 10.9(b) plainly covers securities claims. It covers "any and all" claims against the

3    Debtors and Reorganized Debtors "based on or relating to, or in any manner arising from . . . the

4    purchase, sale, or rescission of the purchase or sale of **any Security** of the Debtors or the

5    Reorganized Debtors," as well as "the subject matter of, or the transactions or events giving rise

6    to, **any Claim or Interest** that is treated in the Plan." *Id.* (emphasis added). Notably, the broad

7    definition of "Security" includes both debt and equity securities. *See* 11 U.S.C. § 101(49); *see*

8    *also* Plan § 1.194 (defining "Security" to have "the meaning set forth in section 101(49) of the

9    Bankruptcy Code"). Indeed, as this Court has previously found, Section 10.9(b) of the Plan does

10   not have any "limitation on the extent and breadth of what has been released." *Elliott I*, 2020 WL

11   9211213, at *3. The securities claims asserted by the Releasing Securities Act Plaintiffs based on

12   transactions in the Debtors' debt and equity securities thus plainly fall within the broad purview

13   of claims released under the Plan and Confirmation Order.

14          The exceptions to Section 10.9(b)—for (1) "rights that remain in effect from and after the

15   Effective Date to enforce the Plan and the Plan Documents," or for (2) rights "otherwise provided

16   in the Plan"—do not apply to the Securities Claims for the same reasons that have been determined

17   by this Court, the District Court, and the Ninth Circuit. Earlier in this case, this Court dismissed

18   an administrative expense claim asserted by a Releasing Party because it plainly fell within the

19   scope of Section 10.9(b). *Elliott I*, 2020 WL 9211213, at *4. Both the District Court and the Ninth

20   Circuit affirmed, also agreeing that neither of the above exceptions applied. *Elliott III*, 2023 WL

21   2064520 at *1–2; *Elliott II*, 2022 WL 794815, at *4–7.

22          The same result is warranted here for the same reasons. The first exception—for "rights

23   that remain in effect from and after the Effective Date to enforce the Plan and the Plan

24   Documents"—does not apply to the securities claims. The Ninth Circuit's analysis on this

25   exception in *Elliott III* could not have been more straightforward. The Court held that the first

26

27   _____

28   [28] The Plan defines "Released Parties" to include both the Debtors and the Reorganized Debtors.
     Plan § 1.179. In addition, Section 10.9(b) of the Plan has a corresponding provision in the
     Confirmation Order. *See* ECF No. 8053 ¶ 56.

exception did not apply just because the claimant was seeking to bring a claim that was expressly contemplated by the Plan, *i.e.*, an administrative claim, because the claimant was seeking to enforce a separate contract, which "is neither the 'Plan' nor a 'Plan Document.'" *Elliott III*, 2023 WL 2064520 at \*2. Similarly, here, the securities claims asserted by the Releasing Securities Act Plaintiffs do not seek to enforce the Plan or any Plan Document. Rather, they seek damages based on alleged prepetition violations of the federal securities laws. Indeed, the Plan did not even exist at the time the Securities Claims arose. The first exception therefore does not apply.

The second exception—for rights "otherwise provided in the Plan"—is similarly inapplicable. In *Elliott III*, the Ninth Circuit held that this exception also did not apply because Sections 2.1 and 1.4 of the Plan preserve only "allowable" administrative expense claims, and the breach of contract claim was not "allowable" because it had been released. 2023 WL 2064520 at \*1. Indeed, the Ninth Circuit expressly stated that this Court had "properly consulted other Plan provisions, including the Release Provision," to "determine if a claim is allowable." *Id.* Like Section 2.1 (the treatment provision at issue in *Elliott*), Sections 4.12, 4.14, and 4.32 of the Plan merely establish "procedure[s] for satisfaction" of "Allowed" Securities Claims.[29] *See id.* The Releasing Securities Act Plaintiffs do not hold any "Allowed" Securities Claims (as defined Section 1.7 of the Plan) because they released any and all claims based on transactions involving "any Security of the Debtors or Reorganized Debtors." *See* Plan § 10.9(b). They **also** released their right to bring claims based on or in any way arising from "the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan." *Id.*

---

[29] *See* Plan § 4.12 ("[E]ach holder of an *Allowed* HoldCo Subordinated Debt Claim shall receive Cash in an amount equal to such holder's *Allowed* HoldCo Subordinated Debt Claim.") (emphasis added); *id.* § 4.14 ("[E]ach holder of an *Allowed* HoldCo Rescission or Damage Claim shall receive a number of shares of New HoldCo Common Stock equal to such holder's HoldCo Rescission or Damage Claim Share.") (emphasis added); *id.* § 4.32 ("[E]ach holder of an *Allowed* Utility Subordinated Debt Claim shall receive Cash in an amount equal to such holder's *Allowed* Utility Subordinated Debt Claim.") (emphasis added); *see also id.* § 2.1 ("[E]ach holder of an *Allowed* Administrative Expense Claim shall receive . . . an amount in Cash equal to the *Allowed* amount of such Administrative Expense Claim . . . .") (emphasis added).

1      Accordingly, the securities claims asserted by the Releasing Securities Act Plaintiffs

2 should be dismissed because they are barred by the release provisions of the Plan and the

3 Confirmation Order.

4 **VI.**     **CONCLUSION**

5      As set forth above, PERA and the Securities Act Plaintiffs have failed to state a claim under

6 the Exchange Act or the Securities Act, respectively. Because these plaintiffs have had every

7 opportunity to amend their claims, but have repeatedly stood by them and chose not to amend,

8 their claims should be dismissed with prejudice, just as the claims were dismissed with prejudice

9 in *Edison*. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990).

10      PG&E respectfully requests entry of an order (i) disallowing and expunging the claims

11 listed on Exhibit A hereto, and (ii) granting such other and further relief as the Court may deem

12 just and appropriate.

13

14 Dated: December 13, 2023                Respectfully submitted,

15

16                                 **WEIL, GOTSHAL & MANGES LLP**
                                **KELLER BENVENUTTI KIM LLP**

17                                 **LATHAM & WATKINS LLP**

18                               By:  */s/ Joshua G. Hamilton*

19                               Joshua G. Hamilton

20

21                               Attorneys for Debtors and Reorganized
                              Debtors

22

23

24

25

26

27

28

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW