**WEIL, GOTSHAL & MANGES LLP**
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel:     (212) 310-8000
Fax:     (212) 310-8007

**KELLER BENVENUTTI KIM LLP**
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
Thomas B. Rupp (#278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, CA 94105
Tel: (415) 496-6723
Fax: (650) 636 9251

**LATHAM & WATKINS LLP**
Joshua G. Hamilton (#199610)
(joshua.hamilton@lw.com)
Michael J. Reiss (#275021)
(michael.reiss@lw.com)
10250 Constellation Blvd., Suite 1100
Los Angeles, California  90067
Tel: 424 653 5500

**LATHAM & WATKINS LLP**
James E. Brandt (*pro hac vice*)
(james.brandt@lw.com)
1271 Avenue of the Americas
New York, NY 10020
Tel: 212 906 1200

*Attorneys for the Debtors and Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**REORGANIZED DEBTORS' THIRTY-FOURTH SECURITIES CLAIMS OMNIBUS OBJECTION TO CLAIMS ADOPTING RKS AMENDMENT** |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................1

II.  THE RKS CLAIMANTS' CLAIMS AND ADDITIONAL ALLEGATIONS ..................3

   A.   The RKS Claimants' Claims Largely Track PERA's Claims. ...............................3

   B.   The RKS Claimants Rely On 10 Additional Alleged Misstatements. .....................4

      1.   General Statements Regarding Safety Efforts And Improvements ............5

      2.   Statement Regarding Compliance ................................................................5

      3.   Statements Regarding Specific Safety Initiatives .......................................6

   C.   The RKS Claimants Assert The Same Section 11 Allegations As PERA. .............8

III. THE RKS CLAIMANTS' EXCHANGE ACT CLAIMS FAIL ........................................9

   A.   The RKS Claimants Fail To Plead That Any Statement Was False Or
        Misleading .............................................................................................................10

      1.   The RKS Claimants Fail To Meet Their Burden To Plead That
           Statements Containing Generalizations Regarding PG&E's Safety
           And Risk Mitigation Efforts Were Materially False (RKS Stmts.
           20-22, 25, 27) ............................................................................................11

      2.   The RKS Claimants Fail To Plead That Statements Regarding
           Compliance Were Materially False  (RKS Stmt. 28) ...............................14

      3.   The RKS Claimants Fail To Plead That Statements Regarding
           PG&E's Safety Practices Were Materially False (RKS Stmts. 20,
           23-24, 26, 29) ............................................................................................16

      4.   The RKS Claimants' Additional Allegations Fail To Identify Any
           Concealed Risk Of Wildfire, Let Alone Liability .....................................21

   B.   The RKS Claimants Fail To Plead Scienter ..........................................................22

      1.   Allegations Regarding Specific Deficiencies Do Not Establish
           Scienter .....................................................................................................23

      2.   Later Statements In Judicial And Criminal Proceedings Do Not
           Support A Strong Inference Of Scienter ...................................................25

C.    The RKS Claimants Do Not Establish They Relied On The Alleged Misstatements. ................................................................................26

D.    The RKS Claimants' Allegations Regarding Loss Causation Fail For The Same Reasons That PERA's Allegations Fail. ...........................................29

E.    The RKS Claimants' Scheme Liability Claim Fails. ...............................................31

IV.    THE RKS CLAIMANTS' SECURITIES ACT CLAIMS FAIL .....................................32

V.    CONCLUSION ..............................................................................................................35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affiliated Ute Citizens of Utah v. U.S.*,
    406 U.S. 128 (1972) ........................................................................................................28

*In re Apple Computer, Inc.*,
    127 F. App'x 296 (9th Cir. 2005) ...................................................................................24

*Barnes v. Edison Int'l*,
    No. 21-55589, 2022 WL 822191 (9th Cir. 2022) ...........................................................16

*Barnes v. Edison Int'l*,
    No. CV 18-0690 CBM, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ..........................16, 33

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................................27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................21

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) .......................................................................................28

*In re BofI Holding, Inc. Sec. Litig.*,
    No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23, 2017) .........20, 21, 22

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ..................................................................................27, 28

*Curry v. Yelp Inc.*,
    2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017) .18, 20, 21

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) .......................................................................................11

*Danan v. Outform Inc.*,
    2019 WL 6771828 (N.D. Cal. Dec. 12, 2019) ...............................................................21

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ...................................................................................10, 32

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .....................................................................................................9, 26

*In re Facebook, Inc. Sec. Litig.*,
    477 F. Supp. 3d 980 (N.D. Cal. 2020) ...........................................................................16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Gaines v. Haughton*,
  645 F.2d 761 (9th Cir. 1981) ............................................................................................19

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ......................................................................................10, 23

*Haideri v. Jumei Int'l Holding Ltd.*,
  No. 20-CV-02751-EMC, 2021 WL 4170791 (N.D. Cal. Sept. 14, 2021) ..............................23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)............................................................................................................27

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019) ................................................................................23

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ...........................................................................................................24

*In re Kalobios Pharms., Inc. Sec. Litig.*,
  258 F. Supp. 3d 999 (N.D. Cal. 2017) ................................................................................27

*Kang v. PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022) ................................................................................32

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...........................................................................................9, 13

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
  2022 WL 2119122 (N.D. Cal. 2022) ...................................................................................29

*In re LifeLock, Inc. Sec. Litig.*,
  690 F. App'x 947 (9th Cir. 2017) ...................................................................................13, 19

*Linenweber v. Sw. Airlines Co.*,
  2023 WL 6149106 (N.D. Tex. Sept. 19, 2023).....................................................................32

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).........................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .........................................................................................................18, 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ............................................................................................29

*Mineworkers Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ..............................................................................................29

*Mucha v. Volkswagen AG*,
  540 F. Supp. 3d 269 (E.D.N.Y. 2021) .................................................................................12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ...................................................................................10, 29

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) .................................................................................24

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2019) ...............................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................................18

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018).....................................................................12

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ...............................................................9, 11, 27, 30

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) .....................................................................................14

*Plumley v. Sempra Energy*,
    2017 WL 271229 (S.D. Cal. June 20, 2017)...........................................................12

*Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019) ..........................................................................12

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..................................................................11, 12, 20, 26

*Prodanova v. H.C. Wainright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) .........................................................................24, 25

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ..............................................................................27

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) .....................................................................3, 11, 31

*In re Rigel Pharmaceuticals, Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .................................................................................23

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)........................................................................................19, 32

*SEC v. Curshen*,
    888 F. Supp. 2d 1299 (S.D. Fla. 2012) ..................................................................32

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) .....................................................................................32

*SEC v. Rubera,*
    350 F.3d 1084 (9th Cir. 2003) ...................................................................26

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999), *as amended* (Aug. 4, 1999), *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130 (9th Cir. 2017).26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ...........................................................................9, 10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.,*
    2 F.4th 1199 (9th Cir. 2021) ............................................................28, 29

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.,*
    2017 WL 6041723 (N.D. Cal. Dec. 6, 2014) ........................................24

*Weston Fam. P'ship LLLP v. Twitter, Inc.,*
    29 F.4th 611 (9th Cir. 2022) ......................................................9, 16, 21

*In re Worlds of Wonder Sec. Litig.,*
    35 F.3d 1407 (9th Cir. 1994) ...............................................................20

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ..........................................................24, 25

## STATUTES

15 U.S.C.
    § 77k(a) .............................................................................................34
    § 77m .................................................................................................33
    § 78u-4(b)(1)(A)-(B) ...........................................................................9

California Penal Code
    § 192(b) .............................................................................................26
    § 452 ..................................................................................................25

## REGULATIONS

17 C.F.R.
    § 280.10b-5(a) ...................................................................................31
    § 280.10b-5(c) ...................................................................................31

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| Alleged Relevant Period | April 29, 2015, through November 15, 2018 |
| Baupost | Baupost Group Securities, L.L.C. |
| Cal Fire | California Department of Forestry and Fire Protection |
| CEMA | Catastrophic Event Memorandum Account |
| CPUC | California Public Utilities Commission |
| District Court Action | *In re PG&E Corporation Securities Litigation*, No. 5:18-cv-03509 (N.D. Cal.) |
| *Edison I* | *Barnes v. Edison Int'l*, No. CV 18-09690 CBM, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) |
| *Edison II* | *Barnes v. Edison Int'l*, No. 21-55589, 2022 WL 822191 (9th Cir. 2022) |
| Edison or SCE | Southern California Edison |
| ESRB | Electric Safety and Reliability Branch of the CPUC's Safety and Enforcement Division |
| ESRB-4 | A June 2014 resolution promulgated by the ESRB |
| ESRB-8 | A July 2018 resolution promulgated by the ESRB |
| Exchange Act | Securities Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Exchange Offer | PG&E's April 2018 exchange offer |
| FAC | Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed by PERA in the District Court Action on November 9, 2018 |
| FERC | Federal Energy Regulatory Commission |
| GRC | General Rate Case |
| Mid-Jersey | Mid-Jersey Trucking & Local 701 Pension Fund |
| Notes Offerings | PG&E's note offerings in March 2016, December 2016, and March 2017 |
| Offering Documents | Registration statements, prospectuses and prospectus supplements filed with the SEC in connection with the Notes Offerings and Exchange Offer |

| Defined Term | Definition |
|---|---|
| PERA | Public Employees Retirement Association of New Mexico |
| PERA Objection or PERA Obj. | Reorganized Debtors' 33rd Securities Omnibus Claims Objections To PERA's TAC, Including to Certain Claimants that Adopted the TAC |
| PG&E | PG&E Corporation and Pacific Gas and Electric Company (the "Utility") are referred to as "PG&E" solely for purposes of the Objections |
| Plan | Joint Chapter 11 Plan of Reorganization |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| RKS | The law firm of Rolnick Kramer Sadighi LLP |
| RKS Amendment or RKS Am. | The Amended Statement of Claim on Behalf of the RKS Claimants |
| RKS Claimants | Claimants represented by RKS in this matter, and also any non-RKS-represented claimants that adopted, in whole or in part, the allegations in the RKS Amendment |
| RKS Objection or RKS Obj. | Reorganized Debtors' 34th Securities Omnibus Claims Objections To RKS Amendment, Including to Certain Claimants that Adopted the RKS Amendment |
| SAC | Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed by PERA in the District Court Action on December 14, 2018 |
| SEC | Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |
| Securities Act Plaintiffs | County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking & Local 701 Pension Fund |
| SED | CPUC's Safety Enforcement Division |
| Supplemental Baupost Obj. | Reorganized Debtors' 35th Securities Omnibus Claims Objections To Baupost's Supplemental Proof Of Claim |
| Supplemental POC or Supp. POC | The Supplemental Proofs of Claim filed by Baupost as Claim Nos. 109847 and 109848, which adopted and incorporated the allegations in the TAC and added additional substantive allegations, attached as Exhibit 113 to the accompanying Request for Judicial Notice |

| Defined Term | Definition |
|---|---|
| TAC | Third Amended Complaint filed by PERA and the Securities Act Plaintiffs in the District Court Action, attached as Exhibit 92 to the accompanying Request for Judicial Notice |
| Warren | City of Warren Police and Fire Retirement System |
| York | County of York Retirement Fund |

PG&E Corporation and Pacific Gas and Electric Company, the debtors and reorganized debtors in the above-captioned chapter 11 cases (referred to together, solely for purposes of this Objection, as "**PG&E**"), file this supplemental claims objection to the Amended Statement of Claim on Behalf of the RKS Claimants[1] (the "**RKS Amendment**" or "**RKS Am.**"). PG&E adopts and fully incorporates the facts and arguments in its Omnibus Claim Objection to PERA's TAC[2] (the "**PERA Objection**" or "**PERA Obj.**").

PG&E files this objection, pursuant to section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, Bankruptcy Local Rule 3007-1, and the Securities ADR Procedures Order, seeking entry of an order disallowing and/or expunging the proofs of claims identified in the column headed "Claim(s) to be Disallowed and Expunged" on **Exhibit A** annexed hereto.[3]

## I. INTRODUCTION

The RKS Claimants are a group of purported securities claimants—largely consisting of sophisticated investment funds—that implausibly allege PG&E's public statements regarding its fire safety efforts concealed the risk of catastrophic wildfires. The reality, however, is that PG&E at all times disclosed that very risk in its public statements and filings. The RKS Claimants, who owned PG&E securities at the time of the fires, nonetheless seek to transfer to PG&E's current stockholders—many of whom are actual fire victims—the burden of covering the losses they suffered because they were owners when the fires occurred. But the federal securities laws do not

---

[1] For purposes of this Objection, "**RKS**" refers to the law firm of Rolnick Kramer Sadighi LLP, and the "**RKS Claimants**" refers to claimants represented by RKS in this matter, and also any non-RKS-represented claimants that adopted, in whole or in part, the allegations in the RKS Amendment. All such claimants and claims are listed in **Exhibit A**.

[2] Definitions for terms not otherwise defined herein can be found in the PERA Objection and in the Glossary in this Objection.

[3] In accordance with Paragraph I.E of the Securities Omnibus Objection Procedures, **Exhibit A** hereto provides the following information: (i) an alphabetized list of the Claimants whose claims are subject to this Objection; (ii) the claim numbers of the claims that are the subject of this Objection; (iii) the amount of the claim asserted in each claim, or a statement that the claim seeks an unliquidated amount; and (iv) the grounds for this Objection. Upon the establishment of a hearing date and briefing schedule for this Objection, PG&E will provide notice to the claimants, the form of which will satisfy the requirements set forth in Paragraph I.F of the Securities Omnibus Objection Procedures.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

insure against market losses. The RKS Claimants' claims fail to plead a claim under the securities laws. They were required to meet the exacting burden of pleading a violation of the securities laws, including that PG&E made material false statements, with scienter, that they relied upon, and which caused them to suffer damages. The RKS Amendment—which largely relies on the same allegations and theories as the TAC—falls far short of satisfying that burden. Accordingly, their claims should be dismissed.

Like the claims alleged in the TAC, the RKS Amendment alleges claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, and under Sections 11 and 15 of the Securities Act, to recover purported losses on the RKS Claimants' investments in PG&E. PG&E has moved to dismiss all of the claims in the TAC, demonstrating why those claims must be dismissed for failure to state a claim under the securities laws. *See generally* PERA Obj. The RKS Amendment should likewise be dismissed. In an effort to overcome the TAC's shortcomings, the RKS Claimants add a handful of new claims (*i.e.*, alleged misstatements or omissions) and other allegations, and then slightly alter PERA's theory of fraud. As demonstrated by the deficiencies of their (and PERA's) allegations, there is no plausible theory of securities fraud that rests on PG&E's statements regarding its fire safety efforts during the Alleged Relevant Period.

- All of the alleged additional false statements the RKS Claimants add to support their Section 10(b) claim were made *after* the North Bay Fires—*i.e.*, after the public was aware that Cal Fire concluded that PG&E caused the Butte Fire, after PG&E's equipment ignited several North Bay Fires, and after PG&E suspended its annual shareholder dividend based on uncertainty about liability from the North Bay Fires. The RKS Claimants' theory assumes, implausibly, that the heightened risk of PG&E liability for wildfires was not known *even after the North Bay Fires*, and was only revealed when the Camp Fire started. The RKS Claimants plead these statements without the proper context and ask this Court to interpret PG&E's statements as promises that wildfire risks and the attendant potential liability were fully mitigated. This theory is not only implausible on its face, it is also inconsistent with PG&E's other detailed disclosures.

1      • The RKS Claimants improperly substitute public officials' hindsight-based criticism of

2      PG&E's business practices and corporate oversight for any facts showing that PG&E's

3      statements were false when made.

4      • Finally, the RKS Claimants allege that PG&E's guilty plea to claims of involuntary

5      manslaughter related to the Camp Fire (that this Court approved as a settlement with

6      the Butte County District Attorney's Office) establishes both that PG&E concealed its

7      criminal conduct before the Camp Fire, and that PG&E made the alleged misstatements

8      with scienter because it made them "recklessly." The critical inquiry under the

9      securities laws is whether a statement was "false when made," and whether it was made

10      intentionally or with "deliberate recklessness." The guilty plea to different counts

11      under different standards of *mens rea* does not support a strong inference of scienter

12      here.

13      The RKS Claimants' additional allegations do nothing to strengthen the claims asserted in

14 the TAC. Instead, the new allegations further illuminate the deficiencies in all claimants' securities

15 claims which, at their core, are about whether PG&E should have done more to prevent wildfires,

16 not about whether investors were misled. *Retail Wholesale & Dep't Store Union Local 338 Ret.*

17 *Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).

18      There is no doubt that the wildfires that rampaged through Northern California in 2015,

19 2017, and 2018 were tragic. But that is not a valid basis for a securities fraud claim. PG&E warned

20 investors of these exact risks, and investors like the RKS Claimants took that risk with eyes wide

21 open. That the risk materialized and investors lost money is unfortunate, but not actionable under

22 the securities law statutes upon which the RKS Claimants' claims are based. The Court should

23 sustain PG&E's objection, and dismiss and expunge the RKS Claimants' claims.

24 **II.    THE RKS CLAIMANTS' CLAIMS AND ADDITIONAL ALLEGATIONS**

25      **A.    The RKS Claimants' Claims Largely Track PERA's Claims.**

26      The RKS Amendment mirrors the TAC, as it must, because PG&E made the same

27 disclosures to all investors. In fact, it is evident that the RKS Claimants essentially copied and

28 pasted large swaths of the TAC into the RKS Amendment. *Compare, e.g.*, TAC ¶¶ 633-49, *with*

RKS Am. ¶¶ 375-93.[4]  Unsurprisingly then, the RKS Claimants allege that the "Relevant Period" is between April 29, 2015 and November 15, 2018—the same timeframe PERA alleges.  RKS Am. ¶ 7.

Specifically, and just like PERA, the RKS Claimants assert claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder, and they likewise allege that PG&E Corporation is liable as a control person under Section 20(a) of the Exchange Act.  RKS Am. ¶¶ 622-33, 645-53.  The RKS Claimants have asserted one additional claim under Section 10(b) and SEC Rules 10b-5(a) and (c) promulgated thereunder, alleging that PG&E engaged in a "fraudulent scheme to deceive the investing public" through the same alleged misstatements by concealing the real risk of wildfires and liability.  *Id.* ¶¶ 634-44.[5]  The RKS Amendment incorporates PERA's 19 alleged misstatements and identifies 10 additional statements.  *Id.* ¶¶ 302, 307, 310, 313, 316, 338, 340, 346, 349, 363.

In addition, and again like PERA, the RKS Claimants bring claims under Section 11 of the Securities Act based on allegations that PG&E made materially false or misleading statements in the same four notes offerings.[6]  RKS Am. ¶¶ 654-664.  The RKS Claimants too allege that PG&E Corporation is subject to control person liability under Section 15 of the Securities Act for any violation of Section 11.  RKS Am. ¶¶ 665-673.

## B.    The RKS Claimants Rely On 10 Additional Alleged Misstatements.

The RKS Claimants challenge the same 19 statements as those in the TAC.  For the reasons stated in the PERA Objection, those claims fail as a matter of law.  *See* PERA Obj. § III.C.  The RKS Claimants' 10 additional alleged misstatements add nothing beyond what PERA has already

---

[4] *Compare also* RKS Am. ¶¶ 231, 234, 242, 245, 252, 259, 264, 269, 277, 283, 290, 298, 320, 326, 335, 343, 353, 359, 366, *with* TAC ¶¶ 194, 197, 208, 211, 222, 233, 237, 241, 249, 258, 264, 271, 280, 287, 296, 300, 303, 309, 314.

[5] As discussed below, the RKS Claimants' second claim for scheme liability under Rules 10b-5(a) and (c) is factually and legally indistinguishable from its first claim for misstatement liability under Rule 10b-5(b), and therefore the claims are analyzed together.

[6] The offerings at issue are PG&E's (1) March 2016 public offering of senior notes; (2) December 2016 public offering of senior notes; (3) March 2017 public offering of senior notes; and (4) April 2018 public offering of senior notes.  RKS Am. ¶ 371 n.77.

alleged, and likewise should be dismissed.  The 10 additional statements fall into the same three categories as PERA's 19 statements: (1) general statements regarding safety efforts and improvements; (2) statements regarding compliance with law; and (3) statements regarding specific safety initiatives.

### 1.    General Statements Regarding Safety Efforts And Improvements

The RKS Claimants challenge two of PG&E's general statements about its safety efforts. The first was from a March 22, 2018, press release in which PG&E stated it was "[a]ugmenting . . . already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission."  RKS. Am. ¶ 310.  The second was from a PG&E executive who, on July 16, 2018, spoke regarding PG&E's safety efforts and improvements:

> "Over the last seven years, we have accomplished so much together on our journey to become one of the safest, most reliable energy companies in the country.  As a team, we've worked to improve our culture, augment our operations, upskill our people and, most importantly, improve public and employee safety."

RKS Am. ¶ 338 (emphasis omitted).

The press release is similar to PG&E's April 29, 2015 statement about "stepping up [its] vegetation management," TAC ¶ 194 (PERA Stmt. No. 1), and the executive's remarks are similar to PG&E's May 31, 2017 press release which mentioned PG&E's "commitment to safety and operational excellence," TAC ¶ 241 (PERA Stmt. No. 8), both of which PERA alleges are misleading.  None of these statements are actionable because they are general statements of corporate efforts, optimism, or puffery.  *See* PERA Obj. § III.C.1.c(1).

### 2.    Statement Regarding Compliance

The RKS Claimants challenge one new statement regarding PG&E's compliance with laws and regulations.  On October 1, 2018, a PG&E employee submitted written testimony to the Federal Energy Regulatory Commission ("**FERC**") describing the allocations of expenses in PG&E accounts for "Load Dispatching," "Overhead Line Expenses," and "Maintenance of Overhead Lines."  RKS Am. ¶¶ 41, 349.  As further described below, *see infra* § III.A.2, the RKS

Claimants blatantly mischaracterize this alleged misstatement as testimony that PG&E was "in compliance with all applicable rules, standards and regulations." *Id.* ¶ 41 (emphasis omitted).

### 3. Statements Regarding Specific Safety Initiatives

The RKS Claimants challenge additional statements regarding PG&E's safety practices, none of which differs materially from the statements PERA challenged, and which can be categorized into three groups: vegetation management; pole maintenance and inspection practices; and PG&E's Public Safety Power Shutoff Program pursuant to ESRB-8.

***Vegetation management***.  On the issue of vegetation management, the RKS Claimants claim the following additional statements were misleading:

- A statement by a PG&E arborist in a YouTube video posted on March 2, 2018 that "PG&E prunes and removes over a million trees every year to ensure that hazardous trees can't impact our lines.  And since the onset of the drought we've doubled our efforts."  RKS Am. ¶ 302 (emphasis omitted).

- A May 3, 2018 statement during an earnings call that PG&E had "more than doubled our annual spend to manage vegetation from roughly $190 million in 2013 to $440 million in 2017 and we increased the frequency of our patrols, particularly in high fire threat areas, but the new normal needs new solutions."  RKS Am. ¶ 316 (emphasis omitted).

These statements are similar to the November 2, 2017 statement that PERA challenges, in which PG&E's president stated that "over the last 2 years, we've doubled the amount that we've invested in veg[etation] management."  TAC ¶ 264-65 (PERA Stmt. No. 11) (brackets in original); *see also* PERA Obj. § III.C.1.c(2) (demonstrating that these statements were true).

***Pole maintenance and inspection practices***.  The RKS Claimants allege that three statements regarding PG&E's pole maintenance and inspection practices were misleading.  First, the RKS Claimants point to a March 22, 2018 press release:

- PG&E was "doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe," including by "investing in stronger, coated power lines, spacing lines further apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years."  RKS Am. ¶ 307 (emphasis omitted).

This alleged misstatement is similar to various statements in the PERA TAC, including PG&E's November 2, 2017 statement that "we routinely inspect, maintain and replace our electric

poles." TAC ¶ 258 (PERA Stmt. No. 10) (emphasis omitted); *see also* PERA Obj. § III.C.1.c(3) (showing that these statements were true).

The second statement is from a press release five days later on March 27, 2018:

- PG&E "inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times." RKS Am. ¶¶ 313 (emphasis omitted).

This statement is no different than the November 2, 2017 statement that PERA challenged, in which PG&E stated that "we inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year." TAC ¶ 264 (PERA Stmt. No. 11) (emphasis omitted); *see also* PERA Obj. § III.C.1.c(3) (explaining that these statements were true).

The RKS Claimants' third alleged misstatement regarding pole maintenance and inspection practices is from testimony by a PG&E employee submitted to FERC on October 1, 2018:

> Q. How is PG&E reducing transmission overhead conductor risk?
>
> A. PG&E is currently implementing four mitigations to reduce overhead conductor risk. The first two mitigations revolve around equipment replacement work: additional overhead conductor replacement and additional insulator replacement. Replacing additional conductors and insulators reduces the likelihood that those conductors and insulators will fail, therefore reducing the likelihood that those failures will lead to transmission wires down .
> . . .
>
> Q. Describe the Tower Replacement Program and how that will address the Transmission Risk.
>
> A. The Tower Replacement Program is established to manage the replacement of steel structures that have reached the end of their useful lives. The program targets replacement of deteriorated structures where repair is either less cost effective or not feasible.

RKS Am. ¶ 346; Ex. 82 (Gabbard Testimony) at 10-11. This statement is like PERA's May 25, 2018 alleged misstatement, where PG&E stated that it "meets or exceeds regulatory requirements for pole integrity management, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles." TAC ¶ 280 (PERA Stmt. No. 13) (emphasis omitted); *see also* PERA Obj. § III.C.1.d (explaining that statements regarding compliance with law are not actionable).

1       ***PG&E's Public Safety Power Shutoff Program pursuant to ESRB-8***. Finally, the RKS

2 Claimants challenge two additional statements regarding PG&E's Public Safety Power Shutoff

3 Program pursuant to ESRB-8:

- A statement in a September 2018 document summarizing PG&E's de-energization protocol adopted pursuant to California Public Utility Commission ("CPUC") Resolution ESRB-8 that PG&E was implementing "[d]isabling [of] automatic reclosing of circuit breakers and reclosers[.]" RKS Am. ¶ 340 (modifications in original) (emphasis omitted).

- A statement by PG&E's then-CEO on a November 5, 2018 conference call that "We also have our public safety power shut off program that I mentioned earlier, and we'll of course only utilize this as a last resort in the most extreme forecasted weather conditions. All of these efforts are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets. We plan to continue patrolling our poles at frequencies within high fire threat areas beyond the compliance requirements in place in California. Collectively, this is an integrated comprehensive program to further reduce risk across our high fire threat areas." RKS Am. ¶ 363 (emphasis omitted).

13       These two alleged misstatements add nothing to the statements PERA has already alleged,

14 such as PG&E's November 18, 2015 statement that it was developing "capabilities where we are

15 able to take our reclosers out of service remotely[.]" TAC ¶ 208 (PERA Stmt. No. 3) (emphasis

16 omitted); *see also* PERA Obj. § III.C.1.c(5) (establishing that the statement was true).

17     **C.**     <u>**The RKS Claimants Assert The Same Section 11 Allegations As PERA.**</u>

18       The allegations in support of the RKS Claimants' Section 11 claims are largely a copy-

19 paste from the TAC. The RKS Claimants allege that offering documents in connection with the

20 same notes offerings "omitted, and failed to disclose, PG&E's widespread and systemic failures

21 to comply with laws and regulations relating to vegetation management safety"; "further failed to

22 disclose that PG&E chose to ignore existing and known conditions posing extreme wildfire risk

23 by failing to implement prudent safety and maintenance practices and procedures"; and "misled

24 investors by distorting the nature of the wildfire risk facing PG&E by concealing that PG&E was

25 actually aware of significant undisclosed risks posed by its failure to comply with law, to properly

26 address vegetation growing near its powerlines, and to address its aging and failing infrastructure."

27 RKS Am. ¶ 372; *see also* TAC ¶¶ 632-33, 649, 663.

28

The RKS Claimants further allege that the offering documents were misleading because while they disclosed certain risks facing the business, such as "the impact of droughts," "severe weather conditions," and "fires," they purportedly failed to disclose that "PG&E's widespread safety deficiencies and violations had already increased the risk of wildfires, [and] caused wildfires and liability for those wildfires[.]"  RKS Am. ¶¶ 376-382; *see also* TAC ¶ 633-39; PERA Obj. § IV.C (PERA's allegations fail to show that risk disclosures were false when made).

## III.  THE RKS CLAIMANTS' EXCHANGE ACT CLAIMS FAIL

The legal standard this Court must apply in determining the sufficiency of the RKS Claimants' Exchange Act claims, which is set forth in detail in the PERA Objection, is straightforward.  To overcome this Objection, the RKS Amendment must plead (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  These elements must be pled with the particularity required under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("**PSLRA**").  *See* PERA Obj. § III.B.[7]

On the first element, the RKS Claimants bear the burden to adequately plead that each and every statement they challenge was materially false or misleading.  15 U.S.C. § 78u-4(b)(1)(A)-(B); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).  For a statement to be materially false or misleading, it must have been "capable of objective verification," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), and "directly contradict what the defendant knew at that time" or "omit[ ] material information" that existed at the time.  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (affirming dismissal with prejudice for failure to allege falsity and citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018)).  *See* PERA Obj. § III.C.1.a.

---

[7] The arguments in the PERA Objection are all incorporated herein.

On the element of scienter, the RKS Claimants must plead, "in great detail, facts that constitute strong circumstantial evidence" that PG&E engaged in "deliberately reckless or conscious misconduct" in making false or misleading statements. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (citation omitted). The inference of fraud must be "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 323-24 (footnote omitted). The Court must look at the RKS Claimants' allegations both individually and holistically to determine if the RKS Claimants have satisfied their burden to plead a "strong inference" of scienter as required by the Ninth Circuit. PERA Obj. § III.C.2.

On reliance, the RKS Claimants must plead a "causal connection between the alleged fraud and the securities transaction." PERA Obj. § III.C.4 (citing *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009)).

Finally, they must also plead loss causation with particularity by tying the losses they claim "to the very facts about which the defendant lied." PERA Obj. § III.C.3 (citing *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022)).

The RKS Claimants have failed to meet any of these high burdens.

A.     <u>The RKS Claimants Fail To Plead That Any Statement Was False Or Misleading</u>.

The purportedly false statements that the RKS Claimants copied from the TAC are addressed in depth in the PERA Objection. In this Objection, PG&E focuses on the handful of new allegations raised in the RKS Amendment. To start, the RKS Claimants fail to sufficiently plead that any of the additional 10 purported misstatements alleged in the RKS Amendment were materially false or misleading. Appendix 4, RKS Stmts. 20-29.[8] As set forth above, all of their additional purported misstatements are substantively similar, if not identical, to the statements that PERA challenges. *Compare, e.g.*, RKS Stmt. 24 ("We have more than doubled our annual spend to manage vegetation from roughly $190 million in 2013 to $440 million in 2017"), *with* PERA

---

[8] To facilitate the Court's review, PG&E has prepared a chart, attached hereto as Appendix 4, that lists the RKS Claimants' 10 additional alleged misstatements and describes the various reasons each is insufficient to state a claim under the securities laws.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Stmt. 10 ("In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year."); *compare also, e.g.*, RKS Stmt. 23 (discussing frequency of overhead line inspections), *with* PERA Stmt. 11 (same).

        **1.**        **The RKS Claimants Fail To Meet Their Burden To Plead That Statements Containing Generalizations Regarding PG&E's Safety And Risk Mitigation Efforts Were Materially False (RKS Stmts. 20-22, 25, 27)**

Four of the 10 additional misrepresentations the RKS Claimants allege are inactionable generalizations about PG&E's efforts to mitigate wildfire risk and endorsements of new safety initiatives. *See* RKS Stmts. 20 ("Since the onset of the drought, we've doubled our efforts"); 21 ("doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe"); 22 ("[a]ugmenting [their] already rigorous vegetation management practices"); 25 ("we've worked to improve our culture, augment our operations, upskill our people and, most importantly, improve public and employee safety"). The RKS Claimants repeat PERA's claims that similar generalizations were misleading. *See* PERA Obj. § III.C.1.c(1).

The RKS Claimants have failed to sufficiently plead that any of these statements were materially false or misleading. The RKS Claimants' additional allegations and tweaks to PERA's theory of falsity for these statements describing high-level safety practices and efforts reinforce the deficiencies in these allegations. It is fundamental under Ninth Circuit law, and common sense, that "[t]o be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale*, 845 F.3d at 1275 (citation omitted). "[G]eneral terms" that "provide[] nothing concrete" are not actionable, *Apollo*, 774 F.3d at 606, and a mere "optimistic, subjective assessment hardly amounts to a securities violation," *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

All that is to say, the law recognizes that reasonable investors could not be misled when, for example, a Chief Executive Officer says the company is building a better future, or that it is making progress, or doubling its efforts because the future is important. Nothing in those

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

statements conveys any objective fact or metric, as a matter of law. Professional and "most amateur investors as well, know how to devalue the optimism of corporate executives." *Id*. ("Statements of mere corporate puffery, vague statements of optimism . . . are not actionable." (internal quotations omitted)).

The RKS Claimants' additional alleged misrepresentations focus on general post-incident comments about safety practices. Courts routinely reject securities claims based on similar allegations. *See, e.g., Plumley v. Sempra Energy*, 2017 WL 271229, at *7 (S.D. Cal. June 20, 2017) (holding that statements regarding SoCalGas's "commitment to or prioritization of safety" were "too nonspecific and unmeasurable to state a claim"); *Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) ("emphasiz[ing] Plains' commitment to proper systems and their intention to comply with regulations . . . were generalized positive goals rather than specific promises," and hence inactionable); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232-33 (S.D.N.Y. 2018) (statements about efforts were not guarantees); *Mucha v. Volkswagen AG*, 540 F. Supp. 3d 269, 296-97 (E.D.N.Y. 2021) (rejecting claims based on a company's stated "goals" or what it "aims to do" (citation and internal quotation marks omitted)).

In the quintessential example, the RKS Claimants challenge PG&E's statement in July 2018 that "[o]ver the last seven years, we have accomplished so much together on our journey to become one of the safest, most reliable energy companies in the country," and "[a]s a team, we've worked to improve our culture, augment our operations, upskill our people and, most importantly, improve public and employee safety." RKS Am. ¶ 338, RKS Stmt. 25 (emphasis omitted). The RKS Claimants do not identify the objective fact in this statement, and do not explain what misleading impression investors would derive from it. Indeed, by its plain language, the statement does not express that PG&E was currently the safest or most reliable—just that it was on a journey to become—and does not identify any specific initiatives or business segment. In context and in light of PG&E's other disclosures, the RKS Claimants' position further lacks merit because PERA alleges that, prior to that time, the market and analysts had already responded to news of the Cal Fire investigation relating to PG&E's role in the North Bay Fires. *See* TAC ¶ 346-361.

1   The RKS Claimants allege that the statement concealed PG&E's "pervasive" violations of

2 regulations necessary for preventing wildfires, and thus concealed the true risk of wildfires within

3 PG&E's service area.  RKS Am. ¶ 339.  But nothing in this statement contains anything concrete,

4 much less a factual representation about wildfire safety.  *See Khoja*, 899 F.3d at 1008-09 (to be

5 false or misleading, a statement must "directly contradict what the defendant knew at that time").

6   Several of the RKS Claimants' additional challenges overstate and mischaracterize

7 statements about PG&E's safety efforts and practices to manufacture a fraud claim.  *E.g.*, RKS

8 Stmt. 27 ("PG&E is currently implementing four mitigations to reduce overhead conductor risk.");

9 RKS Am. ¶ 347 (alleging statement 27 "created the false impression that PG&E was sufficiently

10 investing in its electrical system infrastructure to reduce fires" on the Caribou-Palermo line).  The

11 RKS Claimants also challenge a March 22, 2018 statement that PG&E was "doing more over the

12 long term to harden the electric system to help reduce wildfire threats and to keep customers safe,"

13 including by "investing in stronger, coated power lines, spacing lines further apart to prevent line-

14 on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming

15 years."  RKS Stmt. 21.  But they fail to plead that PG&E did not plan to, or did not, undertake

16 these initiatives.  Instead, the RKS Claimants convert this statement into a guarantee that no

17 wildfires would start from PG&E equipment, alleging "it created the false impression that PG&E

18 was sufficiently investing in its electrical system infrastructure to reduce fires," RKS Am. ¶ 308,

19 and claiming that the single tower at issue there had not been inspected or replaced.  *Id.*  But PG&E

20 made no claim about whether these initiatives would be enough to fully mitigate wildfire risk.

21 Instead, the statement itself conveyed the opposite, as PG&E told investors that these planned

22 initiatives would be implemented "in the coming years," not right away.  RKS Stmt. 21.  No

23 reasonable investor would interpret a statement that PG&E was implementing additional

24 precautionary measures to mean all such efforts would be completed in a matter of weeks or

25 months to prevent another wildfire, let alone in the drought conditions that existed at the time.

26 Indeed, PG&E's securities filings throughout the relevant period contained numerous detailed

27 disclosures concerning precisely that risk.  *See* PERA Obj. §§ III.A.c-g; *see also In re LifeLock,*

28 *Inc. Sec. Litig.*, 690 F. App'x 947, 953 (9th Cir. 2017) ("[N]o reasonable investor would interpret

LifeLock's statements as promising perfect service."); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S,* 11 F.4th 90, 104 (2d Cir. 2021) ("Although Danske averred that it took steps to comply with [anti-money laundering] protocols and vaguely recited some AML buzzwords, it claimed no particular acts of compliance.  No reasonable investor . . . would weigh these generic statements in its investment calculus.").

The RKS Claimants' claims that generalized statements describing safety initiatives are rendered false by a subsequent fire are unconvincing, especially when considered in light of PG&E's repeated risk disclosures.  Companies are not liable for securities fraud where they describe a plan to implement (and do implement) measures over time to address a risk, but that known risk materializes while they are still implementing those plans.

### 2. The RKS Claimants Fail To Plead That Statements Regarding Compliance Were Materially False  (RKS Stmt. 28)

The RKS Claimants plead no particularized facts to show that PG&E's statements regarding compliance with applicable regulations or law—either those ported from the PERA TAC or those alleged for the first time in the RKS Amendment—were actionably false or misleading. The RKS Claimants' allegations do not show that PG&E made statements claiming strict compliance with every law.  *See* PERA Obj. § III.C.1.d.  The new allegations the RKS Claimants offer are not "facts" at all, but rather conclusory allegations that the Court is not required to treat as true at this stage.

Despite the RKS Claimants' insinuations to the contrary, PG&E never stated that the entirety of its operations (across most of California, down to every last detail of its business) was in full compliance with every applicable law and regulation at all times—and the RKS Claimants have to twist PG&E's words to suggest PG&E said otherwise.  For example, the RKS Claimants cherry-pick an isolated statement from testimony given by a regulatory analyst in a FERC rate application in which they claim the analyst stated that PG&E was "in compliance with all applicable rules, standards and regulations."  RKS Stmt. 28; Ex. 83 at 5 (Tsang Testimony).  But the RKS Claimants' mischaracterization ignores that this statement was made to describe the *purpose* of funds incurred for a particular account ("Load Dispatch"), and the account and the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   statement discussed had nothing to do with vegetation management, inspections, pole

2   maintenance, or wildfire safety (expenses for which were covered by separate accounts).  Ex. 83

3   at 6-9 (Tsang Testimony) (describing separate accounts).  And of course, reasonable (and

4   especially sophisticated) investors would not assume that a statement that PG&E was spending

5   money in order to comply with regulations regarding its electrical grid was the same as a

6   representation that PG&E was in full compliance with all regulations at all times across the entirety

7   of its operations.  Nor would reasonable investors read the statements to hold PG&E to the

8   impossible standard of never igniting another wildfire, as RKS Claimants apparently do.  RKS

9   Am. ¶ 4.

10      In an attempt to breathe life into their claims that investors were misled by PG&E

11  statements regarding compliance even *after* the North Bay Fires (and after Cal Fire disclosed

12  evidence of compliance issues related to those fires, which PERA claims revealed the truth

13  regarding compliance issues, PERA Obj. §§ III.C.1.d(3)-(4)), the RKS Claimants rely on

14  compliance statements alleged by PERA, including PG&E's statement that it "meets or exceeds

15  regulatory requirements for pole integrity management."  *See* PERA Stmts. 13, 14; RKS Am.

16  ¶¶ 320, 326 (same statements).  But again, the RKS Claimants are twisting PG&E's words to imply

17  that it said more than it did.  *See* RKS Am. ¶ 325 (alleging PG&E's statements convinced investors

18  that "the specific programs PG&E was engaged in [kept] wild fire risks de minimis").  PG&E

19  never guaranteed that every one of its transmission poles was in compliance with every regulatory

20  requirement at all times or that wild fire risks were "de minimis"; rather, PG&E merely stated that

21  its inspections and maintenance schedules followed what regulations required for pole integrity

22  management.  *See* PERA Obj. § III.C.1.d.  Indeed, the statements themselves reference the

23  database used to manage patrols and inspections for PG&E's two million poles across California.

24  PERA Stmts. 13, 14.

25      Like PERA, the RKS Claimants attempt to tie violations identified after exhaustive post-

26  fire investigations, and commentary on those findings, to their allegations that specific compliance

27  violations must have been known prior to the outbreak of the North Bay Fires, in order to plead

28  that PG&E's statements regarding legal and regulatory compliance were false.  *See,* e.g., RKS Am.

¶¶ 137-171, 139-142, 320-334, 540, 582-83.   The Ninth Circuit rejected similar hindsight allegations in *Barnes v. Edison Int'l*, No. 21-55589, 2022 WL 822191 (9th Cir. 2022) (*Edison II*). *See also Twitter*, 29 F.4th at 621 (holding it was "simply not enough to assume or implausibly infer that the defendants must have known" in July about issues disclosed in August); PERA Obj. § III.C.1.d.

Finally, the RKS Claimants' allegations that at any time after "mid-2015," PG&E should have told investors that "it was engaged in criminally negligent and criminally reckless activities" is not sufficient to plead fraud.   RKS Am. ¶ 3 (emphasis omitted).   A California district court already rejected this theory of securities fraud in *Edison I*, which was later affirmed by the Ninth Circuit in *Edison II*.   The *Edison* plaintiffs alleged that Southern California Edison should have disclosed how the government would ultimately judge their behavior in connection with the wildfires, but the Court expressly rejected the argument: "Defendants could not have known, at the time the statements were made, that [the government] would determine in a future proceeding that their conduct would not meet the [required] standard[s]."   *Barnes v. Edison Int'l*, No. CV 18-0690 CBM, 2021 WL 2325060, at *12 (C.D. Cal. Apr. 27, 2021) (*Edison I*); *see also In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1023 (N.D. Cal. 2020) ("Defendants had no duty to disclose unproven violations [or to] elaborate on any alleged non-compliance because they had not yet been found to be non-compliant." (emphasis omitted)).

Furthermore, as explained in the PERA Objection, PG&E's expressions of belief that it was in compliance with applicable laws are inactionable because they are statements of opinion as recognized under the Exchange Act.   *See* PERA Obj. § III.C.1.d(6).

**3.    The RKS Claimants Fail To Plead That Statements Regarding PG&E's Safety Practices Were Materially False (RKS Stmts. 20, 23-24, 26, 29)**

The RKS Claimants allege that various statements regarding PG&E's vegetation management, pole maintenance, and power shutoff practices were false or misleading, but none of their allegations—whether related to statements challenged in the TAC or raised for the first time

1   in the RKS Amendment—are sufficient to plead that any challenged statement was materially false

2   or misleading when made.

3                    *a.*      ***Vegetation Management Spending And Efforts (Stmts. 20, 24)***

4           As described above, the additional statements the RKS Claimants challenge regarding

5   PG&E's specific safety practices are no different in substance from statements challenged in the

6   TAC, and do nothing to bolster the RKS Claimants' claims.  The RKS Claimants claim that PG&E

7   made two additional misstatements regarding PG&E's increased vegetation management spending

8   and "doubling of efforts."  RKS Stmts. 20, 24.  The RKS Claimants fail to adequately plead falsity

9   for these statements, just as PERA did for the nearly identical statements made months earlier.  *See*

10  PERA Obj. § III.C.1.c(2) (explaining that PG&E doubled its spending on vegetation management

11  for 2016 and 2017 through the CEMA process).

12          Like PERA, the RKS Claimants allege no facts showing that the challenged statements

13  were actionable as false statements under the securities laws.  The RKS Claimants attempt to make

14  this showing by alleging that, on April 10, 2017, Richard Yarnell, a PG&E Vegetation Program

15  Manager in PG&E's Stockton Division (just one of PG&E's many divisions), testified that "to the

16  best of my knowledge, we have not made any changes as a result of" the 2015 Butte Fire.  RKS

17  Am. ¶ 124.  PERA made the same allegation, and the RKS Claimants, like PERA, fail to plead

18  sufficient facts that would allow the Court to credit the allegations concerning Mr. Yarnell's

19  testimony to contradict PG&E's challenged statements.[9]  *See* PERA Obj. § III.C.2.b.

20                   *b.*      ***Pole Maintenance And Inspection Practices (RKS Stmts. 21, 23,***

21                            ***27, 29)***

22          The RKS Claimants also follow PERA to allege that PG&E statements regarding investing

23  in, inspecting, and maintaining its electric poles were false or misleading.  RKS Stmts. 21, 23, 27,

24

---

25  [9] The RKS Claimants grossly mischaracterize Mr. Yarnell's testimony, stating that "Yarnell later
26  testified that for the entire period from September 2015 to April 10, 2017, 'PG&E—*to the best of*
    *my knowledge*, we have not made any changes' to improve safety."  RKS Am. ¶ 265 (emphasis
27  added).  They also plead no facts that Mr. Yarnell would have sufficient information outside of his
    own division such that his testimony could be imputed to an entire organization.  *See* PERA Obj.
28  § III.C.2.b.

29.  But the RKS Claimants plead no facts showing that the statements were false, and none of their allegations make the statements materially misleading.  The additional facts the RKS Claimants allege regarding the Caribou-Palermo transmission line—that PG&E failed to inspect and repair particular issues—do not render statements of general corporate practice covering the entirety of PG&E's vast territory false.  *See* PERA Obj. § III.C.1.c(3).  The alleged omitted "facts" regarding one tower on one line in PG&E's network do not "conflict with what a reasonable investor would take from" PG&E's statements about its general, state-wide practices.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).  None of PG&E's challenged statements say anything about particular lines—*i.e.* PG&E never publicly claimed it had or had not inspected Tower :27/222 of the Caribou-Palermo transmission line more recently than August 2014.  Rather, it reported the frequency of those inspections and the manner in which they were conducted.  The RKS Claimants do not allege any facts to support falsity as to these statements.[10]

A reasonable investor would not read a statement that PG&E had an ongoing program to replace certain structures and conclude that all such structures must already have been replaced.  Indeed, a reasonable investor would come to the opposite conclusion.  *See Curry v. Yelp Inc.*, 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017) (dismissing claims based in part on "common-sense understanding" that reasonable investors would not have believed that "all Yelp reviews were authentic"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577-78 (S.D.N.Y. 2014) ("[I]t is unreasonable to read statements on the company's website regarding product quality as guarantees of no product defects."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  The RKS Claimants allege that PG&E's efforts were insufficient to prevent the Camp Fire,

---

[10] The RKS Claimants allege that a PG&E "Electric Transmission Preventative Maintenance Manual" ("**ETPM**"), which went into effect in 2005, provided that the Caribou-Palermo line would be "inspected once every five years and patrolled once per year in non-inspection years." RKS Am. ¶ 154.  They allege that "PG&E did not, in fact, follow the procedures and requirements established in the ETPM," RKS Am. ¶ 158, but they never explain what requirements were not followed.  The RKS Claimants claim that it was determined (years later) that employees failed to comply with the ETPM , but no facts suggest that was known at the time the statements were made by PG&E or any of the executives that allegedly made any misstatement.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

RKS Am. ¶ 348, but that allegation is irrelevant for the simple reason that PG&E never promised or warranted perfection, and instead repeatedly disclosed to investors in its SEC filings the risks that its equipment could cause fires and that PG&E could be held financially liable. *See, e.g.* PERA Obj. § C.1.d.

### c. ESRB-8 And PG&E's Public Safety Power Shutoff Program (RKS Stmts. 26, 29)

The RKS Claimants' additional claims challenging statements regarding PG&E's Public Safety Power Shutoff Program fail along with PERA's claims challenging similar statements. RKS Stmts. 26, 29; PERA Obj. § III.C.1.c(5). The RKS Claimants, like PERA, claim that PG&E's statements regarding its shutoff program were false or misleading because certain aspects of the program were not employed, or did not function as well, as the RKS Claimants believe they should have in connection with the North Bay and Camp Fires. *See* RKS Stmts. 26, 29; TAC ¶ 208. But the RKS Claimants plead no facts to support that anything PG&E said about its shutoff program was false at the time the statements were made, and allegations that PG&E did not optimally implement or employ that program are quintessential business judgments and operational issues that cannot form the basis for a securities fraud claim. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (adhering to the position that Congress "did not seek to regulate transactions which constitute no more than internal corporate mismanagement" in enacting Section 10(b) of the Exchange Act); *LifeLock*, 690 F. App'x at 955 ("Federal securities laws do not protect investors from quality control problems, service lapses, or management miscues." (citing *Gaines v. Haughton,* 645 F.2d 761, 799 n.33 (9th Cir. 1981))).

The RKS Claimants' additional theory that statements about the shutoff protocol were false because PG&E had a separate purportedly "secret" ESRB-8 Shutoff Protocol is insufficient to render any of the challenged statements false or misleading. RKS Am. ¶ 365.[11] "In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible

---

[11] This allegation also conflicts with PERA's theory that the program itself was "illusory." TAC ¶ 36.

judgments, but rather the result of a falsehood." *In re BofI Holding, Inc. Sec. Litig*., No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980, at *16 (S.D. Cal. May 23, 2017); *In re Worlds of Wonder Sec. Litig*., 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20 20 hindsight to turn management's business judgment into securities fraud.").

The RKS Claimants allege that the summary of PG&E's shutoff protocol published on its website pursuant to the CPUC's ESRB-8 resolution conflicted with PG&E's actual policy, which was not published. RKS Am. ¶ 175, 207. But they point to no *statements* in the publicly available summary that conflicted with the policy. As the RKS Claimants acknowledge, ESRB-8 did not require that a utility's full de-energization protocol be published on its website, but instead required only that PG&E and other utilities "post a summary of [their] de-energization policies and procedures[.]" RKS Am. ¶ 72; *see also* Ex. 25 at 6-7 (ESRB-8). They nowhere allege PG&E ever stated that what it published on its website was anything but a summary. Furthermore, as the RKS Claimants acknowledge, PG&E's publicly-available summary of the protocol was explicit that "no single factor will drive a Public Safety Shutoff." RKS Am. ¶ 176. The protocol summary stated that PG&E would "take a combination of many criteria into consideration, **including**" the seven criteria on which RKS focuses in its Amendment. RKS Am. ¶ 343 (emphasis added). Contrary to the RKS Claimants' assertion, no reasonable investor would interpret a statement that PG&E would take "many criteria" into consideration, "including" (but not limited to) seven enumerated ones, to mean that those seven constituted "all of the criteria PG&E would consider[.]" RKS Am. ¶ 344. *See Intuitive Surgical*, 759 F.3d at 1060 ("[T]he context in which the statements were made is key."); *Curry*, 2015 WL 7454137, at *6 (dismissing claims based on what a reasonable investor's "common-sense understanding" would be of the challenged statements). And contrary to their allegations, PG&E never represented—and no reasonable investor would have concluded—that PG&E would definitely shut off power under any particular set of circumstances, and the ESRB-8 regulation did not require that PG&E do so. *See* PERA Obj. § III.C.1.c(5). This is yet another example of the RKS Claimants using hyperbole to distort PG&E's actual statements.

The RKS Claimants also allege that the shutoff protocol summary PG&E published on its website "represented that its ESRB-8 Shutoff Protocol applied to all types of powerlines, without

qualification." RKS Am. ¶ 175. But the only statement in the summary they identify to reach that conclusion is the statement that "PG&E's Wildfire Safety Operations Center team will monitor conditions across our system and evaluate whether to temporarily turn off electric lines, in the interest of public safety." *Id.* (emphasis omitted). A reasonable investor would not read "across our system" to necessarily mean that every line in PG&E's system was subject to possible shutdown, and the RKS Amendment pleads no facts showing otherwise. The RKS Claimants' only allegation on this point is that the Butte County District Attorney purportedly came to that conclusion—after the fact—but this is a legal conclusion entitled to no weight on a motion to dismiss. RKS Am. ¶ 209; *see Danan v. Outform Inc.*, 2019 WL 6771828, at *1 (N.D. Cal. Dec. 12, 2019) ("'[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions,' and on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). Under any circumstances, it is not pled with sufficient particularity under the heightened pleading standards, including by pleading what about the summary was misleading, why it was misleading, to whom it was misleading, and why the purportedly omitted information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" regarding PG&E's broad wildfire-safety practices. *Matrixx Initiatives*, 563 U.S. at 38 (citation omitted); *Twitter*, 29 F.4th at 619.

Finally, as the RKS Claimants acknowledge, PG&E's CEO stated on November 5, 2018 that PG&E would "only utilize" the shutoff program "as a last resort in the most extreme forecasted weather conditions." RKS Am. ¶ 363. The RKS Claimants' allegations come down to a claim, with the benefit of hindsight, that PG&E should have shut off power before the Camp Fire. This theory is insufficient to state a claim for securities fraud. *See In re BofI Holding*, 2017 WL 2257980, at *16.

### 4. The RKS Claimants' Additional Allegations Fail To Identify Any Concealed Risk Of Wildfire, Let Alone Liability

In an attempt to fill holes in PERA's claims, the RKS Claimants adjust their theory of falsity in some places, and allege broad headline omissions in others, to establish that PG&E

concealed the risk of liability after the North Bay Fires. *E.g.*, RKS Am. ¶¶ 322, 332, 357. The RKS Claimants' new theory is that nearly every statement was misleading because PG&E concealed "the true risks" of wildfire and liability. *Id.* ¶ 48. They claim, incredibly, that reasonable investors would interpret PG&E's statements in the wake of the North Bay Fires to mean that PG&E could, and did, immediately mitigate its wildfire risks, thereby somehow concealing the "true risks leading to the Camp Fire[.]" *Id.* That is, the RKS Claimants work backward from the specific disclosures in the wake of the Camp Fire to claim that the 10 additional challenged statements the RKS Claimants identify, and the statements challenged by PERA in 2018, conveyed to investors that PG&E had substantially reduced the risks of wildfire and liability (in a matter of months), and thereby concealed the severity of those risks from investors.

These claims fail as a matter of common sense and law. *First*, like the statements regarding safety practices and compliance with law discussed above, no reasonable investor would interpret statements that PG&E was in the process of implementing enhanced safety measures to mean that those measures would be completely effective in a matter of months to further prevent future risk of wildfires. RKS Stmts. 21-22. *Second*, the RKS Claimants fail to plead that any of PG&E's statements regarding its safety enhancements were false when made. The RKS Claimants' allegations are based on later determinations after a lengthy investigation by the Butte County District Attorney, separate criminal proceedings involving PG&E by Hon. William Alsup in the United States District Court for the Northern District of California, and commentary by others. *See* RKS Am. ¶¶ 15, 109. The RKS Claimants do not allege facts, however, tying these later reports or proceedings to a particular misstatement, or that they found that the disclosures PG&E made to investors alleged by the RKS Claimants or in the PERA Complaint were false or misleading to support a claim for securities fraud.

## B. The RKS Claimants Fail To Plead Scienter.

The RKS Claimants' allegations of scienter fail for the same reasons as those alleged in the TAC. *See* PERA Obj. § III.C.2. In short, they do not plead facts supporting a strong inference of fraud that is "cogent" and "at least as compelling as any opposing inference." *Id.* (collecting authority). The RKS Claimants do not plead what senior management at PG&E knew at the time

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

the challenged statements were made that would render those statements intentionally false or misleading, or show that they were made with deliberate recklessness. General allegations that "PG&E" was aware of issues, without alleging who at PG&E purportedly knew them or whether those individuals were involved in making the statements, are insufficient.[12]

### 1. Allegations Regarding Specific Deficiencies Do Not Establish Scienter

The RKS Claimants' allegations about particular deficiencies in certain specific areas of PG&E's operations are insufficient to establish scienter. They do not sufficiently plead that the makers of the statements knew, or should have known, that localized issues rendered their general statements about PG&E's broad operations false or misleading.

For example, allegations that certain PG&E personnel purportedly knew in 2012, 2014, and 2016 about certain issues with the Caribou-Palermo transmission line, RKS Am. ¶¶ 134-36, do not demonstrate that PG&E's officers knew, or should have known, that general statements relating to the entirety of PG&E's safety and wildfire-management practices were false. For the same reason, allegations that "PG&E was aware of," but "chose not to address," "dangerous wear issues" with a particular type of component—"a 'C hook'"—that was ultimately implicated in causing the Camp Fire do not establish scienter. RKS Am. ¶ 46. *Cf. Glazer*, 549 F.3d at 744–45 (rejecting theory that "so long as any employee . . . had knowledge of the violation of any law, scienter could be imputed to the company"); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 562

---

[12] To the extent the RKS Claimants rely on the "core operations doctrine," that fails for the same reasons explained in the PERA Objection. *See* PERA Obj. § III.C.2(b). *See also, e.g., Haideri v. Jumei Int'l Holding Ltd.*, No. 20-CV-02751-EMC, 2021 WL 4170791, at *17 (N.D. Cal. Sept. 14, 2021) (allegation that the employees who made the statements had access to the information showing the falsity was insufficient to raise a strong inference of scienter); *Glazer*, 549 F.3d at 748–49 ("Simply raising an inference that a company's executive 'should have' discovered misconduct, not that the executive actually knew of misconduct, is insufficient "to meet the stringent scienter pleading requirements of the PSLRA."); *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 883-884 (9th Cir. 2012) ("Even assuming . . . that Plaintiff adequately pled that all of the defendants had knowledge of the detailed clinical results at the time the allegedly false statements were made, such an allegation does not support a strong inference of scienter" because it does not establish that defendants knowingly misled investors about the drug's overall efficacy or commercial prospects).

1  (W.D. Pa. 2019) (rejecting plaintiff's argument that scienter as to a statement on one subject could

2  establish scienter as to falsity of statements on other, unrelated subjects).

3        For the same reasons, the RKS Claimants' allegations regarding statements that certain

4  PG&E employees made in testimony submitted to FERC in October 2018 fail to establish scienter.

5  RKS Am. ¶¶ 346, 349; Exs. 82, 83. The RKS Claimants do not allege that the employees who

6  made the statements knew the statements were false at the time they were made, or that

7  management was exposed to any of the information. *Zucco Partners, LLC v. Digimarc Corp.*, 552

8  F.3d 981, 1000 (9th Cir. 2009) (plaintiff must plead "detailed and specific allegations about

9  management's exposure to factual information within the company" to establish knowledge).

10  Because they have not pled facts to support that the employees testified with scienter or

11  management's exposure to the information, these allegations cannot support a strong inference of

12  scienter. *See Prodanova v. H.C. Wainright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021)

13  (affirming dismissal without leave to amend where plaintiff had "not alleged with particularity—

14  or even alleged at all—that [the relevant employees or agents] acted with scienter"); *In re Apple

15  Computer, Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005) (citing *Nordstrom, Inc. v. Chubb & Son,

16  Inc.*, 54 F.3d 1424, 1435–36 (9th Cir. 1995)) (false statements by Steve Jobs were not actionable

17  misstatements by Apple for purpose of 10(b) liability because no proof that Jobs knew the

18  statements were false, even though many other employees were allegedly aware of the falsity); *In

19  re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.*, 2017 WL 6041723,

20  at *8 (N.D. Cal. Dec. 6, 2014) ("[L]iability for fraud cannot be imputed to a corporation without

21  evidence that an agent of the corporation who participated in making the challenged statements

22  did so with scienter.").[13]

23

24

25

---

26  [13] Even if the RKS Claimants had sufficiently pled the cited employees' scienter, their statements
27  would still not be actionable, as it was the employees, not PG&E, that made the statements in their
   testimony. PG&E was therefore not the "maker" of the statement for purposes of liability under
   the federal securities laws. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135,
28  142 (2011).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1
2
**2.** **Later Statements In Judicial And Criminal Proceedings Do Not Support A Strong Inference Of Scienter**

3    The RKS Claimants' attempts to bolster their scienter allegations by citing a post-Relevant

4 Period report by the Butte County District Attorney and PG&E's criminal proceeding with Judge

5 Alsup do not support a strong inference of scienter. *See Zucco*, 552 F.3d at 1000 (requiring

6 "detailed and specific allegations about management's exposure to factual information within the

7 company" to establish scienter). Moreover, "[m]ere negligence—even head-scratching

8 mistakes—does not amount to fraud." *Prodanova v. H.C. Wainwright & Co*., LLC, 993 F.3d 1097,

9 1103 (9th Cir. 2021).

10    The RKS Claimants' allegations note that the Butte County District Attorney Report, and

11 the information and conclusions expressed in the PG&E criminal case, were made after a several-

12 year investigation into the North Bay Fires and Camp Fire. *See, e.g.,* RKS Am. ¶¶ 291-292. *See*

13 *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2019) (finding that articles written

14 after NVIDIA's corrective disclosure were insufficient to establish scienter because "[t]hey were

15 written in hindsight and do not reflect [the President's] or NVIDIA's knowledge prior to July 2008.

16 Simply because scientists were able to explain in retrospect the science behind NVIDIA's chip

17 failures, it does not mean that NVIDIA knew or should have known it would be liable for those

18 failures during the class period or that its liability would exceed its normal reserve."). The RKS

19 Claimants do not plead sufficient facts that these later findings and statements support a strong

20 inference of scienter as to the alleged misstatements and omissions at issue in the TAC and RKS

21 Amendment. *See* PERA Obj. § III.C.2.

22    The RKS Claimants' allegation that PG&E's guilty plea to charges of unlawfully causing

23 the Camp Fire and involuntary manslaughter "establishes its scienter as a matter of law" is

24 incorrect as a matter of law and fact. RKS Am. ¶¶ 611-15. The indictment to which PG&E pled

25 guilty charged PG&E with unlawfully causing a fire in violation of California Penal Code Section

26 452, and involuntary manslaughter in violation of California Penal Code Section 192(b). First,

27 neither of those charges address the elements of a knowing false statement to investors under the

28 securities laws. *See* Cal. Pen. Code § 452 ("A person is guilty of unlawfully causing a fire when

1   he recklessly sets fire to or burns or causes to be burned, any structure, forest land or property);

2   *id*. § 192(b) (recklessly failing to maintain and operate electrical lines and equipment).

3   Second, both charges require a different *mens rea*—the charges PG&E pled guilty to do

4   not require deliberate recklessness, but the Exchange Act claims do. "Plaintiffs proceeding under

5   the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or

6   'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness

7   that strongly suggests actual intent. . . . [T]he PSLRA requires plaintiffs to plead, at a minimum,

8   particular facts giving rise to a strong inference of deliberate or conscious recklessness." *In re*

9   *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999), *as amended* (Aug. 4, 1999),

10  *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865

11  F.3d 1130, 1146 (9th Cir. 2017)); *SEC v. Rubera*, 350 F.3d 1084, 1094–95 (9th Cir. 2003)

12  ("Recklessness satisfies the scienter requirement only 'to the extent that it reflects some degree of

13  intentional or conscious misconduct.'" (citation omitted)). Deliberate recklessness requires that

14  an actor "had reasonable grounds to believe material facts existed that were misstated or omitted,

15  but nonetheless failed to obtain and disclose such facts although [the actor] could have done so

16  without extraordinary effort." *Intuitive Surgical*, 759 F.3d at 1063 (citation omitted). Because the

17  criminal charges brought by the Butte County District Attorney against PG&E did not involve the

18  same claims at issue or necessarily include a determination of intent or deliberate recklessness,

19  those charges and plea do not establish scienter under the federal securities laws.

20  **C.     The RKS Claimants Do Not Establish They Relied On The Alleged**

21  **Misstatements.**

22  In order to plead a viable claim under the Exchange Act, the RKS Claimants must plead

23  that they relied upon the alleged misrepresentations and omissions. *Dura*, 544 U.S. at 341-42.

24  The RKS Claimants do not plead, with any specificity, that any of them actually relied on any of

25  the alleged misstatements or omissions in deciding to purchase PG&E securities. Instead, the RKS

26  Amendment pleads that, "[f]or the Exchange Act claims, [the RKS Claimants] will rely upon the

27

28

presumption of reliance established by the fraud-on-the-market doctrine . . . ." RKS Am. ¶ 617.[14] But the "fraud on the market" theory for reliance—*i.e.*, the presumption that investors rely on a defendant's misleading statements—is of no help to the RKS Claimants. If the misrepresentation did not distort the stock's market price, or "if the plaintiff did not buy the stock after the misrepresentation was made but before the truth was revealed," then the presumption does not apply. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014); *Basic Inc. v. Levinson,* 485 U.S. 224, 248 (1988) (presumption not applicable where "market price would not have been affected by [a defendant's] misrepresentations"). That means, where the market is already aware of the facts that the plaintiff alleges are concealed, the "truth-on-the-market" doctrine overcomes the "fraud-on-the-market" presumption, and the claims should be dismissed at the pleading stage. PERA Claim Obj. § III.C.4. *See In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1008 (N.D. Cal. 2017) (Davila, J.) (granting dismissal at the pleading stage where defendant established that "the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression" (citation omitted)); *see also Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996) ("In a 'fraud on the market' case an omission is materially misleading only if the information has not already entered the market." (citation omitted)); *In re Convergent Techs. Sec. Litig*., 948 F.2d 507, 513 (9th Cir. 1991) ("[A]n omission is materially misleading only if the information has not already entered the market. If the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market will not be misled." (citation and internal quotation marks omitted)).

Here, the RKS Claimants allege they continued to rely on PG&E's public statements *after* the purportedly concealed truth had been revealed through multiple corrective disclosures. For

---

[14] The RKS Amendment states that, "[i]n the alternative, [the RKS Claimants] relied on PG&E's statements and omissions, either generally or specifically, in making investment decisions as to PG&E securities." RKS Am. ¶ 621. But this conclusory allegation is insufficient to plead actual reliance. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

example, claimants purchased PG&E shares after the market had already learned that (1) the CPUC had issued a litigation hold letter to PG&E about its safety practices (TAC ¶ 246), (2) Cal Fire was investigating PG&E's role in the fires (*id.* ¶ 247), (3) PG&E was cooperating with Cal Fire's investigation and suspending its dividend because of uncertainty from its potential liability associated with the North Bay Fires (*id.* ¶ 339), and (4) numerous lawsuits had been filed seeking damages against PG&E alleging it caused the North Bay Fires (Exs. 100-102). Consequently, the potential for PG&E to face massive liability for future catastrophic wildfires was "already reflected in [PG&E's] stock price" before several RKS Claimants ever purchased a single PG&E share, and they cannot rely on the fraud-on-the-market presumption of reliance. *See In re Convergent*, 948 F.2d at 513.

As another misplaced attempt to avoid their obligation to plead reliance as required under the Exchange Act, the RKS Claimants invoke a separate judicially created presumption of reliance under *Affiliated Ute Citizens of Utah v. United States* that applies only to cases where a plaintiff's claims are based on alleged omissions, as opposed to affirmative misrepresentations. 406 U.S. 128 (1972). The RKS Claimants invoke this exception in a single conclusory allegation that "PG&E's misstatements throughout the Relevant Period included omissions." RKS Am. ¶ 620. However, "the *Affiliated Ute* presumption is limited to cases that ***primarily allege omissions*** and present plaintiffs with the difficult task of proving a speculative negative." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*, 2 F.4th 1199, 1208-09 (9th Cir. 2021) (emphasis added). In *Volkswagen,* the Ninth Circuit held that in a "mixed" case involving both affirmative misrepresentations and omissions, courts must limit the *Affiliated Ute* presumption to "situations in which a plaintiff would be forced to prove a speculative negative: that the plaintiff relied on what was not said." *Id.* at 1206 (quoting *Binder v. Gillespie*, 184 F.3d 1059 (9th Cir. 1999)) (internal quotation marks omitted). The Ninth Circuit held that the presumption did not apply because throughout the complaint, "Plaintiff alleges much was said, and importantly, that it relied on what was said." *Id.* Likewise, the RKS Amendment (like the TAC) repeatedly alleges affirmative statements from PG&E, and that "investors" "relied on" those statements. *See* RKS Am. ¶¶ 10,16, 95, 621, 628. In sum, just like in *Volkswagen*, the RKS Claimants allege "pages of

affirmative misrepresentations that [they] . . . relied upon when purchasing" PG&E securities. *See* 2 F.4th at 1209. Therefore, the RKS Claimants cannot invoke the *Affiliated Ute* presumption to escape their obligation to plead facts supporting reliance.

The RKS Claimants' failure to specifically plead reliance requires dismissal. *See LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at *4-6 (N.D. Cal. 2022) (granting motion to dismiss Exchange Act claims and holding that *Affiliated Ute* presumption did not apply to mixed case where plaintiff failed to allege facts showing that it relied on the misrepresentation that the company was not in violation of any statute, rule or regulation).

### D. The RKS Claimants' Allegations Regarding Loss Causation Fail For The Same Reasons That PERA's Allegations Fail.

Like the TAC, the RKS Amendment fails to sufficiently plead loss causation—*i.e.*, a "causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). While a corrective disclosure need not precisely mirror the earlier representation, a plaintiff must establish that the "defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Nektar*, 34 F.4th at 838. To make that showing, a plaintiff must plead facts showing that the market "learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor health generally" or other negative information. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). But as explained in the PERA Objection, investors were aware of the risk of wildfires and the attendant liability no later than May or June 2018. *See* PERA Obj. § III.C.3. None of the alleged corrective disclosures revealed any material facts bearing on the alleged misrepresentations—*i.e.*, they did not reveal any allegedly misstated or concealed information about PG&E's compliance, risk of liability, or any of the specific safety programs the RKS Claimants allege were non-existent. *Id.*

The only additional allegations that the RKS Claimants add with respect to loss causation underscore that neither the RKS Claimants nor PERA can successfully plead the alleged misrepresentations caused their purported losses. The RKS Claimants modify PERA's allegations to allege that the truth was only "partially revealed" after the North Bay Fires, and they then

1   identify additional disclosures after the ignition of the Camp Fire that they allege revealed the

2   remainder of the fraud. RKS Am. ¶¶ 494, 492. The RKS Claimants made this change in an attempt

3   to recover losses based on the stock price declines during, and following, the Camp Fire. But none

4   of the RKS Claimants' new allegations are sufficient to plead loss causation under the securities

5   laws.[15]

6          None of the additional purported corrective disclosures pled in the RKS Amendment

7   disclosed any new revelatory facts regarding the cause of the Camp Fire, let alone any new

8   information that corrected any of the alleged misrepresentations. The RKS Claimants allege that

9   "investors were receiving contradictory information about whether PG&E had a role in causing

10  the fire," RKS Am. ¶¶ 496, 499, in an apparent attempt to claim that the "PG&E securities . . .

11  remained artificially inflated," *id.* ¶ 498. However, the RKS Claimants never identify any

12  information in the corrective disclosures that corrected the purported artificial inflation from the

13  specific misstatements, as required by Ninth Circuit law. PERA Obj. § III.C.3. The RKS

14  Claimants do not explain how the cited reports during the Camp Fire uniquely corrected any

15  specific previously alleged misrepresentation or omission about PG&E's safety practices or

16  PG&E's compliance with regulations applicable to the inspection and maintenance of its overhead

17  lines and towers. Because the RKS Claimants cannot claim that PG&E guaranteed it could prevent

18  wildfires, the ignition of the Camp Fire alone could not be a corrective disclosure. PERA Obj. §

19  III.C.4. Simply put, the RKS Claimants fail to connect any purported revelation to the prior alleged

20  misstatements or omissions. *See Apollo Grp.*, 774 F.3d at 608 (affirming district court dismissal

21  because it was "unclear" what prior statements "made by the Defendants were invalidated" by the

22  alleged corrective disclosures).

23

24  _____

25  [15] If the Court finds, as it should, that statements made after the North Bay Fires are not actionable
    because investors at least as of then knew the risks of their investments, it will eliminate the claims
26  of numerous opportunistic institutional investors, including several of the RKS Claimants. As just
    one example of an RKS Claimant that fits this description, RKS Claimant Nuveen Santa Barbara
27  did not start purchasing shares until November 14, 2018, *right after the Camp Fire started* and
    was still burning. Investors purchasing after the North Bay Fires simply have no viable securities
28  fraud claim. *See* PERA Obj. § III.C.3.

1       Viewed through the lens of loss causation, these theories make clear that the RKS

2    Claimants' claimed losses are not based on the revelation of a purported prior misrepresentation,

3    but their desire to recoup investment losses from the misfortune of the Camp Fire itself. As the

4    RKS Claimants acknowledge, after the Camp Fire started, PG&E's stock price continued to drop

5    between November 9 and 12, 2018 "amid concerns from investors about the utility's liability

6    connected to the Camp Fire." RKS Am. ¶ 500; *see also id.* ¶¶ 502-03, 506-08 (reports regarding

7    amount of liability). And, on November 15, 2018, the RKS Claimants attribute the stock price

8    drop to "liability for the Camp Fire and the chance of bankruptcy." *Id.* ¶ 513. The fact that the

9    market was discussing PG&E's potential bankruptcy provided no new information about PG&E's

10   safety practices. PERA Obj. § III.C.4.b.

11       Ultimately, even if the RKS Claimants have pled that any statement was materially false

12   (they have not), the disclosures they identify in November 2018 are not corrective, but instead are

13   consistent with PG&E's disclosures leading up to November 2018 concerning findings regarding

14   PG&E's operations with respect to the North Bay Fires, and confirming the risks PG&E repeatedly

15   disclosed that PG&E's operations are inherently dangerous, that PG&E's equipment can start fires,

16   and that PG&E faces liability for causing fires. *See, e.g.,* TAC ¶¶ 346-362; PERA Obj. § III.C.3

17   The materialization of a known and disclosed risk forecloses loss causation, and no pled facts

18   provide otherwise. The RKS Claimants therefore, like PERA, fail to plead loss causation.

19       **E.**     **The RKS Claimants' Scheme Liability Claim Fails.**

20       Finally, the RKS Claimants' second cause of action for scheme liability pursuant to Rule

21   10b-5(a) and (c) must be dismissed because it is wholly duplicative of their first cause of action

22   for false-statement liability pursuant to Rule 10b-5(b). Rule 10b-5(b) prohibits the making of

23   knowingly false or misleading statements, which is the entire focus of the RKS Complaint. *See*

24   *Hewlett-Packard*, 845 F.3d at 1274. Rules 10b-5(a) and (c), on the other hand, prohibit

25   "employ[ing] any device, scheme, or artifice to defraud," or "engag[ing] in any act, practice, or

26   course of business which operates or would operate as a fraud or deceit upon any person." 17

27   C.F.R. § 280.10b-5(a), (c). Prototypical 10b-5(a) and (c) claims involve fraudulent activities

28   *different from* making purportedly false statements, such as pump-and-dump schemes, wash

trading, or other active market manipulation. *See, e.g.*, *Santa Fe Indus.*, 430 U.S. at 476 (giving examples including "wash sales, matched orders, or rigged prices"); *Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009) (explaining these provisions prohibit "activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand"); *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1307 (S.D. Fla. 2012) ("A pump-and-dump stock scheme is a classic violation of these provisions.").

The case law is clear that where a plaintiff's allegations relate only to alleged false statements or omission, not some other type of fraudulent activity—as with the RKS Claimants' claims here—then the plaintiff has no separate claim under 10b-5(a) and (c). And because the RKS Claimants' claim under Rule 10b-5(b) fails, their purported claim under Rule 10b-5(a) and (c) fails for the same reasons. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (reaffirming "that misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections" and instead a complaint must allege "something extra" (citation omitted)); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022) (dismissing plaintiffs' claims because "PayPal correctly argues that this alleged scheme [under Rule 10b-5(a) & (c)] consists entirely of (and fails for the same reasons as) the misstatements analyzed above [under Rule 10b-5(b)]."); *Linenweber v. Sw. Airlines Co.*, 2023 WL 6149106, at *14 (N.D. Tex. Sept. 19, 2023) ("Since the only fraudulent or deceptive acts identified by Plaintiffs are Defendants' alleged misstatements and Plaintiffs fail to meet the pleading standard for a misstatement claim, the Court dismisses Plaintiffs' misstatement-based scheme liability claim.").[16]

## IV.  THE RKS CLAIMANTS' SECURITIES ACT CLAIMS FAIL

The RKS Claimants' allegations supporting their claims under Section 11 are exactly the same as those pled in the TAC, and fail for the same reasons. The RKS Claimants allege to have purchased debt securities in the same offerings as the Securities Act Plaintiffs in the TAC— namely, note offerings in March 2016, December 2016, and March 2017, and an exchange offer

---

[16] Because the RKS Claimants' claims under Section 10(b) fail, their derivative control person claim under Section 20(a) also fails. *See* PERA Obj. § III.D.

in April 2018.[17]   And because a Section 11 claim under the Securities Act is confined to the documents that make up the securities offering, the RKS Claimants allege the exact same purportedly false statements in the offering materials as are alleged in the TAC.[18]  As explained in the PERA Objection, none of the RKS Claimants' allegations regarding the challenged statements in the offering materials are sufficient to establish actionable falsity under Section 11.  *See* PERA Obj. § IV.C.2.

But even if the RKS Claimants had sufficiently pled falsity—which they have not—their Section 11 claims would still fail for the additional reasons explained in the PERA Objection.  ***First***, all claims based on notes that were issued in the 2016 or 2017 notes offerings are barred by Section 11's one-year statute of limitations.  15 U.S.C. § 77m; s*ee* PERA Obj. § IV.C.1.  The one-year limitations period for Section 11 claims begins to run "once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first."  *Edison I*, 2021 WL 2325060, at *7 (citation and internal quotation marks omitted).  The RKS Claimants allege that the market began to learn about PG&E's purportedly poor safety practices, thereby revealing the supposed falsity of PG&E's prior representations, on October 12, 2017—more than one year prior to PG&E's bankruptcy.  RKS Am. ¶ 435.  As explained in the PERA Objection, the RKS claimants cannot allege that the October 12, 2017, corrective disclosure revealed the purported fraud for purposes of their Section 10(b) claims, while simultaneously ignoring that the same revelation put them on notice to assert Section 11 claims.  *See* PERA Obj. § IV.C.1.

***Second***, the RKS Claimants have failed to plead necessary facts to support claims based on notes that were purchased in the aftermarket, as opposed to in the original offerings—which is the vast majority of the RKS Claimants' notes.[19]   A noteholder that purchases notes in the

---

[17] *Compare* TAC ¶ 496 n.149, *with* RKS Am. ¶ 371 n.77.

[18] *Compare* TAC ¶¶ 634, 636-38, 640-48, 660-68, 674-82, *with* RKS Am. ¶¶ 376, 378, 380-81, 383-89, 391-92, 402-03, 405-08, 412-17

[19] The only notes purchased by any RKS Claimants in the offerings themselves, as opposed to in the aftermarket, are a relatively small number of notes purchased by some claimants in the

aftermarket after the issuer has published "an earning statement covering a period of at least twelve months after the effective date of the registration statement" cannot pursue a Section 11 claim based on purported misstatements in the registration statement unless the noteholder actually pleads and proves that it *relied* on any purported "untrue statement." 15 U.S.C. § 77k(a). Like the Securities Act Plaintiffs, the RKS Claimants have pled no facts showing that they actually relied on any of the purported misstatements in the registration statements. *See* PERA Obj. § IV.C.5.

*Third*, the RKS Claimants' claims based on the 2018 Exchange Offer fail as a matter of law because there can be no liability under Section 11 for notes sold in private offerings. PERA Obj. § IV.C.6.

*Fourth*, the RKS Claimants cannot establish economic loss because the allegations in the RKS Amendment demonstrate that any declines in the prices of PG&E notes were caused by the occurrence of the fires and the prior disclosures concerning PG&E's potential liability, not the revelation of any previously concealed misrepresented facts. *See, e.g.,* RKS Am. ¶ 443 (noting that "[n]umerous PG&E debt securities reacted to the North Bay fire news during the two-day period of October 12th and 13th"); *see also* PERA Obj. § IV.C.3.

*Fifth*, the RKS Claimants cannot establish damages under Section 11 because the true *value* (as opposed to price) of the subject notes never declined, as evidenced by the fact the notes at issue were reinstated or paid in full. *See* PERA Obj. § IV.C.4.

*Sixth*, as a basis for dismissal that is independent of Rule 12(b)(6), certain of the RKS Claimants' claims must be disallowed because the relevant claimants released them. As explained in the PERA Objection, any claimants that held one or more utility senior notes as of the petition date and the effective date are "Releasing Parties" under the Plan, and the Plan provides that such parties released any claims relating to PG&E's securities—including any equity and debt securities on which those claimants are presently seeking to recover. PERA Obj. § V. Therefore, the claims

---

December 2016, March 2017, and March 2018 offerings—although, as explained *infra*, notes purchased in the March 2018 offering are not actionable for another independent reason.

1 of any RKS Claimant who held utility senior notes as of the petition date and the effective date,

2 which are listed on Exhibit A, should be dismissed.

3    ***Finally***, to the extent the RKS Claimants purport to allege Section 10(b) claims based on

4 statements in the challenged debt instrument registration statements, such claims fail as well.  The

5 RKS Claimants fail to plead that any purchaser of the notes relied on any of the statements

6 challenged under Section 10(b).  Nor can they do so without alleging that individual claimants

7 read and relied upon those statements at the time that they purchased the notes.  That is, the RKS

8 Claimants cannot rely on the fraud-on-the-market presumption (which requires an efficient

9 market), because there can be no dispute that the market for the notes was not efficient and the

10 RKS Claimants have not even alleged market efficiency for these notes.[20]

11 **V.  CONCLUSION**

12    For all of the above reasons, and the reasons set forth in the PERA Objection, the RKS

13 Amendment fails to state a claim under the federal securities laws.  Therefore, PG&E respectfully

14 requests entry of an order (i) disallowing and expunging the claims listed on **Exhibit A** hereto, and

15 (ii) granting such other and further relief as the Court may deem just and appropriate.

16

17 Dated:  December 13, 2023       Respectfully submitted,

18

19          **WEIL, GOTSHAL & MANGES LLP**
         **KELLER BENVENUTTI KIM LLP**

20          **LATHAM & WATKINS LLP**

21          By:  */s/ Joshua G. Hamilton*

22

23          Joshua G. Hamilton

24          Attorneys for Debtors and Reorganized
         Debtors

25

26

27

_____

28 [20] Because the RKS Claimants' claims under Section 11 fail, their claim under Section 15 also fails.  *See* PERA Obj. § IV.D.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW