# Exhibit 29

**General Order
Number 165**


Prescribed by the
**Public Utilities Commission**
of the
State Of California



California Public Utilities Commission
505 Van Ness Avenue
San Francisco, Ca 94102

(This Space Intentionally Left Blank)

# Public Utilities Commission of the State of California
# Inspection Requirements for Electric Distribution and Transmission Facilities

Adopted March 31, 1997                                    Effective March 31, 1997
(D.97-03-070 in I.95-02-015 and R.96-11-004)

Amended August 20, 2009 by D.09-08-029 in R.08-11-005
Amended January 12, 2012 by D.12-01-032 in R.08-11-005

## I.      Purpose

The purpose of this General Order is to establish requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service.

## II.     Applicability

This General Order applies to all electric distribution and transmission facilities (excluding those facilities contained in a substation) that come within the jurisdiction of this Commission, located outside of buildings, including electric distribution and transmission facilities that belong to non-electric utilities. The requirements of this order are in addition to the requirements imposed upon utilities under General Orders 95 and 128 to maintain a safe and reliable electric system.  Nothing in this General Order relieves any utility from any requirements or obligations that it has under General Orders 95 and 128.

This General Order does not apply to facilities of communication infrastructure providers.

## III.    Distribution Facilities

### A       Definitions

For the purpose of this General Order,

**(1)**    **"Urban"** shall be defined as those areas with a population of more than 1,000 persons per square mile as determined by the United States Bureau of the Census.

**(2)**    **"Rural"** shall be defined as those areas with a population of less than 1,000 persons per square mile as determined by the United States Bureau of the Census.

1

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 4 of 565

(3) **"Patrol inspection"** shall be defined as a simple visual inspection, of applicable utility equipment and structures, that is designed to identify obvious structural problems and hazards. Patrol inspections may be carried out in the course of other company business.

(4) **"Detailed"** inspection shall be defined as one where individual pieces of equipment and structures are carefully examined, visually and through use of routine diagnostic test, as appropriate, and (if practical and if useful information can be so gathered) opened, and the condition of each rated and recorded.

(5) **"Intrusive"** inspection is defined as one involving movement of soil, taking samples for analysis, and/or using more sophisticated diagnostic tools beyond visual inspections or instrument reading.

(6) **"Corrective Action"** shall be defined as maintenance, repair, or replacement of utility equipment and structures so that they function properly and safely.

**B    Standards for Inspection**

Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.

**C    Record Keeping**

The utility shall maintain records for (1) at least ten (10) years of patrol and detailed inspection activities, and (2) the life of the pole for intrusive inspection activities. Such records shall be made available to parties or pursuant to Commission rules upon 30 days notice. Commission staff shall be permitted to inspect such records consistent with Public Utilities Code Section 314 (a).

For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.

2

**D     Reporting**

By July 1st each utility subject to this General Order shall submit an annual report for the previous year under penalty of perjury.

The report shall list four categorical types of inspections:  Patrols, Overhead Detailed, Underground Detailed and Wood Pole Intrusive. The report shall denote the total units of work by inspection type for the reporting period and the number of outstanding (not completed) inspections within the same reporting period for each of the four categories.

**Sample Report Template:**

| Type of Inspections (1) | Due (2) | Outstanding (3) |
|---|---|---|
| Patrols | xxx | xxx |
| OH Detailed | xxx | xxx |
| UG Detailed | xxx | xxx |
| Wood Pole Intrusive | xxx | xxx |

Notes:
1) Each utility will define its reporting unit basis (e.g., circuit, grid, facility / equipment).
2) Total inspections due in the reporting period. (Does not include outstanding inspections from prior years.)
3) Total inspections required that were not completed in the reporting period. (Does not include outstanding inspections from prior years.)

## IV.   Transmission Facilities

Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines.

Each utility shall maintain records of inspection and maintenance activities.  Commission staff shall be permitted to inspect records and procedures consistent with Public Utilities Code Section 314 (a).

/s/ Paul Clanon
Paul Clanon
Executive Director

3

**Table 1**
**Distribution Inspection Cycles (Maximum Intervals in Years)**

| | Patrol | | Detailed | | Intrusive | |
|---|---|---|---|---|---|---|
| | Urban | Rural | Urban | Rural | Urban | Rural |
| **Transformers** | | | | | | |
| Overhead | 1 | 2[1] | 5 | 5 | --- | --- |
| Underground | 1 | 2 | 3 | 3 | --- | --- |
| Padmounted | 1 | 2 | 5 | 5 | --- | --- |
| **Switching/Protective Devices** | | | | | | |
| Overhead | 1 | 2[1] | 5 | 5 | --- | --- |
| Underground | 1 | 2 | 3 | 3 | --- | --- |
| Padmounted | 1 | 2 | 5 | 5 | --- | --- |
| **Regulators/Capacitors** | | | | | | |
| Overhead | 1 | 2[1] | 5 | 5 | --- | --- |
| Underground | 1 | 2 | 3 | 3 | --- | --- |
| Padmounted | 1 | 2 | 5 | 5 | --- | --- |
| | | | | | | |
| Overhead Conductor and Cables | 1 | 2[1] | 5 | 5 | --- | --- |
| Streetlighting | 1 | 2 | x | x | --- | --- |
| Wood Poles under 15 years | 1 | 2 | x | x | --- | --- |
| Wood Poles over 15 years which have not been subject to intrusive inspection | 1 | 2 | x | x | 10 | 10 |
| Wood poles which passed intrusive inspection | --- | --- | --- | --- | 20 | 20 |

(1)    Patrol inspections in rural areas shall be increased to once per year in Extreme and Very High Fire Threat Zones in the following counties Imperial, Los Angeles, Orange, Riverside, Santa Barbara, San Bernardino, San Diego, and Ventura.  Extreme and Very High Fire Threat Zones are designated on the Fire and Resource Assessment Program (FRAP) Map prepared by the California Department of Forestry and Fire Protection or the modified FRAP Map prepared by San Diego Gas & Electric Company (SDG&E) and adopted by Decision 12-01-032 in Phase 2 of Rulemaking 08-11-005.  The fire-threat map is to be used to establish approximate boundaries and Utilities should use their own expertise and judgment to determine if local conditions require them to adjust the boundaries of the map.

Note:    This General Order does not apply to cathodic protection systems associated with natural gas facilities.

Note:    For the purpose of implementing the patrol and detailed inspection intervals in Table 1 above, the term "year" is defined as 12 consecutive calendar months starting the first full calendar month after an inspection is performed, plus or minus two full calendar months, not to exceed the end of the calendar year in which the next inspection is due.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 7 of 565

# Exhibit 30


Search example: How can I reduce my bill?    SEARCH

Home › Regulatory Services › Enforcement and Citations › Electric Safety Citations

# Electric Safety Citations

In December 2014, the CPUC issued Decision 14-12-001 to permit CPUC staff to fine electric corporations for violating state rules and regulations. Citations may arise out of an ongoing investigation or when a violation is directly brought to the CPUC's attention.

Decision 14-12-001 implements an electric safety citation program that is consistent with the requirements included in Senate Bill 291. In response to an application for rehearing, the CPUC issued Decision 15-05-054 in May 2015, modifying Decision 14-12-001 for purposes of clarification, and denying rehearing.

In September 2016, the CPUC issued Decision 16-09-055 adopting improvements to the electric safety citation program.

## Citations Issued

- **August 29, 2023:** $1,074,000 Citation to PG&E for involvement in the ignition of the Mule Fire.
  - Enclosure 1: SED Investigation Report
  - Enclosure 2: SED NOV to PG&E
  - Enclosure 3: PG&E Response to NOV
- **May 5, 2023:** $132,500 Citation to PG&E for involvement in the ignition of the Brewer Fire in Grass Valley
- **December 16, 2022:** $4,500,000 Citation to SCE for a 2018 incident that resulted in a fatality
  - All of the redactions are proposed by SCE and are currently under review.
  - Enclosure 1
  - Enclosure 2
  - Enclosure 3
  - Enclosure 4
  - Enclosure 5
  - Enclosure 6
  - Enclosure 7
  - Enclosure 8
  - Enclosure 9
- **November 15, 2022:** $1,020,000 Citation to SCE for its involvement in the ignition of the Easy Fire in Simi Valley
  - Enclosure 1
  - Enclosure 2
  - Enclosure 3
  - Enclosure 4
  - Enclosure 5
  - Enclosure 6
  - Enclosure 7
  - Enclosure 8
- **October 21, 2022:** $100,000 Citation to PG&E for its involvement in the ignition of the Drum Fire in Lompoc
- **November 22, 2021:**
  $2,500,000 Citation to PG&E for violating GO-165 related to the incomplete detailed inspection of 54,755 distribution poles in 2019
- **November 22, 2021:**
  $5,000,000 Citation to PG&E for inadequate inspections of the Ignacio-Alto-Sausalito transmission lines from 2008-2019
  - Enclosure 1
  - Enclosure 2
  - Enclosure 3
  - Confidentiality Declaration
- **December 4, 2020:** $1,000,000 Citation to SCE for December 2, 2017 incident in Oxnard (All of the redactions are proposed by SCE and are currently under review)
  - Enclosure 1 SED Incident Investigation Report
  - Enclosure 2 SED Notice of Violation
  - Enclosure 3 SCE's Response to NOV Letter
  - Enclosure 4 SCE's Initial Incident Report
  - Enclosure 5 SCE's Section 315 Letter
- **June 6, 2017:** $400,000 Citation for October 18, 2015 Incident near Moss Landing Substation/Monterey
  - Enclosure 1 SED Incident Investigation Report
  - Enclosure 2 PG&E Moss Landing Tower Collapse Direct Cause Analysis
  - Enclosure 3 PG&E Moss Landing Tower Collapse Root Cause Analysis
  - Enclosure 4 Root Cause Analysis Report Addendum
- **April 25, 2017:**
  $8 million Citation to PG&E for Violation of General Order 95, Rule 31.1 for Butte Fire Ignited September 9, 2015
  - Enclosure 1 SED Incident Investigation Report

### FEATURED LINKS

Administrative Consent Orders

Natural Gas Safety Citations

- Attachment 1 [CAL FIRE Investigation Report](#)
- Attachment 2 [Arborist Report](#)
- **April 25, 2017**:
  [$300,000 Citation to PG&E for Violation of General Order 95, Rule 35 and Resolution E-4184 for Butte Fire Ignited September 9, 2015](#)
  - Enclosure 1 [SED Incident Investigation Report](#)
    - Attachment 1 [CAL FIRE Investigation Report](#)
    - Attachment 2 [Arborist Report](#)
- **February 12, 2016**: [$50,000 Citation to Edison for May 15, 2014 Incident in Whittier](#)
  - Enclosure 1 [SED Incident Investigation Report](#)
  - Enclosure 2 [SCE's Initial Notice to SED](#)
  - Enclosure 3 [SCE 315 Letter](#)
  - Enclosure 4 [SCE Data Request Response 1](#)
  - Enclosure 5 [SCE Data Request Response 1 Supplement](#)
  - Enclosure 6 [SED Notice of Violation](#)
  - Enclosure 7 [SCE's Reply to NOV](#)
- **August, 31, 2015**: [$50,000 Citation to PG&E for August 26-27, 2014, incident at Metcalf Substation](#)
  - Enclosure 1 [SED Incident Investigation Report](#)
  - Enclosure 2 [PG&E Data Request Response 1](#)
  - Enclosure 3 [PG&E Root Cause Analysis Report](#)
  - Enclosure 4 [PG&E Data Request Response 2](#)
  - Enclosure 5 [PG&E Supplemental Response 2](#)
- **July 21, 2015**: [$450,000 Citation to PG&E for November 7, 2014, incident in San Jose](#)
  - Enclosure 1 [SED Incident Investigation Report](#)
  - Enclosure 2 [OSHA Evidence](#)
  - Enclosure 3 [PG&E Data Request Response 1](#)
  - Enclosure 4 [PG&E Data Request Response 2](#)
  - Enclosure 5 [USA Ticket](#)
  - Enclosure 6 [SED Notice of Violation](#)
  - Enclosure 7 [PG&E NOV Response](#)

## Other Actions

- December 16, 2022: [CPUC Staff Propose $4.5 Million SCE Penalty for Safety Failure](#)
- November 15, 2022: [CPUC Staff Propose Penalizing SCE $1 Million for Easy Fire](#)
- November 22, 2021: [CPUC Issues Citations to PG&E for Safety Code Violations](#)
  - [Letter Directive to PG&E to Take Corrective Actions to Address Safety Concerns with Cellon-Treated Wood Poles](#)

**HOW CAN WE HELP?**

Emergency? **Call 911**

File a Complaint

Late Bill Assistance

Power Outage Map

Are you in a high fire-threat area?

Financial Assistance

Consumer Programs and Services

Electric Rate Comparison Website

Website Feedback

**MORE INFORMATION**

Consumer Support

Regulatory Services

Industries and Topics

News and Updates

Events and Meetings

Proceedings and Rulemaking

Public Advocates Office

Office of the Tribal Advisor

About CPUC

Careers

**CALIFORNIA STATE CAMPAIGNS**

Register to Vote

Save our Water

Flex Alert

Back to Top | Conditions of Use | Privacy Policy | Accessibility | Contact us | Employees

Twitter  Facebook  Instagram  YouTube  Linked In

Copyright © 2021 State of California

# Exhibit 31

# CITATION FOR VIOLATION(S)
# ISSUED PURSUANT TO RESOLUTION ALJ-274
# OF GENERAL ORDER 112-E

**Gas Corporation (Operator):**  Pacific Gas & Electric Company
*To Which Citation Is Issued*

## RESPONDENT:

Mr. Jesus Soto, Vice President
Pacific Gas & Electric Company
6111 Bollinger Canyon Road, Room 4590-D
San Ramon, CA 94583

## CITATION:

Operator is hereby cited for two violations resulting in a financial penalty of $50,000 for each violation, for a total fine amount of $100,000.

## VIOLATIONS:

Operator is cited for violating General Order (GO) 112-E, as described below.  SED discovered these violations during the GO 112-E Operator Qualification (OQ) program audit conducted in 2012.

### 1.  49 CFR §192.805

> *"Each operator shall have and follow a written qualification program. The program shall include provisions to:*
> *(a) Identify covered tasks.*

PG&E did not identify some applicable covered tasks in its OQ Plan. These tasks include welding, non-destructive testing, excavation, compressor station maintenance, meter installation and maintenance, regulator installation and maintenance, backfilling, service line installation and repair.

## 2. 49 CFR §192.805

*"Each operator shall have and follow a written qualification program. The program shall include provisions to:*
*(f) Communicate changes that affect covered tasks to individuals performing those covered tasks"*

PG&E's OQ Plan, Section 1.7.1, "Communicate Changes" does not include a provision to identify how changes to the procedures, tools standards and other elements used by individuals in performing covered tasks are communicated to its contractors and how these changes are implemented in the evaluation process.

## ENCLOSURES:

The following enclosures were used to establish the findings of fact:

1. *Enclosure 1 - SED Investigation Report, dated 8/25/14*

2. *Enclosure 2 - SED 2012 PG&E OQ Audit Report, dated 11/07/2013*

3. *Enclosure 3 - PG&E Response to OQ Audit Report, dated 01/10/2014*

## STATEMENT OF FACTS:

The above violations are documented in the attached *Enclosure 1 – SED Investigation Report* which is based on one or more of the following: SED's review of the 2012 PG&E OQ program Audit, PG&E's response to the audit findings, Operator's records and/or substantiating documents obtained from other sources, or other reasons as stated in the attached report.

## SED CITATION ANALYSIS

| Element of Sentencing Schedule | Staff Finding |
|---|---|
| Number of violation (s) and duration of violation(s) | *Two violations of Title 49 CFR §192.805(a) and §192.805(f) found in 2012* |
| Severity of the offense: overall level of risk of violation(s) | *Two violations which did not create significant hazardous conditions, each for $50,000, resulting in total fine amount of $100,000* |
| The conduct of the utility before, during, and after the offense | *The utility is being cooperative and has undertaken corrective actions* |
| Previous occurrence of similar violations by the utility | *N/A* |
| Self-reporting of the violation | *Not self-reported. Violations found as a result of GSRB 2012 PG&E OQ Audit* |
| Indication of the violation (s) being willful | *No* |
| Actions taken by the utility to address the violation | *Refer to Enclosures 1 thru 3* |
| Associated safety related condition | *N/A* |
| Financial resources of the utility | *4.3 Million customers, $715 Million Revenue requirement* |
| The totality of the circumstances | *(1) Missing identification of several covered tasks - 49CFR192.805(a); and (2) Excluding contractors from communication of changes in the program - 49CFR192.805(f). Both violations affect PG&E's entire gas system* |
| Other factors deemed relevant by SED | *Utility cooperative with staff, calculated citation amount based on number of offenses (2).* |



# Public Utilities Commission
## STATE OF CALIFORNIA

| Resultant Citation Taking All Of These Factors Into Account | $100,000.00 |
|---|---|

### RESPONSE:

Respondent is hereby called upon to provide a response to this Citation by: **5:00 PM (PST) on February 2, 2015.**

By way of such response, Respondent, **within 10 calendar days,** may either:

(1) Correct the violations with any immediate safety hazard requiring immediate correction as soon as feasible, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** pay a fine pursuant to Pub. Util. Code § 2107. (Submit a check payable to California Public Utilities Commission using the attached *Citation Payment Form.* Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final); **or**

(2) Confirm that the violation(s) noted in this Citation have been corrected and/or otherwise do not present an on-going safety hazard to the Operator's employees and the general public, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** contest this citation by completing and submitting a *Notice of Appeal Form.* Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Resolution ALJ-274" for information on the appeals process and the attached "Notice of Appeal Form". Also attached is a copy of Resolution ALJ-299 including Appendices A and B.

Respondent's failure to provide a response, as noted above, within 10 calendar days from the date the citation is served, will place Respondent in default of the citation and will result in forfeiture of the Respondent's rights to appeal the citation. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

### NOTIFICATION TO PUBLIC AGENCIES:

As soon as is reasonable and necessary, and no later than 10 calendar days after service of the citation is effected, Respondent must provide a notification to the City Manager or similar local agency authority in the city and county where the citation is issued. Within 10 days of providing such notification, Respondent must serve an affidavit to the Director of SED, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

# Public Utilities Commission
## STATE OF CALIFORNIA

The CPUC expects Operators to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Operator's intentions to accept or appeal the violation(s) noted in the Citation.

*Elizaveta Malashenko*
Deputy Director
Office of Utility Safety and Reliability
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov

# Public Utilities Commission
## STATE OF CALIFORNIA

# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation

dated _____, and have corrected/mitigated the violation(s)

noted in the citation on _____ and no later than _____,

all work to make permanent corrections to any mitigated, or otherwise remaining

concerns related to the violation(s) will be completed as noted in the Compliance Plan

we have submitted to the Director of SED and, herewith, pay a fine in the amount of  $

_____ as included in the citation.

Signature of Gas Corporation's Treasurer,
Chief Financial Officer, or President/CEO, or
delegated Officer thereof

_____
(Signature)                              (Date)

_____
(Printed Name and Title)

Payment with a check must be made payable to the *California Public Utilities Commission* and sent to the below address.  Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

NOTE: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the addresses provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO RESOLUTION ALJ-274

Within 10 calendar days of the Respondent being served with a ***CITATION FOR VIOLATION(S) ISSUED PURSUANT TO RESOLUTION ALJ-274***, Respondent may appeal the citation. Beyond 10 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as feasible unless, within 10 calendar days from the date of service of the citation, the Respondent submits to the Director of SED, a Compliance Plan that provides a detailed description of when the violation(s) will be corrected, the methodology to be utilized, and a statement, supported by an affidavit from the Gas Corporation's Chief Executive Officer, that in the Respondent's best judgment, the time necessary to correct the violation(s) will not affect the integrity of the operating system or unduly endanger the public.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must be served, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Division of Ratepayer Advocates

within 10 calendar days of the date on which the Appellant is served the Citation at the address listed below. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

***California Public Utilities Commission***
***505 Van Ness Ave,***
***San Francisco, CA 94102***
***Attn: <Insert Title>***

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.



Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After SED receives the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a) Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Respondent;

(b) Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c) Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing; and

(d) Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Respondent's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a hearing room at either of the offices of the CPUC at the following locations:

**San Francisco**:
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.

## Public Utilities Commission
STATE OF CALIFORNIA

### Notice of Appeal Form
### Appeal of PG&E from Citation ALJ 274 15-01-001 issued by Safety and Enforcement Division (For A Citation Issued Pursuant to Resolution ALJ-274)

**Appellant:**

Name
Vice President, Gas Operations
Gas Utility Name
Mailing Address
City, CA Zip

Citation Date:

Citation #: _____-__-____

Operator ID#:

Appeal Date: _____

_____

"Appeal of [insert Operator Name] from [insert Citation number] issued by Safety and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages if needed and/or attach copies of supporting materials along with this form).

## Enclosures to Accompany Utility Appeal

*Utility to add Enclosures as appropriate*

# Exhibit 32

# CITATION FOR VIOLATION(S)
# ISSUED PURSUANT TO RESOLUTION ALJ-274
# OF GENERAL ORDER 112-E

**Gas Corporation (Operator):** Pacific Gas & Electric Company
*To Which Citation Is Issued*

### RESPONDENT:

Mr. Jesus Soto, Vice President
Pacific Gas & Electric Company
6111 Bollinger Canyon Road, Room 4590-D
San Ramon, CA 94583

### CITATION:

Operator is hereby cited for three violations from 2004-2012 resulting in a financial penalty of

$430,000

### VIOLATIONS:

Operator is cited with having violated General Order 112-E, as described below.  These violations occurred during the period 2004 through 2012.

**1. Title 49, CFR §192.925 What are the requirements for using External Corrosion Direct Assessment (ECDA)?**

*(a) Definition. ECDA is a four-step process that combines preassessment, indirect inspection, direct examination, and post assessment to evaluate the threat of external corrosion to the integrity of a pipeline.*

*(b) General requirements. An operator that uses direct assessment to assess the threat of external corrosion must follow the requirements in this section, in ASME/ANSI B31.8S (incorporated by reference, see §192.7), section 6.4, and in NACE SP0502-2008 (incorporated by reference, see §192.7). An operator must develop and implement a direct assessment plan that has procedures addressing preassessment, indirect examination, direct examination, and post-assessment. If the ECDA detects pipeline coating damage, the operator must also integrate the data from the ECDA with other information from the data integration (§192.917(b)) to evaluate the covered segment for the threat of third party damage, and to address the threat as required by §192.917(e)(1).*


*(3) Direct examination. In addition to the requirements in ASME/ANSI B31.8S
section 6.4 and NACE SP0502-2008, section 5, the plan's procedures for direct
examination of indications from the indirect examination must include—*

> *(i) Provisions for applying more restrictive criteria when conducting ECDA for
> the first time on a covered segment;*

*Section 5.9.1.2 of NACE RP0502-2002 states "When ECDA is applied for the first
time, the pipeline operator should not downgrade any indications that were originally
placed in the immediate or scheduled priority category to a lower priority category."*

*Section 5.2 Prioritization of NACE RP0502-2002 states in part:*

> *"5.2.1 The pipeline operator shall establish criteria for prioritizing the need for
> direct examination of each indication found during the Indirect Inspection Step.*
>
> *5.2.1.1 Prioritization, as used in this standard, is the process of estimating the
> need for direct examination of each indication based on the likelihood of current
> corrosion activity plus the extent and severity of prior corrosion."*

SED noted that for the first time ECDA, PG&E reclassifies some of the immediate
indications found as a result of indirect assessment based on some of its direct
examinations. The NACE standard states that all immediate indications should be
excavated if found as a result of indirect examination when ECDA is applied for the
first time. If it is a first time ECDA, PG&E cannot use a sample of the immediate
indications as a basis for reclassifying all the remaining immediate indications without
conducting a direct examination of all identified immediate indications.

PG&E must directly examine all immediate indications found as a result of indirect
assessment for the first time ECDA unless PG&E has a documented technical
justification for not implementing the NACE recommendation.

## 2. Title 49, CFR §192.935 What additional preventive and mitigative measures must an operator take?

*(a) General requirements. An operator must take additional measures beyond those
already required by Part 192 to prevent a pipeline failure and to mitigate the
consequences of a pipeline failure in a high consequence area. An operator must
base the additional measures on the threats the operator has identified to each
pipeline segment. (See §192.917) An operator must conduct, in accordance with one
of the risk assessment approaches in ASME/ANSI B31.8S (incorporated by
reference, see §192.7), section 5, a risk analysis of its pipeline to identify additional
measures to protect the high consequence area and enhance public safety. Such
additional measures include, but are not limited to, installing Automatic Shut-off
Valves or Remote Control Valves, installing computerized monitoring and leak
detection systems, replacing pipe segments with pipe of heavier wall thickness,
providing additional training to personnel on response procedures, conducting drills*


with local emergency responders and implementing additional inspection and maintenance programs.

PG&E established its procedure RMP-17, LTIMP to identify acceptable preventive and mitigative (P&M) measures for pipeline segments. The LTIMP provides details about how to perform a continual evaluation on PG&E's covered segments of pipeline. PG&E may also use the procedure as a basis for selection of P&M measures on selected non-covered segments with similar characteristics and threat susceptibility.

RMP-17 states that "The LTIMP process includes conducting a review following an integrity assessment, identifying P&M measures, and performing continual evaluations. The integrity assessment review integrates data and develops P&M measures based on threats identified for each pipe segment."

V-1 SED reviewed several LTIMP reports and found that PG&E did not generate many of them in a timely manner.

SED noted that since PG&E did not create the LTIMP reports in a timely manner after it completed the assessments, PG&E might have not addressed and promptly communicated to the responsible work groups some P&M measures for implementation.

During the audit, PG&E provided a copy of its LTIMP summary report which shows all pending LTIMP reports along with P&M work activity measures identified as a result of integrity management assessments.

As of September 2012, PG&E had a total of approximately 610 pending LTIMP projects. PG&E categorized approximately one third of these (229) as Priority 1 projects. This summary report also indicated that PG&E generated more than one third of all its pending LTIMP projects (258) for the assessments conducted prior to 2006 and based approximately 50% (116) of the pending Priority 1 projects on the inspections it conducted prior to 2006.

SED noted that as of September 2012, PG&E has only completed 17% of LTIMPs based on its 2004 baseline assessment mileage. It appears that since PG&E generated LTIMPs several years after the completion of integrity assessments, by the time PG&E started implementing the P&M measures, in some cases, covered segments were due for a reassessment.

SED determined that PG&E RMP-17 neither specifies any timeframe to create an LTIMP after PG&E completes an assessment nor does it require an allowed time interval to complete the implementation of P&M measures.

Therefore, PG&E must establish provisions in its RMP-17 for not only creating LTIMP reports but also implementing P&M measures with specific timeframes after conducting integrity assessments.


V-2 SED also determined that PG&E does not have an effective method of providing the Risk Management group with the results of the LTIMPs.

PG&E must clear its LTIMP backlog and establish procedures for implementing its LTIMP process in a timely manner.

SED has concluded that PG&E must do the following:

> ➢ PG&E must initiate the LTIMP process immediately after it completes the assessments to ensure timely implementation of P&M measures.
> ➢ PG&E must prioritize the P&M measures and schedule the highest priority ones for implementation promptly for each assessed segment and record them in the database.
> ➢ PG&E's IM group must improve its communication with PG&E's other departments in order to take remedial actions in a timely manner.
> ➢ PG&E must improve its LTIMP database to track the progress of projects and completed work and to update the status of each project.
> ➢ PG&E's LTIMP team must provide documentation for project time extensions in order to justify the need for the extension and to ensure that it would not affect the integrity of the pipeline adversely.

3. **Title 49, CFR, §192.937 What is a continual process of evaluation and assessment to maintain a pipeline's integrity?**

(a) General. After completing the baseline integrity assessment of a covered segment, an operator must continue to assess the line pipe of that segment at the intervals specified in §192.939 and periodically evaluate the integrity of each covered pipeline segment as provided in paragraph (b) of this section. An operator must reassess a covered segment on which a prior assessment is credited as a baseline under §192.921(e) by no later than December 17, 2009. An operator must reassess a covered segment on which a baseline assessment is conducted during the baseline period specified in §192.921(d) by no later than seven years after the baseline assessment of that covered segment unless the evaluation under paragraph (b) of this section indicates earlier reassessment.

(b) Evaluation. An operator must conduct a periodic evaluation as frequently as needed to assure the integrity of each covered segment. The periodic evaluation must be based on a data integration and risk assessment of the entire pipeline as specified in §192.917. For plastic transmission pipelines, the periodic evaluation is based on the threat analysis specified in 192.917(d). For all other transmission pipelines, the evaluation must consider the past and present integrity assessment results, data integration and risk assessment information (§192.917), and decisions about remediation (§192.933) and additional preventive and mitigative actions (§192.935). An operator must use the results from this evaluation to identify the threats specific to each covered segment and the risk represented by these threats.

SED did not find any documentation to verify that PG&E has performed continual evaluation for establishing reassessment methods and schedules by considering all



information relevant and required to determining risk associated with pipeline operations in HCAs as required by CFR, §192.937(b). SED noted, at the time of the audit that PG&E recently developed a Continual Evaluation Form; however, PG&E had not implemented the form for usage.

PG&E must prioritize and implement P&M measures identified in the LTIMPs based on their risk score and complete all remedial actions before the next reassessment of the covered segments.

PG&E must improve its procedure for continual evaluation in Section 7 of RMP-17, by providing additional specificity to improve the clarity and repeatability of the process. Additionally, PG&E must improve the procedure by adding robustness and missing pieces of information to meet the requirements of CFR, §192.937(b).

During the audit, it was unclear to SED what events and data PG&E needed to complete its "Continual Evaluation Form". PG&E needs to clearly define in its procedures that process for filling-out this form.

## ENCLOSURES:

The following enclosures were used to establish the findings of fact:

1. *Enclosure 1 – SED Investigation Report, dated August 29, 2014*

2. *Enclosure 2 – SED 2013 PG&E Transmission Integrity Management Program Audit, dated December 17, 2013*

3. *Enclosure 3 – PG&E Response to Transmission Integrity Management Program Audit  Report, dated February 18, 2014*

4. *Enclosure 4 – CPUC, Transmission Integrity Management Program Audit Report, dated October 21, 2010*

5. *Enclosure 5 – PG&E Response to Transmission Integrity Management Program Audit  Report and Attachment A, dated December 16, 2010*

## STATEMENT OF FACTS:

The above violations are documented in the attached *Enclosure 1 – SED's Investigation Report* which is based on one or more of the following: SED's review of the 2012 PG&E Transmission Integrity Management Program (TIMP) Audit, PG&E's response to the audit findings, Operator's records and/or substantiating documents obtained from other sources, or other reasons as stated in the attached report.



# Public Utilities Commission
## STATE OF CALIFORNIA

## SED CITATION ANALYSIS

| Element of Sentencing Schedule | Staff Finding |
|---|---|
| Number of violation (s) and duration of violation (s) since inception | *Three violations total; Title 49 CFR §192.925(b)(3), §192.935(a), and §192.937(a)(b) from 2004 through 2012* |
| Severity of the offense: overall level of risk of violation(s) | These violations contributed unnecessary risk to the utility's operations prior to corrective action |
| The conduct of the utility before, during, and after the offense | *The utility was cooperative* |
| Previous occurrence of similar violations by the utility | *2010 TIMP audit finding* |
| Self-reporting of the violation | *Not self-reported. Violations found as a result of SED 2012 PG&E TIMP Audit* |
| Indication of the violation (s) being willful | *No* |
| Actions taken by the utility to address the violation | *Refer to Enclosures 3 and 5* |
| Associated safety related condition | *N/A* |
| Financial resources of the utility | *4.3 Million customers, $715 Million Revenue requirement* |
| The totality of the circumstances | SED used annual compounding in accordance with Public Utilities Code § 2108 and considered the factors of Public Utilities Code § 2104.5 in its determination of the citation amount |
| Other factors deemed relevant by SED | *See Enclosure 1* |
| **Resultant Citation Taking All Of These Factors Into Account** | **$430,000.00** |

## RESPONSE:

Respondent is hereby called upon to provide a response to this Citation by: **5:00 PM (PST)** on **February 2, 2015**.

By way of such response Respondent, **within 10 calendar days,** may either:

(1) Correct the violations with any immediate safety hazard requiring immediate correction as soon as feasible, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** pay a fine pursuant to Pub. Util. Code § 2107. (Submit a check payable to California Public Utilities Commission using the attached *Citation Payment Form*. Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final); **or**

(2) Confirm that the violation(s) noted in this Citation have been corrected and/or otherwise do not present an on-going safety hazard to the Operator's employees and the general public, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** contest this citation by completing and submitting a *Notice of Appeal Form*. Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Resolution ALJ-274" for information on the appeals process and the attached "Notice of Appeal Form". Also attached is a copy of Resolution ALJ-299 including Appendices A and B.

Respondent's failure to provide a response, as noted above, within 10 calendar days from the date the citation is served, will place Respondent in default of the citation and will result in forfeiture of Respondent's rights to appeal the citation. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

## NOTIFICATION TO PUBLIC AGENCIES:

As soon as is reasonable and necessary, and no later than 10 calendar days after service of the citation is effected, Respondent must provide a notification to the City Manager or similar local agency authority in the city and county where a citation is issued. Within 10 days of providing such notification, Respondent must serve an affidavit to the Director of SED, at the mail or e-mail address noted below, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects Operators to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Operator's intentions to accept or appeal the violation(s) noted in the Citation.

*Elizaveta Malashenko*
Deputy Director
Office of Utility Safety and Reliability
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov



**Public Utilities Commission**
STATE OF CALIFORNIA

**Citation Date:** January 23, 2015
**Citation #:** ALJ 274 15-01-002
**Operator ID#:** 15007

## <u>CITATION PAYMENT FORM</u>

I (we) _____ hereby agree to comply with this citation

dated _____, and have corrected/mitigated the violation(s)

noted in the citation on _____ and no later than _____,

all work to make permanent corrections to any mitigated, or otherwise remaining

concerns related to the violation(s) will be completed as noted in the Compliance Plan

we have submitted to the Director of SED and, herewith, pay a fine in the amount of $

_____ as included in the citation.

> Signature of Gas Corporation's Treasurer, Chief Financial Officer, or President/CEO, or delegated Officer thereof

_____
(Signature)                                (Date)

_____
(Printed Name and Title)

Payment with a check must be made payable to the *California Public Utilities Commission* and sent to the below address. Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

NOTE: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the addresses provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO RESOLUTION ALJ-274

Within 10 calendar days of the Respondent being served with a ***CITATION FOR VIOLATION(S) ISSUED PURSUANT TO RESOLUTION ALJ-274***, Respondent may appeal the citation. Beyond 10 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as feasible unless, within 10 calendar days from the date of service of the citation, the Respondent submits to the Director of SED, a Compliance Plan that provides a detailed description of when the violation(s) will be corrected, the methodology to be utilized, and a statement, supported by an affidavit from the Gas Corporation's Chief Executive Officer, that in the Respondent's best judgment, the time necessary to correct the violation(s) will not affect the integrity of the operating system or unduly endanger the public.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must be served, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Division of Ratepayer Advocates

within 10 calendar days of the date on which the Appellant is served the Citation at the address listed below. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

***California Public Utilities Commission***
***505 Van Ness Ave,***
***San Francisco, CA 94102***
***Attn: <Insert Title>***

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.



# Public Utilities Commission
## STATE OF CALIFORNIA

**Citation Date:** January 23, 2015
**Citation #:** ALJ 274 15-01-002
**Operator ID#:** 15007

Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After SED receives the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a)  Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Respondent;
(b)  Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;
(c)  Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing; and
(d)  Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Respondent's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a hearing room at either of the offices of the CPUC at the following locations:

**San Francisco:**
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.



# Public Utilities Commission
## STATE OF CALIFORNIA

## Notice of Appeal Form
### Appeal of PG&E from Citation ALJ 274 15-01-002 issued by Safety and Enforcement Division (For A Citation Issued Pursuant to Resolution ALJ-274)

### Appellant:

Name
Vice President, Gas Operations
Gas Utility Name
Mailing Address
City, CA Zip

Citation Date:

Citation #: _____-__-___

Operator ID#:

Appeal Date: _____

_____

"Appeal of [insert Operator Name] from [insert Citation number] issued by Safety and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages if needed and/or attach copies of supporting materials along with this form).



# Public Utilities Commission
STATE OF CALIFORNIA

**Citation Date:** January 23, 2015

**Citation #:** ALJ 274 15-01-002

**Operator ID#:** 15007

## <u>Enclosures to Accompany Utility Appeal</u>

*Utility to add Enclosures as appropriate*

# Exhibit 33

# CITATION FOR VIOLATION(S)
# ISSUED PURSUANT TO RESOLUTION ALJ-274
# OF GENERAL ORDER 112-E

**Gas Corporation (Operator):**  Pacific Gas & Electric Company
*To Which Citation Is Issued*

**RESPONDENT:**

Mr. Jesus Soto, Vice President
Pacific Gas & Electric Company
6111 Bollinger Canyon Road, Room 4590-D
San Ramon, CA 94583

**CITATION:**

Operator is hereby cited for three violations for a total citation of $150,000.

**VIOLATIONS:**

Operator is cited with having violated General Order 112-E, as described below.  These violations occurred during the period 2001 through 2012.

1. **Title 49, CFR, § 192.605 Procedural manual for operations, maintenance, and emergencies.**

   *(b) Maintenance and normal operations. The manual required by paragraph (a) of this section must include procedures for the following, if applicable, to provide safety during maintenance and operations.*

   *(8) Periodically reviewing the work done by operator personnel to determine the effectiveness, and adequacy of the procedures used in normal operation and maintenance and modifying the procedures when deficiencies are found.*

   Safety and Enforcement Division (SED) noted that Pacific Gas & Electric (PG&E) does not currently have a written quality control (QC) and quality assurance (QA) procedures which its personnel follow for normal operation and maintenance activities conducted to assure safe and reliable gas service. PG&E explained that it is in the process of establishing a Gas Compliance Assurance Program (GasCAP) Procedure to provide a uniform process for implementing the Gas Compliance Program for the Distribution and Transmission Divisions and Districts within the Gas Maintenance and Construction Organization.


PG&E must establish written QC and QA procedures and implement the GasCAP to ensure that all necessary normal operations, maintenance, inspections, and testing activities it performs are in accordance with the applicable rules and standards and within allowed timeframes. Moreover, PG&E must ensure that it properly trains all of its affected employees to execute the GasCAP effectively and efficiently throughout the organization.

PG&E must implement this program throughout the company consistently and document the outcome of QC activities and compliance of the rules. Additionally, PG&E must ensure that corrective actions are taken to improve the quality of all field activities and corresponding record keeping and that the affected programs, manuals, plans, rules, standards, and procedures are complied with.

2. **Title 49, CFR, § 192.605 Procedural manual for operations, maintenance, and emergencies.**

   *(c) Abnormal operation. For transmission lines, the manual required by paragraph (a) of this section must include procedures for the following to provide safety when operating design limits have been exceeded:*

   *(1) Responding to, investigating, and correcting the cause of:*

   > *(i)  Unintended closure of valves or shutdowns;*
   > *(ii)  Increase or decrease in pressure or flow rate outside normal operating limits;*
   > *(iii) Loss of communications;*
   > *(iv) Operation of any safety device; and*
   > *(v)  Any other foreseeable malfunction of a component, deviation from normal operation, or personnel error, which may result in a hazard to persons or property.*

   *(2) Checking variations from normal operation after abnormal operation has ended at sufficient critical locations in the system to determine continued integrity and safe operation.*

   *(3) Notifying responsible operator personnel when notice of an abnormal operation is received.*

   *(4) Periodically reviewing the response of operator personnel to determine the effectiveness of the procedures controlling abnormal operation and taking corrective action where deficiencies are found.*

   PG&E refers to its Gas Safety and Emergency Response Plan (GERP) as addressing the requirements of abnormal operation procedures for transmission lines required by Title 49, CFR §192.605(c). PG&E's GERP addresses emergency response procedures; however, it does not satisfy the procedural requirements of transmission line abnormal operations per Title 49, CFR §192.605(c).



SED determined that the guidance materials provided by PG&E do not specifically and adequately address each type of abnormal operation defined by Title 49, CFR §192.605(c), nor do they clearly provide the appropriate response based on the situation and facilities involved.

## ENCLOSURES:

The following enclosures were used to establish the findings of fact:

1. *Enclosure 1 – SED Investigation Report, dated August 27, 2014*

2. *Enclosure 2 – SED 2013 PG&E Operation, Maintenance, and Emergency Audit, dated June 27, 2013*

3. *Enclosure 3 – PG&E Response to Operation, Maintenance, and Emergency Audit Report, dated July 29, 2013*

## STATEMENT OF FACTS:

The above violations are documented in the attached *Enclosure 1 – SED's Investigation Report* which is based on one or more of the following: SED's review of the 2013 PG&E Operation, Maintenance, and Emergency Plan Audit, PG&E's response to the audit findings, Operator's records and/or substantiating documents obtained from other sources, or other reasons as stated in the attached report.



# Public Utilities Commission
## STATE OF CALIFORNIA

## SED CITATION ANALYSIS

| Element of Sentencing Schedule | Staff Finding |
|---|---|
| Number of violation (s) and duration of violation (s) since inception | Two violations of Title 49 CFR §192.605(b)(8) and one violation of §192.605(c) |
| Severity of the offense: overall level of risk of violation(s) | These violations contributed unnecessary risk to the utility's operations prior to corrective action |
| The conduct of the utility before, during, and after the offense | The utility is being cooperative and has undertaken corrective actions |
| Previous occurrence of similar violations by the utility | N/A |
| Self-reporting of the violation | Not self-reported.  Violations found as a result of SED 2013 PG&E OM&E Audit |
| Indication of the violation (s) being willful | No |
| Actions taken by the utility to address the violation | Please see Enclosure 2 |
| Associated safety related condition | N/A |
| Financial resources of the utility | 4.3 Million customers, $715 Million Revenue requirement |
| The totality of the circumstances | SED considered the factors of Public Utilities Code § 2104.5 in its citation determination |
| Other factors deemed relevant by SED | See Enclosure 1 |
| **Resultant Citation Taking All Of These Factors Into Account** | **$150,000.00** |

## RESPONSE:

Respondent is hereby called upon to provide a response to this Citation by: **5:00 PM (PST) on February 9, 2015.**

By way of such response Respondent, **within 10 calendar days,** may either:

(1) Correct the violations with any immediate safety hazard requiring immediate correction as soon as feasible, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** pay a fine pursuant to Pub. Util. Code § 2107. (Submit a check payable to California Public Utilities Commission using the attached *Citation Payment Form*. Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final); **or**

(2) Confirm that the violation(s) noted in this Citation have been corrected and/or otherwise do not present an on-going safety hazard to the Operator's employees and the general public, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** contest this citation by completing and submitting a *Notice of Appeal Form*. Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Resolution ALJ-274" for information on the appeals process and the attached "Notice of Appeal Form". Also attached is a copy of Resolution ALJ-299 including Appendices A and B.

Respondent's failure to provide a response, as noted above, within 10 calendar days from the date the citation is served, will place Respondent in default of the citation and will result in forfeiture of Respondent's rights to appeal the citation. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

## NOTIFICATION TO PUBLIC AGENCIES:

As soon as is reasonable and necessary, and <u>no later than 10 calendar days</u> after service of the citation is effected, Respondent must provide a notification to the City Manager or similar local agency authority in the city and county where a citation is issued. <u>Within 10 days of providing such notification</u>, Respondent must serve an affidavit to the Director of SED, at the mail or e-mail address noted below, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects Operators to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Operator's intentions to accept or appeal the violation(s) noted in the Citation.

**Elizaveta Malashenko**
Deputy Director
Office of Utility Safety and Reliability
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov

# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation
dated _____, and have corrected/mitigated the violation(s)
noted in the citation on _____ and no later than _____,
all work to make permanent corrections to any mitigated, or otherwise remaining
concerns related to the violation(s) will be completed as noted in the Compliance Plan
we have submitted to the Director of SED and, herewith, pay a fine in the amount of $
_____ as included in the citation.

Signature of Gas Corporation's Treasurer, Chief Financial Officer, or President/CEO, or delegated Officer thereof

_____
      (Signature)                (Date)

_____
      (Printed Name and Title)

Payment with a check must be made payable to the *California Public Utilities Commission* and sent to the below address. Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

NOTE: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the addresses provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO RESOLUTION ALJ-274

Within 10 calendar days of the Respondent being served with a ***CITATION FOR VIOLATION(S) ISSUED PURSUANT TO RESOLUTION ALJ-274***, Respondent may appeal the citation. Beyond 10 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as feasible unless, within 10 calendar days from the date of service of the citation, the Respondent submits to the Director of SED, a Compliance Plan that provides a detailed description of when the violation(s) will be corrected, the methodology to be utilized, and a statement, supported by an affidavit from the Gas Corporation's Chief Executive Officer, that in the Respondent's best judgment, the time necessary to correct the violation(s) will not affect the integrity of the operating system or unduly endanger the public.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must be served, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Division of Ratepayer Advocates

within 10 calendar days of the date on which the Appellant is served the Citation at the address listed below. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

***California Public Utilities Commission***
***505 Van Ness Ave,***
***San Francisco, CA 94102***
***Attn: <Insert Title>***

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.



# Public Utilities Commission
## STATE OF CALIFORNIA

Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After SED receives the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a)    Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Respondent;

(b)    Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c)    Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing; and

(d)    Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Respondent's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a hearing room at either of the offices of the CPUC at the following locations:

**San Francisco:**
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.

## Notice of Appeal Form
### Appeal of PG&E from Citation ALJ 274 15-01-003 issued by Safety and Enforcement Division (For A Citation Issued Pursuant to Resolution ALJ-274)

**Appellant:**

Name
Vice President, Gas Operations
Gas Utility Name
Mailing Address
City, CA Zip

Citation Date:

Citation #:  ____-__-____

Operator ID#:

Appeal Date: _____

_____

"Appeal of [insert Operator Name] from [insert Citation number] issued by Safety and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages if needed and/or attach copies of supporting materials along with this form).



**Public Utilities Commission**
STATE OF CALIFORNIA

## Enclosures to Accompany Utility Appeal

*Utility to add Enclosures as appropriate*

# Exhibit 34

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



February 9, 2015                                                    EA2014-30

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Sacramento Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission, Ivan Garcia of my staff conducted an electric audit of PG&E's Sacramento
Division from November 3-7, 2014. The audit included a review of PG&E's records and field
inspections of PG&E's facilities.

During the audit, we identified violations of one or more General Orders. A copy of the audit
findings itemizing the violations is enclosed. Please advise me no later than March 9, 2015, by
electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such
violations.

If you have any questions concerning this audit please contact Ivan Garcia at (916) 928-5875 or
iag@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division

Enclosure:   Audit Findings

Cc:

> Elizaveta Malashenko, Deputy Director, Safety and Enforcement Division
> Charlotte F. TerKeurst, Program Manager, Electric Safety and Reliability Branch
> Alok Kumar, Senior Utilities Engineer, Supervisor, CPUC
> Ivan Garcia, Utilities Engineer, CPUC

# AUDIT FINDINGS

| A. | Location: | PG&E – Sacramento Division |
|---|---|---|
| | **Date Visited by CPUC:** | 11/3/2014- 11/7/2014 |

| **Explanation of Violation(s):** |
|---|
| **Late Inspection**

GO 165, Section III-B, – Standards for Inspection, states:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

The following PG&E's facilities were not inspected as required by GO 165:

- One underground enclosure in Map Q1212 was inspected late on 4/19/2011. The enclosure should have been inspected by 12/31/2010
- One pole in Map L2415 (EC Notification #106587978) was inspected late on 4/16/2013. The pole should have been inspected by 12/31/2012.
- One pole in Map K2824 (EC Notification #106588333) was inspected late on 4/16/2013. The pole should have been inspected by 12/31/2012.
- 37 overhead facilities in Map N12 were patrolled late in 2013. The overhead facilities should have been patrolled by 12/31/2012.
- 76 overhead facilities in Map M1223 were patrolled late in 2013. The overhead facilities should have been patrolled by 12/31/2012.
- 168 overhead facilities in Map M1224 were patrolled late in 2013. The overhead facilities should have been patrolled by 12/31/2012.
- 77 overhead facilities in Map M1225 were patrolled late in 2013. The overhead facilities should have been patrolled by 12/31/2012.
- 93 overhead facilities in Map M1219 were patrolled late in 2013. The overhead facilities should have been patrolled by 12/31/2012.
- 2 poles in Map M1710 were inspected late on 3/20/2014. The poles should have been inspected by 12/31/2013.
- One underground enclosure on Map M1907 was inspected late on 3/21/2014. The enclosure should have been inspected by 12/31/2013.
- 7 overhead maps with a total of 167 facilities missed a patrol and/or an inspection cycle.
- 21 underground maps with a total of 119 facilities missed a patrol and/or an inspection cycle. |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 53 of 565

PG&E failed to provide us with records indicating that the following maps were inspected:

- Map L2415 with twenty-eight overhead facilities
- Map Q2319 with one overhead facility
- Map O20 with one underground facility
- Map O22 with one underground facility
- Map S2412 with fifty-one underground facilities
- Map S2305 with two underground facilities
- Map P2414 with eighteen underground facilities
- Map R1122 with seventeen underground facilities
- Map S13 with one underground facility
- Map P2008 with one underground facility
- Map Q21 with two underground facilities
- Map V2524 with one underground facility
- Map L2OT with one underground facility
- Map L2OU with one underground facility
- Map Q2110 with one underground facility
- Map Q2323 with six underground facilities
- Map Q27 with one underground facility
- Map R23 with one underground facility
- Map S2422 with one underground facility
- Map S1307 with six underground facilities
- Map S1312 with two underground facilities

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 54 of 565

| B. | Location: | PG&E – Sacramento Division |
|---|---|---|
| | Date Visited by CPUC: | 11/3/2014- 11/7/2014 |

**Explanation of Violation(s):**

**Late Work orders**

GO 165, Section III-C, – Record Keeping, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

GO 95, Rule 31.1, Design, Construction, and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's records indicated that from January 2009 to November 7, 2014, 14,068 work orders were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 55 of 565

| C. | Location: | PG&E – Sacramento Division |
|---|---|---|
| | Date Visited by CPUC: | 11/3/2014- 11/7/2014 |

| Explanation of Violation(s): |
|---|

**Records Keeping**

GO 165, Section III-C, – Record Keeping, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

PG&E does not document all items requiring corrective action during an inspection. Specifically, PG&E staff does not document "minor work". PG&E staff only marks a "tally mark" indicating minor work, and does not specify the equipment identified for corrective action in the tally marks.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 56 of 565

The following violation discovered by ESRB engineers during the field audit was incorrectly documented and addressed by PG&E.

| D. | Location: | 5th St. and Alhambra, Davis |
|---|---|---|

| **Equipment No.:** | Switch 20490 |
|---|---|
| **Previous Visit by PG&E:** | 9/24/2014 |
| **Date Visited by CPUC:** | 11/6/2014 |

**Explanation of Violation(s):**

**Electric Underground Notification Not Completed In The Field**

GO 128, Rule 17.1, Design, Construction and Maintenance, states in part:

> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions know at the time by those responsible for the design, construction, or maintenance of [the] communication or supply lines and equipment."*

PG&E's Electric Underground Notification #107413702, stated that a retainer wall was needed at Switch 20490. The notification also stated the work was completed on 9/24/2014. Our field inspection revealed that the retainer wall was not built as documented in notification #107413702. We request that you explain this discrepancy in your records.

# Exhibit 35

**Public Utilities Commission**
STATE OF CALIFORNIA

| | |
|---|---|
| **Citation Date:** March 20, 2015 | |
| **Citation #:** ALJ 274 15-03-001 | |
| **Operator ID#:** 15007 | |

# CITATION FOR VIOLATION(S)
# ISSUED PURSUANT TO RESOLUTION ALJ-274
# OF GENERAL ORDER 112-E

**Gas Corporation (Operator):** Pacific Gas & Electric Company (PG&E)
*To Which Citation Is Issued*

## RESPONDENT:

Mr. Jesus Soto, Vice President
Pacific Gas & Electric Company
6111 Bollinger Canyon Road, Room 4590-D
San Ramon, CA 94583

## CITATION:

Operator is hereby cited for one violation resulting in a financial penalty of $200,000

## VIOLATIONS:

Operator is cited for violating General Order 112-E, as described below.

1. **§191.25 Filing safety-related condition reports.**

   *"(a) Each report of a safety-related condition under §191.23(a) must be filed (received by the Associate Administrator) in writing within five working days (not including Saturday, Sunday, or Federal Holidays) after the day a representative of the operator first determines that the condition exists, but not later than 10 working days after the day a representative of the operator discovers the condition. Separate conditions may be described in a single report if they are closely related. Reports may be transmitted by facsimile at (202) 366-7128..."*

   PG&E submitted a Safety Related Condition Report (SRCR) to Pipeline and Hazardous Materials Safety Administration (PHMSA) and California Public Utilities Commission (CPUC) on Transmission Line DFM-1601-09 located in the City of Tracy, San Joaquin County, California on December 9, 2014. The submitted report has the date of discovery as August 19, 2014 and the date of determination August 21, 2014.

The pressure reduction took place on August 21, 2014 and pipe replacement and pressure restoration took place on December 2, 2014. However, PG&E failed to submit the SRCR to PHMSA and CPUC in the timeframe outlined in Title 49 Code of Federal Regulations - §191.25.

PG&E in a response to email inquiry on January 9, 2015 reported, "Human error is the reason this Safety-Related Condition report was submitted late. The issue was brought to the attention of Regulatory Compliance in a timely manner via email, but the email was missed and did not get acted upon until the later date."

## ENCLOSURES:

The following enclosures were used to establish the findings of fact:

1. *Enclosure 1 – PG&E Safety Related Condition Report, dated 12/09/2014*

2. *Enclosure 2 - PG&E email response, dated 01/09/2015*

3. *Enclosure 3 - PG&E email response, dated 02/05/2015*

## STATEMENT OF FACTS:

The above violation is evident from the attached *Enclosure 1 – PG&E submitted Safety Related Condition Report* and submission of facts by PG&E as in *Enclosure 2 - PG&E email response*.


### SED CITATION ANALYSIS

| Element of Sentencing Schedule | Staff Finding |
|---|---|
| Number of violation (s) and duration of violation(s) | *One violation of Title 49 CFR §191.25 in 2014 (for the period August – December 2014).* |
| Severity of the offense: overall level of risk of violation(s) | *One violation that did not create significant hazardous conditions since remedial action(s) were taken in required timeframe. Late reporting is unacceptable for Safety Related Conditions and deprives the regulator of conducting a timely field examination. One violation resulting in total fine amount of $200,000 ($50,000 for each month of violation)* |
| The conduct of the utility before, during, and after the offense | *The utility is being cooperative and has undertaken corrective actions* |
| Previous occurrence of similar violations by the utility | *N/A* |
| Self-reporting of the violation | *This was reported as "safety related condition"* |
| Indication of the violation (s) being willful | *No* |
| Actions taken by the utility to address the violation | *Refer to Enclosure 1* |
| Associated safety related condition | *Several corrosion pits were found, the deepest pit measured 41% wall loss* |
| Financial resources of the utility | *4.3 Million customers, $715 Million Revenue requirement* |
| The totality of the circumstances | *Several corrosion pits were observed on the 6-inch diameter DFM-1601-09 pipeline at mile point 0.42. The pipeline was exposed at this location for a casing* |


| | |
|---|---|
| | *remediation project. The deepest corrosion pit measured 41% wall loss and was near a girth weld for a mitered bend. PG&E took necessary remedial actions, but failed to submit the required report to PHMSA and CPUC within timeframe outlined in Title 49 CFR §191.25* |
| Other factors deemed relevant by SED | *Utility cooperative with staff, calculated citation amount based on number of offenses (1) over a period of four months* |
| **Resultant Citation Taking All Of These Factors Into Account** | $200,000.00 |

## RESPONSE:

Respondent is hereby called upon to provide a response to this Citation by: **5:00 PM (PST) on March 30, 2015.**

By way of such response, Respondent, **within 10 calendar days,** may either:

(1) Correct the violations with any immediate safety hazard requiring immediate correction as soon as feasible, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** pay a fine pursuant to Pub. Util. Code § 2107. (Submit a check payable to California Public Utilities Commission using the attached *Citation Payment Form.* Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final); **or**

(2) Confirm that the violation(s) noted in this Citation have been corrected and/or otherwise do not present an on-going safety hazard to the Operator's employees and the general public, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** contest this citation by completing and submitting a *Notice of Appeal Form.* Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Resolution ALJ-274" for information on the appeals process and the attached "Notice of Appeal Form". Also attached is a copy of Resolution ALJ-299 including Appendices A and B.

Respondent's failure to provide a response, as noted above, within 10 calendar days from the date the citation is served, will place Respondent in default of the citation and will result in forfeiture of the Respondent's rights to appeal the citation. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

## NOTIFICATION TO PUBLIC AGENCIES:

As soon as is reasonable and necessary, and no later than 10 calendar days after service of the citation is effected, Respondent must provide a notification to the City Manager or similar local agency authority in the city and county where the citation is issued. Within 10 days of providing such notification, Respondent must serve an affidavit to the Director of SED, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects Operators to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations regardless of the Operator's intentions to accept or appeal the violation(s) noted in the Citation.

_Elizaveta Malashenko_
Director
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov

# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation

dated _____, and have corrected/mitigated the violation(s)

noted in the citation on _____ and no later than _____,

all work to make permanent corrections to any mitigated, or otherwise remaining

concerns related to the violation(s) will be completed as noted in the Compliance Plan

we have submitted to the Director of SED and, herewith, pay a fine in the amount of $

_____ as included in the citation.

Signature of Gas Corporation's Treasurer,
Chief Financial Officer, or President/CEO, or
delegated Officer thereof

_____
(Signature)                           (Date)

_____
(Printed Name and Title)

Payment with a check must be made payable to the *California Public Utilities Commission* and sent to the below address. Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

NOTE: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the addresses provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO RESOLUTION ALJ-274

Within 10 calendar days of the Respondent being served with a ***CITATION FOR VIOLATION(S) ISSUED PURSUANT TO RESOLUTION ALJ-274***, Respondent may appeal the citation. Beyond 10 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as feasible unless, within 10 calendar days from the date of service of the citation, the Respondent submits to the Director of SED, a Compliance Plan that provides a detailed description of when the violation(s) will be corrected, the methodology to be utilized, and a statement, supported by an affidavit from the Gas Corporation's Chief Executive Officer, that in the Respondent's best judgment, the time necessary to correct the violation(s) will not affect the integrity of the operating system or unduly endanger the public.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must be served, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Division of Ratepayer Advocates

within 10 calendar days of the date on which the Appellant is served the Citation at the address listed below. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

*California Public Utilities Commission*
*505 Van Ness Ave,*
*San Francisco, CA 94102*
*Attn: <Insert Title>*

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.



Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After SED receives the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a)    Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Respondent;

(b)    Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c)    Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing; and

(d)    Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Respondent's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a hearing room at either of the offices of the CPUC at the following locations:

**San Francisco:**
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.

## Notice of Appeal Form
### Appeal of PG&E from Citation ALJ 274 15-03-001 issued by Safety and Enforcement Division (For A Citation Issued Pursuant to Resolution ALJ-274)

**Appellant:**

Name
Vice President, Gas Operations
Gas Utility Name
Mailing Address
City, CA Zip

Citation Date:

Citation #:  ____-__-___

Operator ID#:

Appeal Date: _____

"Appeal of [insert Operator Name] from [insert Citation number] issued by Safety and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages if needed and/or attach copies of supporting materials along with this form).


## <u>Enclosures to Accompany Utility Appeal</u>

*Utility to add Enclosures as appropriate*

# Exhibit 36

Decision 15-04-024       April 9, 2015

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company to Determine Violations of Pub. Util. Code § 451, General Order 112, and Other Applicable Standards, Laws, Rules and Regulations in Connection with the San Bruno Explosion and Fire on September 9, 2010. | Investigation 12-01-007 (Filed January 12, 2012) <br><br> (Not Consolidated) |
| Order Instituting Investigation on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Facilities Records for its Natural Gas Transmission System Pipelines. | Investigation 11-02-016 (Filed February 24, 2011) <br><br> (Not Consolidated) |
| Order Instituting Investigation on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company's Natural Gas Transmission Pipeline System in Locations with High Population Density. | Investigation 11-11-009 (Filed November 10, 2011) <br><br> (Not Consolidated) |

**DECISION ON FINES AND REMEDIES TO BE IMPOSED ON
PACIFIC GAS AND ELECTRIC COMPANY FOR SPECIFIC VIOLATIONS
IN CONNECTION WITH THE OPERATION AND PRACTICES
OF ITS NATURAL GAS TRANSMISSION SYSTEM PIPELINES**

# TABLE OF CONTENTS

**Title**                                                                                    **Page**

1.    **Executive Summary** .................................................................................1

2.    **Background** ..............................................................................................4

3.    **Summary of Violations** ..........................................................................10

3.1.    San Bruno Violations Decision (I.12-01-007) ....................................... 10

3.2.    Recordkeeping Violations Decision (I.11-02-016) ............................... 15

3.3.    Class Location Violations Decision (I.11-11-009) ............................... 19

3.4.    Alleged Duplication of Violations ........................................................ 20

4.    **Legal Framework for Fines and Remedies** .........................................24

4.1.    Commission Authority to Impose Fines ............................................. 24

4.2.    Commission Authority to Impose Other Remedies ....................................... 27

4.3.    The Excessive Fines Clause .................................................................. 30

5.    **Factors to Consider in Setting Penalty Amount** ...............................39

5.1.    Severity of the Offense ......................................................................... 40

      5.1.1.    CPSD and Intervenors' Positions ................................ 40

      5.1.2.    PG&E's Position ...................................................... 42

      5.1.3.    Discussion ................................................................ 43

5.2.    Conduct of the Utility Before, During and After the Offense ..................... 48

      5.2.1.    CPSD and Intervenors' Positions ................................ 48

      5.2.2.    PG&E's Position ...................................................... 50

      5.2.3.    Discussion ................................................................ 53

5.3.    Financial Resources of the Utility ........................................................ 57

      5.3.1.    CPSD and Intervenors' Positions ................................ 57

      5.3.2.    PG&E's Position ...................................................... 60

      5.3.3.    Discussion ................................................................ 62

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 72 of 565

I.12-01-007 et al. L/MP6/mal

**TABLE OF CONTENTS**
(cont'd)

**Title**                                                         **Page**

5.4. The Totality of the Circumstances in Furtherance of the Public Interest ....71

    5.4.1. CPSD and Intervenors' Positions ........................................................71

    5.4.2. PG&E's Position ...................................................................................72

    5.4.3. Discussion ............................................................................................73

5.5. The Role of Precedent ........................................................................................73

    5.5.1. CPSD and Intervenors' Positions ........................................................73

    5.5.2. PG&E's Position ...................................................................................75

    5.5.3. Discussion ............................................................................................75

**6. Penalty to Be Imposed ............................................................................................77**

6.1. Allocation and Tracking of the $850 Million ....................................................94

6.2. Summary of Remedies .......................................................................................102

**7. Other Remedies ....................................................................................................102**

7.1. CPSD Proposed Remedies .................................................................................102

    7.1.1. CPSD Recommended Remedies in all three OIIs .........................104

    7.1.2. CPSD Recommended Remedies in I.12-01-007 (San Bruno OII) 106

    7.1.3. Recommended Remedies in I.11-02-016 (Recordkeeping OII)..127

    7.1.4. Recommended Remedies in I.11-11-009 (Class Location OII)...148

7.2. Intervenors' Proposed Remedies ......................................................................153

    7.2.1. California Pipeline Safety Trust .......................................................153

    7.2.2. Independent Monitor ........................................................................155

    7.2.3. Peninsula Emergency Response Fund ..............................................160

    7.2.4. Training for Emergencies..................................................................161

    7.2.5. Formal Agreement with Agencies in PG&E's Territory ...........162

    7.2.7. Incentive Program Modifications ....................................................167

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
73 of 565

# TABLE OF CONTENTS
## (cont'd)

**Title**                                                                                    **Page**

7.2.8.    Implementation of NTSB Recommendations ............................... 167

7.2.9.    Reimbursement of Litigation Expenses ........................................ 168

**8.    Compliance Filing** ............................................................................... **171**

**9.    Transcript Corrections** ....................................................................... **172**

**10.    Rulings on Motions** ............................................................................ **172**

**11.    Appeals and Requests for Review of Presiding Officers' Decision** ..... **176**

11.1.    Number of Violations ........................................................................ 176

11.1.1.    Duplicative and Overlapping Violations ..................................... 176

11.1.2.    Hindsight ..................................................................................... 184

11.1.3.    Alleged New Charges ................................................................. 186

11.2.    Penalties Imposed ............................................................................. 190

11.2.1.    Violations under Pub. Util. Code § 451 ...................................... 190

11.2.2.    Level of Penalties ....................................................................... 195

11.2.3.    Allocation of Penalties ................................................................ 196

11.2.4.    Proportionality and Constitutionality of Penalties ...................... 199

11.2.5.    Extension of Time to Pay Penalties ............................................ 203

11.3.    Rule 1.1 of the Commission's Rules of Practice and Procedure ................ 204

11.4.    Continuing Violations ....................................................................... 207

11.5.    Spoliation .......................................................................................... 209

11.6.    California Pipeline Safety Trust ........................................................ 212

11.7.    Independent Monitor ......................................................................... 215

11.8.    Reimbursement of Litigation Expenses ............................................ 217

11.8.1.    Legal Authority to Order Shareholders to Reimburse
          Intervenors' Litigation Expenses ............................................. 217

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
74 of 565

# TABLE OF CONTENTS
## (cont'd)

**Title**                                                                                          **Page**

11.8.2.    Reimbursement of PG&E's Litigation Expenses ..........................219

11.9.  Revisions to Remedies ........................................................................220

11.10. Other Revisions ................................................................................221

12.     **Comments on the Proposed Decision Different ......................................221**

**13.     Assignment of Proceeding.............................................................227**

**Findings of Fact ......................................................................................227**

**Conclusions of Law ................................................................................232**

Appendix A – List of Appearances

Appendix B – Table of Violations for I.12-01-007 (San Bruno OII)

Appendix C – Table of Violations for I.11-02-016 (Recordkeeping OII)

Appendix D – Table of Violations for I.11-11-009 (Class Location OII)

Appendix E – Adopted Remedies

Case: 19-30088     Doc# 14208-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page
75 of 565

**DECISION ON FINES AND REMEDIES TO BE IMPOSED ON
PACIFIC GAS AND ELECTRIC COMPANY FOR SPECIFIC VIOLATIONS
IN CONNECTION WITH THE OPERATION AND PRACTICES
OF ITS NATURAL GAS TRANSMISSION SYSTEM PIPELINES**

## 1.    Executive Summary

On September 9, 2010, a segment of Pacific Gas and Electric Company's (PG&E) 30-inch gas transmission line exploded in San Bruno, claiming the lives of eight people, injuring 58 people, destroying 38 homes and damaging 70 other homes.  The Commission's investigations into the San Bruno gas transmission pipeline explosion, PG&E's recordkeeping practices and PG&E's pipeline classification related to higher density populations have brought to light the characteristics and consequences of PG&E's longstanding failure to heed federal and state regulations governing the safe operation of natural gas transmission pipelines throughout its system.

This decision adopts penalties to be imposed on Pacific Gas and Electric Company (PG&E) for violations arising from:  (1) the September 9, 2010 San Bruno explosion and fire; (2) PG&E's recordkeeping practices for its gas transmission pipeline system; and (3) PG&E's failure to maintain the proper class designation for pipelines in areas of higher population density.  The Commission hereby imposes a fine and other penalties and remedies totaling $1.6 billion. This consists of:

- $850 million in future gas infrastructure improvements related to transmission pipeline safety to be paid for by PG&E shareholders;

- $300 million fine payable to the General Fund;

- $400 million bill credit to PG&E's gas ratepayers in the form of a one-time bill credit; and

- Approximately $50 million to implement over 75 remedies proposed by the Commission's Safety and Enforcement Division

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 76 of 565

previously called the Consumer Protection and Safety Division (CPSD)[1] and other intervenors to enhance pipeline safety.

The total of $1.6 billion in penalties and remedies imposed on PG&E in this decision, to be paid for by PG&E shareholders, when added to the disallowances already adopted in Rulemaking (R.) 11-02-019 (*Order Instituting Rulemaking on the Commission's Own Motion to Adopt New Safety and Reliability Regulations for Natural Gas Transmission and Distribution Pipelines and Related Ratemaking Mechanisms*), would exceed $2.2 billion.

These penalties and remedies are based on our findings – in our companion decisions issued today, Decision (D).15-04-021, (D).15-04-022 and (D).15-04-023 – that PG&E committed 2,425 violations of various provisions of Part 192 of Title 49 of the Code of Federal Regulations, Pub. Util. Code § 451, the 1955 American Society of Mechanical Engineers Standard B.31.8 (and its subsequent revisions), General Order 112 (and its subsequent revisions), and Rule 1.1 of the Commission's Rules of Practice and Procedure. Many of these violations occurred over a number of decades, for a total of 18,447,803 days in violation.[2] In some cases, the violations lasted for nearly 60 years. PG&E identified some violations in prior years, and some later violations prevented the identification and/or correction of prior violations. Records indicating the deficient materials, installation techniques, and pipeline locations were lost, in some cases with PG&E's knowledge that records were missing, PG&E deferred some needed pipeline integrity investments, even though the Commission had

---

[1] Prior to January 1, 2013, the Safety and Enforcement Division had been called the Consumer Protection and Safety Division (CPSD). However, for consistency and to avoid confusion, this Decision continues to refer to the Safety and Enforcement Division by its former name, CPSD.

[2] "Days in violation" refers to the number of violations multiplied by the number of days that violation continued.

Case: 19-30088　　Doc# 14208-2　　Filed: 12/13/23　　Entered: 12/13/23 22:10:31　　Page 77 of 565

authorized rate recovery for gas transmission safety investments. Where violations accumulate in the manner PG&E allowed, the accumulation compounds the risk to the safety of the public and to workers.

Our decision to use a mix of penalties and remedies is based on our intention to penalize PG&E for its violations and to deter similar behavior and violations in the future. This decision differs from the Presiding Officers' Decision (POD) on Fines and Remedies as follows: 1) the overall amount of penalties and remedies is increased by $200 million, from $1.4 billion to $1.6 billion; 2) the amount of future gas infrastructure improvements related to transmission pipeline safety to be paid for by PG&E shareholders is increased from zero to $850 million; 3) PG&E will pay a fine to the General Fund of $300 million instead of $950 million; and 4) intervenor compensation will be processed through our statutory intervenor compensation program as is standard practice.

We believe that a significant portion of the total penalty should be committed to making PG&E's gas transmission system as safe as possible for the public, ratepayers, utility workers, and the environment. Thus we will require PG&E shareholders to pay an $850 million penalty to be spent on these safety improvements. Most of the $850 million penalty will be spent on capital investments which PG&E will not add to its rate base and thus will not earn any profit on them.

At the same time, we recognize both the statutory tool for penalties (i.e., fines to the state General Fund) and the Commission's long-standing policy and practice of imposing fines on IOUs as a means of penalizing and deterring, and therefore require PG&E to pay $300 million of the total penalties and remedies in the form of a fine to the state General Fund.

We also order that PG&E provide a bill credit of $400 million. This portion of the penalties and remedies recognizes that, when PG&E committed these violations, it breached the trust between a regulated utility with an exclusive franchise and its customers that PG&E would maintain and operate a safe gas transmission system. We accordingly believe a bill credit provided directly to PG&E's gas customers is an appropriate part of the total penalties and remedies.

Finally, we order PG&E shareholders to fund approximately $50 million to implement over 75 remedies proposed by CPSD and other intervenors to enhance pipeline safety.

This decision recognizes that some of these remedies adopted here may have already been mandated by the National Transportation Safety Board, the Pipeline and Hazardous Materials Safety Administration, the Blue Ribbon Panel or decisions issued in Rulemaking 11-02-019. Therefore, PG&E shall file a Compliance Filing in these dockets, which:

1. Identifies the remedies ordered in this decision that have already been ordered elsewhere, where that remedy (decision, report, etc.) was ordered, and PG&E's progress to date in complying with that remedy.

2. Identifies any remedy ordered in this decision that modifies or eliminates any remedies ordered elsewhere.

The Compliance Filing shall also include a timeframe for completion of each of the remedies adopted in Appendix E of this decision. This Compliance Filing shall be filed within 60 days of the date this decision is issued.

Investigations (I.) 12-01-007, I.11-02-016 and I.11-11-009 remain open.

## 2. Background

On September 9, 2010, a 30-inch diameter segment of a natural gas transmission pipeline owned and operated by Pacific Gas and Electric Company (PG&E) ruptured in a residential area in San Bruno, California. In the months

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
79 of 565

following the explosion, the Commission opened the following investigations into PG&E operations and practices:

- Investigation (I.) 11-02-016 (Recordkeeping OII) – The Commission's investigation into whether PG&E violated any provision or provisions of the California Public Utilities Code, Commission general orders or decisions, or other applicable rules or requirements pertaining to safety recordkeeping for its gas service and facilities.

- I.11-11-009 (Class Location OII) – The Commission's investigation into whether any of PG&E's operations and practices of its natural gas transmission pipeline system in locations with higher population density were in violation of state or federal statutes and regulations or Commission rules, general orders or decisions.

- I.12-01-007 (San Bruno OII) – The Commission's investigation into whether PG&E violated any state or federal statutes or Commission orders in connection with the San Bruno explosion.[3]

Due to the overlap of witnesses and issues among the Pipeline OIIs, the assigned Administrative Law Judges (ALJs) coordinated hearing and briefing schedules as needed.  On September 7, 2012, CPSD filed two coordinated motions in the Pipeline OIIs seeking leave to serve additional prepared testimony regarding PG&E's financial resources and permission to file a single coordinated brief regarding fines and remedies.  The two motions were granted on September 25, 2012.  As noted in that ruling, a coordinated brief on fines and remedies would benefit the decisionmaking process, as the Commission could then consider CPSD's recommendations in a comprehensive manner.[4]

---

[3] Together, the three OIIs are referred to as the "Pipeline OIIs".  In addition to the Pipeline OIIs, the Commission also opened Rulemaking (R.) 11-02-019 to adopt new safety and reliability programs for natural gas transmission and distribution pipelines.

[4] *Administrative Law Judges' Ruling Granting Motions of Consumer Protection and Safety Division for Leave to Serve Additional Prepared Testimony and for Permission to File a Single Coordinated Brief Regarding Fines and Remedies and Notice of Hearing*, filed September 25, 2012, at 2-3.

CPSD served *Financial Analysis of PG&E Corporation (Overland Report)* on September 7, 2012.[5] The date for intervenors to serve financial testimony was December 17, 2012. No intervenor testimony was served. PG&E served its rebuttal testimony, *Wells Fargo Report*, on January 11, 2013.[6] CPSD served *Rebuttal by Overland Consulting to Report by Wells Fargo Securities* (*Overland Rebuttal*) on February 8, 2013.[7]

Evidentiary hearings on fines and remedies were held on March 4 and 5, 2013. Opening briefs were filed on May 6, 2013 by CPSD, the Division of Ratepayer Advocates (DRA);[8] the City of San Bruno (CSB); The Utility Reform Network (TURN); and the City and County of San Francisco (CCSF).[9] PG&E filed its response on May 24, 2013.[10] On June 5, 2013, CPSD filed its reply brief; DRA, TURN, CCSF and CSB filed their reply briefs on June 7, 2013.

On July 8, 2013, CPSD filed a motion for permission to file an amended reply brief. CPSD's motion was granted on July 12, 2013 in an electronic ruling, which also provided for a round of response/rebuttal briefs. CPSD filed its amended reply brief (*CPSD Amended Reply*) on July 16, 2013. PG&E filed its response to the *CPSD Amended Reply* on August 21, 2013. Rebuttal briefs to

---

[5] The confidential version of the *Overland Report* is Exh. JOINT-50; the public version of the *Overland Report* is Exh. JOINT-51.

[6] The confidential version of the *Wells Fargo Report* is Exh. JOINT-66; the public version is JOINT-67.

[7] The confidential version of the *Overland Rebuttal* is Exh. JOINT-53; the public version is JOINT-54.

[8] The Division of Ratepayer Advocates (DRA) was renamed the Office of Ratepayer Advocates (ORA) effective September 26, 2013, pursuant to Senate Bill 96. However, for consistency and to avoid confusion, this Decision continues to refer to ORA by its former name, DRA.

[9] DRA, TURN, CSB and CCSF are jointly referred to as "Intervenors."

[10] Pursuant to an ALJ Ruling issued on June 3, 2013, PG&E filed an amended brief on June 5, 2013.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 81 of 565

PG&E's August 21st response were filed on August 28, 2013 by CPSD, TURN, DRA, CCSF, CSB and the Californians for Renewable Energy (CARE).[11] Table 1 below summarizes the penalty proposals.

**TABLE 1**
**Penalty Proposals**

| Party | Fine to be Paid to General Fund | Other Disallowances/Remedies |
|---|---|---|
| CPSD[12] | Minimum $300 million | - $635 million disallowance for shareholders from D.12-12-030<br><br>- $1.515 billion for payment of ratepayers' share of Pipeline Safety Enhancement Plan (PSEP) Phase I costs, with any remaining amounts to pay for the ratepayers' share of PSEP Phase II costs.<br><br>- Specific remedies to address violations in each proceeding |
| DRA[13] | $550 million | - Shareholders responsible for all approved costs of Phase I of the PSEP, including the $1.169 billion approved in D.12-12-030<br><br>- Hire independent monitor<br><br>- Implement NTSB recommendation regarding comprehensive audit of all aspects of PG&E's operations |
| TURN[14] | $670 million | - $785 million already or to be paid by PG&E shareholders for PSEP |

---

[11] CARE is a party in only the Recordkeeping OII.

[12] *Amended Reply Brief of the Consumer Protection and Safety Division on Fines and Remedies (CPSD Amended Reply)*, filed July 16, 2013, at 4.

[13] *Opening Brief of the Division of Ratepayer Advocates Regarding Fines and Remedies (DRA Opening Brief)*, filed May 6, 2013, at 4-5.

[14] *Opening Brief of The Utility Reform Network on Fines and Remedies (TURN Opening Brief)*, filed May 6, 2013, at viii – x.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 82 of 565

| | | |
|---|---|---|
| | | work ordered in D.12-12-030 |
| | | - $1.0 billion of PSEP costs apportioned to PG&E's ratepayers in D.12-12-030 (after-tax cost = $740 million) |
| | | - $50 million associated with proposed remedies |
| | | - Centralized database on reused pipeline |
| | | - PG&E should pay costs for independent auditor |
| CSB[15] | $900 million | - Require $2.333 billion in PSEP investments be made at shareholder expense |
| | | - Appoint Independent Monitor |
| | | - $100 million to establish and fund California Pipeline Safety Trust |
| | | - $150 million to establish and fund Peninsula Emergency  Response Fund |
| | | - Require memorandum of understanding (MOU) with city, county and fire districts regarding emergency response role |
| | | - Direct PG&E to undertake automated safety value pilot program |
| | | - Direct PG&E to modify incentive |

---

[15] *Rebuttal Brief of the City of San Bruno Concerning the Fines and Remedies to be Imposed on Pacific Gas and Electric Company (CSB Rebuttal Brief)*, filed June 7, 2013, at 7-8.  In its opening brief, CSB had proposed a fine amount of $1.25 billion fine to be paid to the State's General Fund and various remedies.  (*Opening Brief of the City of San Bruno Concerning the Fines and Remedies to be Imposed on Pacific Gas and Electric Company (CSB Opening Brief),* filed May 6 2014, at 7.)  In its rebuttal brief, CSB updated its penalty proposal to "support, oppose or respond to specific proposals" advanced by CPSD, TURN, DRA, CCSF and PG&E in their opening briefs on fines and remedies, and by CPSD in its rebuttal brief.  (*CSB Rebuttal Brief* at 6.)

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 83 of 565

| | | structure. |
|---|---|---|
| CCSF[16] | Total amount of at least $2.25 billion. No allocation between fines and disallowances, but advocates that a large portion should be directed to remedial measures proposed by CSB, DRA and TURN. | |

On July 30, 2013, the ALJs issued a ruling requesting additional comment in the following areas:

1.  PG&E was asked to respond to various questions concerning how it would treat any fines or disallowances. (Section 3 Questions)

2.  All parties were asked to respond to various questions concerning "the impact that fines and disallowances would have on PG&E's ability to raise capital and otherwise remain financially viable, including the tax treatment of amounts disallowed."[17] (Section 4 Questions)

PG&E filed its response to the Section 3 Questions on August 21, 2013.[18] Responses to the Section 4 Questions were filed on September 20, 2013 by CPSD, PG&E, TURN and CSB.[19] Replies to those responses were filed on October 15, 2013 by CPSD, PG&E, and TURN.

---

[16] *Opening Brief of the City and County of San Francisco on Penalties (CCSF Opening Brief)*, filed May 6, 2013, at 15-17 & 47-50.

[17] *Administrative Law Judges' Ruling Requesting Additional Comment*, filed July 30, 2013, at 4.

[18] Pursuant to an ALJ Ruling issued on September 16, 2013, PG&E filed an amended response on September 17, 2013.

[19] Pursuant to an ALJ Ruling issued on October 9, 2013, PG&E and CSB filed amended responses on October 11, 2013.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 84 of 565

On April 9, 2015 the Commission issued decisions on violations associated with the three investigations – Decision (D).15-04-023 (*San Bruno Violations Decision*), (D).15-04-021 (*Recordkeeping Violations Decision*) and (D).15-04-022 (*Class Location Violations Decision*). [20]  The violations found in these three decisions form the basis for our consideration of the penalties to be imposed.

## 3.      Summary of Violations

In the decisions on violations, we found that PG&E committed a total of 2,425 violations of various provisions of Part 192 of Title 49 of the Code of Federal Regulations (CFR), Pub. Util. Code § 451, American Society of Mechanical Engineers Standard B.31.8 (ASME B.31.8) (and its subsequent revisions), General Order (GO) 112 (and its subsequent revisions), and Rule 1.1 of the Commission's Rules of Practice and Procedure.  These violations are summarized below.

### 3.1.    San Bruno Violations Decision (I.12-01-007)

In the *San Bruno Violations Decision*, we found PG&E had committed 32 violations, many of them continuing for years, and a total of 59,255 separate offenses.  These violations are:

1. PG&E violated Section 841.412(c) of ASME B31.1.8-1955 by not conducting a hydrostatic test on Segment 180 post-installation, creating an unsafe system in violation of Pub. Util. Code § 451. This violation began in 1956 and, because PG&E did not subsequently conduct a hydrostatic test, continued to September 9, 2010.

2. By failing to visually inspect for and discover the defects in Segment 180, PG&E violated Section 811.27(A) of ASME B31.1.8-1955, creating an unsafe system in violation of Pub. Util. Code § 451.  This violation occurred in 1956.

---

[20] These three decisions are the Modified Presiding Officer (ModPod) Decisions in these three OIIs.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 85 of 565

3. By installing pipe sections in Segment 180 that were less than 5 feet in length, PG&E violated API 5LX Section VI, creating an unsafe system in violation of Pub. Util. Code § 451. This violation occurred in 1956.

4. By assigning a yield strength value for Segment 180 above 24,000 psi when the yield strength was actually unknown, PG&E violated Section 811.27(G) of ASME B31.1.8-1955, creating an unsafe system in violation of Pub. Util. Code § 451. This violation occurred in 1956.

5. By not completely welding the inside of the longitudinal seams on pups 1, 2, and 3 of Segment 180 and failing to measure the wall thickness to ensure compliance with the procurement orders which required 0.375-inch wall thickness, PG&E violated Section 811.27(C) of ASME B31.1.8-1955, creating an unsafe system in violation of Pub. Util. Code § 451. This violation occurred in 1956.

6. By welding the pups in a deficient manner such that the girth welds contained incomplete fusion, burnthrough, slag inclusions, cracks, undercuts, excess reinforcement, porosity defects, and lack of penetration, PG&E violated Section 1.7 of API standard 1104 (4th edition, 1956), creating an unsafe system in violation of Pub. Util. Code § 451. This violation occurred in 1956.

7. By failing to properly account for the actual conditions, characteristics, and specifications of the Segment 180 pups when it established the MAOP of 400 psig for Segment 180, PG&E failed to comply with the maximum allowable operating pressure (MAOP) determination requirements in Section 845.22 of ASME B31.1.8-1955. PG&E therefore created an unsafe system condition in violation of Pub. Util. Code § 451. This violation occurred in 1956.

8. By installing pipeline sections in Segment 180 out of compliance with industry standards and transmission pipe specifications, and not suitable or safe for the conditions under which they were used, contrary to Section 810.1 of ASME B31.1.8-1955, PG&E created an unreasonably unsafe system in violation of Pub. Util. Code § 451. Because the unsafe condition remained uncorrected, this violation continued from 1956 to September 9, 2010.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 86 of 565

9.  PG&E violated ASME-B31.8S Appendix A, Section 4.2, and 49 CFR 192.917(b), by failing to use conservative assumptions where PG&E was missing important pipeline data such as pipe material, manufacturing process, and seam type. This violation continued from December 17, 2004 to September 9, 2010.

10. PG&E violated 49 CFR 192.917(b), by not adequately gathering and integrating required pipeline data, thereby not having an adequate understanding of the threats on Line 132. This violation continued from December 17, 2004 to September 9, 2010.

11. PG&E's failure to analyze the data on pipeline weld defects resulted in an incomplete understanding of the manufacturing threats to Line 132, in violation of 49 CFR 192.917(a) and ASME-B31.8S Section 2.2. This violation continued from December 17, 2004 to September 9, 2010.

12. PG&E violated 49 CFR 192.917(e)(2), by failing to consider and test for the threat of cyclic fatigue on Segment 180. This violation continued from December 17, 2004 to September 9, 2010.

13. As a result of ignoring the category of Double Submerged Arc Welded (DSAW) as one of the weld types potentially subject to manufacturing defects, PG&E failed to determine the risk of failure from this defect in violation of 49 CFR 192.917(e)(3). This violation continued from December 17, 2004 to September 9, 2010.

14. PG&E violated 49 CFR 192.917(e)(3) by not considering manufacturing and construction defects on Line 132 unstable and prioritizing the covered segments as high risk for the baseline assessment or a subsequent reassessment, and thereby failing to determine the risk of failure from manufacturing and construction defects of Line 132 after operating pressure increased above the maximum operating pressure experienced during the preceding five years. This violation continued from December 17, 2004 to September 9, 2010.

15. By not performing pipeline inspections using a method capable of detecting seam issues, PG&E violated 49 CFR 192.921(a). This violation continued from December 17, 2004 to September 9, 2010.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 87 of 565

16. PG&E violated 49 CFR 192.917(c) and ASME-B31.8S Section 5, by using risk ranking algorithms that did not: (1) properly weigh the threats to Line 132, because PG&E did not include its actual operating experience; (2) properly identify the Potential Impact Radius of a rupture, by using a value of 300 feet where the PIR is less than that; (3) identify the proper Consequence of Failure formula, by not accounting for higher population densities; (4) use conservative values for electrical interference on Line 132, which created an external corrosion threat; (5) include any consideration of one –call tickets, which indicates third party damage threats; (6) include any consideration of historic problems with the type of pipe used on Segment 180. This violation continued from December 17, 2004 to September 9, 2010.

17. PG&E violated Pub. Util. Code § 451 by engaging in the practice of increasing the pressure on Line 132 every 5 years to set the MAOP for the purpose of eliminating the need to deem manufacturing and construction threats unstable, thereby avoiding the need to conduct hydrostatic testing or in-line inspections on Line 132. This violation continued from December 17, 2004 to September 9, 2010.

18. PG&E violated 49 CFR 192.13(c), by failing to follow its internal work procedures that are required to be established under 49 CFR 192. This violation occurred on September 9, 2010.

19. By failing to follow its work procedures on September 9, 2010, PG&E created an unreasonably dangerous condition in violation of Pub. Util. Code § 451. This violation occurred on September 9, 2010.

20. PG&E violated 49 CFR 192.605(c), by failing to establish adequate written procedures for maintenance and operations activities under abnormal conditions. This violation occurred on September 9, 2010.

21. PG&E created an unreasonably unsafe system in violation of Pub. Util. Code § 451, by poorly maintaining a system at Milpitas that had defective electrical connections, improperly labeled circuits, missing wire identification labels, aging and obsolete equipment, and inaccurate documentation. This violation continued from February 28, 2010 to September 9, 2010.

22. PG&E's slow and uncoordinated response to the explosion violates the requirement of 49 CFR 192.615(a)(3) for an operator to respond promptly and effectively to an emergency. This violation occurred on September 9, 2010.

23. PG&E did not adequately receive, identify, and classify notices of the emergency, in violation of 49 CFR 192.615(a)(1). This violation occurred on September 9, 2010.

24. PG&E did not provide for the proper personnel, equipment, tools and materials at the scene of an emergency, in violation of 49 CFR 192.615(a)(4). This violation occurred on September 9, 2010.

25. PG&E's efforts to perform an emergency shutdown of its pipeline were inadequate to minimize hazards to life or property, in violation of 49 CFR 192.615(a)(6). This violation occurred on September 9, 2010.

26. Rather than make safe any actual or potential hazards to life or property, PG&E's response made the hazards worse, in violation of 49 CFR 192.615(a)(7). This violation occurred on September 9, 2010.

27. PG&E's failure to notify the appropriate first responders of an emergency and coordinate with them violated 49 CFR 192.615(a)(8). It is clear that PG&E's emergency plans were ineffective, and were not followed. This violation occurred on September 9, 2010.

28. PG&E violated 49 CFR 192.605(c)(1) and (3) by failing to have an emergency manual that properly directed its employees to respond to and correct the cause of Line 132's decrease in pressure, and its malfunction which resulted in hazards to persons and property, and notify the responsible personnel when notice of an abnormal operation is received. This violation occurred on September 9, 2010.

29. PG&E failed to establish and maintain adequate means of communication with the appropriate fire, police and other public officials, in violation of 49 CFR 192.615(a)(2). This violation occurred on September 9, 2010.

30. PG&E violated 49 CFR 199.225(a), by failing to perform alcohol tests on the employees involved within 2 hours of the incident,

and failing to record the reasons for not administering the test in a timely fashion.  This violation occurred on September 9, 2010.

31. PG&E's failure to create and follow good emergency plans created an unreasonably unsafe system in violation of Pub. Util. Code § 451.  This violation occurred on September 9, 2010.

32. PG&E created an unreasonably unsafe system in violation of Pub. Util. Code § 451, by continuously cutting its safety-related budgets for its Gas Transmission and Storage (GT&S).  This violation continued from January 1, 2008 to September 9, 2010.

### 3.2.   Recordkeeping Violations Decision (I.11-02-016)

In the *Recordkeeping Violations Decision*, we found that PG&E committed 33 violations, many of them continuing for years, for a total of 350,189 days in violation.  These violations are:

1. PG&E's lack of accurate and sufficient records to determine whether it had used salvaged pipe in Segment 180 impacted its ability to safely maintain and operate this segment in violation of Pub. Util. Code § 451.  (Felts Violation 1)  This violation ran from 1956 to September 9, 2010.

2. PG&E violated Pub. Util. Code § 451 for failing to retain the necessary design and construction records in Job File GM 136471 for the construction of Segment 180.  (Felts Violation 2)  This violation ran from 1956 to September 9, 2010.

3. PG&E violated ASME B.31.8 § 841 and Pub. Util. Code § 451 for failing to perform a post-installation pressure test on Segment 180 and retaining the record of that test for the life of the facility. (Felts Violation 3)  This violation ran from 1956 to September 9, 2010.

4. PG&E violated Pub. Util. Code § 451 by increasing the MAOP of Line 132 from 390 psi to 400 psi without conducting a hydrostatic test.  (Felts Violation 4)  This violation ran from December 10, 2003 to September 9, 2010.

5. PG&E violated Pub. Util. Code § 451 by operating Line 132 above 390 psi on December 11, 2003, December 9, 2008 and September 9, 2010 without having records to substantiate the higher operating pressure.  (Felts Violation 11)  These constitute three

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 90 of 565

separate violations.  The first violation ran from December 11, 2003 to September 9, 2010; the second violation ran from December 9, 2008 to September 9, 2010; and the final violation occurred on September 9, 2010.

6.  PG&E violated Pub. Util. Code § 451 by failing to provide the proper clearance procedures for work performed at the Milpitas Terminal on September 9, 2010.  (Felts Violation 5)  This violation ran from August 27, 2010 to September 9, 2010.

7.  PG&E violated Pub. Util. Code § 451 by failing to have accurate drawings and computer diagrams of the Milpitas Terminal. (Felts Violation 7)  This violation ran from December 2, 2009 to July 2011.

8.  PG&E violated Pub. Util. Code § 451 by failing to have accurate Supervisory Control and Data Acquisition System (SCADA) diagrams.  (Felts Violation 7 and 9)  This violation ran from December 2, 2009 to October 27, 2010.

9.  PG&E violated Pub. Util. Code § 451 by failing to have the necessary backup software readily available at the Milpitas Terminal on September 9, 2010.  (Felts Violation 8)  This violation occurred on September 9, 2010.

10.  PG&E's October 10, 2011 data response about the video recording for Camera 6 misled Commission staff and impeded their investigation into the San Bruno explosion.  (Felts Violation 13)  This is a violation of Rule 1.1 of the Commission's Rules of Practice and Procedure.

11.  PG&E violated Rule 1.1 by misleading CPSD in two separate data responses regarding personnel present at the Milpitas Terminal who were working on the pressure problem on September 9, 2010.  (Felts Violation 14)  The first violation occurred on October 10, 2011, PG&E's response to DR 30, Q 8.d; the second violation occurred on December 17, 2011, PG&E's response to DR 30, Q 2.  Both violations ran until January 15, 2012.

12.  PG&E's recordkeeping practices with respect to Job Files adversely impacts its ability to operate its gas transmission pipeline system in a safe manner and violates Pub. Util. Code

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 91 of 565

§ 451.  (Felts Violation 16)  This violation ran from 1987 to December 12, 2012.

13.  PG&E has failed to retain pressure test records for all segments of its gas transmission pipeline system as required by Pub. Util. Code § 451, ASME B.31.8, GO 112 through 112-B and PG&E's internal records retention policies.  (Felts Violation 18)  This violation ran from 1956 through December 20, 2012.

14.  PG&E violated ASME B.31.8 § 828.2, GO 112 through 112-B § 206.1, 49 CFR 192.241 and 192.243 and PG&E's Standard Practice 1605 by failing to retain weld inspection reports.  (Felts Violation 19)  This violation ran from 1955 through December 20, 2012.

15.  PG&E violated Pub. Util. Code § 451 for failing to maintain records necessary to ensure the safe operations of its gas transmission pipeline system by failing to create and retain operating pressure records over the life of the pipe.  (Felts Violation 20)  This violation ran from 1955 to December 17, 2004.

16.  Starting in 1955, inaccurate and incomplete data in PG&E's leak reports would prevent PG&E from operating its gas transmission pipeline system safely, as required by Pub. Util. Code § 451. (Felts Violations 21 and 22)  This violation ran from 1955 to December 20, 2012.

17.  PG&E violated Pub. Util. Code § 451 by failing to retain records of reconditioned and reused pipe in its transmission pipeline system.  (Felts Violation 23)  This violation ran from 1940 to December 20, 2012.

18.  PG&E violated Pub. Util. Code § 451 by failing to ensure the accuracy of data in its Geographic Information System (GIS) system and assuming values for missing data that were not conservative.  (Felts Violation 24)  This violation ran from 1995 to December 20, 2012.

19.  PG&E violated Pub. Util. Code § 451 because its ability to assess the integrity of its pipeline system and effectively manage risk is compromised by the availability and accuracy of its pipeline data.  (Felts Violation 25)  This Violation ran from December 17, 2004 to December 20, 2012.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 92 of 565

20. PG&E violated Pub. Util. Code § 451 for failing to retain a metallurgist report concerning a 1963 fire and explosion on Line 109 caused by a failure in a circumferential weld. (Felts Violation 27)  This violation ran from 1963 to December 20, 2012.

21. The shortcomings in PG&E's records management activities has resulted in PG&E's inability to operate and maintain PG&E's gas transmission line in a safe manner and violate Pub. Util. Code § 451; GO 112 through 112-B, Section 107; ASME B.31.8. (Duller/North Violation A.1)  This violation ran from 1955 to December 20, 2012.

22. PG&E violated ASME B.31.8 § 851.5 by failing to retain records of Leak Survey Maps for as long as the line remains in service. (Duller/North Violation B.1)  This violation ran from April 16, 2010 to December 20, 2012.

23. PG&E violated ASME B.31.8 § 851.5 by failing to retain records of Line Patrol Reports for as long as the line remains in service. (Duller/North Violation B.2)  This violation ran from September 1, 1964 to December 20, 2012.

24. PG&E violated ASME B.31.8 § 851.5 by failing to retain records of Line Inspection Reports as long as the line remains in service. (Duller/North Violation B.3)  This violation ran from December 17, 1991 to December 20, 2012.

25. PG&E violated ASME B.31.8 § 851.417 by failing to retain pressure test records for the useful life of the pipeline. (Duller/North Violation B.4)  This violation ran from September 1, 1964 to December 20, 2012.

26. PG&E violated ASME B.31.8 § 851.5 by failing to retain records of transmission line inspections for as long as the line remains in service. (Duller/North Violation B.5)  This violation ran from September 1, 1964 to December 20, 2012.

27. PG&E violated 49 CFR 192.13(c) for failing to comply with its internal records retention policies. (Duller/North Violation B.6)  This violation ran from 1955 to December 20, 2012.

28. PG&E violated Pub. Util. Code § 451 by failing to identify and include in the Gas Pipeline Replacement Plan (GPRP) all pipe segments with unusual longitudinal seams and joints.

(Duller/North Violation C.1)  This violation ran from June 1988 to December 20, 2012.

29. PG&E violated Pub. Util. Code § 451 because missing and inaccurate pipeline records prevented PG&E from properly identifying and replacing those pipelines that were prone to damage during severe earthquakes.  (Duller/North Violation C.2)  This violation ran from June 1992 to December 20, 2012.

30. PG&E violated Pub. Util. Code § 451 for failing to maintain a definitive, complete and readily accessible database of all gas leaks for their pipeline system.  (Duller/North Violation C.3)  This violation ran from 1957 to December 20, 2012.

### 3.3.  Class Location Violations Decision (I.11-11-009)

In the *Class Location Violations Decision*, we found that PG&E committed 2,360 violations that continued for years, for a total of 18,038,359 days in violation.  These violations are:

1. PG&E failed to maintain or operate all segments of its transmission pipeline system at the proper class location.  Based on PG&E's acknowledgement that it is responsible for maintaining complete, up-to-date class locations for its entire gas transmission system, and that that it has failed to do so, we find that PG&E has violated the following Federal Regulations:

    a. PG&E violated its own internal rules by failing to identify 843 segments with increased population density.  This constitutes a violation of 49 CFR 192.13(c).

    b. PG&E failed to identify changes in population density and misclassified 224 pipeline segments.  As a result, PG&E failed to conduct a study to determine the actual class location of these pipeline segments in violation of 49 CFR 192.609.

    c. Due to misclassification of 224 pipeline segments, PG&E did not confirm or revise the MAOP of segments with changed class designations within 24 months of the change in class location.  This failure is a violation of 49 CFR 192.611.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 94 of 565

    d. PG&E violated 49 CFR 192.613 by not having a procedure for continuing surveillance of its facilities to determine and take appropriate action concerning, among other things, changes in class location, for 677 segments.

    e. PG&E violated 49 CFR 192.619 by operating 63 pipe segments at pressures greater than allowed for the current class location.

2. PG&E violated 49 CFR 192.107 by using an assumed Specified Minimum Yield Strength (SMYS) value above 24,000 psi for 133 segments of pipe that moved to a higher class designation when those segments did not have sufficient known pipe attributes to support an assumed value over 24,000 psi.

3. By operating 63 pipe segments at pressures greater than allowed for the current class designation and 133 segments with an assumed SMYS value above 24,000 psi, PG&E subjected pipelines to higher stresses and lower safety margins than allowed by federal and state safety regulations.  PG&E's operation of these pipeline segments at excessive MAOPs constitute unsafe operations and is a violation of Pub. Util. Code § 451.

### 3.4. Alleged Duplication of Violations

In its briefs on violations in the San Bruno OII and the Recordkeeping OII, PG&E contends that there is substantial overlap of violations.[21]  PG&E raises this same argument again, contending that in the Pipeline OIIs, CPSD has alleged the same violation or violations arising out of the same conduct.[22]  Among other things, PG&E contends that CPSD alleged the same violation in both the San Bruno OII and the Recordkeeping OII concerning PG&E's SCADA system,

---

[21] The *Reply Brief of Pacific Gas and Electric Company*, filed April 25, 2013 in I.12-01-007, discussed duplication and/or overlap of alleged violations at 2, 6, 83, 89, 90, 98, 159, and Appendixes D and E; *Reply Brief of Pacific Gas and Electric Company*, filed August 24, 2013 in I.11-02-016, at 29-30.

[22] *Coordinated Remedies Brief of Pacific Gas and Electric Company (PG&E Remedies Brief)*, filed May 24, 2013 and amended June 5, 2013, at 39.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 95 of 565

emergency response plans and GIS data, and that CPSD alleged in all three OIIs that PG&E had improperly used assumed SMYS values above 24,000 psi.  PG&E asserts that since these alleged violations concern the same conduct, they cannot be considered separate violations.

We agree with PG&E that to the extent the three OIIs allege the same violations, these violations should not be counted multiple times.  However, the fact that PG&E's actions resulted in violations of multiple regulations and statutes does not constitute duplicative or overlapping violations.  Failure to comply with each of these regulations would constitute a separate violation.  In the Pipeline OIIs, CPSD has explained the applicable statute that serves as the basis of each violation and the acts supporting the alleged violation.

PG&E has alleged the following duplicative and overlapping alleged violations among the three OIIs:[23]

1. **Assumed SMYS values greater than 24,000 psi (alleged San Bruno violations 8 & 14, alleged Recordkeeping violation 24 (Felts Violation 24) and alleged Class Location violation 1) –** Alleged San Bruno violation 8 concerns the assumed SMYS value for Segment 180, while alleged Class Location violation 1 concerns the assumed SMYS value for 133 pipeline segments of pipe that moved to a higher class designation when those segments did not have sufficient known pipe attributes.  Since the segments identified in the Class Location OII do not include Segment 180, there is no duplication or overlap.  Similarly, Felts Violation 24 concerns incorrect data in survey sheets and GIS, which is not a factor in alleged San Bruno violation 8 or Class Location violation 1.  Finally, alleged San Bruno violation 14 was not adopted.  For the reasons discussed here, there was no duplication in alleged violations regarding assumed SMYS values.

---

[23] *PG&E Remedies Brief* at 39.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 96 of 565

2. **Hydrostatic Testing on Segment 180 (alleged San Bruno violation 4 and Recordkeeping violation 3 (Felts Violation 3) –** Alleged San Bruno violation 4 concerns a continuing violation of Pub. Util. Code § 451 from 1956 to 2010 for not conducting a hydrostatic test on Segment 180, while Felts Violation 3 concerns failure to retain records.  However, we believe there is substantial similarity between these two violations, with the major difference being that alleged San Bruno violation 4 does not address recordkeeping violations.  As Felts Violation 3 is more inclusive for the purpose of determining fines and remedies, we will exclude the number of violations contained in alleged San Bruno violation 4 (adopted as San Bruno violation 1) from the total number of violations.

3. **Accounting for Segment 180 Pups in establishing MAOP (alleged San Bruno violations 12 and 13 and alleged Recordkeeping violation 4 (Felts Violation 4)) –** The *San Bruno Violations Decision* agrees that alleged San Bruno violations 12 and 13 were duplicative, and adopted a single violation (adopted violation 7).  Adopted San Bruno violation 7 found that PG&E violated ASME B.31.8 § 845.22, and therefore Pub. Util. Code § 451, by failing to account for the conditions, characteristics and specifications for the pups when it established an MAOP of 400 psi.  This was a one-time violation in 1956.  In contrast, Felts Violation 4 concerns PG&E increasing the MAOP for Line 132 from 390 psi to 400 psi in 2004 without first performing a hydrostatic test.  Felts Violation 4 was a continuing violation running from 2004 to 2010.  Given the different timeframes and focus of the two violations, there is no duplication.

4. **Clearance documentation (alleged San Bruno violations 29 and 30 and alleged Recordkeeping violation 5 (Felts Violation 5)) –** Alleged San Bruno violations 29 and 30 deal with PG&E's clearance procedures for the Milpitas Terminal work.  The first is a violation of 49 C.F.R § 192.13(c), which PG&E does not contest.  The second is the same facts, and resulted in a violation of Pub. Util. Code § 451.  Felts Violation 5 concerns PG&E's failure to properly follow its clearance procedures, likewise resulting in

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 97 of 565

a violation of Pub. Util. Code § 451.[24] Based on the facts presented, it appears that alleged San Bruno Violation 30 is included in Felts Violation 5, both of which are § 451 violations. Therefore, we will exclude the number of violations contained in alleged San Bruno violation 30 (adopted as San Bruno violation 19) from the total number of violations.

5. **SCADA Inadequacy (alleged San Bruno violation 33 and alleged Recordkeeping violations 7 & 9 (Felts Violations 7 & 9))** – Alleged San Bruno violation 33 was not upheld in the *San Bruno Violations Decision*. Further, while the *Recordkeeping Violations Decision* had upheld Felts Violation 7, it had determined that Felts Violation 9 was not a separate violation. Accordingly, PG&E's assertions of duplication among these violations are moot.

6. **Emergency Procedures (alleged San Bruno violations 33-51 and alleged Recordkeeping violation 10 (Felts Violation 10))** – PG&E has not specified which of the alleged San Bruno violations are duplicative, nor the manner in which there is duplication. In any event, the *San Bruno Violations Decision* has rejected several of CPSD's alleged emergency response violations. Additionally, the *Recordkeeping Violations Decision* rejected Felts Violation 10. Accordingly, PG&E's assertions of duplication among these violations are moot.

7. **GIS Data (alleged San Bruno violations 15 & 16 and alleged Recordkeeping violations 24 & 25 (Felts Violations 24 & 25))** – Alleged San Bruno violation 15 concerns a violation of 49 CFR 192.917(b), while Felts Violations 24 and 25 concern violations of Pub. Util. Code § 451. Additionally, the *San Bruno Violations Decision* rejected alleged violation 16. As such, there is no duplication.

8. **Patrol Records (alleged Recordkeeping violation 30 (Duller/North Violation B.2) and alleged Class Location violation 6)** – Alleged Class Location violation 6 concern violations of 49 CFR 192.605 and 192.709(c) for failing to adequately maintain pipeline patrol records. However, the *Class Location Violations Decision* specifically notes that the

---

[24] The same course of conduct may result in the violation of both federal regulations and § 451.

recordkeeping violations alleged in that proceeding were considered in the Recordkeeping OII.[25]  Accordingly, PG&E's assertions of duplication among these violations are moot.

## 4.    Legal Framework for Fines and Remedies

The Commission adopted General Order (GO) 112 pursuant to state law to establish certain state pipeline safety standards during the 1960's.[26] Subsequently, the Commission has been certificated pursuant to 49 U.S.C. § 60105 to enforce the Department of Transportation's minimum federal safety standards for gas pipeline facilities.  In 1971, the Commission revised GO 112 to adopt the federal pipeline safety rules in 49 CFR 192.[27]  The current revision of this general order, GO 112-E, automatically incorporates all revisions to the Federal Pipeline Safety Regulations, 49 CFR 190, 191, 192, 193 and 199.[28] Consequently, the Commission may enforce violations of 49 CFR 192 pursuant to its constitutional and statutory authority.

### 4.1.    Commission Authority to Impose Fines

The Commission has specific statutory authority to impose fines under Pub. Util. Code §§ 2107 and 2108.  The Commission's authority to impose fines

---

[25] *Class Location Violations Decision,* Section 6.

[26] The jurisdictional basis pursuant to which the Commission adopted GO 112 is Pub. Util. Code § 768, which states in relevant part: "The commission may, after a hearing, require every public utility to construct, maintain, and operate its line, plant, system, equipment, apparatus, tracks, and premises in a manner so as to promote and safeguard the health and safety of its employees, passengers, customers, and the public.  The commission may prescribe, among other things, the installation, use, maintenance, and operation of appropriate safety or other devices or appliances, including interlocking and other protective devices at grade crossings or junctions and block or other systems of signaling.  The commission may establish uniform or other standards of construction and equipment, and require the performance of any other act which the health or safety of its employees, passengers, customers, or the public may demand."

[27] *See* Recordkeeping Exh. PG&E-5 (D.78513, with GO 112-C attached).

[28] *See* Recordkeeping Exh. PG&E-7 (D.95-08-053, as modified by D.95-12-065, with GO 112-E attached).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 99 of 565

pursuant to Pub. Util. Code § 2107 has also been affirmed by the California Courts.[29]

Section 2107 states:

Any public utility that violates or fails to comply with any provision of the Constitution of this state or of this part, or that fails or neglects to comply with any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commission, in a case in which a penalty has not otherwise been provided, is subject to a penalty of not less than five hundred dollars ($500), nor more than fifty thousand dollars ($50,000) for each offense.[30]

Section 2108 states:

Every violation of the provisions of this part or of any part of any order, decision, decree, rule, direction, demand, or requirement of the commission, by any corporation or person is a separate and distinct offense, and in case of a continuing violation each day's continuance thereof shall be a separate and distinct offense.

There is some disagreement between CPSD/Intervenors and PG&E over the use of fines or penalties imposed pursuant to these Code sections. CPSD and Intervenors maintain that fines and penalties imposed under Pub. Util. Code §§ 2107 and 2108 must be paid to the General Fund.[31] PG&E, on the other hand, argues that "[t]here is no requirement that

---

[29] *See, e.g.*, *Pacific Bell Wireless, LLC v. Public Utilities Com. (Cingular)* (2006) 140 Cal. App. 4th 718.

[30] Between 1994 and 2012, the maximum fine was $20,000 per offense. Prior to 1994, the maximum fine was $2,000 per offense.

[31] CPSD Amended Reply at 5; *Opening Brief of the City of San Bruno concerning the Fines and Remedies to be Imposed on Pacific Gas and Electric Company (CSB Opening Brief)*, filed May 6, 2013, at 8-9; *Opening Brief of the City and County of San Francisco on Penalties (CCSF Opening Brief)*, filed May 6, 2013, at 1; *Opening Brief of The Utility Reform Network on Fines and Remedies (TURN Opening Brief)*, filed May 6, 2013 at 3; *Opening Brief of the Division of Ratepayer Advocates Regarding Fines and Remedies (DRA Opening Brief)*, filed May 6, 2013, at 4.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 100 of 565

[Public Utilities Code] Section 2107 penalties be paid to the General Fund and the Commission has authority under [Public Utilities Code] Section 701 to order that they be invested in pipeline safety."[32] [33] Later, CPSD explained how the Commission can both impose a fine under Section 2017 and require an investment in pipeline safety under Section 701:

> "The Commission's powers under § 2107 are not exclusive. Notably, PG&E does not contest the Commission's "broad authority" under § 701 to impose equitable remedies. (*See, e.g., Assembly, supra,* 12 Cal. 4th, at 736).[34] As recognized by the California Supreme Court, § 701 is "supplemented by additional specific fine authority…" as set forth in § 2107. (*Id.* at 737). (CPSD Response to PG&E's Appeal of the Penalties POD at 11.)

We agree that the California Constitution, along with Pub. Util. Code § 701, confer broad authority on the Commission to regulate public utilities, in particular the fashioning of remedies in addition to those specifically set forth in the Public Utilities Code. (See, *Southern California Edison Co. v. Peevey,* (2003) 31 Cal. 4th 781, 792, citing *Assembly v. Public Utilities Commission* (1995) 12 Cal. 4th 87, 103.)

Unlike the POD, however, we conclude that we do not need to resolve here the issue of whether penalties under Section 2107 must be paid to the General Fund.  This decision imposes a penalty payable to the General Fund

---

[32] *PG&E Remedies Brief* at 19.

[33] Pub. Util. Code § 701 states:

> The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.

[34] The correct citation appears to be to *Pacific Bell Wireless, LLC, v. Public Utilities Commission (Cingular)* (2006) 140 Cal. App. 4th 718, 737.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 101 of 565

pursuant to Pub. Util. Code § 2107.  In addition, we impose equitable remedies pursuant to our authority under the California Constitution and Pub. Util. Code § 701.[35]  There is no conflict or inconsistency in our doing so.

We note, however, that parties use the term "penalty" to refer to monies paid to the General Fund, as well as to refer to the combination of fines, disallowances and other remedies.  To avoid further confusion in this decision, we refer to monies imposed under Pub. Util. Code § 2107 and paid to the General Fund as "fines", whereas the term "penalties" in this decision refers to the combination of fines, disallowances and remedies.

### 4.2.   Commission Authority to Impose Other Remedies

In addition to specific authority to impose fines pursuant to Pub. Util. Code §§ 2107 and 2108, the Commission has authority to fashion other equitable remedies.  As applicable here, these remedies include exercising our ratemaking authority to disallow expenditures that are needed to redress violations found in these proceedings, i.e., PG&E's failure to maintain its gas transmission pipeline system and records in accordance with applicable statutes, regulations and orders.

As applicable here, Pub. Util. Code § 728 confers ratemaking authority[36] upon the Commission and states:

> Whenever the commission, after a hearing, finds that the rates or classifications, demanded, observed, charged, or collected by any public utility for or in connection with any service, product, or commodity, or the rules, practices, or contracts affecting such

---

[35]  See also, Pub. Util. Code §§ 728 and 761.

[36]  The Commission's general ratemaking authority comes from Section XII, Article 6 of the California Constitution, which states:  "The commission may fix rates, establish rules, examine records, issue subpoenas, administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction."

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
102 of 565

rates or classifications are insufficient, unlawful, unjust,
unreasonable, discriminatory, or preferential, the commission
shall determine and fix, by order, the just, reasonable, or
sufficient rates, classifications, rules, practices, or contracts to be
thereafter observed and in force.

Similarly, § 761 confers authority on the Commission to require a utility to
maintain proper facilities. It provides in pertinent part:

Whenever the commission, after a hearing, finds that the rules,
practices, equipment, appliances, facilities, or service of any
public utility, or the methods of manufacture, distribution,
transmission, storage, or supply employed by it, are unjust,
unreasonable, unsafe, improper, inadequate, or insufficient, the
commission shall determine and, by order or rule, fix the rules,
practices, equipment, appliances, facilities, service, or methods to
be observed, furnished, constructed, enforced, or employed.

In *Decision Mandating Pipeline Safety Implementation Plan, Disallowing Costs,
Allocating Risk of Inefficient Construction Management to Shareholders, and Requiring
Ongoing Improvement in Safety Engineering (PSEP Decision)* [D.12-12-030], the
Commission adopted a Pipeline Safety Enhancement Plan (PSEP) for PG&E and
authorized PG&E to increase its revenue requirements in 2012, 2013 and 2014 for
these projects. However, the decision further noted:

Our upcoming decisions in Investigation (I.) 11-02-016,
I.11-11-009 and I.12-01-007 will address potential penalties for
PG&E's actions under investigation. We do not foreclose the
possibility that further ratemaking adjustments may be adopted
in those investigations; thus all ratemaking recovery authorized
in today's decision is subject to refund.[37]

---

[37] *PSEP Decision* at 4 (slip op.).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
103 of 565

This determination is reiterated in Ordering Paragraph 3 of the *PSEP Decision*.[38] Thus, CPSD and Intervenors have urged that some or all of the PSEP costs authorized to be recovered from ratepayers be disallowed.[39] DRA further argues that even without these provisions in the *PSEP Decision* "the Commission has equitable authority to exercise its ratemaking powers to disallow all further PSEP costs to the extent those costs fund activities that will redress the violations in these proceedings."[40]

Additionally, TURN argues that PG&E's conduct should be considered imprudent because PG&E is "unable to foreclose the possibility that other dangerously defective segments are present in its system without testing or replacing all segments that lack a valid pressure test record."[41] It therefore contends that since the costs to test or replace pipeline is the result of this imprudence, those costs should be disallowed from recovery under Pub. Util. Code §§ 451 and 463.[42]

Finally, the Commission has broad authority under Pub. Util. Code § 701 to "do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient" in the supervision and regulation

---

[38] *PSEP Decision* at 126 (slip op.) ("All increases in revenue requirement authorized in Ordering Paragraph 2 are subject to refund pending further Commission decisions in Investigation (I.) 11-02-016, 1.11-11-009, and 1.12-01-007.").

[39] *CPSD Amended Reply* at 4; *DRA Opening Brief* at 4; *TURN Opening Brief* at viii; *CSB Opening Brief* at 8; *CCSF Opening Brief* at 16-17.

[40] *DRA Opening Brief* at 16.

[41] *TURN Opening Brief* at 9.

[42] Pub. Util. Code § 463 requires the Commission to disallow direct and indirect expenses "reflecting the direct or indirect costs resulting from any unreasonable error or omission relating to the planning, construction, or operation of any portion of the corporation's plant which cost, or is estimated to have cost, more than fifty million dollars ($50,000,000), including any expenses resulting from delays caused by any unreasonable error or omission."

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 104 of 565

of public utilities.[43]  However, the Commission's exercise of these additional powers and jurisdiction "must be cognate and germane to the regulation of public utilities. . ."[44]  In this instance, the remedies considered below are to ensure that PG&E's gas transmission pipeline system will be maintained and operated safely.  Accordingly, they lie squarely within our jurisdiction.  For example, pursuant to the subject-to-refund language of the *PSEP Decision* and Pub Util. Code §§ 701 and 728, we have authority to require PG&E's shareholders to absorb costs that the *PSEP Decision* initially allocated to ratepayers.  Since we may order such an equitable remedy, we do not need to reach the issue of disallowance due to imprudence under Pub. Util. Code § 463.

### 4.3.　The Excessive Fines Clause

CPSD and Intervenors, with the exception of CARE, propose a combination of fines and disallowances and other remedies that would equal approximately $2.25 billion after tax.  Their proposals are summarized in Table 1 above.

CARE states that no portion of the penalty should be in the form of a fine.  Rather, it believes that the entire $2.25 billion penalty should be directed to improve PG&E's pipeline system.[45]  CARE further argues that "a penalty would not change PG&E's operations without an incentive to reduce the penalty, because there is nothing that PG&E can do to reduce the likelihood of new pipeline leaks except by replacing the old natural gas pipelines now in service."[46]

---

[43] *See*, e.g., *Pacific Bell Wireless, LLC v. Public Utilities Com.*, 140 Cal. App. 4th at 736; *Consumers Lobby Against Monopolies v. Public Utilities Com. (CLAM)* (1979) 25 Cal. 3d 891, 905.

[44] *CLAM* 25 Cal. 3d at 905-906 (citations omitted).

[45] *Californians for Renewable Energy Rebuttal to the Amended Reply Brief of the Consumer Protection and Safety Division*, filed August 26, 2013, at 6.

[46] *CARE Rebuttal to Amended Reply* at 5.

Case: 19-30088　　Doc# 14208-2　　Filed: 12/13/23　　Entered: 12/13/23 22:10:31　　Page 105 of 565

We disagree with CARE's proposal that no fine be imposed under Pub. Util. Code §§ 2107 and 2108. The purpose of a fine goes beyond restitution, as it is to deter PG&E and others from future violations. CARE's proposal appears to reward PG&E if it now performs the needed safety improvements that had been deferred. We do not see how such a penalty would serve to deter future violations.

PG&E notes that, in determining the level of penalties to be assessed, the Commission's ability to impose a fine is limited by the state and federal Excessive Fines Clauses.[47] Consequently, according to PG&E, the Commission must consider the penalties assessed in other fatal pipeline accidents, not just penalties previously assessed by the Commission.[48] PG&E identifies eight pipeline accidents resulting in fatalities between 1999 and 2011 and contends that the amount proposed by CPSD and Intervenors is disproportionate to the penalties assessed in these prior accidents.[49] Moreover, PG&E states that CPSD's proposal ignores the fact that other jurisdictions cap the level of penalties and argues that "other legislatures' determinations should weigh heavily" in analyzing whether the proposed penalty amount violates the Excessive Fines Clauses.[50]

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Similarly, Article 1, § 17 of the California

---

[47] *PG&E Remedies Brief* at 24; *Pacific Gas and Electric Company's Response to Consumer Protection and Safety Division's Amended Reply Brief on Fines and Remedies (PG&E Response to Amended Reply)*, filed August 21, 2013, at 8.

[48] *PG&E Remedies Brief* at 24-25.

[49] *PG&E Remedies Brief* at 22 – 24.

[50] *PG&E Response to Amended Reply* at 9.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 106 of 565

Constitution prohibits "cruel or unusual punishment" and "excessive fines."  In *People ex rel. Lockyer v. R.J Reynolds Tobacco Company* (2005) 37 Cal. 4th 707, the California Supreme Court noted four factors that are relevant to determining whether a fine is grossly disproportional to the gravity of the offense.  More specifically, *Lockyer* cited the factors used by the U.S. Supreme Court in *United States v. Bajakajian* (1998) 524 U.S. 321, 334, where the U.S. Supreme Court determined that the forfeiture of more than $350,000 for failure to report taking more than $10,000 cash out of the country was an excessive fine.  As summarized by *Lockyer*, these factors are:  "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay."[51]  These considerations are similar to those articulated in D.98-12-075, although there we said we would look at our own precedents, not other statutes.  PG&E argues that CPSD and Intervenors fail to consider comparable cases and statutes from other jurisdictions when setting the proposed penalty amount.[52]  "Given that CPSD and Intervenors assert there has been no prior Commission enforcement action of comparable magnitude to these three OII proceedings, it is particularly important for the Commission to consider penalties imposed by court and other enforcement agencies in connection with natural gas pipeline accidents in other jurisdictions."[53]

PG&E asserts that the two most comparable fatal natural gas pipeline accidents are the natural gas pipeline rupture near Carlsbad, New Mexico in August 2000 and the gas line rupture and explosion in Allentown, Pennsylvania in February 2011.  PG&E argues that the Carlsbad accident is comparable to

---

[51] *People ex rel. Lockyer v. R.J Reynolds Tobacco Company, supra*, 37 Cal. 4th at 728.

[52] *PG&E Remedies Brief* at 24.

[53] *PG&E Remedies Brief* at 26.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 107 of 565

San Bruno in size, scope and severity in the following areas: (1) twelve people died as a direct result of the rupture and resulting fire; (2) the National Transportation Safety Board (NTSB) had concluded that the failure was the result of the operator's failure to prevent, detect, or control internal corrosion within the company's pipeline; (3) the accident involved a large diameter transmission pipe installed in 1950, and there were concerns regarding the design and construction of the pipe; (4) as a result of the Carlsbad accident, there were changes to federal safety regulations that impacted the entire natural gas industry; and (5) the NTSB had determined that a contributing factor of the Carlsbad accident was the operator's failure to monitor, investigate and mitigate internal corrosion in two of its pipelines transporting corrosive gas.[54] PG&E notes that "a U.S. District Court entered a consent decree in which El Paso Natural Gas Company agreed to pay $101.5 million – consisting of a $15.5 million civil penalty and $86 million to implement program improvements."[55] PG&E states that despite the parallels between the Carlsbad accident and the San Bruno explosion, CPSD's proposed penalty is "approximately 20 times the penalty and other relief imposed for the Carlsbad accident."[56]

PG&E further contends that the February 2011 natural gas explosion in Allentown, Pennsylvania is "[a]nother case of reasonable comparable 'size, scope and severity'"[57] There, PG&E states: (1) there were five fatalities, three injuries and the destruction of eight homes; (2) the cast-iron natural gas main was

---

[54] *PG&E Remedies Brief* at 27-29.

[55] *PG&E Remedies Brief* at 29.

[56] *PG&E Remedies Brief* at 29.

[57] *PG&E Remedies Brief* at 30.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 108 of 565

circumferentially fractured; (3) the utility had experienced numerous safety problems with its cast-iron gas mains in the past four years, yet had taken no remedial action; and (4) the Pennsylvania PUC enforcement staff had alleged numerous ongoing violations.[58]  The Pennsylvania PUC ultimately approved a settlement motion for a $500,000 civil penalty and the utility agreed to not seek rate recovery for remedial measures estimated to cost $24.75 million.[59]  PG&E states that CPSD's proposed $2.25 billion penalty is about 90 times larger than what had been imposed on UGI Corporation.[60]  PG&E contends that in light of the similarities between the Carlsbad and Allentown accidents to San Bruno, the disproportionate penalty proposed by CPSD and Intervenors raises constitutional concerns.[61]

Finally, PG&E notes that CPSD's proposed recommendation not only exceeds the "largest penalty ever imposed", but also exceeds the statutory cap on penalties fixed by 48 other states and the District of Columbia.[62]  As support, PG&E cites to *BMW of N. Am., Inc. v. Gore* (1996) 517 U.S. 559, 583-84 and *Hale v. Morgan* (1978) 22 Cal. 3d 388, 403 for its contention that the constitutionality of a penalty must be considered in light of sanctions authorized in other states.  It further notes that the proposed penalty "is almost five times the equity investment in PG&E's GT&S business in 2010 and almost as much as the total GT&S revenues for the nine years prior to the San Bruno accident."[63]

---

[58] *PG&E Remedies Brief* at 30.

[59] *PG&E Remedies Brief* at 30.

[60] *PG&E Remedies Brief* at 31.

[61] *PG&E Remedies Brief* at 32.

[62] *PG&E Remedies Brief* at 31; *PG&E Response to Amended Reply* at 9.

[63] *PG&E Response to Amended Reply* at 8-9.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 109 of 565

We do not find PG&E's arguments that the Carlsbad and Allentown accidents are comparable to San Bruno to be convincing.  Although we do not deny that there are some similarities between these two accidents and San Bruno, they fall well short of being comparable in size, scope and severity.  Unlike Carlsbad and Allentown, the ruptured transmission pipeline in San Bruno caused "an explosion and lengthy fire in a major metropolitan area" and resulted in significantly more physical harm (eight fatalities, injuries to 58 others, destruction of 38 homes and damage to 70 other homes).[64]  Additionally, the penalties imposed here are the result of three separate proceedings.  While the San Bruno OII pertained to violations associated with the explosion of a portion of a transmission pipeline in a single neighborhood, the Recordkeeping OII and Class Location OII pertained to violations that affected thousands of segments (and hundreds of miles) of PG&E's gas transmission pipeline system.  As we have found in the *Recordkeeping Violations Decision* and the *Class Location Violations Decision*, PG&E committed "numerous violations of pipeline safety regulations … which were very lengthy in time and endangered many other high consequence areas in PG&E's service territory."[65]  Moreover, PG&E chooses to ignore the fact that the penalties imposed on El Paso Natural Gas Company for the Carlsbad accident were the result of a consent decree.  Similarly, UGI Corporation had settled the enforcement actions brought against it for the Allentown accident.[66]  In contrast, PG&E has not settled any of the violations brought against it in the Pipeline OIIs.  Considering these facts, there is nothing

---

[64] *CPSD Amended Reply* at 8.

[65] *CPSD Amended Reply* at 8.

[66] Moreover, as noted by PG&E and CPSD, at the time of the Allentown accident, Pennsylvania law capped the civil penalty for accidents at $500,000.  Thus, the civil penalty imposed on UGI Corporation was limited to a maximum of $500,000.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 110 of 565

inappropriate or disproportionate about any penalties imposed on PG&E in connection with the violations arising from the Pipeline OIIs being significantly greater than those imposed on El Paso Natural Gas Company or UGI Corporation.

PG&E's argument that CPSD's proposed penalty amount exceeds the statutory cap on fines in most other jurisdictions is similarly not persuasive. We agree with CPSD that the fact that other states have capped the amounts allowed for violations "simply reflect other legislatures' prerogatives."[67] Unlike other jurisdictions, the California legislature has given the Commission broad discretion to determine the appropriate level of fines, rather than establish the maximum amount of fines that may be imposed on a continuing violation or a related series of violations.

In *Gore,* the U.S. Supreme Court in determining whether punitive damages were reasonable, compared statutory penalties for comparable misconduct, noting that a reviewing court should defer to "legislative judgments concerning appropriate sanctions for the conduct at issue."[68] As a result, the Supreme Court disallowed punitive damages imposed on BMW by an Alabama court that were substantially greater than the statutory fines available in Alabama and elsewhere for similar misconduct.[69] In this case, Pub. Util. Code §§ 2107 and 2108 authorize the Commission to impose a fine of "not less than five hundred dollars ($500) nor

---

[67] *CPSD Amended Reply* at 9.

[68] *Gore*, 517 U.S. at 583.

[69] *Gore*, 517 U.S. at 584. The defendant in *Gore* was a national distributor of autos, thus making the statutory penalties in other states relevant to the issue of whether it could have expected such a large penalty for what it had done. (517 U.S. at 584.) Here, of course, PG&E is well aware of the potential penalties under California law.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 111 of 565

more than fifty thousand dollars ($50,000) for each offense"[70] and provides that for continuing violations, each day "shall be a separate and distinct offense." Accordingly, as this case involves a statutory fine, and not punitive damages, it is not essential to consider the statutory penalties in other states.

PG&E's reliance on *Hale* is also unpersuasive. In that case, the California Supreme Court found that a penalty, pursuant to Civ. Code § 789.3, imposed on the landlord of a small mobile home park for willfully depriving his tenant of utility services for the purpose of evicting the tenant was excessive under the circumstances. Although the Court found it significant that no other jurisdiction appeared to have a mandatory daily penalty for a similar violation, it went on to state:

> [T]here are doubtless some situations in which very large punitive assessments are both proportioned to the landlord's misconduct and necessary to achieve the penalty's deterrent purposes.[71]

The Court then concluded that where "a penal statute may be subject to both constitutional and unconstitutional applications, courts evaluate the propriety of the sanction on a case-by-case basis."[72] The thrust of *Hale* is that where a mechanical imposition of a penalty would result in an excessive penalty, the entity imposing the fine must reduce the fine to a reasonable level. As further explained below, we have done so here. Based on the violations presented in the Pipeline OIIs (e.g., the magnitude of the physical harm resulting from the

---

[70] The maximum penalty of $50,000 for each offense was effective January 1, 2012. Prior to January 1, 1994, the maximum penalty for each offense was $2,000. Between January 1, 1994 and December 31, 2011, the maximum penalty for each offense was $20,000.

[71] *Hale*, 22 Cal. 3d at 404. In considering the constitutionality of the penalties imposed in *Hale,* the Court also considered the size of the business organization charged with the violation.

[72] *Hale*, 22 Cal. 3d at 404.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 112 of 565

San Bruno explosion, the potential risk to millions of residents from operating gas transmission pipelines at non-commensurate SMYS in areas of high population density, and PG&E's failure to have proper records to ensure safe operations of its natural gas transmission pipeline system), CPSD's proposed amount would not be excessive and may be necessary to deter future violations.

While we consider penalties imposed in other fatal pipeline accidents and the level of penalties set by other jurisdictions, this factor does not control our analysis under the federal and state Excessive Fines Clauses.  In *People ex rel. State Air Res. Bd. v. Wilmshurst* (1999) 68 Cal. App. 4th 1332, the State Attorney General had brought an action against defendants for violations of Cal. Health & Safety Code §§ 43150-43156, which resulted in a fine of $45,000 against each defendant. In rejecting the defendants' arguments that the amount of the penalty imposed violated the Excessive Fines Clause, the California Court of Appeal, Third Appellate District, noted

> [a]lthough a number of *forfeiture* cases have articulated a multifactor analysis of proportionality to be followed by a trial court (e.g., *United States v. Bajakajian* (1998) 524 U.S. 321 …), the constitutionality of a *fine* is determined by a simpler test. "Proportionality is likely to be the most important issue in a forfeiture case, since the claimant-defendant is able to pay by forfeiting the disputed asset.  In imposing a fine, on the other hand, ability to pay becomes a critical factor."[73]

Consequently, the *Wilmshurst* Court concluded "The defendants' concern with the relationship between the amount of the fines and nature of their offenses or the amounts of fines imposed in other cases is consequently

---

[73] *Wilmshurst*, 68 Cal. App. 4th at 1350 (citing *U.S. v. Hines* (8th Cir. 1996) 88 F.3d 661, 664). (Emphasis in original.)

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 113 of 565

irrelevant; it is their ability to pay which is the constitutional lodestar."[74]  As we discuss in Section 5.3 below, we find that PG&E is financially able to bear the $2.25 billion penalty proposed by CPSD.

Moreover, as noted by CCSF, any proportionality assessment must consider "the extent to which a sanction is punitive in nature and 'whether a penalty is grossly disproportional to the gravity of a defendant's offense'..."[75]  In this instance, CPSD is proposing a $2.25 billion penalty for over *18.4 million* days of violations.  *If* we were to impose a fine for each day of violation this would equate to approximately $122 per day of violation, well below the minimum fine specified in Pub. Util. Code § 2107.  Consequently, while we do not dispute that CPSD's proposed $2.25 billion penalty is significant, we do not find that it violates the Excessive Fines Clause.

## 5.    Factors to Consider in Setting Penalty Amount

In determining the penalty to be imposed for violations found in the *San Bruno Violations Decision*, the *Recordkeeping Violations Decision* and the *Class Location Violations Decision*, we are guided by D.98-12-075, which identified the following factors:[76]

1.  Severity of the offense;

2.  The conduct of the utility before, during, and after the offense;

---

[74] *Wilmshurst*, 68 Cal. App. 4th at 1350.  See also, *City and County of San Francisco v. Sainez* (2000) 77 Cal. App. 4th 1302, 1321 ("Other authority has since held, and we agree, that 'in the case of fines, as opposed to forfeitures,  the defendant's ability to pay is a factor under the Excessive Fines Clause.  [Citations.]'."

[75] *Reply Brief of the City and County of San Francisco on Penalties (CCSF Reply)*, filed June 6, 2013, at 8.

[76] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates* (D.98-12-075), 84 Cal.P.U.C.2d 155 186-190.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 114 of 565

3. The financial resources of the utility;

4. The totality of the circumstances in furtherance of the public interest; and

5. The amount of the fine in relationship to prior Commission decisions.

We have consistently applied the factors identified in D.98-12-075 to all enforcement proceedings, including, most recently, our investigation into the 2008 gas distribution pipeline explosion at Rancho Cordova.[77]

## 5.1. Severity of the Offense

The severity of the offense includes consideration of economic harm, as well as physical harm to people or property. Further, "disregarding a statutory or Commission directive, regardless of the effects on the public, will be accorded a high level of severity."[78]

### 5.1.1. CPSD and Intervenors' Positions

There is no dispute that the San Bruno explosion resulted in physical harm to persons and destruction or damage to property. From that standpoint alone, the violations associated with the San Bruno explosion and Segment 180 would be considered severe. Moreover, DRA contends the San Bruno explosion was the result of "*multiple continuing violations by PG&E committed over many years . . . and that these violations compromised the integrity of PG&E's entire gas pipeline system.*"[79]

---

[77] See *Presiding Officer's Decision Regarding Joint Motion to Approve the Stipulation of Pacific Gas And Electric Company and the Consumer Protection and Safety Division Concerning Rancho Cordova and Related Stipulation* (*Rancho Cordova Decision*) (D.11-11-001), issued November 3, 2011, at 35.

[78] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C.2d at 188.

[79] *DRA Opening Brief* at 20 (emphasis in original).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 115 of 565

In addition to this physical harm, CPSD and Intervenors argue that violations associated with PG&E's operations and recordkeeping practices should also be considered severe, as they have resulted in economic harm to ratepayers.

As an example, CPSD argues that PG&E's failure to maintain complete and accurate records, as well as cutting back on other safety-related activities, resulted in the company's GT&S revenues exceeding the amounts needed to earn its authorized returns for a number of years.[80]  Consequently, CPSD contends that many of the safety-related projects ordered in the *PSEP Decision* are to correct these deficiencies.[81]  Moreover, CPSD asserts these violations relate to the safety of PG&E's entire system, not just Segment 180, and many of the violations began over 40 years ago.[82]

TURN echoes many of CPSD's comments and contends that, based on the evidence in these proceedings, "the testing and replacement that was approved in [the *PSEP Decision*] is made necessary by the fact that PG&E's violations prevent any reasonable assurance of the integrity of PG&E's underground pipelines."[83]

Finally, CPSD and Intervenors note that these cases do not involve single, isolated violations.  Rather these proceedings involve "a pervasive, systemic and long-standing failure on the part of PG&E to maintain its gas pipeline system safely."[84]  As TURN points out, "the sheer number and scope of the ongoing

---

[80] *CPSD Opening Brief* at 42.

[81] *CPSD Opening Brief* at 43.

[82] *CPSD Opening Brief* at 44.

[83] *TURN Opening Brief* at 26.

[84] *CCSF Opening Brief* at 5.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 116 of 565

violations is unprecedented."[85]  Moreover, PG&E had more than adequate prior notice of recordkeeping problems, yet failed to take any actions.[86]  Consequently, "PG&E will be doing remedial work *for decades*, much of it at the expense of ratepayers."[87]  By way of example, CPSD refers to PG&E's response to a joint CPSD and TURN data request, which included a list of more than 23,700 pipe segments in the most heavily populated high consequence areas for which PG&E had not located a valid strength test record.[88]

Based on these considerations, CPSD and Intervenors argue that the violations should be accorded a high level of severity, and the highest level of fines should be imposed.[89]

### 5.1.2.  PG&E's Position

PG&E does not dispute that the San Bruno explosion caused physical harm.  However, it asserts "the fact that physical harm occurs does not mean that the harm was caused by the alleged violation."[90]  Further, PG&E notes that many of the violations alleged in the Class Location OII and the Recordkeeping OII are unrelated to the San Bruno explosion and did not cause any physical harm.[91]  PG&E therefore contends "the conduct underlying alleged violations was not

---

[85] *TURN Opening Brief* at 25.

[86] *TURN Opening Brief* at 26; *DRA Opening Brief* at 20-21; *CCSF Opening Brief* at 5.

[87] *CPSD Opening Brief* at 44 (emphasis in original).

[88] *CPSD Opening Brief* at 45.

[89] *CPSD Opening Brief* at 42-44; *TURN Opening Brief* at 4; *CCSF Opening Brief* at 2; *DRA Opening Brief* at 18; *CSB Reply Brief* at 4.

[90] *PG&E Remedies Brief* at 36.

[91] *PG&E Remedies Brief* at 36.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 117 of 565

intentional and is unrelated to the cause of the [Segment 180] rupture."[92]  As such, PG&E argues that the violations do not merit a severe penalty.

PG&E further argues that CPSD "improperly transformed single categories or courses of conduct into numerous individual alleged violations" and then exponentially increased the violations by counting each as a "continuing violation."[93]  PG&E argues that this methodology not only results in a total potential penalty that is unrealistic, but also is contrary to Commission precedent.

Finally, PG&E contends that the Commission should group violations "by category for the purpose of finding violations and calculating any penalties."[94]  It notes that in *Utility Consumers Action Network v. SBC Communications (AT&T)* [D.08-08-017], the Commission had determined that although AT&T had "violated two subsections of [Pub. Util. Code] § 2883, the company had pursued essentially one course of conduct:  failure to comply with the warm line policies enacted by the legislature.[95]"  On that basis, PG&E argues that the millions of violations alleged by CPSD in the Class Location OII be condensed into a "single course of conduct, failure to properly implement patrol, class location and continuing surveillance procedures."[96]

### 5.1.3.  Discussion

We do not agree with PG&E's arguments that violations that did not cause or result in physical harm should be considered less severe.  In D.98-12-075, we

---

[92] *PG&E Remedies Brief* at 38.

[93] *PG&E Remedies Brief* at 39 & 41.

[94] *PG&E Remedies Brief* at 41.

[95] *PG&E Remedies Brief* at 41 (citing D.08-08-017 at 37-38 (slip op.)).

[96] *PG&E Remedies Brief* at 40.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 118 of 565

noted that both economic harm and failure to comply with statutes or Commission directives were also considered when determining the severity of a violation. With respect to economic harm, we noted: "The fact that the economic harm may be difficult to quantify does not diminish severity or the need for sanctions." We further noted:

> Many potential penalty cases before the Commission do not involve any harm to consumers but are instead violations of reporting or compliance requirements. In these cases, the harm may not be to consumers but rather to the integrity of the regulatory process.
>
> …
>
> Such compliance is absolutely necessary to the proper functioning of the regulatory process. For this reason, disregarding a statutory or Commission directive, regardless of the effects on the public, will be accorded a high level of severity.[97]

Therefore, contrary to PG&E's arguments, economic harm and failure to comply with statutes or Commission directives are considered severe violations.

We find that PG&E's violations have caused economic harm to ratepayers. As noted by TURN, the San Bruno explosion caused economic harm to the residents of San Bruno.[98] Moreover, PG&E has failed to comply with statutes and Commission directives. Many of the actions mandated in the *PSEP Decision* are due to PG&E's failure to comply with statutes – e.g., to maintain complete and accurate records and to comply with the applicable statutes and regulations

---

[97] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C.2d at 188.

[98] *TURN Opening Brief* at 26.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 119 of 565

concerning the proper surveillance, operation and maintenance of its transmission pipeline system.[99]

We further disagree with PG&E's argument that those violations alleged in the Recordkeeping OII and the Class Location OII that do not directly relate to the San Bruno explosion should not be considered as severe. All of the violations raised in the Pipeline OIIs concern failure to comply with federal or state laws or regulations. Consistent with D.98-12-075, PG&E's violations in those OIIs will be accorded a high level of severity.

PG&E has acknowledged in the Class Location OII that it has not maintained nor operated all segments of its transmission pipeline system at the proper class location.[100] Although PG&E has argued that the failure to maintain the proper class location did not necessarily present a serious risk to public safety, failure to maintain the proper MAOP in light of the population density where the pipeline was located increases the potential physical and economic harm to the public in the event of a pipeline failure. Similarly, as we discussed in *Resolution ALJ-277 Affirming Citation No. ALJ-274 2012-01-001 Issued to Pacific Gas and Electric Company for Violations of General Order 112-E (Resolution ALJ-277)*, issued on April 20, 2012, concerning PG&E's violations of leak survey requirements:

> Leak surveys are the primary industry tool available to detect and correct gas leaks before they become serious. Moreover, leak survey data provides critical information that operators must consider in determining the need and schedule for necessary maintenance or replacement. … The potential public harm from

---

[99] *PSEP Decision* at 87 (slip op.).

[100] See, e.g., Class Location Exh. PG&E-1 at 1-1 – 1-2 (PG&E/Yura); *PG&E Remedies Brief* at 1.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 120 of 565

these violations was great.  The violations were significant, with the capacity for serious injury to persons and property.…[101]

Additionally, we do not agree that CPSD has inappropriately inflated the number of violations to enhance their severity.  PG&E's efforts to reduce the number of violations, and thus the severity of these violations, disregards the company's responsibility to ensure the safe operations of its pipeline system.

With respect to the Class Location OII, PG&E cannot credibly argue that maintaining the proper class location designation in response to changes in population density (49 CFR 192.609), confirming the maximum allowable operating pressure of pipelines in response to changes in class designation (49 CFR 192.611), or performing continuous surveillance over the maintenance and operations of its facilities (49 CFR 192.613) are not all, individually, important aspects of operating its pipeline system in a safe manner.  Similarly, PG&E cannot reasonably believe that failure to maintain the proper class designation for a segment of pipe in San Francisco is the same violation as failing to maintain the proper class designation for a segment of pipe in the Mojave Desert.  If these violations had occurred individually and/or on one or two segments of pipeline, they would have been charged separately.  The fact that the violations are pervasive throughout PG&E's pipeline system and result in the violation of more than one regulation or law does not change the need to consider these as separate violations.

With respect to the San Bruno OII, PG&E cites two examples where, it contends, CPSD improperly expanded the number of violations.[102]  First, PG&E contends that CPSD "doubled" a violation for Segment 180 girth welds by

---

[101] *Resolution ALJ-277* at 6-7.

[102] *PG&E Remedies Brief* at 40.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 121 of 565

alleging violations of both Section 811.27(E) of ASME B31.1.8 – 1955 and API 1104.[103]  However, CPSD had withdrawn the Section 811.27(E) violation and the *San Bruno Violations Decision* did not adopt it.[104]  Second, PG&E contends that CPSD improperly included specific violations within the scope of a "generic" violation.[105]  The generic alleged violation referenced by PG&E is that "By installing pipeline sections that were not suitable and safe for the conditions under which they were used, PG&E violated the safe industry practices described in Section 810.1 of ASME B31.1.8 – 1955, creating an unsafe system in violation of Pub. Util. Code § 451."  The *San Bruno Violations Decision* concurred with PG&E's contention that this violation significantly overlapped two other alleged violations and therefore combined them into a single adopted violation.[106]  Accordingly, we do not find that the examples cited by PG&E support its argument that there has been an improper expansion of the number of violations in the San Bruno OII.

Finally, in addition to violations of federal and state statutes and regulations, we found that PG&E violated Rule 1.1 of the Commission's Rules of Practice and Procedure in the Recordkeeping OII.[107]  Rule 1.1 states

> Any person who signs a pleading or brief, enters an appearance, offers testimony at a hearing, or transacts business with the Commission, by such act represents that he or she is authorized to do so and agrees to comply with the laws of this State; to maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges; and never to

---

[103] *PG&E Remedies Brief* at 40.

[104] *San Bruno Violations Decision*, Section 5.1.8.

[105] *PG&E Remedies Brief* at 40.

[106] *San Bruno Violations Decision,* Section 5.1.10.

[107] *Recordkeeping Violations Decision,* Section 7.4.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 122 of 565

mislead the Commission or its staff by an artifice or false statement of fact or law.[108]

There is no dispute that misleading the Commission and impeding the staff's investigation in the Recordkeeping OII are severe offenses.

For the reasons discussed above, we find that the violations are severe.

## 5.2.   Conduct of the Utility Before, During and After the Offense

This factor takes into consideration the utility's efforts to prevent a violation by ensuring compliance with applicable laws, regulations, and Commission directives.  Additionally, the Commission will assess the utility's monitoring of activities to ensure compliance.  Pursuant to Pub. Util. Code § 702,

Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees.

Moreover, in considering utility culpability in violations, "the act, omission, or failure of any officer, agent, or employee of any public utility, acting within the scope of his official duties or employment, shall in every case be the act, omission, or failure of such public utility."  Finally, the Commission will consider whether once the utility became aware of the violation, it promptly brought the violation to the attention of the Commission.[109]

### 5.2.1.   CPSD and Intervenors' Positions

CPSD argues that PG&E failed to take action to prevent the violations from occurring.  With respect to Segment 180, CPSD argues that PG&E failed to follow

---

[108]  Rules of Practice and Procedure, Rule 1.1 (emphasis added).

[109]  *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C.2d at 188-189.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 123 of 565

industry standards related to construction and installation of pipe, including visual examination of the pipe and its welds, pressure testing and retention of necessary records.[110]  Additionally, CPSD notes that PG&E's corporate culture placed profits over safety by making significant cuts in its safety-related personnel and tasks.[111]  In particular, CPSD states that PG&E had discontinued its GPRP for a risk management program, resulting in significantly reducing the number of miles of high consequence areas (HCA) transmission pipeline replaced.  However, as CPSD notes, "[r]egulations are not goals, they are absolute requirements.  Systems should be engineered so that those requirements are met."[112]

CPSD further maintains that although PG&E was required to actively monitor all activities concerning its transmission pipeline system, it did not take any actions to detect violations.[113]  As such, CPSD argues that PG&E's claims that it was unaware of problems with its records for over 50 years are not credible. CPSD points to various occasions where it believes PG&E could have detected the flawed pup sections in Segment 180.  Further, it notes that PG&E had been informed of errors in its risk assessment program in 1984, but failed to take any action.  CPSD argues that if PG&E had done so, PG&E "could have avoided the San Bruno rupture and fire."[114]

Finally, CPSD states "the violations came to light subsequent to the explosion in San Bruno.  PG&E did nothing to disclose them to the Commission,

---

[110] *CPSD Opening Brief* at 45-46.

[111] *CPSD Opening Brief* at 46.

[112] *CPSD Opening Brief* at 46.

[113] *CPSD Opening Brief* at 47.

[114] *CPSD Opening Brief* at 48-49.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 124 of 565

or rectify them in advance."[115]  CPSD and TURN further note that all the actions PG&E has taken since the San Bruno explosion to rectify the disclosed violations were mandated by PHMSA or the Commission, not initiated by the company.[116] For example, CPSD notes that although PG&E knew its GIS system was missing data, it had taken no actions to "immediately correct and report" the violations.[117]

Intervenors further argue that PG&E's conduct throughout the course of these proceedings demonstrate that it was not acting in good faith.  Both CSB and CCSF point to PG&E's aggressive litigation strategy and efforts to delay providing records necessary for a thorough investigation.[118]  CSB further states that while PG&E has admitted to two minor violations, it "cannot prove that [it] will fix the numerous and egregious deficiencies in its system."[119]  Similarly, TURN notes that PG&E has only admitted to the most trivial violations and "made frivolous legal arguments, such as the argument that [Pub. Util. Code] § 451 does not impose any safety requirements."[120]

### 5.2.2.  PG&E's Position

PG&E contends that it has always acted in good faith.  It notes that CPSD had conducted multiple audits of PG&E's gas transmission operations prior to the San Bruno explosion and its audit findings had approved PG&E's general

---

[115] *CPSD Opening Brief* at 49.

[116] *CPSD Opening Brief* at 49; *TURN Opening Brief* at 27.

[117] *CPSD Opening Brief* at 50.

[118] *CSB Opening Brief* at 33; *CCSF Opening Brief* at 6.

[119] *CSB Opening Brief* at 36.

[120] *TURN Opening Brief* at 28.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 125 of 565

practices.[121] Thus, PG&E argues that even if CPSD's audits were not thorough or comprehensive, "that is not a valid aggravating factor in penalizing PG&E."[122] PG&E further states "while PG&E had room for improvement, its practices met regulatory requirements and were consistent with accepted industry practices."[123] In particular, PG&E notes that the shortfalls in its recordkeeping practices were not unique, and gaps in pipeline construction and maintenance records were common among natural gas pipeline operators.[124]

PG&E adds that the Commission should take into account PG&E's efforts to improve the safety of its gas transmission system immediately after the San Bruno explosion. It also lists the numerous actions it took to assist the residents and CSB immediately after the explosion.[125]

PG&E disputes CPSD's and Intervenors' assertions that it only took action after being ordered to do so by the Commission or PHMSA. It states that it undertook to verify pipeline specifications before ordered to do so by the Commission.[126] Further, PG&E argues that it has "acted in good faith on the Commission's directives, and the recommendations issued by the CPSD and the NTSB."[127] It then discusses the various improvements it has undertaken since the San Bruno explosion, including corporate-level organization changes, creation of a new records management system and policy and improvements

---

[121] *PG&E Remedies Brief* at 43.

[122] *PG&E Remedies Brief* at 43.

[123] *PG&E Remedies Brief* at 47.

[124] *PG&E Remedies Brief* at 47-48.

[125] *PG&E Remedies Brief* at 49 – 51.

[126] *PG&E Remedies Brief* at 44.

[127] *PG&E Remedies Brief* at 51.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 126 of 565

and initiatives undertaken in its gas organization.[128]  Moreover, PG&E contends that even if these improvements were mandated by the Commission,

> {Pub. Util. Code] § 2104.5 presupposes that the improvements were required to achieve compliance with Commission rules and orders.  The question is the good faith of the utility in attempting to achieve that compliance and whether the company embraced the spirit of change, rather than grudgingly accepting a mandate.[129]

Thus, PG&E argues that it should be given credit for its good faith in implementing the changes mandated by the Commission in the *PSEP Decision*.[130]

Finally, PG&E addresses CPSD's allegations that PG&E demonstrated bad faith because it had withheld evidence of errors in GIS (the audit change log). PG&E first states that CPSD incorrectly concluded that all changes made to pipeline attribute fields in GIS were to correct errors, when many of the changes were, in fact, "due to new pipe installation, hydro testing, changes made to more precisely reflect the location of the pipeline, and changes to pipe attribute information (including corrections to pipe attributes identified through normal course of business and records research)."[131]  Further, PG&E asserts it had not withheld this information from CPSD, but rather had "provided a written description of the HCA audit change log and an excerpt of the log itself on September 29, 2011."[132]  Finally, PG&E asserts that CPSD's allegations were made based on hindsight.  "Prior to the [San Bruno explosion], there was no indication that Segment 180 was constructed from anything other than the properly

---

[128] *PG&E Remedies Brief* at 54 – 62.

[129] *PG&E Remedies Brief* at 63.

[130] *PG&E Remedies Brief* at 51-53 & 63.

[131] *PG&E Remedies Brief* at 45.

[132] *PG&E Remedies Brief* at 46.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 127 of 565

manufactured DSAW transmission pipe requisitioned for the job, and the lack of pressure testing records, or even pressure testing, was permissible for Segment 180 under the grandfather clause."[133]

For these reasons, PG&E argues that it had acted in good faith to discover, disclose and remedy violations.

### 5.2.3.　Discussion

We find that PG&E did not take adequate steps to prevent the violations from occurring.  PG&E appears to rely on CPSD's audits, which had approved PG&E's general practices, to determine that it was in compliance with the regulations.[134]  However, as PG&E recognizes, CPSD's audits are not comprehensive.  More importantly, as the pipeline operator, the onus to ensure that its gas transmission pipeline system is operated safely is on PG&E, not CPSD.

PG&E also did not take adequate steps to ensure compliance with applicable laws and regulations.  Although PG&E recognizes its duty to maintain design, installation, testing, operating and maintenance records for all segments of its transmission pipeline system, it admits that it had lost or inadvertently destroyed records over the years.  Despite knowing that it was missing records and the associated data that it was required to maintain, PG&E took no action to correct these violations.

As we discuss in the *Recordkeeping Violations Decision*, PG&E management had been notified at various times of the impact of not having the necessary records.  Some examples include:

---

[133]　*PG&E Remedies Brief* at 47.

[134]　*PG&E Remedies Brief* at 43.

Case: 19-30088　　Doc# 14208-2　　Filed: 12/13/23　　Entered: 12/13/23 22:10:31　　Page 128 of 565

- In 1981, the NTSB investigated a gas pipeline leak in San Francisco and determined that PG&E's delay in stopping the flow of gas was because it could not locate one emergency valve due to inaccurate records.

- In 1984, PG&E hired Bechtel Petroleum, Inc. (Bechtel) to conduct a risk analysis to develop a methodology and database to prioritize replacement of transmission line segments and distribution mains.   In its report to PG&E, Bechtel stated that due to the inaccuracy and lack of various data variables, the risk analysis was of limited use.

- Bechtel advised PG&E in 1986 of the risk to its integrity management program caused by missing pipeline data, and the need for additional research to resolve these "uncertainties."

- In 1992, PG&E's Records and Information Coordinator had written a memo concerning PG&E's document recordkeeping practices and expressing concern over the utility's inability to maintain essential pipeline data.

Despite repeatedly being notified of these recordkeeping shortfalls, PG&E did not take any action to obtain the missing data.  Further, as we determined in the *PSEP Decision*, PG&E's actions since the 1980's has been a shift away from safety:

> The decision-making and priorities driving PG&E's pipeline safety actions in 1985 and 1992 show a different PG&E than the PG&E of the early 2000's. The 1985 plan showed PG&E thinking ahead, coordinating with local authorities planning similar trenching work, updating meters and associated system components as part of a comprehensively planned, orderly approach to making economically sound upgrades as part of an overall system improvement plan.  PG&E included "manpower and training" among its considerations, showing that it was planning to use its own employees and not outside consultants. In this way, PG&E staff would study its system and actually perform pipeline tests and replacements, thus retaining the knowledge within the organization for long-term operations and planning.

In contrast, as the Independent Review Panel pointed out, more recently PG&E's field operations and integrity management efforts were not coordinated.[135]

We also do not agree with PG&E's arguments that it should be found to have acted in good faith because its practices were consistent with accepted industry practices. As we have discussed in our decisions on violations, PG&E's attempts to equate its conduct with that of other gas utilities is unpersuasive.[136] Those other utilities are not subject to our jurisdiction, GO 112 and its successors, or California law. Moreover, the fact that other gas utilities may also be violating statutes and regulations is not an excuse for PG&E to not be in compliance. PG&E has not provided any authority that states that compliance with gas safety requirements is optional or can be waived.

We further disagree that PG&E should be considered to have demonstrated good faith and given "credit" because it "embraced" the directives contained in the *PSEP Decision* and did not "grudgingly" accept them. All utilities under the Commission's jurisdiction are expected to comply with Commission directives and orders. Failure to do so subjects the utility to sanctions under Pub. Util. Code § 2107. The fact that PG&E has complied with the *PSEP Decision* without complaining does not demonstrate good faith. Moreover, the *PSEP Decision* directs PG&E to take corrective action for failing to have the records necessary to ensure safe operations of its transmission system. PG&E should not be considered to be acting in good faith simply because it is now maintaining and operating its gas transmission pipeline system in accordance with governing laws and regulations. PG&E was aware it was not in

---

[135] *PSEP Decision* at 47 (slip op.).

[136] *See*, e.g., *Recordkeeping Violations Decision,* Section 9.1.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 130 of 565

compliance with various state and federal regulations regarding the maintenance of pipeline records, yet took no corrective action.

Nonetheless, we acknowledge PG&E's effort immediately after the San Bruno explosion when it provided assistance to the CSB and its residents affected by the explosion. These actions, along with PG&E's corporate-level reorganization to improve operations and implementation of new practices and activities in its gas transmission business reflect PG&E's renewed commitments to ensuring the safe operation of its transmission system.

Finally, while we do not agree with Intervenors that PG&E's aggressive litigation strategy in these proceedings reflects bad faith, we do agree that some of the actions taken by PG&E's counsel in the course of these proceedings reflect bad faith. In the *Recordkeeping Violations Decision*, we found that PG&E violated Rule 1.1 on two occasions with respect to its responses to CPSD's data requests[137] and that it potentially violated Rule 1.1 in another.[138] Finally, we note that in all three OIIs, CPSD and Intervenors have alleged that PG&E has delayed and failed to completely respond to data requests. PG&E's delay and failure to provide complete responses impeded CPSD's ability to conduct its investigation and prepare its reports in the OIIs.

In light of the above, we do not find that PG&E has acted in good faith to discover, disclose and remedy the violations.

---

[137] *Recordkeeping Violations Decision*, Section 7.4.

[138] See *Recordkeeping Violations Decision*, Section 9.3.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 131 of 565

## 5.3.    Financial Resources of the Utility

In setting the level of the fine, the Commission needs to balance "the need for deterrence with the constitutional limitations on excessive fines."[139] Consequently, the Commission must "adjust fine levels to achieve the objective of deterrence, without becoming excessive, based on each utility's financial resources."[140]  We have addressed the Excessive Fines Clause in Section 4.3 above.  In this section, we address the extent to which PG&E's financial resources would limit the amount of the penalty to be imposed.

### 5.3.1.    CPSD and Intervenors' Positions

CPSD asserts that in setting the penalty level, the Commission must take into account that PG&E is one of the largest utilities in the nation and that between 1999 and 2010 PG&E's actual revenues from GT&S services exceeded revenue requirements by at least $435 million at a time when PG&E was underspending on safety[141]  Based on testimony from CPSD witnesses Lubow and Malko of Overland Consulting (Overland), CPSD contends that PG&E could sustain fines and remedies up to $2.25 billion.[142]  CPSD states that this

---

[139] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C. 2d at 189.

[140] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C. 2d at 189.

[141] *CPSD Opening Brief* at 51.

[142] *CPSD Opening Brief* at 51-53.  The Overland Report evaluates the financial strength of PG&E's parent company, PG&E Corporation (PCG).  It explains "Although Pacific Gas & Electric is the utility subsidiary regulated by the CPUC, we mainly focused on the holding company, PCG, in our analysis because the financial strength of the holding company ultimately determines the amount of capital that can be raised."  (Exh. Joint-52 at 1, fn. 3.)  In fact, Overland actually calculated that PG&E could sustain penalties up to $2.45 billion, including the  $2.25 billion "threshold amount" of "incremental equity" discussed in Overland's testimony, plus the $200 million of non-revenue producing equity that PCG had included in its 2012 forecasts.  (See Overland Rebuttal Testimony, Exh. JT 54, at page 7.)

recommended penalty amount "while harsh enough to have a deterrent effect, is not so harsh that PG&E's credit worthiness would suffer to the point where ratepayers would be negatively impacted."[143]

Intervenors support the proposed level of fines and remedies proposed by CPSD. CSB notes that PG&E reported operating revenues of $13.841 billion in 2010, and PG&E Corporation's net income after dividends on preferred stock for the first quarter of 2012 was $239 million.[144] CSB cites to various PG&E reports and concludes that PG&E has conveyed increasing confidence in the company's financial outlook to investors.[145] CSB argues that PG&E's own witness had conceded that while it would be a challenge to issue equity or raise capital sufficient to pay a $2 billion fine, PG&E had the capacity to do so.[146] As such, CSB maintains a $1.25 billion fine (excluding other proposed remedies and disallowances) would be appropriate in light of PG&E's size, 2010 operating revenues and 2013 profits.[147]

CCSF echoes CSB's arguments, noting that PG&E is the biggest public utility in California, with ample resources. Additionally, CCSF argues that it is important for the Commission "to devise a penalty high enough to deter a large, well-resourced corporation like PG&E from undervaluing safety in the future" while still allowing PG&E to survive.[148]

---

[143] *CPSD Opening Brief* at 53.

[144] *CSB Opening Brief* at 29.

[145] *CSB Opening Brief* at 29.

[146] *CSB Opening Brief* at 29-31.

[147] *CSB Opening Brief* at 28. CSB subsequently lowered its proposed fine amount to $900 million in its reply brief.

[148] *CCSF Opening Brief* at 7.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 133 of 565

TURN further notes that given the extent of the harm resulting from the San Bruno explosion and the scope of the violations at issue in the Pipeline OIIs, fines imposed in other proceedings do not provide much guidance.[149]  It notes that the penalties imposed in six incidents identified by PG&E that involved natural gas pipeline explosions and fatalities in other jurisdictions are not comparable to the San Bruno explosions, as three of the incidents were caused by third-parties and one had a statutory cap on the penalty amount.[150]  In contrast, TURN argues that the scope and number of the violations and the extent of harm in the Pipeline OIIs means that the fines in these proceedings would likely exceed PG&E's market value.  Therefore, TURN states "[t]he ability to pay should be limited not by total available assets, but by the amount the company can pay without impacting the utility's ability to provide service (for example, by raising capital for investment) or increasing rates."[151]  At the same time, TURN cautions that the penalty level should not be set based on analysts' expectations, as that perspective "creates a Catch-22 that would circumvent the Commission's statutory and legal responsibilities."[152]  Finally, TURN notes that the $2.25 billion "threshold" level of penalties estimated by Overland included both fines and other potential disallowances.[153]  It asserts "[t]his number is absolutely within the range of forecasts by equity analysts of the total 'fines and penalties.'"[154]

---

[149]  *TURN Opening Brief* at 29.

[150]  *TURN Opening Brief* at 30.

[151]  *TURN Opening Brief* at 31.

[152]  *TURN Opening Brief* at 38.

[153]  *TURN Opening Brief* at 40 (referencing Exh. Joint-52 at 6).

[154]  *TURN Opening Brief* at 40.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 134 of 565

### 5.3.2. PG&E's Position

PG&E disputes Overland's analysis, arguing that the $2.25 billion threshold is "essentially a made-up number based on two financial metrics that have nothing to do with market capacity for equity to be used to fund a penalty."[155]  It states that a $2 billion penalty would be larger than any penalty ever imposed on a utility and "there is no evidence that a utility has ever issued stock for the specific purpose of paying *any* fine or penalty, much less one of that magnitude."[156]

PG&E argues that Overland's analysis fails to take into account PG&E's planned equity issuances to fund capital expenditures.[157]  PG&E states that the company has already projected significant capital expenditures through 2016 and that any equity issuances to fund a penalty would be incremental to planned equity issuances.  PG&E believes that such an equity issuance would be met with heightened investor scrutiny and may require PG&E to postpone some of its planned infrastructure improvements.[158]  Further, it argues that an equity offering to fund a penalty would likely be less well-received by investors.[159]  Among other things, PG&E contends that an equity offering to pay a fine or penalty would not provide any of the benefits that investors view favorably, such as "reduce financial risk, increase future investment flexibility and reduce interest expense."[160]  PG&E goes on to warn that if CPSD's or Intervenors'

---

[155] *PG&E Remedies Brief* at 64.  The two metrics used are the price to book and dividend payout ratios.

[156] *PG&E Remedies Brief* at 71 (emphasis in original).

[157] *PG&E Remedies Brief* at 65.

[158] *PG&E Remedies Brief* at 66 – 67.

[159] *PG&E Remedies Brief* at 69.

[160] *PG&E Remedies Brief* at 69.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 135 of 565

proposed penalties are approved, it may result in "a less favorable perception of the regulatory climate in California."[161]

PG&E next criticizes Overland's methodology to calculate the $2.25 billion threshold level. It contends that neither of the metrics used by Overland to calculate this threshold amount – neither the price to book ratio nor the dividend payout ratio – is "typically used by investment banks to determine the market's capacity for an equity offering."[162] PG&E discusses Overland's methodology and concludes that "Overland's conclusion that PG&E could absorb a penalty of $2.25 billion lacks any meaningful support in the record."[163]

Finally, PG&E maintains that CPSD and Intervenors have proposed remedies that "do not recognize the full extent of PG&E's unrecovered and unrecoverable costs that should be counted against the [$2.25 billion] threshold level."[164] PG&E asserts that PG&E has already incurred and will incur unrecovered and unrecoverable costs as a result of disallowances in the *PSEP Decision*, spending above rate case amounts in gas transmission and other lines of business, right of way management costs and contributions to the City of San Bruno.[165] Further, PG&E argues that investors do not distinguish between equity to fund an explicit disallowance or utility expenditures that exceeded the amounts adopted in its rate case.[166] Therefore, PG&E argues that based on the amount of "unrecovered and unrecoverable operating costs since the San Bruno

---

[161] *PG&E Remedies Brief* at 68.

[162] *PG&E Remedies Brief* at 75.

[163] *PG&E Remedies Brief* at 75.

[164] *PG&E Remedies Brief* at 81.

[165] *PG&E Remedies Brief* at 82.

[166] *PG&E Remedies Brief* at 84.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 136 of 565

accident – most of which went to the gas transmission system . . . PG&E should not be penalized beyond the costs that its shareholders are already bearing."[167]

### 5.3.3.  Discussion

There is no dispute that the Commission must consider PG&E's financial resources in setting the penalty amount.  PG&E's market value as of January 10, 2012 was $16.439 billion, and an aggregate value of $29.117 billion.[168]  These values are significantly higher than the mean ($2.494 billion and $2.766 billion) and median ($2.215 billion and $3.060 billion) for comparable companies.[169]  Additionally, even if one were to only consider PG&E's gas transmission and distribution business on a standalone basis, it would have an aggregate value of approximately $6.4 billion, and an equity value of approximately $4.3 billion.[170]

Despite PG&E's disagreement with Overland's methodology for arriving at the $2.25 billion "threshold level," the record supports a conclusion that PG&E has the financial resources to support a penalty of up to $2.45 billion.

Overland's witnesses testified that PG&E's parent corporation, PG&E Corporation (PCG), should be able to issue approximately $2.45 billion in equity to fund fines or penalties associated with the outcome of proceedings arising from the San Bruno incident. PCG owns all of PG&E's stock.  When PG&E needs additional investor equity, that equity is raised by issuing additional PCG stock.  (This figure consists of the $2.25 billion "threshold amount" of "incremental equity" discussed in Overland's testimony, plus the $200 million of

---

[167] *PG&E Remedies Brief* at 84.

[168] Exh. Joint-70, PG&E Corporation Discussion Materials, dated January 24, 2012, at 13. "Aggregate Value" is defined as "Market Value + Long-term Debt + Short-term Debt + Leases + Preferred Stock + Minority Interest – Cash". (Exh. Joint-70 at 13, fn 1.)

[169] Exh. Joint-70 at 13.

[170] Exh. Joint-70, PG&E Corporation Discussion Materials, dated January 24, 2012, at 2.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 137 of 565

non-revenue producing equity[171] that PCG had included in its 2012 forecasts. See Overland Rebuttal Testimony, Exh. JT 54, at page 7. ) The thrust of Overland's testimony was that PCG could issue $2.45 billion of non-revenue producing equity without unfavorably impacting ratepayers or PG&E's ability to raise the revenue-producing capital it needs to invest in projects to provide safe and adequate service. See, e.g., Overland Rebuttal Testimony, Exhibit Joint 54, at p. 17. PG&E has attempted to discredit this testimony by arguing that the key factors that Overland relied on in making this calculation are not the factors that an investment banker would use in determining how much equity the stock market could absorb. See, e.g., PG&E's Coordinated Remedies Brief at pp. 64, 71, 73. An investment banker, however, does not typically look at the maximum level of non-revenue producing equity that a company could issue to cover the cost of penalties as this is a highly unusual situation. Rather, an investment banker is typically looking at how much equity a company can issue for other purposes, and when it should be issued. Thus, the mere fact that Overland relied on different factors does not detract from the credibility of Overland's testimony. PG&E has also pointed out that the price-to-book ratio figures included in Overland's testimony are erroneous and do not support Overland's conclusion. See PG&E's Coordinated Remedies Brief at pp. 75-76.

Nevertheless, we find Overland's testimony concerning the amount of equity that PGC could issue to fund the penalties in these proceedings to be credible, for the following reasons: Both Overland and PG&E's opposing witness (from Wells Fargo) generally agreed that investors in utility stocks are looking for: dividends that are relatively stable (i.e., with limited volatility); and

---

[171] By "non-revenue producing equity" we mean equity that will not be spent on revenue-producing investments.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 138 of 565

increased earnings over time.[172]  Therefore, Overland looked at how much
non-revenue producing equity PGC could issue while maintaining its existing
dividend per share.  Furthermore, in making its calculations, Overland kept the
dividend payout ratio (i.e., the percentage of earnings paid out to shareholders in
the form of dividends) within the range approved by PGC.[173]  In addition, in
order to determine how many shares of stock PGC would have to sell to raise the
needed amount of equity.  Overland used the conservative assumption of full
dilution, i.e., that PGC's total market capitalization would remain constant before

---

[172]  See, e.g., Wells Fargo testimony, Exhibit Joint 67, at pp. 6-7.

[173]  In its Coordinated Remedies Brief at pp. 76-77, PG&E argues that an equity issuance as large
as Overland's threshold figure would cause its dividend payout ratio to exceed PG&E's internal
guidelines in 2013, citing the earnings per share guidance in its Fourth Quarter Earnings Call
Presentation, February 21, 2013.  However, as explained by Overland, PG&E's projected
earnings per share for 2013 were lower than those in 2012 and those projected for subsequent
years because of PG&E's plan to write off a lot of its costs in 2013.  (JT TR p. 1422 (March 4,
2013).)  Presumably such a large write-off would include San Bruno related costs.

(JT TR p. 1422 is in a portion of the transcript that has been under seal.  To make the basis for
this and other portions of our Decision more transparent, we will unseal pages 1421-29 of the
Joint Transcript, but not any of the confidential exhibits discussed in that portion of the
transcript. )

Indeed, if PG&E were to write off San Bruno costs equal to the threshold amount in a single
year, PCG would apparently show a loss for that one year.  See, JT Exh. 57 (Fourth Quarter
Earnings Call Presentation, February 21, 2013) at p. 18, showing PCG's total "Earnings from
Operations" and "Earnings on a GAAP basis" for 2011 and for 2012 in amounts lower than
Overland's threshold amount.  In that case, there would be no earnings per share, and any
distribution of earnings in the form of dividends would necessarily exceed PCG's dividend
payout ratio guideline.  However, we do not find this conclusion troubling or undermining of
Overland's calculation of the threshold level.  PG&E has stated that it expects PGC to issue
equity to fund the full amount of the penalties imposed in these proceedings.  Thus, PG&E will
not need any cash from its ongoing operations to fund the penalties, and its earnings from
operations will therefore be available to fund dividends.  Even if the penalties are written-off
over several years, as we expect will be the case under this decision, the issuance of off-setting
equity will mean that PG&E will have cash from its ongoing operations to maintain (or even
increase) its dividend.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
139 of 565

and after the issuance of the incremental equity.[174]  Based on these inputs and requirements, as well as financial information it received from PG&E, Overland calculated that PGC could issue up to approximately $2.25 billion in incremental equity[175] while still allowing PGC to maintain its per-share dividend.  PG&E projects a substantial increase in rate base going forward, [176] which would result in increased earnings over time.[177]  Furthermore, PG&E plans to fund the penalties in these proceedings by issuing additional PGC equity. Therefore, once that equity has been issued it would be expected that PG&E's earnings per share will increase (albeit the amount of those earnings per share will be less than before the issuance of the non-revenue producing equity)[178] and that PG&E will

---

[174]  In other words, Overland assumed the PGC's share price would fall upon issuance of the incremental equity such that the total value of all shares outstanding (the market capitalization) would be the same before and after the issuance.  (See Overland Opening Testimony, Exh. JT 52, at p. 11.)  This is a conservative assumption given the testimony that PGC's market capitalization has already been discounted by 1.6 to 2 billion dollars by the expectation that PG&E will be subject to substantial penalties in these proceedings.  (See Overland Rebuttal Testimony, Exh. JT 54, at p. 26.)  To the extent that the market price of PGC's shares has already been discounted to reflect expected penalties, the issuance of non-revenue producing stock would not cause any further fall in the market price.

[175]  I.e., in addition to the $200 million that PCG had included in its 2012 forecasts.

[176]  See, e.g., slides from PGC's Fourth Quarter Earnings Call, February 21, 2013, Exh. Joint 57, p. 12.  See also JT TR, p. 1422 where the Overland witness states:  "And you can see that 2013 is certainly an anomaly in relation to 2012 and all other years being forecasted.  2014, '15' and '16, all indicate significant improvement over 2013 and are higher than . . . 2012 EPS.  It's obvious the company intends to write off a lot of its costs for GAAP purposes in 2013, that's going to be driving down their earnings.  The investment community is aware of the longer-term earnings potential of the company."

[177]  Rate base represents PG&E's reasonable investment in revenue-earning plant, minus accrued depreciation.  PG&E earns a rate of return on its rate base.

[178]  Because PG&E funds a portion of its capital investment with retained earnings, only a portion of the equity needed to fund its investment in additional rate-based plant has to be raised by issuing additional PGC stock.  Thus, as PG&E's rate base increases, the earnings per share will also increase (all other things being equal), as a portion of the increased earnings are due to investment for which no additional shares of PGC stock had to be issued.  See also JT TR

*(Footnote continued on next page)*

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 140 of 565

therefore be able to increase its dividend over time as well. Thus, we conclude from the Overland testimony, that despite issuing a very substantial amount of non-revenue producing equity, PG&E will be able to maintain its per share dividend, and increase that dividend over time, thus meeting the expectations of those who invest in utility stocks. From this, we further conclude that PGC should be able to continue to issue equity to fund needed revenue-producing investments, while also issuing equity to fund the non-revenue producing penalties imposed in this decision.

A review of equity analyst reports introduced into the record similarly shows that PG&E should be to continue to raise equity even after funding the penalties imposed in this decision. A review of projected penalties estimated by various equity analysts, listed in Table 2 below, finds that the total projected fines, disallowances and other remedies range from $500 million to $3.65 billion (pre-tax):

///

///

///

---

*(Footnote continued from previous page)*

p. 1422 (March 4, 2013), where Overland describes PG&E's projection that earnings per share in 2014, 2015, and 2016 will exceed its earnings per share in 2012.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 141 of 565

**Table 2**
**Estimated Level of Penalties**[179]

| Equity Analyst | Date of Report | Projected Fine | Other unrecoverable expenses |
|---|---|---|---|
| Bank of America Merrill Lynch | Oct. 31, 2012 | $300 million | $1.039 billion[180] |
| Barclays | Jan. 4, 2013 | $500 million | |
| Bernstein Research | Nov. 29, 2012 | $400 million - $500 million | $3.1 billion[181] |
| BGC | Jan. 2, 2013 | $600 million | |
| Citi Research | Oct. 24, 2012 | $400 million | $625 million[182] |
| Credit Suisse | Feb. 17, 2012 | $400 million | $1.8 billion |
| Deutsche Bank | Oct. 31, 2012 | $500 million | Reduced projected 2013 and 2014 earnings per share to reflect impact of PSEP Decision. |
| Goldman Sachs | Aug. 7, 2012 | $500 million - $700 million | |
| ISI | Nov. 1, 2012 | $750 million | $2.9 billion |
| J.P. Morgan | Oct. 11, 2012 | $100 million | $535 million |
| Macquarie (USA) | Feb. 17, 2012 | $300 million | $1.5 billion |
| Morgan Stanley | Oct. 15, 2012 | $500 million | $1 billion[183] |
| UBS | Dec. 31, 2012 | $500 million | |
| Wells Fargo | Oct. 24, 2012 | $750 million | Costs from PSEP Decision |

---

[179] Exh. Joint-79, PG&E Data Responses to OCHP_005-1013, Excerpts from Equity Analyst Reports re Level of Penalty.

[180] Exh. Joint-79 at 1 (estimated unrecoverable expenses of $514M in 21013, $435M in 2014 and $90M in 2015).

[181] Exh. Joint-79 at 3 ($1 billion unrecovered costs incurred under *PSEP Decision* and a further $2.1 billion in San Bruno-related costs, excluding fines).

[182] Exh. Joint-79 at 7 ($225 million in 2012, $250 million in 2013, $75 million in 2014 and $75 million in 2015).

[183] Exh. Joint-79 at 13 ("We believe a headline figure of ~$1.5 billion is likely, including a penalty of $500 million and little recovery of certain pipeline costs.").

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 142 of 565

As TURN notes "The Commission should be cognizant of Wall Street expectations only to the extent they may affect the company's financial health to such an extent that they affect utility ratepayers."[184]  In this respect, Wall Street has signaled that CPSD's proposed penalty amount may not have the adverse impact on PG&E's financial health predicted by PG&E.  For example:

1. BernsteinResearch concluded that even after incorporating its estimates of unrecoverable San Bruno-related costs into its revised earnings forecast for PG&E, its revised target price still implied an 11% upside (i.e., PG&E's share price was expected to increase).[185]

2. ISI stated that its "forecast now assumes that PCG shareholders incur total unrecoverable costs *before* fines and penalties totaling $2.9 billion dollars, and assumes additional fines and penalties of $750 million dollars.  Despite our frustration with the continue [sic] degradation of value at PGC, the stock still looks undervalued to this punitive outcome, and we retain our Buy rating."[186]

Thus even analysts who have estimated a range of unrecoverable San Bruno related costs and penalties far in excess of the Overland calculation, express confidence in PG&E's stock performance once the uncertainty surrounding these proceedings is resolved.  Therefore, there appears to be confidence by the financial community that PG&E has the financial resources to pay the penalty proposed by CPSD and will still be able to raise capital for other needed investments.

PG&E argues that while "it may be doable" to raise sufficient equity to pay a $2 billion fine, its witness Mr. Fornell testified it would place PG&E "in a world

---

[184] *TURN Opening Brief* at 39.

[185] Exh. Joint-79 at 3.

[186] Exh. Joint-79 at 10 (emphasis in original).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 143 of 565

of hurt."[187]  We remind PG&E that the purpose of a penalty is to deter future violations by the company and others.  In achieving this purpose, the Commission is not guided by whether the adopted penalty imposes a hardship upon the company and its shareholders, but rather, whether the adopted penalty has a deterrent effect without adversely impacting ratepayers.

PG&E contends that a large penalty will increase its cost of equity (and possibility the cost of the debt) that it needs to raise for revenue-producing purposes, because such a penalty would cause investors to have a negative view of California's regulatory environment, which could easily impact other utilities as well.[188]  We find this argument unconvincing.  We believe that investors will understand the difference between what we are doing here, imposing a substantial one-time penalty on PG&E for past bad behavior, and a regulatory environment that is unfavorable for investors because the regulatory system does not permit utilities to recover their costs on an ongoing basis.  In fact, the regulatory system we have in place for PG&E and the other large energy utilities has numerous mechanisms designed to ensure that these utilities are able to recover their reasonable costs on a going forward basis, despite large swings in variables such as energy costs and energy usage.  For example, on the electric side, PG&E has:  (i) a balancing account called the Energy Resource Recovery Account, that protects PG&E against fluctuations in purchased power and fuel costs, so long as they are incurred in compliance with the procurement rules; (ii) several accounts, such as the Distribution Revenue Adjustment Mechanism and the Utility Generation Balancing Account, which ensure recovery of PG&E's approved GRC costs (for distribution and for the power plants it owns,

---

[187] *PG&E Remedies Brief* at 70 (citing 15 Joint RT at 1619:8 (PG&E/Fornell)).

[188] See, e.g., PG&E's Coordinated Remedies Brief at 68.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 144 of 565

respectively), regardless of fluctuations in the amount of electricity that PG&E sells; and (iii) pre-approval of the contract price included in purchased power contracts either (a) as authorized by its procurement plan (see Pub. Util. Code sec. 454.5(b)(7)), or by advance approval of other power purchase contracts. On the gas side, PG&E has, for example: (i) a balancing account called the Purchased Gas Account, which balances core gas procurement costs with procurement rate revenues and thus limits PG&E's risk for not recovering the cost of gas it purchases for core customers; and (ii) several balancing accounts that limit PG&E's risk of not recovering its approved GRC costs due to fluctuations in gas sales or amounts of gas transported, including the Core Fixed Cost Account and the Noncore Customer Class Charge Account.

Investors should be able to distinguish between a penalty and unrecoverable ongoing operating costs. The analyst reports included in the record demonstrate that there is an understanding that the fines and other remedies under contemplation are in response to these adjudicatory proceedings. In contrast, unrecoverable operating costs are associated with the ongoing general operations of the company, not expenditures for remediation of past wrongdoing.

For all the foregoing reasons, we find that PG&E has the financial resources to pay the penalty proposed by CPSD. Furthermore, PG&E should be able to pay a penalty of that magnitude without harming ratepayers or its ability raise the equity needed for revenue-producing investments required to provide adequate and safe service.

Finally, PG&E's arguments against a $2.25 billion penalty on the grounds that (a) it is the larger than any penalty ever imposed on a utility and (b) there is no evidence any utility has every issued stock for paying a penalty, are unpersuasive. PG&E has provided no authority that a penalty imposed in these

Case: 19-30088　　Doc# 14208-2　　Filed: 12/13/23　　Entered: 12/13/23 22:10:31　　Page 145 of 565

proceedings cannot exceed penalties previously imposed on a utility. As discussed in Sections 4.3 and 5.5 of this decision, we considered penalties imposed in other Commission enforcement proceedings and other pipeline accidents and determined that any penalty imposed in these Pipeline OIIs should be significantly greater.

## 5.4. The Totality of the Circumstances in Furtherance of the Public Interest

This factor takes into consideration facts that may mitigate or exacerbate the degree of wrongdoing.[189] "In all cases, the harm will be evaluated from the perspective of the public interest."[190]

### 5.4.1. CPSD and Intervenors' Positions

CPSD argues that given the strong public interest, the Commission must set a penalty that is not simply "the cost of doing business."[191] Rather, the penalty must be "commensurate with the harm caused."[192] Similarly, CSB maintains that the Commission must evaluate facts that exacerbate the wrongdoing and evaluate harm "from the perspective of the public interest, not the utility, not utility shareholders, not investment banks, not underwriters, and not investment analysts that cover the utility industry beat."[193]

DRA and CCSF also contend that the totality of circumstances requires a severe penalty.[194] Among other things, DRA argues that in addition to the

---

[189] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C.2d at 189.

[190] *Id.*

[191] *CPSD Opening Brief* at 55.

[192] *CPSD Opening Brief* at 55.

[193] *CSB Opening Brief* at 37 (citations omitted).

[194] *DRA Opening Brief* at 34; *CCSF Opening Brief* at 7.

Case: 19-30088 Doc# 14208-2 Filed: 12/13/23 Entered: 12/13/23 22:10:31 Page 146 of 565

severity of the offense, PG&E's conduct after the San Bruno explosion lacked any contrition, as evidenced by PG&E's efforts to mislead the Commission.[195]  CCSF makes similar arguments and notes "An overriding exacerbating fact is the degree of physical harm involved in this case, . . . the systematic nature of the violations, the corporate culture that deemphasized safety, and PG&E's continued insistence that its substandard maintenance and shoddy record practices are not violations of the law."[196]

### 5.4.2.  PG&E's Position

PG&E argues that an objective evaluation of the regulatory environment and PG&E's practices over time would demonstrate "that PG&E's prior shortcomings do not constitute violations that justify the extreme penalty proposed."[197]  Among other things, PG&E contends that its gas transmission business has cooperated with CPSD in audits of PG&E's operations, practices and procedures and that "there was no intentional misconduct or willful neglect on the part of PG&E that led to the rupture."[198]

PG&E further notes that "missing, inaccurate or incomplete records, especially regarding pressure testing of older pipelines, are a challenge faced by the entire natural gas industry."[199]  Thus, PG&E's recordkeeping shortfall is not unique.  Despite that fact, PG&E states that the Commission expects all gas operators to have maintained "traceable, verifiable, and complete" MAOP

---

[195] *DRA Opening Brief* at 34.

[196] *CCSF Opening Brief* at 7.

[197] *PG&E Remedies Brief* at 84.

[198] *PG&E Remedies Brief* at 84 – 85.

[199] *PG&E Remedies Brief* at 86.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 147 of 565

records, even though "by the account of every industry participant this requirement is new to the industry and difficult to achieve."[200]

### 5.4.3.    Discussion

We agree with PG&E that it is not the only gas pipeline operator that has experienced pipeline failure or is faced with recordkeeping shortfalls.  We also agree that PG&E did not intentionally cause the San Bruno explosion.  However, neither of these arguments diminishes either the severity of the San Bruno explosion or the extent of the recordkeeping shortfalls presented by CPSD.

In considering the appropriate penalty, we must consider the gravity and severity of the violations presented in the Pipeline OIIs, PG&E's statutory obligation to provide safe and reliable gas service, the pervasive nature of PG&E's recordkeeping shortfalls, the impact of the San Bruno explosion on its residents, and the Commission's and the public interest in ensuring safe and reliable natural gas service.  Based on our discussion in connection with the other factors, we find that a severe penalty is warranted.

## 5.5.    The Role of Precedent

This factor takes into consideration the proposed outcome with "previously issued decisions which involve the most reasonably comparable factual circumstances and explain any substantial differences in outcome."[201]

### 5.5.1.    CPSD and Intervenors' Positions

CPSD and Intervenors maintain that the San Bruno explosion and fire cannot be compared to any previous incidents.  Both CPSD and CSB state that with the exception of the investigation into the explosion of a distribution

---

[200] *PG&E Remedies Brief* at 87.

[201] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C. 2d at 190.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 148 of 565

pipeline in Rancho Cordova, the Commission's past enforcement cases that resulted in large fines did not involve deaths or severe property damage.[202] Additionally, CSB maintains that the $38 million fine assessed for the Rancho Cordova explosion was the result of a revised settlement, where the ALJ "estimated that PG&E faced up to $97 million in penalties for stipulated violations."[203]

CSB further argues that none of the "fatal gas pipeline accidents since 1999" identified in the *Wells Fargo Report* could be considered precedential since they were the result of different circumstances.[204] CSB notes that, unlike Line 132, the other pipeline explosions involved either pipelines that were significantly smaller in diameter or occurred in rural areas.[205]

Moreover, CPSD argues that the magnitude of PG&E's "failure to keep traceable, verifiable, complete and accurate gas transmission records" is unprecedented.[206] Since there are no comparable cases, CPSD argues that comparison of other precedential cases to San Bruno should be made carefully because "the death and destruction are more severe than any previous public utility incident."[207] CCSF echoes this argument, stating "prior Commission

---

[202] *CPSD Opening Brief* at 57; *CSB Opening Brief* at 38.

[203] *CSB Opening Brief* at 38 (citing *Presiding Officer's Decision Regarding Joint Motion to Approve the Stipulation of Pacific Gas and Electric Company and the Consumer Protection and Safety Division Concerning Rancho Cordova and Related Stipulation (Rancho Cordova)* [D.11-11-001] at 41 (slip op.).)

[204] *CSB Opening Brief* at 39-40.

[205] *CSB Opening Brief* at 40.

[206] *CPSD Opening Brief* at 58.

[207] *CPSD Opening Brief* at 58.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 149 of 565

decisions are simply inapplicable and the Commission must decide this case based on the particular facts before it."[208]

### 5.5.2.    PG&E's Position

PG&E notes that a $2.25 billion penalty would exceed the total amount of fines and restitution ordered by the Commission between 1999 and February 21, 2012 or any penalty imposed in any other jurisdiction.[209]  PG&E identifies two pipeline accidents, in Carlsbad, New Mexico and Allentown, Pennsylvania, that it believes are substantially similar to San Bruno and notes that penalties imposed in those accidents are significantly less than what is being considered here.  PG&E further notes that the Commission had determined in its decision on the Rancho Cordova accident:  "The potential penalty exposure of more than $97 million is moderate to large in comparison to the size of PG&E's operation of its public utility business, and would serve as a significant deterrent to ensure that similar incidents do not occur in the future."[210]

### 5.5.3.    Discussion

CPSD and Intervenors are correct that none of the Commission's prior enforcement proceedings are comparable with these proceedings.  Unlike the other proceedings, the penalties under consideration are for three separate OIIs, each covering separate and distinct violations.  The penalties to be imposed here would be for violations that directly resulted in 8 fatalities, numerous injuries, destruction or damage to over 100 homes as well as potential risk of harm to the public due to PG&E's failure to have the necessary records to properly maintain and operate its gas transmission pipeline system and provide safe and reliable

---

[208] *CCSF Opening Brief* at 8.

[209] *PG&E Remedies Brief* at 89.

[210] *PG&E Remedies Brief* at 93 – 94 (citing D.11-11-001 at 41.)

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 150 of 565

gas service.  As CSB notes, PG&E "provides natural gas and electric service to approximately 15 million people throughout a 70,000 square mile service area in northern and central California."[211]  None of the Commission's prior enforcement cases or the other gas pipeline accidents identified in the *Wells Fargo Report* had an impact on such a large area or number of people.

Nonetheless, the 2008 Rancho Cordova explosion and fire does provide some limited guidance.  The Rancho Cordova explosion and fire concerned the rupture of a natural gas distribution pipe, which resulted in one fatality, injuries to several others, destruction of one home and damages to adjoining homes.[212]  In considering whether to grant a joint motion between PG&E and CPSD to approve a stipulation between the parties, the ALJ had concluded:

> In this OII, CPSD alleges five different instances involving violations of Pub. Util. Code §451 and seven sections of 49 CFR that have been incorporated into GO 112-E.  If these allegations are fully litigated, and assuming each CPSD allegation is proven and a continuing penalty amount of $20,000 per day is imposed for each violation of Pub. Util. Code §451 and GO 112-E, PG&E potentially faces $97 million *or more* in penalties.

> The potential penalty exposure of more than $97 million is moderate to large in comparison to the size of PG&E's operation of its public utility business, and would serve as a significant deterrent to ensure that similar incidents do not occur in the future."[213]

In contrast to *Rancho Cordova*, the San Bruno explosion and fire resulted in eight fatalities, 58 people injured (many with life-altering injuries), 38 homes destroyed and 70 homes damaged.  In addition, the scope of the three OIIs here

---

[211] *CSB Opening Brief* at 28.

[212] *Rancho Cordova* at 3 (slip op.).

[213] *Rancho Cordova* at 41-42 (slip op.) (citations omitted, emphasis added).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 151 of 565

is significantly broader than the one OII for the *Rancho Cordoba* incident.  Here we are looking at broader, systemic safety failures on the part of PG&E, not just the accident itself.  Based on the determinations in *Rancho Cordova*, and in consideration of the significantly greater physical impact of the San Bruno explosion and fire, the broader scope of these proceedings and the increased risk to all residents in PG&E's service territory, along with the duration of the violations,[214] it is reasonable for the potential penalty exposure to PG&E for the violations found in these OII proceedings be significantly higher than the $97 million calculated by the ALJ in the *Rancho Cordova* proceeding.[215]

Further, unlike prior enforcement proceedings, parties have proposed that the Commission adopt a wide-range of remedies in addition to any fines imposed under Pub. Util. Code §§ 2107 and 2108.  The remedies are not those traditionally utilized in enforcement proceedings), but rather to ensure that PG&E fulfills its obligations to operate its gas pipeline system in a safe manner.

For these reasons, we find that the unique and extraordinary nature of these enforcement proceedings cannot be compared to any prior Commission decisions, or even other gas pipeline explosions.

## 6.    Penalty to Be Imposed

Our decisions on violations in the Pipeline OIIs have found that PG&E committed 2,425 violations, many of them continuing for years, for a total of

---

[214]  Most of the violations in the Pipeline OIIs were found to have continued for a period of over 50 years.  In contrast, most of the violations alleged and stipulated to by PG&E in Rancho Cordova ran for slightly more than two years.  (See, *Rancho Cordova Decision* at 38-39 & 41, fn. 25 (slip op.).)

[215]  In terms of proportionality, CPSD has argued "since the San Bruno explosion and fire had eight times as many fatalities, more than 10 times as many injuries, and approximately 40 times the homes destroyed or damaged, this would support at least a $500 million fine in the San Bruno OII alone."  (*Response of the Consumer Protection and Safety Division to Request for Review of Commissioner Picker*, filed October 27, 2014, at 3.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 152 of 565

18,447,803 days in violation.  The Table of Violations for each proceeding is found in Appendix B through D of this decision.  Table 3 below summarizes the days in violations by proceeding:

**Table 3**
**Number of Violations from Violations Decisions**

| Proceeding | Number of Days in Violation prior to 1/1/1994 | Number of Days in Violation on or After 1/1/94 | Total Number of Days in Violation |
|---|---|---|---|
| I.12-01-007 (San Bruno) | 27,036 | 32,219 | 59,255 |
| I.11-02-016 (Recordkeeping) | 206,984 | 143,205 | 350,189 |
| I.11-11-009 (Class Location) | 6,128,519 | 11,909,840 | 18,038,359 |
| **TOTAL** | **6,362,539** | **12,085,264264** | **18,447,803803** |

Based on our discussion in Section 3.4 above, we have found duplication in two areas.  Accordingly, we exclude adopted San Bruno violations 1 and 19, for a total reduction of 19,612 days in violation.  Table 4 below reflects the total number of days in violation considered for the purpose of determining the penalty to be imposed on PG&E:

**Table 4**
**Revised Number of Violations**

| Proceeding | Number of Days in Violation prior to 1/1/1994 | Number of Days in Violation on or After 1/1/94 | Total Number of Days in Violation |
|---|---|---|---|
| I.12-01-007 (San Bruno) | 13,521 | 26,122 | 39,643 |
| I.11-02-016 (Recordkeeping) | 206,984 | 143,205 | 350,189 |
| I.11-11-009 (Class Location) | 6,128,519 | 11,909,840 | 18,038,359 |
| **TOTAL** | **6,349,024** | **12,079,167167** | **18,428,191191** |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 153 of 565

As noted in Section 4.1 above, the range of fines that may be imposed pursuant to Pub. Util. Code § 2107 ranged from $500 to $2,000 per offense prior to 1994; from $500 to $20,000 per offense between 1994 and 2011; and from $500 to $50,000 per offense after 2011.  Even if we exclude the increased maximum fine amount in place after 2011, the range of potential fines that could be imposed based on the number of days in violation is from $9.2 billion to $254.3 billion.[216] Nonetheless, we realize that the amount of the penalty to be imposed must be significantly decreased from that potential level in consideration of PG&E's financial resources.

Similarly, we take into consideration CPSD and parties' proposals that any penalty imposed should consist of a combination of a fine paid to the state's General Fund, a disallowance of rate recovery of certain costs associated with improving PG&E's gas transmission pipeline system and recordkeeping systems, shareholder-funded improvements to PG&E's gas pipeline system, and other remedies.  As CSB argues, the Commission should ease the burden on ratepayers by requiring PG&E's shareholders to bear responsibility for a greater portion of the costs adopted in the *PSEP Decision* to improve PG&E's pipeline system.[217] Further, CCSF maintains "payment of a penalty that consists largely of remedial measures will happen over time and thus can be effectively managed with PG&E's other financial needs."[218]  Consequently, CPSD and Intervenors propose that the recommended $2.25 billion penalty consist of:  (1) fines ranging from

---

[216]  This range is calculated as follows: 18,428,191 violations x $500 = $9,214,095,500, to (6,349,024 violations x $2,000) + (12,079,167 violations x $20,000) = $254,281,388,000.

[217]  *CSB Opening Brief* at 8; see also *CCSF Opening Brief* at 16 ("A large payment to the general fund sends a good signal to utilities but beyond that does not contribute to reasonable rates or ensure that needed safety improvements are made.")

[218]  *CCSF Opening Brief* at 16.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 154 of 565

$300 million to $900 million, and (2) disallowances and other remedies for the remaining balance.

Based on the arguments above, we agree that the penalty imposed should be a combination of fines, disallowances and remedies. In setting the penalty amount, we also take into account the fact that PG&E has been ordered to make certain safety improvements and enhancements at shareholder expense. Since any penalties imposed in this decision will be in addition to disallowances adopted in the PSEP (D.12-12-030), we must balance the need to set the proper penalty at the appropriate level to deter future violations with the need to ensure that any penalty imposed does not adversely impact PG&E's ratepayers.

In their arguments regarding the amount of disallowances, CSB, TURN and DRA all argue that there is a need to consider the tax benefits PG&E would receive from any disallowance. TURN estimates that a $1.0 billion disallowance would result in an actual financial impact to PG&E of approximately $744 million.[219] As such, TURN proposed a $670 million fine to be paid to the General Fund which would "*more than* cover the lost revenue to the state General Fund resulting from PG&E's reduced tax liability for unrecovered costs."[220] Similarly, CSB states that its proposed $900 million fine "approximates the value of the federal and state tax deductions available to PG&E for natural gas pipeline safety investments" assuming $2.333 billion of investment and a 40% combined federal and state income tax rate.[221] In light of the tax benefits received by PG&E

---

[219] *TURN Opening Brief* at 9.

[220] *Reply Brief of The Utility Reform Network on Fines and Remedies (Public Version)*, filed June 7, 2013, at 8 (emphasis added).

[221] *CSB Reply Brief* at 7.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 155 of 565

for unrecovered costs, CPSD and Intervenors have proposed that all costs incurred under the *PSEP Decision* be recovered from PG&E shareholders.[222]

PG&E argues that all unrecovered gas pipeline safety costs should be applied to the penalty. However, it argues that its shareholders have already paid, or will incur in the future, unrecovered costs totaling more than $2.25 billion for gas transmission safety work since the San Bruno explosion and fire.[223] As such, PG&E argues that no further fine is warranted. Moreover, PG&E asserts that there is no legal basis for further disallowances of PSEP costs. PG&E states:

> The Commission unanimously ruled that PG&E's PSEP is reasonable and authorized recovery of other PSEP Phase I costs because those costs did not result from unreasonable and imprudent conduct. In so ruling, the Commission rejected claims by DRA and TURN that the Commission should disallow all PG&E's PSEP Phase I costs as the product of past imprudent conduct. … [T]he Commission has already found the allowed PSEP costs were not the result of such past imprudence, but represent the reasonable cost of the safety enhancements mandated by the Commission in R.11-02-019.[224]

The majority of the projects approved in the *PSEP Decision* were to correct recordkeeping shortfalls and implement safety improvements, including pipeline testing and replacement that had been neglected by PG&E management for decades.[225] Thus, to the extent that these projects are to address violations found in these proceedings, we may order that their costs be the responsibility of PG&E

---

[222] *CPSD Opening Brief* at 6; *CPSD Amended Reply* at 3; *CSB Reply Brief* at 7; *CCSF Opening Brief* at 17; *TURN Opening Brief* at 8; *DRA Opening Brief* at 19.

[223] *PG&E Remedies Brief* at 12.

[224] *PG&E Response to Amended Brief* at 4.

[225] See, e.g., *PSEP Decision* at 55 & 99 (slip op.).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 156 of 565

shareholders pursuant to Pub. Util. Code §§ 701 and 728. The fact that these projects had been approved in a different decision does not change this conclusion. Indeed, as we noted in Section 4.2 above, the *PSEP Decision* contemplated that further disallowances may be warranted based on findings in the Pipeline OIIs and thus made "all ratemaking recovery authorized in today's decision is subject to refund."[226] There is no requirement that any further disallowances be based on a finding of imprudence. Rather, we may adopt disallowances as an equitable remedy pursuant to our authority under Pub. Util. Code §§ 701 and 728.

The *PSEP Decision* already disallows rate recovery of costs incurred prior to the date of that decision, for the Pipeline Records Integration Program, and for certain pressure-test and pipeline replacement expenditures. These disallowances were approximately $635 million.[227] We are unpersuaded by PG&E's arguments that "other unrecoverable gas transmission costs in 2013 and beyond" should be counted in any penalties imposed here.[228] Many of the unrecoverable costs identified by PG&E are both outside of the scope of this proceeding and speculative and should be given no weight.

In PG&E's Appeal of the Presiding Officer's Decision on Fines and Remedies [Penalties POD Appeal] PG&E continues to argue that, in determining an appropriate penalty, the Commission should take into account allegedly

---

[226] *PSEP Decision* at 4 (slip op.).

[227] CPSD estimates that the disallowances adopted in Decision 12-12-030 in R.11-02-019 to be $635,000,000. (*CPSD Amended Reply Brief* at 3-4.) In addition to the disallowances, the Commission rejected PG&E's request for a $380.5 million contingency in the event of cost overruns. (*PSEP Decision* at 97-100 (slip op.).) We do not consider this amount to be a disallowance, since "PG&E's pressure testing cost forecasts are already biased to the high end of the expected cost range and thus include an implicit allowance for unexpected cost overruns." (*PSEP Decision* at 98-99 (slip op.).)

[228] *PG&E Remedies Brief* at 12.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 157 of 565

unrecoverable gas safety related costs.  (Appeal, pp. 4-8.)  It thus renews arguments earlier made in its Coordinated Remedies Brief.  The Penalties POD rejected PG&E's argument that, in setting a penalty in this decision, we must consider amounts shareholders have spent and plan to spend on gas system safety, beyond the $635 million in disallowed PSEP expenditures recognized in the Penalties POD.  We continue to reject this argument, and believe it worthwhile to further explain why.

First, as pointed out in the examination of Overland, PG&E has chosen to characterize as an unrecovered shareholder cost "any dollar that . . . wasn't specifically approved by the Commission."[229]  Thus, PG&E seeks to have us consider as part of its penalty not only those amounts that the Commission has expressly ordered shareholders to pay, but also:  (i) any costs for which it never sought recovery; (ii) categories of costs for which it spent more than the amount included in its revenue requirement; or (iii) any costs which the Commission did not include in PG&E's revenue requirement because PG&E failed to carry its burden of proof.[230]  However, given that the utility has some discretion to shift spending from one area to another, as necessary, the mere fact that a given cost was not expressly recognized in calculating its revenue requirement does not mean that the utility did not recover those costs.  As explained by Overland, the real test is whether the utility earns approximately its authorized rate of return.[231]  If, during the period in question the utility earns nearly its authorized

---

[229]  JT TR p. 1424 (March 4, 2013).  This portion of the transcript has been under seal.  To make the basis for this and other portions of our Decision more transparent, we are unsealing pages 1421-29 of the Joint Transcript, but not any of the Confidential Exhibits discussed in that portion of the transcript.

[230]  With regard to item (iii) see JT TR pp. 1424-25.

[231]  JT TR pp. 1425-26; see also JT TR pp. 1369-70.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 158 of 565

rate of return, despite spending money on costs not expressly included in its revenue requirement, the utility has in fact succeeded in recovering those costs, and there are not any unrecovered costs being paid by shareholders. PG&E does not argue, nor cite to any evidence, that it has failed to earn nearly its authorized rate of return for any past period.

With regard to future periods, of course there can be no evidence as to whether or not PG&E has earned approximately its authorized rate of return. That is why we find much of PG&E's argument to be speculative.[232] For future periods, PG&E's argument necessarily relies on forecasts of the amounts that it will spend on various categories of costs and its ability to find revenues to fund those costs. Furthermore, the costs beyond those disallowed in the PSEP Decision are neither costs that the Commission has required PG&E to incur nor that the Commission has found to be reasonable;[233] therefore there is no record as to whether PG&E ought to incur those costs, thus making PG&E's argument that such future costs ought to be considered in setting the penalty here even more speculative.

The majority of PG&E's argument on this point relies on matters that are not in the record or for which an adequate foundation has not been established, as evidenced by the motions to strike portions of PG&E's Coordinated Remedies Brief and Appeal that have been granted.[234] Furthermore, to the extent PG&E's Coordinated Remedies Brief cites to matters that are in the record, those sources are so lacking in detail about the basis of the cost and cost-forecast figures they

---

[232] See, e.g., Heading II.A. of PG&E's Consolidated Brief on Penalties (p. 12) where it addresses amounts that shareholders allegedly "will pay" for Gas Transmission Safety-Related Work.

[233] Similarly, the Commission has also not found whether other allegedly unrecovered *past* costs were reasonably incurred.

[234] See Section 10 of this Decision granting CPSD's Motion to Strike Portions of PG&E's Appeal.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 159 of 565

contain that we cannot consider those numbers to be reliable.  If we were to accept PG&E's argument that in setting a penalty we must consider amounts shareholders have spent and plan to spend on gas system safety, beyond the $635 million in disallowed PSEP expenditures, then we would effectively be allowing PG&E to unilaterally determine what expenditures are reasonable and how the penalty should be structured.  We will not thus abdicate our responsibilities to determine the reasonableness of PG&E's expenditures and what penalties should be imposed as a consequence of PG&E's violations of safety requirements.

We have considered CPSD and Intervenors' arguments regarding further disallowances and find that an additional $400 million bill credit, as an equitable remedy associated with PG&E's Pipeline Modernization Program, is both warranted and supported by the record. For example, DRA recommended that PG&E be disallowed rate recovery of all approved costs of Phase I of the PSEP, including the $1.169 billion approved in D.12-12-030 (DRA Opening Brief at 4-5), while CSB recommended that $2.333 billion in PSEP investments be made at shareholder expense (Rebuttal Brief of CSB at 7-8).  TURN and CCSF also argue for similarly large-scale disallowances.  (See Table 1, supra.) At the other end of the spectrum, PG&E (as described above) essentially argues that any such disallowance should be considered already paid, as PG&E would have us subtract other unrecoverable gas costs from any such disallowance we impose here.

This presents us with support for possible disallowances ranging from zero to over $2 billion.  We have rejected PG&E's argument for zero; a disallowance of over $2 billion would be excessive in light of the other remedies we are imposing; accordingly, the appropriate amount should fall well between those two extremes.  $400 million does so.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
160 of 565

In addition, this amount approximates the amount of revenues earned by PG&E's GT&S group in excess of revenue requirements between 1999 and 2010.[235]  As CPSD argues, PG&E's actual revenues for GT&S exceeded revenue requirements during that period "as a result of cutting back on safety-related expenses, deferring needed maintenance, reducing safety-related workers and choosing less effective pipeline inspection methods."[236]  Our determination that a $400 million bill credit is warranted is based in part on the evidence that PG&E's revenues exceeded the amount needed to earn its authorized return on equity by over $435 million from 1999 to 2010, during a time when PG&E was reducing its gas safety expenditures.  We note that this bill credit is adopted as an equitable remedy for PG&E's violations of natural gas transmission safety laws and regulations, including PG&E's record of safety-related budget cuts as discussed in Section 5.5.4 of the *San Bruno Violations Decision.*  In summary, it is a proper exercise of the Commission's equitable powers to order  a bill credit of $400 million to PG&E's ratepayers.[237]

An example of this shift may be seen in PG&E's program to replace aging pipeline.  In 1985, PG&E implemented the Gas Pipeline Replacement Program (GPRP), which

> calls for the replacement of over 2,000 miles of steel transmission
> and distribution lines and over 800 miles of cast iron distribution
> main over a 20-year period.  According to PG&E, the replacement
> of these lines will enhance the safety and reliability of the gas

---

[235] *CPSD Opening Brief* at 42.  CPSD examined the GT&S revenues between 1999 and 2010 and found that revenues were at least $435 million higher than the amounts needed to ear PG&E's authorized return.  (*Id.*)

[236] *CPSD Opening Brief* at 42.

[237] *See, Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal. App.4th 287, 300.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
161 of 565

piping system and reduce leak repair expenses as
high-maintenance piping is eliminated.[238]

In 1986, and again in 1992,[239] PG&E was authorized dollars related to the
GPRP.  However, instead, beginning in the late 1990s, "PG&E has performed risk
assessments on its gas transmission pipelines through a Risk Management
Program."[240]  Consequently, as noted by CPSD, "[i]nstead of replacing 165 miles
of HCA transmission pipeline from 2000-2010, PG&E replaced only 25 miles."[241]

As noted by TURN, PG&E's recordkeeping shortfalls, including missing
and incorrect data in the GIS database, missing pressure test records and failure
to track reused and salvaged pipe in its pipeline system, prevented PG&E from
properly managing risk and identifying pipe in need of replacement.[242]  We
believe that this additional disallowance is an equitable remedy for PG&E's
failure to replace pipeline as needed to ensure the safe operation of its gas
transmission pipeline system.  Accordingly, PG&E must provide a bill credit of
$400 million to ratepayers, and that amount must be absorbed by shareholders.

We have determined that the most equitable and practical way for
ratepayers to receive $400 million is to require a one-time bill credit to all
customers.  PG&E shall calculate the bill credit according to the following
guidance and direction.  First, the credit should be based on a cents per therm
calculation based on the total actual billed gas throughput during the November
and December 2015 billing cycles.  For example, if PG&E's actual customer

---

[238] *Re Pacific Gas and Electric Company* [D.86-12-095] (1986) 23 Cal.P.U.C. 2d 149, 198.

[239] *Re Pacific Gas and Electric Company* [D.92-12-057] (1992) 47 Cal.P.U.C. 2d 143.

[240] Recordkeeping *PG&E's June 20, 2011 Response* at 6C-1.

[241] *CPSD Opening Brief* at 46 (citation omitted).

[242] *TURN Opening Brief* at 7-8.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
162 of 565

billing for its November and December 2015 billing cycles gas volume is 600,000,000 therms, the billing credit would be $0.666667/therm ($400 million therms divided by 600 therms equals $0.666667/therm). November and December should be used as those are traditionally the months with the highest volumetric throughput. PG&E shall apply this mechanism for all its natural gas customers. Each customer shall receive a bill credit based on their billed usage during their November and December billing cycles on their February 2016 PG&E bill. If PG&E finds that it is impossible to provide the bill credits on its February 2016 bills, PG&E shall propose the earliest possible dates for providing the bill credits in the Advice Letter required by Ordering Paragraph 5. We recognize this methodology may result in PG&E issuing bill credits that do not exactly equal the $400 million penalty. If the total amount of bill credits distributed is more or less than $400 million PG&E shall, at the same time as it submits its report, submit a Tier 2 advice letter proposing a method of truing up the $400 million using existing balancing accounts. PG&E shall file a Tier 2 Advice Letter within 45 days after the effective date of this decision to implement the $400 million bill credit in accordance with this guidance and direction. We are directing PG&E to provide this bill credit to all of its gas customers using the same methodology. We do so because we prefer a simple and clear methodology that can be implemented as soon as possible and without controversy. Accordingly, we are requiring the use of a Tier 2 Advice Letter process, as we envision that the implementation of the bill credit should be ministerial. This Advice Letter shall provide a mechanism to inform master meter customers at mobile home parks and other residential complexes of their obligation to pass the bill credit on to

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 163 of 565

their submetered customers in the manner required by Public Utilities Code Section 739.5(b).[243]

This decision differs from the Penalties POD, which would impose a $950 million fine on PG&E to be paid to the General Fund under PU Code section 2107. We prefer to allocate more resources to infrastructure improvements, and doing so is supported by the record in this proceeding. CPSD, in its litigation position, argued that the amount paid to the General Fund should be at least $300 million, with up to $1.950 billion to be applied to PSEP safety-related costs and expenses (and other remedies) in order to "decrease the burden on ratepayers." (CPSD Amended Reply Brief on Fines and Remedies at 1-3.)[244]

The Joint Parties support a similar result, reducing the size of the fine PG&E would pay to the General Fund while increasing PG&E shareholder responsibility for the cost of pipeline safety improvements; the Joint Parties argue that doing so would "alleviate the burden on PG&E customers" who will be paying for improvements to the safety of PG&E's gas system. (Joint Parties Appeal at 14.) Even PG&E, in its Appeal of the Penalties POD, states: "However, PG&E strongly believes that the monetary penalty set forth in the Penalties POD

---

[243] Section 739.5(b) provides "Every master-meter customer of a gas or electrical corporation subject to subdivision (a) who, . . . receives any rebate from the corporation shall distribute to, or credit to the account of, each current user served by the master-meter customer that portion of the rebate which the amount of gas or electricity, or both, consumed by the user during the last billing period bears to the total amount furnished by the corporation to the master-meter customer during that period.

[244] CPSD chose not to appeal this part of the Penalties POD, but in its Response to the Request for Review of Commissioner Picker, it noted that the Commission could use its equitable powers to order PG&E to pay for a greater share of the expense for replacing or testing PG&E's transmission system. CPSD argued that if the Commission did this, it should also increase the amount of ratepayer relief from that provided in the Fines and Remedies POD. (CPSD Response to Request for Review of Commissioner Picker at 5.)

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 164 of 565

should be reduced and reoriented toward future pipeline safety enhancements to be made at shareholder cost." (PG&E Appeal at 3.)

As a policy matter, we agree with CPSD, the Joint Parties and PG&E. We want to do all we can to improve the safety of PG&E's gas transmission system. Sending money to the General Fund (while it may have other salutary effects) does not further that goal, nor does it reduce the cost to ratepayers of the necessary improvements. Accordingly, in comparison to the Penalties POD, we will reduce the fine that PG&E is to pay to the General Fund but require PG&E shareholders to provide future pipeline safety enhancements.

This Commission has the legal authority to require PG&E shareholder funding of future pipeline safety enhancements. The parties concur that the Commission has broad authority to craft equitable remedies (in addition to express statutory remedies such as the penalties set forth in section 2107). For example, PG&E argues that the Commission, under section 701, can "direct PG&E to spend a certain amount on pipeline safety costs rather than paying those monies to the General Fund, which would do nothing to enhance gas pipeline safety." (PG&E Appeal at 11.) In response to the Appeal of the Joint Parties, PG&E reiterated: "PG&E does not challenge the authority of the Commission to order a penalty in the form of a disallowance under Public Utilities Code § 701 and, in fact, encourages the Commission to order that any financial penalty be used to improve gas transmission safety rather than be paid to the General Fund." (PG&E Response to Appeals at 3.)

The Commission does in fact have broad authority under P.U. Code section 701, which states: "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." This allows the Commission to craft

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 165 of 565

equitable remedies, as long as those remedies are not barred by a specific statutory limit or restriction. The California Supreme Court has stated: "If PUC lacked substantive authority to propose and enter into the rate settlement agreement at issue here, it was not for lack of inherent authority, but because this rate agreement was barred by some specific statutory limit on PUC's power to set rates." (*Southern California Edison Co. v. Peevey*, *supra,* 31 Cal. 4th at 792, citing *Assembly v. Public Utilities Commission, supra,* 12 Cal. 4th at 103.)

> PG&E describes the California case law as follows:

> In *Assembly v. Public Utilities Commission*, for example, the court explained that Public Utilities Code § 701 authorizes the Commission to shape appropriate remedies so long as the remedy does not contravene "*express* legislative directives and restrictions." The Court reaffirmed this principle in *Southern California Edison Co. v. Peevey*, stating that, where the Commission has authority under § 701, only "specific statutory limit[s] on [its] power" bar it from acting. (PG&E Appeal at 9.)

> The proposed remedy here – directing PG&E to make future pipeline safety enhancements at shareholder cost – is not barred by any such statutory limit or restriction.

> The concept that regulatory agencies have broad discretion, particularly in fashioning equitable remedies, is consistent with and supported by Federal law as well:

> Finally, we observe that the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives. [citation omitted] This source of discretion is available not only where an agency has the explicit power to

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 166 of 565

impose penalties…" (_Niagara Mohawk Power Corp. v. Federal Power Commission_, (DC Cir. 1967) 379 F.2d 153, 159.

Accordingly, consistent with our authority to craft equitable remedies, and our policies of enhancing the safety of PG&E's gas transmission system and minimizing costs to ratepayers, we will change the amount of the fine that PG&E is to pay to the General Fund to $300 million. This change will allow for $650 million to be redirected to improving the safety of PG&E's gas transmission system.

PG&E implies that a large penalty payment would have a negative effect upon safety, because a large fine "could force PG&E to postpone planned infrastructure improvements." (PG&E Brief at 67.) PG&E's argument is that they simply cannot pay for both a large fine and capital expenditures (such as significant gas transmission system upgrades), and would accordingly postpone "as much capex as possible going forward." (Id. at 70.) We have already rejected this PG&E argument, for the reasons explained in Section 5.3.3, above.

Nevertheless, we note that the $650 million that the POD would have had PG&E pay to the General Fund will instead be used for capital expenditures on its gas transmission system. In other words, that $650 million would no longer be unavailable for use for capital expenditures, and in fact is earmarked for capital expenditures to improve pipeline safety.

In any event, the record supports increasing further the amount of money that PG&E shareholders should pay for future pipeline safety enhancements.[245] Accordingly, we will require PG&E shareholders to pay $850 million towards

---

[245] For example, the Joint Parties argue that PG&E can and should pay $877 million towards pipeline safety enhancements (Appeal of Joint Parties at 13-15), and CPSD argued that PG&E should pay $1.515 billion (out of a total disallowance of $1.950 billion) to decrease the cost to ratepayers of pipeline safety enhancements. (Rebuttal Brief of CPSD at 1.)

future pipeline safety enhancements. This increase of $200 million from the POD's total penalties and remedies of $1.4 billion brings the total penalties and remedies here to $1.6 billion. This amount is consistent with the record, and is within PG&E's ability to raise equity capital, as discussed at Section 5.3.

The $850 million should be applied to the cost of future pipeline safety improvements to be approved in the pending Gas Transmission and Storage (GT&S) proceeding (A.13-12-012) and any subsequent GT&S proceeding, if necessary. Some pipeline safety improvements have already been made, pursuant to our previous PSEP decision (D.12-12-030). The issue of how much PG&E's shareholders have spent on pipeline safety improvements has been an extremely contentious one in this proceeding, and the record is neither clear nor complete.[246] Rather than attempt to unravel the question of how much PG&E may have spent in the past, and whether or not that spending was related to improvement of pipeline safety, we will focus on what they spend in the future. In this way we can establish criteria to ensure that the moneys that are spent legitimately contribute to improved pipeline safety, making it clearer what should (or should not) count towards the $850 million.

Accordingly, instead of looking back to our PSEP decision and PG&E's past spending, this remedy will be based on the GT&S proceeding and PG&E's future spending. Only costs that PG&E would have been granted rate recovery for in the GT&S - but for this decision - will count towards the $850 million. Work that PG&E has chosen to do at shareholder expense (i.e. not approved in the GT&S proceeding or a similar subsequent proceeding)) will not count towards the $850 million total.

---

[246] See e.g. Section 10 below, discussing CPSD Motion to Strike.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 168 of 565

Finally, we decline to make any adjustments to account for any tax benefits that PG&E may receive. In response to Intervenors' comments regarding tax impacts, we had requested further briefing on this issue.[247] The comments highlight, however, that it would be difficult to project actual tax impacts and that a subsequent proceeding would be necessary to ensure that the actual after-tax consequences were obtained. Our desire is to provide finality of these proceedings with this decision and our companion decisions on violations. Adjusting for tax treatments could result in further litigation and uncertainty that would not achieve that objective.

## 6.1.   Allocation and Tracking of the $850 Million

While the majority of these funds to be spent on improving pipeline safety will be capital expenditures, certain expensed items are likely to further pipeline safety as well. Accordingly, we will allow PG&E to count some expenses towards the $850 million total.

In the PSEP decision (D.12-12-030), we authorized total capital expenditures for 2013 and 2014 in the amount of $696.2 million (Table E-3), and for the same period we authorized expenses in the amount of $162.5 million (Table E-2), for a combined total of $858.7 million, so expenses were about 19% of the total.[248] We will apply that same proportion here. Accordingly, of the $850 million, up to 19% ($161.5 million) may be devoted to items that are expensed for projects, or programs authorized in its currently pending GT&S proceeding

---

[247] *Administrative Law Judges' Ruling Requesting Additional Comment*, filed July 30, 2013, at 4-7.

[248] We use 2013 and 2014 figures because 2011 and 2012 expenses were largely paid by shareholders while capital expenditures were not, so using 2011 and 2012 figures would skew the relative levels of expenses and capital expenditures.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 169 of 565

(A.13-12-012). The remainder (at least 81%, or $688.5 million) shall be devoted to capital expenditures.

The amounts to be expensed that will be funded by shareholders shall be excluded from the expenses used to calculate PG&E's retail revenue requirements in A.13-12-012. As a number of the parties have suggested, the amounts of capital expenditures to be funded by shareholders shall be excluded from PG&E'S rate base to be determined in A.13-12-012, and in all PG&E proceedings thereafter. As noted by the Joint Parties in their Appeal, if PG&E were allowed to collect a rate of return on capital expenditures that its shareholders are required to fund as part of the penalties imposed in these proceedings, this would mute the financial impact of the disallowance over many decades. "The result would be to unnecessarily undermine the deterrence effect of the financial penalties and reduce the ratepayer value of the disallowance."[249]

In A.13-12-012, we will determine which expenses and capital expenditures authorized in that proceeding are for safety-related gas transmission projects or programs that should be funded by shareholders, subject to the expense and capital expenditure requirements noted above. If the total amount to be funded by shareholders is not exhausted by designated safety-related projects or programs authorized in the GT&S proceeding, we will make a determination of additional capital projects or programs to be funded by shareholders in future proceedings, as necessary to ensure that PG&E ultimately spends the full $850 million designated for safety-related projects and programs.

---

[249] *Joint Parties' Appeal* at 16. When ratepayers pay for a rate of return (ROR) on undepreciated capital expenditures, they also pay a tax gross-up on the portion of the ROR that is a return on equity. Id. At 16-17.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 170 of 565

In order to avoid unproductive litigation in the GT&S proceeding, we will specify here which kinds of expenses and capital expenditures shall be considered "safety-related" for purposes of fulfilling the requirement that shareholders fund $850 million of such costs. For purposes of the capital expenditures, "safety-related" will mean any capital expenditure to replace, repair, or upgrade transmission lines, unless the work is for the purpose of serving new load. We adopt this definition because replacement of old pipelines and upgrading of existing pipelines should have a favorable impact on safety. Only expenditures authorized by the Commission in the GT&S (or other) proceeding will count towards the shareholder funding requirement. For purposes of items that are properly expensed, rather than capitalized, "safety-related" will mean: (i) costs for safety inspections and testing of transmission pipeline; (ii) any costs for repairing or replacing transmission lines that are properly expensed, and (iii) projects or programs to improve transmission line record-keeping, including GIS equipment and systems, but excluding any items that shareholders were required to fund by the PSEP Decision (D. 12-12-030, in R.11-02-019).

To track the recorded expenditures on designated safety-related projects or programs to be funded by shareholders, we will direct PG&E to establish a deferred liability account, to be called the Shareholder-Funded Gas Transmission Safety Account (Shareholder-Funded Account) with two sub-accounts. Our intention is that PG&E's books will show this account as a liability obligating PG&E to implement designated safety-related projects and programs to be funded by shareholders over time. One sub-account, in a total amount not to exceed $161.5 million, will be for tracking the costs, of designated projects or programs authorized in the GT&S proceeding, that are to be expensed, to be called the Shareholder-Funded Gas Transmission Safety Expense Sub-Account.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 171 of 565

The other sub-account, to be called the Shareholder-Funded Gas Transmission Safety Capital Sub-Account, in an amount of at least $688.5 million, will be for tracking capital expenditures as plant is placed into service. The total of the two subaccounts shall equal $850 million.

Once a decision has been issued in PG&E's pending GT&S proceeding determining which expensed costs qualify as "safety-related," and therefore could be recorded in the Shareholder Funded Account, PG&E shall cap the amount included in the Expense Sub-Account at the lesser of $161.5 million or the amount of such "safety-related" costs designated in that decision. If that amount is less than $161.5 million, the amount to be included in the Capital Sub-Account shall be adjusted above $688.5 million, so that the two sub-accounts total $850 million.

With regard to expensed costs for safety-related gas transmission projects or programs designated in the GT&S proceeding, PG&E shall record these expenses as a debit entry into the Expense Sub-Account when PG&E spends money for the authorized projects or programs. In order to ensure that the Expense Sub-Account only includes amounts for these expensed costs that are prudently incurred, for each project or program PG&E shall record no more than the amount authorized for that project or program (including any contingency, if authorized).[250] If PG&E is able to complete any particular project or program for less than the authorized amount, only the amount actually expended shall be recorded in the Expense Sub-Account.

---

[250] If the GT&S proceeding authorizes expenses on a program (rather than project) basis, the Commission may choose to state the amount authorized as so many dollars per unit of work accomplished, in order to help ensure that the expenses recorded in the Shareholder-Funded Account are prudently incurred.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 172 of 565

With regard to capital expenditures for safety-related gas transmission projects or programs designated in the GT&S (or another) proceeding, PG&E shall record these capital expenditures as a debit entry into the Capital Sub-Account when PG&E places the plant or facilities in service.  As with expensed amounts, PG&E shall record the lesser of the authorized expenditure (plus contingency, if any) or the actual expenditure as a debit entry to the Capital Sub-Account.  PG&E shall not include amounts recorded in the Capital Sub-Account in its rate base, such that ratepayers will not ever be responsible for any depreciation, or rate of return on these capital amounts.[251]

The $850 million may only be spent on projects or programs that are approved by this Commission in the GT&S, or other proceeding; and amounts that may be recorded in the Shareholder-Funded Account are limited to the lesser of (i) the amount authorized (including any contingency) or (ii) the amount actually expended.  Accordingly if this Commission disallows, or limits, any proposed safety-related expenditure by PG&E, in the current GT&S or subsequent proceeding, for any reason other than that the amount is to be paid out of the Shareholder-Funded Account, such disallowed amounts may not booked into the Shareholder-Funded Account, i.e., may be paid for out of the $850 million.

The following steps should be taken to ensure that the amounts to be paid by shareholders via the Shareholder-Funded Account are not recovered from ratepayers.  For items to be included in the Expense Sub-Account, the GT&S proceeding will adopt a forecast of when those expenses will be incurred, and those expenses shall be excluded in calculating the ratepayer-funded revenue

---

[251] Ratepayers, will, however, be responsible for ongoing operation and maintenance of these facilities, unless those costs are otherwise required to be funded by shareholders, or disallowed.

requirement for the applicable year.  Similarly, the GT&S proceeding will exclude from its forecast of rate base those capital projects or programs to be funded by shareholders and tracked through the Capital Sub-Account, and therefore shall exclude from its rate-payer funded revenue requirement all related fixed capital charges for those projects or programs, such as depreciation and rate of return.  Because shareholders will ultimately be responsible for paying the full amounts included in the two sub-accounts, there should be no need to adjust customer rates to account for differences between forecast and actual expenses and dates of plant in service.  A key effect of excluding from rate base plant placed in service that is funded by shareholders via the Capital Sub-Account will be that, throughout the expected useful life of that plant, ratepayers will never be charged for depreciation or a rate of return on the excluded plant in future general rate cases.

To ensure that amounts debited to the Shareholder-Funded Account are properly recorded, after the end of each calendar year, and no later than May 1 of the following year, PG&E shall submit a detailed accounting to the Commission as an information-only filing, pursuant to Section 6 of General Order 96-B.  This information-only filing shall also be served on all parties to these proceedings, all parties to A.13-12-012, and any other persons as directed by the Commission's Energy Division (collectively, the "Relevant Parties").  For each project or program recorded in the Shareholder-Funded Account, PG&E shall include at least the following:  the precise location of the authorization to include the project or program in the Shareholder-Funded Account; the maximum amount it was authorized to include for that project or program; the actual cost of that project or program up to authorized spending limits (with reference to where

detailed supporting accounting can be found); the scope of work actually accomplished;[252] and for capital projects or programs, the date the plant was placed into service.  In case of doubt, PG&E should provide more, rather than less, detail about how the monies were expended.  PG&E shall also include any additional information as directed by the Energy Division.

Elsewhere in this Decision (Section 7.1.1 and Appendix E), we require PG&E's shareholders to "reimburse CPSD for contracts retaining independent industry experts, chosen by CPSD, for the cost of verification audits and inspections to ensure compliance with the other remedies."  PG&E's accountings of its Shareholder-Funded Account should likewise be audited by an independent auditor.  Accordingly, we will similarly require PG&E's shareholders to reimburse the Commission for the cost of an independent auditor, to be selected by Commission Staff, to conduct audits of the Shareholder-Funded Account.  The Commission-selected independent auditor shall review each of PG&E's detailed annual accountings and prepare a report. The auditor's report shall be served on all the Relevant Parties.

In order to ensure that this shareholder-funding remedy is fully implemented, PG&E shall continue recording costs into each sub-account until the total amount designated for funding through each sub-account has been utilized.  If PG&E is unable to utilize the full amount designated for funding through the Expense Sub-Account, (because the lesser of its authorized or actual expenses for projects or programs designed in the GT&S proceeding for funding

---

[252] For example, if the GT&S proceeding authorizes replacement of certain pipeline segments to be funded via this mechanism, a listing of those pipeline segments actually replaced.  For another example, if the GT&S proceeding authorizes installing a certain number of automated valves to be funded via this mechanism, the number of valves actually installed.  Similarly, if the cost of certain pipeline inspections were authorized to be recovered via this mechanism, the length of pipeline inspected and by what method.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 175 of 565

through this subaccount do not in total reach the amount originally recorded in the account) then the amount not utilized shall be transferred to the Capital Sub-Account, to be spent on capital projects or programs.

If the GT&S proceeding designates for funding via the Shareholder-Funded Account projects or programs whose costs are projected to equal or exceed $850 million, but thereafter PG&E determines that the total of its actual costs for these projects and programs will not exhaust the $850 million, PG&E shall file an information-only filing, informing the Commission of that conclusion and showing the applicable amounts actually spent (or expected to be spent), and serve it on all Relevant Parties.

When both sub-accounts have been fully utilized (i.e. PG&E's spending obligations have been exhausted), PG&E shall submit a final accounting to the Commission, as an information-only filing, to be served on all Relevant Parties. This final accounting shall be filed within 180 days of the date when the Shareholder-Funded Account was exhausted.  This final accounting may be combined with PG&E's annual information-only filing if this timing requirement can be met.  Thereafter, the independent auditor shall prepare a final audit and serve its audit report on all Relevant Parties.  Thereafter, PG&E shall file an advice letter to close out the Shareholder-Funded Account, with service on all Relevant Parties.

Within 60 days of today's decision, PG&E shall submit an Advice Letter, with service on all Relevant Parties, setting up the Shareholder-Funded Account and its two sub-accounts, and in the Advice Letter PG&E shall specify any additional accounting measures that will be necessary to carry out the intent of this Decision with regard to the Shareholder-Funded Account.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 176 of 565

### 6.2.   Summary of Remedies

Finally, we adopt additional, specific remedies, as discussed in Section 7 below.  These remedies shall be at shareholder expense and are estimated to cost at least $50,000,000.

Based on the considerations above, we impose a total penalty of approximately $1.6 billion, consisting of the following:

| | |
|---|---|
| Fines (Pub. Util. Code §§ 2107 & 2108) | $300 million |
| Bill Credit (Pub. Util. Code §§ 701 and 728) | $400 million |
| Shareholder funding of gas infrastructure | $850 million |
| Other Remedies | $50 million |

These fines and disallowances are in addition to monies PG&E already has been ordered to spend on safety enhancements, as well as future safety investments.  That is to say, the penalties adopted in this decision shall not be considered "paid" through prior, current or future pipeline safety investments, except as specified in this decision.

## 7.   Other Remedies

### 7.1.   CPSD Proposed Remedies

CPSD proposes 75 separate remedies in these proceedings:  2 applicable to all three proceedings,[253] 38 applicable to I.12-01-007, 22 applicable to I.11-02-016, and 13 applicable to I.11-11-009.[254]  PG&E agrees with many of CPSD's recommended remedies and has "identified operational commitments to achieve

---

[253] CPSD included a third proposed remedy in connection with all three proceedings:  "PG&E should apply the remainder of the $2.25 billion penalty to the PSEP cost and expenses for Phases I and II until it reaches the maximum amount of the penalty."  *CPSD Amended Reply*, Appendix A.  This proposed remedy is addressed in Section 6 of this decision.

[254] *CPSD Opening Brief* at 58-70.

them."[255]  CPSD accepted certain of PG&E's proposed modifications to the recommended remedies.[256]

In general, subject to exceptions discussed below, the remedies proposed by CPSD appear to be well-calculated to address PG&E's practices that led to the extensive and serious violations of safety laws that we have found in these proceedings.  In light of these violations, we fully concur with CPSD's assessment that "[t]he extensive shortcomings in PG&E's safety systems and compliance with the law call for extensive changes in their operations."[257]  Clearly, remedies such as those proposed by CPSD are both necessary and appropriate in addition to the fine we are imposing on PG&E.  The remedies adopted here are based on the record in these proceedings.  This decision does not limit the Commission's ability to require additional changes to PG&E's business practices or governance in any subsequent proceeding, as supported by the record in that proceeding.

To the extent that CPSD's proposed remedies are uncontested, we adopt them without further discussion.  In the following discussion we address the disputed recommended remedies as well as those for which clarification is needed.  A full statement of the adopted remedies is set forth in Appendix E to this decision.  For consistency and clarity, we use the same numbering of remedies used by CPSD and PG&E in their briefs.

Finally, we reiterate that, since these remedies are to cure violations found in the *San Bruno Violations Decision, Recordkeeping Violations Decision* and *Class*

---

[255] *PG&E Remedies Brief* at 94.

[256] *CPSD Amended Reply* at 10, Appendixes A and B.

[257] *CPSD Amended Reply* at 10.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 178 of 565

*Location Violations Decision*, all remedies are to be paid for by shareholders. We estimate the cost to implement these remedies to be at least $50,000,000.

### 7.1.1.  CPSD Recommended Remedies in all three OIIs

As noted above, CPSD proposes the following two remedies in connection with all three OIIs:

> 4.A.1  PG&E should pay to reimburse CPSD for contracts retaining independent industry experts, chosen by CPSD, for the cost of verification audits and inspections to ensure compliance with the other remedies. PG&E should also pay to reimburse CPSD for contracts retaining independent industry experts, chosen by CPSD in the near term to provide needed technical expertise as PG&E proceeds with its hydrostatic testing program, in order to provide a high level of technical in order to provide a high level of technical oversight and to assure the opportunity for legacy piping characterization though sampling is not lost in the rush to execute the program.

> 4.A.2  PG&E should reimburse CPUC/CPSD for the cost of conducting all three of the present investigations.

PG&E agrees with both proposed remedies. The only contested issue is whether PG&E's proposal to require that CPSD auditors be governed by Government Auditing Standards.

PG&E proposes to modify CPSD recommended Remedy 4.A.1 to provide that "[t]hese auditors should apply the Government Auditing Standards issued by the U.S. Government Accountability Office when conduction their audits."[258] PG&E also proposes that the Government Auditing Standards be mandated in connection with CPSD recommended remedies 4.C.21 and 4.C.22, which pertain to CPSD audits of PG&E's recordkeeping practices.

---

[258] *PG&E Remedies Brief* at 101-102, Appendix B.

PG&E asserts that the Government Auditing Standards issued by the U.S. Government Accountability Office contain appropriate protocols for conducting recordkeeping audits such as those contemplated by CPSD.[259]  PG&E notes in particular that the standards call for auditors to (1) identify criteria that are relevant to the audit, (2) obtain and report the views of responsible officials of the audited entity concerning the findings, conclusions and recommendations included in the audit report, and (3) provide a draft report for review and comment by responsible officials of the audited entity and others.[260]

CPSD opposes this proposed requirement.[261]  CPSD notes that the Government Auditing Standards are designed to audit the government and that they do not contemplate recordkeeping audits.[262]  CPSD further notes that "it is within this Commission's discretion to choose whatever audits it wishes to employ."[263]

PG&E has not shown that the Government Auditing Standards are necessary for CPSD recordkeeping audits; CPSD has shown that they were not designed for the purposes of the audits contemplated by CPSD.  Therefore, we will not require CPSD to follow those requirements.

We find CPSD's proposed remedies 4.A.1 and 4.A.2 reasonable.  However, we clarify these proposed remedies to make it clear that the reimbursement shall be paid for by PG&E's shareholders.

---

[259] *PG&E Remedies Brief* at 101-102.

[260] *PG&E Remedies Brief* at 102.

[261] *CPSD Amended Reply* at 10-11, Appendix A.

[262] *CPSD Amended Reply* at 11.

[263] *CPSD Amended Reply* at 11.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 180 of 565

### 7.1.2.  CPSD Recommended Remedies in I.12-01-007 (San Bruno OII)

CPSD's 38 recommended remedies in the San Bruno OII, the majority of which are uncontested, address PG&E's pipeline construction standards, integrity management practices, SCADA system, work clearance procedures, emergency procedures, corporate governance (including employee incentives), and the NTSB's recommendations.[264]  PG&E states it has implemented many of the proposals or is taking steps to do so.[265]  We therefore find it reasonable to adopt the following uncontested recommendations:

> 4.B.3  PG&E should perform a complete company-wide record search to populate its GIS database with all identified gas transmission pipeline leak history, including closed leak, information not already transferred to the GIS.

> 4.B.4  PG&E should revise its Integrity Management training to ensure that missing data is represented by conservative assumptions, and that those assumptions are supportable, per the requirements of ASME B31.8S.  As required by Ordering Paragraph 1 of D.11-06-017, PG&E should be required to fully document any engineering-based assumption it makes for data that is missing, incomplete or unreliable.  Such assumptions must be clearly identified and justified and, where ambiguities arise, the assumption allowing the greatest safety margin must be adopted.

> 4.B.6  PG&E should revise its threat identification and assessment procedures and training, including its Baseline Assessment Plans, to fully incorporate all relevant data for both covered and non-covered segments, including but not limited to potential manufacturing and construction threats, and leak data.

---

[264] National Transportation Safety Board.  2011.  *Pacific Gas and Electric Company Natural Gas Transmission Pipeline Rupture and Fire, San Bruno, California, September 9, 2010.*  Pipeline Accident Report NTSB/PAR-11/01.  Washington, DC.  (NTSB Report).  The NTSB Report was received in evidence in the San Bruno OII as Exh. CPSD-9.

[265] *PG&E Remedies Brief*, Appendix B at B-1.

4.B.7   PG&E should re-label its system MAOP nomenclature in accordance with 49 CFR Part 192.

4.B.10   PG&E should revise its threat identification and assessment procedures and training to ensure that cyclic fatigue and other loading conditions are incorporated into their segment specific threat assessments and risk ranking algorithm, and that threats that can be exacerbated by cyclic fatigue are assumed to exist per the requirements of 49 CFR Part 192.917(b).

4.B.11   PG&E should revise its risk ranking algorithm to ensure that PG&E's weighting factors in its risk ranking algorithm more accurately reflect PG&E's actual operating experience along with generally reflected industry experience.

4.B.12   PG&E should revise its threat identification and assessment procedures and training to ensure that PG&E's weighing of factors in its risk ranking algorithm and the input of data into that algorithm corrects the various systemic issues identified in the NTSB report and the CPSD/PHMSA 2011 Risk Assessment Audit.

4.B.13   PG&E should revise its threat identification and assessment procedures and training to ensure that the proper assessment method is being used to address a pipeline's actual and potential threats.

4.B.15   PG&E should revise its SCADA system to reduce the occurrence of "glitches" and anomalies in the control system that desensitizes operators to the presence of alarms and other inconsistent information.

4.B.16   PG&E should reevaluate SCADA alarm criteria with the goal of reducing unnecessary alarm messages.

4.B.24   Internal coordination – PG&E should revise its procedures to outline each individual Dispatch and Control Room employee's roles, responsibility, and lines of communication required to be made in the event of an emergency either during or outside normal working hours.  This should include assigning

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 182 of 565

specific geographical monitoring responsibilities for Control Room employees.

4.B.25  External coordination – CPSD agrees with NTSB recommendation P-11-2, which requests that PHMSA issue guidance to operators of natural gas transmission and distribution pipelines and hazardous liquid pipelines regarding the importance of control room operators immediately and directly notifying the 911 emergency call center(s) for the communities and jurisdiction in which those pipelines are located when a possible rupture of any pipeline is indicated.  CPSD further recommends that prior to such PHMSA guidance PG&E should revise their own procedures to allow for the immediate and direct notification of 911 emergency call centers when a possible pipeline rupture is indicated.

4.B.26  Decision making authority – PG&E should revise its emergency procedures to clarify emergency response responsibilities, especially in regards to authorizing valve shut offs.  PG&E policies should not just delegate authority to act but also detail obligations to act.

4.B.27  RCV/ASV – PG&E should perform a study to provide Gas Control with a means of determining and isolating the location of a rupture remotely by installing RCVs, ASVs, and appropriately spaced pressure and flow transmitters on critical transmission line infrastructure and implement the results.

4.B.28  Response time – PG&E should review required response times in other utility service territories nationwide and devise appropriate response time requirements to ensure that its Emergency Plan results in a "prompt and effective" response to emergencies.  PG&E will provide its analysis and conclusions to CPSD.

4.B.29  Emergency Plan Revision – Currently a maintenance supervisor annually reviews SCADA alarm responses and makes revisions as necessary.  This process needs to be formalized to ensure a robust feedback loop such that new information is fully analyzed and necessary changes to PG&E's Emergency Plan

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 183 of 565

and/or other procedures are implemented with a subsequent review of made changes to ensure they are adequate.

4.B.30  Public Awareness – CPSD agrees with NTSB recommendation P-11-1, which requests PHMSA issue guidance to operators of natural gas transmission and distribution pipelines and hazardous liquid pipelines regarding the importance of sharing system-specific information, including pipe diameter, operating pressure, product transported, and potential impact radius, about their pipeline systems with the emergency response agencies of the communities and jurisdiction in which those pipelines are located.  CPSD further recommends that prior to such PHMSA action PG&E undertake a review of its gas transmission public awareness and outreach programs to ensure that system-specific information is appropriately disseminated.

4.B.37  PG&E shall examine internal communication processes to ensure that all employees understand their job responsibilities and priorities.  Goals of PG&E gas employees shall describe what is expected of them and their teams.

### 7.1.2.1.    Construction Standards

CPSD and PG&E have largely agreed to recommended Remedy 4.B.1, which, with CPSD's adoption of most of PG&E's proposed edits, provides that "PG&E's pipeline construction standards should meet or exceed all legal requirements and industry standards for identifying and correcting pipe deficiencies and strength testing."[266]

PG&E would qualify this remedy by adding "relevant" before "legal requirements and industry standards."[267]  We concur with CPSD's contention that the term "relevant" is subjective and unnecessary, and we therefore exclude the term.

---

[266] *CPSD Amended Reply,* Appendix A at B-4.

[267] *PG&E Remedies Brief*, Appendix B at B-2.

### 7.1.2.2.    Data Gathering Requirements

CPSD's recommended Remedy 4.B.2 pertains to PG&E's data gathering requirements:  "PG&E should revise its GTRIMPRMP to robustly meet the data gathering requirements of 49 CFR Part 192.917(b) and ASME-B31.8S, and to do so without limiting its data-gathering to only that data which is 'readily available, verifiable, or easily obtained' by PG&E."[268]

CPSD states that it accepts PG&E's proposed edits that would change CPSD's original wording from "PG&E should revise section 2 of RMP-06 …" to "PG&E should revise its integrity management procedures …."[269]  However, CPSD also proposes without explanation another revision to the remedy so that it reads "PG&E should revise its GTIMRMP …."[270]  We find that the phrase "integrity management procedures" conveys more information than either "GTIMRMP" or "GTRIMPRMP" and, therefore, do not accept this revision.  This determination also applies to Remedy 4.B.5.

PG&E agrees that its data gathering practices should be reviewed to confirm that they meet or exceed regulatory and industry consensus guidance and revised if necessary.[271]  However, PG&E proposes to delete the wording "and to do so without limiting its data-gathering to only that data which is 'readily available, verifiable, or easily obtained' by PG&E."[272]

The deficiencies in PG&E's data gathering that were disclosed in these proceedings demonstrate the need for the wording proposed by CPSD.  As CPSD

---

[268] *CPSD Amended Reply,* Appendix B at 1.

[269] *CPSD Amended Reply,* Appendix A at B-5.

[270] *CPSD Amended Reply,* Appendix A at B-5.

[271] *PG&E Remedies Brief,* Appendix B at B-3.

[272] *PG&E Remedies Brief,* Appendix B at B-3.

notes, inclusion of the language puts PG&E on notice that it is expected to retrieve and organize all of its transmission pipeline records.

### 7.1.2.3.    Documentation of Assessments

CPSD and PG&E agree with respect to recommended Remedy 4.B.8, which reads: "PG&E should permanently cease the self-suspended practice of regularly increasing pipeline pressure up to a 'system MAOP' to eliminate the need to consider manufacturing and construction threats.  In addition, PG&E should analyze all segments that were subjected to the planned pressure increases to determine the risk of failure from manufacturing threats under 49 CFR Part 192.917(e)(3), and perform further integrity assessments as warranted."[273]

CPSD proposes to add the following sentence to this remedy:  "Each assessment should be documented and retained for the life of the facility."[274]  We concur with CPSD that such documentation is necessary.  This added requirement is reasonable and will therefore be adopted.

### 7.1.2.4.    Threat Identification and Assessment Procedures

CPSD recommended Remedy 4.B.9 states that "PG&E should revise its threat identification and assessment procedures and training to ensure that HCA pipeline segments that have had their MAOP increased are prioritized for a suitable assessment method (e.g., hydro-testing), per the requirements of 49 CFR Part 192.917(e)(3)-(4)."[275]  PG&E agrees with implementing this recommendation

---

[273] *CPSD Amended Reply,* Appendix A at B-9.

[274] *CPSD Amended Reply,* Appendix A at B-9.

[275] *CPSD Amended Reply,* Appendix A at B-10.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 186 of 565

but proposes to delete "that have had their MAOP increased" following "HCA pipeline segments."[276]

CPSD states that it accepts PG&E's proposed edit.[277] However, CPSD's final recommended remedies do not reflect this agreement.[278] Since CPSD accepts this edit, and it appears reasonable on its face, we will adopt it.

### 7.1.2.5.    Equipment Retention Policy

CPSD recommended Remedy 4.B.14 originally stated that "PG&E should make revisions to its equipment retention policy to ensure that integrity of equipment, wiring and documentation and identification of electrical components does not deteriorate to unsafe conditions such as occurred at the Milpitas Terminal, described herein. If PG&E does not have an applicable equipment retention policy then it should formulate one."[279]

PG&E states that it is implementing this recommendation and reviewing its inspection, testing, and maintenance procedure applicable to stations to ensure the integrity of electrical equipment, wiring, documentation, and identification of electrical components.[280] PG&E proposes several edits to CPSD's proposed language, including deletion of reference to the Milpitas Terminal and deletion of the last sentence.[281]

---

[276] *PG&E Remedies Brief,* Appendix B at B-7.

[277] *CPSD Amended Reply,* Appendix A at B-10.

[278] *CPSD Amended Reply,* Appendix B at 2.

[279] *CPSD 0pening Brief* at 60.

[280] *PG&E Remedies Brief,* Appendix B at B-9.

[281] *PG&E Remedies Brief,* Appendix B at B-9.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 187 of 565

CPSD states that it accepts PG&E's proposed edits.[282]  However, CPSD's final recommended remedies do not reflect this agreement.[283]  Since CPSD accepts the edits, and they appear reasonable on their face, we will adopt them.

CPSD also states that it has included language to ensure the procedure is implemented.[284]  We understand that CPSD is referring to the phrase "and implement" following "PG&E should review."  We concur with CPSD that this provision should be included.

### 7.1.2.6.    Redundant Pressure Sensors

CPSD recommended Remedy 4.B.17 states that "PG&E should revise its control systems, including SCADA, to ensure that all relevant information, including redundant pressure sensors, is considered."[285]

PG&E agrees that its SCADA system should make available all relevant information and states that it is implementing this recommendation through its Valve Automation Program.[286]  However, PG&E does not agree that all redundant information is necessarily relevant, and it proposes edits to delete "including redundant pressure sensors" and to add a sentence indicating this remedy is being implemented through its Valve Automation Program.[287]

CPSD opposes PG&E's proposed edits.[288]  CPSD asserts that even with the Valve Automation Program, redundant pressure sensor data will be available

---

[282] *CPSD Amended Reply,* Appendix A at B-12.

[283] *CPSD Amended Reply,* Appendix B at 3.

[284] *CPSD Amended Reply,* Appendix A at B-12.

[285] *CPSD Amended Reply,* Appendix A at B-13.

[286] *PG&E Remedies Brief,* Appendix B at B-10.

[287] *PG&E Remedies Brief,* Appendix B at B-10.

[288] *CPSD Amended Reply,* Appendix A at B-13.

and should be incorporated into systems including SCADA.[289]  CPSD asserts that redundant information from alternate sources is both important and relevant in emergency situations.[290]

We note that PG&E does not make the positive assertion that redundant pressure sensor data is irrelevant, only that it is not necessarily relevant.  We are therefore persuaded to adopt CPSD recommended Remedy 4.B.17 without modification.

### 7.1.2.7.    Additional Pressure Sensors

CPSD recommended Remedy 4.B.18 states that "PG&E should install more pressure sensors and have them closely spaced and use the additional information to incorporate leak or rupture recognition algorithms in its SCADA system."[291]

PG&E states that it agrees with this recommendation and is currently performing a pilot program to test the feasibility of performing real time leak and line break detection using SCADA information.[292]  PG&E states that it will review the results of the pilot program before proposing the installation of more pressure sensors system-wide.[293]  CPSD responds with the assertion that the remedy has merit because PG&E has already begun the pilot program.[294]

---

[289] *CPSD Amended Reply,* Appendix A at B-13.

[290] *CPSD Amended Reply,* Appendix A at B-13.

[291] *CPSD Amended Reply,* Appendix A at B-14.

[292] *PG&E Remedies Brief,* Appendix B at B-10.

[293] *PG&E Remedies Brief,* Appendix B at B-10.

[294] *CPSD Amended Reply,* Appendix A at B-14.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 189 of 565

CPSD's recommendation calls for more sensors and for closer spacing of them but does not include specific, quantifiable standards for doing so.[295]  This suggests that PG&E would have flexibility in its implementation.  We also note PG&E's testimony in response to this recommended remedy stated that "[w]e have installed and continue to install additional SCADA monitoring and control devices and capability."[296]  This testimony did not state that PG&E's addition of monitoring and control devices and capability is limited to a pilot program. Since PG&E agrees with the recommendation, and we are not persuaded to limit it to a pilot program, we will adopt CPSD's remedy without the wording changes proposed by PG&E.

### 7.1.2.8.    Negative Pressure Values

CPSD recommended Remedy 4.B.19 states that "PG&E should program its [Power Line Communications] PLCs to recognize that negative pressure values are erroneous and require intervention to prevent valves from fully opening."[297]

PG&E opposes this remedy.[298]  PG&E believes that the redundant pneumatic pressure limiting system is the appropriate countermeasure where regulator valves open unintentionally.[299]  PG&E does not believe that programming PLCs to disregard pressure information is a prudent practice.[300]

---

[295] *CPSD Amended Reply,* Appendix A at B-14.

[296] San Bruno Exh. PG&E 1-A at 13A-5.

[297] *CPSD Amended Reply,* Appendix A at B-14.

[298] *PG&E Remedies Brief,* Appendix B at B-10.

[299] *PG&E Remedies Brief,* Appendix B at B-10.

[300] *PG&E Remedies Brief,* Appendix B at B-10.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 190 of 565

In response, CPSD maintains the proposed remedy is appropriate and necessary in light of the problems encountered at the Milpitas Station.[301]  CPSD takes issue with PG&E's characterization that the goal is to program PLCs to disregard pressure information.[302]  Instead, CPSD asserts, the remedy is to program the PLCs to see negative pressure as reason to signal a problem in the system and take the necessary steps to prevent the valves from fully opening.[303]

As we noted in the *San Bruno Violations Decision*, redundant pneumatically operated monitor valves provide protection against catastrophic failure but are outside the pressure control system and do not fully provide adequate integrity.[304]  Thus, we do not share PG&E's confidence that negative pressure values should be disregarded.  PG&E's testimony in the San Bruno OII asserted that programming the PLC to disregard pressure information is not prudent.[305]  However, we do not find that this assertion is adequately substantiated or that the prudency concern outweighs the safety concern that led CPSD to make this recommendation.  We therefore adopt the remedy as proposed by CPSD.

### 7.1.2.9.    Replacement of Pressure Controllers

CPSD recommended Remedy 4.B.20 states that "PG&E should replace the three pressure controllers which malfunctioned on September 9, 2010."[306]  PG&E responds that it is "implementing enhanced functionality to the PLCs at Milpitas Terminal, which will render the valve controllers unnecessary, at which point all

---

[301] *CPSD Amended Reply,* Appendix A at B-14.

[302] *CPSD Amended Reply,* Appendix A at B-14.

[303] *CPSD Amended Reply,* Appendix A at B-14.

[304] *San Bruno Violations Decision*, Section 5.3.2.

[305] San Bruno Exh. PG&E-1A at 13A-5 to 13A-6; San Bruno Exh. PG&E-1 at 8-7 to 8-8 and 8-14.

[306] *CPSD Amended Reply,* Appendix A at B-15.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 191 of 565

valve controllers will be removed."[307]  PG&E therefore proposes to revise the wording of the remedy to state "PG&E should remove the three pressure controllers…"[308]

CPSD notes, however, that even though PG&E proposes changes to the Milpitas Terminal, the three controllers could potentially remain in service for years and thereby pose a risk to safety.[309]  CPSD therefore stands by its proposed remedy as stated "unless PG&E demonstrates that the controllers have already been removed from the system."[310]

We share CPSD's concern that even though PG&E has plans to remove the controllers that malfunctioned, that might not occur for years.  We therefore decline to adopt PG&E's proposed edit.  We will, however, add language to the remedy that incorporates CPSD's conditional agreement to PG&E's edits.

### 7.1.2.10.  Abnormal Operating Conditions

CPSD recommended Remedy 4.B.21 states that "PG&E should review its work clearance process to ensure that abnormal operating conditions that may arise during the course of work are anticipated and responses to those conditions are detailed.  Additionally, PG&E should create a procedure covering the commission of electrical equipment from one Uninterruptable Power Supply to another.  Each project Clearance should include possible scenarios and contingency plans to mitigate any abnormal operating conditions that may

---

[307] San Bruno Exh. PG&E-1A at 13-A-6.

[308] *PG&E Remedies Brief*, Appendix B at B-11.

[309] *CPSD Amended Reply*, Appendix A at B-15.

[310] *CPSD Amended Reply*, Appendix A at B-15.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 192 of 565

arise."[311]  This recommended remedy enjoys PG&E's agreement, and it reflects CPSD's acceptance of edits proposed by PG&E.[312]

The above-quoted language also incorporates two additional, minor clarifying edits to the last sentence that were proposed by CPSD.[313]  We concur with CPSD's clarifying addition of "Clearance" since the work clearance process is the subject of this remedy.  We also concur with CPSD's language providing that each clearance should "include" rather than "cover" or "require" possible scenarios and contingency plans.  We therefore adopt CPSD's wording.

### 7.1.2.11.  Work Clearance Procedures

CPSD recommended Remedy 4.B.22 states that "PG&E should revisit its Work Clearance procedures and training to ensure that future work will not be authorized unless:  all forms and fields therein are comprehensively and accurately populated, and reviewed by a designated clearance supervisor. Additionally, work should not commence until such time as the operator and technician have reviewed the work clearance and have confirmed that understand the actions to take in the event an abnormal condition is encountered.  Lastly, PG&E must ensure that proper records showing the specific steps taken, when taken, and by whom, are maintained pursuant to its Record Retention Schedule."[314]

PG&E states that it agrees with and is implementing this recommendation.[315]  Apart from typographical errors, the language quoted

---

[311]  *CPSD Amended Reply*, Appendix A at B-15.

[312]  *CPSD Amended Reply*, Appendix A at B-15.

[313]  *CPSD Amended Reply*, Appendix A at B-15.

[314]  *CPSD Amended Reply*, Appendix A at B-16.

[315]  *PG&E Remedies Brief*, Appendix B at B-12.

above reflects PG&E's edits to CPSD's originally proposed remedy with one exception.[316] CPSD otherwise accepts PG&E's edits.[317]

In the first sentence, PG&E had inserted "necessary" prior to "forms and fields therein."[318] We concur with CPSD that "necessary" leaves room for subjective determination of what is and is not to be filled out. As CPSD notes, this could lead to incomplete forms, which was a problem that arose when the Milpitas work clearance form was filled out. We also correct two typographical errors in CPSD's restatement of the remedy by deleting a semicolon after "unless" and adding "both" after "confirmed that."

### 7.1.2.12.   Gas Service Representative Training

CPSD recommended Remedy 4.B.23 states: "Training - PG&E should provide training to Gas Service Representatives to recognize the differences between fires of low-pressure natural gas, high-pressure natural gas, gasoline fuel, or jet fuel."[319]

PG&E agrees that Gas Service Representatives should be provided training to identify hazards associated with natural gas infrastructure, and to make the system safe for the public and other employees.[320] PG&E proposes a restated remedy: "Training - PG&E should provide training to Gas Service Representatives [GSR] to identify hazards associated with PG&E natural gas infrastructure and take action to make the condition safe for the public and

---

[316] *CPSD Amended Reply*, Appendix A at B-16.

[317] *CPSD Amended Reply*, Appendix A at B-16.

[318] *PG&E Remedies Brief*, Appendix B at B-12.

[319] *CPSD Amended Reply*, Appendix A at B-17.

[320] *PG&E Remedies Brief*, Appendix B at B-13.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 194 of 565

employees. If assistance is needed and the situation is an imminent hazard, the GSR will remain on site until appropriate resources take control."[321]

CPSD opposes PG&E's edits to its remedy, claiming that they "completely alters the purpose of the proposed remedy."[322] CPSD notes that PG&E's proposed language is already included in the company's emergency response training and asserts that CPSD's proposed training could easily be incorporated into PG&E's current emergency response training program.[323]

We note that PG&E does not oppose the training proposed by CPSD and that CPSD does not explicitly oppose the training proposed by PG&E. We will therefore combine both statements into a single restated remedy.

### 7.1.2.13.   PG&E's Business Strategies

CPSD recommended Remedy 4.B.31 states that "PG&E's business strategies and associated programs should expressly ensure that safety is a higher priority than shareholder returns and be designed to implement that priority, which may include reinvesting operational savings into infrastructure improvements."[324]

PG&E opposes this remedy, asserting that it has already committed substantial shareholder investments to gas transmission improvements.[325] PG&E contends that there is no need to adopt an express requirement that any savings from operational efficiencies be reinvested in infrastructure improvements.[326] In

---

[321] *PG&E Remedies Brief*, Appendix B at B-13.

[322] *CPSD Amended Reply*, Appendix A at B-17.

[323] *CPSD Amended Reply*, Appendix A at B-17.

[324] *CPSD Amended Reply*, Appendix A at B-23.

[325] *PG&E Remedies Brief*, Appendix B at B-16.

[326] San Bruno Exh. PG&E 1A at 13A-11.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 195 of 565

response, CPSD continues to assert that PG&E should have a program to expressly ensure that safety is a higher priority than shareholder returns.[327]

We fully concur with the proposition that a public utility should make safety the highest priority, even at the expense of shareholder returns. This reflects our view that the requirement of Pub. Util. Code § 451 to "furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities … as are necessary to promote the safety … of its patrons, employees, and the public" is absolute and cannot be compromised by shareholder return considerations. We do not concur with CPSD that the utility's safety obligation can or should be met by linking necessary safety expenditures and investments to operational efficiencies. PG&E must spend whatever is necessary to meet its safety obligation whether or not operational efficiencies have been achieved. We therefore adopt this remedy without reference to operational savings.

### 7.1.2.14.   Retained Earnings

CPSD recommended Remedy 4.B.32 states that "PG&E should target retained earnings towards safety improvements before providing dividends, especially if the ROE exceeds the level set in a GRC decision."[328] PG&E opposes this remedy, asserting that shareholders have spent and will spend significant funds to improve gas transmission safety without rate recovery.[329] PG&E also contends that CPSD's proposed remedy is "vaguely worded" and "would likely have an adverse effect on PG&E's ability to access debt and equity markets on as

---

[327] *CPSD Amended Reply*, Appendix A at B-23.

[328] *CPSD Amended Reply*, Appendix A at B-24.

[329] *PG&E Remedies Brief*, Appendix B at B-17.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 196 of 565

favorable terms as other California utilities, potentially increasing its cost of capital."[330]

We make no findings here regarding the amounts PG&E shareholders have spent or will spend on gas transmission work without rate recovery.[331] The Commission did not authorize a memorandum account to track expenditures that PG&E asserts to be safety-related expenditures after San Bruno.  Indeed, the Commission expressly rejected PG&E's request for a memorandum account.[332] Furthermore, there is no evidence timely or properly submitted in the record of this proceeding to establish what those expenditure might be.   Nevertheless, we are not persuaded that imposing restrictions on dividends is either necessary to achieve safety or an effective means of doing so.  As we noted in Section 7.1.2.13 above, the absolute safety obligation created by Pub. Util. Code § 451 means that PG&E must spend whatever is necessary for safe operations and practices without regard to whether operational savings have been achieved.  Similarly, PG&E must ensure safe operations and practices without regard to its dividends policy.  Accordingly, we will not adopt proposed Recommendation 4.B.32.

### 7.1.2.15.   Incentive Plan

CPSD recommended Remedy 4.B.33 originally provided that "PG&E's incentive plan, and other employee awards programs, should include selection criteria for improved safety performance and training and/or experience in the

---

[330]  *PG&E Remedies Brief*, Appendix B at B-17.

[331]  See also Section 6, above, discussing PG&E's overly broad contentions about what costs it has allegedly not recovered.

[332] See D.12-12-030, at. pp. 70-73.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 197 of 565

reliability and safety aspects of gas transmission and distribution. PG&E should ensure that upper management attends gas safety training."[333]

PG&E responded that it agrees with this recommendation.[334] PG&E noted that: (1) it has revised its short-term incentive plan (STIP) program to make safety performance 40% of the score used to determine the total award, (2) it endorses the recommendation that upper management participate in activities that enhance and expand their safety knowledge, (3) it continues to enhance its gas emergency response training, and (4) all officers have an opportunity to participate in an annual drill, but it is expanding the number and types of exercises conducted throughout the year.[335] PG&E proposed edits to the remedy so that it would read " A component of PG&E's gas employee incentive plan should include safety. PG&E's annual training plan should require that all gas leaders attend gas safety training."[336]

CPSD recommends incorporating PG&E's implementation plan into the remedy and proposes further language revisions to accomplish that.[337] We concur with CPSD that it is appropriate to codify PG&E's implementation plan by incorporating it into the remedy. We therefore adopt CPSD's proposed modifications to the language of the remedy along with clarifying wording indicated by PG&E.

---

[333] *CPSD Opening Brief* at 62.

[334] *PG&E Remedies Brief*, Appendix B at B-18.

[335] San Bruno Exh. PG&E 1A at 13-13 to 13-14, Appendix A at 13A-12.

[336] *PG&E Remedies Brief*, Appendix B at B-18.

[337] *CPSD Amended Reply*, Appendix A at B-25.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 198 of 565

### 7.1.2.16.  Joint Board Meetings

CPSD recommended Remedy 4.B.34 states that "PG&E should not hold joint Company and Corporation Board of Director meetings as the two entities should have different priorities."[338]  PG&E opposes this remedy, asserting that "the interests of the Company and the Utility are aligned."[339]

CPSD's witness asserted that "[t]he same corporate culture seems to run through PG&E Corporation and PG&E Company, as evidenced in part by the fact that the Corporation and the Company hold joint board meetings."[340]  He also provided evidence that "[i]t is understandable that PG&E Corporation has a goal in growing its financial performance.  It is also understandable that PG&E Company focuses on being financially healthy; however, its primary and overarching focus should be on the safe and reliable operation of the electric and natural gas pipeline facilities."[341]  CPSD's rebuttal testimony went on to assert that "PG&E's history demonstrates that PG&E Corporation cannot appropriately balance the responsibility for both pipeline safety and maximizing profits.  The San Bruno explosion exposed this inherent conflict.  Decisions on safety and budgeting were distorted with tragic results."[342]  The rebuttal testimony went on to assert that "[t]he Company and the Corporation each serve a conflicting purpose."[343]

---

[338] *CPSD Amended Reply*, Appendix A at B-26.  CPSD is clearly referring to PG&E Corporation and its subsidiary, Pacific Gas and Electric Company.

[339] *PG&E Remedies Brief*, Appendix B at B-19.

[340] San Bruno Exh. CPSD-1 at 127.

[341] San Bruno Exh. CPSD-1 at 130.

[342] San Bruno Exh. CPSD-5 at 56.

[343] San Bruno Exh. CPSD-5 at 57.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 199 of 565

We do not find that the evidence offered by CPSD demonstrates that there is a conflict of interest between PG&E Corporation and PG&E that impacts safety in a way that would be resolved by precluding joint board meetings. Accordingly, we do not adopt this recommended remedy.

### 7.1.2.17. Safety as Core Mission

CPSD recommended Remedy 4.B.35 initially provided that "PG&E should examine whether the time and money it spends on public relations and political campaigns distracts it from its core mission of providing safe and reliable gas service."[344] PG&E's testimony stated that "[w]hile we do not agree with the premise of this recommendation, … we are focusing on enhancing public safety and operational excellence."[345] PG&E thus opposes this remedy as unnecessary.[346]

In response, CPSD modified the wording of its recommended remedy to incorporate PG&E's statement so that it reads: "PG&E should focus on enhancing public safety and operational excellence as a core mission, and should examine whether the time and money it spends on public relations and political campaigns distracts it from this core mission."[347]

PG&E's opposition to this remedy is based on its objection to the underlying premise and its position that it is unnecessary. PG&E does not indicate opposition to a self-examination of whether expending resources on public relations and political campaigns is distracting. We are pleased that PG&E is focusing on enhancing both public safety and operational excellence,

---

[344] *CPSD Opening Brief* at 62.

[345] San Bruno Exh. PG&E 1A, Appendix A at 13A-13.

[346] *PG&E Remedies Brief*, Appendix B at B-19.

[347] *CPSD Amended Reply*, Appendix A at B-26.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 200 of 565

and are at a loss to understand why it would object to a remedy requiring such focus.  We adopt the remedy with the wording changes proposed by CPSD.

### 7.1.2.18.   Pipeline 2020 Program

CPSD recommended Remedy 4.B.36 states that "PG&E should revisit its Pipeline 2020 program, and subsequent variations thereof, to ensure that its implementation is fully flushed out with specific goals, performance criteria, and identified funding sources."[348]  PG&E opposes this remedy and asserts it is unnecessary.[349]  The Pipeline 2020 program is no longer active and has been superseded by the PSEP.   CPSD has agreed with deleting this remedy,[350] and we therefore do so.

### 7.1.2.19.   NTSB Recommendations

CPSD recommended Remedy 4.B.38 begins with the statement that "CPSD agrees with the following NTSB recommendations to PG&E."[351]  CPSD then lists several recommendations that the NTSB made to PG&E.[352]

PG&E agrees with and is implementing this recommendation to follow the NTSB recommendations.[353]  We wish to make clear that this remedy does not merely note CPSD's agreement with the NTSB's recommendations.  This remedy directs PG&E to follow and implement them.

---

[348] *CPSD Amended Reply*, Appendix A at B-26.

[349] *PG&E Remedies Brief*, Appendix B at B-19.

[350] *CPSD Amended Reply*, Appendix A at B-26.

[351] *CPSD Amended Reply*, Appendix A at B-27.

[352] *CPSD Amended Reply*, Appendix A at B-28-32.

[353] *PG&E Remedies Brief*, Appendix B at B-20.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 201 of 565

### 7.1.3.  Recommended Remedies in I.11-02-016 (Recordkeeping OII)

CPSD proposed 22 recommended remedies in the Recordkeeping OII to ensure "compliance with all applicable rules, regulations and laws related to recordkeeping."[354]  CPSD, however, warns that while these recommendations are based on evidence in the record, they "are not intended to state all regulatory and engineering requirements for PG&E's recordkeeping systems."[355]

PG&E proposed revisions to a number of CPSD's recommendations, which CPSD accepted with no additional changes.  Since these recommendations and edits were not opposed, we find it reasonable to adopt the following recommendations:

> 4.C.1     PG&E's gas transmission organization should be required to achieve at least a Level 3 information maturity score under the Generally Accepted Records Keeping Principles within 3 years. (CPSD Exhibit 6, Appendix 4.)

> 4.C.7     PG&E should identify and document the employees responsible for implementing the Records and Information Management program for gas transmission.

> 4.C.8     PG&E should develop consistent standard practices that include gas transmission records management linked to corporate polices on information governance.

> 4.C.10   PG&E should ensure that each gas transmission standard conforms with Records and Information Management (RIM) policies for gas transmission.

> 4.C.11   PG&E should include the treatment of active and inactive records in its Records and Information Management (RIM) Policy for gas transmission.

---

[354] *CPSD Opening Brief* at 64.

[355] *CPSD Opening Brief* at 64.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 202 of 565

### 7.1.3.1.    ISO Certification

CPSD's recommended Remedy 4.C.2 would require PG&E to "achieve International Organization Standard (ISO) certification against ISO 30300 for its Management System for Records (MSR) within five years of the ISO 30300 audit standard being finalized and published."[356]  PG&E opposes this recommendation, stating "ISO 30300, which will be a newly revised update to ISO 15489, is primarily used for organizations that have international demands on information governance, including EU directives and other cross-country requirements."[357]

CPSD argues that the ISO 30300 series is applicable to all organizations, regardless of size or location, and "is especially useful in demonstrating compliance with the documentation and records requirements of other Management System Standards."[358]  Additionally, since the standard has not yet been finalized and published, CPSD suggests "PG&E could begin working toward the ISO 15489 standard currently in place."[359]

Although the *Duller/North Report* refers to the ISO 30300 series in its discussion of records management responsibilities, CPSD has not provided sufficient justification why it is necessary for PG&E to achieve ISO certification against ISO 30300.  Accordingly, Recommendation 4.C.2 is rejected.  While we reject CPSD's recommendation at this time, we do not foreclose the possibility that achieving this certification may be appropriate in the future.

---

[356] *CPSD Opening Brief* at 65.

[357] *CPSD Amended Reply*, Appendix A at B-33.

[358] *CPSD Amended Reply*, Appendix A at B-33.

[359] *CPSD Opening Brief* at 65, fn.32.

### 7.1.3.2. Corporate Record and Information Management Policy

CPSD recommended Remedy 4.C.3 states

3  PG&E should develop a program to draft, review, approve and issue corporate policies and policy guidance that will:

   a.  establish guidance for all departments and divisions to assist them with drafting standard practices to implement the corporate policies,

   b.  will incorporate an internal audit function to review standard practices for compliance, consistency and accuracy, and

   c.  will incorporate a retention policy with a schedule that identifies all records within the business for which there is a retention period mandated by federal/state laws; general orders and regulations including CPUC section 451 and its successors.[360]

PG&E generally agrees with this proposed remedy and notes that its Information Management (IM) and Compliance Department has begun to implement this recommendation.  However, PG&E proposes several edits, as "It is impractical to draft standard practices that would fit business processes as diverse as Gas Operations, Human Resources and Regulatory Affairs, for example."[361]

CPSD accepts PG&E's proposed revisions with one edit.  It proposes to add the phrase "that underlie its post-2010 Corporate Records and Information Management Policy and Standard" to subpart (a) so that it will read:

Communicate recordkeeping expectations that underlie its post-2010 Corporate Records and Information Management

---

[360]  *CPSD Opening Brief* at 65.

[361]  *CPSD Amended Reply*, Appendix A at B-34 – B-35.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 204 of 565

Policy and Standard for all departments and divisions across PG&E.[362]

CPSD's edit provides the context for PG&E's recordkeeping expectations. We concur with this edit and adopt recommended Remedy 4.C.3 as follows:

3   PG&E shall issue a corporate policy and standard that will:

   3.a   Communicate recordkeeping expectations that underlie its post-2010 Corporate Records and Information Management Policy and Standard for all departments and divisions across PG&E. These expectations should be incorporated into procedures specific to meet the needs of every Line of Business.

   3.b   The Information Management and Compliance Department should design a governance controls catalog for recordkeeping practices to assess compliance with the corporate policy and standard, consistency of behavior with official records being stored in approved systems of record, and timeliness of addressing records during their lifecycle.

   3.c   The retention schedule will support the policy by providing retention length for all identified official records to meet legal and regulatory mandates.

### 7.1.3.3.    Records Management Education and Training

PG&E agrees with CPSD recommended Remedy 4.C.4 that it should develop and implement Records and Information Management (RIM) training. It proposes several edits and also clarifies that the training is "for the gas transmission organization."[363]

CPSD accepts PG&E's edits, but adds back the phrase "within an information governance framework" that PG&E had proposed be deleted.  CPSD

---

[362] *CPSD Amended Reply*, Appendix A at B-34.

[363] *CPSD Amended Reply*, Appendix A at B-36.

explains that this is the basis of Generally Accepted Record-keeping Principles (GARP).[364]  Since PG&E agrees to CPSD recommended Remedy 4.C.1, which recommend PG&E achieve a Level 3 information maturity under GARP within three years, we find that retention of the phrase "within an information governance framework" in recommended Remedy 4.C.4 to be reasonable.

CSB also proposes three remedies – V.D.2.c, V.D.2.d and V.D.2.e – related to records management training.[365]  PG&E opposes these recommendations on the grounds that they are duplicative of CPSD's recommended Remedy 4.C.4.[366]  We do not agree.  CPSD recommended Remedy 4.C.4 is a general recommendation for training, while CSB's proposed remedies outline the expectations of the training and education programs.  We find it is reasonable to incorporate CSB's recommendations into CPSD recommended Remedy 4.C.4, as this will provide more specificity regarding the requirements that should be included.  Finally, we modify CSB proposed remedies V.D.2.d and V.D.2.e to add a requirement that these training programs be offered at least annually.  We believe that requiring this training be offered at regular intervals will ensure that PG&E's recordkeeping practices are communicated to employees in a consistent and ongoing manner.

We therefore adopt recommended Remedy 4.C.4 as follows:

4   PG&E shall develop and implement an education and training program for the gas transmission organization in Records and Information Management principles and practices within an information governance framework.  The education and training program shall include the following:

---

[364] *CPSD Amended Reply*, Appendix A at B-36.

[365] *CPSD Amended Reply*, Appendix A at B-62 – B-63.

[366] *CPSD Amended Reply*, Appendix A at B-62 – B-63.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 206 of 565

a. All staff shall receive training to understand the responsibilities and tasks that relate to managing records. These education and training programs shall be updated and offered at regular intervals, at least twice annually, to include amendments to the records management program and for the benefit of new staff.

b. There shall be specific and additional training for those staff involved directly in the management of retention and disposal of records. These education and training programs shall be offered at least annually.

c. There shall be specific and additional training focusing on all of the recordkeeping systems used within the Gas Operations Organization. Employees and PG&E contractors who have duties using these programs shall be required to attend these training sessions. These education and training programs shall be offered at least annually.

### 7.1.3.4.    Records

CPSD recommended Remedy 4.C.5 states

PG&E should develop and deploy the systems necessary to manage, maintain, access and preserve both records and documents (physical and electronic, in all formats and media types); their related data, metadata, and geographic location and geospatial content in accordance with legal and business mandated rules, utilizing technology that includes appropriate aids to help improve data and metadata quality, including but not limited to validation, verification and referential integrity.[367]

PG&E agrees to this recommended, but proposes several edits. CPSD opposes PG&E's proposal to have the recommendation apply to "gas transmission" systems. It argues that "systems" is not limited to gas transmission, as it could also refer to "records/document/content/management

---

[367] *CPSD Opening Brief* at 65.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 207 of 565

systems; Quality management systems at any level in the Corporation."[368]  CPSD further opposes PG&E's addition to have this recommendation apply in accordance with "PG&E's records retention schedule."[369]  CPSD believes this phrase is unnecessarily vague and is not convinced the record retention schedule would incorporate the requirements specified in the CPSD remedy.

We agree with CPSD that the phrase "gas transmission" may be limiting and therefore exclude the phrase.  We also agree that the phrase "records retention schedule" is vague, especially since there is no assurance that these retention schedules incorporate all the requirements contained in the CPSD recommendation.  This phrase is also excluded.  Although CPSD did not oppose other edits proposed by PG&E, it did not include them in its final revised proposal.  We find PG&E's other proposed changes reasonable and adopt them.

### 7.1.3.5.    Responsibility for Information Governance Strategies

PG&E agrees with CPSD recommended Remedy 4.C.6 and states that it is already implementing this recommendation in its gas transmission business.  However, PG&E proposes edits to clarify the proposed operational commitment for purposes of implementation.[370]  CPSD agrees that the remedy should be clarified, and proposes further edits that incorporates PG&E's proposed language.  CPSD's additional edits would identify PG&E senior management as responsible for implementation of PG&E's governance strategy.[371]

---

[368] *CPSD Amended Reply*, Appendix A at B-37.

[369] *CPSD Amended Reply*, Appendix A at B-37.

[370] *CPSD Amended Reply*, Appendix A at B-38.

[371] *CPSD Amended Reply*, Appendix A at B-38.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 208 of 565

While we believe that it should be understood that PG&E senior management would be responsible for ensuring PG&E's governance strategy is implemented, there is no harm in making that specific statement.  We therefore, adopt recommended Remedy 4.C.6 as follows:

> PG&E shall establish accountability for development and implementation of a PG&E governance strategy across gas transmission that shall rest with PG&E Senior Management and a method of accountability shall be developed and implemented.

### 7.1.3.6.    Mandated Retention Period

CPSD recommended Remedy 4.C.9 states "PG&E should implement mandated retention periods for all relevant records."[372]  PG&E agrees with this recommendation and proposes to add the phrase "in gas transmission" at the end of the sentence.[373]

CPSD accepts PG&E's edit and makes a further edit to insert the word "relevant" to gas transmission.  We agree that this further edit is reasonable and adopt the proposed changes.

### 7.1.3.7.    Records Management Processes

CPSD recommended Remedy 4.C.12 requires PG&E's records management processes be managed and maintained in accordance with the traceable, verifiable and complete standard.[374]  PG&E agrees with this recommendation, which it is already implementing in its gas transmission business.  PG&E proposes edits to clarify the proposed operational commitment for purposes of implementation.[375]

---

[372] *CPSD Opening Brief* at 66.

[373] *CPSD Amended Reply*, Appendix A at B-39.

[374] *CPSD Opening Brief* at 66.

[375] *CPSD Amended Reply*, Appendix A at B-40.

CPSD agrees with some of PG&E's edits. However, it does not agree that the phrase "for the life of the asset" should be replaced with "aligned with PG&E's record retention schedule." It notes that the primary concern of this remedy relates to the physical assets. CPSD also does not agree to limit the records to just "as built" records because, as "it has been difficult to discern exactly what records PG&E includes in that classification."[376]

We concur with CPSD that the phrase "for the life of the asset" should be retained in the remedy. As we found in the *Recordkeeping Violations Decision*, PG&E's retention schedules were both inconsistent and did not comply with federal requirements to retain certain records for the life of the asset.[377] We further agree with CPSD that the term "as-built" should be excluded because it is unclear what PG&E considers an "as-built" record.

We therefore adopt recommended Remedy 4.C.12 as follows:

PG&E's records management processes shall be managed and maintained in accordance with the traceable, verifiable and complete standard, including retention of physical and digital pipeline records for the 'life of the asset.'

### 7.1.3.8.    Data Discrepancies

CPSD recommended Remedy 4.C.13 states:

The accuracy and completeness of data within gas transmission records should be traceable, verifiable and complete and when errors are discovered, the record should be corrected as soon as correct information is available and the reason(s) for each change should be documented and kept with the record.[378]

---

[376] *CPSD Amended Reply*, Appendix A at B-40.

[377] *Recordkeeping Violations Decision,* Section 7.2.1, 8.3 and 9.3.

[378] *CPSD Opening Brief* at 66.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 210 of 565

PG&E agrees with this recommendation states that it is implementing this recommendation in its gas transmission business. PG&E proposes edits to the recommendation to discrepancies in GIS 3.0.[379]

CPSD opposes this edit, as it believes this would limit PG&E to addressing discrepancies in only GIS 3.0, not any other PG&E records. However, it proposes to add a sentence to this recommendation to refer to requirements for discrepancies discovered in GIS 3.0.

We agree with CPSD that this limiting language should be deleted. PG&E has had more than one database system tracking gas transmission records, and will likely have more in the future. It is important that records in all of these systems are accurate and complete, not only the records in GIS 3.0. We do not believe, however, that CPSD's proposed sentence "For example, when discrepancies are discovered in GIS 3.0, GIS 3.0 should be updated as soon as the new information is available and reflected in the audit change log" is necessary and therefore exclude it.

### 7.1.3.9.   Job Files

CPSD proposed remedies 4.C.14 and 4.C.15 address problems associated with Job Files. These recommendations state:

> 14   PG&E should create a standard format for the organization of a job file so that PG&E personnel will know exactly where to look in a file folder, or set of file folders, to find each type of document associated with a job file. At a minimum, a job file will contain traceable, verifiable and complete records to support the MAOP of the pipeline segment installed; design documentation; purchase documentation showing the sources and specifications of equipment purchased; permits; environmental documents; field notes; design, construction

---

[379] *CPSD Amended Reply*, Appendix A at B-41.

and as-built drawings; x-ray reports and weld maps; pressure test records; correspondence with the CPUC; and inspection reports and correspondence.

15    Job file data, including drawings, for all parts of the active PG&E gas transmission system should be immediately accessible from multiple locations. The development of a complete and accurate catalog of "job files that can be searched immediately should be included within this objective."[380]

PG&E agrees with both recommendations.  PG&E states that it is implementing recommendation 4.C.14 by creating an electronic format for job file organization and recommendation 4.C.15 through Project Mariner.[381]  It proposes edits to clarify the proposed operational commitment for purposes of implementation.

For recommendation 4.C.14, PG&E proposes that the job files be in a standard "electronic" format and would limit the records to the "features that were reviewed as part of the MAOP Validation project."  Further, it proposes to delete the following types of records listed by CPSD:  segment installed, permits, environmental documents, field notes, x-ray reports and weld maps, correspondence with the CPUC and inspection reports and correspondence.[382]

CPSD opposes PG&E's proposed edits.  It argues that Job Files should "include all of the records listed that document the history of the pipeline, including any past, present or future records that support the MAOP of the

---

[380] *CPSD Opening Brief* at 66.

[381] Project Mariner is PG&E's Gas Transmission Asset Management Project which was authorized in the *PSEP Decision*.

[382] *CPSD Amended Reply*, Appendix A at B-42.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 212 of 565

pipeline or pipeline segment installed."[383]  Further, CPSD notes that the list of document types included in recommendation 4.C.14 "was developed from lists of job file contents provided by PG&E."[384]

We concur with CPSD that Job Files should include all records documenting the history of the pipeline.  PG&E has represented in the Recordkeeping OII that a Job File that contains original documents is the "master job file" or file of record.[385]  These original documents include permits, environmental documents, x-ray reports and weld maps and inspection reports.[386]  PG&E witness Keas has testified that Job Files are a source of information for PG&E's integrity management program and used as a means to confirm information in GIS.[387]  However, PG&E now proposes that a Job File only contain information obtained as part of the MAOP Validation Project conducted between 2011 and 2013, not historical information.  Further, PG&E proposes to eliminate documents that are relevant to the design and construction of transmission pipelines.

As we found in the *Recordkeeping Violations Decision*, PG&E's recordkeeping practices with respect to Job Files, along with errors in its GIS system, adversely impacted PG&E's ability to operate its gas transmission pipeline system in a safe manner.[388]  CPSD's recommended Remedy 4.C.14

---

[383] *CPSD Amended Reply*, Appendix A at B-42.

[384] *CPSD Amended Reply*, Appendix A at B-42.

[385] Recordkeeping, Exh. CPSD-18, GasTransmissionSystemRecordsOII_DR_CPUC_017-Q05Supp.pdf.

[386] Recordkeeping, *PG&E's June 20, 2011 Response* at 2A-19 – 2A-20 (Table 2A-3) & 7-3.

[387] Recordkeeping, 11 Joint RT at 1153:7 – 1154:26 (PG&E/Keas).

[388] *Recordkeeping Violations Decision*, Section 8.1 and 8.7.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 213 of 565

addresses these deficiencies.  Therefore, we agree with CPSD that PG&E's proposed edits should be excluded.

For recommendation 4.C.15, PG&E proposes that the word "immediately" be deleted and to limit the scope of Job Files to "records" of gas transmission "pipelines."  PG&E further proposes to delete the requirement to have a complete and accurate catalog of Job Files.[389]

CPSD opposes these edits.  It states that the recommendation should apply to PG&E's entire gas transmission system, including terminals, etc., and not just "pipelines."  CPSD further notes that it had included a requirement for a catalog of Job Files so the PG&E's staff would "have immediate access to relevant information and not have to wait days or months for the information to be located."[390]

As we found in the *Recordkeeping Violations Decision*, PG&E does not have a central repository or a system-wide index for Job Files.[391]  As a result, it took a total of 250,000 man days of work to gather, review, catalogue and index, copy and analyze PG&E's Job Files for all phases of its MAOP validation project.[392]  Given the inherent dangers associated with operating a high pressure natural gas transmission pipeline system, we concur with CPSD that it is imperative that PG&E employees have immediate access to relevant information.  It is simply unacceptable to have employees search for information and hope to find it at some point.  As such, we concur with CPSD that PG&E's edits should be excluded.

---

[389] *CPSD Amended Reply*, Appendix A at B-43.

[390] *CPSD Amended Reply*, Appendix A at B-43.

[391] *Recordkeeping Violations Decision*, Section 8.1.

[392] *Recordkeeping Violations Decision*, Section 8.1.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 214 of 565

For the reasons stated above, we adopt CPSD's proposed remedies 4.C.14 and 4.C.15 with no changes.

### 7.1.3.10.   Missing or Destroyed Information

CPSD's recommended Remedy 4.C.16 addresses the methodology to recover information contained in PG&E's historic records and documents that has been identified as "missing" or "disposed of."[393]  PG&E states that it is implementing this recommendation through its MAOP validation effort.  It therefore proposes that this recommendation read:

> In the course of the MAOP Validation Project, when PG&E cannot locate records, PG&E should apply conservative assumptions in its development of its Pipeline Features Lists for gas transmission pipelines.[394]

CPSD opposes PG&E's proposed edits.  CPSD states that these edits "completely ignore the inferred 'duty of care' element to recover such information via a range of options, rather than simply insert a conservative value."[395]  We agree with CPSD that PG&E cannot simply "apply conservative assumptions" whenever there is missing information in its historical records and documents.  However, we note that the CFR allows the use of conservative assumptions.  We therefore, reject PG&E's modifications, but modify this recommendation to reflect TURN's recommended Remedy 2A concerning the use of assumed values.[396]  Accordingly, CPSD recommended Remedy 4.C.16 is revised to read:

---

[393] *CPSD Opening Brief* at 66-67.

[394] *CPSD Amended Reply*, Appendix A at B-44.

[395] *CPSD Amended Reply*, Appendix A at B-44.

[396] *CPSD Amended Reply*, Appendix A at B-59.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 215 of 565

16. The information that was contained in PG&E's historic records and documents, and that has been identified as 'missing or disposed of,' and is necessary to be retained for the safe operation of the pipelines, pursuant to laws, regulations and standards and the PG&E retention schedule, shall be recovered. This recovery shall include but not be limited to:

  a. updating and verification of data in engineering databases, such as the leak database, GIS and the integrity management model,

  b. updating plat sheets and other engineering drawings, and

  c. updating and organizing job files.

When PG&E cannot locate records, it may apply conservative assumptions consistent with the requirements of Ordering Paragraph 1 of D.11-06-017.  PG&E shall be required to fully document any engineering-based assumptions it makes for data that has been identified as "missing or disposed of."  Such assumptions must be clearly identified and justified and, where ambiguities arise, the assumption allowing the greatest safety margin must be adopted.[397]

### 7.1.3.11.  Changes in Gas Transmission Policies and Standard Practices

CPSD's recommended Remedy 4.C.17 addresses the documentation and preservation of changes to PG&E's policies and standards.[398]  Although PG&E agrees with this recommendation, it would limit the requirement to "gas transmission standards and procedures" and eliminate the requirement for

---

[397] This does not override prior Commission Orders regarding hydro testing and replacement of pipeline.  Nor does it relieve PG&E of its on-going responsibility and duty going forward to keep accurate records.

[398] *CPSD Opening Brief* at 67.

permanent retention. It argues "Permanent retention of all documents is not practicable."[399]

We concur with PG&E that this requirement should not apply to all documents. However, we do not agree that a limitation to "gas transmission standards and procedures" is appropriate, as it is unclear what documents would be included. As demonstrated by language in this proposed remedy, CPSD and PG&E have used the terms "standards and procedures," "policies and standard practices" and "policies, standards and procedures." It is unknown whether these terms are all the same, or would encompass different types of documents. For purposes of ensuring all documents are included, we revise the recommendation to use the term "policies, standards and procedures." We further revise the recommendation to apply to all documentation within the Gas Operations Organization.

We further reject PG&E's proposal to retain only documentation of changes "according to PG&E's Records and Information Management (RIM) policies, standards and procedures."[400] As highlighted in the Recordkeeping OII, there is a need to retain policies, standards and procedures even after they are discontinued. For example, PG&E's standards and procedures for the reconditioning of A O Smith pipe in the late 1950's and early 1960's was not retained. Consequently, when the Office of Pipeline Safety issued a safety alert about this type of pipe in 1988, PG&E had to determine what had been done "based on discussion with people who were involved with the Decoto Pipe Yard reconditioning program" during that time.[401] Consequently, adopting PG&E's

---

[399] *CPSD Amended Reply*, Appendix A at B-45.

[400] *CPSD Amended Reply*, Appendix A at B-45.

[401] Recordkeeping Exh. PG&E-48 at 2; see also, 4 RT at 498:18 – 499:9.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 217 of 565

proposed retention requirement would not provide the audit trail proposed by CPSD, especially since PG&E believes that an explanation of changes "should be maintained so long as the standard practice is in effect, or for a reasonable, defined period of time." As such, while it is not necessary to retain a permanent record of all documents, we find CPSD's proposal to require permanent retention of an audit trail of changes, including cancellation, to be reasonable.

For the reasons discussed above, we adopt recommended Remedy 4.C.17 as follows:

> PG&E shall document adoption of, and changes and amendments to policies, standards and procedures within the Gas Operations Organization (or its successor division(s) with responsibility for design, construction, operations, maintenance, testing, safety and integrity management of PG&E's natural gas pipeline system). The documentation shall include the reasons for adoption, amendment or cancellation of the policies, standards and procedures. An audit trail of changes shall be maintained, retained for as long as the standard is in effect. If a policy, standard or procedure is cancelled, a copy of the policy, standard or procedure in effect at the time of cancellation, as well as the reason for its cancellation, shall be preserved permanently, taking heed of potential changes in technology that may render documents unreadable in the future.

### 7.1.3.12.  Salvaged and Reused Pipe

CPSD proposed remedies 4.C.18 and 4.C.19 address the need to identify and track salvaged and reused pipe in PG&E's gas transmission pipeline system.[402]  PG&E agrees with recommendation 4.C.18 and states that it will identify salvaged and reused pipes through its MAOP Validation Effort.  PG&E opposes recommendation 4.C.19 on the grounds that it is duplicative of

---

[402] *CPSD Opening Brief* at 67.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 218 of 565

recommendation 4.C.18.[403]  Similarly, PG&E states that TURN recommended Remedy 1 is duplicative of CPSD proposed remedies 4.C.18 and 4.C.19.[404]

CPSD opposes PG&E's proposal to limit the methodology for identifying salvaged and reused pipe to PG&E's MAOP validation effort.  It further argues that recommendation 4.C.19 is not duplicative of recommendation 4.C.18.  CPSD states that proposed recommendation 4.C.18 concerns identification of salvaged and reused pipe in its system and corrections to GIS.[405]  In contrast, recommendation 4.C.19 would require PG&E to create and maintain a separate system to track salvaged and reused pipe in its gas transmission system.[406]

We agree with CPSD that proposed remedies 4.C.18 and 4.C.19 impose different requirements on PG&E.  Recommendation 4.C.18 addresses the fact that PG&E considers the date of pipe installation as the date of manufacture in the GIS system.  As such, GIS cannot be used to identify salvaged or reused pipe.  Since GIS is a source of data for PG&E's integrity management program, this would mean that PG&E's ability to assess the integrity of its pipeline system and effectively manage risk is compromised, resulting in safety risks to the public.

In contrast, recommended Remedy 4.C.19 addresses the fact that PG&E does not have a means to track where salvaged and reused pipe has been reinstalled in its pipeline system.  This system would provide different information than what is currently contained in GIS.  We agree with PG&E that TURN recommended Remedy 1 duplicates CPSD recommended Remedy 4.C.19.  However, we find TURN's recommendation better addresses the violations

---

[403] *CPSD Amended Reply*, Appendix A at B-47.

[404] *CPSD Amended Reply*, Appendix A at B-58.

[405] *CPSD Amended Reply*, Appendix A at B-47.

[406] *CPSD Amended Reply*, Appendix A at B-47.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 219 of 565

found.  We therefore reject CPSD recommended Remedy 4.C.19 and adopt TURN recommended Remedy 1 instead.  We modify the first sentence of TURN recommended Remedy 1 to read "PG&E shall create a centralized database to track where…"  We further modify TURN recommended Remedy 1 to add the following sentence at the end:  "PG&E will maintain this database so long as there are sections of reused pipe in the PG&E operating gas transmission pipeline system."

Based on the above, we adopt CPSD recommended Remedy 4.C.18 as follows:

> PG&E will identify each section of pipe that has been salvaged and reused within the PG&E gas transmission system. For each section of pipe identified, PG&E will change the installed date in its GIS and its IM model to the date the pipe was originally installed in the PG&E pipeline system.

We adopt TURN recommended Remedy 1, as modified:

> PG&E shall create a centralized database to track where it has placed re- used or otherwise reconditioned pipe in its system. For each such segment, the database should show the date of manufacture of the segment, if known.  If this date is unknown, the database should so indicate, to ensure that the segment is given appropriate attention in integrity management.  The database shall include a link to reliable and readily accessible documentation showing, for each re-used or otherwise reconditioned pipe segment, that all steps necessary to prepare the segment for installation were performed and inspected.  If such documentation is unavailable, the centralized documentation shall so indicate so that the segment will be given appropriate attention in integrity management.  PG&E will maintain this database so long as there are sections of reused pipe in the PG&E operating gas transmission pipeline system.

### 7.1.3.13. Pricewaterhouse Coopers Audit Report Recommendations

CPSD recommended Remedy 4.C.20 requires PG&E to "implement the recommendations included in the final Pricewaterhouse Coopers (PwC) audit report. (TURN Exhibit 16, Appendix B)."[407]  PG&E opposes this recommendation and states that it has already addressed the PwC recommendations in Exh. PG&E-61 of the Recordkeeping OII.[408]

CPSD asserts that its proposed remedy should stand because PG&E does not commit that it will implement all of the PwC recommendations, but "merely states that many PwC recommendations are under review or under consideration."[409]  We agree with CPSD that PG&E's statement does not constitute a commitment to implement all of the PwC recommendations, as it gives PG&E discretion over which recommendations should be implemented.

The PwC recommendations are complementary or supplement the remedies proposed by CPSD.  We therefore find that these recommendations should be implemented and adopt recommended Remedy 4.C.20.

### 7.1.3.14. Audits

CPSD proposed remedies 4.C.21 and 4.C.22 address CPSD's audit of PG&E's recordkeeping practices and PG&E's correction of any deficiencies found.[410]  PG&E proposes that these audits be performed in accordance with the Government Auditing Standards.  It further opposes CPSD's proposal that audits

---

[407] *CPSD Opening Brief* at 67.

[408] *CPSD Amended Reply*, Appendix A at B-47.

[409] *CPSD Amended Reply*, Appendix A at B-47.

[410] *CPSD Opening Brief* at 67.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 221 of 565

be performed annually for a minimum of ten years after the final decision is issued in the Recordkeeping OII.[411]

CPSD opposes both of PG&E's proposals.  We have already considered and rejected PG&E's proposal to use Government Auditing Standards issued by the U.S. Government Accountability Office in Section 7.1.1.

We further reject PG&E's proposal that these audits not be performed annually.  PG&E argues that an annual audit would not be "practical or useful" because "[t]he steps necessary for audits to be successful (define audit criteria, conduct and audit, discuss findings with PG&E, issue report, PG&E to implement corrective actions in response to findings, allow time for implementation) will take longer than a year."[412]  However, many of the actions listed are the same as those performed in annual financial audits.  Furthermore, as provided in recommended Remedy 4.C.22, CPSD does not anticipate that all deficiencies will be corrected and implemented within a year.  Finally, it is up to CPSD to determine whether annual audits are useful, not PG&E.

We therefore adopt proposed remedies 4.C.21 and 4.C.22 as follows:

21.  Using independent auditors, CPSD will undertake audits of PG&E's recordkeeping practices within the Gas Transmission Division on an annual basis for a minimum of ten years after the final decision is issued in I.11-02-016.

22.  PG&E will correct deficiencies in recordkeeping discovered as a result of each CPSD audit and will report to CPSD when such deficiencies have been corrected.

---

[411] *CPSD Amended Reply*, Appendix A at B-48 – B-49.

[412] *CPSD Amended Reply*, Appendix A at B-48.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 222 of 565

### 7.1.4. Recommended Remedies in I.11-11-009 (Class Location OII)

CPSD proposed 13 recommended remedies in the Class Location OII, all of which were contained in CPSD's Investigative Report.[413]  PG&E did not oppose 7 of these proposed remedies.  Additionally, PG&E proposed revisions to 3 of CPSD's recommendations, which CPSD accepted.  We therefore adopt the following remedies:

4.D.1  Systems:  Utilize industry-standard software for electronic storage of class location information. Devise a process to capture new PG&E service hook-ups especially in proximity to transmission lines and incorporate into the class location analysis.

4.D.3  Procedure 6.3 (3) should be rewritten as: "List all new observations regardless if it is believed that the ground crew has already investigated the observation."

4.D.4  TD-4412-07 section 6.1 (2) should include specific language for the pilot to recommended increased patrolling to the Aerial Patrol Program Manager.

4.D.5  Ensure that the Report of New Construction forms are completed.

4.D.6  Increase the duties of the Aerial Patrol Program Manager (APPM) to include oversight and review of the quality and accuracy of patrol reports.

4.D.7  Create a detailed procedures manual containing the APPM's duties to ensure quality control of aerial patrol responsibilities.

4.D.8  Training:  Utilize varied training exams for patrolling.

---

[413]  Class Location OII, Exh. CPSD-1, Attachment 17.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 223 of 565

4.D.11  Audits the patrolling process should include a comparison of new construction observations with new gas/electrical hook ups near the line to ensure that new construction has not been missed.

4.D.12  A new item "All Sections of Document Completed" should be added to the audit checklist when reviewing Reports of New Construction.

4.D.13  Audits should make sure that copies of completed Reports of New Construction are being provided to local supervisors as required by standard procedure TD-4127P-01 section 3.8 (5).

### 7.1.4.1.    Patrol Standards

CPSD recommended Remedy 4.D.2 states:

> Procedures:  Update procedure TD 4412-07 6.2 (4) to require written confirmation to patrollers that follow up has been performed on all new construction that the patroller has previously observed and documented.  The same change should be made to Attachment 7 Item 5 of TD 4412-07, *Aerial Patrolling Process Instructions*.[414]

PG&E states that it agrees with the essence of CPSD's recommendation and is in the process of revising its patrol standard to ensure that all patrol observations are properly addressed.  Additionally, PG&E states it will use its SAP software to schedule all pipeline patrols and necessary corrective actions.[415] PG&E proposes various changes to this recommendation to clarify the proposed operational commitment for purposes of implementation.  Among other things, PG&E proposes deletion of reference to TD 4412-07 and requiring confirmation to Patrol Supervisors, and allowing confirmation to be verbal or written.[416]

---

[414] *CPSD Opening Brief* at 68.

[415] *CPSD Amended Reply*, Appendix A at B-51.

[416] *CPSD Amended Reply*, Appendix A at B-51.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 224 of 565

CPSD agrees with some of PG&E's edits, but opposes other. It proposes further edits to the proposed remedy so that it would state:

> Procedures: Update procedures, patrolling process instructions, and related OQ training to require written confirmation to Patrol Supervisors that follow up has been performed on all new construction that the patroller has previously observed and documented.[417]

We find CPSD's revised recommended Remedy 4.D.2 reasonable and accept it. We believe written confirmation will provide assurance that new construction has been considered when evaluating whether to revise class designations. However, we replace the acronym "OQ" to "Operator Qualification" for further clarity.

### 7.1.4.2.    Patrolling Exams

CPSD recommended Remedy 4.D.9 would require training exams for patrolling to "include questions with greater detail and complexity than the current exam."[418] PG&E states that it is evaluating a specialized training program and testing regiment utilizing enhanced training exams for patrolling personnel. It proposes that this recommendation be revised to read: "Training materials and associated tests will be reviewed and updated to enhance employee competency, use aerial photos as exam exhibits where pilots indicate which structures are approximately 660 feet from the right of way and would require reporting. Training materials and associated tests should be reviewed and updated to enhance employee competency, utilize aerial photos and other

---

[417] *CPSD Amended Reply*, Appendix A at B-51.

[418] *CPSD Opening Brief* at 69.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 225 of 565

aids, and reflect field conditions to approximate buildings' key distances from lines."[419]

CPSD opposes PG&E's proposed deletion. It states that patrolling exams currently contain "fairly simple questions which require only a rudimentary understanding of class locations."[420] Therefore it believes the exams should contain greater detail and complexity. CPSD therefore proposes to retain the language in its originally-proposed remedy, but include PG&E's additional language. Further, in response to PG&E's assertion that CSB recommended Remedy V.D.2.g is duplicative, CPSD proposes to add the following language from VD.2.g to the proposed remedy: "and shall use aerial photos as exam exhibits where pilots indicate which structures are approximately 600 feet from the right of way and would require exploring."[421]

We concur with CPSD that PG&E's training exams for patrolling should contain greater detail and complexity to ensure that there is more than a rudimentary understanding of class location. We therefore adopt CPSD's proposed revised remedy.

### 7.1.4.3.    Aerial Patrol Pilot Training

CPSD recommended Remedy 4.D.10 states:

PG&E should consider pilot training using aerial photographs taken at an altitude of 750 feet, which replicates what the pilots see on patrol, and include a number of structures both within and outside of the 660 foot standard. Use the photos as exam exhibits where the pilots indicate which structures are approximately

---

[419] *CPSD Amended Reply*, Appendix A at B-55.

[420] *CPSD Amended Reply*, Appendix A at B-55.

[421] *CPSD Amended Reply*, Appendix A at B-55.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 226 of 565

660 feet from the right of way and would require reporting. Training should also include a WDA in the exhibit as well.[422]

PG&E agrees with CPSD's proposed remedy. However, it proposes to delete the use of aerial photographs taken at an altitude of 750 feet and replace it with "photographs, video or other aids to reflect expected views to be seen from typical patrol altitudes."[423]

CPSD does not oppose the language proposed by PG&E. However, it opposes proposed deletion of aerial photographs taken at an altitude of 750 feet. It believes that "PG&E employees may gain a better understanding of the structures and PG&E's system by using this additional source of information."[424]

We concur with CPSD that the Aerial Pilot Training Program should include photographs that replicate what pilots would see on patrol. Accordingly, we adopt CPSD's revised proposed remedy which states:

> Improve Aerial Patrol Pilot training. PG&E shall consider pilot training using aerial photographs taken at an altitude of 750 feet, which replicates what the pilots see on patrol, and include a number of structures both within and outside of the 660 foot standard. Use the photos as exam exhibits where the pilots indicate which structures are approximately 660 feet from the right of way and would require reporting. Training shall also include a Well-Defined Area (WDA) in the exhibit as well. PG&E shall also consider using in its training photographs, video or other aids to reflect expected views to be seen from typical patrol altitudes.

---

[422] *CPSD Opening Brief* at 69.

[423] *CPSD Amended Reply*, Appendix A at B-56.

[424] *CPSD Amended Reply*, Appendix A at B-56.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 227 of 565

## 7.2.   Intervenors' Proposed Remedies

In addition to the remedies proposed by CPSD, CSB has proposed 6 additional remedies (some with multiple sub-parts), TURN has proposed 4 additional remedies and DRA has proposed 2 additional remedies.  We have addressed the following proposed remedies in our discussion of CPSD's proposed remedies:

1. CSB recommended Remedy V.D.2.a – Incorporated into CPSD adopted Remedy 23 for I.12-01-007.

2. CSB recommended Remedy V.D.2.c – Incorporated into CPSD adopted remedy 4 for I.11-02-016.

3. CSB recommended Remedy V.D.2.d – Incorporated into CPSD adopted remedy 4 for I.11-02-016.

4. CSB recommended Remedy V.D.2.e – Incorporated into CPSD adopted remedy 4 for I.11-02-016.

5. CSB recommended Remedy V.D.2.f – Incorporated into CPSD adopted remedy 10 for I.11-11-009.

6. TURN recommended Remedy 1 – Adopted in lieu of CPSD proposed remedy 19 in I.11-02-016.

7. TURN recommended Remedy 2A – Incorporated into CPSD adopted remedy 4 for I.12-01-007.

The remainder of this section addresses all remaining proposed remedies.

### 7.2.1.   California Pipeline Safety Trust

CSB recommended Remedy V.B requests that the Commission direct PG&E to provide an endowment of $5 million per year over a minimum of 20 years to fund a "California Pipeline Safety Trust" (Pipeline Trust).[425]  CSB states that the purpose of the Pipeline Trust would be to serve as an independent, pipeline safety organization that would provide "proper oversight

_____
[425] *CSB Opening Brief* at 41 – 42.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
228 of 565

over the implementation, not only of PG&E's PSEP, but the other equitable remedies the Commission imposes in connection with the Line 132 Investigatory Proceedings."[426]  Additionally, the Pipeline Trust would:

- Ensure that California citizens and emergency responders are represented in policymaking, ratemaking and investigatory proceedings that bear on natural gas safety matters before the Commission;

- Promote a regional pipeline system in which technology, policy, and practice together provide the safest possible means of transporting gas across California; and

- Promote independent scrutiny of natural gas pipeline investment, maintenance and operations.[427]

CSB argues that the Pipeline Trust is necessary to establish a long-term partnership between local communicates, government and industry to improve pipeline safety; increase accountability for intrastate pipeline safety, and; increase awareness of pipeline safety.[428]  It further proposes that PG&E be allowed to seek contribution from other regulated pipeline operators to fund the Pipeline Trust.  Additionally, CSB contends that the Pipeline Trust "will serve a role not currently filled by Intervenors that regularly appear before the Commission" and "there is not one Intervenor in these historic and unprecedented proceedings that advocates solely for public safety."[429]

PG&E opposes this recommendation.  It contends that "any penalty should be directed toward improving pipeline safety" and dedicating any portion of a

---

[426] *CSB Opening Brief* at 42 – 43.

[427] *CSB Opening Brief* at 43.

[428] *CSB Opening Brief* at 43.

[429] *City of San Bruno's Rebuttal Brief in Response to the Amended Reply Brief of the Consumer Protection and Safety Division on Fines and Remedies and Pacific Gas and Electric's Response to CPSD's Amended Reply Brief on Fines and Remedies*, filed August 28, 2013, at 10.

penalty "to fund an advocacy organization will not address the more immediate infrastructure concerns at the center of these proceedings."[430] PG&E therefore believes that in light of the cost of already-identified pipeline safety projects, it would be an inappropriate use of funds.

CSB correctly points out that there is no safety/advocacy counterpart to CPSD.[431] However, while CSB advocates for the Pipeline Trust, it has provided no specifics on how the Pipeline Trust would be organized or why it needs to be funded by PG&E over 20 years. We note that CSB envisions the Pipeline Trust intervening in Commission proceedings. Under those circumstances, the Pipeline Trust could be subject to the requirements for an intervenor pursuant to Pub. Util. Code § 1801 et seq.

While we do not dispute that such an organization could provide a unique voice and perspective in Commission proceedings, we do not find it appropriate to require PG&E shareholders to fund this work. Therefore, CSB's proposed remedy is rejected.

### 7.2.2. Independent Monitor

CSB recommended Remedy V.C requests that the Commission direct PG&E shareholders to pay for an Independent Monitor and necessary consultants to evaluate and review PG&E's compliance with the *PSEP Decision*, and any fines and remedies ordered in this decision.[432] DRA makes a similar proposal.[433] Both TURN and CCSF support the proposal for an independent

---

[430] *PG&E Remedies Brief* at 97.

[431] *Rebuttal Brief of the City of San Bruno Concerning the Fines and Remedies to be Imposed on Pacific Gas and Electric Company*, filed June 7, 2013, at 24.

[432] *CSB Opening Brief* at 43.

[433] *DRA Opening Brief* at 38 – 39.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 230 of 565

third-party monitor.[434]  Additionally, TURN proposes the following specific remedies regarding audits to be performed:

> 2B.   With respect to the MAOP Validation Project, PG&E should pay for the costs of a qualified independent auditor, retained by the Commission, to: (a) audit PG&E's MAOP Validation results for accuracy, reliability, and compliance with the requirements of D.11-06-017, and (b) to prepare a full report to the Commission and available to interested parties of its conclusions and recommendations for remediation of any observed deficiencies.

> 3.    With respect to Project Mariner, PG&E should pay for the costs of a qualified independent auditor, retained by the Commission, to (a) examine the new systems developed in Project Mariner, including observations of the systems in operation, to ensure that they result in accurate, reliable, and accessible pipeline data that meets all safety operational needs, and (b) to prepare a report to the Commission and available to interested parties of its conclusions and recommendations for remediation of any observed deficiencies.[435]

Noting that "CPSD is the Commission's staff responsible for safety enforcement," PG&E opposes this proposed remedy.[436]  PG&E states that it "recognizes that CPSD's resources are limited and that adding substantial management and oversight obligations to its existing duties could outstrip available resources."[437]  PG&E proposes that instead of creating an independent monitor, the Commission should provide CPSD with additional resources by ordering that a portion of the penalty in this proceeding be used to fund

---

[434] *TURN Opening Brief* at 49; *CCSF Opening Brief* at 17.

[435] *TURN Opening Brief* at 49.

[436] *PG&E Remedies Brief* at 95-96, Appendix B at B-41.

[437] *PG&E Remedies Brief* at 96.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 231 of 565

consultants retained to assist CPSD in managing and overseeing PSEP activities.[438]  This would continue a practice that has been followed for two years whereby such consultants would be identified, hired, and directed by CPSD but funded by PG&E.[439]

CSB and DRA discuss their proposals for an independent monitor and the rationales therefore at length in their briefs.[440]  However, the essence of their argument is that an independent monitor is required because CPSD is not positioned to adequately fulfill its regulatory role in overseeing the safety of PG&E's natural gas safety practices and operations, including in particular the company's implementation of PSEP and its compliance with the remedies ordered in these investigation proceedings.  For evidence of this proposition, DRA points to the findings of the Independent Review Panel (IRP) regarding the cultures of the Commission as well as PG&E.[441]  DRA also points to the NTSB Report's finding that the Commission's "failure to detect the inadequacies of PG&E's pipeline integrity management program" contributed to the San Bruno explosion.[442]  DRA goes on to note the NTSB's finding that the Commission is unable to effectively evaluate and assess the integrity of PG&E's pipeline system because neither PG&E nor the Commission has incorporated the use of effective and meaningful metric as part of their performance-based pipeline safety

---

[438] *PG&E Remedies Brief* at 96.

[439] *PG&E Remedies Brief* at 96.

[440] *CSB Opening Brief* at 43-49; *DRA Opening Brief* at 36-40; CSB *Rebuttal Brief*, filed June 7, 2013, at 21-24; *DRA Rebuttal Brief*, filed June 7, 2013, at 19; *CSB Rebuttal Brief in Response to Amended Reply Brief of CPSD*, filed August 28, 2013, at 7-9.

[441] *DRA Opening Brief* at 37-38, citing the IRP Report at 8 and 18-22.  The IRP Report is San Bruno Exh. CPSD-10.

[442] *DRA Opening Brief* at 38, citing the NTSB Report at xii.  The NTSB Report is San Bruno Exh. CPSD-9.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 232 of 565

management programs.[443]  CSB similarly notes the IRP finding that CPSD lacks adequate resources[444] and the NTSB finding that an ineffective enforcement posture on the part of CPSD allowed PG&E's organizational failures to continue for decades.[445]

     The evidence from the IRP and NTSB reports shows that in the years leading to the San Bruno disaster, the Commission, including CPSD, did not meet all reasonable expectations for its oversight of PG&E's gas transmission safety.  However, it does not follow from evidence of past shortcomings that CPSD cannot or will not fulfill its mission if provided with adequate resources. In particular, there is no record evidence that CPSD is stuck in the culture of the past.  Moreover, the Commission and CPSD are designated by law as the exclusive California regulator of the safety of PG&E's natural gas transmission system facilities, operations and practices.  The Commission's safety jurisdiction cannot be delegated, and an independent monitor established to augment CPSD's role is no substitute for, and does not obviate the need for, a properly resourced, trained, and tasked CPSD.

     We also find shortcomings in the current proposals for an independent monitor:  Parties have pointed to the use of independent monitors elsewhere as examples that might be followed here, such as the independent monitors established in settlements of the BP oil spill in Alaska in 2006, the 1999 rupture of a Shell and Olympic Oil pipeline, and the 2000 Carlsbad accident.  However, those were settled matters where the party to be monitored consented to be monitored.  Moreover, parties have not pointed to evidence of the effectiveness,

---

[443] *DRA Opening Brief* at 38, citing the NTSB Report at 126, Finding 25.

[444] *CSB Opening Brief* at 44-45, citing the IRP Report at 5.

[445] *CSB Opening Brief* at 45, citing the NTSB Report at 122.

or lack thereof, of such independent monitor programs or what the costs were or would be for an independent monitor here. Further, no party has provided adequate information that would allow us to adopt an independent monitor program without further consideration. DRA acknowledges this by proposing further proceedings in the form of a comment process to implement its proposal.[446]

Rather than establish an independent monitor program to address the resource constraints and organizational issues identified by the IRP and the NTSB, the more appropriate course is to ensure that CPSD has adequate resources to oversee compliance with the adopted remedies and to oversee PSEP implementation. Adopted Remedy 1 for all three OIIs directs PG&E to reimburse CPSD for the costs of contracts to retain independent experts chosen by CPSD for verification audits and inspections to ensure compliance with other remedies. We clarify here that this includes ensuring compliance with the *PSEP Decision* and all remedies ordered in this decision, including CPSD's costs for hiring qualified independent auditors to audit and issue reports for both PG&E's MAOP Validation results and Project Mariner systems as proposed by TURN. If CPSD determines that it needs the services of outside consultants to develop additional capabilities to evaluate and assess the integrity of PG&E's pipeline system through the use of meaningful metrics, then the costs of such consultants would fall within the scope of this remedy.

We note that while the *PSEP Decision* provided a funding mechanism for carrying out the directives in that decision subject to balancing account treatment for recovery from ratepayers,[447] the directives in this decision are remedies in

---

[446] *DRA Opening Brief* at 39.

[447] *PSEP Decision*, Ordering Paragraph 9 at 128.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 234 of 565

consideration of violations of gas safety laws by PG&E. Accordingly, the reimbursement costs that PG&E incurs pursuant to this order are not eligible for recovery from ratepayers. The PSEP Decision capped the reimbursement obligation in that decision at $15,000,000.[448] At this time we will cap the reimbursement penalty ordered by this remedy at $30,000,000. If CPSD determines that additional funding is required to carry out this remedy, it may file a petition for modification of this decision seeking additional reimbursement obligation on the part of PG&E.

Finally, we direct CPSD to present a proposal to the Commissioners within 60 days of the effective date of this decision to perform the MAOP Validation and Project Mariner audits, and the timing for such audits to occur.

### 7.2.3. Peninsula Emergency Response Fund

CSB recommended Remedy V.D.1 requests that the Commission direct PG&E shareholders to pay $150 million over three fiscal years in equal installments that would be placed in a trust for a newly established Peninsula Emergency Response Fund (Response Fund).[449] CSB states that the Response Fund would assist cities on the Peninsula in San Mateo County and focus on enhancing the Peninsula's emergency preparedness and response. CSB further proposes that the Response Fund provide funding for certain fire, emergency response, police or sheriff buildings, facilities, and/or equipment.

Similar to its arguments opposing the Pipeline Trust, PG&E does not believe it is appropriate to designate a portion of penalty funds for the Response Fund, since the proposed use of these amounts "will neither increase pipeline

---

[448] *PSEP Decision*, Ordering Paragraph 9 at 128.

[449] *CSB Opening Brief* at 50.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 235 of 565

safety nor have an impact outside a limited area."[450]  Additionally, PG&E notes that it has already paid $70 million to establish a non-profit entity directed by the City of San Bruno, and an additional $50 million to a trust for the benefit of the City.

While the CSB was directly impacted by the September 9, 2010 explosion and fire, most of the violations found in these proceedings affect ratepayers and residents throughout PG&E's service territory.  San Bruno has not provided sufficient justification why a fund should be established solely to assist cities on the Peninsula in San Mateo County.  In light of the impact of this remedy on a limited area, we reject CSB's proposed remedy.

### 7.2.4.  Training for Emergencies

CSB recommended Remedy V.D.2.b states that PG&E should

> Provide training to its Gas Service Representatives and Gas Control Operators to ensure that they coordinate effectively with emergency responders, follow PG&E's own internal procedures when responding to emergencies, and each GSR Gas Control Operators shall be trained and able to manually shut off valves. PG&E shall also audit its GSRs and Gas Control Operators annually to ensure that they are properly trained.[451]

PG&E agrees with this proposed remedy except that it contends that annual auditing to ensure proper training is impractical and unnecessary.[452] PG&E also proposes clarifying wording changes so that the remedy reads as follows:

> PG&E shall provide training to its Gas Service Representatives and Gas Control Operators to ensure that they coordinate

---

[450] *PG&E Remedies Brief* at 97.

[451] *CSB Opening Brief* at 51.

[452] *PG&E Remedies Brief*, Appendix B at B-42.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 236 of 565

effectively with emergency responders, follow PG&E's own internal procedures when responding to emergencies, and each GSR under Gas Control Operators' direction should be trained and able to manually shut off emergency shutdown zone valves. PG&E should also audit its GSRs and Gas Control Operators to ensure they are properly trained.[453]

We are not persuaded that annual auditing is necessary to ensure that GSRs and Gas Control Operators are properly trained. Accordingly, we adopt this remedy with the revisions proposed by PG&E.

### 7.2.5. Formal Agreement with Agencies in PG&E's Territory

CSB recommended Remedy V.D.3 requests the Commission

require PG&E to formalize its emergency response role and disclosure obligation with each city, county and fire district in its service territory either through a memorandum of understanding (MOU) or by reforming PG&E's franchise agreements to make them conform to the public interest in protecting property used by the franchisee and responding to threats or catastrophes quickly and efficiently.[454]

CSB maintains that this remedy is necessary because "[l]ocal governments cannot trust PG&E to do what's necessary to protect its customers."[455] It proposes that this formal agreement "would allow local communities to require PG&E to provide them with the information and support they need to protect the public welfare and effectively respond in an emergency."[456] This agreement would also give local communities the option to specify PG&E's emergency response role and obligations, so that failure to meet these obligations would be

---

[453] *PG&E Remedies Brief*, Appendix B at B-42.

[454] *CSB Opening Brief* at 52.

[455] *CSB Opening Brief* at 52.

[456] *CSB Opening Brief* at 53.

considered a breach of contract, and hold PG&E strictly liable for any pipe or facility failure regardless of cause.[457]

PG&E opposes this recommendation.  It argues that CSB's proposal "could impose through contract broad, additional quasi-regulatory mandates and potentially unlimited cost exposures that would fundamentally change the utility-ratepayer relationship, to the detriment of both."[458]  "Shifting the regulatory balance to place additional, poorly-defined liabilities onto a utility, as San Bruno's proposal would do, is contrary to the public interest and would inevitably result in adverse consequences to both the utility and all its ratepayers."[459]  Finally, PG&E maintains that any effort by the Commission to modify PG&E's contractual franchise agreements with local governments would be in violation of the Contract Cause.[460]

We agree with CSB that PG&E must formalize its emergency response and disclosure obligations with each and every city, county and fire district in its service territory.  In *San Bruno Violations Decision*, we found that PG&E had violated 49 CFR 192.615(a)(8) for failing to notify the appropriate first responders of an emergency and coordinate with them.[461]  Further, we had found a violation of 49 CFR 192.615(a)(2) for failing to establish and maintain adequate means of communication with the appropriate fire, police and other public officials during the San Bruno explosion and fire.[462]

---

[457] *CSB Opening Brief* at 53-54.

[458] *PG&E Remedies Brief* at 98.

[459] *PG&E Remedies Brief* at 98.

[460] *PG&E Remedies Brief* at 98-99.

[461] *San Bruno Violations Decision*, COL 44 (Violation 27).

[462] *San Bruno Violations Decision*, COL 44 (Violation 29).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 238 of 565

Many of the reasons identified by CSB for adopting this recommendation have already been addressed in remedies proposed by CPSD.[463]  However, these remedies do not require PG&E to formalize its emergency response and disclosure obligations to cities, counties and fire districts.  We agree with CSB that these obligations should be provided to cities, counties and fire districts in writing.  However, we do not agree that this should be achieved through a memorandum of understanding or by modifying existing franchise agreements.  As CSB notes, PG&E's Emergency Plan already contains a section for "external mutual assistance agreements."[464]  Enforcement of these mutual assistance agreements lies with the Commission, not the individual cities, counties or fire districts.  We therefore direct PG&E to enter into such agreements with the individual cities, counties or fire districts by no later than December 2015.  These mutual assistance agreements shall be maintained in the appropriate Division Emergency Plan.

### 7.2.6.  Automatic Shutoff Valve Pilot Program

CSB proposed remedy V.E requests the Commission direct PG&E to install automated valves with automatic capabilities (ASVs)[465] in all HCAs and undertake an ASV pilot program within six months of the issuance of this decision.[466]  CSB proposes that the pilot program should be specifically calculated to fully resolve any remaining policy and technological issues associated with deployment of ASV devices and pave the way for ASVs or their

---

[463]  See CPSD adopted Remedies 4.B.25, 4.B.26 and 4.B.30.

[464]  *CSB Reply Brief* at 29.

[465]  Parties have also used the term "automated safety valve" and "automatic shutoff valve" when referring to ASVs.

[466]  *CSB Opening Brief* at 54.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 239 of 565

true equivalent (i.e., not remote control valves) in terms of response time capability to be deployed by PG&E and operational in all HCAs in the utility's service territory on an expedited basis.[467]

PG&E supports automated valves in its gas transmission system and notes that its PSEP includes the installation of 300 automated valves, but it opposes this recommendation, noting that automated safety valve implementation is addressed in the PSEP in R.11-02-019.[468]

A remote control valve (RCV) can be operated remotely from a control room distant from the actual valve, whereas an ASV is designed to stop the flow of gas, without human intervention, when established criteria are met.[469] The main benefit of an ASV or RCV over a manually operated valve is that a rupture may be isolated sooner, limiting the amount of natural gas release after a rupture has occurred.[470] Major concerns regarding ASVs are that they may trigger and close when closure criteria are met but no emergency condition exists, although newer ASVs have the ability to send an alarm before tripping and closing, giving the operator an option to review operating data before deciding whether to allow or cancel imminent valve closure.[471] The vast majority of injuries, fatalities, and property damage associated with a catastrophic pipeline incident occur within the first few minutes of the event, well before activation of ASVs or RCVs is possible.[472]

---

[467] *CSB Opening Brief* at 54-55.

[468] *PG&E Remedies Brief* at 99, Appendix B at B-44.

[469] San Bruno Exh. CPSD-1 at 104.

[470] San Bruno Exh. CPSD-1 at 104.

[471] San Bruno Exh. CPSD-1 at 104.

[472] San Bruno Exh. CPSD-1 at 105.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 240 of 565

In approving PG&E's PSEP, including the company's plan to replace, automate, and upgrade 228 valves in Phase 1 of the Implementation Plan, the Commission stated that:

> We share the parties' objective of reliable and automatic shut-off valves. We direct PG&E to continue its review of new designs and operational options to allow for expanded use of automated valves. In its next rate case, PG&E must submit an updated showing of then-current best practices within the natural gas pipeline industry for automated shut-off valves. PG&E must also continue to improve its gas system control room operation due to the critical role it plays in addressing a rupture or functioning as the manual override on automatic valves. PG&E must avoid unnecessarily complicating natural gas system operations with unpredictable technology, and at the same time develop knowledgeable and fast-acting human control to enhance system safety. The Independent Panel recognized that remote controlled and/or automated shut-off valves are a major issue for the pipeline industry, with the safety and reliability trade-offs discussed at length in Appendix L to their report. [Footnote Omitted.] PG&E should monitor the development of this issue in the pipeline industry.[473]

CSB points to evidence that RCVs would not have been as effective as ASVs on September 9, 2010 in San Bruno.[474] Still, the record evidence in this proceeding shows that there are remaining concerns with ASVs that must be addressed, and it does not provide a basis for us to depart from the plan for PG&E's system going forward that the Commission adopted in D.12-12-030. Accordingly, we do not adopt CSB's proposed remedy for ASVs.

---

[473] *PSEP Decision* at 76-77 (slip op.).

[474] CSB Rebuttal Brief at 26-27, citing October 2, 2012 Jt. Hearing Tr. At 200-201.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 241 of 565

### 7.2.7. Incentive Program Modifications

Concerned that PG&E's employee incentive program links employee financial reward to shareholder return, CSB requests the Commission direct PG&E to revise its Long-Term Incentive Plan (LTIP) and its Short-Term Incentive Plan (STIP) such that safety is the single largest factor that determines employee financial rewards (proposed remedy V.F.).[475]

PG&E opposes this remedy as duplicative of CPSD recommended Remedy 4.B.33, which we have adopted as discussed in Section 7.2.1.15 above.[476] PG&E also argues, however, that it is not appropriate to modify the LTIP.[477]

Since CPSD remedy 4.B.33 incorporates PG&E's revised STIP, for which safety performance now accounts for 40% of the score used to determine the total award, this proposed remedy is duplicative with respect to the STIP. However, CSB's recommendation for the LTIP is not duplicative. Nevertheless, we do not find that CSB has produced or referred us to record evidence that would enable us to make findings in support of modifying PG&E's LTIP. Accordingly, we do not adopt this proposed remedy.

### 7.2.8. Implementation of NTSB Recommendations

DRA proposes that the Commission "conduct a comprehensive audit of all aspects of PG&E's operations, including control room operations, emergency planning, record-keeping, performance-based risk and integrity management

---

[475] *CSB Opening Brief* at 55.

[476] *PG&E Remedies Brief,* Appendix B at B-44.

[477] *PG&E Remedies Brief,* Appendix B at B-44.

Case: 19-30088　　Doc# 14208-2　　Filed: 12/13/23　　Entered: 12/13/23 22:10:31　　Page 242 of 565

programs and public awareness programs" as recommended by the NTSB in its report on the San Bruno explosion.[478]

DRA's recommendation is directed at the Commission, not PG&E. We agree with the NTSB's recommendation that a comprehensive audit of all aspects of PG&E's operations should be performed. Therefore, we direct CPSD to present a proposal to the Commissioners within 60 days of the effective date of this decision to perform such an audit, and the timing for such audit to occur.

### 7.2.9. Reimbursement of Litigation Expenses

DRA proposes that the Commission require PG&E shareholders to compensate TURN, CSB, CCSF, and DRA for their litigation costs, including expert witness fees.[479] PG&E did not initially respond to this recommendation.

CSB subsequently expressed support for DRA's proposal, arguing that the Commission has the legal authority to award compensation to CSB and other intervenors, and that the Commission should exercise that authority. [Response of the City of San Bruno to Request for Review of Commissioner Picker.] PG&E subsequently opposed DRA's proposal, arguing that compensation should be (and legally must be) limited to the statutory intervenor compensation program. [PG&E's Response to Appeals and Requests for Review of the Presiding Officers' Decision on Fines and Remedies at 10-12.]

In adopted CPSD Remedy A.2, PG&E agreed that its shareholders would pay the Commission's and CPSD's costs of conducting the Pipeline OIIs. DRA's proposed remedy seeks to expand this to include all intervenors.

---

[478] *DRA Opening Brief* at 5, citing *National Transportation Safety Board Pipeline Accident Report of Pacific Gas and Electric Company Natural Gas Transmission Pipeline Rupture and Fire, San Bruno, California, September 9, 2010* (NTSB/PAR-11/01), adopted August 30, 2011, at 130.

[479] *DRA Opening Brief* at 5.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 243 of 565

Generally, compensation for participation in Commission proceedings is governed under the Commission's Intervenor Compensation Program.[480] However, intervenors who are eligible to receive compensation under the program must be a "customer"[481] and the compensation award would be funded by utility ratepayers.[482]  Accordingly, under the Intervenor Compensation Program, only organizations such as TURN would be eligible to seek intervenor compensation for their participation in these proceedings.

The POD however, departed from this standard, and found that PG&E shareholders should compensate TURN, CSB, CCSF, and DRA for their litigation expenses, including expert witness fees, for these three proceedings.  (POD at 153-154.)  The POD would make this award under Pub. Util. Code § 701, rather than the Intervenor Compensation Program, on the grounds that "TURN, CSB, CCSF, and DRA have all actively participated in these proceedings and have contributed substantially to our decisions on violations, as well as this decision. Given the nature of these proceedings, we do not believe it would be equitable for utility ratepayers to pay for intervenor's litigation costs, nor to limit compensation to a single intervenor." (Id. at 154.)

As a policy matter, we will not make an exception here to our standard practice of awarding intervenor compensation under our Intervenor Compensation Program.  Accordingly, TURN may seek intervenor compensation pursuant to our standard processes.   CSB, CCSF and DRA are not eligible for compensation for these proceedings.  We acknowledge that TURN, CSB, CCSF and DRA did all actively participate in this proceeding, and did substantially

---

[480] *See*, Pub. Util. Code § 1801 et seq.

[481] *See*, Pub. Util. Code § 1802(b) (defining "customer").

[482] Pub. Util. Code § 1807.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 244 of 565

contribute to our decisions; we do not differ from the POD on this matter, but only on the policy question of whether their participation should be compensated via our equitable authority under Pub. Util. Code § 701.

CSB, CCSF, and DRA are all governmental entities, all of whom chose to participate in these proceedings. At the time they chose to participate in these proceedings, they did not have any reasonable expectation of compensation for their expenses. Under Pub. Util. Code § 1802(b)(2), state, federal and local governmental agencies are not eligible for intervenor compensation, and recent legislative attempts to expand intervenor compensation to government entities were unsuccessful. (See, Senate Bill 1364 (Huff, 2012) and Senate Bill 1165 (Wright, 2012).)

Cities, counties and other governmental agencies regularly participate in Commission proceedings with no expectation of compensation for their litigation expenses. In many cases they have made very significant contributions to important Commission decisions, and have received no compensation. (See, e.g., D. 91-05-028, denying the proposed merger of Southern California Edison and San Diego Gas & Electric; D.04-05-019, denying PG&E's proposed sale of its Kern Facility power plant; and D.13-07-018, undergrounding Southern California Edison's Tehachapi Renewable Transmission Project in the City of Chino Hills.) They participate in Commission proceedings either because they have a duty to do so (as in the case of DRA), or because they determine that it is in their or their constituents' interests that they do so, not because they need or expect compensation for doing so. In the case of DRA, we note that DRA has a statutory obligation to participate in Commission proceedings and receives state funding to do so. (Pub. Util. Code § 309.5.) TURN, on the other hand, does have a reasonable expectation of compensation for its litigation expenses in these proceedings, and the Commission has previously found that it would be a

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 245 of 565

hardship for TURN to participate in Commission proceedings absent intervenor compensation.

We agree with the POD that we have the legal authority under Pub. Util. Code § 701 to craft equitable remedies, including the equitable power to award attorneys' fees in quasi-judicial proceedings. (See, Consumers Lobby Against Monopolies v. Public Utilities Commission (1979) 25 Cal. 3d 891, 908 (CLAM).) But the fact that this Commission has the legal authority to craft such a remedy does not mean that the Commission should necessarily choose to do so.

DRA participated in these proceedings because doing so was consistent with its statutory responsibilities, and as an experienced participant in Commission proceedings, it presumably chose its level (and cost) of participation, with no reasonable expectation of financial compensation. Similarly, CSB and CCSF chose to actively participate in these proceedings in order to protect their interests or the interests of their constituents, again with no reasonable expectation of financial compensation. We appreciate their participation, but unlike the POD, we find that their participation does not provide an adequate basis for deviating from our standard and statutorily-authorized practices regarding intervenor compensation. Accordingly, while TURN may seek intervenor compensation for its participation in these proceedings, CSB, CCSF and DRA may not.

## 8. Compliance Filing

It is likely that some of the remedies adopted here have already been implemented in response to mandates by the National Transportation Safety Board, the Pipeline and Hazardous Materials Safety Administration, the Blue Ribbon Panel or decisions issued in Rulemaking 11-02-019. It is not our intent to

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
246 of 565

duplicate remedies.  Therefore, PG&E shall file a Compliance Filing in these dockets, which:

1. Identifies the remedies ordered in this decision that have already been ordered elsewhere, where that remedy (decision, report, etc.) was ordered, and PG&E's progress to date in complying with that remedy.

2. Identifies any remedy ordered in this decision that modifies or eliminates any remedies ordered elsewhere.

Further, PG&E shall include a timeframe for completion of each of the remedies adopted in Appendix E of this decision.  This Compliance Filing shall be filed within 60 days of the date this decision is issued.

## 9.  Transcript Corrections

PG&E proposes various corrections to the March 4 & 5, 2013 Transcripts.[483] No parties have opposed PG&E's corrections and they are hereby accepted.

## 10.  Rulings on Motions

As expected from proceedings of this complexity and high level of contention, parties have made numerous requests and filed a large number of motions.  Motions have been filed in each individual proceeding, as well as coordinated motions applicable to all three proceedings.  The assigned ALJs have issued filed, electronic and oral rulings in response to these motions.  This decision confirms all rulings issued in response to the coordinated motions.

On July 28, 2014, CSB filed *Motion of the City of San Bruno For An Order To Show Cause Why Pacific Gas And Electric Company Should Not Be Held In Violation of Commission Rule of Practice And Procedure 8.3(b) (Rule Against Ex Parte Communications) and for Sanctions and Fees*.  In its motion, CSB alleges 41 separate instances where PG&E communicated with Commissioner Peevey concerning

---

[483] *PG&E Remedies Brief*, Appendix D.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 247 of 565

the level of the penalty to be imposed in the Pipeline OIIs.  On November 10, 2014, CSB filed *Motion for Evidentiary Hearing on City of San Bruno's Motion for an Order to Show Cause as to Why Pacific Gas and Electric Company Should Not Be Held in Violation of Commission Rule of Practice And Procedure 8.3(b) and for Sanctions and Fees.*  All the motions were opposed by PG&E.  Due to seriousness of the allegations raised by CSB we believe they should be further investigated.  However, we do not want to prolong these proceedings further to deal with these motions that are no longer relevant to the substance of this Decision.  Accordingly, within 60 days of the date of this decision we will issue a new OII to look into the specific allegations raised by these two motions, and at that time, remove them from further consideration in these proceedings.

On October 15, 2014, CPSD filed *Motion of the Consumer Protection and Safety Division To Strike Extra-Record Material from Pacific Gas and Electric Company Appeals of Presiding Officers' Decisions (CPSD Motion to Strike)*.  This motion was opposed by PG&E and supported by CSB.  CPSD's motion concerns statements made in PG&E's appeals of this POD, the San Bruno POD and the Recordkeeping POD.  CPSD contends that in all three of these appeals, PG&E includes references to alleged PG&E shareholder funding to argue that a lower penalty should be imposed.[484]  CPSD argues that this is in direct violation of our June 3, 2013 Ruling.  Therefore, CPSD requests that these references be struck from the appeals.  We have reviewed the references identified by CPSD in Exhibit F of the *Declaration of Harvey Y. Morris in Support of Motion to Strike* that was attached to the *CPSD Motion to Strike* and agree that PG&E has referred to extra-record evidence in its appeals.  Moreover, our June 3, 2013 Ruling had ordered PG&E to remove extra-record evidence from its coordinated brief on

---

[484] *CPSD Motion to Strike* at 4.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 248 of 565

fines and remedies. PG&E's inclusion of the very same extra-record evidence in its appeals can only be construed as a direct violation of our June 3, 2013 Ruling. Accordingly, we grant the *CPSD Motion to Strike* and strike from PG&E's appeals of this POD, the San Bruno POD and the Recordkeeping POD the references to extra-record evidence identified by CPSD in Exhibit F of the *Declaration of Harvey Y. Morris in Support of Motion to Strike*. Further, we give no weight to any references to shareholder funding of safety improvements to PG&E's gas transmission pipeline system unless those references are supported by record evidence that has been tested and subject to cross-examination.

CPSD also filed on October 15, 2014 *Motion of the Consumer Protection and Safety Division for an Order to Show Cause as to Why Pacific Gas and Electric Company Should not be Held in Contempt, or Fines Imposed (CPSD OSC Motion)*. This motion was opposed by PG&E and supported by San Bruno. CPSD alleges PG&E's inclusion of extra-record evidence regarding alleged PG&E shareholder funding violates a June 3, 2013 Ruling. As discussed above, we agree that PG&E's inclusion of this extra-record evidence in its appeals rises to the level of a violation of our June 3, 2013 Ruling and sanctions should be imposed. Nonetheless, we decline to grant the *CPSD OSC Motion* in this instance.

Our decision to not grant the *CPSD OSC Motion* does not diminish the seriousness of this violation. PG&E's apparent failure to comply with our June 3, 2014 Ruling is a serious violation. However, the Commission has already initiated other enforcement proceedings against PG&E for violations associated with its natural gas pipeline system,[485] and we will also be considering in this

---

[485] *See, e.g.,* Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with respect to Facilities Records for its Natural Gas Distribution System Pipelines (I.14-11-008).

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 249 of 565

proceeding whether further action should be taken concerning the alleged ex parte communications violations. If further action is taken against PG&E for violations of the Commission's ex parte rules, it could require significant Commission resources and result in further sanctions imposed on PG&E. In light of those considerations, we do not believe that it is necessary in this instance to pursue sanctions for this violation, especially since we have ordered the extra-record evidence to be struck from PG&E's appeals.

On November 14, 2014, CSB filed *Motion to Strike Extra-Record Material from Pacific Gas and Electric Company's Response to Appeals and Requests for Review of the Presiding Offices' Decision on Fine and Remedies*. The motion concerns a footnote regarding payments from PG&E to CSB. We agree with CSB that this footnote refers to extra-record evidence and therefore grant the motion and strike Footnote 42 on page 11 of *Pacific Gas and Electric Company's Response to Appeals and Requests for Review of the Presiding Officers' Decision on Fines and Remedies.*

On December 15, 2014, San Bruno filed *City of San Bruno's Motion to Compel Pacific Gas and Electric Company to Respond to Data Request Seeking Production of Documents and to Appoint a Special Discovery Master, or in the Alternative, to Set Aside Submission and Reopen the Record; Declaration of Britt K. Strottman in Support of City of San Bruno's Motion to Compel Pacific Gas and Electric Company to Respond to Data Request Seeking Production of Documents and to Appoint a Special Discovery Master, or in the Alternative, to Set Aside Submission and Reopen the Record; Proposed Ruling Granting Motion of the City of San Bruno to Compel Discovery and Appointing a Special Discovery Master*. This motion, concerning 65,000 email communications between PG&E and the Commission, is essentially the same as a motion filed in Application (A.) 13-12-012. In a January 13, 2015 ALJ Ruling issued in A.13-12-012, CSB's motion to compel was granted in part and denied in part. As such, San Bruno's motion in this proceeding is rendered moot.

Unless specifically discussed in this section, all outstanding motions filed in all three proceedings that have not yet been ruled on are hereby denied.

## 11.    Appeals and Requests for Review of Presiding Officers' Decision

CARE filed its appeal of the Presiding Officers' Decision (POD) on September 17, 2014.[486]  PG&E, CPSD, CSB and Joint Appellants (TURN, DRA and CCSF) filed appeals on October 2, 2014.  Commissioners Florio, Sandoval and Picker each filed a Request for Review on October 2, 2014.[487]  CPSD filed its response to CARE's appeal on October 2, 2014.  PG&E, CPSD, CSB and Joint Parties filed responses on October 27, 2014.

The grounds of the appeals and requests for review are discussed below. Where noted, this decision has been revised in response to the appeals or requests for review.  In all other respects, the appeals and requests for review are denied.

### 11.1.  Number of Violations

#### 11.1.1.  Duplicative and Overlapping Violations

##### 11.1.1.1.    Alleged Duplication Among Proceedings

PG&E argues that "egregious examples of duplicative violations occur across the different PODS."[488]  PG&E claims that such duplication is in

---

[486]  CARE's appeal, filed in all three Pipeline OIIs, fails to state specific grounds as to why the POD is unlawful.  Further, CARE relies on evidence that is not in the record of any of the OIIs. As such, the arguments raised in CARE's appeal have been accorded little weight.  (See, Commission's Rules of Practice and Procedures, Rule 14.4(c).)

[487]  On October 15, 2014, Commissioner Florio recused himself from further participation in the Pipeline OIIs.  This decision therefore does not address the issues raised in his request for review.

[488]  *PG&E Appeal* at 27.  PG&E's reference to "the different PODs" means the *Presiding Officers' Decision on Fines and Remedies to Be Imposed on Pacific Gas and Electric Company for Specific Violations in Connection with the Operation and Practices of its Natural Gas Transmission System Pipelines* (POD) as well as the PODs in I.12-01-007, I.11-02-016, and I.11-11-009 (San Bruno POD,
*(Footnote continued on next page)*

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 251 of 565

contravention of "[a] fundamental principle of statutory construction, with roots in due process principles, … that a statute cannot be interpreted to allow the imposition of 'double penalties for the same conduct.'"[489]  PG&E goes on to assert that this "fundamental principle" is contravened by the POD's finding of "multiple and overlapping violations of the same statutory and regulatory provisions based on the same conduct and course of conduct."[490]

However, the POD has not found multiple violations of the same law for the same conduct.  On the contrary, it has considered PG&E's allegations of duplication and overlap of violations, found that certain instances of such duplication or overlap occurred, and removed those violations for purposes of assessing penalties.[491]

In one example of alleged duplication, PG&E claims that the POD relies on findings of deficiencies in its GIS data from both the San Bruno and Recordkeeping OIIs.[492]  PG&E claims this is improper and disagrees with the POD's justification of separate treatment because "the San Bruno violation is found under 49 C.F.R §192.917(b) while the Records violations are based on §451."[493]  This example does not uphold PG&E's duplication argument.  Even if the same conduct or course of conduct were at issue, we do not accept PG&E's contention that a single course or instance of conduct can only lead to a single

---

*(Footnote continued from previous page)*

Recordkeeping POD, and Class Location POD, respectively; also referred to collectively as the Violations PODs) (See *PG&E Appeal* at 1, fn 2.)

[489] *PG&E Appeal at 27*, citing *De Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Cruz Mobile Estates*, 94 Cal. App 4th 890, 912 (2001).

[490] *PG&E Appeal* at 27.

[491] POD at 21-24.

[492] *PG&E Appeal* at 28.

[493] *PG&E Appeal* at 28, referring to the POD at 23.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 252 of 565

violation.  Violation of each regulation or statute is a separate and distinct offense.  Applying PG&E's argument would lead to absurd results as discussed in the three Decisions on violations.[494]  By considering PG&E's conduct a single course of conduct, we would be ignoring the decades of inattention and failure to comply with both state and federal regulations with regards to PG&E's duty to have accurate recordkeeping, accurate pipeline classifications and the public's expectation that PG&E is running its entire system at the minimum in accordance with all required safety practices.  Indeed, this Commission expects more out of our utilities.   We expect our utilities to be leaders in developing best practices in pipeline safety.  Accordingly, PG&E can and should be held responsible for its multiple violations of different laws.

PG&E contends that another example of the POD's improper use of allegedly duplicative violations is its reliance on the Violations PODs' findings of violations related to SMYS values greater than 24,000 psi.[495]  Here, PG&E is referring to San Bruno OII Violation 4, Recordkeeping Violation 21, and Class

---

[494] Those Decisions illustrated the problem with PG&E's argument by use of the following hypothetical:  Albert is in a club and takes a speedball (heroin and cocaine).  He decides to leave, but he doesn't have a car, because his license has been suspended for a prior drug DUI that he is still on probation for.   He steals the car keys of one of his companions and takes their car.   As he drives off, Albert hits another car but keeps going until he crashes into a light pole. The police come and arrest him.  Albert is charged with: 1) driving with a suspended license (Vehicle Code § 14601); 2) driving under the influence of drugs (Vehicle Code § 23152(e)); 3) being under the influence of a controlled substance (Health and Safety Code § 11550(a)); 4) driving or taking a vehicle that is not his own (Vehicle Code § 10851); 5) hit-and-run (Vehicle Code § 20002); and 6) a probation revocation (and resulting penalties) on his prior drug DUI. Under PG&E's "fundamental principle" theory, Albert could only be charged with one count of a drug DUI, as he really only did one thing wrong (driving while under the influence of drugs). Or, to take PG&E's argument to its logical extreme, the only thing Albert really did wrong was taking the drugs (the rest flowing from that one course of conduct), so he could only be charged with one count of being under the influence of a controlled substance.

[495] *PG&E Appeal* at 27.

Location Violation 1.[496]  PG&E argues that "the fact that an assumed value – once assumed, and even if it should not have been – is utilized in various aspects of PG&E's pipeline operations does not form a proper basis for multiple violations premised on the same initial act."[497]  PG&E appears to be arguing that if it is found to have incorrectly assigned a yield strength above 24,000 psi on Segment 180 in 1956, it can never again be held responsible for a violation for any action involving SMYS values above 24,000 anywhere on its pipeline system.  Such an argument is absurd on its face and must be rejected.  As the POD explains, the San Bruno violation pertains to Segment 180, while the Class Location violation pertains to 133 pipeline segments that do not include Segment 180.[498]  Similarly, the Recordkeeping violation concerns incorrect data in survey sheets, which was not a factor in the San Bruno or Class Location violations.[499]  Even if all three violations involve SMYS values greater than 24,000 psi, that does not mean they are the same or overlap.

PG&E next claims that San Bruno Violation 7 and Recordkeeping Violation 4 are the same because both are "based on the absence of the same records relating to Line 132."[500]  PG&E purports to acknowledge that the POD addressed this issue by noting that the San Bruno POD addressed records issues in the 1950s whereas the Recordkeeping POD addressed the absence of records of

---

[496] *PG&E Appeal* at 27.  As CPSD notes (CPSD Response at 28, fn 20), PG&E's Appeal switches between adopted and alleged violation numbers.  However, Appendix B of the Recordkeeping POD and Appendix B of the San Bruno POD delineate between alleged and adopted violation numbers.  Unless otherwise indicated, violation numbers refer to the adopted violations as set forth in those appendixes.

[497] *PG&E Appeal* at 27.

[498] POD at 21-22.

[499] POD at 22.

[500] *PG&E Appeal* at 28.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 254 of 565

pressure testing decades later.[501] Nevertheless, PG&E fails to explain why a one-time violation found to have occurred in 1956 duplicates another violation found to have continued from 2004 to 2010. Moreover, even if the same absence of records underlies both violations, PG&E fails to address the POD's explanation that the violations have a different focus -- the San Bruno violation concerns PG&E's failure to account for the conditions, characteristics, and specifications for the pups whereas the Recordkeeping violation concerns PG&E's failure to first conduct a hydrostatic test.[502] There is no duplication or overlap of these two violations.

Finally, PG&E argues that San Bruno Violation 18 and Recordkeeping Violation 5 are duplicative because both pertain to PG&E's clearance documentation.[503] However, the former is a violation of 49 CFR 192.13(c) while the latter is a violation of Section 451. As noted above, a single course of conduct can result in the violation of more than one law. Therefore, these violations are not duplicative.

### 11.1.1.2. Alleged Duplication Within Proceedings

PG&E contends that San Bruno Violations 1 through 7 are encompassed within San Bruno Violation 8 and that San Bruno Violations 18 and 19 (Violations of 49 CFR 192.913(c) and Section 451, respectively) are duplicative because they are for the same conduct.[504] The latter contention is without merit because, as noted above, a single course of conduct can result in two or more separate violations of law. Also, PG&E fails to recognize the San Bruno POD's holding

---

[501] *PG&E Appeal* at 28.

[502] POD at 22.

[503] *PG&E Appeal* at 28.

[504] *PG&E Appeal* at 28-29.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 255 of 565

that that failure to follow a work procedure in violation of 49 CFR 192.913(c) "was not just a technical violation of federal regulations; it was [also] unsafe" in violation of Section 451.[505]

With respect to San Bruno Violations 1–7 allegedly being encompassed within Violation 8, we first note that the POD determined that San Bruno Violation 1 was similar to the more inclusive Recordkeeping Violation 3 and therefore excluded it from the total number of violations considered for fines and remedies.[506]  Accordingly, PG&E's contention is moot as to San Bruno Violation 1.  Also, each of San Bruno Violations 2-7 is a one-time violation that was found to have occurred in 1956 in connection with the installation of Segment 180, whereas San Bruno Violation 8 is a continuing violation calculated from December 31, 1956 to September 9, 2010.  From a timing aspect alone it is not reasonable to characterize San Bruno Violations 2-7 as being "encompassed" within San Bruno Violation 8.  Moreover, the subject matter of San Bruno Violation 8 pertains to PG&E's failure to install suitable and safe pipe on Segment 180 as necessary to promote the safety of the line as well as its failure to remediate the unsafe condition for decades,[507] whereas San Bruno Violations 2-7 arise from a series of discrete safety-related failures that occurred in 1956.[508] PG&E's noncompliance with Section 810.1 of ASME B31.1.8-1955 (requiring suitable and safe materials and equipment) is separate and distinct from its noncompliance with the requirement to visually inspect the pups and other such requirements where it failed to comply.  We therefore find that PG&E's

---

[505]  San Bruno POD at 156.

[506]  POD at 22.

[507]  San Bruno POD at 93.

[508]  San Bruno POD at 79-91.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 256 of 565

contention that San Bruno Violation 8 encompasses San Bruno Violations 1 through 7 lacks merit.

PG&E next contends that Recordkeeping Violation 19 duplicates Recordkeeping Violation 33.[509] We disagree. Although both violations relate to leak records, they are two distinct violations. Recordkeeping Violation 19 concerns leak records with inaccurate and/or missing data, while Recordkeeping Violation 33 concerns PG&E's failure to maintain a "definitive, complete and readily accessible database of all leaks for their pipeline system."[510] PG&E's bases its arguments that these two violations are duplicative on the grounds that the violations "are premised on the same course of conduct, namely PG&E's historic practices for maintaining leak records."[511] However, as we have discussed elsewhere in this POD, PG&E's "same course of conduct" consisted of multiple discrete courses of action, each of which would be considered a violation. In this instance, PG&E's "historic practices" resulted in both failing to maintain complete and accurate leak records and failing to maintain a database to access leak information. Accordingly, we find PG&E's arguments to be without merit.[512]

PG&E also contends that Recordkeeping Violation 1 should be subsumed within Recordkeeping Violation 2 because the pipeline specifications for Segment 180 are a subset of the records the Recordkeeping POD finds should be

---

[509] *PG&E Appeal* at 29.

[510] Recordkeeping POD at 245-246.

[511] *PG&E Appeal* at 29.

[512] PG&E further appears to suggest that the Recordkeeping POD found these violations because of the "decentralized nature of [PG&E's leak] records." (*PG&E Appeal* at 29.] PG&E is incorrect. The Recordkeeping POD clearly notes that regardless of PG&E's approach to recordkeeping (centralized vs. decentralized), "it is still required to retain records to ensure the safe operation of its gas transmission pipeline system." (Recordkeeping POD at 204.)

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 257 of 565

included in the job files.[513]  However, Recordkeeping Violation 1 relates to the lack of pipe inventory records, while Recordkeeping Violation 2 concerns the lack of design or construction records for the construction for the installation of Segment 180.  These are distinct violations and PG&E is incorrect that Recordkeeping Violation 1 should not be counted as an independent violation.

PG&E claims that the Class Location POD improperly counts violations of various standards and rules on a per-segment basis.[514]  However as we have discussed in the Class Location POD, the Federal Regulations refer specifically to "segments" of pipeline and each segment of pipeline must comply with multiple federal regulations.[515]  Violation of each regulation is a separate and distinct offense.  As we have discussed above, to conclude otherwise would lead to an absurd result.

Finally, PG&E claims the Class Location POD improperly finds "cascading violations" when it finds at various points that PG&E's failure to correctly designate the classification of a segment constituted a violation of applicable standards, then finds that the consequences of those violation themselves constituted separate violations.[516]  PG&E's assertions, however, fails to acknowledge that classification of a segment and applying the correct MAOP to a pipeline segment are two separate and distinct activities, governed by different regulations under the CFR.[517]  As we have discussed in this POD, as well as in

---

[513] *PG&E Appeal* at 29.

[514] *PG&E Appeal* at 29.

[515] Class Location POD, Sections 7.2 and 12.1.

[516] *PG&E Appeal* at 30.

[517] See, 49 CFR § 192.13(c) & 49 CFR § 192.611.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 258 of 565

the Violations PODs, violation of each regulation or statute is a separate and distinct offense.  Accordingly, we find PG&E's claims to be without merit.

### 11.1.1.3.  "Other" Alleged Duplication

PG&E claims that "other duplicative findings across and within the PODs account for thousands of the adjudicated findings."[518]  Apart from including a footnote that lists certain violations adopted in the three Violations PODs, however, PG&E offers no explanation of why such violations are duplicative.[519] We therefore give this claim no weight.

### 11.1.2. Hindsight

PG&E claims that the PODs improperly find violations based on hindsight, *i.e.*, where the "circumstances surrounding the violation [were not] known or at least knowable to the party at the time of the event."[520]  Citing *Lambert v. California,* PG&E argues that even for strict liability offenses, "while the party need not intend for the violation to occur, the facts that render the conduct unlawful must at least be discernible to the party at the time."[521]  However, *Lambert* is inapposite because there, the appellant had "no actual knowledge of the requirement that she register" pursuant to a city ordinance that required felons to register within five days.  In other words, the appellant knew that she was a felon.  What she did not know is that the law required felons to register with the city.

---

[518] *PG&E Appeal* at 30.

[519] *PG&E Appeal* at 30, fn 105.

[520] *PG&E Appeal* at 36.  Although PG&E refers to "the PODs," the discussion of hindsight at pages 36-37 of the PG&E Appeal is limited to the San Bruno POD.

[521] *PG&E Appeal* at 36, citing *Lambert v. California (Lambert)* 355 U.S. 225, 228 (1957).

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 259 of 565

Here, in contrast, PG&E was aware of the law but alleges ignorance of the facts underlying the violation. Also unlike here, *Lambert* did not involve a strict liability health and safety offense. As the San Bruno POD noted, public welfare offenses are strict liability offenses.[522] A strict liability offense is an unlawful act which does not require proof of mental state.[523] Thus, the PODs do not need to establish PG&E's mental state with regard to the alleged violations. PG&E violated the law when it placed the flawed pups into service, and much like a driver who speeds, the reasons why are irrelevant. PG&E's ignorance of the pups and their condition is not a defense.

Moreover, as the San Bruno POD discusses, PG&E's actual ignorance of the flawed pups is questionable as there were numerous instances where PG&E could have and should have discovered the flaws in the pups but failed to do so.[524] Finally, as the San Bruno POD also noted, the law requires that PG&E know what it has in its system, as "[f]urnishing and maintaining safe natural gas transmission equipment and facilities requires that a natural gas transmission system operator know the location and essential features of all such installed equipment and facilities."[525] It is not acceptable that a public utility like PG&E did not know the nature of the pipes it puts in the ground. PG&E is responsible because, as a public utility operating dangerous natural gas pipelines, it has a duty to know the condition of those pipelines.

---

[522] San Bruno POD at 45.

[523] Black's Law Dictionary, 6th Ed.

[524] San Bruno POD at 46-48.

[525] San Bruno POD at 45, citing D.12-12-030 at 91-92.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 260 of 565

### 11.1.3. Alleged New Charges

PG&E argues that "new charges [were] introduced after the accused [had] already made its defense."[526]  However, as explained in the San Bruno POD[527] and below, no new charges were made against PG&E after the close of the hearings.  All of CPSD's allegations were contained in the San Bruno OII, the CPSD Report[528] and supporting testimony, and the Scoping Memo, all of which were provided to PG&E months before the hearings.

PG&E has alleged that the CPSD Report is the "charging document" in this investigation.[529]  However, the San Bruno POD explains that the OII itself is a source of notice of the violations.[530]  Just as the indictment, not the police report, is the charging document in a criminal case, the OII, not the CPSD Report, is the charging document here.

PG&E asserts that it cannot be required to "decipher and distill" from the CPSD Report the "legal basis" for CPSD's alleged violations.[531]  However, PG&E has not cited any authority for the proposition that CPSD must present all of its legal arguments in advance of its opening briefs.  As the San Bruno POD correctly noted, "if a statement of alleged facts constituting a violation is set forth in the OII or in its referenced documents [i.e., the NTSB, IRP, and CPSD reports],

---

[526] *PG&E Appeal* at 42.  Although PG&E refers to "the PODs" in the heading for this discussion, the discussion of belatedly-asserted allegations at pages 42-44 of the PG&E Appeal is limited to the San Bruno POD.

[527] San Bruno POD, Section 4.5.

[528] *Consumer Protection and Safety Division Incident Investigation Report, September 9, 2010 PG&E Pipeline Rupture in San Bruno, California*, received in evidence in I.12-01-007 as San Bruno Exhibit CPSD-1.

[529] *PG&E Appeal* at 42-43.

[530] San Bruno POD at 52-53.

[531] *PG&E Appeal* at 44.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 261 of 565

then PG&E had adequate notice prior to evidentiary hearings of the factual allegations that it needed to defend against."[532]

PG&E claims that it must be provided with "clear and effective notice."[533] However, it is well-established that due process requires "adequate notice" and an opportunity to be heard. PG&E ignores the controlling California Supreme Court case in this area, *People v. Western Airlines*, which states: "Due process as to the commission's initial action is provided by the requirement of adequate notice to a party affected and an opportunity to be heard before a valid order can be made."[534] In a recent decision, the Commission described the due process notice requirements as follows:

> Constitutional due process protections require this Commission, in broad terms, to give parties adequate notice and an opportunity to be heard. (*People v. Western Airlines, Inc.* (1954) 42 Cal.2d 621, 632.) Parties are normally entitled to know the subject matter of a proceeding, to know what information this Commission will consider when it addresses those subjects, and to have an opportunity to present their views to us.[535]

PG&E complains that "[t]he San Bruno POD notes that the original charges consistently alleged that '49 CFR Parts 192 and 199 and Section 451 are applicable,' but 49 C.F.R Part 192 contains the entire set of federal regulations addressing gas pipeline construction, operation, maintenance, integrity management, written policies and procedures and emergency response,

---

[532] San Bruno POD at 50.

[533] *PG&E Appeal* at 44.

[534] *People v. Western Airlines, Inc.* (1954) 42 Cal. 2d 621, 632; 1954 Cal. LEXIS 193.

[535] *Order Modifying Decision 11-12-053 and Denying Rehearing of the Decision as Modified* [D.12-08-046.] at 28 (slip op.).

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 262 of 565

including hundreds, if not thousands, of regulatory provisions.[536]  PG&E goes on to argue that "[a]lleging that an operator violated 49 C.F.R Part 192 (or 49 CFR Part 199, or § 451) is only slightly more meaningful than alleging that the operator 'violated federal law.'"[537]  This distorts what was actually stated in the San Bruno POD.  A fair reading of the San Bruno POD demonstrates that it was not content to allow CPSD to merely allege that PG&E had violated unspecified provisions of Parts 192 and 199 of Title 49.[538]

The fact is that the San Bruno OII provided PG&E notice of the violations and an opportunity to respond, as the following example demonstrates.  PG&E has claimed that it was not adequately placed on notice of violations of 49 CFR § 192.615, which applies to emergency plans and procedures.[539]  49 CFR § 192.615, which was referenced in Section X of the CPSD Report, contains more than one requirement.  In its Opening Brief in the San Bruno OII, CPSD referred to the different provisions of 49 CFR § 192.615 that mandate that operators' emergency plans provide for "receiving, identifying, and classifying notices of events" as well as "emergency shutdown and pressure reduction" in an emergency situation.  Thus, PG&E was adequately on notice, especially in light of the fact that the factual allegations underpinning the violations were fully described in the CPSD Report.

Moreover, PG&E's claim that it was unaware of the emergency plans and procedures violation allegations is undermined by the fact that its prepared testimony in the San Bruno OII presented PG&E's defenses to the specific

---

[536]  *PG&E Appeal* at 43.

[537]  *PG&E Appeal* at 43-44.

[538]  San Bruno POD at 49-60.

[539]  *PG&E Appeal of San Bruno POD* at 25.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 263 of 565

subsections that it now claims it was unaware of.  That testimony contains factual arguments as to why PG&E's emergency plans were legally sufficient.[540] On page 5 of Chapter 11, PG&E states that "PG&E had a written, comprehensive plan in effect that met the requirements of § 192.615."  PG&E then goes on to describe how its plans assertedly met all of the subsections of 49 CFR § 192.615. For example, 49 CFR § 192.615(a)(1) ("receiving, identifying, and classifying notices of events") is addressed on pages 14 and 15 of Chapter 11.  Part 192.615(a)(8) ("notifying appropriate fire, police, and other public officials") is addressed on pages 15 and 16.  49 CFR § 192.615(b)(2) ("failure to properly train personnel") is addressed on pages 14, 15, 17, and 20.  PG&E specifically reprinted 49 CFR § 192.615(a)(1) through (a)(8) in its testimony.  At pages 3–5 of Chapter 11, PG&E reprinted the entirety of 49 CFR § 192.615, including every subsection of (a)(1) through (a)(8), (b)(1) to (b)(4), and (c)(1) to (c)(4).  49 CFR § 192.615(a)(3) relates to "prompt and effective" responses to emergencies.  The text of (a)(3) is reprinted on page 3 of Chapter 11.  On page 12 of Chapter 11, PG&E explains that its emergency plans call for its personnel to "gather critical information to promptly initiate the operator's response efforts", and cites to 49 CFR § 192.615(a).  In Attachment C to Chapter 11, PG&E includes copies of its emergency plans, which contain the following:

> Section 192.615(a)(3)(i) allows operators latitude in responding to notices of gas odor inside buildings. As long as an operator's response is "prompt" and is "effective" in minimizing the hazard, there would be little reason, if any, to challenge the appropriateness of the operator's procedures.[541]

---

[540] San Bruno Exhibit PG&E-1, Chapter 11.

[541] Page 71 of PG&E's Emergency Plans, San Bruno PG&E-1, Chapter 11.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 264 of 565

PG&E would not have presented a defense to allegations of violations of 49 CFR § 192.615 and its subsections if it were truly unaware of them being at issue.  PG&E had an opportunity to respond to the charges against it and did so.

## 11.2.  Penalties Imposed

### 11.2.1.  Violations under Pub. Util. Code § 451

As with its appeals of the Violations PODs, PG&E contends that Pub. Util. Code § 451 is a ratemaking statute and may not serve as a basis for finding violations.[542]  Among other things, PG&E notes that § 451 is placed within the "Rates" article of the Public Utilities Code and argues that the language of the statute "requires a balancing of rates against the proper level of service."[543]  Further, PG&E argues that Pub. Util. Code § 451 cannot be read as imposing a stand-alone safety obligation, as that would "render superfluous entire provisions of the Public Utilities Code and every Commission regulation that requires any safety measure of any kind."[544]  Finally, PG&E asserts that Pub. Util. Code § 451 cannot be interpreted "to incorporate extrinsic safety standards," particularly ASME B.31.8.[545]

Many of PG&E's arguments have already been considered and rejected in Sections 4.2, 9.1 and 9.6 of the *San Bruno Violations Decision*, Sections 5.3 and 14.1 of the *Recordkeeping Violations Decision*, and Sections 9 and 12.6 of the *Class Location Violations Decision*.  We find no reason for repeating our discussion in those decisions verbatim here, but rather summarize our discussions in the violations decisions here and incorporate their full discussion by reference.

---

[542] *PG&E Appeal* at 18.

[543] *PG&E Appeal* at 19.

[544] *PG&E Appeal* at 20.

[545] *PG&E Appeal* at 24.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 265 of 565

PG&E's statutory construction argument is contradicted by *Gay Law Students Ass'n v. Pac. Tel & Tel. Co. (Gay Law Students Ass'n)* (1979) 24 Cal.3d 458. In *Gay Law Students Ass'n*, the California Supreme Court addressed a complaint alleging in part that PT&T illegally practiced discrimination against homosexuals in the hiring, firing and promotion of employees. The complainant sought declaratory and injunctive relief to prevent PT&T from continuing such practices. The Court rejected PT&T's argument that Pub. Util. Code § 453(a) was "limited only to a prohibition of rate or service-oriented discrimination."[546] Rather, the Court found that Pub. Util. Code § 453(a) "prohibits a public utility from engaging in arbitrary employment discrimination."[547] As relevant here, Pub. Util. Code § 453 is also within the same "Rates" article of the Public Utilities Code as section 451. Thus, just as the California Supreme Court held that Pub. Util. Code § 453 is not merely a ratemaking provision, Pub. Util. Code § 451 cannot be limited to ratemaking either. Furthermore, PG&E fails to recognize Pub. Util. Code § 6 which states: "Division, part, chapter, article, and section headings do not in any manner affect the scope, meaning, or intent of the provisions of this code." PG&E's reliance on the heading of an article in its attempt to undermine Pub. Util. Code § 451's safety obligation is contrary to § 6 and we therefore reject it. Finally, we note that the language of § 451 does not expressly grant any authority to the Commission. Rather, the express language of § 451 only imposes various requirements on the utility, e.g., that its rates be reasonable and that its facilities be safe. This fact undermines PG&E's argument that § 451 is directed at "the factors *the Commission* must balance when

---

[546] *Gay Law Students Ass'n v. Pac. Tel & Tel. Co.,* 24 Cal.3d at p. 478.

[547] *Gay Law Students Ass'n v. Pac. Tel & Tel. Co.,* 24 Cal.3d at p. 475.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 266 of 565

determining the level of service to require in exchange for reasonable rates . . . "[548]

Other considerations further undermine PG&E's attempt to frame Pub. Util. Code § 451 as a balancing of rates and service. In *Cingular*, the California Court of Appeal upheld the Commission's imposition of a fine on a wireless carrier under Pub. Util. Code § 451 even though the court found that the Commission was preempted by federal law from regulating rates of wireless carriers. In other words, the court held that the Commission may find violations under the second paragraph of Pub. Util. Code § 451, even where the first paragraph is inapplicable because no rate issue is directly presented.[549] Moreover, even under the construct described by PG&E, i.e., that Pub. Util. Code § 451 provides for a balancing of rates and other considerations that include safety, there is nothing to suggest that safety is not an absolute duty under Pub. Util. Code § 451. The fact that the safety obligation appears in an article entitled "Rates" does not diminish the significance of that obligation.

PG&E challenges the Commission's reliance on *Cingular* on the grounds that "Cingular had nothing to do with safety."[550] However, we did not rely on *Cingular* for the proposition that Pub. Util. Code § 451 serves as a basis for safety requirements.[551] Rather, *Cingular* affirms our conclusion that the second paragraph of Pub. Util. Code § 451 is a stand-alone provision, independent of

---

[548] *PG&E Appeal* at 20 (emphasis added).

[549] *Pacific Bell Wireless (Cingular) v. PUC, supra,* 140 Cal.App. 4th at p. 723.

[550] *PG&E Appeal* at 22.

[551] This second paragraph states, in relevant part: "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities … as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees and the public."

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 267 of 565

ratemaking.  Indeed, the *Cingular* Court stated: "Even in the absence of a specific statute, rule or order barring the imposition of an EFT without a grace period, or barring the specific nondisclosures identified by the Commission in this case, Cingular can be charged with knowing its actions violated section 451's requirement that is provide 'adequate, efficient, just and reasonable service' to its customers."[552]  Similarly in this instance, PG&E can be charged with violating Pub Util. Code § 451 for not providing "instrumentalities, equipment, and facilities" necessary to promote the safety of its customers.  *Cingular* clearly supports this conclusion.

PG&E's argument that Pub. Util. Code § 451 cannot be read as imposing a stand-alone safety obligation has been rejected by the California Courts.  The California Court of Appeal has cited numerous instances where Pub. Util. Code § 451's mandate for public utilities to operate safely has been invoked on a stand-alone basis.[553]  In *Cingular* the California Court of Appeals specifically addressed the argument that  Section 451 is void for vagueness and rejected it.[554]  The Court examined Cingular's alleged conduct and rhetorically asked:  "how could [Cingular] have notice that this conduct would violate section 451?"[555]  The Court found that Cingular could reasonably discern from the Commission's interpretations of Pub. Util. Code § 451 that its conduct in that case would violate

---

[552] *Cingular*, *supra*, 140 Cal.App. 4th at p. 740.

[553] See, e.g., *Cingular, supra,* 140 Cal.App. 4th at p. 751.

[554] "We agree that section 451 is not void for vagueness on its face. (*Carey v. Pacific Gas and Electric Company* (1999) 85 Cal.P.U.C.2d 682, 689 ["it would be virtually impossible to draft Section 451 to specifically set forth every conceivable service, instrumentality and facility which might be defined as 'reasonable' and necessary to promote the public safety. That the terms are incapable of precise definition given the variety of circumstances likewise does not make Section 451 void for vagueness, either on its face or in application to the instant case." (140 Cal.App. 4th at p.741, n. 10.)

[555] *Id.*

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 268 of 565

the statute.  Similarly here, the Violations PODs do not impose "arbitrary or capricious" interpretations on Pub. Util. Code § 451, but in fact grounds the violations in well-known industry standards and guidelines in effect in the 1950s. PG&E was more than adequately on notice that standards such as ASME B.31.8 created guidelines for good safety practices.  In addition, in *Carey v. Pacific Gas & Electric Company* [D.99-04-029] (1999) 85 Cal. P.U.C. 2d 682, the Commission specifically invoked Pub. Util. Code § 451 for a stand-alone safety violation.

We further disagree with PG&E's argument that interpreting Pub. Util. Code § 451 as imposing a stand-alone safety obligation would render superfluous entire provisions of the Public Utilities Code and Commission regulations that require any safety measure.  Section 5.3.2 of the Recordkeeping POD specifically addresses this allegation and discusses the complementary relationship between the general, overarching safety obligation established by Pub. Util. Code § 451 and other, specific gas pipeline safety requirements.

Finally, PG&E states: "Although [Pub. Util. Code] § 451 did not and does not grant authority for the Commission to impose sanctions for particular violations of 'safety' standards, it clearly allows the Commission to consider a utility's record on 'safety' issues in setting rates…"[556]  PG&E does not cite to any authority to support this assertion.  Moreover, as noted by CPSD, PG&E's argument is contradicted by the testimony of its own expert witness in the San Bruno OII.[557]  In the San Bruno OII, PG&E witness O'Laughlin stated that the authorized revenue requirement and the amount PG&E should spend on reliable

---

[556] *PG&E Appeal* at 23.

[557] *CPSD Response* at 21.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 269 of 565

and safe service "are two independent questions or two independent items."[558] Accordingly, we find this assertion to be without merit.

### 11.2.2.  Level of Penalties

The level of penalties imposed is the subject of both appeals and requests for review.  PG&E asserts that a $1.4 billion penalty is too high, and raises various arguments why the amount should be lower in its appeal.  Joint Parties, on the other hand, argue that in light of the number of violations found in the three decisions on violations, as well as the potential maximum and minimum fines authorized under Pub. Util. Code §§ 2107 and 2108, "penalties of over $2 billion are not just warranted, but necessary to ensure that PG&E fully comprehends the reprehensible nature of the way it has conducted its business for the past 60 years and to deter any utility from allowing the type of carelessness and mismanagement that led to the San Bruno explosion."[559] Finally, both Commissioners Picker and Sandoval seek review to determine whether the level of fines and refunds ordered in the POD is adequate.[560]  We have considered the arguments presented in the appeals and the requests for review of Commissioners Picker and Sandoval and conclude that there should be a noticeable increase in the level of penalties, while maintaining that level well within PG&E's ability to pay.

As discussed in Section 5 above, our determination of the penalty to be imposed took into consideration the factors identified in D.98-12-075.  In particular, we considered PG&E's financial resources.  Under Pub. Util. Code

---

[558]  8 RT (San Bruno OII) at 616; see also San Bruno POD at 200.

[559]  *Joint Parties' Appeal of the Presiding Officers' Decision on Fines and Remedies in the Pipeline Investigations* filed October 2, 2015, at 12.

[560]  *Request for Review [of Commissioner Picker],* filed October 2, 2014, at 2; *Request for Review [of Commissioner Sandoval]*, filed October 2, 2014, at 2.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 270 of 565

§§ 2107 and 2108, if every day of violation were charged as a separate violation, the potential fine to be imposed would have been $9.2 billion, or nearly a third of PG&E's market capitalization. However, a fine of that magnitude would have significantly affected PG&E's ability to provide safe and reliable gas and electric service to its customers. The *Overland Report* has provided guidance on the maximum level of penalties PG&E could sustain without negatively impacting its ability to raise equity for revenue-producing investments. The penalty we adopt in this decision, which is comprised of a fine paid to the General Fund, a one-time bill credit to ratepayers, shareholder funding of gas infrastructure improvement and other remedies, will allow PG&E to provide safe and reliable gas and electric service, while still providing notice to all gas pipeline operators of the need to maintain and operate their pipeline systems in compliance with all federal and state safety requirements.

PG&E's argument that the Decision must take into consideration "other unrecoverable gas safety-related PSEP and Gas Accord V costs that PG&E's shareholders have incurred or will incur"[561] has been addressed in Section 6, above. Here, we merely add that, as noted by CPSD, PG&E's efforts to include all expenses it allegedly had already incurred or may incur in the future would essentially allow PG&E to decide what it should pay for its violations.

### 11.2.3. Allocation of Penalties

Some of the appeals seek to change how the penalties are allocated. The Joint Parties, for example, do not propose to change the overall level of penalties, but request that the allocation be changed to reduce the fine imposed under Pub. Util. Code §§ 2107 and 2108 and to increase the disallowance to include all PSEP

---

[561] *PG&E Appeal* at 4.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 271 of 565

costs, which they estimate to be $877 million, with the remainder of $473 million still going to the General Fund. (Joint Parties Appeal at 1-2.) Joint Parties make several arguments, including one that disallowing all PSEP costs would: "…(3) better alleviate the burden on PG&E customers who will still be called upon to pay several billion dollars to improve the safety of PG&E's gas system." (Id.)

PG&E also urges that a portion of the penalties that the POD would direct to the General Fund should be redirected toward future pipeline safety enhancements.[562] PG&E presents various arguments why penalties should be directed towards pipeline safety, and summarizes them as follows:

> The ultimate purpose of monetary penalties and other remedies in these proceedings, as the Commission explained in its Order Instituting Investigation in the San Bruno docket, is "to ensure that a catastrophe of this type does not occur again." [citing San Bruno OII at 2-3.] The San Bruno accident has shed light on the need for not only PG&E but also other utilities across the state and country to make improvements to their gas pipeline infrastructure to reduce and minimize the risk of similar tragedies in the future. The best way to ensure that the remedies imposed in these proceedings achieve the Commission's goal is to direct that the penalties be used to improve pipeline safety. The unprecedented size of the penalty, the overriding public importance of pipeline safety, and the fact that PG&E has finite resources to spend on pipeline improvement projects without rate recovery all weigh in favor of directing that any penalty be invested in the gas pipeline system. Requiring PG&E to spend its own money on pipeline safety without rate recovery would act as a forceful deterrent to PG&E and other California utilities and would send a strong message about the importance of gas pipeline safety." (PG&E Appeal at 8-9.)

---

[562] *Pacific Gas and Electric Company's Appeal of the Presiding Officer's [sic] Decision on Fines and Remedies (PG&E Appeal)*, filed October 2, 2014, at 8; see also, *Request for Review [of Commissioner Picker]* at 2; *Request for Review [of Commissioner Sandoval]* at 2.

We generally agree with these policy arguments, and there are no legal constraints on implementing them. We accordingly grant in part the appeals of the Joint Parties and PG&E, and reallocate some of the moneys that the Fines and Remedies POD would have sent to the General Fund to instead be spent on improving the safety of PG&E's gas pipeline system. This is a change from the Fines and Remedies POD, and we will implement it via the current GT&S proceeding, rather than the prior PSEP proceeding (which was the assumption of PG&E and the Joint Parties). More details on this issue, and how our approach differs from the Fines and Remedies POD, are set forth in [Section 6] above.

PG&E further argues that the Fines and Remedies POD improperly justifies the $400 million disallowance based on revenues earned by PG&E's GT&S group in excess of revenue requirement between 1999 and 2010. PG&E argues that these earnings in excess of revenue requirements "were due to its 'at risk' market storage business, not any 'underspending' on gas transmission safety-related work."[563] PG&E misinterprets our discussion regarding the basis for this disallowance, which could more properly be called a bill credit. The $400 million bill credit is an equitable remedy for PG&E's failure to comply with Commission orders and state and federal regulations and statutes regarding pipeline safety; it is not based on asserted cost savings on gas transmission safety-related work. As discussed in great detail in the San Bruno POD, the record demonstrates that PG&E had intentionally cut back on transmission safety expenditures between 1999 and 2010 in a manner inconsistent with Commission orders and state and federal regulations and statutes regarding

---

[563] *PG&E Appeal* at 11-12.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 273 of 565

pipeline safety.[564]  To eliminate further confusion, we revise Section 6 of the POD to clarify this point.

PG&E also requests that Ordering Paragraph 4 be revised to permit the option of a rate reduction and/or a one –time bill credit.[565]  CPSD does not oppose this request.[566]  We do not agree that PG&E should be given the option to choose the method of payment of the $400 million.  A one-time bill credit would, however, address the concerns raised by Joint Parties regarding the mechanics associated with a revenue requirement reduction.  Accordingly, we revise Section 6 of the POD and Ordering Paragraph 4 to implement a one-time $400 million bill credit..

### 11.2.4. Proportionality and Constitutionality of Penalties

PG&E's appeal maintains that the penalty imposed is disproportionate and in violation of the Excessive Fines Clause.  We have considered PG&E's arguments regarding the proportionality and constitutionality of the penalties imposed in Sections 4.3 and 5.5.3 of this Decision.   While we do not repeat our discussion here, we address the two main arguments raised by PG&E on appeal.

First, PG&E asserts that violations did not result from intentional misconduct and "most of the violations had no practical impact on system operations."[567]  PG&E contends that it "acted at all times in good faith and with the goal of complying with all applicable regulations, rules and standards."[568]

---

[564] San Bruno POD at 201-205; see also San Bruno Exh. CPSD-168 (Harpster).

[565] *PG&E Appeal* at 15.

[566] *CPSD Response* at 13.

[567] *PG&E Appeal* at 45.

[568] *PG&E Appeal* at 45.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 274 of 565

PG&E's argument, however, is unsupported by the record in the Pipeline OIIs.  As part of our analysis in setting the penalty amount, we considered PG&E's conduct before, during and after the San Bruno explosion and fire and concluded that PG&E had demonstrated bad faith.  As discussed in Section 5.2.3 of this Decision, PG&E recognized its duty pursuant to Commission orders and federal regulations to maintain specific documents for all segments of its gas transmission pipeline system, yet did not take adequate steps to ensure compliance prior to the San Bruno explosion and fire.  The Violations Decisions discuss in detail, even when PG&E was made aware that it was in violation of applicable laws and regulations, it took no action to correct these violations.  PG&E's actions immediately after the San Bruno explosion and fire do not minimize the fact that it had neglected to take necessary actions to correct or address violations for decades prior to that incident.

Further, PG&E mistakenly believes that a lower penalty should be imposed because the violations were "unintentional" or may not have "actually caused or contributed to" the San Bruno explosion and fire.[569]  Regardless of whether the violations were due to intentional conduct, or were due to mistake, irresponsibility or incompetence, the fact remains that PG&E took no corrective action even after it was made aware of the violations.  Further, PG&E is incorrect that the violation must be directly related to the San Bruno explosion and fire before a penalty can be imposed.  PG&E is essentially arguing that there must be actual physical harm before a penalty can be imposed.  This is comparable to arguing that a driver may not be cited for exceeding the speed limit because he did not hit another vehicle.  However, as discussed in D.98-12-075, "disregarding a statutory or Commission directive, regardless of the effects on the public," will

---

[569] *PG&E Appeal* at 45 & 46.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 275 of 565

be accorded a high level of severity" due to its harm to the integrity of the regulatory process."[570]  Moreover, PG&E's arguments that the penalty is excessive because the violations were "unintentional" or caused no actual harm ring hollow because the amount proposed is significantly less than the *minimum* potential penalty of $500 per day in violation, or $9.2 billion.

PG&E's second argument is that that the POD fails to consider the fines and penalties imposed in comparable circumstances, in particular the penalties associated with the natural gas accidents in Carlsbad, New Mexico and Allentown, Pennsylvania.[571]  It contends the Excessive Fines Clause "requires consideration of sanctions imposed in analogous cases."[572]

PG&E's argument that Carlsbad and Allentown accidents are similar to the Pipeline OIIs is flawed.  As we note in Section 4.3 above, the Carlsbad and Allentown investigations focused on the accident, while the Pipeline OIIs encompass not only an investigation into the San Bruno explosion and fire, but also examination of PG&E's classification of pipeline segments in areas of higher population density and a comprehensive review of PG&E's recordkeeping practices.  Further, any potential penalties imposed as a result of the Carlsbad and Allentown accidents were limited by statute.  In the Carlsbad example, El Paso Natural Gas was governed by a federal statute, which provides for civil penalties of $200,000 per violation with the maximum civil penalty "for a related series of violations" capped at $2 million.[573]  At the time of the Allentown

---

[570] *Standards of Conduct Governing Relationships Between Energy Utilities and Their Affiliates*, 84 Cal. P.U.C.2d at 188.

[571] *PG&E Appeal* at 46.

[572] *PG&E Appeal* at 46 (citing *Hale v. Morgan* (1978) 22 Cal. 3d 388, 403 and *BMW of N. Am., Inc. v. Gore* (1996) 517 U.S. 559, 584).

[573] See 49 U.S.C. § 60122.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 276 of 565

accident, Pennsylvania law capped the civil penalty for accidents at $500,000.  In contrast, Pub. Util. Code §§ 2107 and 2108 do not establish the maximum amount of fines that may be imposed for a continuing violation or related series of violations.  Thus, although we do not deny that there are some similarities between these two accidents and the San Bruno explosion and fire, there is nothing inappropriate or disproportionate about the penalties imposed on PG&E in light of the facts presented in the Pipeline OIIs.

PG&E's reliance on *Hale* and *Gore* are equally unpersuasive.   In *Hale,* the California Supreme Court found that a penalty, pursuant to Civ. Code § 789.3, imposed on the landlord of a small mobile home park for willfully depriving his tenant of utility services for the purpose of evicting the tenant was excessive under the circumstances.  Those circumstances included the fact that the tenant had moved his mobile home onto the park premises without permission and that the total amount of fines was so large that they might result in the tenant becoming the owner of the mobile home park.[574] Furthermore, the Court was concerned that under the Civil Code section the trial court was *required* to impose an additional fine of $100 for each day of violation.[575]  Here in contrast, we are imposing penalties that would be less than the statutory minimum *if* we were imposing the minimum fine amount for each day in violation.

In *Gore,* the U.S. Supreme Court, in determining whether *punitive damages* were reasonable, compared statutory penalties for comparable misconduct, noting that a reviewing court should defer to "legislative judgments concerning appropriate sanctions for the conduct at issue."[576]  As a result, the Supreme Court

---

[574] 22 Cal. 3d at 393, 405.

[575] 22 Cal. 2d at 399.

[576]  *Gore*, *supra*, 517 U.S. at 583.

disallowed punitive damages imposed on BMW by an Alabama court that were substantially greater than the statutory fines available in Alabama and elsewhere for similar misconduct. In this instance, there is no need to refer to other statutes, as Pub. Util. Code §§ 2107 and 2108 authorize the level of fines that the Commission may impose. Further the defendant in *Gore* was a national distributor of autos, thus making the statutory penalties in other states relevant to the issue of whether it could have expected such a large penalty for what it had done.[577] In contrast, PG&E is aware of the potential penalties available under California law. Moreover, consistent with *Hale*, this Decision has considered evidence concerning PG&E's financial resources and has adopted a penalty that should have a deterrent effect without impacting PG&E's ability to raise the money it needs for further investment. Accordingly, the penalty adopted does not violate the Excessive Fines Clause.

### 11.2.5. Extension of Time to Pay Penalties

PG&E requests that the time to pay the fine be extended.[578] It presents various reasons why 40 days is not enough time to raise the required funds. PG&E first states that depending on the timing of the final decision, it may not be able to issue public securities to pay the fine during the 40-day time period due to restrictions under federal and state securities laws.[579] Further, PG&E explains that it needs "some flexibility in timing to ensure that the capital raising transaction is successful, and 40 days is not sufficient."[580] For these reasons, PG&E requests that the time to pay any fine be extended to 180 days.

---

[577] *Gore*, *supra*, 517 U.S. at 584.

[578] *PG&E Appeal* at 14.

[579] *PG&E Appeal* at 14.

[580] *PG&E Appeal* at 15.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 278 of 565

CPSD does not oppose PG&E's request to extend the time for it to make its payment, "so long as interest accrues from the date of the Commission's Decision."[581]

We modify the time to pay the fine as requested by PG&E.  PG&E explained that it is seeking an extension of time to allow it to comply with federal and state securities laws and to provide flexibility for a successful issuance of public securities.  Given the size of the fine adopted in this decision, we agree that an extension of time is warranted.  However, we decline to accrue interest on this amount from the date of this decision, provided the fine is paid in full within 180 days of this decision.  If not, payment of any outstanding amount shall include interest at the rate earned on prime, three-month, non-financial commercial paper as reported in Federal Reserve Statistical Release H.15, beginning the 181st day after the effective date of this decision.

### 11.3.  Rule 1.1 of the Commission's Rules of Practice and Procedure

PG&E next challenges penalties imposed as a result of violations of Rule 1.1 of the Commission's Rules of Practice and Procedure (Rule 1.1).[582] Specifically, PG&E asserts that the Recordkeeping POD errs in holding that a violation of Rule 1.1 does not require an intention to mislead the Commission.[583] PG&E relies on the language of Rule 1.1 and a line of Commission decisions and court orders to support its arguments.

PG&E's arguments are without merit.  As relevant to PG&E's arguments, Rule 1.1 states that a party shall "never … mislead the Commission or its staff by

---

[581] *CPSD Response* at 13.

[582] See, *Pacific Gas and Electric Company's Appeal of the Presiding Officer's Decision*, filed in I.11-02-016 on October 2, 2014, at 18.

[583] *PG&E Appeal* at 26.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 279 of 565

an artifice or false statement of fact or law." From PG&E's perspective, the word "'mislead' …necessarily implies a purposeful action."[584] Further, it asserts that the terms "artifice" and "false statement" also incorporate an element of intentional deception. While PG&E is correct that "artifice" requires intention, a "false statement" does not. A statement does not have to be intentionally false in order to be false. Rather, it may be false due to carelessness, ignorance or mistake. The Commission is equally misled regardless of whether the statement was intended to be false or not. Thus, if the sentence had ended with the term "artifice," PG&E would be correct that there must be an intention to mislead. However, the inclusion of "or false statement" shows that intent is not required.

Moreover, PG&E's interpretation is not supported by the plain language of Rule 1.1. Nowhere does the plain language of Rule 1.1 refer to *mens rea*, state of mind, or purposeful intent. To interpret Rule 1.1 as proposed by PG&E would effectively rewrite the Rule to include the word "knowingly," "purposely" or "intentionally" before the term "mislead."

Prior Commission decisions have held that a violation of Rule 1.1 can result from a reckless or grossly negligent act. As we previously held: "The misleading or misrepresentation that occurs as a result of the reckless or grossly negligent act can cause the Commission to expend additional staff resources in trying to resolve the misleading statement."[585]

---

[584] *PG&E Appeal* at 26.

[585] *Re Facilities-based Cellular Carriers and Their Practices, Operations and Conduct in Connection with their Siting of Towers* (D.94-11-018) (1994) 57 Cal. PUC 2d 176, 204; see also, *Order Instituting Investigation Into Southern California Edison Company's Electric Line Construction, Operation, and Maintenance Practices Southern California Edison Company* (D.04-04-065) 2004 Cal. PUC LEXIS 207 at *53.

PG&E's reliance on penal or criminal cases is also unavailing.  The Pipeline OIIs are not criminal cases, so the requirements for proving a criminal offense do not apply.  As we have discussed elsewhere in this decision, the relationship between the Commission and the utilities it regulates is very different than that between the court and a litigant.  As a regulator, the Commission needs accurate information from the utility in order to, among other things, ensure that it is providing just, reasonable and safe service.  Further, the utility is under an obligation to provide information to the Commission under state law,[586] and presumably that information needs to be accurate.  Thus, regardless of whether the Commission received wrong information because PG&E intended to deceive the Commission, or because PG&E was negligent, the end result is the same – the Commission was misled.

As discussed in Section 7.4 of the Recordkeeping POD, PG&E "had failed to verify that its security system had been configured to operate as specified, failed to take steps to preserve any recordings from the security cameras at the Brentwood Facility, and failed to inquire with Corporate Affairs whether the security tapes were subject to the preservation order."  PG&E's gross negligence resulted in misleading information being provided to CPSD, which caused CPSD staff to expend additional time and resources.  Similarly, PG&E's failure to identify all the people in Milpitas Terminal handling the pressure problem on September 9, 2010 or who were present at the Milpitas Terminal after 5:00 p.m. on that date prejudiced CPSD's investigation.

Based on these considerations, the Recordkeeping POD properly found violations of Rule 1.1, and this decision properly imposes penalties associated with these violations.

---

[586] See, e.g., Pub. Util. Code §§ 313, 314, 581, 582, 584 and 702.

### 11.4.  Continuing Violations

PG&E asserts that the Fines and Remedies POD, as well as the PODs on violations, incorrectly concludes that many of the violations are continuing in nature.  According to PG&E, the language in Pub. Util. Code § 2108 "applies only to violations that **continue** over time, not to the subsequent consequences of finite events that themselves constitute a violation."[587]  Based on its interpretation, PG&E maintains that a violation may only be considered continuing "when the misconduct at issue was actually ongoing."[588]  As support, PG&E cites to *People ex rel. Younger v. Superior Court* (1976) 16 Cal. 3d 30, which construed Water Code Section 13350(a)(3) by holding that a penalty for an unlawful oil deposit should be based on each day the process of deposit lasted, and not each day the oil remained on the water.[589]  Thus, in its appeal, PG&E argues that the continued absence of a record is not  a continuing violation until the record appears.[590]

> The statute construed in *Younger* provided:

>> Any person who  . . . (3) causes or permits any oil or any residuary product of petroleum to be deposited in or on any of the waters of the state, except in accordance with waste discharge requirements or other provisions of this division, may be liable civilly in a sum of not to exceed six thousand dollars ($ 6,000) for each day in which such violation or deposit occurs.

> The *Younger* Court examined the meaning of the word "deposit" and on that basis determined that the statutory clause under examination might refer to each

---

[587] *PG&E Appeal* at 31 (emphasis in original).

[588] *PG&E Appeal* at 32.

[589] PG&E does not assert that Pub. Util. Code § 2108 is ambiguous.

[590] *PG&E Appeal* at 32.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 282 of 565

day in which: (1) the act of depositing takes place or (2) the matter placed down [i.e. the oil] is found. The Court concluded that the statute imposed liability for each day that a person deposits oil in the waters of the state and not for each day during which the oil remains there. The Court reasoned that this construction of the statute was not only consistent with the ordinary meaning of the words used but also was in harmony with the overall statutory scheme, and that it additionally effectuated the legislative purpose of penalizing continuous acts of depositing oil. PG&E's Appeal does not explain how any word in Section 2108[591] is like the word "deposit" that the *Younger* Court was construing. Nor does the Appeal explain how PG&E's construction of 2108 is consistent with the ordinary meaning of the words used, or in harmony with the overall statutory scheme or legislative purpose. Finally, PG&E's Appeal is simply incorrect when it argues that the Younger Court construed the statute the way it did in order to avoid an "unduly punitive"[592] result. The *Younger* Court did not rely on any such reasoning.

PG&E raises the same arguments in its briefs and appeals of the Violations PODs. We have considered these arguments and found them to be without merit. The Violations PODs consider each violation and determine whether it should be considered continuing in nature. We find no reason for repeating our discussion in those decisions verbatim here, but incorporate their full discussion by reference.

---

[591] Section 2108 provides: "Every violation of the provisions of this part or of any part of any order, decision, decree, rule, direction, demand, or requirement of the commission, by any corporation or person is a separate and distinct offense, and in case of a continuing violation each day's continuance thereof shall be a separate and distinct offense."

[592] *PG&E Appeal* at 32.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 283 of 565

As each of the Violations PODs discusses, the violations that were determined to be continuing in nature were not one-time occurrences, but on-going obligations.[593]  Thus, each day that PG&E failed to fulfill this obligation constituted a separate offense.  Such a conclusion is entirely consistent with *Younger*, which states:

> It appears that the Legislature by enacting section 13340, subdivision (a) (3) [of the Water Code], was concerned with persons who caused oil spills day after day – in other words, with persons who intentionally or negligently caused oil to be deposited regularly or over a period of time.  By imposing an additional penalty for each day that the person continues to deposit the oil in the waters, the Legislature provides an effective deterrent to continuous or chronic violations.[594]

Finally, as noted by Joint Parties:  "Operating a gas pipeline system without legally required information is a continuing violation."[595]  For these reasons, the POD and the Violations PODs correctly concluded that many of the violations were continuing in nature.

## 11.5.  Spoliation

PG&E argues that the PODs misapply the spoliation doctrine.[596]  It contends "[s]poliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or

---

[593] For example, the Class Locations POD found that continuing obligations include patrolling pipeline system on a regular basis, performing continuing surveillance and monitoring changes in population density; the San Bruno POD found that continuing obligations include correcting unsafe condition and conducting required pressure tests; the Recordkeeping POD found that continuing obligations include keeping records of its gas transmission pipeline system.

[594] *Younger, supra,* 16 Cal. 3d at p. 44.

[595] *Joint Parties Response* at 20.

[596] *PG&E Appeal* at 33.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 284 of 565

reasonably foreseeable litigation.'"[597]  According to PG&E, the Recordkeeping POD illogically concludes that PG&E should have been on notice that as far back as 80 years ago there would have been future litigation that would have required PG&E to preserve its documents.[598]  PG&E contends litigation is "reasonable foreseeable" if there is an identifiable specific claim, not the "mere existence of a potential claim or the distant possibility of litigation."[599]

PG&E raised these same arguments in its appeal of the Recordkeeping POD.[600]  However, as stated in *Reeves v. MV Transportation* (2010) 186 Cal. App. 4th 666, 681:  "In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed."[601]  Thus, the real question is whether PG&E had a duty or obligation to preserve the documents in question, not whether PG&E reasonably foresaw or anticipated litigation. PG&E's argument, however, narrows the spoliation doctrine by arguing that the duty to preserve documents <u>only</u> arises if there is "pending or reasonably foreseeable litigation."  In essence, PG&E argues that it had no duty to create or maintain records of its transmission pipeline system unless it had advance notice of the initiation of the Pipeline OIIs or civil litigation.

For a typical company, which may or may not face litigation at any given time, the focus on whether litigation is reasonably foreseeable is generally an appropriate standard.  The relationship of a regulated utility to its regulator,

---

[597] *PG&E Appeal* at 33.

[598] *PG&E Appeal* at 33-34.

[599] *PG&E Appeal* at 8.

[600] See *Pacific Gas and Electric Company's Appeal of the Presiding Officer's Decision,* filed October 2, 2014 in I.11-02-016, at 14-17.

[601] *Reeves, supra*, 186 Cal.App.4th at p.681 (citing *Kronish v. U.S. (2d Cir., 1998)* 150 F.3d 112, 126).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 285 of 565

however, is different than the relationship of a company to the courts. A company may become subject to the authority of the courts in the context of litigation, or it may not. A regulated utility is <u>always</u> under the authority of its regulatory agency. Thus, it is entirely foreseeable that the records of the installation, testing and maintenance of PG&E's gas transmission pipeline system would be the routine subject of administrative proceedings and necessary to ensure the safe operation of its system and the safety of the public. Courts have held that destruction of evidence in violation of a regulation that requires its retention can give rise to an inference of spoliation.[602]

As relevant here, utilities such as PG&E have a statutory duty to maintain records under Pub. Util. Code §§ 313 and 314. These provisions would be rendered meaningless if PG&E could destroy or discard any records at its discretion. In addition, 49 CFR § 192 requires PG&E to maintain and retain records concerning the design, installation, maintenance and operation of its gas transmission pipeline system.[603] In other words, PG&E is always under a duty to maintain records relevant to the safe and reliable operation of its natural gas transmission pipeline system.

PG&E further argues that the Violations PODs could not rely on an adverse inference to decide issues against PG&E because "the record did not contain any evidence that PG&E actually failed to create or maintain records, or that the lack of a particular record impacted PG&E's operations."[604] PG&E

---

[602] See, e.g. *Byrnie v. Town of Cromwell*, 243 F.3d 95, 108-109 (2nd Cir. 2001); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1409 (10th Cir. 1987).

[603] *See, e.g.,* 49 CFR § 192.709, which specifies the record to be maintained for transmission lines and the retention period.

[604] *PG&E Appeal* at 35-36.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 286 of 565

argues that even if an adverse inference were permissible, CPSD still bore the burden of "introducing evidence tending affirmatively to prove [its] case."[605]

PG&E is essentially arguing that CPSD must present some evidence that the non-existence of relevant documents was because PG&E intentionally or inadvertently destroyed or discarded records, or failed to create the records at issue. Regardless of the reason, the result is the same: relevant evidence is missing. It would not be fair for PG&E to benefit in this litigation as a result of the absence of records that PG&E was under a duty to maintain, whether that absence is the result of intentional destruction, inadvertent loss, or failure to create those records.

The effect of the missing evidence on this proceeding is fundamentally identical to the effect of spoliation on a court proceeding. There are a number of potential remedies that are available under such circumstances.[606] Thus, we properly exercised our discretion in determining that the application of the traditional remedy for spoliation would be appropriate here, and applied an adverse inference to the lack of evidence that PG&E was under a duty to maintain.

### 11.6. California Pipeline Safety Trust

CSB's appeal argues that the POD's denial of its proposed Pipeline Safety Trust is in error because (1) the denial is based on the POD's holding CSB to a higher standard of proof than CPSD, (2) the fact that the Trust could intervene before the Commission in future proceedings is not grounds for rejecting the creation of a trust, and (3) the POD's reliance on a lack of evidence of community

---

[605] *PG&E Appeal* at 36 (citation omitted).

[606] *See, Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 11-13 (listing remedies for spoliation of evidence).

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 287 of 565

support is factually and legally erroneous.[607]  Joint Parties state that as an alternative to an independent monitor, "a California Pipeline Safety Trust would provide many of the same benefits as an Independent Monitor:  a safety advocate with guaranteed independence that could complement the efforts of CPSD by acting as a watchdog for utility compliance with safety regulations and decisions."[608]

CSB argues that the POD placed a higher burden of proof on CSB regarding its Trust proposal than it placed on CPSD regarding its proposal for increased duties of the Aerial Patrol Program Manager.[609]  CSB notes that in making its proposal, CPSD had not discussed how the Aerial Patrol Program Manager's role would be organized.[610]  We do not find that this example upholds CSB's argument that it was held to a higher burden of proof than CPSD.  As the POD stated, all of CPSD's proposed remedies in the Class Location OII were contained in CPSD's Investigative Report for that proceeding.[611]  Thus, unlike CSB's contested Trust proposal, CPSD's proposal was vetted through the evidentiary hearing process.

CSB objects to the POD's reference to the fact that the Trust could intervene before the Commission in future proceedings and could be subject to intervenor compensation requirements.[612]  We clarify here that this reference was

---

[607] *CSB Appeal* at 17-21.

[608] *Joint Parties' Response* at 16.

[609] *CSB Appeal* at 18.  While CSB does not explicitly identify the proposed CPSD remedy, it is clear that it is referring to Proposed Remedy 4.D.6 (POD at 132).

[610] *CSB Appeal* at 18, referring to the CPSD Opening Brief at 68.

[611] POD at 131.

[612] *CSB Appeal* at 19-20.

intended to illuminate the discussion of the lack of specifics in CSB's proposal and was not intended as sufficient grounds for denial of CSB's Trust proposal.

Finally, CSB argues that the POD's reference to a lack of evidence of community support is factually and legally erroneous.[613]  We find that the reference to community support is not needed and therefore delete it.

As noted in the POD, we do not disagree that an organization such as the proposed Trust could provide a unique voice and perspective promoting safety in Commission proceedings.  We are open to the institution of independent advocacy for safety before this Commission, whether that advocacy resides within the Commission, outside the Commission, or both.  Still, at this time we are not persuaded that CSB's Trust proposal represents the best way to meet the goals of such advocacy.

Nor are we persuaded that payment by PG&E shareholders is the most equitable means of funding such advocacy, which we regard as a statewide function not restricted to PG&E or its service territory.  CSB has proposed that PG&E shareholders pay at least $100 million for the Trust.  While it is appropriate to impose significant penalties on PG&E, as this decision does, we are not persuaded that it is appropriate to require PG&E's shareholders to provide $100 million for advocacy and oversight that benefits all California citizens.

Finally, we note that Pub. Util. Code § 854.5(b) discourages the Commission from establishing "nonstate entities" such as the Trust.  Creating such entities with shareholder money is permitted, but is subject to a 30-day review by the Joint Legislative Budget Committee prior to creation.

---

[613] *CSB Appeal* at 20-21.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 289 of 565

### 11.7. Independent Monitor

CSB has appealed the POD's denial of its proposal for establishment of a PG&E shareholder-funded independent monitor that would evaluate and review PG&E's compliance with the PSEP Decision and any fines and remedies ordered in the POD.[614] Joint Parties support CSB on this issue.[615] Most of the grounds relied upon by CSB in its appeal represent policy disagreements that do not require further discussion here.[616]

CSB argues that the POD placed a higher burden of proof on CSB regarding the effectiveness of an independent monitor than it placed on CPSD regarding the effectiveness of its request that PG&E reimburse CPSD for contracts for independent industry experts for verification audits and inspections to ensure compliance with other remedies and inspectors as well as experts to provide expertise with PG&E's hydrostatic testing program.[617]

The evidentiary basis for the POD's denial of an independent monitor can be distilled to the following points:

- Prior to the 2010 San Bruno disaster, CPSD was at times ineffective in its safety oversight of PG&E's natural gas transmission system; however, there is no evidence that, going forward, CPSD will be ineffective.[618]

- Independent monitors have been used elsewhere, but their effectiveness is not in evidence.[619]

---

[614] CSB Appeal at 1-16.

[615] Joint Parties' Response at 13-16.

[616] For example, we find that CSB's call for more transparency than CPSD can offer in its oversight process (CSB Appeal at 14-15) to be a policy rather than a legal question.

[617] CSB Appeal at 7-8, referring to the request of CPSD in its Fines and Remedies Opening Brief at 58 and its Fines and Remedies Reply Brief at 4, 7-8, Appendix B at 1, 4.A.1.

[618] POD at 142.

[619] POD at 142-43.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 290 of 565

We do not find that the POD's reliance on this evidence is based on holding CSB to a higher standard of proof than CPSD. Rather, the decision not to establish an independent monitor is based on the POD's weighing of the evidence.

CSB argues that the POD "unlawfully concludes it can disregard other jurisdictions' fines and penalties in response to energy industry disasters because any party subject to an Independent Monitor 'was not subject to comprehensive regulatory oversight such as this Commission exercises.'"[620] While we do not fully accept CSB's argument, we find that the language in question does not add to the discussion. We therefore modify the POD to delete it.

CSB argues that the POD ignored its request to establish an independent financial monitor that would oversee PG&E's expenditures and follow each dollar the Commission directs PG&E shareholders to spend.[621] Compliance with this decision means that PG&E, at shareholder expense, will have paid a fine of $300 million to the State of California General Fund, issued a $400 million bill credit to ratepayers, , established a deferred liability account (the Shareholder-Funded Gas Transmission Safety Account), track expenditures on designated safety-related projects or programs to be funded by shareholders, and fully and faithfully implement approximately 75 other remedies described in Section 7 and Appendix E of this decision.

Since compliance with the first three of those penalty elements is straightforward and readily verifiable, the remaining concern is with full implementation of the other remedies: the proper tracking of future expenditures on safety-related projects or programs, and the remedies listed in Appendix E.

---

[620] CPSD Appeal at 7, quoting the POD at 143.

[621] CSB Appeal at 15.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 291 of 565

The tracking of future expenditures is already subject to independent audits, and the first adopted "other remedy" in Appendix E provides for verification audits and inspections by CPSD-selected independent experts to ensure compliance with the other remedies.[622]  We expect that when CPSD retains independent experts pursuant to the first remedy, it will do so to ensure compliance with both the financial and non-financial aspects of the adopted remedies. Given the reporting and independent auditing requirements already in place for the tracking of future safety-related expenditures, CSB's proposal for an independent financial monitor is duplicative.  CSB has not persuaded us that establishment of an independent financial monitor is necessary and appropriate to ensure compliance with the PSEP decision.  This is reinforced by Pub. Util. Code § 854.5(b) which, as discussed above, discourages the Commission from establishing nonstate entities.  Accordingly, establishment of an independent financial monitor is not required.

### 11.8.  Reimbursement of Litigation Expenses

#### 11.8.1.  Legal Authority to Order Shareholders to Reimburse Intervenors' Litigation Expenses

PG&E, CPSD, CSB and Joint Parties responded to Commissioner Picker's request for review of the POD's proposal that would "… order a public utility's shareholders to compensate parties in a Commission proceeding outside of the Intervenor Compensation framework…"[623]  PG&E opposed the POD's proposal

---

[622]  POD, Appendix E, page 1.

[623]  *Request for Review [of Commissioner Picker]* at 3.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 292 of 565

to broadly reimburse the intervenors' litigation expenses, and argued that: "The order is expressly prohibited by Pub. Util. Code § 1802(b)."[624]

CPSD, Joint Parties and CSB, on the other hand, maintain that the Commission has authority to order shareholders to pay for intervenor compensation instead of ratepayers, and that ordering PG&E's shareholders to do so is warranted in this instance.[625]  CPSD notes:  "the Commission has broad equitable powers under the California Constitution, Art. XII, and under § 701 of the Cal. Pub. Util. Code to supervise utilities particularly when the utility has violated Commission regulations, statutory provisions or orders."[626]

We have considered the legal arguments presented by parties and have concluded that the Commission does have the authority to order utility shareholders to reimburse intervenors for certain litigation expenses as an equitable remedy under Pub. Util. Code § 701.   Just because we can do something, however, does not mean that we should do something.

As discussed in Section 7.2.9, the Commission has determined that policy and equity considerations do not support a departure from our standard approach to intervenor compensation.  Accordingly, this decision differs from the POD and does not make a broad award of compensation to all intervenors under Pub. Util. Code § 701, but rather only provides for intervenor

---

[624] *Pacific Gas and Electric Company's Response to Appeals and Requests for Review of the Presiding Officers' Decision on Fines and Remedies*, filed October 27, 2015, at 10, fn. 17.  All of PG&E's arguments are contained in this single footnote.

[625] *Response of the Consumer Protections and Safety Division to Request for Review of Commissioner Picker (CPSD Response to Request for Review)*, filed October 27, 2014, at 9-11; *Joint Parties' Response to Appeals and Requests for Review of the Presiding Officers' Decisions in the Pipeline Investigations*, filed October 27, 2014, at 7-9; *Response of the City of San Bruno to Request for Review of Commissioner Picker (CSB Response to Request for Review)*, filed October 27, 2014.

[626] *CPSD Response to Request for Review* at 10.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 293 of 565

compensation via the intervenor compensation program, pursuant to Pub. Util. Code §§ 1801 et seq.

### 11.8.2. Reimbursement of PG&E's Litigation Expenses

Joint Parties contend that in addition to the Pipeline OIIs, the San Bruno explosion and fire have resulted in "a myriad of legal challenges," and the cost to defend these challenges has been enormous.[627]  Joint Parties argue that the legal fees and expenses associated with these gas pipeline safety cases should not be paid by ratepayers and request that a new Ordering Paragraph 11 be added to the POD:[628]

> PG&E shareholders shall pay all of PG&E's legal expenses incurred on or after September 9, 2010 for the purpose of defending these proceedings, and any other proceedings that can reasonably be construed to be related to the San Bruno explosion or the Pipeline Investigations, including, without limitation the National   Transportation Safety Board Investigation, shareholder derivative lawsuits, lawsuits brought by the City of San Bruno or any of the explosion victims and/or their survivors, and the defense of any criminal proceedings. Legal expenses shall include, without limitation, expert witness fees, and the costs associated with PG&E employee time devoted to those proceedings.

We do not find that the issue of PG&E's employee and legal fees should be considered in these proceedings.  Rather, these costs are more appropriately considered as part of PG&E's General Rate Case (GRC) proceedings.  Indeed, PG&E notes, San Bruno-related costs incurred in 2014, including employee costs,

---

[627] *Joint Parties' Appeal* at 23-24.

[628] *Joint Parties' Appeal* at 25-26.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 294 of 565

were considered and addressed in its most recent GRC.[629]  Accordingly, we
decline to adopt Joint Parties' proposed Ordering Paragraph.

### 11.9.  Revisions to Remedies

PG&E requests revisions to two remedies.[630]  First, it requests that adopted
remedy 33 in the San Bruno OII be revised to delete the sentence:  "PG&E shall
revise its STIP program to make safety performance 40% of the score used to
determine the total award."[631]  PG&E explains that setting the specific
requirement that the safety component of the STIP (Short Term Incentive
Program) is not necessary because PG&E is already meeting this requirement.
Although CPSD had originally recommended the STIP program element that
makes safety 40% of the score used to determine the award be included in this
remedy, it does not oppose PG&E's proposed modification.[632]  Accordingly,
adopted remedy 33 in I.12-01-007 is revised to read as follows:

> PG&E's incentive plan shall include safety.  PG&E shall require
> upper management to participate in annual training activities
> that enhance and expand their knowledge of safety, including
> exercises in which gas officers will have an opportunity to
> enhance their knowledge of incident command and will
> participate in an annual safety leadership workshop.

PG&E also requests that adopted remedy 14 in the Recordkeeping OII be
amended so that its MAOP validation effort and records management
improvement efforts be utilized instead of the minimum records to be included

---

[629] *PG&E Response* at 11-12.

[630] *PG&E Appeal* at 16.

[631] *PG&E Appeal* at 16.

[632] *CPSD Response* at 13.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
295 of 565

in a job file currently listed.[633]  CPSD opposes this proposed revision.[634]  As CPSD notes, we have already considered and rejected the proposed changes to adopted remedy 14.[635]  We agree with CPSD that PG&E's proposed revision to adopted remedy 14 should be rejected.

### 11.10. Other Revisions

CPSD identifies several technical or legal errors in the POD.  First, it notes that the POD incorrectly identifies the legal authority under which GO 112 was originally adopted.[636]  CPSD states that GO 112 was adopted pursuant to Pub. Util. Code § 768, not 49 U.S.C. § 60105.  We agree with CPSD that the jurisdictional basis pursuant to which the Commission adopted GO 112 was misidentified.  The POD is revised to correct the jurisdictional basis.

CPSD further notes that there is a mathematical error in the total number of segments (violations) identified in the Class Location POD.  CPSD states the total number of segments (violations) should be 2,360, not 3,643.[637]  In the modified Class Location POD, we corrected the total number of segments (violations) to 2,360.  We make the corresponding changes in the POD.

Finally, we make non-substantive edits to correct typographical errors or to clarify our discussion.

## 12.   Comments on the Proposed Decision Different

On March 13, 2015, a proposed Decision Different of President Picker was sent to the parties to these proceedings, who were given an opportunity to file

---

[633] *PG&E Appeal* at 16.

[634] *CPSD Response* at 15.

[635] *See*, Section 7.1.3.9.

[636] *Consumer Protection and Safety Division's Appeal of Presiding Officers' Decision (CPSD Appeal)*, filed October 2, 2014, at 2.

[637] *CPSD Appeal* at 3.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 296 of 565

comments, although no comment period was legally required.   Comments were due on April 1, 2015, and were limited to differences between the Penalties POD and the proposed Decision Different.  Parties were informed that to the extent any comments exceeded that scope, they would not be considered.  Timely comments were filed by CSB, CARE,  CPSD, DRA, TURN, and PG&E.  Changes were made to the decision as appropriate.

In its comments, PG&E requested several changes to the Decision Different.  PG&E commented on the $850 million disallowance (the Shareholder-Funded Account).

Two of these changes would have the effect of shifting more of the disallowance away from capital investments on which the utility will never receive a rate of return or depreciation.  For the reasons explained above, we believe it appropriate to devote most of the Shareholder-Funded Account to capital expenditures and to ensure that PG&E does not earn a rate of return or depreciation on those investments.  Accordingly, we will not adopt either (i) PG&E's request to base the split of the $850 million between expenses and capital expenditures on the ratio of those two items to be adopted in the GT&S proceeding (which covers items that are not especially safety-related); and (ii) PG&E's request to simply offset the $850 million disallowance against its authorized GT&S revenues.

PG&E requests that the reasonableness of its expenditures out of the Shareholder-Funded Account be evaluated through audits, rather than cost caps. We reject this suggestion.  Audits will be time-consuming and costly and could easily lead to further litigation at the Commission.  We prefer a simpler approach that can be handled through the advice letter process, rather than a formal proceeding.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 297 of 565

PG&E also requests that it be allowed to track expenditures out of the Shareholder-Funded Account on a program-by-program, rather than project-by-project, basis. It may well be more appropriate that some (or all) of the safety-related expenses and capital expenditures designated in the GT&S (or subsequent) proceeding will be better tracked on a program, rather than project, basis. Accordingly, we have revised the text above to allow the GT&S (or other) proceeding to determine how each category of expenditures should be tracked. That is appropriate because the details of the specific programs or projects to be funded out of the Shareholder Account are on the record in those proceedings, not these proceedings.

In its comments, TURN requests that PG&E's shareholders bear the cost of property taxes on the capital investments paid for out of the $850 million Shareholder-Funded Account. That was not our intention, and we decline to make that change. Shareholders earn no profit on property taxes, the cost of which is simply passed through to ratepayers. As property taxes are an ongoing cost of operating plant that is in service, the property taxes on this shareholder-funded plant should be paid by ratepayers, unless otherwise disallowed. For purposes of this part of this decision property taxes are like the ongoing operation and maintenance costs for which ratepayers will also be responsible.

DRA, TURN and PG&E all filed comments suggesting technical changes to the Decision's implementation of the $400 million bill credit. DRA proposes that the bill credit be based on the throughput forecast that will be adopted in the 2015 Gas Transmission and Storage (GT&S) Application (A.13-12-012), and that the credit be applied to the January 2016 bill (and succeeding months) to reduce costs for core customers during the typically higher cost winter heating month(s). DRA also suggests that a different methodology may be appropriate for Non-Core customers.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 298 of 565

TURN proposes that the bill credit be based on two months' actual consumption (November and December) to generate an equitable and adequate refund, and that any over- or under-collection of the bill credit be apportioned using the same two months of actual consumption.  Additionally, TURN suggests that the Commission add language directing master-metered customers to pass the bill credit through to their submetered tenants, as required by Section 739.5(b) of the Public Utilities Code.

PG&E proposes that the bill credit be based on the most recent recorded usage data, and has particular suggestions for the proper accounting of any shortfall or excess refunds.  PG&E also suggests that it submit a plan that takes into consideration the differences in customer usage and rates in its Advice Letter filing.

The Commission agrees that some technical changes and clarifications to the implementation of the $400 million bill credit should be made, so that the Commission's intention as to this equitable remedy is made clear.  First, we agree with both TURN and PG&E that the bill credit should be based on the most recent actual consumption.  Therefore, we clarify that the bill credit will be based on a cents-per-therm methodology, based on the total actual billed gas throughput during the November and December 2015 billing cycles.  Each customer shall receive a bill credit based on their billed amounts during their November and December 2015 billing cycles on their February 2016 bill.[638]  We are directing PG&E to provide this bill credit to all of its gas customers using the same methodology. We do so because we prefer a simple and clear methodology

---

[638]  If PG&E finds that it is impossible to provide the bill credits on its February 2016 bills, we direct PG&E to propose the earliest possible dates for providing the bill credits in the Advice Letter required by Ordering Paragraph 5.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 299 of 565

that can be implemented as soon as possible. Accordingly, we are requiring the use of a Tier 2 Advice Letter process, as we envision that the implementation of the bill credit should be ministerial.  Finally, we will adopt TURN's suggestion in part, and will direct residential master-metered customers to pass the bill credit through to their submetered tenants.

CSB devotes most of its comments on the Decision Different to arguments that the Decision Different should award CSB and other intervenors their litigation expenses, including attorney's fees, expert witness fees and costs.[639]  On this issue, TURN's comments support CSB, while the comments of ORA, CPSD and PG&E are silent.

CSB characterizes the Penalties POD's fee award as being based on evidence, arguing that there is "undisputed evidence in support of an award,"[640] and that this is a "factually sensitive issue."[641] CSB argues that, by comparison, there is "no evidence" to support the Decision Different on this issue.[642]  In fact, the Penalties POD's resolution of this issue is not based on specific evidence; just like the Decision Different, the Penalties POD made its determination based on policy and equity concerns, not on specific factual evidence.[643] The level of evidentiary support on this issue is no different in the Decision Different than in the Penalties POD.

---

[639] *City of San Bruno's Comments on Decision Different of President Picker on Fines and Remedies to be Imposed on Pacific Gas and Electric Company for Specific Violations in Connection With the Operation and Practices of its Natural Gas Transmission System Pipelines* (CSB Comments) at 2.  The rest of CSB's comments address issues on which there is no substantive difference between the Penalties POD and the Decision Different.

[640] *Id*. at 4.

[641] *Id*. at 9.

[642] *Id*. at 4 and 6.

[643] Penalties POD at 153-154.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 300 of 565

CSB argues that the Decision Different, by awarding compensation under the intervenor compensation statutes, is acting unfairly because PG&E ratepayers, rather than PG&E shareholders, would be bearing the burden of paying TURN's fees.[644] We note that our approach here is consistent with the provisions of California's intervenor compensation statute,[645] which generally governs intervenor compensation in Commission proceedings, and which the Commission believes can be fairly applied in this proceeding.

CSB argues that it was "forced" to participate in these proceedings, that its participation was "non-negotiable" and that it was "required" to expend significant resources and time in these proceedings.[646] TURN makes a similar argument in support of CSB on this issue.[647] CSB was not a respondent or a defendant in these proceedings; only CPSD and PG&E were required to participate. CSB chose to participate because they determined that doing so was important for the City and its residents. In any event, it is unclear why the unusual importance of this proceeding to CSB supports a deviation from the intervenor compensation method spelled out in California law.

CSB claims that the Commission committed legal error in citing to three previous Commission decisions.[648] According to CSB, the Commission relied upon those three decisions for its determination that CSB should not be compensated here.[649] CSB mischaracterizes the Decision Different's use of those

---

[644] *CSB Comments* at 4 and 5.

[645] Pub. Util. Code § 1801 et seq.

[646] *CSB Comments* at 5-6.

[647] *TURN Comments* at 10-11.

[648] *CSB Comments* at 7.

[649] Id.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 301 of 565

cases.  The Decision Different does not rely upon those cases as precedent or legal authority, but only provides them as illustrative examples, showing that cities and counties regularly appear before the Commission (and make substantial contributions to Commission decisions) with no expectation of compensation.  Providing examples to illustrate a point is not legal error.

No changes are made on the issue litigation compensation in response to comments.  Other minor changes have been made in response to comments on other issues.

## 13.    Assignment of Proceeding

Michael Picker is the assigned Commissioner.[650]  Mark S. Wetzell is the assigned Administrative Law Judge in I.12-01-007 and Amy C. Yip-Kikugawa is the assigned Administrative Law Judge in I.11-02-016 and I.11-11-009.  The Presiding Officers in these proceedings are Administrative Law Judges Wetzell and Yip-Kikugawa.

## Findings of Fact

1.  In response to the September 9, 2010 explosion and fire in San Bruno, the Commission opened three separate investigations.  Investigation (I.) 11-02-016 (Recordkeeping), I.11-11-009 (Class Location) and I.12-01-007 (San Bruno).

2.  Decisions on violations were issued in each of the investigations.

3.  The decisions on violations serve as the basis for determining penalties to be imposed.

---

[650]  Michael R. Peevey was the assigned Commissioner in I.12-01-007 until the proceeding was reassigned to Commissioner Picker on September 23, 2014.  Michel Peter Florio was the assigned Commissioner in I.11-02-016 and I.11-11-009 until the proceeding was reassigned to Commissioner Picker on October 16, 2014.

4.  The *San Bruno Violations Decision* found PG&E had committed 32 violations, many of them continuing for years, and a total of 59,255 separate offenses.

5.  The *Recordkeeping Violations Decision* found PG&E had committed 33 violations, many of them continuing for years, and a total of 350,189 separate offenses.

6.  The *Class Location Violations Decision* found PG&E had committed 2,360 violations, many of them continuing for years, and a total of 18,038,359 separate offenses.

7.  There is no duplication of alleged violations regarding assumed SMYS values.

8.  Adopted San Bruno violation 1 regarding hydrostatic testing is substantially similar to Felts Violation 3.  Felts Violation 3 is more inclusive, as it addresses recordkeeping violations.

9.  There is no duplication of alleged violations regarding establishing MAOP for Segment 180.

10.  Adopted San Bruno violation 19, regarding clearance documentation, appears to be included in Felts Violation 5 and, therefore should be excluded from the total number of violations.

11.  There is no duplication of alleged violations regarding the adequacy of SCADA.

12.  There is no duplication of alleged violations regarding PG&E's emergency procedures.

13.  There is no duplication of alleged violations regarding PG&E's GIS data.

14.  There is no duplication of alleged violations regarding patrol records.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 303 of 565

15. The Commission has been certificated pursuant to 49 U.S.C. § 60105 to enforce the Department of Transportation's minimum federal safety standards for gas pipeline facilities.

16. GO 112-E automatically incorporates all revisions to the Federal Pipeline Safety Regulations, 49 CFR Parts 190, 191, 192, 193 and 199.

17. Ordering Paragraph 3 of the *PSEP Decision* provides that all increases in revenue requirement ordered in that decision are subject to refund pending decisions in these Pipeline OIIs.

18. CPSD, TURN, DRA, CSB and CCSF propose penalties that consist of fines, disallowances and other remedies that would equal approximately $2.25 billion after tax.

19. The penalties imposed on El Paso Natural Gas Company for the Carlsbad explosion were the result of a consent decree.

20. UGI Corporation settled the enforcement actions brought upon it for the Allentown explosion.

21. Decision 98-12-075 identified five factors to be considered in determining the level of penalties to be imposed.

22. The San Bruno explosion and fire resulted in physical harm.

23. A violation of Rule 1.1 of the Commission's Rules of Practice and Procedure is a severe offense.

24. PG&E management had been notified at various times that its pipeline records were not complete and of the impact of not having those records.

25. The *Recordkeeping Violations Decision* found that PG&E violated Rule 1.1 on two occasions with respect to its responses to CPSD's data requests, and potentially violated Rule 1.1 with respect to another data request.

26. PG&E's market value as of January 10, 2012 was $16.439 billion, and an aggregate value of $29.117 billion.

Case: 19-30088     Doc# 14208-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page 304 of 565

27.  If one were to consider PG&E's gas transmission and distribution business on a standalone basis, it would have an aggregate value of approximately $6.4 billion, and an equity value of approximately $4.3 billion.

28.  Between February 2012 and February 2013, various equity analysts projected fines, disallowances and other remedies ranging from $500 million to $3.65 billion (pre-tax).

29.  PG&E has the ability to raise equity to cover penalties and remedies in the amount of $2.45 billion, without harming ratepayers or its ability to raise the equity needed for revenue-producing investments required to provide adequate and safe service.

30.  Investors should be able to distinguish between a penalty and unrecoverable ongoing operating costs.

31.  The California regulatory system in place for PG&E and other large energy utilities has numerous mechanisms designed to ensure that these utilities are able to recover their reasonable costs on a going forward basis, despite large swings in variables such as energy costs and energy usage.

32.  With the exception of the investigation into the explosion of a distribution pipeline in Rancho Cordova, the Commission's past enforcement cases that resulted in large fines did not involve deaths or severe property damage.

33.  The penalties under consideration are for violations found in three separate proceedings.

34.  None of the Commission's prior enforcement cases or the other gas pipeline accidents identified in the *Wells Fargo Report* had an actual or potential impact on such a large area or number of people.

35.  The $38,000,000 penalty adopted in the *Rancho Cordova Decision* was the result of a modified settlement agreement.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 305 of 565

36.  The decision on violations in the Pipeline OIIs found that PG&E committed 2,425 violations, many of them continuing for years, for a total of 18,447,803 days in violation.

37.  If a fine were to be imposed based on every day in violation, the range of fines that could be imposed pursuant to Pub. Util. Code § 2107 would be from $9.2 billion to $254.3 billion.

38.  PG&E does not cite to any evidence that it has failed to earn nearly its authorized rate of return for any past period.

39.  There is no credible record evidence whether or not PG&E will earn approximately its authorized rate of return in the future.

40.  The allegedly unrecoverable gas transmission costs identified by PG&E are largely outside the record of this proceeding, speculative, or lacking in foundation, and PG&E's argument that the Commission should take those costs into consideration is not credible.

41.  Although PG&E had been authorized to collect in rates costs to replace pipeline segments as part of its Gas Pipeline and Replacement Program in 1986 and 1992, PG&E moved to performing risk assessments in the late 1990's and only replaced 25 miles of pipe between 2000 and 2010.

42.  The majority of the projects approved in the *PSEP Decision* were to correct recordkeeping shortfalls and implement safety improvements, including pipeline testing and replacement that had been neglected by PG&E.

43.  The *PSEP Decision* (D.12-12-030) disallowed rate recovery of approximately $635,000,000.

44.  In the *PSEP Decision* (D.12-12-030), the Commission authorized total capital expenditures for 2013 and 2014 in the amount of $696.2 million (Table E-3), and for the same period authorized expenses in the amount of

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 306 of 565

$162.5 million (Table E-2), for a combined total of $858.7 million.  Expenses were about 19% of the total.

45.  Additional PG&E gas infrastructure improvements will need to be made in the future, which will require additional capital expenditures and expenses.

46.  CSB, CCSF and DRA are governmental entities that are not eligible for statutory intervenor compensation under Pub. Util. Code § 1801 et. seq. for their participation in Commission proceedings..

47.  CSB, CCSF and DRA chose to actively participate in these proceedings.

48.  CSB, CCSF and DRA have not shown that they had a reasonable expectation of compensation for their participation in these proceedings.

**Conclusions of Law**

1.  Each violation of a regulation or statute is considered a separate offense, even if it is the result of the same underlying actions.

2.  It is reasonable to eliminate duplicative and overlapping violations from the total number of days in violation used to calculate the penalties.

3.  The Commission may enforce violations of 49 CFR 192 pursuant to its constitutional and statutory authority.

4.  Pub. Util. Code § 451 imposes various requirements on the utility, e.g., that its rates be reasonable and that its facilities be safe, but does not expressly grant any authority to the Commission.

5.  The Commission may impose fines for violation of laws and regulations pursuant to Pub. Util. Code §§ 2107 and 2108.

6.  The California Constitution, along with Pub. Util. Code § 701, confers broad authority on the Commission to regulate public utilities.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 307 of 565

7.  Fines imposed pursuant to Pub. Util. Code § 2107 are paid to the State's General Fund.

8.  The purpose of fines is to deter further violations by the perpetrator and others.

9.  The Commission has the authority to fashion equitable remedies pursuant to the California Constitution and Pub. Util. Code §§ 701, 728 and 761.

10.  The Commission may order refunds or bill credits as an equitable remedy pursuant to the California Constitution and Pub. Util. Code §§ 701 and 728.

11.  Any penalties imposed on PG&E in connection with the violations arising from the Pipeline OIIs should be significantly greater than those imposed on El Paso Natural Gas Company or UGI Corporation.

12.  The California legislature has given the Commission broad discretion to determine the appropriate level of fines for violations, rather than establish a maximum fine for a continuing violation or a related series of violations.

13.  Based on the violations presented in the Pipeline OIIs, the penalties imposed by this decision are not excessive and are necessary to deter future violations.

14.  Violations that result in physical or economic harm and the failure to comply with statutes or Commission directions are considered severe violations.

15.  The fact that PG&E's violations are pervasive throughout its pipeline system and result in violations of more than one regulation or law does not change the need to consider them as separate violations.

16.  Misleading the Commission and impeding the staff's investigation in the Recordkeeping OII are severe offenses.

17.  PG&E's offenses should be considered severe.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 308 of 565

18.  PG&E has the responsibility to ensure that its gas transmission pipeline systems are operated safely, not CPSD.

19.  The fact that other gas utilities may also be violating statutes and regulations is not an excuse for PG&E to not be in compliance.

20.  All utilities under the Commission's jurisdiction are expected to comply with Commission directives and orders.

21.  PG&E has not acted in good faith to discover, disclose and remedy the violations.

22.  The purpose of a penalty is to deter future violations by the company and others.

23.  Based on the gravity and severity of the violations, PG&E's statutory obligation to provide safe and reliable gas service, the pervasive nature of PG&E's recordkeeping shortfalls, the impact of the San Bruno explosion on its residents, and the commission's and the public interest in ensuring safe and reliable natural gas service, a severe penalty is warranted.

24.  Based on the significantly greater physical impact of the San Bruno explosion and fire, the increased risk to all residents in PG&E's service territory and the duration of the violations, the potential penalty exposure to PG&E should be significantly higher than the $97,000,000 calculated in *Rancho Cordova*.

25.  PG&E's argument that, in determining an appropriate penalty, the Commission should take into account allegedly unrecoverable gas safety related costs is not credible, and should be given no weight.

26.  PG&E should be ordered to pay a fine of $300 million pursuant to Pub. Util. Code §§ 2107 and 2108.

27.  PG&E should be ordered to issue one-time bill credits totaling $400 million to its natural gas transmission customers.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 309 of 565

28.  The additional $400 million bill credit is an equitable remedy for PG&E's failure to replace pipeline as needed to ensure the safe operation of its gas transmission pipeline system.

29.  PG&E should file a Tier 2 Advice Letter within 45 days after the effective date of this decision to implement the bill credit mechanism adopted in this decision. This Advice Letter should also provide proposed bill language that will be used to explain the bill credit to customers.

30.  This Advice Letter should provide a mechanism to inform master meter customers at mobile home parks and other residential complexes of their obligation to pass the bill credit on to their submetered customers in the manner required by Public Utilities Code Section 739.5(b).

31.  Ratepayer costs of PG&E's future gas infrastructure improvements should be minimized.

32.  As an equitable remedy, PG&E shareholders should pay for $850 million of the costs of PG&E's future gas transmission pipeline improvements, with expenditures to be considered and approved through the GT&S proceeding (A.13-12-012), or subsequent proceeding, and tracked through the accounts described herein.

33.  PG&E should be ordered to set up a deferred liability account, to be called the Shareholder-Funded Gas Transmission Safety Account (Shareholder-Funded Account) with two sub-accounts.

34.  PG&E's books should show this account as a liability obligating PG&E to implement designated safety-related projects or programs to be funded by shareholders over time.

35.  PG&E should apply that same proportion of expenses to capital expenditures that were authorized by the Commission in the PSEP decision (D.12-12-030) for 2013 and 2014.  Accordingly, of the $850 million, up to 19%

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 310 of 565

($161.5 million) may be devoted to items that are expensed for projects or programs authorized in its currently pending GT&S proceeding (A.13-12-012). The remainder (at least 81%, or $688.5 million) should be devoted to capital expenditures.

36.  One sub-account, to be called the Shareholder-Funded Gas Transmission Safety Expense Sub-Account in a total amount not to exceed $161.5 million, should be for tracking the costs of designated projects or programs authorized in the GT&S proceeding that are to be expensed.

37.  The other sub-account, to be called the Shareholder-Funded Gas Transmission Safety Capital Sub-Account, in an amount of at least $688.5 million, should be for tracking capital expenditures authorized in the GT&S (or subsequent proceeding) as plant is placed into service.  The total of the two subaccounts should equal $850 million.

38.  Once a decision has been issued in PG&E's pending GT&S proceeding determining which expensed costs qualify as "safety-related" (as defined in this Decision), and therefore could be recorded in the Shareholder Funded Account, PG&E should cap the amount included in the Expense Sub-Account at the lesser of $161.5 million or the amount of such "safety-related" costs designated in that decision.  If that amount is less than $161.5 million, the amount to be included in the Capital Sub-Account should be adjusted above $688.5 million, so that the two sub-accounts total $850 million.  Similarly, if PG&E does not spend the full amount originally authorized to be recorded in the Expense Sub-Account, then the amount not utilized should be transferred to the Capital Sub-Account, so that the total of the two sub-accounts remains $850 million.

39.  In the Expense Sub-Account, PG&E should record no more than the amount authorized for any project or program (including any contingency, if authorized).  If PG&E is able to complete any particular project or program for

less than the authorized amount, only the amount actually expended should be recorded in the Expense Sub-Account.

40.   In the Capital Sub-Account, PG&E should record only those capital expenditures that the GT&S (or subsequent) proceeding determines to be "safety-related" (as defined in this Decision).  PG&E should record these capital expenditures as a debit entry into the Capital Sub-Account when PG&E places the plant or facilities in service.  As with expensed amounts, PG&E should record the lesser of the authorized expenditure (plus contingency, if any) or the actual expenditure as a debit entry to the Capital Sub-Account.  PG&E should not include amounts recorded in the Capital Sub-Account in its rate base, such that ratepayers will not be responsible for any depreciation, or rate of return on these capital amounts.

41.   Ratepayers should be responsible for the ongoing operation and maintenance costs of the facilities funded from the Capital Sub-Account, as well as property taxes on these capital facilities, unless those costs are otherwise required to be funded by shareholders, or disallowed.

42.   If this Commission disallows, or limits, any proposed safety-related expenditure by PG&E, in the current GT&S or subsequent proceeding, for any reason other than that the amount is to be paid out of the Shareholder-Funded Account, such disallowed amounts should not be booked into the Shareholder-Funded Account, and should not be paid for out of the $850 million.

43.   If the GT&S proceeding designates for funding via the Shareholder-Funded Account projects or programs whose total costs are projected to equal or exceed $850 million, but thereafter PG&E determines that the total of its actual costs for these projects and programs will not exhaust the $850 million, PG&E should file an information-only filing, informing the Commission of that

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
312 of 565

conclusion and showing the applicable amounts actually spent (or expected to be spent).

44.  If the current GT&S proceeding does not designate enough capital projects or programs to exhaust the Shareholder-Funded Account of $850 million, additional capital projects or programs should be authorized in a subsequent proceeding(s) such that the capital investments and expenses total $850 million before the Shareholder-Funded Account is closed.

45.  PG&E should submit an annual accounting of the Shareholder-Funded account, as an information-only filing, no later than May 1 of the following year.

46.  PG&E's shareholders should pay the costs of a Commission-selected independent auditor to audit PG&E's accounting of the Shareholder-Funded Account.  The independent auditor will prepare a report on each of PG&E's annual accountings.

47.  When both sub-accounts have been fully utilized, PG&E should submit a final accounting to the Commission, as an information-only filing.  This final accounting should be filed within 180 days of the date when the Shareholder-Funded Account was exhausted.

48.  The independent auditor should prepare a final audit report. Thereafter, PG&E should file an advice letter to close out the Shareholder-Funded Account..

49.  There should be no adjustment to the bill credit or other remedies adopted in this decision to account for any tax benefits PG&E should receive.

50.  The remedies contained in Appendix E of this decision should be adopted.

51.  The remedies adopted in this decision should not limit the Commission's ability to require additional changes to PG&E's business practices or governance in a future proceeding.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 313 of 565

52.  CSB's proposal that PG&E be directed to provide a $100,000,000 endowment to fund a "California Pipeline Safety Trust" should be rejected.

53.  CSB's and DRA's proposal that PG&E shareholders pay for an independent monitor to evaluate and review PG&E's compliance with the *PSEP Decision* and any fines or remedies ordered in this decision should be rejected.

54.  The Commission's safety jurisdictions cannot be delegated, and an independent monitor established to augment CPSD's role is no substitute for, and does not obviate the need for, a properly resourced, trained, and tasked CPSD.

55.  PG&E shareholders should reimburse CPSD up to $30,000,000 for the costs to ensure compliance with the *PSEP Decision* and all remedies ordered in this decision, including CPSD's costs for hiring qualified independent auditors to audit and issue reports for both PG&E's MAOP Validation results and Project Mariner systems.

56.  CPSD should present a proposal to the Commissioners within 60 days of the effective date of this decision to perform the MAOP Validation and Project Mariner audits, and the timing for such audits to occur.

57.  CSB's proposal that PG&E pay $150,000,000 to be placed in trust for a newly established Peninsula Emergency Response Fund should be rejected.

58.  CSB's proposal V.D.2.b, regarding training of Gas Service Representatives and Gas Control Operators for responding to emergencies, as modified by PG&E, should be adopted.

59.  PG&E should formalize its emergency response and disclosure obligations to cities, counties and fire districts.

60.  PG&E should enter into mutual assistance agreements with the individual cities, counties or fire districts by no later than December 2015.  These

mutual assistance agreements shall be maintained in the appropriate Division Emergency Plan.

61. Responsibility for enforcing the mutual assistance agreements lies with the Commission, not the individual cities, counties or fire districts.

62. CSB's proposed remedy for automated shutoff valves with automatic capability should be rejected.

63. CSB's proposal that PG&E revise its Long-Term Incentive Plan and its Short-Term Incentive Plan should be rejected.

64. CPSD should present a proposal to the Commission within 60 days of the effective date of this decision for a comprehensive audit of all aspects of PG&E's operations, including control room operations, emergency planning, record-keeping, performance-based risk and integrity management programs and public awareness programs, as recommended by the NTSB.

65. The Commission has the authority under Pub. Util. Code § 701 to craft equitable remedies, including the awarding of attorneys' fees in quasi-judicial proceedings, but the Commission is not required to do so.

66. The Commission should not deviate from the statutory intervenor compensation program in these proceedings.

67. CSB, CCSF and DRA should not be awarded compensation for their litigation costs in these proceedings.

68. TURN may seek intervenor compensation for its litigation costs in these proceedings.

69. To make the basis for portions of our Decision more transparent, pages 1421-1429 of the Joint Transcript should be unsealed, pursuant to PU Code Section 583; but the confidential Exhibits discussed in that portion of the transcript shall remain under seal.

# O R D E R

**IT IS ORDERED** that:

1. Pacific Gas and Electric Company (PG&E) must pay a fine of $300 million by check or money order payable to the California Public Utilities Commission and mailed or delivered to the Commission's Fiscal Office at 505 Van Ness Avenue, Room 3000, San Francisco, CA 94102, within 180 days of the effective date of this order. PG&E shall write on the face of the check or money order "For deposit to the General Fund per Decision 15-04-024."

2. All money received by the Commission's Fiscal Office pursuant to the preceding Ordering Paragraph shall be deposited or transferred to the State of California General Fund as soon as practical.

3. If Pacific Gas and Electric Company does not pay in full the $300 million fine ordered in Ordering Paragraph 1, the outstanding amount shall include interest at the rate earned on prime, three-month, non-financial commercial paper as reported in Federal Reserve Statistical Release H.15, beginning the 181st day after the effective date of this decision.

4. Pacific Gas and Electric Company (PG&E) shall issue one-time bill credits totaling $400 million to its natural gas customers in accordance with the following:

   a. PG&E shall calculate the gas customer bill credit using a cents per therm methodology based on the total actual billed gas throughput during the November and December 2015 billing cycles.

   b. Each customer shall receive a bill credit based on their billed amounts during their November and December billing cycles on their February 2016 PG&E bill. If PG&E finds that it is impossible to provide the bill credits on its February 2016 bills, PG&E shall propose the earliest possible dates for providing the bill credits in the Advice Letter required by Ordering Paragraph 5.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 316 of 565

    c. PG&E shall submit a report to the Commission 45 days after the $400 million bill credit has been distributed describing its calculation of the bill credit on a customer class basis, the number of customers it was distributed to on a customer class basis, and the total amount of bill credits distributed.

    d. If the total amount of bill credits distributed is more or less than $400 million PG&E shall, at the same time as it submits its report, submit a Tier 2 advice letter proposing a method of truing up the $400 million using existing balancing accounts.

5. Pacific Gas and Electric Company shall submit a Tier 2 Advice Letter to implement the bill credit mechanism adopted in Ordering Paragraph 4, including proposed customer bill language, within 45 days of the effective date of this decision. This Advice Letter shall also provide a mechanism to inform master meter customers at mobile home parks and other residential complexes of their obligation to pass the bill credit on to their submetered customers in the manner required by Public Utilities Code Section 739.5(b).

6. Within 60 days of today's decision, PG&E shall submit a Tier 3 Advice Letter establishing the Shareholder-Funded Gas Transmission Safety Account and its two sub-accounts, consistent with the requirements detailed in Section 6.1 above, with service on all parties to these proceedings, all parties to A.13-12-012, and any other persons as directed by Energy Division. In addition to complying with all of the requirements of Section 6.1, the Advice Letter shall specify any additional accounting measures that will be necessary to carry out the intent of that section.

7. In A.13-12-012, the Commission will determine which expenses and capital expenditures authorized in that proceeding are for "safety-related" gas transmission projects or programs (as that term is defined in Section 6.1 above) that should be funded via the Shareholder-Funded Gas Transmission Safety Account, subject to the expense and capital expenditure requirements contained

Case: 19-30088     Doc# 14208-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page 317 of 565

in Section 6.1 above.

8.  If the amounts of safety-related gas transmission projects or programs identified in A.13-12-012 do not exceed $850 million, additional capital expenditures and expenses will be identified in a subsequent GT&S proceeding to bring the total expenditures from the Shareholder-Funded Gas Transmission Safety Account to $850 million.

9.  If the GT&S proceeding designates for funding via the Shareholder-Funded Account projects or programs whose total costs are projected to equal or exceed $850 million, but thereafter PG&E determines that the total of its actual costs for these projects and programs will not exhaust the $850 million, PG&E shall file an information-only filing, informing the Commission of that conclusion and showing the applicable amounts actually spent (or expected to be spent), and serve it on all parties to these proceedings, all parties to A.13-12-012, and any other persons as directed by Energy Division.

10.  After the end of each calendar year, and no later than May 1 of the following year, PG&E shall submit a detailed accounting to the Commission of all entries to the Shareholder-Funded Gas Transmission Safety Account, as an information-only filing, pursuant to Section 6 of General Order 96-B.  This information-only filing shall also be served on all parties to these proceedings, all parties to A.13-12-012, and any other persons as directed by the Commission's Energy Division, and shall contain the details specified in Section 6.1 above.

11.  PG&E shall reimburse the Commission for the cost of an independent auditor, to be selected by Commission Staff, to conduct audits of the Shareholder-Funded Gas Transmission Safety Account.  This reimbursement shall be funded by shareholders, not ratepayers.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 318 of 565

12. The independent auditor referred to in the preceding Ordering Paragraph shall review each of PG&E's detailed annual accountings and prepare a report. Each auditor's report shall be served on all parties who PG&E served with its annual accounting.

13. When both sub-accounts in the Shareholder-Funded Gas Transmission Safety Account have been fully utilized (i.e. PG&E's spending obligations have been exhausted), PG&E shall submit a final accounting to the Commission, as an information-only filing, to be served on all parties to these proceedings, all parties to A.13-12-012, and any other persons as directed by the Commission's Energy Division. This final accounting shall be filed within 180 days of the date when the Shareholder-Funded Account was exhausted. This final accounting may be combined with PG&E's annual information-only filing if this timing requirement can be met.

14. The independent auditor shall prepare an audit of PG&E's final accounting and serve its final audit report on all parties PG&E served with its final accounting. Thereafter, PG&E shall file an advice letter to close out the Shareholder-Funded Account, with service on all parties served with its final accounting.

15. Pacific Gas and Electric Company shall implement the remedies adopted in Appendix E of this decision.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
319 of 565

16. Within 60 days of the effective date of this decision, Pacific Gas and Electric Company shall file a Compliance Filing in these dockets, which:

 a. Identifies the remedies ordered in this decision that have already been ordered elsewhere, where that remedy (decision, report, etc.) was ordered, and PG&E's progress to date in complying with that remedy.

 b. Identifies any remedy ordered in this decision that modifies or eliminates any remedies ordered elsewhere.

17. The Compliance Filing ordered in Ordering Paragraph 16 shall also include a timeframe for completion of each of the remedies adopted in Appendix E of this decision.

18. Within 60 days of the effective date of this decision, CPSD shall present a proposal to the Commissioners for the MAOP Validation and Project Mariner audits, and the timing for such audits to occur.

19. Within 60 days of the effective date of this decision, CPSD shall present a proposal to the Commissioners to perform the comprehensive audit recommended by the National Transportation and Safety Board, and the timing for such audit to occur. This audit will include all aspects of PG&E's operations, including control room operations, emergency planning, record-keeping, performance-based risk and integrity management programs and public awareness programs.

20. Investigation (I.) 12-01-007, I.11-02-016 and I.11-11-009 remain open.

21.  Pages 1421-1429 of the Joint Transcript shall be unsealed, but the Confidential Exhibits discussed in that portion of the transcript shall remain under seal.

This order is effective today.

Dated April 9, 2015, at San Francisco, California.


                                        MICHAEL PICKER
                                                President
                                        CATHERINE J.K. SANDOVAL
                                        CARLA J. PETERMAN
                                        LIANE RANDOLPH
                                                Commissioners


I voluntarily recused myself and
did not participate in the deliberation
of this item.

/s/ MICHEL PETER FLORIO
        Commissioner


I will file a written concurrence.

/s/ CATHERINE J.K. SANDOVAL
        Commissioner

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
321 of 565

# APPENDIX A

# LIST OF APPEARANCES

*********** **APPEARANCE LIST** ***********
**I.11-11-009**

************** **PARTIES** **************

Traci Bone
Legal Division
RM. 5027
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2048
tbo@cpuc.ca.gov
For: ORA

Connie Jackson
City Manager
CITY OF SAN BRUNO
567 EL CAMINO REAL
SAN BRUNO CA 94066-4299
(650) 616-7056
cjackson@ci.sanbruno.ca.us
For: City of San Bruno

_____

Harvey Y. Morris
Legal Division
RM. 5036
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1086
hym@cpuc.ca.gov
For: SED

Theresa L. Mueller
Chief Energy & Telecom. Deputy
OFFICE OF THE CITY ATTY. DENNIS HERRERA
CITY HALL
1 DR. CARLTON B. GOODLETT PL., RM. 234
SAN FRANCISCO CA 94102
(415) 554-4640
theresa.mueller@sfgov.org
For: City and County of San Francisco

_____

Joseph Malkin
ORRICK, HERRINGTON & SUTCLIFFE LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO CA 94105
(415) 773-5505
JMalkin@orrick.com
For: Pacific Gas & Electric Company

Thomas J. Long
Legal Dir.
THE UTILITY REFORM NETWORK
785 MARKET ST., STE. 1400
SAN FRANCISCO CA 94103
(415) 929-8876 X303
TLong@turn.org
For: The Utility Reform Network

_____

********** **STATE EMPLOYEE** **********

Niki Bawa
Executive Division
RM. 5038
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2049
nb2@cpuc.ca.gov

Kenneth Bruno
Safety and Enforcement Division
AREA 2-D
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5265
kab@cpuc.ca.gov

Maryam Ebke
CPUC - ALJ DIV.
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-5112
meb@cpuc.ca.gov

Christine Hammond
CPUC - LEGAL
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-2682
Christine.hammond@cpuc.ca.gov

Michael Minkus
Legislative Liaison
CPUC - OFFICE OF GOV'T AFFAIRS
EMAIL ONLY
EMAIL ONLY CA 00000
(916) 905-7364
michael.minkus@cpuc.ca.gov

# APPEARANCE LIST
## I.11-11-009

Elizabeth Dorman
Legal Division
RM. 4300
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5884
edd@cpuc.ca.gov

Julie A. Fitch
Executive Division
RM. 5214
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-3134
jf2@cpuc.ca.gov

Travis Foss
Legal Division
RM. 5026
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1998
ttf@cpuc.ca.gov
For: SED

Sepideh Khosrowjah
Executive Division
RM. 5201
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1190
skh@cpuc.ca.gov

Michele Kito
Energy Division
AREA 4-A
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2197
mk1@cpuc.ca.gov

Andrew Kotch
Executive Division
RM. 5301
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1072
ako@cpuc.ca.gov

Richard A. Myers
Energy Division
AREA 4-A
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1228
ram@cpuc.ca.gov

David Peck
Office of Ratepayer Advocates
RM. 4108
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1213
dbp@cpuc.ca.gov

Amy C. Yip-Kikugawa
Administrative Law Judge Division
RM. 5024
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5256
ayk@cpuc.ca.gov

********* INFORMATION ONLY **********

Jamie L. Mauldin
ADAMS BROADWELL JOSEPH & CARDOZO, PC
EMAIL ONLY
EMAIL ONLY CA 00000
(650) 589-1660
jmauldin@adamsbroadwell.com

Marc D. Joseph
Attorney
ADAMS BROADWELL JOSEPH & CORDOZO
601 GATEWAY BLVD., STE. 1000
SOUTH SAN FRANCISCO CA 94080
(650) 589-1660
mdjoseph@adamsbroadwell.com

Rachael Koss
ADAMS BROADWELL JOSEPH & CORDOZO
601 GATEWAY BLVD., STE. 1000
SOUTH SAN FRANCISCO CA 94080
(650) 589-1660
rkoss@adamsbroadwell.com

Randall Li
Analyst
AEGEAN OIL USA, LLC

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 324 of 565

# APPEARANCE LIST
## I.11-11-009

20 SIGNAL RD
STAMFORD CT 06902-7909
(664) 722-2007
randall@nexusamllc.com

Kelly C. Lee
Office of Ratepayer Advocates
RM. 4108
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1795
kcl@cpuc.ca.gov

John Mcintyre
ALCANTAR & KAHL
33 NEW MONTGOMERY STREET, SUITE 1850
SAN FRANCISCO CA 94105
(415) 421-4143 X-109
jfm@a-klaw.com

Nora Sheriff
ALCANTAR & KAHL LLP
33 NEW MONTGOMERY ST., STE. 1850
SAN FRANCISCO CA 94105
(415) 421-4143
nes@a-klaw.com

Mike Cade
ALCANTAR & KAHL, LLP
EMAIL ONLY
EMAIL ONLY OR 00000
(503) 402-8711
wmc@a-klaw.com

Mark Chediak
Energy Reporter
BLOOMBERG NEWS
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 617-7233
mchediak@bloomberg.net

Patrick S. Berdge
Legal Division
RM. 4300
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1519
psb@cpuc.ca.gov

Andrew Greenberg
CADWALADER WICKERSHAM & TAFT LLP
ONE WORLD FINANCIAL CENTER
NEW YORK NY 10281

Terence T. Healey
CADWALADER WICKERSHAM & TAFT LLP
700 ISXTH ST., N.W.
WASHINGTON DC 20001
(202) 862-2335
terence.healey@cwt.com

Hillary Corrigan
CALIFORNIA ENERGY MARKETS
425 DIVISADERO ST. STE 303
SAN FRANCISCO CA 94117-2242
(415) 963-4439
cem@newsdata.com

Jack D'Angelo
CATAPULT CAPITAL MANAGEMENT LLC
666 5TH AVENUE, 9TH FLOOR
NEW YORK NY 10019
(212) 320-1059
jdangelo@catapult-llc.com

Melissa Kasnitz
Attorney
CENTER FOR ACCESSIBLE TECHNOLOGY
3075 ADELINE STREET, STE. 220
BERKELEY CA 94703
(510) 841-3224 X2019
service@cforat.org

Sophie Karp
CITIGROUP
388 GREENWICH ST.
NEW YORK NY 10013
(212) 816-3366
sophie.karp@citi.com

Austin M. Yang
Deputy City Attorney
CITY AND COUNTY OF SAN FRANCISCO
OFFICE OF CITY ATTORNEY DENNIS J.HERRERA
1 DR. CARLTON B. GOODLETT PL, RM 234

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
325 of 565

## APPEARANCE LIST
## I.11-11-009

(212) 504-6077
andrew.greenberg@cwt.com

SAN FRANCISCO CA 94102-4682
(415) 554-6761
Austin.yang@sfgov.org

Kenneth W. Irvin
CADWALADER WICKERSHAM & TAFT LLP
700 SIXTH STREET, N.W.
WASHINGTON DC 20001
(202) 862-2315
ken.irvin@cwt.com

Grant Kolling
Senior Assistant City Attorney
CITY OF PALO ALTO
PO BOX 10250
PALO ALTO CA 94303
(650) 329-2171
grant.kolling@cityofpaloalto.org

Jessica Mullan
Senior Deputy City Attorney
CITY OF PALO ALTO
PO BOX 10250
PALO ALTO CA 94303
(650) 329-2577
jessica.mullan@cityofpaloalto.org

Adam Miller
DRW
540 W. MADISON , STE. 2600
CHICAGO IL 60661
(312) 542-3478
filings@drw.com

Kevin Prior, Cfa
Research Associate
CRT CAPITAL GROUP LLC
262 HARBOR DRIVE
STAMFORD CT 06902
(203) 569-4375
KPrior@crtllc.com

Andrew B. Brown
Attorney At Law
ELLISON SCHNEIDER & HARRIS, LLP
2600 CAPITAL AVENUE, SUITE 400
SACRAMENTO CA 95816-5905
(916) 447-2166
abb@eslawfirm.com

Sarah Grossman-Swenson
DAVIS COWELL & BOWE, LLP
595 MARKET STREET, STE. 1400
SAN FRANCISCO CA 94105
(415) 497-7200
sgs@dcbsf.com

Dave A. Weber
GILL RANCH STORAGE
220 NW 2ND AVENUE
PORTLAND OR 97209
(503) 220-2405
dweber.nwngs@nwnatural.com

Ann L. Trowbridge
DAY CARTER & MURPHY LLP
3620 AMERICAN RIVER DRIVE, SUITE 205
SACRAMENTO CA 95864
(916) 570-2500 X 103
atrowbridge@daycartermurphy.com

Brian Cragg
Attorney
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111
(415) 392-7900
BCragg@GoodinMacbride.com

Scott Senchak
DECADE CAPITAL
666 - 5TH AVENUE
NEW YORK NY 10103
(212) 320-1933
scott.senchak@decade-llc.com

Megan Somogyi
Attorney
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 SANSOME ST., STE. 900
SAN FRANCISCO CA 94111
(415) 392-7900
MSomogyi@GoodinMacBride.com

Jonathan Arnold
DEUTSCHE BANK
60 WALL STREET

Norman A. Pedersen, Esq.
Attorney At Law

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 326 of 565

## APPEARANCE LIST
## I.11-11-009

NEW YORK NY 10005
(212) 250-3182
jonathan.arnold@db.com

HANNA AND MORTON, LLP
444 SOUTH FLOWER STREET, STE. 1500
LOS ANGELES CA 90071-2916
(213) 430-2510
npedersen@hanmor.com

Lauren Duke
DEUTSCHE BANK SECURITIES INC.
60 WALL STREET
NEW YORK NY 10005
(212) 250-8204
lauren.duke@db.com

Charlyn A. Hook
Legal Division
RM. 5131
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-3050
chh@cpuc.ca.gov

Christopher Turnure
J.P. MORGAN CHASE SECURITIES
383 MADISON AVENUE, FLOOR 34
NEW YORK NY 10179
(212) 622-5696
Christopher.Turnure@JPMorgan.com

Britt K. Strottman
MEYERS NAVE
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2083
bstrottman@meyersnave.com

Anthony Crowdell
Equity Research - Electric Utilities
JEFFERIES LLC
520 MADISON AVENUE, 13TH FL.
NEW YORK NY 10022
(212) 284-2563
acrowdell@jefferies.com

Susan Griffin
Paralegal
MEYERS NAVE
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
sgriffin@meyersnave.com

Eric Selmon
JEMZAR CORP.
EMAIL ONLY
EMAIL ONLY IS 000 000
ISRAEL
(646) 843-7200
ESelmon@Jemzar.com

Emilie E. De La Motte
Attorney At Law
MEYERS NAVE RIBACK SILVER & WILSON
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
edelamotte@meyersnave.com

C. Susie Berlin
LAW OFFICES OF SUSIE BERLIN
1346 THE ALAMEDA, STE. 7, NO. 141
SAN JOSE CA 95126
(408) 778-8478
berlin@susieberlinlaw.com
For: Northern California Generation Coalition (NCGC)

Steven R. Meyers
Principal
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
smeyers@meyersnave.com
For: City of San Bruno

Brendan Naeve
LEVIN CAPITAL STRATEGIES
595 MADISON AVENUE, 17TH FLR
NEW YORK NY 10022
(212) 259-0841
bnaeve@levincap.com

Gregory Reiss
MILLENNIUM MANAGEMENT LLC
666 FIFTH AVENUE, 8TH FLOOR
NEW YORK NY 10103
(212) 320-1036
Gregory.Reiss@mlp.com

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
327 of 565

## APPEARANCE LIST
## I.11-11-009

Michael Goldenberg
LUMINUS MANAGEMENT
1700 BROADWAY, 38TH FLOOR
NEW YORK NY 10019
(212) 615-3427
mgoldenberg@luminusmgmt.com

James (Jim) Von Riesemann
MIZUHO SECURITIES USA, INC.
320 PARK AVENUE, 12TH FLOOR
NEW YORK NY 10022
(212) 205-7857
James.vonRiesemann@us.mizuho-sc.com

David Marcus
EMAIL ONLY
EMAIL ONLY CA 00000
(510) 528-0728
dmarcus2@sbcglobal.net

MRW & ASSOCIATES, LLC
EMAIL ONLY
EMAIL ONLY CA 00000
(510) 834-1999
mrw@mrwassoc.com

Ray Welch
Associate Director
NAVIGANT CONSULTING, INC.
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 399-2176
ray.welch@navigantconsulting.com

Henry W. Pielage, P.E.
Ratepayer Advocate
2860 GLEN CANYON ROAD
SANTA CRUZ CA 95060
henrypielage@comcast.net

Jasmin Anes
PACIFIC GAS & ELECTRIC COMPANY
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 973-8225
jjav@pge.com

Edward Heyn
POINTSTATE CAPITAL
40 WEST 57TH STREET, 25TH FL.
NEW YORK NY 10019
(212) 830-7061
ted@PointState.com

Laura Doll
PACIFIC GAS & ELECTRIC COMPANY
77 BEALE STREET, RM. 1075
SAN FRANCISCO CA 94105

Mark Gall
SACRAMENTO MUNICIPAL UTILITY DISTRICT
PO BOX 15830
SACRAMENTO CA 95852-1830
(916) 732-5926
Mark.Gall@smud.org

Stephen Garber
Attorney
PACIFIC GAS & ELECTRIC COMPANY
77 BEALE STREET, RM. 3177
SAN FRANCISCO CA 94105
(415) 973-8003
slg0@pge.com

William W. Westerfield Iii
Sr. Attorney - Off. Of Gen. Counsel
SACRAMENTO MUNICIPAL UTILITY DISTRICT
6201 S STREET, M.S. B402
SACRAMENTO CA 95817
(916) 732-6123
wwester@smud.org

Alejandro Vallejo
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, MC B30A
SAN FRANCISCO CA 94105
(415) 973-1611
axvu@pge.com

Hugh Wynne
SANFORD C. BERNSTEIN & CO.
1345 AVENUE OF THE AMERICAS, 15TH FLR
NEW YORK NY 10105
(212) 823-2692
hugh.wynne@bernstein.com

Case Coordination
PACIFIC GAS AND ELECTRIC COMPANY

Paul Schaafsma
Attorney At Law

A-6

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
328 of 565

# APPEARANCE LIST
## I.11-11-009

EMAIL ONLY
EMAIL ONLY CA 00000
(415) 973-2776
RegRelCPUCCases@pge.com

Jonathan Pendleton
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, B30A
SAN FRANCISCO CA 94105
(415) 973-2916
j1pc@pge.com

Karen Paull
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-2630
karenppaull@gmail.com

Shirley Amrany
Regulatory Case Manage 1
SO. CAL. GAS COMPANY / SAN DIEGO GAS CO
555 WEST 5TH STREET, GT14-D6
LOS ANGELES CA 90013
(213) 244-4845
samrany@semprautilities.com

Angelica Morales
Attorney
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE / PO BOX 800
ROSEMEAD CA 91770
(626) 302-6160
angelica.morales@sce.com

Douglas Porter
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE./PO BOX 800
ROSEMEAD CA 91770
(626) 302-3964
douglas.porter@sce.com

Frank A. Mcnulty
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE. / PO BOX 800
ROSEMEAD CA 91770
(626) 302-1499
Francis.McNulty@sce.com

Deana Ng
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14E7
LOS ANGELES CA 90013
dng@semprautilities.com

521 WEST SUPERIOR STREET, UNIT 221
CHICAGO IL 60654
(312) 664-0906
paulschaafsma@yahoo.com

Chris King
SIEMENS SMART GRID SOLUTIONS
4000 E. THIRD AVE., STE. 400
FOSTER CITY CA 94404
(650) 227-7770 X-187
chris_king@siemens.com

Kevin Fallon
SIR CAPITAL MANAGEMENT
620 EIGHTH AVENUE, 22ND FLR.
NEW YORK NY 10018
(212) 993-7104
kfallon@sirfunds.com

Rasha Prince
Director, Regulatory Affairs
SOUTHERN CALIFORNIA GAS COMPANY
555 WEST 5TH STREET, GT14D6
LOS ANGELES CA 90013-1034
(213) 244-5141
RPrince@SempraUtilities.com

Sharon Tomkins
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14E7
LOS ANGELES CA 90013
stomkins@semprautilities.com

Steven Hruby
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14D6
LOS ANGELES CA 90013
SHruby@SempraUtilities.com

Catherine Mazzeo
Assistant General Counsel
SOUTHWEST GAS CORPORATION
5241 SPRING MOUNTAIN ROAD
LAS VEGAS NV 89150-0002
(702) 876-7250
catherine.mazzeo@swgas.com
For: Southwest Gas Corporation

Daniel D. Van Hoogstraten
Legal Admin Assistant
STINSON MORRISON HECKER LLP
EMAIL ONLY
EMAIL ONLY DC 00000-0000

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
329 of 565

# APPEARANCE LIST
## I.11-11-009

Jeff Salazar
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14D6
LOS ANGELES CA 90013
JLSalazar@SempraUtilities.com

Michael Franco
Regulatory Case Mgr
SOUTHERN CALIFORNIA GAS COMPANY
555 WEST FIFTH STREET, GT14D6
LOS ANGELES CA 90013-1011
(213) 244-5839
MFranco@SempraUtilities.com

Garance Burke
Reporter
THE ASSOCIATED PRESS
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 495-1708
gburke@ap.org

Marcel Hawiger
Staff Attorney
THE UTILITY REFORM NETWORK
785 MARKET ST., STE. 1400
SAN FRANCISCO CA 94103
(415) 929-8876 X311
marcel@turn.org

Nina Suetake
Staff Attorney
THE UTILITY REFORM NETWORK
EMAIL ONLY
EMAIL  ONLY CA 00000
(415) 929-8876 X 308
nsuetake@turn.org

Alex Kania
WOLFE RESEARCH
420 LEXINGTON AVENUE, SUITE 648
NEW YORK NY 10170
(646) 582-9244
akania@wolferesearch.com

David Paz
WOLFE RESEARCH

(202) 572-9919
dvanhoogstraten@stinson.com

Kelly Daly
STINSON MORRISON HECKER LLP
1775 PENNSYLVANIA AVE., NW, STE. 800
WASHINGTON DC 20006-4605
(202) 728-3011
kdaly@stinson.com
For: Sacramento Municipal Utility District (SMUD)
_____

Matt Fallon
TALON CAPITAL
1001 FARMINGTON AVENUE
WEST HARTFORD CT 06107
(860) 920-1000
mfallon@taloncap.com

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
330 of 565

## APPEARANCE LIST
## I.11-11-009

420 LEXINGTON AVE., STE. 648
NEW YORK NY 10170
(646) 582-9242
dpaz@wolferesearch.com

Steve Fleishman
WOLFE RESEARCH
420 LEXINGTON AVENUE, SUITE 648
NEW YORK NY 10170
(646) 582-9241
sfleishman@wolferesearch.com

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 331 of 565

# Appearance List
# I.11-02-016

************** **PARTIES** **************

Traci Bone
Legal Division
RM. 5027
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2048
tbo@cpuc.ca.gov
For: ORA

Theresa L. Mueller
CITY AND COUNTY OF SAN FRANCISCO
CITY HALL, ROOM 234
1 DR. CARLTON B. GOODLETT PLACE
SAN FRANCISCO CA 94102-4682
(415) 554-4640
theresa.mueller@sfgov.org
For: City and County of San Francisco
_____

Travis Foss
Legal Division
RM. 5026
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1998
ttf@cpuc.ca.gov
For: SED

Martin Homec
PO BOX 4471
DAVIS CA 95617
(530) 867-1850
martinhomec@gmail.com
For: Californians for Renewable Energy
_____

C. Susie Berlin
LAW OFFICES OF SUSIE BERLIN
1346 THE ALAMEDA, STE. 7, NO. 141
SAN JOSE CA 95126
(408) 778-8478
berlin@susieberlinlaw.com
For: Northern California Generation Coalition
_____

Steven R. Meyers
Principal
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
smeyers@meyersnave.com

Harvey Y. Morris
Legal Division
RM. 5036
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1086
hym@cpuc.ca.gov
For: SED

Joseph M. Malkin
ORRICK HERRINGTON & SUTCLIFFE LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO CA 94105-2669
(415) 773-5505
JMalkin@Orrick.com
For: Pacific Gas and Electric Company
_____

Thomas J. Long
Legal Dir.
THE UTILITY REFORM NETWORK
785 MARKET ST., STE. 1400
SAN FRANCISCO CA 94103
(415) 929-8876 X303
TLong@turn.org
For: TURN
_____

********** **STATE EMPLOYEE** **********

Niki Bawa
Executive Division
RM. 5038
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2049
nb2@cpuc.ca.gov

Kenneth Bruno
Safety and Enforcement Division
AREA 2-D
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5265
kab@cpuc.ca.gov

David B. Peck
CPUC
ELECTRICITY PRICING & CUSTOMER PROGRAM
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-1213
dbp@cpuc.ca.gov

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
332 of 565

# Appearance List
## I.11-02-016

For: City of San Bruno

_____

Maryam Ebke
CPUC - ALJ DIV.
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-5112
meb@cpuc.ca.gov

Michael Colvin
Advisor
CPUC - ENERGY
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 355-5484
michael.colvin@cpuc.ca.gov

Christine Hammond
CPUC - LEGAL
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-2682
Christine.hammond@cpuc.ca.gov

Michael Minkus
Legislative Liaison
CPUC - OFFICE OF GOV'T AFFAIRS
EMAIL ONLY
EMAIL ONLY CA 00000
(916) 905-7364
michael.minkus@cpuc.ca.gov

Eugene Cadenasso
Energy Division
AREA 4-A
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1214
cpe@cpuc.ca.gov

Michelle Cooke
Administrative Services
RM. 2004
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2163
mlc@cpuc.ca.gov

Julie A. Fitch
Executive Division
RM. 5214
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-3134
jf2@cpuc.ca.gov

Darryl J. Gruen
Legal Division
RM. 5133
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1973
djg@cpuc.ca.gov

Julie Halligan
Administrative Law Judge Division
RM. 5041
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1587
jmh@cpuc.ca.gov

Catherine A. Johnson
Legal Division
RM. 4300
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1385
caj@cpuc.ca.gov

Sepideh Khosrowjah
Executive Division
RM. 5201
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1190
skh@cpuc.ca.gov

Andrew Kotch
Executive Division
RM. 5301
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1072
ako@cpuc.ca.gov

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
333 of 565

# Appearance List
## I.11-02-016

Elizabeth Dorman
Legal Division
RM. 4300
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5884
edd@cpuc.ca.gov

Richard A. Myers
Energy Division
AREA 4-A
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1228
ram@cpuc.ca.gov

Terrie D. Prosper
Executive Division
RM. 5301
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2160
tdp@cpuc.ca.gov

Thomas Roberts
Office of Ratepayer Advocates
RM. 4108
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5278
tcr@cpuc.ca.gov

Matthew Tisdale
Executive Division
RM. 5202
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5137
mwt@cpuc.ca.gov

Kan Wai Tong
Safety and Enforcement Division
RM. 500
320 West 4th Street Suite 500
Los Angeles CA 90013
(213) 576-5700
kwt@cpuc.ca.gov

Kelly C. Lee
Office of Ratepayer Advocates
RM. 4108
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1795
kcl@cpuc.ca.gov

Marc D. Joseph
ADAMS BROADWELL JOSEPH & CARDOZO
601 GATEWAY BLVD., STE. 1000
SOUTH SAN FRANCISCO CA 94080-7037
(650) 589-1660
mdjoseph@adamsbroadwell.com

Rachael E. Koss
ADAMS BROADWELL JOSEPH & CARDOZO
601 GATEWAY BOULEVARD, SUITE 1000
SOUTH SAN FRANCISCO CA 94080
(650) 589-1660 X20
rkoss@adamsbroadwell.com

Jamie L. Mauldin
ADAMS BROADWELL JOSEPH & CARDOZO, PC
EMAIL ONLY
EMAIL ONLY CA 00000
(650) 589-1660
jmauldin@adamsbroadwell.com

Randall Li
Analyst
AEGEAN OIL USA, LLC
20 SIGNAL RD
STAMFORD CT 06902-7909
(664) 722-2007
randall@nexusamllc.com

John Mcintyre
ALCANTAR & KAHL
33 NEW MONTGOMERY STREET, SUITE 1850
SAN FRANCISCO CA 94105
(415) 421-4143 X-109
jfm@a-klaw.com

Karen Terranova
ALCANTAR & KAHL, LLP
33 NEW MONTGOMERY STREET, SUITE 1850
SAN FRANCISCO CA 94105
(415) 421-4143
filings@a-klaw.com

A-3

# Appearance List
## I.11-02-016

Amy C. Yip-Kikugawa
Administrative Law Judge Division
RM. 5024
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5256
ayk@cpuc.ca.gov

********* INFORMATION ONLY *********

Nora Sheriff
ALCANTAR & KAHL, LLP
33 NEW MONTGOMERY ST., STE. 1850
SAN FRANCISCO CA 94105
(415) 421-4143
nes@a-klaw.com

Naaz Khumawala
BANK OF AMERICA, MERRILL LYNCH
700 LOUISIANA, SUITE 401
HOUSTON TX 77002
(713) 247-7313
naaz.khumawala@baml.com

Mark Chediak
Energy Reporter
BLOOMBERG NEWS
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 617-7233
mchediak@bloomberg.net

Andrew Greenberg
CADWALADER WICKERSHAM & TAFT LLP
ONE WORLD FINANCIAL CENTER
NEW YORK NY 10281
(212) 504-6077
andrew.greenberg@cwt.com

Kenneth W. Irvin
CADWALADER WICKERSHAM & TAFT LLP
700 SIXTH STREET, N.W.
WASHINGTON DC 20001
(202) 862-2315
ken.irvin@cwt.com

Terence T. Healey
CADWALADER WICKERSHAM & TAFT LLP
700 ISXTH ST., N.W.
WASHINGTON DC 20001

Mike Cade
ALCANTAR & KAHL, LLP
EMAIL ONLY
EMAIL ONLY OR 00000
(503) 402-8711
wmc@a-klaw.com

Andrew Gay
CARLSON CAPITAL L.P.
712 FIFTH AVE., 25 TH FLOOR
NEW YORK NY 10019
(212) 994-8324
agay@carlsoncapital.com

Jack D'Angelo
CATAPULT CAPITAL MANAGEMENT LLC
666 5TH AVENUE, 9TH FLOOR
NEW YORK NY 10019
(212) 320-1059
jdangelo@catapult-llc.com

Melissa W. Kasnitz
CENTER FOR ACCESSIBLE TECHNOLOGY
3075 ADELINE STREET, SUITE 220
BERKELEY CA 94703
(510) 841-3224 X2019
service@cforat.org

Sophie Karp
CITIGROUP
388 GREENWICH ST.
NEW YORK NY 10013
(212) 816-3366
sophie.karp@citi.com

Austin M. Yang
Deputy City Attorney
CITY AND COUNTY OF SAN FRANCISCO
OFFICE OF CITY ATTORNEY DENNIS J.HERRERA
1 DR. CARLTON B. GOODLETT PL, RM 234
SAN FRANCISCO CA 94102-4682
(415) 554-6761
Austin.yang@sfgov.org

Grant Kolling
Senior Assistant City Attorney
CITY OF PALO ALTO

# Appearance List
# I.11-02-016

(202) 862-2335
terence.healey@cwt.com

PO BOX 10250
PALO ALTO CA 94303
(650) 329-2171
grant.kolling@cityofpaloalto.org

Hillary Corrigan
CALIFORNIA ENERGY MARKETS
425 DIVISADERO ST. STE 303
SAN FRANCISCO CA 94117-2242
(415) 963-4439
cem@newsdata.com

Jessica Mullan
Senior Deputy City Attorney
CITY OF PALO ALTO
PO BOX 10250
PALO ALTO CA 94303
(650) 329-2577
jessica.mullan@cityofpaloalto.org

Connie Jackson
City Manager
CITY OF SAN BRUNO
567 EL CAMINO REAL
SAN BRUNO CA 94066-4299
(650) 616-7056
cjackson@ci.sanbruno.ca.us

Scott Senchak
DECADE CAPITAL
EMAIL ONLY
EMAIL ONLY NY 00000-0000
(212) 320-1933
scott.senchak@decade-llc.com

Klara A. Fabry
Dir. - Dept. Of Public Services
CITY OF SAN BRUNO
567 EL CAMINO REAL
SAN BRUNO CA 94066-4247
(650) 616-7065
kfabry@sanbruno.ca.gov

Lauren Duke
DEUTSCHE BANK SECURITIES INC.
EMAIL ONLY
EMAIL ONLY NY 00000
(212) 250-8204
lauren.duke@db.com

Sergeant Geoff Caldwell
CITY OF SAN BRUNO-POLICE DEPARTMENT
POLICE PLAZA-1177 HUNTINGTON AVENUE
SAN BRUNO CA 94066-1500
(650) 616-7100
gcaldwell@sanbruno.ca.gov

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY CA 94704-1204
(510) 665-8644
pucservice@dralegal.org

Kevin Prior, Cfa
Research Associate
CRT CAPITAL GROUP LLC
262 HARBOR DRIVE
STAMFORD CT 06902
(203) 569-4375
KPrior@crtllc.com

Cassandra Sweet
DOW JONES NEWSWIRES
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 439-6468
cassandra.sweet@dowjones.com

Robert C. Cagen
Legal Division
RM. 4107
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1385
rcc@cpuc.ca.gov

Adam Miller
DRW
540 W. MADISON , STE. 2600
CHICAGO IL 60661
(312) 542-3478
filings@drw.com

Paul Duller
EMAIL ONLY
EMAIL ONLY CA 00000
p.duller@btinternet.com

Sarah Grossman-Swenson

Andrew B. Brown

# Appearance List
## I.11-02-016

DAVIS, COWELL & BOWE, LLP
595 MARKET STREET, STE. 1400
SAN FRANCISCO CA 94105
(415) 977-7200
sgs@dcbsf.com

Ann L. Trowbridge
DAY CARTER & MURPHY LLP
3620 AMERICAN RIVER DRIVE, SUITE 205
SACRAMENTO CA 95864
(916) 570-2500 X 103
atrowbridge@daycartermurphy.com

Megan Somogyi
Attorney
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 SANSOME ST., STE. 900
SAN FRANCISCO CA 94111
(415) 392-7900
MSomogyi@GoodinMacBride.com

Norman A. Pedersen, Esq.
Attorney At Law
HANNA AND MORTON, LLP
444 SOUTH FLOWER STREET, STE. 1500
LOS ANGELES CA 90071-2916
(213) 430-2510
npedersen@hanmor.com

Charlyn A. Hook
Legal Division
RM. 5131
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-3050
chh@cpuc.ca.gov

Christopher Turnure
J.P. MORGAN CHASE SECURITIES
383 MADISON AVENUE, FLOOR 34
NEW YORK NY 10179
(212) 622-5696
Christopher.Turnure@JPMorgan.com

Anthony Crowdell
Equity Research - Electric Utilities
JEFFERIES LLC
520 MADISON AVENUE, 13TH FL.
NEW YORK NY 10022

Attorney At Law
ELLISON SCHNEIDER & HARRIS, LLP
2600 CAPITAL AVENUE, SUITE 400
SACRAMENTO CA 95816-5905
(916) 447-2166
abb@eslawfirm.com

Brian Cragg
Attorney
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111
(415) 392-7900
BCragg@GoodinMacbride.com
For: Engineers and Scientists of California, Local 20

_____

Neil Stein
LEVIN CAPITAL STRATEGIES
595 MADISON AVENUE
NEW YORK NY 10022
(212) 259-0823
NStein@LevinCap.com

Michael Goldenberg
LUMINUS MANAGEMENT
1700 BROADWAY, 38TH FLOOR
NEW YORK NY 10019
(212) 615-3427
mgoldenberg@luminusmgmt.com

Margaret C. Felts
M.C. FELTS COMPANY
8822 SHINER CT.
ELK GROVE CA 95624
(916) 468-8443
margaret@mfelts.com

Sunny Kwak
MACQUARIE CAPITAL (USA)
125 WEST 55TH STREET
NEW YORK NY 10019
(212) 231-1683
sunny.kwak@macquarie.com

Susan Griffin
Paralegal
MEYERS NAVE
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
sgriffin@meyersnave.com

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 337 of 565

# Appearance List
# I.11-02-016

(212) 284-2563
acrowdell@jefferies.com

Eric Selmon
JEMZAR CORP.
EMAIL ONLY
EMAIL ONLY IS 000 000
ISRAEL
(646) 843-7200
ESelmon@Jemzar.com

Brendan Naeve
LEVIN CAPITAL STRATEGIES
595 MADISON AVENUE, 17TH FLR
NEW YORK NY 10022
(212) 259-0841
bnaeve@levincap.com

Emilie E. De La Motte
Attorney At Law
MEYERS NAVE RIBACK SILVER & WILSON
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
edelamotte@meyersnave.com

Britt K. Strottman
Attorney
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12TH STREET, SUITE 1500
OAKLAND CA 94607
(510) 808-2000
bstrottman@meyersnave.com
For: City of San Bruno

_____

Gregory Reiss
MILLENNIUM MANAGEMENT LLC
EMAIL ONLY
EMAIL ONLY NY 00000
(212) 320-1036
Gregory.Reiss@mlp.com

James (Jim) Von Riesemann
MIZUHO SECURITIES USA, INC.
320 PARK AVENUE, 12TH FLOOR
NEW YORK NY 10022
(212) 205-7857
James.vonRiesemann@us.mizuho-sc.com

Phillip Moskal
EMAIL ONLY
EMAIL ONLY CA 00000
thnxvm@gmail.com
For: Phillip Moskal

_____

Jasmin Anes
PACIFIC GAS & ELECTRIC COMPANY
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 973-8225
jjav@pge.com

Jonathan Seager
PACIFIC GAS & ELECTRIC COMPANY
EMAIL ONLY
EMAIL ONLY CA 00000

Lise H. Jordan
PACIFIC GAS AND ELECTRIC COMPANY
LAW DEPT.
77 BEALE STREET, MC B30A / PO BIX 7442
SAN FRANCISCO CA 94105
(415) 973-6965
LHJ2@pge.com

Michelle L. Wilson
PACIFIC GAS AND ELECTRIC COMPANY
MAIL CODE B30A
77 BEALE STREET, ROOM 1087
SAN FRANCISCO CA 94105
(415) 973-6655
mlw3@pge.com

Karen Paull
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-2630
karenppaull@gmail.com

Edward Heyn
POINTSTATE CAPITAL
40 WEST 57TH STREET, 25TH FL.
NEW YORK NY 10019
(212) 830-7061
ted@PointState.com

William W. Westerfield Iii
Sr. Attorney - Off. Of Gen. Counsel
SACRAMENTO MUNICIPAL UTILITY DISTRICT

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
338 of 565

# Appearance List
# I.11-02-016

j7se@pge.com

Bruce T. Smith
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, B9A
SAN FRANCISCO CA 94105
(415) 973-2616
bts1@pge.com

Case Coordination
PACIFIC GAS AND ELECTRIC COMPANY
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 973-4744
RegRelCPUCCases@pge.com

Christopher P. Johns
President
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET
SAN FRANCISCO CA 94105
cpj2@pge.com

6201 S STREET, M.S. B402
SACRAMENTO CA 95817
(916) 732-6123
wwester@smud.org

Paul Schaafsma
Attorney At Law
521 WEST SUPERIOR STREET, UNIT 221
CHICAGO IL 60654
(312) 664-0906
paulschaafsma@yahoo.com

Marie L. Fiala
CARTER G. PHILLIPS; QUINN M. SORENSON
SIDLEY AUSTIN LLP
555 CALIFORNIA STREET, STE. 2000
SAN FRANCISCO CA 94104-1522
(415) 772-1278
MFiala@sidley.com
For: Pacific Gas and Electric Company

_____

Chris King
SIEMENS SMART GRID SOLUTIONS
4000 E. THIRD AVE., STE. 400
FOSTER CITY CA 94404
(650) 227-7770 X-187
chris_king@siemens.com

Kevin Fallon
SIR CAPITAL MANAGEMENT
620 EIGHTH AVENUE, 22ND FLR.
NEW YORK NY 10018
(212) 993-7104
kfallon@sirfunds.com

Shirley Amrany
Regulatory Case Manage 1
SO. CAL. GAS COMPANY / SAN DIEGO GAS CO
555 WEST 5TH STREET, GT14-D6
LOS ANGELES CA 90013
(213) 244-4845
samrany@semprautilities.com

Angelica Morales
Attorney
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE / PO BOX 800
ROSEMEAD CA 91770
(626) 302-6160
angelica.morales@sce.com

Jeffery L. Salazar
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH STREET, GT14D6
LOS ANGELES CA 90013
(213) 244-5916
JLsalazar@SempraUtilities.com

Michael Franco
Regulatory Case Mgr
SOUTHERN CALIFORNIA GAS COMPANY
555 WEST FIFTH STREET, GT14D6
LOS ANGELES CA 90013-1011
(213) 244-5839
MFranco@SempraUtilities.com

Rasha Prince
Director, Regulatory Affairs
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH STREET, GT14D6
LOS ANGELES CA 90013-1034
(213) 244-5141
RPrince@SempraUtilities.com

Steven Hruby
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14D6
LOS ANGELES CA 90013
SHruby@SempraUtilities.com

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 339 of 565

# Appearance List
## I.11-02-016

Douglas Porter
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE./PO BOX 800
ROSEMEAD CA 91770
(626) 302-3964
douglas.porter@sce.com

Catherine Mazzeo
Assistant General Counsel
SOUTHWEST GAS CORPORATION
5241 SPRING MOUNTAIN ROAD
LAS VEGAS NV 89150-0002
(702) 876-7250
catherine.mazzeo@swgas.com

Frank A. Mcnulty
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE. / PO BOX 800
ROSEMEAD CA 91770
(626) 302-1499
Francis.McNulty@sce.com

Daniel D. Van Hoogstraten
Legal Admin Assistant
STINSON MORRISON HECKER LLP
EMAIL ONLY
EMAIL ONLY DC 00000-0000
(202) 572-9919
dvanhoogstraten@stinson.com

Deana Michelle Ng
SOUTHERN CALIFORNIA GAS COMPANY
555 W. 5TH ST., STE. 1400, GT-14E7
LOS ANGELES CA 90013
(213) 244-3013
dng@SempraUtilities.com
For: Southern California Gas Company

_____

Kelly A. Daly
STINSON MORRISON HECKER LLP
1775 PENNSYLVANIA AVE., N.W. NO. 800
WASHINGTON DC 20006-4305
(202) 728-3011
kdaly@stinson.com
For: SMUD

_____

Matt Fallon
TALON CAPITAL
1001 FARMINGTON AVENUE
WEST HARTFORD CT 06107
(860) 920-1000
mfallon@taloncap.com

Steve Fleishman
WOLFE RESEARCH
420 LEXINGTON AVENUE, SUITE 648
NEW YORK NY 10170
(646) 582-9241
sfleishman@wolferesearch.com

Garance Burke
Reporter
THE ASSOCIATED PRESS
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 495-1708
gburke@ap.org

Stephanie C. Chen
Sr. Legal Counsel
THE GREENLINING INSTITUTE
EMAIL ONLY
EMAIL ONLY CA 00000
(510) 898-0506
StephanieC@greenlining.org

Nina Suetake
Staff Attorney
THE UTILITY REFORM NETWORK
EMAIL ONLY

A-9

# Appearance List
## I.11-02-016

EMAIL ONLY CA 00000
(415) 929-8876 X 308
nsuetake@turn.org

Julien Dumoulin-Smith
UBS INVESTMENT RESEARCH
EMAIL ONLY
EMAIL ONLY NY 00000
(212) 713-9848
julien.dumoulin-smith@ubs.com

Alex Kania
WOLFE RESEARCH
420 LEXINGTON AVENUE, SUITE 648
NEW YORK NY 10170
(646) 582-9244
akania@wolferesearch.com

David Paz
WOLFE RESEARCH
420 LEXINGTON AVE., STE. 648
NEW YORK NY 10170
(646) 582-9242
dpaz@wolferesearch.com

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
341 of 565

# Appearance List
## I.11-02-016

************** **PARTIES** **************

Traci Bone
Legal Division
RM. 5027
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2048
tbo@cpuc.ca.gov
For: ORA

Martin Homec
CALIFORNIANS FOR RENEWABLE ENERGY, INC.
EMAIL ONLY
EMAIL ONLY CA 00000-0000
(530) 867-1850
martinhomec@gmail.com
For: CAlifornians for Renewable Energy

_____

Erica Schroeder Mcconnell
KEYES FOX & WIEDMAN, LLP
436 14TH ST., STE. 1305
OAKLAND CA 94612
(510) 314-8206
emcconnell@kfwlaw.com
For: Interstate Renewable Energy Council, Inc.

_____

Britt K. Strottman
MEYERS NAVE
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2083
bstrottman@meyersnave.com
For: City of San Bruno

_____

Harvey Y. Morris  SED
Legal Division
RM. 5036
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1086
hym@cpuc.ca.gov
For: SED

Theresa L. Mueller
Chief Energy & Telecom. Deputy
OFFICE OF THE CITY ATTY. DENNIS HERRERA
CITY HALL
1 DR. CARLTON B. GOODLETT PL., RM. 234
SAN FRANCISCO CA 94102
(415) 554-4640

Joseph M. Malkin
ORRICK HARRINGTON
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 773-5505
jmalkin@orrick.com
For: Pacific Gas and Electric (PG&E)

_____

Michelle L. Wilson
PACIFIC GAS AND ELECTRIC COMPANY
MAIL CODE B30A
77 BEALE STREET, ROOM 1087
SAN FRANCISCO CA 94105
(415) 973-6655
mlw3@pge.com
For: Pacific Gas and Electric Company

_____

Thomas J. Long
Legal Dir.
THE UTILITY REFORM NETWORK
785 MARKET ST., STE. 1400
SAN FRANCISCO CA 94103
(415) 929-8876 X303
TLong@turn.org
For: The Utility Reform Network

_____

********** **STATE EMPLOYEE** **********

Niki Bawa
Executive Division
RM. 5038
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2049
nb2@cpuc.ca.gov

Kenneth Bruno
Safety and Enforcement Division
AREA 2-D
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5265
kab@cpuc.ca.gov

David Peck
CALIFORNIA PUBLIC UTILITIES COMMISSION
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-1213
DBP@cpuc.ca.gov

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 342 of 565

# Appearances
# I.12-01-007

theresa.mueller@sfgov.org
For: City and County of San Francisco

Maryam Ebke
CPUC - ALJ DIV.
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-5112
meb@cpuc.ca.gov

Christine Hammond
CPUC - LEGAL
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-2682
Christine.hammond@cpuc.ca.gov

Michael Minkus
Legislative Liaison
CPUC - OFFICE OF GOV'T AFFAIRS
EMAIL ONLY
EMAIL ONLY CA 00000
(916) 905-7364
michael.minkus@cpuc.ca.gov

Christopher Chow
Executive Division
RM. 5301
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2234
crs@cpuc.ca.gov

Michelle Cooke
Administrative Services
RM. 2004
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2163
mlc@cpuc.ca.gov

Elizabeth Dorman
Legal Division
RM. 4300
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-5884
edd@cpuc.ca.gov

Julie A. Fitch
Executive Division
RM. 5214
505 Van Ness Avenue
San Francisco CA 94102 3298

Julie Halligan
Administrative Law Judge Division
RM. 5041
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1587
jmh@cpuc.ca.gov

Andrew Kotch
Executive Division
RM. 5301
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1072
ako@cpuc.ca.gov

Kelly C. Lee
Office of Ratepayer Advocates
RM. 4108
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1795
kcl@cpuc.ca.gov

Richard A. Myers
Energy Division
AREA 4-A
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1228
ram@cpuc.ca.gov

Tony Marino
OFFICE OF SENATOR JERRY HILL
EMAIL ONLY
EMAIL ONLY CA 00000
(916) 651-4013
tony.marino@sen.ca.gov

Marion Peleo
Legal Division
RM. 4107
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-2130
map@cpuc.ca.gov

Terrie D. Prosper
Executive Division
RM. 5301
505 Van Ness Avenue

# Appearances
## I.12-01-007

(415) 703-3134
jf2@cpuc.ca.gov


K. Konolige
BGC FINANCIAL, LP
EMAIL ONLY
EMAIL ONLY CA 00000
kkonolige@bgcpartners.com

Peter Battaglia
BGC FINANCIAL, LP
EMAIL ONLY
EMAIL ONLY CA 00000
(201) 787-9386
pbattaglia@bcgpartners.com

Mark Chediak
Energy Reporter
BLOOMBERG NEWS
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 617-7233
mchediak@bloomberg.net

Andrew Greenberg
CADWALADER WICKERSHAM & TAFT LLP
ONE WORLD FINANCIAL CENTER
NEW YORK NY 10281
(212) 504-6077
andrew.greenberg@cwt.com

Kenneth W. Irvin
CADWALADER WICKERSHAM & TAFT LLP
700 SIXTH STREET, N.W.
WASHINGTON DC 20001
(202) 862-2315
ken.irvin@cwt.com

Terence T. Healey
CADWALADER WICKERSHAM & TAFT LLP
700 ISXTH ST., N.W.
WASHINGTON DC 20001
(202) 862-2335
terence.healey@cwt.com

Deborah Slon
Deputy Attorney General
CALIFORNIA DEPARTMENT OF JUSTICE
1515 CLAY STREET, STE. 2000
OAKLAND CA 94612
(510) 622-2112
deborah.slon@doj.ca.gov

San Francisco CA 94102 3298
(415) 703-2160
tdp@cpuc.ca.gov


CALIFORNIA ENERGY MARKETS
425 DIVISADERO ST. STE 303
SAN FRANCISCO CA 94117-2242
(415) 963-4439
cem@newsdata.com

Jack D'Angelo
CATAPULT CAPITAL MANAGEMENT LLC
666 5TH AVENUE, 9TH FLOOR
NEW YORK NY 10019
(212) 320-1059
jdangelo@catapult-llc.com

Melissa Kasnitz
Attorney
CENTER FOR ACCESSIBLE TECHNOLOGY
3075 ADELINE STREET, STE. 220
BERKELEY CA 94703
(510) 841-3224 X2019
service@cforat.org

Sophie Karp
CITIGROUP
388 GREENWICH ST.
NEW YORK NY 10013
(212) 816-3366
sophie.karp@citi.com

Austin M. Yang
Deputy City Attorney
CITY AND COUNTY OF SAN FRANCISCO
OFFICE OF CITY ATTORNEY DENNIS J.HERRERA
1 DR. CARLTON B. GOODLETT PL, RM 234
SAN FRANCISCO CA 94102-4682
(415) 554-6761
Austin.yang@sfgov.org

Keith Helmuth. P.E.
CITY OF MADERA
205 W. FOURTH STREET
MADERA CA 93637
(559) 661-5418
khelmuth@cityofmadera.com

Jessica Mullan
Senior Deputy City Attorney
CITY OF PALO ALTO
PO BOX 10250
PALO ALTO CA 94303

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
344 of 565

# Appearances
# I.12-01-007

(650) 329-2577
jessica.mullan@cityofpaloalto.org

Connie Jackson
City Manager
CITY OF SAN BRUNO
567 EL CAMINO REAL
SAN BRUNO CA 94066-4299
(650) 616-7056
cjackson@ci.sanbruno.ca.us

Kevin Prior, Cfa
Research Associate
CRT CAPITAL GROUP LLC
262 HARBOR DRIVE
STAMFORD CT 06902
(203) 569-4375
KPrior@crtllc.com

Sarah Grossman-Swenson
DAVIS COWELL & BOWE, LLP
595 MARKET STREET, STE. 1400
SAN FRANCISCO CA 94105
(415) 497-7200
sgs@dcbsf.com

DAVIS WRIGHT TREMAINE LLP
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 276-6500
dwtcpucdockets@dwt.com

Ann Trowbridge
Attorney
DAY CARTER & MURPHY LLP
3620 AMERICAN RIVER DR., STE. 205
SACRAMENTO CA 95864
(916) 246-7303
ATrowbridge@DayCarterMurphy.com

Jonathan Arnold
DEUTSCHE BANK
60 WALL STREET
NEW YORK NY 10005
(212) 250-3182
jonathan.arnold@db.com

Lauren Duke
DEUTSCHE BANK SECURITIES INC.
EMAIL ONLY
EMAIL ONLY NY 00000
(212) 250-8204
lauren.duke@db.com

Adam Miller
DRW
540 W. MADISON , STE. 2600
CHICAGO IL 60661
(312) 542-3478
filings@drw.com

Andrew B. Brown
ELLISON, SCHNEIDER & HARRIS LLP
2600 CAPITOL AVENUE, SUITE 400
SACRAMENTO CA 95816-5905
(916) 447-2166
abb@eslawfirm.com

Travis Foss
Legal Division
RM. 5026
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-1998
ttf@cpuc.ca.gov
For: SED (formerly CPSD)

Paul Patterson
GLENROCK ASSOCIATES LLC
EMAIL ONLY
EMAIL ONLY NY 00000
(212) 246-3318
ppatterson2@nyc.rr.com

Brian Cragg
Attorney
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111
(415) 392-7900
BCragg@GoodinMacbride.com

Megan Somogyi
Attorney
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 SANSOME ST., STE. 900
SAN FRANCISCO CA 94111
(415) 392-7900
MSomogyi@GoodinMacBride.com

Darryl J. Gruen
Legal Division
RM. 5133
505 Van Ness Avenue

A-4

# Appearances
# I.12-01-007

San Francisco CA 94102 3298
(415) 703-1973
djg@cpuc.ca.gov

Norman A. Pedersen, Esq.
Attorney At Law
HANNA AND MORTON, LLP
444 SOUTH FLOWER STREET, STE. 1500
LOS ANGELES CA 90071-2916
(213) 430-2510
npedersen@hanmor.com

Charlyn A. Hook
Legal Division
RM. 5131
505 Van Ness Avenue
San Francisco CA 94102 3298
(415) 703-3050
chh@cpuc.ca.gov

Christopher Turnure
J.P. MORGAN CHASE SECURITIES
383 MADISON AVENUE, FLOOR 34
NEW YORK NY 10179
(212) 622-5696
Christopher.Turnure@JPMorgan.com

Anthony Crowdell
Equity Research - Electric Utilities
JEFFERIES LLC
520 MADISON AVENUE, 13TH FL.
NEW YORK NY 10022
(212) 284-2563
acrowdell@jefferies.com

Eric Selmon
JEMZAR CORP.
EMAIL ONLY
EMAIL ONLY IS 000 000
ISRAEL
(646) 843-7200
ESelmon@Jemzar.com

Nazia Sheikh
JP MORGAN CHASE
383 MADISON AVENUE, FLOOR 34
NEW YORK NY 10179
(212) 622-5696
nazia.x.sheikh@jmorgan.com

C. Susie Berlin
LAW OFFICES OF SUSIE BERLIN

Brendan Naeve
LEVIN CAPITAL STRATEGIES
595 MADISON AVENUE, 17TH FLR
NEW YORK NY 10022
(212) 259-0841
bnaeve@levincap.com

Neil Stein
LEVIN CAPITAL STRATEGIES
595 MADISON AVENUE
NEW YORK NY 10022
(212) 259-0823
NStein@LevinCap.com

Michael Goldenberg
LUMINUS MANAGEMENT
1700 BROADWAY, 38TH FLOOR
NEW YORK NY 10019
(212) 615-3427
mgoldenberg@luminusmgmt.com

Sunny Kwak
MACQUARIE CAPITAL (USA)
125 WEST 55TH STREET
NEW YORK NY 10019
(212) 231-1683
sunny.kwak@macquarie.com

Susan Griffin
Paralegal
MEYERS NAVE
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
sgriffin@meyersnave.com

Emilie E. De La Motte
Attorney At Law
MEYERS NAVE RIBACK SILVER & WILSON
555 12TH STREET, STE. 1500
OAKLAND CA 94607
(510) 808-2000
edelamotte@meyersnave.com

Steven R. Meyers
Principal
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12TH STREET, STE. 1500

Case: 19-30088  Doc# 14208-2  Filed: 12/13/23  Entered: 12/13/23 22:10:31  Page 346 of 565

**Appearances**
**I.12-01-007**

1346 THE ALAMEDA, STE. 7, NO. 141
SAN JOSE CA 95126
(408) 778-8478
berlin@susieberlinlaw.com
For: Northern California Generation Coalition (NCGC)
_____

Gregory Reiss
MILLENNIUM MANAGEMENT LLC
666 FIFTH AVENUE, 8TH FLOOR
NEW YORK NY 10103
(212) 320-1036
Gregory.Reiss@mlp.com

James (Jim) Von Riesemann
MIZUHO SECURITIES USA, INC.
320 PARK AVENUE, 12TH FLOOR
NEW YORK NY 10022
(212) 205-7857
James.vonRiesemann@us.mizuho-sc.com

Rajeev Lalwani
MORGAN STANLEY
EMAIL ONLY
EMAIL ONLY NY 00000
(212) 761-6978
rajeev.lalwani@morganstanley.com

Stephen Byrd
MORGAN STANLEY
1585 BROADWAY, 38TH FLOOR
NEW YORK NY 10036
(212) 761-6978
stephen.byrd@morganstanley.com

Phillip Moskal
EMAIL ONLY
EMAIL ONLY CA 00000
thnxvm@gmail.com

Attn.: Agent For Service Of Process
PACIFIC GAS & ELECTRIC COMPANY
77 BEALE ST., STE. 100
SAN FRANCISCO CA 94105

Bruce Smith
Grc & Regulatory Support
PACIFIC GAS & ELECTRIC COMPANY
EMAIL ONLY
EMAIL ONLY CA 00000
BTS1@pge.com

Dionne Adams

OAKLAND CA 94607
(510) 808-2000
smeyers@meyersnave.com

Shilpa Ramaiya
PACIFIC GAS & ELECTRIC COMPANY
77 BEALE STREET, 9BA
SAN FRANCISCO CA 94105
(415) 973-3186
SRRD@pge.com

Case Administration
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE ST./ PO BOX 770000; MC B9A
SAN FRANCISCO CA 94177
regrelcpuccases@pge.com

Kevin Hietbrink
Regulatory Case Coordinator
PACIFIC GAS AND ELECTRIC COMPANY
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 973-0223
kxhy@pge.com

Karen Paull
EMAIL ONLY
EMAIL ONLY CA 00000
(415) 703-2630
karenppaull@gmail.com

Henry W. Pielage, P.E.
Ratepayer Advocate
2860 GLEN CANYON ROAD
SANTA CRUZ CA 95060
henrypielage@comcast.net

Ted Heyn
POINTSTATE CAPITAL
40 WEST 57TH ST., 25TH FLOOR
NEW YORK NY 10019
(212) 830-7061
ted@pointstate.com

William Westfield
SACRAMENTO MUNICIPAL UTILITY DISTRICT
6201 S STREET
SACRAMENTO CA 95817-1899
(916) 732-6123
William.Westfield@smud.org

A-6

## Appearances
## I.12-01-007

PACIFIC GAS & ELECTRIC COMPANY
2700 YGNACIO VALLEY ROAD, SUITE 100
WALNUT CREEK CA 94598
(925) 459-3757
dng6@pge.com

Paul Schaafsma
Attorney At Law
521 WEST SUPERIOR STREET, UNIT 221
CHICAGO IL 60654
(312) 664-0906
paulschaafsma@yahoo.com

Chris King
SIEMENS SMART GRID SOLUTIONS
4000 E. THIRD AVE., STE. 400
FOSTER CITY CA 94404
(650) 227-7770 X-187
chris_king@siemens.com

Kevin Fallon
SIR CAPITAL MANAGEMENT
620 EIGHTH AVENUE, 22ND FLR.
NEW YORK NY 10018
(212) 993-7104
kfallon@sirfunds.com

Shirley Amrany
Regulatory Case Manage 1
SO. CAL. GAS COMPANY / SAN DIEGO GAS CO
555 WEST 5TH STREET, GT14-D6
LOS ANGELES CA 90013
(213) 244-4845
samrany@semprautilities.com

Angelica Morales
Attorney
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE / PO BOX 800
ROSEMEAD CA 91770
(626) 302-6160
angelica.morales@sce.com

Case Administration
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE, PO BOX 800
ROSEMEAD CA 91770
(626) 302-6906
case.admin@sce.com

Douglas Porter
SOUTHERN CALIFORNIA EDISON COMPANY

Hugh Wynne
SANFORD C. BERNSTEIN & CO.
1345 AVENUE OF THE AMERICAS, 15TH FLR
NEW YORK NY 10105
(212) 823-2692
hugh.wynne@bernstein.com

Frank A. Mcnulty
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE. / PO BOX 800
ROSEMEAD CA 91770
(626) 302-1499
Francis.McNulty@sce.com

Gloria Ing
Attorney At Law
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE./PO BOX 800
ROSEMEAD CA 91770
(626) 302-1999
gloria.ing@sce.com

Deana Ng
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14E7
LOS ANGELES CA 90013
dng@semprautilities.com

Jeffrey L. Salazar
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH STREET, GT14D6
LOS ANGELES CA 90013
jlsalazar@semprautilities.com

Michael Franco
Regulatory Case Mgr
SOUTHERN CALIFORNIA GAS COMPANY
555 WEST FIFTH STREET, GT14D6
LOS ANGELES CA 90013-1011
(213) 244-5839
MFranco@SempraUtilities.com

Rasha Prince
Director, Regulatory Affairs
SOUTHERN CALIFORNIA GAS COMPANY
555 WEST 5TH STREET, GT14D6
LOS ANGELES CA 90013-1034
(213) 244-5141
RPrince@SempraUtilities.com

Sharon Tomkins
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14E7

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 348 of 565

# Appearances
## I.12-01-007

2244 WALNUT GROVE AVE./PO BOX 800
ROSEMEAD CA 91770
(626) 302-3964
douglas.porter@sce.com

Catherine M. Mazzeo
Assistant General Counsel
SOUTHWEST GAS CORPORATION
5241 SPRING MOUNTAIN ROAD
LAS VEGAS NV 89150
(702) 876-7250
catherine.mazzeo@swgas.com
For: Southwest Gas Corporation

_____

Daniel D. Van Hoogstraten
Legal Admin Assistant
STINSON MORRISON HECKER LLP
EMAIL ONLY
EMAIL ONLY DC 00000-0000
(202) 572-9919
dvanhoogstraten@stinson.com

Kelly Daly
STINSON MORRISON HECKER LLP
1775 PENNSYLVANIA AVE., NW, STE. 800
WASHINGTON DC 20006-4605
(202) 728-3011
kdaly@stinson.com
For: Sacramento Municipal Utility District (SMUD)

_____

Matt Fallon
TALON CAPITAL
1001 FARMINGTON AVENUE
WEST HARTFORD CT 06107
(860) 920-1000
mfallon@taloncap.com

Marcel Hawiger
Staff Attorney
THE UTILITY REFORM NETWORK
785 MARKET ST., STE. 1400
SAN FRANCISCO CA 94103
(415) 929-8876 X311
marcel@turn.org

Julien Dumoulin-Smith
UBS INVESTMENT RESEARCH
EMAIL ONLY

LOS ANGELES CA 90013
stomkins@semprautilities.com

Steven Hruby
SOUTHERN CALIFORNIA GAS COMPANY
555 W. FIFTH ST., GT14D6
LOS ANGELES CA 90013
SHruby@SempraUtilities.com

Alex Kania
WOLFE RESEARCH
420 LEXINGTON AVENUE, SUITE 648
NEW YORK NY 10170
(646) 582-9244
akania@wolferesearch.com

David Paz
WOLFE RESEARCH
420 LEXINGTON AVE., STE. 648
NEW YORK NY 10170
(646) 582-9242
dpaz@wolferesearch.com

Steve Fleishman
WOLFE RESEARCH
420 LEXINGTON AVENUE, SUITE 648
NEW YORK NY 10170
(646) 582-9241
sfleishman@wolferesearch.com

Naaz Khumawala
Utilities & Power Research
WOLFE TRAHAN
420 LEXINGTON, SUITE 648
NEW YORK NY 10170
(646) 582-9243
NKhumawala@WolfeTrahan.com

Stephen Ludwick
ZIMMER PARTNERS
EMAIL ONLY
EMAIL ONLY CA 00000
sludwick@zimmerpartners.com

Ashar Khan
Portfolio Manager
VISIUM ASSET AMANGEMENT
888 SEVENTH AVENUE, 22 FLR.
NEW YROK NY 10019
(212) 474-6880
akhan@visiumfunds.com

**Appearances**
**I.12-01-007**

EMAIL ONLY NY 00000
(212) 713-9848
julien.dumoulin-smith@ubs.com


**(END OF APPENDIX A)**

# APPENDIX B

# TABLE OF VIOLATIONS AND OFFENSES

# Table of Violations and Offenses
# San Bruno Investigation OII 12-01-007

| Adopted No. | Alleged No. | Violation (abbreviated description; see applicable conclusion of law for full statement of violation) | Date (one-time violations) | Date Range (Continuing Violations) | | Offenses (Pub. Util Code § 2108) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Pre-1994 | 1994 & forward | Pre-1994 | 1994 & forward | Total |
| 1 | 4 | Section 451 – Violation of ASME B31.1.8-1955 (§811.412(c)) by not conducting a hydrostatic test | - | 12/31/56 - 12/31/93 | 1/1/94-9/9/10 | 13,515 | 6,096 | 19,611 |
| 2 | 5 | Section 451 – Violation of ASME B31.1.8-1955 (§811.27(A) by failing to visually inspect segments | 1956 | - | - | 1 | 0 | 1 |
| 3 | 6 | Section 451 – Violation of API 5LX (§VI) by installing pups less than five feet | 1956 | - | - | 1 | 0 | 1 |
| 4 | 8 | Section 451 – Violation of ASME B31.1.8-1955 (§811.27(G)) by assigning a yield strength above 24,000 psi | 1956 | - | - | 1 | 0 | 1 |
| 5 | 11 | Section 451 – Violation of ASME B31.1.8-1955 (§811.27(C)) by using incomplete welds and failing to measure wall thickness | 1956 | - | - | 1 | 0 | 1 |
| 6 | 10 | Section 451 – Violation of Section 1.7 of API Standard 1104 (4th Ed 1956) by using defective welds | 1956 | - | - | 1 | 0 | 1 |
| 7 | 12, 13 | Section 451 – Violation of ASME B31.1.8-1955 (§845.22) by failing to meet MAOP requirements | 1956 | - | - | 1 | 0 | 1 |
| 8 | 1, 2, 3 | Section 451 – Violation of industry standards and specifications, including ASME B31.1.8-1955 (§810.1) by installing pipe unsafe for operational conditions | - | 12/31/56 - 12/31/93 | 1/1/94-9/9/10 | 13,515 | 6,096 | 19,611 |
| 9 | 27 | 49 CFR 192.917(b) - Failure to use conservative assumptions | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 10 | 15 | 49 CFR 192.917(b) - Failure to gather and integrate GIS data | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 11 | 17 | 49 CFR 192.917(a) - Failure to analyze weld defects | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 12 | 21 | 49 CFR 192.917(e)(2) - Failure to consider cyclic fatigue | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 13 | 18 | 49 CFR 192.917(e)(3) - Failure to determine risk of DSAW threat | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 14 | 19, 20 | 49 CFR 192.917(e)(3) - Failure to identify threats as unstable after pressure increase | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 15 | 22 | 49 CFR 192.921(a) - Failure to use an appropriate assessment method | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |

B-1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 16 | 26 | 49 CFR 192.917(c) - Use of improper risk ranking algorithm | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 17 | 28 | Section 451 - Creation of unsafe condition by avoiding hydrostatic testing or ILI | - | - | 12/17/04 -9/9/10 | 0 | 2,093 | 2,093 |
| 18 | 29 | 49 CFR 192.13(c) - Failure to follow internal work procedures | 9/9/2010 | - | - | 0 | 1 | 1 |
| 19 | 30 | Section 451 - Failure to follow internal work procedures | 9/9/2010 | - | - | 0 | 1 | 1 |
| 20 | 31 | 49 CFR 192.605(c) - Failing to have adequate written procedures | 9/9/2010 | - | - | 0 | 1 | 1 |
| 21 | 32 | Section 451 - Unsafe conditions at Milpitas Terminal | - | - | 2/28/10- 9/9/10 | 0 | 194 | 194 |
| 22 | 38 | 49 CFR 192.615(a)(3) - Failure to respond promptly and effectively | 9/9/2010 | - | - | 0 | 1 | 1 |
| 23 | 39 | 49 CFR 192.615(a)(1) - Failure to receive, identify, and classify notices | 9/9/2010 | - | - | 0 | 1 | 1 |
| 24 | 40 | 49 CFR 192.615(a)(4) - Failure to provide resources at scene | 9/9/2010 | - | - | 0 | 1 | 1 |
| 25 | 41 | 49 CFR 192.615(a)(6) - Failure to adequately perform emergency shutdown | 9/9/2010 | - | - | 0 | 1 | 1 |
| 26 | 42 | 49 CFR 192.615(a)(7) - Failure to make hazards safe | 9/9/2010 | - | - | 0 | 1 | 1 |
| 27 | 43 | 49 CFR 192.615(a)(8) - Failure to notify first responders | 9/9/2010 | - | - | 0 | 1 | 1 |
| 28 | 44 | 49 CFR 192.605(c)(1) and (3) - Failure to have adequate emergency manual | 9/9/2010 | - | - | 0 | 1 | 1 |
| 29 | 45 | 49 CFR 192.615(a)(2) - Failure to follow adequate procedures for communication with first responders | 9/9/2010 | - | - | 0 | 1 | 1 |
| 30 | 53 | 49 CFR199.225(a) - Failure to perform alcohol tests | 9/9/2010 | - | - | 0 | 1 | 1 |
| 31 | 34 | Section 451 - Unsafe condition caused by emergency response deficiencies | 9/9/2010 | - | - | 0 | 1 | 1 |
| 32 | 55 | Section 451 - Unsafe condition due to budget cutting | - | - | 1/1/08- 9/9/10 | 0 | 983 | 983 |
| | | | | | | | | |
| | | | | | Total Offenses | 27,036 | 32,219 | 59,255 |

**(End of Appendix B)**

# APPENDIX C

# Table  of Violations for I.11-02-016 (Recordkeeping  OII)

**Appendix C**
**Table of Violations for I.11-02-016 (Recordkeeping OII)**

| | Violation (abbreviated description; see applicable conclusion of law for full statement of violation) | Duration | Pre-1/01/1994 Days in Violation | Post-1/01/1994 Days in Violation | Total Days in Violation |
|---|---|---|---|---|---|
| 1 | No records for salvaged pipe installed into Segment 180 - Violation of Public Utilities Code Section 451 (Felts Violation 1) | 1956- September 9, 2010 | 13,698 | 6,095 | 19,793 |
| 2 | Failure to create/retain construction records for 1956 project GM 136471 - Violation of Public Utilities Code Section 451 (Felts Violation 2) | 1956- September 9, 2010 | 13,698 | 6,095 | 19,793 |
| 3 | Failure to create/retain post- installation pressure test records for Segment 180 - Violation of Public Utilities Code Section 451 and ASME B.31.8 Section 841 (Felts Violation 3) | 1956- September 9, 2010 | 13,698 | 6,095 | 19,793 |
| 4 | Increase MAOP of Line 132 without conducting hydrostatic test – Violation of Public Utilities Code Section 451 (Felts Violation 4) | December 10, 2003 - September 9, 2010 | | 2,465 | 2,465 |
| 5 | Failure to Follow Procedures to Create Clearance Record - Violation of Public Utilities Code Section 451 (Felts Violation 5) | August 27,2010- September 9, 2010 | | 13 | 13 |
| 6 | Out of date drawings and computer diagrams of Milpitas Terminal- Violation of Public Utilities Code Section 451 (Felts Violation 7) | December 2, 2009 - July 2011 | | 590 | 590 |
| 7 | Failure to have accurate SCADA diagrams- Violation of Public Utilities Code Section 451 (Felts Violations 7 and 9) | December 2, 2009 - October 27, 2010 | | 329 | 329 |
| 8 | No Back-up Software at the Milpitas Terminal -Violation of Public Utilities Code Section 451 (Felts Violations 8) | September 9, 2010 | | 1 | 1 |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 355 of 565

## Appendix C
## Table of Violations for I.11-02-016 (Recordkeeping OII)

| 9 | Operated Line 132 in excess of 390 MAOP - Violation of Public Utilities Code Section 451 (Felts Violation 11 ) | December 11, 2003- September 9, 2010 | | 2,464 | 2,464 |
|---|---|---|---|---|---|
| 10 | Operated Line 132 in excess of 390 MAOP - Violation of Public Utilities Code Section 451 (Felts Violation 11 ) | December 9, 2008- September 9, 2010 | | 639 | 639 |
| 11 | Operated Line 132 in excess of 390 MAOP - Violation of Public Utilities Code Section 451 (Felts Violation 11) | September 9, 2010 | | 1 | I |
| 12 | PG&E's Contradictory Data Responses Regarding Recorded Brentwood Camera 6 Video - Violation of Commission Rules of Practice and Procedure Rule 1.1 (Felts Violation 13) | October 10,2011 – March 9, 2012 | | 151 | 151 |
| 13 | PG&E's Data Response 30, Q 8.d Did Not Identify All of the People in Milpitas Handling the Pressure Problem on September 9, 2010- Violation of Commission Rules of Practice and Procedure Rule 1.1 (Felts Violation 14) | December 17,2011- January 15, 2012 | | 29 | 29 |
| 14 | PG&E's Data Response 30, Q 2 Did Not Identify All of the People in Milpitas Handling the Pressure Problem on September 9, 2010- Violation of Commission Rules of Practice and Procedure Rule 1.1 (Felts Violation 14) | December 17, 2011 – January 15, 2012 | | 29 | 29 |
| 15 | PG&E's recordkeeping practices for Job Files adversely impacts ability to operate transmission pipeline system safely - Violation of Public Utilities Code Section 451. (Felts Violation 16) | !987 – December 12, 2012 | 2,376 | 6,928 | 9,304 |

Case: 19-30088　Doc# 14208-2　Filed: 12/13/23　Entered: 12/13/23 22:10:31　Page 356 of 565

## Appendix C
## Table of Violations for I.11-02-016 (Recordkeeping OII)

| 16 | PG&E failed to retain pressure test records for all segments of its gas transmission pipeline system - Violation of Public Utilities Code Section 451, ASME B.31.8, GO 112 through 112-B and PG&E's internal records retention policies (Felts Violation 18) | 1956 - December 20, 2012 | 13,698 | 6,928 | 20,626 |
|---|---|---|---|---|---|
| 17 | Weld Inspection Records Missing or Incomplete -Violation of Public Utilities Code Section 451, 49 CFR 192.241 and 192.243, ASME B.31.8, General Orders 112, 112-A, 112-B, section 107. (Felts Violation 19) | 1955- December 20, 2012 | 14,064 | 6,928 | 20,992 |
| 18 | Operating Pressure Records Missing, Incomplete or Inaccessible – Violation of Public Utilities Code Section 451 (Felts Violation 20) | 1955- December 17, 2004 | 14,064 | 4,003 | 18,067 |
| 19 | Inaccurate and incomplete data in leak reports; missing leak records - Violation of Public Utilities Code Section 451 (Felts Violations 21 and 22) | 1955 - December 20, 2012 | 14,064 | 6,928 | 20,992 |
| 20 | Failure to retain records of reconditioned and reused pipe in transmission pipeline system - Violation of Public Utilities Code Section 451 (Felts Violation 23) | 1940 - December 20, 2012 | 19,542 | 6,928 | 26,470 |
| 21 | Failure to ensure the accuracy of data in GIS and to adopt conservative assumed values for missing data in GIS - Violation of Public Utilities Code Section 451 (Felts Violation 24) | 1995 - December 20, 2012 | | 6,382 | 6,382 |
| 22 | PG&E unable to assess the integrity of its pipeline system and effectively manage risk – Violation of Public Utilities Code Section 451 (Felts Violation 25) | December 17, 2004 - December 20, 2012 | | 2,925 | 2,925 |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 357 of 565

## Appendix C
## Table of Violations for I.11-02-016 (Recordkeeping OII)

| 23 | Failure to retain metallurgist report concerning a 1963 fire and explosion on Line 109 - Violation of Public Utilities Code Section 451 (Felts Violation 27) | 1963 - December 20, 2012 | 11,142 | 6,928 | 18,070 |
|----|----|----|----|----|----|
| 24 | Inability to operate and maintain PG&E's gas transmission pipeline system in a safe manner due to poor records management activities - Violation of Public Utilities Code Section 451, GO 112 through 112-B, Section 107, ASME B.31.8. (Duller/North Violation A.1) | 1955 - December 20, 2012 | 14,064 | 6,928 | 20,992 |
| 25 | Failure to retain records of Leak Survey Maps - Violation of ASME B.31.8 Section 851.5. (Duller/North Violation B.1) | April 16 2010- December 20, 2012 | | 979 | 979 |
| 26 | Failure to retain records of Line Patrol Reports - Violation of ASME B.31.8 Section 85L5. (Duller/North Violation B.2) | September 1, 1964 - December 20, 2012 | 10,714 | 6,928 | 17,642 |
| 27 | Failure to retain records of Line Inspection Reports - Violation of ASME B.31.8 Section 851.5. (Du11er/North Violation B.3) | December 17,1991- December20, 2012 | 746 | 6,928 | 7,674 |
| 28 | Failure to retain pressure test records - Violation of ASME B.31.8 Section 851.417. (Duller/North Violation B.4) | September 1 ,1964 - December 20, 2012 | 10,714 | 6,928 | 17,642 |
| 29 | Failure to retain records of transmission line inspections - Violation of ASME B.31.8 Section 851.5. (Duller/North Violation B.5) | September 1 ,1964- December 20, 2012 | 10,714 | 6,928 | 17,642 |
| 30 | Failure to comply with internal records retention policies - Violation of 49 CFR 192.13(c). (Duller/North Violation B.6) | 1955- December 20, 2012 | 14,064 | 6,928 | 20,992 |
| 31 | Failure to identify and include in all pipe segments with unusual longitude seams and joints for replacement- Violation of Public Utilities Code Section 451. (Duller/North Violation C.l) | June 1988- December 20, 2012 | 2,026 | 6,928 | 8,954 |

C-4

**Appendix C**
**Table of Violations for I.11-02-016 (Recordkeeping OII)**

| 32 | Failure to properly identify and replacing those pipelines that were prone to damage during severe earthquake- Violation of Public Utilities Code Section 451. (Duller/North Violation C.2) | June 1992- December 20,2012 | 565 | 6,928 | 7,493 |
|---|---|---|---|---|---|
| 33 | Failure to maintain comprehensive database for all gas leaks in transmission pipeline system – Violation of Public Utilities Code Section 451. (Duller/North Violation C.3) | 1957 - December 20, 2012 | 13,333 | 6,928 | 20,261 |
| | **Total Days in Violation** | | **206,984** | **143,205** | **350,189** |

**(End of Appendix C)**

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 359 of 565

# APPENDIX D

## Table of Violations for I.11-11-009
## (Class Location OII)

**Appendix D**
**Table of Violations for I.11-11-009 (Class Location O I I )**

| Violation (abbreviated description; see applicable conclusion of law for full statement of violation) | Number of Segments (Violations) | Pre-1/01/1994 Days in Violation | Post-1/01/1994 Days in Violation* | Total Days in Violation |
|---|---|---|---|---|
| 49 CFR § 192.107 (b) (Assumed SMYS Values) | 133 | 451,890 | 766,482 | 1,218,372 |
| P.U. Code § 451 (Assumed SMYS Values Resulting in Excessive MAOPs) | 133 | 451,890 | 766,482 | 1,218,372 |
| 49 CFR § 192.13(c) (Not Following Procedures) | 843 | 2,107,255 | 4,162,027 | 6,269,282 |
| 49 CFR § 192.609 (Required Study) | 224 | 542,030 | 1,095,373 | 1,637,403 |
| 49 CFR § 192.611 (MAOP Confirmation/Revision) | 224 | 542,030 | 1,095,373 | 1,637,403 |
| 49 CFR § 192.613 (Continuing Surveillance) | 677 | 1,723,956 | 3,346,447 | 5,070,403 |
| 49 CFR § 192.619 (Non-Commensurate | 63 | 154,734 | 338,828 | 493,562 |
| P.U. Code § 451 (Non-Commensurate | 63 | 154,734 | 338,828 | 493,562 |
| TOTAL | 2,360 | 6,128,519 | 11,909,840 | 18,038,359 |

*End Date January 17, 2012

**(END OF APPENDIX D)**

# APPENDIX E

## ADOPTED REMEDIES

### Adopted Remedies Proposed by CPSD in All Three OIIs

1.      PG&E shareholders shall pay to reimburse CPSD for contracts retaining independent industry experts, chosen by CPSD, for the cost of verification audits and inspections to ensure compliance with the other remedies. PG&E shall also pay to reimburse CPSD for contracts retaining independent industry experts, chosen by CPSD in the near term to provide needed technical expertise as PG&E proceeds with its hydrostatic testing program, in order to provide a high level of technical oversight and to assure the opportunity for legacy piping characterization through sampling is not lost in the rush to execute the program.

2.      PG&E shareholders shall pay to reimburse CPUC/CPSD for the cost of conducting all three of the present investigations.

### Adopted Remedies Proposed by CPSD in I.12-01-007 (San Bruno OII)

1.      PG&E's pipeline construction standards shall meet or exceed all legal requirements and industry standards for identifying and correcting pipe deficiencies and strength testing.

2.      PG&E shall revise its integrity management procedures to robustly meet the data gathering requirements of 49 CFR Part 192.917(b) and ASME-B31.8S, and to do so without limiting its data-gathering to only that data which is "readily available, verifiable, or easily obtained" by PG&E.

3.      PG&E shall perform a complete company-wide record search to populate its GIS database with all identified gas transmission pipeline leak history, including closed leak, information not already transferred to the GIS.

4.      PG&E shall revise its Integrity Management training to ensure that missing data is represented by conservative assumptions, and that those assumptions are supportable, per the requirements of ASME B31.8S.  As required by Ordering Paragraph 1 of D.11-06-017, PG&E shall fully document any engineering-based assumption it makes for data that is missing, incomplete or unreliable.  Such assumptions must be clearly identified and justified and, where ambiguities arise, the assumption allowing the greatest safety margin must be adopted.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 362 of 565

5.      PG&E shall revise its integrity management procedures and related training, to ensure robust data verification processes are enacted and implemented.

6.      PG&E shall revise its threat identification and assessment procedures and training, including its Baseline Assessment Plans, to fully incorporate all relevant data for both covered and non-covered segments, including but not limited to potential manufacturing and construction threats, and leak data.

7.      PG&E shall re-label its system MAOP nomenclature in accordance with 49 CFR Part 192.

8.      PG&E shall permanently cease the self-suspended practice of regularly increasing pipeline pressure up to a "system MAOP" to eliminate the need to consider manufacturing and construction threats.  In addition, PG&E shall analyze all segments that were subjected to the planned pressure increases to determine the risk of failure from manufacturing threats under 49 CFR Part 192.917(e)(3), and perform further integrity assessments as warranted.  Each assessment shall be documented and retained for the life of the facility.

9.      PG&E shall revise its threat identification and assessment procedures and training to ensure that HCA pipeline segments are prioritized for a suitable assessment method (e.g., hydro-testing), per the requirements of 49 CFR Part 192.917(e)(3)-(4).

10.      PG&E shall revise its threat identification and assessment procedures and training to ensure that cyclic fatigue and other loading conditions are incorporated into their segment specific threat assessments and risk ranking algorithm, and that threats that can be exacerbated by cyclic fatigue are assumed to exist per the requirements of 49 CFR Part 192.917(b).

11.      PG&E shall revise its risk ranking algorithm to ensure that PG&E's weighting factors in its risk ranking algorithm more accurately reflect PG&E's actual operating experience along with generally reflected industry experience.

12.      PG&E shall revise its threat identification and assessment procedures and training to ensure that PG&E's weighing of factors in its risk ranking algorithm and the input of data into that algorithm corrects the various systemic issues identified in the NTSB report and the CPSD/PHMSA 2011 Risk Assessment Audit.

13.      PG&E shall revise its threat identification and assessment procedures and training to ensure that the proper assessment method is being used to address a pipeline's actual and potential threats.

14.     PG&E shall review and implement its Inspection, Testing, and Maintenance procedure applicable to stations to ensure that integrity of electrical equipment, wiring and documentation and identification of electrical components does not deteriorate to unsafe conditions.

15.     PG&E shall revise its SCADA system to reduce the occurrence of "glitches" and anomalies in the control system that desensitizes operators to the presence of alarms and other inconsistent information.

16.     PG&E shall reevaluate SCADA alarm criteria with the goal of reducing unnecessary alarm messages.

17.     PG&E shall revise its control systems, including SCADA, to ensure that all relevant information, including redundant pressure sensors, is considered.

18.     PG&E shall install more pressure sensors and have them closely spaced and use the additional information to incorporate leak or rupture recognition algorithms in its SCADA system.

19.     PG&E shall program its PLCs to recognize that negative pressure values are erroneous and require intervention to prevent valves from fully opening.

20.     PG&E shall replace the three pressure controllers which malfunctioned on September 9, 2010 unless PG&E demonstrates to CPSD's satisfaction that the controllers have been removed from the system.

21.     PG&E shall review its work clearance process to ensure that abnormal operating conditions that may arise during the course of work are anticipated and responses to those conditions are detailed. Additionally, PG&E shall create a procedure covering the commission of electrical equipment from one Uninterruptable Power Supply to another. Each project Clearance shall include possible scenarios and contingency plans to mitigate any abnormal operating conditions that may arise.

22.     PG&E shall revisit its Work Clearance procedures and training to ensure that future work will not be authorized unless all forms and fields therein are comprehensively and accurately populated, and reviewed by a designated clearance supervisor. Additionally, work shall not commence until such time as the operator and technician have reviewed the work clearance and have confirmed that both understand the actions to take in the event an abnormal condition is encountered. Lastly, PG&E must ensure that proper records showing the specific steps taken, when taken, and by whom, are maintained pursuant to its Record Retention Schedule.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 364 of 565

23.     PG&E shall provide training to Gas Service Representatives (GSRs) to identify hazards associated with PG&E natural gas infrastructure and take action to make the condition safe for the public and employees.  If assistance is needed and the situation is an imminent hazard, the GSR will remain on site until appropriate resources take control.  The training provided GSRs should enable them to recognize the differences between fires of low-pressure natural gas, high-pressure natural gas, gasoline fuel, or jet fuel.

24.     Internal coordination – PG&E shall revise its procedures to outline each individual Dispatch and Control Room employee's roles, responsibility, and lines of communication required to be made in the event of an emergency either during or outside normal working hours.  This shall include assigning specific geographical monitoring responsibilities for Control Room employees.

25.     External coordination – Until PHMSA issues guidance to operators of natural gas transmission and distribution pipelines and hazardous liquid pipelines regarding the importance of control room operators immediately and directly notifying the 911 emergency call center(s) for the communities and jurisdiction in which those pipelines are located when a possible rupture of any pipeline is indicated, PG&E shall revise its own procedures to allow for the immediate and direct notification of 911 emergency call centers when a possible pipeline rupture is indicated.

26.     Decision making authority – PG&E shall revise its emergency procedures to clarify emergency response responsibilities, especially in regards to authorizing valve shut offs.  PG&E policies shall not just delegate authority to act but also detail obligations to act.

27.     RCV/ASV – PG&E shall perform a study to provide Gas Control with a means of determining and isolating the location of a rupture remotely by installing RCVs, ASVs, and appropriately spaced pressure and flow transmitters on critical transmission line infrastructure and implement the results.

28.     Response time – PG&E shall review required response times in other utility service territories nationwide and devise appropriate response time requirements to ensure that its Emergency Plan results in a "prompt and effective" response to emergencies.  PG&E will provide its analysis and conclusions to CPSD.

29.     Emergency Plan Revision – Currently a maintenance supervisor annually reviews SCADA alarm responses and makes revisions as necessary. This process shall be formalized to ensure a robust feedback loop such that new information is fully analyzed and necessary changes to PG&E's Emergency Plan

and/or other procedures are implemented with a subsequent review of made changes to ensure they are adequate.

30.      Public Awareness – Until PHMSA issues guidance to operators of natural gas transmission and distribution pipelines and hazardous liquid pipelines regarding the importance of sharing system-specific information, including pipe diameter, operating pressure, product transported, and potential impact radius, about their pipeline systems with the emergency response agencies of the communities and jurisdiction in which those pipelines are located, PG&E shall undertake a review of its gas transmission public awareness and outreach programs to ensure that system-specific information is appropriately disseminated.

31.      PG&E's business strategies and associated programs shall expressly ensure that safety is a higher priority than shareholder returns and be designed to implement that priority.

32.      Deleted.

33.      PG&E's gas employee incentive plan shall include safety.  PG&E shall revise its STIP program to make safety performance 40% of the score used to determine the total award.  PG&E shall require all gas leaders including officers to participate in annual training activities that enhance and expand their knowledge of safety, including exercises in which gas leaders including officers will have an opportunity to enhance their knowledge of incident command and will participate in an annual safety leadership workshop.

34.      Deleted.

35.      PG&E shall focus on enhancing public safety and operational excellence as a core mission, and shall examine whether the time and money it spends on public relations and political campaigns distracts it from this core mission.

36.      Deleted.

37.      PG&E shall examine internal communication processes to ensure that all employees understand their job responsibilities and priorities.  Goals of PG&E gas employees shall describe what is expected of them and their teams.

38.      PG&E shall follow and implement the following NTSB recommendations:

        38.a    Revise work clearance procedures to include requirements
                for identifying the likelihood and consequence of failure

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
366 of 565

associated with the planned work and for developing contingency plans. (P-11-24)

38.b.1 Establish a comprehensive emergency response procedure for responding to large- scale emergencies on transmission lines; the procedure shall (1) identify a single person to assume command and designate specific duties for supervisory NTSB Pipeline Accident Report 131 control and data acquisition staff and all other potentially involved company employees.

38.b.2 Establish a comprehensive emergency response procedure for responding to large- scale emergencies on transmission lines; the procedure shall include the development and use of trouble-shooting protocols and checklists.

38.b.3 Establish a comprehensive emergency response procedure for responding to large- scale emergencies on transmission lines; the procedure shall include a requirement for periodic tests and/or drills to demonstrate the procedure can be effectively implemented. (P-11-25).

38.c Equip supervisory control and data acquisition system with tools to assist in recognizing and pinpointing the location of leaks, including line breaks; such tools could include a real-time leak detection system and appropriately spaced flow and pressure transmitters along covered transmission lines. (P-11-26).

38.d Expedite the installation of automatic shutoff valves and remote control valves on transmission lines in high consequence areas and in class 3 and 4 locations, and space them at intervals that consider the factors listed in Title 49 Code of Federal Regulations Part 192.935(c). (P-11-27).

38.e Revise post-accident toxicological testing program to ensure that testing is timely and complete. (P-11-28).

38.f Assess every aspect of the integrity management program, paying particular attention to the areas identified in this investigation, and implement a revised program that includes, at a minimum, (1) a revised risk model to reflect PG&E Company's actual recent experience data on leaks, failures, and incidents; (2) consideration of all defect and leak data for

the life of each pipeline, including its construction, in risk analysis for similar or related segments to ensure that all applicable threats are adequately addressed; (3) a revised risk analysis methodology to ensure that assessment methods are selected for each pipeline segment that address all applicable integrity threats, with particular emphasis on design/material and construction threats; and (4) an improved self-assessment that adequately measures whether the program is effectively assessing and evaluating the integrity of each covered pipeline segment.  (P-11-29).

38.g    Conduct threat assessments using the revised risk analysis methodology incorporated in your integrity management program, as recommended in Safety Recommendation P-11-29, and report the results of those assessments to the Commission and the Pipeline and Hazardous Materials Safety Administration. (P-11-30).

38.h    Develop, and incorporate into PG&E's public awareness program, written performance measurements and guidelines for evaluating the plan and for continuous program improvement. (P-11-31).

**Adopted Remedies Proposed by CPSD in I.11-02-016 (Recordkeeping OII)**

1.      PG&E's gas transmission organization shall achieve at least a Level 3 information maturity score under the Generally Accepted Records Keeping Principles within 3 years.

2.      Rejected

3       PG&E shall issue a corporate policy and standard that will:

3.a    Communicate recordkeeping expectations that underlie its post-2010 Corporate Records and Information Management Policy and Standard for all departments and divisions across PG&E. These expectations shall be incorporated into procedures specific to meet the needs of every Line of Business.

3.b    The Information Management and Compliance Department shall design a governance controls catalog for recordkeeping practices to assess compliance with the corporate policy and standard, consistency of behavior with official records being

stored in approved systems of record, and timeliness of addressing records during their lifecycle.

  3.c The retention schedule will support the policy by providing retention length for all identified official records to meet legal and regulatory mandates.

4. PG&E shall develop and implement an education and training program for the gas transmission organization in Records and Information Management principles and practices within an information governance framework. The education and training program shall include the following:

  4.a All staff shall be receive training to understand the responsibilities and tasks that relate to managing records. These education and training programs shall be updated and offered at regular intervals, at least twice annually, to include amendments to the records management program and for the benefit of new staff.

  4.b There shall be specific and additional training for those staff involved directly in the management of retention and disposal of records. These education and training programs shall be offered at least annually.

  4.c There shall be specific and additional training focusing on all of the recordkeeping systems used within the Gas Operations Organization. Employees and PG&E contractors who have duties using these programs shall be required to attend these training sessions. These education and training programs shall be offered at least annually.

5. PG&E shall develop and deploy the systems necessary to manage, maintain, access and preserve records (physical and electronic, in all formats and media types); their related data, metadata, and geographic location and geospatial content to the extent appropriate in accordance with legal and business mandated rules, utilizing technology that includes appropriate aids to help improve data and metadata quality.

6. PG&E shall establish accountability for development and implementation of a PG&E governance strategy across gas transmission that shall rest with PG&E Senior Management and a method of accountability shall be developed and implemented.

7.    PG&E shall identify and document the employees responsible for implementing the Records and Information Management program for gas transmission.

8.    PG&E shall develop consistent standard practices that include gas transmission records management linked to corporate polices on information governance.

9.    PG&E shall implement mandated retention periods for all records relevant to gas transmission.

10.    PG&E shall ensure that each gas transmission standard conforms with Records and Information Management (RIM) policies for gas transmission.

11.    PG&E shall include the treatment of active and inactive records in its Records and Information Management (RIM) Policy for gas transmission.

12.    PG&E's records management processes shall be managed and maintained in accordance with the traceable, verifiable and complete standard, including retention of physical and digital pipeline records for the "life of the asset."

13.    The accuracy and completeness of data within gas transmission records shall be traceable, verifiable and complete and when errors are discovered, the record shall be corrected as soon as correct information is available and the reason(s) for each change shall be documented and kept with the record.

14.    PG&E shall create a standard format for the organization of a job file so that PG&E personnel will know exactly where to look in a file folder, or set of file folders, to find each type of document associated with a job file. At a minimum, a job file will contain traceable, verifiable and complete records to support the MAOP of the pipeline segment installed; design documentation; purchase documentation showing the sources and specifications of equipment purchased; permits; environmental documents; field notes; design, construction and as-built drawings; x-ray reports and weld maps; pressure test records; correspondence with the CPUC; and inspection reports and correspondence.

15.    Job file data, including drawings, for all parts of the active PG&E gas transmission system shall be immediately accessible from multiple locations. The development of a complete and accurate catalog of job files that can be searched immediately shall be included within this objective.

16.    The information that was contained in PG&E's historic records and documents, and that has been identified as 'missing or disposed of,' and is

9

necessary to be retained for the safe operation of the pipelines, pursuant to laws, regulations and standards and the PG&E retention schedule, shall be recovered. This recovery shall include but not be limited to:

      a.  updating and verification of data in engineering databases, such as the leak database, GIS and the integrity management model,

      b.  updating plat sheets and other engineering drawings, and

      c.  updating and organizing job files.

When PG&E cannot locate records, it may apply conservative assumptions consistent with the requirements of Ordering Paragraph 1 of D.11-06-017. PG&E shall be required to fully document any engineering-based assumptions it makes for data that has been identified as "missing or disposed of." Such assumptions must be clearly identified and justified and, where ambiguities arise, the assumption allowing the greatest safety margin must be adopted.

17.    PG&E shall document adoption of, and changes and amendments to policies, standards and procedures within the Gas Operations Organization (or its successor division(s) with responsibility for design, construction, operations, maintenance, testing, safety and integrity management of PG&E's natural gas pipeline system). The documentation shall include the reasons for adoption, amendment or cancellation of the policies, standards and procedures. An audit trail of changes shall be maintained, retained for as long as the standard is in effect. If a policy, standard or procedure is cancelled, a copy of the policy, standard or procedure in effect at the time of cancellation, as well as the reason for its cancellation, shall be preserved permanently, taking heed of potential changes in technology that may render documents unreadable in the future.

18.    PG&E will identify each section of pipe that has been salvaged and reused within the PG&E gas transmission system. For each section of pipe identified, PG&E will change the installed date in its GIS and its IM model to the date the pipe was originally installed in the PG&E pipeline system.

19.    Rejected. TURN proposed remedy 1 adopted instead.

20.    PG&E shall implement the recommendations included in the final Pricewaterhouse Coopers (PwC) audit report. (TURN Exhibit 16, Appendix B).

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 371 of 565

21.     Using independent auditors, CPSD will undertake audits of PG&E's recordkeeping practices within the Gas Transmission Division on an annual basis for a minimum of ten years after the final decision is issued in I.11-02-016.

22.     PG&E will correct deficiencies in recordkeeping discovered as a result of each CPSD audit and will report to CPSD when such deficiencies have been corrected.

## Adopted Remedies Proposed by CPSD in I.11-11-009 (Class Location OII)

1.     Systems:  PG&E shall utilize industry-standard software for electronic storage of class location information.  PG&E shall devise a process to capture new PG&E service hook-ups especially in proximity to transmission lines and incorporate into the class location analysis.

2.     Procedures:  PG&E shall update procedures, patrolling process instructions, and related Operator Qualification training to require written confirmation to Patrol Supervisors that follow up has been performed on all new construction that the patroller has previously observed and documented.

3.     Procedure 6.3 (3) shall be rewritten as "List all new observations regardless if it is believed that the ground crew has already investigated the observation."

4.     TD-4412-07 section 6.1 (2) shall include specific language for the pilot to recommended increased patrolling to the Aerial Patrol Program Manager.

5.     PG&E shall ensure that the Report of New Construction forms are completed.

6.      The Aerial Patrol Program Manager's duties shall be increased to include oversight and review of the quality and accuracy of patrol reports.

7.     PG&E shall create a detailed procedures manual containing the Aerial Patrol Program Manager's duties to ensure quality control of aerial patrol responsibilities.

8.     Training:  PG&E shall utilize varied training exams for patrolling.

9.     The new training exams for patrolling shall include questions with greater detail and complexity than the current exam and shall use aerial photos as exam exhibits where pilots indicate which structures are approximately 660 feet from the right of way and would require reporting. Training materials and associated tests shall be reviewed and updated to enhance employee competency, utilize aerial photos and other aids, and reflect field conditions to approximate buildings' key distances from lines.

10.     Improve Aerial Patrol Pilot training:  PG&E's pilot training shall include aerial photographs taken at an altitude of 750 feet, which replicates what the pilots see on patrol, and include a number of structures both within and outside of the 660 foot standard. Use the photos as exam exhibits where the pilots indicate which structures are approximately 660 feet from the right of way and would require reporting.  Training shall also include a Well-Defined Area (WDA) in the exhibit as well.  PG&E shall also include in its training photographs, video or other aids to reflect expected views to be seen from typical patrol altitudes.

11.     Audits the patrolling process shall include a comparison of new construction observations with new gas/electrical hook ups near the line to ensure that new construction has not been missed.

12.     A new item "All Sections of Document Completed" shall be added to the audit checklist when reviewing Reports of New Construction.

13.     Audits shall make sure that copies of completed Reports of New Construction are being provided to local supervisors, as required by standard procedure TD-4127P-01 section 3.8 (5).

## Adopted Remedies Proposed by City of San Bruno

1.     Recommendation V.B rejected.

2.     PG&E shall reimburse CPSD for the costs of contracts to retain independent experts chosen by CPSD for verification audits and inspections to ensure compliance with the *PSEP Decision* and remedies ordered in this decision. This shall include CPSD's costs for hiring qualified independent auditors to audit and issue reports for both PG&E's MAOP Validation results and Project Mariner systems.  If CPSD determines that it needs the services of outside consultants to develop additional capabilities to evaluate and assess the integrity of PG&E's pipeline system through the use of meaningful metrics, then the costs of such consultants will fall within the scope of this remedy.  The reimbursement amount is capped at $30 million.

3.     Recommendation V.D.1 rejected

4.     Recommendation V.D.2.a incorporated into CPSD adopted remedy 23 for I.12-01-007.

5.     PG&E shall provide training to its Gas Service Representatives and Gas Control Operators to ensure that they coordinate effectively with emergency responders, follow PG&E's own internal procedures when responding to emergencies, and each GSR under Gas Control Operators' direction should be

trained and able to manually shut off emergency shutdown zone valves. PG&E should also audit its GSRs and Gas Control Operators to ensure they are properly trained.

6.      Recommendation V.D.2.c incorporated into CPSD adopted remedy 4 for I.11-02-016.

7.      Recommendation V.D.2.d incorporated into CPSD adopted remedy 4 for I.11-02-016.

8.      Recommendation V.D.2.e incorporated into CPSD adopted remedy 4 for I.11-02-016.

9.      Recommendation V.D.2.f incorporated into CPSD adopted remedy 10 for I.11-11-009.

10.     PG&E shall enter into Mutual Assistance Agreements with the cities, counties and fire districts within its service territory by no later than December 31, 2015. The Mutual Assistance Agreements shall formalize PG&E's emergency response role and disclosure obligations. A copy of each Mutual Assistance Agreement shall be maintained in the appropriate Division Emergency Plan.

11.     Recommendation V.E rejected.

12.     Recommendation V.F rejected.

**Adopted Remedies Proposed by TURN**

1.      PG&E shall create a centralized database to track where it has placed re- used or otherwise reconditioned pipe in its system. For each such segment, the database should show the date of manufacture of the segment, if known. If this date is unknown, the database should so indicate, to ensure that the segment is given appropriate attention in integrity management. The database should include a link to reliable and readily accessible documentation showing, for each re-used or otherwise reconditioned pipe segment, that all steps necessary to prepare the segment for installation were performed and inspected. If such documentation is unavailable, the centralized documentation should so indicate so that the segment will be given appropriate attention in integrity management. PG&E will maintain this database so long as there are sections of reused pipe in the PG&E operating gas transmission pipeline system.

2.      Recommendation 2A incorporated into CPSD adopted remedy 4 for I.12-01-007.

3.      Recommendation 2B incorporated into CSB adopted remedy 2.

4.      Recommendation 3 incorporated into CSB adopted remedy 2.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 374 of 565

**Adopted Remedies Proposed by DRA**

1. CPSD shall present a proposal to the Commission within 60 days of the effective date of this decision for a comprehensive audit of all aspects of PG&E's operations, including control room operations, emergency planning, record-keeping, performance-based risk and integrity management programs and public awareness programs, as recommended by the NTSB.

2. Recommendation I.B.7. that PG&E shall compensate TURN, CSB, CCSF and DRA for their litigation expenses in connection with these three proceedings, is rejected.

**(End of Appendix E)**

**Concurring Statement
Catherine J.K. Sandoval, Commissioner,
California Public Utilities Commission
Re: San Bruno Orders Instituting Investigation,
Presiding Officer's Decisions and Decision on Penalties and Remedies**

On September 9, 2010, I watched with horror the live television coverage of the tragic gas explosion in San Bruno, California. I shared with millions of Californians and Americans the shock, sadness, and worry about that explosion, and the losses and devastation left in its aftermath.

When Governor Brown appointed me to the CPUC in January 2011, analyzing and addressing the root cause of what happened in San Bruno was top priority at the CPUC. The CPUC worked to gather information, coordinated with the National Transportation Safety Board, appointed a Blue Ribbon Panel, and investigated the causes of this accident. In spring of 2011, my staff, Ditas Katague, my Chief of Staff, Colette Kersten, my Energy Advisor, and Steve St. Marie, my water advisor and I visited the site of the San Bruno explosion on a rainy spring day before the drought. Looking at the empty lots where houses used to be and where children once played brought tears to my eyes and my heart. Wildflowers were growing on the lots where houses once stood, as if God had planted flowers in the memory of the families who lived there.

The CPUC's investigation and analysis revealed that San Bruno was not just an isolated tragedy, but reflected larger systemic failures that affected all PG&E gas customers. I thank the CPUC's Safety and Enforcement Division (SED) (then CPSD) for its work in developing the Orders Instituting Investigation. I am proud that my colleagues and I who voted to open the OIIs in 2011 and 2012 recognized that the San Bruno investigation needed to analyze the incidents leading to the San Bruno explosion in the context of the systemic issues that posed a threat to public safety and system reliability. The central question posed in the OIIs was whether PG&E had fulfilled its

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
376 of 565

duty as a utility to provide safe, reliable service at just and reasonable rates, with adequate facilities, and complied with other requirements of the California Public Utilities Code, this Commission's Decisions, Orders, and rules, and with federal law.

The OIIs led to a detailed process of investigation, document production, litigation, analysis, comments, reply comments, hearings, public comment, and other procedures that built the record evidence. We heard from the people of San Bruno, from the parties, and from other Californians and Americans about what happened that led to the San Bruno explosion. We considered suggestions about steps to ensure this would never happen again. During the process, the CPUC in 2011, ordered PG&E to take steps to ensure the safety of the gas system through hydrotesting to verify pipeline safety and integrity, and to improve recordkeeping. The CPUC ordered several other steps to ensure that we relied on evidence, not assumptions, to protect gas pipeline and public safety.

The methodical and, yes, lengthy process, of the OIIs led to the PODs carefully developed and meticulously prepared by ALJ Yip-Kikugawa and ALJ Wetzel that my colleagues and I adopt today. The OII process created record evidence to support the Decision we adopt today that imposes substantial penalties on PG&E both for the failures that led to the explosion on September 9, 2010 in San Bruno, California, and for systemic deficiencies that affect all of PG&E's gas customers and every community it serves. Accordingly, the Decision on penalties and remedies we adopt today orders PG&E shareholders to pay for improvements to its natural gas infrastructure including the recordkeeping and management systems. These landmark decisions will improve gas safety and reliability for a generation.

With today's decision, we take steps to heal wounds and restore confidence. This occurs in the context of other CPUC efforts to improve our decision-making process through the work of the Commissioner Committees, and through the evaluation and analysis of our rules and procedures.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
377 of 565

Today, we mark a turning point in the relationship between the Commission and the public, Pacific Gas and Electric and the public, PG&E and the CPUC. We honor the victims who lost their lives and were injured that day. We thank the first responders, families, friends, and community who helped the victims of the San Bruno blast. We thank the CPUC employees who worked with dedication and integrity to restore safety and reliability, and to create a record that is the foundation for accountability. We give new impetus to and underscore the vital importance of the work of PG&E's employees, management, and shareholders to improve PG&E's gas pipeline system. That work is reflected in the PG&E employees who turned off the gas on September 9, 2010, and those who have worked to inspect and improve the gas pipeline, recordkeeping, leak detection, management, and other systems. This decision orders PG&E shareholders to pay for more work to create a safe and reliable gas delivery and management system, worthy of the people of it serves.

I would like to take a moment to remark upon the decision-making process and the rare procedural mechanism, codified in CPUC Rules of Practice and Procedure Section 15.5(b), this Commission utilized in reviewing the appeal to the Presiding Officer's Decision on the Remedies portion of this case. When a Presiding Officer's Decision is appealed, the Rules create an opportunity for Commissioners to discuss the issues raised in the appeal in a noticed and calendared closed session meeting. Leading up to today's vote, there have been notices posted on the Commission's calendar and around the Commission building noticing closed session meetings regarding the Appeal to the Presiding Officers' Decision. These closed session meetings enable Commissioners to exchange thoughts on the issues raised on appeal, without impairing any Commissioner's ability to come to an individual decision or an alternate Decision.

This was a productive procedural mechanism. I would welcome more opportunities for deliberative discussion, consistent with CPUC rules.

Few mechanisms exist whereby Commissioners have the ability to meet and exchange views on issues. They are: (1) a Ratesetting Deliberative Meeting, (2) during

17

Commissioner Reports or comments about agenda items at regular Commission Business Meetings, a topic upon which I remarked at our last session, and (3) an appeal of a Presiding Officer's Decision. Just as Commissioners in other states have rules that allow collaborative deliberation, I recommend that as we evaluate Commission modernization efforts and potential rule changes, we consider creating more opportunities for deliberative discussion.

The Decisions we adopt today signal that we expect accountability and performance from utilities we regulate and from ourselves at the CPUC. Since the tragic San Bruno explosion, the CPUC has stepped up enforcement, fined utilities including PG&E and others for safety violations, increased SED's authority to impose fines, and refocused the CPUC and the utilities it regulates on the primacy of safety. Where appropriate, the CPUC will investigate and take action to protect public safety, and we have explicitly made safety our highest priority. Californians should receive what the law says they have the right to expect: safe, reliable utility service at just and reasonable rates with adequate facilities. Let this Decision and our votes today herald a new era of commitment to safety and integrity, in the memory of and out of respect for the victims of the San Bruno blast, and for all Californians.

April 9, 2015             /s/    CATHERINE J.K. SANDOVAL
                                 Catherine J.K. Sandoval
                                 Commissioner

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 379 of 565

# Exhibit 37

STATE OF CALIFORNIA

EDMUND G. BROWN JR., *Governor*

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



April 13, 2015

TA2015-001

Hicham Mejjaty
Senior Manager, Electric Operations Compliance
Pacific Gas and Electric Company
245 Market St. Mail Unit N9G
San Francisco, CA 94105

**SUBJECT**: Audit of PG&E's Eureka Headquarters – Electric Transmission

Dear Mr. Mejjaty:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public
Utilities Commission, Raymond Cho of my staff conducted an electric transmission audit
of PG&E's Eureka Headquarters from February 23-25, 2015. The audit included a
review of PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders. A copy of
the audit findings itemizing the violations is enclosed. Please advise us no later than
May 13, 2015, by electronic or hard copy, of all corrective measures taken by PG&E to
remedy and prevent such violations.

If you have any questions concerning this audit please contact Raymond Cho at
(415) 703-2236 or raymond.cho@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric and Communication Facility Safety Section
California Public Utilities Commission

Enclosure: Audit Findings

Cc:    Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
       Charlotte TerKeurst, Program Manager, Safety and Enforcement Division, CPUC
       Raymond Cho, Utilities Engineer, CPUC
       Yoko Williams, Supervisor, Transmission Compliance, PG&E

# Audit Findings

**Company: PG&E – Eureka Headquarters**
**Transmission Audit**
**Date: February 23 to 25, 2015**

## Violations

| A. | Location: | PG&E – Eureka Headquarters |
|---|---|---|
| | **Date Visited by CPUC:** | 2/23/2015 – 2/25/2015 |
| | **Explanation of Violation(s):** | |

**Late Work Orders**

GO 165, Section IV, Transmission Facilities, states in part:

> *Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines.*

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service. For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

CPUC staff found 60 PG&E work orders completed past their due dates and 55 pending work orders that past their due dates.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 382 of 565

The following violations that ESRB engineers discovered during the field audit were not documented and addressed by PG&E during its last detailed inspection as required by its maintenance program:

| B. | Circuit: | Arcata - Humboldt |
|---|---|---|
| | **Structure No.:** | 7/7 |
| | **Previous Visit by PG&E:** | 3/21/14 |
| | **Date Visited by CPUC:** | 2/24/15 |
| | **Explanation of Violation(s):** | |

**Damaged Guy Guard and Guy Wire Contact Above Insulator**

GO 165, Section IV, Transmission Facilities, states in part:

> *Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines.*

GO 95, Rule 56.7-B, Anchor Guys, states in part:

> *In order to prevent trees, buildings, messengers, metal–sheathed cables or other similar objects from grounding portions of guys above guy insulators, it is suggested that anchor guys be sectionalized, where practicable, near the highest level permitted by this Rule.*

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*
> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

The guy guard was damaged and vegetation was in contact with the guy wire above its insulator.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 383 of 565

# Exhibit 38

# PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



June 5, 2015                                                                              EA2014-032

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's East Bay Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities Commission (CPUC), Jamie Lau and Raymond Cho of my staff conducted an electric audit of PG&E's East Bay Division from December 8 to 10, 2014.  The audit included a review of PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs).  A copy of the audit findings itemizing the violations is enclosed.  Please advise me no later than July 10, 2015, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such violations.

If you have any questions concerning this audit, please contact Jamie Lau at (415) 703-2233 or jamie.lau@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:      Audit Findings

Cc:  Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
     Charlotte TerKeurst, Program Manager, ESRB, CPUC
     Alok Kumar, P.E., Senior Utilities Engineer Supervisor, ESRB, CPUC
     Jamie Lau, P.E., Utilities Engineer, ESRB, CPUC
     Raymond Cho, P.E., Utilities Engineer, ESRB, CPUC

# Audit Findings

**Company: PG&E – East Bay**
**Electric Distribution Audit**
**Date:  December 8 to 10, 2014**

| A. | Location: | PG&E – East Bay Division |
|---|---|---|
| | Date of CPUC Inspection: | 12/8/2014-12/10/2014 |
| | **Explanation of Violation(s):** | |

**Incomplete Inspections**

GO 165, Section III-B, Standards for Inspection, states:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

Facilities in the following maps were not inspected on time as required by GO 165:

| Map | Units | Inspection Type | Year Missed |
|---|---|---|---|
| H0906 | 8 | OH Patrol | 2013 |
| A0521 | 5 | UG Patrol/Detailed | 2003 thru 2011 |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 386 of 565

| B. | Location: | PG&E – East Bay Division |
|---|---|---|
| | **Date of CPUC Inspection:** | 12/8/2014-12/10/2014 |

**Explanation of Violation(s):**

**Past-Due Electric Corrective Notifications**

GO 165, Section III-C, – Record Keeping, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

GO 128, Rule 17.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

Our audit found that 1,442 Electric Corrective (EC) notifications, from August 1, 2011 to October 31, 2014, were completed past their scheduled date of corrective action. Furthermore, 22 EC notifications were open past their scheduled date of corrective action. The past-due EC notifications include overhead and underground facilities.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 387 of 565

| C. | Location: | PG&E – East Bay Division |
|---|---|---|

| | Date of CPUC Inspection: | 12/8/2014-12/10/2014 |
|---|---|---|

**Explanation of Violation(s):**

**Late Equipment Tests**

GO 165, Section III-C, – Record Keeping, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

The following overhead equipment were tested late per PG&E's required deadlines:

| Equipment # | Type | Required Date | Test Date |
|---|---|---|---|
| TS141 | Capacitor | 6/1/2011 | 8/10/2011 |
| C689 | Capacitor | 6/1/2011 | 10/27/2013 |
| TV550 | Capacitor | 6/1/2011 | 12/5/2013 |
| TV633 | Capacitor | 6/1/2011 | 12/5/2013 |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 388 of 565

| D. | Location: | PG&E – East Bay Division |
|---|---|---|
| | Date of CPUC inspection: | 12/8/2014-12/10/2014 |
| | Explanation of Violation(s): | |

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service……*

*All temporary attachments shall be restricted to installations where the period is estimated to be one year or less.*

GO 95, Rule 34, Foreign Attachments, states in part:

*Nothing in these rules shall be construed as permitting the unauthorized attachment, to supply, street light or communication poles or structures, of antennas, signs, posters, banners, decorations, wires, lighting fixtures, guys, ropes and any other such equipment foreign to the purposes of overhead electric line construction.*

PG&E's East Bay Division has numerous "kicked-out poles" as a result of its joint pole reconstructions. The cut and kick method is a way of replacing an old pole with a new one. Once the old pole is replaced, it should be removed and disposed of properly. Attaching the old pole to the new pole and supporting it by a "peg leg", ropes, braces, or other temporary means violates GO 95, Rule 31.1, and Rule 34. In addition, GO 95, Rule 49.1, addresses specific strength and depth requirements for all poles, the old pole in this case would not meet the pole depth requirements of GO 95. Within the East Bay Division, we found numerous locations as shown below with an old pole attached to a new pole:

1) 2666 Milvia Street, Berkeley
2) Corner of Carleton Street and Milvia Street, Berkeley
3) 2813 8th Street, Berkeley
4) 2910 Mc Clure Street, Oakland
1) 4112 Webster Street, Oakland
2) 4335 Webster Street, Oakland
3) 465 42nd Street, Oakland
4) 450 43rd Street, Oakland

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 389 of 565

5)  463 43rd Street, Oakland
6)  419 49th Street, Oakland
7)  400 Avon Street, Oakland
8)  420 Avon Street, Oakland
9)  424 Cavour Street, Oakland
10) 461 Cavour Street, Oakland
11) 5227 Lawton Avenue, Oakland
12) 5320 Shafter Avenue, Oakland
13) 5352 Shafter Avenue, Oakland
14) 5422 Shafter Avenue, Oakland
15) 5434 Shafter Avenue, Oakland
16) 5446 Shafter Avenue, Oakland

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
390 of 565

**We also discovered the following violation during our field inspection. This violation occurred during pole replacement and PG&E did not take any action to remedy the violation.**

| E. | Location: | 5842 Kingsley Circle, Oakland |
|---|---|---|
| | Pole No.: | N/A |
| | **Previous Visit by PG&E:** | 5/13/2014 |
| | **Date Visited by CPUC:** | 12/10/2014 |
| | **Explanation of Violation(s):** | |
| | **Service Drop Radial Clearance** <br><br> GO 95, Rule 54.8-C, Clearances between Supply Service Drops and other Conductors, states that the clearance between a supply service drop conductor and a communication service drop shall not be less than twelve (12) inches within 15 feet from point of attachment. <br><br> A service drop at this location was in contact with a communication cable. | |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 391 of 565

# Exhibit 39

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



July 13, 2015

EA2015-01

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Fresno Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities Commission, Ivan Garcia, Raymond Cho, and Derek Fong of my staff conducted an electric audit of PG&E's Fresno Division from February 9 to 13, 2015. The audit included a review of PG&E's records and field inspections of PG&E's facilities.

During the audit, we identified violations of one or more General Orders. A copy of the audit findings itemizing the violations is enclosed. Please advise me no later than August 14, 2015, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such violations.

If you have any questions concerning this audit please contact Ivan Garcia at (916) 928-5875 or iag@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:     Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division
        Charlotte F. TerKeurst, Program Manager, Electric Safety and Reliability Branch
        Alok Kumar, Senior Utilities Engineer, Supervisor, CPUC
        Ivan Garcia, Utilities Engineer, CPUC

# AUDIT FINDINGS

| A. | **Location:** | **PG&E – Fresno Division** |
|---|---|---|
| | **Date Visited by CPUC:** | 2/9/2015- 2/13/2015 |

**Explanation of Violation(s):**

**Late Inspection**

GO 165, Section III-B, – Standards for Inspection, states:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

The following PG&E's facilities were inspected late:

- Eight underground enclosures in maps 191629, 1521365, 132096, 1521365, and 1820356 were inspected late in 2007. The enclosures should have been inspected by 12/31/2006
- 125 underground enclosures on 72 maps were inspected late in 2010. The enclosures should have been inspected by 12/31/2009
- One underground enclosure in Map 1320244 was inspected late on 2/11/2011. The enclosure should have been inspected by 12/31/2010.

The following PG&E's facilities were not inspected as required by GO 165:

- 19 overhead maps with a total of 295 facilities missed a patrol and/or an inspection cycle.
- 189 underground maps with a total of 339 facilities missed a patrol and an inspection cycle.

| B. | Location: | PG&E – Fresno Division |
|---|---|---|
| | Date Visited by CPUC: | 2/9/2015-2/13/2015 |

**Explanation of Violation(s):**

**Late Work orders**

GO 165, Section III-C, – Record Keeping, states in part:

> For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.

GO 95, Rule 31.1, Design, Construction, and Maintenance, states in part:

> Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.

PG&E's records indicated that from January 2010 to February 9, 2015, a total of 15,106 work orders were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards.

| C. | Location: | PG&E – Fresno Division |
|---|---|---|
| | Date Visited by CPUC: | 2/9/2015-2/13/2015 |

**Explanation of Violation(s):**

**Records Keeping**

GO 165, Section III-C, – Record Keeping, states in part:

> For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.

PG&E does not document all items requiring corrective action during an inspection. Specifically, PG&E staff does not document "minor work". PG&E's staff only marks a "tally mark" indicating minor work, and does not specify the equipment identified for corrective action in the tally marks.

ESRB Engineers identified the following violations during the field inspection that were not documented and/or addressed by PG&E during its last detailed inspection as required by General Order 165:

| D. | Location: | Intersection of N. Fifth St. and E. Austin Way, Fresno |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 1/12/2015, Detailed Overhead Inspection Map 1320232 |
| | Date Visited by CPUC: | 2/10/2015 |

**Explanation of Violation(s):**

**Unauthorized Attachment**

GO 95, Rule 34, Foreign Attachments, states in part:

> *Nothing in these rules shall be construed as permitting the unauthorized attachment, to supply, street light or communication poles or structures, of antennas, signs, posters, banners, decorations, wires, lighting fixtures, guys, ropes and any other such equipment foreign to the purposes of overhead electric line construction .*

A third party sign was attached to the pole.

| E. | Location: | Intersection of E. Austin Way and N. 4th St., Fresno |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 1/12/2015, Detailed Overhead Inspection Map 1320232 |
| | Date Visited by CPUC: | 2/10/2015 |

**Explanation of Violation(s):**

**Deteriorated Primary Crossarm**

GO 95, Rule 44.3 Replacement Installation and Reconstruction states in part:

> *Lines or parts thereof shall be replaced or reinforced before safety factors have been reduced (due to factors such as deterioration and/or installation of additional facilities) in Grades "A" and "B" construction to less than two-thirds of the safety factors specified in Rule 44.1*

The crossarm showed signs of deterioration indicating that its safety factor may not be in compliance with GO 95, Rule 44.3.

| F. | Location: | Intersection of E. Austin Way and N. Bond Ave., Fresno |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 1/12/2015, Detailed Overhead Inspection Map 1320232 |
| | Date Visited by CPUC: | 2/10/2015 |

**Explanation of Violation(s):**

<u>Deteriorated Secondary Crossarm</u>

GO 95, Rule 44.3 Replacement Installation and Reconstruction states in part:

> *Lines or parts thereof shall be replaced or reinforced before safety factors have been reduced (due to factors such as deterioration and/or installation of additional facilities) in Grades "A" and "B" construction to less than two-thirds of the safety factors specified in Rule 44.1*

The crossarm showed signs of deterioration indicating that its safety factor may not be in compliance with GO 95, Rule 44.3.

| G. | Location: | 1450 Oakwood Ct., Lemoore |
|---|---|---|
| | Equipment No.: | T8342 |
| | Previous Visit by PG&E: | 1/31/2015, Detailed Underground Inspection Map 1820354 |
| | Date Visited by CPUC: | 2/10/2015 |

**Explanation of Violation(s):**

<u>Tripping Hazard</u>

GO 128, Rule 12.2 Maintenance states:

> *Systems shall be maintained in such condition as to secure safety to workmen and the public in general. Systems and portions thereof constructed, reconstructed, or replaced on or after the effective date of these rules shall be kept in conformity with the requirement of these rules.*

The underground vault cover extends above ground causing a tripping hazard to the public.

Case: 15-90088-13 Doc# 14208-2 Filed: 12/13/23 Entered: 12/13/23 22:10:38 Page Page 397 of 565

| H. | **Location:** | 3207 W. Figured Dr., Fresno |
|---|---|---|
| | **Equipment No.:** | Switch 3918 |
| | **Previous Visit by PG&E:** | 1/22/2015, Detailed Underground Inspection Map 1319121 |
| | **Date Visited by CPUC:** | 2/10/2015 |

**Explanation of Violation(s):**

### Switch Not Inspected In 2015

GO 165, Table 1 requires underground switching devices to be inspected once every 3 years.

GO 128, Rule 17.2 Inspection states:

> *Systems shall be inspected by the operator frequently and thoroughly for the purpose of insuring that they are in good condition and in conformance with all applicable requirements these rules.*

During the field inspection portion of the audit, we discovered that the switch in this vault was not included on PG&E's map and was not inspected in the past 3 years.

### Bolt Covers Missing On Underground Vault

GO 128, Rule 32.7, Covers states in part:

> *Manholes, handholes, and subsurface equipment enclosures while not being worked in, shall be securely closed by covers of sufficient strength to sustain such loads as may reasonably be imposed upon them and arrangements shall be such that a 1; 001 or appliance shall be required for their opening and cover removal.*

The vault cover was not securely closed (the covers' bolt were missing).

# Exhibit 40

# Public Utilities Commission
STATE OF CALIFORNIA

# CITATION FOR VIOLATIONS
# OF GENERAL ORDER 128
# ISSUED PURSUANT TO DECISION 14-12-001

**Electrical Corporation To Which Citation Is Issued:**

Pacific Gas and Electric Company (U39 E)

**RESPONDENT:**

Mr. Gregory K. Kiraly
Senior Vice President, Distribution Operations
Pacific Gas and Electric Company
77 Beale Street
San Francisco, CA 94105

**CITATION:**

Pacific Gas and Electric Company (PG&E or Utility) is cited for two (2) violations resulting in a financial penalty of $450,000. Safety and Enforcement Division (SED) found these violations in its investigation of Incident Number E20141112-01, which occurred on November 7, 2014.

**VIOLATIONS:**

PG&E is cited with having violated General Order (GO) 128, as described below. These violations occurred during the period 1990 through 2014.

1. **General Order 128, Rule 17.7: Location Information**

   Each party operating or owning facilities shall, upon request, provide information as to location of its underground facilities to any other party contemplating underground construction, or work, in the vicinity thereof. Provision of such information by a party will not relieve such other party of his responsibility to locate accurately such underground facilities and to exercise reasonable care during construction or work. If at any time damage or interruption to existing facilities should occur, said other party is enjoined immediately to report such damage to the party owning such damaged or interrupted facilities.


The Underground Service Alert (USA) ticket showed that the delineated area to be marked by PG&E included forty (40) feet into the street and ten (10) feet toward a house (measurements from the curb line). SED's investigation revealed that the USA ticket was issued and valid at the time of the incident; however, PG&E did not properly mark all of its underground facilities in the delineated area. PG&E did not mark the ground identifying the location of the facilities in the street. Therefore, PG&E is in violation of GO 128, Rule 17.7.

2. **General Order 128, Rule 33.4-A3a: Separation from Other Cables, Ducts, Pipes and Structures**

Independently installed: Supply cables, when independently installed, shall be separated where practicable, from gas, water, oil, or other pipe systems, or other foreign substructures, by a clearance of a (sic) least 12 inches when paralleling and by at least 6 inches when crossing.

The subject conductor was installed in a conduit by PG&E in 1990 via a bore-in method that does not require excavation. The conduit and conductor were installed by boring through the ground and a clay sewer pipe. The PG&E facilities were left interfering with the operation of the sewer pipe and creating a hazard to third parties. PG&E did not install its underground facilities with a minimum clearance of six (6) inches from the sewer pipe at this location. Therefore, PG&E is in violation of GO 128, Rule 33.4-A3a.

**ENCLOSURES:**

The following enclosures were used to establish the findings of fact:

1. *Enclosure 1 – SED Incident Investigation Report, dated March 27, 2015*
2. *Enclosure 2 – Occupational Safety and Health Administration (OSHA) Evidence*
3. *Enclosure 3 – PG&E Data Response 1 (DR1411131), dated November 13, 2014*
4. *Enclosure 4 – PG&E Data Response 2 (DR1501132), dated January 13, 2015*
5. *Enclosure 5 – Underground Service Alert (USA) Ticket #452871*
6. *Enclosure 6 – SED Notice of Violation, dated March 30, 2015*
7. *Enclosure 7 – PG&E Response to Notice of Violation, dated May 1, 2015*

## STATEMENT OF FACTS:

The above violations are documented in the attached *Enclosure 1 – SED Incident Investigation Report* which is based on the following:  SED's evidence collected at the scene of the incident, SED's review of evidence collected by OSHA, review of PG&E Data Responses 1 and 2, and USA Ticket #452871.

In its response to SED's Notice of Violation, PG&E described actions taken since the incident.  Thirteen (13) nearby addresses were inspected to verify that no other sewer lateral cross-bore exists.  Also, as part of  its damage prevention procedures, PG&E amended its boring practice and added a Utility Bulletin providing guidance to construction personnel regarding cross-bore prevention (TD-4412B-012, dated 3/20/15), including pre- and post-construction requirements to verify that the crossings of a new conduit or conductor do not bore through any underground facilities.

PG&E described that its existing damage prevention procedures (TD-4412P-05, Revision 0), published on August 24, 2012, required using  a camera system to inspect underground bores but that PG&E did not have such procedures in 1990, at the time the subject conduit was installed.

## SED CITATION ANALYSIS

| Element | Staff Finding |
|---|---|
| Number of violation(s) and duration of violation(s) | *Two violations:* *One violation of GO 128, Rule 17.7 from 10/30/14, 1213 hours to 11/7/14, 1320 hours (eight days) for mismarking underground facilities.* *One violation of GO 128, Rule 33.4-A3a from 1990 through 2014 (twenty-four years) for improper installation.* |
| Severity of the offense: overall level of risk of violation(s) | *The incident resulted in explosion and injury to a third party; injuries included burns to the face, head, and arms. A sustained outage affected 635 customers and a momentary outage affected 5,718 customers; total combined outage duration was 10 hours and 19 minutes.* |
| The conduct of the utility before, during, and after the offense | *At the time of the installation, PG&E assumed the depth of the sewer pipe without verification. The cross-bore violation was not detected by regular inspection/ maintenance during the ensuing years. When requested, PG&E's locator did not accurately follow PG&E procedures for locating and marking electric facilities. After the incident, PG&E inspected 13 locations to verify no additional sewer lateral cross-bores exist in the area. PG&E has since made significant changes to its procedures to prevent new cross-bores.* |
| Previous occurrence of similar violations by the utility | *E20120105-01: January 5, 2012, a city employee dug into an energized, underground PG&E cable. E20110709-01: July 9, 2011, a third party contractor cut into an energized, underground PG&E cable. PG&E did not mark its underground facilities properly prior to each of these incidents.* |
| Self-reporting of the violation | *No; SED found the violations during investigation of the reported incident. (Per D.14-12-001, consideration of self-reporting as a mitigating factor is not applicable in incidents involving an injury.)* |

| Indication of the violation(s) being willful | No indication of willful violation. |
|---|---|
| Actions taken by the utility to address the violation(s) | After the incident, the utility inspected 13 locations to verify no additional sewer lateral cross-bores exist in the area. As of 3/20/2015, PG&E made significant changes to its boring procedures. Refer to Enclosure 6. |
| Associated safety related condition | |
| Financial resources of the utility | 5.4 million electric customers; 4.3 million natural gas customers; $7.094 billion authorized General Rate Case revenues for test year 2014. |
| The totality of the circumstances | SED considered mitigating and aggravating factors to determine the number of days to assess the fines. Aggravating factors included the consequences of the incident (injury and customer outages), and the existence of earlier violations of the facilities marking protocols. Mitigating factors include the difficulty of identifying the cross-bore violation and the corrective actions PG&E has taken since the event, including PG&E's changes to its installation procedures. Other factors considered include that the violations were not willful, PG&E was generally cooperative during SED's investigation, and PG&E possesses sufficient financial resources to pay the penalties. |
| Other factors deemed relevant by SED | California Government Code Section 4216 does not require non-pressurized sewer lines or drain lines to be marked. PG&E has been aware of issues with cross-boring while installing underground electric and natural gas facilities. |

| Resultant Citation Taking All Of These Factors Into Account | For the violation of Rule 33.4-A3a (cross-bore violation of clearance rules), SED sets the penalty at the statutory maximum of $50,000, assessed only for the day PG&E performed the cross-bore which initially placed its facilities in violation of the clearance rule. Violation of Rule 33.4-A3a is assessed at $50,000.<br><br>Mismarking of electrical facilities can cause serious consequences regardless of whether PG&E violated any other rules. Therefore, for the violation of General Order 128, Rule 17.7 (mismarking of facilities), SED sets the penalty at the statutory maximum of $50,000 assessed for the number of days (8) the utility remained in violation. Violation of Rule 17.7 is assessed at $400,000.<br><br>**The resulting penalty is $450,000.** |

## RESPONSE:

Respondent is called upon to provide a response to this Citation by: **5:00 PM (PST) on August 20, 2015.**

By way of such response Respondent, **within 30 calendar days,** may either:

(1) Correct the violations with any immediate safety hazard requiring immediate correction as soon as feasible, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 30 days to correct, **and** pay a fine pursuant to Pub. Util. Code § 2107. (Submit a check payable to California Public Utilities Commission using the attached *Citation Payment Form.* Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final); **or**

(2) Confirm that the violation(s) noted in this Citation have been corrected and/or otherwise do not present an on-going safety hazard to the Utility's employees and the general public, and /or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 30 calendar days to correct, **and** contest this citation by completing and submitting a *Notice of Appeal Form.* Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Decision 14-12-001" for information on the appeals process and the attached "Notice of Appeal of Citation Form." Also attached is a copy of Resolution ALJ-299, including Appendices A and B.

Respondent's failure to provide a response, as noted above, within 30 calendar days from the date the citation is served, will place Respondent in default of the citation and will result in forfeiture of Respondent's rights to appeal the citation. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

The CPUC expects the Utility to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Utility's intentions to accept or appeal the violation(s) noted in the Citation.


**Elizaveta Malashenko**
Director
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov

8



# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation dated _____, and have corrected/mitigated the violation(s) noted in the citation on _____ and no later than _____, all work to make permanent corrections to any mitigated, or otherwise remaining concerns related to the violation(s) will be completed as noted in the Compliance Plan we have submitted to the Director of SED and, herewith, pay a fine in the amount of $_____ as included in the citation.

                                Signature of Electrical Corporation's Treasurer, Chief Financial Officer, or President/Chief Executive Officer, or delegated Officer thereof

_____
(Signature)                               (Date)

_____
(Printed Name and Title)

Payment with a check must be made payable to the **California Public Utilities Commission** and sent to the below address. Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

<u>**NOTE**</u>: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the addresses provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO DECISION 14-12-001

Within 30 calendar days of the Respondent being served with a ***CITATION FOR VIOLATION(S) ISSUED PURSUANT TO DECISION 14-12-001***, Respondent may appeal the citation.  Beyond 30 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation.  The Respondent  must still correct the violation(s) as feasible unless, within 30 calendar days from the date of service of the citation, the Respondent submits to the Director of SED, a Compliance Plan that provides a detailed description of when the violation(s) will be corrected, the methodology to be utilized, and a statement, supported by an affidavit from the Electrical Corporation's Chief Executive Officer, that in the Respondent's best judgment, the time necessary to correct the violation(s) will not affect the integrity of the operating system or unduly endanger the public.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must serve the Notice of Appeal, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Office of Ratepayer Advocates

at the address listed below within 30 calendar days of the date on which the Appellant is served the Citation.  The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

*California Public Utilities Commission*
*505 Van Ness Ave.*
*San Francisco, CA  94102*
*Attn:  <Insert Title>*

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.

Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After receipt of the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a)   Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Respondent;

(b)   Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c)   Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing; and

(d)   Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Respondent's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a hearing room at either of the offices of the CPUC at the following locations:

**San Francisco**:
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles**:
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.



**Public Utilities Commission**
STATE OF CALIFORNIA

## Notice of Appeal Form
### Appeal of PG&E from Citation D.14-12-001 15-07-001 Issued by Safety and Enforcement Division
### (For A Citation Issued Pursuant to Decision 14-12-001)

### Appellant:

_____
[Name]

_____
[Title]

_____
[Utility Name]

_____
[Mailing Address]

_____
[City, CA  Zip Code]

Citation Date:_____

Citation #: D.14-12-001 __-__-__

Utility U#: _____

Appeal Date:_____

"Appeal of _____ from _____issued by Safety
                  [Utility Name]               [Citation Number]
and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional
pages if needed and/or attach copies of supporting materials along with this form).

### Enclosures to Accompany Utility Appeal

*Utility to add Enclosures as appropriate*

# Exhibit 41

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



August 10, 2015                                                    EA2015-008

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Peninsula Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities Commission (CPUC), Jamie Lau of my staff conducted an electric audit of PG&E's Peninsula Division from June 8 to June 10, 2015. The audit included a review of PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs). A copy of the audit findings itemizing the violations is enclosed. Please advise me no later than September 11, 2015, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such violations.

If you have any questions concerning this audit, please contact Jamie Lau at (415) 703-2233 or jamie.lau@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:      Audit Findings

Cc:  Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
      Charlotte TerKeurst, Program Manager, ESRB, CPUC
      Alok Kumar, P.E., Senior Utilities Engineer Supervisor, ESRB, CPUC
      Jamie Lau, P.E., Utilities Engineer, ESRB, CPUC

# Audit Findings

**Company: PG&E – Peninsula**
**Electric Distribution Audit**
**Date:  June 8 to 10, 2015**

| A. | Location: | PG&E – Peninsula Division |
|---|---|---|
| | Date of CPUC Inspection: | 6/8/2015-6/10/2015 |
| | **Explanation of Violation(s):** | |

**Missed and Past-Due Inspections**

GO 165, Section III-B, Standards for Inspection, states:

*Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

Facilities in the following map were not inspected on time as required by GO 165:

| Map | Units | Inspection Type | Findings |
|---|---|---|---|
| F0417 | 1 | UG Patrol (Urban) | Missed 2014 |
| F0424 | 30 | OH Inspection (Urban) | Inspected late in 2014 |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 415 of 565

| B. | Location: | PG&E – Peninsula Division |
|---|---|---|
| | **Date of CPUC Inspection:** | 6/8/2015-6/10/2015 |

**Explanation of Violation(s):**

**Missed Equipment Test**

GO 165, Section III-B, Standards for Inspection, states:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's Utility Standard, TD-2302S, required an overhead capacitor to be tested yearly. Capacitor No. C0558 was not tested in year 2013.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
416 of 565

| C. | Location: | PG&E – Peninsula Division |
|---|---|---|
| | Date of CPUC Inspection: | 6/8/2015-6/10/2015 |

**Explanation of Violation(s):**

**Past-Due Work Orders**

GO 165, Section III-C, – Record Keeping, states in part:

> For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.

GO 128, Rule 17.1, Design, Construction and Maintenance, states in part:

> Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.

Our audit found that 604 "Electric Corrective Notifications" work orders, from October 1, 2012 to May 7, 2015, were completed late. Furthermore, 40 work orders were open past their scheduled due dates. The past-due work orders include overhead and underground facilities.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 417 of 565

| D. | Location: | PG&E – Peninsula Division |
|---|---|---|
| | Date of CPUC Inspection: | 6/8/2015-6/10/2015 |

**Explanation of Violation(s):**

**Past-Due COE Work Order**

GO 128, Rule 31.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*
>
> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E has a one-year range for completing a Critical Operating Equipment (COE) work order. At the time of the audit, the following COE work order was open past one year:

| Work Order # | Type | Date Created |
|---|---|---|
| 107777059 | UG Cable | 1/25/2014 |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 418 of 565

| E. | Location: | 1250 Alden Ct., Belmont |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 4/7/2015 (emergency repair) |
| | Date Visited by CPUC: | 6/8/2015 |

**Explanation of Violation(s):**

### Emergency Work Order Improperly Cancelled

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

*For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E, Electric Distribution Preventative Maintenance Manual 2015, Closing EC Notifications, states in part:

*The EC Notification cannot be closed until all of the identified maintenance conditions on the notification have been addressed and/or the facilities are in a safe and reliable condition that will not require action. The field employee (Crew, T-Man, Contractor, etc.) completing the EC notification is required to check that all FDA's identified on the notification have been completed, cancelled (action is not required), or found completed upon arrival, and to sign and date the EC notification to confirm that "all maintenance on this notification is addressed (completed, cancelled, or found completed upon arrival)"*

An emergency work order to repair a broken crossarm was cancelled while the repair was incomplete. PG&E repaired the broken crossarm shortly after our field discovery.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 419 of 565

The following violations were identified during the field inspection of the audit and were not documented and/or addressed by PG&E during its last detailed inspection as required by General Order 165:

| F. | Location: | 2571 Rosewood Drive, San Bruno |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 2/5/2015 |
| | Date Visited by CPUC: | 6/9/2015 |

**Explanation of Violation(s):**

**Third-Party Notification**

GO 95, Rule 18-B, Notification of Safety Hazards, states in part:

> *If a company, while performing inspections of its facilities, discovers a safety hazard(s) on or near a communications facility or electric facility involving another company, the inspecting company shall notify the other company and/or facility owner of such safety hazard(s) no later than 10 business days after the discovery.*

A communication ground wire installed on the surface of the pole was partially exposed. . PG&E did not notify the communications company of this safety hazard when it last inspected the pole.

**Conductor in Contact with Primary Down Guy**

GO 95, Rule 38, Table 2, Case 19-D, requires the radial separation between secondary conductors and down guy wires supported on the same pole to be 3 inches.

A PG&E secondary conductor was in contact with a down guy wire attached to the same pole.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
420 of 565

| G. | Location: | 2510 Rosewood Drive, San Bruno |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 2/5/2015 |
| | Date Visited by CPUC: | 6/9/2015 |

**Explanation of Violation(s):**

**Missing High-Voltage Sign**

GO 95, Rule 51.6-A, High Voltage Marking, states in part:

> Poles which support line conductors of more than 750 volts shall be marked with high voltage signs.

Half of the High Voltage sign was missing on one side of the crossarm.

**Down Guy Wire in contact with Communication Service Drop**

GO 95, Rule 38, Table 2, Case 19-C, requires the radial separation between communication service drops and down guy wires supported on the same pole to be 3 inches. A PG&E down guy wire was in contact with a communication service drop supported on the same pole.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 421 of 565

| H. | Location: | Corner of Third Lane and Chestnut Ave, South San Francisco |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 3/16/2015 |
| | Date Visited by CPUC: | 6/9/2015 |

**Explanation of Violation(s):**

**Third-Party Notification**

GO 95, Rule 18-B, Notification of Safety Hazards, states in part:

> *If a company, while performing inspections of its facilities, discovers a safety hazard(s) on or near a communications facility or electric facility involving another company, the inspecting company shall notify the other company and/or facility owner of such safety hazard(s) no later than 10 business days after the discovery.*

A communication ground wire installed on the surface of the pole was partially exposed. The exposed portion of ground wire was less than 7 feet above the ground. PG&E did not notify the communications company of this safety hazard when it last inspected the pole.

**Metal Visibility Strips Over Ground Molding**

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's Overhead Inspection Job Aid (TD-2305M-JA99) requires metal visibility strips to be installed under wood moldings. PG&E's metal visibility strips were installed over a wooden ground molding.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 422 of 565

| I. | Location: | 310 Chestnut Ave, South San Francisco |
|----|-----------|----------------------------------------|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 3/16/2015 |
| | Date Visited by CPUC: | 6/9/2015 |

**Explanation of Violation(s):**

**Third-Party Notification**

GO 95, Rule 18-B, Notification of Safety Hazards, states in part:

*If a company, while performing inspections of its facilities, discovers a safety hazard(s) on or near a communications facility or electric facility involving another company, the inspecting company shall notify the other company and/or facility owner of such safety hazard(s) no later than 10 business days after the discovery.*

A communication ground wire installed on the surface of the pole was partially exposed. The exposed portion of ground wire was less than 7 feet above the ground. PG&E did not notify the communications company of this safety hazard when it last inspected the pole.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 423 of 565

| J. | Location: | 322 Chestnut Ave, South San Francisco |
|---|---|---|
| | Pole No.: | N/A |
| | Previous Visit by PG&E: | 3/16/2015 |
| | Date Visited by CPUC: | 6/9/2015 |

**Explanation of Violation(s):**

**Third-Party Notification**

GO 95, Rule 18-B, Notification of Safety Hazards, states in part:

> *If a company, while performing inspections of its facilities, discovers a safety hazard(s) on or near a communications facility or electric facility involving another company, the inspecting company shall notify the other company and/or facility owner of such safety hazard(s) no later than 10 business days after the discovery.*

A communication ground wire installed on the surface of the pole was partially exposed. The exposed portion of ground wire was less than 7 feet above the ground. PG&E did not notify the communications company of this safety hazard when it last inspected the pole.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 424 of 565

| K. | **Location:** | Corner of Miller Ave. and Chestnut Ave., South San Francisco |
|---|---|---|
| | **Pole No.:** | N/A |
| | **Previous Visit by PG&E:** | 3/16/2015 |
| | **Date Visited by CPUC:** | 6/9/2015 |

| **Explanation of Violation(s):** |
|---|

**Missing High-Voltage Sign**

GO 95, Rule 51.6-A, High Voltage Marking, states in part:

> *Poles which support line conductors of more than 750 volts shall be marked with high voltage signs.*

A High Voltage sign was missing on one side of the crossarm.

**Missing Visibility Strip**

GO 95, Rule 31.1, Design, Construction and Maintenance, states in part:

> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

One of the three visibility strips on the pole was missing.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
425 of 565

| L. | Location: | 127 Morton Drive, Daly City |
|---|---|---|
| | Equipment No.: | SW 2684 |
| | Previous Visit by PG&E: | 3/5/2015 |
| | Date Visited by CPUC: | 6/10/2015 |

**Explanation of Violation(s):**

**Loose Bolt on Subsurface Enclosure Cover**

GO 128, Rule 17.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

A bolt on the subsurface switch enclosure lid was loose. The bolt could be removed by hand.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
426 of 565

| M. | Location: | 1 Nelson Ct., Daly City |
|---|---|---|
| | Equipment No.: | T-6149 and T-89 |
| | Previous Visit by PG&E: | 3/12/2015 |
| | Date Visited by CPUC: | 6/10/2015 |

**Explanation of Violation(s):**

**Missing & Incorrectly Colored Visibility Strips**

GO 128, Rule 17.1, Design, Construction and Maintenance, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's Underground Inspection Job Aid (TD-2305M-JA03) requires all barrier posts to have three visibility strips in orange color.

There were ten PG&E barrier posts protecting two padmount transformers. Four posts had only one visibility strip, and the strips were not orange; five posts had three visibility strips but some of the strips were not orange.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 427 of 565

# Exhibit 42

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



September 8, 2015                                                                          SA2015-006

Hicham Mejjaty
Senior Manager, Electric Operations Compliance
Pacific Gas and Electric Company
245 Market St. Mail Unit N9G
San Francisco, CA 94105

**SUBJECT**: Audit of PG&E's Hayward Headquarters – Electric Substation

Dear Mr. Mejjaty:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission, Raymond Cho of my staff conducted a substation audit of PG&E's Hayward
Headquarters from August 3 to August 5, 2015. The audit included a review of PG&E's records
and field inspections of PG&E's facilities.

During the audit, my staff identified violations of General Order 174. A copy of the audit
findings itemizing the violations is enclosed. Please advise us no later than October 9, 2015, by
electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such
violations.

If you have any questions concerning this audit please contact Raymond Cho at (415) 703-2236
or raymond.cho@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric and Communication Facility Safety Section
California Public Utilities Commission

Enclosure:     Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC Charlotte
        TerKeurst, Program Manager, Safety and Enforcement Division, CPUC
        Alok Kumar, Senior Utilities Engineer (Supervisor), CPUC
        Raymond Cho, Utilities Engineer, CPUC
        Yoko Williams, Supervisor, Transmission Compliance, PG&E

**Company: PG&E – Hayward Headquarters**
**Substation Audit**
**Date: August 3 to 5, 2015**

<u>**Violations**</u>

| A. | Location: | PG&E – Hayward Headquarters |
|---|---|---|
| | **Date Visited by CPUC:** | 8/3/2015 – 8/5/2015 |
| | **Explanation of Violation(s):** | |
| | <u>**Late Work Orders**</u> | |

GO 174, Rule 12, states in part:

*Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.*

*Design, construction and maintenance should be performed in accordance with accepted good practices for the given local conditions known at the time by those responsible.*

(continued on next page)

Case: 19-30088     Doc# 14208-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page
430 of 565

| A. | Location: | **PG&E – Hayward Headquarters** |
|---|---|---|
| | **Date Visited by CPUC:** | 8/3/2015 – 8/5/2015 |

**Explanation of Violation(s):**

(continued from previous page)

PG&E Utility Procedure, TD-3320P-12, states that Line Corrective (LC) notification codes B and E require work to be completed within 90 days and 365 days, respectively.

| Notification | Priority | Created on | Due Date | Reference date (Date done in Field) |
|---|---|---|---|---|
| 106245031 | E | 10/15/2012 | 10/15/2013 | 1/29/2014 |
| 107108845 | B | 8/30/2013 | 11/30/2014 | 12/30/2014 |
| 107108846 | B | 8/30/2013 | 11/30/2014 | 6/22/2015 |
| 109674703 | B | 11/16/2014 | 2/16/2015 | 3/24/2015 |
| 109691174 | B | 11/30/2014 | 2/30/2015 | 4/26/2015 |
| 109691248 | B | 11/30/2014 | 2/30/2015 | 6/22/2015 |
| 109691249 | B | 11/30/2014 | 2/30/2015 | 6/22/2015 |

Seven PG&E notifications were completed past their due dates as shown above.

Case: 19-30088     Doc# 14208-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page 431 of 565

| B. | Location: | PG&E – Hayward Headquarters |
|---|---|---|
| | **Date Visited by CPUC:** | 8/3/2015 – 8/5/2015 |

**Explanation of Violation(s):**

### Missing or Late Maintenance Work

GO 174, Rule 12, states in part:

> *Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.*

> *Design, construction and maintenance should be performed in accordance with accepted good practices for the given local conditions known at the time by those responsible.*

PG&E Standard TD-3322B-040, Updated Transmission Circuit Breaker Exercise Requirements, dated 8/29/2014, states that all 60kV and above transmission class circuit breakers will receive an annual exercise.

PG&E Standard TD-3322S, Table 3: Load Tap Changer (LTC) Internal Inspection Counter Triggers, state that ABB Type UZE LTCs shall be internally inspected at 50,000 or 75,000 counter operations.

There were two (2) missing or late maintenance items:
1. Documentation of a 2014 operation or exercise of circuit breaker #152 in Dumbarton Substation was not documented.
2. Documentation of a prior internal inspection for the Bank 1 LTC in Tassajara Substation was not documented. The counter for this bank read 156,789 operations at the time of inspection.

Case: 19-30088     Doc# 14208-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page
432 of 565

My staff discovered the following violations during the field audit that were not documented and addressed by PG&E during its last inspection:

| C. | **Substation:** | Vineyard |
| --- | --- | --- |
| | **Equipment No.:** | Bank No. 2 |
| | **Previous Visit by PG&E:** | 6/2/15 |
| | **Date Visited by CPUC:** | 8/4/15 |
| | **Explanation of Violation(s):** | |

**Leaking Transformer**

GO 174, Rule 12, states in part:

*Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.*

*Design, construction and maintenance should be performed in accordance with accepted good practices for the given local conditions known at the time by those responsible.*

PG&E Substation Maintenance and Construction Manual, Substation Equipment Oil Leaks, states that inspectors must "check all of the oil-filled equipment for oil leaks, weeps, or spills. If any leaks are found, document the equipment's designation, the location of the leaks, the PCB content, and the extent of the leaks."

Transformer Bank No. 2 was leaking oil.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 433 of 565

| D. | Substation: | Vineyard |
|---|---|---|
| | Equipment No.: | Bank No. 1 |
| | Previous Visit by PG&E: | 6/2/15 |
| | Date Visited by CPUC: | 8/4/15 |

| Explanation of Violation(s): |
|---|

**Weeping Transformer**

GO 174, Rule 12, states in part:

*Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.*

*Design, construction and maintenance should be performed in accordance with accepted good practices for the given local conditions known at the time by those responsible.*

PG&E Substation Maintenance and Construction Manual, Substation Equipment Oil Leaks, states that inspectors must "check all of the oil-filled equipment for oil leaks, weeps, or spills. If any leaks are found, document the equipment's designation, the location of the leaks, the PCB content, and the extent of the leaks."

There was oil weep on transformer Bank No. 1, at the drain valve.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 434 of 565

| E. | Substation: | Grant |
|---|---|---|
| | Equipment No.: | Distribution Breaker No. 1108 |
| | Previous Visit by PG&E: | 6/2/15 |
| | Date Visited by CPUC: | 8/4/15 |

## Explanation of Violation(s):

### Damaged Insulator

GO 174, Rule 12, states in part:

*Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.*

*Design, construction and maintenance should be performed in accordance with accepted good practices for the given local conditions known at the time by those responsible.*

PG&E Substation Maintenance and Construction Manual, "Substation Condition Assessment Checklist" Requirements, state that inspectors must "ensure that the substation's porcelain and composite insulators do not have broken skirts, excessive contamination, damage, or other abnormal conditions."

There was a damaged insulator on the distribution vacuum breaker.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
435 of 565

| F. | Substation: | Grant |
| --- | --- | --- |
| | **Equipment No.:** | Air Switch No. 127 |
| | **Previous Visit by PG&E:** | 6/2/15 |
| | **Date Visited by CPUC:** | 8/4/15 |

| **Explanation of Violation(s):** |
| --- |

### Cut Ground Wire

GO 174, Rule 12, states in part:

> *Substations shall be designed, constructed and maintained for their intended use, regard being given to the conditions under which they are to be operated, to promote the safety of workers and the public and enable adequacy of service.*
>
> *Design, construction and maintenance should be performed in accordance with accepted good practices for the given local conditions known at the time by those responsible.*

PG&E Substation Maintenance and Construction Manual, "Substation Condition Assessment Checklist" Requirements, state that inspectors must "visually check the condition and continuity of all equipment case ground connections."

There was a severed ground wire for the air switch withevidence of significant oxidation on the damaged portion of the ground wire.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 436 of 565

# Exhibit 43

**PUBLIC UTILITIES COMMISSION**
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



September 14, 2015                                                                        TA2015-002

Hicham Mejjaty
Senior Manager, Electric Operations Compliance
Pacific Gas and Electric Company
245 Market St. Mail Unit N9G
San Francisco, CA 94105

**SUBJECT**: Audit of PG&E's Metcalf Division– Electric Transmission

Dear Mr. Mejjaty:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public
Utilities Commission, Ivan Garcia of my staff conducted an electric transmission audit of
PG&E's Metcalf Division from May 18 to 20, 2015.  The audit included a review of
PG&E's records and a field inspection of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders.  A copy of
the audit findings itemizing the violations is enclosed.  Please advise us no later than
October 16, 2015, by electronic or hard copy, of all corrective measures taken by PG&E
to remedy and prevent such violations.

If you have any questions concerning this audit please contact Ivan Garcia at (916) 928-
5875 or ivan.garcia@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:   Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
        Charlotte TerKeurst, Program Manager, ESRB, CPUC
        Ivan Garcia, Utilities Engineer, CPUC
        Yoko Williams, Supervisor, Transmission Compliance, PG&E

# Audit Findings

**Company: PG&E – Metcalf Division**
**Transmission Audit**
**Date: May 18 to 20, 2015**

My staff identified the following violations during the field inspection that were not documented and/or addressed by PG&E during its last inspection.

| A. | Circuit: | Evergreen-Maybury |
|---|---|---|
| | **Structure No.:** | 5/117 |
| | **Previous Visit by PG&E:** | 8/4/14 |
| | **Date Visited by CPUC:** | 5/19/15 |
| | **Explanation of Violation(s):** | |

**Exposed Ground Wire**

GO 95, Rule 54.6B, Ground Wires, states in part:

> *Ground wires of supply circuits must be protected by suitable covering and be in good repair throughout their length.*

A PG&E ground wire was exposed throughout its length.

| B. | Circuit: | Monte Vista-Los Gatos |
|---|---|---|
| | **Structure No.:** | 2/48 |
| | **Previous Visit by PG&E:** | 7/29/14 |
| | **Date Visited by CPUC:** | 5/20/15 |
| | **Explanation of Violation(s):** | |

**Down Guy Wire In Contact With Communication Cable**

GO 95, Rule 38, Table 2, Case 19C, requires that the minimum radial separation between guys passing communication conductors supported on the same pole to be 3 inches.

A PG&E down guy wire was in contact with an AT&T cable.

# Exhibit 44

**PUBLIC UTILITIES COMMISSION**
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



December 31, 2015                                                          EA2015-018

Mr. Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Sonoma Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission, Wilson Tsai and Raymond Cho of my staff conducted an electric audit of PG&E's
Sonoma Division from September 21 to September 24, 2015.  The audit included a review of
PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs).  A copy of
the audit findings itemizing the violations is enclosed. Please advise me no later than February 1,
2016, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and
prevent such violations.

If you have any questions concerning this audit please contact Wilson Tsai at (415) 703-1359 or
wilson.tsai@cpuc.ca.gov.


Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:     Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division
        Charlotte TerKeurst, Program Manager, Safety and Enforcement Division, CPUC
        Alok Kumar, Senior Utilities Engineer (Supervisor), ESRB, CPUC

# AUDIT FINDINGS

## I. Records Review

My staff reviewed the following records during the audit:
   a. GO95 detailed inspection records for 2015 for Maps HH19, GG22, KK2824, and MM3502 located in Cazadero, Guerneville, and Rohnert Park.
   b. GO128 detailed inspection records for 2015 for Maps LL3422 and JJ2709 located in Sonoma and Santa Rosa.
   c. GO165 inspection records for Sonoma division from Oct. 2010 to Sept. 2015.
   d. Completed work orders for overhead and underground facilities for Maps LL3301 and JJ2701 in Sonoma and Santa Rosa.
   e. Pole loading calculations for poles in Santa Rosa and Windsor.
   f. Pole Test and Treat records for poles in Maps GG22, GG2613, and JJ2605.
   g. Joint Pole Work forms for a pole in Rohnert Park.
   h. Cancelled work orders for facilities in Santa Rosa and Windsor.
   i. New Construction records for work order 110413216 in Windsor.

## II. Records Review - Violations

**GO 165, Section III-B, Standards for Inspection**, states in part:

*Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

The following PG&E facilities were not inspected on time as required by GO 165:

Maps with overhead (OH) facilities:
- Map KK3307 with 36 OH facilities was inspected late on 11/5/2012. The map should have been inspected in 2011.
- Map MM3205 with 5 OH facilities was inspected late on 12/10/2012. The map should have been inspected in 2011.
- Map KK3321 with 8 OH facilities was inspected late on 12/10/2012. The map should have been inspected in 2011.
- Map KK312 with 1 OH facility was inspected late on 11/5/2012. The map should have been inspected in 2011.
- Map GG1409 with 1 OH facility was inspected late on 12/4/2012. The map should have been inspected in 2011.
- Map JJ3215 with 10 OH facilities was patrolled late on 11/28/12. The map was not patrolled prior to 2012.

Maps with underground (UG) facilities:
- Map MM3205 with 13 UG facilities was inspected late on 11/28/2012. The map should have been inspected in 2010.
- Map FF28 with 9 UG facilities was patrolled late on 11/29/2012. The map should have been patrolled in 2011.

Case: 15-30088     Doc# 14206-2     Filed: 12/13/23     Entered: 12/13/23 22:10:31     Page 1 of
442 of 565

- Map GG2820 with 7 UG facilities was patrolled late on 11/28/2012. The map should have been patrolled in 2011.

**GO 165, Section III-C, Record Keeping**, states in part:

*For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's records indicated that from August 2010 to September 21, 2015, a total of 3,527 work orders were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards. Late work orders included overhead and underground facilities.

Case: 15-30088    Doc# 14266-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 443 of 565

## III. Field Inspection

My staff inspected the following facilities:

| Structure Number | Type of Structure | Location | Map Number |
|---|---|---|---|
| CTC-1014521 | Pole | Cazadero | HH19 |
| N/A | Pole | Cazadero | HH19 |
| CTC-1023652 | Pole | Cazadero | HH19 |
| CTC-1152374 | Pole | Cazadero | HH19 |
| N/A | Pole | Cazadero | HH19 |
| 12653 | Pole | Guerneville | GG22 |
| 93134 | Pole | Guerneville | GG22 |
| N/A | Pole | Guerneville | GG22 |
| N/A | Pole | Rohnert Park | KK2824 |
| N/A | Pole | Rohnert Park | KK2824 |
| N/A | Pole | Rohnert Park | KK2824 |
| N/A | Pole | Rohnert Park | KK2824 |
| N/A | Pole | Rohnert Park | KK2824 |
| N/A | Pole | Rohnert Park | KK2824 |
| N/A | Pole | Rohnert Park | KK2824 |
| 4963 | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| 6805 | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| N/A | Pole | Sonoma | MM3502 |
| J209 | Underground Junction Box | Sonoma | LL3422 |
| T103 | Subsurface Transformer | Sonoma | LL3422 |
| 1880/1888 | Underground Two-Way Tap | Sonoma | LL3422 |
| N/A | Underground Splice Box | Sonoma | LL3422 |
| T5371 | Underground Duplex Transformer | Sonoma | LL3422 |
| J9466 | Underground Load Breaker | Sonoma | LL3422 |
| T3051 | Underground Transformer | Sonoma | LL3422 |
| T7106 | Subsurface Transformer | Sonoma | LL3301 |
| N/A | Underground Junction Box | Santa Rosa | JJ2709 |
| J1397 | Underground Load Breaker | Santa Rosa | JJ2709 |
| J1336 | Underground Load Breaker | Santa Rosa | JJ2709 |
| T8718 | Subsurface Transformer | Santa Rosa | JJ2709 |
| J1381 | Underground Load Breaker | Santa Rosa | JJ2709 |
| T8863 | Subsurface Transformer | Santa Rosa | JJ2709 |
| N/A | Underground Junction Box | Santa Rosa | JJ2709 |
| N/A | Pole | Windsor | N/A |

Case: 15-30088    Doc# 14268-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 444 of 565

| Structure Number | Type of Structure | Location | Map Number |
|---|---|---|---|
| PT8726 | Pole | Windsor | N/A |
| N/A | Pole | Santa Rosa | GG2613 |
| 2597 | Pole | Santa Rosa | N/A |
| N/A | Pole | Santa Rosa | N/A |
| N/A | Overhead Transformer | Santa Rosa | JJ2701 |
| N/A | Pole | Santa Rosa | JJ2605 |

Case: 15-30088    Doc# 14200-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
445 of 565

## IV. Field Inspection – Undocumented Violations List

We observed the following violations during our field inspection. None of these violations were documented and/or addressed by PG&E during its last inspections:

**GO 95, Rule 56.2, Use**, states in part:

> *Where guys are used with poles or similar structures capable of considerable deflection before failure, the guys shall be able to support the entire load, the pole below the point of guy attachment acting merely as a strut.*

> *Guys shall be attached to structures, as nearly as practicable, at the center of load. They shall be maintained taut and of such strength as to meet the safety factors of Rule 44.*

A secondary anchor guy on a PG&E pole located at 2952 Lomitas Ave. was not attached to the ground. Therefore the anchor guy was not taut and able to support the entire load.

**GO 95, Rule 18-B, Notification of Safety Hazards**, states in part:

> *If a company, while performing inspections of its facilities, discovers a safety hazard(s) on or near a communications facility or electric facility involving another company, the inspecting company shall notify the other company and/or facility owner of such safety hazard(s) no later than 10 business days after the discovery.*

A communications splice was hanging ten feet above ground at a PG&E pole located at 2952 Lomitas Ave. PG&E did not notify the communications company of this safety hazard when it last inspected the pole.

**GO 95, Rule 37, Table 1, 13-E**, requires a minimum radial clearance of 18 inches between bare line supply conductors 750-22,500 Volts and tree branches or foliage.

Vegetation was less than 18 inches from a primary conductor on Pole 6805.

**GO 95, Rule 56.2, Use**, states in part:

> *Guys shall be attached to structures, as nearly as practicable, at the center of load. They shall be maintained taut and of such strength as to meet the safety factors of Rule 44.*

There was noticeable slack on the span guy located at 1375 E. Napa St.

**GO 95, Rule 54.7, Climbing and Working Space**, states in part:

> *Climbing space, measured from center line of pole, shall be provided on one side or in one quadrant of all poles or structures*

The climbing space on a PG&E pole at 1439 E Napa St. was obstructed by vegetation from all sides.

Case: 15-30088   Doc# 14206-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 446 of 565

**V. Field Inspection – Documented Violations List**

We observed the following violations during our field inspection. These violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

**PG&E TD-2305M-JA02, Guys/Anchors**, requires the top of an anchor head to be above grade.

The poles at the following addresses had buried anchor guys:
- 516 Baron Dr.
- 2952 Lomitas Ave.

**GO 95, Rule 56.4-C – Clearances From Conductors**, requires a 3 inch radial separation between guys and 0-750 Volt conductors.

The poles at the following addresses had an anchor guy in contact with secondary conductor:
- 4090 Cazadero Hwy.
- 4300 Cazadero Hwy.
- 1439 E Napa St.

**GO 95, Rule 51.6-A, High Voltage Marking**, states in part:

> *Poles which support line conductors of more than 750 volts shall be marked with high voltage signs…… Such signs shall be of weather and corrosion–resisting material, solid or with letters cut out therefrom and clearly legible.*

The poles at the following addresses did not have High Voltage signs:
- 18361 Sweetwater Springs Rd.
- 1383 E Napa St.

**GO 95, Rule 54.6-B, Ground Wires**, states in part:

> *That portion of the ground wires attached on the face or back of wood crossarms or on the surface of wood poles and structures shall be covered by a suitable protective covering*

The poles at the following addresses had exposed ground moldings:
- 544 Baron Dr.
- 516 Baron Dr.

Case: 15-30088    Doc# 14206-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 447 of 565

# Exhibit 45

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



January 13, 2016                                              EA2015-016

Mr. Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Central Coast Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission, Wilson Tsai and Ivan Garcia of my staff conducted an electric audit of PG&E's
Central Coast Division from November 2 to November 6, 2015. The audit included a review of
PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs). A copy of
the audit findings itemizing the violations is enclosed. Please advise me no later than February
15, 2016, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and
prevent such violations.

If you have any questions concerning this audit please contact Wilson Tsai at (415) 703-1359 or
wilson.tsai@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:    Audit Findings

Cc:    Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
       Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC

# AUDIT FINDINGS

## I. Records Review

My staff reviewed the following records during the audit:
   a. 2015 GO 95 detailed inspection records for Maps G0908 & F0918 located in Salinas.
   b. 2015 GO 128 detailed inspection records for Maps I0212 & I0214 located in Pacific Grove.
   c. GO165 inspection records for Central Coast division from Oct. 2010 to Sept. 2015.
   d. Completed work orders for overhead facilities for Maps I0214, G0813, G0923B, G0924, and F0923 in Pacific Grove and Salinas.
   e. Cancelled work orders for overhead facilities for Maps I0214, G0813, and G0907 in Pacific Grove and Salinas.
   f. Pole loading calculations for poles in Salinas.
   g. New Construction records for work order 109910494 in Salinas.

## II. Records Review - Violations

**GO 165, Section III-B, Standards for Inspection**, states in part:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

The following PG&E facilities were not inspected as required by GO 165:
- 3 overhead maps with a total of 49 facilities missed a patrol and/or an inspection cycle.
- 42 underground maps with a total of 107 facilities missed a patrol and/or an inspection cycle.

**GO 165, Section III-C, Record Keeping**, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's records indicated that from October 2010 to September 30, 2015, a total of 3,527 work orders were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards. In addition, 1,597 work orders were cancelled past their scheduled date of corrective action. Late work orders included overhead and underground facilities.

## III. Field Inspection

My staff inspected the following facilities:

| Structure Number | Type of Structure | Location | Map Number |
|---|---|---|---|
| N/A | Pole | Salinas | G0908 |
| #1176 | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| Streetlight #147 | Pole | Salinas | G0908 |
| Streetlight #146 | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| N/A | Pole | Salinas | G0908 |
| T-85979 | Underground Transformer | Pacific Grove | I0212 |
| SW-68006 | Underground 3-Way Switch | Pacific Grove | I0212 |
| SW-91640 | Underground 3-Way Switch | Pacific Grove | I0212 |
| SW-42618 | Underground 3-Way Switch | Pacific Grove | I0212 |
| SW-99040 | Underground Interrupter | Pacific Grove | I0212 |
| J-9305 | Underground Junction Box | Pacific Grove | I0212 |
| J-9311 | Underground Junction Box | Pacific Grove | I0212 |
| SW-38290 | Underground 3-Way Switch | Pacific Grove | I0212 |
| SW-91032 | Underground 3-Way Switch | Pacific Grove | I0212 |
| SW-54060 | Underground 3-Way Switch | Pacific Grove | I0212 |
| SW-2714 | Underground 2-Way Switch | Pacific Grove | I0214 |
| SW-2724 | Underground 2-Way Switch | Pacific Grove | I0214 |
| T-1746 | Underground Transformer | Pacific Grove | I0214 |
| T-1745 | Underground Transformer | Pacific Grove | I0214 |
| J-420 | Underground Junction Box | Pacific Grove | I0214 |
| T-1744 | Underground Duplex Transformer | Pacific Grove | I0214 |
| T-1704 | Pad-mounted Transformer | Pacific Grove | I0214 |
| Fuse #4731 | Pole | Salinas | F0918 |
| 110441384 | Pole | Salinas | F0918 |
| Streetlight #4637 | Pole | Salinas | F0918 |
| N/A | Pole | Salinas | F0918 |
| #110441385 | Pole | Salinas | F0918 |
| #110441386 | Pole | Salinas | F0918 |
| Fuse #4503 | Pole | Salinas | F0918 |
| N/A | Pole | Salinas | F0918 |

| Structure Number | Type of Structure | Location | Map Number |
|---|---|---|---|
| N/A | Pole | Salinas | F0918 |
| Structure Number | Type of Structure | Location | Map Number |
| N/A | Pole | Salinas | F0918 |
| Cutout #59021 | Pole | Salinas | F0918 |
| N/A | Pole | Salinas | F0918 |

Case: 15-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
453 of 565

## IV. Field Inspection – Undocumented Violations List

We observed the following violations during our field inspection. None of these violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 51.6-A, High Voltage Marking**, states in part:

> *Poles which support line conductors of more than 750 volts shall be marked with high voltage signs…… Such signs shall be of weather and corrosion–resisting material, solid or with letters cut out therefrom and clearly legible.*

The pole at the intersection of Navajo Drive and First St. in Salinas did not have a "High Voltage" sign.

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

Streetlight #4637, located at the intersection of North Main St. and Russell Rd. in Salinas did not have a "lip washer and nut" where the insulator connects to the outer crossarm.

**GO 95, Rule 54.8-B, Clearances Above Ground, Buildings, Etc.**, states in part:

> *Above Public Thoroughfares: Service drop conductors shall have a vertical clearance of not less than 18 feet above public thoroughfares, except that this clearance may grade from 18 feet at a position not more than 12 feet horizontally from the curb line to a clearance of not less than 16 feet at the curb line, provided the clearance at the centerline of any public thoroughfare shall in no case be less than 18 feet.*
>
> *Residential Premises: Over private driveways or lanes or other private property areas accessible to vehicles on premise used for residential purposes only, service drops shall have a vertical clearance not less than 12 feet.*

- The service drop at 257 Cherry Dr. had a vertical clearance of 9 feet 10 inches at the lowest point above the driveway. It had a vertical clearance of 12 feet 3 inches at the lowest point above the street curb.

- The service drop at 269 Cherry Dr. had a vertical clearance of 12 feet at the lowest point above the street curb.

**GO 95, Rule 38, Table 2, 19-C**, requires a minimum radial clearance of 3 inches between communication conductors and guy wires supported on the same pole.

A guy wire installed on the pole at the corner of Peach and Cherry Dr. in Salinas was in contact with a communication conductor.

**GO 95, Rule 56.2**, requires guy wires to be maintained taut.

The pole at 689 Lobos St.in Pacific Grove had a loose down guy. PG&E repaired the down guy during the CPUC's field inspection.

## V. Field Inspection – Documented Violations List

We observed the following violations during our field inspection. These violations were documented and/or addressed by PG&E during its last inspection:

**GO 128, Rule 12.2, Maintenance**, states in part:

> *Systems shall be maintained in such condition as to secure safety to workmen and the public in general. Systems and portions thereof constructed, reconstructed, or replaced on or after the effective date of these rules shall be kept in conformity with the requirement of these rules..*

Pad-mounted transformer T-1704 in Pacific Grove had corrosion on the top part of the cabinet.

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

- The pole across from Cutout #59021 in Salinas had a decayed primary crossarm.

- Pole #1176 in Salinas was not drawn on Map G0908.

- The pole at 2381 N. Main St. in Salinas had vegetation in contact with the down guy above the down guy insulator.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 456 of 565

# Exhibit 46

# CITATION FOR VIOLATION(S)
# ISSUED PURSUANT TO RESOLUTION ALJ-274
# OF GENERAL ORDER 112

**Gas Corporation (Operator):** Pacific Gas & Electric Company (PG&E)
*To Which Citation Is Issued*

## RESPONDENT:

Mr. Jesus Soto, Vice President
Pacific Gas & Electric Company
6111 Bollinger Canyon Road, Room 4590-D
San Ramon, CA 94583

## CITATION:

Operator is hereby cited for system-wide violations related to the Operator Qualification (OQ) rule as it relates to PG&E's cross-bore inspection program, resulting in a financial penalty of $200,000

## VIOLATIONS:

Operator is cited for violating General Order 112[1], as described below.

1. **§192.805  Qualification program.**

   *"Each operator shall have and follow a written qualification program.  The program shall include provisions to:*

   *(a) Identify covered tasks;*
   *(b) Ensure through evaluation that individuals performing covered tasks are qualified…"*

   PG&E contracted out activities related to the cross bore inspection program to a third party.  The third party provided some training to its own personnel to do "proximity clearances."  The training does not appear to

---

[1] General Order 112-F was adopted by the Commission on June 25, 2015 via Decision 15-06-044.

meet the OQ requirements. It is the responsibility of PG&E to ensure that training of all personnel performing OQ tasks are done in a manner that ensures adequate performance and is acceptable to PG&E.

The proximity clearances took place at various times between 2011 and April 21, 2015 (the time of the meeting with PG&E representatives). The exact number and dates of the proximity clearances with unqualified personnel is unknown. Unqualified personnel means individuals from the primary contractor and any subcontractors who performed "proximity" clearances during the timeframe noted above.

PG&E in its response to the Notice of Proposed Violation (NOPV), stated:

*"The PG&E cross bore program performs proximity clearances to identify the approximate location of PG&E's distribution gas lines in relation to sewer lines as part of the assessments being performed for the program rather than in preparation for excavation as is the case with a non-production task. In the interest of continuous improvement of the Cross Bore Program, PG&E will use locate and mark Operator Qualified employees to perform proximity clearances on a going forward basis. Additionally, PG&E will revisit the locations that were previously determined not to have a cross bore through a proximity clearance and perform the proximity clearance with locate and mark Operator Qualified personnel."*

## ENCLOSURES:

The following enclosures were used to establish the findings of fact:

1. *Enclosure 1 – Whistleblower Investigation Report (REDACTED), dated 3/1/2016*

2. *Enclosure 2 – SED PG&E's Cross Bore Inspection Program, dated 9/9/2015*

3. *Enclosure 3 – PG&E NOPV response, dated 10/09/2015*

## STATEMENT OF FACTS:

The above violations were established from the attached *Enclosure 1 – Whistleblower Investigation Report (REDACTED).*

# Public Utilities Commission
## STATE OF CALIFORNIA

| | |
|---|---|
| **Citation Date:** March 29, 2016 | |
| **Citation #:** ALJ 274 16-03-001 | |
| **Operator ID#:** 15007 | |

## SED CITATION ANALYSIS

| Element of Sentencing Schedule | Staff Finding |
|---|---|
| Number of violation (s) and duration of violation(s) | *System-wide violations of Title 49 CFR §192.805(b) between the time each "proximity clearance" was performed and April 21, 2015 (the date of the meeting with PG&E representatives).* |
| Severity of the offense: overall level of risk of violation(s) | *These violations did not create significant hazardous conditions since PG&E did not accept these "proximity" cross-bore inspections as being complete. The violations were system-wide which results in total fine amount of $200,000 due to the programmatic nature of the violations.* |
| The conduct of the utility before, during, and after the offense | *The utility is being cooperative and has undertaken corrective actions.* |
| Previous occurrence of similar violations by the utility | *N/A* |
| Self-reporting of the violation | *No* |
| Indication of the violation (s) being willful | *No* |
| Actions taken by the utility to address the violation | *PG&E has accepted none of the proximity clearances performed by the primary contractor as being complete.* |
| Associated safety related condition | *Potential cross-bores in sewer and storm drain lines* |
| Financial resources of the utility | *4.3 Million customers, $715 Million Revenue requirement* |
| The totality of the circumstances | *The cross-bore inspection program was done in response to the Distribution Integrity Management Program (DIMP)* |

| | |
|---|---|
| | *Rule in 2011 to reduce risk on PG&E's system due to potential cross-bores. The proximity clearances were done where visual inspection of the sewer lines was difficult to complete.* |
| Other factors deemed relevant by SED | *The utility was cooperative with staff; the calculated citation amount is based on the programmatic nature of the violation.* |
| **Resultant Citation Taking All Of These Factors Into Account** | **$200,000.00** |

## RESPONSE:

Respondent is hereby called upon to provide a response to this Citation by: **5:00 PM (PST) on April 8, 2016.**

By way of such response, Respondent, **within 10 calendar days,** may either:

(1) Correct the violations with any immediate safety hazard requiring immediate correction as soon as feasible, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** pay a fine pursuant to Pub. Util. Code § 2107. (Submit a check payable to California Public Utilities Commission using the attached *Citation Payment Form.* Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final);  **or**

(2) Confirm that the violation(s) noted in this Citation have been corrected and/or otherwise do not present an on-going safety hazard to the Operator's employees and the general public, and/or submit a Compliance Plan to the Director of SED for correcting those violations requiring more than 10 days to correct, **and** contest this citation by completing and submitting a *Notice of Appeal Form.* Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Resolution ALJ-274" for information on the appeals process and the attached "Notice of Appeal Form". Also attached is a copy of Resolution ALJ-299 including Appendices A and B.

Respondent's failure to provide a response, as noted above, within 10 calendar days from the date the citation is served, will place Respondent in default of the citation and will result in forfeiture of the Respondent's rights to appeal the citation. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

## NOTIFICATION TO PUBLIC AGENCIES:

As soon as is reasonable and necessary, and <u>no later than 10 calendar days</u> after service of the citation is effected, Respondent must provide a notification to the City Manager or similar local agency authority in the city and county where the citation is issued. <u>Within 10 days of providing such notification</u>, Respondent must serve an affidavit to the Director of SED, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects Operators to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations regardless of the Operator's intentions to accept or appeal the violation(s) noted in the Citation.

**Elizaveta Malashenko**
Director - Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov

# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation

dated _____, and have corrected/mitigated the violation(s)

noted in the citation on _____ and no later than _____,

all work to make permanent corrections to any mitigated, or otherwise remaining

concerns related to the violation(s) will be completed as noted in the Compliance Plan

we have submitted to the Director of SED  and, herewith, pay a fine in the amount of  $

_____ as included in the citation.

Signature of Gas Corporation's Treasurer, Chief Financial Officer, or President/CEO, or delegated Officer thereof

_____
(Signature)                          (Date)

_____
(Printed Name and Title)

Payment with a check must be made payable to the **California Public Utilities Commission** and sent to the below address.  Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

NOTE: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the addresses provided on the Citation.

**DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
ISSUED PURSUANT TO RESOLUTION ALJ-274**

Within 10 calendar days of the Respondent being served with a ***CITATION FOR VIOLATION(S) ISSUED PURSUANT TO RESOLUTION ALJ-274***, Respondent may appeal the citation. Beyond 10 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as feasible unless**,** within 10 calendar days from the date of service of the citation**,** the Respondent submits to the Director of SED, a Compliance Plan that provides a detailed description of when the violation(s) will be corrected, the methodology to be utilized, and a statement, supported by an affidavit from the Gas Corporation's Chief Executive Officer, that in the Respondent's best judgment, the time necessary to correct the violation(s) will not affect the integrity of the operating system or unduly endanger the public.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must be served, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to:
   ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Division of Ratepayer Advocates

within 10 calendar days of the date on which the Appellant is served the Citation at the address listed below. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

*California Public Utilities Commission*
*505 Van Ness Ave,*
*San Francisco, CA 94102*
*Attn: <Insert Title>*

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.


Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After SED receives the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a) Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Respondent;

(b) Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c) Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing; and

(d) Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Respondent's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a hearing room at either of the offices of the CPUC at the following locations:

**San Francisco**:
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA  90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.

**Public Utilities Commission**
STATE OF CALIFORNIA

| | |
|---|---|
| **Citation Date:** March 29, 2016 | |
| **Citation #:** ALJ 274 16-03-001 | |
| **Operator ID#:** 15007 | |

## Notice of Appeal Form
## Appeal of PG&E from Citation ALJ 274 16-04-001 issued by Safety and Enforcement Division (For A Citation Issued Pursuant to Resolution ALJ-274)

**Appellant:**

Name
Vice President, Gas Operations
Gas Utility Name
Mailing Address
City, CA Zip

Citation Date:

Citation #: _____-__-___

Operator ID#:

Appeal Date: _____

_____ _____

"Appeal of [insert Operator Name] from [insert Citation number] issued by Safety and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages if needed and/or attach copies of supporting materials along with this form).

**Public Utilities Commission**
STATE OF CALIFORNIA

| | |
|---|---|
| **Citation Date:** March 29, 2016 | |
| **Citation #:** ALJ 274 16-03-001 | |
| **Operator ID#:** 15007 | |

## Enclosures to Accompany Utility Appeal

*Utility to add Enclosures as appropriate*

# Exhibit 47

**PUBLIC UTILITIES COMMISSION**
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



April 15, 2016                                                                          EA2016-004

Mr. Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company (PG&E)
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's De Anza, Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities Commission Jamie Lau of my staff conducted an electric audit of PG&E's De Anza Division from March 7, 2016, to March 10, 2016.  The audit included a review of PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs).  Enclosed is a copy of the audit findings with itemized violations. Please advise me no later than May 16, 2016, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such violations.

If you have any questions concerning this audit please contact Jamie Lau at (415) 703-2233 or jamie.lau@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:     Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
        Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC

# AUDIT FINDINGS

## I. Records Review

My staff reviewed the following records for the period of October 1st, 2013 to February 25th, 2016:

a. Overhead and underground patrol and detailed inspection records.
b. Completed, pending, and cancelled corrective action work orders generated as a result of inspections and trouble calls.
c. Pole loading calculations.
d. Intrusive pole testing records (the latest tests were done on 2/26/2016).
e. New Construction records.
f. Diagnostic testing records.
g. Inspector training records

## II. Records Review - Violations

**<u>GO 165, Section III-B, Standards for Inspection</u>**, states:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

PG&E's records indicated that Pole #110495987 at 290 Dillion Ave, in the city of Campbell was installed in 1989. As such, Table 1 of GO 165 requires the pole to be intrusively tested no later than 2014. PG&E intrusively inspected the pole on February 18, 2016, therefore, violating the requirement of GO 165.

**<u>GO 165, Section III-C, Record Keeping</u>**, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

**<u>GO 95, Rule 31.1, Design, Construction, and Maintenance</u>**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*
>
> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
471 of 565

PG&E's records indicated that from October 1, 2013 to February 25, 2016, 151 overhead Electric Corrective (EC) work orders were either completed late or open past their due date. These work orders were generated as a result of GO 165 inspections or trouble calls.

Furthermore, PG&E's records indicated 4 overhead Critical Operating Equipment (COE) work orders were open past their maximum correction time of one year.

**GO 165, Section III-C, Record Keeping**, states in part:

> *For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*
>
> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's records indicated that from October 1, 2013 to February 25, 2016, 36 underground Electric Corrective (EC) work orders were either completed late or open past their due date. These work orders were generated as a result of GO 165 inspections or trouble calls.

Furthermore, PG&E's records indicated 4 underground Critical Operating Equipment (COE) work orders were open past their maximum correction time of one year.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 472 of 565

## III. Field Inspection

My staff inspected the following facilities:

| Structure Number | Type of Structure | Approx. Location | Map Number |
|---|---|---|---|
| N/A | Overhead Service | 1102 Steeplechase Ln, Cupertino | H1310 |
| N/A | Pole | 116 Taaffe St, Sunnyvale | F1315 |
| N/A | Pole | 150 Taaffe St, Sunnyvale | F1315 |
| N/A | Pole | 174 Taaffe St, Sunnyvale | F1315 |
| 3157 | Pole | 275 Beemer Ave, Sunnyvale | F1315 |
| N/A | Pole | 241 Beemer Ave, Sunnyvale | F1315 |
| N/A | Pole | Corner of Beemer Ave and N. Frances Ave, Sunnyvale | F1315 |
| N/A | Pole | 176 N. Frances Ave, Sunnyvale | F1315 |
| N/A | Pole | 158 N. Frances Ave, Sunnyvale | F1315 |
| N/A | Pole | 116 N. Frances Ave, Sunnyvale | F1315 |
| 15312 | Underground Junction Box | 1312 Crossman Ave, Sunnyvale | N/A |
| C4576 | Pad-mounted Transformer | 783 N. Mary Ave, Sunnyvale | F1305 |
| PG980155-1 | Pole | 1190 Evelyn Ave, Sunnyvale | F1313 |
| PG020302-1 | Pole | 1190 Evelyn Ave, Sunnyvale | F1313 |
| N/A | Pole | 1188 Evelyn Ave, Sunnyvale | F1313 |
| N/A | Pole | 1186 Evelyn Ave, Sunnyvale | F1313 |
| N/A | Pole | 1140 Evelyn Ave, Sunnyvale | F1313 |
| N/A | Pole | 1136 Evelyn Ave, Sunnyvale | F1313 |
| N/A | Pole | 1128 Evelyn Ave, Sunnyvale | F1313 |
| N/A | Pole | 987 Lane Ave, Mountain View | F1214 |
| SW31240 | Underground Switch | 1 Infinite Loop, Cupertino | N/A |
| T-9319 | Pad-mounted Transformer | 10101 N. De Anza Blvd, Cupertino | G1325 |
| T-12312 | Pad-mounted Transformer | 833 El Camino, Sunnyvale | F1319 |
| C3559 | Underground Transformer | 833 El Camino, Sunnyvale | F1319 |
| T-10745 | Pad-mounted Transformer | 903 El Camino, Sunnyvale | F1319 |
| N/A | Underground Splice Box | Olive Ave and All American Way, Sunnyvale | F1319 |
| C4539 | Underground Transformer | 515 Latimer Ct, Campbell | H1514 |
| N/A | Pole | 3832 W. Campbell Ave, Campbell | N/A |
| T-7429 | Underground Transformer | 1541 Keith Dr, Campbell | H1522 |
| T-7428 | Underground Transformer | 616 Park Hurst, Campbell | H1522 |
| 30 | Pole | 1555 Oakhurst Ave, Los Altos | G1204 |
| N/A | Pole | 1515 Oakhurst Ave, Los Altos | G1204 |
| N/A | Pole | 1495 Oakhurst Ave, Los Altos | G1204 |
| N/A | Pole | 1102 Lisa Ln, Los Altos | G1204 |
| N/A | Pole | 1110 Lisa Ln, Los Altos | G1204 |
| N/A | Pole | 1135 Lisa Ln, Los Altos | G1204 |
| N/A | Pole | 1150 Lisa Ln, Los Altos | G1204 |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
473 of 565

| 335 | Pole | 1158 Lisa Ln, Los Altos | G1204 |
|------|------|-------------------------|-------|
| N/A | Pole | 1203 Lisa Ln, Los Altos | G1204 |
| 7-1525-G | Pole | 1228 Lisa Ln, Los Altos | G1204 |
| PT18219-2 | Pole | 1228 Lisa Ln, Los Altos | G1204 |
| N/A | Pole | 1575 Kensington Cir, Los Altos | G1204 |
| N/A | Pole | 1545 Kensington Cir, Los Altos | G1204 |

## IV. Field Inspection – Undocumented Violations List

We observed the following violations during our field inspection. None of these violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

The following poles had a loose "under-arm bus" on the secondary level:

- 1135 Lisa Ln, Los Altos
- 1150 Lisa Ln, Los Altos

**GO 95, Rule 51.6-A, High Voltage Marking**, states in part:

> *Poles which support line conductors of more than 750 volts shall be marked with high voltage signs. This marking shall consist of a single sign showing the words "HIGH VOLTAGE", or pair of signs showing the words "HIGH" and "VOLTAGE", not more than six (6) inches in height with letters not less than 3 inches in height. A pair of signs may be stacked to a height of no more than 12 inches. Such signs shall be of weather and corrosion–resisting material, solid or with letters cut out therefrom and clearly legible.*

Poles at the following locations had "High Voltage" signs partially missing:

- 150 Taaffe St, Sunnyvale
- Pole #PG980155-1 at 1190 Evelyn Ave, Sunnyvale

**GO 95, Rule 18B, Notification of Safety Hazards**, states in part:

> *If a company, while performing inspections of its facilities, discovers a safety hazard(s) on or near a communications facility or electric facility involving another company, the inspecting company shall notify the other company and/or facility owner of such safety hazard(s) no later than 10 business days after the discovery. To the extent the inspecting company cannot determine the facility owner/operator, it shall contact the pole owner(s), who shall be responsible for promptly notifying the company owning/operating the facility with the safety hazard(s), normally not to exceed five business days after being notified of the safety hazard. The notification shall be documented and such documentation must be preserved by all parties for at least ten years.*

A communication ground wire on the following pole was partially exposed. PG&E did not notify the communications company of the safety hazard:

- 116 Taaffe St, Sunnyvale
- Pole #PG020302-1 at 1190 at Evelyn Ave, Sunnyvale
- 1515 Oakhurst Ave, Los Altos

**GO 95, Rule 54.6B, Ground Wires**, states in part:

*Minor separation, warping, and/or cracking of the protective covering is allowed, provided the ground wire is not exposed.*

The ground wire on the following poles was exposed:

- 174 Taaffe St, Sunnyvale
- 116 N. Frances Ave, Sunnyvale

**GO 95, Rule 91.3A-1, Use of Steps**, states in part:

*Poles with Vertical Runs or Risers: All jointly used poles which support supply conductors shall be provided with pole steps if vertical runs or risers are attached to the surface of such poles……*

The following jointly used poles with vertical runs did not have pole steps:

- 174 Taaffe St, Sunnyvale
- Pole #PG980155-1 at 1190 at Evelyn Ave, Sunnyvale
- Pole #PG020302-1 at 1190 at Evelyn Ave, Sunnyvale
- 1136 Evelyn Ave, Sunnyvale
- 3832 W. Campbell Ave, Campbell
- 1555 Oakhurst Ave, Los Altos
- Pole #7-1525-G at 1228 Lisa Ln, Los Altos

**GO 95, Rule 31.1, Design, Construction and Maintenance**, states in part:

*For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's Overhead Inspection Job Aid (TD-2305M-JA02) requires metal visibility strips to be installed under wood moldings. PG&E's metal visibility strips were installed over a wooden ground molding on the pole located at 116 Taaffe St, Sunnyvale.

**GO 95, Rule 56.7-B, Location of Sectionalizing Insulators - Anchor Guys**, states in part:

*In order to prevent trees, buildings, messengers, metal–sheathed cables or other similar objects from grounding portions of guys above guy insulators, it is suggested that anchor guys be sectionalized, where practicable, near the highest level permitted by this Rule.*

Case: 19-30088  Doc# 14208-2  Filed: 12/13/23  Entered: 12/13/23 22:10:31  Page 476 of 565

A tree was in contact with a guy wire on Pole # PT18219-2 located at 1228 Lisa Ln, Los Altos, above its insulator.

**GO 95, Rule 93, Climbing Space.** states in part:

> *Climbing space shall be provided on all jointly used poles which support conductors and the provisions of Rules 54.7 and 84.7 are directly applicable to such poles. Climbing space on jointly used poles shall be so correlated between conductor levels that its position in relation to the pole is not changed by more than 90 degrees in a vertical distance of less than 8 feet. Climbing space shall be maintained from the ground level.*

- The climbing space on Pole # PT18219-2 located at 1228 Lisa Ln, Los Altos was obstructed by a tree.
- The climbing space on the pole located at 1575 Kensington Cir, Los Altos, was obstructed by a bolt extended more than 1 inch at the secondary level.

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*
>
> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's Underground Inspection Job Aid (TD-2305M-JA03) requires underground equipment's operating number to be identified. An underground transformer No. C2539 located at 515 Latimer Ct, Campbell, did not have equipment operating number identified.

**GO 128, Rule 17.8, Identification of Manholes, Handholes, Subsurface and Self-contained Surface-mounted Equipment Enclosures**, states:

> *Manholes, handholes , subsurface and self-contained surface-mounted equipment enclosures shall be marked as to ownership to facilitate identification by persons authorized to work therein and by other persons performing work in their vicinity.*

An underground transformer No. C2539 located at 515 Latimer Ct, Campbell did not have ownership identification.

**GO 128, Rule 35.3 Warning Signs,** states in part:

> *Warning signs indicating high voltage shall be installed on an interior surface, or barrier if present, inside the entrance of vaults, manholes, handholes, pad mounted*

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 477 of 565

*transformer compartments, and other above ground enclosures containing exposed live parts above 750 volts.*

The interior barrier of a pad-mounted transformer No. C4579 located at 783 N. Mary Ave, Sunnyvale, did not have a warning sign on the primary live-front side.

## V. Field Inspection – Documented Violations List

We observed the following violations during our field inspection. These violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

*For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

The following poles had a loose "under-arm bus" on the secondary level:

- 1110 Lisa Ln, Los Altos
- 1575 Kensington Cir, Los Altos

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 479 of 565

# Exhibit 48

**PUBLIC UTILITIES COMMISSION**
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



April 22, 2016                                                                                    EA2016-002

Mr. Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's San Jose Division

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission, Wilson Tsai and Ryan Yamamoto of my staff conducted an electric audit of
PG&E's San Jose Division from February 22, 2016 to February 25, 2016. The audit included a
review of PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs). A copy of
the audit findings itemizing the violations is enclosed. Please advise me no later than May 23,
2016, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and
prevent such violations.

If you have any questions concerning this audit please contact Wilson Tsai at (415) 703-1359 or
wilson.tsai@cpuc.ca.gov.

Sincerely,

*Fadi Daye*

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:     Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
        Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC

# AUDIT FINDINGS

## I. Records Review

My staff reviewed the following records during the audit:

    a. 2015/2016 GO 95 detailed inspection records for Maps G16 and G1624.
    b. 2015/2016 GO 128 detailed inspection records for Maps F1807 and H1902.
    c. 2015 GO 95 patrol inspection records for Map F1912.
    d. GO165 inspection records for San Jose division from Feb. 2011 to Feb. 2016.
    e. Completed work orders for Maps G1624 and F1711.
    f. Cancelled work orders for Maps E1721, H2009, and I1701
    g. Cancelled S9 notifications for Map G1621.
    h. Pole loading calculations for poles in San Jose.
    i. New Construction records for work orders 108871959, 110878726

## II. Records Review - Violations

**GO 165, Section III-B, Standards for Inspection**, states in part:

*Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

Nine underground maps with a total of 401 facilities were inspected late.

**GO 165, Section III-C, Record Keeping**, states in part:

*For all inspections records shall specify the circuit, area, facility or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's records indicated that from February 1, 2011 to February 22, 2016, a total of 775 work orders completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 482 of 565

**GO 95, Rule 44.1, Installation and Reconstruction**, states in part:

> *Lines and elements of lines, upon installation or reconstruction, shall provide as a minimum the safety factors specified in Table 4. The design shall consider all supply and communication facilities planned to occupy the structure. For purposes of this rule, the term "planned" applies to the facilities intended to occupy the structure that are actually known to the constructing company at the time of design.*

The following poles had pole loading calculations that were inconsistent with what was observed in the field and should be redone:

- 787 S 3rd St
- 1020 S 2nd St
- Rear of 3043 Kilo Ave
- Rear of 1537 Santa Monica Ave
- Rear of 798 Wedgewood Dr
- Rear of 1646 Karl St
- Rear of 1262 Sundown Ln

## III. Field Inspection

My staff inspected the following facilities in the City of San Jose:

| Structure Number | Type of Structure | Location | Map Number |
|---|---|---|---|
| N/A | Pole | 312 Brokaw Rd | G16 |
| 72199 | Pole | Corner of Brokaw Rd/Coleman Ave | G16 |
| K2201 | Pole | 1 Pole West Brokaw/Coleman | G16 |
| N/A | Pole | 328 Brokaw Rd | G16 |
| 3435 | Pole | 3 Poles West Brokaw/Coleman | G16 |
| N/A | Pole | 340 Brokaw Rd | G16 |
| N/A | Pole | 457 S Genevieve Ln | G1621 |
| 15507 | Pole | 1753 Shasta Ave | G1624 |
| N/A | Pole | Corner of Martin Ave/Shasta Ave | G1624 |
| 120019775 | Pole | 1775 W San Carlos St | G1624 |
| N/A | Pole | Front of 1725 Martin Ave | G1624 |
| N/A | Pole | Intersection of Martin/Hanchett | G1624 |
| N/A | Pole | Intersection of Martin/Hanchett | G1624 |
| N/A | Pole | Rear of 1748 Hanchett Ave | G1624 |
| N/A | Overhead Service | 1297 Bascom Ave | G1612 |
| N/A | Pole | 1639 Willowmont Ave | I1701 |
| N/A | Overhead Transformer | 1157 Roycott Way | H1712 |
| N/A | Enclosure Lid | 4138 Grapeleaf Way | H2009 |
| T-8833 | Underground Transformer | 2868 Stallion Way | H1902 |
| J4067 | Underground Junction Box | 2862 Stallion Way | H1902 |
| N/A | Underground Splice Box | 1622 Barberry Ln | H1902 |
| N/A | Underground Junction Box | 1578 Barberry Ln | H1902 |
| N/A | Underground Junction Box | Behind 1558 Dina Ln | H1902 |
| T-10172 | Underground Transformer | 1562 Barberry Ln | H1902 |
| N/A | Enclosure Lid | 1665 Alum Rock Ave | G1807 |
| N/A | Light Traffic Lid | 1663 Alum Rock Ave | G1807 |
| T-67070 | Pad-mounted Transformer | 1370 Vander Way | E1721 |
| T10559 | Pad-mounted Transformer | Rear of 2153 Paragon Dr | F1711 |
| C-2545 | Pad-mounted Transformer | 1384 Morrill Rd | F1807 |
| SW31756 | Underground Fuse | 1374 Morrill Rd | F1807 |
| J2733 | Underground Junction Box | 1372 Morrill Rd | F1807 |
| SW25446 | Underground Interrupter | 1368 Morrill Rd | F1807 |
| SW25444 | Underground Switch | 1366 Morrill Rd | F1807 |
| N/A | Pole | 787 S 3rd St | G1724 |
| N/A | Pole | 1020 S 2nd St | G1724 |
| N/A | Pole | Rear of 3043 Kilo Ave | N/A |
| N/A | Pole | Rear of 1537 Santa Monica Ave | N/A |
| N/A | Pole | Rear of 798 Wedgewood Dr | N/A |
| N/A | Pole | Rear of 1646 Karl St | N/A |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
484 of 565

| Structure Number | Type of Structure | Location | Map Number |
|---|---|---|---|
| N/A | Pole | Rear of 1262 Sundown Ln | N/A |
| N/A | Pole | 310 Gordon Ave | F1912 |
| 6728 | Pole | Across from 301 Gordon Ave | F1912 |
| 6725 | Pole | Gordon Ave & McKee Rd | F1912 |
| N/A | Pole | Fairway Dr & McKee Rd | F1912 |
| 6760 | Pole | 5318 Fairway Dr | F1912 |
| N/A | Pole | 5345 Fairway Dr | F1912 |
| 6759 | Pole | Fairway Dr & Crest Dr | F1912 |
| N/A | Pole | 5410 Fairway Dr | F1912 |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
485 of 565

## IV. Field Inspection – Undocumented Violations List

We observed the following violations during our field inspection. None of these violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 91.3-B, Location of Steps**, states in part:

> *The lowest step shall not be less than 8 feet from the ground line, or any easily climbable foreign structure from which one could reach or step.*

The pole located 3 poles west of Brokaw Rd and Coleman Ave had a low pole step. The pole step was approximately 7.5 feet from the ground.

**GO 95, Rule 51.6-A, High Voltage Marking**, states in part:

> *Poles which support line conductors of more than 750 volts shall be marked with high voltage signs…… Such signs shall be of weather and corrosion–resisting material, solid or with letters cut out therefrom and clearly legible.*

Poles at the following locations did not have "High Voltage" signs:

- 340 Brokaw Road
- Corner of Martin Ave and Shasta Ave

**GO 95, Rule 54.6-B, Ground Wires**, states in part:

> *That portion of the ground wires attached on the face or back of wood crossarms or on the surface of wood poles and structures shall be covered by a suitable protective covering*

Poles at the following locations had exposed ground moulding:

- In front of 1725 Martin Ave
- Intersection of Martin Ave and Hanchett Ave

**GO 95, Rule 56.7-B, Anchor Guys**, states in part:

> *In order to prevent trees, buildings, messengers, metal–sheathed cables or other similar objects from grounding portions of guys above guy insulators, it is suggested that anchor guys be sectionalized, where practicable, near the highest level permitted by this Rule.*

The pole located at the corner of Martin Ave and Shasta Ave had vegetation in contact with the secondary down guy above the insulator.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 486 of 565

**GO 128, Rule 32.7, Covers**, states in part:

> *Manholes, handholes, and subsurface equipment enclosures while not being worked in, shall be securely closed by covers of sufficient strength to sustain such loads as may reasonably be imposed upon them and arrangements shall be such that a 1;001 or appliance shall be required for their opening and cover removal.*

The subsurface enclosure lid at 1663 Alum Rock Ave only had a bolt in one of its six holes and was not securely closed.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
487 of 565

**V. Field Inspection – Documented Violations List**

We observed the following violations during our field inspection. These violations were documented and/or addressed by PG&E during its last inspection:

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

Transformer T-10559 located at the rear of 2153 Paragon Drive was missing a barrier post.

# Exhibit 49

PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



May 19, 2016                                                                           TA2016-003

Mr. Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company (PG&E)
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Moss Landing Headquarter

Dear Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission Jamie Lau of my staff conducted a transmission audit of PG&E's Moss Landing
Headquarter from April 4, 2016, to April 7, 2016. The audit included a review of PG&E's
records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs). Enclosed
is a copy of the audit findings with itemized violations. Please advise me no later than June 20,
2016, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and
prevent such violations.

If you have any questions concerning this audit please contact Jamie Lau at (415) 703-2233 or
jamie.lau@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:     Audit Findings

Cc:     Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
        Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC
        Alok Kumar, P.E., Senior Utilities Engineer Supervisor, ESRB, CPUC
        Jamie Lau, P.E., Utilities Engineer, ESRB, CPUC

**AUDIT FINDINGS**

## I. Records Review

My staff reviewed the following records for the period of January 1, 2015 to March 30, 2016:

    a. Overhead patrol and detailed inspection records.
    b. Completed, pending, and cancelled corrective action work orders generated as a result of inspections and trouble calls.
    c. Pole loading calculations.
    d. Intrusive pole testing records.
    e. New Construction records.
    f. Inspector training records

## II. Records Review - Violations

**GO 165, Section IV, Transmission Facilities**, states in part:

> *Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines.*

PG&E's Wood Poles Inspection standard "TD-2325S" requires transmission wood poles to follow GO 165's intrusive inspection cycles for distribution poles. GO 165 requires distribution poles wood poles that are over 15 years of age and have not been subject to intrusive inspection, to be intrusively inspected within 10 years from the date GO 165 became effective (March 31, 1997). PG&E's records indicated that Pole #005-133 of Del Monte-Viejo circuit was installed in 1948 and was not intrusively inspected until year 2015 , therefore, violating the requirement of GO 165.

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*
>
> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's records indicated that from October 30, 2013 to March 30, 2016, 118 overhead Electric Transmission Line Corrective (LC) work orders were either completed late or open past their due date. These work orders were generated as a result of inspections or trouble calls.

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 491 of 565

**GO 95, Rule 44.3, Replacement**, states in part:

> *Lines or parts thereof shall be replaced or reinforced before safety factors have been reduced (due to factors such as deterioration and/or installation of additional facilities) in Grades "A" and "B" construction to less than two-thirds of the safety factors specified in Rule 44.1...*

PG&E's records indicated that the safety factor of Pole #0/5 located at 950 Blanco Cir, Salinas, was 1.88.  GO 95 requires such a pole to have a safety factor of 2.0 or above.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 492 of 565

## III. Field Inspection

My staff inspected the following facilities during the audit:

| Circuit | Structure Number | Type of Structure | Approx. Location |
|---|---|---|---|
| 115 kV Moss Landing-Salinas #1 and 2 | 0/3 | Tower | Moss Landing Substation – Dolan Rd and Hwy 1, Moss Landing |
| 115 kV Moss Landing-Salinas #1 and 2 | 0/4 | Tower | Moss Landing Substation – Dolan Rd and Hwy 1, Moss Landing |
| 115 kV Moss Landing-Salinas #1 and 2 | 0/4A | Tower | Moss Landing Substation – Dolan Rd and Hwy 1, Moss Landing |
| 60 kV Salinas-Firestone #2 | 10/234 | Pole | West and along Hwy 101 (crossing Hartnell Rd), Salinas |
| 60 kV Salinas-Firestone #2 | 10/232 | Pole | West and along Hwy 101 (crossing Hartnell Rd), Salinas |
| 60 kV Salinas-Firestone #2 | 10/231 | Pole | West and along Hwy 101 (crossing Hartnell Rd), Salinas |
| 60 kV Salinas-Firestone #2 | 10/230 | Pole | West and along Hwy 101 (crossing Hartnell Rd), Salinas |
| 60 kV Salinas-Firestone #2 | 10/229 | Pole | West and along Hwy 101 (crossing Hartnell Rd), Salinas |
| 60 kV Fresh Express Tap from Salinas-Firestone #1 | 0/1 | Pole | 950 Blanco Cir, Salinas |
| 60 kV Fresh Express Tap from Salinas-Firestone #1 | 0/2 | Pole | 950 Blanco Cir, Salinas |
| 60 kV Fresh Express Tap from Salinas-Firestone #1 | 0/3 | Pole | 950 Blanco Cir, Salinas |
| 60 kV Fresh Express Tap from Salinas-Firestone #1 | 0/5 | Pole | 950 Blanco Cir, Salinas |
| 60 kV Fresh Express Tap from Salinas-Firestone #1 | 0/6 | Pole | 950 Blanco Cir, Salinas |
| 60 kV Fresh Express Tap from Salinas-Firestone #1 | 0/7 | Pole | 950 Blanco Cir, Salinas |
| 115 kV Moss Landing-Crazy Horse #1 and 2 | 0/3 | Tower | Moss Landing Substation – Dolan Rd and Hwy 1, Moss Landing |
| 115 kV Moss Landing-Crazy Horse #1 and 2 | 0/2 | Tower | Moss Landing Substation – Dolan Rd and Hwy 1, Moss Landing |
| 115 kV Moss Landing-Crazy Horse #1 and 2 | 0/4 | Tower | Moss Landing Substation – Dolan Rd and Hwy 1, Moss Landing |
| 60 kV Del Monte-Viejo | 0/1 | Pole | Kolb Ave and Casanova Ave, Monterey |
| 60 kV Del Monte-Viejo | 0/2 | Pole | Kolb Ave and Hannon Ave, Monterey |
| 60 kV Del Monte-Viejo | 0/3 | Pole | 2332 Fremont St, Monterey |
| 60 kV Del Monte-Viejo | 0/4 | Pole | Ramona Ave and Bruce Ln, Monterey |
| 60 kV Del Monte-Viejo | 0/5 | Pole | 287 Bruce Ln, Monterey |
| 60 kV Salinas-Laureles | 8/192 | Pole | 724 Monterey Rd, Salinas |
| 60 kV Salinas-Laureles | 6/149 | Pole | Along Hwy 68, Salinas |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 493 of 565

| | | | |
|---|---|---|---|
| 115 kV Llagas-Hollister | 20/129 | Tower | 6835 Camino Arroyo, Gilroy |
| 115 kV Llagas-Hollister | 20/130 | Tower | 6755 Camino Arroyo, Gilroy |
| 115 kV Llagas-Hollister | 20/131 | Tower | A farm road near 652 Holloway, Gilroy |
| 115 kV Llagas-Hollister | 20/132 | Tower | A farm road near 652 Holloway, Gilroy |
| 115 kV Llagas-Hollister | 20/133 | Tower | A farm road near 652 Holloway, Gilroy |
| 115 kV Llagas-Hollister | 5/79 | Pole | Fraizer Lake Rd and Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 5/80 | Pole | Along Fraizer Lake Rd crossing Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 5/81 | Pole | Along Fraizer Lake Rd crossing Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 5/82 | Pole | Along Fraizer Lake Rd crossing Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 5/83 | Pole | Along Fraizer Lake Rd crossing Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 5/84 | Pole | Along Fraizer Lake Rd crossing Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 5/85 | Pole | Along Fraizer Lake Rd crossing Shore Rd, Hollister |
| 115 kV Llagas-Hollister | 0/7 | Pole (Steel) | Y Rd (East of Hwy 101), San Juan Bautista |

## IV. Field Inspection – Undocumented Violations List

We observed the following violations during our field inspection. None of these violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's Transmission Preventive Maintenance Manual requires a tower foundation with steel members not to be covered by earth. Tower #20/130 located at 6755 Camino Arroyo, Gilroy, had its foundation's steel members covered by earth.

**GO 95, Rule 34, Foreign Attachments**, states in part:

> *Nothing in these rules shall be construed as permitting the unauthorized attachment, to supply, street light or communication poles or structures, of antennas, signs, posters, banners, decorations, wires, lighting fixtures, guys, ropes and any other such equipment foreign to the purposes of overhead electric line construction.*

Pole #5/82 located along at Fraizer Lake Rd, Hollister had an unauthorized third-party sign attachment. PG&E removed it shortly after CPUC's finding.

**GO 95, Rule 54.6A, Unprotected Conductors**, states in part:

> *Unprotected conductors may pass laterally on a pole or structure or vertically from one level on a pole or structure to another level, but shall not pass within the climbing space…*

A cover for a transmission insulator bonding wire was broken, thus exposing the wire at the climbing space on Pole #0/3 located at 2332 Fremont St, Monterey.

**GO 95, Rule 54.7-A3j, Allowable Climbing Space Obstructions,** states in part:

> *Bolts and their washers. However, bolts bonded to or used for the attachment of deadend hardware of circuits above 750 volts in wood crossarm configuration that project into the climbing space shall be covered with a non-conducting material as specified in Rule 22.8-C. If such bolts are bonded, a positive electrical contact shall be made.*

The climbing space on Pole # 5/84 located along at Fraizer Lake Rd, Hollister, was obstructed by two bolts projected into the climbing space without bolt covers at the distribution level.

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 495 of 565

<u>**GO 95, Rule 91.3-A1, Use of Steps**</u>, states in part:

> *Poles with Vertical Runs or Risers: All jointly used poles which support supply conductors shall be provided with pole steps if vertical runs or risers are attached to the surface of such poles……*

Jointly used Pole #0/5 located at 287 Bruce Ln, in Monterey had vertical runs and did not have pole steps.

# Exhibit 50

PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



September 21, 2016                                                                                        TA2016-05

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company (PG&E)
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Transmission Audit of PG&E Midway Division

Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission (CPUC), Ivan Garcia and Wilson Tsai of my staff conducted a Transmission Audit of
PG&E Midway Division on August 8, 2016 to August 12, 2016.  The audit included a review of
PG&E's records and field inspections of its transmission facilities.

During the audit, my staff identified violations of one or more General Orders (GOs).  A copy of the
audit findings itemizing the violations is enclosed.  Please advise me no later than October 21, 2016,
by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such
violations.

If you have any questions concerning this audit, please contact Ivan Garcia at (916) 928-5875 or
ivan.garcia@cpuc.ca.gov.

Sincerely,

Fadi Day, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosures: CPUC Audit Findings

Cc:  Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
       Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC
         Ivan Garcia, Utilities Engineer, CPUC

**AUDIT FINDINGS**

## I. Records Review

During the audit, my staff reviewed the following records:

- PG&E's Electric Transmission Preventative Maintenance Manual, TD-1001M, Revision 3
- Overhead patrol and detailed inspection records
- Completed and pending corrective action work orders (LC Notifications)
- Pole loading calculations
- Intrusive pole testing records
- Vegetation Management records

## II. Records Review – Violations List

**GO 95, Rule 31.1, Design, Construction, and Maintenance,** states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

**GO 165, Section IV, Transmission Facilities,** states in part:

> *Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines.*

PG&E's records indicated that from September 30, 2013 to June 30, 2016, 160 Electric Transmission Line Corrective (LC) work orders were completed late per PG&E Standard TD-1001M Electric Transmission Preventive Maintenance Manual.

## III. Field Inspection

The following are the facilities we inspected during the field inspection:

| Circuit | Structure Number | Approximate Location |
|---|---|---|
| 115 kV Sierra Tap | 0/2 | Oilfields Rd., Bakersfield |
| 115 kV Midway-Shafter | 7/71 | 29613 7th Standard Rd., Bakersfield |
| 70 kV Taft-Elk Hills | 7/126 | Airport Rd., Taft |
| 115 kV Midway-Taft | 19/4A | A Street and Terrace Dr., Taft |
| 70 kV Taft-Cuyama #1 | 000/001 | A Street and Terrace Dr., Taft |
| 70 kV Taft-Cuyama #2 | 000/005 | A Street and Terrace Dr., Taft |
| 70 kV Taft-Cuyama #2 | 000/006 | A Street and Terrace Dr., Taft |
| 70 kV Carneras-Taft | 0/1 | A Street and Terrace Dr., Taft |
| 70 kV Maricopa-Copus | 3/60 | Cadet Rd. and Agnes Dr., Maricopa |
| 70 kV Taft-Cuyama #2 | 015/128 | Cuyama Highway 166 and Kirshenmann Rd., Cuyama |
| 70 kV Taft-Cuyama #2 | 015/129 | Cuyama Highway 166 and Kirshenmann Rd., Cuyama |
| 70 kV Taft-Cuyama #2 | 015/130 | Cuyama Highway 166 and Kirshenmann Rd., Cuyama |
| 70 kV Taft-Cuyama #2 | 015/131 | Cuyama Highway 166 and Kirshenmann Rd., Cuyama |
| 70 kV Taft-Cuyama #2 | 015/132 | Cuyama Highway 166 and Kirshenmann Rd., Cuyama |
| 70 kV Taft-Cuyama #2 | 015/133 | Cuyama Highway 166 and Kirshenmann Rd., Cuyama |
| 115 kV Discovery Tap | 000/013 | China Grade Loop and Monte Cristo Rd., Oildale |
| 70 kV 70117 Wasco-Famoso | 008/150 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/149 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/148 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/147 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/146 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/145 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/144 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/143 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/142 | Paso Robles Highway 46 and Smith Ave., Wasco |
| 70 kV 70117 Wasco-Famoso | 008/141 | Paso Robles Highway 46 and Smith Ave., Wasco |

TA2016-005: PG&E Transmission Midway Division, August 8-12, 2016

| | | |
|---|---|---|
| 70 kV 70116 Semitropic-Wasco | 002/049 | Paso Robles Highway 46 and Leonard Ave., Wasco |
| 70 kV 70116 Semitropic-Wasco | 002/048 | Paso Robles Highway 46 and Leonard Ave., Wasco |
| 70 kV 70116 Semitropic-Wasco | 002/047 | Paso Robles Highway 46 and Leonard Ave., Wasco |
| 70005B 70 kV Chevron (Lost Hills) Tap | 011/175 | Paso Robles Highway 46 and Holloway Rd., Lost Hills |
| 70005B 70 kV Chevron (Lost Hills) Tap | 011/181 | Paso Robles Highway 46 and Holloway Rd., Lost Hills |
| 70005B 70 kV Chevron (Lost Hills) Tap | 000/005 | Twisselman Rd. and Holloway Rd., Lost Hills |
| 500 kV Los Banos-Midway #2 | 119/491 | Twisselman Rd. and Lost Hills Rd., Lost Hills |
| 10140A 115 kV Vedder Tap | 000/002B | Wesley Ln., Oildale |

TA2016-005: PG&E Transmission Midway Division, August 8-12, 2016

## IV. Field Inspection – Undocumented Violations List

We observed the following violations during the field inspection. None of the violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 54.6, Vertical and Lateral Conductors, Ground Wires,** states in part:

> *Ground Wires of supply circuits must be protected by suitable covering and be in good repair throughout their length.*

The ground wire at Taft-Cuyana #2, pole 000/006, was exposed at approximately 45 feet above ground.

## V. Field Inspection – Documented Violations List

We observed the following violation during the field inspection. The violation were documented and/or addressed by PG&E during its last inspections:

**GO 95, Rule 31.1 Design, Construction and Maintenance,** states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

> *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply line and equipment.*

A down guy anchor was buried in the ground at Taft-Cuyana #2 circuit, pole 000/005 (LC Notification #11828493).

# Exhibit 51

**PUBLIC UTILITIES COMMISSION**
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



November 7, 2016                                                      TA2016-006

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company (PG&E)
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E Victor Division

Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities Commission, Wilson Tsai of my staff conducted a Transmission audit of PG&E's Victor Division from October 10, 2016 to October 13, 2016. The audit included a review of PG&E's records and field inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs). A copy of the audit findings itemizing the violations is enclosed. Please advise me no later than December 7, 2016, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such violations.

If you have any questions concerning this audit please contact Wilson Tsai at (415) 703-1359 or wilson.tsai@cpuc.ca.gov.


Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:    Audit Findings

Cc:    Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
       Lee Palmer, Deputy Director, Office of Utility Safety, SED, CPUC
       Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC

# AUDIT FINDINGS

## I. Records Review

My staff reviewed the following during the audit:

  a. PG&E's GO 95 & 128 inspection program records
  b. Circuit map for Stockton and surrounding areas
  c. Closed and open notifications from 2015 & 2016
  d. Pole loading and intrusive test records
  e. PG&E's procedures on infrared inspections, insulator washing, and metal pole inspections
  f. Field inspection records for 10 overhead circuits

## II. Field Inspection

My staff inspected the following facilities:

| Structure Number | Circuit |
|---|---|
| 7/39 | Tesla-Tracy 500 kV |
| 7/40 | Tesla-Tracy 500 kV |
| 7/41 | Tesla-Tracy 500 kV |
| 7/42 | Tesla-Tracy 500 kV |
| 7/43 | Tesla-Tracy 500 kV |
| 37/248 | Weber-Tesla 230 kV |
| 35/237 | Weber-Tesla 230 kV |
| 34/223 | Weber-Tesla 230 kV |
| 34/224 | Weber-Tesla 230 kV |
| 34/225 | Weber-Tesla 230 kV |
| 33/222 | Weber-Tesla 230 kV |
| 33/221 | Weber-Tesla 230 kV |
| 33/220 | Weber-Tesla 230 kV |
| 33/220 | Tesla-Tracy 115 kV |
| 33/221 | Tesla-Tracy 115 kV |
| 33/222 | Tesla-Tracy 115 kV |
| 34/223 | Tesla-Tracy 115 kV |
| 33/219 | Tesla-Tracy 115 kV |
| 33/218 | Tesla-Tracy 115 kV |
| LC | Tesla-Tracy 115 kV |
| 0/4 | Kasson-Carbona 60 kV |
| 2/13 | Kasson-Carbona 60 kV |
| 2/14 | Kasson-Carbona 60 kV |
| 2/15 | Kasson-Carbona 60 kV |
| 2/16 | Kasson-Carbona 60 kV |

Case: 19-30088    Doc# 14206-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 506 of 565

| Structure Number | Circuit |
|---|---|
| 2/17 | Kasson-Carbona 60 kV |
| 2/18 | Kasson-Carbona 60 kV |
| 2/19 | Kasson-Carbona 60 kV |
| 2/20 | Kasson-Carbona 60 kV |
| 0/4 | Kyoho Tap 115 kV |
| 0/5 | Kyoho Tap 115 kV |
| 0/6 | Kyoho Tap 115 kV |
| 0/7 | Kyoho Tap 115 kV |
| 0/8 | Kyoho Tap 115 kV |
| SW-594 | Camanche Pumping Plant Tap 230 kV |
| SW-597 | Camanche Pumping Plant Tap 230 kV |
| SW-599 | Camanche Pumping Plant Tap 230 kV |
| 11/51A | Camanche Pumping Plant Tap 230 kV |
| 11/52A | Camanche Pumping Plant Tap 230 kV |
| 0/8 | Camanche Tap 115 kV |
| 0/9 | Camanche Tap 115 kV |
| 0/4 | Lockeford-Industrial 60 kV |
| 0/5 | Lockeford-Industrial 60 kV |
| 0/3 | Lockeford-Industrial 60 kV |
| 0/2 | Lockeford-Industrial 60 kV |

Case: 19-30088    Doc# 14206-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
507 of 565

**III. Field Inspection – Undocumented Violations List**

My staff observed the following violations during our field inspection. None of these violations were documented and/or addressed by PG&E during its last inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

A switch platform was missing a pier block support on Kasson-Carbona Tower No. 2/16.

Case: 19-30088    Doc# 14205-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 508 of 565

## IV. Field Inspection – Documented Violations List

My staff observed the following violations during the field inspection that were documented by PG&E during its last inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

There was a cracked concrete foundation block which supports Tesla-Tracy 500 kV Tower No. 37/248.

A steel leg at the base of Tesla-Tracy 115 kV Tower No. 33/220 was bent.

**GO 95, Rule 61.6, Design, Construction, and Maintenance**, states in part:

> *A minimum radial distance of six feet shall be maintained between any portion of the fence or wall and the tower*

A third-party unauthorized fence runs directly underneath Tesla-Tracy 500 kV Tower No. 35/237. The fence, while not intended as a barrier for the tower, falls within the six feet minimum radial distance.

# Exhibit 52

# CITATION
# ISSUED PURSUANT TO DECISION 16-09-055

**Gas Corporation (Operator) To Which Citation Is Issued:** Pacific Gas & Electric Company (PG&E)

## OFFICER OF THE RESPONDENT:

Mr. Jesus Soto, Vice President
Pacific Gas & Electric Company
6111 Bollinger Canyon Road, Room 4590-D
San Ramon, CA 94583

## CITATION:

Operator is cited a total financial penalty amount of $5,450,000 made up of the following: 1) A system-wide violation resulting in a financial penalty of $5,050,000; 2) Another violation resulting in a financial penalty of $350,000; and 3) A third violation resulting in a financial penalty of $50,000. Safety and Enforcement Division (SED) found these violations as a result of SED's inspection and investigation of the self-identified violation reported by PG&E on September 14, 2016.

## VIOLATIONS:

General Order 112F, Section 104.1 states:

*"It is the intent of the California Public Utilities Commission to automatically incorporate all revisions to the Federal Pipeline Safety Regulations, 49 CFR Parts 191, 192, 193, and 199 with the effective date being the date of the final order as published in the Federal Register.."*

The operator has violated Title 49 of the Code of Federal Regulations §§192.805 and 192.481, as identified in the first two sections below, therefore, also violated General Order 112F. However, for simplicity and to avoid duplicate of counting, the first two violations will be referenced below only as violations of 49 CFR Section §192. The third violation is the 10-day reporting requirement in CPUC Resolution ALJ-274.

1. **Title 49, Code of Federal Regulations (CFR), § 192.805 Qualification Program.**

   §192.805 states in part:

   *"Each operator shall have and follow a written qualification program. The program shall include provisions to:*

   *b) Ensure through evaluation that individuals performing covered tasks are qualified..."*

   On September 14, 2016, PG&E reported to the Safety and Enforcement Division (SED) of the California Public Utilities Commission (CPUC) that some of its contractor inspectors were



discovered to be unqualified after they performed approximately half a million Atmospheric Corrosion (AC) inspections of gas distribution meters located in PG&E's seven Divisions in 2014.

SED's Gas Safety and Reliability Branch (GSRB) staff investigated PG&E's findings from the self-identified violations report. SED's GSRB also conducted an audit of PG&E's AC inspection program, its process to train and check qualifications of contractor inspectors who performed AC inspections in 2014 and 2015, its records showing each contractor inspector's qualifications and its evaluations of each contractor inspector, and its relevant AC inspection standards and procedures from October 24 through 26, 2016.

As a result of this investigation, SED concluded the following:

1. PG&E failed to properly train and qualify its contractor employees to perform AC inspections.
2. PG&E failed to verify the qualifications of its contractor employees hired in 2014, prior to those contractors performing work.
3. PG&E did not have quality control and quality assurance controls in place to ensure that its contractor employees were operator qualified.

SED determined that PG&E is in violation of CFR, Part 192, Subpart N—Qualification of Pipeline Personnel, §192.805 (b) because PG&E failed to ensure that 101 contractor inspectors were qualified to perform AC inspections of gas distribution meters in PG&E's seven Divisions.

In this case, 101 non-operator qualified inspectors conducted AC inspections between February 2014 and May of 2014, and also in November, 2014. SED determined that this is violation of Title 49 CFR § 192.805(b). D.16-09-055 limits the maximum amount of a penalty to $8 million per citation.[1]

Therefore, SED assesses a penalty of $50,000 for each non-operator qualified contractor inspector, with a total penalty of $5,050,000 for 101 employees per §192.805 (b).

## 2. Title 49, CFR, § 192.481 Atmospheric corrosion control: Monitoring.

§192.481 states in part:

*"(a) Each operator must inspect each pipeline or portion of pipeline that is exposed to the atmosphere for evidence of atmospheric corrosion, as follows:*

*If the pipeline is located onshore, then the frequency of inspection is at least once every 3 calendar years, but with intervals not exceeding 39 months..."*

Since approximately half a million AC inspections were performed by non-operator personnel in 2014, they were not valid and had to be repeated. PG&E started re-inspecting the affected distribution meters in 2015 and will complete all of them in 2017. SED determined that PG&E was not able to complete the AC inspections of distribution gas meters located in its seven Divisions within 39 months from the previous valid inspections, completed before 2014.

---

[1] See D.16-09-055 mimeo, pp. 86-87, Conclusion of Law 8.


Therefore, SED concluded that PG&E is in violation of CFR, Part 192, Subpart I—Requirements for Corrosion Control, §192.481 (a) Atmospheric corrosion control because in 2014 PG&E did not complete the inspection of all of its distribution pipeline system that is exposed to atmosphere for evidence of AC within 39 months from the previous valid inspections in its seven Divisions. D.16-09-055 limits the maximum amount of a penalty to $8 million per citation.[2]

SED assesses a penalty of $50,000 for late AC inspections in each Division, with a total penalty of $350,000 for seven Divisions per 192.481 (a).

### 3. CPUC's Resolution ALJ-274

SED also noted that even though PG&E discovered the system-wide operator qualification deficiency of its contractor inspectors in 2015 and early 2016, it did not report it to SED until September 14, 2016. PG&E also violated the 10-day self-reporting requirement of CPUC Resolution ALJ-274, which was in effect at the time of the violation. D.16-09-055 limits the maximum amount of a penalty to $8 million per citation.[3] To keep within this limit, SED assesses a penalty of $50,000 for this single violation.

Therefore, SED assesses a penalty of $50,000 for this violation.

### Total Penalty Amount

As a result of all violations determined by SED and identified in this report, SED could have created a separate citation for the violations of each of the three requirements identified above, counting ongoing daily offenses for each violation up to the $8 million citation limit.[4] However, the total amount of penalty that SED $5,450,000, provided that PG&E agrees to waive its appeal rights and to the follow remedial recommendations identified at the bottom of SED's Investigation Report dated November 30, 2016 (See Enclosure 1).

As a result of all violations determined by SED and identified in this report, the total amount of this citation is 5,450,000.

## STATEMENT OF FACTS AND ENCLOSURES:

The following enclosures were used to establish the findings of fact:

1- *Enclosure 1 – SED's Investigation Report dated December 23, 2016*

2- *Enclosure 2 – PG&E's Self-Identified Violation Notification Letter dated September 14, 2016*

3- *Enclosure 3 – SED's 2015 Sierra Division Audit Report dated February 8, 2016*

4- *Enclosure 4 – PG&E's Response to SED's 2015 Sierra Division Audit Report dated March 9, 2016*

The violations in this citation were established based upon the four enclosures identified immediately above. Facts stated in the attached Enclosure 1 – SED's Investigation Report, Enclosure 2 – PG&E's Self-Identified Violation Letter, Enclosure 3 – SED's 2015 Sierra Division Audit Report dated February 8, 2016, Enclosure 4 – PG&E's Response to SED's 2015 Sierra

---

2 See D.16-09-055, mimeo, pp. 86-87, Conclusion of Law 8.
3 Id.



Division Audit Report dated March 9, 2016, SED's AC Inspection Audit conducted from October 24 through 26, 2016, Operator's records and/or substantiating documents obtained from other sources, or other reasons as stated in the attached report.

## SED CITATION ANALYSIS

| Element | Staff Finding |
|---|---|
| Number of violation(s) and duration of violation(s) | *One Violation of Title 49, CFR §192.805 (b) between February and May 2014, and also November 2014; one Violation of Title 49, CFR §192.481 (a) from 2014; and one Violation of Resolution ALJ-274 from 2015.* |
| Severity or gravity of the offense | *Violations described in this letter did not create significant hazardous conditions and PG&E started taking mitigative actions when they were discovered. One violation resulting in fine amount of $5,050,000, one violation resulting in fine amount of $350,000, one violation resulting in fine amount of $50,000.* |
| Conduct of the utility | *Prior History: Similar violation related to OQ of contractors was recorded and Utility was cited by Citation 16-03-001 issued on 3/29/16 with a penalty amount of $200,000. The utility is being cooperative and has started taking corrective actions and preventive measures.* |
| Self-reporting of the violation | *One violation was self-reported, two violations were found as a result of SED's Investigation conducted in 2016.* |
| Financial resources of the utility | *4.3 Million customers, $715 Million Revenue requirement* |


| The totality of the circumstances | (1) *PG&E did not ensure that its contractor inspectors are operator qualified for the AC inspections performed in 2014 as per Title 49, CFR, §192.805 (b).*<br>(2) *PG&E did not complete the AC inspections of its distribution gas meters located in seven Divisions within 39 months from the previous inspections as per Title 49, CFR, §192.481 (a).*<br>(3) *PG&E did not report the self-identified violations to the CPUC within 10 days of the discovery as per CPUC's Resolution ALJ-274.*<br><br>*All violations affect PG&E's distribution gas pipeline facilities located in the following Divisions: De Anza, Diablo, North Bay, Peninsula, Sacramento, San Jose, and Sierra.* |
|---|---|
| The role of precedent | *N/A* |
| **Resultant Citation Taking All Of These Factors Into Account** | **$5,450,000** |



# Public Utilities Commission
## STATE OF CALIFORNIA

After receipt of the Appellant's *Notice of Appeal Form*, Appellant has a right to a hearing to be convened before an Administrative Law Judge. At least ten business days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a) Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Appellant;

(b) Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c) Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing;

(d) Appellant is entitled to a copy of or electronic reference to Resolution ALJ-299 Establishing Pilot Program Citation Appeal and General Order 156 Appellate Rules (Citation Appellate Rules); and

(e) Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Appellant's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a CPUC hearing room at either of the following locations:

**San Francisco:**
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.



# Public Utilities Commission
## STATE OF CALIFORNIA

### Notice of Appeal Form
### Appeal from Citation Issued by Safety andEnforcement Division
### Pursuant to Decision 16-09-055

**Appellant:**

Name
Vice President, Gas Operations
Gas Utility Name
Mailing Address
City, CA Zip

Citation Date: _____

Citation #:  D1609055 ____-__-___

Operator ID#: _____

Appeal Date: _____

"Appeal of _____ from _____ issued by Safety and
          [Operator Name]          [Citation Number]
Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages
if needed and/or attach copies of supporting materials along with this form).



# Public Utilities Commission
## STATE OF CALIFORNIA

### Enclosures to Accompany Utility Appeal

*Utility to add Enclosures as appropriate*


**Public Utilities Commission**
STATE OF CALIFORNIA

## RESPONSE:

Respondent is hereby called upon to provide a response to this Citation by: **5:00 PM on January 23, 2017.** By way of such response, Respondent, **within 30 calendar days,** must either pay the amount of the penalty set forth in this citation[5], or appeal[6] the citation. In addition Respondent must do one of the following:

(1) <u>For violations constituting immediate safety hazards</u>: Respondent must immediately correct the immediate safety hazards.

(2) <u>For violations that do not constitute immediate safety hazards</u>: Violations that do not constitute immediate safety hazards must be corrected within 30 days after the citation is served. If said violations that do not constitute immediate safety hazards cannot be corrected within 30 days, then the Respondent must submit a detailed Compliance Plan to the Director of SED within 30 days after the citation issues, unless the utility and the Director of SED, before the expiration of the 30 day period, agree in writing to another date, reflecting the soonest that the Respondent can correct the violations. The Compliance Plan must provide a detailed description of when the violation will be corrected, the methodology to be utilized, and a statement supported by an declaration from Respondent's Chief Executive Officer or appropriate designee (CEO Declaration) stating that in the Respondent's best judgment, the time that will be taken to correct the violation will not affect the safety or integrity of the operating system or endanger public safety.

<u>Note:</u> Respondent will forfeit the right to appeal the citation by failing to do one of these two options outlined in the Response above within 30 days. Payment of a citation or filing a Notice of Appeal does not excuse Respondent from curing the violation. The amount of the penalty may continue to accrue until a Notice of Appeal is filed. Penalties are stayed during the appeal process. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

---

5 For fines paid pursuant to Pub. Util. Code § 2107 and D.16-09-055 Respondent shall submit a check payable to California Public Utilities Commission using the attached Citation Payment Form. Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final.

6 Respondent may Appeal this citation by completing and submitting a Notice of Appeal Form. Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant To Decision 16-09-055" for information on the appeals process and the attached "Notice of Appeal Of Citation Form."

**Public Utilities Commission**
STATE OF CALIFORNIA

| |
|---|
| **Citation Date:** December 23, 2016 |
| **Citation #:** D.16-09-055 G.16-12-001 |
| **Operator ID#:** 15007 |

**NOTIFICATION TO PUBLIC AGENCIES:**

As soon as is reasonable and necessary, and <u>no later than 10 calendar days</u> after service of the citation is effected, Respondent must provide a notification to the Chief Administrative Officer or similar local agency authority in the city and county where the violation occurred. <u>Within 10 days of providing such notification</u>, Respondent must serve an affidavit to the Director of SED, at the mail or e-mail address noted below, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects the Operator to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Operator's intentions to accept or appeal the violation(s) noted in the Citation.

_Leslie L. Palmer, Deputy Director, Utility Safety_

FOR ***Elizaveta Malashenko***
Director – Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov



# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation
dated _____, and have corrected/mitigated the violation(s)
noted in the citation on _____ and no later than _____,
all work to make permanent corrections to any mitigated, or otherwise remaining
concerns related to the violation(s) will be completed as noted in the Compliance Plan
we have submitted to the Director of SED and, herewith, pay a fine in the amount of $
_____ as included in the citation. Also as payment for the citation,
PG&E agrees to follow the remedies stated in Enclosure 1.

Signature of Gas Corporation's Treasurer,
Chief Financial Officer, or President/Chief Executive
Officer, or delegated Officer thereof

_____
(Signature)                    (Date)

_____
(Printed Name and Title)

Payment must be with a check made payable to the *California Public Utilities Commission* and sent to the below address. Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission
Attn: Fiscal Office
505 Van Ness Avenue
San Francisco, CA 94102-3298**

NOTE: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the address provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO DECISION 16-09-055

Within 30 calendar days of the Respondent being served with a ***CITATION ISSUED PURSUANT TO DECISION 16-09-055***, Respondent may appeal the citation. Beyond 30 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as instructed in the Response section of this citation.

To appeal the citation, Respondent/Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must serve the Notice of Appeal, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Office of Ratepayer Advocates

at the address listed below within 30 calendar days of the date on which the Appellant is served the Citation. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

*California Public Utilities Commission*
*505 Van Ness Ave*
*San Francisco, CA 94102*
*Attn: <Insert Title>*

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.

Ex Parte Communications, as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

# Exhibit 53

# CITATION
# ISSUED PURSUANT TO DECISION 16-09-055

**Electrical Corporation (Utility) To Which Citation is Issued:**

Pacific Gas and Electric Company (U39E)

## OFFICER OF THE RESPONDENT:

Mr. Patrick M. Hogan
Senior Vice President, Electric Operations
Pacific Gas and Electric Company
77 Beale Street
San Francisco, CA 94105

## CITATION:

Pacific Gas and Electric Company (PG&E or Utility) is cited for one violation that lasted 246 days, resulting in a financial penalty of $8 million for this citation.  Safety and Enforcement Division (SED) discovered this violation in its investigation of Incident Number E20150916-01, the Butte Fire, which was ignited on September 9, 2015.

## VIOLATIONS:

PG&E is cited for violating General Order (GO) 95, as described below.   PG&E is in violation of GO 95, Rule 31.1, for failing to maintain its 12 KV overhead conductors safely and properly.  This violation  began  on January 6, 2015, when PG&E and/or its contractors failed to identify a gray pine tree as a hazard or as needing trimming or removal to prevent contact with a PG&E 12 kV overhead conductor.  Such contact occurred on September 9, 2015 and started the Butte Fire.

1. **General Order 95, Rule 31.1 Design, Construction, and Maintenance,** states in part:

   *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

   *For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

**ENCLOSURES:**

The following enclosures were used to establish the findings of fact:

*Enclosure 1 – SED Incident Investigation Report, dated March 29, 2017*

> *Attachment 1 – California Department of Forestry and Fire Protection Butte Incident Investigation Report*
>
> *Attachment 2– Arborist Report Prepared for California Department of Forestry and Fire Protection*

**STATEMENT OF FACTS:**

The above violation is documented in the attached *Enclosure 1 – SED Incident Investigation Report* which is based on the following: SED's data requests and field observations, interviews conducted, and review of the Investigation Report of the California Department of Forestry and Fire Protection (CAL FIRE) and the Arborist Report prepared for CAL FIRE.

SED's investigation found that neither PG&E nor its contractors took appropriate steps to remedy the condition and consequences when two grey pine trees in a stand were removed. The appropriate steps were not taken to prevent a remaining grey pine tree from leaning and contacting the 12 kV overhead conductor. This failure created an unsafe and dangerous condition that resulted in the subject tree leaning and making contact with the 12 kV overhead conductor, thus causing a fire.

## SED CITATION ANALYSIS

| Element | Staff Finding |
|---|---|
| Number of violation(s) and duration of violation(s) | One violation of GO 95, Rule 31.1 from January 6, 2015 to September 9, 2015 (246 days) for not identifying the subject grey pine tree as a hazard or as needing trimming or removal to prevent contact with a 12 kV conductor. |
| Severity or gravity of the offense | The violation described in this citation created a significant hazard to public safety. The incident resulted in a fire that burned 70,868 acres, destroyed 921 structures (549 homes, 368 outbuildings, and 4 commercial properties) and damaged 44 structures, resulted in two "indirect" civilian fatalities, one injury and a sustained outage to 14,267 customers. |
| Conduct of the utility | Prior to the incident, PG&E had a vegetation management program in place that performs annual patrols of all primary and secondary distribution lines. Trees near the circuits covered by routine patrols are to be pruned on an annual basis. PG&E also uses LiDAR (Light Detection And Ranging) technology and spectral imagery to identify hazardous trees in high fire danger areas. Trees identified using these technologies are then inspected from the ground and abated as necessary. PG&E uses contractors as part of its vegetation management for pre-inspections and tree trimming. |
|  | Even though PG&E has a vegetation management program in place that addresses hazardous trees, PG&E and/or its contractors failed to identify the hazardous condition that was created after two other gray pines were removed. |
|  | PG&E regularly updates its vegetation management program but nothing new was implemented related to the Butte Fire. |


| Prior history of similar violation(s) | SED's incident investigations have found PG&E in violation of GO 95, Rule 31.1, 37 times since 1999. Examples include: |
| --- | --- |
| | E20101110-01 - PG&E in violation of Rule 31.1 for improperly installing switches in a substation which led to equipment failure and an outage. |
| | E20070614-01 - PG&E in violation of Rule 31.1 for failing to maintain its 21 kV overhead conductors safely and properly. |
| Self-reporting of the violation | Not self-reported; SED discovered the violations during investigation of the reported incident. |
| Financial resources of the utility | 5.4 million electric customers; 4.3 million natural gas customers; $7.094 billion authorized General Rate Case revenues for test year 2014. |
| The totality of the circumstances | Aggravating factors included the consequences of the incident (loss of life, injury, infrastructure/environmental damages, and customer outages), not taking steps to remedy the condition and consequences of removing trees, creating an unsafe and dangerous condition, and allowing a tree to contact an energized conductor. Mitigating factors include the actions taken to address the violations, performing appropriate inspections and PG&E taking major fire risk mitigation initiatives prior to the start of the fire. |
| | Other factors considered are that PG&E was generally cooperative during SED's investigation, and PG&E possesses sufficient financial resources to pay the penalties. |



| The role of precedent | CPUC decisions approving settlements in which utility agreed to a penalty related to vegetation management: |
|---|---|
| | D.10-04-047 regarding three fires, one of which allegedly was due to San Diego Gas & Electric Company (SDG&E) tree trimming; SDG&E agreed to pay $14.35 million related to the three fires. |
| | D.99-07-029 regarding PG&E compliance with vegetation clearance standards; PG&E agreed to pay $6 million and to fund up to $22.7 million in vegetation-related activities. |
| | D.98-12-025 regarding SDG&E's tree trimming practices and related fires; SDG&E agreed to pay $1 million and to spend $200,000 for public education. |
| **Resultant Citation Taking All Of These Factors Into Account** | **$8,000,000, consistent with the administrative limit on citations adopted in Decision 16-09-055.** |

**RESPONSE:**

Respondent is called upon to provide a response to this Citation by: **5:00 PM on May 25, 2017**.  By way of such response, Respondent, **within 30 calendar days,** must either pay the amount of the penalty set forth in this citation[1], or appeal[2] the citation.  In addition, the Respondent must do one of the following:

(1) <u>For violations constituting immediate safety hazards</u>:  Respondent must immediately correct the immediate safety hazards.

(2) For violations that do not constitute immediate safety hazards:  Violations that do not constitute immediate safety hazards must be corrected within 30 days after the citation is served.  If said violations that do not constitute immediate safety hazards cannot be corrected within 30 days, then the Respondent must submit a detailed Compliance Plan to the Director of SED within 30 days after the citation issues, unless the utility and the Director of SED, before the expiration of the 30 day period, agree in writing to another date, reflecting the soonest that the Respondent can correct the violations.  The Compliance Plan must provide a detailed description of when the violation will be corrected, the methodology to be utilized, and a statement supported by a declaration from the Respondent's Chief Executive Officer or appropriate designee (CEO Declaration) stating that in the Respondent's best judgment, the time that will be taken to correct the violation will not affect the safety or integrity of the operating system or endanger public safety.

<u>Note:</u> Respondent will forfeit the right to appeal the citation by failing to do one of the options outlined above within 30 days.  Payment of a citation or filing a Notice of Appeal does not excuse the Respondent from curing the violation.  The amount of the penalty may continue to accrue until a Notice of Appeal is filed.  Penalties are stayed during the appeal process.   A late payment will be subject to a penalty of 10% per year, compounded daily and to be  assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

---

1 For fines paid pursuant to Pub. Util. Code §2107 and D.16-09-055 Respondent shall submit a certified check payable to California Public Utilities Commission using the attached Citation Payment Form.  Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final.
2 Respondent may Appeal this citation by completing and submitting a Notice of Appeal Form.  Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant to Decision 16-09-055" for information on the appeals process and the attached "Notice of Appeal Of Citation Form."

**Public Utilities Commission**
STATE OF CALIFORNIA

| | |
|---|---|
| **Citation Date:** April 25, 2017 | |
| **Citation #:** D.16-09-055 E.17-04-001 | |
| **Utility/Operator ID#:** U39E | |

## NOTIFICATION TO LOCAL AUTHORITIES:

As soon as is reasonable and necessary, and <u>no later than 10 calendar days</u> after service of the citation is effected, Respondent must provide a notification to the Chief Administrative Officer or similar authority in the city and county where the violation occurred. <u>Within 10 days of providing such notification</u>, Respondent must serve an affidavit to the Director of SED, at the mail or e-mail address noted below, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects the Utility to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Utility's intentions to accept or appeal the violation(s) noted in the Citation.


**Elizaveta Malashenko**
Director
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov

# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation

dated _____, and have corrected/mitigated the violation(s)

noted in the citation on _____ and no later than _____,

all work to make permanent corrections to any mitigated, or otherwise remaining

concerns related to the violation(s) will be completed as noted in the Compliance Plan

we have submitted to the Director of SED  and, herewith, pay a fine in the amount of

$_____ as included in the citation.

> Signature of Electrical Corporation's Treasurer, Chief
> Financial Officer, or President/Chief Executive
> Officer, or delegated Officer thereof

_____
(Signature)                                              (Date)

_____
(Printed Name and Title)

Payment must be with a certified check made payable to the **California Public Utilities Commission** and sent to the below address.  Please include the citation number on the memorandum line of the check to ensure your payment is properly applied.

> **California Public Utilities Commission**
> **Attn: Fiscal Office**
> **505 Van Ness Avenue**
> **San Francisco, CA 94102-3298**

**NOTE**: A copy of the completed Citation Payment Form must be sent to the Director of the Safety and Enforcement Division, via email or regular mail, to the address provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO DECISION 16-09-055

Within 30 calendar days of the Respondent being served with a **CITATION ISSUED PURSUANT TO DECISION 16-09-055**, Respondent may appeal the citation. Beyond 30 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as instructed in the Response section of this citation.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must serve the Notice of Appeal, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Office of Ratepayer Advocates

at the address listed below within 30 calendar days of the date on which the Appellant is served the Citation. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

> **California Public Utilities Commission**
> **505 Van Ness Ave.**
> **San Francisco, CA 94102**
> **Attn: <Insert Title>**

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.

Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After receipt of the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a) Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Appellant;

(b) Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c) Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing;

(d) Appellant is entitled to a copy of or electronic reference to Resolution ALJ-299 Establishing Pilot Program Citation Appeal and General Order 156 Appellate Rules (Citation Appellate Rules); and

(e) Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Appellant's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a CPUC hearing room at either of the following locations:

| | |
|---|---|
| **San Francisco**: | **Los Angeles:** |
| 505 Van Ness Avenue | 320 West 4th Street, Suite 500 |
| San Francisco, CA 94102 | Los Angeles, CA 90013 |

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.

**Notice of Appeal Form**
**Appeal from Citation issued by Safety and Enforcement Division**
**(Pursuant to Decision 16-09-055)**

**Appellant:**

_____
[Name]

_____
[Title]

_____
[Utility Name]

_____
[Mailing Address]

_____
[City, CA  Zip Code]

Citation Date: _____

Citation #: D.16-09-055 ____-___-_____

Utility/Operator ID#: _____

Appeal Date: _____

"Appeal of _____ from _____issued by Safety
                    [Utility/Operator Name]                    [Citation Number]
and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages
if needed and/or attach copies of supporting materials along with this form).

**Enclosures to Accompany Utility Appeal**

*Utility to add list of Enclosures as appropriate:*

# Exhibit 54

# CITATION
## ISSUED PURSUANT TO DECISION 16-09-055

**Electrical Corporation (Utility) To Which Citation is Issued:**

Pacific Gas and Electric Company (U39E)

**OFFICER OF THE RESPONDENT:**

Mr. Patrick M. Hogan
Senior Vice President, Electric Operations
Pacific Gas and Electric Company
77 Beale Street
San Francisco, CA 94105

**CITATION:**

Pacific Gas and Electric Company (PG&E or Utility) is cited for the following: 1) one violation resulting in a financial penalty of $50,000; and 2) a second violation that lasted 5 days, resulting in a financial penalty of $250,000. Safety and Enforcement Division (SED) discovered these violations in its investigation of Incident Number E20150916-01, the Butte Fire, which was ignited on September 9, 2015. The total financial penalty for this citation is $300,000.

**VIOLATIONS:**

PG&E is cited for violating General Order (GO) 95 and Resolution E-4184, as described below. These violations occurred when a gray pine tree contacted PG&E's 12 kV conductor and initiated a fire, and when PG&E did not report the incident in a timely manner.

1. **General Order 95, Rule 35 Vegetation Management,** states in part:

   *Where overhead conductors traverse trees and vegetation, safety and reliability of service demand that certain vegetation management activities be performed in order to establish necessary and reasonable clearances, the minimum clearances set forth in Table 1, Cases 13 and 14, measured between line conductors and vegetation under normal conditions shall be maintained. (Also see Appendix E for tree trimming guidelines.) These requirements apply to all overhead electrical supply and communication facilities that are covered by this General Order, including facilities on lands owned and maintained by California state and local agencies.*

**Public Utilities Commission**
STATE OF CALIFORNIA

| | |
|---|---|
| **Citation Date:** April 25, 2017 |
| **Citation #:** D.16-09-055 E.17-04-002 |
| **Utility/Operator ID#:** U39E |

GO 95, Rule 35 requires an 18-inch minimum radial clearance between 12 kV overhead conductors and vegetation. In this incident, the subject tree contacted PG&E's 12 kV overhead conductor. Therefore, PG&E is in violation of GO 95, Rule 35, for failing to maintain the minimum required clearance between the 12 kV conductor and the subject tree.

There is no evidence available to determine when the 18-inch minimum clearance was breached/violated, other than the day of the incident, when the subject tree contacted the 12 kV overhead conductor.

**2. Resolution E-4184, which modified Decision 06-04-055,** requires PG&E to report incidents within 2 hours of occurrence during normal working hours, or within 4 hours of the incident occurrence outside of normal working hours. Reportable incidents are those which meet the following criteria: (a) result in fatality or personal injury rising to the level of in-patient hospitalization and attributable or allegedly attributable to utility owned facilities; (b) are the subject of significant public attention or media coverage and are attributable or allegedly attributable to utility facilities; or (c) involve damage to property of the utility or others estimated to exceed $50,000.

The website, *http://www.mymotherlode.com/community/fire/butte-fire-summary-timeline* indicated that the damage from the Butte Fire exceeded $50,000 soon after the fire was ignited on September 9, 2015. The fire started at 160 acres and expanded to 64,728 acres in three days.

In addition, on September 11, 2015, Department of Forestry and Fire Protection (CAL FIRE) investigators requested PG&E to remove a section of PG&E's 12 kV overhead conductor on suspicion of its possible link to the ignition of the fire. PG&E was aware that its facilities may have been involved in a fire with damages that exceeded $50,000 on September 11, 2015, but did not report the incident to the CPUC until September 16, 2015, five (5) days later. PG&E violated Resolution E-4184 for reporting the incident late.

**ENCLOSURES:**

The following enclosures were used to establish the findings of fact:

*Enclosure 1 – SED Incident Investigation Report, dated March 29, 2017*

> *Attachment 1 – California Department of Forestry and Fire Protection Butte Incident Investigation Report*

> *Attachment 2 – Arborist Report Prepared for California Department of Forestry and Fire Protection*

**STATEMENT OF FACTS:**

The above violations are documented in the attached *Enclosure 1 – SED Incident Investigation Report* which is based on the following: SED's data request and field observations, interviews conducted, and review of CAL FIRE's Investigation Report and the Arborist Report prepared for CAL FIRE.

## SED CITATION ANALYSIS

| Element | Staff Finding |
|---|---|
| Number of violation(s) and duration of violation(s) | One violation of GO 95, Rule 35, for failing to maintain the minimum required clearance between the 12 kV conductor and the subject grey pine tree, which lasted for at least one (1) day.<br><br>One violation of Resolution E-4184, for failing to report the incident on time, which lasted for five (5) days. |
| Severity or gravity of the offense | The violation of Rule 35 described in this citation created a significant hazard to public safety. The incident resulted in a fire that burned 70,868 acres, destroyed 921 structures (549 homes, 368 outbuildings, and 4 commercial properties) and damaged 44 structures, resulted in two "indirect" civilian fatalities, one injury and a sustained outage to 14,267 customers. |
| Conduct of the utility | Prior to the incident, PG&E had a vegetation management program in place that performs annual patrols of all primary and secondary distribution lines. Trees near the circuits covered by routine patrols are to be pruned on an annual basis. PG&E also uses LiDAR (Light Detection And Ranging) technology and spectral imagery to identify hazardous trees in high fire danger areas. Trees identified using these technologies are then inspected from the ground and abated as necessary.<br><br>PG&E regularly updates its vegetation management program but nothing new was implemented related to the Butte Fire.<br><br>PG&E reports incidents regularly using the online reporting website. PG&E follows up with a final electric incident report form that provides details of the incident typically within 30 days. |


| Prior history of similar violation(s) | E20160718-01– PG&E in violation of Rule 35 for allowing a tree branch to fully encompass a service drop which compromised the conductor's insulation or caused damage to the neutral conductor. As a result, an arc was formed and resulted in a fire. |
|---|---|
| | E20121003-02– PG&E in violation of Rule 35 for failing to maintain the minimum required clearance between a 12 kV conductor and the subject tree. |
| | In the following incidents, PG&E was found to be in violation of Resolution E-4184 for reporting the incident late to the Commission: |
| | E20150925-01<br>E20121003-02<br>E20110921-02<br>E20110601-01<br>E20101228-01<br>E20100925-02 |
| Self-reporting of the violation | Not self-reported; SED discovered the violations during investigation of the reported incident. |
| Financial resources of the utility | 5.4 million electric customers; 4.3 million natural gas customers; $7.094 billion authorized General Rate Case revenues for test year 2014. |
| The totality of the circumstances | Aggravating factors included the consequences of the incident (loss of life, injury, infrastructure/environmental damages, and customer outages), allowing a tree to contact an energized conductor, and delayed reporting of the incident. Mitigating factors include the actions taken to address the violations and to prevent future occurrences once the utility recognized the underlying issues. |
| | Other factors considered are that PG&E was generally cooperative during SED's investigation, and PG&E possesses sufficient financial resources to pay the penalties. |


| The role of precedent | CPUC decisions approving settlements in which the utility agreed to a penalty related to vegetation management: |
|---|---|
| | D.10-04-047 regarding three fires, one allegedly due to San Diego Gas & Electric Company (SDG&E) tree trimming; SDG&E agreed to pay $14.35 million related to the three fires. |
| | D.99-07-029 regarding PG&E compliance with vegetation clearance standards; PG&E agreed to pay $6 million and to fund up to $22.7 million in vegetation-related activities. |
| | D.98-12-025 regarding SDG&E's tree trimming practices and related fires; SDG&E agreed to pay $1 million and to spend $200,000 for public education. |
| **Resultant Citation Taking All Of These Factors Into Account** | $300,000 |

**Public Utilities Commission**
STATE OF CALIFORNIA

| |
|---|
| **Citation Date:** April 25, 2017 |
| **Citation #:** D.16-09-055 E.17-04-002 |
| **Utility/Operator ID#:** U39E |

## RESPONSE:

Respondent is called upon to provide a response to this Citation by: **5:00 PM on May 25, 2017.** By way of such response, Respondent, **within 30 calendar days,** must either pay the amount of the penalty set forth in this citation[1], or appeal[2] the citation. In addition, the Respondent must do one of the following:

(1) <u>For violations constituting immediate safety hazards</u>: Respondent must immediately correct the immediate safety hazards.

(2) For violations that do not constitute immediate safety hazards: Violations that do not constitute immediate safety hazards must be corrected within 30 days after the citation is served. If said violations that do not constitute immediate safety hazards cannot be corrected within 30 days, then the Respondent must submit a detailed Compliance Plan to the Director of SED within 30 days after the citation issues, unless the utility and the Director of SED, before the expiration of the 30 day period, agree in writing to another date, reflecting the soonest that the Respondent can correct the violations. The Compliance Plan must provide a detailed description of when the violation will be corrected, the methodology to be utilized, and a statement supported by a declaration from the Respondent's Chief Executive Officer or appropriate designee (CEO Declaration) stating that in the Respondent's best judgment, the time that will be taken to correct the violation will not affect the safety or integrity of the operating system or endanger public safety.

<u>Note:</u> Respondent will forfeit the right to appeal the citation by failing to do one of the options outlined above within 30 days. Payment of a citation of filing a Notice of Appeal does not excuse the Respondent from curing the violation. The amount of the penalty may continue to accrue until a Notice of Appeal is filed. Penalties are stayed during the appeal process. A late payment will be subject to a penalty of 10% per year, compounded daily and to be assessed beginning the calendar day following the payment-due date. The Commission may take additional action to recover any unpaid fine and ensure compliance with applicable statutes and Commission orders.

---

1 For fines paid pursuant to Pub. Util. Code §2107 and D.16-09-055 Respondent shall submit a certified check payable to California Public Utilities Commission using the attached Citation Payment Form. Upon payment, the fine will be deposited in the State Treasury to the credit of the General Fund and this citation will become final.

2 Respondent may Appeal this citation by completing and submitting a Notice of Appeal Form. Please see the attached document, "Directions For Submitting An Appeal To A Citation Issued Pursuant to Decision 16-09-055" for information on the appeals process and the attached "Notice of Appeal Of Citation Form."

**NOTIFICATION TO LOCAL AUTHORITIES:**

As soon as is reasonable and necessary, and <u>no later than 10 calendar days</u> after service of the citation is effected, Respondent must provide a notification to the Chief Administrative Officer or similar authority in the city and county where the violation occurred. <u>Within 10 days of providing such notification</u>, Respondent must serve an affidavit to the Director of SED, at the mail or e-mail address noted below, attesting that the local authorities have been notified; the date(s) for when notification was provided; and the name(s) and contact information for each local authority so notified.

The CPUC expects the Utility to take actions, as soon as feasible, to correct, mitigate, or otherwise make safe all violations noted on the Citation regardless of the Utility's intentions to accept or appeal the violation(s) noted in the Citation.

**Elizaveta Malashenko**
Director
Safety and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
elizaveta.malashenko@cpuc.ca.gov



**Public Utilities Commission**
STATE OF CALIFORNIA

**Citation Date:** April 25, 2017
**Citation #:** D.16-09-055 E.17-04-002
**Utility/Operator ID#:** U39E

# CITATION PAYMENT FORM

I (we) _____ hereby agree to comply with this citation

dated _____, and have corrected/mitigated the violation(s)

noted in the citation on _____ and no later than _____,

all work to make permanent corrections to any mitigated, or otherwise remaining

concerns related to the violation(s) will be completed as noted in the Compliance Plan

we have submitted to the Director of SED  and, herewith, pay a fine in the amount of

$_____ as included in the citation.

Signature of Electrical Corporation's Treasurer, Chief
Financial Officer, or President/Chief Executive
Officer, or delegated Officer thereof

_____
(Signature)                                              (Date)

_____
(Printed Name and Title)

Payment must be with a certified check made payable to the **California Public Utilities
Commission** and sent to the below address.  Please include the citation number on the
memorandum line of the check to ensure your payment is properly applied.

**California Public Utilities Commission**
**Attn: Fiscal Office**
**505 Van Ness Avenue**
**San Francisco, CA 94102-3298**

**NOTE**: A copy of the completed Citation Payment Form must be sent to the Director
of the Safety and Enforcement Division, via email or regular mail, to the address
provided on the Citation.

## DIRECTIONS FOR SUBMITTING AN APPEAL TO A CITATION
## ISSUED PURSUANT TO DECISION 16-09-055

Within 30 calendar days of the Respondent being served with a **CITATION ISSUED PURSUANT TO DECISION 16-09-055**, Respondent may appeal the citation. Beyond 30 calendar days of being served with the citation, Respondent is in default and, as a result, is considered as having forfeited rights to appeal the citation. The Respondent must still correct the violation(s) as instructed in the Response section of this citation.

To appeal the citation, Appellant must file a Notice of Appeal (including a completed title page complying with Rule 1.6 of the Commission's Rules of Practice and Procedure, and attached Notice of Appeal Form) along with copies of any materials the Appellant wants to provide in support of its appeal with the Commission's Docket Office **and** must serve the Notice of Appeal, at a minimum, on

1) The Chief Administrative Law Judge (with an electronic copy to: ALJ_Div_Appeals_Coordinator@cpuc.ca.gov),
2) The Director of Safety and Enforcement Division
3) The Executive Director
4) General Counsel
5) The Director of the Office of Ratepayer Advocates

at the address listed below within 30 calendar days of the date on which the Appellant is served the Citation. The Appellant must file a proof of service to this effect at the same time the Appellant files the Notice of Appeal. The Notice of Appeal must at a minimum state: (a) the date of the citation that is appealed; and (b) the rationale for the appeal with specificity on all grounds for the appeal of the citation.

**California Public Utilities Commission**
**505 Van Ness Ave.**
**San Francisco, CA 94102**
**Attn: <Insert Title>**

**NOTE:** Submission of a *Notice of Appeal Form* in no way diminishes Appellant's responsibility for correcting the violation described in the citation, or otherwise ensuring the safety of facilities or conditions that underlie the violations noted in the Citation.

Ex Parte Communications as defined by Rule 8.1(c) of the Commission's Rules of Practice and Procedure, are prohibited from the date the citation is issued through the date a final order is issued on the citation appeal.

After receipt of the Appellant's *Notice of Appeal Form*, a hearing will be convened before an Administrative Law Judge. At least ten days before the date of the hearing, the Appellant will be notified and provided with the location, date, and time for the hearing. At the hearing,

(a) Appellant may be represented by an attorney or other representative, but any such representation shall be at the sole expense of the Appellant;

(b) Appellant may request a transcript of the hearing, but must pay for the cost of the transcript in accordance with the Commission's usual procedures;

(c) Appellant is entitled to the services of an interpreter at the Commission's expense upon written request to the Chief Administrative Law Judge not less than five business days prior to the date of the hearing;

(d) Appellant is entitled to a copy of or electronic reference to Resolution ALJ-299 Establishing Pilot Program Citation Appeal and General Order 156 Appellate Rules (Citation Appellate Rules); and

(e) Appellant may bring documents to offer in evidence (Rule 13.6 (Evidence) of the Commission's Rules of Practice and Procedure applies) and/or call witnesses to testify on Appellant's behalf. At the Commission's discretion, the hearing in regard to the Appellant's appeal can be held in a CPUC hearing room at either of the following locations:

**San Francisco**:
505 Van Ness Avenue
San Francisco, CA 94102

**Los Angeles:**
320 West 4th Street, Suite 500
Los Angeles, CA 90013

The hearing(s) held in regard to the Appellant's appeal will be adjudicated in conformance with all applicable Public Utilities Code requirements.

## Notice of Appeal Form
## Appeal from Citation issued by Safety and Enforcement Division
### (Pursuant to Decision 16-09-055)

**Appellant:**

_____
[Name]

_____
[Title]

_____
[Utility Name]

_____
[Mailing Address]

_____
[City, CA  Zip Code]

Citation Date: _____

Citation #: D.16-09-055 ____-___-_____

Utility/Operator ID#: _____

Appeal Date: _____

"Appeal of _____ from _____issued by Safety
            [Utility/Operator Name]           [Citation Number]
and Enforcement Division"

Statements supporting Appellant's Appeal of Citation (You may use additional pages
if needed and/or attach copies of supporting materials along with this form).

## Enclosures to Accompany Utility Appeal

*Utility to add list of Enclosures as appropriate:*

# Exhibit 55

PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



May 4, 2017                                                                              EA2017-748

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company (PG&E)
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Electric Distribution Audit of PG&E Yosemite Division

Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission (CPUC), Ivan Garcia of my staff conducted an Electric Distribution Audit of PG&E's
Yosemite Division on March 20, 2017 to March 24, 2017.  The audit included a review of PG&E's
records and a field inspection of its distribution facilities.

During the audit, my staff identified violations of one or more General Orders (GOs).  A copy of
the audit findings itemizing the violations is enclosed.  Please advise me no later than June 5, 2017,
by electronic or hard copy, of all corrective measures taken by PG&E to remedy and prevent such
violations.

If you have any questions concerning this audit, please contact Ivan Garcia at (916) 928-5875 or
ivan.garcia@cpuc.ca.gov.

Sincerely,

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosures: CPUC Audit Findings

Cc:  Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
     Lee Palmer, Deputy Director, Office of Utility Safety, SED, CPUC
     Charlotte TerKeurst, Program Manager, ESRB, CPUC
     Ivan Garcia, Utilities Engineer, ESRB, CPUC

# AUDIT FINDINGS

## I. Records Review

During the audit, my staff reviewed the following records:

- Reliability Metrics from March 2013 to February 2017
- Patrol and Inspection Records from February 2012 to February 2017
- Completed Corrective Action Work Orders from February 2012 to February 2017
- Cancelled Corrective Action Work Orders from February 2016 to February 2017
- Pending Corrective Action Work Orders from February 2016 to February 2017
- Pole Loading Calculations from February 2016 to February 2017
- New Construction Projects from February 2016 to February 2017
- Third Party Notification Records from February 2012 to February 2017
- Diagnostic Equipment Testing Records from February 2012 to February 2017

## II. Records Violations

**GO 165, Section III-B, Standards for Inspection,** States:

*Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

A total of 507 overhead and underground facilities were inspected late per GO 165.

**GO 165, Section III-C, Record Keeping,** states in part:

*For all inspections records shall specify circuit, area, facility, or equipment inspected, the inspector, the date of the inspection, and any problems (or items requiring corrective action) identified during each inspection, as well as the scheduled date of corrective action.*

**GO 95, Rule 31.1, Design, Construction, and Maintenance,** states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

*For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

**GO 128, Rule 17.1, Design, Construction, and Maintenance,** states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

PG&E's records indicated that from January 2012 to February 28, 2017, 2684 work orders for overhead facilities and 282 work orders for underground facilities were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards. In addition, 67 work orders have passed their corrective action date and are still pending.

## III. Field Inspection

The following are the facilities we inspected during the field inspection:

| Structure Number | Type of Structure | Approximate Location |
|---|---|---|
| 101175531 | Pole | 2018 Santa Rita St., Dos Palos |
| 101175534 | Pole | 2nd pole in alley, next to 2018 Santa Rita St., Dos Palos |
| N/A | Pole | 802 California Ave., Dos Palos |
| N/A | Pole | 8586 Pole Line Rd., Dos Palos |
| N/A | Pole | Highway 180 and West Belmont St., Mendota |
| N/A | Pole | Paul Negra Rd. and Nees Rd., Firebaugh |
| N/A | Pole | 24352 Kome Rd., Miwuk Village |
| N/A | Pole | 20714 Muheli Way, Miwuk Village |
| N/A | Pole | 20718 Muheli Way, Miwuk Village |
| N/A | Pole | 20737 Muheli Way, Miwuk Village |
| N/A | Pole | 24042 Pine Lake Dr., Miwuk Village |
| N/A | Pole | 24058 Pine Lake Dr., Miwuk Village |
| N/A | Pole | Pine Lake Dr. & Wildcat Dr., Miwuk Village |
| N/A | Pole | Wildcat Dr., Miwuk Village |
| N/A | Pole | 24247 Highway 108, Twain Harte |
| N/A | Pole | Across from 24247 Highway 108, Twain Harte |
| N/A | Pole | 24252 Highway 108, Twain Harte |
| N/A | Pole | 24262 Highway 108, Twain Harte |
| N/A | Pole | 24628 Highway 108, Twain Harte |
| N/A | Pole | 24630 Highway 108, Twain Harte |
| N/A | Pole | Pole next to 24630 Highway 108, Twain Harte |
| N/A | Pole | 5746 McHenry Rd., Merced |
| N/A | Pole | 1078 Lawndale Ave., Merced |
| N/A | Pole | 2729 Pioneer Rd., Merced |
| N/A | Pole | Pole across from 2729 Pioneer Rd., Merced |
| N/A | Pole | 2020 E Childs Ave., Merced |
| N/A | Pole | Next pole west from 2020 E Childs Ave., Merced |
| N/A | Pole | Second pole west from 2020 E Childs Ave., Merced |
| N/A | Pole | 5678 McHenry Rd., Merced |
| 110527896 | Pole | 5646 McHenry Rd., Merced |
| 120105800 | Pole | 512 Arboleda Dr., Merced |
| N/A | Pole | Next pole west of 512 Arboleda Dr., Merced |

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 555 of 565

## IV. Field Inspection Violations

We observed the following violations during the field inspection.

**GO 95, Rule 56.2, Use of Overhead Guys, Anchor Guys and Span Wires** states in part:

> *Guys shall be attached to structures, as nearly as practicable, at the center of load. They shall be maintained taut and of such strength as to meet the safety factors of Rule 44.*

The guy wire on the following poles was not taught:

- #101175531 at 2018 Santa Rita St., Dos Palos
- Pole at 802 California Ave., Dos Palos
- Pole at 20737 Muheli Way, Miwuk Village

**GO 95, Rule 56.7-B, Location of Sectionalizing Insulators for Anchor Guys** states in part:

> *In order to prevent trees, buildings, messengers, metal-sheathed cables or other similar objects from grounding portions of guys above guy insulators, it is suggested that anchor guys be sectionalized, where practicable, near the highest level permitted by this Rule.*

Vegetation was in contact with a section above the sectionalizing insulator of the down guy on the pole located at 24630 Highway 108, Twain Harte.

**GO 95, Rule 84.7-A, Climbing and Working Space** states in part:

> *The climbing space shall be kept free from obstructions excepting those obstructions permitted by Rule 84.7-E.*

An AT&T jumper wire on the pole located at 1078 Lawndale Ave., Merced, obstructed the climbing space.

# Exhibit 56

**PUBLIC UTILITIES COMMISSION**
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



May 30, 2017                                              EA2017-750

Adeel Babar
Supervisor – Regulatory Compliance
Pacific Gas and Electric Company
3401 Crow Canyon Road, #221E
San Ramon, CA 94583

**SUBJECT**: Audit of PG&E's Diablo Division

Mr. Babar:

On behalf of the Electric Safety and Reliability Branch (ESRB) of the California Public Utilities
Commission, Wilson Tsai of my staff conducted an electric audit of PG&E's Diablo Division
from April 3, 2017 to April 7, 2017.  The audit included a review of PG&E's records and field
inspections of PG&E's facilities.

During the audit, my staff identified violations of one or more General Orders (GOs).  A copy of
the audit findings itemizing the violations is enclosed. Please advise me no later than June 30,
2017, by electronic or hard copy, of all corrective measures taken by PG&E to remedy and
prevent such violations.

If you have any questions concerning this audit you can contact Wilson Tsai at (415) 703-1359
or wilson.tsai@cpuc.ca.gov.

Sincerely,

*Fadi Daye*

Fadi Daye, P.E.
Program and Project Supervisor
Electric Safety and Reliability Branch
Safety and Enforcement Division
California Public Utilities Commission

Enclosure:    Audit Findings

Cc:    Elizaveta Malashenko, Director, Safety and Enforcement Division, CPUC
       Lee Palmer, Deputy Director, Office of Utility Safety, SED, CPUC
       Charlotte TerKeurst, Program Manager, Electric Safety and Reliability Branch, CPUC
       Wilson Tsai, Utilities Engineer, ESRB, CPUC

**AUDIT FINDINGS**

## I. Records Review

My staff reviewed the following records during the audit:

- GO165 inspection records from 2012 to2017
- Work order records for 2016 & 2017
- Completed 2016 and 2017 work orders for Maps B1520, B1717, B1718, and D1022
- Pole loading calculations
- Feeder reliability metrics from March 2013 to February 2017

## II. Records Violations

**GO 128, Rule 17.2, Inspection**, states in part:

> *Systems shall be inspected by the operator frequently and thoroughly for the purpose of insuring that they are in good condition and in conformance with all applicable requirements of these rules.*

**GO 165, Section III-B, Standards for Inspection**, States:

> *Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation, but in no case may the period between inspections (measured in years) exceed the time specified in Table 1.*

Padmounted transformer T-23357 on Map C2012 was inspected late. The underground inspection was due on 12/31/11 and completed on 5/16/15.

**GO 95, Rule 18-A2a,** states in part:

> *All companies shall establish an auditable maintenance program for their facilities and lines. All companies must include a timeline for corrective actions to be taken following the identification of a Safety Hazard or nonconformances with General Order 95 on the company's facilities.*

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

Case: 15-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
559 of 565

*For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.*

PG&E's records (Request 2-A Late Work Orders) indicated that from March 2012 to April 2017, 1,699 overhead work orders were completed past their scheduled date of corrective action.

**GO 128, Rule 17.1, Design, Construction, and Maintenance**, states in part:

*Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

*For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of [the] communication or supply lines and equipment.*

PG&E's records (Request 2-A Late Work Orders) indicated that from March 2012 to April 2017, 1,369 underground work orders were completed past their scheduled date of corrective action.

## III. Field Inspection

My staff inspected the following facilities:

| Structure Number | Structure Type | Address | Map | City |
|---|---|---|---|---|
| | Pole | West of Trembath Street on E 18th St. | B1718 | Antioch |
| 110153415 | Pole | Intersection of Trembath & E 18th St. | B1718 | Antioch |
| 110153417 | Pole | North of E 18th St. on Trembath Ln. | B1718 | Antioch |
| 110153418 | Pole | Across from 1660 Trembath Ln. | B1718 | Antioch |
| 110153421 | Pole | Intersection of Mike Yorba Way & Trembath Ln. | B1718 | Antioch |
| 110153419 | Pole | 1675 Trembath Ln. | B1718 | Antioch |
| 110153420 | Pole | End of Mike Yorba Way | B1718 | Antioch |
| 110350199 | Pole | 1 Pole w/o Trembath Ln. | B1718 | Antioch |
| 40875645 | Pole | Intersection of Hargrove St. & E 18th St. | B1718 | Antioch |
| SW-11070 | Enclosure | 1812 Trembath Ln. | B1717 | Antioch |
| | Padmounted Transformer | 1107 E 18th St. | B1717 | Antioch |
| 110153358 | Pole | Parsons Ln. | B1717 | Antioch |
| 110153114 | Pole | 983 Fitzuren Road | | Antioch |
| 110130796 | Pole | 2413 Kendree St. | B1520 | Antioch |
| 110130798 | Pole | 2423 Kendree St. | B1520 | Antioch |
| 110130777 | Pole | 2433 Kendree St. | B1520 | Antioch |
| 110130778 | Pole | 4011 Carla Ct. | B1520 | Antioch |
| 110130797 | Pole | 4004 Leticia Ct. | B1520 | Antioch |
| SW-18937 | Enclosure | 838 Ygnacio Valley Blvd. | D1018 | Walnut Creek |
| 120002386 | Pole | 2055 N Broadway | D1018 | Walnut Creek |
| 110258331 | Pole | 2075 N Broadway | D1018 | Walnut Creek |
| 110258330 | Pole | 2085 N Broadway | D1018 | Walnut Creek |
| 110258329 | Pole | Across from 2100 N Broadway | D1018 | Walnut Creek |
| 110258328 | Pole | Across from 2140 N Broadway | D1018 | Walnut Creek |
| 110258327 | Pole | 2141 N Broadway | D1018 | Walnut Creek |
| 110258326 | Pole | 2155 N Broadway | D1018 | Walnut Creek |
| 110258375 | Pole | 2195 N Broadway | D1018 | Walnut Creek |
| 110253872 | Pole | 1332 Pine St. | D1018 | Walnut Creek |
| 110258373 | Pole | 1350 Pine St. | D1018 | Walnut Creek |
| 110160186 | Pole | 1949 Dora Ave. | D1022 | Walnut Creek |

Case: 15-30008    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 561 of 565

| Structure Number | Structure Type | Address | Map | City |
|---|---|---|---|---|
| 110160187 | Pole | 1927 Dora Ave. | D1022 | Walnut Creek |
| 110160188 | Pole | Side of 1521 Brooks St. | D1022 | Walnut Creek |
| 110160189 | Pole | Front of 1521 Brooks St. | D1022 | Walnut Creek |
| 110160190 | Pole | 1505 Brooks St. | D1022 | Walnut Creek |
| 110160184 | Pole | 1895 Shuey Ave. | D1022 | Walnut Creek |
| 110160183 | Pole | Across from 1918 Shuey Ave. | D1022 | Walnut Creek |
| 110160182 | Pole | 1939 Shuey Ave. | D1022 | Walnut Creek |
| 110160181 | Pole | 1971 Shuey Ave. | D1022 | Walnut Creek |
| 110160180 | Pole | 1975 Shuey Ave. | D1022 | Walnut Creek |
| 110258439 | Pole | Intersection of Mt. Pisgah Rd. & Mt. Diablo Blvd. | D1023 | Walnut Creek |
| 110258438 | Pole | Front of 1315 Mt. Pisgah Rd. | D1023 | Walnut Creek |
| 110258437 | Pole | 1315 Mt. Pisgah Rd. | D1023 | Walnut Creek |
| 110258436 | Pole | 1st Pole on Alta Vista Ct. | D1023 | Walnut Creek |
| 110258435 | Pole | 1186 Alta Vista Ct. | D1023 | Walnut Creek |
| 110258434 | Pole | 1196 Alta Vista Ct. | D1023 | Walnut Creek |
| 110258433 | Pole | Across from 1330 Mt. Pisgah Rd. | D1023 | Walnut Creek |
| 110258432 | Pole | 1365 Mt. Pisgah Rd. | D1023 | Walnut Creek |
| 110258426 | Pole | Intersection of Mt. Pisgah Rd. & Alta Vista Ct. | D1023 | Walnut Creek |
| 110258427 | Pole | Intersection of Mt. Pisgah Rd. & Village Ct. | D1023 | Walnut Creek |
| 110258428 | Pole | 130 Village Ct. | D1023 | Walnut Creek |
| 110258429 | Pole | 140 Village Ct. | D1023 | Walnut Creek |
|  | Enclosure | 10 Mountain Valley Place | G1305 | Danville |
| T-16400 | Sub-surface Transformer | 18 Mountain Valley Place | G1305 | Danville |
| T-16401 | Sub-surface Transformer | 31 Mountain Valley Place | G1305 | Danville |
|  | Enclosure | 39 Mountain Valley Place | G1305 | Danville |
| T-16403 | Sub-surface Transformer | 209 Woodvalley Place | G1305 | Danville |
| T-16402 | Sub-surface Transformer | 59 Woodvalley Dr. | G1305 | Danville |
|  | Enclosure | 55 Woodvalley Dr. | G1305 | Danville |
| T-16404 | Sub-surface Transformer | 107 Woodvalley Ct. | G1305 | Danville |
| SW-18542 | Sub-surface Switch | NE Corner of Maison Dr. | G1304 | Danville |
|  | Enclosure | Corner of Maison Dr. & Old Blackhawk Rd. | G1304 | Danville |

Case: 15-30008    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 562 of 565

| Structure Number | Structure Type | Address | Map | City |
|---|---|---|---|---|
| T-15758 | Sub-surface Transformer | 190 Old Blackhawk Rd. | G1304 | Danville |
| | Enclosure | SW Corner of Maison Dr. & Old Blackhawk Rd. | G1304 | Danville |
| SW-25876 | Sub-surface Switch | Old Blackhawk Rd. | G1304 | Danville |
| SW-25944 | Sub-surface Switch | Fontaine Dr. | G1304 | Danville |

Case: 19-30088    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 563 of 565

## IV. Field Inspection Violations

My staff observed the following violations during the field inspection:

**GO 95, Rule 31.1, Design, Construction, and Maintenance**, states in part:

> *Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service.*

The crossarm on pole #110160187 located at 1927 Dora Ave., was decayed.

**GO 95, Rule 54.6-E(2), Risers**, states in part:

> ***Covered from 8 Feet Above the Ground Level and Above:*** *All risers from underground cables or other conductors which pass through an unrelated conductor or cable level shall be covered or encased by material as described in Rule 54.6–E1 or by a suitable protective covering as described in Rule 22.8 from a distance of 8 feet above the ground to:*
>
> *a) Not less than 18 inches above supply conductors.*
>
> *b) Not less than 36 inches above communication conductors for supply risers of 750 volts or less; and*
>
> *c) Not less than 48 inches above communication conductors for supply risers of 750 - 7500 volts; and*
>
> *d) Not less than 60 inches above communication conductors for supply risers of more than 7500 volts.*

The riser from 8 feet above ground to the primary level on pole #110258426 located at the intersection of Mt. Pisgah Rd. and Alta Vista Ct., was not covered or encased by a suitable protective covering.

**GO 95, Rule 91.3-B, Location of Steps**, states in part:

> *The lowest step shall not be less than 8 feet from the ground line, or any easily climbable foreign structure from which one could reach or step.*

The lowest pole step on pole #110160180 located at 1939 Shuey Ave., was approximately 7 feet from the ground.

Case: 15-30008    Doc# 14208-2    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 564 of 565

**GO 95, Rule 51.6-A, High Voltage Marking**, states in part:

*Poles which support line conductors of more than 750 volts shall be marked with high voltage signs…… Such signs shall be of weather and corrosion–resisting material, solid or with letters cut out therefrom and clearly legible.*

The following poles were not marked with "High Voltage" signs:

- Pole #110130796 located at 2413 Kendree St., Antioch
- Pole #110130777 located at 2433 Kendree St., Antioch
- Pole #110130797 located at 4004 Leticia Ct., Antioch
- Pole #110258330 located at 2085 N Broadway, Walnut Creek
- Pole #110160190 located at 1505 Brooks St., Walnut Creek
- Pole #110258437 located at 1315 Mt. Pisgah Rd., Walnut Creek
- Pole #110160184 located at 1895 Shuey Ave., Walnut Creek

**GO 95, Rule 54.6-B, Ground Wires**, states in part:

*That portion of the ground wires attached on the face or back of wood crossarms or on the surface of wood poles and structures shall be covered by a suitable protective covering (see Rule 22.8).*

The ground wire on the following poles was exposed:

- Pole #110130777 located at 2433 Kendree St, Antioch
- Pole #110130797 located at 4004 Leticia Ct, Antioch
- Pole #110258328 located across from 2140 N Broadway, Walnut Creek
- Pole #110258436 located at 1st Pole on Alta Vista Ct., Walnut Creek
- Pole #110258435 located at 1186 Alta Vista Ct., Walnut Creek