# Exhibit 84

View this email in a web browser    |    Forward to a friend



FOR IMMEDIATE RELEASE:                              Contact: Governor's Press Office

Friday, January 17, 2014                                              (916) 445-4571

# Governor Brown Declares Drought State of Emergency

## Calls for Conservation Statewide, Directs State to Manage Water for Drought

SAN FRANCISCO – With California facing water shortfalls in the driest year in recorded state history, Governor Edmund G. Brown Jr. today proclaimed a State of Emergency and directed state officials to take all necessary actions to prepare for these drought conditions.

"We can't make it rain, but we can be much better prepared for the terrible consequences that California's drought now threatens, including dramatically less water for our farms and communities and increased fires in both urban and rural areas," said Governor Brown. "I've declared this emergency and I'm calling all Californians to conserve water in every way possible."

In the State of Emergency declaration, Governor Brown directed state officials to assist farmers and communities that are economically impacted by dry conditions and to ensure the state can respond if Californians face drinking water shortages. The Governor also directed state agencies to use less water and hire more firefighters and initiated a greatly expanded water conservation public awareness campaign (details at saveourh2o.org).

In addition, the proclamation gives state water officials more flexibility to manage supply throughout California under drought conditions.

State water officials say that California's river and reservoirs are below their record lows. Manual and electronic readings record the snowpack's statewide water content at about 20 percent of normal average for this time of year.

The Governor's drought State of Emergency follows a series of actions the administration has taken to ensure that California is prepared for record dry conditions. In May 2013, Governor Brown issued an Executive Order to direct state water officials to expedite the review and processing of voluntary transfers of water and water rights. In December, the Governor formed a Drought Task Force to review expected water allocations, California's preparedness for water scarcity and whether conditions merit a drought declaration. Earlier this week, the Governor toured the Central Valley and spoke with growers and others impacted by California's record dry conditions.

The full text of the emergency proclamation is below:

### A PROCLAMATION OF A STATE OF EMERGENCY

**WHEREAS** the State of California is experiencing record dry conditions, with 2014 projected to become the driest year on record; and

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 2 of 1229

**WHEREAS** the state's water supplies have dipped to alarming levels, indicated by: snowpack in California's mountains is approximately 20 percent of the normal average for this date; California's largest water reservoirs have very low water levels for this time of year; California's major river systems, including the Sacramento and San Joaquin rivers, have significantly reduced surface water flows; and groundwater levels throughout the state have dropped significantly; and

**WHEREAS** dry conditions and lack of precipitation present urgent problems: drinking water supplies are at risk in many California communities; fewer crops can be cultivated and farmers' long-term investments are put at risk; low-income communities heavily dependent on agricultural employment will suffer heightened unemployment and economic hardship; animals and plants that rely on California's rivers, including many species in danger of extinction, will be threatened; and the risk of wildfires across the state is greatly increased; and

**WHEREAS** extremely dry conditions have persisted since 2012 and may continue beyond this year and more regularly into the future, based on scientific projections regarding the impact of climate change on California's snowpack; and

**WHEREAS** the magnitude of the severe drought conditions presents threats beyond the control of the services, personnel, equipment and facilities of any single local government and require the combined forces of a mutual aid region or regions to combat; and

**WHEREAS** under the provisions of section 8558(b) of the California Government Code, I find that conditions of extreme peril to the safety of persons and property exist in California due to water shortage and drought conditions with which local authority is unable to cope.

**NOW, THEREFORE, I, EDMUND G. BROWN JR.,** Governor of the State of California, in accordance with the authority vested in me by the state Constitution and statutes, including the California Emergency Services Act, and in particular, section 8625 of the California Government Code **HEREBY PROCLAIM A STATE OF EMERGENCY** to exist in the State of California due to current drought conditions.

**IT IS HEREBY ORDERED THAT**:

1.State agencies, led by the Department of Water Resources, will execute a statewide water conservation campaign to make all Californians aware of the drought and encourage personal actions to reduce water usage. This campaign will be built on the existing Save Our Water campaign (www.saveourh20.org) and will coordinate with local water agencies. This campaign will call on Californians to reduce their water usage by 20 percent.

2.Local urban water suppliers and municipalities are called upon to implement their local water shortage contingency plans immediately in order to avoid or forestall outright restrictions that could become necessary later in the drought season. Local water agencies should also update their legally required urban and agricultural water management plans, which help plan for extended drought conditions. The Department of Water Resources will make the status of these updates publicly available.

3.State agencies, led by the Department of General Services, will immediately implement water use reduction plans for all state facilities. These plans will include immediate water conservation actions, and a moratorium will be placed on new, non-essential landscaping projects at state facilities and on state highways and roads.

4.The Department of Water Resources and the State Water Resources Control Board (Water Board) will expedite the processing of water transfers, as called for in Executive Order B-21-13. Voluntary water transfers from one water right holder to another enables water to flow where it is needed most.

5.The Water Board will immediately consider petitions requesting consolidation of the places of use of the State Water Project and Federal Central Valley Project, which would streamline water transfers and exchanges between water users within the areas of these two major water projects.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 3 of 1229

6. The Department of Water Resources and the Water Board will accelerate funding for water supply enhancement projects that can break ground this year and will explore if any existing unspent funds can be repurposed to enable near-term water conservation projects.

7. The Water Board will put water right holders throughout the state on notice that they may be directed to cease or reduce water diversions based on water shortages.

8. The Water Board will consider modifying requirements for reservoir releases or diversion limitations, where existing requirements were established to implement a water quality control plan. These changes would enable water to be conserved upstream later in the year to protect cold water pools for salmon and steelhead, maintain water supply, and improve water quality.

9. The Department of Water Resources and the Water Board will take actions necessary to make water immediately available, and, for purposes of carrying out directives 5 and 8, Water Code section 13247 and Division 13 (commencing with section 21000) of the Public Resources Code and regulations adopted pursuant to that Division are suspended on the basis that strict compliance with them will prevent, hinder, or delay the mitigation of the effects of the emergency. Department of Water Resources and the Water Board shall maintain on their websites a list of the activities or approvals for which these provisions are suspended.

10. The state's Drinking Water Program will work with local agencies to identify communities that may run out of drinking water, and will provide technical and financial assistance to help these communities address drinking water shortages. It will also identify emergency interconnections that exist among the state's public water systems that can help these threatened communities.

11. The Department of Water Resources will evaluate changing groundwater levels, land subsidence, and agricultural land fallowing as the drought persists and will provide a public update by April 30 that identifies groundwater basins with water shortages and details gaps in groundwater monitoring.

12. The Department of Water Resources will work with counties to help ensure that well drillers submit required groundwater well logs for newly constructed and deepened wells in a timely manner and the Office of Emergency Services will work with local authorities to enable early notice of areas experiencing problems with residential groundwater sources.

13. The California Department of Food and Agriculture will launch a one-stop website (www.cdfa.ca.gov/drought) that provides timely updates on the drought and connects farmers to state and federal programs that they can access during the drought.

14. The Department of Fish and Wildlife will evaluate and manage the changing impacts of drought on threatened and endangered species and species of special concern, and develop contingency plans for state Wildlife Areas and Ecological Reserves to manage reduced water resources in the public interest.

15. The Department of Fish and Wildlife will work with the Fish and Game Commission, using the best available science, to determine whether restricting fishing in certain areas will become necessary and prudent as drought conditions persist.

16. The Department of Water Resources will take necessary actions to protect water quality and water supply in the Delta, including installation of temporary barriers or temporary water supply connections as needed, and will coordinate with the Department of Fish and Wildlife to minimize impacts to affected aquatic species.

17. The Department of Water Resources will refine its seasonal climate forecasting and drought prediction by advancing new methodologies piloted in 2013.

18. The California Department of Forestry and Fire Protection will hire additional seasonal firefighters to suppress wildfires and take other needed actions to protect public safety during this time of elevated fire risk.

19.The state's Drought Task Force will immediately develop a plan that can be executed as needed to provide emergency food supplies, financial assistance, and unemployment services in communities that suffer high levels of unemployment from the drought.

20.The Drought Task Force will monitor drought impacts on a daily basis and will advise me of subsequent actions that should be taken if drought conditions worsen.

**I FURTHER DIRECT** that as soon as hereafter possible, this Proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Proclamation.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 17th day of January, 2014.


_____
EDMUND G. BROWN JR.,
Governor of California

ATTEST:


_____
DEBRA BOWEN,
Secretary of State


<center>###</center>


<center>**Governor Edmund G. Brown Jr.**
State Capitol Building
Sacramento, CA 95814</center>




Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 5 of 1229

# Exhibit 85



# 2014 DROUGHT
## IMPACTS AND STRATEGIES FOR RESILIENCE
*June 2014*



## Association of California Water Agencies

**Contacts and Location:**

**Sacramento Office**
910 K Street, Suite 100
Sacramento CA, 95814
tel 916.441.4545

**John Coleman**
ACWA President

**Kathleen Tiegs**
ACWA Vice President

**Timothy Quinn**
Executive Director

ACWA's mission is to assist its members in promoting the development, management and reasonable beneficial use of good quality water at the lowest practical cost in an environmentally balanced manner.

© 2014 by Association of California Water Agencies
916.441.4545 • www.acwa.com
All rights reserved.



**Left: Running on empty: The concrete spillway pad lies exposed at Cachuma's Bradbury Dam.**
(Courtesy U.S. Bureau of Reclamation)

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Strategies for Resiliency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Regional Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ACWA Region Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ACWA's Drought Action Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Contributors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2014-2015 ACWA Board of Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

# Executive Summary



Left: An idle field next to a planted one near Firebaugh shows the effects of drought in 2014. Last year, the idle field produced melons; this year it will remain unplanted due to lack of water. Right: Folsom Lake, a key reservoir on the American River, dipped to critically low levels in January and February. Thousands of visitors trekked to the shrunken lake to view the remnants of a long-submerged Gold Rush-era town.

By nearly any measure, California is in extreme drought. On the heels of two consecutive dry years, the 2014 water year (Oct. 1, 2013 through Sept. 30, 2014) is tracking to be the third-driest on record. Major reservoirs are at half capacity and diminishing by the week, the Sierra snowpack had dwindled to 3% of the seasonal average by late May, and wildfires already are causing major destruction even before the dry summer months begin.

Though the full story of the drought continues to unfold, the effects are being felt across many sectors of the state. California's $44.7 billion agricultural economy is facing significant impacts, while ripple effects are extending to everything from ports to equipment dealers to the landscape industry. Wildfire protection, ecosystems and other commercial industries also are seeing impacts.

As historic dry conditions emerged in January of this year, the Association of California Water Agencies established a Drought Action Group to share information and develop recommendations to address the current drought and prepare for future dry times.

The Drought Action Group, composed of 40 water community experts from throughout the state, compiled information on drought impacts around California and identified future vulnerabilities if dry conditions continue in 2015 and beyond.

This report summarizes that information as a snapshot in time and describes significant drought impacts across the areas of agriculture, wildlife protection, ecosystems, commercial industries and trade. It also identifies 2015 vulnerabilities and recommends strategies and priority actions to address this and future droughts.

Overall, the report finds the current drought has exposed key vulnerabilities in California's water management system that must be addressed now if we are to avoid facing even more dire challenges in 10, 15 or 20 years. A variety of strategies and actions must be pursued to improve the resilience of the state's water supply system, including investments in backbone water storage and conveyance infrastructure. These investments must be made as part of a comprehensive plan that includes expanded water conservation, water recycling, storm water capture and reuse, local and regional water storage, groundwater management and other strategies to ensure water supply reliability and ecosystem health in California.

As summer gets under way and agencies begin to prepare for 2015, the water community urges state and federal agencies to take action in partnership with local agencies to put California on a path to resilience. Even if California receives above-average rainfall next winter, vulnerabilities exposed by this drought must be addressed. The work simply must begin today.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 10 of 1229

Following are the 10 key recommendations identified by ACWA's Drought Action Group:

# KEY RECOMMENDATIONS

**1.** State and federal agencies should facilitate construction of shovel-ready water infrastructure projects by providing funding and technical assistance as soon as possible.

**2.** Consistent with *ACWA's Recommendations for Achieving Groundwater Sustainability*, the Department of Water Resources (DWR) and the State Water Resources Control Board (SWRCB) should identify ways to reduce impediments and provide funding and technical assistance for projects that create new surface and groundwater storage and improve conveyance around the state to help address the state's groundwater challenges.

**3.** State and federal agencies should continue to move toward using real-time data for operational decisions to allow for greater flexibility and efficiency in getting water to the state's economy. Examples include using flexibility under existing law to maximize water supplies from the Delta while remaining consistent with species protection requirements; maintaining a one-to-one ratio in April and May for water transfers and exchanges involving the San Joaquin River; monitoring turbidity to allow for increased water deliveries while avoiding jeopardy to adult Delta smelt due to entrainment at state and federal pumping plants; and accelerating review of temporary barriers and operable gates to help manage salinity and improve water quality in the Delta.

**4.** The state should work with stakeholders and explore opportunities to further streamline transfers including additional collaboration with the federal government and a careful review of the recent report from the Streamline Our Agency Regulations (SOAR) Water Transfers Action Team.

**5.** The state should facilitate and/or expedite regulations or permitting processes that encourage innovative technologies including water recycling and desalination.

**6.** The state should work with local agencies to review opportunities for more closely coordinating planning documents in drought conditions. The state also should facilitate long-term solutions for agencies that indicate sustainability concerns in the applicable water management plans.

**7.** The state and federal government should provide funding and technical support in partnership with local agencies to develop long-term water infrastructure projects that will help ensure reliable water supplies for both the economy and the environment.

**8.** The state and federal government should disburse funding approved through state drought emergency legislation passed earlier this year and other federal programs so projects can move forward and assist impacted communities. The state and federal government also should work to ensure additional funding is available, including through a 2014 water bond, for projects and programs that will improve California's aging water infrastructure and further the coequal goals.

**9.** The state should acknowledge that local water systems are best equipped to determine which water conservation programs are most effective for their customers. In addition, the state should provide funding for water use efficiency activities in disadvantaged communities and support programs that are not locally cost effective but contribute broad benefits to California.

**10.** The state should review its overall 2014 drought response and look for opportunities to improve coordination in future dry conditions or other extreme weather events.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 11 of 1229

# Overview



Left: A state-of-the-art water delivery system sits idle this year due to zero surface water allocations on the west side of the San Joaquin Valley. Right: A productive almond orchard in full bloom across from a newly bulldozed orchard owned by the same grower in the Westlands Water District reflects the difficult choices made in 2014 due to lack of water.

The Association of California Water Agencies (ACWA) represents nearly 430 public water agencies that collectively supply 90% of the water delivered in California for domestic, agricultural and industrial uses.

When the severity of the drought began to crystallize in early 2014, ACWA and its member agencies began bracing for a water year like no other. Immediately following the formation of ACWA's Drought Action Group in January, participants set out to leverage their collective knowledge of drought impacts, activities and potential solutions to develop this report.

The following pages identify current drought impacts and future vulnerabilities, provide an overview of ACWA's regions and recommend priority actions for combating this and future droughts. This report complements ACWA's Statewide Water Action Plan (SWAP) released in September 2013 and other strategic planning documents that highlight the importance of a comprehensive action plan to advance sustainable water management.

## 2014 DROUGHT

Governor Jerry Brown declared a statewide drought emergency on Jan. 17, 2014 and directed state officials to take all necessary actions to prepare for drought conditions. The governor called on Californians to reduce water use by 20% and followed his drought declaration with a more detailed executive order on April 25, 2014.

Even with late winter rains bringing limited relief, the Golden State remains locked in drought. The latest National Weather Service data continue to show nearly the entire state in severe drought and over two-thirds in extreme drought. The 2014 water year (Oct. 1, 2013 through Sept. 30, 2014) is on track to be the third-driest on record and follows two consecutive dry years. With the rainy season now completed, the state's major reservoirs are at less than 60% of capacity and water storage is declining weekly.

After announcing an initial water supply forecast of zero percent this year for customers of the State Water Project (SWP), DWR released a revised allocation of just 5% of requested supplies on April 18. However, SWP contractors will not be able to draw on those allocations until September. Federal officials similarly announced in February that the federal Central Valley Project would likely deliver zero water in 2014 to agricultural service contractors north and south of the Delta. The forecast for CVP settlement contractors north of the Delta was later revised from a 40% to a 75% supply, providing limited but not total relief with most planting decisions already made. In an unprecedented announcement May

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 12 of 1229

13, the U.S. Bureau of Reclamation (USBR) said it would release water from Millerton Lake behind Friant Dam to meet contractual obligations to deliver Central Valley Project (CVP) water to the San Joaquin River Exchange Contractors. Deliveries for contractors in the Friant Unit of the CVP remain at zero.

Citing insufficient water to serve all water-rights holders, the State Water Resources Control Board sent notices in late May to more than 4,900 junior water-rights holders in the Sacramento River watershed, the San Joaquin River watershed and the upper Russian River ordering users to immediately cease diverting water to allow it to flow to more senior water-rights holders. It marked the first time such orders have been issued since the 1977 drought.

Water users who received orders to stop diverting were required to fill out forms within seven days to confirm that they have stopped. Limited exceptions apply, such as water that is needed for human health and safety purposes.

To help coordinate CVP and SWP drought response efforts, state and federal agencies on April 8 released a 2014 Drought Operations Plan outlining a multi-stage, collaborative effort to manage the projects from April 1 through November 15, 2014. Developed by the Department of Water Resources in coordination with the Bureau of Reclamation, U.S. Fish and Wildlife Service (USFWS), National Marine Fisheries Service (NMFS), California Department of Fish and Wildlife (CDFW) and the SWRCB, the plan's proposed actions and likely range of coordinated operations are based on the assumption that conditions would remain dry in 2014 and potentially continue into 2015. The plan indicates that all water users, including agricultural, municipal, and fish and wildlife uses, will suffer hardship due to drought.

California water agencies are currently experiencing a variety of significant impacts based on this lack of available water supply. Even with proactive efforts through Urban and Agricultural Water Management Plans, the severity of this drought has affected areas throughout the state. From mandatory water use restrictions to failing groundwater wells

to reduced water quality, these impacts highlight the widespread vulnerabilities that exist in the state's water infrastructure system and the urgent need to create more resilient water supplies.

Unless otherwise indicated, impacts data included in this report was provided by ACWA members. While the drought story continues to evolve and change, the information provides a snapshot of impacts around the state.

## SIGNIFICANT IMPACTS

### Agriculture

Although many of the state's economic sectors have been affected, agriculture — one of the top 10 economic drivers in the state — is bearing the brunt this year with impacts ranging from idled acreage to reduced traffic in ports to loss of jobs in a variety of agriculture-related industries. Current estimates from the UC Davis Center for Watershed Sciences project a $1.7 billion loss to the agricultural industry and it is expected that over 400,000 acres will be idled this year because of lack of water.

Impacts to California's agricultural communities are widespread. In some parts of the northern Sacramento Valley, farmers are idling thousands of acres, negatively



CURRENT WATER CONDITIONS
As of May 22, 2014, percentage of total capacity at major California reservoirs

Lake Oroville 50%
Shasta Reservoir 50%
Folsom Lake 58%
New Melones 34%
San Luis Reservoir 44%
Don Pedro 53%

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 13 of 1229

impacting the local and statewide economy. Though most are idling acres this year that would normally produce a variety of crops, continued dry conditions next year and beyond could spell the loss of numerous orchards, creating severe long-term economic and ecological impacts. (California Farm Water Coalition.)

Growers in the Tehama-Colusa Canal Authority service area anticipate idling approximately 80,000 acres of annual crops to prioritize water for permanent crops.

As a result of the drought, Sacramento Valley 2014 rice production is expected to see a 20% decline in planted acreage. This affects not only exports but on-farm and related industry employment. In addition, because rice acreage provides unique benefits as wetlands habitat, less water for rice farmers this year will reduce or eliminate key wildlife areas and refuges. (California Farm Water Coalition.)

In the San Joaquin Valley, many different crops are being affected adversely, including cotton, citrus and other permanent crops. A 300-square-mile area on the west side of Fresno and Kings Counties is expected to be idled this year, according to information from Westlands Water District.

Many citrus farmers in the federal CVP's Friant Division receiving a 0% water allocation stand to lose their crops this year and possibly their entire farm because their trees will die. Up to 50,000 acres of citrus trees in the San Joaquin Valley could be pulled out this year where surface supplies are being cut and there is no access to groundwater. According to local growers it could cost over $600,000 to restore a 90-acre citrus grove. (California Farm Water Coalition.)

The effects extend beyond idled acreage. Cotton grown in Fresno County is considered the highest quality in the world, leading to high demand for it for fine fabrics, high-end linens and towels. In 2014, cotton production will be down by 32% (or 90,000 acres) as a direct result of the drought. For all agricultural commodities, idling acreage or losing trees would also result in economic losses to local businesses, increased unemployment and a potential loss of export markets if growers cannot reliably deliver product to customers throughout the U.S. and overseas, according to the California Farm Water Coalition.

One example of job loss is in Huron, a small town in Fresno County that normally sees an influx of up to



Wildfires such as this blaze near Glendora in January 2014 remain a huge threat during California's ongoing drought. In the first five months of 2014, CAL FIRE crews battled nearly double the number of fires normally seen for that time of year.

6,000 seasonal workers to irrigate and harvest crops. This year it is expected that only 1,500 jobs will be available between March and November. Businesses have closed and tax revenue is in decline due to the loss of economic activity. (California Farm Water Coalition.)

Where available, farmers are turning to groundwater to sustain fields and orchards through the 2014 growing season. In many areas, including parts of the San Joaquin Valley, increased pumping this year will add further strain to basins already experiencing potentially unstable groundwater level declines. Though groundwater will keep many growers from devastating losses in 2014, over reliance on the resource without adequate recharge is not sustainable as a long-term water supply.

Pumping in many areas of the valley is accelerating depletion of the region's groundwater basins, which can lead to groundwater-related land subsidence. This subsidence has economic consequences through damaged wells and water conveyance facilities such as canals and flood channels. An April 2014 report by DWR confirmed that groundwater levels are experiencing record lows in most areas of the state and especially in the northern portion of the San Francisco Bay hydrologic region, the southern San Joaquin Valley, and also the South Lahontan and South Coast hydrologic regions.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 14 of 1229

In many areas of the San Joaquin Valley, recent groundwater levels are more than 100 feet below previous historical lows. The intensive use of groundwater also increases pumping costs and energy usage (e.g., the City of Tulare is looking at an additional $500,000 for increased energy costs to run wells), further affecting the state's economy.

This information gives only a brief glimpse into the potential impacts on the state's agricultural communities based on 2014 drought conditions. For growers, it could mean pushing legacy industries to a tipping point. For consumers, it means loss of jobs and higher prices for food and other products. It also means less locally produced food, which affects food security and our carbon footprint.

## Wildfire Protection

Wildfire protection is another sector facing significant impacts due to California's extremely dry conditions. The California Department of Forestry and Fire Protection (CAL FIRE) never fully closed out the 2013 fire season and returned to peak staffing levels on March 31 of this year, several months earlier than normal. The move became necessary as spring temperatures arose and conditions became even drier around the state. The first five months of 2014 also have seen a significant increase in wildfires across much of California. By May 23, state fire crews had battled 1,661 wildfires since Jan. 1, almost double the 933 wildfires seen by that date in an average year, according to CAL FIRE. In mid-May alone, nine significant fires burned over 27,000 acres in San Diego County, destroying homes and other structures, damaging critical infrastructure and causing the evacuation of thousands of residents. Warmer than average temperatures, very dry conditions and strong Santa Ana winds made these fires difficult to contain and caused the fires to spread rapidly.

Land management agencies are extremely concerned about the potential for additional wildfires throughout the state, particularly with reduced water availability in many areas.

## Ecosystem

California's ecosystem also has been affected adversely by the current drought. Concerned that conditions in the Sacramento River and Delta were becoming detrimental to the survival of juvenile Chinook salmon, the USFWS activated a drought contingency plan in conjunction with CDFW and the NMFS to transport 12 million hatchery

smolts by truck for release into the ocean in 2014. USFWS announced in late May that it completed its plan with the final trucking and release of approximately 900,000 salmon smolts from the Coleman National Fish Hatchery to the Mare Island area of San Pablo Bay.

Scientists at UC Davis said at a drought summit in April that drought stress is causing foothill pine trees in Yolo County to die this year because they are unable to fend off the dwarf pine mistletoe, which makes them vulnerable to both the mistletoe and the bark beetle. In previous droughts, native bark beetles took hold in Southern California forests following severe drought years causing unprecedented tree mortality.

## Commercial Sector and Trade

Industries such as the commercial and recreational fishing sector have also suffered ecosystem and financial damages due to the closure of rivers and streams and activities like the trucking of salmon populations outlined earlier in this report. Several remote areas dependent on fishing-based tourism are faced with not only severe water cutbacks but also reduced tax and tourist income.

In addition, lack of water is impacting agricultural commodities that are destined for nationwide and global markets. For example, California-grown almonds, according to the California Department of Food and



California is home to three of the largest ports in the United States. Significant reductions in rice and almond production this year will have a ripple effect on commodities exported from the Port of Oakland, shown here, as well as the trucking industry that moves cargo in and out of ports.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 15 of 1229

Agriculture, are the state's second most valuable crop and the top agricultural export. California supplies over 80% of the global almond crop according to the Almond Board of California with top export markets in China, Spain, India, Germany and the United Arab Emirates. However, in 2014 most almond orchards are in counties suffering "extreme" drought conditions and many growers are being forced to remove trees or sacrifice entire orchards. The resulting significant reductions in almond production and other such commodities will not only affect growers and their employees, but will have a considerable effect on urban areas due to reduced activity in the transportation industry and ports that depend on these types of overseas shipments.

## 2015 Vulnerabilities

In 2014 the most noticeable and significant drought-related impacts in California are to the agricultural economy and certain areas that are dependent upon a single source of supply (e.g. Willits). While efforts have been made to shore up supplies for the most vulnerable communities throughout the summer, a dry 2015 would have disastrous consequences for agencies and sectors up and down the state.

Hundreds of thousands of acres of annual and permanent crops throughout the state would be idled, affecting the growers, local communities, related industries and the statewide economy. For example, in ACWA's Region 4, Oakdale Irrigation District is expecting to utilize all its conserved water to meet demands in 2014, so if 2015 is dry, the district would likely need to idle nearly one-third of its acreage, or 20,000 acres.

In a worst case scenario for the agricultural industry, cotton production in California's San Joaquin Valley could cease completely, resulting in severe economic losses from crop revenue, employment, shipping and more. Even agencies with access to groundwater in 2014 would likely have to contend with an increasing number of challenges including reduced water quality, higher energy costs, and subsidence.

A dry 2015 would increasingly affect commercial and industrial sectors in California. While businesses based in urban areas that made investments in water infrastructure and water conservation activities may not be significantly affected in 2014, future drought would likely begin to impact production including businesses that may begin to relocate to states with more reliable water supplies.

Continuing drought conditions would also put significant strain on the state's headwaters, exponentially increasing the risk for catastrophic wildfires, infestation of devastating forest pests and requiring substantial investment in proactive fire prevention efforts.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 16 of 1229

# Strategies for Resiliency



Left: Interties such as this one along the Mokelumne Aqueduct near Brentwood can provide emergency water supply in droughts and improve water supply reliability. Right: Regional off-stream storage projects such as Contra Costa Water District's Los Vaqueros Reservoir can store high-quality water when it's available to improve water quality and bolster supplies during droughts.

While 2014 has been extremely dry, climate change is expected to bring more extreme weather events that include very dry and very wet years, so it is critical that California take action to create a more resilient water management system in all weather conditions. Following are priority actions and recommendations to help achieve that goal.

## PRIORITY ACTIONS

ACWA's Drought Action Group compiled these priority actions from water agencies throughout the state and has categorized them into several issue areas and a recommended timeline for completion. The actions range from specific infrastructure improvements to legislative or legal solutions and highlight only a small portion of the infrastructure and regulatory improvements that were received through the data collection efforts.

The types of actions and solutions are organized into three time frames: immediate (0-12 months), short-term (12-24 months), and longer-term (24 months+) and a separate fourth category that includes overall actions. The overall actions should begin immediately but due to their nature or complexity were not limited to a specific timeframe.

### Immediate Actions (0-12 months)

1.  **Immediate Infrastructure and Funding Needs**:

ACWA members have identified a significant number of projects and programs — many shovel ready — that could provide relief to systems currently at risk or located in a vulnerable area. Examples include replacing faulty water mains and/or distribution systems or creating emergency interties with other systems. A list of those immediate needs from ACWA agencies is provided in Appendix A.

> ✎ *Recommendation: State and federal agencies should facilitate construction of shovel-ready water infrastructure projects by providing funding and technical assistance as soon as possible.*

2.  **Groundwater Sustainability Actions:** The 2014 drought has brought into sharper focus the need for more sustainable groundwater management in California. In many areas, including parts of the San Joaquin Valley, overdraft has been and continues to be exacerbated by a significant reduction in available surface water supplies over the last three years. ACWA issued a suite of recommendations April 7 for improving management of groundwater basins throughout California in response to growing concern about potentially unsustainable groundwater level declines, local subsidence and degraded groundwater quality in some subbasins, along with widespread recognition that

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 17 of 1229

further action is required to promote and achieve groundwater sustainability. The *Recommendations for Achieving Groundwater Sustainability* include legislative and administrative changes to strengthen groundwater management and accountability where it is deficient, provide new tools and authorities to accelerate progress by local and regional agencies, and guide enhanced state support where needed. As outlined in the recommendations, many of these actions can and should be implemented as soon as possible to ensure groundwater resources are protected for the future. This is particularly important for the agricultural industry, which depends heavily on the successful coordination of groundwater and surface water management (conjunctive use) so groundwater can be available when needed.

✎ *Recommendation: Consistent with ACWA's Recommendations for Achieving Groundwater Sustainability, the Department of Water Resources (DWR) and the State Water Resources Control Board (SWRCB) should identify ways to reduce impediments and provide funding and technical assistance for projects that would create new surface and groundwater storage and improve water conveyance around the state to help address the state's groundwater challenges.*

3. **Regulatory and Operational Efficiencies**: Coordination among state and federal agencies and more efficient project operations are essential to address short- and long-term drought impacts. ACWA encourages DWR, SWRCB, USBR and the California Office of Emergency Services (OES) to continue injecting flexibility wherever possible into their decisions to immediately increase water supply for urban, agricultural and/or environmental needs. This includes regulatory decisions allowing water from precipitation events to be used in the most beneficial manner and maximizing opportunities for recycled water use to provide both immediate and longer-term water supplies for water agencies throughout the state.

✎ *Recommendation: State and federal agencies should continue to move toward using real-time data for operational decisions to allow for greater flexibility and efficiency in the state's water management system. Examples include using flexibility under existing law to maximize water supplies from the Delta while remaining*

*consistent with species protection requirements; maintaining a one-to-one ratio in April and May for water transfers and exchanges involving the San Joaquin River; monitoring turbidity to allow for increased water deliveries while avoiding jeopardy to adult Delta smelt due to entrainment at state and federal pumping plants; and accelerating review of temporary barriers and operable gates to help manage salinity and improve water quality in the Delta.*

4. **Water Transfers**: Water transfers can provide much needed flexibility in meeting water supply and environmental needs and have proven invaluable in dry years and droughts. A well-defined set of policies and procedures that provide certainty to transferring parties is essential to facilitate future transfers and promote local and statewide economic, social and environmental sustainability.

✎ *Recommendation: The state should work with stakeholders and continue to explore opportunities to further streamline transfers including additional collaboration with the federal government and a careful review of the recent report from the Streamline Our Agency Regulations (SOAR) Water Transfers Action Team. The SOAR report offers a number of recommendations such as the creation of common application form templates for all state agencies to use that would prevent unnecessary cost, confusion and duplication of efforts.*

## Short-Term Actions (12-24 months)

1. **Innovative technologies**: Local agencies are at the forefront of developing new technologies for recycling water, desalinating both brackish groundwater and seawater, creating opportunities for conjunctive use, and treating contaminated drinking water. ACWA members have identified and are working to advance many of these innovative projects in the next 12-24 months.

As an example, San Diego County Water Authority is currently constructing what will be the nation's largest ocean desalination facility in Carlsbad, which is expected to provide up to 56,000 AF per year by the fall of 2015. Both San Diego and Orange Counties also are looking at a variety of potable reuse and groundwater desalination facilities. Santa Cruz County has made progress on a regional desalination

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 18 of 1229

facility and has investigated a conjunctive use (water exchange) project but is delayed due to water rights. The City of Fresno is continuing to implement its Metropolitan Water Resources Management Plan which has the potential to include conjunctive use through the development of a 650,000-750,000 AF groundwater bank.

Another example is the City of Visalia/Tulare ID water exchange, whereby 11,000 AF per year of tertiary-treated wastewater would be delivered for irrigation uses in exchange for more imported water being used for recharging the groundwater basin.

In Northern California, the Del Puerto Water District (DPWD) and the cities of Turlock and Modesto are proposing to implement a regional solution to address water supply shortages within DPWD's service area on the west side of the San Joaquin River in San Joaquin, Stanislaus and Merced Counties, south of the Sacramento-San Joaquin River Delta. The North Valley Regional Water Recycling Program proposes to deliver up to 59,000 AF per year of recycled water produced by the cities via the Delta-Mendota Canal. Recycled water would be conveyed from Modesto and Turlock through pipelines from their wastewater treatment facilities and ending at the Delta-Mendota Canal. The recycled water would then be conveyed directly to DPWD customers or to San Luis Reservoir for storage during low water demand periods and may also provide water to Central Valley Project Improvement Act (CVPIA)-designated refuges located south of the Delta to meet their need for water supply.

✎ *Recommendation: The state should facilitate and/or expedite regulations or permitting processes that encourage innovative technologies such as water recycling and desalination.*

2. **Drought Planning**: California's water agencies develop a number of planning documents, some of which include requirements to consider climate change impacts on water supplies and drought response actions for two or three years of reduced supply. However, these documents, which include Urban Water Management Plans, Agricultural Water Management Plans, Groundwater Management Plans and Integrated Regional Water Management Plans, often are not linked, which can reduce their effectiveness in drought conditions. An integrated approach is needed among local planning efforts to enhance local and regional solutions during dry years.

✎ *Recommendation: The state should work with local agencies to review opportunities for more closely coordinating planning documents in drought conditions. The state also should facilitate long-term solutions for agencies that indicate sustainability concerns in the applicable water management plans.*

## Longer-Term Actions (24 months+)

1. **Longer-Term Infrastructure Needs**: Infrastructure needs identified by ACWA members also include longer-term projects such as expanding surface water or groundwater storage capacity and constructing new facilities for desalination and water recycling. Additional storage is needed not only to meet growing demands, but also to make up for water supplies reallocated to environmental/regulatory purposes. Many ACWA member agencies, including those that have sufficient water in 2014 given existing demands, have identified a large number of projects that would help provide a sustainable water supply in 2015 and beyond.

For example, Metropolitan Water District of Southern California is looking at infrastructure improvements that would allow the delivery of Colorado River Aqueduct water to parts of its service area normally supplied exclusively by water from the SWP, providing for a supplemental supply when SWP water is not available. The San Francisco Bay Area and the Sacramento region are developing partnerships among their agencies to improve reliability within their respective regions, optimizing existing infrastructure through new interties and other improvements.

In addition, Soquel Creek Water District is working with the City of Santa Cruz on a regional desalination project and is coordinating with a number of local agencies on a regional recycled water treatment for irrigation and future Direct Potable Reuse (DPR).

To complement information received through the Drought Action Group process, ACWA recently partnered with the California Water Commission (CWC), Delta Stewardship Council (DSC), and DWR on a water projects survey that requested information from water agencies on water infrastructure projects that could be completed in the next five to 10 years.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 19 of 1229

ACWA and CWC received over 60 responses, which will provide more opportunities for creating drought-resilient water supplies.

✎ *Recommendation: The state and federal government should provide funding and technical support in partnership with local agencies to facilitate the development of these longer-term water infrastructure projects that will help ensure reliable water supplies for both the economy and the environment.*

## Overall Recommendations without Specific Timeline

1. **Funding**: Most of the solutions for securing adequate water supplies in both this and future droughts are dependent on some type of funding support. Local agencies have invested billions in new or upgraded infrastructure, which is reflected in part by reviewing the current supply balances of those areas where significant investments were made after the last drought. However, much more needs to be done.

Examples of infrastructure projects that could benefit from funding include the restoration of Wilson Dam in the Calaveras County Water District (CCWD) service area that has failed, severely affecting the availability of water for residents in the West Point Water System. Restoration of the dam could produce 150 AF of storage and other ecosystem benefits, but would cost this disadvantaged community $580,000 for design and construction.

Another part of CCWD, Ebbitts Pass Expansion, has 2,200 homes dependent on marginal fractured rock groundwater supplies and its well will likely fail by June. Developing surface water supply would cost $8.4 million and relieve drought impacts for 2,200 properties.

The state and federal government have indicated that water infrastructure is an important investment and ACWA members have identified a variety of projects that with appropriate funding would help solve many of the short and long-term challenges faced by water agencies.

✎ *Recommendation: The state and federal government should disburse funding approved through the state drought emergency legislation and other federal programs as soon as possible so projects can move forward and assist impacted communities. The state and federal government also should work to ensure additional funding is available, including through a 2014 water bond, for projects and programs that will improve California's aging water infrastructure and further the coequal goals.*

2. **Continued and heightened conservation**: In both the SWAP and the recent resolution passed by its Board of Directors urging water agencies to call for heightened water conservation statewide, ACWA has expressed its strong support for both urban and agricultural water use efficiency. In addition to ACWA's partnership with DWR on the Save Our Water program, ACWA member agencies continue to be leaders on a variety of initiatives at the local and regional level to encourage water conservation and water use efficiency. Many of these activities are identified on ACWA's 2014 Drought Watch website.

For example, Sonoma County Water Agency and its contractors are implementing voluntary 20% conservation and a regional water conservation program called "There's a Drought On. Turn the Water Off." The program includes an easy-to-use website, local toolkits, eco-friendly garden tours, rebates and more. The City of Sacramento has implemented mandatory 20% conservation and is using a host of measures including limiting outdoor irrigation to twice per week, increased water patrols and implementing a "cash for grass" program.

Metropolitan Water District of Southern California recently doubled its existing conservation and outreach budget from $20 million to $40 million, which includes $5.5 million for an outreach campaign designed to raise public awareness and target inefficient practices. MWD's programs include rebates, incentives for turf removal, large landscape audits, California Friendly Landscape Training Classes and a Public Agency Program and Fitness Center Program, both of which target larger water users with higher upfront incentives for conservation devices.

San Diego County Water Authority also is urging additional voluntary conservation through its "When in Drought" campaign featuring paid advertising, public service announcements and online communications. The campaign is

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 20 of 1229

supported by $300,000 in drought response grant funds from DWR and is being coordinated with other local and statewide conservation efforts, including Save Our Water.

Should dry conditions persist into 2015, ACWA members have detailed plans to step up their conservation efforts.

✎ *Recommendation: The state should acknowledge that local water systems are in the best position to determine which water conservation programs are most effective for their customers. In addition, the state should provide funding for water use efficiency activities in disadvantaged communities and support programs that are not locally cost effective but contribute broad benefits to California.*

3. **Agency Coordination**: As outlined in ACWA's SWAP and earlier in this report, improved coordination among state agencies and between the state and federal government will be critical to successfully implementing a comprehensive set of actions, including those that will help navigate the effects of drought conditions. The success of many actions will rely on consistent and deliberate cooperation between local agencies, regulators and their policymaking counterparts.

✎ *Recommendation: The state should review its 2014 drought response and look for opportunities to improve coordination in future dry times or other extreme weather events.*

# Regional Overview



Left: San Luis Reservoir, a key storage facility for both the Central Valley Project and State Water Project, was at just 41% of capacity in early June 2014. Right: Dry conditions prevail at this field west of Firebaugh in the San Joaquin Valley.

To provide context for the priority actions outlined in this report, following is a summary of conditions and vulnerable areas in ACWA's 10 geographic regions.

The summary includes a brief description of each ACWA region including geographic boundaries, major water sources, and areas that should be watched closely if the state continues to experience dry conditions.

## NORTH COAST (ACWA REGION 1)



Extending through nearly 25,814 square miles of California's northern coast, Region 1 includes the nine counties of Del Norte, Humboldt, Siskiyou, Trinity, Lake, Mendocino, Sonoma, Napa, and Marin. This north coast region is 12 percent of California's landscape, but home to less than 2 percent of the state's population. Approximately 25 ACWA member agencies help serve this region's 1.4 million residents.

### Major Water Sources

ACWA's Region 1 agencies are supplied by diverse water sources. Larger surface water supply projects in this region include the USBR Klamath Project, the US Army Corps of Engineers' (USACE) Russian River Project (Lake Mendocino and Lake Sonoma), and the Humboldt Bay Municipal Water District's Ruth Reservoir, which serves coastal communities from Eureka to McKinleyville. Two of the largest water supply reservoirs in this area are Trinity Lake (2.437 million acre-feet), a CVP facility on the Trinity River and the USACE Lake Sonoma (380,000 acre-feet) in the Russian River watershed. The North Bay Aqueduct of the SWP also supplies water to agencies within Napa County.

Groundwater development is sporadic throughout the northern and mountainous areas of this region, and wells are generally along the many valleys' rivers and streams. Very few significant aquifers in the coastal mountains are capable of providing a reliable water supply. Significant groundwater basins exist in the upper Klamath River Valley along the California border with Oregon, along with the Napa-Sonoma Valley and underlying the Santa Rosa area.

### Vulnerable Areas

Much of the northern coastal part of this region is sparsely populated and without major commerce. Remaining population centers such as Fort Bragg, Arcata and Willits were previously home to active logging and fishing industries but now rely on tourism that depends largely on weather conditions. These factors result in a network of many small and often disadvantaged communities (DACs) with water systems

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 22 of 1229

that must contend with significant challenges during droughts because they frequently rely on one water source and cannot easily tie into another water system. Several communities within this area are regularly at risk due to limited groundwater or local surface water supplies, in addition to risks associated with catastrophic wildfires.

The southern part of this region (Marin, Napa and Sonoma Counties) is more densely populated, and agencies can more closely coordinate with neighboring systems along with diversifying their water supply portfolio. However, local major surface water supplies (Lake Mendocino and Lake Sonoma) are low, and further dry conditions will put additional pressure on the system, reducing available water for urban, agricultural and environmental needs.

## SACRAMENTO VALLEY (ACWA REGION 2)

 Spanning 8,362 square miles of Northern California's agricultural lands, Region 2 is comprised of Butte, Colusa, Glenn, Shasta, Sutter, Tehama and Yuba counties. Forty-five ACWA member agencies help serve the region's population of 502,000 residents, with water, utility, irrigation and reclamation services.

### Major Water Sources

Region 2 water agencies receive much of their surface water from SWP and CVP facilities. Major SWP water supply facilities are along the Feather River basin in this region, consisting of Oroville Reservoir Complex, Lake Davis, and Frenchman Reservoir. Major CVP facilities include Lake Shasta and Whiskeytown Lake. A large amount of water from both SWP and CVP reservoirs also is released downstream to maintain environmental water quality standards in the Delta, which are critical in the summer and fall to prevent ocean salt water from penetrating east into the Delta during high tidal cycles.

CVP and SWP water is delivered to agriculture and wildlife refuges throughout the region including the state's Butte Basin and Graylodge Wildlife Areas as well as the federal Sacramento Wildlife Refuge Complex. For example, the new $180 million Red Bluff Pumping Plant and Fish Screen convey water to districts served by the Tehama-Colusa and Corning Canals on the Sacramento River. Sacramento River CVP Settlement Contractors, CVP Water

Service Contractors and the Feather River Service Area Contractors collectively irrigate over 2 million acres.

Local surface water supplies are also a key part of the water supply portfolio for the region, including the Yuba-Bear River system and New Bullards Bar Reservoir, the Yuba River's largest reservoir at 966,000 acre-feet.

Groundwater provides about 30% of the water supply. Reliance on this resource varies greatly depending on the area within the region; in some areas groundwater is the only source of water supply including most if not all of the local cities and communities. Agencies often rely upon available groundwater resources when surface water supplies are not available and have been working to develop conjunctive use opportunities. However, local groundwater ordinances in Butte, Glenn, Shasta and Tehama counties limit or prohibit groundwater substitution transfers. Shasta County also limits inter-county groundwater transfers.

### Vulnerable Areas

Because many agencies receive all or a significant portion of their water through the SWP and CVP, these areas are at risk when allocations are reduced or not available. With record low allocations for both projects during the 2014 drought, some agencies are relying on groundwater (where available), particularly for agriculture and crops. Communities in Region 2 are highly dependent on the agriculture industry, especially rice production that accounts for over 600,000 acres and much of their economic activity.

Much of the Redding basin is urbanized and highly reliant upon CVP surface water supplies. Most of these agencies have water service contracts with shortage provisions that can reduce water allocations to zero for agricultural purposes and to 50% of historical use for non-agricultural purposes. Agencies around the basin with limited groundwater resources are the most severely impacted due to severely curtailed surface water supplies and continued dry conditions will intensify these impacts.

Also, increased long-term use of groundwater will exacerbate existing groundwater declines and contribute to additional negative effects including increased pumping costs, reduced water quality and potential land subsidence.

Farmers in some parts of Region 2 are idling thousands of acres due to drought, negatively impacting both the

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 23 of 1229

local and statewide economy. At this time most are idling acres that normally produce a variety of crops, but should dry conditions persist, farmers will lose orchards that are particularly vulnerable, resulting in severe long-term economic and ecological impacts.

Impacts on the availability of habitat could be severe. In Region 2, agricultural lands, wildlife areas and refuges provide sanctuary to hundreds of species of wildlife. This is especially important because 95% of the state's wetlands no longer exist. Rice is the only crop that provides similar benefits.

## SIERRA FOOTHILLS AND MOUNTAINS (ACWA REGION 3)



The 14 counties in Region 3 (Alpine, Amador, Calaveras, El Dorado, Inyo, Lassen, Mariposa, Modoc, Mono, Nevada, Placer, Plumas, Sierra, and Tuolumne) encompass 36,229 square miles of California forest and Sierra Nevada range communities. The regional population of 875,000 is partly served by 30 water, utility, irrigation and reclamation districts that make up ACWA's Region 3 membership.

### Major Water Sources

Of California's developed water supply, about 40% originates within this region, more than from any other source. However, much of the water supplies are unavailable locally due to prior water rights appropriations for downstream or out-of-basin users. For example, Bay Area water agencies export water supplies from the Mokelumne and Tuolumne rivers, and the Los Angeles Department of Water and Power exports water from Owens River and Mono Lake. The state and federal government, Central Valley water agencies, and the USACE also built major foothill multipurpose reservoirs from Lake Oroville to Millerton Lake, enabling delivery of water to other regions of the state through canals, aqueducts, and via the Delta.

Locally developed surface water accounts for the vast majority of the local public water supply, with the remainder of the water provided by federal water facilities, groundwater, locally developed imports from adjacent hydrologic regions, and reclaimed wastewater. Local water sources include the Truckee, Walker, Carson and Susan Rivers, although water rights issues, interstate agreements with Nevada, in-stream

environmental requirements, and miscellaneous private rights holders can limit access to this water supply. In the Lake Tahoe Basin, further development is strictly limited because of concerns regarding water quality in the lake. Local supplies vary seasonally and year to year, depending on precipitation and the corresponding large fluctuations in runoff.

Groundwater availability provides a small portion of the water supply in this region and is more likely to be in fractured rock and small alluvial deposits immediately adjacent to the area's many streams, although some wells constructed in volcanic formations can produce large amounts of groundwater. In rural areas, many individual residences are dependent upon individual wells for domestic use, which are often unreliable during drought periods. In the southern counties of this region, there are areas that use groundwater as their sole source of supply but much of the area has very low population density and within these areas there has been little groundwater development.

### Vulnerable Areas

As outlined above, water systems in Region 3 largely depend on local surface water and groundwater supplies so in times of drought, lack of rainfall quickly affects these agencies. In addition, similar to Region 1, there are many areas that are not densely populated, agencies are not closely connected, and many small communities are also disadvantaged. Small communities in this region will likely experience severe water shortages in the summer and fall. Continued dry conditions will increase the number of agencies and areas affected.

This region also is vulnerable to catastrophic wildfires, which are becoming more of a risk due to reduced snowpack levels and warm temperatures experienced so far in 2014. A large wildfire or (multiple smaller ones) could have disastrous consequences for both the water quality and supply for this region along with the affected downstream water users.

## LOWER SACRAMENTO VALLEY AND DELTA (ACWA REGION 4)



Region 4 is made up of five counties — Yolo, Solano, Sacramento, San Joaquin, and Stanislaus counties — which cover about 4,357 square miles the Sacramento Valley. Approximately 45 irrigation districts, utilities, and

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 24 of 1229

cities are members of this region, helping to serve a population of more than 3.3 million residents.

## Major Water Sources

The Sacramento-San Joaquin Delta serves as a hub for California's two largest water systems, the SWP and CVP. Four of this region's five counties border the Sacramento-San Joaquin Delta, which puts a local emphasis on Delta issues. Water sources in this region include both surface water from the major delivery projects and groundwater. Surface water sources include the Sacramento, San Joaquin, American, Tuolumne, Calaveras and Stanislaus Rivers.

Releases from CVP's Folsom Reservoir on the American River, serve Delta and CVP export needs including maintaining environmental water quality standards in the Delta and in the Lower American River, and also supplying agencies in the Sacramento metropolitan area. Many agencies, such as the cities of Sacramento, Roseville, Folsom and San Juan Water District, rely heavily on deliveries from Folsom Reservoir. Local agencies in the Sacramento region have invested $1 billion in activities on demand management, conservation and conjunctive use in an effort to create a sustainable water supply.

Solano County's primary sources of water are from Lake Berryessa, the principal water storage facility of USBR's Solano Project, and SWP water from the Delta through the North Bay Aqueduct. Other surface water supplies in the region include Don Pedro Reservoir, USACE's New Hogan Lake, and CVP's New Melones Reservoir.

Groundwater provides approximately 30% of the total water for this region but some agencies use it more extensively than others. Efforts continue to improve access to groundwater in the Sacramento region as a complement to existing surface water supplies, for aquifer storage and recovery, and as a secondary supply during drought conditions.

## Vulnerable Areas

As home to the Delta, this entire region is vulnerable to the effects of drought-related water supply fluctuations including reduced water quality that could result in salt water entering the Delta during high tidal cycles. In the current drought, the Sacramento region was "ground zero" for impacts to larger urban agencies in the first few months of 2014, highlighting the need for more diverse and reliable supplies. Because Folsom Reservoir serves

multiple purposes, including maintaining environmental quality standards in the Delta and in the Lower American River, those agencies that depend on the reservoir for all or a large portion of their water supply have been significantly affected and will be working to ensure sufficient supplies throughout 2014.

Continued dry conditions will additionally strain existing infrastructure, further reduce surface and groundwater quality and supplies, and require an increased effort to conserve in this region.

## BAY AREA/CENTRAL COAST (ACWA REGION 5)



Residing along California's central coastline, Region 5 includes the 14,793 square miles that are Contra Costa, San Francisco, Alameda, San Mateo, Santa Clara, Santa Cruz, Monterey, San Benito, San Luis Obispo, and Santa Barbara Counties. Region 5's membership includes 50 irrigation, utility, reclamation, and cities to help serve its population of more than 7 million.

## Major Water Sources

In Region 5, water agencies manage a diverse portfolio of water supplies including groundwater, local surface water, imported Sierra Nevada supplies from the Tuolumne and Mokelumne rivers, Delta supplies via the SWP and CVP and other sources (recycled water, desalination, and transfers). Major storage facilities include Pardee, Los Vaqueros and Hetch Hetchy Reservoirs. About 70% of the urban supplies are imported to the Bay Area portion of this region.

In the Bay Area, local groundwater accounts for about 15% of the water supply. For agencies like Santa Clara Valley Water District, Alameda County Water District, and Zone 7 Water Agency, groundwater is a critically important component that reduces the demand on imported water. Several agencies such as Alameda County Water District have entered into agreements with groundwater banks in the San Joaquin Valley for a portion of their supply portfolio, particularly in dry years, but due to 0% allocation from SWP, ACWD and others are unable to retrieve those banked supplies.

In the Central Coast counties of Region 5, groundwater provides more than 80% of the water supply. The

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 25 of 1229

remainder is provided by a variety of sources including local streams and rivers, such as the San Lorenzo and Carmel Rivers, USBR projects such as the Santa Maria Project and the Cachuma Project and the SWP Coastal Branch, which delivers surface water to San Luis Obispo and Santa Barbara counties. Agencies in this area are also working to increase desalination efforts for both brackish groundwater and ocean saltwater.

## Vulnerable Areas

Many of the major Bay Area agencies have sufficient supplies this year because of $3 billion-$5 billion invested in conservation, recycled water, upstream reservoirs, the construction of the Freeport Regional Water Project and Los Vaqueros Reservoir, and conjunctive use. However, several agencies dependent on the SWP or on other wholesale agencies with reduced or even zero projected allocations are significantly impacted by the drought, particularly those that receive direct supply or have banked water south of the Delta that could otherwise be accessed when allocations are higher. With continued drought, water quality will likely become a primary concern for many agencies in this part of the region. Several member agencies are also concerned that a low Delta outflow to protect the state's water supply will adversely impact their local supplies from the Delta.

Central Coast agencies in this region are experiencing drought impacts and the ongoing challenge of saline intrusion into groundwater aquifers, the primary water source. Record low rainfall exacerbated the salinity issue and agencies are under a State Water Resources Control Board (SWRCB) Cease and Desist Order to reduce the use of the Carmel River. Further, much of the groundwater in that area contains hexavalent chromium, and water systems soon will be required to install expensive treatment systems or lose that source. While these agencies have worked diligently to reduce their per capita water use, options are limited, and they are increasingly turning to desalination, water recycling and water budgets. The City of Santa Cruz began water rationing on May 1 with strict allotments per household and significant penalties for those who exceed their allotment. The City of Santa Barbara is looking at potentially restarting its desalination plant as a last resort if drought conditions continue into 2015 and water usage is not reduced enough through conservation.

Continued dry conditions would significantly affect both water supply and quality throughout this region.

# NORTHERN SAN JOAQUIN VALLEY (ACWA REGION 6)



Located in California's San Joaquin Valley, Region 6 expands throughout 11,590 square miles and includes Merced, Madera, Fresno, and Kings counties. Region 6 has approximately 48 member agencies that help serve its 1.5 million residents and agricultural industry.

## Major Water Sources

Most of this region's imported surface water supplies are delivered by the CVP although the SWP also provides water to several districts. Most of the surface water in the upper San Joaquin River is stored and diverted at Friant Dam and is then conveyed north through the Madera Canal and south through the Friant-Kern Canal. The Kings River and the tributaries of the San Joaquin River provide the region with high-quality water that constitutes most of the surface water supplies for local uses. Much of this water is regulated by reservoirs and used on the east side of the San Joaquin Valley.

Groundwater provides a significant portion of the water needs for this region. The availability and use of groundwater is of critical importance to many areas in the San Joaquin Valley. Efforts are under way to address concerns related to water quality and subsidence that have occurred for a variety of reasons. As outlined above, ACWA's *Recommendations for Achieving Groundwater Sustainability* outline a suite of actions regarding the future of California's groundwater resources.

Agricultural operations have worked diligently to increase agricultural water use efficiency in the San Joaquin Valley. In fact, from 2003 through 2010, San Joaquin Valley farmers invested almost $2.2 billion installing upgraded irrigation systems (drip, micro sprinklers, high-efficiency pumps) on more than 1.8 million acres and continue to look for opportunities to enhance the efficiency of their operations.

## Vulnerable Areas

This region is home to some of California's leading agricultural producing areas, ranking in the state's top 10 counties in farm production value. If local or imported surface water supplies are not available, demand for these activities in many areas can initially

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 26 of 1229

be met with groundwater supplies but intensive groundwater pumping can also outstrip the aquifer system's ability to recharge itself, affecting water quality and potentially causing groundwater-related land subsidence. In Region 6 some the most severe subsidence is occurring on the west side of Madera County. The intensive use of groundwater also increases pumping costs and energy usage. Should there be continued drought, farmers and water agencies that are not able to utilize available groundwater will be forced to idle hundreds of thousands of acres.

# SOUTHERN SAN JOAQUIN VALLEY (ACWA REGION 7)



Region 7 spans nearly 13,014 square miles of southern San Joaquin Valley, including both Tulare and Kern Counties. ACWA has over 50 members in this region who help serve its 1.3 million residents and agricultural industry. Tulare County is the most productive county in the U.S. in terms of agricultural revenues.

## Major Water Sources

Water districts in both the western and eastern sides of the valley floor depend heavily on contracts for imported water from the CVP and SWP. These two projects follow a coordinated operation agreement governing Delta export facility pumping for water shortage, water quality, and environmental requirements. The CVP's Friant Unit also provides surface water for the region's east side. Additional surface water runoff is provided by four rivers in this region: the Kings, Kern, Kaweah and Tule.

Groundwater is a critical water source in this region, providing approximately 4% of total needs. However, because surface water supplies are unreliable or have been reduced, Region 7's increased reliance on groundwater has resulted in water extraction amounts exceeding recharge to some of the region's groundwater aquifers, worsening an existing overdraft situation.

In the western valley area, groundwater quality is often poor, and availability is highly variable. In addition, drainage problem areas have developed with high water tables that have high total dissolved solids (TDS).

However, as with Region 6, agricultural operations have worked diligently to increase agricultural water

use efficiency through upgraded irrigation systems and other activities. This region also features some of the state's oldest and most successful conjunctive use efforts including those of North Kern Water Storage District and Tulare Irrigation District. The Kern Water Bank and groundwater banking storage partnerships in the Arvin-Edison Water Storage District, the Semitropic Water Storage District, and other groundwater banking projects help sustain the local groundwater basins and successfully provide water to agencies throughout the state.

## Vulnerable Areas

Much of the industry and consequently water use in this region is related to agriculture. A large portion of this region farms permanent crops, making it difficult for the agricultural industry when faced with low to zero water allocations, particularly if those areas have limited access to groundwater. While demands can initially be met in many areas with groundwater supplies, intensive groundwater pumping can also outstrip the aquifer system's ability to recharge. Intensive groundwater pumping is causing increased depletion of the region's groundwater basins with DWR reporting that recent groundwater levels in the San Joaquin Valley at more than 100 feet below previous historical lows. This increased activity can lead to water quality issues and groundwater-related land subsidence, potentially damaging wells and water infrastructure. Some the most severe subsidence has occurred in this part of the San Joaquin Valley. The intensive use of groundwater also increases pumping costs and energy usage (e.g., the City of Tulare is looking at an additional $500,000 for increased energy costs to run wells).

Should there be continued drought conditions coupled with limited surface water imports, farmers and water agencies that are not able to utilize available groundwater, whether due to quality or quantity, will be forced to idle hundreds of thousands of acres.

In addition, as outlined above, many local and also geographically distant agencies have water banked in the Semitropic or Kern facilities. However, because of the drought and extremely low allocations of water for the SWP and CVP (5% and 0% respectively), agencies cannot transfer the water as needed. This adversely affects both local and those more distant agencies that rely on that water as part of their supply portfolio. Several agencies have even proposed a "pump-back plan" to the state that would reverse the flow of up to 47 miles of the California

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 27 of 1229

Aqueduct and allow water from the Kern Water Bank to reach distressed agricultural water districts.

# GREATER LOS ANGELES (ACWA REGION 8)



ACWA's second-smallest geographic region happens to be its most populous. Los Angeles and Ventura counties make up Region 8, serving a population of 11.1 million over 6,000 square miles. Fifty ACWA member agencies are among the water providers for the densely populated region.

## Major Water Sources

To meet current and growing demands for water, this region leverages all available water resources: imported water, water transfers, conservation, captured surface water, groundwater, recycled water, and desalination. Water is imported into Region 8 from three major sources: the Sacramento-San Joaquin Delta via the SWP, the Colorado River, and the Owens Valley/Mono Basin.

Local surface capture plays an important role in this region. Dozens of impound structures are used to capture local runoff for direct use or groundwater recharge, operational or emergency storage for imported supplies, or flood protection. Water recycling, desalination and urban water conservation are also important sources of water for this region and have significantly reduced water demand.

Groundwater plays an important role in the water supply portfolio for Region 8, although water quality concerns have prevented its use in some areas, particularly in Los Angeles County. Contamination has significantly reduced groundwater availability for the Los Angeles Department of Water and Power. Los Angeles will soon complete a multiyear groundwater status report with the goal of creating an inventory for pollution and contaminants that compromise San Fernando Valley groundwater.

## Vulnerable Areas

After the last major drought (1987-1992), agencies in this region invested $12 billion in storage and other water facilities to prepare for future dry times, along with implementing aggressive conservation programs to increase water use efficiency. MWD increased its storage capacity from 200,000 AF in early 1990s to 4+

MAF today and since that time imported water demand is down about 20%.

While most of the region can withstand drought conditions in 2014 due to these investments, Metropolitan may need to withdraw upward of a million acre-feet this year to meet demands, the most it has taken from reserves in any one year. Should drought conditions persist into 2015, storage reserves available this year will not be an option and an increasing number of areas will be vulnerable to water shortages or water quality issues.

In addition, while snowpack in the Colorado River watershed is above average this year, the river system is recovering from 12 years of drought. Storage in the system's two huge reservoirs — Lake Mead and Lake Powell — is just above 40%.

This region also is at risk for catastrophic wildfires, particularly with unusually strong Santa Ana winds already affecting the area.

# INLAND EMPIRE (ACWA REGION 9)



The counties of Imperial, Riverside, and San Bernardino span 32,000 square miles of vast desert lands. The 4.2 million residents of the region are served by 49 ACWA members representing water, utility, irrigation and reclamation districts.

## Major Water Sources

Water demands in this region are met through a combination of imported surface water, supplies from the Colorado River and the SWP, local groundwater basins, and recycled water supplies.

Colorado River supplies meet either all or most of the agricultural and urban water demands in the Imperial, Palo Verde, Coachella, and Bard valleys. The All-American Canal is used to import water supplies from the river to Imperial Irrigation District for its agricultural customers and for the urban customers of the public and investor-owned water agencies in the valley. The Coachella Canal conveys river water into the Coachella Valley for agricultural and some urban uses.

The SWP and recycled and local surface water supplies such as the Santa Ana River also provide water to the region. A portion of SWP supplies is obtained through

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 28 of 1229

an exchange agreement among Coachella Valley Water District, Desert Water Agency and Metropolitan Water District of Southern California because no facilities exist at this time to deliver SWP supplies to Coachella Valley contractors.

Groundwater also is important to Region 9 as many of the alluvial valleys in the area are underlain by aquifers that are the sole source of water for local communities and farming operations. Groundwater is used to meet much of the urban demand along the Colorado River, but not all groundwater sources are suitable for potable uses without treatment due to water quality issues such as salinity and hexavalent chromium. Many aquifers in the eastern part of this region also are experiencing overdraft and depend on imported water from the SWP to ensure sufficient water supplies.

## Vulnerable Areas

Because SWP supplies have not been as readily available, it has increased the region's reliance on groundwater. There are several basins in overdraft or challenged by water quality issues including from naturally occurring hexavalent chromium. While the Colorado River basin is experiencing normal weather conditions in 2014, it is recovering from a 12-year drought and further dry conditions could also negatively affect this region.

Region 9 also was well prepared for the current drought year, though agencies have noted that a continuing drought will become an eventual crisis.

# SOUTH COASTAL PLAIN (ACWA REGION 10)

Thirty-nine ACWA member agencies in California's southernmost coastal counties of Orange and San Diego make up Region 10, which is home to a population of just over 6.2 million and encompasses 5,000 square miles of urban area.

## Major Water Sources

Local water agencies utilize a diverse mixture of local and imported sources, groundwater and water management strategies (including water transfers and conservation) to meet urban and agricultural demands each year in Region 10. For example, the San Diego region is projected to produce approximately 182,000 acre-

feet per year of local supplies through water recycling, desalination, groundwater, and surface storage programs by 2030 including the launch in 2015 of the Carlsbad seawater desalination facility. The area currently receives approximately 180,000 acre-feet from the San Diego County Water Authority-Imperial Irrigation District (SDCWA-IID) water conservation and transfer agreement and canal-lining programs, which by 2021 will increase to 280,000 acre-feet of supply. Imported water sources for both San Diego and Orange counties include the SWP and the Colorado River. Local water supply sources for Orange County include the Santa Ana River.

Groundwater also provides a portion of this region's water supply. Orange County Water District manages the vast groundwater basin under northern and central Orange County that supplies water to more than 20 cities and water agencies and has developed its state-of-the-art Groundwater Replenishment System, a water purification system for potable reuse that supplies 72,000 acre-feet per year to the groundwater basin. The current expansion of the Groundwater Replenishment System will increase production capacity up to 102,000 acre-feet per year.

## Vulnerable Areas

Because this region depends so heavily on imported water and even in a typical year experiences low rainfall, local water systems are susceptible to the impacts of a drought. To ensure reliable supplies, local water agencies have invested in a diverse portfolio of water sources, storage and conservation programs to reduce these impacts. However, communities in this region relying on a single source are more at risk, including agricultural and small water system users.

As with Region 8, should drought conditions persist into 2015, storage reserves available this year will be severely reduced, and an increasing number of areas will be vulnerable to water shortages or water quality issues. Increased groundwater use also could cause additional salt water intrusion in coastal areas and pollution from industrial sources and underground gasoline tanks to migrate throughout the basin.

This region also is at risk for catastrophic wildfires, particularly with unusually strong Santa Ana winds that are already affecting the area. The recent fires in San Diego illustrate the increased danger of wildfires to Region 10.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 29 of 1229

# ACWA Region Map



Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 30 of 1229

# Summary



Left: Don Pedro Reservoir in Tuolumne County retreated to unusually low levels in early 2014, revealing the long-hidden remnants of a gold and copper mine. Right: Bare ground at relatively high elevations signaled the severity of the drought during the Department of Water Resources' January 2014 snow survey.

No two droughts are exactly the same in California, and this one is unique. It is indeed a statewide drought, but as highlighted throughout the report, immediate impacts vary. Several agencies and areas have learned from previous droughts and made significant investments in local groundwater storage, regional surface water storage, water transfers, conservation and water recycling, which are allowing some agencies to effectively manage drought conditions in 2014. Lack of surface water is forcing many agricultural users to rely heavily on groundwater to survive this year, a short-term solution that adds to mounting concerns about potentially unsustainable groundwater level declines and local subsidence in some areas of the state.

This report highlights the major water sources that currently supply California's water agencies, describes many of the areas that we expect would be most vulnerable should the drought continue and provides a roadmap for actions that can be taken now and in the near future to combat this and future droughts.

To be most effective, actions outlined in this and other ACWA efforts should be implemented as part of a package to help ensure overall water supply reliability and ecosystem health in California. From the immediate need to secure water availability for isolated communities in the North Coast to the larger and longer-term issues of sustainable groundwater management in the San Joaquin Valley to a Delta conveyance solution, successful planning and execution will require the strong commitment and efforts of local water agencies, state policymakers and the federal government.

As summer gets under way and agencies begin to prepare for 2015, the water community is extremely concerned about the effects of continuing drought conditions. As outlined above, a dry 2015 would wreak havoc on California's citizens, the environment and the state's economy, including its world-renowned agricultural industry. Even if the state receives above-average rainfall next winter, the past three years have exposed the fragility of California's water management system. This crisis should be a wake-up call for state government and water managers throughout California regarding the need for comprehensive action and significant investments in a more resilient water supply. Working together, we can improve the state's water future for generations to come.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 31 of 1229

# Appendix A

ACWA member agencies have identified the following examples of projects, programs or regulatory approvals that could provide relief to systems that are currently at risk or located in a vulnerable area. This is not an exhaustive list and focuses on short-term, specific actions in some of the regions most affected by this year's dry conditions.

As outlined in the report, the entire state is in drought and a comprehensive set of actions is needed to truly create a resilient water management system.

## NORTH COAST (REGION 1)

### Hidden Valley Lake CSD
- Secure State Water Resources Control Board (SWRCB) approval to reduce if not cease supplemental stream flow releases to Putah Creek

- Approve SWRCB Petition for Change for construction of additional groundwater well(s) capable of diverting Putah Creek underflow under existing appropriative water rights

- Secure SWRCB approval to temporarily expand beneficial uses of Hidden Valley Lake and California Department of Public Health (CDPH) approval to treat and use Hidden Valley Lake supply

### Marin Municipal Water District
- Ensure flexibility to modify instream flow requirements when storage levels remain low

### North Marin Water District (Novato Service Area)
- Ensure clarity on use of raw water and/or recycled water for stock watering from the California Department of Food & Agriculture and at CDPH

- Review and revise rules on place/purpose of use by the SWRCB for non-customers, principally ranchers for stock watering or rural "off water grid" residents with failing wells

### Sonoma County Water Agency
- Secure SWRCB approval to lower minimum instream flow conditions in the Russian River to preserve water storage in Lake Mendocino

## SACRAMENTO VALLEY (REGION 2)

### Sacramento River Settlement Contractors
- Ensure coordination with Reclamation and the Department of Water Resources on operations of the projects and Sacramento Valley diversions to maximize the efficiency of the system

- Implement salmon restoration efforts on the Sacramento River to benefit winter run and spring run.

- Reoperate Shasta Reservoir to time releases with flood flows and hatcheries to benefit out-migrating salmon smolts

- Longer term, complete Sites Reservoir, which will provide additional water supply, environmental benefits, and system flexibility

### Tehama Colusa Canal Authority
- Ensure flexibility and streamlining of water transfers

- Provide greater flexibility on giant garter snake habitat requirements under ESA and CEQA

## SIERRA FOOTHILLS AND MOUNTAINS (REGION 3)

### Calaveras County Water District
- Build inner basin conduit from Stanislaus to Calaveras River tributaries, which would provide alternatives to water shortages and many secondary enhancements including the replacement of 15 miles of pipe that currently provide treated water for 38 connections but cannot address shortfall

- Restore Wilson Dam in the Calaveras County Water District (CCWD) service area which has failed, severely affecting the availability of water for residents in the West Point Water System. This project could produce 150 AF of storage and other ecosystem benefits

- Extend raw water line into area to relieve domestic wells and preserve potable water supplies in the N. Burson/West County Groundwater service area. Extend potable water to provide for additional fill stations to reduce hauling distance for makeshift water transport vehicles being used by homeowners

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 32 of 1229

- Develop surface water supply for 2,200 homes in the Ebbitts Pass Expansion area, which are currently dependent on marginal fractured rock groundwater supplies; its well will likely fail by June

## City of Lincoln

- Secure more reliable water supplies through the following infrastructure projects: repair Nelson Well (2,000 GPM), reactivate Well #2 (800 GPM), make improvements to Well #4 (500 GPM) and dig two new wells (1,600 GPM total)

- Increase amount of water available for use by local residents through reclaimed water delivery to Western Placer Waste Management Authority Material Recovery Facility (MRF) and reclaimed water use for construction water

## City of Placerville

- Provide funding for ongoing capital improvement program to replace its aging water infrastructure as the city does not have an adequate revenue source to fund the necessary improvements. Master planning efforts have identified the need to replace at least 2,500 linear feet of waterline each year for the next 10 to 15 years at a cost of $500,000 per year

- Complete a pipeline replacement project with El Dorado Irrigation District that initially will be funded in part through Prop 84 funds awarded by DWR through CABY IRWM. This important project will increase local water supply reliability and use efficiency within the American River watershed upstream of Folsom Reservoir

## City of Roseville

- Build booster pump station to move water (up to 7.0 MGD) from Sacramento Suburban Water District (SSWD) into the City of Roseville

- Install pumps and piping into two existing groundwater well casings to access additional groundwater

- Install Zone 4 to Zone 1 booster pump station to move local groundwater supplies within the city's service area

- Install recycled water infrastructure to deliver up to 1.0 MGD of recycled water to the Sierra View Golf Course

- Construct a new groundwater well (3.0 MGD) to access local groundwater

## El Dorado County Water Agency

- Install water filling stations for remote customers

- Support water conservation program planning, $100,000

- Replace Grizzly Flats Community Services District Raw Waterline

## El Dorado Irrigation District

- Construct a temporary 5 mgd pump station to allow pumping out of Folsom at elevations below 350 feet

- Pipe the Main Ditch to conserve up to 1,100 AF / year

- Construct a reliable intake at Strawberry on the South Fork American River

- Construct a reliable intake in Outingdale on the North Fork Cosumnes River

- Provide reliable pumping to the Pollock Pines area at the Moosehall Pump Station to support the transference of water through the Hazel Creek Tunnel to Jenkinson Lake

- Install Swansboro auto flusher to allow automatic flushing to reduce water loss by about 50,000 gallons per week

- Secure flexible terms from Federal Energy Regulatory Commission (FERC) and the State Board regarding FERC-licensed Project 184

- Secure regulatory relief for Deer Creek Wastewater Treatment Plant

## Georgetown Divide Public Utility District

- Rehabilitate (line or pipe) approximately 12,000 feet of open ditch, saving up to 2,000 acre-feet of water each year

## Lukins Brothers Water Company

- Install new water meters at 900 service locations in the water company service area

## Placer County Water Agency

- Construct Ophir Road pipeline extension for Ophir Gardens community

- Plan on additional pump(s) in American River to increase access to this supply. Contract under negotiation, plan to authorize work in spring 2014 and have running ahead of summer 2015

## South Tahoe Public Utility District
- Install 8,030 meters for connections that are currently not metered but are scheduled for meter installation within the next five years

- Install MTBE treatment for Glenwood and Paloma wells

- Implement Waterline Replacement Program to conserve water and provide sufficient fire flows

- Irrigation piping upgrades

- Increase funding for turf removal program and hire a water efficiency technician for next 4 summer irrigation months.

- Continue leadership on Tahoe Sierra Integrated Regional Water Management Planning (TSIRWMP) partnership/regional water conservation program

## Tahoe City Public Utilities District
- Build the West Lake Tahoe Regional Water Treatment Plant, a permanent, all season surface water treatment plant on the West Shore of Lake Tahoe utilizing Lake Tahoe as the water source (replaces an interim seasonal water treatment plant that TCPUD constructed in 2004 that has reached its useful life and needs to be replaced)

- Consolidate with Tahoe Cedars Water Company and install water meters on TCWC connections

- Implement the Tahoe City Main Emergency Water Supply Project, which would construct an emergency raw water line from the Grove Street lake intake, up to a level publicly-owned parcel, for the opportunity to install a connection to an emergency water treatment plant

## LOWER SACRAMENTO VALLEY AND DELTA (REGION 4)

### Carmichael Water District (CWD)/Fair Oaks Water District (FOWD)
- Build booster pump station at Sweitzer School (2.0 MGD) to deliver water to FOWD

- Build Dewey booster pump station (2.0 MGD) to deliver water to FOWD

- Build booster pump station near San Juan Ave and Lincoln Ave (2.0 MGD) to deliver water to FOWD

## City of Folsom
- Secure funding for developing groundwater wells in city's east area

- Include regional infrastructure projects in drought relief bills or legislative water bills

- Pass legislative language to facilitate "in watershed" surface water transfers when infrastructure is in place to move water

## City of Sacramento
- Secure funding and regulatory support for interties with the Sacramento Suburban Water District and Sacramento County Water Agency that could potentially supply up to 29 MGD of additional supply through emergency agreements

- Include regional infrastructure projects in drought relief bills or legislative water bills

- Secure support for drought relief projects that include water conservation programs and shovel-ready infrastructure projects to improve water supply quality and reliability, including:

  ○ Five ground water projects to build new capacity and restore stand by wells to service

  ○ Two treatment plant projects to ensure functionality at lower river levels

  ○ Expansion of River Friendly Landscape (cash for grass) program in line with 20% water consumption mandates

## City of West Sacramento
- Develop Southport Well 19 conditioning project to pump and treat groundwater

- Implement Bryte Bend Water Treatment Plant well project to pump and treat groundwater

- Implement City of West Sacramento Parks Grey Water Retrofit Project, which will serve 19 parks with grey water

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 34 of 1229

## Golden State Water Company
- Construct intertie with Carmichael Water District (CWD)
  - CWD would capture, treat and deliver water introduced to the American River from Aerojet's groundwater extraction and treatment (GET) remediated water discharges
  - Build pipeline from CWD's service area into Golden State Water Company's water service area

## Oakdale Irrigation District
- Install Rubicon Total Channel Control Technology throughout its water delivery system; expected savings of up to 15,000 acre feet

## Sacramento County Water Agency
- Upgrade striker well (1.5 MGD) to move water to City of Sacramento
- Convert and upgrade North Freeway well (1.5 MGD) to move water to City of Sacramento
- Retrofit Big Horn Blend Line well site (2.2 MGD) to move water to City of Sacramento
- Enhance and improve filtration of Poppy Ridge Wells (6.5 MGD) to move water to City of Sacramento

## Sacramento Suburban Water District
- Increase well capacity within the district to possibly serve neighboring water purveyors, including the City of Sacramento
- Upgrade existing well sites with manganese treatment that are currently offline

## San Juan Water District
- Construct facilities to access treated groundwater from Sacramento Suburban Water District (up to 14.4 MGD)
- Construct interties with Placer County Water Agency (up to 3.0 MGD)
- Establish groundwater pumping option from wholesale agencies with access to groundwater supplies (FOWD and Citrus Heights Water District)

## Turlock Irrigation District
- Provide funding for the following shovel-ready water efficiency projects*

  - Lateral 4.5 to 5.5 intertie
  - Pump automation
  - Intermediate canal measurement points
  - Lateral 7 to 8 booster pump
  - Automation of lateral heads
  - Ceres Main Canal regulating reservoir
  - Lateral 6 pump back reservoir
  - Lateral 8 total channel control
  - Shelansky regulating reservoir

* These projects are expected to produce over 36,000 AF / year in water savings

# BAY AREA/CENTRAL COAST (REGION 5)

## Alameda County Water District
- Repair Lago Los Osos rediversion pipeline
- Repair Vallecitos Channel banks
- Replace membranes at SWTP #1 to PES – a material that can treat Del Valle water chemistry
- Complete alternative booster station (B16) which could supplement reduced production at TP1
- Install ozone at TP1 to handle degraded water quality
- Construct new groundwater well and piping to feed existing non-potable distribution system

## City of Watsonville
- Provide funding and regulatory support to address groundwater supply that is impacted by the hexavalent chromium MCL including an exemption or variance to operate affected wells until funding for treatment is available

## Contra Costa Water District
- Implement shovel-ready recycled water projects to increase utilization during the drought
- Provide operational flexibility through temporary modifications to CCWD's Biological Opinion restrictions when necessary, which can preserve water in storage to meet future public health and safety needs

- Confirm state and federal commitment to operational coordination that optimizes opportunities for refill of Los Vaqueros reservoir in upcoming years

- Facilitate delivery of CCWD's CVP water from the Freeport Intake through EBMUD's system as it would partially alleviate the adverse water quality impacts

- Preserve Delta water quality through placement of temporary rock barriers in Delta channels as necessary so as to reduce seawater intrusion

## Dublin San Ramon Services District

- Extend recycled water distribution to landscape irrigation users, including parks, schools, streetscapes and commercial areas in established portions of the City of Dublin and to Alameda County facilities, to permanently reduce potable water demand by approximately 300 AF / year

- Longer term, extend recycled water distribution system into the Parks Reserve Forces Training Area, and expand capacity of recycled water treatment facilities by 6.8 MGD to reduce ultimate potable water demand by approximately 6,460 AF / year

## East Bay Municipal Utility District

- Accelerate processing and approvals of transfers on State Board petitions and US Bureau of Reclamation Warren Act contracts

- Provide funding for conservation and recycling programs

- Expedite processing of transfers and exchanges by the State Board and Reclamation to facilitate regional collaboration and exchanges through interties (Execution of a water transfer with Placer County Water Agency (PCWA) to purchase up to 20,000 AF of water starting in April, diverted at Freeport)

- Provide funding for treatment improvements to utilize additional capacity in Freeport project facilities.

## Monterey Peninsula Water Management District

- Provide federal or state funding to finance laundry retrofits and to extend rebate programs

- Include regional infrastructure projects in drought

relief bills or legislative water bills; Coastal communities need specific carve-out for recycled water and desalination projects in state water bond (not as part of IRWM funding)

## Pajaro Valley Water Management Agency

- Optimize production of supply from the Recycled Water Facility located in Watsonville

- Construct additional storage (two 1M gallon tanks) for finished recycled water. Partially funded through Prop 84 grant funds but additional support is needed

- Provide funding for conservation / irrigation efficiency workshops

## San Benito County Water District

- Develop reclaimed water and seasonal storage ponds as source of agricultural water

- Provide federal or state funding for reclaimed water project and development of local groundwater bank

## San Francisco Public Utilities Commission

- Develop the Lower Cherry Aqueduct supply by Fall 2014 to access 200,000 AF of water currently stored in Cherry Lake, which SFPUC does not normally use directly for supply (some conveyance infrastructure was damaged during the Rim Fire in 2013)

## Santa Barbara County

- Streamline approval for Cachuma Operations and Maintenance Board (COMB) pumping project

- Provide funding for recycled water projects, the COMB pumping project, Santa Barbara's desal facility, rehabilitation of groundwater wells, and other infrastructure projects

## Scotts Valley Water District

- Fast track short term solution for providing Pasatiempo Golf Course with recycled water in 2014

## Soquel Creek Water District

- Streamline water rights for neighboring water exchanges

- Facilitate commitment/support from community and permitting/regulatory agencies

- Finalize direct potable reuse regulations

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 36 of 1229

## Zone 7 Water Agency

- Construct Chain of Lakes Well #5 and the Cope Lake to Lake I pipeline intertie. The additional groundwater recharge capacity is up to 15 MGD through the intertie and extraction from the well is estimated at 2 MGD, allowing improved management and placement of wells in the Livermore-Amador Valley Groundwater Basin

- Provide funding for water conservation and landscape irrigation efficiency improvements and education

- Construct an intertie between Zone 7 and East Bay Municipal Utility District to provide increased water supply reliability and also allow wheeling of up to 25 MGD should a regional desalination project move forward

- Preserve Delta water quality through placement of temporary rock barriers or interim demonstration project barge barriers in Delta channels to reduce seawater intrusion

- Construct a two-way pipeline and pump station between the Del Valle Water Treatment Plant and the Chain of Lakes to allow for groundwater recharge and local storage when State Water Project water supplies are abundant and allow for treatment of lake water at the existing plant during drought

## NORTHERN SAN JOAQUIN VALLEY (REGION 6)

### City of Fresno

- Revise land use ordinances with respect to sustainability; both agriculture and urban

- Review and improve rules and regulations that negatively impact an appropriate return on investments

- Provide funding for education to better address existing attitudes regarding preferential uses, whether it's agriculture, urban, or environment that negatively impact our ability to implement practical solutions immediately and provide the best solutions to meet today's needs

## SOUTHERN SAN JOAQUIN VALLEY (REGION 7)

### County of Tulare

- Ensure old wells are abandoned correctly upon permitting a new well. The number of new well installations increases in dry years due to changing groundwater levels

- Require a 50 annular seal on all new agricultural wells, rather than 20 feet previously required for an ag well

- Prioritize disadvantaged communities and other small community water systems that may be at risk this summer and develop an emergency water service plan that can be implemented if needed

- Extend the pipes on four wells that draw water from the underground aquifers under the city by another 100 feet, in case water levels dip so low in the spring and summer — when water use goes up — that the pumps run dry

### Tulare County/Friant Region

- Develop ways to isolate the Friant-Kern Canal and regulate reservoirs where possible to minimize losses

- Address operational challenges for the Friant-Kern Canal, which include trying to move water orders aggregating to 10 cfs in a system designed to move 5,000 cfs. Meters aren't designed to measure such low flows. High water temperatures will occur, making algae blooms a real problem for turnout deliveries and on-farm delivery systems

## GREATER LOS ANGELES (REGION 8)

### Metropolitan Water District of Southern California

- Evaluate conveyance and distribution system to most efficiently manage available supplies

- Pursue facility improvements, operational modifications and pump-back capabilities to augment deliveries of Colorado River Aqueduct and stored water supplies within MWD service area

- Coordinate with member agencies to investigate changes in normal operations and delivery points to help accommodate additional use of Colorado River Aqueduct and stored water supplies

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 37 of 1229

- Pursue exchange agreements with other parties to provide flexibility and resources to respond to hydrologic uncertainty and address supply and system issues

## Sunnyside Farms Mutual Water Company

- Acquire permits from Los Angeles County Health Department for the operation of two new wells that have been constructed but are not yet permitted for operation

# INLAND EMPIRE (REGION 9)

## Coachella Valley Water District

- Expand distribution of recycled water to golf courses

- Continue providing incentives and rebates to help domestic customers reduce water use

- Pursue extension of Coachella Canal delivery system to provide Colorado River water to farmers currently using groundwater

- Increase funding for conservation program, including turf rebates

## Desert Water Agency

- Construct shallow groundwater recovery wells to recover percolated secondary-treated wastewater

- Expand recycled water supply to offset existing irrigation and reduce need for additional groundwater pumping

- Implement efficiency projects that mitigate the need for flushing dead ends in the water distribution system that result from high temperatures

- Continue turf reduction programs and other conservation efforts to reduce demand

# SOUTH COASTAL PLAIN (REGION 10)

## Orange County Water District

- Complete first expansion of Groundwater Replenishment System expansion, providing an additional 30,000 AF / year of water for groundwater recharge

- Begin second expansion of GWRS to add another 30,000 AF; secure California Department of Public Health approval to allow recycling of brine waste from inland areas

- Secure legislation to streamline grant funding processes for pipeline extensions in a short timeframe

- Secure legislation to streamline CEQA requirements for minor extensions of recycled water pipelines (e.g., 8 miles or less)

## San Diego County Water Authority

- Complete construction of Carlsbad Desalination project to provide an additional 56,000 AF / year

- Extend existing non-potable member agency recycled water distribution systems to serve additional customers

- Develop and implement short- and long-term potable reuse projects

- Secure temporary drought variance criteria from SWRCB for total dissolved solids (TDS) and other constituents applied to existing recycled water permits, in response to use of higher TDS imported water supplies due to drought

- Pass legislation that would allow recycled water agencies to approve use sites under a master permit

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 38 of 1229

# ACWA's Drought Action Group

**Chair:** Dave Brent, City of Sacramento Utilities Department (Region 4)
**Vice Chair:** Taj Dufour, Soquel Creek Water District (Region 5)

## REGION 1

- Grant Davis, Sonoma County Water Agency
- Chris DeGabriele, North Marin Water District
- David Guhin, City of Santa Rosa Utilities Department
- Krishna Kumar, Marin Municipal Water District

## REGION 2

- Lewis Bair, Reclamation District #108
- Sean Earley, Richvale Irrigation District
- Bryce Lundberg, Western Canal Water District
- Jeff Sutton, Tehama-Colusa Canal Authority

## REGION 3

- Mitch Dion, Calaveras County Water District
- Tony Firenzi, Placer County Water Agency
- Remleh Scherzinger, Nevada Irrigation District

## REGION 4

- Terry Erlewine, State Water Contractors
- John Mills, Turlock Irrigation District
- John Woodling, Regional Water Authority
- Marcus Yasutake, City of Folsom

## REGION 5

- Jerry Brown, Contra Costa Water District
- Andy Moran, San Francisco Public Utilities Commission (David Briggs, alternate)
- David Stoldt, Monterey Peninsula Water Management District

## REGION 6

- Chris Kapheim, Alta Irrigation District
- Ara Azhderian, San Luis Delta Mendota Water Authority
- Dan Nelson, San Luis Delta Mendota Water Authority
- Martin Querin, City of Fresno

## REGION 7

- Curtis Creel, Kern County Water Agency
- Paul Hendrix, Tulare Irrigation District
- Dan Vink, Lower Tule River Irrigation District

## REGION 8

- Shane Chapman, Upper San Gabriel Valley MWD
- Penny Falcon, Los Angeles Department of Water and Power
- Debra Man, Metropolitan Water District
- Dave Pedersen, Las Virgenes Municipal Water District

## REGION 9

- Robert Cheng, Coachella Valley Water District
- Luis Cetina, Cucamonga Valley Water District
- Paul Jones, Eastern Municipal Water District

## REGION 10

- Paul Cook, Irvine Ranch Water District
- Carlos Lugo, Helix Water District
- Ken Weinberg, San Diego County Water Authority (Dana Friehauf, alternate)

# Contributors

California Farm Water Coalition
Westlands Water District

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 39 of 1229

# 2014-2015 ACWA Board of Directors

| | |
|---|---|
| John A. Coleman, ACWA President, 5 | East Bay MUD, Director |
| Kathleen J. Tiegs, ACWA Vice President, 9 | Cucamonga Valley WD, Director |
| Randy Record, Immediate Past President, 9 | Eastern MWD, Board Vice-President, Director, MWD First Vice Chair |
| Aldaron Laird, Region 1 Chair | Humboldt Bay MWD, Director |
| Judy Mirbegian, Region 1 Vice Chair | Hidden Valley Lake CSD, Director |
| Eric Larrabee, Region 2 Chair | Western Canal WD, Board President, Director |
| Walter Cotter, Region 2 Vice Chair | Browns Valley ID, General Manager |
| Robert Dean, Region 3 Chair | Calaveras County WD, Director |
| Bill George, Region 3 Vice Chair | El Dorado ID, Director |
| Mike Hardesty, Region 4 Chair | Reclamation District #2068, General Manager |
| Robert Roscoe, Region 4 Vice Chair | Sacramento Suburban WD, General Manager |
| Dick Quigley, Region 5 Chair | Zone 7 WA, Director |
| David Hodgin, Region 5 Vice Chair | Scotts Valley WD, Director |
| Dave Orth, Region 6 Chair | Kings River CD, General Manager |
| Matthew Hurley, Region 6 Vice Chair | Angiola WD, General Manager |
| William Taube, Region 7 Chair | Wheeler-Ridge-Maricopa WSD, Outside Consultant |
| David Bixler, Region 7 Vice Chair | Kaweah River Power Authority, Director |
| Stephen Cole, Region 8 Chair | Newhall County WD, General Manager |
| Michael Touhey, Region 8 Vice Chair | Upper San Gabriel Valley MWD, Director |
| Harvey R. Ryan, Region 9 Chair | Elsinore Valley MWD, Director |
| Craig Ewing, Region 9 Vice Chair | Desert WA, Director |
| Peer Swan, Region 10 Chair | Irvine Ranch WD, Director |
| De Ana Verbeke, Region 10 Vice Chair | Helix WD, Vice President, Director |
| Linda Ackerman, Federal Affairs Cmte. Chair, 10 | Municipal WD of Orange County, MWD Representative, Director |
| Gary Arant, Energy Cmte. Chair, 10 | Valley Center MWD, General Manager |
| Angelique Ashby, Membership Cmte. Chair, 4 | City of Sacramento, City Council, Vice Mayor / Councilmember |
| Paul Bartkiewicz, State Legislative Cmte. Chair, 2 | Yuba County WA, Outside Counsel |
| Thad Bettner, Water Management Cmte. Chair, 2 | Glenn-Colusa ID, General Manager |
| Jill Duerig, Water Quality Cmte. Chair, 5 | Zone 7 WA, General Manager |
| Daniel Hentschke, Legal Affairs Cmte. Chair, 10 | San Diego County Water Authority, General Counsel |
| Shauna Lorance, Personnel & Benefits Cmte. Chair, 4 | San Juan WD, General Manager |
| Jo MacKenzie, Local Government Cmte. Chair, 10 | Vista ID, Director |
| Joe Parker, Finance Cmte. Chair, 3 | Placer County WA, Director of Financial Services |
| Sue Stephenson, Communications Cmte. Chair, 5 | Dublin San Ramon SD, Community Affairs Supervisor |
| Greg Zlotnick, Groundwater Cmte. Chair, 6 | San Luis & Delta-Mendota WA, Delta and Special Projects Administrator |
| Thomas A. Cuquet, ACWA/JPIA Vice President, 2 | South Sutter WD, Director |

## COUNCIL OF PAST PRESIDENTS

| | | |
|---|---|---|
| James H. Blake | E.G. "Jerry" Gladbach | John E. Kidd |
| Bette Boatmun | Gene C. Harris | Glen D. Peterson |
| Randy Fiorini | Paul Kelley | Randy Record |





www.acwa.com

# Exhibit 86

**Wildfire Hearing – Senator Hill**
**November 18, 2015 – 10:00 am**
*Opening Statement for Pat Hogan*

o   Thank you Senator Hill (if present: and committee members) and good morning.

o   At PG&E, our top priority is the safety of our customers, the communities we serve, and our employees.  Wildfire poses one of the highest risks to California and PG&E views wildfire as a major public safety risk.

o   The past two years have proven to be as challenging as many had forecasted, with record drought conditions in California, exponentially raising the risk of wildfires.

o   Over this time period, California has experienced some of the largest and most destructive wildfires and seen them spread at rates never seen before.

o   The Butte fire is one of those fires and, as you know, we released a statement on September 16, where we stated that a live tree may have contacted a PG&E line in the vicinity of the ignition point.  We are fully cooperating with Cal-Fire on their investigation.

o   PG&E's comprehensive risk ranking program quantifies wildfires as the highest risk in our Electric Risk Register.

o   We have controls in place for this risk, and we continue to strengthen those controls, especially given the current conditions.

o   Each year, we review and refresh our operating risks as part of our Integrated Planning Process.  This review process provides an opportunity to evaluate current conditions and measure the progress of our Risk Response Plan.

o   PG&E has in place a number of plans and programs to prevent and mitigate the risk of fire ignitions from electric facilities.

**Vegetation Program**
o   Our Vegetation Management program is a key program to mitigate the risk of wildfire.

o   Each year, we patrol every mile of our system.  That's 114,000 miles of distribution line and more than 18,000 miles of transmission lines that have nearly 50 million trees that have the potential to come into contact with power lines.

o   By the end of this year, we will have trimmed or removed almost 1.2 million trees.

1

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 43 of 1229

o Last year, following the Governor declaring a state of emergency and the California Public Utilities Commission directing utilities to take extended measures to address drought-related fire risk, we initiated a six-part response plan of additional mitigations—actions that go above and beyond our existing comprehensive program—to reduce this risk.

o These mitigations include:
- Additional patrols in high risk fire areas: we have conducted additional and redundant patrols of nearly 44,000 miles of our power lines in high fire danger areas.

- Pole clearing work in designated Wildland Urban interface areas.

- Utilizing advanced technology such as LiDAR and spectral imaging in our inspections to detect dead, diseased, and dying trees that could impact our lines, even before they display signs of deterioration;
  - LiDAR shows how tall a tree is and its proximity to a power line. Spectral imagery provides critical information about a tree's health.

- Funding $7.5 million to local Fire Safe Councils over the past two years for fire fuel reduction, improving emergency access roads for rural communities and assisting low-income residents clear defensible space around their properties.

- Funding remote cameras in lookout towers for early fire detection. One of these cameras even helped rescue a woman who had given birth in Butte County.

- Funding daily aerial fire patrols from mid-June through the end of October. These flights spotted 146 fires, and in 25 instances, were the first to report the fire to CAL FIRE or the U.S. Forest Service.

- PG&E is supporting multiple CAL FIRE campaigns asking for the public's help to reduce the risk of additional wildfires by safely removing or pruning dead or dying trees on their property, including the One Less Spark, One Less Wildfire and Prepare for Bark Beetle awareness campaigns.

o In addition to our comprehensive response to the drought, we continued our Vegetation Public Safety and Reliability program, which concentrates on areas where we've had previous outages.

o Overall, we're on track for the lowest number of vegetation-caused outages and wires down in our history.

2

o   We also established an internal Electric Wildfire Risk Council to assure appropriate engagement, governance, and coordination of wildfire-related activities such as detection, response, and mitigation efforts.

**Asset Management Program**
o   Asset resiliency is another key aspect of our wildfire prevention plans.
- We conduct annual infrared inspection of all overhead conductors in wildfire areas to identify equipment before it fails.

- We continue to implement SCADA—Supervisory Control and Data Acquisition—in our wildfire areas.  These upgrades will allow for remote disabling of automatic reclosing during extreme fire risk conditions.  By the end of next year, we will have this capability across all 132 locations in wildfire areas.

- Our targeted conductor replacement program focuses on replacing sections of electrical circuits in wildfire areas equipped with small conductor with a higher number of line splices.

- We are also replacing equipment that has the potential to emit sparks during its normal operation with improved equipment that does not produce sparks.

**Operational**
o   In addition to these activities and programs, we have a wide range of tools we use to help our employees prevent wildfires.

o   This year, we increased fire safety awareness training of field and operational personnel who work on facilities or use equipment, tools, or vehicles that could result in wildfires.

o   We also disseminate predicted weather and fire threat information daily to employees in order to keep them informed of critical meteorological conditions.

o   We also have programs to educate customers and our first responder partners on electric safety.

**Areas of Opportunity**
o   Our future holds several other areas where we will continue to improve how we detect, respond, and mitigate wildfire risk.

o   We are currently in Phase One development period for our System Tool for Asset Risk, or STAR, which will help prioritize asset replacement by high priority locations, including wildfire areas.

3

o   Improvements with our Grid Operations Situational Intelligence tool are being implemented to provide our grid operators with a platform to improve real-time decision making in a critical operating environment during the response to wildfires.

o   In 2015 we began pre-treating our poles with an approved wildland fire retardant to prevent ignition of the power pole from direct flame impingement or radiant heat.

**Future Concerns**
o   This is where we are today.  I'd like to share with you the concerns we have for the next few years regarding this risk.

o   During the last two years, extreme drought conditions, along with elevated temperatures and unprecedented rates of insect infestation, have resulted in high mortality rates across all tree species.

o   We have several areas in our service territory where tree mortality exceeds 50 percent, creating a continued wildfire risk in the coming years, regardless of whether the drought ends this year.

o   As you are aware, the Governor recently declared a state of emergency over tree mortality in our forests related to bark beetles. PG&E will be taking an active role on the Governor's Task Force on Tree Mortality.

o   And while PG&E has taken a comprehensive approach to assisting the state in fighting the drought and helping to prevent wildfires, we are continuously striving to improve.

o   We have recently taken CPUC staff to see firsthand the level of devastation that the drought and bark beetle infestation have had on forests, particularly in the southern Sierras.  I would like to extend an invitation to you and your fellow committee members, to tour these areas to see for yourself these conditions and the challenges the drought presents.

o   The safety of our customers and the communities we serve are our top priorities.  PG&E is committed to implementing strategies and programs to mitigate the risk of wildfires in California.

o   Thank you.

4

# Exhibit 87

**Butte County District Attorney**

**Michael L. Ramsey**
District Attorney

Mark Murphy
Chief Deputy District Attorney

Juan Diaz
Chief Investigator

# THE CAMP FIRE PUBLIC REPORT

## A SUMMARY OF THE CAMP FIRE INVESTIGATION

### June 16, 2020

# PREFACE

During the early morning hours of Thursday, November 8, 2018, the Cal Fire Captain in charge of the Jarbo Gap station in the Feather River Canyon could hear the "Jarbo Winds" as they were known locally begin to howl as he got up to fix breakfast for his crew. As he fixed that breakfast he started to hear what he thought was rain begin to hit the roof and sides of the fire station. He started to look outside when the wind took the door from his hand. He discovered it wasn't rain he was hearing, but pine needles from the surrounding forest forcibly pelting the outside of the station. He went back inside to continue fixing breakfast, but was interrupted as the station's dispatch radio feed went off alerting him to a possible fire in the Canyon.

The Cal Fire crew immediately rolled out of the station up Highway 70 and the Canyon, past the small enclave of Pulga and up river to the Poe Dam. Arriving above PG&E's Poe Dam just before sunrise, the Captain and crew saw the beginnings of a conflagration under the PG&E high voltage power line on the ridge top across the river from them. The sight sent a chill through the Captain and crew because they could see the fire was already exploding toward the south and west riding the Jarbo Winds, which were so high the Captain struggled to remain upright. The Captain radioed into his headquarters with urgency in his voice – his crew would never be able to get in front of this fire to control it and in a prophetic understatement he told dispatchers: "This has the potential of a major incident."

In less than an hour, the fire had torn through Pulga and the mountain hamlet of Concow and reached the eastern outskirts of Paradise – throwing softball-sized embers ahead to the north into Magalia and over the town into the Butte Creek Canyon on the west side. Paradise and its residents were hit from three side by massive walls of fire. Chaos and confusion reigned. Thousands of homes and businesses were lost in the matter of a couple of hours. A town of some 26,000 people was utterly destroyed.

Eight-four souls were lost in the most horrific way imaginable – burned to death.

Within a few hours of the fire, Cal Fire arson investigators began to make their way to where the responding Captain had seen the start of the fire. Traveling up Camp Creek Road (from which the Camp Fire took its quirky name), the investigators came to what appeared to be the fire's beginning. The ground under what was PG&E's transmission tower #27/222 showed clear signs of the fire's beginning and a burnt path toward the southwest. Looking up, the investigators saw a detached line hanging down into the steel superstructure of the high-voltage transmission tower.

Something had broken - and sent the live 115 kilovolt (kV) power line (also known as a conductor) to arc against the steel tower and shower molten steel and aluminum metal onto the grass and brush below. A painstakingly detailed arson investigation began.

Within a few hours, the Cal Fire investigators had begun to reach their preliminary conclusions that the Camp Fire was started by the failure of a suspension hook holding up an insulator string which in turn held up the highly energized line. The investigators had found the broken iron

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 49 of 1229

hook, also known as a "C hook", and it appeared to have not just broken, but had worn through after a great deal of time hanging in the windy environs of the Feather River Canyon.

The investigators reached out to the Butte County District Attorney's Office on November 9, 2018 and discussed their initial findings with the office – including their concern that a PG&E helicopter had been seen hovering above the suspect tower.

The Butte County District Attorney's Office had had past dealings with PG&E and its criminal violations of failing to clear vegetation from its lines which sparked fires. The office also knew PG&E was a federal felon for its criminal actions leading to the San Bruno gas line explosion.

A directive was given the Cal Fire arson investigators that the DA's office was opening a joint investigation with them and to treat the fire origin site as a crime scene and to prevent anyone, including PG&E, from entering. (The Cal Fire investigators had already started the process of securing the scene with private security.)

And so began the Camp Fire Investigation. . .

The next week Cal Fire arson investigators directed PG&E linemen under their close scrutiny to begin the dismantling of tower 27/222 and seized relevant portions for evidence.  Later, Butte County District Attorney investigators teamed with Cal Fire arson investigators to examine other power lines in the vicinity of the suspect tower. Evidence from those surrounding towers was seized with the assistance of experienced linemen from PG&E under the close scrutiny of a loaned Federal Bureau of Investigation (FBI) Evidence Team.

Prosecutors were taken from normal day-to-day business in the office and assigned to oversee the investigation. Thus began the arduous task of gathering information from PG&E and others to determine the who, what, how and why of the Camp Fire.

Early into the investigation it became clear that as we began to collect terabytes of data from a facially cooperative PG&E that more broad based and intrusive subpoenas would be needed to dig out data from the extensive PG&E files including its vendor files. Additionally as PG&E witnesses, past and present, were being contacted for interviews, we found PG&E has hired attorneys to represent them and encourage silence.

We partnered with the California Attorney General who assigned experienced prosecutors to assist in the investigation and it was decided a special investigative criminal grand jury should be sworn to subpoena evidence and examine reluctant witnesses under oath. This grand jury was in addition to the regular "watchdog grand jury" that is sworn in every June in Butte County. This special grand jury of 19 ordinary Butte County citizens was selected from 100 summoned potential jurors and sworn in on March 25, 2019.

As an investigatory grand jury, it was the duty of the jurors to sift through all the evidence, hear the witnesses and keep an open mind as to whether there truly was any criminal liability on the part of anyone for causing the Camp Fire. This dedicated group of citizens then meet in secrecy for the next year and heard nearly 100 witnesses, reviewed approximately 1600 exhibits, and produced some 6000 pages of transcript. It cannot be overemphasized the patience and sacrifice

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 50 of 1229

of these citizens, meeting once to twice a week for almost a year. And since they were sworn to secrecy, they were not even able to tell their employers, friends and family what they were so diligently working on. Even more amazing was their dedication to their important work to seek justice. Such was their dedication that only three grand jurors were unable to finish their term.

The remaining 16, after their months of hard work and review of all matters, returned an Indictment finding sufficient evidence to charge the Pacific Gas and Electric Company with 85 felony counts – one count of unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line, and 84 individual counts of involuntary manslaughter naming each of the persons directly killed in the Camp Fire by PG&E's criminal negligence. The Indictment also included three special allegations for PG&E's causing great bodily injury to a firefighter; causing great bodily injury to more than one surviving victim; and causing multiple structures to burn (listed as approximately 18,804 structures). (See attached Indictment.)

PG&E, who had been represented by criminal defense attorneys during the investigation and Grand Jury proceedings, was informed of the Indictment and decided to plead guilty "as charged" to all counts – thereby agreeing the evidence of its criminal negligence has been established beyond a reasonable doubt.

The following Camp Fire Public Report is a summary of the massive undertaking to determine if there was sufficient evidence to convict PG&E of its criminal behavior which lead to the Camp Fire and the awful destruction that followed. The Report also forms the core of legal documents filed with the Butte County Superior Court today to establish the Factual Basis for the pleas by PG&E to the Indictment and the People's Statement in Aggravation for the sentencing of the defendant corporation.

4

# Table of Contents

PREFACE ........................................................................................................................... 2

INTRODUCTION .............................................................................................................. 7

I.    INITIAL TIME LINE ............................................................................................... 7

II.    ORIGIN AND CAUSE INVESTIGATIONS ......................................................... 9

III.    INJURIES AND LOST LIVES ............................................................................ 10

IV.    BACKGROUND OF THE FAILED COMPONENT ......................................... 18

    a.   History of the Caribou-Palermo 115kV Transmission Line ............................... 18

    b.   C Hook and Hanger Hole Wear ......................................................................... 19

V.    INSPECTION AND PATROL POLICIES ......................................................... 23

    a.   1987 Inspection and Patrol Bulletin .................................................................. 23

    b.   1995 Inspection and Patrol Policy ..................................................................... 24

    c.   2005 ETPM Inspection and Patrol Procedures .................................................. 24

    d.   Patrol and Inspections Subsequent to the 2005 ETPM ...................................... 25

    e.   The 2012 Quanta Report .................................................................................... 26

VI.    REDUCTION OF UNIT COSTS FOR INSPECTIONS AND PATROLS ...... 26

VII.    TROUBLEMEN AND TRAINING ................................................................... 28

    a.   Creation of the Troubleman Program ................................................................. 28

    b.   Troubleman Training .......................................................................................... 28

VIII.    FAILURES IN MAINTENANCE, REPAIR AND REPLACEMENT RECORD
KEEPING ON THE CARIBOU-PALERMO LINE ..................................................... 31

    a.   Hanger Brackets .................................................................................................. 31

    b.   Parallel Groove Connectors ................................................................................ 31

    c.   The "Deteriorated Transmission Equipment Replacement Program." .............. 33

    d.   The Caribou-Palermo 7/55-8/64 Replacement Towers project .......................... 34

    e.   The Rock Fire ..................................................................................................... 35

    f.   Tower Collapse ................................................................................................... 35

    g.   Center Phase Conductor on Tower 24/200 ......................................................... 36

    h.   Broken J Hook .................................................................................................... 36

IX.    INSPECTION AND PATROL OF THE CARIBOU-PALERMO LINE ......... 37

X.    COMPARISON OF CARIBOU-PALERMO WITH OTHER TRANSMISSION LINES 44

XI.    BUDGETARY CONSIDERATIONS ................................................................. 48

    A.   Expense Budget ................................................................................................... 49

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
52 of 1229

B.      Capital Budget and Comparative Risk Analysis (RIBA)..................................... 53

C.      Transmission Asset Management........................................................................ 56

XII.     SAFETY, RELIABILITY AND ENVIROMENT ...................................................... 60

XIII.    RISK MANAGEMENT ......................................................................................... 62

A.      Risk of Equipment Failure ................................................................................ 62

B.      Risk of Fire ....................................................................................................... 64

XIV.    San Bruno .............................................................................................................. 66

XV.     THE BUTTE FIRE ................................................................................................ 67

XVI.    DROUGHT AND WIND........................................................................................ 67

XVII.   PUBLIC SAFETY POWER SHUT-OFF .............................................................. 72

XVIII.  KNOWLEDGE OF RISK/CONSEQUENCE......................................................... 73

XIX.    PERSONAL LIABILITY FOR PG&E EXECUTIVES ........................................... 79

A. The Law: ............................................................................................................... 79

B. The Facts: .............................................................................................................. 79

C. Conclusion: ........................................................................................................... 80

XX.     ELEMENTS OF THE OFFENSES ...................................................................... 80

XXI.    DUTY .................................................................................................................... 81

XXII.   CONCLUSION ..................................................................................................... 82

XXIII.  SENTENCING ..................................................................................................... 87

A.      RESTITUTION ................................................................................................. 87

B.      Factors In Aggravation ..................................................................................... 88

C.      Factors in Mitigation ........................................................................................ 90

D.      Conclusion........................................................................................................ 92

# INTRODUCTION

On November 8, 2018, a fire started underneath a PG&E transmission tower near Camp Creek Road, not far from the town of Pulga in Butte County, California. The fire quickly raged out of control, travelled to the town of Concow within an hour, and to Paradise – seven miles from the point of ignition – in less than 1.5 hours. Seventeen days later, on November 25, 2018, what had become known as the Camp Fire was finally declared 100% contained. It had burned 153,336 acres and destroyed approximately 18, 800 structures.[1] Some 589 structures were damaged.[2] A total of 84 lives were lost as a direct result of the fire and at least two civilians and one firefighter suffered great bodily injury. {Attachment – Camp Fire Presentation}

## I.     INITIAL TIME LINE

On November 8, 2018 at 6:15 a.m., the PG&E Grid Control Center (GCC)[3] in Vacaville documented an "interruption" on the energized Caribou-Palermo 115kV transmission line in the Feather River Canyon.

At approximately 6:20 a.m. on November 8, 2018, a PG&E Hydro Division employee[4] driving eastbound on Highway 70 observed a "bright light" above a ridgeline as he approached the Pulga Bridge. Initially the employee believed the bright light to be the sun rising behind the ridgeline; however, as he continued driving, he realized the source of the bright light was a fire underneath the PG&E transmission lines on a ridge on the north side of the Feather River. The employee noted the fire appeared to be at the base of a transmission tower. In that area of the Feather River Canyon cell phone service is not available. The employee used his PG&E radio to contact PG&E employees at the Rock Creek Powerhouse and reported the fire. These employees then called 911 and were transferred to the Cal Fire Emergency Communications Center (ECC) in Oroville. The 911 call from the Rock Creek Switching Station was received by Cal Fire ECC at 6:25:19 a.m.

At approximately 6:30 a.m., an employee of the California Department of Transportation (Cal Trans) arrived at the Cal Trans Pulga Station for work. While in the parking lot of the Pulga Station he observed a fire under a PG&E transmission tower northeast of the Pulga Station and took a photograph of it. The photograph {Attachment 001} showed a fire emanating out from

---

[1] 13,696 single family residences, 276 multi-family residences, 528 commercial structures, and 4,293 other structures were destroyed according to Cal Fire.

[2] 462 single family residences, 25 multi-family residences, and 102 commercial structures were damaged according to Cal Fire.

[3] The GCC is the consolidated hub for all transmission operations for PG&E. GCC monitors the Supervisor Control and Data Acquisition (SCADA) for all transmission lines at all times. Any problem on any PG&E transmission line triggers an immediate alert in the GCC.

[4] Throughout this report the names of local current/ former PG&E employees are not used. The Butte County District Attorney's Office believes, based upon anger and frustration within the community, that disclosure of the identity of involved PG&E personnel living and/or working in the area may expose those personnel to harassment, threats or violence.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 54 of 1229

under transmission Tower :027/222[5] (Tower 27/222) of the Caribou-Palermo 115kV transmission line (Caribou-Palermo line).

At 6:29:55 a.m., the initial Cal Fire notification went out to Captain Matt McKenzie at the Concow/Jarbo Gap Station. By 6:35 a.m., two Cal Fire engines from the Concow/Jarbo Gap Station were on Highway 70 headed eastbound toward Pulga. Captain McKenzie and his firefighters first observed the fire just before reaching the Pulga Bridge. The two engines continued on Highway 70 to the Poe Dam to assess the fire and formulate a plan of attack. From above the Poe Dam on the south side of the Feather River, at 6:44 a.m., Captain McKenzie observed that the fire was burning under the electric transmission lines on the ridge on the north side of the Feather River. Based upon the location of the fire {Google Earth map of 27/222 area and Pulga.}as well as the high wind speed and direction, Captain McKenzie concluded there was no available route to attack the fire. Captain McKenzie immediately realized that the community of Pulga was in danger and dispatched his second engine to evacuate the residents of that community. From his position on Highway 70, Captain McKenzie took measure of the fire (and a photograph {Attachment 002})) and requested additional resources be deployed to the west to stop the fire at Concow Road. During his initial report to the ECC, based upon his observations of the fire, the topography, and the wind, Captain McKenzie warned, "this has the potential of a major incident." (An hour later, at 7:44 a.m., the fire reached the Town of Paradise, a distance of approximately seven miles.)

At approximately 6:38 a.m., PG&E employees at the Rock Creek Powerhouse informed the GCC of the fire burning near the Poe Dam in the vicinity of the transmission lines. At approximately 6:40 a.m., the GCC notified the Transmission Line Supervisor for the Table Mountain District[6] of the fire. The Transmission Line Supervisor dispatched a troubleman to immediately perform an emergency air patrol of the Caribou-Palermo line. The troubleman located and documented damage on Caribou-Palermo line Tower 27/222 at 12:00 p.m. on November 8, 2018.[7]

At approximately 6:48 a.m. fire watch cameras on Flea Mountain and Bloomer Hill {Attachment – Google Earth map} recorded a plume of smoke east of Concow and west of Pulga. {Fire

---

[5] According to PG&E naming convention, a transmission line name is based upon the starting point and ending point of the line. The Caribou-Palermo line starts at the Caribou Powerhouse and ends at the Palermo substation. Tower numbers are determined by the distance from the start of the line in miles and the sequential number of towers. The Caribou-Palermo line is divided into two segments; Caribou-Big Bend and Palermo-Big Bend. The inclusion of a colon (:) before the tower number denotes the Caribou-Big Bend segment. On the Caribou-Big Bend segment the tower numbering starts at the first tower coming out of the Caribou Powerhouse (:000/001) and ends with the last tower before the Big Bend Substation (:037/303). Tower 27/222 is located in the 27th mile away from the Caribou Powerhouse and is the 222nd structure in the line. On the Palermo-Big Bend segment the tower numbers begin with the last tower before the Palermo Substation (000/001) and ends with the first tower after the Big Bend Substation (016/130). {Attachment – Google Earth Map of C-P}

[6] PG&E's electrical transmission grid is divided into geographic districts. Each district is supervised by a Transmission Line Supervisor. The transmission lines in the Feather River Canyon are within the Table Mountain District.

[7] At 12:01 p.m. a Cal Fire investigator spotted and photographed a helicopter from a local charter helicopter firm hovering above tower 27/222. Based upon the tail number of the helicopter it was confirmed this was the helicopter performing the emergency inspection of the Caribou-Palermo line.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 55 of 1229

} Cal Fire monitors initially attributed the plume of smoke to the Camp Fire. Later Cal Fire monitors and investigators determined the smoke plume was not associated with the Camp Fire and was caused by a separate and unrelated fire. Utilizing mapping tools Cal Fire investigators determined the plume of smoke had arisen from an area near the intersection of Concow Road and Rim Road in eastern Concow. The fire was named the Camp B Fire.

## II.     ORIGIN AND CAUSE INVESTIGATIONS

Cal Fire assigned a team of highly trained and experienced "Origin and Cause" investigators from around California to assist the local Butte Unit investigators. Cal Fire also retained and assigned subject matter experts to assist with the investigation. The investigators were divided into two teams. One team was assigned to investigate the Camp Fire. The second team was assigned to investigate the Camp B Fire.

Cal Fire investigators determined the origin of the Camp Fire was the dry brush below Tower 27/222 of the Caribou-Palermo line, an electrical transmission line owned and operated by PG&E. Tower 27/222 was determined to be a "Transposition" tower[8] {[Attachment – Krelle 3D model]()}. With the assistance of a licensed electrical engineer, Cal Fire investigators determined the cause of the Camp Fire was electrical arcing between an energized "jumper" conductor (power line) and the steel tower structure. {[Attachment - Framework of transposition tower]()} Investigators determined a "C hook" that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure. {[Attachment 004]()} The ensuing electrical arcing between the jumper conductor and steel tower structure caused the aluminum strands of the conductor to melt as well as a portion of the steel tower structure.[9] The molten aluminum and steel fell to the brush covered ground at the base of the steel tower structure. {[Attachment 005]()} This molten metal ignited the dry brush.

Cal Fire investigators determined the Camp B Fire originated to the west of Concow Road south of the intersection of Concow Road and Rim Road in a geographical bowl. The area of origin was under the right of way of the Big Bend 1101 12kV distribution line. The area of origin was approximately 2.6 miles west of the origin of the Camp Fire. At the area of origin investigators located a broken conductor from the Big Bend 1101 12kV distribution line and a fallen Ponderosa pine tree. Burn patterns on the Ponderosa pine indicated the tree had contacted a live electrical line. {[Attachment 006]()} PG&E records show a documented outage on the Big Bend 1101 12kV circuit at 6:45 a.m. on November 8, 2018. Investigators determined the Camp B Fire was ignited when the Ponderosa pine tree toppled over onto and broke the energized Big Bend 1101 12kV distribution line. The Ponderosa pine and its stump were examined and analyzed by a certified arborist[10] retained by Cal Fire. The arborist determined that the Ponderosa pine was

---

[8] A transposition tower is a transmission tower that changes the relative positions of the conductors (power lines) to each other to maintain electrical balance. Transposition towers are placed at intervals along the transmission line.
[9] Aluminum melts at approximately 1200 degrees Fahrenheit, steel melts at approximately 2700 degrees Fahrenheit. The electrical engineer estimated the temperature of the electrical arc between the conductor and the steel structure between 5,000 and 10,000 degrees Fahrenheit.
[10] International Society of Arboriculture Board Certified Master Arborist.

diseased and dying prior to November 8, 2018.[11]  However, the arborist determined the disease was internal and likely would not have been visible to PG&E tree inspectors during their vegetation management inspections.  According to the arborist the disease likely only would have been discoverable by an advanced inspection.[12]

Before the Camp B Fire grew large enough to escape its geographical bowl, it was passed over and consumed by the Camp Fire.  Based upon fire indicators and patterns within the Camp B Fire and recordings from the fire watch cameras, Cal Fire investigators determined that the Camp B Fire had little, or no, effect on the Camp Fire.


### III.    INJURIES AND LOST LIVES

In support of the great bodily injury enhancements, evidence was presented of two civilians and one fire fighter who were severely burned during the Camp Fire.

Victim 1, an adult female, was located in Concow by a Cal Fire crew in the area trying to locate another reportedly trapped victim.  As the engine was trying to leave the area, visibility was near or at zero, when suddenly the smoke cleared briefly.   In that moment, the Captain of the fire crew saw an arm appear from between two vehicles.  The Captain and his crew stopped and located the badly burned female victim.  Lying beside the female victim was a deceased male.  The deceased male was later identified as the female victim's roommate.  The Captain described how he and his crew repeatedly checked the male roommate futilely hoping to find signs of life.  The Cal Fire crew rescued the female victim.  According to the Captain, when Victim 1 was lifted into the engine, her skin sloughed off due to the severity of her severe burns.  She was taken to a medical evacuation area for transport to a hospital.

Victim 2, an adult female, was located in Paradise with her husband. Victim 2 and her husband had been trying to flee the fire but were overtaken.  Victim 2 and her husband took shelter behind a boulder but both were severely burned.  Victim 2 and her husband were rescued by Cal Fire and taken to a medical evacuation area for transport to a hospital. According to the Cal Fire Captain, who supervised that rescue and evacuation, Victim 2 also had skin sloughing off as she was taken from an engine and placed into an ambulance.  Both Victim 2 and her husband were transported to the UC Davis Medical Center Burn Unit.  Victim 2's husband ultimately succumbed to his burn injuries.

Victim 3, an adult male, was a Cal Fire Captain.  The Captain described that as he and his crew were preparing to do a back fire operation to create a fire break east of Clark Road and south of Rattlesnake Flats Road, northeast of Butte College, the fire changed direction and, fueled by high winds, "exploded."  As the fire came rushing towards them, the Captain held strands of barbed wire up to allow his crew to quickly escape into the safety of a clearing.  After his crew was safely through the fence, the Captain attempted to go through the fence.  As he was going

---

[11] The arborist also consulted with a professor of Dendrochronology at the Indiana State University Dendro Lab.

[12] An advanced inspection would entail use of diagnostic tools such as a mallet, a resistograph or a sonic tomogram and generally only occurs when anomalies or outward signs of disease or decay are observed during the visual inspection.

10

through the fence the Captain's gear caught on the barbed wire. As a result, the fire overran his position and the Captain was severely burned. The Captain was medically evacuated to UC Davis Medical Center Burn Unit. All members of his crew survived with only minor injuries.

The Camp Fire also directly[13] caused the deaths of the following 84 persons: {Attachment – Camp Fire Victim Locations download and open with Google Earth Pro}

**Joyce Acheson** – Ms. Acheson, who was 78 years old, was found deceased in her home at 1250 Elliot Road, Unit 17, in the Town of Paradise. Ms. Acheson was of limited mobility, and lived in an area that was closed off to public access, thereby preventing any caregiver from getting to her.

**Herbert Alderman** – Mr. Alderman was 80 years old and was found deceased inside his home at 5775 Deanna Way in the Town of Paradise. A severely sprained ankle prevented his mobility at the time of the fire, and he made several phone calls to friends seeking rescue before he perished.

**Teresa Ammons** – Ms. Ammons was 82 years old. She was found deceased outside her home at 6674 Pentz Road, Unit 112, in the Town of Paradise. The evidence indicated Ms. Ammons died while attempting to flee the fire as she was found just outside her trailer with her purse nearby.

**Rafaela Andrade** – Ms. Andrade was 84 years old and was found deceased inside her home at 6664 Moore Road in the Town of Paradise. She could not walk without the assistance of a walker, and did not have the ability to evacuate on her own.

**Carol Arrington** – Ms. Arrington was 88 years old. Ms. Arrington was found deceased inside her home at 1866 Stark Lane in the Town of Paradise.

**Julian Binstock** – Mr. Binstock was 88 years old. The remains of Mr. Binstock and his dog were located in the shower of his residence at 5900 Canyon View Drive in the Town of Paradise.

**David Bradburd** – Mr. Bradburd was 70 years old. Mr. Bradburd was found near 6028 Dubarry Lane, in the Town of Paradise. Mr. Bradburd was found within 400 feet of his residence on Pentz Road, near a power line knocked down by the fire. Based upon the evidence, Mr. Bradburd was fleeing the fire when he died.

**Cheryl Brown** – Ms. Brown was 75 years old. Ms. Brown was found deceased in her home at 1387 N-B Lane in the Town of Paradise. Ms. Brown was found seated in a recliner next to her husband, Larry Brown.

**Larry Brown** – Mr. Brown was 72 years old. Mr. Brown was found deceased in his home at 1387 N-B Lane in the Town of Paradise. Mr. Brown was found seated in a recliner next to his wife, Cheryl Brown.

---

[13] Only persons who died within the Camp Fire footprint on November 8, 2018 from fire-related injuries; or who were medically evacuated from within the Camp Fire footprint on November 8, 2018 to medical facilities and subsequently died as a result of fire-related injuries were counted as direct victims.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 58 of 1229

**Richard Brown** – Mr. Brown was 74 years old. Mr. Brown was found deceased under his pickup truck outside his residence at 13377 Eleran Lane in the community of Concow. Based upon the physical evidence, Mr. Brown tried to hide from the fire under his truck.

**Andrew Burt** – Mr. Burt was 36 years old. Mr. Burt was found deceased just outside of the front passenger side door of a minivan. The minivan was located facing north in the 5000 Block of Edgewood Road, approximately .3 miles south of Mr. Burt's residence at 5236 Edgewood Lane in the Town of Paradise. The remains of Mr. Burt's dog were found next to Mr. Burt. Based upon the evidence, Mr. Burt had been in the minivan attempting to escape the fire when the minivan was overcome by the fire. There were three other vehicles containing the remains of four other victims near the minivan.

**Joanne Caddy** – Ms. Caddy was 75 years old. Ms. Caddy was found deceased inside her home at 13812 West Park Drive in the community of Magalia.

**Barbara Carlson** – Ms. Carlson was 71 years old. Ms. Carlson was found deceased in her residence at 5577 Heavenly Place in the Town of Paradise. Ms. Carlson's remains were comingled with those of her sister, Shirley Haley.

**Vincent Carota** – Mr. Carota was 65 years old and found deceased inside his residence at 5471 South Libby Road in the Town of Paradise. Mr. Carota was a partial leg amputee without a vehicle.

**Dennis Clark, Jr.** – Mr. Clark was 49 years old. Mr. Clark was found deceased in the passenger seat of a car with his mother Joy Porter deceased in the driver's seat. Their vehicle was in a line of three other vehicles found facing north in the 5000 block of Edgewood Lane in the Town of Paradise. The vehicle was located approximately .3 miles south of Mr. Clark and Ms. Porter's residence on Sunny Acres Road, off of Edgewood Lane.

**Evelyn Cline** – Ms. Cline was 81 years old. Ms. Cline was found deceased in her residence at 578 Roberts Drive in the Town of Paradise. She was physically immobile and unable to leave her home without assistance.

**John Digby** – Mr. Digby was 78 years old and found deceased inside his residence at 6920 Clark Road, Unit #3, in the Town of Paradise.

**Gordon Dise** – Mr. Dise was 66 years old and was found deceased inside his home at 2735 Eskin Maidu Trail in Chico (Butte Creek Canyon.). According to his daughter, who fled the house with her father, he went back in their home for something and never made it back out.

**Paula Dodge** – Ms. Dodge was 70 years old. Ms. Dodge was found deceased between two cars in the carport of her residence at 5152 Pentz Road in the Town of Paradise. Ms. Dodge's husband, Randall Dodge, was found deceased next to her. Based upon the evidence, Mr. and Ms. Dodge were attempting to flee the fire.

**Randall Dodge** – Mr. Dodge was 66 years old. Mr. Dodge was found deceased between two cars in the driveway of his residence at 5152 Pentz Road in the Town of Paradise. Mr. Dodge's

wife, Paula Dodge, was found deceased next to him.  Based upon the evidence, Mr. and Ms. Dodge were attempting to flee the fire.

**Andrew Downer** – Mr. Downer was 54 years old.  Mr. Downer was found deceased outside the front door of his residence at 8030 Skyway, Unit A, in the Town of Paradise.  Based upon the evidence, it appears Mr. Downer died while attempting to flee the fire. He was a wheelchair bound amputee and was unable to drive.

**Robert Duvall** – Mr. Duvall was 76 years old.  Mr. Duvall was found deceased in the passenger seat of his truck.  No one else was located in the truck.  The truck was in a line of three vehicles found facing north in the 5000 block of Edgewood Lane in the Town of Paradise.  The vehicle was located approximately .3 mile north of Mr. Duvall's residence on Sunny Acres Road, off of Edgewood Lane.  A second vehicle registered to Mr. Duvall and containing the remains of Mr. Duvall's girlfriend, Beverly Powers, was located nearby.

**Paul Ernest** – Mr. Ernest was 72 years old.  Mr. Ernest and his wife attempted to escape the fire by driving quads[14] off road through a canyon.  When their escape route was blocked by a rock formation, Mr. Ernest and his wife were overtaken by the fire.  Both were severely burned, and airlifted to UC Davis Medical Center Burn Unit in Sacramento.  Mr. Ernest passed away from his injuries on August 5, 2019, nearly 9 months after the fire. He never left the extended care medical facility in Sacramento, after being transferred there from the UC Davis Burn Unit.

**Rose Farrell** – Ms. Farrell was 99 years old.  Ms. Farrell was found deceased on the front porch of her residence at 1378 Herman Way in the Town of Paradise.   Her wheelchair was found near Ms. Farrell.

**Jesus Fernandez** – Mr. Fernandez was 48 years old.  Mr. Fernandez was found on the ground between two vehicles on Broken Glass Circle near Vista Ridge Road in Concow.   Mr. Fernandez was the roommate of burn Victim 1 (above). Victim 1 believed Mr. Fernandez died shortly before her rescue.

**Jean Forsman** – Ms. Forsman was 83 years old and found deceased inside her residence at 13747 Andover Drive in the community of Magalia.

**Ernest Foss, Jr.** – Mr. Foss was 63 years old. Mr. Foss was found deceased outside of his residence at 5236 Edgewood Lane in the Town of Paradise.  Mr. Foss was found with his oxygen tank.  The evidence indicates Mr. Foss, who had limited mobility, was attempting to flee the fire at the time of his death.

**Elizabeth Gaal** – Ms. Gaal was 80 years old and found deceased inside her residence at 5393 Sawmill Road, Unit # 27 in the Town of Paradise.

**Sally Gamboa** – Ms. Gamboa was 69 years old. Ms. Gamboa was located deceased in a field/clearing behind her residence at 1560 Sunny Acres Road in the Town of Paradise.  Based upon the evidence, Ms. Gamboa died while attempting to flee the oncoming flames.

---

[14] All terrain sport utility vehicles

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 60 of 1229

**James Garner** – Mr. Garner was 63 years old. Mr. Garner was found deceased inside his residence at 6284 Woodbury Drive in the community of Magalia. Earlier on the morning of November 8, 2018, Mr. Garner had engaged in multiple telephone calls with his sister and nephew.

**Richard Garrett** – Mr. Garrett was 58 years old. Mr. Garrett was found deceased among trees not far from a residence at 4238 Schwyhart Lane in the community of Concow. Based upon the physical evidence Mr. Garrett was actively running from the fire when he was overtaken and killed by the flames.

**William Godbout** – Mr. Godbout was 79 years old and found deceased inside his residence at 3831 Camelot Lane in the community of Concow.

**Shirley Haley** – Ms. Haley was 67 years old. Ms. Haley was found deceased at 5577 Heavenly Place in the Town of Paradise. Ms. Haley's remains were found comingled with the remains of her sister, Barbara Carlson.

**Dennis Hanko** – Mr. Hanko was 56 years old and found deceased inside his residence at 5081 Wilderness Way, Unit 3A, in the Town of Paradise.

**Anna Hastings** – Ms. Hastings was 67 years old. Ms. Hastings was found deceased in her residence at 8391 Montna Drive in the Town of Paradise. She was disabled, with severe scoliosis, and unable to drive.

**Jennifer Hayes** – Ms. Hayes was 53 years old. Ms. Hayes was found deceased in her residence at 5683 Scotty Lake Drive, in the Town of Paradise.

**Christina Heffern, Ishka Heffern and Matilde Heffern** – Christina Heffern was 40 years old. Ishka Heffern, the daughter of Christina, was 20 years old. Matilde Heffern, the mother of Christina Heffern, was 68 years old. All three were located in their residence at 1865 Norwood Drive in the Town of Paradise. Their remains were located commingled in the bathtub of their residence. The Hefferns placed a 911 call as the fire approached their home. Somehow the phone line remained open as the house, and the three women, burned as helpless Cal Fire ECC dispatchers listened to their screams.

**Louis Herrera** – Mr. Herrera was 86 years old and found deceased inside of his home at 2376 Clearview Drive in the Town of Paradise. The remains of Mr. Herrera's wife, Dorothy Lee-Herrera, were also found in the residence.

**Evva Holt** – Ms. Holt was 85 years old and was found deceased in a burned vehicle near the intersection of Pearson Road and Stearns Road in the Town of Paradise, approximately 1.8 miles from Ms. Holt's residence.

**TK Huff** – Mr. Huff was 71 years old. Mr. Huff was located deceased outside of his residence at 13471 Green Forest Lane in the community of Concow. Mr. Huff only had one leg and generally used a wheelchair. Mr. Huff's wheelchair was found approximately 10 feet away from Mr. Huff. The physical evidence indicated Mr. Huff tried to escape the flames by dragging himself along the ground.

**Gary Hunter** – Mr. Hunter was 67 years old. Mr. Hunter was located deceased inside of his residence at 13554 Andover Drive in the community of Magalia. He had limited mobility, due to a stroke, and could not walk without assistance.

**James Kinner** – Mr. Kinner was 83 years old. Mr. Kinner was located deceased inside his residence at 5237 Black Olive Drive in the Town of Paradise.

**Dorothy Lee-Herrera** – Ms. Lee-Herrera was 93 years old. Ms. Lee-Herrera was found deceased in her residence at 2376 Clearview Drive in the Town of Paradise. The remains of Ms. Lee-Herrera's husband, Louis Herrera, were also found in the residence.

**Warren Lessard** – Mr. Lessard was 68 years old. Mr. Lessard was found deceased on the front porch of his residence at Athens Way and South Park Drive in the community of Magalia.

**Dorothy Mack** – Ms. Mack was 88 years old and found deceased inside her residence at 6674 Pentz Road, Unit 19, in the Town of Paradise.

**Sara Magnuson** – Ms. Magnuson was 75 years old. Ms. Magnuson was found deceased inside her residence at 1812 Drendel Circle in the Town of Paradise. Based upon the physical evidence it appears Ms. Magnuson wrapped herself in a wet carpet and sheltered in the bathtub in an attempt to save herself.

**Dolores Joanne Malarkey** – Ms. Malarkey was 90 years old. Ms. Malarkey was found deceased in her residence at 432 Plantation Drive in the Town of Paradise. The remains of Ms. Malarkey's husband, John Malarkey, were also found in the residence.

**John Malarkey** – Mr. Malarkey was 89 years old and was found deceased in his residence at 432 Plantation Drive in the Town of Paradise. The remains of Mr. Malarkey's wife, Joanne Malarkey, were also found in the residence.

**Christopher Maltby** – Mr. Maltby was 69 years old. Mr. Maltby was found deceased in his residence at 1040 Buschmann Road in the Town of Paradise.

**David Marbury** – Mr. Marbury was 66 years old. Mr. Marbury was found deceased inside his residence at 1481 Sun Manor, Unit A, in the Town of Paradise.

**Deborah Morningstar** - Ms. Morningstar was 65 years old and found deceased inside of her residence at 5848 Black Olive Drive, Unit 3, in the Town of Paradise. She was unable to drive, which prevented her from being able to flee.

**Helen Pace** – Ms. Pace was 84 years old. Ms. Pace was found deceased inside her residence at 6674 Pentz Road in the Town of Paradise. She had medical issues, which limited her ability to leave her home.

**Joy Porter** – Ms. Porter was 72 years old. Ms. Porter was found deceased in the driver's seat of her car with her son, Dennis Clark Jr., in the passenger seat. Their vehicle was in a line of three other vehicles found facing north in the 5000 block of Edgewood Lane in the Town of Paradise. The vehicle was located approximately .3 miles south of Mr. Clark and Ms. Porter's residence on Sunny Acres Road, off of Edgewood Lane.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 62 of 1229

**Beverly Powers** – Ms. Powers was 64 years old. Ms. Powers was found deceased in the driver's seat of a pickup truck registered to her boyfriend, Robert Duvall. The vehicle was in a line of three other vehicles found facing north in the 5000 block of Edgewood Lane, approximately .3 miles south of Mr. Duvall and Ms. Powers residence on Sunny Acres Road. One of the other two vehicles contained the remains of Mr. Duvall.

**Robert Quinn** – Mr. Quinn was 74 years old and found deceased in his residence at 5684 Clara Lane in the Town of Paradise.

**Joseph Rabetoy** – Mr. Rabetoy was 39 years old and found deceased in his residence at 5580 Angel Drive in the Town of Paradise. He had no means of escape as he didn't have a vehicle.

**Forrest Rea** - Mr. Rea was 89 years old and found deceased in his residence at 1909 Dean Road in the Town of Paradise.

**Vernice Regan** – Ms. Regan was 95 years old. Ms. Regan was found deceased outside of her home at 102 Magnolia Drive in the Town of Paradise.

**Ethel Riggs** – Ms. Riggs was 96 years old. Ms. Riggs was located deceased inside of her residence at 220 Berry Creek Drive in the Town of Paradise. Ms. Riggs spoke with her grandson via phone at least twice on the day of the fire and told him because the power was out she was unable to get her car out of the garage. Ms. Riggs told the grandson she could not reach the manual release for the garage door, and even if she could, she was not strong enough to raise the door.

**Lolene Rios** – Ms. Rios was 56 years old. Ms. Rios was found deceased in the basement of her home at 750 Meyers Lane in the Town of Paradise, along with the remains of her four dogs and two cats.

**Gerald Rodrigues** – Mr. Rodrigues was 74 years old and found deceased inside of his residence at 5436 Clark Road, Unit 14, in the Town of Paradise.

**Frederick Salazar, Jr.** – Mr. Salazar was 76 years old. Mr. Salazar was found deceased in his residence at 5303 Sawmill Road in the Town of Paradise. The remains of Mr. Salazar's wife, Phyllis Salazar, were also found in the residence.

**Phyllis Salazar** – Ms. Salazar was 72 years old. Ms. Salazar was found deceased in her residence at 5303 Sawmill Road in the Town of Paradise. The remains of Ms. Salazar's husband, Frederick Salazar, Jr., were also found in the residence.

**Sheila Santos** – Ms. Santos was 64 years old and found deceased in her home at 5471 S. Libby Road, Unit 34, in the Town of Paradise.

**Ronald Schenk** – Mr. Schenk was 74 years old. Mr. Schenk was found deceased in his home at 5471 S. Libby Road, Unit 33, in the Town of Paradise.

**Berniece Schmidt** – Ms. Schmidt was 93 years old. Ms. Schmidt was found deceased inside of her residence at 14175 Citadel Way in the community of Magalia with the remains of her cat and a kitten.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 63 of 1229

**John Sedwick** – Mr. Sedwick was 82 years old. Mr. Sedwick was found deceased on the front porch of his residence at 13816 Glover Lane in the community of Magalia.

**Don Shores** - Mr. Shores was 70 years old. Mr. Shores was found deceased in a recliner in his residence at 6778 Ishi Drive in the community of Magalia. The remains of Mr. Shores' wife, Kathy Shores, were found in an adjacent recliner. Also located with Mr. and Ms. Shores were the remains of two dogs and two cats.

**Kathy Shores** – Ms. Shores was 65 years old. Ms. Shores was found deceased seated in a recliner in her residence at 6778 Ishi Drive in the community of Magalia. The remains of Ms. Shores' husband, Don Shores, were found in an adjacent recliner. Also located with Mr. and Ms. Shores were the remains of two dogs and two cats.

**Judith Sipher** – Ms. Sipher was 68 years old. Ms. Sipher was found deceased in her residence at 1005 Village Parkway in the Town of Paradise.

**Larry Smith** – Mr. Smith was found severely burned in the driveway of his home at 6428 Rocky Lane in the Town of Paradise. Mr. Smith was rescued and transported to the UC Davis Medical Burn Center. Mr. Smith succumbed to his injuries while still in the hospital 17 days later. Mr. Smith was 80 years old.

**Russell Stewart** – Mr. Stewart was 63 years old and found deceased inside of his home at 6884 Pentz Road in the Town of Paradise.

**Victoria Taft** – Ms. Taft was 67 years old and found deceased inside of her home at 5883 Copeland Road in the Town of Paradise.

**Shirlee Teays** - Ms. Teays was 90 years old. Ms. Teays was found deceased inside of her residence at 9289 Skyway Road, Unit 15, in the Town of Paradise. She appears to have been holding or hugging a framed photograph.

**Joan Tracy** – Ms. Tracy was 82 years old. Ms. Tracy was found deceased inside of her home at 5326 Sawmill Road in the Town of Paradise.

**Unknown** – The remains of this unknown victim were found comingled with the remains of another victim in Concow. Attempts at identification are still being made.

**Ellen Walker** – Ms. Walker was 72 years old and found deceased inside of her home at 4220 Schwyhart Lane in the community of Concow.

**Donna Ware** – Ms. Ware was 86 years old and found deceased inside her home at 5783 Waco Lane in the Town of Paradise.

**Isabel Webb** – Ms. Webb was 68 years old. Ms. Webb was found deceased inside her home at 1449 Sleepy Hollow Lane in the Town of Paradise.

**Marie Wehe** – Ms. Wehe was 78 years old. Ms. Wehe was found deceased inside a burned truck on the side of Windermere Lane in the community of Concow approximately .3 mile east of Ms. Wehe's residence on Windermere Lane.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 64 of 1229

**Kimber Wehr** – Ms. Wehr was 53 years old and found deceased inside her residence at 5908 Del Mar Avenue in the Town of Paradise. She was unable to drive due to a neurological disability, and was unable to flee the fire on her own.

**David Young** – Mr. Young was 69 years old. Mr. Young was found deceased with two unidentified animals inside his mini-van. The mini-van was found crashed into a tree near the intersection of Hoffman Road and Jordan Hill Road in the community of Concow. The vehicle was located approximately 1.5 miles west of Mr. Young's residence on Hog Ranch Road in the community of Concow. Based upon the evidence, Mr. Young crashed while fleeing the oncoming fire. Mr. Young and the two animals were found in the cargo area of the mini-van. The autopsy determined Mr. Young survived the crash, but was killed by the fire.

## IV.  BACKGROUND OF THE FAILED COMPONENT

### a. History of the Caribou-Palermo 115kV Transmission Line

According to historical reports[15] provided by PG&E, the section of the Caribou-Palermo line that runs in the Feather River Canyon from the Caribou Powerhouse to the Big Bend Substation, was built between 1919 and 1921 by the Great Western Power Company. What is now known as the Caribou-Palermo line was originally part of a 165kV transmission line that carried electricity from the Caribou Powerhouse to the Valona Substation in Contra Costa County.[16] PG&E acquired the Caribou Powerhouse and the entire Caribou-Valona 165kV transmission line (Caribou-Valona line) when it purchased Great Western Power Company in 1930. According to the reports, sometime during the 1960s the Caribou-Palermo line was converted to 115kV. According to the reports, there were eleven segments[17], including the Caribou-Big Bend segment, of the original Caribou-Valona transmission line still in service in 2018.

Despite the fact that PG&E has owned the Caribou-Big Bend portion of the Caribou-Palermo line since 1930, the evidence established PG&E did not catalogue or replace the original

---

[15] In April 2017 cultural resources specialists from PG&E produced a document entitled "National Register of Historic Places Inventory and Evaluation of Eleven Transmission Lines Associated with the Historic Alignment of the Caribou-Valona Transmission Corridor (NRHP Inventory and Evaluation). The NRHP Inventory and Evaluation was updated in October, 2018 by Cardno Inc. The NRHP Inventory and Evaluation includes a 2018 report entitled "DPR 523 Form" produced by the California Department of Parks and Recreation (DPR Report).

[16] Using a current map, the original Caribou-Valona line ran parallel to the Feather River from Caribou-Road through the Feather River Canyon, passing to the east of Oroville to Palermo. South of Palermo the line ran parallel to State Route 70 thru Sacramento. From south of Sacramento the line ran parallel to Interstate 80 to Vallejo. The line crossed the bay from Vallejo to Valona parallel to the current Carquinez Bridge on Interstate 80. The total length of the line was 1368 steel towers and 186 miles.

[17] As the electrical transmission grid has grown and substations were added the original Caribou-Valona line was divided into segments (sometimes referred to as circuits in PG&E historical documents) corresponding to the substations. The eleven segments still in use in 2018 were the Caribou-Palermo line, Paradise-Table Mountain, Palermo Pease, Pease-Rio Oso, Rio Oso-West Sacramento, Brighton-Davis, Brighton-Davis (idle), Vaca-Suison-Jamison, Ignacio-Mare Island #1, Oleum-G #1 and Oleum-G #2.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 65 of 1229

conductors,[18] insulators or attachment hardware[19] on many of the towers in the original Caribou-Big Bend section of the transmission line.

Many components on Tower 27/222 were identified by PG&E as original Great Western Power components because they matched components included in the original Great Western Power Company schematic drawings for construction of the transmission line. Among those components were the insulators hung from C hooks[20]. The records provided by PG&E clearly established the insulator string hanging from the C hook that broke on November 8, 2018 was an original 1921 insulator. Other components, such as the C hooks and the conductor, either did not completely match the original records[21] or PG&E did not possess original records.[22]

Evidence established that, with the exception of add-on hanger brackets which were added to the ends of the transposition arms to replace worn hanger holes, the transposition components on Tower 27/222, including the transposition arms, C hooks, insulator strings and jumper conductor, were original components in service since 1921. The evidence further established that despite owning Tower 27/222 since 1930, PG&E had little or no information about the 97-year-old conductor and the hooks, original hanger holes and bolted-on hanger hole plates supporting that conductor.

**b. C Hook and Hanger Hole Wear**

The broken C hook{Attachment 7} and the transposition arm {Attachment 8}on which it had been hung were collected as evidence by Cal Fire investigators[23]. The transposition arm was identified as the left "phase" arm of Tower 27/222 {Attachment – 3D model w/ left phase highlighted}. This left phase arm had a bolted-on hanger hole plate which showed substantial wear where the broken hook had hung.

Cal Fire investigators also collected as evidence the right phase transposition arm and its still-connected (hung) C hook from Tower 27/222. .{Attachment 9} While examining the right phase C hook, Cal Fire investigators observed a "channel" had been worn into that hook where it hung from the bolted-on hanger plate hole of that transposition arm. {Attachment 10} The wear channel was similar to the channel cut into the broken left phase C hook. Similarly the right

---

[18] In layman's terms, a "conductor" is known as a power line or wire.

[19] Hot end attachment hardware attaches the insulators to the conductor. Cold end attachment hardware attaches the insulators to the tower/structure/pole. {Attachment – illustrative photo}

[20] Also known as "Suspension hooks." C hooks are part of the cold end attachment hardware.

[21] The plans for the original Great Western Power transposition towers included a schematic, dated October 11, 1912, of an Ohio Brass suspension hook with a raised B on the right face of the hook. The relevant hook from Tower 27/222 matched the schematic except the raised B was on the left face of the hook.

[22] PG&E responded to questions about the make, model and manufacturer of the conductor on Tower 27/222 by referring to an April 1922 article written by W. A. Scott in Engineering World entitled "Great Western Power Co.'s 165,000-Volt Transmission Line".

[23] The front portion of the C hook that broke off was never recovered. Cal Fire personnel spent several days meticulously searching the area below Tower 27/222 and could not locate that broken piece. It was noted however that area was on a steep rocky slope which ran off toward the Feather River Canyon.

phase hanger hole showed substantial wear where the hole and hook connected. {Attachment 11}

Investigators also noted there were original hanger holes on both the left and right transposition arms that showed extensive wear. It was obvious the bolted-on hanger plates with their holes were replacements for these original hanger holes indicating that PG&E was aware that the hooks and holes were rubbing on each other causing wear. The wear patterns observed on the hanger holes is described as "keyholing."

As a result of the observations of the Cal Fire investigators, an inspection of other transposition towers[24] on the Caribou-Palermo line was initiated by the Butte County District Attorney. Based upon the historical records and the C hooks and hanger holes from Tower 27/222, investigators from Cal Fire and the Butte County District Attorney's Office concluded that any more than 3/16" space between top of the C hook and top of the hole indicated wear to either the C hook or the hanger hole, or both[25]. In January 2019, investigators from the Butte County District Attorney's Office flew the Caribou-Palermo line in a county helicopter and documented transposition towers on which the gap between the top of the C hook and the top of the hanger hole were substantially larger than 3/16."

From the helicopter, investigators located wear to C hooks and hanger holes on three other transposition towers on the Caribou-Palermo line between the Caribou Powerhouse and the Big Bend Substation. The towers were identified as tower numbers 20/160, {attachment – 20/160 wear}24/199 {Attachment – 24/199 wear} and 35/281. {Attachment – 35/281 wear} This wear was similar to that found on the C hooks and hanger holes on Tower 27/222. Subsequently, Butte County District Attorney investigators and Cal Fire investigators, along with Jon McGormley - an engineer and failure analysis expert,[26] further inspected each of these three towers. Investigators and Mr. McGormley also identified a fourth transposition tower, tower number 32/260, {attachment – 32/260 wear} on which there appeared to be very little wear between the C hooks and hanger holes. Tower numbers 20/160, 24/199, 27/222 and 35/281 were all located on ridgelines and exposed to the wind. Tower 32/260 was located in a valley where it was protected from the wind.

During the inspection of one of the four towers - Tower 24/199 - investigators noted that, similar to Tower 27/222, bolted-on hanger plate holes had been added to the transposition arms and the C hooks were hanging from those hanger holes instead of the original hanger holes of the transposition arm. This again indicates that PG&E was aware of the wear on C hooks and

---

[24] Because transposition towers have unique physical characteristics, investigators focused only on transposition towers. Transposition towers on the Caribou-Big Bend section are distinguished from other towers by the T mast atop the tower and the transposition arms on the source side of the tower. Towers 20/160, 24/199, 32/260 and 35/281 were transposition towers identical to Tower 27/222.

[25] According to the original schematics of the transposition towers the C hooks were 15/16" thick at the point of contact and the hanger holes were 1 1/8" in diameter. The hooks were intended to fit snugly into the holes.

[26] Jon McGormley was retained by Cal Fire and is an engineer and failure analysis expert with Wiss, Janney, Elstner Associates (WJE). WJE is a global firm of engineers, architects and materials scientists with a division focused on failure analysis.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 67 of 1229

hanger holes. It appeared to investigators that, at some previous time, the jumper conductor on Tower 24/199 {Attachment – 24/199 jumper} had been shortened and spliced together using a parallel groove connector. PG&E has no records of when or why this work was done. Investigators further observed the right phase[27] insulator string appeared to be less aged than the left phase insulator string and, as a result of the shorter jumper conductor, was not hanging plumb. From the ground, investigators also observed black marks on the tower leg nearest the right phase insulator string. This was indicative of arcing due to faulty or broken equipment. On the ground below Tower 24/199, investigators found an old insulator string.[28]

With the assistance of PG&E[29], investigators seized C hooks and transposition arms from two of the three towers[30] with obvious wear and the tower without obvious wear. Seizure of all of the C hooks and transposition arms was catalogued and documented by a Federal Bureau of Investigation (FBI) Evidence team. Of the four towers, Tower 24/199 was found to be the most similar to Tower 27/222 in terms of topography, meteorology and wear. The right phase C hook from Tower 24/199 was the most worn C hook found on any of the towers.

The C hooks, transposition arms, and hanger plate holes from Towers 27/222 and 24/199 were sent to the Metallurgy Unit of the FBI Laboratory at Quantico, Virginia for metallurgical analysis by their recognized metallurgical experts. The C hooks were examined for defects. No defects were found. The broken left phase C hook from Tower 27/222 and the most worn right phase C hook from Tower 24/199 were determined to be malleable cast iron. The least worn C hooks from Towers 27/222 and 24/199 were determined to be forged, plain carbon steel. The broken C hook from Tower 27/222, the most worn hook from Tower 24/199, and a less worn hook were tested for hardness.[31] The testing determined there was a significant difference in hardness between the most worn malleable cast iron hooks, and the least worn forged plain carbon steel hook. The transposition arms were also examined and analyzed, and all four transposition arms and the bolted on hanger brackets were found to be made of galvanized plain carbon steel.[32]

---

[27] The term phase relates to the connection between the tower structure and the conductors. The Caribou-Big Bend section has three conductors and three phases; left, center and right.

[28] This was not unusual. Under numerous towers on the Caribou-Palermo line investigators found discarded insulator strings, insulator bells, conductor line and steel members.

[29] Any work on an electrical transmission tower requires special training and equipment. Investigators were unable to identify any qualified persons to perform the work. As a result, investigators had to rely on PG&E personnel to remove the relevant components from Tower 27/222 in November, 2018 and Towers 20/160, 24/199 and 32/260 in March, 2019.

[30] The C hooks and transposition arms from the fourth tower, 35/281, were replaced by PG&E in February, 2019. Those C hooks and transposition arms were seized by Cal Fire and BCDA investigators from a PG&E evidence storage facility.

[31] The Superficial Rockwell HR30TW hardness test was used to determine hardness.

[32] All of the transposition arms and hanger brackets were tested for hardness utilizing the Rockwell HRBW hardness test.

The FBI Lab scanned all of the hooks and transposition arms. The scans were used to build 3D models of each of the components. {Attachment – 3D models download and open with Adobe Acrobat Pro}

The metallurgist at the FBI Lab also analyzed the wear patterns on the C hooks and hanger holes (both original holes and the added brackets). The metallurgist determined that as a result of rotational body on body wear, the edge of the hanger holes had cut a channel into the C hooks and the C hooks had worn away the bottom of the hanger holes elongating the holes[33]. {Attachment – Camp Fire Presentation 3:29-3:46} On the broken C hook from Tower 27/222 it was determined the channel had cut approximately 14/16" {Attachment – FBI lab photo of break} into the hook before the remaining metal broke under the weight of the insulator string and jumper conductor.[34] On the most worn C hook from Tower 24/199 it was determined that the channel had cut approximately 12/16" channel into the hook.

Under microscopic analysis, the FBI Metallurgist also observed the channeling of the right phase C hook from Tower 24/199 showed a distinct change in angle. The metallurgist testified it was her opinion the distinct change in angle could have been caused by shortening of the jumper conductor which changed the position and angle of the insulator string attached to the C hook.

The FBI data, along with LIDAR scans[35] of Towers 27/222 and 24/199, was forwarded to Jon McGormley. Using this information, Mr. McGormley was able to build a computer model of Tower 27/222. The model took into account the differing hardness of the C hooks and hanger holes.[36] Working with meteorologist Kris Kuyper[37], Mr. McGormley and his team created a wind load model of the Feather River canyon, enabling them to calculate that the wear on the broken C hook from Tower 27/222, as well as the most worn C hook from Tower 24/199, was consistent with approximately **97 years of rotational body on body wear**.[38] {Attachment – Camp Fire Presentation 3:52-3:54}

---

[33] Known as keyhole wear or "keyholing."

[34] According to PG&E written response to CPUC data request SED-007 question 2 each suspension hook supports approximately 142.8 pounds.

[35] Lidar scans were performed by the Cal Fire Lidar Team.

[36] The hardness of the individual metals involved plays a significant role in body on body wear. Metallurgical data from the FBI Laboratory was provided and fed into the model. The Superficial Rockwell HR30TW results for the C hooks and the Rockwell HRBW results for the transposition arms were converted using ASTM E140 for comparison purposes. On the Vickers Kg/mm2 the broken hook from 27/222 scored 114 for hardness, the most worn hook from 24/199 scored 119 for hardness and the least worn hook scored 222, the transposition arm and bracket from 27/222 scored 134 and 152 for hardness, the transposition arm and bracket associated to the most worn hook on 24/199 scored 120 and 138 for hardness and the transposition arm and bracket associated to the least worn hook scored 118 and 152 for hardness.

[37] Kris Kuyper is the former Chief Meteorologist for Action News in Chico. Kuyper was retained as an expert by the Butte County DA.

[38] The transposition arms metal (around the original hanger holes) was less hard than the bolted-on hanger plate hole metal. The original hanger holes showed significantly more keyhole wear than the bracket holes.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 69 of 1229

## V. INSPECTION AND PATROL POLICIES

State and federal regulatory requirements dictate PG&E must establish and follow set guidelines for patrol, inspection and maintenance of its overhead electric transmission lines. The 2012 Quanta Technology "Transmission Line Inspection Procedures Final Report"[39] outlined the various regulatory requirements. Among these requirements is CPUC General Order (GO) 165. Section IV of this General Order states "[e]ach utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines."[40]

Since 2005, PG&E electric transmission inspection, patrol, and maintenance policies have been set forth in the "Electric Transmission Preventative Maintenance Manual" (ETPM). According to the ETPM: "Inspection and patrol procedures are a key element of the preventive maintenance program. The actions recommended in this manual reduce the potential for component failure and facility damage and facilitate a proactive approach to repairing or replacing identified, abnormal components."

### a. 1987 Inspection and Patrol Bulletin

Prior to the implementation of the ETPM in 2005, inspection and patrol policies were documented in "bulletins". The oldest bulletin provided by PG&E was dated November 1, 1987[41], and entitled "Routine Patrolling and Inspection of Transmission Lines." This bulletin stated patrols are performed "to ensure that the transmission facilities are in good repair in order to maintain a high standard of service, reliability, and safety, and the patrol policy is consistent with GO95.[42]" In this 1987 bulletin, the terms "patrol" and "inspection" were used interchangeably.

The 1987 policy divided PG&E's electrical transmission system into 4 parts: Class A circuits, Class B circuits, Class C circuits, and Underground. For overhead circuits,[43] the patrol or inspection cycles were determined by the class designation of the circuit. A PG&E troubleman,[44] who worked in the Feather River Canyon between 1987 and 1995, established the Caribou-Palermo line was considered a "Class B Circuit." As such, under the 1987 policy the Caribou-Palermo line was required to be patrolled three times each year: one ground patrol and two aerial patrols. In addition, the 1987 policy required climbing inspections of five percent of the tower structures per year; and an infrared patrol[45] every five years. According to the 1987 policy bulletin, all patrols of transmission lines were to be completed by a "Transmission Troubleman." This policy ensured that every overhead transmission structure would be climbed

---

[39] Quanta Technologies is a multi-national electrical utility consulting company. Quanta Technologies was retained by PG&E in 2011 to review the ETPM. This report was commissioned by, and paid for by, PG&E.

[40] The California Independent System Operator (CAISO) "Transmission Control Agreement" and Western Electricity Coordinating Council (WECC) standard FAC-501 also require PG&E to have and follow written policies for inspection and maintenance of electrical transmission lines.

[41] The 1987 bulletin was the sixth revision of an existing policy bulletin and replaced the fifth revision which was published December 1, 1984 according to the face page of the 1987 bulletin. Based upon interviews with PG&E linemen from the 1970s and 1980s it is believed that the original policy bulletin was published 1972-75.

[42] GO95 is General Order of the CPUC number 95. GO95 establishes building, maintenance and replacement regulations for electrical transmission.

[43] A circuit is the path electrical current flows. In the 1980s PG&E referred to transmission lines as circuits. Distribution lines are still referred to as circuits. Transmission lines are now referred to as lines.

[44] See Section VII "Troublemen and Training" below for the definition of the position of Troubleman.

[45] An infrared patrol uses infrared, thermal cameras to identify hot spots on the line. Hot spots may indicate a defect or weakness on the line.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 70 of 1229

at least once every 20 years. Because PG&E inspection/patrol records prior to 2000 are not available, it is unknown if Tower 27/222 was one of the towers subjected to a climbing inspection between 1987 and 1994.

Appendix A to the 1987 policy bulletin contained a checklist of "Conditions to be noted when patrolling lines." One of the conditions to be noted was "Worn hardware and connectors." Through interviews with transmission lineman, troublemen, and engineers, it was established the C hooks were technically part of the "cold end attachment hardware."

Former PG&E Transmission Line Supervisors from 1987 noted the checklist inclusion of "worn hardware" was a result of a 1987 PG&E Laboratory Test Report[46] documenting a worn C hook and hanger hole from a Bay Area transmission tower[47]. Photos of the worn C hooks and holes were distributed to troublemen in all of the PG&E regions for training purposes, and inspection of C hooks and hanger holes was made a specific priority during inspections/ patrol.

### b. 1995 Inspection and Patrol Policy

The 1987 policy remained in effect until it was replaced by the "ES Guideline" in 1995. The 1995 ES Guideline made substantial changes, specifically separating out patrols from inspections. Inspection frequency was determined by a transmission line score on an "Inspection Frequency Checklist" and drastically reduced the frequency and thoroughness of inspections. The Caribou-Palermo line was reduced from three patrol/inspections (one ground/two aerial) per year to one ground inspection every 24 months and one aerial inspection every 24 months. Required routine climbing inspections were eliminated. Climbing inspections would only occur if "triggered" by one or more specific findings listed as triggers.

### c. 2005 ETPM Inspection and Patrol Procedures

The 1995 policies remained in effect until they were replaced by the ETPM in 2005. According to the ETPM section entitled General Inspection and Patrol Procedures, "[t]hese inspection and patrol procedures were developed as a key element of the preventative maintenance program. The recommended actions were selected to reduce the potential for component failures and facility damage and to facilitate a proactive approach to repairing or replacing identified, abnormal components."

The ETPM differentiated between inspections and patrols, and established definitions for each. According to the 2005 ETPM in the Detailed Overhead (OH) Inspections section:

"A detailed ground, aerial or climbing inspection of the asset[48] looks for abnormalities or circumstances that will negatively impact safety, reliability, or asset life. Individual elements and components are carefully examined through visual and/or routine diagnostic tests and the abnormal conditions of each are graded and/or recorded.

Overhead line facilities are to be inspected in accordance with the provisions in Section 2.0 of this manual. The inspections are to include detailed visual observations,

---

[46] The Laboratory Test Report was published approximately nine months before the Inspection and Patrol Bulletin. This Laboratory Test Report is described more fully in Section XVII "Knowledge of Risk/Consequence."

[47] Based upon historical records it is believed that the tower was part of the original Caribou-Valona line built 1918-1921.

[48] An asset is a structure, pole or tower.

24

operational readings, and component testing to identify abnormalities or circumstances that will negatively impact safety, reliability or asset life."

The 2005 ETPM **Patrols** of overhead transmission assets section states that:

"The QCR's[49] primary responsibility in an overhead electric facility is to visually observe the electric facilities, looking for obvious structural problems or hazards without the use of measuring devices, tools, or diagnostic tests, and to record that the facilities have been patrolled."[50]

The ETPM adopted verbatim the 1995 policy on climbing inspections and triggers. According to section 3.4:

"A climbing inspection is a detailed, supporting structure based observation of the facilities installed to determine if there are any abnormal or hazardous conditions that adversely impact safety, service reliability or asset life, and to evaluate when each identified abnormal condition warrants maintenance."

Climbing inspections may also be required for specific structures or components to properly assess a condition found during a ground or aerial inspection or patrol that could not be adequately assessed during the inspection of patrol."

As of the 2005 ETPM, the Caribou-Palermo line was reduced to only being inspected once every five years and patrolled once per year in non-inspection years. (This reduction again is from the three patrol/inspections per year prior to 1995.)

The 2006 revision of the ETPM appears identical to section 2 of the 2005 ETPM and identifies the "Best View Position" for individual components on a transmission structure.[51] According to Table 2.3-1 the best position to view insulators and hardware is aerial inspection (not patrol), ground inspection above 10', and climbing inspection. The terms "aerial inspection" and "ground inspections above 10'" were not specifically defined in the ETPM. According to former PG&E personnel, an "aerial inspection" is significantly more detailed than an "aerial patrol" and requires a helicopter to fly 360 degrees around each structure at an altitude and speed which allows for detailed inspection of the structure components. A ground inspection above 10' involves the use of a bucket truck to lift the QCR to allow for close inspection of the top part of the structure.

### d.   Patrol and Inspections Subsequent to the 2005 ETPM

Since 2005 the ETPM has been revised on multiple occasions[52]. The revisions have not changed the inspection or patrol cycles or the requirements for inspections and patrols. At the time of the Camp Fire, the third revision of the ETPM, issued May 12, 2016 was in use. Shortly after the Camp Fire, on November 20, 2018, the 4th revision of the ETPM[53] was published. Among other changes, the fourth revision of the ETPM incorporated new requirements for the prioritization and correction of safety hazards in Tier 2 and Tier 3 high fire threat areas identified in the 2018

---

[49] QCR is Qualified Company Representative. See section VII-"Troublemen and Training" for more information.
[50] See Section VII "Troublemen and Training" below for the definition of the position of QCR.
[51] Copies of the 2005 ETPM provided by PG&E were missing page 2-4.
[52] Revised editions of the ETPM were published in October 2006, April 2009, January 2011, December 2014, May 2015, May 2016 and November 2018
[53] Although the May 2016 revision was the sixth revision of the ETPM, PG&E did not start numbering revisions until the December 2014 edition, which was designated revision one.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 72 of 1229

CPUC Fire Threat Map.[54] These changes were required by amendments to GO95 by the CPUC, which took effect in January 2018.[55]

### e.   The 2012 Quanta Report

The 2012 Quanta Technologies "Transmission Line Inspection Procedures Final Report" was a "comprehensive review of Pacific Gas and Electric's (PG&E) current standards and practices used for ground patrol inspection of overhead transmission lines."[56]  According to the report, the ETPM was "found to be a comprehensive, well written document that adhered to its purpose to "ensure uniform and consistent required procedures for patrols, inspections, equipment testing, and condition assessment of electric transmission line facilities."  Quanta did not, and the report did not, evaluate the actual use, or non-use, of the ETPM by PG&E.

The evidence clearly established that PG&E did not, in fact, follow the procedures and requirements established in the ETPM. Based upon the evidence, it is reasonable to conclude that sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO[57].

## VI.   REDUCTION OF UNIT COSTS FOR INSPECTIONS AND PATROLS

Although there were no changes to the frequency of inspections and patrols between the 2005 and 2018 ETPMs, the evidence established PG&E considered further reducing the frequency of inspections and patrols.  According to 2013 internal PG&E PowerPoint, a committee was formed to explore opportunities to reduce costs by reducing the frequency of inspections and patrols and examine said "unit costs."  According to the "Problem Statement:"

> "Tline[58] patrols/inspection have not been modified in approximately 10 years relative to frequency and work methods.  There may be opportunities to reduce costs by 1) changing frequency of patrols/inspections or 2) finding more efficient work practices. Benchmarking PG&E's practices against other utilities may identify potential opportunities for efficiency savings."

Under the heading "Business Objectives:"

---

[54] On January 19, 2018, the CPUC adopted and published the CPUC Fire-Threat Map.  The Fire-Threat Map identified elevated (Tier 2) and extreme (Tier 3) fire threat areas in the State of California.

[55] In conjunction with the Fire-Threat Map, the CPUC amended GO 95 to add regulations to enhance fire safety in Tier 2 and Tier 3 fire threat areas.

[57] California Independent System Operator Corporation.  CA ISO is a private, non-profit corporation that manages the high voltage power grid and the wholesale energy market for most of California.  CA ISO was created in 1997 as part of an effort to restructure the wholesale electric industry in California.  CA ISO is not a regulator.  CA ISO's power over electric transmission utilities derives from the Transmission Control Agreement entered into between CA ISO and the utilities.  In the Transmission Control Agreement the utilities agree to, among other things, properly maintain electric transmission lines, provide CA ISO with all current maintenance policies (referred to as a Transmission Owner Maintenance Practices (TOMP)).  Failure to comply with the terms of the Transmission Control Agreement could be a breach of contract.

[58] PG&E abbreviation for Transmission line

26

Define improvements in our frequency, tools or processes to find efficiencies in the patrols/inspections.
Perform benchmarking and analysis to measure current practices
Determine frequency of patrols/inspections (are we doing more than industry standard)
Analyze current patrols/inspections work methods (i.e. crew size)

Under the heading "Scope"

Patrols and Inspections for Transmission Lines
Frequency of patrols/inspections
Work methods/practices (tools, crew size, processes)
Unit costs measurement

Emails obtained from PG&E established committee members subsequently met with other electrical utilities for the purpose of benchmarking inspection and patrol practices of those utilities and submitted to a national electrical utilities association a patrol and inspection survey to be distributed to and completed by its members. This was done despite the fact the 2010 Quanta Technologies "Structures" Report[59] included data on patrol and inspection frequency gathered from a survey of 104 electrical utilities worldwide conducted in 2003 by the International Council on Large Electrical Systems, also known as Cigre'[60].   According to the Cigre' study 74% of the companies utilized "Walking" inspections, 63% utilized "Climbing" inspections and 66% utilized "Helicopter" inspections.  The average inspection period for each type of inspection was 1.4 years for walking, 1.5 years for helicopter and 4.2 years for climbing.

The lack of change in inspection and patrol frequency in subsequent revisions of the ETPM indicates that reduction of inspection and patrol frequency was not approved.  The committee was also exploring opportunities to reduce costs by finding more efficient work practices.  A key component of this inquiry was "Unit cost measurement."  The evidence indicates that PG&E reduced costs by reducing the unit cost for each inspection and patrol.  The evidence shows that this was accomplished by reducing the thoroughness of the inspections and patrols.

Review of internal PG&E documents, including emails, and interviews with PG&E personnel determined that the unit cost for inspection and patrol is calculated based upon the time that a troubleman spends inspecting an individual structure.  Based upon interviews it was established that each year PG&E determines an average unit cost for each type of inspection or patrol.  The unit cost would be translated into time and multiplied by the total number of structures on an individual line.  The result would be the time allotted for the inspection or patrol of that transmission line.  Prior to the start of each calendar year each transmission region headquarters was provided a list of inspections and patrols, including the allotted time, scheduled for the following year.  The inspection and patrol budgets for each transmission region headquarters was based upon the total allotted time for all scheduled inspections and patrols. The evidence established that the Business Finance Department of the Electric Transmission Division sent monthly budget reports tracking spending, both monthly and year to date, for inspection and patrol against budget allocations.  The reports were color-coded - red for over budget and green

---

[59] In 2009 PG&E hired Quanta to evaluate its electrical transmission system.  In 2010 Quanta submitted to PG&E the Transmission Line Component Management Report which included the Structures Report.
[60] Cigre is an international association of electrical transmission companies located in Paris, France.  Cigre was established in 1921 and claims 1250 member organizations from 90 countries.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
74 of 1229

for under budget. The evidence also established that salary incentives (bonuses) of Transmission Line Supervisors and Transmission Superintendents was, at least partially, based upon compliance with the inspection and patrol budget.

Based upon the evidence, PG&E reduced costs of inspection and patrol by reducing the amount of time budgeted for the inspections and patrols. As expected, the result of these reductions was less thorough and less complete inspections and patrols.


## VII.   TROUBLEMEN AND TRAINING

### a.   Creation of the Troubleman Program

The evidence established the inspection and patrol of the transmission lines is done by the "Troublemen." Similar to the inspection and patrol policy, the position of Troubleman has evolved and changed. Based upon interviews with former PG&E employees from the 1980s, the evidence established the position of Transmission Troubleman was created in the mid-1980s. The earliest reference to troublemen in documents provided by PG&E is found in the 1987 "Routine Patrolling and Inspection of Transmission Lines" policy bulletin.

According to the original Transmission Line Supervisors interviewed, the Transmission Troubleman position was initially intended to be a qualified and experienced transmission line expert. According to one of the original Transmission Lines Supervisors the "intent here was to have people that knew exactly what to look for, how to establish priorities on repairs, and would, would keep it operating." In addition to the physical demands and climbing requirements of the position, the Troublemen were also expected to take ownership of individual transmission lines and be accountable for the continued safe and reliable operation of that line.

### b.   Troubleman Training

The 1987 "Routine Patrolling and Inspection of Transmission Lines" policy memo established training requirements for the new Transmission Troublemen[61]. In the late 1980s, training for Transmission Troublemen included periodic meetings of all of the Transmission Line Supervisors and Troublemen. At these meetings issues and problems were shared and discussed. According to one of the original Transmission Line Supervisors, a supervisor was designated to document and/or collect all of the examples presented at the meetings in order to compile a training manual for future Transmission Troublemen. According to several of the original Transmission Line Supervisors and Troublemen, an inspection checklist was developed based in part on the information being shared at these meetings. Appendix A to the 1987 "Routine

---

[61] "It is the responsibility of each Region to ensure proper training of personnel conducting line patrols. This is to be accomplished through use of periodic training classes for all transmission troublemen and any other personnel who may be called upon to patrol. The training should include a review of this bulletin, other T&D bulletins as appropriate, patrol safety, Engineering Drawing 022168, and G.O. 95 requirements. The use of available videotapes (spacer damage, infrared patrolling, etc.) is encouraged. Particular attention should be given to the specific items listed on the code sheet that is provided with this bulletin. The Transmission and Distribution Department will assist the Regions in setting up and conducting the training classes."

Patrolling and Inspection of Transmission Lines" policy memo appears to be the earliest form of the checklist.

In addition to eliminating routine climbing inspections, reducing the frequency of inspections, and creating an Inspection Frequency Checklist, the 1995 ES Guideline eliminated the training requirement for troublemen. Notwithstanding that, the training requirement was dropped from the ES Guideline, the evidence does show that PG&E had created a Troubleman training program. According to one of the former PG&E employees involved in the creation of the 1995 ES Guideline, one of his duties from 1995 until 2005, was to provide direct annual training on inspection and patrol policies and requirements to all Troublemen. According to this former employee, a decision was made in 2005 to eliminate direct training of Troublemen. Instead, the Transmission Line Supervisors were provided training and expected to train the Troublemen under their supervision.

In December 1997, PG&E filed its first "Transmission Owner Maintenance Practice (TOMP) with the CA ISO[62]. In the TOMP the term "Troubleman" was replaced with the term "Inspector". According to the definition of terms, an Inspector is a "PG&E employed inspector commonly referred to as "troubleman."

In the 2002 "Transmission Owner Maintenance Practice" (TOMP) the term Inspector was replaced with "Qualified Company Representative (QCR). According to the Definition of Terms, a QCR is "a person, who by reason of training and work experience is able to complete an accurate assessment of the electric transmission facilities that he/she is asked to inspect." The required training and work experience necessary to be considered a QCR was never defined.

In the first version of the ETPM (2005), the term Troubleman does not appear. Instead, the ETPM continues the use of the term QCR. The 2005 ETPM definition of a QCR differed from the definition in the TOMP – "A Company representative who, by knowledge, required training, and/or work experience, is able to prepare an accurate and complete assessment of electric transmission facilities." The definition of a QCR continued to evolve through each revision of the ETPM. According to the 2018 ETPM a QCR is "A company representative, who, by knowledge, required training and/or work experience, is able and allowed to perform a specific job. For the purposes of this manual, QCR refers to an employee qualified to prepare an accurate and complete assessment of electrical transmission facilities." The ETPM does not define the knowledge, training of work experience required of a QCR.

Every QCR who has inspected or patrolled the Caribou-Palermo line since the publication of the ETPM in 2005 was interviewed. All of the QCRs denied having receiving any formal training on how to perform an inspection or patrol. According to all of the QCRs, any inspection and patrol training was limited to filling out reporting forms and notifications for any issues

---

[62] California Independent System Operator Corporation. CA ISO is a private corporation that operates the high voltage grid in California. CA ISO monitors the flow of power in transmission lines that providers use, operate wholesale electricity markets for energy and ancillary services, and maintain transmission maintenance standards. Transmission owners (TO's) mutually agree to contract with them. CA ISO was created by the State of California in 1997 in an effort to restructure the wholesale electric industry in California.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 76 of 1229

identified during an inspection or patrol.  All of the QCRs asserted that the only training on how to perform an inspection or patrol was via informal mentoring by other, more experienced, Troublemen.

The evidence also established that some of the QCRs performing inspections and patrols of the transmission lines in the Feather River Canyon had little or no transmission line experience before becoming a Troubleman.[63]

Although PG&E documents and management personnel assert that troublemen receive training on the requirements of the position, the troublemen themselves unanimously denied having received any formal training on conducting inspections and patrols and assessing wear.  The troublemen also denied being provided with any records (for example tower schematics) specific to the transmission lines being inspected.  The lack of specific training and records was especially significant for troublemen inspecting the Caribou-Palermo line.  The hanger holes, according to the original schematics, were 1 1/8" in diameter and the C hooks were 15/16" thick at the contact point.  On other Feather River Canyon transmission lines the C hooks were the same size but the hanger holes were significantly larger.  The evidence established that the Troublemen's lack of knowledge of the different sized hanger holes contributed greatly to the failure of PG&E to recognize the degree of wear on the C hook on Tower 27/222.

The evidence established that, despite the lofty goals of the originators of the troubleman position, and the designation of QCR by PG&E, by 2007 the inspections and patrols of the Caribou-Palermo line were being conducted by inexperienced, untrained and unqualified troublemen.  Both of the "Detailed Ground Inspections (2009 and 2014) and seven of the ten Annual Air Patrols on the Caribou Palermo were completed by troubleman who had little or no prior transmission experience, and no formal training on performing inspections and patrols.  This is contrary to the third Revision of the ETPM which requires that the "QCRs must be thoroughly familiar with all of the facilities, equipment, safety rules and procedures associated with the facilities and equipment."   Under the ETPM the QCRs are supposed to be looking at components and estimating wear by percentage of material lost.  In order to judge material loss a troubleman would have to know what a component looked like at 100%.  The majority of the troubleman sent to inspect and patrol the Caribou-Palermo line had no idea what the C hooks and hanger holes were supposed to look like.  Because of their lack of knowledge, experience, and training, the troubleman could not have been expected to identify the wear.  The overwhelming

---

[63] One former troubleman assigned to the Caribou-Palermo line admitted that although he was a journeyman lineman, he worked in distribution (almost 30 years) and had never worked as a transmission lineman prior to becoming a transmission troubleman.  Another troubleman assigned to the Caribou-Palermo line was also a distribution lineman prior to becoming a transmission troubleman and admitted his only experience with transmission lines above 60kV was during his apprenticeship.  According to a former Table Mountain HQ Transmission Line Supervisor, this Troubleman had so little experience with transmission lines that he was assigned to work with the transmission lineman until the Supervisor was forced by the union to allow the troubleman to conduct inspections and patrols.   Another former troubleman assigned to the Caribou-Palermo line had worked on transmission lines as a journeyman lineman until PG&E split distribution and transmission in the mid-80s.  The former troubleman worked in distribution exclusively for over twenty years before becoming a transmission troubleman.

evidence clearly established that troublemen and linemen inspecting and patrolling the Caribou-Palermo line did not meet the standards established in the ETPM.


## VIII.   FAILURES IN MAINTENANCE, REPAIR AND REPLACEMENT RECORD KEEPING ON THE CARIBOU-PALERMO LINE

As part of the Camp Fire Investigation, all maintenance/repair/replacement records for the Caribou-Palermo line were requested and obtained from PG&E.  Any and all records received from PG&E pertaining to Towers 27/222 and 24/199 were reviewed in depth.  The only records of any maintenance/repair/replacement located for these towers related to the replacement of parallel groove connectors[64] {Attachment – parallel groove connector} on each tower in 2016.

### a.   Hanger Brackets

During the investigation it was observed that "hanger brackets" (bolted add-on brackets for hanger plates for the hole that the C hooks hung from) {Attachment – add-on hanger bracket} had been added to the transposition arms of towers 27/222 and 24/199.   Similar hanger brackets were not found on other transposition towers and the brackets were not shown on the original plans for the transposition arms.  After being removed from the towers, the transposition arms were examined.  Some of the original hanger holes displayed significant "keyhole" wear. {Attachment – significant keyhole wear} PG&E was unable to produce any records of when, why, and by whom the hanger brackets had been added.  Based upon the keyhole wear observed on the original hanger holes, the only reasonable conclusion to be drawn was someone at PG&E at some time in the past had noticed the keyhole wear and was concerned enough to take action.

### b.   Parallel Groove Connectors

As previously mentioned, during the inspection of Tower 24/199 investigators noticed a parallel groove connector on the jumper conductor.  {Attachment – parallel groove connector on 24/199 jumper} It appeared to investigators that, at some previous time the jumper conductor had been shortened and spliced together using the parallel groove connector.  Investigators also observed that the right phase insulator string appeared to be less aged than the left phase insulator and, as a result of the shorter jumper conductor, was not hanging plumb.  From the ground, investigators also observed black marks on the tower leg nearest the right phase insulator string.  On the ground below Tower 24/199, investigators found an old insulator string.  The old insulator string was complete except for the C hook.

PG&E was unable to produce any records of when, why, and by whom the parallel groove connector had been added to the jumper.  No explanation was provided as to why the parallel groove connector on the jumper conductor was not replaced when all of the other parallel groove connectors in the tower were replaced in 2016.  PG&E was also unable to produce any records as to the replacement of the insulator.  Based upon the observations of investigators, the only reasonable conclusion that could be drawn is that at some time in the past the jumper conductor made contact with the tower leg, causing the blackening observed on the tower leg.  This damaged the jumper conductor, necessitating the removal of a portion and replacement of the

---

[64] Parallel groove connectors are used to connect two parallel pieces of power line (conductor).

insulator. It was also clear, based upon the change in the wear pattern on the C hook observed by the FBI metallurgist, the C hook was not replaced when the jumper conductor was shortened and the insulator changed.[65]

Although no records were found to explain why, the evidence established that as part of a scheduled Detailed Ground Inspection in 2009, the troubleman assigned to complete the inspection of the Caribou-Palermo line was instructed to document all towers with parallel groove connectors and create work orders for replacement of the parallel groove connectors. In total, the "Transmission Line Inspection Datasheet" completed by the troubleman as part of the report of the 2009 Detailed Ground Inspection, lists 85 towers for "Rpl Connectors." For each tower, a notification number was assigned and a "Corrective Work Form" was generated. Copies of these Corrective Work Forms for towers 24/199 and 27/222 were obtained during the investigation. Replacement of the parallel groove connectors was designated, according to the Corrective Work Forms as "Priority F – Schd Compl Yr 1+."[66] At the time the Corrective Work Forms were created, the April 2009 revision of the ETPM was in effect. The priority code F did not exist in the 2009 ETPM. The priority codes listed in the 2009 ETPM were A, C, G and P. Prior to the April 2009 revision of the ETPM, numerical (as opposed to letter) priority codes were used. The priority code F did not come into existence until the 2011 revision of the ETPM. According to the 2011 version of the ETPM, Priority Code F is defined as "Corrective action is recommended within 24 months from the date the condition is identified, except for nominations notifications or system wide initiatives identified by Asset Strategy (e.g., bridge bonding, shunt splicing), which can have due dates beyond 24 months."

According to the Corrective Work Forms for Towers 27/222 and 24/199, the parallel groove connectors were re-assessed during the 2011 Annual Air Patrol. A note dated August 16, 2011, states "per (troubleman) on 8/1/11 during patrol OK to move out 2 yrs." On November 10, 2009,[67] PG&E Applied Technology Services (ATS)[68] published a Lab Test Report entitled "Analysis of bolted aluminum transmission connectors from various PG&E sites." Based upon the ATS Lab Test Report the problems identified were internal to the connector. There is nothing in the report documenting any outward signs of the interior wear. The question of how a troubleman flying in a helicopter could assess the wear inside the bolted connectors was never answered[69].

A note on both Corrective Work Forms dated January 10, 2012, states "move required end date to 11/30/2015." No explanation is given as to why the required end date was moved back three

---

[65] According to PG&E and all transmission lineman interviewed, it was standard practice to replace the used C hook when replacing an insulator string. While inspecting the Caribou-Palermo line in February and March 2019 investigators noted another tower in which the insulator strings had recently (post Camp Fire) been changed but the C hooks were re-used.

[66] In a written response to a CPUC data request PG&E wrote "Between 10:41 a.m. and 10:42 a.m. on October 4, 2009, all 85 notifications were changed from Priority Code G to Priority Code B conditions by {name redacted}, the same PG&E contractor who changed the Priority Code on LC Notification 103995542. Between 5:38 p.m. and 5:39 p.m. on October 27, 2009, all 85 notifications were changed from Priority Code B to Priority Code F conditions by {name redacted}."

[67] Approximately three months after the completion of the 2009 Detailed Ground Inspection of the Caribou-Palermo line.

[68] Applied Technology Services is PG&E's internal engineering and scientific research lab. ATS was previously known as the PG&E Department of Engineering Research.

[69] Interior wear on parallel groove connectors may cause the connector to show excessive heat in an infrared inspection. None of the Annual Air Patrols included infrared inspections.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
79 of 1229

years.  PG&E addressed this issue in a Data Response to CPUC.  According to PG&E's written explanation, the Corrective Work Forms were initially assigned priority code G – required repair/replacement within 12 months.  On October 4, 2009, the priority code was changed to Priority B – required repair/replacement within three months in the PG&E SAP system.  According to PG&E, the priority code was changed again on October 27, 2009, to Priority F.  Also according to PG&E's written response to the CPUC, because the replacement of the connectors was a Priority F and was "for nominations[,] notifications[,] or systemwide initiatives identified by Asset Strategy (e.g., bridge bonding, shunt splicing), which can have due dates beyond 24 months" no documentation or reason was required for re-assessment.  The quoted language is from the 2011 version of the ETPM.  The 2009 version of the ETPM stated "Any reassessment must have sound business or technical supporting reasons and documentation on file and recorded in SAP."  No explanation was ever provided as to how and why a priority code and exception which did not come into existence until January 2011, was being applied in October 2009.

This raised serious questions as to the accuracy of the few maintenance/repair/replace records PG&E was able to locate. The final note on the Corrective Work Form is dated June 29, 2016, and reads that the connectors were replaced on June 18, 2016.  There is no record as to why the parallel groove connector on the jumper conductor of Tower 24/199 was not replaced.

In total, almost seven years elapsed between the identification of the defective parallel groove connectors on the Caribou-Palermo line and the replacement of those connectors.  At least ten years elapsed from the time replacement of parallel groove connectors were identified as a fire[70] mitigation.  No valid explanation for the extended amount of time was ever provided.


### c.  The "Deteriorated Transmission Equipment Replacement Program."

In 2007, PG&E introduced the "Deteriorated Transmission Equipment Replacement Program."  According to internal documents, the Deteriorated Transmission Equipment Replacement Program was included in PG&E's capital spending five-year plan and was funded through 2015.

PG&E was unable to produce any documentation as to the budget or eligibility requirements for the Deteriorated Transmission Equipment Replacement Program. Although the name of the program implied that the program was established to replace deteriorated equipment, no records of funding or eligibility requirements for the program were found.  During interviews and testimony of PG&E employees familiar with the program, it was simply a "bucket" of money available to fund capital improvements on transmission lines regardless of the condition of the line or its components.  Based upon the evidence the name Deteriorated Transmission Equipment Replacement Program did not accurately depict the true nature of the program.

---

[70] Parallel groove connectors were identified as a fire risk in the October 2006 Risk Analysis of Urban Wild Land Fires. See section XVII – "Knowledge of Risk/Consequence" for details re: the 2006 Risk Analysis.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 80 of 1229

### d. The Caribou-Palermo 7/55-8/64 Replacement Towers project

A portion of the Caribou-Palermo line was nominated for replacement through this program by the Maintenance and Construction Engineer[71] (M&C Engineer) assigned to the North Area[72]. According to a PG&E internal budget document "Request for Advance Authorization of Expenditures in Accordance with Capital Expenditures Policy," $800,000 was initially requested "for preliminary engineering and purchase of long lead-time material to replace conductor and tower structures on a section of the Caribou-Palermo line between structures 7/55 and 8/64.[73]" {Attachment – Google Earth Map showing 7/55-8/64} The initial Advance Authorization specifically stated:

> "There have been multiple conductor failures on this line due to conductor being annealed[74] and parting.[75] Since 2002 there have been 8 event reports created on this line. 5 of which was equipment related failures."

> "It is very time consuming and costly to correct any failures that occur in this dilapidated line section, especially during the winter months when failures are more likely."

> "The probability of that failure is imminent due to the age of both the towers and the conductor."

> "The intent of this project is to be pro-active and replace this deteriorated line section in a controlled and planned manner instead of under emergency conditions."

The initial Advance Authorization for $800,000 was not approved by PG&E's Electric Asset Strategy Division, and instead, upon re-writing and re-submission, was reduced to $200,000 by the then Director of the Electric Asset Strategy Division. The second Advance Authorization did not include the descriptor "dilapidated" or the prediction of imminent failure but did state: "Replace deteriorated structures, conductor, insulators, and hardware between structures 7/55 and 8/64." The second Advanced Authorization was approved. The project was named the "Caribou-Palermo 7/55-8/64 RPL Towers" project.

A "Project Manager"[76] was assigned to this project. According to internal PG&E documents, between 2007 and 2009 the Project Manager spent almost $800,000 conducting engineering studies of the proposed new tower sites and preparatory work, including building a road to allow access to the proposed new tower sites. In 2009, the project was canceled as, according to internal emails, "this project fell below the cut line for 2010 approved projects." According to a 2014 email from a member of PG&E's Capital Accounting Department the project "was canceled due to Asset Management's reprioritization and is not expected to be resumed." During an email chain, starting on November 2, 2009 and ending on January 22, 2010, the Project

---

[71] Although the job title was Engineer this person was not an engineer and had no engineering education or experience. This person described his position as "You're kind of a liason between the field crews and both civil and electrical engineers."

[72] Includes Sacramento District, Table Mountain District, Eureka District and Lakeville District

[73] On the southside of the Feather River between Caribou Road and Beldon.

[74] According to the M&C Engineer "annealed usually means a little more brittle."

[75] The M&C Engineer also identified the conductor as copper and not aluminum because "we wouldn't put shunts on aluminum."

[76] A project manager is a person assigned to supervise a specific project.

Manager made the following arguments for continuing and completing the Caribou-Palermo 7/55-8/64 RPL Towers project to the Program Manager[77] assigned to that major work category:

> "If it is not funded for permitting etc., we could be picking up these towers out of the Feather River Canyon when they fall over."

> "We have already notified FERC[78] of the project and it will not look good if towers we have identified as deteriorated fall over in the canyon because we did not perform the work due to funding."

Despite the representations of the Project Manager the project was not reinstated by the Program Manager.

During interviews with investigators and testimony, the author of the Advance Authorizations[79] and the Project Manager separately asserted they had no factual basis for the statements about the condition of the Caribou-Palermo line towers and downplayed the statements as exaggerations made while advocating for a project.

### e. __The Rock Fire__

A Corrective Work form[80] was located for replacement of a failed connector on Tower 11/87 in September of 2008. The Corrective Work Form was generated based upon a non-routine patrol of the Caribou-Palermo line generated by a power interruption on the line on September 30, 2008.

On September 30, 2008, at approximately 2:30 p.m., the Plumas National Forest Headquarters received a report of a fire near the Rock Creek Dam. {Attachment – Google Earth map of Rock Creek Dam} The fire was named the Rock Fire. This fire burned approximately five acres in the Plumas National Forest. Origin and Cause investigators from the United States Forest Service (USFS) investigated the fire and determined the origin to be directly below Tower 11/87 of the Caribou-Palermo line. The Rock Fire was determined to have been caused by an equipment failure, specifically the failure of a connector on a jumper line, on Tower 11/87. PG&E records obtained by the USFS investigators showed PG&E experienced an interruption on the Caribou-Palermo line at approximately 2:02 p.m. on September 30, 2008. No records of a root cause investigation of the failure of the connector were found. Consistent with PG&E's practice, as supported by the evidence, PG&E did not conduct climbing or aerial inspections on other Caribou-Palermo line towers with similar connectors.

### f. __Tower Collapse__

On December 21, 2012, a catastrophic failure occurred on the Caribou-Palermo line that generated six corrective work forms. Five towers, 22/187 through 23/191, collapsed and a sixth

---

[77] PG&E divides electrical transmission work (repair/replace/maintain/improve) into "major work categories" (also referred to by PG&E personnel as budgetary "buckets"). The program manager oversees all projects within a major work category.

[78] It appears that this is a reference to a Federal Energy Regulatory Commission (FERC) rate case. In support of requests for rate increases PG&E files a rate case with FERC. To justify the proposed rate increase in the rate case PG&E lists planned capital projects with cost projection. Projects are generally forecasted five years in the future.

[79] A former Maintenance and Construction (M&C) engineer.

[80] A PG&E form generated by field personnel to document and describe problems, defects, wear or other conditions on transmission assets requiring maintenance/repair/replacement.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 82 of 1229

tower, 23/192, {Attachment – Google Earth map of towers} was badly damaged to the extent that it needed to be replaced.

A PG&E Civil Engineer investigated the incident and did not author a report, but did communicate his conclusions in an email. He determined Tower 22/188 initially collapsed causing a domino effect that pulled down towers 22/187, 22/189, 23/190 and 23/191. He concluded the collapse of Tower 22/188 was caused by the failure of the "stub angles"[81] possibly due to strong wind and/or icing wet ground conditions. No formal "Root Cause Analysis" was conducted. Although he concluded his analysis by stating "Due to this failure phenomenon, it would be advisable to inspect towers with similar line angle on this line to ensure no other foundations had experienced similar uplift during same wind storm." The evidence established none of the other Caribou-Palermo line tower foundations were inspected. Again, this is consistent with PG&E's practice of not following up on clearly established potential safety and/or maintenance issues.

The six towers were temporarily replaced by a "Shoe Fly," consisting of fifteen wooden poles, constructed along Camp Creek road. {Attachment – Google Earth map of Shoe Fly} The Shoe Fly was completed by January 30, 2013. The Shoe Fly remained in service until the six towers were permanently replaced. The six towers were eventually, permanently, replaced by modern H-Frame tubular steel pole structures in 2016.

### g. Center Phase Conductor on Tower 24/200

On January 10, 2014, a PG&E employee doing "crew work" documented a problem on the center phase conductor on Tower 24/200. Pictures attached to the Corrective Work Form appear to show a damaged conductor. In addition, the photos appear to show damage to the corona shield[82] (part of the hot end attachment hardware) and melting on the conductor below the corona shield. Another photograph appeared to show a piece missing from another section of the conductor and blackening on the conductor a few inches from that missing piece. The Corrective Work Form stated the conductor was repaired on 5/1/2014, but did not indicate that either the hot end attachment hardware generally, or the corona shield specifically, were replaced. No records were found indicating a root cause analysis was ever done to determine the cause of the damage to the conductor and corona shield.

### h. Broken J Hook

On October 19, 2016, a J hook in Tower 11/99 broke when a member of a PG&E contractor painting crew attempted to use a cross brace attached to the J hook for support. According to the PG&E report on the incident "I[]t appears as though about 20% of the thickness of the bolt had been compromised through corrosion." Although the incident was reported to and investigated by PG&E, nonetheless true to the company's practice, the failure of the J hook did not cause inspections of J hooks in other similar towers.

---

[81] The stub angles connect the foundation to the base of the tower.
[82] Corona discharge is the leakage of electric current into the air around high voltage conductors. A corona shield is a disc of conductive material designed to absorb the destructive corona discharge and protect the attachment hardware.

## IX.   INSPECTION AND PATROL OF THE CARIBOU-PALERMO LINE

Based upon PG&E records and flight records obtained from their contracted helicopter company, the evidence established inspections and patrols of the Caribou-Palermo line did not comply with the standards set forth in the ETPM and did not meet the requirements of the law or the regulatory agencies.

Routine inspection and patrol records for the Caribou-Palermo line were obtained back to 2001. According to PG&E, no inspection or patrol records prior to 2001 could be located.  Based upon the inspection and patrol records the evidence established that the Caribou-Palermo line was subjected to "Detailed Ground Inspections" in 2001, 2003, 2005, 2009 and 2014.  Based upon the inspection and patrol records the evidence established the Caribou-Palermo line was subjected to "Annual Aerial Patrols" in 2001, 2002, 2004, 2006-2008, 2010-2013, 2015-2018. There is no record of any climbing inspections, detailed ground inspections above 10' or aerial inspections conducted on the Caribou-Big Bend section of the transmission line.  All of the inspection and patrol records were reviewed and all of the troublemen/linemen who conducted the inspections and patrols were interviewed.

Because it was the last "Detailed Ground Inspection" of the Caribou-Palermo line prior to the Camp Fire, the 2014 Detailed Ground Inspection became a focus of the investigation.  The 2014 Detailed Ground Inspection was memorialized in a 60-page "Report" which included an "Operational Control Ticket," a "Transmission Line Data Inspection Sheet," a "Priors" list[83] and a "Transmission Object List."[84]  According to the report, the detailed ground inspection was completed between August 5, 2014 and August 13, 2014 by a troubleman and a lineman.  Four issues that necessitated the creation of a Corrective Work Form were documented in the report: flashed insulator bells were found on tower numbers 21/180A, 26/215 and 16/129 and a broken insulator bell was observed on tower number 27/226.  The report was signed by both the troubleman and the lineman on August 28, 2014 and the Transmission Line Supervisor on September 3, 2014.  The evidence established that the lineman was assigned to "assist" with the inspection because the troubleman, who was nearing retirement, was no longer physically able to hike/climb to many of the towers on the Caribou-Big Bend section of the line.  The evidence also established that the troubleman and lineman were also assigned to take line clearance measurements (which included date, time and air temperature) at pre-determined intervals along the transmission line to determine compliance with new NERC clearance guidelines.

The 2014 Detailed Ground Inspection Report was subjected to intense scrutiny.  PG&E records, including troubleman and lineman daily timecards, were obtained for comparison against the report.  The evidence established the following:

---

[83] A list of previously documented issues pending an open corrective work form.

[84] The Transmission Object List lists every structure on the transmission line.  In 2014 each structure was identified by its tower number, a SAP equipment ID number, a physical description of the structure and the GPS coordinates for the structure.  For each structure the list has an Inspection Result section in which the QCR checks the applicable box and a notes section for the QCR to write any notes about the structure or record any problems/issues/defects observed.

1) The detailed ground inspection started on July 24, 2014 and ended on August 27, 2014. Although the report states that the physical inspection of the Caribou-Palermo occurred on August 5, 6, 7, 13, and 14; emails, records and interviews established that an unknown, and undocumented number of towers was inspected on August 27.

2) In addition to the troubleman and lineman, four linemen whose names do not appear in the report assisted with the inspections on August 27, 2014. According to emails and helicopter records, prior to August 27, 2014, the Transmission Line Supervisor scheduled a helicopter to fly the lineman to difficult to reach towers. Four additional lineman were assigned to assist with inspections on August 27, 2014. No records indicate which towers were inspected on August 27, 2014 and which lineman inspected which tower.

3) The allotted time[85] for the 2014 Caribou-Palermo Detailed Ground Inspection was 89.5 hours. Based upon time cards, 121 hours were initially billed to the Caribou-Palermo Detailed Ground Inspection. After the inspection was complete, a secretary changed billing records to re-assign hours billed to the inspection of the Caribou-Palermo line to lower the total hours billed to the Caribou-Palermo Detailed Ground Inspection to 91 hours.

4) The lineman assigned to assist with the 2014 Detailed Ground Inspection of the Caribou-Palermo line had previously completed some troubleman training but focused mainly on "Switching." The lineman did not recall receiving any training on performing inspections and patrols other than informal training by troublemen. No evidence was found to establish the four other linemen who performed inspections had previously completed any training on inspection and patrol. Additionally, the evidence established the lineman did not complete his inspections under the supervision of the troubleman. The evidence established that the troubleman divided the Caribou-Palermo line between himself and the lineman, and each conducted an independent inspection of the towers in the assigned section. The lineman was assigned to inspect the Caribou-Big Bend section of the line.

5) Recall the six steel towers numbered 22/187 through 23/192 ceased to exist in December 2012 due to the catastrophic failure and were replaced by a "Shoe Fly" consisting of 15 wood poles in January 2013 until the towers were permanently replaced in 2016. However, according to this 2014 report, those missing towers were physically inspected in August 2014, including a previously documented issue on tower 22/188. The previously documented issue on Tower 22/188 was the replacement of the parallel groove connectors identified during the 2009 Detailed Ground Inspection.

6) The lineman assigned to assist with the 2014 Detailed Ground Inspection of the Caribou-Palermo line was not trained to complete the ground clearance

---

[85] The amount of time budgeted for each inspection/patrol. See section VI – "Reduction of Unit Costs for Inspections and Patrols" and subsection A – Expense Budget of section XI – "Budgetary Considerations"

measurements. According to PG&E policy, clearance measurements must include the measurement, and the date, time and air temperature when the measurement was taken. Although the report shows the clearance measurements were done concurrently with the inspection, the evidence established they were not. The lineman said he was not initially instructed to perform the clearance measurements and did not do so during his initial inspection. He went on to say it was not until after he had completed his inspection of the Caribou-Big Bend section of the line and submitted his report that he was told to perform clearance measurements. He stated he was ordered[86] to return to the field and perform the clearance measurements. He stated he was not initially told he needed to record the time of each measurement. According to the lineman, he returned to the Caribou-Big Bend Section of the line with the "Transmission Object List" and obtained the measurements. He stated he then added the measurements and air temperature to the already completed "Transmission Objects List." He then submitted his report a second time and was informed of the requirement to record the time of each measurement. He said that he then estimated the time he had taken the measurements and added those time estimates to his report. The result was the dates and times of the clearance measurements documented in his reports were not accurate.

Written documents clearly establish the Table Mountain Transmission Line Supervisor knew the dates inspected on the Transmission Object List were wrong. Written documents also clearly established that he knew that for some of the towers the name of the inspector conducting the inspection was wrong. The evidence also establishes he knew the line clearance measurements did not occur on the dates listed on the Transmission Object List. Despite specific knowledge the report was not accurate; the Transmission Line Supervisor approved and signed the report.

Although the investigative team did not scrutinize other patrols and inspections of the Caribou-Palermo line to the extent devoted to the 2014 Detailed Ground Inspection, similar issues were found in other inspection and patrol reports. The 2009 Detailed Ground Inspection of the Caribou-Palermo line was conducted by the same troubleman who conducted the 2014 Detailed Ground Inspection. There is evidence that a lineman, who was not mentioned or listed in the 2009 report, assisted with that inspection also.

The 2012 Annual Air Patrol Report was also found to be inaccurate. In 2012, another troubleman, was assigned to complete the patrol. According to the date-inspected line on the report, this troubleman started his patrol on August 6, 2012. The patrol was interrupted at Tower 16/130 due to "fire." The remainder of the patrol was completed by yet another troubleman. However, the report only lists the assigned troubleman and lists the "Date Inspection Completed" as August 6, 2012. In an email dated August 13, 2012 from the assigned troubleman to the Transmission Line Supervisor, the troubleman stated he would be going out on medical leave and had updated the subsequent troubleman on the "caribou-palermo partially flown on 8-6…not complt'd do to the fire in the canyon." According to the assigned troubleman, he was

---

[86] The lineman was not clear about who ordered him.

unable to complete the patrol prior to going out of medical leave and the another troubleman completed the patrol sometime after August 21, 2012.

One former troubleman admitted he did not like flying the Feather River Canyon transmission lines and, whenever possible, assigned an available lineman to complete the routine air patrols. According to the former troubleman, after the lineman completed the air patrol the troubleman would use the lineman's notes to complete the patrol report and submit the report as if the former troubleman had personally completed the patrol.

The evidence also established during the 2013 and 2015 Annual Aerial Patrols of the Caribou-Palermo line, which were completed by different troublemen, towers 22/187 through 23/192, which ceased to exist in December 2012, were "inspected" and the pre-existing condition (parallel groove connectors) on Tower 22/188 was checked.

The inspection and patrol records clearly established that between 2001 and 2018 aerial patrol by helicopter was the primary method of inspection and patrol for the Caribou-Palermo line. As such, the thoroughness of aerial patrols of the Caribou-Palermo line was examined closely. The evidence established the thoroughness of the aerial patrols declined through the years.

Troublemen assigned to inspect the Caribou-Palermo line from 1987 through 2018 were interviewed regarding the thoroughness of air patrols. A former troubleman who conducted air patrols prior to 2001, described helicopter patrols of the Caribou-Palermo line as taking one to one and half days. One former troubleman explained his protocol for aerial patrols included instructing the pilot to fly low enough and slow enough that the troubleman could step out onto a tower if necessary. On a report of the 2001 Annual Air Patrol was a handwritten note "10 hrs." According to the former troubleman who performed the 2001 air patrol, 10 hours was the approximate flight time for the patrol of the Caribou-Palermo line.

During the investigation, helicopter flight records from 2011 through 2018 for Caribou-Palermo line aerial patrols were obtained from a local helicopter company contracted by PG&E to assist with aerial patrols. According to that company, flight records and billing records prior to 2011 no longer existed.

In 2011, flight records document 3.2 hours for the aerial patrol of the Caribou-Palermo line. In 2012, the aerial patrol of the Caribou-Palermo line was interrupted by fire and complete records for the patrol were not located.[87] In 2013, a troubleman completed aerial patrols of the Caribou-Palermo line, Caribou-Westwood and Palermo-Pease transmission lines (990 total structures) in 7.6 hours. In 2015, a troubleman completed the aerial patrols of the Caribou-Palermo line, Cresta-Rio Oso, Oroville-Thermalito-Table Mt #1, Oroville-Thermalito-Table Mt #3, Oroville-Table Mt (CDWR), Hamilton Branch-Chester, Collins Pine Tap and Palermo-Pease transmission lines (1,430 total structures) in 6.1 hours. In 2016, a troubleman completed the aerial patrols of the Caribou-Palermo line, Grizzly Tap, Cresta-Rio Oso, Butte Valley-Caribou and Plumas Sierra Tap transmission lines (1050 total structures) in 6.8 hours. In 2017, a troubleman completed the aerial patrols of the Caribou-Palermo line, Butt Valley-Caribou and Hamilton Branch-Chester transmission lines (813 total structures) in 4.9 hours. In 2018, a troubleman completed the aerial

patrols of the Caribou-Palermo line, Grizzly Tap, Grizzly Tap SVP, Plumas-Sierra Tap, Butt Valley-Caribou and Caribou #2 transmission lines (1708 total structures) in 5.7 hours.

A retired PG&E employee, who spent over 30 years in the Electrical Transmission Division reviewed the flight records. This former employee had been involved in the drafting of the 1995 inspection policy memo and the ETPM and the troublemen training program from 1995 to 2005. This former employee stated the flight records reflected the aerial patrols are "fly bys" not patrols or inspections. One recently retired troubleman admitted when doing aerial patrols he was only confirming the structures and components were "standing upright".

All of the troublemen who performed aerial patrols on the Caribou-Palermo line since 2012 and the current Transmission Line Supervisor assigned to Table Mt. Headquarters, were shown photographs, both the January 31, 2019 BCDA photographs and PG&E WSIP[88] photographs, of worn C hooks and hanger holes. All of the troublemen consistently denied it was possible to see and assess the wear on the C-hooks and hanger holes during aerial patrols.[89] The Transmission Line Supervisor asserted that, based upon wind and topography, it was not safe for the helicopters to fly low enough and slow enough to enable the troublemen to see and assess the C-hooks and hanger holes. The troublemen also denied it was possible to assess the wear on the C hooks and hanger holes during a detailed ground inspection. The ETPM corroborates the troublemen on both. According to Table 2 in section 1 of the ETPM the best view positions for assessing insulators and hardware do not include ground inspections nor aerial patrols. Only climbing inspections or lifted bucket inspections above 10 feet in the air would give the appropriate best view for assessment of insulators and their connectors.

Since the enactment of the ES Guideline E-TSL-G013 in 1995, **climbing inspections have only occurred "as triggered."** The specific language regarding triggers has changed very little since 1995. Appropriate "triggers" for climbing inspections were covered in section 2.1.3 of the ETPM (emphasis added):

> **Triggers** are **specific conditions** that **require** follow-up inspections and/or maintenance scheduled by the supervisor, independent of the routine schedule.
>
> The following triggers can be applied to one unit of inspection or many units, either grouped or spread over a line section/area:
>
> - **Component defects identified by inspection**
> - **Component failure (including failure in like components)**
> - **Components proven defective by testing**
> - **Wire/structure strike**
> - **Burned area or high fire hazard**
> - **Failures caused by natural disaster or storm**
> - Third-party observations and complaints
> - Marginal capability components of a re-rated line section

---

[88] Wildfire Safety Inspection Program – an "enhanced" post Camp Fire inspection of all PG&E electric transmission structures. See section X – Comparison of Caribou-Palermo With Other Transmission Lines for details on the WSIP and analysis of WSIP results.

[89] All of the troublemen also denied knowing the sizes of the hanger holes and C hooks. Therefore, even if the troublemen had looked at the C hooks and hanger holes, without knowledge as to their respective sizes, the troublemen would not have been able to assess wear.

- Known, recurring conditions that jeopardize line integrity
- Suspected vegetation clearances less than required or less than legal vegetation clearances, or concerns about fast growth of vegetation

Despite the facially mandatory language, "specific conditions that **require,**" many PG&E employees who were interviewed, including electric transmission troublemen, linemen and support personnel expressed an understanding that an occurrence or discovery of a specific condition did not necessarily trigger climbing inspections. The evidence clearly established that on the Caribou-Palermo line, PG&E interpreted the mandate of "require" as discretionary. The maintenance/repair/replacement records established that since 2007 many of the "required" triggers occurred. Some of the triggers (e.g. failures caused by storm, fires under the transmission line) have occurred multiple times. The evidence established the following triggers documented in PG&E records between 2007 and 2018:

- 2008 Lightning Complex fires (burned under and around transmission line)
- 2008 Rock Fire (started by failure of connector on Caribou-Palermo line Tower 11/87)
- 10/17/08 - failure to underarm jumper
- 2009 identification of parallel groove connectors on 83 towers (defective components)
- 2009 ATS Lab Test Report identifying defects in installation of parallel groove connectors
- 2012 fire which caused delay of 2012 Annual Air Patrol
- 2012 tower collapse (defective component)
- 1/10/14 - Unknown Failure/Locked Out causing interruption, no cause determined
- 2/7/15 – storm damage
- 12/10/15 Sustained outage. Found center phase guy wire tie down broken. North phase top insulator unpinned @ structure 23/194.
- 10/19/16 failure of a J hook in structure 11/99.
- 1/9/17 Storm related emergency due to (6) lockouts on the Caribou Palermo line. Non-routine air due to line locked out, crew found problem of floating center phase conductor at tower 24/200.
- 1/10/17 storm damage, conductor repaired.
- 2/1/17 storm related interruptions. "Non-routine airs due to momentary outages, fault location 10/79, found hold insulator hold down parted at structures 8/67 and 11/89, will create notifications for repairs."
- 2/21/17 "Non-routine air patrol due to strom related momentarys [sic]. After several relays GCC placed non-test on line and line went to lock-out." "Per [Troubleman] on 2/21/17 during storm damage: Air patroled [sic]fault area and found hardware loose on tower 3/28 but not sure if this was part of the problem, re-energized line and held."
- 3/2/18 "Investigate relay that occurred on 3/1/18 @11:43. Found damaged insulator on structure 37/301. Created notification to replace insulators."

Between January 1, 2017 and February 21, 2017 there were at least nine documented storm related interruptions on the Caribou-Palermo line and at least six equipment failures. Based upon the evidence neither the individual events nor the cumulative events were deemed sufficient to trigger climbing inspections on the Caribou-Palermo line.

Although several PG&E transmission line employees referred to the ETPM as "The Bible" and asserted strict compliance with the standards and policies of the ETPM, the totality of the evidence shows that on the Caribou-Palermo line, the ETPM was not followed. Because PG&E had inexperienced, untrained and uninformed personnel conducting inspections and patrols under unrealistic time constraints, the inspections and patrols did not spot defects and wear.

On June 26, 2018, a PG&E work order requiring climbing inspections of all Caribou-Palermo line structures was issued by a PG&E Tower Department supervisor. The supervisor was interviewed. The supervisor could not provide any reason or rationale for the work order. Specifically, the supervisor stated that the work order was requested by someone else and his job was simply to compile the information into a template report and forward the template report to the appropriate work group.

PG&E was unable to provide any further information. "PG&E's inspection records do not identify the factors that led to the selection of the Caribou Palermo 115 kV Transmission Line as one of the lines selected for climbing inspections as part of this effort. PG&E understands that the age of lines was a factor that was considered in their selection."[90]

Beginning in September 2018 climbing crews from the PG&E Tower Department climbed and inspected 80 towers on the Caribou-Palermo line. The vast majority of the towers climbed and inspected were on the Palermo-Big Bend section of the Caribou-Palermo line. "PG&E understands that the reason these approximately 80 towers were selected first and the order in which they were inspected was determined by the Tower Department based on various considerations, including weather conditions and crew availability."[91]

All of the towers climbed in September and October 2018 were subjected to WSIP enhanced inspection starting in December 2018. The WSIP enhanced inspections documented problems and defects on numerous towers that were not discovered/detected/documented during the September 2018 climbing inspections.

The fact that PG&E has no explanation for how or why or by whom the decision to conduct climbing inspections was made is disturbing but not unusual. Numerous decisions and policies were investigated. As to many decisions and policies, PG&E was unable to provide any documentation as to who made the decision, how the decision was made and upon what the decision was based. This inability to determine who made decisions and upon what those decisions were based, frustrated efforts to identify individuals potentially personally liable for policies that lead to the conditions which caused the Camp Fire.

---

[90] PG&E written response to CPUC Data Request 008, Question 1.
[91] PG&E written response to CPUC Data Request 008, Question 1.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 90 of 1229

## X. COMPARISON OF CARIBOU-PALERMO WITH OTHER TRANSMISSION LINES

Although the undetected problems on the Caribou-Palermo line were bad, the evidence established that the Caribou-Palermo line was only marginally worse than other comparison transmission lines. Records from post-Camp Fire enhanced inspections of other, similar lines clearly established PG&E's problems were systemic as opposed to local.

The evidence established by early afternoon on November 8, 2018, a PG&E troubleman on an emergency air patrol of the Caribou-Palermo line had identified and photographed the equipment failure on Tower 27/222. Within six days PG&E initiated climbing inspections of the Caribou-Palermo line and other similar transmission lines. The initial inspections were named the "Nine Lines Inspections.[92]" PG&E records established that by November 14, 2018 the inspections were underway. The evidence showed the inspectors were specifically focused on C hook and hanger hole wear. By early December the Nine Lines Inspection program was superseded by the Wildfire Safety Inspection Program (WSIP). The WSIP involved enhanced (climbing and drone) inspections of all electrical transmission lines within higher wildfire risk areas. The WSIP inspections "identified thousands of conditions requiring repairs on PG&E's system that had not been previously identified."[93]

As a result of the WSIP, and at the request of the CPUC, an independent engineering company named Exponent was retained to review the data from the WSIP. According to its website "Exponent is a multi-disciplinary engineering and scientific consulting firm that brings together more than 90 different disciplines to solve engineering, science, regulatory and business issues facing our clients." Based upon historical records, Exponent has a longstanding relationship with the CPUC and has conducted failure analysis investigations of previous PG&E incidents.

According to interviews with Dr. Brad James, PhD in Metallurgical Engineering and Failure Analysis expert at Exponent, Exponent was tasked to confirm whether the Caribou-Palermo line had significantly more repair tags when compared to other lines and to discover the reasons behind the high volume of high priority repair tags.

Exponent published its final report, entitled "PG&E Caribou-Palermo Asset Condition Investigation" to PG&E and the CPUC on November 1, 2019. A copy of the report was obtained via Grand Jury Subpoena.

According to the Exponent report the comparison lines were chosen from a list of transmission lines based on four criteria:

- 115 or 230kV lines only
- Elevations greater than 1,000 feet
- Single circuit steel lattice towers
- Tier 2 or Tier 3 fire zones

---

[92] The nine lines were identified as the Caribou-Palermo line, the Drum-Rio Oso #1 line, the Pitt #1-Cottonwood line, the Caribou #2 line, the Caribou-Plumas Jct line, the Colgate-Alleghany line, the Fulton-Hopland line, the Hat Creek #1-Westwood line and the Keswick-Trinity line.
[93] CPUC Data Request: SED-007, Response to Question 6.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 91 of 1229

Other criteria that were also applied included mountainous terrain and wind exposure. Based upon the criteria only transmission lines in running through low population, rural areas were chosen. There were no transmission lines from the Bay Area, Central Valley or central coast chosen for comparison.

Among the conclusions reached by Exponent are the following:

- The Caribou-Palermo line was confirmed to have greater post–Camp Fire high-priority ("A" + "B") repair tag[94] counts than all selected comparison lines, as well as an increased per-structure high-priority tag rate when normalized[95] for the number of steel lattice towers.
- Other lines adjacent to Caribou-Palermo line such as Bucks Creek–Rock Creek–Cresta (BCRC), Cresta–Rio Oso (CRO), and Paradise–Table Mountain (PTM) had the second, fourth, and fifth highest post–Camp Fire high-priority tag counts, respectively, when normalized for steel lattice towers. Pit #4 Tap (P4T) had the third highest normalized high-priority tag count. It is not near Caribou-Palermo line.
- Wear was the most commonly observed post–Camp Fire damage mechanism for Caribou-Palermo line "A" tags and second most commonly observed damage mechanism for "B" tags. Nearly all Caribou-Palermo line wear-related tags were associated with cold-end hardware. Cold-end hardware wear issues were likely caused by repeated conductor and insulator movement over time.
- Caribou-Palermo line, BCRC, and CRO lines, each located within the North Fork Feather River Canyon, exhibited high-priority cold-end hardware wear tag counts more than three times higher than the next highest comparison line when normalized for steel lattice towers.
- Caribou-Palermo North experiences higher annual average wind speeds than non-adjacent comparison lines. Lines analyzed within the North Fork Feather River Canyon may have increased wear tag rates associated with longer-duration high-wind conditions. No apparent correlation between wear tags and temperature, precipitation, or peak wind speed (50-year return) was observed.
- From 2001 to November 2018, the Caribou-Palermo line was subjected to similar ground inspection and patrol frequencies as comparison lines. These inspections and patrols yielded comparable normalized high-priority tag counts between Caribou-Palermo line and comparison lines.

---

[94] A report that documents a problem found, assigns a priority code to that problem and requests repair/replacement. PG&E Corrective Work Forms (CWF) are commonly referred to as tags. CWFs/tags are also referred to as notifications, especially in Transmission Asset Management.

[95] Normalization is a statistical analysis used for comparison purposes. Exponent divided the number of tags on a transmission line by the number of towers in the transmission line in order to compare transmission lines with disparate numbers of towers.

- The Caribou-Palermo line had more normalized equipment-based outages between 2007 and 2018 than approximately 80 percent of the other WSIP transmission lines.
- Caribou-Palermo line and other North Fork Feather River Canyon lines appear to have a unique set of factors that contributed to increased rates of high-priority cold-end hardware tags relative to other comparison lines. Factors such as design (link connectors and a relatively large number of non-tensioned insulated conductors), long-duration exposure to higher winds, age, and historical inspection methodologies likely all contributed to these cold-end hardware wear issues.

Although Exponent did not complete a forensic root cause analysis of the C hook that failed on Tower 27/222, when questioned Dr. James stated "That said, things like wear, things like fatigue do have a time component because the more times you rub that metal against each other, the more chance you have to – create wear. The more times you cyclically load the spring in your garage door, the longer you do that, the more chance you are going to initiate a fatigue crack and eventually grow it."

The Exponent report analyzed historical (2001-2018) high priority tags[96]. Consistent with the statements of the troublemen and linemen who have completed all inspections and patrols on the Caribou-Palermo line, Exponent found no high priority tags for cold end attachment hardware wear. Exponent also examined historical (2001-2018) inspection and patrol records for all of the comparison transmission lines. Exponent did not find any high priority tags for cold end attachment hardware on any of the comparison lines. This evidence established that the local Table Mountain District troublemen and linemen were not doing less than the troublemen and linemen assigned to other districts involved in the study.

Although the primary focus was cold end attachment hardware wear, the Exponent report also analyzed all Priority A and B "tags" generated by the WSIP. Priority A and B tags were "binned"[97] by component type and damage mode.

Organized by component type, on the Caribou-Palermo line there were actually more tags (all Priority B) generated for "Foundation" issues than "Cold End Hardware." There were also tags generated for steel frame issues, insulator issues and conductor issues.

Organized by damage mode, there were more tags generated on the Caribou-Palermo line for soil movement (associated with foundation) than wear (exclusively associated with cold end attachment hardware). The other damage mode tags included bent, loose, missing, broken and corrosion.

The fact the troublemen and linemen missed that tower foundations were buried and portions of the steel structures were bent, loose, broken or missing contradicted the assertions of PG&E

---

[96] Issues that would be considered A or B priority under the current version of the ETPM
[97] In layman's terms the tags were separated, sorted and organized by category.

46

employees that inspections and patrols were being conducted pursuant to the requirements of the ETPM.

Tower 27/221 best illustrates this lack of attention and thoroughness. On September 11, 2018, during the Annual Air Patrol of the Caribou-Palermo line, the troubleman noticed that a "hold down insulator anchor" on Tower 27/221 had failed. The troubleman noted the problem on his report and created a Corrective Work Form for repair of the hold down insulator anchor. On November 11, 2018, during the Camp Fire origin and cause investigation, the electrical engineer retained by Cal Fire noted and photographed the failed hold down insulator anchor on Tower 27/221. The electrical engineer also noted the arm of the transmission tower to which the hold down insulator anchor should have been attached was bent and two of the steel members of the arm were buckled. No corrective work form for the arm was located. The troubleman **only** created a corrective work form for the hold down insulator anchor. According to PG&E policy, as explained by multiple transmission troublemen, supervisors and specialists, corrective work forms are problem specific and if there are multiple problems in a tower each problem gets a separate corrective work form.

The Exponent report also compared the number of post-Camp Fire A and B tags with the comparison lines. Except for tags related to foundation issues, Exponent did not separate and organize the tags from the comparison lines. According to the Exponent report there were previously undocumented issues on all of the comparison lines. The only reasonable conclusion to be drawn from this data is that inspections and patrols on other lines are only marginally more thorough than those done on the Caribou-Palermo line. This conclusion was corroborated by Exponent's comparison of A and B tags across maintenance districts. According to the Exponent report the post Camp Fire normalized A and B tags for comparison lines in the Table Mountain maintenance district (referred to as Table Mountain Headquarters by PG&E personnel) were not inconsistent with those of comparison lines in the Sacramento and Lakeville maintenance districts.

Based upon the totality of the evidence regarding the ETPM and inspections and patrols the only reasonable conclusion to be drawn was the Caribou-Palermo line specifically and the Table Mountain District in general are not outliers. The evidence established the lack of thorough inspections and patrols on the Caribou-Palermo line was a systemic problem not a local problem. Based upon the evidence the only reasonable conclusion was that in low population density mountainous areas, the PG&E Electrical Transmission Division was not following the standards and procedures established by the ETPM. As a result in those areas PG&E was not complying with the standards and procedures submitted to the regulatory agencies and required by regulation.

## XI.    BUDGETARY CONSIDERATIONS

Financial records from 2007 through 2018 obtained from PG&E, the CPUC and FERC clearly established PG&E had consistently increased its budget for maintenance, repair and replacement of transmission assets[98]. The central issue in the FERC litigation over PG&E's 2018 Transmission Owner's Rate Case request was how that money was being spent. In the "Summary of the Prepared Rebuttal Testimony of {Vice President of Electrical Asset Management}"[99] then PG&E Vice President of Electrical Asset Management states: "PG&E makes these investments to address deteriorating electric system infrastructure and to address equipment that has reached the end of its useful life and system designs that no longer meet operational requirements." The PG&E Senior Director, Transmission Asset Management at the time, also provided testimony in the FERC litigation. In the "Rebuttal Testimony of {Senior Director, Transmission Asset Management}"[100] it was stated:

> "PG&E must repair or replace assets that are approaching the end of their service lives, that are deteriorating, or that have failed. Replacement and repair of PG&E's assets are essential to maintaining and improving PG&E's transmission service to its customers. PG&E expects that replacement-related capital work will continue to grow as PG&E's assets continue to age. A significant part of PG&E's transmission infrastructure was constructed in the years following World War II, with some assets being even older. In addition, PG&E has one of the largest investor-owned fleet of hydroelectric facilities in the Country. By and large, these facilities are located remotely from PG&E's load centers. Many of these facilities—and their related transmission assets—were constructed in the early 1900s. Due to an increasingly large number of these assets nearing the end of their useful service lives, capital investment will shift significantly, from capacity increase-related projects, to lifecycle replacement projects."

However, the evidence gathered during the Camp Fire Investigation contradicted the FERC testimony of both Vice President of Electrical Asset Management and Senior Director, Transmission Asset Management. PG&E was **not** using the money to replace the oldest and most deteriorated transmission assets.

Because of limited available resources, the investigation was unable to fully analyze PG&E's financial records and assumed all figures were correct. The investigation instead focused on how, where and why the money was being spent. The evidence established the maintenance/repair/replace budget was primarily based upon "reliability metrics[101]."

---

[98] During litigation relating to PG&E's 2018 Transmission Owner Tariff (TO18) rate case, PG&E represented that from 2007 ($405,739,000) through 2016 ($1,124,457,000) electrical capital expenditures increased every year except 2013 (decreased app. $20,000,000 from 2012) and 2016 (decreased app. $7,000,000 from 2015). In total, spending increased $734,812,000 between 2007 and 2015 (the high spending mark), or an average of $81,645,777 per year.

[99] Exhibit PGE-0037, FERC Docket No. ER16-2320-002.

[100] Exhibit PGE-0038

[101] Reliability metrics measure how often a power line is out of operation, how long it is out of operation and how many customers are affected by that outage. SAIDI, SAIFI, CAIDI, ACOF and ACOD were the performance metrics used.

48

The evidence established PG&E electrical transmission expenditures were divided into two budget categories: 1) capital and 2) expense. The capital budget for the electric transmission division of PG&E was funded through customer rates which were determined by FERC "rate cases.[102]" The expense budget was funded by the company. Any money spent on the expense budget potentially reduced the amount of profit of the company. In general, inspection, patrol and maintenance of electrical transmission assets were paid from the expense budget. Replacement of electrical transmission assets was paid from the capital budget. FERC rate cases, and PG&E's future capital budgets, were based upon PG&E's projections of capital projects. The evidence established that, for budget purposes, all components of the electrical transmission system were considered "assets."

## A. **Expense Budget**

Based upon PG&E internal records and interviews of electrical transmission employees, including a former employee of the PG&E Business Finance Department, it was established the budget for inspection and patrol of the transmission lines was controlled by the Business Finance Department. Each year the Business Finance Department set an inspection and patrol budget for each of the PG&E transmission maintenance divisions. That budget was based upon the allotted time for all of the inspections and patrols scheduled for that year. The allotted time for each inspection and patrol was based upon the specific time allotted for a troubleman to spend on a single structure (e.g. tower or pole). To compute the time allotment for a transmission line, the single-structure time-allotment was multiplied by the number of structures in the transmission line.

The time allotted to be spent on a single structure was a system-wide constant and did not take into account the physical location of any specific structure or the amount of time necessary to travel from structure to structure. For example, the time allotment assumed the inspection of a tower on the Caribou-Palermo line, parts of which could be accessed only by hiking a steep trail, would take the same amount of time as inspecting a tower in the Central Valley, located directly adjacent to a public roadway.

When questioned about the time allotments for inspections and patrols, a former employee of the Business Finance Department who was intimately involved in the allotment process, admitted he had no knowledge or experience with inspections and patrols, and based the allotments solely on dividing up the overall electric transmission expense budget. This former employee also asserted the Transmission Line Supervisors and Superintendents were consulted regarding the proposed allotments. The Transmission Line Supervisors and Superintendents interviewed denied having any input or control over the time allotted for inspections and patrols.

Although denied by the involved employees, emails between the Table Mountain Headquarters secretary and several troublemen indicated the troublemen were not able to complete some

---

[102] A rate case is the utility's explanation and justification for a rate increase. In layman's terms, the utility lists all of the capital projects the utility deems necessary and their projected costs. If the total cost of all of the projects is higher than the projected amount to be collected from customers, the utility requests a rate increase and files a rate case. The rate increase is based upon the difference between projected costs and projected collections from customers. The rates which PG&E is allowed to charge customers includes a profit margin defined by FERC.

49

inspections in the time allotted.  For example, the 2014 Detailed Ground Inspection of the Caribou-Palermo line was allotted 89.5 hours.  PG&E records showed, before the secretary re-assigned hours billed by the troubleman to other projects, that the troubleman and five linemen actually spent 121 hours completing the inspection. When asked, a former Transmission Line supervisor asserted that because of the artificially constrained budget, his district was constantly under pressure to limit the hours necessary to complete thorough inspections and patrols of transmission lines.

During this same time period internal PG&E emails indicate the expense budget for electrical transmission was being reduced.  An October 2015 email noted: "For the overhead tower inspections, I don't think we would be able to do any repairs and incur land costs shown in item three and four in 2015."  The email includes a chart of projects with the 2015 and proposed 2016 budgets.  Item three in the chart is "Severe deterioration repair (tower department)."

In an August 2016 email regarding a transmission expense budget meeting from a manager in Business Finance to a Senior Director of Transmission Lines, it was stated: "The purpose of the meeting is to obtain Leadership guidance on *which* items to pursue and *when.* This input is important given the Expense reduction pressures being pushed down on Transmission Operations for 2017."  One of the people involved invited to this meeting was the former Business Finance employee assigned to track unit costs for the transmission inspection and patrol budgets.  When questioned by investigators, the former Business Finance employee conceded one way to reduce budget for inspections and patrols is to reduce the unit cost.  According to the employee, the unit cost is reduced by reducing the time allotted for inspection/patrol of each transmission asset.

During this same time period, internal PG&E documents establish the "T Lines Patrols and Inspection Continuous Improvement Charter" was formed.  The T Lines Patrols and Inspection Continuous Improvement Charter was a committee made up of PG&E personnel from the transmission line division, asset management, asset strategy and business finance.  One of the specific mandates of the committee was evaluation of the feasibility of reducing costs by changing the frequency of inspections and patrols or finding more efficient work practices.

Based upon the totality of the evidence, specifically the reductions in times allotted for patrol and inspection, the internal emails indicating budget reductions and the formation of a committee to investigate reducing patrol and inspection costs, the only reasonable conclusion was that PG&E achieved expense budget cost savings by reducing the thoroughness of inspections and patrols.

PG&E also reduced its expense budget by charging expense projects to the capital budget. Moving projects from the expense budget benefits PG&E in two ways.  First, every expense budget dollar saved was an additional dollar of potential profit.  Second, the customers (ratepayers) pay over 100% of each dollar spent on capital improvements that brings in additional profit.  Based upon internal emails and interviews with engineers involved in the planning and management of transmission projects, it was common for PG&E to look for ways to bootstrap expense budget projects on to capital budgets projects. Hypothetically, for example, instead of paying $1000 from the expense budget to fix a component, PG&E would pay $10,000

50

from the capital budget to replace the component. The $1,000 saved from the expense budget becomes profit and the company charges the customers $10,500[103] for capital improvement of the component.

The evidence established that PG&E personnel were consistently looking for ways charge expense budget projects to the capital budget. In a 2018 email from a PG&E civil engineer to a supervisor in the Transmission Line Asset Strategy Department of Transmission Asset Management, the civil engineer wrote:

> "I understand Asset Strategy has been working on a new way to define unit of capital to make it easier to capitalize a partial replacement on tower sections (e.g. footing, crossarm, etc…). We are replacing the top part of a distorted tower under emergency and was wondering if that could be considered a unit of capital and capitalize the project for corporate accounting purposes."

Based upon interviews with various PG&E personnel it was established that PG&E, as is common with large companies, had developed company accounting rules. Application of these rules determines if a project is charged to the expense budget or the capital budget. In general the rules hold that maintenance and repair are paid from the expense budget and replacement is paid from the capital budget. The above email indicates a move within PG&E to blur the lines between repair and replace to allow some repairs to be charged to the capital budget.

Another example occurred after the cancellation of the 2007 project to relocate ten deteriorating towers on the Caribou-Palermo line. The original Advance Authorization (AA) requested $800,000. Only $200,000 was approved. Once the project moved forward, the $200,000 budget was quickly surpassed. By the time the project was cancelled in 2009 almost $800,000 had been spent. A portion of that money was spent constructing an access road along the proposed new route of the ten new towers. According to internal emails obtained, the money spent to construct the new access road was charged as a capital improvement on another, adjacent transmission line. According to the former PG&E Director of Electric Asset Strategy who approved the 2007 AA, the rest of the money spent on the canceled project should have been charged to the expense budget. Internal emails establish that PG&E made an effort to find ways to charge the remainder of the money spent on the canceled project to the capital budget. A 2013 email from the former Maintenance and Construction Engineer (M&C) Engineer in charge of the project stated:

> "Looks like we will be forced into trying to Capture the $650K+/- that has been spent on the now canceled project for relocating Towers 6/53 to 7/65 from the non-accessible River side to Hwy side that (Project Manager) was managing.
>
> In order to not have to Expense the dollars spent we will be required to perform the following work."

---

[103] The extra $500 added to the $10,000 is the FERC allowed profit margin that PG&E would charge on capital improvements.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 98 of 1229

The email goes on to list the proposed work which mainly consisted of replacing insulators on the towers that Maintenance and Construction Engineer had previously described in the Advance Authorization as deteriorated. The work did not include replacement of the deteriorated conductor (annealed and parting) or any of the deteriorated hardware.

In a subsequent, 2014 email regarding the canceled project, the former M&C Engineer stated:

> "In order to try and capture the $900K that was spent for nothing, Asset Management decided that we would just replace the Insulators and Hardware on the section of towers that were initially going to be relocated."

In a 2016 email regarding the canceled project the former M&C Engineer stated:

> "This work was deemed by *{the Sr. Director of Transmission Asset Management}*in order not to end up expensing $800,000 that was spent by *{Project Manager}* on an original job started by *{former Table Mountain TLine Supervisor}* to relocate this section of towers."

When asked about these emails, the former M&C Engineer denied he was instructed to find ways to capitalize the money already spent and asserted that he was lying in the emails in order to get necessary work done quickly. As to the 2013 and 2014 emails, he stated the recipient of the emails, the Transmission Line Supervisor at Table Mountain Headquarters, distrusted engineers, so he lied and put blame on Asset Management in order to avoid argument. When asked about the 2016 email, which was directed to an engineer in Asset Management, the former M&C Engineer replied that the Sr. Director of Transmission Asset Management was not involved in the project and he invoked the name of the Sr. Director of Transmission Asset Management to speed up the process. This person is the same former M&C Engineer who wrote the original AA and the approved AA and now claims that his description of the condition of the relevant Caribou-Palermo line structures and conductor was unsupported and exaggerated for the purpose of securing funding for the project. In a 2016 email to the Transmission Line Asset Strategist, who canceled the 2007 project, the former M&C Engineer stated:

> "The only thing that after reading the below that came to my mind would be to also add life expectancies on some of our older lines that we purchased from other utilities. Caribou-Palermo (old Caribou-Golden Gate) for example…Built roughly in 1907. This line is in a very remote area. Access is extremely limited. Conductor was deemed annealed several years back. Line has tons of splices in it. Some spans have 5 splices within said span. Most of the upper line section is subject to rockslides that have taken this line out in the past. Restoration time is lengthy..

> Just one example, but I feel we should identify lines or line sections that meet this type of criteria and add them to our mitigation plan or part of future complete structure replacements…"

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 99 of 1229

### B. Capital Budget and Comparative Risk Analysis (RIBA)

For the capital budget, the evidence established PG&E employed "comparative risk analysis" to determine the budgetary priority of potential capital projects. Based upon interviews with several current and former PG&E employees who were involved in risk analysis, it was established PG&E has traditionally used some form of comparative risk analysis. Comparative Risk Analysis balances the probability of risk against the probability of consequence; and depends upon accurate projections and analysis of both. One of the former employees interviewed was the former Senior Vice President of PG&E. According to the former Senior Vice President of PG&E when he arrived at PG&E in 2007 the company was using comparative risk analysis, which he disapproved because of its subjective nature[104]. The former Senior Vice President of PG&E tried to install an objective risk model focused solely on the probability of failure. The former Senior Vice President of PG&E left PG&E in 2011.

The evidence established in 2014 PG&E again began using comparative risk analysis for capital funding. Since 2014 PG&E has used the Risk Informed Budget Allocation (RIBA). Based upon internal documents and interviews, the evidence established that under RIBA, capital projects were evaluated for funding based upon safety, environmental and reliability impacts that were scored based upon a complex matrix. According to a Manager in Transmission Asset Management, and one of the persons actively involved in the RIBA scoring process in 2014, reliability is "more about the customer impacts. So number of customers, the duration of outages, large cities, metropolitan areas. It's what we call critical locations. This can be anywhere from towns to cities."

For each category (safety, reliability, environment), a project would score between 1 and 10,000. The scores for the three categories were combined with the result being a project score between 3 and 30,000. The final score, according to the Manager in Transmission Asset Management, represents the "consequence if we don't complete the project." Once all of the proposed projects are scored the projects are ranked high to low by total score. RIBA scoring determined whether a project that is not mandated by a regulator was funded for the coming year, RIBA scoring and ranking was independent from and occurred after a project had been included in a FERC rate case.

Based upon the evidence, projects were used in FERC rate cases to justify rate increases and then, later, not funded because of a low RIBA score.

As examples, in 2014 three proposed projects on the Caribou-Big Bend section of the Caribou-Palermo line were scored under RIBA; the TL[105] Relocate 10 Towers project, the Replace 5 Damaged Towers project, and the 115kV NERC Alert. Through internal documents and witnesses it was determined that the TL Relocate 10 Towers project was the 2007 project to replace and relocate the ten deteriorating towers that had been canceled in 2009. By 2014 the only portion of the project active was the replacement of insulators so that the money spent on the project prior to cancellation could be charged to the Capital Budget. Based upon internal

---

[104] Relative risk analysis is a form of comparative risk analysis.
[105] TL is abbreviation for Transmission Line.

documents and witnesses, it was established that the Replace 5 Damaged Towers project referred to the replacement of the five towers that collapsed in December of 2012. Based upon internal documents and witnesses it was established that the 115kV NERC Alert project referred to the 2013 Caribou-Big Bend NERC project.

According to the "Risk scoring for baselined projects" the Replace 5 Damaged Towers total risk score was 180. The total risk score for the Replace 5 Damaged Towers project was explained in a February 2014 email from a RIBA team member[106] to the Senior Director of Transmission Asset Management in 2014. According to the RIBA team member:

> "<200 score because there is no likely large environmental event (if structures fail, it will be likely due to heavy rain and no wildfires are possible then). Also no likely public safety issue with live wires down because it is in a remote area. Reliability score is not that high because although the likelihood of failed structures happening is high, the affected customers are likely in the order of >1K."

According to the RIBA scoring sheet for the Replace 5 Damaged Towers project the person(s) scoring the project felt that the failure of the Shoe Fly "Probably could happen this next season." On the "Frequency/time-to-impact taxonomy" the project scored 6 out of 7 possible points.

In 2014 the Manager in Transmission Asset Management took part in the RIBA scoring. In addition she was the "Program Manager" for the Replace 5 Damaged Towers project. Based upon the 2014 RIBA scoring records the Manager in Transmission Asset Management stated that the Replace 5 Damaged Towers project scored the lowest possible scores of 1 for safety and environmental and scored 178 for reliability. According to the Manager in Transmission Asset Management the safety score was justified because the "worst reasonable direct impact," (WRDI) "basically in the particular case, would a structure fall down and hit somebody" was negligible because of the "remote" location of the Shoe Fly poles. According to the Manager in Transmission Asset Management, despite the written statements from 2014 documenting concern for the long term reliability of the Shoe Fly, the Shoe Fly was "temporary permanent" and it was not felt to be a danger to collapse. A former Transmission Specialist for PG&E and the person who was in charge of the construction of the Shoe Fly, was also asked about the Shoe Fly. According to the former Transmission Specialist, the Shoe Fly was only designed to be in place for a few months with the expectation that permanent replacement towers would be erected the following summer of 2013. Notes in the RIBA scoring sheet under the category reliability category of "Frequency[107]" corroborate the former Transmission Specialist. The former Transmission Specialist was also corroborated by an October 2013 email from the former M&C Engineer to multiple people. In the email the former M&C Engineer states "I do not believe there was a PO[108] created under MWC 70[109] yet for that replacement project that is now sitting

---

[106] The position/job title of the RIBA team member was never determined.

[107] The "Frequency" category measures how often a problem is expected to occur.

[108] In layman's terms, a project proposal.

[109] MWC is an abbreviation of Major Work Category. Each major work category is identified by a number. In this case the proposed project falls with major work category number 70. All PG&E electric transmission work projects are assigned to a major work category for accounting purposes.

54

on Wood poles and was not intended for long term reliability." The project was assigned a frequency score of 6 out of 7 possible with the note "Probably could happen this next season."

No records were ever located to support The RIBA team member's conclusion that the Shoe Fly poles would most likely fail due to heavy rain. According to the Manager in Transmission Asset Management, The RIBA team member was an expert on the RIBA process who was assigned to assist "the engineer walk through the process." Based upon the records the Manager in Transmission Asset Management identified the engineer as the engineer most familiar with the overall project and assigned to do the RIBA scoring for the project. According to an undated PG&E Org Chart, the engineer assigned to score the project was a Senior Engineer assigned to Transmission Asset Development and reported directly to the Manager in Transmission Asset Management. According to the notes on the scoring sheet, as interpreted by the Manager of Transmission Asset Development, "the concern here is the note says that the structures would go down during rainy and wet storm. And what's not shown here is that the wildfire is not likely, because on the wet ground not likely to have wildfire." No records in support of Senior Engineer's conclusion were ever located.

On the other hand, the TL Relocate 10 Towers project scored 581. According to the scoring sheet, the Senior Engineer was also the engineer assigned to score this project. Despite the fact that by 2014 the scope of the project was limited to the replacement of insulators so that money spent on the project prior to cancellation could be charged to the Capital Budget, the project scored 18 points out of 10,000 possible points for safety[110]. Despite the fact that the project involves the same Caribou-Palermo line the Reliability Risk Score is 562. 434 of those points are justified because "WRDI is possible contact with public leading or to other facilities causing potential injuries to few employees" according to the notes on the scoring sheet.

The 2014 RIBA scoring is used to highlight the subjective nature of the comparative risk analysis. Because they are subjective the risk scores are easily manipulated. PG&E was highly motivated to complete the TL Relocate 10 Towers project in order to be able to charge the budget overruns, money already spent, to the capital budget. By 2014 the Replace 5 Damaged Towers project was about future spending. The best example of the manipulation is the WRDI justifications. One of the oft-stated justifications for the TL Relocate 10 Towers Project was the fact that the ten towers were located in a remote, inaccessible location. The towers were so inaccessible that PG&E had to use helicopters to fly personnel to the towers. Also, there was no evidence that any of the ten towers was on the verge of collapse according to the 2009 email from the manager who cancelled the project in 2009. On the other hand, the Shoe Fly was built on Camp Creek Road and any, or all of those poles, could reasonably be expected to fall down within a year.

Another example of manipulation of facts in the 2014 RIBA was the RIBA team member's conclusion, apparently based upon the Senior Engineer's scoring note that "structures would go down only if it is rainy and wet"; and restated several times by the Manager in Transmission Asset Management that the wood Shoe Fly poles would probably only collapse during heavy rain

---

[110] 18 times the safety score for the Replace 5 Damaged Towers project

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 102 of 1229

thereby minimizing the chance of a wildfire. This statement was made in 2014, in the middle of a historic drought.

PG&E's own records clearly establish wind has long been classified as one of the top causes of structure failure on both transmission and distribution lines. PG&E's own records also establish the Feather River Canyon is known for high and sometimes extreme winds. Based upon PG&E wind records, the Exponent Report stated "Maximum (or peak) wind speeds in the areas of the chosen lines are generally found to vary between 60 to 100 mph, as measured and reported in "Extreme Wind Speed Estimates Along PG&E Transmission Line Corridors" across one-minute time intervals and at an elevation of 33 feet above ground level, over a 50-year return period." According to data pulled from the Jarbo Gap RAWS[111] by Meteorologist Kris Kuyper the highest number of high wind events occur in the month of October.

The inherent weakness of comparative risk analysis is its subjective nature. Data can be manipulated to achieve a desired result. Based upon the evidence the 2014 RIBA process exposes the manipulation of comparative risk analysis by PG&E personnel.

### C. Transmission Asset Management

The examination of the 2014 RIBA scoring also highlighted the central role of Transmission Asset Management (TAM) in the development and execution of the capital budget. The former Senior Director was replaced as Senior Director of Transmission Asset Management in 2017. The Senior Director of Transmission Asset Management who assumed the position in 2017 explained the role of Transmission Asset Management:

> "My team's responsibility for managing those assets would be to track performance of the operation of the assets and ultimately make recommendations for enhanced -- future enhancements for those assets, investments that would occur over the next five to ten years both to replace aging infrastructure, enhance existing infrastructure for greater operational flexibility as well as increased capacity to meet NERC reliability plan and standards."

> "My job is to identify future work, future planned capital work. Our process has a bias towards identifying work approximately six years out.

In 2017, shortly after the new Senior Director of Transmission Asset Manager took over, TAM published the Electric Transmission Overhead Steel Structure Strategy Overview (2017 Strategy Overview). The document was written by a Senior Engineer assigned to Transmission Asset Strategy (TAS) within TAM. According to the Senior Engineer, the function of TAS is to review conditions reported from the field, study performance of the assets, apply criteria and develop a strategy for replacement or repair. According to the Senior Engineer the "conditions reported from the field" are the notifications/tags generated by the troublemen, linemen and towermen[112]. The "criteria" listed by the Senior Engineer include the age of the asset, environmental risk, safety risk, reliability risk.

---

[111] Remote Automated Weather Station. See section XVI "Drought and Wind"
[112] Towermen work only on the steel structure of the tower.

According to the Senior Engineer, prior to the 2017 Strategy Overview neither a comprehensive plan for tower risk nor a tower risk database existed at PG&E. The Senior Engineer's statement was corroborated by internal emails obtained from PG&E. A June 10, 2016 email from a Manager in Transmission Line and Substation Asset Strategy[113], to a group of PG&E employees including the Senior Engineer, appears to be the genesis of the 2017 Strategy Overview. This email regarded a "Comprehensive Plan for Towers." According to the text the email was follow-up to a meeting held earlier in the day. The stated goal of the meeting was "Develop a Comprehension Plan for Tower Risk with emphasis on steel corrosion risks. Plans should include maintenance plans, detail inspection specifications, repair vs. replace criteria, capital and expense cost estimates, risk database, update Standards." Based upon the evidence, the only reasonable conclusion to be drawn is that, despite the fact that PG&E decisions were allegedly based upon risk analysis, until 2017 PG&E had no consistent and comprehensive risk database or policy for evaluating risk.

According to the 2017 Strategy Overview "The Transmission Line Steel Structure strategy will manage the asset life cycle (e.g. Create, Utilize, Maintain, Renew (replace), and Dispose) based on risk. The renew asset life cycle is based on proactive cost replacements for high-risk assets. For medium risk assets, it is based on reactive replacements following asset failures." The "high risk," "medium risk" theme continues throughout the 2017 Strategy Overview. Although not mentioned in the quoted sentence, there is also a "low risk" category. The appendix to the 2017 Strategy Overview includes an "Asset One Page Summary T-Line Strategy From A PAS 55 Framework." The summary consisted of five different charts. Although she is the author of the 2017 Strategy Overview, the Senior Engineer asserted that she was not familiar with the charts and was unable to explain the charts or their significance. According to the Senior Engineer the One Page Summary was prepared by her supervisor and attached to her work. The final chart, which has no title, appeared to summarize PG&E TAM risk strategy. According to the chart, for low risk assets the strategy was "run to failure" with "minimal patrol to continuously assess risk," "no maintenance," and "only replacement no repairs." For high risk assets the strategy was "condition base and cause evaluation," "extensive patrol with more frequency," "minimum req[114] maintenance" and "replace/repair."

During interviews and testimony, TAM personnel stated that the high, medium and low risk categories applied to components of the transmission lines and not the entire lines. Insulators were identified as an example of a low risk component. All current TAM personnel disavowed the term "run to failure" during interviews and testimony.

Shortly after publication of the 2017 Strategy Overview PG&E published the 2018 TD-8101 – Transmission Line Overhead Asset Management Plan (2018 AMP). According to the Senior Engineer the 2018 AMP was written by multiple engineers, including herself. The "Document Owner" listed on the 2018 AMP is the Senior Director of Transmission Asset Management.

---

[113] At the time The Senior Engineer's direct supervisor
[114] abbreviation of required.

The 2018 AMP included a modified version of the TAM Risk Strategy chart found in the Appendix of the 2017 Strategy Overview. According to the preface to the chart:

> "The characteristics and condition of each transmission line overhead asset inform the risk and approach to replacement and operation, as well as patrol and maintenance frequency, as shown in" the charts

For low risk assets the strategy is "run to maintenance," with "low degree or patrol with minimal frequency to continuously assess risk," and "corrective maintenance." For high-risk assets, the strategy is "preventative maintenance and cause evaluation," with "high degree of patrol with more frequency," and "preventative maintenance." The 2018 AMP also includes a table entitled "Risk and Replacement Strategy per Asset." The Risk and Replacement Strategy per Asset table identifies individual components of the, identifies the risk for each component and defines the replacement strategy for each component. Overhead conductor is listed as a "high to medium" risk with the replacement strategy "preventative maintenance for high risk" "run to maintenance for medium risk." Steel structures are listed as high risk with the replacement strategy "preventative maintenance."

The most relevant difference between the chart in the 2017 Strategy Overview and the chart in the 2018 AMP is the replacement of "Run to Failure" with "Run to Maintenance." When asked about "Run to Failure" TAM employees tended to distance themselves from the phrase and criticize the phrase as being undefined although the term "Run to Failure" appears to be an industry standard and was discussed as an appropriate strategy for some components of the electrical transmission system in the 2010 Quanta studies. When asked to define "Run to Maintenance" most TAM employees identified failure as the trigger to maintenance. Based upon the evidence it appears that the change from failure to maintenance was semantical only.

As Senior Director of Transmission Asset Management the witness was responsible for overseeing the organization within PG&E responsible for managing assets of transmission and substation infrastructure and overseeing risk management within electrical transmission. As the manager of transmission assets, he played a sponsor role for new capital projects to replace to replace infrastructure. Transmission infrastructure was defined as transmission structures, conductor, insulators, circuit breakers, substation busses and transformers.

According to the Senior Director of Transmission Asset Management, information from the field, in the form of notifications/tags generated as a result of inspections and patrols, play a role in identifying potential projects to be included in the five year plan. According to the 2018 AMP "Transmission line overhead asset performance is primarily tracked through two factors: historical line outages and maintenance and inspection found notifications." The Senior Director of Transmission Asset Management conceded the quality of the input received from the field has an impact on the overall asset strategy. The Senior Director of Transmission Asset Management also conceded problems not identified by field representatives would never be brought to the attention of TAM. As a result projects to repair or replace those problems would never be

planned. The Senior Director of Transmission Asset Management also conceded that as of 2018, other than the NERC Project there were no projects planned through 2022 on the Caribou-Big Bend section of the Caribou-Palermo line.

Although PG&E policy, as defined in documents like the 2017 Strategy Overview and the 2018 AMP and explained by TAM personnel, represented that decisions were made based upon a combination of performance information and patrol and inspection findings, the evidence indicated that performance information played an oversized role and patrol and inspection findings were insignificant. As a result of years of reductions of frequency and thoroughness of patrols and inspections, problems were not being identified. Based upon the WSIP and the Exponent report it was clear that on the Caribou-Palermo line and comparable lines, PG&E troublemen were not identifying problems.

The evidence established decisions regarding repair or replacement of transmission assets could not have been based upon non-existent patrol and inspection notifications. As such, then the decisions were being made solely on asset performance information. Performance information consisted of a complex series of reliability metrics (SAIDI, SAIFI, CAIDI, ACOD, ACOF). The evidence established these reliability metrics were a statistical analysis of outage data. This information was required to be tracked and reported yearly to CPUC, CA ISO, WECC, NERC and FERC. In general, all of the reliability metrics measured either the number or the effect, or both, of power outages per year. Effect is measured by either the number of customers who lose power as a result of the outage or the duration of the outage or both. The evidence established that the Caribou-Palermo line had only one dedicated customer (a powerhouse) who could be effected by an outage.

Information regarding transmission asset conditions was based upon information received from the field. This includes notifications/tags generated by troublemen, linemen and towermen during inspections and patrols, both routine and non-routine). According to the Senior Director of Transmission Asset Management, TAM relied upon notifications/tags to identify potential preventative maintenance projects. After substantial discussion the Senior Director of Transmission Asset Management conceded that the fact that if troublemen, linemen and towermen did not inspect specific components of the transmission assets, it would affect the reliability of the information upon which TAM was making decisions. Specifically he conceded that because nobody was looking for wear on cold end attachment hardware and therefor, no notifications/tags were being generated for replacement of cold end attachment hardware there were, as of November 8, 2018, no projects in the foreseeable future for the replacement of cold end attachment hardware.

Although there were no specific plans to replace cold end attachment hardware the Senior Director of Transmission Asset Management asserted that plans were being made to perform preventative maintenance on the Caribou-Palermo line. According to the Senior Director of Transmission Asset Management, the NERC Project included non-NERC required preventative maintenance on the Caribou-Palermo line. When confronted with the Project Scope document for the NERC Project the Senior Director of Transmission Asset Management was unable to identify any non-required work. According to the Senior Director of Transmission Asset

Management the non-required preventative maintenance was not included in the Project Scope document but that plans were being made to perform the preventative maintenance. However, no records or plans for any preventative maintenance projects on the Caribou-Palermo line were located through 2022.

Another concept, which came up repeatedly in interviews and testimony of TAM personnel was "bundling." Based upon the evidence, for PG&E, bundling meant doing multiple projects on a transmission asset or line at the same time. According to the Senior Director of Transmission Asset Management TAM decisions were, in part, "informed by the most cost-effective approach for our customers." Having crews do multiple projects at once is much more cost effective than having multiple crews make multiple visits to the asset or line. An example of bundling occurred in 2018 on the Parkway-Moraga 230kV transmission line. The line had been de-energized so that the tower department[115] could fix a tower. While the line was de-energized the line department[116] performed preventative maintenance by replacing insulators.

Bundling often involved the intertwining of capital budget and expense budget projects. Based upon internal PG&E emails and interviews with PG&E personnel, it appeared PG&E bundled expense budget projects with capital budget projects in order to charge the expense budget costs to the capital budget project.

Despite their preference for bundling projects there is no evidence of any intent to bundle any preventative maintenance projects to the 2013 NERC Alert Project.

The only reasonable conclusion to be drawn from the totality of the evidence is that PG&E was employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line. Pursuant to the run to failure strategy, PG&E only applied a low degree or patrol with minimal frequency to continuously assess risk, and only performed corrective maintenance.

## XII.  SAFETY, RELIABILITY AND ENVIROMENT

The phrase "Safety, Reliability, Environment" appears consistently in PG&E documents, regulatory filings and public pronouncements. Members of the Electric Transmission Asset Management interviewed said safety, reliability and environment are the criteria by which all project decisions are judged. The Senior Director of Transmission Asset Management testified:

> "In terms of how PG&E quantifies consequences, we usually categorize it in a number of areas focused on safety, impact reliability, impact to the environment are some examples."

> "An analysis starts with defining a risk event, and that's really defining what is that event that we believe could have exposure from a public safety reliability environmental standpoint, and then quantifying the potential drivers for that event, and the associated consequences for that event."

---

[115] The tower department deals solely with the steel transmission structures. Employees are called Towermen.
[116] The line department deals with energized components (conductor, insulators, hot and cold attachment hardware) of the transmission system. Employee are called Linemen.

All members of TAM were asked which of the three criteria was considered the most important. They unanimously replied safety. The evidence, however, contradicted that assertion. The evidence showed disparate treatment of transmission assets based upon the reliability metrics.

The most basic example of disparate treatment based upon reliability metrics was the 500kV transmission lines. According to PG&E personnel the 500kV lines are the backbone of the electrical transmission system and an outage on a 500kV can potentially affect millions of customers. According to the ETPM, all 500kV structures were subjected to detailed ground inspections every three years. "Critical" 500 kV structures were subjected to climbing inspections every three years and as triggered. "Non-Critical" 500 kV structures were subjected to climbing inspections every twelve years and as triggered. All 500 kV structures were also subjected to yearly patrols. In contrast, 115 kV structures were subjected to detailed ground inspections every five years, air patrols in non-detailed ground inspection years and are never subjected to climbing inspections.

Another example of disparate treatment based upon reliability metrics established by evidence developed during this investigation was the Bay Waters power towers. Since 2005, the Bay Waters towers had their own classification in the ETPM. Although the ETPM refers to the Bay Waters Foundation Inspection, numerous PG&E documents and TAM personnel established the special treatment extended to the entire tower. Some documents limited the Bay Waters towers to only towers that were actually in the water but other documents and information from some TAM personnel indicated the Bay Waters towers included all towers in the Bay Area. The justification given by TAM personnel for the special treatment of the Bay Waters towers is the highly corrosive effect of salt on steel structures. When asked why special treatment was afforded to Bay Area steel towers but not steel towers along the Sonoma, Mendocino, Humboldt, Monterrey and San Luis Obispo coasts, TAM personnel were unable to explain the difference.

The final example of disparate treatment based upon reliability metrics established by the evidence arose out of a 2018 PG&E Lab Report on the hanger plates from the Parkway-Moraga 230 kV transmission line. According to the Lab Report, the hanger plates were submitted by the Supervisor, T-Line Construction, T-Line M&C Central-Bay Maintenance. When questioned, the supervisor stated wear was observed on the hanger plates while replacing insulators on the Parkway-Moraga line in the spring of 2018. There was no mention made of the C hooks and none were preserved. According to the supervisor a tower on the Parkway-Moraga was damaged in a mudslide and needed to be repaired. In order to repair the tower the line had to be de-energized. While the line was de-energized, a decision was made to proactively replace all of the "old" insulators and hardware. The Parkway-Moraga line was built after World War II in 1946. The insulators and hardware were assumed, because PG&E has no definitive records, to be 72 years old. In contrast, the Caribou-Palermo line was 91 years old when it was de-energized for over a month in December 2012 and January 2013 as a result of tower collapse. There is no record of PG&E doing any preventative or proactive maintenance on the Caribou-Palermo line while it was de-energized. According to PG&E, the reason no preventative or proactive maintenance was done was that the winter weather was not conducive to working in the Feather River Canyon.

A former PG&E Transmission Line Supervisor who, during his career in transmission lines, worked in almost all of the transmission line maintenance districts was asked if he had noticed a difference in the way transmission lines were inspected and maintained based upon a local population base. The former supervisor responded "We're kind of out-of-sight, out of mind up there," "We're always fighting the political battle," "But if something flips the screen down there [the Bay Area] they get a lot of attention."

## XIII.  RISK MANAGEMENT

Prior to the Camp Fire, risk management for electric transmission was supervised by TAM. During his testimony the Senior Director of Transmission Asset Management at the time of the Camp Fire, stated that the formulation of strategies by TAM relied, in part, on the assessment of risk. He defined "Risk" as "the probability and consequence of an event occurring." He defined probability as the "likelihood of something happening" and consequence as "the impact of that event occurring." He defined consequence as the result of an event occurring measured by impact on safety, impact on reliability and impact on the environment.

The Camp Fire investigation focused on two types of risk; risk of equipment failure and risk of fire.

### A.  Risk of Equipment Failure

The recommendations of the 2010 Quanta reports focused on ways to minimize the risk of equipment failure. In summary, the Quanta reports stated wear is a product of age and failure is a product of wear. All of the complex statistical analysis in the Quanta reports boiled down to the fact a large percentage of PG&E's transmission assets were very old and needed extra attention. Despite hiring Quanta to assess and analyze its transmission assets and make recommendations, PG&E ignored those recommendations. According to internal PG&E documents, in 2010 a committee was assigned to review and comment on the Quanta reports. Numerous current and former TAM personnel who were part of that committee were interviewed. None of the former committee members could recall who made the decision to disregard the recommendations of Quanta or why. The Senior Director of Transmission Asset Management, who was not on the committee and was not assigned to TAM in 2010 testified regarding the Quanta reports:

> "The Quanta study did not look at asset data from those utilities but rather business practices from those utilities. The only age information and corresponding failure data that was used in that study was associated with the subset of assets that failed in a two-year period within PG&E and made some assumptions that made the statistical analysis incorrect. So it wasn't sufficient for us to justify significant amounts of investments in the future, and we needed to do additional analysis in order to build the case for our regulators to be able to justify requesting authorization to be able to make additional investments in the infrastructure based on the results of that bullet point at a later date."

Although the Senior Director of Transmission Asset Management was dissatisfied with the Quanta reports, information from the Quanta reports was used and cited in numerous subsequent TAM documents, including documents produced by himself.

PG&E internal documents and reports and a report filed with the CPUC clearly established PG&E was aware of the risk of equipment failure. In an undated internal PG&E draft report entitled "Transmission Overhead Conductors[117]" it was stated, "The major root cause of conductor failures is Equipment Failure (35%)." The report also stated inspections and maintenance performed according to the ETPM "are not preventing equipment failure due to wear, corrosion and other factors on conductors and associated equipment (splices)." The report also addressed the use of infrared inspections on transmission conductor: "In most cases, Infrared Inspections identify faults with components just prior to failure. Ariel (sic) inspections are conducted annually. This proactive approach yields little results." No final copy of this report was located and it is unknown why this report was drafted and to whom this report was distributed.

In another undated, unattributed internal report entitled "EO[118] Transmission OH[119] White Paper[120]" the effects of equipment failure was again discussed. Whereas the Transmission Overhead Conductors was focused on conductor failure and how to mitigate/reduce the number of conductor failures, the EO Transmission OH White Paper focused on outages and how to reduce outages to improve reliability metrics. According to the OH White Paper, at the time of writing, conductors 105 years old were still in service. According to the OH White Paper, "The root causes of about 85% of the outages due to conductors from 2007 to 2012 can be attributed to trees, hardware, conductor, wind and snow…" Under the heading "Existing Conductor Strategy" the report reflects the strategy "is primarily Run to Failure (RTF), supplemented by" "periodic condition assessment and maintenance" and "program of targeted reliability improvements focusing on poorly performing lines which contribute the most to SAIFI."

In November, 2017 PG&E filed the 2017 Risk Assessment and Mitigation Phase Report (RAMP)[121] with CPUC. Chapter 10 of the RAMP was dedicated to, non-wildfire risks of the electric transmission overhead system. The RAMP looked at the known risks (identified as risk drivers) to the electric transmission system and explains how PG&E is mitigating those risks. The RAMP identified "Equipment Failure – Connectors/Hardware" as a significant risk. "Deterioration of connectors, splices or other connecting hardware that results in wire down events. This driver was associated with 28 out of 279 (10.0 percent) wire down events from 2012-2016, or an average of 5.7 events per year." Efforts to mitigate the risk of Equipment Failure – Connectors/Hardware are divided into past (2016), present (2017-2019) and future

---

[117] The author of the report is not identified and was not identified during the investigation. Based upon content it appears the report was written in 2013

[118] EO is the PG&E abbreviation for Electric Operations.

[119] OH is the PG&E abbreviation for Overhead.

[120] The author of the report is not identified and was not identified during the investigation. Based upon content it appears the report was written in 2014

[121] Although not specific to equipment failure, the RAMP stated "Much of PG&E's transmission infrastructure was constructed in the years following WWII. As such, many assets are nearing "end of useful life". As these of assets near the end of their expected useful lives, PG&E will need to increase its level of asset replacements to avoid degradation in overall customer reliability and system performance." Construction of the Caribou-Palermo line began in the months (six months) following WW1.

(2020-2022). The mitigations listed are "Inspection and Maintenance," "Overhead Conductor Replacement" and "Insulator Replacement."

The 2018 AMP also addressed equipment failure. The 2018 AMP used and defined the term "Risk Driver." The definition includes reference to equipment failure:

> "A risk driver is defined as an element which alone or in combination with other drivers has the intrinsic potential to give rise to risk (which can be a single risk or multiple risks). There are 83 risk drivers related to transmission overhead line assets. Though there are many risk drivers, common drivers for transmission line overhead assets include equipment failure, vegetation, natural hazards (wind, snow, earthquakes, etc.) and third-party contact. These risk drivers enable PG&E to evaluate the controls that are in place and to strategically allocate resources to programs that strengthen these controls or create new controls to mitigate these risks."

According to the 2018 AMP "Conductor or connector/hardware failures account for 37% of all wire down events." The AMP also stated 25% (26 of 103) of wire down events 2013-2017 were caused by failure of "connector/hardware and 42% (44 0f 103) of wire down events 2013-2017 were caused by conductor failures.

The documents prove beyond any doubt that PG&E was aware of the risk of equipment failure causing conductor failure or "wire down events." The undated draft Transmission Overhead Conductors established that at least one person within PG&E TAM was aware that inspections and patrols being done pursuant to the ETPM were doing very little to identify and prevent equipment failures.

## B. Risk of Fire

Since, at least 2007, fire has been identified as the number one risk for PG&E. Chapter 11 of the 2017 RAMP stated:

> "PG&E defines wildfire risk as: PG&E assets may initiate a wildland fire that endangers: the public, private property, sensitive lands, and/or leads to long-duration service outages.

> PG&E has designated wildfire as an enterprise risk (in addition to being a top safety risk) since 2006. This risk is reviewed annually by the Safety, Nuclear and Operations, Committee of PG&E's Board of Directors. PG&E's exposure to wildfire risks continues to escalate despite increasing investment in compliance and public safety programs given various environmental and human factors. The most notable investments are the T&D routine VM work and the CEMA VM work related to the drought and the ongoing tree mortality state of emergency.

> The CEMA work investment alone amounts to $190 million in 2016 and$208 million in 2017.14 Environmental variations, such as drought conditions or periods of wet weather that drive additional vegetation growth and wildfire fuel increases, can influence both the likelihood and severity of a wildfire event.

Although vegetation management is rightfully a focus of PG&E's fire mitigation efforts, equipment failure was also identified as a significant fire risk. According to PG&E statistics included in the RAMP, 33% of fires initiated by PG&E assets were caused by equipment failure. Vegetation management caused 37% of fires initiated by PG&E assets. The RAMP breaks equipment failure into three categories: 1) conductor; 2) connector/hardware; and, 3) other. Equipment failure – connector/hardware is defined in the RAMP as "Failure of connectors, splices, or other connecting hardware resulting in wire down and fire ignition."  Equipment Failure – Connector/Hardware risk driver accounts for 6 percent of 243 ignitions, or 15.5 per year.

Similar to Chapter 10 discussed above, Chapter 11 of the RAMP identified fire mitigation efforts as past (2016), present (2017-2019) and future (2020-2022).  Although the RAMP listed extensive fire mitigation efforts done, being done, or planned to be done, none directly addresses the risk of connecting hardware failure.

The 2017 RAMP was not the first PG&E document that connected equipment failure – connectors/hardware to fire.  The draft Transmission Overhead Conductors cited fire risk in a discussion of the "Bolted Connector Program."  The Bolted Connector Program was apparently[122] a name given to the replacement of bolted, parallel groove connectors, which began prior to 2009.  As to the Bolted Connector Program the report sets forth: "M&C[123] only replacing bolted connectors during routine or emergency work with to those components identified during infra-red inspection or in areas identified as high fire risk."

PG&E records also document a previous equipment failure – connector/hardware on the Caribou-Palermo line.  The 2007 Rock Fire was caused by the failure of a connector on a Caribou-Palermo line.

The evidence clearly establishes, beyond a doubt, PG&E was aware of the causal relationship between fire and equipment failure on transmission towers.  The vast majority of PG&E initiated fires were caused by something (a tree, an animal, a person, the ground, or a steel structure) coming into contact with an energized conductor.  The entire purpose of the electric transmission system is to move electricity from point A to point B through the conductor.  The entire purpose of all of the components of the overhead transmission system, except the conductor, is to keep the conductor safely hanging in the air.  Essential to keeping the conductor hanging in the air is the hardware that connects the conductor to the structure.  PG&E knows that if that hardware breaks the result is a wire down event.  Despite all of this knowledge PG&E did absolutely nothing to identify and replace the worn hardware essential to keeping the conductor safely in the air.

---

[122] This is the only reference to the Bolted Connector Program found in records provided by PG&E.  Based upon the description of the program it refers to the replacement of bolted, parallel groove connectors.
[123] Maintenance and Construction

### XIV.  <u>San Bruno</u>

Early in the Camp Fire Investigation, San Mateo County District Attorney Stephen M. Wagstaffe generously and graciously assigned Senior Inspector James Haggarty to assist in this investigation.  Senior Inspector Haggarty was the lead investigator on the San Bruno explosion and an expert on investigating PG&E.  Senior Inspector Haggarty immediately began seeing parallels between PG&E Gas Transmission operations prior to the San Bruno explosion and PG&E Electric Transmission operations prior to the Camp Fire.

On September 9, 2010, a PG&E gas transmission line buried beneath a residential neighborhood in the City of San Bruno ruptured and exploded.  The explosion and ensuing fire killed eight people, destroyed 35 structures and damaged many more.  In 2014, after three years of investigation by city, county, state and federal law enforcement PG&E was federally indicted for multiple federal felony counts.  PG&E was later found guilty of five felony counts by a federal jury in the Northern District of California.  A transcript of the jury trial testimony and copies of all admitted exhibits were obtained from the Federal District Court in San Francisco. During that trial, testimony established two relevant factual issues: 1) PG&E record keeping was flawed; and, 2) PG&E inspection policies for the gas transmission lines were budget dependent.

During the San Bruno investigation and subsequent trial, the flaws in PG&E's historical records were exposed.  Evidence established that for many of the older gas transmission lines PG&E had few records.  Many of those gas transmission lines had been acquired from other gas companies and PG&E never made an effort to examine, evaluate and catalogue the components of those lines.  Instead, PG&E used "assumed values" instead of inspecting the actual line to determine true values.

Similarly, during the Camp Fire investigation the evidence established that the Caribou-Palermo line was purchased from Great Western Power in 1930, and PG&E never made any effort to examine, evaluate and catalogue the line components. [124]

The San Bruno investigation also established that PG&E was making inspection policy decisions based on budget.  Testimony and documents presented during the Federal jury trial clearly established in the years prior to the San Bruno explosion, PG&E used the least expensive inspection method to inspect older gas transmission lines, including the San Bruno line that ruptured and exploded.  The chosen inspection method was less expensive in two ways: 1) it was less expensive to execute; and, 2) it was not designed to actually detect pipe integrity flaws that would require immediate and costly repair or replacement.  Prior to the Camp Fire, for the Caribou-Palermo line PG&E utilized the least expensive inspection method (air patrols) in a

---

[124] In a written response to a CPUC data request PG&E states "PG&E has not historically maintained an inventory of suspension hooks or their manufacturers, age or material composition.  As a result, PG&E does not have an inventory of all transmission and distribution facilities in the entire PG&E service territory organized by location and the presence of suspension hooks similar to the Incident Location 1 suspension hook.  Suspension hooks are common hardware on transmission structures and occasionally are used on distribution structures. In PG&E's service territory, there are in excess of 50,000 steel transmission structures, most of which have multiple suspension hooks of some type supporting insulators and other equipment.  There are also suspension hooks on many of the nearly 100,000 non-steel transmission structures in PG&E's service territory.  There are more than two million distribution poles in PG&E's service territory."

manner guaranteed not to detect any problems that would require immediate and costly repairs. Because troublemen were not finding safety problems requiring repairs, PG&E was able to devote capital budget funds to projects focused on improving reliability metrics.

The evidence uncovered during the investigation and presented during trial clearly established the San Bruno explosion was the direct result of the fact that, because of faulty record keeping, PG&E was unaware of the potential threat/defect in the San Bruno pipe. Because PG&E intentionally used an inspection method that could not detect the potential threat/defect, the threat/defect was not found.

## XV.   THE BUTTE FIRE

On September 9, 2015, a pine tree fell onto an energized PG&E distribution line in Amador County sparking the Butte Fire.  The Butte Fire burned over 70,000 acres in Amador and Calaveras Counties, killed two people and destroyed hundreds of structures.  Cal Fire conducted an investigation of the origin and cause of the Butte Fire.  PG&E was not criminally prosecuted for the Butte Fire.  A civil suit was brought against PG&E by the victims of the Butte Fire in the Sacramento County Superior Court. Early in the Camp Fire Investigation, records from the Butte Fire civil suit, including investigative reports and deposition transcripts, were obtained and reviewed.

The investigation into the Butte Fire focused on the PG&E vegetation management practices in the Stockton Division.  Similar to the ETPM in the transmission division, PG&E had written policies for distribution vegetation management.  Much like the Camp Fire investigation, the evidence uncovered during the Butte Fire investigation established as a result of reductions of the vegetation management budget, the written vegetation management policies were not being followed; vegetation management inspections and patrols were being conducted by unqualified, untrained, inexperienced personnel;[125] and PG&E was instructing those tree inspectors to ignore all but the most dangerous conditions.  Additionally the evidence established PG&E had no quality assurance programs to monitor and evaluate the vegetation management program.  As with the transmission inspection and patrol policies in effect at the time of the Camp Fire, PG&E relied solely on the observations of unqualified, untrained and inexperienced inspectors to identify dangerous conditions.


## XVI.   DROUGHT AND WIND

Since at least 2013, PG&E was aware of increased risk of catastrophic wildfires. Chapter 11 of the 2017 RAMP begins:

> "Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California. Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional

---

[125] The vegetation management program was conducted by hired contractors.

vegetation growth (fuel) and influence both the likelihood and severity of extraordinary wildfire events.

Over the past five years, as we have seen across California, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made it increasingly more difficult to manage.

The risk posed by wildfires has increased in PG&E's service area as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases resulting from record rainfall following the drought, among other environmental factors. Other contributing factors include local land use policies and historical forestry management practices. The combined effects of extreme weather and climate change also impact this risk."

According to the United States Geological Survey[126] three of the five worst droughts[127] in California history have occurred since 2001. The three droughts listed are 2001-2002, 2007-2009 and 2012-2016. According to the U.S Drought Monitor[128] in 2012 the Feather River Canyon was classified as "Abnormally dry." By 2013 the Feather River Canyon was classified as "Severe Drought." By 2014, and through 2015, the Feather River Canyon was given the highest drought classification: "Exceptional Drought"

According to an internal PG&E presentation from late 2013 entitled "Wild Fire –Enterprise Risk", PG&E was already aware of the heightened fire risk. "Wild Fire risk in California is increasing due to weather conditions and resulting record low fuel moisture content. Fire activity has seen a significant increase in 2013 as compared to 2012 with PG&E responding to 36% more fires YTD. Acreage impact as compared to 2012 is almost doubled."

According to the presentation PG&E created "administrative zones for areas at highest risk of a major wildland fire and proactively addresses these areas through operational and asset management standards. Current administrative wildland fire boundaries encompass geographies which exhibit a combination of active fire history, fire prone vegetation, terrain that promotes rapid fire spread, and/or locations specified by existing regulations for special treatment." The presentation includes a map of "Wildfire Administrative Areas at PG&E." The Feather River Canyon, from approximately Beldon to Lake Oroville appears to fall within a Wildfire Administrative Area. Under the title "Lessons Learned: Previously-Approved Mitigation Activities" bolted connector inspection/replacement is listed with the note "Wild Fire zones are now a consideration for program rollout prioritization."

Also in 2013 PG&E published the "Wild Fire Administrative Zones in PG&E's Service Area" map. According to this map the Feather River Canyon is falls within an "Other Wildfire Area." In 2014 PG&E Transmission Asset Strategy compiled a list of all transmission structures located within the boundaries of a designated wild fire area. Approximately 85 towers on the Caribou-Palermo line between the Butte-Plumas County line and the Big Bend Substation were included

---

[126] ca.water.usgs.gov
[127] measured by precipitation and runoff
[128] https://droughtmonitor.unl.edu

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 115 of 1229

on the list. Tower 27/222 for some unknown reason was not on the list, but Towers 22/187 through 23/192 (which did not exist in 2014 because they had collapsed in 2012) were listed.

According to PG&E documents, including publicly available reports, PG&E has its own meteorological department and continuously monitors data from both its own weather stations and government weather stations.  The closest weather station to Tower 27/222 is the Jarbo Gap RAWS[129].  Meteorologist Kris Kuyper analyzed data from the Jarbo Gap RAWS, as well as other government sources including the National Oceanic and Atmospheric Administration and the U.S. Drought Monitor and PG&E.  According to Kuyper's analysis, although the winter of 2016-17 was very wet and broke the 2012-16 drought, the winter of 2017-18 was dry "abnormally dry."  Although the season as a whole was abnormally dry, March and April were wet.  As a result of spring rains, native grasses grew in abundance.  In May the rain disappeared.[130]  From June 1, 2018 through November 8, 2018, there was no measurable rain in Paradise.[131]

Because of the lack of rain, by November 8, 2018 the EDDI[132] listed the Feather River Canyon in the ED3 or ED2 drought categories[133].  Based upon the lack of rain and the EDDI statistics, Kuyper opined that the dry air was "taking moisture from the plants, draining the plants of their moisture, making them even drier than they should have been."  As a result, on November 8, 2018 the Feather River Canyon was approaching "record dry levels of fuel (trees, shrubs, bushes, grasses).[134]

According to data from the Jarbo Gap RAWS station from 9:13pm on November 7, 2018 until 5:13am on November 8, sustained winds were between 24 mph and 32 mph with gusts between 41 mph and 52 mph.  According to Kuyper this wind pattern was not unusual for Jarbo Gap. Based upon analyzing six years of wind data from the Jarbo Gap RAWS Kuyper determined that Jarbo Gap experiences this wind pattern approximately 20 times per year,[135]  the majority of which occur from October through February.[136]

According to Kuyper, the Jarbo Gap winds occur as the result of a difference in atmospheric pressure between east of the Sierra Nevada and west of the Sierra Nevada. Higher pressure over the Great Basin in Nevada forces air west, towards lower pressure on the west side of the Sierra Nevada. The Sierra Nevada blocks this, except through gaps and passes such as the Feather River Canyon. The air is then channeled through the gaps and passes, which accelerates the flow of air.  Cold air flowing downhill also causes acceleration.

---

[129] Remote Automated Weather Station
[130] Average rainfall in Paradise area in May is approximately. 5".  May, 2018 rainfall for Paradise was .14".
[131] Average rainfall in Paradise area in October is approximately 3".
[132] Environmental Demand Drought Index, esrl.noaa.gov
[133] On a scale of 0 – 4.  0 being normal, ED2 is defined as "Severe Drought."  ED3 is defined as "Extreme Drought." 4 being "Exceptional Drought."
[134] https://gacc.nifc/oncc/fuelsFireDanger.php
[135] From 2013-2019, 118 individual events with wind gusts over 45mph, 66 individual events with wind gusts over 50 mph.
[136] October averages more than 5 events per month, November averages under 2.

Internal PG&E records established PG&E has known since the mid-1980s that high winds constitute a serious threat to its electric transmission assets. In 1990, PG&E Research and Development published the "Extreme Wind Speed Estimates Along the PG&E Transmission Line Corridors" report. The report was the result of a five year study, recommended by the CPUC, "to assess the adequacy of PG&E's power wind loading design criteria" after five separate incidents in which transmission line assets were toppled during wind storms in 1982 and 1983. The report mainly focused on the 500kV transmission line corridors. According to the report "Electric transmission lines in the PG&E service area were originally designed to withstand wind loadings associated with 1-minute average gusts to 57 miles per hour (mph). The report concludes the original PG&E wind loading criteria for transmission lines was inadequate at some locations and needed upgrade. According to the reports, from November 1984 through November 1985 PG&E had wind meters installed at the Cresta Reservoir and the Rock Creek Reservoir in the Feather River Canyon. Both locations recorded gusts in excess of 50 mph hour in November, 1984 (54.6 mph) and February, 1985 (70.9 mph).

In 1999, PG&E Technical and Ecological Services published an updated "Extreme Wind Speed Estimates Along the PG&E Transmission Line Corridors." The report stated "Electric transmission lines throughout the PG&E service area were originally designed to withstand wind loadings of 70 miles per hour." No explanation was given as to why the original wind loading design increased from 57 miles per hour (as stated in the 1990 report) to 70 miles per hour between 1990 and 1999. Although not stated as a justification for the update, the report did note that severe storms in January, March and December of 1995 caused approximately $100 million damage to electrical transmission and distribution systems. The report mainly focused on the 500kV transmission line corridors and Bay Area, while noting a lack of wind data from the Sierra Nevada and northeastern areas. The report did include the 1984-85 wind speed data from the Rock Creek and Cresta reservoirs.

The 1999 report included a section entitled "Santa Ana Type Winds." According to the report Santa Ana type winds occur because "High pressure frequently forms in the Great Basin area of the Rockies in the vicinity of Utah and Nevada during winter months. When pressure builds beyond a critical point, air spills through the mountain gaps, gaining momentum as it flows to lower elevations." The report recognized although mainly thought to be a Southern California phenomenon, Santa Ana type winds do occur in Northern California, mainly in the Tehachapi region near Bakersfield.

In 2015, PG&E Applied Technology Services published the "Extreme Wind Speed Estimates Across the PG&E Service Territory" report. This report updated and built upon the previous wind reports. According to the report "major wind storms" occurred in December, 2005, January, 2008, October, 2009 and January 2010. The report did not mention the December, 2012 wind event that toppled five Caribou-Palermo line towers.[137]

The 2015 wind report refers to "Offshore/Northerly Wind Events." According to the report:

---

[137] According to historical wind data for RAWS available at https://wrcc.dri.edu the maximum wind gust speed recorded by Jarbo Gap RAWS on December 21, 2012 was 30 miles per hour.

These events occur when surface high pressure develops north or east of the territory, which sometimes occurs as storm systems bypass California to the north and drop southeast of the territory generally east of the Sierra Nevada. This pattern produces a northerly to easterly pressure gradient and offshore winds. When flowing downhill these winds are known as 'katabatic' winds and are also named by geographic location in some instances (e.g. Diablo, Mono).

The wind report does not recognize the Feather River Canyon/Jarbo Gap winds.  The wind report does conclude:

"The quality and precision of the data is proportional to the density of weather stations in the analysis and is generally higher in the Bay Area and Central Valley where station coverage is robust and lower in the Sierra Nevada and Coastal Ranges.  Since wind speeds were produced from the RAWS in the more remote terrain in the Sierra Nevada and north and south Coast Ranges and since RAWS are more often located in more exposed terrain, the isotachs[138] … typically represent ridge top winds."

According to the report the "most notable offshore wind event in recent history occurred on November 30 to December 1, 2011, which produced katabatic winds across the Sierra Nevada and the elevated terrain of the Bay Area and Central Coast.  Wind gusts from 40-60 mph were observed across the central and southern Sierra Nevada foothills…"  According to historical wind data from the National Oceanic and Atmospheric Administration gusts of 66 mph were recorded at Jarbo Gap on November 30, 2011.

The report also concluded "Offshore or Northerly wind events are typically associated with extreme fire danger and can be strong enough to produce widespread damage to distribution and transmission infrastructure."

This natural phenomenon has been occurring for many years.  Exponent also analyzed the wind in the Feather River Canyon.  According to the Exponent Report, the Caribou-Big Bend section of the line experienced the highest average wind speed, the highest average time at high wind conditions and the highest percentage of towers that experience more than 605 hours of high wind conditions per year of the comparison transmission lines.

During its investigation, the CPUC asked PG&E if PG&E had "ever done a wind loading study" on Tower 27/222.  In its written response[139] PG&E stated "A wind loading study was completed as part of the initial installation of the transmission line between 1919 and 1921" and "PG&E's understanding based on its records is that no additional wind loading studies were performed on the two towers (27/222 and 27/221) since the installation of the transmission line between 1919 and 1921.  PG&E's transmission line design criteria do not require analysis on structures for which no significant work is proposed."  According to the design criteria listed in PG&E's written response, the towers were designed to withstand winds of approximately 56 miles per hour.  During the short period of time that wind meters were installed at the Cresta Reservoir and

---

[138] An isotachs is a line on a map connecting points of equal wind speed.
[139] CPUC Data Request SED-002, Question 27.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 118 of 1229

the Rock Creek Reservoir in the Feather River Canyon, PG&E recorded wind gusts over 70 miles per hour. From 2013 to 2019 the Jarbo Gap RAWS station recorded wind gusts over 50 miles per hour over 60 times. Despite the fact the towers of the Caribou-Palermo line were routinely subjected to winds at or near their design criteria, PG&E never inspected or tested any of the towers or components for wind damage.

Based upon the meteorological data, PG&E knew that the Feather River Canyon was a drought ravaged tinderbox. Based on their own reports, PG&E also either knew or should have known the Feather River Canyon experiences katabatic winds during the fall when the fire danger is highest. Despite its own meteorological data, PG&E chose not to replace the aged and deteriorating conductor and components on the Caribou-Palermo line.


### XVII. PUBLIC SAFETY POWER SHUT-OFF

On November 6, 2018, PG&E issued a Public Safety Power Shut-Off (PSPS) notice to approximately 70,000 PG&E customers in nine California counties, including Butte. The PSPS notified customers of potential de-energization of power lines on November 8, 2018, based upon meteorological forecasts. On November 6 and November 7 PG&E went to great lengths to notify customers in the nine counties of the potential de-energization[140] on November 8, 2018. On November 8, 2018 PG&E decided not to de-energize power lines.

An initial focus of the Camp Fire Investigation was the decision by PG&E not to de-energize power lines in the Feather River Canyon prior to ignition of the Camp Fire on November 8, 2018.

The PG&E PSPS Policy was enacted in September, 2018. A PSPS guide was published on the PG&E website {Attachment - Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018}in September 2018. PG&E's PSPS Policy was enacted based upon a CPUC decision in July, 2018[141] to allow electrical utilities to pro-actively de-energize[142] at-risk power lines during wind events. The PSPS guide publicly available on the PG&E website broadly described the meteorological conditions necessary for de-energization. The publicly available PSPS guide used the term "power lines" and did not differentiate between distribution and transmission lines or by voltage or area.

Based upon the meteorological data, {Attachment - Jarbo Gap Weather Station Readings} the conditions in the Feather River Canyon in the hours prior to the failure of the C hook on Tower 27/222 exceeded the wind conditions necessary for de-energization under the publicly posted PSPS guidelines.

However, the Butte County DA obtained copies of the PSPS policy filed by PG&E with the CPUC. The actual PSPS policy was much more detailed and specific than the guide published

---

[140] In layman's terms shutting off the power.
[141] CPUC Resolution ESRB-8.
[142] In layman's terms shutting off the power during high wind events to avoid fires caused by contact between energized power lines and objects such as vegetation.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 119 of 1229

on PG&E's public website. As opposed to the publicly posted PSPS guide, the official PG&E PSPS policy differentiated between transmission and distribution lines. The actual policy specifically and explicitly exempted all 115kV, 230kV and 500kV transmission lines from the PSPS. After comparing the PSPS guide published on the website with the actual PSPS policy, it appears the authors of the public PSPS guide, in an effort to make the guide understandable to the average PG&E customer, simplified the policy to an extent that became misleading.

Additionally, the transmission and distribution lines in the Feather River Canyon were not within the area of PSPS program. According to internal PG&E documents, inclusion of 115kV transmission lines in the new PSPS program was initially considered. The committee drafting the PSPS policy explored three transmission line options: 1) all 70kV and below; 2) all 115kV and below; 3) all 70kV and below and some 115kV depending upon factors such as location within high fire threat areas. Ultimately the committee settled on all 70kV transmission lines and below and exempted all 115kV transmission lines from the PSPS program. PG&E did not provide any written documents explaining or justifying this decision. However, based upon all the documents provided, there was no evidence the decision to exempt all 115kV transmission lines and above was reckless or criminally negligent. Based upon the 2018 PG&E PSPS policy, the Caribou-Palermo line was not subject to de-energization prior to the ignition of the Camp Fire and was therefore not included in any PSPS. However if PG&E had included 115 kV lines, the Caribou-Palermo line should have been included based on the extreme wind conditions in the Feather River Canyon.


## XVIII. KNOWLEDGE OF RISK/CONSEQUENCE

Internal PG&E documents show that by 2006 PG&E was aware that equipment failure (risk) causes fires. According to the October 2006 Risk Analysis of Urban Wild land Fires, written by the PG&E Enterprise Risk Management Committee, in 2005 PG&E electrical equipment failures caused 20 fires. That same document defined the Urban Wild Land Interface area as the "geographical area where structures and other human development meets or intermingles with wild land or vegetative fuels" and lists aging infrastructure as a potential "gap" in PG&E's fire mitigation efforts. Another potential gap identified by PG&E is "our asset strategy to address urban wildland fires is limited." To mitigate this potential gap the report included the following "Proposed Solutions:"

> Identify urban wildfire geographic area
> Identify quick result items such as:
>> Perform patrols/inspections just before fire season
>> Replace parallel groove (PG) connectors
>> Inspect equipment that could be high risk.

The 2009 Enterprise Risk Management Urban Wildland Fire Risk Review report written for the Executive Management Committee specifically listed as fire risk drivers:

> Failure to perform quality inspections or workmanship
> Inadequate procedures relating to fire danger
> Failure to consider local conditions in design standards

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 120 of 1229

Improperly maintained equipment
Failure to replace aging equipment.

Under "Current Mitigation Activities," the report specifically listed "Equipment maintenance and replacement programs, including patrols and inspections."

These themes were repeated in Enterprise Risk Management (ERM) reports for several years.

"EMC: Electric T&D Asset Road Map," an internal PG&E document believed to have been published within the company in 2010, stated:

> "For more than twenty years, PG&E's asset management practices have focused on maximizing the utilization of T&D[143] assets and reducing capital investments to the greatest extent possible. Only recently has the Company utilized an alternate approach that places a higher value on reliability and operational flexibility of the electric T&D system. It is recommended that PG&E continue this current approach to pursue a combination of measures designed to upgrade and modernize its aging electric T&D assets."

In the section of the document entitled "Aging Assets" it is stated:

> "While much has been done in the last several years to improve the design, maintenance and operations of the system, the Company's electric T&D assets comprise an aging system that it operated close to its design capacity limits. Many of our electric T&D facilities were installed in the 1950s and planned lifetime design for these facilities is 40 years. Continuing to rely on aging facilities has increased the Utility's risk of equipment failure and extended service interruptions. Additionally, the repair time and costs for failed equipment is much higher than planned replacement."

In December 2018, in response to questions from the Honorable William Alsup, Judge of the United States District Court, Northern District of California, PG&E submitted to the Federal District Court a list of all fires caused by PG&E 2014-2017. 2017 {Attachment – PGE caused fire 2014-17}. According to the list there were eighteen fires caused by equipment failures on transmission lines.

The list submitted to the Federal District Court did not include the 2008 Rock Fire and the 2018 Murphy Fire,[144] both of which occurred in the Feather River Canyon and both of which were caused by equipment failures on transmission lines. The Rock Fire was caused by the failure of a connector on a tower on the Caribou-Palermo line. The Murphy Fire was caused by the failure of a connector on a tower on the Caribou-Table Mountain 230kV transmission line. In both fires the failure of a connector allowed an energized jumper conductor to make contact with the steel tower structure and sent a shower of molten metal onto dry vegetation at the base of the tower.

In the 2017 RAMP, PG&E clearly identified equipment failure as a known cause of fire. According to section C of Chapter 11, Drivers and Associated Frequency, there were an average of 243 fires per year during 2015-16 causes by PG&E. Of those 243, on average 82.5 (33%)

---

[143] PG&E abbreviation for Transmission and Distribution

[144] The Murphy Fire occurred on August 6, 2018. The origin of the fire was directly below a PG&E transmission tower – not the Caribou-Palermo line – just west of Belden in the Feather River Canyon. The fire was caused by equipment failure – specifically failure of a connector – which allowed an energized 230kV conductor to come into contact with steel tower structure.

were caused by equipment failure. Equipment failure caused fires are broken down into Conductor (29.5 per year), Connector/Hardware (15.5 per year) and Other (37.5 per year).

The evidence clearly established PG&E has been aware of the risk/consequence connection between equipment failure and fire since at least 2005. Similarly, the evidence also clearly establishes that PG&E was aware of the risk/consequence connection between aging infrastructure and equipment failure.

In 2009 PG&E retained Quanta Technologies to review, assess and critique the electrical transmission system. In 2010 Quanta submitted to PG&E the Transmission Line Component Management Report. The report was divided into a series of individual reports. Each report focused on a component of the electrical transmission system. Not all of the reports were relevant to the risk of equipment failure on transmission towers.

Relevant individual reports and information in those reports was summarized:

Transmission Line Component Management Executive Summary

"As part of a comprehensive effort to manage its infrastructure PG&E Transmission Asset Management has begun study of all components of transmission line infrastructure, both overhead and underground, to develop an understanding of the component behavior over its installed service life. The intent of this effort is to ultimately develop an understanding of what the expected service life of line components should be, given normal operating and maintenance practices of the service life. This understanding also drives decisions of what the "normal" operating and maintenance practices should be to allow a component to survive to an "end of service life" condition, barring external events that cause sudden or catastrophic failure of a component (e.g. severe weather event, vehicular impact)."

"Certain aspects of a utility maintenance program can be characterized as following a "run to failure" philosophy. The practice of allowing equipment to fail often applies to utility equipment that is large in total population but low in overall impact to the system and/or customer reliability."

"Run to failure as a maintenance philosophy has a place in the overall maintenance program of a utility. The equipment managed under this philosophy, however, is generally high volume, low risk facilities. Operational risk, technical effectiveness, and financial considerations drive the determination."

Conductor and Fittings

"Based on PG&E conductor inventory data, the average age of 115 kV copper conductor on the PG&E system is 75 years. Conductor other than copper at 115 kV averages 36 years of age.[145]"

"The overall age of conductor is a concern to most utility asset managers and the concern is based primarily in lack of knowledge of what is to be expected from aging conductor."

---

[145] The conductor on Tower 27/222 was aluminum.

"Greatest risk of failure in transmission conductors is thought to be with the oldest steel reinforced conductors[146]."

Insulators

"…the failure rate of porcelain increases at a faster rate as they age beyond 50 or so years. Nonetheless, even with increasing failure rate, porcelain is only projected to a rate of 0.06 failures per at age 60."

"Industry has come to expect a service life for porcelain and glass insulators beyond 50 years. The service life is contingent of course on the original quality and proper application of the units."

"…lack of data consistency and accuracy result in the need for many assumptions to address data voids. Accurate information on insulator type (porcelain, glass, poly), vintage, manufacture, date of installation, and location is critical to building a dataset that will facilitate meaningful statistical analysis over the service life of the material."

Structures

63% of the 104 electrical utilities surveyed utilized routine climbing inspections as part of inspection policy. The average inspection period for climbing inspections was 4.2 years.

44.4% of PG&E 115kV structures were installed prior to 1931.

Component service life was calculated based upon condition and environment. Environment was further divided by "Mild," "Avg." and "Severe." For "Twr attachments : Susp/Jumper." for the condition "Wear" and environment "Wind run" the component life in years is Mild – 80 years, Avg – 57 years, and Severe – 35 years.

"With recognition of the issues associated with aging infrastructure, more attention is expected to be given to steel tower condition throughout the industry."

"Inspection, repair, and refurbishment of steel structures and associated components (guys, anchors, foundations, etc.) are a critical part of the ongoing maintenance and management of the transmission infrastructure. Normal aging and deterioration, coupled with years of inadequate inspection and maintenance, put many structure at a point of less that desired structural integrity."

"A comprehensive maintenance and inspection program for an aging structure population should include a diagnostic testing component, particularly when structures reach and age threshold that is appropriate. That threshold varies by many factors: geographic location and associated environmental conditions, age of infrastructure, proximity to other infrastructure, historical performance of similar vintage structures in the company, etc."

---

[146] Steel reinforced conductor has a solid steel core to increase the strength of the conductor. The conductor on Tower 27/222 was steel reinforced.

"An effective strategy for structure and foundation management would include elements such as:

> Routine visual inspections by ground patrol and aerial patrol as part of general line inspection process,
>
> Comprehensive climbing inspection at 3-5 year intervals,
>
> ….
>
> Laboratory testing of components removed from service as part of repair or replacement work to determine overall condition and remaining strength of material."

"For a population of structures and foundations such as exists at PG&E, the leading criterion for determining inspection and testing targets, would initially be age.  With a structure population age span of over 100 years (according to inventory records), a programmed sampling of the population over 80 years of age to test structure and foundation integrity would be an appropriate beginning."

According to Figure 9.1[147] the only structures still in use at the time of the report that were built prior to 1923 (87 years of age at time of report) were 115kV structures.  According to a footnote to Figure 9.1 and subsequent figures in section 9, there are 6908 115kV structures for which PG&E has no age data.  According to other PG&E reports there are 18,800 115kV structures in the PG&E inventory.

The evidence developed during this investigation clearly establishes that PG&E essentially ignored the recommendations of the Quanta Reports.  PG&E did not adopt any new policies or procedures for inspection of the oldest transmission assets. There is no evidence of a programmed sampling of the oldest structures and foundations.  Even the collapse of five Caribou-Palermo line structures in 2012 did not cause PG&E to take a closer look at one of their oldest transmission assets.  In 2010 the TLine Structures Committee met to review the Quanta Reports.  Neither The Senior Engineer nor the former Transmission Specialist, members of the TLine Structures Committee and "Required Attendees" of the 2010 meeting, had any recollection of the alleged meeting or any recommendations regarding the Quanta Reports made by the committee.  Neither was able to shed any light on the question as to why the recommendations of the Quanta Reports were not adopted.  According to the Senior Director of Transmission Asset Management, who was not involved in the TLine Structure Committee at the time of Quanta Reports, the recommendations of the Quanta Reports were ignored because "we could not rely on the information in the Quanta study."  The Senior Director explained:

"The Quanta study did not look at asset data from those utilities but rather business practices from those utilities.  The only age information and corresponding failure data that was used in that study was associated with the subset of assets that failed in a two-year period within PG&E and made some assumptions that made the statistical analysis incorrect. So it wasn't sufficient for us to justify significant amounts of investments in the

---

[147] A line graph displaying the age distribution of PG&E transmission structures.

future, and we needed to do additional analysis in order to build the case for our regulators to be able to justify requesting authorization to be able to make additional investments in the infrastructure based on the results of that bullet point at a later date."

The Senior Director of Transmission Asset Management also stated "I didn't have high confidence in the Quanta study so we intended to do additional benchmarking and collaboration in the industry in order to come up with more robust information."

In addition to general knowledge of the problems of wear and failure in aging infrastructure, PG&E had specific knowledge that C hooks and hanger holes suffer rotational body on body wear as far back as 1987.

According to internal PG&E documents, in 1987 a transmission line crew noticed concerning wear patterns on both the C hooks and the hanger holes on the Oleum-G transmission line[148]. The transmission line supervisor removed the C hooks and hanger holes from the tower structure and sent them to the PG&E Lab for analysis. The PG&E lab evaluated the C hooks (referred to as J hooks in the report) and hanger holes (referred to as attaching plates) and issued a Laboratory Test Report on February 9, 1987. According to the report "Both of the J-Hooks and their attaching plates had grooves worn in them and there was concern that they may not be able to hold the weight of insulator strings that are suspended from them." The lab report included photographs of the C hooks and the hanger holes. Figure 1 of the report is a picture of one of the C hooks. According to the caption to Figure 1 "As shown in the Figure above a wear pattern was formed in the bowl-saddle of the J-hook. This was possibly caused by the insulator string swinging in the wind over a period of time." Figure 2 of the report is a photograph of one of the hanger holes. According to the caption to Figure 2 "This figure shows the key-hole wear in the plate eye caused by the J-hook while in service."

In 2011, PG&E transmission line crews working in the South Bay, observed similar wear on hanger holes on the Jefferson-Hillsdale transmission line. Photographs were taken of the wear and sent to PG&E engineers. After reviewing the photographs a Supervising Engineer responded via email "Looking at the photo of the hanger plate. I would recommend changing it to a new plate. It appears that there is a groove cutting into the plate probably caused by years of rubbing between the c-hook and the plate."

In March of 2018, PG&E transmission line crews working on a transmission line in the East Bay observed similar wear on hanger holes. The transmission line supervisor, removed the hanger plates from service and sent them to the PG&E Lab for review and analysis. On June 20, 2018, the PG&E Lab issued a report entitled "Metallurgical Evaluation of Insulator Suspension Plates from the Parkway-Moraga 230 kV line at structure 020/115. The report found that "the wear was attributed to wind-driven swinging of the insulators (wind-sway)." The report opined a wear rate of .007" per year and a useful life of the hanger plates of 97-100 years based upon the wear rate and the expected strength of the remaining metal.

The evidence establishes that PG&E is aware that wear increases with age, the possibility of equipment failure increases relative to the amount of wear, and, ignition of a fire is a definite

---

[148] The Oleum-G transmission line is located in Contra Costa County, just south of the Carquinez Bridge and near the community of Valona. The Oleum-G line is one of the segments of the original Caribou-Valona line still in service. It is believed, but not confirmed that the tower from which the C hooks and hanger holes were removed was an original, 1921 Caribou-Valona tower and the worn C hooks were vintage 1921.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 125 of 1229

possible consequence of equipment failure.  It is clear, based upon the internal PG&E documents that PG&E has clearly understood, at least since 2006, the correlation between aging infrastructure and fire.

The Quanta Reports and internal PG&E reports clearly established a connection between wear and inspection/patrol.  From the October 2006 Risk Analysis of Urban Wild land Fires through the 2017 RAMP inspection and patrol are specifically listed mitigation to fire threat.  Since 2005 PG&E electric transmission inspection, patrol and maintenance policies are set out in the Electric Transmission Preventative Maintenance Manual (ETPM).  According to section 1.2 of the ETPM "Inspection and patrol procedures are a key element of the preventive maintenance program.  The actions recommended in this manual reduce the potential for component failure and facility damage and facilitate a proactive approach to repairing or replacing identified, abnormal components."


## XIX.   PERSONAL LIABILITY FOR PG&E EXECUTIVES

During the course of the Camp Fire investigation, many witnesses from PG&E were interviewed and examined under oath by the Grand Jury. Many, many internal discussions were had as to whether there was sufficient evidence to indict any individual PG&E personnel or executives. It was finally determined based on the current state of the law in California and the facts discovered during the investigation that there was insufficient evidence to proceed against individuals.

**A. The Law:**

Many people have heard of or understand the concept of "Respondeat superior" (Latin for "Let the Master answer") in which an organization's top executives are held **vicariously liable** for the actions/omissions of their subordinates regardless of the executive's personal participation or knowledge. However this is a **civil concept** that does not apply in **criminal** cases. The leading California case in the area of **corporate officer criminal liability** is *Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal. App. 4th 446, which states: "[A]n officer of a corporation is not criminally answerable for any act of a corporation in which he [or she] is not personally a participant. In the context of negligent homicide such an officer would be said not to be liable unless he or she was personally aware of the omissions or other behavior that gives rise to the criminal negligence. The decisions involving criminal liability of corporate officers, either expressly or impliedly, focus either on the officer's direct participation in illegal conduct, or his or her knowledge and control of the illegal behavior. **The mere fact of the officer's position at the apex of the corporate hierarchy does not automatically bestow [criminal] liability**."

**B. The Facts:**

Based upon the forensic analysis of the failed "C" hook from the suspect tower, it was the opinion of the experts consulted that the wear which caused the hook to break occurred gradually over almost 100 years.  It is our belief the wear had been visible for at least 50 years.  Over the past 50 years scores of PG&E employees should have been in a position to observe the wear.  However, none of the employees documented the wear.  Since nobody apparently noticed the wear, it would be impossible to prove any single person was negligent. Additionally PG&E

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 126 of 1229

culture made decision-making "by committee" a standard, virtually eliminating individual responsibility. A "silo mentality" also pervaded the company in which departments and management groups did not share information, goals, tools, priorities and processes with each other. (E.g. The PG&E Tower Division took responsibility for maintenance of the steel tower structures. The PG&E Line Division took responsibility for the maintenance of the power lines. The "C" hooks seemed to fall between their two responsibilities – i.e. neither took responsibility for the hooks, assuming the other division was responsible, which left the hooks as orphan equipment.)

## C. Conclusion:

Many of the decisions that ultimately lead to the Camp Fire were made in the 1980s, 1990s and 2000s. It would be almost impossible to prove a person making decisions in 1995 knew the decision was creating the risk of a catastrophic fire over 20 years later and either disregarded or ignored that risk. **But the corporation as an entity is tasked with that knowledge and reckless behavior and was so indicted.**

## XX.    ELEMENTS OF THE OFFENSES

Unlawfully Causing a Fire to a Structure/Forest land (Pen Code § 452(c))

     a. PG&E set fire to, or burned, or caused the burning of a structure or forest land or property;
     b. PG&E did so **recklessly**;
     c. The fire burned an inhabited structure or the fire caused great bodily injury to another person.

Definition of Recklessly

     A corporation acts recklessly when:
     a. It is aware that its actions present a substantial and unjustifiable risk of causing a fire.
     b. It ignores that risk
     c. Ignoring the risk is a gross deviation from what a reasonable person would have done in the same situation.

Involuntary Manslaughter (Pen. Code §192(b))

     a. PG&E had a legal duty to the decedents
     b. PG&E failed to perform that legal duty;
     c. PG&E's failure was **criminally negligent**;
     d. PG&E's failure caused the death of decedents

Definition of Criminal Negligence

     a. Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A corporation acts with criminal negligence when:

      i. It acts in a reckless way that creates a high risk of death or great bodily injury;
      ii. A reasonable person would have known that acting in that way would create such a risk.
    b. In other words, a corporation acts with criminal negligence when the way it acts is so different from how an ordinarily careful person would act in the same situation that its act amounts to disregard for human life or indifference to the consequences of that act.

## XXI. DUTY

On September 24, 2016, the Governor signed 2016 Cal SB 1028. SB 1028 added Chapter 6 to division 4.1 of the California Public Utilities Code. One of the newly created sections was 8386, which took effect on January 1, 2017. Section 8386 created a statutory duty on electrical utility companies. Section 8386(a) states "Each electrical corporation shall construct, maintain, and operate its electrical lines and equipment in a manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and equipment."

California Public Utilities Code section 451, enacted in 1951 and amended in 1977, states "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

The California Public Utilities Commission promulgates regulations known as General Orders (GO). GO 165 section IV states "Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines."

GO 95 includes multiple rules that apply to electrical transmission line safety, including:

1) Rule 31.1
   Electrical supply and communication systems shall be designed, constructed, and maintained for their intended use, regard being given to the conditions under which they are to be operated, to enable the furnishing of safe, proper, and adequate service. For all particulars not specified in these rules, design, construction, and maintenance should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the design, construction, or maintenance of communication or supply lines and equipment.
2) Rule 31.2
   Lines shall be inspected frequently and thoroughly for the purpose of ensuring that they are in good condition so as to conform with these rules. Lines temporarily out of service shall be inspected and maintained in such condition as not to create a hazard.
3) Rule 18
   Each company (including electric utilities and communications companies) is responsible for taking appropriate corrective action to remedy potential violations of GO 95 and Safety Hazards posed by its facilities.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 128 of 1229

4) Rule 44.3

Lines or parts thereof shall be replaced or reinforced before safety factors have been reduced (due to factors such as deterioration and/or installation of additional facilities) in Grades "A" and "B" construction to less than two-thirds of the safety factors specified in Rule 44.1 and in Grade "C" construction to less than one-half of the safety factors specified in Rule 44.1. Poles in Grade "C" construction that only support communication lines shall also conform to the requirements of Rule 81.3A. In no case shall the application of this rule be held to permit the use of structures or any member of any structure with a safety factor less than one.

## XXII. <u>CONCLUSION</u>

The evidence developed during this investigation clearly established that the reckless actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk.

The C hook that broke was at least 97 years old. The exact age of the C hook is unknown because PG&E has no record of the hook. Ninety-seven (97) years is assumed because the Caribou-Valona transmission line, of which the Caribou-Palermo line is a segment, went into service in 1921. The records from the Great Western Power Company establish the entire line was built between 1918 and 1921. There are no records of when each tower was built. It is possible Tower 27/222 was built in 1918 and the C hook had been hanging for 100 years as of November 8, 2018. The same is true of the insulator string and the jumper conductor hanging from the C hook.

PG&E also has no records, and no idea, by whom the C hook was made, and more importantly, of what type of metal and how the C hook was made. The type of metal and the process of manufacture are what determines the hardness of metal. The transposition towers were designed to allow for movement of the conductor and insulator. The fact the C hook was constantly rubbing back forth against the hanger hole was known. The concept of body-on-body wear from constant rubbing together of two metals is a long established and well known phenomenon. Also long established and well known is the fact the various hardness of the metals rubbing together plays a key role in the body-on-body wear. The fact that PG&E relied on a 97-100 year old C hook it knew nothing about to hold an energized 115kV conductor is, by itself, negligent and reckless.

It is also disturbing that PG&E's only information of the composition of the conductor running through Tower 27/222 comes from a 1922 article in an engineering journal. A conductor is the wire that carries electricity from Point A to Point B. A conductor is the most important component of the transmission system. Everything else in the transmission system is designed around the conductor. PG&E has owned the Caribou-Palermo line since 1930. Based upon the lack of records PG&E has never made any attempt to inventory and catalogue the conductor. The fact that PG&E was using a 97-100 year old conductor for which they knew almost nothing is evidence of absolute indifference on the part of PG&E.

Perhaps even more disturbing is the fact the conductor was aluminum reinforced with a steel core. 452.3 kcmil Aluminum Conductor Steel Reinforced to be exact. According to the Quanta report the average age of non-copper conductor was 36 years and the "greatest risk of failure in transmission conductors is thought to be with the oldest steel reinforced conductors" Although PG&E knew almost nothing about the conductor they did know it was at least 97 years old and made of steel reinforced aluminum. Despite this knowledge, PG&E did nothing and made no plans to replace that conductor. Even though because of updated NERC guidelines, PG&E was forced to replace conductor on some segments of the Caribou-Big Bend section, they elected to leave in place the 97-year-old aluminum steel reinforced conductor in other areas. The fact that the Senior Director of Transmission Asset Management preached the cost effective value of bundling projects but had no plans through 2022 to replace the 97-year-old aluminum, steel-reinforced conductor speaks volumes. What it says is that PG&E fully intended to run that conductor to failure. A reasonable person doesn't need an electrical engineer or Quanta Technologies to tell him that failure of an energized 115kV is extremely dangerous. PG&E's decision to leave the 97-year-old aluminum, steel-reinforced conductor in service was extraordinarily reckless.

In addition to basic engineering principles and common sense, PG&E had actual knowledge that both the C hooks and the hanger holes suffer wear and would eventually break if not replaced. At some unknown point between 1921 and 2018 somebody added the hanger plate brackets to Tower 27/222. Although there are no records of when or why the hanger plate brackets were added the only reasonable conclusion, based upon the wear observed on the original hanger holes, is somebody noticed the wear and was concerned enough to take action.

In 1987 PG&E had absolute knowledge of the wear to both the C hooks and hanger holes. The photographs in the 1987 Laboratory Report document channeling on the C hooks and key holing on the hanger holes similar to what was found on the Caribou-Palermo line. The similarities are not surprising because the transmission line on which the C hooks and hanger holes were found, the Oleum G line, was also part of the original Caribou-Valona line. The fact PG&E chose to only perform tensile strength testing in 1987 and did not subject the hooks and hanger plates to metallurgical analysis tends to show PG&E was not concerned with the wear or the expected useful life of the hooks and holes. Although in 1987 the evidence indicated at least some action was taken based upon the observed wear on the C hooks and hanger holes, when similar wear was found on hanger holes on the Jefferson-Hillsdale transmission line in 2011 the only action taken was the replacement of the hanger plates. According to the email string a PG&E Engineer correctly surmised that this wear was "probably caused by years of rubbing between the c-hook and the plate." Based upon the reaction, or lack thereof, to the photographs of the wear it appears that the wear was neither a surprise nor was it considered a major issue by PG&E engineers.

In 2018 the discovery of keyhole wear on hanger plates on the par transmission line caused enough concern that the Transmission Line Supervisor sent the plates to the PG&E lab for analysis and evaluation. Unlike in 1987, in 2018 the lab actually did a metallurgical evaluation. A PG&E lab scientist, with a PhD in Material Science and Engineering, used the available data

to opine the keyhole wear was occurring at a rate of .007 inches per year. Based upon the average wear rate, the PG&E lab scientist determined the useful life of those hanger plates to be between 97 and 100 years. PG&E now had scientific confirmation of the body-on-body wear caused by the constant movement of the C hooks within the hanger holes and had an estimate of average wear per year. Nothing was done. The report was not distributed through the company and no targeted inspections of older C hooks and hanger holes were ordered. Based upon this report, a reasonable person, knowing they had C hooks which were 90+ years old hanging in hanger holes that were 90+ years old would have taken immediate action to determine the condition of those hooks and holes. The fact PG&E did nothing is evidence of complete and absolute indifference to the inherent danger of a C hook or hanger hole breaking.

Knowledge of the danger inherent in a C hook or hanger hole breaking is firmly established in PG&E documents. Since at least 2006, PG&E has recognized bad things, especially fire, happen when equipment failures occur on transmission lines. Everything in the overhead electric transmission system is designed to keep the conductor hanging in the air and away from persons or objects it could harm. Despite this knowledge PG&E put almost no effort into ensuring the components that keep the extremely dangerous overhead transmission lines hanging safely in the air were safe. Based upon the assertions of the PG&E personnel assigned to inspect and patrol the Caribou-Palermo line, it was not possible to assess the condition of the C hooks and hanger holes from either the ground or a helicopter flying 30 to 40 miles per hour a couple hundred feet above the line. Although claims it was impossible to assess the condition of the C hooks and hanger holes from a helicopter were completely discredited by BCDA investigators, the results of the post Camp Fire "enhanced" inspections and the Exponent Report clearly establish this was not solely a Caribou-Palermo line or Table Mountain Headquarters problem. This was a systemic PG&E problem.

During the post Camp Fire inspections, worn C hooks and worn hanger holes were found throughout the PG&E Overhead Transmission System. Despite the knowledge C hooks and hanger holes wear over time and despite the knowledge of the danger inherent in the failure of a C hook or hanger hole, the evidence clearly established nobody in PG&E was inspecting C hooks and hanger holes.

Despite the efforts of PG&E personnel to distance the company from the "Run to Failure" model, the evidence clearly establishes quite the opposite. PG&E had knowledge of the potential consequences of failure of the nearly 100-year-old C hooks, yet PG&E continued its policy of "Run to Failure."

Because nobody was looking at and assessing the C hooks and hanger holes, there were very few, if any, notifications/tags generated for worn C hooks or hanger holes. As a result, the need for replacement of C hooks and hanger holes never came to the attention of Transmission Asset Management. The lack of verified records for many of the older, acquired transmission lines made the problem worse. In large population areas PG&E was staffed by experts, trained and qualified engineers and specialists having decades of experience. In less populated areas, Transmission Line Management was almost completely dependent upon less qualified Troublemen, Linemen and Towermen and other personnel. For approximately ten years the

M&C engineer assigned to the rural northern area was not an actual engineer and had no engineering education, training or background.

Very little effort was made to audit the lack of findings of line personnel. Equipment failure related outages were repaired as they occurred and no effort was made to investigate the root cause of the failure. Transmission Asset Management essentially employed a strategy of either intentional or incompetent ignorance.

In essence, in 1930 PG&E blindly bought a used car. PG&E drove that car until it fell apart. The average reasonable person understands the basic proposition that older equipment needs more attention. A reasonable person doesn't buy a used car blindly and without at least a test drive. A reasonable person doesn't drive that used car for 200,000 miles without, at the very least, changing the oil and rotating the tires. A reasonable person has the common sense to know that service and maintenance become more important as the car ages and the miles accumulate.

This is, in essence what PG&E did. PG&E bought a used transmission line in 1930. PG&E knew next to nothing about the transmission line and made no attempt to learn about the line. PG&E ran the line for 88 years with minimal maintenance and repair. But for the Camp Fire, PG&E would have continued using the line with minimal maintenance and repair. Catastrophic failure of the Caribou-Palermo line was not an "if" question; it was a "when" question.

Although Quanta Technologies is well known and well respected in electrical utilities circles, the conclusions and recommendations of the 2010 Quanta Reports were essentially common sense findings. The basic findings of Quanta were that PG&E's infrastructure was aging and continued use required increased inspections and maintenance. According to the Senior Director of Transmission Asset Management, the Quanta Reports were discredited because of issues with tower failure data. The PG&E criticisms of the Quanta Reports may have been well founded, but the areas criticized have very little relevance to the ultimate conclusion that the transmission assets were old and needed more attention and care. PG&E obviously didn't take issue with the Quanta conclusions about the age of the transmission infrastructure. Transmission Asset Management continued to cite the Quanta age data and conclusions in subsequent internal and regulatory documents for the next seven years.

The evidence established that despite common sense and the Quanta Report, PG&E went the opposite direction. PG&E internal emails and documents established that by 2007 PG&E was aware of the aging electric transmission infrastructure problem. Former employees of the predecessor departments to the current Transmission Asset Management established PG&E was aware of its aging electric transmission infrastructure problem by the early 1990s.

Despite its knowledge that many of its assets were built prior to World War 2 and despite its lack of knowledge of the components of acquired electric transmission lines, PG&E had consistently reduced the frequency and thoroughness of inspections and patrols on those lines. In other, more populated areas, PG&E routinely used the fact that transmission lines were built after World War 2 to justify repair and replacement.

The 2014 RIBA process demonstrated how PG&E manipulated data to achieve desired results. It is beyond reasonable comprehension that a project to replace temporary poles not expected to stand through the winter scored lower for safety than an unnecessary project proposed solely to allow PG&E to transfer money spent from the expense budget to the capital budget. The fact that PG&E minimized and, ultimately, ignored a serious safety issue is reckless and negligent. The fact that they did so in the middle of a historic drought in an area known for consistent, extreme winds, is criminally negligent.

Despite its knowledge that its transmission assets were nearing the end of useful life and deteriorating PG&E decreased the expertise of the persons doing the inspections. This pattern continued after and in spite of the Quanta Reports. This is the exact opposite of how a reasonable person would have been expected to respond. The evidence clearly demonstrated PG&E understood the relationships between age of components and wear, wear and equipment failure and equipment failure and fire, but unlike a reasonable person, devoted less time and qualified personnel to inspecting the oldest assets.

This trend continued even in the face of the devastating effects of climate change. According to data from the US Geological Survey three of the four worst droughts in the recorded history of California have occurred since 2001. PG&E risk analysis reports, both internal and regulatory have consistently identified wildfire as the number one enterprise risk since 2006. The evidence clearly established PG&E was aware of the drought and the danger of catastrophic fire by 2013. Internal PG&E documents established that in 2013 PG&E identified the Feather River Canyon as a high fire danger area. Despite its knowledge of the increasing risk, the evidence established PG&E not only did nothing to mitigate the fire risk in the Feather River Canyon, it ignored known fire dangers for years.

Prior to 2006 PG&E had identified parallel groove connectors as a fire danger. In PG&E's 2006 "Risk Analysis of Urban Wild land Fires", the replacement of the parallel groove connectors is listed as a proposed mitigation. Unfortunately the proposal was only applied to Urban-Wildland Interface areas, which PG&E limited to the Bay Area. In the Feather River Canyon hundreds of known fire threats were left in transmission towers until 2016. Although the parallel groove connectors were ultimately replaced before causing a known fire, the fact those connectors remained in use for ten years, through two historic droughts, shows the complete disregard and indifference to the potential consequences by PG&E.

PG&E electrical transmission policies and records prior to the Camp Fire mirrored PG&E gas transmission policies prior to the San Bruno catastrophe. The investigation of the San Bruno catastrophe established that prior to the explosion, PG&E gas transmission had made very little effort to investigate and catalogue the components of the acquired gas transmission assets. Instead PG&E relied on assumed values. The San Bruno investigation also established PG&E intentionally was using the least expensive method of inspection in the least expensive manner. The chosen inspection method also saved money because problems that are not found do not need to be repaired. The investigation also established records relating to inspections, both justifying methods of inspection and the inspection reports, were fraudulent.

Somehow, the lessons of San Bruno were not learned on the electric transmission side. The evidence established that despite the lessons of San Bruno on the electrical transmission side, since 2010 PG&E has continued to rely on assumed values, the least expensive method of inspection and done nothing to ensure the veracity of inspection reports. The tragedy of San Bruno somehow had no effect on the electric transmission division. The five felonies for which PG&E was convicted changed nothing on the electric transmission side.

The philosopher George Santayana is credited with saying "Those who cannot remember the past are condemned to repeat it." By ignoring the lessons of San Bruno PG&E condemned itself to another catastrophe. Based upon its own history PG&E knew it was creating a high risk of causing a catastrophic fire but, unlike a reasonable person, chose to ignore that risk.

Because of PG&E's reckless and negligent decisions to unreasonably ignore risk, 18,804 structures, including almost 14,000 residential structures were destroyed – and 84 Butte County citizens needlessly lost their lives.

## XXIII.  SENTENCING

The court's sentencing options are limited.   As a corporation PG&E cannot be incarcerated and PG&E has indicated that it will decline probation.  The only punishment available to the court is to fine PG&E.  The maximum fine for a violation of Penal Code section 192(b) is $10,000.  The maximum fine for a violation of Penal Code section 452 is $50,000.  Based upon the foregoing the People urge the court to impose the maximum possible fines.

### A.  RESTITUTION

The People request that the court reserve jurisdiction over restitution and set a hearing in six months to review restitution in light of PG&E's bankruptcy proceedings.  In the wake of the Camp Fire many civil suits were filed against PG&E by the victims of the Camp Fire. Subsequently PG&E filed for bankruptcy in the Federal Bankruptcy Court in San Francisco.  All Camp Fire civil suits and claims have been transferred to the Federal Bankruptcy Court.  As of December 31, 2019, it is estimated that over 90% of the eligible Camp Fire victims have filed claims in the Federal Bankruptcy Court.  PG&E has entered into a settlement agreement with all claimants in the Federal Bankruptcy Court.

Based upon consultation with bankruptcy experts in the California Attorney General's Office, the People believe any restitution order issued by this court would be discharged in the bankruptcy proceedings.   PG&E filed for bankruptcy under Chapter 11.  A Chapter 11 reorganization produces a plan detailing how much various debts will be reduced.  (11 U.S.C. § 1123(a)(3).)  The plan applies to all debts that "arose before the date" of the confirmation of the plan by the bankruptcy court.  (11 U.S.C. § 1141(d)(1)(A).)  A debt arises at the time of the "conduct giving rise to the debt." (4 Collier Bankruptcy Practice Guide (2018) § 76.03A.)

The Supreme Court has ruled that criminal restitution qualifies as a debt for bankruptcy purposes.  (See _Pennsylvania Dept. of Public Welfare v. Davenport_ (1990) 495 U.S. 552, 564.)  Thus, restitution may be reduced or discharged in a Chapter 11 plan unless an exception applies.  An exception exists for criminal fines and restitution.  (11 U.S.C. § 523(a)(7); _Kelly v. Robinson_ (1986) 479 U.S. 36, 53.)  But the exception applies only to "individual" debtors.  (11

U.S.C. § 1141(d)(2).)  And exceptions for individual debtors do not apply to corporate debtors.  (See *Garrie v. James L. Gray, Inc.* (5th Cir. 1990) 912 F.2d 808; *In re Spring Valley Farms* (11th Cir. 1989) 863 F.2d 832, 834; *Yamaha Motor Corp. v. Shadco* (8th Cir. 1975) 762 F.2d 668, 670.)  As one bankruptcy court put it, "It is almost undebateable and universally held that a corporate Chapter 11 debtor is not subject to the" exceptions that apply to individual Chapter 11 debtors.  (*In re Push & Pull Enterprises, Inc.* (N.D.Ind. 1988) 84 B.R. 546, 548 (N.D.Ind. 1988).)

Of the exceptions that apply to corporations, none includes criminal restitution.  The closest exception deals with debts owed on money or property obtained by fraud.  (11 U.S.C. § 1141(d)(6).)  In short, criminal restitution owed by a corporation for a crime committed before the bankruptcy petition is filed is a debt that may be reduced or discharged as part of a Chapter 11 reorganization.  The one court to have considered this issue reached the same conclusion.  (See *In re Wisconsin Barge Lines, Inc.* (E.D. Mo. 1988) 91 B.R. 65, 67-68.)

Thus, any restitution owed by PG&E to persons harmed by the Camp Fire will be subject to reduction or discharge in a Chapter 11 reorganization.  Any restitution order by this court is limited in fact, if not in law, to the final order of the Federal Bankruptcy Court and this court should await the outcome of the pending Bankruptcy proceedings.

**B.  Factors In Aggravation**

California Rule of Court 4.421 defines factors the court may consider in making a sentencing determination.  Under Rule 4.421 the court may consider the following relevant factors:

(a)  **Factors relating to the crime**

(1)  The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness;

**PG&E is pleading to 84 felony counts of Involuntary Manslaughter in violation of Penal Code section 192(b) and one count of Unlawfully Causing a Fire in violation of Penal Code section 452.  PG&E is also admitting Special Allegations involving Great Bodily Injury to a firefighter and two civilian victims.**

**The facts establish a callous disregard for the safety and property of the citizens of Butte County.**

(3)  The victim was particularly vulnerable;

**There are almost 50,000 victims of the Camp Fire.  All of those people relied upon PG&E to provide safe electric power.  Despite years of extreme drought, consistently high down canyon winds and the knowledge equipment failure on high voltage transmission lines can**

cause fires, PG&E ignored warning signs and did the absolute minimum to mitigate the fire danger.

The most vulnerable population were the mobility challenged and the elderly.  People like Rafaela Andrade, Andrew Downer, Rose Farrell, Helen Pace, Ethel Riggs and Kimber Wehr had no ability to escape the fire.  Those and other lives depended upon PG&E doing its statutory and moral duty.

> **(4)**  The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission;

PG&E, although an inchoate entity, nonetheless operates only through the actions of its employees. Through a corporate culture of elevating profits over safety by taking shortcuts in the safe delivery of an extremely dangerous product – high-voltage electricity – PG&E certainly lead otherwise good people down an ultimately destructive path.

> **(9)**  The crime involved an attempted or actual taking or damage of great monetary value;

By saving money on needed maintenance, repairs, replacements was able to generate profits in the billions of dollars.

> **(11)**  The defendant took advantage of a position of trust or confidence to commit the offense.

PG&E was entrusted by the People of the State of California to provide safe and reliable electricity.  PG&E took advantage of that position of trust and was able to generate billions of dollars in profit.

> **(b)**　**Factors relating to the defendant**

> **(2)**  The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness;

In 2016 PG&E was convicted of multiple federal felonies as a result of the 2010 explosion of a PG&E gas transmission pipe in the City of San Bruno.  The San Bruno explosion killed eight people, destroyed 35 residential structures and damaged many additional residential and commercial structures.  The felonies for which PG&E was convicted related to inspection policies, procedures and record keeping.  Eight years later, as a result of similar reckless and criminal inspection policies, procedures and record keeping PG&E stands convicted of 84 counts of manslaughter.

**(4)** The defendant was on probation, mandatory supervision, post release community supervision, or parole when the crime was committed;

**PG&E was on federal probation on November 8, 2018. On January 26, 2017, PG&E was granted five years' probation in United States District Court, Northern District of California case number 0971 3:14CR00175-001 TEH.**

**(5)** The defendant's prior performance on probation, mandatory supervision, post release community supervision, or parole was unsatisfactory.

**Special condition of probation number 1 states "While on probation, PG&E shall not commit another Federal, State, or local crime." While on probation, as a result of policies similar to those for which PG&E was convicted, PG&E has continued to cause disasters, including the 2015 Butte Fire, the 2017 Wine Counties Fire, the 2017 Honey Fire, the Camp Fire and, most recently, the Kincaide Fire in 2019.**

### C. Factors in Mitigation

a)   Factors relating to the crime Factors relating to the crime include that:

(1)  The defendant was a passive participant or played a minor role in the crime;

**Not applicable**

(2)  The victim was an initiator of, willing participant in, or aggressor or provoker of the incident;

**Not applicable**

(3)  The crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur;

**Not applicable**

(4)  The defendant participated in the crime under circumstances of coercion or duress, or the criminal conduct was partially excusable for some other reason not amounting to a defense;

**Not applicable**

(5)  The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime;

**Not applicable**

(6) The defendant exercised caution to avoid harm to persons or damage to property, or the amounts of money or property taken were deliberately small, or no harm was done or threatened against the victim;

**Not applicable**

(7) The defendant believed that he or she had a claim or right to the property taken, or for other reasons mistakenly believed that the conduct was legal;

**Not applicable**

(8) The defendant was motivated by a desire to provide necessities for his or her family or self; and

**Not applicable**

(9) The defendant suffered from repeated or continuous physical, sexual, or psychological abuse inflicted by the victim of the crime, and the victim of the crime, who inflicted the abuse, was the defendant's spouse, intimate cohabitant, or parent of the defendant's child; and the abuse does not amount to a defense.

**Not applicable**

(b)Factors relating to the defendant Factors relating to the defendant include that:

(1) The defendant has no prior record, or has an insignificant record of criminal conduct, considering the recency and frequency of prior crimes;

**Not applicable**

(2) The defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime;

**Not applicable**

(3) The defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process;

**PG&E plead guilty as charged to the Indictment at arraignment.**

(4) The defendant is ineligible for probation and but for that ineligibility would have been granted probation;

**Not applicable**

(5) The defendant made restitution to the victim; and

**PG&E has agreed to restitution to victims of the Camp Fire as part of a civil settlement in the Federal Bankruptcy Court.**

(6)  The defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was satisfactory.

**Not applicable**

(c) Any other factors statutorily declared to be circumstances in mitigation or which reasonably relate to the defendant or the circumstances under which the crime was committed.

**Not Applicable**

### D.  <u>Conclusion</u>

The factors in aggravation greatly outweigh the factors in mitigation.  For this reason the court should impose the greatest sentence allowed under the law – the maximum fines of $10,000 for each of the 84 counts of manslaughter and the maximum fine of $50,000 for the count of Unlawfully Causing a fire.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
139 of 1229

# Exhibit 88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**Attorney for Plaintiff**
*- additional counsel on signature page -*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JON PAUL MORETTI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> PG&E CORPORATION, ANTHONY F. EARLEY, JR., JASON P. WELLS, GEISHA J. WILLIAMS, CHRISTOPHER P. JOHNS, DINYAR B. MISTRY, and DAVID S. THOMASON, <br><br> Defendants | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

Plaintiff Jon Paul Moretti ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PG&E Corporation ("PG&E" or the "Company"), analysts' reports and advisories about the Company, and

1

information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired securities of PG&E between April 29, 2015 and June 8, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. PG&E is a holding company that holds interests in energy based businesses. The Company's leading operating subsidiary is Pacific Gas and Electric Company, a public utility operating in northern and central California that provides electricity and natural gas distribution, electricity generation, procurement, and transmission, and natural gas procurement, transportation, and storage. The Company generates revenues mainly through the sale and delivery of electricity and natural gas to customers.

3. Founded in 1905, PG&E is headquartered in San Francisco, California. The Company's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG."

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in violation of state laws and regulations; (iii) PG&E's noncompliant electricity networks could foreseeably cause wildfires in

2

California; and (iv) as a result of the foregoing, Defendants' statements about the Company's business and operations were materially false and misleading at all relevant times.

5. On June 8, 2018, after the market close, the California Department of Forestry and Fire Protection issued a press release announcing the cause of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties involving equipment owned by PG&E. The press release stated that CAL FIRE Investigators had determined "that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles," and referred "eight of the 12 fires – Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas" to the county District Attorney's offices for review "due to evidence of alleged violations of state law."

6. On June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

7. Following these news, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.     Plaintiff, as set forth in the accompanying Certification, purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

14.     Defendant PG&E is incorporated in California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.  PG&E's securities trade on the NYSE under the ticker symbol "PCG."

15.     Defendant Anthony F. Earley, Jr. ("Earley") served as the Company's President and Chief Executive Officer ("CEO") from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 144 of 1229

16.     Defendant Jason P. Wells ("Wells") has served as the Company's Senior Vice President and Chief Financial Officer ("CFO") since January 1, 2016, and served as its Vice President of Finance from October 1, 2011 to July 31, 2013.

17.     Defendant Geisha J. Williams ("Williams") has served as the Company's CEO and President since March 1, 2017, and served as the President of Electric operations at Pacific Gas and Electric from September 15, 2015 to March 1, 2017.

18.     Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

19.     Defendant Dinyar B. Mistry ("Mistry") has served as the Company's Chief Diversity Officer since February 1, 2017, and as its Senior Vice President of Human Resources since March 1, 2016.  Mistry also served as the Company's Controller from March 8, 2010 to May 31, 2016.

20.     Defendant David S. Thomason ("Thomason") has served as the Vice President, CFO, and Controller of Pacific Gas and Electric Company since June 1, 2016.

21.     The Defendants referenced above in ¶¶ 15-20 are sometimes referred to- herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of PG&E's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

5

## SUBSTANTIVE ALLEGATIONS

### Background

23.     PG&E is a holding company that holds interests in energy based businesses. The Company's leading operating subsidiary is Pacific Gas and Electric Company, a public utility operating in northern and central California that provides electricity and natural gas distribution, electricity generation, procurement, and transmission, and natural gas procurement, transportation, and storage. The Company generates revenues mainly through the sale and delivery of electricity and natural gas to customers.

### Materially False and Misleading Statements Issued During the Class Period

24.     The Class Period begins on April 29, 2015, when PG&E held a conference call to discuss the Company's financial and operating results for the quarter ended March 31, 2015.  During the call, Defendant Johns, former President of PG&E's wholly-owned subsidiary Pacific Gas & Electric, assured investors of the Company's commitment to ***"[step] up vegetation management activities to mitigate wildfire risk."*** (Emphasis added.)

25.     On February 18, 2016, PG&E filed an Annual Report on Form 10-K the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 ("2015 10-K").  The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Earley, Wells, Williams and Mistry, stating that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  In the 2015 10-K, PG&E stated in pertinent part:

> ***Throughout 2015, the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.*** The Utility expects to undertake various

6

1
2
3

additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.

* * *

In 2015, the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages. Another 83 circuits were outfitted with this equipment, bringing the total deployment to 700 of the Utility's 3200 distribution circuits. The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand. ***The Utility plans to continue performing work to improve the reliability and safety of its electricity distribution operations in 2016.***

* * *

In addition, the Utility obtains permits, authorizations, and licenses in connection with the construction and operation of the Utility's generation facilities, electricity transmission lines, natural gas transportation pipelines, and gas compressor station facilities. The Utility also periodically obtains permits, authorizations, and licenses in connection with distribution of electricity and natural gas that grant the Utility rights to occupy and/or use public property for the operation of the Utility's business and to conduct certain related operations. The Utility has franchise agreements with approximately 300 cities and counties that permit the Utility to install, operate, and maintain the Utility's electric and natural gas facilities in the public streets and highways. In exchange for the right to use public streets and highways, the Utility pays annual fees to the cities and counties. In most cases, the Utility's franchise agreements are for an indeterminate term, with no expiration date.

(Emphasis added.)

26.     On February 16, 2017, PG&E filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 ("2016 10-K"). The 2016 10-K contained signed certifications pursuant to SOX by Defendants Earley, Wells, Williams and Thomason, stating that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." In the 2016 10-K, PG&E stated in pertinent part:

***Throughout 2016, the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.*** The Utility expects to undertake various

7

additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.

* * *

The Utility's operations are subject to extensive federal, state and local laws and requirements relating to the protection of the environment and the safety and health of the Utility's personnel and the public. These laws and requirements relate to a broad range of activities, including the remediation of hazardous and radioactive substances; the discharge of pollutants into the air, water, and soil; the reporting and reduction of $CO_2$ and other GHG emissions; the transportation, handling, storage and disposal of spent nuclear fuel; and the environmental impacts of land use, including endangered species and habitat protection.

(Emphasis added.)

27.     At all relevant times, PG&E's Media Relations department maintained a news website named Currents[1] providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services. Throughout the website, PG&E repeatedly touts the safety of its network and the Company's proactivity in fighting wildfire risk.

28.     The statements referenced in ¶¶ 24-27 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in violation of state laws and regulations; (iii) PG&E's noncompliant electricity networks could foreseeably cause wildfires in California; and (iv) as a result of the foregoing, Defendants'

---

[1] http://www.pgecurrents.com, last accessed on June 13, 2018.

statements about the Company's business and operations were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

29.     On or about October 8, 2017, several wildfires started in California, burning at least 245,000 acres and devastating properties in Sonoma, Mendocino, Lake, Santa Rosa, Napa, Humboldt, Butte, and Solano counties. On or about October 11, 2017, various news outlets reported that Californian authorities and officials were looking into whether PG&E's power lines had caused fires. On October 13, 2017, PG&E filed a Form 8-K with the SEC announcing an investigation of the fires. Therein, the Company stated in relevant part:

> ### *Investigation of Northern California Fires*
>
> Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation.
>
> It currently is unknown whether the Utility would have any liability associated with these fires. The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.

30.     On these disclosures, PG&E's share price fell $15.72, or 22.73%, over the next three trading days, to close at $53.43 on October 16, 2017.

31.     On December 20, 2017, PG&E issued a press release entitled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and Potential Liabilities Associated with Northern California Wildfires," also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the suspension of its cash dividend. In the press release, PG&E stated in pertinent part:

> **SAN FRANCISCO, Calif.**—PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to suspend the quarterly cash dividend on the Corporation's common stock, beginning with the fourth quarter of 2017,

9

citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires.

In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same uncertainty.

No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.

However, California is one of the only states in the country in which courts have applied inverse condemnation to events caused by utility equipment. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire – even if the utility has followed established inspection and safety rules – the utility may still be liable for property damages and attorneys' fees associated with that event.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

"We fully recognize the importance of dividends and intend to revisit the issue as we get more clarity. In the meantime, PG&E is committed to working with state policymakers to address the negative investment environment that strict liability under inverse condemnation is creating for California's utilities. This ultimately hurts our customers and the state. The company also remains committed to supporting recovery and rebuilding efforts by those communities that were impacted by these devastating fires," he said.

32.     On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day.

33.     On May 25, 2018, the California Department of Forestry and Fire Protection issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

### CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties

Sacramento – After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

10

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. ***The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.***

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. ***CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.***

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. ***CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.***

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

(Emphasis added.)

34.    On this news, PG&E share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day.

11

35.     On June 8, 2018, after the market close, the California Department of Forestry and Fire Protection issued another press release announcing the cause of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

**CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

**Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 152 of 1229

a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

> CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

> CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

> CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

> CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line

> CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

***CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires – Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas – due to evidence of alleged violations of state law.***

(Emphasis added.)

36.   On June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires."  The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of

13

1
2

alleged violations of law by PG&E in connection with" the fires.  Specifically, the state's investigation

found "that PG&E equipment caused at least 12 of the wine country blazes."

3
4

37.     Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76

on June 11, 2018, the following trading day.

5
6
7
8

38.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in

the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

9

**Additional Misstatements**

10
11
12
13
14

39.     On February 9, 2018, PG&E filed a Form 10-K with the SEC announcing the

Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December

31, 2017 ("2017 10-K"), which was signed and certified under the Sarbanes-Oxley Act of 2002 by the

Individual Defendants. Therein, PG&E stated in pertinent part:

15
16
17
18
19
20

> PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected by potential losses resulting from the impact of the multiple wildfires that spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Del Norte, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City, beginning on October 8, 2017 (the "Northern California wildfires"). According to the Cal Fire California Statewide Fire Summary dated October 30, 2017, at the peak of the wildfires, there were 21 major wildfires in California that, in total, burned over 245,000 acres, resulted in 43 fatalities, and destroyed an estimated 8,900 structures. Subsequently, the number of fatalities increased to 44.

21
22
23
24

> The Utility incurred $219 million in costs for service restoration and repair to the Utility's facilities (including $97 million in capital expenditures) through December 31, 2017 in connection with these fires. While the Utility believes that such costs are recoverable through CEMA, its CEMA requests are subject to CPUC approval. The Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected if the Utility is unable to recover such costs.

25
26
27
28

> The fires are being investigated by Cal Fire and the CPUC, including the possible role of the Utility's power lines and other facilities. The Utility expects that Cal Fire will issue a report or reports stating its conclusions as to the sources of ignition of the fires and the ways that they progressed. The CPUC's SED also is conducting investigations to assess the compliance of electric and communication companies' facilities with applicable rules and regulations in fire impacted areas.

14

According to information made available by the CPUC, investigation topics include, but are not limited to, maintenance of facilities, vegetation management, and emergency preparedness and response. Various other entities, including fire departments, may also be investigating certain of the fires. (For example, on February 3, 2018, it was reported that investigators with the Santa Rosa Fire Department had completed their investigation of two small fires that reportedly destroyed two homes and damaged one outbuilding and had concluded that the Utility's facilities, along with high wind and other factors, contributed to those fires.) It is uncertain when the investigations will be complete and whether Cal Fire will release any preliminary findings before its investigation is complete.

As of January 31, 2018, the Utility had submitted 22 electric incident reports to the CPUC associated with the Northern California wildfires where Cal Fire has identified a site as potentially involving the Utility's facilities in its investigation and the property damage associated with each incident exceeded $50,000. The information contained in these reports is factual and preliminary, and does not reflect a determination of the causes of the fires. The investigations into the fires are ongoing.

If the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies, the Utility could be liable for property damage, interest, and attorneys' fees without having been found negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. (See "The doctrine of inverse condemnation, if applied by courts in litigation to which PG&E Corporation or the Utility are subject, could significantly expand the potential liabilities from such litigation and materially negatively affect PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows" below.) In addition to such claims for property damage, interest and attorneys' fees, the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal injury damages, and other damages under other theories of liability, including if the Utility were found to have been negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. Further, the Utility could be subject to material fines or penalties if the CPUC or any other law enforcement agency brought an enforcement action and determined that the Utility failed to comply with applicable laws and regulations.

40.     The statements in paragraph 39 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in

15

violation of state laws and regulations; (iii) PG&E's noncompliant electricity networks could foreseeably cause wildfires in California; and (iv) as a result of the foregoing, Defendants' statements about the Company's business and operations were materially false and misleading at all relevant times.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of PG&E;

- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

47.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- PG&E securities are traded in efficient markets;

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 157 of 1229

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold PG&E securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

48. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

49. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**<u>Against All Defendants</u>**

50. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51. This Count is asserted against PG&E and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52. During the Class Period, PG&E and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and

18

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     PG&E and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

54.     PG&E and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

55.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Plaintiff and the Class.

56.     As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period.  In ignorance of the falsity of PG&E's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of PG&E securities during the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result of PG&E's and the Individual Defendants' false and misleading statements.

57.     Had Plaintiff and the other members of the Class been aware that the market price of PG&E securities had been artificially and falsely inflated by PG&E's and the Individual Defendants' misleading statements and by the material adverse information which PG&E's and the Individual Defendants did not disclose, they would not have purchased PG&E's securities at the artificially inflated prices that they did, or at all.

58.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

59.     By reason of the foregoing, PG&E and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PG&E securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

60.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, the Individual Defendants participated in the operation and management of PG&E, and conducted and participated, directly and indirectly, in the conduct of

20

PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

62.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

63.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

64.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 161 of 1229

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: June 14, 2018

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _Jon Paul Moretti_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against PG&E Corporation ("PG&E" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire PG&E securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired PG&E securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in PG&E securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____6-12-18_____

               **(Date)**

_____
               **(Signature)**

_Jon P. Moretti_____
               **(Type or Print Name)**

**PG&E CORPORATION (PCG)**                                        **Moretti, Jon Paul**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 10/12/2017 | Purchase | 95 | $66.1500 |
| 10/13/2017 | Purchase | 10 | $57.2700 |
| 10/13/2017 | Purchase | 175 | $58.0600 |

JS-CAND 44 (Rev 06/17)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JON PAUL MORETTI, Individually and on Behalf of All Others Similarly Situated,

**(b)** County of Residence of First Listed Plaintiff   Orange County, New York
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pomerantz LLP
468 North Camden Drive, Beverly Hills, CA 90210
Tel: 818-532-6499

## DEFENDANTS

PG&E CORPORATION, ANTHONY F. EARLEY, JR., JASON P. WELLS, GEISHA J. WILLIAMS, CHRISTOPHER P. JOHNS, DINYAR B. MISTRY, and DAVID S. THOMASON,

County of Residence of First Listed Defendant   San Francisco County, California
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U S Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U S Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U S Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer  ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and the PSLRA

Brief description of cause:
Plaintiff seeks to pursue remedies against PG&E Corporation for violations of federal securities laws

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE  Richard Seeborg

DOCKET NUMBER  18-cv-03509-RS

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*

☐ **SAN FRANCISCO/OAKLAND**    ☐ **SAN JOSE**    ☐ **EUREKA-MCKINLEYVILLE**

DATE  06/14/2018    SIGNATURE OF ATTORNEY OF RECORD

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 166 of 1229

| Print | Save As... | Reset |
|---|---|---|

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original from by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)   Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b)   County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c)   Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.   Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1)   United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2)   United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3)   Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4)   Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.   Origin.** Place an "X" in one of the six boxes.

(1)   Original Proceedings. Cases originating in the United States district courts.

(2)   Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3)   Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4)   Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5)   Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6)   Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8)   Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.   Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit 89

1    Rosemary M. Rivas (State Bar No. 209147)
     Email: rrivas@zlk.com
2    **LEVI & KORSINSKY, LLP**
     44 Montgomery Street, Suite 650
3    San Francisco, California 94104
     Telephone: (415) 291-2420
4    Facsimile: (415) 484-1294

5    *Counsel for Individual and Representative Plaintiff*
     *David C. Weston*
6

7    [*Additional Counsel listed on signature block.*]

8                    **UNITED STATES DISTRICT COURT**

9              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11   DAVID C. WESTON, on behalf of himself and all          Case No. 3:18-cv-03509
     others similarly situated,
12                                                           **CLASS ACTION**
             Plaintiff,
13                                                           **COMPLAINT FOR VIOLATION OF**
     v.                                                      **FEDERAL SECURITIES LAW**
14
     PG&E CORPORATION, ANTHONY F.                            **JURY TRIAL DEMANDED**
15   EARLEY, JR., JASON P. WELLS, GEISHA J.
     WILLIAMS, CHRISTOPHER P. JOHNS,
16   DINYAR B. MISTRY, and DAVID S.
     THOMASON,
17
             Defendants.
18

19           Plaintiff David C. Weston ("Plaintiff") alleges the following based upon the investigation of

20   counsel, which included a review of United States Securities and Exchange Commission ("SEC")

21   filings by PG&E Corporation ("PG&E" or the "Company"), as well as regulatory filings and reports,

22   securities analyst reports and advisories by the Company, press releases and other public statements

23   issued by the Company, and media reports about the Company.  Plaintiff believes that additional

24   evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

25   discovery.

26                          **NATURE OF THE ACTION**

27           1.      This is a federal securities class action on behalf of all investors who purchased or

28   otherwise acquired PG&E common stock between April 29, 2015, and June 8, 2018, inclusive (the

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

"Class Period").

2.      This is a class action brought by Plaintiff, on behalf himself and all others similarly situated, against Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

3.      The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

5.      This Court has jurisdiction over each Defendant named herein because each Defendant either conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.

## PARTIES

7.      Plaintiff David C. Weston purchased PG&E common stock as set forth herein and in his certification filed herewith.

8.      PG&E is a California corporation with its principal executive offices located at 77 Beale Street, P.O. Box 770000 San Francisco, California 94177.  PG&E mainly operates through its wholly-owned subsidiary Pacific Gas and Electric Company ("Pacific Gas Electric" or the "Utility").  PG&E trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG."

9.      Defendant Anthony F. Earley, Jr. ("Earley") was the President, Chairman of the Board of Directors, and Chief Executive Officer ("CEO") of the Company until March 1, 2017, when he

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

1   became Executive Chair of the Board of PG&E.

2        10.    Defendant Jason P. Wells ("Wells") was the Senior Vice President and Chief Financial

3   Officer ("CFO") of the Company from January 1, 2016, to the end of the Class Period.

4        11.    Defendant Geisha J. Williams ("Williams") was the President of the Electric

5   operations at Pacific Gas and Electric from the beginning of the Class Period until March 1, 2017,

6   when she became CEO and President of PG&E.

7        12.    Defendant Christopher P. Johns ("Johns") was the President of Pacific Gas and

8   Electric from the beginning of the Class Period to December 31, 2015.

9        13.    Defendant Dinyar B. Mistry ("Mistry") was the Vice President and Controller of

10   PG&E and the Vice President, CFO, and Controller of Pacific Gas and Electric until June 1, 2016.

11   Additionally, Mistry became the Senior Vice President, Human Resources of PG&E on March 1,

12   2016.

13        14.    Defendant David S. Thomason ("Thomason") was the Vice President, CFO, and

14   Controller of Pacific Gas and Electric from June 1, 2016 to the end of the Class Period.

15        15.    Defendants in paragraphs 9-14 above are collectively referred to herein as the

16   "Individual Defendants."

17        16.    PG&E and the Individual Defendants are collectively referred to as "Defendants."

18   **CONTROL PERSON ALLEGATIONS**

19        17.    By reason of the Individual Defendants' positions as executive officers with the

20   Company, the Individual Defendants possessed the power and authority to control the contents of

21   PG&E's quarterly reports, press releases, and presentations to securities analysts, money and

22   portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were

23   provided with copies of the Company's reports and press releases alleged herein to be misleading

24   prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

25   cause them to be corrected. Because of their positions with the Company, and their access to

26   material, non-public information available to them but not to the public, the Individual Defendants

27   knew that the adverse facts specified herein had not been disclosed to and were being concealed from

28   the public, and that the positive representations being made were then materially false and

1  misleading.  The Individual Defendants are liable for the false statements pleaded herein.

2  <center>**SUBSTANTIVE ALLEGATIONS**</center>

3  **Background**

4        18.     PG&E was incorporated in California in 1995 as a holding company whose primary

5  operating subsidiary is Pacific Gas and Electric, a public utility operating in northern and central

6  California.  The Company generates revenues mainly through the sale and delivery of electricity and

7  natural gas to customers.

8  **Material Misrepresentations and Omissions**

9        19.     At all relevant times, PG&E's Media Relations department maintained a news website

10  named Currents[1] providing news, information, and commentary about PG&E's activities, including

11  the delivery of electricity and the operation, maintenance, and safety of the Company's electric

12  services.   Throughout the website, PG&E repeatedly touts the safety of its network and the

13  Company's proactivity in fighting wildfire risk.

14        20.     The Class Period begins on April 29, 2015, when, during a conference call to discuss

15  the Company's financial and operating results for the first fiscal quarter ended March 31, 2015 ("Q1

16  2015 Conf. Call"), Defendant Johns, former President of PG&E's wholly-owned subsidiary Pacific

17  Gas & Electric, assured investors of the Company's commitment to "*[step] up vegetation*

18  *management activities to mitigate wildfire risk.*"  (Emphasis added.)

19        21.     On February 18, 2016, PG&E filed a Form 10-K with the SEC announcing the

20  Company's financial and operating results for the fiscal fourth quarter and fiscal year ended

21  December 31, 2015 ("2015 10-K"), which was signed and certified under the Sarbanes-Oxley Act of

22  2002 by the Individual Defendants.  Therein, PG&E stated in pertinent part:

23        *Throughout 2015, the Utility upgraded several critical substations and re-conducted a number of transmission lines to improve maintenance and system flexibility, reliability and safety*.   The Utility expects to undertake various
24        additional transmission projects over the next several years to upgrade and expand
             the capacity of its transmission system to accommodate system load growth, secure
25        access to renewable generation resources, replace aging or obsolete equipment and
             improve system reliability.  The Utility also has taken steps to improve the physical
26        security of its transmission substations and equipment.

27

28  _____

[1] http://www.pgecurrents.com/, last accessed on June 11, 2018 at 4:00 pm ET.

<center>COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW</center>

*     *     *

In 2015, the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages. Another 83 circuits were outfitted with this equipment, bringing the total deployment to 700 of the Utility's 3200 distribution circuits. The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand. ***The Utility plans to continue performing work to improve the reliability and safety of its electricity distribution operations in 2016.***

*     *     *

In addition, the Utility obtains permits, authorizations, and licenses in connection with the construction and operation of the Utility's generation facilities, electricity transmission lines, natural gas transportation pipelines, and gas compressor station facilities. The Utility also periodically obtains permits, authorizations, and licenses in connection with distribution of electricity and natural gas that grant the Utility rights to occupy and/or use public property for the operation of the Utility's business and to conduct certain related operations. The Utility has franchise agreements with approximately 300 cities and counties that permit the Utility to install, operate, and maintain the Utility's electric and natural gas facilities in the public streets and highways. In exchange for the right to use public streets and highways, the Utility pays annual fees to the cities and counties. In most cases, the Utility's franchise agreements are for an indeterminate term, with no expiration date.

Emphasis added.

22.     On February 16, 2017, PG&E filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("2016 10-K"), which was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants. Therein, PG&E stated in pertinent part:

***Throughout 2016, the Utility upgraded several critical substations and re-conducted a number of transmission lines to improve maintenance and system flexibility, reliability and safety.*** The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.

*     *     *

The Utility's operations are subject to extensive federal, state and local laws and requirements relating to the protection of the environment and the safety and health of the Utility's personnel and the public. These laws and requirements relate to a broad range of activities, including the remediation of hazardous and radioactive substances; the discharge of pollutants into the air, water, and soil; the reporting and reduction of $CO_2$ and other GHG emissions; the transportation, handling, storage and disposal of spent nuclear fuel; and the environmental impacts of land use,

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

including endangered species and habitat protection.

Emphasis added.

23.     The statements in paragraphs 20-22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in violation of state law regulation; (iii) PG&E's electricity networks would cause numerous wildfires in California; and (iv) as a result of the foregoing, Defendants' statements about the Company's business and operations were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

24.     On or about October 8, 2017, numerous wildfires started in California, burning at least 245,000 acres and devastating properties in Sonoma, Mendocino, Lake, Santa Rosa, Napa, Humboldt, Butte, and Solano counties.

25.     On or about October 11, 2017, various news outlets reported that Californian authorities and officials were looking at whether PG&E's power lines had caused fires.  Notably, on October 13, 2018, Reuters reported the following:

> Oct 13 (Reuters) - Shares of PG&E PCG.N fell for the third straight day on Friday on investor concerns the company may have to pay damages after authorities suggested power lines toppled by strong winds may have sparked the worst wildfire in California's history.
>
> Flames erupted on Sunday night, gaining strength over the week. The exact cause of the disaster is under investigation. (Full Story)
>
> Shares of the California-based utility fell as much as 13 percent on Friday to $56.32 on the New York Stock Exchange.
>
> "While it is too early to determine the utility's responsibility, it is possible that shareholders will bear responsibility for some damages," RBC Capital Markets analyst Shelby Tucker said, cutting her price target on the company's stock by $2 to $68.
>
> The analyst said even if the company is insured for damages, it would still be financially responsible for harm to property and could be sued for damages.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

"The extent of damages possible under negligence are far higher since they include personal injury damages, among others," Tucker said.

PG&E has been investigated by California's department of forestry and fire protection earlier too.

According to media reports, a 2015 investigation found that a power line operated by the utlity ignited fires that burned more than 70,000 acres.

Shares of PG&E have fallen nearly 20 percent since Wednesday, when officials said electric wires knocked down by winds could have caused the fire.

The utility's shares were trading at $59.33 on late Friday morning.

26.     The same day, PG&E filed a Form 8-K with the SEC announcing an investigation of the fires ("October 2017 Press Release"). Therein, the Company stated in relevant part:

### *Investigation of Northern California Fires*

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation.

It currently is unknown whether the Utility would have any liability associated with these fires.  The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires.  If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.

27.     As a result of this news and these disclosures, the stock price declined from a close of $69.15 per share of PG&E common stock on October 11, 2017, to a close of $53.43 per share on October 16, 2017, *a drop of approximately 22.7 percent*.

28.     On December 20, 2017, PG&E issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the suspension of its cash dividend ("December 2017 Press Release"). Therein, PG&E stated in pertinent part:

### PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and Potential Liabilities Associated with Northern California Wildfires

**SAN FRANCISCO, Calif.**—PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to suspend the quarterly cash dividend on the Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same uncertainty.

No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.

However, California is one of the only states in the country in which courts have applied inverse condemnation to events caused by utility equipment. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire – even if the utility has followed established inspection and safety rules – the utility may still be liable for property damages and attorneys' fees associated with that event.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

"We fully recognize the importance of dividends and intend to revisit the issue as we get more clarity. In the meantime, PG&E is committed to working with state policymakers to address the negative investment environment that strict liability under inverse condemnation is creating for California's utilities. This ultimately hurts our customers and the state. The company also remains committed to supporting recovery and rebuilding efforts by those communities that were impacted by these devastating fires," he said.

29. On this news, the stock price declined from a close of $51.12 per share of PG&E common stock on December 20, 2017, to a close of $44.50 per share on December 21, 2017, *a drop of approximately 12.95 percent*.

**Additional Misstatements**

30. On February 9, 2018, PG&E filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2017 ("2017 10-K"), which was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants. Therein, PG&E stated in pertinent part:

PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected by potential losses resulting from the impact of the multiple wildfires that spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Del Norte, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City, beginning on October 8, 2017 (the "Northern California wildfires"). According to the Cal Fire California Statewide Fire Summary dated October 30, 2017, at the peak of the wildfires, there were 21 major wildfires in California that, in total, burned over 245,000 acres, resulted in 43 fatalities, and destroyed an estimated 8,900 structures. Subsequently, the number of fatalities increased to 44.

1

2

3

4

The Utility incurred $219 million in costs for service restoration and repair to the Utility's facilities (including $97 million in capital expenditures) through December 31, 2017 in connection with these fires. While the Utility believes that such costs are recoverable through CEMA, its CEMA requests are subject to CPUC approval. The Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected if the Utility is unable to recover such costs.

5

6

7

8

9

10

11

12

The fires are being investigated by Cal Fire and the CPUC, including the possible role of the Utility's power lines and other facilities. The Utility expects that Cal Fire will issue a report or reports stating its conclusions as to the sources of ignition of the fires and the ways that they progressed. The CPUC's SED also is conducting investigations to assess the compliance of electric and communication companies' facilities with applicable rules and regulations in fire impacted areas. According to information made available by the CPUC, investigation topics include, but are not limited to, maintenance of facilities, vegetation management, and emergency preparedness and response. Various other entities, including fire departments, may also be investigating certain of the fires. (For example, on February 3, 2018, it was reported that investigators with the Santa Rosa Fire Department had completed their investigation of two small fires that reportedly destroyed two homes and damaged one outbuilding and had concluded that the Utility's facilities, along with high wind and other factors, contributed to those fires.) It is uncertain when the investigations will be complete and whether Cal Fire will release any preliminary findings before its investigation is complete.

13

14

15

16

As of January 31, 2018, the Utility had submitted 22 electric incident reports to the CPUC associated with the Northern California wildfires where Cal Fire has identified a site as potentially involving the Utility's facilities in its investigation and the property damage associated with each incident exceeded $50,000. The information contained in these reports is factual and preliminary, and does not reflect a determination of the causes of the fires. The investigations into the fires are ongoing.

17

18

19

20

21

22

23

24

25

26

If the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies, the Utility could be liable for property damage, interest, and attorneys' fees without having been found negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. (See "The doctrine of inverse condemnation, if applied by courts in litigation to which PG&E Corporation or the Utility are subject, could significantly expand the potential liabilities from such litigation and materially negatively affect PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows" below.) In addition to such claims for property damage, interest and attorneys' fees, the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal injury damages, and other damages under other theories of liability, including if the Utility were found to have been negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. Further, the Utility could be subject to material fines or penalties if the CPUC or any other law enforcement agency brought an enforcement action and determined that the Utility failed to comply with applicable laws and regulations.

27

28

31.     The statements in paragraphs 30 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in violation of state law regulation; (iii) PG&E's electricity networks would cause numerous wildfires in California; and (iv) as a result of the foregoing, Defendants' statements about the Company's business and operations were materially false and misleading at all relevant times.

**The Truth Continues to Emerge**

32.     On May 25, 2018, the California Department of Forestry and Fire Protection issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

### CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties

Sacramento – After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. ***The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293***.

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. *CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated*.

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. *CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated*.

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

Emphasis added.

33.     On this news, the stock price declined from a close of $44.66 per share of PG&E common stock on May 25, 2018, to a close of $42.34 per share on May 29, 2018, *a drop of approximately 5.19 percent*.

34.     On June 8, 2018, after the market close, the California Department of Forestry and Fire Protection issued another press release announcing the cause of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties ("June 2018 Press Release"), stating in relevant part:

**CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

**Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

> CAL FIRE investigators determined the **Norrbom Fire** was caused by a tree falling and coming in contact with PG&E power lines.

> CAL FIRE investigators determined the **Adobe Fire** was caused by a eucalyptus tree falling into a PG&E powerline.

> CAL FIRE investigators determined the **Partrick Fire** was caused by an oak tree falling into PG&E powerlines.

> CAL FIRE investigators determined the **Pythian Fire** was caused by a downed powerline after PG&E attempted to reenergize the line

> CAL FIRE investigators determined the **Nuns Fire** was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

*CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires – Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas – due to evidence of alleged violations of state law.*

Emphasis added.

35.     On this news, the stock price declined from a close of $41.45 per share of PG&E common stock on June 8, 2018, to a close of $39.76 per share on June 11, 2018, *a drop of approximately 4.03 percent*.

## LOSS CAUSATION AND ECONOMIC LOSS

36.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  As detailed above, when the truth about PG&E's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price.  The decline in PG&E's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

37.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of PG&E's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

or misleading, causing PG&E's common stock to be artificially inflated.  Plaintiff and other Class members purchased PG&E's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

### SCIENTER ALLEGATIONS IN SUPPORT OF EXCHANGE ACT VIOLATIONS

38.     Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants.  Further, Defendants' actions, intentions, and deliberate reckless conduct are imputed to the Company as a matter of law.  Because of their key roles in the Company, the Individual Defendants caused PG&E to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period.  Defendants acted with the requisite intent to establish liability under the Exchange Act.  Their conduct with respect to PG&E's statements was intentionally misleading and/or reckless with regard to the risk of investors being misled.

39.     For the reasons stated above, the factual allegations strongly support an inference of scienter on the part of Defendants.

### PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

40.     At all relevant times, the market for PG&E common stock was an efficient market for the following reasons, among others:

        a)  PG&E common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

        b)  During the Class Period, PG&E common stock was actively traded, demonstrating a strong presumption of an efficient market;

        c)  As a regulated issuer, PG&E filed with the SEC periodic public reports during the Class Period;

        d)  PG&E regularly communicated with public investors via established market communication mechanisms;

        e)  PG&E was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period.  Each of these reports was publicly

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

available and entered the public marketplace; and

  f) Unexpected material news about PG&E was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

41. As a result of the foregoing, the market for PG&E common stock promptly digested current information regarding PG&E from all publicly available sources and reflected such information in PG&E's stock price.  Under these circumstances, all purchasers of PG&E common stock during the Class Period suffered similar injury through their purchase of PG&E's common stock at artificially inflated prices, and a presumption of reliance applies.

42. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to a ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld are material because an investor would have considered the Company's actual net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in PG&E.

### NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

43. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

44. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and no meaningful cautionary statements were made identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

45. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of PG&E who knew that the "forward-looking

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

statement" was false.   Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired PG&E common stock on the public market during the Class Period, and were damaged, excluding the Company, the Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest (the "Class").

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PG&E common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of April 24, 2018, PG&E had 516,427,502 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.   Joinder would be highly impracticable.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

49.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a)  whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

    b)  whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

    c)  whether the price of PG&E common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

    d)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase PG&E common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

54.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for PG&E common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of PG&E as specified herein.

56.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PG&E's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PG&E and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of PG&E common stock during the Class Period.

57.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all

relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

58.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PG&E's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PG&E's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of PG&E's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PG&E's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

60.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding PG&E's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PG&E common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

61.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

63.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of the Company's common stock giving rise to the cause of action.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of PG&E within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership, and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

66.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, PG&E and the Individual Defendants each violated Section 10(b) and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

68.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

69.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of the Company's common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23, and Plaintiff's counsel as class counsel;

b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: June 12, 2018                    **LEVI & KORSINSKY, LLP**

                                        By: /s/ *Rosemary M. Rivas*
                                        Rosemary M. Rivas
                                        44 Montgomery Street, Suite 650
                                        San Francisco, CA 94104
                                        Telephone: (415) 291-2420
                                        Facsimile: (415) 484-1294

                                        Eduard Korsinsky (to be admitted *pro hac vice*)
                                        30 Broad Street, 24th Floor
                                        New York, NY 10004
                                        Tel: (212) 363-7500
                                        Fax: (212) 363-7171
                                        Email:ek@zlk.com

                                        *Counsel for Individual and Representative*
                                        *David C. Weston*



# LEVI&KORSINSKY LLP

30 Broad Street, 24th Floor
New York, NY 10004
T:212-363-7500
F:212-363-7171
www.zlk.com

**CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, David C. Weston, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in PG&E Corporation which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this June 12, 2018.

Name: David C. Weston

Signed:

**SCHEDULE A**

**David C. Weston**
**Transactions in PG&E Corporation (PCG) Common Stock**
**Class Period: April 29, 2015 and June 8, 2018, inclusive**

| Date of Transaction | Buy (B) or Sell (S) | Quantity | Price ($) |
|---|---|---|---|
| 9/27/2017 | B | 1,000 | 68.7500 |
| 10/13/2017 | S | (1,000) | 57.9612 |
| 10/17/2017 | B | 100 | 70.0000 |

JS-CAND 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DAVID C. WESTON, on behalf of himself and all others similarly situated

**DEFENDANTS**

PG&E CORPORATION, ANTHONY F. EARLEY, JR., JASON P. WELLS, GEISHA J. WILLIAMS, CHRISTOPHER P. JOHNS, DINYAR B. MISTRY, and DAVID S. THOMASON

**(b)** County of Residence of First Listed Plaintiff    Miami-Dade County, Florida
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Rosemary Rivas, Levi & Korsinsky, LLP, 44 Montgomery Street, Suite 650, San Francisco, CA 94104; 415-291-2420

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff* 
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 751 Family and Medical Leave Act | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | 861 HIA (1395ff) | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | ☒ 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | | | 462 Naturalization Application | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 440 Other Civil Rights | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations | 530 General | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| 290 All Other Real Property | 448 Education | 540 Mandamus & Other | | | |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court |
| ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer |
| ☐ 8 Multidistrict Litigation–Direct File | | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Private Securities Litigation Reform Act

Brief description of cause:
Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE      DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**    ☐ **SAN FRANCISCO/OAKLAND**    ☐ **SAN JOSE**    ☐ **EUREKA-MCKINLEYVILLE**

**DATE**    06/12/2018    **SIGNATURE OF ATTORNEY OF RECORD**

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a)  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

b)  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

c)  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.  **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1)  United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2)  United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3)  Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4)  Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.  **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.  **Origin.** Place an "X" in one of the six boxes.

(1)  Original Proceedings. Cases originating in the United States district courts.

(2)  Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3)  Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4)  Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5)  Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6)  Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8)  Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII.  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX.  **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit 90

1  **LABATON SUCHAROW LLP**
   THOMAS A. DUBBS (*pro hac vice*)
2  LOUIS GOTTLIEB (*pro hac vice*)
   JEFFREY A. DUBBIN (#287199)
3  JAMES L. OSTASZEWSKI (*pro hac vice*)
   WENDY TSANG (*pro hac vice*)
4  140 Broadway
   New York, New York 10005
5  Telephone: (212) 907-0700
   Facsimile: (212) 818-0477
6  Email: tdubbs@labaton.com
   lgottlieb@labaton.com
7  jdubbin@labaton.com
   jostaszewski@labaton.com
8  wtsang@labaton.com
   *Counsel for Lead Plaintiff the Public Employees Retirement*
9  *Association of New Mexico and Lead Counsel for the Class*

10 **KERR & WAGSTAFFE LLP**
   JAMES M. WAGSTAFFE (#95535)
11 FRANK BUSCH (#258288)
   101 Mission Street, 18th Floor
12 San Francisco, California 94105
   Telephone: (415) 371-8500
13 Facsimile: (415) 371-0500
   Email: wagstaffe@kerrwagstaffe.com
14 busch@kerrwagstaffe.com
   *Liaison Counsel for the Class*

15

16                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
17                       **SAN FRANCISCO DIVISION**

18                                        Civil Action No. 3:18-cv-03509-RS

19                                        **CONSOLIDATED CLASS ACTION**
     IN RE PG&E CORPORATION             **COMPLAINT FOR VIOLATION OF THE**
20   SECURITIES LITIGATION              **FEDERAL SECURITIES LAWS**

21                                        JURY TRIAL DEMANDED

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................... 1

   A.  Summary of the Case ....................................................................................... 1

   B.  Claims Being Asserted ..................................................................................... 4

II.  JURISDICTION AND VENUE ................................................................................... 5

III.  PARTIES ..................................................................................................................... 5

IV.  FACTUAL BACKGROUND ...................................................................................... 7

   A.  PG&E Operates Within a Robust Legal Regime .............................................. 7

      1.  California Law Required PG&E to Maintain a Safe Distance Between Its
          Electrical Equipment and Nearby Vegetation .......................................... 7

      2.  PG&E Is Regulated by the CPUC .............................................................. 8

      3.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
          California for Wildfires .............................................................................. 9

      4.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
          the Cost of Wildfires It Causes If It Proved That It Acted Reasonably and
          Prudently .................................................................................................. 10

   B.  PG&E's Vegetation Management Expenditures Did Not Materially Change
       from Year to Year During the Class Period, Let Alone Double at Any Point ............. 10

   C.  PG&E's Tree Trimming and Removal Did Not Come Close to Doubling
       During the Class Period ................................................................................. 12

   D.  After the North Bay Fires, PG&E Started Reporting Inflated Numbers for
       Tree Removal ................................................................................................. 12

   E.  PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ................. 13

      1.  PG&E Used Reclosers to Prioritize Convenience Over Safety ................ 13

      2.  PG&E Concealed Its Use of Reclosers From Investors During the Class
          Period ....................................................................................................... 14

   F.  PG&E Engaged in an Unsafe Pattern of Noncompliance with Vegetation
       Management Requirements That Caused Many of the North Bay Fires .................. 15

      1.  PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ............. 15

      2.  PG&E's Unsafe Noncompliance Continued Through 2010 ...................... 15

      3.  PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte
          Fire in 2015 .............................................................................................. 16

      4.  PG&E's Compliance Measures Allowed More than One Million
          Vegetation Management Violations During the Class Period ................... 16

5. PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them ........................ 18

V.  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...... 19

A.  Overview of Defendants' Fraudulent Course of Conduct ........................................... 19

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ........................................... 20

1. April 29, 2015 – Misstatement No. 1 ................................................................ 20

2. October 16, 2015 – Misstatement No. 2 ............................................................ 21

3. November 18, 2015 – Misstatement No. 3 ......................................................... 22

4. October 6, 2016 – Misstatement No. 4 .............................................................. 23

5. August 9, 2017 – Misstatement No. 5 ............................................................... 24

C.  Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires ........................................... 26

1. May 23, 2016 – Misstatement No. 6 ................................................................. 26

2. November 4, 2016 – Misstatement No. 7 .......................................................... 27

3. May 31, 2017 – Misstatement No. 8 ................................................................. 28

D.  After the North Bay Fires Erupted, the Truth Began to Emerge ............................... 29

E.  After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ........................................... 30

1. October 31, 2017 – Misstatement No. 9 ............................................................ 30

2. November 2, 2017 – Misstatement No. 10 ......................................................... 30

3. November 2, 2017 – Misstatement No. 11 ......................................................... 32

4. November 5, 2017 – Misstatement No. 12 ......................................................... 34

5. May 25, 2018 – Misstatement No. 13 ............................................................... 35

VI.  MATERIALITY .................................................................................................. 36

VII.  LOSS CAUSATION ............................................................................................. 37

A.  Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock ........................................... 37

B.  PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires ................................................................................................. 37

C.  When the Market Learned the Truth, the Price of PG&E's Common Stock Fell Dramatically ............................................................................... 38

    1.  October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................... 38

        (a)  The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .................................... 38

        (b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017 .................................... 39

    2.  October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ....................................................................... 41

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ..................... 41

        (b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017 .................................... 41

    3.  December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ....................................................................... 42

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ..................... 42

        (b)  Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017 ............... 43

    4.  May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ....................................................................... 44

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ..................... 44

        (b)  Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018 ............................................................. 46

    5.  June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ....................................................................... 46

        (a)  The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers .............................................................. 49

        (b)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ..................... 49

        (c)  Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018 ............................................. 50

VIII.   POST-CLASS PERIOD DEVELOPMENTS .......................................................... 51

IX.   SCIENTER ........................................................................................................ 52

    A.   PG&E's  Safety Practices Continued to Violate the Law Even After Being on Notice of the Butte Fire Safety Violations ................................................ 52

    B.   Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It ........................................................................ 52

    C.   PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations ................................... 55

        1.   PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants .............................. 55

        2.   PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored ............................................................................................. 56

    D.   PG&E's Compliance Statements Were Authorized by Defendant Kane and Made under Her Ultimate Authority ......................................................... 58

    E.   The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors ................................................................................... 60

X.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET ........................................................................................................ 61

XI.   CLASS ACTION ALLEGATIONS ......................................................... 62

XII.   CAUSES OF ACTION ......................................................................... 64

1     Lead Plaintiff Public Employees Retirement Association of New Mexico ("PERA" or

2  "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, allege the

3  following against PG&E Corporation, Pacific Gas and Electric Company (the "Utility," and

4  together with PG&E Corporation, "PG&E" or the "Company"), and Anthony F. Earley, Jr.,

5  Geisha J. Williams, Nickolas Stavropoulos, Julie M. Kane, Christopher P. Johns, and Patrick M.

6  Hogan (collectively, the "Individual Defendants" and together with PG&E, the "Defendants")

7  based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief

8  as to all other matters. Lead Plaintiff's information and belief is based on the investigation

9  conducted by and through their attorneys, which included a review of the Company's Securities

10  and Exchange Commission ("SEC") filings, conference call transcripts and press releases; media

11  and analyst reports about the Company; and other public information regarding the Defendants.

12  Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth

13  herein will be produced through discovery.

## I.    INTRODUCTION

### A.    Summary of the Case

16    1.    This federal securities class action arises out of the false and misleading

17  statements that Defendants made to investors from April 29, 2015 through June 8, 2018 (the

18  "Class Period") to conceal the Company's lax wildfire safety practices, including its numerous

19  and widespread violations of California safety regulations for power lines. PG&E's ability to

20  maintain safe power lines, compliant with California safety regulations, is vital to the Company's

21  financial health. One of the most important functions PG&E must perform in this area is clearing

22  vegetation, including dead or dying trees, away from its power lines as required by California

23  law. PG&E's failure to do so resulted in numerous and widespread wildfires in October 2017,

24  causing enormous property destruction and loss of life.

25    2.    Between PG&E's history of causing wildfires and California's drought

26  conditions, PG&E knew it was essential to assure investors that the Company's wildfire safety

27  measures were adequate and that it complied with applicable laws and regulations. PG&E

28

wanted investors to believe that the Company was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***";
- Its "***vegetation management program* . . . *compl[ies] with state and federal regulations***";
- "***PG&E follows all applicable federal and state vegetation clearance requirements***" to "***help to reduce*** outages or ***fires caused by trees or other vegetation***"; and
- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[1]

3.      These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires.

4.      The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[2] These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[3] The size of this liability imperiled the financial viability of the Company. In fact, several of Defendants' false and misleading statements were made in the months before PG&E openly expressed its fear that its liability for the North Bay Fires could send the Company into bankruptcy.

---

[1] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[2] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[3] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire, the October 1991 Tunnel Fire in Oakland, which, according to a May 27, 2011 article in *Scientific American*, caused $2.687 billion in insured property damage. https://www.scientificamerican.com/article/graphic-science-how-much-do-fires-cost-property-damage/

CONSOLIDATED CLASS ACTION COMPLAINT
CIV/E ACTION NO. 3:18-CV-03509-RS

2

5.      Of the **seventeen** main North Bay Fires for which the State of California's investigation has been completed by the California Department of Forestry and Fire Protection ("Cal Fire"), the truth emerged over time that **all seventeen** were caused by PG&E equipment. Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson, lightning, fireworks, hikers, children playing with matches, or any other such cause. Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of California safety regulations – contradicting Defendants' false representations of compliance with those regulations. California's investigation into the eighteenth and final North Bay Fire (the Tubbs Fire, which was the largest and most destructive) remains ongoing.

6.      Accordingly, PG&E's statements of compliance with safety regulations during the Class Period at issue here misrepresented current facts and were not statements of opinion.

7.      Defendants' false and misleading misrepresentations and omissions came at a crucial time for the Company. As described below, over the past three decades, PG&E caused a series of wildfires and other disasters in California. For example, in September 2015, its violations of California safety regulations regarding vegetation clearance caused a wildfire known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed two people – making it the seventh most destructive wildfire in California history at the time.

8.      Revealingly, just months before the North Bay Fires began, in an April 2017 non-public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we have not made any changes as a result of this fire**." Thus, despite being on notice of its dangerous safety violations and their deadly consequences, neither the Company nor its officers took any steps to improve safety or compliance between the Butte Fire and the far more disastrous North Bay Fires. Over this time period, Defendants either knew, or should have known, that the Company's wildfire-related safety violations continued unabated.

9.      Though the North Bay Fires began on a windy night, they were not the result of an unexpected or unique event. Rather, the circumstance of PG&E causing seventeen (or more) concurrent fires across **nine counties** shows that the Company tolerated numerous and

1  widespread violations of California safety regulations across its territory. As detailed herein, the

2  underlying explanation for these near-simultaneous North Bay Fires is neither unusual weather

3  nor coincidence, but PG&E's failure to comply with even minimal legal requirements.

4  Accordingly, PG&E and its officers knew, or deliberately disregarded, that the Company's

5  power lines were often not in compliance with California safety requirements when making false

6  and misleading statements to the contrary.

7       10.     Notwithstanding PG&E's false and misleading statements to the marketplace,

8  investors learned over time that PG&E's safety violations were responsible for most of the North

9  Bay Fires. As this information emerged between October 12, 2017 and June 11, 2018, investors

10 were surprised, given Defendants' numerous public statements during the Class Period touting

11 the Company's compliance, safety measures, and its intertwined financial health. As the truth

12 regarding PG&E's inadequate safety measures came to light, PG&E's artificially inflated share

13 price dropped significantly. Thus, as a result of Defendants' wrongful acts and omissions, Lead

14 Plaintiff and other Class members have suffered significant damages.

15     **B.    Claims Being Asserted**

16     11.     Lead Plaintiff asserts the claims herein against PG&E and certain of its executives

17 and officers, seeking to recover for its damages suffered due to these declines in PG&E's

18 publicly traded securities. The action is brought on behalf of a class of all persons and entities

19 that purchased or otherwise acquired PG&E publicly traded securities during the period from

20 April 29, 2015 through June 8, 2018, inclusive (the "Class Period"). Excluded from the class are:

21 (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any

22 person who was an officer or director of PG&E during the Class Period; (iv) any firm, trust,

23 corporation, or other entity in which any Defendant has or had a controlling interest; (v) PG&E's

24 employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they

25 made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs,

26 successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks to recover

27 compensable damages caused by Defendants' violations of the federal securities laws and to

28

---

CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

4

1   pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

2   "Exchange Act") and Rule 10b-5 promulgated thereunder.

3   **II.    JURISDICTION AND VENUE**

4        12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

5   the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

6   SEC (17 C.F.R. § 240.10b-5).

7        13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

8   §1331 and Section 27 of the Exchange Act.

9        14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

10   Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located

11   within this Judicial District.

12        15.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

13   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

14   including but not limited to, the United States mail, interstate telephone communications and the

15   facilities of the national securities exchange.

16   **III.    PARTIES**

17        16.    Lead Plaintiff PERA was established in 1947 and manages a retirement system

18   for state, county, and municipal employees including police, firefighters, judges, magistrates,

19   legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of

20   its members, retirees, and beneficiaries. As set forth in the Certification accompanying the

21   motion for appointment as Lead Plaintiff (ECF No. 29), PERA purchased securities of PG&E at

22   artificially inflated prices during the Class Period and was damaged as the result of Defendants'

23   wrongdoing as alleged in this Complaint. On September 10, 2018, this Court appointed PERA to

24   serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act

25   of 1995 (the "PSLRA").

26        17.    Defendant PG&E Corporation is a publicly traded corporation that is

27   headquartered in San Francisco, California, with principal executive offices located at 77 Beale

28   Street, P.O. Box 770000, San Francisco, California 94177. PG&E's securities trade on the New

1    York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that

2    holds, directs the actions of, and controls energy-based businesses such as the Utility.

3          18.    Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned

4    subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling

5    and delivering electricity and natural gas to its customers, also known as "rate-payers." The

6    Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have

7    overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-

8    K. Indeed, all of the Utility's shares are owned by PG&E.  Alternatively, PG&E Corporation

9    controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and

10    PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

11          19.    Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's

12    President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13,

13    2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

14          20.    Defendant Geisha J. Williams ("Williams") has served as PG&E Corporation's

15    CEO and President since March 1, 2017, and served as the President of Electric Operations at the

16    Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice

17    President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.

18          21.    Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and

19    COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President

20    of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he

21    served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to

22    August 16, 2015.

23          22.    Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief

24    Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May

25    18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance

26    Officer.

27          23.    Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas

28    and Electric Company from August 1, 2009 to August 17, 2015.

24.     Defendant Patrick M. Hogan has served as the Utility's Senior Vice President of Electric Operations from March 2016 through the present, and previously served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

25.     The Defendants referenced above in ¶¶19-24 are referred to herein as the "Individual Defendants."

26.     The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E or the Utility, possessed the power and authority to control, and did control, the contents of PG&E's SEC filings, press releases, and other market communications during the Class Period. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and/or Utility, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.     FACTUAL BACKGROUND

### A.     PG&E Operates Within a Robust Legal Regime

27.     As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1.     California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

28.      To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

29.     Pursuant to California Public Resources Code §4292, for instance:

1

2

3

4

5

6

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

7       30.    Similarly, California Public Resources Code §4293 provides that:

8

9

10

11

12

13

14

15

16

17

18

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

19       31.    Under California Public Utilities Code §451, PG&E was further required to

20   "furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities,

21   equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil

22   Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons,

23   employees, and the public."

24              **2.    PG&E Is Regulated by the CPUC**

25       32.    PG&E's primary regulator is the California Public Utilities Commission

26   ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General

27   Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which

28   costs PG&E must bear. The CPUC was created under Article XII of the California State

Constitution, and derives its regulatory authority from Section 701 of the California Public Utilities Code.

33.     Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish necessary and reasonable clearances" between overhead conductors and nearby vegetation, with certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

> * * *

> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

### 3.     Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires

34.     The California Department of Forestry and Fire Protection ("Cal Fire") is an agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is administratively in charge of both the state's fire departments and its law enforcement with regard to state fire and forest laws. As a result, it is responsible for both fighting fires as they occur and for investigating the causes of fires after they have been contained. Cal Fire conducts official investigations as an arm of the State of California to determine the causes of wildfires within the state, as well as any violations of state laws and regulations.

35.     Pursuant to an agreement with the U.S. Department of the Interior and the U.S. Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and origin determinations for wildfires – such as the North Bay fires – that fall within its jurisdiction.

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 208 of 1229

**4.    Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes If It Proved That It Acted Reasonably and Prudently**

36.    The California Supreme Court has interpreted Article 1, Section 19 of the California Constitution as imposing a doctrine known as "inverse condemnation," whereby public utilities such as PG&E are required to compensate individuals whose real property has been damaged by the utility under a strict liability regime. However, importantly, a utility such as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

37.    In other words, PG&E will be left to bear the costs of wildfires causes unless it can prove that it was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id.* Embodied in this standard, at minimum, is compliance with state safety laws and regulations.

**B.    PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point**

38.    The State of California declared a state of emergency due to drought conditions in January 2014,[4] which ended in April 2017.[5] In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an epidemic of insect infestations causing millions of trees to die annually.[6] These conditions significantly increased the danger of wildfires in the North Bay region of California. PG&E knew about these conditions and its obligations to ensure safety from wildfires in spite of these

---

[4] https://www.gov.ca.gov/2014/01/17/news18368/
[5] https://www.gov.ca.gov/2017/04/07/news19747/
[6] https://www.gov.ca.gov/wp-content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf

environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree

mortality made explicit: **"[U]tilities . . . to the extent required by their existing**

**responsibilities to protect the public health and safety, shall undertake efforts to remove**

**dead or dying trees in these high hazard zones that threaten power lines**. . . ."

39.     Based on information released by CPUC, PG&E spent $194,094,406 on

vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

only 2.4% and 1.4%, respectively.[7] Each year's spending was substantially identical to the

amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

General Rate Cases – notwithstanding the state of emergency directive above. In contrast,

inflation rose 5.48% over the same three-year period.[8] Thus, PG&E's spending did not even

keep pace with inflation during the Class Period.

40.     CPUC released the following chart confirming that PG&E's vegetation

management spending underwent only modest increases over the relevant time period:

### Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management

|       | PG&E Requested | CPUC Authorized | PG&E Spent |
|-------|----------------|-----------------|------------|
| 2017  | $201.0         | $201.0          | *$150.4 YTD* |
| 2016  | $198.8         | $198.8          | $198.7     |
| 2015  | $194.2         | $194.2          | $194.1     |
| 2014  | $190.0         | $190.0          | $189.7     |
| 2013  | $180.0         | $161.5          | $161.6     |
| 2012  | $180.0         | $161.5          | $161.5     |
| 2011  | $180.0         | $161.5          | $161.6     |

41.     While Defendants falsely represented on November 2, 2017 that PG&E

"***doubled***" vegetation management expenditures in 2016 (*see* ¶¶102 & 105), tellingly, they made

---

[7] https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf
https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf;
https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf

[8] https://www.bls.gov/data/inflation_calculator.htm

this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.

### C. PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period

42. Nor did the Company's reported numbers for trees that it trimmed or removed double during this time period, or come close to doubling. During the Class Period, the Company touted the results of its vegetation management expenditures, slowly inflating the numbers it was reporting. Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about **236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the state" (May 3, 2017, Press Release).

43. Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

### D. After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal

44. Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶102, *infra*).

45. Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

### E.   PG&E Concealed Its Unsafe Use of Reclosers During the Class Period

#### 1.   PG&E Used Reclosers to Prioritize Convenience Over Safety

46.    "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted. Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

47.    San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in the state court litigation concerning the North Bay Fires,[9] these two utility companies are aware of the dangers of using reclosers, and they have a practice of blocking reclosers from working during fire season.[10]

48.    Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to reprogram its reclosers during fire season so that they did not attempt to restart lines that had been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit, but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit," which would lead to consumer complaints), but that PG&E also understood this measure would

---

[9] https://www.norcalfirelawyers.com/wp-content/uploads/2018/01/atlas-fire.pdf

[10] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in California, declared such by the responsible public agency fire administrator. This declaration is based on fuel and weather conditions conducive to the ignition and spread of wildland fires. http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 212 of 1229

improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose reliability over safety.

### 2. PG&E Concealed Its Use of Reclosers From Investors During the Class Period

49.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "*just about done*" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "*first*" in "*high wildfire risk areas*," followed by "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next year."

50.     However, PG&E did not disable all of its reclosers during fire season, like San Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

51.     As is discussed in more detail below, it was not until **after** the deadly North Bay Fires that PG&E finally disabled these reclosers.[11] Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.

> "I think that's the troubling part," Hill said, "that **they misled us in that**.

> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

---

[11] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf

Likewise, investors were misled by PG&E's recloser statements.

  **F.** **PG&E Engaged in an Unsafe Pattern of Noncompliance with Vegetation Management Requirements That Caused Many of the North Bay Fires**

  52. Despite the important safety measures imposed by California law, PG&E has a long history of causing deadly wildfires through its failure to comply with the legal requirements for vegetation management. Between causing the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws and regulations.  PG&E assured investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation management" was now "*in compliance with relevant laws*" or "*complying with state and federal regulations*."  Notably, in its 2018 Corporate Responsibility and Sustainability Report issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to investors that its vegetation management complies with California's safety laws.

  **1.** **PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

  53. One of the most notable of the pre-Class Period fires was the "Trauner Fire," where PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems.[12]

  **2.** **PG&E's Unsafe Noncompliance Continued Through 2010**

  54. Subsequently, PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire (1999),[13] the Sims Fire (2004), and the Whiskey Fire (2008).

  55. Moreover, according to documents released by The Utility Reform Network ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had

---

[12] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

[13] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been earmarked for tree trimming and removal.

identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project and repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

56.     On August 9, 2016, a California federal jury found PG&E guilty of five criminal counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion.

### 3.     PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015

57.     In 2015, five months after PG&E made Misstatement No. 1, PG&E's vegetation management program once again failed, causing the Butte Fire that killed two people, destroyed 921 homes, and scorched more than 70,000 acres over 22 days.

58.     On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations, including evidence of negligence. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

59.     There is currently pending litigation over PG&E's liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E negligently caused the Butte Fire by maintaining an inadequate vegetation management system.

### 4.     PG&E's Compliance Measures Allowed More than One Million Vegetation Management Violations During the Class Period

60.     Internally, PG&E's numerous and widespread violations of California safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management violations to go unchecked.  Investigative journalists and attorneys have uncovered that PG&E internally accepts that its vegetation management practices leave 1 of every 100 trees noncompliant with California regulations, and further reportedly "cheats" on its internal

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 215 of 1229

compliance reviews, in order to give a misleading impression of compliance with tree clearance

requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon

Van Derbeken on November 6, 2017, published a month after the North Bay Fires began,

PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line

clearance standards:

> **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards**, NBC Bay Area has learned.
>
> * * *
>
> [I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.
>
> * * *
>
> When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . the company just expanded the universe of trees covered in a particular audit.
>
> "So what PG&E does when it doesn't pass, it basically cheats," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte Fire] said. "It adds more miles and more miles until it reaches a passing grade."

61.     With approximately 123 million trees under PG&E's control,[14] this means

approximately 1.2 million trees may not be in compliance with state safety laws at any given

time. The measurement of 1.2 million safety violations is a conservative estimate when

combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence

PG&E's real rate of noncompliance may be even higher.

62.     According to the plaintiffs litigating against PG&E for injuries caused by the

2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony

purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant,

---

[14] See PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, Oct. 17, 2017, *available at*
http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to
%20Data%20Request.pdf

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
216 of 1229

1  and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that

2  PG&E knows that it allows approximately 123,000 safety violations in the nature of trees

3  touching its powerlines at any given time.

4       63.     Thus, PG&E has been on notice for many years that its vegetation management

5  practices did not comply with California safety regulations and never disclosed that their own

6  internal compliance reviews showed a lack of compliance on a huge scale.

7       **5.**     **PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them**

8

9

10       64.     Even though PG&E suffered from endemic wildfire safety problems, the

11  Company did not meaningfully change its practices even after the deadly Butte Fire that occurred

12  in 2015. As noted above, in a deposition transcript that has not yet been made publicly available,

13  PG&E's Vegetation Program Manager (Stockton Division)[15] Richard Yarnell reportedly testified

14  under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a**

15  **result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the

16  Butte Fire in 2015 continued unabated throughout the Class Period.

17       65.     Moreover, the vegetation management problems detailed herein were

18  institutionally entrenched by certain incentive structures PG&E put in place. According to a

19  lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case

20  No. CGC-17-563293), which asserted claims on behalf of victims of North Bay Fires, PG&E

21  provided monetary incentives to its employees that had the effect of discouraging the

22  implementation of vegetation safety measures.

23       66.     For instance, PG&E's Vegetation Management Program adopted a Vegetation

24  Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce

25  the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work

26  that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E

27  _____

[15] PG&E's Stockton Division is a geographic subdivision within the Company that contained

28  the Butte Fire.

Case: 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 217 of 1229

1    effectively shifted its resources away from rural areas that were more prone to wildfires (where

2    the "annual routine compliance" work was typically done), and towards more densely populated

3    urban areas (where the "reliability" work was done). For example, pursuant to this program,

4    PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's

5    bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire

6    season) put safety at risk in an effort to reduce consumer complaints.

7        67.     According to the same lawsuit, Robert Urban, a regional officer for a PG&E

8    contractor, stated that he had a concern that the bonus system incentivized his employees to not

9    do their job, but PG&E chose to keep this program despite knowing this risk.

10       68.     It was in this context that Defendants touted PG&E's vegetation management to

11   investors, falsely representing that it was in full compliance with all relevant regulations

12   throughout the Class Period. *E.g.*, ¶76 (Misstatement No. 2, October 16, 2015 ); ¶86

13   (Misstatement No. 5, August 9, 2017); ¶100 (Misstatement No. 9, October 31, 2017); and ¶109

14   (Misstatement No. 12, November 5, 2017).  As noted above, though PG&E falsely assured

15   investors during the Class Period that its vegetation management failures had been resolved after

16   the Butte Fire, the Company's own employee Richard Yarnell later admitted that nothing of

17   substance had changed over the same time period.

18   **V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

19       69.     In light of PG&E's history of causing wildfires and the drought conditions in

20   California, investors and analysts were focused on the Company's compliance with wildfire-

21   related safety regulations during the Class Period. With an eye towards artificially inflating its

22   share price, PG&E responded to this interest with false and misleading reassurances that PG&E

23   was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend

24   during the Class Period, repeatedly touting that such a move was based, in part, on its success in

25   ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

26       **A.     Overview of Defendants' Fraudulent Course of Conduct**

27       70.     Of the **seventeen** main North Bay Fires for which Cal Fire's investigations have

28   been completed, **all seventeen** were caused by PG&E equipment. Among those, **eleven** of these

fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**.

71.     PG&E was responsible for all the North Bay Fires.  Even though Cal Fire's investigations have not found evidence of violations for six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety violations merged into and strengthened other fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the eleven North Bay Fires which never should have ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the North Bay Fires.

72.     The news about PG&E's responsibility for causing the North Bay Fires directly impacted the Company's bottom line, because California law requires PG&E to bear the cost of wildfire property damage and personal injury caused by its violations of California safety regulations. In other words, those costs likely could not be passed on to ratepayers. And, given the conclusions of Cal Fire's investigations into these fires to date – where Cal Fire has referred at least eleven of its investigations to the appropriate counties' district attorneys' offices to review for potential criminal violations – the market understood that the financial consequences to PG&E would be huge.

73.     As of the filing of this Complaint, Cal Fire has not yet completed its investigations into the Tubbs Fire, and may find that it, too, was caused by PG&E's safety violations.

**B.      Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires**

**1.      April 29, 2015 – Misstatement No. 1**

74.     The Class Period begins on April 29, 2015, when PG&E held a conference call to discuss the Company's financial and operating results for the first financial quarter of 2015,

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
219 of 1229

which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility, misleadingly assured investors of the Company's commitment to safety:

> As California enters its fourth year of drought, we're working hard to help the state meet this challenge by reducing water usage at our own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. ***We're stepping up our vegetation management activities to mitigate wildfire risk*** and improve access for firefighters.

75.   This statement was materially false and/or misleading because PG&E did not materially increase its vegetation management budget in 2015. In fact, based on information released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015: whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015, respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively. Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage points above inflation, which rose 1.12% over the same time period.[16] Accordingly, PG&E had not meaningfully "stepp[ed] up" its vegetation management activities.[17]

### 2.   October 16, 2015 – Misstatement No. 2

76.   On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and Sustainability Report. This report falsely assured investors that PG&E's "vegetation management" was "in compliance with relevant laws":

**Vegetation Management**

***Each year, PG&E's Vegetation Management department***, in consultation with utility arborists and foresters, ***inspects every mile of power line in our service area for public safety*** and electric reliability. ***We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 20 consecutive years for demonstrating best practices in utility arboriculture.

---

[16] https://www.bls.gov/data/inflation_calculator.htm

[17] PG&E also omitted that it was supposed to perform $441,192 (the total amount by which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management during 2015, but failed to do so.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 220 of 1229

77.     Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws." According to reports released in subsequent corrective disclosures on May 25 and June 8, 2018, PG&E violated relevant California laws, including Public Resources Code section 4293, multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

78.     This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a Chief Ethics and Compliance Officer, a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors, and the Compliance and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
>
> - Building a best-in-class ethics and **compliance** program and **overseeing its implementation**,
>
> - **Overseeing company-wide programs for compliance reporting and related investigatory processes**. . . .

79.     Kane therefore was responsible for both "overseeing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

### 3.     November 18, 2015 – Misstatement No. 3

80.     On November 18, 2015, Hogan publicly testified before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety.

During that testimony, Hogan assured the public that PG&E was "just about done" implementing

a program that would remotely disable the Company's recloser devices in areas that included

"high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are able to **take our reclosers out of service remotely**, we first **focus on the wildfire areas** and then we have about 130 some odd locations, we are going to complete about 126 of those this year, **just about done with that program**, which leaves six for next year, which will be completed.

81.     This statement was materially false and/or misleading because PG&E

misleadingly said that it had implemented policies and procedures to disable recloser devices

from areas that were at high risk for wildfires, which includes the areas where the North Bay

Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed

that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has

determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire.

Thus, PG&E did not have the safety policies and procedures in place that they said they had.

### 4.      October 6, 2016 – Misstatement No. 4

82.     On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and

Sustainability Report. This report provided false assurances to investors regarding PG&E's

compliance with relevant regulations:

> **Vegetation Management**
>
> Each year, PG&E's Vegetation Management department and its contracting arborists and foresters inspect miles of power lines in our service area for public safety and electric reliability. **We do so in compliance with relevant laws** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 21 consecutive years for demonstrating best practices in energy sector arboriculture.

83.     Because PG&E's vegetation management practices failed to follow relevant

California safety laws, PG&E's vegetation management activities were decidedly not "in

compliance with relevant laws." According to reports released in subsequent corrective

disclosures, PG&E violated California's Public Resources Code section 4293 multiple times.

Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the

1    relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus,

2    this statement was materially false and/or misleading because of PG&E's numerous and

3    widespread violations of safety regulations, including regulations specifically related to

4    vegetation management – regulations which were essential for preventing devastating wildfires.

5    In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires

6    all at the same time in **seven** different counties – therefore they cannot be explained away as an

7    isolated lapse.

8        84.    This statement regarding compliance was reviewed and authorized by Defendant

9    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

10   2016 Corporate Responsibility and Sustainability Report:

11          Within senior leadership, ethics and compliance are managed by
            the Chief Ethics and Compliance Officer (CECO), who reports to
12          the PG&E Corporation Chairman and CEO. The CECO has
            additional reporting responsibility to the Audit Committees of the
13          PG&E Corporation and Pacific Gas and Electric Company Boards
            of Directors, and the Compliance and Public Policy Committee of
14          the PG&E Corporation Board.

15          The CECO is responsible for:

16          • Building a best-in-class ethics and **compliance** program
              and **managing its implementation**,
17
18          • **Overseeing enterprise-wide programs for compliance
              monitoring, reporting**, assessment and remediation. . . .

19       85.    Kane therefore was responsible for both "managing . . . implementation" of

20   PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including

21   this report.

22          **5.    August 9, 2017 – Misstatement No. 5**

23       86.    On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and

24   Sustainability Report. This report provided false assurances to investors regarding PG&E's

25   compliance with relevant regulations:

26          **Vegetation Management**

27          PG&E prunes and removes trees growing too close to power lines
            while maintaining as much vegetation as possible to balance land
28          use and environmental stewardship with customer needs. Through
            a well-established and innovative vegetation management

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
223 of 1229

1

program, ***PG&E balances the need to maintain a vast system of
trees growing along power lines while complying with state and
federal regulations and delivering safe***, reliable and affordable
***electric service***.

2

3

87.     Because PG&E's vegetation management practices failed to follow relevant

4

California safety laws, PG&E's vegetation management activities were decidedly not

5

"complying with state and federal regulations and delivering safe . . . electric service."

6

According to reports released in subsequent corrective disclosures, PG&E violated California's

7

Public Resources Code section 4293 multiple times. Further, Cal Fire found sufficient evidence

8

of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North

9

Bay fires. *See* Sections VII.C.4-5, *infra*. Thus, this statement was materially false and/or

10

misleading because of PG&E's numerous and widespread violations of safety regulations,

11

including regulations specifically related to vegetation management – regulations which were

12

essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that

13

they caused multiple North Bay Fires all at the same time in seven different counties – therefore

14

they cannot be explained away as an isolated lapse.

15

88.     This statement regarding compliance was reviewed and authorized by Defendant

16

Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

17

2017 Corporate Responsibility and Sustainability Report:

18

19

Within senior leadership, compliance and ethics are managed by
the Senior Vice President, Chief Ethics and Compliance Officer
and Deputy General Counsel (CECO), who reports to the PG&E
Corporation Chief Executive Officer (CEO) and President. The
CECO has additional reporting responsibility to the Audit
Committees of the PG&E Corporation and Pacific Gas and Electric
Company Boards of Directors, and the Compliance and Public
Policy Committee of the PG&E Corporation Board.

20

21

22

23

The CECO is responsible for:

24

- Building a best-in-class **compliance** and ethics program
  **and managing its implementation**,

25

26

- **Overseeing enterprise-wide programs for compliance
  monitoring, reporting**, assessment and remediation. . . .

27

28

89. Kane therefore was responsible for both "managing implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting**," including this report.

**C.     Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires**

90. Throughout the Class Period, Defendants repeatedly tied the sustainability of its quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period for the first time in six years, and then raised it again – touting the Company's "progress on safety" and "improvements we have made in safety." Yet PG&E's violations of California's safety regulations were so numerous and widespread that they caused and worsened the North Bay Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

**1.     May 23, 2016 – Misstatement No. 6**

91. Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at Annual Shareholder Meeting." It stated:

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> * * *
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> * * *
>
> ***Earley and other senior executives also discussed continued progress on safety***, reliability and other goals, as well as PG&E's strategy for the future [at the annual shareholder meeting].
>
> Earley said, '***We've continued to demonstrate leadership and commitment on safety.*** We're delivering the most reliable service in our company's history.

92. This statement was materially false and/or misleading because it affirmed that PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 225 of 1229

1    Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

2    connecting purported safety achievements to its ability to increase its dividend, importantly, "to

3    levels that are comparable with those of similar utilities." In reality, PG&E lacked the touted

4    "progress on safety." It fell so far short of this touted achievement that its safety violations, and

5    resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on

6    December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave

7    investors a false impression that safety risks would not imperil the Company's dividend, which is

8    precisely what occurred on December 20, 2017. Further, this statement touting PG&E's

9    "commitment on safety" materially omitted that the Company's spending on vegetation

10   management barely kept pace with inflation at that time.

11             **2.       November 4, 2016 – Misstatement No. 7**

12       93.     On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

13   financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

14       ***The improvements we have made in safety*** and reliability ***over the***
         ***last six years have put us in a position to deliver strong financial***
15       ***results going forward.***

16       Earlier this year, we announced our first dividend increase in six
         years, and we have committed to achieving a roughly 60% payout
17       ratio by 2019. Combined with our expected rate based growth, we
         are confident we can deliver a strong overall return for our
18       shareholders.

19       94.     The statement was materially false and/or misleading because PG&E **did not**

20   **make** "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E

21   Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from

22   September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made

23   any changes" to improve safety. Nor was the Company "in a position to deliver strong financial

24   results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the

25   results of its numerous, widespread safety violations – had such a significant **negative** impact on

26   PG&E's financial results and financial outlook that PG&E had to suspend its dividend entirely

27   on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires. This

28

1   statement gave investors a false impression that concealed safety risks would not imperil the

2   Company's dividend, which is precisely what occurred on December 20, 2017.

3               **3.      May 31, 2017 – Misstatement No. 8**

4        95.      On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

5   Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

6   Johnson to Boards of Directors." The release stated:

> PG&E Corporation (NYSE: PCG) today announced that it is
> raising its quarterly common stock dividend by 4 cents per share to
> 53 cents per share, beginning with the dividend for the second
> quarter of 2017. On an annual basis, this action increases PG&E
> Corporation's dividend by 8 percent, from $1.96 per share to $2.12
> per share.
>
>                          * * *
>
> Yesterday, in remarks at the joint annual shareholders meeting of
> PG&E Corporation and Pacific Gas and Electric Company, [CEO]
> Williams highlighted the companies' ***progress on safety, reliability***
> and reducing greenhouse gas emissions, among other
> accomplishments. ***She reaffirmed PG&E's commitment to safety***
> ***and operational excellence***, delivering for customers and leading
> the way to achieve California's clean energy goals.

16       96.      This statement falsely connected PG&E's decision increasing its dividend to

17  "progress on safety" and PG&E's "commitment to safety and operational excellence," only

18  months before the Company's pervasive failure to comply with safety regulations caused at least

19  eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted

20  that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program

21  Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly

22  testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a

23  result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so

24  testified). PG&E's above statement on May 31, 2017 gave investors a false impression that

25  concealed safety risks would not imperil the Company's dividend, which is precisely what

26  occurred on December 20, 2017.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
227 of 1229

1

## D.    After the North Bay Fires Erupted, the Truth Began to Emerge

2    97.    The North Bay Fires began on Sunday evening, October 8, 2017. However, it was

3 not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety

4 regulation violations were a major cause. On that date, as detailed below (*see* Section VII.C.1,

5 *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must preserve any

6 factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment

7 from each fire event" and (b) "must inform all employees and contractors that they must preserve

8 all electronic (including emails) and non-electronic documents related to potential causes of the

9 fires, vegetation management, maintenance and/or tree-trimming." This was the first disclosure

10 indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share

11 price declined 6.7%.

12    98.    Late the next day, PG&E issued a statement explaining to investors that: "The

13 causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's]

14 power lines and other facilities." It reported that the Company "has approximately $800 million

15 in liability insurance for potential losses that may result from these fires" – to prepare investors

16 for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in

17 which case, its "financial condition or results of operations could be materially affected." The

18 market had understood that PG&E would be reimbursed by rate-payers for damages by fires it

19 caused while nevertheless acting as a prudent manager; hence, the Company's discussion of

20 liability and insurance signaled to the market that at least some of the North Bay Fires were

21 proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share

22 price continued to decline until the end of the next trading day, Monday, October 16, 2017,

23 falling by approximately 16.5%.

24    99.    Thereafter, PG&E's management attempted to reassure investors, falsely, as

25 detailed below.

26

27

28

E.    **After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

1.    **October 31, 2017 – Misstatement No. 9**

100.    On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***."

101.    This statement was materially false and/or misleading because PG&E did **not** follow "all applicable … state vegetation clearance requirements." According to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. This statement concealed the sizeable risk that PG&E's numerous and widespread violations of safety regulations would **worsen** rather than "help to reduce . . . fires caused by trees or other vegetation." Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

2.    **November 2, 2017 – Misstatement No. 10**

102.    On November 2, 2017, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

> Thank you, Chris, and good morning, everyone. Given the recent wildfires impacting our customers and communities, our discussion today will be different from our usual earnings call. . . .

* * *

1    Now I know there's a lot of interest in how these fires started and
     in how PG&E assets might have been involved in or impacted by
2    the wildfires. Our communities deserve answers and we are
     committed to learning what happened. It's critical that we identify
3    anything that will help us to keep our customers and communities
     safe in the future. That is our goal as we work with CAL FIRE and
4    the CPUC.

5                                 * * *

6    **Many of you have reached out with questions about the**
     **potential impact of the wildfires to the company's financials**
7    **and also about the doctrine of inverse condemnation in**
     **California.** At this time, the known financial impact of the
8    wildfires is limited to the cost of the unprecedented response and
     restoration efforts, costs related to our liability insurance and some
9    legal expenses, and Jason [Wells] will cover these later this
     morning.
10
                                  * * *
11
     **I know there's a lot of interest in our pole maintenance and**
12   **vegetation management programs**, so let me address these as
     well. First, we routinely inspect, maintain and replace our electric
13   poles. This includes annual scheduled patrols, 5-year visual
     inspections, an intrusive testing and treating on our wood poles on
14   a frequency that significantly exceeds CPUC requirements.

15   **We also have one of, if not, the most comprehensive vegetation**
     **management programs in the country.** Our vegetation
16   management program manages about 123 million trees across the
     service territory. And every year, we inspect every segment of the
17   99,000 miles of overhead line and we clear vegetation as needed.
     This is well beyond what is typical in our industry where most
18   utilities have a 3-year vegetation management cycle or sometimes
     longer. **Typically, we spend about $200 million every year to**
19   **line clear or remove 1.3 million trees to mitigate both the risk**
     **of wildfires and to prevent electric outages. With the drought**
20   **and the tree mortality crisis we've experienced in California,**
     **we have been expanding our vegetation management work**
21   **since 2014.**

22   ***In 2016, we spent an additional $200 million, essentially***
     ***doubling our typical vegetation management spending last year***.
23   We've removed an incremental 236,000 dead or dying trees, and
     we enhanced our tree maintenance work with additional patrols in
24   areas of high fire danger, including a combination of boots on the
     ground, aerial patrols, and sophisticated LiDAR technology.
25
            103.   These statements were materially false and/or misleading because PG&E did not
26
"doubl[e]" its "typical vegetation management spending last year." As explained in Section
27
IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years
28

---

CONSOLIDATED CLASS ACTION COMPLAINT                                                    31
CIVIL ACTION NO. 3:18-CV-03509-RS

indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[18] The lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a result of th[e September 2015 Butte] fire."

104.     Further, PG&E failed to comply with safety regulations – including regulations specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation management program as "one of, if not, the most comprehensive vegetation management programs in the country," she gave investors the false impression that PG&E's vegetation management did not fall short of applicable safety regulations, when in fact it did. Given PG&E's numerous and widespread violations of safety regulations, its "vegetation management programs" were **not** "comprehensive."

### 3.     November 2, 2017 – Misstatement No. 11

105.     Later on the same call, an analyst asked the Company for more detail about PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as follows:

> [ANALYST:] And then, I guess, ***can you discuss your vegetation practices for trees that are located near power lines?*** I guess we've seen sort of end reports that have come out for some of your peers that they sort of track vegetation that's within certain distances from the lines, and they basically make their decisions on what to do based on sort of updates.
>
> [Stavropoulos:] Thank you for the question. So as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile -- square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. ***And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management.*** That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and

---

[18] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 231 of 1229

aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. ***We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year.*** So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

106.     This statement was materially false and/or misleading because PG&E did not "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since September 2015.

107.     Further, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires erupted. In reality, violations were so pervasive that they caused at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires would have been discovered. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 232 of 1229

### 4.     November 5, 2017 – Misstatement No. 12

108.     At all relevant times, PG&E's Media Relations department maintained a news website named Currents,[19] providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services. Through the website, PG&E repeatedly touted the safety of its electricity lines, the Company's vegetation management programs, and its success mitigating wildfire risk.

109.     In one such article, dated November 5, 2017 and titled "Facts About PG&E's Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[20]

110.     This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements." According to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. *See* Section VII.C.4., *infra*. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

---

[19] http://www.pgecurrents.com, last visited on November 6, 2018.

[20] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at Issue in NorCal Wildfires." *See* https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html

1

### 5.    May 25, 2018 – Misstatement No. 13

2      111.    On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports

3 regarding some of the October 2017 Northern California wildfires to reassure investors that

4 PG&E had met all state regulations concerning fire safety. The press release stated:

5
- Following Governor Brown's January 2014 Drought State
6    of Emergency Proclamation and the California Public
     Utilities Commission's Resolution ESRB-4, PG&E has
7    added enhanced measures to address areas particularly
     affected by drought and bark beetles including:

8
- Increased foot and aerial patrols along power lines in high
     fire-risk areas;
9

10
- Removed approximately 236,000 dead or dying trees in
     2016 and 140,000 dead or dying trees in 2017; these tree
11   removals were in addition to approximately 30,000 trees
     removed per year prior to the drought;

12
- Launched daily aerial fire detection patrols during high fire
     season to improve fire spotting and speed of fire response;
13

14
- Since 2014, provided $11.4 million to local Fire Safe
     Councils (FSCs) for fuel reduction projects in
15   communities; and

16
- Provided $1.7 million to local FSCs for 28 highly
     programmable remote-sensing cameras for critical fire
17   lookout towers.

18
- ***PG&E meets or exceeds regulatory requirements for pole
     integrity management***, using a comprehensive database to
19   manage multiple patrol and inspection schedules of our
     more than two million poles.

20      112.    This statement was materially false and/or misleading because PG&E did not

21 "meet" – much less "exceed" – "regulatory requirements for pole integrity management."

22 According to a report released in a subsequent corrective disclosure, PG&E violated California's

23 safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its

24 "investigators have determined that 12 Northern California wildfires in the October 2017 Fire

25 Siege were caused by electric power and distribution lines, conductors **and the failure of power**

26 **poles**." Indeed, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the

27 failure of a PG&E owned power pole" evidencing "violations of state law" sufficient to be

28 referred to the relevant district attorney. Further, Cal Fire found enough evidence of violations of

1   state law to refer PG&E to the relevant district attorneys for eight of these twelve North Bay

2   fires. *See* Section VII.C.5., *infra*. Thus, this statement was materially false and/or misleading

3   because of PG&E's numerous and widespread violations of safety regulations – regulations

4   which were essential for preventing devastating wildfires. In fact, PG&E's violations were so

5   pervasive that they caused multiple North Bay Fires all at the same time in seven different

6   counties – therefore they cannot be explained away as an isolated lapse.

## VI.   MATERIALITY

113.   PG&E's reassurances to investors about its safety, prudence, and compliance with the law were especially important to investors because of California's legal regime known as inverse condemnation. As described in more detail above (*see* Section IV.A.4., *supra*), PG&E is strictly liable for the property costs of wildfires it caused. However, during the Class Period, it could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E for some or all of its liability.

114.   PG&E's shareholders understood that PG&E would bear the costs of wildfires it caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21, 2017 stated:

> On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire, but they still had little information regarding the cause of the fire or potential shareholder exposure.
>
> * * *
>
> PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country. Further, the company doubled its vegetation management spending in 2016 due to the drought and tree mortality crisis in California. That being said, we still do not know and likely will not know what caused the various fires for some time, **whether or not PCG's equipment was solely or partly the cause**, and whether or not the facts will support a ruling at CPUC that PCG **acted prudently** should they be successfully sued under inverse condemnation.

CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

36

115.    In light of these provisions of California law, PG&E's repeated reassurances to its investors – *e.g.*, that it complied with relevant safety regulations and doubled its vegetation management spending – effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage caused by the North Bay Fires.

116.    In total, PG&E's share price declined $25.80 per share on the five corrective disclosures and/or materializations of concealed risk herein alleged. Given that the Company had approximately 514.9 million shares outstanding as of February 1, 2018, it implies that the losses caused by PG&E's fraud exceed $13.28 billion.

117.    Indeed, as detailed further below (*see* Section IX.E., *infra*), PG&E believed that the liabilities it faced put it at risk of bankruptcy.

## VII.    LOSS CAUSATION

### A.    Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock

118.    As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017.

### B.    PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires

119.    PG&E caused the North Bay Fires. To date, Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson, lightning, fireworks, hikers, children playing with matches, or any other such cause. Of the seventeen fires for which Cal Fire has determined the cause, it has determined that **all seventeen were caused by PG&E equipment**.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 236 of 1229

120.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **9 of the 44 North Bay Fire fatalities.**

121.    Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations.

122.    Cal Fire's investigation of the Tubbs fire – the largest and most destructive of the North Bay Fires – is still ongoing.

**C.    When the Market Learned the Truth, the Price of PG&E's Common Stock Fell Dramatically**

123.    On or about October 8, 2017, eighteen major wildfires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

**1.    October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

124.    It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were a proximate cause of the North Bay Fires. On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program

Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."

125.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event**" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to **potential causes of the fires, vegetation management, maintenance and/or tree-trimming**." This was the first indication that PG&E failures caused any of the North Bay Fires.

126.    On this news that PG&E would likely bear at least some responsibility for the fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost 13 million shares (compared to a Class Period daily average trading volume of 3.2 million[21]).

### (b)    Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017

127.    The following morning, news outlets began to report that PG&E was being connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October 13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may have started California wildfires."[22] The article began by observing: "The California Public Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano Counties,' according to multiple reports." It continued to note that PG&E's share price decline was "on concerns its power lines may have started the massive wildfires that have ravaged California recently." The article also repeated market commentary that the decline in PG&E's

---

[21] This average excludes alleged corrective disclosure dates.

[22] This article was published prior to the Company's corrective disclosure later that day, discussed *infra*.

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 238 of 1229

1   share price reflected investors' understanding that PG&E was financially responsible for the

2   North Bay Fires:

> The drop in the stock "reflects the following assumptions: 1) the fire was caused by PCG's negligence, 2) insurance coverage for 3rd party liabilities will be very limited, 3) damage costs per acre far larger than those for the 2015 Butte fire and 4) material fines and penalties will be assessed," Christopher Turnure, an analyst at JPMorgan, said in a note Thursday. "We appreciate the severity of the fires and the legal challenges of operating in California, but estimate this loss of value as approaching a worst-case scenario for PCG shares."

8       128.   Similarly, on the same date, *SF Gate* published an article observing: "[T]**he state**

9 **agency that regulates utilities has told PG&E to save every piece of damaged equipment**

10 **from the area as evidence for the investigations to come**." The article concluded by stating

11 that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company**

12 **spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money –

13 all of it coming from PG&E's customers – **may not have been enough**."[23]

14       129.   Investors started to be concerned regarding whether PG&E violated any

15 regulations with respect to the North Bay fires. For example, Wells Fargo stated in its analyst

16 report the very next day:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

---

[23] https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 239 of 1229

130.     Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

**2.     October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)     The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

131.     Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading. Therein, the Company stated in relevant part:

**Investigation of Northern California Fires**

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation**.

It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected**.

132.     On these disclosures, PG&E's share price continued its decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same two-day period, it experienced unusually heavy trading volume of over 68.5 million shares.

**(b)     Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

133.     Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires. Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability

1   signaled to the market that at least some of the North Bay Fires were caused by PG&E's

2   negligence or worse. For example, a Guggenheim stock analyst published a report that day

3   reacting to this news, noting that PG&E "had slid even further in the early afternoon actually as

4   well, following the company's 8-K disclosing the utility's $800mm in liability insurance, which

5   we noted had not been disclosed previously (since it had been renewed following the Butte

6   fire)."

7        134.    PG&E's announcement and resulting share price decline were proximately caused

8   by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

9        **3.    December 20, 2017 – Corrective Disclosure and/or Materialization of
             Concealed Risk**

10

11            **(a)    The Market Continued to Learn the Extent and Effects of
                        PG&E's Responsibility for the North Bay Fires**

12       135.    On December 20, 2017, after the market closed, PG&E issued a press release

13   titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and

14   Potential Liabilities Associated with Northern California Wildfires." The filing also included, as

15   exhibit 99.1, a press release in which the Company announced that it would be suspending its

16   quarterly cash dividend. In the press release, PG&E stated in pertinent part:

17            **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG)
              today announced that its Board of Directors has determined to
18            **suspend the quarterly cash dividend on the Corporation's
              common stock**, beginning with the fourth quarter of 2017, **citing
19            uncertainty related to causes and potential liabilities associated
              with the extraordinary October 2017 Northern California
20            wildfires**.

21            In addition, the Board of Directors of the Corporation's utility
              subsidiary, Pacific Gas and Electric Company, determined to
22            suspend the dividend on the utility's preferred stock, beginning
              with the three-month period ending Jan. 31, 2018, citing the same
23            uncertainty.

24            No causes have yet been identified for any of the unprecedented
              wildfires, which continue to be the subject of ongoing
25            investigations.

26            However, California is one of the only states in the country in
              which courts have applied inverse condemnation **to events caused
27            by utility equipment**. This means that if a utility's equipment is
              found to have been a substantial cause of the damage in an event
28            such as a wildfire - even if the utility has followed established
              inspection and safety rules - **the utility may still be liable for**

Case 19-30088   Doc# 14299-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
241 of 1229

1

**property damages and attorneys' fees associated with that event**.

2

3

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

4

5

6

7        136.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on

8    December 21, 2017, the following trading day. The stock experienced its heaviest single-day

9    trading volume of the Class Period that day, with over 52 million shares trading hands.

10       137.    Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶90),

11   investors were shocked by this unexpected suspension of the dividends due to Defendants'

12   intervening false reassurances of progress on safety and compliance with safety regulations.

13   Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its

14   dividend due to the Company's "***progress on safety***." Even more recently, on October 31, 2017,

15   PG&E had reassured investors that it "***follows all applicable federal and state vegetation***

16   ***clearance requirements and performs regular power line tree safety activities in accordance***

17   ***with industry standards, guidelines, and acceptable procedures that help to reduce outages or***

18   ***fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly

19   reassured investors that it had "***doubl[ed]***" its vegetation management expenditures.

20   Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained

21   concealed from the market.

22              **(b)     Market Commentators Confirmed the Proximate Cause of
                           PG&E's Share Price Decline on December 20, 2017**

23

24       138.    When PG&E announced it would suspend its dividend entirely, investors

25   understood that as a revelation that PG&E would bear a higher level of responsibility, and thus

     liability, for the North Bay Fires.

26

27       139.    For example, a RBC Capital Markets analysts report issued on December 21,

28   2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend

---

1   the dividend. **This unexpected decision suggests greater risk than we had assumed**

2   **surrounding regulatory treatment of the October 2017 Northern California wildfires**."

3       140.    Similarly, an analyst report issued by Evercore ISI the same day stated:

4               On the 3Q17 call PCG indicated company operations were
                conducted properly leading up to and after the fire. . . . PCG also
5               indicated they found instances of wires down, vegetation near PCG
                facilities and some broke poles. PCG reiterated the company
6               routinely inspects, maintains, and replaces poles, and tests and
                treats wood poles on a frequency that significantly exceeds CPUC
7               requirements. The company claims to have one of, if not the most
                comprehensive vegetation management programs in the country.

8

9       141.    PG&E's suspension of its dividend and resulting share price decline were

10  proximately caused by PG&E's inadequate safety practices and violations that resulted in the

    North Bay Fires.

11

12          **4.      May 25, 2018 – Corrective Disclosure and/or Materialization of
                      Concealed Risk**

13              **(a)      The Market Continued to Learn the Extent and Effects of
                           PG&E's Responsibility for the North Bay Fires**

14

15      142.    On May 25, 2018, Cal Fire issued a press release announcing the cause of four

16  wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

17          **CAL FIRE Investigators Determine Cause of Four Wildfires in
            Butte and Nevada Counties**

18          Sacramento - After extensive and thorough investigations, CAL
            FIRE investigators have determined that four Northern California
19          wildfires in last year's October Fire Siege were caused by trees
            coming into contact with power lines. The four fires, located in
20          Butte and Nevada counties, are the first fire investigations from
            last October to be completed.

21
            CAL FIRE investigators were dispatched to the fires last year and
22          immediately began working to determine their origin and cause.
            The Department continues to investigate the remaining 2017 fires,
23          both in October and December, and will release additional reports
            as they are completed.

24
            The October 2017 Fire Siege involved more than 170 fires and
25          charred more than 245,000 acres in Northern California. More than
            11,000 firefighters from 17 states helped battle the blazes.

26
            Below is a summary of the four completed investigations:

27
28              •   The La Porte Fire, in Butte County, started in the early
                    morning hours of Oct. 9 and burned a total of 8,417 acres,
                    destroying 74 structures. There were no injuries to civilians

CONSOLIDATED CLASS ACTION COMPLAINT                                                          44
CIVIL ACTION NO. 3-18-CV-03509-RS

or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

143. Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. The filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be substantial."

144.    On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 5.7 million shares changing hands on May 29, 2018.

> **(b)    Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018**

145.    Analysts were surprised by the results of the Cal Fire reports. For example, Deutsche Bank stated in its May 28, 2018 report:

> From the investor perspective the market should not be particularly surprised that PG&E's lines have been found to be involved in starting the fires. **That said, the fact that this was the case in all four of the fires – and that violations were found in three of the four instances – will likely be seen as a negative data point.** Reading through the LaPorte fire investigation for other data points, investors may be concerned to note that the wind speeds around the time of the ignition do not seem to have been particularly high – with a maximum gust of 29mph.

146.    One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

147.    Accordingly, the new information contained in these disclosures, including the severity of PG&E's conduct and the role of its violations of California safety laws in causing the North Bay Fires, proximately caused PG&E's share price decline.

> **5.    June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

148.    On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 245 of 1229

**CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

**Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

149.   While this news release did not discuss specific violations found, it disclosed that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

1

          (a)      **The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers**

2

3

150.     By stating that "CAL FIRE investigators determined the Pythian Fire was caused

by a downed powerline after PG&E attempted to reenergize the line," this press release revealed

4

that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

5

          (b)      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

6

7

151.     On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May

8

Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that

9

following an investigation into the causes of wildfires "that altogether killed 44 people,

10

consumed thousands of homes and racked up an estimated $10 billion in damages" in October

11

2017, California's fire agency "found evidence of alleged violations of law by PG&E in

12

connection with" the fires. Specifically, the state's investigation found "that PG&E equipment

13

caused at least 12 of the wine country blazes."

14

152.     Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a

15

Current Report on Form 8-K with the SEC. The filing quoted extensively from the June 8, 2018

16

Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the

17

relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight

18

of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of

19

state law." The filing also admitted that Defendants expected to "record a **significant liability**

20

**for losses associated with**" at least 14 of the North Bay Fires, as follows:

21

          Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:

22

23

- for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

24

25

26

27

28

- for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

153.    Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.

**(c)    Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018**

154.    The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company**." Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs**." Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring tis evidence to the District Attorney – likely a strong indictment to potential criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted that "all signs seem to point to PCG being imprudent operators in the majority of instances, which would therefore mean it should assume liability." Accordingly, the number and range of safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

155.    On June 11, 2018, *Bloomberg* published an article reporting: "The company said Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in five months at the open" of trading. The article also noted that "[t]he alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was

Case 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 249 of 1229

convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California."

156.    Accordingly, the new information contained in these June 8 and 11 disclosures, including the severity of PG&E's conduct, the role of its violations of California safety laws in causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately caused PG&E's share price decline.

                    *        *        *

157.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VIII.    POST-CLASS PERIOD DEVELOPMENTS

158.    As of the date of this filing, thousands of separate plaintiffs have filed hundreds of complaints against PG&E in relation to the North Bay Fires. PG&E has been producing discovery in connection with those cases and is scheduled to proceed to trial on certain claims in early 2019.

159.    As of the date of this filing, PG&E is still under investigation for potential criminal violations of California's safety regulations. In addition, Cal Fire has yet to release its report on the cause of the final North Bay Fire, the Tubbs Fire.

160.    During the October 2018 wildfire season, PG&E chose to shut off electricity for nearly 60,000 Northern California customers, acknowledging that doing so was necessary to prevent further wildfires from occurring. PG&E's spokesperson, Paul Doherty, simply commented on this drastic measure – in an implicit admission that PG&E's power lines are still not safe – that "We're adapting our electric system our operating practices to improve safety and reliability. That's really the bottom line for us."

161.    On August 16, 2018, PG&E released its 2018 "Corporate Responsibility and Sustainability Report." Unlike the Company's reports from 2015, 2016, and 2017 alleged above, its most recent iteration **no longer** represents to investors that PG&E's vegetation management is

in "compliance with relevant laws," or that its vegetation management "complies with state and federal regulations."

## IX.   SCIENTER

162.    Throughout the Class Period, Defendants acted with scienter by either knowingly misleading the public about PG&E's financial health and compliance with relevant safety rules and regulations, or doing so in a deliberately reckless manner.

### A.    PG&E's  Safety Practices Continued to Violate the Law Even After Being on Notice of the Butte Fire Safety Violations

163.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations. At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.

164.    Even after the disastrous Butte Fire revealed the seriousness of PG&E's fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers made any changes to improve safety or compliance. Thus, they either knew, or should have presumed, that its violations continued unabated.

### B.    Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It

165.    During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the

1   Individual Defendants. For instance, the PG&E Board's Finance Committee was alleged in a

2   separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively

3   involved in, and responsible for, assisting the Boards in their oversight of safety risk through its

4   review of strategies to manage the largest individual risks identified in the enterprise risk

5   management program," including the risk of "wildfire." Indeed, because the Company faced the

6   possibility of strict liability for property damages caused by wildfires, and such liability could be

7   extraordinary, wildfire safety was a particular focus of the Individual Defendants, who spoke

8   personally on the subject with investors and regulators throughout the Class Period. Further,

9   Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned

10  the Company's core operations. Therefore, the Individual Defendants, by virtue of the

11  importance of safety to the Company and their positions as its leaders, reasonably had

12  knowledge about PG&E's safety and regulatory failures during the Class Period.

13      166.    As discussed in Sections IV.C. and IV.D., *supra*, the Individual Defendants

14  repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and

15  results. For example, they kept investors apprised about how many hundreds of thousands of

16  trees the Company was trimming and removing, including how many thousands were "dead or

17  dying." Not only that, but the Individual Defendants also inflated these numbers over time

18  without explanation, raising the number of trees supposedly trimmed or removed from 1.2

19  million to 1.4 million. In both reporting and inflating these numbers, the Individual Defendants

20  showed they knew that vegetation management and compliance was important to investors.

21      167.    A core operation concerns a company's primary products or services, and it

22  extends to matters of importance that might significantly impact the company's bottom line.

23  There is no question that PG&E's safety policies and procedures were critically important to the

24  Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it

25  is also notable that PG&E is potentially facing $17 billion of liability due to its failures, and that

26  the California legislature has imposed a regulatory regime that imposes significant liability for

27  PG&E's vegetation management failures. This is strong evidence of the centrality of the

28  Company's wildfire safety and compliance regime.

168.     In a separate lawsuit that was filed in connection with the Butte Fire, it was publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly revealed – that Individual Defendants Williams and Hogan both served on an Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues. Further, according to the parties litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another individual's[24] deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." As noted above, this means noncompliance for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety violations in the nature of trees touching its powerlines at any given time. *See* Section IV.F.4.

169.     Just months before the North Bay Fires broke out, Judge Thelton E. Henderson in the Northern District of California ordered that PG&E work with federal prosecutors to retain a monitor to oversee the Company's compliance and ethics programs, and implement "policies and procedures that address threats caused by vegetation," in light of the deadly San Bruno explosion. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175, Order at 3, ECF No. 916, (N.D. Cal. Jan. 26, 2017). As part of the sentencing process, PG&E had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's safety and compliance, such that "high-level personnel of the organization ensure its effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, ECF No. 906 (N.D. Cal. Jan. 9, 2017).

170.     Because the Defendants represented that they closely monitored PG&E's safety and compliance, they knew – or were deliberately reckless in not knowing – that PG&E's level of safety with respect to vegetation management and wildfire prevention did not comport with state law.

---

[24] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance Supervisor.

Case: 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 253 of 1229

**C.     PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations**

**1.     PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants**

171.    PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E states that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[25]

172.    This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[26] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[27] The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[28] PG&E's 2016 Corporate Responsibility and Sustainability Report announced that a Margaret Mooney Award for Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a new technology that provides work crews with a dramatically enhanced data visualization of **work in progress**." The report further mentioned "[t]he development of an SAP-based **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus, PG&E used sophisticated software to kept track of safety regulation noncompliance for its powerlines and poles.

---

[25] http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/, last visited on November 8, 2018.

[26] http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx, last visited on November 8, 2018.

[27] *Id.*

[28] *Id.*

173.   PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's data.[29] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he status of a pole's inspection is tracked in SAP [database technology] so the inspection team knows when it's time to inspect each pole**. That information flows into the enterprise platform PG&E built, which pushes electronic lists to inspectors' iPad Pros."[30] The data collected is extensive enough to enable "an enterprise data and analytics organization that is using advanced analytics to predict when poles will fail."[31] And by 2017, the PG&E Corporate Responsibility and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze trends in environmental compliance. Thus, PG&E's records of safety regulation violations were stored in a readily accessible database.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

174.   Consequently, to the extent that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.

## 2.   PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored

175.   PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Individual Defendants touted their knowledge and familiarity with this practice at the Company, indicating either they personally received information of safety violations this way, or they knew where to find such information but deliberately avoided it.

---

[29] https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-data-request-form.pdf, last visited on November 8, 2018.

[30] https://www.informationweek.com/big-data/pgandes-winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251, last visited on November 8, 2018.

[31] *Id.*

176.     On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First Natural Gas Utility to Receive Process Safety." It contained a description of an internal Company policy termed "**The Corrective Action Program, a program that empowers employees at all levels of PG&E to speak up and identify issues that are in need of improvement**."

177.     On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on PG&E's culture of encouraging "every employee" to report safety violations up the chain of command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**
>
> We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> * * *
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

178.     Thus, PG&E went significantly beyond making employees feel safe "report[ing] things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up" "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 256 of 1229

1   of what employees actually reported. Indeed, he stated that he was involved in "publicly

2   recogniz[ing] employees when they do speak up."

3       179.    As a result, the persistence of safety violations cannot be attributed to their being

4   unknown. Rather, such problems persisted because of what the Individual Defendants did – or

5   neglected to do – to mitigate safety problems once they were reported. Indeed, PG&E's long

6   history of inadequate safety compliance did not stem from a lack of information but rather a lack

7   of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see*

8   Sections IV.B.-F., *supra*).

9       180.    Earley's statement also affirms the direct connection between PG&E's treatment

10  of safety issues, the Company's long-term financial results, and the size of its dividend. Indeed,

11  as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period

12  (as alleged above, *see* Section VII, *supra*), the market understood the connection between the

13  Company's safety violations and the foreseeable, material detriment they would have on the

14  Company's financial results and dividend.

15          **D.    PG&E's Compliance Statements Were Authorized by Defendant Kane and
                    Made under Her Ultimate Authority**

16

17      181.    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer

18  ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the

19  Class Period. These statements were approved and made under her ultimate authority as CECO.

20      182.    PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and

21  compliance program and performance,"[32] a role which Kane assumed on May 18, 2015 and held

22  through the end of the Class Period. As CECO, she was responsible for both managing

23  implementation of PG&E's legal compliance efforts as well as overseeing compliance

24  monitoring and reporting during almost the entirety of the Class Period. When PG&E was being

25

26      [32] PG&E Press Release,
    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints

27  _julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_
    officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-

28  class_corporate_ethics_program

1  sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its
2  January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the
3  Company-wide compliance and ethics program, including **compliance management**, risk-
4  mitigation and **reporting**; **overseeing employee-investigatory processes**; and reinforcing
5  PG&E's ethics and compliance culture, among many other compliance and ethics program
6  elements." The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E
7  Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's
8  Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy
9  Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's
10  and PG&E's Boards."

11       183.    Accordingly, Kane was apprised of any compliance violations reported within the
12  Company, including violations reported by PG&E's lower-level employees and logged in
13  PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors
14  that it was in compliance (*e.g.*, ¶76 (Misstatement No. 2, October 16, 2015); ¶82 (Misstatement
15  No. 4, October 6, 2016); ¶86 (Misstatement No. 5, August 9, 2017); ¶100 (Misstatement No. 9,
16  October 31, 2017); ¶108 (Misstatement No. 12, November 5, 2017); and ¶111 (Misstatement No.
17  13, May 25, 2018)).

18       184.    The CECO position was sufficiently senior such that Kane's scienter can be
19  imputed to the Company regarding knowledge of legal compliance with California vegetation
20  management and safety regulations.

21       185.    Additionally, because Kane reported directly to the CEO in her capacity as
22  CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and Williams.[33]
23  Because Kane was institutionally installed to advise the CEO of PG&E's compliance and safety,
24  Kane would have told Earley and Williams what she knew regarding the Company's
25  noncompliance with vegetation management regulations, or Earley and Williams would have

26
27  _____
    [33] Further, she reported directly to the Company's Chairman of the Board, a position which
28  was also occupied by Earley during the Class Period.

been deliberately reckless in speaking on the subjects of compliance and safety without input from their CECO.

**E.    The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors**

186.    PG&E is currently facing approximately **$17 billion** in liability over the North Bay Fires that began on October 8, 2017. This immense exposure dwarfs the $1.6 billion that the Company earned in the full year 2017. In fact, it would take PG&E more than ten years of similar earnings to pay off such a liability.

187.    It is clear from Defendants' statements and actions that PG&E's liability over the North Bay Fires could have severe repercussions for the Company as a whole, and consequently for the careers of the Individual Defendants.

188.    One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [P&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol."

189.    NBC News reported on February 2, 2018 that after the North Bay Fires broke out, PG&E "sent out letter[s] to dozens of its non-profit 'community partners' warning them that a potentially 'unlimited' North Bay wildfire liability could imperil funding unless the legislature eases that legal burden." In those letters, PG&E's external affairs vice president Travis Kiyota implicitly threatened the funding for charitable endeavors: "This type of unlimited liability may affect our charitable giving and other non-profit community activities."

190.    On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company."

191.    On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

192.    The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part in causing the North Bay Fires.

193.     It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements," and that "we've doubled the amount that we've invested in veg[etation] management." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

194.     Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically. When PG&E faced a substantially **lower** liability for its role in the deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

**X.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET**

195.     Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Lead Plaintiff and other members of the Class purchased PG&E common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

196.     At all relevant times, the market for PG&E shares was efficient for the following reasons, among others:

1          (a)     PG&E stock met the requirements for listing, and was listed and actively

2    traded on the NYSE, a highly efficient and automated market;

3          (b)     As a regulated issuer, PG&E filed periodic public reports with the SEC

4    and the NYSE;

5          (c)     PG&E regularly communicated with public investors via established

6    market communication mechanisms, including through the regular dissemination of press

7    releases on the major newswire services and through other wide-ranging public disclosures, such

8    as communications with the financial press, securities analysts and other similar reporting

9    services; and

10          (d)     PG&E was followed by numerous securities analysts employed by major

11    brokerage firms who wrote reports that were distributed to the sales forces and certain customers

12    of their respective brokerage firms. Each of those reports was publically available and entered

13    the public marketplace.

14          197.     As a result of the foregoing, the market for PG&E common stock promptly

15    digested current information regarding PG&E from publicly available sources and reflected such

16    information in PG&E's stock price. Under these circumstances, all purchasers of PG&E common

17    stock during the Class Period suffered similar injury because of their purchases of common stock

18    at artificially inflated prices and a presumption of reliance applies.

19          198.     Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

20    Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

21    as Defendants' misstatements throughout the Class Period included omissions, in that they failed

22    to inform investors of PG&E's safety and regulatory failures.

23    **XI.     CLASS ACTION ALLEGATIONS**

24          199.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25    Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

26    otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

27    and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

28    Class are Defendants herein, the officers and directors of the Company, members of their

1    immediate families and their legal representatives, heirs, successors or assigns and any entity in

2    which Defendants have or had a controlling interest.

3          200.    The members of the Class are so numerous that joinder of all members is

4    impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE.

5    While the exact number of Class members is unknown to Lead Plaintiff at this time and can be

6    ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or

7    thousands of members in the proposed Class. Record owners and other members of the Class

8    may be identified from records maintained by PG&E or its transfer agent and may be notified of

9    the pendency of this action by mail, using the form of notice similar to that customarily used in

10   securities class actions.

11         201.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

12   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

13   federal law that is complained of herein.

14         202.    Lead Plaintiff will fairly and adequately protect the interests of the members of

15   the Class and has retained counsel competent and experienced in class and securities litigation.

16   Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

17         203.    Common questions of law and fact exist as to all members of the Class and

18   predominate over any questions solely affecting individual members of the Class. Among the

19   questions of law and fact common to the Class are:

20              •   whether the federal securities laws were violated by Defendants' acts as

21                  alleged herein;

22              •   whether statements made by Defendants to the investing public during the

23                  Class Period misrepresented material facts about the financial condition,

24                  business, operations, and safety of PG&E;

25              •   whether Defendants caused PG&E to issue false and misleading financial

26                  statements during the Class Period;

27              •   whether Defendants acted knowingly or recklessly in issuing false and

28                  misleading financial statements;

- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

204.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

205.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶195-197.

206.     Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XII.    CAUSES OF ACTION

### FIRST CLAIM

**For Violation of Section 10(b) of
The Exchange Act and Rule 10b-5 Against All Defendants**

207.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208.     This Count is asserted against PG&E and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

209.     During the Class Period, PG&E and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210.     PG&E and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

211.     PG&E and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

212.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

213.     As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the

1    statements described above and/or the integrity of the market price of PG&E securities during

2    the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result

3    of PG&E's and the Individual Defendants' false and misleading statements.

4        214.    Had Lead Plaintiff and the other members of the Class been aware that the market

5    price of PG&E securities had been artificially and falsely inflated by PG&E's and the Individual

6    Defendants' misleading statements and by the material adverse information which PG&E's and

7    the Individual Defendants did not disclose, they would not have purchased PG&E's securities at

8    the artificially inflated prices that they did, or at all.

9        215.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

10   members of the Class have suffered damages in an amount to be established at trial.

11       216.    By reason of the foregoing, PG&E and the Individual Defendants have violated

12   Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the

13   plaintiff and the other members of the Class for substantial damages which they suffered in

14   connection with their purchase of PG&E securities during the Class Period.

15                                   **SECOND CLAIM**

16                          **For Violation of Section 20(a) of**
                      **The Exchange Act Against PG&E Corporation**
17

18       217.    Lead Plaintiff repeats and realleges each and every allegation contained in the

     foregoing paragraphs as if fully set forth herein.
19

20       218.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against

21   Defendant PG&E Corporation.

22       219.    During the Class Period, PG&E Corporation participated in the operation and

23   management of the Utility. PG&E Corporation conducted and participated, directly and

24   indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of

25   PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's

26   directors also sat on the board of PG&E Corporation.[34]  Further, both companies filed joint

27   _____

28   [34] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly,
     Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo,

Case 3:30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
265 of 1229

annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both** Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

220.     Through its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to disseminate accurate and truthful information with respect to the Utility's financial condition and results of operations, and to correct promptly any public statements issued by the Utility which had become materially false or misleading.

221.     Because of its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and did, control the contents of the various reports, press releases and public filings which the Utility disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

222.     By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

---

*(continued)*
Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Johns was a director of the Utility only.

2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos and Williams were directors of the Utility only.

2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the Utility only.

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 266 of 1229

1

2

**THIRD CLAIM**

**For Violation of Section 20(a) of
The Exchange Act Against The Individual Defendants**

3

4

223.    Lead Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

5

6

224.    During the Class Period, the Individual Defendants participated in the operation

and management of PG&E.  The Individual Defendants conducted and participated, directly and

7

8

indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they

knew the adverse non-public information regarding the Company's financial condition and

9

10

noncompliance with relevant laws and regulations.

11

225.    As officers and/or directors of a publicly owned company, the Individual

12

Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's

13

financial condition and results of operations, and to correct promptly any public statements

14

issued by PG&E which had become materially false or misleading.

15

226.    Because of their positions of control and authority as senior officers, the

16

Individual Defendants were able to, and did, control the contents of the various reports, press

17

releases and public filings which PG&E disseminated in the marketplace during the Class Period.

18

Throughout the Class Period, the Individual Defendants exercised their power and authority to

19

cause PG&E to engage in the wrongful acts complained of herein. The Individual Defendants

20

therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the

21

Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

22

artificially inflated the market price of PG&E securities.

23

227.    By reason of the above conduct, the Individual Defendants are liable pursuant to

24

Section 20(a) of the Exchange Act for the violations committed by PG&E.

**FOURTH CLAIM**

25

**Alter Ego Liability for Violation of Section 10(b) of
The Exchange Act and Rule 10b-5 Against PG&E Corporation**

26

27

228.    Lead Plaintiff repeats and realleges each and every allegation contained in the

28

foregoing paragraphs as if fully set forth herein.

229.    PG&E Corporation is jointly and severally liable for the misstatements and omissions of the Utility, insofar as:

(a)    PG&E Corporation and the Utility operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

(b)    PG&E Corporation and the Utility do not operate as completely separate entities, but rather integrate their resources to achieve a common business purpose;

(c)    the Utility is so organized and controlled, and its decisions, affairs, and business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

(d)    PG&E Corporation's and the Utility's officers and management are intertwined and do not act completely independently of one another;

(e)    PG&E Corporation has control and authority to choose and appoint the Utility's board members as well as its other top officers and managers;

(f)    PG&E Corporation and the Utility are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

(g)    PG&E Corporation and the Utility have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

(h)    PG&E Corporation and the Utility have unified personnel policies and practices and/or a consolidated personnel organization or structure;

(i)    PG&E Corporation and the Utility are represented by common legal counsel;

(j)    PG&E Corporation and the Utility acknowledged in their joint 10-K statement for the year 2015 that eight separate officers were "executive officers of both PG&E Corporation and the Utility;"

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 268 of 1229

1           (k)      PG&E Corporation and the Utility acknowledged in their joint 10-K

2 statement for the year 2016 that nine separate officers were "executive officers of both PG&E

3 Corporation and the Utility;"

4           (l)      PG&E Corporation's officers, directors, and other management make

5 policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

6 directions and making decisions for the Utility;

7           (m)      PG&E Corporation's officers, directors, and other management direct

8 certain financial decisions for the Utility including the amount and nature of capital outlays;

9           (n)      PG&E Corporation's written guidelines, policies, and procedures control

10 the Utility's employees, policies, and practices;

11           (o)      PG&E Corporation files consolidated earnings statements factoring in all

12 revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

13 tax relief; and

14           (p)      PG&E Corporation generally directs and controls the Utility's relationship

15 with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

16 for the benefit of PG&E Corporation.

17      230.    For purposes of this litigation, it would be inequitable to treat the misstatements

18 and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

19      231.    By reason of the above allegations, any misstatements made by the Utility –

20 including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

21 Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

22 the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

23 members of the Class for substantial damages which they suffered in connection with their

24 purchase of PG&E securities during the Class Period.

25                         **PRAYER FOR RELIEF**

26      WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

27      A.     Determining that this action may be maintained as a class action under Rule 23 of

28 the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

1      B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class

2 by reason of the acts and transactions alleged herein;

3      C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and

4 post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

5 and

6      D.     Awarding such other and further relief as this Court may deem just and proper.

7                  **DEMAND FOR TRIAL BY JURY**

8     Lead Plaintiff hereby demands a trial by jury.

9

10 DATED: November 9, 2018            */s/ Thomas A. Dubbs*

Thomas A. Dubbs (*pro hac vice*)
Louis Gottlieb (*pro hac vice*)
Jeffrey A. Dubbin (#287199)
James L. Ostaszewski (*pro hac vice*)
Wendy Tsang (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
jdubbin@labaton.com
jostaszewski@labaton.com
wtsang@labaton.com

*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico*

**KERR & WAGSTAFFE LLP**
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
101 Mission Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
Email: wagstaffe@kerrwagstaffe.com
busch@kerrwagstaffe.com

*Liaison Counsel for the Class*

1

**CERTIFICATE OF SERVICE**

2        I HEREBY CERTIFY that on November 9, 2018, I electronically filed the foregoing with

3   the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

4   counsel of record.

5                                   /s/ Thomas A. Dubbs
                                    THOMAS A. DUBBS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
CIVIL ACTION NO. 3:18-CV-03509-RS

# Exhibit 91

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
272 of 1229

1  **LABATON SUCHAROW LLP**
   THOMAS A. DUBBS (*pro hac vice*)
2  LOUIS GOTTLIEB (*pro hac vice*)
   JEFFREY A. DUBBIN (#287199)
3  JAMES L. OSTASZEWSKI (*pro hac vice*)
   WENDY TSANG (*pro hac vice*)
4  140 Broadway
   New York, New York 10005
5  Telephone: (212) 907-0700
   Facsimile: (212) 818-0477
6  Email: tdubbs@labaton.com
   lgottlieb@labaton.com
7  jdubbin@labaton.com
   jostaszewski@labaton.com
8  wtsang@labaton.com
   *Counsel for Lead Plaintiff the Public Employees Retirement*
9  *Association of New Mexico and Lead Counsel for the Class*

10 **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
   JAMES M. WAGSTAFFE (#95535)
11 FRANK BUSCH (#258288)
   100 Pine Street, Suite 725
12 San Francisco, California 94111
   Telephone: (415) 357-8900
13 Facsimile: (415) 371-0500
   Email: wagstaffe@wvbrlaw.com
14 busch@wvbrlaw.com
   *Liaison Counsel for the Class*

15

16                **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
17                    **SAN FRANCISCO DIVISION**

18 |                                      | Civil Action No. 3:18-cv-03509-RS |

19 | IN RE PG&E CORPORATION               | SECOND AMENDED CONSOLIDATED CLASS |
   |                                      | ACTION COMPLAINT FOR VIOLATION OF |
20 | SECURITIES LITIGATION                | THE FEDERAL SECURITIES LAWS |

21 |                                      | JURY TRIAL DEMANDED |

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

1

# TABLE OF CONTENTS

2    I.     INTRODUCTION ................................................................................................. 1

3          A.  Summary of the Case .................................................................................... 1

4          B.  PG&E's Failure to Comply with Safety Regulations Proximately Caused
              Wildfires in 2017 and Investors' Consequent Losses .................................... 2

5          C.  PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
6              Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
              Losses ............................................................................................................ 4

7                1.  PG&E Continued to Make False and Misleading Statements and
8                   Omissions .......................................................................................... 4

9                2.  Evidence Emerged that a Defective PG&E Electrical Transmission Line
                   Tower, and Vegetation Underneath, Caused the Camp Fire ................................. 6

10         D.  Claims Being Asserted ................................................................................... 8

11   II.    JURISDICTION AND VENUE ........................................................................... 9

12   III.   PARTIES ............................................................................................................. 9

13   IV.   SUBSTANTIVE ALLEGATIONS ..................................................................... 11

14          A.  PG&E Operates Within a Robust Legal Regime ........................................... 11

15                1.  California Law Required PG&E to Maintain a Safe Distance Between Its
16                   Electrical Equipment and Nearby Vegetation .................................... 11

17                2.  California Law Required PG&E to Safely Maintain Its Electrical
18                   Equipment and Infrastructure ........................................................... 12

19                3.  PG&E Is Regulated by the CPUC ...................................................... 13

20                      (a)  CPUC's General Orders 95 and 165 Impose Strict Safety
                         Regulations on PG&E ............................................................ 13

21                      (b)  CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to
22                         Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol .................... 14

23                      (c)  PG&E Must Follow CPUC's Regulations Under Penalty of Law ............. 16

24                4.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
                   California for Wildfires ...................................................................... 16

25                5.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
26                   the Cost of Wildfires It Causes If It Could Prove That It Acted Reasonably
                   and Prudently ................................................................................... 17

27          B.  PG&E's Vegetation Management Expenditures Did Not Materially Change
              from Year to Year During the Class Period, Let Alone Double at Any Point ............ 17

28

C. PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period ....................................................................................19

D. After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal ...................................................................................................20

E. PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ..................20

   1. PG&E Used Reclosers to Prioritize Convenience Over Safety ...........................20

   2. PG&E Concealed Its Use of Reclosers from Investors During the Class Period ......................................................................................................21

F. PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period.......................................22

   1. PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ................23

   2. PG&E's Unsafe and Knowing Noncompliance with Safety Regulations Continued Through the Class Period ....................................................................23

   3. PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015 ................................................................................................24

   4. PG&E's Compliance Measures Allowed More than One Million Vegetation Management Violations During the Class Period ...........................25

   5. PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them .......................27

G. Investors Could Not Have Reasonably Expected The Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire.............................................................................................................29

   1. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires .........................................29

   2. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire ................................................30

      (a) The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations ..................................................................................30

      (b) The Camp Fire's Second Ignition Point Was Also Caused by PG&E Safety Violations ..................................................................................31

H. PG&E's ESRB-8 Shutoff Protocol Was Illusory, and Its Failure to Adhere Thereto Was a Proximate Cause of the Camp Fire .........................................32

   1. PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ...................................................................................35

      (a) Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ...........................35

(b) Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ........................................................... 37

(c) Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff ................................................ 37

(d) Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ........................................................... 38

2. All of the Weather Criteria Weighed in Favor of Shutting Off the Power .......... 39

(a) Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels .......................................................................... 41

(b) Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ........ 42

(c) Criterion 5: Site-Specific Conditions Further Favored Shutoff .................. 43

3. PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power ................................................ 43

V. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...... 45

A. Overview of Defendants' Fraudulent Course of Conduct ........................................... 45

B. Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ....................................... 46

1. April 29, 2015 – Misstatement No. 1 ................................................... 46

2. October 16, 2015 – Misstatement No. 2 ................................................ 47

3. November 18, 2015 – Misstatement No. 3 ............................................. 49

4. October 6, 2016 – Misstatement No. 4 ................................................. 49

5. August 9, 2017 – Misstatement No. 5 .................................................. 51

C. Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires ................................................. 52

1. May 23, 2016 – Misstatement No. 6 .................................................... 53

2. November 4, 2016 – Misstatement No. 7 ............................................... 54

3. May 31, 2017 – Misstatement No. 8 .................................................... 55

D. After the North Bay Fires Erupted, the Truth Began to Emerge .............................. 56

E. After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ........................................................... 57

1. October 31, 2017 – Misstatement No. 9 ................................................ 57

2.   November 2, 2017 – Misstatement No. 10 ...................................... 58

3.   November 2, 2017 – Misstatement No. 11 ...................................... 60

4.   November 5, 2017 – Misstatement No. 12 ...................................... 61

5.   May 25, 2018 – Misstatement No. 13 ............................................ 63

F.   While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol ................................... 64

1.   June 8, 2018 – Misstatement No. 14 ............................................. 65

2.   June 8, 2018 – Misstatement No. 15 ............................................. 66

3.   September 27, 2018 – Misstatement No. 16 .................................. 67

4.   October 9, 2018 – Misstatement No. 17 ....................................... 69

5.   October 9, 2018 – Misstatement No. 18 ....................................... 70

6.   November 9, 2018 – Misstatement No. 19 .................................... 71

VI.   MATERIALITY .......................................................................................... 71

VII.   LOSS CAUSATION .................................................................................. 73

A.   Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock ....................................................... 73

B.   PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires ........................................................................................... 73

C.   PG&E's Safety Violations Proximately Caused the Devastating Camp Fire ............ 74

D.   When the Market Learned the Truth, the Price of PG&E's Common Stock Fell Dramatically ........................................................................ 74

1.   October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................ 74

(a)   The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ....................................... 74

(b)   Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017 ....................................... 75

2.   October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................ 77

(a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ............................ 77

(b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017 ........................................................ 77

3.  December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 78

(a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ........................................ 78

(b)  Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017 ................................ 79

4.  May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 80

(a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ........................................ 80

(b)  Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018 ........................................................................................ 82

5.  June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 82

(a)  The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers ........................................................................................ 84

(b)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ........................................ 85

(c)  Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018 ........................................................................................ 86

6.  November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 87

(a)  The Market Began to Learn the Extent and  Effects of PG&E's Responsibility for the Camp Fire ................................................ 87

(b)  Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline ........................................................ 88

7.  November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 89

(a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ................................................ 89

(b)  Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline. ........................................................ 90

8.  November 14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 91

(a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ............................................................ 91

(b)   Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018 ................................................. 92

9.   November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................ 93

(a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ............................................................ 93

(b)   Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018 ................................................. 94

VIII.   SCIENTER ..................................................................................................... 95

A.   PG&E's  Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ........................................ 95

B.   Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It .................................................................................. 95

C.   The Federal Court Overseeing PG&E's Safety Monitoring Program Is Investigating Whether PG&E Recklessly Caused the Camp Fire in Violation of California Criminal Law and the Company's Parole ................................. 98

D.   PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations .......................................... 99

1.   PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants ............................... 99

2.   PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored ........................................................................................ 101

E.   PG&E's Compliance Statements Were Authorized by Defendant Kane and Made under Her Ultimate Authority ..................................................... 103

F.   The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors ......................................................................... 104

G.   After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up .......................................... 106

IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET ...................................................................................................... 110

X.   CLASS ACTION ALLEGATIONS ................................................................ 111

XI.   CAUSES OF ACTION .................................................................................... 113

Lead Plaintiff Public Employees Retirement Association of New Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), and Anthony F. Earley, Jr., Geisha J. Williams, Nickolas Stavropoulos, Julie M. Kane, Christopher P. Johns, and Patrick M. Hogan (collectively, the "Individual Defendants" and together with PG&E, the "Defendants") based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation conducted by and through its attorneys, which included a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases; media and analyst reports about the Company; and other public information regarding the Defendants. Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

# I.    INTRODUCTION

## A.    Summary of the Case

1.    This federal securities class action arises out of the false and misleading statements that Defendants made to investors from April 29, 2015 through November 15, 2018 (the "Class Period") to conceal the Company's lax wildfire safety practices, including its numerous and widespread violations of California safety regulations for power lines. PG&E's ability to maintain safe power lines, compliant with California safety regulations, is vital to the Company's financial health. One of the most important functions PG&E must perform in this respect is clearing vegetation, including dead or dying trees, away from its power lines as required by California law.  As of July 16, 2018, another important safety regulation requires PG&E to temporarily shut off its power lines when certain dangerous conditions are met that make an area susceptible to wildfires, including high wind speed and low humidity.  PG&E's failure to follow these safety requirements resulted in numerous and widespread wildfires in October 2017 and November 2018, causing enormous loss of life and destruction of property.

Among these fires was the Camp Fire, the deadliest and most destructive wildfire California has ever faced.

2.     Because of PG&E's history of causing wildfires and California's drought conditions, Defendants knew it was essential to assure investors that the Company's wildfire safety measures were adequate and that it complied with applicable laws and regulations.

**B.    PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses**

3.     Throughout the Class Period (April 29, 2015 through November 15, 2018), Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***";

- Its "***vegetation management program . . . compl[ies] with state and federal regulations***";

- "***PG&E follows all applicable federal and state vegetation clearance requirements***" to "***help to reduce*** outages or ***fires caused by trees or other vegetation***"; and

- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[1]

4.     These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires.

5.     The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[2] These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte,

---

[1] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[2] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

1   Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[3] The

2   size of this liability imperiled the financial viability of the Company. In fact, several of

3   Defendants' false and misleading statements were made in the months before PG&E openly

4   expressed its fear that its liability for the North Bay Fires could send the Company into

5   bankruptcy.

6          6.      Of the **seventeen** main North Bay Fires for which the State of California's

7   investigation has been completed by the California Department of Forestry and Fire Protection

8   ("Cal Fire"), the truth emerged over time that **all seventeen** were caused by PG&E equipment.

9   Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson,

10  lightning, fireworks, hikers, children playing with matches, or any other such cause.  Instead, Cal

11  Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

12  California safety regulations – contradicting Defendants' false representations of compliance

13  with those regulations. California's investigation into the eighteenth and final North Bay Fire

14  (the Tubbs Fire, which was the largest and most destructive) remains ongoing.

15         7.      Defendants' false and misleading misrepresentations and omissions came at a

16  crucial time for the Company. As described below, over the past three decades, PG&E caused a

17  series of wildfires and other disasters in California. For example, in September 2015, its

18  violations of California safety regulations regarding vegetation clearance caused a wildfire

19  known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed

20  two people – making it then the seventh most destructive wildfire in California history.

21         8.      Revealingly, just months before the North Bay Fires began, in an April 2017 non-

22  public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation

23  Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we**

24  **have not made any changes as a result of this fire**." Thus, despite being on notice of its

25

26         [3] This $17 billion estimate is approximately six times greater than the second most expensive
       California wildfire, the October 1991 Tunnel Fire in Oakland, which, according to a May 27,

27     2011 article in *Scientific American*, caused $2.687 billion in insured property damage.
       https://www.scientificamerican.com/article/graphic-science-how-much-do-fires-cost-property-

28     damage/ (last visited Dec. 12, 2018)

1    dangerous safety violations and their deadly consequences, neither the Company nor its officers

2    took any steps to improve safety or compliance between the Butte Fire and the far more

3    disastrous North Bay Fires. Over this time period, Defendants either knew or should have known

4    that the Company's wildfire-related safety violations continued unabated.

5         9.    Though the North Bay Fires began on a windy night, they were not the result of

6    an unexpected or unique event. Rather, the circumstance of PG&E causing seventeen (or more)

7    concurrent fires across **nine counties** shows that the Company tolerated numerous and

8    widespread violations of California safety regulations across its territory. As detailed herein, the

9    underlying explanation for these near-simultaneous North Bay Fires is neither unusual weather

10   nor coincidence, but PG&E's failure to comply with even minimal legal requirements.

11   Accordingly, PG&E and its officers knew, or deliberately disregarded, that the Company's

12   power lines were often not in compliance with California safety requirements when making false

13   and misleading statements to the contrary.

14   **C.    PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
          Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
15        Losses**

16        **1.    PG&E Continued to Make False and Misleading Statements and
              Omissions**

17        10.   After the public learned of PG&E's responsibility for the North Bay Fires, the

18   Company faced a new crisis: the widespread belief that it failed to prioritize safety in

19   maintaining its power lines and preventing wildfires.  It also faced a financial crisis, as its

20   liabilities for the North Bay Fires threatened to bankrupt the Company.

21        11.   As a result, PG&E needed the public, including investors, to believe that it would

22   prioritize safety thereafter.  So when Cal Fire announced its conclusions that PG&E caused the

23   preponderance of the North Bay Fires (on June 8, 2018), and PG&E's share price continued to

24   decline as its financial situation deteriorated, PG&E responded that same day by reassuring its

25   investors that, *e.g.*:

26

27

28

- Its "***Programs Overall Met [California]'s High Standards***," including "***Vegetation Management***," and "***meets or exceeds regulatory requirements for pole integrity management***";

- "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, ***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***";

12. Indeed, one month later, on July 16, 2018, PG&E's primary state regulator **mandated** that PG&E formalize and publicize its protocol for proactively turning off its power lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8. The Company announced its response to this new safety requirement on or about September 27, 2018 (the "ESRB-8 Shutoff Protocol"), including:

- "PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. ***It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring***."

- "***PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety***."

13. While the Company was finalizing its protocol, on September 21, 2018, California enacted S.B. 901, a law to rescue PG&E from the threat of bankruptcy due to its responsibility for the North Bay Fires. The resulting law put in place a financial stress test to monitor PG&E's financial health, as well as a method to raise capital should PG&E's liability for the North Bay Fires cause it to fail the test. The same law made it less likely that PG&E would bear the costs of wildfires it caused in 2019 or later.

14. However, the new law did not help the Company bear the financial consequences of any wildfires it might cause in the remaining months of 2018.

15.     Put differently, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018.

16.     PG&E continued to assure the public that it had implemented these measures successfully.  For example, when the news broke on October 9, 2018 that Cal Fire had concluded PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade Fire, the Company attempted to reassure investors by stating:

- "[W]e are continuing to focus on *implementing additional precautionary measures* intended to further reduce wildfire threats, such as *working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas*, and taking other actions to make our system, and our customers and communities, *even safer* in the face of a growing wildfire threat"; and

- "*PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur*."

17.     All of the above statements, and others, were materially false and misleading because PG&E had **not** meaningfully improved its safety practices—as would soon be revealed by a wildfire even more devastating than any of the North Bay Fires.  By pitching the statements to convince the investing public that PG&E had resolved its safety failures and would prioritize safety thereafter, Defendants concealed the true extent to which the Company was exposed to liability for causing further wildfires, inflating PG&E's share price.

    2.     **Evidence Emerged that a Defective PG&E Electrical Transmission Line Tower, and Vegetation Underneath, Caused the Camp Fire**

18.     This continuation of the fraud unraveled when evidence emerged that PG&E was responsible for the Camp Fire, which devastated Northern California in November 2018, burning 153,336 acres, destroying 18,793 structures, and killing at least 86 people[4] – with 3 people still

---

[4] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 12, 2018)

1   unaccounted for.[5]  It has resulted in damages estimated up to $13 billion.  The Camp Fire is the

2   single most destructive and deadliest fire in California history.

3          19.     The Camp Fire began when a PG&E electrical tower – carrying a high-voltage

4   115 kilovolt transmission line – failed.  PG&E has also acknowledged a second ignition point for

5   the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires,

6   and other signs of safety violations.

7          20.     As a result, vegetation underneath the lines ignited at two ignition points

8   approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California

9   Public Resources Code §4293, and its failure to maintain the integrity of its poles and towers

10  violated California Public Utilities Code §451.

11         21.     Starting with two PG&E admissions at the end of the day the Camp Fire began, it

12  emerged that PG&E's promises to prioritize safety over customer complaints were false and

13  misleading.  PG&E's statements promoting its ESRB-8 Shutoff Protocol encapsulated this

14  prioritization by promising to shut off electricity broadly rather than risk further wildfires.  Soon,

15  however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: the protocol dictated

16  that the electrical lines that caused the Camp Fire **should have been shut off, but PG&E**

17  **flouted it.** Investors learned not only that PG&E's ESRB-8 Shutoff Protocol should have

18  prevented the fire entirely, but also that PG&E needlessly imperiled lives rather than risk

19  upsetting customers.

20         22.     PG&E would later attempt to justify its inaction by claiming that its ESRB-8

21  Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the

22  Camp Fire.  However, Plaintiff's investigation has uncovered that this explanation is

23  demonstrably false.  The fact is that PG&E's ESRB-8 Shutoff Protocol would have prevented the

24  Camp Fire if only it were followed.  The Company's attempt to cover it up substantiates not only

25  that PG&E's safety failures caused the Camp Fire, but further that PG&E's false and misleading

26

27         ─────────────────────
           [5] https://www.chicoer.com/2018/12/09/editorial-list-helped-camp-fires-lost-get-found/ (last
28  visited Dec. 12, 2018)

1  statements—concealing how the Company was not sufficiently prioritizing safety— were made

2  with knowledge of their falsity or at least deliberate recklessness.

3       23.      Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's

4  materially false and misleading statements assuring investors of the Company's compliance with

5  California safety regulations, including the ESRB-8 Shutoff Protocol.

6       **D.    Claims Being Asserted**

7       24.      Notwithstanding PG&E's false and misleading statements to the marketplace,

8  investors learned over time that PG&E's safety violations were responsible for most of the North

9  Bay Fires. As this information emerged between October 12, 2017 and November 15, 2018,

10  investors were surprised, given Defendants' numerous public statements during the Class Period

11  touting the Company's compliance, safety measures, and its intertwined financial health. As the

12  truth regarding PG&E's inadequate safety measures came to light, PG&E's artificially inflated

13  share price dropped significantly. Thus, as a result of Defendants' wrongful acts and omissions,

14  Lead Plaintiff and other Class members have suffered significant damages.

15       25.      Lead Plaintiff asserts the claims herein against PG&E and certain of its executives

16  and officers, seeking to recover for its damages suffered due to these declines in PG&E's

17  publicly traded securities. The action is brought on behalf of a class of all persons and entities

18  that purchased or otherwise acquired PG&E publicly traded securities during the period from

19  April 29, 2015 through November 15, 2018, inclusive (the "Class Period"). Excluded from the

20  class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii)

21  any person who was an officer or director of PG&E during the Class Period; (iv) any firm, trust,

22  corporation, or other entity in which any Defendant has or had a controlling interest; (v) PG&E's

23  employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they

24  made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs,

25  successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks to recover

26  compensable damages caused by Defendants' violations of the federal securities laws and to

27  pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

28  "Exchange Act") and Rule 10b-5 promulgated thereunder.

26.     PG&E's statements of compliance with safety regulations during the Class Period misrepresented current facts and were not statements of opinion.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

29.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located within this Judicial District.

30.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

31.     Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of its members, retirees, and beneficiaries. As set forth in the Certification accompanying the motion for appointment as Lead Plaintiff (ECF No. 29), PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint. On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

32.     Defendant PG&E Corporation is a publicly traded corporation that is headquartered in San Francisco, California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177. PG&E's securities trade on the New

1  York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that

2  holds, directs the actions of, and controls energy-based businesses such as the Utility.

3        33.    Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned

4  subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling

5  and delivering electricity and natural gas to its customers, also known as "rate-payers." The

6  Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have

7  overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-

8  K. Indeed, all of the Utility's shares are owned by PG&E. Alternatively, PG&E Corporation

9  controls the Utility as detailed herein. Accordingly, this Complaint refers to the Utility and

10 PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

11       34.    Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's

12 President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13,

13 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

14       35.    Defendant Geisha J. Williams ("Williams") has served as PG&E Corporation's

15 CEO and President since March 1, 2017, and served as the President of Electric Operations at the

16 Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice

17 President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.

18       36.    Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and

19 COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President

20 of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he

21 served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to

22 August 16, 2015.

23       37.    Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief

24 Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May

25 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance

26 Officer.

27       38.    Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas

28 and Electric Company from August 1, 2009 to August 17, 2015.

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 289 of 1229

39.     Defendant Patrick M. Hogan has served as the Utility's Senior Vice President of Electric Operations from March 2016 through the present, and previously served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

40.     The Defendants referenced above in ¶¶32-39 are referred to herein as the "Individual Defendants."

41.     The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content on the Company's website and official Twitter.com account, and other market communications during the Class Period. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and/or Utility, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     PG&E Operates Within a Robust Legal Regime

42.     As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1.     California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

43.      To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

44.     Pursuant to California Public Resources Code §4292, for instance:

1
2
3
4
5
6

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

7      45.    Similarly, California Public Resources Code §4293 provides that:

8
9
10
11
12
13
14
15
16
17
18

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

19     46.    Under California Public Utilities Code §451, PG&E was further required to

20 "furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities,

21 equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil

22 Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons,

23 employees, and the public."

24         **2.     California Law Required PG&E to Safely Maintain Its Electrical Equipment and Infrastructure**

25

26     47.    In addition to the vegetation management regulations discussed above, California

27 laws and regulations further require PG&E to safely maintain its electrical equipment and

28

infrastructure, including an obligation to maintain the towers and poles that carry its transmission and distribution lines.

48. Pursuant to California Public Utilities Code §451:

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

49. California Health & Safety Code §13007 further provides:

> Any person who personally or through another wilfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned, is liable to the owner of such property for any damages to the property caused by the fire.

50. Accordingly, California law required PG&E to maintain its electrical equipment and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from being caused by the failure of its towers and poles.

### 3. PG&E Is Regulated by the CPUC

51. PG&E's primary regulator is the California Public Utilities Commission ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which costs PG&E must bear. The CPUC was created under Article XII of the California State Constitution, and derives its regulatory authority from Section 701 of the California Public Utilities Code.

#### (a) CPUC's General Orders 95 and 165 Impose Strict Safety Regulations on PG&E

52. Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish necessary and reasonable clearances" between overhead conductors and nearby vegetation, with certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean

toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

* * *

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

53. CPUC General Order 95 provides further details regarding the maintenance and upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to "Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule be held to permit the use of structures or any member of any structure with a safety factor less than one." This order further provides certain requirements intended to, among other things, guard against corrosion.[6]

54. Pursuant to CPUC General Order 165, PG&E must also follow certain "requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service." In relevant part, General Order 165 requires that: "Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation."[7]

   **(b)**   **CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

55. On July 16, 2018, the CPUC issued Resolution ESRB-8. Recognizing that the "2017 California wildfire season was the most destructive wildfire season on record," the

---

[6] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf (last visited Dec. 12, 2018).

[7] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K552/209552704.pdf (last visited Dec. 12, 2018).

1   resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-

2   energization policy and procedures" pursuant to which each utility will "de-energize power

3   lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established

4   notification, mitigation, and reporting requirements.

5        56.   Resolution ESRB-8 included the following directives:

6   PROPOSED OUTCOME:
    This Resolution extends the de-energization reasonableness, public
7   notification, mitigation and reporting requirements in Decision
    (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs)
8   [including PG&E] and adds new requirements.  It also places a
    requirement on utilities to make all feasible and appropriate
9   attempts to notify customers of a de-energization event prior to
    performing de-energization.

10
    SAFETY CONSIDERATIONS:
11  De-energizing electric facilities during dangerous conditions can
    save lives and property and can prevent wildfires. This resolution
12  provides guidelines that IOUs must follow and strengthens public
    safety requirements when an IOU decides to de-energize its
13  facilities during dangerous conditions.

14           *      *      *

15  PG&E reports that prior to 2018, it did not have a policy to de-
    energize lines as a fire prevention measure. PG&E reported that it
16  did not proactively de-energize lines due to extreme fire weather
    conditions in 2017. However, in March 2018 PG&E announced
17  that it is developing a program to de-energize lines during periods
    of extreme fire conditions and has been meeting with local
18  communities to gather feedback.

19           *      *      *

20     ▪   The IOU shall ensure that de-energization policies and
    procedures are well-communicated and made publicly
21  available, including the following:

22        •   **Make available and post a summary of de-
    energization policies and procedures on its**
23  **website**.

24        •   Meet with representatives from local communities
    that may be affected by de-energization events,
25  before putting the practice in effect in a particular
    area.

26
          •   Provide its de-energization and restoration policy **in**
27  **full**, and in summary form, to the affected
    community officials before de-energizing its
28  circuits.

\*        \*        \*

De-energization of electric facilities could save lives, protect property, and prevent fires.

### (c)    PG&E Must Follow CPUC's Regulations Under Penalty of Law

57.    The CPUC's regulations have the full force of law, and PG&E has a legal obligation to follow them, including the general orders and resolutions listed above, under penalty of law.

58.    For example, California Public Utilities Code §702 provides that:

Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees.

59.    Further, under California Public Utilities Code §2106:

Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages.

### 4.    Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires

60.    The California Department of Forestry and Fire Protection ("Cal Fire") is an agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is administratively in charge of both the state's fire departments and its law enforcement related to state fire and forest laws. As a result, it is responsible for both fighting fires as they occur and for investigating the causes of fires after they have been contained. Cal Fire conducts official investigations as an arm of the State of California to determine the causes of wildfires within the state, as well as any violations of state laws and regulations.

61.    Pursuant to an agreement with the U.S. Department of the Interior and the U.S. Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

origin determinations for wildfires – such as the North Bay fires and Camp Fire – that fall within its jurisdiction.

> **5.     Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes If It Could Prove That It Acted Reasonably and Prudently**

62.     The California Supreme Court has interpreted Article 1, Section 19 of the California Constitution as imposing a doctrine known as "inverse condemnation," whereby public utilities such as PG&E are required to compensate individuals whose real property has been damaged by the utility under a strict liability regime. However, importantly, a utility such as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

63.     In other words, PG&E bears the costs of wildfires it causes unless it can prove that it was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id.* Embodied in this standard, at minimum, is compliance with state safety laws and regulations.

> **B.     PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point**

64.     The State of California declared a state of emergency due to drought conditions in January 2014,[8] which ended in April 2017.[9] In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an

---

[8] https://www.gov.ca.gov/2014/01/17/news18368/ (last visited Dec. 12, 2018).

[9] https://www.gov.ca.gov/2017/04/07/news19747/ (last visited Dec. 12, 2018).

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 296 of 1229

epidemic of insect infestations causing millions of trees to die annually.[10] These conditions significantly increased the danger of wildfires in the North Bay region of California. PG&E knew about these conditions and its obligations to ensure safety from wildfires in spite of these environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent required by their existing responsibilities to protect the public health and safety, shall undertake efforts to remove dead or dying trees in these high hazard zones that threaten power lines**. . . ."

65.     Based on information released by CPUC, PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[11] Each year's spending was substantially identical to the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases – notwithstanding the state of emergency directive above. In contrast, inflation rose 5.48% over the same three-year period.[12] Thus, PG&E's spending did not even keep pace with inflation during the Class Period.

66.     CPUC released the following chart confirming that PG&E's vegetation management spending underwent only modest increases over the relevant time period:

---

[10] https://www.gov.ca.gov/wp-content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf (last visited Dec. 12, 2018).

[11] https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf (last visited Dec. 12, 2018); https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf (last visited Dec. 12, 2018); https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf (last visited Dec. 12, 2018)

[12] https://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 14, 2018).

**Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management**

|  | PG&E Requested | CPUC Authorized | PG&E Spent |
|---|---|---|---|
| 2017 | $201.0 | $201.0 | *$150.4 YTD* |
| 2016 | $198.8 | $198.8 | $198.7 |
| 2015 | $194.2 | $194.2 | $194.1 |
| 2014 | $190.0 | $190.0 | $189.7 |
| 2013 | $180.0 | $161.5 | $161.6 |
| 2012 | $180.0 | $161.5 | $161.5 |
| 2011 | $180.0 | $161.5 | $161.6 |

67.     While Defendants falsely represented on November 2, 2017 that PG&E "*doubled*" vegetation management expenditures in 2016 (*see* ¶¶208 & 211), tellingly, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.

68.     In fact, it was only after the Camp Fire that PG&E announced in December 2018 that it plans to spend an additional $5 billion on wildfire safety programs over five years, with a focus on improving its vegetation management efforts. This post-Class-Period development strongly supports the inference that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[13]

C.     **PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period**

69.     Nor did the Company's reported numbers for trees that it trimmed or removed double during this time period, or come close to doubling. During the Class Period, the Company touted the results of its vegetation management expenditures, slowly inflating the numbers it was reporting. Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about

---

[13] http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month (last visited Dec. 14, 2018).

**236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the state" (May 3, 2017, Press Release).

70.     Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

**D.     After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal**

71.     Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶205, *infra*).

72.     Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

**E.     PG&E Concealed Its Unsafe Use of Reclosers During the Class Period**

**1.     PG&E Used Reclosers to Prioritize Convenience Over Safety**

73.      "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (*i.e.*, an outage). Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

74.     San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in

the state court litigation concerning the North Bay Fires,[14] these two utility companies are aware of the dangers of using reclosers, and they have a practice of blocking reclosers from working during fire season.[15]

75.     Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to reprogram its reclosers during fire season so that they did not attempt to restart lines that had been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit, but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit," which would lead to consumer complaints), but that PG&E also understood this measure would improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose reliability over safety.[16]

### 2.     PG&E Concealed Its Use of Reclosers from Investors During the Class Period

76.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "***just about done***" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "***first***" in "***high wildfire risk areas***," followed by

---

[14] https://www.norcalfirelawyers.com/wp-content/uploads/2018/01/atlas-fire.pdf (last visited Dec. 12, 2018).

[15] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in California, declared such by the responsible public agency fire administrator. This declaration is based on fuel and weather conditions conducive to the ignition and spread of wildland fires. http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F (last visited Dec. 12, 2018).

[16] Notably, PG&E's ESRB-8 Shutoff Protocol embodied the same tradeoff.  As a protocol that required PG&E to proactively shut off power when certain conditions were met, it similarly purported to prioritize safety over reliability.  Likewise, a failure to abide by the ESRB-8 Shutoff Protocol would evidence another example of the Company choosing reliability over safety, unbeknownst to investors.

1    "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next

2    year."

3            77.     However, PG&E did not disable all of its reclosers during fire season, like San

4    Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the

5    North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore

6    power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its

7    reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers

8    were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

9            78.     Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as

10   saying that he felt "misled" by PG&E's executives into believing that the Company had followed

11   the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the

12   start of 2017:

13              Hill said he was surprised the company's recloser shutdown was so
                limited, given that a top PG&E official assured him back in 2015
14              that the company would be able to shut down reclosers in all 132
                of the high risk fire areas by the start of 2017.
15
                "I think that's the troubling part," Hill said, "that **they misled us in
16              that**.

17              "Had they said they did not have that system in place, then we
                would have followed up with more questions to try to find what the
18              problem was -- and may have been able to focus in on that a couple
                of years ago that may have prevented these fires in October."
19
     Likewise, investors were misled by PG&E's recloser statements.
20
             79.     As is discussed in more detail below, it was not until **2018** that PG&E finally
21
     committed to disabling these reclosers.[17]
22
         **F.      PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety
23               Requirements Before and Throughout the Class Period**

24           80.     Despite the important safety measures imposed by California law, PG&E has a

25   long history of causing deadly wildfires through its failure to comply with the legal requirements

26

27   _____

28   [17] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-
     Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf  (last visited Dec. 12, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          22
CIVIL ACTION NO. 3-18-CV-03509-RS

1   for vegetation management, pole maintenance, and other safety requirements. Between causing

2   the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly

3   violated California's vegetation management laws and other regulations.  PG&E assured

4   investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017

5   Corporate Responsibility and Sustainability Reports that its "vegetation management" was now

6   "*in compliance with relevant laws*" or "*complying with state and federal regulations*."

7          81.    Notably, in its 2018 Corporate Responsibility and Sustainability Report issued

8   **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to

9   investors that its vegetation management complies with California's safety laws.

10          **1.**      **PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

11          82.    One of the most notable of the pre-Class Period fires was the "Trauner Fire,"

12   where PG&E was convicted of 739 counts of criminal negligence and required to pay $24

13   million in penalties due to the Company's deficient vegetation management systems.[18]

14          **2.**      **PG&E's Unsafe and Knowing Noncompliance with Safety Regulations Continued Through the Class Period**

15          83.    Subsequently, PG&E's deficient vegetation management practices ignited other

16   fires, including the Pendola Fire (1999),[19] the Sims Fire (2004), and the Whiskey Fire (2008).

17          84.    Moreover, according to documents released by The Utility Reform Network

18   ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had

19   identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5

20   million from its customers to complete the project by 2009, but instead deferred the project and

21

22

23

---

24   [18] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

25

26

27   [19] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been earmarked for tree trimming and removal.

28

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

23

1  repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline

2  exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

3    85. On August 9, 2016, a California federal jury found PG&E guilty of five criminal

4  felony counts for violating minimum federal safety standards under the Natural Gas Pipeline

5  Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all

6  of its records to the National Transportation Safety Board during an investigation into the San

7  Bruno explosion.

8    86. On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter*

9  *alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did

10  not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely

11  rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners

12  defraud regulators and the public about the safety of PG&E's utilities continued up to and

13  including the Class Period.  The strong inference is that PG&E's statements concealing the

14  inadequate safety of its electrical utilities, during the Class Period, were also made with a intent

15  to defraud.[20]

16    **3.**  **PG&E's Unsafe, Noncompliant Vegetation Management Caused the**
       **Butte Fire in 2015**

17

18    87. In 2015, five months after PG&E made Misstatement No. 1, PG&E's vegetation

19  management program once again failed, causing the Butte Fire that killed two people, destroyed

20  921 homes, and scorched more than 70,000 acres over 22 days.

21    88. On April 28, 2016, Cal Fire issued a press release announcing its conclusion that

22  the Butte Fire was caused by PG&E's safety violations, including evidence of negligence. Cal

23  Fire also referred its investigation to the two relevant district attorneys for the counties the Butte

24  Fire burned.

25    89. There is currently pending litigation over PG&E's liability for the Butte Fire,

26  including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the

27

28

---

[20] https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/ (last visited Dec. 14, 2018).

1    costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E

2    negligently caused the Butte Fire by maintaining an inadequate vegetation management system.

3              **4.    PG&E's Compliance Measures Allowed More than One Million
                       Vegetation Management Violations During the Class Period**

4          90.    Internally, PG&E's numerous and widespread violations of California safety laws

5    are shown by the fact that the Company's internal controls were designed to permit vegetation

6    management violations to go unchecked.  Investigative journalists and attorneys have uncovered

7    that PG&E internally accepts that its vegetation management practices leave 1 of every 100 trees

8    noncompliant with California regulations, and further reportedly "cheats" on its internal

9    compliance reviews, in order to give a misleading impression of compliance with tree clearance

10   requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon

11   Van Derbeken on November 6, 2017, published a month after the North Bay Fires began,

12   PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line

13   clearance standards:

14            **PG&E auditors allow one out of 100 trees they check to violate**
              **state power line clearance standards**, NBC Bay Area has
15            learned.

16                                    * * *

17            [I]t emerged during the Butte fire litigation that [internal] auditors
              were giving out a passing grade when one out of 100 trees they
18            checked turned out to be too close to power lines under state
              standards.
19
                                      * * *
20
              When [PG&E] failed to reach that 99 percent compliance rate in
21            the area around the fire . . . the company just expanded the
              universe of trees covered in a particular audit.
22
23            "So what PG&E does when it doesn't pass, it basically cheats,"
              [Amanda Riddle, one of the attorneys participating in a lawsuit
24            against PG&E related to the Butte Fire] said. "It adds more miles
              and more miles until it reaches a passing grade."
25

26

27

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
304 of 1229

91.     With approximately 123 million trees under PG&E's control,[21] this means approximately 1.2 million trees may not be in compliance with state safety laws at any given time. The measurement of 1.2 million safety violations is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

92.     According to the plaintiffs litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it allows approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

93.     Thus, PG&E has been on notice for many years that its vegetation management practices did not comply with California safety regulations and never disclosed that their own internal compliance reviews showed a lack of compliance on a huge scale.

94.     According to data released by the CPUC,[22] PG&E equipment caused 1,486 vegetation fires between June 10, 2014 and December 29, 2017.  Among those vegetation fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire, including 26 fires caused by lines of the exact same high voltage, 115 kilovolts.  PG&E supplied the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire Incident Data Collection Plan."[23]

---

[21] See PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, Oct. 17, 2017, *available at* http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf (last visited Dec. 12, 2018).

[22] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisions/News_and_Outreach_Office/PGE_Fire%20Incident%20Data%202014-2017.pdf (last visited Dec. 12, 2018).

[23] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF (last visited Dec. 12, 2018).  Pursuant to the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must "collect and report data to SED regarding power-line fires." *Id.* ("SED" refers to CPUC's  Safety and Enforcement Division).

5.     **PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them**

95.     Even though PG&E suffered from endemic wildfire safety problems, the Company did not meaningfully change its practices even after the deadly Butte Fire that occurred in 2015. As noted above, in a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager (Stockton Division)[24] Richard Yarnell reportedly testified under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the Butte Fire in 2015 continued unabated throughout the Class Period, contrary to PG&E's public statements.

96.     Moreover, the vegetation management problems detailed herein were institutionally entrenched by certain incentive structures PG&E put in place. According to a lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E provided monetary incentives to its employees that had the effect of discouraging the implementation of vegetation safety measures.

97.     For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E effectively shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's

---

[24] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

1   bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire

2   season) put safety at risk in an effort to reduce consumer complaints.

3         98.     According to the same lawsuit, Robert Urban, a regional officer for a PG&E

4   contractor, stated that he had a concern that the bonus system incentivized his employees to not

5   do their job, but PG&E chose to keep this program despite knowing this risk.

6         99.     PG&E also knew, but concealed, that its aging infrastructure had dangerously

7   decayed.  In December 2012, during windy conditions, five steel towers supporting the Caribou-

8   Palermo transmission line, originally built in 1919, collapsed.  In a July 16, 2013 letter to the

9   CPUC, PG&E proposed replacing the five collapsed towers on the Caribou-Palermo line

10  "[s]panning Plumas-Butte County border" in a row "up slope and west of Highway 70 and

11  generally parallel to the unpaved Pulga Road in a remote area of the Feather River Canyon

12  within Plumas National Forest"[25]—that is, to say, near the first Camp Fire ignition point.

13        100.    The rest of the aging towers on the line, including the tower believed to have

14  started the Camp Fire, were not replaced during that project.[26]  The age of these remaining

15  towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related

16  factors would fail to support transmission line cables and cause fires.  Indeed, the relevant tower

17  included uninsulated "jumper" lines used to switch currents between transmission lines, making

18  the risk of fire even greater.[27]  Tellingly, the cross arm from that transmission tower, which was

19  attached to the "jumper" line, has been removed by Cal Fire investigators as part of its probe into

20  the cause of the Camp Fire.[28]

21        101.    It was in this context that Defendants touted PG&E's vegetation management and

22  infrastructure maintenance to investors, falsely representing that it was in full compliance with

23  ───────────────

24  [25] https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf  (last visited Dec. 12, 2018).

25  [26] https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-tower-part-in-camp-fire-probe/ (last visited Dec. 12, 2018).

26  [27] https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/ (last visited Dec. 12, 2018).

27  [28] https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-tower-part-in-camp-fire-probe/ (last visited Dec. 12, 2018).

28

all relevant regulations throughout the Class Period. *E.g.*, ¶159 (Misstatement No. 2, October 16, 2015); ¶177 (Misstatement No. 5, August 9, 2017); ¶198 (Misstatement No. 9, October 31, 2017); ¶213 (Misstatement No. 12, November 5, 2017); ¶220 (Misstatement No. 13, May 25, 2018); ¶226 (Misstatement No. 14, June 8, 2018).

102.    As noted above, though PG&E falsely assured investors during the Class Period that its compliance failures had been resolved after the Butte Fire, the Company's own employee Richard Yarnell later admitted that nothing of substance had changed over much of the same time period.

G.    **Investors Could Not Have Reasonably Expected The Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire**

1.    **PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires**

103.    Of the **seventeen** main North Bay Fires for which Cal Fire's investigations have been completed, **all seventeen** were caused by PG&E equipment. **Eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the integrity of its poles.

104.    Even though Cal Fire's investigations have not found evidence of violations for six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety violations merged into and strengthened other fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the eleven North Bay Fires which never should have ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the North Bay Fires.

105.    As of the filing of this Complaint, Cal Fire has not yet completed its investigations into the Tubbs Fire, and may find that it, too, was caused by PG&E's safety violations.

Case 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 308 of 1229

### 2. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire

106. Though Cal Fire has not completed its official investigation into the Camp Fire's causes, other sources have revealed that PG&E's safety violations were its cause.

### (a) The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations

107. According to firefighter radio transmissions and the journalist whose investigation made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County on November 08, 2018 at 6:33 a.m.[29]—matching the location where Cal Fire officials pinpointed the Camp Fire's origin four minutes earlier.[30] As one firefighter described the fire to dispatch: "It is on the west side of the river underneath the transmission lines."

108. Independently that evening, PG&E admitted to the CPUC that one of its 115-kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m. that day, and noted that the site was near the Camp Fire.[31] Cal Fire has listed Pulga Road as the Camp Fire starting point.[32]

109. The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E further specified that this observed damage included the separation of a suspension insulator, meant to

---

[29] https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/ (last visited Dec. 13, 2018).

[30] http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf (last visited Dec. 13, 2018).

[31] http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf (last visited Dec. 13, 2018); *see also* https://www.fresnobee.com/news/state/california/article221448500.html (last visited Dec. 13, 2018).

[32] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 13, 2018).

---

support a transposition jumper, from an arm on the tower.[33]  PG&E also observed a broken C-hook attached to the separated suspension insulator that once connected the suspension insulator to a tower arm.[34]  According to the report, the connection point showed signs of wear; a flash mark was visible close to where the transposition jumper was suspended; and there was damage to the transposition jumper and suspension insulator.[35]

110.    Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property that "were having problems with sparks."[36]

111.    Accordingly, the truth has emerged that a PG&E electrical pole carrying a high-voltage 115 kilovolt transmission line lost its integrity, in whole or in part, on the morning of November 8, 2018.  Shortly thereafter, vegetation underneath the line ignited.  PG&E's apparent failure to maintain a clearance for vegetation up to 10 feet away from this transmission line, inclusive of all vegetation underneath, violated California Public Resources Code §4293. Further, PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated California Public Utilities Code §451.

**(b)    The Camp Fire's Second Ignition Point Was Also Caused by PG&E Safety Violations**

112.    On November 15, 2018, Cal Fire announced that it had identified a possible second ignition point for the Camp Fire.[37]  On November 16, 2018, PG&E admitted to CPUC

---

[33] http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf (last visited Dec. 13, 2018).

[34] *Id.*

[35] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor" had become disconnected.  *Id.*

[36] https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/ (last visited Dec. 13, 2018).

[37] https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/ (last visited Dec. 13, 2018).

that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on another power line in a nearby part of Butte County near Concow, California.[38]

113.    In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further admitted that it discovered a broken pole on the second power line on November 9, 2018; that the pole was on the ground, along with pole equipment; and that the pole had a line recloser.[39] The supplemental report also detailed a second inspection of the area on November 12, 2018, where a PG&E employee found damaged and downed poles, several snapped trees, downed wires, and some snapped trees on top of the downed wires.[40]  The presence of the line recloser further calls into question PG&E's prior representation that it was "just about done" disabling recloser devices in "high wildfire risk areas" as of November 18, 2015 (Misstatement No. 3).

114.    Accordingly, the truth emerged that the Camp Fire's second ignition point also exhibited evidence of failures regarding vegetation management, pole integrity, and the possible use of a recloser in further violation of California safety regulations, including Public Resources Code §§4292, 4293 and Public Utilities Code §451.

**H.    PG&E's ESRB-8 Shutoff Protocol Was Illusory, and Its Failure to Adhere Thereto Was a Proximate Cause of the Camp Fire**

115.    On July 16, 2018, the CPUC passed Resolution ESRB-8.  As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur.  PG&E announced its response to this new safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its existence throughout the rest of the Class Period.

116.    PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations

---

[38]
http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/EIR_IncidentNo181116-9015.pdf; https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html (last visited Dec. 13, 2018).

[39] http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf (last visited Dec. 13, 2018).

[40] *Id.*

Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off **electric power lines**, in the interest of public safety."  Thus, PG&E's ESRB-8 Shutoff Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

117.    Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.)  PG&E stated that "no single factor will drive a Public Safety Power Shutoff," and never identified any other criteria, during the Class Period or since.

118.    All seven criteria were met or exceeded when the Camp Fire was ignited by PG&E's lines on November 8.  Indeed, PG&E had warned customers in that area on November 6 – two days before the Camp Fire began – that it may need to "proactively turn off power for safety starting on Thursday, November 8."[41]

119.    PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits

---

[41]

https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff (last visited Dec. 14, 2018).

Case: 19-30088   Doc#: 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 312 of 1229

1    and thirty-three distribution power line circuits, in seven counties.  Though PG&E found damage

2    to its equipment before restoring power, it nevertheless faced strong backlash from customers

3    who were affected by the shutoff.

4            120.    On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via

5    its official Twitter.com account: "PG&E has determined that it will not proceed with plans today

6    for a Public Safety Power Shutoff in portions of 8 Northern CA counties, **as weather conditions**

7    did not warrant this safety measure."[42]  The three weather-relevant criteria are humidity levels (at

8    20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and

9    wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local

10   climate and terrain).

11           121.    However, as detailed below, **each of these factors weighed in favor of a shutoff**.

12   Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were

13   measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific

14   conditions contributed to the ignition of the most destructive and deadliest fire in California

15   history.

16           122.    The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[43]

17   Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39°

18   44' 09" N (Latitude), 121° 29' 20" W (Longitude),[44] approximately six miles from the Camp

19   Fire's origin.[45]  The Jarbo Gap weather station provided the most accurate record of weather

20   conditions at the time and place where the Camp Fire ignited.

21

22

23

24

_____

25   [42] https://twitter.com/PGE4Me/status/1060672000929267713 (last visited Dec. 14, 2018).

26   [43] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 13, 2018).

27   [44] https://raws.dri.edu/cgi-bin/rawMAIN.pl?caCJAR (last visited Dec. 13, 2018).

28   [45] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 13, 2018).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.  PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power

123.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted in three press releases that all seven criteria weighed in favor of a shutoff—providing only small caveats that weather-related factors might change.

### (a)  Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level

124.    The area where the Camp Fire ignited was classified as having an "Extreme" fire danger threat level by the National Fire Danger Rating System ("NFDRS").  The U.S. Forest Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in map[46] and data[47] form, both of which confirm that the Jarbo Gap was rated "Extreme" on November 8, 2018.  The graphic on the following page has modified the WFAS map to highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on November 8, 2018:

---

[46] https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png (last visited Dec. 14, 2018).

[47] *See* https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme") (last visited Dec. 14, 2018).



125.    As the U.S. Department of Agriculture Forest Service explained the NFDRS:

> When the fire danger is "extreme", fires of all types start quickly and burn intensely.  All fires are potentially serious and can spread very quickly with intense burning.  Small fires become big fires much faster than at the "very high" level.  Spot fires are probable, with long-distance spotting likely.  These fires are very difficult to fight and may become very dangerous and often last for several days.[48]

126.    Indeed, in a press release on November 7, 2018, PG&E admitted that "Due to expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[49]

---

[48]
https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368 839 (last visited Dec. 13, 2018).

[49]
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe r_shutoff_due_to_forecasted_extreme_weather (last visited Dec. 13, 2018).

Case 3:18-cv-03509-RS   Document 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 315 of 1229

           **(b)**      **Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area**

127.    The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[50] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions, **including the Red Flag warning from the National Weather Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[51]

           **(c)**      **Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff**

128.    Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by an extended period of dry fall weather, only one rain event since May, and periods of dry north winds which caused the moisture content of live and dry fuels to remain low."[52]

129.    PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch, Magalia, Oroville, **Paradise**). . . ."[53]

---

[50] Shirin Rajaee, "PG&E Could Cut Power to 63,000 Amid Red Flag Warning," CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), *available at* https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/ (last visited Dec. 13, 2018).

[51] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff (last visited Dec. 13, 2018).

[52] http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/11-27-18%20PGE%20PSPS%20Report.pdf (last visited Dec. 13, 2018).

[53] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather (last visited Dec. 13, 2018).

130.     As Pulitzer Prize winning journalist Matthias Gafni would later report, information from the National Aeronautics and Space Administration ("NASA") showed that California's moisture levels that month were "at the lowest levels in [the] last four years."[54] As the graphic below confirms, this led to extremely dry vegetation:

## Root Zone Soil Moisture Percentile






    **(d)    Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff**

131.     PG&E's on-the-ground observations favored a shutoff.  In a press release dated November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected

---

[54] Matthias Gafni, |"Why didn't PG&E shut down power in advance of deadly Camp Fire? Here's the data." Bay Area News Group (Nov. 18, 2018 5:00 p.m.) *available at* https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-camp-fire-heres-the-data/ (last visited Dec. 13, 2018).

1    extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to

2    initiate" a shutoff included its "on-the-ground observations."[55]

3        132.    This conclusion is corroborated by PG&E's admission in a November 8, 2018

4    press release that ***only weather factors*** weighed against shut-off: "[PG&E] has determined that it

5    will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern

6    California counties, **as weather conditions did not warrant this safety measure**."[56]

### 2. All of the Weather Criteria Weighed in Favor of Shutting Off the Power

8        133.    As described above, PG&E attributed its decision not to shut off power to weather

9    conditions.  Specifically, in a November 27, 2018 filing to the CPUC , PG&E explained that the

10   primary weather condition that fell short was wind speed:

> On Wednesday, November 7, 2018, PG&E refined the forecasted impact down to 63,000 customers and eight counties (Butte, Lake, Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather conditions stayed consistent, nearing but not reaching forecasted levels that would warrant temporarily turning off power for customer safety**.
>
> By around 13:00 on Thursday, November 8, **winds were decreasing**, and conditions were no longer forecast to approach [Public Safety Power Shutoffs] criteria. Based on the forecasted information, PG&E no longer anticipated a possible need to de-energize.

18       134.    However, all weather factors – including wind speed – weighed in favor of an

19   electricity shutoff in Jarbo Gap on November 7-8, 2018.  The charts[57] on the following page

20   show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through

21   the next day:

---

55

https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather (last visited Dec. 13, 2018).

56

https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181108_pge_determines_to_not_proceed_with_public_safety_power_shutoff_planned_for_portions_of_eight_northern_california_counties (last visited Dec. 13, 2018).

57 Source: https://raws.dri.edu/cgi-bin/rawMAIN.pl?caCJAR (last visited Dec. 13, 2018).

## Jarbo Gap California

Daily Summary for

### November 7, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

Daily Summary for

### November 8, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

135.    Accordingly, PG&E's November 27, 2018 statement to the CPUC that its decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on Thursday, November 8, winds were decreasing," was misdirection.  The Camp Fire had already begun over six hours before that point.  And indeed, as shown in the chart above, wind speed

weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

### (a)   Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels

136.   Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

137.   Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

138.   PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[58]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[59]

139.   In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[60]

---

[58]
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties (last visited Dec. 13, 2018).

[59] https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html (last visited Dec. 13, 2018).

[60] https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html (last visited Dec. 13, 2018).

(b)    **Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed**

140.    As noted above (*see* ¶133), PG&E informed the CPUC on November 27, 2018 that the primary reason it did not shut off the power was wind speed.

141.    Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

142.    At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour. Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

143.    PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[61]—warned of winds "during the morning and afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[62]

144.    In fact, sustained wind speed weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary.  The National Weather Service's forecast of sustained winds of 20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

---

[61] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties (last visited Dec. 13, 2018).

[62] https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html (last visited Dec. 13, 2018).

1   predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . where sustained winds are

2   forecast to reach 20-25 mph for a few hours."[63]

3           **(c)**        **Criterion 5: Site-Specific Conditions Further Favored Shutoff**

4          145.    The specific conditions beneath PG&E's 115 kilovolt transmission line where the

5   Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted

6   Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having

7   problems with sparks," indicating that conditions were hazardous.[64]  Further, it is indisputable

8   that dry vegetation existed underneath the transmission line given reports of vegetation burning

9   beneath it (*see* ¶107, *supra*).  Notably, PG&E identified nothing about the area's terrain,

10  temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to

11  shut off its lines.[65]

12         **3.**      **PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power**

13

14       146.    PG&E knew that severe weather conditions requiring a shutoff were in effect.

15  First, the Company admitted it had been monitoring the weather in the area for days; its

16  November 7 press release confirmed that "PG&E meteorologists continuously monitor weather

17  conditions."  Second, the Company had its own "network of PG&E weather stations to enhance

18  weather forecasting and modeling," and stated that the Company had the capability of

19

20

---

21  [63] https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html (last visited Dec. 13, 2018).

22  [64] https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/ (last visited Dec. 13, 2018).

23  [65] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further supported a shutoff.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with "extreme topography."  *See* https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf (last visited Dec. 13, 2018).  After the Camp Fire, an article reported on the terrain immediately around the same transmission line as making fire containment more difficult: "The remoteness and rugged terrain around the tower would make any firefight by hand crews nearly impossible." *See* https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/  (last visited Dec. 13, 2018).

"[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[66] Finally, the weather data referenced above was publicly available. Indeed, for the hour from midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap weather station reported that **all weather conditions were met**: humidity at 19%, sustained winds at 27 miles per hour, and wind gusts at 45 miles per hour. Accordingly, PG&E either knew that weather conditions existed that weighed in favor of a shutoff, or deliberately disregarded such information.

147. Every factor weighed in favor of shutting off PG&E's transmission line running through the Jarbo Gap outside of Paradise, California. PG&E knew or should have known that all such factors were met. But shutting off its high voltage transmission lines would have deprived approximately 70,000 customers of electricity. Evidently, PG&E prioritized temporary customer satisfaction over safety.

148. Indeed, PG&E had only shut off electricity in the face of wildfire conditions once before, in October 2018. The backlash to that shutoff was strong, and PG&E received numerous customer complaints.[67] PG&E noted in its October 31, 2018 report to the CPUC that as of October 24, "17 residential customers have complained to the CPUC as a result of the PSPS [Public Safety Power Shutoffs] event since the first customer notification on October 13."[68] Moreover, PG&E reported to the CPUC that it had "received a total of 146 claims as of October 24, 2018," including claims for property damage, business interruption, and spoiled food.

---

[66] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last visited Dec. 13, 2018).

[67] For instance, the *San Francisco Gate* reported that many were "upset" and "frustrated" over PG&E's decision, including one consumer who said that PG&E's decision was "totally irresponsible" and made her "angry." Another member of the community believed that PG&E "didn't take care of what needed to be taken care of in the past, and now we're having to pay the price for that." This resident continued to state "That's what I'm hearing on social media really loudly." https://www.sfgate.com/california-wildfires/article/PG-E-warns-it-may-shut-off-power-amid-red-flag-13306256.php (last visited Dec. 13, 2018).

[68]

http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last visited Dec. 13, 2018).

---

Case 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 323 of 1229

149.   In sum, all seven criteria weighed in favor of a shutoff that never happened.  From the beginning, the Company misrepresented to investors that it would prioritize safety over customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  The strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its ESRB-8 Shutoff Protocol was illusory, and that the Company did not believe itself bound by the seven criteria it told the public and investors were the crucial criteria.  By PG&E's statements listing these – and only these – criteria in its ESRB-8 Shutoff Protocol, investors were entitled to believe that when **all** criteria were met, PG&E would prioritize safety and shut off the power rather than risk causing wildfires.

150.   In the alternative, PG&E had a duty to update investors once it decided to abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result was the deadliest and most destructive wildfire California has ever faced.

## V.   DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

151.   In light of PG&E's history of causing wildfires and the drought conditions in California, investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the Class Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

### A.   Overview of Defendants' Fraudulent Course of Conduct

152.   PG&E was responsible for all the North Bay Fires.  Of the **seventeen** main North Bay Fires for which Cal Fire's investigations have been completed, **all seventeen** were caused by PG&E equipment. Among those, **eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**.

153.   Furthermore, PG&E was responsible for the Camp Fire, which began when a PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed.  PG&E acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed

1    poles, vegetation on top of downed wires, and a recloser.  As a result, vegetation underneath the

2    lines ignited in two ignition points approximately 30 minutes apart.  PG&E's failure to remove

3    such vegetation violated California Public Resources Code §4293.  PG&E's failure to maintain

4    the integrity of its poles violated California Public Utilities Code §451.

5          154.    Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power

6    lines be shut off.  While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria

7    when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in

8    the hours leading up to the Camp Fire in the precise location where it started.  Though adhering

9    to the ESRB-8 Shutoff Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

10         155.    Tellingly, the CPUC is investigating whether PG&E violated CPUC rules and

11   standards.

12         156.    The news about PG&E's responsibility for causing the North Bay Fires and Camp

13   Fire directly impacted the Company's bottom line, because California law requires PG&E to

14   bear the cost of wildfire-related property damage and personal injury caused by its violations of

15   California safety regulations. In other words, those costs likely could not be passed on to

16   ratepayers. And, given the information that has emerged, including the conclusions of Cal Fire's

17   investigations into these fires to date – where Cal Fire has referred at least eleven of its

18   investigations to the appropriate counties' district attorneys' offices to review for potential

19   criminal violations – the market has come to understand that the financial consequences to

20   PG&E are extraordinary.

21       **B.    Defendants Made Materially False and Misleading Statements and**
         **Omissions Regarding Its Vegetation Management Activities and Compliance**
22       **with Wildfire Safety Regulations Before the North Bay Fires**

23             **1.    April 29, 2015 – Misstatement No. 1**

24         157.    The Class Period begins on April 29, 2015, when PG&E held a conference call to

25   discuss the Company's financial and operating results for the first financial quarter of 2015,

26   which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility,

27   misleadingly assured investors of the Company's commitment to safety:

28                 As California enters its fourth year of drought, we're working hard
                   to help the state meet this challenge by reducing water usage at our

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    46
CIVIL ACTION NO. 3:18-CV-03509-RS

own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. **We're stepping up our vegetation management activities to mitigate wildfire risk** and improve access for firefighters.

158.    This statement was materially false and/or misleading because PG&E did not materially increase its vegetation management budget in 2015. In fact, based on information released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015: whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015, respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively. Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage points above inflation, which rose 1.12% over the same time period.[69] Accordingly, PG&E had not meaningfully "stepp[ed] up" its vegetation management activities.[70]

### 2.    October 16, 2015 – Misstatement No. 2

159.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and Sustainability Report. This report falsely assured investors that PG&E's "vegetation management" was "in compliance with relevant laws":

**Vegetation Management**

**Each year, PG&E's Vegetation Management department**, in consultation with utility arborists and foresters, **inspects every mile of power line in our service area for public safety** and electric reliability. **We do so in compliance with relevant laws** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 20 consecutive years for demonstrating best practices in utility arboriculture.

160.    Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws."

---

[69] https://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 14, 2018).

[70] PG&E also omitted that it was supposed to perform $441,192 (the total amount by which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management during 2015, but failed to do so.

161.    First, according to reports released in subsequent corrective disclosures on May 25 and June 8, 2018, PG&E violated relevant California laws, including Public Resources Code section 4293, multiple times.

162.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

163.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

164.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

165.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a Chief Ethics and Compliance Officer, a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors, and the Compliance and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
>
> - Building a best-in-class ethics and **compliance** program and **overseeing its implementation**,
>
> - **Overseeing company-wide programs for compliance reporting and related investigatory processes**. . . .

166.     Kane therefore was responsible for both "overseeing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

### 3.     November 18, 2015 – Misstatement No. 3

167.     On November 18, 2015, Hogan publicly testified before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety. During that testimony, Hogan assured the public that PG&E was "just about done" implementing a program that would remotely disable the Company's recloser devices in areas that included "high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are able to *take our reclosers out of service remotely*, we first *focus on the wildfire areas* and then we have about 130 some odd locations, we are going to complete about 126 of those this year, *just about done with that program*, which leaves six for next year, which will be completed.

168.     This statement was materially false and/or misleading because PG&E misleadingly said that it had implemented policies and procedures to disable recloser devices from areas that were at high risk for wildfires, which includes the areas where the North Bay Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire. Indeed, a recloser was found on a broken PG&E pole at the second ignition point for the Camp Fire.  Thus, PG&E did not have the safety policies and procedures in place that they said they had.

### 4.     October 6, 2016 – Misstatement No. 4

169.     On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

**Vegetation Management**

Each year, PG&E's Vegetation Management department and its contracting arborists and foresters inspect miles of power lines in our service area for public safety and electric reliability. *We do so in compliance with relevant laws* and with a focus on public involvement, including extensive "Right Tree, Right Place"

1                outreach. PG&E has been recognized by the National Arbor Day
Foundation as a Tree Line USA recipient for 21 consecutive years
2                for demonstrating best practices in energy sector arboriculture.

3        170.    Because PG&E's vegetation management practices failed to follow relevant

4  California safety laws, PG&E's vegetation management activities were decidedly not "in

5  compliance with relevant laws."

6        171.    First, according to reports released in subsequent corrective disclosures, PG&E

7  violated California's Public Resources Code section 4293 multiple times.

8        172.    Second, Cal Fire found sufficient evidence of violations of state law to refer

9  PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5,

10  *infra*.

11        173.    Third, investigations into the causes of the Camp Fire have already disclosed

12  evidence that this most destructive and deadly wildfire in California history was caused by

13  PG&E violating California Public Resources Code §4293 and California Public Utilities Code

14  §451, among other safety regulations.

15        174.    Thus, this statement was materially false and/or misleading because of PG&E's

16  numerous and widespread violations of safety regulations, including regulations specifically

17  related to vegetation management – regulations which were essential for preventing devastating

18  wildfires. In fact, PG&E's violations were so pervasive that they caused the Camp Fire as well as

19  at least 11 of the North Bay Fires all at the same time in **seven** different counties – therefore they

20  cannot be explained away as an isolated lapse.

21        175.    This statement regarding compliance was reviewed and authorized by Defendant

22  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

23  2016 Corporate Responsibility and Sustainability Report:

24                Within senior leadership, ethics and compliance are managed by
the Chief Ethics and Compliance Officer (CECO), who reports to
25                the PG&E Corporation Chairman and CEO. The CECO has
additional reporting responsibility to the Audit Committees of the
26                PG&E Corporation and Pacific Gas and Electric Company Boards
of Directors, and the Compliance and Public Policy Committee of
27                the PG&E Corporation Board.

28                The CECO is responsible for:

- Building a best-in-class ethics and **compliance** program and **managing its implementation**,

- **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

176. Kane therefore was responsible for both "managing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including this report.

### 5. August 9, 2017 – Misstatement No. 5

177. On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

**Vegetation Management**

PG&E prunes and removes trees growing too close to power lines while maintaining as much vegetation as possible to balance land use and environmental stewardship with customer needs. Through a well-established and innovative vegetation management program, ***PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe***, reliable and affordable ***electric service***.

178. Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service."

179. First, according to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times.

180. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

181. Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

182.     Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

183.     This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by the Senior Vice President, Chief Ethics and Compliance Officer and Deputy General Counsel (CECO), who reports to the PG&E Corporation Chief Executive Officer (CEO) and President. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program **and managing its implementation**,
>
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

184.     Kane therefore was responsible for both "managing implementation" of PG&E's compliance and "**overseeing . . . compliance monitoring [and] reporting**," including this report.

**C.     Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires**

185.     Throughout the Class Period, Defendants repeatedly tied the sustainability of its quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period for the first time in six years, and then raised it again – touting the Company's "progress on safety" and "improvements we have made in safety." Yet PG&E's violations of California's

safety regulations were so numerous and widespread that they caused and exacerbated the North Bay Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

### 1.    May 23, 2016 – Misstatement No. 6

186.    Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at Annual Shareholder Meeting." It stated:

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> * * *
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> * * *
>
> ***Earley and other senior executives also discussed continued progress on safety***, reliability and other goals, as well as PG&E's strategy for the future [at the annual shareholder meeting].
>
> Earley said, '***We've continued to demonstrate leadership and commitment on safety.*** We're delivering the most reliable service in our company's history.

187.    This statement was materially false and/or misleading because it affirmed that PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires. Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically connecting purported safety achievements to its ability to increase its dividend, importantly, "to levels that are comparable with those of similar utilities." In reality, PG&E lacked the touted "progress on safety." It fell so far short of this touted achievement that its safety violations, and resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave investors a false impression that safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017. Further, this statement touting PG&E's

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 332 of 1229

1  "commitment on safety" materially omitted that the Company's spending on vegetation

2  management barely kept pace with inflation at that time.

3      188.    The false and misleading nature of this statement was further revealed in a series

4  of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

5  the Camp Fire: the most destructive and deadly wildfire in California history.

6          **2.**      **November 4, 2016 – Misstatement No. 7**

7      189.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

8  financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

9
10  > ***The improvements we have made in safety*** and reliability ***over the last six years have put us in a position to deliver strong financial results going forward.***

11
12  > Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.
13

14      190.    The statement was materially false and/or misleading because PG&E **did not**

15  **make** "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E

16  Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from

17  September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made

18  any changes" to improve safety. Nor was the Company "in a position to deliver strong financial

19  results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the

20  results of its numerous, widespread safety violations – had such a significant **negative** impact on

21  PG&E's financial results and financial outlook that PG&E had to suspend its dividend entirely

22  on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires. This

23  statement gave investors a false impression that concealed safety risks would not imperil the

24  Company's dividend, which is precisely what occurred on December 20, 2017.

25      191.    The false and misleading nature of this statement was further revealed in a series

26  of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations

27  caused the Camp Fire: the most destructive and deadly wildfire in California history.

28

3.      **May 31, 2017 – Misstatement No. 8**

192.    On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C. Johnson to Boards of Directors." The release stated:

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend by 4 cents per share to 53 cents per share, beginning with the dividend for the second quarter of 2017. On an annual basis, this action increases PG&E Corporation's dividend by 8 percent, from $1.96 per share to $2.12 per share.

> \* \* \*

> Yesterday, in remarks at the joint annual shareholders meeting of PG&E Corporation and Pacific Gas and Electric Company, [CEO] Williams highlighted the companies' *progress on safety, reliability* and reducing greenhouse gas emissions, among other accomplishments. *She reaffirmed PG&E's commitment to safety and operational excellence*, delivering for customers and leading the way to achieve California's clean energy goals.

193.    This statement falsely connected PG&E's decision increasing its dividend to "progress on safety" and PG&E's "commitment to safety and operational excellence," only months before the Company's pervasive failure to comply with safety regulations caused at least eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so testified). PG&E's above statement on May 31, 2017 gave investors a false impression that concealed safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017.

194.    The false and misleading nature of this statement was further revealed in a series of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused the Camp Fire: the most destructive and deadly wildfire in California history.

### D.     After the North Bay Fires Erupted, the Truth Began to Emerge

195.     The North Bay Fires began on Sunday evening, October 8, 2017. However, it was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were a major cause. On that date, as detailed below (*see* Section VII.D.1, *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must preserve any factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment from each fire event" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share price declined 6.7%.

196.     Late the next day, PG&E issued a statement explaining to investors that: "The causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's] power lines and other facilities." It reported that the Company "has approximately $800 million in liability insurance for potential losses that may result from these fires" – to prepare investors for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in which case, its "financial condition or results of operations could be materially affected." The market had understood that PG&E would be reimbursed by rate-payers for damages by fires it caused while nevertheless acting as a prudent manager; hence, the Company's discussion of liability and insurance signaled to the market that at least some of the North Bay Fires were proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share price continued to decline until the end of the next trading day, Monday, October 16, 2017, falling by approximately 16.5%.

197.     Thereafter, PG&E's management attempted to reassure investors, falsely, as detailed below.

1

2

**E.    After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

3

    **1.    October 31, 2017 – Misstatement No. 9**

4    198.    On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's

5    Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable***

6    ***federal and state vegetation clearance requirements and performs regular power line tree***

7    ***safety activities in accordance with industry standards, guidelines, and acceptable procedures***

8    ***that help to reduce outages or fires caused by trees or other vegetation***."

9    199.    This statement was materially false and/or misleading because PG&E did **not**

10    follow "all applicable … state vegetation clearance requirements."

11    200.    First, according to reports released in subsequent corrective disclosures, PG&E

12    violated California's Public Resources Code section 4293 multiple times.

13    201.    Second, Cal Fire found sufficient evidence of violations of state law to refer

14    PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5,

15    *infra.*

16    202.    Third, investigations into the causes of the Camp Fire have already disclosed

17    evidence that this most destructive and deadly wildfire in California history was caused by

18    PG&E violating California Public Resources Code §4293 and California Public Utilities Code

19    §451, among other safety regulations.  This statement concealed the sizeable risk that PG&E's

20    numerous and widespread violations of safety regulations would **worsen** rather than "help to

21    reduce . . . fires caused by trees or other vegetation."

22    203.    Thus, this statement was materially false and/or misleading because of PG&E's

23    numerous and widespread violations of safety regulations, including regulations specifically

24    related to vegetation management – regulations which were essential for preventing devastating

25    wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire

26    as well as multiple North Bay Fires all at the same time in seven different counties – therefore

27    they cannot be explained away as an isolated lapse.

28

1    204.    This statement regarding compliance was reviewed and authorized by Defendant

2  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

3  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

4  compliance reporting," including this press release.  Because of her senior position within the

5  Company, Kane had ultimate authority to control the content of this statement.

6    **2.    November 2, 2017 – Misstatement No. 10**

7    205.    On November 2, 2017, PG&E hosted a conference call with analysts to discuss its

8  financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams

9  falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

> Thank you, Chris, and good morning, everyone. Given the recent wildfires impacting our customers and communities, our discussion today will be different from our usual earnings call. . . .
>
> * * *
>
> Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.
>
> * * *
>
> **Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.
>
> * * *
>
> **I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.
>
> **We also have one of, if not, the most comprehensive vegetation management programs in the country.** Our vegetation management program manages about 123 million trees across the service territory. And every year, we inspect every segment of the

99,000 miles of overhead line and we clear vegetation as needed. This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

***In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year.*** We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

206. These statements were materially false and/or misleading because PG&E did not "doubl[e]" its "typical vegetation management spending last year." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[71] The lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a result of th[e September 2015 Butte] fire."

207. Further, PG&E failed to comply with safety regulations – including regulations specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation management program as "one of, if not, the most comprehensive vegetation management programs in the country," she gave investors the false impression that PG&E's vegetation management did not fall short of applicable safety regulations, when in fact it did. Given PG&E's numerous and widespread violations of safety regulations, including those violations that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its "vegetation management programs" were **not** "comprehensive."

---

[71] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

1

### 3.      November 2, 2017 – Misstatement No. 11

2        208.    Later on the same call, an analyst asked the Company for more detail about

3    PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as

4    follows:

5              [ANALYST:] And then, I guess, ***can you discuss your vegetation
              practices for trees that are located near power lines?*** I guess
6              we've seen sort of end reports that have come out for some of your
              peers that they sort of track vegetation that's within certain
7              distances from the lines, and they basically make their decisions on
              what to do based on sort of updates.

8
              [Stavropoulos:] Thank you for the question. So as Geisha
9              mentioned, we have a very aggressive vegetation management
              program across our 70,000-mile -- square mile territory. We
10             manage about 123 million trees that are near and adjacent to our
              facilities. ***And over the last 2 years, we've doubled the amount
11             that we've invested in veg[etation] management.*** That includes
              line clearing to remove parts of trees that are adjacent to our
12             facilities as well as removal of dead and dying trees. So the
              program involves year-round effort to identify these dead and
13             dying trees through inspection processes where we use foot and
              aerial patrols; we use LiDAR, which is light, detecting and ranging
14             technology, to identify the trees that need to be worked. ***We
              inspect all of our overhead lines every year, and we do second
15             patrols in high fire danger areas at least twice a year. In some
              areas, we do as often as 4x a year.*** So it's a very aggressive
16             program. There are specific requirements around line clearing, and
              it depends upon the voltage of the lines. And it can range up to feet
17             [sic] to as much a sort of 18 inches away from the facility. So there
              are all sorts of different requirements, depending upon where the
18             facilities are located and the voltage of the facilities.

19       209.    This statement was materially false and/or misleading because PG&E did not

20   "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section

21   IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

22   indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

23   2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation

24   management practices was confirmed by PG&E's own Vegetation Program Manager Richard

25   Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of

26   my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since

27   September 2015.

28

210.    Further, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, violations were so pervasive that they evidently caused the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

211.    As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line.  PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.

### 4.    November 5, 2017 – Misstatement No. 12

212.    At all relevant times, PG&E's Media Relations department maintained a news website named *Currents*,[72] providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services. Through the website, PG&E repeatedly touted the safety of its power lines, the Company's vegetation management program, and its purported success mitigating wildfire risk.

---

[72] http://www.pgecurrents.com (last visited Dec. 13, 2018).

213.    In one such article, dated November 5, 2017 and titled "Facts About PG&E's Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[73]

214.    This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

215.    First, according to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. *See* Section VII.D.4., *infra*.

216.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

217.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

218.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

219.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

---

[73] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at Issue in NorCal Wildfires." *See* https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html (last visited Dec. 13, 2018).

1    compliance reporting," including this news release. Because of her senior position within the

2    Company, Kane had ultimate authority to control the content of this statement.

3            **5.**      **May 25, 2018 – Misstatement No. 13**

4        220.      On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports

5    regarding some of the October 2017 North Bay Fires (*see* Section VII.D.4, *infra*), to reassure

6    investors that PG&E had met all state regulations concerning fire safety. The press release stated:

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

- ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

22        221.      This statement was materially false and/or misleading because PG&E did not

23    "meet" – much less "exceed" – "regulatory requirements for pole integrity management."

24    According to a report released in a subsequent corrective disclosure, PG&E violated California's

25    safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its

26    "investigators have determined that 12 Northern California wildfires in the October 2017 Fire

27    Siege were caused by electric power and distribution lines, conductors **and the failure of power**

28    **poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT           63
CIVIL ACTION NO. 3:18-CV-03509-RS

of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to the relevant district attorney. Further, Cal Fire found enough evidence of violations of state law to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires. *See* Section VII.D.5., *infra*.

222. Additionally, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point that exhibited damaged and downed poles, in violation of §451. Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" – regulations which were essential for preventing devastating wildfires. PG&E's representation to the contrary was materially false and/or misleading.

223. Overall, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

224. This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

**F.      While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol**

225. As detailed below (*see* Section VII.D., *infra*), PG&E's share price declined precipitously as the truth about its responsibility for the North Bay Fires emerged. As liabilities for the North Bay Fires threatened the Company's financial viability, Defendants would realize that the Company needed a legislative bailout to avoid bankruptcy. As a result, PG&E needed the public, including investors, to believe that it would prioritize safety thereafter.

1

### 1.     June 8, 2018 – Misstatement No. 14

2      226.    On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the

3    preponderance of the North Bay Fires (*see* Section VII.D.5, *infra*), PG&E's share price

4    continued its decline, and its financial situation deteriorated.  Later that day, PG&E issued a

5    press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that

6    PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E

7    Responds to Latest CAL FIRE Announcement" stated, in relevant part:

8          ***Programs Overall Met State's High Standards***

9             We look forward to the opportunity to carefully review the
              CAL FIRE reports to understand the agency's perspectives.
10
              Based on the information we have so far, we continue to
11            believe our overall programs met our state's high standards.

12            For example, ***PG&E meets or exceeds regulatory
              requirements for pole integrity management***, using a
13            comprehensive database to manage multiple patrol and
              inspection schedules of our more than two million poles.
14
              Similarly, ***under PG&E's industry-leading Vegetation
15            Management Program***, we inspect and monitor every PG&E
              overhead electric transmission and distribution line each year,
16            with some locations patrolled multiple times. We also prune or
              remove approximately 1.4 million trees annually.
17
       227.    Because PG&E's compliance violations would soon cause the Camp Fire, the
18
     most destructive and deadly wildfire in California history, PG&E's "Vegetation Management
19
     Program" and "pole integrity management" decidedly did not meet California's "High
20
     Standards."  Investigations into the causes of the Camp Fire have already uncovered evidence
21
     that it was caused by PG&E violating California Public Resources Code §4293 and California
22
     Public Utilities Code §451, among other safety regulations.
23
       228.    First, the Camp Fire was described in initial communications between firefighters
24
     and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should
25
     have been cleared by PG&E pursuant to §4293.
26

27

28

229.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in violation of §451.

230.    Third, PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.

231.    Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" or "Vegetation Management" – regulations which were essential for preventing devastating wildfires.  PG&E's representation to the contrary was materially false and/or misleading.

232.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 2.    June 8, 2018 – Misstatement No. 15

233.    The same press release contained a further false and/or misleading statement:

> To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched the Community Wildfire Safety Program* to help keep our customers and communities safe. Among the key components of the new program are. . .
>
> • Public Safety Power Shutoff: As a last resort, *a program to proactively turn off electric power for safety when extreme fire danger conditions occur*, while helping customers prepare and providing early warning notification, when and where possible.

234.    PG&E's representation that it "has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur" was false and misleading. It was false because the touted program, which would eventually become its ESRB-8 Shutoff Protocol, was illusory; hence, PG&E never "launched" it.  Further, it was misleading because

any guidelines PG&E did develop were a mere pretense of safety that the Company never felt bound to follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E flouted its own supposed program.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history.  By touting a wildfire safety program PG&E did not adhere to, and where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

235.    This press release regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 3.    September 27, 2018 – Misstatement No. 16

236.    On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power lines" in the face of unprecedented wildfire threats "to ensure public safety."  It was the Company's official announcement of its de-energization policy and procedures implementing Resolution ESRB-8, detailed below, that materially misled investors.

237.    On or about September 27, 2018, PG&E announced the full details of its ESRB-8 Shutoff Protocol in a filing with CPUC[74] that was also posted on its website.[75]  The ESRB-8 Shutoff Protocol stated:

> PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. ***It includes*** . . . ***executing protocols to temporarily turn off***

[74] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last visited Dec. 13, 2018).

[75] https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last visited Dec. 13, 2018).

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 346 of 1229

*electric power for safety when extreme fire danger conditions are occurring.*"

. . .

Public Safety Power Shutoff is one component of the Community Wildfire Safety Program. ***PG&E has created a set of procedures for. . . [d]etermining what combination of conditions necessitates turning off lines for safety.***

. . .

PG&E will take a combination of many criteria into consideration, including:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.)

238.    PG&E's representation that it had "implement[ed] additional precautionary measures" including "determining what combination of conditions necessitates turning off lines for safety" was false and misleading.  It was false because the ESRB-8 Shutoff Protocol was illusory; hence, PG&E did not "implement" it, as required by law.  Further, it was misleading because any guidelines PG&E did develop were a mere pretense of safety that the Company never felt bound to follow.  Even when all seven relevant "criteria" weighed in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its protocol.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history.  By touting a wildfire

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 347 of 1229

safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

239.   This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this report. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 4.      October 9, 2018 – Misstatement No. 17

240.   On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment caused another of the North Bay Fires, known as the Cascade Fire.  Later the same day, PG&E issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

> [W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas***, and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat.

241.   It was false and misleading for PG&E to tout "implementing additional precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and poles stronger in high fire threat areas."  Indeed, just one month later, PG&E would cause the Camp Fire through its failure to remove vegetation and maintain its poles, in violation of California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

242.   As noted above, the Camp Fire was described in initial communications between firefighters and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should have been cleared by PG&E under §4293.  Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission

1    tower" or pole that PG&E failed to maintain, as well as a second ignition point that exhibited

2    damaged and downed poles, in violation of §451.  PG&E's representation to the contrary was

3    materially false and/or misleading.

4         243.    This statement regarding compliance was reviewed and authorized by Defendant

5    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

6    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

7    compliance reporting," including this press release.  Because of her senior position within the

8    Company, Kane had ultimate authority to control the content of this statement.

9              **5.    October 9, 2018 – Misstatement No. 18**

10        244.    The same press release contained a further false and/or misleading statement:

> To address the growing threats posed by wildfires and extreme
> weather, and in light of the wildfires throughout our state last
> year, ***PG&E has launched the Community Wildfire Safety
> Program*** to help keep our customers and communities safe ***by
> implementing additional precautionary measures*** intended to
> further reduce wildfire threats. Among the key components of
> the new program are. . .
>
> • Public Safety Power Shutoff: As a last resort, ***a program to
>   proactively turn off electric power for safety when
>   extreme fire danger conditions occur***, while helping
>   customers prepare and providing early warning
>   notification, when and where possible.

18        245.    PG&E's representation that it "has launched" and "implement[ed] . . . a program

19   to proactively turn off electric power for safety when extreme fire danger conditions occur" was

20   false and misleading.  It was false because the touted program, its ESRB-8 Shutoff Protocol, was

21   illusory from the beginning; hence, PG&E never "launched" or "implement[ed]" it.

22        246.    Further, it was misleading because any guidelines PG&E did develop were a mere

23   pretense of safety that the Company never felt bound to follow.  Even when all seven relevant

24   "extreme fire danger conditions" **did** "occur," weighing in favor of shutting off PG&E's

25   transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted

26   its supposed program.

27        247.    PG&E's failure to shut off its transmission line caused the Camp Fire: the most

28   destructive and deadly wildfire in California history.  By touting a wildfire safety program

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              70
CIVIL ACTION NO. 3-18-CV-03509-RS

1   PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E

2   misrepresented existing and material facts to investors.

3       248.    This statement regarding compliance was reviewed and authorized by Defendant

4   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

5   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6   compliance reporting," including this press release.  Because of her senior position within the

7   Company, Kane had ultimate authority to control the content of this statement.

8                  **6.      November 9, 2018 – Misstatement No. 19**

9       249.    On November 8, 2018, the Camp Fire started after PG&E decided not to shut off

10  its power.  Before the public became aware of PG&E's true role in causing the Camp Fire, the

11  Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has

12  determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions

13  of 8 Northern CA counties, as ***weather conditions did not warrant this safety measure***."[76]

14      250.    This statement was affirmatively false: weather conditions did, in fact, warrant a

15  shutoff.  As detailed above, all seven criteria that PG&E deemed relevant, including those related

16  to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

17  *See* Section IV.H., *supra*.

18      251.    This statement regarding compliance was reviewed and authorized by Defendant

19  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

20  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

21  compliance reporting," including this announcement.  Because of her senior position within the

22  Company, Kane had ultimate authority to control the content of this statement.

23  **VI.    MATERIALITY**

24      252.    PG&E's reassurances to investors about its safety, prudence, and compliance with

25  the law were especially important to investors because of California's legal regime known as

26  inverse condemnation. As described in more detail above (*see* Section IV.A.5., *supra*), PG&E is

27

28      [76] https://twitter.com/PGE4Me/status/1060672000929267713  (last visited Dec. 14, 2018).

1    strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

2    could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

3    acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

4    for some or all of its liability.

5        253.    PG&E's shareholders understood that PG&E would bear the costs of wildfires it

6    caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

7    by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

8    2017 stated:

9            On the 3Q17 call PCG indicated company operations were
             conducted properly leading up to and after the fire, but they still
10           had little information regarding the cause of the fire or potential
             shareholder exposure.
11
                                    * * *
12
             PCG reiterated the company routinely inspects, maintains, and
13           replaces poles, and tests and treats wood poles on a frequency that
             significantly exceeds CPUC requirements. The company claims to
14           have one of, if not the most comprehensive vegetation
             management programs in the country. Further, the company
15           doubled its vegetation management spending in 2016 due to the
             drought and tree mortality crisis in California. That being said, we
16           still do not know and likely will not know what caused the various
             fires for some time, **whether or not PCG's equipment was solely
17           or partly the cause**, and whether or not the facts will support a
             ruling at CPUC that PCG **acted prudently** should they be
18           successfully sued under inverse condemnation.

19       254.    In light of these provisions of California law, PG&E's repeated reassurances to its

20   investors – *e.g.*, that it complied with relevant safety regulations and doubled its vegetation

21   management spending – effectively communicated that the Company would be able to recover

22   any property damage liabilities from wildfires caused by its systems, through the CPUC. Those

23   reassurances, when revealed to have been false and misleading, impacted the Company's

24   valuation by at least the amount of damage caused by the North Bay Fires and Camp Fire.

25       255.    In total, PG&E's share price declined $55.60 per share on the nine corrective

26   disclosures and/or materializations of concealed risk herein alleged. Given that the Company had

27   between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to

28   October 25, 2018, it implies that the losses caused by PG&E's fraud exceed $28.71 billion.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              72
CIVIL ACTION NO. 3-18-CV-03509-RS

256.    Indeed, as detailed further below (*see* Section VIII.F., *infra*), PG&E believed that the liabilities it faced put it at risk of bankruptcy.

## VII.    LOSS CAUSATION

### A.    Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock

257.    As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017.

### B.    PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires

258.    PG&E caused the North Bay Fires. To date, Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson, lightning, fireworks, hikers, children playing with matches, or any other such cause. Of the seventeen fires for which Cal Fire has determined the cause, it has determined that **all seventeen were caused by PG&E equipment**.

259.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire fatalities.**

260.    Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than**

**50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations.

261.    Cal Fire's investigation of the Tubbs fire – the largest and most destructive of the North Bay Fires – is still ongoing.

**C.    PG&E's Safety Violations Proximately Caused the Devastating Camp Fire**

262.    At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in Pulga, California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo Gap.[77]  A second ignition point, also caused by faulty PG&E equipment, began approximately 15 minutes later near the community of Concow.  The combined Camp Fire soon devastated several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill.

**D.    When the Market Learned the Truth, the Price of PG&E's Common Stock Fell Dramatically**

263.    On or about October 8, 2017, eighteen major wildfires known as the North Bay Fires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

**1.    October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

264.    It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were a proximate cause of the North Bay Fires. On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The

---

[77] http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf (last visited Dec. 13, 2018).

public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."

265.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event**" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to **potential causes of the fires, vegetation management, maintenance and/or tree-trimming**." This was the first indication that PG&E failures caused any of the North Bay Fires.

266.    On this news that PG&E would likely bear at least some responsibility for the fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost 13 million shares (compared to a Class Period daily average trading volume of 3.5 million[78]).

### (b)    Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017

267.    The following morning, news outlets began to report that PG&E was being connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October 13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may have started California wildfires."[79] The article began by observing: "The California Public Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano Counties,' according to multiple reports." It continued to note that PG&E's share price decline occurred "on concerns its power lines may have started the massive wildfires that have ravaged California recently." The article also repeated market commentary that the decline in PG&E's share price reflected investors' understanding that PG&E was financially responsible for the North Bay Fires:

---

[78] This average excludes alleged corrective disclosure and/or materialization of risk dates.

[79] This article was published prior to the Company's corrective disclosure later that day, discussed *infra*.

> The drop in the stock "reflects the following assumptions: 1) the fire was caused by PCG's negligence, 2) insurance coverage for 3rd party liabilities will be very limited, 3) damage costs per acre far larger than those for the 2015 Butte fire and 4) material fines and penalties will be assessed," Christopher Turnure, an analyst at JPMorgan, said in a note Thursday. "We appreciate the severity of the fires and the legal challenges of operating in California, but estimate this loss of value as approaching a worst-case scenario for PCG shares."

268.    Similarly, on the same date, *SF Gate* published an article observing: "[T]**he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[80]

269.    Investors started to be concerned regarding whether PG&E violated any regulations with respect to the North Bay fires. For example, Wells Fargo stated in its analyst report the very next day:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

270.    Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

[80] https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php (last visited Dec. 13, 2018).

### 2. October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

271.    Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading. Therein, the Company stated in relevant part:

**Investigation of Northern California Fires**

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation**.

It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.**

272.    On these disclosures, PG&E's share price continued to decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of over 68.5 million shares.

#### (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017

273.    Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires. Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse. For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even further in the early afternoon actually as

Case 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 356 of 1229

1   well, following the company's 8-K disclosing the utility's $800mm in liability insurance, which

2   we noted had not been disclosed previously (since it had been renewed following the Butte

3   fire)."

4        274.    PG&E's announcement and resulting share price decline were proximately caused

5   by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

6            **3.**       **December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

7

8                 **(a)**     **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

9        275.    On December 20, 2017, after the market closed, PG&E issued a press release

10   titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and

11   Potential Liabilities Associated with Northern California Wildfires." The filing also included, as

12   exhibit 99.1, a press release in which the Company announced that it would be suspending its

13   quarterly cash dividend. In the press release, PG&E stated in pertinent part:

14            **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG)

15   today announced that its Board of Directors has determined to **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing**

16   **uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California**

17   **wildfires**.

18   In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to

19   suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same

20   uncertainty.

21   No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing

22   investigations.

23   However, California is one of the only states in the country in which courts have applied inverse condemnation **to events caused**

24   **by utility equipment**. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event

25   such as a wildfire - even if the utility has followed established inspection and safety rules - **the utility may still be liable for**

26   **property damages and attorneys' fees associated with that event**.

27   "After extensive consideration and in light of the uncertainty

28   associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E

boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

276.     On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced heavy trading volume, with over 52 million shares trading hands.

277.     Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶185), investors were shocked by this unexpected suspension of the dividends due to Defendants' intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market.

### (b)     Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017

278.     When PG&E announced it would suspend its dividend entirely, investors understood that as a revelation that PG&E would bear a higher than expected level of responsibility, and thus liability, for the North Bay Fires.

279.     For example, a RBC Capital Markets analysts report issued on December 21, 2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend the dividend. **This unexpected decision suggests greater risk than we had assumed surrounding regulatory treatment of the October 2017 Northern California wildfires**."

280.     Similarly, an analyst report issued by Evercore ISI the same day stated:

On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire. . . . PCG also indicated they found instances of wires down, vegetation near PCG facilities and some broke poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country.

281.    PG&E's suspension of its dividend and resulting share price decline were proximately caused by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

### 4.    May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

282.    On May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

**CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**

Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

283. Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. The filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be substantial."

284. On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 5.7 million shares changing hands on May 29, 2018.

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

81

> **(b)   Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018**

285.   Analysts were surprised by the results of the Cal Fire reports. For example, Deutsche Bank stated in its May 28, 2018 report:

> From the investor perspective the market should not be particularly surprised that PG&E's lines have been found to be involved in starting the fires. **That said, the fact that this was the case in all four of the fires – and that violations were found in three of the four instances – will likely be seen as a negative data point.** Reading through the LaPorte fire investigation for other data points, investors may be concerned to note that the wind speeds around the time of the ignition do not seem to have been particularly high – with a maximum gust of 29mph.

286.   One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

287.   Accordingly, the new information contained in these disclosures, including the severity of PG&E's conduct and the role of its violations of California safety laws in causing the North Bay Fires, proximately caused PG&E's share price decline.

> **5.   June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

288.   On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**
>
> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric

power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

289. While this news release did not discuss specific violations found, it disclosed that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

(a)     **The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers**

290. By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

<div style="text-align:center">

**(b)** **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

</div>

291.    On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

292.    Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. The filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability for losses associated with**" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:
>
> - for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and
>
> - for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

293.     Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.

**(c)     Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018**

294.     The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company**." Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs**." Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring its evidence to the District Attorney – likely a strong indictment to potential criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted that "all signs seem to point to PCG being imprudent operators in the majority of instances, which would therefore mean it should assume liability." Accordingly, the number and range of safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

295.     On June 11, 2018, *Bloomberg* published an article reporting: "The company said Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in five months at the open" of trading. The article also noted that "[t]he alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California."

296.     Accordingly, the new information contained in these June 8 and 11 disclosures, including the severity of PG&E's conduct, the role of its violations of California safety laws in

1    causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately

2    caused PG&E's share price decline.

3         **6.    November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

4

5    297.    The Camp Fire began in the early morning of November 8, 2018 and grew

6    steadily throughout the day.  However, as of the close of trading that day, no prominent news

7    sources had reported that PG&E may have caused it.

8         **(a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

9    298.    After the close of trading on November 8, 2018, PG&E announced via its official

10   Twitter.com account that it had decided not to implement its procedure for shutting power lines

11   during dangerous weather conditions.  This communication was the first indication that PG&E's

12   equipment and decisions may have contributed to the Camp Fire, undermining the Company's

13   assurances to investors that it would comply with safety regulations and prioritize safety, detailed

14   above.  While the announcement began to disclose the truth regarding PG&E's responsibility for

15   the Camp Fire, it also contained a further false reassurance that PG&E's decision was because

16   "***weather conditions did not warrant this safety measure***," as detailed above.

17   299.    Also after the close of trading on November 8, 2018, PG&E filed an Electric

18   Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-

19   Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen

20   minutes before the Camp Fire began, "in the area of the Camp Fire."  The same report

21   acknowledged that an aerial patrol later in the day showed "damage" to the same transmission

22   tower.  However,  this information undermining PG&E's statements about compliance and

23   prioritizing safety during the Class Period would not be reported by major news outlets until the

24   next day, November 9, 2018.

25   300.    On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at

26   $39.92 on November 9, 2018, the following trading day.  The stock experienced unusually high

27   trading volume of 23,627,100 shares.

28

1

2

### (b)    Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline

301.    Market commentators confirmed that PG&E's share price declined due to the Camp Fire, the true risk of which was concealed by PG&E's false and misleading statements and omissions.

302.    On November 9, 2018, CNBC published an article entitled "Shares of electricity provider PG&E have worst day since 2002 as wildfires ravage California."[81]  The article noted that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ." It further observed: "PG&E also traded 23.6 million shares, about five time its average 30-day volume."  The article was initially published at 1:03 p.m. Eastern Time (*i.e.,* prior to the close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the Camp Fire.

303.    On November 9, 2018, Deutsche Bank described how investors were "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of provisions regarding 2018 wildfires:

> While there has been no specific indication of utility lines being involved in these ignitions, investors are understandably concerned considering that the recently passed wildfire bill (SB901) left utilities particularly exposed to 2018 fires if their infrastructure ends up being implicated. This is due to the fact that the so-called stress test or customer harm threshold is only applicable to 2017 fire losses. Meanwhile, the new reasonableness standard which the CPUC will use to determine eligibility for recovery of liability costs from customers only kicks in from 2019.

304.    A Barclays report from the same day supported the conclusion that investor concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the stock price drop:

> **We believe the lack of explicit language for 2018 wildfires in SB 901 may be increasing market pressure**. SB 901 specifically

---

[81] https://www.cnbc.com/2018/11/09/shares-of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html (last visited Dec. 13, 2018).

addresses 2017 wildfire liability by tasking the CPUC with creating a cap on IOU liability to ensure safe and affordable service. The bill addresses wildfire liability in 2019 and beyond by creating a securitization mechanism. However, specific language addressing 2018 liability coverage is noticeably absent. The general consensus among CA stakeholders is that 2018 will be treated in a similar fashion to 2017, however the lack of a specific prescription may be heightening investor concern if the Camp Fire is found to be started by PCG.

305.    While this report stated that there was no indication yet that electrical equipment had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could become a source of liability if PG&E equipment was found to be involved: "we expect PCG's decision not to de-energize lines after warning of high fire risk will be investigated if the fire is found to have been sparked by PCG equipment."

> **7.    November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**
>
> **(a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

306.    Because PG&E had concealed the extent of its safety violations and failures to prioritize safety, the market was shocked to learn how much evidence supported the conclusion that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety regulations.  Thus, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers.  *See* Section VI, *supra*.

307.    After the close of trading on Friday, November 9, 2018, news outlets began to report that there was evidence PG&E caused the Camp Fire based on PG&E's incident report the previous evening.  The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[82]

---

[82] https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/ (last visited Dec. 13, 2018).

308.     On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[83]  It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at least 6,453 homes and 260 commercial buildings.[84]  The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill.  By Sunday November 11, 2018, it was reported that more than 200 people were missing, the death toll had risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent contained.[85]

309.     Then on Monday, November 12, 2018, the next trading day, it was reported that BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the Camp Fire ignited; the email communicated that the Utility needed access to her property to repair a transmission line that was "sparking."  It was further reported that the incident occurred near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and Camp Creek Road.

310.     On this news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on November 12, 2018.  The stock experienced a trading volume of 44,033,200 on November 12, 2018.

### (b)     Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline.

311.     Investors were concerned over this evidence of PG&E causing the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to the press regarding PG&E's knowledge of transmission line problems in the area.  As a result, PG&E's stock price continued to drop.  As the *San Francisco Chronicle* reported on November 12, 2018, "Cowley's

---

[83] https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/ (last visited Dec. 13, 2018).

[84] *Id.*

[85] https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php (last visited Dec. 13, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

90

1  revelation came as shares of Pacific Gas and Electric Co.'s parent company plummeted Monday

2  amid concerns from investors about the utility's liability connected to the Camp Fire."[86]

3    312.   Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp

4  Fire is in PCG's service territory and there are initial indications that the company's transmission

5  infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

6    313.   A Macquarie Research analyst report on November 13, 2018 estimated PG&E's

7  fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could

8  be higher given that the Camp Fire was not yet contained:

9    We've reduced our [target price] to US$45 from US$57, is based
   on 10.4x our '20E EPS vs 13.6x previously. Our new [target price]

10   reflects incremental ~US$8bn in fire-related liabilities, which we
   hope proves excessive given the stress test included in the SB901,

11   but we have no way to assess the potential liabilities as the fire is
   only 30% contained.

12    314.   A November 13, 2018 Bloomberg Intelligence report remarked that the analyst

13  **expected** PG&E's liability to **exceed its total equity valued** absent additional assistance from

14  the California government, and that such a bailout was not certain: "Unless mitigated by

15  regulators, we expect PG&E's write-offs could exceed the company's total equity.  California's

16  utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule

17  makes utilities liable for most of the billions in fire damage, but powerful political resistance

18  prevents customer bills from rising much above inflation."

19    **8.   November 14, 2018 – Corrective Disclosure and/or Materialization of**
        **Concealed Risk**

20

21      **(a)   The Market Continued to Learn the Extent and Effects of**
             **PG&E's Responsibility for the Camp Fire**

22

23    315.   After the close of trading on November 13, 2018, PG&E released a Form 8-K that

24  showed a much bleaker picture of PG&E's deteriorating financial situation than investors had

25  reason to expect, even calling into question its ability to remain solvent in the face of mounting

26  evidence of its liability for the Camp Fire.  The SEC filing admitted, among other things, that

27    _____

28  [86] https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-
   wildfire-fallout-13384830.php (last visited Dec. 13, 2018).

1   PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the

2   Camp Fire could exceed its insurance:

3   **Item 2.03. Creation of a Direct Financial Obligation or an**
    **Obligation Under an Off-Balance Sheet Arrangement of a**
4   **Registrant**

5       As of November 13, 2018, Pacific Gas and Electric
    Company ("Utility"), a subsidiary of PG&E Corporation, and
6   PG&E Corporation have aggregate borrowings outstanding under
    their respective revolving credit facilities of $3.0 billion and $300
7   million, respectively. . . . **No additional amounts are available**
    **under the Utility's and PG&E Corporation's respective**
8   **revolving credit facilities**.

9                               *        *        *

10  **Item 8.01 Other Events.**

11      *Camp Fire*

12      On November 8, 2018, a wildfire began near the city of
    Paradise, Butte County, California (the "Camp Fire"), located in
13  the service territory of the Utility. . . .

14      As previously reported, during the third quarter of 2018,
    PG&E Corporation and the Utility renewed their liability insurance
15  coverage for wildfire events in an aggregate amount of
    approximately $1.4 billion for the period from August 1, 2018
16  through July 31, 2019. . . .

17      While the cause of the Camp Fire is still under
    investigation, if the Utility's equipment is determined to be the
18  cause, the Utility could be subject to significant liability in excess
    of insurance coverage that would be expected to have a material
19  impact on PG&E Corporation's and the Utility's financial
    condition, results of operations, liquidity, and cash flows.

20
    316.    On this news, PG&E's share price fell $7.13, or 21.791%. to close at $25.59 on
21
    November 14, 2018.  The stock experienced high trading volume of 53,543,100.
22
                **(b)    Market Commentators Confirmed the Cause of PG&E's Share**
23                       **Price Decline on November 14, 2018**

24      317.    Analyst commentary attributed the drop in PG&E's stock price to news about

25  PG&E's insufficient insurance coverage and deteriorating financial situation, including the

26  chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market

27  closed the previous day.

28

---

318. CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop in stock price on November 14, 2018:

> Shares of utility PG&E fell 21 percent on Wednesday after the company said that if its equipment is responsible for the "Camp Fire" burning in Northern California, the cost of the damage would exceed its insurance coverage and **harm its financial health**. . . . "With these borrowings, the entire credit facility has been drawn and PG&E now has $3.5 billion of cash on its balance sheet," Citi analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a non-investment grade credit rating and the liquidity requirements as a result of the downgrade."[87]

319. Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%) is concerned about a near-term cash and credit crunch**. The company warned of bankruptcy earlier this year, and **the situation is more desperate now**. If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

### 9. November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

320. On November 15, 2018, Cal Fire announced that it had identified a possible second ignition point for the Camp Fire.[88] This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

321. On this news, PG&E's share price fell $7.85, or 30.676%. to close at $17.74 on November 15, 2018. The stock experienced its highest trading volume during the Class Period of 107,155,700 on November 15, 2018.

---

[87] https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html (last visited Dec. 13, 2018).

[88] https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/ (last visited Dec. 13, 2018).

1

        **(b)   Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018**

2

322.   Market commentary confirmed that the November 15, 2018 decline in PG&E's share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements and omissions.  Indeed, PG&E's share price declined until CPUC President Michael Picker commented after the close of trading that day that he did not want the Company to become bankrupt.  A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E shares. They lost about two-thirds of their value during several days of free fall, then partially rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[89]

323.   A J.P. Morgan report from November 16, 2018 noted that the market was affected by continued uncertainty over California's willingness to aid PG&E:

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

*         *         *

324.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

---

[89] https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk (last visited Dec. 13, 2018).

## VIII.   SCIENTER

325.   Throughout the Class Period, Defendants acted with scienter by either knowingly misleading the public about PG&E's financial health and compliance with relevant safety rules and regulations, or doing so in a deliberately reckless manner.

### A.   PG&E's  Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations

326.   As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations. At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.

327.   Even after the disastrous Butte Fire revealed the seriousness of PG&E's fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers made any changes to improve safety or compliance. Thus, they either knew, or should have presumed, that its violations continued unabated.

### B.   Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It

328.   During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the Individual Defendants. For instance, the PG&E Board's Finance Committee was alleged in a separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively

1   involved in, and responsible for, assisting the Boards in their oversight of safety risk through its

2   review of strategies to manage the largest individual risks identified in the enterprise risk

3   management program," including the risk of "wildfire." Indeed, because the Company faced the

4   possibility of strict liability for property damages caused by wildfires, and such liability could be

5   extraordinary, wildfire safety was a particular focus of the Individual Defendants, who spoke

6   personally on the subject with investors and regulators throughout the Class Period. Further,

7   Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned

8   the Company's core operations. Therefore, the Individual Defendants, by virtue of the

9   importance of safety to the Company and their positions as its leaders, reasonably had

10   knowledge about PG&E's safety and regulatory failures during the Class Period.

11       329.   As discussed in Sections IV.C. and IV.D., *supra*, the Individual Defendants

12   repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and

13   results. For example, they kept investors apprised about how many hundreds of thousands of

14   trees the Company was trimming and removing, including how many thousands were "dead or

15   dying." Not only that, but the Individual Defendants also inflated these numbers over time

16   without explanation, raising the number of trees supposedly trimmed or removed from 1.2

17   million to 1.4 million. In both reporting and inflating these numbers, the Individual Defendants

18   showed they knew that vegetation management and compliance was important to investors.

19       330.   A core operation concerns a company's primary products or services, and it

20   extends to matters of importance that might significantly impact the company's bottom line.

21   There is no question that PG&E's safety policies and procedures were critically important to the

22   Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it

23   is also notable that PG&E is potentially facing $17 billion of liability due to its failures, and that

24   the California legislature has imposed a regulatory regime that imposes significant liability for

25   PG&E's vegetation management failures. This is strong evidence of the centrality of the

26   Company's wildfire safety and compliance regime.

27       331.   In a separate lawsuit that was filed in connection with the Butte Fire, it was

28   publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 375 of 1229

1   revealed – that Individual Defendants Williams and Hogan both served on an Executive Officer

2   Risk & Compliance Committee that was charged with monitoring vegetation management issues.

3   Further, according to the parties litigating against PG&E for injuries caused by the 2015 Butte

4   Fire, Defendant Hogan's and another individual's[90] deposition testimony purportedly showed

5   that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will

6   be touching its powerlines."  As noted above, this means noncompliance for approximately 1.2

7   million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety

8   violations in the nature of trees touching its powerlines at any given time.  *See* Section IV.F.4.

9        332.   Just months before the North Bay Fires broke out, United States District Judge

10   Thelton E. Henderson in the Northern District of California ordered that PG&E work with

11   federal prosecutors to retain a monitor to oversee the Company's compliance and ethics

12   programs, and implement "policies and procedures that address threats caused by vegetation," in

13   light of the deadly San Bruno explosion. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175,

14   Order at 3, ECF No. 916, (N.D. Cal. Jan. 26, 2017). As part of the sentencing process, PG&E

15   had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of

16   the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's

17   compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's

18   safety and compliance, such that "high-level personnel of the organization ensure its

19   effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, ECF No. 906 (N.D. Cal. Jan. 9, 2017).

20        333.   Because the Defendants represented that they closely monitored PG&E's safety

21   and compliance, they knew – or were deliberately reckless in not knowing – that PG&E's level

22   of safety with respect to vegetation management and wildfire prevention did not comport with

23   state law.

---

[90] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance
Supervisor.

C.     **The Federal Court Overseeing PG&E's Safety Monitoring Program Is Investigating Whether PG&E Recklessly Caused the Camp Fire in Violation of California Criminal Law and the Company's Parole**

334.     As described above, *see supra* Section IV.F.2., PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010.  On January 26, 2017, Judge Henderson sentenced PG&E to an expansive program of probation,  including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and refraining from any further criminal behavior. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175, Order, ECF No. 916, (N.D. Cal. Jan. 26, 2017) (the "San Bruno Order").

335.     The first condition to PG&E's probation is that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175, PG&E Sentencing Memorandum at 15, ECF No. 905-1, (N.D. Cal. Jan. 9, 2017).  PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations.  This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike.

336.     On August 14, 2017, United States District Judge William Alsup was assigned to preside over the criminal case.

337.     After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?
>
> 2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?
>
> 3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 377 of 1229

4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

338.    On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." He further stated: "The Court would appreciate receiving an amicus brief on this issue by December 31."

339.    While PG&E has not yet answered, these developments indicate that Judge Alsup is investigating whether PG&E may be criminally liable for recklessly causing the Camp Fire in violation of PG&E's court-imposed probation and California law.  This permits an inference that further evidence of PG&E's criminal responsibility the Camp Fire exists and will emerge.  It further implies that PG&E knew of such conduct due to its ongoing monitoring and reporting obligations.  Accordingly, these facts support the inferences that Defendants knew, or had reason to know, that it failed to comply with relevant laws and regulations when making the false and misleading statements detailed above.

D.    **PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations**

1.    **PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants**

340.    PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E states that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[91]

---

[91] http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/ (last visited Dec. 13, 2018).

341.     This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[92] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[93] The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[94] PG&E's 2016 Corporate Responsibility and Sustainability Report announced that a Margaret Mooney Award for Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a new technology that provides work crews with a dramatically enhanced data visualization of **work in progress**." The report further mentioned "[t]he development of an SAP-based **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus, PG&E used sophisticated software to kept track of safety regulation noncompliance for its powerlines and poles.

342.     PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's data.[95] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he status of a pole's inspection is tracked in SAP [database technology] so the inspection team knows when it's time to inspect each pole**. That information flows into the enterprise platform PG&E built, which pushes electronic lists to inspectors' iPad Pros."[96] The data collected is extensive enough to enable "an enterprise data and analytics organization that is using advanced analytics to predict when poles will fail."[97] And by 2017, the PG&E Corporate Responsibility and

---

[92] http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx  (last visited Dec. 13, 2018).

[93] *Id.*

[94] *Id.*

[95] https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-data-request-form.pdf  (last visited Dec. 13, 2018).

[96] https://www.informationweek.com/big-data/pgandes-winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251 (last visited Dec. 13, 2018).

[97] *Id.*

Sustainability Report mentions that the company's "SAP-based tool" was used to analyze trends in environmental compliance. Thus, PG&E's records of safety regulation violations were stored in a readily accessible database. Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

343. Consequently, to the extent that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.

> **2. PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored**

344. PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Individual Defendants touted their knowledge and familiarity with this practice at the Company, indicating either they personally received information of safety violations this way, or they knew where to find such information but deliberately avoided it.

345. On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First Natural Gas Utility to Receive Process Safety." It contained a description of an internal Company policy termed "**The Corrective Action Program, a program that empowers employees at all levels of PG&E to speak up and identify issues that are in need of improvement**."

346. On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on PG&E's culture of encouraging "every employee" to report safety violations up the chain of command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**

> We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> \* \* \*
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

347. Thus, PG&E went significantly beyond making employees feel safe "report[ing] things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up" "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness of what employees actually reported. Indeed, he stated that he was involved in "publicly recogniz[ing] employees when they do speak up."

348. As a result, the persistence of safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what the Individual Defendants did – or neglected to do – to mitigate safety problems once they were reported. Indeed, PG&E's long history of inadequate safety compliance did not stem from a lack of information but rather a lack of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see* Sections IV.B.-H., *supra*).

349. Earley's statement also affirms the direct connection between PG&E's treatment of safety issues, the Company's long-term financial results, and the size of its dividend. Indeed, as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period (as alleged above, *see* Section VII, *supra*), the market understood the connection between the

Company's safety violations and the foreseeable, material detriment they would have on the Company's financial results and dividend.

**E.     PG&E's Compliance Statements Were Authorized by Defendant Kane and Made under Her Ultimate Authority**

350.    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the Class Period. These statements were approved and made under her ultimate authority as CECO.

351.    PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and compliance program and performance,"[98] a role which Kane assumed on May 18, 2015 and held through the end of the Class Period. As CECO, she was responsible for both managing implementation of PG&E's legal compliance efforts as well as overseeing compliance monitoring and reporting during almost the entirety of the Class Period. When PG&E was being sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the Company-wide compliance and ethics program, including **compliance management**, risk-mitigation and **reporting**; **overseeing employee-investigatory processes**; and reinforcing PG&E's ethics and compliance culture, among many other compliance and ethics program elements." The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's and PG&E's Boards."

352.    Accordingly, Kane was apprised of any compliance violations reported within the Company, including violations reported by PG&E's lower-level employees and logged in

---

[98] PG&E Press Release, https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints _julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_ officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-class_corporate_ethics_program (last visited Dec. 13, 2018).

PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors that it was in compliance (*e.g.*, ¶159 (Misstatement No. 2, October 16, 2015); ¶169 (Misstatement No. 4, October 6, 2016); ¶177 (Misstatement No. 5, August 9, 2017); ¶198 (Misstatement No. 9, October 31, 2017); ¶213 (Misstatement No. 12, November 5, 2017); ¶220 (Misstatement No. 13, May 25, 2018); ¶¶226, 233 (Misstatement Nos. 14 & 15, June 8, 2016); ¶237 (Misstatement No. 16, September 27, 2018); ¶¶240, 244 (Misstatement Nos. 17-18, October 9, 2018); and ¶249 (Misstatement No. 19, November 9, 2018)).

353.    The CECO position was sufficiently senior such that Kane's scienter can be imputed to the Company regarding knowledge of legal compliance with California vegetation management and safety regulations.

354.    Additionally, because Kane reported directly to the CEO in her capacity as CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and Williams.[99] Because Kane was institutionally installed to advise the CEO of PG&E's compliance and safety, Kane would have told Earley and Williams what she knew regarding the Company's noncompliance with vegetation management regulations, or Earley and Williams would have been deliberately reckless in speaking on the subjects of compliance and safety without input from their CECO.

**F.    The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors**

355.    PG&E is currently facing approximately **$17 billion** in liability over the North Bay Fires that began on October 8, 2017. This immense exposure dwarfs the $1.6 billion that the Company earned in the full year 2017. In fact, it would take PG&E more than ten years of similar earnings to pay off such a liability.  Further, PG&E's liability for the Camp Fire has been estimated at up to $13 billion.

---

[99] Further, she reported directly to the Company's Chairman of the Board, a position which was also occupied by Earley during the Class Period.

356.    It is clear from Defendants' statements and actions that PG&E's liability over the North Bay Fires could have severe repercussions for the Company as a whole, and consequently for the careers of the Individual Defendants.

357.    One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol."

358.    NBC News reported on February 2, 2018 that after the North Bay Fires broke out, PG&E "sent out letter[s] to dozens of its non-profit 'community partners' warning them that a potentially 'unlimited' North Bay wildfire liability could imperil funding unless the legislature eases that legal burden." In those letters, PG&E's external affairs vice president Travis Kiyota implicitly threatened the funding for charitable endeavors: "This type of unlimited liability may affect our charitable giving and other non-profit community activities."

359.    On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company."

360.    On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

361.    The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part in causing the North Bay Fires.

362.    It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements," and that "we've doubled the amount that we've invested in veg[etation] management." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

363.    Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically. When PG&E faced a substantially **lower** liability for its role in the

Case 3:18-cv-03509-RS   Document 142-84   Filed 12/13/23   Entered: 12/13/23 22:10:31   Page 384 of 1229

deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

### G. After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up

364. As noted above, the public learned after the Camp Fire erupted that PG&E did not shut down its Caribou-Palermo transmission line that ignited the Camp Fire, despite the Company's ESRB-8 Shutoff Protocol. As further detailed above, PG&E faced criticism from a variety of sources for that decision, as well as significant decreases to its share price. *See* Section VII.D.6, *supra*.

365. While the Camp Fire continued to burn, the Company insisted that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line.

366. For example, in a November 16, 2018 statement reported by *KQED News*, PG&E spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the potential public safety issues resulting from de-energizing higher voltage transmission lines, including the potential to impact millions of people and create larger system stability issues for the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at 115kV or above."[100]

367. Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues resulting from de-energizing higher voltage transmission lines, including the potential to impact millions of people and create larger system stability issues for the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at 115kV or above."[101] Spokeswoman Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission

---

[100] https://www.kqed.org/news/11706846/pge-high-voltage-transmission-lines-not-covered-by-fire-safety-shutdown-plan (last visited Dec. 13, 2018).

[101] https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-down-power-ahead-of-camp-fire/ (last visited Dec. 13, 2018).

lines and such an emergency shutdown would need to be coordinated with the California

Independent System Operator, which oversees the state's power grid."  But as the article further

reported:

> But state and federal regulators say PG&E can shut down
> transmission lines of any size at its own discretion.
>
> "The transmission owners are solely responsible for operating their
> transmission and distribution lines and they can de-energize
> transmission and distribution lines without seeking approval from
> the ISO, with or without prior notice," Cal ISO spokesman Steven
> Greenlee said. "The transmission owner tells us that they are de-
> energizing a line and if a 230kV or 500kV line is de-energized it
> may require (us) to re-dispatch generation if the remaining lines
> become heavily loaded. This is a practice we perform every day
> with scheduled work and unplanned outages."
>
> CPUC spokeswoman Terrie Prosper also said the decision is up to
> the individual utility.
>
> "Utilities can de-energize whatever lines and voltage they deem
> appropriate," Prosper said. "They typically de-energize distribution
> lines because those lines are more localized than transmission
> lines."
>
> FERC Spokesman Craig Cano said PG&E would not need its
> approval to cut power to high-voltage lines for safety reasons.
>
> "FERC-approved standards address transmission system reliability
> and explicitly exclude safety matters, which could be the reason
> for shutting down a power line in response to wildfires or to
> mitigate the risk of fires," he said.

368.    Indeed, PG&E's entire response, including its denial that its ESRB-8 Shutoff

Protocol would not have included the Caribou-Palermo transmission line, was not true.

369.    First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation

on 115-kilovolt transmission lines or in fact any transmission lines.[102]  However, pursuant to

CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary

of de-energization policies and procedures on its website" and "Provide its de-energization and

restoration policy **in full**, and in summary form, to the affected community officials before de-

---

[102] *See generally* https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last visited Dec. 13, 2018).

1  energizing its circuits."[103]  Because a limitation on transmission lines was never mentioned in

2  PG&E's ESRB-8 Shutoff Protocol, it did not exist.

3  370.   Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission

4  lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-

5  Palermo transmission line and causing the Camp Fire.

6  371.   Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on

7  October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and

8  distribution lines.  Specifically, PG&E shut off eight transmission power line circuits and thirty-

9  three distribution power line circuits, as detailed in its later filing to CPUC.[104]  This admission

10  confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down

11  transmission lines.

12  372.   The same conclusion is confirmed by a telling revision PG&E made to otherwise

13  identical text in two succeeding reports to the CPUC—the first being its October "Public Safety

14  Power Shutoff Report" regarding the October shutoff,[105] and the second being its November

15  "Public Safety Power Shutoff Report" **after the Camp Fire**.  Therein, PG&E made the

16  following revelatory insertion:

17  > [PG&E has] reached out to more than 570,000 homes and
>  businesses that are served by our electric lines, operating at 70kV

18  > and lower, that run through extreme fire-threat areas. We have
>  communicated to these customers through several formats (letter,

19  > email, TV and print ads, social media and news stories) that, if
>  extreme fire danger conditions were forecasted, it might be

20  > necessary to temporarily turn off power to their neighborhood or
>  community for safety.

21

22

23  [103] http://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf (last visited Dec. 13, 2018).

24  [104]

25  http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last visited Dec. 13, 2018).

26  [105]

27  http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last

28  visited Dec. 13, 2018).

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 387 of 1229

(Underlining added to signify PG&E's addition.)  The absence of such language in its October 2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

373.    Finally, PG&E was required to answer questions posed by the CPUC's Safety and Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[106] The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines in the last 10 days without being requested to do so by CAL FIRE? If so, please provide information about location, duration and reasons for doing so."  In response, PG&E stated that it had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

> PG&E de-energized multiple transmission lines as described below without the direction of CAL FIRE:
>
> . . .
>
> 3.  On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #1-**115kV line** due to fire in the area. The line was returned to service on 10/9 at 1455.
>
> 4.  On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-**115kV line** due to fire in the area. The line was returned to service on 10/14 at 1044.

374.    As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol excluded transmission lines of any kind.  It was also false that PG&E's ESRB-8 Shutoff Protocol excluded 115-kilovolt transmission lines in particular.

375.    PG&E's statements representing such exclusions after the Camp Fire amount to a cover-up, and evidence the Company's scienter.  It is a continuation of PG&E's deliberate efforts to conceal the unsafe operations of its utilities, as further exposed by CPUC's allegations that the Company falsified records and data concerning the safety of its utilities from 2012 through 2017. *See* ¶86, *supra*.

---

[106] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf (last visited Dec. 13, 2018).

IX.     **APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET**

376.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Lead Plaintiff and other members of the Class purchased PG&E common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

377.    At all relevant times, the market for PG&E shares was efficient for the following reasons, among others:

(a)     PG&E stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, PG&E filed periodic public reports with the SEC and the NYSE;

(c)     PG&E regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)     PG&E was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publically available and entered the public marketplace.

378.    As a result of the foregoing, the market for PG&E common stock promptly digested current information regarding PG&E from publicly available sources and reflected such information in PG&E's stock price. Under these circumstances, all purchasers of PG&E common stock during the Class Period suffered similar injury because of their purchases of common stock at artificially inflated prices and a presumption of reliance applies.

379.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny, as Defendants' misstatements throughout the Class Period included omissions, in that they failed to inform investors of PG&E's safety and regulatory failures.

## X.    CLASS ACTION ALLEGATIONS

380.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

381.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

382.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

383. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

384. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;

- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

385. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

386. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶376-378.

387.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XI.    CAUSES OF ACTION

### FIRST CLAIM

#### For Violation of Section 10(b) of
#### The Exchange Act and Rule 10b-5 Against All Defendants

388.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

389.    This Count is asserted against PG&E and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

390.    During the Class Period, PG&E and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

391.    PG&E and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

392.    PG&E and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or

Case 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 392 of 1229

1   disseminated to the investing public; and knowingly and substantially participated, or acquiesced

2   in the issuance or dissemination of such statements or documents as primary violations of the

3   securities laws. These Defendants by virtue of their receipt of information reflecting the true

4   facts of PG&E, their control over, and/or receipt and/or modification of PG&E allegedly

5   materially misleading statements, and/or their associations with the Company which made them

6   privy to confidential proprietary information concerning PG&E, participated in the fraudulent

7   scheme alleged herein.

8       393.    Individual Defendants, who are the senior officers and/or directors of the

9   Company, had actual knowledge of the material omissions and/or the falsity of the material

10  statements set forth above, and intended to deceive Lead Plaintiff and the other members of the

11  Class, or, in the alternative, acted with reckless disregard for the truth when they failed to

12  ascertain and disclose the true facts in the statements made by them or other PG&E personnel to

13  members of the investing public, including Lead Plaintiff and the Class.

14      394.    As a result of the foregoing, the market price of PG&E securities was artificially

15  inflated during the Class Period. In ignorance of the falsity of PG&E's and the Individual

16  Defendants' statements, Lead Plaintiff and the other members of the Class relied on the

17  statements described above and/or the integrity of the market price of PG&E securities during

18  the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result

19  of PG&E's and the Individual Defendants' false and misleading statements.

20      395.    Had Lead Plaintiff and the other members of the Class been aware that the market

21  price of PG&E securities had been artificially and falsely inflated by PG&E's and the Individual

22  Defendants' misleading statements and by the material adverse information which PG&E's and

23  the Individual Defendants did not disclose, they would not have purchased PG&E's securities at

24  the artificially inflated prices that they did, or at all.

25      396.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

26  members of the Class have suffered damages in an amount to be established at trial.

27      397.    By reason of the foregoing, PG&E and the Individual Defendants have violated

28  Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
393 of 1229

plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PG&E securities during the Class Period.

<div align="center">

**SECOND CLAIM**

**For Violation of Section 20(a) of**
**The Exchange Act Against PG&E Corporation**

</div>

398.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

399.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendant PG&E Corporation.

400.    During the Class Period, PG&E Corporation participated in the operation and management of the Utility. PG&E Corporation conducted and participated, directly and indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's directors also sat on the board of PG&E Corporation.[107]  Further, both companies filed joint annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both** Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

---

[107] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Johns was a director of the Utility only.

2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos and Williams were directors of the Utility only.

2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the Utility only.

401.    Through its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to disseminate accurate and truthful information with respect to the Utility's financial condition and results of operations, and to correct promptly any public statements issued by the Utility which had become materially false or misleading.

402.    Because of its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and did, control the contents of the various reports, press releases and public filings which the Utility disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

403.    By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

## THIRD CLAIM

### For Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

404.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

405.    During the Class Period, the Individual Defendants participated in the operation and management of PG&E.  The Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

406.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's

1   financial condition and results of operations, and to correct promptly any public statements

2   issued by PG&E which had become materially false or misleading.

3       407.    Because of their positions of control and authority as senior officers, the

4   Individual Defendants were able to, and did, control the contents of the various reports, press

5   releases and public filings which PG&E disseminated in the marketplace during the Class Period.

6   Throughout the Class Period, the Individual Defendants exercised their power and authority to

7   cause PG&E to engage in the wrongful acts complained of herein. The Individual Defendants

8   therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the

9   Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

10   artificially inflated the market price of PG&E securities.

11       408.    By reason of the above conduct, the Individual Defendants are liable pursuant to

12   Section 20(a) of the Exchange Act for the violations committed by PG&E.

13                           **FOURTH CLAIM**

14   **Alter Ego Liability for Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Against PG&E Corporation**

15       409.    Lead Plaintiff repeats and realleges each and every allegation contained in the

16   foregoing paragraphs as if fully set forth herein.

17       410.    PG&E Corporation is jointly and severally liable for the misstatements and

18   omissions of the Utility, insofar as:

19       (a)    PG&E Corporation and the Utility operate as a single business enterprise

20   operating out of the same building located at 77 Beale Street, San Francisco, California, for the

21   purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for

22   the benefit of PG&E Corporation;

23       (b)    PG&E Corporation and the Utility do not operate as completely separate

24   entities, but rather integrate their resources to achieve a common business purpose;

25       (c)    the Utility is so organized and controlled, and its decisions, affairs, and

26   business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of

27   PG&E Corporation;

28

1    (d) PG&E Corporation's and the Utility's officers and management are

2 intertwined and do not act completely independently of one another;

3    (e) PG&E Corporation has control and authority to choose and appoint the

4 Utility's board members as well as its other top officers and managers;

5    (f) PG&E Corporation and the Utility are insured by the same carriers and

6 provide uniform or similar pension, health, life, and disability insurance plans for employees;

7    (g) PG&E Corporation and the Utility have unified 401(k) Plans, pension and

8 investment plans, bonus programs, vacation policies, and paid time off from work schedules and

9 policies;

10    (h) PG&E Corporation and the Utility have unified personnel policies and

11 practices and/or a consolidated personnel organization or structure;

12    (i) PG&E Corporation and the Utility are represented by common legal

13 counsel;

14    (j) PG&E Corporation and the Utility acknowledged in their joint 10-K

15 statement for the year 2015 that eight separate officers were "executive officers of both PG&E

16 Corporation and the Utility;"

17    (k) PG&E Corporation and the Utility acknowledged in their joint 10-K

18 statement for the year 2016 that nine separate officers were "executive officers of both PG&E

19 Corporation and the Utility;"

20    (l) PG&E Corporation's officers, directors, and other management make

21 policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

22 directions and making decisions for the Utility;

23    (m) PG&E Corporation's officers, directors, and other management direct

24 certain financial decisions for the Utility including the amount and nature of capital outlays;

25    (n) PG&E Corporation's written guidelines, policies, and procedures control

26 the Utility's employees, policies, and practices;

27

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
397 of 1229

1           (o)     PG&E Corporation files consolidated earnings statements factoring in all

2 revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

3 tax relief; and

4           (p)     PG&E Corporation generally directs and controls the Utility's relationship

5 with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

6 for the benefit of PG&E Corporation.

7     411.    For purposes of this litigation, it would be inequitable to treat the misstatements

8 and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

9     412.    By reason of the above allegations, any misstatements made by the Utility –

10 including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

11 Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

12 the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

13 members of the Class for substantial damages which they suffered in connection with their

14 purchase of PG&E securities during the Class Period.

15 <div align="center">**PRAYER FOR RELIEF**</div>

16 WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

17     A.    Determining that this action may be maintained as a class action under Rule 23 of

18 the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

19     B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class

20 by reason of the acts and transactions alleged herein;

21     C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and

22 post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

23 and

24     D.    Awarding such other and further relief as this Court may deem just and proper.

25

26

27

28

1

## DEMAND FOR TRIAL BY JURY

2
Lead Plaintiff hereby demands a trial by jury.

3

4
DATED: December 14, 2018

/s/ Thomas A. Dubbs

Thomas A. Dubbs (*pro hac vice*)

5
Louis Gottlieb (*pro hac vice*)
Jeffrey A. Dubbin (#287199)

6
James L. Ostaszewski (*pro hac vice*)
Wendy Tsang (*pro hac vice*)

7
**LABATON SUCHAROW LLP**
140 Broadway

8
New York, NY 10005
Telephone: (212) 907-0700

9
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com

10
lgottlieb@labaton.com
jdubbin@labaton.com

11
jostaszewski@labaton.com
wtsang@labaton.com

12

13
*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico*

14

15
**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**

16
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)

17
100 Pine Street, Suite 725
San Francisco, California 94111

18
Telephone: (415) 357-8900
Facsimile: (415) 371-0500

19
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

20
*Liaison Counsel for the Class*

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I HEREBY CERTIFY that on December 14, 2018, I electronically filed the foregoing

3  with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing

4  to all counsel of record.

5                                          */s/ Thomas A. Dubbs*
                                          THOMAS A. DUBBS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
CIVIL ACTION NO. 3:18-CV-03509-RS

# Exhibit 92

1   **LABATON SUCHAROW LLP**
    THOMAS A. DUBBS (*pro hac vice*)
2   LOUIS GOTTLIEB (*pro hac vice*)
    JEFFREY A. DUBBIN (#287199)
3   ARAM BOGHOSIAN (*pro hac vice*)
    140 Broadway
4   New York, New York 10005
    Telephone: (212) 907-0700
5   Facsimile: (212) 818-0477
    Email: tdubbs@labaton.com
6   lgottlieb@labaton.com
    jdubbin@labaton.com
7   aboghosian@labaton.com

8   *Counsel for Lead Plaintiff the Public Employees Retirement*
    *Association of New Mexico and Lead Counsel for the Class*
9
    **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
10  JAMES M. WAGSTAFFE (#95535)
    FRANK BUSCH (#258288)
11  100 Pine Street, Suite 725
    San Francisco, California 94111
12  Telephone: (415) 357-8900
    Facsimile: (415) 371-0500
13  Email: wagstaffe@wvbrlaw.com
    busch@wvbrlaw.com
14
    *Liaison Counsel for the Class*
15

16                  **UNITED STATES DISTRICT COURT**
                  **NORTHERN DISTRICT OF CALIFORNIA**
17                     **SAN FRANCISCO DIVISION**

18
19                                          Civil Action No. 3:18-cv-03509-EJD

20  IN RE PG&E CORPORATION            THIRD AMENDED CONSOLIDATED CLASS
    SECURITIES LITIGATION             ACTION COMPLAINT FOR VIOLATION OF
21                                    THE FEDERAL SECURITIES LAWS

22                                    JURY TRIAL DEMANDED

23
24
25
26
27
28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................... 1

II.     NATURE OF THE CASE ............................................................................ 4

III.    JURISDICTION AND VENUE ................................................................... 5

IV.     OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ......................... 5

        A.  PG&E's Failure to Comply with Safety Regulations Proximately Caused
            Wildfires in 2017 and Investors' Consequent Losses .......................................6

        B.  PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
            Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
            Losses .............................................................................................................8

            1.  After the North Bay Fires, PG&E Continued to Make False and
                Misleading Statements and Omissions ................................................ 8

            2.  PG&E's Continuing Noncompliance With Safety Regulations Caused the
                Camp Fire.......................................................................................... 10

        C.  Exchange Act Claims Being Asserted .............................................................12

V.      THE EXCHANGE ACT PARTIES ............................................................. 13

VI.     SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS 15

        A.  PG&E Operates Within a Robust Legal Regime ..............................................15

            1.  California Law Required PG&E to Maintain a Safe Distance Between Its
                Electrical Equipment and Nearby Vegetation.................................... 15

            2.  California Law Required PG&E to Safely Maintain Its Electrical
                Equipment and Infrastructure ............................................................ 16

            3.  PG&E Is Regulated by the CPUC ..................................................... 17

                (a)   CPUC's General Orders 95 and 165 Impose Strict Safety
                      Regulations on PG&E .............................................................. 17

                (b)   CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to
                      Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol ..... 19

                (c)   PG&E Must Follow CPUC's Regulations Under Penalty of Law ............. 20

            4.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
                California for Wildfires....................................................................... 20

            5.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
                the Cost of Wildfires It Causes if It Could Prove That It Acted Reasonably
                and Prudently ................................................................................... 21

            6.  Federal Law Also Requires PG&E to Follow Minimum Safety Standards.......... 21

B. PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point............22

C. PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period .................................................................24

D. After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal.................................................................25

E. PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ..................25

    1. PG&E Used Reclosers to Prioritize Convenience Over Safety ...........................25

    2. PG&E Concealed Its Use of Reclosers from Investors During the Class Period .................................................................27

F. PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period...............................28

    1. PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ...............28

    2. PG&E Unsafely Flouts Safety Regulations ......................................................28

    3. PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015 .................................................................30

    4. PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period .................................................................30

        (a) PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period...........................30

        (b) PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards...............32

G. Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire ........33

    1. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires..............................................33

    2. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire ..............................................34

        (a) The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations.................................................................34

        (b) The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations.................................................................37

H. PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did

Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations ........................................................................................38

    1.  PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire ....................................... 38

    2.  PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire ................................. 39

I.  PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire ...................................43

    1.  PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ................................................ 45

        (a)  Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ........................... 45

        (b)  Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ............................................ 47

        (c)  Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff ........................................ 47

        (d)  Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ............................................... 49

    2.  All of the Weather Criteria Weighed in Favor of Shutting Off the Power .......... 50

        (a)  Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels ............................................ 52

        (b)  Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ........ 53

        (c)  Criterion 5: Site-Specific Conditions Further Favored Shutoff ................. 54

    3.  PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power ........................................ 54

J.  PG&E's Bankruptcy and Other Post-Class-Period Developments ...........................56

VII.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT .................................................... 59

A.  Overview of Defendants' Fraudulent Course of Conduct .......................... 59

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ......................................61

    1.  April 29, 2015 – Misstatement No. 1 ................................................. 61

    2.  October 16, 2015 – Misstatement No. 2 ............................................. 62

    3.  November 18, 2015 – Misstatement No. 3 .......................................... 64

4.   October 6, 2016 – Misstatement No. 4 ........................................... 65

5.   August 9, 2017 – Misstatement No. 5............................................. 67

C.   Defendants Tied the Company's Dividend to Safety Compliance, Making
     Materially False and Misleading Statements and Omissions Regarding Its
     Dividend and Safety Before the North Bay Fires .........................................69

     1.   May 23, 2016 – Misstatement No. 6 ............................................. 70

     2.   November 4, 2016 – Misstatement No. 7 ....................................... 71

     3.   May 31, 2017 – Misstatement No. 8 ............................................. 72

D.   After the North Bay Fires Erupted, the Truth Began to Emerge .................74

E.   After the North Bay Fires Were Contained, the Company Made Additional
     False and Misleading Statements and Omissions Regarding Compliance with
     Wildfire-Related Safety Regulations ...........................................................75

     1.   October 31, 2017 – Misstatement No. 9 ........................................ 75

     2.   November 2, 2017 – Misstatement No. 10 ..................................... 76

     3.   November 2, 2017 – Misstatement No. 11 ..................................... 79

     4.   November 5, 2017 – Misstatement No. 12 ..................................... 81

     5.   May 25, 2018 – Misstatement No. 13............................................ 83

F.   While the Truth Regarding PG&E's Role in Causing the North Bay Fires
     Emerged, the Company Made Additional False and Misleading Statements
     and Omissions Regarding Compliance with Wildfire-Related Safety
     Regulations, Including Its ESRB-8 Shutoff Protocol ...................................85

     1.   June 8, 2018 – Misstatement No. 14.............................................. 85

     2.   June 8, 2018 – Misstatement No. 15.............................................. 87

     3.   September 27, 2018 – Misstatement No. 16 ................................... 88

     4.   October 9, 2018 – Misstatement No. 17 ........................................ 90

     5.   October 9, 2018 – Misstatement No. 18 ........................................ 91

     6.   November 8, 2018 – Misstatement No. 19 ..................................... 92

VIII.   MATERIALITY UNDER THE EXCHANGE ACT ......................................... 93

IX.   LOSS CAUSATION UNDER THE EXCHANGE ACT .................................. 94

A.   Defendants' False and Misleading Statements Artificially Inflated the Price of
     PG&E's Securities .......................................................................................94

B.   PG&E's Safety Violations Caused the Devastating North Bay Fires.........................95

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 406 of 1229

C. PG&E's Safety Violations Caused the Devastating Camp Fire ...............................95

D. As the Market Learned About the Effects and Extent of PG&E's Inadequate
Safety Practices, the Price of PG&E's Securities Fell Dramatically .........................96

    1. October 12, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk ........................................................................................... 96

        (a) The Market Began to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires...................................... 96

        (b) Market Commentators Confirmed the Cause of PG&E's Share Price
Decline on October 12, 2017 ...................................................... 97

    2. October 13-16, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk ........................................................................................... 99

        (a) The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires...................................... 99

        (b) Market Commentators Confirmed the Cause of PG&E's Share Price
Decline on October 13, 2017 ...................................................... 99

    3. December 20, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk ......................................................................................... 100

        (a) The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires.................................... 100

        (b) Market Commentators Confirmed the Proximate Cause of PG&E's
Share Price Decline on December 20, 2017 ............................. 101

    4. May 25, 2018 – Corrective Disclosure and/or Materialization of
Concealed Risk ......................................................................................... 102

        (a) The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires.................................... 102

        (b) Market Commentators Confirmed that the News Regarding Safety
Violations Proximately Caused PG&E's Share Price Decline on May
25-29, 2018 .............................................................................. 104

    5. June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed
Risk ........................................................................................................... 105

        (a) The Market Learned the Truth of PG&E's Continued, Unsafe Use of
Reclosers ................................................................................... 107

        (b) The Market Continued to Learn the Extent and Effects of PG&E's
Safety Violations and Responsibility for the North Bay Fires ................ 107

        (c) Market Commentators Confirmed that the Number and Range of
Safety Violations Proximately Caused PG&E's Share Price Decline
on June 8-11, 2018........................................................................ 108

6.  November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 109

    (a)  The Market Began to Learn the Extent and  Effects of PG&E's Responsibility for the Camp Fire ................................................ 109

    (b)  Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline .................................................... 110

7.  November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 112

    (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ...................................... 112

    (b)  Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline. ...................................... 113

8.  November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ...................................................................... 114

    (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ...................................... 114

    (b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018 .............................................. 115

9.  November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 116

    (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ...................................... 116

    (b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018 .............................................. 117

X.  SCIENTER UNDER THE EXCHANGE ACT ................................................ 118

A.  PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ........................... 118

B.  Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It ........................................ 120

C.  The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter ...................... 123

D.  PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations .................................... 129

    1.  PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants ...... 129

2. PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored ................................................................. 131

E. PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority ........................................................ 133

F. The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors .................................................................................................. 135

G. After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up .................................................... 136

H. PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter .......................................................................................... 140

XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS ................................................................. 141

XII. CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS .............. 142

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......................................... 144

XIV. NATURE OF THE SECURITIES ACT CLAIMS ........................................................ 151

XV. OVERVIEW OF THE SECURITIES ACT VIOLATIONS ......................................... 151

XVI. THE SECURITIES ACT PARTIES ............................................................................. 153

A. Securities Act Named Plaintiffs .......................................................................... 153

B. Bankrupt Entities .................................................................................................. 154

C. Securities Act Individual Defendants .................................................................. 154

D. Underwriter Defendants ....................................................................................... 159

XVII. SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS 162

A. PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations .............................................................................................................. 162

1. Overview of Laws and Regulations Governing PG&E's Operations ................ 162

2. PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires ....... 164

XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS ................................................................................................................................ 186

A. The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance .................................................................... 187

1. The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices ... 188

2.   The Offering Documents Did Not Disclose PG&E's Investments in, Commitment to, and Practices Related to Safety Were Inadequate .................. 194

B.   The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires .............................................................. 203

C.   PG&E's Offering Documents Misled Investors by Failing to Comply with Item 303's Disclosure Requirements and Disclosure Safety Violations .................. 208

XIX.   NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS .................................. 211

XX.   CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ............ 212

XXI.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ...................................... 214

XXII.   PRAYER FOR RELIEF ................................................................................ 216

Court-appointed Lead Plaintiff, the Public Employees Retirement Association of New Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), the Exchange Act Individual Defendants (defined below), the Securities Act Individual Defendants (defined below), and the Underwriter Defendants (defined below). In addition, named Plaintiff York County on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund (collectively, the "Securities Act Plaintiffs," and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, allege violations of the Securities Act of 1933 ("Securities Act") against the Securities Act Individual Defendants and the Underwriter Defendants. These allegations are based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation conducted by and through its attorneys, which included a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases, media and analyst reports about the Company, court filings, and other public information regarding the Defendants. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

# I.  INTRODUCTION

1.  The investing public depends on PG&E to be honest when talking about its safety practices and level of compliance with vital safety regulations. This federal securities class action arises out of the materially false statements that Defendants made to investors from April 29, 2015 through November 15, 2018 (the "Class Period"). Their statements and omissions misled investors about PG&E's wildfire safety practices, including their representations of achieving full legal compliance and investing in safety, notwithstanding the Company's numerous and widespread violations of powerline safety regulations.

2.  For example, in just 14 months from October 2017 through November 2018, California experienced some of the deadliest and most destructive wildfire events of its recorded

1    history.  This narrow time period included both the 2017 North Bay Fires and the 2018 Camp

2    Fire.  One thing these fires have in common is that they were started or exacerbated by

3    noncompliant PG&E electrical equipment and vegetation management: an astounding fact to

4    those who believed PG&E's public statements that it complied with California and federal safety

5    regulations.  The other thing these fires have in common is that they incited a series of

6    investigations, which have revealed PG&E's gross deficiencies in the area of safety compliance.

7           3.     The timing of these catastrophic fires is no coincidence; they occurred at the

8    height of PG&E's knowing noncompliance with safety regulations.  Among the many details that

9    have emerged, the Honorable William Alsup of the United States District Court for the Northern

10   District of California, in presiding over PG&E's criminal probation, has found as fact "that as of

11   **June 2017**, there were 3,962 unworked trees which PG&E had identified **in 2016** as hazardous

12   with the potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy

13   wires before the next inspection cycle.'"  By June 2017, PG&E had known about these

14   thousands of vegetation fire hazards for six to eighteen months (*i.e.*, as far back as January 2016)

15   – yet did nothing other than to internally record their existence.  Judge Alsup based this finding

16   on PG&E's own admissions.

17          4.     Thus, mere months before its vegetation safety violations would cause and

18   exacerbate the 2017 North Bay Fires, PG&E actually knew it was not addressing thousands of

19   violations in the form of vegetation fire hazards, even while falsely assuring investors over the

20   same time period that its vegetation management was, *e.g.*, "*in compliance with relevant laws*"

21   (October 6, 2016 – Misstatement No. 4), and "*complying with state and federal regulations and*

22   *delivering safe, reliable and affordable electric service*" (August 9, 2017 – Misstatement No. 5).

23          5.     The public did not immediately know that PG&E was responsible for the North

24   Bay Fires—information that would threaten the Company's financial condition.  So PG&E

25   doubled down on misinformation in order to build up the public perception of its safety and

26   compliance before the tide of public opinion could turn against it.  For example, after the North

27   Bay Fires erupted, Defendants falsely insisted that the Company had "*doubl[ed] our typical*

28   *vegetation management spending last year*" and "*inspect[ed] all of our overhead lines*"

---

1   (November 2, 2017 – Misstatement Nos. 10 & 11), when **it had not**. Similarly, the Company

2   reiterated that it "***meets or exceeds all applicable federal and state vegetation clearance***

3   ***requirements***" (November 5, 2017 – Misstatement No. 12), yet soon thereafter, state

4   investigators would link evidence of PG&E's violations of California safety regulations to at

5   least **eleven** of the North Bay Fires.

6         6.    Even as the truth began to emerge about PG&E's insufficient safety practices, and

7   PG&E continued to falsely insist on its compliance, California imposed additional safety

8   regulations on the Company.  This included a mandate that PG&E formalize a protocol for

9   proactively turning off its power lines when certain extreme conditions were met, to prevent any

10  further wildfires.  By the deadline, PG&E stated that it had "***created a set of procedures for . . .***

11  ***[d]etermining what combination of conditions necessitates turning off lines for safety***"

12  (September 27, 2018 – Misstatement No. 16).  Yet less than two months later, on a day when

13  hazardous weather and other conditions required PG&E to shut off certain lines, the Camp Fire

14  erupted.  Not only is it now known that **those very power lines caused the Camp Fire**, but facts

15  have emerged suggesting that PG&E's shutoff program **was not in effect when Defendants said**

16  **it was** – facts which PG&E has tried to cover up.

17        7.    PG&E's false and misleading statements destroyed billions of dollars of economic

18  value in the Company's stocks and bonds.  When the true nature and extent of PG&E's

19  responsibility for these fires materialized, investors holding PG&E's publicly traded securities

20  experienced compensable losses.

21        8.    PG&E's ability to maintain safe power lines, compliant with federal and

22  California safety regulations, is essential to the Company's financial health. PG&E has admitted

23  that it is probable it will incur billions of dollars in losses for claims in connection with the North

24  Bay and Camp wildfires.  According to a recent SEC filing, the Company has, to date, recorded

25  charges exceeding $14.2 billion, an amount which it believes is at the "lower end of the range of

26  . . . reasonably estimated losses."[1]

27   

28      [1] PG&E recently announced in its May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting

9. Indeed, PG&E's responsibility for the North Bay Fire and Camp Fire catastrophes has caused the Company to file for bankruptcy under Chapter 11 of Title 11 of the United States Code (11 U.S.C. § 101 et seq.). The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North Bay and Camp Fires.[2]

10. Because it was vital for PG&E's business to be perceived as making safety its highest priority, Defendants assured investors that the Company's wildfire safety measures were adequate and compliant with applicable laws and regulations. However, the investigations following these devastating fires have revealed that PG&E's assurances were false: evidence has emerged that PG&E's safety violations caused at least twelve of these devastating fires, including the Camp Fire—California's deadliest and most destructive wildfire ever.

## II.   NATURE OF THE CASE

11. This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a class of all persons and entities who, during the period from April 29, 2015 through November 15, 2018, inclusive (the "Class Period"), purchased or otherwise acquired publicly traded PG&E securities and were damaged thereby. Excluded from the class are: (i) all defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii) any person who is or was an officer or director of PG&E during or after the Class Period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks to recover compensable damages caused by defendants' violations of the federal securities laws and to pursue remedies under

*(continued)*
for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte Fire." *See* ¶¶663-72, *infra*.

[2] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-bk-30088 (N.D. Cal. Feb. 1, 2019), ECF No. 263.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-EJD

4

1   Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule

2   10b-5 promulgated thereunder.  This Action also is brought pursuant to the Securities Act of

3   1933 (the "Securities Act") as set forth in Sections XIV-XII, *infra*.

4   **III.    JURISDICTION AND VENUE**

5          12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

6   the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

7   SEC (17 C.F.R. § 240.10b-5), as well as Sections 11 and 15 of the Securities Act (15 U.S.C.

8   §§77k and 77o).

9          13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

10  §1331, Section 27 of the Exchange Act, and Section 22 of the Securities Act.

11         14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

12  Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located

13  within this Judicial District.  Further, many of the acts and practices complained of herein

14  occurred in substantial part in this Judicial District.

15         15.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

16  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

17  including but not limited to, the United States mail, interstate telephone communications and the

18  facilities of the national securities markets.

19  **IV.    OVERVIEW OF THE EXCHANGE ACT VIOLATIONS**

20         16.    PG&E's false statements began on April 29, 2015 and continued through

21  February 8, 2018.  As detailed herein, they misled investors about PG&E's wildfire safety

22  practices, including representations that the Company was in full legal compliance and

23  continuing to invest in safety, notwithstanding the Company's numerous and widespread

24  violations of safety regulations and inadequate safety practices.

25

26

27

28

### A. PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses

17.    Throughout the Class Period, Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***" (October 6, 2016 – Misstatement No. 4);

- Its "***vegetation management program*** . . . ***compl[ies] with state and federal regulations***" (August 9, 2017 – Misstatement No. 5);

- "***PG&E follows all applicable federal and state vegetation clearance requirements***" to "***help to reduce*** outages or ***fires caused by trees or other vegetation***" (October 31, 2017 – Misstatement No. 9); and

- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***" (November 5, 2017 – Misstatement No. 12).[3]

18.    These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California and federal law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires and additional costs to improve their inadequate wildfire safety practices.

19.    The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[4]  These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[5]  The

---

[3] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[4] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[5] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire at the time, the October 1991 Tunnel Fire in Oakland, which, according to a

1   size of this liability imperiled the financial viability of the Company.  In fact, several of

2   Defendants' false and misleading statements were made in the months before PG&E openly

3   expressed its fear that its liability for the North Bay Fires could send the Company into

4   bankruptcy.

5        20.    As the State of California's official investigations into the eighteen North Bay

6   Fires were completed by the California Department of Forestry and Fire Protection ("Cal Fire"),

7   the truth emerged over time that **at least seventeen** were caused by PG&E equipment.  Indeed,

8   Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

9   California safety regulations – contradicting Defendants' false representations of compliance

10  with those regulations.

11       21.    Defendants' false and misleading misrepresentations and omissions came at a

12  crucial time for the Company.  As described below, over the past three decades, PG&E caused a

13  series of wildfires and other disasters in California.  For example, in September 2015, its

14  violations of California safety regulations regarding vegetation clearance caused a wildfire

15  known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed

16  two people – making it then the seventh most destructive wildfire in California history, but small

17  compared to the North Bay and Camp Fires that would follow.

18       22.    Revealingly, just months before the North Bay Fires began, in an April 2017 non-

19  public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation

20  Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we**

21  **have not made any changes as a result of this fire**."  Thus, despite being on notice of its

22  dangerous safety violations and their deadly consequences, neither the Company nor its officers

23  took any steps to improve safety or compliance between the Butte Fire and the far more

24

25

26  *(continued)*
    May 27, 2011 article in *Scientific American*, caused $2.687 billion in insured property damage.

27  Mark Fischetti, *How Much Do Wildfires Cost in Terms of Property Damage?* Scientific
    American (May 27, 2011), https://www.scientificamerican.com/article/graphic-science-how-

28  much-do-fires-cost-property-damage/?redirect=1.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-EJD

7

disastrous North Bay Fires.  Over this time period, Defendants either knew or should have

known that the Company's wildfire-related safety violations continued unabated.

23.    Though the North Bay Fires began on a windy night, they were not the result of

an unexpected or unique event. Rather, the circumstance of PG&E causing **seventeen** concurrent

fires across **nine counties** shows that the Company tolerated numerous and widespread

violations of California safety regulations across its territory. As detailed herein, the underlying

explanation for these near-simultaneous North Bay Fires is neither unusual weather nor

coincidence, but PG&E's failure to comply with even minimal legal requirements. Accordingly,

PG&E and its officers knew, or deliberately disregarded, that the Company's power lines and

other electrical infrastructure were often not in compliance with federal and California safety

requirements when making false and misleading statements to the contrary.

**B.    PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing a Disastrous Wildfire in November 2018 as Well as Further Investor Losses**

**1.    After the North Bay Fires, PG&E Continued to Make False and Misleading Statements and Omissions**

24.    After the public came to understand PG&E's responsibility for the North Bay

Fires over the course of five events from October 12, 2017 and June 11, 2018 (*see* Sections

IX.D.1-5, *infra*), the Company faced a new crisis: the widespread belief that it failed to prioritize

safety in maintaining its power lines and preventing wildfires.  It also faced a financial crisis, as

its liabilities for the North Bay Fires threatened to bankrupt the Company.

25.    As a result, PG&E needed the public, including investors, to believe that it would

prioritize safety thereafter.  So when Cal Fire announced (on June 8, 2018) its conclusions that

PG&E had caused the preponderance of the North Bay Fires, and PG&E's share price continued

to decline as its financial situation deteriorated, PG&E responded that same day by reassuring its

investors that, *e.g.*:

- Its "*Programs Overall Met [California]'s High Standards*," including "*Vegetation Management*," and "*meets or exceeds regulatory requirements for pole integrity management*" (May 25, 2018 – Misstatement No. 13);

- "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur*" (June 8, 2018 – Misstatement No. 15);

26.     Indeed, one month later, on July 16, 2018, PG&E's primary state regulator **mandated** that PG&E formalize and publicize its protocol for proactively turning off its power lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8.  The Company announced its response to this new safety requirement on or about September 27, 2018 (the "ESRB-8 Shutoff Protocol"), including:

- "PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. *It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring*" and "*PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety*" (September 27, 2018 – Misstatement No. 16).

27.     While the Company was finalizing its protocol, on September 21, 2018, California enacted S.B. 901, a law to rescue PG&E from the threat of bankruptcy due to its responsibility for the North Bay Fires.  The resulting law put in place a financial stress test to monitor PG&E's financial health, as well as a method to raise capital should PG&E's liability for the North Bay Fires cause it to fail the test.  The same law made it less likely that PG&E would bear the costs of wildfires it caused in 2019 or later.

28.     However, the new law did not help the Company bear the financial consequences of any wildfires it might cause in the remaining months of 2018.

29.     Put differently, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018, or their failure would drive the Company to ruin.

30.     PG&E continued to assure the public that it had implemented these measures successfully.  For example, when the news broke on October 9, 2018 that Cal Fire had concluded

that PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade Fire, the Company reassured investors by stating:

- "[W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas***, and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat" (October 9, 2018 – Misstatement No. 17); and

- "***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***" (October 9, 2018 – Misstatement No. 18).

31.     Such statements were materially false and misleading because PG&E had **not** meaningfully improved its safety practices—as would soon be revealed by the Camp Fire.  By pitching their statements to convince the investing public that PG&E had resolved its fire safety failures and would prioritize fire safety thereafter, Defendants concealed the true extent to which the Company was exposed to massive liability for causing further wildfires, thereby significantly inflating PG&E's share price.

32.     Ultimately, the North Bay Fires resulted in damages estimated up to $17 billion, for which the Company has already taken a charge of $3.5 billion, admitting the likelihood that it will be liable for, and bear the costs of, at least some of these fires.[6]

### 2.     PG&E's Continuing Noncompliance With Safety Regulations Caused the Camp Fire

33.     This continuation of the fraud unraveled when evidence emerged that PG&E was responsible for the Camp Fire, which devastated Northern California in November 2018, burning 153,336 acres, destroying 18,804 structures, and killing at least 85 people[7]—making it

---

[6] Press Release, PG&E, *PG&E Provides Update on Financial Impact of 2017 and 2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K), https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.

[7] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

1  the single most destructive and deadliest wildfire in California history.  It has resulted in

2  damages estimated up to $13 billion, for which the Company has already taken a $10.5 billion

3  charge, admitting the likelihood that it will be liable for, and bear the costs of, the Camp Fire.[8]

4  Moreover, Cal Fire has confirmed that PG&E's electrical equipment caused the Camp Fire.[9]

5          34.     The Camp Fire began when a PG&E electrical tower, carrying a high-voltage 115

6  kilovolt transmission line, failed.  PG&E has also acknowledged a second ignition point for the

7  Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and

8  other signs of safety violations.

9          35.     As a result, vegetation underneath the lines ignited at two ignition points

10  approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California

11  Public Resources Code Section 4293, and its failure to maintain the integrity of its poles and

12  towers violated California Public Utilities Code Section 451.

13          36.     Starting with two PG&E admissions at the end of the day the Camp Fire began

14  (November 8, 2019), it emerged that PG&E's promises to prioritize fire safety were false and

15  misleading.  PG&E's statements promoting its ESRB-8 Shutoff Protocol were a prime example

16  of this prioritization, promising to shut off electricity broadly rather than risk further wildfires.

17  Soon, however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: the protocol

18  dictated that the electrical lines that caused the Camp Fire **should have been shut off, but

19  PG&E flouted it.**  Investors learned not only that PG&E's ESRB-8 Shutoff Protocol should

20  have prevented the fire entirely, but also that PG&E needlessly imperiled lives rather than risk

21  upsetting customers.

22

23

24  _____

[8]

25      Press Release, PG&E, PG&*E Corporation Provides Update on Financial Impact of 2017 and
    2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K),

26      https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.
    [9] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May

27  15, 2019),

28  https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

37.     PG&E would later attempt to justify its inaction by claiming that its ESRB-8 Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the Camp Fire.  However, Plaintiff's investigation has uncovered that this explanation is demonstrably false.  The fact is that PG&E's promised ESRB-8 Shutoff Protocol would have prevented the Camp Fire if only it were followed.  The Company's attempt to cover it up substantiates not only that PG&E's safety failures caused the Camp Fire, but further that PG&E's false and misleading statements—concealing how the Company was not sufficiently prioritizing safety—were made with knowledge of their falsity, or at least deliberate recklessness.

38.     Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's materially false and misleading statements assuring investors of the Company's compliance with California safety regulations, including the ESRB-8 Shutoff Protocol.

**C.     Exchange Act Claims Being Asserted**

39.     Notwithstanding PG&E's false and misleading statements to the marketplace, investors learned over time that PG&E's safety violations were numerous and widespread. Indeed, they were responsible for most of the North Bay Fires and the Camp Fire. As information regarding the impact of PG&E's deficient safety practices emerged between October 12, 2017 and November 15, 2018, investors were surprised, given Defendants' numerous public statements during the Class Period touting the Company's compliance, safety measures, and its intertwined financial health. As information came to light relating to PG&E's inadequate safety measures and/or the effects thereof, PG&E's artificially inflated share price dropped significantly.  Thus, as a result of Defendants' wrongful acts and omissions, Lead Plaintiff and other Class members have suffered significant damages.

40.     Lead Plaintiff asserts the claims herein against PG&E and certain of its executives and officers, seeking to recover for its damages suffered due to these declines in PG&E's publicly traded securities.  PG&E's statements of compliance with safety regulations during the Class Period misrepresented current facts and were not statements of opinion.

## V.     THE EXCHANGE ACT PARTIES

41.     Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of its members, retirees, and beneficiaries.  As set forth in its Certification (attached hereto as "Attachment A"), PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint.  On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

42.     Defendant PG&E Corporation is a publicly traded corporation that is headquartered in San Francisco, California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.  PG&E's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that holds, directs the actions of, and controls energy-based businesses such as the Utility.

43.     Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling and delivering electricity and natural gas to its customers, also known as "rate-payers." The Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-K. Indeed, all of the Utility's shares are owned by PG&E Corporation.  Alternatively, PG&E Corporation controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

44.     It is understood that the action against the PG&E Defendants (PG&E Corporation and Pacific Gas and Electric Company) is stayed pursuant to the automatic stay provisions of 11 U.S.C. § 362.

45.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

46.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017.  Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.  Additionally, Williams was a director of PG&E Corporation from May 2017 to January 2019 and a director of the Utility from August 2015 to January 2019.

47.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.  Stavropoulos was a director of the Utility from August 2015 to September 2018.

48.     Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance Officer.

49.     Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

50.     Defendant Patrick M. Hogan ("Hogan") served as the Utility's Senior Vice President of Electric Operations from March 2016 through January 8, 2019, and he retired from the Utility on January 28, 2019.  Prior to that, he served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

51.     The Defendants referenced above in ¶¶45-50 are referred to herein as the "Exchange Act Individual Defendants."

52.     The Exchange Act Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content

on the Company's website and official Twitter.com account, and other market communications

during the Class Period. The Exchange Act Individual Defendants were provided with copies of

the Company's reports and press releases alleged herein to be misleading prior to or shortly after

their issuance and had the ability and opportunity to prevent their issuance or to cause them to be

corrected. Because of their positions within the Company and/or Utility, and their access to

material information available to them but not to the public, the Exchange Act Individual

Defendants knew that the adverse facts specified herein had not been disclosed to, and were

being concealed from, the public, and that the positive representations being made were then

materially false and misleading. The Exchange Act Individual Defendants are liable for the false

statements and omissions pleaded herein.

## VI.   SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS

### A.   PG&E Operates Within a Robust Legal Regime

53.   As detailed herein, electricity transmission and distribution is a heavily regulated

industry in California.

#### 1.   California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

54.   To ensure public safety from wildfires, California has laws and regulations that

require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees,

and otherwise safe.

55.   Pursuant to California Public Resources Code Section 4292, for instance:

> [A]ny person that owns, controls, operates, or maintains any
> electrical transmission or distribution line upon any mountainous
> land, or forest-covered land, brush-covered land, or grass-covered
> land shall, during such times and in such areas as are determined to
> be necessary by the director or the agency which has primary
> responsibility for fire protection of such areas, maintain around and
> adjacent to any pole or tower which supports a switch, fuse,
> transformer, lightning arrester, line junction, or dead end or corner
> pole, a firebreak which consists of a clearing of not less than 10
> feet in each direction from the outer circumference of such pole or
> tower.

56.   Similarly, California Public Resources Code Section 4293 provides that:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, **maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current**: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

57.     Cal Fire interprets this law to "mean[] that a tree, or portion thereof, that is leaning toward the line, must be 'felled, cut, or trimmed' regardless of its health, if it 'may contact the line from the side or may fall on the line.'"  The law also "requires utilities to identify and remove such hazards."  Thus, Section 4293 not only "mandates that utilities trim or remove limbs overhanging powerlines if those limbs are inside the statutory clearance distances," but further "also mandates that utilities trim or remove, among other hazards, trees or portions thereof that are leaning toward the powerlines, including overhanging limbs, if those trees or limbs **may** contact the line from the side or fall on the line."  Cal Fire also makes clear that "[a] utility's compliance with Section 4293 is mandatory, not discretionary."[10]

### 2.     California Law Required PG&E to Safely Maintain Its Electrical Equipment and Infrastructure

58.     In addition to the vegetation management regulations discussed above, California laws and regulations further require PG&E to safely maintain its electrical equipment and

---

[10] Supplemental Response of Cal Fire following Jan. 30. 2019 Hearing on Order to Show Cause, *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175 ("PG&E Criminal Proceedings") (N.D. Cal. Feb. 6, 2019), ECF No. 1012.

infrastructure, including an obligation to maintain the towers and poles that carry its transmission and distribution lines.

59.    Pursuant to California Public Utilities Code Section 451:

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

60.    California Health & Safety Code Section 13007 further provides:

> Any person who personally or through another wilfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned, is liable to the owner of such property for any damages to the property caused by the fire.

61.    Accordingly, California law required PG&E to maintain its electrical equipment and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from being caused by the failure of its towers and poles.

### 3.    PG&E Is Regulated by the CPUC

62.    PG&E's primary regulator is the California Public Utilities Commission ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which costs PG&E must bear. The CPUC was created under Article XII of the California State Constitution, and derives its regulatory authority from Section 701 of the California Public Utilities Code.

#### (a)    CPUC's General Orders 95 and 165 Impose Strict Safety Regulations on PG&E

63.    Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish necessary and reasonable clearances" between overhead conductors and nearby vegetation, with certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean

Case 19-30088    Doc# 14209-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 427 of 1229

toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

* * *

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

64.     CPUC General Order 95 provides further details regarding the maintenance and upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to "Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule be held to permit the use of structures or any member of any structure with a safety factor less than one." This order further provides certain requirements intended to, among other things, guard against corrosion.[11]

65.     Pursuant to CPUC General Order 165, PG&E must also follow certain "requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service." In relevant part, General Order 165 requires that: "Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation."[12]

---

[11] CPUC General Order 95, *Rules for Overhead Electric Line Construction* (May 2018), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf
[12] CPUC General Order 165, *Inspection Requirements for Electric Distribution and Transmission Facilities* (Dec. 2017), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K552/209552704.pdf.

           **(b)**      **CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

66.     On July 16, 2018, the CPUC issued Resolution ESRB-8.  Recognizing that the "2017 California wildfire season was the most destructive wildfire season on record," the resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-energization policy and procedures" pursuant to which each utility will "de-energize power lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established notification, mitigation, and reporting requirements.

67.     Resolution ESRB-8 included the following directives:

PROPOSED OUTCOME:
This Resolution extends the de-energization reasonableness, public notification, mitigation and reporting requirements in Decision (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs) [including PG&E] and adds new requirements.  It also places a requirement on utilities to make all feasible and appropriate attempts to notify customers of a de-energization event prior to performing de-energization.

SAFETY CONSIDERATIONS:
De-energizing electric facilities during dangerous conditions can save lives and property and can prevent wildfires. This resolution provides guidelines that IOUs must follow and strengthens public safety requirements when an IOU decides to de-energize its facilities during dangerous conditions.

            *     *     *

PG&E reports that prior to 2018, it did not have a policy to de-energize lines as a fire prevention measure. PG&E reported that it did not proactively de-energize lines due to extreme fire weather conditions in 2017. However, in March 2018 PG&E announced that it is developing a program to de-energize lines during periods of extreme fire conditions and has been meeting with local communities to gather feedback.

            *     *     *

- The IOU shall ensure that de-energization policies and procedures are well-communicated and made publicly available, including the following:

  - **Make available and post a summary of de-energization policies and procedures on its website**.

  - Meet with representatives from local communities that may be affected by de-energization events,

1  before putting the practice in effect in a particular
   area.

2

3  • Provide its de-energization and restoration policy **in
     full**, and in summary form, to the affected
4     community officials before de-energizing its
      circuits.

5                    *          *          *

6  De-energization of electric facilities could save lives, protect
   property, and prevent fires.

7

8         **(c)      PG&E Must Follow CPUC's Regulations Under Penalty of
                      Law**

9      68.    The CPUC's regulations have the full force of law, and PG&E has a legal

10 obligation to follow them, including the general orders and resolutions listed above, under

11 penalty of law.

12     69.    For example, California Public Utilities Code Section 702 provides that:

13         Every public utility shall obey and comply with every order,
           decision, direction, or rule made or prescribed by the commission
14         in the matters specified in this part, or any other matter in any way
           relating to or affecting its business as a public utility, and shall do
15         everything necessary or proper to secure compliance therewith by
           all of its officers, agents, and employees.

16

17     70.    Further, under California Public Utilities Code Section 2106:

18         Any public utility which does, causes to be done, or permits any
           act, matter, or thing prohibited or declared unlawful, or which
19         omits to do any act, matter, or thing required to be done, either by
           the Constitution, any law of this State, or any order or decision of
20         the commission, shall be liable to the persons or corporations
           affected thereby for all loss, damages, or injury caused thereby or
21         resulting therefrom. If the court finds that the act or omission was
           wilful, it may, in addition to the actual damages, award exemplary
22         damages.

23         **4.      Cal Fire Is the Duly Authorized Investigative Arm of the State of
                     California for Wildfires**

24     71.    Cal Fire is an agency of the State of California that, pursuant to Title 14 of

25 California's Code of Regulations, is administratively in charge of both the state's fire

26 departments and its law enforcement related to state fire and forest laws. As a result, it is

27 responsible for both fighting fires as they occur and for investigating the causes of fires after they

28 have been contained. Cal Fire conducts official investigations as an arm of the State of California

to determine the causes of wildfires within the state, as well as any violations of state laws and regulations.

72.     Pursuant to an agreement with the U.S. Department of the Interior and the U.S. Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and origin determinations for wildfires – such as the North Bay fires and Camp Fire – that fall within its jurisdiction.

5.     **Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes if It Could Prove That It Acted Reasonably and Prudently**

73.     The California Supreme Court has interpreted Article 1, Section 19 of the California Constitution as imposing a doctrine known as "inverse condemnation," whereby public utilities such as PG&E are required to compensate individuals whose real property has been damaged by the utility under a strict liability regime. However, importantly, a utility such as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

74.     In other words, PG&E bears the costs of wildfires it causes unless it can prove that it was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id.* Embodied in this standard, at a minimum, is compliance with state safety laws and regulations.

6.     **Federal Law Also Requires PG&E to Follow Minimum Safety Standards**

75.     PG&E is also required by law to adhere to a number of federal laws and regulations.  FERC Electric Reliability Standard FAC-003-4, for example, "requires that trees

and other vegetation growing in or adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree contact with a transmission line."[13]

76.     FAC-003-4 also imposes minimum vegetation clearance distances that depend on the type of current (alternating or direct), the nominal and maximum system voltages, and the altitude of the conductor above sea level. FAC-003-4 also imposes other requirements on owners and operators of transmission facilities, including but not limited to annual inspections, annual completion of necessary work, timely notification and correction of urgent conditions and documentation of vegetation management practices.[14]

### B.     PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point

77.     The State of California declared a state of emergency due to drought conditions in January 2014,[15] which ended in April 2017.[16] In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an epidemic of insect infestations causing millions of trees to die annually.[17] These conditions added to the already existing danger of wildfires in the North Bay region of California as a result of PG&E's safety violations. PG&E knew about these conditions and its obligations to ensure safety from wildfires in spite of these environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent**

---

[13] *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018), https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp;  FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt/fac-003-4.pdf; *see also* Order Adopting New Conditions of Probation, PG&E Criminal Proceedings, (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

[14] *See* PG&E Response to Request for Information at 4, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[15] California Drought, *State Water Board Approves State and Federal Water Projects Petition to Conserve Water During Drought Conditions*, Drought News Release Archive (Jan. 31, 2014), https://drought.ca.gov/news/story-21.html.

[16] California Executive Dept., *Executive Order B-40-17* (Apr. 7, 2017), https://www.gov.ca.gov/wp-content/uploads/2017/09/4.7.17_Exec_Order_B-40-17.pdf.

[17] California Executive Dept., *Proclamation Of A State of Emergency* (Oct. 30, 2015), https://www.gov.ca.gov/wp-content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf.

1   **required by their existing responsibilities to protect the public health and safety, shall**

2   **undertake efforts to remove dead or dying trees in these high hazard zones that threaten**

3   **power lines**. . . ."

4   78.   Based on information released by CPUC, PG&E spent $194,094,406 on

5   vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

6   only 2.4% and 1.4%, respectively.[18] Each year's spending was substantially identical to the

7   amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

8   General Rate Cases – notwithstanding the state of emergency directive above and PG&E's

9   continued deficient safety practices. In contrast, inflation rose 5.48% over the same three-year

10  period.[19] Thus, PG&E's spending did not even keep pace with inflation during the Class Period.

11  79.   CPUC released the following chart confirming that PG&E's vegetation

12  management spending underwent only modest increases over the relevant time period:

### Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management

|        | PG&E Requested | CPUC Authorized | PG&E Spent |
|--------|----------------|-----------------|------------|
| 2017   | $201.0         | $201.0          | *$150.4 YTD* |
| 2016   | $198.8         | $198.8          | $198.7     |
| 2015   | $194.2         | $194.2          | $194.1     |
| 2014   | $190.0         | $190.0          | $189.7     |
| 2013   | $180.0         | $161.5          | $161.6     |
| 2012   | $180.0         | $161.5          | $161.5     |
| 2011   | $180.0         | $161.5          | $161.6     |

---

[18] Letter from CPUC to PG&E re: Advice Letter 4827-E (June 3, 2016), https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5036-E (Apr. 25, 2017), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf.; Letter from CPUC to PG&E re: Advice Letter 5402-E (Nov. 29, 2018), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf.

[19] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

80.     While Defendants falsely represented on November 2, 2017 that PG&E "***doubled***" vegetation management expenditures in 2016 (*see* ¶¶258 & 264), tellingly, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.  Nor did it disclose these expenditures were inadequate to reasonably ensure safety.  Indeed, as Judge Alsup later found, "PG&E's performance with respect to vegetation management has been **dismal.**"

81.     It was only after the Camp Fire that PG&E announced in December 2018 that it plans to spend an additional $5 billion on wildfire safety programs over five years, with a focus on improving its vegetation management efforts. This post-Class-Period development strongly supports the inference that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[20]  In fact, it was not until PG&E's 2019 vegetation management plan, detailed further below, that the Company indicated that it was materially increasing its vegetation management spending, to more than $338 million.

## C.     PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period

82.     Likewise, the Company's reported numbers for trees that it trimmed or removed during this time period did **not** double, or come close to doubling. During the Class Period, the Company reported the results of its vegetation management expenditures, slowly inflating the numbers it was reporting.  Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about **236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the state" (May 3, 2017, Press Release).

---

[20] *PG&E asking state regulators to charge customers up to $12 more a month*, KTVU Fox 2 (Dec. 14, 2018), http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month.

83.     Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

**D.      After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal**

84.     Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "***doubl[ed]***" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶258, *infra*).

85.     Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

**E.      PG&E Concealed Its Unsafe Use of Reclosers During the Class Period**

**1.      PG&E Used Reclosers to Prioritize Convenience Over Safety**

86.     "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (*i.e.*, an outage). Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

87.     San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in

Case 19-30088   Doc# 14298-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 435 of 1229

1   the state court litigation concerning the North Bay Fires,[21] these two utility companies are aware

2   of the dangers of using reclosers, and they have a practice of blocking reclosers from working

3   during fire season.[22]

4        88.     Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of

5   causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the

6   Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement

7   Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate

8   Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of

9   Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to

10  reprogram its reclosers during fire season so that they did not attempt to restart lines that had

11  been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit,

12  but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside

13  to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit,"

14  which would lead to consumer complaints), but that PG&E also understood this measure would

15  improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose

16  short-term "reliability" over safety.[23]

17

18

19

---

20     [21] Senate Bill Policy Committee Analysis, Assembly Committee on Utilities and Energy

21  (amended June 7, 2018),
    https://autl.assembly.ca.gov/sites/autl.assembly.ca.gov/files/SB%20901%20%28Dodd%29%20U

22  %26E%20Analysis%206-25-18.pdf.
       [22] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in

23  California, declared such by the responsible public agency fire administrator. This declaration is
    based on fuel and weather conditions conducive to the ignition and spread of wildland fires.  Cal

24  Fire Incident Information, Fire Terminology page,

25  http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F.
       [23] Notably, PG&E's ESRB-8 Shutoff Protocol embodied the same tradeoff.  As a protocol that

26  required PG&E to proactively shut off power when certain conditions were met, it similarly

27  purported to prioritize safety over reliability.  Likewise, a failure to abide by the ESRB-8 Shutoff
    Protocol would evidence another example of the Company choosing reliability over safety,

28  unbeknownst to investors.

---

## 2. PG&E Concealed Its Use of Reclosers from Investors During the Class Period

89.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "***just about done***" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "***first***" in "***high wildfire risk areas***," followed by "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next year."

90.     However, PG&E did not disable all of its reclosers during fire season, like San Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

91.     Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that **they misled us in that**.
>
> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

Likewise, investors were misled by PG&E's recloser statements.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 437 of 1229

92.     Yet, even as late as **2018**, PG&E was still stating that it would need to commit to disabling these reclosers.[24]

F.     **PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period**

93.     Despite the important safety measures imposed by California law, PG&E has caused deadly wildfires through its failure to comply with the legal requirements for vegetation management, pole maintenance, and other safety requirements. Between causing the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws and other regulations.  PG&E assured investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation management" was now "*in compliance with relevant laws*" or "*complying with state and federal regulations*."

94.     Notably, in its undated 2018 Corporate Responsibility and Sustainability Report issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to investors that its vegetation management complies with California's safety laws.

1.     **PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

95.     One of the most notable of the pre-Class Period fires was the "Trauner Fire," where PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems.[25]

2.     **PG&E Unsafely Flouts Safety Regulations**

96.     Subsequently, PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire (1999).[26]

---

[24] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[25] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

97.      Moreover, according to documents released by The Utility Reform Network ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project and repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

98.      On August 9, 2016, a California federal jury found PG&E guilty of five criminal felony counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion.

99.      On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners, and defraud regulators and the public about the safety of PG&E's utilities, continued up to and including the Class Period.  The strong inference is that PG&E's statements concealing the inadequate safety of its electrical utilities, during the Class Period, were likewise made with an intent to defraud.[27]  On December 21, 2018, the CPUC issued a Scoping Memo and Ruling, which found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and failed "to develop a comprehensive enterprise-wide approach to address safety."  CPUC concluded that it "was, and remains, concerned that the safety problems

---

*(continued)*

[26] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been earmarked for tree trimming and removal.

[27] George Avalos, *PG&E Accused of Gas Pipeline Violations, Falsifying Records: Regulator*, Mercury News (updated Dec. 17, 2018 4:06 am), https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/.

being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

### 3. PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015

100. In September of 2015, five months after PG&E made Misstatement No. 1 touting its vegetation management, PG&E's vegetation management program once again failed, causing the Butte Fire that killed two people, destroyed 921 homes, businesses, and other structures, and scorched more than 70,000 acres over 22 days.

101. On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

102. There is currently pending litigation over PG&E's liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E caused the Butte Fire by maintaining an inadequate vegetation management system.

### 4. PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period

103. Internally, PG&E's numerous and widespread violations of relevant safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management and other violations to go unchecked on a dangerous scale.

#### (a) PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period

104. On March 5, 2019, the U.S. District Court presiding over PG&E's criminal probation (Judge Alsup) issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations.  The Order stated that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions," and found that PG&E's conduct had now "**led to recurring deadly wildfires caused by its electrical system**."  It contained the following findings summarizing the results of the federal

Case 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 440 of 1229

court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay and Camp Fires:

> PG&E's filings have included several relevant **admissions**. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines." ("Vegetation" means trees and limbs in this context.) In 2016 alone, PG&E experienced approximately **1,400** wires down caused by vegetation contact. As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the **486** fire ignitions associated with PG&E facilities, causing **37%** of those fires. **PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."**[28]

105.     Thus, PG&E has admitted that it had **actual knowledge since 2015** that its vegetation management practices did not comply with California safety regulations on the order of **thousands of violations per year**. PG&E has further admitted to **actually knowing** that its violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never disclosed that their own internal compliance reviews showed a lack of compliance on such a huge scale.

106.     According to data released by the CPUC,[29] PG&E equipment caused a total of 1,486 vegetation fires between June 10, 2014 and December 29, 2017.  Among those vegetation fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire, including 26 fires caused by lines of the exact same high voltage, 115 kilovolts.  PG&E supplied the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire Incident Data Collection Plan."[30]

---

[28] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[29] PG&E Fire Incident Data Collection Plan Report Data Compiled from 2014-2017, CPUC website, http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisions/News_and_Outreach_Office/PGE_Fire%20Incident%20Data%202014-2017.pdf.

[30] Decision Adopting Regulations To Reduce The Fire Hazards Associated With Overhead Electric Utility Facilities and Aerial Communications Facilities, CPUC Decision 14-02-015 (CPUC Feb. 5, 2014), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF. Pursuant to

---

107.     Similarly, according to documents described in a report by *NBC Bay Area*, PG&E completed a review of its transmission towers' safety compliance immediately after the Camp Fire.  As a result, "PG&E's inspections of thousands of transmission towers since the deadly Camp Fire in Butte County found more than 450 safety violations, including 59 that posed serious safety hazards."[31]

**(b)     PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards**

108.     Investigative journalists and attorneys have uncovered that PG&E internally accepts that its vegetation management practices leave 1 of every 100 trees noncompliant with California regulations, and further reportedly "cheats" on its internal compliance reviews, in order to give a misleading impression of compliance with tree clearance requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon Van Derbeken on November 6, 2017, published a month after the North Bay Fires began, PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line clearance standards:

**PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards**, NBC Bay Area has learned.

* * *

[I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.

* * *

When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . the company just expanded the universe of trees covered in a particular audit.

---

*(continued)*
the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must "collect and report data to SED regarding power-line fires."  *Id.* ("SED" refers to CPUC's Safety and Enforcement Division).

[31] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

"So what PG&E does when it doesn't pass, it basically cheats," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte Fire] said. "It adds more miles and more miles until it reaches a passing grade."

109.    With approximately 123 million trees under PG&E's control,[32] this means that PG&E knew during the Class Period that it may have been tolerating as many as approximately 1.2 million trees to be noncompliant with state safety laws at any given time.  The measurement of 1.2 million safety violations is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

110.    According to the plaintiffs litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it could be allowing as many as approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

**G.    Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire**

**1.    PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires**

111.    Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E equipment. **Eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the integrity of its poles.

---

[32] *See* PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

112.     Even though Cal Fire's investigations have not found evidence of violations for six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety violations merged into and strengthened other fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the eleven North Bay Fires which never should have ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the North Bay Fires, thereby negatively impacting the Company's financial condition.

### 2.     PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire

113.     On May 15, 2019, Cal Fire issued a press release announcing its determination that PG&E's electrical equipment caused the Camp Fire.[33]  Cal Fire further concluded, "[a]fter a very meticulous and thorough investigation," that PG&E caused **both** of the Camp Fire's two ignition points.  Cal Fire also referred its investigation to the Butte County District Attorney to review for potential criminal violations.  As noted above, PG&E expects to bear at least $10.5 billion, if not more, in liability for causing this fire.

### (a)     The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations

114.     The Camp Fire's first ignition point was "in the Pulga area," according to Cal Fire, and "was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[34]  Per its May 15, 2019 press release, "PG&E accepts this determination."[35]

---

[33] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[34] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[35] Press Release, PG&E, *PG&E Responds to Camp Fire Announcement from CAL FIRE* (May 15, 2019),
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20190515_pge_responds _to_camp_fire_announcement_from_cal_fire.

115.     According to firefighter radio transmissions and the journalist whose investigation made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County on November 08, 2018 at 6:33 a.m.[36]—matching the location where Cal Fire officials pinpointed the Camp Fire's origin four minutes earlier.[37] As one firefighter described the fire to dispatch: "It is on the west side of the river underneath the transmission lines."

116.     Independently that evening, PG&E admitted to the CPUC that one of its 115-kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m. that day, and noted that the site was near the Camp Fire.[38] Cal Fire has listed Pulga Road as the Camp Fire starting point.[39]

117.     The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E identified the tower as number ":27/222" and further specified that this observed damage included the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower.[40] PG&E also observed a broken C-hook attached to the separated suspension insulator

---

[36] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 pm), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

[37] Camp Fire Incident Update, CAL FIRE Incident Information (Nov. 22, 2018 7:00 pm), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf .

[38] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181108-9002 (Nov. 8, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf; *see also,* Tony Bizjak, *PG&E Reports Power Line Problem In Butte County Near Time and Place Where Wildfire Sparked*, The Fresno Bee (updated Nov. 10, 2018 7:51 PM), https://www.fresnobee.com/news/state/california/article221448500.html.

[39] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[40] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

35

that once connected the suspension insulator to a tower arm.[41]  According to the report, the connection point showed signs of wear; a flash mark was visible close to where the transposition jumper was suspended; and there was damage to the transposition jumper and suspension insulator.[42]

118.    PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not since 2009, pursuant to an internal policy whereby "Steel structures on PG&E's 115 kV transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and detailed inspections every five years."  PG&E has admitted that an aerial patrol is not an inspection, as it is only "[d]uring a detailed inspection of a transmission line" that "PG&E personnel are instructed to look for and document abnormalities or circumstances that will negatively impact safety, reliability, or asset life."[43]

119.    Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property that "were having problems with sparks."[44]

120.    Accordingly, it emerged that a PG&E electrical pole carrying a high-voltage 115 kilovolt transmission line lost its integrity, in whole or in part, on the morning of November 8, 2018.  Shortly thereafter, vegetation underneath the line ignited.  PG&E's failure to maintain a clearance for vegetation up to 10 feet away from this transmission line, inclusive of all vegetation underneath, violated California Public Resources Code Section 4293.  Further, PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated California Public Utilities Code Section 451.

---

[41] *Id.*

[42] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor" had become disconnected.  *Id.*

[43] PG&E Camp Fire Incident Description & Factual Summary at 4, PG&E Criminal Proceedings (N.D. Cal. Dec. 31, 2018), ECF No. 956-1.

[44] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM), https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/.

**(b)   The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations**

121.   Cal Fire determined that the Camp Fire also had a second ignition point, which began "near the intersection of Concow Rd. and Rim Rd" before merging with the first fire PG&E caused at first ignition point.[45]   According to Cal Fire's report: "The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E," a violation of California Public Resources Code Sections 4292 and 4293, as well as California Public Utilities Code Section 451.   Thus, Cal Fire has concluded that PG&E's violation of safety regulations caused at least one of the Camp Fire's two ignition points.

122.   Cal Fire first announced that it had identified a second ignition point for the Camp Fire on November 15, 2018.[46]   On November 16, 2018, PG&E admitted to CPUC that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on another power line in a nearby part of Butte County near Concow, California.[47]

123.   In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further admitted that it discovered a broken pole on the second power line on November 9, 2018; that the pole was on the ground, along with pole equipment; and that the pole had a line recloser.[48] The supplemental report also detailed a second inspection of the area on November 12, 2018, where a PG&E employee found damaged and downed poles, several snapped trees, downed

---

[45] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[46] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

[47] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181116-9015 (Nov. 16, 2018), http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/EIR_IncidentNo181116-9015.pdf; *PG&E Reports Another Outage On The Morning When California Camp Fire Started*, CNBC (Nov. 19, 2018 6:43 AM), https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html.

[48] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

1   wires, and some snapped trees on top of the downed wires.[49]  The presence of the line recloser

2   further calls into question PG&E's prior representation that it was "just about done" disabling

3   recloser devices in "high wildfire risk areas" as of November 18, 2015 (Misstatement No. 3).

4       124.    Accordingly, the truth emerged that the Camp Fire's second ignition point also

5   exhibited evidence of failures regarding vegetation management, pole integrity, and the possible

6   use of a recloser in further violation of California safety regulations, including Public Resources

7   Code Sections 4292, 4293 and Public Utilities Code Section 451.  Cal Fire's investigation later

8   confirmed these facts.

9       **H.**    **PG&E's Repeated Vegetation Management and Pole Integrity Safety**

10       **Violations Show that the Company Knew of Its Numerous and Widespread**
       **Violations of Fire Safety Regulations Throughout the Class Period, but Did**

11       **Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety**
       **Violations**

12       **1.**    **PG&E Did Not Improve Its Inadequate Safety Practices After Its**
       **Safety Violations Caused the Deadly Butte Fire**

13       125.    Even though PG&E suffered from endemic wildfire safety problems, the

14   Company did not meaningfully change its practices even after the deadly Butte Fire that occurred

15   in 2015. As noted above, in a deposition transcript that has not yet been made publicly available,

16   PG&E's Vegetation Program Manager (Stockton Division)[50] Richard Yarnell reportedly testified

17   under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a**

18   **result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the

19   Butte Fire in 2015 continued unabated throughout the Class Period, contrary to PG&E's public

20   statements.

21       126.    Moreover, the vegetation management problems detailed herein were

22   institutionally entrenched by certain incentive structures PG&E put in place. According to a

23   lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case

24   No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E

---

[49] *Id.*

[50] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

provided monetary incentives to its employees that had the effect of discouraging the implementation of vegetation safety measures.

127.    For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E effectively shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire season) put safety at risk in an effort to reduce consumer complaints. *See* ¶569, *infra*.

128.    According to the same lawsuit, Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk.

129.    As noted above, though PG&E **falsely and repeatedly** assured investors during the Class Period that its compliance failures had been resolved after the Butte Fire, the Company's own employee Richard Yarnell later admitted that nothing of substance had changed over much of the same time period. Accordingly, PG&E's repeated safety violations show that the Company knew of its numerous and widespread violations of California safety regulations throughout the Class Period, but did nothing to change them.

### 2.    PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire

130.    PG&E's Caribou-Palermo transmission powerline was originally built in 1919, and was responsible for causing the first ignition point of the Camp Fire.

131.    PG&E knew, but concealed, that this powerline had dangerously deteriorated.  In December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed due to windy conditions.  In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the

five collapsed towers, and one additional tower, on the Caribou-Palermo line "[s]panning

Plumas-Butte County border" in a row "up slope and west of Highway 70 and generally parallel

to the unpaved Pulga Road in a remote area of the Feather River Canyon within Plumas National

Forest"[51]—that is, to say, near the first Camp Fire ignition point.

132.    The rest of the aging towers on the line, including the tower alleged to have

started the Camp Fire, were not replaced during that project.[52]  The age of these remaining

towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related

factors would fail to support transmission line cables and cause wildfires.  Indeed, the relevant

tower included uninsulated "jumper" lines used to switch currents between transmission lines,

making the risk of fire even greater.[53]  Tellingly, the cross arm from that transmission tower,

which was attached to the "jumper" line, was removed by Cal Fire investigators as part of its

probe into the cause of the Camp Fire.[54]  And Cal Fire's investigation has not only concluded

that PG&E equipment caused the Camp Fire in a manner evidencing safety violations, but also

referred the matter to the Butte County district attorney for a criminal investigation.

133.    In a July 26, 2017 FERC filing that news outlets have reported on extensively,[55]

PG&E proposed considerable work for the Caribou-Palermo line as part of the Company's

---

[51] Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.

[52] Ivan Penn, et al., *How PG&E Ignored Fire Risks in Favor of Profits*, New York Times (Mar. 18, 2019), https://www.nytimes.com/interactive/2019/03/18/business/pge-california-wildfires.html.

[53] Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM),

https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

[54] Matthias Gafni, et al., *Why Did Fire Iinvestigators Remove PG&E Transmission Tower Part in Camp Fire Probe*, Enterprise-Record (updated Dec. 6, 2018 8:07 AM), https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-tower-part-in-camp-fire-probe.

[55] *E.g.*, George Avalos, *PG&E Knew For Years That Repairs Were Needed On Transmission Lines In Area Of Fatal Camp Fire*, Mercury News (updated Feb. 28, 2019 6:05 AM), https://www.mercurynews.com/2019/02/27/pge-delayed-repairs-for-years-on-transmission-line-linked-to-lethal-camp-fire/.

---

1   annual request to FERC for rate changes.  PG&E reported that "[t]he Caribou-Palermo 115

2   kilovolt circuit was analyzed as part of [a] 2013 NERC Assessment," referring to an analysis by

3   the North American Electric Reliability Corporation ("NERC").  The filing indicated that the

4   2013 NERC study examined 455 spans of the of the transmission line and found that vegetation

5   or trees were allowed to grow too close to 127 (27.9%) of them: "The completed [NERC]

6   analysis identified 127 spans with clearance issues out of the 455 spans on the electric

7   transmission line."  PG&E never fixed the identified issues from the time it learned about them

8   in 2013 as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system

9   would later be implicated in the 2018 Camp Fire.

10        134.    On March 18, 2019, *The New York Times* published an exposé on PG&E titled,

11   "How PG&E Ignored California Fire Risks in Favor of Profits."  The article discussed an internal

12   Company email, sent long before the Camp Fire, which noted that a group of structures including

13   the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due

14   to their age and windy conditions in the area.  Indeed, the Company noted that corrosion on

15   another tower in the vicinity was so severe that it had endangered crews attempting to repair it.

16   The Company's own guidelines had warned that **the tower was a quarter-century past its**

17   **useful life**, yet PG&E failed to repair or replace the aging tower.

18        135.    The article also portrayed a corporate culture at the Company which disregarded

19   safety risks and avoided paying for necessary fire prevention precautions in favor of short-term

20   operating results.  The article quoted Mike Florio, a former California utilities commissioner,

21   who observed, "There was very much a focus on the bottom line over everything [at PG&E]:

22   'What are the earnings we can report this quarter? . . .  And **things really got squeezed on the**

23   **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

24   expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

25   **again, lying, manipulating or misleading the public. . .  They cannot be trusted.**"  The article

26   contrasted the lack of focus on safety at the Company with the approach taken by another

27   California utility facing similar risks, San Diego Gas & Electric, which had significantly

28   revamped its safety protocols to respond to increased wildfire dangers.

136.     Also on March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal Company emails demonstrating that PG&E had identified the transmission lines implicated in the 2018 Camp Fire as unsafe long before the fire started.[56]  For example, **internal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high**" – a risk PG&E concealed from the public.

137.     Similarly, a November 1, 2016 PG&E document detailed the failure of necessary hardware along the transmission line, with a support hook snapping off during routine painting. PG&E documents internally acknowledged that the supports "had been compromised through corrosion."[57]

138.     Despite the internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never undertaken, and **the Caribou-Palermo line caused the first ignition point of the Camp Fire** in 2018.

139.     Accordingly, PG&E had actual knowledge about the safety violations that caused the Camp Fire, months if not years in advance.

140.     It was in this context that Defendants touted PG&E's vegetation management and infrastructure maintenance to investors, falsely representing that it was in full compliance with all relevant regulations throughout the Class Period. *E.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶222 (Misstatement No. 5, August 9, 2017); ¶249 (Misstatement No. 9, October 31,

---

[56]   *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019), https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

[57]   *Id.*

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

42

2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280 (Misstatement No. 13, May 25, 2018); ¶287 (Misstatement No. 14, June 8, 2018).

**I.      PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire**

141.    After the North Bay Fires but before the Camp Fire, on July 16, 2018, the CPUC passed Resolution ESRB-8.  As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur.  PG&E announced its response to this new safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its existence throughout the rest of the Class Period.

142.    PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off **electric power lines**, in the interest of public safety."  Thus, PG&E's ESRB-8 Shutoff Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

143.    Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

Case 19-30088    Doc# 14289-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 453 of 1229

1    (Emphasis original.)   PG&E stated that "no single factor will drive a Public Safety Power

2    Shutoff," and never identified any other criteria, during the Class Period or since.

3        144.    When PG&E's lines ignited the Camp Fire on November 8, all seven criteria had

4    been met or exceeded – a fact of which PG&E could not have been ignorant.  Indeed, PG&E had

5    warned customers in that area as early as November 6 – two days before the Camp Fire began –

6    that it may need to "proactively turn off power for safety starting on Thursday, November 8."[58]

7        145.    PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once

8    before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits

9    and thirty-three distribution power line circuits, in seven counties.  Though PG&E found damage

10   to its equipment before restoring power, it nevertheless faced strong backlash from customers

11   who were affected by the shutoff.

12       146.    On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via

13   its official Twitter.com account: "PG&E has determined that it will not proceed with plans today

14   for a Public Safety Power Shutoff in portions of 8 Northern CA counties, **as weather conditions**

15   **did not warrant this safety measure.**"[59]  The three weather-relevant criteria are humidity levels (at

16   20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and

17   wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local

18   climate and terrain).

19       147.    However, as detailed below, **each of these factors weighed in favor of a shutoff**.

20   Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were

21   measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific

22   conditions contributed to the ignition of the most destructive and deadliest fire in California

23

24   _____

25   [58] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About*
     *Extreme Weather Forecasts and Potential for Public Safety Power Shutoff* (Nov. 6, 2018),
     https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifyin

26   g_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_p
     ublic_safety_power_shutoff.

27   [59] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM),

28   https://twitter.com/PGE4Me/status/1060672000929267713.

history.   As Cal Fire later confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."[60]

148.    The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[61] Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39° 44' 09" N (Latitude), 121° 29' 20" W (Longitude),[62] approximately six miles from the Camp Fire's origin.[63]   The Jarbo Gap weather station provided the most accurate record of weather conditions at the time and place where the Camp Fire ignited.

**1.    PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power**

149.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted in three press releases that all seven criteria weighed in favor of a shutoff—providing only small caveats that weather-related factors might change.

**(a)    Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level**

150.    The area where the Camp Fire ignited was classified as having an "Extreme" fire danger threat level by the National Fire Danger Rating System ("NFDRS").   The U.S. Forest Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in map[64] and data[65] form, both of which confirm that the Jarbo Gap was rated "Extreme" on

---

[60] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[61] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[62] Jarbo Gap California Weather Station Information, RAWS USA Climate Archive, https://raws.dri.edu/cgi-bin/wea_info.pl?caCJAR.

[63] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[64] Observed Fire Danger Class, WFAS-Maps Graphics Fire Behavior Research (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png.

November 8, 2018.  The graphic on the following page has modified the WFAS map to highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on November 8, 2018:



151.     As the U.S. Department of Agriculture Forest Service explained the NFDRS:

> When the fire danger is "extreme", fires of all types start quickly and burn intensely.  All fires are potentially serious and can spread very quickly with intense burning.  Small fires become big fires much faster than at the "very high" level.  Spot fires are probable, with long-distance spotting likely.  These fires are very difficult to fight and may become very dangerous and often last for several days.[66]

---

*(continued)*

[65] *See* Data Chart of Fire Weather Observations from WIMS at 1700 Mountain Time (Nov. 8, 2018),  https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme").

[66] USDA Forest Service, National Fire Danger Rating System, https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368 839.

152.     Indeed, in a press release on November 7, 2018, PG&E admitted: "Due to expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[67]

### (b)     Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area

153.     The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[68] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions **including the Red Flag warning from the National Weather Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[69]

### (c)     Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff

154.     Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by

---

[67] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather.

[68] Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning*, CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/.

[69] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff Due to* (Nov. 6, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff .

1   an extended period of dry fall weather, only one rain event since May, and periods of dry north

2   winds which caused the moisture content of live and dry fuels to remain low."[70]

3        155.   PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to

4   forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of

5   the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch,

6   Magalia, Oroville, **Paradise**). . . ."[71]

7        156.   As Pulitzer Prize winning journalist Matthias Gafni would later report,

8   information from the National Aeronautics and Space Administration ("NASA") showed that

9   California's moisture levels that month were "at the lowest levels in [the] last four years."[72] As

10  the graphic below confirms, this led to extremely dry vegetation:

11

12

13

14

15

16

17

18

19

20

---

21  [70] PG&E Letter to CPUC re: Compliance Report (Nov. 27, 2018),
    http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/
22  11-27-18%20PGE%20PSPS%20Report.pdf.

23  [71] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties
    About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov.
24  7, 2018),
    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue
25  s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe
    r_shutoff_due_to_forecasted_extreme_weather .

26  [72] Matthias Gafni, *Why Didn't PG&E Shut Down Power In Advance Of Deadly Camp Fire?
    Here's The Data,* Bay Area News Group (Nov. 18, 2018 5:00 P.M.),
27  https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-
28  camp-fire-heres-the-data/.

---

## Root Zone Soil Moisture Percentile






**(d)   Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff**

157.    PG&E's on-the-ground observations favored a shutoff.  In a press release dated November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to initiate" a shutoff included its "on-the-ground observations."[73]

---

[73] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe r_shutoff_due_to_forecasted_extreme_weather.

158.    This conclusion is corroborated by PG&E's admission in a November 8, 2018 press release that *only weather factors* weighed against shut-off: "[PG&E] has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern California counties, **as weather conditions did not warrant this safety measure**."[74]

### 2.    All of the Weather Criteria Weighed in Favor of Shutting Off the Power

159.    As described above, PG&E attributed its decision not to shut off power to weather conditions.  Specifically, in a November 27, 2018 filing to the CPUC, PG&E explained that the primary weather condition that fell short was wind speed:

> On Wednesday, November 7, 2018, PG&E refined the forecasted impact down to 63,000 customers and eight counties (Butte, Lake, Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather conditions stayed consistent, nearing but not reaching forecasted levels that would warrant temporarily turning off power for customer safety**.

> By around 13:00 on Thursday, November 8, **winds were decreasing**, and conditions were no longer forecast to approach [Public Safety Power Shutoffs] criteria. Based on the forecasted information, PG&E no longer anticipated a possible need to de-energize.

160.    However, all weather factors – including wind speed – weighed in favor of an electricity shutoff in Jarbo Gap on November 7-8, 2018.  The charts[75] on the following page show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through the next day:

---

[74] Press Release, PG&E, *PG&E Determines to Not Proceed with Public Safety Power Shutoff Planned for Portions of Eight Northern California Counties* (Nov. 8, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181108_pge_determines_to_not_proceed_with_public_safety_power_shutoff_planned_for_portions_of_eight_northern_california_counties.

[75] Weather Station Summary for Jarbo Gap California (Nov. 7, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=7&mon=11&yea=18&unit=E; Weather Station Summary for Jarbo Gap California (Nov. 8, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=8&mon=11&yea=18&unit=E.

## Jarbo Gap California

Daily Summary for

### November 7, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

Daily Summary for

### November 8, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

161.    Accordingly, PG&E's November 27, 2018 statement to the CPUC that its decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on Thursday, November 8, winds were decreasing," was misdirection.  The Camp Fire had already begun over six hours before that point.  And indeed, as shown in the chart above, wind speed

weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

        **(a)    Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels**

162.    Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

163.    Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

164.    PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[76]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[77]

165.    In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[78]

---

[76] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties.

[77] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

[78] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

1

2

> **(b)    Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed**

166.    As noted above (*see* ¶159), PG&E informed the CPUC on November 27, 2018 that the primary reason it did not shut off the power was wind speed.

167.    Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

168.    At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour. Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

169.    PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[79]—warned of winds "during the morning and afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[80]

170.    In fact, sustained wind speed weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary.  The National Weather Service's forecast of sustained winds of 20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

---

[79] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties.

[80] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

1   predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . . where sustained winds are

2   forecast to reach 20-25 mph for a few hours."[81]

3                   **(c)**        **Criterion 5: Site-Specific Conditions Further Favored Shutoff**

4         171.   The specific conditions beneath PG&E's 115 kilovolt transmission line where the

5   Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted

6   Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having

7   problems with sparks," indicating that conditions were hazardous.[82]  Further, it is indisputable

8   that dry vegetation existed underneath the transmission line given reports of vegetation burning

9   beneath it (*see* ¶115, *supra*).  Notably, PG&E identified nothing about the area's terrain,

10  temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to

11  shut off its lines.[83]

12                **3.**      **PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power**

13

14        172.   PG&E knew that severe weather conditions requiring a shutoff were in effect.

15  First, the Company admitted it had been monitoring the weather in the area for days; its

16  November 7 press release confirmed that "PG&E meteorologists continuously monitor weather

17  conditions."  Second, the Company had its own "network of PG&E weather stations to enhance

18

19      [81] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

20      [82] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM),

21  https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/.

22      [83] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further

23  supported a shutoff.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with

24  "extreme topography."  *See* Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.  After the Camp Fire,

25  an article reported on the terrain immediately around the same transmission line as making fire containment more difficult: "The remoteness and rugged terrain around the tower would make

26  any firefight by hand crews nearly impossible."  *See* Matthias Gafni, *It was originally built in

27  1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-

28  what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO: 3:18-CV-03509-EJD

54

weather forecasting and modeling," and stated that the Company had the capability of

"[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[84]

Finally, the weather data referenced above was publicly available.  Indeed, for the hour from

midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap

weather station reported that **all weather conditions were met**: humidity at 19%, sustained

winds at 27 miles per hour, and wind gusts at 45 miles per hour.  Accordingly, PG&E either

knew that weather conditions existed that weighed in favor of a shutoff, or deliberately

disregarded such information.

173.    Every factor weighed in favor of shutting off PG&E's transmission line running

through the Jarbo Gap outside of Paradise, California.  PG&E knew or should have known that

all such factors were met.

174.    Indeed, PG&E had only shut off electricity in the face of wildfire conditions once

before, in October 2018.  The backlash to that shutoff was strong, and PG&E received numerous

customer complaints. PG&E noted in its October 31, 2018 report to the CPUC that as of October

24, "17 residential customers have complained to the CPUC as a result of the PSPS [Public

Safety Power Shutoffs] event since the first customer notification on October 13."[85]  Moreover,

PG&E reported to the CPUC that it had "received a total of 146 claims as of October 24, 2018,"

including claims for property damage, business interruption, and spoiled food.

175.    In sum, all seven criteria weighed in favor of a shutoff that never happened.  From

the beginning, the Company misrepresented to investors that it would prioritize safety over

customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  The

strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its

ESRB-8 Shutoff Protocol was illusory, and that the Company did not believe itself bound by the

---

[84] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-
Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[85] Letter from PG&E to CPUC re: Compliance Report (Oct. 31, 2018),
http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/En
ergy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

1    seven criteria it told the public and investors were the crucial criteria.  By PG&E's statements

2    listing these – and only these – criteria in its ESRB-8 Shutoff Protocol, investors were entitled to

3    believe that when **all** criteria were met, PG&E would prioritize safety and shut off the power

4    rather than risk causing wildfires and the resulting economic as well as reputational harm to

5    PG&E.

6         176.    In the alternative, PG&E had a duty to update investors once it decided to

7    abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result of PG&E's

8    non-adherence to the protocol was the deadliest and most destructive wildfire California has ever

9    faced.

10        **J.    PG&E's Bankruptcy and Other Post-Class-Period Developments**

11        177.    Following PG&E's felony convictions for knowingly and willfully violating

12   safety standards in causing the deadly San Bruno gas explosion and obstructing justice (*see*

13   *supra* Section VI.F.2.), PG&E's sentence included criminal probation.  Since November 27,

14   2018, the U.S. District Court presiding over PG&E's probation instituted further proceedings to

15   determine whether, *inter alia*, PG&E's safety violations causing the North Bay and Camp Fires

16   may have violated its probation.  These proceedings remain ongoing as of the filing of this

17   Complaint, and are detailed in Section X.C., *infra*.

18        178.    On January 14, 2019, PG&E filed a current report on Form 8-K stating that it

19   expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the

20   Company provided for the expected bankruptcy was the "series of catastrophic wildfires that

21   occurred in Northern California in 2017 and 2018" – namely, the North Bay and Camp Fires.[86]

22        179.    On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's

23   bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30

24   billion in potential liabilities tied to the North Bay and Camp Fires.[87]

25

26   ───────────────
     [86] PG&E Corp., Current Report (Form 8-K) (Jan. 13, 2019),
27   https://www.sec.gov/Archives/edgar/data/75488/000095015719000032/form8k.htm.
     [87] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-br-30088, (N.D. Cal. Feb. 1, 2019),
28   ECF No. 263.

180.    On February 6, 2019, PG&E submitted to CPUC its new wildfire mitigation plan, as required by SB 901.  PG&E later corrected the filing on February 12, 2019 and amended it on February 14, 2019 (the "2019 Mitigation Plan").  On April 29, 2019, the CPUC largely approved PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned mitigation that require improvement or other follow-up activity," including improved "[a]nalysis of data to determine whether PG&E's new vegetation-pole clearances have contributed to reduced ignitions, especially during critical weather conditions."[88]  As detailed below, the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it should have during the Class Period.

181.    PG&E's 2019 Mitigation Plan stated that the Company would substantially increase its vegetation management efforts.  First, the plan provided that approximately 375,000 "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in 2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual).  Second, it called for performing 2,450 miles of "enhanced vegetation management" (including fuel reduction and overhang clearing,) in 2019, an increase of 320% from its 2018 target of only 760 miles.  In approving this proposal, the CPUC noted that "PG&E proposes to spend between $800 million and $1.3 billion to support [this] expansion of its vegetation management program."

182.    PG&E's 2019 Mitigation Plan also stated that the Company would substantially increase its inspections.  Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting "enhanced inspections" of 685,000 electricity distribution poles in High Fire Threat Districts "in addition to routine inspections" over the course of just "five months." (Emphasis original.)  "Enhanced Inspection" was described as

---

[88] Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was "filed too late to be considered and to receive party comment," and thus "not act on those proposals."  *See* Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf.

1    "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing

2    inspections of every transmission tower," implying such measures had not been undertaken in

3    the past.  Similarly, for its electricity transmission structures, PG&E committed to conducting

4    enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from

5    9,400 and 76,000, respectively).  PG&E also committed to conducting "enhanced risk-based

6    inspections" of 200 electricity substations in High Fire Threat Districts.

7         183.    The CPUC noted that these increased inspections were expected to cost PG&E

8    **between $798 million and $1.396 billion—**"**an increase from $15 million authorized in**

9    **PG&E's last [General Rate Case]**."

10        184.    The 2019 Mitigation Plan also proposed that the Company would significantly

11   expand the geographic regions where it might preemptively shutoff power pursuant to its ESRB-

12   8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million

13   customers, a **950% increase** from what previously covered approximately 570,000 consumers.

14        185.    Thus, PG&E's 2019 Mitigation Plan described dramatic increases in safety

15   practices and expenditures compared to prior years.  These and other aspects of PG&E's

16   expensive proposals represented that it was finally providing the necessary, dramatic expansion

17   of its safety practices and increases in expenditures, which had been absent.  Accordingly, the

18   vastly expanded scope of PG&E's 2019 wildfire plan strongly demonstrates the inadequacy of

19   PG&E's prior safety practices, showing that PG&E did far less than it should have during the

20   Class Period.

21        186.    Following the plan's release, the *Associated Press* summarized the general

22   reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"[89]

23        187.    On February 28, 2019, PG&E issued a press release providing an update on the

24   financial impact of the North Bay and Camp Fires, along with the Company's fourth quarter and

25   full-year 2018 financial results.  The release stated that the Company "believes it is probable that

26

27   _____

28   [89] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, Associated
     Press (Feb. 7, 2019), https://www.apnews.com/c1d0e16811914177a9b4b473f1eeebee.

1   its equipment will be determined to be an ignition point of the 2018 Camp Fire," half-

2   anticipating Cal Fire's determination three months later implicating PG&E in both of the Camp

3   Fire's ignition points.  The press release also stated that the Company would be recording a

4   **$10.5 billion charge** related to the 2018 Camp Fire.  It also reported an additional $1 billion

5   charge related to the North Bay Fires, "in addition to the previously recorded $2.5 billion charge

6   in the second quarter of 2018" related to the same fires.  As a result, the Company reported full-

7   year ***net losses of $6.9 billion***, compared to 2017 net income of $1.6 billion.  It further stated:

8   "Management has concluded that these circumstances raise substantial doubt about PG&E

9   Corporation's and the Utility's ability to continue as going concerns…."

10   **VII.   DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS
         UNDER THE EXCHANGE ACT[90]**

12   188.   Investors and analysts were focused on the Company's compliance with wildfire-

13   related safety regulations during the Class Period. With an eye towards artificially inflating its

14   share price, PG&E responded to this interest with false and misleading reassurances that PG&E

15   was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend

16   during the Class Period, repeatedly touting that such a move was based, in part, on its success in

17   ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

18   **A.   Overview of Defendants' Fraudulent Course of Conduct**

19   189.   PG&E was responsible for the North Bay Fires.  Of the eighteen main North Bay

20   Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E

21   equipment. Among those, **eleven** of these fires evidenced violations of California safety

22   regulations, in **seven** different counties at the **same time**.

23   190.   Furthermore, PG&E was responsible for the Camp Fire, which began when a

24   PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed.  On May

25   15, 2019, Cal Fire issued a news release confirming that its investigation had "determined that

26   the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas

27   _____

28   [90] All references to "Defendants" in Sections I & IV-XIII refer to the Exchange Act
     Defendants (PG&E and the Exchange Act Individual Defendants).

1   and Electric[]."[91]  PG&E acknowledged a second ignition point for the Camp Fire that exhibited

2   damaged and downed poles, vegetation on top of downed wires, and a recloser.  As a result,

3   vegetation underneath the lines ignited in two ignition points approximately 30 minutes apart.

4   PG&E's failure to remove such vegetation violated California Public Resources Code §4293.

5   PG&E's failure to maintain the integrity of its poles violated California Public Utilities Code

6   §451.  Cal Fire's investigation also confirmed: "The cause of the second fire was determined to

7   be vegetation into electrical distribution lines owned and operated by PG&E."[92]

8       191.    Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power

9   lines be shut off.  While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria

10  when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in

11  the hours leading up to the Camp Fire in the precise location where it started.   This, too, Cal Fire

12  confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and

13  Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted

14  this fire and caused extreme rates of spread…."[93]   Though adhering to the ESRB-8 Shutoff

15  Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

16      192.    Tellingly, the CPUC is investigating whether PG&E violated CPUC rules and

17  standards.  And since determining that PG&E is responsible for the Camp Fire, Cal Fire has

18  forwarded its investigative report to the Butte County District Attorney.

19      193.    The news about PG&E's responsibility for causing the North Bay Fires and Camp

20  Fire directly impacted the Company's bottom line, because California law requires PG&E to

21  bear the cost of wildfire-related property damage and personal injury caused by its violations of

22

_____

23   [91] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
     15, 2019),
24   http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

25   [92] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
     15, 2019),
26   http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

27   [93] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
     15, 2019),
28   http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

1   California safety regulations.  In other words, those costs likely could not be passed on to

2   ratepayers.  And, given the information that has emerged, including the conclusions of Cal Fire's

3   investigations into these fires to date – where Cal Fire has referred at least twelve of its

4   investigations to the appropriate counties' district attorneys' offices to review for potential

5   criminal violations – the market has come to understand that the financial consequences to

6   PG&E are extraordinary.

7     **B. Defendants Made Materially False and Misleading Statements and
    Omissions Regarding Its Vegetation Management Activities and Compliance
8       with Wildfire Safety Regulations Before the North Bay Fires**

9       **1. April 29, 2015 – Misstatement No. 1**

10     194. The Class Period begins on April 29, 2015, when PG&E held a conference call to

11   discuss the Company's financial and operating results for the first financial quarter of 2015,

12   which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility,

13   misleadingly assured investors of the Company's commitment to safety:

14       As California enters its fourth year of drought, we're working hard
    to help the state meet this challenge by reducing water usage at our
15       own facilities, encouraging customers to conserve by offering
    rebates for more efficient washers and agricultural pumps. ***We're***
16       ***stepping up our vegetation management activities to mitigate***
    ***wildfire risk*** and improve access for firefighters.

17

18     195. This statement was materially false and/or misleading because PG&E did not

19   materially increase its vegetation management budget in 2015. In fact, based on information

20   released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015:

21   whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015,

22   respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively.

23   Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage

24   points above inflation, which rose 1.12% over the same time period.[94]  Indeed, Judge Alsup held

25   that the "large number of trees that should have been removed by PG&E but weren't . . . was a

26   major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018

27   _____
[94] CPI Inflation Calculator, Bureau of Labor Statistics,
28   https://www.bls.gov/data/inflation_calculator.htm.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD             61

Case 19-30088   Doc# 14288-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 471 of 1229

1    in Northern California," and he concluded that "PG&E's performance with respect to vegetation

2    management has been **dismal**."  Accordingly, PG&E had not meaningfully "stepp[ed] up" its

3    vegetation management activities.[95]

4         196.    Further, this statement materially omitted the numerous and widespread safety

5    violations that would not be fixed by PG&E's "stepp[ed] up . . . vegetation management

6    activities."

7                    **2.      October 16, 2015 – Misstatement No. 2**

8         197.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and

9    Sustainability Report. This report falsely assured investors that PG&E's "vegetation

10   management" was "in compliance with relevant laws":

11       **Vegetation Management**

12       ***Each year, PG&E's Vegetation Management department***, in
         consultation with utility arborists and foresters, ***inspects every mile***
13       ***of power line in our service area for public safety*** and electric
         reliability. ***We do so in compliance with relevant laws*** and with a
14       focus on public involvement, including extensive "Right Tree,
         Right Place" outreach. PG&E has been recognized by the National
15       Arbor Day Foundation as a Tree Line USA recipient for 20
         consecutive years for demonstrating best practices in utility
16       arboriculture.

17       198.    Because PG&E's vegetation management practices failed to follow relevant

18   federal and California safety laws, PG&E's vegetation management activities were decidedly not

19   "in compliance with relevant laws."

20       199.    First, according to reports released in subsequent corrective disclosures, including

21   on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

22   Public Resources Code Section 4293, multiple times.

23       200.    Second, Cal Fire found sufficient evidence of violations of state law to refer

24   PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

25   *infra*.

26

27       [95] PG&E also omitted that it was supposed to perform at least $441,192 (the total amount by
     which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management
28   during 2015, but failed to do so.

201.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.    Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

202.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

203.    Fifth, PG&E has admitted that it did not "inspect[] every mile of power line" "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

204.    Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

205.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same

1    time in seven different counties, and then caused both of the Camp Fire's two ignition points a

2    year later – therefore the violations cannot be explained away as an isolated lapse.

3         206.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5    2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a
> Chief Ethics and Compliance Officer, a position created in 2015 as
> part of our commitment to achieve a best-in-class ethics and
> compliance program. The position reports to the PG&E
> Corporation CEO and has additional reporting responsibility to the
> Audit Committees of the Board of Directors, and the Compliance
> and Public Policy Committee of PG&E Corporation.

> The new position is responsible for:

> - Building a best-in-class ethics and **compliance** program
>   and **overseeing its implementation**,
>
> - **Overseeing company-wide programs for compliance
>   reporting and related investigatory processes**. . . .

14        207.    Kane therefore was responsible for both "overseeing . . . implementation" of

15   PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

16            **3.        November 18, 2015 – Misstatement No. 3**

17        208.    On November 18, 2015, Hogan publicly testified before the California Senate

18   Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety.

19   During that testimony, Hogan assured the public that PG&E was "just about done" implementing

20   a program that would remotely disable the Company's recloser devices in areas that included

21   "high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are
> able to *take our reclosers out of service remotely*, we first *focus
> on the wildfire areas* and then we have about 130 some odd
> locations, we are going to complete about 126 of those this year,
> *just about done with that program*, which leaves six for next year,
> which will be completed.

25        209.    This statement was materially false and/or misleading because PG&E

26   misleadingly said that it had implemented policies and procedures to disable recloser devices

27   from areas that were at high risk for wildfires, which includes the areas where the North Bay

1  Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed

2  that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has

3  determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire.

4  Indeed, a recloser was found on a broken PG&E pole at the second ignition point for the Camp

5  Fire.  Thus, PG&E did not have the safety policies and procedures in place that they led investors

6  to believe they had.

7      210.    This statement materially omitted the true risk that PG&E would cause wildfires

8  serious enough to imperil the Company's financial condition.

9              **4.    October 6, 2016 – Misstatement No. 4**

10     211.    On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and

11 Sustainability Report. This report provided false assurances to investors regarding PG&E's

12 compliance with relevant regulations:

13     **Vegetation Management**

14     *Each year,* PG&E's Vegetation Management department and its
       contracting arborists and foresters *inspect miles of power lines in*
15     *our service area for public safety and electric reliability. We do so*
       *in compliance with relevant laws* and with a focus on public
16     involvement, including extensive "Right Tree, Right Place"
       outreach. PG&E has been recognized by the National Arbor Day
17     Foundation as a Tree Line USA recipient for 21 consecutive years
       for demonstrating best practices in energy sector arboriculture.

18

19     212.    Because PG&E's vegetation management practices failed to follow relevant

20 federal and California safety laws, PG&E's vegetation management activities were decidedly not

21 "in compliance with relevant laws."

22     213.    First, according to reports released in subsequent corrective disclosures, including

23 on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

24 Public Resources Code Section 4293, multiple times.

25     214.    Second, Cal Fire found sufficient evidence of violations of state law to refer

26 PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

27 *infra.*

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
475 of 1229

215.     Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

216.     Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

217.     Fifth, PG&E has admitted that it did not "inspect" all of its powerlines "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

218.     Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

219.     Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires all at the

1    same time in **seven** different counties, and then caused both of the Camp Fire's two ignition

2    points a year later – therefore the violations cannot be explained away as an isolated lapse.

3        220.   This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5    2016 Corporate Responsibility and Sustainability Report:

6            Within senior leadership, ethics and compliance are managed by
     the Chief Ethics and Compliance Officer (CECO), who reports to

7            the PG&E Corporation Chairman and CEO. The CECO has
     additional reporting responsibility to the Audit Committees of the

8            PG&E Corporation and Pacific Gas and Electric Company Boards
     of Directors, and the Compliance and Public Policy Committee of

9            the PG&E Corporation Board.

10           The CECO is responsible for:

11           &bull;  Building a best-in-class ethics and **compliance** program
          and **managing its implementation**,

12

13           &bull;  **Overseeing enterprise-wide programs for compliance
          monitoring, reporting**, assessment and remediation. . . .

14       221.   Kane therefore was responsible for both "managing . . . implementation" of

15   PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including

16   this report.

17          **5.**     **August 9, 2017 – Misstatement No. 5**

18       222.   On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and

19   Sustainability Report. This report provided false assurances to investors regarding PG&E's

20   compliance with relevant regulations:

21           **Vegetation Management**

22           ***PG&E prunes and removes trees growing too close to power lines***
     while maintaining as much vegetation as possible to balance land

23           use and environmental stewardship with customer needs. Through
     a well-established and innovative vegetation management

24           program, ***PG&E balances the need to maintain a vast system of
     trees growing along power lines while complying with state and***

25           ***federal regulations and delivering safe***, reliable and affordable
     ***electric service***.

26

27

28

223.    Because PG&E's vegetation management practices failed to follow relevant federal and California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service."

224.    First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

225.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

226.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

227.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

228.    Fifth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

229.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

230. This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by the Senior Vice President, Chief Ethics and Compliance Officer and Deputy General Counsel (CECO), who reports to the PG&E Corporation Chief Executive Officer (CEO) and President. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program **and managing its implementation**,
>
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

231. Kane therefore was responsible for both "managing implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting**," including this report.

**C.      Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires**

232. Throughout the Class Period, Defendants repeatedly tied the sustainability of its quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period for the first time in six years, and then raised it again – touting the Company's "progress on safety" and "improvements we have made in safety." Yet PG&E's violations of relevant safety regulations were so numerous and widespread that they caused and exacerbated the North Bay Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

1      **1.      May 23, 2016 – Misstatement No. 6**

2      233.    Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press

3  release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at

4  Annual Shareholder Meeting." It stated:

5              PG&E Corporation (NYSE: PCG) today announced that it is
               raising its quarterly common stock dividend to 49 cents per share,
6              an increase of 3.5 cents per share, beginning with dividends for the
               second quarter of 2016.

7                                          * * *

8              The increase, which is the company's first in six years, is a
9              meaningful step toward gradually returning the company's
               dividend payout to levels that are comparable with those of similar
10             utilities.

11                                         * * *

12             ***Earley and other senior executives also discussed continued
               progress on safety***, reliability and other goals, as well as PG&E's
13             strategy for the future [at the annual shareholder meeting].

14             Earley said, '***We've continued to demonstrate leadership and
               commitment on safety.*** We're delivering the most reliable service
15             in our company's history.

16      234.    This statement was materially false and/or misleading because it affirmed that

17  PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

18  Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

19  connecting purported safety achievements to its ability to increase its dividend, importantly, "to

20  levels that are comparable with those of similar utilities."  In reality, PG&E lacked the touted

21  "progress on safety" as well as "leadership and commitment on safety" for all the reasons found

22  by Judge Alsup (*see* ¶¶104-105 & 411) that led him to conclude: "**it's not really true. Safety is**

23  **not your number one thing**."   PG&E's purported "leadership and commitment on safety" is

24  belied by each unaddressed safety violation and safety deficiency alleged herein, and

25  corroborated by the fact that PG&E's electrical equipment caused far more, and more serious,

26  wildfires than comparable utilities in California (¶412).[96]

27  _____

28      [96] Furthermore, this statement is false and misleading for all of the reasons discussed in
    ¶¶649-658, *infra*.

235.     PG&E fell so far short of this touted achievement that its safety violations, and resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave investors a false impression that safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017.  Further, this statement touting PG&E's "commitment on safety" materially omitted that the Company's spending on vegetation management was inadequate and barely kept pace with inflation at that time.  It also materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

236.     The false and misleading nature of this statement was further revealed in a series of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused the Camp Fire: the most destructive and deadly wildfire in California history.

### 2.     November 4, 2016 – Misstatement No. 7

237.     On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

> ***The improvements we have made in safety*** and reliability ***over the last six years have put us in a position to deliver strong financial results going forward.***
>
> Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

238.     The statement was materially false and/or misleading because PG&E **did not make** substantial "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety. Nor was the Company "in a position to deliver strong financial results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the results of its numerous, widespread safety violations – had such a significant **negative** impact on PG&E's financial results and financial outlook that PG&E had to suspend its dividend

1    entirely on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires.

2    This statement gave investors a false impression that concealed safety risks would not imperil the

3    Company's dividend, which is precisely what occurred on December 20, 2017.  Further, this

4    statement touting PG&E's "improvements . . . made in safety" materially omitted that the

5    Company's deficient investments in safety, including inadequate spending on vegetation

6    management that barely kept pace with inflation at that time.  It also materially omitted the true

7    risk that PG&E would cause wildfires serious enough to imperil the Company's financial

8    condition.

9        239.    In addition, it has been documented that PG&E actually knew that it was not in

10   compliance with relevant safety laws and best practices at the time of this statement.  In

11   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

12   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

13   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

14   before the next inspection cycle.'"  *See* ¶104.

15       240.    The false and misleading nature of this statement was further revealed in a series

16   of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations

17   caused the Camp Fire: the most destructive and deadly wildfire in California history.

18           **3.     May 31, 2017 – Misstatement No. 8**

19       241.    On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

20   Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

21   Johnson to Boards of Directors." The release stated:

22           PG&E Corporation (NYSE: PCG) today announced that it is
             raising its quarterly common stock dividend by 4 cents per share to
23           53 cents per share, beginning with the dividend for the second
             quarter of 2017. On an annual basis, this action increases PG&E
24           Corporation's dividend by 8 percent, from $1.96 per share to $2.12
             per share.
25
                               * * *
26
             Yesterday, in remarks at the joint annual shareholders meeting of
27           PG&E Corporation and Pacific Gas and Electric Company, [CEO]
             Williams highlighted the companies' ***progress on safety, reliability***
28           and reducing greenhouse gas emissions, among other

accomplishments. ***She reaffirmed PG&E's commitment to safety and operational excellence***, delivering for customers and leading the way to achieve California's clean energy goals.

242. This statement falsely connected PG&E's decision increasing its dividend to "progress on safety" and PG&E's "commitment to safety and operational excellence," only months before the Company's pervasive failure to comply with safety regulations caused at least eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so testified). In reality, PG&E lacked the touted "progress on safety" as well as "commitment to safety and operational excellence" for all the reasons found by Judge Alsup (*see* ¶¶104-105 & 411) that led him to conclude: "**it's not really true. Safety is not your number one thing**" and "**PG&E's performance with respect to vegetation management has been dismal**."

243. PG&E's above statement on May 31, 2017 gave investors a false impression that concealed safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017. Further, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

244. In addition, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* ¶104.

245. The false and misleading nature of this statement was further revealed in a series of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused the Camp Fire: the most destructive and deadly wildfire in California history.

Case: 19-30088 Doc# 14289-4 Filed: 12/13/23 Entered: 12/13/23 22:10:31 Page 483 of 1229

1

      **D.**     **After the North Bay Fires Erupted, the Truth Began to Emerge**

2         246.    The North Bay Fires began on Sunday evening, October 8, 2017. However, it was

3  not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety

4  regulation violations were likely a major cause. On that date, as detailed below (*see* Section

5  VII.D.1, *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must

6  preserve any factual or physical evidence … includ[ing] all failed poles, conductors and

7  associated equipment from each fire event" and (b) "must inform all employees and contractors

8  that they must preserve all electronic (including emails) and non-electronic documents related to

9  potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This

10  was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to

11  this news, PG&E's share price declined 6.7%.

12       247.    Late the next day, PG&E issued a statement explaining to investors that: "The

13  causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's]

14  power lines and other facilities." It reported that the Company "has approximately $800 million

15  in liability insurance for potential losses that may result from these fires" – to prepare investors

16  for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in

17  which case, its "financial condition or results of operations could be materially affected." The

18  market had understood that PG&E would be reimbursed by rate-payers for damages by fires it

19  caused while nevertheless acting as a prudent manager; hence, the Company's discussion of

20  liability and insurance signaled to the market that at least some of the North Bay Fires were

21  proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share

22  price continued to decline until the end of the next trading day, Monday, October 16, 2017,

23  falling by approximately 16.5%.

24       248.    Thereafter, PG&E's management attempted to reassure investors, falsely, as

25  detailed below.

26

27

28

E.   **After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

1.   **October 31, 2017 – Misstatement No. 9**

249.   On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***."

250.   This statement was materially false and/or misleading because PG&E did **not** follow "all applicable … state vegetation clearance requirements."

251.   First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

252.   Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

253.   Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.  This statement concealed that, far from "help[ing] to reduce . . . fires caused by trees or other vegetation," PG&E's vegetation management practices tolerated numerous and widespread violations of safety regulations that would **worsen** the risk of fires.

254.   Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

1   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

2   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

3   before the next inspection cycle.'"  *See* ¶104.

4        255.   Fifth, this statement materially omitted the true risk that PG&E would cause

5   wildfires serious enough to imperil the Company's financial condition.

6        256.   Thus, this statement was materially false and/or misleading because of PG&E's

7   numerous and widespread violations of safety regulations, including regulations specifically

8   related to vegetation management – regulations which were essential for preventing devastating

9   wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

10  **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

11  should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

12  **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

13  PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

14  the same time in seven different counties, and then caused both of the Camp Fire's two ignition

15  points a year later – therefore the violations cannot be explained away as an isolated lapse.

16       257.   This statement regarding compliance was reviewed and authorized by Defendant

17  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

18  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

19  compliance reporting," including this press release.  Because of her senior position within the

20  Company, Kane had ultimate authority to control the content of this statement.

21          **2.   November 2, 2017 – Misstatement No. 10**

22       258.   On November 2, 2017, PG&E hosted a conference call with analysts to discuss its

23  financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams

24  falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

25            Thank you, Chris, and good morning, everyone. Given the recent
          wildfires impacting our customers and communities, our

26            discussion today will be different from our usual earnings call. . . .

27                 * * *

28

1    Now I know there's a lot of interest in how these fires started and
     in how PG&E assets might have been involved in or impacted by
2    the wildfires. Our communities deserve answers and we are
     committed to learning what happened. It's critical that we identify
3    anything that will help us to keep our customers and communities
     safe in the future. That is our goal as we work with CAL FIRE and
4    the CPUC.

5                                        * * *

6    **Many of you have reached out with questions about the
     potential impact of the wildfires to the company's financials
7    and also about the doctrine of inverse condemnation in
     California.** At this time, the known financial impact of the
8    wildfires is limited to the cost of the unprecedented response and
     restoration efforts, costs related to our liability insurance and some
9    legal expenses, and Jason [Wells] will cover these later this
     morning.

10                                       * * *

11   **I know there's a lot of interest in our pole maintenance and
     vegetation management programs,** so let me address these as
12   well. First, we routinely inspect, maintain and replace our electric
     poles. This includes annual scheduled patrols, 5-year visual
13   inspections, an intrusive testing and treating on our wood poles on
     a frequency that significantly exceeds CPUC requirements.
14

15   ***We also have one of, if not, the most comprehensive vegetation
     management programs in the country.*** Our vegetation
16   management program manages about 123 million trees across the
     service territory. ***And every year, we inspect every segment of the
17   99,000 miles of overhead line and we clear vegetation as needed.***
     This is well beyond what is typical in our industry where most
18   utilities have a 3-year vegetation management cycle or sometimes
     longer. **Typically, we spend about $200 million every year to
19   line clear or remove 1.3 million trees to mitigate both the risk
     of wildfires and to prevent electric outages. With the drought
20   and the tree mortality crisis we've experienced in California,
     we have been expanding our vegetation management work
21   since 2014.**

22   ***In 2016, we spent an additional $200 million, essentially
     doubling our typical vegetation management spending last year***.
23   We've removed an incremental 236,000 dead or dying trees, and
     we enhanced our tree maintenance work with additional patrols in
24   areas of high fire danger, including a combination of boots on the
     ground, aerial patrols, and sophisticated LiDAR technology.

25       259.    These statements were materially false and/or misleading because PG&E did not

26   "doubl[e]" its "typical vegetation management spending last year." As explained in Section

27   IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

28

1   indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

2   2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[97] The lack of

3   improvement to PG&E's vegetation management practices was confirmed by PG&E's own

4   Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by

5   April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a

6   result of th[e September 2015 Butte] fire."

7       260.   Second, PG&E failed to comply with safety regulations – including regulations

8   specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation

9   management program as "one of, if not, the most comprehensive vegetation management

10   programs in the country," she gave investors the false impression that PG&E's vegetation

11   management did not fall short of applicable safety regulations, when in fact it did. Given

12   PG&E's numerous and widespread violations of safety regulations, including those violations

13   that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its

14   "vegetation management programs" were **not** "comprehensive."

15       261.   Third, PG&E has admitted that it did not "every year . . . inspect every segment of

16   the 99,000 miles of overhead line," because at the time this statement was made, it did not

17   inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of

18   annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part

19   of the Camp Fire's first ignition point.

20       262.   Fourth, PG&E did **not** "have one of, if not, the most comprehensive vegetation

21   management programs in the country" for all the reasons found by Judge Alsup (*see* ¶¶104-105

22   & 411) that led him to conclude: "**PG&E's performance with respect to vegetation**

23   **management has been dismal**."

24       263.   Fifth, this statement materially omitted the true risk that PG&E would cause

25   wildfires serious enough to imperil the Company's financial condition.

[97] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

1

### 3. November 2, 2017 – Misstatement No. 11

2

264.   Later on the same call, an analyst asked the Company for more detail about

3

PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as

4

follows:

5

[ANALYST:] And then, I guess, ***can you discuss your vegetation***
***practices for trees that are located near power lines?*** I guess

6

we've seen sort of end reports that have come out for some of your
peers that they sort of track vegetation that's within certain

7

distances from the lines, and they basically make their decisions on
what to do based on sort of updates.

8

[Stavropoulos:] Thank you for the question. So as Geisha

9

mentioned, we have a very aggressive vegetation management
program across our 70,000-mile -- square mile territory. We

10

manage about 123 million trees that are near and adjacent to our
facilities. ***And over the last 2 years, we've doubled the amount***

11

***that we've invested in veg[etation] management.*** That includes
line clearing to remove parts of trees that are adjacent to our

12

facilities as well as removal of dead and dying trees. So the
program involves year-round effort to identify these dead and

13

dying trees through inspection processes where we use foot and
aerial patrols; we use LiDAR, which is light, detecting and ranging

14

technology, to identify the trees that need to be worked. ***We***
***inspect all of our overhead lines every year, and we do second***

15

***patrols in high fire danger areas at least twice a year. In some***
***areas, we do as often as 4x a year.*** So it's a very aggressive

16

program. There are specific requirements around line clearing, and
it depends upon the voltage of the lines. And it can range up to feet

17

[sic] to as much a sort of 18 inches away from the facility. So there
are all sorts of different requirements, depending upon where the

18

facilities are located and the voltage of the facilities.

19

265.   This statement was materially false and/or misleading because PG&E did not

20

"doubl[e] the amount that we've invested in veg[etation] management." As explained in Section

21

VI.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

22

indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

23

2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation

24

management practices was confirmed by PG&E's own Vegetation Program Manager Richard

25

Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of

26

my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since

27

September 2015.

28

266.     Second, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many safety violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, safety violations were so pervasive that they evidently caused both ignition points of the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered and the fires prevented. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

267.     As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line.  PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire has determined that PG&E caused both of these ignition points.

268.     Third, PG&E has admitted that it did not "inspect all of our overhead lines every year," much less "twice a year" or "4x a year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

269.     Fourth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

1

### 4.    November 5, 2017 – Misstatement No. 12

2       270.    At all relevant times, PG&E's Media Relations department maintained a news

3   website named *Currents*,[98] providing news, information, and commentary about PG&E's

4   activities, including the delivery of electricity and the operation, maintenance, and safety of the

5   Company's electric services. Through the website, PG&E repeatedly touted the safety of its

6   power lines, the Company's vegetation management program, and its purported success

7   mitigating wildfire risk.

8       271.    In one such article, dated November 5, 2017 and titled "Facts About PG&E's

9   Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or***

10  ***exceeds all applicable federal and state vegetation clearance requirements***."[99]

11      272.    This statement was materially false and/or misleading because PG&E did not

12  "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

13      273.    First, according to reports released in subsequent corrective disclosures, including

14  on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

15  Public Resources Code Section 4293, multiple times. *See* Section VII.D.4., *infra*.

16      274.    Second, Cal Fire found sufficient evidence of violations of state law to refer

17  PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

18  *infra*.

19      275.    Third, investigations into the causes of the Camp Fire have already disclosed

20  evidence that this most destructive and deadly wildfire in California history was caused by

21  PG&E violating California Public Resources Code Section 4293 and California Public Utilities

22  Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

23

24  _____

[98] *Currents*, PG&E, http://www.pgecurrents.com.

25  [99] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and
misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at

26  Issue in NorCal Wildfires." *See* Jaxon Van Derbeken, *Utility Company's Risk Assessment at Issue in NorCal Wildfires*, NBC Universal Media (Nov. 14, 2017),

27  https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-
at-Issue-in-North-Bay-Wildfires-457356963.html.

28

1  equipment was responsible for both ignition points of the Camp Fire and has since reported

2  PG&E to the Butte County District Attorney based on evidence of safety violations.

3      276.    Fourth, it has been documented that PG&E actually knew that it was not in

4  compliance with relevant safety laws and best practices at the time of this statement.  In

5  proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

6  as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

7  hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

8  before the next inspection cycle.'"  *See* ¶104.

9      277.    Fifth, this statement materially omitted the true risk that PG&E would cause

10 wildfires serious enough to imperil the Company's financial condition.

11     278.    Thus, this statement was materially false and/or misleading because of PG&E's

12 numerous and widespread violations of safety regulations, including regulations specifically

13 related to vegetation management – regulations which were essential for preventing devastating

14 wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

15 **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

16 should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

17 **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

18 PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

19 the same time in seven different counties, and then caused both of the Camp Fire's two ignition

20 points a year later – therefore the violations cannot be explained away as an isolated lapse.

21     279.    This statement regarding compliance was reviewed and authorized by Defendant

22 Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

23 for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

24 compliance reporting," including this news release. Because of her senior position within the

25 Company, Kane had ultimate authority to control the content of this statement.

26

27

28

**5.      May 25, 2018 – Misstatement No. 13**

280.      On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports regarding some of the October 2017 North Bay Fires (*see* Section VII.D.4, *infra*), to reassure investors that PG&E had met all state regulations concerning fire safety. The press release stated:

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

- ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

281.      This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "regulatory requirements for pole integrity management." According to a report released in a subsequent corrective disclosure, PG&E violated California's safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its "investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors **and the failure of power poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to the relevant district attorney.  Further, Cal Fire found enough evidence of violations of state law

1   to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires. *See*

2   Section VII.D.5., *infra*.

3       282.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later

4   the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as

5   well as a second ignition point that exhibited damaged and downed poles, in violation of Section

6   451.  Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity

7   management" – regulations which were essential for preventing devastating wildfires.  PG&E's

8   representation to the contrary was materially false and/or misleading.  Cal Fire has since

9   confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points,

10   and referred its investigations to the relevant district attorney based on evidence of safety

11   violations.

12       283.    Overall, this statement was materially false and/or misleading because of PG&E's

13   numerous and widespread violations of safety regulations – regulations which were essential for

14   preventing devastating wildfires.  In fact, PG&E's violations were so pervasive that they

15   evidently caused multiple North Bay Fires all at the same time in seven different counties, and

16   then caused both of the Camp Fire's two ignition points a year later – therefore the violations

17   cannot be explained away as an isolated lapse.  This statement materially omitted the true risk

18   that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19       284.    It has additionally been documented that PG&E actually knew that it was not in

20   compliance with relevant safety laws and best practices at the time of this statement.  In

21   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24   before the next inspection cycle.'"  *See* ¶104.

25       285.    This statement regarding compliance was reviewed and authorized by Defendant

26   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

27   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

28

---

compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

**F.   While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol**

286.   As detailed below (*see* Section VII.D., *infra*), PG&E's share price declined precipitously as the truth about its responsibility for the North Bay Fires emerged.  As liabilities for the North Bay Fires threatened the Company's financial viability, Defendants would realize that the Company needed a legislative bailout to avoid bankruptcy.  As a result, PG&E needed the public, including investors, to believe that it would prioritize safety thereafter.

### 1.   June 8, 2018 – Misstatement No. 14

287.   On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the preponderance of the North Bay Fires (*see* Section VII.D.5, *infra*), PG&E's share price continued its decline, and its financial situation deteriorated.  Later that day, PG&E issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E Responds to Latest CAL FIRE Announcement" stated, in relevant part:

> ***Programs Overall Met State's High Standards***
>
> We look forward to the opportunity to carefully review the CAL FIRE reports to understand the agency's perspectives.
>
> Based on the information we have so far, we continue to believe our overall programs met our state's high standards.
>
> For example, ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.
>
> Similarly, ***under PG&E's industry-leading Vegetation Management Program***, we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times. We also prune or remove approximately 1.4 million trees annually.

288.   Because PG&E's compliance violations would soon cause the Camp Fire, the most destructive and deadly wildfire in California history, PG&E's "Vegetation Management

Program" and "pole integrity management" decidedly did not meet California's "High Standards." Investigations into the causes of the Camp Fire have already uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

289. First, the Camp Fire was described in initial communications between firefighters and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should have been cleared by PG&E pursuant to Section 4293.

290. Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in violation of Section 451.

291. Third, PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire has since confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points, and referred its investigations to the relevant district attorney based on evidence of safety violations.

292. Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* ¶104.

293. Fifth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

294. Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" or "Vegetation Management" – regulations which were essential for

1   preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe**

2   **conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large

3   number of trees that should have been removed by PG&E but weren't . . . was a major

4   contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in

5   Northern California."  PG&E's representation to the contrary was materially false and/or

6   misleading.

7        295.    This statement regarding compliance was reviewed and authorized by Defendant

8   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

9   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

10   compliance reporting," including this press release.  Because of her senior position within the

11   Company, Kane had ultimate authority to control the content of this statement.

12         **2.    June 8, 2018 – Misstatement No. 15**

13        296.    The same press release contained a further false and/or misleading statement:

14          **To address the growing threats posed by wildfires and**
15          **extreme weather, and in light of the wildfires throughout**
            **our state last year, *PG&E has launched the Community***
16          ***Wildfire Safety Program*** **to help keep our customers and**
            **communities safe. Among the key components of the new**
17          **program are. . .**

18          •  **Public Safety Power Shutoff: As a last resort, *a program to***
              ***proactively turn off electric power for safety when***
19            ***extreme fire danger conditions occur***, while helping
              customers prepare and providing early warning
20            notification, when and where possible.

21        297.    PG&E's representation that it "has launched . . . a program to proactively turn off

22   electric power for safety when extreme fire danger conditions occur" was false and misleading.

23   It was false because the touted program, which would eventually become its ESRB-8 Shutoff

24   Protocol, was illusory; hence, PG&E never "launched" it.  Further, it misleadingly omitted that

25   any guidelines PG&E did develop were a mere pretense of safety that the Company did not

26   follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing

27   strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7

28   and 8, 2018, PG&E flouted its own supposed program.  PG&E's failure to shut off its

1   transmission line caused the Camp Fire: the most destructive and deadly wildfire in California

2   history.  By touting a wildfire safety program PG&E did not adhere to, and where its

3   nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts

4   to investors.

5          298.    This press release regarding compliance was reviewed and authorized by

6   Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was

7   responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . .

8   . compliance reporting," including this press release.  Because of her senior position within the

9   Company, Kane had ultimate authority to control the content of this statement.

10                    **3.      September 27, 2018 – Misstatement No. 16**

11         299.    On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E

12  to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power

13  lines" in the face of unprecedented wildfire threats "to ensure public safety."  It was the

14  Company's official announcement of its de-energization policy and procedures implementing

15  Resolution ESRB-8, detailed below, that materially misled investors.

16         300.    On or about September 27, 2018, PG&E announced the full details of its ESRB-8

17  Shutoff Protocol in a filing with CPUC[100] that was also posted on its website.[101]  The ESRB-8

18  Shutoff Protocol stated:

19              PG&E's Community Wildfire Safety Program implements
              additional precautionary measures intended to reduce wildfire
20              threats. ***It includes . . . executing protocols to temporarily turn off
              electric power for safety when extreme fire danger conditions are***
21              ***occurring***."

22              . . .

23              Public Safety Power Shutoff is one component of the Community
              Wildfire Safety Program.  ***PG&E has created a set of procedures***

24

25         [100] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
      http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-
26  Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

27         [101] PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018),
      https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-
28  disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          88
CIVIL ACTION NO. 3:18-CV-03509-EJD

*for. . . [d]etermining what combination of conditions necessitates turning off lines for safety.*

. . .

PG&E will take a combination of many criteria into consideration, including:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.)

301.  PG&E's representation that it had "implement[ed] additional precautionary measures" including "determining what combination of conditions necessitates turning off lines for safety" was false and misleading.  It was false because the ESRB-8 Shutoff Protocol was illusory; hence, PG&E did not "implement" it, as required by law.  Further, it misleadingly omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company did not follow.  Even when all seven relevant "criteria" weighed in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its protocol.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history.  By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

302.  This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

1   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

2   compliance reporting," including this report. Because of her senior position within the Company,

3   Kane had ultimate authority to control the content of this statement.

4   **4.      October 9, 2018 – Misstatement No. 17**

5   303.   On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment

6   caused another of the North Bay Fires, known as the Cascade Fire.  Later the same day, PG&E

7   issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring

8   investors that PG&E had met all state regulations concerning fire safety.  The press release, titled

9   "PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

> [W]e are continuing to focus on ***implementing additional
> precautionary measures*** intended to further reduce wildfire
> threats, such as ***working to remove and reduce dangerous
> vegetation, improving weather forecasting, upgrading
> emergency response warnings, [and] making lines and poles
> stronger in high fire threat areas***, and taking other actions to
> make our system, and our customers and communities, ***even
> safer*** in the face of a growing wildfire threat.

304.   It was false and misleading for PG&E to tout "implementing additional

precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and

poles stronger in high fire threat areas."  Indeed, just one month later, PG&E would cause the

Camp Fire through its failure to remove vegetation and maintain its poles, in violation of

California Public Resources Code Section 4293 and California Public Utilities Code Section 451,

among other safety regulations.

305.   As noted above, the Camp Fire was described in initial communications between

firefighters and dispatch as a vegetation fire "underneath the transmission lines," which

vegetation should have been cleared by PG&E under Section 4293.  Second, PG&E

acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage

to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point

that exhibited damaged and downed poles, in violation of Section 451.  PG&E's representation

to the contrary was materially false and/or misleading.   Indeed, Cal Fire has found that PG&E

1   equipment was responsible for both ignition points of the Camp Fire and has since reported

2   PG&E to the Butte County District Attorney based on evidence of safety violations.

3       306.   Moreover, PG&E was **not** "making lines and poles stronger in high fire threat

4   areas."  For example, PG&E never performed planned safety work on, or otherwise updated, the

5   100 year-old Caribou-Palermo transmission line even though it knew that its lines and poles were

6   weak and that "**the likelihood of failed structures happening is high**" (¶136).  The same

7   transmission line would soon cause the Camp Fire's first ignition point, as found by Cal Fire and

8   accepted by PG&E (¶138).

9       307.   Further, this statement materially omitted the true risk that PG&E would cause

10  wildfires serious enough to imperil the Company's financial condition.

11      308.   This statement regarding compliance was reviewed and authorized by Defendant

12  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

13  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

14  compliance reporting," including this press release.  Because of her senior position within the

15  Company, Kane had ultimate authority to control the content of this statement.

16      **5.   October 9, 2018 – Misstatement No. 18**

17      309.   The same PG&E press release contained a further false and/or misleading

18  statement:

19          To address the growing threats posed by wildfires and extreme
        weather, and in light of the wildfires throughout our state last

20          year, ***PG&E has launched the Community Wildfire Safety
        Program*** to help keep our customers and communities safe ***by***

21          ***implementing additional precautionary measures*** intended to
        further reduce wildfire threats. Among the key components of

22          the new program are. . .

23          •  Public Safety Power Shutoff: As a last resort, ***a program to
           proactively turn off electric power for safety when***

24             ***extreme fire danger conditions occur***, while helping
           customers prepare and providing early warning

25             notification, when and where possible.

26      310.   PG&E's representation that it "has launched" and "implement[ed] . . . a program

27  to proactively turn off electric power for safety when extreme fire danger conditions occur" was

28

false and misleading. It was false because the touted program, its ESRB-8 Shutoff Protocol, was illusory from the beginning; hence, PG&E never "launched" or "implement[ed]" it.

311. Further, it misleadingly omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company did not follow. Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its supposed program.

312. PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history. By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

313. This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 6. November 8, 2018 – Misstatement No. 19

314. On November 8, 2018, the Camp Fire started after PG&E decided not to shut off its power. Before the public became aware of PG&E's true role in causing the Camp Fire, the Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as *weather conditions did not warrant this safety measure*."[102]

315. This statement was affirmatively false: weather conditions did, in fact, warrant a shutoff. As detailed above, all seven criteria that PG&E deemed relevant, including those related

---

[102] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

1    to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

2    *See* Section IV.H., *supra*.

3         316.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

5    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6    compliance reporting," including this announcement.  Because of her senior position within the

7    Company, Kane had ultimate authority to control the content of this statement.

8    **VIII.    MATERIALITY UNDER THE EXCHANGE ACT**

9         317.    PG&E's reassurances to investors about its safety, prudence, and compliance with

10   the law were especially important to investors because of California's legal regime known as

11   inverse condemnation. As described in more detail above (*see* Section VI.A.5., *supra*), PG&E is

12   strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

13   could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

14   acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

15   for some or all of its liability.

16        318.    PG&E's investors understood that PG&E would bear the costs of wildfires it

17   caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

18   by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

19   2017 stated:

20            On the 3Q17 call PCG indicated company operations were
             conducted properly leading up to and after the fire, but they still
21           had little information regarding the cause of the fire or potential
             shareholder exposure.
22
                                       * * *
23
             PCG reiterated the company routinely inspects, maintains, and
24           replaces poles, and tests and treats wood poles on a frequency that
             significantly exceeds CPUC requirements. The company claims to
25           have one of, if not the most comprehensive vegetation
             management programs in the country. Further, the company
26           doubled its vegetation management spending in 2016 due to the
             drought and tree mortality crisis in California. That being said, we
27           still do not know and likely will not know what caused the various
             fires for some time, **whether or not PCG's equipment was solely
28           or partly the cause**, and whether or not the facts will support a

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
503 of 1229

ruling at CPUC that PCG **acted prudently** should they be successfully sued under inverse condemnation.

319.    In light of these provisions of California law, PG&E's repeated reassurances to its investors – *e.g.*, that it complied with relevant safety regulations, doubled its vegetation management spending, inspected all of its powerlines every year, and would adhere to a formal ESRB-8 Shutoff Protocol – effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage it caused by starting or exacerbating the North Bay and Camp Fires.  The impact of these misstatements, and their importance to the Company's financial condition, is underscored by PG&E's decision to file for Chapter 11 bankruptcy based on its anticipated $30 billion in potential liabilities tied to the North Bay and Camp Fires, and related concern that as a result, neither PG&E Corporation nor the Utility would be able "to continue as going concerns."

320.    In total, PG&E's share price declined $55.60 per share on the nine corrective disclosures and/or materializations of concealed risk herein alleged. Given that the Company had between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to October 25, 2018, the losses caused by PG&E's fraud under the Exchange Act were in the billions of dollars.

## IX.    LOSS CAUSATION UNDER THE EXCHANGE ACT

### A.    Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Securities

321.    As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017.

**B.    PG&E's Safety Violations Caused the Devastating North Bay Fires**

322.    PG&E caused the North Bay Fires.  Of the eighteen fires for which Cal Fire has determined the cause, it has determined that **seventeen were caused by PG&E equipment**.

323.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire fatalities.**

324.    Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices.[103]

**C.    PG&E's Safety Violations Caused the Devastating Camp Fire**

325.    At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in Pulga, California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo Gap.[104]  A second ignition point, also caused by faulty PG&E equipment, began approximately 15 minutes later near the community of Concow.  The combined Camp Fire soon devastated

---

[103] Similarly, another of the North Bay Fires known as the Tubbs fire (which burned 36,807 acres, destroyed 5,636 structures, and resulted in 22 fatalities) would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices at the same time.

[104] Camp Fire Incident Update (Nov. 25, 2018 7:00AM), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf.

several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill. The Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85 people.

326.    As noted above, Cal Fire has concluded that PG&E caused both of the Camp Fire's two ignition points under circumstances evidencing violations of safety regulations and referred its investigation to the Butte County District Attorney.

**D.    As the Market Learned About the Effects and Extent of PG&E's Inadequate Safety Practices, the Price of PG&E's Securities Fell Dramatically**

327.    On or about October 8, 2017, eighteen major wildfires known as the North Bay Fires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

**1.    October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

328.    It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires. On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."

329.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event**" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to **potential causes of the**

**fires, vegetation management, maintenance and/or tree-trimming**." This was the first indication that PG&E failures caused any of the North Bay Fires.

330.    On this news that PG&E would likely bear at least some responsibility for the fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost 13 million shares (compared to a Class Period daily average trading volume of 3.5 million[105]). The price of PG&E securities, however, remained artificially inflated.

### (b)    Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017

331.    The following morning, news outlets began to report that PG&E was being connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October 13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may have started California wildfires."[106] The article began by observing: "The California Public Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano Counties,' according to multiple reports." It continued to note that PG&E's share price decline occurred "on concerns its power lines may have started the massive wildfires that have ravaged California recently." The article also repeated market commentary that the decline in PG&E's share price reflected investors' understanding that PG&E was financially responsible for the North Bay Fires:

> The drop in the stock "reflects the following assumptions: 1) the fire was caused by PCG's negligence, 2) insurance coverage for 3rd party liabilities will be very limited, 3) damage costs per acre far larger than those for the 2015 Butte fire and 4) material fines and penalties will be assessed," Christopher Turnure, an analyst at JPMorgan, said in a note Thursday. "We appreciate the severity of the fires and the legal challenges of operating in California, but estimate this loss of value as approaching a worst-case scenario for PCG shares."

---

[105] This average excludes alleged corrective disclosure and/or materialization of risk dates.

[106] This article was published prior to the Company's corrective disclosure later that day, discussed *infra*.

Case 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 507 of 1229

332.     Similarly, on the same date, *SF Gate* published an article observing: "**[T]he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[107]

333.     Investors started to be concerned regarding whether PG&E violated any regulations (*e.g.*, failed to adequately trim trees) with respect to the North Bay Fires. For example, Wells Fargo stated in its analyst report the very next day:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

334.     Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

[107] David R. Baker, *PG&E Spent Millions on Fire Prevention; It May Not Have Been Enough*, San Francisco Gate (Oct. 13, 2017), https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php.

**2.     October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)     The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

335.    Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading.  Therein, the Company stated in relevant part:

> **Investigation of Northern California Fires**
>
> Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation.**
>
> It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.**

336.    On these disclosures, PG&E's share price continued to decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of over 68.5 million shares.  The price of PG&E securities, however, remained artificially inflated.

**(b)     Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

337.    Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct with respect to causing the North Bay Fires was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires.  Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse. For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even

1   further in the early afternoon actually as well, following the company's 8-K disclosing the

2   utility's $800mm in liability insurance, which we noted had not been disclosed previously (since

3   it had been renewed following the Butte fire)."

4        338.   PG&E's announcement and resulting share price decline were proximately caused

5   by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

**3.    December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

9        339.   On December 20, 2017, after the market closed, PG&E filed a press release on

10   Form 8-K with the SEC titled "PG&E Announces Suspension of Dividend, Citing Uncertainty

11   Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The

12   filing also included, as exhibit 99.1, a press release in which the Company announced that it

13   would be suspending its quarterly cash dividend. In the press release, PG&E stated in pertinent

14   part:

> **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires**.

> In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, **determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018**, citing the same uncertainty.

> No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.

> However, California is one of the only states in the country in which courts have applied inverse condemnation **to events caused by utility equipment**. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire - even if the utility has followed established inspection and safety rules - **the utility may still be liable for property damages and attorneys' fees associated with that event**.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

340.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced heavy trading volume, with over 52 million shares trading hands.

341.    Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶232), investors were shocked by this unexpected suspension of the dividends due to Defendants' intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, for example on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market, and the price of PG&E securities remained artificially inflated.

#### (b)    Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017

342.    When PG&E announced it would suspend its dividend entirely, investors understood that as a revelation that Defendants' prior representations regarding its safety operations may have been misleading and PG&E would bear a higher than expected level of responsibility, and thus liability, for the North Bay Fires.

343.    For example, a RBC Capital Markets analysts report issued on December 21, 2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend

the dividend. **This unexpected decision suggests greater risk than we had assumed surrounding regulatory treatment of the October 2017 Northern California wildfires.**"

344.   Similarly, an analyst report issued by Evercore ISI the same day stated:

> **On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire**. . . . PCG also indicated they found instances of wires down, vegetation near PCG facilities and some broke poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country.

345.   PG&E's suspension of its dividend and resulting share price decline were proximately caused by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

### 4.   May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

346.   On May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

> **CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**
>
> Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.
>
> The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.
>
> Below is a summary of the four completed investigations:

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 512 of 1229

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

347.    Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC.  Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E

1  Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in

2  the future, the amount of which could be substantial."

3      348.    On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May

4  29, 2018, the following trading day. The stock experienced unusually high trading volume that

5  day, with over 5.7 million shares changing hands on May 29, 2018.  The price of PG&E

6  securities, however, remained artificially inflated.

7                **(b)**    **Market Commentators Confirmed that the News Regarding
8  Safety Violations Proximately Caused PG&E's Share Price
   Decline on May 25-29, 2018**

9      349.    Analysts were surprised by the results of the Cal Fire reports. For example,

10  Deutsche Bank stated in its May 28, 2018 report:

11              From the investor perspective the market should not be particularly
   surprised that PG&E's lines have been found to be involved in
12  starting the fires. **That said, the fact that this was the case in all
   four of the fires – and that violations were found in three of the
13  four instances – will likely be seen as a negative data point.**
   Reading through the LaPorte fire investigation for other data
14  points, investors may be concerned to note that the wind speeds
   around the time of the ignition do not seem to have been
15  particularly high – with a maximum gust of 29 mph.

16

17      350.    One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports

18  specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for

19  three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire

20  reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages

21  under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for

22  "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it

23  would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

24      351.    Accordingly, the new information contained in these disclosures, including the

25  severity of PG&E's conduct and the role of its violations of California safety laws in causing the

26  North Bay Fires, proximately caused PG&E's share price decline.

27      352.    Defendants, however, continued to mislead investors regarding the extent of

28  PG&E's safety deficiencies and the impact thereof.

5.    **June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

353.    On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**
>
> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.
>
> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.
>
> Below is a summary of the findings from the 12 completed investigations:
>
> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.
>
> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. **CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole**, resulting in the power lines and equipment coming in contact with the ground.
>
> The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

Case 19-30088   Doc# 14288-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 515 of 1229

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

354.     While this news release did not discuss specific violations found, it disclosed that the causes of the fires involved PG&E equipment and vegetation, as well as the facts that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

<div align="center">

**(a)     The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers**

</div>

355.     By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

<div align="center">

**(b)     The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires**

</div>

356.     On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

357.     Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability** for losses associated with" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:

- for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

- for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

358.    Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.  The price of PG&E securities, however, remained artificially inflated.

         (c)    **Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018**

359.    The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company.**" Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs.**" Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring its evidence to the District Attorney – likely a strong indictment to potential**

Case 19-30088    Doc# 14289-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 518 of 1229

1    **criminal and civil cases/lawsuits against the company**.” The analyst from Guggenheim noted

2    that “all signs seem to point to PCG being imprudent operators in the majority of instances,

3    which would therefore mean it should assume liability.” Accordingly, the number and range of

4    safety violations proximately caused PG&E’s Share Price Decline on June 8-11, 2017.

5         360.    On June 11, 2018, *Bloomberg* published an article reporting: “The company said

6    Monday it expects to record a ‘significant liability’ for fires, and the shares plunged the most in

7    five months at the open” of trading. The article also noted that “[t]he alleged violations could

8    also expose PG&E to criminal charges only two years after the San Francisco company was

9    convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno,

10   California.”

11        361.    Accordingly, the new information contained in these June 8 and 11 disclosures,

12   including the severity of PG&E’s conduct, the role of its violations of California safety laws in

13   causing the North Bay Fires, and the “significant liability” it would incur as a result, proximately

14   caused PG&E’s share price decline.

15        362.    Defendants, however, continued to mislead investors regarding the extent of

16   PG&E’s safety deficiencies and the impact thereof.

17        **6.    November 8-9, 2018 – Corrective Disclosure and/or Materialization of
           Concealed Risk**

18

19        363.    The Camp Fire began in the early morning of November 8, 2018 and grew

20   steadily throughout the day.  However, as of the close of trading that day, no prominent news

     sources had reported that PG&E may have caused it.

21

22        **(a)    The Market Began to Learn the Extent and
               Effects of PG&E’s Responsibility for the Camp Fire**

23        364.    After the close of trading on November 8, 2018, PG&E announced via its official

24   Twitter.com account that it had decided not to implement its procedure for shutting power lines

25   during dangerous weather conditions.  This communication was the first indication that PG&E’s

26   equipment and decisions may have contributed to the Camp Fire, undermining the Company’s

27   assurances to investors that it would comply with safety regulations and prioritize safety, detailed

28   above.  While the announcement began to disclose the truth regarding PG&E’s responsibility for

1    the Camp Fire, it also contained a further false reassurance that PG&E's decision was because

2    "*weather conditions did not warrant this safety measure*," as detailed above.

3         365.    Also after the close of trading on November 8, 2018, PG&E filed an Electric

4    Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-

5    Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen

6    minutes before the Camp Fire began, "in the area of the Camp Fire." The same report

7    acknowledged that an aerial patrol later in the day showed "damage" to the same transmission

8    tower. However, this information undermining PG&E's statements about compliance and

9    prioritizing safety during the Class Period would not be reported by major news outlets until the

10   next day, November 9, 2018.

11        366.    On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at

12   $39.92 on November 9, 2018, the following trading day. The stock experienced unusually high

13   trading volume of 23,627,100 shares. The price of PG&E securities, however, remained

14   artificially inflated.

15                    **(b)    Market Commentators Confirmed the Cause of PG&E's
                             November 9, 2018 Share Price Decline**
16

17        367.    Market commentators confirmed that PG&E's share price declined due to news

18   connecting PG&E to the Camp Fire, the true risk of which was concealed by PG&E's false and

     misleading statements and omissions.
19

20        368.    On November 9, 2018, CNBC published an article entitled "Shares of electricity

21   provider PG&E have worst day since 2002 as wildfires ravage California."[108] The article noted

22   that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage

23   through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ."

     It further observed: "PG&E also traded 23.6 million shares, about five time [sic] its average 30-
24
     day volume." The article was initially published at 1:03 p.m. Eastern Time (*i.e.,* prior to the
25

26

27        _____

          [108] Fred Imbert, *Shares of Electricity Provider PG&E Have Worst Day Since 2002 as
28   Wildfires Ravage California*, CNBC (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/shares-
     of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html.

1    close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no

2    mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the

3    Camp Fire.

4           369.    On November 9, 2018, Deutsche Bank described how investors were

5    "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of

6    provisions regarding 2018 wildfires:

7                    While there has been no specific indication of utility lines being
                     involved in these ignitions, investors are understandably concerned
8                    considering that the recently passed wildfire bill (SB901) left
                     utilities particularly exposed to 2018 fires if their infrastructure
9                    ends up being implicated. This is due to the fact that the so-called
                     stress test or customer harm threshold is only applicable to 2017
10                   fire losses. Meanwhile, the new reasonableness standard which the
                     CPUC will use to determine eligibility for recovery of liability
11                   costs from customers only kicks in from 2019.

12          370.    A Barclays report from the same day supported the conclusion that investor

13   concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the

14   stock price drop:

15                   **We believe the lack of explicit language for 2018 wildfires in
                     SB 901 may be increasing market pressure**. SB 901 specifically
16                   addresses 2017 wildfire liability by tasking the CPUC with
                     creating a cap on IOU [Investor-Owned Utility] liability to ensure
17                   safe and affordable service. The bill addresses wildfire liability in
                     2019 and beyond by creating a securitization mechanism.
18                   However, specific language addressing 2018 liability coverage is
                     noticeably absent. The general consensus among CA stakeholders
19                   is that 2018 will be treated in a similar fashion to 2017, however
                     the lack of a specific prescription may be heightening investor
20                   concern if the Camp Fire is found to be started by PCG.

21          371.    While this report stated that there was no indication yet that electrical equipment

22   had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could

23   become a source of liability if PG&E equipment was found to be involved: "we expect PCG's

24   decision not to de-energize lines after warning of high fire risk will be investigated if the fire is

25   found to have been sparked by PCG equipment."

26

27

28

1

            **7.**     **November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

2

3

                **(a)**     **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

4         372.    Because PG&E had concealed the extent of its safety violations and failures to

5 prioritize safety, the market was shocked to learn how much evidence supported the conclusion

6 that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety

7 regulations. Thus, investors began to learn the true likelihood and extent to which PG&E would

8 bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for

9 reimbursement by ratepayers. *See* Section VIII, *supra*.

10        373.    After the close of trading on Friday, November 9, 2018, news outlets began to

11 report that there was evidence PG&E caused the Camp Fire based on PG&E's incident report the

12 previous evening. The first such report, written by Pulitzer Prize-winning journalist Matthias

13 Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[109]

14        374.    On Saturday, November 10, 2018, it was reported that the town of Paradise was

15 destroyed as the Camp Fire continued to spread.[110] It was further reported that the fire had raced

16 through the communities of Concow and Magalia, causing at least nine fatalities and the loss of

17 at least 6,453 homes and 260 commercial buildings.[111] The Camp Fire grew in size and severity

18 over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was

19 only 5 percent contained—with winds pushing it toward Chico and Yankee Hill. By Sunday

20 November 11, 2018, it was reported that more than 200 people were missing, the death toll had

21

22

23        [109] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To*

24 *Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 PM), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-

25 county-wildfire-according-to-radio-transmissions/.

26        [110] Anna Sciacca and Lisa Krieger, *'Our Town Has Burned': Most of Paradise is Lost After Camp Fire Ravages the Area*, Enterprise Record (Nov. 10, 2018),

27 https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/.

28        [111] *Id.*

risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent contained.[112]

375.    Then on Monday, November 12, 2018, the next trading day, it was reported that BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the Camp Fire ignited; the email communicated that the Utility needed access to her property to repair a transmission line that was "sparking."  It was further reported that the incident occurred near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and Camp Creek Road.

376.    On this news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on November 12, 2018.  The stock experienced a trading volume of 44,033,200 on November 12, 2018.  The price of PG&E securities, however, remained artificially inflated.

### (b)    Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline.

377.    Investors were concerned over this evidence that PG&E's safety violations likely caused the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to the press regarding PG&E's knowledge of transmission line problems in the area.  As a result, PG&E's stock price continued to drop.  As the *San Francisco Chronicle* reported on November 12, 2018, "Cowley's revelation came as shares of Pacific Gas and Electric Co.'s parent company plummeted Monday amid concerns from investors about the utility's liability connected to the Camp Fire."[113]

378.    Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp Fire is in PCG's service territory and there are initial indications that the company's transmission infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

---

[112] Melody Gutierrez, *More than 200 Remain Missing in Camp Fire*, San Francisco Chronicle (Nov. 8, 2018), https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php.

[113] J.D. Morris and Kurtis Alexander, *Homeowner's Claim on PG&E Work Raises Questions on Camp Fire's Origin*, San Francisco Chronicle (Nov. 12, 2018), https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php.

379. A Macquarie Research analyst report on November 13, 2018 estimated PG&E's fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could be higher given that the Camp Fire was not yet contained:

> We've reduced our [target price] to US$45 from US$57, is based on 10.4x our '20E EPS vs 13.6x previously. Our new [target price] reflects incremental ~US$8bn in fire-related liabilities, which we hope proves excessive given the stress test included in the SB901, but we have no way to assess the potential liabilities as the fire is only 30% contained.

380. A November 13, 2018 Bloomberg Intelligence report remarked that the analyst **expected** PG&E's liability to **exceed its total equity valued** absent additional assistance from the California government, and that such a bailout was not certain: "Unless mitigated by regulators, we expect PG&E's write-offs could exceed the company's total equity. California's utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule makes utilities liable for most of the billions in fire damage, but powerful political resistance prevents customer bills from rising much above inflation."

**8. November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

381. After the close of trading on November 13, 2018, PG&E released a Form 8-K that showed a much bleaker picture of PG&E's deteriorating financial situation than investors had reason to expect, even calling into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire. The SEC filing admitted, among other things, that PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the Camp Fire could exceed its insurance:

> **Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**
>
> As of November 13, 2018, Pacific Gas and Electric Company ("Utility"), a subsidiary of PG&E Corporation, and PG&E Corporation have aggregate borrowings outstanding under their respective revolving credit facilities of $3.0 billion and $300 million, respectively. . . . **No additional amounts are available under the Utility's and PG&E Corporation's respective**

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 524 of 1229

1

**revolving credit facilities**.

2

\*         \*         \*

3

**Item 8.01 Other Events.**

4

*Camp Fire*

5

On November 8, 2018, a wildfire began near the city of
Paradise, Butte County, California (the "Camp Fire"), located in
the service territory of the Utility. . . .

6

7

As previously reported, during the third quarter of 2018,
PG&E Corporation and the Utility renewed their liability insurance
coverage for wildfire events in an aggregate amount of
approximately $1.4 billion for the period from August 1, 2018
through July 31, 2019. . . .

8

9

10

While the cause of the Camp Fire is still under
investigation, if the Utility's equipment is determined to be the
cause, the Utility could be subject to significant liability in excess
of insurance coverage that would be expected to have a material
impact on PG&E Corporation's and the Utility's financial
condition, results of operations, liquidity, and cash flows.

11

12

13

382.   On this news, PG&E's share price fell $7.13, or 21.791%. to close at $25.59 on

14

November 14, 2018.  The stock experienced high trading volume of 53,543,100.  The price of

15

PG&E securities, however, remained artificially inflated.

16

**(b)     Market Commentators Confirmed the Cause of PG&E's Share
Price Decline on November 14, 2018**

17

18

383.   Analyst commentary attributed the drop in PG&E's stock price to news about

19

PG&E's insufficient insurance coverage and deteriorating financial situation, including the

20

chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market

21

closed the previous day.

22

384.   CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop

23

in stock price on November 14, 2018:

24

Shares of utility PG&E fell 21 percent on Wednesday after the
company said that if its equipment is responsible for the "Camp
Fire" burning in Northern California, the cost of the damage would
exceed its insurance coverage and **harm its financial health**. . . .
"With these borrowings, the entire credit facility has been drawn
and PG&E now has $3.5 billion of cash on its balance sheet," Citi

25

26

27

28

analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a non-investment grade credit rating and the liquidity requirements as a result of the downgrade."[114]

385.   Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%) is concerned about a near-term cash and credit crunch**. The company warned of bankruptcy earlier this year, and **the situation is more desperate now**. If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

**9.     November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)     The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

386.   On November 15, 2018, Cal Fire announced that it had identified a second ignition point for the Camp Fire.[115]  This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

387.   On this news, PG&E's share price fell $7.85, or 30.676%. to close at $17.74 on November 15, 2018.  The stock experienced its highest trading volume during the Class Period of 107,155,700 on November 15, 2018.

---

[114] Thomas Franck, *PG&E Plunges 21% Amid Disclosure of an 'Electric Incident' Just Before Wildfire*, CNBC (Nov. 14, 2018), https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html.

[115] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

**(b)    Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018**

388.    Market commentary confirmed that the November 15, 2018 decline in PG&E's share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements and omissions.  Indeed, PG&E's share price declined until CPUC President Michael Picker commented after the close of trading that day that he did not want the Company to become bankrupt.  A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E shares. They lost about two-thirds of their value during several days of free fall, then partially rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[116]

389.    A J.P. Morgan report from November 16, 2018 noted that the market was affected by continued uncertainty over California's willingness to aid PG&E:

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

*         *         *

390.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

---

[116] David R. Baker, Mark Chediak & Romy Varghese, *PG&E State Review Puts Board Shuffle and Breakup on the Table*, Bloomberg (updated Nov. 17, 2018 12:00AM), https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk.

## X.      SCIENTER UNDER THE EXCHANGE ACT

391.    The public was surprised to learn the extent to which PG&E had misled everyone about its lack of safety procedures related to wildfire prevention and responsibility for the North Bay and Camp Fires.  Based on the extensive, widespread, and egregious nature of PG&E's underlying noncompliance and disregard for safety, there is a strong inference that PG&E itself, and the officers who spoke on its behalf and controlled its public statements, knew or should have known the truth.  As detailed below, they either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality.  Thus, throughout the Class Period, Defendants acted with scienter (a) by making false and misleading statements and omissions about PG&E's financial health and compliance with relevant safety rules and regulations while having actual knowledge of their false or misleading nature, and/or (b) by acting in a deliberately reckless manner.

### A.      PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations

392.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations.  At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.  As noted above (¶¶127-28) and described in more detail below (¶569), PG&E had a company policy to perversely incentivize its contractors to clear less vegetation than is safe.

393.    Even after PG&E caused the disastrous Butte Fire through its serious fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers

1    made any changes to improve safety or compliance.  Thus, they either knew, or should have

2    presumed, that its violations continued unabated.

3         394.    On March 5, 2019, Judge Alsup, presiding over PG&E's criminal probation,

4    issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation

5    management and other safety regulations.  The Order contained the following findings

6    summarizing the results of the federal court's probe into PG&E's actual knowledge of safety

7    violations leading up to the North Bay and Camp Fires:

> PG&E's filings have included several relevant admissions.
> Significantly, PG&E acknowledged "that vegetation contact is the
> primary risk driver with respect to ignitions on its distribution
> lines." ("Vegetation" means trees and limbs in this context.) In
> 2016 alone, PG&E experienced approximately 1,400 wires down
> caused by vegetation contact. As PG&E reported to the CPUC,
> during 2015 and 2016, vegetation contact with conductors was the
> leading cause of the 486 fire ignitions associated with PG&E
> facilities, causing 37% of those fires. PG&E further admitted that
> as of June 2017, there were 3,962 unworked trees which PG&E
> had identified in 2016 as hazardous with the potential to "fall into
> or otherwise impact the conductors, towers or guy wires before the
> next inspection cycle."[117]

15        395.    Thus, PG&E has admitted its **actual knowledge from 2015 to 2017** that its

16   vegetation management practices did not comply with California safety regulations on the order

17   of **thousands of violations per year**.  PG&E has further admitted to **actually knowing** that its

18   violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never

19   disclosed to investors that their own internal compliance reviews showed a lack of compliance

20   on a huge scale.

21        396.    In the time period of 2017 to 2018, after the North Bay Fires and leading up to the

22   Camp Fire, PG&E's notice of its numerous and widespread safety violations was even stronger.

23   For example, PG&E had known about the dangerous noncompliance of its Caribou-Palermo

24   transmission line – the same line whose failure would cause the Camp Fire's first ignition point –

---

[117] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

Case 1:19-30088   Doc# 14288-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
529 of 1229

since a **2014 internal Company email stated that "the likelihood of failed structures** [on the Caribou-Palermo line] **happening is high.**"

    **B.**    **Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It**

    397.    In a January 16, 2019 filing to the CPUC, PG&E stated unequivocally that safety is its "core business," and as such, was the "focus" of Defendant Williams's activities as CEO: "Since the Utility is the sole operating subsidiary of PG&E Corporation, the activities of the PG&E Corporation CEO and President **focus on** the Utility's **core business**, including most notably **safety**."[118]

    398.    During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the Exchange Act Individual Defendants.  For instance, the PG&E Board's Finance Committee was alleged in a separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively involved in, and responsible for, assisting the Boards in their oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including the risk of "wildfire." Indeed, because the Company faced the possibility of strict liability for property damages caused by wildfires, and such liability could not only be extraordinary but also non-reimbursable if its officers had not acted "prudently," wildfire safety was a particular focus of the Exchange Act Individual Defendants, who spoke personally on the subject with investors and regulators throughout the Class Period.  Further,

---

[118] Summary of Corporate Structure of Pacific Gas and Electric Company (U 39 M) and PG&E Corporation (Cal. Public Utilities Commission filed Jan. 16, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M263/K658/263658434.PDF.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
530 of 1229

Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned the Company's core operations. Therefore, the Exchange Act Individual Defendants, by virtue of the importance of safety to the Company and their positions as its leaders, reasonably had knowledge about PG&E's safety and regulatory failures during the Class Period.

399.    As discussed in Sections VI.C. and VI.D., *supra*, the Exchange Act Individual Defendants repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and results. For example, they kept investors apprised about how many hundreds of thousands of trees the Company was trimming and removing, including how many thousands were "dead or dying." Not only that, but the Exchange Act Individual Defendants also inflated these numbers over time without explanation, raising the number of trees supposedly trimmed or removed from 1.2 million to 1.4 million.  In both reporting and inflating these numbers, the Exchange Act Individual Defendants showed they knew that vegetation management and compliance was important to investors on a granular level.

400.    A core operation concerns a company's primary products or services, and it extends to matters of importance that might significantly impact the company's bottom line. There is no question that PG&E's safety policies and procedures were critically important to the Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it is also notable that PG&E is potentially facing $30 billion of liability or more due to its failures, and that California's regulatory regime imposes significant liability for PG&E's vegetation management and other safety failures. This is strong evidence of the centrality of the Company's wildfire safety and compliance regime.

401.    In a separate lawsuit that was filed in connection with the Butte Fire, it was publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly revealed – that Exchange Act Individual Defendants Williams and Hogan both served on an Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues. Further, according to the parties litigating against PG&E for injuries caused

by the 2015 Butte Fire, Defendant Hogan's and another individual's[119] deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." As noted above, this means noncompliance for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety violations in the nature of trees touching its powerlines at any given time. *See* Section IV.F.4.

402.     Just months before the North Bay Fires broke out, United States District Judge Thelton E. Henderson in the Northern District of California ordered that PG&E work with federal prosecutors to retain a monitor to oversee the Company's compliance and ethics programs, and implement "policies and procedures that address threats caused by vegetation," in light of the deadly San Bruno explosion. Order at 3, PG&E Criminal Proceedings, (N.D. Cal. Jan. 26, 2017), ECF No. 916 (the "San Bruno Order"). As part of the sentencing process, PG&E had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's safety and compliance, such that "high-level personnel of the organization ensure its effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906. Accordingly, Exchange Act Individual Defendants Kane, Earley, and Williams had actual knowledge of PG&E's lack of compliance.

403.     Because the Defendants represented that they closely monitored PG&E's critically important safety and compliance, and because PG&E's fire safety practices resulted in thousands of fire safety violations during the Class Period, they knew – or were deliberately reckless in not knowing – that PG&E's level of safety with respect to vegetation management and wildfire prevention did not comport with state law.

---

[119] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance Supervisor.

**C.** **The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter**

404. As described above, *see supra* Section IV.F.2., PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010. On January 26, 2017, Judge Henderson sentenced PG&E to an expansive program of probation, including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and a mandate to refrain from any further criminal behavior. San Bruno Order.

405. The first condition to PG&E's probation is that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum. PG&E Sentencing Memorandum at 15, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906. PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations. This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike. Accordingly, as of January 8, 2017, PG&E had an unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed investors to believe it was meeting the terms of its probation.

406. On August 14, 2017, Judge Alsup was assigned to preside over the criminal case and PG&E's resulting probation.

407. After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?
>
> 2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?
>
> 3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

Case 19-30088   Doc# 14288-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
533 of 1229

**4. Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

408.    On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." In response, the Attorney General of California replied that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[120]  The listed potential offenses ranged from "misdemeanor offenses related to vegetation and power lines" to "implied-malice murder and involuntary manslaughter."

409.    On January 17, 2019, Judge Alsup issued a tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been **the susceptibility of PG&E's distribution lines to trees or limbs falling onto them** during high-wind events."[121]

410.    On January 30, 2019, Judge Alsup held a probationary hearing to determine whether PG&E's conduct had violated the terms of its probation.  Part of the hearing concerned PG&E's failure to inform the probation officer that the Butte County District Attorney's Office was investigating PG&E's role starting several of the North Bay Fires, that the District Attorney considered criminal prosecution, and that it executed a settlement with PG&E to avoid such prosecution.  The court made a "**find[ing] that PG&E violated the conditions of probation**," with sentencing to be determined at a later date.[122]  Judge Alsup also reminded the Company:

> [O]ne of the conditions of probation is you will not commit another federal, state, or local crime. It doesn't have to be a pipeline or a natural gas. It can be any crime. You cannot – you've

---

[120] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

[121] U.S. Response to Court's Order to Show Cause and Request for Comment, PG&E Criminal Proceedings (N.D. Cal. Jan. 17, 2019), ECF No. 970.

[122] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

got to be on your absolute best behavior. No more crimes. . . .
That's what PG&E is up against now.

411.    During the hearing, Judge Alsup reportedly stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**. . . . PG&E, according to Cal Fire, started the fire. Global warming did not start the fire. According to Cal Fire, PG&E started it, all 17 of them." Judge Alsup continued, "what do we do[?] Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more fires'?"[123] Judge Alsup heard testimony from PG&E's probation officer, Jennifer Hutchings, concerning the Honey Fire – one of the North Bay Fires for which Cal Fire found evidence of a safety violation and referred further criminal investigation to the relevant district attorney for Butte County. Probation Officer Hutchings testified: "I discovered that there had actually been an extensive investigation done by Butte County, that they were fully prepared to bring criminal charges against Pacific Gas and Electric; that Pacific Gas and Electric had entered into a settlement agreement with them in order to avoid these charges being brought." **The court then made a "find[ing] that PG&E violated the conditions of probation as charged in the Form 12."** Thereafter, the court turned to address whether it "should not impose further condition on PG&E to help protect the public from possible further other crimes of the offender," including the following exchange with PG&E representative:

| The Court: | Okay. When you say "mitigate," why can't the risk [of wildfire] be zero? Why is it that PG&E should be permitted to start a single wildfire?" |
|---|---|
| PG&E: | Well, the answer to the first question is bringing the risk to zero is an incredibly complicated series of policy decisions that have to factor in reliability, cost, safety, and there's a tremendous amount of analysis that goes into how best to, for instance, make vegetation management decisions and how aggressive vegetation management should be versus the cost of – |

. . .

---

[123] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

125

| | |
|---|---|
| The Court: | So why is it PG&E says all the time "Safety is our number one thing"?  I hear it all the time, "Safety. Safety. Safety," **but it's not really true. Safety is not your number one thing**. |

At the conclusion of this proceeding, PG&E accepted that full compliance with safety regulations, rather than "mitigation," was both possible and PG&E's goal: "[U]ltimately we agree with Your Honor's goal. We think that Your Honor's goal of trying to eliminate the risk is exactly what we all need to be working towards."

412.    On February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[124]  The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers.  For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and miles of distribution lines, ***PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017*** as self-reported to the CPUC.  In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period.  Put differently, PG&E's equipment caused ***4.5 times more wildfires*** than SoCalEd.  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas & Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 (and below 300) acres.  By contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning over 10 acres.

---

[124] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

413. On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[125] Judge Alsup's Revised Order further found that this **"record demonstrates that PG&E's performance with respect to vegetation management has been dismal**." Although PG&E had previously balked at new conditions of probation that would require full compliance on the grounds that they would be impossible to achieve, Judge Alsup's March 5, 2019 order rejected that notion:

> To address PG&E's complaints that the vegetation-management conditions proposed in the January 9 order would be unduly expensive, require superhuman efforts, and exceed the requirements of state and federal law, the above conditions would now simply require full compliance with existing law and with the metrics proposed in PG&E's own wildfire mitigation plan. This order rejects PG&E's back-up contention that "perfect compliance" with Section 4293 is impossible due to "densely forested, highly dynamic, living environments, in which conditions can rapidly change" (Dkt. No. 1016 at 9). **The record demonstrates that PG&E's performance with respect to vegetation management has been dismal.** And, not only does the offender provide no evidentiary support for its claim, but anyone who knows the terrain and its vegetation knows that it takes years for trees to grow to the height of PG&E's lines. Regular inspections could easily spot trees that are high enough to present a hazard. If state or federal law is too strict, moreover, PG&E's remedy would be to seek the relaxation of such laws through its well-oiled lobbying efforts. . . . The proposed conditions would help ensure that, going forward, funds are adequately allocated to PG&E's vegetation management and wildfire mitigation costs.[126]

414. On April 2, 2019, Judge Alsup held a hearing on his second order to show cause in PG&E's probation proceedings. At the hearing, Judge Alsup stated:

> PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't. And that was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California.[127]

---

[125] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[126] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[127] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047.

Judge Alsup also explained "as we've gotten into the evidence, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees that should have been taken down were not."  He concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . . PG&E has started more than – way more than its share of these fires. . .  This is a problem of your own making."

415.    Under these circumstances, PG&E's violation of court-imposed probation and California law, while under monitoring and reporting obligations regarding its purported compliance throughout the Class Period, support strong inferences that Defendants knew, or were severely reckless in not knowing, that it failed to comply with relevant laws and regulations when making the false and misleading statements detailed above.

416.    As a result, on April 3, 2019, Judge Alsup issued an Order Adopting New Conditions of Probation.  The court modified the terms of PG&E's probation to require it to (i) "fully comply with all applicable laws concerning vegetation management and clearance requirements";  (ii) "fully comply with the specific targets and metrics set forth in its" 2019 Mitigation Plan, and (iii) not issue dividends until it was in compliance with all applicable vegetation management requirements, among other conditions.[128]

417.    On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's violation of probation.  In a colloquy with PG&E's new CEO William D. Johnson, the Court stated: "one of the biggest problems we've had is that PG&E has been starting a lot of fires, and they had that horrible explosion in San Bruno, and **I just don't think PG&E has put safety first.**"  He further reminded the new CEO: "your company **admitted** that it started 17 of those fires in 2017 just in the Wine Country."[129]

---

[128] Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

[129] Transcript of Proceedings at 11, PG&E Criminal Proceedings, (N.D. Cal. May 7, 2019), ECF No. 1061.

418.    During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "**no one has started more fires than PG&E**."

419.    The magnitude of PG&E's failures show that the Company and Exchange Act Individual Defendants either knew these facts, or were deliberately reckless in not knowing them.  The inference of scienter is made even stronger when combined with the fact that safety was a core operation of PG&E's, as discussed in Section X.B., *supra*.

**D.     PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations**

**1.     PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants**

420.    PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E stated that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[130]

421.    This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[131] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[132]  The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[133]  PG&E's 2016 Corporate

---

[130] *Facts about PG&E Pole Management and Maintenance*, Currents, PG&E (Nov. 8, 2017), http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/.

[131] Press Release, PG&E, *Innovative App for PGE Field Crews Earns InformationWeek IT Excellence Award* (May 22, 2017), http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx.

[132] *Id.*

[133] *Id.*

---

1  Responsibility and Sustainability Report announced that a Margaret Mooney Award for

2  Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a

3  new technology that provides work crews with a dramatically enhanced data visualization of

4  **work in progress**." The report further mentioned "[t]he development of an SAP-based

5  **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus,

6  PG&E used sophisticated software that kept track of its safety regulation noncompliance for its

7  powerlines and poles in real time.

8      422.  PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's

9  data.[134] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he**

10  **status of a pole's inspection is tracked in SAP [database technology] so the inspection team**

11  **knows when it's time to inspect each pole**. That information flows into the enterprise platform

12  PG&E built, which pushes electronic lists to inspectors' iPad Pros."[135] The data collected is

13  extensive enough to enable "an enterprise data and analytics organization that is using advanced

14  analytics to predict when poles will fail."[136] And by 2017, the PG&E Corporate Responsibility

15  and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze

16  trends in environmental compliance. Thus, PG&E's records of safety regulation violations were

17  stored in a readily accessible database. Defendants Earley, Williams, Stavropoulos, Kane, Johns,

18  and Hogan each had easy access to this database.

19      423.  Furthermore, in its submissions to Judge Alsup in the Company's criminal

20  probation, PG&E represented that it conducts quality assurance audits to obtain "real time"

21  assessments of its vegetation management compliance:

22          PG&E has also implemented checks on its contractors' vegetation
        management work as another way to monitor compliance. For

23          example, PG&E conducts audits and reviews of its vegetation

24     [134] PG&E Pole Data Request Form, PG&E (Aug. 9, 2017),

25  https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-
data-request-form.pdf.

26     [135] Lisa Morgan, *PG&E's Winning Recipe for a Mobile Asset Inspection App*,

27  InformationWeek (June 29, 2017), https://www.informationweek.com/big-data/pgandes-
winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251.

28     [136] *Id.*

management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). . . . .

**PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations**. To ascertain a **true "real-time" condition** of the program, audits are performed throughout the year. . . . The audits indicate whether any identified issues pose compliance violations or potential violations (e.g., potential violation may occur within 90 days).[137]

424. Further, in those same criminal probation proceedings, Judge Alsup found that PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  Such a precise admission confirms the existence of such a database, awareness of its contents showing that vegetation management violations were widespread during the Class Period, and access to that information by the highest levels.

425. Consequently, it is clear that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, and that such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

**2.  PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored**

426. PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Exchange Act Individual Defendants touted their knowledge and familiarity with this practice at the Company,

---

[137] PG&E Response to Request for Information at 12, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

1  indicating either they personally received information of safety violations this way, or they knew

2  where to find such information but deliberately avoided it.

3        427.    On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First

4  Natural Gas Utility to Receive Process Safety." It contained a description of an internal

5  Company policy termed "**The Corrective Action Program, a program that empowers**

6  **employees at all levels of PG&E to speak up and identify issues that are in need of**

7  **improvement**."

8        428.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

9  financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on

10  PG&E's culture of encouraging "every employee" to report safety violations up the chain of

11  command, as follows:

12        **We also wanted to make sure that every employee felt**
          **comfortable raising concerns, no matter how big or small, so**
13        **we made a number of changes to encourage all employees to**
          **speak up when something doesn't seem right. For example, we**
14        **worked with our unions to develop a non-punitive self-**
          **reporting policy.**

15        We've also adapted the nuclear industry's corrective action
16        program **across the Company**, to **make it easy for employees to**
          **report things that need to be fixed. In fact, employees can now**
17        **report corrective action items through a simple app on their**
          **smart devices. And we've created a number of awards to**
18        **publicly recognize employees when they do speak up, so that**
          **we are encouraging and reinforcing that behavior.**

19                                    * * *

20        **The improvements we have made in safety and reliability over**
21        **the last six years have put us in a position to deliver strong**
          **financial results going forward.**

22
          **Earlier this year, we announced our first dividend increase in**
23        **six years, and we have committed to achieving a roughly 60%**
          **payout ratio by 2019.** Combined with our expected rate based
24        growth, we are confident we can deliver a strong overall return for
          our shareholders.

25        429.    Thus, PG&E went significantly beyond making employees feel safe "report[ing]

26  things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every

27  employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up"

28

Case 18-30088   Doc# 14298-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
542 of 1229

"**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness of what employees actually reported. Indeed, he stated that he was involved in "publicly recogniz[ing] employees when they do speak up."

430.    As a result, the persistence of safety violations cannot be attributed to their being unknown.  Rather, such problems persisted because of what the Exchange Act Individual Defendants did – or failed to do – to mitigate safety problems once they were reported.  Indeed, PG&E's inadequate safety compliance did not stem from a lack of information but rather a lack of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see* Sections VI.B.-J., *supra*).

431.    Earley's statement also affirms the direct connection between PG&E's treatment of safety issues, the Company's long-term financial results, and the size of its dividend.  Indeed, as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period (as alleged above, *see* Section IX, *supra*), the market understood the connection between the Company's safety violations and the foreseeable, material detriment they would have on the Company's financial results and dividend.

**E.    PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority**

432.    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the Class Period. These statements were approved and made under her ultimate authority as CECO.

433.    PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and compliance program and performance,"[138] a role which Kane assumed on May 18, 2015 and held

---

[138] Press Release, PG&E, *PG&E Appoints Julie M. Kane to New Position as Senior Vice President and Chief Ethics and Compliance Officer; Company Takes Next Step Toward Goal of Establishing a Best-in-Class Corporate Ethics Program* (Mar. 25, 2015), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints _julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_ officer_company_takes_next_step_toward_goal_of_establishing_a_best-in- class_corporate_ethics_program.

1    through the end of the Class Period.  As CECO, she was responsible for both managing

2    implementation of PG&E's legal compliance efforts as well as overseeing compliance

3    monitoring and reporting during almost the entirety of the Class Period.  When PG&E was being

4    sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its

5    January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the

6    Company-wide compliance and ethics program, including **compliance management**, risk-

7    mitigation **and reporting**; **overseeing employee-investigatory processes**; and reinforcing

8    PG&E's ethics and compliance culture, among many other compliance and ethics program

9    elements."  The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E

10   Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's

11   Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy

12   Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's

13   and PG&E's Boards."

14          434.    Accordingly, Kane was apprised of any compliance violations reported within the

15   Company, including violations reported by PG&E's lower-level employees and logged in

16   PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors

17   that it was in compliance (*e.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶211

18   (Misstatement No. 4, October 6, 2016); ¶222 (Misstatement No. 5, August 9, 2017); ¶249

19   (Misstatement No. 9, October 31, 2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280

20   (Misstatement No. 13, May 25, 2018); ¶¶287, 296 (Misstatement Nos. 14 & 15, June 8, 2016);

21   ¶300 (Misstatement No. 16, September 27, 2018); ¶¶303, 309 (Misstatement Nos. 17-18,

22   October 9, 2018); and ¶314 (Misstatement No. 19, November 8, 2018)).

23          435.    The CECO position was sufficiently senior such that Kane's scienter can be

24   imputed to the Company regarding knowledge of legal compliance with California vegetation

25   management and safety regulations.

26          436.    Additionally, because Kane reported directly to the CEO in her capacity as

27   CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and

28

Williams.[139] Because Kane was institutionally installed to advise the CEO of PG&E's compliance and safety, Kane would have told Earley and Williams what she knew regarding the Company's noncompliance with vegetation management regulations, or Earley and Williams would have been deliberately reckless in speaking on the subjects of compliance and safety without input from their CECO.

### F. The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors

437. PG&E is currently facing approximately $17 billion in liability over the North Bay Fires and $13 billion for the Camp Fire, of which the Company has already recorded anticipated losses totaling over $14 billion. This immense exposure dwarfs the $1.6 billion that the Company reported it earned in the full year 2017—a performance not likely to be repeated given the substantial increase in PG&E's required vegetation management and other safety compliance expenditures.

438. Once the North Bay Fires began, it was clear to Defendants that PG&E's liability could have severe repercussions for the Company's financial condition, and for the careers of the Exchange Act Individual Defendants. This was true even before the flight of PG&E's officers and directors and the Company's bankruptcy.

439. One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol." On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company." On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

440. The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part

---

[139] Further, she reported directly to the Company's Chairman of the Board, a position which was also occupied by Earley during the Class Period.

in causing the North Bay Fires.  After the North Bay Fires had erupted, the threat of bankruptcy and the narrow possibility of a legislative bail-out gave PG&E and the Exchange Act Individual Defendants had an unusual motivation to hide their culpability.

441.    It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "**PG&E meets or exceeds all applicable federal and state vegetation clearance requirements**," and that "**we've doubled the amount that we've invested in veg[etation] management**." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

442.    Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically.  When PG&E faced a substantially *lower* liability for its role in the deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

**G.    After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up**

443.    As noted above, the public learned after the Camp Fire erupted that PG&E did not shut down its Caribou-Palermo transmission line that ignited the Camp Fire, despite the Company's ESRB-8 Shutoff Protocol.  As further detailed above, PG&E faced criticism from a variety of sources for that decision, as well as significant decreases to its share price.  *See* Section IX.D.6, *supra*.

444.    While the Camp Fire continued to burn, the Company insisted that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line.

445.    For example, in a November 16, 2018 statement reported by *KQED News*, PG&E spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the potential public safety issues resulting from de-energizing higher voltage transmission lines, including the potential to impact millions of people and create larger system stability issues for

1  the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at

2  115kV or above."[140]

3       446.   Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E

4  spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues

5  resulting from de-energizing higher voltage transmission lines, including the potential to impact

6  millions of people and create larger system stability issues for the grid, PG&E has not extended

7  the (shutoff) program to transmission lines that operate at 115kV or above."[141]  Spokeswoman

8  Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission

9  lines and such an emergency shutdown would need to be coordinated with the California

10  Independent System Operator, which oversees the state's power grid."  But as the article further

11  reported:

12          But state and federal regulators say PG&E can shut down
              transmission lines of any size at its own discretion.
13
              "The transmission owners are solely responsible for operating their
14            transmission and distribution lines and they can de-energize
              transmission and distribution lines without seeking approval from
15            the ISO, with or without prior notice," Cal ISO spokesman Steven
              Greenlee said. "The transmission owner tells us that they are de-
16            energizing a line and if a 230kV or 500kV line is de-energized it
              may require (us) to re-dispatch generation if the remaining lines
17            become heavily loaded. This is a practice we perform every day
              with scheduled work and unplanned outages."
18
              CPUC spokeswoman Terrie Prosper also said the decision is up to
19            the individual utility.

20            "Utilities can de-energize whatever lines and voltage they deem
              appropriate," Prosper said. "They typically de-energize distribution
21            lines because those lines are more localized than transmission
              lines."
22
              FERC Spokesman Craig Cano said PG&E would not need its
23            approval to cut power to high-voltage lines for safety reasons.

24  _____

25  [140] Dan Brekke, *PG&E: High-Voltage Transmission Lines Not Covered by Fire Safety
    Shutdown Plan*, KQED (Nov. 16, 2018), https://www.kqed.org/news/11706846/pge-high-
26  voltage-transmission-lines-not-covered-by-fire-safety-shutdown-plan.

27  [141] Matthias Gafni, *Camp Fire: Map Shows Where PG&E Had Planned to Shut Down Power
    Ahead of Blaze*, Mercury News (Nov. 22, 2018),
    https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-down-
28  power-ahead-of-camp-fire/.

> "FERC-approved standards address transmission system reliability
> and explicitly exclude safety matters, which could be the reason
> for shutting down a power line in response to wildfires or to
> mitigate the risk of fires," he said.

447.     PG&E's entire response, including its denial that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line, **was not true**.

448.     First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation on 115-kilovolt transmission lines or in fact any transmission lines.[142]  However, pursuant to CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary of de-energization policies and procedures on its website" and "Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-energizing its circuits."[143]  Because a limitation on transmission lines was never mentioned in PG&E's ESRB-8 Shutoff Protocol, it did not exist.

449.     Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-Palermo transmission line and causing the Camp Fire.

450.     Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and distribution lines.  Specifically, PG&E shut off eight transmission power line circuits and thirty-three distribution power line circuits, as detailed in its later filing to CPUC.[144]  This admission confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down transmission lines.

---

[142] *See generally* PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[143] Resolution Extending De-Energization Reasonableness, Notification, Mitigation And Reporting Requirements In Decision 12-04-024 To All Electric Investor Owned Utilities, (Cal. Public Utilities Commission July 16, 2018), http://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf.

[144] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

451.    The same conclusion is confirmed by a telling revision PG&E made to otherwise identical text in two succeeding reports to the CPUC—the first being its October "Public Safety Power Shutoff Report" regarding the October shutoff,[145] and the second being its November "Public Safety Power Shutoff Report" **after the Camp Fire**.  Therein, PG&E made the following revelatory insertion:

> [PG&E has] reached out to more than 570,000 homes and businesses that are served by our electric lines, operating at 70kV and lower, that run through extreme fire-threat areas. We have communicated to these customers through several formats (letter, email, TV and print ads, social media and news stories) that, if extreme fire danger conditions were forecasted, it might be necessary to temporarily turn off power to their neighborhood or community for safety.

(Underlining added to signify PG&E's addition.)  The absence of such language in its October 2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

452.    Finally, PG&E was required to answer questions posed by the CPUC's Safety and Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[146] The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines in the last 10 days without being requested to do so by CAL FIRE? If so, please provide information about location, duration and reasons for doing so."  In response, PG&E stated that it had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

> PG&E de-energized multiple transmission lines as described below without the direction of CAL FIRE:
>
> . . .
>
> 3.  On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #1-**115kV line** due to fire in the area. The line was returned to service on 10/9 at 1455.

---

[145] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

[146] PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

Case 19-30088   Doc# 14298-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 549 of 1229

4. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-**115kV line** due to fire in the area. The line was returned to service on 10/14 at 1044.

453.     As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol excluded transmission lines of any kind.  It was also false that PG&E's ESRB-8 Shutoff Protocol excluded 115-kilovolt transmission lines in particular.

454.     PG&E's representations after the Camp Fire that such exclusions existed – when they did not exist – amount to a cover-up, and evidence the Company's scienter.  It is a continuation of PG&E's deliberate efforts to conceal the unsafe operations of its utilities, as further exposed by CPUC's allegations that the Company falsified records and data concerning the safety of its utilities from 2012 through 2017.  *See* ¶99, *supra*.

**H.     PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter**

455.     On January 13, 2019, PG&E announced the abrupt departure of its CEO and President, Defendant Williams.[147]  To explain Williams's unceremonious departure—less than two years after she became CEO in March 2017—PG&E's May 17,  2019, preliminary proxy statement began with a letter to shareholders from the PG&E Board of Directors, stating:

> "The tragic events of the past few years have made clear that the energy system status quo is no longer working for California. We have heard the calls for change and are committed to answering them with strong actions that will help us re-earn the trust of all our stakeholders. **This starts at the top. We replaced PG&E Corporation's CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to redirect our safety culture** and navigate one of the most complex corporate reorganizations ever."

456.     Thus, shortly after Williams's departure, PG&E admitted that she lacked the commitment and expertise necessary for safety.  In the same letter, PG&E argued its Chapter 11 bankruptcy would ultimately provide "a reorganized enterprise with refreshed management and Board members who are committed to safety and reliability in all aspects of our business."

---

[147] J.D. Morris, *PG&E CEO Geisha Williams Out Amid Utility's Widening Financial Crisis*, San Francisco Chronicle (Jan, 13, 2019), https://www.sfchronicle.com/business/article/PG-E-CEO-Geisha-Williams-out-amid-utility-s-13530807.php.

457.     In addition to Williams's departure, three senior executives in PG&E's electric division also left the Company after the 2017 or 2018 fires.  Earley left his position as Executive Chairman of the Company in December 2017, Stavropoulos left his position as COO in September 2018, and Hogan left his position as Senior Vice President of Electric Operations in January 2019.  As a consequence, it may be inferred that the Company had widespread dissatisfaction with its officers' and directors' commitment and expertise necessary for safety beyond just Williams.

458.     Indeed, on February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of its Boards.  As of today, only two Board members out of 13 have not been replaced.  In a further expression of lack of support for the Company's previous leadership, the release acknowledged "that **PG&E must re-earn trust and credibility** with its customers, regulators, the communities it serves and all of its stakeholders . . . ."

## XI.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS

459.     For the Exchange Act claims, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Lead Plaintiff and other members of the Class purchased PG&E securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

460.     At all relevant times, the market for PG&E securities was efficient for the following reasons, among others:

1    (a)  PG&E stock met the requirements for listing, and was listed and actively

2 traded on the NYSE, a highly efficient and automated market;

3    (b)  As a regulated issuer, PG&E filed periodic public reports with the SEC

4 and the NYSE;

5    (c)  PG&E regularly communicated with public investors via established

6 market communication mechanisms, including through the regular dissemination of press

7 releases on the major newswire services and through other wide-ranging public disclosures, such

8 as communications with the financial press, securities analysts and other similar reporting

9 services; and

10    (d)  PG&E was followed by numerous securities analysts employed by major

11 brokerage firms who wrote reports that were distributed to the sales forces and certain customers

12 of their respective brokerage firms. Each of those reports was publically available and entered

13 the public marketplace.

14   461.  As a result of the foregoing, the market for PG&E securities promptly digested

15 current information regarding PG&E from publicly available sources and reflected such

16 information in PG&E's stock price. Under these circumstances, all purchasers of PG&E

17 securities during the Class Period suffered similar injury because of their purchases of securities

18 at artificially inflated prices and a presumption of reliance applies.

19   462.  Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

20 Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

21 as Defendants' misstatements throughout the Class Period included omissions, in that they failed

22 to inform investors of PG&E's safety and regulatory failures.

23 **XII. CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS**

24   463.  Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25 Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

26 otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

27 and were damaged thereby. Excluded from the Class are the excluded persons defined in ¶11,

28 *supra*.

464.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

465.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

466.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

467.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;
- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;
- whether Defendants acted with actual knowledge of falsity or recklessly in issuing false and misleading financial statements;
- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

- whether some or all of Defendants' false and misleading misstatements or omissions served to maintain PG&E's inflated securities prices; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

468. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

469. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶459-462.

470. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM

**For Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against PG&E and the Exchange Act Individual Defendants**

471. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

472. This Count is asserted against PG&E and the Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

473. During the Class Period, PG&E and the Exchange Act Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

474.    PG&E and the Exchange Act Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

475.    PG&E and the Exchange Act Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

476.    Exchange Act Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

477.    As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Exchange Act Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on

1    the statements described above and/or the integrity of the market price of PG&E securities

2    during the Class Period in purchasing PG&E securities at prices that were artificially inflated as

3    a result of PG&E's and the Exchange Act Individual Defendants' false and misleading

4    statements.

5         478.    Had Lead Plaintiff and the other members of the Class been aware that the market

6    price of PG&E securities had been artificially and falsely inflated by PG&E's and the Exchange

7    Act Individual Defendants' misleading statements and by the material adverse information which

8    PG&E's and the Exchange Act Individual Defendants did not disclose, they would not have

9    purchased PG&E's securities at the artificially inflated prices that they did, or at all.

10        479.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

11   members of the Class have suffered damages in an amount to be established at trial.

12        480.    By reason of the foregoing, PG&E and the Exchange Act Individual Defendants

13   have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are

14   liable to the plaintiff and the other members of the Class for substantial damages which they

15   suffered in connection with their purchase of PG&E securities during the Class Period.

16                              **SECOND CLAIM**

17                     **For Violation of Section 20(a) of**
                  **The Exchange Act Against PG&E Corporation**
18

19        481.    Lead Plaintiff repeats and realleges each and every allegation contained in the

20   foregoing paragraphs as if fully set forth herein.

21        482.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against

22   Defendant PG&E Corporation.

23        483.    During the Class Period, PG&E Corporation participated in the operation and

24   management of the Utility. PG&E Corporation conducted and participated, directly and

25   indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of

26   PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's

27

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
556 of 1229

directors also sat on the board of PG&E Corporation.[148] Further, both companies filed joint annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both** Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

484.    Through its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to disseminate accurate and truthful information with respect to the Utility's financial condition and results of operations, and to correct promptly any public statements issued by the Utility which had become materially false or misleading.

485.    Because of its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and did, control the contents of the various reports, press releases and public filings which the Utility disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

---

[148] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Johns was a director of the Utility only.

2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos and Williams were directors of the Utility only.

2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the Utility only.

486.     By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

### THIRD CLAIM

**For Violation of Section 20(a) of The Exchange Act**
**Against The Exchange Act Individual Defendants**

487.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of PG&E.  The Exchange Act Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

489.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

490.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

491.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

Case 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 558 of 1229

**FOURTH CLAIM**

**Alter Ego Liability for Violation of Section 10(b) of
The Exchange Act and Rule 10b-5 Against PG&E Corporation**

492.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

493.    PG&E Corporation is jointly and severally liable for the misstatements and omissions of the Utility, insofar as:

(a)    PG&E Corporation and the Utility operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

(b)    PG&E Corporation and the Utility do not operate as completely separate entities, but rather integrate their resources to achieve a common business purpose;

(c)    the Utility is so organized and controlled, and its decisions, affairs, and business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

(d)    PG&E Corporation's and the Utility's officers and management are intertwined and do not act completely independently of one another;

(e)    PG&E Corporation has control and authority to choose and appoint the Utility's board members as well as its other top officers and managers;

(f)    PG&E Corporation and the Utility are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

(g)    PG&E Corporation and the Utility have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

(h)    PG&E Corporation and the Utility have unified personnel policies and practices and/or a consolidated personnel organization or structure;

1          (i)      PG&E Corporation and the Utility are represented by common legal

2    counsel;

3          (j)      PG&E Corporation and the Utility acknowledged in their joint 10-K

4    statement for the year 2015 that eight separate officers were "executive officers of both PG&E

5    Corporation and the Utility;"

6          (k)      PG&E Corporation and the Utility acknowledged in their joint 10-K

7    statement for the year 2016 that nine separate officers were "executive officers of both PG&E

8    Corporation and the Utility;"

9          (l)      PG&E Corporation's officers, directors, and other management make

10   policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

11   directions and making decisions for the Utility;

12         (m)     PG&E Corporation's officers, directors, and other management direct

13   certain financial decisions for the Utility including the amount and nature of capital outlays;

14         (n)      PG&E Corporation's written guidelines, policies, and procedures control

15   the Utility's employees, policies, and practices;

16         (o)      PG&E Corporation files consolidated earnings statements factoring in all

17   revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

18   tax relief; and

19         (p)      PG&E Corporation generally directs and controls the Utility's relationship

20   with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

21   for the benefit of PG&E Corporation.

22         494.    For purposes of this litigation, it would be inequitable to treat the misstatements

23   and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

24         495.    By reason of the above allegations, any misstatements made by the Utility –

25   including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

26   Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

27   the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          150
CIVIL ACTION NO. 3:18-CV-03509-EJD

1    members of the Class for substantial damages which they suffered in connection with their

2    purchase of PG&E securities during the Class Period.

3    **XIV.    NATURE OF THE SECURITIES ACT CLAIMS**

4         496.    Securities Act Plaintiffs (defined below) bring claims for violations of the

5    Securities Act, individually and on behalf of all persons or entities that acquired PG&E senior

6    notes in or traceable to the Company's Notes Offerings, as detailed herein, against certain of the

7    Company's officers and directors, and the underwriters of the Notes Offerings.[149]  Since

8    March 2016, PG&E has issued over $4 billion worth of senior notes registered with the SEC.

9    According to a PG&E filing in the United States District Court for the Northern District of

10   California, "PG&E consistently spends more cash than it generates through its operations and

11   cannot fund all its infrastructure investments without external financing from the debt and equity

12   markets."[150]

13        497.    The Securities Act claims set forth herein are based on strict liability and

14   negligence and are not based on any allegation that any defendant engaged in fraud or intentional

15   misconduct.  The Securities Act Plaintiffs specifically disclaim any reference to or reliance on

16   allegations of fraud.

17   **XV.    OVERVIEW OF THE SECURITIES ACT VIOLATIONS**

18        498.    PG&E's failure to follow safety requirements and prudent practices, including

19   regulations and laws, resulted in numerous devastating wildfires in 2015, 2017 and 2018, causing

20   catastrophic loss of life and destruction of property.

21

22

---

23   [149]  "Notes Offerings" refers to the Company's March 2016 public offering of senior notes
     (the "March 2016 Notes Offering"), the Company's December 2016 public offering of senior

24   notes (the "December 2016 Notes Offering"), the Company's March 2017 public offering of
     senior notes (the "March 2017 Notes Offering"), and the Company's April 2018 public offering

25   of senior notes (the "April 2018 Notes Offering").  The "Offering Documents" refers to the
     Registration Statement and Prospectus (to include all amendments and supplements thereto for

26   each offering, together with all documents incorporated by reference in each Registration
     Statement and Prospectus).  *See* ¶ 630(a)-(d).

27   [150] Response to Second Order to Show Cause Why PG&E's Conditions of Probation Should

28   Not Be Modified at 11, PG&E Criminal Proceedings, (N.D. Cal. Mar. 22, 2019), ECF No. 1032.

---

499.     In all, the Company has been implicated in causing **more than 1,500 fires** between June 2014 and November 2018,[151] including some of the most widespread and destructive wildfires in California history.  PG&E failed to implement required safety precautions even as the risk of wildfires increased.  The Company has filed Chapter 11 bankruptcy, as it faces a host of regulatory investigations, criminal probes, and civil lawsuits.  PG&E estimates it could be liable for more than $30 billion in costs, expenses and other losses from the North Bay and Camp Fires excluding any penalties, fines, or punitive damages.

500.     In addition to liability for causing destructive wildfires, PG&E recently announced in the Company's May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte Fire."

501.     At the same time that PG&E's equipment and operations were posing an unreasonable risk to the lives and property of California residents – indeed, even as the Company's equipment was in the midst of setting hundreds of wildfires – PG&E raised billions of dollars from investors through the sale of senior notes.  From March 2016 to May 2018, PG&E offered and sold approximately $4.35 billion worth of senior notes that it registered with the SEC to ensure that the notes could be widely sold and distributed to the investing public.

502.     Specifically, PG&E offered and sold: (i) $600 million worth of 2.95% PG&E senior notes due March 1, 2026 pursuant to the March 2016 Notes Offering; (ii) $250 million worth of floating rate PG&E senior notes due November 30, 2017 and $400 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the December 2016 Notes Offering; (iii) $400 million worth of 3.30% PG&E senior notes due March 15, 2027 and $200 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the March 2017 Notes Offering; and (iv) up to $500 million worth of floating rate PG&E senior notes due

---

[151] *The Wall Street Journal* reported on January 13, 2019 that PG&E started more than 1,500 fires between June 2014 and December 2017.  In November 2018, PG&E also caused the Camp Fire.  *See* Fn 168, *infra*.

Case: 19-30088   Doc# 14209-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 562 of 1229

November 28, 2018, $1.15 billion worth of 3.30% PG&E senior notes due December 1, 2027, and $850 million worth of 3.95% PG&E senior notes due December 1, 2047 pursuant to the April 2018 Notes Offering.

503.    PG&E's Offering Documents to the Notes Offerings materially misled investors as to *inter alia*: (i) the safety of the Company's equipment by highlighting its commitment to safety and touting upgrades and investments; (ii) the real risk of wildfires by emphasizing the important role of the Company's vegetation management activities; (iii) the risks associated with and impact of wildfires on PG&E;  (iv) the sufficiency of the Company's investments in safety to prevent wildfires; (v) the Company's liability with respect to wildfires; and (vi) the known adverse trends impacting PG&E.

504.    PG&E's conduct has subsequently been revealed to contradict the representations made to investors in the Offering Documents, and now poses an existential threat to the Company.  Subsequent to, and due to, Defendants' omission of the true state of PG&E's business and operations and the risks posed by the Company's lax wildfire safety practices and inadequate investment in safety, the value of the senior notes associated with the Notes Offerings has substantially declined.

505.    For example, subsequent to the Notes Offerings, on November 13, 2018, the price of the 2.95% note sold in the March 2016 Notes Offering closed at $86.46 per unit, or ***more than 13% below par***; the price of the 4.00% note sold in the December 2016 Notes Offering closed at $72.26 per unit, or ***more than 27% below par***; the price of the 3.3% note sold in the March 2017 Notes Offering closed at $82.82 per unit, or ***more than 17% below par***; the price of the 3.3% note sold in the April 2018 Notes Offering closed at $81.38 per unit, or ***more than 18% below par***; and the price of the 3.95% note sold in the April 2018 Notes Offering closed at $72.23 per unit, or ***more than 27% below par***.

## XVI.    THE SECURITIES ACT PARTIES

### A.    Securities Act Named Plaintiffs

506.    Plaintiff York County on behalf of the County of York Retirement Fund acquired PG&E senior notes issued in the March 2016 Notes Offering and the April 2018 Notes Offering

1    as described in the Certification attached hereto (as "Attachment B") and incorporated by

2    reference, and has been damaged thereby.

3        507.    Plaintiff City of Warren Police and Fire Retirement System acquired PG&E

4    senior notes issued in the April 2018 Notes Offering as described in the Certification attached

5    hereto (as "Attachment C") and incorporated by reference, and has been damaged thereby.

6        508.    Plaintiff Mid-Jersey Trucking Industry & Local No. 701 Pension Fund acquired

7    PG&E senior notes issued in the December 2016 Notes Offering and the March 2017 Notes

8    Offering as described in the Certification attached hereto (as "Attachment D") and incorporated

9    by reference, and has been damaged thereby.

10        **B.**      **Bankrupt Entities**

11        509.    Pacific Gas and Electric Company is a California public utility operating in

12    northern and central California, with headquarters in San Francisco. The Utility is the registrant

13    and issuer of the PG&E senior notes issued in the Notes Offerings. The Utility has declared

14    bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of

15    proceedings under the federal bankruptcy laws. But for the automatic stay of proceedings, the

16    Utility would be named as a defendant for all counts asserted herein.

17        510.    PG&E Corporation is a holding company whose primary operating subsidiary is

18    Pacific Gas and Electric Company. PG&E Corporation is headquartered in the same San

19    Francisco building as the Utility, and it shared an overlapping board of directors with the Utility.

20    As the parent and owner of the Utility, PG&E Corporation also issued and sold the PG&E senior

21    notes issued in the Notes Offerings. Like the Utility, PG&E Corporation has declared bankruptcy

22    and is therefore not named as a defendant in this action due to the automatic stay of proceedings

23    under the federal bankruptcy laws. But for the automatic stay of proceedings, PG&E Corporation

24    would be named as a defendant for all counts asserted herein.

25        **C.**      **Securities Act Individual Defendants**

26        511.    The following current or former directors and/or officers are named as Defendants

27    for the Securities Act claims.

28

512.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017. Earley was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering and the March 2017 Notes Offering.  Earley signed the registration statement for the March 2016 Notes Offering and the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.

513.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Williams was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Williams signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

514.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.  Stavropolous was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Stavropolous signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

515.     Defendant Barbara L. Rambo ("Rambo") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Rambo signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for

1    the April 2018 Notes Offering.  Rambo was appointed a director of PG&E in 2005. On April 3,

2    2019, PG&E announced that Rambo would be replaced at the next Board meeting.  As of May 2,

3    2019, Rambo was no longer a director.

4         516.   Defendant David S. Thomason ("Thomason") was the Vice President, Chief

5    Financial Officer ("CFO") and Controller of the Utility at the time of the December 2016 Notes

6    Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Thomason signed

7    the registration statement for the March 2017 Notes Offering and the registration statement for

8    the April 2018 Notes Offering. Thomason has worked in various roles at PG&E since 2001, and

9    as CFO, VP and controller since June 2016.

10        517.   Defendant Dinyar B. Mistry ("Mistry") was the Vice President, CFO and

11   Controller of the Utility at the time of the March 2016 Notes Offering, and PG&E's Senior Vice

12   President of Human Resources during the December 2016 Notes Offering, the March 2017 Notes

13   Offering and the April 2018 Notes Offering.  Mistry signed the registration statement for the

14   March 2016 Notes Offering and the December 2016 Notes Offering.  According to PG&E,

15   Mistry joined Pacific Gas and Electric Company in 1994 and has held various positions since

16   then, including Vice President and Controller of Pacific Gas and Electric Company; as Vice

17   President, Regulation and Rates; as Vice President, Internal Audit and Compliance; and most

18   recently as Vice President and Chief Risk and Audit Officer.

19        518.   Defendant Lewis Chew ("Chew") was a director of the Utility at the time of the

20   March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

21   and the April 2018 Notes Offering.  Chew signed the registration statement for the March 2016

22   Notes Offering, the registration statement for the December 2016 Notes Offering, the registration

23   statement for the March 2017 Notes Offering and the registration statement for the April 2018

24   Notes Offering.  Chew was appointed a director of PG&E in 2009. On April 3, 2019, PG&E

25   announced that Chew would be replaced at the next Board meeting.  As of May 2, 2019, Chew

26   was no longer a director.

27        519.   Defendant Fred J. Fowler ("Fowler") was a director of the Utility at the time of

28   the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

1    Offering and the April 2018 Notes Offering.  Fowler signed the registration statement for the

2    March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

3    the registration statement for the March 2017 Notes Offering, and the registration statement for

4    the April 2018 Notes Offering. Fowler has been a PG&E director since 2012.

5         520.    Defendant Maryellen C. Herringer ("Herringer") was a director of the Utility at

6    the time of the March 2016 Notes Offering and the December 2016 Notes Offering.  Herringer

7    signed the registration statement for the March 2016 Notes Offering, the registration statement

8    for the December 2016 Notes Offering and the registration statement for the March 2017 Notes

9    Offering.  Herringer was appointed a director of PG&E in 2009. On April 3, 2019, PG&E

10   announced that Herringer would be replaced at the next Board meeting.  As of May 2, 2019,

11   Herringer was no longer a director.

12        521.    Defendant Richard C. Kelly ("Kelly") was a director of the Utility at the time of

13   the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

14   Offering and the April 2018 Notes Offering.  He was also Chairman of the Board of PG&E

15   Corporation beginning in December 2017.  Kelly signed the registration statement for the March

16   2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the

17   registration statement for the March 2017 Notes Offering, and the registration statement for the

18   April 2018 Notes Offering.  Kelly has been a PG&E director from 2013 until his resignation

19   from the Board as announced by PG&E on April 22, 2019.

20        522.    Defendant Roger H. Kimmel ("Kimmel") was a director of the Utility at the time

21   of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

22   Offering and the April 2018 Notes Offering.  Kimmel signed the registration statement for the

23   March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

24   the registration statement for the March 2017 Notes Offering, and the registration statement for

25   the April 2018 Notes Offering.  Kimmel was appointed a director of PG&E in 2009. On April 3,

26   2019, PG&E announced that Kimmel would be replaced at the next Board meeting.  As of May

27   2, 2019, Kimmel was no longer a director.

28

Case 19-30088   Doc 14288-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
567 of 1229

523.     Defendant Richard A. Meserve ("Meserve") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Meserve signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Meserve was appointed a director of PG&E in 2006. On April 3, 2019, PG&E announced that Meserve would be replaced at the next Board meeting.  As of May 2, 2019, Meserve was no longer a director.

524.     Defendant Forrest E. Miller ("Miller") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering, and Chairman of the Utility's Board since May 2017.  Miller signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Miller was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Miller would be replaced at the next Board meeting.  As of May 2, 2019, Miller was no longer a director.

525.     Defendant Barry Lawson Williams ("B. Williams") was a director of the Utility at the time of the March 2016 Notes Offering and the December 2016 Notes Offering, during which time he served as Chairman of the Utility's Board of Directors.  B. Williams signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.   B. Williams was appointed a director of PG&E in 1996. On April 3, 2019, PG&E announced that B. Williams would be replaced at the next Board meeting.  As of May 2, 2019, B. Williams was no longer a director.

526.     Defendant Rosendo G. Parra ("Parra") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Parra signed the registration statement for the

1   March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

2   Parra was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Parra

3   would be replaced at the next Board meeting.  As of May 2, 2019, Parra was no longer a director.

4        527.    Defendant Anne Shen Smith ("Smith") was a director of the Utility at the time of

5   the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

6   Offering and the April 2018 Notes Offering.  Smith signed the registration statement for the

7   March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

8   Smith was appointed a director of PG&E in 2015. On April 3, 2019, PG&E announced that

9   Smith would be replaced at the next Board meeting.  As of May 2, 2019, Smith was no longer a

10   director.

11        528.    Defendant Eric D. Mullins ("Mullins") was a director of the Utility at the time of

12   the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes

13   Offering. Mullins signed the registration statement for the March 2017 Notes Offering and the

14   registration statement for the April 2018 Notes Offering.  Mullins has been a PG&E director

15   since 2016.

16        529.    The defendants identified in ¶¶512-28 are referred to herein as the "Securities Act

17   Individual Defendants."  The Individual Securities Act Defendants signed the registration

18   statements for one or more of the Notes Offerings as detailed herein, and, as directors and/or

19   executive officers of the Company, participated in the solicitation and sale of PG&E senior notes

20   to investors in the Notes Offerings for their own benefit and the benefit of PG&E.

21       **D.**    **Underwriter Defendants**

22        530.    In addition to the above, the following underwriters are named as defendants for

23   the Securities Act claims for the Notes Offerings for which they served as underwriters.

24        531.    Defendant Barclays Capital Inc. served as a lead underwriter for the March 2016

25   Notes Offering.

26        532.    Defendant BNP Paribas Securities Corp. served as a lead underwriter for the

27   March 2016 Notes Offering and the March 2017 Notes Offering.

28

533.    Defendant Morgan Stanley & Co. LLC served as a lead underwriter for the March 2016 Notes Offering.

534.    Defendant MUFG Securities Americas, Inc. f/k/a Mitsubishi UFJ Securities (USA), Inc. served as a lead underwriter for the March 2016 Notes Offering.

535.    Defendant The Williams Capital Group, L.P. served as a lead underwriter for the March 2016 Notes Offering.

536.    Defendant Citigroup Global Markets Inc. served as a lead underwriter for the December 2016 Notes Offering.

537.    Defendant J.P. Morgan Securities LLC served as a lead underwriter for the December 2016 Notes Offering.

538.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated served as a lead underwriter for the December 2016 Notes Offering.

539.    Defendant Mizuho Securities USA LLC served as a lead underwriter for the December 2016 Notes Offering.

540.    Defendant Goldman, Sachs & Co., LLC served as a lead underwriter for the March 2017 Notes Offering.

541.    Defendant RBC Capital Markets, LLC served as a lead underwriter for the March 2017 Notes Offering.

542.    Defendant Wells Fargo Securities, LLC served as a lead underwriter for the March 2017 Notes Offering.

543.    Defendant BNY Mellon Capital Markets, LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

544.    Defendant TD Securities (USA) LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

545.    Defendant C.L. King & Associates, Inc. served as an underwriter for the March 2016 Notes Offering.

546.    Defendant Great Pacific Securities served as an underwriter for the March 2016 Notes Offering.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 570 of 1229

547.    Defendant CIBC World Markets Corp. served as an underwriter for the December 2016 Notes Offering.

548.    Defendant SMBC Nikko Securities America, Inc. served as an underwriter for the December 2016 Notes Offering.

549.    Defendant U.S. Bancorp Investments, Inc. served as an underwriter for the December 2016 Notes Offering.

550.    Defendant Lebenthal & Co., LLC served as an underwriter for the December 2016 Notes Offering.

551.    Defendant Mischler Financial Group, Inc. served as an underwriter for the December 2016 Notes Offering.

552.    Defendant Blaylock Van, LLC served as an underwriter for the March 2017 Notes Offering.

553.    Defendant Samuel A. Ramirez & Company, Inc. served as an underwriter for the December 2016 Notes Offering.

554.    Defendant MFR Securities, Inc. served as an underwriter for the March 2017 Notes Offering.

555.    The defendants identified in ¶¶531-554 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants served as underwriters for the Notes Offerings and sold billions of dollars' worth of PG&E senior notes in the Note Offerings, for which they collectively received tens of millions of dollars in fees and commissions. The Underwriter Defendants drafted and disseminated the offering documents used to effectuate each of the Note Offerings for which they served as underwriters. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein with respect to the Securities Act claims. The Underwriter Defendants are not alleged to be defendants for the April 2018 Notes Offering at this time.

556.    The Individual Securities Act Defendants, together with the Underwriter Defendants, are collectively referred to as the "Securities Act Defendants" and are named as defendants with respect to the Securities Act Claims alleged herein.

## XVII.   SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS

### A.   PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations

557.   PG&E engaged in a pattern and practice of ignoring laws and California safety regulations and failed to take appropriate measures to mitigate wildfire hazards.  Results of government investigations, media coverage, analyst coverage, SEC filings, court filings, admissions before and findings of the Honorable William Alsup of the United States District Court for the Northern District of California, and other public information regarding PG&E and the Securities Act Defendants, all demonstrate that each of the Offering Documents for the Notes Offerings contained materially false and/or misleading statements.

#### 1.   Overview of Laws and Regulations Governing PG&E's Operations

558.   PG&E's ability to maintain safe electrical equipment that complies with state regulations and minimizes the risk of causing wildfires is critical to the Company's business and prospects.  California law includes a doctrine of inverse condemnation as explained in detail in §VI.A.5.  Inverse condemnation imposes strict liability for damages and takings as a result of the design, construction and maintenance of utility facilities, including its electric transmission and distribution lines.  If a utility such as PG&E affirmatively proves "that it reasonably and prudently operated and managed its system" it can recover payments made to property owners for damages caused by a wildfire from the CPUC.  In other words proof "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made."  This would include proof that it complied with the following laws and CPUC regulations.

559.   **California Law**.  As explained in detail in §V.A.1-2, PG&E was required by California law, including California Public Utilities Code §702 and §2106, to adequately maintain its equipment and infrastructure, including electrical towers and poles, to prevent fires from being caused by its equipment or infrastructure, and was liable to property owners for damage caused for failure to do so.  For example, California law required PG&E to: (i) maintain

1  equipment that promotes the safety and health of the public pursuant to California Public

2  Utilities Code §451; and (ii) regularly service and maintain its equipment, including by clearing

3  vegetation away from its power lines pursuant to California law, including California Public

4  Resources Codes §4292 and §4293.  And PG&E was liable to the owners of property for any

5  damages to the property caused by fire for negligently or in violation of law setting a fire or

6  allowing a fire to be set pursuant to California Health & Safety Code §13007.

7       560.  **CPUC Regulations**.  PG&E was also required by law to adhere to CPUC

8  regulations as explained in detail in §VI.A.3.  These regulations include the requirements under

9  General Order 95 that PG&E: (i) "establish necessary and reasonable clearances" between

10  overhead conductors and nearby vegetation, with certain "minimum clearances"; and (ii) ensure

11  that that "[a]ll lines and portions of lines shall be maintained in such condition as to provide

12  safety factors not less than those specified in Rule 44.3," which in turn prohibits the use of poles,

13  towers and structures "with a safety factor less than one."  The regulations also include the

14  requirement under General Order 165 that PG&E "shall conduct inspections of its distribution

15  facilities, as necessary, to ensure reliable, high-quality, and safe operation."  As explained in

16  detail in §VI.A.3(b), as of July 2018, another California safety regulation, CPUC Resolution

17  ESRB-8, also required PG&E to temporarily shut off its power lines when certain dangerous

18  conditions are present that make an area susceptible to wildfires, including high wind speed and

19  low humidity.  On September 27, 2018 PG&E indicated that it had implemented measures in

20  response to ESRB-8.

21       561.  PG&E violated California laws and CPUC regulations with respect to maintaining

22  the Company's equipment, engaging in adequate vegetation management practices and shutting

23  down power when weather conditions warrant such a safety precaution to prevent wildfires.

24       562.  **Federal Regulations**.  PG&E is also required by law to adhere to a number of

25  federal laws and regulations as explained in detail in §VI.A.6.  FERC Electric Reliability

26  Standard FAC-003-4, for example, "requires that trees and other vegetation growing in or

27

28

adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree contact with a transmission line."[152]  PG&E failed to comply with this requirement.

## 2. PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires

563.    On September 9, 2015, the 2015 Butte Fire was started when a tree came into contact with a power line.  The fire, which killed two people, destroyed more than 500 homes and more than 400 other properties and structures, and scorched more than 70,000 acres over 22 days, is described in more detail *supra*.  ¶¶100-102.

564.    Cal Fire, which is authorized to make fire cause and origin determinations for wildfires as explained in §VI.A.4 above, launched an investigation "as part of the initial response to the Butte Fire" at which time its investigators "immediately began working to determine the origin and cause of the fire."[153]

565.    On March 1, 2016, PG&E issued and delivered the notes offered in the March 2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the prospectus supplement filed on February 23, 2016 with the SEC and the final prospectus supplement filed February 24, 2016.

566.    On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the 2015 Butte Fire was caused by PG&E's safety violations, including evidence of negligence. Cal Fire has indicated it would seek $90 million for costs of suppressing the 2015 Butte Fire and PG&E called that estimate reasonable in a May 2, 2016 Form 8-K filing.[154]  Cal Fire also referred its investigation to the two relevant district attorneys for the counties in which the 2015

---

[152]    *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018), https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt/fac-003-4.pdf?csrt=10652948532787038938.

[153]    Press Release, Cal Fire, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016), calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

[154]    *See also* Press Release, CAL FIRE, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016), calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

1    Butte Fire burned.  On June 22, 2017, California Superior Court Judge Allen Sumner found

2    PG&E liable in Inverse Condemnation for damages for the 2015 Butte Fire.[155]

3          567.    Part of the evidence regarding the 2015 Butte Fire includes an internal PG&E

4    May 8, 2008 slide presentation filed in the *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct.

5    Sacramento Cty. Nov. 2, 2018) titled "2008 Utility Offsite Strategy Discussion."  The slide

6    presentation was for a meeting which PG&E's CEO Williams testified in deposition on July 7,

7    2017 that she recalled attending.  It includes a slide which asks, "What is up for debate?" and the

8    response includes among less than ten items, "Safety."  It also asks, "What is not up for debate?"

9    and the response includes "8% EPS growth":



27   ───────────────

     [155]   *Butte Fire Cases*, No. JCCP 4853, Ruling on Submitted Matter: Inverse Condemnation

28   Motions (Cal. Super. Ct. Sacramento Cty. June 22, 2017).

568.    Similarly, other evidence indicates that PG&E did not provide adequate resources for safety.  According to the October 15, 2018 deposition testimony of Janaize Markland, filed in the PG&E Criminal Proceedings before Judge Alsup, the director of PG&E's Enterprise and Operational Risk and Insurance Department testified regarding prepared testimony dated May 1, 2015.  According to the prepared testimony referred to in the deposition and Ms. Markland's deposition it was possible to improve tree-related outages "but that would require a level of investment greater than what PG&E is making today."[156]  The prepared testimony went on to indicate "[w]ith limited resources, PG&E cannot do everything and must decide at what point it's okay not to mitigate the risk further.  Tradeoff decisions must be made," which Ms. Markland testified was "a true statement."  She further testified that a tradeoff decision "has to do with at what point can you reduce risk further and at what cost."[157]

569.    Evidence submitted in the *Butte Fire Cases* also includes the depositions of contractors who worked for PG&E and who described incentives PG&E provided to not clear as much vegetation as was required for safety purposes so as to save PG&E money.[158]   For example, Robert Urban was deposed on May 16, 2017 as the person most qualified to testify on behalf of a PG&E contractor, ACRT, that worked on PG&E's behalf to, among other services, clear vegetation.  According to Mr. Urban's testimony, PG&E paid its contractors bonuses if they identified and cleared fewer trees as well as other vegetation, incentivizing contractors to clear less vegetation than is safe:

> Q. And under the VMII [bonus] program – correct me if I'm wrong – the way it was set up is if ACRT listed fewer trees than the target number and it ended up fewer trees than the target number were worked, there would be a bonus provided ACRT met certain other metrics; right?
>
> Urban: That is correct.

---

[156] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1; PG&E Response to Request for Information, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[157] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings, (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1.

[158] *See generally* Declaration of Kristine K. Meredith , *Butte Fire Cases*, No. JCCP 4853, (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018).

Q. All right. And if ACRT met those certain other metrics, then there would be an amount per tree not worked that would be paid to ACRT; true?

Urban: There would be an incentive paid for trees that came – for unit count that came in under target. That is correct.

\*       \*       \*

Q. So for every tree underneath – or every tree less than the VMII target, assuming the other metrics had been met, ACRT would receive seven bucks per tree; correct?

Urban: That is correct.  Seven bucks per unit.

Q. Okay.  That's right.  Because a unit might be a brush, for example; right?

Urban: It may.

\*       \*       \*

Q. Did you ever harbor that belief yourself that, hey, this bonus system kind of incentivizes my people to not do their job?

Urban: That is a concern.

570.    Additional evidence regarding PG&E's insufficient safety practices includes PG&E quality assurance audits of the Jackson District where the 2015 Butte Fire occurred. Those audits showed a trend from 2012 through 2015 of an extremely high concentration of potentially hazardous non-compliant trees in that District.  For example, PG&E conducted an audit in the summer of 2015 (June 8, 2015 to July 10, 2015) which identified in a sample of 48.71 line miles, 15 non-compliant trees, 87% of those trees were in the Jackson District.

571.    PG&E employee Kelly O'Flinn, deposed on November 3, 2016 pursuant to the *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento Cty. Jan. 17, 2019), was asked about the same audit and incidence of noncompliant trees in Jackson.  O'Flinn confirmed that the vegetation issues were a negative trend affecting PG&E:

Q: There is a paragraph there [in the audit] that says, "Regulatory compliance has declined slightly for the last three consecutive SRA audits and fallen below 99.50 percent for the first time since 2009."  . . . Would you consider that to be a trend?

O'Flinn: I would say, yes, it's a trend.

Q: And that is a trend in the wrong direction, right?

\* \* \*

O'Flinn: Slight – slight downward trend. [159]

572.   On December 1, 2016, PG&E issued and delivered the notes offered in the December 2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the prospectus supplement filed with the SEC on November 28, 2016, and final prospectus supplement filed November 29, 2016.

573.   And on March 10, 2017, PG&E issued and delivered the notes offered in the March 2017 Notes Offering.  The notes were offered pursuant to the Registration Statement filed with the SEC on January 4, 2017 (and as amended on January 19, 2017), and the prospectus supplement and final prospectus supplement filed with the SEC March 7 and March 8, 2017, respectively.

574.   Then, in October 2017, a series of devastating fires, which became known as the North Bay Fires, ravaged at least 245,000 acres of land and killed 44 people.  At the time, the fires were the most destructive in California history and are responsible for billions in damages.

575.   Many sources pointed to the cause of the deadly North Bay Fires.  According to a report from NBC reporter Jaxon Van Derbeken published on November 6, 2017, a month after the North Bay Fires began, PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line clearance standards and "cheated" when too many violations were found:

> **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards, NBC Bay Area has learned.**
>
> \* \* \*
>
> . . .[I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.
>
> \* \* \*

---

[159] *Butte Fire Cases*, No. JCCP 4853, Exhibit G to the Declaration of Kristine K. Meredith, at 45:12-24 (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018); *see also* at 124:3-12.

> . . .When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . **the company just expanded the universe of trees covered in a particular audit.**
>
> "So what PG&E does when it doesn't pass, it basically cheats," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte Fire] said.  "It adds more miles and more miles until it reaches a passing grade."

576.  Shortly thereafter, in a press release on December 20, 2017, PG&E announced that its "Board of Directors has determined to suspend the quarterly cash dividend on the Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires."

577.  With respect to the wildfires, on January 3, 2018, State Senator Jerry Hill was quoted by NBC as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers – a type of "smart" switch that can automatically turn power back on – in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that they misled us in that.
>
> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was – and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

578.  On April 2, 2018, PG&E filed with the SEC the registration statement for the April 2018 Notes Offering.  On April 13, 2018, PG&E filed the prospectus for the offering.  The exchange offer under the April 2018 Notes Offering ran until 5pm ET on May 14, 2018.

579.  On May 25, 2018, Cal Fire issued a press release announcing the results of its investigation into four of the North Bay Fires.  The agency found that **all four had begun as a result of downed vegetation disrupting PG&E power lines, and that three of the four were due to PG&E's apparent violations of California safety regulations** regarding the necessary

1    clearance between trees and power lines.  The violations were of such a nature that Cal Fire

2    referred these incidents to the appropriate district attorneys' offices for further review.

3         580.     Less than a month later, on June 8, 2018, Cal Fire issued a press release

4    announcing the results of its investigation into 12 additional wildfires that occurred during the

5    North Bay Fires.  The agency determined that **all 12 wildfires were caused by PG&E**

6    **equipment**.  The agency also stated that eight of the 12 had been referred to the appropriate

7    district attorneys' offices for further review "due to evidence of alleged violations of state law."

8         581.     The next day, on June 9, 2018, *Bloomberg* published an article titled "PG&E May

9    Face Criminal Charges After Probe of Deadly Wildfires."  The article stated that PG&E was

10    exposed to potential criminal liability due to Cal Fire's finding that PG&E's failure to follow the

11    law had led to a majority of the North Bay Fires investigated to date.

12         582.     On June 10, 2018, analysts at Guggenheim issued a research report on PG&E that

13    recommended investors sell PG&E securities.  The report stated: "At this point, we question

14    whether the applicability of inverse condemnation even matters when **all signs seem to point to**

15    **PCG being imprudent operators in the majority of instances, which would therefore mean**

16    **it should assume liability."**

17         583.     On June 21, 2018, PG&E announced that it would take an estimated pre-tax

18    charge in the amount of *2.5 billion* for the quarter ending June 30, 2018, for claims related to

19    the North Bay Fires.

20         584.     On October 9, 2018, Cal Fire issued a press release announcing the results of its

21    investigation into the Cascade Fire, part of the North Bay Fires.  Again, PG&E equipment was

22    found to be the cause of the fire.

23         585.     PG&E's admitted exposure for the North Bay Fires continued to increase.  On

24    February 28, 2019, PG&E issued a press release indicating the Company was taking an

25    additional $1 billion charge for the quarter ending December 31, 2018 for the North Bay Fires.

26    Accordingly, a total of $3.5 billion in charges for the North Bay Fires had been taken to date.

27         586.     By the time PG&E filed its quarterly report on Form 10-Q on May 2, 2019,

28    PG&E would report that "Cal Fire has issued its determination on the causes of 19 of the 2017

Case 19-30088   Doc# 14289-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 580 of 1229

1   Northern California wildfires, and alleged that all of these fires, with the exception of the Tubbs

2   fire, involved [PG&E's] equipment.  Cal Fire has not publicly announced any determination of

3   cause on the remaining wildfires."  PG&E has also indicated in this latest Form 10-Q, filed with

4   the SEC on May 2, 2019, that "[i]n light of the current state of the law on inverse condemnation

5   and the information currently available to the Utility, including, among other things, the Cal Fire

6   determinations of cause as stated in Cal Fire's press releases and their released reports, PG&E

7   Corporation and the Utility have determined that it is probable they will incur a loss for claims in

8   connection with 17 of the 2017 Northern California wildfires."

9       587.    Following the North Bay Fires, on November 8, 2018, the Camp Fire began near

10   the town of Paradise, Butte County.  The fire would grow to surpass the North Bay Fires – **which**

11   **PG&E equipment had played a central role in igniting nearly all only one year previously**.

12   The 2018 Camp Fire is the most destructive and fatal wildfire in California history.  The fire

13   burned 153,336 acres, caused at least 85 fatalities, with total damages estimated on the low-end

14   at $16.5 billion.  The fire was considered the costliest natural disaster in the world in 2018.

15       588.    Cal Fire, as it did with the 2015 Butte Fire and North Bay Fires, conducted an

16   investigation.  PG&E equipment was implicated as the cause of the Camp Fire. Specifically, Cal

17   Fire identified the location of the fire as near a PG&E transmission line, which the Company

18   revealed in a December 11, 2018 electric incident report had relayed and de-energized shortly

19   before the fire began.  A PG&E employee also reported a fire in the vicinity of the transmission

20   line to 911 the morning the Camp Fire started, and an aerial patrol identified a suspension

21   insulator supporting a transposition jump at the transmission tower that had separated.

22       589.    On November 13, 2018, PG&E filed a report on Form 8-K with the SEC stating

23   that PG&E had submitted an electric incident report to the CPUC suggesting that PG&E's

24   equipment was at fault for the Camp Fire, and that PG&E had significantly increased their

25   liability insurance, as follows:

26           The cause of the Camp Fire is under investigation.  On November
          8, 2018, the Utility submitted an electric incident report to the

27           California Public Utilities Commission (the "CPUC") indicating
          that "on November 8, 2018 at approximately 0615 hours, PG&E

28           experienced an outage on the Caribou-Palermo 115 kV

Transmission line in Butte County.  **In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line**, approximately one mile north-east of the town of Pulga, in the area of the Camp Fire. This information is preliminary."  Also on November 8, 2018, acting governor Gavin Newsom issued an emergency proclamation for Butte County, due to the effect of the Camp Fire.

As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019.

590.    PG&E has also acknowledged (¶190) that another ignition point for the Camp Fire had exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.  At times approximately 30 minutes apart, vegetation underneath the lines ignited at two ignition points.  At the same time, despite PG&E's ESRB-8 Shutoff Protocol, PG&E had canceled plans to shut off power as a precaution against fires in parts of Butte County, where the fire ignited.  Additionally, media reports (¶375) have indicated that a PG&E crew was planning to address sparking transmission lines in a location near the origin of the Camp Fire.

591.    On November 14, 2018, *Reuters* published an article describing the market's reaction to the news about PG&E's liability for wildfires, titled "UPDATE 3-PG&E shares and bonds plunge as California wildfire risks mount."[160]

592.    On November 15, 2018, Moody's downgraded PG&E's debt.  As *Bloomberg* described in a November 15, 2018 article titled "PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk":

PG&E Corp.'s credit rating was cut to the brink of junk amid doubt about its ability to manage liabilities from the California wildfires.

Moody's Investors Service lowered the rating to Baa3 from Baa2, the second-lowest level of investment grade, with the possibility of

---

[160]   Dan Burns, *UPDATE 3-PG&E Shares and Bonds Plunge as California Wildfire Risks Mount*, Reuters (Nov. 14, 2018), https://www.reuters.com/article/california-wildfires-pge/update-3-pge-shares-and-bonds-plunge-as-california-wildfire-risks-mount-idUSL2N1XP0UP.

further downgrade, according to a statement. PG&E's grade reflects an exposure of about $10 billion to the 2017 wildfires, and uncertainty around 2018 liabilities, said Moody's, which also reduced the utility's Pacific Gas & Electric Co. subsidiary to Baa2.

"**The rating downgrade reflects the material exposure to new potential liabilities associated with the Camp Fire** and the uncertainties associated with how the fire-related liabilities will be recovered," Moody's analyst Jeff Cassella said in the statement.

California's biggest utility said this week it exhausted its credit facilities to boost cash, a move that was widely seen to be in anticipation of a credit rating downgrade, and raising concerns it may have to eventually file for bankruptcy.

593.    On November 27, 2018, Judge Alsup ordered PG&E to provide written answers to several questions regarding the Company's role in starting the Camp Fire and any other fires in the last three years.[161]  Judge Alsup is presiding over PG&E's probation proceedings following its 2016 conviction related to the explosion of a PG&E gas pipeline in San Bruno, California, that killed eight people and destroyed 38 homes.

594.    Despite the 2015 Butte Fire and North Bay Fires, on December 10, 2018, *The San Diego Union-Tribune* reported that PG&E had never produced a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted.  Under California Senate Bill 1028 ("SB 1028") – enacted in September 2016 – PG&E and other California utilities were required to produce an annual report detailing efforts to limit the risks from wildfires and specifying who was responsible for implementing safety provisions in the plans.  State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: **"They have done absolutely nothing in those two years."**  In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in the Fall of 2018 in order to force California utilities to develop and submit their wildfire mitigation plans no later than February 2019.  According to a submission of

---

[161] *See* Notice re California Wilfires, PG&E Criminal Proceedings (N.D. Cal. Nov. 27, 2018), ECF No. 951.

1   the CPUC in the probation proceedings pending before Judge Alsup, on February 6, 2019,

2   PG&E finally submitted said plan.[162]

3       595.    In addition to not producing a plan for wildfire mitigation risks, PG&E is alleged

4   to have falsified safety data and records for five years. As PG&E noted in a press release, filed

5   on January 14, 2019 with the SEC on a Form 8-K, the CPUC announced on December 14, 2018

6   that it had opened a case against PG&E for allegedly falsifying its data and safety records.

7   While the documented violations related to the intentional falsification of pipeline data, the

8   agency stated that the findings were an example of why it was "investigating PG&E's safety

9   culture" and considering the forced implementation of measures that "address systemic safety

10  issues at PG&E." In other words, according to the CPUC, the Company's falsification of

11  pipeline safety data implicated the Company's entire operations and approach to safety.

12  According to the CPUC's annual report for 2018, PG&E falsified records from 2012 through

13  2017.[163]

14      596.    Thereafter, on December 21, 2018, the CPUC issued a Scoping Memo and Ruling

15  (the "Ruling") regarding its efforts to reform PG&E's corporate safety culture. The Ruling

16  found that "PG&E has had serious safety problems with both its gas and electric operations for

17  many years" and stated that, despite these shortcomings, **the Company had failed "to develop a**

18  **comprehensive enterprise-wide approach to address safety**." The Ruling stated that the

19  CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were

20  **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

21      597.    On December 28, 2018, the Attorney General of California filed an amicus brief

22  in connection with PG&E's probation proceedings before Judge Alsup. The brief stated that

23  PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was

24

---

25     [162] Comments of the CPUC in Response to Second Order to Show Cause at 1, PG&E
    Criminal Proceedings (N.D. Cal. Mar. 22, 2019), ECF No. 1033.

26     [163] *See* CPUC 2018 Annual Report at 9,
    http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/

27  Divisions/Office_of_Governmental_Affairs/Legislation/2019/CPUC%20Annual%20Report%20

28  2019%20-%20page%20view%20only.pdf.

1   found to be "reckless" in causing California wildfires.[164]  The listed potential offenses ranged

2   from misdemeanors to implied-malice murder.

3       598.   On January 9, 2019, in PG&E's probation proceedings before Judge Alsup, a U.S.

4   probation officer filed a Petition for Summons for Offender Under Supervision, which: (i) found

5   "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their

6   Probation" stemming from the San Bruno pipeline explosion;[165] (ii) cited the Company's failure

7   to report the investigation by the Butte County District Attorney's Office into PG&E's role in

8   starting several fires that formed part of the North Bay Fires; and (iii) cited PG&E's failure to

9   report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that

10  there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire,

11  or that the Company had entered into a settlement agreement with Butte County to avoid such

12  criminal prosecution.

13      599.   On January 9, 2019, Judge Alsup also issued an order to show cause as to why the

14  terms of PG&E's probation should not be modified "[i]n order to protect the public from further

15  wrongs by the offender, to deter similar wrongs by other utilities, and to promote the

16  rehabilitation of the offender."[166]  The order cited Cal Fire's finding that **PG&E had caused 18

17  wildfires in 2017, 12 of which it had referred to criminal prosecution**, and suggested the

18  Company significantly bolster its vegetation management activities and re-inspect its entire

19  electrical grid in "light of PG&E's history of falsification of inspection reports," among other

20  proposed modifications to the terms of the Company's probation.[167]

21

22

---

23  [164] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E
Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

24  [165] Petition for Summons for Offender Under Supervision at 4, PG&E Criminal Proceedings
25  (N.D. Cal. Dec. 28, 2018), ECF No. 960.

26  [166] Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 1,
PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 961.

27  [167] PG&E has been found responsible by Cal Fire for at least *18 of the 19 major fires*
stemming from the 2017 Northern California wildfires that Cal Fire had investigated up until that
28  point.  Only the Tubbs Fire had not been found to have been PG&E's fault.

600.    On January 13, 2019, *The Wall Street Journal* reported that PG&E had **started more than 1,500 fires** between June 2014 and December 2017, or more than one a day on average.[168] The newspaper provided the following graphic, which illustrates the shocking extent of PG&E's contribution to fires throughout California with incidents reported across essentially *all* of the Utility's service area:



---

[168] Russell Gold et al., *PG&E Sparked at Least 1,500 California Fires. Now the Utility Faces Collapse*, Wall Street J. (Jan. 13, 2019), https://www.wsj.com/articles/pg-e-sparked-at-least-1-500-california-fires-now-the-utility-faces-collapse-11547410768.

601.     On January 14, 2019, PG&E filed with the SEC a report on Form 8-K stating that the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the Company provided for the expected bankruptcy filing was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018."

602.     On January 15, 2019, *MarketWatch* reported in an article titled "PG&E's slide into bankruptcy would mark third largest investment-grade default since 1998,"[169] that PG&E faced a significant risk of defaulting on its bonds:

> If Pacific Gas & Electric Co. follows through with its bankruptcy announcement, the country's largest utility would record the third largest default in the U.S. investment-grade corporate bond market since 1998.
>
> PG&E announced it would file for bankruptcy by Jan. 29 after devastating California wildfires in 2017 and 2018 left it facing billions in potential liabilities.  The company also said it would not pay an interest payment due on bonds maturing in 2040 on Wednesday, which would also trigger a default.
>
> *          *          *
>
> PG&E's bankruptcy would mark a dramatic collapse for a company that was once seen as an attractive bet among hedge funds.  More than $17 billion of its bonds would be facing default, according to analysts at Bank of America Merrill Lynch.
>
> *          *          *
>
> In terms of sheer scale of a default from an investment-grade issuer, BAML found only Lehman Bros. and WorldCom would rank above the PG&E.

603.     On January 17, 2019, Judge Alsup issued a request for comment on his tentative finding that "**the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines to trees or limbs falling onto them during high-wind events.**"

---

[169] Sunny Oh, *PG&E's Slide Into Bankruptcy Would Mark Third Largest Investment-Grade Default Since 1998*, MarketWatch (Jan. 15, 2019), https://www.marketwatch.com/story/pges-slide-into-bankruptcy-would-mark-third-largest-investment-grade-default-since-1998-2019-01-15.

604.     On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the North Bay Fires.

605.     On January 30, 2019, Judge Alsup, during a probationary hearing, stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**."[170] Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual.  Kill more people by starting more fires'?"  On the subject of whether PG&E had made safety a priority, Judge Alsup reportedly stated: "**[I]t's not really true. Safety is not your number one thing**."

606.     On February 6, 2019, PG&E finally filed a wildfire mitigation plan as required by SB 901.  PG&E's wildfire plan stated that the Company would significantly expand its public-safety power shutoff program, from about 570,000 affected consumers to as many as 5.4 million customers, substantially increase its tree-clearing practices, beef up inspections of its equipment and install more weather stations and cameras for earlier risk detection.

607.     Accordingly, the expanded scope of PG&E's 2019 wildfire plan further demonstrates the inadequacy of PG&E's prior safety practices and investment in safety, showing that PG&E did far less than it should have previously done.

608.     Similarly, the 2019 wildfire mitigation plan provided for more $2 billion in new expenditures and significant increases in inspections and other measures over what PG&E had done in 2018.  Those new measures included the following:

- remove 375,000 trees in 2019, after cutting down 160,000 in 2018;

- 2,450 miles of Enhanced Vegetation Management in 2019, a 320% increase from the 760 miles of assorted related practices in 2018;

- increase enhanced transmission structure inspections from 9,400 in 2018 to 40,600 in 2019; and

---

[170] Transcript of Proceedings at 12-13, 24, PG&E Criminal Proceedings (N.D. Cal. Jan. 31, 2019), ECF No. 999.

- enhanced inspections of 685,000 distribution poles, including climbing of all transmission towers, after making 517,500 routine inspections of distribution poles in 2018.

609.    Following the plan's release, the *Associated Press* summarized the general reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?" However, at the hearing on the second order to show cause in PG&E's probation proceedings before Judge Alsup, counsel for PG&E stated that the plan was not final.  He explained, "the wildfire mitigation plan is still in the process of being reviewed and there isn't a final one . . . that plan is still in flux."[171]

610.    Also on February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[172]  The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers.  For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and miles of distribution lines, **PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017** as self-reported to the CPUC.  In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period.  Put differently, PG&E's equipment caused **4.5 times more wildfires** than SoCalEd.  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas &

---

[171] Transcript of Proceedings at 10, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047. To date, PG&E has filed two amended plans, on February 12, 2019 and April 25, 2019.

[172] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

1   Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 acres.  By

2   contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning

3   over 10 acres.

4   611.   On February 11, 2019, PG&E issued a press release stating that it would be

5   replacing the majority of its Board.  As of today, only two Board members out of 13 have not

6   been replaced.  This announcement followed the departure of several Company executives,

7   including PG&E's CEO defendant Williams and three senior executives in PG&E's electric

8   division.  The release acknowledged "that **PG&E must re-earn trust and credibility** with its

9   customers, regulators, the communities it serves and all of its stakeholders . . . ."

10   612.   On February 27, 2019, *The Wall Street Journal* published an article titled, "PG&E

11   Delayed Safety Work on Power Line That Is Prime Suspect in California Wildfire."  The article

12   stated that the Company had delayed for several years needed repairs to its high-voltage Caribou-

13   Palermo transmission line, the likely source of the Camp Fire.  PG&E had failed to fix the **100-**

14   **year old line** despite informing federal regulators of its plans to repair and replace damaged

15   sections of the line as early as 2013.  Similarly, in a July 2017 federal filing, PG&E proposed

16   overhauling the line, noting that more than **one in four wire spans between towers were too**

17   **close to vegetation**.  The plan involved swapping 61 lattice towers with modern tubular-steel

18   poles, and replacing wire and hardware connecting it to the towers.  But PG&E never began the

19   work.  The article also detailed PG&E's antiquated safety monitoring procedures and lack of

20   transparency in transmission line spending.  According to the article, "An internal PG&E audit

21   from 2013 found that the company focused mainly on spending its allotted budget, not ensuring

22   expenditures were prudent and effective, and that it lacked performance data and other records

23   for many projects."

24   613.   Also on February 26, 2019, *The Mercury News* published an article titled, "PG&E

25   knew for years that repairs were needed on transmission lines in area of fatal Camp Fire."

26   According to the article, energy officials had been warning PG&E about its fast-aging system of

27   transmission lines for the better part of a decade.  For example, according to a May 2017 CPUC

28   filing, "In 2010 and again in 2015, the California Independent System Operator transmission

1    plan identified the need to improve and upgrade this system to address potential overloads and

2    power outages that would affect customers in the service area."

3         614.    PG&E likewise stated in a July 2017 filing to FERC that it would embark on

4    numerous repairs of the Caribou-Palermo system.  The planned repairs and maintenance

5    included new tower frames, steel poles, improved line tension and hardware upgrades.  As

6    PG&E stated in the filing:  "The project has a forecasted capital expenditure of $30.3 million."

7         615.    PG&E also proposed in July 2017 considerable work for the Caribou-Palermo

8    line as part of the Company's annual request to FERC for rate changes.  "The Caribou-Palermo

9    115 kilovolt circuit was analyzed as part of the 2013 NERC Assessment," PG&E stated,

10   referring to an analysis by the North American Electric Reliability Corporation.  The filing

11   indicated the 2013 NERC study determined that well over 100 transmission line spans were

12   perilously close to vegetation or trees.  "The completed analysis identified 127 spans with

13   clearance issues out of the 455 spans on the electric transmission line," PG&E stated in its 2017

14   FERC filing.  PG&E never fixed the identified issues from the time it learned about them in 2013

15   as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system would later

16   be implicated in the 2018 Camp Fire.

17        616.    On February 28, 2019, PG&E issued a press release providing an update on the

18   financial impact of the Camp Fire and the North Bay Fires, along with the Company's fourth

19   quarter and full-year 2018 financial results.  The release stated that PG&E "believes it is

20   probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire."  It

21   also stated that the Company would be taking a *10.5 billion charge* related to the Camp Fire.

22   As set forth in ¶¶583 & 585, the Company also stated that it expected a $1 billion charge related

23   to the North Bay Fires, which was on top of the prior $2.5 billion charge that the Company had

24   previously taken in connection with the fires.  According to the Company, primarily due to the

25   large number of third-party claims against PG&E, the Company reported full-year **net losses of**

26   **$6.9 billion**, compared to 2017 net income of $1.6 billion.  As a result of the "extraordinary

27   challenges" caused by the wildfires, the release stated that PG&E **may not be able to continue**

28   **as a going concern**.

617.    On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[173]  In the order, Judge Alsup found that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions" and had now "**led to recurring deadly wildfires caused by its electrical system**."

618.    Judge Alsup's order noted that in its submissions, PG&E had made several **admissions** including that: (i) vegetation contact was the primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) PG&E agreed "that vegetation presents an acute risk of wildfire ignition across PG&E's service territory"; (iii) in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; (iv) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of such fires; (v) as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle"; and (vi) the Company believed its equipment caused the Camp Fire.

619.    Judge Alsup further found that **the "record demonstrates that PG&E's performance with respect to vegetation management has been dismal**."  As a result, the court modified the terms of PG&E's probation to require it to comply with state laws regarding vegetation management and its wildfire prevention plan, among other remedial measures, and suspended PG&E's dividend until it could demonstrate that the Company had complied with the modified probation terms.

620.    On March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal PG&E emails demonstrating that PG&E had identified the transmission lines

---

[173] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

1   implicated in the Camp Fire as unsafe long before the fire started.[174]  For example, **internal**

2   **Company documents showed that in December 2012 five aging towers along the Caribou-**

3   **Palermo transmission line had collapsed, and a 2014 internal Company email stated that**

4   **"the likelihood of failed structures happening is high**."  Similarly, a November 1, 2016 PG&E

5   document detailed the failure of necessary hardware along the transmission line, with a support

6   hook snapping off during routine painting.  PG&E documents internally acknowledged that the

7   supports "had been compromised through corrosion."[175]  Despite the internal acknowledgment

8   that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse,

9   PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not

10  impact a sufficient number of customers to warrant the repairs and that the risks would be

11  mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never

12  undertaken, and **the Caribou-Palermo line became the devastating source of the Camp Fire**

13  later that year.

14          621.    Also on March 18, 2019, *The New York Times* published an exposé on PG&E

15  titled, "How PG&E Ignored California Fire Risks in Favor of Profits."  The article portrayed a

16  corporate culture at PG&E which disregarded safety risks and neglected necessary fire

17  prevention precautions in favor of short-term operating results.  For example, an internal PG&E

18  email had noted that the transmission tower implicated in the Camp Fire, tower 27/222, was at

19  risk of collapse long before the blaze was ignited.  The Company's own guidelines also warned

20  that **the tower was a quarter-century past its useful life**, yet PG&E did not repair or replace

21  the aging tower.  The article quoted Mike Florio, a former California utilities commissioner, who

22  observed, "There was very much a focus on the bottom line over everything [at PG&E]: 'What

23  are the earnings we can report this quarter? . . . And **things really got squeezed on the**

24  **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

---

[174]*Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019), https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

[175]*Id.*

1   expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

2   **again, lying, manipulating or misleading the public. . .  They cannot be trusted.**"  The article

3   contrasted the lack of safety focus at the Company with the approach taken by another California

4   utility facing similar risks, SDG&E, that had significantly revamped its safety protocols to

5   respond to increased wildfire dangers.  According to one industry expert quoted in the article, if

6   PG&E had followed the lead of SDG&E its equipment would have caused far fewer destructive

7   fires.  This expert concluded that "**[PG&E's] culture of a lack of safety is unique**" amongst

8   utilities.

9        622.    On April 2, 2019, Judge Alsup held a hearing on his second order to show cause

10  in PG&E's probation proceedings.  At the hearing, Judge Alsup stated: **"PG&E over several**

11  **years allowed the trees that needed to be removed to be built up and did not remove them**,

12  did not trim them so that we wound up with a large number of trees that should have been

13  removed by PG&E but weren't.  And that was a major contributing factor, maybe the single-

14  biggest factor, in causing the fires in 2017 and 2018 in Northern California." [176]  Judge Alsup

15  also explained "as we've gotten into the evidence, and I've studied quite a lot of it, again I want

16  to say it's quite clear that PG&E pumped out $4.5 billion in the last five years in dividends and

17  **let the tree budget wither so that a lot of trees that should have been taken down were not."**

18  As Judge Alsup concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and

19  **PG&E is the single-most culpable entity in the mix**. . . .  PG&E has started more than – way

20  more than its share of these fires. . .  This is a problem of your own making.  A lot of money

21  went out in dividends that should have gone to the tree budget."

22       623.    On April 12, 2019, *NBC Bay Area* published an article titled "PG&E Inspectors

23  Find Hundreds of Safety Issues on Electrical Towers."  The article indicated that "PG&E's

---

[176] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 4, 2019),
ECF No. 1047.

1  inspections of thousands of transmission towers since the deadly Camp Fire in Butte County

2  found more than 450 safety violations, including 59 that posed serious safety hazards."[177]

3    624. On May 2, 2019, PG&E filed its Q1 2019 Form 10-Q with the SEC wherein,

4  PG&E reinforced that "PG&E Corporation and the Utility are facing extraordinary challenges

5  relating to a series of catastrophic wildfires that occurred in Northern California in 2017 and

6  2018. . . .  Uncertainty regarding these matters raises substantial doubt about PG&E

7  Corporation's and the Utility's abilities to continue as going concerns."

8    625. According to PG&E's Q1 2019 Form 10-Q, it estimates that its liabilities for

9  wildfire-related claims remains at over $14.2 billion, including the 2015 Butte Fire ($212

10  million), the North Bay Fires ($3.5 billion) and the Camp Fire ($10.5 billion).  These estimated

11  liabilities do not include liabilities for the Camp Fire or North Bay Fires for, among other things,

12  "potential penalties or fines that may be imposed by governmental entities on PG&E Corporation

13  or the Utility, or punitive damages, if any, or any losses related to future claims for damages that

14  have not manifested yet, each of which could be significant."  As reported in the same Form 10-

15  Q, PG&E's "liability could exceed $30 billion" if it were found to be liable for the Camp Fire

16  and the North Bay Fires.

17    626. PG&E also remains subject to criminal liability.  According to PG&E's Q1 2019

18  Form 10-Q, the Butte County District Attorney's Office and the California Attorney General are

19  investigating the Camp Fire and that a grand jury has been empaneled in Butte County.

20    627. PG&E also reported in its Q1 2019 Form 10-Q that its operating and maintenance

21  expenses had increased by $443 million, or 35%, over the same quarter the prior year "primarily

22  due to $210 million related to enhanced and accelerated inspections and repairs of transmission

23  and distribution assets and $179 million for clean-up and repair costs relating to the 2018 Camp

24  Fire."

25

26

27   [177] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

28

628.     On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's violation of probation.  When speaking to PG&E's new CEO Johnson he noted that PG&E "admitted that it started 17 of those fires in 2017 just in the Wine Country."[178]  He further exclaimed that here in California "We have six to seven months of no rain.  And **you can't blame it on global warming** because I have been here a long time and it's been that way every summer."  During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "no one has started more fires than PG&E."

629.     On May 15, 2019, Cal Fire issued a release finding PG&E at fault for the Camp Fire: "[a]fter a very meticulous and thorough investigation, Cal Fire has determined that **the Camp Fire was caused by electrical transmission lines owned and operated by [PG&E]** located in the Pulga area."  As to the second ignition site of the Camp Fire Cal Fire found: **"[t]he cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E."**  PG&E issued a press release the following day accepting the determination that PG&E electrical lines located near Pulga were a cause of the Camp Fire.  On May 22, 2019, PG&E acknowledged in a Schedule 14A filing with the SEC that "[t]he tragic wildfires of the past two years have been extraordinarily challenging, and have made clear that the energy status quo is no longer working for California."

## XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS

630.     Each of PG&E's Prospectuses filed on February 24, 2016, November 29, 2016, March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration statement (hereinafter, "Offering Documents"), as well as a number of other PG&E filings and reports including the following:

---

[178] Transcript of Proceedings at 11, PG&E Criminal Proceedings (N.D. Cal. May 7, 2019), ECF No. 1061.

1           (a)       The February 24, 2016 Offering Documents for the March 2016 Notes

2  Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with

3  the SEC on February 18, 2016;

4           (b)       The November 29, 2016 Offering Documents for the December 2016

5  Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed

6  with the SEC on February 18, 2016;

7           (c)       The March 8, 2017 Offering Documents for the March 2017 Notes

8  Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with

9  the SEC on February 18, 2016; Annual Report on Form 10-K for FY16 filed with the SEC on

10  February 16, 2017; and Press release, filed on Form 8-K with the SEC on May 23, 2016; and

11           (d)       The April 13, 2018 Offering Documents for the April 2018 Notes Offering

12  incorporated by reference PG&E's: Annual Report on Form 10-K for FY17 filed with the SEC

13  on February 9, 2018.

14       631.   The statements in or incorporated by the Offering Documents alleged to be

15  materially false and/or misleading for purposes of the Securities Act Claims alleged herein are

16  set out in Exhibit A attached hereto.[179]

17     **A.**     **The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance**

18

19       632.   The Offering Documents, including the documents incorporated by reference

20  therein, omitted material adverse information from investors regarding PG&E's deficient safety

21  practices and policies while simultaneously falsely assuring investors that PG&E complied with

22  safety laws and regulations, sufficiently invested in safety, and provided for public safety by

23  clearing vegetation around its equipment, updating equipment, and inspecting its equipment.  In

24  contrast to what investors were led to believe in the Offering Documents, PG&E's "unsafe

25

26        [179] For purposes of this complaint not all of the statements alleged to be materially false and misleading are set forth in the text of the complaint as many are repetitive and are false and

27  misleading for the same reasons as nearly identical statements.  They are however, alleged in Exhibit A and incorporated by reference herein.  References to Exhibit A are referred to herein

28  as "Ex. A."

conduct" led to deadly wildfires and "PG&E's performance with respect to vegetation management has been dismal." Nor had PG&E expended sufficient resources to reasonably prevent wildfires.

### 1. The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices

633. Each of the Offering Documents referenced risk factors, including warnings that droughts, climate change, wildfires and other events ***could*** cause a material impact on PG&E's financial results. These statements were materially misleading because they did not disclose the already existing negative impact on PG&E as a result of PG&E's subpar safety practices that caused wildfires resulting in death, destruction and liability. PG&E faces more than $30 billion in potential liability and has filed bankruptcy as a result. Cal Fire has found PG&E caused wildfires in 2015, 2017 and 2018.

634. The Offering Documents for each of the Notes Offerings did not disclose the true existing risks facing PG&E as a result of its deficient safety practices and policies, including the extent of the risks or that they had already come to fruition. For example, the prospectus filed on February 24, 2016, pursuant to the March 2016 Notes Offering, stated:

> Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include*** . . .
>
>        \*       \*       \*
>
> - ***the impact of droughts or other weather-related conditions or events, wildfires (including the Butte fire in September 2015***, which affected portions of Amador and Calaveras counties), ***climate change***, natural disasters, acts of terrorism, war, or vandalism (including cyber-attacks), ***and other events***, that can cause unplanned outages, reduce generating output, disrupt the our [sic] service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by us, our customers, or third parties on which we rely; ***whether we incur liability to third parties for property damage or personal injury caused by such events; and whether the we [sic] are subject to civil, criminal, or regulatory penalties in connection with such events***. See Ex. A, Stmt. No. 1.

635.   The Offering Documents for the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering each repeated in substantially similar language the same purported warning.  *See* Ex. A, Stmt. Nos. 10-11, 20.  So too did the FY15 Form 10-K, FY16 Form 10-K, and FY17 Form 10-K.  *See* Ex. A, Stmt. Nos. 2, 23, 24.

636.   Similarly, PG&E's annual report for FY17 filed with the SEC on Form 10-K incorporated by the Offering Documents for the April 2018 Notes Offering misleadingly purported to warn that:

> ***Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.***
>
> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California.  Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events.  ***In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage.  In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors.***  Other contributing factors include local land use policies and historical forestry management practices.  The combined effects of extreme weather and climate change also impact this risk.  *See* Ex. A, Stmt. No. 26.

637.   In addition, each of the Company's Forms 10-K referenced by the Offering Documents also represented climate change as a risk to the Company's financial condition while omitting the real risks stemming from PG&E's woefully inadequate safety practices.  For example, the "Risk Factors" section of PG&E's FY15 and FY16 annual reports on Forms 10-K purported to warn that "***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows***," and that climate change could "***increase the occurrence of wildfires***."  Ex. A, Stmt.  Nos. 5, 13.

638.    The same FY15 and FY16 Forms 10-K, along with PG&E's FY17 Form 10-K, went on to falsely reassure investors, in substantially similar language, that PG&E had studied climate change but omitted the negative impact and risk of PG&E's safety violations and deficient safety practices:

> The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant.  Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather.  Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains.  If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost.
>
> If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits.  **In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life**.  In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets.  **The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries**.  The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.  *See* Ex. A, Stmt. Nos. 6, 14, 27.

639.    The foregoing statements in ¶¶634-638 were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E's safety practices were deficient and the Company's deficient safety practices had already caused wildfires.  The Offering Documents' repeatedly represented that: (i) PG&E's financial results could be impacted by weather-related conditions, wildfires, climate change or other events, or that they could incur liability caused by such events; and (ii) the climate change, increasing temperatures, or other events could increase the occurrence of wildfires which could result in substantial costs or

damages.  These representations were contradicted by material adverse facts that existed at the

time of the statements, including, *inter alia*, that:

(a)     PG&E's widespread safety deficiencies and violations had already

increased the risk of wildfires, caused wildfires and liability for those wildfires (*see generally*

§XVII.A.2.);

(b)     PG&E had caused hundreds or thousands of fires across California since

June 2014, averaging more than one fire a day – significantly more than, SoCalEd, for example,

a utility operating under similar conditions and legal and regulatory framework (¶¶600, 610, 628;

*see also* ¶621);

(c)     Rather than weather related events, the real risk of wildfires (and in fact

the cause of many) were a result of PG&E not sufficiently investing in providing its services in a

safe manner.  For example, PG&E's "dismal" vegetation management practices resulted in

wildfires (¶619).  As Judge Alsup  noted, PG&E has admitted that: (i) vegetation contact was the

primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) in 2016 alone,

PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; and

(iii) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with

conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities,

causing 37% of such fires. (¶618). Further, as PG&E Vegetation Program Manager Richard

Yarnell testified, for the entire period from September 2015 to April 10, 2017, "PG&E—to the

best of my knowledge, we have not made any changes" to improve safety. (¶22);

(d)     In addition, PG&E's lax tree clearing practices threatened the safety of

PG&E's operations.   For example, PG&E auditors had given PG&E a passing grade despite too

many trees found to violate state regulations by improperly expanding the area under review to

artificially increase PG&E's compliance rate (¶575).  Similarly, an internal PG&E audit,

conducted in the summer of 2015 revealed a negative trend of non-compliant trees in the same

district in which the Butte Fire started (¶570).  And, as Judge Alsup observed, PG&E has

admitted that as late as June 2017, there remained 3,962 unworked trees which PG&E had

identified in 2016 as hazardous with the potential to "fall into or otherwise impact the

conductors, towers or guy wires before the next inspection cycle" (¶618).  Judge Alsup also indicated that "PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't" which was a contributing factor to the causes of wildfires (¶622);

(e)     PG&E had incentivized its contractors to identify and clear fewer trees and vegetation by paying them for reporting under the target number (¶569);

(f)     Outdated PG&E equipment was not replaced or updated – for example, the Company had never, as planned, addressed dangerously encroaching vegetation by replacing old lattice towers with modern tubular steel poles or replacing wire and hardware connecting those to towers, or updated the 100 year-old Caribou-Palermo transmission line that presented a high likelihood of failure (¶¶612, 620; *see also* ¶613-615).  Likewise, despite assurances in 2015 that the Company would be able to shut down reclosers in high risk fire areas, they did not have the system in place to do so causing wildfires (¶¶577, 606);

(g)     PG&E did not sufficiently invest in wildfire safety.  For example, Judge Alsup observed, PG&E "let the tree budget wither so that a lot of trees that should have been taken down were not" (¶622).  And PG&E internal documents show that tree-related outages could have been reduced if PG&E was willing to invest more (¶¶620-622).  Likewise, safety was up for debate at the Company but not earnings growth (¶¶567, 606);

(h)     At the time of the issuance of each of the Offering Documents, PG&E's warning of weather-related conditions or climate change potentially impacting PG&E did not disclose the then existing risks as a result of the safety violations and deficient practices (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  As Judge Alsup indicated, you can't blame the fires "on global warming because I have been here a long time and it's been that way every summer" (¶628);

(i)     As a result of the extent and nature of PG&E's safety deficiencies and numerous violations, PG&E was unable to prove "it reasonably and prudently operated and managed its system" rendering it liable for the wildfires that it had already caused (¶558);

(j)      At the time of the issuance of the March 2016, December 2016 and March 2017 Notes Offerings' Offering Documents, rather than the risk of wildfires (including the 2015 Butte Fire) potentially impacting PG&E (*see* ¶¶566, 579, 584, 588, 599, 600, 617, 628, 629), the true facts were that PG&E's safety deficiencies and violations caused wildfires.  The Offering Documents failed to disclose the then existing risk to PG&E's financial condition as a result of the Company's widespread safety violations.  For example, the 2015 Butte Fire – which killed two people and destroyed more than 500 homes – was caused by PG&E's safety violations (¶566).  Additionally, the Offering Documents omitted the existing risk of wildfires from the already identified problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely source of the Camp Fire and PG&E's overall dismal vegetation management practices (¶¶619-622).  PG&E's own inspections of transmission towers showed 450 safety violations, with 59 posing a serious safety hazard (¶623).  When speaking on risks relating to wildfires, the Securities Act Defendants did not disclose the extent of PG&E's wildfire inducing safety deficiencies and violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623);  and

(k)      At the time of the issuance of the April 2018 Notes Offerings' Offering Documents, the Securities Act Defendants warned of conditions that could impact PG&E's financial results (¶¶582, 583, 685-686, 601-602, 604, 616, 625; *see also* ¶624; ¶667) without disclosing the then existing widespread safety violations and insufficient safety practices (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  Nor did the Offering Documents disclose what PG&E has now admitted to Judge Alsup– "that it started 17 of those fires in 2017 just in the Wine Country" (¶628).  At the time of the issuance of the Offering Documents for the April 2018 Notes Offering, the Securities Act Defendants' misled investors regarding the then existing risks as a result of adverse facts, including the likelihood of failed structures, use of a transmission tower a quarter-century past its useful life, or the "dismal" vegetation practices of the Company (¶¶619-621).  When speaking on the risks related to wildfires, the Securities Act Defendants did not disclose PG&E's widespread safety lapses and

1   violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

2   623).

3           **2.      The Offering Documents Did Not Disclose PG&E's Investments in,**
                 **Commitment to, and Practices Related to Safety Were Inadequate**

4

5   640.    PG&E's Forms 10-K incorporated by reference in the Offering Documents falsely

6   emphasized PG&E's safety efforts by investing in its energy distribution system, in particular by

7   clearing vegetation to prevent wildfires.  For example, the annual reports for FY15 and FY16

8   filed with the SEC on Forms 10-K incorporated in the Offering Documents for the March 2016,

9   December 2016 and March 2017 Notes Offerings misleadingly stated as follows:

10           With respect to electric operations, climate scientists project that,
sometime in the next several decades, climate change will lead to

11           increased electricity demand due to more extreme, persistent, and
frequent hot weather.  The Utility believes its strategies to reduce

12           GHG emissions through energy efficiency and demand response
programs, infrastructure improvements, and the use of renewable

13           energy and energy storage are effective strategies for adapting to
the expected increase [changes] in demand for electricity.  ***The***

14           ***Utility is making substantial investments to build a more modern***
***and resilient system that can better withstand extreme weather***

15           ***and related emergencies.  The Utility's vegetation management***
***activities also reduce the risk of wildfire impacts on electric*** and

16           gas facilities.  Over the long-term, the Utility also faces the risk of
higher flooding and inundation potential at coastal and low

17           elevation facilities due to sea level rise combined with high tides,
storm runoff and storm surges.  *See* Ex. A, Stmt. Nos. 4, 12.

18   641.    The Company's FY17 Form 10-K, incorporated in the Offering Documents for

19   the April 2018 Notes Offering contained similarly false language:

20           With respect to electric operations, climate scientists project that,
sometime in the next several decades, climate change will lead to

21           increased electricity demand due to more extreme, persistent, and
frequent hot weather.  The Utility believes its strategies to reduce

22           GHG emissions through energy efficiency and demand response
programs, infrastructure improvements, and the use of renewable

23           energy and energy storage are effective strategies for adapting to
the expected changes in demand for electricity.  ***The Utility is***

24           ***making substantial investments to build a more modern and***
***resilient system that can better withstand extreme weather and***

25           ***related emergencies.***  Over the long-term, the Utility also faces the
risk of higher flooding and inundation potential at coastal and low

26           elevation facilities due to sea level rise combined with high tides,
storm runoff and storm surges.  ***As the state continues to face***

27           ***increased risk of wildfire, the Utility's vegetation management***
***activities will continue to play an important role to help reduce***

28           ***the risk of wildfire and its impact on electric and gas facilities.***

194

1    *See* Ex. A, Stmt. No. 29.

2    642.    PG&E's FY15 and FY16 Forms 10-K referenced in the Offering Documents for

3    the March 2016, December 2016 and March 2017 Notes Offerings also misleadingly emphasized

4    that PG&E had developed plans and strategies to mitigate the impact of climate change and

5    respond effectively to emergencies as well as prioritizing infrastructure investments minimizing

6    the real risks PG&E faced with respect to wildfires as a result of dismal safety practices and

7    insufficient funding to prevent wildfires:

> *Climate Change Mitigation and Adaptation Strategies.*  During 2015 [2016], the Utility **continued its programs** to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations.  The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and **wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks**, including extreme storms, heat waves and **wildfires** and **uses its risk-assessment process to prioritize infrastructure investments** for longer-term risks associated with climate change.  The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.  *See* Ex. A, Stmt. Nos. 3, 15.

17   643.    Following the 2017 North Bay Fires, the Company's 2017 Form 10-K

18   incorporated in the Offering Documents for the April 2018 Notes Offering misleadingly

19   represented that PG&E had developed "resilience strategies" to mitigate the impacts of climate

20   change on PG&E:

> *Climate Change Resilience Strategies*
>
> ***During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations***.  The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves, **wildfires**, drought and land subsidence, **to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks, including**

*wildfires*, extreme storms, and heat waves and *uses its risk-assessment process to prioritize infrastructure investments* for longer-term risks associated with climate change.  The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.  *See* Ex. A, Stmt. No. 28.

644.   Similarly, each of PG&E's Forms 10-K incorporated by the Offering Documents also materially misled investors by regarding the safety of its operations emphasizing the Company's upgrades to its equipment.  For example, the Company's FY15, FY16 and FY17 Forms 10-K stated:

At December 31, 2015 [2016; 2017], the Utility owned approximately 18,400 [19,200] circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV.  The Utility also operated 91 [92] electric transmission substations with a capacity of approximately 63,400 [64,600; 64,700] MVA.

*          *          *

*Throughout 2015 [2016; 2017], the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.*  The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability.  The Utility also has taken steps to improve the physical security of its transmission substations and equipment.  *See* Ex. A, Stmt. Nos. 7, 16, 30.

645.   The same electricity distribution passage from each of PG&E's Forms 10-K for FY15, FY16, and FY17 thereafter concluded with the following materially misleading statement, which did not disclose that PG&E did not have adequate systems or policies in place to shut down reclosers to prevent wildfires:

*In 2015 [2016; 2017], the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages.  Another 83 [89; 92] circuits were outfitted with this equipment, bringing the total deployment to 700 [789; 882] of the Utility's 3,200 distribution circuits.  [The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.]*  The Utility plans to *continue* performing work *to improve the reliability and safety of its electricity distribution operations* in 2016 [2017; 2018].  *See* Ex.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 606 of 1229

1           A, Stmt. Nos. 8, 17, 31.

2           646.    In addition, each of PG&E's Forms 10-K incorporated by the Offering

3    Documents materially misled investors by warning that the Company's equipment might fail, a

4    risk falsely described as "beyond the Utility's control."  For example, PG&E's Forms 10-K for

5    FY15 and FY16, as well as PG&E's Form 10-K for FY17, misleadingly purported to warn

6    investors as follows:

7               Utility's ability to safely and reliably operate, maintain, construct
                and decommission its facilities is **subject to numerous risks**, **many**
8               **of which are beyond the Utility's control**, including those that
                arise from:
9
10              •   **the breakdown or failure of equipment, electric**
                    **transmission or distribution lines**, or natural gas
                    transmission and distribution pipelines, **that can cause**
11                  **explosions, fires, or other catastrophic events**;[180]

12                              *        *        *

13              •   **the failure to take expeditious or sufficient action to**
                    **mitigate operating conditions, facilities, or equipment,**
14                  **that the Utility has identified, or reasonably should have**
                    **identified, as unsafe, which failure then leads to a**
15                  **catastrophic event (such as a wild land fire or natural gas**
                    **explosion)**, [and the failure to respond effectively to a
16                  catastrophic event.][181]  *See* Ex. A, Stmt. Nos. 9, 18, 32.

17          647.    PG&E's 2017 Form 10-K incorporated by reference in the Offering Documents

18   for the April 2018 Notes Offering added false assurances to investors that PG&E had taken steps

19   to safely operate and maintain its equipment:

20              On April 12, 2017, the Utility retained a third-party monitor at the
                Utility's expense as part of its compliance with the sentencing
21              terms of the Utility's January 27, 2017 federal criminal conviction,
                which sentenced the Utility to, among other things, a five-year
22              corporate probation period and oversight by a third-party monitor
                for a period of five years, with the ability to apply for early
23              termination after three years.  **The goal of the monitor is to help**
                **ensure that the Utility takes reasonable and appropriate steps to**
24              **maintain the safety of its gas and electric operations and**
                **maintains effective ethics, compliance, and safety related**
25
     ────────────────────
26   [180] This language is included in each of PG&E's Forms 10-K incorporated in the Offering
     Documents, and similar language is also included in the registration statement for the April 2018
27   Notes Offering.  *See* Ex. A, Stmt. Nos. 9, 18, 21, 22, 32.

     [181]   The Form 10-K for FY 2017 removed the part of the sentence ending "and the failure to
28   respond effectively to a catastrophic event."

*incentive programs on a Utility-wide basis*.  *See* Ex. A, Stmt. No. 33.

648.    In addition to PG&E's annual reports, the Company's May 23, 2016 press release filed with the SEC on a Form 8-K (and as incorporated by the March 2017 Offering Documents), also falsely represented that PG&E "'continued to demonstrate leadership and commitment on safety'":

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> *          *          *
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> *          *          *
>
> [Earley:] ***"We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history."*** *See* Ex. A, Stmt. No. 19.

649.    The foregoing statements in ¶¶640-648 were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E was not making substantial investments in its systems, its safety practices were deficient and the Company's deficient safety practices had already caused wildfires.  The Offering Documents repeatedly represented that: (i) PG&E was making "substantial investments" in its system; (ii) the Utility had a risk-assessment process to  prioritize infrastructure investments for risks associated with climate change; (iii) the Utility's vegetation management activities were adequate and reduced the risk of wildfire impact; (iv) the Utility had the programs and strategies to address wildfire risks as a result of climate change; (v) the Utility had upgraded critical substations and improved a number of transmission lines; (vi) the Utility continued to deploy technology related to its reclosers to improve reliability and safety; (vii) the risk of equipment failures or the failure to sufficiently mitigate operating conditions could have an adverse material impact of the Company implying that such adverse events were "beyond the Utility's control"; and (viii) that PG&E

1  "demonstrated leadership and commitment on safety." These representations misled investors

2  because they omitted the true state of PG&E's operations related to safety – namely, PG&E's

3  systemic safety deficiencies.

4        650.    At the time the issuance of each of the Offering Documents for each of the Note

5  Offerings material adverse facts existed that contradicted the representations made therein,

6  including that: (i) PG&E had committed widespread safety violations including violations of

7  California law and regulations as well as federal law (¶¶571, 595, 599; 618; *see generally* ¶¶568,

8  570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623 *for safety*

9  *violations*); (ii) PG&E's vegetation management programs were deficient (¶¶568, 570-571, 575,

10  577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623); (iii) compared to the

11  industry in California, PG&E's electrical equipment caused far more wildfires (¶¶610, 628); (iv)

12  PG&E had not updated its outdated equipment (¶¶599, 605, 612-616, 618-623); and (v) PG&E

13  had not sufficiently invested in safety and had not made safety a priority (¶¶582, 583, 585-586,

14  601-602, 604, 616, 625; *see also* ¶624; ¶667).

15        651.    Contrary to assurances in the Offering Documents for the March 2016, December

16  2016, March 2017 and April 2018 Notes Offerings that PG&E's vegetation management

17  practices reduced the risk of wildfire impact, PG&E's practices were dismal and increased, not

18  reduced, wildfire impact and caused wildfires (¶619; *see generally* ¶¶568, 570-571, 575, 577,

19  594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-629). As Judge Alsup noted, PG&E

20  has admitted that: (i) vegetation contact was the primary risk driver with respect to ignitions

21  along PG&E's distribution lines; (ii) in 2016 alone, PG&E had experienced approximately 1,400

22  downed wires caused by vegetation contact; and (iii) during 2015 and 2016, PG&E had reported

23  to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire

24  ignitions associated with PG&E facilities, causing 37% of such fires. A 2013 NERC study also

25  determined that that well over 100 transmission line spans, out of 455 total spans, were

26  perilously close to vegetation or trees (¶615). Further, PG&E had incentivized its contractors to

27  identify and clear fewer trees and vegetation by paying them for reporting under the target

28  number (¶569). And, as PG&E Vegetation Program Manager Richard Yarnell testified, for the

1  entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we

2  have not made any changes" to improve safety (¶22).

3      652.    Contrary to the impression the Offering Documents for the March 2016,

4  December 2016, March 2017 and April 2018 Notes Offerings gave investors by emphasizing the

5  substantial investments PG&E was purportedly making with respect to the Utility's system,

6  PG&E was not sufficiently investing in safety, and any risk-assessment process it had to

7  prioritize infrastructure investments was inadequate.  Instead, PG&E had: "let the tree budget

8  wither so that a lot of trees that should have been taken down were not" (¶622); engaged in

9  dismal vegetation management practices (¶619); did not have a sufficient system in place to

10  shutdown reclosers (¶¶577, 606); failed to update equipment known to be outdated (¶¶599, 605,

11  612-616, 618-623); "focused mainly on spending its allotted budget, not ensuring expenditures

12  were prudent and effective" (¶612); failed, according to the CPUC, "to develop a comprehensive

13  enterprise-wide approach to address safety" (¶596);  and had not engaged in a level of

14  investment that would promote safety (¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-

15  616, 618-623). In addition, PG&E's 2019 wildfire plan illustrates that a dramatic increase in

16  resources to mitigate wildfires was needed; it calls for more than doubling tree removal, and

17  increasing vegetation management by 320% and inspections from 9,400 transmission structures

18  to 40,600 (¶608).

19      653.    For the same reasons as ¶652 above, the representations in the Offering

20  Documents for the March 2016, December 2016 and March 2017 Notes Offerings that PG&E

21  had: (i) the necessary adaption strategies with respect to wildfire risk; and (ii) procedures to

22  address wildfires were materially false and misleading.  These representations omitted that

23  PG&E was plagued with safety deficiencies.  And rather than prioritizing infrastructure

24  investments, PG&E had not committed sufficient resources for safety.

25      654.    For the same reasons as ¶651 above, the similar representations in the Offering

26  Documents for the April 2018 Notes Offering regarding procedures to address wildfires,

27  prioritizing infrastructure and mitigation programs were materially false and misleading.  In

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

200

1  addition, rather than prioritizing infrastructure in 2017, PG&E spent only $201,456,193 on

2  vegetation management in 2017, failing to keep pace with inflation (¶78);

3      655.   Contrary to the representations in the Offering Documents for the March 2016,

4  December 2016, March 2017 and April 2018 Notes Offerings that PG&E had "re-conductored a

5  number of transmission lines to improve . . . safety" and made other upgrades, PG&E's

6  equipment was outdated and hazardous.  For example, there was significant damage to and other

7  problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely

8  source of the Camp Fire including: (i) the collapse of aging towers in 2012; (ii) the

9  acknowledgment in 2014 that "the likelihood of failed structures happening is high"; (iii) the

10  identification of failed hardware in 2016; and (iv) the acknowledgement that the transmission

11  tower implicated in the Camp Fire was at risk of collapse long before the blaze was ignited and

12  that it was a quarter-century past its useful life (¶¶612-615, 619-622).  In addition, contrary to the

13  Utility's technology improving safety, PG&E did not have adequate systems in place to shut

14  down reclosers (¶¶577, 606).

15      656.   Purported warnings in the Offering Documents for the March 2016, December

16  2016,  March 2017 and April 2018 Notes Offerings that equipment might fail or that the failure

17  to sufficiently mitigate operating conditions could impact the Company, while implying that

18  such adverse events were "beyond the Utility's control," were materially false and misleading.

19  The Securities Act Defendants omitted that these risks had, in fact, already materialized as a

20  result of the Utility's conduct – including inadequate vegetation management programs and tree

21  clearing practices and the failure to update PG&E's system as described above. The Utility's

22  choice not to provide adequate resources towards safety or, for example, to incentivize its

23  contractors to not report or clear hazardous trees was within its control (¶569).

24      657.   In addition, investors were misled by the representation in PG&E's May 23, 2016

25  press release specifically incorporated by reference in the Offering Documents for the March

26  2017 Offering that PG&E "continued to demonstrate leadership and commitment on safety".

27  Rather than being a leader with respect to safety,  PG&E's electrical equipment caused far more

28  wildfires than industry peers in California (¶¶610, 621, 628).  And rather than being committed

1   to safety the truth was that PG&E was plagued with safety deficiencies and did not sufficiently

2   invest in fire mitigation.  For example, the following contradicts that PG&E was committed to

3   safety:

4           (a)      Judge Alsup has observed that: "There is one very clear-cut pattern here:

5   That PG&E is starting these fires."  He continued, "What do we do[?] Does the judge just turn a

6   blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more

7   fires'?"  When Company representatives stated that PG&E had made safety a priority, Judge

8   Alsup reportedly responded: "It's not really true. Safety is not your number one thing."  Judge

9   Alsup has also found that the "record demonstrates that PG&E's performance with respect to

10  vegetation management has been dismal."  (¶619);

11          (b)      Judge Alsup has also observed in January 2019 that "PG&E pumped out

12  $4.5 billion in the last five years in dividends and let the tree budget wither so that a lot of trees

13  that should have been taken down were not" (¶622);

14          (c)      PG&E had not, according to PG&E Vegetation Manager Richard Yarnell,

15  made any changes to improve safety from September 2015 to April 10, 2017 (¶22); and

16          (d)      The CPUC ruled in December 2018:  "PG&E has had serious safety

17  problems with both its gas and electric operations for many years" and the Company had failed

18  "to develop a comprehensive enterprise-wide approach to address safety."  The Ruling stated that

19  the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E

20  were not just one-off situations or bad luck, but indicated a deeper and more systemic problem"

21  (¶596).

22          658.    For the same reasons as set forth in ¶¶650-652 above, the representation in the

23  Offering Documents for the April 2018 Notes Offering that assured investors that PG&E had

24  taken steps to safely operate and maintain its equipment when explaining the role of third-party

25  monitor "to help ensure" such steps were taken was materially false and misleading.  Contrary to

26  this statement, PG&E had systemic failures with respect to wildfire safety and failed to update or

27  maintain its equipment as explained above.   In addition, the representation misled investors with

28

regard to its "safety related incentive programs" by not disclosing that it had incentivized its

contractors to not report or clear hazardous trees (¶569).

**B.    The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires**

659.    The Offering Documents for the April 2018 Notes Offering, including the

documents incorporated by reference therein, misled investors by insinuating that PG&E may

not have caused and might not be liable for the destruction of life and property resulting from

fires that PG&E caused, or the costs associated with wildfires.

660.    PG&E's Offering Documents for the April 2018 Notes Offering (including the

registration statement for the offering and PG&E's FY17 Form 10-K incorporated by reference),

misleadingly represented that it was only a possibility that PG&E caused or would face liability

for the fires following investigations, stating:

> *[T]he impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the [Company] facilities, and whether the [Company] is able to recover such costs through a [Catastrophic Event Memorandum Account]; the timing and outcome of the wildfire investigations, including into the causes of the wildfires; whether the [Company] may have liability associated with these fires*; if liable for one or more fires, whether the [Company] would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the [Company] if the [California Department of Forestry and Fire Protection and the California Public Utilities Commission] ("CPUC") or any other law enforcement agency brought an enforcement action and determined that the [Company] failed to comply with applicable laws and regulations.   *See* Ex. A, Stmt. Nos. 24, 34.

661.    The same Form 10-K for FY17 incorporated into the April 2018 Offering

Documents also misleadingly claimed that it was not "***probable***" that PG&E would face liability

for the fires, stating that PG&E "***could*** be liable for property damage, interest, and attorneys'

fees without having been found negligent… *[i]f* the Utility's facilities, such as its electric

distribution and transmission lines, are determined to be the cause of one or more fires, and the

doctrine of inverse condemnation applies."  The Form 10-K for FY17 also stressed that "***[g]iven***

***the preliminary stages of investigations and the uncertainty as to the causes of the fires,***

1  ***PG&E Corporation and the Utility do not believe a loss is probable at this time***." *See* Ex. A,

2  Stmt. No. 25.[182]

3      662.    PG&E's 10-K for FY17 further misleadingly claimed that even if PG&E were

4  found liable for the fires, PG&E's liability insurance and ability to recover through regulatory

5  mechanisms would mitigate any costs to PG&E arising from its liability for the fires.  As stated

6  in PG&E's Form 10-K, ***while additional facts "could emerge" rendering a loss probable***, "[t]he

7  Utility has liability insurance from various insurers, which provides coverage for third-party

8  liability attributable to the Northern California Fires in an aggregate amount of approximately

9  $800 million" and could also "apply for cost recovery." *See* Ex. A, Stmt. No. 25.

10     663.    The foregoing statements in ¶¶660-662 were materially false and misleading

11 because contrary to the impression created by the Offering Documents for the April 2018 Notes

12 Offering regarding PG&E's liability for the North Bay Fires, the Company's deficient safety

13 practices had caused the majority of those wildfires and liability for those wildfires.  There was

14 no reasonable basis for the Securities Act Individual Defendants to claim that there was

15 "uncertainty as to the causes of the fires" or that additional facts were necessary to render a loss

16 probable.  Given PG&E's safety deficiencies and the facts known at the time, it was probable

17 that PG&E caused many of the North Bay Fires.

18     664.    Sufficient facts pertaining to the causes of the Northern California wildfires

19 existed to properly conclude that a loss was probable as of December 31, 2017, in accordance

20 with Generally Accepted Accounting Principles ("GAAP"), Accounting Standards Codification

21 ("ASC") 450, *Loss Contingencies*.[183]  As a result, PG&E materially understated operating

22

23     [182] PG&E's consolidated balance sheet as of December 31, 2017 filed with the SEC on
   PG&E's FY17 Form 10-K materially understated operating expenses (reported ~$14.2 billion)
24 and pretax income (reported ~$2.2 billion) by $10.0 billion, and materially understated total
   liabilities (reported ~$48.5 billion) and overstated total equity (reported ~$13 billion) by $10.0
25 billion.

26     [183] GAAP are the principles established by the Financial Accounting Standards Board that
   are recognized by the accounting profession as the conventions, rules, and procedures necessary
27 to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R.
   §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in
28 compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and

1    expenses and pretax income by $10.0 billion on PG&E's consolidated statement of income for

2    FY 2017, and materially understated total liabilities and overstated total equity by $10.0 billion

3    on PG&E's consolidated balance sheet as of December 31, 2017.

4         665.    According to GAAP, an estimated loss from a loss contingency shall be accrued

5    by a charge to income and by the establishment of a liability when both of the following

6    conditions are met:

7              a. Information available before the financial statements are issued
               or are available to be issued [] indicates that it is probable that an
8              asset had been impaired or a liability had been incurred at the date
               of the financial statements

9              b.  The amount of loss can be reasonably estimated.[184]

10   ASC 450-20-25-2.[185]

11        666.    GAAP also provided specific instructions to the Company on assessing the

12   probability of the occurrence (ASC 450-20-55-12) and required PG&E to assess whether the

13   events were probable, reasonably possible or remote (ASC-450-20-55-14).

14        667.    PG&E was obligated to report and properly disclose wildfire-related operating

15   expenses and wildfire-related liabilities as of December 31, 2017 because both requirements of

---

*(continued)*

other disclosure.  Regulation S-X requires that interim financial statements must also comply
with GAAP, with the exception that interim financial statements need not include disclosures
that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R.
§210.10-01(a).

[184] GAAP states regarding this second provision that the "requirement shall not delay accrual
of a loss until only a single amount can be reasonably estimated."  ASC 450-20-25-5.  "To the
contrary, when the condition in [ASC] 450-20-25-2(a) is met and information available indicates
that the estimated amount of loss is within a range of amounts, it follow that some amount of loss
has occurred and can be reasonably estimated."  *Id.*  GAAP further instructs that "[i]f some
amount within a range of loss appears at the time to be a better estimate than any other amount
within the range, that amount shall be accrued."  ASC 450-20-30-1.  "When no amount within
the range is a better estimate than any other amount, however, the minimum amount in the range
shall be accrued."  *Id.*

[185] In assessing ASC 450's requirements, Defendants were also required by ASC 855 to
consider "subsequent events" that occurred after the December 31, 2017 balance sheet date, but
before PG&E filed the FY17 Form 10-K on February 9, 2018, including, subsequent events that
provide additional evidence about conditions that existed at the balance sheet date that should be
recognized in the financial statements.

---

1   ASC 450 were met when PG&E issued its FY17 Form 10-K incorporated into the Offering

2   Documents for the April 2018 Notes Offering; specifically that: (i) the wildfire-related expenses

3   and liabilities were probable as a result of the Northern California wildfires; and (ii) the

4   minimum amount of the potential damages in connection with the Northern California wildfires

5   was estimable.

6       668.    A loss was probable because: (i) PG&E had for years before the North Bay Fires

7   engaged in a pattern and practice of ignoring laws and California safety regulations and failed to

8   take appropriate measures to mitigate or prevent wildfire hazards from occurring; (ii) the facts,

9   evidence, and circumstances that existed strongly supported that PG&E's liability for damages in

10  connection with the 2017 wildfires was probable as of December 31, 2017; and (iii) "inverse

11  condemnation" liability laws applied to the 2017 North Bay Fires.

12      669.    PG&E did not properly maintain its power lines (including the Utility's failure to

13  maintain and repair distribution and transmission lines), and had failed to properly perform

14  vegetation management in the regions affected by the 2017 North Bay Fires (¶¶579-580).   In

15  addition, in November 2017 it was reported that PG&E auditors permitted one out of 100 trees

16  checked to violate clearance standards (¶575) and in January 2018 that PG&E had only engaged

17  in a limited recloser shutdown (¶¶577, 606).  "The conditions [pertaining to the recognition of

18  loss contingencies] are not intended to be so rigid that they required virtual certainty before a

19  loss is accrued." ASC 450-20-25-3.  GAAP did ***not*** permit PG&E to wait until the ongoing

20  investigations by the California Department of Forestry and Fire Protection and the California

21  Public Utilities Commission made it a "virtual certainty" that PG&E would be held liable before

22  recognizing that a loss was probable.  As one analyst observed, when signs pointed to PG&E

23  being "imprudent operators in the majority of instances…it should assume liability." (¶582).

24      670.    The loss also could have been reasonably estimated under ASC 450-20-25-2(b).

25  First, On January 31, 2018, the California Department of Insurance issued a press release

26  announcing an update on property losses in connection with the October and December 2017

27  wildfires in California, stating that, as of such date, "insurers have received nearly 45,000

28

insurance claims totaling more than $11.79 billion in losses," of which approximately $10.0 billion related to statewide claims from the October 2017 wildfires.[186]

671.   Second, PG&E admitted that the magnitude of the loss from the North Bay Fires could be greater than $10.0 billion in its FY17 Form 10-K.

> If the Utility were to be found liable for certain or all of such other costs and expenses, the amount of PG&E Corporation's and the Utility's liability could be higher than the approximately $10 billion estimated in respect of the wildfires that occurred in October 2017, depending on the extent of the damage in connection with such fire or fires.

672.   The Offering Documents were false and misleading because they claimed further investigation was needed and uncertainty surrounding PG&E's liability for the 2017 North Bay wildfires was such that a loss was not probable at the time.  There was no reasonable basis for these representations based on the adverse facts existing at the time or reasonably available to the issuers of the Offering Documents.

673.   In addition to the above, the foregoing statements in ¶672 were contradicted by adverse facts that existed at the time of the statements including, *inter alia*, that:

(a)   PG&E started and was at fault for the vast majority of the 2017 North Bay Fires.  (¶¶579-580, 584, 586).  Cal Fire investigations have confirmed that PG&E equipment caused at least the significant majority of these fires.  Cal Fire has referred the cases of many of the individual fires to the appropriate District Attorneys' offices, and the Company faced potential criminal liability as well, for offenses ranging from misdemeanors to implied-malice murder. (¶¶582, 583, 585-586, 601-602, 604, 616, 625; s*ee also* ¶624; ¶667);

(b)   PG&E – unlike other utilities – did not shut off reclosers, increasing the danger and likelihood of wildfires in cases where vegetation has fallen onto power lines, including in 132 high risk areas in 2017 (¶¶577, 606);

---

[186] The press release does not account for uninsured losses, interest, attorneys' fees, fire suppression costs, evacuation costs, medical expenses, personal injury and wrongful death damages or other costs.

(c)     In the two years prior to the Camp Fire, including roughly the year before the 2017 North Bay Fires, PG&E did "absolutely nothing" to produce an annual wildfire safety plan, as required by state law (¶594), and indeed failed to develop any "comprehensive enterprise-wide approach to address safety," a sign of "systemic problem[s]" at the Company (¶596);

(d)     PG&E Vegetation Program Manager, Richard Yarnell, testified that for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety (¶22); and

(e)     As demonstrated by admissions made by PG&E in PG&E's probation proceedings before Judge Alsup, in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact, and, as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618).

**C.      PG&E's Offering Documents Misled Investors by Failing to Comply with Item 303's Disclosure Requirements and Disclosure Safety Violations**

674.    Item 303 of SEC Regulation S-K requires the Management's Discussion & Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected" and "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(i)-(ii).

675.    The SEC has provided guidance concerning the MD&A requirements, including Item 303:

> The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."  The MD&A requirements are intended to satisfy three principal objectives:

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

676.    To effectuate that purpose, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future."

677.    The Offering Documents (including the registration statements) for the Notes Offerings  failed to provide the information required by Item 303, including the omission of information necessary to understand the Company's financial condition, changes in financial condition, and results of operations.

678.    The March 2016, December 2016, March 2017, and April 2018 Notes Offering' Offering Documents (specifically the registration statements associated with each of the Notes Offerings) failed to disclose that PG&E had systematically violated California regulations regarding fire prevention and failed to take reasonable steps or investments to mitigate fire dangers.  They also violated 17 C.F.R. §229.303(a)(3)(ii),[187] because they did not disclose facts that were known to PG&E and would (and did) have an unfavorable impact on the Company's earnings and income from continuing operations. This failure also violated 17 C.F.R. §229.503(c), because specific risks were not adequately disclosed, or disclosed at all, even

---

[187] Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make . . . the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

1   though they were some of the most significant factors that made an investment in PG&E notes

2   speculative or risky.

3         679.   At the time of the issuance of the Offering Documents for each of the Notes

4   Offerings (including the registration statements for each offering) the known trends adversely

5   impacting PG&E included: (i) the fact that despite suffering from serious safety problems for

6   years, the Company had failed to develop a comprehensive approach to address safety (¶22, 594,

7   596); (ii) the Company's deficient safety practices related to wildfire safety and widespread

8   safety violations, including the systemic failure to clear vegetation and trees as required by

9   regulations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

10   623); (iii) PG&E's failure to update outdated equipment or flawed systems (¶¶599, 605, 612-

11   616, 618-623); and (iv) the Company's failure to allocate sufficient resources or investments in

12   safety (¶¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-618, 618-623).  Each of these

13   adverse trends increased the risk of wildfires and liability which the Offering Documents

14   (including the registration statements) did not sufficiently disclose so that investors understood

15   the true state of PG&E's financial condition (including the quality of its earnings) or operations.

16         680.   These known trends impacting PG&E's financial condition, operations and future

17   performance were not disclosed when the Offering Documents for the March 2016 and

18   December 2016 Notes Offerings (including the registration statements) were filed with the SEC

19   despite adverse facts existing at the time including, *inter alia*, that: (i) PG&E had caused

20   hundreds or thousands of fires across California since June 2014, averaging more than one fire a

21   day (¶600); (ii) its vegetation management practices were deficient (¶¶568, 570-571, 575, 577,

22   594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623;); (iii) in 2014 the Company had

23   documented that the "likelihood of failed structures happening [was] high" with respect to the

24   transmission line at the center of the subsequent Camp Fire (¶620); and (iv) as PG&E Vegetation

25   Program Manager Richard Yarnell testified,  for the entire period from September 2015 to April

26   10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve

27   safety (¶22).

28

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
620 of 1229

681.     These known trends were similarly not disclosed when the Offering Documents for the March 2017 Notes Offering (including the registration statement) were filed with the SEC despite adverse facts existing at the time including those above (¶¶679-680) and *inter alia*, that: (i) the Company had never, as planned, addressed dangerously encroaching vegetation or replaced old lattice towers with modern tubular steel poles or replaced wire and hardware connecting those to towers (¶612); (ii) there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618); and (iii) the Company's vegetation management was dismal, inadequate, and it had allowed its tree budget to wither (¶¶619, 622). The March 2017 registration statement failed to disclose the known adverse safety trends that were unfavorably impacting PG&E.

682.     Likewise, at the time the Offering Documents for the April 2018 Notes Offering (including the registration statement), these known trends were not disclosed despite adverse facts existing at the time include those above (¶¶679-681) and *inter alia*, that the Company still had failed to create a "comprehensive enterprise-wide approach to address safety" or address the "systemic problem[s]" at the Company, with the result that a "very clear-cut pattern" had established itself by 2018: "PG&E is starting these fires" (¶¶596, 605).  The April 2018 registration statement failed to disclose PG&E's known adverse safety trends that were unfavorably impacting PG&E.

**XIX.   NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS**

683.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements or material omissions pleaded with respect to the Securities Act claims.

684.     First, none of the misstatements complained of herein were forward-looking statements.  Rather, they were misstatements concerning current facts and conditions existing at the time the statements were made.  None of the historic or present tense statements made by the Securities Act Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions

underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Securities Act Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

685.    Second, to the extent that any statements may be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth in detail above, then-existing facts contradicted the Securities Act Defendants' statements. Given the then-existing facts contradicting the Securities Act Defendants' statements, the generalized risk disclosures made by the Securities Act Defendants were not sufficient to insulate the Securities Act Defendants from liability for their materially false or misleading statements and material omissions.

686.    Third, to the extent any statement that may be construed as a false or misleading forward-looking statement, at the time each forward-looking statement was purportedly made, the speaker also knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of PG&E who knew that the forward-looking statement was false.

## XX.    CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

687.    The Securities Act Plaintiffs bring the Securities Act claims on behalf of themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure consisting of all persons or entities that acquired PG&E senior notes in or traceable to one or more of the Notes Offerings and corresponding Offering Documents, and who were damaged thereby (the "Securities Act Subclass").  Excluded from the Securities Act Subclass are: (i) all defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii) any person who is or was an officer or director of PG&E during or after the Class Period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or

1 │ beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

2 │ representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

3 │     688.    The members of the Securities Act Subclass are so numerous that joinder of all

4 │ members is impracticable.  PG&E notes are traded on the New York Stock Exchange ("NYSE"),

5 │ and over $4 billion worth of PG&E notes were sold in the Notes Offerings.  While the exact

6 │ number of the Securities Act Subclass members is unknown to the Securities Act Plaintiffs at

7 │ this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs

8 │ believe that there are hundreds of members in the proposed Securities Act Subclass.  Record

9 │ owners and other members of the Subclass may be identified from records maintained by PG&E

10 │ or its transfer agent and may be notified of the pendency of this action by mail, using the form of

11 │ notice similar to that customarily used in securities class actions.

12 │     689.    Securities Act Plaintiffs' claims are typical of the claims of the members of the

13 │ Securities Act Subclass, as all members of the Securities Act Subclass are similarly affected by

14 │ Securities Act Defendants' conduct in violation of the Securities Act that is complained of

15 │ herein.

16 │     690.    Securities Act Plaintiffs will fairly and adequately protect the interests of the

17 │ members of the Securities Act Subclass and have retained counsel competent and experienced in

18 │ class and securities litigation.

19 │     691.    Common questions of law and fact exist as to all members of the Securities Act

20 │ Subclass and predominate over any questions solely affecting individual members of the

21 │ Securities Act Subclass.  Among the questions of law and fact common to the Securities Act

22 │ subclass are:

23 │     (a)    whether the Securities Act Defendants violated the Securities Act;

24 │     (b)    whether statements made by the Securities Act Defendants to the investing

25 │ public in the Offering Documents for the Notes Offerings misrepresented or omitted material

26 │ facts about the business and operations of PG&E; and

27 │     (c)    to what extent the members of the Securities Act Subclass have sustained

28 │ damages and the proper measure of damages.

692.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Securities Act Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of the Securities Act Subclass as a class in this action.

## XXI.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### FIFTH CLAIM

#### For Violations of §11 of the Securities Act
#### Against All Securities Act Defendants

693.     This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Subclass, against all Securities Act Defendants.

694.     This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent for this Claim, which are not elements of a §11 claim.  This Claim is based solely on negligence.  Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §11 claim.

695.     Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-694 by reference.

696.     The registration statements for the Notes Offerings were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

697.     The Utility, a subsidiary of PG&E Corporation, is the registrant for the senior notes sold in the Notes Offerings.  The Utility and PG&E Corporation would be named as defendants herein for this Claim but for their declaration of bankruptcy and the imposition of the automatic bankruptcy stay under federal law.

698.     The Securities Act Defendants named herein were responsible for the contents and dissemination of the registration statements for the Notes Offerings.  None of the Securities

Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statements for the Notes Offerings were true and without omissions of any material facts and were not misleading.

699.     By reason of the conduct alleged herein, each Securities Act Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

700.     Securities Act Plaintiffs acquired PG&E senior notes sold in the Notes Offerings traceable to the registration statements for the Notes Offerings.

701.     Securities Act Plaintiffs and the Securities Act Subclass have sustained damages.

702.     At the time of their purchases of the PG&E notes sold in the Notes Offerings, Securities Act Plaintiffs and other members of the Securities Act Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that Securities Act Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Securities Act Plaintiffs filed their initial complaint on February 22, 2019.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Securities Act Plaintiffs filed their initial complaint.

## SIXTH CLAIM

### For Violation of §15 of the Securities Act
### Against the Securities Act Individual Defendants

703.     This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Securities Act Subclass against the Securities Act Individual Defendants.

704.     This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants had scienter or fraudulent intent, which are not elements of a §15 claim. This Claim is based solely on negligence.  Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §15 claim.

705.     Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-704 by reference.

706.    The Securities Act Individual Defendants each were control persons of PG&E by virtue of their positions as directors and/or senior officers of PG&E.  The Individual Securities Act Defendants oversaw the Notes Offerings, including the preparation and dissemination of the registration statements for the Notes Offerings, and took steps to ensure that the Notes Offerings were successfully completed, including, for example, by signing the registration statements for the Notes Offerings.

## XXII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative and the Securities Act Plaintiffs as representatives of the Securities Act Subclass;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 626 of 1229

1

## DEMAND FOR TRIAL BY JURY

2

Plaintiffs hereby demand a trial by jury.

3

DATED: May 28, 2019

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Thomas A. Dubbs*

THOMAS A. DUBBS (*pro hac vice*)
LOUIS GOTTLIEB (*pro hac vice*)
JEFFREY A. DUBBIN (#287199)
ARAM BOGHOSIAN (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
jdubbin@labaton.com
aboghosian@labaton.com

*Counsel for Lead Plaintiff the Public
Employees Retirement Association of New
Mexico and Lead Counsel for the Class*

**WAGSTAFFE, VON LOEWENFELDT,
   BUSCH & RADWICK, LLP**
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS (#168593)
BRIAN E. COCHRAN (#286202)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile: (619) 231-7423
Email:darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE (#200087)
KENNETH J. BLACK (#291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email: willowr@rgrdlaw.com
kennyb@rgrdlaw.com

*Counsel for the Securities Act Plaintiffs*

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email: tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act
Plaintiffs*

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

218

1

### CERTIFICATE OF SERVICE

2   I HEREBY CERTIFY that on May 28, 2019, I electronically filed the foregoing with the

3 Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

4 counsel of record.

5                                   /s/ Thomas A. Dubbs
                                    THOMAS A. DUBBS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
CIVIL ACTION NO. 3:18-CV-03509-EJD

# Attachment A

## CERTIFICATION

I, Susan G. Pittard, as Chief of Staff and General Counsel of the Public Employees Retirement Association of New Mexico ("PERA"), hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of PERA. I have reviewed a Third Amended Consolidated Class Action Complaint prepared against PG&E Corporation ("PG&E") alleging violations of the federal securities laws;

2.     PERA did not purchase securities of PG&E at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     PERA is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     PERA's transactions in PG&E securities during the Class Period are reflected in Exhibit A, attached hereto;

5.     PERA sought to serve as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*Government Employees' Retirement System of the Virgin Islands v. WageWorks, Inc.,*
No. 4:18-cv-1523 (N.D. Cal.)
*In re PG&E Corporation Securities Litigation,* No. 3:18-cv-3509 (N.D. Cal.)

6.     Beyond its pro rata share of any recovery, PERA will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is

true and correct this        day of May, 2019.

Susan G. Pittard
Chief of Staff / General Counsel
*Public Employees Retirement Association of*
*New Mexico*

2

# EXHIBIT A

## TRANSACTIONS IN PG&E CORPORATION

| PG&E CORP Common Stock | | | |
|---|---|---|---|
| **Ticker** | **CUSIP** | **SEDOL** | **ISIN** |
| PCG | 69331C108 | 2689560 | US69331C1080 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 06/03/15 | 1,000.00 | $51.97 | ($51,970.00) |
| Purchase | 06/03/15 | 2,000.00 | $51.97 | ($103,940.00) |
| Purchase | 07/13/15 | 2,500.00 | $51.15 | ($127,872.75) |
| Purchase | 03/10/16 | 1,100.00 | $56.95 | ($62,645.99) |
| Purchase | 06/24/16 | 3,200.00 | $62.66 | ($200,512.00) |
| Purchase | 08/09/16 | 94,400.00 | $63.60 | ($6,004,113.76) |
| Sale | 08/25/16 | -54.00 | $63.56 | $3,432.41 |
| Sale | 08/25/16 | -1,691.00 | $63.58 | $107,512.43 |
| Purchase | 08/25/16 | 11,768.00 | $63.66 | ($749,143.82) |
| Sale | 08/26/16 | -1,315.00 | $62.99 | $82,826.06 |
| Sale | 08/26/16 | -1,503.00 | $63.08 | $94,803.98 |
| Sale | 08/29/16 | -376.00 | $62.50 | $23,500.00 |
| Sale | 08/29/16 | -1,865.00 | $62.55 | $116,646.98 |
| Sale | 08/30/16 | -1,878.00 | $62.04 | $116,508.87 |
| Sale | 08/31/16 | -126.00 | $61.80 | $7,786.99 |
| Purchase | 08/31/16 | 74,700.00 | $61.94 | ($4,627,052.46) |
| Purchase | 09/27/16 | 6,153.00 | $63.80 | ($392,539.25) |
| Purchase | 10/20/16 | 8,307.00 | $60.96 | ($506,386.41) |
| Purchase | 11/08/16 | 700.00 | $62.02 | ($43,414.00) |
| Sale | 11/17/16 | -8,258.00 | $58.72 | $484,925.45 |
| Sale | 11/17/16 | -227.00 | $58.96 | $13,383.38 |
| Sale | 11/17/16 | -7,285.00 | $59.03 | $430,058.32 |
| Sale | 11/18/16 | -4,630.00 | $58.40 | $270,409.59 |
| Purchase | 11/22/16 | 6,224.00 | $59.28 | ($368,962.45) |
| Sale | 11/29/16 | -4,519.00 | $60.69 | $274,260.37 |
| Sale | 11/30/16 | -2,288.00 | $59.21 | $135,469.51 |
| Sale | 12/01/16 | -1,197.00 | $57.90 | $69,308.57 |
| Sale | 12/02/16 | -796.00 | $58.32 | $46,424.55 |
| Purchase | 12/13/16 | 7,217.00 | $60.40 | ($435,937.11) |
| Sale | 01/06/17 | -3,108.00 | $60.84 | $189,090.72 |
| Sale | 01/06/17 | -8,392.00 | $60.97 | $511,683.74 |
| Purchase | 01/20/17 | 10,349.00 | $61.41 | ($635,532.09) |
| Purchase | 02/13/17 | 400.00 | $63.69 | ($25,476.00) |
| Purchase | 02/24/17 | 7,378.00 | $65.95 | ($486,588.69) |
| Sale | 03/08/17 | -4,763.00 | $65.24 | $310,739.07 |
| Sale | 03/09/17 | -1,809.00 | $65.29 | $118,105.63 |
| Sale | 03/10/17 | -928.00 | $65.35 | $60,648.33 |

| PG&E CORP Common Stock | | | |
|---|---|---|---|
| **Ticker** | **CUSIP** | **SEDOL** | **ISIN** |
| PCG | 69331C108 | 2689560 | US69331C1080 |
| **Transaction Type** | **Trade Date** | **Shares / Par Value** | **Price Per Share / Par Value** | **Cost / Proceeds** |
| Purchase | 03/22/17 | 1,010.00 | $67.57 | ($68,241.56) |
| Sale | 04/07/17 | -8,900.00 | $67.11 | $597,294.13 |
| Purchase | 04/10/17 | 50,200.00 | $66.93 | ($3,359,735.40) |
| Purchase | 05/25/17 | 5,600.00 | $66.80 | ($374,085.04) |
| Sale | 05/31/17 | -427.00 | $68.38 | $29,198.26 |
| Sale | 05/31/17 | -1,710.00 | $68.38 | $116,929.80 |
| Purchase | 06/06/17 | 2,323.00 | $68.74 | ($159,680.93) |
| Purchase | 06/30/17 | 11,240.00 | $66.61 | ($748,694.15) |
| Purchase | 07/24/17 | 1,168.00 | $67.90 | ($79,307.20) |
| Purchase | 08/31/17 | 1,700.00 | $70.30 | ($119,510.51) |
| Sale | 10/10/17 | -8,637.00 | $69.16 | $597,294.33 |
| Sale | 10/11/17 | -977.00 | $69.08 | $67,494.38 |
| Sale | 10/11/17 | -4,936.00 | $69.30 | $342,064.80 |
| Purchase | 10/30/17 | 4,180.00 | $57.23 | ($239,222.65) |
| Sale | 11/20/17 | -2,900.00 | $52.65 | $152,685.00 |
| Sale | 11/30/17 | -13,862.00 | $54.24 | $751,874.88 |
| Sale | 11/30/17 | -41,586.00 | $54.24 | $2,255,624.64 |
| Sale | 11/30/17 | -7,887.00 | $54.25 | $427,869.75 |
| Sale | 12/01/17 | -15,727.00 | $54.28 | $853,636.40 |
| Sale | 12/04/17 | -9,743.00 | $54.13 | $527,404.18 |
| Sale | 12/05/17 | -12,339.00 | $53.54 | $660,590.58 |
| Sale | 12/06/17 | -2,135.00 | $53.53 | $114,282.07 |
| Sale | 12/07/17 | -4.00 | $53.01 | $212.03 |
| Sale | 12/08/17 | -665.00 | $53.19 | $35,369.69 |
| Sale | 12/15/17 | -5,000.00 | $53.05 | $265,250.00 |
| Sale | 01/31/18 | -2,040.00 | $41.79 | $85,260.37 |
| Sale | 02/21/18 | -500.00 | $39.79 | $19,895.00 |
| Purchase | 04/16/18 | 5,859.00 | $45.08 | ($264,123.72) |
| Purchase | 04/16/18 | 94.00 | $45.30 | ($4,257.97) |
| Purchase | 04/16/18 | 40,480.00 | $45.50 | ($1,842,026.21) |
| Purchase | 04/17/18 | 3,307.00 | $45.91 | ($151,838.92) |
| Sale | 05/31/18 | -24,012.00 | $43.33 | $1,040,439.96 |
| Purchase | 06/25/18 | 1,100.00 | $42.10 | ($46,307.03) |
| Sale | 06/20/18 | -22,400.00 | $40.00 | $896,000.00 |
| Sale | 06/20/18 | -1,600.00 | $40.00 | $64,000.00 |
| Purchase | 08/20/18 | 1,700.00 | $44.80 | ($76,163.23) |
| Sale | 08/21/18 | -42,400.00 | $44.83 | $1,900,817.44 |
| Purchase | 10/11/18 | 5,228.00 | $46.93 | ($245,358.93) |
| Purchase | 10/11/18 | 14,772.00 | $47.09 | ($695,682.91) |
| Sale | 10/22/18 | -17,750.00 | $47.87 | $849,747.53 |
| Sale | 10/23/18 | -17,750.00 | $47.47 | $842,539.25 |

2

**PACIFIC GAS & ELECTRIC CO 5.625% 11/30/2017 DD 12/04/07**

| Ticker | CUSIP | | SEDOL | ISIN |
|---|---|---|---|---|
| | 694308GL5 | | B29T8Z2 | US694308GL57 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Maturity | 11/30/17 | -750,000.00 | $100.00 | $750,000.00 |

**PACIFIC GAS & ELECTRIC CO 8.250% 10/15/2018 DD 10/21/08**

| Ticker | CUSIP | | SEDOL | ISIN |
|---|---|---|---|---|
| | 694308GN1 | | BG491B2 | US694308GN14 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Corporate Actions | 12/29/17 | -500,000.00 | $104.71 | $523,568.99 |
| Corporate Actions | 02/20/18 | -500,000.00 | $103.79 | $518,935.16 |

**PACIFIC GAS & ELECTRIC CO 3.750% 08/15/2042 DD 08/16/12**

| Ticker | CUSIP | | SEDOL | ISIN |
|---|---|---|---|---|
| | 694308HA8 | | B7MTCC9 | US694308HA83 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Sales | 03/31/17 | -250,000.00 | $94.87 | $237,182.50 |

**PACIFIC GAS & ELECTRIC CO 6.050% 03/01/2034 DD 03/23/04**

| Ticker | CUSIP | | SEDOL | ISIN |
|---|---|---|---|---|
| | 694308GE1 | | B8FPMT8 | US694308GE15 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 05/11/16 | 850,000.00 | $132.53 | ($1,126,471.00) |

**PACIFIC GAS & ELECTRIC CO 4.250% 08/01/2023 DD 08/06/18**

| Ticker | CUSIP | | SEDOL | ISIN |
|---|---|---|---|---|
| | 694308HZ3 | | BDG28N9 | US694308HZ35 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 08/02/18 | 1,405,000.00 | $99.77 | ($1,401,698.25) |
| Sale | 11/15/18 | -220,000.00 | $89.00 | $195,800.00 |

**PACIFIC GAS & ELECTRIC CO 4.600% 06/15/2043 DD 06/14/13**

| Ticker | CUSIP | | SEDOL | ISIN |
|---|---|---|---|---|
| | 694308HD2 | | BBK3XJ5 | US694308HD23 |

| Transaction Type | Trade Date | Shares / Par Value | Price Per Share / Par Value | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 06/03/15 | 125,000.00 | $101.50 | ($126,875.00) |
| Sales | 08/14/15 | -875,000.00 | $103.58 | $906,298.75 |

3

| PACIFIC GAS & ELECTRIC CO 3.300% 03/15/2027 DD 03/10/17 | | | | |
|---|---|---|---|---|
| **Ticker** | **CUSIP** | | **SEDOL** | **ISIN** |
| | 694308HS9 | | BYXYH72 | US694308HS91 |
| **Transaction Type** | **Trade Date** | **Shares / Par Value** | **Price Per Share / Par Value** | **Cost / Proceeds** |
| Purchases | 03/07/17 | 95,000.00 | $99.65 | ($94,662.75) |

4

# Attachment B

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

York County on behalf of the County of York Retirement Fund ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of May, 2019.

York County on behalf of the County of York Retirement Fund

By: _____
Gregory F. Bower, Secretary

PG&E

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Bonds**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 05/03/2018 | 2.95% due 03/01/2026 | 112,000 | $92.16 |
| 05/30/2018 | 2.95% due 03/01/2026 | 212,000 | $91.95 |
| 11/27/2017 | 3.3% due 12/01/2027 | 162,000 | $99.70 |
| 11/27/2017 | 3.3% due 12/01/2027 | 162,000 | $99.99 |
| 05/14/2018[e] | 3.3% due 12/01/2027 | 212,000 | $92.51 |

| Date Sold | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 11/15/2018 | 2.95% due 03/01/2026 | 25,000 | $80.00 |
| 11/15/2018 | 2.95% due 03/01/2026 | 25,000 | $81.00 |
| 11/15/2018 | 2.95% due 03/01/2026 | 46,000 | $79.92 |
| 11/15/2018 | 2.95% due 03/01/2026 | 64,000 | $81.63 |
| 11/15/2018 | 2.95% due 03/01/2026 | 64,000 | $82.25 |
| 11/16/2018 | 2.95% due 03/01/2026 | 38,000 | $87.00 |
| 01/09/2019 | 2.95% due 03/01/2026 | 62,000 | $79.00 |
| 05/03/2018 | 3.3% due 12/01/2027 | 112,000 | $92.92 |
| 05/14/2018[e] | 3.3% due 12/01/2027 | 212,000 | $92.51 |
| 05/30/2018 | 3.3% due 12/01/2027 | 212,000 | $92.73 |

[e]Debt exchange offer.

Attachment C

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*None.*

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*None.*

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Warren Police and Fire Retirement System v. Zebra Technologies*, No. 2:17-cv-4412 (E.D.N.Y.)
*City of Warren Police and Fire Retirement System v. TransDigm Group*, No. 1:17-cv-01677 (N.D. Ohio)
*City of Warren Police and Fire Retirement System v. Foot Locker, Inc.*, No. 1:18-cv-01492 (E.D.N.Y.)
*City of Warren Police and Fire Retirement System v. Hasbro, Inc.*, No. 1:18-cv-00543 (D.R.I.)
*City of Warren Police and Fire Retirement System v. DXC Technology*, No. 1:18-cv-01599 (E.D. Va.)
*Atansio v. Tenaris S.A., et al.*, No. 1:18-cv-07059 (E.D.N.Y.)

PG&E

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of May, 2019.

CITY OF WARREN POLICE AND FIRE
RETIREMENT SYSTEM

By:     _Scott D. Salyen_____

Its:     _Chairman_____

PG&E

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/29/2015 | 21 | $53.47 |
| 12/18/2015 | 19 | $53.11 |
| 02/29/2016 | 15 | $56.73 |
| 03/31/2016 | 9 | $59.72 |
| 05/05/2016 | 956 | $59.15 |
| 05/31/2016 | 16 | $60.08 |
| 06/24/2016 | 65 | $62.66 |
| 07/06/2016 | 18 | $65.39 |
| 09/14/2016 | 23 | $61.43 |
| 12/16/2016 | 23 | $61.04 |
| 02/28/2017 | 19 | $66.75 |
| 03/31/2017 | 19 | $66.36 |
| 09/15/2017 | 29 | $70.28 |
| 12/15/2017 | 27 | $53.05 |
| 03/16/2018 | 25 | $45.08 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 07/08/2016 | 6 | $64.83 |
| 03/01/2017 | 8 | $65.85 |
| 03/27/2017 | 142 | $67.19 |
| 06/23/2017 | 27 | $68.03 |
| 06/22/2018 | 125 | $42.92 |
| 09/21/2018 | 223 | $46.79 |
| 10/15/2018 | 1,170 | $47.84 |

*Opening position of 1,081 shares for common stock.

**Bonds**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 12/21/2017 | 3.3% due 12/01/2027 | 75,000 | $98.89 |
| 05/01/2018 | 3.3% due 12/01/2027 | 25,000 | $93.09 |
| 05/14/2018[e] | 3.3% due 12/01/2027 | 100,000 | $92.51 |

| Date Sold | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 05/14/2018[e] | 3.3% due 12/01/2027 | 100,000 | $92.51 |
| 01/14/2019 | 3.3% due 12/01/2027 | 100,000 | $78.00 |

[e]Debt exchange offer.

# Attachment D

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MID-JERSEY TRUCKING INDUSTRY & LOCAL NO. 701 PENSION FUND
("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28TH day of May, 2019.

MID-JERSEY TRUCKING INDUSTRY &
LOCAL NO. 701 PENSION FUND

By: _____
     Giancarlo Prezioso, Administrator

PG&E

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Bonds**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 12/22/2017 | 3.3% due 03/15/2027 | 65,000 | $98.80 |
| 01/31/2018 | 4.0% due 12/01/2046 | 20,000 | $97.97 |
| 11/14/2018 | 4.75% due 02/15/2044 | 5,000 | $77.76 |
| 10/19/2015 | 6.05% due 03/01/2034 | 16,000 | $121.84 |
| 10/21/2015 | 6.05% due 03/01/2034 | 4,000 | $122.19 |
| 11/03/2015 | 6.05% due 03/01/2034 | 10,000 | $120.06 |

| Date Sold | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 01/14/2019 | 3.3% due 03/15/2027 | 65,000 | $78.00 |
| 01/14/2019 | 4.0% due 12/01/2046 | 20,000 | $75.75 |
| 01/14/2019 | 4.75% due 02/15/2044 | 5,000 | $76.57 |
| 03/10/2017 | 6.05% due 03/01/2034 | 5,000 | $123.44 |
| 01/29/2018 | 6.05% due 03/01/2034 | 15,000 | $123.00 |
| 01/31/2018 | 6.05% due 03/01/2034 | 10,000 | $122.65 |

# EXHIBIT A

**Exhibit A: Securities Act Claims – False and Misleading Statements**

| No. | Source | Referenced | Statement |
|---|---|---|---|
| 1. | 424B2 (Prosp. Supp.) (2/24/2016) | March 2016 Reg. Stmt.[1] (2/11/2014) and Prosp. Supp. (2/24/2016) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .*** <br><br>              *      *      * <br><br> ● ***the impact of droughts or other weather-related conditions or events, wildfires (including the Butte fire in September 2015***, which affected portions of Amador and Calaveras counties), climate change, natural disasters, acts of terrorism, war, or vandalism (including cyber-attacks), ***and other events***, that can cause unplanned outages, reduce generating output, disrupt the our [sic] service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by us, our customers, or third parties on which we rely; ***whether we incur liability to third parties for property damage or personal injury caused by such events; and whether the we [sic] are subject to civil, criminal, or regulatory penalties in connection with such events.*** |
| 2. | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .*** <br><br>              *      *      * <br><br> ● ***the impact of droughts or other weather-related conditions or events, wildfires (such as the Butte fire)***, climate change, natural disasters, acts of terrorism, war, or vandalism (including cyber-attacks), ***and other events***, that can cause unplanned outages, reduce generating output, disrupt the Utility's service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by the Utility, its customers, or third parties on which the Utility relies; ***whether the Utility incurs liability to third parties for property damage or personal injury caused by such events; and whether the Utility is subject to civil, criminal, or regulatory penalties in connection with such events***. |

---

[1]   "Reg. Stmt." refers to the registration statement filed with the SEC as part of the Offering Documents for the Notes Offerings as defined in the Third Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws.  "Prosp. Supp." refers to the prospectus supplement filed with the SEC as part of the Offering Documents for the Notes Offerings as defined in the Third Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws.

| No. | Source | Referenced | Statement |
|-----|--------|------------|-----------|
| **3.** | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | *Climate Change Mitigation and Adaptation Strategies.*  During 2015, the Utility ***continued its programs*** to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations.  The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and ***wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks,*** including extreme storms, heat waves and wildfires and ***uses its risk-assessment process*** to ***prioritize infrastructure investments*** for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future. |
| **4.** | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017), | With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and frequent hot weather.  The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to the expected increase in demand for electricity.  ***The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies.  The Utility's vegetation management activities also reduce the risk of wildfire impacts on electric*** and gas facilities.  Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. |
| **5.** | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | ***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows.*** |

| No. | Source | Referenced | Statement |
|---|---|---|---|
| 6. | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains. If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost. If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits. ***In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life.*** In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets. ***The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries***. The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase. |
| 7. | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | At December 31, 2015, the Utility owned approximately 18,400 circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV. The Utility also operated 91 electric transmission substations with a capacity of approximately 63,400 MVA.<br><br>*        *        *<br><br>***Throughout 2015, the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.*** The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment. |

3

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **8.** | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | *In 2015, the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages. Another 83 circuits were outfitted with this equipment, bringing the total deployment to 700 of the Utility's 3200 distribution circuits. The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.* The Utility plans to ***continue*** performing work ***to improve the reliability and safety of its electricity distribution operations*** in 2016. |
| **9.** | FY15 10-K (2/18/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (2/24/2016); March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016); March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017). | *Utility's ability to safely* and reliably ***operate***, maintain, construct and decommission its facilities is ***subject to numerous risks, many of which are beyond the Utility's control***, including those that arise from:<br><br>• ***the breakdown or failure of equipment, electric transmission or distribution lines***, or natural gas transmission and distribution pipelines, ***that can cause*** explosions, ***fires, or other catastrophic events***<br><br>      \*      \*      \*<br><br>• ***the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire or natural gas explosion)***, and the failure to respond effectively to a catastrophic event. |
| **10.** | 424B2 (Prosp. Supp.) (11/29/2016) | March 2016 Reg. Stmt. (2/11/2014) and Prosp. Supp. (11/29/2016). | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .***<br><br>      \*      \*      \*<br><br>● ***the impact of droughts or other weather-related conditions or events, wildfires (such as the Butte fire),*** climate change, natural disasters, acts of terrorism, war, vandalism (including cyber-attacks), ***and other events***, that can cause unplanned outages, reduce generating output, disrupt our service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by us, our customers, or third parties on which we rely; ***whether we incur liability to third parties for property damage or personal injury caused by such events; and whether we are subject to civil, criminal, or regulatory penalties in connection with such events;*** and whether our insurance coverage is available for these types of claims and sufficient to cover our liability. |

4

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **11.** | S-3 (Reg. Stmt.) (1/4/2017) | March 2017 Reg. Stmt. (3/8/2017) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .***<br><br>        *             *             *<br><br>●***the impact of droughts or other weather-related conditions or events, wildfires (such as the Butte fire)***, climate change, natural disasters, acts of terrorism, war, vandalism (including cyber-attacks), ***and other events***, that can cause unplanned outages, reduce generating output, disrupt the Utility's service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by the Utility, its customers, or third parties on which the Utility relies; ***whether the Utility incurs liability to third parties for property damage or personal injury caused by such events; whether the Utility is subject to civil, criminal, or regulatory penalties in connection with such events;*** and whether the Utility's insurance coverage is available for these types of claims and sufficient to cover the Utility's liability. |
| **12.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and frequent hot weather.  The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to the expected [increase] in demand for electricity.  ***The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies. The Utility's vegetation management activities also reduce the risk of wildfire impacts on electric*** and gas facilities.  Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. |
| **13.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | ***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows.*** |

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 652 of 1229

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **14.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains.  If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost.<br><br>If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits.  ***In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life.***  In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets.  ***The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries.***  The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase. |
| **15.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | *Climate Change Mitigation and Adaptation Strategies.*  During 2016, the Utility ***continued its programs*** to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations, including forming an officer-level coordinating committee to govern and oversee the Utility's activities.  The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and ***wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks,*** including extreme storms, heat waves and wildfires and uses its risk-assessment process to ***prioritize infrastructure investments*** for longer-term risks associated with climate change.  The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future. |

6

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **16.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | At December 31, 2016, the Utility owned approximately 18,400 circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV.  The Utility also operated 92 electric transmission substations with a capacity of approximately 64,600 MVA.  The Utility's electric transmission system is interconnected with electric power systems in the Western Electricity Coordinating Council, which includes many western states, Alberta and British Columbia, and parts of Mexico.<br><br>\*          \*          \*<br><br>*Throughout 2016, the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.* The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability.  The Utility also has taken steps to improve the physical security of its transmission substations and equipment. |
| **17.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | *In 2016, the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages. Another 89 circuits were outfitted with this equipment, bringing the total deployment to 789 of the Utility's 3,200 distribution circuits.* The Utility plans to *continue* performing work *to improve the reliability and safety of its electricity distribution operations* in 2017. |
| **18.** | FY16 10-K (2/16/2017) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | *Utility's ability to safely* and reliably *operate*, maintain, construct and decommission its facilities is *subject to numerous risks, many of which are beyond the Utility's control*, including those that arise from:<br><br>• *the breakdown or failure of equipment, electric transmission or distribution lines*, or natural gas transmission and distribution pipelines, *that can cause* explosions, *fires, or other catastrophic events*;<br><br>\*          \*          \*<br><br>• *the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire or natural gas explosion)*, and the failure to respond effectively to a catastrophic event. |

7

| No. | Source | Referenced | Statement |
|-----|--------|-----------|-----------|
| **19.** | 8-K (Press Release) (5/23/2016) | March 2017 Reg. Stmts. (1/4/17; 1/19/17) and Prosp. Supp. (3/8/2017) | PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016. <br><br>      *      *      * <br><br>      The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities. <br><br>      *      *      * <br><br> [Earley]: ***"We've continued to demonstrate leadership and commitment on safety.  We're delivering the most reliable service in our company's history."*** |
| **20.** | S-4 (Reg. Stmt.) (4/2/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .*** <br><br>      *      *      * <br><br> ● ***the impact of wildfires, droughts, floods, or other weather-related conditions or events,*** climate change, natural disasters, acts of terrorism, war, vandalism (including cyber-attacks), downed power lines, ***and other events,*** that can cause unplanned outages, reduce generating output, disrupt the Company's service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by the Company, its customers, or third parties on which the Company relies, and the reparation and other costs that the Company may incur in connection with such conditions or events; the impact of the adequacy of the Company's emergency preparedness; ***whether the Company incurs liability to third parties for property damage or personal injury caused by such events; whether the Company is subject to civil, criminal, or regulatory penalties in connection with such events;*** and whether the Company's insurance coverage is available for these types of claims and sufficient to cover the Company's liability; |
| **21.** | S-4 (Reg. Stmt.) (4/2/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .*** <br><br>      *      *      * <br><br> ● ***the breakdown or failure of equipment that can cause fires and unplanned outages; and whether the Company will be subject to investigations, penalties, and other costs in connection with such events;*** |

8

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **22.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .***<br><br>         *          *          *<br><br>● ***the breakdown or failure of equipment that can cause fires and unplanned outages; and whether the Utility will be subject to investigations, penalties, and other costs in connection with such events;*** |
| **23.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .***<br><br>         *          *          *<br><br>● ***the impact of wildfires, droughts, floods, or other weather-related conditions or events,*** climate change, natural disasters, acts of terrorism, war, vandalism (including cyber-attacks), downed power lines, ***and other events,*** that can cause unplanned outages, reduce generating output, disrupt the Utility's service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by the Utility, its customers, or third parties on which the Utility relies, and the reparation and other costs that the Utility may incur in connection with such conditions or events; the impact of the adequacy of the Utility's emergency preparedness; ***whether the Utility incurs liability to third parties for property damage or personal injury caused by such events; whether the Utility is subject to civil, criminal, or regulatory penalties in connection with such events;*** and whether the Utility's insurance coverage is available for these types of claims and sufficient to cover the Utility's liability; |

9

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **24.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include . . .*** <br><br> ● the impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the Utility's facilities, and whether the Utility is able to recover such costs through CEMA; the timing and outcome of the wildfire investigations, ***including into the causes of the wildfires; whether the Utility may have liability associated with these fires;*** if liable for one or more fires, whether the Utility would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the Utility if the CPUC or any other law enforcement agency brought an enforcement action and determined that the ***Utility failed to comply with applicable laws and regulations;*** |
| **25.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | ***If*** the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies, the Utility ***could*** be liable for property damage, interest, and attorneys' fees without having been found negligent . . . the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal injury damages, and other damages under other theories of liability, including if the Utility were found to have been negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. Further, the Utility could be subject to material fines or penalties if the CPUC or any other law enforcement agency brought an enforcement action and determined that the Utility failed to comply with applicable laws and regulations. <br> ***Given the preliminary stages of investigations and the uncertainty as to the causes of the fires, PG&E Corporation and the Utility do not believe a loss is probable at this time***. However, it is reasonably possible that facts ***could emerge*** through the course of the various investigations that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be material. <br><br> <div align="center">*          *          *</div> <br> The Utility has liability insurance from various insurers, which provides coverage for third-party liability attributable to the Northern California wildfires in an aggregate amount of approximately $800 million. |

10

| No. | Source | Referenced | Statement |
|-----|--------|-----------|-----------|
| **26.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | ***Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.*** <br><br> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California. Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events. ***In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage. In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors***. Other contributing factors include local land use policies and historical forestry management practices. The combined effects of extreme weather and climate change also impact this risk. |
| **27.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Further, the Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. As a result, the Utility's hydroelectric generation could change and the Utility would need to consider managing or acquiring additional generation. If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits. In addition, flooding caused by rising sea levels could damage the Utility's facilities, including generation and electric transmission and distribution assets. ***The Utility could incur substantial costs to repair or replace facilities, restore service, or compensate customers and other third parties for damages or injuries.*** The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase. |

11

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 658 of 1229

| No. | Source | Referenced | Statement |
|---|---|---|---|
| 28. | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | *Climate Change Resilience Strategies*<br><br>*During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations*. The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves, *wildfires,* drought and land subsidence, *to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks, including wildfires,* extreme storms, and heat waves and uses its *risk-assessment process to prioritize infrastructure investments* for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future. |
| 29. | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and frequent hot weather. The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to the expected changes in demand for electricity. *The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies*. Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. *As the state continues to face increased risk of wildfire, the Utility's vegetation management activities will continue to play an important role to help reduce the risk of wildfire and its impact on electric* and gas facilities. |

12

| No. | Source | Referenced | Statement |
|---|---|---|---|
| **30.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | At December 31, 2017, the Utility owned approximately 19,200 circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV.  The Utility also operated 92 electric transmission substations with a capacity of approximately 64,700 MVA. <br><br> \*          \*          \* <br><br> ***Throughout 2017, the Utility upgraded several substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.***  The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability.  The Utility also has taken steps to improve the physical security of its transmission substations and equipment. |
| **31.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | ***In 2017, the Utility continued to deploy its fault location, isolation, and service restoration circuit technology that involves the rapid operation of smart switches to reduce the duration of customer outages. Another 92 circuits were outfitted with this equipment, bringing the total deployment to 882 of the Utility's 3,200 distribution circuits.***  The Utility plans to ***continue*** performing work ***to improve the reliability and safety of its electric distribution operations*** in 2018. |
| **32.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | *Utility's ability to safely* and reliably *operate*, maintain, construct and decommission its facilities is *subject to numerous risks*, *many of which are beyond the Utility's control*, including those that arise from: <br><br> • ***the breakdown or failure of equipment, electric transmission or distribution lines,*** or natural gas transmission and distribution pipelines, ***that can cause*** explosions, ***fires, or other catastrophic events;*** <br><br> \*          \*          \* <br><br> • ***the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire or natural gas explosion);*** |

13

| No. | Source | Referenced | Statement |
|-----|--------|------------|-----------|
| **33.** | FY17 10-K (2/9/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | On April 12, 2017, the Utility retained a third-party monitor at the Utility's expense as part of its compliance with the sentencing terms of the Utility's January 27, 2017 federal criminal conviction, which sentenced the Utility to, among other things, a five-year corporate probation period and oversight by a third-party monitor for a period of five years, with the ability to apply for early termination after three years.  ***The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations and maintains effective ethics, compliance, and safety related incentive programs on a Utility-wide basis***. |
| **34.** | S-4 (Reg. Stmt.) (4/2/2018) | April 2018 Reg. Stmt. (4/2/2018) and Prosp. Supp. (4/13/2018) | Some of the ***factors that could cause future results to differ materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include…*** <br><br> ● the impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the Company facilities, and whether the Company is able to recover such costs through a Catastrophic Event Memorandum Account; the timing and outcome of the wildfire investigations, ***including into the causes of the wildfires; whether the Company may have liability associated with these fires***; if liable for one or more fires, whether the Company would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the Company if the California Department of Forestry and Fire Protection and the California Public Utilities Commission ("CPUC") or any other law enforcement agency brought an enforcement action and determined that the ***Company failed to comply with applicable laws and regulations;*** |

14

# Exhibit 93

Neal A. Potischman (SBN 254862)
Ian C.J. Hogg (SBN 313924)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
Email:   neal.potischman@davispolk.com
         ian.hogg@davispolk.com

Charles S. Duggan (admitted *pro hac vice*)
Dana M. Seshens (admitted *pro hac vice*)
Craig T. Cagney  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   charles.duggan@davispolk.com
         dana.seshens@davispolk.com
         craig.cagney@davispolk.com

*Attorneys for Defendant Underwriters*
*(listed on signatures page)*

Stephen P. Blake (SBN 260069)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002
Email: sblake@stblaw.com

Paul C. Curnin (admitted *pro hac vice*)
Nicholas S. Goldin (admitted *pro hac vice*)
Rachel Sparks Bradley (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: pcurnin@stblaw.com
       ngoldin@stblaw.com
       rachel.sparksbradley@stblaw.com

*Attorneys for Defendant Directors*
*(listed on signatures page)*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE PG&E CORPORATION SECURITIES LITIGATION | Case No. 5:18-cv-03509-EJD |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DIRECTORS AND UNDERWRITERS' MOTION TO DISMISS THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | Date:      February 6, 2020 |
| | Time:      9:00 a.m. |
| | Ctrm:      4 |
| | Judge: Hon. Edward J. Davila |

# **TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.    The Parties ............................................................................................ 3

    B.    PG&E's Offerings and Wildfire Disclosures.................................................. 3

    C.    Procedural Background........................................................................... 9

ARGUMENT ........................................................................................................... 9

I.    THE TAC FAILS TO IDENTIFY ANY ACTIONABLE FALSE OR MISLEADING STATEMENT IN THE 2016-2017 NOTES OFFERING DOCUMENTS ........................... 9

    A.    PG&E Disclosed that Its Wildfire Risk Had Already Materialized......................... 9

    B.    PG&E Warned that Safety Violations Increased  Present and Future Wildfire Risk ..................................................................................................... 12

    C.    PG&E Did Not Mislead Investors About Its Safety Efforts ...................................... 14

    D.    Item 303 and Item 503 Do Not Require Any Additional Disclosures...................... 18

II.    THE SECURITIES ACT CLAIMS BASED ON THE 2016-2017 NOTES OFFERINGS ARE UNTIMELY............................................................................................. 19

    A.    Plaintiffs Should Have Discovered Their Alleged Securities Act Claims More Than One Year Before Filing the *York County* Action on February 22, 2019 ......... 20

    B.    The Securities Act Claims Do Not Relate Back to the Earlier Exchange Act Complaints ......................................................................................... 22

III.    THE TAC FAILS TO IDENTIFY ANY ACTIONABLE FALSE OR MISLEADING STATEMENT IN THE 2018 EXCHANGE OFFERING DOCUMENTS .......................... 24

    A.    PG&E Did Not Mislead About Its Wildfire Risks or Safety Practices..................... 24

    B.    PG&E Accurately Disclosed Its Liability For The North Bay Fire .......................... 26

    C.    Plaintiffs Fail To Plead A Violation of Section 11 Under Items 303 and 503 of Regulation S-K................................................................................. 29

IV.    THE TAC NEGATES ANY INFERENCE OF LOSS CAUSATION ................................. 29

V.    CLAIMS BASED ON THE 2016 OFFERINGS MUST BE DISMISSED.......................... 31

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC      CASE NO. 5:18-CV-03509-EJD

    A.    Claims Based on the March 2016 Offering Must Be Dismissed Because No Plaintiff Is Alleged to Have Relied on the Offering Documents .............................. 31

    B.    Claims Based on the December 2016 Offering Must Be Dismissed Because No Named Plaintiff Has Standing to Assert Them ......................................................... 32

    C.    Claims Against The Directors For The March and December 2016 Offerings Must Be Dismissed Because The Alleged Misrepresentations Post-Date The Effective Date of the 2014 Shelf Registration Statement That They Signed ........... 33

VI.    CLAIMS BASED ON THE 2018 EXCHANGE OFFERINGS MUST BE DISMISSED ... 34

VII.    THE TAC FAILS TO STATE A SECTION 15 CLAIM AGAINST THE DIRECTORS ... 35

CONCLUSION ................................................................................................................. 35

## **TABLE OF AUTHORITIES**

Page

### Cases

*Anderson v. Clow,*
No. CIV. 92-1120-R, 1993 WL 497212 (S.D. Cal. Sept. 17, 1993) ............................................ 11

*Anderson v. Spirit AeroSystems Holdings, Inc.,*
105 F. Supp. 3d 1246 (D. Kan. 2015) ............................................ 17

*Bartesch v. Cook,*
941 F. Supp. 2d 501 (D. Del. 2013) ............................................ 30

*Batwin v. Occam Networks, Inc.,*
2008 WL 2676364 (C.D. Cal. July 1, 2008) ............................................ 35

*Belodoff v. Netlist, Inc.,*
No. SACV 07-00677DOCMLGX, 2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) .................... 11

*Bonanno v. Cellular Biomedicine Grp., Inc.,*
No. 15-cv-1795, 2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ............................................ 29

*Brody v. Transitional Hosps. Corp.,*
280 F.3d 997 (9th Cir. 2002) ............................................ 16

*City of Brockton Ret. Sys. v. Avon Prod., Inc.,*
No. 11-cv-4665, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ............................................ 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
856 F.3d 605 (9th Cir. 2017) ............................................ 26

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.,*
14 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................ 19

*City of Roseville Emps' Ret. Sys. v. Sterling Fin. Corp.,*
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ............................................ 14, 18

*Diehl v. Omega Protein Corp.,*
339 F. Supp. 3d 153 (S.D.N.Y. 2018) ............................................ 25

*Employees Ret. Sys. v. Embraer S.A.,*
No. 16 Civ. 6277, 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ............................................ 26

*FDIC v. Countrywide Fin. Corp.,*
No. 2:12-CV-4354, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ............................................ 31

*Felarca v. Birgeneau,*
No. 11–cv–05719, 2014 WL 7140262 (N.D. Cal. Dec. 12, 2014) ............................................ 23

*Gaines v. Haughton,*
645 F.2d 761 (9th Cir. 1981) ............................................ 14

*Golub v. Gigamon Inc.,*
372 F. Supp. 3d 1033 (N.D. Cal. 2019) ............................................ 27

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC                CASE NO. 5:18-cv-03509-EJD

*Greenberg v. Sunrun Inc.,*
   233 F. Supp. 3d 764 (N.D. Cal. 2017) ...........................................................11, 16, 28

*Grossman v. Novell, Inc.,*
   120 F.3d 1112 (10th Cir. 1997) ...............................................................................17

*Hertzberg v. Dignity Partners, Inc.,*
   191 F.3d 1076 (9th Cir. 1999) ................................................................................32

*In re Bare Escentuals, Inc. Sec. Litig.,*
   745 F. Supp. 2d 1052 (N.D. Cal. 2010); ...............................................................35

*In re BP p.l.c. Sec. Litig.,*
   843 F. Supp. 2d 712 (S.D. Tex. 2012) .............................................................11, 15

*In re Century Aluminum Co. Sec. Litig.,*
   729 F.3d 1104 (9th Cir. 2013) ................................................................................32

*In re Citigroup, Inc. Sec. Litig.,*
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ...............................................................13, 28

*In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.,*
   467 F. Supp. 227 (W.D. Tex. 1979) ........................................................................23

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.,*
   932 F. Supp. 2d 1095 (C.D. Cal. 2013) .................................................................33

*In re Countrywide Fin. Corp. Sec. Litig.,*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................32

*In re Gen. Elec. Co. Sec. Litig.,*
   856 F. Supp. 2d 645 (S.D.N.Y. 2012) ....................................................................15

*In re Infonet Servs. Corp.,*
   310 F. Supp. 2d 1106 (C.D. Cal. 2003) .................................................................20

*In re Intel Corp. Sec. Litig.,*
   No. 18-CV-00507, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)......................13-14

*In re ITT Educ. Servs., Inc. Sec. & Shareholder Derivatives Litig.,*
   859 F. Supp. 2d 571 (S.D.N.Y. 2012) ....................................................................28

*In re Levi Strauss & Co. Sec. Litig.,*
   527 F. Supp. 2d 965 (N.D. Cal. 2007) ...................................................................34

*In re LifeLock, Inc. Sec. Litig.,*
   690 F. App'x 947 (9th Cir. 2017) .....................................................................14, 18

*In re Lions Gate Entm't Corp. Sec. Litig.,*
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ..................................................................26, 27

*In re Nimble Storage, Inc.,*
   No. 15-cv-05803, 2016 WL 7209826 (N.D. Cal. Dec. 9, 2016).............................11

*In re Petrobras Sec. Litig.,*
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ....................................................................31

*In re Plains All Am. Pipeline L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) ........................................................15, 16, 17

*In re Refco, Inc. Sec. Litig.*,
   503 F.Supp.2d 611 (S.D.N.Y. 2007) .....................................................................35

*In re Rocket Fuel, Inc. Sec. Litig.*,
   No. 14-CV-3998, 2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ..........................18

*In re Safety–Kleen Corp.*,
   No. C/A 3:00-1145-17, 2002 WL 32349819 (D.S.C. Mar. 27, 2002) ....................35

*In re Stac Elecs. Sec. Litig.*,
   89 F. 3d 1399 (9th Cir. 1996) .........................................................................10, 16

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996) ...................................................................................23

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ...................................................................................27

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
   258 F. Supp. 3d 1037 (N.D. Cal. 2017) .................................................................13

*In re Xchange Inc. Sec. Litig.*,
   No. CIV.A.00-10322, 2002 WL 1969661 (D. Mass. Aug. 26, 2002) .....................23

*In re Zynga Inc. Sec. Litig.*,
   No. C 12-04007, 2014 WL 721948 (N.D. Cal. Feb. 25, 2014) ..............................31

*In re Shoretel Inc. Sec. Litig.*,
   No. C 08-00271, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ...........................29, 30

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
   No. 17-CV-05558, 2018 WL 418954 (N.D. Cal. Aug. 31, 2018) ...................... 17-18

*Jablon v. Dean Witter & Co.*,
   614 F.2d 677 (9th Cir. 1980) .................................................................................19

*Lentell v. Merrill Lynch & Co. Inc.*,
   396 F.3d 161 (2d Cir. 2005)...................................................................................30

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) .................................................................................29

*Louisiana-Pacific Corp. v. ASARCO, Inc.*,
   5 F.3d 431 (9th Cir. 1993) .....................................................................................23

*Markette v. XOMA Corp.*,
   No. 15-cv-03425, 2017 WL 4310759 (N.D. Cal. Sept. 28, 2017)..................25-26, 27

*Mosco v. Motricity, Inc.*,
   649 F. App'x 526 (9th Cir. 2016) ..........................................................................18

*Nuveen Mun. High Income Opp'y Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) ...............................................................................30

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ............................................................................10, 16, 26

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
  No. 15 CIV. 5999, 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ............................................18

*Plumley v. Sempra Energy*,
  No. 3:16-cv-00512, 2017 WL 2712297 (S.D. Cal. June 20, 2017) ......................................15, 17

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ............................................................................11, 15

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
  898 F. Supp. 2d 673, (S.D.N.Y. 2012) ..........................................................................30

*Primo v. Pac. Biosciences of Cal., Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) .........................................................................35

*Rubke v. Capital Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ................................................................................9

*SEC v. Seaboard Corp.*,
  677 F.2d 1301 (9th Cir. 1982) ...............................................................................23

*Shwarz v. United States*,
  234 F.3d 428 (9th Cir. 2000) ................................................................................15

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
  707 F.3d 95 (1st Cir. 2013) .................................................................................19

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ..................................................................................18

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................................................22, 23

*Webster v. Omnitrition Int'l, Inc.*,
  79 F.3d 776 (9th Cir. 1996) .................................................................................20

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) .........................................................................17

*Welgus v. TriNet Grp., Inc.*,
  No. 15-cv-03625, 2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ................................................35

*Willner v. Manpower Inc.*,
  No. 11-CV-02846, 2014 WL 2939732 (N.D. Cal. June 30, 2014) .............................................23

*Zeid v. Kimberley*,
  930 F. Supp. 431 (N.D. Cal. 1996) ..........................................................................28

*Ziolkowski v. Netflix*,
  No. 17-01070, 2018 WL 4587515 (N.D. Cal. Sept. 25, 2018) ................................................28

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC          CASE NO. 5:18-CV-03509-EJD

**Statutes**

15 U.S.C. § 77k(a) ....................................................................................9, 16, 31, 33

15 U.S.C. § 77m ...............................................................................................19, 20

17 C.F.R. § 229.303(a)(3)(ii) .................................................................................18

17 C.F.R. § 229.503(c) ...........................................................................................19

17 C.F.R. § 230.430B(f)(2) .....................................................................................33

17 C.F.R. § 230.430B(f)(4) .....................................................................................33

**Rules**

Fed. R. Civ. P. 15(c)(1)(B) .....................................................................................23

Fed. R. Civ. P. 15(c)(1)(C) .....................................................................................23

Fed. R. Civ. P. 15(c)(1)(C)(ii) ................................................................................22

The defendant Directors and Underwriters (as identified on the signatures page) respectfully submit this brief in support of their motion to dismiss the Third Amended Complaint ("TAC").

## INTRODUCTION

Pacific Gas & Electric Corp. (together with PG&E Corporation, "PG&E") is an electric and gas utility that transmits inherently hazardous products across thousands of miles of terrain, much of it impacted by California's periodic droughts.  In October 2017 and November 2018, devastating wildfires—the North Bay Fires and the Camp Fire—swept through PG&E's service area, causing numerous fatalities and widespread damage.  This lawsuit is not about PG&E's liability for these fires.  It is about whether PG&E misled investors in violation of the federal securities laws.

Plaintiffs are investors in three PG&E note offerings in March 2016, December 2016 and March 2017 (the "Notes Offerings") and participants in an April 2018 exchange offer (the "Exchange Offer") (collectively, the "Offerings").  They assert claims under the Securities Act of 1933, seeking to recover for the claimed loss in value of the notes following the revelation of the devastation wrought by the October 2017 North Bay and November 2018 Camp Fires, and PG&E's potential responsibility for them.  Plaintiffs' claims fail for numerous reasons:

*First*, Plaintiffs fail to plead that PG&E's offering documents for the notes sales and exchange (the "Offering Documents") contained any material misrepresentations or omitted information required to be included by law or SEC rule.  Plaintiffs assert that the Offering Documents misled investors about the risk of wildfires to PG&E's business and the increased wildfire risk posed by PG&E's own safety deficiencies.  Yet, PG&E disclosed these risks.  It disclosed in great detail the long history of devastating fires caused by PG&E equipment, the costs of those fires to PG&E, and the potential impact of those fires on PG&E's business.  It disclosed that it had previously been investigated and penalized by multiple government agencies for safety violations and was subject to ongoing governmental safety reviews, including an investigation into its "safety culture."  And it disclosed that its failure to mitigate conditions it had identified as unsafe could lead to additional catastrophic fires in the future.  Far from hiding wildfire risk from investors, PG&E disclosed the very risks that materialized in the North Bay and Camp Fires.

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC                    CASE NO. 5:18-CV-03509-EJD

*Second*, the TAC's claims based on PG&E's notes sales in 2016 and 2017 are untimely because they were brought more than a year after widespread reports and disclosures by PG&E in October 2017 regarding the North Bay Fires.  According to Plaintiffs, investors understood immediately that PG&E had negligently caused the North Bay Fires and would bear substantial liability—precisely the risk of loss that Plaintiffs claim was omitted from the Offering Documents. Given these disclosures, a reasonable investor should have discovered its claims by October 2017 (and certainly by February 2018 at the latest) and timely filed suit then.  Yet Plaintiffs did not file their Securities Act claims until more than a year later, in February 2019.

*Third*, the TAC negates any inference that Plaintiffs' losses were caused by PG&E's alleged failures to disclose its wildfire risk.  As noted, the TAC alleges that, when news broke in October 2017 that regulators were investigating PG&E's role in causing the North Bay Fires, investors immediately recognized that PG&E could face substantial liability for them, and its stock price fell dramatically.  The stock price fell, not because PG&E had concealed its wildfire risk, but because it had expressly *disclosed* that risk.  When investors learned of the fire and its possible attribution to PG&E, they understood that the contingency about which PG&E had warned investors had come to pass, and it was the new fire liability, not materialization of a concealed risk, that caused trading loss.

*Finally*, the TAC's claims based on two notes offerings by PG&E in March and December 2016 and the April 2018 Exchange Offer should be dismissed for various reasons, including because no plaintiff asserts a viable claim under Section 11 for either Notes Offering and because the Exchange Offer is not actionable under Section 11.

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC            CASE NO. 5:18-cv-03509-EJD

# BACKGROUND[1]

### A.    The Parties

Three purported representative plaintiffs (the "Securities Act Plaintiffs") assert the TAC's claims under Section 11 of the Securities Act on behalf of the proposed class. TAC ¶¶ 506-08.

The defendant Directors served as non-executive members of PG&E's Board of Directors and signed one or more registration statements related to the Offerings. *Id.* ¶¶ 515, 518-28.

The Underwriters are financial institutions that participated in one or more of the 2016-2017 Notes Offerings. *Id.* ¶¶ 531-54.  None participated in the Exchange Offer, and the TAC asserts no claim against any Underwriter based on the Exchange Offer.  *Id.* ¶ 555.

### B.    PG&E's Offerings and Wildfire Disclosures

PG&E's equipment has been found responsible for causing numerous wildfires throughout the Company's history.  A number of those fires are listed in the TAC, according to which "PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems" that caused the 1994 Trauner Fire, *id.* ¶ 95, and PG&E was fined and reprimanded for "not spending money that had been earmarked for tree trimming and removal" after "PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire" in 1999, *id.* ¶ 96 & n.26.  Just months prior to the first Offering, PG&E was implicated in causing the 2015 Butte Fire, which was, at the time, "the seventh most destructive wildfire in California history," killing two people, destroying 921 structures, and scorching more than 70,000 acres.  *Id.* ¶¶ 21, 563.

The Offering Documents also expressly warned investors about the wildfire risks of PG&E's operations, including risks that could arise from its own safety deficiencies and its potentially material liability for wildfires that it might cause through negligence.  For example, PG&E continually identified as a key risk affecting its ability to "safely and reliably operate" "the failure to take expeditious or sufficient action to mitigate operating conditions. . . that the Utility

---

[1]  This background is derived from the allegations in the TAC and documents referenced therein, without conceding the accuracy of these allegations.

has identified. . . as unsafe, which failure then leads to a catastrophic event (such as a wild land fire. . .)."  *See* Ex. 2 (2015 10-K) at 28; Ex. 7 (2016 10-K) at 32; Ex. 9 (2017 10-K) at 36.[2]

### 1.    The March 2016 Offering

On February 23, 2016, PG&E filed a Rule 424(b)(2) prospectus supplement to a Form S-3 dated February 11, 2014 (the "2014 Shelf Registration") and issued $600 million of senior notes (the "March 2016 Offering").  The prospectus supplement included the same disclosures concerning the risk of wildfires to PG&E's future performance included in its 2015 annual Form 10-K and incorporated the 2015 10-K by reference.  Ex. 1 (Feb. 23, 2016 Pro. Supp.) at S-1-3.[3]

*2015 10-K.*  In this annual report (and in each successive annual report), PG&E expressly warned investors that "[t]he Utility's electrical . . . operations are inherently hazardous and involve significant risks which, if they materialize, can adversely affect. . . [PG&E]'s financial results." Ex. 2 (2015 10-K) at 28.  Beneath that heading, it explained that its ability to safely operate its business was subject to numerous risks, including failures of "electrical transmission or distribution lines. . . that can cause explosions, fires or other catastrophic events."  *Id.* at 28.  It warned that failures to identify and control workplace hazards could result in "serious injury or loss of life for employees or the public, environmental damage, or reputational damage" and that failures to identify and mitigate an unsafe condition could "lead[] to a catastrophic event (such as a wild land fire . . .)."  *Id.* at 29.

PG&E's 2015 10-K also made clear that PG&E could bear material liability if such failures resulted in a catastrophe:

---

[2] References to "Ex." are to the exhibits to the Declaration of Neal A. Potischman in Support of Defendant Directors and Underwriters' Motion to Dismiss Third Amended Consolidated Class Action Complaint ("Potischman Decl.").

[3]  A Form S-3 "shelf" registration statement allows issuers to issue securities pursuant to prospectus supplements filed on a later date.  The registration statement's "effective date" for each Offering, for purposes of Section 11 liability, varies depending on each defendant's role in the Offering.

1
2
3
4

> As a result, the Utility could incur costs . . . to compensate third parties. In particular, the Utility may incur material liability in connection with a wildfire (known as the "Butte fire") . . . depending on the outcome of the investigations into the cause of the fire. If insurance recoveries are unavailable or insufficient to cover such costs, [PG&E's] financial condition or results of operations could be materially affected. The Utility also could incur material fines, penalties, or disallowances, as a result of enforcement actions taken by the [CPUC] or other law enforcement agencies.

5   *Id.* at 29. Indeed, the 2015 10-K disclosed that regulators were investigating whether PG&E caused

6   the Butte Fire, noted that twenty-seven lawsuits had been filed against PG&E and its vegetation

7   management contractors, and that PG&E believed "it is reasonably possible that it would be liable"

8   for over $350 million in damages. *Id.* at 36, 123.

9   The 2015 10-K also warned that, as a result of climate change, "increasing temperatures and

10  lower levels of precipitation could increase the occurrence of wildfires in the Utility's service area,

11  causing damage to the Utility's facilities . . ., damage to third parties for loss of property, personal

12  injury, or loss of life." *Id.* at 32. PG&E cautioned that future results could "differ materially" from

13  current expectations or past historical results due to factors such as "the impact of . . . wildfires

14  (such as the Butte fire)," possible "liability to third parties for property damage or personal injury

15  caused by such events," and possible "civil, criminal, or regulatory penalties in connection with

16  such events." *Id.* at 65-66.

17  The 2015 10-K also reported that the CPUC had launched "a formal investigation into

18  whether the organizational culture and governance of PG&E Corporation and the Utility prioritize

19  safety and adequately direct resources to promote accountability and achieve safety goals and

20  standards," which included an evaluation of PG&E's "record of safety incidents," *id.* at 58, and

21  warned it could have a material impact on the Company, *id.* at 66. It further noted that PG&E had

22  been fined between "$50,000 to $16.8 million for violations of electric and natural gas laws and

23  regulations," and warned that "it is probable that the [CPUC's Safety & Enforcement Division

24  ("SED")] will impose penalties . . . based on some of the Utility's self-reported non-compliance. . .,

25  based on the SED's investigations. . ., or based on allegations of non-compliance with[] laws and

26  regulations." *Id.* at 120. Such "additional regulatory or governmental enforcement action" could

27  specifically result from PG&E's violations of regulations concerning "vegetation management" and

28  "safety and inspection practices." *Id.* at 25. In addition, PG&E prominently described its 2014

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC                    CASE NO. 5:18-CV-03509-EJD

federal criminal indictment for "knowingly and willfully violat[ing] minimum safety standards" in connection with a highly publicized 2010 gas pipe explosion caused by PG&E equipment in San Bruno, California.  *Id.* at 120.

### 2.    The December 2016 Offering

On November 28, 2016, PG&E filed a new Rule 424(b) prospectus supplement to the 2014 Shelf Registration and issued $650 million of senior notes (the "December 2016 Offering").  The prospectus supplement incorporated by reference PG&E's 2015 10-K, and its quarterly Form 10-Q reports for the first and third quarters of 2016.  Ex. 3 (Nov. 28, 2016 Pro. Supp.) at S-1-3.

***First quarter 2016 10-Q.***  Filed May 4, 2016, this quarterly report informed investors that, on April 28, 2016, the California Department of Forestry and Fire Protection ("Cal Fire") had concluded that PG&E's poor vegetation management practices were responsible for the Butte Fire.  TAC ¶¶ 101, 564, 566; Ex. 4 (1Q 2016 10-Q) at 35.

***Third quarter 2016 10-Q.***  Filed November 4, 2016, this quarterly report disclosed that, in August 2016, PG&E had been convicted of violations of law in connection with the 2010 incident involving its San Bruno gas pipeline.  Ex. 5 (3Q 2016 10-Q) at 36.

### 3.    The March 2017 Offering

On March 7, 2017, PG&E filed a Rule 424(b) prospectus supplement to a new Form S-3 shelf registration statement dated January 25, 2017, and issued $600 million of senior notes.  The prospectus supplement incorporated by reference the 2015 10-K, the 1Q and 3Q 2016 10-Qs, and PG&E's annual Form 10-K report for 2016.  Ex. 6 (Mar. 7, 2017 Pro. Supp.) at S-1-3, at 20.

***2016 10-K.***  This annual report included similar risk disclosures as the earlier annual reports, *see*, *e.g.*, Ex. 7 (2016 10-K) at 32-33, 36, 78-81, as well as substantially the same descriptions of the CPUC's safety culture investigation, *id.* at 70, and PG&E's safety record, *id.* at 27, 134.  In addition, PG&E disclosed that damages estimates for the Butte Fire had increased to $750 million, and warned that its "financial condition, results of operations, and cash flows could be materially affected by the ultimate amount of third-party liability that the Utility incurs in connection with the Butte Fire."  *Id.* at 26.  PG&E further noted that, "[a]s a result of the strict liability standard applied to wildfires, . . . the risk of increase in wildfires including as a result of the

ongoing drought, and the Butte fire, the Utility may not be able to obtain sufficient insurance coverage in the future" and "is unable to predict whether it would be allowed to recover in rates the increased costs of insurance or the costs of any uninsured losses." *Id.* at 33.  PG&E warned that if its potential wildfire liability exceeded available insurance and was not recoverable in rates, its "financial condition, results of operations, or cash flows could be materially affected." *Id.*

### 4.  The North Bay Fires and PG&E's Subsequent Disclosures

In early October 2017, the devastating North Bay Fires burned approximately 249,000 acres, destroyed 8,898 structures and caused 44 deaths.  TAC ¶¶ 19, 574.

***October 13, 2017 Form 8-K.***  In this report, PG&E reported that regulators were investigating the "causes of these fires . . . including the possible role of [PG&E's] power lines and other facilities."  PG&E noted that it "currently is unknown whether the Utility would have any liability" and warned that, because it had only $800 million in insurance coverage, "its financial condition or results of operations could be materially affected" if its liability exceeded that amount.  Ex. 11 (October 13, 2017 8-K) at 2.

***November 27, 2017 Form 8-K.***  On November 27, 2017, PG&E sold restricted notes in a private placement and, in a Form 8-K filed that same day, warned the markets that PG&E's "financial conditions, results of operations, liquidity, and cash flows could be materially and adversely affected by potential losses resulting from the impact of the [North Bay Fires]."  Ex. 12 (Nov. 27, 2017 8-K) at 1.  PG&E cautioned that its liability for the North Bay Fires "could be substantially higher than $3 billion" and that 32 lawsuits had already been filed alleging that PG&E's "failure to maintain and repair their distribution and transmission lines and failure to properly maintain the vegetation surrounding such lines were the causes of the fires."  *Id.* at 2.

### 5.  The April 2018 Exchange Offer

On April 13, 2018, PG&E filed a Form S-3 registration statement offering to exchange restricted notes that were issued in a November 2017 private placement for equivalent, publicly traded notes (the "April 2018 Exchange Offer").  The April 2018 registration statement incorporated by reference PG&E's annual Form 10-K report for 2017 filed on February 9, 2018.

1    **2017 10-K.** This annual report repeated PG&E's warnings that its potential liability related

2    to the North Bay Fires posed a material risk to its financial condition and liquidity, identifying its

3    liability for the North Bay Fires as the first "Key Factor[] Affecting Financial Results," and the first

4    Risk Factor. Ex. 9 (2017 10-K) at 54. PG&E disclosed that, while ongoing investigations were

5    still in their preliminary stages, "it is reasonably possible that facts could emerge through the course

6    of the various investigations that lead [PG&E] to believe that a loss is probable" in an amount

7    possibly exceeding $10 billion. *Id.* at 28. It also included substantially similar risk disclosures as

8    those in the 2015 and 2016 10-Ks, *see, e.g.*, *id.* at 36-37, 40-41, 81-85, as well as substantially the

9    same descriptions of the CPUC's safety culture investigation, *id.* at 44, and PG&E's safety record,

10   *id.* at 31, 141. In addition, PG&E emphasized that "[California] continues to face increased risk of

11   wildfire" and that "the risk posed by wildfires has increased in the Utility's service area" due to

12   environmental factors, *id.* at 24, 40. Finally, PG&E cautioned that "[l]iabilities that could be

13   incurred as a result of the [North Bay Fires] could adversely affect PG&E's ability to comply with

14   [its debt] covenants. . . [and] the ability to borrow." *Id.* at 34.

15                  **6.      Subsequent Events**

16         In May and June 2018, Cal Fire publicly announced its conclusion that PG&E's equipment

17   had caused sixteen of the North Bay Fires as a result of purported violations of safety regulations.

18   TAC ¶¶ 579-80. Although PG&E's potential liability at that time was substantial, in September

19   2018, California passed legislation that permitted PG&E to pay any damages arising from the 2017

20   fires through new bond issuances or by passing certain costs on to customers. *See id.* ¶ 27. In

21   November 2018, the Camp Fire—"the most destructive and fatal wildfire in California history"—

22   caused at least $16.5 billion in damages and 85 fatalities. *Id.* ¶ 587. Just as it had for the North

23   Bay Fires, shortly after the Camp Fire broke out, PG&E publicly disclosed that its equipment may

24   have been at fault. *Id.* ¶ 589. In light of its mounting potential wildfire liability, which PG&E

25   estimated could be in excess of $30 billion, PG&E filed for Chapter 11 bankruptcy protection on

26   January 29, 2019. *Id.* ¶ 179.

27

28

C. **Procedural Background**

On June 12, 2018, PG&E common stockholder David C. Weston filed a putative class action against PG&E and certain officers asserting only claims under Section 10(b) of the Securities Exchange Act of 1934. Dkt. No. 1. The Public Employees Retirement Association of New Mexico ("PERA") was appointed Lead Plaintiff on September 10, 2018. Dkt. No. 62. PERA filed a Consolidated Amended Complaint ("CAC") on November 8, 2018 and a Second Amended Complaint ("SAC") on December 14, 2018, each of which asserted only Exchange Act claims against PG&E and its officers. None asserted claims under the Securities Act, referenced the Offerings or named the Directors or Underwriters as defendants.

On February 22, 2019, the Securities Act Plaintiffs filed a separate complaint (the "*York County* Action") asserting Securities Act claims against the Directors, Officers and Underwriters. PG&E was not named due to the automatic bankruptcy stay. By stipulated order entered May 7, 2019, Dkt. No. 117, the *York County* Action was consolidated with PERA's Exchange Act claims. PERA and the Securities Act Plaintiffs jointly filed the TAC on May 28, 2019.

## ARGUMENT

To state a claim under Section 11, Plaintiffs must allege that the Offering Documents (1) "contain[ ] an untrue statement of a material fact," (2) "omit[ ] to state a material fact required to be stated therein," or (3) "omit[ ] to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (Section 11 plaintiff must identify a material "omission or misrepresentation" that "would have misled a reasonable investor about the nature of his or her investment").

I. **THE TAC FAILS TO IDENTIFY ANY ACTIONABLE FALSE OR MISLEADING STATEMENT IN THE 2016-2017 NOTES OFFERING DOCUMENTS**

A. **PG&E Disclosed that Its Wildfire Risk Had Already Materialized**

Plaintiffs allege that PG&E's wildfire risk disclosures—including disclosures about increased wildfire risk due to climate change and other weather-related conditions—were misleading because they stated only that wildfires "could" or "may" have a material impact on PG&E's financial performance when, in fact, PG&E was facing an "already existing negative

1   impact" due to "subpar safety practices that caused wildfires."  TAC ¶¶ 633, 637; *see also id.* ¶ 634

2   (alleging that PG&E "did not disclose the true existing [wildfire] risks facing PG&E as a result of

3   its deficient safety practices and policies, including the extent of the risks or that they had already

4   come to fruition"), *id.* ¶¶ 637-38.  But this contention is belied by the "full text of the [disclosures],

5   including portions of which were not mentioned in the complaint[]," *In re Stac Elecs. Sec. Litig.,* 89

6   F. 3d 1399, 1405 n.3 (9th Cir. 1996), such as PG&E's comprehensive disclosures about its wildfire

7   history, safety record, and resulting liability.  *See Omnicare, Inc. v. Laborers Dist. Council Const.*

8   *Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) ("reasonable investor" must read a statement,

9   not "in a vacuum," but "in a broader frame" and "in its full context" in determining if there is an

10  "omission of material facts that cannot be squared with such a fair reading").

11      Each Offering Document used the 2015 Butte fire as a specific example of the material risk

12  posed by wildfires.  *See supra* pp. 5-6 (describing "the impact of wildfires *(such as the Butte fire)*")

13  (emphasis added).  PG&E updated investors in real time regarding the investigation into the Butte

14  Fire and its impact on its potential liabilities.  PG&E's 2015 10-K (incorporated into the 2016 and

15  2017 Offering Documents) disclosed that PG&E's vegetation management practices may have

16  caused the Butte Fire (as numerous tort plaintiffs had already alleged) and that PG&E could be

17  liable for at least $350 million in damages.  *See* Ex. 2 (2015 10-K) at 36, 123 (disclosing Butte Fire

18  litigation against PG&E and its vegetation management contractors, and that Cal Fire was

19  investigating whether PG&E's power line "was the cause of the fire").  The 1Q 2016 10-Q

20  (incorporated into the December 2016 and March 2017 offering documents) disclosed that Cal Fire

21  concluded the Butte Fire was caused by PG&E's "failure . . . to identify certain potential hazards

22  during its vegetation management program."  Ex. 4 (1Q 2016 10-Q) at 35.  And the 2016 10-K

23  (incorporated into the March 2017 offering documents) reported that PG&E had been sued by at

24  least 1,950 tort plaintiffs over the Butte Fire and "it is *probable* that [PG&E] will incur a loss of at

25  least $750 million for all potential damages."  Ex. 7 (2016 10-K) at 26, 39, 60-61, 136.

26      Thus, contrary to Plaintiffs' contentions, the Offering Documents "disclose[d] the already

27  existing negative impact on PG&E as a result of PG&E's subpar safety practices."  TAC ¶ 633.

28  Where, as here, "the prospectus warned against the risks that Plaintiffs claim materialized," a

Section 11 claim is inappropriate and should be dismissed. *Belodoff v. Netlist, Inc.*, No. SACV 07-00677DOCMLGX, 2009 WL 1293690, at *7–8 (C.D. Cal. Apr. 17, 2009); *see also Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 773 (N.D. Cal. 2017) (no misstatement when allegedly omitted risk disclosed in the next sentence in the prospectus); *Anderson v. Clow*, No. CIV. 92-1120-R, 1993 WL 497212, at *7 (S.D. Cal. Sept. 17, 1993) (no Section 11 claim where "the purported omissions were actually disclosed" and "other statements . . . rendered the Prospectus *as a whole* not misleading").

Moreover, it was widely known that PG&E had long been associated with causing wildfires. The TAC itself alleges that "PG&E's deficient vegetation management practices ignited other fires" in the past, TAC ¶ 96 & n.26, which had resulted in material fines and even criminal penalties, *id.* ¶ 95-96. And since 2014, the CPUC had required PG&E to submit annual reports of instances in which its equipment was implicated in a wildfire, which were published on the CPUC website.[4] Given this well-known track record, no additional disclosure was required. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060–61 (9th Cir. 2014) (finding statement not misleading when "the market already knew of the difficulties facing" the company); *In re Nimble Storage, Inc.*, No. 15-cv-05803, 2016 WL 7209826, at *9 n.10 (N.D. Cal. Dec. 9, 2016) ("[t]he market was aware [of] shortcomings in Nimble's products" so "defendants need not disclose the same facts"); *see also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 761–62 (S.D. Tex. 2012) ("In fact, many of the statements Plaintiffs claim are misleading are actually acknowledgments of BP's risk exposure. . . . While the risk associated with the oil industry. . . is obviously a subject matter important—even material—to investors, it is not one that investors are generally unaware of.").

---

[4] Ex. 17 (Jan. 13, 2019 WSJ Article) ("The state required [PG&E] to report fires beginning in June 2014. It has since disclosed its equipment started about 1,550 fires through 2017."), *cited in* TAC ¶¶ 499 & n.151, 600 & n.168; *see also* Ex. 13 (CPUC Fire Incident Data).

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC          CASE NO. 5:18-cv-03509-EJD

**B.**     **PG&E Warned that Safety Violations Increased Present and Future Wildfire Risk**

Plaintiffs contend that the Offering Documents were misleading because they failed to disclose that PG&E's purported safety deficiencies and violations contributed to PG&E's wildfire risk.  *See generally* TAC ¶¶ 632-658; *see also* ¶ 632 (allegedly omitting that "PG&E's 'unsafe conduct' led to deadly wildfires[;] 'PG&E's performance with respect to vegetation management has been dismal[;]'[and] 'PG&E [had not] expended sufficient resources to reasonably prevent wildfires").  This is not so.  Plaintiffs ignore myriad disclosures PG&E made about its safety record and the resulting risk that its equipment could cause additional catastrophic damages in the future:

- *Ongoing Butte Fire Investigations and Lawsuits*.  "[Cal Fire] concluded that the wildfire was caused [by tree impact, and that the] failure by the Utility and/or its vegetation management contractors . . . during its vegetation management program ultimately led to the failure of the tree. . . ." Ex. 7 (2016 10-K) at 39; *see also* Ex. 2 (2015 10-K) at 36.

- *Federal Criminal Conviction and Court-Ordered Monitorship*.  "The Utility also faces criminal charges [for] knowingly and willfully violat[ing] minimum safety standards . . . [and] obstructed the NTSB's investigation into the cause of the San Bruno accident."  Ex. 2 (2015 10-K) at 7.  "[T]he jury in the federal criminal trial. . . found the Utility guilty [and] the court issued a judgment of conviction against the Utility.  The court sentenced the Utility to a five-year corporate probation period, oversight by a third-party monitor for a period of five years, . . . a fine of $3 million [etc.]"  Ex. 7 (2016 10-K) at 28.

- *$1.6 Billion CPUC Penalty.*  "On April 9, 2015, the CPUC issued a decision in its investigative enforcement proceedings against the Utility to impose total penalties of $1.6 billion [for] numerous violations of laws and regulations . . . that could have . . . contributed to the natural gas explosion that occurred in [San Bruno] on September 9, 2010."  Ex. 7 (2016 10-K) at 38; *see also* Ex. 2 (2015 10-K) at 34.

- *"Safety Culture" Investigation*.  "[In 2015,] the CPUC began a formal investigation into whether the organizational culture and governance of [PG&E] prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards," Ex. 2 (2015 10-K) at 58; "the outcome of the CPUC's investigation into the Utility's safety culture" could have a material impact on PG&E's business, *id.* at 65; see also Ex. 7 (2016 10-K) at 70, 79.

- *DOI Debarment Proceeding*. "In September 2015, … DOI[] initiated an inquiry into whether the Utility should be suspended or debarred from

entering into federal procurement and non-procurement contracts and programs [on account of] alleged poor record-keeping, poor identification and evaluation of threats" related to the San Bruno explosion and fire.  Ex. 7 (2016 10-K) at 60; *see also* Ex. 2 (2015 10-K) at 55.

With this context, in each set of Offering Documents, PG&E specifically warned investors of the risk that its **"*failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, [could] then lead[] to a catastrophic event (such as a wild land fire. . .).*"** *See, e.g.*, Ex. 2 (2015 10-K) at 29 (emphasis added).  PG&E additionally warned of risks resulting from "future investigations or other enforcement proceedings that may be commenced relating to the Utility's compliance with [rules] applicable to its operations, including . . . inspection and maintenance practices." *id.* at 66, and cautioned that "it is probable that the SED will impose penalties or take other enforcement action" against the Company, *see, e.g.*, *id.* at 120, and that such "additional regulatory or governmental enforcement action" could specifically result from PG&E's violations of regulations concerning "vegetation management" and "safety and inspection practices," *see, e.g.*, *id.* at 25.

Contrary to Plaintiffs' suggestion, PG&E had no obligation to go further than these disclosures and "accuse itself of wrongdoing"—especially where, as here, no regulator had found such wrongdoing and Plaintiffs have not alleged the Company knew that its safety deficiencies could have caused the tragedies that subsequently occurred.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. 2017) (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)).[5]

---

[5]  Contrary to Plaintiffs' contentions, PG&E did not "falsely describe[ ]" the failure to remedy unsafe conditions as "beyond the Utility's control."  TAC ¶ 646.  Instead, PG&E identified "numerous risks, *many of which* are beyond the Utility's control," but not all.  *Id.* (emphasis added). PG&E identified both risks that were beyond its control (*e.g.*, natural disasters) *and* risks clearly in its control, such as the possible failure to take an action or mitigate conditions it should have identified.  *See In re Intel Corp. Sec. Litig.*, No. 18-CV-00507, 2019 WL 1427660, at *10 (N.D.

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC          CASE NO. 5:18-CV-03509-EJD

Moreover, to the extent that Plaintiffs contend that PG&E should have disclosed that its current safety practices were insufficient to prevent the North Bay and Camp fires, that is an inactionable allegation of mismanagement, not a false or misleading statement. *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 955 (9th Cir. 2017) ("Federal securities laws do not protect investors from quality control problems, service lapses, or management miscues.") (citing *Gaines v. Haughton*, 645 F.2d 761, 799 n.33 (9th Cir. 1981)); *City of Roseville Employees Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1119 (E.D. Wash. 2013) ("Plaintiff certainly raises the prospect that Defendants' failure to maintain higher reserves was corporate mismanagement, even negligence. But Plaintiff does not allege sufficient facts to support the argument that Defendants' [disclosed] reserve levels resulted from or constituted a false or misleading statement.").

### C.   PG&E Did Not Mislead Investors About Its Safety Efforts

Plaintiffs contend that PG&E's description of its system upgrades and vegetation management practices misled investors about its level of commitment to and investment in safety. *See* TAC ¶¶ 632, 640-658. But all of PG&Es allegedly misleading statements in the Offering Documents are either inactionably vague, or are not misleading when read in light of PG&E's comprehensive disclosures about the state of its safety efforts and investment.

As a threshold matter, the challenged disclosures from the Offering Documents do not make any assurances about safety or legal compliance. Rather, they simply recite actions that PG&E had taken to improve safety or address issues like climate change.[6] Plaintiffs do not allege that these

---

Cal. Mar. 29, 2019) ("Courts evaluate defendants' alleged false statements in the context in which they were made, specifically in regard to contemporaneous qualifying or clarifying language.").

[6] Although Plaintiffs assert that PG&E "falsely assur[ed] investors that [it] complied with safety laws and regulations, [and] sufficiently invested in safety," TAC ¶ 632, Plaintiffs do not identify any such statements in the Offering Documents. Plaintiffs cite a May 23, 2016 press release statement that "[w]e've continued to demonstrate leadership and commitment on safety," which they wrongly allege "was filed with the SEC on a Form 8-K [and] incorporated by the March 2017

statements are inaccurate.  Moreover, insofar as Plaintiffs allege that PG&E's disclosures created the impression that PG&E was committed to safety when it was not, such an *impression* cannot be actionable because even an *express* "commitment to safety" is inactionably vague.  *See Intuitive Surgical*, 759 F.3d at 1060 ("[M]ere corporate puffery, 'vague statements of optimism like "good," "well-regarded," or other feel good monikers' are not actionable because '[investors] know how to devalue the optimism of corporate executives.'").  Courts have routinely rejected challenges to vague "commitments to safety," even when the issuer subsequently caused a catastrophic accident. *See Plumley v. Sempra Energy*, No. 3:16-cv-00512, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017) (SoCalGas's stated "commitment to or prioritization of safety" before Aliso Canyon gas leak "are too nonspecific and unmeasurable to state a claim"); *In re Plains All Am. Pipeline L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 626 (S.D. Tex. 2018) (Plains' "general commitments to improving safety and legal compliance" before Santa Barbara oil spill were "not specific or objective factual representations, much less 'unambiguous representations' that every Plains pipeline was safely maintained or fully complied with all applicable laws"); *In re BP*, 843 F. Supp. 2d at 756-57 ("generalized statements about BP's 'commitment to safety' [and] prioritization of 'process safety performance'" before Gulf oil spill are "too squishy, too untethered to anything measureable").

None of PG&E's accurate descriptions of its system upgrades or investments misled investors about PG&E's safety efforts.  Although Plaintiffs point to certain alleged facts they would

_____

Offering Documents."  TAC ¶ 648.  But this press release was not filed in the Form 8-K, *see* Ex. 10 (May 23, 2016 8-K), or in any other SEC filing, and thus was not incorporated into the Offering Documents.  *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) ("The court need not accept as true . . . allegations that contradict facts that may be judicially noticed by the court. . . and may consider documents that are referred to in the complaint whose authenticity no party questions." (citations omitted)).  Plaintiffs cannot premise a Securities Act claim on "statements [that] were not incorporated into the Offering Documents."  *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 655 (S.D.N.Y. 2012).  In any event, the "commitment to safety" expressed in the press release is mere puffery and not actionable.

1   have liked to have seen PG&E disclose, "Section 11's omissions clause . . . is not a general

2   disclosure requirement; it affords a cause of action only when an issuer's failure to include a

3   material fact has rendered a published statement misleading." *Omnicare*, 135 S. Ct. at 1332.  To be

4   misleading, Plaintiffs must show that a statement "affirmatively create[s] an impression of a state of

5   affairs that differs in a material way from the one that actually exists," and not merely that "it is

6   incomplete or does not include all relevant facts." *Brody v. Transitional Hosps. Corp.*, 280 F.3d

7   997, 1006 (9th Cir. 2002); *see also Greenberg*, 233 F. Supp. 3d at 773 (merely "'omitting material

8   information' . . . is not a problem. . . . . Instead, the omitted information must have been 'necessary

9   to make the <u>statements therein</u> not misleading.'" (quoting 15 U.S.C. § 77k(a))).  Plaintiffs fail to

10   show that any challenged statement creates the required impression.

11        *First*, Plaintiffs contend that the Offering Documents misled investors about the safety of its

12   operations by "emphasiz[ing] the Company's upgrades to its equipment," TAC ¶ 644, and its

13   efforts to address climate change, which "minimiz[ed] the real risks PG&E faced with respect to

14   wildfires as a result of dismal safety practices and insufficient funding to prevent wildfires."

15   *Id.* ¶ 642; *see also id.* ¶¶ 637-38 (risk disclosure that climate change could "increase the occurrence

16   of wildfires" allegedly "omit[s] the real risks stemming from PG&E's woefully inadequate safety

17   practices").  But, as discussed, *supra* pp. 9-14, the risks to PG&E posed by wildfires and safety

18   deficiencies are extensively disclosed elsewhere and these disclosures must be considered in full.

19   *See Stac*, 89 F.3d at 1405 n.4.  Plaintiffs do not allege that the described network upgrades or

20   climate change efforts did not actually occur.  *See Plains*, 307 F. Supp. 3d at 621 (alleged

21   regulatory violations are not "actionably false or misleading" where they did not "undermine the

22   general proposition that Plains did in fact have an internal-review process in place . . . and

23   that Plains had and implemented programs intended to maintain the integrity of

24   its pipeline network").  At most, Plaintiffs allege in conclusory terms that "PG&E's equipment was

25   outdated and hazardous," TAC ¶ 655, but PG&E never said it had modernized all equipment.  To

26   the contrary, PG&E regularly disclosed that it "plans to continue performing work to improve the

27   reliability and safety of its electricity distribution operations."  *See, e.g.*, Ex. 2 (2015 10-K) at 16.

28        *Second*, Plaintiffs fail to allege that any of the upgrades described as improving safety did

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC      CASE NO. 5:18-cv-03509-EJD

1   not, in fact, do so.  Plaintiffs contend that PG&E misleadingly omitted that the "smart switches" it

2   was installing could not be "shut down . . .  to prevent wildfires," TAC ¶ 645, which "increas[ed]

3   the danger and likelihood of wildfires in cases where vegetation has fallen onto power lines," *id.*

4   ¶ 673.  This allegation ignores, however, that the Offering Documents only claimed that these

5   devices "reduce the duration of customer outages," *see, e.g.*, Ex. 2 (2015 10-K) at 16, and say

6   nothing about how they operate during wildfires.  *See Plains*, 307 F. Supp. 3d at 624 (statements

7   were not misleading where "falsity allegations are that the tools were ineffectively used" but

8   challenged "statements are about the tools and programs Plains had in place, not about how well the

9   tools worked or that they were 100 percent effective").  Plaintiffs also claim that PG&E's statement

10  that its "vegetation management activities also reduce the risk of wildfire impacts on electric and

11  gas facilities," *see, e.g.*, Ex. 2 (2015 10-K) at 21, is misleading because PG&E's vegetation

12  "practices were dismal and increased, not reduced, wildfire impact."  TAC ¶ 651.  This conclusory

13  assertion is unsupported and contradicted by Plaintiffs' own theory of the case: that "vegetation

14  contact was the primary risk driver" of wildfires, *id.*, and wildfires "could have been reduced *if*

15  *PG&E was willing to invest more*" in its vegetation management.  *Id.*  ¶ 639 (emphasis added).

16          *Finally*, Plaintiffs' allegation that the Offering Documents were misleading because "PG&E

17  was not sufficiently investing in safety" fails to state a claim.  *See id.* ¶¶ 640, 649, 652 (challenging

18  statement that PG&E was "making substantial investments to build a more modern and resilient

19  system that can better withstand extreme weather and related emergencies").  Any contention that

20  allegedly inadequate spending undermines PG&E's statements that its investments were

21  "substantial" fails because such vague adjectives are "too nonspecific and unmeasurable to state a

22  claim for securities fraud." *Plumley*, 2017 WL 2712297, at *7; *see Grossman v. Novell, Inc.*, 120

23  F.3d 1112, 1121-22 (10th Cir. 1997) ("substantial success" was "incapable of objective

24  verification" and the type "that courts routinely dismiss as vague"); *Anderson v. Spirit AeroSystems*

25  *Holdings, Inc.*, 105 F. Supp. 3d 1246, 1261 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016)

26  ("making substantial improvements" was "too vague and indefinite"); *Weiss v. Amkor Tech., Inc.*,

27  527 F. Supp. 2d 938, 955-56 (D. Ariz. 2007) ("substantial progress" was inactionably vague); *see*

28  *also Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-CV-05558, 2018 WL 418954, at

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC          CASE NO. 5:18-CV-03509-EJD

1  *5 (N.D. Cal. Aug. 31, 2018) ("business remains healthy and resilient" is non-actionable); *Singh v.*

2  *Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (statement that issuer was "'allocat[ing] *significant*

3  resources' to regulatory compliance" was not misleading due to alleged compliance violations

4  because it "suggests a company actively working to improve its compliance efforts, rather than one

5  expressing confidence in their complete (or even substantial) effectiveness").

6       Moreover, Plaintiffs themselves allege that PG&E was making substantial safety

7  investments, spending over $190 million annually on vegetation management activities alone.

8  TAC ¶ 78.  Their contention that this amount was inadequate to sufficiently mitigate the wildfire

9  risk does not render false or misleading PG&E's statement that its vegetation management

10  activities generally reduce wildfire risk.  As set forth above, *supra* p. 14, their real complaint is of

11  mismanagement, not misleading disclosures.  *See LifeLock*, 690 F. App'x at 955; *Sterling*, 963 F.

12  Supp. 2d at 1119.

13       **D.    Item 303 and Item 503 Do Not Require Any Additional Disclosures**

14       Unable to identify any misleading statement in the Offering Documents, Plaintiffs invoke

15  Items 303 and 503 of SEC Regulation S-K in a flawed attempt to impose an affirmative duty to

16  disclose the additional detail they would like to have seen included.  Item 303 requires that the

17  issuer's Form 10-K "[d]escribe any known trends or uncertainties that have had, or that the

18  registrant reasonably expects will have, a material favorable or unfavorable impact on net sales or

19  revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  As described

20  above, PG&E adequately disclosed its wildfire risks, and Plaintiffs have failed to identify any other

21  allegedly omitted trend or uncertainty.  *See Mosco v. Motricity, Inc.*, 649 F. App'x 526, 528 (9th

22  Cir. 2016) (rejecting Item 303 claim when "the Registration Statement disclosed the very trend that

23  Plaintiffs claim [the issuer] hid from the market, adequately warning investors"); *In re Rocket Fuel,*

24  *Inc. Sec. Litig.*, No. 14-CV-3998, 2015 WL 9311921, at *9 (N.D. Cal. Dec. 23, 2015) (dismissing

25  Item 303 claims where allegedly adverse trend was "extensively discussed in the registration

26  statements"); *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15 CIV.

27  5999, 2017 WL 4403314, at *19 (S.D.N.Y. Sept. 30, 2017) (no Item 303 violation when the

28  adverse trend and its effect on the business were disclosed), *aff'd*, No. 17-4142-CV, 2019 WL

2023621 (2d Cir. May 8, 2019).[7]  Similarly, at the time of the Offerings, Item 503 required "a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c) (current version at 17 C.F.R. § 229.105).  PG&E fully disclosed all the allegedly omitted risks, including the risk of present and future wildfires that could have a material impact on PG&E's financial position.  *See Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) ("[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item 503 risks needs to allege . . . the offering documents failed to disclose the risk factor.").  Accordingly, Plaintiffs fail to allege any material misstatement or omission.

## II.   THE SECURITIES ACT CLAIMS BASED ON THE 2016-2017 NOTES OFFERINGS ARE UNTIMELY

Section 11 claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence,"  15 U.S.C. § 77m, and they may be dismissed at the pleadings stage "[i]f the running of the statute [of limitations] is apparent on the face of the complaint."  *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

The Securities Act claims were first asserted in the *York County* Action filed on February 22, 2019—more than sixteen months after the TAC alleges that the market discovered in October 2017 that PG&E had negligently caused the North Bay Fires and potentially faced billions in liability, more than a year after PG&E disclosed that its potential liability for the North Bay Fires was the number one risk affecting its financial results and could cut off its access to capital markets, and more than eight months after the first securities claims were asserted against PG&E and its Officers.  Even if the Notes Offering Documents misled investors about the risk that PG&E

---

[7]  Plaintiffs do not state a claim under Item 303 for the additional reason that they do not allege that PG&E's safety practices were "trending toward inadequacy, but rather that [they were] already inadequate and remained so."  *City of Roseville Employees Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011); *see, e.g.*, TAC ¶ 679 ("[F]or years, the Company had failed to develop a comprehensive approach to address safety.").

could cause such a devastating wildfire—which, as discussed *supra*, they did not—a reasonably diligent investor should have discovered it had been misled more than one year before the *York County* Action was filed on February 22, 2018. The Securities Act claims for the 2016-2017 Notes Offerings are thus time barred, and do not "relate back" to the earlier Exchange Act complaints.

**A.      Plaintiffs Should Have Discovered Their Alleged Securities Act Claims More Than One Year Before Filing the *York County* Action on February 22, 2019**

According to the TAC, "the [m]arket [l]earned [a]bout the [e]ffects and [e]xtent of PG&E's [i]nadequate [s]afety [p]ractices" beginning in October 2017, when news of the North Bay Fires broke. TAC ¶¶ 327-338. Investors allegedly "began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires" on October 12, 2017, when CPUC sent PG&E a notice to preserve all relevant documents. *Id.* ¶¶ 328-30. PG&E's stock price dropped 6.7% on the news, and market analysts confirmed the drop "reflected investors' understanding that PG&E was financially responsible for the North Bay Fires." *Id.* ¶¶ 330-34; *see, e.g. id.* ¶ 331 (noting analyst concluded the "drop in [PG&E's] stock reflect[s] the following assumptions: 1) the fire was caused by [PG&E's] negligence, . . . and 4) material fines and penalties will be assessed"). The next day, PG&E filed a Form 8-K disclosing that regulators were investigating its role in the North Bay Fires and warning that its insurance coverage may be insufficient to cover its potential liability. *Id.* ¶ 335. The filing caused PG&E's stock price to drop another 16.5%, as PG&E's "discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse." *Id.* ¶¶ 336-38. If PG&E's securities lost value in response to the North Bay Fires because, as Plaintiffs claim, the 2016 and 2017 Offering Documents had misled investors about PG&E's wildfire risk, then the statute of limitations began to run at that time, when investors purportedly realized or should have realized that they had been misled. *See* 15 U.S.C. § 77m; *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 788 (9th Cir. 1996) ("The plaintiffs' discovery of the statement's falsity is sufficient to start the limitation period running."); *In re Infonet Servs. Corp.*, 310 F. Supp. 2d 1106, 1118 (C.D. Cal. 2003) (stock drop and news reports contradicting issuer's statements "should have 'raise[d] sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further'").

Consistent with Plaintiffs' own allegations, myriad additional disclosures, lawsuits and new reports prior to February 22, 2018—one year before York County filed Securities Act claims—addressed PG&E's wildfire risks and safety deficiencies in significant detail.  For example:

- On October 19, 2017, the media reported that "Cal Fire investigators are likely examining whether inadequate maintenance of poles or inadequate trimming of vegetation caused the utility's electric lines to fall and spark during high winds, igniting some of the fires.  Last year[,] Cal Fire. . . found PG&E responsible for the 70,000-acre Butte Fire in 2015."[8]

- On October 30, 2017, the media reported that a consultant's "exhaustive review of PG&E's overall safety performance" concluded it did not "add up to a consistent, robust, and accountable corporate-wide safety program" and "f[e]ll short of . . . the expectations of the Commission, community leaders, and ratepayers."[9]

- On November 9, 2017, the media reported that "Utility giant PG&E is facing new scrutiny of its vegetation management program after reports that several downed power lines, some of which might have been affected by trees falling on them, may have sparked some of last month's deadly Wine Country wildfires. . . .Whether those lines were brought down by poorly maintained trees, which would have been eliminated or pruned under PG&E's vegetation program, is now being questioned by regulators, victim's attorneys and the media."[10]

- On November 27, 2017, PG&E disclosed that 32 lawsuits had been filed blaming the North Bay Fires on PG&E's alleged safety violations.  Ex. 12 (November 27, 2017 8-K) at 2.[11]  PG&E warned the market that it faced over $3 billion in potential liability for the North Bay Fires, which could threaten PG&E's sources of financing and its liquidity.  *Id.* at 1-2.

---

[8] Ex. 14 (Oct. 19, 2017 Sacramento Bee Article).

[9] Ex. 15 (Oct. 30, 2017 Lake County Record-Bee Article).

[10] Ex. 16 (Nov. 9, 2017 San Francisco Business Times Article).

[11] Amongst these lawsuits were two putative investor derivative lawsuits that asserted claims against the Directors, including that "some of the fires were caused by: (i) the defendants' improper and negligent operation of the Company's power lines and related equipment; (ii) the failure of equipment . . . that were operated . . . by the defendants or the Company (under the defendants' direction and on their watch); and/or (iii) the defendants' utter failure to maintain vegetation with prescribed California law and regulations."  *See* Ex. 18 (*Lentine v. Williams* Complaint) at 1; *see also* Ex. 19 (*Firemen's Ret. Sys. of St. Louis v. Williams* Complaint).

- In December 2017, PG&E suspended its quarterly dividend, "citing uncertainty related to causes and potential liabilities associated with the extraordinary" North Bay fires, and indicating that the potential liability was already impacting both PG&E's finances and investors.  TAC ¶ 576.

On February 9, 2018, when it filed its 2017 10-K, PG&E identified "[t]he Impact of the North[ Bay] Wildfires" as the *first* "Key Factor[] Affecting Financial Results" and the *first* Risk Factor in PG&E's 2017 Form 10-K.  Ex. 9 (2017 10-K) at 54.  The 2017 10-K further contained detailed disclosures about PG&E's North Bay Fire exposure.  *See infra* pp. 26-28.

Thus, before February 22, 2018, a reasonably diligent investor should have known PG&E's wildfire liability was a significant threat to the company's economic viability and had sufficient information to plead any alleged Section 11 claim.  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1053 (N.D. Cal. 2016) (in addition to corrective disclosure, "there were several other sources of information that a reasonably diligent investor would likely uncover").  Plaintiffs offer no explanation for waiting until February 22, 2019 to file the *York County* Action when other PG&E investors (as well as countless other plaintiffs impacted by the North Bay Fires) were able to plead, before February 22, 2018, that PG&E's safety practices had caused material wildfires—the very risk purportedly omitted from the 2016-2017 Offering Documents.  Plaintiffs' claims based on those Offerings are therefore time barred.

## B.  The Securities Act Claims Do Not Relate Back to the Earlier Exchange Act Complaints

Plaintiffs cannot save their untimely claims, first asserted in the *York County* Action, by "relating them back" to the earlier Exchange Act complaints.  They fail to satisfy several of the criteria for "relation back," and the absence of any one of the criteria is fatal to such an argument:

*First*, a complaint naming new defendants—such as the Directors and Underwriters here—relates back to an earlier complaint only if the new defendants "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii).  But neither the Directors nor the Underwriters were omitted from the Exchange Act complaints by "mistake"; instead, the omission was due to a strategic choice about which claims to bring and whom to sue.  The identities of the Directors and

Underwriters and their respective roles were well known.  Any of the Exchange Act plaintiffs easily could have named them in one of their complaints, and PERA—a purchaser of notes issued in the March 2017 Offering (Dkt. No. 121-1)—had standing to bring at least some of the Securities Act claims, but decided not to do so, which is fatal to any "relation back" argument Plaintiffs may advance.  Courts routinely hold that a decision to exclude a known defendant is not a "mistake" contemplated by Rule 15(c).  *See Louisiana-Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434-35 (9th Cir. 1993) (affirming denial of relation back where "[t]here was no mistake of identity, but rather a conscious choice of whom to sue"); *Felarca v. Birgeneau*, No. 11–cv–05719, 2014 WL 7140262, at *6 (N.D. Cal. Dec. 12, 2014) (denying relation back where "plaintiffs chose not to name [certain defendants], presumably for some strategic reason rather than a lack of knowledge").

*Second*, the Securities Act claims do not arise out of the same "conduct, transaction, or occurrence" as the Exchange Act claims.  Fed. R. Civ. P. 15(c)(1)(B).  None of the Securities Act claims relies on the same statements as the Exchange Act claims.  Courts routinely reject attempts to tack on unrelated and untimely Securities Act claims to earlier Exchange Act filings.  *See, e.g.*, *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982); *In re Xchange Inc. Sec. Litig.*, No. CIV.A.00-10322, 2002 WL 1969661, at *4 (D. Mass. Aug. 26, 2002); *In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*, 467 F. Supp. 227, 259–60 (W.D. Tex. 1979).

*Third*, the Directors and Underwriters did not receive notice of the Securities Act claims "within the period provided by Rule 4(m) for serving the summons and complaint."  Fed. R. Civ. P. 15(c)(1)(C).  The Rule 4(m) period is 90 days, but the *York County* Action was filed more than 90 days after the filing of the original *Weston* Complaint and the CAC.

*Finally*, there is no "identity of interests between the original and newly proposed plaintiff." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996).  The initial plaintiff, Weston, only owned common stock and could not sue on any of the Offerings.  *See Magnachip*, 167 F. Supp. 3d at 1054 ("no identity of interests because the later complaint . . . was based on a different securities transaction and different disclosures").  While PERA owns notes issued in the March 2017 Offering, it chose not to assert any of the claims alleged in the *York County* Action.  *Cf. Willner v. Manpower Inc.*, No. 11-CV-02846, 2014 WL 2939732, at *5 (N.D. Cal. June 30, 2014)

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC                    CASE NO. 5:18-cv-03509-EJD

1    (identity of interests "is not present when the 'focus of the litigation changed distinctly upon the

2    amendment of the complaint'").

3    **III.    THE TAC FAILS TO IDENTIFY ANY ACTIONABLE FALSE OR MISLEADING
         STATEMENT IN THE 2018 EXCHANGE OFFERING DOCUMENTS**

4

5            **A.    PG&E Did Not Mislead About Its Wildfire Risks or Safety Practices**

6            Plaintiffs cannot state a claim related to the 2018 Offering Documents given both (a) the

7    TAC's own acknowledgment that the market understood in October 2017 that PG&E had

8    negligently caused the North Bay Fires just months earlier, and (b) PG&E's own extensive

9    disclosures in the 2017 10-K about its North Bay Fire risks, including that:

10   •    "The fires are being investigated by Cal Fire and the CPUC, including the possible
         role of the Utility's power lines and other facilities . . . . [and our] maintenance of
11       facilities, vegetation management, and emergency preparedness and response."  Ex.
         9 (2017 10-K) at 27, 50, 135.
12

13   •    "[I]t is reasonably possible that facts could emerge through the course of the various
         investigations that lead PG&E . . . to believe that a loss is probable . . . the amount
14       of which could be substantial."  *Id.* at 28, 136.

15   •    "As of January 31, 2018, the Utility had submitted 22 electric incident reports to the
         CPUC . . . where Cal Fire has identified a site as potentially involving the Utility's
16       facilities in its investigation."  *Id.* at 27, 135.

17   •    "[O]n February 3, 2018, it was reported that investigators with the Santa Rosa Fire
         Department had completed their investigation . . . and had concluded that the
18       Utility's facilities . . ., contributed to those fires."  *Id.*

19   •    "PG&E [is] the subject of a still increasing number of lawsuits . . . [over PG&E's]
         alleged failure to maintain and repair their distribution and transmission lines and
20       failure to properly maintain the vegetation surrounding such lines were the causes of
         the fires."  *Id.* at 28.

21   •    "If the Utility were to be found liable . . . liability could be higher than. . .
22       approximately $10 billion."  *Id.*

23   In addition, PG&E warned investors that "[e]xtreme weather, extended drought and shifting climate

24   patterns have intensified the challenges associated with wildfire management in California

25   [including the] likelihood and severity of extraordinary fire events" and that these factors "have

26   increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage." *Id*. at 40.

27   Given these explicit disclosures—and because investors knew of the allegedly omitted risks prior to

28

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC                    CASE NO. 5:18-cv-03509-EJD

February 22, 2018—Plaintiffs cannot state a claim for the 2018 Exchange Offer.[12]

Plaintiffs also target two PG&E disclosures unique to the 2018 Exchange Offering Documents.  They find fault with PG&E's disclosure that "the risk posed by wildfires has increased in the Utility's service area" due to environmental factors, TAC ¶ 636, but Plaintiffs do not dispute that these factors increased that risk.  As described *supra* pp. 9-15 for the 2016-2017 Offering Documents, and immediately above, the 2018 Offering Documents fully disclosed PG&E's wildfire risk.  Plaintiffs also claim that PG&E's disclosure that it retained a third-party monitor as part of its sentence for its criminal conviction related to the San Bruno gas pipeline explosion was offered as a "false assurance" that PG&E had taken steps to safely operate and maintain its equipment.  *See* TAC ¶ 647.  Plaintiffs do not allege, however, that no monitor was retained (including at the time of the Camp Fire) or explain how a straightforward factual disclosure that PG&E was required to retain a safety monitor as a condition of its "convict[ion] of five felony counts for knowingly and willfully violating federal safety standards," *id.* ¶ 404, somehow assured investors that PG&E did not face continued wildfire risk or safety problems—especially in light of its other disclosures that these risks continued.  If anything, PG&E's conviction and a monitorship would suggest the opposite. *See, e.g.*, *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 163-64 (S.D.N.Y. 2018) (accurate disclosure of terms of company's probation did not mislead investors to believe that company would not commit further violations); *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11-cv-4665, 2014 WL 4832321, at *29 (S.D.N.Y. Sept. 29, 2014) (disclosure that company "continued transition away from [problematic] business model" would not have "be[en] assur[ing to shareholders] that Avon had not committed FCPA violations" in light of disclosed investigations).  Moreover, issuers are not required to disclose all information about their activities, "even if investors would consider the omitted information significant" as long as the omitted information "do[es] not make the actual statements misleading."  *Markette v. XOMA Corp.*, No. 15-

---

[12] Most of Plaintiffs' challenges to the 2018 Offering Documents are duplicative of or similar to their challenges to the 2016-2017 Offering Documents, *see* TAC ¶¶ 632-34, 641, 643-46, 660, and fail for the same reasons, *see supra* pp. 9-19.

cv-03425, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017). Accordingly, these disclosures do not require PG&E to affirmatively include all of the allegedly omitted pieces of information Plaintiffs would have liked to have seen disclosed. *See* TAC ¶¶ 639, 649-658.

### B. PG&E Accurately Disclosed Its Liability For The North Bay Fire

Plaintiffs separately allege that the 2018 Offering Documents "misled investors by insinuating that PG&E may not have caused and might not be liable for" the North Bay Fires. TAC ¶¶ 659; 662-63. Plaintiffs concede, however, that at the time of the 2018 Exchange Offer, Cal Fire and CPUC were still investigating—and had not determined—the cause of the North Bay Fires. *See id.* Plaintiffs focus their argument primarily on PG&E's disclosure of *Loss Contingencies* under ASC 450 and claim that PG&E *should have* concluded that a loss in excess of $10 billion was both (a) "probable," TAC ¶¶ 667-68, and (b) "reasonably estimable," *id.* ¶¶ 770-71, as of the relevant December 31, 2017 measurement date (two months after the North Bay Fires). PG&E instead opined that "[i]t is reasonably possible that facts could emerge that lead PG&E . . . to believe that a loss is probable." *Id.* ¶ 347. This determination is a quintessential statement of opinion not subject to "second-guessing" under the securities laws. *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016) (finding statement that "the Company does not believe . . . the outcome of any currently pending claims . . . will have a material adverse effect" to be an opinion statement); *Employees. Ret. Sys. v. Embraer S.A.*, No. 16 Civ. 6277, 2018 WL 1725574, at *9 (S.D.N.Y. Mar. 30, 2018) (finding that loss contingency accrual is a matter of opinion); *see also Omnicare,* 135 S. Ct. at 1327 (the securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments").

To challenge an opinion statement as materially misleading, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the "belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Plaintiffs have not adequately pled either. *First*, rather than allege subjective disbelief (Plaintiffs expressly disclaim "intentional misconduct," TAC ¶ 497), Plaintiffs instead argue that "there was no reasonable basis for [the] representations" related to liability for the North Bay Fires, *id.* ¶ 672. This is patently insufficient to plead a subjective disbelief. Indeed, Plaintiffs

make no attempt to plead that PG&E knew the results of the ongoing Cal Fire investigations at the time of the 2018 Exchange Offer, or had the results of any of the other multiple contingencies required to accrue a loss—*e.g.*, that it had been determined that PG&E would be held civilly liable for the damages, that those damages would not be recoverable in rates, and that material fines or penalties would be assessed.[13]  *Second*, Plaintiffs have not sufficiently pled that PG&E's statements were "objectively untrue" and that a $10 billion loss was in fact "probable."  *See Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1052 (N.D. Cal. 2019) (requiring "particularized facts that 'directly contradict' or are 'necessarily inconsistent with' the allegedly misleading statements.").  Plaintiffs' assertion that PG&E should have accrued a liability of "$10 billion on [its] consolidated balance sheet," TAC ¶ 664, because of (a) Cal Fire's subsequent conclusions, *id.* ¶ 673, and (b) a January 2018 report—that PG&E disclosed—estimating statewide claims from the North Bay Fires to exceed $10 billion, *id.* ¶ 760, dramatically oversimplifies PG&E's loss contingency assessment.  PG&E's ultimate liability does not depend on Cal Fire's investigatory findings, but on the outcome of subsequent regulatory proceedings and lawsuits.  *See* Ex. 9 (2017 10-K) at 27-28.  Indeed, even with hindsight, Plaintiffs fail to plead objective falsity.  For instance, Cal Fire did not find PG&E at fault for the Tubbs Fire (which caused a substantial portion of damages in the North Bay Fires), and PG&E's liability for the North Bay Fires is currently being adjudicated.  *See, e.g.*, *Ziolkowski v.*

---

[13] Plaintiffs cannot plead a claim based entirely on hindsight.  *See Markette,* 2017 WL 4310759 at *5 ("Plaintiff, in other words, makes no effort to allege that Defendants 'did not hold the belief they professed,' . . . opting instead to argue that their beliefs and expectations were ultimately not borne out") (citation omitted); *see also In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) ("The fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made."); *In re Lions Gate*, 165 F. Supp. 3d at 15–16 (dismissing action based on defendant's opinion statement that it did "not believe . . . the outcome of any currently pending claims or legal proceedings will have a material adverse effect,'" on the grounds that "[p]laintiffs have failed to plead how the defendants' opinions were not supported by the facts known to them at the time") (internal quotations omitted).

1    *Netflix*, No. 17-01070, 2018 WL 4587515, *3 (N.D. Cal. Sept. 25, 2018) ("The burden is on

2    Plaintiff to present facts plausibly showing that the [opinion was objectively wrong], and that the

3    Defendants knew as much when they made the challenged statements.").

4          PG&E's disclosures provided investors with significant detail about its potential exposure

5    for the North Bay Fires—both in terms of what was reasonably estimable as of December 31, 2017

6    and as to the outer bounds of such liability based on third-party estimates.  It was not obligated to

7    do more.  *See, e.g.*, *In re Citigroup*, 330 F. Supp. 2d at 377 ("Citigroup was not required to make

8    disclosures predicting" liability, particularly where disclosures contained "discuss[ion of] pending

9    litigation."); *see also In re ITT Educ. Servs., Inc. Sec. & Shareholder Derivatives Litig.*, 859 F.

10   Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[T]he securities laws do not impose a general duty to disclose

11   corporate mismanagement or uncharged criminal conduct.").[14]

12

13

14

15

16   _____

17   [14]  To the extent that Plaintiffs are also arguing that typical risk factor phraseology—such as

18   identifying "whether the company [may] have liability associated with these fires" as a risk—

19   created a misleading impression that PG&E was not at fault, TAC ¶ 660, such claim fails because it

20   ignores (a) the totality of PG&E's disclosures and publicly available information, *see supra* pp. 23-

21   27, and (b) market practice for drafting risk disclosures.  *See, e.g.*, *Zeid v. Kimberley*, 930 F. Supp.

22   431, 437 (N.D. Cal. 1996) (dismissing as "absurd" the argument that "Defendants' warnings

23   regarding potential adverse factors" were misleading where "Plaintiffs do not assert that any of the

24   warnings were without basis or wrong [and i]nstead, Plaintiffs [merely] assert that the warnings

25   should have been more specific"); *Greenberg*, 233 F. Supp. 3d at 774 (disclosure that regulatory

26   developments "could pose risks" do not "'affirmatively' create[] a misimpression" because

27   "although [disclosure] did not shine the brightest possible spotlight [on the issue], it did not hide

28   the ball").

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC          CASE NO. 5:18-cv-03509-EJD

### C.   Plaintiffs Fail To Plead A Violation of Section 11 Under Items 303 and 503 of Regulation S-K

Plaintiffs' arguments that the 2018 Offering Documents omitted information required to be disclosed under Items 303 and 503 of Regulation S-K, TAC ¶¶ 677−79, fail for the same reasons their arguments about the 2016-2017 Offering Documents fail. *See supra* pp. 18-19. Moreover, Plaintiffs cannot seriously advance this claim in connection with the 2018 Offering Documents, which identified wildfire risk and North Bay Fire liability as both the *first* key factor affecting the Company's results and the *first* risk factor. *See supra* p. 8.

## IV.   THE TAC NEGATES ANY INFERENCE OF LOSS CAUSATION

Section 11 provides a so-called "negative" causation affirmative defense, pursuant to which a defendant cannot be liable if it can establish that the purported losses were not caused by alleged misrepresentations and omissions in the Offering Documents. Like other affirmative defenses, negative causation can supply a basis for dismissal where, as here, it is established by the pleadings. *See In re Shoretel Inc. Sec. Litig.*, No. C 08-00271, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009) (negative causation defense can be resolved on a motion to dismiss "if the facts as alleged by plaintiffs, and documents which the court may take judicial notice of, establish the affirmative defense as a matter of law"). The TAC makes clear that investors' reaction to news of the North Bay Fires and the Camp Fire (and the attendant losses) was informed by PG&E's own warnings about its wildfire risk, rather than by the revelation of a concealed risk.

Loss causation is typically established through evidence that the alleged truth concealed from the Offering Documents was revealed through a "corrective disclosure." *See Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-cv-1795, 2016 WL 4585753, at *3 (N.D. Cal. Sept. 2, 2016). "To be corrective, the disclosure must relate back to the misrepresentation and not to some other negative information about the company." *Id*. Although the TAC alleges numerous "corrective disclosures and/or materializations of concealed risk" after the Offerings, TAC ¶¶ 327-90, these do not reveal any facts that were inconsistent with PG&E's warning about its wildfire risk. *Cf. Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("[T]he announcement of an investigation, without more, is insufficient to establish loss causation."). In fact, these post-offering events reveal the opposite and reflect an expectation of likely losses that naturally follows

1   from PG&E's warnings that it could suffer substantial liability if a wildfire occurred.  *See Shoretel*,

2   2009 WL 248326, at *5 (dismissing Section 11 claim where alleged corrective disclosure "reveals

3   nothing about what was allegedly misrepresented in or omitted from the Registration Statement"

4   and complaint instead shows "that the market reacted to defendant's poor financial health").

5       The Ninth Circuit has not adopted the "'materialization of the risk' approach. . . [which]

6   recognizes loss causation where a plaintiff shows that 'misstatements and omission[s] concealed

7   the price volatility risk (or some other risk) that materialized and played some part in diminishing

8   the market value' of a security."  *Nuveen Mun. High Income Opp'y Fund v. City of Alameda*, 730

9   F.3d 1111, 1120, 1122 n.5 (9th Cir. 2013) (quoting *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d

10  161, 176-77 (2d Cir. 2005).  Under this theory, "a misstatement or omission is the proximate cause

11  of an investment loss if the risk that caused the loss was within the zone of risk concealed by the

12  misrepresentations and omissions alleged by a disappointed investor."  *Id.* at 1120 (quoting *Lentell*,

13  396 F.3d at 173).

14      Even if this approach applied, however, the TAC negates any inference of loss causation

15  because the risk that materialized was not "concealed."  *See id.*  Rather, PG&E fully disclosed its

16  wildfire risk, *see supra* pp. 9-14, 23-26, and the market was so well conditioned by these warnings

17  that, according to the TAC, news that CPUC had simply sent a preservation notice to PG&E

18  purportedly triggered a "drop in [its] stock reflect[ing] the following assumptions: 1) the fire was

19  caused by [PG&E's] negligence, . . . and 4) material fines and penalties will be assessed."  TAC ¶

20  331; *see also id.* ("We appreciate the severity of the fires and the legal challenges of operating in

21  California, but estimate this loss of value as approaching a worse-case scenario for [PG&E]

22  shares.").  There can be no loss causation where investors were warned about the very risk that later

23  materialized.  *See, e.g.*, *Bartesch v. Cook*, 941 F. Supp. 2d 501, 513 (D. Del. 2013) ("[P]laintiff's

24  theory under the materialization of risk test fails because 'substantial indicia of the risk that

25  materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very

26  same risk.'") (quoting *Lentell.*, 396 F.3d at 177); *Prime Mover Capital Partners L.P. v. Elixir

27  Gaming Techs., Inc.,* 898 F. Supp. 2d 673, 685–86 (S.D.N.Y. 2012) (same), *aff'd*, 548 F. App'x 16

28  (2d Cir. 2013).

**V.    CLAIMS BASED ON THE 2016 OFFERINGS MUST BE DISMISSED**

Although Plaintiffs' claims should be dismissed in their entirety for the reasons set forth above, Plaintiffs' claims based on the March and December 2016 Offerings should be dismissed for the additional reasons that no plaintiff has any claim against the Directors and Underwriters involved in those Offerings.  "[T]he named plaintiff must have standing to sue for each of the asserted claims by purchasing in the offerings that are putatively part of the class action."  *FDIC v. Countrywide Fin. Corp.*, No. 2:12-CV-4354, 2012 WL 5900973, at *10 (C.D. Cal. Nov. 21, 2012); *see also In re Zynga Inc. Sec. Litig.*, No. C 12-04007, 2014 WL 721948, at *3 (N.D. Cal. Feb. 25, 2014) ("The ability to have standing to bring a claim based on . . . one registration statement does not grant statutory standing to bring claims based on different registration statements for an offering in which the plaintiff did not purchase any securities. . . .  [A] plaintiff must demonstrate standing for each claim [it] seeks to press.").

**A.    Claims Based on the March 2016 Offering Must Be Dismissed
Because No Plaintiff Is Alleged to Have Relied on the Offering Documents**

Plaintiffs fail to allege, as required, that any named plaintiff purchased notes issued in the March 2016 offering in reliance on the Offering Documents.  If the security was purchased "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under [Section 11] shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement."  15 U.S.C. § 77k(a)(5). Only Plaintiff York County purchased notes from the March 2016 Offering, but it bought them in May 2018, *see* Dkt. 121-2, nearly two years after the offering and after PG&E filed both its 2016 and 2017 Form 10-Ks on February 16, 2017 and February 9, 2018, respectively.  *See* TAC ¶ 665 n.185; Ex. 7 (2016 10-K), Ex. 9 (2017 10-K).  Because the TAC fails to plead that York County relied on the March 2016 Offering Documents in deciding to purchase the notes, its claims based on the March 2016 Offering must be dismissed.  *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 385-86 (S.D.N.Y. 2015) (dismissing Section 11 claims "based on Notes purchased after Petrobras issued the relevant earning statements" where plaintiffs "fail to plead that they relied on

DIRECTORS & UNDERWRITERS MP&A IPO MOT. TO DISMISS TAC            CASE NO. 5:18-cv-03509-EJD

the original registration statements").  Because no other named plaintiff has standing to assert a

claim for that Offering, all claims based on the March 2016 Offering must be dismissed.

### B.   Claims Based on the December 2016 Offering Must Be Dismissed Because No Named Plaintiff Has Standing to Assert Them

To have standing, a Section 11 plaintiff "must have purchased a security issued under that,

rather than some other, registration statement."  *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076,

1080 (9th Cir. 1999).  "[T]hose who purchased shares in the aftermarket have standing to sue

provided they can trace their shares back to the relevant offering."  *In re Century Aluminum Co.

Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).

Here, no named plaintiff purchased any notes traceable to the December 2016 Offering.

That Offering included an initial offering of certain floating rate notes, which no named Plaintiff

purchased,[15] and certain 4.00% notes.  TAC ¶¶ 502, 572.  PG&E then made a secondary offering of

the 4.00% notes in the March 2017 Offering, and the 4.00% notes issued in March 2017 were

indistinguishable from those issued in December 2016.[16]  *Id.* ¶¶ 502, 573.  Only Plaintiff Mid-

Jersey purchased the 4.00% Notes, but did so in January 2018, long after both the December 2016

and March 2017 Offerings.  Mid-Jersey does not allege that its notes are traceable to the December

2016 Offering, TAC ¶ 508, and "aftermarket purchasers usually will *not* be able to trace their

---

[15]  Any claims based on the floating rate notes should also be dismissed because they were

redeemed in full in November 2017, Ex. 9 (2017 10-K) at 63, and Plaintiffs have not alleged—nor

could they—that any investor suffered losses on those notes.  *See In re Countrywide Fin. Corp.

Sec. Litig.*, 588 F. Supp. 2d 1132, 1169 (C.D. Cal. 2008).

[16]  *See* Ex. 6 (Mar. 8, 2017 Pro. Supp.) at S-7 ("We first issued our 4.00% Senior Notes . . . on

December 1, 2016.  The [4.00%] notes offered by this prospectus supplement and the

accompanying prospectus will have the same CUSIP number as the other notes of the same series

and will trade interchangeably with notes of the same series immediately upon settlement.").

1    shares back to a particular offering," *In re Century*, 729 F.3d at 1107-08. Thus, no named plaintiff

2    has standing to assert a claim for the December 2016 Offering.

3        **C.    Claims Against The Directors For The March and December 2016 Offerings**
         **Must Be Dismissed Because The Alleged Misrepresentations Post-Date The**
4        **Effective Date of the 2014 Shelf Registration Statement That They Signed**

5        Section 11 provides for liability as of "*when such part became effective.*" 15 U.S.C.

6    § 77k(a) (emphasis added). The March and December 2016 Offerings were both issued pursuant to

7    the 2014 Shelf Registration that was signed and became effective in February 2014. *See* TAC Ex.

8    A; Ex. 1 (Feb. 23, 2016 Pro. Supp.), Ex. 3 (Nov. 29, 2016 Pro. Supp.). Plaintiffs do not challenge

9    the Shelf Registration; they instead allege misrepresentations in "PG&E's [Rule 424] Prospectuses

10   filed on February 24, 2016 . . . [and] November 29, 2016[, and documents] incorporated by

11   reference." TAC ¶ 630. However, SEC Rule 430B explicitly distinguishes for purposes of Section

12   11 liability between the effective date for "the issuer and any underwriter" on the one hand, and

13   directors and individuals signing the registration statement, on the other hand. *Compare* 17 C.F.R.

14   § 230.430B(f)(2), *with* (f)(4). As to the former, the date on which a form of prospectus is filed—

15   here, in March and December 2016—becomes "the new effective date." As to the latter, the later

16   date "shall not be an effective date . . . as to [a]ny director" except in limited circumstances not

17   applicable here.[17] Plaintiffs thus cannot rely on the Rule 424 Prospectus to establish a new

18   effective date for the Directors. *See e.g.*, *Countrywide*, 932 F. Supp. 2d at 1120 ("[T]he date the

19   prospectus supplements [were filed] is not a new 'effective date' for directors. . . . The only

20   effective date, then, is the filing date of the registration statements. . . . [Because] the registration

21   statements did not contain misstatements on their effective dates[, t]he Individual Defendants

22

23   ───────────────

     [17]  An exception applies only in narrow circumstances, where a prospectus is filed to either (i)
24   "include[] information required by section 10(a)(3) of the Act" (*i.e.*, an "update [to] the financial

25   information in a registration statement after its effective date"), or (ii) "pursuant to Item

26   512(a)(1)(ii) of Regulation S-K" (*i.e.*, an update to address "a fundamental change in the

27   information set forth in the registration statement."). *In re Countrywide Fin. Corp. Mortg.-Backed

28   Sec. Litig.*, 932 F. Supp. 2d 1095, 1119-20 (C.D. Cal. 2013)). Neither exception applies here.

1  cannot be held liable.") (citing SEC Release Nos. 33–8591, 34–52056, 70 Fed.Reg. 44722, 44774

2  (Aug. 3, 2005) ("The prospectus filing will not create a new effective date for directors or signing

3  officers of the issuer," except when the two exceptions listed above occur)).  Plaintiffs' Section 11

4  claims against the Directors for the 2016 Offerings must be dismissed.

5  **VI.    CLAIMS BASED ON THE 2018 EXCHANGE OFFERINGS MUST BE DISMISSED**

6         The April 2018 Exchange Offer was not an independent offering of PG&E notes.  Instead,

7  PG&E offered to "exchange equal principal amounts of . . . Exchange Notes [for] Restricted

8  Notes," which "Exchange Notes are identical in all material respects to those of the outstanding

9  Restricted Notes, except that the transfer restrictions, registration rights and additional interest

10 provisions relating to the Restricted Notes do not apply to the Exchange Notes."  Ex. 8 (April 13,

11 2018 Reg. Statement) at 1.[18]  Plaintiffs York County and City of Warren are alleged to have

12 purchased PG&E 2017 Restricted Notes in private placements prior to the May 14, 2018 Exchange

13 Offering and exchanged their notes in the Exchange Offer.  *See* TAC Exs. B & C.  York County

14 and City of Warren cannot assert a Section 11 claim based on their purchase of securities in private

15 placements.  "Section 11 liability, which applies to misstatements or omissions in registration

16 statements, is not available for [private] offerings."  *In re Levi Strauss & Co. Sec. Litig.*, 527 F.

17 Supp. 2d 965, 975 (N.D. Cal. 2007).  Nor can York County and City of Warren assert a Section 11

18 claim based on purported misrepresentations in connection with the Exchange Offering Documents.

19 "Because the unregistered bondholders had already invested in [unregistered] bonds through the

20 [private] offerings, they were not presented with the decision of whether or not to purchase

21 [registered] bonds pursuant to the registration statement."  *Id.* at 978 (dismissing Section 11 claims

22 related to exchanged shares because "alleged misstatements and omissions would not have been

---

25 [18]  The Exchange Offer covered an exchange of PG&E's "2018 Restricted Notes, 2027 Restricted

26 Notes and 2047 Restricted Notes" for "2018 Exchange Notes, 2027 Exchange Notes and 2047

27 Exchange Notes."  Because no named Plaintiff is alleged to have purchased or exchanged the 2018

28 or 2047 Notes, no claim can be asserted based on those notes.  *See supra* note 15.

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC          CASE NO. 5:18-cv-03509-EJD

1  material to the unregistered bondholders' decision whether to exchange unregistered shares they

2  had already chosen to purchase"); *see also In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 619

3  (S.D.N.Y. 2007) (dismissing exchange offer Section 11 claims as non-actionable due to either a

4  lack of materiality or a lack of reliance); *In re Safety–Kleen Corp.*, No. C/A 3:00-1145-17, 2002

5  WL 32349819, *1 (D.S.C. Mar. 27, 2002) (dismissing exchange offer Section 11 claims for lack of

6  reliance and damages).

7  **VII.    THE TAC FAILS TO STATE A SECTION 15 CLAIM AGAINST THE DIRECTORS**

8       Because Plaintiffs have failed to plead an underlying Section 11 violation, their Section 15

9  claim necessarily fails.  *See Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1130-31

10 (N.D. Cal. 2013) (dismissing Section 15 claims).  Moreover, Plaintiffs have not pled facts

11 demonstrating that any of the Individual Defendants exercised a "significant degree of day to day

12 operational control" over PG&E.  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052

13 (N.D. Cal. 2010); *see also Welgus v. TriNet Grp., Inc.*, No. 15-cv-03625, 2017 WL 167708 (N.D.

14 Cal. Jan. 17, 2017).  Plaintiffs' Section 15 claim must therefore be dismissed.[19]

15                              <u>**CONCLUSION**</u>

16      For all these reasons, the Director and Underwriter Defendants respectfully request that the

17 Court dismiss the Securities Act claims asserted against them with prejudice.

18

19

20

21

_____

22 [19]  Finally, it is axiomatic that Directors who neither signed certain registration statements nor were

23 directors at the time they became effective are not liable under Section 11 or Section 15.  *Batwin v.*

24 *Occam Networks, Inc.*, 2008 WL 2676364, at *20 (C.D. Cal. July 1, 2008) ("[B]y its clear

25 language, Section 11 limits liability to signatory issuers, officers and directors, underwriters and

26 auditors.").  Accordingly, claims against Mullins (March 2016 Notes Offering) and Herringer and

27 Williams (Exchange Offering) must be dismissed.  For the same reasons, Plaintiffs cannot assert

28 Section 11 claims against underwriters for offerings they did not underwrite.

1  Date: October 4, 2019                          Respectfully submitted,

2

3   */s/ Stephen P. Blake*                          */s/ Neal A. Potischman*
    Stephen P. Blake (SBN 260069)                   Neal A. Potischman (SBN 254862)
4   SIMPSON THACHER & BARTLETT LLP                  DAVIS POLK & WARDWELL LLP
    2475 Hanover Street                             1600 El Camino Real
5   Palo Alto, CA 94304                             Menlo Park, California 94025
    Telephone: (650) 251-5000                       Telephone: (650) 752-2000
6   Facsimile: (650) 251-5002                       Facsimile:  (650) 752-2111
    Email: sblake@stblaw.com                        Email: neal.potischman@davispolk.com
7

8   Paul C. Curnin (admitted *pro hac vice*)        Charles S. Duggan (admitted *pro hac vice*)
    Nicholas S. Goldin (admitted *pro hac vice*)    Dana M. Seshens (admitted *pro hac vice*)
9   Rachel Sparks Bradley (admitted *pro hac vice*) Craig T. Cagney (admitted *pro hac vice*)
    SIMPSON THACHER & BARTLETT LLP                  DAVIS POLK & WARDWELL LLP
10  425 Lexington Avenue                            450 Lexington Avenue
    New York, NY 10017                              New York, New York 10017
11  Telephone: (212) 455-2000                       Telephone: (212) 450-4000
    Facsimile: (212) 455-2502                       Facsimile: (212) 701-5800
12  Email: pcurnin@stblaw.com                       Email:    charles.duggan@davispolk.com
13         ngoldin@stblaw.com                                 dana.seshens@davispolk.com
           rachel.sparksbradley@stblaw.com                    craig.cagney@davispolk.com
14

15  *Attorneys for Defendant Directors Barbara L.*   *Attorneys for Defendant Underwriters*
    *Rambo, Lewis Chew, Fred J. Fowler, Richard*     *Barclays Capital Inc., BNP Paribas Securities*
16  *C. Kelly, Roger H. Kimmel, Richard A.*          *Corp., Morgan Stanley & Co. LLC, MUFG*
    *Meserve, Forrest E. Miller, Maryellen C.*       *Securities Americas, Inc., The Williams*
17  *Herringer, Barry Lawson Williams, Rosendo*      *Capital Group, L.P., Citigroup Global Markets*
    *G. Parra, Anne Shen Smith and Eric D.*          *Inc., J.P Morgan Securities LLC, Merrill*
18  *Mullins.*                                       *Lynch, Pierce, Fenner & Smith Incorporated*
                                                     *(n/k/a BofA Securities, Inc.), Mizuho Securities*
19                                                   *USA LLC, Goldman, Sachs & Co., LLC, RBC*
20                                                   *Capital Markets, LLC, Wells Fargo Securities,*
                                                     *LLC, BNY Mellon Capital Markets, LLC, TD*
21                                                   *Securities (USA) LLC, C.L. King & Associates,*
                                                     *Inc., Great Pacific Securities, CIBC World*
22                                                   *Markets Corp., SMBC Nikko Securities*
23                                                   *America, Inc., U.S. Bancorp Investments, Inc.,*
                                                     *Mischler Financial Group, Inc., Blaylock Van,*
24                                                   *LLC, Samuel A. Ramirez & Company, Inc.,*
                                                     *and MFR Securities, Inc. (but not Lebenthal &*
25                                                   *Co. LLC, which has not appeared in this*
                                                     *action)*
26

27

28

DIRECTORS & UNDERWRITERS MP&A IPO MOTION TO DISMISS TAC          CASE NO. 5:18-CV-03509-EJD

# Exhibit 94

1   McDERMOTT WILL & EMERY LLP
    STEVEN S. SCHOLES (admitted *pro hac vice*)
2   444 West Lake Street
    Chicago, IL  60606-0029
3   Telephone:     +1 312 372 2000
    Facsimile:     +1 312 984 7700
4
    MICHAEL A. PIAZZA (State Bar No. 235881)
5   GREGORY R. JONES (State Bar No. 229858)
    JASON D. STRABO (State Bar No. 246426)
6   2049 Century Park East, Suite 3200
    Los Angeles, CA  90067-3218
7   Telephone:     +1 310 277 4110
    Facsimile:     +1 310 277 4730
8   Email:         PG&E@mwe.com

9   Attorneys for Officer Defendants
    ANTHONY F. EARLEY, JR., GEISHA J.
10  WILLIAMS, NICKOLAS STAVROPOULOS, JULIE
    M. KANE, CHRISTOPHER P. JOHNS, PATRICK M.
11  HOGAN, DAVID THOMASON, and DINYAR
    MISTRY
12

13              UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                  SAN JOSE DIVISION

16

17                                          CASE NO.  5:18-cv-03509-EJD

18                                          **BRIEF IN SUPPORT OF THE OFFICER**
                                            **DEFENDANTS' MOTION TO DISMISS**
19                                          **THE THIRD AMENDED**
                                            **CONSOLIDATED CLASS ACTION**
20                                          **COMPLAINT**

21  IN RE PG&E CORPORATION                  [NOTICE OF MOTION AND MOTION AND
    SECURITIES LITIGATION                   REQUEST FOR JUDICIAL NOTICE FILED
22                                          CONCURRENTLY HEREWITH]

23                                          Hearing:

24                                          Date:      February 6, 2020
                                            Time:      9:00 a.m.
25                                          Location:  Courtroom 4 (5th Floor)

26

27

28

*McDERMOTT WILL & EMERY LLP*
*ATTORNEYS AT LAW*
*LOS ANGELES*

1

# **TABLE OF CONTENTS**

2

**Page**

3

I.    INTRODUCTION ................................................................................................ 1

4

II.   THE PARTIES .................................................................................................... 3

5

     A.    The PG&E Defendants ............................................................................ 3

6

     B.    The Officer Defendants .......................................................................... 4

     C.    The Plaintiffs .......................................................................................... 4

7

III.  RELEVANT BACKGROUND ........................................................................... 5

8

     A.    The Utility's Electrical Operations ......................................................... 5

9

     B.    Wildfire Risk In California ...................................................................... 6

10

     C.    The 2017 North Bay Fires ....................................................................... 9

     D.    The 2018 Camp Fire ................................................................................ 9

11

IV.   THE LEGAL STANDARD GOVERNING A MOTION TO DISMISS ........................ 10

12

V.    PLAINTIFF HAS FAILED TO ALLEGE A RULE 10B-5 CLAIM AGAINST
     THE OFFICER DEFENDANTS ........................................................................... 11

13

     A.    Plaintiff Has Not Adequately Pled That The Officer Defendants Concealed
14           The Risk Of Wildfire Posed By The Utility's Wildfire Safety Practices ............ 12

15

     B.    None Of The 19 Alleged Misstatements Is Actionable ......................................... 14

16

         1.    Plaintiff Has Failed To Allege Any Actionable False Statements
             Concerning The Utility's Wildfire Safety Practices ................................. 15

17

             a.    Statements About The Utility's "Progress,"
18                    "Improvements," "Leadership," & "Commitment" To
                    Safety And The Quality Of Its Vegetation Management
19                    Program Are Not Actionable ........................................................ 16

20

             b.    Plaintiff Has Not Alleged The Falsity Of Statements About
                    The Utility's Spending On Vegetation Management In
21                    2016-2017 ...................................................................................... 17

22

             c.    Plaintiff Has Not Alleged The Falsity Of Statements About
                    The Utility's ESRB-8 Shutoff Protocol & Recloser Program ...... 18

23

         2.    Plaintiff Has Failed To Allege The Falsity Of Statements
24             Concerning The Utility's Compliance With Wildfire Safety Laws.......... 20

25

     C.    Plaintiff Has Not Pled That Each Officer Defendant Engaged In Conduct In
         Violation Of Rule 10b-5........................................................................................ 22

26

         1.    Plaintiff Has Not Alleged A Violation Of Rule 10b-5(b)......................... 23

27

         2.    Plaintiff Has Not Alleged A Violation Of Subsections (a) And (c)
             Of Rule 10b-5 For Each Officer Defendant............................................. 26

28

- i -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-cv-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

D. Plaintiff Has Failed To Plead A Strong Inference Of Scienter For Each Of The Officer Defendants ........................................................................ 26

   1. Plaintiff Fails To Plead Individualized Scienter Allegations .................. 28

   2. Plaintiff Has Not Alleged Sufficient Facts To Invoke The Core Operations Doctrine As A Means Of Establishing Scienter .................... 28

   3. Plaintiff's "Motive" Allegations Do Not Give Rise To A Strong Inference Of Scienter ............................................................................. 31

   4. Plaintiff's Remaining Scienter Allegations Do Not Plausibly Indicate That The Officer Defendants Recklessly Misled Investors ........ 32

E. Plaintiff Has Failed To Allege Loss Causation ....................................... 35

VI. PLAINTIFF'S SECTION 20(A) CLAIM ALSO MUST BE DISMISSED ..................... 39

VII. THE SECURITIES ACT PLAINTIFFS HAVE FAILED TO ALLEGE PLAUSIBLE CLAIMS AGAINST THE OFFICER DEFENDANTS ............................ 39

VIII. CONCLUSION ................................................................................................. 40

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS Case No. 5:18-CV-03509-EJD

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Ashcroft v. Iqbal*,
5        556 U.S. 662 (2009).........................................................................................11

6   *In re Atossa Genetics Inc. Sec. Litig.*,
        868 F.3d 784 (9th Cir. 2017)...........................................................................15
7

*Balistreri v. Pacifica Police Dep't*,
8        901 F.2d 696 (9th Cir. 1988)...........................................................................11

9   *Bell Atlantic Corp. v. Twombly*,
10        550 U.S. 544 (2007).........................................................................................10

11  *In re BofI Holding, Inc. Sec. Litig.*,
        No. 3:15-CV-02324-GPC-KSC, 2017 U.S. Dist. LEXIS 79062 (S.D. Cal. May
12        23, 2017)....................................................................................................20, 27

13  *Brody v. Transitional Hosps. Corp.*,
        280 F.3d 997 (9th Cir. 2002)...........................................................................13
14

15  *Bruce v. Suntech Power Holdings Co.*,
        No. CV 12-04061 RS, 2013 U.S. Dist. LEXIS 180784 (N.D. Cal. Dec. 26,
16        2013)......................................................................................................23, 24

17  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
        65 F. Supp. 3d 840 (N.D. Cal. 2014) ...............................................................20
18

19  *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
        691 Fed. Appx. 393 (9th Cir. 2017)..................................................................22

20  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
21        880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...........................................23, 25, 33

22  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
        No. 5:11-CV-04003-LHK, 2013 U.S. Dist. LEXIS 70531 (N.D. Cal. May 17,
23        2013)...............................................................................................................24

24  *Cooper v. Pickett*,
25        137 F.3d 616 (9th Cir. 1997)...........................................................................11

26  *In re Cutera Sec. Litig.*,
        610 F.3d 1103 (9th Cir. 2010).........................................................................15
27

28  *Desaigoudar v. Meyercord*,
        223 F.3d 1020 (9th Cir. 2000).........................................................................12

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-CV-03509-EJD

*Destfino v. Reiswig*,
    630 F.3d 952 (9th Cir. 2011).............................................................................................24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................................11, 35

*Epstein v. Wash. Energy Co.*,
    83 F.3d 1136 (9th Cir. 1996)....................................................................................11

*In re Facebook Sec. Litig.*,
    No. 5:18-cv-01725-EJD, 2019 U.S. Dist. LEXIS 166027 (N.D. Cal. Sep. 25,
    2019) ..................................................................................................14, 15, 16, 33

*Fadia v. FireEye, Inc.*,
    No. 5:14-cv-05204-EJD, 2016 U.S. Dist. LEXIS 157391 (N.D. Cal. Nov. 14,
    2016) ..................................................................................................15, 16, 27, 29

*In re Finisar Corp. Sec. Litig.*,
    5:11-CV-01252, 2013 U.S. Dist. LEXIS 6690 (N.D. Cal. Jan. 16, 2013)................................18

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-CV-01252-EJD, 2013 U.S. Dist. LEXIS 142836 (N.D. Cal. Sep. 30,
    2013) ..................................................................................................16, 23, 25

*Gavish v. Revlon, Inc.*,
    2004 U.S. Dist. LEXIS 19771 (S.D.N.Y. Sep. 29, 2004)..................................................30

*GIA-GMI, LLC v. Michener*,
    No. C-06-7949 SBA, 2007 U.S. Dist. LEXIS 54031 (N.D. Cal. July 16, 2007)....................21

*Glazer Capital Management, LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008)................................................................................21, 27

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003)....................................................................................15

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994)....................................................................................20

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002)....................................................................................12

*Hefler v. Wells Fargo & Co.*,
    No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874 (N.D. Cal. Feb. 27, 2018)..23, 25, 26, 33

*In re Intrexon Corp. Sec. Litig.*,
    No. 16-cv-02398-RS, 2017 U.S. Dist. LEXIS 26401 (N.D. Cal. Feb. 24, 2017)..............12, 16

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

- iv -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-CV-03509-EJD

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  No. 17-cv-05558-HSG, 2018 U.S. Dist. LEXIS 149393 (N.D. Cal. Aug. 31,
  2018) ...........................................................................................................................22

*Jackson v. Fischer*,
  No. C 11-2753 PJH, 2015 U.S. Dist. LEXIS 32128 (N.D. Cal. Mar. 13, 2015) .....................31

*Janus Capital Grp. v. First Deriv. Traders*,
  564 U.S. 135 (2011) ................................................................................................2, 23

*Jui-Yang Hong v. Extreme Networks, Inc.*,
  No. 15-cv-04883-BLF, 2017 U.S. Dist. LEXIS 64297 (N.D. Cal. Apr. 27,
  2017) .....................................................................................................................16, 27

*Kim v. Advanced Micro Devices, Inc.*,
  No. 5:18-cv-00321-EJD, 2019 U.S. Dist. LEXIS 87287 (N.D. Cal. May 23,
  2019) .....................................................................................................................15, 29

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) .......................................................................................35

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019) ................................................................................................26

*In re Maximus, Inc. Sec. Litig.*,
  Civil Action No. 1:17-cv-0884, 2018 U.S. Dist. LEXIS 146068 (E.D. Va. Aug.
  27, 2018) .............................................................................................................33, 34

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ........................................................................14, 33, 35

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014) ..........................................................................33

*Norfolk Cty Ret. Sys. v. Solazyme, Inc.*,
  15-cv-02938-HSG, 2016 U.S. Dist. LEXIS 179949 (N.D. Cal. Dec. 29, 2016) .....................17

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .......................................................................................27

*Oregon Pub. Employees Ret. Fund v. Apollo Grp., Inc.*,
  774 F.3d 598 (9th Cir. 2014) .................................................................................11, 35

*Orshan v. Apple, Inc.*,
  5:14-cv-05659-EJD, 2018 U.S. Dist. LEXIS 190913 (N.D. Cal. Nov. 6, 2018) ...................18

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ........................................................................................32

Case: 19-30088   Doc# 14208-2   Filed: 12/19/23   Entered: 12/19/23 22:10:31   Page
713 of 1229

*Pacific Bell Tel. Co. v. S. Cal. Edison Co.*,
208 Cal. App. 4th 1400 (2012) ...............................................................36

*In re Pacific Gateway Exchange, Inc. Sec. Litig.*,
No. C-00-1211 JPH, 2002 U.S. Dist. LEXIS 8014 (N.D. Cal. Apr. 30, 2002) .................13, 37

*Parks Sch. of Bus. v. Symington*,
51 F.3d 1480 (9th Cir. 1995)...................................................................11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)..........................................................27, 31

*Powell v. Idacorp, Inc.*,
Nos. CV-04-249-S-EJL, 2005 U.S. Dist. LEXIS 41647 (D. Idaho Sep. 14,
2005) ......................................................................................................13

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014).................................................................21

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard
Co.*,
52 F. Supp. 3d 961 (N.D. Cal. 2014) ....................................................21

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard
Co.*,
845 F.3d 1268 (9th Cir. 2017)...............................................................15

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)...........................................................13, 31

*Schueneman v. Arena Pharmaceuticals, Inc.*,
840 F.3d 698 (9th Cir. 2016).................................................................31

*Sgarlata v. PayPal Holdings, Inc.*,
No. 17-cv-06956-EMC, 2018 U.S. Dist. LEXIS 210564 (N.D. Cal. Dec. 13,
2018) ......................................................................................................39

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................16

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008).............................................................27, 29

*In re Splash Tech. Holdings Sec. Litig.*,
No. C 99-00109 SBA, 2000 U.S. Dist. LEXIS 15369 (N.D. Cal. Sept. 29,
2000) ......................................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...............................................................................26

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; No. 5:18-CV-03509-EJD

*Turocy v. El Pollo Loco Holdings, Inc.*,
  No. SACV 15-1343-DOC, 2017 U.S. Dist. LEXIS 123458 (C.D. Cal. Aug. 4,
  2017) ..................................................................................................................23

*In re Verifone Sec. Litig.*,
  No. 13-cv-01038-EJD, 2016 U.S. Dist. LEXIS 42722 (N.D. Cal. Mar. 29,
  2016) ......................................................................................................15, 16, 34

*Wanca v. Super Micro Comput., Inc.*,
  No. 5:15-cv-04049-EJD, 2018 U.S. Dist. LEXIS 107758 (N.D. Cal. June 27,
  2018) ..................................................................................................................12

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018).............................................................27, 29, 31

*Weller v. Scout Analytics, Inc.*,
  230 F. Supp. 3d 1085 (N.D. Cal. 2017) ..........................................................39

*Westley v. Oclaro, Inc.*,
  897 F. Supp. 2d 902 (N.D. Cal. 2012) ............................................................31

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994).............................................................................20

*Wozniak v. Align Tech., Inc.*,
  No. C-09-3671 MMC, 2011 U.S. Dist. LEXIS 60894 (N.D. Cal. June 8, 2011) ...................16

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).....................................................................34, 39

**Statutes**

15 U.S.C. § 77a *et seq.* ......................................................................................1

15 U.S.C. § 78a *et seq.* ......................................................................................1

15 U.S.C. § 78j(b) ............................................................................................11

15 U.S.C. § 78u-4(b)(2)(A).............................................................................26

Cal. Pub. Util. Code § 454(a).......................................................................6, 17

Cal. Pub. Util. Code § 454.9(a)....................................................................6, 17

15 U.S.C. § 77t..............................................................................................2, 3, 39

15 U.S.C. § 77k..................................................................................................1, 39

15 U.S.C. § 77o..................................................................................................1, 39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-CV-03509-EJD

**Other Authorities**

17 C.F.R. § 230.430B(f)(4)(i)-(ii)..................................................................................40

17 C.F.R. § 240.10b-5.......................................................................................... *passim*

17 C.F.R. § 240.10b-5(a)...............................................................................23, 26

17 C.F.R. § 240.10b-5(b)...........................................................................23, 24, 25

17 C.F.R. § 240.10b-5(c)..............................................................................23, 26

FED. R. CIV. P. 9(b).............................................................................11, 18, 24, 26

FED. R. CIV. P. 12(b)(6)..........................................................................................11

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- viii -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS Case No. 5:18-CV-03509-EJD

1    **I.    INTRODUCTION**

2          Pacific Gas and Electric Company (the "Utility") operates an inherently dangerous

3    electricity generation, transmission, and distribution business.  These dangers include the risk of

4    catastrophic events, such as wildfires, which has dramatically increased in California over recent

5    years.    The Utility's publicly-traded parent company, PG&E Corporation ("PG&E"), fully

6    disclosed this risk to investors at all relevant times.  Unfortunately, the risk of catastrophic

7    wildfires was realized in 2015 with the Butte Fire, in 2017 with the North Bay Fires, and again in

8    2018 with the Camp Fire.  These fires presented massive potential financial liabilities to the

9    Utility under California's inverse condemnation regime, which may subject utilities to strict

10   liability for damage substantially caused by their equipment regardless of fault.  Faced with tens

11   of billions of dollars in potential liabilities for the 2017 and 2018 fires, PG&E filed for

12   bankruptcy on January 29, 2019.

13         This action is not about the tragic personal injury and property damage caused by the fires

14   or whether the fires were caused by the Utility's negligence.   Rather, the third amended

15   consolidated class action complaint ("TAC") is an effort by PG&E investors to assert securities

16   fraud claims to recoup stock losses in the wake of the North Bay and Camp Fires.  However, the

17   federal securities laws do not insure against ordinary market losses due to unfortunate events that

18   affect a company's business.  Those laws only protect against fraud.  Here, only the former is

19   alleged.  The latter is not.  All of the plaintiffs invested in full view of the risk of catastrophic

20   wildfires and now seek to recover their investment losses from the realization of that risk.

21         The TAC asserts claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et*

22   *seq.* (the "Exchange Act"), and the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (the "Securities

23   Act").  The Exchange Act claims are brought by a seasoned institutional investor who alleges that

24   PG&E's shareholders were defrauded by 19 statements concerning the Utility's wildfire safety

25   practices over a three-and-half-year period.  The Securities Act claims are brought by highly-

26   sophisticated bondholders who allege that they were misled by statements in four of PG&E's

27   securities filings.  In this motion, the Officer Defendants do not focus on the deficiency of the

28   claims asserted under Sections 11 and 15 of the Securities Act.  The Officer Defendants reference

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 18-CV-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    and rely on the arguments of the Director and Underwriter Defendants with respect to those

2    claims.  The primary focus of this motion is the deficiency of the claims asserted under Rule 10b-

3    5 and Section 20(a) of the Exchange Act.

4        Notwithstanding PG&E's fulsome disclosures concerning the dangers inherent with

5    operating an electric business, including the risk of catastrophic wildfires, the Exchange Act

6    plaintiff alleges that PG&E and certain of its officers committed securities fraud by concealing

7    those risks and making statements like the Utility is "stepping up" its vegetation management

8    practices and making "progress on safety," which plaintiff alleges artificially inflated PG&E's

9    stock price.  Plaintiff further alleges that the market discovered the falsity of such statements

10   when the risk of catastrophic fires was realized in 2017 and 2018, causing the stock price to

11   decline and investors to suffer financial losses.  The TAC fails to state a claim under Rule 10b-5

12   for five reasons, each of which independently requires dismissal.

13       *First*, plaintiff has not alleged a viable concealment theory.  PG&E publicly disclosed to

14   investors the risk of catastrophic wildfires and the potential financial impact of that risk.

15   Moreover, the allegedly-concealed wildfire risk was well publicized in various other sources both

16   before and during the class period.  Investors purchased securities in full view of this risk, and the

17   risk was unfortunately realized.  No claim for securities fraud can lie under these circumstances.

18       *Second*, plaintiff has not alleged any actionable misrepresentations.  General statements

19   about the Utility's "progress," "improvements," "leadership," and "commitment" to safety and

20   the quality of its vegetation management program are not actionable.  Statements concerning the

21   money spent by the Utility on its vegetation management activities are demonstrably true based

22   on judicially-noticeable facts.  Statements about the Utility's energy shut-off protocol are also

23   true.  Statements purportedly warranting the Utility's compliance with wildfire safety laws are

24   either mischaracterized or unsupported by factual allegations that they were false when made.

25       *Third*, plaintiff has not pled specific facts that each Officer Defendant violated the

26   Exchange Act.  Plaintiff does not allege the role each Officer Defendant played with respect to

27   each alleged misstatement.  Rather, plaintiff apparently seeks to hold each Officer Defendant

28   responsible for every one of the 19 alleged misstatements, even though none of the Officer

- 2 -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; No. 18-CV-03509-EJD

Defendants is alleged to have made all of the statements, and some of them were not even employed by PG&E when certain statements were made. Plaintiff's conclusory "ultimate authority" allegations are insufficient to bridge the gap.

*Fourth*, plaintiff also does not allege facts that raise a strong inference of scienter for any of the Officer Defendants. The TAC is devoid of any factual allegations as to what each defendant knew that rendered any of his or her statements recklessly false. Instead, plaintiff relies on the Officer Defendants' corporate positions, points to irrelevant occurrences, such as the timing of certain of their resignations, and attempts to invoke the exceptional "core operations" doctrine as a shortcut to pleading scienter. These tactics fail.

*Finally*, plaintiff fails to allege that any of the purported misstatements caused their investment losses. Plaintiff identifies nine instances when PG&E's stock price dropped. It then pairs those drops with the disclosure of some information about the North Bay Fires or the Camp Fire and characterizes those disclosures as "corrective" of some previous false statement. However, none of the nine statements constitutes a corrective disclosure. They merely disclose facts relating to the Utility's involvement in the fires. Moreover, many of the purported corrective disclosures overlap with the alleged fraud. On three occasions, plaintiff alleges that the fraud and revelation of the truth occurred on the same day, and in one instance, both are alleged to have simultaneously happened in the *same communication*. It is not plausible to have securities fraud where the majority of the purported misstatements were made during the same time when the investing public was also purportedly learning the truth. Plaintiff has failed to allege the essential element of loss causation.

Plaintiff's Section 20(a) claim must also be dismissed. Not only has plaintiff failed to allege a primary violation of Rule 10b-5 m, but it also has failed to plead control person liability for any of the Officer Defendants.

## II. THE PARTIES

### A. The PG&E Defendants

The Utility provides gas and electric services to California residents. TAC ¶ 43. It is a wholly-owned subsidiary of PG&E Corporation (the "Holding Company"). *Id*. ¶¶ 43-46. The

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

- 3 -

Holding Company is publicly-traded on the New York Stock Exchange. *Id*. ¶ 42. PG&E is headquartered in San Francisco. *Id*. In January 2019, PG&E filed for bankruptcy. *Id*. ¶ 179.

### B.    The Officer Defendants

For the Exchange Act claims, the TAC names as individual defendants one current and five former officers of PG&E. TAC ¶¶ 45-51. From September 13, 2011 to March 1, 2017, Anthony Earley served as the Chief Executive Officer, President, and Chairman of the Holding Company. *Id*. ¶ 45. From March 1, 2017 to January 13, 2019, Geisha Williams served as the Chief Executive Officer and President of the Holding Company. *Id*. ¶ 46. Williams previously served as the Utility's President of Electric Operations (from August 17, 2015 to February 28, 2017) and its Executive Vice President of Electric Operations (from June 1, 2011 to August 16, 2015). *Id*. From March 1, 2017 to September 30, 2018, Nickolas Stavropoulos served as the President and Chief Operating Officer of the Utility. *Id*. ¶ 47. Since May 18, 2015, Julie Kane has served as the Chief Ethics and Compliance Officer of the Holding Company. *Id*. ¶ 48. From August 1, 2009 to August 17, 2015, Christopher Johns served as the President of the Utility. *Id*. ¶ 49. From March 2016 to January 28, 2019, Patrick Hogan served as the Senior Vice President of Electric Operations of the Utility. *Id*. ¶ 50. Hogan previously served as the Utility's Vice President of Electric Operations (from November 2013 to February 2016). *Id*.

For the Securities Act claims, the TAC names as individual defendants two current officers and three former officers of PG&E. TAC ¶¶ 512-514, 516-517. The three former officers are Earley, Williams, and Stavropoulos. *Id*. ¶¶ 512-514. The two current officers are David Thomason and Dinyar Mistry. *Id*. ¶¶ 516-517. Thomason has served as the Utility's Controller since June 2016. *Id*. ¶ 516. Mistry has served as the Utility's Senior Vice President of Human Resources since March 2016. *Id*. ¶ 517.

### C.    The Plaintiffs

The Exchange Act claims are brought on behalf of a putative class of plaintiffs who acquired PG&E stock between April 29, 2015 and November 15, 2018. TAC ¶ 11. The lead plaintiff for the Exchange Act claims is the Public Employees Retirement Association of New

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

1  Mexico, which purchased and sold securities of PG&E at various times between June 3, 2015 and

2  October 23, 2018.  *Id.* ¶ 41; ECF No. 121-1, p. 5.

3        The Securities Act claims are brought on behalf of a putative class of plaintiffs who

4  acquired PG&E senior notes pursuant to public offerings that were issued in March 2016,

5  December 2016, and March 2017 and a public exchange offering issued in April 2018.  TAC

6  ¶ 496.  The three named plaintiffs for the Securities Act claims are York County on behalf of the

7  County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-

8  Jersey Trucking Industry & Local No. 701 Pension Fund.  *Id.* ¶¶ 506-508.

9  **III.**    **RELEVANT BACKGROUND**

10      **A.**    <u>The Utility's Electrical Operations</u>

11        The Utility operates roughly 99,000 miles of overhead electric power lines in California,

12  comprising about 81,000 miles of overhead distribution lines and 18,000 miles of overhead

13  transmission lines.  TAC ¶¶ 258, 412. 636.  Operating an electrical business is inherently

14  dangerous and involves significant risks that can have an adverse material impact on PG&E's

15  financial condition, results, and reputation, including the risk of a catastrophic wildfire.  Ex. 21,

16  p. 193.[1]  PG&E has disclosed this information to investors since at least 2012.  *Id.*; *see also*

17  Ex. 22, p. 107-108; Ex. 23, p. 30; Ex. 24, p. 29-30; Ex. 26, p. 33-34; Ex. 27, p. 37-38, 42-43.

18        The Utility's electrical operations are subject to extensive federal, state, and local statutes,

19  regulations, and rules.  Ex. 21, p. 196-197.  The failure to comply with these laws also can have

20  an adverse material impact on PG&E's financial condition, results, and reputation.  *Id.*  PG&E

21  also has disclosed this information to investors since at least 2012.  *Id.*; *see* Ex. 22, p. 107-108,

22  111-113; Ex. 23, p. 30, 33; Ex. 24, p. 29-30, 64, 63; Ex. 26, p. 33-34, 36; Ex. 27, p. 37-38, 42-43.

23  Included among such laws are vegetation management guidelines promulgated by the California

24  Public Utilities Commission ("CPUC").  TAC ¶¶ 53-67.

25

26

---

27  [1] All exhibit references correspond to documents submitted with the Officer Defendants' Request

28  for Judicial Notice.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

- 5 -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS   No. 5:18-CV-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Within its 70,000 square-mile territory, the Utility is responsible for managing more than

2   120 million trees.  TAC ¶ 264.  The Utility manages this massive tree population through its

3   vegetation management program, which is funded, in part, by expenditures that are approved by

4   the CPUC through a General Rate Case ("GRC").  *Id.* ¶¶ 78-79, 85.  A GRC is a regulatory

5   proceeding before the CPUC to determine the costs a utility can spend to operate and maintain its

6   system and the allocation of those costs to its customers.  *Id.* ¶ 62.  A utility must present a GRC

7   to determine how much it can charge ratepayers for electrical services in an upcoming year.  *See*

8   Cal. Pub. Util. Code § 454(a).  The rates a utility can charge are based, in part, on its projected

9   and approved costs, one of which includes vegetation management activities, which are managed

10  through a "Vegetation Management Balancing Account" ("VMBA").  *See, e.g.*, Exs. 29-30.  A

11  utility can spend more than the CPUC has approved for its VMBA and then later *retroactively*

12  seek reimbursement for those costs by applying for a "Catastrophic Events Memorandum

13  Account" ("CEMA").  *See* Cal. Pub. Util. Code § 454.9(a).

14  **B.**     **Wildfire Risk In California**

15  In 2013, California experienced more wildfires than it had in the previous six years.

16  Ex. 37, p. 43.  In January 2014, California declared a state of emergency due to drought

17  conditions.  TAC ¶ 77.  That same month, then-Governor Brown ordered the California

18  Department of Forestry and Fire Protection ("Cal Fire") to hire additional seasonal firefighters to

19  suppress wildfires due to elevated fire risk.  Ex. 31.  In June 2014, the Association of California

20  Water Agencies published a report titled "2014 Drought, Impacts and Strategies for Resilience,"

21  finding that "[b]y nearly any measure, California is in extreme drought … and wildfires already

22  are causing major destruction even before the dry summer months begin." Ex. 34, p. 5.

23  As a result, the CPUC issued a resolution (ESRB-4) in June 2014 directing California

24  utilities to take additional measures to reduce wildfire risk.  Ex. 33, p. 2-4.  One of the measures

25  identified by the CPUC was "increasing" vegetation management activities.  *Id.* at 15.  The

26  CPUC stated that if utilities need additional funding to cover the cost of these activities, they

27  should file an application through the CEMA process.  *Id.* at 15-16.

28

- 6 -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS Case No. 5:18-CV-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

In February 2015, PG&E filed its 2014 annual report, reiterating disclosures about the risks associated with operating an electrical utility.  Ex. 23, p. 30-31.  PG&E disclosed that:

> The operations of the Utility's electricity ... facilities is inherently dangerous and involves significant risks which, if they materialize, can adversely affect [PG&E's] financial results.
>
> The Utility's ability to safely and reliably operate [and] maintain ... its facilities is subject to numerous risks, many of which are beyond the Utility's control, including those that arise from:
>
> - the breakdown or failure of equipment, electric transmission or distribution lines ... that can cause explosions, fires, or other catastrophic events …;
>
> - the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire ….)

*Id*.  PG&E further disclosed that climate conditions in California "could increase the occurrence of wildfires in the Utility's service territory."  *Id*. at 33.

During a quarterly earnings call in April 2015, the Utility's then-President (defendant Christopher Johns) indicated that "[a]s California enters its fourth year of drought," the company was "stepping up [its] vegetation management activities to mitigate wildfire risk."  Ex. 1, p. 6; TAC ¶ 194.  That same year, the Utility undertook "five major fire risk mitigation initiatives" in response to the CPUC's ESRB-4 directive, which included:

- **Enhanced Vegetation Inspection and Mitigation** – Additional ground and air inspection in high fire threat areas …, including using remote sensing technologies, to provide increased assurance that changing forest conditions will not result in vegetation and power line conflicts.

- **Wild Land Urban Interface Protection** – Additional VM inspections in Local Reliability Areas (LRAs) and providing greater clearance of poles in high fire danger LRAs.

- **Fuel Reduction and Emergency Response Access** – Funding Fire Safe Councils to support fuel reduction in high fire danger areas around PG&E's electric distribution facilities.

- **Early Detection and Response to Wildfires and Early Detection of Forest Disease/Infection** – Continuing cooperative information sharing with universities, CAL FIRE, and the United States Forest Service on forest health, as well as funding fire lookouts, aerial patrols, and fire detection cameras located near PG&E's electric distribution facilities.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

Ex. 36, p. 22-26.  The Utility filed a CEMA application seeking to recover $34 million related to costs spent on these vegetation management activities.  *Id.* at 8.  These costs were in addition to the $194 million that the Utility spent through its GRC-approved VMBA for 2015.  TAC ¶ 79.

In September 2015, a wildfire ignited in Amador and Calaveras Counties in Northern California that burned nearly 71,000 acres, destroyed more than 920 buildings, and caused two deaths (the "Butte Fire").  TAC ¶¶ 21, 100-102; Ex. 26, p. 27, 43.  Cal Fire concluded that the Butte Fire was caused when a tree fell into an electrical line operated by the Utility.  Ex. 26, p. 43. At the time, the Butte Fire was the seventh most destructive wildfire in California history.  TAC ¶ 21.  In PG&E's annual report for 2015, the company disclosed that the Utility may incur "material liability" in connection with the Butte Fire and that if insurance does not cover the losses, PG&E's financial condition could be "materially affected."  Ex. 24, p. 37, 67, 126.

In October 2015, the month following the Butte Fire, the State of California publicly declared another state of emergency as a result of millions of trees dying each year due to drought conditions and massive beetle infestations.  TAC ¶ 77.

In February 2017, PG&E disclosed in its annual report for 2016 that the Utility could be liable for property damage caused by wildfires ignited by its electrical facilities "without having been found negligent, through the theory of inverse condemnation."  Ex. 26, p. 27, 34, 43, 62-63, 144-145.  As PG&E further disclosed:

> California law includes a *doctrine of inverse condemnation* that is routinely invoked in California for wildfire damages.  Inverse condemnation *imposes strict liability* (including liability for attorneys' fees) for damages and takings as a result of the design, construction and maintenance of utility facilities, including its electric transmission lines.  As a result of the strict liability standard applied to wildfires, recent losses recorded by insurance companies, *the risk of increase of wildfires including as a result of the ongoing drought*, and the Butte fire, the Utility may not be able to obtain sufficient insurance coverage in the future at comparable cost and terms as the Utility's current insurance coverage, or at all.  In addition, the Utility is unable to predict whether it would be allowed to recover in rates the increased costs of insurance or the costs of any uninsured losses.

*Id.* at 34 (emphasis added).  PG&E also disclosed that the Utility's liability for the Butte Fire could exceed $750 million and that Cal Fire determined that the fire was the result of "the failure by the Utility and/or its vegetation management contractors … to identify certain potential hazards during its vegetation management program."  *Id.* at 27.  PG&E also disclosed that the

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Utility might not be able to obtain sufficient insurance coverage in the future because of "the risk

2    of increase of wildfires as a result of the ongoing drought." *Id.* at 33.

3    **C.       The 2017 North Bay Fires**

4          On October 8 and 9, 2017, numerous separate wildfires ignited across nine counties in the

5    North Bay region of California (the "North Bay Fires").  TAC ¶¶ 19, 246, 327.  The fires began

6    on a dry and windy night.  *Id.* ¶ 23.  Tragically, the North Bay Fires burned more than 245,000

7    acres, destroyed almost 8,900 buildings, and killed 43 people.  *Id.* ¶ 19.

8          Cal Fire, the agency responsible for assessing the causes of the North Bay Fires,

9    determined that 17 of the fires were caused in some manner by the Utility's electrical equipment.

10   TAC ¶¶ 20, 72, 111-112.  It concluded that 12 of the 17 North Bay Fires were ignited by contact

11   between vegetation and the Utility's electrical distribution lines.  Exs. 18-19; TAC ¶¶ 346, 353.

12   However, Cal Fire also concluded that the most destructive and deadly fire (the Tubbs Fire) was

13   not started by the Utility's equipment, let alone the product of a legal violation.  Ex. 42; TAC

14   ¶ 599, n. 167.  Cal Fire determined that the Utility did not violate state law for four of the North

15   Bay Fires.  Ex. 19; TAC ¶ 353.  The six fires for which Cal Fire concluded that the Utility did

16   nothing wrong account for the vast majority (more than 80%) of the overall destruction and

17   fatalities caused by the North Bay Fires.  Exs. 18-19, 42; TAC ¶¶ 346, 353, 599, n. 167.  Cal Fire

18   determined that 11 of the North Bay Fires may have involved violations of state law by the

19   Utility.  Exs. 18-19.  For those 11 fires, Cal Fire identified a variety of different causes.  *Id.*

20   **D.       The 2018 Camp Fire**

21         On November 8, 2018, a fire ignited in Butte County that ultimately became the most

22   destructive and deadly in California history (the "Camp Fire").  TAC ¶ 587.  The Camp Fire

23   tragically burned more than 153,000 acres, destroyed more than 18,804 buildings, and killed 85

24   people.  *Id.*; Ex. 20.  Although it remains under investigation, Cal Fire determined that the

25   Camp Fire ignited when the cross-arm of an 115,000-volt (115kV) steel tower on the Caribou-

26   Palermo transmission line broke, fell to the ground, and caused a spark that ignited vegetation

27   somewhere underneath the tower.  *Id.* ¶ 132; Ex. 20.  Once ignited, the Camp Fire spread quickly

28   due to "strong winds, low humidity and warm temperatures."  Ex. 20.

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-CV-03509-EJD

On November 13, 2018, while the cause of the Camp Fire was still under investigation, PG&E disclosed that the Utility submitted an incident report to the CPUC stating that the Utility observed a damaged tower along the Caribou-Palermo transmission line on the afternoon of November 8, 2018.   Ex. 28.   PG&E further disclosed that "if the Utility's equipment is determined to be the cause, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on [PG&E's] financial condition, results of operations, liquidity, and cash flows." *Id.*

Plaintiff alleges that the Camp Fire would not have started if the Utility had de-energized the Caribou-Palermo transmission line and that the Utility violated its own policy by not de-energizing the line.   TAC ¶¶ 141-176.   Plaintiff bases its allegation on a resolution passed by the CPUC in July 2018 (ESRB-8) that requires utilities to prepare a protocol for de-energizing power lines when extreme fire danger conditions exist.   *Id.* ¶¶ 141-143.   ESRB-8 does not require de-energization in particular circumstances; instead, it merely requires a utility to formulate its own protocol and to communicate it to the CPUC and public.   *Id.* ¶ 446 ("Utilities can de-energize whatever lines and voltage they deem appropriate").   The protocol adopted by the Utility states that "no single factor will drive a Public Safety Shutoff" and that it would "take a combination of many criteria into consideration." *Id.* ¶¶ 143, 300.

Following the Camp Fire, PG&E disclosed that its shutoff protocol does not extend to its transmission lines above 115,000 volts because of "the potential to impact millions of people and create larger system stability issues for the grid...."  TAC ¶ 446.  Plaintiff alleges that PG&E's statement is not true, that the weather conditions on November 8 counseled for shutting down the power for all of the Utility's transmission lines in the area, but that the Utility simply decided to prioritize system reliability over fire safety.  *Id.* ¶¶ 141-176, 443-454.

## IV.   THE LEGAL STANDARD GOVERNING A MOTION TO DISMISS

Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  The facial plausibility standard "requires more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action."  *Id.* at 555 (internal citations and quotation marks omitted).

McDermott Will & Emery LLP<br>Attorneys At Law<br>Los Angeles

- 10 -

1   Under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "[a] claim has facial plausibility when the plaintiff

2   pleads factual content that allows the court to draw the reasonable inference that the defendant is

3   liable for the misconduct alleged." *Id.* at 678.

4        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims. *See*

5   *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A Rule 12(b)(6) motion can

6   be based on either the "lack of a cognizable legal theory" or "the absence of sufficient facts

7   alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

8   (9th Cir. 1988). When evaluating such a motion, "the tenet that a court must accept as true all of

9   the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at

10  678. In addition, "unwarranted inferences" are also "insufficient to defeat a motion to dismiss for

11  failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

12        Heightened pleading requirements apply to fraud claims. FED. R. CIV. P. 9(b). A plaintiff

13  alleging fraud "must state with particularity the circumstances constituting fraud or mistake." *Id.*

14  To satisfy this rule, a plaintiff must allege the "who, what, where, when, and how" of the alleged

15  fraudulent misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). Moreover, in

16  securities fraud cases, the Private Securities Litigation Reform Act ("PSLRA") imposes

17  additional pleading requirements, as discussed below.

18  **V.   PLAINTIFF HAS FAILED TO ALLEGE A RULE 10b-5 CLAIM AGAINST THE OFFICER DEFENDANTS**

19

20        For securities fraud claims brought under Section 10(b) of the Exchange Act (15 U.S.C. §

21  78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5), a plaintiff must plead each of the following

22  elements:  (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the

23  purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura*

24  *Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Every element of a securities fraud claim

25  must be pled with particularity under Rule 9(b). *See Oregon Pub. Employees Ret. Fund v. Apollo*

26  *Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities

27  fraud action …."). Together, Rule 9(b) and the PSLRA require plaintiffs to plead their case "with

28

Case: 19-30088   Doc# 14208-2   Filed: 12/19/23   Entered: 12/19/23 22:10:31   Page 727 of 1229

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1  a high degree of meticulousness." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir.

2  2000).

3      Congress enacted the PSLRA "to eliminate abusive and opportunistic securities litigation

4  and to put an end to the practice of pleading fraud by hindsight." *Wanca v. Super Micro Comput.,*

5  *Inc.*, No. 5:15-cv-04049-EJD, 2018 U.S. Dist. LEXIS 107758, at *7-8 (N.D. Cal. June 27, 2018)

6  (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)).  The PSLRA's elimination

7  of a "fraud-by-hindsight" approach to pleading securities fraud means that "[a] plaintiff cannot

8  show that a prior statement was false or misleading merely by pointing to the market reaction

9  upon a subsequent disclosure of information." *In re Intrexon Corp. Sec. Litig.*, No. 16-cv-02398-

10  RS, 2017 U.S. Dist. LEXIS 26401, at *14 (N.D. Cal. Feb. 24, 2017).

11      Plaintiff asserts a claim under Rule 10b-5 based on the alleged concealment of the

12  financial and safety wildfire risks posed by the Utility's vegetation management practices and

13  19 allegedly-false statements made over a three-and-half-year period from April 29, 2015 to

14  November 9, 2018.  TAC ¶¶ 194-316.  Plaintiff claims that the alleged fraud inflated PG&E's

15  stock price, which then dropped on nine different dates between October 12, 2017 and November

16  15, 2018 following the public disclosure of facts that supposedly revealed the prior fraud.  *Id.*

17  ¶¶ 327-390.  Plaintiff seeks to recover shareholder losses "in the billions of dollars."  *Id.* ¶ 320.

18      As discussed below, plaintiff's Rule 10b-5 claim is fatally flawed because it does not

19  allege:  (1) that the Officer Defendants concealed the risk of wildfire posed by the Utility's

20  wildfire safety practices; (2) that each of the 19 statements constitutes an actionable

21  misrepresentation; (3) that each of the Officer Defendants engaged in conduct that violates

22  Rule 10b-5; (4) that the Officer Defendants acted with scienter; and (5) that the declines in

23  PG&E's stock price were caused by the alleged fraud.  Each of these independent deficiencies

24  requires the dismissal of plaintiff's Rule 10b-5 claim.

25      **A.**    **Plaintiff Has Not Adequately Pled That The Officer Defendants Concealed**
   **The Risk Of Wildfire Posed By The Utility's Wildfire Safety Practices**

26

27      To plead an actionable omission theory of securities fraud, the alleged omission "must …

28  affirmatively create an impression of a state of affairs that differs in a material way from the one

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-CV-03509-EJD

Case: 19-30088   Doc# 14208-2   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
728 of 1229

1  that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

2  Not all material adverse events must be disclosed to investors. *See In re Rigel Pharm., Inc. Sec.*

3  *Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).

4      Plaintiff alleges that the Officer Defendants concealed two facts:  (1) "the extent to which

5  shareholders would be exposed to liability for damages caused by wildfires" (TAC ¶ 18); and

6  (2) the Utility's "numerous and widespread violations of California safety regulations for power

7  lines" (*id*. ¶ 1).  Plaintiff has not pled an actionable concealment theory.

8      First, the Officer Defendants could not have concealed the risk of catastrophic wildfires or

9  the potentially-significant financial impact from the realization of that risk because PG&E

10  publicly disclosed that information to investors well before the class period.  In its annual reports

11  for 2012-2017, PG&E clearly disclosed:  (1) that the Utility is heavily regulated, and that its

12  failure to comply with applicable law could materially and adversely impact its financial

13  condition; (2) that operating electrical facilities is inherently dangerous, involves significant risks,

14  and may cause a catastrophic event that could result in financial losses that may not be

15  recoverable through rates or insurance; and (3) that one such catastrophic event is wildfire caused

16  by the unsafe operation of its electric facilities.  *See* Ex. 21, p. 193, 196; Ex. 22, p. 107-108, 111;

17  Ex. 23, p. 30, 33; Ex. 24, p. 29-30, 32; Ex. 26, p. 33-34, 36-37; Ex. 27, p. 32, , 42-43.  PG&E also

18  disclosed that it is subject to strict liability for damages caused by wildfires ignited by the

19  Utility's electrical equipment under an inverse condemnation theory.  Ex. 26, p. 27, 33-34, 43, 63,

20  144-145.   A company cannot fraudulently conceal information that it has already publicly

21  disclosed.  *See In re Pacific Gateway Exchange, Inc. Sec. Litig.*, No. C-00-1211 JPH, 2002 U.S.

22  Dist. LEXIS 8014, at *42-43 (N.D. Cal. Apr. 30, 2002) (company did not conceal that it was

23  delinquent in payments to vendors and exhausted its financing options because securities filings

24  disclosed that the company did not have sufficient cash to meets its financial commitments);

25  *Powell v. Idacorp, Inc.*, Nos. CV-04-249-S-EJL, 2005 U.S. Dist. LEXIS 41647, at *29 (D. Idaho

26  Sep. 14, 2005) (company did not conceal that the stock price volatility was due to lack of

27  creditworthy counterparties because information was disclosed in press release).

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Moreover, the rising wildfire risk in California was publicized both before and during the

2    class period.  *See* TAC ¶ 77; Ex. 31; Ex. 34, p. 5; Ex. 33, p. 2-4.  Indeed, the exact risk plaintiff

3    alleges was concealed was realized early in the alleged class period when the Butte Fire occurred,

4    and its significant financial consequences were disclosed.  Ex. 24, p. 29-30, 37, 126; Ex. 27,

5    p. 27, 34, 43, 62-63, 144-145.  Investors purchased securities in full view of this risk, and that risk

6    was unfortunately realized.  No claim for securities fraud can lie under these circumstances.

7    Second, plaintiff has not sufficiently alleged that the Officer Defendants concealed the

8    Utility's "widespread" violations of wildfire safety laws.  TAC ¶ 1.  Plaintiff does not plead any

9    undisclosed violations of wildfire safety laws that occurred before the North Bay Fires or any

10    facts suggesting that the conditions constituting the violations identified by Cal Fire for certain

11    North Bay Fires existed before those fires began, much less that they dated back to the first

12    alleged omission in April 2015.  Nor does plaintiff allege that any of the Officer Defendants knew

13    about those specific conditions at any point before the North Bay Fires.  The only allegation

14    asserted by plaintiff is an alleged inference that the Utility maintains a database showing that

15    123,000 trees under its management are "touching its powerlines" at any given time.

16    TAC ¶¶ 110, 401, 420-421.  As discussed later, plaintiff has not adequately pled that the Officer

17    Defendants knew about, much less recklessly concealed, this purported fact.  Plaintiff's

18    conclusory assertion of "numerous and widespread violations of California safety regulations" is

19    not based on any specific factual allegations.  Therefore, plaintiff's omission theory of liability

20    fails to state a cognizable Rule 10b-5 claim.

21    **B.    None Of The 19 Alleged Misstatements Is Actionable**

22    The PSLRA requires plaintiffs to plead specific facts demonstrating that the statements at

23    issue are false or misleading.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049,

24    1070 (9th Cir. 2008) (noting that "alleged false statements, unaccompanied by the pleading of

25    specific facts indicating why those statements were false, does not meet [the PSLRA's]

26    standard").  The failure to plead an actionable misstatement is grounds for dismissal.  *See*, *e.g.*, *In*

27    *re Facebook Sec. Litig.*, No. 5:18-cv-01725-EJD, 2019 U.S. Dist. LEXIS 166027, at *46-78

28    (N.D. Cal. Sep. 25, 2019) (dismissing Rule 10b-5 claim where plaintiff failed to adequately allege

Case: 19-30088   Doc# 14208-2   Filed: 12/19/23   Entered: 12/19/23 22:10:31   Page
730 of 1229

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

that corporate statements were false or misleading); *Kim v. Advanced Micro Devices, Inc.*, No. 5:18-cv-00321-EJD, 2019 U.S. Dist. LEXIS 87287, at *17 (N.D. Cal. May 23, 2019) (same).

An actionable statement must "be capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal citation omitted). This means that a securities fraud claim cannot be based on "generalized, vague and unspecific" statements that constitute "puffery" or corporate optimism. *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (statement that company placed a "high priority" on product development not actionable). Courts in this Circuit routinely dismiss securities fraud claims that rely on such statements. *See, e.g.*, *Facebook*, 2019 U.S. Dist. LEXIS 166027, at *46-50 (dismissing Rule 10b-5 claim based on statements that merely expressed corporate optimism); *Fadia v. FireEye, Inc.*, No. 5:14-cv-05204-EJD, 2016 U.S. Dist. LEXIS 157391, at *15-28 (N.D. Cal. Nov. 14, 2016) (same); *In re Verifone Sec. Litig.*, No. 13-cv-01038-EJD, 2016 U.S. Dist. LEXIS 42722, at *16-18 (N.D. Cal. Mar. 29, 2016) (same). The rationale behind this limiting principle is that "[w]hen valuing corporations, [] investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 800 (9th Cir. 2017) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

### 1. Plaintiff Has Failed To Allege Any Actionable False Statements Concerning The Utility's Wildfire Safety Practices

Twelve of the 19 alleged misrepresentations involve statements about the Utility's wildfire safety practices. TAC ¶¶ 194, 208, 233, 237, 241, 258, 264, 287, 296, 299, 309, 314. The content of these 12 statements can be grouped into three subcategories: (1) statements concerning the Utility's progress, improvements, leadership, and commitment to safety and the quality of its vegetation management program (Statements 1, 6-8, 10, and 14); (2) statements concerning the Utility's spending on its vegetation management activities in 2016-2017 (Statements 10-11); and (3) statements concerning the Utility's ESRB-8 shutoff protocol and recloser program (Statements 3, 15-16, and 18-19). *Id.* None of these statements is actionable. *See* Appendix A (chart of alleged misstatements).

Case: 19-30088   Doc# 14208-2   Filed: 12/15/23   Entered: 12/15/23 22:10:31   Page
731 of 1229

1

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

a.   *Statements About The Utility's "Progress," "Improvements," "Leadership," & "Commitment" To Safety And The Quality Of Its Vegetation Management Program Are Not Actionable*

Plaintiff alleges that the Officer Defendants misrepresented that the Utility made "continued progress on safety," "continued to demonstrate leadership and commitment on safety," made "improvements … in safety … over the last six years," made "progress on safety," was "stepping up [its] vegetation management activities," has a "commitment to safety and operational excellence," has "one of, if not, the most comprehensive vegetation management programs in the country," and had "an industry-leading Vegetation Management Program."  TAC ¶¶ 194, 233, 237, 241, 258, 287 (Statements 1, 6-8, 10, and 14) (emphasis omitted).

These are precisely the type of generalized and vague statements courts have rejected as inactionable puffery or corporate optimism.  *See, e.g.*, *Facebook*, 2019 U.S. Dist. LEXIS 166027, at \*46-50 (statements that company has "worked hard" and that user community "continues to grow" not actionable); *Fadia*, 2016 U.S. Dist. LEXIS 157391, at \*25-27 (statements that company's sales force was "making great progress" and "moving in the right direction" not actionable); *Verifone*, 2016 U.S. Dist. LEXIS 42722, at \*17-21 (statements that company "made significant progress" and was "making great strides" not actionable); *Finisar*, 2013 U.S. Dist. LEXIS 142836 at \*20-24 (statement that demand has been "incredibly strong" not actionable); *Wozniak v. Align Tech., Inc.*, No. C-09-3671 MMC, 2011 U.S. Dist. LEXIS 60894, at \*11-12 (N.D. Cal. June 8, 2011) (statements that company's sales efforts made "good progress" and "significant progress" not actionable); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141-42 (N.D. Cal. 2017) (statements that company's new initiative was making "continuous improvements" not actionable); *Intrexon Corp.*, 2017 U.S. Dist. LEXIS 26401, at \*10-11 (statement that company is "a leader in the field" not actionable); *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-cv-04883-BLF, 2017 U.S. Dist. LEXIS 64297, at \*43-44 (N.D. Cal. Apr. 27, 2017) (statements that company has a "commitment" to achieving 10% operating margin and "double-digit" revenue growth not actionable).  Therefore, the Court should dismiss plaintiff's Rule 10b-5 claim based on Statements 1, 6-8, 10, and 14.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   b.   *Plaintiff Has Not Alleged The Falsity Of Statements About The Utility's Spending On Vegetation Management In 2016-2017*

Plaintiff also alleges that the Officer Defendants misrepresented that the Utility "spent an additional $200 million" in 2016 and "doubled the amount [it has] invested in veg[etation] management" in 2017.  TAC ¶¶ 258, 264 (Statements 10-11) (emphasis omitted).  Plaintiff asserts that these statements were false because the Utility did not actually double its spending on vegetation management in 2016 and 2017.  *Id*. ¶¶ 259, 265.  Plaintiff's theory critically ignores the reimbursement process for vegetation management expenditures and mischaracterizes PG&E's statements.

A utility can receive funding for vegetation management activities two different ways.  The GRC-process fixes how much a utility can *prospectively* charge its customers for such work.  *See* Cal. Pub. Util. Code § 454(a).  But that does not limit how much a utility can spend on vegetation management.  A utility can spend more than the CPUC has approved for its VMBA and then *retroactively* seek reimbursement for those costs through the CEMA recovery process.  *See id*. at § 454.9(a).  Indeed, the CPUC directed the Utility to use this process to recover costs related to performing additional wildfire risk mitigation activities.  Ex. 33, p. 11.  This is precisely what the Utility did for 2016 and 2017:  it filed a CEMA application seeking to recover $394.5 million in costs for vegetation management work it performed in those years beyond the funds approved in its GRC-approved VMBAs.  Ex. 40, p. 6-8.  This nearly additional $400 million that the Utility spent on vegetation management activities in 2016 and 2017 is the basis for stating that the company "essentially" doubled the nearly $400 million that was approved by the CPUC in the Utility's GRC for these years. [2]  TAC ¶¶ 79-80.

A plaintiff cannot plead an actionable fraud theory by omitting or mischaracterizing critical facts.  *See Norfolk Cty Ret. Sys. v. Solazyme, Inc.*, 15-cv-02938-HSG, 2016 U.S. Dist. LEXIS 179949, at *9 (N.D. Cal. Dec. 29, 2016) (finding that plaintiffs failed to satisfy the

---

[2] The CPUC authorized the Utility to spend $198.8 million in 2016 and $201 million in 2017.  TAC ¶ 79.  The Utility filed a CEMA application seeking to recover $254.3 million and $140.2 million for tree mortality and fire risk reduction work performed in 2016 and 2017.  Ex. 40, p. 8.

Case: 19-30088   Doc# 14208-2   Filed: 12/15/23   Entered: 12/15/23 22:10:31   Page
733 of 1229

PSLRA and Rule 9(b) pleading requirements because allegations omitted "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality"); *In re Finisar Corp. Sec. Litig.*, 5:11-CV-01252, 2013 U.S. Dist. LEXIS 6690, at *14-16 (N.D. Cal. Jan. 16, 2013) (plaintiff failed to plead fraud where the allegedly fraudulent statements, when read within context, were not misleading); *Orshan v. Apple, Inc.*, 5:14-cv-05659-EJD, 2018 U.S. Dist. LEXIS 190913, at *9 (N.D. Cal. Nov. 6, 2018) (noting that under Rule 9(b) a plaintiff must plead facts that explain why a statement was false when it was made). Therefore, the Court should dismiss plaintiff's Rule 10b-5 claim based on Statements 10-11.[3]

> c. *Plaintiff Has Not Alleged The Falsity Of Statements About The Utility's ESRB-8 Shutoff Protocol & Recloser Program*

In the wake of the North Bay Fires, the CPUC issued ESRB-8 requiring utilities to create a protocol for de-energizing power lines during dangerous fire conditions and notifying customers in advance of any such de-energization. TAC ¶ 141. The CPUC did not impose any formal requirements dictating when a utility must de-energize its power lines. *Id.* ¶ 446. To the contrary, the CPUC stated that "[u]tilities can de-energize *whatever* lines and voltage *they deem appropriate*…. They *typically* de-energize *distribution lines* because those lines are more localized than transmission lines." *Id.* (emphases added). Moreover, as the CPUC has cautioned, "[d]e-energization of the electric grid must be carefully exercised because it leaves communities and essential services without electrical power…. Deciding whether to de-energize is a nuanced and multi-dimensional analysis…. It should be reserved as a last line of defense to protect public safety due to extreme fire weather conditions, not as a first step." Ex. 43-A, p. 15. The Utility issued its ESRB-8 shutoff protocol on September 27, 2018. TAC ¶ 141. Although the Utility had taken steps to de-energize power lines in portions of eight counties in advance of the Camp Fire,

---

[3] Plaintiff also alleges that PG&E misrepresented that the Utility conducts annual inspections of its overhead electrical lines, but it does not allege any facts demonstrating that these statements were untrue when they were made. *See* TAC ¶¶ 211, 261, 266.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; No. 5:18-CV-03509-EJD

1   the company ultimately decided to not shutoff the power on November 8, 2018 because it

2   believed that "weather conditions did not warrant this safety measure." *Id*. ¶ 146.

3       Plaintiff has pled four alleged misstatements related to public announcements made about

4   the Utility's ESRB-8 shutoff protocol.  TAC ¶¶ 296-316 (Statements 15-16 and 18-19).  Plaintiff

5   alleges that each of these statements was false or misleading because if the Utility had actually

6   "launched" and "implemented" a legally-compliant, non-"illusory" shutoff protocol, it would

7   have de-energized the exact *transmission* line that was involved in the Camp Fire.  *Id*. ¶¶ 141-

8   176.  These four statements were not false or misleading when made.

9       First, plaintiff claims that it was false that the Utility "launched" or was "implementing"

10  an ESRB-8 shutoff protocol in June, September, and October 2018 because the Utility failed to

11  activate it on the morning of the Camp Fire in November 2018.  TAC ¶¶ 296-297, 300-301, 309-

12  310.  But that is a non-sequitur.  The Utility actually did launch and implement an ESRB-8

13  shutoff protocol before November 2018.  Ex. 13.  Indeed, plaintiff expressly alleges that the

14  Utility used the protocol to de-energize 41 different power lines in October 2018.  TAC ¶ 145.

15      Second, the Utility did not promise that it would shutoff power to any line "whenever" the

16  seven weather-related criteria existed.  To the contrary, the Utility stated that "no single factor

17  will drive a Public Safety Shutoff" and that it would "take a combination of many criteria into

18  consideration," including the non-exclusive seven criteria.  Ex. 13, p. 5; TAC ¶¶ 143, 300.

19  Further, the criteria are not meant to be mechanically applied.  Ex. 43-A, p. 15; TAC ¶ 446

20  (CPUC:  "Utilities can de-energize whatever lines and voltage they deem appropriate").  Rather,

21  decisions as to whether to de-energize a line are inherently judgmental and based on a broad array

22  of factors.  Ex. 41, p. 9 ("We expect an [investor-owned utility] to use its best judgment on a

23  case-by-case basis to determine whether de-energization is needed for public safety.").  Plaintiff's

24  assertion that the protocol was "illusory" because the Utility did not "believe itself bound" by the

25  seven non-exclusive criteria (TAC ¶ 175) is based on a false premise.  The Utility was *not* bound

26  by the seven non-exclusive criteria and was free to consider other criteria, as the protocol itself

27  makes clear on its face.  Ex. 41, p. 9 ("The decision to de-energize electric facilities for public

28  safety is complex and dependent on many factors including and not limited to [listing factors].").

- 19 -

1   The same problems plague the alleged misstatement concerning the Utility's recloser

2   program. Plaintiff alleges that PG&E misled investors when it said that the Utility was "just

3   about done" with a program "to take [its] reclosers out of service remotely" and "focus on the

4   wildfire areas." TAC ¶¶ 208-209. As before, plaintiff does not allege any facts demonstrating

5   that this statement was false or misleading when made, *i.e.*, that the Utility was not actually close

6   to finishing its remote recloser program in November 2015 and that the program did not focus on

7   wildfire areas. *Id*. Nor did PG&E make any promises about how and when the Utility was going

8   to use this program in conditions like the ones that precipitated the North Bay Fires. *Id*.

9   The securities laws do not permit a plaintiff to assert a claim based on a "judgment that, in

10   hindsight, proved to be unwise or imprudent or negligent." *In re BofI Holding, Inc. Sec. Litig.*,

11   No. 3:15-CV-02324-GPC-KSC, 2017 U.S. Dist. LEXIS 79062, at *50 (S.D. Cal. May 23, 2017)

12   (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) ("In order to allege the

13   circumstances constituting fraud, plaintiff must set forth facts explaining why the difference

14   between the earlier and the later statements is not merely the difference between two permissible

15   judgments, but rather the result of a falsehood.")); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d

16   1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn

17   management's business judgment into securities fraud.") (citations omitted); *City of Dearborn*

18   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 861 (N.D. Cal.

19   2014) (dismissing Rule 10b-5 claim where the "more plausible inference" was that the defendants

20   "made a business judgment that, in hindsight, proved to be extremely poor," which is "not

21   actionable securities fraud"). That is precisely what plaintiff seeks to do here. Therefore, the

22   Court should dismiss plaintiff's Rule 10b-5 claim based on Statements 3, 15-16, and 18-19.

23   2.   <u>Plaintiff Has Failed To Allege The Falsity Of Statements Concerning The
     Utility's Compliance With Wildfire Safety Laws</u>

24   Most of the 19 misstatements alleged in the TAC involve purported representations about

25   the Utility's compliance with wildfire safety laws. *See* TAC ¶¶ 197, 211, 222, 249, 271, 280,

26   287, 296, 300, 303, 309, 314 (Statements 2, 4-5, 9, 12-19). Plaintiff alleges that PG&E warranted

27   to investors that the Utility's vegetation management practices do not violate applicable law. *Id*.

28

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

- 20 -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS — No. 5:18-CV-03509-EJD

As discussed below, the alleged "compliance" statements make no such representation, and even if they did, they are not accompanied by factual allegations that establish their falsity.

First, plaintiff improperly mischaracterizes many of the "compliance" statements. A plaintiff cannot maintain a securities fraud claim by mischaracterizing a statement as saying something that it does not. *See GIA-GMI, LLC v. Michener*, No. C-06-7949 SBA, 2007 U.S. Dist. LEXIS 54031, at *27 (N.D. Cal. July 16, 2007) (noting that "Plaintiff cannot sidestep the heightened pleading requirements for fraud by simply mischaracterizing" documents and the statements therein); *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 971 (N.D. Cal. 2014) (concluding that alleged misstatements "about corporate ethics did not constitute a warranty of compliance"). Despite plaintiff's description of certain statements as ones "regarding compliance" (TAC ¶¶ 298, 302, 308, 313, 316), Statements 15-19 do not even use the word "compliance" or any comparable terminology. *Id.* ¶¶ 296, 300, 303, 309, 314. Thus, these statements make no "compliance" representation at all. Plaintiff also misconstrues other statements where PG&E used the word "compliance" or "follows" to mean that the Utility is not in violation of any wildfire safety laws. *Id.* ¶¶ 197, 211, 222, 249 (Statements 2, 4-5, and 9). A fair reading of those statements is that the Utility performs vegetation management activities *pursuant to* applicable law, rather than that it *has not violated* any laws. Finally, plaintiff improperly attempts to expand two "compliance" statements that specifically address "regulatory requirements for *pole integrity* management" to mean that the Utility has met "*all state regulations* concerning fire safety." *Id.* ¶¶ 280, 287 (Statements 13-14). The Court should dismiss plaintiff's Rule 10b-5 claim based on Statements 2, 4-5, 9, and 12-19.

Second, to the extent any of PG&E's statements warranted that the Utility was not in violation of any wildfire safety laws, plaintiff still has not adequately pled the falsity of those statements. Courts have held that a corporate statement of legal compliance violate Rule 10b-5 only if it is supported by allegations that *specific* legal violations *existed* when the statement was made. *See Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014) (citing *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 741-42 (9th Cir. 2008) ("Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that

- 21 -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; Case No. 5:18-cv-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

existed at the time the warranties were made."), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 691 Fed. Appx. 393, 395 (9th Cir. 2017) (plaintiffs failed to establish the falsity of legal compliance statements because they did not allege that there were legal violations at the time the statements were made); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv-05558-HSG, 2018 U.S. Dist. LEXIS 149393, at *18 (N.D. Cal. Aug. 31, 2018) (same).

Here, plaintiff alleges that the "compliance" statements were false or misleading because Cal Fire determined that certain North Bay Fires and the Camp Fire were ignited as the result of the Utility's violations of state law.  TAC ¶¶ 199-201, 213-215, 224-226, 251-253, 273-275, 281-282, 289-291, 297, 301, 305.  However, for the three "compliance" statements that were made before the North Bay Fires, plaintiff does not allege that any of these specific legal violations (or even the conditions underlying those violations) existed at the time when PG&E allegedly represented that the Utility was in compliance with all wildfire safety laws.  *Id.* ¶¶ 197, 211, 222 (Statements 2 and 4-5).  For the nine "compliance" statements that were made after the North Bay Fires but before the Camp Fire, there is no fact to render them false because the statements either do not make any "compliance" representations at all (Statements 9 and 15-19) or do not address the specific vegetation clearance requirements that were violated (Statements 12-14).  *Id.* ¶¶ 249, 271, 280, 287, 296, 300, 303, 309, 314.  And none of the alleged "compliance" statements can be fairly construed as a warranty that the Utility will never violate any wildfire safety laws in the future.  Therefore, plaintiff has failed to plead the falsity of its alleged "compliance" statements.  For these reasons, the Court should dismiss plaintiff's Rule 10b-5 claim based on Statements 2, 4-5, 9, and 12-19.

## C.   **Plaintiff Has Not Pled That Each Officer Defendant Engaged In Conduct In Violation Of Rule 10b-5**

Rule 10b-5 makes it unlawful to:  (a) "employ any device, scheme, or artifice to defraud"; (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made,

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

- 22 -

not misleading"; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."   17 C.F.R. § 240.10b-5(a)-(c).   Plaintiff alleges that the Officer Defendants engaged in each type of unlawful practice under Rule 10b-5. TAC ¶ 474.  Plaintiff's allegations are insufficient as to each Officer Defendant.

### 1.   Plaintiff Has Not Alleged A Violation Of Rule 10b-5(b)

Under Rule 10b-5(b), corporate officers are not liable for false or misleading statements they did not make personally.  *See Janus Capital Grp. v. First Deriv. Traders*, 564 U.S. 135, 142-43 (2011).   The "maker" of a statement is the "speaker" as well as any other person with "ultimate authority" over the statement, which means one who has the ability to control its content and dissemination.   *Id*.   Otherwise, officers are not liable for making misstatements "spoken" by their colleagues or contained in general corporate statements, such as press releases, reports, and securities filings, that are not specifically attributable to them.  *See Bruce v. Suntech Power Holdings Co.*, No. CV 12-04061 RS, 2013 U.S. Dist. LEXIS 180784, at *16-17 (N.D. Cal. Dec. 26, 2013) (dismissing Rule 10b-5 claim against CFO based on alleged false statements made by the company or other officer defendants); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC, 2017 U.S. Dist. LEXIS 123458, at *37-38 (C.D. Cal. Aug. 4, 2017) (dismissing Rule 10b-5 claim against CFO and CMO based on oral statement made by CEO).

To allege that a non-speaking officer had "ultimate authority" over a statement, a plaintiff must plead specific and non-conclusory facts demonstrating such authority.  *See Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874, at *31-32 (N.D. Cal. Feb. 27, 2018) (rejecting conclusory allegations based on officer defendants' "positions of control and authority"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070-71 (N.D. Cal. 2012) (same); *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2013 U.S. Dist. LEXIS 142836, at *16 (N.D. Cal. Sep. 30, 2013) (third-party report could not be attributed to CEO because plaintiff did not allege that he "had editorial control over the author's use of [the statement] or the preparation of the ultimate report"), *rev'd on other grounds by Finisar Corp. Sec. Litig. v. Finisar Corp.*, 646 F. App'x. 506 (9th Cir. 2016).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

1    This pleading principle aligns with the rejection of the group pleading doctrine under Rule

2    9(b) and the PSLRA.  *See Bruce*, 2013 U.S. Dist. LEXIS 180784, at *16-17 (observing that most

3    courts have concluded that group pleading is no longer viable under the PSLRA).  A plaintiff is

4    not permitted "to merely lump multiple defendants together" but rather must "differentiate [its]

5    allegations when suing more than one defendant ... and inform each defendant separately of the

6    allegations surrounding his alleged participation in the fraud."  *City of Royal Oak Ret. Sys. v.*

7    *Juniper Networks, Inc.*, No. 5:11-CV-04003-LHK, 2013 U.S. Dist. LEXIS 70531, at *13-15 n.2

8    (N.D. Cal. May 17, 2013) (citations omitted); *see Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir.

9    2011) (Rule 9(b) does not allow plaintiffs to assert "everyone did everything" allegations).

10    Here, plaintiff fails to identify which Officer Defendants they seek to hold liable under

11    Rule 10b-5(b) as the "makers" of the 19 alleged misstatements.  TAC ¶¶ 16-495.  Instead,

12    plaintiff appears to assert that each Officer Defendant is liable for making each misstatement,

13    regardless of whether the statement was personally spoken by them, attributed to them, or even

14    made while they were employed by PG&E.  *Id*. ¶ 52.  This is impermissible for multiple reasons.

15    First, certain Officer Defendants were not even employed by PG&E when many of the

16    alleged misstatements were made.  For example, Johns left PG&E in August 2015.  TAC ¶ 49.

17    As such, he cannot be liable for any of the 18 alleged misstatements that occurred after that date.

18    *See Bruce*, 2013 U.S. Dist. LEXIS 180784, at *16-17 (CFO could not be held liable for

19    statements made outside of his employment with the company).  The same is true for Earley and

20    Stavropoulos, who no longer served as officers of PG&E after March 2017 and September 2018,

21    respectively.  *Id*. ¶¶ 45, 47.  Neither can they be liable for any statements that occurred following

22    their departures.  *See Bruce*, 2013 U.S. Dist. LEXIS 180784, at *16-17.

23    Second, the Officer Defendants are not automatically liable for statements spoken by or

24    attributed to the other individual defendants.  Of the 19 statements alleged in the TAC, only seven

25    are attributed to a specific defendant:  Statement 1 (Johns); Statement 3 (Hogan); Statements 6-7

26    (Earley); Statements 8 & 10 (Williams); Statement 11 (Stavropoulos).  TAC ¶¶ 194, 208, 233,

27    237, 241, 258, 264.  None of the statements is directly attributable to Kane.  Exs. 1-15.  Absent

28    particularized allegations showing that the non-speaking defendants had the ultimate authority to

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 24 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

control the content and dissemination of these seven statements, only the actual speakers can be potentially liable for securities fraud under Rule 10b-5(b).  *See Finisar*, 2013 U.S. Dist. LEXIS 142836 at *15-17; *Hefler*, 2018 U.S. Dist. LEXIS 31874, at *31-32.

Third, plaintiff has failed to allege specific facts demonstrating that the Officer Defendants had the ultimate authority for any alleged misstatement they did not speak.  There are 12 statements that were not spoken by or otherwise directly attributable to any of the Officer Defendants.  TAC ¶¶ 197, 211, 222, 249, 271, 280, 287, 296, 300, 303, 309, 314.  Plaintiff apparently seeks to impose liability against the Officer Defendants for these statements under an ultimate authority theory.  *Id.* ¶¶ 52, 473-476.

Plaintiff's ultimate authority allegations are insufficient under the PSLRA.  With the exception of Julie Kane, the only allegation contained in the TAC that addresses ultimate authority is the single conclusory assertion that the Officer Defendants "because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content on the Company's website and office Twitter.com account, and other market communications during the Class Period."  TAC ¶ 52.  Such a generic allegation is inadequate to state a viable securities fraud claim.  *See Finisar*, 2013 U.S. Dist. LEXIS 142836 at *15-17; *Hefler*, 2018 U.S. Dist. LEXIS 31874, at *31-32.  Therefore, plaintiff has not adequately alleged that Williams, Johns, Earley, Stavropoulos, or Hogan had the ultimate authority over any statements that are not directly attributable to them.

Nor do plaintiff's ultimate authority allegations against Kane pass muster.  Unlike the other Officer Defendants, only Kane is alleged to have "reviewed and authorized" the 12 alleged misstatements made by PG&E.  TAC ¶¶ 206, 220, 230, 257, 279, 285, 295, 298, 302, 308, 313, 316.  However, each of these allegations is based on the same conclusory assertion:  that Kane "reviewed and authorized" the statements "in her capacity as PG&E's Chief Ethics and Compliance Officer."  *Id.*  A plaintiff cannot establish ultimate authority simply based on an officer's position, title, and responsibilities with the company.  *See City of Royal Oak*, 880 F. Supp. 2d at 1071 (rejecting allegation that board chairman had ultimate authority over statements

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS, Case No. 5:18-cv-03509-EJD

1   made by CEO and CFO during analyst and investor calls simply based on his position); *Hefler*,

2   16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874, at *31-32 (finding that plaintiff failed to allege

3   defendants' ultimate authority over alleged misstatements by virtue of their positions).   Thus,

4   plaintiff's ultimate authority allegations against Kane are also deficient.

> 2.   Plaintiff Has Not Alleged A Violation Of Subsections (a) And (c) Of Rule
> 10b-5 For Each Officer Defendant

7   Plaintiff fares no better with its alleged violations of Rule 10b-5(a) and (c).   First, plaintiff

8   fails to identify any "device, scheme, or artifice to defraud" (17 C.F.R. § 240.10b-5(a)) or

9   fraudulent "act, practice, or course of business" (17 C.F.R. § 240.10b-5(c)).   *See* TAC ¶¶ 474-

10   475.   Second, plaintiff fails to identify the particular conduct each Officer Defendant engaged in

11   that constituted these violations.   *See id.*   Although the Supreme Court recently held that the same

12   conduct may violate both subsections (see *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-03 (2019)),

13   Rule 9(b) and the PSLRA still require a plaintiff to allege specific facts identifying the conduct

14   and the role each individual defendant played.   *See In re Splash Tech. Holdings Sec. Litig.*, No. C

15   99-00109 SBA, 2000 U.S. Dist. LEXIS 15369, at *65 (N.D. Cal. Sept. 29, 2000) (dismissing

16   Rule 10b-5 claim premised on violations of subsections (a) and (c) against non-speaking

17   defendants because plaintiffs failed to allege specific facts establishing culpable conduct).

18   Because plaintiff failed to do so for each Officer Defendant, its Rule 10b-5(a) and (c) claims fail.

> **D.   Plaintiff Has Failed To Plead A Strong Inference Of Scienter For Each Of
> The Officer Defendants**

20   To plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving

21   rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. §

22   78u-4(b)(2)(A).   To qualify as "strong," "an inference of scienter must be more than merely

23   plausible or reasonable – it must be cogent and at least as compelling as any opposing inference

24   of nonfraudulent intent."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

25   The ultimate question is:   "When the allegations are accepted as true and taken collectively,

26   would a reasonable person deem the inference of scienter at least as strong as any opposing

27   inference?"   *Id.* at 326.   The Court must determine whether the plaintiff's allegations either

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -
BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS TAC – Case No. 5:18-CV-03509-EJD

individually or holistically support an inference of scienter. *See Fadia*, 2016 U.S. Dist. LEXIS 157391, at \*36 ("The Court must evaluate scienter in the context of the entirety of the complaint).

To allege a strong inference of scienter, a plaintiff must plead facts showing that the defendant made a false or misleading statement with an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (citations omitted). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citations omitted) (alteration in original). "Generally speaking, such an inference must be made by pleading scienter as to the individual executive or director who made the misstatement." *BofI*, 2017 U.S. Dist. LEXIS 79062, at \*39 (S.D. Cal. May 23, 2017) (citing *Glazer*, 549 F.3d at 743); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) ("the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.") (citations omitted).

A plaintiff cannot create a strong inference of scienter merely by pointing to an officer's position, role, or title with a company except in very limited and unusual circumstances. *Webb*, 884 F.3d at 854. A narrow exception permits courts to infer that an officer has knowledge of facts critical to a business's "core operations," but only where the plaintiff alleges that the officer either had "actual access to the disputed information" or "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008)). Succeeding on a core operations theory "is not easy" and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, ... or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   Plaintiff Fails To Plead Individualized Scienter Allegations

The TAC contains 60 allegations grouped into eight categories that are ostensibly devoted to the element of scienter.   *See* TAC ¶¶ 391-458.   However, very few of these allegations reference any Officer Defendant by name.   *Id.*   Indeed, other than Julie Kane, who is mentioned about 14 times, the Officer Defendants are identified in only a handful or two of paragraphs in the scienter allegations:   Geisha Williams (8); Anthony Earley (7); Patrick Hogan (5); Nickolas Stavropoulos (3); Chris Johns (2).   *Id.*   Even then, plaintiff only uses the names of the Officer Defendants to assert allegations based on their corporate positions, responsibilities, reporting hierarchy, tenure with PG&E, and conclusory "easy access" to a database.   *Id.*   Fatally, plaintiff does not plead any specific facts identifying what information each Officer Defendant knew or acts they performed that strongly suggest the alleged misstatements were made with scienter.

### 2.   Plaintiff Has Not Alleged Sufficient Facts To Invoke The Core Operations Doctrine As A Means Of Establishing Scienter

Instead of pleading individualized allegations, plaintiff attempts to satisfy its scienter burden by invoking the core operations doctrine.   TAC ¶¶ 397-403.   Plaintiff alleges that safety was a "core business" of PG&E, that "wildfire safety" was a "top priority," a "particular focus," and "critically important" to the Utility's operations, that the Officer Defendants "closely monitored" the Utility's safety and compliance activities, and that therefore, they must have known (or were reckless in not knowing) about the Utility's "widespread" non-compliance with wildfire safety laws.   *Id.*   Plaintiff's core operations allegations fail to establish scienter.

Plaintiff has not alleged that any of the Officer Defendants knew, or were reckless in not knowing, operational details related to wildfire safety.   And the law imposes no duty to know detailed operational information in such a large company.   If it did, scienter automatically would be established in every securities fraud case related to a significant aspect of the company's operations.   Pleading scienter through the core operations doctrine requires much more:   a plaintiff must allege facts establishing one of two circumstances:   (1) each officer defendant had "actual access to the disputed information"; or (2) "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS — No. 5:18-CV-03509-EJD

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

matter." *Webb*, 884 F.3d at 854 (quoting *South Ferry*, 542 F.3d at 785-86); *see Kim*, 2019 U.S. Dist. LEXIS 87287, at *29-32 (rejecting core operations allegations because they were not sufficiently "developed"); *Fadia*, 2016 U.S. Dist. LEXIS 157391, at *45-48 (rejecting core operations allegations because they did not allege what information and facts defendants were exposed to). Plaintiff has not alleged either circumstance.

Under the first circumstance, plaintiff has not pled sufficient facts to create a plausible inference that the Officer Defendants had "actual access" to information demonstrating that the Utility's wildfire safety practices were not compliant with applicable law. *Webb*, 884 F.3d at 854; *South Ferry*, 542 F.3d at 785-786; *Kim*, 2019 U.S. Dist. LEXIS 87287, at *29-31; *Fadia*, 2016 U.S. Dist. LEXIS 157391, at *45-48. Plaintiff seeks to satisfy its burden by alleging that the Officer Defendants had "easy access" to a pole inspection database that plaintiff infers revealed "approximately 123,000 … safety violations in the nature of trees touching [the Utility's] powerlines at any given time." TAC ¶¶ 401 (quoted language), 420-431.

Plaintiff's "database allegations" do not raise a strong inference of scienter. Trees and other vegetation constantly grow. They are not static objects. The CPUC's vegetation management regulations require utilities to conduct annual inspections of their overhead power lines, to keep minimum clearance distances with vegetation, and to remedy clearance encroachments within a certain timeframe. TAC ¶¶ 63-65, 560. To comply with these regulations, the Utility's vegetation management program uses a database to track its inspections, clearance issues, and remediation schedule. *Id*. ¶¶ 420-422. Plaintiff alleges that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." *Id*. ¶¶ 110, 401. Applying these "metrics" to the fact that the Utility allegedly manages 123 million trees, plaintiff speculates that at any given moment, there are 123,000 trees touching overhead power lines and thus 123,000 violations of wildfire safety laws. *Id*. ¶ 401. These allegations are insufficient for at least two reasons.

First, plaintiff's allegations do not raise a plausible inference. Of the more than 120 million trees that have the potential to contact the Utility's electrical lines, some may encroach the clearance area at any given time. That is why the Utility is charged with regularly

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS; No. 5:18-CV-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   monitoring the trees and remediating trees that are within the prescribed clearance zone or present

2   hazards.  The numbers cited by plaintiff simply represent inferences of how many trees possibly

3   could encroach at any given time, not actual "legal violations."  Plaintiffs' allegations assume that

4   the Utility is required to achieve perfect compliance with clearance requirements in real time.

5   But before December 14, 2017, when the CPUC's most recent revisions to the vegetation

6   management regulations became effective, utilities based in Northern California had 59 months to

7   correct a clearance issue unless it qualified as an "immediate" safety risk.  Ex. 39, p. 37, 41.

8   Plaintiff has not alleged that the Officer Defendants knew or were reckless in not knowing that

9   the Utility violated its obligation to inspect and, after encroachments were discovered and known

10  to exist, to remediate issues within a proper timeframe.

11          Plaintiff repeatedly alleges that PG&E admitted that as of June 2017, there were "3,962

12  unworked trees" that the Utility identified as "hazardous" in 2016 and in need of removal "before

13  the next inspection cycle."  TAC ¶¶ 3, 104, 202, 216, 227, 239, 244, 254, 276, 284, 292, 394, 424.

14  Plaintiff does not explain why this admission means that the Utility violated any wildfire safety

15  laws with respect to either the "unworked" trees or the specific vegetation issues involved in the

16  North Bay Fires.  To the contrary, plaintiff's allegation demonstrates that the Utility was doing

17  exactly was it supposed to do:  identify hazardous trees and schedule them for removal.  The

18  insinuation that the Utility did not remove these trees according its own internal schedule does not

19  indicate a violation of the CPUC's vegetation management regulations.

20          Second, even if the Utility's database did detail tens of thousands of safety violations,

21  plaintiff still has not sufficiently pled that the Officer Defendants had actual access to it.  Indeed,

22  plaintiff merely alleges that the database is "readily accessible" and that the Officer Defendants

23  had "easy access" to it.  TAC ¶ 422.  But an officer's *ability* to access information does not mean

24  he or she has *actual* access to it.  If the law were otherwise, the CEO of every publicly-traded

25  company would be charged with knowing virtually everything about the business.  *See Gavish v.*

26  *Revlon, Inc.*, 2004 U.S. Dist. LEXIS 19771, at *58 (S.D.N.Y. Sep. 29, 2004) ("the complaint's

27  totally conclusory allegations regarding defendants' omniscient awareness of [operational details]

28  are insufficiently particularized to support a strong inference of defendants' scienter").  Here,

- 30 -

Case: 19-30088   Doc# 14208-2   Filed: 12/15/23   Entered: 12/15/23 22:10:31   Page
746 of 1229

plaintiff does not allege that reviewing the database was within the specific scope of duties of any Officer Defendant or any other facts that would suggest they had "actual access" to it.  As the Ninth Circuit has stated, succeeding on a core operations theory "is not easy" and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring … or witness accounts demonstrating that executives had actual involvement in creating false reports."  *Intuitive Surgical*, 759 F.3d at 1062.  Plaintiff has not alleged any such admissions or witness accounts.

Plaintiff has also failed to plead facts establishing the second circumstance to which the core operations doctrine applies.  Plaintiff must allege that the concealed or misrepresented fact "is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *Webb*, 884 F.3d at 854.  Plaintiff has not pled any such facts.

### 3.   Plaintiff's "Motive" Allegations Do Not Give Rise To A Strong Inference Of Scienter

Plaintiff also attempts to satisfy the scienter element by alleging that the potential threat of bankruptcy supplied the Officer Defendants with a strong motive to mislead investors.  TAC ¶¶ 437-42.  Plaintiff's motive allegations are insufficient.

First, the Ninth Circuit has rejected an officer's general desire to achieve "routine corporate objectives" as a sufficient motive to commit securities fraud.  *See Webb*, 884 F.3d at 856-857.  This includes the desire to obtain good financing, expand the business, and bring on new partners (*Rigel*, 697 F.3d at 884-88), developing new products (*Jackson v. Fischer*, No. C 11-2753 PJH, 2015 U.S. Dist. LEXIS 32128, at *52 (N.D. Cal. Mar. 13, 2015)), the desire to have a stock offering succeed (*Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 927 (N.D. Cal. 2012)), firing personnel (*Webb*, 884 F.3d at 856-57), and raising capital (*Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698, 709 n.8 (9th Cir. 2016)).  Much like these examples, the desire to avoid bankruptcy is likewise a fundamental and routine objective common to many businesses.  Such an objective is not indicative of scienter.

Second, even if plaintiff's motive theory were viable, there is no connection between that theory and the facts that were allegedly misrepresented or concealed by the Officer Defendants.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS No. 5:18-CV-03509-EJD

1  Plaintiff alleges that the Officer Defendants hid from investors the fact that the Utility was

2  plagued by "numerous and widespread violations of California safety regulations for power

3  lines." TAC ¶ 1. However, concealing this alleged fact does not avoid the threat of bankruptcy

4  posed by subjecting the company to tens of billions of dollars in liability from wildfires caused by

5  the company's safety violations. Such a threat only would be avoided by not committing the

6  safety violations that may have contributed to the ignition of the wildfires in the first place.

7  Plaintiff's "motive" allegations do not add anything to the scienter calculus.

8            4.    Plaintiff's Remaining Scienter Allegations Do Not Plausibly Indicate That

9                 The Officer Defendants Recklessly Misled Investors

        Plaintiff also attempts to plead scienter by alleging that: (i) the Officer Defendants knew

10  about the Utility's ongoing violations of wildfire safety regulations following the 2015 Butte Fire;

11  (ii) the judge monitoring PG&E's probation in the criminal proceeding surrounding the 2010

12  San Bruno gas pipeline explosion uncovered additional facts supporting scienter; (iii) knowledge

13  of any compliance violations by the Utility can be imputed to certain Officer Defendants because

14  defendant Kane serves as the company's Chief Ethics and Compliance Officer; (iv) PG&E

15  purportedly attempted to cover up the Utility's failure to follow its ESRB-8 shutoff protocol in

16  advance of the Camp Fire; and (v) the timing of the resignations of certain Officer Defendants.

17  TAC ¶¶ 392-396, 404-419, 432-436, 443-458. None of these allegations, whether considered

18  individually or holistically, is sufficient to plead scienter for each Officer Defendant.

19          First, nothing related to the 2015 Butte Fire supports an inference of scienter. Plaintiff

20  claims that the Officer Defendants knew about the Utility's violations of wildfire safety laws

21  because the cause of the Butte Fire was itself a violation. TAC ¶¶ 392-396. The cause of the

22  Butte Fire was not a secret. That fact was publicly disclosed in reports issued by Cal Fire and the

23  CPUC, the lawsuits brought against PG&E, and the company's securities filings. Ex. 38; Ex. 35;

24  Ex. 26, p. 27, 43. Knowledge of a publicly-disclosed fact is not indicative of scienter. *See Owens*

25  *v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015) ("Even as to those alleged misstatements that

26  occurred after the 'red flags' were apparent, the red flags were disclosed to the public, which

27  negates the inference that defendants acted with scienter").

28  

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Second, plaintiff has not alleged any facts supporting scienter in connection with the

2   proceedings about whether PG&E violated its conditions of probation in the San Bruno criminal

3   matter.  TAC ¶¶ 404-419.  The TAC includes allegations of various inquiries, comments, and

4   findings by Judge Alsup.  *Id.*  But plaintiff does not identify facts showing that any particular

5   Officer Defendant knew about undisclosed information.  *Id.*  The number of wildfires caused by

6   the Utility each year and the particular causes of those fires are facts that PG&E annually

7   discloses to the CPUC by law.  Ex. 32, p. 8, 78-85.  Moreover, although Judge Alsup criticized

8   the Utility's vegetation management practices and spending in those proceedings (TAC ¶¶ 413-

9   414), he did not find that PG&E misrepresented anything about those topics or that the Utility

10  was committing thousands of safety violations on any given day.  None of these allegations

11  supports an inference of scienter against the Officer Defendants.

12      Third, Kane's role and responsibilities with PG&E do not support an inference of scienter

13  for her or the two CEO defendants to whom she directly reported (Earley and Williams).  As

14  discussed previously, scienter cannot be inferred merely from an officer's role with a company

15  absent additional factual allegations regarding specific information to which she had access.  *See*

16  *City of Royal Oak*, 880 F. Supp. 2d at 1071; *Hefler*, 2018 U.S. Dist. LEXIS 31874, at *31-32; *see*

17  *also Metzler*, 540 F.3d at 1068 ("corporate management's general awareness of the day-to-day

18  workings of the company's business does not establish scienter – at least absent some additional

19  allegation of specific information conveyed to management and related to the fraud"); *Facebook*,

20  2019 U.S. Dist. LEXIS 166027, at *82 (quoting same); *Mogensen v. Body Cent. Corp.*, 15 F.

21  Supp. 3d 1191, 1220 (M.D. Fla. 2014) ("Otherwise, any executives working at a company with an

22  internal reporting system would work at their peril.  To impute knowledge of or extremely

23  reckless disregard for the truth from the mere existence of an internal reporting system, and the

24  mere active engagement of management, would allow almost any securities fraud case to proceed

25  into discovery.").  Plaintiff has not pled such additional facts.  Therefore, Kane's general title,

26  duties, and authority are insufficient to establish scienter as to her.  Even if they were, one

27  officer's scienter cannot be imputed to another merely because they report to that person.  *See In*

28  *re Maximus, Inc. Sec. Litig.*, Civil Action No. 1:17-cv-0884 (AJT/IDD), 2018 U.S. Dist. LEXIS

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 33 -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS C. No. 5:18-CV-03509-EJD

146068, at *34 n.5 (E.D. Va. Aug. 27, 2018) ("the knowledge of one corporate officer is not necessarily imputed to another for the purposes of establishing the second's scienter").

Fourth, plaintiff's allegations that PG&E attempted to cover up the Utility's failure to follow the ESRB-8 shutoff protocol before the Camp Fire are neither plausible nor indicative of scienter. Plaintiff claims that "it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol excluded transmission lines [above 115kV]." TAC ¶ 453. To support this claim, plaintiff alleges that the Utility de-energized two 115kV transmission lines in October 2018. *Id*. ¶ 452. However, plaintiff itself alleges that the Utility *reactively* de-energized the line in response to existing fires that had already occurred. *Id*. That fact does not contradict the Utility having a discretionary ESRB-8 protocol that excluded *proactively* de-energizing transmission lines to avoid the risk of a future fire. Even if it did, such an allegation does not suggest that any particular Officer Defendant knew information that rendered a prior statement false or misleading.

Finally, plaintiff alleges that an inference of scienter is supported by the timing of the resignations of certain Officer Defendants. TAC ¶¶ 455-458. This allegation does not bolster a scienter inference for Kane because she is still employed by PG&E. The Ninth Circuit has held that an employee's resignation supports an inference of scienter only when it is "uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (observing "the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons"); *VeriFone*, 2016 U.S. Dist. LEXIS 42722, at *25 (rejecting resignation allegations of supportive of scienter because connection between alleged fraud and resignation was "too attenuated"). Plaintiff alleges that Earley resigned in December 2017, Stavropoulos resigned in September 2018, Hogan resigned in January 2019, and Williams resigned in May 2019. TAC ¶¶ 455-458. Although plaintiff alleges that the Court should infer that the reason for the departures of these Officer Defendants was PG&E's "widespread dissatisfaction" with their "commitment and expertise necessary for safety" (*id*.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 34 -

¶ 457), that inference, even if credited, does not scienter.  Plaintiff does not plead any facts suggesting that these resignations were suspicious in any way or otherwise connected to some particular misstatement.  Whether considered individually or collectively, plaintiff's allegations fail to raise a strong inference of scienter for any Officer Defendant.

### E.      Plaintiff Has Failed To Allege Loss Causation

Loss causation refers to the causal relationship between a misrepresentation and the economic loss suffered by an investor.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Courts have interpreted this element to require that "a securities fraud plaintiff must prove that the defendant's misrepresentation was a substantial cause of his or her financial loss." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  At the pleading stage, the plaintiff must allege "that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.*; *Metzler*, 540 F.3d at 1062.  The plaintiff must allege that the market "learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally."  *Id.* at 1063.  In *Metzler*, the Ninth Circuit observed that a plaintiff cannot plead loss causation through "euphemism" or by claiming that the disclosure was "a coded message revealing the fraud."  *Metzler*, 540 F.3d at 1064.  A plaintiff must also plead loss causation with specificity.  *See Apollo*, 774 F.3d at 605.

Plaintiff alleges that over a 13-month period between October 2017 and November 2018, there were nine instances when PG&E's stock price dropped in response to a "corrective disclosure" of fraud or a "materialization of concealed risk."  TAC ¶¶ 327-390.  Plaintiff claims each disclosure revealed "the extent and effects of PG&E's responsibility" for the North Bay and Camp Fires.  *Id*.  Plaintiffs' loss causation allegations fail because none of the alleged "corrective disclosures" exposes any previous fraud.

October 12, 2017 Disclosure.  The CPUC ordered PG&E to preserve evidence "related to potential causes of the [North Bay Fires], vegetation management, maintenance and/or tree-trimming."  TAC ¶ 329 (emphasis omitted).  Plaintiff alleges that this is when "the market began to understand that PG&E's safety regulation violations were a proximate cause of the North Bay

- 35 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Fires." *Id*. ¶ 328.   The CPUC's evidence preservation letter says nothing about legal violations.

2    Ex. 16.   And although PG&E's stock dropped 6.7% following this disclosure, as plaintiff points

3    out, "[t]his was the first indication that PG&E failures caused any of the North Bay Fires."

4    *Id*. ¶ 329.   That the Utility may have been involved in starting the North Bay Fires does not mean

5    that they were the product of legal violations.   Indeed, Cal Fire did not address that topic until

6    months later (May 25, 2018).   *Id*. ¶ 346.   In light of PG&E's disclosures (Ex. 26, p. 27, 34, 43, 63,

7    144), the plausible explanation for the stock drop is the market's reaction to the possibility that

8    the Utility would incur significant liabilities for the fires, especially in view of how lower

9    California courts have extended inverse condemnation to investor-owned utilities like PG&E.

10   *See Pacific Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400, 1407 (2012).   The

11   CPUC's preservation letter does not reveal any previous fraud.

12       October 13, 2017 Disclosure.   In an SEC filing, PG&E disclosed "the possible role of

13   power lines and other facilities" in causing the North Bay Fires.   TAC ¶ 335.   PG&E is not

14   alleged to have misled investors about possibly having caused the North Bay Fires or to have

15   falsely promised investors that such a catastrophic event was not a possible risk.   To the contrary,

16   PG&E has long disclosed that risk.   Exs. 21-24, 26-27.   Plaintiff alleges that the 16.5% decline in

17   share price that followed PG&E's securities filing was connected to the Utility's "inadequate

18   safety practices and violations…."   TAC ¶ 338.   But again, the alleged corrective disclosure does

19   not mention anything about inadequate safety practices or legal violations.   Ex. 25.   It simply says

20   that "any liability associated with these fires" is currently "unknown."   *Id*.

21       December 20, 2017 Disclosure.   In a press release, PG&E disclosed that it was suspending

22   its quarterly cash dividend because of "uncertainty related to causes and potential liability

23   associated with" the North Bay Fires.   TAC ¶ 339; Ex. 17.   PG&E also disclosed that under

24   California's inverse condemnation law, "even if the utility has followed inspection and safety

25   rules – the utility may still be liable for property damages and attorneys' fees associated with that

26   event."   TAC ¶ 339.   Plaintiff alleges that this disclosure "shocked" investors and caused another

27   12.95% stock drop because it revealed PG&E's "false reassurances of progress on safety and

28   compliance with safety regulations."   *Id*. ¶ 341.   PG&E's press release did no such thing.   To the

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

- 36 -

BRIEF IN SUPPORT OF THE OFFICER DEFENDANTS'
MOTION TO DISMISS, No. 5:18-CV-03509-EJD

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

contrary, it disclosed that the company could be held financially responsible even if the Utility followed applicable law, and that as a result of the potential liabilities, PG&E was suspending its dividend. *Id.* ¶ 339. A dividend suspension, regardless of cause, often results in a company's stock price dropping.

May 25 & June 8, 2018 Disclosures. In two press releases, Cal Fire announced its preliminary determinations that 11 of the 17 North Bay Fires may have involved various legal violations by PG&E. TAC ¶¶ 346, 353. Plaintiff alleges that the disclosure of this information in May and June 2018 caused PG&E's stock to drop 5.19% and 4.08%, respectively. *Id.* ¶¶ 348, 358. Plaintiff claims that Cal Fire's press releases revealed the falsity of PG&E's prior representations concerning the Utility's compliance with wildfire safety laws. *Id.* ¶¶ 351, 361. But as discussed earlier, the five purported "compliance" statements that preceded these press releases did not warrant that the Utility's vegetation management practices complied with wildfire safety laws such that no legal violations existed throughout its entire system, let alone the specific violations identified by Cal Fire. *Id.* ¶¶ 197, 211, 222, 249, 271 (Statements 2, 4-5, 9, and 12). Thus, Cal Fire's press releases do not correct any prior disclosure.

November 8, 2018 Disclosure. On the afternoon the Camp Fire started, PG&E tweeted that the Utility did not proactively de-energize transmission lines pursuant to its ESRB-8 protocol because of its belief that "weather conditions did not warrant this safety measure." TAC ¶ 364. Plaintiff alleges that this tweet "was the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire" and undermined "assurances to investors that it would comply with safety regulations." *Id.* But the tweet does not disclose anything about the Utility's involvement in the Camp Fire or reveal that any prior statements about legal compliance were false or misleading. Ex. 15. In fact, plaintiff implausibly alleges that this same tweet also misrepresented the Utility's compliance with the CPUC's ESRB-8 resolution. *Id.* ¶¶ 314-316. A statement cannot simultaneously misstate a fact and also reveal that the same exact fact was misstated. *See Pacific Gateway*, 2002 U.S. Dist. LEXIS 8014, at *42-43. PG&E's tweet is not a "corrective disclosure" of any actionable fraud.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1      November 9-12, 2018 Disclosures.  Plaintiff alleges that between November 9 and 12,

2  2018, news outlets began reporting that the Utility's electrical equipment may have been involved

3  in starting the Camp Fire based on an incident report filed by PG&E with the CPUC.  TAC

4  ¶¶ 372-374.  PG&E's stock dropped by 17.385% following this news.  *Id*. ¶ 376.  But again, just

5  because the Utility may have been involved in starting the Camp Fire does not mean that the fire

6  was the product of a legal violation.  And this stock drop is hardly surprising given the company's

7  prior disclosure of the potential financial liabilities that might result from just such an event.  This

8  news did not correct any prior false or misleading statements made by PG&E.

9      November 13-14, 2018 Disclosure.  In an SEC filing, PG&E disclosed that "[w]hile the

10  cause of the Camp Fire is still under investigation, if the Utility's equipment is determined to be

11  the cause, the Utility could be subject to significant liability in excess of insurance coverage that

12  would be expected to have a material impact on PG&E Corporation's and the Utility's financial

13  condition, results of operations, liquidity, and cash flows."  TAC ¶ 381; Ex. 28.  Plaintiff alleges

14  that PG&E's stock price fell 21.791% following this disclosure because it "call[ed] into question

15  its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire."

16  TAC ¶ 381-82.  But again, PG&E is not alleged to have misled investors about possibly having

17  caused the Camp Fire or that such a catastrophic event was not possible.  Indeed, not only has

18  PG&E long disclosed this risk (*see* Exs. 22-25, 27-28), but the disclosure occurred months after

19  the public knew about the Utility's potential liability exposure in connection with the North Bay

20  Fires.  No fact was disclosed in this public filing that revealed some prior fraudulent statement.

21      November 15, 2018 Disclosure.  In a press release, Cal Fire announced that the Camp Fire

22  may have had a second ignition point that occurred near the Utility's electrical equipment.  TAC

23  ¶ 386.  Plaintiff alleges that PG&E's stock dropped 30.676% following this announcement

24  because it supposedly "further evidenced the extent of PG&E's responsibility for the Camp Fire"

25  and undermined "assurances" of complaint regulatory compliance.  *Id*. ¶ 386-87.  Cal Fire's

26  announcement about a potential second ignition point for the Camp Fire does not disclose any

27  facts about the Utility's vegetation management practices or compliance with wildfire safety

28  laws.  Thus, no previous fraud was revealed by this disclosure.

1

## VI.   PLAINTIFF'S SECTION 20(a) CLAIM ALSO MUST BE DISMISSED

2

Section 20(a) of the Exchange Act imposes liability on anyone who "exercised actual

3

power or control" over a person who violates Rule 10b-5.  *Zucco Partners*, 552 F.3d at 990

4

(citations omitted).  To plead a viable Section 20(a) claim, a plaintiff must allege a predicate

5

violation of Rule 10b-5.  *Id.*; *see Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1096

6

(N.D. Cal. 2017) (dismissing Section 20(a) claim where there was no underlying violation of

7

Rule 10b-5).  A plaintiff must also allege specific facts to state a valid Section 20(a) claim.  *See*

8

*Sgarlata v. PayPal Holdings, Inc.*, No. 17-cv-06956-EMC, 2018 U.S. Dist. LEXIS 210564, at

9

\*23 (N.D. Cal. Dec. 13, 2018) (dismissing Section 20(a) claim because plaintiffs "cannot rely on

10

boilerplate allegations; they must provide some factual support that defendants were in a position

11

to control a primary violator") (citations omitted).

12

Plaintiff's Section 20(a) claim must be dismissed for two separate reasons.  First, plaintiff

13

has failed to allege a primary violation of Rule 10b-5.  Second, even if it had, plaintiff has failed

14

to allege facts showing that any Officer Defendant "exercised actual power or control over the

15

primary violator."  *Zucco Partners*, 552 F.3d at 990.  Plaintiff fails to identify the primary

16

violator, who controlled the primary violator, how they controlled the primary violator, and when

17

such control existed.  TAC ¶ 490.  Instead, plaintiff generically alleges that the Officer

18

Defendants exercised the requisite control due to their positions "as senior officers."  *Id.*  Such

19

boilerplate allegations are insufficient to plead a valid Section 20(a) claim.  *Sgarlata*, 2018 U.S.

20

Dist. LEXIS 210564, at \*23.  Therefore, plaintiff's Section 20(a) claim also must be dismissed.

21

## VII.   THE SECURITIES ACT PLAINTIFFS HAVE FAILED TO ALLEGE PLAUSIBLE CLAIMS AGAINST THE OFFICER DEFENDANTS

22

The Securities Act plaintiffs assert claims under Section 11 and 15 of the Securities Act

23

related to senior notes issued by PG&E pursuant to public offerings in March 2016,

24

December 2016, and March 2017 and a public exchange offering issued in April 2018.  TAC

25

¶¶ 496-706.  The Officer Defendants incorporate by reference and join in the arguments raised in

26

the motion to dismiss filed by the Director Defendants and Underwriter Defendants.

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6

Plaintiffs' Section 11 claim is also deficient for the following additional reason.   An individual defendant is not liable under Section 11 for shelf registration statements they did not sign or for offerings issued when they were not a director.   *See* 17 C.F.R. § 230.430B(f)(4)(i)-(ii). This limiting principle means that certain Officer Defendants cannot be held liable for all of the offerings alleged in the TAC:   Thomason (March 2016 and December 2016 offerings); Mistry (March 2017 and April 2018 offerings); Earley (April 2018 offering).   TAC ¶¶ 512, 516-517.

7    **VIII.   CONCLUSION**

8
9

For the foregoing reasons, the Court should dismiss each of the claims asserted in the Third Amended Consolidated Class Action Complaint against the Officer Defendants.

10

11    Dated: October 4, 2019                                    McDERMOTT WILL & EMERY LLP

12

13                                                              By: */s/ Steven S. Scholes*

14                                                              STEVEN S. SCHOLES
                                                                Attorneys for Officer Defendants
15                                                              ANTHONY F. EARLEY, JR., GEISHA J.
                                                                WILLIAMS, NICKOLAS
16                                                              STAVROPOULOS, JULIE M. KANE,
                                                                CHRISTOPHER P. JOHNS, PATRICK M.
17                                                              HOGAN, DAVID THOMASON, and
                                                                DINYAR MISTRY

18
19
20
21
22
23
24
25
26
27
28

Case: 19-30088   Doc# 14208-2   Filed: 12/15/23   Entered: 12/15/23 22:10:31   Page 756 of 1229

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

# Exhibit 95

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  CR-14-00175-TEH |
| v. | ) | |
| | ) | |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) | |
| Defendant. | ) | |
| | ) | |

ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY ORDERED:

I.       Goals and Scope of the Monitorship

A.  The goal of the Monitorship shall be to prevent the criminal conduct with respect to gas

pipeline transmission safety that gave rise to the Superseding Indictment filed in this matter.

To that end, and as more directly detailed in Sections I.B. and I.C. below, the Monitor's goal

is to help ensure Pacific Gas and Electric Company ("PG&E") takes reasonable and

appropriate steps to maintain the safety of the gas transmission pipeline system, performs

appropriate assessment testing on gas transmission pipelines, and maintains an effective

ethics and compliance program and safety related incentive program.  The Monitor shall seek

to assure defendant's compliance with the goals outlined in United States Sentencing

Guidelines Section 8B2.1: Effective Compliance and Ethics Program.

B.  Since the time of the pipeline explosion in San Bruno, PG&E's gas transmission pipeline

safety programs and initiatives have been reviewed by federal and state agencies, and several

independent third parties.  As a result of those reviews, PG&E has initiated numerous

1

programs and initiatives designed to improve the safety and effectiveness of its gas transmission pipeline system.  Those programs and initiatives are subject to the review of PG&E's primary regulator, California Public Utilities Commission ("CPUC"), which has and continues to conduct its own reviews and direct PG&E to take certain actions.  The Monitor does not have authority to supplant the CPUC's authority over, or decisions related to, gas transmission operations or pipeline safety.  Nor does the Monitor have authority to take action that would, directly or indirectly, require PG&E to take action contrary to the directives of its regulators.  Consistent with the CPUC's primary jurisdiction over PG&E, the Monitor shall focus his or her review on the adequacy of PG&E's completion of and continuing adherence to the following activities and standards:

1) Implementation of policies and procedures sufficient to comply with CPUC Decision 16-09-055 (effective Sept. 30, 2016) relating to the handling of safety citations and timely reporting of self-identified potential violations.

2) Completion of the collection and organization of the necessary pipeline strength test records and pipeline features information for validation of the Maximum Allowable Operating Pressure for PG&E's gas transmission pipeline, consistent with the NTSB's recommendations for maintaining asset records to a "traceable, verifiable, and complete" requirement, and in accordance with CPUC Resolution L-410 (Jan. 13, 2011), Decision 11-06-017, and Decision 12-12-030.

3) Confirmation of satisfactory strength testing of at least 500 miles of gas transmission pipelines in 2017 and 2018.

4) Upgrading and/or retrofitting approximately 300 miles of gas transmission pipelines to accommodate in-line inspection tools in 2017 and 2018.

5) Consistent with CPUC Decision 15-04-024, Appx E at 1 (San Bruno OII Remedy 4), implementation of Integrity Management procedures that ensure where data is missing, direct the Company to use conservative, supportable assumptions as required by ASME B31.8S.

6) Consistent with CPUC Decision 15-04-024, Appx E at 1 (San Bruno OII Remedy 3), completion of records search to include gas transmission pipeline historical leak data into a single database of transmission leak record data.

7) Consistent with CPUC Decision 15-04-024, Appx. E at 1 (San Bruno OII Remedy 2), implementation of Integrity Management procedures sufficient to ensure that

2

the data gathering processes, the data elements collected and reviewed, and company data sources meet the requirements of 49 CFR Part 192.917(b) and ASME B31.8S.

8) Consistent with NTSB Recommendation P-11-29, implementation of Integrity Management revisions to include (1) a revised risk model, reflecting actual recent data on leaks, failures, and incidents; (2) consideration of defect and leak data for the life of each pipeline; (3) revised risk methodology to ensure assessment methods are selected for each pipeline segment; and (4) improved self-assessment that adequately measures whether the program is effectively assessing and evaluating the integrity of each covered segment.

9) Implementation of policies and procedures that address threats caused by vegetation and structural encroachments on gas transmission pipelines.

10) Implementation of processes and procedures that for each segment of gas transmission line in High-Consequence Areas, enable PG&E to calculate the expected life of the pipe using a fracture control analysis that (1) estimates maximum flaw sizes remaining after inspections and/or strength testing; (2) estimates potential crack growth rate based on the past history of and potential pressure cycles; (3) assesses the remaining life calculations; and (4) determines appropriate methods of reassessment and frequency of reassessment of each such segment.

11) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 6), implementation of policies and procedures such that relevant data is incorporated in threat identification and assessment procedures for both covered and non-covered segments, including but not limited to potential manufacturing and construction threats, and leak data.

12) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 9), implementation of threat identification and assessment procedures such that High-Consequence Areas are prioritized consistent with 49 CFR Part 192.917(e)(3)-(4).

13) Implementation of policies designed to incorporate changed circumstances into assessment methodologies and prioritization, including Risk Management Procedure 16 ("Threat Identification") and TD 4810B-001 ("Changes to Integrity Management Pressure Testing Requirements for Unstable Manufacturing Threats"), consistent with ASME B31.8S.

14) Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 8), cessation of regularly increasing pipeline pressure up to a "system MAOP" to eliminate the need to consider manufacturing and construction threats, and analysis of segments that were subjected to the planned pressure increases to determine the risk of failure from manufacturing threats under 49 CRF Part 192.917(e)(3), including review of strength-testing of all segments identified as having an unstable manufacturing threat.

3

15)    Consistent with CPUC Decision 15-04-024, Appx. E at 2 (San Bruno OII Remedy 10), implementation of threat identification and assessment policies and procedures such that cyclic fatigue and other loading conditions are incorporated into segment-specific threat assessments and risk ranking algorithm, including review of risk management procedures for appropriate treatment of cyclic fatigue and loading.

C.  If gas transmission pipeline safety issues arise during the term of the Monitorship, PG&E shall promptly bring those issues to the attention of the Monitor.  PG&E and the Monitor shall agree to the types of gas transmission pipeline safety issues that should be brought to the attention of the Monitor, with the United States Attorney's Office for the Northern District of California (the "USAO" or "Government") resolving any disagreements on the scope of such issues.  The Monitor will review and report on the adequacy of PG&E's response to any gas transmission pipeline safety issues that arise during his or her term.

4

II.   <u>Monitor</u>

A. <u>Retention of Monitor</u>:

1) *Monitor:* PG&E shall retain a monitor who shall be familiar with best practices for corporate codes of conduct, including implementation, training, and enforcement thereof (hereinafter the "Monitor").  The parties shall collaborate to identify a mutually acceptable monitor within 90 calendar days after the Court imposes sentence (the "Effective Date").  In the event the parties are unable to reach agreement on a mutually acceptable monitor, each party shall submit no more than two names to the Court and the Court shall determine the monitor.  PG&E shall retain the Monitor as soon as possible, but not later than 60 calendar days after the date the parties agree on a mutually acceptable monitor or the Court determines the monitor.  If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set forth herein, a replacement Monitor shall be chosen consistent with the procedures set forth in this paragraph.

B. <u>Monitorship Scheduling and Compensation</u>:

1) The monitorship shall exist for a period of five years from the date of the Monitor's retention unless terminated pursuant to paragraph D(8)(a) herein.

2) The Monitor shall be authorized to employ personnel with appropriate professional qualifications, who are reasonably necessary, to assist in the proper discharge of the Monitor's duties, as specified herein.  PG&E may offer suggestions on qualified professional personnel to assist the Monitor and the Monitor shall interview any such suggested personnel to assess their qualifications and any potential conflicts of interest.  PG&E may perform routine conflict checks on individuals or entities the Monitor proposes to engage, and within two weeks of a proposed engagement, PG&E shall advise the Monitor if any conflict exists.  Disputes regarding conflicts shall be brought, in the

5

first instance, to the USAO for resolution.  If, after consideration and direction from the USAO, either the Monitor or PG&E believes the conflict issue has not been satisfactorily resolved, either the Monitor or PG&E may request the Court's assistance in resolving the conflict issue.

3) PG&E shall pay reasonable compensation and expenses of the Monitor, and any persons hired by the Monitor pursuant to his/her authority hereunder.  The Monitor, and any persons hired by the monitor, shall be compensated in accordance with their hourly rates or a reasonable fee determined by the Monitor based on applicable market rates.

4) The Monitor shall prepare annual budgets for review by PG&E and the USAO.  The Monitor, PG&E, and the USAO shall meet at least annually to discuss improvements on the monitorship scope and/or cost.  PG&E may raise any concerns or issues regarding the monitorship cost and/or annual budgets either with the Monitor or the USAO, and the Monitor and the USAO shall give reasonable consideration to defendant's concerns or issues.  If, after consideration and direction from the USAO, either the Monitor or PG&E believes the monitorship cost and/or annual budget issue has not been satisfactorily resolved, either the Monitor or PG&E may request the Court's assistance in resolving the issue.

C. <u>Powers of the Monitor</u>:

1) The Monitor shall take such reasonable steps as, in the Monitor's view, may be necessary to be fully informed with respect to the Monitor's duties.

2) PG&E shall cooperate with the Monitor to allow the Monitor to fulfill his or her duties under this Order, including providing the Monitor with access to all non-privileged information, documents, records, facilities and/or employees, as reasonably requested by the Monitor.

3) The Monitor shall maintain as confidential all non-public information, documents, and records it receives from PG&E, subject to the Monitor's reporting requirements herein. The Monitor shall take steps to ensure that any of his/her consultants or employees shall also maintain the confidentiality of all non-public information. Within thirty (30) days after the end of the Monitor's term, the Monitor shall either return anything obtained from PG&E, or certify that such information has been destroyed.

4) To the extent that the Monitor seeks access to information that is privileged or attorney work product, PG&E shall use its best efforts to provide the Monitor with comparable information without compromising the asserted privilege or protection.

5) The Monitor may ask the Court to review *in camera* any documents the Monitor believes are necessary for him or her to review, but which PG&E has refused to provide to the Monitor based upon a claim of privilege, such as the attorney-client privilege.  The Court shall then determine whether such documents are protected by the attorney-client privilege and/or work product doctrine.

D.  <u>Monitor's Reviews and Reports</u>:

1) The Court may meet with the Monitor to discuss aspects of the monitorship as the Court sees fit.

2) Initial Review and Report

   a. The Monitor shall conduct an initial review and prepare an initial report.  The Monitor's initial review shall commence no later than 120 calendar days from the date of the engagement of the Monitor, unless otherwise agreed among PG&E, the Monitor, and the USAO.  After consultation with PG&E and the USAO, the Monitor shall prepare an initial written work plan, which shall be submitted to PG&E and the USAO for review and comment no fewer than 60 calendar days prior to commencing

7

the initial review.  PG&E and the USAO may provide comment no later than 30 calendar days after receipt of the initial written work plan.  The Monitor's work plan for the initial review shall set forth such steps as are reasonably necessary to conduct an effective initial review, and include a proposed budget.  In developing the work plan and in carrying out the review, the Monitor is encouraged to coordinate with PG&E. Any disputes between PG&E and the Monitor with respect to the work plan shall be brought, in the first instance, to the USAO for resolution.  If, after consideration and direction from the USAO, either the Monitor or PG&E believes the issue has not been satisfactorily resolved, either the Monitor or PG&E may request the Court's assistance in resolving the issue submitted to the USAO for review and consideration. The Monitor shall issue a written report within 120 calendar days of completing the initial review setting forth the Monitor's assessment and making recommendations consistent with the goals and scope of the monitorship as set forth in Section I above. The Monitor shall provide the initial written report to PG&E, the Probation Officer, the USAO, and the Board of Directors of PG&E.

3) Semi-Annual Reports

   a. The Monitor shall prepare reports on a semi-annual basis beginning six months after completion of the initial report setting forth the Monitor's continued assessment and making recommendations consistent with the goals and scope of the monitorship as set forth in Section I above.  The Monitor shall consult with PG&E concerning the Monitor's findings and recommendations on an ongoing basis.  The Monitor shall provide the semi-annual written reports to PG&E, the Probation Officer, the USAO and the Board of Directors of PG&E.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 765 of 1229

4) Final Report for Public Release

    a. At the conclusion of the monitorship, the Monitor shall prepare a final written report for public release setting forth the Monitor's assessment of the monitorship and PG&E's compliance with the goals of the monitorship as set forth in Section I above. The Monitor and PG&E shall work together to ensure the public final written report sufficiently protects PG&E's proprietary and business confidential information and does not otherwise compromise PG&E's business interests or competitive business information.  The Monitor may take whatever steps the Monitor deems appropriate to protect the confidentiality of individuals, if any, mentioned in the final written report. If disagreement exists between the Monitor and PG&E concerning which portions of the report may be made public, the Court shall make the determination regarding the content of the final version of the publicly available report.

    b. PG&E shall have the option to file its own final public written report simultaneously with the Monitor's final public written report.

5) Potential Violation of Criminal Law

    a. If the Monitor identifies a potential violation of the criminal law, the Monitor shall promptly report the potential violation to the Probation Office, the USAO and PG&E.

6) Defendant's Adoption of Monitor's Recommendations

    a. To the extent the Monitor's report makes recommendations, PG&E shall begin the process of adopting all recommendations in the report within 120 calendar days after receiving the Monitor's report; provided, however, that within 30 calendar days after receiving the report, PG&E shall notify the Monitor and the USAO in writing of any recommendations that PG&E

considers inconsistent with applicable law or regulation or otherwise inadvisable and/or unreasonable.  Should the Monitor amend its recommendation after receiving PG&E's notice, the Monitor shall extend the time period for beginning the process of adopting the recommendation.  As to any recommendation on which PG&E and the Monitor do not agree, PG&E and the Monitor shall attempt in good faith to reach an agreement within 45 calendar days after PG&E serves the written notice.  In the event PG&E and the Monitor are unable to agree on an acceptable alternative proposal, PG&E shall promptly consult with the USAO regarding the dispute.  The USAO will submit a written opinion to PG&E and Monitor as to whether PG&E should adopt the Monitor's recommendation or an alternative proposal.  If, after receiving the written opinion from the USAO, either the Monitor or PG&E believes the issue has not been satisfactorily resolved, either the Monitor or PG&E may request the Court's assistance in resolving the issue.  Pending such determination, PG&E shall not be required to begin adoption of any contested recommendation(s).  With respect to any recommendation that the Monitor determines PG&E cannot reasonably begin to adopt within 120 calendar days after receiving the USAO's written opinion or the Court's assistance, the Monitor shall extend the time period for beginning adoption of the recommendation with prior written approval of the USAO or the concurrence of the Court.

7) Extensions or Cancellation of Certain Reviews and Reports

   a. After consultation with PG&E, the Monitor may extend the time period for any review or report for up to 60 calendar days with prior written approval of the USAO.  In the event that a deadline is extended, PG&E, the Monitor, and the

10

USAO may agree to eliminate the Monitor's obligation to prepare a subsequent semi-annual review and report.

8) Early Termination of Monitorship

   a. If, reasonably promptly after completing three years of the monitorship or at any time thereafter, the Monitor or PG&E believe that PG&E's applicable policies and procedures, and implementation and enforcement thereof, are appropriate, and that further monitoring and review is not warranted, then the Monitor or PG&E may apply to the USAO for permission to forego the remaining reviews and reports.  If the USAO approves, then the USAO shall make a recommendation to the Probation Officer and the Court to forego any remaining reviews and reports, and, upon approval by the Court, the engagement of the monitorship shall terminate.

   b. In no event shall the total term of the monitorship exceed the term of Probation.

9) In undertaking the assessments and reviews described in Subsection II.D of this Order, the Monitor shall formulate conclusions based on, among other things: (a) inspection of documents, including PG&E's current policies and procedures regarding compliance with the relevant gas transmission pipeline safety regulations; (b) on-site observations of PG&E's procedures at various locations; (c) meetings with PG&E employees and officers at mutually convenient times and places; (d) analyses, studies, and testing of PG&E's program with respect to gas transmission pipeline safety regulations, including results of CPUC audits; and (e) attendance at leadership governance meetings (i.e., Risk and Compliance meetings), other than during privileged portions of such meetings.

10)    Should the Monitor discover that PG&E or any PG&E employee has not complied with the gas transmission pipeline safety regulations, the Monitor shall promptly report

11

such non-compliances to PG&E's Chief Ethics and Compliance Officer and Senior Vice President, Gas Operations for further action.  The Monitor shall address in his or her reports the appropriateness of PG&E's response to all uncured non-compliances, whether previously disclosed to the USAO or not.  Further, in the event that PG&E, or any entity or person working directly with PG&E, refuses to provide information necessary for the performance of the Monitor's responsibilities and PG&E refuses to cure the failure to provide the information, the Monitor shall disclose that fact and supporting documentation to the USAO.

### III.   Successors

A.  This Order shall be applicable to PG&E during PG&E's supervision by the Monitor.

B.  In the event of a sale of the gas pipeline transmission system, assignment or transfer of all of PG&E's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to PG&E and to any successor of PG&E.

C.  The requirements of this Order are in addition to all other applicable requirements of law. This Order does not operate as a permit under federal, state or local regulations, and PG&E remains responsible for complying with all applicable federal, state and local laws, orders, and permits.  PG&E may not claim that compliance with this Order is a defense to any action commenced under applicable federal, state, or local law.  The government does not warrant that PG&E's compliance with this Order constitutes compliance with other applicable legal requirements including but not limited to CPUC, NTSB, and PHMSA requirements.

D.  Within thirty days of this Order, PG&E shall provide written assurance to the USAO that it will not employ, retain, or otherwise be affiliated with the Monitor, or professionals

12

retained by the Monitor during the monitorship, for a period of at least one year from the

date of termination of the monitorship.


SO ORDERED this 26th day of January, 2017.

_____
UNITED STATES DISTRICT JUDGE

13

# Exhibit 96

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
771 of 1229

1   JENNER & BLOCK LLP
2       Reid J. Schar (*pro hac vice*)
        RSchar@jenner.com
3       353 N. Clark Street
        Chicago, IL 60654-3456
4   Telephone: +1 312 222 9350
    Facsimile: +1 312 527 0484
5
6   CLARENCE DYER & COHEN LLP
        Kate Dyer (Bar No. 171891)
7       kdyer@clarencedyer.com
        899 Ellis Street
8       San Francisco, CA 94109-7807
    Telephone: +1 415 749 1800
9   Facsimile: +1 415 749 1694
10
11   CRAVATH, SWAINE & MOORE LLP
        Kevin J. Orsini (*pro hac vice*)
12       korsini@cravath.com
        825 Eighth Avenue
13       New York, NY 10019
    Telephone: +1 212 474 1000
14   Facsimile: +1 212 474 3700
15
16   Attorneys for Defendants PACIFIC GAS AND ELECTRIC
    COMPANY
17

18                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
19                    SAN FRANCISCO DIVISION

20
    UNITED STATES OF AMERICA,            Case No. 14-CR-00175-WHA
21
                          Plaintiff,     **PACIFIC GAS AND ELECTRIC
22                                       COMPANY'S RESPONSE TO REQUEST
                                         FOR INFORMATION**
23          v.
                                         Judge:  Hon. William Alsup
24   PACIFIC GAS AND ELECTRIC            Date:   February 22, 2019
    COMPANY,
25
                          Defendant.
26

27

28  _____
                   RESPONSE TO REQUEST FOR INFORMATION
                        Case No. 14-CR-00175-WHA

**PARAGRAPH 1 OF PLAINTIFFS' SUBMISSION:**

> "**I.     INTRODUCTION**
>
> Pursuant to this Court's Order following hearing on the Order To Show Cause dated January 30, 2019, attorneys Frank M. Pitre ('Pitre') and Steven M. Campora ('Campora'), hereby file their written submission in support of their brief comments during the hearing. The purpose of this submission is to address specific deficiencies in PG&E's risk management practices and corporate governance which the undersigned believe have contributed to an increased risk of catastrophic wildfires in recent years. The hope is that a better understanding of the factors that have contributed to the increased risk, from those who have served adversarial roles in representing the victims of these tragedies, will provide a framework for implementing short and long-term policies, practices and procedures to prevent any reoccurrence. Attorneys Pitre and Campora wish to acknowledge the assistance from the law firms of Walkup, Melodia, Kelly & Schoenberger and Corey, Luzaich, De Ghetaldi & Riddle, LLP in preparing this submission."

**RESPONSE TO PARAGRAPH 1:**

As PG&E stated in its Memorandum Regarding 2019 Wildfire Safety Plan in Response to Court's January 30, 2019 Order ("Mem.") (Dkt. 1004), PG&E welcomes comments from members of the community concerning the ways in which it is combating wildfire risk.  (Mem., Dkt. 1004 at 5.)  That includes Plaintiffs' counsel, who have familiarity with PG&E's policies and procedures and who represent thousands of customers in PG&E's service territory who are affected by the myriad issues related to increased wildfire risk, such as vegetation management and de-energization.  It is important to PG&E that all stakeholders' voices are heard so that PG&E may consider the views of the communities it serves.  PG&E notes, however, that the vast majority of discovery that Plaintiffs' counsel has received through litigation against PG&E, including with respect to the October 2017 North Bay Wildfires, has focused on issues pre-October 2017 and has not included much information about the new and enhanced measures PG&E has taken since the 2017 and 2018 wildfires occurred to further reduce the risk of catastrophic wildfires.  Those measures, which are most relevant to this Court's Order to Show Cause, are set forth in detail in recent PG&E submissions to this Court and the California Public Utilities Commission ("CPUC"), including in its Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified

1

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

(the "Jan. 23 Br.") (Dkt. 976), its 2020 General Rate Case testimony dated December 13, 2018 (Dkt. 976-6) and its 2019 Wildfire Safety Plan ("WSP") dated February 6, 2019 (Dkt. 1004-1).[1]

Although PG&E disagrees with many of the characterizations set forth in Plaintiffs' submission, it is open to Plaintiffs' suggestions and in fact, as previously discussed with the Court and as set forth in PG&E's Wildfire Safety Plan, has already implemented measures that cover the majority of Plaintiffs' short-term and long-term recommendations. Plaintiffs propose several recommendations related to vegetation management, such as a focus on higher risk areas, removal of overhanging branches and monitoring of contractor certification, all of which PG&E has already adopted. Plaintiffs also recommend that PG&E adopt San Diego Gas & Electric's ("SDG&E") policies related to de-energization, which PG&E has already embraced in creating its own de-energization plan. To the extent that PG&E disagrees with any of Plaintiffs' recommendations in whole or in part, PG&E explains its rationale and sets forth the actions it has taken, and continues to take, to address the issue raised by that particular recommendation. PG&E continues to approach wildfire prevention with the goal of doing all that it can to make sure its facilities do not create public safety risks, and looks forward to receiving public comments on its Wildfire Safety Plan both as part of this proceeding and the CPUC process.

**PARAGRAPH 2 OF PLAINTIFFS' SUBMISSION:**

> "**II.   PG&E ACCEPTS A HIGH RISK OF WILDFIRES IN ITS ELECTRICAL OPERATIONS AND CAUSES SIGNIFICANTLY MORE WILDFIRES THAN OTHER COMPARABLE UTILITIES**
>
> Every three years, PG&E submits to the CPUC the General Rate Case, a proposal for funding its core gas and electric operations. As part of its rate case for the period 2017 to 2019, PG&E submitted written testimony – GRC-050115-PGE-Safety-Assessment-Testimony. Part of the submission was the written testimony of Janaize Markland. At the time, Ms. Markland was the Director of PG&E's Enterprise and Operational Risk and Insurance Department. (See Campora Decl., Exhibit A). Ms. Markland's testimony stated in pertinent part:
>
> > 'Risk cannot be completely driven out of PG&E's—or any—business. Today, risk tolerance is implicitly defined by the resources allocated to manage specific

---

[1] The page numbers referenced in all citations to the WSP throughout PG&E's Response refer to the Wildfire Safety Plan's internal pagination, not the ECF page numbers.

<div align="center">

2

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

</div>

risks. For example, PG&E has a robust program to manage Wildfire Risk that consists of an award-winning vegetation management program, equipment retrofits in high-risk areas, and enhanced inspections. **As a result, tree-related outages are in the neighborhood of 17 per 1,000 miles, <0.02 percent of trees in contact**, and there are a small number of wildfires caused by PG&E equipment each year. **It may be possible to drive tree-related outages to less than 17 per 1,000 miles, or to have less than 0.02 percent of trees in contact, but that would require a level of investment greater than what PG&E is making today.** With limited resources—PG&E cannot do everything and must decide at what point it is okay not to mitigate the risk further— tradeoff decisions must be made.'

(Campora Decl., Exhibit A [Exhibit 2034 - Written Testimony of Janaize Markland])."

**RESPONSE TO PARAGRAPH 2:**

PG&E admits Paragraph 2 with respect to the fact that every three years, it submits to the CPUC its General Rate Case and that on May 1, 2015, it submitted its General Rate Case containing the Safety Model Assessment Proceeding testimony, cited in Paragraph 2 of Plaintiffs' Submission above. To be clear, however, the way in which PG&E performed its risk assessment and allocated resources throughout its service territory in 2015, at the time PG&E provided to the CPUC the testimony cited above, is vastly different from the way in which PG&E assesses and manages risk today given the significantly increased risk of catastrophic wildfires. That is precisely why, in PG&E's most recent General Rate Case submission to the CPUC, dated December 13, 2018, PG&E recognized that "system risk driven by climate change has increased" and therefore its Electric Operations department is "moving forward aggressively with wildfire mitigation plans", including "longer term grid resiliency initiatives[] and systemwide vegetation management". (Jan. 23 Br. Exhibit F, Dkt. 976-6 at 9.) And, in its Wildfire Safety Plan, PG&E described the enhanced, accelerated and new programs that it is and will aggressively continue to implement to prevent wildfires in 2019 and beyond. (*See generally* WSP, Dkt. 1004-1.)[2]

---

[2] The page numbers cited throughout PG&E's Response refer to the Wildfire Safety Plan's page numbers, not the ECF page numbers.

3
RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

**PARAGRAPH 3  OF PLAINTIFFS' SUBMISSION:**

> "During the course of discovery in the State Court actions, PG&E has at various times identified the number of miles of its distribution line as anywhere between 81,000 miles and 115,000 miles. (See Campora Decl., Exhibit B.) This means that PG&E was accepting trees on its lines would cause between 1,377 to 1,955 outages per year. In 2016, PG&E actually had 3,299 transmission and distribution 'wires down' (outages). According to PG&E, this total number was exacerbated by 'full tree failures.' (See Campora Decl., Exhibit C.)"

**RESPONSE TO PARAGRAPH 3:**

PG&E admits Paragraph 3 with respect to the number of wires down in 2016 and otherwise clarifies its accuracy.  The document that Plaintiffs cite in support of the number of PG&E's line miles indicates that PG&E has approximately 81,000 miles of overhead distribution lines and 26,000 miles of underground distribution lines.  (*See* Campora Decl. Exhibit B, Dkt. 1008-2 at 3.)  It further indicates that PG&E's electric transmission system consists of approximately 18,000 line miles, the majority of which are overhead lines.  (*Id.*)  Combined, PG&E has approximately 100,000 overhead line miles.[3]  PG&E's underground lines are not vulnerable to above ground vegetation contact.

In its May 2015 Safety Model Assessment Proceeding testimony, discussed in Paragraph 2, PG&E did acknowledge that "[r]isk cannot be completely driven out of PG&E's—or any—business".  (Campora Decl. Exhibit A, Dkt. 1008-1 at 46.)  PG&E explained that it used a risk management process to determine where resources should be allocated based on the risk assessment procedures used at that time.  (*Id.*)  At that time, as discussed below in response to Plaintiffs' Paragraph 50, the risk of wildfire in Northern California was understood by PG&E and other stakeholders, such as the CPUC and the California Department of Forestry and Fire Protection ("CAL FIRE"), to be significantly lower than it is today.  In fact, the statewide fire maps adopted by the CPUC in 2012 classified Santa Barbara County as the only "high fire threat area" in PG&E's service territory.  PG&E's 2015 risk assessment with respect to vegetation contact with power lines must be understood in that pre-October 2017 context.  That is not the risk climate in which PG&E

---

[3] This figure is consistent with the figures PG&E represented to the Court in its January 23 Submission (Jan. 23 Br. at 37), as well as its 2020 General Rate Case (*id.* Exhibit F, Dkt. 976-6 at 99).

operates today, and as PG&E has set forth in its Wildfire Safety Plan and its prior submissions to this Court, PG&E has fundamentally changed its risk management approach to address increased risks, particularly as it relates to vegetation management.

Plaintiffs further state that PG&E experienced 3,299 wires down in 2016.  Although Plaintiffs are accurately citing the document, the PG&E data does not refer only to wires down caused by vegetation contact with power lines.  Instead, it is "the number of instances where an electric transmission or primary distribution conductor is broken or falls".  (Campora Decl. Exhibit C, Dkt. 1008-3 at 4.)  This can and does occur for reasons other than vegetation contact (*e.g.*, car-pole collisions or other third-party contacts with power lines).[4]

Finally, Plaintiffs state that the number of wires down in 2016 was exacerbated by full tree failures.  In 2014, Governor Brown declared a state of emergency due to California's severe drought and associated unprecedented tree mortality.[5]  As an emergency measure to mitigate the effects of the drought and further reduce the likelihood of fire ignition associated with its facilities, PG&E began its Drought & Tree Mortality Response Program ("CEMA Program") in 2014.  The program includes, among other things, increased inspections and vegetation removal in higher-fire threat areas, cooperating with California agencies and organizations to increase protective measures to decrease fire response times (*e.g.*, scheduling aircraft flights to provide early detection of fires), clearing access roads, and reducing fire fuels, such as brush.

In 2016, due to drought conditions, PG&E did experience a higher number of tree failures than it had experienced in prior years.  (*Id.*)  2016 was a highly unusual year for tree mortality in California.  Because of the drought, which continued to worsen in the years following 2014, as well

---

[4] In 2016, approximately 1,400 of the wires down were caused by vegetation contact as compared to approximately 800 caused by third-party contact (primarily vehicles) with power lines.

[5] By December 2017, the U.S. Forest Service ("USFS") and CAL FIRE announced that a record-breaking 129 million trees on 8.9 million acres died due to drought and bark beetles in California from 2010 to 2017.  U.S. Forest Service, News Release, *Record 129 Million Dead Trees in California* (Dec. 12, 2017), *available at* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd566303.pdf.

5

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

as the associated bark beetle infestation, by November 2016, the USFS estimated that 62 million trees had died in that year alone—a 100 percent increase in trees dying in California since 2015. U.S. Forest Service, News Release, *New Aerial Survey Identifies More Than 100 Million Dead Trees in California* (Nov. 18, 2016), *available at* https://www.fs.fed.us/news/releases/new-aerial-survey-identifies-more-100-million-dead-trees-california.  PG&E's drought and tree mortality response program was designed to respond to this increasing volume of dead and dying trees.  Between 2010 and 2013, PG&E addressed between approximately 30,000 and 39,000 Facility Protection Trees ("FPTs") per year, and in 2014, when the drought and tree mortality response program began, PG&E addressed approximately 57,000 FPTs in connection with its routine and drought response programs.[6]  By 2015, PG&E addressed more than 100,000 FPTs, and by 2016, PG&E addressed approximately 280,000 FPTs, nearly triple the trees it had removed the prior year.

**PARAGRAPH 4 OF PLAINTIFFS' SUBMISSION:**

"In 2015, PG&E electrical equipment caused 435 fires, including the Butte Fire which burned 70,868 acres, destroyed 549 homes, and killed two people. (See Campora Decl., Exhibit D.) In 2016, PG&E reported 362 wildfires caused by its equipment. In 2017, that number was 501. (See Pitre Decl., Exhibit A [CPUC Fire Incident Data submitted by PG&E, SoCalEd, and SDG&E for 2014- 2017]). As of 2017, PG&E's own data predicted its equipment would cause '1 to 2 large fires per year (300 acres or greater).' (See Campora Decl., Exhibit C.)"

**RESPONSE TO PARAGRAPH 4:**

PG&E clarifies Paragraph 4.  On February 5, 2014, the CPUC adopted a Fire Incident Data Collection Plan, which requires all electric utilities to submit an annual report to the CPUC of all fire-related reportable events that could include PG&E facilities meeting the following conditions: "(a) A self-propagating fire of material other than electrical and/or communication facilities, [where] (b) The resulting fire traveled greater than one linear meter from the ignition point, and (c) The

---

[6] As discussed in more detail below, PG&E defines FPTs as "[t]rees that are dead, show signs of disease, decay or ground or root disturbance, which may fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle".  (Biancardi Decl. Ex. B, at PGE-CPUC_00005483.)

1  utility has knowledge that the fire occurred". (CPUC Decision 14-02-015.) This reporting

2  requirement does not include fires where the ignitions are not associated with utility facilities. (*Id.*

3  Appendix C-3 n.4.) Many of the fires referenced in PG&E's incident reports from 2015 to 2017

4  were very small. For example, in 2015, 206 of the 435 fire incidents reported were less than 0.25

5  acres and another 121 were less than three meters. (*See* Pitre Decl. Exhibit A, Dkt. 1006-1.) Only

6  16 of the reported incidents were more than 10 acres.[7] (*Id.*)

7        Plaintiffs cite a March 2017 PG&E document that discusses the risk of wildfire in PG&E's

8  service territory and noted that PG&E's Fire Incident Data Collection Plans from 2014 to 2016

9  indicated that there was a possibility that one to two large fires (300 acres or greater) could occur

10  each year. (Campora Decl. Exhibit C, Dkt. 1008-3 at 4.) That risk assessment was performed before

11  the 2017 and 2018 wildfires, at which point PG&E, CAL FIRE and others understood that the risk of

12  wildfire spreading at a catastrophic rate in Northern California had significantly increased. The

13  cited risk assessment must be understood in this pre-October 2017 context. As PG&E has set forth in its

14  Wildfire Safety Plan and its prior submissions to this Court, PG&E has fundamentally changed its

15  risk management approach to address increased risks, particularly as it relates to vegetation

16  management.[8]

17  **PARAGRAPH 5 OF PLAINTIFFS' SUBMISSION:**

18  "Although PG&E claims that there are only 'a small number of wildfires caused by PG&E
19  equipment each year,' the data reflects a much different story; especially when PG&E's
   numbers are compared to the number of wildfires caused by Southern California Edison
20  ('SoCalEd') -- a comparable utility to PG&E. (Campora Decl., Exhibit A). SoCalEd serves
   15 million people across approximately 50,000 square-miles, operating and maintaining
21  91,375 miles of distribution lines and 1,433,336 electric poles.* In comparison, PG&E
   services approximately 16 million people throughout a 70,000-square-mile service area,
22  operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and
   2,400,000 electric poles.*

23

24     [7] 106 of the 435 fire incidents reported were caused by vegetation contact. (*Id.*)

25

26     [8] PG&E also notes that the California Department of Forestry and Fire Protection's ("CAL
   FIRE") data showed that at that time, only a small fraction of those one to two fires—approximately
27  5-10%—could become catastrophic. (Campora Decl. Exhibit C, Dkt. 1008-3 at 3.)

28

* [FN 1]:  https://www.sce.com/about-us/who-we-are.

* [FN 2]:  https://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/."

**RESPONSE TO PARAGRAPH 5:**

PG&E clarifies Paragraph 5.   Plaintiffs assert that "PG&E claims that there are only 'a small number of wildfires caused by PG&E equipment each year'", but do not attribute that statement to any source.  PG&E made that statement in its May 1, 2015 Safety Model Assessment Plan testimony.  (*See* Campora Decl. Ex. A, at 46.)  As of the date of that submission, there had been only six ignitions that year, all of which were smaller than 9.99 acres.  The statement was accurate at the time it was made, before the Butte fire and long before the 2017 and 2018 wildfires.  When the quote is viewed in its proper context, it confirms PG&E's statements here and in other submissions that wildfire risk in PG&E's service territory has fundamentally changed in the past few years.

Plaintiffs' attempt to draw comparisons between PG&E and Southern California Edison ("SCE") is misleading given differences between PG&E's and SCE's service territories.  For example, the geography of the utilities' service territories differs significantly.  According to the USFS, most of the high-density forest area in California is in Northern California.  (WSP at 19 & n.19 (citing USDA Forest Service, 2017 RPA data).)  PG&E therefore operates in a more heavily forested and vegetated area than SCE.  (*Id.* at 71 & n.54 (citing California Forest Resources:  Forest Inventory and Analysis, 2001-2010, Gen. Tech. Rep. PNW-GTR-913, Portland, OR, U.S. Dep't of Agriculture, Forest Service, Pacific Northwest Research Station (2016) at 3, 6-7, 17, available at https://www.fs.fed.us/pnw/pubs/pnw_gtr913.pdf).)  This is readily evident from the number of trees in proximity to each utility's power lines:  there are more than 100 million trees in proximity to PG&E's overhead power lines whereas SCE has closer to 900,000 trees in proximity to its overhead power lines.  Southern California Edison, 2018 Fire Prevention Plan, Oct. 30, 2018, at 20 *available at* http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_and_Reliability/Filings/2018%20SCE%20GO%20166.pdf.

1        Further, Plaintiffs note that SCE operates 91,375 miles of distribution lines compared to

2  PG&E's 81,000 miles of distribution lines, apparently seeking to suggest that the two companies

3  have a comparable number of distribution circuit miles impacting wildfire risk.  PG&E, however,

4  has approximately 25,000 overhead primary distribution circuit miles in High Fire-Threat Districts

5  ("HFTDs")—nearly twice as many as SCE's approximately 13,000 HFTD overhead primary

6  distribution circuit miles.[9]  Moreover, many of SCE's HFTD miles are  more densely populated

7  urban areas generally understood to represent lower wildfire risk.  In fact, PG&E has more overhead

8  distribution circuit miles in its service territory that traverse HFTD areas than SCE and SDG&E

9  combined; about 65 percent of California investor owned utilities' overhead distribution circuits

10  located in Tier 2 and Tier 3 HFTD areas are in PG&E's service territory.

11  **PARAGRAPH 6 OF PLAINTIFFS' SUBMISSION:**

12        "**Despite the similarities in service size and miles of distribution lines, PG&E's electrical
equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to
2017** – as self-reported to the CPUC by the utilities. **In total, PG&E's equipment caused
1552 wildfires. While SoCalEd only caused 344 fires over the same time period. This
means PG&E's equipment caused 4.5 times more wildfires than SoCalEd.** (See Pitre
Decl., Exhibit A [CPUC Fire Incident Data submitted by PG&E, SoCalEd, and SDG&E for
2014-2017])."

17  **RESPONSE TO PARAGRAPH 6:**

18        For the reasons stated in its response to Paragraph 5, PG&E denies Paragraph 6 with respect

19  to Plaintiffs' statement that PG&E's and SCE's service size and miles of distribution lines are

20  comparable.  PG&E also clarifies Paragraph 6 with respect to Plaintiffs' inaccurate description of the

21  data reported to the CPUC as set forth in PG&E's response to Paragraph 4 (*i.e.*, the Fire Incident

22  Collection Plan requires that utilities submit data concerning all fire incidents greater than one linear

---

[9] In January 2018, the CPUC adopted the High Fire-Threat District Map that identified certain areas statewide as Tier 2 ("elevated") and Tier 3 ("extreme") for wildfire risk.  (*See* Pitre Decl. Exhibit D, Dkt. 1006-4.)

mile associated to a utility's facilities).  From 2014 to 2017, PG&E reported nine fires greater than 300 acres.  In comparison, SCE reported seven fires greater than 300 acres during that same time.[10]

**PARAGRAPH 7 OF PLAINTIFFS' SUBMISSION:**

> "PG&E's equipment was also responsible for more fires of large scale, including 43 more fires than SoCalEd that burned between 10-99 acres, 3 more between 100-299 acres, and 2 more between 300-999 acres. (Id.). 'CALFIRE data shows ~5% to 10% of large fires become catastrophic fires (P95 events).'  (See Campora Decl., Exhibit C.)"

**RESPONSE TO PARAGRAPH 7:**

PG&E admits that Paragraph 7 accurately summarizes the utilities' respective Fire Incident Data Collection Plans and accurately quotes the language in Campora Decl. Exhibit C, Dkt. 1008-3. PG&E also refers to its response to Paragraph 4.

**PARAGRAPH 8 OF PLAINTIFFS' SUBMISSION:**

> "What is more troubling is that PG&E's numbers do not include the North Bay Fires, as PG&E admitted to this Court that it did not include those fires in its submission of 2017 Fire Incident Data to the CPUC. (See document 971, Case No. 14-CR-00175-WHA, 'Response to Request for Clarification', pg. 2 ['Fire incidents that apparently occurred as part of the October 2017 Northern California Wildfires have been excluded from this report were the cause of the ignition is under investigation or may be disputed.'])."

**RESPONSE TO PARAGRAPH 8:**

PG&E admits Paragraph 8 to the extent that its 2017 Fire Incident Data Collection Plan does not include the North Bay Fires, as the causes of the ignitions were under investigation and/or disputed.  These fires collectively burned about 230,000 acres.  PG&E notes that SCE's 2017 Fire Incident Data Collection Plan does not include the Thomas fire, which occurred in SCE's service territory in December 2017 and burned approximately 282,000 acres.

**PARAGRAPH 9 OF PLAINTIFFS' SUBMISSION:**

> "While PG&E may not be able to mitigate all risk, it should be able to at least keep pace with its counter-part SoCalEd, which serves more extreme wildfire prone areas. Roughly a quarter

---

[10] As discussed in Response to Paragraph 8, PG&E's 2017 Fire Incident Data Collection Plan did not include the North Bay Fires, and SCE's 2017 Fire Incident Data Collection Plan did not include the Thomas fire.

of SoCalEd's service territory is categorized as a high fire risk area.* (See also Pitre Decl., Exhibit B [Utility Service Territories Overlaid onto CPUC Fire Map]).

* [FN 3]:  https://www.sce.com/safety/wildfire."

## RESPONSE TO PARAGRAPH 9:

PG&E denies Paragraph 9 to the extent Plaintiffs assert that SCE currently serves more extreme wildfire prone areas than does PG&E.  As stated in response to Paragraph 5, PG&E has more overhead distribution circuit miles in its service territory that traverse HFTD areas than SCE and SDG&E combined; about 65 percent of California investor owned utilities' overhead distribution circuits located in Tier 2 and Tier 3 HFTDs are in PG&E's service territory. Approximately 52 percent of PG&E's service territory is characterized as an HFTD area as compared to roughly a quarter of SCE's.

PG&E accepts and acknowledges that with respect to wildfire mitigation measures, there are certain areas in which SDG&E and SCE are more advanced than PG&E.  This is because, as discussed in response to Paragraph 50, historically, Southern California faced a higher wildfire risk. The wildfire risks in Northern California were not comparable to those seen in Southern California in the 2007-2008 time period, which is when the Southern California utilities began developing their wildfire reduction programs.  At that time, Northern California had not yet experienced the confluence of weather events that led to a dramatic increase in wildfire risk that culminated in the October 2017 North Bay Wildfires.  PG&E is working diligently to adopt similar aggressive and effective programs given the new risk level present in PG&E's service territory.

## PARAGRAPH 10 OF PLAINTIFFS' SUBMISSION:

"**III.   IT IS WELL-UNDERSTOOD THAT UTILITY CAUSED WILDFIRES OCCUR IN PREDICTABLE LOCATIONS, DURING EXTREME HIGH WIND EVENTS, AND ARE PRIMARILY CAUSED BY TREE FAILURES**

A.   High Wildfire-Prone Areas Are Identifiable Based On Fire History, Vegetation And Topography

First, it is important to note that '[l]arge wildfires are not new to California's landscape.' (See Pitre Decl., Exhibit C, pg. 1). CAL FIRE statistics dating back to 1933 confirm that the number of wildfires and the acreage burned by those fires is not the 'new' normal, but has been occurring for decades. (See Pitre Decl., Exhibit U)."

11

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

**RESPONSE TO PARAGRAPH 10:**

PG&E admits that the first sentence of Paragraph 10 accurately quotes a line from a 2018 study by the National Oceanic Atmospheric Agency and the National Weather Service Storm Prediction Center titled "The 2017 North Bay and Southern California Fires: A Case Study", but denies that the study supports the general proposition for which Plaintiffs cite it—that the October 2017 North Bay Wildfires and the 2018 Camp Fire do not represent a "new normal" of large, catastrophic wildfires.  Instead, that very same study found that the October 2017 fires "featured key fire-weather metrics that were unprecedented in the observational record that followed a sequence of climatic conditions that enhanced fine fuel abundance and fuel availability".  (*See* Pitre Decl., Exhibit C, Dkt. 1006-3 at 2.)  According to the report, this confluence of abnormal weather events, including an exceptionally wet winter, preceded by a severe four-year drought and the delayed onset of autumn precipitation, meant that the conditions in October 2017 were uniquely preconditioned for intense and quickly moving wildfires.  (*Id.*)

Plaintiffs have also chosen to exclude data from 2016, when 3,233 fires in California burned 250,956 acres of land.  (Pitre Decl. Exhibit U, Dkt. 1006-21 at 3).  In sharp contrast, the last two years have seen a doubling in wildfire frequency and severity with 7,117 fires burning over 505,956 acres in 2017 and 6,284 fires burning over 876,147 acres in 2018.  (CAL FIRE Incident Information, Number of Fires and Acres for 2017 and 2018, available at: http://cdfdata.fire.ca.gov/incidents/incidents_stats?year=2018.)

The dramatic increase in the frequency and destructiveness of wildfires in recent years has been recognized by key government stakeholders.  As CAL FIRE stated following the October 2017 North Bay Wildfires, "California now often experiences a year-round fire season, with an increase in both the number and the intensity of large, damaging wildfires over the last decade.  This is the 'new normal' of the State's wildfire environment."  (CAL FIRE, News Release, "Board of Forestry and Fire Protection and CAL FIRE Working to Increase Pace and Scale of Wildfire Prevention Activities (Dec. 19, 2017) *available at* http://calfire.ca.gov/communications/downloads/newsreleases/2017/2017_BOF_CALFIRE_VTPPEI

12

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

R_newsrlease.pdf.)  In August of last year, Governor Brown echoed these comments, stating that a busy fire season is "the new normal that [California] will have to face", and he expected that over the next decade, California would see "more destructive fire".  (Mireya Villarreal, "Devastating wildfires a 'new normal' for California, Gov. Jerry Brown says", CBS News, August 1, 2018, *available at* https://www.cbsnews.com/news/devastating-wildfires-a-new-normal-for-california-gov-brown-says/.)

**PARAGRAPH 11 OF PLAINTIFFS' SUBMISSION:**

> "The areas in California at high and/or extreme risk for utility associated wildfires are identifiable and predictable. (See Pitre Decl., Exhibit D [CPUC Press Release, CPUC Approves Statewide Fire-Threat Map, which states: 'The map, approved by the CPUC's Safety and Enforcement Division following a public process, **delineates areas in the state where there is an elevated risk and an extreme risk** (including likelihood and potential impacts on people and property) **from utility associated wildfires**. **The Fire-Threat Map helps prioritize fire hazard areas** to allow for implementation of new fire-safety regulations adopted by the CPUC in December 2017.']; see also Pitre Decl., Exhibit E [a May 2014 study done at Duke University, Nicholas School of the Environment titled 'Quantifying the Economic Risk of Wildfires and Power Lines in San Diego County' revealed 'clear spatial patterns in the distribution of [] fire history … .'])."

**RESPONSE TO PARAGRAPH 11:**

PG&E agrees that the High Fire Threat Maps are useful tools for predicting fire prone areas, but disagrees with Plaintiffs' suggestion that such maps somehow predicted the October 2017 North Bay Wildfires or the 2018 Camp Fire.

The High Fire-Threat Map that Plaintiffs cite in support of their claim was adopted by the CPUC on January 18, 2018, after the October 2017 North Bay Wildfires.  (*See generally* Pitre Decl. Exhibit D, Dkt. 1006-4.)  In the previous iteration of this map, adopted by the CPUC in 2012, the only portion of PG&E's service territory that was classified as a "high fire threat area" was Santa Barbara County and just 15 percent of PG&E's territory was identified as having an elevated wildfire risk.  (Jan 23 Br. at 16.)  In the 2018 maps, more than 50 percent of PG&E's territory is now identified as having an elevated or extreme wildfire risk.  (*Id.* at 17.)  These changes, which were implemented after a years-long process involving input from various stakeholders, including PG&E,

13

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

other utilities and CAL FIRE, demonstrate the innate complexity in identifying and mapping wildfire risk in a changing climate.

The 2014 Duke University study that Plaintiffs cite looks only at SDG&E's service territory and speaks only to "clear spatial patterns in the distribution of both fire history and property values" in San Diego County.  (Pitre Decl. Exhibit E, Dkt. 1006-5 at 22.)  As discussed in PG&E's response to Paragraphs 9 and 46, the conditions in Southern California are significantly different than those present in PG&E's Northern California service territory.  That was true in 2014, before the risk of extreme wildfires grew in Northern California.

**PARAGRAPH 12 OF PLAINTIFFS' SUBMISSION:**

"According to a study by the Department of Environmental Science, Policy and Management at the University of California, Berkeley, titled 'Spatial Variation in Extreme Winds Predicts Large Wildfire Locations in Chaparral Ecosystems', (hereinafter the 'Berkeley Study'),

**'Based on modeled fire weather patterns, we found that large October wildfires consistently occur in locations experiencing higher fire weather severities**, compared to distributions from all shrublands available to burn during Santa Ana events (i.e., distributions shifted rightward in Figure 4). Across the chaparral-dominated ecosystems of the region, only about one quarter (~24%) of the area experiences very high fire weather severities (e.g., index > 25) during the wind episodes we examined. Nonetheless, almost half (45%) of the large fires > 500 have occurred in these regions prone to the highest fire weather severities, and the relationship is stronger in terms of area burned (65%).'

(Pitre Decl., Exhibit F, pg. 4)."

**RESPONSE TO PARAGRAPH 12:**

PG&E admits that Paragraph 12 accurately quotes from page 1 of a 2010 U.C. Berkeley study titled "Spatial Variation in Extreme Winds Predicts Large Wildfire Locations in Chaparral Ecosystems", but denies that this study supports Plaintiffs' claim that the October 2017 North Bay Wildfires were predictable.  The 2010 U.C. Berkeley study does not review Northern California weather or fire data, but provides "the first detailed analysis of fire weather severity patterns during Santa Ana wind events and how they relate to past fire activity, particularly large fire events, in the chaparral ecosystems of Mediterranean-climate southern California".  (Pitre Decl. Exhibit F, Dkt. 1006-6 at 2.)

14

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1

**PARAGRAPH 13 OF PLAINTIFFS' SUBMISSION:**

2

3

"According to a 2018 Study by the National Oceanic Atmospheric Agency and the National Weather Service Storm Prediction Center:

4

5

6

7

'California's fire history is littered with fast-moving, destructive wildfires adjacent to populated areas. Many wind-driven fires that occur in the coastal ranges of California burn across steep terrain with fuels shaped by a Mediterranean climate during periods of strong foehn winds in early autumn when fuels remain dry prior to the onset of cool-season precipitation. The coincidence of land development in areas prone to wind driven extreme fire weather (i.e., Diablo winds, Santa Ana winds) results in fire-related hazards for a large number of people.'

8

(See Pitre Decl., Exhibit C, pg. 1)."

9

**RESPONSE TO PARAGRAPH 13:**

10

11

PG&E admits that Paragraph 13 accurately quotes from page 1 of a 2018 study by the

12

National Oceanic Atmospheric Agency and the National Weather Service Storm Prediction Center

13

titled "The 2017 North Bay and Southern California Fires: A Case Study", but denies that the study

14

supports Plaintiffs' claim that the October 2017 North Bay Wildfires were predictable.  As explained

15

in PG&E's Response to Paragraph 10, the study found that the October 2017 North Bay Wildfires

16

were unprecedented and the result of a confluence of abnormal weather events.

**PARAGRAPH 14 OF PLAINTIFFS' SUBMISSION:**

17

18

"**B.      Catastrophic Wildfires Are Associated With Extreme High Wind Events**

19

'Across Mediterranean-climate ecosystems – those highly fire-prone regions experiencing cool, wet winters and warm, dry summers – devastating fires are often associated with short episodes of severe fire weather generated by hot and dry winds.' (Pitre Decl., Exhibit F, pg. 1). The Berkeley Study notes that Santa Ana winds in Southern California 'have long been linked to large wildfire occurrence,' citing to several academic publications dating back to 1964. (Id.)."

20

21

22

23

**RESPONSE TO PARAGRAPH 14:**

24

PG&E admits that Paragraph 14 accurately quotes from page 1 of a 2010 U.C. Berkeley

25

study titled "Spatial Variation in Extreme Winds Predicts Large Wildfire Locations in Chaparral

26

Ecosystems".  As detailed in PG&E's response to Paragraph 12 above, this 2010 Berkeley study

27

concerns Southern California and does not review Northern California weather or fire data.

28

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

**PARAGRAPH 15 OF PLAINTIFFS' SUBMISSION:**

"And the CPUC and CAL FIRE agree, noting that: '[w]ind data is indeed critical for wildfire mitigation and response.' (See Pitre Decl., Exhibit G [CPUC Safety and Enforcement Division Rulemaking 15-05-006 SED-CAL FIRE Joint Assessment and Recommendation Report (Sept. 19, 2018)] pg. 2). This is why as of September 2018, the CPUC's Safety and Enforcement Division ('SED') along with CAL FIRE recommended:

'in light of the great potential public benefit of and the current expenditures already underway for deployment of weather stations throughout the HFTD and other high- risk fire areas, **SED and CAL FIRE recommend that, to the extent reasonable, the Commission encourage and support utility efforts to install weather stations and gather high-quality weather data** . Furthermore, we also recommend the Commission, to the extent reasonable, encourage studies for potential uses of such high-quality weather data to develop and implement operational and predictive tools that enhance utility situational awareness and allow for improved detection and response, thus increasing system resiliency and further growing mitigating wildfire risk.'

(Id. at 3)."

**RESPONSE TO PARAGRAPH 15:**

PG&E admits that Paragraph 15 accurately quotes from the September 19, 2018 CPUC Safety and Enforcement Division Rulemaking 15-05-006 SED-CAL FIRE Joint Assessment and Recommendation Report, but denies that the SED and CAL FIRE comments in the quotation are agreeing with the 2010 Berkeley study concerning wildfires in Southern California or that the 2018 Joint Assessment has any connection to that study.  PG&E agrees with SED's and CAL FIRE's finding that the Commission should encourage and support utility efforts to install weather stations. PG&E notes that the report went on to recognize that several utilities, including PG&E, "have taken heed to the issue of increasing wildfire risk and preemptively began dedicating resources to implement systems and programs to better understand local conditions throughout the service territory and the potential impacts on the system".  (Pitre Decl. Exhibit G, 1006-7 at 21.)  The SED and CAL FIRE cited in particular PG&E's installation of over 100 weather stations since 2017 and its plan to install an additional 100 by the end of 2018.  (*Id.* at 19.)  PG&E is committed to making significant investments to continue to enhance its situational awareness in HFTDs, as PG&E agrees that monitoring local conditions in HFTDs can be an important tool in preventing and responding to

16

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

wildfires.  That is precisely why PG&E already has implemented measures to enhance its situational awareness in HFTDs, including:

- Installing 200 weather stations in its service territory in 2017 and 2018 with plans to install an additional 400 weather stations by September 1, 2019, and approximately 1,300 weather stations in total within five years.  (WSP at 91.)

- Installing nine high-definition cameras in 2018 with plans to install approximately 70 more in 2019, and nearly 600 cameras (90 percent HFTD coverage) by 2022.  (*Id.*)

- The development of forecast models that use data and information from the National Weather Service ("NWS") and the European Center for Medium Range Forecasting ("ECM"), which will then be input into PG&E's proprietary in-house mesoscale forecast model, PG&E Operational Mesoscale Modeling System ("POMMS") to generate short- and medium-term fire danger forecasts across PG&E's service area down to a 3-km resolution.  (*Id.* at 90.)

- Deploying advanced fire spread modelling technology that will produce hourly fire spread risk scores for overhead distribution and transmission circuits in HFTDs by running hundreds of millions of fire spread simulations daily, designed to provide PG&E with an hour-by-hour understanding of the risk of asset-related wildfires and help inform de-energization and recloser disabling decisions in real time.  (*Id.*)

- The creation, in 2018, of PG&E's Wildfire Safety Operations Center ("WSOC") which operates as a central wildfire-related information hub for PG&E and coordinates PG&E's wildfire prevention and response efforts throughout its service area.  (*Id.* at 93-94.)

## PARAGRAPH 16 OF PLAINTIFFS' SUBMISSION:

### "C.  Wildfires Are Overwhelmingly Caused by Tree Failures

'Based on a review of existing data and information, [the CPUC Safety and Enforcement Division ('SED')] and CAL FIRE have concluded that **most utility-caused fire ignitions are due to (1) contact with vegetation and (2) failure of conductors**.' (See Pitre Decl., Exhibit G, pg. 2-3)."

## RESPONSE TO PARAGRAPH 16:

PG&E admits that Paragraph 16 accurately quotes from the September 19, 2018 CPUC Safety and Enforcement Division Rulemaking 15-05-006 SED-CAL FIRE Joint Assessment and Recommendation Report.  As PG&E has stated to the Court, our Wildfire Safety Plan includes enhanced vegetation management ("EVM") measures designed to mitigate potential ignitions caused by vegetation contact.  (WSP at 70-86.)  In addition, PG&E is implementing system hardening

17

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

measures as well as enhanced inspections of its distribution, transmission and substation assets.  (*See* Resp. to ¶ 16; WSP at 52-69.)

**PARAGRAPH 17 OF PLAINTIFFS' SUBMISSION:**

"PG&E also reported to the CPUC in March 2018 that **'vegetation contact with conductors' was the leading cause of the 486 fire ignitions associated with PG&E facilities during 2015-2016, causing 37% of the fires**. (See Pitre Decl., Exhibit H [Risk and Safety Aspects of Risk Assessment and Mitigation Phase Report of PG&E Investigation 17-11-003 (March 30, 2018)], pg. 84)."

**RESPONSE TO PARAGRAPH 17:**

PG&E admits Paragraph 17.

**PARAGRAPH 18 OF PLAINTIFFS' SUBMISSION:**

"In February 2013, Charles Filmer of Pacific Gas & Electric Company prepared a report based on PG&E Vegetation Management fire investigations, which he testified to receiving 50 to 100 such investigations per year.* (See Campora Decl., Exhibit E.) Four findings are of particular note.

1.  **Over 85% of vegetation-related fire incidents involved high-voltage distribution lines and almost 90% of those fires were caused by tree failures**;
2.  Ignitions are most frequent during the 'conventional fire season of 'mid-April through October;'
3.  PG&E was aware that during the May-October time frame, Blue Oak, Valley Oak, and Blue Gum trees suffered branch failures and, **'it could be cost effective fire-risk reduction work to remove overhanging branches of these species in high-risk areas'**; and
4.  'Gray pine located in high-risk areas that are tall enough to hit the powerlines should be considered for removal or lowering in height to protect facilities.'

*[FN 4]:  Although the report references 'ignitions,' Mr. Filmer made it clear in his deposition that, he was referring only to ignitions referenced in Vegetation Management investigative reports for the years 2007 to 2012. He did not know how many vegetation related PG&E fires occurred each year. (See Campora Decl., Exhibit E, Filmer Depositions, pages 44- 46.)"

**RESPONSE TO PARAGRAPH 18:**

PG&E admits Paragraph 18 to the extent that Mr. Filmer made the statements at his deposition and in his February 2013 report that Plaintiffs attribute to him.  PG&E notes, however, that for over ten years, as one facet of its vegetation management program, it has performed

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1  additional foot patrols and tree work on its distribution lines as part of the Public Safety &

2  Reliability Program.  The patrols are focused on areas that have a higher rate of vegetation-caused

3  outages and vegetation-caused wires down.  As part of this program, in 2017, over 26,000 additional

4  trees were either pruned or removed in these higher-risk areas.  By focusing on areas with a higher

5  rate of vegetation-caused outages, the patrols are designed to address wildfire risk.  In addition,

6  another facet of PG&E's vegetation management program, the Drought and Tree Mortality Program,

7  was implemented in 2014 to respond to the effects of the drought, including increased tree fatality.

8  This program also resulted in additional patrols in higher-risk areas as well as the removal of tens of

9  thousands of potentially hazardous trees.  (*See* Resp. to  3.)

10       As the Court has noted, the problem today is that a single ignition can result in a catastrophe.

11  That was not the environment in Northern California in 2013 when the document Plaintiffs cite was

12  created.  Mr. Filmer's findings must be considered in that context.  Given the increased level of

13  wildfire risk in Northern California, PG&E has implemented several measures to address these

14  issues.  PG&E's EVM program includes clearing all overhanging branches above the four-foot radial

15  clearance zone of electric distribution lines in HFTD areas.  Its EVM program also includes an

16  initiative in HFTD areas to remove or trim trees from the ten species that have been responsible for

17  approximately 75 percent of the vegetation-related fire ignitions that are tall enough to strike

18  distribution lines, have a clear path to strike, and/or exhibit other potential risk factors such as

19  leaning toward a line or being weighted toward a line.  Black Oak, Coast Live Oak/Valley Oak, Blue

20  Gum and Grey Pine are four of the ten species covered by this program.  (WSP at 79-80.)

21  **PARAGRAPH 19 OF PLAINTIFFS' SUBMISSION:**

22       "**IV.    PG&E CAN TAKE TARGETED MEASURES TO MITIGATE AND/OR**
23  **           PREVENT THE RISK**

24            **A.     PG&E Can Harden Its Equipment In Wildfire Prone Areas.**

25  After the 2007 wildfires, SDG&E 'fire-hardened' its electrical equipment in high fire prone

26  areas, including **replacement of wooden poles with steel poles and installation of heavier**

27  **conductors.** (Pitre Decl., Exhibit E, pg. 4). According to SDG&E:

27                                    19

28  RESPONSE TO REQUEST FOR INFORMATION
   Case No. 14-CR-00175-WHA

1
2
3
4
5
6

'Steel poles are generally stronger and thus better able to withstand extreme wind gusts associated with high fire risk Santa Ana wind conditions. Stronger steel poles can support a wider spacing of conductors, which, when combined with heavier conductors, lowers the likelihood of high winds causing contact between conductors that could result in line faults, sparking, and potential ignitions of ground vegetation. The installed steel poles are taller than the wooden poles they replace, so conductors are raised higher above potential ground fires which have the potential to damage line insulation or cause excessive line sag. Finally, steel poles are more resistant to damage from ground fires than wooden poles.'

7
8
9

(Pitre Decl., Exhibit E, pg. 4, *citing to* San Diego Gas & Electric Company. (2013). *Application of San Diego Gas & Electric Company for a Permit to Construct The Tie-Line 637 Wood-to-Steel Project (A13-03-003).* San Diego, CA: SDG&E.).

10
11
12
13

**SDG&E prioritizes the maintenance of poles in each power line in high-risk fire areas according to the existing vegetation and fuel conditions**, the history of high-speed winds, and the age and condition of existing infrastructure as part of a strategy to strengthen power lines connecting substations for improved reliability. (Pitre Decl., Exhibit I [San Diego Gas & Electric Company Tie Line 649 Wood-to-Steel Replacement Project: Chapter 2 – Project Purpose and Need (Aug. 2015)] pg. 2-3)."

14

**RESPONSE TO PARAGRAPH 19:**

15

PG&E admits that Paragraph 19 accurately quotes from a May 2014 Master's Project titled

16

"Quantifying the Economic Risk of Wildfires and Power Lines in San Diego County" and an August

17

2015 chapter from SDG&E's Tie Line 649 Wood-to-Steel Replacement Project.  To the extent that

18

Plaintiffs quote from these sources to suggest that PG&E can take similar measures, PG&E agrees

19

and following the 2017 and 2018 wildfires, PG&E is taking these steps to harden its system.  Among

20

other measures, PG&E is implementing the following in HFTD areas:

21
22

- Replacement of bare overhead primary (high voltage) conductor as well as lower voltage conductor with insulated conductor.

23

- Replacement of existing primary line equipment such as fuses/cutouts and switches with equipment that CAL FIRE has certified as low fire risk.

24
25

- Installation of non-wood poles to support the additional weight of insulated wire, which will also further reduce the likelihood of pole failures during extreme weather events.

26
27

(WSP at 52-69.)

28

20

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

**PARAGRAPH 20 OF PLAINTIFFS' SUBMISSION:**

"Furthermore,

As part of its Community Fire Safety Program, **SDG&E has undertaken one of the largest deployments of state-of-the-art pulse reclosers, focusing heavily on the [High Fire Threat District]**. This equipment allows SDG&E to operate its system with significantly reduced energy flows during reclosing operations and be able to sectionalize various elements of its distribution system to better manage system operations and reliability. … In addition, SDG&E has implemented more sensitive relay settings to all SCADA reclosers in the [High Fire Threat District]. These sensitive relay settings provide very fast clearing of faults on distribution circuits and are remotely operated via SCADA, allowing for real-time adjustments triggered by adverse weather conditions.

(Pitre Decl., Exhibit J [San Diego Gas & Electric Company Fire Prevention Plan (Oct. 31, 2018)] pg. 12)."

**RESPONSE TO PARAGRAPH 20:**

PG&E admits that Paragraph 20 accurately quotes from SDG&E's October 31, 2018 Fire Prevention Plan. To the extent that Plaintiffs quote from this source to suggest that PG&E can take similar measures, PG&E notes that it is continuing to automate recloser devices to enable selective reclosing functionality as well as installing additional line reclosers at HFTD area boundaries. PG&E's Wildfire Reclosing Disable program includes nearly 2,800 reclosing devices on PG&E's distribution lines in Tier 2 and Tier 3 HFTD areas. At the end of 2018, approximately 2,100 of the distribution devices in the program were SCADA-enabled and capable of being disabled remotely. If a protection zone does not have SCADA capability in Tier 2 or Tier 3 HFTD areas, PG&E manually disables automated reclosing on these devices throughout fire season. These locations are identified and scheduled for disablement prior to the projected beginning of elevated wildfire risk exposure. These manual devices will remain disabled for reclosing until wildfire risk is significantly lower during the year.

PG&E is working to SCADA-enable all line reclosers in Tier 2 and Tier 3 HFTD areas by June 1, 2019. In addition, devices located on nearly 400 transmission lines with voltages of 115 kV and below were included in the 2018 program. Over 95 percent of the transmission line devices are SCADA-enabled and can be disabled remotely, and similar to the distribution devices that are not

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 793 of 1229

1   SCADA-enabled, PG&E will manually disable the remaining devices for the duration of wildfire

2   season.  PG&E also is implementing two pilot programs to evaluate alternative technologies to

3   further reduce potential ignitions:  (1) Rapid Earth Fault Current Limiter Technology that

4   immediately reduces the voltage on a line experiencing a line to ground fault to reduce the energy

5   available for an ignition; and (2) Enhanced Wires Down Technology Detection Project to identify

6   when one of the lines in a distribution system is down and to help pinpoint the location of any

7   outages to enable PG&E and first responders to respond more quickly.  (*See* WSP at 109-112.)

8   **PARAGRAPH 21 OF PLAINTIFFS' SUBMISSION:**

9   "**B.    PG&E Can Identify and Remove Hazard Trees in Wildfire Prone Areas.**

10   **i.    PG&E Is Required by Law to Remove Hazard Trees**

11   According to PG&E:

12   [Public Resource Code section] 4293 requires a 4-foot clearance be maintained at

13   all times for power lines between 2,400 and 72,000 volts, and a 10-foot clearance
    for conductors 115,000 volts and above. GO 95, Rule 35 also requires the removal

14   of dead, diseased, defective and dying trees that could fall into the lines. The
    clearance requirements increase as the voltage increases. This applies in the SRA

15   during designated fire season.

16   (See de Ghetaldi Decl., Exhibit 1)"

17   **RESPONSE TO PARAGRAPH 21:**

18   PG&E admits Paragraph 21.

19   **PARAGRAPH 22 OF PLAINTIFFS' SUBMISSION:**

20   "In PG&E's parlance, 'dead, diseased, defective and dying trees' are known as 'hazard' or
    'facility protect' trees. The statutory clearance requirements apply whether a tree is a

21   'hazard' tree or not. As PG&E recognizes, the required clearances must be maintained 'at all
    times'. (See de Ghetaldi Decl., Exhibit 1)."

22

23   **RESPONSE TO PARAGRAPH 22:**

24   PG&E generally admits Paragraph 22, but clarifies that if a tree or branch fails and contacts a

25   line—where that tree or branch was healthy (not dead, old decadent or rotten, or weakened by decay

26

27

28

22

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1  or disease) and was outside the clearance requirements prior to the contact—there is no Public

2  Resource Code § 4293 violation.

3  **PARAGRAPH 23 OF PLAINTIFFS' SUBMISSION:**

4     "The CPUC interprets the statutory requirements in the same way: 'It's the LAW. State law
   requires utility companies to maintain specific clearances (depending on voltage running
5     through the line) between electric power lines and all vegetation.' (See de Ghetaldi Decl.,
   Exhibit 2)."
6

7  **RESPONSE TO PARAGRAPH 23:**

8     PG&E admits that Paragraph 23 accurately quotes from a web page concerning tree trimming

9  safety on the CPUC's website.

10 **PARAGRAPH 24 OF PLAINTIFFS' SUBMISSION:**

11    "Public Resources Code § 4293 operates in conjunction with rules and orders promulgated
   by the CPUC. Originally adopted in March 1929, General Order ('GO') 95, Rule 11
12    provides:

13       'The purpose of these rules is to formulate, for the State of California,
      requirements for overhead line design, construction, and maintenance, the
14       application of which will ensure adequate service and secure safety to persons
      engaged in the construction, maintenance, operation or use of overhead lines
15       and to the public in general.'"

16 **RESPONSE TO PARAGRAPH 24:**

17    PG&E admits Paragraph 24.

18 **PARAGRAPH 25 OF PLAINTIFFS' SUBMISSION:**

19    "Thus, one of the citations issued by the CPUC to PG&E for the 2015 Butte Fire was for
   'One violation of GO 95, Rule 35, for failing to maintain the minimum required clearance
20    between the 12 kV conductor and the subject grey pine tree, which lasted for at least one (1)
   day.' (See de Ghetaldi Decl., Exhibit 3, pp. 1-2.)"
21

22 **RESPONSE TO PARAGRAPH 25:**

23    PG&E admits Paragraph 25, to the extent that it accurately quotes the citation issued by the

24 CPUC.  PG&E denies that it was out of compliance with GO 95, Rule 35 when the Butte Fire

25 ignited.  PG&E also notes that the CPUC stated in the citation that "[t]here [wa]s no evidence

26 available to determine when the 18-inch minimum clearance was breached/violated, other than the

27

28

<center>23</center>
<center>RESPONSE TO REQUEST FOR INFORMATION</center>
<center>Case No. 14-CR-00175-WHA</center>

1    day of the incident, when the subject tree contacted the 12 kV overhead conductor".  (de Ghetaldi

2    Decl. Exhibit 3, Dkt. 1007-3 at 2.)

3    **PARAGRAPH 26 OF PLAINTIFFS' SUBMISSION:**

4                    "**ii.    As Of June 2017, PG&E Failed To Remove Or Otherwise Trim More
                              Than 6000 Hazard Trees Which It Had Identified In 2016**

5

6            As of June 7, 2017, there were more than 6000 Facility Protect Trees (FPT), identified by
7            inspectors during 'routine patrol' in 2016 which had not been addressed. Of that number, 888
             were in the divisions where fires occurred in 2017. (See Campora Decl., Exhibit F [Depo of
8            Biancardi - Exhibit 007-006])."

9    **RESPONSE TO PARAGRAPH 26:**

10           Paragraph 25 requires clarification.  Plaintiffs cite to a June 6, 2017 email attaching a

11   screenshot taken from PG&E's Vegetation Management Database.  The number reflected in the

12   June 6, 2017 email does not accurately reflect the number of FPTs identified in 2016 that had not yet

13   been worked as of that date because PG&E's Vegetation Management Database does not register

14   work as "complete" until the tree contractor has submitted all required invoicing paperwork.

15   (Biancardi Decl. ¶ 21.)  As of June 6, 2017, there were 3,962 FPTs (not 6,000) identified by PG&E

16   pre-inspectors in 2016 that remained pending.  (*Id.* at ¶ 27)  Moreover, by October 8, 2017, when the

17   October 2017 North Bay Wildfires began, 131 of the 6,000 FPTs referenced in the June 6, 2017

18   email were still pending, and 50 of those trees were in divisions affected by the October 2017 North

19   Bay Wildfires.  (*Id.* at ¶ 28.)  PG&E's records indicate there was no FPT work remaining to be

20   performed at any of the alleged origin points associated with the October 2017 North Bay Wildfires.

21   (*Id.* Exhibit E, PGE-CPUC_DR-112117_Common_Q69 at 2.)

22   **PARAGRAPH 27 OF PLAINTIFFS' SUBMISSION:**

23           "A Facility Protect Tree is a tree which, because of a disease, defect or condition, poses a
             danger of falling into the line. A green healthy tree can be an FPT tree. (See Campora Decl.,
24           Exhibit F [Depo of Biancardi], pgs. 43-55 and Exhibit G [Depo of Tankersley], pgs. 235-
             236)."
25

26

27

28
                                                  24
                              RESPONSE TO REQUEST FOR INFORMATION
                                    Case No. 14-CR-00175-WHA

1  **RESPONSE TO PARAGRAPH 27:**

2      PG&E denies Paragraph 27 to the extent that Plaintiffs assert that a green and healthy tree

3  can be an FPT.  PG&E defines FPTs as "[t]rees that are dead, show signs of disease, decay or ground

4  or root disturbance, which may fall into or otherwise impact the conductors, towers or guy wires

5  before the next inspection cycle".[11]  (Biancardi Decl., Exhibit B, at PGE-CPUC 00005483; *see id.*

6  Exhibit A, at 44:1-6.)

7  **PARAGRAPH 28 OF PLAINTIFFS' SUBMISSION:**

8      "On October 3, 2017, 5 days before the fires in the North Bay, an email exchange between
       PG&E employees, read as follows:

9

10          Employee One: 'Looks like we got creamed yesterday in North Bay assuming due
            to wind. Luckily no Wires Down on any of the outages.'

11          Employee Two: 'We did. Unfortunately, a line clearance job was cancelled today
            because there were no available PG&E line crews.'

12          Employee One: '2016 work?' Employee Two: 'Yes, expired units.*'

13          (Campora Decl., Exhibit F [Depo of Biancardi - Exhibit 0070-007]).

14          *[FN 5]:  An 'expired unit' is a tree schedule for work, which 'has gone past one
            year.' (See Campora Declaration, Exhibit C.)"

15

16  **RESPONSE TO PARAGRAPH 28:**

17      Paragraph 28 requires clarification.  As Plaintiffs quoted, in an October 3, 2017 email, a

18  PG&E employee wrote, "Unfortunately, a line clearance job was cancelled today because there were

19  no available PG&E line crews."  A "line clearance job" in this context refers to a job requiring

20  PG&E to de-energize its lines prior to performing trimming or removal.  Federal regulations require

21  power conductors and equipment to be de-energized and grounded before any employee approaches

22  or takes any conductive object closer than the minimum approach distance prescribed by the

23  ─────────────────

24      [11] PG&E's definition of FPT is based on state regulations governing vegetation management.
    Public Resource Code Section 4293 requires that all utilities trim or remove "[d]ead trees, old
    decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are

25  leaning toward the line which may contact the line from the side or may fall on the line."  CPUC
    General Order 95, Rule 35 similarly requires utilities to trim or remove "dead, rotten or diseased

26  trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may
    fall into a span of supply or communication lines."

27

28

<center>25</center>
<center>RESPONSE TO REQUEST FOR INFORMATION</center>
<center>Case No. 14-CR-00175-WHA</center>

Occupational Safety and Health Administration ("OSHA").  29 C.F.R. 1910.268(b)(7).  PG&E's records indicate that the tree at issue in this email was inspected and prescribed for work in 2016, but upon arrival at the site in 2016, the crew members who were to perform the work found that the job required de-energization of the line.  The contractor was unable to perform the work during this initial visit, but put in a request with the local Vegetation Program Manager ("VPM") to schedule a date when the line could be de-energized.  Because de-energization requires coordination among numerous departments, the job was scheduled for October 2, 2017.  As indicated in the email exchange, the job was rescheduled due to a wind storm on October 2, 2017, and was ultimately completed on December 29, 2017.

The tree at issue (which was located several miles away from any of the October 2017 North Bay Wildfire fire perimeters) presented a low potential for wildfire ignition because it was in the vicinity of a secondary conductor, which operates at a lower voltage than primary distribution or transmission lines and therefore poses a lower risk of ignition if contact occurs.  For this reason, California law actually permits contact between vegetation and secondary lines below a certain voltage.  Cal. Pub. Res. Code § 4293; CPUC General Order 95 Rule 35.  Further, the tree was in a Tier 1 area, which presents a lower fire risk than Tier 2 or Tier 3.

**PARAGRAPH 29 OF PLAINTIFFS' SUBMISSION:**

"PG&E did not complete this work despite admitting that it knew FPT trees posed the risk of death to the public.

Q. And PG&E knew, in October of 2017, that an FPT tree could come down, cause a fire that could kill people, true?

A. That's correct.

(See Campora Decl., Exhibit F [Depo of Biancardi] pg. 81:5-8.)"

**RESPONSE TO PARAGRAPH 29:**

PG&E denies Paragraph 29 to the extent it asserts that PG&E did not complete the work referenced in the October 3, 2017 email exchange despite knowing that the tree in question posed a risk of death to the public.  *First*, as noted above, the work was completed on December 29, 2017.

*Second*, the tree in question did not pose a high risk of wildfire ignition because it was located near a secondary conductor in a Tier 1 area (several miles away from the fire perimeters of all October 2017 North Bay Wildfires).[12]

PG&E further denies Paragraph 29 to the extent it asserts that all FPTs pose the same level of risk. Rather, the level of risk depends upon the location of the tree and conditions on the ground. (Biancardi Decl. Exhibit A, at 84:10-20.) For example, as noted above, the risk of wildfire ignition is significantly lower for trees in near secondary conductors.

PG&E's vegetation management program is designed to take risk, including wildfire risk, into account and is intended to schedule work on the highest risk trees first. In fact, when a pre-inspector identifies a tree for work, he or she must assess the risk of wildfire posed by that individual tree. If a tree poses an imminent threat, the pre-inspector must immediately notify the Supervising Vegetation Program Manager ("SVPM") or local VPM and remain on site until a tree crew arrives to trim or remove the tree. (Biancardi Decl. Exhibit C, at PGE-CPUC 00005996.) If a tree "requires urgent mitigation but does not pose an imminent threat," the pre-inspector may not leave the site until they receive confirmation from either the SVPM or VPM that notice of the hazard was received. (*Id.* at PGE-CPUC 00005994-96.) Given the high volume of vegetation management work PG&E performs—which in 2016 included removing approximately 280,000 FPTs—prioritizing risk is a critical aspect of its vegetation management program. PG&E supervisors and managers also track all pending work on an ongoing basis by, for example, issuing regular reports of FPTs to SVPMs and VPMs in their divisions and districts. SVPMs and VPMs may also independently track pending FPTs. (Biancardi Decl. ¶ 20-22.)

Moreover, PG&E's vegetation management program is designed to manage external factors that may delay work. PG&E is required to abide by numerous state and federal regulations that may delay FPT work. For example, as noted above, OSHA imposes de-energization requirements for

---

[12] As discussed in Response to Paragraph 28, California law permits contact between vegetation and secondary lines below a certain voltage. Cal. Pub. Res. Code § 4293; CPUC General Order 95 Rule 35.

1    tree work that puts workers within a certain proximity to live conductors, and numerous other federal

2    agencies restrict vegetation management work that may interfere with protected or endangered

3    species.  Customers may also refuse to allow PG&E on their property or otherwise prevent PG&E

4    from performing necessary vegetation management work.  In 2016, for example, there were more

5    than 40,000 instances in which work was delayed because a customer refused to permit PG&E to

6    conduct necessary vegetation management work, and more than 1,200 instances in which work was

7    delayed because a protected bird's nest was found in a tree prescribed for work.[13]  Where such

8    conditions exist, PG&E has procedures to address the issue, which may include obtaining any

9    necessary permits or de-energizing the area until work is completed.

10         In short, PG&E's vegetation management program is designed to prioritize work posing the

11   highest risk to public safety, and additional measures have been implemented to allow PG&E

12   employees to monitor all delayed and low-risk tree work over time.

13   **PARAGRAPH 30 OF PLAINTIFFS' SUBMISSION:**

14         "**iii.   PG&E Officers Ignored Audit Results Showing 'Statistically
                    Significant Sample' Of Hazard Trees Near Powerlines Were Missed**

15                 **by Tree Inspectors**

16

17         "In 2016, PG&E auditors inspected 1,539 miles of line in SRA. In that distance they
           evaluated 102,502 trees and identified 3,603 FPT trees. 0.035% of the trees its auditors

18         inspected posed a danger to its lines.  (See Campora Decl., Exhibit H [Depo of Oldford -
           Exhibit 0052-006]). Despite finding *that after its Pre-Inspectors and Tree Trimmers had*

19         *done their work*, more than 3 trees out of 100 still posed a risk to its lines. PG&E chose not
           to extrapolate its 'statistically significant sample.' (See Campora Decl., Exhibit H [Depo of

20         Oldford], pgs. 78-79, 85-90, and 128-129)."

21   **RESPONSE TO PARAGRAPH 30:**

22         PG&E admits Paragraph 30 to the extent that Plaintiffs assert that in 2016, PG&E inspected

23   1,539 miles of line in state responsibility areas ("SRAs") through PG&E's Quality Assurance

24

25   _____

         [13] The Migratory Bird Treaty Act makes it unlawful to pursue, hunt, take, capture, kill or
26   possess any migratory bird or their eggs, nest and body parts without allowance via regulation or
     federal permit.

27

28
                                                    28
                                RESPONSE TO REQUEST FOR INFORMATION
                                       Case No. 14-CR-00175-WHA

("QA") audits and identified 3,603 FPTs within that audit mileage.  The remainder of Paragraph 30 requires clarification, however, as Plaintiffs suggest that once PG&E identified these FPTs it should have extrapolated this number across its entire service territory to determine the total number of FPTs that could exist.[14]

PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations.[15]   To ascertain a true "real-time" condition of the program, audits are performed throughout the year.  Unlike QC reviews, QA audits are not scheduled to follow inspections and tree trimming/removal work, but are instead scheduled independently.  The audits indicate whether any identified issues pose compliance violations or potential violations (*e.g.*, potential violation may occur within 90 days).  The auditors perform a root-cause analysis of any actual or potential compliance issues, identify trends and report the results to the VM-Operations Managers and the

---

[14] Plaintiffs also appear to imply that the trees identified in these audits were "missed" by pre-inspectors and tree workers.  This is not correct.  Auditors conduct a root cause analysis for all FPTs identified during the audit, including whether the tree appeared to have declined before or after the last inspection.  For example, the 2016 QA audit for the North Bay Division (which includes parts of PG&E's service territory affected by the October 2017 North Bay Wildfires) found that out of 16 FPTs identified, eight did not begin to decline until after the last inspection and therefore they were not "missed" by the pre-inspector who patrolled that line.  (Biancardi Decl., Exhibit D, at PGE-CPUC 00006639.)

[15] In addition to these inspections, PG&E also conducts system-wide quality control ("QC") reviews, designed to assess whether the vegetation management contractors are performing according to PG&E's expectations, including whether they are complying with the applicable regulations.  The QC reviews assess whether pre-inspection contractors identify and prescribe the proper work, as well as whether the tree workers' performance is consistent with contractual requirements (*e.g.*, completing work prescribed by pre-inspectors).  The reviewers pull random samples of work performed by pre-inspectors and tree workers from all locations recently worked within a given date range.  The reviewers use a set of criteria to measure each pre-inspector's or tree worker's performance in that random sample of work.  Because reviewers use the same set of criteria, the expectation is that a reviewer working in one division would make the same assessment of contractor work product as a reviewer in another division.  Assigned corrective actions are documented by VPMs, who help track whether the corrective actions are fully implemented.  The SVPM, VPM, and VM-Operations Manager monitor and track compliance, quality control results, and corrective actions.

1   VPM for the area.  The VPM is responsible for taking short-term action to correct identified

2   deficiencies and for communicating any required corrective actions to the contractors.  If an auditor

3   identifies a recurring or systemic issue, the VM Operations group, working in conjunction with the

4   QA Specialists, develops long-term action plans to reduce or prevent the issue from recurring.

5          The QA audits are not intended to determine the number of non-compliant trees or FPTs

6   throughout the system.  Instead, the QA audits are designed to assess contractors' compliance in a

7   given area with internal PG&E Vegetation Management policies, standards, and work procedures, as

8   well as the applicable laws.  To the extent the auditors identify any actual or potential compliance

9   issues, those issues are communicated to the contractors who are then responsible for implementing

10  any assigned corrective actions.  If the auditors identify systemic or recurring issues, preventive

11  actions may be implemented, designed to prevent the deficiency or non-conformance from

12  happening again.  Reporting on-going and relevant QA information to PG&E's contractors provides

13  them with the opportunity to take appropriate corrective action to maintain compliance with the

14  applicable laws.

15  **PARAGRAPH 31 OF PLAINTIFFS' SUBMISSION:**

16                   "**iv.    PG&E Ignored Lessons from the 2015 Butte Fire Which Evidenced
                              Clear Failures by Its Vegetation Management Contractors to Perform**

17                   **Their Job Duties Responsibly and Adequately**

18          First and foremost, it is important to note that PG&E contracts out all of its vegetation

19          management responsibilities, including tree inspections, tree removals, and LiDAR. From

            depositions in the Butte Fire case, it is apparent the **employees of the tree inspection and**

20          **removal companies are not sufficiently trained, experienced, or knowledgeable about**

21          **their job responsibilities**."

22  **RESPONSE TO PARAGRAPH 31:**

23          PG&E denies Paragraph 31 to the extent Plaintiffs state that the pre-inspectors and tree

24  workers employed by PG&E's contractors are not sufficiently trained, experienced or

25  knowledgeable.  PG&E contracts with a limited number of well-established, large scale vendors who

26  employ qualified and trained pre-inspectors, many of whom hold industry certifications.  Although

27  PG&E relies on these vendors to conduct contractor training, PG&E requires that its contractors

28

1  annually review PG&E's policies to drive consistency across their vegetation management work.

2  PG&E also provides two days per year of training to all pre-inspectors to align on safety practices

3  and relevant procedures.  Throughout their training and once deployed, pre-inspectors follow an

4  established set of procedures for consistency in how their pre-inspection work is performed, and pre-

5  inspectors' findings and tree prescriptions (*i.e.*, whether a tree needs to be pruned or removed) are

6  recorded.

7   Additionally, for pre-inspectors to move up in their career paths, they are required to acquire

8  professional certifications from outside authorities.  Specifically, the International Society of

9  Arboriculture grants Certified Arborist and Utility Specialist certifications that directly support and

10  validate proficiency in this kind of work.  Maintaining these certifications also requires completing

11  continuing education requirements as well as recertification every three years.  Arborists can also be

12  certified as a Registered Professional Forester from the California State Board of Forestry and Fire

13  Prevention.  A pre-inspector cannot attain the third or fourth step of their career progression without

14  validating their proficiency through acquiring one or more of these certifications.

15   PG&E agrees that it is important both for efficacy and for safety that tree inspectors and

16  workers be adequately trained.  Not only is logging and felling one of the most hazardous industries

17  in the nation, but the Northern California forests pose unique challenges.  Safely removing a 200+

18  foot tall tree in the proximity of a high voltage distribution line takes a significant degree of skill that

19  not all tree workers possess, and, absent adequate training, there is a risk that contractors can be

20  fatally injured.  PG&E's agreements with its contractors require that the tree workers used for each

21  job be trained for the type of work involved with that particular job.[16]  This is why the most

---

[16] Different types of tree work require different training.  For example, pursuant to regulations promulgated by the California Department of Industrial Relations, before a tree worker can remove vegetation within 10 feet of a power line, he or she must be certified by his or her company for such work, which requires the tree worker to complete 18 months of training and related on-the-job experience.  Cal. Code Regs. tit. 8, §§ 2950, 2951 (establishing minimum approach distances and excepting qualified line clearance tree trimmers); § 2700 (defining "qualified line clearance tree trimmer").  Trainees are also permitted to do this work under the direct supervision and instruction of certified individuals.  Cal. Code Regs. tit. 8, § 2951.

1    significant challenge to the EVM program schedule is the limited availability of a qualified work

2    force, in particular, limited qualified tree workers.

3    **PARAGRAPH 32 OF PLAINTIFFS' SUBMISSION:**

4        "In 2014-2015, PG&E used foot patrols to inspect its distribution circuits. In October 2014,
         an employee of a company PG&E used to conduct inspections marked two 'edge trees' near

5        the Electra 1101 circuit in southern Amador County. The inspector did not mark for removal
         a top heavy 44-foot grey pine that was being supported by the edge trees the inspector

6        marked for removal. **The inspector admitted to not using any measuring device to**

7        **determine the height of the tree or its distance from the power lines, nor did the**
         **inspector walk around the grey pine to inspect whether it was diseased or dying.**"

8

9    **RESPONSE TO PARAGRAPH 32:**

10       PG&E denies paragraph 32 to the extent that Plaintiffs allege that a closer inspection would

11   have identified any issues.  PG&E's pre-inspectors and tree workers were on site three times in the

12   year before the Butte fire, and the evidence does not establish that the grey pine had defects

13   requiring its removal at the time those inspections occurred.

14       • October 2014:  A pre-inspector patrolled the area and marked two nearby trees for
           removal but did not prescribe any work for the grey pine.

15
         • January 2015:  Tree workers removed the two nearby trees.  The tree workers did not
16         identify any condition with respect to the grey pine.  If tree workers identify a
           condition that does not conform to legal requirements, including required clearances,
17         they are required to notify PG&E and abate the condition if it exists on the same
           property as the trees for which the work request was issued.
18
         • July 2015:  A pre-inspector patrolled the area and did not identify the grey pine as
19         leaning.

20       PG&E further denies that the grey pine was being supported by the two trees marked for

21   removal and that removing those trees caused the grey pine to fall.  Additionally, Plaintiffs do not

22   contend that the grey pine was diseased or dying or that it displayed any visible sign of defect, and

23   there is no evidence of any such defect.

24       PG&E admits that the pre-inspector did not use a measuring device, nor was she required to

25   do so under PG&E policies.  The pre-inspector was trained to use her judgment to determine

26   whether a tree could fall into the lines, which is the same way that the pre-inspector identified the

27
                                                    32
28   ─────────────────────────────────────────────
                        RESPONSE TO REQUEST FOR INFORMATION
                              Case No. 14-CR-00175-WHA

1   two trees near the grey pine for removal.  The pre-inspector did not mark the grey pine for removal

2   because she did not believe it required removal given its condition, not because she concluded the

3   tree was too short to strike the line even if it were diseased, dying or defective.

4   **PARAGRAPH 33 OF PLAINTIFFS' SUBMISSION:**

5   "In January 2015, employees of another company that contracted with PG&E removed the
    two edge trees supporting the grey pine. Over the next nine months, the grey pine leaned
6   further and further over toward the sun in the direction of the power lines."

7   **RESPONSE TO PARAGRAPH 33:**

8   PG&E admits Paragraph 33 to the extent that the tree workers, who were employed by one of

9   PG&E's contractors, removed two trees in the vicinity of the grey pine, but denies that the two trees

10  were "supporting" the grey pine or that the grey pine leaned towards the line as a result of the

11  removal of the two trees.  PG&E further refers to its response to Paragraph 32.

12  **PARAGRAPH 34 OF PLAINTIFFS' SUBMISSION:**

13  "**In July 2015, PG&E hired a tree inspection contractor who used uncertified and
    unqualified persons to conduct vegetation management inspections.** The three men sent
14  to conduct the supplemental CEMA foot patrol inspection of the Electra 1101 circuit were a
    Walmart greeter, a dog catcher, and a man who had worked in a plant nursery. When asked at
15  their depositions, none of the three could recall patrolling the Electra 1101 circuit."

16

17  **RESPONSE TO PARAGRAPH 34:**

18  Paragraph 34 requires clarification.  The July 2015 vegetation management inspections were

19  conducted by three pre-inspectors from one of PG&E's contractors.  One of the pre-inspectors had,

20  at one time, worked as an automobile technician at Walmart, but he also had previously worked as a

21  firefighter.  Prior to his employment as a pre-inspector, that individual had received training on the

22  identification of tree species and trees that have the potential for failure.  At his deposition, he did

23  recall patrolling the relevant circuit.[17]  The second pre-inspector had, at one time, worked in

24

25  [17] He referred to a July 2015 patrol of the Martell 1102 circuit, which is another name for the
    Electra 1101 circuit.  Power lines run from the Electra to the Martell substation, and vegetation
26  management companies refer to it as the Martell 1102 circuit because they historically worked from
    the Martell substation to the Electra substation.
27

28

landscaping.  PG&E admits that individual was unable to recall patrolling the relevant circuit during his deposition, but notes that his deposition occurred two years later, in July 2017.  The third pre-inspector had most recently worked as an animal cruelty investigator, but had also worked for the California Department of Fish and Game in state refuges, pruning and removing trees that were dead or otherwise hazardous to the public.  That individual testified that he did remember patrolling the relevant circuit.[18]  All three individuals received vegetation management training from ACRT when they were hired as pre-inspectors.  As discussed in response to paragraph 31, PG&E denies that its pre-inspectors are unqualified.

**PARAGRAPH 35 OF PLAINTIFFS' SUBMISSION:**

"PG&E started using LiDAR ('Light-detecting and Ranging') remote sensing technology on a limited scale in 2014 to help identify hazard trees near high voltage lines. In 2015, PG&E contracted with Quantum Spatial to obtain LiDAR scans of 9,547 miles of its distribution system and orthoimagery of 15,320 miles of its distribution system, including the portion of the Electra 1101 circuit where the Butte Fire started. The 'deliverables' included: (a) the use of hyperspectral data processing to identify individual grey pine and black oak trees; (b) graphic identification of individual grey pine and black oak 'risk trees' with 'tree polygons'; and (c) a 'fall-in analysis' to identify trees with the potential to strike conductors."

**RESPONSE TO PARAGRAPH 35:**

Paragraph 35 requires clarification.  PG&E started using LiDAR in 2014 to measure compliance with the then-governing NERC reliability standard regarding vegetation management on transmission lines, FAC-003-1.  PG&E admits that it expanded its use of LiDAR in 2015 as stated in Paragraph 35 but notes that it surveyed approximately 13,450 distribution circuit miles in 2015 using LiDAR and spectral imagery technologies.

**PARAGRAPH 36 OF PLAINTIFFS' SUBMISSION:**

"**Aerial surveys of the selected circuits in high fire risk areas began in July 2105 and delivery of the results was scheduled for October 31, 2015--only weeks after the Butte Fire ignited**. The orthoimagery results identify the grey pine that hit the line as a hazard tree with the potential to strike the line. (de Ghetaldi Decl., Exhibit 4 and 5)."

---

[18] As with the first pre-inspector, at his deposition, this pre-inspector referred to a patrol of the Martell 1102 circuit.

34

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1   **RESPONSE TO PARAGRAPH 36:**

2         PG&E admits Paragraph 36 with respect to the dates and locations of aerial surveys, but

3   clarifies that they began in July 2015.  PG&E denies that the orthoimagery results could or do alone

4   identify the grey pine that hit the line as a hazard tree with the potential to strike the line.  PG&E

5   defines "hazard tree" as a tree that is dead or shows signs of disease, decay or ground or root

6   disturbance and which may fall into or otherwise impact conductors, towers or guy wires before the

7   next inspection cycle.  (*See* Biancardi Decl. ¶ 11.)  The orthoimagery results did not indicate that the

8   grey pine was "dead or show[ed] signs of disease, decay or ground or root disturbance and" may

9   have failed, only that the crown of the grey pine was within six feet of the circuit.[19]

10  **PARAGRAPH 37 OF PLAINTIFFS' SUBMISSION:**

11         "Manipulation of the July 2015 'point cloud' data shows the grey pine leaning toward and
           within six feet of the circuit, demonstrating the incompetence of the July 2015 foot patrol
12         inspectors who failed to identify the grey pine as in violation of Public Resources Code §
           4293. (de Ghetaldi Decl., Exhibits 5 and 6)."
13

14  **RESPONSE TO PARAGRAPH 37:**

15         PG&E admits that the data shows the crown of the grey pine within six feet of the circuit.

16  (de Ghetaldi Decl. Exhibit 4, Dkt. 1007-4 at 23.)  For the reasons set forth in its response to

17  Paragraph 34, PG&E denies that its contractors were "incompetent".  PG&E also denies that it was

18  in violation of Public Resources Code § 4293.  Section 4293 required four feet of clearance around

19  the 12 kV conductor that the grey pine contacted.  In its Investigation Report regarding the Butte

20  Fire, CAL FIRE, which investigated the potential cause of the Butte fire, did not allege that PG&E

21  violated Public Resources Code § 4293.

22  _____

23         [19]  Orthoimagery does not identify leaning trees, because it is taken aerially and captures trees'
       crowns, not their bases.  The location of the grey pine's base, depicted by the dot marked on Exhibit
24     6 to the Declaration of Dario de Ghetaldi, was obtained by GPS surveys and scans taken after the
       Butte Fire.  (de Ghetaldi Decl. Exhibit 4, Dkt. 1007-4 at 5-7.)  The location of a tree's base, and
25     therefore whether a tree is leaning, would not have been identifiable using the orthoimagery results.
       As noted in response to Paragraph 32, the inspectors who visited the location a few weeks prior to
26     the date on which the LiDAR image was taken did not note any abnormality with the subject tree
       requiring its removal.

27

28

**RESPONSE TO REQUEST FOR INFORMATION**
Case No. 14-CR-00175-WHA

**PARAGRAPH 38 OF PLAINTIFFS' SUBMISSION:**

> "**C.  PG&E Can Develop Ways to Monitor Local Conditions in Wildfire Prone Areas**
>
> After the 2007 wildfires, SDG&E significantly increased its ability to monitor local conditions and assess those conditions for fire risk. **SDG&E installed 167 anemometers, or wind measuring devices. It hired three meteorologists 'who provide operational weather information' and 'four experienced fire professionals who provide advice about fire risk and mitigation**.' (Pitre Decl., Exhibit I, pg. 2-1)."

**RESPONSE TO PARAGRAPH 38:**

PG&E admits that Paragraph 38 accurately paraphrases and quotes from an SDG&E document related to Wood-to-Steel pole replacement.  (Pitre Decl., Exhibit I, Dkt. 1006-9 at 3.).  As detailed in Response to Paragraph 15, as part of its Wildfire Safety Plan, PG&E is implementing several measures designed to enhance its situational awareness in HFTDs.

**PARAGRAPH 39 OF PLAINTIFFS' SUBMISSION:**

> "**According to the CPUC and CAL FIRE, these efforts have been successful**: '[the CPUC Safety and Enforcement Division] and CAL FIRE have evaluated the benefits achieved by San Diego Gas & Electric (SDG&E) through the use and implementation of information learned from its network of weather stations and concluded that it provides substantial benefit to wildfire risk mitigation, system planning and hardening, operational awareness and emergency response.' (See Pitre Decl., Exhibit G, pg. 2)."

**RESPONSE TO PARAGRAPH 39:**

PG&E admits that Paragraph 39 accurately quotes from the CPUC Safety and Enforcement Division Rulemaking 15-05-006 SED-CAL FIRE Joint Assessment and Recommendation Report (Sept. 19, 2018).

PG&E agrees that monitoring local conditions in HFTDs can be an important tool in preventing and responding to wildfires.  As detailed in Response to Paragraph 15, as part of its Wildfire Safety Plan, PG&E is implementing several measures designed to enhance its situational awareness in HFTDs.

**PARAGRAPH 40 OF PLAINTIFFS' SUBMISSION:**

> "Regrettably, it **was not until after the North Bay Fires that PG&E announced it would install around 200 new weather stations in its service territory** that would feed real-time

36

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

weather data to a wildfire safety team that would interpret the data relative to wildfire risk. **But PG&E did not plan to complete the installation of the new weather stations until 'the end of the year', i.e. after the Camp Fire hit**.* However, PG&E certainly understood, and has understood historically, the importance of local weather conditions in assessing fire danger, as Kevin Dasso, PG&E Vice President of Electric Asset Management in July 2018 stated:

> We saw first-hand last year how extreme weather events driven by climate change are causing unprecedented and unanticipated wildfires. Adding new weather stations in high fire-threat areas across our service area enhances our weather forecasting and modeling to help bolster wildfire prevention and response efforts and keep our customers safe.
>
> …
>
> PG&E has historically used weather forecast data for many purposes, mainly for predicting storm damage and for assessing fire danger. Its team of meteorologists, which includes fire-weather specialists, performs daily monitoring of current and forecast weather patterns and fire threat projections using in-house and publicly available data from the National Weather Service, CAL FIRE, US Forest Service and more. This information helps PG&E predict when and where the fire threat will be high or extreme so additional steps can be taken to keep critical infrastructure, utility crews and communities safe.
>
> With these new weather stations, PG&E will be able to capture additional real-time data related to temperature, wind speeds and humidity levels to provide improved awareness of current fire danger conditions. PG&E's meteorologists will feed information to the company's new Wildfire Safety Operations Center team to review data and determine any needed action to help reduce wildfire risks.*
>
> *[FN 6]:   https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20180716_pge_adds_over_50_new_weather_stations_to_advance_forecasting_abilities_better_predict_extreme_weather_and_wildfire_potential.
>
> *[FN 7]:  Id."

**RESPONSE TO PARAGRAPH 40:**

PG&E admits that Paragraph 40 accurately paraphrases and quotes from a July 16, 2018 press release announcing that PG&E would install approximately 200 new weather stations by the end of 2018. The quoted material accurately reflects that monitoring weather is an important part of PG&E's work, and PG&E has long had a team of meteorologists using internal and external data and modeling to assess storm and fire danger. PG&E denies Plaintiffs' suggestion that PG&E was slow to install additional weather stations. As discussed below, the scope of the threat of catastrophic

37

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

fires in Northern California changed with the October 2017 North Bay Wildfires.  (*See* Response to

Paragraph 50.)  PG&E responded by developing a comprehensive set of additional fire mitigation

tools and continues to implement and improve and those measures today.

**PARAGRAPH 41 OF PLAINTIFFS' SUBMISSION:**

"**D.  PG&E Can De-Energize Lines In Wildfire Prone Areas When Local
Conditions Indicate an Extreme Risk for a Catastrophic Wildfire**

"**i.     In 2008, SDG&E Began Shutting Off Power to Protect Public
Safety**

In October 2007, Santa Ana winds caused SDG&E's overhead power lines to ignite the
Witch Fire, the Guejito Fire, and the Rice Fire. (Pitre Decl., Exhibit N, CPUC Decision 09-
09-030 at pg 24). Together, those fires burned more than 200,000 acres and 1,800 buildings
and killed two people. (Id.)"

**RESPONSE TO PARAGRAPH 41:**

PG&E admits that the CPUC's September 2009 Decision 09-09-030 states that the Witch,

Guejito and Rice fire combined burned more than 200,000 acres and 1,800 buildings and killed two

people, but notes that the decision states that Santa Ana winds "reportedly" caused SDG&E lines to

ignite the fires, and the CPUC specified that its decision "does not prejudge any issues being

addressed in [the Witch, Guejito and Rice fire] Investigations".  (Pitre Decl. Exhibit N, Dkt. 1006-14

at 27, n. 26.)

**PARAGRAPH 42 OF PLAINTIFFS' SUBMISSION:**

"A year later, in December of 2008, SDG&E submitted an Emergency Power Shut-Off Plan
for review by the CPUC. SDG&E sought permission to turn off electricity during periods of
extreme fire danger in order to prevent its overhead power lines from igniting potentially
catastrophic wildfires. (Pitre Decl. Exhibit N [Decision 09-09-030] pgs. 3-4)."

**RESPONSE TO PARAGRAPH 42:**

PG&E admits that Paragraph 42 accurately summarizes information in CPUC Decision 09-

09-030.

**PARAGRAPH 43 OF PLAINTIFFS' SUBMISSION:**

"Although the CPUC rejected SDG&E's plan at that time, the CPUC made clear that it
believed all utilities were presently legally obligated to de-energize lines that would present a

38

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1    safety risk under extreme weather conditions pursuant to Public Utility Code Section 451 and
2    399.*  (Id. at pg 61).

3    SDG&E's statutory obligation to operate its system safely requires SDG&E to shut off
4    its system if doing so is necessary to protect public safety. For example, there is no
     dispute that SDG&E may need to shut off power in order to protect public safety if
     Santa Ana winds exceed the design limits for SDG&E's system and threaten to topple
     power lines onto tinder dry brush.  (Id. at pgs 61-62)

6    * [FN 8]:  The Commission noted that in 2003 SCE implemented a temporary program to
     shut off power to rural areas to protect against the possibility of strong winds causing dead
7    trees to fall onto its power lines and igniting a wildfire. (Pitre Decl. Exhibit N [Decision 09-
     09-030] pg. 40). SCE did not wait for the CPUC's permission to initiate the program. (Id.) It
8    put the program in place then got the CPUC's blessing later. (Id.). During the time SCE's
     power shut-off program was in effect, SCE shut off power one time. (Id. at 41). When SCE
9    inspected its power lines prior to re-energization, it found six locations where trees had fallen
     onto the lines. (Id.). SCE credited the de-energization with preventing a catastrophic wildfire.
10   (Id. at 41)."

12   **RESPONSE TO PARAGRAPH 43:**

13        PG&E admits that Plaintiffs' quotation from CPUC Decision 09-09-030 at pages 61-62 is

14   accurate but otherwise disputes Plaintiffs' characterization of the decision.  In its application,

15   SDG&E sought pre-approval to turn off electricity to certain regions during periods of high fire

16   danger.[20]  (Pitre Decl. Exhibit N, Dkt. 1006-14 at 5-6.)  The CPUC rejected SDG&E's request.  The

17   CPUC noted that if SDG&E exercised its discretion and shut off power in an emergency situation to

18   protect public safety, the CPUC could subsequently review whether that decision was reasonable

19   based on its prudent operator standard.  (*See id.* at 64-65.)

20        The portion of the CPUC's decision Plaintiffs quote states that "SDG&E *may* need to shut

---

[20] PG&E notes that "[a]ll the intervening parties except SCE oppose[d] SDG&E's Power Shut-
Off Plan".  (Pitre Decl. Exhibit N, Dkt. 1006-14 at 10.)  The intervening parties included the Mussey
Grade Road Alliance, Pacific Bell Telephone Company d/b/a AT&T California and affiliated
entities, the California Cable and Telecommunications Association, the California Farm Bureau,
CoxCom, Inc., and Cox California Telecom, L.L.C., the CPUC's Consumer Protection and Safety
Division, CTIA-The Wireless Association, the CPUC's Division of Ratepayer Advocates, Disability
Rights Advocates, the San Diego County Superintendent of Schools, a consortium of six municipal
water districts (Valley Center Municipal Water District, Ramona Municipal Water District, Padre
Dam Municipal Water District, Rainbow Municipal Water District, Fallbrook Public Utilities
District, and Yuima Municipal Water District), and Utility Consumers Action Network.  (*Id.* at 33.)

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1  off power in order to protect public safety if Santa Ana winds exceed the design limits for SDG&E's

2  system and threaten to topple power lines onto tinder dry brush", (*id.* at 61-62 (emphasis added)),

3  not that it is legally obligated to do so.  Indeed, Plaintiffs' next paragraph recognizes that in 2012,

4  the CPUC felt compelled to clarify that Decision 09-09-030 should not be interpreted "as an outright

5  rejection of the option of shutting off power to prevent fire", (*see infra* ¶ 44), which is inconsistent

6  with Plaintiffs' claim that Decision 09-09-030 stated that utilities were legally obligated to de-

7  energize under extreme weather conditions.[21]

8         With respect to footnote 8, PG&E admits that Plaintiffs accurately summarize the CPUC's

9  statements in Decision 09-09-030 regarding SCE's temporary program to shut off power in effect

10  from 2003 to 2005.

11  **PARAGRAPH 44 OF PLAINTIFFS' SUBMISSION:**

12         "**ii.**    **Investor Owned Utilities were Notified by the CPUC that they**

13                     **Could Include Proactive De-energization as Part of Their Fire**
                   **Prevention Plans Five Years Before the 2017 North Bay Fires**

14

15  In 2012, the CPUC revisited its decision to deny SDG&E's plan, clarifying that it should not
have been interpreted as an outright rejection of the option of shutting off power to prevent

16  fires. (Pitre Decl. Exhibit O [Decision 12-01-032] pg. 53). The Commission explained that a
utility could include de-energization as part of its fire-prevention plan but must first file an

17  application for authority to do so. (Id. at 51). 'The application shall demonstrate with a cost-
benefit analysis developed in accordance with the guidance provided by D.09-09-030 that the

18  benefits of shutting off power in terms of a net reduction in wildfire ignitions outweigh the
substantial costs, burdens, and risks that shutting off power would impose on customers and

19  communities affected by the shut off. The application must also include mitigation measures
to reduce or eliminate the inevitable adverse impacts caused by shutting off power.' (*Id.* at

20  51-52; *see also* Ordering Paragraph 6 at pg 175)."

21

22  **RESPONSE TO PARAGRAPH 44:**

23         PG&E admits that Paragraph 44 accurately quotes from pages 51 to 52 of the CPUC's

24  [21] Moreover, much of Decision 09-09-030 discusses why de-energization itself poses significant
safety risks, including a potentially increased risk of wildfire ignitions.  (*See id.* at 45.)  The CPUC

25  stated that it would approve SDG&E's Power Shut-Off Plan only if SDG&E could demonstrate that
"shutting off power results in a net reduction in wildfire ignitions during hazardous fire conditions"

26  and "the benefits of SDG&E's Power Shut-Off Plan outweigh the adverse impacts".  (*Id.* at 44.)  The
CPUC decided that SDG&E did not satisfy that standard.  (*Id.* at 71.)

27

28

January 2012 Decision 12-01-032 and that the CPUC states in the decision that Decision 09-09-030 should not be interpreted as a rejection of the option of shutting off power to prevent fires. PG&E disputes Plaintiffs' characterization of the decision as "revisiting" the CPUC's decision to deny SDG&E's proactive de-energization plan. As described by the CPUC, Disability Rights Advocates "represent[ed] that SDG&E . . . refused to commit to any plan for notifying customers when SDG&E anticipate[d] that it w[ould] shut off power for safety reasons pursuant to its statutory authority, or for helping customers to cope with statutory shut offs by providing shelter, evacuation assistance, generators, or financial assistance." (Pitre Decl. Exhibit P, Dkt. 1006-16 at 9.) Disability Rights Advocates was "concerned that shutting off power without notice or mitigation w[ould] place SDG&E's residential customers at serious risk, especially those with disabilities". (*Id.*) Disability Rights Advocates therefore petitioned the CPUC to modify Decision 09-09-030 to address these issues.

In Decision 12-01-032, the CPUC thus considered and decided whether to adopt additional regulations "to reduce the fire hazards associated with overhead power-line facilities and aerial communication facilities in close proximity to power lines" as a part of the CPUC's Order Instituting Rulemaking to Revise and Clarify Commission Regulations Relating to the Safety of Electric Utility and Communications Infrastructure Provider Facilities ("Safety OIR"). (Pitre Decl. Exhibit O, Dkt. 1006-15 at 9.)

Notably, the CPUC found in Decision 12-01-032 that the wildfire risk in Northern California was not comparable to that in Southern California, holding that "we will require investor-owned electric utilities (electric IOUs) in Southern California to develop plans to reduce the risk of severe windstorms igniting power-line fires during periods of high fire danger" (*id.* at 55), but that "[u]nlike Southern California, the need for electric utilities to develop fire-prevention plans in Northern California is not clear cut. To our knowledge, there has never been an instance in Northern California where strong winds have caused power lines to ignite large-scale wildfires". (*Id.* at 56 (footnote omitted)).

41

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

When the conditions in Northern California changed with the October 2017 North Bay Wildfires, PG&E developed a comprehensive de-energization program—its Public Safety Shutoff ("PSPS") program—in advance of the 2018 fire season. (*See* WSP at 94-109 (describing development of PG&E's PSPS program, scope of current program and planned enhancements).) As discussed in more detail below, that program was modeled on SDG&E's proactive de-energization program after performing extensive benchmarking with SDG&E in a variety of areas, including meteorology, operational processes, emergency response, restoration, communications and customer support. (*See* Response to Paragraph 50.)

## PARAGRAPH 45 OF PLAINTIFFS' SUBMISSION:

"**Approximately four months later, the CPUC issued a decision authorizing SDG&E to proactively shut off power in emergency situations when necessary to protect public safety**. (Pitre Decl. Exhibit P [Decision 12-04-024] pg. 35)."

## RESPONSE TO PARAGRAPH 45:

PG&E denies Plaintiffs' characterization of the CPUC's April 2012 Decision 12-04-024 and clarifies that Decision 12-04-024 reviewed a petition by the Disability Rights Advocates to modify Decision 09-09-030, (*see supra* ¶¶ 42-43), "to provide notice and mitigation, to the extent feasible and appropriate, whenever SDG&E shuts off power for public-safety reasons." (Pitre Decl. Exhibit P, Dkt. 1006-16 at 4.) The decision did not mandate that SDG&E proactively shut off power but provided additional guidance with respect to the CPUC's earlier determination (in Decision 09-09-030) that SDG&E had the statutory authority to shut off power in order to protect public safety. (*Id.*)

## PARAGRAPH 46 OF PLAINTIFFS' SUBMISSION:

"**Since 2014, SDG&E's electrical equipment has only caused 109 wildfires with only ONE wildfire being over 10 acres, and even that fire was contained before it reached 300 acres.** (See Pitre Decl., Exhibit A [CPUC Fire Incident Data submitted by PG&E, SoCalEd, and SDG&E for 2014-2017]). **Compare that to PG&E who caused 1552 wildfires during the same timeframe with 68 of those fires burning over 10 acres.** (Id.)"

1    **RESPONSE TO PARAGRAPH 46:**

2           PG&E admits that Paragraph 46 accurately calculates the number of fire incidents reflected

3    in the CPUC Fire Incident Data for 2014-2017, but otherwise denies the accuracy of Paragraph 46

4    and offers the following additional clarification.  *First*, the data Plaintiffs cite excludes the 2018 fire

5    season, during which SDG&E reported two fire incidents over ten acres.  (*See* CPUC Feb. 6 Br.,

6    Dkt. 1010 at 4.)  *Second*, a direct comparison does not take into account the significant differences

7    between SDG&E's and PG&E's territories.  As the CPUC explained in its supplemental submission

8    to the Court, "SDG&E's history and development of its de-energization program must be understood

9    in the context of SDG&E's service territory, which is considerably smaller and less geologically

10   diverse than PG&E's."  (*Id.* at 3.)  PG&E's territory covers more than 17 times the acreage of

11   SDG&E's territory, and PG&E has approximately five times the number of transmission and

12   distribution line miles of SDG&E.[22]  (*Id.*)  PG&E's territory includes more dense vegetation in more

13   rural areas than SDG&E's territory and, not surprisingly given its size, covers a far wider range of

14   climatic and topographical conditions.  (*See id.*; WSP at 18-19.)  *Third*, the fact that an ignition does

15   not spread and result in a catastrophic wildfire is also a function of conditions on the ground where

16   the ignition occurs (*e.g.*, whether the location contains dry fuel).

17   **PARAGRAPH 47 OF PLAINTIFFS' SUBMISSION:**

18                     "**iii.    The CPUC Outlined Basic Factors for SDG&E to Consider Prior
                              to De-energization and Ordered SDG&E to Submit A Report
19                             Each Time It Shut Off Power to Prevent A Wildfire**

20            In its decision authorizing SDG&E to proactively de-energize power lines, the CPUC made
         clear that the utility should first deploy other measures as an alternative to shutting off power.
21       '**These measures include reliance on sensitive relay settings to shut off power in
         milliseconds if there is an electrical failure caused by power lines falling to the ground
22       and disabling reclosers to keep power off until SDG&E can inspect its facilities** to

23

24   _____

25           [22] SDG&E serves two counties in Southern California covering approximately 4,100 square
     miles with 2,090 transmission and 23,479 distribution line miles.  PG&E serves 44 counties in
26   Northern California covering approximately 70,000 square miles with 18,466 transmission and
     106,681 distribution line miles.  *Id.*
27

                                              43
28                          RESPONSE TO REQUEST FOR INFORMATION
                                   Case No. 14-CR-00175-WHA

determine if it is safe to re-energize its power lines.' (Pitre Decl. Exhibit P [Decision 12-04-024] pgs. 30-31)."

**RESPONSE TO PARAGRAPH 47:**

PG&E admits that Plaintiffs accurately quote from the CPUC's April 2012 Decision 12-04-024 at pages 30 to 31, but denies Plaintiffs' characterization of the decision as authorizing SDG&E to proactively de-energize (*see supra* Response to ¶ 45), and clarifies that the decision states that SDG&E should rely on other measures "to the extent available" as an alternative to de-energization (Pitre Decl. Exhibit P, Dkt. 1006-16 at 32.). PG&E notes that, consistent with the CPUC's guidance, PG&E relies on alternatives to de-energization where possible because de-energization is a tool of last resort and refers to its response to Paragraph 20.

**PARAGRAPH 48 OF PLAINTIFFS' SUBMISSION:**

"SDG&E thereafter submitted a 39-page Fire Prevention Plan to the CPUC that provided 'a comprehensive inventory of the organizational and operational activities SDG&E undertakes in order to address the risk of fire in the SDG&E service territory.' (Pitre Decl. Exhibit Q [Attachment A to SDG&E Supplemental Advice Letter 2429-E-A 6/3/13 Fire Prevention Plan] pg. 4)."

**RESPONSE TO PARAGRAPH 48:**

PG&E admits that SDG&E submitted a Fire Prevention Plan to the CPUC in June 2013 and that Plaintiffs accurately quote from page 4 of that plan, but clarifies that SDG&E submitted the plan as required by Decision 12-01-032 (the CPUC's order in the Safety OIR), not in response to Decision 12-04-024 (the CPUC's review of its earlier decision regarding SDG&E's de-energization program).

**PARAGRAPH 49 OF PLAINTIFFS' SUBMISSION:**

"With respect to de-energization, SDG&E explained that **when the National Weather Service declared a Red Flag Warning, the utility would activate its Emergency Operations Center** – 'a secure and dedicated facility which serves as a command center for SDG&E operations under high- threat conditions.' (Pitre Decl. Exhibit Q [Attachment A to SDG&E Supplemental Advice Letter 2429-E-A 6/3/13 Fire Prevention Plan] pg. 27). That triggering event would also require certain senior managers and operating personnel to report to the Emergency Operations Center. (*Id.* at pg 27). **Those persons would then closely monitor the electrical system and, if necessary, shut off power 'in order to protect the**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**public safety and defend against the threat that SDG&E's electrical facilities will become a source of ignition.'** (Id. at pg 27)."

**RESPONSE TO PARAGRAPH 49:**

PG&E admits that Plaintiffs accurately summarize and quote portions of SDG&E's June 2013 Fire Prevention plan at page 27, but clarifies that the cited section does not concern SDG&E's Power Shut-Off Program specifically. Instead, de-energization is identified as one of a number of "appropriate and timely actions" SDG&E might take "as necessary in order to protect the public safety and defend against the threat that SDG&E's electrical facilities will become a source of ignition". (Pitre Decl. Exhibit Q, Dkt. 1006-17 at 33-37.)

**PARAGRAPH 50 OF PLAINTIFFS' SUBMISSION:**

"**iv.    PG&E Resisted the Notion of Utilizing De-energization to Prevent Wildfires Until After the North Bay Fires**

PG&E did not follow SDG&E's lead and implement a comprehensive approach to prevent wildfires. After the October 2017 fires erupted, the CPUC asked the following question as part of its post-fire investigation:

Some utilities, for example SDG&E, have procedures in place to proactively de-energize power lines when weather conditions indicate extremely high risks of fires (based on temperature, humidity, wind-speed and other factors). Does PG&E have similar procedures in place?

(Pitre Decl. Exhibit R [10/17/17 PG&E Response to Safety and Enforcement Division Question No. 5])"

**RESPONSE TO PARAGRAPH 50:**

PG&E admits that Plaintiffs accurately quote the CPUC Safety and Enforcement Division's Question 5, but denies Plaintiffs' suggestion that PG&E should have implemented a proactive de-energization program at the time that SDG&E did so. PG&E refers to its response to Paragraph 44 with respect to wildfire risk in Northern California.

In its 2012 Safety OIR decision, the CPUC found that the need for fire prevention plans in Northern California was "not clear cut" as it was in Southern California and noted that to its knowledge "there has never been an instance in Northern California where strong winds have caused

power lines to ignite large-scale wildfires".  (Pitre Decl. Exhibit O, Dkt. 1006-15 at 56.)  It was not until July 2018 that the CPUC expanded its de-energization regulations to apply to all investor owned utilities, which it did because "[r]ecent California experience with wildfires demands that we enhance existing de-energization policy and procedures".  CPUC Resolution ESRB-8 (July 16, 2018), at 5, *available at* http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M218/K186/-218186823.PDF.[23]  As the CPUC has reiterated in each of its decisions concerning de-energization, shutting off the power poses significant public safety risks and should only be used as a last resort after carefully balancing the relative risk of wildfire ignitions against the substantial costs, burdens and risks that shutting off power imposes.  (*See id.* at 4; Pitre Decl. Exhibit N, Dkt. 1006-14 at 5, 63-64; Pitre Decl. Exhibit P, Dkt. 1006-16 at 32-33.)  PG&E respectfully submits that the calculus for determining that a de-energization program was a necessary additional wildfire mitigation measure in Northern California did not shift until after the October 2017 fires.

Following the October 2017 North Bay Wildfires, PG&E developed a comprehensive de-energization program—its Public Safety Power Shutoff ("PSPS") program—in advance of the 2018 fire season.  (*See* WSP at 94-109 (describing development of PG&E's PSPS program, scope of current program and planned enhancements).)  PG&E's PSPS program was modeled on SDG&E's proactive de-energization program after performing extensive benchmarking with SDG&E in a variety of areas, including meteorology, operational processes, emergency response, restoration, communications and customer support.  (*Id.* at 95.)  In particular, PG&E utilized SDG&E's methodology for determining the circumstances under which it would initiate a PSPS, its early stakeholder communication strategy (including with customers) and its methods for determining

---

[23] The CPUC noted in its press release that prior to that time "regulations regarding de-energization applied only to San Diego Gas & Electric.  Today's decision extends the existing regulations to all electric investor-owned utilities in California and also strengthens the requirements."  CPUC Press Release, "CPUC Strengthens Utility Public Notice Requirements for De-energizing in Emergencies" (July 12, 2018), available at http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K918/217918600.PDF.

46

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

readiness for post-event patrols and verifying the safety of overhead facilities before re-energization. (*Id.* at 95-96.)

Consistent with SDG&E's de-energization plan, before making the decision to de-energize, PG&E considers numerous real-time factors, including red flag warnings, wind, weather and fuel conditions, ignition spread modeling and on-the-ground observations from its Emergency Operations Center teams. (*Id.* at 97-98.) PG&E also developed (based on SDG&E's practices) a comprehensive notification system designed to provide early and continuous communications with customers, local communities, first responders, health care facilities and other critical service providers, including in-person notification as needed for Medical Baseline customers.[24] (*Id.* at 100-109.)

In addition, like SDG&E, PG&E is implementing several key enhancements to its de-energization program in 2019, including increased density of weather stations and improved base meteorological modeling. (*Id.* at 87-88.) PG&E has also engaged the same company that SDG&E used to develop an advance fire ignition spread model tailored to PG&E's service area to help focus on the areas of highest risk. (*Id.* at 96.)

To be clear, PG&E did not—and cannot—adopt SDG&E's program wholesale because each system is different both in terms of its construction and the risks confronting the utility based on environmental, geographic and human factors; rather, using SDG&E's best practices, PG&E developed its de-energization program to fit the attributes of PG&E's service territory.[25] (*Id.*) In fact, in 2019, PG&E will expand its program's scope to include high voltage transmission lines (500 kV and below) in the Tier 2 and Tier 3 HFTD areas. (*Id.*)

---

[24] Medical Baseline customers are customers who rely on life-sustaining medical equipment that requires electricity or who require life-sustaining temperature control from heat and/or air conditioning.

[25] For example, SDG&E's de-energization decision factors include a Santa Ana Wildfire Threat Index. However, because Santa Ana winds are not prevalent in PG&E's Northern California service territory, PG&E's de-energization decision factors do not include a similar index.

47
RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

**PARAGRAPH 51 OF PLAINTIFFS' SUBMISSION:**

"PG&E replied, in pertinent part: 'PG&E does not have a procedure to de-energize power lines and thereby disable power service to its customers in advance of weather conditions that indicate extreme fire risk.' (Pitre Decl. Exhibit R [10/17/17 PG&E Response to Safety and Enforcement Division Question No. 5])"

**RESPONSE TO PARAGRAPH 51:**

PG&E admits that Plaintiffs accurately quote the first sentence of PG&E's response to the SED's Question No. 5 and refers to its Response to Paragraph 50 for further clarification.

**PARAGRAPH 52 OF PLAINTIFFS' SUBMISSION:**

"In response to the 2017 North Bay Fires, PG&E created a Community Wildfire Safety Program. (Pitre Decl. Exhibit S [Sept. 2018 PG&E Public Safety Power Shutoff Policies and Procedures] pg. 1) One component of that program was the 'Public Safety Power Shutoff' – PG&E's 'policies and procedures related to proactively turning off power for safety – and later restoring power – when necessary due to extreme weather and wildfire danger.' (Id.)"

**RESPONSE TO PARAGRAPH 52:**

PG&E admits Paragraph 52.

**PARAGRAPH 53 OF PLAINTIFFS' SUBMISSION:**

"**v.  In the Days and Hours Leading Up to the Camp Fire, PG&E Notified Paradise That It Was Considering De-Energization, But Never Turned the Power Off**

PG&E was aware in advance of the Camp Fire of the extreme fire danger presented by weather conditions on November 8, 2018. Two days earlier, on November 6, PG&E activated its Emergency Operations Center (EOC) 'due to forecasted weather conditions with increasing fire risk.' (Pitre Decl., Exhibit K [PG&E 11/2/7/2018 ESRB-8 Compliance Report for Potential Proactive De-energization]). PG&E then began notifying customers that it might be shutting down power in certain Northern California counties, including Butte County, on November 8 due to forecasted high winds and low humidity."

**RESPONSE TO PARAGRAPH 53:**

PG&E admits that it was monitoring the risk of extreme weather conditions and the potential for extreme fire danger presented by those weather conditions in advance of November 8, 2018. PG&E activated its EOC on November 6, 2018, and the same day, initiated communications regarding a potential PSPS event to state agencies (the CPUC, Cal OES, CAL FIRE and the

48

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1  Governor's Office), local first responders and community leaders, then initiated out-bound

2  communications to approximately 70,000 customers across portions of nine counties, including

3  Butte County, where the forecasted weather and wildfire potential indicated a high likelihood of

4  impact to PG&E's equipment and facilities.  (Pitre Decl. Exhibit K, Dkt. 1006-11 at 4.)  PG&E

5  continued to issue communications to potentially impacted customers multiple times from

6  November 6 through November 8, as discussed in PG&E's response to Paragraph 54.  (*Id.* at

7  Appendix Table A-2.)

8       For a complete and accurate description of the potential PSPS events of November 6 to 8,

9  2018, PG&E directs the Court to the PG&E Public Safety Power Shutoff Report to the CPUC.  (*See*

10  *generally id*. Exhibit K, Dkt. 1006-11.)

11  **PARAGRAPH 54 OF PLAINTIFFS' SUBMISSION:**

12       "PG&E followed up with 17 additional warnings over the next two days advising that it was
   going to shut off power on the morning of November 8. PG&E's warnings referenced

13  forecasts of sustained winds of 20 to 30 miles per hour, with gusts of 40 to 50 mph overnight
   Wednesday into Thursday and lasting until late afternoon.*

14

15  *[FN 9]:  https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-
   deadly-buttecounty- wildfire-according-to-radio-transmissions/."

16

17  **RESPONSE TO PARAGRAPH 54:**

18       PG&E denies the accuracy of Plaintiffs' description of "17 additional warnings over the next

19  two days" in Paragraph 54.  PG&E issued multiple notifications regarding the potential PSPS event

20  from November 6 to November 8, 2018, via telephone messages, emails, texts, website notices, news

21  releases and social media.  (Pitre Decl. Exhibit K, Dkt. 1006-11 at 4-6.)  The notifications' content

22  varied over time and by location, and different language was used for different notification modes.

23  (*Id.* at Appendix Table A-2.)  A November 7, 2018 PG&E press release advised of a potential power

24  shutoff on the morning of November 8, 2018, and stated that "sustained winds of 20 to 30 miles per

25  hour, with gusts of 40 to 45 miles per hour, are forecasted overnight Wednesday into Thursday".

26  (PG&E News Release (Nov. 7, 2018), *PG&E Continues to Closely Monitor Weather Conditions*

27  *Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties*, *available at*

28

49

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

1    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to

2    _closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_o

3    f_eight_counties.)  Other notifications did not specify the timing of a potential shutdown or detail

4    wind speeds.  (*See, e.g.*, Pitre Decl. Exhibit K, Dkt. 1006-11 at Appendix Table-A2.)

5           For a complete and accurate description of the potential Public Safety Power Shutoff events

6    of November 6 to 8, 2018, PG&E directs the Court to the PG&E Public Safety Power Shutoff Report

7    to the CPUC.  (*See generally id.* Pitre Decl. Exhibit K., Dkt. 1006-11.)

8    **PARAGRAPH 55 OF PLAINTIFFS' SUBMISSION:**

9           "**At 7:56 a.m. on the morning of November 8 - over an hour after the Camp Fire had**
     **already started - PG&E was still reporting that it may be shutting off power due to the**
10   **'potential extreme fire danger'. Unfortunately, PG&E never did turn off the power and**
     **86 people died.**"

11

12   **RESPONSE TO PARAGRAPH 55:**

13          PG&E denies Paragraph 55 and objects to Plaintiffs' suggestion that its decision not to de-

14   energize its distribution lines on November 8, 2018 was the reason that the town of Paradise was

15   tragically destroyed in the Camp Fire.

16          PG&E activated its Emergency Operations Center on November 6, 2018, "due to forecasted

17   weather conditions with increasing fire risk, including forecasted high winds and extremely low

18   humidity".  (Pitre Decl. Exhibit K, Dkt. 1006-11 at 4.)  That same day, PG&E initiated out-bound

19   communications across nine counties notifying customers of a potential PSPS event.  (*Id.*)  On

20   November 7, weather conditions remained consistent, nearing but not reaching forecasted levels that

21   would warrant a PSPS event.  (*Id.*)  By 1:00 p.m. on November 8, winds were decreasing, and

22   conditions were no longer forecast to approach levels warranting a PSPS event; consequently PG&E

23   did not shut off its lines.  (*Id.* at 5.)  Plaintiffs do not point to any evidence indicating that PG&E's

24   data were wrong or that the factors it considered in making its decision not to de-energize were

25   wrong.

26

27

28

For a complete and accurate description of the potential Public Safety Power Shutoff events of November 6 to 8, 2018, PG&E directs the Court to the PG&E Public Safety Power Shutoff Report to the CPUC.  (*See generally id.* Pitre Decl. Exhibit K., Dkt. 1006-11.)

\*      \*      \*

Although the Court did not order PG&E to respond to Plaintiffs' summary recommendations, PG&E is committed to significantly reducing the ignitions caused by its power lines and agrees that it must enhance its wildfire reduction programs to address the increased wildfire risk in Northern California.  It is focused on doing just that.  To that end, PG&E already has taken many of the measures Plaintiffs suggest it could take to mitigate wildfire risk and is continually working to improve on those measures.  PG&E thus addresses each of Plaintiffs' summary recommendations below.

**A.      PG&E's Response to Plaintiffs' Short-Term Recommendations**

      **i.      Immediate adoption of SDG&E's policies, practices and procedures for de-energizing conductors during prescribed high wind and high fire danger conditions.**

As PG&E stated to the Court at the January 30 hearing, after performing extensive benchmarking with SDG&E in a variety of areas relating to de-energization, including meteorology, operational processes, emergency response, restoration, communications and customer support, PG&E modeled its proactive de-energization processes and technologies on SDG&E's.  In particular, PG&E utilized SDG&E's methodology for determining the circumstances under which it would initiate a PSPS, its early stakeholder communication strategy (including with customers) and its methods for determining readiness for post-event patrols and verifying the safety of overhead facilities before re-energization.  (*See* WSP at 95-96.)

Consistent with SDG&E's de-energization plan, before making the decision to de-energize, PG&E considers numerous real-time factors, including red flag warnings, wind speeds and gusts,

<div align="center">51</div>

<div align="center">RESPONSE TO REQUEST FOR INFORMATION<br>Case No. 14-CR-00175-WHA</div>

weather and fuel conditions, ignition spread modeling[26] and on-the-ground observations from its Emergency Operations Center teams. (*Id.* at 97-98.) SDG&E and PG&E both share similar methodologies for making de-energization decisions, with neither relying on a set algorithm, but instead making the decision based upon an analysis of all relevant factors and criteria. (*Id.*)

PG&E also developed (based on SDG&E's practices) a comprehensive notification system designed to provide early and continuous communications with customers, local communities, first responders, health care facilities and other critical service providers, including in-person notification as needed for Medical Baseline customers and the use of multiple methods of notification, including phone, text, email, social media, local news and radio, to provide a wide reach of any notices. (*Id.* at 100-109.) PG&E's practice, similar to SDG&E's, is to provide 48 hours' notice to potentially impacted customers when and where possible.[27] (*Id.* at 6.)

In addition, like SDG&E, PG&E is implementing several key enhancements to its de-energization program in 2019, including increased system sectionalization, increased density of weather stations and improved base meteorological modeling. (*Id.* at 95-96.) PG&E has also engaged the same company that SDG&E used to develop an advance fire ignition spread model tailored to PG&E's service area to help focus on the areas of highest risk. (*Id.* at 96.)

To be clear, PG&E did not—and cannot—adopt SDG&E's program wholesale because each system is different both in terms of its construction and the risks confronting the utility based on environmental, geographic and human factors; rather, using SDG&E's best practices, PG&E developed its de-energization program to fit the attributes of PG&E's service territory. (*Id.*) In fact, in 2019, PG&E will expand its program's scope to include high voltage transmission lines (500 kV and below) in the Tier 2 and Tier 3 HFTD areas. (*Id.*)

---

[26] SDG&E's ignition spread modeling is based on current climate conditions. In 2018, PG&E's ignition spread modeling was based on historic climatology, but in 2019, PG&E is developing its ignition spread modeling on current climate conditions, consistent with SDG&E.

[27] Because weather conditions can change rapidly, 48 hours' notice is not always feasible.

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

PG&E notes as well that its de-energization program is the current focus of SB 901 and the CPUC-initiated Rulemaking 18-12-005 and respectfully submits that the Court permit the various stakeholders the opportunity to review and comment on PG&E's program.

ii. **Immediate concentration of inspections, tree removal and trimming focused on Tier 3 – Extreme areas identified in the CPUC Fire-Threat Map.**

Although PG&E agrees that vegetation work should be prioritized based on areas of high wildfire risk, PG&E does not agree that this work should focus only on Tier 3 HFTD areas. That is why the various wildfire reduction measures that PG&E implemented following the 2017 and 2018 wildfires are focusing on both Tier 2 and Tier 3 HFTDs. It is not enough to focus only on Tier 3 as the Tier 2 HFTD areas also present an elevated risk of wildfire and this risk must be addressed. PG&E is focused on both Tier 2 and Tier 3 HFTD areas, and is taking a nuanced, data-driven approach to prioritizing wildfire reduction work, including vegetation management, within those areas, as even within each area the risk may vary. As discussed in its Wildfire Safety Plan, PG&E analyzed historical outages and corrective maintenance notifications to inform the type of asset conditions that could lead to wildfire risk, and used this analysis to assess wildfire risk for individual circuits considering three components: (1) likelihood of asset failure; (2) risk of wildfire spread and consequence; and (3) egress risk (*i.e.*, ease of entering/exiting a town in the event of an evacuation). (WSP at 32-34.)

This updated wildfire risk circuit prioritization presents a more robust approach to assessing potential wildfire risk across PG&E's service territory—not just those portions of its territory that are classified as Tier 3—and therefore should be more effective at reducing wildfire risk than Plaintiffs' proposal. For example, PG&E used its findings to shift the timing of its 2019 enhanced and accelerated inspection schedules (when each circuit will be inspected and subsequently worked), including vegetation management inspections. Similarly, PG&E is using this information to develop a new vegetation management distribution routine inspection cycle, which will take into consideration relative wildfire risk, regrowth patterns and local weather and environmental

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

conditions throughout the year.  PG&E anticipates that this will result in a substantially realigned routine vegetation management plan that schedules the highest risk circuits in both Tier 2 and Tier 3 HFTD areas for inspection and work prior to the peak of the wildfire season, while at the same time scheduling inspection and work for other circuits such that they are inspected in accordance with relevant state laws and regulations.

### iii. Any prior ambiguity over clearing of hazard trees near lines must be clarified to specifically include overhanging branches.

As CAL FIRE stated in its February 6, 2019 submission, Public Resource Code § 4293 requires that utilities remove overhanging branches that are *within* the applicable clearance area. (*See* CAL FIRE Br., Dkt. 1012 at 3.)  Regardless of what the regulation requires, however, in Tier 2 and Tier 3 HFTD areas, PG&E, as part of the Enhanced Vegetation Management Program, is removing overhanging branches around electric power lines even if they do not fall within the applicable clearance area.  In 2019, PG&E plans to clear overhangs in approximately 2,450 distribution circuit miles in Tier 2 and Tier 3 HFTD areas.  On the electric transmission system, all circuits are planned to be inspected and worked in 2019 to remove overhangs.[28]

## B.   PG&E's Response to Plaintiffs' Long-Term Recommendations

### i. Evaluation and re-structure of the process used to assess and manage wildfire risk.

As stated above in response to Plaintiffs' short-term recommendation two, in response to the increased wildfire risk in Northern California, PG&E's process to assess and manage wildfire risk has evolved since the October 2017 North Bay Wildfires, and PG&E continues to refine its process.  PG&E agrees that it cannot continue to use its prior risk approach in light of the

---

[28] Due to the historically broader clearances maintained between transmission lines and vegetation and a practice of preventing direct overhangs of transmission lines, the number of trees anticipated to require work to align the electric system with this scope will be significantly less than for the distribution system.

significantly increased risk of wildfire in its service territory.  Accordingly, since October 2017, PG&E has made some significant refinements to its risk model.  *First*, PG&E revised the number of overhead circuit miles considered to be exposed to wildfire risk based on the CPUC's January 2018 HFTD Map.  (WSP at 21.)  In addition, PG&E began using wind-related outage data from certain wind events and the data collected in connection with its Fire Incident Data Collection Plan for the CPUC to further expand its understanding of the highest risk areas within the HFTD areas.  (*Id.* at 25.)  *Second*, PG&E updated its assumptions regarding the likelihood of various factors to cause ignitions (*e.g.*, vegetation, equipment failure) based on this change in overhead circuit miles as well as more recent fire incident data.  (*Id.* at 21.)  This demonstrated to PG&E that the primary drivers for ignition risk varied between distribution lines (vegetation) and transmission lines (animal actions), providing insight into how risk mitigation options may need to be deployed.  (*Id.* at 27-28.)  *Third*, PG&E has taken a more comprehensive evaluation of wildfire risk mitigation options, including a detailed assessment of the likelihood that specific measures could have reduced past fire incidents.  (*Id.* at 22.)  *Finally*, PG&E Meteorology's Fire Potential Index is applied to 91 locations across the entire HFTD area to capture sections of the service area with consistent fuel, topography and exposure to meteorological conditions at a more granular level for more accurate weather forecasting.  (*Id.* at 30.)

Following the 2017 and 2018 wildfires, PG&E used its updated analysis to help design and implement additional programs intended to address the increased wildfire risks as well as improve situational awareness, mitigation and response.  (*Id.* at 22.)  This revised methodology, in conjunction with benchmarking results from several other utilities, informed the basis for the EVM and system hardening programs that PG&E has implemented.  (*Id.* at 31.)

In addition, PG&E is partnering with the B. John Garrick Institute for the Risk Sciences, University of California Los Angeles to leverage the rigorous modeling used in the nuclear power industry to perform thorough and complex wildfire risk assessments and management planning.  (*Id.* at 35.)  PG&E has used a probabilistic risk assessment model for over 30 years at its Diablo Canyon Nuclear Power Plant.  (*Id.*)  The model is regularly updated with, among other

55

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

inputs, state of the art analysis methodologies, and is capable of performing quantitative assessment of risks from a multitude of complex factors (*e.g.*, seismic events, fire and flooding).  (*Id.*)  The model can also quantitatively risk rank over 3,000 individual system components.  (*Id.*)  PG&E is planning to develop a similar model for wildfire risks for its electrical assets within HFTD areas. (*Id.*)

> ii.    **Adoption of a mandatory process for training and certification of individuals assigned to identify trees that pose a hazard to electrical conductors, in addition to required continuing education and re-certification of inspectors every three years.**

As stated in response to Paragraph 31, PG&E contracts with well-established, large scale vendors who are qualified and trained.  Although PG&E relies on these contractors to train their workers, PG&E requires that its contractors annually review PG&E's policies to drive consistency across its vegetation management work.  In 2018, PG&E began requiring each contractor to submit a roster verifying that its employees were trained on the required PG&E procedures.  PG&E also provides two days per year of training to all pre-inspectors to align on safety practices and relevant procedures and, in 2019, PG&E began implementing additional training modules for its vegetation management contract employees.  For 2019, the first of these modules, covering key policies related to vegetation management patrols and tree work, is currently underway and will continue through May 2019.

Historically, PG&E has required supervising contract employees who oversee pre-inspectors to become certified arborists or certified utility specialists within one year of becoming a supervisor. Beginning in 2019, PG&E is also requiring that the pre-inspectors themselves become certified arborists or certified utility specialists within an allotted time frame.[29]  Many of these pre-inspectors

---

[29] Pre-inspectors have a range of minimum qualifications depending on their seniority, and pre-inspector rank ranges from Levels I through IV.  New pre-inspectors (CUF-I) must have, at a minimum, one year of arboricultural experience or certifications as an arborist or utility specialist or a two-year degree or higher in a related field.  CUF III pre-inspectors are required to become certified arborists or utility inspectors within one year, and a CUF-IV pre-inspector must already have said qualifications.

56

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

hold industry certifications.  PG&E plans to implement a program to verify and record contractor certifications later this year.  Maintaining these certifications already requires completing continuing education requirements as well as recertification every three years.

PG&E is also continuing to explore all available options to hire additional trained pre-inspectors who will be employees of PG&E, including by exploring partnerships with the relevant unions and contractors to create new training programs so that additional qualified workers can be deployed as soon as possible.

### iii. Prohibition against Facility Protection work being carried over from year to year.

PG&E has already implemented plans to significantly reduce the percentage of trees that are carried over from one year to the next; these plans apply to all trees identified for work, not only facility protection trees.

All trees identified for work by pre-inspectors are evaluated for the urgency of the required tree work.  If tree failure is judged to be possibly imminent, a crew will be dispatched the same day.  Trees can also be flagged for immediate follow up work, while trees that require work but show no near-term risk factors are scheduled following the standard process.  The standard cycle time for trees exhibiting no near-term risk factors would be expected to be in the 60- to 90-day range after the completion of the pre-inspection activity.  This means that some trees identified for work in one period (year, quarter, etc.) will not be worked on until the next period.  Although these trees are sometimes referred to as "carryover" trees, they do not represent a higher risk or a risk left un-addressed; they are simply trees where the normal work cycle resulted in them falling on the other side of a particular date.

Given the current risk environment and PG&E's understanding that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines, PG&E has taken steps to

significantly reduce the percentage of trees that are carried over from one year to the next.[30]  To that end, PG&E recently entered into new contracts in vegetation management services indicating that if any contractor is unable to complete all of the work assigned to them, they are required to inform PG&E and PG&E will, at the contractor's expense, locate additional resources to complete any remaining work.  PG&E is monitoring contractor compliance at both a regional and system-wide level.

> **iv.  Establishing budgets and timetables for burying lines underground or insulating lines in areas of higher fire danger.**

PG&E already has a forecasted budget and timeline for burying lines underground or insulating lines in HFTD areas and is already replacing overhead distribution primary and secondary conductor with insulated conductor or engaging in targeted undergrounding in HFTD areas.  (*See* WSP at 63, 66-67; 2020 General Rate Case, Dkt. 976-6 at 397-400.)  In 2018, PG&E initiated construction pilots to evaluate various overhead conductor and equipment configurations, including potential undergrounding, and to develop best practices.  PG&E completed initial insulated conductor projects on approximately 17 circuit miles of distribution lines in 2018.

PG&E's target for 2019 is to complete 150 circuit miles, and in 2020-2022, PG&E forecasts completing work on approximately 600 circuit miles per year.  (WSP at 63.)  The precise scope of hardening work (*e.g.*, whether to install insulated conductor or underground lines) will be site-specific and dependent on local conditions.  Where appropriate, PG&E may perform some undergrounding of select overhead lines.  PG&E intends to complete this work on 7,100 circuit miles and expects that completion will take approximately ten years due to the constraints on available qualified personnel and materials.

---

[30] Because of external factors beyond PG&E's control, such as customer refusals and certain environmental restrictions, it may be the case that PG&E has to carry over a limited number of trees from one year to another.  For example, there may be instances in which work is delayed because a customer refuses to permit PG&E to conduct necessary vegetation management work or because a particular environmental permit is required prior to the work's commencement.  Where such conditions exist, PG&E may be required to obtain permits or discontinue electric service to the area until the issue is resolved.

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

> **v.    Corporate Governance:  creation of a wildfire safety and risk management committee composed of three qualified process safety and risk management officers.**

PG&E does not believe that the creation of an additional committee is the most effective way to further mitigate wildfire risk.  As PG&E has previously discussed with the Court, there are several layers of regulatory oversight—both state and federal—of its activities.  In addition to oversight from these state and federal agencies, PG&E also has the oversight of the Monitor, whom PG&E has invited to take a more active role in reviewing and monitoring the progress of PG&E's wildfire mitigation work.  PG&E does not object to expanding the Monitor's remit, and is willing to consider other enhanced controls in addition to those it is already implementing, but does not agree that an additional oversight committee is a necessary or efficient control.

Further, in 2018, PG&E initiated the Community Wildfire Safety Program ("CWSP") to work closely with first responders, customers and communities, to implement new and enhanced safety measures to help reduce wildfire risk and to improve situational awareness and emergency response.  (WSP at 12.)  The CWSP utilizes a risk-based approach to identify and address the assets most at risk of wildfire ignition and in areas with greatest potential fire spread to inform the development of wildfire and safety programs.  (*Id.*)

To support this recommendation, Plaintiffs state that "independent analysis continues to confirm that PG&E's safety culture and governance are lacking".  (Plf. Br. at 15-17.)  Two of the three documents Plaintiffs cite in support of that claim, however—excerpts from a deposition discussing PG&E's risk management program in 2007 and a 2011 report of the CPUC's Independent Review Panel following the San Bruno gas explosion—do not speak to PG&E's safety culture and governance today.  The only recent review of PG&E's safety culture that Plaintiffs cite is the May 2017 report of NorthStar Consulting Group ("NorthStar"), whose recommendations PG&E actively supports.

In August 2015, the CPUC opened a proceeding to review PG&E's safety culture and engaged NorthStar to evaluate PG&E's "organizational culture, governance, policies, practices, and accountability metrics in relation to PG&E's record of operations, including its record of safety

<div align="center">59</div>

incidents, and to produce a report on the issues and questions contained in this order". (Pitre Decl. Exhibit M, Dkt. 1006-13 at 5.) NorthStar began its review in April 2016 and conducted detailed fieldwork from May to December 2016. In its report, NorthStar notes that it was provided "unfettered access to PG&E personnel and executive management", including Board committee meetings, executive management meetings and internal self-assessments. (*Id.* at 10.)

First and foremost, NorthStar affirmed "PG&E employees at all levels are committed to safety". (*Id.*) NorthStar noted that both "PG&E executive management" and "field employees" are committed to safety. (*Id.*) NorthStar also found that "PG&E has made positive strides in embedding a safety consciousness throughout the workforce" and "has placed a heavy emphasis on training to improve safety performance and promote a positive safety culture". (*Id.* at 12.)

At the same time, NorthStar identified opportunities for improvement, including the need for a comprehensive company-wide health and safety plan and lack of clarity regarding the roles and responsibilities of PG&E's Corporate Safety organization and Chief Safety Officer. NorthStar made 60 recommendations for PG&E to address these and other safety and governance issues. PG&E embraced NorthStar's work and advocated for the CPUC to adopt its recommendations. In fact, PG&E began implementing NorthStar's safety culture recommendations immediately and had implemented the vast majority of them by the end of 2018. PG&E intends to implement the remainder of NorthStar's recommendations by this July.

1

2
Dated:  February 22, 2019

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

JENNER & BLOCK LLP

By:    /s/ Reid J. Schar
       Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:    /s/ Kevin J. Orsini
       Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By:    /s/ Kate Dyer
       Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS
AND ELECTRIC COMPANY

61

RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

# Exhibit 97

1  AROCLES AGUILAR, SBN 94753
   CHRISTINE JUN HAMMOND, SBN 206768
2  CHRISTOFER NOLAN, SBN 229542
   California Public Utilities Commission
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 703-2682
   Facsimile:  (415) 703-4592
5  cjh@cpuc.ca.gov
6

**FILED**

**JAN 28 2019**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

7  Attorneys for the California Public Utilities Commission and
   Michael Picker, Liane Randolph,
8  Martha Guzman Aceves, and Clifford Rechtschaffen,
   in their official capacities as
9  Commissioners of the California Public Utilities Commission

10

11              **UNITED STATES DISTRICT COURT**

12          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN FRANCISCO DIVISION**

14

15  UNITED STATES OF AMERICA,              Case No. 14-CR-00175-WHA

16                  Plaintiff,             **COMMENTS OF THE**
                                           **CALIFORNIA PUBLIC UTILITIES**
17      vs.                                **COMMISSION IN RESPONSE TO**
                                           **ORDER TO SHOW CAUSE**
18  PACIFIC GAS AND ELECTRIC COMPANY,

19                  Defendant.             Hearing Date: January 30, 2019
                                           Time:        9:00 a.m.
20                                         Courtroom:   12, 19th Floor
                                           Judge:       Hon. William H. Alsup
21

22

23

24

25

26

27

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
835 of 1229

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................................ 1

II.  THE CPUC'S AUTHORITY TO REGULATE ELECTRIC UTILITIES IS
     COMPREHENSIVE AND BALANCES A WIDE RANGE OF PUBLIC
     INTERESTS AND POLICIES. ................................................................................... 3

     A.   The CPUC's Regulation of Public Utilities Derives from the Police
          Power of the State. ............................................................................................ 3

     B.   The Reach of and the Public's Dependence on Reliable Public Utility
          Services Necessitates the CPUC's Broad Discretion to Regulate Public
          Utilities. ............................................................................................................ 6

III. THE CPUC IS CURRENTLY IN THE MIDST OF IMPLEMENTING SB 901
     AND JUST INITIATED ITS LATEST DE-ENERGIZATION RULEMAKING,
     BOTH OF WHICH BUILD ON EXISTING WILDFIRE PREVENTION AND
     MITIGATION INITIATIVES. .................................................................................... 8

     A.   California Senate Bill 901 Mandates an Enlargement of Statewide
          Wildfire Mitigation Efforts and Enhanced Wildfire Mitigation Plans. ............. 8

     B.   The CPUC's Current Regulations for De-Energization Require A Utility
          to De-Energize Its Electrical System Only After Fully Informing
          Affected Persons of De-Energization and Only After Reasonably
          Limiting the Impacts. ....................................................................................... 11

          1.   The CPUC, CAL FIRE, and the California Office of Emergency
               Services Have Collaborated on De-Energization Notification
               Improvements. ........................................................................................ 13

     C.   The CPUC Very Recently Initiated a Rulemaking to Improve Electric
          De-Energization in Dangerous Conditions, With A Focus on Providing
          a Broad Forum to Receive Comments from Utility Customers, First
          Responders, Local Communities, and Anyone Affected by De-
          Energization Events: ........................................................................................ 13

     D.   SB 901 Sits Atop Recently-Adopted and Now-Coalescing CPUC
          Measures Intended to Enhance Wildfire Prevention, Suppression, and
          Mitigation. ...................................................................................................... 15

          1.   A Recent MOU Between the CPUC and CAL FIRE Ensures Close
               Cooperation and Draws From CAL FIRE's Expert Knowledge of
               Wildfire Prevention, Suppression, and Mitigation. ................................. 15

          2.   The CPUC Has Recently Developed, Adopted, and Employed a
               Comprehensive Statewide Fire Mapping Project. .................................... 16

          3.   Vegetation Management Is an Resource-Intensive Undertaking That
               Requires a Reasonable Schedule to Effectively Accomplish. ................... 17

CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

IV. THE CONSEQUENCES OF THE PROPOSED NEW TERMS OF PROBATION
WOULD HAMPER FIREFIGHTING CAPABILITIES AND CAUSE BROADER
NEGATIVE IMPACTS TO PUBLIC HEALTH AND SAFETY ...........................20

    A.   Loss of Electric Power Will Negatively Impact Communications
Services Supporting Both Wildfire-Suppression Capabilities and the
General Public. ...............................................................................................21

        1.  First Responders Rely on Utility Electric Services to Meet the
Demands of Emergency Situations...........................................................21

        2.  Wireline Infrastructure Network Power. ....................................................23

        3.  Electric Utilities. ........................................................................................24

        4.  Experience Demonstrates that De-Energizations Result in Lost
Phone Service. ...........................................................................................24

        5.  Local Government Impacts...........................................................................25

        6.  Public Reliance and Vulnerable Populations..............................................26

    B.   Impacts of Loss of Power On Potable and Agricultural Water Services
and Wastewater and Sewer Services .................................................................26

    C.   Impacts of De-Energization on Vulnerable Communities  and On
General Public Health, Safety, and Wellbeing .................................................29

V. CONCLUSION .............................................................................................................31

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
837 of 1229

1  **I.    INTRODUCTION**

2          At the invitation of the Court, the California Public Utilities Commission ("CPUC")

3  comments on the Court's "Order to Show Cause Why PG&E's Conditions of Probation

4  Should Not Be Modified" (ECF 961).

5          According to CAL FIRE and the California State Board of Forest and Fire

6  Protection, "California now often experiences a year-round fire season, with an increase in

7  both the number and the intensity of large, damaging wildfires." Cal. Assembly Bill 2911

8  (2018, Friedman), § 1(a)(4).  The increased frequency and intensity of large wildfires in

9  recent years is caused in significant part by climate change. *See id.*, § 1(a)(5).  Some of

10  those devastating wildfires have been traced to a utility-asset ignition source; in some cases

11  the utility violated safety regulations and prudent operator standards, in others the utility did

12  not.  Since the catastrophic wildfires in Southern California in 2007, the CPUC has stepped

13  up efforts to mitigate the risk of utility-sourced wildfires.  Among other actions and orders,

14  the CPUC now requires that public utilities prioritize their asset management and

15  expenditure plans according to a safety risk-ranking; strengthened its regulations governing

16  the minimum safety standards of overhead electrical infrastructure (e.g., the CPUC's

17  General Order 95); and continually improves the required protocols for electric grid de-

18  energization so as to maximize public safety.  Despite our best efforts to date, utility-caused

19  wildfires are still occurring, and the CPUC recognizes the need to redouble wildfire

20  prevention efforts, which we are presently doing.  The State Legislature recently passed a

21  comprehensive statewide wildfire mitigation framework, Cal. Senate Bill 901 (2018, Dodd)

22  ("SB 901"), which builds upon and enlarges existing CPUC regulatory tools:  de-

23  energization protocols, vegetation management, and utility wildfire mitigation plans.  The

24  CPUC is working closely with CAL FIRE and other state and local agencies to order utilities

25  to begin implementing those wildfire mitigation plans by May 2019.

26          The Court's proposed order is motivated by a desire to "reduce to zero the number of

27  wildfires caused by PG&E in the 2019 Wildfire Season." OSC at 3.  The proposed order

28

1   would have Defendant Pacific Gas and Electric Company ("PG&E") operate only those
2   parts of its electrical system that actually have been re-inspected, rated and certified under
3   oath as safe in specific wind conditions (little wind to high wind), and operation is restricted
4   to the wind conditions for which it was rated safe and certified.

5       In practice, the proposed order will in all likelihood conflict with and frustrate the
6   extensive federal statutory and state Constitutional and statutory regulatory scheme under
7   which the CPUC regulates PG&E. California statutory law and CPUC orders allow electric
8   utilities to selectively de-energize portions of their system under carefully considered,
9   specified conditions. *See, e.g.,* Rulemaking 18-12-005 (**Exhibit 1**), at 4, citing Cal. Pub.
10  Util. Code §§ 451 and 399.2(a). More recently, the CPUC, CAL FIRE, and the California
11  Office of Emergency Services have jointly communicated their expectations that electric
12  utilities follow specified guidelines and protocols for an effective, safe, and orderly de-
13  energization event and to minimize unintended negative consequences. *See* Letter from
14  CPUC, CAL FIRE, and California Office of Emergency Services to PG&E, Southern
15  California Edison Company, and San Diego Gas & Electric Company, dated October 26,
16  2018 (**Exhibit 2**). Recognizing "the stark new reality of wildfire events in California," the
17  CPUC only last month instituted a rulemaking to improve upon existing de-energization
18  protocols in order to minimize unintended negative consequences to emergency response
19  services and to public health and safety. CPUC Rulemaking 18-12-005 (**Exhibit 1**).

20      The proposed order would also likely conflict with state law requiring public utilities
21  to provide both safe and reliable electric service, *without compromising either policy. See*
22  Cal. Pub. Util. Code §§ 451, 854.2. This statutory mandate is in tension with the proposed
23  order's exclusion of reliability considerations. Reliable electric service provides
24  irreplaceable sustained support for emergency, public health, and safety services throughout
25  the State in the form of: emergency calls, dispatch, triage, evacuation orders, and other
26  forms of emergency communication; water pumping, fire hydrant services, the provision of
27  potable water to millions of households, and the operation of sewer and wastewater services;
28

1   operational support for hospitals, outpatient and nursing care facilities, as well as powering

2   medical equipment in private homes; and public street lighting at night and during

3   conditions with impaired visibility such as smoke-congestion caused by wildfires and heavy

4   storms.  Loss of electric service puts vulnerable populations at particular risk, as they might

5   depend on others or community support services to function independently or perform daily

6   activities, and de-energization disrupts these "lifelines."  The operation of all branches and

7   agencies of government, including the courts, legislative bodies and local governments,

8   public welfare agencies, police, and schools, depends on electrical service.  Public

9   transportation (electricity-powered buses and trains) could also be negatively affected.

10  California's electric public utilities are also necessary to support military bases and

11  components of the defense industrial base, large business enterprises such as heavy industry

12  and manufacturing, agriculture, and server farms and computing/programming, and vital

13  medium- and small-business enterprises like grocery stores and gas stations.  Even basic

14  financial transactions (electronic direct deposit of paychecks, on-line bill-paying, use of

15  credit card payment machines, and ready access to cash) could be rendered inoperable

16  without electricity to run computer systems and ATM machines.

17         The CPUC submits that the most appropriate response plan for insuring the safety of

18  California before, during, and after the 2019 Wildfire Season is to avoid conflicting with the

19  CPUC's ongoing exercise of exclusive jurisdiction to regulate the safe and reliable operation

20  of the electric system at just and reasonable rates.  The Court should accordingly allow the

21  CPUC's investigations, rulemakings, and other regulatory processes to continue, and to

22  refrain from implementing the proposed order.

23  **II.    THE CPUC'S AUTHORITY TO REGULATE ELECTRIC UTILITIES
          IS COMPREHENSIVE AND BALANCES A WIDE RANGE OF**

24  **       PUBLIC INTERESTS AND POLICIES.**

25         **A.    The CPUC's Regulation of Public Utilities Derives from the Police
                  Power of the State.**

26

27         Reliable electric utility service is in many ways a human necessity.  *See* Cal. Pub.

28  Util. Code § 739(b).  The use of and dependence on electrical service is so varied, far-

1    reaching, and consequential that any question of de-energization would best be considered in

2    an open and public rulemaking.  *See*, e.g., discussion of consequences of the Court's

3    proposed order in Section IV, below.  The simultaneously *safe* operation of the electrical

4    system and the *reliable* provision of electric utility service are necessary to support public

5    health, safety, and well-being.  "Reliable electric service is of utmost importance to the

6    safety, health, and welfare of the state's citizenry and economy." Cal. Pub. Util. Code §

7    330(g).  Because of this, "[t]he regulation of utilities is one of the most important functions

8    traditionally associated with the police power of the States." *Arkansas Elec. Coop. Corp. v.*

9    *Arkansas Public Serv. Comm'n,* 461 U.S. 375, 377 (1983), citing *Munn v. Illinois*, 94 U.S.

10   113, 24 L.Ed. 77 (1877).  Central to this State police power to regulate public utilities is the

11   safety regulation of those public utilities.  The State's police powers are so broad as to

12   permit regulation that might affect interstate commerce (in the absence of Congressional

13   intent to preempt).  *See*, *e.g.*, *California v. Thompson*, 313 U.S. 109, 115-116 (1941)

14   (upholding the authority of the California Railroad Commission (the CPUC's predecessor)

15   to regulate the safety of transport agents operating in both interstate and interstate

16   commerce, absent Congressional preemption); *Bradley v. Pub. Utils. Comm'n of Ohio*, 289

17   U.S. 92, 95-96 (1933).

18       The CPUC is an agency of state constitutional origin with far-reaching duties,

19   functions and powers.  *See* Cal. Const., art. XII, §§ 1-6.  The California Constitution confers

20   broad authority on the CPUC to regulate utilities, including the power to fix rates, establish

21   rules, hold various types of hearings, award reparation, and establish its own procedures.

22   Cal. Const., art. XII, §§ 2, 4, 6.  The CPUC's powers are not restricted to those expressly

23   mentioned in the Constitution.  "The Legislature has plenary power, unlimited by the other

24   provisions of this constitution but consistent with this article, to confer additional authority

25   and jurisdiction  upon the commission . . . . (Cal. Const., art. XII, § 5.)" *Consumers Lobby*

26   *Against Monopolies v. Public Utilities Com.*, 25 Cal.3d 891, 905 (1979); *San Diego Gas &*

27   *Electric Co. v. Superior Court*, 13 Cal.4th 893, 914-915 (1966).  The CPUC's authority to

28

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
7 of 12

1  regulate investor-owned electrical utilities is expansive because such regulation is a complex

2  matter that must capture and balance wide-ranging interests.  *See In re. Permian Basin Area*

3  *Rate Cases*, 390 U.S. 747, 767 (1968) (state public utility commissions "must be free, within

4  the limitations imposed by pertinent constitutional and statutory commands, to devise

5  methods of regulation capable of equitably reconciling diverse and conflicting interests").

6  In California, the wide-ranging interests in electric utility regulation include:  safety,

7  reliability, cost-reasonableness and affordability, universal and non-discriminatory access,

8  greenhouse gas emissions reduction, environmental justice, and State environmental

9  policies.  *See, e.g.,* Cal. Const., art. XII, § 4; Cal. Pub. Util. Code §§ 451, 454.54, 379.6, and

10  740.8.

11          In public utility regulation, safety, reliability, and consideration of costs and timing

12  are never considered in isolation.  A utility's costs of programs such as vegetation

13  management, safety inspections, and asset repair and replacement must be orderly and

14  executed over a schedule of years.  A public utility has a constitutional right to recover in its

15  rates all just and reasonable and prudently-incurred costs to own and safety and reliably

16  operate its electrical system.  *See, e.g., Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989);

17  *Federal Power Comm'n v. Hope Natural  Gas Co.* 320 U.S. 591 (1944); and *Permian Basin*,

18  390 U.S. at 767.  Because a public utility's capital and operations expenditures are

19  oftentimes so capital-intensive, utility ratemaking generally either orders cost-recovery over

20  a period of time to normalize and equitably socialize these costs, or else paces the incursion

21  of costs for the same reasons.[1]

22

23

24  ─────────────────

25  [1] To illustrate, in the aftermath of PG&E's intrastate gas transmission pipeline explosion in
   San Bruno in September 2010, the CPUC ordered all intrastate gas pipeline owners to
   develop a comprehensive Pipeline Safety Enhancement Program to pressure test their entire

26  systems, replace equipment if necessary, update records, and other safety actions.  The
   CPUC ordered that the Pipeline Safety Enhancement Program work plans be executed over

27  a number of years, and approved the ratemaking associated with work plans to normalize the
   rate impacts on customers.

28

CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1
2

**B.      The Reach of and the Public's Dependence on Reliable Public
Utility Services  Necessitates the CPUC's Broad Discretion to
Regulate Public Utilities.**

3      PG&E's electrical system is not islanded.  Its system is inextricably connected to and

4   interdependent with other electrical systems:  PG&E's electric transmission system delivers

5   electricity across its system to serve customers of the Southern California investor-owned

6   public utilities, as well as the Sacramento Municipal Utility District and other municipalities

7   that operate their own electric public utilities (e.g., Anaheim, Azusa, Banning, Colton,

8   Pasadena, and Riverside), and supports neighboring states in the Western Interconnection.

9   For this reason, and because the CPUC's regulation of electric utilities is so comprehensive,

10   the regulation of California's electrical utilities, and by extension the de-energization of an

11   electrical system, must be done in an orderly, deliberate, and unified manner.  This is

12   particularly true where wildfires are a statewide challenge.

13      The California Legislature has conferred broad regulatory powers to the CPUC.

14   Pub. Util. Code § 701 provides, "The commission may supervise and regulate every public

15   utility in the State and may do all things, whether specifically designated in this part or in

16   addition thereto, which are necessary and convenient in the exercise of such power and

17   jurisdiction."  Where necessary, the CPUC exercises its broad authority to pursue

18   nontraditional regulatory tools where traditional tools fail to achieve the statutorily-

19   mandated safe and reliable electric service.

20      For example, while committing to safety in the aftermath of the San Bruno pipeline

21   explosion, PG&E continued – and continues – to cause and experience safety failures.  The

22   CPUC recognizes the limited effectiveness of traditional regulatory enforcement

23   mechanisms – civil fines and equitable penalties – to realize a safe and reliable utility

24   system.  The CPUC has aggressively sought other remedial tools to improve PG&E's safety

25   performance, most notably through its investigation into PG&E's governance and safety

26   culture.  *See* CPUC's *Order Instituting Investigation on the Commission's Own Motion to*

27   *Determine Whether Pacific Gas and Electric Company and PG&E Corporation's*

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page

1  *Organizational Culture and Governance Prioritize Safety*, Investigation 15-08-019, 2015

2  WL 5256612 (September 2, 2015) ("Safety Governance Investigation"). After a thorough

3  investigation by the CPUC Safety and Enforcement Division's consultant, NorthStar

4  Consulting Group, the CPUC ordered PG&E to implement all 61 of NorthStar's safety

5  recommendations by July 1, 2019. *See Decision Ordering Pacific Gas and Electric*

6  *Company to Implement the Recommendations of the NorthStar Report*, Decision 18-11-050,

7  2018 WL 6566915 (December 5, 2018). Some of these recommendations include

8  developing a comprehensive safety plan and updating it every two years, improving the

9  safety credentials of its Board of Directors, its Corporate Safety Officer, and among

10 personnel in PG&E's safety functions and organizations, methodologically separating safety

11 expenditures from routine reliability and integrity expenditures, aligning compensation with

12 safety performance, and improving training and communications. *See* NorthStar Consulting

13 Group, *Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric*

14 *Company's Safety Culture* (May 8, 2017), CPUC Decision 18-11-050, Appendix A.

15 Just within the past two months, the CPUC issued a new order in the pending Phase

16 2 of the Safety Governance Investigation. There, the Assigned Commissioner recognized

17 the "failure of PG&E to develop a comprehensive enterprise-wide approach to address

18 safety, eight years after the 2010 San Bruno pipeline explosion," even after the 2017 and

19 2018 wildfires and this Court's expressed concerns over PG&E's role in some of those

20 wildfires. *See Assigned Commissioner's Scoping Memo and Ruling* in Investigation 15-08-

21 019 (December 21, 2018) (**Exhibit 3**), at 4-6. The Assigned Commissioner, empowered to

22 establish the scope of this proceeding, has requested comment on a wide variety of far-

23 reaching alternatives to PG&E's current organizational structure in order to promote better

24 safety outcomes, including potential changes to its Board of Directors, management, and

25 operational structures.

26 The CPUC requests that the Court allow the CPUC to pursue the full breadth of its

27 expansive powers in a deliberate manner – according all parties their due process rights in

28

1   the course of CPUC proceedings – while simultaneously ensuring that utility customers and

2   the general public are not undeserving and unwitting casualties of the loss of electric

3   reliability.

4   **III.   THE CPUC IS CURRENTLY IN THE MIDST OF IMPLEMENTING
        SB 901 AND JUST INITIATED ITS LATEST DE-ENERGIZATION
5        RULEMAKING, BOTH OF WHICH BUILD ON EXISTING
        WILDFIRE PREVENTION AND MITIGATION INITIATIVES.**

6          Wildfires are a challenge throughout the state of California, not just in PG&E's

7   territory.  The operation of an electrical system in a wildfire-prone state is a highly complex

8   matter that must account for the public's undeniable reliance on and different requirements

9   for electric service.  The CPUC has in recent years enacted a number of measures to enhance

10  wildfire prevention and mitigation, and these will undergird important new statutory

11  requirements promulgated just a few months ago in SB 901, which overhauls requirements

12  placed on electric utilities and their wildfire mitigation plans.

13         The CPUC, CAL FIRE, other state agencies, and local governments are presently

14  working together under this legislation to develop comprehensive utility wildfire mitigation

15  plans that address the varying and sometime competing needs surrounding first responders,

16  the public (and which are particular to disparate local concerns), public utilities, public

17  infrastructure that continues to serve the public, and the sustenance of a healthy

18  environment.

19         These various programs are developing or are currently being implemented, or have

20  recently been implemented and require at least a modicum of time for their strengths,

21  efficacies, and potential shortfalls to be understood. The Court's proposed order would

22  essentially dislodge these programs at the very moment they are taking shape.

23         **A.    California Senate Bill 901 Mandates an Enlargement of Statewide
                Wildfire Mitigation Efforts and Enhanced Wildfire Mitigation
24              Plans.**

25         SB 901 builds on the public utilities' existing CPUC-regulated wildfire mitigation

26  plans and vegetation management plans.  SB 901 is a comprehensive plan of action for

27  effective forest management and wildfire mitigation and suppression across the state in

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
845 of 1229

multiple sectors.[2]  With respect to utility infrastructure-related wildfire risks, SB 901

requires electric utilities to submit statutory wildfire mitigation plans each year to an

independent evaluator.  Cal. Pub. Util. Code § 8386(b).  These annual wildfire mitigation

plans must include, among other things:

- "Protocols for … **deenergizing** portions of the electrical distribution system that consider the associated impacts on public safety, as well as protocols related to mitigating the public safety impacts of those protocols, including impacts on critical first responders and on health and communication infrastructure," Cal. Pub. Util. Code § 8386(c)(6) (emphasis added);

- Actions the utility will pursue "**to ensure its system will achieve the highest level of safety, reliability, and resiliency, and to ensure that its system is prepared for a major event**, including hardening and modernizing its infrastructure with improved engineering, system design, standards, equipment, and facility, such as undergrounding, insulation of distribution wires, and pole replacement," Cal. Pub. Util. Code § 8386(c)(12) (emphasis added);

- The utility's "**preventative strategies and programs** … to minimize the risk of its electrical lines and equipment causing catastrophic wildfires, including consideration of dynamic climate change risks," Cal. Pub. Util. Code § 8386(c)(3) (emphasis added);

- Metrics to **evaluate the utility's wildfire mitigation plan's performance**, Cal. Pub. Util. Code § 8386(c)(4);

- A **ranking of "all wildfire risks, and drivers for those risks,"** throughout the utility's service territory, which shall include wildfire risk and risk mitigation information contained in the utility's Safety Model Assessment Proceeding and Risk Assessment Mitigation Phase filings (these are CPUC-mandated programs to compel risk-based utility management and spending), Cal. Pub. Util. Code § 8386(c)(10) (emphasis added);

---

[2] Among other things, SB 901 requires the State Forestry Board to adopt new regulations implementing minimum fire safety standards in very high fire hazard severity zones, where such regulations would apply to perimeters and access to all residential, commercial, and industrial buildings in these zones; eases restrictions on commercial timber operations to promote the removal of trees from firebreak and fuelbreaks; and requires CAL FIRE to create a Wildfire Resilience Program to assist owners of approximately 87,000 parcels (each parcel sized up to 100 acres, totaling nearly 8 million acres) of private noncorporate forest land to improve wildfire resilience.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- **Vegetation Management Plans**, Cal. Pub. Util. Code § 8386(c)(8);

- **Inspection plans** for the utility's electric infrastructure, Cal. Pub. Util. Code § 8386(9); and

- Improvements to the CPUC's **fire mapping**, Cal. Pub. Util. Code § 8386(c)(14).

Pursuant to its implementation of SB 901, the CPUC instituted Rulemaking 18-10-007[3] to oversee a formal rulemaking process for receiving comments from the public, local and state agencies, and other interested parties, after which the CPUC will approve, subject to CPUC modification, the statutory wildfire mitigation plans after verifying compliance with "all applicable rules, regulations, and standards, as appropriate." Cal. Pub. Util. Code § 8386(d). The utilities have been ordered to file their wildfire mitigation plans by February 6, 2019, and the CPUC must approve the plans within three months of that date, or the first week of May 2019. Cal. Pub. Util. Code § 8386(e).[4]

Once the wildfire mitigation plan is approved, the CPUC will conduct an annual review of the utility's compliance with the plan utilizing an independent evaluator "with experience in assessing the safe operation of electrical infrastructure." Cal. Pub. Util. Code § 8386(h)(2)(A)&(B). Eligible independent evaluators conducting compliance reviews shall be chosen by the CPUC in consultation with CAL FIRE, with the utility choosing the independent evaluator among the CPUC's list of qualified experts. *See* Cal. Pub. Util. Code § 8386(h)(A). Although the utility will pay the costs of the independent evaluators conducting compliance reviews, the evaluators are required to "consult with, and operate under the direction of, the [CPUC's] Safety and Enforcement Division." Cal. Pub. Util.

---

[3] The Order Instituting Rulemaking 18-10-007 to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901 (2018) is found at http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M235/K696/235696605.PDF.

[4] The Court should be aware that SB 901 provides that the CPUC may extend the deadline to approve wildfire mitigation plans only by formal order. Cal. Pub. Util. Code § 8386(e).

1  Code § 8386(h)(B)(i).  The CPUC is required to penalize a utility for failing to comply with
2  approved wildfire mitigation plans.  Cal. Pub. Util. Code § 8386.1.

3       Only those costs incurred by the utility to implement its wildfire mitigation plan that
4  the CPUC determines are reasonable may be recoverable from ratepayers.  Cal. Pub. Util.
5  Code § 8386(j).

6       SB 901 also requires the utility to submit to an independent third-party evaluation of
7  its safety culture each year, and begins to tackle the difficult question of cost-responsibility
8  for utility infrastructure-related wildfires.  *See*, e.g., Cal. Pub. Res. Code §4205(a), (b); Cal.
9  Pub. Util. Code § 8386.2.

10       In short, the CPUC's Rulemaking to consider the utilities' SB 901 mitigation plans
11  will be a comprehensive consideration of many aspects of wildfire mitigation and prevention
12  and will be an appropriate forum in which to hear from a broad cross-section of interests.

13       **B.**    **The CPUC's Current Regulations for De-Energization Require A**
              **Utility to De-Energize Its Electrical System Only After Fully**
14                **Informing Affected Persons of De-Energization and Only After**
              **Reasonably Limiting the Impacts.**
15

16       De-energization of the electric grid must be carefully exercised because it leaves
17  communities and essential services without electrical power.  *See* Letter from Counties of
18  Mendocino, Napa, and Sonoma to Michael Picker, dated January 23, 2019 (**Exhibit 10**); *see*
19  *also* City of Malibu's Petition for Modification of Resolution ESRB-8, dated October 5,
20  2018 (**Exhibit 13**), at 6.  Deciding whether to de-energize is a nuanced and multi-
21  dimensional analysis.  The goal of de-energization is to limit its scope and "avoid[] power
22  cutoffs to essential services that are critical during emergencies."  Rulemaking 18-12-005
23  (**Exhibit 1**), at 5.  It should be reserved as a "last line of defense to protect public safety due
24  to extreme fire weather conditions," CPUC Resolution ESRB-8, 2018 WL 3584003 (July
25  12, 2018) (**Exhibit 4**), not as a first step.

26       The CPUC expects the electric utilities to use all pertinent inputs and tools at its
27  disposal before determining that de-energization is the correct decision.  These
28  considerations include: atmospheric conditions, the state of vegetation, wind speeds, weather

1  sensors and wind modeling software, the type and quality of utility infrastructure,

2  knowledge of population centers, their density, and vulnerable communities, evacuation

3  routes, and proximity of first responders. *See*, e.g., Rulemaking 18-12-005 (**Exhibit 1**), at 5.

4  The utility is not permitted to consider wind conditions alone.

5        Utilities must follow a series of specific protocols and reasonably limit a de-

6  energization's impact, including tailoring its geographic scope to the areas where conditions

7  warrant it. The guidelines are contained in CPUC Resolution ESRB-8, and require a utility

8  to perform the following:

9        • The utility must rely on other measures, to the extent available, as alternatives to

10        de-energization;

11        • The utility must "reasonably believe that there is an imminent and significant risk

12        that strong winds will topple its power lines onto tinder dry vegetation during

13        periods of extreme fire hazard;"

14        • The utility must consider efforts to mitigate the adverse impacts on the customers

15        and communities in areas considered for de-energization;

16        • The utility must take steps to warn and protect its customers when it de-

17        energizes; and

18        • The utility must consider other factors, as appropriate, to assess whether de-

19        energization is reasonable.

20  CPUC Resolution ESRB-8 (**Exhibit 4**). ESRB-8 also requires that the utilities meet with the

21  local communities that may be impacted by a future de-energization event before it occurs,

22  requires notification to appropriate first-responders, critical facilities, and customers as far

23  ahead of time as feasible prior to a de-energization event, requires notification to the

24  CPUC's Safety and Enforcement Division as soon as practicable after a decision to de-

25  energize facilities and within 12 hours after the last service is restored, and submit a report

26  to the CPUC within 10 business days after each de-energization.

27

28

1      **1.   The CPUC, CAL FIRE, and the California Office
            of Emergency Services Have Collaborated on De-
2            Energization Notification Improvements.**

3          In October 2018, the CPUC, CAL FIRE, and the Governor's Office of Emergency

4     Services together informed California's three large electric utilities that they expect real-

5     time information to increase the likelihood of an orderly de-energization event during high

6     wildfire weather conditions. *See* letter dated October 26, 2018 (**Exhibit 2**). The protocol

7     required by the State involves:

8          • Immediately notifying to the California State Warning Center of the utility's plan
            to de-energize, the utility's decision to de-energize, actual de-energization, and
9            restoration of power. This protocol still contemplates a utility's compliance with
            other de-energization protocols, such as notifying the public.
10

11         • The utility providing maps identifying in granular detail the de-energized areas,
            circuits, and roads, so that the maps can be shared with local, state, and federal
12           partner agencies.

13         • Data on de-energization start and end times, the number of Medical Baseline
            Customers affected, the identities of impacted critical customers (e.g., hospitals,
14           fire stations, police stations, water/irrigation districts and waste water treatment
            plants, communications facilities, and schools).
15

16
      **C.   The CPUC Very Recently Initiated a Rulemaking to Improve
17          Electric De-Energization in Dangerous Conditions, With A Focus
            on Providing a Broad Forum to Receive Comments from Utility
18          Customers, First Responders, Local Communities, and Anyone
            Affected by De-Energization Events.**
19
           Only last month, the CPUC instituted Rulemaking 18-12-005 (**Exhibit 1**) to consider
20
      improvements to Resolution ESRB-8 in light of recent de-energization events. This
21
      Rulemaking recognizes that electric utilities have in the past "used the option of proactively
22
      shutting down power to specific power lines to limit the impact or damage of these lines to
23
      communities in situations where the utilities are aware of dangerous conditions," but also
24
      recognizes that "de-energization can leave communities and essential facilities without
25
      power, which brings its own risks and hardships, particularly for vulnerable communities."
26
      Rulemaking 18-12-005 (**Exhibit 1**), at 2.
27

28
                    CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE

1    The primary focus of the Rulemaking will be to (a) examine conditions in which

2    proactive and planned de-energization is practiced; (b) develop best practices and ensuring

3    an orderly and effective set of criteria for evaluating de-energization programs; (c) ensure

4    electric utilities coordinate with state and local level first responders, and align their systems

5    with the Standardized Emergency Management System framework ("SEMS");[5] (d) mitigate

6    the impact of de-energization on vulnerable populations; (e) examine whether there are ways

7    to reduce the need for de-energization; (f) ensure effective notice to affected  stakeholders of

8    possible de-energization and follow-up notice of actual de-energization; and (g) ensure

9    consistency in notice and reporting of de-energization events. *Id.*

10    Actual de-energization events produce a significant volume of input to the CPUC

11    from those affected.  This is hardly surprising because de-energization causes far-reaching

12    impacts (discussed below) and utilities are not always able to adequately pre-warn the public

13    of de-energization.  After passage of ESRB-8 in July 2018, and pursuant thereto, the

14    electrical utilities were required to and did hold meetings between July and November 2018

15    in communities that could be affected by de-energization and entertain concerns, particularly

16    related to impacts on vulnerable populations and emergency responders.

17    The de-energization Rulemaking 18-12-005 will seek "input from affected

18    communities, governments, first responders and other stakeholders," and the CPUC has

19    planned "workshops in different parts of the state to receive input on de-energization" and

20    "examine how de-energization has affected California thus far, and to refine [the CPUC's]

21    approach to the practice to ensure it enhances public safety while minimizing unintended

22    consequences." Rulemaking 18-12-005 (**Exhibit 1**) at 3.  Already, the CPUC has held two

23    statewide workshops to receive public input:  the first on December 14, 2018 in Santa Rosa,

24    California, and the second on January 9, 2019 in Calabasas, California.  Parties will file

25

26    _____

27    [5] SEMS is the system required by Government Code Section 8607(a) for managing
      emergencies involving multiple jurisdictions and agencies.

28

1 | written comments, and hearings may be held. The CPUC received extensive comments

2 | from members of vulnerable populations, mayors, community leaders, residential customers,

3 | businesses, and first responders.

4 | The CPUC has begun a formal rulemaking to determine California's best path

5 | forward in the relatively nascent area of power-line de-energization as a means of combating

6 | wildfire. Critically, the CPUC's rulemaking will be informed by the input of the

7 | communities most likely to be impacted, will consider the issue of notice to those affected,

8 | and develop a series of best practices that can be used in the future.

9 | **D.** **SB 901 Sits Atop Recently-Adopted and Now-Coalescing CPUC**
**Measures Intended to Enhance Wildfire Prevention, Suppression,**

10 | **and Mitigation.**

11 | **1.** **A Recent MOU Between the CPUC and CAL FIRE**
**Ensures Close Cooperation and Draws From CAL**

12 | **FIRE's Expert Knowledge of Wildfire Prevention,**
**Suppression, and Mitigation.**

13 |

14 | CAL FIRE is the lead investigator of wildfire ignitions in California. The CPUC has

15 | long worked closely with CAL FIRE to determine whether utility equipment that might be

16 | linked to wildfire ignitions meets the CPUC's safety standards. More recently, however, the

17 | CPUC and CAL FIRE have enhanced their reliance on each other's respective expertise in

18 | conducting investigations and routinely share investigatory data.

19 | In August 2017, the CPUC and CAL FIRE executed a Memorandum of

20 | Understanding ("MOU") to memorialize a shared commitment to "develop consistent

21 | approaches to forest management, wildfire prevention, public safety, and energy programs,"

22 | to "[a]ssist one another in preparing for, responding to, and mitigating the effects of

23 | wildfires," and to establish the Interagency Fire Safety Working Group ("IFSWG"). (The

24 | MOU is attached as **Exhibit 5**.) The IFSWG, comprised of directors and programmatic staff

25 | from both agencies, have since been meeting monthly to: inform and assist each agency's

26 | respective wildfire investigation efforts and regulatory and enforcement duties; align their

27 | understanding of fire mapping and effective vegetation management; enhance the CPUC's

28 |

1  enforcement of General Order 95;[6] optimize wildfire suppression mobilization efforts and

2  communications and the utilities' participation in them; and contribute to and regulate the

3  utilities' fire hazard prevention plans. The CPUC and CAL FIRE are working in lockstep on

4  the issue of fire prevention, detection, suppression, and mitigation.

5          **2.**    **The CPUC Has Recently Developed, Adopted, and**
               **Employed a Comprehensive Statewide Fire**

6                 **Mapping Project.**

7        The CPUC began interim fire mapping in 2009 but initiated the formal Rulemaking

8  15-05-006 to develop and adopt a single statewide map. In 2017, the CPUC adopted Fire-

9  Threat Maps and established a new classification, the High Fire Threat District, and

10  integrated them into General Order 95 such that stricter regulations would apply to the new

11  High Fire Threat District. The High-Fire Threat District map is a composite of two maps:

12  (1) a U.S. Forest Service-CAL FIRE joint map of Three Mortality High Hazard Zones

13  ("HHZs"), or the Tree Mortality HHZ Map; Tier 1 HHZs are zones where tree mortality is

14  in direct proximity to communities and critical infrastructure (roads and utility lines), and

15  are a *direct* threat to public safety; Tier 2 HHZs are in watershed areas and are not pertinent

16  here; and (2) a CPUC Fire-Threat Map was recently adopted on January 19, 2018, and is

17  required by CPUC Decisions 17-01-009 and 17-06-024 to be updated every ten years; Tier 2

18  fire-threat areas are those with an *elevated* risk (including likelihood and potential impacts

19  on people and property) from utility-associated wildfires; and Tier 3 fire-threat areas depict

20  areas where there is an *extreme* risk (including likelihood and potential impacts on people

21  and property from utility-associated wildfires). All maps are available at

22  www.cpuc.ca.gov/FireThreatMaps.

23        In January 2018, the CPUC adopted a comprehensive statewide fire-threat map with

24  Tier 2 (Elevated Fire Threat) and Tier 3 (Extreme Fire Threat) High Hazard Zones

25

26

27  [6] CPUC's GO 95, which governs utility overhead line construction, was amended in May
2018 to strengthen pole and wire regulations.

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   22:10:31   Page
853 of 1229

1  ("HHZs"); these maps were developed using the U.S. Forest Service and CAL FIRE's joint

2  map of tree mortality HHZs.  This wildfire map is overlaid with substantial data to enhance

3  wildfire prevention, mitigation, and suppression.  The data overlays identify the location of

4  electric utility infrastructure, geographic and topographic details, forestry density,

5  concentrations of tree mortality (dead and dying trees), among other things.  This wildfire

6  mapping effort is designed to help utilities, together with the CPUC and CAL FIRE,

7  pinpoint and rank the areas of highest wildfire risk and prioritize inspections, repairs and

8  replacement, and vegetation management.

9  
10  
### 3.   Vegetation Management Is an Resource-Intensive Undertaking That Requires a Reasonable Schedule to Effectively Accomplish.

11  Electric utilities' vegetation management practices must account for the sheer

12  breadth of the undertaking.  Northern California has over eight times the amount of CPUC

13  Fire-Threat Map Tier 2 elevated acreage as Southern California (51,827 acres to 6,352

14  acres), although both the Northern and Southern California regions each have about 6,000-

15  6400 acres of CPUC Fire-Threat Map Tier 3 acres.  As well, the State's comprehensive fire

16  mapping discussed above should inform vegetation management risk identification and

17  prioritize vegetation management plans according to highest risk.  The framework of the

18  CPUC's ratemaking and safety regulation counsels an emphasis on a well-ordered and

19  thorough vegetation management program, which requires a longer, more considered

20  schedule than the proposed order envisions.

21  Vegetation management at the transmission level begins with the 2005 Energy

22  Policy Act, 16 U.S.C. § 8240, which authorized FERC to certify the North American

23  Electric Reliability Corporation ("NERC") as the organization to develop and enforce

24  standards for the electric transmission system.  NERC's Reliability Standards for Vegetation

25  Management is FAC-003-4 and does not set forth mandatory minimum clearances, but it

26  does endorse certain American National Standards Institute ("ANSI") standards with

27  specific vegetation removal as industry best practices.

28

1  CPUC General Order 95[7] is the CPUC's regulation governing the construction and

2  maintenance of overhead electrical facilities. Rule 31.2 of General Order 95 requires that

3  overhead electric lines "be inspected frequently and thoroughly for the purpose of ensuring

4  that they are in good condition so as to conform" with the remainder of the rules in the

5  General Order. Rule 31.2 of General Order 95 requires overhead electric supply lines and

6  communications lines to be inspected "frequently and thoroughly for the purpose of

7  ensuring that they are in good condition."

8  In addition, electric utilities are required by the CPUC's General Order 165 to

9  conduct patrol inspections and detailed inspections of their overhead electric distribution

10  facilities at the following intervals:

| Table 1 | | | |
|---|---|---|---|
| GO 165 Inspection Intervals for Overhead Electric Distribution Facilities | | | |
| Patrol Inspection | | Detailed Inspection | |
| Urban | Rural | Urban | Rural |
| 1 Year | 2 Years (See Note 1) | 5 Years | 5 Years |

**Note 1**: Patrol inspections in rural areas are once per year in the Extreme and Very High Fire-Threat Zones of the following counties: Imperial, Los Angeles, Orange, Riverside, Santa Barbara, San Bernardino, San Diego, and Ventura. Extreme and Very High Fire-Threat Zones are defined by the California Department of Forestry and Fire Protection's Fire and Resource Assessment Program Fire Threat Map (FRAP Map).

22  CPUC Decision 12-01-032 defines "patrol inspections" as "simple visual inspections that

23  are designed to identify obvious structural problems and hazards," and defines "detailed

24  inspections" as "careful visual inspections using binoculars and measuring devices, as

25  appropriate."

---

[7] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf.

1    Rule 35 of General Order 95 prescribes vegetation management standards such as

2    *minimum* radial vegetation clearances from electric equipment. Rule 35 is attached as

3    **Exhibit 6**. This Rule derives in part from the minimum vegetation clearance requirements

4    in Cal. Pub. Res. Code §§ 4292-4293. *See* Guidelines for Rule 35 (**Exhibit 7**). Rule 35

5    provides for greater radial clearances for "Case 14" equipment, i.e., where lines are in High

6    Fire Threat Districts. *See* Guidelines for Rule 35 (**Exhibit 7**). Rule 35's Guidelines provide

7    that prudent vegetation management may require greater clearances, taking into

8    consideration such factors as:

> line operating voltage, length of span, line sag, planned
> maintenance cycles, location of vegetation within the span,
> species type, experience with particular species, vegetation
> growth rate and characteristics, vegetation management
> standards and best practices, local climate, elevation, fire risk,
> and vegetation trimming requirements that are applicable to
> State Responsibility Area lands pursuant to Public Resource
> Code Sections 4102 and 4293.

14    Rule 35 was adopted in 1942 and has been improved and updated since then.

15    Through 1995, there were no mandatory minimum vegetation clearance requirements. In

16    September 1996, the CPUC first mandated a vegetation clearance requirement of six inches.

17    *See* CPUC Decision 05-01-030. In January 1997, the CPUC increased the clearance to 18

18    inches. Although the present day's greater radial clearances for Case 14 cases was first

19    implemented in 2009 only for Southern California High Fire Threat Areas, *see* CPUC

20    Decision 09-08-029, 2009 WL 2910747, the larger Case 14 clearance requirement has

21    applied statewide since 2017, *see* CPUC Decision 17-12-024, 2017 WL 6621842.

22    Public utilities also encounter sometimes voluntary and involuntary cooperation of

23    landowners for utilities to access private property or trim trees originating on privately-

24    owned land. In order to assist utilities in expeditiously executing their vegetation

25    management plans, the CPUC amended Electric Tariff Rule 11 to allow electric utilities to

26    disconnect electric service to a customer in the High Fire-Threat District who does not

27    cooperate with a utility's proper vegetation management. *See* CPUC Decision 17-12-024,

28

1    2017 WL 6621842.  Another emerging challenge associated with vegetation management in

2    California is the expansion of the urban-forest interface and PG&E's statutory duty to serve

3    – and construct lines to and around – many of these new communities in higher fire-risk

4    areas.

5            The complexity and magnitude of responsible vegetation management requires a

6    carefully considered plan that reflects regulatory safety standards, environmental protection

7    and local concerns.  *See* Letter from Counties of Mendocino, Napa, and Sonoma to Michael

8    Picker, dated January 23, 2019 (**Exhibit 10**).  The CPUC requests that the Court refrain

9    from potentially conflicting with the federal and state overhead electric safety and

10   vegetation management regulations.

11           All of the foregoing is merely to demonstrate that the State of California is more than

12   aware of the wildfire crisis it is undergoing. The CPUC, in alignment with coterminous

13   branches of State government, has already set upon a deliberate path to bring order to the

14   issue of de-energization and the multitude of other factors that contribute not only to

15   wildfires, but also to the difficulties inherent to protecting susceptible groups from

16   unnecessary, prolonged electricity outages.

17   **IV.     THE CONSEQUENCES OF THE PROPOSED NEW TERMS OF
             PROBATION WOULD HAMPER FIREFIGHTING CAPABILITIES**
18   **AND CAUSE BROADER NEGATIVE IMPACTS TO PUBLIC
             HEALTH AND SAFETY**

19
             De-energization events are very different from power blackouts.  They are far longer
20
     in duration and may last three days or even more; they require physical inspections of the
21
     de-energized assets prior to re-energizing them; and they can affect a wide geographic area.
22
     Without consideration of de-energization's potential characteristics, the Court's proposed
23
     order could cause widespread unintended negative consequences by imperiling both fire-
24
     suppression and emergency first-responder capabilities and by adversely impacting public
25
     health and safety across a broad spectrum.
26
             The CPUC's experience is that customers, the broader public, first responders, and
27
     providers of essential services do not feel that their concerns and interests are adequately
28

1   considered in a utility's decision to de-energize. Throughout the 2018 wildfire season,

2   California's electric utilities called several de-energization events. The CPUC received a

3   large amount of feedback from the public, government agencies, and first responders about

4   the utility's implementation of Resolution ESRB-8. The CPUC determined that it should

5   review how Resolution ESRB-8 is working in practice in part by receiving feedback and

6   input from a broad base of affected persons: local communities, government agencies, first

7   responders, and the broader public. The CPUC's new Rulemaking 18-12-005 will consider

8   the actual experiences of customers, including in particular vulnerable populations, state and

9   local first responders, and others. Rulemaking 18-12-005 (**Exhibit 1**) at 2.

10

11

      **A.**   **Loss of Electric Power Will Negatively Impact Communications
          Services Supporting Both Wildfire-Suppression Capabilities and
          the General Public.**

12   Communications networks of the 21st century depend substantially on a functioning

13   electrical distribution system. *See* Declaration of Karen Eckersley in Support of CPUC

14   Comments, ¶ 5 ("Eckersley Decl.") (**Exhibit 8**). The world's reliance on the internet, smart

15   phones, constant connection, and immediate access to emergency response require a

16   constant, reliable operation of the electric grid. The communications network will fail in

17   critical places without electrical power, and the result is that first responders, the public, and

18   the machines which operate California's electrical grid will fail. For example, home

19   devices, hospital equipment, and communications network infrastructure, including cell

20   towers and landlines, rely on electricity provided by power companies. Id.

21

22

        **1.**   **First Responders Rely on Utility Electric Services to
           Meet the Demands of Emergency Situations.**

23   Emergency services require a functioning wireless and wireline infrastructure, upon

24   which the public relies to make 9-1-1 calls and the first responders rely to receive those calls

25   and gain situational awareness in emergency events. *See id.* ¶¶ 11, 12; *see also* Letter from

26   Signatory Communications Companies to Alice Stebbins, dated January 24, 2019 (**Exhibit
     9**). Incident coordination in large-scale disasters depends on cell towers, internet service,

27   and land lines to communicate with each other to manage wildfire response, coordinate and

28

1   triage evacuation centers, and to direct the public and emergency personnel to specific

2   locations. Fire Chief Anthony Bowden of the Santa Clara County Central Fire Protection

3   District ("Santa Clara County Fire") recently was involved in combating the Summer 2018

4   Mendocino Complex Fire. On August 20, 2018, he submitted a declaration to the U.S.

5   Court of Appeals for the District of Columbia Circuit in *Mozilla Corp. v. FCC*, Appeal No.

6   18-1051(L) and consolidated cases (concerning the FCC's net neutrality rule repeal),

7   explaining the extent of the Santa Clara County Fire's reliance on Internet-based systems,

8   which (as discussed above) depend on utility electrical service. "[Santa Clara] County Fire

9   relies upon Internet-based systems to provide crucial and time-sensitive public safety

10  services. The Internet has become an essential tool in providing fire and emergency

11  response, particularly for events like large fires which require rapid deployment and

12  organization of thousands of personnel and hundreds of fire engines, aircraft, and

13  bulldozers." Bowden Decl., ¶ 4.[8]

14        The State of California Office of Emergency Services, too, relies on the Internet to

15  "track, organize, and prioritize routing of resources from around the state and country to

16  sites where they are most needed." Id., ¶ 6. When Santa Clara County Fire recently

17  deployed a support team in response to California Office of Emergency Services' call for

18  statewide mutual fire assistance, Santa Clara County Fire's support team "relied heavily on

19  the use of specialized software and Google Sheets to do near-real-time resource tracking

20  through the use of cloud computing over the Internet." *Id.*, ¶ 6.

21        The public relies on communications infrastructure to make 9-1-1 calls, and first

22  responders rely upon this same infrastructure to receive those calls and manage emergencies.

23  Situation management of emergencies by first responders depends on cell towers, internet

24  service, and land lines to communicate with each other to manage wildfire and other disaster

25

26

27  [8] This declaration can be accessed at https://arstechnica.com/wp-content/uploads/2018/08/fire-department-net-neutrality.pdf.

28

1  response, coordinate and triage evacuation centers, and to direct the public and emergency

2  personnel to specific locations. Eckersley Decl., ¶ 13.

3  Public Safety Answering Points ("PSAPs") also require power to maintain their

4  operations at a local level. A PSAP is the name for the location of the service with people

5  who answer, coordinate, and respond to the public's 9-1-1 calls. Id. at ¶ 11. The California

6  Office of Emergency Services provides guidance to local agencies for maintaining

7  operations for a very short period of time without electricity, and each local government

8  determines the amount of time that their PSAP will be operational without electricity. There

9  are approximately 450 PSAPs in California, each is funded by its local government for

10  operations, and hence there is variability in the times each facility can operate on backup

11  power. Id. at ¶ 14.

12  Additionally, electricity is generally necessary to pump water at sufficient pressure

13  for fire-fighting purposes. Lack of water pressure directly compromises firefighting

14  capabilities. See Declaration of James Boothe In Support of CPUC Comments, ¶ 8 (Boothe

15  Decl.") (**Exhibit 12**).

16  **2.  Wireline Infrastructure Network Power.**

17  Wireline communications are provided by both local exchange carriers and cable

18  companies.  The network facilities of both of these types of providers require power to

19  operate. Central offices are wireline carrier facilities which serve a number of customers

20  with traditional phone service and/or DSL. Eckersley Decl., ¶ 9.

21  The CPUC has information on the network power resources which serve 54% of

22  California residential and small business subscribers. Of the approximately 900 central

23  offices that serve these subscribers, approximately 36% would lose the ability to operate

24  after 1-3 days (24-72 hours) without power from the electrical grid. Fifty-one percent of the

25  central offices would lose the capacity to operate on battery power after 10 days, while the

26  remaining 13% have the possibility to operate for longer depending on availability of fuel

27  that feeds the onsite generator. However, these calculations are approximate and dependent

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
860 of 1229

1   on many variables such as traffic on the network e.g., the more traffic, the more drain on
2   batteries, availability of diesel fuel and accessibility of central office locations (for diesel
3   fuel delivery). Id. at ¶ 10.

4       The CPUC does not have rules for the provision of backup power for communication
5   network elements in wireless or wireline networks. The Federal Communications
6   Commission requires those central offices which serve PSAPs to have only 24 hours of
7   battery backup and selective routers (the switches which route calls to PSAPs) to have 72
8   hours. Id. at ¶ 11. Thus, there is no assurance that the telecommunications networks have
9   anything close to an adequate supply of backup energy to power their systems during a
10  prolonged electrical outage.

11          **3.     Electric Utilities.**

12      Power companies themselves rely on communications infrastructure to provide inter-
13  machine and voice communications to remote stations. PG&E reported to the CPUC in
14  December of 2017 that 8,951 communication circuits based on copper technology leased
15  from a variety of communication providers provide critical communications to their power
16  assets.  These critical communications consist of communication facilities which provide
17  voice and potentially remote control of devices within the electrical facilities. In other
18  words, the electric utility's own communication facilities and equipment require power to
19  operate. Id. at ¶ 12.

20          **4.     Experience Demonstrates that De-
              Energizations Result in Lost Phone Service.**

21      Beginning on October 13, 2018, PG&E conducted a public safety power shutoff
22  ("PSPS" or de-energization) event during a period of predicted high winds and fire danger,
23  which resulted in 67 cell sites in California losing power for between 4 and 40 hours.  These
24  67 cell sites were operated by the five facilities-based wireless companies operating in
25  California, and hundreds of their resale partners (companies which resell minutes without
26  owning cellular infrastructure) were also unable to provide service to their customers during
27  that period. Id. at ¶ 6.
28

1    Cellular resellers are the primary providers of wireless LifeLine service, an essential

2    communications service provided for low-income households in California.  The CPUC has

3    the responsibility both to designate carriers for providing federal Lifeline funds and for the

4    collection and payment of funds for the California LifeLine program.  The California

5    LifeLine program provides discounted home phones and cell phone service to qualified

6    households. This service lowers phone bills for low-income households and insures access

7    to voice and broadband services. Id. at ¶ 7.

8        Additionally, during this particular PSPS event, nine cities and towns in California

9    experienced cell site outages from multiple carriers at the same time. It is likely a high

10   percentage of customers in these areas were not able to make wireless calls when the cell

11   sites were out of service. The communities which had outages at the same time from

12   multiple carriers are Calistoga, Camino, Colfax, Placerville, Pollock Pines, Fontana, Irvine,

13   Orange, and Silverado.  The result of the PSPS was that no one could make a wireless call in

14   these communities during the de-energization. Id. at ¶ 8.

15               **5.    Local Government Impacts.**

16       According to the El Dorado County Sheriff's Department, the County of El Dorado

17   experienced de-energization in the latter half of 2018 to reduce the risk of wildfire.

18   According to Lieutenant Beyers of the El Dorado County Sheriff's Department, the pre-

19   emptive PSPS cut off power to the street lights that comprised the only evacuation route out

20   of the area.  Lieutenant Beyers believes that if a wildfire or other disaster that necessitated

21   evacuation were to have occurred at this time, the ensuing traffic gridlock would have been

22   catastrophic. Id. at ¶ 19.

23       Similar concerns have been raised by the City of Malibu, which, like El Dorado

24   County, has relatively few traffic lights and limited ways in and out of the populated areas,

25   conditions which can impair evacuation during de-energization. *See* **Exhibit 13** at p. 3.

26

27

28

#### 6.    Public Reliance and Vulnerable Populations.

1

2        The public relies on cell towers, internet, and land lines to communicate with first

3  responders, for their own emergency needs as well as to communicate the location of new,

4  spreading, or quickly-moving fires. The public also relies on electric service to charge their

5  own cell phones and maintain power for their home electrical devices (routers, modems,

6  cordless phones). Id. at ¶ 15.

7        The CPUC held a workshop on December 14, 2018,  to address the impacts of PSPS,

8  or electricity grid de-energization, on vulnerable populations. De-energizations have wide-

9  reaching impacts, especially when they occur for indefinite periods of time. As part of the

10  October 2018 PSPS event described in Section IV.A.4, de-energization occurred in Santa

11  Rosa. According to Chris Coursey, Mayor of the City of Santa Rosa, the consequences of

12  the de-energization were significant and widespread. Mayor Coursey noted examples of

13  difficulties that emerge from extensive or indefinite periods of de-energization, including the

14  spoiling of food and whether to evacuate due to homes becoming uninhabitable from the

15  inability to regulate temperatures.  These impacts would also apply to senior centers, group

16  homes, and other medical facilities. Id. at ¶ 16.

17        According to another workshop attendee who spoke on the impacts of de-

18  energization on vulnerable populations, there are Californians that rely on power for the use

19  of medical technology that performs a life-saving function, such as a respirator while

20  sleeping.  This point would apply to other home medical equipment. Furthermore, these

21  vulnerable populations may not have the financial means necessary to purchase back-up

22  generators due to being on a fixed income. They may also lack the means to evacuate to an

23  area not experiencing a PSPS. Id. at ¶ 18.

24    **B.    Impacts of Loss of Power On Potable and Agricultural Water**
         **Services and Wastewater and Sewer Services**

25

26        The State Water Project is the largest state-owned, multi-purpose water project in the

27  country.  It pumps and transports water across nearly the entire state and delivers an average

28  of 3.3 million acre-feet of water per year to 29 public agency water contractors throughout

1   California.  Approximately 40% of the deliveries are used to irrigate about 750,000 acres of

2   farmland, and the remainder of deliveries serve the water needs of more than 24 million

3   Californians.  Although the State Water Project generates electricity to meet some of its own

4   power needs through hydropower, a significant portion of its operations depends on

5   deliveries of electricity through PG&E's electrical system.  Its dependence on PG&E's

6   electric system increases in drought years.

7        The California Water Association ("CWA"), a statewide association that represents

8   water utilities that provide water to six million Californians, has written to the CPUC with

9   its concerns about the Court's Order to Show Cause.  *See* Correspondence from Jack Hawk

10  of CWA to Michael Picker, dated January 24, 2019 (**Exhibit 11**).  In the letter, CWA notes

11  that first responders rely on the availability of water for fire protection and suppression, and

12  that the water systems "unequivocally" rely on electricity for operation. Id. at p.1. The letter

13  notes that water utilities would have to invest many millions of dollars in coming years to

14  have available backup power generation, and also notes the unfortunate fact that permits for

15  fossil-fuel burning generators are difficult to obtain from regional Air Quality Management

16  Districts because of the amount of greenhouse gases they emit. Id. at pp.2-3.[9]

17       While some of the larger water utilities have some backup power, with short notice it

18  may not be possible to relocate the necessary backup generators to impacted areas.  There is

19  no public, centralized source of information that tracks the amount of backup power each

20  utility has at each facility, if it has any at all. Boothe Decl., ¶ 5.

21       Except for a small percentage of gravity-fed water systems and pumps fueled by

22  natural gas, the pumps at all water utilities require electricity in order to operate, and without

23  _____

24  [9] The prospect of not only water utilities, but many Northern Californian businesses and
    homes having to purchase, in all likelihood, diesel generators to prepare for large-scale,
25  prolonged de-energizations brings with it many unwelcome elements. Diesel generators are
    themselves fire hazards, require a continuous supply of diesel fuel, are very difficult to
26  permit pursuant to air quality standards, and are generally not affordable to large segments
    of society.
27

28

1  operable water pumps, a utility cannot deliver potable water to its customers. In fact, well

2  and distribution pumps, wastewater treatment plants, potable water treatment plants, storage

3  reservoirs, and other infrastructure dependent on electricity could be adversely impacted by

4  a prolonged de-energization. This is true of all water facilities, not just CPUC-regulated

5  water companies, but all retail water service entities such as municipal water utilities insofar

6  as they rely on PG&E. Id. at ¶ 6.

7        Commission General Order 103-A establishes rules governing water service,

8  including minimum standards for operation, maintenance, design, and construction over

9  Commission-regulated water utilities. Section VII.6.A requires that "each potable water

10  distribution system shall be operated in a manner to assure that the minimum operating

11  pressure at each service connection throughout the distribution system is not less that 40 psi

12  [pounds per square inch] . . ." Without operating pumps due to electricity outage, this

13  minimum operating pressure cannot be satisfied. Id. at ¶ 7.

14        Without access to electricity, a water utility lacks the ability to deliver potable water

15  to its customers, because the distribution system must be pressurized to move the water

16  throughout the system. The distribution system must also remain pressurized in order to

17  prevent bacteria and other harmful contaminants from entering the system. If water sits

18  unpressurized in the distribution system, there is a risk of contamination to the water, which

19  often requires utilities to advise customers to boil their water or drink bottled water once the

20  distribution has been re-pressurized, until the water can be tested to ensure safety. Id. at ¶ 8.

21        The prolonged loss of electricity at wastewater facilities could also pose a potential

22  health threat, since without electricity or some other fuel source for the pumps, the ability to

23  move the wastewater would be compromised. If the electricity is out at sewage treatment

24  facilities, there is a risk of untreated sewage contaminating waterways, like rivers, creeks,

25  and bays, depending on where the water is to be deposited. Moreover, without power, there

26  will be no water supply to businesses and residences and thus a curtailment of waste water

27

28

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 865 of 1229

1  leaving homes and businesses. The inability to move human waste from a residence or

2  business is considered a health hazard. Id. at ¶ 9.

3       Many of the larger water utilities employ supervisory control and data acquisition

4  ("SCADA") systems for the maintenance and operation of their infrastructure. A SCADA

5  system monitors and adjusts the operating parameters for the facilities of a water utility from

6  well production and water treatment to water distribution to ensure the various components

7  are operating within acceptable parameters to provide safe and reliable water quality to

8  residential, business, and institutional customers 24 hours a day and 365 days a year.

9  SCADA systems can be relatively simple, such as one that monitors environmental

10 conditions of a small office building, or incredibly complex, such as a system that monitors

11 all the activity in a nuclear power plant or the activity of a large municipal or investor-

12 owned water system. SCADA systems depend on electricity to run the computers and the

13 telecommunications network (landline, cellular, microwave) to communicate with a

14 multitude of infrastructure facilities. Without power, water utilities that employ a SCADA

15 system would have no efficient or continuous means to monitor facility safety. Id. at ¶ 11.

16      After any power outage of any substantial length, a water utility would need to

17 sample and test for the quality of its water throughout its entire system – and take corrective

18 measures where necessary – before assuring its customers that its water was safe for use. It

19 could take days for some water utilities to come back on to full service after an outage. Id. at

20 ¶ 12.

21      **C.    Impacts of De-Energization on Vulnerable Communities and On**
        **General Public Health, Safety, and Wellbeing**

22

23      In recognition that electricity is a human necessity, Cal. Pub. Util. Code § 739(b)

24 requires the CPUC to "designate a baseline quantity of gas and electricity which is necessary

25 to supply a significant portion of the reasonable energy needs of the average residential

26 customer." This baseline quantity is to inform the CPUC in designing rates to ensure that

27 the minimum required amount of electricity is affordable. Cal. Pub. Util. Code § 739(d)(1).

28 The minimum quantity must recognize that some customers living in areas with high

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page
866 of 1229

1 | summer temperatures or low winter temperatures have varying baseline requirements. Cal.

2 | Pub. Util. Code § 739(a)(1). Such nuance in public utility regulation is particularly

3 | important in light of heat waves experienced in many parts of the State during the summer

4 | and for persons whose body temperatures must be regulated for medical reasons. *See* Cal.

5 | Pub. Util. Code § 739(c)(3)-(5).

6 |        The CPUC is required to establish higher baseline quantities for "residential

7 | customers dependent on life-support equipment." Cal. Pub. Util. Code § 739(c)(1). This

8 | includes customers whose lives depend on uninterrupted supplies of electricity to power

9 | respirators, iron lungs, hemodialysis machines, suction machines, electric nerve stimulators,

10 | pressure pads and pumps, aerosol tents, electrostatic and ultrasonic nebulizers, compressors,

11 | IPPB machines, and motorized wheelchairs. *See* Cal. Pub. Util. Code § 739(c)(2). These

12 | vulnerable communities merit particularly careful consideration when implementing de-

13 | energization events.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **V.    CONCLUSION**

2 |        The CPUC believes that safe and appropriate de-energization actions are only those

3 | done in accordance with the CPUC's regulations, guidelines, and protocols.  The CPUC

4 | respectfully urges the Court to allow the CPUC to continue its redoubled efforts to prevent

5 | and mitigate the risks of catastrophic fires within the context of regulating a human

6 | necessity:  the safe and reliable provision of electrical utility service at just and reasonable

7 | rates.

8 |

9 |                                      Respectfully submitted,

10 |

11 |                                 By:    /s/    *Christine Jun Hammond*
   | January 25, 2019                        AROCLES AGUILAR

12 |                                         CHRISTINE JUN HAMMOND
   |                                         CHRISTOFER NOLAN

13 |

14 |                                         Attorneys for the CALIFORNIA PUBLIC
   |                                         UTILITIES COMMISSION

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

## CERTIFICATE OF SERVICE

2    I, Christine J. Hammond, the undersigned, hereby declare as follows:

3

4    1. I am over the age of 18 years old and am not a party to the within cause. I am

5 employed by the California Public Utilities Commission in the City of San Francisco,

6 California. My business address is 505 Van Ness Avenue, San Francisco, CA 94102.

7

8    2. On January 25, 2019, I electronically served the document titled:

9   • **COMMENTS OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION**

10     **IN RESPONSE TO ORDER TO SHOW CAUSE**

11   • **EXHIBITS 1-13**

12 in Case No. 14-CR-00175-WHA on whacrd@cand.uscourts.gov.

13

14    I declare under penalty of perjury that the foregoing is true and correct.

15    Executed on this 25th day of January, 2019, at San Francisco, California.

16

17                    /s/ *Christine Jun Hammond*

18                    CHRISTINE JUN HAMMOND

19

20

21

22

23

24

25

26

27

28

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
869 of 1229

# EXHIBIT 1

ALJ/UNC/mph                                     **Date of Issuance 12/19/2018**

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions. | FILED PUBLIC UTILITIES COMMISSION DECEMBER 13, 2018 SAN FRANCISCO, CALIFORNIA RULEMAKING 18-12-005 |

## ORDER INSTITUTING RULEMAKING

### Summary

The Commission opens this Order Instituting Rulemaking (OIR) to examine its rules allowing electric utilities under the Commission's jurisdiction to de-energize power lines in case of dangerous conditions that threaten life or property in California.  The Commission recently adopted de-energization rules in Resolution ESRB-8,[1] which built on Decision (D.) 12-04-004.  Resolution ESRB-8 will remain in effect during the pendency of this proceeding unless and until the Commission explicitly modifies or rescinds it.

California is experiencing an increase in wildfire events due to a number of factors, including an extended period of drought, upwards of 10 years, increased fuel for fires, and unprecedented conditions that are leading to extreme weather events.  Exacerbating wildfire conditions are energized power lines and the

---

[1]  Resolution Extending De-Energization Reasonableness, Notification, Mitigation and Reporting Requirements in Decision 12-04-024 to All Electric Investor Owned Utilities (July 16, 2018), available at http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M218/K186/218186823.PDF.

R.18-12-005  ALJ/UNC, mph

potential of these lines to either spark or worsen an existing wildfire.  To mitigate these and other risks, electric utilities have in the past used the option of proactively shutting down power to specific power lines to limit the impact or damage of these lines to communities in situations where the utilities are aware of dangerous conditions.  However, de-energization can leave communities and essential facilities without power, which brings its own risks and hardships, particularly for vulnerable communities.

This proceeding will focus on the following issues:

- Examining conditions in which proactive and planned de-energization is practiced;
- Developing best practices and ensuring an orderly and effective set of criteria for evaluating de-energization programs;
- Ensuring electric utilities coordinate with state and local level first responders, and align their systems with the Standardized Emergency Management System framework (SEMS)[2];
- Mitigating the impact of de-energization on vulnerable populations;
- Examining whether there are ways to reduce the need for de-energization;
- Ensuring effective notice to affected stakeholders of possible de-energization and follow-up notice of actual de-energization; and
- Ensuring consistency in notice and reporting of de-energization events.

---

[2] SEMS is the system required by Government Code Section 8607(a) for managing emergencies involving multiple jurisdictions and agencies.

We will serve this OIR broadly, and seek input from affected communities, governments, first responders and other stakeholders. Staff has planned workshops in different parts of the state to receive input on de-energization. We intend to examine how de-energization has affected California thus far, and to refine our approach to the practice to ensure it enhances public safety while minimizing unintended consequences.

The Commission-jurisdictional electric corporations (collectively, Investor Owned Utilities or IOUs) that are required to participate in this proceeding are Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), San Diego Gas & Electric Company (SDG&E), Liberty Utilities/CalPeco Electric (Liberty), Bear Valley Electric Service, a division of Golden State Water Company (Bear Valley), and Pacific Power, a division of PacifiCorp (PacifiCorp). The Commission also invites the input of all stakeholders in guiding our approach.

In October 2018, the Commission opened a rulemaking, R.18-10-007, to implement the portions of SB 901 (Dodd) related to Wildfire Mitigation Plans. Pertinent to this proceeding, Public Utilities Code Section 8386(c)(6) requires the plans to include:

> 6) Protocols for disabling reclosers and deenergizing portions of the electrical distribution system that consider the associated impacts on public safety, as well as protocols related to mitigating the public safety impacts of those protocols, including impacts on critical first responders and on health and communication infrastructure.

Because of the important role de-energized power lines can play in ensuring public safety and the public's keen interest in the impact of de-energization on their communities, the Commission will address the implementation and logistics for de-energization of power lines in this

proceeding.  Though this detailed examination will take place outside of the initial Wildfire Mitigation Plans OIR, we recognize that de-energization will be one element considered in the annual plans.  In future years, the outcome of this proceeding may guide the portion of utilities' wildfire mitigation plans required per Section 8386(c)(6).

## 1. Background

Devastating wildfires have become a regular occurrence in California.  The Commission is examining the impact of wildfires and other emergencies in several proceedings,[3] but this proceeding will focus specifically on proactive electric power line de-energization.  California Public Utilities Code (Pub. Util. Code) Sections 451 and 399.2(a) give electric utilities authority to shut off electric power in order to protect public safety.  This authority includes shutting off power for the prevention of fires where strong winds, heat events, and related conditions are present.

The Commission considered and allowed SDG&E to engage in proactive de-energization in Application (A.) 08-12-021, resulting in Decision (D.) 12-04-024.  That decision allowed SDG&E authority to shut off power as a fire-prevention measure against severe Santa Ana winds.  SDG&E requested this authority after the 2007 wildfire season that resulted in the Rice, Witch and Guejito wildfires discussed in D.17-11-033 (on rehearing, D.18-07-025).  The Commission allowed SDG&E to de-energize its lines in emergency situations

---

[3] Those proceedings include Rulemaking (R.) 18-10-007, Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901 (2018); R.18-03-011, Order Instituting Rulemaking Regarding Emergency Disaster Relief Program; and R.15-06-009, Physical Security of the Electric System and Disaster and Emergency Preparedness.

R.18-12-005 ALJ/UNC, mph

when necessary to protect public safety and adopted certain review and notice requirements when proactive de-energization takes place.

Over a period of several years, the utility deployed important new tools, such as weather sensors focused on many highly local sites capable of measuring real time wind speeds and atmospheric conditions, carefully placed video monitors, and employed sophisticated weather and wind modelling software. Over time, the company developed detailed profiles of specific geographic features (canyons and hills and not just peaks) and the settlements located nearby, and developed risk profiles for possible infrastructure failure under potential weather conditions, with the goal of limiting the scope of de-energization and avoiding power cutoffs to essential services that are critical during emergencies. Through careful observation of operation during weather events, the utility has improved the effectiveness of the program. Decision 12-04-024 provided for after-the-fact Commission reasonableness review of SDG&E's de-energization decisions, required community notice and mitigation measures, and mandated reporting to the Commission on de-energization events.

We explained the stark new reality of wildfire events in California in Resolution ESRB-8:

> The 2017 California wildfire season was the most destructive wildfire season on record, and saw multiple wildfires burning across California, including five of the 20 most destructive wildland-urban interface fires in the state's history. Devastating fires raged in Santa Rosa, Los Angeles, and Ventura, and the Thomas Fire proved to be the largest wildfire in California history. These fires further demonstrated the fire risk in California. As a result of the fires and critical fire weather conditions, both the President of the United States and the Governor of California issued State of Emergency declarations. Resolution ESRB-8 at 2.

R.18-12-005  ALJ/UNC, mph

The Commission's Safety and Enforcement Division (SED) reviewed SDG&E's de-energization events that occurred in December 2017.  SED reached the following conclusions:

- SDG&E faced a real and significant risk of wildfires and its de-energization decisions were based on an adequate risk assessment.

- Prior to deciding to de-energize specific circuits, SDG&E considered and implemented other mitigation strategies, including adjustments of recloser settings, vegetation management, and inspection and monitoring during the extreme fire risk conditions.

- SDG&E considered location-specific wind speeds and the age, condition, and loading of facilities on the circuits and reasonably believed that there was an imminent and significant fire hazard.

- SDG&E made reasonable efforts to mitigate the adverse impacts on customers and communities in areas where SDG&E de-energized circuits.

SED concluded that SDG&E's actions appear to have been reasonable under the factors specified in D.12-04-024 and that SDG&E complied with the decision's reporting requirements.[4]

Resolution ESRB-8 extended the de-energization notice, reporting and reasonableness review requirements to all electric IOUs (PG&E, SCE, Liberty, Bear Valley and PacifiCorp) and adopted additional measures to supplement the

---

[4] SED, Review of San Diego Gas & Electric Company December 2017 De-Energization Events, May 2018, http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisions/News_and_Outreach_Office/May%202018%20SED%20Review%20of%20SDGE%20December%202018%20Deenergization%20Events_.pdf.

R.18-12-005  ALJ/UNC, mph

D.12-04-024 requirements.  The new measures included more detailed reporting and additional public outreach, notification and mitigation.

The year 2018 has brought additional devastating wildfires all over the state – including the recent Camp Fire in Butte County, the largest in California's history with the greatest death toll.  At the same time as the Camp Fire, huge fires also burned in Los Angeles and Ventura Counties.  In addition, the IOUs have called numerous de-energization events and the Commission has received a large volume of input from the public, government agencies and other first responders concerned about the practice.  It is therefore prudent to examine how the Resolution ESRB-8 process is working, and to determine whether additional refinement is appropriate.  We also seek to enhance stakeholder involvement in examining our de-energization requirements.  To that end, staff will hold at least two workshops, as noted in the schedule below, and we expect to conduct other outreach around the state to allow input from local communities, first responders and others with concerns about wildfire and de-energization.

## 2.  Preliminary Scoping Memo

The Commission will conduct this rulemaking in accordance with Article 6 of the Commission's Rules of Practice and Procedure, "Rulemaking."[5]  As required by Rule 7.1(d), this OIR includes a preliminary scoping memo as set forth below, and preliminarily determines the category of this proceeding and the need for hearing.

---

[5] All references to "Rules" are to the Commission's Rules of Practice and Procedure unless otherwise indicated.

## 2.1. Issues

The scope of this proceeding is electric IOU de-energization.  The

following issues are preliminarily determined to be within the scope of the

proceeding:

1. Conditions in which proactive and planned de-energization
   is practiced;

   a. Should the Commission limit de-energization in
      specific ways?

   b. Should we develop metrics for determining when
      de-energization is appropriate?

   c. How much discretion should the IOUs have in calling
      de-energization events?

   d. Are there other guidelines we should apply to
      de-energization?

2. Best practices and a set of criteria for evaluating
   development of effective programs;

   a. What are the best tools that can be applied to
      different landscapes and fire conditions across
      California?

   b. Are there tools deployed by the National Weather
      Service (*e.g.*, Santa Ana Wind Warnings) used in
      specific locations in California that should be
      adapted and deployed elsewhere?

   c. How should programs be designed for use of new
      technologies and for continuous improvement?

3. Notification to the public, local governments, critical
   facilities, and emergency responders.

   a. What are the best ways to notify the aforementioned
      parties of a planned de-energization event and when
      power will be restored in the event of
      de-energization?

   b. Do notification standards differ for vulnerable
      populations?

R.18-12-005  ALJ/UNC, mph

4. Electric utility coordination with state and local level first responders when they call a de-energization event.

    a. How do the IOUs coordinate with state and local first responders?

    b. What is working and what is not working in this coordination?

    c. What changes are required to ensure better coordination?

5. The extent to which the electric utilities' systems are in compliance with and align their systems with California's Standardized Emergency Management System framework (SEMS).

    a. What are the SEMS requirements?

    b. What do the IOUs do to meet these requirements?

    c. What additional steps should we require to ensure the IOUs are acting in a way that furthers the SEMS process, if appropriate?

6. How to mitigate the impact of de-energization on vulnerable populations.

    a. What are the impacts of de-energization on vulnerable populations, and what can the Commission and IOUs do to minimize these impacts?

    b. What are the requirements and process for sharing contact information to the extent permissible by law?

7. How to reduce the need for de-energization, if possible.

8. Examine the need for community and first responder notification improvements.

    a. How are the current notification requirements working?

    b. What additional notice requirements should we consider?

R.18-12-005 ALJ/UNC, mph

   c. What notification is occurring that we should discontinue, if any, due to lack of effectiveness? For example, are repeated notices causing notice fatigue and reducing the effectiveness of notice?

9. Examine best practices around the country or the world in implementing de-energization.

   a. Should the Commission extend such practices to the California electric IOUs?

   b. What is the cost of such best practices?

   c. Would conforming California's rules to those of other jurisdictions or countries achieve greater safety for California's residents?

10. Develop reporting and notice requirements that best serve Californians.

   a. What reporting and notification templates exist?

   b. What are the best types of notification and reporting (understandable, timely, effective, complete)?

   c. Should all IOUs use a standard notification and reporting format?

   d. Whom should the IOUs notify of de-energization and how should they ensure their notification lists are current and relevant?

11. What data should be collected when IOUs initiate a de-energization event, during and after these events?

12. Other de-energization issues that the assigned Commissioner and Administrative Law Judge may deem appropriate.

## 3. Categorization; *Ex Parte* Communications; Need for Hearing

Rule 7.1(d) of the Commission's Rules of Practice and Procedure requires that an order instituting rulemaking preliminarily determine the category of the proceeding and the need for hearing. As a preliminary matter, we determine

- 10 -

R.18-12-005 ALJ/UNC, mph

that this proceeding is quasi-legislative, because our consideration and approval of this matter would establish policy or rules affecting a class of regulated utilities. Accordingly, *ex parte* communications are permitted without restriction or reporting requirement pursuant to Article 8 of the Rules

We are also required to preliminarily determine if hearings are necessary. We preliminarily determine that hearings are not necessary.

## 4. Preliminary Schedule

The preliminary schedule for this proceeding is as follows:

### SCHEDULE

| EVENT | DATE |
|---|---|
| Comments on OIR filed and served, with responses to questions in "Preliminary Scoping Memo" | 45 days from issuance of OIR |
| Staff Workshop 1: Northern California | December 14, 2018, 9:00 a.m.–12:30 p.m. Santa Rosa Veteran's Memorial Building, Lodge Room 1351 Maple Ave., Santa Rosa CA 95404 **Remote Access:** <ul><li>WebEx: https://bit.ly/2KdtB61, meeting number 710 613992, Password: Mitigation</li><li>Listen-only call-in number 1-877-820-7831, access code 479881</li></ul> |
| Staff Workshop 2: Southern California | January 9, 2019, 9:00 a.m.-12:30 p.m. Calabasas Founders Hall, 100 Civic Center Way Calabasas, CA 91302 **Remote Access:** <ul><li>WebEx: https://bit.ly/2RU90ef, meeting number 717 534 465, Password: Mitigation,</li><li>Listen-only call-in number 1-877-820-7831, access code 479881</li></ul> |
| Prehearing conference | February 6, 2019, 10:30 a.m., Commission hearing room A, 505 Van Ness Avenue, San Francisco, CA. |

R.18-12-005  ALJ/UNC, mph

| EVENT | DATE |
|---|---|
| Scoping memo | February 2019 |
| Prehearing conference | Wednesday, February 6, 2019 at 10:30 a.m. |
| Opening comments | March 2019 |
| Reply comments | April 2019 |
| Proposed Decision on de-energization rules | Summer 2019 |
| Final Decision | Summer 2019 |

The prehearing conference (PHC) will be held for the purposes of (1) taking appearances, (2) discussing schedule and process, and (3) informing the scoping memo.  The PHC shall be held beginning at 10:30 a.m. on February 6, 2019 in the Commission Courtroom, 505 Van Ness Avenue, San Francisco, California.

The assigned Commissioner or the assigned Administrative Law Judge(s) (ALJ) may change the schedule to promote efficient and fair administration of this proceeding.

As noted in the schedule above, staff are holding two workshops on de-energization issues to gather input from first responders, affected communities and other stakeholders.  Notice of these workshops has been posted on the Commission's Daily Calendar.  In the event that additional workshops are held, notice will be posted on the Commission's Daily Calendar to inform the public that a decision-maker or an advisor may be present at those meetings or workshops.  Parties shall check the Daily Calendar regularly for such notices.

## 5. Respondents

PG&E, SCE, SDG&E, Liberty, Bear Valley and PacifiCorp are named as respondents to this proceeding.

R.18-12-005  ALJ/UNC, mph

## 6. Service of OIR

This OIR shall be served on all respondents.

In addition, in the interest of broad notice, this OIR will be served on the

official service lists for the following proceedings:

- Rulemaking 18-10-007, Order Instituting Rulemaking
  Implement Electric Utility Wildfire Mitigation Plans
  Pursuant to Senate Bill 901 (2018);

- Rulemaking 18-03-011, Order Instituting Rulemaking
  regarding Emergency Disaster Relief Program;

- Rulemaking 15-05-006, Order Instituting Rulemaking to
  Develop and Adopt Fire-Threat Maps and Fire-Safety
  Regulations;

- Rulemaking 15-06-009, Order Instituting Rulemaking
  Regarding Policies, Procedures and Rules for Regulation of
  Physical Security for the Electric Supply Facilities of
  Electrical Corporations Consistent with Public Utilities
  Code Section 364 and to Establish Standards for Disaster
  and Emergency Preparedness Plans for Electrical
  Corporations and Regulated Water Companies Pursuant to
  Public Utilities Code Section 768.6;

- Application 15-09-010, Application of San Diego Gas &
  Electric Company for Authorization to Recover Costs
  Related to the 2007 Southern California Wildfires Recorded
  in the Wildfire Expense Memorandum Account (WEMA);

- Application 17-07-011, Application of Pacific Gas and
  Electric Company for Authority to Establish the Wildfire
  Expense Memorandum Account;

- Application 18-04-001, Application of Southern California
  Edison Company to Establish the Wildfire Expense
  Memorandum Account;

- Application 18-09-002, Application of Southern California
  Edison Company for Approval of Its Grid Safety and
  Resiliency Program; and

- Application 08-12-021, Application of San Diego Gas & Electric Company for Review of its Proactive De-Energization Measures and Approval of Proposed Tariff Revisions.

In addition, in the interest of broad notice, this OIR will be served on the following agencies named in SB 901, and organizations representing local governments:

- State Board of Forestry and Fire Protection (CAL FIRE)
- California Energy Commission
- State Air Resources Control Board
- California Governor's Office of Emergency Services
- California Department of Fish and Wildlife
- California Infrastructure and Economic Development Bank
- California Office of Planning and Research
- California Department of Parks and Recreation
- California State Association of Counties
- League of California Cities
- California Native American Heritage Commission
- California Municipal Utilities Association
- California State Sheriffs' Association
- California Fire Chiefs' Association

Service of the OIR does not confer party status or place any person who has received such service on the Official Service List for this proceeding, other than respondents. Instructions for obtaining party status or being placed on the official service list are given below.

## 7. Filing and Service of Comments and Other Documents

Filing and service of comments and other documents in the proceeding are governed by the Commission's Rules of Practice and Procedure.

- 14 -

R.18-12-005  ALJ/UNC, mph

### 8. Addition to Official Service List

Addition to the official service list is governed by Rule 1.9(f) of the Commission's Rules of Practice and Procedure.

Respondents are parties to the proceeding (see Rule 1.4(d)) and will be immediately placed on the official service list.

Any person will be added to the "Information Only" category of the official service list upon request, for electronic service of all documents in the proceeding, and should do so promptly in order to ensure timely service of comments and other documents and correspondence in the proceeding. (*See* Rule 1.9(f).)  The request must be sent to the Process Office by e-mail (process_office@cpuc.ca.gov) or letter (Process Office, California Public Utilities Commission, 505 Van Ness Avenue, San Francisco, California  94102).  Please include the Docket Number of this rulemaking in the request.

Persons who file comments on this OIR become parties to the proceeding (see Rule 1.4(a)(2)) and will be added to the "Parties" category of the official service list upon such filing.  In order to assure service of comments and other documents and correspondence in advance of obtaining party status, persons should promptly request addition to the "Information Only" category as described above; they will be removed from that category upon obtaining party status.

### 9. Subscription Service

Persons may monitor the proceeding by subscribing to receive electronic copies of documents in this proceeding that are published on the Commission's website.  There is no need to be on the official service list in order to use the subscription service.  Instructions for enrolling in the subscription service are available on the Commission's website at http://subscribecpuc.cpuc.ca.gov/.

R.18-12-005 ALJ/UNC, mph

## 10. Intervenor Compensation

Intervenor Compensation is permitted in this proceeding. Any party that expects to claim intervenor compensation for its participation in this Rulemaking must file a timely notice of intent to claim intervenor compensation. (*See* Rule 17.1(a)(2).) Intervenor compensation rules are governed by §§ 1801 et seq. of the Public Utilities Code. Parties new to participating in Commission proceedings may contact the Commission's Public Advisor.

## 11. Public Advisor

Any person or entity interested in participating in this rulemaking who is unfamiliar with the Commission's procedures should contact the Commission's Public Advisor in San Francisco at (415) 703-2074 or 1-(866) 849-8390 or e-mail public.advisor@cpuc.ca.gov. The TTY number is 1-(866) 836-7825.

Therefore, **IT IS ORDERED** that:

1. This Order Instituting Rulemaking is adopted to examine the Commission's rules regarding electric utility de-energization practices pursuant to Public Utilities Code Sections 451 and 399.2(a) and Rule 6.1 of the Commission's Rules of Practice and Procedure.

2. The preliminary categorization is quasi-legislative.

3. The preliminary determination is that a hearing is not needed.

4. The preliminarily scope of issues is as stated above.

5. A prehearing conference is set for 10:30 a.m. on Wednesday, February 6, 2019 at the Commission's offices in San Francisco, California.

6. The preliminary schedule for the proceeding is set forth in Section 3.1 above.

7. Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, Liberty Utilities (CalPeco Electric), Bear

- 16 -

R.18-12-005  ALJ/UNC, mph

Valley Electric Service, a division of Golden State Water Company, and Pacific Power, a division of PacifiCorp, are respondents to this Order Instituting Rulemaking.

8.  Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, Liberty Utilities (CalPeco Electric), Bear Valley Electric Service, a division of Golden State Water Company, and Pacific Power, a division of PacifiCorp shall, and any other person may, file and serve comments of not more than 20 pages responding to this Order Instituting Rulemaking (OIR) not later than 45 days from the issuance of this OIR.

9.  Comments on this Order Instituting Rulemaking should address the scope and schedule of this proceeding, and its interaction with other related proceedings.

10.  The Executive Director will cause this Order Instituting Rulemaking to be served on all respondents and on the service lists for the following Commission proceedings:  Rulemaking (R.) 18-10-007, R.18-03-011, R.15-05-006, R.15-06-009, Application (A.) 15-09-010, A.17-07-011, A.18-04-001, A.18-09-002, and A.08-12-021.  In addition, the Executive Director will cause this Order Instituting Rulemaking to be served on the following agencies and organizations:  State Board of Forestry and Fire Protection (CAL FIRE), California Energy Commission, State Air Resources Control Board, California Office of Emergency Services, California Department of Fish and Wildlife, California Infrastructure and Economic Development Bank, California Office of Planning and Research, California Department of Parks and Recreation, California State Association of Counties, League of California Cities, California Municipal Utilities Association, California Native American Heritage Commission, California State Sheriffs' Association and California Fire Chiefs' Association.

R.18-12-005  ALJ/UNC, mph

11.   Any party that expects to claim intervenor compensation for its participation in this Rulemaking must timely file its notice of intent to claim intervenor compensation.  (*See* Rule 17.1(a)(2).)

This order is effective today.

Dated December 13, 2018, at San Francisco, California.

MICHAEL PICKER
            President
CARLA J. PETERMAN
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
            Commissioners

- 18 -

# EXHIBIT 2

  

October 26, 2018

Geisha Williams
Chief Executive Officer
Pacific Gas and Electric Company
77 Beale Street
San Francisco, California 94105

Kevin Sagara
Chairman and Chief Executive Officer
San Diego Gas and Electric
8330 Century Park Court
San Diego, California 92123-4150

Kevin M. Payne
Chief Executive Officer
Southern California Edison
2244 Walnut Grove Avenue
Rosemead, California 91770

**Subject: Public Safety Power Shut-Off**

Dear Ms. Williams, Mr. Sagara, and Mr. Payne:

Ensuring the safety of Californians is of the utmost importance to the Governor's Office of Emergency Services (Cal OES), the Department of Forestry and Fire Protection (CAL FIRE), and the California Public Utilities Commission (CPUC). Recent actions of Pacific Gas and Electric (PG&E), Southern California Edison (SCE), and San Diego Gas and Electric (SDG&E), to proactively de-energize power lines during high wildfire danger weather conditions make clear that utilities must provide specific, real-time information so the State can take appropriate steps to ensure public safety. This letter sets forth Cal OES, CAL FIRE, and the CPUC's expectations regarding your potential Public Safety Power Shut-off (PSPS) that may occur during high wildfire danger weather conditions.

NOTIFICATIONS

The State expects PG&E, SCE, and SDG&E to provide notifications at several distinct stages of a PSPS event. These notifications must be made to the California State Warning Center [warning.center@caloes.ca.gov; (916) 845-8911] as follows:

  

- First, immediately notify the California State Warning Center upon the utility's decision to activate its PSPS program to consider de-energization during high wildfire danger weather conditions. This notice to the California State Warning Center must be made in advance of any public notice of this potential de-energization.
- Second, immediately notify the California State Warning Center upon the decision to carry out the de-energizing of power lines.
- Third, immediately notify the California State Warning Center upon the actual de-energization of power lines.
- Finally, immediately notify the California State Warning Center upon the restoration of power.

### INFORMATION AND BRIEFINGS

In its initial notification(s) to the California State Warning Center, the utility must provide the designated point of contact, to include name, phone number, and email address, within that utility who will serve as the primary source of updated information regarding the potential PSPS.

The utility must also provide the State with its proposed operational periods and provide briefings prior to the PSPS, during the power shut-down, and during restoration. The State expects no less than three briefings per day. In the event the State requests a modification to the briefing schedule, the utility is expected to make its best effort to comply with the State's request.

In these briefings, the State expects the utility to provide information including, but not limited to: the expected duration of the power outage; the number of customers potentially impacted; the method of public notification, including the proposed language to be disseminated to the public; the plan for public messaging, as well as coordination with Cal OES, CAL FIRE, and local public safety agencies; and information regarding the deployment of any asset.

Additionally, if Cal OES, CAL FIRE, or the CPUC deploys a representative to a utility's Emergency Operations Center, the State expects the utility to accommodate that deployment, include the State representative in its operational briefings, and provide workspace within its Emergency Operations Center.

### DATA

It is critical that each utility provide the State with real-time data, in advance of the utility's actual de-energization, so the State can prepare for the proposed power outage. Therefore, upon its initial notification to the California State Warning Center of a potential de-energization, the utility must provide the State with all data related to the potentially-impacted areas, as set forth below. Additionally, the State must have the ability to share such data with any state or local agency it deems necessary to protect public safety.

  

The utility must provide the State with maps in PDF format, containing: outage areas; circuits; impacted critical customers; and roads for distribution to emergency response personnel at the local, state, and federal partner agencies. Additionally, each utility must provide GIS datasets, as set forth below, in an ESRI-compliant web service updated and maintained by the utility. If web service is unavailable, data can be in geodatabase format, shapefile, or a KMZ file type. The utility must provide updated files as the data changes. Any point location data provided via a spreadsheet must include an address and/or latitude and longitude.

The specific GIS datasets are as follows:

- Planned Outage Areas (Polygon)
  - Customers per outage area
  - Time of outage
  - Time to restoration
  - # of Medical Baseline Customers

- Current Outage Areas (Polygon)
  - Customers per outage area
  - Time of outage
  - Time to restoration
  - # of Medical Baseline Customers

- Impacted Circuits (Line)
  - Circuit type
  - Customers per circuit
  - Voltage
  - # of Medical Baseline Customers

- Impacted Critical Customers (e.g. Hospitals, Fire Stations, Police Stations, Water/Irrigation Districts, Waste Water Treatment Plants, Telecom, Schools) (Point)
  - Facility Name
  - Street Address
  - City
  - ZIP
  - County
  - Latitude
  - Longitude
  - Customer Type

- Medical Baseline Customer (this can be provided in a spreadsheet format)
  - Impacted Population, by County
  - Impacted Population, by City

  

Having real-time information in preparation for, during, and following a utility's de-energization of a community is essential for the preservation of public safety. This effort will ensure that the State, as well as all potentially-impacted local jurisdictions, are able to effectively prepare for any impacts that may result from a utility's de-energization and respond accordingly. We look forward to your cooperation.

Sincerely,

Mark S. Ghilarducci
Director, Governor's Office of
Emergency Services

Ken Pimlott
Director, California Department of
Forestry and Fire Protection

Michael Picker
President, California Public Utilities
Commission

Cliff Rechtschaffen
Commissioner, California Public Utilities
Commission

# EXHIBIT 3

MP6/eg3  12/21/2018



**FILED**
12/21/18
03:51 PM

## BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion to Determine Whether Pacific Gas and Electric Company and PG&E Corporation's Organizational Culture and Governance Prioritize Safety. | Investigation 15-08-019 |

## ASSIGNED COMMISSIONER'S SCOPING MEMO AND RULING

### Summary

This Scoping Memo and Ruling (Ruling) sets forth the scope to be addressed and the schedule for the next phase of this proceeding, consistent with the Order Instituting Investigation and the prior Scoping Memo in this proceeding.  This Ruling builds on this Commission's Decision (D.) 18-11-050 adopting the recommendations of the NorthStar Report and directing Pacific Gas and Electric Company (PG&E) to implement the recommendations as adopted in the decision.

### 1. Principles

Continuous, safe, and reliable gas and electric service at just and reasonable rates must be provided to Northern California in order to protect human life and sustain prosperity.  The Commission's examination of PG&E's

252283198

safety culture accordingly continues in this proceeding.  The Commission will examine PG&E's and PG&E Corporation's (PG&E Corp.) current corporate governance, structure, and operations to determine if the utility is positioned to provide safe electrical and gas service, and will review alternatives to the current management and operational structures of providing electric and gas service in Northern California.

As the Commission evaluates proposed alternatives, it will consider a range of factors, including:

- the safety and reliability of utility service;
- the operational integrity and technical unity of components within PG&E's gas and electric transmission and distribution systems;
- the stability and adequacy of the utility workforce;
- the utility's relationships with and role in local communities;
- the ability of the state to implement its energy policies, including the need to reduce greenhouse gas (GHG) emissions and local criteria pollutants in both the utility sector and the economy as a whole;
- the ability of the utility to meet financial challenges posed by large catastrophic events such as earthquakes and wildfires;
- the utility's ability to raise capital and purchase gas, electricity, equipment and services; and
- the cost of utility service.

Careful consideration is also necessary to determine whether there is a viable transition process from the status quo to any preferred alternative.  If there is not a clear path forward to implement an alternative (including consideration

of legal, financial, and technical grid issues), then the alternative will not be considered a viable option in this proceeding.

The future of PG&E may also be impacted by other actors beyond the Commission.  The Legislature, the court appointed Federal Monitor, the various courts considering claims against PG&E, the Federal Energy Regulatory Commission, and the communities served by PG&E all have a role in determining PG&E's future.  As a publicly traded company, PG&E must also respond to the financial markets, and to the requirements of the vendors and other parties with which it conducts business.

The Commission has not drawn any conclusions about the outcome of this proceeding and recognizes these other actors may be the origin of proposals for consideration.  The Commission undertakes this next phase of this proceeding in a thoughtful and deliberate manner, consistent with the importance of the issues being addressed.

## 2. Background

PG&E has had serious safety problems with both its gas and electric operations for many years.  The following examples illustrate both the types of safety incidents PG&E has experienced and the remedial consequences imposed by this Commission and several courts.

On September 9, 2010, a PG&E natural gas transmission pipeline ruptured in San Bruno.  The event is well detailed in a Commission decision:

> At 6:11 p.m. on September 9, 2010, Segment 180 of Line 132, a 30-inch diameter natural gas transmission pipeline owned and operated by PG&E, ruptured in the Crestmoor neighborhood of San Bruno, California.  Gas escaping from the rupture

- 3 -

> ignited.  There was an explosion of such tremendous force
> that a crater approximately 72 feet long by 26 feet wide was
> created.  A 28-foot long section of pipe weighing about
> 3,000 pounds was blown approximately 100 feet from the
> crater.  The conflagration continued for over an hour and a
> half, releasing 47.6 million cubic feet of flammable natural gas
> before the flow was stopped.  It required the response of
> 600 firefighting (including emergency medical service)
> personnel and 325 law enforcement personnel.
>
> The resulting deaths, injuries, and damage to property were
> especially severe […].
>
> The Crestmoor neighborhood was effectively wiped off the
> map.  An entire community was displaced.[1]

PG&E faced historically significant administrative penalties and fines and
criminal punishment as a result of the San Bruno explosion.  This Commission
imposed a fine and other penalties on PG&E totaling $1.6 billion.[2]  PG&E was
also found guilty by a federal jury of federal criminal conduct, specifically
multiple willful violations of the Natural Gas Pipeline Safety Act of 1968 and of
obstructing an agency proceeding.[3]  As part of PG&E's sentence in the federal
criminal proceeding, it was required to submit to a federal monitor for
compliance and ethics.[4]  In November 2018, Judge William Alsup, who was

---

[1] D.15-04-023 at 3-4.

[2] D.15-04-024 at 2.

[3] Case No. CR-14-00175-THE; *see also* Press Release, Department of Justice, U.S. Attorney's
Office, Northern District of California, dated August 9, 2016, available at:
https://www.justice.gov/usao-ndca/pr/pge-found-guilty-obstruction-agency-proceeding-and-
multiple-violations-natural-gas.

[4] Case No. CR-14-00175-THE, Order dated January 26, 2017.  In February 2017, Mark Filip was
selected as the Compliance and Ethics Monitor of PG&E for a period of five years.

assigned the PG&E federal criminal manner, directed PG&E to respond by December 31, 2018, to questions regarding the Camp Fire, which occurred in November 2018.

On June 19, 2012, a PG&E subcontractor was killed during demolition of PG&E's decommissioned Kern Power Plant. As part of a settlement of the subsequent Commission Order Instituting Investigation (OII), PG&E was required to implement, on a company-wide basis, a Corrective Action Plan that included a Contractor Safety Program and an Enterprise Causal Evaluation Standard, and pay penalties totaling $5,569,313.[5]

On August 18, 2016, the Commission imposed penalties on PG&E of $25,626,000 in response to six incidents from 2010 through 2014 that called into question the safety of PG&E's natural gas distribution system.[6] In response to the Commission's OII in that proceeding, "PG&E also set forth its efforts to enhance gas distribution system recordkeeping accuracy, accessibility, and controls, as well as operational safety improvements."[7]

On August 27, 2015, the instant OII was opened by the Commission, to examine PG&E's and PG&E Corp.'s safety culture. This Commission was, and remains, concerned that the safety problems being experienced by PG&E were not just one-off situations or bad luck, but indicated a deeper and more systemic

---

[5] These penalties consist of $3,269,313 in ratemaking offsets that benefit customers and $2,300,000 in fines payable to the state's General Fund. (D.15-07-014 at 2.)

[6] D.16-08-020 at 2-4. An additional penalty of $10.8 million was imposed for the Carmel incident. (*Id*. at 10, 51.)

[7] *Id*. at 4.

- 5 -

problem.  The fact that imposing penalties on PG&E (the Commission's standard tool for addressing safety problems) did not seem to change the situation reinforced this concern.

As the Commission stated: "[t]his investigation will…determine whether PG&E's organizational culture and governance are related to PG&E's safety incidents and performance record, and if so, to what extent; and if so, how can or should the Commission order or encourage PG&E to develop, implement, and update as necessary a safety culture of the highest order."[8]  In D.18-11-050, the Commission adopted the findings of the consultant to the Safety and Enforcement Division, the Northstar Consulting Group.  The report concluded that "[w]hile PG&E is committed to safety and efforts have been made to reduce incidents and increase the organizational focus on safety, these efforts have been somewhat reactionary – driven by immediate needs and an understandable sense of urgency, rather than a comprehensive enterprise-wide approach to addressing safety."[9]  The failure of PG&E to develop a comprehensive enterprise -wide approach to address safety, eight years after the 2010 San Bruno pipeline explosion, is of vital concern to this Commission.

The Butte Fire, which began on September 9, 2015, burned approximately 70,000 acres of land and destroyed 921 structures, and left two civilians dead.[10]

---

[8]  Investigation 15-08-019, OII at 15.

[9]  Northstar Report at I-1.

[10]  Cal Fire Report, last modified October 15, 2015, available at
http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=1221.

*Footnote continued on next page*

- 6 -

I.15-08-019  COM/MP6/cg3

The Commission's Safety and Enforcement Division (SED) issued PG&E a citation for $8 million for violation of the CPUC's General Order 95, Rule 31.1, for failing to maintain its 12 kilovolt (kV) overhead conductors safely and properly.[11] SED also cited PG&E $300,000 for failure to timely report to the CPUC that PG&E's facilities may have been linked to the ignition of the Butte Fire and for failing to maintain the minimum required clearance between a 12 kV conductor and a tree.[12]

In the fall of both 2017 and 2018, historically large wildfires burned in PG&E's service territory.  The scale of these fires set new records on almost every metric which exists to measure wildfires.  Because the Commission's investigations into these fires are ongoing, the specific causes of the fires, potential enforcement actions, and PG&E's prudency related to the fires will not be addressed in this proceeding.  However, the Commission will consider the fact that PG&E's service territory includes fire prone land according to the Commission's fire threat maps,[13] which is a critical safety challenge for PG&E.

On December 14, 2018, the Commission opened an OII proceeding to consider penalties and ordered immediate action against PG&E for what

---

[11] Citation Issued Pursuant to D.16-09-055.  Available here:
http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/E1704001
E2015091601Citation20170425.pdf.

[12] Citation Issued Pursuant to D.16-09-055.  Available here:
http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/E1704002
E20150916_01Citation20170425.pdf.

[13] D.17-01-009, revised by D.17-06-024.

*Footnote continued on next page*

Commission staff says are systemic violations of rules to prevent damage to natural gas pipelines during excavation activities.[14]  The Commission directed PG&E to take immediate corrective measures and to attest under penalty of perjury that it is conducting natural gas pipeline locate and mark efforts and programs in a safe manner consistent with all applicable laws.  The Commission has not prejudged the outcome of that proceeding; however, the fact that these allegations have been made are noted to provide context for the type of challenges we expect PG&E to address by adopting and maintaining a safety culture.

This Commission is tasked with regulating PG&E's safe operation of its natural gas pipeline and electricity infrastructure.  Given PG&E's record and the dangers inherent in PG&E's service territory, the Commission must evaluate whether there is a better way to serve Northern California with safe and reliable electric and gas service at just and reasonable rates.  This ruling identifies the scope of issues considered in the next phase of this proceeding.

## 3. Scope of Issues

The safe operation of PG&E's gas and electric systems and the threat of personal harm to PG&E employees and members of the public are of critical concern to the Commission and California.  To address that concern and mitigate future risk, the next phase of this proceeding will consider a broad range of alternatives to current management and operational structures for providing electric and natural gas in Northern California.  Accordingly, the following list of

---

[14]  I.18-12-007.

I.15-08-019 COM/MP6/cg3

proposals is illustrative rather than exclusive and is intended to show the range of possible alternatives under consideration. This list does not limit the Commission's potential actions or directives. The outcome of this investigation may include recommendations to other entities that have a role in ensuring safe electrical and gas service in Northern California, if a desired outcome requires action by someone other than this Commission. Parties may present other options than the ones listed below. The Commission may revise the scope of alternatives to be considered after receiving comments from parties.

This is not a punitive exercise. Indeed, the keystone question is, compared to PG&E and PG&E Corp. as presently constituted, would any of the following proposals provide Northern Californians safer gas and electric service at just and reasonable rates?

### Corporate Governance – Board of Directors

- Should PG&E and PG&E Corp. be subject to a utility-specific business judgment rule (BJR) to require the Board of Directors to account for safety beyond the current fiduciary duties?[15] If so, should such a utility-specific business judgment rule apply to corporate officers as well?

- Should the PG&E Board of Directors regularly file with the Commission a report of how the Board met its duties under the BJR to account for safety? Should this include a summary of the oversight exercised by the Board including information reviewed, when deliberations occurred, and the depth of the review? Should the report include the Board review of the corporate officers' leadership as it pertains to safety? Should compensation to the Board

---

[15] *See, e.g.* California Corporations Code § 309 and *Gaillard v. Natomas Co.*, 208 Cal. App. 3d 1250 (1989).

Members be dependent on a Commission finding that the Board members discharged their safety duties appropriately?

- Should PG&E form an independent nominating committee to identify and select candidates for the Board of Directors?

- Should PG&E identify specific criteria for potential Board of Directors members?  For example, should PG&E have one or more Board of Directors members be experts in organizational safety, gas safety, and/or electrical safety?  If so, should the appointment of safety experts be made subject to Commission or Governor approval?

- Should PG&E form an audit committee constituted of independent directors possessing financial and safety competence, as defined by the Commission, to evaluate the Board of Directors' discharge of their duties and make recommendations for qualifications of future members of PG&E's Board of Directors?

- The Securities and Exchange Commission requires publicly traded companies to file an 8-K Form when a material event occurs.  Generally, an event is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  Should PG&E file an analogous safety report with the Commission when PG&E makes a significant decision regarding capital expenditures pertaining to safety, a change in management as it pertains to safety, or any other decision that may impact safety?

- Should PG&E file a public annual report of all Directors and Officers insurance policies obtained by PG&E and identify the risk PG&E identified to obtain the insurance?  If PG&E amends its Directors and Officers insurance, should it notify the Commission of the risk identified and the terms of the amended policy?

I.15-08-019  COM/MP6/eg3

- Should part or all of the existing Board of Directors resign and be replaced by directors with a stronger background and focus on safety?

## Corporate Management – Officers and Senior Leadership

- Should PG&E retain new corporate management in all or in part?

- Should the questions posed above for Corporate Governance be similarly considered for corporate management?

- Should compensation for non-officer executives be modified?  Does the current incentive structure properly incent PG&E decision-makers?[16]

## Corporate Structure

- Should PG&E's gas and electric distribution and transmission divisions be separated into separate companies?  If so, should the separate companies be controlled by a holding company?  Should the holding company be a regulated utility?

- Should PG&E's corporate structure be reorganized with regional subsidiaries based on regional distinctions?  For example, PG&E could be divided into multiple smaller utilities operating under a single parent company.  If so, should such a reorganization apply to both gas and electric services?  Do the physical characteristics of the gas and electric systems lend themselves to the same regional structure, or do the physical characteristics of the respective systems lend themselves to different regional structures?

---

[16] Senate Bill 901 (Dodd) prohibits an electrical or gas corporation from recovering any annual salary, bonus, benefits, or other consideration of any value, paid to an officer of the corporation, from ratepayers.

- 11 -

I.15-08-019  COM/MP6/cg3

- Should the Commission revoke holding company authorization, so PG&E is exclusively a regulated utility? Should all affiliates and subsidiaries be spun off or incorporated into the regulated utility?

- Should the Commission form a standing working group with the union leadership of PG&E to identify the safety concerns of PG&E staff?

**Publicly Owned Utility, Cooperative, Community Choice Aggregation or other Models**

- Should some or all of PG&E be reconstituted as a publicly owned utility or utilities?

- Should PG&E be a "wires-only company" that only provides electric distribution and transmission services with other entities providing generation services? If so, what entities should provide generation services?

**Return On Equity**

- Should the Commission condition PG&E's return on equity on safety performance?

- What are the safety considerations for the utility if its financial status is downgraded by the investment community?

**Other Proposals**

- What other measures should be taken to ensure PG&E satisfies its obligation to provide safe service?

## 4. Comments

Parties should make preliminary comments on the desirability of these alternatives with discussion of how each proposal impacts the following considerations:

- the safety and reliability of utility service;

- 12 -

I.15-08-019  COM/MP6/g3

- the operational integrity and technical unity of components within PG&E's gas and electric transmission and distribution systems;

- the stability and adequacy of the utility workforce;

- the utility's relationships with and role in local communities;

- the ability of the state to implement its energy policies, including the need to reduce GHG emissions and local criteria pollutants in both the utility sector and the economy as a whole;

- the ability of the utility to meet financial challenges posed by large catastrophic events such as earthquakes and wildfires;

- the utility's ability to raise capital and purchase gas, electricity, equipment and services; and

- the cost of utility service.

In addition, the parties shall make initial observations on the legal, technical, and financial feasibility of these proposals and include observations on the feasibility of transitioning from the current utility structure to proposed alternatives. Parties may also offer additional proposals with consideration given to the same factors and feasibility concerns. Parties may also comment on scope and process recommendations.

For ease of reference, parties' comments shall follow the same format provided in this ruling. Specifically, parties shall comment on proposals in the following sequence: Corporate Governance, Corporate Management, Corporate Structure, Public Utility or Cooperative, Return on Equity, and Other Proposals. Opening comments are limited to 40 pages. Reply comments are limited to 20 pages.

- 13 -

I.15-08-019  COM/MP6/cg3

To better inform this proceeding, on or before January 16, 2019, PG&E is also directed to file a summary of:

- PG&E's and PG&E Corp.'s corporate structures, including organizational charts for the respective Board of Directors, executives, and other senior leadership as of September 1, 2010, and as of December 31, 2018.  The summary should also explain the different lines of business of PG&E and PG&E Corp.
- The senior positions in PG&E and PG&E Corp. responsible for management of safety, and how the different roles interact.

After review of comments filed by parties, the Commission will identify the best process to consider proposals and identify concerns that require additional filings from parties.

## 5.  Schedule

The next step for this Commission is to obtain input on the various possible approaches to address the underlying issue of PG&E's safety culture. The Commission needs to have more information and analysis from a range of perspectives before it can consider implementation of any particular approach, or even select any approach to consider in more detail.  Accordingly, the schedule set forth below is limited to the filing and service of party comments on the issues identified above.

The following schedule is adopted:

| PG&E and PG&E Corp. Background Filing | January 16, 2019 |
| Concurrent Opening Comments filed and served | January 30, 2019 |
| Concurrent Reply Comments filed and served | February 13, 2019 |

This schedule may be modified by the assigned Commissioner or Administrative Law Judge (ALJ) as necessary.  Once comments are received, the assigned Commissioner and ALJ will determine the next procedural steps to take.

## 6. Presiding Officer

In the interest of judicial efficiency, ALJ Peter V. Allen is designated as the Presiding Officer in this phase of the proceeding.

## 7. Public Category of Proceeding/*Ex Parte* Restrictions

As stated in the original scoping memo issued on May 8, 2017, this proceeding is categorized as ratesetting.  With the change in presiding officer, the voluntary *ex parte* prohibition previously imposed by the assigned Commissioner is lifted, and will not apply to this phase of the proceeding.  The Commission's rules regarding *ex parte* communications in ratesetting proceedings remain in place.  Accordingly, *ex parte* communications are restricted and must be reported pursuant to Article 8 of the Commission's Rules of Practice and Procedure.

## 8. Advisor

Any person interested in participating in this proceeding who is unfamiliar with the Commission's procedures or has questions about the electronic filing procedures is encouraged to obtain more information at http://consumers.cpuc.ca.gov/pao/ or contact the Commission's Public Advisor at 866-849-8390 or 415-703-2074 or 866-836-7825 (TYY), or send an e-mail to public.advisor@cpuc.ca.gov.

**IT IS RULED** that:

1. The scope of this proceeding is described above.

I.15-08-019  COM/MP6/cg3

2.  The schedule of this proceeding is as set forth above.

3.  Administrative Law Judge Peter V. Allen is designated as the presiding officer for this phase of the proceeding.

4.  Page limitations for opening and reply comments are as set forth above.

Dated December 21, 2018, at San Francisco, California.

/s/  MICHAEL PICKER
Michael Picker
Assigned Commissioner

# EXHIBIT 4

Date of Issuance: July 16, 2018

## PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

**SAFETY AND ENFORCEMENT DIVISION**　　　　　**Resolution ESRB-8**
**Electric Safety and Reliability Branch**　　　　　　　**July 12, 2018**

## R E S O L U T I O N

### RESOLUTION EXTENDING DE-ENERGIZATION REASONABLENESS, NOTIFICATION, MITIGATION AND REPORTING REQUIREMENTS IN DECISION 12-04-024 TO ALL ELECTRIC INVESTOR OWNED UTILITIES.

PROPOSED OUTCOME:

This Resolution extends the de-energization reasonableness, public notification, mitigation and reporting requirements in Decision (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs) and adds new requirements. It also places a requirement on utilities to make all feasible and appropriate attempts to notify customers of a de-energization event prior to performing de-energization.

SAFETY CONSIDERATIONS:

De-energizing electric facilities during dangerous conditions can save lives and property and can prevent wildfires. This resolution provides guidelines that IOUs must follow and strengthens public safety requirements when an IOU decides to de-energize its facilities during dangerous conditions.

ESTIMATED COST: Costs of compliance with the new requirements are unknown.

## SUMMARY

Commission Decision (D.) 12-04-024 established requirements for reasonableness, notification, mitigation and reporting by San Diego Gas & Electric Company (SDG&E) for its de-energization events.

This resolution extends the requirements established in D.12-04-024 to all electric IOUs, requires that the utilities meet with the local communities that may be impacted by a future de-energization event before putting the practice in effect in a particular area, requires feasible and appropriate customer notifications prior to a de-energization event, and requires notification to the Safety and Enforcement Division (SED) as soon as practicable after a decision to de-energize facilities and within 12 hours after the last service is restored.

Resolution ESRB-8                                                          July 12, 2018

## BACKGROUND

California Public Utilities Code (PU Code) Sections 451 and 399.2(a) give electric utilities authority to shut off electric power in order to protect public safety. This authority includes shutting off power for the prevention of fires caused by strong winds.

Application (A.) 08-12-021 filed by SDG&E on December 22, 2008, requested specific authority to shut off power as a fire-prevention measure against severe Santa Ana winds and a review of SDG&E's proactive de-energization measures. SDG&E also requested that such power shut-offs would qualify for an exemption from liability under SDG&E's Tariff Rule 14.

Decision (D.) 12-04-024 issued on April 19, 2012 provided guidance on SDG&E's authority to shut off power under the PU Code and also established factors the Commission may consider in determining whether or not a decision by SDG&E to shut off power was reasonable. The decision ruled that SDG&E has the authority under Public Utilities Code, Sections 451 and 399.2(a) to shut off power in emergency situations when necessary to protect public safety. It also ruled that a decision to shut off power by SDG&E under its statutory authority, including the adequacy of any notice given and any mitigation measures implemented, may be reviewed by the Commission to determine if SDG&E's actions were reasonable.  The decision requires SDG&E to take appropriate and feasible steps to provide notice and mitigation to its customers whenever it shuts off power. The decision also requires SDG&E to notify the Commission's Consumer Protection and Safety Division, now the Safety and Enforcement Division (SED), of the shut-off within 12 hours and submit a report to SED with a detailed explanation of its decision to shut off the power.

Southern California Edison Company (SCE) and Pacific Gas and Electric Company (PG&E) both currently exercise their authority to shut off power during dangerous fire conditions. However, there are currently no established standards on reasonableness, notification, mitigation and reporting by IOUs other than SDG&E.

## DISCUSSION

The 2017 California wildfire season was the most destructive wildfire season on record, and saw multiple wildfires burning across California, including five of the 20 most destructive wildland-urban interface fires in the state's history.  Devastating fires raged in Santa Rosa, Los Angeles, and Ventura, and the Thomas Fire proved to be the largest wildfire in California history.  These fires further demonstrated the fire risk in California.  As a result of the fires and critical fire weather conditions, both the President of the United States and the Governor of California issued State of Emergency declarations.

SDG&E exercised its statutory authority under Public Utilities Code Sections 451 and 399.2(a), to de-energize specific circuits in December of 2017.  The first group of de-energization events occurred during the period of December 4 through 12, 2017.  There were 55 individual circuit de-energization events involving 28 circuits (some circuits had multiple de-energization events) in various eastern San Diego County communities.  A total of approximately 14,000 customers were affected.

2

Resolution ESRB-8                                                July 12, 2018

A second group of de-energization events occurred on December 14 and 15, 2017. There were six individual circuit de-energization events involving three circuits in various eastern San Diego County communities. A total of approximately 650 customers were affected.

In 2017, SCE also used de-energization as a measure to protect its system against fire safety hazards. The de-energization event occurred on December 7, 2017 and affected customers in the community of Idyllwild. Approximately 8,061 total customers were affected in SCE's and nearby Anza Co-Op's service territories. The de-energization event occurred in response to a Red Flag Warning in effect, SCE meteorological forecasting, field-validated extreme high winds and associated fire risks in the area.

According to SCE, during such an event, the company typically attempts to notify customers who could be affected prior to de-energization if timing allows. For the December 7, 2017 event, SCE notified city, county and government officials prior to de-energizing but was not able to notify affected customers prior to the outage occurring. SCE also utilizes other wildfire mitigation practices, such as blocking of distribution reclosers in High Fire Areas, prior to de-energization. According to SCE, de-energization of circuits would be the last line of defense to protect public safety due to extreme fire weather conditions. SCE requires that such an event must be authorized by its activated Incident Management Team.

PG&E reports that prior to 2018, it did not have a policy to de-energize lines as a fire prevention measure. PG&E reported that it did not proactively de-energize lines due to extreme fire weather conditions in 2017. However, in March 2018 PG&E announced that it is developing a program to de-energize lines during periods of extreme fire conditions and has been meeting with local communities to gather feedback.

## I.   Current De-Energization Policies Applicable to SDG&E

D.12-04-024 established de-energization policies applicable to SDG&E addressing reporting, reasonableness review and customer notification.

### A.  <u>Reporting</u>

Under D.12-04-024, SDG&E is required to provide the following notifications:

- A notification to the Director of SED provided no later than 12 hours after the power shut-off.

- A report to the Director of SED provided no later than 10 business days after the shut-off event ends that includes (i) an explanation of the decision to shut off power; (ii) all factors considered in the decision to shut off power, including wind speed, temperature, humidity, and moisture in the vicinity of the de-energized circuits; (iii) the time, place, and duration of the shut-off event; (iv) the number of affected customers, broken down by residential, medical baseline, commercial/industrial, and other; (v) any wind-related damage to SDG&E's overhead power-line facilities in the areas where power is shut off; (vi) a description of the notice to customers and any other mitigation provided by

3

SDG&E; and (vii) any other matters that SDG&E believes are relevant to the
Commission's assessment of the reasonableness of SDG&E's decision to shut off power.

As other electric IOUs shut off power in a similar manner and in similar situations, such
notifications are important to allow safety oversight by SED, and it would be appropriate to have
these reporting requirements apply to all electric IOUs' de-energization events.

### B. Reasonableness Review

D.12-04-024 identified several factors that the Commission may consider in assessing whether
an SDG&E decision to de-energize "was reasonable and qualifies for an exemption from liability
under SDG&E's Electric Tariff Rule 14."[1]  These factors are summarized below:

- SDG&E has the burden of demonstrating that its decision to shut off power is necessary
  to protect public safety.
- SDG&E must rely on other measures, to the extent available, as alternatives to shutting
  off power.
- SDG&E must reasonably believe that there is an imminent and significant risk that strong
  winds will topple its power lines onto tinder dry vegetation during periods of extreme fire
  hazard.
- SDG&E must consider efforts to mitigate the adverse impacts on the customers and
  communities in areas where it shuts off power. This includes steps to warn and protect its
  customers whenever it shuts off power.
- Other additional factors, as appropriate, to assess whether the decision to shut off power
  is reasonable.

As other electric IOUs are developing and/or instituting de-energization plans, it is important that
these factors be used to assess the reasonableness of all electric IOU de-energization events in
order to ensure that the power shut off is executed only as a last resort and for a good reason.
However, we modify the third factor listed above by adding the phrase underlined below:

- [The IOU] must reasonably believe that there is an imminent and significant risk that
  strong winds will topple its power lines onto tinder dry vegetation or will cause major
  vegetation-related impacts on its facilities during periods of extreme fire hazard.

### C. Public Outreach, Notification, and Mitigation

D.12-04-024 requires that SDG&E provide notice and mitigation to its customers, to the extent
feasible and appropriate, whenever SDG&E shuts off power pursuant to its statutory authority.

---

[1] D.12-04-024, page 30.

**4**

Resolution ESRB-8                                                                 July 12, 2018

As other electric IOUs are developing and/or instituting de-energization plans, it is important that this requirement for public outreach, notification, and mitigation apply to all electric IOUs in order to ensure that customers are impacted to the least extent necessary. We recognize that it is not practicable to have an absolute requirement that electric IOUs provide advance notification to customers prior to a de-energization event.

## II.    Strengthened Requirements Applicable to all Electric IOUs

Recent California experience with wildfires demands that we enhance existing de-energization policy and procedures. In order to ensure that the public and local officials are prepared for power shut off and aware of an IOU de-energization policy, and in order to ensure proper safety oversight by SED, we adopt the following:

1. The guidelines in D.12-04-024, currently applicable to SDG&E only, shall apply to all electric IOUs.

2. The guidelines shall be strengthened as described in the following sections and the strengthened guidelines shall apply to all electric IOUs.

### A.  Reporting

IOUs shall submit a report to the Director of SED within 10 business days after each de-energization event, as well as after high-threat events where the IOU provided notifications to local government, agencies, and customers of possible de-energization though no de-energization occurred. Reports to the Director of SED must include at a minimum the following information:

- The local communities' representatives the IOU contacted prior to de-energization, the date on which they were contacted, and whether the areas affected by the de-energization are classified as Zone 1, Tier 2, or Tier 3 as per the definition in General Order 95, Rule 21.2-D.

- If an IOU is not able to provide customers with notice at least 2 hours prior to the de-energization event, the IOU shall provide an explanation in its report.

- The IOU shall summarize the number and nature of complaints received as the result of the de-energization event and include claims that are filed against the IOU because of de-energization.

- The IOU shall provide detailed description of the steps it took to restore power.

- The IOU shall identify the address of each community assistance location during a de-energization event, describe the location (in a building, a trailer, etc.), describe the assistance available at each location, and give the days and hours that it was open.

### B.  Reasonableness Review

The reasonableness review discussion in D.12-04-024 and detailed above shall apply to all electric IOUs. At this time, we are not adding additional requirements and, while we recognize that this issue along with financial liability are important ongoing discussions, this resolution is not the venue for that discussion.

Resolution ESRB-8                                                    July 12, 2018

## C. <u>Public Outreach, Notification, and Mitigation</u>

Increased coordination, communication and public education can be effective measures to increase public safety and minimize adverse impact from de-energization.

- The IOU shall notify the Director of SED, as soon as practicable, once it decides to de-energize its facilities. If the notification was not prior to the de-energization event, the IOU shall explain why a pre-event notification was not possible. The notification shall include the area affected, an estimate of the number of customers affected, and an estimated restoration time. The IOU shall also notify the Director of SED of full restoration within 12 hours from the time the last service is restored.

- Within 90 days of the effective date of this resolution, each IOU shall convene De-Energization Informational Workshops with representatives of entities that may be affected by a de-energization event, including but not limited to: state agencies, tribal governments, local agencies and representatives from local communities. Workshops should be inclusive of, but not limited to, representatives of customers who are low-income, have limited English, have disabilities, or are elderly. The purpose of these workshops is to explain, and receive feedback on, the IOU's de-energization policies and procedures. The workshops should be supplemented by focused working sessions, upon request by specific groups such as communications providers or Community Choice Aggregators that might have notification needs different than those of the general public.

- Within 30 days of the effective date of this resolution, each IOU shall submit a report to the Director of SED outlining its public outreach, notification, and mitigation plan. The plan must include at a minimum, the following information:

  o Names of communities that will be invited to De-Energization Informational Workshops.

  o Names of state agencies and tribal governments that the IOU will coordinate with in developing its de-energization plan and will invite to De-Energization Informational Workshops.

  o Names of local agencies the IOU will coordinate with in developing its de-energization plan and will invite to De-Energization Informational Workshops.

  o Proposed communication methods for publicizing and convening the De-Energization Informational Workshops.

  o Details regarding its plans for notification in advance of, and during, a de-energization event, and its plans for mitigation when de-energization occurs.

- The IOU shall ensure that de-energization policies and procedures are well-communicated and made publicly available, including the following:

  o Make available and post a summary of de-energization policies and procedures on its website.

  o Meet with representatives from local communities that may be affected by

6

de-energization events, before putting the practice in effect in a particular area.

- o Provide its de-energization and restoration policy in full, and in summary form, to the affected community officials before de-energizing its circuits.
- o Discuss the details of any potential shut-off and mitigation measures that the communities should consider putting in place, including information about any assistance that the IOU may be able to provide during events.

- In anticipation of a specific de-energization event, the IOU shall:
  - o Notify customers of planned de-energization as soon as practicable before the event.
  - o As practicable and operationally feasible, notify and communicate with representatives from the fire departments, first responders, local communities, government, communications providers, and Community Choice Aggregators that may be affected by the de-energization event.
  - o Discuss with local government and community representatives the details of any potential shut-off and mitigation measures the IOU can provide to lessen the negative impacts of the power outage (e.g., cooling centers).
  - o Ensure that critical facilities such as hospitals, emergency centers, fire departments, and water plants are aware of the planned de-energization event.

- The IOU shall retain documentation of community meetings and information provided in electronic form, and make that information available to SED upon request. The information shall be retained for a minimum of one year after the de-energization event or five years after the community meetings, whichever comes first.

- After the de-energization event, IOUs shall assist critical facility customers to evaluate their needs for backup power and determine whether additional equipment is needed. To address public safety impacts of a de-energization event, the IOU may provide generators to critical facilities that are not well prepared for a power shut off.

- The IOU shall retain records of customer notifications and make that information available to SED upon request. The information shall be retained for a minimum of one year after the de-energization event.

## COMMENTS ON DRAFT RESOLUTION

PU Code Section 311(g)(1) provides that a resolution must be served on all parties and subject to at least 30 days public review and comment prior to a vote of the Commission. Section 311(g)(2) provides that this 30-day period may be reduced or waived upon the stipulation of all parties in the proceeding or in other specified situations.

The draft resolution was mailed to parties for comment on May 30, 2018, and was noticed on the Commission's Daily Calendar on June 8, 2018. The 30-day comment period for the draft resolution was neither waived nor reduced. Parties submitted comments by June 28, 2018, and reply comments by July 6, 2018.

Resolution ESRB-8                                                    July 12, 2018

Based on parties' comments, several modifications were made to the draft resolution, including the following:

- One of the factors specified in D.12-04-024 for consideration during reasonableness reviews was expanded for use when applied to all IOUs.

- The requirements for reporting events that do not eventually trigger de-energization were clarified.

- The full restoration reporting period to the SED was increased from 30 minutes to 12 hours.

- The period for convening De-Energization Informational Workshops was increased from 60 days to 90 days.

- The guidance for meeting with local communities was made a general requirement, rather than tied to specific de-energization events.

- Low-income, limited English, and disability communities were added to the list of parties to include in the De-Energization Informational Workshops.

- Communications providers were added to the list of representatives to be notified in anticipation of a de-energization event.

- The requirement to provide generators and/or batteries to critical facilities was removed since most critical facilities are required to have their own back-up power resources.

Also in response to comments by the parties, we clarify that the requirements adopted in this resolution are not in conflict with IOU authority to de-energize power lines to ensure public safety provided under the PU Code. We expect an IOU to use its best judgment on a case-by-case basis to determine whether de-energization is needed for public safety. We hold this expectation even if an IOU has not complied fully with each of the requirements in this resolution, for example, if a need for de-energization arises before an IOU has meet with the impacted local communities. If an IOU did not fulfill one or more of the requirements in this resolution prior to a de-energization, the IOU shall identify the missed requirement(s) and provide an explanation in its report submitted to the Director of SED after the de-energization event.

## **FINDINGS**

1. Under PU Code Sections 451 and 399.2(a), electric IOUs have the authority to shut off power in order to protect public safety.

2. The decision to de-energize electric facilities for public safety is complex and dependent on many factors including and not limited to fuel moisture; aerial and ground firefighting capabilities; active fires that indicate fire conditions; situational awareness provided by fire agencies, the National Weather Service and the United States Forest Service; and local meteorological conditions of humidity and winds.

3. The decision to shut off power may be reviewed by the Commission pursuant to its broad jurisdiction over public safety and utility operations.

8

Resolution ESRB-8                                                    July 12, 2018

4. The requirements for reporting, public outreach, notification, mitigation and reasonableness review in D.12-04-024 are effective, but are only applicable to SDG&E.

5. All electric IOUs may face similar safety situations requiring power shut-off in emergencies and de-energization events in their service territory.

6. De-energization of electric facilities could save lives, protect property, and prevent fires.

7. The measures in D.12-04-024 should be strengthened to further ensure that the public and local officials are prepared for de-energization events and to ensure the proper safety oversight by the Commission's Safety and Enforcement Division.

**THEREFORE, IT IS ORDERED THAT:**

1. All electric IOUs shall take appropriate and feasible steps to provide notice and mitigation to their customers in accordance with the guidelines in D.12-04-024 whenever they shut off power pursuant to their statutory authority.

2. All electric IOUs shall follow the notification requirements to SED established in D.12-04-024.

3. All electric IOUs shall comply with the additional guidelines stated in the section of this resolution titled "**Strengthened Requirements Applicable to all Electric IOUs.**"

This Resolution is effective today.

I certify that the foregoing resolution was duly introduced, passed and adopted at a conference of the Public Utilities Commission of the State of California held on July 12, 2018; the following Commissioners voting favorably thereon:

/s/ *ALICE STEBBINS*
ALICE STEBBINS
Executive Director

MICHAEL PICKER
President
CARLA J. PETERMAN
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
Commissioners

9

# EXHIBIT 5

# MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
# CALIFORNIA PUBLIC UTILITIES COMMISSION
## AND THE
# CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION

The California Public Utilities Commission (CPUC) and California Department of Forestry and Fire Protection (CAL FIRE) (collectively the Parties) enter into this Memorandum of Understanding (MOU) to cooperatively develop consistent approaches to forest management, safety and energy programs.

## ROLES AND RESPONSIBILTIES

CAL FIRE is charged with the fire prevention, protection, and stewardship of over 31 million acres of California's privately-owned wildlands. CAL FIRE answers the call to more than 350,000 emergencies each year such as fires, medical aids, hazardous material spills, search and rescue missions, train derailments, and earthquakes. CAL FIRE is responsible for fire and life safety code review of all State-owned and leased buildings, the training certification of firefighters, and the inspection of 6,500 miles of intrastate hazardous liquid pipelines. In addition, CAL FIRE provides varied emergency services to approximately 150 local cities, counties, and fire districts via cooperative contracts.

The CPUC ensures that regulated services are delivered in a safe, reliable manner. CPUC regulations are designed to protect the public from potential hazards, including fires, which may be caused from electric utility transmission or distribution lines, or communications infrastructure providers' facilities in proximity to the electric overhead transmission or distribution lines. The Commission's current General Orders 95, 128, and 165 are designed to promote the safe installation and operation of electric utility and communications infrastructure facilities, and provide the minimum safety requirements which the utilities are supposed to supplement with additional safety precautions when operations and local conditions warrant.

## SHARED PRIORITIES

The following priorities are shared by the CPUC and CAL FIRE for effective communication and coordination:

1. Work together to develop consistent approaches to forest management, wildfire prevention, public safety, and energy programs.
2. Develop management alignment on key policy issues.

1

3. Develop a statewide biomass/bioenergy/biofuel strategy to ensure cost effective methods exists to deliver fuel to biomass/biofuel facilities.

4. Assist one another in preparing for, responding to, and mitigating the effects of wildfires.

5. Deepen awareness of the requirements and goals of each other's programs.

6. Create an Interagency Fire Safety Working Group to vet ideas and develop programmatic solutions to shared goals in the interest of fire safety and resource protection.

**Immediate-Term Goals:**

In order to achieve optimal results for the shared priorities, the Parties' immediate term goals are as follows:

1. Develop a shared understanding of the use of fire mapping, including enhanced enforcement of the CPUC's General Order 95.

2. Develop a shared understanding of utility deployment timelines, procedures, and operations during a wildfire event, including enhanced enforcement of CPUC General Order 166. Ensure utilities establish significant base camps and are a major presence at incident sites of major fires.

3. Enhance the Parties' communication during and following a wildfire event. The CPUC can serve as a link between CAL FIRE and utilities during an event.

4. Coordinate on a range of resource management issues, fuels treatments, tree mortality, and bark beetle infestation. Jointly identify any mitigation measures that the utilities need to take in response to the tree mortality crisis.

5. Initiate the process for utilities to develop and submit fire hazard prevention plans required by SB 1028. Work together on identifying the requirements for fire hazard prevention plans and communicating these requirements to the utilities. Develop a process for review of fire hazard prevention plans.

6. Provide complementary resources in the areas of risk mitigation, risk management, and investigative relationships between CAL FIRE and the CPUC relating to suspected utility involved fire events.

7. Share best practices related to regulation, inspection, and overall safety of hazardous liquid and gas pipeline systems.

## CAL FIRE RESPONSIBILITIES

In order to achieve optimal results for the shared priorities, CAL FIRE will perform the activities and functions summarized below.

2

1. Upon request, review utility wildfire mitigation plans in accordance with Public Utilities Code Sections 8385 to 8387. Assist CPUC in developing criteria and standards to be used in wildfire mitigation plans.

2. Identify and develop contracting requirements necessary for the completion of Fire Map 2 and the establishment of the CPUC Wildfire Mitigation Section in accordance with SB 1028.

   a. Participate in the Technical Review Team (as defined in the CPUC's Fire Map 2 Work Plan Decision 17-01-009).

   b. Assess, evaluate, and provide formal feedback via public comments or reports on future Party-submitted mapping proposals regarding physical mapping changes and challenges and/or adjustments to existing mapping methodologies.

   c. Assess, evaluate, and provide formal feedback via public comments on utility SB 1028 wildfire mitigation plans and utility vegetation management plans.

3. Provide subject matter expertise in mechanical engineering, utility design and testing, and wildland fire risk analysis to the CPUC to advise on wildfire mitigation program management, audit schedule, mitigation plan details, and enforcement. In addition, this liaison(s) will interface with CPUC staff to assist with technical fire science/behavior assessment and allocation of resources.

4. Participate in identifying best practices of design and operation of utility systems for the purposes of fire mitigation.

5. Provide CPUC staff with CAL FIRE operations documentation, including current CAL FIRE structure, operations model, field operations, investigation procedures, and utility/local community outreach efforts/relationships and also be available for follow-up regarding briefing documentation.

6. Provide safety training to select CPUC personnel in order to enhance the CPUC's ability to coordinate with CAL FIRE and/or utilities in the vicinity of a wildfire event.

## CPUC RESPONSIBILITIES

In order to achieve optimal results for the shared priorities, the CPUC will perform the activities and functions summarized below.

1. Oversee utility implementation of wildfire mitigation plans and ensure adherence to best practices identified by CAL FIRE.

2. Adopt risk-based regulations that are in alignment with Fire Map 2 through the CPUC formal process.

3. Perform compliance and enforcement activities pertaining to adopted rules related to fire mitigation and emergency response.

3

4. Use CPUC regulatory authority to assist CAL FIRE to resolve issues with utilities.

5. Dedicate staff to work with CAL FIRE and ensure staff participation in training.

6. Provide funding as necessary to support CAL FIRE's efforts to meet CPUC assistance requests.

7. Assist CAL FIRE in areas of CPUC expertise.

8. Track and report vegetation management clearance activities on an annual basis to CAL FIRE and the California Board of Forestry and Fire Protection.

9. Fund applied research to examine the effectiveness of vegetation clearance and other activities in wildlife mitigation plans designed to reduce wildfire risk. Fund research to refine fire models and data layers that are used to develop Fire Map 2.

## PROTECTION OF CONFIDENTIAL INFORMATION

"Confidential Information" includes information obtained pursuant to California Public Utilities Code section 583, records exempt from public disclosure under the California Public Records Act (Government Code sections 6250, et seq.), or written or verbal information that is designated by the Parties to be exempt, prohibited, or privileged from disclosure by State or federal law.

The Parties shall take all necessary measures to protect Confidential Information and, consistent with the Public Records Act and any other laws requiring disclosure, treat the shared Confidential Information as confidential. The Parties shall impose all the requirements of this MOU on all of their respective officers, members, employees and agents with access to Confidential Information. Any Confidential Information obtained by the Parties shall only be used for purposes which are consistent with existing law.

All Confidential Information provided to the Parties pursuant to this MOU shall be subject to Government Code Section 6254.5, subdivision (e), which exempts from public disclosure under the California Public Records Act, confidential records that one State or local agency has provided to another State or local agency pursuant to an agreement that the latter will treat the disclosed records as confidential.

## SCOPE

This MOU is made for the sole benefit of CAL FIRE and CPUC, and no other person or entity shall have any rights or remedies under or by reason of this MOU. Nothing in this MOU may be the basis of any third-party challenges or appeals. Nothing in this MOU creates any rights, remedies, or causes of action in any person or entity not party to this MOU.

CAL FIRE and CPUC each retain all rights, responsibilities, and authorities provided for by law. Nothing in this MOU delegates any rights, responsibilities, or authorities

4

provided by law to either Party. Nothing in this MOU delegates or otherwise prevents, compromises, or precludes each Party from exercising all rights, responsibilities, or authorities provided by law.

Both parties will meet and coordinate progress regarding the MOU on an annual basis, or as mutually agreed upon by the parties.

## APPROVAL

This MOU is effective upon completion of the signatures listed below. This MOU shall not be modified except by a written agreement signed by authorized representatives of the Parties.

This MOU shall continue unless or until either Party to the MOU determines that the MOU should be terminated. Unless otherwise provided for by the written agreement of both of the Parties, unilateral termination of the MOU shall be effected no sooner than 60 days from the date either party provides written notice of its intent to terminate the MOU. Termination of this MOU shall not affect the obligation of the parties to maintain the confidentiality of information pursuant to this MOU.

CALIFORNIA PUBLIC UTILITIES COMMISSION:

TIMOTHY J. SULLIVAN
Executive Director

August 18, 2017

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION:

KEN PIMLOTT
Director

August 23, 2017

5

# EXHIBIT 6

# STATE OF CALIFORNIA

# **RULES**

FOR

# Overhead Electric Line Construction



Prescribed by the

## PUBLIC UTILITIES COMMISSION

OF THE

## **STATE OF CALIFORNIA**

## GENERAL ORDER No. 95

**May 2018**

### F. Energized Conductor (Wire or Cable)

All energized conductor (wire or cable) shall be covered with an insulation suitable for the voltage involved (See Rule 20.9–G).

### G. Guying

Where mechanical loads imposed on poles or structures exceed safety factors as specified in Rule 44, or at the request of the granting authority, additional strength shall be provided by the use of guys or other suitable construction. When guying is required, refer to Rules 56 and 86 for applicable requirements.

Note:    Revised November 6,1992 by Resolution No. SU–15.

### 35    Vegetation Management

Where overhead conductors traverse trees and vegetation, safety and reliability of service demand that certain vegetation management activities be performed in order to establish necessary and reasonable clearances, the minimum clearances set forth in Table 1, Cases 13 and 14, measured between line conductors and vegetation under normal conditions shall be maintained. (Also see Appendix E for tree trimming guidelines.)  These requirements apply to all overhead electrical supply and communication facilities that are covered by this General Order, including facilities on lands owned and maintained by California state and local agencies.

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

Communication and electric supply circuits, energized at 750 volts or less, including their service drops, should be kept clear of vegetation in new construction and when circuits are reconstructed or repaired, whenever practicable. When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s). For the purpose of this rule, abrasion is defined as damage to the insulation resulting from the friction between the vegetation and conductor. Scuffing or polishing of the insulation or covering is not considered abrasion. Strain on a conductor is present when vegetation contact significantly compromises the structural integrity of supply or communication facilities. Contact between vegetation and conductors, in and of itself, does not constitute a nonconformance with the rule.

**EXCEPTIONS:**

**1.** Rule 35 requirements do not apply to conductors, or aerial cable that complies with Rule 57.4-C, energized at less than 60,000 volts, where trimming or removal is not practicable and the conductor is separated from the tree with suitable materials or devices to avoid conductor damage by abrasion and grounding of the circuit through the tree.

**2.** Rule 35 requirements do not apply where the utility has made a "good faith" effort to obtain permission to trim or remove vegetation but permission was refused or unobtainable. A "good faith" effort shall consist of current documentation of a minimum of an attempted personal contact and a written communication, including documentation of mailing or delivery. However, this does not preclude other action or actions from demonstrating "good faith". If permission to trim or remove vegetation is unobtainable and requirements of exception 2 are met, the utility is not compelled to comply with the requirements of exception 1.

**3.** The Commission recognizes that unusual circumstances beyond the control of the utility may result in nonconformance with the rules. In such cases, the utility may be directed by the Commission to take prompt remedial action to come into conformance, whether or not the nonconformance gives rise to penalties or is alleged to fall within permitted exceptions or phase–in requirements.

Note:  Revised November 6,1992 by Resolution No. SU–15, September 20, 1996 by Decision No. 96–09–097, January 23, 1997 by Decision No. 97–01–044 and January 13, 2005 by Decision No. 0501030..

**4.** Mature trees whose trunks and major limbs are located more than six inches, but less than the clearance required by Table 1, Cases 13E and 14E, from primary distribution conductors are exempt from the minimum clearance requirement under this rule. The trunks and limbs to which this exemption applies shall only be those of sufficient strength and rigidity to prevent the trunk or limb from encroaching upon the six–inch minimum clearance under reasonably foreseeable local wind and weather conditions. The utility shall bear the risk of determining whether this exemption applies, and the Commission shall have final authority to determine whether the exemption applies in any specific instance, and to order that corrective action be taken in accordance with this rule, if it determines that the exemption does not apply.

Note:  Added October 22, 1997 by Decision No. 97–10–056. Revised August 20, 2009 by Decision No. 09-08-029 and January 12, 2012 by Decision No. 1201032

## 36  Pole Clearances from Railroad Tracks

Poles or other supporting structures which are set in proximity to railroad tracks shall be so located that the clearance requirements of General Order 26–D are met. The clearance requirements of General Order 26–D, applicable to pole line construction, are contained in Appendix E.

Note:  Revised February 1, 1948 by Supplement No. 1 (Decision No. 41134, Case No. 4324).

# EXHIBIT 7

# Appendix E
# Guidelines to Rule 35

The following are guidelines to Rule 35.

The radial clearances shown below are recommended minimum clearances that should be established, at time of trimming, between the vegetation and the energized conductors and associated live parts where practicable. Reasonable vegetation management practices may make it advantageous for the purposes of public safety or service reliability to obtain greater clearances than those listed below to ensure compliance until the next scheduled maintenance. Each utility may determine and apply additional appropriate clearances beyond clearances listed below, which take into consideration various factors, including: line operating voltage, length of span, line sag, planned maintenance cycles, location of vegetation within the span, species type, experience with particular species, vegetation growth rate and characteristics, vegetation management standards and best practices, local climate, elevation, fire risk, and vegetation trimming requirements that are applicable to State Responsibility Area lands pursuant to Public Resource Code Sections 4102 and 4293.

| Voltage of Lines | Case 13 of Table 1 | Case 14 of Table 1 |
|---|---|---|
| Radial clearances for any conductor of a line operating at 2,400 or more volts, but less than 72,000 volts | 4 feet | 12 feet |
| Radial clearances for any conductor of a line operating at 72,000 or more volts, but less than 110,000 volts | 6 feet | 20 feet |
| Radial clearances for any conductor of a line operating at 110,000 or more volts, but less than 300,000 volts | 10 feet | 30 feet |
| Radial clearances for any conductor of a line operating at 300,000 or more volts | 15 feet | 30 feet |

Note:   Added November 6, 1992 by Resolution SU–15. Revised September 20, 1996 by Decision No. 96–09–097, August 20, 2009 by Decision No. 09-08-029, January 12, 2012 by Decision No. 12-01-032, and December 14, 2017, by Decision D. 17-12-024.

.

E-2

May 2018

# EXHIBIT 8

1   AROCLES AGUILAR, SBN 94753
    CHRISTINE JUN HAMMOND, SBN 206768
2   CHRISTOFER NOLAN, SBN 229542
    California Public Utilities Commission
3   505 Van Ness Avenue
    San Francisco, CA  94102
4   Telephone:  (415) 703-2682
    Facsimile:  (415) 703-4592
5   cjh@cpuc.ca.gov
6
7   Attorneys for the California Public Utilities Commission and
    Michael Picker, Liane Randolph,
8   Martha Guzman Aceves, and Clifford Rechtschaffen,
    in their official capacities as Commissioners
9   of the California Public Utilities Commission
10

11                     **UNITED STATES DISTRICT COURT**

12            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13                        **SAN FRANCISCO DIVISION**

14

15   UNITED STATES OF AMERICA,                    Case No. 14-CR-00175-WHA

16                        Plaintiff,              **DECLARATION OF KAREN
                                                  ECKERSLEY IN SUPPORT OF
17            vs.                                 COMMENTS OF THE
                                                  CALIFORNIA PUBLIC UTILITIES
18   PACIFIC GAS AND ELECTRIC COMPANY,            COMMISSION IN RESPONSE TO
                                                  ORDER TO SHOW CAUSE
19
20                        Defendant.              Hearing Date: January 30, 2019
                                                  Time:         9:00 a.m.
21                                                Courtroom:    12, 19th Floor
                                                  Judge:        Hon. William H. Alsup
22

23

24

25

26

27

28

ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1  I, KAREN ECKERSLEY, declare as follows:

2      1.      I am currently employed as a Program and Project Supervisor in the

3  Communications Division of the California Public Utilities Commission ("Commission" or

4  "CPUC") at 505 Van Ness Avenue, San Francisco, CA 94102. I make this declaration in

5  
6  support of comments filed by the Commission in response to an Order to Show Cause issued

7  by this Court on January 10, 2019. I have personal knowledge of the facts set forth in this

8  declaration and, if called and sworn as a witness, could and would competently testify to

9  them.

10     2.      I hold a Master's degree in Telecommunications from the School of

11  Engineering at the University of Colorado and a bachelor's degree in Journalism from the
12  
13  same university. I have been employed by the Commission in various capacities for 6 years.

14  I have worked as the lead technical and business manager for the engineering, building and

15  integration of large communications systems for carriers and enterprises, in addition to

16  having an in-depth background in the technologies upon which these systems are delivered

17  to customers. Through my professional career and academic studies, I have over 30 years of
18  
19  experience with the engineering, construction and operation of privately owned and

20  regulated communications companies

21     3.      As a program and project supervisor in the Commission's Communications

22  Division, my day-to-day responsibilities include managing the team responsible for

23  monitoring wireline telephone service quality for California, including regular reporting by

24  
25  carriers and major service interruptions. The Communications Division ongoing role is to

26  help the Commission in ensuring fair, affordable, universal access to necessary services,

27  with special emphasis on preserving universal access and developing clear regulatory tools.

28
ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

As of January 2019, there are approximately 968 communications carriers which are licensed by the CPUC.[1]

4.    Through the course of my professional career, I have gained substantial experience with and expertise about the physical operation and infrastructure of communication companies, including those utilities that would be affected if the Court's Order to Show Cause were to be implemented under the terms described therein. There are approximately 127 facilities-based broadband communication providers in Pacific Gas and Electric's ( "PG&E") service territory of varying size and customer base, and, although difficult to predict with certainty, each company and its customer base would be detrimentally affected by a prolonged de-energization.

5.    Communications networks of the 21st century depend substantially on a functioning electrical distribution system. The world's reliance on the internet, smart phones, constant connection, immediate access to emergency response, requires 24x7 operation of the power grid. The communications network will fail in critical places without power, and the result is that first responders, the public and the machines which operate California's electrical grid will eventually cease operating. For example, home devices, hospital equipment and communications network infrastructure, including cell towers and landlines, rely on electricity provided by power companies.

---

[1] This is the number of communication companies who hold licenses or registration from the CPUC, which includes CPCNs (Certificate of Convenience and Public Necessity), VOIP Registration, Wireless Registration or Digital Video Service

<div align="center">PSPS Event in October 2018</div>

6.      Beginning on October 13, 2018, PG&E conducted a public safety power shutoff (PSPS or de-energization) event during a period of predicted high winds and fire danger, which resulted in 67 cell sites in California losing power for between 4 and 40 hours.[2] These 67 cell sites were operated by the five facilities-based wireless companies operating in California,[3] and hundreds of their resale partners (companies which resell minutes without owning cellular infrastructure) were also unable to provide service to their customers during that period.

7.      Cellular resellers are the primary providers of wireless LifeLine service, an essential communications service provided for low-income households in California.[4] The CPUC has the responsibility both to designate carriers for providing federal Lifeline funds and for the collection and payment of funds for the California LifeLine program.  The California LifeLine program provides discounted home phones and cell phone service to qualified households. This service lowers phone bills for low income households and insures access to voice and broadband services.

---

[2] Consolidated response to October 17th, 2018, CPUC data request answered by five facilities-based wireless carriers.

[3] AT&T Mobility, Verizon Wireless, T-Mobile, Sprint, and US Cellular.

[4] January 2018 wireless providers and number of users can be found here: http://www.cpuc.ca.gov/General.aspx?id=1100.  Site last visited January 18, 2019.  These providers include AirVoice Wireless dba Feel Safe Wireless, AirVoice Wireless dba Feel Safe Wireless, Assurance Wireless by Virgin Mobile, Boomerang Wireless dba enTouch Wireless, Global Connection dba Standup Wireless, iWireless dba Access Wireless, Tag Mobile, Telrite dba Life wireless, TruConnect, TracFone dba SafeLink, Blue Jay Wireless, and American Broadband and Telecommunications.

ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

8.      Additionally, during this particular PSPS event, nine cities and towns in

California experienced cell site outages from multiple carriers at the same time. It is likely a

high percentage of customers in these areas were not able to make wireless calls when the

cell sites were out of service. The communities which had outages at the same time from

multiple carriers are Calistoga, Camino, Colfax, Placerville, Pollock Pines, Fontana, Irvine,

Orange, and Silverado.[5] The result of the PSPS was that no one could make a wireless call in

these communities during the de-energization.

<center>Wireline Infrastructure Network Power</center>

9.      Wireline communications are provided by both local exchange carriers and

cable companies.  The network facilities of both of these types of providers require power to

operate.[6] Central offices are wireline carrier facilities which serve a number of customers

with traditional phone service and/or DSL.

10.     The CPUC has information on the network power resources which serve 54%

of California residential and small business subscribers. [7] Of the approximately 900 central

offices that serve these subscribers, approximately 36% would lose the ability to operate

after 1-3 days (24-72 hours) without power from the electrical grid. Fifty-one percent of the

---

[5] October 17, 2018 data request response.

[6] Final Analysis Report, May 2008, Reliability Standards for Telecommunications
Emergency Backup Power Systems and Emergency Notification Systems, found here:
http://www.cpuc.ca.gov/General.aspx?id=5655  Site last visited January 18, 2019.
[7] CALIFORNIA PUBLIC UTILITIES COMMISSION COMMUNICATIONS DIVISION,
Total Number of Working Telephone lines from 26 Carriers Reporting Under General Order
133-D in California for June 2018." The number of lines under this reporting in California
for June 2018 was approximately 5.9 million.  There are approximately 13 million
households in California, so this means that less than half of the households and small
businesses in California have a POTS (plain old telephone service) telephone.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
939 of 1229

1     central offices would lose the capacity to operate on battery power after 10 days, while the

2     remaining 13% have the possibility to operate for an infinite amount of time depending on

3     availability of fuel that feeds the onsite generator.[8] However, these calculations are

4     approximate and dependent on many variables such as traffic on the network e.g., the more

5     traffic, the more drain on batteries, availability of diesel fuel and accessibility of central

6     office locations (for diesel fuel delivery).

7

8         11.      The CPUC does not have rules for the provision of backup power for

9     communication network elements in wireless or wireline networks. The Federal

10    Communications Commission (FCC) requires those central offices which serve Public

11    Safety Answering Points (PSAPs) to have 24 hours of battery backup and selective routers

12    (the switches which route calls to PSAPs) to have 72 hours.[9] A PSAP is the name for the

13    location of the service with people who answer, coordinate, and respond to the public's 9-1-

14

15    1 calls.

16                                     <u>Power Utility</u>

17

18         12.      Power companies themselves rely on communications infrastructure to

19    provide inter-machine and voice communications to remote stations. PG&E reported to the

20    CPUC in December of 2017 that 8,951 communication circuits based on copper technology

21

22    [8] Data Requests 05-A and 05-F from AT&T California and Frontier California dated
      6/12/2018 and 6/26/2018 respectively.

23    [9] 47 CFR 12.4 (c) 2 (A) "…With respect to any central office it operates that directly serves

24    a PSAP, a covered 911 service provider shall certify whether it: Provisions backup power
      through fixed generators, portable generators, batteries, fuel cells, or a combination of these

25    or other such sources to maintain full-service functionality, including network monitoring
      capabilities, for at least 24 hours at full office load or, if the central office hosts a selective

26    router, at least 72 hours at full office load…"

27

28
    ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
                           Case No. 14-CR-00175-WHA

leased from a variety of communication providers provide critical communications to their

power assets.[10] These critical communications consist of communication facilities which

provide voice and potentially remote control of devices within the electrical facilities. In

other words, the power utility itself requires that the communication facilities which it owns

and leases to be operational in a power outage.

<p align="center">First Responders</p>

13.     The public relies on communications infrastructure to make 9-1-1 calls, and

first responders rely upon this same infrastructure to receive those calls and manage

emergencies. Situation management of emergencies by first responders depends on cell

towers, internet service, and land lines to communicate with each other to manage wildfire

and other disaster response, coordinate and triage evacuation centers, and to direct the public

and emergency personnel to specific locations.

14.     Public Safety Answering Points (PSAPs) also require power to maintain their

operations at a local level. The State of California Office of Emergency Services provides

guidance to local agencies for maintaining operations for a very short period of time, and

each local government determines the amount of time that their PSAP will be operational

without power. There are approximately 450 PSAPs in California, each is funded by its local

government for operations, and hence there is variability in the times each facility can

operate without power.

---

[10] PG&E Representative speaking at the CPUC workshop "Copper Communication Facilities Usage in the IP Transition," December 6, 2017.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 941 of 1229

1

<u>Public Reliance and Vulnerable Populations</u>

2

15.     The public relies on cell towers, internet, and land lines to communicate with

3

first responders, for their own emergency needs as well as to communicate the location of

4

new, spreading, or quickly-moving fires. The public also relies on electric service to charge

5

6

their own cell phones and maintain power for their home electrical devices (routers,

7

modems, cordless phones).

8

16.     The CPUC held a workshop on December 14, 2018,[11] to address the impacts

9

of Public Safety Power Shutoffs (PSPS), or electricity grid de-energization, on vulnerable

10

populations. De-energization has wide-reaching impacts, especially when they occur for

11

indefinite periods of time. As part of the October 2018 PSPS event described in Paragraph 6,

12

de-energization occurred in Santa Rosa. According to Chris Coursey, Mayor of the City of

13

14

Santa Rosa, the consequences of the de-energization were significant and widespread.

15

Mayor Coursey noted examples of difficulties that emerge from extensive or indefinite

16

periods of de-energization, including the spoiling of food and whether to evacuate due to

17

homes becoming uninhabitable from the inability to regulate temperatures.[12] These impacts

18

would also apply to senior centers, group homes, and other medical facilities.

19

20

17.     According to Susan Goran, former Mayor of Santa Rosa, there are economic

21

impacts on Californians from de-energization, in addition to those from spoiled food from

22

loss of power to refrigerators and freezers for individuals and grocery stores and restaurants,

23

24

---

25

[11] This was the first of two workshops on de-energization as part of R.18-12-005. See
http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M251/K987/251987258.PDF.

26

[12] Mayor Chris Coursey of Santa Rosa spoke at the December 14, 2018 CPUC Workshop on
De-Energization.

27

28

ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1   or the need of residents or employees to seek shelter elsewhere. Businesses also suffer from

2   the inability to make sales once payment systems lose power. Furthermore, loss of power

3   impacts emergency care facilities, hospitals, and hospices.[13]

4

5       18.    According to Barry Atwood, a principal in a design firm which specializes in

6   accessible architecture, who spoke on the impacts of de-energization on vulnerable

7   populations, there are Californians that rely on power for the use of medical technology that

8   performs a life-saving function, such as a respirator while sleeping.[14] This point would apply

9   to other home medical equipment. Furthermore, these vulnerable populations may not have

10  the financial means necessary to purchase back-up generators due to being on a fixed

11  income. They may also lack the means to evacuate to an area not experiencing a PSPS.

12

13                        Local Government Impacts

14      19.    According to the El Dorado County Sheriff's Department, the County of El

15  Dorado experienced de-energization in the latter half of 2018 to reduce the risk of wildfire.

16  According to Lieutenant Beyers of the El Dorado County Sheriff's Department, the pre-

17  emptive PSPS cut off power to the street lights that comprised the only evacuation route out

18  of the area. According to Lieutenant Beyers, if a wildfire or other disaster that necessitated

19

20

21

22

23

24  _____

    [13] Examples cited by Susan Goran, the former Mayor of Santa Rosa at the December 14,
25  2018 CPUC De-Energization Workshop.

26  [14] Statement of Barry Atwood at the December 14, 2018 CPUC Workshop on De-
    Energization.

27

28
    ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE

1  evacuation were to have occurred at this time, the ensuing traffic gridlock would have been

2  catastrophic.[15]

3

      I declare under penalty of perjury that the foregoing is true and correct to the best of

4

5  my knowledge.

6

7  Executed this 25th day of January, 2019.

8

9  Karen Eckersley
      Program and Project Supervisor

10        California Public Utilities Commission

11

12

13

14

15

16

17

18

19

20

21

22

23

24  _____

25  [15] This example is from the comments of Lieutenant James Beyers of the El Dorado County
   Sherriff's Department at the CPUC's January 9, 2019, workshop in Calabasas on the

26  Impacts of De-energization: Focus on First Responders and Local Government.

27

28

ECKERSLEY DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA
9

# EXHIBIT 9

January 24, 2019

Alice Stebbins
Executive Director
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102

*via email at alice.stebbins@cpuc.ca.gov*

Re: Order to Show Cause in *United States of America v. Pacific Gas and Electric Company*
    USDC Northern District of California, Case No. CR 14-0175 WHA

Ms. Stebbins:

On behalf of the signatory communications companies below (the "Communication Providers"),
we encourage the Commission to propose to the District Court that Commission Resolution
ESRB-8 represents a more comprehensive and fulsome approach to ensuring fire safety than the
de-energization protocol proposed in the above-referenced Order to Show Cause ("OSC"). In
brief, the OSC seems to rely on a single factor to trigger a de-energization decision by PG&E,
i.e., wind, while at the same time Commission Resolution ESRB-8, as well as SB901[1], already
recognize that a number of additional factors need to be considered before any such decision is
made. Thus, the OSC appears to conflict with this Commission's Resolution and with SB901,
which could inadvertently create unintended safety issues.

The OSC proposes to mandate de-energization by PG&E "of any part of its grid not yet rated as
safe by PG&E for the wind conditions then prevailing until those conditions have subsided."
This approach, based on the single data point of wind conditions, seems to completely discount
consideration of any other fire-ignition factors, including vegetation conditions and air
moisture/humidity, or any other considerations enumerated in ESRB-8.

Furthermore, the OSC expressly mandates that, "in determining safety, PG&E may *not* take into
account the need for *reliability of service*, the inconvenience to customers resulting from
interruption in service, or its impact upon PG&E's revenues and profits." [emphasis added].
Although the Communication Providers support the need to make safety the top priority, this
limitation with respect to reliability appears to conflict with SB901, which was signed into law
last year. SB901 amended Section 8386 of the Public Utilities Code to require Investor Owned
Utilities ("IOUs") to create a wildfire mitigation plan, which is to include:

> *Protocols for disabling reclosers and deenergizing portions of the electrical distribution
> system that consider the associated impacts on public safety, as well as protocols related
> to mitigating the public safety impacts of those protocols, including impacts on critical
> first responders and on health and communication infrastructure.*

_____

[1] Chapter 626, Statutes of 2018

The Commission recently commenced a new Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions (R.18-12-005) to, among other things, "address the implementation and logistics" for the de-energization element of the wildfire mitigation plans required by SB901.

As you know, the Commission has been addressing the complexities of de-energization since 2008, resulting in major decisions and policy implementation in 2009 (D.09-09-030), 2012 (D.12-04-024) and 2018 (Resolution ESRB-8). Throughout these activities, the Commission has actively engaged the electric utilities, communications companies, water companies, counties and municipalities, the California Department of Forestry, disability and consumer rights advocates and other stakeholders. The protocols developed under Resolution ESRB-8 still require further attention, and de-energization issues are still otherwise being considered at the Commission in its current Rulemaking (R.18-12-005).

The Communication Providers further note that the Commission has determined that de-energizing electric facilities during certain dangerous conditions can prevent wildfires. ESRB-8, p. 1. The OSC seems to recognize that as well. However, the Commission also recognizes (in D.09-09-030, at pp 51-53) that there are numerous safety risks that can increase with de-energization, including:

- Shutting off power could disrupt landline and wireless telephone service, including internet access and text alerts. Without these services, residents may not be able to report fires, which could delay the situational awareness and response by firefighters and thereby increase the chance of wildfires growing to catastrophic size. Residents also may not be able to call to report crimes, medical emergencies, and vehicle accidents. The delayed response to emergencies of all types poses a serious risk to lives and public safety in general.

- Residents without power may not be able to use their telephones, cell phones, televisions, radios, and computers, losing internet access and text alerts. Thus, those who work or live in an area where power is shut off will lose their primary means of obtaining information, about fire proximity, evacuation notices, and other critical information.

- Loss of power to traffic signals and street lights may cause traffic accidents and impede evacuations, particularly at night.

- Water District pump stations are critical to maintaining the supply of water. In the event that pump stations lose power, and/or run out of backup power, the supply of stored water in the area served by the pump station could be exhausted within hours, leaving no water to fight fires.

- People with disabilities rely disproportionately on communications devices that need to be plugged into a power outlet to operate, such as TTYs[2] and computers, making them vulnerable to being cut off from communications with the outside world during a power

[2] A TTY is a special device that lets people who are deaf, hard of hearing, or speech-impaired use the telephone to communicate, by allowing them to type messages back and forth to one another instead of talking and listening.

shut-off event. Shutting off power would place such people at greater risk of not receiving a notice to evacuate due to an oncoming wildfire. In addition, people with disabilities are more likely to need assistance in evacuating. The inability to receive evacuation notices or to call for assistance could have deadly consequences.

- Unless equipped with backup power (and most are not), electric garage door openers will not work when power is shut off.  If wildfire forces an evacuation, customers who are elderly or have disabilities may not be able to open their garage doors manually, potentially trapping them in their homes.

Due to these competing risks, the Commission has determined that the decision to de-energize should be made only after consideration of multiple factors, only one of which is wind conditions.[3]

The OSC seems to ignore those safety risks and could create confusion and inadvertently increase public safety risks associated with de-energization. Accordingly, the Communication Providers urge the Commission to propose to the District Court that either (a) the District Court defer to the Commission on the complex issue of de-energization, or (b) any final order be consistent with ESRB-8 and any other Commission decisions, most significantly decisions resulting from R.18-12-005.

**Signatory Companies:**

| | |
|---|---|
| **AT&T CA and AT&T Mobility** | **Sprint Communications Company** |
| **T-Mobile West** | **Verizon** |
| **Frontier Communications** | **Consolidated Communications of California and the Small LECs** |

cc:    Cynthia Walker, Communications Division Director (*via email at cynthia.walker@cpuc.ca.gov*)

Christine Hammond, Legal Division (*via email at christine.hammond@cpuc.ca.gov*)

---

[3] Recognizing the competing risks that accompany a decision to de-energize, the Commission in ESRB-8 found that this decision "is complex and dependent on many factors including and not limited to fuel moisture; aerial and ground firefighting capabilities; active fires that indicate fire conditions; situational awareness provided by fire agencies, the National Weather Service and the United States Forest Service; and local meteorological conditions of humidity and winds." ESRB-8, Finding #2.  The Commission further stated that the electric IOU must reasonably believe that there is an imminent and significant risk that strong winds will topple its power lines onto tinder dry vegetation or will cause major vegetation-related impacts on its facilities during periods of extreme fire hazard. ESRB-8, p. 4.

# EXHIBIT 10

GOODIN,
MacBRIDE,
SQUERI & DAY, LLP

Megan Somogyi, Attorney at Law

January 23, 2019

President Michael Picker
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, California 94102

> Re:   **Commission Response to the U.S. District Court Order to Show Cause
> Why PG&E's Conditions of Probation Should Not Be Modified**

Dear President Picker:

On behalf of the County of Mendocino, the County of Napa, and the County of
Sonoma (the "Counties"), we are writing to provide the Counties' input and response to the U.S.
District Court for the Northern District of California's January 9, 2018 Order to Show Cause
why the terms of PG&E's probation for criminal convictions arising from the San Bruno natural
gas pipeline explosion should not be modified to include de-energization and vegetation removal
measures. The Counties and their residents suffered significant harm in the October 2017
Northern California wildfires. CAL FIRE determined that the Adobe Fire, the Atlas Fire, the
Norrbom Fire, the Nuns Fire, the Oakmont Fire, the Partrick Fire, the Pocket Fire, the Pressley
Fire, the Pythian Fire, the Redwood Valley Complex Fire, and the 37 Fire were all caused by
PG&E electrical equipment; the cause of the Tubbs Fire remains under investigation. The
Counties generally support the swift and comprehensive action relating to fire safety that the
District Court is proposing to order. But this support is dependent on there being clear
recognition by the court and PG&E that the Commission will retain jurisdiction and authority, in
the event the court adopts the proposed additional conditions of probation, to direct PG&E as to
how those measures ordered by the court are to be implemented. PG&E must adhere to all rules
adopted by the Commission in the pending de-energization and wildfire mitigation plan
proceedings, and other relevant proceedings that will affect PG&E's wildfire prevention
activities.

The Counties believe that it is not only important that the steps covered by the
Court's proposed order be done, but also believe that it matters *how* the work is done. Given the
sweeping scope of the court's Order, and the potential that PG&E's activities in complying with
the order will significantly affect the public health, safety, and quality of life, the Counties urge
the Commission to provide the court with a more nuanced view of what is required to effectively
implement the fire safety measures in the Order to Show Cause.

The court cites CAL FIRE's referral for possible criminal prosecution of twelve
of the October 2017 Northern California wildfires caused by PG&E's electrical equipment as the

T 415.392.7900   F 415.398.4321
www.goodinmacbride.com
505 Sansome Street, Suite 900 | San Francisco, CA 94111

Direct 415.765.8429
msomogyi@goodinmacbride.com

President Michael Picker
January 23, 2019
Page 2

basis for modifying the terms of PG&E's probation.  If adopted, the Order would obligate PG&E to re-inspect all of its electrical grid and trim trees and branches that might come into contact with electrical lines or equipment under high-wind conditions; identify and fix all above-ground electrical equipment that might cause a fire or is in a damaged or weakened state; and to fix any condition anywhere on its grid similar to any condition that contributed to any previous wildfire, among other proposed conditions.  This must be done before June 21, 2019—the official start of wildfire season.  The Order would direct PG&E to document its inspections and work, and to rate each segment's safety under various wind conditions.  During the 2019 wildfire season, and thereafter, PG&E would be allowed to supply electricity only through the parts of its grid that have been determined safe under the prevailing wind conditions; any part of the grid not yet rated safe for the existing wind conditions would be de-energized.  The court invited the Commission to submit a better plan for ensuring the safety of California before the 2019 wildfire season; the Commission's plan, if any, must be submitted by January 25, 2019.

The court's Order is focused on outcomes—clearing trees away from power lines, fixing overhead electrical equipment, and shutting off the power in high-wind conditions.  These outcomes are largely duplicative of the enhanced wildfire safety measures ordered by Senate Bill 901 and proposed in PG&E's Community Wildfire Safety Program, which is the cornerstone of its 2020 general rate case application.  The Counties support these combined efforts to reduce wildfire risk. The Counties are concerned, however, that requiring PG&E to achieve outcomes without also addressing the manner in which those outcomes must be achieved could have serious negative consequences for the very citizens the court hopes to protect.  The Commission has the opportunity to raise with the court the process by which the fire safety objectives in the Order should be achieved.  Although the Commission has not yet adopted the rules that will govern the measures covered by the court's proposed Order, the Commission could ask the court to include a general provision in any Order issued that requires PG&E to comply with the Commission's rules, as applicable.

Removing and trimming trees that are likely to fall onto or come into contact with overhead power lines in high winds will  reduce wildfire risk, and the Counties support this endeavor.  It is important, however, that PG&E not indiscriminately clear-cut the areas around its power lines, as it appears to have been doing in certain areas of the Counties since the 2017 wildfires.  Removing significant numbers of trees and other vegetation creates the risk of erosion and flooding, and harms the environment.  It is also PG&E's policy to leave large trees and tree limbs on the property from which they were cut, and to chip smaller branches and vegetation and leave that debris on the property for the owner to dispose of.  While the Counties understand that the trees and vegetation are the property of the landowner, replacing living trees and vegetation with a large mass of rapidly desiccating wood debris not only places a financial burden on the property owner, but is a fire hazard in and of itself.  If PG&E is to undertake significant tree removal and trimming under the court's Order, the court should also address these unintended and significant consequences of over-zealous vegetation management.

De-energizing power lines in high-wind conditions will also reduce wildfire risk, which the Counties support.  The court's Order is focused on wildfire safety from the end result,

President Michael Picker
January 23, 2019
Page 3

de-energized power lines, and does not appear to contemplate the safety implications of shutting power off or the manner in which the lines are de-energized.  Power shutoffs impact the Counties' infrastructure that is critical in emergency events, including radio tower communications, water and fuel pumps, hospitals, camera networks, etc., as well as resources and communication channels for first responders, tactical situation awareness, and the ability to effectively communicate with residents through alert and warning systems.  The length of a de-energization event can exceed the battery backup capabilities of cell towers and generators, which would increase public safety risks for residents and first responders in affected areas.  The Counties are also home to thousands of medically vulnerable people, not all of whom are enrolled in PG&E's medical baseline program, who depend on electricity to operate medical equipment or otherwise ensure their continued wellbeing.  PG&E's current practices for notifying vulnerable populations before a Public Safety Power Shutoff event are not adequate, nor is its communication with local emergency and safety officials about power shutoff events particularly effective.  The Counties understand that PG&E has no experience de-energizing power lines before 2018, and therefore does not have the kinks worked out of its practices, but this lack of experience will create significant problems when PG&E is required to de-energize any portion of its system not rated safe for the prevailing wind conditions in June 2019.  The Commission's Rulemaking on de-energization, R.18-12-005, is scheduled to produce a final decision that delineates best practices, utility coordination with local first responders, protocols for minimizing impacts to vulnerable populations, and reporting requirements by Summer 2019—in time for the 2019 wildfire season.  It is critical that the Commission complete R.18-12-005 on time.  The court's final Order should take into account the harm that can result from poorly executed de-energization and should direct PG&E to follow the protocols adopted in R.18-12-005.

The Counties are not parties to the District Court case in which PG&E's probation is addressed and therefore do not have the ability to voice these concerns directly to the court.  But the Commission has been invited to offer its views on the court's Order and how best to ensure that PG&E's electrical system does not pose a continued threat for wildfires.  The Counties ask that the Commission take this opportunity to urge the District Court to ensure that PG&E undertakes its wildfire prevention measures in a manner that will not adversely affect the customers the measures are intended to protect through adherence to the Commission's rules to be issued on these matters.

The Counties appreciate the Commission's consideration of this request.

President Michael Picker
January 23, 2019
Page 4

Very truly yours,

GOODIN, MACBRIDE,
SQUERI & DAY, LLP

Megan Somogyi

Counsel for the County of
Mendocino, the County of Napa, and
the County of Sonoma

CC:    Commissioner Liane Randolph
       Commissioner Martha Guzman Aceves
       Commissioner Clifford Rechtschaffen
       Service Lists for A.18-12-009, R.18-10-007, R.19-01-006

3759/001/X205227.v1

# EXHIBIT 11

Working Together.
Achieving Results.



January 24, 2019

Honorable Michael Picker, President
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102

Re:   Order to Show Cause filed January 9, 2019 in *U.S. v. Pacific Gas and Electric
Company*, No. CR 14-0175 (U.S.D.C. N. Dist. Cal., Alsup, J.)

Dear President Picker:

Executive Director
Jack Hawks
California Water Association
601 Van Ness Avenue, Suite 2047
San Francisco, CA  94102-6316
415.561.9650
415.561.9852 fax
415.305.4393 cell
jhawks@calwaterassn.com
www.calwaterassn.com

Administrative Director
Melissa Dixon
California Water Association
700 R Street, Suite 200
Sacramento, CA 95811
916.231.2147
916.231.2141 fax
mdixon@calwaterassn.com

CWA President
Keith Switzer
Golden State Water Company

First Vice President
Evan Jacobs
California American Water

Second Vice President
Ed Jackson
Liberty Utilities Corporation

Third Vice President
Tim Guster
Great Oaks Water

CWA General Secretary and Treasurer
Joel Reiker
San Gabriel Valley Water Company

CWA Billing Address
California Water Association
700 R Street, Suite 200
Sacramento, CA 95811

CWA Mailing and Shipping Address
California Water Association
601 Van Ness Avenue, Suite 2047
Mail Code: #E3-608
San Francisco, CA  94102-3200

By this letter, the California Water Association (CWA) respectfully presents its concerns and suggestions regarding the above-referenced Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified (OSC). The OSC was entered in the Federal District Court for the Northern District of California January 9, 2019, in a criminal case, referenced above, arising out of the San Bruno explosion and fire. The OSC proposes to impose on Pacific Gas and Electric Company (PG&E), as new conditions of probation, a very stringent mandate to de-energize parts of its electric grid that have not been determined to be safe under prevailing wind conditions.

As you know, CWA is a statewide association that represents the interests of Commission-regulated water service providers that furnish safe, reliable, and high-quality drinking water service to approximately 6 million Californians. Of particular import here is that the regulated water systems also provide water to first responders for fire protection and suppression, as well as water essential for communities in the aftermath of fires. This vital role played by regulated water systems unequivocally depends on a reliable source of electricity, a source that may be compromised should the proposed new conditions of PG&E's probation be adopted without addressing the water utilities' legitimate concerns.

In its *Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions*, adopted December 13, 2018, the Commission has recognized that de-energizing power lines can play an important role in ensuring public safety. (OIR 18-12-005, p. 3.) That OIR noted the Commission's recent adoption of de-energization rules by Resolution ESRB-8 and confirmed that Resolution ESRB-8 will remain in effect during the pendency of the new rulemaking unless the Commission explicitly modifies or rescinds it.

Working Together.
Achieving Results.



California
Water
Association

Honorable Michael Picker
January 24, 2019
Page 2 of 3

The Commission opened another rulemaking, R.18-10-007, in October 2018, to implement portions of SB 901 (Dodd, 2018), which require electric utilities to develop Wildfire Mitigation Plans, including the new requirement of Public Utilities Code Section 8386(c)(6) that such plans include protocols for de-energizing portions of the electrical distribution system and that consider associated impacts on public safety, including impacts on critical first responders and on health and communication infrastructure.

All these ongoing, concerted actions by the Commission and the Legislature demonstrate an appropriate true sense of urgency to address the increased risk of disastrous wildfires and the potential contribution of electric infrastructure to such disasters. Both the Commission and the Legislature have recognized that de-energization of electric lines can provide an important measure of protection in extreme circumstances, but also that use of de-energization requires consideration of multiple factors. Resolution ESRB-8 specifically found that "the decision to de-energize electric facilities for public safety is complex and dependent on many factors" – including but not limited to fuel moisture, firefighting capabilities, active fires, and local humidity and winds. (*Id.*, Finding 2, p. 8.)

CWA is concerned that the OSC takes too rigid an approach to a very complex set of challenges. CWA does not question that "safety must come first." But safety cannot be optimized by considering only the single factor of "wind conditions ... in a given county." (OSC, p. 3.) Reliable electric utility service is an essential element in the normal operation of the public water systems managed by CWA's member companies. The determination by an electric utility to curtail service under threatening weather conditions itself imposes serious risks not only to public safety in general, but specifically to water utilities and their customers, at just that time when the water utilities' ability to deliver water service is most critical.

This is why the Commission, in Resolution ESRB-8, imposed strict procedural requirements in connection with such actions and, in R.18-12-005, has undertaken a detailed consideration of ways to make the best possible use of de-energization as a tool for enhancing public safety. This is also why one of CWA's principal goals in the rulemaking is to ensure that the Commission's final decision applies the electric utility notification and grid location requirements equally to Commission-regulated water utilities and to the public agencies already identified.

The OSC suggests that PG&E advise all those concerned to consider arranging for back-up emergency generators as a hedge against interruption of power. This is good advice, but water utilities will need to invest many millions of dollars in such facilities in coming years in efforts to protect their customers from the disruption of water service (including the need to have adequate water available for fire suppression).

Working Together.
Achieving Results


California
Water
Association

Honorable Michael Picker
January 24, 2019
Page 3 of 3

Unfortunately, the deployment of fossil-fuel burning generators requires permits from regional Air Quality Maintenance Districts, which are not easily obtained and the conflict with California's greenhouse gas emission reduction goals may not easily be reconciled. This is just one of many examples of competing public health and safety goals that cannot be resolved by a simple statement that "only safe operation will be allowed."

Also, implementing such measures is not as easy as the OSC suggests. Especially for vulnerable populations, such as the many disabled, elderly, and/or low-income residents of rural communities and smaller towns and cities that may be threatened by wildfires, gaining access to backup power generators will be a challenge. For water utilities, de-energization of electric lines, even with adequate advance notice, will present serious challenges for the safe operation of water treatment facilities and the pumping of water to meet fire flow requirements and customer needs. The massive interruptions of electric service that might result from enforcement of the OSC could overwhelm many water utilities' ability to maintain essential service.

CWA is confident the Commission will continue its coordinated and timely, but not hasty, work to resolve these complex and interrelated safety issues, and we respectfully urge the Commission to bring the complexity of these challenges to the Court's attention. CWA and its member companies pledge to work with the Commission to achieve the best and most reliable solutions, for the benefit of all California residents and communities.

Very sincerely,

Jack Hawks
Executive Director

cc:     All Commissioners
        Alice Stebbins, Executive Director
        Arocles Aguilar, General Counsel
        Raminder Kahlon, Director, Water Division

# EXHIBIT 12

1  AROCLES AGUILAR, SBN 94753
   CHRISTINE JUN HAMMOND, SBN 206768
2  CHRISTOFER NOLAN, SBN 229542
   California Public Utilities Commission
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 703-2682
   Facsimile:  (415) 703-4592
5  cjh@cpuc.ca.gov
6
7  Attorneys for the California Public Utilities Commission and
   Michael Picker, Liane Randolph,
8  Martha Guzman Aceves, and Clifford Rechtschaffen,
   in their official capacities as Commissioners
9  of the California Public Utilities Commission
10
11                    UNITED STATES DISTRICT COURT
12             FOR THE NORTHERN DISTRICT OF CALIFORNIA
13                       SAN FRANCISCO DIVISION
14
   UNITED STATES OF AMERICA,                    Case No. 14-CR-00175-WHA
15
16                    Plaintiff,                **DECLARATION OF JAMES BOOTHE
                                                IN SUPPORT OF COMMENTS OF THE
17         vs.                                  CALIFORNIA PUBLIC UTILITIES
                                                COMMISSION IN RESPONSE TO
18  PACIFIC GAS AND ELECTRIC COMPANY,           ORDER TO SHOW CAUSE**
19
                      Defendant.                Hearing Date: January 30, 2019
20                                              Time:         9:00 a.m.
                                                Courtroom:    12, 19th Floor
21                                              Judge:        Hon. William H. Alsup
22
23
24
25
26
27
28
   BOOTHE DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE

1    I, JAMES BOOTHE, declare as follows:

2        1.      I am currently employed as a Program and Project Supervisor in the Water

3    Division at the California Public Utilities Commission ("Commission" or "CPUC") at 505

4    Van Ness Avenue, San Francisco, CA 94102.  I make this declaration in support of

5    comments filed by the Commission in response to an Order to Show Cause issued by this

6

7    Court on January 10, 2019. This declaration is based on my years of experience in the water

8    utility industry and, if called and sworn as a witness, could and would competently testify.

9        2.      I hold a Ph.D. in Economics from the University of California, Santa

10   Barbara, an M.B.A, in Business/Finance from the University of Miami, and a B.S. in

11   Finance from the University of Virginia.  I have been employed by the Commission in

12   various capacities for approximately 20 years. I have also worked in the private sector on

13

14   utility issues. Through my professional career and academic studies, I have over 20 years of

15   experience with the operation of privately and municipally owned water utilities.

16       3.      As Program and Project Supervisor at the Commission's Water Division, my

17   day-to-day responsibilities include overseeing the regulation of water utilities. The Water

18   Division advises the Commission on all matters related to these utilities, including

19

20   rulemaking, investigations, and formal applications filed by the utilities.

21       4.      Through the course of my professional career, I have gained substantial

22   experience with and expertise about the physical operation of water utilities in general,

23   including those utilities that would be affected if the Court's Order to Show Cause were to

24

25   be implemented under the terms described therein. There are approximately 3,000

26   community water systems in the State of California, and Pacific Gas and Electric's

27   ("PG&E") service territory covers about one-half of the state. The water utilities within

28

BOOTHE DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1    PG&E's service area are of varying size with varying customer bases, and, although difficult

2    to predict with specificity, each utility and its customer base could be detrimentally affected

3    by a prolonged de-energization.

4        5.    While some of the larger water utilities have some backup power, with short

5    notice it may not be possible to relocate the necessary backup generators to impacted areas.

6    There is no public, centralized source of information that tracks the amount of backup power

7    each utility has at each facility, if it has any at all.

8        6.    Except for a small percentage of gravity-fed water systems and pumps fueled

9    by natural gas, the pumps at all water utilities require electricity in order to operate, and

10   without operable water pumps, a utility cannot deliver potable water to its customers. In fact,

11   well and distribution pumps, wastewater treatment plants, potable water treatment plants,

12   storage reservoirs, and other infrastructure dependent on electricity could be adversely

13   impacted by a prolonged de-energization. This is true of all water facilities, not just CPUC-

14   regulated water companies, but all retail water service entities such as municipal water

15   utilities insofar as they rely on PG&E.

16       7.    Commission General Order 103-A establishes rules governing water service,

17   including minimum standards for operation, maintenance, design, and construction over

18   Commission-regulated water utilities. Section VII.6.A requires that "each potable water

19   distribution system shall be operated in a manner to assure that the minimum operating

20   pressure at each service connection throughout the distribution system is not less that 40 psi

21   [pounds per square inch] . . ." Without operating pumps due to electricity outage, this

22   minimum operating pressure cannot be satisfied.

BOOTHE DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

8.      Without access to electricity, a water utility lacks the ability to deliver potable water to its customers, because the distribution system must be pressurized to move the water throughout the system. The distribution system must remain pressurized in order to prevent the bacteria and other harmful contaminants from entering the system. If water sits unpressurized in the distribution system, there is a risk of contamination to the water, which often requires utilities to advise customers to boil their water or drink bottled water once the distribution has been re-pressurized, until the water can be tested to ensure safety.

9.      The prolonged loss of electricity at wastewater facilities could also pose a potential health threat, since without electricity or some other fuel source for the pumps, the ability to move the wastewater would be compromised. If the electricity is out at sewage treatment facilities, there is a risk of untreated sewage contaminating waterways, like rivers, creeks, and bays, depending on where the water is to be deposited.  Moreover, without power, there will be no water supply to businesses and residences and thus a curtailment of waste water leaving homes and businesses. The inability to move human waste from a residence or business is considered a health hazard.

10.     Electricity is generally necessary to pump water at sufficient pressure for fire-fighting purposes. Lack of water pressure directly compromises firefighting capabilities.

11.     Many of the larger water utilities employ supervisory control and data acquisition ("SCADA") systems for the maintenance and operation of their infrastructure. A SCADA system monitors and adjusts the operating parameters for the facilities of a water utility from well production and water treatment to water distribution to ensure the various components are operating within acceptable parameters to provide safe and reliable water quality to residential, business, and institutional customers 24 hours a day and 365 days a

BOOTHE DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1  year. SCADA systems can be relatively simple, such as one that monitors environmental

2  conditions of a small office building, or incredibly complex, such as a system that monitors

3  all the activity in a nuclear power plant or the activity of a large municipal or investor-

4  owned water system. SCADA systems depend on electricity to run the computers and the

5

6  telecommunications network (landline, cellular, microwave) to communicate with a

7  multitude of infrastructure facilities. Without power, water utilities that employ a SCADA

8  system would have no efficient or continuous means to monitor facility safety.

9      12.     After any power outage of any substantial length, a water utility would need

10  to sample and test for the quality of its water throughout its entire system – and take

11  corrective measures where necessary – before assuring its customers that its water was safe

12

13  for use. It could take days for some water utilities to come back on to full service after an

14  outage.

15      I declare under penalty of perjury that the foregoing is true and correct to the best of

16  my knowledge.

17  Executed this 25th day of January, 2019.

18

19  James Boothe

20  Program and Project Supervisor
   California Public Utilities Commission

21

22

23

24

25

26

27

28

BOOTHE DECLARATION RE CPUC COMMENTS IN RESPONSE TO ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA
4

# EXHIBIT 13

BEFORE THE PUBLIC UTILITIES COMMISSION

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| RESOLUTION EXTENDING DE-ENERGIZATION REASONABLENESS, NOTIFICATION, MITIGATION AND REPORTING REQUIREMENTS IN DECISION 12-04-024 TO ALL ELECTRIC INVESTOR OWNED UTILITIES. | A._____ |

**CITY OF MALIBU'S PETITION FOR MODIFICATION OF RESOLUTION ESRB-8**

<div align="right">

**Christi Hogin**
**Joshua Nelson**
**BEST BEST & KRIEGER LLP**
**for City of Malibu**
**1230 Rosecrans Ave Ste 110**
**Manhattan Beach, CA 90266**
**Telephone: (310) 643-8448**
**Facsimile: (310) 643-8441**
**Email: christi.hogin@bbklaw.com**
**joshua.nelson@bbklaw.com**

</div>

October 5, 2018

BEFORE THE PUBLIC UTILITIES COMMISSION

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| RESOLUTION EXTENDING DE-ENERGIZATION REASONABLENESS, NOTIFICATION, MITIGATION AND REPORTING REQUIREMENTS IN DECISION 12-04-024 TO ALL ELECTRIC INVESTOR OWNED UTILITIES. | A._____ |

**CITY OF MALIBU'S PETITION FOR MODIFICATION OF RESOLUTION ESRB-8**

**I.     Introduction**

Pursuant to the Rules of Practice and Procedure (RPP) 16.4 and General 8.2 of General Order 96-B, the City of Malibu (City) respectfully petitions the Commission to modify Resolution ESRB-8 (Resolution).

Alarm bells have sounded throughout neighborhoods in the high risk fire zones of the City as residents got wind of SCE's plan to cut off power needed for emergency water pumps and communications when their homes are threatened by wildfires.  The de-energization policy responds to important considerations involving risk but it was formed without sufficient information and community input to appropriately balance the benefits, risks, and effects of the policy itself.  There are options that have not been examined.  These are the reasons that the City brings this petition and the explanation for its timing.   We appeal to the Commission's commitment to just resolutions in requesting this petition for modification.

For the reasons set forth herein, the City requests that the Commission modify the Resolution and not apply the standards developed in D.12-04-024 outside of SDG&E's service territory.  Rather, the Commission should invite each IOU to submit an application to consider its de-energization policy or open a new rulemaking to consider a standard statewide policy.  Any new or revised de-energization policy should be developed after meaningful public input and notice.

**II.     Procedural Background**

On July 12, 2018, the Commission adopted the Resolution after the least public notice and review permitted by any formal and informal process set forth in the RPP and General

1

Order 96-B. As a resolution proposed by the Commission, notice was included in the daily calendar and provided to the service list for the prior San Diego Gas & Electric (SDG&E) de-energization proceeding. No notice was provided to the City or other affected agencies in Southern California Edison (SCE) or Pacific Gas and Electric (PG&E) service territories. As a result, the Commission was not afforded the benefit of public vetting and received very few comments on the draft Resolution. Specifically, opening comments were filed by PG&E, SCE, SDG&E, the California Association of Small and Multi-Jurisdictional Utilities ("CASMU"), Center for Accessible Technology and the Utility Reform Network ("CforAT/TURN"), and a coalition of communications providers. Reply comments were filed by the communications providers, CforAT/TURN, PG&E, SCE, and SDG&E.

## III.  Standard of Review and City's Ability to Petition for Modification

RPP 16.4 authorizes a petition for modification of a Commission decision. A petition must include the "requested relief and must propose specific wording to carry out all requested modifications to the decision."[1] The petition must generally be filed within one year of the decision at issue.[2] Lastly, "[i]f the petitioner was not a party to the proceeding in which the decision proposed to be modified was issued, the petition must state specifically how the petitioner is affected by the decision and why the petitioner did not participate in the proceeding earlier."[3]

The Commission has clarified that a petition for modification is not a rigid procedural tool but a means for achieving substantial justice:

> Precedent establishes that the Commission has not applied the justification and timing requirements of Rule 16.4 and its predecessor, Rule 47, in a mechanical way if that would thwart justice; thus, even where the Commission has determined that a petition was not the appropriate procedural remedy, on occasion and for public policy reasons, it has considered the substantive merits and after that review, has either granted or denied the petition.[4]

---

[1] RPP 16.4(b).

[2] RPP 16.4(d).

[3] RPP 16.4(e).

[4] *In the Matter of the Application of Southern California Edison Company (U 338-E) for a Certificate of Public Convenience and Necessity Concerning the Tehachapi Renewable Transmission Project (Segments 4 through 11,* (2013) Cal. P.U.C. Decision D.13-07-018, Conclusion of Law #1, p. 65-66.

2

The City meets these procedural requirements. First, the Resolution was adopted on July 12, 2018, and this Petition is being filed well within a year of this date. Second, while the City was not a party in this matter, it did submit informal comments to the Commission prior to its meeting to adopt the Resolution. Moreover, the City did not participate earlier as it was not aware of the draft Resolution. As noted above, the draft Resolution was released by the Safety and Enforcement Division and served on all parties to the SDG&E power shut-off proceeding. As the City is not located within SDG&E territory and that proceeding was closed in 2012, it has not been monitoring that proceeding and was unaware of the proposal. Once the City became aware, it submitted its informal comments.[5] The City will be dramatically affected by the Resolution, both directly and on behalf of its residents. It is located in a high fire area with limited ingress and egress, and any future de-energization events will affect City facilities and the City's ability to provide law enforcement and similar services during an emergency. For example, the Resolution requires SCE and other IOUs to evaluate the need for back-up generators and similar equipment at critical facilities _after_ a de-energization event.[6] This could result in a loss of water or communication service during a de-energization event interfering with or stopping the City's and other first responders' ability to fight the fire or respond to related medical and public safety emergencies.

## IV.     **Modification Is Required**

Modification should be granted for three reasons: (1) the Resolution improperly modifies D.12-04-024; (2) extending the de-energization requirements adopted in D.12-04-024 statewide is not supported by the record; and (3) the substantial policy and public safety issues implicated by the Resolution require careful vetting after allowing all affected entities, and not simply parties to D.12-04-024, an opportunity to provide input.

### A.     Resolution Improperly Modifies D.12-04-024

The Petition must be granted as the Resolution improperly modifies D.12-04-024. Under General Order 96-B and Public Utilities Code section 1708, a resolution, which is adopted through an informal proceeding, cannot amend or modify a decision adopted as a result of a

---

[5] A copy of the City's informal comment letter is attached as Attachment A.
[6] While the Resolution would have required mitigation to critical facilities, this requirement was removed from the final Resolution. (See Resolution, p. 8.)

3

formal proceeding. In D.16-08-027, the Commission considered an application for rehearing of Resolution E-4770. In part, the application challenged the decision in Res. E-4770 to utilize a solicitation process approved in a prior formal Commission decision, D.10-12-048. The Commission had declined to modify the solicitation process as it had been approved in a formal proceeding and could not be modified in an informal proceeding. The Commission stated:

> Res. E-4770 is an order of this Commission, adopted as a result of informal proceedings. As our General Order ("GO") 96-B 9 explains, resolutions are adopted when we resolve a matter outside an application, complaint, petition, investigation or rulemaking proceeding. (GO 96-B, § 3.7; cf. GO 96-B, § 5.1.) This Commission circulates draft proposed resolutions for public comment, but no formal hearing is provided before a resolution is adopted. (See Pub. Util. Code, § 311(g)(1).) Pursuant to GO 96-B, a formal proceeding (initiated by an application, application for rehearing, or petition to modify) must be commenced when it is proposed that we modify one of our past decisions or take other action that affects the result of a decision rendered in a formal proceeding. (GO 96-B, §§ 5.2, 5.3; see Pub. Util. Code, § 1708.)

Here, the Resolution was adopted through an informal proceeding and purports to modify D.12-04-024. For example, the Resolution modifies D.12-04-024 by extending its SDG&E-only de-energization plan to PG&E and SCE territories. Similarly, the Resolution revises the reasonableness factors outlined in D.12-04-024 for determining when SDG&E may de-energize power lines. Specifically, the Resolution notes:

> However, we modify the third factor listed above by adding the phrase underlined below:
>
> • [The IOU] must reasonably believe that there is an imminent and significant risk that strong winds will topple its power lines onto tinder dry vegetation or will cause major vegetation-related impacts on its facilities during periods of extreme fire hazard.

These modifications to D.12-04-024 are procedurally improper and the Commission must conduct a formal proceeding prior to amending D.12-04-024.

4

B.    Resolution's Determination Is Not Supported by the Record

Even if the Resolution is procedurally proper (and it is not), the Resolution's expansion of the de-energization plan to PG&E, SCE and other IOU territories is not supported by the record.  The SDG&E de-energization program was adopted after a multi-year process that began with SDG&E filing Application (A.) 08-12-021 in 2008 to allow it to shut-off power whenever winds were above a certain threshold.  This application was ultimately rejected by the Commission in 2009 (D.09-09-030).  While the Commission rejected SDG&E's power plan, it recognized that SDG&E retained the statutory authority to de-energize in response to an emergency and encouraged SDG&E to develop a revised shut-off plan after consultation with interested parties.  This resulted in an interested party, the Disability Rights Advocates, filing a petition to modify D.09-09-030 to require SDG&E "… to provide notice and mitigation, to the extent feasible and appropriate, whenever SDG&E shuts off power for public-safety reasons." (D.12-04-024, p. 2.)   The Commission issued D.12-04-024 in response to this petition. Accordingly, D.09-09-030 and D.12-04-024 were the result of a six-year process that involved multiple opportunities for parties to formally and informally provide input on the need for, scope and substance of the de-energization plan.

No similar efforts occurred with the Resolution.   While the Resolution notes that wildfires occur throughout the state and highlights recent fires in SCE and PG&E territory, it does not discuss the causes, likelihood, impact or potential mitigation efforts that may apply. (Resolution, p. 2-3.) This sharply contrasts with the robust record developed in A.08-12-021. For example, the Commission and SDG&E conducted numerous public participation hearings and technical workshops.   (D.09-09-030, p. 5-6.)   As noted in D.09-09-030, "[t]here was considerable public participation in this proceeding.   More than 100 members of the public, elected representatives, government officials, and representatives of community organizations spoke at the PPHs and public workshop, and there were many letters and email sent to the Commission. The public's input was carefully considered in crafting today's decision." (at p. 5-6.)   In addition, the Commission also accepted written testimony, informational filings and robust written comments.  (D.09-09-030, p. 5-6.) These efforts and additional efforts taken after D.09-09-030 was adopted provided substantial evidence and support for the Commission's conclusions in D.09-09-030 and D.12-04-024.

5

Similarly, the Commission conducted no review of the Resolution under the California Environmental Quality Act ("CEQA"). CEQA review would have evaluated the potential environmental effects of the Resolution, which are numerous given its dramatic effect on transportation, water, communications, and electrical systems during emergency events. CEQA review would have also provided an opportunity for further public comment and input on the Resolution and its potential effects.

Moreover, the (scant) record developed in this proceeding is devoid of any input from affected local agencies. The Commission received comments from six parties or joint parties, and no comments were submitted by any local government. This is likely due to the fact that the Resolution was served on the service list for A.08-12-021. Given its SDG&E focus, this service list does not include a single local government located in SCE or PG&E territory. As such, the Commission failed to provide direct notice to a single local government effected by the policy outside of SDG&E territory.

There is simply no support in the record for applying the de-energization standards in D.12-04-024 outside of SDG&E's service territory.

## C.    Substantial Justice and Good Public Policy Require Modifying the Resolution

Lastly and most importantly, even assuming that the Resolution is procedurally and substantively proper (and it is not), the Commission should amend the Resolution in the interest of justice and good public policy. The City does not dispute the threat posed to it and other communities in California. The City further does not dispute that the Commission may and should ensure that all investor-owned utilities have appropriate plans in place to determine if and when to de-energize lines to avoid or mitigate wildfire risk. However, these far reaching, fundamental policy decisions require careful consideration and robust public and stakeholder input. Malibu and its residents should be heard and their perspectives considered. The Resolution has generated substantial public interest and concern within the City, and the City has received numerous oral and written comments from residents almost all opposed to the Resolution and its de-energization policy.[7] These residents should have the opportunity to provide input on the development of any de-energization policy and not simply the results. It is

---

[7] Examples of email comments received from City residents are attached as Attachment B.

6

simply improper to impose a statewide policy in this important issue through an informal resolution where notice was not provided to any of the affected communities.

Again, the inadequacy of the process can be seen with a simple comparison between the public outreach provided by SDG&E in A.08-12-021 and the effort taken by the Commission in this case.  As noted in D.09-09-030:

> SDG&E filed A.08-12-021 on December 22, 2008.  Notice of A.08-12-021 appeared in the Daily Calendar on December 30, 2008.  SDG&E served copies of A.08-12-021 on the San Diego Office of Emergency Services; the San Diego County Red Cross; and all State Legislators and members of Congress who represent any part of SDG&E's service territory.  SDG&E also mailed a notice of A.08-12-021 to (1) all cities and counties in SDG&E's service territory, and (2) all customers in areas subject to the Power Shut-Off Plan.  In addition, SDG&E published notice of A.08 12 -021 in newspapers of general circulation.  (p. 3.)[8]

In this case, no notice was provided to the City or other affected local agencies (with the exception of those that participated in A.08-12-021).  No notice was provided to local offices of emergency services, the Red Cross or similar disaster relief agencies.  No notice was provided to affected legislators.  The Commission should recognize the far reaching impacts of its decision and invite input from all affected stakeholders.  As such, even if the Resolution is legal (and it is not), the City should be afforded the opportunity to show how the Resolution is bad policy and should be revised to permit a public process.

## V.   Requested Relief

The City requests that the Commission modify the Resolution to require each IOU to submit an application to consider its de-energization policy.  This policy should be developed after significant public input and notice.  As an alternative, the Commission could instate a rulemaking to develop a statewide policy.  A complete list of the requested changes to the Resolution is attached as Attachment C.

///

///

---

[8] *In re Application of San Diego Gas & Electric Company for Review of its Proactive De-Energization Measures and Approval of Proposed Tariff Revisions (U902E)* (2009) Cal. P.U.C. Decision D-09.09-030, p. 3.

7

## VI.   **Conclusion**

Based on the foregoing, the City requests that the Commission grant its petition for modification and modify the Resolution to require a public process before approving a revised de-energization policy.

DATED:  October 5, 2018                        Respectfully submitted,

                                                      _/s/ Joshua Nelson_
                                                      Christi Hogin
                                                      Joshua Nelson
                                                      Attorneys for City of Malibu

                                                      BEST BEST & KRIEGER LLP
                                                      1230 Rosecrans Ave Ste 110
                                                      Manhattan Beach, CA 90266
                                                      Telephone: (310) 643-8448
                                                      Email: christi.hogin@bbklaw.com
                                                      joshua.nelson@bbklaw.com

65273.00301\31449829.4

## DECLARATION OF REVA FELDMAN

I, Reva Feldman, declare as follows:

I, Reva Feldman, am City Manager for the City of Malibu, responsible for, among other things, overseeing the City's challenge to Resolution ESRB-8. I have reviewed the document entitled *City of Malibu's Petition for Modification of Resolution ESRB-8*. If called as a witness, I, on information and belief, could attest to the factual statements contained therein.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

Executed this ⎵4⎵ th day of October 2018, at Malibu, California.

_____

REVA FELDMAN

9

# ATTACHMENT A

# ATTACHMENT A



# City of Malibu

23825 Stuart Ranch Road · Malibu, California · 90265-4861
Phone (310) 456-2489 · Fax (310) 456-3356 · www.malibucity.org

July 11, 2018                                        *Sent via Email to public.advisor@cpuc.ca.gov*

President Michael Picker
and Members of the California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102

RE:   Resolution No. ESRB-8 Public Safety Power Shutoff
      CPUC July 12, 2018 Agenda ID #16556

Dear Commissioners:

Southern California Edison recently presented its Public Safety Power Shutoff program to the City of
Malibu and the City has many serious concerns that need to be mitigated before this program is
implemented.

The entire City of Malibu, which stretches 21 miles along the coast, sits in a Tier 3 Extreme Risk high
fire threat area of the Santa Monica Mountains. Most of our residents live in neighborhoods nestled
at the foot of the mountains or in the canyons with just one way in and one way out. Even under the
best conditions, evacuating residents during a fire is extremely difficult. The City has multiple alerting
systems to support the field evacuation efforts, but without power, that effort will be severely crippled.

We understand that the intent of the program is to decrease the chances of a fire during high wind
events, but power lines are only one cause of fires. Fires are also frequently started by weed abatement
tools, illegal campfires and lightning strikes. If Edison shuts off the power preemptively and a fire
starts by another means, it could create an extremely dangerous and life-threatening situation in our
community. Even if we request to have lines reenergized to implement our alert and warning systems,
it could take hours before the first notification could be sent. During high wind events, there are not
hours to wait for this, especially during the night when people are sleeping, and emergency resources
are at their lowest.

The City's alert and warning systems are not the only concern. Our water system relies on pump
stations that require power. If power is out, the water will not be able to flow, and the fire department
will be severely hampered in its fire-fighting efforts. Also, Malibu is dependent on Pacific Coast
Highway for a significant amount of ingress and egress from the area. Gridlock caused by inoperable
traffic signals will negatively impact people's ability to evacuate the area, as well as impact the ability
of emergency resources to enter the City. Another concern is that most of the City is on septic and
extended power outages could negatively impact those pump stations and systems. Lastly, many
residents do not have landlines and power outages cut off WiFi and all communication.


Recycled Paper

California Public Utilities Commission
City of Malibu Comments on Resolution ESRB-8
July 11, 2018
Page 2 of 2

Due to the above stated concerns, the City of Malibu requests that the language in Resolution ESRB-8 regarding extending the requirements of D.12-040024 to all electrical IOUs, be amended in the following manner:

1) Under II, C. Public Outreach, Notification, and Mitigation, bullet six located on page 6 of the Resolution where it states:

"To address public safety impacts of a de-energization event, the IOU may provide generators to critical facilities that are not well prepared for a power shut off."

We request that the word "may" be changed to "will" and "critical facilities" be specified by adding "including, but not limited to cell phone towers, water pumps, key traffic signals and emergency communication."

2) Under II, C. Public Outreach, Notification, and Mitigation, bullet four located on page 6 of the Resolution where it states:

"Discuss the details of any potential shut off and mitigation measure the IOU can provide to lessen the negative impacts of the power outage"

We request the language be strengthened to say, "Develop a detailed mitigation plan that is vetted with the local jurisdictions and emergency response agencies."

Your consideration of these recommended changes to the proposed Resolution is greatly appreciated and crucial to the protection of the Malibu community and so many others throughout the state. If you have any questions regarding these suggestions, please contact me at 310-456-2489 x226 or rfeldman@cityof malibu.org.

Sincerely,

Reva Feldman
City Manager

cc:     Mayor Rick Mullen and Honorable Members of the Malibu City Council
        Susan Dueñas, Public Safety Manager
        Rob DuBoux, Acting Public Works Director
        Diane Forte, Region Manager, Public Affairs, Southern California Edison

# ATTACHMENT B

# ATTACHMENT B

**Heather Glaser**

| | |
|---|---|
| **From:** | Georgia Goldfarb, MD |
| **Sent:** | Monday, August 27, 2018 12:05 PM |
| **To:** | Rick Mullen; Jefferson Wagner; Skylar Peak; Lou La Monte; Laura Rosenthal |
| **Cc:** | Heather Glaser |
| **Subject:** | Edison shutoff comment for city council meeting |
| **Attachments:** | Comment City Council 18.08.27.docx |

Dear Councilmembers,
Please see attached.
Thank you,

Georgia Goldfarb



RECEIVED
AUG 2 7 2018
CITY CLERKS OFFICE
CITY OF MALIBU

FILED
City of Malibu
Office of the City Clerk

Meeting Date 8/27/18

Agenda Item # 10

C C : Council ; CM ; CA ; PSM ; Ref. Binder ; Original to 8/27/18 Agenda File

I strongly oppose Edison's plan for outages. Their plan presents a high level of risk for many in our community. As we know, high fire hazard conditions can last for several days and will only become longer and more frequent with climate change. To shut off all ability to communicate at various times over some 400 square miles (the Santa Monicas) and possibly some 100,000 people without very careful planning, coordination and testing for secure mechanisms for communication, electrical supply to water pumps and traffic lights, is grossly irresponsible.

From Edison's perspective, concern about their liability is paramount: this is seen in their reported lobbying expenditures this year, in SB 901 language (which has thankfully been tabled) and in new PUC directives regarding these shutoffs. The solution to the wildfire crisis is not to desperately seek various ways of funding Edison's costs related to the disaster – e.g. absolution of liability, costs covered by rate payers, government programs, shareholders (their last choice) – but to ameliorate the causes of these fires. Edison does not discuss burying their wires, but that is the obvious answer to their liability. And, incidentally, it will also reduce hazard from arcing and downed powerlines and transformers which cause or contribute to wildfire, the main concern of residents.

The City has rightfully opposed their plan. I agree.

Here are some of my concerns:

1. Frequency and risk assessment for projected black outs by Edison, as I understand it, may be inaccurate.

   a. Edison has stated that the expected frequency of blackouts is 2-10/year in their entire service area. However, much of the 50,000 sq mile SCE area has either limited risk of fire from sparking and downed wires or very low population. Clearly the highest risk will be concentrated in wildland, mountainous areas adjacent to cities, like the SMM. It is not acceptable that the risk of blackout for the Santa Monica Mountains has not been specifically calculated, especially when this risk is used to develop a wildfire plan. Edison continues to misrepresent the risk of blackout to our areas.

   b. The stated frequency of blackouts is based on historical data, while the need for the blackout intervention, as evidenced by the NEW frequency and spread of wildfires for the present and future has NOT been incorporated into the projected frequency and duration of the blackouts. That is, they have no idea how often and how long these blackouts will occur now or in the future for our area. One respondent at the Public Safety meeting, August 1, found that Malibu had 32 red flag days over the previous year. Does this mean that we can expect that the power will be shut off for a possible 30 days per year and likely more? Further, Edison's criteria for shut-offs, apart from the trigger of red flag days are not clear.

   c. Generalizability. SCE has tested the blackout intervention twice: Once in Idyllwild in December 2017, population ~3800, and another that wasn't discussed. Generalizing the validity of this one-time experience is NOT applicable to the Santa Monica Mountains considering the area covered, total population, and population density.

2. Communications. Without electricity, communications would not be available to residents or first responders regarding fire hazard, wind, road conditions, and evacuation information in the most critical areas. How will we learn of the advice from Cal Fire, Fire Department, City, Sheriff,

NOAA, and citizen information? This can change frequently and inform our decisions to stay, go and where to go. As has been made abundantly clear in the fires in northern California, it is ridiculous to think, that in a firestorm the entire populace will individually receive timely emergency information as Edison has suggested.

3. Here is an example Edison used which illustrates the lack of detail in planning: As I understood their statement at the public safety meeting, there will be no communication possible whatsoever during these blackouts, including cell and even landline service without additional batteries. For example, what additional batteries were they referring to? How will people know what type of batteries are required? How will this information be communicated to everyone? How do they deal with people who cannot afford the batteries or have the knowledge of how to install them? This is just one tiny part of the lack of information in Edison's shutoff plan.

4. Water supply would be limited. Water is pumped to a tank on a hill which feeds by gravity to our homes. Without electricity, the water supply would be whatever is left in the tank prior to the shutoff. So the fire department's water supply would have to rely on air and truck support, limiting their effectiveness and their safety. People who are unable to evacuate or who shelter in place would not have the water they need to protect themselves or safely defend their homes. In the 1993 Old Topanga fire in the Santa Monica Mountains, I understand that water ran out in Big Rock, which compromised the ability to fight the fire. And, in terms of personal needs, unless residents have stored 1-3 gallons of water per person per day at their house, they will not be able to cover their basic needs under a prolonged blackout, particularly worrisome under severe heat conditions.

5. Further, without power, absence of air-conditioning and electricity will place people at risk for heat related illness, particularly vulnerable people, older people, young children, people dependent on medical equipment, and people with disabilities. If moving to a hotel is not an option for someone, they may die from heat-related illness and lack of support for medical equipment.

6. Additional costs. For example, costs of alternative accommodations, loss of perishables and loss of income from home and other businesses due to inability to communicate have not been addressed in this plan. If, by state law, the PUC or legislators absolve SCE and other power companies of liability, will they develop any interventions to address these concerns or, if the worst happens, with loss of life and property, provide compensation to residents? Have they calculated the risk of loss of life due to inability of agencies to communicate conditions and evacuation orders with residents, or do they expect that whenever they shut off power, everyone will have already evacuated? If they preemptively shut off power, any consequences are certainly their responsibility.

What we need is not a reactive discussion based on business and shareholder needs, but a thoughtful discussion and plan on how collectively to best survive these challenging conditions. This should be the beginning of these discussions not the end.

**Heather Glaser**

| | |
|---|---|
| **Subject:** | Edison's plan to shut down power |

**FILED**
City of Malibu
Office of the City Clerk

Meeting Date 8/27/8

Agenda Item # 1D

ᴿECEIVE
AUG 27 2018
CITY CLERKS OFFICE
CITY OF MALIBU

**From:** Scott Dittrich
**Sent:** Saturday, August 25, 2018 4:16 PM
**To:** Reva Feldman <rfeldman@malibucity.org>; Jefferson Wagner <zumajays@mac.com>; Heather Glaser <hglaser@malibucity.org>
**Cc:** Rick Mullen <rmullen@malibucity.org>; Lou La Monte <llamonte@malibucity.org>; Laura Rosenthal <lrosenthal@malibucity.org>; Skylar Peak <speak@malibucity.org>
**Subject:** Edison's plan to shut down power

To: Rick Mullen, Zuma Jay Wagner, Laura Rosenthal, Lou LaMonte, and Skylar Peak
cc. Reva Felman, Heather Glaser

<u>What shutting off the power will do to our community.</u>

1. No City emergency notification of a fire.
2. No notification from radio and television of a fire.

Think of the consequences of delayed notification in terms of evacuating. Instead of an orderly approach people will flee at the last moment, forced to leave valuables and pets behind. In a panic accidents will occur, blocking access. But some people, especially those most vulnerable, will be caught by surprise, unable to escape.

3. Inability to make a 911 call for fire, accident, or medical emergency (this means our brave fire fighters won't get notified of a fire when it is still small)
4. No power means no water – the pumps bringing water uphill to the storage tanks will not operate without power. The firemen might as well take the day off.
5. Many people in Malibu and Topanga work at home. There were 27 red flag days last year. Think about being unable to work for 27 days. For most of us that means no pay and angry clients.
6. With the traffic lights out on PCH, traffic will be snarled as people try to escape. This means firefighting equipment will not reach the fire in a timely manner.
7. Without traffic lights, those fleeing the fire down the canyons will be unable to turn onto PCH. As the fire approaches they will abandon their vehicles, trapping those behind, some with with horse trailers.
8. This is obviously an attempt to limit legal exposure, but I suggest instead it will increase Edison's liability.

I do not want to leave this without offering a solution: It is clear that the power poles, wires, and transformers are unsafe even in normal weather and cannot withstand the annual Santa Ana winds. In one year in my neighborhood of 100 homes, we had 4 fires related to utility equipment, none during high winds.

It is time to rid ourselves of this 19th Century technology once and for all. The only solution is to underground the utility poles, since clearly the current system is causing a high percentage of the fires in hillside areas. Some fireman say as high as 50%. This means putting this relic of the days of the Pony Express in a museum.

1

CC: CM;CA;Council; Ref. Binder; PSM Original to 8/27/18 Agenda File

Yes undergrounding is expensive,    ｉ the cost of fighting these disastrous f. _s, higher insurance premiums paid by home owners, and the damage to the environment resulting from fires caused by the over the ground delivery system is even more expensive. And it must be Edison who takes the lead in undergrounding, This means the CPUC must allow the company to recover it's cost through higher electric bills. Limiting Edison's exposure could be part of any new undergrounding effort.

Scott Dittrich                                                                              25 August 2018

## ATTACHMENT C

### FINDINGS

1. Under PU Code Sections 451 and 399.2(a), electric IOUs have the authority to shut off power in order to protect public safety.

2. The decision to de-energize electric facilities for public safety is complex and dependent on many factors including and not limited to fuel moisture; aerial and ground firefighting capabilities; active fires that indicate fire conditions; situational awareness provided by fire agencies, the National Weather Service and the United States Forest Service; and local meteorological conditions of humidity and winds.

3. The decision to shut off power may be reviewed by the Commission pursuant to its broad jurisdiction over public safety and utility operations.

4. The requirements for reporting, public outreach, notification, mitigation and reasonableness review in D.12-04-024 are effective, but are only applicable to SDG&E.

5. All electric IOUs may face similar safety situations requiring power shut-off in emergencies and de-energization events in their service territory.

6. De-energization of electric facilities could save lives, protect property, and prevent fires.

7. <u>Without considering the unique facts and circumstances of each IOU and its service area and providing for robust local input, it is premature to apply</u> the measures in D.12-04-024 ~~should be strengthened to further ensure that the public and local officials are prepared for de-energization events and to ensure the proper safety oversight by the Commission's Safety and Enforcement Division~~<u>outside of SDG&E's service area</u>.

### THEREFORE, IT IS ORDERED THAT:

1. All electric IOUs ~~shall take appropriate and feasible steps to provide notice and mitigation to their customers in accordance with the guidelines in D.12-04-024 whenever they shut off power pursuant to their statutory authority.~~<u>may file an application to determine whether to extend the measures in D.12-04-024 to that IOU.</u>

2. ~~All electric IOUs shall follow the notification requirements to SED established in D.12-04-024.~~

3. ~~All electric IOUs shall comply with the additional guidelines stated in the section of this resolution titled "**Strengthened Requirements Applicable to all Electric IOUs.**"~~

# Exhibit 98

**FILED**

Date 3-17-20

Kimberly Flener

By _____ ,Deputy

Superior Court of California, County of Butte

1
2
3
4          SUPERIOR COURT OF THE STATE OF CALIFORNIA

5                 FOR THE COUNTY OF BUTTE

6

7   THE PEOPLE OF THE STATE OF CALIFORNIA,      No.    **20CF01422**

8                                    Plaintiff,      I N D I C T M E N T

9                   v.

10

11  PACIFIC GAS AND ELECTRIC COMPANY

12                              Defendant(s).

13

14

15  The Grand Jury of the County of Butte, State of California, hereby alleges that:

16

17                          COUNT 1

18  On or about November 8, 2018, in the above named Judicial District, the crime of **UNLAWFULLY**

19  **CAUSING A FIRE, in violation of PENAL CODE SECTION 452, a Felony** , was committed by

20  PACIFIC GAS AND ELECTRIC COMPANY who did unlawfully cause a fire that caused to be

21  burned, any structure, forest land and property.

22

23         **SPECIAL ALLEGATION – GREAT BODILY INJURY TO FIREFIGHTER**

24  It is further alleged, pursuant to Penal Code section 452.1(a)(2) as to Count 1, that the following

25  aggravating factor exists: A firefighter suffered great bodily injury as a result.

26

27

28

**SPECIAL ALLEGATION – MULTIPLE GREAT BODILY INJURIES**

It is further alleged, pursuant to Penal Code section 452.1(a)(3) as to Count 1, that the following aggravating factor exists: The defendant(s) proximately caused great bodily injury to more than one victim in any single violation of Section 452.

**SPECIAL ALLEGATION – MULTIPLE STRUCTURES BURNED**

It is further alleged, pursuant to Penal Code section 452.1(a)(4) as to Count 1, that the following aggravating factor exists: The defendant(s) proximately caused approximately 18,804 structures to burn.

COUNT 2

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Joyce Acheson**, a human being.

COUNT 3

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Herbert Alderman**, a human being.

COUNT 4

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Teresa Ammons**, a human being.

COUNT 5

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Rafaela Andrade**, a human being.

COUNT 6

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Carol Arrington**, a human being.

COUNT 7

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Julian Binstock**, a human being.

COUNT 8

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **David Bradburd**, a human being.

COUNT 9

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Cheryl Brown**, a human being.

COUNT 10

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Larry Brown**, a human being.

COUNT 11

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Richard Brown**, a human being.

COUNT 12

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Andrew Burt,** a human being.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 990 of 1229

| | |
|---|---|
| 1 | COUNT 13 |
| 2 | On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY |
| 3 | MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by |
| 4 | PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, |
| 5 | and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and |
| 6 | equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical |
| 7 | lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill |
| 8 | **Joanne Caddy**, a human being. |
| 9 | |
| 10 | COUNT 14 |
| 11 | On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY |
| 12 | MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by |
| 13 | PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, |
| 14 | and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and |
| 15 | equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical |
| 16 | lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill |
| 17 | **Barbara Carlson**, a human being. |
| 18 | |
| 19 | |
| 20 | COUNT 15 |
| 21 | On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY |
| 22 | MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by |
| 23 | PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, |
| 24 | and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and |
| 25 | equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical |
| 26 | lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill |
| 27 | **Vincent Carota**, a human being. |
| 28 | |

COUNT 16

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Dennis Clark, Jr.,** a human being.

COUNT 17

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Evelyn Cline**, a human being.

COUNT 18

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **John Digby**, a human being.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 992 of 1229

<div align="center">COUNT 19</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice,, kill **Gordon Dise**, a human being.

<div align="center">COUNT 20</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Paula Dodge**, a human being.

<div align="center">COUNT 21</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Randall Dodge**, a human being.

<div style="text-align: center;">COUNT 22</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Andrew Downer**, a human being.

<div style="text-align: center;">COUNT 23</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Robert Duvall**, a human being.

<div style="text-align: center;">COUNT 24</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Paul Robert Ernest**, a human being.

COUNT 25

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Rose Farrell**, a human being.

COUNT 26

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Jesus Fernandez**, a human being.

COUNT 27

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Jean Forsman**, a human being.

<pre>
 1                                    COUNT 28
 2   On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY
 3   MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by
 4   PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,
 5   and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and
 6   equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical
 7   lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill
 8   **Ernest Foss, Jr.**, a human being.
 9
10                                    COUNT 29
11   On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY
12   MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by
13   PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,
14   and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and
15   equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical
16   lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill
17   **Elizabeth Gaal**, a human being.
18
19
20                                    COUNT 30
21   On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY
22   MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by
23   PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,
24   and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and
25   equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical
26   lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill
27   **Sally Gamboa**, a human being.
28
</pre>

COUNT 31

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **James Garner**, a human being.

COUNT 32

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Richard Garrett**, a human being.

COUNT 33

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **William Godbout**, a human being.

COUNT 34

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Shirley Haley**, a human being.

COUNT 35

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Dennis Hanko**, a human being.

COUNT 36

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Anna Hastings**, a human being.

<div align="center">COUNT 37</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Jennifer Hayes**, a human being.

<div align="center">COUNT 38</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Christina Heffern**, a human being.

<div align="center">COUNT 39</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Ishka Heffern**, a human being.

COUNT 40

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Matilde Heffern**, a human being.

COUNT 41

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Louis Herrera**, a human being.

COUNT 42

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Evva Holt**, a human being.

<div style="text-align: center">COUNT 43</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **TK Huff**, a human being.

<div style="text-align: center">COUNT 44</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Gary Hunter**, a human being.

<div style="text-align: center">COUNT 45</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **James Kinner**, a human being.

COUNT 46

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Dorothy Lee-Herrera**, a human being.

COUNT 47

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Warren Lessard**, a human being.

COUNT 48

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Dorothy Mack**, a human being.

COUNT 49

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Sara Magnuson**, a human being.

COUNT 50

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Joanne Malarkey**, a human being.

COUNT 51

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **John Malarkey**, a human being.

<div align="center">COUNT 52</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Christopher Maltby**, a human being.

<div align="center">COUNT 53</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **David Marbury**, a human being.

<div align="center">COUNT 54</div>

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Deborah Morningstar**, a human being.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1004 of 1229

COUNT 55

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Helen Pace**, a human being.

COUNT 56

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Joy Porter**, a human being.

COUNT 57

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Beverly Powers**, a human being.

COUNT 58

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Robert Quinn**, a human being.

COUNT 59

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Joseph Rabetoy**, a human being.

COUNT 60

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Forrest Rea**, a human being.

COUNT 61

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Vernice Regan**, a human being.

COUNT 62

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Ethel Riggs**, a human being.

COUNT 63

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Lolene Rios**, a human being.

COUNT 64

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Gerald Rodrigues**, a human being.

COUNT 65

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Frederick Salazar**, a human being.

COUNT 66

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Phyllis Salazar**, a human being.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1008 of 1229

| | |
|---|---|
| 1 | <center>COUNT 67</center> |
| 2 | On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY |
| 3 | MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by |
| 4 | PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, |
| 5 | and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and |
| 6 | equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical |
| 7 | lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill |
| 8 | **Sheila Santos**, a human being. |
| 9 | |
| 10 | <center>COUNT 68</center> |
| 11 | On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY |
| 12 | MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by |
| 13 | PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, |
| 14 | and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and |
| 15 | equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical |
| 16 | lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill |
| 17 | **Ronald Schenk**, a human being. |
| 18 | |
| 19 | |
| 20 | <center>COUNT 69</center> |
| 21 | On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY |
| 22 | MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by |
| 23 | PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, |
| 24 | and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and |
| 25 | equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical |
| 26 | lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill |
| 27 | **Berniece Schmidt**, a human being. |
| 28 | |

1                        COUNT 70

2 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

3 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

4 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

5 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines

6 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

7 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

8 **John Sedwick**, a human being.

9

10                       COUNT 71

11 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

12 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

13 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

14 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines

15 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

16 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

17 **Don Shores**, a human being.

18

19

20                       COUNT 72

21 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

22 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

23 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

24 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

25 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

26 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

27 **Kathy Shores**, a human being.

28

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1010 of 1229

COUNT 73

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Judith Sipher**, a human being.

COUNT 74

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Larry Smith**, a human being.

COUNT 75

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Russell Stewart**, a human being.

1                       COUNT 76

2 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

3 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

4 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

5 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

6 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

7 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

8 **Victoria Taft**, a human being.

9

10                      COUNT 77

11 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

12 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

13 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

14 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

15 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

16 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

17 **Shirlee Teays**, a human being.

18

19

20                      COUNT 78

21 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

22 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

23 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

24 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

25 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

26 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

27 **Joan Tracy**, a human being.

28

1                            COUNT 79

2 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

3 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

4 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

5 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

6 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

7 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

8 **John "Unknown"**, a human being.

9

10                            COUNT 80

11 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

12 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

13 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

14 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

15 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

16 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

17 **Ellen Walker**, a human being.

18

19

20                            COUNT 81

21 On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY

22 MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by

23 PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires,

24 and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and

25 equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical

26 lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill

27 **Donna Ware**, a human being.

28

28

COUNT 82

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Isabel Webb**, a human being.

COUNT 83

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Marie Wehe**, a human being.

COUNT 84

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **Kimberly Wehr**, a human being.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1014 of 1229

COUNT 85

On or about November 8, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER, in violation of PENAL CODE SECTION 192(b), a Felony , was committed by PACIFIC GAS AND ELECTRIC COMPANY, who had a legal duty to the public to avoid wildfires, and failed to perform that legal duty by recklessly failing to maintain and operate its electrical lines and equipment in a manner that would minimize the risk of catastrophic wildfires posed by those electrical lines and equipment, resulting in the Camp Fire; and therefore did unlawfully, and without malice, kill **David Young**, a human being.

* * * * *

THIS INDICTMENT CONSISTS OF 85 COUNT(S).

"A TRUE BILL"

_Linda Lucia_
FOREPERSON OF THE GRAND JURY

THIS PAGE SEALED BY ORDER OF THE COURT

THIS PAGE SEALED BY ORDER OF THE COURT

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1017 of 1229

# Exhibit 99

Exhibit 10.1

MICHAEL L. RAMSEY, District Attorney (State Bar No. 79166)
MARC NOEL, Supervising Deputy District Attorney (State Bar No. 142558)
JENNIFER DUPRE-TOKOS, Deputy District Attorney (State Bar No. 191480)
Butte County District Attorney's Office
25 County Center Dr. #245
Oroville, CA 95965
Telephone: (530) 538-7411


Attorneys for the People

BRAD D. BRIAN (State Bar No. 79001)
MICHAEL R. DOYEN (State Bar No. 119687)
LISA J. DEMSKY (State Bar No. 186006)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100

KATE DYER (State Bar No. 171891)
CLARENCE, DYER & COHEN LLP
899 Ellis Street
San Francisco, California 94109-7807
Telephone: (415) 749-1800


Attorneys for Defendant

<div align="center">

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF BUTTE

</div>

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>vs.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Case No. 2OCF01422<br><br>PLEA AGREEMENT AND SETTLEMENT |

THE PEOPLE OF THE STATE OF CALIFORNIA and the defendant Pacific Gas and Electric Company (the "**Company**" or "**PG&E**"), through its counsel Munger, Tolles & Olson LLP and Clarence, Dyer & Cohen LLP, hereby agree to this Plea and Settlement Agreement (the "**Agreement**"). Subject to the conditions set forth in this Agreement, the Company agrees to enter a plea of guilty to eighty-four (84) counts of involuntary manslaughter in violation of Cal. Penal Code § 192(b), and one (1) count of unlawfully causing a fire in violation of Cal. Penal Code § 452 and will admit the special allegations pursuant to Cal. Penal Code §§ 452.1(a)(2),

452.1(a)(3), 452.1(a)(4), as set forth in the indictment in the criminal prosecution of the Company, case number 2OCF01422.

## I.  INTRODUCTION

This Agreement is made and entered into between the People of the State of California (the "**People**"), currently represented by the District Attorney of Butte County (the "**DA**") and the defendant, Pacific Gas and Electric  Company (the "**Company**" or the "**PG&E**"), currently represented by Munger, Tolles & Olson LLP and Clarence, Dyer & Cohen LLP.  The People and PG&E are individually referred to herein as "**Party**" and, collectively, as the "**Parties**."

1.  On January 29, 2019, PG&E commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**").

2.  This Agreement is entered into to resolve the criminal prosecution of the Company, case number 2OCF01422, arising out of the November 8, 2018 wildfire in Butte County, California known as the "**Camp Fire**."

3.  The DA has determined that entering into this Agreement to resolve the prosecution of the Company is appropriate and in furtherance of justice based upon a totality of the circumstances and in light of the following:

(a)  The Company's acceptance of responsibility and agreement to enter the plea described below;

(b)  The Company's agreement to compensate victims of the Camp Fire, including through:

(i)  The restructuring support agreement entered into on December 6, 2019, by PG&E, certain attorneys representing victims of the Camp Fire, the "Official Committee of Tort Claimants," et al., and approved by the Bankruptcy Court on December 19, 2019, providing for, among other things, the establishment of a "Fire Victim Trust" to compensate victims of the Camp Fire and other wildfires, the payment by PG&E of approximately $13.5 billion in cash and equity, and the settlement, release, and satisfaction of

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1020 of 1229

"Fire Victim Claims," to be effected pursuant to PG&E's Plan of Reorganization in the Chapter 11 Cases (as amended, supplemented, or otherwise modified, and to the extent applicable, confirmed by the United States Bankruptcy Court, the "**Plan of Reorganization**");

        (ii)      The restructuring support agreement entered into on September 22, 2019, by PG&E and certain holders of subrogation claims and approved by the Bankruptcy Court on December 19, 2019, providing for, among other things, the payment by PG&E of $11 billion and the settlement, release, and satisfaction of "Subrogation Claims," to be effected pursuant to the Plan of Reorganization; and

        (iii)     The agreements entered into by the Company and certain "Public Entities," providing for payment by PG&E of $1 billion and the settlement, release, and satisfaction of "Public Entities Wildfire Claims," including payments of approximately $270 million to the Town of Paradise, California, $252 million to Butte County, and $47.5 million to the Paradise Recreation and Park District, to be effected pursuant to the Plan of Reorganization.

        (c)      The Company's cooperation with the DA's investigation of the Camp Fire.

        (d)      The significant risk that a further criminal prosecution of the Company at this time could jeopardize the Company's ability to pay victims pursuant to the agreements noted in sections I.3.b(i), (ii), and (iii) above, to be effected pursuant to the Plan of Reorganization, or to participate in the go-forward wildfire fund established by the State of California pursuant to 2019 Cal. Legis. Serv. Ch. 79 (A.B. 1054) (West).

## II.     GUILTY PLEA AND SETTLEMENT

      The Company knowingly, intelligently, voluntarily, and with the advice of counsel agrees to the following terms:

    **1.**     <u>Acceptance of Responsibility.</u>  The Company acknowledges and accepts criminal responsibility for causing the Camp Fire.

    **2.**     <u>Plea.</u>  Subject to the terms of this Agreement and the promises of the People set forth herein, the Company agrees to plead guilty to eighty-four (84) counts of involuntary manslaughter in violation of Cal. Penal Code § 192(b) and one (1) count of unlawfully causing a

fire in violation of Cal. Penal Code § 452 and admit the special allegations pursuant to Cal. Penal Code §§ 452.1(a)(2), 452.1(a)(3), 452.1(a)(4), as set forth in the indictment in the criminal action against the Company, case number 2OCF01422.

3.   <u>Factual basis.</u>  The Company knowingly, intelligently, voluntarily, and with the advice of counsel, stipulates and agrees that there exists a sufficient factual basis for the Butte County Superior Court to accept the guilty plea described in section II.2. of this Agreement.

4.   <u>Agreed sentence.</u>  The Parties agree that (i) the Company will be sentenced to pay the maximum total fine and penalty of not more than ($3,486,950.00), which amount includes (a) any applicable base fine, pursuant to Cal. Penal Code § 672, and (b) all related fees, penalties and assessments, and (ii) no other or additional sentence will be imposed on the Company in the criminal action against the Company, case number 2OCF01422.

5.   <u>Investigative costs.</u>  The Company agrees to pay $500,000.00 to the Butte County District Attorney Environmental and Consumer Protection Trust Fund to reimburse costs spent on the investigation of the Camp Fire.

6.   <u>Restitution.</u>  Nothing in this Agreement prejudices the rights of any of the heirs of the decedents specified in the indictment returned against the Company on March 17, 2020, in the criminal action against the Company, case number 2OCF01422, with respect to any claims filed on behalf of the decedents in the Chapter 11 Cases.  The People, by and through the DA further agree not to oppose any effort by the Company to seek the discharge of claims for restitution pursuant to Cal. Penal Code § 1202.4 in the Chapter 11 Cases made on the grounds that such claims are satisfied pursuant to the aforementioned agreements and the Plan of Reorganization.

7.   <u>Waiver and acknowledgment of rights.</u>  The Company understands that it has certain constitutional rights including (a) the right to a speedy public jury trial at which it would be presumed innocent and could not be convicted unless twelve impartial jurors were convinced of its guilt beyond a reasonable doubt, (b) the right to confront witnesses and cross-examine witnesses, and (c) the right to produce evidence and issue subpoenas to bring into court all witnesses and evidence favorable to it.  The Company further understands that by pleading guilty, it is giving up

4

its right to a jury trial, its right to confront and cross-examine witnesses, and its right to produce evidence and witnesses on its own behalf.

8. <u>Waiver of appeal.</u> Solely for the purpose of this Agreement and the entry of its guilty plea as provided herein, and provided that the Butte County Superior Court does not impose a sentence in addition to, or other than, as provided herein, the Company knowingly, intelligently, and voluntarily waives any right to appeal its plea of guilty or any agreed upon sentence.

9. <u>Release.</u> Upon approval and acceptance of this Agreement by the Butte County Superior Court and the Bankruptcy Court, the People, by and through the DA, agree not to prosecute any criminal charges related to or arising out of the Camp Fire against the Company, PG&E Corporation, any wholly-owned subsidiaries thereof, and their respective successors and assigns, including PG&E Corporation and Pacific Gas and Electric Company, as reorganized pursuant to the Chapter 11 Cases.

(a) The People, by and through the DA, agree that the implementation of this Agreement will be in full and final satisfaction, release, and discharge of the proofs of claim filed by the People, by and through the DA, on October 17 and October 24, 2019 in the Chapter 11 Cases, Claims Nos. 57948, 59642, 65945, 87014, and 87021. The People, by and through the DA, represent and acknowledge that the aforementioned proofs of claim are the only proofs of claim submitted by People in the Chapter 11 Cases.

10. <u>Withdrawal of plea.</u> The Parties agree that the Company will be entitled to withdraw its guilty plea if:

(a) This Agreement is not approved and accepted by the Butte County Superior Court;

(b) Any obligation, including but not limited to fines, penalties, assessments, obligations to pay restitution pursuant to Cal. Penal Code § 1202.4 in addition to the settlements described in Section I of this Agreement, and non-monetary obligations, is imposed upon the Company in the criminal case against the Company, case number 2OCF01422, in addition to or other than the sentence agreed by the Parties as set forth in section II.4 of this Agreement; or

5

(c)     This Agreement is not approved by the Bankruptcy Court or the Plan of Reorganization is not confirmed by the Bankruptcy Court on or before June 30, 2020 or does not become effective in accordance with the terms thereof.

Should the Company for any reason withdraw its plea, the indictment herein referenced shall remain.

For the avoidance of doubt, nothing in this Agreement and this section II.10. is intended to or shall limit the Company's right to withdraw its guilty plea as provided in Cal. Penal Code § 1192.5.

**11.**     Waiver.  PG&E agrees to waive any objections or challenge to:

(a)     Legality of Grand Jury including:

(b)     Qualifications of Grand Jurors, Cal. Penal Code §§ 893, 894;

(c)     Selection of Grand Jurors, Cal. Penal Code §§ 895-902;

(d)     Impaneling of Grand Jury, Cal. Penal Code §§ 904-913;

(e)     Conduct of Grand Jury Investigations, Cal. Penal Code §§ 939-939.1;

(f)     Grand Jury Finding of the Indictment Cal. Penal Code §§ 940-945;

(g)     PG&E specifically agrees to waive any objection/challenge based upon the Cal. Penal Code § 943 requirement that names of witnesses examined before the grand jury be inserted at the foot of the indictment;

Provided that, for the avoidance of doubt, the waiver contained in this Section II.11 will not be binding on the Company in the event this Agreement is not accepted and approved by the Butte County Superior Court or the Bankruptcy Court or if the Company's plea is withdrawn for any reason stated in Section II.10 above.

## III.     MISCELLANEOUS PROVISIONS

**1.**     Cooperation.  The Parties agree to cooperate in good faith and use their reasonable best efforts to obtain approval of this Agreement by the Bankruptcy Court and the Butte County Superior Court.  The Parties further agree to cooperate in good faith and use reasonable best efforts to incorporate the provisions of this Agreement into the Plan of Reorganization (or the order confirming the Plan of Reorganization).  The People agree not to

6

object to, delay, impede, or take any other action to interfere with, acceptance, confirmation, or implementation of the Plan of Reorganization.

IT IS SO STIPULATED AND AGREED:

DATED: 3/17/2020

/s/ MICHAEL L. RAMSEY, ESQ.
MICHAEL L. RAMSEY, ESQ.
Butte County District Attorney

*For the People*

DATED: 3/17/2020

/s/ BRAD D. BRIAN, ESQ.
BRAD D. BRIAN, ESQ.
MICHAEL R. DOYEN, ESQ.
MUNGER, TOLLES & OLSON LLP

*Counsel for PG&E*

# Exhibit 100

*Document By* **WESTLAW**

2017 WL 6451625 (Cal.Super.) (Trial Pleading)
Superior Court of California.
San Francisco County

Lore OLDS, d/b/a Sky Vineyards; Skyla Olds; Nancy Hitchcock; Herman Bossano; Rebecca Bailey,

Ph.D., d/b/a It's Mine Don't Touch Trust and Transitioning Families; and Charles Holmes;, Plaintiffs,

v.

PG&E CORPORATION; Pacific Gas & Electric Company; and Does 1-20;, Defendants.

No. CGC-17-562791.
November 30, 2017.

Jury Trial Demanded
(1) Negligence
(2) Inverse Condemnation
(3) Third Cause of Action
(4) Private Nuisance
(5) Public Nuisance
(6) Premises Liability
(7) Violation of Public Utilities Code § 2106
(8) Violation of Health & Safety Code § 13007
(9) Negligent Interference with Prospective Economic Advantage

**Class Action Complaint**

Elizabeth J. Cabraser (SBN 083151), Lieff Cabraser Heimann & Bernstein, LLP, 275 Battery Street, 29th Floor, San Francisco, CA 94111-3339, Telephone: (415) 956-1000, Facsimile: (415) 956-1008, Email: ecabraser@lchb.com.

TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 4
II. JURISDICTION AND VENUE ................................................................................. 4
III. THE PLAINTIFFS ................................................................................................... 5
A. Lore Olds d/b/a Sky Vineyards ................................................................................. 5
B. Skyla Olds ................................................................................................................. 5
C. Nancy Hitchcock & Herman Bossano ...................................................................... - 6
D. Rebecca Bailey, Ph.D., d/b/a It Is Mine Don't Touch Trust, & Charles Holmes .............. 6
E. Transitioning Families .............................................................................................. - 7
IV. THE DEFENDANTS ................................................................................................ - 7 -
A. PG&E Defendants ..................................................................................................... 7
B. Doe Defendants ......................................................................................................... 10
V. FACTUAL ALLEGATIONS ..................................................................................... 11 -
B. Multiple Fires, Common Causes ............................................................................... 12 -
C. The Damage Wrought ................................................................................................ 22
D. PG&E Had a Non-Transferable, Non-Delegable Duty to Safely Maintain Electrical
Infrastructure and Adjacent Vegetation. .................................................................... 26
E. Foreseeable and Expected Weather, Climate, and Fire Conditions .................................. 27
F. PG&E Knew Its Infrastructure Was Too Old and Improperly Maintained for Safety ....... 32

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

1

1. Unsafe, Obsolete Wires ........................................................................... 33
2. Old, Overloaded Utility Poles .................................................................. - 33 -
3. Hazardous Live Wires ............................................................................. 34
4. Dangerous Reclosers ............................................................................... 35
5. Failure to Maintain Trees and Vegetation at a Safe Distance ...................... 35
6. Failure to Maintain Electrical Infrastructure .............................................. 36
G. PG&E's Culture of Profits Over Safety .................................................... 37
1. Run to Failure ......................................................................................... 38
2. Prior Safety Violations ............................................................................ 39 -
3. Profits over Safety .................................................................................. 42
VI. CLASS ACTION ALLEGATIONS ......................................................... 43
A. CLASS DEFINITIONS AND EXCLUSIONS ........................................... 43
1. CLASS DEFINITION ............................................................................. 43
2. EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES CLASS
DEFINITION ........................................................................................... 44
First CAUSE OF ACTION Negligence (Against All Defendants) ..................... 47
Second CAUSE OF ACTION Inverse Condemnation (Against All Defendants) ................ - 51
Third CAUSE OF ACTION Trespass (Against All Defendants) ...................... 52 -
Fourth CAUSE OF ACTION Private Nuisance (Against All Defendants) ........... 53
Fifth CAUSE OF ACTION Public Nuisance (Against All Defendants) .............. 54
Sixth CAUSE OF ACTION Premises Liability (Against All Defendants) ........... 57
Seventh CAUSE OF ACTION Violation Of Public Utilities Code § 2106 (Against All
Defendants) ............................................................................................. 57
Eighth CAUSE OF ACTION Violation Of Health & Safety Code § 13007 (Against All
Defendants) ............................................................................................. - 58 -
Ninth CAUSE OF ACTION Negligent Interference With Prospective Economic
Advantage (Brought by Sky Vineyards and Transitioning Families and Similarly Situated
Class Members Against All Defendants) ...................................................... 59
VII. PRAYER FOR RELIEF ........................................................................ 60
VIII. JURY TRIAL DEMAND ...................................................................... 61

## I. INTRODUCTION

1. In October 2017, a series of severe wildfires devastated nearly 250,000 acres across nine Northern California counties, damaging and destroying homes, businesses, vineyards, farms, and lives.

2. These fires (collectively, the "North Bay Fires" or the "Fires") had different points of origin, but share a common underlying cause: they were sparked by unsafe electrical infrastructure owned, operated and (improperly) maintained by PG&E Corporation and Pacific Gas & Electric Company (hereinafter "PG&E"). These Fires are more specifically described in paragraphs 32 through 42 of this Complaint.

3. PG&E had a duty to properly maintain its electrical infrastructure and ensure surrounding trees and vegetation were trimmed and kept at a safe distance. PG&E violated that duty by knowingly operating aging, improperly maintained infrastructure that it "ran to failure." In fact, PG&E's violations had caused fires before, and PG&E had been sanctioned numerous times for this. Yet PG&E's corporate culture emphasized cutting corners and putting profits over safety.

4. Had PG&E acted responsibly, these fires could have been prevented.

5. Plaintiffs have suffered property damage, economic losses, and disruption to their homes, businesses, lives, and livelihoods, and they seek fair compensation for themselves in this case. They also bring this case as a class action, because they believe all those who suffered such damages and losses should be fairly treated and included as beneficiaries of a comprehensive and consistent adjudication or resolution of liability and damages.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

6. Plaintiffs bring claims on behalf of themselves and all others similarly situated for damages for, *inter alia,* damage to and loss of use of real and personal property; loss of income; loss of business; consequential and incidental damages; emotional distress; and other harm caused by Defendants' wrongful conduct.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this matter pursuant to California Code of Civil Procedure § 395(a) because, at all times relevant, Defendants have resided in, been incorporated in, or done significant business in the State of California, so as to render the exercise of jurisdiction over Defendants by California courts consistent with traditional notions of fair play and substantial justice. The amount in controversy exceeds the jurisdictional minimum of this Court.

8. Venue is proper in this County pursuant to California Code of Civil Procedure § 395.5 because, at all times relevant, Defendants each have had their principal place of business in the County of San Francisco.

## III. THE PLAINTIFFS

9. The Plaintiffs are individuals and businesses who suffered property damage and economic losses as a result of the North Bay Fires.

### A. Lore Olds d/b/a Sky Vineyards

10. Sky Vineyards is a sole proprietorship established by Lore Olds located on Mount Veeder in Napa County. The website for Sky Vineyards is http://www.skyvineyards.com/sky/. Sky Vineyards is a family-run vineyard and winery that has been in operation for more than thirty years. Sky Vineyards is operated by Lore Olds and his daughter, Skyla Olds. Before the fires, the property spanned two hundred acres and included Sky's vineyards, winery building, and a home also used as an office. The vast majority of the forested acreage and the vineyards were burned in the Fires. The home office was completely destroyed along with all of the personal property and business records inside. The Fires also destroyed three small outbuildings and business equipment on the property, including the home office they used for wine business. A substantial portion of the vines have been damaged or destroyed. Wine has also been damaged or destroyed.

### B. Skyla Olds

11. Plaintiff Skyla Olds suffered economic and other damages because of the North Bay Fires. Before the Fires, she lived in a rental home located at 8 Old Hill Ranch Road in Glen Ellen in Sonoma County. Ms. Olds works for her family-owned business, Sky Vineyards, as well as a criminal defense attorney. When the Fires approached, Ms. Olds and her guests were forced to evacuate in the middle of the night. The escape was traumatic and very distressing to Ms. Olds and her guests. The Fires destroyed the home and the majority of her belongings, including original artwork and irreplaceable jewelry given to her by her grandmother. Dealing with the aftermath of the fires has made her unable to continue working as a criminal defense attorney because she has had to spend all her time addressing fire-caused issues, such as fire-related erosion, and managing the recovery of Sky Vineyards. Ms. Olds and her family are still reeling from the Fires and are unable to do much besides focus on recovery logistics. She has been staying in a FEMA-funded hotel while she continues to look for a new place to live.

### C. Nancy Hitchcock & Herman Bossano

12. Plaintiffs Nancy Hitchcock and Herman "Mario" Bossano are a husband and wife who lived in their home at 1912 Fountainview Circle in Santa Rosa, California, for twelve years. On the night of the Fires, the power went out at their home around 10 P.M. Ms. Hitchcock called PG&E several times to ask about the outages but did not receive a response. Around

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

the time the Tubbs Fire started, she heard what sounded like transformer explosions on the street and smelled a very strong odor of smoke. A neighbor called and told them they needed to leave immediately. They escaped only eighteen minutes before their house exploded. That night the Fires completely destroyed their home, two cars, and all of their personal possessions. Ms. Hitchcock is in her seventies, and Mr. Bossano is in his eighties. The stress of figuring out how to move forward and relocate at this time in their lives is overwhelming. Both Ms. Hitchcock and Mr. Bossano are suffering from depression and anxiety because of the total loss of their home caused by the Fires.

### D. Rebecca Bailey, Ph.D., d/b/a It Is Mine Don't Touch Trust, & Charles Holmes

13. Plaintiffs Rebecca Bailey, Ph.D., and Charles Holmes were longtime residents of Glen Ellen in Sonoma County, California. Their three-bedroom home and ranch was located at 178 Sylvia Drive, Glen Ellen, California in Sonoma County. The property was owned in trust by Rebecca Bailey, d/b/a It Is Mine Don't Touch Trust. She had lived there since 2002. The North Bay Fires completely destroyed their home, two vehicles, and a horse trailer. Their family was uprooted and they lost everything: all of their personal possessions, priceless memories, and many antiques. Charles Holmes, a professional chef, lost thirty years of recipes. They also lost several original pieces of art. Their horses had to be moved to another location as all of the ash and soot on her property has made it unsafe for them to remain, and the Plaintiffs have had to move into an apartment while they begin the process of rebuilding their home and lives.

### E. Transitioning Families

14. Transitioning Families is a therapy practice which specializes in "high conflict" divorce, child abduction, and family reunification post-trauma run by Plaintiff Rebecca Bailey, Ph.D., a nationally recognized trauma therapist. Transitioning Families' website is http://transitioningfamilies.com/. Transitioning Families' clients sought out the peaceful and beautiful environment of wine country to help them heal from trauma as well as to adjust to difficult changes in their lives. After the Fires, Ms. Bailey's work from her clients has diminished because the clients do not wish to travel to a devastated area. Her business has also been affected by the stress of losing her home and having to deal with the recovery effort. The North Bay Fires also destroyed her records, equipment, and research.

### IV. THE DEFENDANTS

### A. PG&E Defendants

15. At all times herein mentioned PG&E Corporation and Pacific Gas & Electric Company (collectively, "PG&E") were corporations authorized to do business, and doing business, in the State of California, with their principal place of business in the County of San Francisco, State of California. Defendant PG&E Corporation is an energy-based holding company headquartered in San Francisco. It is the parent company of Defendant Pacific Gas & Electric Company. PG&E Corporation subsidiaries provide customers with public utility services, and services relating to the generation of energy, generation of electricity, transmission of electricity and natural gas, and the distribution of energy.

16. Pacific Gas & Electric Company is both an "Electrical Corporation" and a "Public Utility" pursuant to, respectively, Sections 218(a) and 216(a) of the California Public Utilities Code. PG&E is in the business of providing electricity to the residents and businesses of Northern California and, more particularly, to Plaintiffs' residences, businesses, and properties through a network of electrical transmission and distribution lines.

17. PG&E Corporation is a publicly traded company that owns and/or manages an "Electric Plant" as defined in Section 217 of the Public Utilities Code, and, like its subsidiary, Pacific Gas & Electric Company, is both an "Electric Corporation" and a "Public Utility" pursuant to, respectively, Sections 218(a) and 216(a) of the Public Utilities Code. It develops and operates

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

energy infrastructure assets related to the production and distribution of energy such as power plants, electric lines, natural gas pipelines and liquefied natural gas receipt terminals.

18. At all times mentioned herein, the PG&E Defendants were suppliers of electricity to members of the public. As part of supplying electricity to members of the public, PG&E installed, constructed, built, maintained, and operated overhead power lines, together with supporting poles and appurtenances, for the purpose of conducting electricity for delivery to members of the general public. Furthermore, on information and belief, PG&E are responsible for maintaining vegetation near, around, and in proximity to their electrical equipment in compliance with State and Federal Regulations, specifically including, but not limited to, Public Resource Code § 4292, Public Resource Code § 4293, California Public Utilities Commission ("CPUC") General Order 95, and CPUC General Order 165.

19. Plaintiffs allege on information and belief that the PG&E Defendants are jointly and severally liable for each other's negligence, misconduct, and wrongdoing as alleged herein, in that:
a. The PG&E Defendants operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

b. The PG&E Defendants do not operate as completely separate entities, but rather, integrate their resources to achieve a common business purpose;

c. Pacific Gas & Electric Company is so organized and controlled, and its decisions, affairs, and business so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

d. Pacific Gas & Electric Company's income results from function integration, centralization of management, and economies of scale with PG&E Corporation;

e. The PG&E Defendants' officers and management are intertwined and do not act completely independent of one another;

f. The PG&E Defendants' officers and managers act in the interest of PG&E Corporation as a single enterprise;

g. PG&E Corporation has control and authority to choose and appoint Pacific Gas & Electric Company's board members as well as its other top officers and managers;

h. Despite the fact that they are both Electric Companies and Public Utilities, the PG&E Defendants do not compete with one another, but have been structured and organized and their business effectuated so as to create a synergistic, integrated single enterprise where various components operate in concert one with another;

i. PG&E Corporation maintains unified administrative control over Pacific Gas & Electric Company;

j. The PG&E Defendants are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

k. The PG&E Defendants have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

1. The PG&E Defendants invest funds from their programs and plans by a consolidated and/or coordinated Benefits Committee controlled by PG&E Corporation and administered by common trustees and administrators;

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

m. The PG&E Defendants have unified personnel policies and practices and/or a consolidated personnel organization or structure;

n. The PG&E Defendants have unified accounting policies and practices dictated by PG&E Corporation and/or common or integrated accounting organizations or personnel;

o. The PG&E Defendants are represented by common legal counsel;

p. PG&E Corporation's officers, directors, and other management make policies and decisions to be effectuated by Pacific Gas & Electric Company and/or otherwise play roles in providing directions and making decisions for Pacific Gas & Electric Company;

q. PG&E Corporation's officers, directors, and other management direct certain financial decisions for Pacific Gas & Electric Company including the amount and nature of capital outlays;

r. PG&E Corporation's written guidelines, policies, and procedures control Pacific Gas & Electric Company's employees, policies, and practices;

s. PG&E Corporation files consolidated earnings statements factoring in all revenue and losses from Pacific Gas & Electric Company, as well as consolidated tax returns, including those seeking tax relief; and/or, without limitation;

t. PG&E Corporation generally directs and controls Pacific Gas & Electric Company's relationship with, requests to, and responses to inquiries from, the CPUC and uses such direction and control for the benefit of PG&E Corporation.

20. Plaintiffs are informed and believe that the Defendants herein, and each of them, were agents and/or employees each of the other and in acting and/or failing to act as alleged herein, the Defendants, and each of them, were acting in the course and scope of said agency and/or employment relationship.

### B. Doe Defendants

21. The true names of Does 1 through 20, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs who, under California Code of Civil Procedure § 474, sue these Defendants under fictitious names.

22. Each of the fictitiously named Defendants is responsible in some manner for the conduct alleged herein, including, without limitation, by way of conspiracy, aiding, abetting, furnishing the means for, and/or acting in capacities that create agency, respondeat superior, and/or predecessor- or successor-in-interest relationships with the other Defendants.

23. The Doe Defendants are private individuals, associations, partnerships, corporations, or other entities that actively assisted and participated in the negligent and wrongful conduct alleged herein in ways that are currently unknown to Plaintiffs. Some or all of the Doe Defendants may be residents of the State of California. Plaintiffs may amend or seek to amend this Complaint to allege the true names, capacities, and responsibility of these Doe Defendants once they are ascertained, and to add additional facts and/or legal theories. Plaintiffs make all allegations contained this Complaint against all Defendants, including Does 1 through 20.

### V. FACTUAL ALLEGATIONS

24. Beginning late in the evening on or about October 8, 2017, the North Bay Fires broke out in several locations in Northern California and rapidly spread through Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and Yuba counties.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

The North Bay Fires have been the most destructive in California's modern history. The conflagration was so massive that NASA satellites could even see the smoke from the Fires from space. [1]

25. For those who witnessed the destruction firsthand, the Fires were a horrifying and unfathomable sight. Bright orange flames forty, fifty, and even one hundred feet high barreled down over the hills. Sparks "thicker than any snowstorm" flew parallel to the ground, and embers rained down like confetti. The region's bucolic scenery was overwhelmed by the roaring of the Fires' loud "freight train" sound.

26. As of the time of this filing, the North Bay Fires have burned over 245,000 acres. [2] More than 14,700 homes, 728 businesses and 3,600 vehicles have been damaged or destroyed. [3]

27. One hundred thousand residents have been displaced. [4] Many were forced to flee in the dark hours before dawn when the Fires rampaged unrelentingly. They often left on only a moment's notice, without their belongings, as flames engulfed entire neighborhoods.

28. Not all were able to escape. The North Bay Fires have also been the deadliest in California history. The Fires have killed forty-three people so far, [5] and one hundred and eighty five have been injured. [6] The fires resulted in 2,269 missing persons reports. [7]

29. By all measures, the North Bay Fires were devastating - and, tragically, also preventable. As set forth in more detail below, the North Bay Fires share a common cause: PG&E's willful and conscious disregard of public safety. PG&E's aging and improperly maintained electrical infrastructure sparked the North Bay Fires by coming into contact with trees and vegetation that PG&E had allowed to grow too close to power lines and poles.

30. PG&E was aware of these dangers and risks—it knew its infrastructure was aging and inadequately maintained (indeed, "run to failure" is its corporate policy), it knew trees and vegetation were too close to the poles and lines, it knew the current and seasonal weather, climate and fire-risk conditions in Northern California, it knew where and how fires had ignited before in these areas, and it knew its own failures had caused fires and the attendant destruction numerous times before. PG&E knew all this, but failed to act on this knowledge.

31. Because of PG&E's corporate policy of putting profits over public safety, Plaintiffs and others like them have had their homes, businesses, farms, and vineyards damaged or destroyed, lost money and business, and will spend years trying to rebuild their lives and livelihoods.

### B. Multiple Fires, Common Causes

32. On the evening of Sunday, October 8, 2017, emergency responders began receiving dozens of calls reporting fires and other hazards in and around Northern California. While the Fires ignited in various places and were given various names, evidence available thus far suggests they shared a common cause in that they were sparked by electrical infrastructure owned, operated, and improperly maintained by Defendants.

33. The Cherokee Fire started in an area off Cherokee Road and Zonalea Lane Oroville, Butte County at around 9:45 P.M. on October 8, 2017. Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Cherokee Fire started. For example, on October 8 at 9:45 P.M., PG&E reported that a tree limb had a taken down a distribution wire in Oroville, Butte County. [8] The Cherokee Fire burned 8,417 acres.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

7

34. The Atlas Fire started to the south of Lake Berryessa, off Atlas Peak Road at around 9:52 P.M. on October 8, 2017. [9] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Atlas Fire started. For example, in Napa County, a live oak tree and a live oak branch fell and struck two distribution lines near the City of Napa. [10] The Atlas Fire burned 51,624 acres, destroyed 481 structures, and damaged 90 structures. [11]

35. The Tubbs Fire started off of Highway 128 and Bennett Lane in Calistoga at around 9:45 P.M. on October 8, 2017, [12] and raced the approximately 15 miles into Santa Rosa, Sonoma County. [13] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Tubbs Fire started. Dispatchers in Sonoma County fielded 759 emergency calls— an average of about one call every two minutes. [14] According to Sonoma County Fire radio traffic, the first vegetation fire in the heart of Santa Rosa was reported around 9:22 P.M and seconds later, an electrical call went out to a location about 10 miles north. [15] Sonoma fire dispatch sent crews to conduct an electrical investigation at 9:23 P.M. at Mark West Springs Road. [16] One minute later, at 9:24 P.M., another crew was sent to a possible transformer explosion at the intersection of Fulton Road and Old Redwood Highway. [17] At 9:32 P.M., fire dispatch began another electrical investigation at Mark West Station Road where wires were reported down and a transformer had blown. [18] More power lines were reported down at 9:58 P.M. [19] At 10:16 P.M., an arcing transformer was reported. [20] At 10:34 P.M., power lines were reported down at 4858 Montecito Avenue in Santa Rosa. [21] At the exact same time, crews were also dispatched to Guerneville Road and Marlow Road to address power lines that might be down and arcing. [22] In the City of Santa Rosa, PG&E went to check a power outage related to two structures damaged by fire and discovered a "possible issue" with a secondary conductor at an unspecified time on October 8. [23] Another October 8th report without a time notes that a Douglas Fir was uprooted, fell into other trees, and downed a span of power lines outside the city. [24] On its own, the Tubbs Fire was the most destructive in California History. [25]

36. The Nuns Fire started near Highway 12, north of Glen Ellen, at around 10:00 P.M. on October 8, 2017. [26] It later merged with the Norrbom, Adobe, Partrick, Pressley, and Oakmont fires. Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Nuns Fire started. PG&E now acknowledges two separate broken power poles were reported at Highway 12 north of Glen Ellen, where the Nuns Fire started. At 10:00 P.M., a eucalyptus downed three overhead power lines near the area where the Nuns Fire began in Kenwood, Sonoma County. [27] At 10:40 P.M. Sonoma dispatchers were called to respond to a blown transformer at Oak Leaf and Old Oak Lane. [28] In a report dated 1:00 A.M. from October 9, PG&E states that the top of a tree broke off and fell on overhead wires near Glen Ellen, Sonoma County. [29] The Nuns Fire was the sixth most destructive in the state's history. [30]

37. The Redwood Valley Complex Fire started north of Highway 20, west of Mendocino National Forest, and south of Black Bart at around 11:36 P.M. on October 8, 2017. [31] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Redwood Valley Complex Fire started. For example, at 11:35 P.M., PG&E investigators reported a broken tree and downed the high voltage wires in the Potter Valley, Mendocino County area where a firestorm ignited. [32] The Redwood Valley Complex burned 36,523 acres, destroyed 545 structures, and damaged 43 structures. [33] It was the sixteenth most destructive fire in California history. [34]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
Map from the California Department of Forestry and Fire Protection ("Cal Fire"), *available at* http://cdfdata.fire.ca.gov/pub/cdf/images/incidentfile1874_2828.pdf.

38. The Lobo Fire started near Lone Lobo Trail outside the town of Rough and Ready in Nevada County at around 11:35 P.M. on October 8, 2017. [35] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

the Lobo Fire started. For example, at 11:00 P.M., PG&E's report states that a ponderosa pine tree fell and took all three primary conductors to the ground, as well as destroyed a garage in Grass Valley, Nevada County. [36] At 11:20 PM, PG&E reported that another ponderosa pine tree took out distribution lines near Nevada City, Nevada County. [37] The Lobo Fire burned 821 acres. [38]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
Map from Cal Fire, *available at* http://cdfdata.fire.ca.gov/pub/cdf/images/incidentfile1877_2850.pdf.

39. The Cascade Fire started between Cascade Way and Marysville Road, north of Collins Lake in Yuba County at around 11:02 P.M. on October 8, 2017. [39] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Cascade Fire started. For example, in the half hour before the fires began, firefighters responded to at least two trees falling into power lines and power lines falling across the road. [40] Additionally, when firefighters headed to the Cascade Fire, they warned each other about downed power lines. The Cascade Fire burned 9,989 acres. [41]

40. The LaPorte fire started near La Porte Road and Oro Bangor Highway in Bangor, Butte County at around 12:57 A.M. on October 9, 2017. [42] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the LaPorte Fire started. For example, around 11:20 P.M., an incident report reveals that an oak tree limb snapped and hit a nearby electrical wire in Bangor, Butte County. [43] The LaPorte Fire burned 6,151 acres. [44]

41. The Sulphur Fire started off Highway 20 and Sulphur Bank Road in Clearlake Oaks, Lake County at around 1:59 P.M. on October 8, 2017. [45] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Sulphur Fire started. For example, at 11:55 P.M., investigators found two power poles failed and knocked down nearby power lines near Clearlake, Lake County. [46] The Sulphur fire burned 2,207 acres. [47]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
Map from Cal Fire, *available at* http://cdfdata.fire.ca.gov/pub/cdf/images/incidentfile1871_2848.pdf.

42. The Pocket Fire started off Pocket Ranch Road and Ridge Ranch Road in Geyserville at around 3:30 A.M. on October 9, 2017. [48] Contemporaneous calls and reports indicated trees hitting PG&E electrical lines around the time and place the Pocket Fire started. For example, PG&E reported that an electrical power line went down near Geyserville in Sonoma County. [49] The Pocket fire burned three homes and 17,357 acres. [50]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
Map from Cal Fire, *available at* http://cdfdata.fire.ca.gov/pub/cdf/images/incidentfile1867_2689.pdf.

43. Not only did PG&E's wires and transformer problems start the North Bay Fires, but also the downed trees blocked firefighters and emergency responders from reaching the scene. Highway 128, in the center of the battle to contain the flames, was completely blocked by trees and branches, and Highway 101, which provided access through the heart of Santa Rosa, was shut down because of PG&E's downed wires.

44. The North Bay Fires also created serious air quality issues in the affected areas. By October 12, smoke from the wildfires had spread nearly 100 miles, with "unhealthy" air quality indices registered in the cities of Oakland, San Francisco, and San Rafael. [51] The air quality in the city of Napa was ranked the poorest in the nation, due to high levels of particulates and ozone. By October 13, air quality in the city reached the "hazardous" level, the most dangerous on the Environmental Protection Agency scale. [52] In Solano County, over 250 people were sickened by smoke inhalation and sought care at hospitals. [53]

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

45. Due to the poor air quality, San Francisco State University canceled classes, and outdoor activities were canceled in a number of cities, including Danville, Redwood City, and Walnut Creek. [54]

46. Visibility issues spurred the Federal Aviation Administration to implement a ground delay program at San Francisco International Airport, and nearly 280 flights were canceled over a three-day period. [55] For weeks after the fires started, flights continued to be canceled and delayed due to poor visibility from the smoke. [56]

## C. The Damage Wrought

47. The full extent of the damage has not yet been quantified, but as of this filing, the North Bay Fires have devastated nearly 250,000 acres in Northern California, destroying homes, businesses, vineyards, farms, and lives.

48. Over 14,700 structures were damaged or destroyed. These included homes, farm buildings, and commercial structures, often along with everything inside them.

49. Because the Fires spread so fast, individuals and businesses often could not protect their properties and structures or even remove personal possessions, irreplaceable heirlooms, and valuable inventories of products, crops, materials, and records.

50. The fire damage and destruction also has negatively impacted the value of affected property, even undeveloped property, and will continue to affect its resale value and development potential for an as-yet-unknown period of time.

51. In addition to damage and destruction of real and personal property, the North Bay Fires caused widespread economic losses to individuals and businesses throughout the region, and will continue to do so into the future.

52. Individuals who were displaced have incurred and will continue to incur costs related to lodging while being displaced.

53. Businesses have incurred and will continue to incur economic losses due to inability to operate their businesses, loss of access to their business locations, and inability of staff and employees to reach the business. These conditions are ongoing and will continue for an unknown time into the future.

54. Many businesses in Northern California derive significant business from tourists and other out-of-region customers. These businesses have suffered and will continue to suffer economic loss due to these tourists and out-of-region customers choosing not to visit Northern California in the aftermath of the Fires.

55. Individual employees of affected businesses also have incurred and will continue to incur economic losses due to the inability of those businesses to operate, be accessed, or attract or service customers due to the Fires.

56. Businesses and individuals have incurred and will continue to incur economic losses due to the chemical retardant that was used to put out the fires. Cal Fire dumped several million gallons to try to control the blazes. [57] The chemical kills the plants it comes into contact with and also harms the soil. [58] Organic businesses incurred and will continue to incur economic losses due to the foreseeable use of chemical retardant because the product contains fertilizer-type materials that will ruin an organic accreditation. These conditions are ongoing and will continue for an unknown time into the future.

57. Northern California's Wine Country is internationally renowned for its wines and is the world's fourth largest wine producer. The region produces much of the most highly prized and highest-priced wine in California. Napa and Sonoma are America's equivalent to France's Bordeaux region. They are home to many premier viticultural areas: locations where the climate, geology, and other natural factors are considered ideal for producing quality wine.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

58. When the 2017 harvest began in August, it had begun to look like a good year. However, twenty-seven wineries in the region have reported damage thus far. [59] Unfortunately, the industry has only begun to discover the full extent of its loss: the supply and taste of wines could be dramatically affected for years to come.

59. The grapes on the vines that survived the Fires may still suffer from "smoke taint" and be unusable for winemaking. Smoke may have permeated into the plant's leaves or the skin of the grapes, which will only reveal its damage during fermentation. This condition severely damages flavor and the "nose" of the wine. In bad cases, the wine can take on the taste of a "dirty ashtray" or smell "like a smoked fish".

60. Wines made from grapes harvested before the Fires may be in trouble as well. Many wineries lost power during the Fires. Without power, the fermentation process may accelerate too quickly, ruining the wines. Reserves of wines aging in barrels and bottles may also be lost to smoke and heat damage to the wines.

61. The damage the fires caused to the soil may also impact the taste and quality of the wines grown in the region far into the future. Many wine growers cultivate the soil and break down their land into subplots sharing similar characteristics, called natural or basic terroir units. The concept of terroir reflects the idea that each particular piece of land imparts its own unique flavor to the grapes. Those who lost vineyards may have to wait as many as three to five years to return the soil to a place where they can produce a viable crop of grapes.

62. There are more than 100,000 vine-growing acres in Napa Valley and Sonoma, but the full damage to the vines cannot yet be seen. It may take at least two years to really understand if each vine is still viable or how its growth patterns may have changed.

63. The viability of the vines depends on where they were burned. The part of the vine which creates fruit is grafted onto different, hardier rootstock, so it has a better chance to grow and be resistance to disease. Thus, even if the roots were undamaged, the rootstock does not produce grapes which are desirable for winemaking. Whether the vine will remain fruitful is also dependent on the extent of the damage. For example, scorched vine will not produce as much fruit. The worst case is when the trunk of the plant is damaged. If a substantial portion of the trunk is destroyed, there is no saving the vine.

64. A vine does not actually have had to catch fire to be harmed; even just exposure to heat from adjacent burning material can cause damage. Slightly damaged vines are also vulnerable to pathogens like fungi.

65. Each of these lost vines represents many hours of human labor, skill, and artistry. They cannot be easily replaced. Each vine has been manipulated for decades to develop a particular taste or a quality such as the thickness of the grapes' skin. Furthermore, it takes at least three years for a vine to produce usable fruit, and the higher quality grapes come from the more mature vines. Many of the vines in Napa and Sonoma were thirty to forty years old. Some of the vines may have been more than a century old and brought to America in the "baggage of a European immigrant."

66. The Fires also have caused a huge risk of erosion. Individuals and businesses have and will incur damage to personal and real property, business losses, and other damages related to preparing for and preventing erosion, runoff, and debris flow for a yet unknown period of time.

67. Beyond the damage to their properties, vines, and inventories, wineries are also worried about the impact the North Bay Fires are having on tourism. Last year, California wineries drew more than 23 million visits and earned more than $7.2 billion in tourist-related income, most of which was spent in Napa and Sonoma counties. The wine industry in Napa County supports 46,000 jobs locally through the 700 grape growers and 475 wineries operating in the area and employs about 325,000 people statewide. Many in the area depend on the wine industry for their livelihoods.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

68. Northern California receives most of its tourists around the fall wine-grape harvest season, and October is typically among the busiest months for hotels and other tourism-related industries in Northern California.

69. Many hotels had to evacuate and close their properties because of the Fires. If they reopened, they housed emergency responders, evacuees, and insurance groups at lower rates. However, news of the Fires is driving away visitors and leading them to choose other destinations.

70. Many come to Northern California to appreciate its picturesque valleys and the natural beauty of the verdant landscape. Even when businesses are able to reopen, it is hard to say when the environment will be able to recover.

71. The nascent legal cannabis industry was also severely harmed by the North Bay Fires. Sonoma and Mendocino counties are the epicenter of America's legal cannabis commerce. The region is home to the largest and most established growers and the biggest drivers of the $21 billion industry. The timing of these Fires is especially devastating because cannabis revenues were expected to rise as retail sales of the drug for recreational use were set to begin in January 2018.

72. Many growers with plants drying in sheds lost their entire harvest, over a year's worth of work. At least 30 farms had significant losses, and the numbers are expected to increase. Growers are also very concerned that the remaining product will be too damaged by the smoke and ash left behind to be usable. As with grapevines, cannabis crops exposed to smoke are more susceptible to disease, mold, mildew, and fungus.

73. Another factor unique to these growers is that some lost their entire savings. Because they could not deposit their money into a bank, the all-cash savings kept on farms literally went up in smoke.

### D. PG&E Had a Non-Transferable, Non-Delegable Duty to Safely Maintain Electrical Infrastructure and Adjacent Vegetation.

74. At all times prior to October 8, 2017, PG&E had a non-transferable, non-delegable duty to properly construct, inspect, repair, maintain, manage, and/or operate its power lines and/or other electrical equipment and to keep vegetation properly trimmed at a safe distance so as to prevent foreseeable contact with such electrical equipment.

75. In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, PG&E had an obligation to comply with a number of statutes, regulations, and standards, as detailed below.

76. Pursuant to Public Utilities Code § 451, "[e]very public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities... as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

77. To meet this safety mandate, PG&E is required to comply with a number of design standards for its electrical equipment, as stated in CPUC General Order 95. In extreme fire areas, PG&E also must ensure that its power lines can withstand winds of up to 92 miles per hour. Further, PG&E must follow several standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Pursuant to Public Resources Code § 4292, PG&E is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower." Also, Public Resources Code § 4293 mandates PG&E maintain clearances of four to 10 feet for all of its power lines, depending of their voltage. In addition, "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

78. Pursuant to CPUC General Order 165, PG&E is also required to inspect its distribution facilities to maintain a safe and reliable electric system. In particular, PG&E must conduct "detailed" inspections of all of its overhead transformers in urban areas at least every five years. Also, every ten years, PG&E is required to conduct "intrusive" inspections of its wooden poles that have not already been inspected and are over fifteen years old.

79. PG&E knew or should have known that such standards and regulations were minimum standards and that PG&E has a duty to identify vegetation which posed a foreseeable hazard to power lines and/or other electrical equipment, and to manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire. Further, PG&E has a duty to manage, maintain, repair, and/or replace its aging infrastructure to protect public safety. These objectives could and should have been accomplished in a number of ways, including, but not limited to, putting electrical equipment underground in wildfire-prone areas, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk management programs to ensure effectiveness.

80. Defendants were specifically aware that they had a duty to maintain equipment and the surrounding vegetation in compliance with these regulations and that a failure to do so constituted negligence and would expose Plaintiffs and Class members to a serious risk of property damage and economic losses caused by wildfires.

### E. Foreseeable and Expected Weather, Climate, and Fire Conditions

81. At all times mentioned herein, Defendants were aware that the State of California had been in a period of drought, and that even though it received more rain this past winter, the extremely hot summer months brought back drought-like conditions. The heavy rain this winter followed by a hot summer made California especially prone to wildfires: the rains caused a lot of plants and vegetation to grow, and the heat then caused them to dry out. Defendants were aware that the drought conditions existed and were aware that fire danger was at an extraordinarily high level, particularly given the increased amount of dry vegetation.

82. Defendants also knew that Northern California often experiences the "Diablo winds", the hot, dry winds, which can make dangerous weather conditions highly conducive to the spread of wildfire. The Diablo Winds are not abnormal or unforeseeable, and all who live and work in California have to act reasonably under these conditions to prevent fires from starting or spreading.

83. Defendants knew that if their power lines or other equipment came into contact with, or caused electricity to come into contact with, vegetation it was probable that a fire would result and that, given the dry conditions, such a fire would likely result in the loss of life, significant damage to real and personal property, and economic losses to members of the general public, including to these Plaintiffs and the Class.

84. In June 2014, the CPUC directed PG&E to take remedial measures to reduce the risk of fires by way of Resolution ESRB-4, after Governor Brown had declared a Drought State of Emergency in January. [60] In November 2015, the Governor issued another drought-related Executive Order to call for additional actions to respond to the record dry conditions and assist recovery efforts for the victims of 2015's devastating wildfires. [61] Although the Governor issued an Executive Order in April 2017 ending the Drought State of Emergency in all counties except Fresno, Kings, Tulare, and Tuolumne, the declaration directed state agencies "to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife." [62]

85. In October 2015, Governor Brown issued The California Tree Mortality State of Emergency regarding the unprecedented tree-die off in the state. [63] The drought conditions exacerbated a bark beetle infestation that ultimately killed tens of millions of trees. The tree die-off significantly worsened the "risk in many areas of the state and presents life safety risks from falling trees to Californians living in rural, forested communities." Governor Brown sought additional resources to provide for the safe removal of dead and dying trees.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1040 of 1229

86. In addition, the CPUC informed PG&E in Resolution ESRB-4 that it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, i.e. the CPUC was agreeing to provide additional funding on top of vegetation management funding already authorized in order to make sure remedial measures would not go unperformed due to lack of funding.

87. According to PG&E's 2014 Annual Electric Distribution Reliability Report, sent to the CPUC on February 27, 2015, weather conditions have accounted for many of the top ten PG&E electrical outages each year since at least 2004 - proof that Defendants knew that these weather conditions occur and that they can cause electrical problems. For example, four of the "ten largest 2004 outage events" for PG&E occurred in the Santa Rosa and Sonoma areas, and winds were documented at much higher levels than those of October 8, 2017. [64] The CPUC has not rescinded ESRB-4 and the Tree Mortality State of Emergency remains in effect. [65]

88. Further, according to records maintained by Cal Fire, approximately 135 fires in Sonoma and Napa Counties were caused by electrical equipment from 2011 through 2015. [66] In 2015, the last year of reported data, electrical power problems sparked the burning of 149,241 acres across California - more than twice the amount from any other cause. [67]

89. PG&E has long known that the biggest threat of a tree-caused electrical wildfire was in the North Bay. A document entitled "Summary and Analysis of Vegetation-Related Fire Incidents on PG&E Electric Powerlines," an internal PG&E document prepared by Charles Filmer in February 2013 and reviewed by NBC Bay Area, shows that the North Bay counties to have nearly a 3 percent risk of a power line sparking a wildfire. [68] The risk was listed as 1 percent elsewhere in PG&E's territory. Nevertheless, PG&E failed to take reasonable, preventative measures.

90. In May 2016, the CPUC adopted Fire Map 1, which is a map that "depicts areas of California where there is an elevated hazard for the ignition and rapid spread of power line fires due to strong winds, abundant dry vegetation, and other environmental conditions." [69]

91. The CPUC adopted Fire Map 1 "in response to past devastating wildfires that were reportedly ignited by power lines." According to CPUC commissioner Mike Florio, "Fire Map 1 represents an important milestone in identifying areas that face a very high risk of a devastating wildfire."

92. On Fire Map 1, the area in and around the origin of the North Bay Fires is both red and orange, indicating the highest level of elevated hazard for the "ignition and rapid spread of power line fires due to strong winds, abundant dry vegetation, and/or other environmental conditions."

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

93. PG&E was put on direct notice of this map in May 2016, and therefore knew well in advance of the North Bay Fires of the elevated fire risk for the region.

94. After the fires, Defendants initially attempted to shift blame away from themselves by announcing that unusually powerful, "hurricane strength winds" were to blame for the severity of the fires. But local weather station readings found the winds were almost half that speed when Defendants' power lines started to come down.

95. Contrary to Defendants' suggestion, Northern California did not experience highly unusual weather patterns the night the North Bay Fires began. A review of readings at weather stations in the areas impacted by the Fires shows that winds were not at unexpected levels when PG&E's electrical equipment began to fail. For example, a weather station in Santa Rosa in the vicinity of the Tubbs Fire recorded wind gusts of about 30 miles per hour at or around 9:29 p.m. on October 8, 2017. [70] About an hour

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

later, the same station recorded wind gusts of 41 miles per hour. [71] These wind speeds were surpassed in other recent storms in the area on a number of occasions.

### F. PG&E Knew Its Infrastructure Was Too Old and Improperly Maintained for Safety

96. On May 6, 2013, a report (the "2013 Liberty Report") was sent to the Safety and Enforcement Division of the CPUC from the Liberty Consulting Group, which had been retained to conduct an independent review of capital and operations and maintenance expenditures proposed by PG&E. [72] The 2013 Liberty Report concluded that: "several aspects of the PG&E [electrical] distribution system present significant safety issues."

97. The Report further stated, "addressing aging infrastructure and adding SCADA [73] to the system comprise the major focuses of safety initiatives for the distribution system." The Report authors were so concerned about the state of PG&E's aging infrastructure that they advised in the Report: "[w]e also recommend that PG&E treat aging infrastructure as an enterprise-level risk."

98. The Liberty Report concluded that "aging infrastructure is best addressed by having a strategic asset management program in place. These types of programs... force a detailed and thorough condition assessment survey of the major assets. These types of formal programs also take failure modes into consideration. Long term sustainable plans can then be prepared to address the asset conditions. A sustainable asset management plan will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items" for PG&E.

### 1. Unsafe, Obsolete Wires

99. PG&E has known for years that its miles of aging power lines pose a serious safety risk of triggering wildfires.

100. The 2013 Liberty Report found that PG&E's system had a large amount of obsolete, unsafe small-size wiring (a.k.a. "conductors") still in use, which should have been replaced with safer larger-size wires long ago. At the time, PG&E had 113,000 miles of wiring, [74] and according to the report, over 60 percent is of the small-size type that is highly susceptible to failure. The small-size conductors are generally more susceptible to breaking than standard size conductors. As the conductor ages, it becomes even more susceptible to breaking. Weather conditions, such as winds and lightning strikes, will also wear a small conductor more than larger ones. For these reasons, "[t]his conductor [type] is now recognized as obsolete, due to its small size."

101. The 2013 Liberty Report found that about a fifth of PG&E's system was frail and obsolete. Most concerning to the consultants was that three quarters of the system was made of three-wire lines. Three-wire lines lack modern in-line grounding technology that has been available for at least the last four decades. Without a ground wire, PG&E could not always isolate a problem remotely nor shut down a faulty wire quickly. Instead, the live wires remain on the ground when they fall, posing a danger of injuries and fire.

102. PG&E knew the majority of its system was obsolete and had unsafe wiring, yet PG&E did nothing to update it.

### 2. Old, Overloaded Utility Poles

103. According to the 2017 CPUC Order Instituting Investigation into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit:

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1042 of 1229

Poorly maintained poles and attachments have caused substantial property damage and repeated loss of life in this State. Unauthorized pole attachments are particularly problematic. A pole overloaded with unauthorized equipment collapsed during windy conditions and started the Malibu Canyon Fire of 2007, destroying and damaging luxury homes and burning over 4500 acres. Windstorms in 2011 knocked down a large number of poles in Southern California, many of which were later found to be weakened by termites, dry rot, and fungal decay. [75]

104. In the June 29, 2017 CPUC press release for the Order, the CPUC President Michael Picker stated, "[p]lain old wooden poles, along with their cousins, the underground conduits, are work horses, carrying most of our power and telecommunications. They sometimes get crowded and fail, causing outages and fires because of all the equipment crammed onto them." Further, "[n]ot knowing where all the poles are and who owns them, how loaded they are, how safe they are, and whether they can handle any additional infrastructure, is problematic to both the utilities and to the CPUC. Creating a database of utility poles could help owners track attachments on their poles and manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role." [76]

105. In addition, since prior to 1996, PG&E has known or should have known that its choice of chemical treatments for its poles can also make its equipment unsafe. For example, PG&E uses and has used poles treated with pentachlorophenol in liquefied petroleum gas by the Cellon® process. Those poles tend to experience surface decay below ground regardless of the type of wood used for the poles. As a result, digging inspections are required for poles treated by these processes for all wood types. However, Plaintiffs believe that PG&E has failed to conduct the proper inspections, and when PG&E has been advised of necessary repairs to such poles, PG&E failed to repair the poles in a timely manner.

### 3. Hazardous Live Wires

106. The 2013 Liberty Report found that on a daily basis, and in 36 percent of cases, PG&E cannot remotely de-energize a downed line and must send someone to the scene to manually turn off the feed. During that time, the downed line is a live wire and a fire hazard.

### 4. Dangerous Reclosers

107. PG&E has a long-standing practice of using devices called "reclosers" throughout its system to automatically restart power after interruptions, even though it is well known to the industry - including PG&E - that recloser devices can cause wildfires.

108. Reclosers send pulses of electricity through power lines whenever an interruption occurs on lines equipped with the devices. According to experts, if power lines are in contact with trees or vegetation, these pulses of electricity can start fires.

109. PG&E knew that its reclosers posed a great risk of wildfire. At a Congressional hearing in 2015, PG&E's Senior Vice President of Electrical Operations, Patrick Hogan, stated that PG&E had the ability to reprogram its reclosers during fire season to not restart power. Patrick Hogan claimed that shutting down power means "you take the reliability hit, but you gain the wildfire benefit." [77]

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

110. The dangers posed by reclosers are so significant that the other two major utilities in California, San Diego Gas & Electric Company and Southern California Edison, have reprogramed their electrical systems during fire seasons to ensure that reclosers do not automatically restart electrical currents after a service interruption. In contrast, PG&E did not reprogram its reclosers.

111. Since PG&E did not reprogram all of its reclosers to keep electricity turned off after a disruption during fire season, the night the North Bay Fires began, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity.

### 5. Failure to Maintain Trees and Vegetation at a Safe Distance

112. NBC Bay Area has recently reported that PG&E's own auditors allow one out of 100 trees they check to violate state power line clearance standards. [78] With about 55 million trees under its control, this means approximately 500,000 trees may not in compliance with state law. Even more troubling, when PG&E found more than 1 tree in every 100 violated safety laws, the company merely expanded the number of trees it checked until it could meet its compliance rate.

### 6. Failure to Maintain Electrical Infrastructure

113. On top of having aging infrastructure and no formal, organized system to track the condition of the infrastructure, PG&E failed to perform the necessary maintenance and inspections of its electrical equipment. A 2015 audit of PG&E's Sonoma Division revealed that there were over 3,500 unfilled PG&E repair and maintenance requests in the area of the Tubbs Fire. [79] This number is staggering in terms of the safety risk posed to the people and businesses in the Fire Area.

114. In a December 31, 2015 letter to PG&E regarding the audit, Fayi Daye, a supervising electric safety regulator with the CPUC, outlined the violations found in the review of records between 2010 and 2015 and a spot check of PG&E electrical distribution equipment. Fayi Daye's letter stated the following:

> PG&E's records indicated that from August 2010 to September 21, 2015, a total of 3.527 work orders were completed past their scheduled date of corrective action per PG&E's Electric Notification Prioritization Standards. Late work orders included overhead and underground facilities. [80]

The letter concluded that these delays violated CPUC General Order No. 128, Rule 17 .1, which sets forth the CPUC's design, construction, and maintenance rules for electrical systems.

115. The audit also reviewed PG&E's maps for its electrical distribution lines and found that over 50 pieces of overhead equipment - including pole mounted transformers and power lines - had not been inspected every year as required by law. This was a violation of CPUC General Order No. 165, Section III-B, which sets forth standards for inspections. [81]

116. According to State Senator Jerry Hill, these findings are especially troubling because "they are getting the money for these, they are getting the funds to do the work in a timely manner." [82] PG&E takes the money but fails to correct the problems.

### G. PG&E's Culture of Profits Over Safety

© 2023 Thomson Reuters. No claim to original U.S. Government Works.   17

117. PG&E's failure to use due care in maintaining its power lines and its disregard for the requirements of vegetation management caused this foreseeable, preventable tragedy that has harmed thousands of people and businesses.

118. PG&E knew of the risks its system created before the North Bay Fires because PG&E has been called out and punished for this behavior before.

119. PG&E has a long history of disregarding safety regulations in order to maximize corporate profits. In 1994, PG&E was found guilty of 739 counts of negligence and fined nearly $30 million by the CPUC when its high-voltage wires caused a fire in Nevada County after coming into contact with nearby trees. Prosecutors uncovered that PG&E had diverted almost $80 million from its tree-cutting programs into profits. [83]

120. An audit by the CPUC showed that PG&E violated electricity-grid safety regulations at least 11 times in the North Bay in the years prior to the North Bay Fires. CPUC also said that PG&E had failed in thousands of instances over a five-year period to conduct timely inspections and to complete work orders required by the state regulator. During the same time period, PG&E took in about $1 billion in profits each year. [84]

121. PG&E also regularly fails to comply with safety rules set by regulators. Regulators who audit PG&E's work in the field cite the company for late repairs and maintenance jobs far more frequently than any other electric utility in the state.

122. Moreover, PG&E has actively fought against initiatives intended to prevent wildfires. After electrical lines knocked down by wind sparked the catastrophic fires in San Diego in 2007, the CPUC has attempted to adopt stricter regulations and create a map of the power lines that pose the biggest fire risk. Proponents assert that the initiative could have bolstered maintenance efforts and forced PG&E to strengthen poles prior to the Fires. But PG&E opposed these efforts, claiming such mapping would be too expensive for rural areas. This safety initiative was delayed five times, including an additional delay granted on October 6, just two days before the North Bay Fires began.

123. PG&E has also blocked implementation of the safety proposals related to wildfires. In July 2017, PG&E asked again to slow down the effort and for more time to comply with new wildfire regulations. PG&E also argued against increasing the ability of the poles to sustain greater winds, claiming there was no evidence that wildfires had been caused by poles not being able to withstand high winds.

### 1. Run to Failure

124. PG&E has a well-documented history of implementing a "run to failure" approach with its aging infrastructure, whereby it ignores necessary maintenance in order to line its own pockets with excessive profits. According to a filing by the CPUC in March 2013:

[T]he Overland Audit explains how PG&E systematically underfunded [Gas Transmission & Storage ("GT&S")] integrity management and maintenance operations for the years 2008 through 2010. PG&E engaged in a "run to failure" strategy whereby **it deferred needed maintenance projects** and changed the assessment method for several pipelines from (In-line Inspection ("ILI")] to the less informative[External Corrosion Direct Assessment ("ECDA")] approach - **all to increase its profits even further beyond its already generous authorized rate** of return, which averaged 11.2% between 1996 and 2010.

Given PG&E's excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique. The [Integrated Resource Planning] Report supplements the Overland Audit findings with **additional examples of PG&E management's commitment to profits over safety.** Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of PG&E management's **long-standing policy to squeeze every nickel it could**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

from PG&E gas operations and maintenance, regardless of the long term "run to failure" impacts. And PG&E has offered no evidence to the contrary. [85]

125. This same filing also cited to reports which revealed that "the multiple and recurring deficiencies in PG&E operational practices indicate a systemic problem.... [These problems] involve people at numerous levels within a company, and are characterized by a pervasive lack of proactive measures to ensure adoption and compliance with a safety culture." [86] Additionally, the filing found that "[PG&E] did not include any goals for safety as part of its long-term aspirations. It did include an aspiration for financial performance, however." [87]

### 2. Prior Safety Violations

126. PG&E knew about the significant risk of wildfires from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the North Bay Fires began, and has been repeatedly fined and/or convicted of crimes for failing to mitigate these risks:

> a. In 1994, PG&E's failure to trim trees near its power lines caused the devastating "Trauner Fire" in Nevada County, California. In 1997, a jury found PG&E liable for 739 counts of criminal negligence for causing this fire. Subsequent to the trial, a report authored by the CPUC revealed that from 1987 through 1994, PG&E diverted $495 million from its budgets for maintaining its systems, and instead, used this money to boost corporate profits. [88]

b. In 2003, PG&E's apparent inability to learn from its past mistakes caused a fire at its Mission District Substation in San Francisco. In 2004, the CPUC investigated the fire and concluded that "it finds it quite troubling that PG&E did not implement its own recommendations" after a previous fire at the same substation. [89]

c. In 2008, PG&E's inadequate repair job and infrastructure caused a deadly explosion in Rancho Cordova, California. In 2010, the CPUC fined PG&E $38 million for causing and failing to prevent the explosion. [90]

d. In 2010, PG&E's aging infrastructure caused the deadly gas explosion in San Bruno, California that killed eight people and destroyed dozens of homes. As a result, the CPUC slapped PG&E with a $1.6 billion fine, and PG&E was later found guilty of six felony charges. [91]

e. In 2011, PG&E caused an explosion in Cupertino when it failed to replace a plastic pipe that it knew was unsafe since at least 2002. PG&E ignored warnings about the dangerous nature of the pipe, and instead chose to do nothing. [92]

f. In 2014, PG&E's inadequate recordkeeping and disregard for public safety caused an explosion in Carmel. As a result, PG&E was required to pay over $36 million in fines. [93]

g. Since 2014, PG&E has been fined $9.65 million by the CPUC for incidents solely related to their electrical distribution systems. [94]

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

h. In 2015, PG&E was once again responsible for causing a massive wildfire called the "Butte Fire", which destroyed hundreds of homes and killed two people, due its inadequate and unlawful vegetation management practices and disregard for public safety. After the fire, in 2017, the CPUC fined PG&E a total of $8.3 million for violating multiple safety laws. [95]

i. The most recent fine/penalty imposed on PG&E for safety violations occurred on April 9, 2015, when the CPUC imposed a record $1.6 billion for safety violations that resulted in deaths, injuries, and destroyed homes related to the San Bruno Fire. One of the stated purposes of the CPUC in rendering such a record fine against PG&E was to "ensure that nothing like this happens again."

127. In addition, PG&E's disregard for safety has resulted in federal criminal charges for its knowing and willful violation of various minimum safety standards. Despite these penalties and fines, the PG&E Defendants have failed and refused to modify their behavior and they have continued to conduct their business with a conscious disregard for the safety of the public.

128. As a result of the continued actions by these Defendants, in conscious disregard for the safety of others, the CPUC has ordered an investigation into the culture of ignoring safety at PG&E. The CPUC President has recognized that Defendants have failed and refused to modify their conduct. Despite penalties and fines, in July of 2015, the President of the CPUC, specifically stated:

> Despite major public attention, ongoing CPUC investigations ... and rulemakings ... into PG&E's actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, continued safety lapses at PG&E continue to occur. [96]

129. All of these devastating events, and many more, resulted from PG&E's long history of choosing to divert funds from its public safety, vegetation management, and/or infrastructure maintenance programs to instead line its own corporate pockets.

### 3. Profits over Safety

130. Rather than allocate adequate funds from the money it obtains from customers for infrastructure maintenance and safety, PG&E funnels funds to boost its own corporate profits and compensation. This pattern and practice of favoring profits over having a solid and well-maintained infrastructure that would be safe and dependable for years to come exposed the citizens of Northern California, such as the Plaintiffs and Class members, to an increased risk of a catastrophic event such as the North Bay Fires.

131. For example, according to documents released by The Utility Reform Network, PG&E supposedly planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, PG&E spent nearly $5 million on bonuses for six of its top executives. [97]

132. Moreover, PG&E has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors to not protect public safety. Prior to the Butte Fire, PG&E chose to provide a monetary incentive to its contractors to cut fewer trees, even though PG&E was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

133. Similarly, prior to the San Bruno explosion, PG&E had a program that provided financial incentives to employees to not report or fix gas leaks and keep repair costs down. This program resulted in the failure to detect a significant number of gas leaks, many of which were considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert, PG&E's incentive system was "training and rewarding people to do the wrong thing," emblematic of "a seriously broken process," and "explains many of the systemic problems in this operation that contributed to the [San Bruno] tragedy." [98]

## VI. CLASS ACTION ALLEGATIONS

134. Plaintiffs bring this class action individually and on behalf of all others similarly situated pursuant to California Code of Civil Procedure § 382. This action may be brought and properly maintained as a class action because Plaintiffs satisfy the numerosity, adequacy, typicality, and commonality prerequisites for suing as representative parties pursuant to California Code of Civil Procedure § 382.

### A. CLASS DEFINITIONS AND EXCLUSIONS

135. Plaintiffs seek certification of the following Economic and Property Damages Class (the E&PD Class") :

#### 1. CLASS DEFINITION

Economic and Property Damages Class means the individuals and entities defined in this Section 1, subject to the Exclusions in Section 2 below. If a person or entity is included within the geographical descriptions in Section 1(a) or Section 1(b), and their claims meet the descriptions of one or more of the Damage Categories described in Section 1(c), that person or entity is a member of the Economic and Property Damages Class, unless the person or entity is excluded under Section 2:

##### a. Individuals

Unless otherwise specified, all individuals residing in California who, as of October 8, 2017, lived in, worked in, were offered and accepted work in, or owned or leased real or personal property located within, the California counties of Butte, Calaveras, Lake, Mendocino, Napa, Nevada, Solano, Sonoma, and Yuba (the "Fire Area").

##### b. Entities

All California entities that, as of October 8, 2017:
(1) owned, operated, or leased a physical facility in the Fire Area and (A) sold products (i) directly to consumers or end users of those products or (ii) to another entity, or (B) regularly purchased products from the Fire Area in order to produce goods for resale;

(2) provided services while physically present in the Fire Area; or

(3) owned or leased real property in the Fire Area.

##### c. Damage Categories

Individuals and entities who meet the descriptions of Sections 1(a) or 1(b) above are included in the E&PD Class only if their claims meet the descriptions of one or more of the Damage Categories described below:

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

(1) Economic Damage Category. Loss of income, earnings, or profits.

(2) Real Property Damage Category. Losses suffered by owners and lessees of real property located in the Fire Area.

(3) Personal Property Damage Category. Losses suffered by owners and lessees of personal property located in the Fire Area.


## 2. EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES CLASS DEFINITION

Notwithstanding the above, the following individuals and entities are excluded from the E&PD Class:
(1) Any E&PD Class Member who or which timely elects to be excluded from the E&PD Class under the deadlines and procedures to be set forth by the Court.

(2) Defendants, and individuals who are current employees of Defendants.

(3) The Court, including any sitting judges on the Superior Court of the State of California, their law clerks serving during the pendency of this action, and members of any such judge's or current law clerk's immediate family.

(4) Any companies that insure any parties or Class members against the losses alleged in this complaint.


136. This action is brought and may properly be maintained as a class action on behalf of the proposed Class defined above, pursuant to the applicable and appropriate provisions of California Code of Civil Procedure § 382.

137. The members of the Class are so numerous that a joinder of all members would be impracticable. Based on public information on the numbers of acres and structures damaged or destroyed, businesses interrupted, and persons displaced or otherwise affected, the Class of those with Fires-related damages includes tens of thousands of potential claimants.

138. The Class is ascertainable. The Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the Class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications.

139. A well-defined community of interest in questions of law or fact involving and affecting all members of the Class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members. This action is amenable to a class-wide calculation of damages, or the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the Class. The most significant questions of law and fact that will decide the Fires litigation are questions common to the Class, or to definable categories or subclasses thereof, and can be answered by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common to the Plaintiffs and Class members, include, among others, the following:
a. Whether Defendants were negligent in their construction, maintenance, and operation of electrical infrastructure, high voltage power lines, transformers, and/or other equipment;

b. Whether Defendants owed any duties to Class members;

c. Whether Defendants breached one or more duties to Class members;

d. Whether Defendants' actions or inactions were a substantial factor in causing harm to Class members;

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

e. Whether the North Bay Fires caused physical injury to Class members' properties;

f. Whether the North Bay Fires interfered with or continue to interfere with the Class members' comfortable enjoyment of their lives or property;

g. Whether Defendants have created a public nuisance;

h. Whether the nuisance Defendants created is temporary or permanent;

i. Whether the Defendants have taken the property of Plaintiffs and Class members;

j. Whether Defendants have provided just compensation for having taken the property of Plaintiffs and Class members;

k. Whether Defendants violated any California statutes, including California Civil Code § 3479, 3480, Public Utilities Code § 2106, and California Health & Safety Code § 13007;

1. The extent to which Class members have been harmed by the North Bay Fires; and

m. What is the proper measure of damages and formulae of allocation to each category of Class damages and losses.

140. Plaintiffs' claims are typical of the members of the Class. The evidence and the legal theories regarding Defendants' alleged wrongful conduct are substantially the same for Plaintiffs and all of the Class members.

141. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. Plaintiffs and their counsel intend to prosecute this action vigorously.

142. The class action is superior to all other available methods for the fair and efficient adjudication of this case or controversy. Even if any individual persons or group(s) of Class members can afford individual litigation, individual litigation of all claims would be unduly burdensome to the courts in which the individual litigation(s) would proceed. The class action device is preferable to individual litigation(s) because it provides the benefits of unitary and inclusive adjudication, economies of scale, and comprehensive adjudication by a single court.

143. Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class lead to the underinclusive, inconsistent or otherwise inequitable allocation of Defendants' available assets and insurance among similarly situated claimants and would lead to repetitious trials of numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CAUSE OF ACTION

### Negligence (Against All Defendants)

144. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

145. Defendants have a non-transferable, non-delegable duty to apply a level of care commensurate with and proportionate to the danger of designing, engineering, constructing, operating, and maintaining electrical transmission and distribution systems, including vegetation clearance.

146. Defendants have a non-transferable, non-delegable duty of vigilant oversight in the maintenance, use, operation, repair, and inspection appropriate to the changing conditions and circumstances of their electrical transmission and distribution systems.

147. Defendants have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair, and maintenance of electrical lines, infrastructure, equipment, and vegetation in order to assure safety under all the local conditions in their service area, including but not limited to, those conditions identified herein.

148. Defendants negligently breached those duties by, among other things:
a. Failing to conduct reasonably prompt, proper, and frequent inspections of the electrical transmission lines, wires, and associated equipment;

b. Failing to design, construct, monitor, and maintain high voltage transmission and distribution lines in a manner that would avoid igniting and/or spreading fire during foreseeable and expected long, dry seasons;

c. Failing to design, construct, operate, and maintain high voltage transmission and distribution lines and equipment to withstand foreseeable conditions and avoid igniting and/or spreading fires;

d. Failing to maintain and monitor high voltage transmission and distribution lines in known fire-prone areas to avoid igniting and/or spreading fires;

e. Failing to keep equipment in a safe condition at all times to prevent fires;

f. Failing to inspect vegetation within proximity to energized transmission and distribution lines and maintain at a safe distance to avoid igniting and/or spreading fires;

g. Failing to de-energize power lines during foreseeable and expected fire-prone conditions;

h. Failing to de-energize power lines after the fire's ignition;

i. Failing to properly investigate, vet, hire, train, and supervise employees and agents responsible for maintenance and inspection of the distribution lines and proximate vegetation;

j. Failing to implement and follow regulations and reasonably prudent practices to avoid igniting and/or spreading fire; and

k. Failing to properly investigate, monitor, and maintain vegetation sufficient to mitigate the risk of fire.

149. The North Bay Fires were a direct, legal, and proximate result of Defendants' negligence. As a direct, proximate, and legal result of said negligence Plaintiffs and Class members suffered damages as alleged herein.

150. At all times mentioned herein, Defendants failed to properly inspect and maintain electrical infrastructure and equipment which they knew, given the then existing and known weather, climate, and fire-risk conditions, posed a risk of harm to Plaintiffs and the Class, and to their real and/or personal property. Defendants were aware that if the subject electrical infrastructure came in contact with vegetation that a fire would likely result. Defendants also knew that, given the existing and known weather,

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

climate, and fire-risk conditions, said fire was likely to pose a risk of property damage, economic loss, personal injury, and/or death to the general public, including to Plaintiffs and Class members.

151. Over the past decade, Defendants have been subject to numerous fines and penalties as a result of PG&E's ongoing failure to abide by safety rules and regulations.

152. The property damage and economic losses occasioned by the North Bay Fires are the result of the ongoing custom and practice of Defendants of consciously disregarding the safety of the public and not following statues, regulations, standards, and rules regarding their business operations. Despite having caused death and injury to numerous people and extensive property damage and economic loss, these Defendants have continued to act in conscious disregard for the safety of others, and have ratified the unsafe conduct of their employees. Upon information and belief, no employee has been disciplined or discharged as a result of failing and/or refusing to comply with the regulations and/or as a result of the deaths of members of the public.

153. These Defendants, in order to cut costs, failed to properly inspect and maintain the subject electrical infrastructure with full knowledge that any incident was likely to result in a fire that would burn and/or kill people, damage or destroy property, and/or cause harm to the general public, including Plaintiffs and Class members.

154. The actions of Defendants did in fact result in damages to Plaintiffs and Class members. Defendants failed to make the proper inspections, failed to properly maintain the lines, failed to properly trim vegetation, failed to properly and timely remove vegetation, and failed to safely operate their electrical infrastructure, in order to save money.

155. The negligence of Defendants was a substantial factor in causing Plaintiffs' damages.

156. Defendants' failure to comply with their duties of care proximately caused damage to Plaintiffs.

157. As a further direct and proximate result of Defendants' negligence, Plaintiffs and Class members suffered damages including, but not limited to property damage, loss of cherished possessions, economic loss, business loss, emotional distress, annoyance, disturbance, inconvenience, mental anguish, loss of quiet enjoyment of their property, and costs related to evacuation and/or relocation.

158. Defendants were and are in a special relationship to this Class of Plaintiffs. As a supplier of electrical power to Class members (and/or entities in privity with the Class) and the region in which the Class lives and does business, Defendants' operation of its electrical equipment was intended to and did directly affect the Class.

159. Defendants operated their electrical infrastructure in close geographic proximity to the Class, and with knowledge of the homes and businesses in close proximity to those wires. As a result, Defendants' operation of their wires was plainly intended to affect the Class.

160. Due to the geographic proximity between the electrical infrastructure and the Class, and the fact that the Defendants supply energy to the Class (and/or entities in privity with the Class) and the region in which the Class does business, the harm to the Class from massive wildfires was clearly foreseeable. Specifically, it was foreseeable that massive wildfires would destroy personal and real property, force residents in the region to evacuate, and deter those who would have visited the area, resulting in fewer customers to patronize area businesses and fewer economic opportunities for the Class.

161. The Class suffered injuries which were clearly and certainly caused by the Fires, resulting evacuation and/or relocation, and the remedial measures they were forced to take to restore their properties.

162. There is moral blame attached to Defendants as a result of the terrible injuries their misconduct caused, including the incalculable damage to the environment.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

163. Public policy supports finding a duty of care in this circumstance due to Defendants violation of California Civil Code § 3479, 3480, Public Utilities Code § 2106, and California Health & Safety Code § 13007.

164. Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs and Class members to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. Defendants' conduct evidences a conscious disregard for the safety of others, including Plaintiffs and the Class. Defendants' conduct was and is despicable conduct and constitutes malice as defined by Civil Code § 3294. An officer, director, or managing agent of PG&E personally committed, authorized, and/or ratified the despicable and wrongful conduct alleged in this complaint. Plaintiffs and Class members are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants.

## SECOND CAUSE OF ACTION

### Inverse Condemnation (Against All Defendants)

165. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

166. On or about October 8, 2017, Plaintiffs and Class members were owners of real property and personal property located within Northern California.

167. Prior to and on October 8, 2017, Defendants installed, owned, operated, used, controlled, and/or maintained electrical distribution infrastructure in Northern California.

168. On or about October 8, 2017, as a direct, necessary, and legal result of Defendants' installation, ownership, operation, use, control, and/or maintenance for a public use of power lines and electrical equipment, Defendants' electrical lines and/or equipment came in contact with vegetation and caused the North Bay Fires, which burned in excess of 250,000 acres, including property owned or occupied by Plaintiffs and Class members. The fire damaged and/or destroyed Plaintiffs' and Class members real and/or personal property.

169. The damage to Plaintiffs' property was proximately and substantially caused by Defendants' actions in that Defendants' installation, ownership, operation, use, control, and/or maintenance for a public use of power lines and equipment was negligent and caused the North Bay Fires.

170. Plaintiffs and Class members have not received adequate compensation for the damage to and/or destruction of their property, thus constituting a taking or damaging of Plaintiffs' and Class members property by Defendants without just compensation.

171. As a direct and legal result of the above-described damages to Plaintiffs' property, including loss of use and interference with access, enjoyment and marketability of real property, and damage/destruction of personal property, Plaintiffs and Class members have been damaged in amounts according to proof at trial.

172. Plaintiffs and Class members have incurred and will continue to incur attorney's, appraisal, and engineering fees and costs because of Defendant's conduct, in amounts that cannot yet be ascertained, but which are recoverable in this action under Code of Civil Procedure § 1036.

## THIRD CAUSE OF ACTION

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Trespass (Against All Defendants)**

173. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein at length.

174. At all times relevant herein, Plaintiffs and Class members were the owners and lawful occupiers of real property damaged by the North Bay Fires.

175. Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class members' real properties. Defendants negligently allowed the North Bay Fires to ignite and/or spread out of control, causing injury to Plaintiffs and Class members. The spread of a negligently caused fire to wrongfully occupy the land of another constitutes a trespass.

176. Plaintiffs did not grant permission for Defendants to cause the North Bay Fires to enter their properties.

177. As a direct, proximate, and substantial cause of the trespass, Plaintiffs and Class members have suffered and will continue to suffer damages, including but not limited to damage to property, discomfort, annoyance, and emotional distress in an amount to be proved at the time of trial.

178. As a further direct and proximate result of the conduct of Defendants, Plaintiffs have hired and retained counsel to recover compensation for loss and damage and are entitled to recover all attorney's fees, expert fees, consultant fees, and litigation costs and expenses, as allowed under California Code of Civil Procedure § 1021.9.

179. As a further direct and proximate result of the conduct of Defendants, Plaintiffs seek treble or double damages for wrongful injuries to timber, trees, or underwood on their property, as allowed under California Civil Code § 3346.

180. As a further direct and proximate result of the conduct of Defendants, Plaintiffs seek the reasonable cost of repair or restoration of the property to its original condition and/or loss-of-use damages, as allowed under California Civil Code § 3334.

181. Defendants' conduct was willful and wanton, and with a conscious contempt and disdain for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct. Accordingly, Defendants acted with malice towards Plaintiffs and Class members, which is an appropriate predicate fact for an award of exemplary/punitive damages in a sum according to proof.

**FOURTH CAUSE OF ACTION**

**Private Nuisance (Against All Defendants)**

182. Plaintiffs incorporate and re-allege by this reference each of the paragraphs set forth as though fully set forth herein.

183. Plaintiffs and Class members own and/or occupy property at or near the site of the North Bay Fires. At all relevant times herein, Plaintiffs and Class members had a right to occupy, enjoy, and/or use their property without interference by Defendants.

184. Defendants' actions, conduct, omissions, negligence, trespass, and failure to act resulted in a fire hazard and a foreseeable obstruction to the free use of Plaintiffs' property, invaded the right of Plaintiffs to use their property, and interfered with Plaintiffs' enjoyment of their property, causing Plaintiffs unreasonable harm and substantial actual damages constituting a nuisance pursuant to California Civil Code § 3479.

185. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members sustained loss and damage, including but not limited to damage to property, discomfort, annoyance, and emotional distress, the amount of which will be proven at trial.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

186. As a further direct and proximate result of the conduct of Defendants, Plaintiffs seek the reasonable cost of repair or restoration of the property to its original condition and/or loss-of-use damages, as allowed under California Civil Code § 3334.

187. Defendants' conduct was willful and wanton, and with a conscious contempt and disdain for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct. Accordingly, Defendants acted with malice towards Plaintiffs, which is an appropriate predicate fact for an award of exemplary/punitive damages in a sum according to proof.

## FIFTH CAUSE OF ACTION

### Public Nuisance (Against All Defendants)

188. Defendants owed a non-transferable, non-delegable duty to the public, including Plaintiffs and the Class, to conduct their business, in particular the maintenance and/or operation of power lines, power poles, and/or electrical equipment on power poles, and adjacent vegetation in proximity to their electrical infrastructure in Northern California, in a manner that did not threaten harm or injury to the public welfare.

189. Defendants, by acting and/or failing to act, as alleged hereinabove, created a condition that was harmful to the health of the public, including Plaintiffs and the Class, and created a fire hazard and other potentially dangerous conditions to Plaintiffs' property, which interfered with the comfortable occupancy, use, and/or enjoyment of Plaintiffs' property. This interference is both substantial and unreasonable.

190. Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of Defendants.

191. The hazardous condition which was created by and/or permitted to exist by Defendants affected a substantial number of people at the same time within the general public, including Plaintiffs and the Class, and constituted a public nuisance under Civil Code § § 3479 and 3480 and Public Resources Code § 4171. Further, the ensuing North Bay Fires constituted a public nuisance under Public Resources Code § 4170.

192. The damaging effects of Defendants' creation of a fire hazard and the ensuing North Bay Fires are ongoing and affect the public at large. As a result of the North Bay Fires location, temperature, and/or duration, extensive areas of hydrophobic soils developed within the burned areas. This further caused significant post-fire runoff hazards to occur, including hillside erosion, debris flow hazards, sediment-laden flow hazards, and hillside erosion. As a result, large quantities of ash and sediment will be deposited in perennial and ephemeral watercourses.

193. As a direct and legal result of the conduct of Defendants, Plaintiffs and the Class suffered harm that is different from the type of harm suffered by the general public. Specifically, Plaintiffs have lost the occupancy, possession, use, and/or enjoyment of their land, real, and/or personal property, including, but not limited to: a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of their property; an impairment of the ability to sell their property; soils that have become hydrophobic; exposure to an array of toxic substances on their land; the presence of "special waste" on their property that requires special management and disposal; and a lingering smell of smoke, and/or soot, ash, and/or dust in the air.

194. As a further direct and legal result of the conduct of Defendants, Plaintiffs and the Class have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, annoyance, and/or stress attendant to the interference with Plaintiffs' occupancy, possession, use and/or enjoyment of their property.

195. A reasonable, ordinary person would be annoyed or disturbed by the condition created by Defendants, and the resulting North Bay Fires.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

196. Defendants' conduct is unreasonable and the seriousness of the harm to the public, including Plaintiffs and the Class, outweighs the social utility of Defendants' conduct. There is little or no social utility associated with causing wildfires to destroy one of the most beautiful and beloved regions of Northern California.

197. The individual and/or collective conduct of Defendants set forth above resulting in the North Bay Fires is not an isolated incident, but is ongoing and/or a repeated course of conduct, and Defendants' prior conduct and/or failures have resulted in other fires and damage to the public.

198. The unreasonable conduct of Defendants is a direct and legal cause of the harm, injury, and/or damage to the public, including Plaintiffs and the Class.

199. Defendants have individually and/or collectively failed to and refused to conduct proper inspections and to properly trim, prune, and/or cut vegetation in order to ensure the safe delivery of electricity to residents and businesses through the operation of power lines in the affected area, and Defendants' individual and/or collective failure to do so exposed every member of the public to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

200. Defendants' conduct set forth above constitutes a public nuisance within the meaning of Civil Code § 3479 and 3480, Public Resources Code § § 4104 and 4170, and Code of Civil Procedure § 731. Under Civil Code § 3493, Plaintiffs have standing to maintain an action for public nuisance because the nuisance is especially injurious to Plaintiffs and the Class because, as described above, it is injurious and/or offensive to the senses of Plaintiffs, unreasonably interferes with the comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of their properties.

201. For these reasons, Plaintiffs seek a permanent injunction ordering that Defendants stop continued violation of Public Resource Code § § 4292 and 4293 and CPUC General Order 95. Plaintiffs also seek an order directing Defendants to abate the existing and continuing nuisance described above.

## SIXTH CAUSE OF ACTION

### Premises Liability (Against All Defendants)

202. Plaintiffs incorporate and re-allege by this reference, each of the paragraphs set forth as though fully set forth herein.

203. Defendants were the owners of an easement and/or real property in the area of origin of the North Bay Fires, and/or were the owners of the electrical infrastructure upon said easement and/or right of way.

204. Defendants acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near their electrical infrastructure along the real property and easement, allowing an unsafe condition presenting a foreseeable risk of fire danger to exist in said areas.

205. As a direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiffs and the Class suffered, and continue to suffer, the injuries and damages as set forth above.

206. As a further direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiffs seek the recovery of punitive and exemplary damages against Defendants as set forth above.

## SEVENTH CAUSE OF ACTION

### Violation Of Public Utilities Code § 2106 (Against All Defendants)

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

207. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

208. As Public Utilities, Defendants are legally required to comply with the rules and orders promulgated by the CPUC pursuant to Public Utilities Code § 702.

209. Public Utilities whose failure to perform or inadequate performance of duties required by the California Constitution, a law of the State, or a regulation or order of the Public Utilities Commission, leads to loss or injury, are liable for that loss or injury, pursuant to Public Utilities Code § 2106.

210. As Public Utilities, Defendants are required to provide and maintain service, equipment, and facilities in a manner adequate to maintain the safety, health, and convenience of their customers and the public, pursuant to Public Utilities Code § 451.

211. Defendants are required to design, engineer, construct, operate, and maintain electrical supply lines and associated equipment in a manner consonant with their use, taking into consideration local conditions and other circumstances, so as to provide safe and adequate electric service, pursuant to CPUC General Order 95, and CPUC General Order 165.

212. Defendants are required to maintain vegetation in compliance with California Public Resources Code § § 4293, 4294, 4435 and Health & Safety Code § 13001.

213. Through their conduct alleged herein, Defendants violated Public Utilities Code § § 702, 451 and/or CPUC General Order 95, thereby making them liable for losses, damages, and injuries sustained by Plaintiffs and the Class pursuant to Public Utilities Code § 2106.

## EIGHTH CAUSE OF ACTION

### Violation Of Health & Safety Code § 13007 (Against All Defendants)

214. Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

215. By engaging in the acts and omissions alleged in this Complaint, Defendants willfully, negligently, and in violation of law, allowed fire to ignite on or spread to the property of another in violation of California Health & Safety Code § 13007.

216. As a legal result of Defendants' violation of California Health & Safety Code § 13007, Plaintiffs suffered recoverable damages to property under California Health & Safety Code § § 13008 and 13009.1.

217. As a further legal result of the violation of California Health & Safety Code § 13007 by Defendants, Plaintiffs are entitled to reasonable attorney's fees under California Code of Civil Procedure § 1021.9 for the prosecution of this cause of action.

218. Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. Defendants' conduct was carried on with a willful and conscious disregard of the rights and safety of Plaintiffs, constituting malice, for which Defendants must be punished by punitive and exemplary damages according to proof. An officer, director, or managing agent of PG&E personally committed, authorized, and/or ratified the despicable and wrongful conduct alleged in this complaint

## NINTH CAUSE OF ACTION

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

## Negligent Interference With Prospective Economic Advantage

### (Brought by Sky Vineyards and Transitioning Families and Similarly Situated Class Members Against All Defendants)

219. Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

220. Plaintiffs and the Class have existing or prospective economic relationships with citizens of the region impacted by the North Bay Fires, visitors to the region, and other individuals and organizations in and related to the region.

221. These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and the Class.

222. Defendants knew or should have known of these existing and prospective economic relationships.

223. Defendants owed a duty to Plaintiffs and the Class to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and the Class.

224. Defendants breached that duty to Plaintiffs and the Class by, among other things, failing to install and/or maintain reasonable safety equipment to prevent fires, failing to properly maintain their electrical infrastructure in a safe condition, and failing to manage the vegetation surrounding their equipment.

225. Defendants knew or should have known that, if they failed to act with reasonable care, the existing or prospective economic relationships of Plaintiffs and the Class would be interfered with and disrupted.

226. Defendants were negligent and failed to act with reasonable care as set forth above.

227. Defendants engaged in wrongful acts and/or omissions as set forth above, including but not limited to their violations of laws that require Defendants to operate their equipment in a manner that does not damage public health or safety.

228. As a direct and proximate result of Defendants' wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and the Class.

229. As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses as set forth above.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:
1. Costs of repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2. Loss of use, benefit, goodwill, and enjoyment of Plaintiffs' real and/or personal property, and/or alternative living expenses;

3. Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

5. Attorney's fees, expert fees, consultant fees, and litigation costs and expense, as allowed under California Code of Civil Procedure § 1021.9;

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

6. Treble or double damages for wrongful injuries to timber, trees, or underwood on their property, as allowed under California Civil Code § 3346;

7. Punitive/exemplary damages;

8. All costs of suit;

9. Prejudgment interest, according to proof; and

10. General damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, and loss of quiet enjoyment of property; and

11. For such other and further relief as the Court shall deem proper, all according to proof.

### VIII. JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all causes of action for which a jury is available under the law.

Dated: November 30, 2017

By:

Elizabeth J. Cabraser (Cal. State Bar No. 083151)

Lexi J. Hazam (Cal. State Bar No. 224457)

Robert J. Nelson (Cal. State Bar No. 132797)

Annika K. Martin (pro hac vice pending)

Abby R. Wolf (Cal. State Bar No. 313049)

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

275 Battery Street, 29th Floor

San Francisco, CA 94111-3339

Telephone: (415) 956-1000

Facsimile: (415) 956-1008

*Attorneys for Plaintiffs and the Proposed Class*

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Footnotes

1     NASA, Twitter (Oct. 10, 2017, 9:40 AM), https://twitter.com/NASA/status/917791953131069441.

2     George Avalos, *Wildfire Safety Rules Proposed for PG&E, Other Utilities,* Mercury News (Nov. 9, 2017 5:37 P.M.), http://www.mercurynews.com/2017/11/09/wildfire-safety-rules-proposed-for-pge-and-other-utilities/.

3     Jeff Daniels, *Claims Losses from California's Wildfires Top $3 billion; State Says Some Insurers May Exit,* CNBC (Oct. 31, 2017 7:37 P.M.), https://www.cnbc.com/2017/10/31/insured-losses-from-californias-wildfire-disaster-top-3-billion.html.

4     Lisa Bonos, et al., *Death Toll Continues To Rise As California Wildfires Burn On,* Wash. Post (Oct. 15, 2017), https://www.washingtonpost.com/news/post-nation/wp/2017/10/14/more-californians-ordered-to-flee-as-gusting-winds-spread-wildfires/?utm_term=.576e27cc3dbe.

5     David R. Baker, *PG&E Reports From Fire Zones Show Toppled Trees, Downed Lines, Broken Poles,* San Francisco Chronicle (Oct. 31, 2017 11:22 P.M.), http://www.sfgate.com/bayarea/article/PG-E-reports-from-fire-zones-show-toppled-trees-12321803.php.

6     George Avalos, *PG&E Says It Faces "Adverse" Financial Effects From Wildfires Fallout,* Press Democrat (Nov. 27, 2017 3:00 P.M.), http://www.mercurynews.com/2017/11/27/pge-says-it-faces-materially-adverse-financial-effects-from-wildfires-fallout/.

7     Paul Payne, *Uncertainty Looms a Month After Devastating Sonoma County Fires,* Press Democrat (Nov. 7, 2017), http://www.pressdemocrat.com/news/7610560-181/uncertainty-looms-a-month-after?artslide=0.

8     *See* Electric Safety Incident Reported- PG&E Incident No: 171010-8557. Whenever there is a disruption to the electrical system, PG&E documents the incident in an electronic safety incident report and submits it to regulators at the CPUC.

9     *Atlas Fire (Southern LNU Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1866.

10     *See* Electric Safety Incident Reported- PG&E Incident No: 171020-8586 and Electric Safety Incident Reported- PG&E Incident No: 171020-8589.

11     *Atlas Fire (Southern LNU Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1866.

12     *Tubbs Fire (Central LNU Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/currentincidents/incidentdetails/Index/1867.

13     Paul Payne, *Uncertainty Looms a Month After Devastating Sonoma County Fires,* Press Democrat (Nov. 7, 2017), http://www.pressdemocrat.com/news/7610560-181/uncertainty-looms-a-month-after.

14     Julie Johnston, Time-Lapse Video Map Shows 911 Calls on Tubbs Fire, Press Democrat (Oct. 23, 2017), http://www.pressdemocrat.com/news/7555919-181/time-lapse-video-map-shows-911.

15     Paul Rogers, *PG&E Power Lines Linked to Wine Country Fires,* East Bay Times (Oct. 13, 2017 4:16 P.M.), http://www.eastbaytimes.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires/.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1060 of 1229

16    Elizabeth Wagner, et al., *Wine Country Fires: A Timeline of Fire Dispatch Calls,* NBC Bay Area (Oct. 11, 2017 7:25 P.M.),https://www.nbcbayarea.com/news/local/Wine-Country-Fire-A-Timeline-of-Fire-Dispatch-Calls-450503833.html; see also, Paul Rogers, *PG&E Power Lines Linked to Wine Country Fires,* East Bay Times (Oct. 13, 2017 4:16 P.M.), http://www.eastbaytimes.com/2017/10/10/pge-power-lines-linked-to-wine-countr-fires/.

17    Elizabeth Wagner, et al., *Wine Country Fires: A Timeline of Fire Dispatch Calls,* NBC Bay Area (Oct. 11, 2017 7:25 P.M.), https://www.nbcbayarea.com/news/local/Wine-Country-Fire-A-Timeline-of-Fire-Dispatch-Calls-450503833.html.

18    *Id.; see also Paul Rogers, PG&E Power Lines Linked to Wine Country Fires,* East Bay Times (Oct. 13, 2017 4:16 P.M.), http://www.eastbaytimes.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires/.

19    Paul Rogers, *PG&E Power Lines Linked to Wine Country Fires,* East Bay Times (Oct. 13, 2017 4:16 P.M.), http://www.eastbaytimes.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires/.

20    *Id.*

21    Elizabeth Wagner, et al., *Wine Country Fires: A Timeline of Fire Dispatch Calls,* NBC Bay Area (Oct. 11, 2017 7:25 P.M.), https://www.nbcbayarea.com/news/local/Wine-Country-Fire-A-Timeline-of-Fire-Dispatch-Calls-450503833.html.

22    *Id.*

23    See Electric Safety Incident Reported- PG&E Incident No: 171015-8573.

24    *See* Electric Saftety Incident Reported- PG&E Incident No: 171020-8585.

25    Mary Callahan and Christi Warren, *Tubbs Fire in Santa Rosa Now Ranks as California's Most Destructive Wildfire,* Press Democrat (Oct. 20, 2017), http://www.pressdemocrat.com/news/7546956-181/tubbs-fire-in-santa-rosa.

26    Nuns/Adobe/ Norrbom/Pressley/Partrick Fires/Oakmont (Central LNU Complex) Incident Information, Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1868.

27    *See* Electric Safety Incident Reported - PG&E Incident No: 171010-8558.

28    Paul Rogers, *PG&E Power Lines Linked to Wine Country Fires,* East Bay Times (Oct. 13, 2017 4:16 P.M.), http://www.eastbaytimes.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires/.

29    *See* Electric Safety Incident Reported- PG&E Incident No: 171016-8576.

30    Mary Callahan and Christi Warren, *Tubbs Fire in Santa Rosa Now Ranks as California's Most Destructive Wildfire,* Press Democrat (Oct. 20, 2017), http://www.pressdemocrat.com/news/7546956-181/tubbs-fire-in-santa-rosa.

31    *Redwood Valley Fire (Mendocino Lake Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1874

32    *See* Electric Safety Incident Reported - PG&E Incident No: 171009-8553.

33    *Id.*

34    Mary Callahan and Christi Warren, *Tubbs Fire in Santa Rosa Now Ranks as California's Most Destructive Wildfire,* Press Democrat (Oct. 20, 2017), http://www.pressdemocrat.com/news/7546956-181/tubbs-fire-in-santa-rosa.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1061 of 1229

35    *Lobo Fire (Wind Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1877.

36    *See* Electric Safety Incident Reported- PG&E Incident No: 171011-8563.

37    *See* Electric Safety Incident Reported- PG&E Incident No: 171012-8565.

38    *Lobo Fire (Wind Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1877.

39    *Cascade Fire Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1871.

40    Matthia Gafni, *Yuba County's Cascade Fire Bore Similar Hallmarks To Wine Country Fires,* San Jose Mercury News (Oct. 18, 2017 8:59 A.M.), http://www.mercurynews.com/2017/10/17/yuba-countys-cascade-fire-bore-similar-hallmarks-to-wine-country-fires/.

41    *Id.; LaPorte Fire (Wind Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1870.

42    *LaPorte Fire (Wind Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1870; *Wind Complex Update,* Cal Fire (Oct. 18, 2017), http://cdfdata.fire.ca.gov/pub/cdf/images/incidentfile18702961.pdf.

43    *See* Electric Safety Incident Reported- PG&E Incident No: 171013-8569.

44    *Cascade Fire Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1871; *LaPorte Fire (Wind Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1870.

45    *Sulphur Fire (Mendocino Lake Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/currentincidents/incidentdetails/Index/1876

46    See Electric Safety Incident Reported- PG&E Incident No: 171011-8562.

47    *Sulphur Fire (Mendocino Lake Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1876

48    *Pocket Fire (Central LNU Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1883.

49    *See* Electric Safety Incident Reported- PG&E Incident No: 171021-8592.

50    *Pocket Fire (Central LNU Complex) Incident Information,* Cal Fire, http://www.fire.ca.gov/current_incidents/incidentdetails/Index/1883.

51    *Hourly Air Quality Index for Thursday, October 12, 2017,* AirNow (last accessed Nov. 28, 2017), https://airnow.gov/index.cfm?action=airnow.localcity&citid=317&madate=20171012.

52    *Hourly Air Quality Index for Friday, October 13, 2017,* AirNow (last accessed Nov. 28, 2017), https://airnow.gov/index.cfm?action=airnow.local_city&cityid=317&mapdate=20171013.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.                    35

53      Associated Press, *Wildfires Create Worst Air Quality in San Francisco Bay Area,* ABC Bay Area (Oct. 13, 2017 8:44 P.M.), http://abcnews.go.com/amp/Technology/wireStory/wildfires-create-worst-air-quality-san-francisco-bay-50455283.

54      Michael Barba, *Winds To Keep SF Smoky From North Bay Fires For At Least Another Day,* San Francisco Examiner (Oct. 12, 2017 2:29 P.M.), http://www.sfexaminer.com/smoke-wine-country-fires-prompts-sfsu-cancel-classes/; Jenna Lyons, et al., *Live Updates: 35 Dead in NorCal Fires, 5,700 Structures Destroyed,* San Francisco Chronicle (October 13, 2017 5:38 P.M.), http://www.sfgate.com/news/article/Live-updates-Death-toll-climbs-to-29-in-Northern-12274332.php.

55      Filipa Ioannou, *One in Three Flights Delayed by Wildfire Smoke at SFO,* San Francisco Chronicle (Oct. 13, 2017 5:57 P.M.), http://www.sfgate.com/bayarea/article/sfo-cancellations-delays-wildfire-smoke-flights-12276205.php

56      Filipa Ioannou, *Smoke Continues to Cause Delays and Cancellations at SFO,* San Francisco Chronicle (October 17, 2017 4:39 P.M.), http://www.sfgate.com/bayarea/article/sfo-smoke-cancelled-flights-delays-air-fires-12285480.php.

57      Stephen Nett, *How To Safely Clean Fire Retardant From Your Property,* Press Democrat (Nov. 2, 2017), http://www.pressdemocrat.com/lifestyle/7568970-181/how-to-safely-clean-fire.

58      *After Wildfires, What Happens to Fire Retardant-Soaked Crops?,* KHSU (Nov. 2, 2017), http://khsu.org/post/after-wildfires-what-happens-fire-retardant-soaked-crops.

59      Ann Tatko-Peterson and Mary Orlin, *A Closer Look At 27 Wineries Damaged By Wine Country* Fires, The Mercury News (Oct. 25, 2017 5:18 A.M.), http://www.mercurynews.com/2017/10/16/a-closer-look-at-the-22-wineries-damaged-by-wine-country-fires.

60      *Resolution ESRB-4,* Cal. Pub. Utils. Comm'n (June 16, 2014), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M096/K415/96415169.pdf.

61      Exec. Order B-36-15, Office of Gov. Edmund G. Brown, Jr. (Nov. 13, 2015), https://www.gov.ca.gov/docs/11.13.15_EO_B-36-15.pdf.

62      Exec. Order B-40-17 at 3, Office of Gov. Edmund G. Brown, Jr. (Apr. 7, 2017), https://www.gov.ca.gov/docs/4.7.17_Exec_Order_B-40-17.pdf

63      *Governor Brown Takes Action to Protect Communities Against Unprecedented Tree Die-Off,* Office of Gov. Edmund G. Brown, Jr. (Oct. 30, 2015),https://www.gov.ca.gov/news.php?id=19180.

64      PG&E 2014 Annual Electrical Distribution Reliability Report, PG&E, available at https://www.pge.com/includes/docs/pdfs/myhome/outages/outage/reliability/AnnualElectricDistributionReliabilityReport.pdf.

65      *See* CPUC Fact Sheet, PG&E Vegetation Management Spending, *available* at http://www.cpuc.ca.gov/uploadedfiles/cpuc_public_website/content/safety/pge%20vegetation%20management%20spending.pdf (last accessed Nov. 23,2017).

66      Historical Wildfire Activity Statistics (Redbooks), Cal Fire, *available at* http://www.fire.ca.gov/fire_protection/fire_protection_fire_info_redbooks.

67      Ivan Penn, *Power Lines and Electrical Equipment are a Leading Cause of California Wildfires,* Los Angeles Times (Oct. 17, 2017 2:05 P.M.), http://www.latimes.com/business/la-fi-utility-wildfires-20171017-story.html.

68      Jason Van Derbeken, *PG&E 's Vegetation Management Program Under Fire After North Bay Blazes,* NBC Bay Area (Nov. 6, 2017 10:58 P.M.), https://www.nbcbayarea.com/news/local/PGEs-Vegetation-Management-Program-Under-Fire-After-North-Bay-Blazes-455729573.html

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

69    *See CPUC Fire Map Depicts Areas of Elevated Hazards In State; First Step in Creation of Tools to Help Manage Resources,* Cal. Pub. Utils. Comm'n (May 26, 2016), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M162/ K498/162498284.PDF.

70    Paul Rogers, et al., *California Fire Mystery: PG&E Lines Fell in Winds That Weren't "Hurricane Strength",* San Jose Mercury News (Oct. 13, 2017 6:01 P.M.), http://www.mercurynews.com/2017/10/12/ californiafirespgepowerlinesfellinwindsthatwerenthurr icanestrength/.

71    *Id.*

72    "Study of Risk Assessment and PG&E's GRC, Presented to: The California Public Utilities Commission Group, Safety and Enforcement Division, Presented By: The Liberty Consulting Group (May 6, 2013), available at http:// docs.cpuc.ca.gov/publisheddocs/efile/g000/m065/k394/65394210.pdf (last accessed Nov. 23, 2017).

73    SCADA stands for Supervisory Control and Data Acquisition.

74    Now PG&E has approximately 130,000 miles of wiring. See PG&E Company Profile, https://www.pge.com/en_US/ about-pge/company-information/profile/profile.page.

75    Order Instituting Investigation into the Creation of a Shared Database or Statewide Census of Utility Poles and Conduit1, Cal. Pub. Utils. Comm'n (June 29, 2017), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/ K656/191656519.PDF.

76    Press Release, CPUC to Examine Utility Pole Safety and Competition; Considers Creation of Pole Database, Cal. Pub. Utils. Comm'n (June 29, 2017), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M191/K560/191560905.PDF

77    George Avalos, *PG&E Slapped With More Lawsuits Amid North Bay Inferno Probes,* San Jose Mercury News (Nov. 15, 2017 3:31 A.M.), http://www.mercurynews.com/2017/11/14/pge-slapped-with-more-lawsuits-amid-north-bay-inferno-probes/.

78    Jaxon Van Derbeken, PG&E's Vegetation Management Program Under Fire After North Bay Blaze, NBC Bay Area (Nov. 6, 2017 11:41 P.M.), https://www.nbcbayarea.com/news/local/PGEs-Vegetation-Management-Program-Under-Fire-After-North-Bay-Blazes-455729573.html.

79    Letter from Fayi Daye, Program and Project Supervisor ESRB at CPUC, to Adeel Babar, Supervisor - Regulatory Compliance PG&E, (Dec. 31, 2015), *available at* http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/ Content/Safety/Electric_Safety_and_Reliability/Reports_and_Audits/Electric_Facilities/EA2015-018.pdf

80    *Id.* at 2.

81    *Id.* at 1.

82    Jaxon Van Derbeken, *State Audit Shows PG&E Had Repair Job Backlog in Sonoma, Santa Rosa,* NBC Bay Area (Oct. 20, 2017 7:31 P.M.), https://www.nbcbayarea.com/news/local/State-Audit-Shows-PGE-Had-Repair-Job-Backlog-in-Sonoma-Santa-Rosa-451996923.html.

83    Paul Rogers, et al., *PG&E Power Lines Linked To Wine Country Fires,* East Bay Times (Oct. 13, 2017 4:16 P.M.), http:// www.eastbaytimes.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires/.

84    Mercury News Editorial Board, *PG&E Records Show Utility Cannot Be Trusted* (Editorial), San Jose Mercury News (Oct. 27, 2017 1:11 P.M.), http://www.mercurynews.com/2017/10/26/editorial-pge-records-show-utility-cannot-be-trusted/.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1064 of 1229

85    Opening Brief of the Division of Ratepayer Advocates, Cal. Pub. Utils. Comm'n (Mar. 11, 2013), ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/SB_GT&S_0039691.pdf (emphasis added).

86    *Id.* at 27.

87    *Id.* at 28-29.

88    Kenneth Howe, et al., *Tree Trimming Pact Lowers PG&E Fine to $29 Million,* San Francisco Chronicle (Apr. 3, 1999), http://www.sfgate.com/news/article/Tree-Trimming-Pact-Lowers-PG-E-Fine-to-29-Million-2938340.php.

89    Richard W. Clark, Investigation Report on PG&E Mission Substance Fire and Outage (Oct. 20, 2004), http://docs.cpuc.ca.gov/publishedDocs/published/Report/40886.PDF.

90    Associated Press, PG&E to Pay $38 Million Fine in 2008 Explosion, San Diego Tribune (Dec. 1, 2011), http://www.sandiegouniontribune.com/sdut-pge-to-pay-38-million-fine-in-2008-explosion-2011dec01-story.html.

91    George Avalos, *PG&E Loses Ruling in San Bruno Explosion Trial,* San Jose Mercury News (Nov. 18, 2016 3:42 P.M.), http://www.mercurynews.com/2016/11/17/pge-loses-ruling-in-san-bruno-explosion-trial/.

92    Paul Rogers, *PG&E Pipe That Exploded in Cupertino Was Made Of Material Connected With Numerous Other Fires,* San Jose Mercury News (Aug. 13, 2016 2:34 P.M.), http://www.mercurynews.com/2011/09/02/pge-pipe-that-exploded-in-cupertino-was-made-of-material-connected-with-numerous-other-fires/.

93    Tom Leyde, *CPUC Fines PG&E $24.3 Million in Case Related to 2014 Carmel House Explosion,* http://www.montereyherald.com/article/NF/20160601/NEWS/160609989 (noting that PG&E was fined $10.8 M by the CPUC and $24.3 by an Administrative Law Judge). PG&E also paid $1.6 M to the city of Carmel in penalties. *See* Rachel Swan, *PG&E to Pay $1.6 Million To Settle Suit Over Carmel Blast,* San Francisco Chronicle (June 9, 2017), http://www.sfgate.com/bayarea/article/PG-E-to-pay-1-6-million-to-settle-suit-over-11209644.php.

94    "Electric Safety Citations Issued," Cal. Pub. Utils. Comm'n, *available* at http://www.cpuc.ca.gov/General.aspx?id=1965.

95    *PG&E Issued Citations and Fined $8.3M For Violations Related to Butte Fire,* CBS Sacramento (Apr. 25, 2017 9:28 P.M.), http://sacramento.cbslocal.com/2017/04/25/pge-issued-citations-and-fined-8-3m-for-violations-related-to-butte-fire/.

96    President Picker's Comments on PG&E Safety. Culture, and Enforcement Theory 2, http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/About_U/Organization/Commissioners/Michael_J._Picker/PresidentPickerCommentsonPGESafetyCultureandEnforcementTheory.pdf (last accessed Nov. 28, 2017).

97    Steve Johnson, et al., PG&E accused of Delaying Crucial Repair Work, San Jose Mercury News (Sept. 15, 2010 1:58 P.M.), http://www.mercurynews.com/2010/09/15/pgeaccusedofdelayingcrucialrepairwork/.

98    Jaxon Van Derbeken, *PG&E Incentive System Blamed For Leak Oversights,* San Francisco Chronicle (Dec. 25, 2011 4:00 A.M.) http://www.sfgate.com/news/article/PG-E-incentive-system-blamed-for-leak-oversights-2424430.php.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.                                          38

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1065 of 1229

# Exhibit 101

*Document By* **WESTLAW**

2017 WL 6451623 (Cal.Super.) (Trial Pleading)
Superior Court of California.
San Francisco County

Jeffrey LENTINE,

v.

Geisha J WILLIAMS et al.

No. CGC-17-562553.
November 16, 2017.

Demand for Jury Trial

**Shareholder Derivative Complaint for Breach of Fiduciary Duties and Unjust Enrichment**

Conrad B. Stephens (266790), 505 S. McClelland St., Stephens & Stephens LLP, Santa Maria, CA 93454, Telephone: (805) 922-1951, Facsimile: (805) 922-8013, E-mail: conrad@stephensfirm.com, for plaintiff Jeffrey Lentine.

Jeffrey J. Ciarlanto, David M. Promisloff, Promisloff & Ciarlanto, P.C., 5 Great Valley Parkway, Suite 210, Malvern, PA 19355, Telephone: (215) 259-5156, Facsimile: (215) 600-2642, E-mail: ciarlanto@prolawpa.com, david@prolawpa.com, for plaintiff Jeffrey Lentine.

1. Plaintiff Jeffrey Lentine ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Shareholder Derivative Complaint for Breach of Fiduciary Duties and Unjust Enrichment (the "Complaint") for the benefit of nominal defendant PG&E Corporation ("PG&E" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

## NATURE OF THE ACTION

2. According to its public filings, PG&E is a Fortune 200 energy-based holding company, headquartered in San Francisco, California. It is the parent company of Pacific Gas and Electric Company ("Utility"), an energy company that serves 16 million Californians across a 70,000 square-mile service area in Northern and Central California.

3. This action concerns the role and responsibility of the Company (under the defendants' direction and on their watch) in the devastating Northern California Wildfires that started on or about October 8, 2017 (sometimes referred to as the "Northern California Fires" or the "fires").

4. Upon information and belief, at least some of the fires started when electrical infrastructure that was operated, maintained and/or owned by the Company (under the defendants' direction and on their watch) came into contact with vegetation maintained and inspected by the Company (again, under the defendants' direction and on their watch).

5. Upon further information and belief, at least some of the fires were caused by: (i) the defendants' improper and negligent operation of the Company's power lines and related equipment; (ii) the failure of equipment, electrical infrastructure and/or power lines that were operated, maintained, constructed, and designed by the defendants or the Company (under the defendants'

© 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

direction and on their watch); and/or (iii) the defendants' utter failure to maintain vegetation with prescribed California law and regulations concerning vegetation from electrical infrastructure and power lines.

6. Thus, as a result of the defendants' breaches and other misconduct, the Company has suffered damages. These damages include, but are not limited to, current and future costs associated with the fires (including but not limited to potential fines), being named as a defendant in lawsuits brought by individuals and entities harmed by the fires, becoming the subject of regulatory investigations, severe loss of reputation and standing, and decline in the value of the Company's market value.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, section 10, because this case is a cause not given by statute to other trial courts, as this derivative action is brought pursuant to section 800 of the California Corporations Code to remedy defendants' violations of law.

8. This Court retains general jurisdiction over each named defendant who is a resident of California. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. PG&E is incorporated and headquartered in California, and because the allegations contained herein are brought derivatively on behalf of PG&E, Defendants' conduct was purposefully directed at California. Finally, exercising jurisdiction over any non-resident Defendant is reasonable under these circumstances.

9. Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to PG&E occurred in this County, and Defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## THE PARTIES

10. Plaintiff is a current shareholder of PG&E and has continuously held PG&E stock since March 2008.

11. Nominal defendant PG&E is a California corporation with its principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.

12. Defendant Geisha J. Williams ("Williams") has served as the Company's President and Chief Executive Officer ("CEO") and as a director of the Company since March 2017. Previously, Williams served as President of the Utility.

13. Defendant Jason P. Wells ("Wells") has served as the Company's Senior Vice President and Chief Financial Officer ("CFO") since January 2016.

14. Defendant Lewis Chew ("Chew") has served as a director of the Company since 2009. In addition, defendant Chew serves as Chair of the Board's Audit Committee ("the Audit Committee") and as a member of the Board's Compliance and Public Policy Committee (the "Compliance Committee").

15. Defendant Anthony F. Earley, Jr. ("Earley") has served as Executive Chair of the Board since March 2017 and previously served as the Company's Chairman, CEO and President beginning in September 2011.

16. Defendant Fred J. Fowler ("Fowler") has served as a director of the Company since 2012. In addition, defendant Fowler serves as a member of the Board's Safety and Nuclear Oversight Committee (the "Safety Committee").

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

17. Defendant Jeh C. Johnson ("Johnson") has served as a director of the Company since May 2017. In addition, defendant Johnson serves as a member of the Compliance Committee and the Safety Committee.

18. Defendant Richard C. Kelly ("Kelly") has served as a director of the Company since June 2013. In addition, defendant Kelly serves as a member of the Audit Committee.

19. Defendant Roger H. Kimmel ("Kimmel") has served as a director of the Company since 2009. In addition, defendant Kimmel serves as Chair of the Compliance Committee.

20. Defendant Richard A. Meserve ("Meserve") has served as a director of the Company since 2006. In addition, defendant Meserve serves as a member of the Compliance Committee and as Chair the Safety Committee.

21. Defendant Eric D. Mullins ("Mullins") has served as a director of the Company since September 2016. In addition, defendant Mullins serves as a member of the Audit Committee and the Safety Committee.

22. Defendant Forrest E. Miller ("Miller") has served as a director of the Company since 2009. In addition, defendant Miller serves as a member of the Audit Committee.

23. Defendant Rosendo G. Parra ("Parra") has served as a director of the Company since 2009. In addition, defendant Parra serves as member of the Safety Committee.

24. Defendant Barbara L. Rambo ("Rambo") has served as a director of the Company since 2005.

25. Defendant Anne Shen Smith ("Smith") has served as a director of the Company since February 2015. In addition, defendant Smith serves as a member of the Compliance Committee and the Safety Committee.

26. Collectively, defendants Williams, Wells, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo and Smith shall be referred to herein as "Defendants."

27. Collectively, defendants Chew, Johnson, Kimmel, Meserve and Smith shall be referred to as the "Compliance Committee Defendants."

28. Collectively, defendants Fowler, Johnson, Meserve, Mullins, Parra and Smith shall be referred to as the "Safety Committee Defendants."

29. Collectively, defendants Chew, Kelly, Miller and Mullins shall be referred to as the "Audit Committee Defendants."

30. The true names and capacities of defendants sued herein under California Code of Civil Procedure § 474 as Does 1 through 25, inclusive, are presently not known to Plaintiffs, whom therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Company as a result of defendants' wanton and illegal conduct.

<div align="center">DEFENDANTS' DUTIES</div>

31. By reason of their positions as officers, directors, and/or fiduciaries of PG&E and because of their ability to control the business and corporate affairs of PG&E and its subsidiaries, Defendants owed PG&E and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage PG&E and its

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

subsidiaries in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of PG&E and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to PG&E and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32. Defendants, because of their positions of control and authority as directors and/or officers of PG&E, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with PG&E, each of the Defendants had knowledge of material non-public information regarding the Company.

33. To discharge their duties, the officers and directors of PG&E were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company and its subsidiaries. By virtue of such duties, the officers and directors of PG&E were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c. When put on notice of problems with the Company's and/or its subsidiaries' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

34. The Company's Code of Conduct for Employees (the "Employee Code"), which expressly applies or has applied to at least defendants Williams, Wells and Earley (and which is signed by defendant Earley), states the following, in relevant part:

We are passionate about meeting our customers' needs and delivering for our shareholders:

Demonstrate a passion for understanding and meeting the needs of our customers and shareholders

● Take active responsibility for the quality of service we provide to customers and others

● Are open to change and readily implement better ways of doing things

● Have high performance expectations and a mindset of excellence

● Are innovative in identifying new opportunities and approaches for our customers and ourselves

We are accountable for all of our own actions: these include safety, protecting the environment, and supporting our communities:

● Maintain an absolute commitment to safety for ourselves and others

●Take accountability for actions, decisions and results vs. blaming

● Demonstrate through actions a commitment to the well-being of the community and the environment

● Can be counted on to deliver and meet goals and objectives

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

● Have a "can do" attitude and bias for action

Never knowingly violate laws, regulations, policies, standards, or procedures, even if you think doing so would lower costs, increase earnings, or satisfy a customer. Make yourself aware of the requirements associated with your job. Your supervisor can't order you to take an action that intentionally violates this Code, a law, a regulation, or a company policy, standard, or procedure.

Use this decision-making checklist:

● Have I verified the significant facts?

● Is it legal and ethical, and does it meet our internal requirements?

● Will my actions impact public or employee safety?

● Have I made a decision that feels right and is fair and just?

● How would it look in a newspaper or on the Internet?

● Could I explain it to my parents or children?

● How would my decision or actions be judged by others?

● Will I feel comfortable with my decision?

● If I'm not sure of something, have I asked for advice?

<center>Safety</center>

The safety of the public, employees and contractors is our highest priority. The company's commitment to a safety-first culture is reinforced with our Safety Principles, PG&E's Safety Commitment, Personal Safety Commitment and Keys to Life. These tools were developed in collaboration with PG&E employees, leaders, and union leadership and are intended to provide clarity, support and confidence as employees strive to take personal ownership of safety at PG&E.

<center>Safety Principles</center>

Nothing is more important than public and employee safety.

We must create an environment at PG&E where employees feel feel to raise all safety-related issues without peer pressure or fear of reprisal. This includes near hits and unsafe situations of any kind.

We must encourage open and honest communication on safety, so that we identify and eliminate unsafe situations and avoid incidents and injuries.

To enhance safety and prevent future incidents, we will adopt a voluntary non-punitive self-reporting system for unsafe occurrences and hazardous situations.

We acknowledge and reward safe behavior and practices to encourage our employees and to reinforce continuous learning.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

5

PG&E takes a behavior-based approach to discipline. Discipline is considered only when an employee acts in a reckless manner; demonstrates a pattern of carelessness or non-compliance; puts the employee, coworkers or the public at risk by intentionally violating the Keys to Life or the Code of Conduct.

PG&E's Safety Commitment

● We will train, equip and qualify our people to work safely.

● We will design, build, operate and maintain our systems with the highest regard for the safety and well-being of all.

● We will identify and address the underlying causes of incidents to prevent them from recurring.

**Personal Safety Commitment**

● I will make my personal safety and the safety of my coworkers and the public my highest priority.

● I will make sure I understand how to do the work safely before I start the job.

● I will speak up about safety concerns.

● I will look for safety hazards and intervene to stop unsafe acts.

● I will close out and properly document my work.

Federal Securities Laws

As companies with publicly traded securities, PG&E Corporation and Pacific Gas and Electric Company must comply with federal laws and regulations that require the disclosure of certain information in periodic financial and other reports that are filed with the Securities and Exchange Commission (SEC). If you are asked to review a draft SEC report, you are expected to respond promptly to help ensure that the SEC reports are accurate and complete.

The securities laws also impose requirements about recordkeeping and the establishment, maintenance, and evaluation of "disclosure controls and procedures" as well as "internal control over financial reporting," as those terms are defined in the Sarbanes-Oxley Act of 2002. These laws require the Chief Executive Officer and the Chief Financial Officer to certify, among other things, the accuracy and completeness of information in the SEC reports and the effectiveness of disclosure controls and procedures, and that they have disclosed any fraud that involves management or other employees who have a significant role in internal control over financial reporting.

PG&E Corporation's and Pacific Gas and Electric Company's internal controls over financial reporting are regularly tested, and if any deficiencies are identified, the controls are corrected and re-tested until they are effective. While the Chief Executive Officer and Chief Financial Officer are ultimately responsible for establishing and maintaining internal controls, the primary burden of complying with and testing controls falls on all of us. As such, you're expected to perform and test controls with due care.

**Environmental Laws and Regulations**

PG&E is a recognized environmental leader and is committed to conducting its business in an environmentally sensitive manner. This commitment is consistent with our values and our Environmental Policy. It also makes good business sense. Make sure that the decisions you make on behalf of PG&E reflect this commitment.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

For PG&E to be an environmental leader, we must first comply fully with all environmental laws and regulations that govern our business. When appropriate, we seek ways to go beyond what's required in how we deliver energy, serve our customers and manage our operations.

35. The Company's Code of Conduct for Directors (the "Director Code"), which expressly applies to all Defendants named herein other than defendant Wells, states the following, in relevant part:

Values

● We act with integrity and communicate honestly and openly

● We are passionate about meeting our customers' needs and delivering for our shareholders

● We are accountable for all of our own actions: these include safety, protecting the environment, and supporting our communities

● We work together as a team and are committed to excellence and innovation

Compliance With Applicable Laws

Directors must comply with all of the laws, rules, and regulations of the United States and other countries, as well as the states, counties, cities, and other jurisdictions, applicable to either Company or its business.

This Code does not summarize all laws, rules, and regulations applicable to either Company or its business. The Companies will on occasion provide to the directors information about specific laws, rules, and regulations, which may include antitrust laws, securities laws concerning disclosure requirements and insider trading, and Federal Energy Regulatory Commission director interlock preapproval requirements. Directors are expected to consult with the Chairman of the Board or the Compliance Officer if they have questions about laws that they think may be applicable to either Company or its business.

Reporting Any Illegal Or Unethical Behavior

Directors should promptly communicate any suspected violations of the Code, including any violation of law or government rule or regulation, to the Chairman of the Board or the Compliance Officer. Suspected violations will be investigated by the Board, the Audit Committee, or persons designated by the Board or the Audit Committee. Appropriate action will be taken in the event that a violation is confirmed.

Directors should promote ethical behavior and review the Company's steps to (a) encourage employees to talk to supervisors, managers, and other appropriate personnel when in doubt about the best course of action in a particular situation, (b) encourage employees to report violations of laws, rules, regulations, or the Company's employee code of conduct, and potential ethics violations or non-compliance to appropriate personnel through, among other things, an ethics hotline, and (c) inform employees that the Company will not allow retaliation for reports made in good faith.

36. The Safety Committee's Charter (which applies to the Safety Committee Defendants) sets forth, in relevant part, the following responsibilities:

Review significant policies and issues related to safety, operational performance, and compliance.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Review with management the principal risks related to or arising out of PG&E's Operations and Facilities (including risks that are identified through PG&E's enterprise risk management program and that are selected in consultation with this Board of Directors and its committees, as applicable), and assess the effectiveness of PG&E's programs to manage or mitigate such risks, including with respect to... asset management programs for PG&E's electric operations and facilities.

Review and discuss how PG&E can continue to improve its safety practices and operational performance.

Review and discuss the results of PG&E's goals, programs, policies, and practices with respect to promoting a strong safety culture.

Review the impact of significant changes in law and regulations affecting safety and operational performance.

Advise this corporation's Compensation Committee on appropriate safety and operational goals to be included in PG&E's executive compensation programs and plans.

Meet at least six times per year. Such meetings shall include at least semiannual joint meetings with the Utility's Safety and Nuclear Oversight Committee, this corporation's Audit Committee, the Utility's Audit Committee, and the corporation's Compliance and Public Policy Committee to discuss PG&E's compliance program

and any other topics agreed upon by those committees.

(a) Review the adequacy and direction of PG&E's corporate safety functions, including the appointment and replacement of any chief safety officer of this corporation (or any officer who is similarly given direct responsibility for overseeing enterprise-wide safety matters at the corporation) (the "Chief Safety Officer"), (b) review with the Chief Safety Officer the responsibilities, budget, and staffing of the corporation's safety function, (c) periodically review PG&E's corporate safety and health functions, goals, and objectives represented in PG&E's five-year planning process, and (d) periodically review reports provided to management by the Chief Safety Officer and any chief safety officer of the Utility (or any officer who has direct responsibility for overseeing safety matters at the Utility).

Serve as a channel of communication between the Chief Safety Officer and this Board of Directors.

37. The Compliance Committee's Charter (which applies to the Compliance Committee Defendants) sets forth, in relevant part, the following responsibilities:

Review and oversee the corporation's compliance program, including, but not limited to, evaluating its effectiveness.

Review periodic reports from management, including, but not limited to, the Chief Ethics and Compliance Officer (the "CECO") and other operations, compliance, and legal personnel, with respect to (a) the corporation's compliance with laws, regulations, and internal policies and standards, (b) significant pending or threatened litigation and government investigations, examinations, inquiries, demands, or proceedings, in each case which raise or would be expected to raise significant compliance issues, and (c) any other significant claim or complaint alleging that the corporation is not in compliance with laws, regulations, or internal policies and standards.

Review (a) periodic reports with respect to internal or external compliance reviews or audits conducted by the corporation, regulators, or third parties, and (b) reports by management with respect to their work to address any significant deficiencies, findings, and recommendations identified in any such review or audit.

Review the corporation's statements of policy concerning conflicts of interest and general business ethics (including the codes of business conduct and/or ethics).

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

At least semiannually, meet jointly and coordinate with the Audit Committees, the PG&E Corporation SNO Committee, and the Pacific Gas and Electric Company SNO Committee to discuss the corporation's compliance program and monitor that all significant compliance issues are addressed by the appropriate Board committees.

Coordinate with management to facilitate the regular receipt by the Boards of Directors of appropriate reports and materials regarding significant compliance issues.

Monitor that a consistent commitment to maintaining an effective compliance program is conveyed to employees, contractors, and other relevant stakeholders.

Public Policy Matters Review the corporation's policies and practices with respect to the corporation's long-term sustainability and the protection and improvement of the quality of the environment, including, but not limited to, the corporation's social, environmental, economic, climate change, and broader environmental policies and programs.

Review significant societal, governmental, and environmental trends and issues which may affect the corporation's operations, and advise the Boards of Directors regarding plans and programs with respect thereto.

38. The Audit Committee's Charter (which applies to the Audit Committee Defendants) sets forth, in relevant part, the following responsibilities:

Review major issues as to the design, implementation, and adequacy of the internal controls of this corporation and its subsidiaries and affiliates and any special audit steps adopted in light of material control deficiencies (in consultation with the independent auditors and the senior internal auditor).

Review and discuss with management and the independent auditors the corporation's internal controls report and the independent auditors' attestation report, prior to the filing of the corporation's annual report on Form 10-K.

Review and discuss with management and the independent auditors, prior to issuance, the audited consolidated annual and interim financial statements of this corporation and its subsidiaries (the "Financial Statements"), including reviewing this corporation's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Review and discuss with management and the independent auditors (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in this corporation's selection or application of accounting principles, (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the Financial Statements, including analyses as to the effects of alternative GAAP methods on the Financial Statements, and (c) the effect of off-balance sheet structures on the Financial Statements.

Review and discuss with the independent auditors matters required to be discussed under the standards of the PCAOB, as may be modified or supplemented, including any audit problems or difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any

significant disagreements between management and the independent auditors that arose in connection with the preparation of the Financial Statements, and management's response to any audit problems or difficulties. Such discussion may include (a) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise), (b) any communications between the independent auditors' team and the audit firm's national office respecting auditing or

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

accounting issues presented by the engagement, and (c) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the corporation.

Receive and discuss, prior to this corporation's filing of an audit report with the SEC, (a) the independent auditors' report on all critical accounting policies and practices to be used, (b) the independent auditors' report on all alternative treatments within GAAP for policies and practices related to material items that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors, and (c) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences. Review disclosures made by the principal executive officer and the principal financial officer in connection with the officer certifications required for this corporation's annual report on Form 10-K and the quarterly reports on Form 10-Q, regarding all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect this corporation's ability to record, process, summarize, and report financial information, or any fraud that involves management or other employees who have a significant role in the corporation's internal control over financial reporting.

Based on its review and discussion with the independent auditors and management, recommend to the Board of Directors that the audited financial statements be included in this corporation's annual report on Form 10-K.

(a) Review and oversee related party transactions involving this corporation, defined as those transactions required to be disclosed under Items 404(a) and 404(b) of SEC Regulation S-K and applicable rules and regulations of the stock exchanges; and (b) discuss with the independent auditors their evaluation of the corporation's identification of, accounting for, and disclosure of its relationships with related parties as set forth under applicable standards of the PCAOB.

Receive reports from attorneys (including the chief legal officer) that represent or have represented this corporation, about certain information regarding credible evidence of material violations of securities law or material breach of fiduciary duty to the corporation, by the corporation or its agents.

Establish and oversee procedures for (a) the receipt, retention, and treatment of complaints received by this corporation regarding accounting, internal accounting controls, or auditing matters, and (b) the confidential, anonymous submission by employees of the corporation of concerns regarding questionable accounting or auditing matters.

Obtain from the independent auditors assurance that Section 10A(b) of the Securities Exchange Act of 1934, as amended, has not been implicated.

Prepare the Audit Committee's report that is filed with this corporation's annual proxy statement.

(a) Review legal and regulatory matters that may have a material impact on the Financial Statements, including the effect of regulatory and accounting initiatives; (b) discuss with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards; (c) periodically receive reports from the PG&E Corporation Compliance and Public Policy Committee with respect to compliance oversight and related matters; and (d) at least semiannually, meet jointly with the Pacific Gas and Electric Company Audit Committee, the PG&E Corporation Compliance and Public Policy Committee, the PG&E Corporation Safety and Nuclear Oversight Committee, and the Pacific Gas and Electric Company Safety and Nuclear Oversight Committee to discuss the corporation's compliance program.

(a) Discuss this corporation's guidelines and policies that govern the processes by which major risks are assessed and managed; (b) discuss the major financial risk exposures and the overall steps that management has taken to monitor and control such exposures; and (c) to the extent that any aspect of risk assessment and management is delegated to another committee of the Board, the Audit Committee shall generally review the processes by which such risk assessment and management are undertaken.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Discuss the types of information to be disclosed and the types of presentation to be made in connection with this corporation's earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information) and financial information and earnings guidance provided to analysts and rating agencies. This discussion does not need to occur before each earnings release or disclosure of earnings guidance.

Review periodically, and no less than annually, expense reimbursements paid to the Chairman of the Board, the Chief Executive Officer, and the President, if those positions are filled, and to such other officers of this corporation and its subsidiaries and affiliates as may be deemed appropriate by the Committee.

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

39. According to its public filings, PG&E is a Fortune 200 energy-based holding company, headquartered in San Francisco, California. It is the parent company of Utility, an energy company that serves 16 million Californians across a 70,000 square-mile service area in Northern and Central California.

40. Utility is a subsidiary of the Company, and the means through which the Company operates. Notably, the Utility board of directors consists of fourteen individuals, thirteen of whom are the director defendants named herein (i.e., every one of the Defendants except Wells). The only member of the Utility board of directors who is not a director of the Company is Nickolas Stavropoulos ("Stavropoulos"), and every Company director is also a member of the Utility board of directors. Hereinafter, PG&E or the Company shall be used to refer to PG&E individually or PG&E and the Utility collectively.

### B. The Company's History of Safety Failures

41. Under California law, utilities (such as the Company and its subsidiaries) are required to maintain power lines safely and cut back trees to prevent fires. When companies are found to have started fires, they are liable for fines and damages in court to people who have lost homes, businesses and family members in the blazes.

42. Significantly, the Company has a history of safety-related issues, which have caused devastating fires and other catastrophic incidents, and which have spanned two decades.

43. For instance, in 1994, the Company was found guilty of 739 counts of negligence and fined nearly $30 million by state regulators when trees touched its high-voltage wires in Nevada County in the Sierra foothills, sparking a fire near the town of Rough and Ready that destroyed 12 homes and a 19th century schoolhouse. Afterward, prosecutors found that PG&E had diverted nearly $80 million from its tree-cutting programs into profits.

44. Further, the Company was fined $1.6 billion by the PUC after it was found negligent in causing the 2010 San Bruno gas line explosion, which killed eight people and destroyed 38 homes.

45. In 2015, the Company (under Defendants' direction and on their watch) was found responsible by the California Public Utilities Commission (the "PUC") for starting the Butte fire in Amador County because of the Company's failure to maintain its power lines. That fire raged for 22 days, killed two people, destroyed 549 homes and burned 70,868 acres. The PUC fined the Company $8.3 million and billed it $90 million to cover state firefighting costs.

### C. The Company Stymies the PUC's Efforts to Implement Stricter Regulations

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

46. California officials began working to tighten regulations on utilities and create the detailed maps after wind-toppled electrical lines in 2007 ignited catastrophic fires in the San Diego area. But nearly 10 years later, the PUC (which initiated the process) has not completed the maps, (and has certainly not adopted the new stricter regulations). A review of the mapping project by the Bay Area News Group revealed that utilities (including the Company, under Defendants' direction and on their watch) have repeatedly asked to slow down the effort and argued as recently as July 2017 that, as Defendants caused the Company to state, certain proposed regulations would "add unnecessary costs to construction and maintenance projects in rural areas." [1]

47. The PUC's mapping project began in 2008, a year after dozens of fires burned more than 780 square miles, mostly in San Diego County. Several of the worst fires were sparked by power lines that were toppled by Santa Ana winds. The project initially focused on Southern California and simply borrowed Cal Fire "threat maps" that did not factor in power infrastructure. This resulted in some relatively quick changes to the rules in advance of the 2009 fire season (including the creation of the "interim" high-fire-threat zones).

48. The PUC's effort got "bogged down for six years," according to a 2015 state Senate subcommittee report on utility safety issues. That report found that PG&E (undoubtedly under Defendants' direction and on their watch) and other utilities were holding out on agreeing to stricter construction standards until the final maps were completed. The report gave five examples of scheduling delays stretching from 2012 to 2015. "Parties should avoid additional extensions of the schedule if at all possible," administrative law judge Timothy Kenney wrote in May 2015 after the fourth consecutive time extension request by PUC and Cal Fire staff. Three days later, California launched a new mapping effort, with the Company (under Defendants' direction and on their watch) and two other utilities paying $500,000 for the revived project which was supposed to take eighteen months.

49. The project was the subject of renewed interest in September 2015 when the Butte fire (discussed above) was caused by a tree coming in contact with a power line. California state senator Jerry Hill ("Hill") noticed that the footprint of that fire fell outside the fire danger areas on the old interim fire maps. "It showed the work was substandard, inadequate and, in my opinion, useless," he said. Hill called a special hearing after the Butte fire to address the delays in the PUC's mapping project. In 2016 Hill pushed through Senate Bill 1028, which required utilities to file wildfire mitigation plans and charged the PUC with reviewing them. A pair of administrative judges tried to move the utilities along, but Defendants continued to pick away at regulations and map criteria.

50. In October 2016, Defendants caused PG&E to complain to a judge that the PUC's plans to complete the map by March 2017 were "too aggressive."

51. After a March 31, 2017 deadline passed, PG&E (under Defendants' direction and on their watch) complained that the intention to highlight vulnerable power infrastructure on the final map "could present public safety and security issues."

52. In July 2017, Defendants caused PG&E to fight a number of regulatory proposals. For instance, Defendants caused the Company to state it did not want to have to comply with any new wildfire regulations within a proposed six-month deadline (and instead preferred a year). Further, in July 2017, the Company (under Defendants' direction and on their watch) called a proposed regulation to increase the wind speed that power poles must sustain "arbitrary."

53. On October 6, 2017 (two days before the start of the fires), two administrative law judges assigned to oversee the project granted yet another delay at the request of PG&E (under Defendants' direction and on their watch) and other utilities.

54. Defendants also caused PG&E to argue that increasing oversight of overloaded power poles (which often have phone and cable lines weighing them down) was a better proposed regulation than increasing the ability of the poles to sustain greater winds. Defendants caused the Company to claim that there was no evidence that wildfires had been caused by poles not being able to withstand high winds.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

D. The Fires Devastate Northern California

55. Beginning on or about October 8, 2017, the fires began burning across the state of California, breaking out throughout Napa, Lake, Sonoma, Mendocino, Butte, and Solano counties. Seventeen separate wildfires were reported at the time, which included the Tubbs Fire (which grew to become the most destructive wildfire in the history of California), the Atlas Fire, Nuns Fire and others. The Bay Area News Group revealed that within the first 90 minutes of the fires in Sonoma and Napa counties, firefighters received reports of at least 10 blown transformers or downed power lines at the same time they were called out to battle 19 structure and vegetation fires.

56. On October 8, 2017, in connection with the beginning of the fires, heavy winds downed powerlines in the affected area. Two days later, the Bay Area News Group reported that Sonoma County emergency dispatchers sent fire crews to at least 10 reports of downed power lines and exploding transformers as the North Bay fires were starting around 9:22 p.m. In response, Defendants caused PG&E to state that "hurricane strength winds in excess of 75 mph in some cases" had damaged the Company's equipment, but said it was too early to speculate about what started the fires.

57. However, local weather station records indicate that wind speeds were only about half that level as the lines started to come down. It has been reported that at a weather station in north Santa Rosa where the Tubbs fire started, the peak wind gusts at 9:29 p.m. hit 30 mph, and were 41 mph one hour later. Similarly, it has been reported that at another weather station east of the city of Napa, on Atlas Peak, where the Atlas fire started, wind gusts at 9:29 p.m. peaked at 32 mph, and were 30 mph one hour later. Both speeds were substantially under the 56 mph wind speed that power lines must be able to withstand under California state law. According to the National Weather Service, the "hurricane strength winds" that Defendants caused the Company to reference were not "hurricane strength." [2]

58. Shortly after the fires commenced on October 8 and 9, they rapidly grew to become extensive, full-scale incidents spanning from 1,000 acres to over 20,000 acres each within a single day.

59. On October 12, 2017, the PUC's Safety and Enforcement Division sent PG&E a letter requiring it to "preserve all evidence" from the fires in Napa, Sonoma and Solano counties, including "all failed poles, conductors and associated equipment from each fire event" and "all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree trimming."

60. On October 13, 2017, Defendants revealed that Company became the subject of an investigation by the California Department of Forestry and Fire Protection ("Cal Fire"), and indicated that the probe includes "the possible role of power lines and other facilities".

61. By October 14, 2017, the fires had burned more than 210,000 acres while forcing 90,000 people to evacuate from their homes and burning an estimated 8,900 structures. The fires are responsible for the deaths of at least 43 people and the hospitalization at least 185, making the week of October 8, 2017, the deadliest week of wildfires in California history. Collectively, this event constitutes the largest loss of life due to wildfires in the United States since the 1918 Cloquet Fire.

62. By October 23, 2017, as described in detail above, it was being reported by news outlets that the Company (under Defendants' direction and on their watch) had been engaged in a long-running scheme that helped to stall the California's effort to map where power lines presented the highest risk for wildfires.

63. Subsequently, investigators began to examine whether the Company's power line failures were a possible cause of the historic fires. Defendants caused PG&E officials to issue no response to specific questions about the wind speeds and whether Company power lines were in compliance with state safety laws.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

64. Upon information and belief, at least some of the fires were caused by the Company's operation of its overhead power conductors (occurring under Defendants' direction and on their watch). Upon further information and belief, at least some of the fires were caused by one or more of the following occurrences: (i) a tree or other vegetation that had been improperly maintained by the Company (under Defendants' direction and on their watch) struck an overhead power line owned by the Company; (ii) conductors that had been improperly maintained, operated, and/or designed by the Company (under Defendants' direction and on their watch) came into contact with each other; and/or (iii) the Company (under Defendants' direction and on their watch) failed to properly maintain, inspect and/or operate its equipment.

65. The full extent of Defendants' illicit conduct may have yet to fully emerge. Nonetheless, upon information and belief, a partial list of Defendants' misconduct, all of which relate to core operations of the Company, includes the following:

● Failure to conduct reasonably prompt, proper and frequent inspections of electrical transmission lines, wires and associated equipment;

● Failure to design, construct, maintain and monitor high voltage transmission and distribution lines in a manner that avoids igniting fires in dry conditions by allowing the lines to withstand foreseeable conditions to avoid igniting fires;

● Failure to design, construct, operate, and maintain high voltage transmission and distribution lines and equipment to withstand foreseeable conditions to avoid igniting fires;

● Failure to maintain and monitor high voltage transmission and distribution lines in fire prone areas to avoid igniting and spreading fires;

● Failure to install the necessary equipment and/or inspect and repair said equipment to prevent electrical transmission and distribution lines from improperly operating, sagging or making contact with other metal wires placed on its poles igniting fires;

● Failure to keep the equipment in a safe condition at all times to avoid fires;

● Failure to inspect fixtures vegetation within proximity to energized transmission and distribution lines;

● Failure to de-energize power liens during fire prone conditions;

● Failure to de-energize power lines after the fire's ignition;

● Failure to properly train and supervise employees and agents responsible for inspection and maintenance of the distribution lines;

● Failure to implement and follow regulations and reasonably prudent practices to avoid igniting a fire; and

● Failure to properly monitor, investigate and/or maintain vegetation sufficient to mitigate the risk of fire.

66. Notably, when the revelations about Defendants' conduct began to come to light, the Company's share price fell. For example, after closing at $69.15 per share on October 11,2017 and then falling to a close of $64.50 per share on October 12, 2017, the Company's stock fell sharply to close at $57.72 per share on October 13, 2017. The share price has not recovered. As reported by The Mercury News on October 17,2017:

PG&E's stock continued to plunge Monday, with state regulators now conducting a preliminary review of the utility's possible role in the Wine Country firestorms — a potential prelude to a full-scale investigation.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.   14

The San Francisco-based utility's shares had plunged nearly 13 percent in early morning trading, but some buying activity later left the stock with a 7.4 percent loss and a closing price of $53.43.

As of Monday's closing price, PG&E's stock has shed 22.4 percent of its value during the trading days following the outbreak of the deadly wildfires, which have scorched a wide swath of rural and urban stretches in multiple North Bay counties.

67. On November 2, 2017, as a result of the fires and the potential liability related thereto, Defendants caused the Company to trim its 2017 forecast for GAAP earnings per share from a range of $3.54 to $3.79 to a range of $3.36 to $3.56.

### E. Defendants' False and Misleading Statements

68. In the Company's filings with the United States Securities and Exchange Commission (the "SEC"), Defendants caused the Company to state that an occurrence such as the fires was possible. By way of example only, Defendants spoke of such "risks" in the Company's Form 10-K filed with the SEC on February 16, 2017 (the "2016 10-K"). The 2016 10-K was signed (or authorized to be signed) by defendants Earley, Chew, Fowler, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo and Smith. What Defendants failed to disclose in the 2016 10-K and elsewhere was that due to their deliberate actions and scheme to specifically skirt and halt safety regulations (as set forth above), such a catastrophe was not merely possible, but highly likely and imminent.

69. In addition, the 2016 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Earley and Wells, which set forth:

I, [Anthony F. Earley, Jr./Jason P. Wells], certify that:

1.I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2016 of PG&E Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) ) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

In connection with the accompanying Annual Report on Form 10-K of PG&E Corporation for the year ended December 31, 2016 ("Form 10-K"), I, [Anthony F. Earley, Jr., Chairman, Chief Executive Officer and President of PG&E Corporation/Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corporation], hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge and belief, that:

(1) the Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of PG&E Corporation.

70. In addition, the 2016 10-K contained SOX Certifications signed by defendant Williams in her role as President of the Utility, which were substantially similar to those set forth above.

71. Thus, as a result of Defendants' actions, the Company has suffered damages. These damages include (but are not limited to) current and future costs associated with the fires, investigations by regulatory authorities (which could lead to significant fines and costs), being named as a defendant in a mounting number of lawsuits (which could total in the thousands) filed by victims of the fires (and the costs and potential penalties associated therewith), severe loss of reputation and standing, and decimation of its share price.

## DERIVATIVE AND DEMAND ALLEGATIONS

72. Plaintiff brings this action derivatively in the right and for the benefit PG&E to redress the breaches of fiduciary duty and other violations of law by Defendants.

73. Plaintiff will adequately and fairly represent the interests of PG&E and its shareholders in enforcing and prosecuting its rights.

74. The Board currently consists of the following thirteen (13) directors: defendants Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo and Smith. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the reasons that follow.

75. Defendants Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo and Smith (i.e., the entire Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein. The actions regarding the Company's

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

operations with respect to (among other things) safety and maintenance of its power lines and related equipment (as set forth herein) that defendants Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo and Smith caused or allowed to occur continuously and repeatedly were an integral aspect of the Company's core operations. It was these very actions and statements caused or allowed by defendants Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo and Smith that caused the Company to suffer the severe harm (financial, reputational and other), as set forth herein. This was in violation of (among other things) these Defendants' fiduciary duties of due care, good faith and loyalty, as well as the Employee Code and Director Code. Thus, defendants Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo and Smith (the entire Board) each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering a demand upon them futile.

76. Significantly, PG&E's unique history of negligence (at the very least) and repeated attempts to slow or halt the implementation of new safety measures, and the resulting numerous catastrophic incidents (as described herein), renders the basis of this derivative action distinct from many other corporate boards in the United States. A typical corporate board might plausibly claim ignorance concerning these sorts of failures in general. In this case, the Board was made specifically aware by the PUC (and other entities) of the Company's actions with respect to (among other things) the Butte fire and San Bruno gas line explosion. The Board's decision to continue to not follow proper safety and maintenance procedures and requirements (as set forth herein), and to instead knowingly cause PG&E to violate these requirements, and to hamstring efforts to impose and enforce new safety measures as an intentional business strategy, cannot be regarded as a valid exercise of business judgment.

77. Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee within the Company. Rather, as alleged herein, serious safety violations occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated safety and maintenance violations as the Company's deliberate business strategy. There is no legitimate "business judgment" involved in devising or carrying out such an illicit policy. Accordingly, demand on the Board is futile and excused.

78. The principal professional occupation of defendant Williams is her employment with PG&E as its President and CEO, pursuant to which she receives substantial monetary compensation and other benefits. In addition, according to the Company's Proxy statement which Defendants caused to be filed with the SEC and disseminated to shareholders on April 18, 2017 (the "2017 Proxy"), Defendants have admitted that defendant Williams is not independent. Thus, defendant Williams lacks independence from demonstrably interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action.

79. The principal professional occupation of defendant Earley from September 2011 until February 2017 was his employment with PG&E as its President and CEO, pursuant to which he received substantial monetary compensation and other benefits. In addition, according to the 2017 Proxy, Defendants have admitted that defendant Earley is not independent. Thus, defendant Earley lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

80. During the Relevant Period, defendants Chew, Johnson, Kimmel, Meserve and Smith served as members of the Compliance Committee. Pursuant to the Compliance Committee Charter, the members of the Compliance Committee were and are responsible for, inter alia, reviewing periodic reports from management with respect to the Company's compliance with laws, regulations, and internal policies and standards. Defendants Chew, Johnson, Kimmel, Meserve and Smith breached their fiduciary duties of due care, loyalty, and good faith, because the Compliance Committee, inter alia, allowed or permitted the Company to aggressively stall efforts by regulators to prevent the very occurrences described herein, thus causing or allowing the illicit activity described herein. Therefore, defendants Chew, Johnson, Kimmel, Meserve and Smith face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

81. During the Relevant Period, defendants Fowler, Johnson, Meserve, Mullins, Parra and Smith served as members of the Safety Committee. Pursuant to the Safety Committee Charter, the members of the Safety Committee were and are responsible

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

for, inter alia, reviewing with management the principal risks related to or arising out of PG&E's Operations and Facilities assess the effectiveness of PG&E's programs to manage or mitigate such risks, and reviewing and discussing how PG&E can continue to improve its safety practices and operational performance. Defendants Fowler, Johnson, Meserve, Mullins, Parra and Smith breached their fiduciary duties of due care, loyalty, and good faith, because the Safety Committee, inter alia, allowed or permitted the Company to continue to engage in the behavior described above which specifically ensured that the Company's power lines and facilities were being run in an unsafe manner, thus causing or allowing the illicit activity described herein. Therefore, defendants Fowler, Johnson, Meserve, Mullins, Parra and Smith face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

82. During the Relevant Period, defendants Chew, Kelly, Miller and Mullins served as members of the Audit Committee. Pursuant to the Audit Committee Charter, the members of the Audit Committee were and are responsible for, inter alia, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, reviewing legal and regulatory matters that may have a material impact on the financial statements, and discussing with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards. Defendants Chew, Kelly, Miller and Mullins breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein. Therefore, defendants Chew, Kelly, Miller and Mullins face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

83. Plaintiff has not made any demand on shareholders of PG&E to instate this action since such demand would be a futile and useless act for the following reasons:

a. PG&E is a publicly traded company with more than 507 million shares outstanding, held by hundreds or thousands of shareholders;

b. Making a demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c. Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

84. A true and correct copy of this Complaint was delivered to PG&E prior to being filed with this Court.

### FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against All Defendants and Does 1-25

85. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) and Does 1-25 had a duty to ensure that PG&E disseminated accurate, truthful and complete information to its shareholders.

87. Defendants and Does 1-25 violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to PG&E shareholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

88. As alleged herein, each of the Defendants and Does 1-25 had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

89. Defendants and Does 1-25 willfully ignored the obvious and pervasive problems with PG&E's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

90. Defendants' misconduct and the misconduct of Does 1-25 alleged herein constituted an abuse of their ability to control and influence PG&E, for which they are legally responsible. In particular, Defendants and Does 1-25 abused their positions of authority by causing or allowing PG&E to embark upon a scheme to avoid safety regulations and fail to perform proper maintenanc of the Company's power lines and equipment. Among other things, Defendants and Does 1-25 failed to implement and follow regulations and reasonably prudent practices, resulting in the damages set forth herein.

91. Defendants and Does 1-25 had a duty to PG&E and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of PG&E.

92. Defendants and Does 1-25, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of PG&E in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants and Does 1-25 breached their duties of due care, diligence and candor in the management and administration of PG&E's affairs and in the use and preservation of PG&E's assets.

93. During the course of the discharge of their duties, Defendants and Does 1-25 knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants and Does 1-25 caused PG&E to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to PG&E, thus breaching their duties to the Company. As a result, Defendants and Does 1-25 grossly mismanaged PG&E.

94. As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties and the breaches of fiduciary duties of Does 1-25, the Company has sustained damages.

95. As a result of the misconduct alleged herein, Defendants and Does 1-25 are liable to the Compan.

96. Plaintiff, on behalf of PG&E, has no adeuate remedy at law.

## SECOND CAUSE OF ACTION

### Claim for Unjust Enrichment Against All Defendants and Does 1-25

97. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98. By their wrongful acts and omissions, the Defendants and Does 1-25 were unjustly enriched at the expense of and to the detriment of PG&E in the form of salaries, bonuses, and other forms of compensation (including, but not limited to, the Company's "STIP" structure of compensation for executives, which included safety as one of its components).

99. Plaintiff, as a shareholder and representative of PG&E, seeks restitution from thes Defendants and Does 1-25, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants and Does 1-25, and each of them, from their wrongful conduct and fiduciary breaches.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing PG&E to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding to PG&E restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable ttorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.


Dated: November 16, 2017

STEPHENS & STEPHENS LLP CONRAD B. STEPHENS

**CONRAD B. STEPHENS**

505 South McClelland Street

Santa Maria, CA 93454

Telephone: (805) 922-1951

Facsimile: (805) 922-8013

E-mail: conrad@stephensfirm.com

PROMISLOFF & CIARLANTO, P.C.

JEFFREY. J. CIARLANTO

DAVID M. PROMISLOFF

5 Great Valley Parkway, Suite 210

Malvern, PA 19355

Telephone: (215) 259-5156

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Facsimile: (215) 600-2642

E-mail: ciarlanto@prolawpa.com david@prolawpa.com

*Counsel for Plaintiff Jeffrey Lentine*

<div align="center">

**JURY DEMAND**

</div>

Plaintiff demands a trial by jury.

Dated: November 16, 2017

STEPHENS & STEPHENS LLP CONRAD B. STEPHENS

CONRAD B. STEPHENS

505 South McClelland Street

Santa Maria, CA 93454

Telephone: (805) 922-1951

Facsimile: (805) 922-8013

E-mail: conrad@stephensfirm.com

PROMISLOFF & CIARLANTO, P.C.

JEFFREY. J. CIARLANTO

DAVID M. PROMISLOFF

5 Great Valley Parkway Suite 210

Malvern, PA 19355

Telephone: (215) 259-5156

Facsimile: (215) 600-2642

E-mail: ciarlanto@prolawpa.com david@prolawpa.com

Counsel for Plaintiff Jeffrey Lentine

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Footnotes

1    Some of the allegations set forth herein, including much of what follows in this section, are contained in articles that appeared in The Mercury News in October 2017 and November 2017. See http://www.mercurynews.com/2017/10/26/pge-pushes-for-ratepayers-to-pay-millions-in-california-wildfire-costs/ and http://www.mercurynews.com/2017/10/21/pge-helped-stall-effort-to-map-risky-power-lines-prone-to-wildfires/.

2    To qualify as "hurricane strength," winds must be sustained (i.e. lasting for more than 1 minute) at a minimum 74 mph. Such winds are the speeds in a Category 1 hurricane.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.   22

# Exhibit 102

Document By **WESTLAW**

2017 WL 6451626 (Cal.Super.) (Trial Pleading)
Superior Court of California.
San Francisco County

FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Derivatively on
Behalf of PG&E Corporation and Pacific Gas and Electric Company, Plaintiff,

v.

Geisha J. WILLIAMS, Anthony F. Earley, Jr., Nickolas Stavropoulos, Forrest E. Miller,
Richard A. Meserve, Lewis Chew, Roger H. Kimmel, Rosendo G. Parra, Fred J. Fowler,
Richard C. Kelly, Anne Shen Smith, Eric D. Mullins, Barbara L. Rambo, Jeh C. Johnson, Barry
Lawson Williams, Maryellen C. Herringer, and Does 1 through 25, Inclusive, Defendants,
and

PG&E CORPORATION, a California corporation; and Pacific Gas
and Electric Company, a California corporation, Nominal Defendants.

No. CGC-17-562591.
November 20, 2017.

Demand for Jury Trial

**Stockholder Derivative Complaint for Breach of Fiduciary Duties and Unjust Enrichment**

Brian J. Robbins (190264), George C. Aguilar (126535), Lindsey C. Herzik (313859), Robbins Arroyo LLP, 600 B Street, Suite
1900, San Diego, CA 92101, Telephone: (619) 525-3990, Facsimile: (619) 525-3991, E-mail: brobbins@robbinsarroyo.com,
gaguilar@robbinsarroyo.com, lherzik@robbinsarroyo.com, for plaintiff.

### NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative and double derivative action brought by plaintiff on behalf of nominal defendants PG&E
Corporation ("PG&E") and Pacific Gas and Electric Company (the "Utility") against certain current and/or former officers and
directors of PG&E and Utility (collectively, "PG&E" or the "Company"), seeking to remedy defendants' breaches of fiduciary
duties and other violations of the law. This action seeks to hold the Individual Defendants (as defined herein) responsible for
their knowing and reckless failure to abide by and act in accordance with their fiduciary duties.

2. On or about October 8, 2017, wildfires broke out across northern California. The wildfires expanded across Napa, Lake,
Sonoma, Mendocino, Butte, and Solano Counties (the "Wine Country Fires"). By October 14, 2017, the fires had burned more
than 210,000 acres, forced 90,000 people from their homes, killed forty-three and hospitalized at least 185. More than 10,000
firefighters from as far as Australia arrived in Northern California to put their lives at risk to battle the flames. Plaintiff Firemen's
Retirement System of St. Louis now seeks to hold accountable those truly responsible for these fires, the Individual Defendants.

3. While investigations continue, it has become increasingly apparent that PG&E's power lines are at least partially responsible
for the fires. An October 10, 2017 article by the *Bay Area News Group* stated local fire crews were called to at least ten different
locations along PG&E's power lines after 911 calls reported sparking wires and other problems.

© 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

4. This disaster never should have happened. In 2007, toppled electrical lines ignited catastrophic fires in the San Diego County area. After that disaster, state regulators began demanding utilities create detailed maps of at-risk power lines. Over the past decade, PG&E repeatedly attempted to halt the mapping product, arguing this past July that the mapping product would add "***unnecessary*** costs to construction and maintenance projects in rural areas." At the same time, it argued that it should be able to delay needed infrastructure upgrades until the mapping project was complete. If the mapping project was finished as expected, PG&E would have likely been required to inspect the lines in the regions where the fires occurred and fix the faulty lines. State Senator Jerry Hill called the Company's actions "an outrageous example of negligence by a regulatory agency."

5. Notably, the Wine Country Fires are not the first instance of the Company's failure to act to protect the safety of its customers causing substantial harm. Earlier this year, the California Public Utilities Commission ("CPUC") fined PG&E $8.3 million for failing to cull trees near a power line in Amador County, which caused the twenty-two-day-long Butte Fire. This fire began, just like the Wine Country Fires, when one of the Company's power lines came in contact with a pine tree. The Butte Fire killed two people and destroyed 549 homes. State officials stated that PG&E overlooked dangerous trees in its 2014 and 2015 inspections, leading to the Butte Fire.

6. Perhaps the most famous of PG&E's failure to ensure proper infrastructure was the San Bruno explosion. On September 9, 2010, a huge explosion erupted in San Bruno, with the ensuing fire engulfing nearby houses. The fire was apparently caused and then fed by a ruptured PG&E pipeline. On January 13, 2012, an independent audit from the state of California issued a report stating that PG&E had illegally diverted over $100 million from a fund used for safety operations, and instead used it for executive compensation and bonuses. Then, on April 9, 2015, the CPUC fined PG&E $1.6 billion for its role in the San Bruno investigation.

7. Despite PG&E's history, and the harm these disasters caused the Company, its customers, and its stockholders, the Individual Defendants still failed to act in accordance with their duties. The costs and damage from the Wine Country Fires are starting to mount.

8. On October 12, 2017, the CPUC ordered the Company to preserve all evidence related to the fires. On the news of PG&E's connection to the Wine Country Fires, the Company's market capitalization fell 16.5%, a nearly $6 billion reduction. In addition, the Company is now subject to numerous lawsuits in northern California for its responsibility for the fires.

9. Thus, as a result of the Individual Defendants' breaches and other misconduct, the Company has suffered damages. These damages include, but are not limited to: (i) current and future costs associated with the fires (including, but not limited to, potential fines); (ii) being named as a defendant in lawsuits brought by individuals and entities harmed by the fires; (iii) becoming the subject of regulatory investigations; (iv) severe loss of reputation and standing; and (v) decline in the value of the Company's share price.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, section 10, because this case is a cause not given by statute to other trial courts, as this derivative action is brought pursuant to section 800 of the California Corporations Code to remedy defendants' violations of law.

11. This Court retains general jurisdiction over each named defendant who is a resident of California. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. PG&E is headquartered in California, and because the allegations contained herein are brought derivatively on behalf of PG&E, defendants' conduct was purposefully directed at California. Finally, exercising jurisdiction over any non-resident defendant is reasonable under these circumstances.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

12. Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to PG&E occurred in this County, and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

### THE PARTIES

### Plaintiff

13. Plaintiff Firemen's Retirement System of St. Louis was a stockholder of PG&E at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current PG&E stockholder.

### Nominal Defendants

14. Nominal defendant PG&E is a California corporation with principal executive offices located at 77 Beale Street, San Francisco, California. PG&E is an energy-based holding company. As of December 31, 2016, PG&E had approximately thirty employees.

15. Nominal defendant Utility is a California corporation with principal executive offices located at 77 Beal Street, San Francisco, California. The Utility is the primary operating subsidiary of PG&E. The Utility generates revenues mainly through the sale and delivery of electricity and natural gas to sixteen million Californians across a 70,000 square-mile service area in northern and central California. As of December 31, 2016, the Utility had approximately 24,000 regular employees.

### Defendants

16. Defendant Geisha J. Williams ("G. Williams") is PG&E's Chief Executive Officer and President and has been since March 2017 and a PG&E director and has been since May 2017. Defendant G. Williams is also a Utility director and has been since August 2015. Defendant G. Williams was Utility's President, Electric from August 2015 to February 2017; Executive Vice President, Electric Operations from June 2011 to August 2015; and Senior Vice President, Electric Delivery from December 2007 to May 2011. PG&E paid defendant G. Williams the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $695,833 | $2,250,072 | $610,594 | $519,983 | $87,748 | **$4,164,230** |
| 2015 | **$634,183** | **$2,000,115** | **$620,585** | **$395,456** | $72,868 | $3,723,207 |

17. Defendant Anthony F. Earley, Jr. ("Earley") is PG&E's Executive Chair of the Board of Directors (the "Board") and has been since March 2017 and a PG&E director and has been since September 2011. Defendant Earley was also Chairman, Chief Executive Officer, and President of PG&E from September 2011 to March 2017. Defendant Earley is also a Utility director and has been since June 2012. PG&E paid defendant Earley the following compensation as an executive:

© 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $1,318,750 | $7,500,072 | $1,928,672 | $885,572 | $97,580 | $11,730,646 |
| 2015 | $1,281,250 | $7,500,080 | $2,245,365 | $1,075,345 | $96,354 | $12,198,394 |
| 2014 | $1,250,000 | $7,500,007 | $1,825,200 | $955,849 | $96,160 | $11,627,216 |

18. Defendant Nickolas Stavropoulos ("Stavropoulos") is Utility's President and Chief Operating Officer and has been since March 2017 and a Utility director and has been since August 2015. Defendant Stavropoulos was also Utility's President, Gas from August 2015 to February 2017 and Executive Vice President, Gas Operations from June 2011 to August 2015. PG&E paid defendant Stavropoulos the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $660,833 | $2,250,072 | $579,881 | $375,692 | $67,497 | $3,933,975 |
| 2015 | $613,221 | $2,000,115 | $624,713 | $303,098 | $62,695 | $3,603,842 |
| 2014 | $575,317 | $1,375,128 | $606,706 | $274,513 | $63,309 | $2,894,973 |

19. Defendant Forrest E. Miller ("Miller") is PG&E's Lead Director and has been since May 2017 and a PG&E director and has been since February 2009. Defendant Miller is also Utility's non-executive Chair of the Board and has been since May 2017 and a Utility director and has been since February 2009. PG&E paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2016 | $170,000 | $139,982 | $96 | $310,078 |
| 2015 | $163,500 | $119,987 | $96 | $283,583 |
| 2014 | $133,618 | $104,984 | $96 | $238,698 |

20. Defendant Richard A. Meserve ("Meserve") is a PG&E director and a Utility director and has been since December 2006. Defendant Meserve is also the Chairman of PG&E's Safety and Nuclear Oversight Committee and has been since at least March 2013; the Chairman of Utility's Safety and Nuclear Oversight Committee and has been since September 2017; and a member of PG&E's Compliance and Public Policy Committee and has been since at least March 2013. PG&E paid defendant Meserve the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2016 | $135,000 | $139,982 | $1,096 | $276,078 |
| 2015 | $137,500 | $119,987 | $1,096 | $258,583 |

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1093 of 1229

| | | | | |
|---|---|---|---|---|
| 2014 | $117,250 | $104,984 | $2,596 | $224,830 |

21. Defendant Lewis Chew ("Chew") is a PG&E director and a Utility director and has been since September 2009. Defendant Chew is also the Chairman of PG&E's and Utility's Audit Committees and has been since May 2017 and a member of those committees and has been since at least March 2013; and a member of PG&Es Compliance and Public Policy Committee and has been since at least March 2013. Defendant Chew was the Chairman of PG&E's Compliance and Public Policy Committee from at least March 2013 to May 2017. PG&E paid defendant Chew the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| **2016** | **$130,000** | **$139,982** | **$1,096** | **$271,078** |
| 2015 | **$121,750** | $119,987 | $96 | $241,833 |
| 2014 | $110,000 | $104,984 | $2,596 | $217,580 |

22. Defendant Roger H. Kimmel ("Kimmel") is a PG&E director and a Utility director and has been since January 2009. Defendant Kimmel is also the Chairman of PG&E's Compliance and Public Policy Committee and has been since May 2017 and a member of that committee and has been since at least March 2013. PG&E paid defendant Kimmel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| **2016** | $120,000 | $139,982 | $96 | $260,078 |
| 2015 | $119,000 | $119,987 | $96 | $239,083 |
| 2014 | $107,250 | $104,984 | $96 | **$212,330** |

23. Defendant Rosendo G. Parra ("Parra") is a PG&E director and a Utility director and has been since September 2009. Defendant Parra is also a member of PG&E's Safety and Nuclear Oversight Committee and has been since at least April 2014 and a member of Utility's Safety and Nuclear Oversight Committee and has been since September 2017. PG&E paid defendant Parra the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | **$120,000** | **$139,982** | $96 | $260,078 |
| 2015 | $124,250 | $119,987 | $1,096 | $245,333 |
| 2014 | $107,250 | $104,984 | $96 | $212,330 |

24. Defendant Fred J. Fowler ("Fowler") is a PG&E director and a Utility director and has been since March 2012. Defendant Fowler is also a member of PG&E's Safety and Nuclear Oversight Committee and has been since at least March 2013 and a member of Utility's Safety and Nuclear Oversight Committee and has been since September 2017. Defendant Fowler was a member of PG&E's Compliance and Public Policy Committee in at least April 2014. PG&E paid defendant Fowler the following compensation as a director:

© 2023 Thomson Reuters. No claim to original U.S. Government Works. 5

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| **2016** | $185,750 | $139,982 | $96 | $325,828 |
| **2015** | $133,865 | $119,987 | $96 | $253,948 |
| **2014** | **$93,250** | **$104,984** | **$96** | **$198,330** |

25. Defendant Richard C. Kelly ("Kelly") is a PG&E director and a Utility director and has been since June 2013. Defendant Kelly is also a member of PG&E's and the Utility's Audit Committees and has been since at least April 2014. Defendant Kelly was a member of PG&E's Safety and Nuclear Oversight Committee from at least April 2014 to at least April 2017. PG&E paid defendant Kelly the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | **$162,500** | $139,982 | $96 | $302,578 |
| 2015 | $144,557 | $119,987 | $96 | $264,640 |
| 2014 | $101,750 | **$104,984** | **$96** | **$206,830** |

26. Defendant Anne Shen Smith ("Smith") is a PG&E director and a Utility director and has been since February 2015. Defendant Smith is also a member of PG&E's Safety and Nuclear Oversight Committee and has been since at least March 2015; a member of the Utility's Safety and Nuclear Oversight Committee and has been since September 2017; and a member of PG&E's Compliance and Public Policy Committee and has been since at least March 2015. PG&E paid defendant Smith the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| **2016** | $162,500 | $139,982 | $1,096 | $303,578 |
| **2015** | $109,224 | $119,987 | $1,080 | $230,291 |

27. Defendant Eric D. Mullins ("Mullins") is a PG&E director and a Utility director and has been since September 2016. Defendant Mullins is also a member of PG&E's and Utility's Audit Committees and has been since at least April 2017, and a member of PG&E's and Utility's Safety and Nuclear Oversight Committees and has been since at least November 2017.

28. Defendant Barbara L. Rambo ("Rambo") is a PG&E director and a Utility director and has been since January 2005. PG&E paid defendant Rambo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| **2016** | $130,000 | $139,982 | $96 | $270,078 |
| 2015 | $132,500 | $119,987 | $96 | $252,583 |
| 2014 | $115,500 | $104,984 | $96 | $220,580 |

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1095 of 1229

29. Defendant Jeh C. Johnson ("Johnson") is a PG&E director and a Utility director and has been since May 2017. Defendant Johnson is also a member of PG&E's and Utility's Safety and Nuclear Oversight Committees and PG&E's Compliance and Public Policy Committee and has been since at least November 2017.

30. Defendant Barry Lawson Williams ("B. Williams") was PG&E's Lead Director from May 2014 to May 2017; a PG&E director from December 1996 to May 2017; and a Utility director from September 1990 to May 2017. Defendant B. Williams was also a member of PG&E's and Utility's Audit Committees from at least March 2013 to at least April 2016 and was the Chairman of those committees from at least March 2013 to May 2014. PG&E paid defendant B. Williams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | **$185,000** | **$139,982** | **$96** | **$325,078** |
| 2015 | **$187,250** | $119,987 | $96 | $307,333 |
| 2014 | $170,189 | $104,984 | $2,596 | $277,769 |

31. Defendant Maryellen C. Herringer ("Herringer") was a PG&E director and a Utility director from October 2005 to May 2017 and PG&E's Interim Lead Director and Utility's interim Non-Executive Chairman of the Board from May 2011 to September 2011. Defendant Herringer was also a member of PG&E's and Utility's Audit Committees from at least March 2013 to at least April 2017. PG&E paid defendant Herringer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $135,000 | $139,982 | $1,096 | $276,078 |
| 2015 | $135,750 | $119,987 | $96 | $255,833 |
| **2014** | $120,500 | $104,984 | $2,596 | **$228,080** |

32. Collectively, the defendants identified in ¶¶16-31 are referred to herein as the "Individual Defendants."

33. Except as described herein, plaintiff is ignorant of the true names of defendants sued as Does 1-25, inclusive, under California Code of Civil Procedure section 474 and, therefore, plaintiff sues these defendants by such fictitious names. Following further investigation and discovery, plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants are PG&E officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein. These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34. By reason of their positions as officers, directors, and/or fiduciaries of PG&E and because of their ability to control the business and corporate affairs of PG&E and its subsidiaries, Individual Defendants owed PG&E and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage PG&E

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1096 of 1229

and its subsidiaries in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of PG&E and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to PG&E and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of PG&E, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with PG&E, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

36. To discharge their duties, the officers and directors of PG&E were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company and its subsidiaries. By virtue of such duties, the officers and directors of PG&E were required to, among other things:
(a) exercise good faith to ensure that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c) when put on notice of problems with the Company's and/or its subsidiaries' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37. The Company's Employee Code of Conduct (the "Employee Code") states:
**We are passionate about meeting our customers' needs and delivering for our shareholders:**

● Demonstrate a passion for understanding and meeting the needs of our customers and shareholders

● Take active responsibility for the quality of service we provide to customers and others

● Are open to change and readily implement better ways of doing things

● Have high performance expectations and a mindset of excellence

● Are innovative in identifying new opportunities and approaches for our customers and ourselves

**We are accountable for all of our own actions: these include safety, protecting the environment, and supporting our communities:**

● Maintain an absolute commitment to safety for ourselves and others

● Take accountability for actions, decisions and results vs. blaming

● Demonstrate through actions a commitment to the well-being of the community and the environment

● Can be counted on to deliver and meet goals and objectives

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

● Have a "can do" attitude and bias for action

**Never knowingly violate laws, regulations, policies, standards, or procedures,** even if you think doing so would lower costs, increase earnings, or satisfy a customer. Make yourself aware of the requirements associated with your job. Your supervisor can't order you to take an action that intentionally violates this Code, a law, a regulation, or a company policy, standard, or procedure.

**Use this decision-making checklist:**

● Have I verified the significant facts?

● Is it legal and ethical, and does it meet our internal requirements?

● Will my actions impact public or employee safety?

● Have I made a decision that feels right and is fair and just?

● How would it look in a newspaper or on the Internet?

● Could I explain it to my parents or children?

● How would my decision or actions be judged by others?

● Will I feel comfortable with my decision?

● If I'm not sure of something, have I asked for advice?

**Safety**

The safety of the public, employees and contractors is our highest priority. The company's commitment to a safety-first culture is reinforced with our Safety Principles, PG&E's Safety Commitment, Personal Safety Commitment and Keys to Life. These tools were developed in collaboration with PG&E employees, leaders, and union leadership and are intended to provide clarity, support and confidence as employees strive to take personal ownership of safety at PG&E.

**Safety Principles**

Nothing is more important than public and employee safety.

We must create an environment at PG&E where employees feel free to raise all safety-related issues without peer pressure or fear of reprisal. This includes near hits and unsafe situations of any kind.

We must encourage open and honest communication on safety, so that we identify and eliminate unsafe situations and avoid incidents and injuries.

To enhance safety and prevent future incidents, we will adopt a voluntary non-punitive self-reporting system for unsafe occurrences and hazardous situations.

We acknowledge and reward safe behavior and practices to encourage our employees and to reinforce continuous learning.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

PG&E takes a behavior-based approach to discipline. Discipline is considered only when an employee acts in a reckless manner; demonstrates a pattern of carelessness or non-compliance; puts the employee, coworkers or the public at risk by intentionally violating the Keys to Life or the Code of Conduct.

PG&E's Safety Commitment

● We will train, equip and qualify our people to work safely.

● We will design, build, operate and maintain our systems with the highest regard for the safety and well-being of all.

● We will identify and address the underlying causes of incidents to prevent them from recurring.

**Personal Safety Commitment**

● I will make my personal safety and the safety of my coworkers and the public my highest priority.

● I will make sure I understand how to do the work safely before I start the job.

● I will speak up about safety concerns.

● I will look for safety hazards and intervene to stop unsafe acts.

● I will close out and properly document my work.

**Environmental Laws and Regulations**

PG&E is a recognized environmental leader and is committed to conducting its business in an environmentally sensitive manner. This commitment is consistent with our values and our Environmental Policy. It also makes good business sense. Make sure that the decisions you make on behalf of PG&E reflect this commitment.

For PG&E to be an environmental leader, we must first comply fully with all environmental laws and regulations that govern our business. When appropriate, we seek ways to go beyond what's required in how we deliver energy, serve our customers and manage our operations.

38. The Company's Code of Business Conduct and Ethics for Directors (the "Director Code"), which expressly applies to defendants named herein states:
**Values**

The Companies have adopted the following value:

● We act with integrity and communicate honestly and openly

● We are passionate about meeting our customers' needs and delivering for our shareholders

● We are accountable for all of our own actions: these include safety, protecting the environment, and supporting our communities

● We work together as a team and are committed to excellence and innovation

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Compliance With Applicable Laws**

Directors must comply with all of the laws, rules, and regulations of the United States and other countries, as well as the states, counties, cities, and other jurisdictions, applicable to either Company or its business.

This Code does not summarize all laws, rules, and regulations applicable to either Company or its business. The Companies will on occasion provide to the directors information about specific laws, rules, and regulations, which may include antitrust laws, securities laws concerning disclosure requirements and insider trading, and Federal Energy Regulatory Commission director interlock preapproval requirements. Directors are expected to consult with the Chairman of the Board or the Compliance Officer if they have questions about laws that they think may be applicable to either Company or its business.

**Reporting Any Illegal Or Unethical Behavior**

Directors should promptly communicate any suspected violations of the Code, including any violation of law or government rule or regulation, to the Chairman of the Board or the Compliance Officer. Suspected violations will be investigated by the Board, the Audit Committee, or persons designated by the Board or the Audit Committee. Appropriate action will be taken in the event that a violation is confirmed.

Directors should promote ethical behavior and review the Company's steps to (a) encourage employees to talk to supervisors, managers, and other appropriate personnel when in doubt about the best course of action in a particular situation, (b) encourage employees to report violations of laws, rules, regulations, or the Company's employee code of conduct, and potential ethics violations or non-compliance to appropriate personnel through, among other things, an ethics hotline, and (c) inform employees that the Company will not allow retaliation for reports made in good faith.


39. The Board's Safety and Nuclear Oversight Committee's Charter sets forth the following responsibilities:
1. Review significant policies and issues related to safety, operational performance, and compliance.

2. Review with management the principal risks related to or arising out of PG&E's Operations and Facilities (including risks that are identified through PG&E's enterprise risk management program and that are selected in consultation with this Board of Directors and its committees, as applicable), and assess the effectiveness of PG&E's programs to manage or mitigate such risks, including with respect to ... asset management programs for PG&E's electric operations and facilities.

3. Review and discuss how PG&E can continue to improve its safety practices and operational performance.

4. Review and discuss the results of PG&E's goals, programs, policies, and practices with respect to promoting a strong safety culture.

5. Review the impact of significant changes in law and regulations affecting safety and operational performance.

6. Advise this corporation's Compensation Committee on appropriate safety and operational goals to be included in PG&E's executive compensation programs and plans.

7. Meet at least six times per year. Such meetings shall include at least semiannual joint meetings with the Utility's Safety and Nuclear Oversight Committee, this corporation's Audit Committee, the Utility's Audit Committee, and the corporation's Compliance and Public Policy Committee to discuss PG&E's compliance program and any other topics agreed upon by those committees.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

8. (a) Review the adequacy and direction of PG&E's corporate safety functions, including the appointment and replacement of any chief safety officer of this corporation (or any officer who is similarly given direct responsibility for overseeing enterprise-wide safety matters at the corporation) (the "Chief Safety Officer"), (b) review with the Chief Safety Officer the responsibilities, budget, and staffing of the corporation's safety function, (c) periodically review PG&E's corporate safety and health functions, goals, and objectives represented in PG&E's five-year planning process, and (d) periodically review reports provided to management by the Chief Safety Officer and any chief safety officer of the Utility (or any officer who has direct responsibility for overseeing safety matters at the Utility).

9. Serve as a channel of communication between the Chief Safety Officer and this Board of Directors.

40. The Board's Compliance and Public Policy Committee's Charter sets forth the following responsibilities:
1. Review and oversee the corporation's compliance program, including, but not limited to, evaluating its effectiveness.

2. Review periodic reports from management, including, but not limited to, the Chief Ethics and Compliance Officer (the "CECO") and other operations, compliance, and legal personnel, with respect to (a) the corporation's compliance with laws, regulations, and internal policies and standards, (b) significant pending or threatened litigation and government investigations, examinations, inquiries, demands, or proceedings, in each case which raise or would be expected to raise significant compliance issues, and (c) any other significant claim or complaint alleging that the corporation is not in compliance with laws, regulations, or internal policies and standards.

3. Review (a) periodic reports with respect to internal or external compliance reviews or audits conducted by the corporation, regulators, or third parties, and (b) reports by management with respect to their work to address any significant deficiencies, findings, and recommendations identified in any such review or audit.

4. Review the corporation's statements of policy concerning conflicts of interest and general business ethics (including the codes of business conduct and/or ethics).

5. At least semiannually, meet jointly and coordinate with the Audit Committees, the PG&E Corporation SNO Committee, and the Pacific Gas and Electric Company SNO Committee to discuss the corporation's compliance program and monitor that all significant compliance issues are addressed by the appropriate Board committees.

6. Coordinate with management to facilitate the regular receipt by the Boards of Directors of appropriate reports and materials regarding significant compliance issues.

7. Monitor that a consistent commitment to maintaining an effective compliance program is conveyed to employees, contractors, and other relevant stakeholders.

**Public Policy Matters**

8. Review the corporation's policies and practices with respect to the corporation's long-term sustainability and the protection and improvement of the quality of the environment, including, but not limited to, the corporation's social, environmental, economic, climate change, and broader environmental policies and programs.

12. Review significant societal, governmental, and environmental trends and issues which may affect the corporation's operations, and advise the Boards of Directors regarding plans and programs with respect thereto.

41. The Board's Audit Committee's Charter sets for the following responsibilities:

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

7. Review major issues as to the design, implementation, and adequacy of the internal controls of this corporation and its subsidiaries and affiliates and any special audit steps adopted in light of material control deficiencies (in consultation with the independent auditors and the senior internal auditor).

8. Review and discuss with management and the independent auditors the corporation's internal controls report and the independent auditors' attestation report, prior to the filing of the corporation's annual report on Form 10-K.

9. Review and discuss with management and the independent auditors, prior to issuance, the audited consolidated annual and interim financial statements of this corporation and its subsidiaries (the "Financial Statements"), including reviewing this corporation's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

13. Review disclosures made by the principal executive officer and the principal financial officer in connection with the officer certifications required for this corporation's annual report on Form 10-K and the quarterly reports on Form 10-Q, regarding all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect this corporation's ability to record, process, summarize, and report financial information, or any fraud that involves management or other employees who have a significant role in the corporation's internal control over financial reporting.

19. Prepare the Audit Committee's report is filed with this corporation's annual proxy statement.

20. (a) Review legal and regulatory matters that may have a material impact on the Financial Statements, including the effect of regulatory and accounting initiatives; (b) discuss with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards; (c) periodically receive reports from the PG&E Corporation Compliance and Public Policy Committee with respect to compliance oversight and related matters; and (d) at least semiannually, meet jointly with the Pacific Gas and Electric Company Audit Committee, the PG&E Corporation Compliance and Public Policy Committee, the PG&E Corporation Safety and Nuclear Oversight Committee, and the Pacific Gas and Electric Company Safety and Nuclear Oversight Committee to discuss the corporation's compliance program.

21. (a) Discuss this corporation's guidelines and policies that govern the processes by which major risks are assessed and managed; (b) discuss the major financial risk exposures and the overall steps that management has taken to monitor and control such exposures; and (c) to the extent that any aspect of risk assessment and management is delegated to another committee of the Board, the Audit Committee shall generally review the processes by which such risk assessment and management are undertaken.

22. Discuss the types of information to be disclosed and the types of presentation to be made in connection with this corporation's earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information) and financial information and earnings guidance provided to analysts and rating agencies. This discussion does not need to occur before each earnings release or disclosure of earnings guidance.

23. Review periodically, and no less than annually, expense reimbursements paid to the Chairman of the Board, the Chief Executive Officer, and the President, if those positions are filled, and to such other officers of this corporation and its subsidiaries and affiliates as may be deemed appropriate by the Committee.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Applicable Law

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

13

42. According to its public filings, PG&E is a Fortune 200 energy-based holding company, headquartered in San Francisco, California. It is the parent company of the Utility, an energy company that serves sixteen million Californians across a 70,000 square-mile service area in northern and central California. The Utility is a subsidiary of PG&E, and the means through which the Company operates.

43. Pursuant to Public Utilities Code section 451, "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities... as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

44. To meet this safety mandate, utilities are required to comply with CPUC General Order 95's rules for overhead electric line construction.

45. Pursuant to Public Resources Code section 4292, the Company must "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower."

46. Public Resources Code section 4293 requires "Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard" and that, depending on a power line's voltage, there is a clearance of between four to ten feet.

47. CPUC General Order 165 states that the Company must conduct "intrusive" inspections of all wooden poles that over fifteen years old every ten years and "detailed" inspections of all of its overhead transformers in urban areas at least every five years.

48. In addition, on January 17, 2014, Governor Jerry Brown declared a state of emergency due to severe drought conditions. Recognizing that the drought was killing trees at an unprecedented rate, and that dead trees were a significant fire risk, Governor Brown issued another proclamation of a state of emergency on October 30, 2017. This proclamation instructed state agencies, utilities, and local governments to undertake efforts to remove dead or dying trees in high hazard zones that threaten power lines.

### PG&E's Aging Infrastructure Is a Significant Safety Risk

49. As revealed in an October 30, 2017 article by *NBC Bay Area,* in 2013, Pennsylvania based Liberty Consulting Group ("Liberty") conducted a massive review of the Company's power lines, which was commissioned by the CPUC. In its 200-page report, Liberty explained that approximately three quarters of PG&E's power lines lack modern in-line grounding technology, which creates "serious safety issues." Because the lines lack a ground wire, the Company cannot remotely shut them down from a command center. As a result, the wires are still alive on the ground when they fall and crews must go to the site to fix them. Notably, in-line grounding technology has been around for decades.

50. In addition, according to Liberty, 60% of the Company's 113,000 miles of power lines were at-risk of sudden failure. Approximately 22,000 miles of power lines were made of copper wire, which is considered frail, obsolete, and subject to break as it ages. Another 47,000 miles is steel reinforced aluminum, which is prone to pit and corrode.

51. Liberty called on PG&E to "treat aging infrastructure as an enterprise-level risk." The Company, with the Individual Defendants at the helm, failed to adequately act on this risk.

### The Company's History of Placing Short Term Profits Ahead of Safety

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

52. Liberty's report was not the only warning to the Individual Defendants about the Company's aging infrastructure and failure to act with the public's safety in mind. PG&E has an unfortunately long history of placing the interests of turning a profit (with the bonus such profits create) ahead of the safety of life and property in the areas it services. Many of these past instances were well-known and presage the harm from the Wine Country Fires if the Individual Defendants failed to act to fix this culture of profits above all else.

53. The fines against the Company over its failure to properly maintain its power lines started small. In 1990, PG&E pleaded no contest in Sonoma County for failing to keep power lines free of vegetation and paid $10,000. In 1995, PG&E pleaded no contest to similar charges in Nevada County and paid $2,400 in fines.

54. At the same time, the Company's failure to properly maintain its infrastructure began causing significant damages. State forestry investigators blamed PG&E tree-trimming violations for the 1990 Campbell fire in Tehama County, which burned 125,000 acres and cost $10 million to fight; the 1992 Fawn Hill Fire in Placer County, which burned 250 acres and eleven homes, and the 1995 Sailor Fire in Placer County, which burned 150 acres.

55. In 1994, the Company's failure to trim trees near power lines caused the "Trauner Fire" in Nevada County. In particular, a tree limb that PG&E was supposed to keep trimmed hit a 21,000 volt power line. The Trauner Fire burned down a schoolhouse and twelve homes as it raged through 500 acres near the gold rush town of Rough and Ready. Spot investigations revealed approximately 200 violations involving the contact between vegetation and one of PG&E's power lines. A jury found the Company guilty of 739 counts of criminal negligence and the PG&E had to pay $24 million in penalties. Among other pieces of evidence, the jurors considered an internal memo from the Company's corporate headquarters that praised managers for cutting tree-trimming costs. In fact, a subsequent report by the CPUC found that between 1987 and 1994, PG&E diverted $495 million from its budgets for maintenance, including $77.6 million from its tree-trimming budget.

56. In 1996, an untrimmed tree hit one of PG&E's high-voltage power lines in Sonoma County (one of the counties hit by the Wine Country Fires), burning 2,100 acres. Among other settlements, a May 21, 1999 SFGate article reported that PG&E paid a vineyard $5 million for the damage the wildfire caused. In addition, after admitting responsibility for the fire, PG&E paid California $1.7 million to cover the costs of fighting the fire.

57. Also, in 1996, a fire broke out in PG&E's Mission District Substation in San Francisco. This fire went largely forgotten by the public until another fire started in this same substation in December 2003. The December 2003 fire resulted in nearly one-third of San Francisco residents and businesses losing power. The CPUC's subsequent investigation found the same root causes in both the 1996 and 2003 fires. Worse, the CPUC found that PG&E did not even implement the recommendations coming from its own investigation in the 1996 fire.

58. On Christmas Eve in 2008, a pipe exploded in the Sacramento suburb of Rancho Cordova, killing one man and injuring five others. Investigators found that PG&E installed the incorrect pipe during a repair in 2006 and was slow in responding to a leak report the day of the blast. The CPUC stated that PG&E was at fault for the explosion because it should have discovered the inadequate repair job. In 2011, PG&E agreed to pay a then-record fine of $38 million for its safety violations that led to the explosion.

59. That fine is just a small fraction of the fine the CPUC imposed on the Company in 2015. In particular, the CPUC fined PG&E $1.6 billion for its responsibility for the 2010 San Bruno gas line explosion, which killed eight people and destroyed thirty-eight homes. The CPUC stated that it found 2,425 violations of federal and state safety rules. The Company also had to return over $600 million it collected from customers for pipeline improvements that were never made or mismanaged, bringing the total paid to over $2.2 billion. This amount is in addition to the millions that PG&E paid to the San Bruno accident victims and the city itself. In 2016, a federal jury found PG&E guilty of misleading investigators in the San Bruno explosion and of five counts of pipeline safety violations, including failing to gather information to evaluate potential gas line threats and deliberately not classifying a gas line as a high risk.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

60. A substantial cause of the explosion was the inverted incentive system that certain of the Individual Defendants oversaw prior to the San Bruno explosion. In particular, in order to keep costs down and profits up, the Company had a program that provided financial incentives to employees to not report or fix gas leaks.

61. In a 2011, another PG&E gas pipe broke and caused an explosion in Cupertino, California. This pipe was a plastic pipe that was made in the early 1970s. Thirteen years before the explosion, in 1998, the National Transportation Safety Board recommend that utilities monitor these types of pipes and replace them when at risk.

62. In 2014, another gas line leaked and then exploded, this time in Carmel-By-The-Sea, California. In connection with the investigation into the incident, the CPUC found that the Company failed to comply with record keeping practices. The CPUC fined PG&E $26.5 million

due to these record keeping practices and another $10.8 million for its emergency response practices following the gas leak and explosion.

63. In 2015, CPUC found the Company responsible for starting the Butte Fire in Amador County because of the Company's failure to maintain its power lines. The Butte Fire was ignited when a Gray Pine tree came into contact with one of PG&E's power lines. The fire lasted for twenty-two days, killed two people, destroyed 549 homes and burned 70,868 acres.

64. The Individual Defendants' unexcused pattern of inattention was on full display with the Butte Fire. The Company's Risk and Compliance Committee chose to not confirm that properly qualified and trained inspectors were being used by its contractors to identify hazard trees. PG&E also did not verify that its quality assurance audits were properly conducted. The Company's Vegetation Management managers directed its contractor to hire inspectors that they knew did not meet the minimum qualifications required PG&E itself. These managing agents then chose to not train inspectors on the Company's hazardous tree rating system ("HTRS"), verify that its contractor trained inspectors on the HTRS, or require inspectors to use HTRS. Finally, while PG&E conducts annual quality assurance audits that identify a select number of hazardous trees from a small sample, the Company did not look for additional dangerous trees despite knowing that its statistical sample warned of the likelihood that thousands more hazardous trees existed in the larger population.

65. The system the Individual Defendants set up, or was responsible for also setting up, rewarded employees and contractors for cutting corners instead of ensuring safety. In particular, before the Butte Fire, the Company provided a monetary incentive to its contractors to cut fewer trees, even though the Company was required to remove dangerous trees and reduce the risk of wildfire.

66. The CPUC fined the Company $8.3 million because it failed to maintain a minimum distance between power lines and vegetation and "fail[ed] to maintain its 12kV overhead conductors safely and properly." The California Department of Forestry and Fire Protection ("Cal Fire") also billed the Company $90 million to cover its firefighting costs.

67. In the Company's Annual Report on Form 10-K for the year ended December 31, 2016 filed with the U.S. Securities and Exchange Commission ("SEC") on February 16, 2017 (the "2016 Form 10-K"), the Company acknowledged Cal Fire's conclusion that the Company was responsible for the Butte Fire and planned to recover the firefighting costs from the Utility. The 2016 Form 10-K stated that it is "probable" that it will "incur a loss of at least $750 million" from the Butte Fire. The 2016 Form 10-K was signed by defendants Earley, G. Williams, Stavropoulos, Chew, Fowler, Herringer, Kelly, Kimmel, Meserve, Miller, Mullins, Parra, Rambo, Smith, and B. Williams.

### The Company Works to Delay Regulations that Would Increase Safety

68. In 2007, toppled electrical lines caused massive fires in the San Diego County area. As a result, lawmakers and regulators pushed for utilities to map out the location of at-risk electrical lines. PG&E, and other utilities, repeatedly asked to slow down

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

the effort and argued as recently as July 2017 that the mapping requirements and additional safety regulations would add "unnecessary costs to construction and maintenance projects in rural areas."

69. Amazingly, PG&E and other utilities actually used the mapping project, which was supposed to address safety concerns, to argue against the imposition of stricter construction standards, according to a 2015 Senate subcommittee report. The report found that PG&E and other utilities refused to agree to stricter construction standards until the final maps were completed. "Parties should avoid additional extensions of the schedule if at all possible," administrative law judge Timothy Kenney wrote in May 2015, after the fourth consecutive time extension request by CPUC and Cal Fire staff. Three days later, California launched a new mapping effort, with the Company and two other utilities paying $500,000 for the revived project which was supposed to take eighteen months.

70. In September 2015, California State Senator Jerry Hill noticed that the footprint of the Butte Fire (discussed above) fell outside the fire danger areas on the old interim fire maps. "It showed the work was substandard, inadequate and, in my opinion, useless," he said. Senator Hill called a special hearing after the Butte Fire to address the delays in the CPUC's mapping project. In 2016, Senator Hill pushed through Senate Bill 1028, which required utilities to file wildfire mitigation plans and charged the CPUC with reviewing them. A pair of administrative judges tried to move things along, but defendants continued to pick away at regulations and map criteria.

71. In October 2016, the Individual Defendants caused PG&E to complain to a judge that the CPUC's plans to complete the map by March 2017 were "too aggressive."

72. After a March 31, 2017 deadline passed, PG&E complained that the intention to highlight vulnerable power infrastructure on the final map "could present public safety and security issues."

73. In July 2017, the Individual Defendants caused PG&E to fight a number of regulatory proposals. For instance, the Individual Defendants caused the Company to state it did not want to have to comply with any new wildfire regulations within a proposed six-month deadline (and instead preferred a year). Further, in July 2017, the Company (under the Individual Defendants' direction and on their watch) called a proposed regulation to increase the wind speed that power poles must sustain "arbitrary."

74. On October 6, 2017 (two days before the start of the fires), two administrative law judges assigned to oversee the project granted yet another delay at the request of PG&E (under the Individual Defendants' direction and on their watch) and other utilities.

**The Wine Country Fires**

75. Beginning on or about October 8, 2017, fires began burning across the state of California, breaking out throughout Napa, Lake, Sonoma, Mendocino, Butte, and Solano Counties. Seventeen separate wildfires were reported at the time, which included the Tubbs Fire (which grew to become the most destructive wildfire in the history of California), the Atlas Fire, Nuns Fire, and others. The *Bay Area News Group* revealed that within the first ninety minutes of the fires in Sonoma and Napa Counties, firefighters received reports of at least ten blown transformers or downed power lines at the same time they were called out to battle nineteen structure and vegetation fires.

76. On October 8, 2017, in connection with the beginning of the fires, heavy winds downed powerlines in the affected area. Two days later, the Bay Area News Group reported that Sonoma County emergency dispatchers sent fire crews to at least ten reports of downed power lines and exploding transformers as the North Bay fires were starting around 9:22 p.m. In response, the Individual Defendants caused PG&E to state that "hurricane strength winds in excess of 75 mph in some cases" had damaged the Company's equipment, but said it was too early to speculate about what started the fires.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

77. However, local weather station records indicate that wind speeds were only about half that level as the lines started to come down. It has been reported that at a weather station in north Santa Rosa where the Tubbs Fire started, the peak wind gusts at 9:29 p.m. hit 30 mph, and were 41 mph one hour later. Similarly, it has been reported that at another weather station east of the city of Napa, on Atlas Peak, where the Atlas Fire started, wind gusts at 9:29 p.m. peaked at 32 mph, and were 30 mph one hour later. Both speeds were substantially under the 56 mph wind speed that power lines must be able to withstand under California State law. According to the National Weather Service, the "hurricane strength winds" that the Individual Defendants caused the Company to reference were not "hurricane strength." [1]

78. Shortly after the fires commenced on October 8 and 9, 2017, they rapidly grew to become extensive, full-scale incidents spanning from 1,000 acres to over 20,000 acres each within a single day.

79. On October 12, 2017, the CPUC's Safety and Enforcement Division sent PG&E a letter requiring it to "preserve all evidence" from the fires in Napa, Sonoma, and Solano Counties, including "all failed poles, conductors and associated equipment from each fire event" and "all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree trimming."

80. On October 13, 2017, defendants revealed that Company became the subject of an investigation by the Cal Fire, and indicated that the probe includes "the possible role of power lines and other facilities."

81. By October 14, 2017, the fires had burned more than 210,000 acres while forcing 90,000 people to evacuate from their homes and burning an estimated 8,900 structures. The fires are responsible for the deaths of at least forty-three people and the hospitalization at least 185, making the week of October 8, 2017, the deadliest week of wildfires in California's history. Collectively, this event constitutes the largest loss of life due to wildfires in the United States since the 1918 Cloquet Fire, in northern Minnesota.

82. Subsequently, investigators began to examine whether the Company's power line failures were a possible cause of the historic fires. Defendants caused PG&E officials to issue no response to specific questions about the wind speeds and whether Company power lines were in compliance with state safety laws.

83. Upon information and belief, at least some of the fires were caused by the Company's operation of its overhead power conductors (occurring under the Individual Defendants' direction and on their watch). Upon further information and belief, at least some of the fires were caused by one or more of the following occurrences: (i) a tree or other vegetation that had been improperly maintained by the Company (under the Individual Defendants' direction and on their watch) struck an overhead power line owned by the Company; (ii) conductors that had been improperly maintained, operated, and/or designed by the Company (under the Individual Defendants' direction and on their watch) came into contact with each other; and/or (iii) the Company (under the Individual Defendants' direction and on their watch) failed to properly maintain, inspect, and/or operate its equipment. For instance, PG&E records show that two separate broken power poles were reported along Highway 12, north of Glen Ellen, California. That is the same general area where Cal Fire stated was the origin of the Nuns Fire.

84. The full extent of defendants' illicit conduct may have yet to fully emerge. Nonetheless, upon information and belief, a partial list of defendants' misconduct, all of which relate to core operations of the Company, includes the following:
● failure to conduct reasonably prompt, proper, and frequent inspections of electrical transmission lines, wires, and associated equipment;

● failure to design, construct, maintain, and monitor high voltage transmission and distribution lines in a manner that avoids igniting fires in dry conditions by allowing the lines to withstand foreseeable conditions to avoid igniting fires;

● failure to design, construct, operate, and maintain, high voltage transmission and distribution lines and equipment to withstand foreseeable conditions to avoid igniting fires;

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

● failure to maintain and monitor high voltage transmission and distribution lines in fire prone areas to avoid igniting and spreading fires;

● failure to install the necessary equipment and/or inspect and repair said equipment to prevent electrical transmission and distribution lines from improperly operating, sagging, or making contact with other metal wires placed on its poles igniting fires;

● failure to keep the equipment in a safe condition at all times to avoid fires;

● failure to inspect fixtures vegetation within proximity to energized transmission and distribution lines;

● failure to de-energize power lines during fire prone conditions;

● failure to de-energize power lines after the fire's ignition;

● failure to properly train and supervise employees and agents responsible for inspection and maintenance of the distribution lines;

● failure to implement and follow regulations and reasonably prudent practices to avoid igniting a fire; and

● failure to properly monitor, investigate, and/or maintain vegetation sufficient to mitigate the risk of fire.

85. The Individual Defendants' actions show their reckless disregard for and unexcused pattern of inattention to abiding by their fiduciary duties. As explained above, they knew that the Company's infrastructure was again, was a significant safety risk, had a history of endangering life and property, and yet still caused or allowed the Company to place profits over safety.

86. Notably, when the revelations about the Individual Defendants' conduct began to come to light, the Company's share price fell. For example, after closing at $69.15 per share on October 11, 2017, and then falling to a close of $64.50 per share on October 12, 2017, the Company's stock fell sharply to close at $57.72 per share on October 13, 2017. The share price has not recovered. As reported by The Mercury News on October 17, 2017:
...PG&E's stock continued to plunge Monday, with state regulators now conducting a preliminary review of the utility's possible role in the Wine Country firestorms — a potential prelude to a full-scale investigation.

The San Francisco-based utility's shares had plunged nearly 13 percent in early morning trading, but some buying activity later left the stock with a 7.4 percent loss and a closing price of $53.43.

As of Monday's closing price, PG&E's stock has shed 22.4 percent of its value during the trading days following the outbreak of the deadly wildfires, which have scorched a wide swath of rural and urban stretches in multiple North Bay counties.

87. On November 2, 2017, as a result of the fires and the potential liability related thereto, defendants caused the Company to trim its 2017 forecast for generally accepted accounting principles ("GAAP") earnings per share from a range of $3.54 to $3.79 to a range of $3.36 to $3.56.

### Defendants' False and Misleading Statements

88. In the Company's filings with the SEC, defendants caused the Company to state that an occurrence such as the fires was possible. Defendants spoke of such "risks" in the 2016 Form 10-K. What defendants failed to disclose in the 2016 Form 10-K

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1108 of 1229

and elsewhere was that due to their deliberate actions and scheme to specifically skirt and halt safety regulations (as set forth above), such a catastrophe was not merely possible, but highly likely and imminent.

89. In addition, the 2016 Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendant Earley, which set forth:

I, Anthony F. Earley, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2016 of PG&E Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) ) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

In connection with the accompanying Annual Report on Form 10-K of PG&E Corporation for the year ended December 31, 2016 ("Form 10-K"), I, Anthony F. Earley, Jr., Chairman, Chief Executive Officer and President of PG&E Corporation, hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge and belief, that:

(1) the Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of PG&E Corporation.

90. In addition, the 2016 Form 10-K contained SOX Certifications signed by defendant G. Williams in her role as President of the Utility, which were substantially similar to those set forth above.

## DAMAGES TO PG&E

91. As a result of the Individual Defendants' improprieties, PG&E has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:
(a) costs incurred from defending and paying any settlement or judgment in the pending actions for damages caused by the Wine Country Fires;

(b) costs incurred from defending and paying any settlement and judgment in the governmental investigation; and

(c) costs incurred from compensation and benefits paid to the defendants who have breached their duties to PG&E.

## DERIVATIVE AND DEMAND ALLEGATIONS

92. Plaintiff brings this action derivatively in the right and for the benefit PG&E to redress the breaches of fiduciary duty and other violations of law by defendants.

93. Plaintiff will adequately and fairly represent the interests of PG&E and its stockholders in enforcing and prosecuting its rights.

94. The Board currently consists of the following thirteen (13) directors: defendants G. Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, and Smith. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons that follow.

95. Defendants G. Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, and Smith, consisting of the entire Board, served as directors of the Company during at least a substantial part of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein. The actions regarding the Company's operations with respect to (among other things) safety and maintenance of its power lines and related equipment (as set forth herein) that defendants G. Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, and Smith caused or allowed to occur continuously and repeatedly were an integral aspect of the Company's core operations. It was these very actions and statements caused or allowed by defendants G. Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, and Smith that caused the Company to suffer the severe harm (financial, reputational, and other), as set forth herein. This was in violation of (among other things) these defendants' fiduciary duties, as well as the Employee Code and Director Code. Defendants G. Williams, Chew, Earley, Fowler,

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, and Smith unexcused pattern of inattention to their fiduciary duty to ensure the Company was acting appropriately to maintain its infrastructure, leaving them perennially under-maintained, exposing PG&E, its customers, and others in the community to increased risk. Thus, defendants G. Williams, Chew, Earley, Fowler, Johnson, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, and Smith (the entire Board) each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering a demand upon them futile.

96. Significantly, PG&E's unique history of disregard for the safety and property of its customers, the repeated attempts to slow or halt the implementation of new safety measures, and the resulting numerous catastrophic incidents (as described herein), demonstrates constructive knowledge by the Board of these issues. In this case, the Board was made specifically aware by the CPUC (and other entities) of the Company's actions with respect to (among other things) the Butte Fire and San Bruno gas line explosion. In addition, the Company's Chief Ethics and Compliance Officer and Chief Safety Officer regularly attended Board meetings, providing the members of the Board with continued updates on the Company's repeated safety failures. The Board's decision to continue to not follow proper safety and maintenance procedures and requirements (as set forth herein), and to instead knowingly cause PG&E to violate these requirements, and to hamstring efforts to impose and enforce new safety measures as an intentional business strategy, cannot be

regarded as a valid exercise of business judgment.

97. Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee within the Company. Rather, as alleged herein, serious safety violations occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated safety and maintenance violations as the Company's deliberate business strategy. There is no legitimate "business judgment" involved in devising or carrying out such an illicit policy. Rather, the Board's actions show that its members engaged in an unexcused pattern of inattention and inaction which amounts to an abdication of their duty to the corporation. Accordingly, demand on the Board is futile and excused.

98. During the relevant period, defendants Chew, Johnson, Kimmel, Meserve, and Smith served as members of the Compliance and Public Policy Committee. Pursuant to the Compliance and Public Policy Committee Charter, the members of the Compliance and Public Policy Committee were and are responsible for, inter alia, reviewing periodic reports from management with respect to the Company's compliance with laws, regulations, and internal policies and standards. Defendants Chew, Johnson, Kimmel, Meserve, and Smith breached their fiduciary duties of due care, loyalty, and good faith, because the Compliance and Public Policy Committee, inter alia, allowed or permitted the Company to aggressively stall efforts by regulators to prevent the very occurrences described herein, thus causing or allowing the illicit activity described herein. Therefore, defendants Chew, Johnson, Kimmel, Meserve, and Smith face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

99. During the relevant period, defendants Fowler, Johnson, Kelly, Meserve, Mullins, Parra, and Smith served as members of the Safety and Nuclear Oversight Committee. Pursuant to the Safety and Nuclear Oversight Committee Charter, the members of the Safety and Nuclear Oversight Committee were and are responsible for, inter alia, reviewing with management the principal risks related to or arising out of PG&E's operations and facilities, assessing the effectiveness of PG&E's programs to manage or mitigate such risks, and reviewing and discussing how PG&E can continue to improve its safety practices and operational performance. Defendants Fowler, Johnson, Kelly, Meserve, Mullins, Parra, and Smith breached their fiduciary duties of due care, loyalty, and good faith, because the Safety and Nuclear Oversight Committee, inter alia, allowed or permitted the Company to continue to engage in the behavior described above which specifically ensured that the Company's power lines and facilities were being run in an unsafe manner, thus causing or allowing the illicit activity described herein. Therefore, defendants Fowler, Johnson, Kelly, Meserve, Mullins, Parra, and Smith face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

100. During the relevant period, defendants Chew, Kelly, and Mullins served as members of the Audit Committee. Pursuant to the Audit Committee Charter, the members of the Audit Committee were and are responsible for, inter alia, reviewing

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, reviewing legal and regulatory matters that may have a material impact on the financial statements, and discussing with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards. Defendants Chew, Kelly, and Mullins breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein. Therefore, defendants Chew, Kelly, and Mullins face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

101. The principal professional occupation of defendant G. Williams is her employment with PG&E as its President and Chief Executive Officer, pursuant to which she receives substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement which defendants caused to be filed with the SEC and disseminated to stockholders on April 18, 2017 (the "2017 Proxy"), defendants have admitted that defendant G. Williams is not independent. Thus, defendant G. Williams lacks independence from demonstrably interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action.

102. The principal professional occupation of defendant Earley from September 2011 until February 2017 was his employment with PG&E as its President and Chief Executive Officer, pursuant to which he received substantial monetary compensation and other benefits. In addition, according to the 2017 Proxy, defendants have admitted that defendant Earley is not independent. Thus, defendant Earley lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

103. True and correct copies of this Complaint were delivered to PG&E and Utility prior to being filed with this Court.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants and Does 1-25 for Breach of Fiduciary Duties

104. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105. As alleged in detail herein, each of the Individual Defendants and Does 1-25 (and particularly defendants Chew, Kelly, and Mullins as Audit Committee members) had a duty to ensure that PG&E disseminated accurate, truthful, and complete information to its stockholders.

106. The Individual Defendants and Does 1-25 violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to PG&E stockholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

107. As alleged herein, each of the Individual Defendants and Does 1-25 had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

108. The Individual Defendants and Does 1-25 willfully ignored the obvious and pervasive problems with PG&E's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

109. The Individual Defendants' and Does 1-25's misconduct alleged herein constituted an abuse of their ability to control and influence PG&E, for which they are legally responsible. In particular, the Individual Defendants and Does 1-25 abused their

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

positions of authority by causing or allowing PG&E to embark upon a scheme to avoid safety regulations and fail to perform proper maintenance of the Company's power lines and equipment. Among other things, the Individual Defendants and Does 1-25 failed to implement and follow regulations and reasonably prudent practices, resulting in the damages set forth herein.

110. The Individual Defendants and Does 1-25 had a duty to PG&E and its stockholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosure controls of PG&E.

111. The Individual Defendants and Does 1-25, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of PG&E in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants and Does 1-25 breached their duties of due care, diligence, and candor in the management and administration of PG&E's affairs and in the use and preservation of PG&E's assets.

112. During the course of the discharge of their duties, the Individual Defendants and Does 1-25 knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants and Does 1-25 caused PG&E to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to PG&E, thus breaching their duties to the Company. As a result, the Individual Defendants and Does 1-25 grossly mismanaged PG&E.

113. As a direct and proximate result of the Individual Defendants' and Does 1-25's foregoing breaches of fiduciary duties, the Company has sustained damages.

114. As a result of the misconduct alleged herein, the Individual Defendants and Does 1-25 are liable to the Company.

115. Plaintiff, on behalf of PG&E, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants and Does 1-25 for Unjust Enrichment

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117. By their wrongful acts and omissions, the Individual Defendants and Does 1-25 were unjustly enriched at the expense of and to the detriment of PG&E in the form of salaries, bonuses, and other forms of compensation (including, but not limited to, the Company's short-term incentive plan structure of compensation for executives, which included safety as one of its components).

118. Plaintiff, as a stockholder and representative of PG&E, seeks restitution from these defendants and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:
A. Against the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Directing PG&E to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

24

a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C. Awarding to PG&E restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

D. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: November 20, 2017

ROBBINS ARROYO LLP

BRIAN J. ROBBINS

GEORGE C. AGUILAR

LINDSEY C. HERZIK

BRIAN J. ROBBINS

600 B Street, Suite 1900

San Diego, CA 92101

Telephone: (619) 525-3990

Facsimile: (619) 525-3991

E-mail: brobbins@robbinsarroyo.com

gaguilar@robbinsarroyo.com

lherzik@robbinsarroyo.com

Attorneys for Plaintiff

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 20, 2017

ROBBINS ARROYO LLP

BRIAN J. ROBBINS

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

GEORGE C. AGUILAR

LINDSEY C. HERZIK

BRIAN J. ROBBINS

600 B Street, Suite 1900

San Diego, CA 92101

Telephone: (619) 525-3990

Facsimile: (619) 525-3991

E-mail: brobbins@robbinsarroyo.com

gaguilar@robbinsarroyo.com

lherzik@robbinsarroyo.com

Attorneys for Plaintiff

### Footnotes

1     To qualify as "hurricane strength," winds must be sustained (i.e., lasting for more than one minute) at a minimum 74 mph. Such winds are the speeds in a Category 1 hurricane.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.    26

# Exhibit 103



| Date | | | | | | |
|---|---|---|---|---|---|---|
| Oct 17, 2018 | 48.70 | 49.11 | 48.48 | 48.96 | 48.96 | 4,522,100 |
| Oct 16, 2018 | 47.82 | 48.94 | 47.54 | 48.79 | 48.79 | 6,036,600 |
| Oct 15, 2018 | 47.31 | 48.19 | 47.14 | 47.84 | 47.84 | 4,434,300 |
| Oct 12, 2018 | 46.77 | 47.39 | 46.45 | 47.27 | 47.27 | 3,985,600 |
| Oct 11, 2018 | 47.80 | 47.92 | 46.52 | 46.62 | 46.62 | 5,867,000 |
| Oct 10, 2018 | 48.18 | 48.62 | 47.59 | 47.65 | 47.65 | 4,019,500 |
| Oct 09, 2018 | 48.04 | 48.85 | 47.83 | 48.55 | 48.55 | 6,681,900 |
| Oct 08, 2018 | 48.24 | 48.24 | 47.66 | 47.92 | 47.92 | 4,573,500 |
| Oct 05, 2018 | 47.19 | 48.21 | 47.14 | 47.95 | 47.95 | 6,327,400 |
| Oct 04, 2018 | 47.00 | 47.20 | 46.26 | 46.99 | 46.99 | 3,353,700 |
| Oct 03, 2018 | 47.49 | 47.79 | 46.88 | 47.20 | 47.20 | 5,015,900 |
| Oct 02, 2018 | 46.23 | 47.54 | 46.02 | 47.42 | 47.42 | 4,832,900 |
| Oct 01, 2018 | 46.11 | 46.12 | 45.27 | 45.87 | 45.87 | 5,876,900 |
| Sep 28, 2018 | 45.43 | 46.09 | 45.05 | 46.01 | 46.01 | 4,941,600 |
| Sep 27, 2018 | 45.31 | 45.63 | 44.89 | 45.27 | 45.27 | 4,966,500 |
| Sep 26, 2018 | 45.44 | 45.69 | 45.08 | 45.16 | 45.16 | 5,473,400 |
| Sep 25, 2018 | 46.23 | 46.33 | 45.70 | 45.84 | 45.84 | 4,808,700 |
| Sep 24, 2018 | 46.70 | 46.90 | 46.12 | 46.28 | 46.28 | 4,420,300 |
| Sep 21, 2018 | 46.81 | 48.36 | 46.65 | 46.79 | 46.79 | 8,661,700 |
| Sep 20, 2018 | 46.86 | 47.00 | 46.50 | 46.92 | 46.92 | 3,883,400 |
| Sep 19, 2018 | 47.07 | 47.20 | 46.44 | 46.71 | 46.71 | 5,866,600 |
| Sep 18, 2018 | 46.87 | 47.22 | 46.72 | 47.20 | 47.20 | 3,239,200 |
| Sep 17, 2018 | 46.98 | 47.27 | 46.66 | 46.82 | 46.82 | 3,551,200 |
| Sep 14, 2018 | 46.71 | 47.10 | 46.21 | 46.97 | 46.97 | 8,436,100 |
| Sep 13, 2018 | 46.03 | 46.63 | 45.71 | 46.52 | 46.52 | 3,925,700 |
| Sep 12, 2018 | 46.13 | 46.54 | 45.79 | 45.91 | 45.91 | 9,258,600 |
| Sep 11, 2018 | 46.00 | 46.36 | 45.79 | 46.29 | 46.29 | 4,521,400 |
| Sep 10, 2018 | 45.79 | 46.46 | 45.59 | 46.25 | 46.25 | 3,032,400 |
| Sep 07, 2018 | 45.07 | 45.91 | 45.04 | 45.78 | 45.78 | 6,104,200 |
| Sep 06, 2018 | 47.17 | 47.19 | 45.09 | 45.53 | 45.53 | 13,180,100 |
| Sep 05, 2018 | 46.74 | 47.20 | 46.41 | 47.00 | 47.00 | 4,501,000 |
| Sep 04, 2018 | 48.21 | 48.69 | 46.91 | 47.01 | 47.01 | 11,538,200 |
| Aug 31, 2018 | 47.08 | 47.47 | 45.50 | 46.18 | 46.18 | 9,362,500 |
| Aug 30, 2018 | 47.07 | 48.09 | 46.59 | 47.02 | 47.02 | 9,025,100 |
| Aug 29, 2018 | 46.64 | 47.47 | 45.89 | 46.90 | 46.90 | 16,275,600 |
| Aug 28, 2018 | 44.09 | 46.11 | 43.71 | 45.67 | 45.67 | 10,426,900 |
| Aug 27, 2018 | 43.75 | 43.89 | 43.09 | 43.61 | 43.61 | 6,510,500 |
| Aug 24, 2018 | 44.03 | 44.10 | 42.35 | 42.81 | 42.81 | 8,611,000 |
| Aug 23, 2018 | 44.58 | 44.80 | 43.86 | 43.96 | 43.96 | 6,127,700 |
| Aug 22, 2018 | 44.79 | 45.37 | 44.24 | 44.60 | 44.60 | 7,061,600 |
| Aug 21, 2018 | 44.93 | 45.46 | 44.52 | 44.70 | 44.70 | 5,830,100 |
| Aug 20, 2018 | 45.00 | 45.71 | 43.43 | 44.78 | 44.78 | 10,916,300 |
| Aug 17, 2018 | 44.65 | 45.87 | 44.29 | 45.25 | 45.25 | 8,389,900 |
| Aug 16, 2018 | 43.73 | 44.86 | 43.52 | 44.79 | 44.79 | 5,910,200 |
| Aug 15, 2018 | 43.05 | 44.01 | 42.87 | 43.47 | 43.47 | 5,550,400 |
| Aug 14, 2018 | 42.70 | 43.24 | 42.69 | 42.84 | 42.84 | 5,378,800 |
| Aug 13, 2018 | 42.61 | 42.84 | 42.36 | 42.79 | 42.79 | 7,920,300 |
| Aug 10, 2018 | 43.72 | 43.74 | 42.59 | 42.67 | 42.67 | 7,867,800 |
| Aug 09, 2018 | 43.95 | 44.06 | 43.39 | 43.90 | 43.90 | 3,435,900 |
| Aug 08, 2018 | 43.52 | 44.33 | 43.25 | 44.09 | 44.09 | 3,931,500 |
| Aug 07, 2018 | 44.62 | 44.81 | 43.48 | 43.66 | 43.66 | 5,436,000 |
| Aug 06, 2018 | 43.63 | 44.01 | 43.35 | 44.58 | 44.58 | 5,114,600 |
| Aug 03, 2018 | 42.32 | 43.13 | 42.16 | 42.96 | 42.96 | 2,488,500 |
| Aug 02, 2018 | 42.53 | 42.99 | 42.26 | 42.31 | 42.31 | 3,150,900 |



988 SUICIDE & CRISIS LIFELINE

If you're feeling overwhelmed by anxiety, depression, grief, or thoughts of suicide,

CALL, TEXT, OR CHAT

988

FOR SUPPORT 24/7

LEARN MORE →



OMNI
HOTELS & RESORTS

Save up to 20%

Dining Credit & More

Plan Your Holiday

| Symbol | Last Price | Change | % Change |
|---|---|---|---|
| EIX — Edison International | 67.94 | +0.49 | +0.73% |
| PEG — Public Service Enterprise Group Incorpora... | 62.84 | +0.27 | +0.43% |
| SRE — Sempra | 73.66 | +1.28 | +1.77% |
| FE — FirstEnergy Corp. | 37.42 | +0.33 | +0.90% |
| AEP — American Electric Power Company, Inc. | 80.14 | +0.50 | +0.63% |

**Similar to PCG**

| Symbol | Last Price | Change | % Change |
|---|---|---|---|
| EIX — Edison International | 67.94 | +0.49 | +0.73% |
| HE — Hawaiian Electric Industries, Inc. | 13.27 | +0.05 | +0.34% |
| D — Dominion Energy, Inc. | 47.63 | +0.14 | +0.31% |
| AEP — American Electric Power Company, Inc. | 80.14 | +0.50 | +0.63% |
| ETR — Entergy Corporation | 101.83 | -0.18 | -0.18% |

Data Disclaimer   Help   Suggestions
Terms and Privacy Policy
Your Privacy Choices
About Our Ads   Sitemap
© 2023 Yahoo. All rights reserved.

| Date | | | | | |
|---|---|---|---|---|---|
| Aug 08, 2018 | 43.52 | 44.33 | 43.25 | 44.09 | 44.09 | 3,931,500 |
| Aug 07, 2018 | 44.62 | 44.81 | 43.48 | 43.66 | 43.66 | 5,436,000 |
| Aug 06, 2018 | 43.63 | 44.91 | 43.35 | 44.58 | 44.58 | 5,114,600 |
| Aug 03, 2018 | 42.32 | 43.13 | 42.16 | 42.96 | 42.96 | 2,488,500 |
| Aug 02, 2018 | 42.53 | 42.99 | 42.26 | 42.31 | 42.31 | 3,150,900 |
| Aug 01, 2018 | 41.86 | 43.03 | 41.42 | 42.51 | 42.51 | 6,080,700 |
| Jul 31, 2018 | 43.50 | 43.70 | 42.89 | 43.08 | 43.08 | 3,413,000 |
| Jul 30, 2018 | 43.39 | 43.52 | 42.68 | 43.22 | 43.22 | 3,664,300 |
| Jul 27, 2018 | 44.45 | 44.80 | 43.24 | 43.48 | 43.48 | 4,530,500 |
| Jul 26, 2018 | 43.42 | 45.19 | 42.73 | 44.70 | 44.70 | 8,280,100 |
| Jul 25, 2018 | 42.44 | 43.59 | 41.98 | 42.99 | 42.99 | 7,594,300 |
| Jul 24, 2018 | 41.41 | 43.23 | 40.57 | 42.49 | 42.49 | 10,716,900 |
| Jul 23, 2018 | 41.45 | 41.84 | 41.36 | 41.53 | 41.53 | 3,493,500 |
| Jul 20, 2018 | 42.26 | 42.26 | 41.33 | 41.44 | 41.44 | 5,348,000 |
| Jul 19, 2018 | 42.39 | 42.74 | 42.11 | 42.26 | 42.26 | 5,637,200 |
| Jul 18, 2018 | 42.57 | 42.64 | 41.97 | 42.14 | 42.14 | 4,496,500 |
| Jul 17, 2018 | 43.04 | 43.32 | 42.49 | 42.57 | 42.57 | 4,847,600 |
| Jul 16, 2018 | 43.42 | 43.42 | 43.01 | 43.04 | 43.04 | 5,389,500 |
| Jul 13, 2018 | 43.74 | 43.79 | 43.20 | 43.27 | 43.27 | 3,475,100 |
| Jul 12, 2018 | 43.81 | 43.81 | 43.51 | 43.66 | 43.66 | 4,189,500 |
| Jul 11, 2018 | 43.50 | 43.91 | 43.26 | 43.65 | 43.65 | 5,722,100 |
| Jul 10, 2018 | 44.97 | 45.01 | 43.64 | 43.72 | 43.72 | 8,459,400 |
| Jul 09, 2018 | 44.91 | 45.32 | 44.54 | 45.09 | 45.09 | 6,238,300 |
| Jul 06, 2018 | 44.19 | 46.48 | 44.12 | 45.03 | 45.03 | 5,933,500 |
| Jul 05, 2018 | 43.90 | 44.20 | 43.56 | 44.18 | 44.18 | 3,709,900 |
| Jul 03, 2018 | 43.70 | 44.38 | 43.51 | 43.97 | 43.97 | 3,156,900 |
| Jul 02, 2018 | 42.71 | 43.81 | 42.44 | 43.74 | 43.74 | 5,198,200 |
| Jun 29, 2018 | 42.71 | 42.95 | 42.30 | 42.56 | 42.56 | 4,030,400 |
| Jun 28, 2018 | 42.49 | 42.94 | 42.13 | 42.71 | 42.71 | 3,426,100 |
| Jun 27, 2018 | 42.60 | 42.84 | 42.37 | 42.47 | 42.47 | 4,346,900 |
| Jun 26, 2018 | 42.27 | 43.07 | 42.10 | 42.62 | 42.62 | 7,854,500 |
| Jun 25, 2018 | 42.80 | 42.98 | 41.65 | 42.29 | 42.29 | 5,771,900 |
| Jun 22, 2018 | 40.44 | 43.03 | 40.44 | 42.92 | 42.92 | 16,113,700 |
| Jun 21, 2018 | 40.05 | 41.08 | 39.77 | 40.53 | 40.53 | 6,337,700 |
| Jun 20, 2018 | 40.14 | 40.84 | 39.93 | 40.00 | 40.00 | 4,931,700 |
| Jun 19, 2018 | 39.95 | 40.34 | 39.52 | 39.89 | 39.89 | 7,105,200 |
| Jun 18, 2018 | 39.36 | 40.14 | 39.24 | 39.79 | 39.79 | 6,823,800 |
| Jun 15, 2018 | 39.93 | 41.03 | 39.26 | 40.20 | 40.20 | 10,227,200 |
| Jun 14, 2018 | 39.67 | 40.23 | 39.55 | 39.89 | 39.89 | 6,159,800 |
| Jun 13, 2018 | 39.35 | 39.97 | 39.17 | 39.38 | 39.38 | 7,696,900 |
| Jun 12, 2018 | 39.82 | 40.19 | 39.24 | 39.29 | 39.29 | 8,442,200 |
| Jun 11, 2018 | 38.38 | 40.05 | 38.01 | 39.76 | 39.76 | 12,657,900 |
| Jun 08, 2018 | 41.75 | 41.81 | 41.28 | 41.45 | 41.45 | 2,671,900 |
| Jun 07, 2018 | 41.22 | 42.20 | 41.22 | 41.67 | 41.67 | 3,321,700 |
| Jun 06, 2018 | 42.05 | 42.23 | 41.06 | 41.15 | 41.15 | 4,112,000 |
| Jun 05, 2018 | 41.98 | 42.30 | 41.63 | 41.98 | 41.98 | 2,656,600 |
| Jun 04, 2018 | 42.40 | 42.89 | 41.90 | 42.00 | 42.00 | 3,477,100 |
| Jun 01, 2018 | 43.33 | 43.33 | 41.89 | 42.27 | 42.27 | 3,578,500 |
| May 31, 2018 | 43.14 | 43.79 | 42.79 | 43.33 | 43.33 | 5,331,400 |
| May 30, 2018 | 42.27 | 43.22 | 41.94 | 43.09 | 43.09 | 5,484,100 |
| May 29, 2018 | 43.45 | 43.86 | 42.33 | 42.34 | 42.34 | 5,754,400 |
| May 25, 2018 | 43.92 | 44.96 | 43.71 | 44.66 | 44.66 | 2,925,800 |
| May 24, 2018 | 43.91 | 45.11 | 43.84 | 43.89 | 43.89 | 2,044,700 |
| May 23, 2018 | 43.68 | 44.00 | 43.29 | 43.85 | 43.85 | 3,212,800 |

Data Disclaimer  Help  Suggestions
Terms and Privacy Policy
Your Privacy Choices
CA Privacy Notice
About Our Ads  Sitemap
X  f  in
© 2023 Yahoo. All rights reserved.

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| May 30, 2018 | 42.27 | 43.22 | 41.94 | 43.09 | 43.09 | 5,484,100 |
| May 29, 2018 | 43.45 | 43.86 | 42.33 | 42.34 | 42.34 | 5,754,400 |
| May 25, 2018 | 43.92 | 44.96 | 43.71 | 44.66 | 44.66 | 2,925,800 |
| May 24, 2018 | 43.91 | 43.91 | 43.34 | 43.83 | 43.83 | 2,044,700 |
| May 23, 2018 | 43.68 | 44.00 | 43.29 | 43.85 | 43.85 | 3,212,800 |
| May 22, 2018 | 43.31 | 43.83 | 43.23 | 43.63 | 43.63 | 3,429,500 |
| May 21, 2018 | 42.84 | 43.45 | 42.62 | 43.21 | 43.21 | 4,163,500 |
| May 18, 2018 | 42.49 | 42.87 | 41.81 | 42.78 | 42.78 | 4,759,000 |
| May 17, 2018 | 42.73 | 43.18 | 42.19 | 42.22 | 42.22 | 5,178,600 |
| May 16, 2018 | 43.05 | 43.12 | 42.40 | 42.58 | 42.58 | 4,756,600 |
| May 15, 2018 | 42.97 | 43.36 | 42.77 | 42.95 | 42.95 | 2,753,200 |
| May 14, 2018 | 43.15 | 43.70 | 43.04 | 43.23 | 43.23 | 2,767,700 |
| May 11, 2018 | 43.45 | 43.71 | 42.86 | 43.32 | 43.32 | 3,947,800 |
| May 10, 2018 | 43.11 | 43.42 | 42.63 | 43.38 | 43.38 | 3,614,300 |
| May 09, 2018 | 42.93 | 43.20 | 42.35 | 42.59 | 42.59 | 3,417,200 |
| May 08, 2018 | 44.46 | 44.46 | 42.30 | 42.77 | 42.77 | 5,462,600 |
| May 07, 2018 | 44.78 | 45.08 | 44.53 | 44.62 | 44.62 | 2,451,000 |
| May 04, 2018 | 44.60 | 45.26 | 44.37 | 44.88 | 44.88 | 3,052,200 |
| May 03, 2018 | 45.48 | 45.81 | 43.75 | 44.37 | 44.37 | 5,651,600 |
| May 02, 2018 | 46.25 | 46.59 | 45.68 | 45.87 | 45.87 | 4,167,000 |
| May 01, 2018 | 46.12 | 46.58 | 45.99 | 46.27 | 46.27 | 2,885,600 |
| Apr 30, 2018 | 46.83 | 46.94 | 46.00 | 46.10 | 46.10 | 3,903,000 |
| Apr 27, 2018 | 45.68 | 47.13 | 45.66 | 46.63 | 46.63 | 2,559,200 |
| Apr 26, 2018 | 46.30 | 46.37 | 45.64 | 46.29 | 46.29 | 3,659,200 |
| Apr 25, 2018 | 46.09 | 46.47 | 45.46 | 46.34 | 46.34 | 3,931,000 |
| Apr 24, 2018 | 45.80 | 48.90 | 45.48 | 46.30 | 46.30 | 6,356,400 |
| Apr 23, 2018 | 45.80 | 45.97 | 45.24 | 45.57 | 45.57 | 3,580,200 |
| Apr 20, 2018 | 46.59 | 46.59 | 45.67 | 45.73 | 45.73 | 5,174,500 |
| Apr 19, 2018 | 46.44 | 46.83 | 46.01 | 46.50 | 46.50 | 4,296,000 |
| Apr 18, 2018 | 46.95 | 47.36 | 46.45 | 46.45 | 46.45 | 4,095,600 |
| Apr 17, 2018 | 45.77 | 47.00 | 45.70 | 46.80 | 46.80 | 7,157,600 |
| Apr 16, 2018 | 45.44 | 45.66 | 45.02 | 45.59 | 45.59 | 3,860,400 |
| Apr 13, 2018 | 44.85 | 45.63 | 44.85 | 45.34 | 45.34 | 3,448,700 |
| Apr 12, 2018 | 44.81 | 45.35 | 44.50 | 44.63 | 44.63 | 5,024,900 |
| Apr 11, 2018 | 44.14 | 44.83 | 44.14 | 44.80 | 44.80 | 3,461,300 |
| Apr 10, 2018 | 44.54 | 44.70 | 44.03 | 44.15 | 44.15 | 4,280,600 |
| Apr 09, 2018 | 44.00 | 44.84 | 43.94 | 44.43 | 44.43 | 3,292,400 |
| Apr 06, 2018 | 44.28 | 44.49 | 43.81 | 43.97 | 43.97 | 4,130,900 |
| Apr 05, 2018 | 43.55 | 44.16 | 43.13 | 44.03 | 44.03 | 2,860,900 |
| Apr 04, 2018 | 43.53 | 43.67 | 42.82 | 43.46 | 43.46 | 3,051,700 |
| Apr 03, 2018 | 43.32 | 43.86 | 42.93 | 43.68 | 43.68 | 2,344,400 |
| Apr 02, 2018 | 43.97 | 44.05 | 42.99 | 43.33 | 43.33 | 2,276,000 |
| Mar 29, 2018 | 43.30 | 44.22 | 43.22 | 43.93 | 43.93 | 3,474,600 |
| Mar 28, 2018 | 44.00 | 44.19 | 42.98 | 43.24 | 43.24 | 3,684,500 |
| Mar 27, 2018 | 43.05 | 44.24 | 42.72 | 43.94 | 43.94 | 4,292,400 |
| Mar 26, 2018 | 43.39 | 43.50 | 42.64 | 42.87 | 42.87 | 8,519,800 |
| Mar 23, 2018 | 44.17 | 44.17 | 42.94 | 43.08 | 43.08 | 3,340,300 |
| Mar 22, 2018 | 43.07 | 44.65 | 42.78 | 44.13 | 44.13 | 4,323,200 |
| Mar 21, 2018 | 43.53 | 43.60 | 42.46 | 42.96 | 42.96 | 4,469,700 |
| Mar 20, 2018 | 44.50 | 44.65 | 42.26 | 43.45 | 43.45 | 4,698,700 |
| Mar 19, 2018 | 45.05 | 45.16 | 44.26 | 44.48 | 44.48 | 3,075,600 |
| Mar 16, 2018 | 44.22 | 45.19 | 44.22 | 45.08 | 45.08 | 7,944,900 |
| Mar 15, 2018 | 44.28 | 44.27 | 44.02 | 44.66 | 44.66 | 5,513,700 |
| Mar 14, 2018 | 45.04 | 45.70 | 43.56 | 44.17 | 44.17 | 11,014,700 |
| Mar 13, 2018 | 42.63 | 45.68 | 41.97 | 45.10 | 45.10 | 12,897,400 |

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page
1120 of 1229

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Mar 19, 2018 | 45.05 | 45.16 | 44.26 | 44.48 | 44.48 | 3,075,600 |
| Mar 16, 2018 | 44.22 | 45.19 | 44.22 | 45.08 | 45.08 | 7,944,900 |
| Mar 15, 2018 | 44.22 | 44.72 | 43.84 | 44.17 | 44.17 | 5,516,000 |
| Mar 14, 2018 | 45.04 | 45.70 | 43.56 | 44.17 | 44.17 | 11,014,700 |
| Mar 13, 2018 | 42.63 | 45.68 | 41.97 | 45.10 | 45.10 | 12,897,400 |
| Mar 12, 2018 | 41.99 | 42.44 | 41.79 | 42.42 | 42.42 | 5,138,100 |
| Mar 09, 2018 | 41.66 | 42.04 | 41.56 | 42.03 | 42.03 | 3,644,100 |
| Mar 08, 2018 | 41.14 | 41.81 | 41.10 | 41.73 | 41.73 | 2,675,600 |
| Mar 07, 2018 | 42.36 | 42.61 | 41.10 | 41.12 | 41.12 | 6,288,100 |
| Mar 06, 2018 | 41.93 | 42.67 | 41.54 | 42.42 | 42.42 | 6,426,800 |
| Mar 05, 2018 | 40.72 | 42.15 | 40.22 | 41.95 | 41.95 | 5,381,600 |
| Mar 02, 2018 | 41.00 | 41.58 | 40.60 | 40.72 | 40.72 | 4,818,000 |
| Mar 01, 2018 | 41.09 | 42.52 | 41.09 | 41.26 | 41.26 | 7,259,500 |
| Feb 28, 2018 | 40.45 | 41.45 | 40.06 | 41.09 | 41.09 | 7,791,000 |
| Feb 27, 2018 | 41.13 | 41.66 | 40.23 | 40.23 | 40.23 | 5,602,700 |
| Feb 26, 2018 | 41.19 | 41.78 | 40.94 | 41.06 | 41.06 | 8,214,600 |
| Feb 23, 2018 | 40.25 | 41.19 | 40.24 | 41.14 | 41.14 | 3,304,600 |
| Feb 22, 2018 | 39.93 | 40.35 | 39.79 | 40.09 | 40.09 | 4,619,400 |
| Feb 21, 2018 | 39.98 | 40.63 | 39.77 | 39.79 | 39.79 | 6,735,000 |
| Feb 20, 2018 | 40.30 | 40.51 | 39.74 | 40.01 | 40.01 | 4,057,200 |
| Feb 16, 2018 | 40.07 | 40.56 | 39.88 | 40.40 | 40.40 | 4,106,900 |
| Feb 15, 2018 | 39.34 | 39.99 | 39.24 | 39.96 | 39.96 | 4,891,600 |
| Feb 14, 2018 | 39.48 | 39.96 | 39.05 | 39.08 | 39.08 | 4,741,400 |
| Feb 13, 2018 | 39.22 | 40.08 | 38.99 | 39.83 | 39.83 | 8,801,000 |
| Feb 12, 2018 | 38.63 | 39.59 | 38.29 | 39.34 | 39.34 | 6,050,500 |
| Feb 09, 2018 | 38.45 | 38.85 | 37.30 | 38.57 | 38.57 | 7,358,000 |
| Feb 08, 2018 | 39.36 | 39.50 | 38.23 | 38.24 | 38.24 | 6,051,700 |
| Feb 07, 2018 | 39.82 | 40.35 | 39.33 | 39.48 | 39.48 | 5,693,500 |
| Feb 06, 2018 | 40.00 | 40.09 | 38.45 | 39.86 | 39.86 | 7,861,400 |
| Feb 05, 2018 | 41.55 | 41.70 | 40.30 | 40.30 | 40.30 | 5,042,400 |
| Feb 02, 2018 | 42.10 | 42.29 | 41.18 | 41.44 | 41.44 | 5,668,500 |
| Feb 01, 2018 | 42.45 | 47.00 | 41.86 | 42.57 | 42.57 | 15,252,800 |
| Jan 31, 2018 | 42.09 | 42.55 | 41.67 | 42.43 | 42.43 | 7,153,100 |
| Jan 30, 2018 | 42.93 | 43.02 | 41.81 | 41.98 | 41.98 | 7,566,500 |
| Jan 29, 2018 | 43.27 | 43.47 | 42.95 | 42.98 | 42.98 | 2,737,700 |
| Jan 26, 2018 | 43.77 | 43.90 | 43.32 | 43.54 | 43.54 | 4,230,300 |
| Jan 25, 2018 | 43.69 | 43.91 | 43.22 | 43.49 | 43.49 | 5,662,300 |
| Jan 24, 2018 | 43.82 | 44.38 | 43.52 | 43.68 | 43.68 | 6,067,100 |
| Jan 23, 2018 | 43.85 | 44.17 | 43.75 | 43.84 | 43.84 | 4,493,200 |
| Jan 22, 2018 | 44.50 | 44.70 | 43.81 | 43.94 | 43.94 | 4,921,200 |
| Jan 19, 2018 | 44.59 | 44.78 | 44.31 | 44.39 | 44.39 | 4,337,700 |
| Jan 18, 2018 | 44.02 | 44.61 | 43.95 | 44.50 | 44.50 | 7,085,700 |
| Jan 17, 2018 | 44.12 | 44.32 | 43.94 | 44.20 | 44.20 | 4,322,100 |
| Jan 16, 2018 | 43.99 | 44.26 | 43.77 | 44.02 | 44.02 | 4,543,000 |
| Jan 12, 2018 | 43.85 | 44.06 | 43.60 | 43.82 | 43.82 | 6,279,200 |
| Jan 11, 2018 | 44.55 | 44.67 | 43.68 | 43.88 | 43.88 | 5,697,700 |
| Jan 10, 2018 | 44.49 | 44.80 | 43.94 | 44.55 | 44.55 | 6,916,500 |
| Jan 09, 2018 | 45.21 | 45.21 | 44.71 | 44.84 | 44.84 | 6,127,600 |
| Jan 08, 2018 | 44.29 | 45.29 | 44.13 | 45.23 | 45.23 | 6,556,500 |
| Jan 05, 2018 | 43.72 | 44.47 | 43.51 | 44.29 | 44.29 | 6,407,000 |
| Jan 04, 2018 | 43.73 | 44.10 | 43.37 | 43.52 | 43.52 | 10,027,300 |
| Jan 03, 2018 | 44.32 | 44.67 | 43.67 | 43.77 | 43.77 | 6,513,700 |
| Jan 02, 2018 | 44.34 | 44.53 | 43.48 | 44.49 | 44.49 | 7,915,100 |
| Dec 29, 2017 | 44.85 | 45.00 | 44.60 | 44.83 | 44.83 | 4,154,500 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Jan 05, 2018 | 43.72 | 44.47 | 43.51 | 44.29 | 44.29 | 6,407,000 |
| Jan 04, 2018 | 43.73 | 44.10 | 43.37 | 43.52 | 43.52 | 10,027,300 |
| Jan 03, 2018 | 44.32 | 44.67 | 43.67 | 43.77 | 43.77 | 6,513,700 |
| Jan 02, 2018 | 44.34 | 44.53 | 43.48 | 44.49 | 44.49 | 7,915,100 |
| Dec 29, 2017 | 44.85 | 45.00 | 44.60 | 44.83 | 44.83 | 4,154,500 |
| Dec 28, 2017 | 44.86 | 45.19 | 44.63 | 44.81 | 44.81 | 5,923,800 |
| Dec 27, 2017 | 44.47 | 45.03 | 44.45 | 44.68 | 44.68 | 7,581,500 |
| Dec 26, 2017 | 44.77 | 45.06 | 44.27 | 44.45 | 44.45 | 8,470,100 |
| Dec 22, 2017 | 44.64 | 45.09 | 44.36 | 44.57 | 44.57 | 10,939,400 |
| Dec 21, 2017 | 43.08 | 44.82 | 41.61 | 44.50 | 44.50 | 52,389,100 |
| Dec 20, 2017 | 52.00 | 52.44 | 51.00 | 51.12 | 51.12 | 5,923,600 |
| Dec 19, 2017 | 52.46 | 53.18 | 52.01 | 52.05 | 52.05 | 3,638,100 |
| Dec 18, 2017 | 52.80 | 53.04 | 52.42 | 52.50 | 52.50 | 4,235,100 |
| Dec 15, 2017 | 52.96 | 53.47 | 52.89 | 53.05 | 53.05 | 5,757,300 |
| Dec 14, 2017 | 53.02 | 53.18 | 52.66 | 52.72 | 52.72 | 2,451,300 |
| Dec 13, 2017 | 53.67 | 53.79 | 52.94 | 53.09 | 53.09 | 4,851,000 |
| Dec 12, 2017 | 53.48 | 53.88 | 53.32 | 53.43 | 53.43 | 3,504,400 |
| Dec 11, 2017 | 53.26 | 53.74 | 52.74 | 53.71 | 53.71 | 4,697,100 |
| Dec 08, 2017 | 52.88 | 53.46 | 52.61 | 53.46 | 53.46 | 3,299,200 |
| Dec 07, 2017 | 53.06 | 53.15 | 52.48 | 52.96 | 52.96 | 4,303,800 |
| Dec 06, 2017 | 53.80 | 53.89 | 53.03 | 53.06 | 53.06 | 4,275,100 |
| Dec 05, 2017 | 53.65 | 53.71 | 52.60 | 53.60 | 53.60 | 4,675,800 |
| Dec 04, 2017 | 54.28 | 54.42 | 53.37 | 53.52 | 53.52 | 4,594,200 |
| Dec 01, 2017 | 54.20 | 54.66 | 53.52 | 54.13 | 54.13 | 5,284,200 |
| Nov 30, 2017 | 55.07 | 55.28 | 53.01 | 54.24 | 54.24 | 11,086,500 |
| Nov 29, 2017 | 54.88 | 55.22 | 54.44 | 55.06 | 55.06 | 3,996,900 |
| Nov 28, 2017 | 54.38 | 55.35 | 54.26 | 55.05 | 55.05 | 6,209,200 |
| Nov 27, 2017 | 54.00 | 54.25 | 53.73 | 54.19 | 54.19 | 3,104,500 |
| Nov 24, 2017 | 54.01 | 54.10 | 53.82 | 54.06 | 54.06 | 1,865,300 |
| Nov 22, 2017 | 53.78 | 54.39 | 53.43 | 53.89 | 53.89 | 4,241,400 |
| Nov 21, 2017 | 52.75 | 54.02 | 52.46 | 53.73 | 53.73 | 10,990,900 |
| Nov 20, 2017 | 54.00 | 54.23 | 52.65 | 52.65 | 52.65 | 8,836,300 |
| Nov 17, 2017 | 55.01 | 55.25 | 54.00 | 54.00 | 54.00 | 7,721,000 |
| Nov 16, 2017 | 55.63 | 55.66 | 55.13 | 55.15 | 55.15 | 5,942,900 |
| Nov 15, 2017 | 56.82 | 56.90 | 55.54 | 55.63 | 55.63 | 5,129,300 |
| Nov 14, 2017 | 56.71 | 56.89 | 56.25 | 56.61 | 56.61 | 6,677,600 |
| Nov 13, 2017 | 56.92 | 57.11 | 56.48 | 56.89 | 56.89 | 5,047,500 |
| Nov 10, 2017 | 55.58 | 57.02 | 55.50 | 56.95 | 56.95 | 5,597,300 |
| Nov 09, 2017 | 55.72 | 56.34 | 55.45 | 55.95 | 55.95 | 4,783,500 |
| Nov 08, 2017 | 56.20 | 56.61 | 55.68 | 55.83 | 55.83 | 6,035,400 |
| Nov 07, 2017 | 56.99 | 57.00 | 56.19 | 56.30 | 56.30 | 4,986,400 |
| Nov 06, 2017 | 56.50 | 56.96 | 56.23 | 56.77 | 56.77 | 3,449,700 |
| Nov 03, 2017 | 56.68 | 57.01 | 56.04 | 56.80 | 56.80 | 5,250,100 |
| Nov 02, 2017 | 57.90 | 57.99 | 55.90 | 56.65 | 56.65 | 4,879,300 |
| Nov 01, 2017 | 57.61 | 57.68 | 56.91 | 57.24 | 57.24 | 4,444,100 |
| Oct 31, 2017 | 57.26 | 58.38 | 56.97 | 57.77 | 57.77 | 5,332,000 |
| Oct 30, 2017 | 57.01 | 57.57 | 56.70 | 57.27 | 57.27 | 4,254,400 |
| Oct 27, 2017 | 56.70 | 57.28 | 56.59 | 57.13 | 57.13 | 3,027,800 |
| Oct 26, 2017 | 56.98 | 57.34 | 56.64 | 56.74 | 56.74 | 3,300,500 |
| Oct 25, 2017 | 56.85 | 57.14 | 56.38 | 56.68 | 56.68 | 6,567,900 |
| Oct 24, 2017 | 57.27 | 57.53 | 56.95 | 57.11 | 57.11 | 5,599,300 |
| Oct 23, 2017 | 57.74 | 57.84 | 57.03 | 57.26 | 57.26 | 6,345,700 |
| Oct 20, 2017 | 57.34 | 57.67 | 57.05 | 57.57 | 57.57 | 10,741,800 |
| Oct 19, 2017 | 56.83 | 57.55 | 56.54 | 57.00 | 57.00 | 12,402,500 |
| Oct 18, 2017 | 57.71 | 57.89 | 56.41 | 56.44 | 56.44 | 12,402,500 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|------|------|------|-----|-------|-----------|--------|
| Oct 24, 2017 | 57.27 | 57.53 | 56.95 | 57.11 | 57.11 | 5,599,300 |
| Oct 23, 2017 | 57.74 | 57.84 | 57.03 | 57.26 | 57.26 | 6,345,700 |
| Oct 20, 2017 | 57.34 | 58.37 | 57.29 | 57.86 | 57.86 | 7,758,300 |
| Oct 19, 2017 | 56.83 | 57.55 | 56.54 | 57.00 | 57.00 | 10,741,800 |
| Oct 18, 2017 | 57.71 | 57.89 | 56.41 | 56.44 | 56.44 | 12,402,500 |
| Oct 17, 2017 | 55.40 | 59.50 | 54.46 | 57.44 | 57.44 | 27,735,300 |
| Oct 16, 2017 | 57.28 | 57.48 | 49.83 | 53.43 | 53.43 | 39,289,900 |
| Oct 13, 2017 | 63.95 | 64.06 | 56.13 | 57.72 | 57.72 | 29,216,400 |
| Oct 12, 2017 | 69.29 | 69.35 | 64.42 | 64.50 | 64.50 | 12,958,000 |
| Oct 11, 2017 | 69.08 | 69.67 | 68.67 | 69.15 | 69.15 | 4,473,600 |
| Oct 10, 2017 | 68.76 | 69.32 | 68.53 | 69.19 | 69.19 | 2,004,700 |
| Oct 09, 2017 | 68.90 | 68.95 | 68.57 | 68.65 | 68.65 | 963,900 |
| Oct 06, 2017 | 68.93 | 68.95 | 68.59 | 68.84 | 68.84 | 2,201,400 |
| Oct 05, 2017 | 69.16 | 69.32 | 68.72 | 69.07 | 69.07 | 1,783,000 |
| Oct 04, 2017 | 68.45 | 69.21 | 68.28 | 69.20 | 69.20 | 2,279,100 |
| Oct 03, 2017 | 67.99 | 68.36 | 67.61 | 68.31 | 68.31 | 2,576,900 |
| Oct 02, 2017 | 68.29 | 68.53 | 68.01 | 68.13 | 68.13 | 1,525,000 |
| Sep 29, 2017 | 68.08 | 68.25 | 67.73 | 68.09 | 68.09 | 3,118,800 |
| Sep 28, 2017 | 67.41 | 68.13 | 67.26 | 68.05 | 68.05 | 2,349,800 |
| Sep 28, 2017 | **0.53** Dividend | | | | | |
| Sep 27, 2017 | 68.65 | 68.91 | 67.52 | 67.97 | 67.44 | 2,631,300 |
| Sep 26, 2017 | 68.98 | 69.35 | 68.86 | 69.04 | 68.50 | 2,344,000 |
| Sep 25, 2017 | 68.89 | 69.37 | 68.68 | 69.29 | 68.75 | 1,959,700 |
| Sep 22, 2017 | 69.45 | 69.45 | 68.77 | 68.90 | 68.36 | 2,890,000 |
| Sep 21, 2017 | 69.11 | 69.34 | 68.91 | 69.18 | 68.64 | 2,346,000 |
| Sep 20, 2017 | 69.47 | 69.66 | 68.66 | 69.05 | 68.51 | 2,700,700 |
| Sep 19, 2017 | 69.68 | 69.76 | 69.25 | 69.28 | 68.74 | 1,694,000 |
| Sep 18, 2017 | 70.27 | 70.33 | 69.19 | 69.65 | 69.11 | 1,487,900 |
| Sep 15, 2017 | 70.16 | 70.38 | 69.96 | 70.28 | 69.73 | 3,026,000 |
| Sep 14, 2017 | 69.47 | 70.16 | 69.25 | 70.09 | 69.54 | 1,944,600 |
| Sep 13, 2017 | 70.09 | 70.16 | 69.47 | 69.55 | 69.01 | 2,544,900 |
| Sep 12, 2017 | 71.45 | 71.49 | 69.80 | 70.16 | 69.61 | 1,963,400 |
| Sep 11, 2017 | 70.63 | 71.57 | 70.62 | 71.56 | 71.00 | 1,619,100 |
| Sep 08, 2017 | 70.23 | 70.77 | 70.03 | 70.64 | 70.09 | 1,383,300 |
| Sep 07, 2017 | 69.89 | 70.38 | 69.74 | 70.31 | 69.76 | 1,539,300 |
| Sep 06, 2017 | 70.08 | 70.09 | 69.60 | 69.68 | 69.14 | 2,653,800 |
| Sep 05, 2017 | 69.94 | 70.12 | 69.55 | 69.84 | 69.30 | 3,374,600 |
| Sep 01, 2017 | 70.46 | 70.54 | 69.71 | 69.87 | 69.33 | 1,552,200 |
| Aug 31, 2017 | 70.20 | 70.42 | 70.01 | 70.38 | 69.83 | 2,498,300 |
| Aug 30, 2017 | 70.19 | 70.33 | 70.04 | 70.11 | 69.56 | 1,223,100 |
| Aug 29, 2017 | 70.20 | 70.58 | 70.15 | 70.26 | 69.71 | 1,051,100 |
| Aug 28, 2017 | 70.30 | 70.44 | 69.96 | 70.31 | 69.76 | 3,102,000 |
| Aug 25, 2017 | 70.00 | 70.35 | 69.82 | 70.08 | 69.53 | 1,353,400 |
| Aug 24, 2017 | 69.87 | 70.04 | 69.68 | 69.78 | 69.24 | 1,035,700 |
| Aug 23, 2017 | 69.62 | 69.91 | 69.43 | 69.90 | 69.35 | 1,066,300 |
| Aug 22, 2017 | 69.43 | 69.67 | 69.19 | 69.67 | 69.13 | 2,269,600 |
| Aug 21, 2017 | 69.24 | 69.52 | 69.06 | 69.35 | 68.81 | 868,400 |
| Aug 18, 2017 | 69.06 | 69.49 | 68.75 | 69.14 | 68.60 | 2,069,200 |
| Aug 17, 2017 | 69.53 | 69.69 | 68.95 | 68.98 | 68.44 | 1,246,700 |
| Aug 16, 2017 | 69.43 | 69.68 | 69.18 | 69.56 | 69.02 | 1,327,500 |
| Aug 15, 2017 | 68.92 | 69.64 | 68.53 | 69.35 | 68.81 | 1,732,300 |
| Aug 14, 2017 | 68.98 | 69.28 | 68.83 | 69.17 | 68.63 | 1,296,900 |
| Aug 11, 2017 | 69.25 | 69.41 | 68.83 | 69.02 | 68.48 | 2,199,900 |
| Aug 10, 2017 | 68.90 | 69.31 | 68.68 | 69.13 | 68.59 | 1,613,100 |

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1123 of 1229

| Date | Open | High | Low | Close | Adj Close | Volume |
|------|------|------|-----|-------|-----------|--------|
| Aug 16, 2017 | 69.43 | 69.68 | 69.18 | 69.56 | 69.02 | 1,327,500 |
| Aug 15, 2017 | 68.92 | 69.64 | 68.53 | 69.35 | 68.81 | 1,732,300 |
| Aug 14, 2017 | 68.98 | 69.28 | 68.82 | 69.17 | 68.63 | 1,296,900 |
| Aug 11, 2017 | 69.25 | 69.41 | 68.83 | 69.02 | 68.48 | 2,199,900 |
| Aug 10, 2017 | 68.90 | 69.31 | 68.68 | 69.13 | 68.59 | 1,613,100 |
| Aug 09, 2017 | 69.46 | 69.46 | 68.90 | 69.02 | 68.48 | 1,625,100 |
| Aug 08, 2017 | 68.75 | 69.26 | 68.63 | 69.25 | 68.71 | 1,416,100 |
| Aug 07, 2017 | 68.54 | 68.98 | 68.24 | 68.94 | 68.40 | 1,456,700 |
| Aug 04, 2017 | 68.64 | 68.88 | 68.11 | 68.55 | 68.02 | 1,281,300 |
| Aug 03, 2017 | 68.34 | 68.99 | 68.20 | 68.91 | 68.37 | 2,407,000 |
| Aug 02, 2017 | 67.94 | 68.43 | 67.58 | 68.39 | 67.86 | 1,732,700 |
| Aug 01, 2017 | 67.51 | 68.23 | 67.41 | 68.22 | 67.69 | 1,893,000 |
| Jul 31, 2017 | 67.52 | 67.87 | 67.27 | 67.69 | 67.16 | 1,438,900 |
| Jul 28, 2017 | 67.48 | 67.78 | 67.16 | 67.45 | 66.92 | 1,423,500 |
| Jul 27, 2017 | 68.18 | 68.18 | 67.33 | 67.55 | 67.02 | 2,842,200 |
| Jul 26, 2017 | 67.42 | 67.90 | 67.21 | 67.90 | 67.37 | 2,056,000 |
| Jul 25, 2017 | 67.82 | 67.96 | 67.50 | 67.51 | 66.98 | 2,413,500 |
| Jul 24, 2017 | 68.21 | 68.28 | 67.68 | 67.90 | 67.37 | 2,242,300 |
| Jul 21, 2017 | 67.52 | 68.27 | 67.35 | 68.26 | 67.73 | 1,525,400 |
| Jul 20, 2017 | 67.27 | 67.79 | 67.13 | 67.64 | 67.11 | 2,462,300 |
| Jul 19, 2017 | 66.80 | 67.10 | 66.55 | 67.10 | 66.58 | 1,396,000 |
| Jul 18, 2017 | 66.66 | 66.73 | 66.46 | 66.63 | 66.11 | 2,090,700 |
| Jul 17, 2017 | 66.34 | 66.52 | 66.11 | 66.48 | 65.96 | 1,139,000 |
| Jul 14, 2017 | 66.63 | 66.89 | 66.23 | 66.35 | 65.83 | 2,406,300 |
| Jul 13, 2017 | 65.33 | 66.70 | 65.22 | 66.20 | 65.68 | 5,120,700 |
| Jul 12, 2017 | 65.64 | 65.68 | 64.98 | 65.04 | 64.53 | 2,728,200 |
| Jul 11, 2017 | 65.20 | 65.37 | 64.84 | 65.05 | 64.54 | 1,707,100 |
| Jul 10, 2017 | 65.47 | 65.56 | 65.02 | 65.06 | 64.55 | 1,607,800 |
| Jul 07, 2017 | 65.26 | 65.60 | 65.12 | 65.32 | 64.81 | 1,479,600 |
| Jul 06, 2017 | 65.21 | 65.58 | 65.06 | 65.21 | 64.70 | 2,894,200 |
| Jul 05, 2017 | 65.72 | 65.93 | 65.20 | 65.44 | 64.93 | 1,836,600 |
| Jul 03, 2017 | 66.52 | 66.62 | 65.62 | 65.62 | 65.11 | 1,525,400 |
| Jun 30, 2017 | 66.27 | 66.88 | 66.17 | 66.37 | 65.85 | 3,148,800 |
| Jun 29, 2017 | 65.74 | 66.33 | 65.43 | 66.10 | 65.58 | 3,258,800 |
| Jun 28, 2017 | 66.72 | 66.89 | 66.03 | 66.10 | 65.58 | 2,684,000 |
| Jun 28, 2017 | **0.53** Dividend | | | | | |
| Jun 27, 2017 | 67.82 | 68.07 | 67.02 | 67.04 | 65.99 | 2,266,300 |
| Jun 26, 2017 | 68.17 | 68.64 | 67.85 | 68.12 | 67.05 | 1,965,100 |
| Jun 23, 2017 | 68.76 | 68.86 | 67.89 | 68.03 | 66.97 | 2,768,400 |
| Jun 22, 2017 | 69.05 | 69.41 | 68.76 | 68.81 | 67.73 | 1,524,100 |
| Jun 21, 2017 | 69.28 | 69.42 | 68.86 | 69.18 | 68.10 | 1,761,700 |
| Jun 20, 2017 | 69.12 | 69.31 | 68.92 | 69.22 | 68.14 | 1,216,800 |
| Jun 19, 2017 | 69.23 | 69.36 | 68.84 | 69.03 | 67.95 | 2,979,800 |
| Jun 16, 2017 | 69.42 | 69.53 | 69.01 | 69.16 | 68.08 | 4,509,100 |
| Jun 15, 2017 | 68.15 | 69.24 | 68.07 | 69.06 | 67.98 | 4,010,800 |
| Jun 14, 2017 | 67.98 | 68.61 | 67.65 | 68.35 | 67.28 | 2,995,200 |
| Jun 13, 2017 | 67.33 | 67.57 | 67.07 | 67.46 | 66.40 | 1,964,900 |
| Jun 12, 2017 | 68.29 | 68.35 | 67.33 | 67.33 | 66.28 | 2,567,800 |
| Jun 09, 2017 | 68.18 | 68.65 | 67.84 | 68.41 | 67.34 | 2,750,100 |
| Jun 08, 2017 | 69.02 | 69.02 | 67.93 | 68.49 | 67.42 | 2,743,500 |
| Jun 07, 2017 | 68.70 | 69.19 | 68.57 | 69.02 | 67.94 | 1,688,400 |
| Jun 06, 2017 | 68.92 | 68.92 | 68.55 | 68.68 | 67.61 | 2,149,500 |
| Jun 05, 2017 | 68.75 | 68.91 | 68.58 | 68.74 | 67.67 | 1,381,800 |
| Jun 02, 2017 | 70.32 | 70.32 | 68.69 | 68.85 | 67.77 | 2,371,700 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Jun 08, 2017 | 69.02 | | 67.53 | 69.02 | 67.42 | 2,145,500 |
| Jun 07, 2017 | 68.70 | 69.19 | 68.57 | 69.02 | 67.94 | 1,688,400 |
| Jun 06, 2017 | 68.92 | 68.92 | 68.55 | 68.68 | 67.61 | 2,149,500 |
| Jun 05, 2017 | 68.79 | 69.04 | 68.68 | 68.72 | 67.65 | 1,377,000 |
| Jun 02, 2017 | 70.32 | 70.32 | 68.69 | 68.85 | 67.77 | 2,371,700 |
| Jun 01, 2017 | 68.29 | 68.92 | 68.02 | 68.89 | 67.81 | 2,883,900 |
| May 31, 2017 | 67.97 | 68.48 | 67.93 | 68.38 | 67.31 | 3,183,300 |
| May 30, 2017 | 67.35 | 68.11 | 67.12 | 67.89 | 66.83 | 1,958,400 |
| May 26, 2017 | 67.32 | 67.69 | 67.21 | 67.37 | 66.32 | 4,077,100 |
| May 25, 2017 | 66.35 | 67.45 | 66.06 | 67.29 | 66.24 | 5,289,300 |
| May 24, 2017 | 66.30 | 66.50 | 66.13 | 66.23 | 65.19 | 2,476,700 |
| May 23, 2017 | 65.95 | 66.70 | 65.83 | 66.16 | 65.13 | 2,990,400 |
| May 22, 2017 | 65.40 | 66.16 | 65.28 | 65.93 | 64.90 | 2,847,400 |
| May 19, 2017 | 65.73 | 65.86 | 65.24 | 65.54 | 64.51 | 3,901,400 |
| May 18, 2017 | 65.57 | 66.14 | 65.15 | 65.63 | 64.60 | 3,335,700 |
| May 17, 2017 | 65.55 | 66.08 | 65.14 | 65.33 | 64.31 | 4,720,000 |
| May 16, 2017 | 66.55 | 66.66 | 65.53 | 65.55 | 64.52 | 4,067,200 |
| May 15, 2017 | 66.34 | 66.78 | 66.18 | 66.46 | 65.42 | 1,703,200 |
| May 12, 2017 | 66.00 | 66.48 | 65.96 | 66.33 | 65.29 | 2,251,500 |
| May 11, 2017 | 66.25 | 66.31 | 65.33 | 65.92 | 64.89 | 4,307,300 |
| May 10, 2017 | 66.83 | 67.05 | 65.84 | 66.49 | 65.45 | 3,011,100 |
| May 09, 2017 | 66.96 | 67.08 | 66.62 | 66.77 | 65.73 | 1,716,400 |
| May 08, 2017 | 67.27 | 67.29 | 66.83 | 66.97 | 65.92 | 1,443,900 |
| May 05, 2017 | 67.19 | 67.37 | 66.84 | 67.14 | 66.09 | 2,352,100 |
| May 04, 2017 | 66.71 | 67.03 | 66.52 | 66.96 | 65.91 | 1,823,400 |
| May 03, 2017 | 66.73 | 67.23 | 66.55 | 66.77 | 65.73 | 2,477,700 |
| May 02, 2017 | 66.78 | 67.37 | 66.14 | 66.79 | 65.75 | 2,883,700 |
| May 01, 2017 | 67.08 | 67.08 | 66.17 | 66.46 | 65.42 | 2,639,300 |
| Apr 28, 2017 | 67.26 | 67.30 | 66.60 | 67.05 | 66.00 | 3,693,100 |
| Apr 27, 2017 | 67.09 | 67.70 | 66.96 | 67.28 | 66.23 | 2,027,600 |
| Apr 26, 2017 | 67.49 | 67.68 | 67.00 | 67.00 | 65.95 | 2,349,700 |
| Apr 25, 2017 | 67.52 | 67.81 | 67.30 | 67.66 | 66.60 | 2,065,800 |
| Apr 24, 2017 | 67.19 | 67.83 | 67.07 | 67.79 | 66.73 | 2,705,000 |
| Apr 21, 2017 | 66.97 | 67.61 | 66.94 | 67.33 | 66.28 | 2,200,200 |
| Apr 20, 2017 | 67.54 | 67.54 | 66.71 | 67.15 | 66.10 | 2,029,000 |
| Apr 19, 2017 | 67.47 | 67.74 | 67.29 | 67.54 | 66.48 | 2,883,200 |
| Apr 18, 2017 | 67.50 | 67.81 | 67.26 | 67.53 | 66.47 | 1,493,000 |
| Apr 17, 2017 | 67.10 | 67.49 | 67.07 | 67.48 | 66.42 | 1,241,400 |
| Apr 13, 2017 | 67.45 | 67.51 | 66.82 | 67.14 | 66.09 | 1,429,600 |
| Apr 12, 2017 | 66.76 | 67.55 | 66.67 | 67.52 | 66.46 | 1,824,200 |
| Apr 11, 2017 | 67.00 | 67.06 | 66.55 | 67.01 | 65.96 | 1,234,900 |
| Apr 10, 2017 | 67.01 | 67.13 | 66.61 | 67.07 | 66.02 | 1,607,600 |
| Apr 07, 2017 | 67.48 | 67.59 | 66.92 | 67.01 | 65.96 | 1,658,800 |
| Apr 06, 2017 | 67.26 | 67.55 | 67.16 | 67.36 | 66.31 | 2,230,800 |
| Apr 05, 2017 | 66.80 | 67.55 | 66.66 | 67.48 | 66.42 | 3,078,100 |
| Apr 04, 2017 | 66.49 | 67.10 | 66.30 | 66.92 | 65.87 | 1,360,000 |
| Apr 03, 2017 | 66.33 | 66.60 | 65.80 | 66.54 | 65.50 | 1,839,100 |
| Mar 31, 2017 | 66.34 | 66.80 | 66.34 | 66.36 | 65.32 | 1,951,300 |
| Mar 30, 2017 | 66.35 | 66.53 | 66.01 | 66.36 | 65.32 | 1,536,400 |
| Mar 29, 2017 | 66.83 | 66.87 | 66.53 | 66.63 | 65.59 | 1,363,900 |
| Mar 29, 2017 | **0.49** Dividend | | | | | |
| Mar 28, 2017 | 67.23 | 67.40 | 66.94 | 67.34 | 65.80 | 2,690,500 |
| Mar 27, 2017 | 67.95 | 68.27 | 67.08 | 67.19 | 65.66 | 3,418,700 |
| Mar 24, 2017 | 67.42 | 68.29 | 67.39 | 67.86 | 66.31 | 2,590,600 |
| Mar 23, 2017 | 67.72 | 68.16 | 67.34 | 67.54 | 66.00 | 1,898,100 |

| Date | Open | High | Low | Close | Adj Close | Volume |
| --- | --- | --- | --- | --- | --- | --- |
| Mar 29, 2017 | **0.49** Dividend | | | | | |
| Mar 28, 2017 | 67.23 | 67.40 | 66.94 | 67.34 | 65.80 | 2,690,500 |
| Mar 27, 2017 | 67.99 | 68.17 | 66.94 | 67.19 | 65.66 | 3,474,700 |
| Mar 24, 2017 | 67.42 | 68.29 | 67.39 | 67.86 | 66.31 | 2,590,600 |
| Mar 23, 2017 | 67.72 | 68.16 | 67.34 | 67.54 | 66.00 | 1,898,100 |
| Mar 22, 2017 | 67.55 | 68.25 | 67.26 | 67.46 | 65.92 | 2,219,000 |
| Mar 21, 2017 | 66.24 | 67.45 | 66.21 | 67.31 | 65.78 | 2,682,300 |
| Mar 20, 2017 | 66.59 | 66.91 | 65.99 | 66.16 | 64.65 | 1,661,000 |
| Mar 17, 2017 | 66.22 | 66.98 | 66.12 | 66.59 | 65.07 | 3,267,200 |
| Mar 16, 2017 | 66.65 | 66.65 | 65.85 | 66.02 | 64.51 | 2,504,100 |
| Mar 15, 2017 | 65.85 | 67.13 | 65.78 | 66.87 | 65.35 | 2,241,900 |
| Mar 14, 2017 | 65.68 | 65.90 | 65.31 | 65.67 | 64.17 | 1,603,200 |
| Mar 13, 2017 | 65.57 | 65.82 | 65.27 | 65.75 | 64.25 | 1,900,300 |
| Mar 10, 2017 | 65.52 | 65.85 | 65.20 | 65.63 | 64.13 | 2,349,200 |
| Mar 09, 2017 | 65.20 | 65.57 | 65.11 | 65.13 | 63.64 | 1,655,100 |
| Mar 08, 2017 | 65.58 | 65.62 | 65.02 | 65.16 | 63.67 | 2,430,800 |
| Mar 07, 2017 | 65.68 | 66.41 | 65.64 | 66.26 | 64.75 | 1,961,900 |
| Mar 06, 2017 | 65.87 | 66.10 | 65.65 | 65.76 | 64.26 | 2,808,100 |
| Mar 03, 2017 | 66.26 | 66.26 | 65.43 | 66.07 | 64.56 | 2,771,900 |
| Mar 02, 2017 | 65.85 | 66.70 | 65.60 | 66.18 | 64.67 | 2,765,600 |
| Mar 01, 2017 | 65.99 | 66.58 | 65.63 | 65.85 | 64.35 | 3,499,700 |
| Feb 28, 2017 | 66.24 | 66.93 | 66.02 | 66.75 | 65.23 | 2,404,100 |
| Feb 27, 2017 | 66.35 | 66.37 | 65.90 | 66.12 | 64.61 | 1,402,900 |
| Feb 24, 2017 | 65.70 | 66.35 | 65.55 | 66.33 | 64.82 | 2,748,900 |
| Feb 23, 2017 | 64.99 | 65.56 | 64.87 | 65.41 | 63.92 | 2,069,200 |
| Feb 22, 2017 | 64.70 | 64.93 | 64.35 | 64.76 | 63.28 | 1,805,400 |
| Feb 21, 2017 | 63.92 | 64.79 | 63.60 | 64.64 | 63.17 | 1,829,600 |
| Feb 17, 2017 | 63.62 | 64.20 | 63.54 | 63.92 | 62.46 | 2,501,500 |
| Feb 16, 2017 | 63.75 | 63.95 | 63.01 | 63.39 | 61.94 | 2,473,100 |
| Feb 15, 2017 | 62.85 | 63.21 | 62.30 | 62.94 | 61.50 | 1,898,900 |
| Feb 14, 2017 | 63.55 | 63.80 | 62.93 | 63.32 | 61.88 | 2,011,900 |
| Feb 13, 2017 | 63.27 | 63.75 | 63.10 | 63.69 | 62.24 | 2,034,500 |
| Feb 10, 2017 | 62.55 | 63.50 | 62.42 | 63.35 | 61.91 | 1,328,800 |
| Feb 09, 2017 | 63.17 | 63.40 | 62.71 | 62.89 | 61.46 | 1,802,600 |
| Feb 08, 2017 | 62.51 | 63.62 | 62.44 | 63.17 | 61.73 | 2,835,300 |
| Feb 07, 2017 | 61.72 | 61.95 | 61.54 | 61.83 | 60.42 | 908,100 |
| Feb 06, 2017 | 61.66 | 61.92 | 61.45 | 61.63 | 60.22 | 993,000 |
| Feb 03, 2017 | 61.84 | 62.07 | 61.41 | 61.59 | 60.19 | 1,907,600 |
| Feb 02, 2017 | 61.18 | 62.00 | 60.99 | 61.95 | 60.54 | 1,990,900 |
| Feb 01, 2017 | 61.39 | 61.55 | 60.61 | 60.89 | 59.50 | 1,787,400 |
| Jan 31, 2017 | 60.74 | 61.91 | 60.56 | 61.89 | 60.48 | 2,618,500 |
| Jan 30, 2017 | 60.84 | 60.92 | 60.17 | 60.58 | 59.20 | 1,538,800 |
| Jan 27, 2017 | 60.96 | 61.02 | 60.57 | 60.62 | 59.24 | 1,375,700 |
| Jan 26, 2017 | 60.79 | 61.30 | 60.56 | 60.76 | 59.37 | 1,569,900 |
| Jan 25, 2017 | 60.60 | 60.87 | 60.46 | 60.84 | 59.45 | 1,355,100 |
| Jan 24, 2017 | 60.93 | 61.08 | 60.71 | 60.89 | 59.50 | 1,775,800 |
| Jan 23, 2017 | 61.50 | 61.63 | 60.97 | 60.99 | 59.60 | 1,917,700 |
| Jan 20, 2017 | 61.31 | 61.59 | 60.97 | 61.36 | 59.96 | 1,764,000 |
| Jan 19, 2017 | 60.98 | 61.71 | 60.95 | 61.10 | 59.71 | 1,892,400 |
| Jan 18, 2017 | 61.50 | 61.76 | 61.36 | 61.46 | 60.06 | 2,107,800 |
| Jan 17, 2017 | 60.75 | 61.82 | 60.75 | 61.78 | 60.37 | 2,505,300 |
| Jan 13, 2017 | 60.60 | 60.91 | 60.19 | 60.58 | 59.20 | 1,684,200 |
| Jan 12, 2017 | 60.82 | 60.98 | 60.12 | 60.61 | 59.22 | 2,495,700 |
| Jan 11, 2017 | 60.23 | 61.09 | 60.18 | 60.88 | 59.49 | 2,476,000 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Jan 18, 2017 | 61.50 | 61.76 | 61.36 | 61.46 | 60.06 | 2,107,800 |
| Jan 17, 2017 | 60.75 | 61.82 | 60.75 | 61.78 | 60.37 | 2,505,300 |
| Jan 13, 2017 | 60.60 | 60.91 | 60.19 | 60.58 | 59.20 | 1,684,200 |
| Jan 12, 2017 | 60.82 | 60.98 | 60.12 | 60.61 | 59.23 | 2,495,700 |
| Jan 11, 2017 | 60.23 | 61.09 | 60.18 | 60.88 | 59.49 | 2,476,000 |
| Jan 10, 2017 | 60.33 | 60.48 | 59.89 | 60.07 | 58.70 | 1,495,400 |
| Jan 09, 2017 | 61.20 | 61.43 | 60.20 | 60.30 | 58.92 | 1,939,400 |
| Jan 06, 2017 | 60.34 | 61.35 | 60.13 | 61.22 | 59.82 | 3,100,300 |
| Jan 05, 2017 | 60.66 | 61.39 | 60.18 | 60.54 | 59.16 | 3,939,000 |
| Jan 04, 2017 | 60.61 | 60.98 | 60.25 | 60.59 | 59.21 | 1,788,000 |
| Jan 03, 2017 | 60.81 | 60.82 | 60.08 | 60.37 | 58.99 | 1,731,300 |
| Dec 30, 2016 | 61.12 | 61.23 | 60.55 | 60.77 | 59.38 | 1,678,300 |
| Dec 29, 2016 | 60.25 | 61.21 | 60.12 | 61.09 | 59.70 | 1,080,000 |
| Dec 28, 2016 | 60.73 | 60.73 | 60.01 | 60.08 | 58.71 | 998,500 |
| Dec 28, 2016 | **0.49** Dividend | | | | | |
| Dec 27, 2016 | 60.86 | 61.34 | 60.66 | 61.18 | 59.31 | 909,300 |
| Dec 23, 2016 | 61.39 | 61.52 | 60.97 | 61.19 | 59.32 | 703,500 |
| Dec 22, 2016 | 61.07 | 61.36 | 60.86 | 61.28 | 59.40 | 966,200 |
| Dec 21, 2016 | 61.07 | 61.54 | 61.07 | 61.12 | 59.25 | 1,505,200 |
| Dec 20, 2016 | 60.74 | 61.25 | 60.63 | 61.13 | 59.26 | 2,090,200 |
| Dec 19, 2016 | 61.43 | 61.47 | 60.66 | 60.82 | 58.96 | 2,349,200 |
| Dec 16, 2016 | 60.15 | 61.15 | 60.15 | 61.04 | 59.17 | 4,473,000 |
| Dec 15, 2016 | 59.46 | 60.10 | 59.36 | 60.01 | 58.17 | 1,927,600 |
| Dec 14, 2016 | 60.88 | 61.23 | 59.36 | 59.50 | 57.68 | 3,074,300 |
| Dec 13, 2016 | 60.10 | 60.78 | 60.05 | 60.59 | 58.73 | 2,659,600 |
| Dec 12, 2016 | 59.07 | 59.98 | 58.89 | 59.82 | 57.99 | 3,114,200 |
| Dec 09, 2016 | 59.19 | 59.70 | 58.96 | 59.33 | 57.51 | 3,849,300 |
| Dec 08, 2016 | 58.44 | 59.24 | 58.06 | 59.19 | 57.38 | 1,854,300 |
| Dec 07, 2016 | 58.62 | 59.11 | 58.55 | 58.80 | 57.00 | 2,023,900 |
| Dec 06, 2016 | 58.55 | 58.87 | 58.18 | 58.38 | 56.59 | 1,664,100 |
| Dec 05, 2016 | 58.04 | 58.38 | 57.64 | 58.38 | 56.59 | 2,864,200 |
| Dec 02, 2016 | 58.50 | 58.94 | 57.97 | 58.28 | 56.49 | 2,342,900 |
| Dec 01, 2016 | 58.47 | 58.51 | 57.60 | 58.04 | 56.26 | 2,306,300 |
| Nov 30, 2016 | 59.75 | 60.02 | 58.79 | 58.80 | 57.00 | 3,441,900 |
| Nov 29, 2016 | 60.62 | 61.23 | 60.42 | 60.46 | 58.61 | 3,046,800 |
| Nov 28, 2016 | 59.59 | 61.04 | 59.59 | 60.74 | 58.88 | 2,057,800 |
| Nov 25, 2016 | 58.93 | 59.47 | 58.93 | 59.29 | 57.47 | 1,726,100 |
| Nov 23, 2016 | 58.68 | 59.27 | 58.60 | 58.71 | 56.91 | 1,222,700 |
| Nov 22, 2016 | 59.12 | 59.44 | 58.95 | 59.32 | 57.50 | 2,342,200 |
| Nov 21, 2016 | 58.46 | 59.22 | 58.38 | 59.16 | 57.35 | 1,417,700 |
| Nov 18, 2016 | 58.65 | 58.97 | 58.14 | 58.38 | 56.59 | 1,916,500 |
| Nov 17, 2016 | 58.64 | 59.19 | 58.60 | 58.67 | 56.87 | 2,424,700 |
| Nov 16, 2016 | 59.18 | 59.44 | 58.26 | 58.71 | 56.91 | 1,352,800 |
| Nov 15, 2016 | 58.37 | 59.18 | 58.22 | 59.10 | 57.29 | 2,370,900 |
| Nov 14, 2016 | 58.18 | 58.41 | 57.63 | 58.15 | 56.37 | 5,576,700 |
| Nov 11, 2016 | 58.54 | 59.15 | 58.22 | 58.48 | 56.69 | 3,013,000 |
| Nov 10, 2016 | 59.00 | 59.45 | 58.03 | 58.50 | 56.71 | 4,578,600 |
| Nov 09, 2016 | 60.83 | 60.85 | 59.34 | 59.41 | 57.59 | 3,520,000 |
| Nov 08, 2016 | 61.21 | 62.23 | 61.14 | 62.02 | 60.12 | 2,327,300 |
| Nov 07, 2016 | 60.36 | 61.10 | 59.50 | 61.09 | 59.22 | 3,278,400 |
| Nov 04, 2016 | 61.40 | 61.75 | 59.77 | 59.83 | 58.00 | 2,833,300 |
| Nov 03, 2016 | 60.14 | 60.47 | 59.80 | 60.20 | 58.36 | 3,200,900 |
| Nov 02, 2016 | 60.94 | 61.06 | 59.98 | 60.20 | 58.36 | 3,155,900 |
| Nov 01, 2016 | 62.10 | 62.11 | 61.01 | 61.21 | 59.34 | 2,685,200 |
| Oct 31, 2016 | 61.25 | 62.69 | 61.23 | 62.12 | 60.22 | 2,934,000 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Nov 04, 2016 | 61.40 | 61.75 | 59.77 | 59.83 | 58.00 | 2,833,300 |
| Nov 03, 2016 | 60.14 | 60.47 | 59.80 | 60.20 | 58.36 | 3,200,900 |
| Nov 02, 2016 | 60.94 | 60.96 | 59.86 | 60.26 | 58.41 | 3,177,500 |
| Nov 01, 2016 | 62.10 | 62.11 | 61.01 | 61.21 | 59.34 | 2,685,700 |
| Oct 31, 2016 | 61.25 | 62.69 | 61.23 | 62.12 | 60.22 | 2,934,000 |
| Oct 28, 2016 | 60.81 | 61.19 | 60.54 | 60.99 | 59.12 | 1,870,000 |
| Oct 27, 2016 | 60.67 | 60.81 | 60.19 | 60.70 | 58.84 | 1,257,100 |
| Oct 26, 2016 | 60.70 | 61.16 | 60.38 | 60.92 | 59.05 | 1,565,600 |
| Oct 25, 2016 | 60.36 | 60.80 | 60.28 | 60.79 | 58.93 | 1,564,600 |
| Oct 24, 2016 | 60.57 | 60.70 | 60.19 | 60.51 | 58.66 | 1,394,200 |
| Oct 21, 2016 | 60.53 | 60.71 | 60.05 | 60.31 | 58.46 | 1,312,900 |
| Oct 20, 2016 | 60.98 | 61.26 | 60.69 | 60.84 | 58.98 | 1,532,800 |
| Oct 19, 2016 | 60.69 | 61.10 | 60.48 | 60.89 | 59.02 | 2,083,600 |
| Oct 18, 2016 | 60.74 | 61.12 | 60.20 | 60.93 | 59.06 | 1,985,400 |
| Oct 17, 2016 | 60.26 | 60.76 | 60.09 | 60.40 | 58.55 | 1,999,800 |
| Oct 14, 2016 | 60.06 | 60.54 | 59.79 | 59.80 | 57.97 | 2,607,200 |
| Oct 13, 2016 | 59.39 | 60.52 | 59.17 | 60.37 | 58.52 | 3,196,900 |
| Oct 12, 2016 | 58.94 | 59.43 | 58.86 | 59.31 | 57.49 | 1,973,800 |
| Oct 11, 2016 | 59.39 | 59.51 | 58.68 | 58.82 | 57.02 | 2,531,700 |
| Oct 10, 2016 | 59.41 | 59.59 | 59.16 | 59.47 | 57.65 | 2,413,800 |
| Oct 07, 2016 | 59.43 | 59.90 | 59.07 | 59.32 | 57.50 | 3,692,800 |
| Oct 06, 2016 | 58.33 | 59.23 | 58.23 | 59.01 | 57.20 | 3,085,500 |
| Oct 05, 2016 | 58.81 | 59.28 | 58.20 | 58.75 | 56.95 | 4,434,500 |
| Oct 04, 2016 | 60.22 | 60.22 | 58.46 | 58.82 | 57.02 | 3,700,900 |
| Oct 03, 2016 | 61.05 | 61.07 | 59.85 | 60.16 | 58.32 | 2,697,000 |
| Sep 30, 2016 | 62.05 | 62.36 | 60.93 | 61.17 | 59.30 | 3,495,000 |
| Sep 29, 2016 | 62.10 | 62.44 | 61.48 | 61.76 | 59.87 | 2,440,000 |
| Sep 28, 2016 | 62.37 | 62.59 | 61.75 | 62.38 | 60.47 | 2,050,100 |
| Sep 28, 2016 | **0.49** Dividend | | | | | |
| Sep 27, 2016 | 64.17 | 64.39 | 62.79 | 62.85 | 60.45 | 2,941,300 |
| Sep 26, 2016 | 64.13 | 64.28 | 63.77 | 63.90 | 61.46 | 2,099,900 |
| Sep 23, 2016 | 63.96 | 64.40 | 63.56 | 64.20 | 61.75 | 2,120,800 |
| Sep 22, 2016 | 64.09 | 64.35 | 63.56 | 64.02 | 61.58 | 2,113,000 |
| Sep 21, 2016 | 62.52 | 63.73 | 62.42 | 63.71 | 61.28 | 3,153,200 |
| Sep 20, 2016 | 62.94 | 63.10 | 62.50 | 62.55 | 60.16 | 2,531,200 |
| Sep 19, 2016 | 62.45 | 62.90 | 62.34 | 62.67 | 60.28 | 2,068,400 |
| Sep 16, 2016 | 61.81 | 62.56 | 61.39 | 62.42 | 60.04 | 3,084,200 |
| Sep 15, 2016 | 61.25 | 61.88 | 60.97 | 61.84 | 59.48 | 1,763,700 |
| Sep 14, 2016 | 61.06 | 61.54 | 60.76 | 61.43 | 59.08 | 2,777,100 |
| Sep 13, 2016 | 61.38 | 61.49 | 60.44 | 60.82 | 58.50 | 3,615,700 |
| Sep 12, 2016 | 60.74 | 61.72 | 60.74 | 61.55 | 59.20 | 2,925,800 |
| Sep 09, 2016 | 62.58 | 62.72 | 60.81 | 60.83 | 58.51 | 2,775,800 |
| Sep 08, 2016 | 62.70 | 63.16 | 62.63 | 63.09 | 60.68 | 1,594,200 |
| Sep 07, 2016 | 62.81 | 63.03 | 62.47 | 62.90 | 60.50 | 1,914,900 |
| Sep 06, 2016 | 62.72 | 63.36 | 62.51 | 62.99 | 60.58 | 2,330,100 |
| Sep 02, 2016 | 61.76 | 62.56 | 61.64 | 62.35 | 59.97 | 2,423,700 |
| Sep 01, 2016 | 61.93 | 62.21 | 61.62 | 61.81 | 59.45 | 2,112,200 |
| Aug 31, 2016 | 61.87 | 62.05 | 61.48 | 61.94 | 59.57 | 3,373,000 |
| Aug 30, 2016 | 62.36 | 62.73 | 61.86 | 61.87 | 59.51 | 2,451,700 |
| Aug 29, 2016 | 62.14 | 62.71 | 62.14 | 62.36 | 59.98 | 3,541,200 |
| Aug 26, 2016 | 63.47 | 63.81 | 61.97 | 62.10 | 59.73 | 2,928,300 |
| Aug 25, 2016 | 63.72 | 63.89 | 63.37 | 63.44 | 61.02 | 1,841,400 |
| Aug 24, 2016 | 63.70 | 63.83 | 63.20 | 63.69 | 61.26 | 1,716,400 |
| Aug 23, 2016 | 64.69 | 65.20 | 63.81 | 63.85 | 61.41 | 2,448,300 |

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1128 of 1229

| Date | | | | | | |
|------|------|------|------|------|------|------|
| Aug 29, 2016 | 62.14 | 62.71 | 62.14 | 62.36 | 59.98 | 3,541,200 |
| Aug 26, 2016 | 63.47 | 63.81 | 61.97 | 62.10 | 59.73 | 2,928,300 |
| Aug 25, 2016 | 63.72 | 63.89 | 63.37 | 63.44 | 61.02 | 1,841,400 |
| Aug 24, 2016 | 63.70 | 63.83 | 63.20 | 63.69 | 61.26 | 1,716,400 |
| Aug 23, 2016 | 64.69 | 65.20 | 63.81 | 63.85 | 61.41 | 2,448,300 |
| Aug 22, 2016 | 64.95 | 65.29 | 64.65 | 64.69 | 62.22 | 4,793,300 |
| Aug 19, 2016 | 64.90 | 65.02 | 64.22 | 64.79 | 62.32 | 3,467,200 |
| Aug 18, 2016 | 63.62 | 65.18 | 63.50 | 65.17 | 62.68 | 3,713,100 |
| Aug 17, 2016 | 62.49 | 63.78 | 62.00 | 63.68 | 61.25 | 4,953,100 |
| Aug 16, 2016 | 62.66 | 63.04 | 62.29 | 62.64 | 60.25 | 5,784,800 |
| Aug 15, 2016 | 64.15 | 64.34 | 63.44 | 63.45 | 61.03 | 1,769,100 |
| Aug 12, 2016 | 64.35 | 64.50 | 64.07 | 64.12 | 61.67 | 1,734,300 |
| Aug 11, 2016 | 63.60 | 64.10 | 63.45 | 64.08 | 61.63 | 1,956,700 |
| Aug 10, 2016 | 63.66 | 63.77 | 63.40 | 63.61 | 61.18 | 1,835,700 |
| Aug 09, 2016 | 63.53 | 63.90 | 63.40 | 63.46 | 61.04 | 2,583,700 |
| Aug 08, 2016 | 63.97 | 64.22 | 63.49 | 63.51 | 61.08 | 1,960,700 |
| Aug 05, 2016 | 64.40 | 64.49 | 63.71 | 63.90 | 61.46 | 2,954,000 |
| Aug 04, 2016 | 64.92 | 65.39 | 64.31 | 64.51 | 62.05 | 2,958,800 |
| Aug 03, 2016 | 64.34 | 64.78 | 64.02 | 64.55 | 62.08 | 3,648,800 |
| Aug 02, 2016 | 64.05 | 64.36 | 63.64 | 64.33 | 61.87 | 3,328,700 |
| Aug 01, 2016 | 63.78 | 64.24 | 63.68 | 64.15 | 61.70 | 1,922,000 |
| Jul 29, 2016 | 63.73 | 64.19 | 63.55 | 63.94 | 61.50 | 2,775,500 |
| Jul 28, 2016 | 64.09 | 64.09 | 62.90 | 63.75 | 61.32 | 2,511,900 |
| Jul 27, 2016 | 64.00 | 64.30 | 63.28 | 63.95 | 61.51 | 1,944,700 |
| Jul 26, 2016 | 64.91 | 65.01 | 64.06 | 64.16 | 61.71 | 2,496,500 |
| Jul 25, 2016 | 64.96 | 64.96 | 64.32 | 64.93 | 62.45 | 1,762,400 |
| Jul 22, 2016 | 64.19 | 65.02 | 63.84 | 65.02 | 62.54 | 2,921,800 |
| Jul 21, 2016 | 64.09 | 64.25 | 63.75 | 64.16 | 61.71 | 3,160,100 |
| Jul 20, 2016 | 64.40 | 64.55 | 64.03 | 64.26 | 61.81 | 2,017,100 |
| Jul 19, 2016 | 64.60 | 64.67 | 64.12 | 64.41 | 61.95 | 1,868,900 |
| Jul 18, 2016 | 64.71 | 65.03 | 64.51 | 64.52 | 62.06 | 2,889,300 |
| Jul 15, 2016 | 64.53 | 64.75 | 64.18 | 64.62 | 62.15 | 3,028,500 |
| Jul 14, 2016 | 64.22 | 64.53 | 63.93 | 64.20 | 61.75 | 2,936,200 |
| Jul 13, 2016 | 64.18 | 64.59 | 63.89 | 64.56 | 62.09 | 2,536,800 |
| Jul 12, 2016 | 64.46 | 64.50 | 63.64 | 63.70 | 61.27 | 2,675,500 |
| Jul 11, 2016 | 64.44 | 64.75 | 63.85 | 64.73 | 62.26 | 2,070,900 |
| Jul 08, 2016 | 64.14 | 64.85 | 63.47 | 64.83 | 62.35 | 2,813,900 |
| Jul 07, 2016 | 65.10 | 65.33 | 64.16 | 64.40 | 61.94 | 4,517,300 |
| Jul 06, 2016 | 64.86 | 65.43 | 64.50 | 65.39 | 62.89 | 5,048,900 |
| Jul 05, 2016 | 63.97 | 65.03 | 63.97 | 64.89 | 62.41 | 2,873,700 |
| Jul 01, 2016 | 64.24 | 64.33 | 63.28 | 64.03 | 61.58 | 2,331,200 |
| Jun 30, 2016 | 62.88 | 63.95 | 62.67 | 63.92 | 61.48 | 3,851,400 |
| Jun 29, 2016 | 62.70 | 62.93 | 62.37 | 62.58 | 60.19 | 4,018,700 |
| Jun 28, 2016 | 62.72 | 62.72 | 62.00 | 62.40 | 60.02 | 4,076,700 |
| Jun 28, 2016 | 0.49 Dividend | | | | | |
| Jun 27, 2016 | 62.39 | 63.36 | 62.16 | 63.17 | 60.29 | 3,444,700 |
| Jun 24, 2016 | 61.42 | 63.25 | 61.27 | 62.66 | 59.80 | 4,832,300 |
| Jun 23, 2016 | 62.26 | 62.30 | 61.86 | 62.13 | 59.29 | 2,179,500 |
| Jun 22, 2016 | 62.79 | 62.81 | 62.11 | 62.15 | 59.31 | 2,761,100 |
| Jun 21, 2016 | 62.58 | 62.93 | 61.95 | 62.63 | 59.77 | 4,283,400 |
| Jun 20, 2016 | 63.01 | 63.02 | 62.11 | 62.57 | 59.71 | 2,705,600 |
| Jun 17, 2016 | 62.89 | 63.09 | 62.47 | 63.02 | 60.14 | 3,640,300 |
| Jun 16, 2016 | 62.36 | 62.36 | 61.96 | 62.73 | 59.87 | 2,659,000 |
| Jun 15, 2016 | 63.00 | 63.03 | 62.09 | 62.35 | 59.59 | 2,019,400 |
| Jun 14, 2016 | 62.71 | 63.03 | 62.35 | 62.98 | 60.11 | 1,522,400 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Jun 20, 2016 | 63.01 | 63.02 | 62.11 | 62.57 | 59.71 | 2,705,600 |
| Jun 17, 2016 | 62.89 | 63.09 | 62.47 | 63.02 | 60.14 | 3,640,300 |
| Jun 16, 2016 | 62.38 | 63.13 | 62.38 | 62.95 | 60.08 | 2,678,100 |
| Jun 15, 2016 | 63.00 | 63.03 | 62.09 | 62.35 | 59.50 | 2,019,400 |
| Jun 14, 2016 | 62.71 | 63.03 | 62.35 | 62.98 | 60.11 | 1,523,400 |
| Jun 13, 2016 | 63.04 | 63.43 | 62.57 | 62.60 | 59.74 | 2,174,200 |
| Jun 10, 2016 | 62.92 | 63.26 | 62.65 | 63.02 | 60.14 | 2,306,700 |
| Jun 09, 2016 | 61.96 | 63.03 | 61.96 | 62.98 | 60.11 | 2,420,000 |
| Jun 08, 2016 | 61.50 | 62.02 | 61.49 | 62.01 | 59.18 | 1,945,700 |
| Jun 07, 2016 | 61.40 | 61.82 | 61.06 | 61.64 | 58.83 | 2,347,900 |
| Jun 06, 2016 | 61.51 | 61.80 | 60.98 | 61.30 | 58.50 | 1,453,000 |
| Jun 03, 2016 | 61.05 | 61.84 | 61.00 | 61.55 | 58.74 | 3,048,700 |
| Jun 02, 2016 | 60.09 | 60.60 | 59.86 | 60.60 | 57.83 | 1,879,100 |
| Jun 01, 2016 | 60.00 | 60.32 | 59.76 | 60.31 | 57.56 | 2,079,200 |
| May 31, 2016 | 59.48 | 60.18 | 59.26 | 60.08 | 57.34 | 3,375,000 |
| May 27, 2016 | 59.41 | 59.66 | 59.07 | 59.52 | 56.80 | 2,039,200 |
| May 26, 2016 | 58.37 | 59.40 | 58.26 | 59.39 | 56.68 | 1,944,900 |
| May 25, 2016 | 58.26 | 58.74 | 58.07 | 58.45 | 55.78 | 1,903,900 |
| May 24, 2016 | 57.84 | 58.68 | 57.57 | 58.54 | 55.87 | 2,511,600 |
| May 23, 2016 | 57.56 | 58.33 | 57.51 | 57.61 | 54.98 | 2,641,200 |
| May 20, 2016 | 57.76 | 57.93 | 57.24 | 57.63 | 55.00 | 2,164,900 |
| May 19, 2016 | 56.71 | 57.56 | 56.39 | 57.54 | 54.91 | 1,550,400 |
| May 18, 2016 | 57.36 | 58.28 | 56.75 | 57.01 | 54.41 | 3,347,000 |
| May 17, 2016 | 58.94 | 59.07 | 57.36 | 57.65 | 55.02 | 2,732,400 |
| May 16, 2016 | 59.11 | 59.16 | 58.69 | 59.10 | 56.40 | 1,825,600 |
| May 13, 2016 | 59.28 | 59.39 | 58.77 | 59.17 | 56.47 | 2,129,100 |
| May 12, 2016 | 59.18 | 59.53 | 58.92 | 59.24 | 56.54 | 3,716,700 |
| May 11, 2016 | 59.18 | 59.41 | 58.60 | 59.14 | 56.44 | 2,588,300 |
| May 10, 2016 | 59.51 | 59.65 | 59.12 | 59.25 | 56.55 | 1,947,700 |
| May 09, 2016 | 59.15 | 59.44 | 58.94 | 59.12 | 56.42 | 1,544,700 |
| May 06, 2016 | 59.14 | 59.48 | 58.58 | 59.00 | 56.31 | 2,325,400 |
| May 05, 2016 | 59.16 | 59.60 | 58.80 | 59.15 | 56.45 | 2,516,900 |
| May 04, 2016 | 58.70 | 59.59 | 58.66 | 59.14 | 56.44 | 3,680,900 |
| May 03, 2016 | 58.55 | 59.11 | 58.37 | 59.01 | 56.32 | 2,782,100 |
| May 02, 2016 | 58.36 | 59.06 | 58.06 | 58.67 | 55.99 | 1,791,200 |
| Apr 29, 2016 | 57.40 | 58.32 | 56.95 | 58.20 | 55.54 | 1,895,800 |
| Apr 28, 2016 | 57.26 | 58.06 | 57.08 | 57.76 | 55.12 | 1,462,800 |
| Apr 27, 2016 | 57.16 | 58.10 | 56.83 | 57.76 | 55.12 | 2,155,100 |
| Apr 26, 2016 | 57.26 | 57.45 | 56.81 | 57.00 | 54.40 | 1,523,500 |
| Apr 25, 2016 | 56.81 | 57.12 | 56.60 | 57.10 | 54.49 | 1,764,800 |
| Apr 22, 2016 | 56.70 | 57.26 | 56.64 | 56.99 | 54.39 | 2,410,900 |
| Apr 21, 2016 | 58.13 | 58.14 | 56.48 | 56.62 | 54.04 | 3,644,700 |
| Apr 20, 2016 | 59.60 | 59.73 | 58.40 | 58.40 | 55.73 | 3,051,100 |
| Apr 19, 2016 | 59.60 | 59.83 | 59.15 | 59.58 | 56.86 | 2,133,500 |
| Apr 18, 2016 | 59.28 | 59.62 | 58.81 | 59.55 | 56.83 | 1,809,800 |
| Apr 15, 2016 | 59.01 | 59.52 | 58.78 | 59.28 | 56.57 | 2,266,100 |
| Apr 14, 2016 | 58.74 | 58.99 | 58.52 | 58.85 | 56.16 | 1,803,000 |
| Apr 13, 2016 | 59.34 | 59.34 | 58.43 | 58.83 | 56.14 | 1,635,700 |
| Apr 12, 2016 | 59.02 | 59.30 | 58.59 | 59.21 | 56.51 | 1,762,500 |
| Apr 11, 2016 | 59.38 | 59.60 | 58.80 | 58.90 | 56.21 | 2,213,200 |
| Apr 08, 2016 | 59.05 | 59.48 | 58.80 | 59.30 | 56.59 | 2,367,200 |
| Apr 07, 2016 | 58.42 | 59.06 | 58.13 | 58.75 | 56.07 | 1,820,500 |
| Apr 06, 2016 | 58.10 | 58.68 | 57.79 | 58.67 | 55.99 | 4,013,100 |
| Apr 05, 2016 | 59.38 | 59.53 | 58.19 | 58.23 | 55.57 | 3,240,700 |

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1130 of 1229

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Apr 11, 2016 | 59.38 | 59.60 | 58.80 | 58.90 | 56.21 | 2,213,200 |
| Apr 08, 2016 | 59.05 | 59.48 | 58.80 | 59.30 | 56.59 | 2,367,200 |
| Apr 07, 2016 | 58.42 | 59.06 | 58.33 | 58.75 | 56.07 | 1,829,500 |
| Apr 06, 2016 | 58.10 | 58.68 | 57.79 | 58.67 | 55.99 | 4,013,100 |
| Apr 05, 2016 | 59.38 | 59.53 | 58.19 | 58.23 | 55.57 | 3,240,700 |
| Apr 04, 2016 | 59.99 | 60.03 | 59.37 | 59.52 | 56.80 | 2,529,700 |
| Apr 01, 2016 | 59.32 | 60.09 | 59.22 | 59.83 | 57.10 | 2,277,200 |
| Mar 31, 2016 | 59.42 | 59.88 | 59.17 | 59.72 | 56.99 | 2,810,900 |
| Mar 30, 2016 | 59.31 | 59.65 | 58.79 | 59.44 | 56.73 | 2,743,400 |
| Mar 29, 2016 | 58.16 | 59.26 | 58.16 | 59.19 | 56.49 | 2,252,800 |
| Mar 29, 2016 | **0.455** Dividend | | | | | |
| Mar 28, 2016 | 59.00 | 59.30 | 58.35 | 58.52 | 55.41 | 1,703,300 |
| Mar 24, 2016 | 58.71 | 59.11 | 58.62 | 58.85 | 55.73 | 2,026,200 |
| Mar 23, 2016 | 58.40 | 59.18 | 58.27 | 58.96 | 55.83 | 1,545,700 |
| Mar 22, 2016 | 58.47 | 59.14 | 58.31 | 58.57 | 55.46 | 1,726,800 |
| Mar 21, 2016 | 58.87 | 59.34 | 57.96 | 58.58 | 55.47 | 1,644,100 |
| Mar 18, 2016 | 59.19 | 59.50 | 58.44 | 58.74 | 55.62 | 5,690,500 |
| Mar 17, 2016 | 58.09 | 59.30 | 57.65 | 59.00 | 55.87 | 3,023,700 |
| Mar 16, 2016 | 57.23 | 58.11 | 56.70 | 58.06 | 54.98 | 2,669,500 |
| Mar 15, 2016 | 57.37 | 57.88 | 57.22 | 57.48 | 54.43 | 2,485,500 |
| Mar 14, 2016 | 57.05 | 57.63 | 57.00 | 57.54 | 54.49 | 2,040,200 |
| Mar 11, 2016 | 57.50 | 57.63 | 57.08 | 57.32 | 54.28 | 2,304,100 |
| Mar 10, 2016 | 57.29 | 57.61 | 56.56 | 57.04 | 54.01 | 2,023,400 |
| Mar 09, 2016 | 56.93 | 57.44 | 56.93 | 57.28 | 54.24 | 2,035,200 |
| Mar 08, 2016 | 56.38 | 57.08 | 56.36 | 56.94 | 53.92 | 3,398,400 |
| Mar 07, 2016 | 56.37 | 56.86 | 56.20 | 56.47 | 53.47 | 3,824,400 |
| Mar 04, 2016 | 56.09 | 56.58 | 55.71 | 56.50 | 53.50 | 3,636,600 |
| Mar 03, 2016 | 56.34 | 56.40 | 55.61 | 56.29 | 53.30 | 2,171,700 |
| Mar 02, 2016 | 56.00 | 56.34 | 54.71 | 56.23 | 53.25 | 2,665,600 |
| Mar 01, 2016 | 57.10 | 57.24 | 55.92 | 56.21 | 53.23 | 2,868,600 |
| Feb 29, 2016 | 56.48 | 57.17 | 56.33 | 56.73 | 53.72 | 3,186,000 |
| Feb 26, 2016 | 58.07 | 58.39 | 56.40 | 56.43 | 53.44 | 2,557,300 |
| Feb 25, 2016 | 57.65 | 58.46 | 57.29 | 58.34 | 55.24 | 2,755,300 |
| Feb 24, 2016 | 57.01 | 57.55 | 56.49 | 57.46 | 54.41 | 2,873,500 |
| Feb 23, 2016 | 56.30 | 57.35 | 56.19 | 57.22 | 54.18 | 2,680,300 |
| Feb 22, 2016 | 56.03 | 56.51 | 55.63 | 56.48 | 53.48 | 3,043,400 |
| Feb 19, 2016 | 56.08 | 56.13 | 55.31 | 55.89 | 52.92 | 4,175,200 |
| Feb 18, 2016 | 55.60 | 56.38 | 54.95 | 56.00 | 53.03 | 4,134,400 |
| Feb 17, 2016 | 56.06 | 56.52 | 55.38 | 55.81 | 52.85 | 3,998,600 |
| Feb 16, 2016 | 55.80 | 55.97 | 55.24 | 55.75 | 52.79 | 2,939,900 |
| Feb 12, 2016 | 55.26 | 55.59 | 54.45 | 55.21 | 52.28 | 2,877,300 |
| Feb 11, 2016 | 55.88 | 56.48 | 55.08 | 55.16 | 52.23 | 3,672,500 |
| Feb 10, 2016 | 55.80 | 56.56 | 55.20 | 56.17 | 53.19 | 4,100,300 |
| Feb 09, 2016 | 56.07 | 56.61 | 55.68 | 55.92 | 52.95 | 5,980,000 |
| Feb 08, 2016 | 56.24 | 57.12 | 55.73 | 56.30 | 53.31 | 3,841,300 |
| Feb 05, 2016 | 55.91 | 56.47 | 55.12 | 56.24 | 53.26 | 3,687,200 |
| Feb 04, 2016 | 57.27 | 57.43 | 56.23 | 56.33 | 53.34 | 4,175,900 |
| Feb 03, 2016 | 56.91 | 57.73 | 56.70 | 57.46 | 54.41 | 3,970,700 |
| Feb 02, 2016 | 55.08 | 56.73 | 55.07 | 56.67 | 53.66 | 6,190,100 |
| Feb 01, 2016 | 54.96 | 55.53 | 54.61 | 55.46 | 52.52 | 3,141,500 |
| Jan 29, 2016 | 54.14 | 55.11 | 53.93 | 54.91 | 52.00 | 3,727,600 |
| Jan 28, 2016 | 52.73 | 54.16 | 52.35 | 53.76 | 50.91 | 2,223,200 |
| Jan 27, 2016 | 52.27 | 52.76 | 52.06 | 52.77 | 49.97 | 3,604,000 |
| Jan 26, 2016 | 52.12 | 52.81 | 51.85 | 52.14 | 49.37 | 3,367,800 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Feb 01, 2016 | 54.96 | 55.53 | 54.61 | 55.46 | 52.52 | 3,141,500 |
| Jan 29, 2016 | 54.14 | 55.11 | 53.93 | 54.91 | 52.00 | 3,727,600 |
| Jan 28, 2016 | 52.73 | 54.16 | 52.35 | 53.76 | 50.91 | 2,223,200 |
| Jan 27, 2016 | 52.27 | 52.76 | 52.12 | 52.73 | 49.93 | 3,824,900 |
| Jan 26, 2016 | 52.12 | 52.81 | 51.85 | 52.14 | 49.37 | 3,367,800 |
| Jan 25, 2016 | 52.41 | 52.45 | 51.44 | 51.61 | 48.87 | 2,125,100 |
| Jan 22, 2016 | 51.98 | 52.39 | 51.50 | 52.36 | 49.58 | 3,674,700 |
| Jan 21, 2016 | 51.55 | 51.96 | 50.80 | 51.48 | 48.75 | 3,606,100 |
| Jan 20, 2016 | 52.75 | 53.01 | 50.65 | 51.29 | 48.57 | 4,104,800 |
| Jan 19, 2016 | 52.71 | 53.37 | 52.44 | 52.98 | 50.17 | 4,674,800 |
| Jan 15, 2016 | 52.36 | 53.20 | 51.88 | 52.47 | 49.69 | 4,201,600 |
| Jan 14, 2016 | 52.49 | 53.68 | 52.28 | 53.41 | 50.58 | 3,362,600 |
| Jan 13, 2016 | 52.67 | 52.97 | 52.20 | 52.29 | 49.52 | 2,935,000 |
| Jan 12, 2016 | 52.51 | 52.65 | 51.52 | 52.56 | 49.77 | 3,495,200 |
| Jan 11, 2016 | 52.20 | 52.54 | 51.91 | 52.23 | 49.46 | 3,605,300 |
| Jan 08, 2016 | 52.50 | 52.67 | 51.97 | 52.06 | 49.30 | 3,351,500 |
| Jan 07, 2016 | 52.21 | 52.70 | 52.14 | 52.46 | 49.68 | 2,331,100 |
| Jan 06, 2016 | 52.63 | 52.96 | 52.49 | 52.72 | 49.92 | 2,599,300 |
| Jan 05, 2016 | 52.87 | 53.28 | 51.91 | 53.02 | 50.21 | 2,345,700 |
| Jan 04, 2016 | 52.85 | 53.04 | 52.46 | 52.94 | 50.13 | 2,201,500 |
| Dec 31, 2015 | 53.83 | 54.04 | 52.85 | 53.19 | 50.37 | 1,753,600 |
| Dec 30, 2015 | 53.95 | 54.33 | 53.78 | 53.92 | 51.06 | 1,419,200 |
| Dec 29, 2015 | 53.73 | 54.14 | 53.67 | 53.81 | 50.95 | 1,142,700 |
| Dec 29, 2015 | **0.455** Dividend | | | | | |
| Dec 28, 2015 | 53.78 | 54.04 | 53.57 | 53.98 | 50.68 | 1,383,800 |
| Dec 24, 2015 | 54.08 | 54.18 | 53.87 | 53.94 | 50.65 | 592,200 |
| Dec 23, 2015 | 53.39 | 54.10 | 53.27 | 54.08 | 50.78 | 1,625,800 |
| Dec 22, 2015 | 53.18 | 53.43 | 52.48 | 53.21 | 49.96 | 1,453,500 |
| Dec 21, 2015 | 53.29 | 53.63 | 52.72 | 53.06 | 49.82 | 1,800,900 |
| Dec 18, 2015 | 53.57 | 53.82 | 52.84 | 53.11 | 49.87 | 4,426,600 |
| Dec 17, 2015 | 54.26 | 54.39 | 53.70 | 53.85 | 50.56 | 2,723,400 |
| Dec 16, 2015 | 52.84 | 54.29 | 52.73 | 54.23 | 50.92 | 2,453,200 |
| Dec 15, 2015 | 52.43 | 53.38 | 52.40 | 52.70 | 49.48 | 2,830,600 |
| Dec 14, 2015 | 51.84 | 52.34 | 51.48 | 52.28 | 49.09 | 2,025,400 |
| Dec 11, 2015 | 51.56 | 52.14 | 51.19 | 51.71 | 48.55 | 2,292,400 |
| Dec 10, 2015 | 52.60 | 52.80 | 51.43 | 51.65 | 48.50 | 3,091,500 |
| Dec 09, 2015 | 52.54 | 53.44 | 52.41 | 52.57 | 49.36 | 2,223,800 |
| Dec 08, 2015 | 53.02 | 53.18 | 52.07 | 52.72 | 49.50 | 2,377,600 |
| Dec 07, 2015 | 53.06 | 53.16 | 52.07 | 53.14 | 49.90 | 3,506,400 |
| Dec 04, 2015 | 52.01 | 53.21 | 52.01 | 53.12 | 49.88 | 4,915,000 |
| Dec 03, 2015 | 51.80 | 52.22 | 51.40 | 51.81 | 48.65 | 3,279,500 |
| Dec 02, 2015 | 52.72 | 52.88 | 52.14 | 52.22 | 49.03 | 2,979,300 |
| Dec 01, 2015 | 53.04 | 53.30 | 52.39 | 52.93 | 49.70 | 1,619,600 |
| Nov 30, 2015 | 52.75 | 53.29 | 52.64 | 52.73 | 49.51 | 3,410,200 |
| Nov 27, 2015 | 52.43 | 53.05 | 52.43 | 52.77 | 49.55 | 726,200 |
| Nov 25, 2015 | 52.67 | 52.69 | 52.17 | 52.36 | 49.16 | 1,362,000 |
| Nov 24, 2015 | 52.53 | 52.72 | 52.03 | 52.55 | 49.34 | 2,684,900 |
| Nov 23, 2015 | 52.67 | 53.64 | 52.53 | 52.73 | 49.51 | 2,954,500 |
| Nov 20, 2015 | 53.49 | 53.94 | 53.34 | 53.58 | 50.31 | 1,873,600 |
| Nov 19, 2015 | 52.79 | 53.40 | 52.67 | 53.19 | 49.94 | 1,663,100 |
| Nov 18, 2015 | 52.17 | 52.78 | 51.72 | 52.67 | 49.45 | 2,248,000 |
| Nov 17, 2015 | 53.25 | 53.68 | 51.95 | 52.15 | 48.97 | 2,870,700 |
| Nov 16, 2015 | 52.21 | 52.85 | 51.85 | 52.66 | 49.44 | 2,116,900 |
| Nov 13, 2015 | 52.79 | 53.32 | 52.13 | 52.26 | 49.07 | 2,074,500 |
| Nov 12, 2015 | 53.56 | 54.12 | 52.77 | 52.79 | 49.57 | 1,734,900 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Nov 18, 2015 | 52.17 | 52.78 | 51.72 | 52.67 | 49.45 | 2,248,000 |
| Nov 17, 2015 | 53.25 | 53.68 | 51.95 | 52.15 | 48.97 | 2,870,700 |
| Nov 16, 2015 | 52.22 | 53.45 | 52.05 | 53.44 | 50.18 | 2,170,700 |
| Nov 13, 2015 | 52.79 | 53.32 | 52.13 | 52.26 | 49.07 | 2,074,500 |
| Nov 12, 2015 | 53.56 | 54.12 | 52.77 | 52.79 | 49.57 | 1,734,900 |
| Nov 11, 2015 | 53.46 | 53.79 | 53.32 | 53.67 | 50.39 | 2,667,600 |
| Nov 10, 2015 | 52.47 | 53.39 | 52.28 | 53.37 | 50.11 | 2,730,900 |
| Nov 09, 2015 | 51.72 | 52.70 | 51.62 | 52.50 | 49.29 | 3,455,000 |
| Nov 06, 2015 | 52.85 | 52.85 | 51.05 | 51.93 | 48.76 | 4,892,300 |
| Nov 05, 2015 | 54.07 | 54.38 | 53.67 | 53.72 | 50.44 | 2,902,600 |
| Nov 04, 2015 | 53.48 | 54.21 | 53.39 | 54.16 | 50.85 | 2,823,800 |
| Nov 03, 2015 | 53.37 | 53.69 | 52.97 | 53.63 | 50.36 | 2,370,400 |
| Nov 02, 2015 | 53.35 | 53.73 | 52.93 | 53.55 | 50.28 | 2,595,200 |
| Oct 30, 2015 | 52.47 | 53.76 | 52.37 | 53.40 | 50.14 | 4,782,300 |
| Oct 29, 2015 | 52.75 | 53.34 | 51.47 | 52.35 | 49.15 | 5,265,500 |
| Oct 28, 2015 | 53.90 | 54.10 | 52.14 | 52.95 | 49.72 | 3,980,000 |
| Oct 27, 2015 | 53.73 | 54.21 | 53.73 | 54.07 | 50.77 | 4,097,100 |
| Oct 26, 2015 | 53.77 | 53.91 | 53.27 | 53.79 | 50.51 | 3,388,400 |
| Oct 23, 2015 | 54.41 | 54.57 | 53.57 | 53.63 | 50.36 | 2,382,500 |
| Oct 22, 2015 | 54.24 | 54.70 | 54.22 | 54.50 | 51.17 | 2,286,800 |
| Oct 21, 2015 | 54.71 | 54.99 | 54.13 | 54.17 | 50.86 | 1,798,400 |
| Oct 20, 2015 | 54.09 | 54.83 | 54.00 | 54.33 | 51.01 | 1,671,000 |
| Oct 19, 2015 | 53.93 | 54.29 | 53.62 | 54.29 | 50.98 | 2,782,500 |
| Oct 16, 2015 | 53.99 | 54.35 | 53.88 | 54.03 | 50.73 | 4,209,200 |
| Oct 15, 2015 | 52.88 | 54.08 | 52.87 | 54.05 | 50.75 | 3,015,400 |
| Oct 14, 2015 | 52.80 | 53.29 | 52.70 | 52.77 | 49.55 | 2,473,000 |
| Oct 13, 2015 | 52.99 | 53.23 | 52.68 | 52.74 | 49.52 | 2,323,800 |
| Oct 12, 2015 | 52.71 | 53.40 | 52.65 | 53.00 | 49.76 | 4,137,900 |
| Oct 09, 2015 | 53.09 | 53.28 | 52.46 | 52.50 | 49.29 | 2,921,000 |
| Oct 08, 2015 | 52.58 | 53.25 | 52.35 | 53.09 | 49.85 | 2,576,500 |
| Oct 07, 2015 | 53.20 | 53.27 | 52.47 | 52.73 | 49.51 | 2,464,800 |
| Oct 06, 2015 | 53.42 | 53.49 | 52.69 | 53.11 | 49.87 | 3,423,500 |
| Oct 05, 2015 | 53.27 | 53.50 | 52.72 | 53.46 | 50.20 | 3,164,600 |
| Oct 02, 2015 | 52.74 | 53.00 | 52.24 | 53.00 | 49.76 | 2,828,400 |
| Oct 01, 2015 | 52.92 | 53.00 | 52.26 | 52.58 | 49.37 | 3,085,600 |
| Sep 30, 2015 | 52.30 | 52.91 | 52.05 | 52.80 | 49.58 | 4,164,700 |
| Sep 29, 2015 | 52.11 | 52.18 | 51.46 | 52.01 | 48.83 | 3,281,500 |
| Sep 28, 2015 | 52.26 | 52.73 | 51.79 | 52.01 | 48.83 | 3,278,700 |
| Sep 28, 2015 | 0.455 Dividend | | | | | |
| Sep 25, 2015 | 52.56 | 53.59 | 52.37 | 52.92 | 49.26 | 3,907,200 |
| Sep 24, 2015 | 51.71 | 52.60 | 51.35 | 52.44 | 48.82 | 4,600,600 |
| Sep 23, 2015 | 51.49 | 52.05 | 51.18 | 52.00 | 48.41 | 6,284,200 |
| Sep 22, 2015 | 50.92 | 51.69 | 50.52 | 51.45 | 47.89 | 7,625,800 |
| Sep 21, 2015 | 50.69 | 51.35 | 50.52 | 51.18 | 47.64 | 3,629,600 |
| Sep 18, 2015 | 49.90 | 51.10 | 49.32 | 50.53 | 47.04 | 9,342,800 |
| Sep 17, 2015 | 49.21 | 51.03 | 48.94 | 50.09 | 46.63 | 5,314,400 |
| Sep 16, 2015 | 48.80 | 49.38 | 48.73 | 49.28 | 45.87 | 2,387,100 |
| Sep 15, 2015 | 48.58 | 49.01 | 48.20 | 48.80 | 45.43 | 4,465,200 |
| Sep 14, 2015 | 48.52 | 48.84 | 48.02 | 48.49 | 45.14 | 3,257,700 |
| Sep 11, 2015 | 47.53 | 48.48 | 47.47 | 48.44 | 45.09 | 3,036,500 |
| Sep 10, 2015 | 47.78 | 48.32 | 47.54 | 47.70 | 44.40 | 3,056,900 |
| Sep 09, 2015 | 49.00 | 49.08 | 47.82 | 47.91 | 44.60 | 3,499,300 |
| Sep 08, 2015 | 48.30 | 48.79 | 47.90 | 48.78 | 45.41 | 5,176,200 |
| Sep 04, 2015 | 47.83 | 47.97 | 47.42 | 47.60 | 44.31 | 2,813,600 |

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1133 of 1229

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Sep 11, 2015 | 47.53 | 48.48 | 47.47 | 48.44 | 45.09 | 3,036,500 |
| Sep 10, 2015 | 47.78 | 48.32 | 47.54 | 47.70 | 44.40 | 3,056,900 |
| Sep 09, 2015 | 49.00 | 49.08 | 47.82 | 47.91 | 44.60 | 3,499,300 |
| Sep 08, 2015 | 48.30 | 48.79 | 47.90 | 48.78 | 45.41 | 5,176,200 |
| Sep 04, 2015 | 47.83 | 47.97 | 47.42 | 47.60 | 44.31 | 2,813,600 |
| Sep 03, 2015 | 47.98 | 48.43 | 47.73 | 48.30 | 44.96 | 2,566,000 |
| Sep 02, 2015 | 48.34 | 48.80 | 47.33 | 47.93 | 44.62 | 3,055,600 |
| Sep 01, 2015 | 48.52 | 48.90 | 47.59 | 47.88 | 44.57 | 3,462,200 |
| Aug 31, 2015 | 50.24 | 50.53 | 49.41 | 49.58 | 46.15 | 3,144,400 |
| Aug 28, 2015 | 50.29 | 50.51 | 49.76 | 50.42 | 46.93 | 2,511,100 |
| Aug 27, 2015 | 49.68 | 50.40 | 49.27 | 50.34 | 46.86 | 5,577,500 |
| Aug 26, 2015 | 49.63 | 49.67 | 48.51 | 49.43 | 46.01 | 4,967,600 |
| Aug 25, 2015 | 51.08 | 51.16 | 48.90 | 48.96 | 45.58 | 3,850,600 |
| Aug 24, 2015 | 51.50 | 52.48 | 49.94 | 50.41 | 46.93 | 7,272,100 |
| Aug 21, 2015 | 53.49 | 53.96 | 53.04 | 53.08 | 49.41 | 2,665,500 |
| Aug 20, 2015 | 53.80 | 54.46 | 53.55 | 53.88 | 50.16 | 1,707,200 |
| Aug 19, 2015 | 54.18 | 54.39 | 53.72 | 54.13 | 50.39 | 2,337,900 |
| Aug 18, 2015 | 54.08 | 54.51 | 53.81 | 54.41 | 50.65 | 2,317,500 |
| Aug 17, 2015 | 54.14 | 54.63 | 53.97 | 54.27 | 50.52 | 1,872,500 |
| Aug 14, 2015 | 53.22 | 54.10 | 53.01 | 54.08 | 50.34 | 1,673,200 |
| Aug 13, 2015 | 53.02 | 53.62 | 52.50 | 53.36 | 49.67 | 2,276,300 |
| Aug 12, 2015 | 52.40 | 53.30 | 52.30 | 53.18 | 49.50 | 4,918,800 |
| Aug 11, 2015 | 52.23 | 53.05 | 52.13 | 52.63 | 48.99 | 2,059,600 |
| Aug 10, 2015 | 52.95 | 53.16 | 52.14 | 52.24 | 48.63 | 1,848,200 |
| Aug 07, 2015 | 51.98 | 53.00 | 51.79 | 52.89 | 49.23 | 2,071,000 |
| Aug 06, 2015 | 51.99 | 52.24 | 51.64 | 52.16 | 48.55 | 6,080,400 |
| Aug 05, 2015 | 51.84 | 52.04 | 51.55 | 51.83 | 48.25 | 7,303,400 |
| Aug 04, 2015 | 52.43 | 52.47 | 51.89 | 51.99 | 48.40 | 2,390,900 |
| Aug 03, 2015 | 52.66 | 52.91 | 52.30 | 52.64 | 49.00 | 2,403,700 |
| Jul 31, 2015 | 52.56 | 53.25 | 52.43 | 52.51 | 48.88 | 2,825,700 |
| Jul 30, 2015 | 52.06 | 52.49 | 51.80 | 52.18 | 48.57 | 3,044,000 |
| Jul 29, 2015 | 51.90 | 52.69 | 51.66 | 52.34 | 48.72 | 3,111,900 |
| Jul 28, 2015 | 51.73 | 52.29 | 51.56 | 52.28 | 48.67 | 4,114,900 |
| Jul 27, 2015 | 50.44 | 51.87 | 50.44 | 51.83 | 48.25 | 3,111,000 |
| Jul 24, 2015 | 50.29 | 50.58 | 50.11 | 50.35 | 46.87 | 2,835,000 |
| Jul 23, 2015 | 51.14 | 51.27 | 50.15 | 50.33 | 46.85 | 2,534,700 |
| Jul 22, 2015 | 50.63 | 51.48 | 50.59 | 51.32 | 47.77 | 3,136,400 |
| Jul 21, 2015 | 51.08 | 51.16 | 50.34 | 50.60 | 47.10 | 2,105,900 |
| Jul 20, 2015 | 51.28 | 51.45 | 50.82 | 51.19 | 47.65 | 1,428,400 |
| Jul 17, 2015 | 52.12 | 52.15 | 51.32 | 51.33 | 47.78 | 2,419,300 |
| Jul 16, 2015 | 51.54 | 52.33 | 51.54 | 52.27 | 48.66 | 1,457,300 |
| Jul 15, 2015 | 50.91 | 51.49 | 50.76 | 51.42 | 47.87 | 1,676,700 |
| Jul 14, 2015 | 51.26 | 51.62 | 50.91 | 51.00 | 47.47 | 2,209,300 |
| Jul 13, 2015 | 51.30 | 51.59 | 51.00 | 51.22 | 47.68 | 1,609,300 |
| Jul 10, 2015 | 50.89 | 51.74 | 50.56 | 51.12 | 47.59 | 2,178,900 |
| Jul 09, 2015 | 51.52 | 51.52 | 50.58 | 50.70 | 47.20 | 2,557,800 |
| Jul 08, 2015 | 51.40 | 51.77 | 51.18 | 51.43 | 47.87 | 3,034,600 |
| Jul 07, 2015 | 50.30 | 51.65 | 50.25 | 51.40 | 47.85 | 4,067,100 |
| Jul 06, 2015 | 49.61 | 50.10 | 49.53 | 50.03 | 46.57 | 2,697,800 |
| Jul 02, 2015 | 49.68 | 50.18 | 49.52 | 49.79 | 46.35 | 3,714,700 |
| Jul 01, 2015 | 49.23 | 49.47 | 49.07 | 49.38 | 45.97 | 3,031,100 |
| Jun 30, 2015 | 49.65 | 49.65 | 48.91 | 49.10 | 45.71 | 3,082,300 |
| Jun 29, 2015 | 49.64 | 49.64 | 49.33 | 49.45 | 46.04 | 2,652,700 |
| Jun 26, 2015 | 49.11 | 49.74 | 48.77 | 49.70 | 46.26 | 3,099,400 |
| Jun 26, 2015 | **0.455 Dividend** | | | | | |

| Date | | | | | | |
|------|------|------|------|------|------|------|
| Jul 01, 2015 | 49.23 | 49.47 | 49.07 | 49.38 | 45.97 | 3,031,100 |
| Jun 30, 2015 | 49.65 | 49.65 | 48.91 | 49.10 | 45.71 | 3,082,300 |
| Jun 29, 2015 | 49.64 | 50.35 | 49.28 | 49.33 | 45.92 | 2,662,800 |
| Jun 26, 2015 | 49.11 | 49.74 | 48.77 | 49.70 | 46.26 | 3,099,400 |
| Jun 26, 2015 | **0.455** Dividend | | | | | |
| Jun 25, 2015 | 50.01 | 50.05 | 49.51 | 49.60 | 45.75 | 3,418,800 |
| Jun 24, 2015 | 50.55 | 50.72 | 49.75 | 49.85 | 45.98 | 4,142,500 |
| Jun 23, 2015 | 51.08 | 51.26 | 50.15 | 50.44 | 46.52 | 2,364,800 |
| Jun 22, 2015 | 51.34 | 51.45 | 50.83 | 51.15 | 47.18 | 2,353,600 |
| Jun 19, 2015 | 51.60 | 51.77 | 51.08 | 51.08 | 47.11 | 4,780,600 |
| Jun 18, 2015 | 50.81 | 51.90 | 50.75 | 51.69 | 47.68 | 2,552,700 |
| Jun 17, 2015 | 50.11 | 50.87 | 50.02 | 50.80 | 46.85 | 2,131,000 |
| Jun 16, 2015 | 49.66 | 50.14 | 49.46 | 50.11 | 46.22 | 2,081,900 |
| Jun 15, 2015 | 50.17 | 50.19 | 49.65 | 49.81 | 45.94 | 2,658,800 |
| Jun 12, 2015 | 50.39 | 50.51 | 50.08 | 50.24 | 46.34 | 2,002,900 |
| Jun 11, 2015 | 50.77 | 51.12 | 50.43 | 50.62 | 46.69 | 2,872,600 |
| Jun 10, 2015 | 50.66 | 50.87 | 50.38 | 50.43 | 46.51 | 3,033,000 |
| Jun 09, 2015 | 51.33 | 51.43 | 50.24 | 50.33 | 46.42 | 3,562,400 |
| Jun 08, 2015 | 51.37 | 51.37 | 50.76 | 50.79 | 46.85 | 2,289,600 |
| Jun 05, 2015 | 51.79 | 51.79 | 50.84 | 51.36 | 47.37 | 4,312,300 |
| Jun 04, 2015 | 51.77 | 52.11 | 51.65 | 51.85 | 47.82 | 2,501,700 |
| Jun 03, 2015 | 52.73 | 52.80 | 51.52 | 51.97 | 47.93 | 3,445,100 |
| Jun 02, 2015 | 53.32 | 53.46 | 52.22 | 52.90 | 48.79 | 3,136,200 |
| Jun 01, 2015 | 53.79 | 53.96 | 53.42 | 53.66 | 49.49 | 2,527,700 |
| May 29, 2015 | 53.50 | 53.82 | 53.28 | 53.47 | 49.32 | 2,641,400 |
| May 28, 2015 | 53.22 | 53.50 | 53.00 | 53.36 | 49.22 | 2,835,900 |
| May 27, 2015 | 52.65 | 53.29 | 52.52 | 53.26 | 49.12 | 2,030,700 |
| May 26, 2015 | 52.69 | 52.71 | 51.98 | 52.68 | 48.59 | 1,944,700 |
| May 22, 2015 | 52.99 | 53.06 | 52.21 | 52.71 | 48.62 | 2,567,100 |
| May 21, 2015 | 52.89 | 53.19 | 52.61 | 53.15 | 49.02 | 1,961,300 |
| May 20, 2015 | 53.00 | 53.32 | 52.72 | 52.85 | 48.75 | 2,897,900 |
| May 19, 2015 | 52.24 | 53.07 | 52.10 | 53.01 | 48.89 | 2,803,900 |
| May 18, 2015 | 51.87 | 52.68 | 51.87 | 52.52 | 48.44 | 1,964,800 |
| May 15, 2015 | 51.60 | 52.22 | 51.51 | 52.01 | 47.97 | 2,189,000 |
| May 14, 2015 | 51.09 | 51.59 | 51.09 | 51.43 | 47.44 | 2,058,600 |
| May 13, 2015 | 51.82 | 52.19 | 50.75 | 50.94 | 46.98 | 1,837,600 |
| May 12, 2015 | 51.77 | 51.99 | 51.30 | 51.68 | 47.67 | 2,146,600 |
| May 11, 2015 | 52.37 | 52.94 | 51.96 | 52.06 | 48.02 | 1,964,800 |
| May 08, 2015 | 52.34 | 52.83 | 52.10 | 52.40 | 48.33 | 2,127,000 |
| May 07, 2015 | 51.94 | 52.31 | 51.71 | 51.77 | 47.75 | 2,589,000 |
| May 06, 2015 | 52.25 | 52.60 | 51.43 | 51.93 | 47.90 | 1,996,400 |
| May 05, 2015 | 53.48 | 53.62 | 52.31 | 52.35 | 48.28 | 3,431,100 |
| May 04, 2015 | 53.44 | 54.32 | 53.28 | 53.67 | 49.50 | 4,492,400 |
| May 01, 2015 | 52.94 | 53.58 | 52.77 | 53.49 | 49.34 | 2,331,800 |
| Apr 30, 2015 | 53.77 | 53.80 | 52.21 | 52.92 | 48.81 | 5,687,500 |
| Apr 29, 2015 | 53.90 | 54.05 | 52.90 | 53.92 | 49.73 | 7,885,100 |

*Close price adjusted for splits.    **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.

# Exhibit 104


[Company Information](#)  ›  Company Profile

# Company profile

Fast facts about PG&E

Pacific Gas and Electric Company, incorporated in California in 1905, is one of the largest utility companies in the United States. Based in Oakland, the company is part of [PG&E Corporation](#).

There are approximately 23,000 employees who carry out Pacific Gas and Electric Company's primary business—the transmission and delivery of energy. The company provides [natural gas](#) and [electric service](#) to approximately 16 million people throughout a 70,000-square-mile service area in northern and central California.

Pacific Gas and Electric Company and other energy companies in the state are regulated by the [California Public Utilities Commission](#). The CPUC was created by the state Legislature in 1911.

## Fast facts about PG&E

## Service area

PG&E service area stretches from Eureka in the north to Bakersfield in the south, and from the Pacific Ocean in the west to the Sierra Nevada in the east.

## Miles of transmission lines

106,681 circuit miles of electric distribution lines and 18,466 circuit miles of interconnected transmission lines.

## Natural gas pipelines

42,141 miles of natural gas distribution pipelines and 6,438 miles of transmission pipelines.

## Customer accounts

5.5 million electric customer accounts. 4.5 million natural gas customer accounts.

# Additional information about PG&E

## PG&E Corporation

Meet PG&E Corporation and Company Board of Directors and learn about our committees.

**Learn more about the PG&E Corporation**  →

## Diversity and inclusion

Find out about our commitment to diversity and inclusion.

**Visit diversity and inclusion**  →

## About

[About PG&E](#)

[Company Information](#)

[Giving Locally](#)

[Educational Resources](#)

[First Responder Resources](#)

[Careers](#)

[PG&E Systems](#)

[In Your Community](#)

## Newsroom

[PG&E News](#)

[Corporate Sustainability](#)

## Contact Us

[Contact Us](#)

[Help Center](#)

[Site Feedback](#)

[Doing Business with PG&E](#)

## Connect

[Accessibility](#)

[Privacy](#)

[Terms & Conditions](#)

[Security](#)

[Regulation](#)

[Sitemap](#)

[Do Not Sell My Personal Information](#)

©2023 Pacific Gas and Electric Company

# Exhibit 105

The Wayback Machine - https://web.archive.org/web/20171120143832/http://www.pgecurrents.com:80/2017/11/05/facts-about-pges-wildfire-and-prevention-safety-efforts/

HOME | VIDEOS | LOCAL | PIPELINE SAFETY | SOCIAL MEDIA

**PG&E; Commitment:** Latest Updates on Wildfire Response and Recovery Effort

Posted on November 5, 2017

# Facts About PG&E's Wildfire and Prevention Safety Efforts

The safety of our customers, employees, contractors and the communities we serve is PG&E's top priority. As part of this commitment, PG&E works hard to reduce the risk of wildfires.

PG&E plans for wildfire emergencies in order to respond rapidly and effectively to protect the public and restore essential energy services.

PG&E has multiple wildfire prevention and mitigation plans and programs that are used throughout our service area, many of which are being utilized due to the increased fire risk throughout Northern and Central California.

**Wildfire Prevention**

PG&E has several plans in place that help reduce the risk of wildfire associated with its electrical operations throughout Central and Northern California.

- Through its Electric Vegetation Management Program, PG&E dedicates dollars and workforce hours to help reduce electrical outages and wildfire risks.

- PG&E meteorologists utilize in-house and publicly-available data from weather stations to monitor real-time wildfire threat.

- PG&E conducts patrols and inspections of its overhead electric facilities that helps identify damaged facilities and other conditions that could pose a safety or fire risk.

- PG&E performs annual patrols of distribution lines in urban areas, designated by Cal Fire as high-fire threat zones, and all transmission lines, with biannual patrols of overhead distribution facilities in rural areas.

PG&E conducts annual electric safety training for first responders including law enforcement, fire departments, and public works and transportation agencies.

PG&E participates in annual joint exercises with first responders and emergency management partners to enhance and coordinate prevention and preparedness efforts.

PG&E meets annually with local, state and federal agencies and jurisdictions to share wildfire prevention plans and strategize for the coming year.

**Vegetation Management**

Through its Electric Vegetation Management Program, PG&E dedicates hundreds of millions of dollars and thousands of workforce hours to help reduce electrical outages and wildfire risks.

PG&E meets or exceeds all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines and procedures to reduce outages or fires caused by trees or other vegetation. Utilities are not required, nor would it be practical, to remove every tree that could come into contact with its electric lines.

PG&E is focused on maintaining required clearances and removing dead or dying trees. We've taken a number of actions and continue to invest in our system to ensure the continued safe and reliable service to our customers.

Since the California tree mortality crisis began in 2014, PG&E added the following enhanced measures to address areas particularly affected by drought and bark beetles.

- Increased foot and aerial patrols along power lines in high fire-risk areas to twice a year; up to four times a year in some locations.

- Conducted secondary patrols along 68,000 miles of power lines in 2016; expects to patrol 73,000 miles of line a second time in 2017.

- Removed approximately 236,000 additional dead or dying trees in 2016; expects to remove approximately 150,000 additional dead trees in 2017. Since 2014, PG&E provided $11.5 million to local Fire Safe Councils for fuel reduction projects in communities.

- Provided $2 million to local Fire Safe Councils for 28 highly-programmable remote-sensing cameras on critical fire lookout towers. Launched daily aerial fire detection patrols to improve the spotting and speed of fire response.

- Deployed LiDAR (Light-detecting and Ranging), a remote sensing technology to help identify trees to be worked.

Since 2013, PG&E has spent approximately $1.6 billion in our vegetation management programs to reduce power outages and wildfire risks.

- Invested $185 million in transmission vegetation management from 2013 to 2017 (2017 is forecast, 2013-2016 is actuals)

- Invested $946 million in distribution vegetation management from 2013 to 2017 (2017 is forecast, 2013-2016 is actuals)

- Invested $450 million in tree mortality response from 2014 to 2017 (2017 is forecast, 2014-2016 is actuals)

**Meteorology**

On a daily basis, PG&E staff meteorologists (including wildfire-weather specialists) monitor the current weather, weather forecasts, the National Weather Service's Red Flag Warnings, and wildfire threat projections from the United States Forest Service and Cal Fire.

PG&E's meteorology team obtains via satellite reception 'state-of-the-art' high-resolution weather model forecast data including the predominant fire-weather drivers (rain, wind, temperature, relative humidity). This data is used to predict when and where wildfire threat will be high or extreme.

PG&E's meteorology team notifies PG&E personnel of wildfire threat conditions through wildfire weather daily forecasts and weekly summary forecasts, as well as:

- Alerting workers to current and future wildfire weather conditions and providing information on critical wildfire weather conditions.

- Providing spot forecasts for active wildfires which threaten PG&E assets to help in planning for resource needs and deployments.

**Wildfire Response**

In the event of a fire threatening public safety and/or PG&E facilities, PG&E will support firefighting efforts as appropriate, through resources and activation of PG&E's wildfire response plans.

PG&E's Geographic Information System (GIS) team provides critical mapping information which can help PG&E and first responders protect critical infrastructure and deploy and manage crews.

With approval of the wildfire Incident Command, PG&E crews can respond to the fire area and perform pole pre-treatment and fuel reduction activities ahead of a fire, on and near power lines.

- Pole pre-treatment is conducted with an approved wildland fire chemical applied to PG&E infrastructure and surrounding vegetation, helping prevent the pole or other facility from catching fire.

- Vegetation management crews may work ahead of a fire to further reduce the fuel in and around

power lines so that fire fighters will have a better chance of controlling the spread of the fire.

Field personnel work directly with the fire suppression Incident Command to coordinate efforts to identify potential hazards, and to provide a safe area for the public and personnel working onsite. If power lines need to be de-energized, crews are onsite to do that work.

Field personnel can work directly with the fire Incident Command should it become necessary to protect critical power generation, transmission or distribution assets.

After a fire has gone through an area, crews work to clear hazardous, burned or damaged trees that pose a threat to utility lines and public safety.

**Post-Wildfire Incident Recovery**

PG&E conducts a thorough review within 20 days of a fire-related incident that triggers Operations Emergency Center (OEC) activation, focusing on identifying what worked well and areas to improve, and implementing changes to enhance response.

PG&E also takes part in joint public agency/PG&E debrief sessions following a fire event to gather information on what worked well and areas to improve in the future.

PG&E in collaboration with Cal Fire provides safety information to people returning back to their homes following a wildfire evacuation.

*Email Currents at [Currents@pge.com](mailto:Currents@pge.com).*

**Keywords:** California Drought, California Fire Safe Council, Electrical Reliability, Facts, First Responders, News, North Bay Wildfires, Public Safety, Technology, Trees, Vegetation Management, Wildfires



Sign up for our weekly newsletter

Enter Email Address   SIGN UP

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation.
© 2017 Pacific Gas and Electric Company. All rights reserved.

PG&E Home | Contact Us | About Us

# Exhibit 106

Settings

# Post

**Pacific Gas & Electric** ✓
@PGE4Me

PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as weather conditions did not warrant this safety measure. We want to thank our customers for their understanding. bit.ly/2SVpRtw



11:14 PM · Nov 8, 2018

**34** Reposts   **33** Quotes   **29** Likes   **3** Bookmarks

💬            🔁            ♡            🔖 3            ⬆️

## New to X?

Sign up now to get your own personalized timeline!

[G] Sign up with Google

🍎 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

## Relevant people



**Pacific Gas & Elec** ✓    Follow
@PGE4Me

The official account of Pacific Gas and Electric Company. For emergency assistance call 911, for non-emergencies: 1-800-743-5000.

Trends are unavailable.

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2023 X Corp.

## Don't miss what's happening

People on X are the first to know.

Log in     Sign up

# Exhibit 107



**In Advance of 2018 Wildfire Season, PG&E Takes Action with Comprehensive Community Wildfire Safety Program**

03/22/2018

SAN FRANCISCO--(BUSINESS WIRE)-- To help meet the climate-driven challenge of increasing wildfires and extreme weather events, Pacific Gas and Electric Company (PG&E) today announced a comprehensive Community Wildfire Safety Program.

PG&E is working in close coordination with first responders, civic and community leaders and customers on this program. These efforts will have an immediate impact on reducing wildfire threats and improving safety, in advance of the start of wildfire season in Northern and Central California.

Years of drought, extreme heat and 129 million dead trees have created a "new normal" for California. In the interest of public safety, and following the wildfires in 2017, PG&E is implementing additional precautionary measures intended to reduce the risk of wildfires. PG&E is continuously evolving its operating practices in response to new standards and regulations – but this new normal means even more must be done in partnership to strengthen the safety and resilience of the state's energy infrastructure.

The multi-faceted program focuses on three key areas:

- bolstering wildfire prevention and emergency response efforts;
- working with customers and first responders to put in place new and enhanced safety measures; and
- doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe.

"Our system and our mindset need to be laser-focused on working together to help prevent devastating wildfires like the ones in the North Bay in October and in Southern California in December from happening again, and in responding quickly and effectively if they do," said Pat Hogan, PG&E's senior vice president of Electric Operations. "Extraordinary times call for extraordinary measures, which is what the Community Wildfire Safety Program is all about."

Among the actions that PG&E is taking:

<u>Wildfire Prevention and Emergency Response</u>

- Establishing a Wildfire Safety Operations Center to monitor wildfire risks in real-time and coordinate prevention and response efforts with first responders.
- Securing additional PG&E firefighting resources to respond to wildfires, protect poles, power lines and other electrical equipment during fires, and assist utility crews working in high fire danger areas.
- Expanding the company's weather forecasting and modeling by installing a network of PG&E-owned and operated weather stations across the service area.

<u>New and Enhanced Safety Measures</u>

- Augmenting PG&E's already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission. New standards require keeping trees and limbs farther away from power lines. We also will be working to create fire safety zones around power lines in the highest fire-threat areas.
- Refining and executing protocols for proactively turning off electric power lines in areas where extreme fire conditions are occurring, and implementing the appropriate communications and resources to help inform, prepare and support our customers and communities.
- Expanding our practice of disabling line reclosers and circuit breakers in high fire-risk areas during fire season.

<u>Electric System Hardening Over the Long Term</u>

- Investing in stronger, coated power lines, spacing lines farther apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years.
- Expanding our practice of pre-treating electric poles with long-term fire retardant in areas where the fire danger is high.
- Partnering with communities to develop and integrate microgrids to help support community facility resilience in the event of major natural disasters.

Hogan, who has participated in recent legislative and regulatory hearings on wildfires, noted that PG&E won't be able to do this alone. It will require a comprehensive and collaborative partnership that includes civic and community leaders, first responders and other public safety authorities, state leaders, and energy companies.

"All of us need to work together to make decisions and put in place solutions based on the dynamics of climate change and severe weather events," Hogan said. "Our communities are depending on us to take strong and preventive actions that will protect our state's energy future and help reduce the risk of wildfire in California."

**About PG&E**

Pacific Gas and Electric Company, a subsidiary of PG&E Corporation (NYSE:PCG), is one of the largest combined natural gas and electric energy companies in the United States. Based in San Francisco, with more than 20,000 employees, the company delivers some of the nation's cleanest energy to nearly 16 million people in Northern and Central California. For more information, visit www.pge.com/ and pge.com/news.

View source version on businesswire.com: https://www.businesswire.com/news/home/20180322006083/en/

Source: Pacific Gas and Electric Company

Pacific Gas and Electric Company

Media Relations, 415-973-5930

Copyright © 2004 - 2023 PG&E Corporation. All Rights Reserved

Powered By Q4 Inc. 5.112.1.9

# Exhibit 108

# PACIFIC GAS AND ELECTRIC COMPANY

# PUBLIC SAFETY POWER SHUTOFF POLICIES AND PROCEDURES

## SEPTEMBER 2018



Together, Building
a Better California

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements*
*additional precautionary measures intended to further reduce future wildfire risk.*

# PACIFIC GAS AND ELECTRIC COMPANY PUBLIC SAFETY POWER SHUTOFF POLICIES AND PROCEDURES

The following is a description of Pacific Gas and Electric Company's (PG&E) policies and procedures related to proactively turning off power for safety – and later restoring power – when necessary due to extreme weather and wildfire danger. This is often called proactive de-energization and restoration in the industry; PG&E is calling this **Public Safety Power Shutoff**.

Extreme weather events driven by climate change are causing unprecedented and unanticipated wildfires. Years of drought, extreme heat and 129 million dead trees have created a "new normal" for our state, and we must continue to adapt to meet these challenges. PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. It includes:



**WILDFIRE PREVENTION AND EMERGENCY RESPONSE**

- Monitoring wildfire risks in real time from our new Wildfire Safety Operations Center
- Expanding our network of PG&E weather stations to enhance weather forecasting and modeling



**NEW AND ENHANCED SAFETY MEASURES**

- Doing enhanced vegetation management in high fire-threat areas
- Disabling automatic reclosing of circuit breakers and reclosers
- Refining and executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring



**LONGER-TERM ELECTRIC SYSTEM HARDENING**

- Investing in stronger, coated power lines
- Replacing some wood poles with non-wood poles in the coming years
- Working with communities to develop resilience zones

Public Safety Power Shutoff is one component of the Community Wildfire Safety Program. PG&E has created a set of procedures for:

- Monitoring **fire danger conditions**
- Determining what **combination of conditions** necessitates turning off lines for safety
- Identifying **high fire-risk locations**
- **Notifying customers**, municipalities, agencies and critical facilities
- **Restoring power as quickly as possible** once it is safe to do so

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1152 of 1229

# 1 | MONITORING FOR EXTREME FIRE DANGER CONDITIONS

PG&E established a Wildfire Safety Operations Center to monitor potential fire threats across our service area in real time and coordinate prevention and response efforts.



### ■ 24-HOUR STAFFING

The Wildfire Safety Operations Center is staffed 24 hours a day, primarily during wildfire season, and operational other times of the year, depending on conditions.

### ■ HIGHLY-QUALIFIED TEAM

The onsite team is composed of highly-qualified individuals knowledgeable in electric operations, fire safety, meteorology and other areas.

### ■ REAL-TIME MONITORING

The center provides real-time monitoring of conditions from on-the-ground field teams, PG&E weather stations and live video feeds, as well as databases, emergency alert systems and social media from agencies such as CAL FIRE, National Weather Service, National Oceanic and Atmospheric Association (NOAA), Caltrans, the Bay Area Regional Air Quality Control Board and local public safety authorities.



To further advance our weather forecasting capabilities, PG&E is expanding its network of weather stations to monitor and forecast weather conditions and better predict where extreme wildfire danger could occur so we can respond quickly and appropriately to keep our customers safe.

- Data collected by these stations is streamed in real time and is available to state and local agencies and the public through online sources such as the National Weather Service and MesoWest.

- With these new weather stations, PG&E is able to capture additional data related to temperature, wind speeds and humidity levels to provide improved awareness of current fire danger conditions.

- PG&E's meteorologists feed information to the Wildfire Safety Operations Center team to review data and determine any needed action to help reduce wildfire risks, such as a Public Safety Power Shutoff.

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1153 of 1229

# 2 | CRITERIA FOR DETERMINING PUBLIC SAFETY POWER SHUTOFF

PG&E's Wildfire Safety Operations Center team will monitor conditions across our system and evaluate whether to temporarily turn off electric power lines, in the interest of public safety.

A Public Safety Power Shutoff will only be done as a last resort during the most extreme fire danger conditions. Importantly, no single factor will drive a Public Safety Power Shutoff. PG&E will take a combination of many criteria into consideration, including:

- ◼ **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System
- ◼ **A Red Flag Warning declared** by the National Weather Service
- ◼ **Low humidity levels**, generally 20 percent and below
- ◼ **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph
- ◼ **Site-specific conditions** such as temperature, terrain and local climate
- ◼ **Critically dry vegetation** that could serve as fuel for a wildfire
- ◼ **On-the-ground, real-time observations** from PG&E field crews

We anticipate that a Public Safety Power Shutoff could occur 1-2 times a year in our service area, although it is impossible to predict future weather conditions in the "new normal" of climate-driven extreme weather events.



*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

# 3 | IDENTIFICATION OF HIGH FIRE-RISK LOCATIONS

To determine which communities have a high fire-risk, PG&E is using the **California Public Utility Commission's (CPUC) High Fire-Threat District Map**, developed in coordination with CAL FIRE and based on input from electric utilities, communications infrastructure providers and local public safety agencies.



**Fire-Threat Areas**
Tier 2 - Elevated
Tier 3 - Extreme

The map was adopted in January 2018 and is available on the CPUC's website at **cpuc.ca.gov/FireThreatMaps**.

*Source: California Public Utilities Commission (CPUC)*

- The map identifies areas that are at extreme risk (Tier 3) and elevated risk (Tier 2) of wildfire.

- The most likely electric lines to be considered for shutting off for safety will be those that run through areas designated Tier 3.

- If we need to turn off an electric line during extreme fire danger conditions, homes and businesses served by that line would be affected.

- The specific area and number of affected customers will depend on conditions and which circuits PG&E needs to turn off for public safety.

---



Customers can visit **pge.com/wildfiresafety** to enter their address and find out if their home or business is served by an electric line that may be turned off during high wildfire threats.

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1155 of 1229

# 4 | NOTIFICATION OF PUBLIC SAFETY POWER SHUTOFF

In the event we need to temporarily turn off power for safety, we would advise public safety authorities, first responders and local municipalities.

Extreme weather threats can change quickly. When and where possible, we would provide customers with notice between one hour to 48 hours in advance of turning off the power. We will also provide updates until power is restored.

## TIMING OF NOTIFICATIONS (when possible)

**~48 HOURS**
before power is turned off

**~24 HOURS**
before power is turned off

**~1 HOUR**
before power is turned off

**DURING THE PUBLIC SAFETY OUTAGE**

**ONCE POWER HAS BEEN RESTORED**



## HOW WE'LL NOTIFY CUSTOMERS

We will attempt to reach customers through **calls, texts and emails** using the contact information we have on file. We will also use **social media** channels and keep **local news** and **radio outlets** informed and updated.

## 1 NOTICE TO CUSTOMERS

Our goal, dependent on weather and other factors, is to send customer alerts at 48 hours, again at 24 hours and again just prior to shutting off power, when and where possible.

- We are asking customers who live in or near high fire-threat areas to go online to **pge.com/mywildfirealerts** to be sure we have their updated contact information. We will use this information to reach out to them by phone, text and email in advance of a Public Safety Power Shutoff, if conditions allow, and throughout the event until power is restored.

- In addition to notifying customers directly, we will provide outage updates and information through social media, local news, radio and the pge.com website.

- Public Safety Power Shutoff events may be cancelled if weather conditions improve. In that event, we would notify customers that weather conditions have improved in their area, and we are not planning to turn off their electricity for safety.

- We are also encouraging customers to visit **pge.com/wildfiresafety** for tips to prepare an emergency preparedness plan for their home or business.

- Note, there is no advance notice when we need to turn off power at the request of CAL FIRE or a local agency due to an active wildfire or other emergency response situation.

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1156 of 1229

## 2 NOTICE TO STATE, COUNTIES AND CITIES

**If possible based on conditions, we would provide notice to cities, counties and emergency response partners in advance of notifying customers about a potential Public Safety Power Shutoff.**

- We would reach out via phone to our government and agency contacts with notice that we are monitoring conditions and that extreme fire danger conditions may cause power outages or require us to shut off power for safety in the coming days.

- For cities, counties and local agencies, we will use a platform which can send the same message to a list of contacts through multiple channels including phone, text and email.

- We would provide city, county and agency officials with the content of our customer alerts, so they can be shared on channels such as Nixle, Nextdoor and Reverse 911.

## 3 NOTICE TO CRITICAL CUSTOMERS

**PG&E has identified and is doing direct outreach to customers who provide critical services, such as hospitals, fire stations, water agencies and telecommunications providers.**

- We want to be sure they know we may need to turn off power for safety during extreme weather conditions so they can take steps to prepare, such as securing backup generation.

- We are also asking these customers to confirm that we have their correct contact information so we can provide early warning notification, when and where possible depending on conditions.

## 4 NOTICE TO MEDICAL BASELINE CUSTOMERS

**We are conducting additional outreach to customers who are enrolled in PG&E's Medical Baseline program.**

- We are asking customers to please evaluate the safety of their situation and consider if there is a friend or family member they can stay with during an outage.

- If the customer has a backup generator, we encourage them to do a safety check and make sure they have enough fuel to last for a few days. More generator safety tips can be found at **pge.com/generatorsafety**.

- Customers should keep emergency numbers on hand, and are encouraged to check with local authorities regarding resources that may be available.

- We advise all customers to call 911 immediately if a family member experiences a medical emergency.

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

Case: 19-30088   Doc# 14208-1   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1157 of 1229

# 5 | RESTORATION OF POWER

After the extreme weather has passed and it is safe to do so, our crews will work to inspect the lines and safely restore power to customers. If the extreme weather occurs overnight, inspections would take place during daylight hours.



We would make every effort to restore power within 24 hours. However, depending on conditions or if any repairs are needed, outages (weather event plus restoration time) could last between 2 to 5 days.

For planning purposes, we suggest customers served by lines that run through high fire-threat areas prepare for multiple-day outages.



---

**MORE INFORMATION |** For more information about PG&E's Community Wildfire Safety Program, please visit **pge.com/wildfiresafety**. Customers can update their contact information for wildfire safety alerts at **pge.com/mywildfirealerts**.

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*

# APPENDIX | PUBLIC SAFETY POWER SHUTOFF SUMMARY

We are reaching out to our customers who are served by electric lines that run through high fire-threat areas to let them know that, if extreme fire danger conditions occur, it may be necessary for us to temporarily turn off power to their neighborhood or community for safety.

## 1 MONITOR
PG&E continually monitors for extreme weather threats and high fire danger.

**We will consider several factors before shutting off power.**


**Weather Forecast**
Periods of increased risk are identified by wind speed, humidity and temperature.


**Observations**
On-the-ground, real-time observations are made.


**Fuel Conditions**
Conditions such as dry vegetation are factored in.


**Notice**
Inform CAL FIRE, Cal OES* and local agencies of conditions and potential Public Safety Power Shutoff.

*California Governor's Office of Emergency Services*

## 2 INFORM
If we need to turn off power, we will attempt to contact customers in advance to give time to prepare.

**We will use a multi-faceted effort to inform communities.**


**Automated Outreach**
PG&E will provide automated outreach through calls, texts and emails.


**Direct Outreach**
We will take additional steps to reach customers who are enrolled in our Medical Baseline program, as needed.


**Coordination**
Coordination will take place with first responders and local officials.

## 3 SHUT OFF / RESTORE
We know how much people rely on electric service and would only temporarily turn off power for safety as a last resort.

**We will take steps to keep you informed and get power restored as quickly as possible.**


**Inspections**
PG&E crews will be in the field conducting safety inspections and determining when power can be safely restored.


**Updates**
Customers will receive updates until power is restored.


**Safely Restore Power**
Power will be restored as soon as extreme weather conditions have passed and safety inspections are complete.

PG&E has a plan to deal with the growing threat of extreme weather and wildfires. All customers living in high fire-threat areas should also have a personal or family emergency plan. Visit **pge.com/wildfiresafety** to learn more about how to prepare your home or business.

*Following the 2017 wildfires, PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to further reduce future wildfire risk.*





Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1159 of 1229

# Exhibit 109

# Wave of lawsuits blames PG&E for deadly California fires

Sacramento Bee (California)

November 14, 2017 Tuesday

Copyright 2017 Sacramento Bee (California) All Rights Reserved

**Section:** fires

**Length:** 1127 words

**Byline:** Sam Stanton

The Sacramento Bee

## Body

Law firms from across the country have begun preparing and filing suits against Pacific Gas & Electric Co., blaming the utility for October's massive firestorms and paving the way for what may result in billions of dollars in payouts if the company is found responsible.

The first suits were filed in the week after the blazes erupted, and at least seven more were filed Tuesday in superior courts in San Francisco, Napa and Sonoma counties by a team of five California law firms, including Sacramento's Dreyer Babich Buccola Wood Campora.

Dreyer Babich previously sued PG&E over the 2010 San Bruno gas explosion that killed eight people and the 2015 Butte Fire that killed two people, destroyed 549 homes and burned more than 109 square miles, mostly in Calaveras County.

Attorney Steve Campora said his firm expects to file at least five wrongful death suits in the fires in the future and that he anticipated additional lawsuits against PG&E.

"What we need to consider here is, these people are innocent victims," Campora said. "They do nothing to contribute to the injuries or damage they sustained there in the sanctuary of their own homes, and they're subjected to explosions and fire. I have a real problem with that."

More than a dozen lawsuits have been filed over the series of destructive wildfires that erupted Oct. 8 and swept across Northern California's wine country and Santa Rosa as well as Yuba and Mendocino counties. It was the deadliest week in California wildfire history, with at least 43 people killed. The value of the homes, businesses and vehicles burned in the flames is expected to total $3.3 billion.

The group of fire victims who sued Tuesday include a Napa County winery owner, former San Francisco Mayor Frank Jordan and Sonoma County resident Gregory Wilson, who survived the flames by seeking safety in his swimming pool. They blame PG&E for failing to maintain its power lines and for allowing trees and vegetation to grow close enough that it sparked blazes when winds knocked down the lines on the night of Oct. 8.

"...It is clear that the North Bay fires were an inevitable byproduct of PG&E's willful and conscious disregard of public safety," one of the lawsuits says, blaming the utility for decades-old practices of diverting money from maintenance efforts "to boost corporate profits."

PG&E responded Tuesday with a statement noting that there is no official cause yet for what sparked the fires.

Wave of lawsuits blames PG&E for deadly California fires

"Nothing is more important to us than the safety and well-being of our customers and communities we serve," spokesman Donald Cutler said in an email response. "Our thoughts are with everyone impacted by these devastating wildfires.

"We are aware that lawsuits have been filed. There has been no determination on the causes of the fires. We're focused on doing everything we can to help these communities rebuild and recover."

But the lawsuits note that PG&E has repeatedly been fined or found liable for failing to maintain its lines and equipment, including most recently in the 2015 Butte Fire, for which the utility was fined $8.3 million by the state.

In the days before Oct. 8, Cal Fire and the National Weather Service issued stark warnings that high winds expected that weekend could spark devastating wildfires. But the lawsuits claim the gusts in the fire zones were far below the intensity needed to knock down properly constructed power poles.

A weather station in Napa County near where the Atlas Fire erupted measured wind gusts of 32 mph, the lawsuits say, far below "the speed that power lines must be able to withstand winds under state law: approximately 92 mph."

The scope of the damages - and the notion that the fires may have been caused by a deep-pocketed utility like PG&E - have spawned online pitches to fire victims from law firms nationwide offering to represent them.

Nearly 100,000 results were produced Tuesday with a Google search for "pge fire lawsuit," including law firm websites with titles such as "File a Fire Lawsuit - Justice for Wildfire Victims," "Wine Country fire Victims" and "California Fire Lawsuits."

The law firm websites offer victims the chance to fill out short forms online describing their cases, and they promote their past successes in such legal fights.

"Our firm has more than 350 attorneys who aren't afraid to litigate against large corporations, like insurance companies," the Orlando, Fla., law firm of Morgan & Morgan boasts on its "California Wildfire Damage Attorneys" web page. "We understand the complexities of natural disasters, having represented victims of the Gatlinburg, TN wildfires; the BP oil spill; Hurricane Katrina; the Rouse Polymerics Plant explosion in Vicksburg, MS and the Porter Ranch gas well blowout."

The potential payouts in such cases can be enormous: In the San Bruno gas explosion, PG&E was fined $1.6 billion by the state Public Utilities Commission and agreed to $565 million in payments to settle lawsuits.

The utility already has begun an aggressive public relations effort in the aftermath of the fires, offering millions of dollars to community groups to help rebuild affected areas and providing free removal services for wood and trees in the fire zones.

But one safety advocate and utility expert said PG&E has not done enough to proactively identify failing equipment and replace it, and that the utility commission doesn't have enough staff to ensure that PG&E does so.

"A problem is the head of the safety division at the PUC says she's understaffed and there are 4 million telephone poles in PG&E and how's she going to inspect all of them," said Scott Rafferty, a Walnut Creek attorney and president of Collaborative Approaches to Utility Safety Enforcement, a group that advocates before the PUC. "You can't have enough inspectors to go after 4 million telephone poles.

"On the other hand, every one of those poles has a PG&E employee who has some information about it."

Rafferty said the utility needs to empower employees to report problems up the line all the way to top management to create safer systems, rather than relying on set schedules for when to repair or replace equipment.

"Some of this is inevitable, there's an 'act of God' element in this," he said. "Not every wildfire can be prevented."

He added that PG&E has not been as advanced as other utilities in placing power lines underground, and that repeated fines from state regulators for equipment causing fires have not had an impact on the company. Rafferty questioned whether additional fines or settlements would affect the company, which filed for bankruptcy reorganization in 2001 and emerged three years later.

"PG&E has already gone bankrupt once, and they didn't go bankrupt after San Bruno," he said. "In fact, they prospered."

Sam Stanton: 916-321-1091, @StantonSam

**Load-Date:** November 15, 2017

End of Document

# Exhibit 110

# PG&E Risk Assessment at Issue in North Bay Wildfires

**CT** nbcconnecticut.com/news/national-international/pge-risk-assessment-at-issue-in-north-bay-wildfires/79287/

Jaxon Van Derbeken

Pacific Gas and Electric was forced to make "trade-off decisions" between keeping rates affordable for consumers and spending more money to cut its wildfire risk, one official said in a regulatory filing submitted two years before the North Bay firestorm.

"Risk cannot be completely driven out of PG&E's – or any – business," Janaize Markland, a PG&E risk manager, stressed in May 2015 as she described the company's risk assessment practices to the state Public Utilities Commission.

The statement appears to be in sharp contrast to CEO Geisha Williams' testimony in July that the company has zero tolerance for vegetation contact wildfires. The seemingly divergent views could become significant while investigators and lawyers work to unravel the causes of the North Bay firestorm, the worst in modern California history. More than 15 lawsuits have already been filed against the power company.

Despite what Markland called a "robust" and "award-winning" vegetation management program, PG&E had been averaging 17 outages per 1,000 miles of power lines each year due to trees coming into contact with lines.

Such contacts, Markland acknowledged, led to a "small number" of wildfires in the utility's more than 100,000-mile power distribution line system.

Markland conceded that PG&E could reduce that number, but that could have consequences for rates.

"It may be possible to drive tree-related outages to less than 17 per 1,000 miles or to have less than 0.02 percent of trees in contact, but that would require a level of investment greater than what PG&E is making today," she wrote in her assessment.

## U.S. & World





"With limited resources – PG&E cannot do everything and must decide at what point it is OK not to mitigate the risk further – trade-off decisions must be made," Markland said, adding that "additional investment in managing wildfire risk requires that customers either pay more or accept higher risk in another area."

In the end, Markland asked regulators for help to "define risk tolerance for PG&E."

But in testimony in the Butte fire litigation, Williams rejected the idea of tolerating any wildfire risk.

"The reality is we have zero tolerance," she said in a videotaped deposition over the company's responsibility for the Butte fires that left two dead and burned more than 70,000 acres.

"We aspire to having absolutely no wildfires, obviously, at all, or especially any wildfires that are somehow caused or somehow as a result of operations in forests or everything else," Williams said. "So we aspire to zero."

The company added in a statement Monday that it checks all of its power lines each year and some more than once.

"PG&E meets or exceeds all applicable federal and state vegetation clearance requirements," company spokesman Greg Snapper said. Last year, because of the drought, the company doubled its spending on vegetation management to $400 million.

Tom Long, an attorney for the ratepayer advocacy group TURN, said when it comes to wildfires, PG&E should make sure it always spends all the money to ensure safety.

"If they know that's a significant risk," Long said, "and there's more money that could be spent to reduce that risk to a more manageable level -- they should be spending the money, and they shouldn't be inventing trade-offs that are going to disserve their customers and make the system less safe."

# Exhibit 111

## *Cal Fire: PG&E equipment caused 12 wildfires*

The Sonoma Index-Tribune (California)

June 12, 2018

Copyright 2018 Sonoma Index-Tribune
Distributed by Newsbank, Inc. All Rights Reserved

**Section:** NEWS; Pg. A7

**Length:** 970 words

**Byline:** JULIE JOHNSON, THE PRESS DEMOCRAT

# Body

Cal Fire investigators said Friday that equipment owned and operated by PG&E ignited 12 wildfires that burned across Northern California, charring hundreds of square miles, destroying thousands of structures and killing 18 people.

Cal Fire found the utility was in violation of state code on 8 of those fires, failing to clear brush around its lines and properly maintain its power equipment.

The violations were found in fires that burned across Sonoma, Napa and Lake counties, according to Cal Fire.

In the other four fires, flames were ignited by power equipment but investigators found the utility company was not in violation of state regulations.

The report is the latest set of findings from state fire investigators examining the causes of dozens of fires that burned more than 245,000 acres in October, destroyed nearly than 6,200 homes and killed 44 people. The findings do not include any determination on the Tubbs fire — the state's most destructive — that burned from Calistoga into Santa Rosa.

The latest set of investigative reports involved 12 different fires:

The Redwood Fire, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. Cal Fire has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The Sulphur Fire, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. Cal Fire investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The Cherokee Fire, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. Cal Fire investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The 37 Fire, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. Cal Fire investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The Blue Fire, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. Cal Fire investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1,355 structures. There were three civilian fatalities.

The findings:

— Norrbom Fire: caused by a tree falling and coming in contact with PG&E power lines.

— Adobe Fire: caused by a eucalyptus tree falling into a PG&E powerline.

— Partrick Fire: caused by an oak tree falling into PG&E powerlines.

— Pythian Fire: caused by a downed powerline after PG&E attempted to re-energize the line.

— Nuns Fire: caused by a broken top of a tree coming in contact with a power line.

The Pocket Fire, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. Cal Fire has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The Atlas Fire, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. Cal Fire investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

All told, the October fires killed 24 people in Sonoma County, nine people in Mendocino County, seven in Napa County and four in Yuba County.

The investigations suggest the utility giant could be facing significant liability for California's most destructive and deadly fires erupted Oct. 8 and 9, major blazes across northern California that killed 44 people.

In Sonoma County, the Tubbs fire destroyed thousands of homes in the communities between Calistiga and Santa Rosa's Coffey Park, where the fire leveled 1,258 homes before firefighters stopped its spread.

The investor-owned utility is facing more than 100 lawsuits from people who lost homes or family members in the fires, in addition to lawsuits lodged by the counties of Sonoma, Lake, Mendocino and Napa over its alleged role in the historic fires.

PG&E has $800 million in liability insurance, but insurance claims from the fires exceed $9.7 billion.

On May 25, Cal Fire released a first set of investigations into some of the smaller fires that broke out last October in Butte and Nevada counties, saying those fires were all caused by trees or branches falling into PG&E power lines.

In three of those cases — the Lobo and McCourtney fires in Nevada County and the Honey fire in Butte County — investigators found PG&E was responsible and alleged the utility giant violated state code requiring utilities maintain adequate clearance between power lines and trees or other vegetation.

Collectively, those fires burned less than 1,000 acres and destroyed 60 structures. No one was injured or killed. The reports were sent to District Attorneys in Nevada and Butte counties for review.

But Cal Fire investigators found no evidence of violations by PG&E in a fourth fire, the La Porte fire in Butte County, which burned 8,417 acres and destroyed 74 structures.

## Notes

The investigators suggest the utility giant could be facing significant liability...

## Graphic

A San Diego Cal Fire firefighter monitors a flare up on a the head of the Nuns fire, Wednesday Oct. 11, 2017 off of High Road above the Sonoma Valley. KENT PORTER / THE PRESS DEMOCRAT ALVIN JORNADA / THE PRESS DEMOCRAT Flames from the Nuns fire are seen the night of Oct. 16, 2017, on a ridge-line adjacent to Ledson Winery in Kenwood.

**Load-Date:** June 13, 2018

# Exhibit 112



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# PG&E Fire Liability Has Calif. Considering Ch. 11 Alternative

By **Alex Wolf**

Law360 (August 17, 2018, 6:01 PM EDT) -- As wildfires again ravage swaths of California forests in what has become a deadly summer ritual, the threat of a Pacific Gas and Electric Co. bankruptcy looms over state lawmakers who are hastily debating how to apportion liability for billions of dollars' worth of damage stemming from last year's infernos.

California's largest utility has put pressure on the state Legislature to limit the exposure the company and shareholders face after investigators concluded that PG&E's power lines caused 16 of the wildfires that torched hundreds of thousands of acres in Northern California last October. The Wine Country fires, which killed 44 people and burned down nearly 9,000 structures, could cost the utility more than $15 billion in damage liabilities, according to some estimates.

Facing hundreds of lawsuits stemming from the 2017 blazes and awaiting the results of a state agency investigation into the cause of the Tubbs Fire, the most catastrophic of the bunch, the company said in June it will record an estimated $2.5 billion pretax charge for the damages. And according to lawmakers, the utility has also warned it may need to file for bankruptcy if it's stuck paying billions more.

Last month, Reuters reported that PG&E has hired Weil Gotshal & Manges LLP "to explore debt restructuring options," while it pushes to change state policy over "inverse condemnation," a principle which holds utilities strictly responsible for fires caused by their equipment, regardless of negligence.

While it's not immediately clear if a Chapter 11 case will materialize, the issue has gotten the attention of state lawmakers, who are discussing the extent to which PG&E can be held liable for damages and also pass the cost of compensating victims on to customers. One representative with a proposal to finance payments for the damages said that if the utility were forced to file for bankruptcy, customers and fire victims could feel the effects the most.

"A bankruptcy court would likely reprioritize company activities toward restructuring and settling debts, meaning fire victims' claims will be in limbo," Assemblymember Bill Quirk of Hayward, a Bay Area Democrat, said in a statement. "Further, utilities will find it harder and more expensive to borrow money. This leads to higher financing costs for things like buying power and making critical infrastructure upgrades to make the grid more resilient to climate-driven weather events. The inevitable result is higher customer rates."

As wildfires again roar through drought-stricken California forests, pressure is mounting on state representatives to get a bill on the governor's desk by the end of the month, when the legislative session wraps up. The sense of urgency to make sure victims are made whole is compounded by bankruptcy rumors, lobbying to change inverse condemnation and even more devastating wildfires.

PG&E spokeswoman Lynsey Paulo would not say whether the company has used the threat of bankruptcy as leverage in talks with lawmakers, as many familiar with the utility's efforts have claimed, but said "the current situation is not financially sustainable over the long term" as the climate continues to change.

"Without reform, energy companies are going to continue to face massive, essentially uninsurable risks, even when they have followed all established safety and compliance rules," Paulo said. "We strongly believe that yesterday's laws are not going to protect California from the effects of today's

and tomorrow's devastating fires."

While a handful of legislative proposals are up for consideration, the company is putting its support behind Assembly Bill 33, sponsored by Quirk, which would allow it to securitize a bond backed by ratepayer charges and immediately pay all liabilities stemming from last year's blazes. Under the bill, the California Public Utilities Commission would determine whether additional customer costs are just and reasonable while keeping the onus on PG&E shareholders to pay when fires have been caused by negligence.

Though Quirk's bill has been labeled a PG&E bailout by critics, he has defended the proposal by pointing out that it does not absolve the company of liability.

But not all state officials are worried the company is at risk of going bankrupt or that inverse condemnation should be phased out.

PG&E's threat of filing for bankruptcy is a "red herring," said Sen. Jerry Hill of San Mateo, also a Bay Area Democrat, claiming the company has used that warning since the beginning of the year "to try to get us to change the liability issue." He does not believe the law needs to be or even can be legislatively wiped away because it stems from a court ruling, but said he does support apportioning damage liability when a utility dutifully followed the rules.

Hill said that calls to upend the law are reactionary and premature since PG&E's full bill for damages is not yet even clear.

"We're partners in this together so I think we have to work out a solution together, but not based on threats, not based on conjecture and speculation," he said.

Many victims of last year's record-setting wildfires are also hoping the state doesn't respond to the utility's lobbying efforts by changing liability laws. Attorney Mike Danko represents hundreds of people who lost their homes in the 2017 North Bay fires, and he said many of them believe ratepayers should not bear the burden of paying for damages.

It appears PG&E does not want to eat into its profits to pay for damages that exceed insurance coverage, Danko said, referring to the utility's "talk of bankruptcy" as "merely a ploy to get the attention of the legislators and as an aid to get the law of inverse condemnation changed."

And "they have not shown any reason why they would have to file bankruptcy," he said.

Entering into Chapter 11 is also not a "magic bullet" that would absolve PG&E of its liabilities to wildfire victims, said Kevin Maclay, a bankruptcy member at Caplin & Drysdale Chtd. While it can be useful under certain circumstances for a corporation to postpone a resolution of its debts, it is less likely that a large and profitable company like PG&E could eliminate damage payments in bankruptcy, he said.

Maclay recognizes that regulators may feel troubled by the prospect of a bankruptcy court gaining substantial control over a large utility like PG&E, but in the end the company may be the most concerned party because "a lot of the losses caused by the bankruptcy would be borne by its shareholders," he said.

As for claimants who have lost homes and loved ones, the prospect of waiting to see what happens in a bankruptcy case could be unsettling, said Mark Indelicato of Hahn & Hessen LLP. While many victims may not want to see consumer rates increased, some are likely to feel nervous about the timing and certainty of being compensated.

In Chapter 11, "you don't necessarily get the ability to cut the best deal and you don't get the ability to get the money necessarily as quick as you would outside of bankruptcy," Indelicato said.

Whether the utility's political strategy ultimately pushes the Legislature in one direction remains to be seen. An investigation into the Tubbs Fire, which killed 22 people and incinerated more than 5,600 structures, is still in progress.

--Editing by Brian Baresch and Pamela Wilkinson.

All Content © 2003-2023, Portfolio Media, Inc.

# Exhibit 113

# United States Bankruptcy Court, Northern District of California

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case (Select only one Debtor per claim form):</strong></td></tr>
<tr><td>☐ PG&E Corporation (19-30088)</td></tr>
<tr><td>☒ Pacific Gas and Electric Company (19-30089)</td></tr>
</table>

# Rescission or Damage Claim Proof of Claim

This form is for purchasers of the Debtors' publicly traded debt and/or equity securities listed on Annex A during the period from April 29, 2015 through November 15, 2018, inclusive, who are asserting claims against the Debtors for rescission or damages under the securities laws and Section 510(b) of the Bankruptcy Code. Read the instructions before filing this Rescission or Damage Claim Proof of Claim Form.

THIS FORM IS TO BE USED <u>ONLY</u> FOR CLAIMANTS THAT PURCHASED OR ACQUIRED THE DEBTORS' PUBLICLY TRADED DEBT AND/OR EQUITY SECURITIES LISTED ON ANNEX A FROM APRIL 29, 2015 THROUGH NOVEMBER 15, 2018 TO ASSERT CLAIMS FOR RESCISSION OR DAMAGES UNDER THE SECURITIES LAWS AND SECTION 510(b) OF THE BANKRUPTCY CODE AND NOT ANY OTHER CLAIMS.

DO <u>NOT</u> USE THIS FORM TO ASSERT A CLAIM IF YOU DID NOT PURCHASE OR ACQUIRE PUBLICLY TRADED DEBT OR EQUITY SECURITIES OF THE DEBTORS FROM APRIL 29, 2015 THROUGH NOVEMBER 15, 2018 AND YOUR CLAIM IS BASED SOLELY ON YOUR CURRENT AND CONTINUOUS OWNERSHIP OF SUCH SECURITIES.

**Filers must leave out or partially redact SSNs/TINs/birthdates/names of minors/full account numbers.** Attach redacted copies of any documents that support the claim. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of January 29, 2019, the date these Chapter 11 Cases were filed. For purposes of this form, "creditor" means the beneficial owner of the securities that form the basis of the claim.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Baupost Group Securities, L.L.C. (See Addendum.) <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the Debtor _____ |
| 2. Has this claim been acquired from someone else? | ☒ No <br> ☐ Yes. From whom? _____ |
| 3. Are you asserting a Claim for rescission or damages under the securities laws and Section 510(b) of the Bankruptcy Code? | <u>Check the box below to indicate whether you are asserting a claim for rescission or damages under the securities laws and section 510(b) of the Bankruptcy Code, arising from the purchase and/or acquisition of the Debtors' publicly traded debt and/or equity securities during the period from April 29, 2015 through November 15, 2018. You are directed to check only one box below:</u> <br><br> ☐ Debt Securities; <br> ☒ Equity Securities; or <br> ☐ Debt Securities and Equity Securities <br><br> Please also check all applicable CUSIP(s) on Annex A, Part I (attached hereto) for the equity or debt securities to which this Proof of Claim applies (hereinafter "the Securities"). If you purchased/acquired multiple CUSIPs, you must make additional copies of Annex A, Part II, so that you submit a <u>separate</u> corresponding Annex A, Part II for each CUSIP, with the requested documentation. <br><br> In addition to completing this Rescission or Damage Claim Proof of Claim Form, including checking the appropriate boxes on Annex A, Part I and providing the detail in Annex A, Part II, you are also required to attach to this Rescission or Damage Claim Proof of Claim Form any applicable detail regarding your purchases/acquisition of the securities from April 29, 2015 through November 15, 2018. <br><br> Once you have completed Annex A, Part I and Part II, please affix them to this Rescission or Damage Claim Proof of Claim Form. If you are submitting your Proof of Claim electronically, you will be asked to scan all Annex A, Part I and Part II and supporting documentation. If you have numerous transactions to report in Annex A, Part II, Claimants with more than 100 transactions in the Debtors' securities may contact Prime Clerk for instructions on how to file these claims electronically. |

Case: 19-30088    Doc# 9708-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1177 of 1229

**Claim Number: 109847**
**Claim Number: 109847**

| 4. | Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|---|

4. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Contact phone (617) 210-8300

Contact email pcgpublicteam@baupost.com

Contact phone _____

Contact email _____

5. **Does this claim amend one already filed?**

☐ No
☒ Yes. Claim number on court claims registry (if known) 100269&100309

Filed on 04/15/2020
       MM / DD / YYYY

6. **Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

---

**Part 2:** Give Information About the Claim as of January 29, 2019

7. **Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

8. **How much is the claim?** $ To be determined. . **Does this amount include interest or other charges?**

☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

9. **Is all or part of the claim secured?**

☒ No
☐ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
    ☐ Motor vehicle
    ☐ Other. Describe: _____

    **Basis for perfection:** _____
    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:** $_____
    **Amount of the claim that is secured:** $_____
    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:** $_____

    **Annual Interest Rate** (when case was filed) _____%
    ☐ Fixed
    ☐ Variable

10. **Is this claim subject to a right of setoff?**

☒ No
☐ Yes. Identify the property: _____

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1178 of 1229

| Part 3: | Sign Below |
|---------|------------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Frederick H. Fogel*
Frederick H. Fogel (Dec 28, 2022 15:24 PST)

**Email:** dgrassgreen@pszjlaw.com

Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Frederick H. Fogel |
| | First name       Middle name       Last name |
| Title | Partner |
| Company | Baupost Group Securities, L.L.C. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 10 St. James Avenue, 17th Floor |
| | Number       Street |
| | Boston                   MA      02116 |
| | City       State       ZIP Code |
| Contact phone | (617) 210-8300      Email    pcgpublicteam@baupost.com |

**Attach Supporting Documentation Including Annex A** (available for download on https://restructuring.primeclerk.com/pge)
(limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ **I have supporting documentation.**
(attach below)

☐ **I do not have supporting documentation.**

📎 **Attachment**

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.**

**IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.**

**A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.**

# Instructions for Rescission or Damage Claim Proof of Claim

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

---

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
> 18 U.S.C. §§ 152, 157 and 3571.

---

### How to fill out this form

- **Fill in all of the information about any claim you may have based on your belief that you have suffered losses as a result of alleged inadequate or fraudulent disclosure or non-disclosure of information about the Debtors that may have led you to purchase or acquire publicly traded debt and/or equity securities during the period from April 29, 2015 through November 15, 2018, inclusive**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else,** then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Complete Annex A, Part I by checking all applicable CUSIP(s) and provide the information requested in Annex A, Part II for that CUSIP.  If you are asserting a claim based on more than one CUSIP, you must attach a separate Annex A, Part II for each CUSIP.**

- **Attach any supporting documents to this form.**

  Attach documentation requested in Annex A, Part II of the Form.  (See the definition of *redaction* on the next page.)

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

### Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at:

https://restructuring.primeclerk.com/pge.

### Understand the terms used in this form

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

**Please send completed Securities Proof(s) of Claim to:**

### If electronically:

Through the website established by the Debtors' Court-approved claims and noticing agent, Prime Clerk LLC ("**Prime Clerk**"), located at https://restructuring.primeclerk.com/pge (the "**Case Website**"), using the interface available under the linked entitled "Submit a Claim" (the "**Electronic Filing System**").

### If by first class mail:

PG&E Corporation Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

### If by overnight courier or hand delivery:

PG&E Corporation Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

Claimants with more than 100 transactions in the Debtors' securities may contact Prime Clerk for instructions on how to file their claims electronically.

## Do not file these instructions with your form

*IF SUBMITTING YOUR RESCISSION OR DAMAGE CLAIM PROOF OF CLAIM THROUGH PRIME CLERK'S ELECTRONIC PORTAL, THIS ANNEX (ALONG WITH ALL OTHER SUPPORTING DOCUMENTATION) WILL NEED TO BE SCANNED AND UPLOADED*

# Annex A
## Part I

**Check all relevant boxes below. If you purchased multiple CUSIPs, you must make additional copies of Part II.**

| Check One Box Below | Issuer of Securities | Securities Description | CUSIP Number | ISIN Number |
|---|---|---|---|---|
| ☑ | PG&E Corp | Common Stock (including any contract options related thereto) | 69331C108 | US69331C1080 |
| ☐ | Pacific Gas & Electric Co | Preferred 4.36 PERP/CALL | 694308883 | US6943088830 |
| ☐ | Pacific Gas & Electric Co | Preferred 4.5 PERP/CALL | 694308800 | US6943088004 |
| ☐ | Pacific Gas & Electric Co | Preferred 4.8 PERP/CALL | 694308701 | US6943087014 |
| ☐ | Pacific Gas & Electric Co | Preferred 5 PERP/CALL | 694308503 | US6943085034 |
| ☐ | Pacific Gas & Electric Co | Preferred 5 PERP/CALL | 694308602 | US6943086024 |
| ☐ | Pacific Gas & Electric Co | Preferred 5 PERPETUAL | 694308404 | US6943084045 |
| ☐ | Pacific Gas & Electric Co | Preferred 5.5 PERPETUAL | 694308305 | US6943083054 |
| ☐ | Pacific Gas & Electric Co | Preferred 6% Dividend PERPETUAL | 694308206 | US6943082064 |
| ☐ | Pacific Gas & Electric Co | 0.45835% due 5/11/2015 | 694308HJ9 | US694308HJ92 |
| ☐ | Pacific Gas & Electric Co | 1.51778% due 11/30/2017 | 694308HQ3 | US694308HQ36 |
| ☐ | Pacific Gas & Electric Co | 2.45% due 8/15/2022 | 694308HB6 | US694308HB66 |
| ☐ | Pacific Gas & Electric Co | 2.54138% due 11/28/2018 | 694308HU4 | US694308HU48 |
| ☐ | Pacific Gas & Electric Co | 2.54138% due 11/28/2018 | 694308HT7 | US694308HT74 |
| ☐ | Pacific Gas & Electric Co | 2.54138% due 11/28/2018 | U69430AD5 | USU69430AD52 |
| ☐ | Pacific Gas & Electric Co | 2.95% due 3/1/2026 | 694308HP5 | US694308HP52 |
| ☐ | Pacific Gas & Electric Co | 3.25% due 6/15/2023 | 694308HC4 | US694308HC40 |
| ☐ | Pacific Gas & Electric Co | 3.25% due 9/15/2021 | 694308GW1 | US694308GW13 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 12/1/2027 | 694308HW0 | US694308HW04 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 12/1/2027 | U69430AE3 | USU69430AE36 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 12/1/2027 | 694308HV2 | US694308HV21 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 3/15/2027 | 694308HS9 | US694308HS91 |
| ☐ | Pacific Gas & Electric Co | 3.4% due 8/15/2024 | 694308HK6 | US694308HK65 |
| ☐ | Pacific Gas & Electric Co | 3.5% due 10/1/2020 | 694308GT8 | US694308GT83 |
| ☐ | Pacific Gas & Electric Co | 3.5% due 6/15/2025 | 694308HM2 | US694308HM22 |
| ☐ | Pacific Gas & Electric Co | 3.75% due 2/15/2024 | 694308HG5 | US694308HG53 |
| ☐ | Pacific Gas & Electric Co | 3.75% due 8/15/2042 | 694308HA8 | US694308HA83 |
| ☐ | Pacific Gas & Electric Co | 3.85% due 11/15/2023 | 694308HE0 | US694308HE06 |
| ☐ | Pacific Gas & Electric Co | 3.95% due 12/1/2047 | 694308HY6 | US694308HY69 |
| ☐ | Pacific Gas & Electric Co | 3.95% due 12/1/2047 | 694308HX8 | US694308HX86 |
| ☐ | Pacific Gas & Electric Co | 3.95% due 12/1/2047 | U69430AF0 | USU69430AF01 |
| ☐ | Pacific Gas & Electric Co | 4% due 12/1/2046 | 694308HR1 | US694308HR19 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 3/15/2046 | 694308HN0 | US694308HN05 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 5/15/2021 | 694308GV3 | US694308GV30 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 8/1/2023 | 694308HZ3 | US694308HZ35 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 8/1/2023 | U69430AG8 | USU69430AG83 |
| ☐ | Pacific Gas & Electric Co | 4.3% due 3/15/2045 | 694308HL4 | US694308HL49 |
| ☐ | Pacific Gas & Electric Co | 4.45% due 4/15/2042 | 694308GZ4 | US694308GZ44 |
| ☐ | Pacific Gas & Electric Co | 4.5% due 12/15/2041 | 694308GY7 | US694308GY78 |
| ☐ | Pacific Gas & Electric Co | 4.6% due 6/15/2043 | 694308HD2 | US694308HD23 |
| ☐ | Pacific Gas & Electric Co | 4.65% due 8/1/2028 | 694308JA6 | US694308JA65 |
| ☐ | Pacific Gas & Electric Co | 4.65% due 8/1/2028 | U69430AH6 | USU69430AH66 |

| Check One Box Below | Issuer of Securities | Securities Description | CUSIP Number | ISIN Number |
|---|---|---|---|---|
| ☐ | Pacific Gas & Electric Co | 4.75% due 2/15/2044 | 694308HH3 | US694308HH37 |
| ☐ | Pacific Gas & Electric Co | 5.125% due 11/15/2043 | 694308HF7 | US694308HF70 |
| ☐ | Pacific Gas & Electric Co | 5.4% due 1/15/2040 | 694308GS0 | US694308GS01 |
| ☐ | Pacific Gas & Electric Co | 5.625% due 11/30/2017 | 694308GL5 | US694308GL57 |
| ☐ | Pacific Gas & Electric Co | 5.8% due 3/1/2037 | 694308GJ0 | US694308GJ02 |
| ☐ | Pacific Gas & Electric Co | 5.8% due 3/1/2037 | 694308GK7 | US694308GK74 |
| ☐ | Pacific Gas & Electric Co | 6.05% due 3/1/2034 | 694308GE1 | US694308GE15 |
| ☐ | Pacific Gas & Electric Co | 6.05% due 3/1/2034 | 694308GH4 | US694308GH46 |
| ☐ | Pacific Gas & Electric Co | 6.25% due 3/1/2039 | 694308GQ4 | US694308GQ45 |
| ☐ | Pacific Gas & Electric Co | 6.35% due 2/15/2038 | 694308GM3 | US694308GM31 |
| ☐ | Pacific Gas & Electric Co | 6.75% due 10/1/2023 | 694308EY9 | US694308EY96 |
| ☐ | Pacific Gas & Electric Co | 6.75% due 10/1/2023 | 694308EZ6 | US694308EZ61 |
| ☐ | Pacific Gas & Electric Co | 7.05% due 3/1/2024 | 694308FB8 | US694308FB84 |
| ☐ | Pacific Gas & Electric Co | 7.05% due 3/1/2024 | 694308FP7 | US694308FP70 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308EM5 | US694308EM58 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308ET0 | US694308ET02 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308FQ5 | US694308FQ53 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308FY8 | US694308FY87 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308EV5 | US694308EV57 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308FF9 | US694308FF98 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308EX1 | US694308EX14 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308FR3 | US694308FR37 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308FZ5 | US694308FZ52 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308EP8 | US694308EP89 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308EL7 | US694308EL75 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308FM4 | US694308FM40 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308FG7 | US694308FG71 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308EK9 | US694308EK92 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 10/15/2018 | 694308GN1 | US694308GN14 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308EQ6 | US694308EQ62 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308EG8 | US694308EG80 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308EN3 | US694308EN32 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308FJ1 | US694308FJ11 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308FW2 | US694308FW22 |
| ☐ | Pacific Gas & Electric Co | 8.375% due 5/1/2025 | 694308EF0 | US694308EF08 |
| ☐ | Pacific Gas & Electric Co | 8.375% due 5/1/2025 | 694308EJ2 | US694308EJ20 |
| ☐ | Pacific Gas & Electric Co | 8.375% due 5/1/2025 | 694308FX0 | US694308FX05 |
| ☐ | Pacific Gas & Electric Co | 8.8% due 5/1/2024 | 694308DV6 | US694308DV66 |
| ☐ | CA DEV VAR-A-PACIFIC | Municipal Bond ADJ% due 11/1/2026 | 13033WG31 | |
| ☐ | CA DEV VAR-B-PACIFIC | Municipal Bond ADJ% due 11/1/2026 | 13033WG49 | |
| ☐ | CA DEV VAR-C-PACIFIC | Municipal Bond due 12/1/2016 | 13033WG56 | |
| ☐ | CA ECON-VAR-RF-3/14 | Municipal Bond due 12/1/2018 | 13033WG23 | |
| ☐ | CA ECON-VAR-RF-D-3/11 | Municipal Bond due 12/1/2016 | 13033WF73 | |
| ☐ | CA ECON-VAR-RF-E-3/11 | Municipal Bond ADJ% due 11/1/2026 | 13033WF81 | |
| ☐ | CA ECON-VAR-RF-F-3/12 | Municipal Bond ADJ% due 11/1/2026 | 13033WF99 | |
| ☐ | CA INFRA ECON DEV-F | Municipal Bond 1.75% due 11/1/2026 | 13034ASX9 | US13034ASX99 |
| ☐ | CA INFRA REF-GAS-F | Municipal Bond 3.75% due 11/1/2026 | 13033WU84 | |
| ☐ | CA INFRA VAR-A-PACIFI | Municipal Bond ADJ% due 11/1/2026 | 13033WRZ8 | |

DocuSign Envelope ID: 3F860B3A-6CCB-4862-9051-A56E2398F8E1

| Check One Box Below | Issuer of Securities | Securities Description | CUSIP Number | ISIN Number |
|---|---|---|---|---|
| ☐ | CA INFRA VAR-B-PACIFI | Municipal Bond ADJ% due 11/1/2026 | 13033WSA2 | |
| ☐ | CA INFRA VAR-C-PACIFI | Municipal Bond due 12/1/2016 | 13033WSB0 | |
| ☐ | CA INFRA VAR-D-PACIFI | Municipal Bond due 12/1/2016 | 13033WSC8 | |
| ☐ | CA INFRA VAR-E-PACIFI | Municipal Bond due 12/1/2016 | 13033WSD6 | |
| ☐ | CA INFRA VAR-F-PACIFI | Municipal Bond ADJ% due 11/1/2026 | 13033WSE4 | |
| ☐ | CA INFRA VAR-GAS-PACIFI | Municipal Bond due 12/1/2018 | 13033WU92 | |
| ☐ | CA INFRA VAR-G-PACIFI | Municipal Bond due 12/1/2018 | 13033WSF1 | |
| ☐ | CA INFRA VAR-PACIFIC | Municipal Bond ADJ% due 11/1/2026 | 13033WW33 | |
| ☐ | CA INFRA VAR-PACIFIC | Municipal Bond due 12/1/2016 | 13033WW41 | |
| ☐ | CA INFRA VAR-PACIFIC | Municipal Bond due 12/1/2016 | 13033WW58 | |
| ☐ | CA INFRA VAR-REF-PACI | Municipal Bond ADJ% due 11/1/2026 | 13033WW25 | |
| ☐ | CA INFRA-RF-C-PACIFIC | Municipal Bond due 12/1/2016 | 13033W3G6 | |
| ☐ | CA INFRA-RF-D-PACIFIC | Municipal Bond due 12/1/2016 | 13033W3K7 | |
| ☐ | CA INFRA-RF-E-PACIFIC | Municipal Bond 2.25% due 11/1/2026 | 13033W3Z4 | |
| ☐ | CA INFRA-RF-VAR-A-PAC | Municipal Bond 3.75% due 11/1/2026 | 13033W3H4 | US13033W3H41 |
| ☐ | CA INFR-VR-RF-B-PACIF | Municipal Bond 3.75% due 11/1/2026 | 13033W3J0 | US13033W3J07 |
| ☐ | CA PCR DLY PAPER-PACI | Municipal Bond 4% due 11/1/2026 | 130534XA3 | US130534XA35 |
| ☐ | CA PCR DLY-PAC-E-CONV | Municipal Bond 3.5% due 11/1/2026 | 130534XX3 | US130534XX38 |
| ☐ | CA PCR DLY-REF-F-PACI | Municipal Bond 3.25% due 11/1/2026 | 130534XD7 | US130534XD73 |
| ☐ | CA PCR DLY-REF-G-PACI | Municipal Bond ADJ% due 2/1/2016 | 130534XE5 | |
| ☐ | CA PCR VAR CAPCO MADR | Municipal Bond ADJ% due 9/1/2019 | 130535BA4 | US130535BA48 |
| ☐ | CA PCR VAR-REF-B-PACI | Municipal Bond 3.5% due 11/1/2026 | 130534XL9 | US130534XL99 |
| ☐ | CA PCR-REF-A-PAC | Municipal Bond 5.35% due 12/1/2016 | 130534WY2 | |
| ☐ | CA POLLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534A83 | |
| ☐ | CA POLLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534B66 | |
| ☐ | CA POLLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534A91 | |
| ☐ | CA POLLUTN-REF-A-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZP8 | |
| ☐ | CA POLLUTN-REF-B-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZQ6 | |
| ☐ | CA POLLUTN-REF-C-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZR4 | US130534ZR42 |
| ☐ | CA POLLUTN-REF-D-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZS2 | |
| ☐ | CA POOLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534B25 | |
| ☐ | CA POOLT-PCS GAS REMK | Municipal Bond 4.75% due 12/1/2023 | 130534B33 | |
| ☐ | CALIFORNIA ST INFRAST | Municipal Bond 1.75% due 11/1/2026 | 13034ASZ4 | US13034ASZ48 |
| ☐ | NEVADA IRR YUBA PAC | Municipal Bond 3.75% due 7/1/2013 | 641321BT0 | |
| ☐ | SOLANO IRR DIST DIV 1 | Municipal Bond 9.15% due 1/1/2020 | 834125AN6 | US834125AN62 |
| ☐ | SOLANO IRR DIST DIV 2 | Municipal Bond 9.25% due 1/1/2020 | 834125AM8 | US834125AM89 |
| ☐ | SOLANO IRR REF-MONTIC | Municipal Bond 5.47% due 1/1/2020 | 834125BC9 | US834125BC98 |
| ☐ | SOLANO IRR-REF-MONTIC | Municipal Bond 5.29% due 1/1/2016 | 834125AY2 | |
| ☐ | SOLANO IRR-UNREF-#2 | Municipal Bond 9.15% due 1/1/2020 | 834125BF2 | |
| ☐ | SOLANO IRR-UNREF-#2 | Municipal Bond 9.25% due 1/1/2020 | 834125BG0 | US834125BG03 |

| CUSIP (Provide a Separate Tab for Each CUSIP): | 69331C108 | Beginning position held as of opening of trading on April 29, 2015 (if none, enter "0 shares" or "$0"): | 0 shares | Ending position held as of the close of trading on November 15, 2018 (if none, enter "0 shares" or "$0"): | 18,006,139 shares |

**Transaction Detail (Provide one row for each transaction for the above CUSIP between April 29, 2015 and November 15, 2018)**

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 2/9/2018 | 17,500 | $37.9117 | $663,454.75 |
| Purchase | 2/9/2018 | 17,000 | $37.8865 | $644,070.50 |
| Purchase | 2/9/2018 | 101,700 | $37.8050 | $3,844,768.50 |
| Purchase | 2/9/2018 | 26,800 | $37.9180 | $1,016,202.40 |
| Purchase | 2/9/2018 | 35,300 | $37.8471 | $1,336,002.63 |
| Purchase | 2/9/2018 | 38,101 | $37.9170 | $1,444,675.62 |
| Purchase | 2/9/2018 | 207,921 | $37.9011 | $7,880,434.61 |
| Purchase | 2/9/2018 | 16,977 | $37.8424 | $642,450.42 |
| Purchase | 2/9/2018 | 11,100 | $37.8919 | $420,600.09 |
| Purchase | 2/12/2018 | 10,416 | $38.4291 | $400,277.51 |
| Purchase | 2/12/2018 | 1,000 | $38.4340 | $38,434.00 |
| Purchase | 2/12/2018 | 5,984 | $38.4764 | $230,242.78 |
| Purchase | 2/12/2018 | 4,800 | $38.4322 | $184,474.56 |
| Purchase | 2/12/2018 | 1,800 | $38.4619 | $69,231.42 |
| Purchase | 2/12/2018 | 1,100 | $38.4682 | $42,315.02 |
| Purchase | 2/12/2018 | 24,900 | $38.5000 | $958,650.00 |
| Purchase | 2/12/2018 | 100,000 | $38.4850 | $3,848,500.00 |
| Purchase | 2/20/2018 | 122,464 | $39.9810 | $4,896,233.18 |
| Purchase | 2/20/2018 | 366,700 | $40.0812 | $14,697,776.04 |
| Purchase | 2/20/2018 | 78,650 | $39.8352 | $3,133,038.48 |
| Purchase | 2/20/2018 | 25,300 | $40.0318 | $1,012,804.54 |
| Purchase | 2/20/2018 | 6,000 | $39.8659 | $239,195.40 |
| Purchase | 2/20/2018 | 14,600 | $39.9055 | $582,620.30 |
| Purchase | 2/20/2018 | 50,051 | $39.9346 | $1,998,766.66 |
| Purchase | 2/20/2018 | 2,500 | $39.9234 | $99,808.50 |
| Purchase | 2/21/2018 | 41,100 | $40.3800 | $1,659,618.00 |
| Purchase | 2/21/2018 | 268,500 | $40.3538 | $10,834,995.30 |
| Purchase | 2/21/2018 | 11,000 | $40.3376 | $443,713.60 |
| Purchase | 2/21/2018 | 32,700 | $40.2296 | $1,315,507.92 |
| Purchase | 2/21/2018 | 5,600 | $40.0591 | $224,330.96 |
| Purchase | 2/21/2018 | 5,500 | $40.3777 | $222,077.35 |
| Purchase | 2/21/2018 | 1,100 | $40.3545 | $44,389.95 |
| Purchase | 2/21/2018 | 600,000 | $40.0410 | $24,024,600.00 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 2/22/2018 | 4,300 | $40.1908 | $172,820.44 |
| Purchase | 2/22/2018 | 375,000 | $40.0906 | $15,033,975.00 |
| Purchase | 2/22/2018 | 20,000 | $39.9900 | $799,800.00 |
| Purchase | 2/22/2018 | 16,400 | $40.1235 | $658,025.40 |
| Purchase | 2/22/2018 | 30,004 | $40.0247 | $1,200,901.10 |
| Purchase | 2/22/2018 | 10,422 | $40.0793 | $417,706.46 |
| Purchase | 2/22/2018 | 4,900 | $40.0704 | $196,344.96 |
| Purchase | 2/22/2018 | 3,410 | $40.1018 | $136,747.14 |
| Purchase | 2/22/2018 | 183,100 | $39.9905 | $7,322,260.55 |
| Purchase | 2/23/2018 | 2,600 | $40.9481 | $106,465.06 |
| Purchase | 2/23/2018 | 39,229 | $40.8545 | $1,602,681.18 |
| Purchase | 2/23/2018 | 18,400 | $40.8000 | $750,720.00 |
| Purchase | 2/23/2018 | 4,900 | $40.5858 | $198,870.42 |
| Purchase | 2/23/2018 | 30,371 | $40.6648 | $1,235,030.64 |
| Purchase | 2/23/2018 | 2,800 | $40.9945 | $114,784.60 |
| Purchase | 2/28/2018 | 1,242 | $40.3275 | $50,086.76 |
| Purchase | 2/28/2018 | 25,000 | $40.2200 | $1,005,500.00 |
| Purchase | 2/28/2018 | 340 | $40.3750 | $13,727.50 |
| Purchase | 2/28/2018 | 400 | $40.4925 | $16,197.00 |
| Purchase | 2/28/2018 | 300 | $40.4933 | $12,147.99 |
| Purchase | 2/28/2018 | 100 | $40.4650 | $4,046.50 |
| Purchase | 3/5/2018 | 119,300 | $40.3696 | $4,816,093.28 |
| Purchase | 3/5/2018 | 3,090 | $40.4612 | $125,025.11 |
| Purchase | 3/5/2018 | 100 | $40.4800 | $4,048.00 |
| Purchase | 3/5/2018 | 100 | $40.4800 | $4,048.00 |
| Purchase | 5/8/2018 | 100 | $42.4950 | $4,249.50 |
| Purchase | 5/8/2018 | 300 | $42.4950 | $12,748.50 |
| Purchase | 5/8/2018 | 1,000 | $42.5000 | $42,500.00 |
| Purchase | 5/9/2018 | 10,000 | $42.4950 | $424,950.00 |
| Purchase | 5/9/2018 | 4,200 | $42.4746 | $178,393.32 |
| Purchase | 5/9/2018 | 285,000 | $42.4596 | $12,100,986.00 |
| Purchase | 5/16/2018 | 397,016 | $42.5000 | $16,873,180.00 |
| Purchase | 5/16/2018 | 23,957 | $42.4747 | $1,017,566.39 |
| Purchase | 5/16/2018 | 4,755 | $42.4911 | $202,045.18 |
| Purchase | 5/16/2018 | 300 | $42.4950 | $12,748.50 |
| Purchase | 5/16/2018 | 19,100 | $42.5000 | $811,750.00 |
| Purchase | 5/16/2018 | 104,300 | $42.4737 | $4,430,006.91 |
| Purchase | 5/17/2018 | 266,000 | $42.4500 | $11,291,700.00 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 5/17/2018 | 194,300 | $42.2700 | $8,213,061.00 |
| Purchase | 5/17/2018 | 1,016 | $42.2151 | $42,890.54 |
| Purchase | 5/17/2018 | 38,684 | $42.3662 | $1,638,894.08 |
| Sale | 7/3/2018 | 7,700 | $44.2480 | $340,709.60 |
| Sale | 7/3/2018 | 142,200 | $44.0750 | $6,267,465.00 |
| Sale | 7/3/2018 | 84,426 | $44.2049 | $3,732,042.89 |
| Sale | 7/3/2018 | 7,800 | $44.0090 | $343,270.20 |
| Sale | 7/5/2018 | 169,000 | $43.9800 | $7,432,620.00 |
| Sale | 7/5/2018 | 201,820 | $43.9960 | $8,879,272.72 |
| Sale | 7/5/2018 | 153,900 | $43.7847 | $6,738,465.33 |
| Sale | 7/5/2018 | 14,754 | $43.9090 | $647,833.39 |
| Sale | 7/5/2018 | 2,500 | $43.8976 | $109,744.00 |
| Sale | 7/5/2018 | 50,000 | $44.1800 | $2,209,000.00 |
| Sale | 7/5/2018 | 4,600 | $44.0576 | $202,664.96 |
| Purchase | 7/17/2018 | 838,700 | $42.6709 | $35,788,083.83 |
| Purchase | 7/25/2018 | 300,000 | $42.8524 | $12,855,720.00 |
| Purchase | 7/25/2018 | 13,056 | $42.8078 | $558,898.64 |
| Purchase | 7/25/2018 | 27,650 | $42.6298 | $1,178,713.97 |
| Purchase | 7/25/2018 | 2,600 | $42.7412 | $111,127.12 |
| Purchase | 7/25/2018 | 21,700 | $42.6829 | $926,218.93 |
| Purchase | 7/25/2018 | 60,981 | $42.6064 | $2,598,180.88 |
| Purchase | 7/25/2018 | 6,900 | $42.7000 | $294,630.00 |
| Purchase | 7/25/2018 | 12,700 | $42.9698 | $545,716.46 |
| Purchase | 7/26/2018 | 12,100 | $42.9609 | $519,826.89 |
| Purchase | 7/26/2018 | 900 | $42.8939 | $38,604.51 |
| Purchase | 7/26/2018 | 100 | $42.8550 | $4,285.50 |
| Purchase | 7/26/2018 | 8,962 | $42.8866 | $384,349.71 |
| Purchase | 7/26/2018 | 100 | $42.9500 | $4,295.00 |
| Purchase | 7/30/2018 | 32,600 | $42.8776 | $1,397,809.76 |
| Purchase | 7/30/2018 | 15,000 | $42.9700 | $644,550.00 |
| Purchase | 7/30/2018 | 23,808 | $42.9320 | $1,022,125.06 |
| Purchase | 7/30/2018 | 49,373 | $42.9232 | $2,119,247.15 |
| Purchase | 7/30/2018 | 6,000 | $42.9260 | $257,556.00 |
| Purchase | 7/30/2018 | 121,560 | $42.9300 | $5,218,570.80 |
| Purchase | 7/31/2018 | 1,000 | $43.0000 | $43,000.00 |
| Purchase | 7/31/2018 | 200 | $42.9600 | $8,592.00 |
| Purchase | 7/31/2018 | 300 | $42.9500 | $12,885.00 |
| Purchase | 7/31/2018 | 2,600 | $42.9838 | $111,757.88 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 7/31/2018 | 83,000 | $42.9535 | $3,565,140.50 |
| Purchase | 7/31/2018 | 51,000 | $42.9950 | $2,192,745.00 |
| Purchase | 8/1/2018 | 32,100 | $42.8381 | $1,375,103.01 |
| Purchase | 8/1/2018 | 4,600 | $42.4600 | $195,316.00 |
| Purchase | 8/1/2018 | 39,115 | $42.4115 | $1,658,925.82 |
| Purchase | 8/1/2018 | 634,700 | $42.3762 | $26,896,174.14 |
| Purchase | 8/1/2018 | 1,000 | $41.7300 | $41,730.00 |
| Purchase | 8/1/2018 | 9,600 | $42.3690 | $406,742.40 |
| Purchase | 8/1/2018 | 16,816 | $42.4446 | $713,748.39 |
| Purchase | 8/1/2018 | 407,879 | $42.2706 | $17,241,290.06 |
| Purchase | 8/9/2018 | 37,565 | $43.7422 | $1,643,175.74 |
| Purchase | 8/9/2018 | 44,700 | $43.7766 | $1,956,814.02 |
| Purchase | 8/9/2018 | 2,700 | $43.9037 | $118,539.99 |
| Purchase | 8/9/2018 | 2,600 | $43.7115 | $113,649.90 |
| Purchase | 8/9/2018 | 238,778 | $43.9137 | $10,485,625.46 |
| Purchase | 8/9/2018 | 2,800 | $43.9264 | $122,993.92 |
| Purchase | 8/9/2018 | 180,000 | $43.8409 | $7,891,362.00 |
| Purchase | 8/10/2018 | 198,982 | $42.9086 | $8,538,039.05 |
| Purchase | 8/10/2018 | 1,445,000 | $42.8881 | $61,973,304.50 |
| Purchase | 8/10/2018 | 708,857 | $42.7635 | $30,313,206.32 |
| Purchase | 8/10/2018 | 19,600 | $42.8650 | $840,154.00 |
| Purchase | 8/10/2018 | 41,718 | $42.8689 | $1,788,404.77 |
| Purchase | 8/10/2018 | 63,100 | $42.9899 | $2,712,662.69 |
| Purchase | 8/10/2018 | 5,900 | $42.9137 | $253,190.83 |
| Purchase | 8/10/2018 | 7,700 | $42.8551 | $329,984.27 |
| Purchase | 8/13/2018 | 34,700 | $42.7658 | $1,483,973.26 |
| Purchase | 8/13/2018 | 662,369 | $42.7431 | $28,311,704.40 |
| Purchase | 8/13/2018 | 1,100 | $42.7050 | $46,975.50 |
| Purchase | 8/13/2018 | 8,900 | $42.7566 | $380,533.74 |
| Purchase | 8/13/2018 | 27,400 | $42.7450 | $1,171,213.00 |
| Purchase | 8/13/2018 | 839,700 | $42.7466 | $35,894,320.02 |
| Purchase | 8/14/2018 | 600,000 | $42.9897 | $25,793,820.00 |
| Purchase | 8/14/2018 | 118,300 | $42.8474 | $5,068,847.42 |
| Purchase | 8/14/2018 | 162,543 | $42.9671 | $6,984,001.34 |
| Purchase | 8/14/2018 | 76,382 | $43.0154 | $3,285,602.28 |
| Purchase | 8/14/2018 | 100,000 | $42.8400 | $4,284,000.00 |
| Purchase | 8/14/2018 | 46,175 | $42.7826 | $1,975,486.56 |
| Purchase | 8/14/2018 | 3,500 | $42.9481 | $150,318.35 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 8/14/2018 | 500 | $43.0000 | $21,500.00 |
| Purchase | 8/14/2018 | 1,000 | $43.0100 | $43,010.00 |
| Purchase | 8/14/2018 | 300 | $42.7900 | $12,837.00 |
| Purchase | 8/15/2018 | 1,100 | $43.4123 | $47,753.53 |
| Purchase | 8/15/2018 | 33,000 | $43.4517 | $1,433,906.10 |
| Purchase | 8/15/2018 | 200 | $43.4000 | $8,680.00 |
| Purchase | 8/15/2018 | 45,500 | $43.4415 | $1,976,588.25 |
| Purchase | 8/15/2018 | 25,000 | $43.3200 | $1,083,000.00 |
| Purchase | 8/15/2018 | 26,600 | $43.2966 | $1,151,689.56 |
| Purchase | 8/15/2018 | 57,900 | $43.3986 | $2,512,778.94 |
| Purchase | 8/15/2018 | 49,087 | $43.2102 | $2,121,059.09 |
| Purchase | 8/20/2018 | 1,201,300 | $43.9795 | $52,832,573.35 |
| Purchase | 8/22/2018 | 34,500 | $44.4085 | $1,532,093.25 |
| Purchase | 8/22/2018 | 14,600 | $44.4357 | $648,761.22 |
| Purchase | 8/22/2018 | 15,100 | $44.4313 | $670,912.63 |
| Purchase | 8/22/2018 | 4,200 | $44.4702 | $186,774.84 |
| Purchase | 8/22/2018 | 4,100 | $44.4213 | $182,127.33 |
| Purchase | 8/23/2018 | 232,357 | $44.1269 | $10,253,194.10 |
| Purchase | 8/23/2018 | 489,424 | $44.1819 | $21,623,682.23 |
| Purchase | 8/23/2018 | 39,500 | $44.0576 | $1,740,275.20 |
| Purchase | 8/23/2018 | 51,500 | $44.0297 | $2,267,529.55 |
| Purchase | 8/23/2018 | 100,000 | $43.9500 | $4,395,000.00 |
| Purchase | 8/23/2018 | 5,300 | $43.9696 | $233,038.88 |
| Purchase | 8/23/2018 | 400 | $43.9600 | $17,584.00 |
| Purchase | 8/23/2018 | 17,500 | $44.4950 | $778,662.50 |
| Purchase | 8/24/2018 | 22,800 | $42.8050 | $975,954.00 |
| Purchase | 8/24/2018 | 650,000 | $42.8489 | $27,851,785.00 |
| Purchase | 8/24/2018 | 56,700 | $42.7950 | $2,426,476.50 |
| Purchase | 8/24/2018 | 1,000 | $42.7600 | $42,760.00 |
| Purchase | 8/24/2018 | 400 | $42.7600 | $17,104.00 |
| Purchase | 8/24/2018 | 13,300 | $42.7914 | $569,125.62 |
| Purchase | 8/24/2018 | 280,000 | $43.3035 | $12,124,980.00 |
| Purchase | 8/24/2018 | 83,400 | $43.6010 | $3,636,323.40 |
| Purchase | 8/24/2018 | 5,563 | $43.1770 | $240,193.65 |
| Purchase | 8/27/2018 | 2,700 | $43.6967 | $117,981.09 |
| Purchase | 8/27/2018 | 32,900 | $43.6478 | $1,436,012.62 |
| Purchase | 8/27/2018 | 95,172 | $43.6912 | $4,158,178.89 |
| Purchase | 8/27/2018 | 22,400 | $43.2526 | $968,858.24 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 8/27/2018 | 36,500 | $43.6182 | $1,592,064.30 |
| Purchase | 8/27/2018 | 44,700 | $43.5435 | $1,946,394.45 |
| Purchase | 8/27/2018 | 54,628 | $43.5968 | $2,381,605.99 |
| Purchase | 8/27/2018 | 21,988 | $43.2497 | $950,974.40 |
| Purchase | 8/27/2018 | 192,500 | $43.6442 | $8,401,508.50 |
| Purchase | 8/28/2018 | 145 | $44.4950 | $6,451.78 |
| Purchase | 8/28/2018 | 2,400 | $44.4950 | $106,788.00 |
| Purchase | 8/28/2018 | 10,800 | $44.5000 | $480,600.00 |
| Purchase | 8/28/2018 | 2,200 | $44.4555 | $97,802.10 |
| Purchase | 8/28/2018 | 19,900 | $44.5000 | $885,550.00 |
| Purchase | 9/7/2018 | 300 | $45.6900 | $13,707.00 |
| Purchase | 9/7/2018 | 200 | $45.6800 | $9,136.00 |
| Purchase | 9/7/2018 | 95,571 | $45.6784 | $4,365,530.37 |
| Purchase | 9/7/2018 | 82,693 | $45.5665 | $3,768,030.58 |
| Purchase | 9/7/2018 | 17,800 | $45.6831 | $813,159.18 |
| Purchase | 9/7/2018 | 60,100 | $45.6605 | $2,744,196.05 |
| Purchase | 9/7/2018 | 103,500 | $45.2300 | $4,681,305.00 |
| Purchase | 9/18/2018 | 200,000 | $47.1870 | $9,437,400.00 |
| Purchase | 9/18/2018 | 400 | $47.1488 | $18,859.52 |
| Purchase | 9/18/2018 | 15,131 | $47.1285 | $713,101.33 |
| Purchase | 9/19/2018 | 9,400 | $46.7904 | $439,829.76 |
| Purchase | 9/19/2018 | 3,400 | $46.7491 | $158,946.94 |
| Purchase | 9/19/2018 | 2,400 | $46.7746 | $112,259.04 |
| Purchase | 9/19/2018 | 49,700 | $46.6616 | $2,319,081.52 |
| Purchase | 9/19/2018 | 47,375 | $46.6608 | $2,210,555.40 |
| Purchase | 9/19/2018 | 120,600 | $46.7784 | $5,641,475.04 |
| Purchase | 9/19/2018 | 852,105 | $46.8542 | $39,924,698.09 |
| Purchase | 9/19/2018 | 153,294 | $46.6849 | $7,156,515.06 |
| Purchase | 9/20/2018 | 200 | $46.8150 | $9,363.00 |
| Purchase | 9/20/2018 | 400 | $46.7225 | $18,689.00 |
| Purchase | 9/20/2018 | 867 | $46.7335 | $40,517.94 |
| Purchase | 9/20/2018 | 1,650 | $46.8592 | $77,317.68 |
| Purchase | 9/20/2018 | 543,078 | $46.8308 | $25,432,777.20 |
| Sale | 9/21/2018 | 275,334 | $46.9075 | $12,915,229.61 |
| Purchase | 9/26/2018 | 48,800 | $45.3738 | $2,214,241.44 |
| Purchase | 9/26/2018 | 15,236 | $45.2951 | $690,116.14 |
| Purchase | 9/26/2018 | 25,000 | $45.1600 | $1,129,000.00 |
| Purchase | 9/26/2018 | 12,800 | $45.2133 | $578,730.24 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 9/26/2018 | 5,700 | $45.2094 | $257,693.58 |
| Purchase | 9/26/2018 | 900 | $45.3000 | $40,770.00 |
| Purchase | 9/26/2018 | 23,600 | $45.2750 | $1,068,490.00 |
| Purchase | 9/27/2018 | 453,900 | $45.1810 | $20,507,655.90 |
| Purchase | 9/28/2018 | 25,891 | $45.6964 | $1,183,125.49 |
| Purchase | 10/1/2018 | 400 | $45.4400 | $18,176.00 |
| Purchase | 10/1/2018 | 51,100 | $45.4612 | $2,323,067.32 |
| Purchase | 10/1/2018 | 2,500 | $45.5076 | $113,769.00 |
| Purchase | 10/1/2018 | 131,404 | $45.5872 | $5,990,340.43 |
| Purchase | 10/1/2018 | 2,400 | $45.5667 | $109,360.08 |
| Sale | 11/15/2018 | 426,085 | $21.4249 | $9,128,840.90 |
| Sale | 11/15/2018 | 71,100 | $20.5526 | $1,461,291.50 |
| Sale | 11/15/2018 | 286,770 | $20.5797 | $5,901,638.14 |
| Sale | 11/15/2018 | 115,400 | $20.3935 | $2,353,405.50 |
| Sale | 11/15/2018 | 12,600 | $20.1798 | $254,265.00 |
| Sale | 11/15/2018 | 3,500 | $20.1900 | $70,665.00 |
| Sale | 11/15/2018 | 126,100 | $20.7547 | $2,617,166.00 |
| Sale | 11/15/2018 | 32,500 | $20.0621 | $652,017.50 |
| Sale | 11/15/2018 | 87,400 | $20.2773 | $1,772,240.00 |

Note: Documentation supporting the transactions listed in this Annex A, Part II is set forth in Schedule 1, which is appended hereto.

**Schedule 1**

**Documentation for Purchase and Sale Transactions Set Forth in Annex A Part II**

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 115487 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 11,100.00 | 37.8919 | 590280782 |
| 115486 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 16,977.00 | 37.8424 | 465415954 |
| 115479 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 17,500.00 | 37.9117 | 490256234 |
| 115484 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 38,101.00 | 37.917 | 564959296 |
| 115481 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 101,700.00 | 37.805 | 395696557 |
| 115483 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 35,300.00 | 37.8471 | 809062837 |
| 115485 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 207,921.00 | 37.9011 | 395637938 |
| 115480 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 17,000.00 | 37.8865 | 564981470 |
| 115482 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 26,800.00 | 37.918 | 490267648 |
| 115528 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 1,100.00 | 38.4682 | 324009766 |
| 115530 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 100,000.00 | 38.485 | 439709577 |
| 115529 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 24,900.00 | 38.50 | 515934384 |
| 115527 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 1,800.00 | 38.4619 | 439703635 |
| 115525 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 5,984.00 | 38.4764 | 515920260 |
| 115524 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 1,000.00 | 38.434 | 90249914 |
| 115526 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 4,800.00 | 38.4322 | 395760469 |
| 115523 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 10,416.00 | 38.4291 | 540725436 |
| 115739 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 6,000.00 | 39.8659 | 541353312 |
| 115736 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 366,700.00 | 40.0812 | 324646278 |
| 115740 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 14,600.00 | 39.9055 | 516539237 |
| 115741 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 50,051.00 | 39.9346 | 516536196 |
| 115735 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 122,464.00 | 39.981 | 090675989 |
| 115742 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 2,500.00 | 39.9234 | 090675989 |
| 115738 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 25,300.00 | 40.0318 | 491074973 |

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 115737 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 78,650.00 | 39.8352 | 565733984 |
| 115782 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 268,500.00 | 40.3538 | 516626726 |
| 115785 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 5,600.00 | 40.0591 | 541414511 |
| 115786 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 5,500.00 | 40.3777 | 541409181 |
| 115781 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 41,100.00 | 40.38 | 466262891 |
| 115784 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 32,700.00 | 40.2296 | 164656525 |
| 115788 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 600,000.00 | 40.041 | 417119475 |
| 115783 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 11,000.00 | 40.3376 | 466205351 |
| 115787 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 1,100.00 | 40.3545 | 491156152 |
| 115828 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 3,410.00 | 40.1018 | 417238645 |
| 115829 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 183,100.00 | 39.9905 | 440544474 |
| 115827 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 4,900.00 | 40.0704 | 591162352 |
| 115825 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 30,004.00 | 40.0247 | 466308019 |
| 115823 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 20,000.00 | 39.99 | 440583417 |
| 115821 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 4,300.00 | 40.1908 | 090758025 |
| 115822 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 375,000.00 | 40.0906 | 516714021, 516714018, 516714006 |
| 115824 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 16,400.00 | 40.1235 | 565900222 |
| 115826 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 10,422.00 | 40.0793 | 516735767 |
| 115858 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 18,400.00 | 40.80 | 417326241 |
| 115860 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 30,371.00 | 40.6648 | 440633947 |
| 115857 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 39,229.00 | 40.8545 | 164851517 |
| 115861 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 2,800.00 | 40.9945 | 164851517 |
| 115859 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 4,900.00 | 40.5858 | 591256089 |
| 115856 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 2,600.00 | 40.9481 | 491348514 |
| 115968 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 25,000.00 | 40.22 | 541916470 |
| 115970 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 400.00 | 40.4925 | 325249822 |

2

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|----------|-----------|-----------|------------|------------------|----------|-------|---------------|
| 115969 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 340.00 | 40.375 | 491617919 |
| 115971 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 300.00 | 40.4933 | 792497123 |
| 115972 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 100.00 | 40.465 | 517150066 |
| 115967 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 1,242.00 | 40.3275 | 491643756 |
| 116072 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 119,300.00 | 40.3696 | 352172287 |
| 116074 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 100.00 | 40.48 | 566584118 |
| 116073 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 3,090.00 | 40.4612 | 397207331 |
| 116075 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 100.00 | 40.48 | 810063231 |
| 118349 | Buy Long | 5/8/2018 | 5/10/2018 | PCG | 300.00 | 42.495 | 495932611 |
| 118352 | Buy Long | 5/8/2018 | 5/10/2018 | PCG | 1,000.00 | 42.50 | 813030543 |
| 118348 | Buy Long | 5/8/2018 | 5/10/2018 | PCG | 100.00 | 42.495 | 356110818 |
| 118424 | Buy Long | 5/9/2018 | 5/11/2018 | PCG | 285,000.00 | 42.4596 | 570654106 |
| 118423 | Buy Long | 5/9/2018 | 5/11/2018 | PCG | 4,200.00 | 42.4746 | 329620045 |
| 118422 | Buy Long | 5/9/2018 | 5/11/2018 | PCG | 10,000.00 | 42.495 | 329613434 |
| 118673 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 104,300.00 | 42.4737 | 445618624 |
| 118668 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 397,016.00 | 42.50 | 521898532 |
| 118670 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 4,755.00 | 42.4911 | 496449286 |
| 118669 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 23,957.00 | 42.4747 | 813438822 |
| 118671 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 300.00 | 42.495 | 813438822 |
| 118672 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 19,100.00 | 42.50 | 422487565 |
| 118726 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 194,300.00 | 42.27 | 496558035 |
| 118724 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 266,000.00 | 42.45 | 596375486 |
| 118727 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 1,016.00 | 42.2151 | 522071923 |
| 118728 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 38,684.00 | 42.3662 | 996739601 |
| 120620 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (142,200.00) | 44.075 | 499533675 |
| 120622 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (84,426.00) | 44.2049 | 474608571 |
| 120619 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (7,700.00) | 44.248 | 574244581 |
| 120623 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (7,800.00) | 44.009 | 574274058 |

3

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 120669 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (153,900.00) | 43.7847 | 549834815 |
| 120673 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (4,600.00) | 44.0576 | 574327101 |
| 120668 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (201,820.00) | 43.996 | 549809722 |
| 120671 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (2,500.00) | 43.8976 | 998925016 |
| 120672 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (50,000.00) | 44.18 | 998925016 |
| 120667 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (169,000.00) | 43.98 | 400804994 |
| 120670 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (14,754.00) | 43.909 | 599662630 |
| 120952 | Buy Long | 7/17/2018 | 7/19/2018 | PCG | 838,700.00 | 42.6709 | 575418920 |
| 121623 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 6,900.00 | 42.70 | 449990426 |
| 121617 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 300,000.00 | 42.8524 | 550540641 |
| 121624 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 12,700.00 | 42.9698 | 450952121 |
| 121619 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 27,650.00 | 42.6298 | 550536299 |
| 121618 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 13,056.00 | 42.8078 | 97541713 |
| 121620 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 2,600.00 | 42.7412 | 97541713 |
| 121621 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 21,700.00 | 42.6829 | 360991829 |
| 121622 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 60,981.00 | 42.6064 | 450965567 |
| 121701 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 8,962.00 | 42.8866 | 334624337 |
| 121698 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 900.00 | 42.8939 | 334616509 |
| 121702 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 100.00 | 42.95 | 386179172 |
| 121697 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 12,100.00 | 42.9609 | 386191839 |
| 121700 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 100.00 | 42.855 | 501410929 |
| 121807 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 15,000.00 | 42.97 | 451238098 |
| 121811 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 121,560.00 | 42.93 | 476021480, 476021476, 476021475 |
| 121810 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 6,000.00 | 42.926 | 526282972 |
| 121809 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 49,373.00 | 42.9232 | 501586731 |
| 121806 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 32,600.00 | 42.8776 | 451239562 |

4

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 121808 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 23,808.00 | 42.932 | 576132715 |
| 121845 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 51,000.00 | 42.995 | 451345208 |
| 121842 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 300.00 | 42.95 | 402399452 |
| 121844 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 83,000.00 | 42.9535 | 526379110 |
| 121841 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 200.00 | 42.96 | 798859091 |
| 121843 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 2,600.00 | 42.9838 | 361353695 |
| 121840 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 1,000.00 | 43.00 | 402427486 |
| 121880 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 634,700.00 | 42.3762 | 451441452 |
| 121884 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 407,879.00 | 42.2706 | 402494271 |
| 121878 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 4,600.00 | 42.46 | 386540935 |
| 121879 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 39,115.00 | 42.4115 | 402492119 |
| 121881 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 1,000.00 | 41.73 | 476173855, 476173842 |
| 121877 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 32,100.00 | 42.8381 | 900155441 |
| 121882 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 9,600.00 | 42.369 | 425503541 |
| 121883 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 16,816.00 | 42.4446 | 526503881 |
| 122110 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 2,800.00 | 43.9264 | 426040513 |
| 122109 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 238,778.00 | 43.9137 | 387102657 |
| 122107 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 2,700.00 | 43.9037 | 502314674, 426030201, 426019163, 387097740, 335451981 |
| 122108 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 2,600.00 | 43.7115 | 900549049 |
| 122111 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 180,000.00 | 43.8409 | 576853599 |
| 122106 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 44,700.00 | 43.7766 | 426058991 |
| 122105 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 37,565.00 | 43.7422 | 551522436 |
| 122162 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 1,445,000.00 | 42.8881 | 527144314 |

5

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1197 of 1229

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122164 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 19,600.00 | 42.865 | 527144578 |
| 122168 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 7,700.00 | 42.8551 | 335536401 |
| 122161 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 198,982.00 | 42.9086 | 403116776 |
| 122167 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 5,900.00 | 42.9137 | 476780393, 476780387, 476774009, 362013433, 362007084, 362006847, 362006840, 362006790, 335527060, 335526083 |
| 122163 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 708,857.00 | 42.7635 | 502405024 |
| 122166 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 63,100.00 | 42.9899 | 476801879 |
| 122165 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 41,718.00 | 42.8689 | 403138546 |
| 122203 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 839,700.00 | 42.7466 | 362127869 |
| 122199 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 662,369.00 | 42.7431 | 362127242 |
| 122201 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 8,900.00 | 42.7566 | 387247012 |
| 122202 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 27,400.00 | 42.745 | 426205858 |
| 122200 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 1,100.00 | 42.705 | 476872173 |
| 122198 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 34,700.00 | 42.7658 | 362137029 |
| 122239 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 118,300.00 | 42.8474 | 362241668 |
| 122240 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 162,543.00 | 42.9671 | 502614468 |
| 122245 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 500.00 | 43.00 | 577105648 |
| 122241 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 76,382.00 | 43.0154 | 426315480 |
| 122246 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 1,000.00 | 43.01 | 452241205, 452241152 |
| 122242 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 100,000.00 | 42.84 | 799431154 |
| 122247 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 300.00 | 42.79 | 799431154 |

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|----------|-----------|-----------|------------|------------------|----------|-------|---------------|
| 122238 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 600,000.00 | 42.9897 | 476937673 |
| 122244 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 3,500.00 | 42.9481 | 452262013 |
| 122243 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 46,175.00 | 42.7826 | 502618177 |
| 122278 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 45,500.00 | 43.4415 | 362360744 |
| 122279 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 25,000.00 | 43.32 | 335790504 |
| 122275 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 1,100.00 | 43.4123 | 527393203 |
| 122281 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 57,900.00 | 43.3986 | 335777993 |
| 122276 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 33,000.00 | 43.4517 | 551840210, 551840181, 527388532 |
| 122277 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 200.00 | 43.40 | 98411954 |
| 122280 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 26,600.00 | 43.2966 | 502694520 |
| 122283 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 49,087.00 | 43.2102 | 502698587 |
| 122357 | Buy Long | 8/20/2018 | 8/22/2018 | PCG | 1,201,300.00 | 43.9795 | 403785919 |
| 122411 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 34,500.00 | 44.4085 | 527928162 |
| 122414 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 4,200.00 | 44.4702 | 577731531, 577731525, 577731524, 426957014, 387954273, 387954271 |
| 122413 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 15,100.00 | 44.4313 | 799845660 |
| 122412 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 14,600.00 | 44.4357 | 552499118 |
| 122415 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 4,100.00 | 44.4213 | 403934549 |
| 122454 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 51,500.00 | 44.0297 | 528029356 |
| 122458 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 17,500.00 | 44.495 | 528030238 |
| 122456 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 5,300.00 | 43.9696 | 362999334 |
| 122451 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 489,424.00 | 44.1819 | 452970684 |
| 122455 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 100,000.00 | 43.95 | 427038426 |

7

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1199 of 1229

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122457 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 400.00 | 43.96 | 98755670 |
| 122453 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 39,500.00 | 44.0576 | 452981106 |
| 122450 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 232,357.00 | 44.1269 | 388064354 |
| 122484 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 22,800.00 | 42.805 | 528093080 |
| 122491 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 83,400.00 | 43.601 | 528093080 |
| 122485 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 650,000.00 | 42.8489 | 336476541, 336476537, 336476505 |
| 122488 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 400.00 | 42.76 | 528082455 |
| 122486 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 56,700.00 | 42.795 | 363075567 |
| 122492 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 5,563.00 | 43.177 | 363075567 |
| 122487 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 1,000.00 | 42.76 | 388114862 |
| 122490 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 280,000.00 | 43.3035 | 477788567 |
| 122489 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 13,300.00 | 42.7914 | 528097508 |
| 122539 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 192,500.00 | 43.6442 | 453148035 |
| 122535 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 36,500.00 | 43.6182 | 453147389 |
| 122538 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 21,988.00 | 43.2497 | 336533942 |
| 122531 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 2,700.00 | 43.6967 | 336536776 |
| 122533 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 95,172.00 | 43.6912 | 453123758 |
| 122534 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 22,400.00 | 43.2526 | 427180887, 388192313, 388191540, 388191474 |
| 122532 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 32,900.00 | 43.6478 | 901397256 |
| 122536 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 44,700.00 | 43.5435 | 388225489 |
| 122537 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 54,628.00 | 43.5968 | 427216067 |
| 122584 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 19,900.00 | 44.50 | 477971224 |
| 122582 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 10,800.00 | 44.50 | 477970744 |
| 122581 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 2,400.00 | 44.495 | 552805622 |

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1200 of 1229

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122583 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 2,200.00 | 44.4555 | 528272504 |
| 122580 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 145.00 | 44.495 | 477976666 |
| 122869 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 103,500.00 | 45.23 | 700602447 |
| 122866 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 60,100.00 | 45.6605 | 553446972 |
| 122861 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 300.00 | 45.69 | 388889112 |
| 122863 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 95,571.00 | 45.6784 | 553431222 |
| 122862 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 200.00 | 45.68 | 99310919 |
| 122865 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 17,800.00 | 45.6831 | 404812613 |
| 122864 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 82,693.00 | 45.5665 | 553472358 |
| 123285 | Buy Long | 9/18/2018 | 9/20/2018 | PCG | 15,131.00 | 47.1285 | 479184917 |
| 123283 | Buy Long | 9/18/2018 | 9/20/2018 | PCG | 200,000.00 | 47.187 | 579264217 |
| 123284 | Buy Long | 9/18/2018 | 9/20/2018 | PCG | 400.00 | 47.1488 | 389562052 |
| 123331 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 49,700.00 | 46.6616 | 902557527 |
| 123329 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 3,400.00 | 46.7491 | 554111453 |
| 123335 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 153,294.00 | 46.6849 | 529535592 |
| 123330 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 2,400.00 | 46.7746 | 529517681, 529517660, 337926435, 337923385 |
| 123328 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 9,400.00 | 46.7904 | 819671072 |
| 123334 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 852,105.00 | 46.8542 | 504780350, 504780345 |
| 123333 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 120,600.00 | 46.7784 | 529548846 |
| 123332 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 47,375.00 | 46.6608 | 364596429 |
| 123385 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 200.00 | 46.815 | 389719277 |
| 123388 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 1,650.00 | 46.8592 | 504866479 |
| 123389 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 543,078.00 | 46.8308 | 529617712 |
| 123386 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 400.00 | 46.7225 | 529636643 |
| 123387 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 867.00 | 46.7335 | 454612568 |

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1201 of 1229

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 123437 | Sell Long | 9/21/2018 | 9/25/2018 | PCG | (275,334.00) | 46.9075 | 389823472 |
| 123790 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 23,600.00 | 45.275 | 820108850 |
| 123789 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 900.00 | 45.30 | 365041793 |
| 123787 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 12,800.00 | 45.2133 | 455003614 |
| 123784 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 48,800.00 | 45.3738 | 902943860 |
| 123786 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 25,000.00 | 45.16 | 902943860 |
| 123788 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 5,700.00 | 45.2094 | 428993720 |
| 123785 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 15,236.00 | 45.2951 | 455028518 |
| 123831 | Buy Long | 9/27/2018 | 10/1/2018 | PCG | 453,900.00 | 45.181 | 820198075 |
| 123888 | Buy Long | 9/28/2018 | 10/2/2018 | PCG | 25,891.00 | 45.6964 | 701637490 |
| 123952 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 2,500.00 | 45.5076 | 390374187 |
| 123954 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 2,400.00 | 45.5667 | 406243114, 338731995 |
| 123950 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 400.00 | 45.44 | 820345738 |
| 123953 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 131,404.00 | 45.5872 | 820345738 |
| 123951 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 51,100.00 | 45.4612 | 505541759 |
| 126346 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (115,400.00) | 20.39346187 | 341939937 |
| 126347 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (12,600.00) | 20.17976191 | 409364341 |
| 126349 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (126,100.00) | 20.75468676 | 823497095 |
| 126345 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (286,770.00) | 20.57969153 | 583229554 |
| 126348 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (3,500.00) | 20.19 | 533395729 |
| 126350 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (32,500.00) | 20.06207692 | 704243436 |
| 126343 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (426,085.00) | 21.42492905 | 704243436 |
| 126344 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (71,100.00) | 20.55262307 | 368359054 |
| 126351 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (87,400.00) | 20.27734554 | 393545693 |

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1202 of 1229

## <u>ADDENDUM TO SUPPLEMENTAL PROOF OF CLAIM NO. 100269</u>

1.    This Addendum to Supplemental Proof of Claim (the "<u>Addendum</u>") is filed by Baupost Group Securities, L.L.C. (the "<u>Claimant</u>"), on behalf of itself and as trading nominee for the Baupost-Managed Funds,[1] for obligations owing to Claimant and the Baupost-Managed Funds by Debtors under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* This Proof of Claim amends claim number 100269, which was filed on April 15, 2020 (the "<u>2020 POC</u>"), and refiled in duplicate as claim number 100309.[2]

2.    Claimant adopts and incorporates in full herein the allegations of the 2020 POC, including but not limited to the allegations set forth in the Third Amended Consolidated Class Action Complaint for Violation of the Federal of Securities Law filed in *In re PG&E Corp. Securities Litigation*, Civil Action No. 3:18-cv-03509-EJD (N.D. Cal.) [Dkt. No. 121] (the "<u>TAC</u>"), which was incorporated by reference into the 2020 POC (and annexed thereto as Exhibit A).

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Claimant's "Addendum to Rescission of Damage Claim Proof of Claim" forms filed in connection with the 2020 POC (as defined herein).

[2]  As set forth in the 2020 POC:

> Claimant purchased and acquired the equity securities that are the subject of this Proof of Claim as a trading nominee for the Baupost-Managed Funds, which are the beneficial owners of such equity securities. The Court's Order (i) Denying Securities Lead Plaintiff's Motion to Apply Bankruptcy Rule 7023 to Class Proof of Claim and (ii) Extending Bar Date for Certain Holders of Securities Claims for Rescission or Damages, dated February 27, 2020 [Dkt. No. 5943] authorizes "those persons or entities (the '<u>Securities Claimants</u>') that purchased or acquired the Debtors' publicly traded debt and/or equity securities" to file a Rescission or Damage Claim Proof of Claim Form, either directly or through "an authorized agent or attorney."

3.     Claimant has continued to investigate the factual and legal bases of the claims asserted in the 2020 POC. Based on that investigation, which remains ongoing, Claimant files this Addendum to elaborate on the claims set forth in the 2020 POC and the TAC and to provide additional details concerning the misconduct by Debtors alleged in the 2020 POC and the TAC.[3]

4.     The 2020 POC incorporated allegations in the TAC that, between April 29, 2015 and November 15, 2018 (the "<u>Relevant Period</u>"), Debtors made materially false statements that "misled investors about PG&E's wildfire safety practices, including [its] representations of achieving full legal compliance and investing in safety, notwithstanding the Company's numerous and widespread violations of powerline safety regulations" and, thereby, artificially inflated the value of Debtors' securities during the Relevant Period. TAC ¶¶ 1, 321.[4] Specifically, the TAC alleges that:

> Investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the [Relevant] Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety.

*Id.* ¶ 188. The TAC enumerates 19 false or materially misleading statements by Debtors concerning their safety practices, *id.* ¶¶ 194-316, and describes a pattern of serial misrepresentations and misleadingly incomplete disclosures whereby "[e]ven as the truth began

---

[3]  This Addendum does not change the amount sought by the 2020 POC, but, as set forth in Section IV, below, Claimant reserves the right to modify the amount of its claim at such time as may be appropriate.

[4]  "PG&E" is defined in the TAC to mean both Debtors—*i.e.*, PG&E Corporation ("<u>PCG</u>") and Pacific Gas and Electric Company (the "<u>Utility</u>"). TAC at 1.

to emerge about PG&E's insufficient safety practices" because of reports finding Debtors responsible for catastrophic wildfires, "PG&E continued to falsely insist on its compliance" and "doubled down on misinformation in order to build up the public perception of its safety and compliance" and to "conceal[] the true extent to which [Debtors] w[ere] exposed to massive liability for causing further wildfires, thereby significantly inflating [PCG's] share price." *Id.* ¶¶ 5-6, 31. The TAC further alleges that the October 2017 North Bay Fires and the November 2018 Camp Fire occurred during the Relevant Period and that these fires "incited a series of investigations, which . . . revealed PG&E's gross deficiencies in the area of safety compliance," contrary to Debtors' "public statements that it complied with California and federal safety regulations." *Id.* ¶ 2. The TAC identified nine partial corrective disclosures that dissipated a portion of the artificial inflation in the market price of Debtors' securities and alleges that, after each of these partial corrective disclosures, PCG's share price fell. *Id.* ¶¶ 328-389.

5.     "As a result of [these] wrongful acts and omissions" by Debtors, the TAC alleges that there was a "precipitous decline in the market value of" Debtors' securities when "the truth started to emerge"—including "the truth regarding PG&E's responsibility for the Camp Fire"— which caused Claimant, the Baupost-Managed Funds, and other holders of Debtors' securities to "suffer[] significant losses and damages." *See id.* ¶¶ 321, 364, 390. Accordingly, the TAC asserts that Debtors violated Section 10(b) of the Exchange Act and Rule 10b-5 by, among other things "disseminat[ing] or approv[ing] the false statements [alleged], which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.* ¶¶ 471-480. The TAC also asserts causes of action against PCG for (i) "controlling person" liability under Section 20(a) of the Exchange Act as a result of "participat[ing] in the unlawful conduct

alleged which artificially inflated the market price of PG&E securities," *id*. ¶¶ 481-486, and (ii) liability under Section 10(b) and Rule 10b-5 as the "alter ago" of the Utility, *id*. ¶¶ 492-495.[5]

6.     This Addendum elaborates on and amplifies the allegations in the 2020 POC and TAC concerning Debtors' pattern of misrepresentations and incomplete, misleading disclosures about their safety practices, specifically with respect to the 2018 Camp Fire.  The 2020 POC and TAC contain extensive factual allegations that Debtors' inspection, safety, and maintenance failures, particularly with respect to high-voltage transmission lines and towers, including the Utility's failure to follow its own power shutoff protocol, caused the Camp Fire. *See generally id*. ¶¶ 33-38, 130-76, 190-93.  Indeed, Debtors acknowledged to the Court that the TAC "includes claims concerning equipment management and other issues connected with the 2018 Camp Fire." *Reorganized Debtors' Motion for Entry of an Order (I) Approving Settlements Resolving Disputes with Certain Insurers, and (II) Granting Related Relief* [Dkt. No. 13015] at 9 (citing TAC ¶¶ 33-38).

7.     This Addendum details seven additional misstatements by Debtors—all of which occurred during the Relevant Period—in which Debtors made public materially false statements about their safety practices concerning, and their investment in, their electrical transmission and distribution system, including but not limited to the inspection, maintenance, hardening, and replacement of high-voltage transmission lines and other equipment in their electrical infrastructure, as well as their compliance with regulatory requirements concerning the safe operation of their electrical transmission and distribution system (the "Additional Misstatements").  As with the misstatements described in the TAC, these additional "materially

---

[5]  This Addendum does not assert any new causes of action against Debtors but, as set forth in Section IV, below, Claimant reserves the right to assert additional causes of action at such time as may be appropriate.

false and misleading statements assuring investors of the Company's compliance with California safety regulations" concealed "the true risks leading to the Camp Fire," including that Debtors were "not sufficiently prioritizing safety." TAC ¶¶ 37-38.[6]

## I. The Camp Fire Was the Result of Debtors' Inadequate Safety Practices with Respect to Their High-Voltage Transmission Lines

8. The Camp Fire was the "most destructive and deadliest wildfire in California history . . . burning 153,336 acres, destroying 18,804 structures, [ ] killing at least 85 people," and causing an estimated $13 billion in injuries. *Id*. ¶ 133. The TAC alleges that Debtors "[were] responsible for the Camp Fire, which began when a PG&E electrical tower— carrying a high-voltage 115 kilovolt transmission line—failed." *Id*. ¶ 190.

### A. As Alleged in the TAC, Debtors' Failures to Appropriately Maintain, Replace, and Inspect High-Voltage Transmission Equipment on the Caribou-Palermo Line Caused the Camp Fire

9. The TAC contains numerous factual allegations concerning Debtors' responsibility for the Camp Fire and explaining the role that Debtors' inadequate safety and maintenance practices with respect to the equipment on their high-voltage transmission lines played in causing the Camp Fire. *See, e.g.*, *id.* at 34 ("The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations."). For example, the TAC alleges that:

   a. A May 15, 2019 California Department of Forestry and Fire Protection ("Cal Fire") "news release confirm[ed] that its investigation had 'determined that the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[].'" *Id*. ¶ 190; *see also id*. ¶¶ 113-14.

---

[6] The Additional Misstatements—which are set out in Section II, below—are drawn from public statements on Debtors' website, transcripts of Debtors' earnings calls, and various regulatory filings, including Debtors' submissions to the California Public Utilities Commission ("CPUC") and the Federal Energy Regulatory Commission ("FERC").

b. "PG&E's Caribou-Palermo transmission powerline was originally built in 1919, and was responsible for causing the first ignition point of the Camp Fire." *Id.* ¶ 130.

c. "The Camp Fire began when a PG&E electrical tower, carrying a high-voltage 115 kilovolt transmission line, failed." *Id.* ¶ 34; *see also id.* ¶ 114.

a. At the first ignition point—which Debtors identified as tower number ":27/222"—Debtors observed "the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower" as well as "a broken C-hook attached to the separated suspension insulator that once connected the suspension insulator to a tower arm" and which "showed signs of wear." *Id.* ¶ 118.[7]

b. "PG&E knew, but concealed, that [the Caribou-Palermo] powerline had dangerously deteriorated. In December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed due to windy conditions. In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the five collapsed towers, and one additional tower, on the Caribou-Palermo line . . . near the first Camp Fire ignition point." *Id.* ¶ 131.

c. "The rest of the aging towers on the line, including the tower alleged to have started the Camp Fire, were not replaced during that project. The age of these remaining towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related factors would fail to support transmission line cables and cause wildfires. Indeed, the relevant tower included uninsulated 'jumper' lines used to switch currents between transmission lines, making the risk of fire even greater." *Id.* ¶ 132.

d. **"'[I]nternal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high'**—a risk PG&E concealed from the public." *Id.* ¶ 136 (emphasis in original).

e. "A November 1, 2016 PG&E document detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line, with a support hook snapping off during routine painting. PG&E documents internally acknowledged that the supports 'had been compromised through corrosion.'" *Id.* ¶ 137.

---

[7] "PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations." *Id.* Debtors' "failure to remove such vegetation violated California Public Resources Code Section 4293, and its failure to maintain the integrity of its poles and towers violated California Public Utilities Code Section 451." *Id.* ¶ 35.

f. A March 18, 2019 article in *The New York Times* "discussed an internal Company email, sent long before the Camp Fire, which noted that a group of structures including the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due to their age and windy conditions in the area. Indeed, the Company noted that corrosion on another tower in the vicinity was so severe that it had endangered crews attempting to repair it. The Company's own guidelines had warned that the **tower was a quarter-century past its useful life**, yet PG&E failed to repair or replace the aging tower." *Id*. ¶ 134 (emphasis in original).

g. "Despite the internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed. Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain. Tragically, needed repairs were never undertaken, and the Caribou-Palermo line caused the first ignition point of the Camp Fire in 2018. . . . Accordingly, PG&E had actual knowledge about the safety violations that caused the Camp Fire, months if not years in advance." *Id*. ¶¶ 138-39.

10.    The TAC also details how Debtors' failure to appropriately inspect their high-voltage transmission infrastructure, specifically the towers on the Caribou-Palermo line, contributed to the ignition of the Camp Fire. For example:

a. "PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not since 2009, pursuant to an internal policy whereby 'Steel structures on PG&E's 115 kV transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and detailed inspections every five years.' PG&E has admitted that an aerial patrol is not an inspection, as it is only '[d]uring a detailed inspection of a transmission line' that 'PG&E personnel are instructed to look for and document abnormalities or circumstances that will negatively impact safety, reliability, or asset life.'" *Id*. ¶ 118.

b. Debtors submitted a new wildfire mitigation plan to the CPUC in February 2019 (the "2019 Mitigation Plan")—after the Camp Fire—and "the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan confirms the inadequacy of PG&E's prior activities." Specifically, the 2019 Mitigation Plan "stated that the Company would substantially increase its inspections. Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting 'enhanced inspections' of 685,000 electricity distribution poles in High Fire Threat Districts 'in addition to routine inspections' over the course of just 'five months.' (Emphasis original.) 'Enhanced Inspection' was described as 'includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing inspections of every transmission tower,' implying such

7

measures had not been undertaken in the past. Similarly, for its electricity transmission structures, PG&E committed to conducting enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from 9,400 and 76,000, respectively)." *Id.* ¶ 182.

B.    The Findings in the Butte County District Attorney's
      Report Provide Greater Detail Concerning Debtors'
      <u>Maintenance and Inspection Failures that Caused the Camp Fire</u>

11.    On June 16, 2020—following the filing of the TAC and the filing of the

2020 POC—the Butte County District Attorney released *The Camp Fire Public Report:  A*

*Summary of the Camp Fire Investigation* (the "<u>Butte Report</u>").[8]  The Butte Report was issued

shortly after a grand jury in Butte County returned an indictment charging the Utility with

"unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in

maintaining its power line" and the Utility pleaded guilty.  Butte Report at 3.  The Butte Report

summarized the Butte County District Attorney's investigation into whether there "was sufficient

evidence to convict PG&E of its criminal behavior which lead [*sic*] to the Camp Fire" and was

used to establish the factual basis for the Utility's plea of guilty to 84 counts of involuntary

manslaughter and one count of unlawfully causing a fire.  *Id.* at 3-4, 80-81.

12.    The Butte Report sheds additional light on Debtors' failures to properly

inspect, maintain, and replace equipment on their high-voltage transmission lines and on how

Debtors' inadequate safety practices with respect to electrical transmission and distribution

system caused the Camp Fire.

13.    Amplifying the allegation in the TAC concerning the broken C hook on

tower :27/222, TAC ¶ 118, as well as the TAC's allegation that "PG&E knew, but concealed,

---

[8]  The Butte Report is available at:  https://www.buttecounty.net/Portals/30/CFReport/PGE-THE-CAMP-FIRE-PUBLIC-REPORT.pdf?ver=2020-06-15-190515-977.  The TAC had noted that "since determining that PG&E is responsible for the Camp Fire, Cal Fire ha[d] forwarded its investigative report to the Butte County District Attorney."  TAC ¶ 192; *see also id.* ¶¶ 113, 132.

that" equipment on the Caribou-Palermo line "had dangerously deteriorated," *see, e.g.*, *id*. ¶ 131, the Butte Report includes the following detailed findings:

a.  Cal Fire determined that the first ignition point of Camp Fire was "the dry brush below Tower 27/222 of the Caribou-Palermo line," and that the fire began when "a C hook that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure. The ensuing electrical arcing between the jumper conductor and steel tower structure caused the aluminum strands of the conductor to melt as well as a portion of the steel tower structure. The molten aluminum and steel fell to the brush covered ground at the base of the steel tower structure. This molten metal ignited the dry brush." Butte Report at 9.

b.  Cal Fire found that many of the components on towers of the Caribou-Palermo line, including Tower 27/222 and the C hook that broke, dated from the original construction of the line, between 1919 and 1921, and had not been replaced. Specifically, "the insulator string hanging from the C hook that broke on November 8, 2018 was an original 1921 insulator." Further, "with the exception of add-on hanger brackets which were added to the ends of the transposition arms to replace worn hanger holes, the transposition components on Tower 27/222, including the transposition arms, C hooks, insulator strings and jumper conductor[s], were original components in service since 1921." *Id*. at 18-19, 82.

c.  With respect to the specific "C hook" that failed—*i.e.*, broke—and caused the ignition of the Camp Fire, investigators found (i)"that as a result of rotational body on body wear"—caused by movement in the wind—"the edge of the hanger holes had cut a channel into" the C hook and that "the channel had cut approximately 14/16 into the hook before the remaining metal broke under the weight of the insulator string and jumper conductor," (ii) "substantial wear" on the bolted-on hanger hole plate of the left-phase transposition arm "where the broken hook had hung," and (iii) a "channel" worn into the right-phase C hook"—which had not failed—"where it hung from the bolted-on hanger plate hole of that transposition arm" which was "similar to the channel cut into the broken left phase C hook." *Id*. at 19-20, 22.

d.  Investigators found spaces between C hooks and hanger holes indicative of substantial wear on three other towers on the Caribou-Palermo line. *Id*. at 20.

e.  Investigators found that, at Tower 27/222 and at least one other tower on the Caribou-Palermo line, the C hooks hung from "bolted-on hanger plate holes [that] had been added to the transposition arms," instead of the original hanger holes, indicating Debtors' awareness of wear on the C hooks and hanger holes. *Id*. at 20-21, 31.

f.  By at least 1987, Debtors had knowledge of wear on the C hooks and hanger holes on their transmission infrastructure when photographs in the "PG&E Laboratory Test Report" documented worn C hooks and hanger holes on transmission towers. *Id*. at 24, 78, 83. In 2011 and again in 2018, workers on Debtors' transmission line crews observed similar wear on hanger holes. In 2011, a Utility engineer noted in an email that "[i]t appears that there is a groove cutting into the plate probably caused by years of rubbing between the c-hook and the plate." And in 2018, a Utility lab report found that the wear was "attributed to wind-driven swinging of the insulators" and opined that the "useful life of the hanger plates" was 97-100 years. *Id*. at 78, 83-84.

g.  Debtors were aware of the age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program. *Id*. at 33.

h.  By 2007, an engineer employed by Debtors sought $800,000 in funding "for preliminary engineering and purchase of long lead-time material to replace conductor and tower structures on a section of the Caribou-Palermo line," noting that "[t]he probability of . . . failure *is imminent* due to the age of both the towers and the conductor." *Id*. at 34 (emphasis added). After removing language about "the prediction of imminent failure," Debtors' Electric Asset Strategy Division approved the project with a reduced funding amount. Between 2007 and 2009, Debtors conducted "engineering studies of the proposed new tower sites and preparatory work, including building a road to allow access to the proposed new tower sites," but canceled the project "due to Asset Management's reprioritization." *Id*. at 34-35.

i.  Debtors reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire. *Id*. at 50.

14.    The Butte Report also provides additional details corroborating the allegations in the TAC concerning Debtors' inadequate inspection of the Caribou-Palermo line and their other high-voltage transmission equipment. *See* TAC ¶¶ 118, 182. According to the Butte Report:

a.  Debtors changed their inspection and patrol policies over the decade preceding the Camp Fire and "drastically reduced the frequency and thoroughness of inspections." *Id*. at 23-25.

i.  Under Debtors' 1987 policy, "the Caribou-Palermo line was required to be patrolled three times each year: one ground patrol and two aerial patrols." The policy also required "climbing inspections of five percent of the tower structures per year; and an infrared patrol every five years." *Id*.

10

ii. Under policy changes that Debtors made in 1995, "[t]he Caribou-Palermo line was reduced from three patrol/inspections (one ground/two aerial) per year to one ground inspection every 24 months and one aerial inspection every 24 months. Required routine climbing inspections were eliminated." *Id*. at 24.

iii. Under Debtors' Electric Transmission Preventative Maintenance Manual ("ETPM")—which went into effect in 2005—the Caribou-Palermo line was further "reduced to only being inspected once every five years and patrolled once per year in non-inspection years." *Id*. at 25.

iv. Although they did not further revise the relevant portions of the ETPM between 2005 and the Camp Fire, in 2013 Debtors "considered further reducing the frequency of inspections and patrols." *Id*. at 26.

v. Despite making these revisions to the patrol/inspection policy, Debtors' ETPM acknowledged that "the best position to view insulators and hardware is aerial inspection (not patrol), ground inspection above 10', and climbing inspection." *Id*.

b. Although the ETPM was intended to "reduce the potential for component failure and facility damage and facilitate a proactive approach to repairing or replacing identified, abnormal components," Debtors' actual inspections and patrols of the Caribou-Palermo line did not comply with the already-lowered ETPM standards. *Id*. at 23, 26, 37. This was particularly true "in low population density mountainous areas," such as where the Camp Fire began. *Id*. at 47.

i. Debtors sought to cut costs associated with inspections/patrols "by reducing the thoroughness of the inspections and patrols," specifically by "reducing the amount of time budgeted for the inspections and patrols" and tying salary incentives to staying within reduced inspection and patrol budgets. *Id*. at 27-28, 50.

ii. In 2005, Debtors eliminated the direct training of the employees responsible for inspecting and patrolling transmission lines. All of Debtors' employees who "inspected or patrolled the Caribou-Palermo line since the publication of the ETPM in 2005 . . . denied having receiv[ed] any formal training on how to perform an inspection or patrol," including in "assessing wear." Their training was "limited to filling out reporting forms and notifications for any issues" and the "only training on how to perform an inspection or patrol was via informal mentoring by other, more experienced" employees. *Id*. at 28-30.

iii. "[B]y 2007 the inspections and patrols of the Caribou-Palermo line were being conducted by inexperienced, untrained and unqualified [employees]. Both of the "Detailed Ground Inspections (2009 and 2014) and seven of the ten Annual Air Patrols on the Caribou Palermo [line] were completed by [employees] who had little or no prior transmission experience, and no formal training on performing inspections and patrols." This violated the ETPM, which required employees to "be thoroughly familiar with all of the facilities, equipment, safety rules and procedures associated with the facilities and equipment." Specifically, "[b]ecause of their lack of knowledge, experience, and training," the employees inspecting the Caribou-Palermo line "could not have been expected to identify the wear" on C hooks and hanger holes. *Id*. at 30.

iv. The last "Detailed Ground Inspection" of the Caribou-Palermo line prior to the Camp Fire occurred in 2014 and, from 2015 to the Camp Fire in 2018, the line was only subject to annual aerial patrols, *id*. at 37—which were inadequate. PG&E employees "denied it was possible to assess the wear on the C hooks and hanger holes during a detailed ground inspection" or "during aerial patrols." Moreover, such inspections were inconsistent with the ETPM's guidance that "[o]nly climbing inspections or lifted bucket inspections above 10 feet in the air would give the appropriate best view for assessment of insulators and their connectors." *Id*.

v. The linemen who assisted in the inspections of the Caribou-Palermo line had not been trained on performing inspections and patrols and did not conduct their inspections under the supervision of a trained, experienced troubleman. Instead, the linemen and troubleman divided the line into sections and each independently inspected his own section. *Id*. at 38.

vi. "[B]etween 2001 and 2018 aerial patrol by helicopter was the primary method of inspection and patrol for the Caribou-Palermo line. . . . [T]he thoroughness of the aerial patrols declined through the years." For example, patrol flight time declined from 10 hours for the 2001 patrol to between 3.2 and 7.6 hours for patrols from 2011 to 2018. Employees characterized patrols with such flight times as "'fly bys' not patrols or inspections" and reported that they were "only confirming the structures and components were 'standing upright.'" They also stated that it would not be "possible to see and assess the wear on the C-hooks and hanger holes during aerial patrols." *Id*. at 40-41.

vii. The ETPM required climbing inspection upon certain specific triggers, such as component defects or failures, high fire hazard, and equipment failures caused by storms. But, in practice, Debtors

treated this requirement as discretionary and did not order climbing inspections even when multiple triggers had occurred. *Id.* at 41-43.

    viii.  While 80 towers on the Caribou-Palermo line were subjected to climbing inspections in September and October 2018, those inspections were deficient. They failed to detect defects on numerous towers that were later identified in December 2018 wildfire-related inspections. *Id.* at 43.

    ix.  After the Camp Fire, Debtors initiated wildfire-related climbing inspections on the Caribou-Palermo line and other similar transmission lines. Those inspections "identified thousands of conditions requiring repairs on PG&E's system that had not been previously identified." *Id.* at 44.

c.  After "the failure of a connector on a jumper line" on a Caribou-Palermo line tower caused the Rock Fire in September 2008, Debtors "did not conduct climbing or aerial inspections on other Caribou-Palermo line towers with similar connectors." *Id.* at 35.

d.  After five towers on the Caribou-Palermo line fell in 2012 windstorm, Debtors failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses. *Id.* at 36.

e.  After a painting crew broke a J hook on a Caribou-Palermo line tower in 2016, Debtors reported that "about 20% of the thickness of the bolt had been compromised through corrosion." Nonetheless, "the failure of the J hook did not cause inspections of J hooks in other similar towers." *Id.*

f.  "Despite the fact the towers of the Caribou-Palermo line were routinely subjected to winds at or near their design criteria, PG&E never inspected or tested any of the towers or components for wind damage." *Id.* at 72.

    15.    Thus, the allegations in the TAC—as amplified and corroborated by the evidence summarized in the Butte Report—demonstrate that Debtors' inadequate safety practices with respect to their inspection, maintenance, and replacement of their high-voltage transmission infrastructure caused the Camp Fire.

**II.    Debtors Made Multiple Misstatements—As Alleged in Both
the TAC and This Addendum—Concerning Their Safety
Practices with Respect to Powerlines Prior to the Camp Fire**

16.    The TAC alleges that Debtors made numerous materially false and

misleading statements amount their safety practices, including their inspection of powerlines and

compliance with regulatory standards, including:

a.    Misstatement No. 2:  An October 6, 2015 Corporate Responsibility and
Sustainability Report, which states:  "Each year, PG&E's Vegetation
Management department . . . inspects every mile of power line in our service
area for public safety. . . . We do so in compliance with relevant laws."  TAC
¶ 197.

b.    Misstatement No. 11:  A November 2, 2017 conference call with analysts to
discuss Debtors' financial results for the third quarter of 2017, in which
Debtors' then-President and COO, Nickolas Stavropoulos, stated:  "We
inspect all of our overhead lines every year, and we do second patrols in high
fire danger areas at least twice a year. In some areas, we do as often as 4x a
year."  *Id.* ¶ 264.

c.    Misstatement No. 13:  A May 25, 2018 press release, which stated that
Debtors "[i]ncreased foot and aerial patrols along power lines in high fire-risk
areas."  *Id.* ¶ 280.

d.    Misstatement No. 14:  A June 8, 2018 press release, which stated that "under
PG&E's industry-leading Vegetation Management Program, we inspect and
monitor every PG&E overhead electric transmission and distribution line each
year, with some locations patrolled multiple times."  *Id.* ¶ 287.

e.    Misstatement No. 17:  An October 9, 2018 press release, which stated that
Debtors "are continuing to focus on implementing additional precautionary
measures intended to further reduce wildfire threats, such as working to
remove and reduce dangerous vegetation, improving weather forecasting,
upgrading emergency response warnings, [and] making lines and poles
stronger in high fire threat areas[.]"  *Id.* ¶ 303.

17.    Defendants made additional materially false statements during the

Relevant Period concerning their power line safety practices.  These seven Additional

Misstatements are set forth below.

## A. The Additional Misstatements

### 1. *January 8, 2018 – Misstatement No. 12-A[9]*

18.     In August 2015, the CPUC issued an Order Instituting Investigation ("OII") into whether Debtors' organizational culture and governance adequately prioritized safety.  On January 8, 2018 Debtors submitted prepared testimony as part of the OII proceedings. In his written testimony, Nickolas Stavropoulos, the Utility's then-President and COO, stated:

> On the electric system, infrastructure investment has also been extensive over the last five years, including replacement of over 700 miles of overhead distribution conductor, 49 miles of underground distribution cable, 40 miles of network cable, and over 4,300 manhole cover replacements with venting covers, as well as installing or replacing over 700 miles of transmission line.

### 2. *March 22, 2018 – Misstatement No. 12-B*

19.     On March 22, 2018, Debtors issued a press release announcing their Community Wildfire Safety Program.[10]  Among other things, the press release stated that the program focused on "doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe," including by "investing in stronger, coated power lines, spacing lines farther apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years."

20.     The press released also stated that Debtors were "[a]ugmenting [their] already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission."

---

[9]  The numbering of the Additional Misstatements set forth in this Addendum is intended to organize and present such misstatements in chronological order relative to the misstatements alleged in paragraphs 194 through 316 of the TAC.

[10]  The press release is available at:  https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/In-Advance-of-2018-Wildfire-Season-PGE-Takes-Action-with-Comprehensive-Community-Wildfire-Safety-Program/default.aspx.

### 3. March 27, 2018 – Misstatement No. 12-C

21.     On March 27, 2018, Debtors issued a press release concerning their supposed efforts to mitigate wildfire risks.[11]  The press release stated the following:

> Under PG&E's industry-leading Vegetation Management Program, the company **inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times**.

(Emphasis added.)

### 4. May 3, 2018 – Misstatement No. 12-D

22.     During a May 3, 2018 conference call with analysts concerning Debtors' financial results for the first quarter of 2018,[12] Debtor's then-CEO, Geisha Williams, stated the following:

> We have more than doubled our annual spend to manage vegetation from roughly $190 million in 2013 to $440 million in 2017 and **we increased the frequency of our patrols, particularly in high fire threat areas**, but the new normal needs new solutions. To that end, we recently announced our Community Wildfire Safety Program.

(Emphasis added.)

### 5. October 1, 2018 – Misstatement No. 16-A

23.     On October 1, 2018, Debtors submitted an application to FERC for revisions to their "Transmission Owner Tariff."  Exhibit 3 to that filing was written testimony (in question and answer form) by David P. Gabbard, who was the Utility's Senior Director of Transmission Asset Management, concerning Transmission Risk Management and Project Management Improvements."  Gabbard's testimony states:

---

[11] The press release is available at:  https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Working-to-Reduce-Wildfire-Risks-by-Increasing-Distances-Between-Trees-and-Power-Lines-and-Reducing-Fuels/default.aspx.

[12]  The transcript of this call is available at:  https://seekingalpha.com/article/4169513-pg-and-e-pcg-q1-2018-results-earnings-call-transcript.

Q.      How is PG&E reducing transmission overhead conductor risk?

A.      PG&E is currently implementing four mitigations to reduce overhead conductor risk.  The first two mitigations revolve around equipment replacement work: additional overhead conductor replacement and additional insulator replacement.  Replacing additional conductors and insulators reduces the likelihood that those conductors and insulators will fail, therefore reducing the likelihood that those failures will lead to transmission wires down.

. . .

Q.      Describe the Tower Replacement Program and how that will address the Transmission Risk.

A.      The Tower Replacement Program is established to manage the replacement of steel structures that have reached the end of their useful lives.  The program targets replacement of deteriorated structures where repair is either less cost effective or not feasible.

### 6.      October 1, 2018 – Misstatement No. 16-B

24.      As part of the same FERC application, Jessica Tsang, a Principal

Regulatory Analyst at the Utility, submitted written testimony concerning Debtors' Transmission

and Maintenance Operation Expenses.  Her testimony states:

Q.      Please describe the allocation of expenses in Account 561 – Load Dispatching.

A.      This account includes expenses incurred for operating the transmission system safely, reliably, and *in compliance with all applicable rules, standards and regulations*.  Some examples of activities for which expenses are incurred include:

> • Monitoring, assessing, and operating the power system and individual facilities in real-time to maintain safe and reliable operation of the transmission system;

. . .

Q.      Please describe the allocation of expenses in Account 563 – Overhead Line Expenses.

A.      This account includes expenses incurred for operating overhead transmission lines. Some examples of activities for which expenses are incurred include:

> • Patrolling and inspecting assets to identify any potential safety and reliability issues;

> . . .

> Q.     Please describe the allocation of expenses in Account 571 – Maintenance of Overhead Lines.

> A.     This account includes expenses incurred for maintaining overhead transmission plant.  Some examples of activities for which expenses are incurred include:

> > • Preventative and corrective maintenance of steel and wood support structures;

(Emphasis added.)

### 7.     *November 5, 2018 – Misstatement No. 18-A*

25.     During a November 5, 2018 conference call concerning Debtors' financial performance for the third quarter of 2018l,[13] which occurred just days before the ignition of the Camp Fire, PG&E's then-CEO Geisha Williams stated the following:

> We also have our public safety power shut off program that I mentioned earlier, and we'll of course only utilize this as a last resort in the most extreme forecasted weather conditions.  *All of these efforts are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets*.  We plan to continue patrolling our poles at frequencies within high fire threat areas beyond the compliance requirements in place in California. Collectively, this is an integrated comprehensive program to further reduce risk across our high fire threat areas.

(Emphasis added.)

### B.     The Additional Misstatements Were Materially False and Misleading When Made

26.     The Additional Misstatements were materially false and misleading when Debtors made them for several reasons.

---

[13] The transcript of this call is available at:  https://www.nasdaq.com/articles/pge-corp-pcg-q3-2018-earnings-conference-call-transcript-2018-11-05.

27.     ***First***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors were sufficiently investing in their electrical system infrastructure, including by replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life.  *See* Additional Misstatement Nos. 12-A, 12-B, 16-A, and 16-B.  But, as the Butte Report concluded, Debtors were "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line" at the time the statement was made.  Butte Report at 60.  Further, (i) Debtors had known, since at least 1987, that C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" and that the hanger plates were approaching the end of their useful lives, *id*. at 24, 78, 83-84; (ii) Debtors were aware of the advanced age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program, *id.* at 33; (iii) Debtors approved (albeit at reduced funding) a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" because "[t]he probability of . . . failure ***is imminent*** due to the age of both the towers and the conductor," but canceled the project in 2009, *id*. at 34-35; (iv) Debtors reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire, *id*. at 50; (v) after five towers on the Caribou-Palermo line fell in 2012, Debtors proposed replacing the collapsed towers, and one additional tower, but did not replace the remaining towers despite their age and acknowledgements in internal documents that "the likelihood of failed structures happening is high," TAC ¶¶ 131-32, 136; and (vi) internal documents from prior to the Camp Fire, including in 2016, "detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line," warned that at least one tower was over a quarter-century past its useful life, and acknowledged that "the Caribou-Palermo lines were in need of repair and posed a significant risk

of collapse," but Debtors did not replace the tower or otherwise adequately repair the equipment on the line, *id.* ¶¶ 134, 137-39.

28. ***Second***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors employed robust vegetation management practices that complied with applicable regulations. *See* Additional Misstatement Nos. 12-B, 12-C, and 12-D. On the contrary, as alleged in the TAC, (i) "[i]nvestigations into the causes of the Camp Fire . . . uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations," which, among other things, mandate the safe operation of electrical utilities and prescribe clearances between powerlines and vegetation and the removal of dead and decadent trees that might contact powerlines, *id.* ¶¶ 56, 59, 288; and (ii) it "has been documented that PG&E actually knew that it was not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before U.S. District Judge Alsup "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle,'" *id.* ¶ 292.

29. ***Third***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors were performing frequent and rigorous inspections of powerlines in areas prone to fire. *See* Additional Misstatement Nos. 12-C, 12-D, 16-B, and 18-A. On the contrary, at the time the statement was made, Debtors had not inspected Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point." TAC ¶¶ 203, 268.

20

30.     Moreover, these Additional Misstatements materially omitted the facts

that:

a.  over the preceding decades Debtors changed their policies to decrease the frequency and thoroughness of powerline inspections and patrols;

b.  Debtors' actual inspections and patrols of the Caribou-Palermo line and other lines "in low population density mountainous areas" did not comply with their ETPM policy;

c.  Debtors reduced the time budgeted for inspections and patrols;

d.  Debtors eliminated formal training on inspections and patrols;

e.  Debtors reduced the flight time of aerial patrols, so that they were mere "fly bys" that could "only confirm[] the structures and components were 'standing upright;'"

f.  transmission line inspections and patrols were conducted by employees who "could not have been expected to identify the wear" on C hooks and hanger holes;

g.  the aerial patrols and ground inspections that Debtors conducted on the century-old Caribou-Palermo line could not assess wear on C hooks and hanger holes;

h.  climbing inspections were, contrary to Debtors' policy, treated as discretionary;

i.  despite the fact that towers on the Caribou-Palermo line were subject to high wind, Debtors never inspected them for wind damage,

j.  Debtors did not conduct inspections of similar equipment following failures of transmission line components on Caribou-Palermo line towers; and

k.  after five towers on the Caribou-Palermo line fell in 2012, Debtors failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses.

*See* Butte Report at 23-30, 35-37, 40-43, 50, 72.

31.     Because of the foregoing deficiencies in Debtors' inspection practices,

these Additional Misstatements were also materially false and/or misleading because they

created a false impression that Debtors' transmission line inspection regime complied with their ETPM, *id*. at 37, and with CPUC regulations, such as General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which details safety standards for powerlines and infrastructure, including requirements intended to guard against corrosion on towers. *See* TAC ¶¶ 164-65.

32.     When the falsity of Debtors' statements came to light—including through the corrective disclosures described in the TAC—and the undisclosed and under-disclosed risks associated with Debtors' woefully inadequate practices with respect to maintaining and replacing equipment on their high-voltage transmission lines, managing vegetation around powerlines, and inspecting equipment on their high-voltage transmission lines materialized, including in the form of the Camp Fire, there was a dramatic drop in the market value of PCG's common stock from almost $48 per share on November 8, 2018 to $17.74 on November 16, 2018, *see id*. ¶¶ 355, 387.

## III.     Debtors Made the Additional Misstatements with Scienter

33.     As alleged in the TAC, Debtors "either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality" and, consequently, made those misstatements with scienter. *Id*. ¶ 391.

34.     Debtors claimed that safety is their "core business," and as such, was the "focus" of their senior officers. *Id*. ¶ 397; *see also id*. ¶¶ 398-403 (noting representations by Debtors' senior officers that "they closely monitored PG&E's critically important safety and compliance"). Indeed, Debtors stated that they "maintained a database of inspection data to document the condition of [PG&E's] power lines, which provided [PG&E] personnel with ready access to information about instances of noncompliance with state safety regulations," and they

"repeatedly touted the culture among [PG&E's] lower-level employees that encouraged reporting safety problems up the chain of management."  *Id*. ¶¶ 420, 426-29.

35.     Accordingly, "the persistence of [Debtors'] safety violations cannot be attributed to their being unknown.  Rather, such problems persisted because of what [Debtors] did—or failed to do—to mitigate safety problems once they were reported."  *Id*. ¶ 430.

36.     With respect to Debtors' materially false statements concerning their transmission line inspection and patrol regime, at the times those misstatements were made, Debtors either knew, or were culpably reckless in not knowing, that:

a.  Their actual inspections and patrols of the Caribou-Palermo line and other lines "in low population density mountainous areas" did not comply with their ETPM policy;

b.  They had reduced the frequency, thoroughness, and time budgeted for inspections and patrols of transmission lines;

c.  They had eliminated formal training on inspections and patrols of transmission lines;

d.  Their transmission lines were being inspected or patrolled using methods that "could not have been expected to identify the wear" on C hooks and hanger holes despite the advanced aged and known wear on such equipment; and

e.  Their inspections of transmission lines could not have complied with CPUC regulations, such as General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which details safety standards for powerlines and infrastructure, including requirements intended to guard against corrosion on towers.

*See* TAC ¶¶ 164-65; Butte Report at 23-30, 35-37, 40-43, 50, 72.

37.     With respect to Debtors' materially false statements concerning their maintenance, repair, and replacement practices for their high voltage transmission line equipment, at the times those misstatements were made, Debtors either knew, or were culpably reckless in not knowing, that:

Case: 19-30088   Doc# 14208-4   Filed: 12/13/23   Entered: 12/13/23 22:10:31   Page 1225 of 1229

a. They were "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line;"

b. C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" that the hanger plates were approaching the end of their useful lives;

c. They never funded the "Deteriorated Transmission Equipment Replacement Program," despite knowledge of the advanced age of the equipment on the Caribou-Palermo line;

d. They cancelled a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" despite "[t]he probability of . . . failure [being] *imminent* due to the age of both the towers and the conductor;"

e. They reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire; and

f. They did not replace towers or make adequate repairs to the Caribou-Palermo line despite acknowledgements in internal documents that "the likelihood of failed structures happening is high," and that "the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse."

*See* TAC ¶¶ 131-32, 134, 136-39; Butte Report at 24, 33-35, 50, 60, 78, 83-84.

38. And, with respect to Debtors' materially false statements concerning their vegetation management practices, as alleged in the TAC, at the times those misstatements were made, Debtors "actually knew that [they] [were] not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before the Honorable William Alsup of the U.S. District Court for the Northern District of California "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle,'" TAC ¶ 292.

## IV. Reservation of Rights

39. Claimant reserves the right to further amend and/or supplement its Supplemental Proof of Claim (including this Addendum) at any time, including after any bar date, in any manner, and/or to file additional proofs of claim for any additional claims which

may be based on the same or additional documents or grounds of liability, or based on additional facts learned following further investigation.

40. Except to the extent the 2020 POC is amended hereby, the filing of this Supplemental Proof of Claim (including this Addendum) shall be without prejudice to any previous, contemporaneous, or future claims made by or on behalf of Claimant against Debtors or any of their officers, directors, employees, agents, affiliates, or successors in this or any other proceeding. In executing and filing this Supplemental Proof of Claim (including this Addendum), Claimant does not waive (and this Supplemental Proof of Claim and Addendum shall not be deemed or construed to waive) any claims or right to assert any claims, or preserve any remedies, including setoff and recoupment, that Claimant has against Debtors or any of their officers, directors, employees, agents, affiliates, or successors, whether arising from or related to the matters described herein or otherwise.

41. The filing of this Supplemental Proof of Claim (including this Addendum) is not and shall not be deemed or construed as: (a) a waiver or release of Claimant's rights against any person, entity, or property; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (d) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's

right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge or, if applicable, the U.S. Court of Appeals for the Ninth Circuit; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Supplemental Proof of Claim (including this Addendum), any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

42.    All notices regarding this Proof of Claim should be sent to:

The Baupost Group, L.L.C.
10 St. James Avenue, 17th Floor
Boston, Massachusetts 02116
Attn: Frederick H. Fogel, Esq.
Phone:  (617) 210-8300
Email:  pcgpublicteam@baupost.com

Case: 19-30088    Doc# 14208-4    Filed: 12/13/23    Entered: 12/13/23 22:10:31    Page 1228 of 1229

# Electronic Proof of Claim_Z$WMI27423[[CSLT# 4025#CF]]

**Final Audit Report** 2022-12-28

| | |
|---|---|
| Created: | 2022-12-28 |
| By: | Kroll (efiling@ra.kroll.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAILqjh2IIC6fxzIIsUNbmz16ojOgIugQU |

## "Electronic Proof of Claim_Z$WMI27423[[CSLT#4025#CF]]" History

Web Form created by Kroll (efiling@ra.kroll.com)
2022-12-28 - 11:17:34 AM GMT

Frederick H. Fogel (dgrassgreen@pszjlaw.com) uploaded the following supporting documents:
Attachment
2022-12-28 - 11:24:39 AM GMT

Web Form filled in by Frederick H. Fogel (dgrassgreen@pszjlaw.com)
2022-12-28 - 11:24:39 PM GMT- IP address: 38.140.228.90

(User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.0.0 Safari/537.36)
2022-12-28 - 11:24:41 PM GMT- IP address: 38.140.228.90

Agreement completed.
2022-12-28 - 11:24:41 PM GMT

**KROLL**

Powered by
**Adobe**
**Acrobat Sign**