Enrique Galvez
**Claimant/Appellant**
1181 Fulton Avenue
Sacramento, California 95425
(707) 304-2549

FILED

DEC 20 2023

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**In Pro Se**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN CALIFORNIA BANKRUPTCY COURT

**ENRIQUE GALVEZ,**

     Appellant,

vs.

**PG&E CORPORATION,**

    Appellee(s).

**CASE NO.: 19-30088 DM 11**

**APPELLANT'S AMENDED APPENDIX OF DESIGNATED RECORD ON APPEAL FROM BANKRUPTCY COURT**

**VOLUME II**

<u>**APPELLANT'S AMENDED DESIGNATION OF RECORD ON APPEAL**</u>

|     | **DATE:** | **PG&E I.D. #:** | **DOCUMENT DESCRIPTION:** |
| --- | --- | --- | --- |
| **A.** | 12/1/2017 | 160998 | Sutter Medical Records |
| **B.** | 12/1/2017 | 160999 | Cigna Coverage Detail |
| **C.** | 12/1/2017 | 161000 | Treatment Summary |
| **D.** | 2017 | 161001 | Various Blue Cross Treatment Summary |
| **E.** | 12/2017 | 161002 | Injury Photos |
| **F.** | 10/24/2018 | 161005 | Insurance Loss Inventory |
| **G.** | 10/29/2018 | 161003 | Insurance Loss Inventory |
| **H.** | 2017/2018 | 161006 | Pay Stubs |
| **I.** | 2017/2018 | 163459 | Homeowners Insurance Policy |
| **J.** | 10/16/2019 | 160993 | Letter Re: Treating Physician |
| **K.** | 8/6/2020 | 160995 | Declaration of Sister Re: PTSD |
| **L.** | 8/6/2020 | 160996 | Declaration of JMM Re: PTSD |
| **M.** | 8/6/2020 | 160997 | Declaration of SAM Re: PTSD |
| **N.** | 8/6/2020 | 163451 | Declaration of Claimant Re: PTSD |
| **O.** | 9/4/2020 | 161004 | Insurance Loss Inventory |
| **P.** | 9/23/2020 | 176332 | Letter from Life Coach |

1

**CASE NO.: 19-30088 DM 11;**

| | DATE: | PG&E I.D. #: | DOCUMENT DESCRIPTION: |
|---|---|---|---|
| Q. | 9/30/2020 | 179481 | Summary of Coaching Sessions |
| R. | 10/6/2020 | 176335 | Initial Claims Narrative |
| S. | 4/21/2021 | 689844 | Insurance File Review |
| T. | 6/30/2021 | 848962 | Letter from Psychiatrist Confirming Diagnosis |
| U. | 8/5/2021 | 892091 | Inquiry into Status of Case |
| V. | 9/10/2021 | 949898 | Deficiency Notice |
| W. | 10/3/2021 | 999798 | Deficiency Notice |
| X. | 10/5/2021 | 1751067 | Personal Property Eligibility Criteria |
| Y. | 12/1/2021 | 1086947 | Response to Deficiency Notices |
| Z. | 2/10/2022 | 1181855 | Supplemental Response 9/10/2021 Deficiency Notice |
| AA. | 2/10/2022 | 1181842 | Supplemental Response 10/3/2021 Deficiency Notice |
| BB. | 2/21/2022 | 1202421 | Amended Deficiency Notice |
| CC. | 2/21/2022 | 1202978 | Response to Amended Deficiency Notice |
| DD. | 5/16/2022 | 1751068 | Personal Property Eligibility Criteria |
| EE. | 5/27/2022 | 1368961 | Amended Deficiency Notice |
| FF. | 6/16/2022 | 1395147 | Response to Amended Deficiency Notice |
| GG. | 7/8/2022 | 1417378 | Determination Notice |
| HH. | 09/2022 | 438131 | Treatment Letter from Psychiatrist |
| II. | 11/20/2022 | 1580779 | Redetermination Narrative Claim #50006 |
| JJ. | 12/5/2022 | 1601783 | Reconsideration Response Re: Claim #51475 |
| KK. | 12/5/2022 | 1653069 | Reconsideration Narrative Claim #50009 |
| LL. | 3/2/2023 | 1728661 | Reconsideration Determination Notice |
| MM. | 5/20/2023 | 1753844 | Appeal Narrative Re: Insurance Claim #50006 |
| NN. | 5/20/2023 | 1754515 | Appeal Narrative Re: PTSD Claim #50010 |
| OO. | 5/20/2023 | 1754731 | Appeal Narrative Re: Personal Injury Claim #50010 |
| PP. | 10/10/2023 | 1716187 | Notice of Trustee Determination |
| QQ. | | 1594450 | Letter from Psychiatrist Re: Further Diagnosis |
| RR. | 2017/2018 | 1761269 | Homeowners Insurance Declaration Page |

December 15, 2023

I, Enrique Galvez, am the Claimant/Appellant in the above entitled-matter. I declare under perjury under the laws of the State of California that the Amended Appendix of Documents, as listed above, constitutes Appellants Amended Designation of the Record on Appeal. The documents have been submitted electronically in a PDF searchable format and otherwise are compliant with Rules of Court related to the use and submission of digital material.

Appellant Enrique Galvez

CASE NO.: 19-30088 DM 11;

2


**Insurance**

# California
# Homeowners Policy
# Special Form
# HO-3

**Designed Exclusively
For Members**

**CSAA Insurance Exchange
PO Box 22221, Oakland, CA 94623-2221**

To report a claim: (800) 922-8228
Claims fax: (877) 548-1610

61 2000 CA 10012010 (CA 7/2015)

# CONTENTS

AGREEMENT ............................................1

DEFINITIONS .......................................1

SECTION I –COVERAGES ................................4

SECTION I – ADDITIONAL COVERAGES ...........7

SECTION I – PERILS INSURED AGAINST ........14

SECTION I - EXCLUSIONS ................................17

SECTION I – CONDITIONS ................................20

SECTION II – LIABILITY COVERAGES .............27

SECTION II – EXCLUSIONS ................................27

SECTION II – ADDITIONAL COVERAGES ........32

SECTION II – CONDITIONS ................................34

SECTIONS I & II – CONDITIONS ........................35

Includes copyrighted material of ISO, Inc. with its permission (1983, 2000)

## Consumer Complaint Information

Should you have a problem with your policy, please call your local AAA office or our Contact Center for assistance. The toll-free number for the Contact Center is (800) 922-8228. You may also contact us in writing at the following address:

> **CSAA Insurance Exchange**
> **Attn: Insurance Services, P.O. Box 22221, Oakland,**
> **CA 94623-2221**

If we have been unable to assist you in resolving your problems, you may contact the following state agency:

> **California Department of Insurance,**
> **Consumer Services Division**
> **300 South Spring St., Los Angeles, CA 90013**
> **Toll free telephone (800) 927-4357 website:**
> **www.insurance.ca.gov**

You should contact the Department of Insurance only after you have first attempted to resolve your problem through us.

## HOMEOWNERS POLICY SPECIAL FORM– HO-3

### AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

### DEFINITIONS

Throughout this policy "you" and "your" refer to the named "insured" shown in the Declarations and the named "insured's" spouse if a resident of the same household. "We", "us" and "our" refer to the CSAA Insurance Exchange providing this insurance. In addition, certain words and phrases are defined as follows:

1. "Actual cash value" means fair market value or what a willing buyer would pay a willing seller immediately before the loss where neither party has an urgent need to engage in the transaction.

2. "Building structure" means a structure with walls and a roof.

3. "Business" includes trade, profession or occupation; or the rental or holding for rental of any part of any premises by any "insured", whether or not engaged in for profit, full or part time.

4. "Business property" means property pertaining to or intended for use in "business".

1

5. "Contamination" means impairment or impurity due to either an accidental or intentional mixture or contact with a foreign substance, including, but not limited to, biological, chemical, or toxic agents.

6. "Damages" under Section II means monetary compensation recoverable for "personal injury" or "property damage" caused by an "occurrence" to which this insurance applies. It does not include injunctive or equitable relief, statutory costs, or other fees, penalties or fines incurred in responding to actions for, or complying with any such injunctive or equitable relief.

7. "Earthquake" means shaking or trembling of the earth whether caused by volcanic activity, tectonic processes or any other natural cause.

8. "Fungi" means:

   a. Any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi;

   b. Under Section II, this does not include any "fungi" that are, or are contained in, a good or product intended for consumption.

9. "Insured" means you and the following residents of your household:

   a. Your relatives;

   b. A "Domestic Partner" of the named "insured". "Domestic Partner" means a person with whom a committed relationship of mutual caring has been established that meets all of the requirements of Division 2.5 of the California Family Code, commencing with Section 297 as amended from time to time. One of the requirements of the California Family Code is that both Domestic Partners file a Declaration of Domestic Partnership in accordance with Sections 298 and 298.5 of the California Family Code, but there are additional requirements as well. A "Domestic Partner" also includes comparable legal unions from jurisdictions other than California recognized as such under Section 299.2 of the California Family Code.

   c. Any other person up to the age of 25 who is in the care of any person named above.

   Under Section II, "insured" also means:

   d. With respect to animals or watercraft of all types to which this policy applies, any person or organization legally responsible for these animals or watercraft of all types which are owned by you or any person included in **9.a., 9.b.** or **9.c.**

      A person or organization using or having custody of these animals or watercraft of all types in the course of any "business" or without permission of the owner is not an "insured";

   e. With respect to any vehicle to which this policy applies:

2

**(1)** Any person while engaged in your employment or the employment of any person included in **9.a.**, **9.b.** or **9.c.**; or

**(2)** Any other person using the vehicle on an "insured location" with your permission.

**10.** "Insured location" means:

**a.** The "residence premises"; and

**b.** Under Section **II** only:

**(1)** The part of any other premises, other structures and land used by you as a residence and:

**(a)** Which is shown in the Declarations; or

**(b)** Which is acquired by you during the policy period for your use as a residence;

**(2)** Any premises used by you in connection with the premises included in **10.a.** or **10.b.(1)** above;

**(3)** Any part of a premises not owned by any "insured" where any "insured" is temporarily residing;

**(4)** Vacant land, other than farm land, owned by or rented to any "insured";

**(5)** Land owned by or rented to any "insured" on which a one- or two-family dwelling is being constructed as a residence for any "insured";

**(6)** Individual or family cemetery plots or burial vaults of any "insured";

**(7)** Any part of a premises occasionally rented to any "insured" for other than "business" purposes.

**11.** "Occurrence" means an accident, including exposure to conditions which results during the policy period in:

**a.** "Personal injury"; or

**b.** "Property damage".

**12.** "Personal injury" means:

**a.** Bodily injury, sickness or disease, including care, loss of services and death resulting therefrom;

**b.** False arrest, detention or imprisonment or malicious prosecution;

**c.** The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the named "insured";

**d.** Wrongful entry or eviction or other invasion of the right of private occupancy.

**13.** "Property damage" means physical injury to or destruction of tangible property, including loss of use of this property.

**14.** "Replacement cost" means equivalent construction without

3

deduction for depreciation, but does not include the cost of complying with updated building codes, ordinances or laws regulating the construction, repair or demolition of a "building structure" or other structure.

15. "Residence employee" means an employee of any "insured" who performs duties in connection with the maintenance or use of the "residence premises", including household or domestic services, or who performs duties elsewhere of a similar nature not in connection with the "business" of any "insured".

16. "Residence premises" means:

    **a.** The one- or two-family dwelling, other structures, and land located at the address stated in the Declarations; or

    **b.** That part of any other "building structure" where you reside and which is shown as the "residence premises" in the Declarations.

17. "Water" means water ($H_2O$) alone, including moisture, steam or humidity, whether frozen or not or natural or artificial including any liquid or sludge which contains water, whether or not combined with any other chemicals or impurities.

## SECTION I – COVERAGES

### COVERAGE A – Dwelling

### We Cover Under Coverage A – Dwelling:

1. The dwelling on the "residence premises" shown in the Declarations used principally as a private residence, including structures and carpeting permanently affixed to the dwelling; and

2. Materials and supplies located on or adjacent to the "residence premises" for use in the construction, alteration or repair of the dwelling or other structures on the "residence premises".

### We Do Not Cover Under Coverage A – Dwelling:

1. Any structure including fences or other property covered under Coverage **B** – Other Structures;

2. Land, including the cost to replace, rebuild, stabilize or otherwise restore or protect the land.

### COVERAGE B – Other Structures

We cover other structures on the "residence premises", separated from the dwelling by clear space which includes driveways, walkways, exterior patios and swimming pools. Structures connected to or abutting the dwelling such as a fence, utility line or cement, asphalt or brick patio, walkway, driveway, retaining wall or similar connection are considered to be other structures.

We do not cover other structures:

1. Being used in whole or in part for "business" purposes; or

2. Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

4

If you do not have other structures except fences on the "residence premises" described in the Declarations of this policy, or if Section I coverage is excluded on all other structures except fences on the "residence premises" described in the Declarations of this policy, the amount of insurance designated for Coverage **B** – Other Structures can be applied to the amount of insurance available for Coverage **A** – Dwelling.

## COVERAGE C – Personal Property

We cover personal property owned or used by any "insured" while it is anywhere in the world. At your request, we will cover personal property owned by others while the property is on the part of the "residence premises" occupied by any "insured". In addition, we will cover, at your request, personal property owned by a guest or a "residence employee", while the property is in any residence occupied by any "insured".

### Special Limits of Liability

These limits do not increase the Coverage **C** limit of liability. The special limit for each following numbered category is the total limit for each loss for all property in that numbered category.

1.  $500 on money, banknotes, bullion, gold other than goldware, silver other than silverware, platinum, negotiable and nonnegotiable coins and medals and collections of all such properties.

2.  $2,500 on securities evidences of debt, letters of credit, manuscripts, and stamps. This limit applies to these categories regardless of the medium (such as paper or computer software) on which the materials exist. This limit includes the cost to research, replace or restore the information from the lost or damaged material.

3.  $2,500 on watercraft of all types, including their trailers, furnishings, equipment and outboard motors.

4.  $2,500 on trailers not used with watercraft.

5.  $2,500 for loss by theft of jewelry, watches, precious and semi-precious stones.

6.  $2,500 for "business property".

7.  $10,000 for loss by theft of rugs or carpets, including but not limited to, hand-woven silk or wool rugs, carpets, tapestry, wall hangings or other similar articles whose principal value is derived from its color, design, quality of wool or silk, quality of weaving, condition or age.

8.  $10,000 for motorized equipment not licensed for road use being driven or used by an "insured" and which is used exclusively for servicing an "insured location".

9.  $10,000 for motor or engine propelled land conveyances designed for and solely used by the handicapped, including those licensed or subject to license for road use.

### Property Not Covered. We do not cover:

1.  Articles separately described and specifically insured in this or any other insurance;

2.  Animals, birds or fish;

5

3. Motor vehicles or all other motorized land conveyances. This includes:

   **a.** Their accessories, equipment and parts; or

   **b.** Electronic apparatus and accessories designed to be operated solely by power from the electrical system of such vehicles or conveyances.

   The exclusion of property described in **a.** and **b.** above applies only while such property is in or upon the motor vehicle or motorized land conveyance.

   We do cover:

   **a.** Motorized equipment not licensed for road use being driven or used by an "insured" and which is used exclusively to service an "insured location";

   **b.** Motor or engine propelled land conveyances designed for and solely used by the handicapped, including those licensed or subject to license for road use.

4. Any sound, video, mapping, tracking or communications equipment or device or system designed for reproducing, detecting, receiving, transmitting, recording or playing data, maps, locations, sound, videos or pictures which may be powered by electricity from a motor vehicle, motorized land conveyance, watercraft, or a camp or home trailer while such equipment, device or system is in, upon or installed in a motor vehicle, motorized land conveyance, watercraft, or a camp or home trailer. This includes any accessories, antennas, speakers, tapes, reels, cassettes, discs, cartridges, carrying cases or other devices or components used with or as a part of such equipment, device or system.

5. Aircraft and aircraft parts. This does not include model or hobby craft not designed to carry people or cargo;

6. Property of roomers, boarders and other tenants, except property of roomers and boarders related to any "insured";

7. Property contained in a living unit being rented or regularly held for rental to others by any "insured";

8. Property rented or held for rental to others away from the "residence premises";

9. Credit cards except as provided in Additional Coverages **6.**

## COVERAGE D – Loss Of Use

The limit of liability for Coverage **D** is the total limit for all the following coverages.

1. If a loss covered under this section makes that part of the "residence premises" where you reside uninhabitable, we cover, at your option, either:

   **a.** Additional Living Expense, meaning any necessary and reasonable increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   **b.** Fair Rental Value, meaning the fair rental value of that part of the "residence premises" where you primarily reside less any expenses that do not continue while the

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 12 of 265

premises is uninhabitable. Secondary residences are covered for Additional Living Expenses only.

Payment under **a.** or **b.** shall be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the "residence premises" rented to others or held for rental by you uninhabitable, we cover:

   Fair Rental Value, meaning the fair rental value of that part of the "residence premises" rented to others or held for rental by you less any expenses that do not continue while the premises is uninhabitable.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from occupying the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under **1.** and **2.** above for a period not exceeding two weeks during which use is prohibited.

   The periods of time under **1.**, **2.** and **3.** above are not limited by expiration of this policy.

   We do not cover loss or expense due to cancellation of a lease or agreement.

---

## SECTION I - ADDITIONAL COVERAGES

### 1. Debris Removal

We will pay the reasonable expense incurred by you in the removal of debris of covered property provided coverage is afforded for the peril causing the loss. Debris removal expense is included in the limit of liability applying to the damaged property. When the amount payable for the actual damage to the property plus the expense for debris removal exceeds the limit of liability for the damaged property, an additional 5% of that limit of liability will be available to cover debris removal expense.

Under the above we will also pay the reasonable expenses you incur removing fallen trees from the "residence premises" when:

**a.** Coverage is not afforded under Additional Coverage **3.**, Trees, Shrubs and Other Plants for the peril causing the loss; or

**b.** The tree is not covered by this policy: provided the tree damages covered property and a Peril Insured Against under Coverage **C** is the cause of the tree falling.

### 2. Reasonable Repairs

We will pay the reasonable cost incurred by you for necessary repairs made solely to protect covered property from further damage provided coverage is afforded for the peril causing the loss.

7

This coverage does not increase the limit of liability applying to the property being repaired.

### 3. Trees, Shrubs and Other Plants

We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against: Fire or Lightning, Explosion, Riot or Civil Commotion, Aircraft, Vehicles not owned or operated by a resident of the "residence premises", Vandalism or Malicious Mischief or Theft. The limit of liability for this coverage shall not exceed 5% of the limit of liability that applies to the dwelling as shown in the Declarations for Coverage A for all trees, shrubs, plants and lawns nor more than $500 for any one tree, shrub or plant, including expense incurred for removal. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

### 4. Fire Department Service Charge

We will pay up to $250 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

### 5. Property Removed

Covered property while being removed from a premises endangered by a Peril Insured Against and for not more than 30 days while removed is covered for direct loss from any cause.

This coverage does not change the limit of liability applying to the property being removed.

### 6. Credit Card, Forgery and Counterfeit Money

We will pay up to $1,000 for:

**a.** The legal obligation of any "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in any "insured's" name.

We do not cover use by a resident of your household, a person who has been entrusted with the credit card or any person if any "insured" has not complied with all terms and conditions under which the credit card is issued;

**b.** Loss to any "insured" caused by forgery or alteration of any check or negotiable instrument; and

**c.** Loss to any "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover loss arising out of "business" pursuits or dishonesty of any "insured".

No deductible applies to this coverage.

8

Defense:

a. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against any "insured" for liability under the Credit Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense any "insured" or any "insured's" bank against any suit for the enforcement of payment under the Forgery coverage.

### 7. Collapse

We insure for direct physical loss to covered property involving actual or imminent collapse of a "building structure" or any part of a "building structure" caused only by one or more of the following:

a. Perils Insured Against in Coverage **C** – Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

b. Decay that was hidden from view before any actual or imminent collapse;

c. Insect or vermin damage that was hidden from view before any actual or imminent collapse;

d. Weight of contents, equipment, animals or people;

e. Weight of rain or snow which collects on the roof of a "building structure";

f. Use of defective material or methods in construction, remodeling or renovation if the actual or imminent collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, wood deck, pavement, swimming pool, spa, hot tub, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items **b., c., d., e.** and **f.** unless the loss is a direct result of the collapse of a "building structure".

Actual or imminent collapse does not include settling, cracking, shrinking, bulging or expansion. "Imminent collapse" means likely to happen without delay, impending, threatening or likely to occur at any moment.

This coverage does not increase the limit of liability applying to the damaged covered property.

### 8. Freezer Food

We cover under Coverage **C**, for an amount not to exceed $500, loss or damage to the contents of freezer or refrigerated units on the "residence premises" caused by change of temperature resulting from:

a. Interruption of electrical service to refrigeration equipment caused by breakdown of generating or transmission system;

9

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 15 of 265

**b.** Mechanical or electrical breakdown of refrigeration system.

   It is a condition of this coverage that the "insured" shall at all times exercise due diligence in inspecting and maintaining refrigeration equipment in proper working condition. If interruption of electrical service or mechanical or electrical breakdown is known to the "insured", all reasonable means must be used to protect the property insured from further damage or this coverage is void.

9. **Flood Emergency Assistance**

   We will pay up to $3,000 of reasonable and necessary Living Expense actually incurred by you within four weeks after a loss caused by flood or surface "water" from rain or snow if the "residence premises" is uninhabitable during that period.

   Any loss deductible clause shall not apply to this Flood Emergency Assistance coverage.

   OTHER THAN AS EXPRESSED WITHIN THIS "**9.** FLOOD EMERGENCY ASSISTANCE," **THIS POLICY DOES NOT PROVIDE FLOOD INSURANCE.**

10. **Arson Reward**

    We will pay $5,000 for information which leads to an arson conviction in connection with a fire loss to property covered by this policy. This coverage may increase the limit otherwise applicable. However, the $5,000 limit shall not be increased regardless of the number of persons providing the information.

11. **Building Code Upgrade Coverage**

    **a.** You may use up to 25% of the limit of liability that applies to Coverage **A**, excluding any increase in the Coverage **A** limit of liability contained in the HO-28 Limited Home Replacement Cost Endorsement, for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

    **(1)** The construction, demolition, remodeling, renovation or repair of that part of a covered "building structure" damaged by a Peril Insured Against;

    **(2)** The demolition and reconstruction of the undamaged part of a covered "building structure", when that "building structure" must be totally demolished because of damage by a Peril Insured Against to another part of that covered "building structure"; or

    **(3)** The remodeling, removal or replacement of the portion of the undamaged part of a covered "building structure" necessary to complete the remodeling, repair or replacement of that part of the covered "building structure" damaged by a Peril Insured Against.

    **b.** You may use all or part of this Building Code Upgrade coverage to pay for the increased costs you incur to remove debris resulting from the construction,

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 16 of 265

demolition, remodeling, renovation, repair or replacement of the covered building structure as stated in **a**. above.

**c.** We do not cover:

**(1)** The loss in value to any covered "building structure" due to the requirements of any ordinance or law; or

**(2)** The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants or "contaminants" in or on any covered "building structure".

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Any reimbursement we make under this additional coverage is subject to and included in the limit of liability stated in the Declarations and does not increase that limit.

## 12. "Fungi", Wet or Dry Rot or Bacteria

We will reimburse up to $10,000 of the costs covered under Section **I** you reasonably and necessarily incur because of the need to repair, replace, remove or restore any part of the dwelling, other "building structures" or personal property due to the unsafe levels of "fungi", wet or dry rot, or bacteria that occurs during the policy period from an accidental discharge or overflow of "water" from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance. This coverage includes any reasonable and necessary increase in living expenses actually incurred by you under the same terms and conditions in subsection **1.a.** in Coverage **D** – Loss of Use, but does not increase the overall $10,000 limit of liability. This coverage does not include damage caused by constant or repeated seepage or leakage of "water" or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years, unless such seepage or leakage of "water" or the presence or condensation of humidity, moisture, or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a "building structure". This coverage does not apply to:

**a.** The appliance from which the "water" or steam escaped;

**b.** Unsafe levels of "fungi", wet or dry rot or bacteria damage on the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises";

**c.** Damage that results from the failure of an "insured" to use all reasonable means to save and preserve the property from further damage at and after the time the accidental discharge or overflow occurred.

Reimbursement of $10,000 is the most we will pay for all of the following:

11

**a.** The total of all loss payable under SECTION I – COVERAGES caused by unsafe levels of "fungi", wet or dry rot or bacteria;

**b.** The cost to investigate, tear out and/or replace any part of a "building structure" or other covered property as needed to gain access to unsafe levels of "fungi", wet or dry rot or bacteria;

**c.** The cost of testing of air, surfaces or property to confirm the absence, presence or levels of "fungi", wet or dry rot or bacteria whether performed prior to, during, or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of unsafe levels of "fungi", wet or dry rot or bacteria.

### 13. Loss Assessment

**a.** We will pay up to $10,000 for your share of loss assessment charged during the policy period against all members of a corporation or association of property owners. This applies only when the assessment is made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage **A**, other than:

**(1)** "Earthquake"; or

**(2)** Land shock waves or tremors before, during or after a volcanic eruption.

The limit of $10,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

**b.** Paragraph 1. Policy Period under Sections **I** and **II** – Conditions does not apply to this coverage.

This coverage is additional insurance.

### 14. Identity Fraud Expense

### DEFINITIONS

With respect to the provisions of this coverage only, the following definitions are added:

**a.** "Identity fraud" means the act of knowingly transferring or using, without lawful authority, a means of identification of any "insured" with the intent:

**(1)** To commit; or

**(2)** To aid or abet another to commit:

Any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**b.** "Expenses" means:

12

**(1)** Costs for notarizing affidavits or similar documents which attest to fraud required by financial institutions or similar credit grantors or credit agencies.

**(2)** Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors.

**(3)** Lost income resulting from time taken off work to:

    **(a)** Complete fraud affidavits; or

    **(b)** Meet with or talk to law enforcement agencies, credit agencies and/or legal counsel;

    Up to a maximum payment of $200 per day. Total payment for lost income is not to exceed $5,000.

**(4)** Loan application fees for reapplying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

**(5)** Reasonable attorney fees incurred as a result of "identity fraud" to:

    **(a)** Defend lawsuits brought against any "insured" by merchants, financial institutions or their collection agencies;

    **(b)** Remove any criminal or civil judgments wrongly entered against any "insured"; and

    **(c)** Challenge the accuracy or completeness of any information in a consumer credit report.

**(6)** Charges incurred for long distance telephone calls to:

    **(a)** Merchants;

    **(b)** Law enforcement agencies;

    **(c)** Financial institutions; or

    **(d)** Similar credit grantors or credit agencies:

to report or discuss an actual "identity fraud".

## Identity Fraud Expense

We will pay up to $15,000 for "expenses" incurred by any "insured" as the direct result of any one "identity fraud" first discovered or learned of during the policy period.

Any act or series of acts committed by one or more persons, or in which such person or persons are aiding or abetting others against any "insured", is considered to be one "identity fraud", even if a series of acts continues into a subsequent policy period.

## EXCLUSIONS

The following exclusions apply to this coverage:

We do not cover:

    **a.** Loss arising out of or in connection with a "business" of any "insured".

    **b.** "Expenses" incurred due to any fraudulent, dishonest or criminal act by any "insured" or any person aiding or

13

abetting any "insured", or by any authorized representative of any "insured", whether acting alone or in collusion with others.

**c.** Loss other than "expenses".

## 15. Auto Lock Coverage

If your car keys are stolen we will pay reasonable and necessary expenses, up to $250, to replace or reprogram the auto keys or auto locks. This is the most we will pay for one theft, regardless of the number of keys or the number of cars.

You must have auto insurance with us for the auto to qualify for this coverage.

No deductible applies to this coverage.

## 16. Lost Luggage

We will pay up to $500 in any one incident, for loss of your luggage and personal property while in the care, custody, or control of a commercial passenger carrier.

You must submit a claim to the commercial passenger carrier within 30 days of loss. The coverage provided:

**a.** Is excess over any other insurance or coverage provided by the commercial carrier; and

**b.** Does not apply to loss of money, checks, stored value cards or money orders.

---

## SECTION I – PERILS INSURED AGAINST

## COVERAGE A – Dwelling

## COVERAGE B – Other Structures

We insure against risk of direct physical loss to the property described in Coverages **A** and **B**. We do not insure, however, for loss caused by:

**1.** Collapse, other than as provided in Additional Coverage **7.**

**2.** Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant of contents or furnishings, unoccupied or being constructed unless you have used reasonable care to:

**a.** Maintain heat in the building; or

**b.** Shut off the "water" supply and drain the system and appliances of "water";

**3.** Freezing, thawing, pressure or weight of "water", snow or ice, whether driven by wind or not, to a:

**a.** Fence, pavement, patio, wood deck, swimming pool, spa or hot tub;

**b.** Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building or other structure;

**c.** Retaining wall or bulkhead that does not support all or part of a building or other structure; or

14

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 20 of 265

    **d.**    Pier, wharf or dock;

**4.** Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied;

**5.** Vandalism or malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant of contents or furnishings for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

**6**    **a.**    Wear and tear, marring, deterioration;

    **b.**    Inherent vice, latent defect, mechanical breakdown;

    **c.**    Corrosion, electrolysis, or rust;

    **d.**    Mold, mildew, "fungi", wet or dry rot, other than as provided in Additional Coverage **12.**

    **e.**    "Contamination", smog, smoke from agricultural smudging or industrial operations;

    **f.**    Settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

    **g.**    Birds, vermin, rodents, insects or domestic animals;

    **h.**    Release, discharge or dispersal of insecticides, contaminants or pollutants;

    **i.**    Growth of trees, shrubs, plants or lawns, including their roots, whether or not such growth is above or below the surface of the ground.

If any of these cause "water" damage not excepted above or otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the "water" including the cost of tearing out and replacing any part of a "residence premises" necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this "water" escaped.

**7.** Section I – Exclusions;

Under items **1**. through **6**. above, any ensuing loss to property described in Coverages **A** and **B** not excluded or excepted in this policy is covered.

## COVERAGE C –Personal Property

We insure for direct physical loss to property described in Coverage **C** caused by a peril listed below unless the loss is excluded in Section I – Exclusions.

### 1. Fire or lightning

### 2. Windstorm or hail

This peril does not include loss to the property contained in a "building structure" caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the "building structure" causing an opening in a permanent roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

15

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment and outboard motors, only while inside a fully enclosed "building structure".

**3. Explosion**, including its shock waves.

**4. Riot or civil commotion**

**5. Aircraft** and their sonic booms including self-propelled missiles and spacecraft.

**6. Vehicles**, meaning impact from a vehicle, but not including damage to the vehicle itself.

**7. Smoke**, meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

**8. Vandalism or malicious mischief**

**9. Theft**, including attempted theft and loss of property from a known location when it is likely that the property has been stolen.

This peril does not include loss caused by theft:

**a.** Committed by, or at the direction of, any "insured";

**b.** In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

**c.** From that part of a "residence premises" rented by an "insured" to other than an "insured".

This peril does not include loss that occurs away from the "residence premises":

**a.** While the property is at any other residence owned, rented to or occupied by any "insured", except while any "insured" is temporarily residing there. Property of a student who is an "insured" is covered while at a residence away from home;

**b.** Of trailers and campers.

**10. Falling objects**

This peril does not include loss to property contained in a "building structure" unless the permanent roof or an exterior wall of the "building structure" is first damaged by a falling object. Damage to the falling object itself is not included.

**11. Weight of ice, snow or sleet** which causes damage to property contained in a "building structure".

**12. Accidental discharge or overflow of "water" or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

**a.** To the appliance from which the "water" or steam escaped;

**b.** Caused by or resulting from freezing;

16

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 22 of 265

    **c.** On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises".

    **d.** Caused by or resulting in the presence, growth, proliferation, spread, or any activity of "fungi", wet or dry rot or bacteria.

**13. Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating "water".

We do not cover loss caused by or resulting from freezing under this peril.

**14. Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:

    **a.** Maintain heat in the "building structure"; or

    **b.** Shut off the "water" supply and drain the system and appliances of "water".

**15. Sudden and accidental damage to electrical appliances, devices, fixtures and wiring from an increase or decrease of artificially generated electrical current**.

We will only pay up to $1,000 for all items damaged by this peril.

**16. Damage by glass or safety glazing material** which is part of a "building structure", storm door or storm window.

This peril does not include loss on the "residence premises" if the dwelling has been vacant of contents or furnishings for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

---

## SECTION I – EXCLUSIONS

1.    We do not insure for loss caused directly or indirectly by any of the following events. This means that you will not be covered for any loss which was proximately caused by one or more of the excluded events set forth below. You will not receive coverage regardless of: **(a)** whether other causes acted concurrently or in any sequence with an excluded event to produce the loss if the loss was proximately caused by an excluded event; or **(b)** whether the excluded event occurs suddenly or gradually, involved isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these factors.

    **a.** **Ordinance or Law**, which means any ordinance or law:

        **(1)** Requiring or regulating the construction, demolition, remodeling, renovation or repair of a "building structure" or other structure, including

17

removal of any resulting debris. This Exclusion **1.a. (1)** does not apply to the amount of coverage that may be provided for in **11. Building Code Upgrade Coverage** under Section I – Additional Coverages. However, we do cover the replacement of damaged glass, constituting a part of the "building structure", with safety glazing material where required by any ordinance or law;

**(2)** The requirements of which result in a loss in value to any covered "building structure" or other structure; or

**(3)** Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants or "contaminants".

Pollutants means, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This Exclusion **1.a.** applies whether or not the property has been physically damaged.

**b. Earth Movement,** meaning any natural or artificially created loss of any kind attributable in whole or in part to any movement of the earth or soil, whether on or off the "residence premises", that is caused by, resulting from, contributed to or aggravated by rain or snow, including run-off from same, "earthquake", landslide, mudflow, earth sinking, rising or shifting, volcanic eruption meaning the eruption, explosion or effusion of a volcano, unless direct loss by:

**(1)** Fire;

**(2)** Explosion other than the explosion of a volcano; or

**(3)** Breakage of glass or safety glazing material which is part of a "building structure", storm door or storm window;

ensues, and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

**c. Water Damage,** meaning:

**(1)** Flood or surface "water" from rain or snow, waves, tidal "water", tidal wave, tsunami, seiche, sea surge, overflow of a body of "water", or spray from any of these, whether or not driven by wind;

**(2)** Release or escape of "water" held by a dam, levy or dike or by a "water" or flood control device;

**(3)** "Water" or "water"-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment located off the "residence premises"; or

**(4)** "Water" below the surface of the ground whether occurring naturally or artificially, including "water" which exerts pressure on, or seeps or leaks

18

through a "building structure", sidewalk, driveway, foundation, swimming pool, spa, hot tub or other structure;

caused by or resulting from intentional or unintentional human or animal forces or any act of nature.

Direct loss by fire, explosion or theft resulting from "water" damage is covered.

**d. Power Interruption**, meaning the interruption of power or other utility service if the interruption takes place away from the "residence premises", except to the extent that freezer food coverage is provided under Additional Coverages. If a Peril Insured Against ensues on the "residence premises", we will pay only for loss caused by the ensuing peril.

**e. Neglect**, meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**f. War**, including undeclared war, civil war, insurrection, rebellion, revolution, war-like act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a war-like act even if accidental.

**g. Nuclear Hazard**, to the extent set forth in the Nuclear Hazard Clause of Section I – Conditions.

**h. Intentional Loss**, meaning any loss arising out of any act committed by or at the direction of any "insured" with the intent to cause a loss.

**i. "Fungi", Wet or Dry Rot or Bacteria**, whether caused by or consisting of, which means the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot or bacteria, unless:

    **(1)** Direct loss by fire or lightning; or

    **(2)** Additional Coverage **12.** applies.

**j. Terrorism,** meaning any intentional or accidental use of force or violence and/or threat thereof against person(s), property or communication/ information system(s) by any person(s) or group(s) of persons motivated by or committed for political, religious, social, racial, ethnic, ideological, philosophical or similar purpose(s). This includes the intention to:

    **(1)** Put any sector of the public in fear;

    **(2)** Intimidate, coerce, influence or punish any sector of the public or any government; and/or

    **(3)** Disrupt any segment of the economy, including, but not limited to, disrupting or interfering with electronic or communication/information system(s).

This exclusion will only apply when the insured damage to all types of property, including "business" interruption losses in the United States, its territories and possessions and

19

Puerto Rico, sustained by all persons and entities affected by the act(s) of terrorism exceeds a total of $100,000,000 as determined by the Property Claims Services (PCS) and is attributable to a single act of terrorism or to multiple acts of terrorism which appear to be carried out in concert or to have a related purpose or common leadership.

Terrorism does not include vandalism and malicious mischief. For purposes of this exclusion vandalism and malicious mischief do not include acts which are committed for the purpose of, or having the effect of intending to:

    **(1)** Put any sector of the public in fear;

    **(2)** Intimidate, coerce, influence or punish any sector of the public or any government; and/or

    **(3)** Disrupt any segment of the economy, including, but not limited to, disrupting or interfering with electronic or communication/information system(s).

**2.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not excluded or excepted in this policy is covered.

    **a.** Weather Conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in sub-paragraphs **d.** through **h.** of paragraph **1.** above to produce the loss. Any and all loss or damage described in sub-paragraph **b.** or **c.** of paragraph **1.** above that is contributed to in any way by weather conditions shall be, and will remain, excluded in its entirety;

    **b.** Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body;

    **c.** Faulty, Inadequate or Defective:

        **(1)** Planning, zoning, development, surveying, siting;

        **(2)** Design, specifications, workmanship, repair, construction, compaction;

        **(3)** Materials used in repair, construction, renovation or remodeling;

        **(4)** Maintenance; or

        **(5)** Establishment or enforcement of building codes or standards for construction or materials;

of part or all of any property whether on or off the "residence premises".

## SECTION I – CONDITIONS

**1. Insurable Interest and Limit of Liability**

Even if more than one person has an insurable interest in the property covered, we shall not be liable:

    **a.** To the "insured" for an amount greater than the "insured's" interest; nor

    **b.** For more than the applicable limit of liability.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 26 of 265

## 2. Your Duties After Loss

In case of a loss to which this insurance may apply, you shall see that the following duties are performed:

**a.** Give immediate notice to us or our agent, and in case of theft also to the police. In case of loss under the Credit Card coverage also notify the credit card company;

**b.** Protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of repair expenditures;

**c.** Prepare an inventory of damaged personal property showing, in detail, the quantity, description, place of purchase/acquisition, date of purchase/acquisition, "actual cash value" and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

**d.** As often as we reasonably require and subject to all applicable provisions of the Insurance Code:

**(1)** Exhibit the damaged property;

**(2)** Provide us with original records and documents we request and permit us to make copies. Tax returns are privileged against disclosure under applicable law, but may be necessary to process or determine a claim; and

**(3)** Submit to and subscribe, outside the presence of any other "insured":

**(a)** Statements;

**(b)** Examinations under oath; and

**(4)** Produce representatives, employees, members of the "insured's" household or others to the extent it is within the "insured's" power to do so; and

**e.** Submit to us, within 60 days after we request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

**(1)** The time and cause of loss;

**(2)** Interest of the "insured" and all others in the property involved and all encumbrances on the property;

**(3)** Other insurance which may cover the loss;

**(4)** Changes in title or occupancy of the property during the term of the policy;

**(5)** Specifications of any damaged "building structure" and detailed estimates for repair of the damage;

**(6)** An inventory of damaged personal property described in **2.c.;**

**(7)** Receipts for additional living expenses incurred and records supporting the fair rental value loss;

**(8)** Evidence or affidavit supporting a claim under the

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 27 of 265

Credit Card and Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

### 3. Loss Settlement

Covered property losses are settled as follows:

**a.** **(1)** Personal property;

**(2)** Awnings, domestic appliances, outdoor antennas, satellite dishes and outdoor equipment, whether or not attached to the "building structure"; and

**(3)** Structures that are not "building structures", except fences;

at "actual cash value" at the time of loss but not to exceed the amount necessary to repair or replace or the applicable limit of liability.

**b.** "Building structures" under Coverage **A** or **B** at "replacement cost" without deduction for depreciation, subject to the following:

**(1)** If at the time of loss the amount of insurance in this policy on the damaged "building structure" is 80% or more of the full "replacement cost" of the "building structure" immediately prior to the loss, we will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:

**(a)** The limit of liability under this policy applying to the "building structure";

**(b)** The "replacement cost" of that part of the "building structure" damaged for equivalent construction and use on the same premises; or

**(c)** The amount actually and necessarily spent to repair or replace the damaged "building structure".

**(2)** If at the time of loss the amount of insurance in this policy on the damaged "building structure" is less than 80% of the full "replacement cost" of the "building structure" immediately prior to the loss, we will pay the larger of the following amounts, but not exceeding the limit of liability under this policy applying to the "building structure":

**(a)** The "actual cash value" of that part of the "building structure" damaged; or

**(b)** That proportion of the cost to repair or replace, without deduction for depreciation, of that part of the "building structure" damaged, which the total amount of insurance in this policy on the damaged "building structure" bears to 80% of the "replacement cost" of the "building structure".

**(3)** In determining the amount of insurance required to equal 80% of the full "replacement cost" of the "building structure" immediately prior to the loss, you shall disregard the value of excavations,

22

foundations, piers and other supports which are below the undersurface of the lowest basement floor or, where there is no basement, which are below the surface of the ground inside the foundation walls, and underground flues, pipes, wiring and drains.

**(4)** When the cost to repair or replace the damage is more than $1,000 or more than 5% of the amount of insurance in this policy on the "building structure", whichever is less, we will pay no more than the "actual cash value" of the damage until actual repair or replacement is completed and costs incurred.

**(5)** You may disregard the "replacement cost" loss settlement provisions and make claim under this policy for the "actual cash value" for loss to "building structures". You may then make claim for "replacement cost" value according to the provisions of this Condition **3.**, provided that you:

**(a)** Complete the actual repair or replacement of the damaged part of the property within 12 months from the date that we make our first payment to you towards the "actual cash value"; and,

**(b)** Notify us of your claim within 30 days after the work has been completed.

Prior to the deadline, we may grant you extensions of up to six months to complete the work on a showing of good cause.

**(6)** If the loss relates to a "state of emergency", as defined in Section 8558 of the Government Code, paragraph **b.(5)** does not apply. In that event, you may disregard the "replacement cost" loss settlement provisions and make claim under this policy for the "actual cash value" for loss to "building structures". You may then make claim for "replacement cost" value according to the provisions of this Condition **3.**, provided that you:

**(a)** Complete the actual repair or replacement of the damaged part of the property within 24 months from the date that we make our first payment to you toward the "actual cash value"; and,

**(b)** Notify us of your claim within 30 days after the work has been completed.

Prior to the deadline, we may grant you extensions of up to six months to complete the work on a showing of good cause.

**(7)** In the event of a total loss of the "building structure" under Coverage **A** or **B**, you may rebuild or replace the "building structure" at an address other than that stated in the Declarations. Such replacement will not increase the amount we will pay under paragraph **3.b. (1)** or **(2)** above, which

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 29 of 265

does not include the value of any land associated with the "building structure" under Coverage **A** or **B** that sustained a total loss.

**4. Loss to a Pair or Set**

In case of loss to a pair or set we may elect to:

**a.** Repair or replace any part or restore the pair or set to its value before the loss; or

**b.** Pay the difference between "actual cash value" of the property before and after the loss.

**5. Glass Replacement**

Subject to a $50 deductible, loss for damage to glass caused by a Peril Insured Against shall be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

**6. Appraisal**

If you and we fail to agree on the amount of a covered loss, either one can request that the amount of the loss be set by appraisal. If either makes a written request for appraisal, each shall select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written request. Where the request is accepted, the two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of competent jurisdiction in the state where the "residence premises" is located to select an umpire.

Appraisal proceedings are informal unless you and we mutually agree otherwise. For purposes of this section, "informal" means that no formal discovery shall be conducted, including depositions, interrogatories, requests for admission, or other forms of formal civil discovery, no formal rules of evidence shall be applied, and no court reporter shall be used for the proceedings.

The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us.

In the event of a government-declared disaster, as defined in the Government Code, appraisal may be requested by either you or us but shall not be compelled.

**7. Other Insurance**

If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

24

## 8. Suit Against Us

No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the date of loss or damage.

## 9. Our Option

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the property damaged with equivalent property. We may take part or all of the covered damaged property at the agreed or appraised value, though we are not obligated to take any such property.

## 10. Loss Payment

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

**a.** Reach agreement with you; or

**b.** There is an entry of a final judgment; or

**c.** There is a filing of an appraisal award with us.

## 11. Abandonment of Property

We need not accept any property abandoned by any "insured".

## 12. Mortgage Clause

The word "mortgagee" includes trustee. If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** shall be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment shall be the same as the order of precedence of the mortgagees.

If we deny your claim that denial shall not apply to a valid claim of the mortgagee, if the mortgagee:

**a.** Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

**b.** Pays any premium due under this policy on demand if you have neglected to pay the premium;

**c.** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If we pay the mortgagee for any loss and deny payment to you:

**a.** We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

**b.** At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we shall receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 31 of 265

Subrogation shall not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

## 13. No Benefit to Bailee

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this policy.

## 14. Nuclear Hazard Clause

**a.** "Nuclear Hazard" means any nuclear reaction, radiation or radioactive "contamination", all whether controlled or uncontrolled or however caused, or any consequence of any of these.

**b.** Loss caused by the nuclear hazard shall not be considered loss caused by fire, explosion or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

**c.** This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

## 15. Loss Deductible Clause

We pay for loss to covered property only when such loss exceeds $250 and then only for the amount of such excess. This deductible applies separately to each loss.

## 16. Adjustments to Coverage Limits

The maximum limit for Coverage **A** as stated in the Declarations may be adjusted upon renewal of this policy based on indices that measure construction costs or inflation generally. We will not lower the Coverage **A** limit without your consent. You are responsible to advise us if the limits are insufficient to replace your property. At your request, we will assist you in estimating the "replacement cost" of your dwelling. The maximum limits for Coverages **B, C** and **D** will be adjusted upon each renewal date in the same proportion as the adjustment to Coverage **A**. The adjusted limits for Coverages **A, B, C** and **D** will be rounded to the next highest $100 as shown in the Declarations.

## 17. Adjusters

If within a six-month period, we assign a third or subsequent adjuster to be primarily responsible for a claim, we will provide you in a timely manner with a written status report. For purposes of this section, a written status report shall include a summary of any decisions or actions that are substantially related to the disposition of a claim, including, but not limited to, the amount of losses to structures or contents, the retention or consultation of design or construction professionals, the amount of coverage for losses to structures or contents and all items of dispute.

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 32 of 265

## 18. Claim Related Documents

Within 15 days of your request, we will provide you with copies of "claim-related documents" in accordance with applicable provisions of the Insurance Code. Claim-related documents are documents that relate to the evaluation of damages, and are subject to exceptions from disclosure as specified in the Insurance Code and other applicable statutes.

## SECTION II – LIABILITY COVERAGES

## COVERAGE E – Personal Liability

If a claim is made or a suit is brought against any "insured" for "damages" because of "personal injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the "damages" for which the "insured" is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the allegations are groundless, false or fraudulent. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for "damages" resulting from the "occurrence" equals our limit of liability.

## COVERAGE F – Medical Payments to Others

We will pay the necessary medical expenses incurred within three years from the date of an accident causing "personal injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household other than "residence employees". As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of any "insured"; or

2. To a person off the "insured location", if the "personal injury":

    a. Arises out of a condition in the "insured location" or the ways immediately adjoining;

    b. Is caused by the activities of any "insured";

    c. Is caused by a "residence employee" in the course of the "residence employee's" employment by any "Insured"; or

    d. Is caused by an animal owned by or in the care of any "insured".

## SECTION II – EXCLUSIONS

1. **Coverage E – Personal Liability and Coverage F – Medical Payments to Others** do not apply to "personal injury" or "property damage":

    a. The type of which is expected or intended by any "insured";

    b. Arising out of past or present "business" pursuits of any "insured".

27

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 33 of 265

This exclusion does not apply to:

(1) Activities which are ordinarily incident to non-"business" pursuits; or

(2) The rental or holding for rental of a residence of yours:

(a) On an occasional basis for the exclusive use as a residence;

(b) In part, unless intended for use as a residence by more than two roomers or boarders; or

(c) In part, as an office, school, studio or private garage;

**c.** Arising out of the rendering or failing to render professional services;

**d.** Arising out of any premises owned or rented to any "insured" which is not an "insured location";

**e.** Arising out of the:

(1) Ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including any trailers, owned or operated by or rented or loaned to any "insured"; or

(2) Entrustment by the "insured" of a motor vehicle, watercraft of all types, aircraft or any other motorized land conveyance to any person.

This exclusion does not apply to:

(1) A trailer not towed by or carried on a motorized land conveyance;

(2) A motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration, and owned by any "insured", while on an "insured location";

(3) A motorized golf cart designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and at the time of an "occurrence" is within the legal boundaries of:

(a) A golfing facility and is parked or stored there, or being used by an "insured" to:

(i) Play the game of golf or for other recreational or leisure activity allowed by the facility;

(ii) Travel to or from an area where motor vehicles or golf carts are parked or stored; or

(iii) Cross public roads at designated points to access other parts of the golfing facility; or

(b) A private residential community, including its public roads upon which a motorized golf cart can legally travel which is subject to the

28

authority of a property owners association and contains an "insured's" residence.

**(4)** A motorized land conveyance designed and exclusively used by any "insured" for assisting the handicapped or for the maintenance of an "insured location" which is not designed for travel on public roads and not subject to motor vehicle registration;

**f.** Arising out of the ownership, maintenance, use, loading or unloading of a watercraft:

**(1)** Owned by or rented to any "insured" if the watercraft has inboard or inboard-outdrive motor power of more than 50 horsepower or is a sailing vessel, with or without auxiliary power, 26 feet or more in overall length;

**(2)** Powered by one or more outboard motors with more than 50 total horsepower if the outboard motor is owned by any "insured". However, outboard motors of more than 50 total horsepower are covered for the policy period if:

**(a)** They are acquired by you prior to the policy period and:

**(i)** Declared by you at policy inception; or

**(ii)** Your intention to insure is reported in writing to us within 45 days after newly acquiring the outboard motors.

**(b)** They are acquired by you during the policy period.

This exclusion does not apply while the watercraft is stored;

**g.** Arising out of the ownership, maintenance, use, loading or unloading of an aircraft, meaning any contrivance used or designed for navigation of or flight in the air, except model aircraft of the hobby variety not used or designed for the transportation of people or cargo;

**h.** Caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, war-like act by a military force or military personnel, destruction or seizure or use for military purposes, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a war-like act even if accidental;

**i.** To "personal injury" sustained by a person as a result of an offense included in "personal injury" definitions **b., c.** and **d.** directly or indirectly related to the employment of such person by you;

**j.** To "personal injury" arising out of "personal injury" definition **c** if the first injurious publication or utterance of the same or similar material by or on behalf of you was made prior to the effective date of this insurance;

**k.** To "personal injury" arising out of "personal injury" definition **c.** concerning any organization or "business" enterprise, or its products or services, made by or at the direction of any "insured" with knowledge of the falsity thereof;

29

l.    To any person as an "insured" with respect to claims, suits or losses arising out of his activities as:

    (1)    An employee, officer, director, trustee or agent of the United States Government or any state, county, school district or any other political subdivision, or

    (2)    A candidate for public office or arising out of his activities on behalf of a candidate for public office;

m.    To punitive or exemplary "damages";

n.    Arising out of the transmission of a communicable or hereditary disease or physical condition by an "insured".

o.    To "personal injury" arising out of the discharge, dispersal, release or escape of vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants.

This exclusion does not apply to "personal injury" arising out of such discharge if sudden and accidental.

p.    To "property damage" caused by vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants.

q.    Arising out of statutorily imposed liability upon any "insured" in any matter, consisting of or caused by vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants.

r.    Arising out of the sale or transfer of real property, including, but not limited to:

    (1)    Known or unknown structural defects;

    (2)    Known or hidden defects in the plumbing, heating or electrical systems;

    (3)    Known or unknown soil conditions or drainage problems;

    (4)    Alleged concealment or misrepresentation of any known or unknown conditions in the real property.

s.    Arising directly or indirectly, in whole or in part, out of actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot or bacteria.

t.    Resulting from terrorism, meaning any intentional or accidental use of force or violence and/or threat thereof against person(s), property or communication/ information system(s) by any person(s) or group(s) of persons motivated by or committed for political, religious, social, racial, ethnic, ideological, philosophical or similar purpose(s). This includes the intention to:

    (1)    Put any sector of the public in fear;

    (2)    Intimidate, coerce, influence or punish any sector of the public or any government; and/or

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 36 of 265

(3) Disrupt any segment of the economy, including, but not limited to, disrupting or interfering with electronic or communication/information system(s).

This exclusion will only apply when the insured damage to all types of property, including "business" interruption losses in the United States, its territories and possessions and Puerto Rico, sustained by all persons and entities affected by the act(s) of terrorism exceeds a total of $100,000,000 as determined by the Property Claims Services (PCS) and is attributable to a single act of terrorism or to multiple acts of terrorism which appear to be carried out in concert or to have a related purpose or common leadership.

Exclusions **d., e., f.** and **g.** do not apply to "personal injury" to any "residence employee" arising out of and in the course of the "residence employee's" employment by any "insured".

2. **Coverage E – Personal Liability** does not apply to:

   a. Liability:

      (1) For your share of any loss assessment charged against all members of a corporation or association of property owners;

      (2) Under any other contract or agreement, including real estate sales contract, except those written contracts directly relating to the maintenance of the "insured location" not excluded in **(1)** above or elsewhere in this policy;

   b. "Property damage" to property owned by the "insured" or any other resident of the "insured's" household;

   c. "Property damage" to property rented to, occupied or used by or in the care, custody or control of the "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

   d. "Personal injury" to any person eligible to receive any benefits:

      (1) Required to be provided; or

      (2) Voluntarily provided; by the "insured" under any:

         (1) Workers' or workmen's compensation law;

         (2) Non-occupational disability law; or

         (3) Occupational disease law;

   e. "Personal injury" or "property damage" for which any "insured" under this policy:

      (1) Is also an "insured" under a nuclear energy liability policy; or

      (2) Would be an "insured" but for its termination upon exhaustion of its limit of liability.

   A nuclear energy liability policy is a policy issued by:

      (1) American Nuclear Insurers;

      (2) Mutual Atomic Energy Liability Underwriters;

      (3) Nuclear Insurance Association of Canada; or any

31

of their successors; or

**f.** "Personal injury" to you and any "insured" within the meaning of part **a.**, **b.**, **c.**, **d.** or **e.** of Definition **9.** "insured".

**3. Coverage F – Medical Payments to Others** does not apply to "personal injury":

**a.** To a "residence employee" if it occurs off the "insured location" and does not arise out of or in the course of the "residence employee's" employment by any "insured";

**b.** To any person eligible to receive any benefits:

    **(1)** Required to be provided; or

    **(2)** Voluntarily provided; under any:

        **(1)** Workers' or workmen's compensation law;

        **(2)** Non-occupational disability law; or

        **(3)** Occupational disease law;

**c.** From any:

    **(1)** Nuclear reaction;

    **(2)** Nuclear radiation; or

    **(3)** Radioactive "contamination"; all whether controlled or uncontrolled or however caused; or

    **(4)** Any consequence of any of these;

**d.** To any person other than a "residence employee" of any "insured", regularly residing on any part of the "insured location".

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

**1. Claim Expenses**

We pay:

**a.** Expenses incurred by us and costs taxed against any "insured" in any suit we defend;

**b.** Premiums on bonds for covered losses required in a suit defended by us, but not for bond amounts greater than the limit of liability for Coverage E. We are not obligated to apply for or furnish any bond;

**c.** Reasonable expenses incurred by any "insured" at our request, including actual loss of earnings (but not loss of other income) up to $200 per day for assisting us in the investigation or defense of any claim or suit;

**d.** Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

**2. First Aid Expenses**

We will pay up to $1,000 per person/$5,000 per "occurrence" for reasonable first aid expenses incurred by any "insured"

32

because of "personal injury" covered under this policy. We will not pay for first aid to you or any other "insured".

3. **Damage to Property of Others**

We will pay on a "replacement cost" basis up to $1,000 per "occurrence" for "property damage" to property of others caused by any "insured".

We will not pay for "property damage":

a. To property covered under Section I of this policy;

b. Caused intentionally by any "insured" who is 13 years of age or older;

c. To property owned by or rented to any "insured", a tenant of any "insured" or a resident in your household; or

d. Arising out of:

   (1) "Business" pursuits;

   (2) Any act or omission in connection with a premises owned, rented or controlled by any "insured", other than the "insured location"; or

   (3) The ownership, maintenance or use of aircraft, watercraft of any type or motor vehicles or all other motorized land conveyances.

4. **Loss Assessment**

a. We will pay up to $10,000 for your share of any loss assessment charged during the policy period against all members of a corporation or association of property owners providing the loss assessment arises from:

   (1) An "occurrence" that results in "personal injury" or "property damage" not excluded from coverage under Section II – Exclusions; or

   (2) Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided, such person:

      (a) Is elected by the members of a corporation or association of property owners; and

      (b) Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

b. Paragraph 1. Policy Period under Sections I and II – Conditions does not apply to this Loss Assessment Coverage.

c. Regardless of the number of assessments, the limit of $10,000 is the most we will pay for loss arising out of:

   (1) One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

   (2) A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

33

**d.** We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

## SECTION II – CONDITIONS

### 1. Limit of Liability

Regardless of the number of "insureds", claims made or persons injured, our total liability under Coverage E stated in this policy for all "damages" resulting from any one "occurrence" shall not exceed the limit of liability for Coverage E stated in the Declarations.

Our total liability under Coverage F for all medical expense payable for "personal injury" to one person as the result of one accident shall not exceed the limit of liability for Coverage F stated in the Declarations.

### 2. Severability of Insurance

This insurance applies separately to each "insured". This condition shall not increase our limit of liability for any one "occurrence".

### 3. Duties After Loss

In case of an accident, "occurrence", or claim for "personal injury" or "property damage", the "insured" shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

**a.** Give written notice to us or our agent as soon as practicable, which sets forth:

    **(1)** The identity of the policy and "insured";

    **(2)** Reasonably available information on the time, place and circumstances of the accident, "occurrence" or claim; and

    **(3)** Names and addresses of any claimants and available witnesses and other persons involved;

**b.** Forward to us every notice, demand, summons, complaint or other process relating to the accident, "occurrence" or claim;

**c.** At our request, assist in:

    **(1)** Making settlement;

    **(2)** The enforcement of any right of contribution or indemnity against any person or organization who may be liable to any "insured";

    **(3)** The conduct of suits and attend hearings and trials;

    **(4)** Securing and giving evidence and obtaining the attendance of witnesses;

**d.** Under the coverage Damage to Property of Others submit to us within 60 days after the loss, a sworn statement of loss and exhibit the damaged property, if within the "insured's" control;

**e.** No "insured" shall, except at the "insured's" own cost, voluntarily make any payment, assume any obligation

34

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
40 of 265

or incur any expense other than for first aid to others at the time of the "personal injury".

### 4. Duties of an Injured Person – Coverage F – Medical Payments to Others

The injured person or someone acting on behalf of the injured person shall:

**a.** Give us written proof of claim, under oath if required, as soon as practicable;

**b.** Execute authorizations to allow us to obtain copies of medical reports and records; and

**c.** Submit to physical examination by a physician selected by us when and as often as we reasonably require.

### 5. Payment of Claim – Coverage F – Medical Payments to Others

Payment under this coverage is not an admission of liability by any "insured" or us.

### 6. Suit Against Us

No action shall be brought against us unless there has been compliance with the policy provisions.

No one shall have any right to join us as a party to any action against any "insured". Further, no action with respect to Coverage E shall be brought against us until the obligation of the "insured" has been determined by final judgment or agreement signed by us.

### 7. Bankruptcy of Any "Insured"

Bankruptcy or insolvency of any "insured" shall not relieve us of any of our obligations under this policy.

### 8. Other Insurance Coverage E – Personal Liability

This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTIONS I AND II – CONDITIONS

### 1. Policy Period

This policy applies only to loss under Section I or "personal injury" or "property damage" under Section II, which occurs during the policy period.

### 2. Concealment or Fraud

This entire policy is void:

**a.** If it was obtained by fraud or concealment of any material facts or circumstances. If it is determined that the policy is void, all premiums paid will be returned to you since there has been no coverage under this policy; or

**b.** If any "insured" has knowingly and willfully concealed or misrepresented any material fact or circumstance relating to this insurance before or after a claim or loss.

35

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 41 of 265

### 3. Liberalization Clause

If we adopt any revision which would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

### 4. Waiver or Change of Policy Provisions

A waiver or change of any provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination shall not waive any of our rights.

### 5. Cancellation and Non-Renewal

**a.** Your right to cancel. You may cancel this policy by calling or writing us, and stating the future date that the cancellation is to be effective.

**b.** Time for giving notice of cancellation. If we decide to cancel this policy, we will mail to you at the address shown in the Declarations or deliver to you notice of cancellation:

**(1)** Not less than 10 days prior to the effective date of cancellation for non-payment of premium; or

**(2)** Not less than 20 days prior to the effective date of cancellation for any reason other than non-payment of premium.

If we choose to mail the notice of cancellation, there are legal requirements affecting how we mail the notice and which extend the notice periods given above depending on where the notice is mailed. These requirements are given in Section 1013(a) of the Code of Civil Procedure.

**c.** Time for giving notice of non-renewal. If we decide not to renew this policy, we will mail to you at the address shown in the Declarations or deliver to you notice of non-renewal not less than 45 days before the effective date of the non-renewal.

**d.** Grounds for cancellation and non-renewal.

**(1)** If this policy has been in effect for fewer than 60 continuous days and this policy is not a renewal of a prior policy with us, we may cancel this policy for any reason unless prohibited by law.

**(2)** If this policy has been in effect for 60 continuous days or more, or this policy is a renewal of a prior policy with us, we will cancel such a policy only for:

**(a)** Non-payment of premium; or

**(b)** Fraud or material misrepresentation by you or your representative in obtaining this policy or pursuing a claim under this policy; or

**(c)** Grossly negligent acts or omissions by you or your representative substantially increasing any hazard insured against; or

**(d)** Physical changes in the "insured location" which make the property uninsurable; or

**(e)** Any other reason unless prohibited by law.

36

**(3)** We may elect not to renew this policy for any reason unless prohibited by law.

**e.** Other matters concerning cancellation and non-renewal.

**(1)** Proof of mailing is proof of notice.

**(2)** Upon cancellation, you may be entitled to a premium refund; if so, we will send it to you but our making the offer of a refund is not a condition of cancellation. If you or we cancel, any refund will be computed on a pro-rata basis.

## 6. Assignment

Assignment of this policy shall not be valid unless we give our written consent.

## 7. Subrogation

Any "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, any "insured" shall sign and deliver all related papers and cooperate with us in any reasonable manner.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

## 8. Death

If you die:

**a.** We insure the appointed and qualified representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

**b.** "Insured" shall also include:

**(1)** Any member of your household who is an "insured" at the time of your death, but only while a resident of the "residence premises"; and

**(2)** With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative. As to any person qualifying hereunder, they shall notify us of the death of the person named in the Declarations within 60 days of that person's death. Any renewal of the policy after the death may void the policy consistent with paragraph **2.** above.

## 9. Changes

This policy and the Declarations include all the agreements between you and us relating to this insurance. No change or waiver may be effected in this policy except by endorsement issued by us. If a premium adjustment is necessary we will make the adjustment as of the effective date of the change. If the adjustment results in a refund, we may apply it to any premium balance owed on this policy, whether or not then due under our billing plan.

37

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 43 of 265

## 10. Unclaimed Property

Unclaimed property may be transferred to the appropriate state if no activity occurs to claim the property within the time period specified by state law. Any check, bank draft or other form of payment issued by us with respect to this policy is subject to an administrative fee of $2.00 if the check, bank draft or other form of payment has not been presented for payment or otherwise collected prior to the time the check, bank draft or other form of payment becomes unclaimed property under the laws of the state of residence of the payee. This provision applies to any amounts we are required by law to transfer as unclaimed property. This clause is void where prohibited by law.

**In Witness Whereof,** the CSAA Insurance Exchange has caused this policy to be signed by its Attorneys in Fact at Walnut Creek, California.

CSAA Insurance Services, Inc.

Attorney in Fact for

## CSAA Insurance Exchange

President          Secretary

---

## INCLUDED ENDORSEMENTS

## LIMITED HOME REPLACEMENT
## COST COVERAGE
## HO 28 01 05

In exchange for your agreement to insure the dwelling and other "building structures" shown in the Declarations in accordance with the following provisions and to pay the applicable premium we agree that the limit of liability under Coverage **A** – Dwelling and Coverage **B** – Other Structures is increased to 150% of the respective amounts shown in the Declarations if:

**a.** The dwelling and other "building structures" shown in the Declarations have been insured at the time this endorsement was added to the policy to 100% of their "replacement cost"; and

**b.** Each annual adjustment to the limits of liability resulting from the Adjustments to Coverage Limits provisions of Section I – Coverages, conditions has been accepted by you; and

**c.** You notify us within 90 days of the start of any additions or physical changes which increase the value of such

38

dwelling or other "building structures" on the "residence premises" by $5,000 or more.

Coverage is limited to the amount reasonably necessary to repair or replace the dwelling and other "building structures", but does not include any costs required to replace, rebuild, stabilize or otherwise restore or protect the land.

This endorsement supersedes Section I – Conditions, **3.b. (1), (2)** and **(3)**.

All other provisions of this policy apply.

## WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE ENDORSEMENT – CALIFORNIA
### (Residence Employees)
### HO 90 10 86

For an additional premium we agree, with respect to "residence employees":

### Under Coverage I

To pay when due all benefits required of an "insured" by the California Workers' Compensation Law; and

### Under Coverage II

To pay on behalf of an "insured" all "damages" for which the "insured" is legally liable because of "bodily injury" sustained by a "residence employee". The "bodily injury" must be caused by accident or disease and arise out of and in the course of employment by the "insured" while:

**a.** In the United States of America, its territories or possessions, or Canada, or

**b.** Temporarily elsewhere if the "residence employee" is a citizen or resident of the United States or Canada.

Coverage **II** does not apply to any suit brought in or judgment rendered by any court outside the United States of America, its territories and possessions, or Canada, or to any action on such judgment.

### Who Is Covered

A "residence employee" is covered if during the 90 calendar days immediately before the date of injury the employee has:

**a.** Actually been engaged in such employment by the "insured" for no less than 52 hours, and

**b.** Earned no less than $100 in wages.

### Application of Coverage

This insurance applies only to "bodily injury" which occurs during the policy period. If the "bodily injury" is a disease, it must be caused or aggravated by the conditions of the "residence employee's" employment by the "insured".

### Policy Provisions

This insurance is subject to all the provisions of this endorsement and the following provisions of this policy:

39

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 45 of 265

a. Under Section I and II – Conditions:

    **4.** Waiver or Change of Policy Provisions

    **5.** Cancellation

    **7.** Assignment

    **8.** Subrogation

b. Under Section II – Conditions:

    **3.** Duties After Loss.

    **6.** Suit Against Us.

c. Our agreement to defend the "insured" as provided under Coverage **E** – Personal Liability.

d. Under Section II – Additional Coverages:

    **1.** Claim Expenses.

    **2.** First Aid Expenses.

**e.** The definition of **"bodily injury," "business," "insured"** and "residence employee."

## Additional Provisions Applicable to Coverage I

The following provisions are applicable to Coverage I:

a. We shall be directly and primarily liable to any "residence employee" of an "insured" entitled to the benefits of the California Workers' Compensation Law.

b. As between the "residence employee" and us, notice to or knowledge of the "occurrence" of the injury on the part of an "insured" will be deemed notice or knowledge on our part.

c. The jurisdiction of an "insured" will, for the purpose of the law imposing liability for compensation, be our jurisdiction.

d. We will be subject to the orders, findings, decisions or awards rendered against an "insured", under the provisions of the law imposing liability for compensation, subject to the provisions, conditions and limitations of this policy. This policy shall govern as between an "insured" and us as to payments by either in discharge on an "insured's" liability for compensation.

e. The "residence employee" has a first lien upon any amount which we owe you on account of this insurance. In case of your legal incapacity or inability to receive the money and pay it to the "residence employee", we will pay it directly to the "residence employee". Your obligation to the "residence employee" will be discharged to the extent of such payment.

## Limits of Liability Coverage II

Our total limit of liability will not exceed $100,000 for all damages arising out of "bodily injury" by disease or "bodily injury" sustained in any one accident, regardless of the number of "residence employees" who sustain "bodily injury" or the number of "insureds".

## Other Insurance

This insurance does not apply to any loss to which other valid and collectible Workers' Compensation or Employers-Liability

40

Insurance applies.

## Conformity to Statute

Terms of this insurance which are in conflict with the California Workers' Compensation Law are amended to conform to that law.

## Exclusions

This policy does not apply:

**a.** To liability for additional compensation imposed on an "insured" under Sections 4553 and 4557, Division IV, Labor Code of the State of California, because of the serious and willful misconduct of an "insured", or because of "bodily injury" to an employee under 16 years of age and illegally employed at the time of injury;

**b.** To liability for "bodily injury" arising out of "business" pursuits of an "insured".

**c.** Under Coverage **II**:

   **1.** To liability assumed by the "insured" under any contract or agreement.

   **2.** To "bodily injury" by disease unless a written claim is made or suit brought against the "insured" within 36 months after the end of the policy period.

   **3.** To any obligation under a workers' compensation, unemployment or disability benefits law or any similar law.

## OPTIONAL ENDORSEMENTS

*The endorsements listed below apply only if they are shown on the Declarations page of the policy applicable to the loss. We may change the terms and conditions of these endorsements for any renewal period by sending you a new edition of the endorsement.*

## ADDITIONAL RESIDENCE PREMISES – OCCUPIED BY INSURED

### HARI 07 14

For an additional premium, this policy is amended as follows:

Section **II**:
Under Coverage **E** – Personal Liability and Coverage **F** – Medical Payments to Others the structure(s) shown in the Schedule received with your Declarations are included in the definition of "Insured Location".

## REPLACEMENT VALUE ENDORSEMENT PERSONAL PROPERTY

### HO 29 08 05

For an additional premium, we agree, subject to all conditions in this endorsement, to settle losses under Coverage **C** – Personal Property at replacement value instead of "actual cash value". Coverage under this endorsement is subject to and included in the limit of liability shown in the Declarations and does not increase that limit.

"Replacement value" means the current cost at time of loss

41

without deduction for depreciation to replace the damaged, destroyed, or stolen property with articles of like kind and quality.

This endorsement shall not apply to:

1. Property which by its inherent nature cannot be replaced;

2. Property not maintained in good or workable condition;

3. Property not being used by you or stored for such use; or

4. Property being stored and not used.

Our liability for loss to any property insured under this endorsement shall not exceed the smallest of the following:

1. The cost of repair or restoration;

2. The replacement value at time of loss; or

3. Any limit, or Special Limits of Liability described in the policy, including the Declarations.

We will not be liable for any loss under this endorsement unless and until actual repair or replacement is completed. You may elect to disregard this endorsement and make claim under this policy for the "actual cash value" for loss to damaged, destroyed, or stolen property. You may then make claim for "replacement value" according to the provisions of this endorsement provided that you:

**(a)** Complete the actual repair or replacement of the damaged part of the property within 12 months from the date that we make our first payment to you toward the "actual cash value", or if the loss relates to a "state of emergency", as defined in Section 8558 of the Government Code, complete the actual repair or replacement of the damaged part of the property within 24 months from the date that we make our first payment to you toward the "actual cash value"; and,

**(b)** Notify us of your claim within 30 days after the repair or replacement has occurred.

Prior to the deadline, we may grant you extensions of up to six months to repair or replace the damaged part of the property on a showing of good cause.

Special Exclusion. The coverage provided by this endorsement shall not apply to any loss caused by an "earthquake".

All other provisions of the policy, including any applicable deductible not in conflict with this endorsement, remain unchanged. However, if this policy provides "replacement cost" for Coverages **A** and **B**, losses to outdoor radio and television antennas and aerials, satellite dishes, awnings, domestic appliances and outdoor equipment will be settled at "replacement value" as well.

## OTHER STRUCTURES RENTED TO OTHERS
## HO 40

For an additional premium, this policy is amended as follows:

Section I:

We insure for direct physical loss to the structure(s) shown in the Declarations located on the "residence premises" rented or held

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 48 of 265

for rental to any person not a tenant of the described dwelling for use as a private residence for an amount not exceeding the limit of liability shown in the Schedule received with your Declarations. This amount shall be considered specific insurance applicable only to such structure(s).

Section II:

Under Coverage **E** – Personal Liability and Coverage **F** – Medical Payments to Others the structure(s) shown in the Schedule received with your Declarations are included in the definition of "residence premises".

## ADDITIONAL INSURED RESIDENCE PREMISES
## HO 41 04 84

The definition of "insured" in this policy is amended to include any person or organization shown in the Declarations with respect to:

Section I:

Coverage **A** – Dwelling and Coverage **B** – Other Structures; and

Section II:

Coverage **E** – Personal Liability and Coverage **F** – Medical Payments to Others but only with respect to the "residence premises".

This coverage does not apply to "personal injury" to any employee arising out of or in the course of the employee's employment by the person or organization.

## OFFICE, PROFESSIONAL, PRIVATE SCHOOL OR STUDIO OCCUPANCY RESIDENCE PREMISES
## HO 42 08 08

For an additional premium, this policy is amended as follows:

Section I:

Under Coverage **C** – Personal Property the $2,500 Special Limit of Liability for "business property" in Section I - Coverages is deleted for equipment, supplies and furnishings located on the "residence premises" and normally used in office, professional, private school or studio "business" occupancy specifically shown in the Schedule received with your Declarations.

Section II:

Under Coverage **E** – Personal Liability and Coverage **F** – Medical Payments to Others:

1. The "residence premises" shown in the Declarations shall not be considered "business property" because an "insured" occupies a part thereof as an office, school or studio.

2. Subpart **(3)** is added to Section II – Exclusions **1.b.** as follows:

    **(3)** Activities which are ordinarily incident to the specific "business" pursuits shown in the Schedule received with your Declarations.

3. This insurance does not apply to "personal injury" to:

43

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 49 of 265

a. Any employee of any "insured" arising out of specific "business" pursuits shown in the Schedule received with your Declarations; or

b. Any pupil arising out of corporal punishment administered by or at the direction of the "insured".

## OFFICE, PROFESSIONAL, PRIVATE SCHOOL OR STUDIO OCCUPANCY ADDITIONAL RESIDENCE PREMISES (Section II Only)

### HO 43 04 84

For an additional premium, under Coverage E – Personal Liability and Coverage F – Medical Payments to Others:

1. The "residence premises" shown in the Declarations shall not be considered "business property" because an "insured" occupies a part thereof as an office, school or studio.

    Subpart **(3)** is added to Section II – Exclusions **1.b.** as follows:

    **(3)** Activities which are ordinarily incident to the specific "business" pursuits shown in the Schedule received with your Declarations.

2. This insurance does not apply to "personal injury" to:

    a. Any employee of any "insured" arising out of the specific "business" pursuits shown in the Schedule received with your Declarations; or

    b. Any pupil arising out of corporal punishment administered by or at the direction of the "insured".

## RESIDENCE PREMISES - THREE- OR FOUR FAMILY DWELLING

### HO 44 04 84

For an additional premium, the definition of "residence premises" is amended to include the three- or four-family dwelling shown in the Declarations.

## OTHER STRUCTURES-NOT RENTED (Section I)

### HO 48 04 84

For an additional premium, the additional limit of liability shown in the Schedule received with your Declarations for each other structure shall be considered specific insurance applicable only to such structure(s).

This endorsement does not increase the Coverage B – Other Structures limit of liability in the Declarations.

## $100 DEDUCTIBLE (Section I Only)

### HO 57 10 86

For an additional premium, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 50 of 265

"occurrence" exceeds $100 and then only for the amount of such excess.

## $500 DEDUCTIBLE (Section I Only)

### HO 59 10 86

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $500 and then only for the amount of such excess.

## $1,000 DEDUCTIBLE (Section I Only)

### HO 60 10 86

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $1,000 and then only for the amount of such excess.

## SCHEDULED PERSONAL PROPERTY ENDORSEMENT

### HO 61

### 61 1147 0813

For an additional premium, this policy covers Scheduled Personal Property for which a limit of liability is shown in the Declarations or Schedules forming a part hereof. Except as otherwise provided herein, the coverage afforded by this endorsement is subject to the following sections of the policy:

The War Subsection of Section I - Exclusions; Section I – Conditions; and Sections I and II – Conditions.

#### ADDITIONALLY ACQUIRED PROPERTY

The following clause is applicable only to Jewelry, Furs, Cameras, Musical Instruments and Fine Arts when such property is covered hereunder.

In consideration of the agreement by the Insured to report additional property of the kind insured hereunder, acquired by the Insured subsequent to the attachment date of this endorsement, within thirty (30) days from the date acquired and to pay full premium thereon from the date acquired at pro rata of the current rates of this Exchange for such insurance, this endorsement covers on each separate class of such additionally acquired property for not exceeding 25% or $10,000 whichever is the lesser, of the amount of insurance on such class exclusive of this provision. It is specifically understood and agreed by the Insured that this endorsement shall cease to cover such additionally acquired property if it is not reported to this Exchange within the stated thirty (30) day period.

45

The additional coverage does not apply to property of a class not already covered hereunder.

## ADDITIONAL EXCLUSIONS

This endorsement does not insure against:

1. Loss caused by wear and tear, gradual deterioration, insects, vermin, or inherent vice;

2. Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this endorsement; however, subject to the foregoing and all provisions of this policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this endorsement.

3. As to Fine Arts:

   a. Damage sustained due to and resulting from any repairing, restoration or retouching process;

   b. Breakage of art glass windows, statuary, marbles, glassware, brick-a-brac, porcelains and similar fragile articles, unless caused by fire, lightning, aircraft, theft or attempted theft, cyclone, tornado, windstorm, earthquake, flood, explosion, malicious damage or collision, derailment or overturn of conveyance, unless endorsed hereon.

   c. Loss to property on exhibition at fairgrounds or on the premises of any national or international exposition unless such premises are specifically herein described.

4. As to Postage Stamps or Rare and Current Coin Collections:

   a. Fading, creasing, denting, scratching, tearing, thinning, transfer of colors, inherent defect, dampness, extremes of temperature, gradual depreciation, or damage sustained from handling or while being actually worked upon and resulting therefrom;

   b. Mysterious disappearance of individual stamps, coins or other individual articles insured hereunder unless specifically scheduled herein with a definite amount set opposite their description, or if not specifically scheduled, unless mounted in a volume, and the page to which they are attached is also lost;

   c. Loss or damage to property in the custody of transportation companies; nor shipments by mail unless by registered mail;

   d. Theft from any attended automobile except while being shipped by registered mail;

   e. Loss of or damage to any property described herein which is not an actual part of a stamp, money or numismatic collection.

46

# SPECIAL CONDITIONS

1. **Fine Arts:** If Fine Arts are covered hereunder, the Insured represents and agrees that the property insured hereunder will be packed and unpacked by competent packers.

   This Exchange shall be liable for more than the amount set opposite the respective articles covered hereunder, which amounts are agreed to be the value of said articles.

   In the event of the total loss of any article or articles which are a part of a set, this Exchange agrees to pay the Insured the full amount of the value of such set as specified in the schedule attached, and the Insured agrees to surrender the remaining article or articles of the set to this Exchange.

   This insurance covers the property insured while on exhibition otherwise within the limits of the Continental United States, the State of Hawaii and Canada except as hereinbefore excluded.

2. **Golfer's Equipment**: If Golfer's Equipment is covered hereunder, this insurance shall cover gold clubs, golf clothing and golf equipment, which is the property of the named insured, but excluding watches, jewelry and stock for sale; also on other clothing of the named insured while contained in any locker situated in a club house or other building used in connection with the game of golf; except that golf balls are covered hereunder only against loss by fire or burglary, meaning the felonious abstraction of the balls from within a building, room or locker by any persons making felonious entry therein by actual force or violence, or which there shall be visible marks made upon the exterior of such premises at the place of such entry.

3. **Musical Instruments:** If Musical Instruments are covered hereunder, the Insured represents and agrees such instruments insured hereunder will not be played for remuneration during the term of this endorsement.

4. **Silverware:** Silverware shall not include pens, pencils, flasks, smoking implements or accessories or articles of personal adornment.

5. **POSTAGE STAMPS OR RARE AND CURRENT COIN COLLECTION:** IF A STAMP OR A COIN COLLECTION IS COVERED HEREUNDER, IN THE EVENT OF LOSS OR DAMAGE THE AMOUNT PAYABLE HEREUNDER SHALL BE ASCERTAINED IN THE FOLLOWING MANNER:

   A. IN CASE OF LOSS OF OR DAMAGE TO PROPERTY SCHEDULED HEREIN AND REPRESENTING ANY ONE STAMP, COIN OR OTHER INDIVIDUAL ARTICLE INSURED, THIS EXCHANGE SHALL PAY OR MAKE GOOD TO THE INSURED SUCH LOSS OR DAMAGE UP TO BUT NOT EXCEEDING THE AMOUNT(S) SET OPPOSITE THE ITEM(S) INVOLVED.

   B. IN CASE OF LOSS OF OR DAMAGE TO PROPERTY SPECIFICALLY DESCRIBED IN THE ABOVE

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 53 of 265

SCHEDULE AS PAIRS, STRIPS, BLOCKS, SERIES, SHEETS, COVERS, FRAMES, CARDS OR THE LIKE, THIS EXCHANGE SHALL PAY IN THE EVENT OF TOTAL LOSS OF SUCH AN ITEM UP TO BUT NOT EXCEEDING THE AMOUNT SET OPPOSITE THE ITEM INVOLVED AND IN THE EVENT OF PARTIAL LOSS NOT MORE THAN THE CASH MARKET VALUE OF THE WHOLE SET, LESS THE CASH MARKET VALUE OF THE REMAINDER AT THE TIME OF LOSS, IT BEING HOWEVER UNDERSTOOD AND AGREED THAT IN THE EVENT OF THE PROPERTY BEING INSURED FOR LESS THAN THE CASH MARKET VALUE, THE LIABILITY OF THIS EXCHANGE SHALL NOT EXCEED THE PROPORTION THAT THE AMOUNT INSURED BEARS TO THE CASH MARKET VALUE;

c. IN ALL CASES OF LOSS OF OR DAMAGE TO THE INSURED PROPERTY NOT PROVIDED FOR IN THE TWO PREVIOUS PARAGRAPHS, THE EXCHANGE SHALL NOT BE LIABLE FOR MORE THAN THE ACTUAL CASH MARKET VALUE OF THE PROPERTY AT THE TIME OF LOSS, SUBJECT HOWEVER TO A LIMIT OF NOT EXCEEDING $1,000 ON UNSCHEDULED NUMISMATIC PROPERTY AND NOT EXCEEDING $250, WITH RESPECT TO ANY ONE STAMP, COIN OR OTHER INDIVIDUAL ARTICLE OR ANY ONE PAIR, STRIP, BLOCK, SERIES, SHEET, COVER, FRAME, CARD OR THE LIKE;

d. THIS EXCHANGE SHALL NOT BE LIABLE FOR A GREATER PROPORTION OF ANY LOSS ON PROPERTY NOT SPECIFICALLY SCHEDULED HEREIN, THAN THE TOTAL SUM INSURED ON SUCH UNSCHEDULED PROPERTY BEARS TO THE ACTUAL CASH MARKET VALUE THEREOF AT THE TIME SUCH LOSS SHALL HAPPEN.

6. **VALUATION:** THIS EXCHANGE SHALL NOT BE LIABLE FOR MORE THAN THE ACTUAL CASH VALUE OF THE PROPERTY AT THE TIME ANY LOSS OR DAMAGE OCCURS AND THE LOSS OR DAMAGE SHALL BE ASCERTAINED OR ESTIMATED ACCORDING TO SUCH ACTUAL CASH VALUE WITH PROPER DEDUCTION FOR DEPRECIATION, HOWEVER CAUSED, AND SHALL IN NO EVENT EXCEED:

**A.** WHAT IT WOULD COST TO REPAIR OR REPLACE THE SAME WITH MATERIAL OF LIKE KIND AND QUALITY, OR

**B.** THE APPLICABLE AMOUNT OF INSURANCE SET OPPOSITE THE RESPECTIVE ARTICLE COVERED HEREUNDER, WHICHEVER IS LESS.

7. **Loss Clause:** Any loss hereunder shall not reduce the amount of this endorsement, except in the event of payment of claim for total loss of an item specifically scheduled hereon. If claim is paid for total loss of one or more scheduled items, the unearned premium applicable to such

items will be refunded to the Insured or applied to the premium due on item(s) replacing those on which the claim was paid.

8. **PAIR, SET OR PARTS:** IN THE EVENT OF LOSS TO:

    **A.** ANY ARTICLE OR ARTICLES WHICH ARE A PART OF A PAIR OR SET, THE MEASURE OF LOSS TO SUCH ARTICLE OR ARTICLES SHALL BE A REASONABLE AND FAIR PROPORTION OF THE TOTAL VALUE OR THE PAIR OR SET, GIVING CONSIDERATION TO THE IMPORTANCE OF SAID ARTICLE OR ARTICLES, BUT IN NO EVENT SHALL SUCH LOSS BE CONSTRUED TO MEAN TOTAL LOSS OF THE PAIR OR SET; OR

    **B.** ANY PART OF PROPERTY COVERED CONSISTING, WHEN COMPLETE FOR USE, OF SEVERAL PARTS, THE EXCHANGE SHALL ONLY BE LIABLE FOR THE VALUE FOR THE PART LOST OR DAMAGED.

9. **OTHER INSURANCE:** IF THE INSURED HAS OTHER INSURANCE AGAINST A LOSS COVERED BY THIS ENDORSEMENT THIS EXCHANGE SHALL NOT BE LIABLE UNDER THIS ENDORSEMENT FOR A GREATER PROPORTION OF SUCH LOSS THAN THE APPLICABLE LIMIT OF LIABILITY STATED IN THE ABOVE SCHEDULE BEARS TO THE TOTAL APPLICABLE LIMIT OF LIABILITY OF ALL VALID AND COLLECTIBLE INSURANCE AGAINST SUCH LOSS.

## ADDITIONAL RESIDENCE PREMISES –RENTED TO OTHERS
### HO 70 12 02

For an additional premium, the following definitions are amended:

1. "Insured location" is amended for purposes of Coverage **E** - Personal Liability and Coverage **F** Medical Payments to Others to include the premises shown in the Schedule received with your Declarations; and

2. "Business" is amended for purposes of Coverage **E** - Personal Liability and Coverage **F** - Medical Payments to Others so that it does not apply to the rental or holding for rental of the premises shown in the Schedule received with your Declarations.

## BUSINESS PURSUITS (Section II)
### HO 71 12 01

For an additional premium, the insurance provided by this policy under Coverage **E** – Personal Liability and Coverage **F** – Medical Payments to Others will apply to your "business" pursuits conducted in connection with the "business" pursuits shown in the Declarations, subject to the following provisions:

This insurance does not apply:

1. To "personal injury" or "property damage" arising out of past or present "business" pursuits in connection with a "business" owned or financially controlled by an "insured" or

49

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 55 of 265

by a partnership or joint venture of which such an "insured" is a partner or member;

2. To "personal injury" or "property damage" arising out of the rendering of or failure to render professional services of any nature (other than teaching);

3. To "personal injury" to a fellow employee of an "insured" injured in the course of such person's employment;

4. When an "insured" is a member of the faculty or teaching staff of any school or college;

    a. To "personal injury" or "property damage" arising out of the maintenance, operation, use, entrustment, loading or unloading of draft or saddle animals, vehicles for use therewith, aircraft, motor vehicles, recreational motor vehicles or watercraft owned or operated or hired by or for an "insured" or an "insured's" employer or used by an "insured" for the purpose of instruction in the use thereof; or

    b. To "personal injury" to any pupil arising out of corporal punishment administered by or at the direction of an "insured", but this exclusion does not apply under Coverage **E** – Personal Liability if liability for corporal punishment is indicated in the Declarations as included.

## $1,500 DEDUCTIBLE (Section I only)

### HO 76 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $1,500 and then only for the amount of such excess.

## $2,000 DEDUCTIBLE (Section I Only)

### HO 77 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $2,000 and then only for the amount of such excess.

## $2,500 DEDUCTIBLE (Section I Only)

### HO 78 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $2,500 and then only for the amount of such excess.

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 56 of 265

## $3,000 DEDUCTIBLE (Section I Only)
## HO 79 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $3,000 and then only for the amount of such excess.

## $4,000 DEDUCTIBLE (Section I Only)
## HO 80 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $4,000 and then only for the amount of such excess.

## $5,000 DEDUCTIBLE (Section I Only)
## HO 81 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $5,000 and then only for the amount of such excess.

## $7,500 DEDUCTIBLE (Section I Only)
## HO 82 12 07

For a premium credit, the Loss Deductible Clause contained in paragraph **15.** of Section I – Conditions is deleted and replaced by the following:

Loss Deductible Clause: With respect to loss otherwise covered under this policy, we shall be liable only when such loss in each "occurrence" exceeds $7,500 and then only for the amount of such excess.

## SNOWMOBILE (Section II Only)
## HO 164 04 84

For an additional premium, under Coverage **E** – Personal Liability and Coverage **F** – Medical Payments to Others:

1. Section **II** – Exclusion **1.e.** is deleted only with respect to "personal injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading or unloading of the snowmobile(s) described in the Schedule received with your Declarations while away from an "insured location".

51

2. The definition of "insured" includes as an additional "insured" any person or organization legally responsible for a snowmobile owned by you or any other "insured" who is a resident of your household, but does not include a person or organization using or having custody or possession of the snowmobile without the permission of the owner. This insurance for an additional "insured" shall be excess insurance over any other valid and collectible insurance available to such "insured".

With respect to the described snowmobile(s), this insurance does not apply:

a. To any snowmobile subject to the Motor Vehicle Registration Act;

b. While any snowmobile is used to carry persons for a charge;

c. While any snowmobile is used for "business" purposes;

d. While any snowmobile is rented to others; or

e. While any snowmobile is being operated in any prearranged or organized race, speed contest or other competitions.

## $250 THEFT DEDUCTIBLE (Section I)
## HO 177 10 86

For a premium credit, with respect only to loss by theft of property covered under Coverage **C** of this policy, the following Loss Deductible Clause is substituted for any other loss deductible clause which may form a part of this policy.

Loss Deductible Clause: for loss by theft of property covered under Coverage **C**, each claim shall be adjusted separately. The sum of $250 shall be deducted from the amount of each such adjusted claim or the applicable limit of liability, whichever is less.

## JEWELRY AND WATCHES INCREASED LIMITS OF LIABILITY (Section I)
## HO 210 08 08

For an additional premium, Section I – Coverages, Special Limits of Liability, is amended by deleting numbered category **5.** and substituting the following:

5. The aggregate amount shown in the Declarations for loss by theft of jewelry, watches, precious and semi-precious stones, gold other than goldware, silver other than silverware, and platinum.

## EXCLUDED OTHER STRUCTURES (Section I)
## HO 300 04 84

In exchange for our issuing, or at the time of this endorsement continuing in force the policy to which this endorsement is attached, you and we agree that the other structures specified as excluded in the Schedule received with your Declarations are removed from coverage under Section I of the policy.

52

## ADDITIONAL INTERESTS- RESIDENCE PREMISES
## HO 04 10 06 10

In addition to the Mortgagee(s) shown in the Declarations or elsewhere in this policy, the persons or organizations named in the Schedule received with your Declarations also have an interest in the "residence premises".

## CANCELLATION AND NONRENEWAL

## NOTIFICATION

If we decide to cancel or not to renew this policy, the persons or organizations named in the Schedule received with your Declarations will be notified in writing.

All other provisions of this policy apply.

## LENDER'S LOSS PAYABLE ENDORSEMENT
## 438 BFUNS

1. Loss or damage, if any, under this policy, shall be paid **to the Payee named on the first page of this policy**, its successors and assigns, hereinafter referred to as "the Lender", in whatever form or capacity its interests may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

2. The insurance under this policy, or any rider or endorsement attached thereto, as to the interest only of the Lender, its successors and assigns, shall not be invalidated nor suspended: (a) by any error, omission, or change respecting the ownership, description, possession, or location of the subject of the insurance or the interest therein, or the title thereto; (b) by the commencement of foreclosure proceedings or the giving of notice of sale of any of the property covered by this policy by virtue of any mortgage or trust deed; (c) by any breach of warranty, act, omission, neglect, or non-compliance with any of the provisions of this policy, including any and all riders now or hereafter attached thereto, by the named "insured", the borrower, mortgagor, trustor, vendee, owner, tenant, warehouseman, custodian, occupant, or by the agents of either or any of them or by the happening of any event permitted by them or either of them, or their agents, or which they failed to prevent, whether occurring before or after the attachment on this endorsement, or whether before or after a loss, which under the provisions of this policy of insurance or of any rider or endorsement attached thereto would invalidate or suspend the insurance as to the named "insured", excluding here from, however, any acts or omissions of the Lender while exercising active control and management of the property.

3. In the event of failure of the "insured" to pay any premium or additional premium which shall be or become due under the term of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from and

53

within one hundred and twenty (120) days after due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder that the Lender when so notified in writing by the Company of the failure of the "insured" to pay such premium shall pay or cause to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefor. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said written notice by the Lender.

4.   Whenever this Company shall pay to the Lender any sum for loss or damage under this policy and shall claim that as to the "insured" no liability therefor exists, this Company, at its option, may pay to the Lender the whole principal sum and interest and other indebtedness due or to become due from the "insured", whether secured or unsecured, (with refund of all interest not accrued), and this Company, to the extent of such payment, shall thereupon receive a full assignment and transfer, without recourse, of the debt and all rights and securities held as collateral thereto.

5.   If there be any other insurance upon the within described property, this Company shall be liable under this policy as to the Lender for the proportion of such loss or damage that the sum hereby "insured" bears to the entire insurance of similar character on said property under policies held by, payable to and expressly consented to by the Lender. Any Contribution Clause included in any Fallen Building Clause Waiver or any Extended Coverage Endorsement attached to this contract of insurance is hereby nullified except Contribution Clauses for the compliance with which the "insured" has received reduction in the rate charged or has received extension of the coverage to include hazards other than fire and compliance with such Contribution Clause is made a part of the consideration for insuring such other hazards. The Lender upon the payment to it of the full amount of its claims, will surrogate this Company (pro rata with all other insurer contributing to said payment) to all of the Lender's rights of contribution under said other insurance.

6.   The Company reserves the right to cancel this policy at any time, as provided by its terms, but in such case this policy shall continue in force for the benefit of the lender for ten (10) days after written notice of such cancellation is received by the Lender and shall then cease.

7.   This policy shall remain in full force and effect as to the interest of the Lender for a period of ten (10) days after its expiration unless an acceptable policy in renewal thereof with loss thereunder payable to the Lender in accordance with the terms of this Lender's Loss Payable Endorsement, shall have been issued by some insurance company and accepted by the Lender.

8.   Should legal title to and beneficial ownership of any of the property covered under this policy become vested in the Lender or its agents, insurance under this policy shall continue for the term thereof for the benefit of the Lender but, in such event, any privileges granted by this Lender's Loss

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 60 of 265

Payable Endorsement which are not also granted the "insured" under the terms and conditions of this policy and/or under other riders or endorsements attached thereto shall not apply to the insurance hereunder as respects such property.

9. All notices hereby provided to be given by the Company to the Lender in connection with this policy and this Lender's Loss Payable Endorsement shall be mailed to or delivered to the Lender at its office or branch described on the first page of the policy.

\* In the United States and Canada, an insured person can obtain claim service by calling 1-800-922-8228.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 61 of 265





**JAMES F. CARROLL, M.D.**

421 D March Avenue
Healdsburg, California 95448
Telephone: (707) 433-3321

To whom it may concern                    10/16/19

Enrique Godrez 11/27/1969

Was admitted to SRMH from 12/4 - 10/2017 with a life threatening infection in his knee for which there was no apparent cause. A staph infection spread into the lower leg causing necrotizing fasceitis. Surgery was required to debride infected tissue from the knee and lower leg. Months of painful rehab ensued.

On 10/9/17 the "Tubbs fire" holocaust destroyed all his possessions, and shut down his job. Many resources developed to help survivors recover from PTSD as the effects of unremitting stress on physical well being have been recognized.

Enrique has asked me if "stress" contributed to his susceptibility to infection. The answer widely accepted is: yes.

James F. Carroll MD

# Statement of Frances Galvez Hernandez in Support of Claimant

I, *Frances Galvez Hernandez*, declare as follows:

1.  I have personal knowledge of the matters contained in this statement and, if necessary, could testify competently to them;

2.  For those matters which I do not have personal knowledge of, I assert on information and belief;

3.  I am Claimant's sister and am writing this statement on his behalf;

4.  Growing up with my brother was filled with warmth and a priority to family. Claimant was full of curiosity about everything different, whether people or places. As he grew, he became friends with a diverse group of individuals. He had a natural and genuine empathy combined with a strong sense of fairness for all;

5.  In high school, he ran track on the long distance team and was a fierce competitor with a commitment to good sportsmanship. He trained in the neighborhood to the cheers and encouragement of all, running ten miles a day. Prior to the fires, he was always active and pursued a variety of activities. He always finished what he started;

6.  He was always academically excellent, finishing in the top three percent of his graduating class at Piner High school. He knew everyone in Santa Rosa and it was very hard when he attended college at UC Davis, having to leave family and friends. He returned home to Santa Rosa after earning his Business degree, having future plans to earn his Master's Degree;

7.  Before the fires, my brother was an active individual, always on the go and always working with the community whenever possible. He was always on track and timely with everything. He was always very alert and proactive about all family functions and activities;

8.  When he returned to Santa Rosa, he began to volunteer at the local Junior College, providing mentoring for the underprivileged Latino community. He worked in business and wanted to assist troubled students struggling to graduate. He was on the Board for the Puente Project at Santa Rosa Junior College. My brother assisted many students with studies and

goals, never saying to "NO" to anyone. As time went on, he became recognized and acclaimed by his peers and co-workers for his activism and mentoring;

9.  We were developing a plan to combine our households. I began to look for a suitable property based on mutually created criteria. He placed the family home for sale and it quickly sold;

10. The near death experience he had with the *flesh eating bacteria*, caused him to lose a substantial amount of weight in a short period of time. The *PTSD* diagnosis sent him into a state of deep depression. At that point, I knew my brother was in trouble and I feared that he might hurt himself;

11. After the fires destroyed our community, not once but twice, I noticed that his demeanor and focus had changed. He became obsessively preoccupied with everything, never focusing on just one thing. His eagerness disappeared and his confidence and self worth greatly diminished. Remarkably, he overcame some obstacles with his outpatient treatment and returned to work. The relentless pain and mental anguish prevented him from working in his chosen career. I still noticed him struggle with his newly operated leg and loss of ambition;

12. The once active and harmonious person I grew up with was lost with no signs of improvement. He couldn't continue with his career and employment was difficult to obtain and retain. I believe that if the fires had never occurred, my brother would not be suffering from such immeasurable pain and anguish. He fears every time he hears or sees any type of warning or alert siren and has not been back to Santa Rosa much, with no intention of returning to Coffey Park; the memories are too strong and he isn't emotionally sound to remember that frightful night.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

**Dated:** August 6, 2020

*Frances Galvez Hernandez*
Frances Galvez Hernandez

## Statement of John M. Mangiafridda in Support of Claimant

I, *John M. Mangiafridda*, declare as follows:

1.  I have personal knowledge of the matters contained in this declaration and, if necessary, could testify competently to them;

2.  For those matters which I do not have personal knowledge of, I assert on information and belief;

3.  I am writing this statement on behalf of Claimant Enrique Galvez;

4.  My mother and I have known Claimant for over 17 years. My mother did her banking at Wells Fargo Bank and that is when we first became acquainted. He was a strong fiduciary, with ethical and moral strengths and genuine concern for the needs of his clients;

5.  At that time, Claimant consistently emanated a pleasant and positive demeanor, with a firm focus on job, family and community. He was happy, fun, and excited about life. Further, he was reliable, if he said he would be somewhere at a certain time, you could bank on it. He never missed or was late to family functions and most often was involved in planning such events;

6.  All of that changed in October of *2017*, when he was subjected to the horrific events and images of the deadly wildfires that ripped through Sonoma County, overwhelming him physically and mentally;

7.  The change in his persona was extremely evident to all that knew him. He showed signs of stress, depression, anxiety, constant thoughts of the fire and the trauma it caused him, avoiding places and people that reminded him of the fires, appearing tense and easily startled, adamant about sitting as near as possible to an exit when in public places, loss of interest in once happy activities, strong feelings of detachment from friends, family, and community, a complete loss of any positive emotions and extreme hyper vigilance about future fires, to include buying and monitoring a police/fire scanner.

8.  He seems aware that he is suffering and needs professional therapy but has been unable to access such help because of a lack of health insurance. He tells me that he is relentlessly plagued with feeling that something bad is going to happen even

though he knows it isn't rational to have these feelings. I feared for his mental well being;

9.    The fires in *2019* sent Claimant into a severe panic attack. He was overwhelmed with fear and anxiety. He called me in a panic and stated that he was heading to Sacramento to stay with his sister until the fires were under control. He did return to Santa Rosa but only to gather what few belongings he had. He returned to Sacramento where he lives to this day. He tells me the paranoia, fear and anxiety are at such levels that will forever keep him from coming back to the community he cherished and grew up in;

10.   I am not a doctor but I am an honorably discharged combat veteran. I have suffered from *PTSD* for some 30 years and am readily familiar with the symptoms that comprise *PTSD;*

11.   I have seen first hand what these fires have done to a once positive, capable and professional individual. It is my opinion that his *PTSD* won't go away and has become chronic. He won't ever be the same, as such that he is entitled to past and future compensation for the physical pain and decrease in his mobility he has suffered, due to the *flesh eating bacteria* he contracted as a direct result of the poisonous and toxic particulates in the fires *(that would have killed him if not for the speedy intervention of the staff at Sutter Hospital);* full compensation for the loss of his irreplaceable personal property and past and future compensation for the resulting case of severe and chronic *PTSD* surrounding all of these incomprehensible and life altering traumatic events.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

**Dated:** August 6, 2020

*John M. Mangiafridda*
John M. Mangiafridda



# Statement of Sandra Avila-Mangiafridda in Support of Claimant

**I, _Sandra Avila-Mangiafridda_, declare as follows:**

1. I have personal knowledge of the matters contained in this statement and, if necessary, could testify competently to them;

2. For those matters which I do not have personal knowledge of, I assert on information and belief;

3. I am writing this statement on behalf of Claimant Enrique Galvez;

4. I have known Claimant for 15 years and was his Assistant Manager at the Clark Shoes retail store in the Petaluma Outlet Mall;

5. When I first met Claimant, he was always pleasant and positive. He was happy, fun, and excited about life. Further, he was reliable, if he said he would be somewhere at a certain time, you could bank on it. He never missed or was late to work or family functions and most often was involved in planning such events;

6. Claimant was a highly skilled retail manager, with a natural ability to interact with customers and vendors. He was also a great teacher and trainer which enabled me to become competent at my position in rapid fashion. Under his leadership, sales at that store nearly doubled;

7. During this time, Claimant had been victimized by the _2017_ fires and was struggling with what he said was, "severe swelling and pain" in his lower right leg. He was using crutches and a cane to be able to stay on the sales floor and service his customers. Then, with the pain becoming unbearable, he went into the hospital;

8. He went from the hospital to outpatient treatment at his residence. My husband and I visited him several times. The injury from the _flesh eating bacteria_ left his leg with a massive wound and he appeared despondent and depressed. He returned to work for less than a week but it was readily apparent that the pain in his right leg was overwhelming him;

9. The change in Claimant's behavior, after the fires injured him and prevented him from working was, in my opinion extreme. He became negative and paranoid. He was late to everything

and more often than not, didn't show up at all. He is always scattered in thought and would not complete a narrative that he started. This same lack of focus permeated every aspect of his life and I was worried and saddened for him;

10. I am personally familiar with the symptoms that comprise *PTSD* as my husband of 33 years, John M. Mangiafridda, has suffered from it for as many years. To this day, things completely unrelated to the traumas that caused his *PTSD* can trigger one or multiple symptoms. I see this same behavior in Claimant.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

**Dated:** August 6, 2020

*Sandra Avila-Mangiafridda*
Sandra Avila-Mangiafridda



# Claimant's PTSD Statement

**I, _Enrique Galvez_, declare as follows:**

1.  I am the Creditor of this claim against PG&E;

2.  I have personal knowledge of the matters contained in this statement and, if necessary, could testify competently to them;

3.  For those matters which I do not have personal knowledge, I assert on information and belief;

4.  I remember, as if it were yesterday, moving to the Coffey Park area of Santa Rosa with my parents when I was just 10-years old. I was never sick, never had any broken bones, and was healthy;

5.  At that time, much of the area was still open land. I have an abundance of loving memories of spending my summers playing in the walnut orchards, picking hoards of wild blackberries from the endless supply of bushes and summer nights filled with swimming and playing tag with my friends;

6.  As time passed, I grew with the area and saw Coffey Park develop into a community filled with family and friends, many of whom I attended high school with and have remained friends with to this day. I was a member of our high school track team and often trained in my neighborhood to the encouragement of my family, friends and neighbors. This was my community and I actively participated in related events;

7.  Eventually, my uncle purchased a house, with a pool and several acres of open land right outside of Coffey Park. This brought our family closer together. I spent my summers there. Collectively, our homes served as the family hub where all holidays and family get-togethers occurred. Soon after, my cousin purchased a home several streets over and the family grew. The only time I have lived outside the county _(until the fires drove me away forever)_ was the four-years I spent attending the University of California, Davis earning a business degree;

8.  After college, I returned to Sonoma County and acquired a retail manager position. I worked in that professional capacity until the fires caused me great physical and mental injury which has prevented me from working in that field;

9. Prior to the fires, I was a professional businessman that went about his daily responsibilities with ethics, morality, pride, competency, and confidence. I was committed to job and family and went through life without much fear or anxiety and I rarely panicked. My friends and co-workers often stated that I performed well when under pressure. I didn't fear public places or being around crowds and I didn't have a predictable habit of avoidance;

10. The fires caused by PG&E in *2017* and *2019* forever changed my life both physically and mentally. I often have nightmares about the fires. I have become negative about everything. I am fixated by the trauma that the fires caused me. I am persistently feeling stressed and anxious with constant thoughts of the fire. I am severally depressed and have started avoiding places and people that remind me of the fires. I am always tense and easily startled and have adamant about sitting as near as possible to an exit when in public places. I have loss complete interest in once happy activities and am plagued with strong feelings of detachment from friends, family, and community. I have become devoid of any positive emotions and have developed extreme hyper vigilance about future fires, resorting to buying and monitoring a police/fire scanner. I have become overwhelmed with negative thoughts about myself as a family member, friend and co-worker;

11. I cannot shake the feeling that something bad is going to happen that will cause me further physical, mental and financial harm. I have difficulty concentrating and often misperceive common situations which causes me to over or under react;

12. I believe that I need professional therapy and counseling to assist me in creating ways to deal with the daily pain and suffering the fires have caused me. The trauma has not dissipated but instead has grown beyond my ability to properly cope;

13. The *flesh eating disease* that nearly took my life has weakened the strength in my leg and has greatly diminished my mobility serving to restrict the type of work I have done for three decades;

14. I feel that I should receive compensation commensurate with the severity of the physical injury and the long-term effects it will have on me for the rest of my life;

15. Further, I am entitled to the loss of irreplaceable personal property that no amount of money could compensate for, the loss of community, the detachment from family/friends, the severe emotional distress, depression, loss of career, loss of wages, loss of future earning capacity, loss of future income, mental anguish, pain and suffering, and *PTSD* that I have to deal with everyday;

16. In order to repair my life both physically, mentally and to secure adequate employment, I must receive fair and just compensation needed to do so.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

**Dated:** August 6, 2020

_____
Claimant Enrique Galvez



To Whom It May Concern,                          September 23, 2020

My name is Eddie Grassi and I am a life coach with my own life coaching practice - Life and Relationships Coaching (relationshipscoaching.com). I was asked by a client I am seeing to share my thoughts and observations of his coaching sessions with me. His name Enrique Galvez. Enrique came to me seeking help in dealing with feelings of depression and anxiety resulting from past trauma. From our sessions, it has become clear to me that Enrique is experiencing a high degree of unresolved mental and emotional pain. It is my recommendation that Enrique continue receiving guidance and coaching with me until we both see marked and measurable improvement in the quality of his life. To measure this improvement, we are in the process of setting up goals for him to work towards achieving. For example, one of the goals we are working on presently is to increase self-compassion and mindfulness to promote a sense of resiliency and control over his life.

Much if not all of the anguish he continues to struggle with he attributes to two traumatic events that changed his life. The first is the complete loss and destruction of all of his home and possessions from the Tubbs fire that ravaged Northern California. Coping with this event has proven to be very challenging to Enrique. I agree with his doctor James Carrol who writes that the stress of this fire contributed to the second catastrophic event of his life -- the life-threatening Staph infection he needed surgery for in 2017. In my opinion, it is not correct to say Enrique has made a full recovery from either of these two events, certainly mentally or emotionally. I am convinced that he needs a lot of help to feel at ease in the world again. The memories continue to haunt him to this day where he reports the smell of smoke or fire unsettles him greatly. Doctor Carroll mentions PTSD as a condition many survivors experience and while I am not able to diagnose him as a coach, I believe strongly that Enrique shows symptoms of this behavior condition. Having said all this, I am pleased to report that even after just two sessions, Enrique reports to have noticed small positive changes in the way he feels.

Sincerely,
Eddie Grassi, CCP, MA
relationshipscoaching.com



From: Eddie Grassi
Re: Request for long-term coaching plan outline
Date: 9/30/2020

To Whom It May Concern:

Enrique Galvez is a client I am currently coaching as part of my life-coaching business, relationshipscoaching.com. He has asked me to write up a long-term plan for his personal growth and well-being resulting from my coaching services. I am glad to do this and hope it will aid him in receiving services indefinitely.

Long-term Coaching plan for Enrique Galvez written by Eddie Grassi, Life Coach, relationshipscoaching.com

<u>Summary of coaching sessions.</u>

Enrique's mood and outlook are affecting the quality of his life. They are having a negative impact on his daily health and well-being. Enrique reports that his thoughts and feelings of anxiety, depression, despair and confusion are overwhelming him, interfering with his normal day to day activities. The recurrence of these intense thoughts and feelings are the primary reason Enrique has sought coaching. He wants to lead a healthy happy life, free of the sharp mental and emotional suffering he is experiencing. From the first day I spoke with Enrique we began a discussion focusing on solutions to decreasing the intensity and frequency of these thoughts and feelings. At the same time, we discussed ways to create new positive emotions and thoughts. In addition, we also considered possible causes of these emotions. Enrique linked them to two major events. The first was the fires of 2017 that destroyed his home and all of his belongings. The second was a life-threatening infection he got which required surgery in 2017. The stress and uncertainty of these two challenging events are still felt today.

<u>Short-term Goals for the next 3 months</u>

<u>Mindfulness</u> The first goal we decided on is to increase awareness through practicing mindfulness on a daily basis. By practicing mindfulness, the expectation is that Enrique will learn to have greater control over his thoughts and how he reacts to them. These thoughts may include memories of troublesome events like the ones mentioned above. There are exercises I am suggesting he follow to help promote mindfulness. Guided meditation practices is one such example I feel will be very helpful. The idea is to apply mindfulness in his own life as a coping mechanism when difficult emotions like anxiety and depression arise.

<u>Self-Compassion</u> is supposed to be one of the best ways to cultivate other positive emotions like determination and confidence. Enrique can use lots of it. The goal is to practice small acts of self-compassion each day and journal it. The intention to cultivate this skill or trait is to restore a healthy sense of self and our own goodness as a person. Part of reaching this goal entails deliberate focusing of our attention on times during the day when we are treating

ourselves kindly.  There are several exercises which can be used to create a natural love of oneself which Enrique can benefit from over the next few months and even beyond.

Gratitude has been shown to play a powerful role in helping to foster well-being and meaningfulness in one's life.  Enrique is engaging in practicing gratitude by committing to keeping a journal with daily entries describing at least two things he is grateful for each day. These things may be not only present circumstances that elicit a response of appreciation but memories new and old.

Long-term Goals There is some overlap here with short-term goals.  Intended for 12 months and more to grow.

Resiliency All of the goals support this umbrella goal because resiliency is what is going to help Enrique with every challenge, obstacle or set-back.  Becoming resilient takes time and discipline to achieve.  All of the techniques and strategies support this trait of recovering from the hurts and injuries we inevitably will face.   The goal is to increase resiliency by taking steps to build positive emotions, meaningfulness, good relationships and achievement.  These areas of personal growth are essential to success in the positive psychology model to well-being.  There are many exercises I will be introducing to Enrique to strengthen this trait.

Stress, Anxiety and Depression Reduction - gradually, through repeated practice of building traits such as determination and confidence as well as gratitude and self-compassion, I believe Enrique can experience less of these emotions.  I haven't discussed this yet, but there is a lot to learn about these emotions.  They each carry an important message to help us thrive.  We need to pay attention to what they are telling us rather than see them only as a negative.  Just as with the other positive traits, I am hopeful that Enrique may come to accept their importance. This does not mean allowing them to dominate ourselves.   There is a lot of long-term work to be done in terms of understanding and giving ourselves permission to feel these emotions rather than to react to them.  Suggested exercises to foster our awareness of their helpfulness will be introduced in time.

Emotional Intelligence this catch-all phrase is about learning to harness the power of our emotions in dealing with all types of situations and hardships so that we are able to conduct ourselves in the best possible way under high pressure stressful situations.  I am very keen on helping Enrique use his emotions as a tool chest for problem solving skillfulness of what may have previously been insurmountable obstacles.

PTSD In Enrique's doctor's note, he mentioned that PTSD is common among fire victims. Enrique has said he believes he has this.   While I am not able to diagnose this as a life coach, I do feel he is suffering from past trauma as it relates to the fires which destroyed his home and possessions.  I feel positive psychology is an effective coaching modality to use.  I believe it

may help him overcome the lingering thoughts, feelings and behaviors associated with this horrific fire.   I am interested in using some of the exercises available from positive psychology to deal effectively with this possible condition.

Sincerely,
Eddie Grassi
Professional LIfe-coach Practitioner, MA
relationshipscoaching.com



## I.    Introduction

The *October of 2017* Northern California wildfires took a tragic toll on the County of Sonoma and the City of Santa Rosa and many other Northern California communities. Many lives lost and thousands of homes and structures damaged or destroyed. Owing to the then extreme weather conditions, shortly after the fires ignited on *October 8* and *9*, they rapidly grew to become extensive, full-scale incidents spanning from 1,000 acres to well over 20,000 acres, each within a single day. By *October 14*, the fires had burned more than 210,000 acres while forcing Claimant and 90,000 other people to evacuate from their homes. In total, the Northern California wildfires killed 44 people and hospitalized *at least* 192 others. Air quality toxicity levels were at deadly quantities, containing metal, aluminum and toxic materials, such as antifreeze and agricultural chemicals. The fire reached temperatures so extreme that it melted engine blocks and burned through brick and stone. This is considered one of the deadliest wildfire events in the United States during the past century.

In 1981, Enrique Galvez *("Claimant")* and his parents moved to a new home in the developing Coffey Park[1] area of Santa Rosa. He was just 10 years old. At that time, much of the area was still open land. His mind is filled with a plethora of loving memories of spending his summers playing in the walnut orchards, picking hoards of wild blackberries from the endless supply of bushes and summer nights filled with swimming and playing tag with his friends.

As time went on, Claimant grew with the area and saw Coffey Park develop into a community filled with family and friends, many of whom he attended high school with and has remained friends with to this day. Claimant was a member of his high school track team and often trained in his neighborhood to the encouragement of his friends and neighbors. Claimant's uncle soon purchased a house, with a pool and several acres of open land right outside of Coffey Park. This brought the family closer together. Claimant spent his summers there. These homes served as Claimant's family hub where all holidays and family get-togethers occurred. Soon, his cousin purchased a home several streets over and the family expanded. The only time Claimant has resided outside the county was the four-years he spent attending the University of California, Davis earning a business degree.

When Claimant completed college, he returned to Sonoma County to obtain employment consistent with his business degree. He quickly acquired

---

[1] Coffey Park was completely destroyed by the fires and was considered to have suffered more than any other community in Santa Rosa. *(See Page 5)*

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 87 of 265

an Assistant Manager position at the local JC Penney, just several miles from the family hub. After a few years, Claimant was promoted to a Store Manager and, soon after District Manager. For the next 10 years, he endured lengthy and stressful commutes mandated by his position as the company District Manager. The company offered to secure an apartment more geographically neutral to reduce this burden but Claimant was uncomfortable being away from his family so often.

In his 11th year as the District Manager of JC Penney, he was offered a position as a Vice-President at Well Fargo's main branch in Santa Rosa. It was during this time that Claimant began to immerse himself in working with important community projects ranging from mentoring programs at Santa Rosa Junior College to serving on the Hispanic Chamber of Commerce. The majority of his clients and friends lived in the Coffey Park area and were all members of that neighborhood community. This community was the anchor in Claimant's life and was, in great part, an important component in how he identified with himself, family and business acquaintances.

For months prior to the devastating fires, he and his sister were drafting a plan to combine households, becoming co-owner with his sister of a property in Healdsburg or Windsor that had undeveloped acreage, a pool and a private granny home. So in approximately early April, Claimant put the family home up for sale, while his sister began searching for such a property. During the month of August, Claimant received a job offer to manage a Clark's Shoe store in the Petaluma Outlet Mall, the company's flagship store in California. This offer included better benefits and more money. Claimant was told that they recruited him because of his strong work reputation. He proudly accepted the offer and felt strongly that living, working and being committed to his community has been a winning strategy. He felt confident that his life was moving in a strong and positive direction as a direct result of his dedication to family and community. This enthusiasm continued when the family home sold, just several weeks before the fire erupted. Since his sister had yet to acquire the agreed upon home, Claimant had to temporarily put his life's worth of personal property in a storage unit.

Several days before the fire, Claimant learned that his cousin Albert, who lived in Bakersfield, suddenly passed away. The day prior to the fires, Claimant and his family, traveled to the funeral in Bakersfield. The next night, the day the fires started, Claimant was woken in the middle of the night by a phone call from his cousin *(who had remained in Santa Rosa)* who informed the family that Santa Rosa was on fire. Claimant learned that his Uncle Chris and Cousin Veronica lost their homes that night.

2

Claimant returned to Santa Rosa the next day, only to discover that his storage unit had been destroyed by the fire[2], that his residence was under a mandatory evacuation and that the entire area was without power. He also found out that the family home that he had just sold, was unaffected by the fires and had remained standing. He frantically attempted to secure accomadations, but was unable to find anything for 25 miles in any direction. With no other options, Claimant traveled to his sister's home in Sacramento where he spent the next week. The next several days, he had to commute from Sacramento to Petaluma to work. He was anxious and frightened from that day forward and wasn't allowed back into his residence for the next seven days. He was robbed of the ability to properly morn the passing of his cousin.

He was finally allowed to return to his residence but the area remained under an evacuation alert. He could see the flames on the mountain ridge, which terrified him. He was awoken to the sounds of helicopters flying above and bulldozers plowing dirt. There was heavy smoke everywhere. He couldn't sleep not knowing if there would be future evacuations. He was extremely stressed and anxious about the fires unpredictability and couldn't manage the store with no employees. This was the beginning of Claimant's deteriorating mental condition.

When the fire raged through and obliterated the city of Santa Rosa, it annihilated Claimants personal property *(Explained in detail in Section II)*, caused him to suffer from a life threatening and rare infection *(Explained in detail in Section III)* that was facilitated by the fatal levels of toxic and poisonous particulates released into the atmosphere as a direct result of the fires high temperatures, so hot that engine blocks, steel street light posts and masonry block were melted.

Claimant's doctor treated the infection and opined that Claimant displayed all the symptoms necessary for a *Post Traumatic Stress Disorder (PTSD)* diagnosis, combined with *Generalized Anxiety Disorder, Panic Disorder* and *Depression. (See Exhibit A - A4)*

*PTSD* is a serious mental health condition that's triggered by a terrifying event, either experiencing or witnessing it. Symptoms created by *PTSD* are generally grouped into four types:

1. *Intrusive Memories (such as severe emotional distress or physical reactions to something that reminds them of the traumatic event),*

---

[2] Claimant's unit was the only one destroyed amongst the 100 or so units at that location.

# Claim Narrative

    **2.** *__Avoidance__* *(such as avoiding places, activities or people that remind you of the traumatic event),*

    **3.** *__Negative Changes in Thinking & Mood__* *(such as feeling detached from family and friends) and,*

    **4.** *__Changes in Physical and Emotional Reactions__* *(such as always being on guard for danger).*

    These symptoms, all of which Claimant has and will continue to suffer from; can cause significant problems in both social and work situations and in relationships. They also interfere with one's ability to go about their normal daily tasks. Symptoms can vary in intensity over time. One may have more *PTSD* symptoms when stressed in general, or when one comes across reminders of what they went through. For example, one may hear a car backfire and relive combat experiences or see a news report about raging wildfires destroying one's community for the second time in three-years, as is the exact situation Claimant is currently and will forever struggle with.

    This unprecedented event, a direct result of PG&E's tortuous and negligent behavior, ended Claimant's life as he knew it. It forced him to evacuate his residence, harmed him physically and mentally, ended his managerial career, destroyed his community, and took everything that he had ever worked for, including important items that, in the aggregate, comprised the memories of his life. Irreplaceable possessions, such as the urn containing his grandmother's ashes and photos of Claimant with President Clinton, Governor Jerry Brown and Latino entertainer George Lopez, photos & videos, sports memorabilia, baseball card collection, and family heirlooms. These lost items were critical to Claimant's identity, which has been irreparably harmed.

    After the fire, Claimant lived everyday with extreme anxiety, paranoia and fear of future fires. He purchased a public services scanner so he would be warned about similar future events. His plans to co-own with his sister evaporated as Claimant no longer felt safe in Sonoma County. This, by itself has caused his sister to suffer a significant financial burden. He resorted to renting a room from friends hoping that as time passed he would return to a sense of normality as it related to his comfort level. Not a day goes by without some memory of the frantic evacuation or a discussion about the fires. This causes him emotional pain and uncontrollable sobbing. He has yet to find employment that would help in restoring his life to where it was prior to contracting the deadly infection that, amongst other things, altered his ability to stand for long periods of time, which is critical when you're a retail store manager.

4

# Claim Narrative

## I(a).  The 2019 Fires, Again the Result of PG&E's Negligent Behavior

As fate would have it, Sonoma County suffered through another round of destructive wildfires in *October of 2019*. This overwhelmed Claimant and was the straw that broke the camel's back. His anxiety level peaked and he panicked, fleeing to Sacramento where his other sister lives, intending to return to Santa Rosa when the fire was under control. He did revisit Santa Rosa but only to gather what few personal things he still had, then returned to Sacramento where he remains to this day. He will never return to live in the community that he grew up in and where his life's attachments were. It causes him great anxiety, sadness, depression and irrepressible crying. Claimant is unable to return to Coffey Park as it is devoid of all the love and warmth that he cherished so much. Most family members and neighbors have moved from the area and the family hub is gone. Claimant feels forever violated. The fire robbed him of his happy place and the happiness of his childhood.

As Claimant explains, "As the fire unfolded and I was frantically trying to evacuate, I realized that this catastrophe was not happening in another country. It was happening here in my community. I could see the fires on the horizon and I could smell the smoke and see the ash. I could hear sirens, and helicopters hovering overhead. I absorbed and could feel the overwhelming dread and despair of my loved ones and neighbors. This was my county, my city; where whole neighborhoods were damaged and destroyed; friends displaced; neighbors' dead; parents and children displaced from their homes and thousands of lives forever changed. My sadness is immeasurable".

## I(b).  Unprecedented Lightning Strikes Set Sonoma County Ablaze Again in 2020.

Though these recent wildfires weren't the result of PG&E's grossly negligent behavior, they have none the less caused Claimant to suffer *anxiety, extreme emotional distress, enhanced depression, overwhelming feelings surrounding loss of community and an uncontrollable sense of hopelessness and fear*. PG&E's liability extends to future events that may, at any time, trigger *PTSD* symptoms in Claimant. Accordingly, any claims settlement must consider the permanent mental scars and daily long term effects that Claimant will suffer throughout the rest of his life.

5

**Coffey Park soon after the fire roared through**



6

## II.     Personal Property and Related Damages

**Claimant's Storage Unit #469 at Security Public Storage, Santa Rosa, After The Fires Destroyed All His Personal Property.[3]**



As stated in *Section I,* the fire completely destroyed everything Claimant ever owned. A life times worth of personal property, home furnishings, clothing, jewelry, bedroom furnishings, tools of every kind, photos & videos, sports memorabilia, baseball card collection, achievement awards, as well as many irreplaceable items of immense personal and emotional importance, such that it's replacement value cannot be quantified in terms of dollars. Further, Claimant has forever lost the use of these important belongings.

---

[3] Photo taken by the Manager of Security Public Storage.

7

# Claim Narrative

Claimant submitted a timely and procedurally sound claim with his insurance company, *AAA* through their internal computer program. His submission of was carefully developed based on research and extensive interviews with family and friends with possible knowledge of certain items. This claim sought *$330,000.00*[4], and was supported by research Claimant had undertaken. Claimant worked daily with the adjuster, who repeatedly confirmed and agreed with the values that Claimant submitted, only to later accuse Claimant of inflating values. *AAA* paid Claimant only *$147,000.00 (as well as, $15,000.00 in material sales tax)* well short of the actual value of his destroyed personal property *(See Exhibit B).* Also, he did not get paid replacement value despite having that coverage in his policy. *(See Exhibit B3)* In addition, Claimant has not been paid for a motorized wheel chair he submitted a claim for, again, despite having coverage for this item. *(See Exhibit B3, § I, Coverage C, Special Limits of Liability, #8)* Further, Claimant hasn't received compensation for the *loss of use* of his lost personal property, again, despite having that coverage in his policy. *(See Exhibit B3, Page 3, #13 -"property damage" means physical injury to or destruction of tangible property, including loss of use of this property).*

Further, a year after this insufficient and incomplete payment, Claimant discovered that there were items on the original Loss Inventory that he had not received compensation for. Again, the amount was near *$40,000.00* but he only received *$12,000.00. (See Exhibit B1)* If it had not been for Claimant's need to review the original Loss Inventory, *AAA* would have escaped its duty to pay Claimant all the monies he was/is owed under the active policy. Claimant needs the assistance of the Trustee to make his insurer provide further compensation to satisfy the true value of the claim, within the policy limit. Regardless, Claimant is entitled to the full amounts paid under the **collateral source rule** as described below.

The **collateral source rule** *"provides that if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (Hrnjak v. Graymar, Inc. (1971) 4 Cal.3d 725, 729, emphasis added; Helfend v. Southern Cal. Rapid Transit Dist. (1970) 2 Cal.3d 1, 6)* The rule *"expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities".* Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. *"If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his*

---

[4] Below the policy limits. Claimant humbly requests the Trustee to assist Claimant in recovering the full amount due Claimant under the applicable insurance policy.

8

*payment of premiums would have earned no benefit."* (**Helfend, supra, at p. 10, emphasis added**)

The **collateral source rule** applies in *property damage* cases. (**Shaffer v. Debbas (1993) 17 Cal.App.4th 33, 40**) Many insurers contend that they are liable only for items such as unpaid property damage deductibles. However, such a position violates a policy behind the **collateral source rule**, namely that the tortfeasor *"should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide [herself] with insurance."* (**Helfend, supra, 2 Cal.3d at p. 10, emphasis added**) The **collateral source rule** *"is intended to ensure that the right of an injured party to be fully compensated for all his or her damages is protected, even if, in some instances, it entails that party obtaining double recovery from both the insurer and the wrongdoer."* (**Miller, supra, 103 Cal.App.4th at p. 379, emphasis added**)

In California, the **"collateral source rule"** is well settled and tends to favor plaintiffs, in that defendants are barred from introducing any evidence of payment from a **collateral source** and a plaintiff's recoverable damages are not reduced by such payments. This rule includes payments from insurance companies who reserve the right to subrogate to the rights of the plaintiff as well as gratuitous sources and insurance companies who are unable to recover any of the money they paid plaintiff.

Beyond the mandates of the **collateral source rule** *(as previously articulated above),* California courts have opined that the **collateral source rule** has become so integrated into our present tort system that, at least with respect to medical insurance benefits, any judicial nullification would create chaos and hardship. Accordingly, any deviation from its well accepted principles must be legislatively created. It certainly cannot be violated by a private non-judicial entity with no legal authority to do so.

California has supported the principles underlying the **collateral source rule** by developing a line of damages statutes to prop it up. For instance:

1. ***Civil Code § 3333*** provides that *"for the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."*

9

    **2.** ***Civil Code § 3281***, which states in part, *"every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault compensation therefore in money, which is called damages."*

    **3.** ***Civil Code § 3282*** defines the term **"detriment"** as *"a loss or harm suffered in person or property."*

    **4.** ***Civil Code § 1431.2 (b)(1)*** defines the term **"economic damages"** as *"objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities."*

    Additional support for the **collateral source rule** and its cooperative statutes can be found in the ***Restatement Second of Torts § 920A, comment b***, which states: *"It is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself."*

    Regardless, Claimant is entitled to the difference from what he was paid and what he should have received, as well as *replacement value and loss of use* of the destroyed items, as his policy had such coverage. Claimant is also entitled to damages for *pain and suffering, emotional distress* and *fair value for the loss of irreplaceable sentimental items* that no dollar value could possibly compensate for. These amounts must be aggregated to include damages caused by *both fires,* as each contributed to the total amount of *emotional distress* and *PTSD* he has and will continue to suffer for the remainder of his life.

    Additionally, Claimant is aware that the insurance companies, including ***AAA,*** have entered into a separate settlement agreement regarding their losses, including amounts paid out to individual insured. The terms of that agreement have no bearing or weight as it relates to compensating Claimant for the total damages he has occurred. Claimant's insurer has abandoned it's legal mandate to act as a *fiduciary, breached the covenant of good faith & fair dealing*, and has offered no *transparency*, instead opting to restrict Claimants access to critical claims information, an act of fraud, *(he made demands by phone, email & in-person)* essential in enabling Claimant to compare the initial claim he submitted *(which had a value of $330,000.00 and was supported by research)* to the inventory that accompanied the settlement.

Further, there is strong antidotal evidence to suggest that *AAA*, intentionally engaged in *unfair & deceptive business practices* while making no attempt to discharge its *fiduciary and legal duty* to Claimant. *AAA* also sent Claimant a "different" version of the loss inventory. This *"simplified version"* had a compensation total nearly *$6,000.00* more than the loss inventory that accompanied the claims settlement. *(See Exhibit B2)*

Any attempt to bypass or otherwise circumvent the deeply embedded principles surrounding the **collateral source rule** would rob Claimant of the benefit of a long history of paying premiums. Claimant has paid *$1,500.00* a year for *15 years*, approximately *$23,000.00*. Such a violation would surely create a spike to the already high level of Claimant's *PTSD* symptoms. Under the law, *AAA* is entitled to attempt to subrogate. A non-judicial body has no legal authority to ignore the well accepted principles that comprise the **collateral source rule**. Damages are further explained in the conclusion portion of this narrative.

## II(a). Fire Victim Trust Agreement

It appears that the Claims Administrator has developed what appears to be a fair and equitable procedure *("Available Insurance Recoveries")* whereby the intent and purpose of the **collateral source rule** remains intact.

***Available Insurance Recoveries***[5] shall include *(i)* any amount actually paid to the Fire Victim for damages/losses attributable to a Wildfire by an insurer under a policy of insurance, and *(ii)* any amount to be paid, payable, or otherwise owed to the Fire Victim for damages or losses attributable to a Wildfire by an insurer under a policy of insurance.

When determining these amounts, the Trustee shall consider, *(i)* the terms of any available policy of insurance and whether such policy or any other existing insurance policies can be reasonably interpreted to provide coverage, in full or in part, for the damages/losses that the Claimant seeks to recover from the Trust, *(ii)* the available policy limits of Claimant's policy that can reasonably be construed to provide insurance coverage for each category of damages that Claimant seeks to recover from the Trust, *(iii)* whether Claimant exercised reasonable efforts to obtain all recoveries available under his policy for damages/losses attributable to a Wildfire, and, in Claimants case, *(iv)* the amounts that could or should have been paid under his policy of insurance to Claimant for damages/losses attributable to a Fire had Claimant taken reasonable efforts to obtain an insurance recovery for such damages/losses.

---

[5] Synopsized here as a convenience for the Trustee and Claims Administrator.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 97 of 265

# **Claim Narrative**

A Fire Victim shall be deemed to have exercised reasonable efforts with respect to a category of damages/losses attributable to a Fire that is covered by a policy of insurance, if Claimant receives payments from an insurer pursuant to such policy that are equivalent to or greater than *(i)* the full amount of such damages/losses or *(ii)* the available policy limits for claims made for such damages/losses. Claimant exercised persistent and aggressive efforts contesting *AAA's* valuation of his claim and asserting that they were in *breach of the covenant of good faith and fair dealing*. Claimant was required to submit his claim via a computer program. Claimant has repeatedly demanded a copy of this claim submission for the purpose of comparing it to the inventory of items they paid for and their associated values. Claimant has been unsuccessful in obtaining specific details about the claim he submitted, let alone obtaining payment of the available policy limits. Claimant has exercised extraordinary efforts in asserting claims for damages/losses attributable to the fires. The Trustee should deem that Claimant has exercised reasonable efforts with respect to the recoveries available from his insurer for such damage/losses.

Claimant understands that the Trustee will be establishing procedures to assist Claimant *(and fire victims)* in recovering the full amount due Claimant under the applicable insurance policy. ***Claimant requests the Trustee for assistance (See Footnote #3).*** The purpose of this provision is to encourage all Fire Victims to fully pursue all rights and remedies available under their policies of insurance prior to asserting a claim against the Trust, and to ensure that insurance companies do not pass their coverage obligations on to the Trust.

**12**

## III.    **Personal Injury and Related Damages**

The suddenness of the wildfires, coupled with its power and unpredictability, created a chaotic and challenging response for the populace as a whole. Claimant's evacuation and personal property losses took place within the first 48 hours of the event but others in his community, and in all of the areas that were victimized by the fire, suffered daily for weeks and months later. Claimant did what he has always done, help family and friends in evacuation areas, which changed often, and volunteered wherever the need arose, which he did for the next three weeks. He traveled throughout the decimated counties of Northern California daily and through the weekends. This exposed him to massive levels of the toxic and deadly particulates in the atmosphere that were a direct result of PG&E's horrendously negligent behavior.

During the last week of this marathon effort aimed at helping and volunteering throughout Northern California, Claimant began experiencing pain and swelling in his lower right leg. He returned to work after the fires but the constant pain and discomfort made it difficult to discharge his managerial duties and he struggled *(physically & mentally),* resorting to using crutches to get through his shifts. Finally, the pain became unbearable and, on *December 1, 2017* he presented himself at the Emergency Room at Sutter Hospital in Santa Rosa. *(See Exhibit A5)* Claimant underwent numerous imaging and lab tests, as well as related procedures. The diagnosis was that Claimant had *subcutaneous edema* in his lower right leg, caused by *abnormal fluid retention in the tissues of the lower extremities*. Because of this diagnosis, Claimant underwent further testing as per a sepsis protocol *(Sepsis is a life-threatening condition that arises when the body's response to infection causes injury to its tissues and organs. This initial stage is followed by suppression of the immune system. Common signs and symptoms include fever, increased heart rate, increased breathing rate, and confusion.)* As part of this protocol, hospital staff conducted several extensive visual examinations of the exterior of his body in search of any wound or open area that would have provided an opportunity for *bacteria* to enter and facilitate the infection. ***There were none!***[6] Claimant was given intravenous antibiotics and sent home pending results of further lab work. *(See Exhibit A5)*

The hospital called Claimant on *December 4, 2017*, and demanded that he return to the Emergency Room immediately because of alarming lab results. Upon arrival, Claimant received an infectious disease consultation

---

[6] **It is important to note the significance of this**. This bacterium traditionally makes its way into the body and into the bloodstream through a break or open wound in the skin. In Claimant's case, his physicians opined that toxic particulates from the fires entered through his respiratory system.

13

and assessment. Claimant had contracted several serious infections as follows:

    **1.** _**MSSA Bacteremia**_ - *MSSA, or methicillin - susceptible Staphylococcus aurous, is an infection caused by a type of bacteria commonly found on the skin. It is also called a staph infection.* _**Bacteremia**_ - *is the presence of <u>bacteria</u> in the bloodstream that are alive and capable of reproducing. It is a type of bloodstream infection;*

    **2.** _**Right Knee Infection with Abscess**_ - *An abscess is an infection characterized by a collection of pus underneath a portion of the skin. Bacteria commonly causing abscesses are Staphylococcus aureus and Streptococcus. This bacterium normally enters the skin through any cracks or injury to the skin;*

    **3.** _**Necrotizing Fasciitis**_ - *Necrotizing fasciitis, often referred to as "flesh eating bacteria", is a severe bacterial infection that destroys muscles, skin, and underlying tissue. It can be deadly if not treated quickly. The word "necrotizing" refers to something that causes body tissue to die. Necrotizing soft tissue infection develops when the bacteria enters the body. The bacteria begin to grow and release harmful substances (toxins) that kill tissue and affect blood flow to the area. As the tissue dies, the bacteria enter the blood and rapidly spread throughout the body."*

Claimant's condition was life threatening and required immediate surgical intervention to remove abscessed, dead and infected muscle and tissue. This is known as *"Surgical Debridement." Debridement* is defined as *"the removal of sequestrate and resection of infected bone and soft tissue to improve the healing potential of the remaining healthy tissue."* Adequate *surgical debridement* is the prerequisite for the successful treatment of skin, soft tissue, and bone infections. When *Necrotizing Fasciitis* is present such *fascia* must be excised with a scalpel until bleeding from small vessels appears. This is vital in life-threatening *necrotizing fasciitis,* where the only chance of survival is to remove the *necrotic fascia* completely. This often involves extensive incisions and the removal of virtually all *fascia* of the involved extremity. Had it not been for the rapid response of the staff at Sutter Hospital, Claimant would have died.

Accordingly, Claimant underwent *debridement* of his right leg and a 3 compartment *synovectomy*. A *synovectomy* is a surgical procedure used to treat <u>*synovitis*</u> *(inflammation)* and some other conditions that affect the *synovium, a thin membrane that lines the inside of "synovial joints",* which in Claimant's case was his knee. The immediate cause of the swelling and pain is usually inflammation and excessive growth of the *synovium.* In a

14

# Claim Narrative

*synovectomy* procedure, much of the *synovium* is removed, as in Claimant's case.

During the procedure, inflamed *synovium* was *resected (surgical removal of part of an organ or other body part.),* a drain was sewn in place to the skin to avoid inadvertent dislodgement and an 8 cm incision was made midway between the knee and ankle causing large amounts of purulent fluid to flow from the wound, which was copiously irrigated with sterile saline solution. Claimant was placed in the ICU for 1 day and remained in the hospital until he was discharged on *December 7, 2020*. This period in the hospital, without which Claimant surely would have died, was assessed *$80,000.00. (See Exhibit A6)*

Claimant then underwent 6 weeks of painful outpatient care that was comprised of daily injections of antibiotics and pain medication, as well as daily cleansing and monitoring of the wound. This level of care management is required when treating a ***"flesh eating bacteria"*** and was assessed *$30,200.00 (See Exhibit A7)* When this care was completed, Claimant could not return to work immediately as the wound needed time to heal and he needed to attend, for a period of time ***(at that point not yet determined)*** physical therapy to regain the strength in his smashed and deformed leg. He began physical therapy on *January 2, 2018* and it lasted until *April 4, 2018,* at a cost of *$7,200.00 (See Exhibit A8)* His therapists concluded that further therapy was of no benefit to Claimant and the hope was that over time increasing use would aid in returning his leg to the strength that existed prior to contracting the deadly infection. As of this writing, Claimant's leg has not improved and he has resorted to using a cane daily in order to navigate the day. *(See Exhibit A9)*

Claimant suffers daily from *physical pain, anxiety, panic, mental anguish, emotional distress, depression, feelings of negative self worth, and unrelenting memories and images surrounding the fire events. (This list is not intended to be all-inclusive).* In the aggregate, these daily symptoms comprise the basis for his physician's opinion that Claimant has developed *chronic PTSD* and will necessitate long term therapy, counseling and possible prescription drug care, which may cost tens of thousands of dollars each year. *(See Exhibit A - A4) Chronic PTSD* leads to significant disabilities with severe impairment in social and occupational function. To date, Claimant has been unable to engage himself in any type of talk therapy or counseling because when he lost his job, he lost critical health insurance. This must be addressed and resolved with a sense of urgency. With the development of these deadly lightning strikes and the ensuing wildfires, Claimant is being unremittingly bombarded with *PTSD* triggers and related *anxiety and panic disorders*. Claimant is consumed with *severe depression*

15

and withdrawal, and is living everyday with *"fight or flight"* syndrome which is driven by the *neuro-chemical hormone adrenaline* and results in a range of psycho-physiological responses. Further, the lack of supportive resources, the current *Covid-19* pandemic, racial unrest and lack of employment have added multiple layers of uncertainty and severe anxiety to an already weighted bag of *PTSD* symptoms.

### III(a).    **Measure of Damages**

It has already been determined that PG&E is liable for all injuries the fires caused, both economic and non-economic damages. The only thing that remains is damages determination. Lawsuits seeking compensation for *PTSD* consider certain factors such as the severity and extent of the injuries that caused the *PTSD*, in Claimant's case they include, but are not limited to, *flesh eating bacteria injury and its long-term effects, the loss of irreplaceable personal property, loss of use of his lost property, loss of community, detachment from family/friends, severe emotional distress, depression, loss of career, loss of wages, loss of future earning capacity, loss of future income* and the associated degree of *pain and suffering.* Damages must be for past and future.

In *2019*, a Los Angeles jury awarded more than *$11 million* to two former employees who claimed they were sexually harassed and retaliated against for complaining about the harassment, as well as, suffering from panic and post-traumatic stress disorder that resulted from the harassment. The jury awarded *$1 million* for past emotional distress damages, *$1.5 million* for future emotional distress damages, and *$3 million* in punitive damages to each woman. Added to that amount was a substantial amount of prevailing-party attorney's fees. In that case, there were no physical injuries and damages were awarded for the panic disorder and *PTSD* that was a direct result of the harassment the parties suffered. Similar cases abound in California. Any claims adjudication should require the person determining damages to sit in the jury box and make decisions along those lines.

Claimant has provided a *PTSD* diagnosis from his physician *(See Exhibit A)*, a statement from his therapist agreeing with Claimant's physician *(See Exhibit A10)* and an initial treatment plan *(See Exhibit A11)*, as well as statements *(signed under penalty of perjury)* from himself, his sister, a close personal friend, and a co-worker, in support of the fact that Claimant has and continues to suffer from *PTSD* since the fires in *2017 and 2019. (See Exhibits A - A4 & A10)* This has been exasperated by a number of triggers such as the recent Lightning Complex fires, the Covid-19 pandemic, racial unrest, an injury that has handicapped him forever and

prevents him from working in his chosen career, and the agony created by the detachment from his family and loss of his community.

The measure of damages for medical expenses is all reasonable expenses necessarily incurred for doctors' and medical bills which the Claimant has paid or became obligated to pay and the amount of the reasonable expenses of medical care, treatment and services reasonably certain, to be required in the future. The reasonableness of, and the necessity for, such expenses are matters to be determined from the evidence. Claimant has provided the physician notes, from Sutter Hospital, detailing the progression and diagnosis of the disease, as well as related treatment. *(See Exhibit A5)*. Further, Claimant has provided the costs of the hospitalization, *(See Exhibit A6)*, the costs of outpatient care *(See Exhibit A7)* and the costs of the limited physical therapy he received *(See Exhibit A8)*, as well as graphic photographs of the wound *(See Exhibit A9)*. Damages are further explained in the conclusion portion of this narrative.

**17**

## IV.   Loss of Past & Future Wages, Future Earning Capacity & Related Damages

The cause of this deadly *flesh eating disease* is the direct result of PG&E's grossly negligent and reckless behavior in causing a firestorm that unleashed deadly levels of toxic and poisonous particulates into the atmosphere, blanketing Sonoma County. Claimant is entitled to *lost wages* for the time he couldn't work and was either hospitalized or receiving outpatient care. As well as the loss of the accrued sick leave and vacation he was forced to consume. Claimant was hospitalized on *December 1, 2017*, and physical therapy ended on *April 4, 2017*.

He returned to work but was overcome with *pain, anxiety, discomfort* and *depression.* His employer could not accommodate him with comparable employment. Claimant was earning *$1,200.00* per week; accordingly applying that period of time to the afore-mentioned amount is *$9,600.00 (See Exhibit C).* He also had a handsome benefits package which included health insurance, personal sick leave and vacation. Prior to being hospitalized, Claimant had 38 hours of personal sick leave and 70 hours of vacation, hence those damages would be *$2,400.00.* Damages must also include the value of those benefits at the time he couldn't work anymore.

The inquiry then turns on what would fairly compensate Claimant for *loss of future wages* and *lost of future earning capacity* caused by PG&E's tortuous conduct. It is reasonable to presume that, since the injury has restricted Claimant's mobility, he will need some job retraining. Any victim suing for damages for permanent injuries is permitted to base his recovery *"on his prospective earnings for the balance of his life expectancy at the time of his injury as a direct result of that injury." (Fein vs. Permanente Medical Group (1985) 38 Cal 3d. 137, 153)* In addition, *"Damages may be awarded for lost earning capacity without any proof of actual loss of earnings." (Heiner vs. Kmart Corporation (2000) 84 Cal.App.4th 335, 348, fn. 6)*

Claimant is aware that determining these damages can be argumentative and speculative so, with that said, is willing to suggest an offer to compromise that would save PG&E a considerable amount of money and provide a much needed opportunity for Claimant to re-insert himself back into the work place with a sense of confidence and purpose. Claimant's compromise, in this respect is for PG&E to provide Claimant with financial assistance in an amount adequate enough to provide vocational counseling and a job re-training program designed to identify his current skill set and level of education with the purpose of securing employment intended to earn wages equivalent to those in the past and adequate enough to maintain the lifestyle he has experienced for the past two decades. Claimant has

18

researched this issue and their relative costs, concluding that a vocational counseling and job program with the above-stated criteria would be approximately *$50,000.00*. *(**Paid separately from the rest of the settlement**)* This compromise doesn't include any damages award for emotional distress and pain and suffering as it relates to what the injury has done to him emotionally and mentally. Damages are further explained in the conclusion portion of this narrative.

**19**

## V.  Conclusion and Prayer for Damages

Sadly, PG&E has a well documented history of causing fires and explosions as a direct result of their consistently tortuous and grossly negligent behavior *(for failing to maintain it's equipment and infrastructure)* These firestorms caused Claimant and thousands of other long term residents of Northern California irreparable harm and damages.

The fires in *2017* caused Claimant to suffer a life threatening bacterial infection that has forever altered his ability to remain employed in his chosen career and diminished his physical capabilities for the rest of his life. *(See Exhibits A-A11)* The *2017* fire also caused him *anxiety & panic disorders. severe emotional distress, pain, suffering and PTSD*. Also, Claimant lost everything he ever owned that he worked his whole life for *(personal property),* including irreplaceable items of great sentimental and personal value, to include the urn that held the ashes of his beloved grandmother. *(See Exhibit B - B3)* Further, these injuries resulted in *lost wages, lost future wages* and *future earning capacity. (See Exhibit C)*

The fire in *2019* caused Claimant to panic and flee his community forever, exasperating his mental state, resulting in *chronic PTSD* and *severe and pervasive depression.* Losing the benefit of his family and community has forever altered Claimant from being a confident, patient and positive individual into a pessimistic, paranoid, and negative shell of his former self.

Claimant has provided *"best documentary evidence"* in his possession to support his claim and will cooperate with reasonable requests from the Trustee in an effort to resolve this claim.

### *Damages by Category*

1.  ***Physical Injury:***

    A.  **Hospital Bill** - $80,000.00 *(See Exhibit A5)*
    B.  **Outpatient Care -** $30,200.00 *(See Exhibit A6)*
    C.  **Physical Therapy -** $7,500.00 *(See Exhibit A7)*
    D.  **Future Physical Treatment –** to be determined
    E.  **Future Mental Health Treatment -** to be determined
    F.  **Misc. Out–of-Pocket Expenses -** $1,200.00
    G.  **Future Diminished Use of Leg -** to be determined *(See Exhibit A8)*
    H.  **Past & Future Mental Anguish -** to be determined
    I.  **Past & Future Pain & Suffering -** to be determined

20

# Claim Narrative

2. ***Damage to Personal Property:***

    A.    **Actual Damage** - $330,000.00 *(Claimant has received only $147,000.00 for his losses)* **(See Exhibit B, B1 & B2)**

    B.    **Replacement Value** – to be determined

    C.    **Loss of Use** - to be determined

    D.    **Loss of Premiums** - $24,000.00

    E.    **Loss of Irreplaceable Sentimental Items** - to be determined

    F.    **Past & Future Mental Anguish** - to be determined

    G.    **Past & & Future Pain & Suffering** - to be determined

3. ***Loss of Wages & Related Damages:***

    A.    **Loss of Wages** - $9,600.00 **(See Exhibit C)**

    B.    **Loss of Accrued Time** - $2,400.00

    C.    **Loss of Future Wages & Earning Capacity** – to be determined *(See Claimant's Offer of Compromise above)*

    D.    **Loss of Career** - to be determined

    E.    **Loss of Future Benefits** - to be determined

    F.    **Past & Future Mental Anguish** - to be determined

    G.    **Past & & Future Pain & Suffering** - to be determined

4. ***Emotional Distress & Chronic PTSD:***

    A.    **Loss of Community** – to be determined

    B.    **Detachment With Family/Friends** - to be determined

    C.    **Past & Future Depression** - to be determined

    D.    **Past & Future Anxiety** - to be determined

    E.    **Past & Future Panic Disorders** - to be determined

    F.    **Amount for Chronic *PTSD*** - to be determined

5. ***Punitive and Exemplary Damages*** – to be determined.

PG&E's strategy of avoiding a jury by turning litigants into bankruptcy creditors, by its very nature, prevents all Claimants from receiving true and fair compensation. Claimant reminds the Trustee of the *2019* Los Angeles case referenced above. In that case, there were no physical injuries and damages were awarded for panic disorder and *PTSD* that was a direct result of the harassment the parties suffered through, for a limited time. Each of the two Plaintiffs in that case received *$1,000,000.00,* for past emotional distress, *$1.5 million* for future emotional distress and *$3 million* in punitive damages. There was no physical injury in that case.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 107 of 265

# Claim Narrative

In the *"Frequently Asked Questions"* section of PG&E's *Fire Victim Claim Plan Treatment Summary, Question #31,* states, "I received insurance for my claim. Does that affect the amount of my claim? Answer: Yes. You cannot receive money from the Fire Victim Trust for the same exact losses that were paid from insurance. In other words, you cannot receive a "double recovery." Your recovery may be reduced by the amount of your insurance."

As previously asserted and reinforced here, a non judicial body such as a private law firm tasked with claims administration has no authority to disregard the well settled and established laws of the State of California. The events that gave rise to the accumulation of injuries that Claimant has suffered occurred in California, Claimant resides in California and relevant witnesses with specific knowledge of Claimants injuries reside in California. Accordingly, the laws of the State of California will govern this Claims process. Attempts to ignore the **collateral source rule**, without a procedure intended to produce the same results that the rule would, will only serve to unjustly enrich Claimant's insurance company, who has already failed to properly adjudicate Claimant's claim, paying only ½ of the value of the irreplaceable items lost and none of the *replacement values.* As stated *supra,* the **collateral source rule** *"is intended to ensure that the right of an injured party to be fully compensated for all his or her damages is protected, even if, in some instances, it entails that party obtaining double recovery from both the insurer and the wrongdoer."* (***Miller, supra, 103 Cal.App.4th at 379, emphasis added***)

**Dated:** October 6, 2020

**Respectfully Submitted,**

*Enrique Galvez*
_____
**Claimant Enrique Galvez**

22



Results of Claimant's review of the Claim File in this matter.

The file contains 2776 individual pages. The intended purpose was to identify redactions of both protected and privileged information. Below are some observations that require the Trustee to determine the appropriateness of redactions intended to protect privileged information. Without a privilege log, one that provides information adequate in nature to assist a judge in conducting an in-camera review, it is impossible to determine whether these wholesale redactions and missing pages are appropriate.

Below is a simple index of the redactions and missing pages that seem questionable to Claimant:

|  | **Location in Production:** | **Description:** | **Status:** |
|---|---|---|---|
| 1. | Page 1 | "Subrogation Status" | Redacted |
| 2. | Page 2 (Pg. 2 of document) | "Latest Notes" | Redacted |
| 3. | Page 3 (Pg. 39 of document) | "Latest Notes" | 37 pages withheld |
| 4. | Page 4 (Pg. 40 of document) | "General Status Section", "Subrogation Status" | Redacted |
| 5. | Page 5 (Pg. 41 of document) | "SIU Status, SIU Score & Referred to SIU Team"; "Flag Details", "Potential Policy Limits Issues", "Flagged Status" | Redacted |
| 6. | Page 6 (Pg. 43 of document) | "Is there subrogation potential for this loss" | Redacted |
| 7. | Pages 11 & 12 (Pg. 49 & 50) | MISSING | ----------------- |
| 8. | Page 18 (Pg. 56 of document) | Claimant's bank data should be redacted | ----------------- |
| 9. | Page 49 (Pg. 81 of document) | "Latest Notes" | Redacted |
| 10. | Page 50 (Pg. 124 of document) | End of "Latest Notes" | 37 pages withheld |
| 11. | Page 67 (Pg 141. of document) | "Status" | Redacted |
| 12. | Pages 68 & 69 (142 & 143 of document) | "Subrogation Recoveries Notes" | Redacted |
|  |  |  |  |
|  |  |  |  |

These blanket redactions and withholding of pages, without producing a privilege log to support these actions, continues to demonstrate CSAA's breach of its fiduciary duty and its breach of the covenant of good faith & fair dealing. Since the Covered Fire Victim Claim shall be reduced on a dollar-for-dollar basis by all insurance recoveries available to the Fire Victim on account of such damages or losses, it is imperative that CSAA be transparent with its subrogation files so that Claimant and PG&E can insure that that this insurer did not profiteer or otherwise enrich itself to the detriment of its

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 110 of 265

insured's who has already been mistreated and under compensated. Further, this proceeding has ignored the collateral source rule and instead, reduces Claimants recovery on a dollar-for-dollar basis by all insurance recoveries. The tortfeasor "should *not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide [herself] with insurance.*" (***Helfend, supra, 2 Cal.3d at p. 10, emphasis added***) The **collateral source rule** *"is intended to ensure that the right of an injured party to be fully compensated for all his or her damages is protected, even if, in some instances, it entails that party obtaining double recovery from both the insurer and the wrongdoer."* (***Miller, supra, 103 Cal.App.4th at p. 379, emphasis added***) Claimant has a right to insure that his insurer recovers only what it has paid Claimant which is an amount well below the policy limits and none of the *$181,000.00* coverage amount he had in his policy for loss of use.

As Claimant previously asserted in his narrative, Claimant submitted a timely and procedurally sound claim with his insurance company through their internal computer program. His submission of was carefully developed based on research and extensive interviews with family and friends with possible knowledge of certain items. This claim sought *$330,000.00,* and was supported by research Claimant had undertaken. Claimant worked daily with the adjuster, who repeatedly confirmed and agreed with the values that Claimant submitted, only to later accuse Claimant of inflating values. CSAA paid Claimant only *$147,000.00* well short of the actual value of his destroyed personal property and well below the policy limits of *$350,000.00*. Also, he did not get paid replacement value despite having that coverage in his policy and the depreciation value of *$36,000.00*. Further, Claimant hasn't received compensation for the *loss of use* of his lost personal property, again, despite having *$181,000.00* of coverage in his policy.

Claimant has expended great efforts attempting to recover all amounts due him under his policy of insurance. A Fire Victim shall be deemed to have exercised reasonable efforts with respect to a category of damages or losses arising from or attributable to a Fire that is covered by a policy of insurance if such Fire Victim receives payments from an insurer pursuant to such policy that are equivalent to or greater than (i) the full amount of such damages or losses or (ii) the available policy limits for claims made for such damages or losses. If a Fire Victim is unsuccessful in obtaining payment of the available policy limits from an insurer after exercising reasonable efforts in making claims for damages or losses arising from or attributable to a Fire, the Trustee may, in his or her sole and absolute discretion, accept an assignment of his or her rights against the insurance company (**"Claimant Insurance Rights"**) to the Trustee, in which event the Fire Victim shall be deemed to have exercised reasonable efforts with respect to the recoveries available from such insurer for such damages or losses.

A Fire Victim shall be deemed to have exercised reasonable efforts with respect to a category of damages/losses attributable to a Fire that is covered by a policy of insurance, if Claimant receives payments from an insurer pursuant to such policy that are equivalent to or greater than *(i)* the full amount of such damages/losses or *(ii)* the available policy limits for claims made for such damages/losses. Claimant exercised persistent and aggressive efforts contesting CSAA's valuation of his claim and asserting

2

that they were in *breach of the covenant of good faith and fair dealing*. Claimant has been unsuccessful in obtaining specific details about the claim he submitted, let alone obtaining payment of the available policy limits. Claimant has exercised extraordinary efforts in asserting claims for damages/losses attributable to the fires. The Trustee should deem that Claimant has exercised reasonable efforts with respect to the recoveries available from his insurer for such damage/losses.

Pursuant to the Fire Victim Trust Agreement, 2.6 Credits for Amounts Covered by Insurance, (d), Claimant requests the Trustee to provide assistance to recover the full amount due under the applicable insurance policy.

3





**COMMUNITY PSYCHIATRY**

June 30, 2021

RE: Enrique Galvez
DOB: 11/27/1969

To Whom it May Concern:

I am Enrique Galvez's treating psychiatrist; he was initially evaluated on 06/08/2021. I am writing this letter, at the request of Mr. Galvez, to confirm that he has been diagnosed with a mental health disorder as recognized by the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) for which he is currently undergoing treatment. His current working diagnosis is: Anxiety (F41.9) and PTSD (F43.10).

Her current medication regimen includes:
- Fluoxetine 10mg
- Doxepin 10mg

Sincerely,

Dr. Jacob Moulds, DO



COMMUNITYPSYCHIATRY.COM



# NARRATIVE RE: DELAY DAMAGES

## July 20, 2021

To Whom it May Concern:

Claimant submits this formal inquiry into the status of his case, which has been submitted and compliant since October 6, 2020 to include a completed claims questionnaire. It seems that the claims evaluators have not even began work on this case. Claimant requested, at page 12 of his narrative, that the trustee provide assistance with his insurance provider, yet we have heard nothing from the claims administrator.

These unwarranted and unexplained delays have only served to exasperate Claimants level of PTSD. With the silence from PGE, the uncertainty of any fair settlement and anxiety over the future hsve constructed a whole layer of PTSD covering the PTSD concerning the fires and the fallout and loss from same.

With little resources, Claimant has endeavored to mitigate any damage surrounding both the physical and mental injuries related to the wildfires, while the totrfeasor, the party with resources takes no action to insulate Claimant from unnecessary damage.





# DEFICIENCY NOTICE

## DATE OF NOTICE: 9/10/21

### I. FIRE VICTIM INFORMATION

| Claimant Name: | Enrique Galvez | | |
|---|---|---|---|
| Law Firm: | Pro Se | | |
| Claimant ID: | 1021557 | Claims Questionnaire ID: | 10012510 |
| Damage Category: | Real and Personal Property | Claim ID: | 50006 |

### II. EXPLANATION OF MISSING INFORMATION OR DOCUMENTATION

This Notice is an official communication from the Claims Processor for the Fire Victim Trust. Your submitted claim is missing documents or information that prohibits us from concluding our review to make a final determination.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Deficiency Notice button on your secure online Portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this Notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| 1. | You did not submit sufficient documentation to demonstrate any Insurance claims or payment related to the claimed property. | Provide documentation demonstrating any insurance policies you had related to the claimed property. |

### III. HOW TO RESPOND TO THIS NOTICE

**We encourage you to gather the requested information or documents now and respond to this Notice promptly. The sooner you respond, the sooner your submitted claim can move forward in the review process.**

Send us the missing information or documents identified in Sections II or III. We will re-review your submitted claim when documents are received. If you do not respond, we will have to assess your submitted claim based on the materials we have, which could lead to a lower determination or denial of your claim in its entirety.

Submit the requested missing or incomplete information by using your secure online portal to upload additional documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-888-664-1152 or email info@firevictimtrust.com.







# DEFICIENCY NOTICE

## I. FIRE VICTIM INFORMATION

| Claimant Name: | Enrique Galvez | | |
|---|---|---|---|
| Law Firm: | Pro Se | | |
| Claimant ID: | 1021557 | Claims Questionnaire ID: | 10012510 |
| Damage Category: | Real and Personal Property | Claim ID: | 50007 |

## II. EXPLANATION OF MISSING INFORMATION OR DOCUMENTATION

This Notice is an official communication from the Claims Processor for the Fire Victim Trust. Your submitted claim is missing documents or information that prohibits us from concluding our review to make a final determination.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Deficiency Notice button on your secure online Portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this Notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| 1. | You did not submit sufficient Supporting Documentation to verify the level of damage that you experienced due to an Included Fire. | To be eligible to receive compensation from the Trust for a Real or Personal Property Claim you must submit documentation showing the level of damage that was sustained as the result of an Included Fire (e.g. photos, insurance documents, Post-Fire appraisals, etc.). |
| 2. | You did not submit sufficient Supporting Documents to establish the value of your damaged property and the costs of repairs to or replacement. | The Trust does not have a value for the Personal Property damaged by the Fire. If you have a value, you may submit it to expedite your claim. Supporting Documents sufficient to establish the Value can include a list of items destroyed or damaged with valuations, proofs of purchase, pre-Fire and post-Fire photos or videos, appraisals, and Other Supporting Documents in your possession showing the Pre-Fire condition or value of the property. If you do not have a value, the Trust may be able to provide an estimate for your claim. |





# DEFICIENCY NOTICE

## III. HOW TO RESPOND TO THIS NOTICE

**We encourage you to gather the requested information or documents now and respond to this Notice promptly. The sooner you respond, the sooner your submitted claim can move forward in the review process.**

Send us the missing information or documents identified in Sections II or III. We will re-review your submitted claim when documents are received. If you do not respond, we will have to assess your submitted claim based on the materials we have, which could lead to a lower determination or denial of your claim in its entirety.

Submit the requested missing or incomplete information by using your secure online portal to upload additional documents.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-888-664-1152 or email info@firevictimtrust.com.



Claim ID: 50007
CQ ID: 10012510





## Real Property and Personal Property Eligibility Criteria

Real Property Claims are Claims for damage to structures on residential or commercial real property, landscaping, forestry, and other real property improvements (*e.g.*, hardscape, fencing, retaining walls, pools, and solar panels) that was caused by or arising from an Included Fire.

Personal Property claims are for damages to personal property as a result of the Fire. Personal Property is movable property; belongings exclusive of land and buildings, such as household items (for example: clothes, furniture or tools) and mobiles.

Real and Personal Property Claims also include damages for Additional Living Expenses or Loss of Use. Additional Living Expenses (ALE) include, but are not limited to, the following: (1) housing (hotels, apartments, homes, travel trailers, mobile homes, or other temporary housing, moving fees, security deposits); (2) utilities (increased utility costs for electricity, gas, water, sewage, and mobile phones); (3) household costs (laundry, dry cleaning, and housekeeping); (4) furniture rental; (5) food (restaurant meals and groceries); (6) emergency clothing and toiletries; (7) storage for personal property being transferred to another location; (8) boarding of pets and non-commercial livestock; and (9) use of alternative transportation, such as public transportation and ride-share services; and (10) additional mileage to and from work or school. Loss of Use (LOU) is the actual loss of use of the property that was damaged by the fire and is calculated by determining the fair market rental value of the property immediately before the fire and multiplying that amount by the number of months the Claimant was dislocated.

## I. **Real Property**.

### A. **Overview**.

The Trust will evaluate Real Property claims for damages to Structures on Residential or Commercial Real Property, damages to Forestry and Landscaping, and damage to other Real Property improvements (for example: fencing, retaining walls, pools, solar panels, hot tubs, and decks). Residential Property is defined as Real Property consisting of a dwelling that contains no more than four residential units, as well as individually owned units in a residential stock cooperative, condominium, or planned unit development and the Claimant occupies the dwelling or one of its units as their residence. This includes single family homes, multi-family homes, manufactured homes, mobile homes, apartments and condominiums. Commercial Property is all Real Property, except for residential property or vacant land. This includes agricultural property, apartment or condo buildings, commercial office buildings, education and school facilities, healthcare and medical facilities, hospitality and lodging, industrial property, mobile home parks, parking structures and facilities, public and community facilities, retail property, and transportation and airplane related properties.

A Real Property Claim can be for either Diminution in Value (DIV) or Cost of Rebuild/Repair (CoR).

1

10/5/21



1. **Diminution in Value (DIV).** Diminution in Value is the difference between the Fair Market Value of the Real Property immediately before the Fire and the Fair Market Value of the Real Property immediately after the fire.

2. **Cost of Rebuild or Repair (CoR).** Cost of Rebuild or Repair is the actual cost to rebuild or repair the property that was damaged by the Fire. The Cost of Rebuild or Repair can be based on an estimate that is received from insurance or StoneTurn if the Claimant does not provide adequate documentation to show the actual Cost of Rebuild or Repair. Any payment for CoR will be offset by insurance payments the Claimant has previously received.

**B. Eligibility to Submit Claim.**

Each Claimant asserting a Real Property Claim must meet the following requirements. Claimants who do not meet these requirements are not eligible for compensation for a Real Property Claim.

1. **Owner or Lessee of Damaged Property.** To be eligible to receive compensation from the Trust for a Real Property Claim, a Claimant must have:

   (a) Owned the property when it was damaged by the Included Fire; or

   (b) Leased the property, in which case the lease—

      (1) Gave the Claimant the right to possess the property at the time it was damaged by the Included Fire; and

      (2) Was executed before the Included Fire occurred; or

   (c) Received an Assignment of Rights from the Owner or Lessee at the time of the Included Fire. A claim that was sold or assigned before June 20, 2020 will be recognized and processed as if the assignee was the original holder of the claim. Otherwise, subject to certain limited exceptions, the Order Confirming the Plan of Reorganization and the Trust Agreement prohibit the sale or assignment of a Fire Victim Claim from and after June 20, 2020.

   (d) Inherited the Rights from the Owner or Lessee at the time of the Included Fire.

2. **Proof of Authority.**

   (a) **Identity.** The Claimant must submit Supporting Documents sufficient to verify their identity. The Trust will verify the accuracy of this information before beginning review of the Real Property Claim.

   (b) **Ownership/Right to Possess.** The Claimant also must submit sufficient Supporting Documents reflecting that each Claimant identified in the Claims

2

10/5/21



Questionnaire who is asserting a Real Property Claim owned or leased the property.

(1) **Owner.** If the Claimant is the owner of the damaged property, they must submit one or more of the following to prove their ownership:

   a. Deed;

   b. Land grant;

   c. Mortgage Documentation;

   d. Loan Documentation;

   e. Title Search showing ownership; or

   f. Other Documentation showing ownership at the time of the Fire.

   If more than one Real Property claim has been made for a single location, the Claimant may be required to submit additional ownership documentation to ensure that the Trust does not overpay for the loss location.

(2) **Right to Possess.** If the Claimant has or had a lease, executed before the Fire occurred, granting them possession of the property, and the Fire damaged the property during the Claimant's period of possession, the Claimant must submit one or more of the following:

   a. Lease or Rental Agreement showing date of occupancy;

   b. Cancelled checks for rent;

   c. Utility Bill for the Property dated contemporaneously with the Fire; or

   d. Other documentation showing occupancy contemporaneously with the Fire.

(c) **Causation.** The Claimant asserting the Real Property Claim must provide the Trust with evidence proving that an Included Fire was the direct cause of the property damage for which the Claimant is seeking compensation.

C. <u>**Compensation for Damage to Real Property.**</u>

Real Property Claims that satisfy the eligibility criteria listed above will receive the lesser of DIV of the property lost to the Fire; or if the homeowner elects to repair, rebuild or replace the house via purchase of another house at another location, the homeowner is

3

10/5/21



entitled to the reasonable cost of rebuilding the home at its original location with materials of like kind and quality.

If a home is only partially damaged or suffers smoke damage, the measure of the loss is the reasonable cost of repairs and/or cleaning and elimination of smoke damage.

1. **Diminution in Value (DIV).** If the Claimant does not desire to repair, rebuild or replace their property, DIV will be used to calculate compensation. To calculate DIV, the Trust will determine the fair market value of the property immediately before the Fire by analyzing sales of comparable homes before the Fire. Alternatively, if the Claimant submits an appraisal of the home by a certified real estate appraiser at the time of the Fire, the Trust will consider accepting it as long as it is reasonable.

   Once the Trust determines the fair market value of the home before the Fire, the Trust will subtract from it the value of the lot the house was located on after the Fire. The value of the lot is to be determined by either its:

   (a) Sales price, less costs of sale, if the lot was sold; or

   (b) Assessed value as determined after the Fire.

   Most persons who lose their homes in fires ask the county to reassess their property to reflect the value of the lot only after a fire to lower their property taxes. Sometimes assessors will make the reduction/reassessment without request.

   Once the Trust determines the DIV of the Claimant's residence, the Trust will subtract from it any amounts paid to the Claimant for the residence/dwelling/house, other/appurtenant structures, code upgrades, extended replacement costs, and landscaping. However, any amounts paid for debris removal will not be deducted, as these amounts are being paid to clear the property and not as payment for the damage or destruction of the property.

2. **Cost of Repair or Rebuild (CoR).** A Claimant is entitled to the reasonable cost of rebuilding their home using materials of like kind and quality, either on the Claimant's lot at the time of the Included Fire or on another lot. If the Claimant elects to rebuild on another lot, then the Claimant is only entitled to the cost of replacing their home on the original lot. Many Claimants engaged in rebuilding their homes will have plans and construction contracts which will be used to determine the cost of rebuilding.

   Reconstruction costs include the cost of reconstruction, architects' fees, permit fees, and all necessary components of reconstruction. If the total reconstruction cost is higher than the before mentioned percentages, then additional review of the reconstruction cost contract/estimate will be required before acceptance.

4

10/5/21



If the Claimant does not have an estimate of the cost to rebuild their prior home or is not in contract to rebuild their prior home, then a reasonable cost to rebuild will be computed for the Claimant.

Once the cost to rebuild has been established, monies paid or to be paid by the insurer for rebuilding the home, other structures, code upgrades, extended replacement cost, and landscaping will be deducted to determine the value of the Claim. However, any sums paid for debris removal will not be deducted.

The Trust will determine the reasonable and necessary costs to rebuild or repair the damaged property based on the following factors:

(a) Claimant's use of the structure(s) and other improvement(s) on the property;

(b) Severity of damage to the structure(s) (*e.g.*, burn damage vs. smoke and soot damage);

(c) Extent of damage to the structure(s) and other improvement(s) (*e.g.*, damage to the entire structure vs. damage to part of the structure);

(d) Square footage of structure(s);

(e) Geographic location of the property;

(f) Size of the vegetation on the property immediately before the Included Fire;

(g) Severity and extent of damage to vegetation;

(h) Type(s) of vegetation damaged; and

(i) Fair market value of the property immediately before the Included Fire.

## D. Compensation for Additional Living Expenses and Loss of Use

Additional Living Expenses ("ALE"), sometimes referred to as loss of use, are funds owed and paid by the insurer over time to compensate the insured while living in temporary quarters while rebuilding or replacing their home. These payments are usually computed by determining the cost of residing in temporary quarters and other attendant costs such as additional commute costs, the cost of eating out more often, etc. Some policies offer the insured the option of receiving the reasonable rental cost of their former home as their additional living expense payments.

Many Claimants will make both a Claim for ALE and a Claim for Loss of Use ("LOU"), which is computed differently than Claims for additional living expenses/loss of use in an

5

10/5/21


insurance policy. LOU is the reasonable cost of loss of use of the former home and is usually computed as the reasonable rental value of the former home in its furnished condition. A Claimant is not entitled to receive payment for both ALE and LOU for the same loss. The Claims Administrator will determine the value of either ALE or LOU depending on the documentation provided and will deduct any amounts paid by the insurer or which will be paid by the insurer in the future for additional living expenses/loss of use from the Claimant's Claim.

ALE and LOU Claims end when a Claimant moves into their rebuilt or replacement home. Otherwise, ALE can be awarded for up to 4 years (48 months) from the date of the Included Fire.

**E. Compensation for Landscaping & Forestry.**

Landscaping improvements made to real property before the Fire and that are damaged or destroyed can be claimed by providing a description of the type and quantity of landscaping improvements that were damaged. "Landscaping" means any changes made to the property with the intent to improve its visual appearance (*e.g.*, shrubs, flower beds, mulched areas, artificial ponds, etc.).

A Claimant may also seek damages for forestry that is not actively landscaped, such as trees, bushes and other naturally growing vegetation, if it is located on the real property. Landscaping and forestry damages will be calculated in the same manner as traditional Real Property and will be measured either by Diminution in Value or Cost of Repair.

The Trust may compensate claimants for the cost of cleanup of damaged forestry, but only for the cost of the first initial cleanup visit. The Trust will not compensate any additional cleanup visits.

A Claimant may submit the following documents to establish the value of the damaged property and the costs (actually incurred or yet to incur) of repairs to or replacement of the damaged property:

1. Appraisals;

2. Tax records;

3. Purchase records;

4. Mortgage or loan documentation showing the pre-Fire condition or value of the property;

5. Permits;

6. Contractor estimates or invoices;

6

10/5/21



7. Arborist reports, timber surveys, or documents relating to landscaping; or

8. Other Supporting Documents in the Claimant's possession.

## II. Personal Property.

### A. Overview.

Personal Property Claims are Claims for loss of or damages to property that is movable, such as household items (*e.g.*, clothes, furniture, or tools) and automobiles, as a result of the Included Fires. Personal Property Claims also encompass harm to or loss of pets and animals owned for personal use. A Claimant may submit Claims for livestock and animals used for agricultural and farming purposes as part of their Business Income Loss Claim. Claimants can make a claim for Personal Property without making a claim for Real Property.

### B. Eligibility to Submit Claim.

Each Claimant asserting a Personal Property Claim must meet the following requirements. Claimants who do not meet these requirements are not eligible for compensation of a Personal Property Claim.

1. **Owner of Damaged Property.** The Claimant must have owned the personal property at the time that it was damaged by the Included Fire.

2. **Included Fire Caused the Damage.** The Claimant asserting the Personal Property Claim must provide the Trust with evidence proving that an Included Fire was the direct cause of the property damage for which the Claimant is seeking compensation.

### C. Proof of Authority.

1. **Identity.** The Claimant must submit Supporting Documents sufficient to verify their identity. The Trust will confirm the accuracy of this information before beginning review of the Personal Property Claim.

2. **Ownership of Personal Property.** The Claimant also must submit sufficient Supporting Documents reflecting that each Claimant identified in the Claims Questionnaire who is asserting a Personal Property Claim meets the ownership/right to possess Real Property criteria outlined in Section I.B.2(b) above. The Claimant may provide one or more of the following documents to prove ownership of the damaged property:

(a) List of items destroyed or damaged by the Included Fire;

(b) Proofs of Purchase (*e.g.*, receipts, invoices);

7

10/5/21



    (c) Appraisals;

    (d) Pre-Fire photos or videos showing that the Claimant possessed the damaged property; or

    (e) Other Supporting Documents within the Claimant's possession.

**D.**   **Compensation for Damage to Personal Property.**

Claimants must either submit an inventory of lost or damaged property with suggested values, or the Trust will compute a reasonable value of personal property lost. Once the Trust has established the value, The Trust will deduct any amounts paid by the insurer for a contents loss, excluding debris removal expenses.

Renters and visitors are classified accordingly:

**1.**   **Visitors.**

    (a) Claimant was visiting temporarily at the time of the Fire. All personal property are items they had with them as they travelled.

    (b) Claimant must provide an inventory.

    (c) Awards are capped at $2,000.

**2.**   **Storage Unit.**

    (a) Claimant did not live at the location but stores property in a room, garage, or storage unit.

    (b) This is often children or individuals who pay for storage units.

    (c) Claimant must provide an inventory.

    (d) Awards are capped at $5,000.

**3.**   **Occupant.**

    (a) Claimant did not typically pay rent.

    (b) Examples include a child staying with parents briefly, a Claimant who has a primary residence somewhere else, a Claimant whose personal property is limited to items in their room.

8

10/5/21


(c) A renter with a sublease for part of the house including their room and access to common areas is considered an occupant.

(d) The Claimant files a separate Claims Questionnaire and they are one of several individuals (four or more) who rent the property (regardless if it is a single-family home or apartment).

(e) Claimant must provide an inventory.

(f) Awards are capped at $20,000 per Claimant.

4. **Multi-Unit**.

(a) Claimant lives in dwelling with multiple units (e.g. apartment complex) and asserts a claim on the same Claims Questionnaire with all the other residents from the multi-unit dwelling. This includes duplexes where there are four or fewer separate units.

(b) No inventory required.

(c) Awards are capped at $20,000 per resident plus $5,000 per minor resident.

5. **Single Family Home**.

(a) Claimant rents an entire home alone or with family, or all Claimants on the Claims Questionnaire rent the entire home.

(b) No more than three Claimants file separate Claims Questionnaires.

(c) No inventory is required.

(d) If no inventory is provided, Claimants receive 25% of the structure's CoR.

(e) If inventory is provided, Claimants receive up to 40% of the structure's CoR.

6. **Mobile Home**.

(a) Claimant rents a mobile home that has been confirmed to be damaged by the Included Fire.

(b) No Inventory Required.

(c) If no inventory is provided, the Claimant receives $27,500.

(d) If an inventory is provided, the Claimant receives up to $44,000.

9

10/5/21


E. **Establishing Value of Specific Personal Property.**

A Claimant may submit one or more of the following Supporting Documents to establish the value of the damaged property and the costs (actually incurred or yet to incur) of repairs to or replacement of the damaged property:

1. List of items destroyed or damaged;

2. Proofs of purchase;

3. Pre-Fire and post-Fire photos or videos;

4. Appraisals; or

5. Other Supporting Documents in the Claimant's possession.

## III. Smoke and Ash Damage Claim Eligibility

A. **Eligible Claims**: Loss locations *within five miles* of the established qualifying CalFire fire perimeters.

B. **Ineligible Claims**: Loss locations *outside five miles* of the established qualifying CalFire fire perimeters, subject to the discretion of the Claims Administrator.

C. **Smoke and Ash Damages Within Five Miles of Established CalFire Fire Perimeters**

1. **Real Property.**

(a) Statement under the penalty of perjury *only* with no supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

(b) Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $20,000 per loss location prior to offsets for insurance or FEMA payments.

2. **Personal Property.**

(a) Owners, Renters and Occupants of Single-Family Homes, Multi Unit Structures Mobile Homes and Manufactured homes:

1. Statement under the penalty of perjury *only* with no supporting documentation for damages and out of pocket expenses in association with smoke and ash

10

10/5/21



remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

2. Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $10,000 per loss location prior to offsets for insurance or FEMA payments.

(b) Storage:

1. Statement under the penalty of perjury *only* without any supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

2. Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $5,000 per loss location prior to offsets for insurance or FEMA payments.

(c) Visitor:

1. Statement under the penalty of perjury *only* without any supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

2. Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $2,000 per loss location prior to offsets for insurance or FEMA payments.

3. **Additional Living Expenses.** The Trust will award additional living expenses for properties that were not destroyed based on actual documented costs.

4. **Trees.** The Trust will compensate losses for trees and vegetation for properties located within the Cal Fire perimeter to be valued consistent with the model. Claims for tree damage outside the perimeter are ineligible, subject to supporting documentation and discretion of Claims Administrator.

## IV. Prejudgment Interest.

The Trust will add prejudgment interest, applied to the net award. Interest is calculated at the statutory rate set by CCP § 3287.

11

10/5/21



**V. <u>Attorneys' Fees for Inverse Condemnation</u>.**

If the Claimant is represented by attorney, the Trust will add reasonable attorneys' fees to the net award, following CCP § 1021.9. Attorneys' fees apply at the percentage to which the law firm and the Trust have agreed.

**VI. <u>Credits for Amounts Covered by Insurance</u>.**

Pursuant to Section 2.6 of the PG&E Fire Victim Trust Agreement, any determination resulting in an award shall be reduced by all insurance recoveries available to the Fire Victim, whether or not the Fire Victim actually made a claim against a policy of insurance for such damages or losses. The award will be offset by the Claimant's policy limits available to him or her at the time of the fire, not what the insurance carrier paid to the Claimant as a result of the fire.

12

10/5/21



**I.**     **The 9/10/2021 Deficiency Notices:** This notice seemed to seek clarity about the loss of Claimants Personal Property at the Hopper Avenue location. There may be confusion because all the Insurance Inventories and the Policy refer to Claimants former residence at 1832 Sansone Drive. That house sold and closed escrow approximately 8 days before the fire. All of Claimants Personal Property was moved to the storage location on Hopper Avenue, at the time of the fire loss, Claimants homeowner's insurance policy was still in effect. This was explained in Claimants Narrative. In that Narrative, now 13 months old, Claimant explained his Insurers unfair business practices and breach of the covenant of good faith and fair dealings, which resulted in failing to cover items his policy had coverage for. His compensation was well short of the limits ($200,000 short). Claimant requested, pursuant to the Trust Agreement, that the Trustee provide assistance to Claimant. To date, none has been forthcoming.

Each Claimant asserting a Personal Property Claim must meet the following requirements.

**1. Owner of Damaged Property.** The Claimant must have owned the personal property at the time that it was damaged by the Included Fire. (This has been established by the insurance documents as well as documents attached to the initial Proof of Claim)

**2. Included Fire Caused the Damage**. The Claimant asserting the Personal Property Claim must provide the Trust with evidence proving that an Included Fire was the direct cause of the property damage for which the Claimant is seeking compensation. (This has also been established by the insurance documents)

**Proof of Authority**.

**1. Identity**. The Claimant must submit Supporting Documents sufficient to verify their identity. The Trust will confirm the accuracy of this information before beginning review of the Personal Property Claim. (This has also been established by the insurance documents)

**2. Ownership of Personal Property**. The Claimant also must submit sufficient Supporting Documents reflecting that each Claimant identified in the Claims Questionnaire who is asserting a Personal Property Claim meets the ownership/right. The Claimant may provide one or more of the following documents to prove ownership of the damaged property: (a) List of items destroyed or damaged by the Included Fire; (b) Proofs of Purchase (e.g., receipts, invoices); (c) Appraisals; (d)

1

Pre-Fire photos or videos showing that the Claimant possessed the damaged property; or (e) Other Supporting Documents within the Claimant's possession. (This has also been established by the insurance documents)

**Compensation for Damage to Personal Property**. Claimants must either submit an inventory of lost or damaged property with suggested values, or the Trust will compute a reasonable value of personal property lost. Once the Trust has established the value, The Trust will deduct any amounts paid by the insurer for a contents loss, excluding debris removal expenses. (This has also been established by the insurance documents)

All eligibility criteria have been met. The Hopper Avenue address is the location where all of Claimants personal property and all of his lifes memories, were housed and where it was destroyed by an "identified fire".

## II.    **The 10/8/2021 Deficiency Notice:**

### **Evaluation of Damages for Emotional Distress arising from being within the Zone of Danger**

The Sacramento Street address is where I was living when I was evacuated and prevented from returning for 5 days. I have no claim for the loss of any personal property at this location. This location is where the Zone of Danger claims, which are based on emotional distress and/or mental anguish a Claimant experienced as a result of evacuating or sheltering-in-place during the Fire. The Trust will consider Claimants to be in the Zone of Danger if they were: (a) within the Fire perimeter and (b) feared for their safety or the safety of a family member, (c) while evacuating or sheltering-in-place as a result of the Fire. Claimant satisfies all determination factors and the rest of the record should place in Tier I for compensation. This address is reflected on the bill he received for the health services that were provided to him.

### **Evaluation of Damagesfor Emotional Distress arising from Nuisance**

Damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had the right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

2

His W2 for 2018 wages, shows the Sacramento Street address as his residence. He also lived there during his lengthy rehabilitation. Claimant strongly satisfies the six Determination Factors and is well supported by the record in this matter thus placing Claimant in Tier I for compensation.

3



## I.   The 9/10/2021 Deficiency Notices:

This notice seemed to seek clarity about the loss of Claimants Personal Property at the Hopper Avenue location. There may be confusion because all the Insurance Inventories and the Policy refer to Claimants former residence at 1832 Sansone Drive. That house sold and closed escrow approximately 8 days before the fire. All of Claimants Personal Property was moved to the storage location on Hopper Avenue, at the time of the fire loss, Claimants homeowner's insurance policy was still in effect. This was explained in Claimants Narrative. In that Narrative, now 13 months old, Claimant explained his Insurers unfair business practices and breach of the covenant of good faith and fair dealings, which resulted in failing to cover items his policy had coverage for. His compensation was well short of the limits ($200,000 short). Claimant requested, pursuant to the Trust Agreement, that the Trustee provide assistance to Claimant. To date, none has been forthcoming.

Each Claimant asserting a Personal Property Claim must meet the following requirements.

**1. Owner of Damaged Property.** The Claimant must have owned the personal property at the time that it was damaged by the Included Fire. (This has been established by the insurance documents as well as documents attached to the initial Proof of Claim)

**2. Included Fire Caused the Damage**. The Claimant asserting the Personal Property Claim must provide the Trust with evidence proving that an Included Fire was the direct cause of the property damage for which the Claimant is seeking compensation. (This has also been established by the insurance documents)

## II.   Proof of Authority.

**1. Identity**. The Claimant must submit Supporting Documents sufficient to verify their identity. The Trust will confirm the accuracy of this information before beginning review of the Personal Property Claim. (This has also been established by the insurance documents)

**2. Ownership of Personal Property**. The Claimant also must submit sufficient Supporting Documents reflecting that each Claimant identified in the Claims Questionnaire who is asserting a Personal Property Claim meets the ownership/right. The Claimant may provide one or more of the following documents to prove ownership of the damaged property: (a) List of items destroyed or damaged by the Included

1

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 140 of 265

Fire; (b) Proofs of Purchase (e.g., receipts, invoices); (c) Appraisals; (d) Pre-Fire photos or videos showing that the Claimant possessed the damaged property; or (e) Other Supporting Documents within the Claimant's possession. (This has also been established by the insurance documents)

**III.   Compensation for Damage to Personal Property**. Claimants must either submit an inventory of lost or damaged property with suggested values, or the Trust will compute a reasonable value of personal property lost. Once the Trust has established the value, The Trust will deduct any amounts paid by the insurer for a contents loss, excluding debris removal expenses. (This has also been established by the insurance documents)

All eligibility criteria have been met. The Hopper Avenue address is the location where all of Claimants personal property and all of his life's memories, were housed and where it was destroyed by an "identified fire.

2



## I.     The 10/8/2021 Deficiency Notice:

### Evaluation of Damages for Emotional Distress arising from being within the Zone of Danger

The Sacramento Street address is where Claimant was living when he was evacuated and prevented from returning for 5 days. Claimant has no claim for the loss of any personal property at this location. This location is where the Zone of Danger claims, which are based on emotional distress and/or mental anguish, a Claimant experienced as a result of evacuating or sheltering-in-place during the Fire. The Trust will consider Claimants to be in the Zone of Danger if they were: (a) within the Fire perimeter and (b) feared for their safety or the safety of a family member, (c) while evacuating or sheltering-in-place as a result of the Fire. Claimant satisfies all determination factors and the rest of the record should place in Tier I for compensation. This address is reflected on the bill he received for the health services that were provided to him.

### Evaluation of Damages for Emotional Distress arising from Nuisance

Damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had the right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

His W2 for 2018 wages shows the Sacramento Street address as his residence. He also lived there during his lengthy rehabilitation. Claimant strongly satisfies the six Determination Factors and is well supported by the record in this matter thus placing Claimant in Tier I for compensation.

Further, Claimants Narrative provides a detailed roadmap for claims evaluators. Describes the events related to his severe physical and mental injuries, physician official diagnosis, hospital records, rehab record, psychiatrist diagnosis and treatment plain, chiropractor diagnosis and treatment plan, declarations from family and friends supporting his PTSD diagnosis, multiple detailed inventory loss reports from his Insurer, documents in support of lost wages, etc.

Lastly, here is just one of the many studies currently researching the health impacts of the microbial content in wildfire smoke. Any challenge concerning causation is meritless, rendered moot by Claimants medical related evidence and supported by the aggregated scientific data contained in the numerous studies and reports recently published.

**1**

**December 17, 2020**

# Wildfire smoke can carry microbes that cause infectious diseases.

**(SACRAMENTO)**

Wildfire smoke contains microbes, a fact that's often ignored, but one that may have important health repercussions.



Smoke from wildfires carry microbes that can cause diseases

In **an article to be published** Dec. 18 in *Science*, Leda Kobziar and George Thompson call the attention of the scientific community to the health impacts of wildfire smoke's microbial content.

Smoky skies caused by woodland fires are becoming seasonal norms, especially in some parts of the United States and Australia. In 2020, raging wildfires in the Western U.S. have set new records and led to extremely unhealthy or hazardous air quality levels for many weeks in a row.

It's well-documented that exposure to wildfire smoke can damage the heart and lungs. Respiratory allergic and inflammatory diseases, including asthma and bronchitis, are also worsened by smoke exposure.

"The health impact of inhaling wildfire smoke increases dramatically during high-emissions wildfires and with long exposure," said **Kobziar**, associate professor of Wildland Fire Science at the

2

University of Idaho. "Yet, the risk of infection to the respiratory tract after this exposure is frequently overlooked."

## What role do microbes in wildfire smoke play in the spread of disease?

Wildland fire is a source for bioaerosol, airborne particles made of fungal and bacterial cells and their metabolic byproducts. Once suspended in the air, particles smaller than 5 μm can travel hundreds or even thousands of miles. Their movement depends on the fire behavior and the atmospheric conditions. Eventually, they are deposited or inhaled.

Bacteria and fungi can be transported in these wildland fire smoke emissions. While microbial concentration in smoke is higher near the fire source, these microbes may be active agents spreading infection. For example, coccidioidomycoses - a fungus that becomes airborne when soils are disturbed- is the cause of Valley fever, a potentially serious infection.

"We don't know how far and which microbes are carried in smoke," said **Thompson**, associate professor of Clinical Medicine at UC Davis. "Some microbes in the soil appear to be tolerant of, and even thrive under, high temperatures following wildfires."

As Kobziar explained, "At the scale of a microbe, fire behavior research has shown that heat flux is highly variable, so it may be that many microbes aren't even subjected to the high temperatures for very long. They may also be protected in small clusters of particulate matter."

Kobziar and Thompson proposed a multidisciplinary approach to understanding the nature of the relationship between microbes, wildfire smoke and health. The complexity of the phenomenon calls for the expertise of scientists from different fields such as fire ecology, environmental microbiology, epidemiology, atmospheric sciences and public health and infectious disease.

"With longer wildfire seasons and higher severity trends, there is an urgency to work together in studying the behavior of the microbes carried by the smoke and their impact on human health," Thompson said.

*[**Article**: Kobziar & Thompson, (2020). Wildfire smoke: A potential infectious agent, Science, DOI: 0.1126/science.abe8116]*

3




## DATE OF NOTICE: 2/21/22

## I. FIRE VICTIM INFORMATION

| Claimant Name: | Enrique Galvez | | |
|---|---|---|---|
| Law Firm: | Pro Se | | |
| Claimant ID: | 1021557 | Claims Questionnaire ID: | 10012510 |
| Damage Category: | Real and Personal Property | Claim ID: | 50007 |

## II. EXPLANATION OF MISSING INFORMATION OR DOCUMENTATION

This Notice is an official communication from the Claims Processor for the Fire Victim Trust. We previously sent you a Deficiency Notice because your submitted claim was missing documents or information that prohibited us from concluding our review to make a final determination. You responded to that Notice, but your claim is still missing necessary information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Deficiency Notice button on your secure online Portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this Notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| 1. | You did not submit sufficient Supporting Documents to establish the value of your damaged property and the costs of repairs to or replacement. | Please provide one or more of the following documents: List of items destroyed or damaged; Proofs of purchase; Pre-Fire and post-Fire photos or videos; Appraisals; and Other Supporting Documents in the Claimant's possession to show the value of the claimed personal property. |
| 2. | You did not submit sufficient Supporting Documentation to verify the level of damage that you experienced due to an Included Fire. | To be eligible to receive compensation from the Trust for a Real or Personal Property Claim you must submit documentation showing the level of damage that was sustained as the result of an Included Fire (e.g. photos, insurance documents, Post-Fire appraisals, etc.). |


Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
147 of 265



# AMENDED
# DEFICIENCY NOTICE

**We encourage you to gather the requested information or documents now and respond to this Notice promptly. The sooner you respond, the sooner your submitted claim can move forward in the review process.**

Send us the missing information or documents identified in Sections II or III. We will re-review your submitted claim when documents are received. If you do not respond, we will have to assess your submitted claim based on the materials we have, which could lead to a lower determination or denial of your claim in its entirety.

Submit the requested missing or incomplete information by using your secure online portal to upload additional documents.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-888-664-1152 or email info@firevictimtrust.com.





**February 21, 2022**

<u>Response Your "Amended Deficiency Notice" Dated February 21, 2022</u>

Fire Victims Trust:

It goes beyond the pale that you have sent the same exact Deficiency Notice that you previously sent Claimant, except this time you have entitled it an "Amended Notice of Deficiency."

I will say this for the last time. In October of 2020, Claimant wrote a detailed 25 page narrative, which sets forth multiple exhibits that support his claims. Why have you not read it, collected the referenced Exhibits and conducted an analysis based on the evidence.

I. **<u>Evaluation of Damages for Emotional Distress arising from being within the Zone of Danger</u>**

The Sacramento Street address is where Claimant was living when he was evacuated and prevented from returning for 5 days. Claimant has no claim for the loss of any personal property at this location. This location is where the Zone of Danger claims, which are based on emotional distress and/or mental anguish, a Claimant experienced as a result of evacuating or sheltering-in-place during the Fire. The Trust will consider Claimants to be in the Zone of Danger if they were: (a) within the Fire perimeter and (b) feared for their safety or the safety of a family member, (c) while evacuating or sheltering-in-place as a result of the Fire. Claimant satisfies all determination factors and the rest of the record should place in Tier I for compensation. This address is reflected on the bill he received for the health services that were provided to him.

II. **<u>Evaluation of Damages for Emotional Distress arising from Nuisance</u>**

Damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had the right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

His W2 for 2018 wages shows the Sacramento Street address as his residence. He also lived there during his lengthy rehabilitation. Claimant strongly satisfies the six Determination Factors and is well supported by the record in this matter thus placing Claimant in Tier I for compensation.

Further, Claimants Narrative provides a detailed roadmap for claims evaluators. Describes the events related to his severe physical and mental injuries, physician official diagnosis, hospital records, rehab record, psychiatrist diagnosis and treatment plain, chiropractor diagnosis and treatment plan, declarations from family and friends supporting his PTSD diagnosis, multiple detailed inventory loss reports from his Insurer, documents in support of lost wages, etc.

### III.  **Here is the same Deficiency Notice, only "Amended."**

**What is Missing**:

**1.** You did not submit sufficient Supporting Documents to establish the value of your damaged property and the costs of repairs to or replacement. Please provide one or more of the following documents: *List of items destroyed or damaged*; Proofs of purchase; *Pre-Fire and post-Fire photos or videos*; *Appraisals;* and Other Supporting Documents in the Claimant's possession to show the value of the claimed personal property.

**Response:**

**A.    Exhibit B** is a 61 page Inventory, from Claimants Insurer, AAA Insurance Exchange, of all of his personal property that was lost in the fire. It contains detailed descriptions and provides, for each item, the Quantity, the Unit Price, the Tax, Replacement Cost Value, the Age and Life of the Item, the Condition, the Depreciation %, the Depreciation Cost, and the Actual Cash Value, as well as the amount of Depreciation that can be recovered.

The Net Claim if Depreciation is recovered is $179, 404.00.

**B.    Exhibit B1** is a 63 page Inventory of all of his personal property that was lost in the fire. It contains detailed descriptions and provides, for each item, the Quantity, the Unit Price, the Tax, Replacement Cost Value, the Age and Life of the Item, the Condition, the

Depreciation %, the Depreciation Cost, the Actual Cash Value, and the amount of Depreciation that can be recovered.

The Net Claim if Depreciation is recovered is $200.306.00.

**C.** **Exhibit B 2** is a 23 Loss Inventory, again from AAA, which sets forth in detail, Item Description, Brand, Model Number, Quantity Lost, Age of Item, Original Cost Pre-Tax, Where it was Purchased From, Method of Payment, and the Condition of the Item. Could this be more detailed? These three documents provide everything stated as to what needs to be provided. Is it incompetence on your part? Or is this some kind of pre-meditated scheme to under pay on claims where the Claimant is not represented.

**D.** **Exhibit B3** is a 61 page document that was Claimants operative policy at the time of the "Included Fire"

**E.** There are photos in Claimants Narrative that depicts the ash that was once his life.

**2.** You did not submit sufficient Supporting Documentation to verify the level of damage that you experienced due to an Included Fire. To be eligible to receive compensation from the Trust for a Real or Personal Property Claim you must submit documentation showing the level of damage that was sustained as the result of an Included Fire.

***See the responses above to reiterate the Insurance Inventories and Appraisals, Detailed descriptions of the lost items, the Quantity, the Unit Price, the Tax, Replacement Cost Value, the Age and Life of the Item, the Condition, the Depreciation %, the Depreciation Cost, the Actual Cash Value, and the amount of Depreciation that can be recovered.**

What is the problem? Be advised that this unwarranted, unprofessional and continued confusion, on your part, is creating delay damages and is severely exasperating his PTSD and level of anxiety.

As is stated in the Trust Agreement, the administration or mishandling of the trust or related matters, is to be enforced under the laws of the State of California.

**IV.** **There is an Existing Fiduciary Relationship Between the Parties which the Trustee has Breached**

In California, a fiduciary relationship begins once the fiduciary

commences to knowingly act upon behalf of the beneficiary, for their benefit. With the fiduciary relationship established, the fiduciary in a relationship is required to: Treat beneficiary with care and reasonable conduct; Remain open and honest with beneficiary when it comes to relevant information; Act in good faith, by putting the interests of the beneficiary above all personal interests.

Further, in every contract or agreement there is an implied promise of good faith and fair dealing *(Covenant of Good Faith & Fair Dealing)*. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. "In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *(Racine & Laramie, Ltd. v. Department of Parks & Recreation (1992) 11 Cal.App.4th 1026, 1031–1032)*

## V.     The Trustee is Negligent in his Duty to Claimant

Negligence is the failure to use reasonable care to prevent harm to others. A person can be negligent by acting or *by failing to act.* A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.

## VI.     In California, the Parties to a Personal Injury Claim have Mutual Obligations to Mitigate Damages

Claimant is living in poverty as a result of the fires, can't get work in his old career due to the physical and mental injuries he sustained as a direct result of PG&Es grossly negligent and reckless behavior, he is homeless forced to sleep on his sister's couch, and has no resources to get the additional medical and mental services he so desperately needs. If not for help from his family, charity, professional courtesies and his extreme need for these services, he would be undone.

Yet, despite his complete lack of resources and having no funds needed to obtain the much required physical and mental health assistance he needs, he has found a way to discharge his obligation to mitigate any damages.

PG&E, the tortfeasor, is the party with superior resources and has already been found to be responsible for the fires and all the damages it has caused. "The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, and, consequently, when expenditures are necessary for minimization of damages, the duty does not run to a person who is financially unable to make such expenditures." *(Valencia v. Shell Oil Co. (1944) 23 Cal.2d 840, 846)*

"The burden is on defendant to establish matters asserted by him in mitigation or reduction of the amount of plaintiff's damage, and defendant here has not met that burden." *(McNary v. Hanley (1933) 131 Cal. App. 188, 190)*

It is without a doubt that PG&E has failed, nay, not even attempted to mitigate its damages. Not to mention its complete inability to conduct a proper analysis by using Claimants Narrative and associated evidentiary exhibits. This behavior has created a crippling delay in adjudicating Claimants assertions. This has resulted in delay damages. This is supported by the medical evidence that has been created since October of 2020.

The Trustee and Claims Administrator (earning a combined $2,700.00 per hour) have failed in their duty to Claimant(s), and since their actions concerning their handling (or mishandling) of the Trust are not insulated from liability in the Bankruptcy matter, Claimant is considering a lawsuit against the Trustee for:

Breach of Fiduciary Duty, Negligence, Failure to Mitigate Damages, and whatever other causes of action are found during research on these matters.

Claimants' physical and mental conditions are rapidly deteriorating as the delay continues. These Deficiency Notices are without merit as the evidence you state is missing has been in the Portal since October of 2020. Claimant demands that whoever is handling his claim call him and explain what the confusion is. Three (3) times he has called and asked to talk to whoever was handling his claim, only to be told that, since he didn't have a LAWYER, they did not know who to call on his behalf. Really? The Trustee is on a dangerous path where violations of the Constitution are now potential causes of action. Continued delay, without good cause, must be addressed in any Offer of Settlement. This matter must be resolved post hast in order to stop Claimants worsening condition.

Lastly, here is just one of the many studies currently researching the health impacts of the microbial content in wildfire smoke. Any challenge concerning causation is merit less, rendered moot by Claimants medical related evidence and supported by the aggregated scientific data contained in the numerous studies and reports recently published.

**December 17, 2020**

# Wildfire smoke can carry microbes that cause infectious diseases.

**(SACRAMENTO)**

Wildfire smoke contains microbes, a fact that's often ignored, but one that may have important health repercussions.



Smoke from wildfires carry microbes that can cause diseases

In **an article published** on Dec. 18, 2021, in *Science*, Leda Kobziar and George Thompson call the attention of the scientific community to the health impacts of wildfire smoke's microbial content.

Smoky skies caused by woodland fires are becoming seasonal norms, especially in some parts of the United States and Australia. In 2020, raging wildfires in the Western U.S. have set new records and led to extremely unhealthy or hazardous air quality levels for many weeks in a row.

It's well-documented that exposure to wildfire smoke can damage the heart and lungs. Respiratory allergic and inflammatory diseases, including asthma and bronchitis, are also worsened by smoke exposure.

"The health impact of inhaling wildfire smoke increases dramatically during high-emissions wildfires and with long exposure," said **Kobziar**, associate professor of Wildland Fire Science at the University of Idaho. "Yet, the risk of infection to the respiratory tract after this exposure is frequently overlooked."

## What role do microbes in wildfire smoke play in the spread of disease?

Wildland fire is a source for bioaerosol, airborne particles made of fungal and bacterial cells and their metabolic byproducts. Once suspended in the air, particles smaller than 5 µm can travel hundreds or even thousands of miles. Their movement depends on the fire behavior and the atmospheric conditions. Eventually, they are deposited or inhaled.

Bacteria and fungi can be transported in these wildland fire smoke emissions. While microbial concentration in smoke is higher near the fire source, these microbes may be active agents spreading infection. For example, coccidioidomycoses - a fungus that becomes airborne when soils are disturbed- is the cause of Valley fever, a potentially serious infection.

"We don't know how far and which microbes are carried in smoke," said Thompson, associate professor of Clinical Medicine at UC Davis. "Some microbes in the soil appear to be tolerant of, and even thrive under, high temperatures following wildfires."

As Kobziar explained, "At the scale of a microbe, fire behavior research has shown that heat flux is highly variable, so it may be that many microbes aren't even subjected to the high temperatures for very long. They may also be protected in small clusters of particulate matter."

Kobziar and Thompson proposed a multidisciplinary approach to understanding the nature of the relationship between microbes, wildfire smoke and health. The complexity of the phenomenon calls for the expertise of scientists from different fields such as fire ecology, environmental microbiology, epidemiology, atmospheric sciences and public health and infectious disease.

"With longer wildfire seasons and higher severity trends, there is an urgency to work together in studying the behavior of the microbes carried by the smoke and their impact on human health," Thompson said.

*[**Article**: Kobziar & Thompson, (2020). Wildfire smoke: A potential infectious agent, Science, DOI: 0.1126/science.abe8116]*





## Real Property and Personal Property Eligibility Criteria

Real Property Claims are Claims for damage to structures on residential or commercial real property, landscaping, forestry, and other real property improvements (*e.g.*, hardscape, fencing, retaining walls, pools, and solar panels) that was caused by or arising from an Included Fire.

Personal Property claims are for damages to personal property as a result of the Fire. Personal Property is movable property; belongings exclusive of land and buildings, such as household items (for example: clothes, furniture or tools) and mobiles. Business personal property such as business inventory and equipment, livestock, and animals used for agricultural and farming purposes should be included in a Business Income Loss Claim.

Real and Personal Property Claims also include damages for Additional Living Expenses or Loss of Use. Additional Living Expenses (ALE) include, but are not limited to, the following: (1) housing (hotels, apartments, homes, travel trailers, mobile homes, or other temporary housing, moving fees, security deposits); (2) utilities (increased utility costs for electricity, gas, water, sewage, and mobile phones); (3) household costs (laundry, dry cleaning, and housekeeping); (4) furniture rental; (5) food (restaurant meals and groceries); (6) emergency clothing and toiletries; (7) storage for personal property being transferred to another location; (8) boarding of pets and non-commercial livestock; and (9) use of alternative transportation, such as public transportation and ride-share services; and (10) additional mileage to and from work or school. Loss of Use (LOU) is the actual loss of use of the property that was damaged by the fire and is calculated by determining the fair market rental value of the property immediately before the fire and multiplying that amount by the number of months the Claimant was dislocated.

## I. <u>Real Property</u>.

### A. <u>Overview</u>.

The Trust will evaluate Real Property claims for damages to Structures on Residential or Commercial Real Property, damages to Forestry and Landscaping, and damage to other Real Property improvements (for example: fencing, retaining walls, pools, solar panels, hot tubs, and decks). Residential Property is defined as Real Property consisting of a dwelling that contains no more than four residential units, as well as individually owned units in a residential stock cooperative, condominium, or planned unit development and the Claimant occupies the dwelling or one of its units as their residence. This includes single family homes, multi-family homes, manufactured homes, mobile homes, apartments and condominiums. Commercial Property is all Real Property, except for residential property or vacant land. This includes agricultural property, apartment or condo buildings, commercial office buildings, education and school facilities, healthcare and medical facilities, hospitality and lodging, industrial property, mobile home parks, parking structures and facilities, public and community facilities, retail property, and transportation and airplane related properties.

A Real Property Claim can be for either Diminution in Value (DIV) or Cost of Rebuild/Repair (CoR).

1

5/16/22


1. **Diminution in Value (DIV).** Diminution in Value is the difference between the Fair Market Value of the Real Property immediately before the Fire and the Fair Market Value of the Real Property immediately after the fire.

2. **Cost of Rebuild or Repair (CoR).** Cost of Rebuild or Repair is the actual cost to rebuild or repair the property that was damaged by the Fire. The Cost of Rebuild or Repair can be based on an estimate that is received from Insurance or StoneTurn if the Claimant does not provide adequate documentation to show the actual Cost of Rebuild or Repair. Any payment for CoR will be offset by insurance payments the Claimant has previously received.

B. **Eligibility to Submit Claim.**

Each Claimant asserting a Real Property Claim must meet the following requirements. Claimants who do not meet these requirements are not eligible for compensation for a Real Property Claim.

1. **Owner or Lessee of Damaged Property.** To be eligible to receive compensation from the Trust for a Real Property Claim, a Claimant must have:

   (a) Owned the property when it was damaged by the Included Fire; or

   (b) Leased the property, in which case the lease—

      (1) Gave the Claimant the right to possess the property at the time it was damaged by the Included Fire; and

      (2) Was executed before the Included Fire occurred; or

   (c) Received an Assignment of Rights from the Owner or Lessee at the time of the Included Fire.

2. **Proof of Authority.**

   (a) **Identity.** The Claimant must submit Supporting Documents sufficient to verify their identity. The Trust will verify the accuracy of this information before beginning review of the Real Property Claim.

   (b) **Ownership/Right to Possess.** The Claimant also must submit sufficient Supporting Documents reflecting that each Claimant identified in the Claims Questionnaire who is asserting a Real Property Claim owned or leased the property.

      (1) **Owner.** If the Claimant is the owner of the damaged property, they must submit one or more of the following to prove their ownership:

2

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 160 of 265



    a. Deed;

    b. Land grant;

    c. Mortgage Documentation;

    d. Loan Documentation;

    e. Title Search showing ownership; or

    f. Other Documentation showing ownership at the time of the Fire.

If more than one Real Property claim has been made for a single location, the Claimant may be required to submit additional ownership documentation to ensure that the Trust does not overpay for the loss location.

**(2) Right to Possess.** If the Claimant has or had a lease, executed before the Fire occurred, granting them possession of the property, and the Fire damaged the property during the Claimant's period of possession, the Claimant must submit one or more of the following:

    a. Lease or Rental Agreement showing date of occupancy;

    b. Cancelled checks for rent;

    c. Utility Bill for the Property dated contemporaneously with the Fire; or

    d. Other documentation showing occupancy contemporaneously with the Fire.

**(c) Causation.** The Claimant asserting the Real Property Claim must provide the Trust with evidence proving that an Included Fire was the direct cause of the property damage for which the Claimant is seeking compensation.

**C. <u>Compensation for Damage to Real Property</u>.**

Real Property Claims that satisfy the eligibility criteria listed above will receive the lesser of DIV of the property lost to the Fire; or if the homeowner elects to repair or rebuild, the reasonable cost of rebuilding the home at its original location with materials of like kind and quality.

If a home is only partially damaged or suffers smoke damage, the measure of the loss is the reasonable cost of repairs and/or cleaning and elimination of smoke damage.

3

5/16/22



1. **<u>Diminution in Value (DIV)</u>.**  If the Claimant does not desire to repair or rebuild their property, DIV will be used to calculate compensation.  To calculate DIV, the Trust will determine the fair market value of the property immediately before the Fire by analyzing sales of comparable homes before the Fire.  Alternatively, if the Claimant submits an appraisal of the home by a certified real estate appraiser at the time of the Fire, the Trust will consider accepting it as long as it is reasonable.

   Once the Trust determines the fair market value of the home before the Fire, the Trust will subtract from it the value of the lot the house was located on after the Fire.  The value of the lot is to be determined by either its:

   (a)  Sales price, less costs of sale, if the lot was sold; or

   (b)  Assessed value as determined after the Fire.

   Most persons who lose their homes in fires ask the county to reassess their property to reflect the value of the lot only after a fire to lower their property taxes.  Sometimes assessors will make the reduction/reassessment without request.

   Once the Trust determines the DIV of the Claimant's residence, the Trust will subtract from it any amounts paid to the Claimant for the residence/dwelling/house, other/appurtenant structures, code upgrades, extended replacement costs, and landscaping.  However, any amounts paid for debris removal will not be deducted, as these amounts are being paid to clear the property and not as payment for the damage or destruction of the property.

2. **<u>Cost of Repair or Rebuild (CoR)</u>.**  A Claimant is entitled to the reasonable cost of rebuilding their home using materials of like kind and quality on the Claimant's lot at the time of the Included Fire.  Many Claimants engaged in rebuilding their homes will have plans and construction contracts which will be used to determine the cost of rebuilding.

   Reconstruction costs include the cost of reconstruction, architects' fees, permit fees, and all necessary components of reconstruction.

   If the Claimant does not have an estimate of the cost to rebuild their prior home or is not in contract to rebuild their prior home, then a reasonable cost to rebuild will be computed for the Claimant.

   Once the cost to rebuild has been established, monies paid or to be paid by the insurer for rebuilding the home, other structures, code upgrades, extended replacement cost, and landscaping will be deducted to determine the value of the Claim.  However, any sums paid for debris removal will not be deducted.

4

5/16/22



The Trust will determine the reasonable and necessary costs to rebuild or repair the damaged property based on the following factors:

(a) Claimant's use of the structure(s) and other improvement(s) on the property;

(b) Severity of damage to the structure(s) (*e.g.*, burn damage vs. smoke and soot damage);

(c) Extent of damage to the structure(s) and other improvement(s) (*e.g.*, damage to the entire structure vs. damage to part of the structure);

(d) Square footage of structure(s);

(e) Geographic location of the property;

(f) Size of the vegetation on the property immediately before the Included Fire;

(g) Severity and extent of damage to vegetation;

(h) Type(s) of vegetation damaged; and

(i) Fair market value of the property immediately before the Included Fire.

**D. <u>Compensation for Additional Living Expenses and Loss of Use</u>**

Additional Living Expenses ("ALE"), sometimes referred to as loss of use, are funds owed and paid by the insurer over time to compensate the insured while living in temporary quarters while rebuilding or replacing their home. These payments are usually computed by determining the cost of residing in temporary quarters and other attendant costs such as additional commute costs, the cost of eating out more often, etc. Some policies offer the insured the option of receiving the reasonable rental cost of their former home as their additional living expense payments.

Many Claimants will make both a Claim for ALE and a Claim for Loss of Use ("LOU"), which is computed differently than Claims for additional living expenses/loss of use in an insurance policy. LOU is the reasonable cost of loss of use of the former home and is usually computed as the reasonable rental value of the former home in its furnished condition. A Claimant is not entitled to receive payment for both ALE and LOU for the same loss. The Claims Administrator will determine the value of either ALE or LOU depending on the documentation provided and will deduct any amounts paid by the insurer or which will be paid by the insurer in the future for additional living expenses/loss of use from the Claimant's Claim.

5

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 163 of 265



ALE and LOU Claims end when a Claimant moves into their rebuilt or replacement home. Otherwise, ALE can be awarded for up to 4 years (48 months) from the date of the Included Fire.

E. **Compensation for Landscaping & Forestry.**

Landscaping improvements made to real property before the Fire and that are damaged or destroyed can be claimed by providing a description of the type and quantity of landscaping improvements that were damaged. "Landscaping" means any changes made to the property with the intent to improve its visual appearance (*e.g.*, shrubs, flower beds, mulched areas, artificial ponds, etc.).

A Claimant may also seek damages for forestry that is not actively landscaped, such as trees, bushes and other naturally growing vegetation, if it is located on the real property. Landscaping and forestry damages will be calculated in the same manner as traditional Real Property and will be measured either by Diminution in Value or Cost of Repair.

The Trust may compensate claimants for the cost of cleanup of damaged forestry, but only for the cost of the first initial cleanup visit. The Trust will not compensate any additional cleanup visits.

A Claimant may submit the following documents to establish the value of the damaged property and the costs (actually incurred or yet to incur) of repairs to or replacement of the damaged property:

1. Appraisals;

2. Tax records;

3. Purchase records;

4. Mortgage or loan documentation showing the pre-Fire condition or value of the property;

5. Permits;

6. Contractor estimates or invoices;

7. Arborist reports, timber surveys, or documents relating to landscaping; or

8. Other Supporting Documents in the Claimant's possession.

6

5/16/22



## II. Personal Property.

### A. Overview.

Personal Property Claims are Claims for loss of or damages to property that is movable, such as household items (*e.g.*, clothes, furniture, or tools) and automobiles, as a result of the Included Fires. Personal Property Claims also encompass harm to or loss of pets and animals owned for personal use. A Claimant may submit Claims for business inventory, equipment, livestock, and animals used for agricultural and farming purposes as part of their Business Income Loss Claim. Claimants can make a claim for Personal Property without making a claim for Real Property.

### B. Eligibility to Submit Claim.

Each Claimant asserting a Personal Property Claim must meet the following requirements. Claimants who do not meet these requirements are not eligible for compensation of a Personal Property Claim.

1. **Owner of Damaged Property.** The Claimant must have owned the personal property at the time that it was damaged by the Included Fire.

2. **Included Fire Caused the Damage.** The Claimant asserting the Personal Property Claim must provide the Trust with evidence proving that an Included Fire was the direct cause of the property damage for which the Claimant is seeking compensation.

### C. Proof of Authority.

1. **Identity.** The Claimant must submit Supporting Documents sufficient to verify their identity. The Trust will confirm the accuracy of this information before beginning review of the Personal Property Claim.

2. **Ownership of Personal Property.** The Claimant also must submit sufficient Supporting Documents reflecting that each Claimant identified in the Claims Questionnaire who is asserting a Personal Property Claim meets the ownership/right to possess Real Property criteria outlined in Section I.B.2(b) above. The Claimant may provide one or more of the following documents to prove ownership of the damaged property:

   (a) List of items destroyed or damaged by the Included Fire;

   (b) Proofs of Purchase (*e.g.*, receipts, invoices);

   (c) Appraisals;

7


(d) Pre-Fire photos or videos showing that the Claimant possessed the damaged property; or

(e) Other Supporting Documents within the Claimant's possession.

## D. **Compensation for Damage to Personal Property.**

Claimants must either submit an inventory of lost or damaged property with suggested values, or the Trust will compute a reasonable value of personal property lost. Once the Trust has established the value, The Trust will deduct any amounts paid by the insurer for a contents loss, excluding debris removal expenses.

Renters and visitors are classified accordingly:

## 1. **Visitors.**

(a) Claimant was visiting temporarily at the time of the Fire. All personal property are items they had with them as they travelled.

(b) Claimant must provide an inventory.

(c) Awards are capped at $2,000.

## 2. **Storage Unit.**

(a) Claimant did not live at the location but stores property in a room, garage, or storage unit.

(b) This is often children or individuals who pay for storage units.

(c) Claimant must provide an inventory.

(d) Awards are capped at $5,000.

## 3. **Occupant.**

(a) Claimant did not typically pay rent.

(b) Examples include a child staying with parents briefly, a Claimant who has a primary residence somewhere else, a Claimant whose personal property is limited to items in their room.

(c) A renter with a sublease for part of the house including their room and access to common areas is considered an occupant.

8

5/16/22



(d) The Claimant files a separate Claims Questionnaire and they are one of several individuals (four or more) who rent the property (regardless if it is a single-family home or apartment).

(e) Claimant must provide an inventory.

(f) Awards are capped at $20,000 per Claimant.

4. **Multi-Unit.**

(a) Claimant lives in dwelling with multiple units (e.g. apartment complex) and asserts a claim on the same Claims Questionnaire with all the other residents from the multi-unit dwelling. This includes duplexes where there are four or fewer separate units.

(b) No inventory required.

(c) Awards are capped at $20,000 per resident plus $5,000 per minor resident.

(d) If there is a Cost of Repair/Rebuild (CoR) for the individual unit, awards are capped at 40% of CoR for the individual unit.

5. **Single Family Home.**

(a) Claimant rents an entire home alone or with family, or all Claimants on the Claims Questionnaire rent the entire home.

(b) No more than three Claimants file separate Claims Questionnaires.

(c) No inventory is required.

(d) If no inventory is provided, Claimants receive 25% of the structure's CoR.

(e) If inventory is provided, Claimants receive up to 40% of the structure's CoR.

6. **Mobile Home.**

(a) Claimant rents a mobile home that has been confirmed to be damaged by the Included Fire.

(b) No inventory required.

(c) If no inventory is provided, the Claimant receives $27,500.

(d) If an inventory is provided, the Claimant receives up to $44,000.

9

5/16/22



E. **Establishing Value of Specific Personal Property.**

A Claimant may submit one or more of the following Supporting Documents to establish the value of the damaged property and the costs (actually incurred or yet to incur) of repairs to or replacement of the damaged property:

1. List of items destroyed or damaged;

2. Proofs of purchase;

3. Pre-Fire and post-Fire photos or videos;

4. Appraisals; or

5. Other Supporting Documents in the Claimant's possession.

III. **Smoke and Ash Damage Claim Eligibility**

A. **Eligible Claims**: Loss locations ***within five miles*** of the established qualifying CalFire fire perimeters.

B. **Ineligible Claims**: Loss locations ***outside five miles*** of the established qualifying CalFire fire perimeters, subject to the discretion of the Claims Administrator.

C. **Smoke and Ash Damages Within Five Miles of Established CalFire Fire Perimeters**

1. **Real Property.**

   (a) Statement under the penalty of perjury ***only*** with no supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

   (b) Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $20,000 per loss location prior to offsets for insurance or FEMA payments.

2. **Personal Property.**

   (a) Owners, Renters and Occupants of Single-Family Homes, Multi Unit Structures Mobile Homes and Manufactured homes:

      1. Statement under the penalty of perjury ***only*** with no supporting documentation for damages and out of pocket expenses in association with smoke and ash

10

5/16/22


remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

2. Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $10,000 per loss location prior to offsets for insurance or FEMA payments.

(b) Storage:

1. Statement under the penalty of perjury *only* without any supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive $250 per adult Claimant.

2. Claims with supporting documentation for damages and out of pocket expenses in association with smoke and ash remediation for loss locations within five miles of the established CalFire fire perimeters will receive up to $10,000 per loss location prior to offsets for insurance or FEMA payments

3. **Additional Living Expenses.** The Trust will award additional living expenses for properties that were not destroyed based on actual documented costs.

4. **Trees.** The Trust will compensate losses for trees and vegetation for properties located within the Cal Fire perimeter to be valued consistent with model. Claims for tree damage outside the perimeter are ineligible, subject to supporting documentation and discretion of Claims Administrator.

## IV. Prejudgment Interest.

The Trust will add prejudgment interest, applied to the net award, accrued from the date of the Included Fire to January 29, 2019. The Trustee has set the applicable rate for payment of prejudgment interest for the Inverse Awards in accordance with California statutory law at California Code of Civil Procedure (CCP) Sections 1268.311 and 1268.350.

## V. Attorneys' Fees for Inverse Condemnation.

If the Claimant is represented by attorney, the Trust will add reasonable attorneys' fees to the net award, following CCP § 1021.9. Attorneys' fees apply at the percentage to which the law firm and the Trust have agreed.

11

5/16/22





# AMENDED
# DEFICIENCY NOTICE

## I. FIRE VICTIM INFORMATION

| Claimant Name: | Enrique Galvez | | |
|---|---|---|---|
| Law Firm: | Pro Se | | |
| Claimant ID: | 1021557 | **Claims Questionnaire ID:** | 10012510 |
| Damage Category: | Real and Personal Property | **Claim ID:** | 50006 |

## II. EXPLANATION OF MISSING INFORMATION OR DOCUMENTATION

This Notice is an official communication from the Claims Processor for the Fire Victim Trust. We previously sent you a Deficiency Notice because your submitted claim was missing documents or information that prohibited us from concluding our review to make a final determination. You responded to that Notice, but your claim is still missing necessary information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Deficiency Notice button on your secure online Portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this Notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| 1. | You did not submit sufficient Supporting Documents to establish the value of your damaged property and the costs of repairs to or replacement. | Please provide one or more of the following documents: List of items destroyed or damaged; Proofs of purchase; Pre-Fire and post-Fire photos or videos; Appraisals; and Other Supporting Documents in the Claimant's possession to show the value of the claimed personal property. |
| 2. | You did not submit sufficient Supporting Documentation to verify that you are the owner of the damaged personal property. | To be eligible to receive compensation from the Trust for a Personal Property Claim on a property where you did not reside, you must submit a documentation showing proof of the relationship that gave you the right to possess the property at the time it was damaged by the Included Fire; and the document must have been executed before the Included Fire occurred. |
| 3. | You did not submit sufficient Supporting Documentation to verify the level of damage that you experienced due to an Included Fire. | To be eligible to receive compensation from the Trust for a Real or Personal Property Claim you must submit documentation showing the level of damage that was sustained as the result of an Included Fire (e.g. photos, insurance documents, Post-Fire appraisals, etc.). |


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
171 of 265


### III. HOW TO RESPOND TO THIS NOTICE

**We encourage you to gather the requested information or documents now and respond to this Notice promptly. The sooner you respond, the sooner your submitted claim can move forward in the review process.**

Send us the missing information or documents identified in Sections II or III. We will re-review your submitted claim when documents are received. If you do not respond, we will have to assess your submitted claim based on the materials we have, which could lead to a lower determination or denial of your claim in its entirety.

Submit the requested missing or incomplete information by using your secure online portal to upload additional documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-888-664-1152 or email info@firevictimtrust.com.


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
172 of 265



**June 15, 2022**

<u>Response to Amended Deficiency Notice Dated May 27, 2022</u>

It must be stated, yet again, that the information/documents you seek have been in the portal for well over a year. Claimant is flummoxed by the evaluator's inability to even understand the fundamentals of his claim, some 19 months since the claim was filed. It has served to exasperate his mental condition. This delay, as a result of this sub-standard work, continues to harm Claimant in numerous ways.

Let's try this one more time.

<u>Claimant's Addresses</u>

Claimant was the owner of the property located at 1832 Sansone Drive, Santa Rosa, CA 95403. This address is listed on all of the insurance documents. As required by all mortgage lenders, Claimant had a Homeowners Insurance Policy [See Document #163459, Exhibit B3] which included an umbrella of coverage, including coverage for personal property kept in a public storage unit.

Claimant sold the home in September of 2017, and moved to reside at the Sacramento Street address. He also moved everything he ever owned into the storage unit on Hopper Avenue. [See Document #1280458, pg. 9 from Claimants Insurance file (obtained by you), "Wild fire caused fire at STORAGE UNIT, ALL INSURED PROPERTY DESTROYED"; Pg. 10 – Post Fire picture of burned out storage unit; pg. 11 – Ledger Evidencing Claimants Storage Unit]

Please read document #1280458 and Claimants Initial Narrative, which hasn't happened or this wouldn't be so confusing to you.

He lost all his belongings in the storage unit but was still covered under his Homeowners Policy. The Hopper Avenue address is where the storage unit was located as evidenced by the afore-mentioned documents.

He was living at the Sacramento Street address at the time of the fire and was the address he was evacuated from. Please read document #1280458.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 174 of 265

| | What's Missing: | How to Address This Problem: |
|---|---|---|
| **1.** | You did not submit sufficient Supporting Documents to establish the value of your damaged property and the costs of repairs to or replacement. | Please provide one or more of the following documents: List of items destroyed or damaged; Proofs of purchase; Pre-Fire and post-Fire photos or videos; Appraisals; and Other Supporting Documents in the Claimant's possession to show the value of the claimed personal property. |

**See the Following in Response:**

1. Document #161003; Claimants Exhibit B – Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;
2. Document #161004; Claimants Exhibit B1 - Revised, Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;
3. Document #161005; Claimants Exhibit B2 – Initial Loss Inventory Submitted by Claimant to Insurer, CSAA. Contains detailed descriptions.
4. Document #163459; Claimants Exhibit B3 – Copy of Claimants Homeowners Insurance Policy

| | What's Missing: | How to Address This Problem: |
|---|---|---|
| **2.** | You did not submit sufficient Supporting Documentation to verify that you are the owner of the damaged personal property. | To be eligible to receive compensation from the Trust for a Personal Property Claim on a property where you did not reside, you must submit a documentation showing proof of the relationship that gave you the right to possess the property at the time it was damaged by the Included Fire; and the document must have been executed before the Included Fire occurred. |

**See the Following in Response:**

1. Document #161003; Claimants Exhibit B – Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;
2. Document #161004; Claimants Exhibit B1 - Revised, Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;

3. Document #161005; Claimants Exhibit B2 – Initial Loss Inventory Submitted by Claimant to Insurer, CSAA. Contains detailed descriptions;
4. Document #163459; Claimants Exhibit B3 – Copy of Claimants Homeowners Insurance Policy;
5. Document #1280458 – Specifically, pgs. 9, 10 and 11 of the afore-mentioned document

| | | What's Missing: | How to Address This Problem: |
|---|---|---|---|
| 3. | | You did not submit sufficient Supporting Documentation to verify the level of damage that you experienced due to an Included Fire. | To be eligible to receive compensation from the Trust for a Real or Personal Property Claim you must submit documentation showing the level of damage that was sustained as the result of an Included Fire (e.g. photos, insurance documents, Post-Fire appraisals, etc.). |

**See the Following in Response:**

1. Document #161003; Claimants Exhibit B – Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;
2. Document #161004; Claimants Exhibit B1 - Revised, Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;
3. Document #161005; Claimants Exhibit B2 – Initial Loss Inventory Submitted by Claimant to Insurer, CSAA. Contains detailed descriptions.
4. Document #163459; Claimants Exhibit B3 – Copy of Claimants Homeowners Insurance Policy;
5. Document #1280458 – Specifically, pg. 10, Post-Fire Photo of Storage Unit.

Claimant suggests that you read Document # 1280458, in its entirety. I mean the Trustee is a party to a personal injury case and has made no effort to mitigate damages. Pursuant to the Trust Agreement, Claimant has requested some assistance with his Insurance Carrier, 4 times now.

Claimant believes that the Trustee and Claims Administrator are in breach of their fiduciary duty to Claimant.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 176 of 265





# DETERMINATION NOTICE

## I. DETERMINATION NOTICE

This Notice is an official communication from the Claims Processor for the Fire Victim Trust (the "Trust") and relates to the Fire Victim(s) identified in Section II below. This Determination Notice summarizes the aggregate settlement offer for your submitted claims from the Claims Questionnaire ("CQ").

## II. FIRE VICTIM INFORMATION

| Claimant(s): | Enrique Galvez |
|---|---|
| **CQ ID:** | 10012510 |
| **Law Firm:** | Pro Se |
| **Aggregate Claim Amount:**<br>(subject to pro rata distribution) | $8,121.06 |

## III. IMPORTANT INFORMATION ABOUT RECONSIDERATION, APPEALS, PAYMENTS AND LIENS

**Reconsideration and Appeal**: Click here to read about how you can request Reconsideration or appeal the determination to a Neutral if you are dissatisfied with the award or calculation methodology.

**Pro Rata Payments:** Click here to read about the payment information required from each Fire Victim before the Trust can pay any pro rata amounts allowed under this Determination Notice, and the methodology for issuing pro rata payments on Approved Claims

**Credits, Liens, and Taxes:** Click here to read about any amounts the Trustee had to deduct from this determination as required under Article XII of the Claims Resolution Procedures. Go to your Portal to see live information about any medical reimbursement obligations and to determine your potential holdbacks or final repayment amounts for any Medicare, Medi-Cal, or private health insurance reimbursement obligations.

**Minors or Incapacitated Adults:** Click here to read about the Special Master review process required before the Trust can pay any amounts allowed under this Determination Notice to a Minor or Incapacitated Adult Fire Victim.


Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 178 of 265



# REAL AND PERSONAL PROPERTY
# DETERMINATION REPORT

## REAL AND PERSONAL PROPERTY
### DATE OF REPORT: 7/8/22

## I. LOSS LOCATION AND CLAIM INFORMATION

| Loss Location Address: | Street 1021 Hopper Ave | | Apt/Suite/Lot/Number |
|---|---|---|---|
| | City Santa Rosa | State California | Zip Code 95403-1612 |
| | County Sonoma | APN 015-360-049-000 | Fire North Bay |
| Claim ID: | 50006 | | |
| Law Firm: | Pro Se | | |

## II. REAL PROPERTY

### A. LOSS OF USE/ADDITIONAL LIVING EXPENSE

| 1. | Total | $0.00 |
|---|---|---|
| 2. | ALE/LOU Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for ALE/LOU | $0.00 |
| 4. | ALE/LOU Compensation Amount | $0.00 |

### B. PERSONAL PROPERTY - CONTENTS

| 1. | Contents | $5,000.00 |
|---|---|---|
| 2. | Personal Property Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for Essential Tools and/or Personal Property | $0.00 |
| 4. | Personal Property Compensation Amount | $5,000.00 |

### C. OTHER RELATED DAMAGES

| | |
|---|---|
| Total: | $0.00 |
| TOTAL AWARD - LESS SPECIFIC PERSONAL PROPERTY | $5,000.00 |

### D. SPECIFIC ITEMS

| SPECIFIC ITEM | OWNER | AMOUNT | OFFSET | TOTAL |
|---|---|---|---|---|
| | | | Total: | |

## III. SUMMARY OF CLAIM AWARD



Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
179 of 265


| 1. | Net Claim Compensation Amount After Offsets: | $5,000.00 |
|----|----------------------------------------------|-----------|
| 2. | Net Amount After Ownership Percentage Allocation: | $5,000.00 |
| 3. | Statutory Prejudgment Interest: | $121.06 |
| 4. | Attorney's Fees for Inverse Condemnation: | $0.00 |
| 5. | Aggregate Award Amount for Real Property Damages: | $5,121.06 |

### IV. CLAIMANT SUMMARY

| | CLAIMANT NAME | TOTAL |
|----|----------------|-------|
| 1. | Enrique Galvez | $5,121.06 |


Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
180 of 265



# REAL AND PERSONAL PROPERTY DETERMINATION REPORT

## REAL AND PERSONAL PROPERTY
### DATE OF REPORT: 7/8/22

## I. LOSS LOCATION AND CLAIM INFORMATION

| | | |
|---|---|---|
| **Loss Location Address:** | Street: 4082 Sacramento Ave | Apt/Suite/Lot/Number: |
| | City: Santa Rosa | State: California | Zip Code: 95405-7754 |
| | County: Sonoma | APN: 049-483-001-000 | Fire: North Bay |

| Claim ID: | 50007 |
|---|---|
| Law Firm: | Pro Se |

## II. REAL PROPERTY

### A. LOSS OF USE/ADDITIONAL LIVING EXPENSE

| | | |
|---|---|---|
| 1. | Total | $0.00 |
| 2. | ALE/LOU Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for ALE/LOU | $0.00 |
| 4. | ALE/LOU Compensation Amount | $0.00 |

### B. PERSONAL PROPERTY - CONTENTS

| | | |
|---|---|---|
| 1. | Contents | $0.00 |
| 2. | Personal Property Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for Essential Tools and/or Personal Property | $0.00 |
| 4. | Personal Property Compensation Amount | $0.00 |

### C. OTHER RELATED DAMAGES

| | |
|---|---|
| **Total:** | $0.00 |
| **TOTAL AWARD - LESS SPECIFIC PERSONAL PROPERTY** | **$0.00** |

### D. SPECIFIC ITEMS

| SPECIFIC ITEM | OWNER | AMOUNT | OFFSET | TOTAL |
|---|---|---|---|---|
| | | | **Total:** | |

## III. SUMMARY OF CLAIM AWARD



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 181 of 265



# REAL AND PERSONAL PROPERTY DETERMINATION REPORT

| 1. | Net Claim Compensation Amount After Offsets: | $0.00 |
|----|----------------------------------------------|-------|
| 2. | Net Amount After Ownership Percentage Allocation: | $0.00 |
| 3. | Statutory Prejudgment Interest: | $0.00 |
| 4. | Attorney's Fees for Inverse Condemnation: | $0.00 |
| 5. | Aggregate Award Amount for Real Property Damages: | $0.00 |

## IV. CLAIMANT SUMMARY

| | CLAIMANT NAME | TOTAL |
|----|---------------|-------|
| 1. | Enrique Galvez | $0.00 |

## V. EXPLANATION OF MISSING INFORMATION

Your submitted claim is missing documents or information that prohibits us from including those claimed items in our review of the Aggregate Award Amount for Real Property Damage.

This section of the Notice explains what is missing and what you may do to address the issue, if you would like these items included in your final Aggregate Award Amount. We can help if you have questions. To cure the issues identified in this Notice, click the Request Reconsideration button on your secure online Portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this Notice.

If you would like these items included in your final Aggregate Award Amount for Real Property Damage, these following items require action:

| | What is Missing | How to Address this Item |
|----|-----------------|--------------------------|
| 1. | Alternative Living Expenses Not Verified | Provide documentation evidencing your displacement by the fire, duration of displacement, as well as costs of temporary lodging, food, and other incidentals. |



Claim ID: 50007
CQ ID: 10012510



# PERSONAL INCOME LOSS DETERMINATION REPORT

## DATE OF REPORT: 7/8/22

### I. PERSONAL INCOME LOSS CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Name:** | Enrique Galvez | **Claimant ID:** | 1021557 |
| **Claim ID:** | 50008 | **Claim Questionnaire ID:** | 10012510 |
| **Law Firm:** | Pro Se | | |

### II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

Personal Income Loss Claims include Claims of individuals who lost wage income as a result of the Fires, to the extent permitted by California law.

After reviewing all submitted documents, the Trust has made the following determination for your asserted Personal Income Loss Claim.

| | |
|---|---|
| **Net Claim Award for Personal Income Loss:** | **$3,000.00** |



Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
183 of 265



# EMOTIONAL DISTRESS - ZONE OF DANGER DETERMINATION REPORT

## EMOTIONAL DISTRESS - ZONE OF DANGER
### DATE OF REPORT: 7/8/22

### I. EVACUATION/SHELTER-IN-PLACE ADDRESS AND CLAIM INFORMATION

| Name: | Enrique Galvez | | Claimant ID: | | 1021557 |
|---|---|---|---|---|---|
| **Evacuation/Shelter-in-place Address:** | Street<br>4082 Sacramento Ave | | | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | | | Zipcode<br>95405-7754 |
| | County<br>Sonoma | APN<br>049-483-001-000 | | | Fire<br>North Bay |
| **Claim ID:** | 50009 | | | | |

### II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

The Trust considers claimants to be in the Zone of Danger if they were: (a) within the Fire perimeter, (b) and experienced emotional distress or mental anguish contemporaneous to the Fire, (c) while evacuating or sheltering-in-place as a result of the Fire.

The Trust will compare the experiences of similarly situated Claimants and issue award amounts based on whether a Claimant meets the criteria for one of the following tiers: Tier I, Tier II, Tier III, or Tier IV, with Tier I denoting severe distress, Tier II moderate, and Tiers III and IV denoting varying degrees of mild distress. The Trust will make these determinations by evaluating both (a) the conditions that a Claimant encountered while evacuating or sheltering-in-place and (b) any ongoing effects from mental health conditions that Claimants have continued to experience as a result of emotional distress or mental anguish from the Fire. The Claims Administrator, in her sole discretion, may award an additional amount if a Claimant demonstrates a catastrophic and extraordinary experience that exceeds the severe distress contemplated for a Tier I determination. Section III identifies the Trust's tier determination for your asserted Emotional Distress - Zone of Danger Claim.

### DENIAL REASONS

| Reason For Denial | Explanation And How To Cure |
|---|---|
| Claimant Did Not Evacuate/Shelter-in-Place. | To be eligible to receive compensation from the Trust for a Emotional Distress Zone of Danger Claim, you must have: (a) been within the Fire perimeter; (b) and experienced emotional distress or mental anguish contemporaneous to the Fire; and (c) while evacuating or sheltering-in-place as a result of the Fire. |

### III. COMPENSATION METHODOLOGY AND SUMMARY OF CLAIM AWARD

| Zone of Danger Tier: | Denied |
|---|---|
| Gross Claim Compensation Amount: | $0.00 |
| Prior Payment Offsets (from Wildfire Assistance Program): | $0.00 |
| **Net Claim Compensation Amount After Offsets:** | **$0.00** |





# PERSONAL INJURY DETERMINATION REPORT

## DATE OF REPORT: 7/8/22

## I. PERSONAL INJURY CLAIM INFORMATION

| Name: | Enrique Galvez | Claimant ID: | 1021557 |
|---|---|---|---|
| Claim ID: | 50010 | Claim Questionnaire ID: | 10012510 |
| Law Firm: | Pro Se | | |

## II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

Personal Injury Claims include Claims for physical or bodily injuries suffered by a Claimant and any related pain and suffering and/or mental anguish caused as a result of the Fires. This includes any or all Claims for bodily injury caused by a Fire and allowed under California law.

The Trust determines award amounts for eligible Personal Injury Claims based on the Claimant's medical expenses related to treatment of the alleged injury, if medical expenses are submitted, and compensation for the Claimant's pain and suffering and/or mental anguish. After reviewing all submitted documents, the Trust has made the following determination for your asserted Personal Injury Claim.

| Description | Amount | FEMA Offset | Net Amount |
|---|---|---|---|
| Depression; Anxiety; Panic Disorders; Chronic PTSD | $0.00 | $0.00 | $0.00 |
| MSSA Bacteremia; Right Knee Infection with Abscess; Necrotizing Fasciitis | $0.00 | $0.00 | $0.00 |
| **Net Claim Award:** This is the sum of all Injury awards above minus prior related FEMA payments, if any. | | | **$0.00** |

## III. EXPLANATION OF INELIGIBLE INJURY

The table below provides additional information related to the asserted injuries that are not eligible for payment within the Personal Injury Claim Type. If you wish to accept the Aggregate Award included in your Determination Notice, you do not need to submit additional documents or take any other action on these deficiencies. If you would like us to consider these additional Assertions, you must request Reconsideration and submit the additional documents identified below. Your Determination Notice includes additional instructions on how to request Reconsideration.

| What is the issue? | How to Address this Item |
|---|---|
| To be eligible for compensation for a Personal Injury Claim, the Fire must have been a substantial contributing factor causing your physical bodily injury. | The submitted records do not establish that the Fire was a substantial contributing factor causing your physical injuries. Therefore, this injury is not eligible for compensation from the Fire Victim Trust. |
| To be eligible for compensation for a Personal Injury Claim, the Fire must have been a substantial contributing factor causing you physical bodily injury. | Claims only for Emotional Distress are considered under the Emotional Distress Claim category and are not independently compensable as a Personal Injury Claim, as there is no assertion of a physical bodily injury. The Emotional Distress Determination Report includes more information regarding your Emotional Distress Claim Determination. |



Claim ID: 50010
CQ ID: 10012510



# OTHER DAMAGES
# DETERMINATION REPORT

## DATE OF REPORT: 7/8/22

## I. OTHER DAMAGES CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Claim ID:** | 50011 | **Claim Questionnaire ID:** | 10012510 |
| **Claimant Name(s):** | Enrique Galvez | | |
| **Law Firm:** | Pro Se | | |

## II. SUMMARY OF OTHER DAMAGES ASSERTIONS

The Trust reviews and considers all claims for damages and costs recoverable under California law or, if applicable, other non-bankruptcy law. Damages asserted in the Other Damages section of the Claims Questionnaire but eligible within a Claim Type enumerated in Section II of the Claims Resolution Procedure (*e.g.*, Real Property, Emotional Distress, Business Income Loss) will be reclassified to the appropriate Claim Type and considered there. Asserted damages not specifically contemplated in other Claim Types are evaluated as part of an Other Damages Claim.

The table below identifies the assertions made in the Other Damage section of your Claims Questionnaire and the determination for each. For any assertions identified as Considered in Other Claim Type, the attachment for that Claim Type includes additional information on the determination and corresponding award amounts.

| ASSERTION | DETERMINATION | AMOUNT |
|---|---|---|
| Claimant asserts additional living expenes | Considered in Other Claim - Real and Personal Property | N/A |
| **Claim Award:** | | N/A |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
186 of 265



# OTHER OUT-OF-POCKET EXPENSES DETERMINATION REPORT

## DATE OF REPORT: 7/8/22

### I. OTHER OUT-OF-POCKET DAMAGES CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Claim ID:** | 50012 | **Claim Questionnaire ID:** | 10012510 |
| **Claimant Name(s):** | Enrique Galvez | | |
| **Law Firm:** | Pro Se | | |

### II. SUMMARY OF OTHER OUT-OF-POCKET EXPENSE ASSERTIONS

Other Out-of-Pocket Expense Claims include Claims for out-of-pocket expenses that are not considered as in any other Claim Type. Damages asserted in the Other Out-of-Pocket Expenses section of the Claims Questionnaire but eligible within another Claim Type enumerated in Section II of the Claims Resolution Procedure (*e.g.*, Real Property, Personal Injury, Business Income Loss) will be reclassified to the appropriate Claim Type and considered there. Asserted damages not specifically contemplated in other Claim Types are evaluated as part of an Other Out-of-Pocket Expenses Claim.

The table below identifies the assertions made in the Out-of-Pocket Expense section of your Claims Questionnaire and the determination for each. For any assertions identified as Considered in Other Claim Type, the attachment for that Claim Type includes additional information on the determination and corresponding award amounts.

| EXPENSES | DETERMINATION | AMOUNT |
|---|---|---|
| Claimant asserts additional costs of fuel to and from therapists and doctors after the fire | Considered in Other Claim - Real and Personal Property | N/A |
| Claimant asserts miscellaneous costs for medical supplies not covered by insurance | Considered in Other Claim - Personal Injury | N/A |
| **Claim Award:** | | N/A |





# EMOTIONAL DISTRESS - NUISANCE DETERMINATION REPORT

## DAMAGES FOR ANNOYANCE AND DISCOMFORT - NUISANCE
### DATE OF REPORT: 7/8/22

### I. PROPERTY ADDRESS AND CLAIM INFORMATION

| Name: | Enrique Galvez | Claimant ID: | 1021557 |
|---|---|---|---|

| | Street<br>1021 Hopper Ave | | Apt/Suite/Lot/Number |
|---|---|---|---|
| **Property Address:** | City<br>Santa Rosa | State<br>California | Zipcode<br>95403-1612 |
| | County<br>Sonoma | APN<br>015-360-049-000 | Fire<br>North Bay |

| Claim ID: | 51475 |
|---|---|

### II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

The Trust will consider damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had the right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

The Trust will compare the experiences of similarly situated Claimants and issue award amounts based on whether a Claimant meets the criteria for one of the following tiers: Tier I, Tier II, Tier III, or Tier IV, with Tier I denoting severe distress, Tier II moderate, and Tiers III and IV denoting varying degrees of mild distress. The Trust will make these determinations by evaluating both the (a) effect of the Fire on a Claimant's ability to enjoy and use his or her property, and (b) any ongoing effects that a Claimant has continued to experience as a result of the displacement, including difficulties in finding suitable alternative housing, difficulties in accessing the necessities of life and participating in work, family and social activities and the resulting emotional distress or mental anguish related to these considerations. The Claims Administrator, in her sole discretion, may award an additional amount if a Claimant demonstrates a catastrophic and extraordinary experience that exceeds the severe distress contemplated for a Tier I determination. Section III identifies the Trust's tier determination for your asserted Emotional Distress - Nuisance Claim.

### DENIAL REASONS

| Reason For Denial | Explanation And How To Cure |
|---|---|
| No Right to Occupy Property | To be eligible to receive compensation from the Trust for an Emotional Distress Nuisance -- Annoyance claim, you must have resided at, had immediate possession of the property, or had a right to occupy the property at the time of either the: (a) 2015 Butte Fire; (b) 2017 North Bay Fire; or (c) 2018 Camp Fire. |

### III. COMPENSATION METHODOLOGY AND SUMMARY OF CLAIM AWARD

| Nuisance Tier: | Denied |
|---|---|
| Gross Claim Compensation Amount: | $0.00 |
| Prior Payment Offsets (from Wildfire Assistance Program): | $0.00 |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
188 of 265


| Net Claim Compensation Amount After Offsets: | $0.00 |
|---|---|





November 20, 2022

I.  Claimant's Redetermination Narrative to PG&Es Determination Report for Personal Property dated July 8, 2022; Claim ID 50006.

II. **Introduction**

Claimant is flummoxed at this Determination Report as it fails to apply the formula set forth in the Personal Property Eligibility Criteria and Section 2.6 of the Fire Victim Trust Agreement. The Content award is based on Claimant having his Personal Property in a public storage unit, for 17 DAYS. Claimant was not a "renter" then, and never has been. In fact, this was the first time in his life he used a storage unit. Claimant was a "homeowner in transition."

He sold his home on September 26, 2017 and moved his entire life's property into a public storage unit. This was to be temporary, just until he and his sister could find a new home. *(Document #176335)* That dream was snuffed out, on October 8, 2017, by the wildfires caused by PG&Es reckless and tortuous behavior. Claimant had his Personal Property in storage for 17 DAYS. That hardly makes him a "renter", even under the bias guidelines developed by PG&E.

The Trustee has spent the last 2 years promulgating dialogue boosting about the highly skilled staff the Trust has employed to engage in an efficient process intended to fairly compensate Fire Victim Claims. That cannot be true in light of this blatant attempt to deprive Claimant of compensation he is due under the law and the Trust Agreement. This Determination is a clear breach of the Trustee's fiduciary duty to only act in the best interests of the beneficiaries of the Trust.

III. **Facts**

Claimant was the owner of property located at 1832 Sansome Drive, Santa Rosa, California 95403. He owned the property for several decades. During that time, Claimant maintained a Homeowners Insurance Policy *(Document #163459)*. This policy included umbrella coverage for all his Personal Property, regardless of where it was located. Accordingly, Claimants insurer adjudicated the claim as if his Personal Property were in his residence. They categorized his claim as a total loss. *(Document #128458, pg. 9, a document from the insurance files you obtained, states, "Wild Fire caused fire at STORAGE UNIT, ALL INSURED PROPERTY DESTROYED")*.

Claimant submitted a detailed Initial Loss Inventory for damages. *(Document #161005, loss of $340,000.00)* Claimant felt that his insurer was engaging in unfair and deceptive business practices and had breached the

**1**

covenant of good faith and fair dealing. Claimant exercised reasonable and extraordinary efforts in pursuit of obtaining just compensation from his insurer but was not successful. For that reason, Claimant requested, pursuant to the Available Insurance Recoveries section of the Trust Agreement, that the Trustee assist Claimant in recovering the full amount due. *(Document #176335, pgs. 11-12)* That was 2 YEARS AGO. He requested this assistance, in writing, 4 MORE TIMES. These requests were ignored.

Claimant's insurer only paid Claimant $163,334.00 *(Documents #161003 & 161004).* Well short of the Policy Limits of $350,000.00 *(Document #163459)* This Determination does not follow the statement in the Personal Property Eligibility Criteria, at page 12, which states, "The award will be offset by the C Claimants policy limits available to him at the time of the fire, NOT WHAT THE INSURANCE CARRIER PAID CLAIMANT AS A RESULT OF THE FIRE."

## IV.  Analysis

Applying the ridiculous $5,000.00 award for Contents would result in this outcome:

1.  Contents…………………………………………...$5,000
2.  Personal Property Insurance Policy Offset………..$163,333.00
3.  FEMA Payment Offset……………………………$0
4.  Personal Property Compensation Amount ………...(-)$158,333.00

So, Claimant OWES $158,333.00? Who would he owe it to? His Insurer? PG&E?

This suggests that the Trustee is intentionally depriving Claimant(s) of compensation they are entitled to. This action entitles Claimant to Punitive/Delay damages. Claimant is preparing a lawsuit to sue the Trustee for breach of his fiduciary duty and related claims as his/her actions in managing the Trust does not insulate him/her from liability for those actions

## V.  Conclusion

The Trustee requires Claimant to provide documents to establish the value of the damaged property and the costs of repairs to or replacement and requests that one or more of the following documents be provided: List of items destroyed or damaged; Proofs of purchase; Pre-Fire and post-Fire photos or videos; Appraisals; and Other Supporting Documents in the Claimant's possession to show the value of he claimed personal property. Claimant provided the following:

2

**1.** Document #161003; – Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;

**2.** Document #161004; - Revised, Detailed Loss Inventory Prepared by Claimants Insurer, CSAA. Contains detailed descriptions of the lost item, current value, depreciation, age/life, condition and replacement cost;

**3.** Document #161005; – Initial Loss Inventory Submitted by Claimant to Insurer, CSAA. Contains detailed descriptions;

**4.** Document #163459; Claimants Exhibit B3 – Copy of Claimants Homeowners Insurance Policy.

Claimant has also provided detailed narratives and other documents to support his claims. Claimant has more than satisfied what is required of him in order to obtain the fair compensation he deserves. If dealing with the loss of everything he ever owned his entire life, the loss of community and an unethical insurer wasn't enough, he now must contend with a reckless corporate criminal intend on cheating him. This behavior is only serving to exasperate the Chronic Post Traumatic Stress Disorder he has developed and been diagnosed with as a direct result of the fires.

Be advised that continuing determinations of this nature will be met with appeal and Claimant is prepared to exhaust all layers through Judicial Determination and in the Northern District, in front of a jury. This behavior is obviously intentional and punitive in nature.

In closing, Claimant request a phone conference with either Ms. Yanni or the Claims Administrator. It may be wise to facilitate this as 15 minute call now may resolve these escalating issues. The alternative will only add burden and expense for the Trust in the future.

Respectfully Submitted,

Enrique Galvez

Claimant Enrique Galvez

3



**December 5, 2022**

I.    Claimant's Reconsideration Narrative in Response to PG&Es Determination Report, dated 7/8/22, for Emotional Distress – Nuisance; Claim ID #51475.

II.   **Introduction**

The basis stated for the Trustees wholesale denial of Claimant's legitimate and well supported claim that Claimant had, "No Right to Occupy Property". Claimant does not argue the point. He must instead inform the Trust that the address used in order to make its determination is not the address he resided at when he was under a MANDATORY EVACUATION ORDER. The address you have used is the location where his insured personal property was located at the time the Fires erupted. Without pointed fingers and making further acquisitions about this being part of PG&Es ongoing campaign to prevent Claimants from recovering what they are entitled to, the correct address associated with this claim is that listed in the Zone of Danger, the address he was forced to evacuate and was prevented from returning to for over 4 days: 4082 Sacramento Avenue, Santa Rosa, California 95405. This denial again lacks any basic logic or rationale. Obviously, since the Trust has initially denied Claimants Zone of Danger claim, this claim should have denied based on that basis. Instead, the denial is based on an incorrect address. Another example of the deductive reasoning and analytical skills of the Trusts claims evaluators. This analytical deficiency is apparent in every determination that Claimant has received to date.

The record reveals that countless governmental agencies and news services, tracking evacuation data during the Fire, evidences that Claimant was under a MANDATORY EVACUATION notice and restricted from returning to his residence for over 4 days.. Those sources include, but are not limited to, the City of Santa Rosa, the County of Sonoma, the County of Marin, the County of Napa, Cal Fire, the Press Democrat, the New York Times, the Washington Post, CNN, the Mercury News, SF Gate, the San Francisco Chronicle, the Sonoma County Gazette, the Sacramento Bee, KRON 4 News and every major news broadcasters, as well as a plethora of others, just to name a few. The Trust was under a fiduciary obligation to have developed, well in advance of adjudicating any submitted claims, the necessary, required and ACCURATE reference sources that its Claims Evaluators would rely upon again and again, in order to achieve its duty and stated goal to provide a reliable and efficient process to FAIRLY compensate the Fire Victims.

PG&Es well established practice of successfully manipulating the system every time it burns down or blows up communities has reduced these victims to mere creditors in a bankruptcy proceeding. As a result, the issue of guilt has already been established. Victims have been robbed of the benefit of a true judicial proceeding where evidence is presented to an empanelled jury, for the purpose of establishing damages. Instead, PG&E is allowed to design a system whereby damages are decided based on document submission. This creates a nearly unobjectionable construct that PG&E cannot resist to

1

selectively abuse as it sees fit. It appears that PG&E has targeted those most vulnerable, in this case it seems to be those victims that do not have an attorney of record.

### III.    Annoyance & Discomfort, Nuisance

The Trust will consider damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of the property that Claimant had the right to occupy at the time of the Fire, loss of community and the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

> ➢    **Loss of Use or Substantial Interference** – Claimant was under a MANDATORY EVACUATION AND STAY AWAY ORDER requiring strict compliance. In total, Claimant was prevented from returning to his residence for a little over 4 days. *(Again, this data is available from countless sources, including Cal Fire)* Claimant has provided numerous documents evidencing that he resided at and had immediate possession of the property prior to the Fire. This prevented Claimant from enjoyment of the property; nay he had no access for over 4 days.

> ➢    **Loss of Community** – As reflected in the statement from his physician *(Document #160993),* the Fire immediately severed Claimant's access to his family, friends and the spokes of his community support wheel, which took a lifetime to build and a reckless moment to lose. The lack of any available housing forced Claimant to stay with his sister, who lived in Sacramento. Claimant was forced to incur the time and expense, as well as the emotional strain of commuting from Sacramento to his work place in Petaluma for 4 days. This created a hardship for Claimant.

> ➢    **Loss of Cherished Possessions or Irreplaceable Items**– The Fire had destroyed all of his personal property. To include, but not limited to, his grandmother's ashes, signed photos with himself and dignitaries and celebrities, statutes and figurines that had been in his family, awards and accolades from employers over the years, as well as other items.

### IV.    Determination Factors

The Trust must evaluate the following factors when determining Tier position and award amounts:

(a) Whether the property that is the basis for the claim was within the Fire Perimeter;
*(As established by the sources, and many more, referenced above)*

(b) Whether the Claimant resided at or had immediate possession of the property at the time of the Fire:
*(This has been established by numerous documents Claimant has provided and has been available in the portal for over 2 years)*

**2**

(c) Treatment for ongoing effects of a mental condition that Claimant has continued to experience as a result of the emotional distress or mental anguish from the Fire;

*(As contained in the statements of his physician, life coach, psychiatrist and declarations from his immediate family and friends, located in the documents as referenced below. Most importantly, the statements from his psychiatrist that Claimants emotional distress has evolved into Chronic Post Traumatic Stress Syndrome and Panic Disorder. These conditions are very serious and, in California, are Personal Psychiatric Injuries that stand alone and do not require any connection to any physical injury, nor is emotional distress a required element of Post Traumatic Stress Disorder)*

(d) Whether Claimant experienced a decline in the quality of life as a result of the emotional distress or mental anguish from the Fire.

*(As contained in the statement of his physician who describes that the Fire robbed Claimant of precious resources needed to support and assist Claimant with any possible recovery from this catastrophe. Resources that took a lifetime to develop, most importantly, the loss of family and community. See also documents as referenced below)*

(e) The duration and circumstances of Claimant's displacement from the property, including difficulties in finding suitable alternative housing.

*(As described above, Claimant was unable to find any alternative housing, so he was forced to commute from Sacramento to his workplace in Petaluma, some 85 miles one way. This created a hardship)*

## V.    Required Documentation for Emotional Distress Claims.

Claimant has provided documentation that includes written narratives, post-Fire photos and detailed inventories of his lost personal property, written reports from his original physician, life coach and psychiatrist, copies of his related expenses, and declarations from family and friends and additional photos below.

These items can be found at the following document ID numbers:

1.   176335 – Claimants Original Narrative,
2.   160993 - Statement from Claimant's Physician describing his mental condition and the impact on his life for loss of community,
3.   176332 – Statement from Life Coach,
4.   179481 – Additional statement from Life Coach,
5.   848962 – Statement from psychiatrist confirming mental condition,
6.   1594450 - Additional statement from psychiatrist,
7.   163451 – Declaration from Claimant,
8.   160995, 160996, 160997 – Declarations from family and friends concerning Claimant's mental condition prior to and after the fire.

3

**9.** 161003, 161004, 161005, and 163459 – Lost detailed personal property inventories and insurance policy.

Accordingly, Claimant has provided essential documentation to more than satisfy all determination factors. Best evidence that has been in the portal for two (2) years.

## VI.    The Existing Fiduciary Relationship Between the Parties.

In California, a fiduciary relationship begins once the fiduciary commences to knowingly act upon behalf of the beneficiary, for their benefit. With the fiduciary relationship established, the fiduciary in a relationship is required to: Treat beneficiary with care and reasonable conduct; Remain open and honest with beneficiary when it comes to relevant information; Act in good faith, by putting the interests of the beneficiary above all personal interests. The Trustee has failed to follow these well established principles.

In every contract or agreement there is an implied promise of good faith and fair dealing *(Covenant of Good Faith & Fair Dealing)*. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. "In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *(Racine & Laramie, Ltd. v. Department of Parks & Recreation (1992) 11 Cal.App.4th 1026, 1031–1032)*

Claimant is living in poverty as a result of the fires, can't get work in his old career due to the physical and mental injuries he sustained as a direct result of PG&Es grossly negligent and reckless behavior, he is homeless forced to sleep on his sister's couch, and has no resources to get the additional medical and mental services he so desperately needs. If not for help from his family, charity, professional courtesies and his extreme need for these services, he would be undone.

Yet, despite his complete lack of resources and having no funds needed to obtain the much required physical and mental health assistance he needs, he has found a way to discharge his obligation to mitigate any damages.

PG&E, the tortfeasor, is the party with superior resources and has already been found to be responsible for the fires and all the damages it has caused. "The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, and, consequently, when expenditures are necessary for minimization of damages, the duty does not run to a person who is financially unable to make such expenditures." *(Valencia v. Shell Oil Co. (1944) 23 Cal.2d 840, 846)*

4

"The burden is on defendant to establish matters asserted by him in mitigation or reduction of the amount of plaintiff's damage, and Defendant here has not met that burden." *(McNary v. Hanley (1933) 131 Cal. App. 188, 190)*

It is without a doubt that PG&E has failed, nay, not even attempted to mitigate its damages, not to mention its complete inability to conduct a proper analysis of the asserted claims. This behavior is only serving to exasperate the Chronic Post Traumatic Stress Disorder he has developed and been diagnosed with as a direct result of the fires.

## VII.   Conclusion

The Trustee has spent the last 2 years promulgating dialogue boosting about the highly skilled staff the Trust has employed to engage in an efficient process intended to fairly compensate Fire Victim Claims. That cannot be true in light of these incompetent determinations. These baffling outcomes seem to be blatant attempts to deprive Claimant of compensation he is due under the law and the Trust Agreement. These reckless determinations, based on improperly performed analysis, are clear breaches of the Trustee's fiduciary duty to only act in the best interests of the beneficiaries of the Trust.

Further, the Trustee has asserted, on more than one occasion, that the Trust has identified those Claimants suffering the most and in need of some immediate payment to assist in their recovery. These statements have no weight and were nothing more than bullshit intended to satisfy the media and critics of these unfair settlement proceedings. If these statements had any truth to them, Claimant would have been identified as a member of the group identified as most needy and would have received some payment. It begs the question as to why the Trust took two (2) years to come to these determinations. It would seem that any claim asserting a personal injury would have been identified in the beginning of the claims resolution process considering the parties mutual obligation, under the law, to mitigate damages.

Also, none of these erroneous determinations are accompanied by any explanation as to how the Trust arrived at the conclusions it did, leaving Claimant no information to accept or otherwise challenge these outcomes. This behavior is intentional and entitles Claimant to punitive damages.

Be advised that continuing determinations of this nature will be met with appeal and Claimant is prepared to exhaust all layers through Judicial Determination and in the Northern District, in front of a jury. This behavior is obviously intentional and punitive in nature. The Protective Provisions contained in the Trust Agreement afford no insulation to the Trustee or any of the Trust employees from willful misconduct, bad faith or fraud. Claimant is prepared to bring a separate action against the Trustee for this obvious mismanagement of the Trust and the bad faith contained in these claim determinations.

5

**Photographs of Claimant's Evacuation Area**

A.     **Mobile Home Park Several Blocks from Claimant's Residence**



B.     **The Remains of a Burned Commercial Building Close to Claimant's Home**



6

**C.** **The Hilton Hotel Burning Just ½ Mile from Claimants Home.**



**D.** **What was left of Coffey Park, Claimant's Residence was just 1 mile away.**



7

**E.** **Photo Taken Early Next Morning During the Evacuation**



8



**December 5, 2022**

I.    <u>Claimant's Reconsideration Narrative in Response to PG&Es Determination Report, dated 7/8/22, for Emotional Distress – Zone of Danger; Claim ID #50009.</u>

## II.    <u>Introduction</u>

The basis stated for the Trustees wholesale denial of Claimant's legitimate and well supported claim is, "Claimant did not evacuate/shelter-in-place." The denial is not accompanied by any explanation or referenced sources relied upon to arrive at this conclusion. Please provide Claimant with all materials the Trust relied upon to support its denial and a detailed summary of the methodology employed in the analysis of these materials.

Claimant's research reveals that countless governmental agencies and news services, tracking evacuation data during the Fire, evidences that Claimant was under a MANDATORY evacuation notice. Those sources include, but are not limited to, the City of Santa Rosa, the County of Sonoma, the County of Marin, the County of Napa, Cal Fire, the Press Democrat, the New York Times, the Washington Post, CNN, the Mercury News, SF Gate, the San Francisco Chronicle, the Sonoma County Gazette, the Sacramento Bee, KRON 4 News and every major news broadcasters, as well as a plethora of others, just to name a few. How is it that the Trust, with vast resources, did not discover this data? The Trust was under a fiduciary obligation to have developed, well in advance of adjudicating any submitted claims, the necessary, required and ACCURATE reference sources that its Claims Evaluators would rely upon again and again, in order to achieve its duty and stated goal to provide a reliable and efficient process to FAIRLY compensate the Fire Victims.

PG&Es well established practice of successfully manipulating the system every time it burns down or blows up communities has reduced these victims to mere creditors in a bankruptcy proceeding. As a result, the issue of guilt has already been established. Victims have been robbed of the benefit of a true judicial proceeding where evidence is presented to an empanelled jury, for the purpose of establishing damages. Instead, PG&E is allowed to design a system whereby damages are decided based on document submission. This creates a nearly unobjectionable construct that PG&E cannot resist to selectively abuse as it sees fit. It appears that PG&E has targeted those most vulnerable, in this case it seems to be those victims that do not have an attorney of record.

## III.    <u>Zone of Danger</u>

The Trust must consider claimants to be in the Zone of Danger if they were: (a) within the Fire Perimeter, (b) and experienced emotional distress or mental anguish contemporaneous to an included Fire, (c) while evacuating or sheltering-in-place as a result of the Fire. The Trust will make these determinations by evaluating both: (a) the conditions that Claimant encountered while evacuating or sheltering-in-place and (b) any

**1**

ongoing effects from mental health conditions that Claimant has continued to experience as a result of the emotional distress or mental anguish from the Fire.

> **Within the Fire Perimeter** - Although Claimant was at a funeral out of town when the Fire OFFICIALLY began, he arrived at his home, located well within the Zone of Danger, prior to the authorities' issuing a mandatory evacuation notice. The notice required that all evacuees depart from the Zone within an hour. Claimant complied as instructed;

> **Experienced Emotional Distress Contemporaneous to the Fire** – Prior to having to evacuate his residence, under unorganized, chaotic and terrifying conditions, Claimant was informed that the Fire had destroyed all of his personal property. Accordingly, Claimant was already suffering from severe mental anguish, fear and confusion before, during and after the evacuation;

> **While Evacuating** – As described above.

Claimant has provided ample evidence to satisfy all the Zone of Danger elements.

## IV.  **Determination Factors**

The Trust must evaluate the following factors when determining Tier position and award amounts:

(a) The nature of the conditions that a Claimant experienced while evacuating or sheltering-in-place as the result of the Fire;
*(As described above and contained in the documents referenced below)*

(b) Treatment for ongoing effects of a mental condition that Claimant has continued to experience as a result of the emotional distress or mental anguish from the Fire;
*(As contained in the statements of his physician, life coach, psychiatrist and declarations from his immediate family and friends, located in the documents as referenced below. Most importantly, the statements from his psychiatrist that Claimants emotional distress has evolved into Chronic Post Traumatic Stress Syndrome and Panic Disorder. These conditions are very serious and, in California, are Personal Psychiatric Injuries that stand alone and do not require any connection to any physical injury, nor is emotional distress a required element of Post Traumatic Stress Disorder)*

(c) Whether Claimant experienced a decline in the quality of life as a result of the emotional distress or mental anguish from the Fire.
*(As contained in the statement of his physician who describes that the Fire robbed Claimant of precious resources needed to support and assist Claimant with any possible recovery from this catastrophe. Resources that took a*

2

*lifetime to develop, most importantly, the loss of family and community. See also documents as referenced below)*

## V.     Required Documentation for Emotional Distress Claims.

Claimant has provided documentation that includes written narratives, post-Fire photos and detailed inventories of his lost personal property, written reports from his original physician, life coach and psychiatrist, copies of his related expenses, and declarations from family and friends and additional photos below.

These items can be found at the following document ID numbers:

1.      176335 – Claimants Original Narrative,
2.      160993 – Statement from Claimant's Physician describing his mental condition and the impact on his life for loss of community,
3.      176332 – Statement from Life Coach,
4.      179481 – Additional statement from Life Coach,
5.      848962 – Statement from psychiatrist confirming mental condition,
6.      1594450 - Additional statement from psychiatrist,
7.      163451 – Declaration from Claimant,
8.      160995, 160996, 160997 – Declarations from family and friends concerning Claimant's mental condition prior to and after the fire.
9.      161003, 161004, 161005, and 163459 – Lost detailed personal property inventories and insurance policy.

Accordingly, Claimant has provided essential documentation to more than satisfy all three (3) determination factors. Best evidence that has been in the portal for two (2) years.

## VI.     The Existing Fiduciary Relationship Between the Parties.

In California, a fiduciary relationship begins once the fiduciary commences to knowingly act upon behalf of the beneficiary, for their benefit. With the fiduciary relationship established, the fiduciary in a relationship is required to: Treat beneficiary with care and reasonable conduct; Remain open and honest with beneficiary when it comes to relevant information; Act in good faith, by putting the interests of the beneficiary above all personal interests. The Trustee has failed to follow these well established principles.

In every contract or agreement there is an implied promise of good faith and fair dealing *(Covenant of Good Faith & Fair Dealing)*. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. "In essence, the covenant is implied as a supplement

3

to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *(Racine & Laramie, Ltd. v. Department of Parks & Recreation (1992) 11 Cal.App.4th 1026, 1031–1032)*

Claimant is living in poverty as a result of the fires, can't get work in his old career due to the physical and mental injuries he sustained as a direct result of PG&Es grossly negligent and reckless behavior, he is homeless forced to sleep on his sister's couch, and has no resources to get the additional medical and mental services he so desperately needs. If not for help from his family, charity, professional courtesies and his extreme need for these services, he would be undone.

Yet, despite his complete lack of resources and having no funds needed to obtain the much required physical and mental health assistance he needs, he has found a way to discharge his obligation to mitigate any damages.

PG&E, the tortfeasor, is the party with superior resources and has already been found to be responsible for the fires and all the damages it has caused. "The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, and, consequently, when expenditures are necessary for minimization of damages, the duty does not run to a person who is financially unable to make such expenditures." *(Valencia v. Shell Oil Co. (1944) 23 Cal.2d 840, 846)*

"The burden is on defendant to establish matters asserted by him in mitigation or reduction of the amount of plaintiff's damage, and Defendant here has not met that burden." *(McNary v. Hanley (1933) 131 Cal. App. 188, 190)*

It is without a doubt that PG&E has failed, nay, not even attempted to mitigate its damages, not to mention its complete inability to conduct a proper analysis of the asserted claims. This behavior is only serving to exasperate the Chronic Post Traumatic Stress Disorder he has developed and been diagnosed with as a direct result of the fires.

## VII.  Conclusion

The Trustee has spent the last 2 years promulgating dialogue boosting about the highly skilled staff the Trust has employed to engage in an efficient process intended to fairly compensate Fire Victim Claims. That cannot be true in light of these incompetent determinations. These baffling outcomes seem to be blatant attempts to deprive Claimant of compensation he is due under the law and the Trust Agreement. These reckless determinations, based on improperly performed analysis, are clear breaches of the Trustee's fiduciary duty to only act in the best interests of the beneficiaries of the Trust.

Further, the Trustee has asserted, on more than one occasion, that the Trust has identified those Claimants suffering the most and in need of some immediate payment to assist in their recovery. These statements have no weight and were nothing more than

**4**

bullshit intended to satisfy the media and critics of these unfair settlement proceedings. If these statements had any truth to them, Claimant would have been identified as a member of the group identified as most needy and would have received some payment. It begs the question as to why the Trust took two (2) years to come to these determinations. It would seem that any claim asserting a personal injury would have been identified in the beginning of the claims resolution process considering the parties mutual obligation, under the law, to mitigate damages.

Also, none of these erroneous determinations are accompanied by any explanation as to how the Trust arrived at the conclusions it did, leaving Claimant no information to accept or otherwise challenge these outcomes. This behavior is intentional and entitles Claimant to punitive damages.

Be advised that continuing determinations of this nature will be met with appeal and Claimant is prepared to exhaust all layers through Judicial Determination and in the Northern District, in front of a jury. This behavior is obviously intentional and punitive in nature. The Protective Provisions contained in the Trust Agreement afford no insulation to the Trustee or any of the Trust employees from willful misconduct, bad faith or fraud. Claimant is prepared to bring a separate action against the Trustee for this obvious mismanagement of the Trust and the bad faith contained in these claim determinations.

## Photographs of Claimant's Evacuation Area

**A.      Mobile Home Park Several Blocks from Claimant's Residence**



Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 208 of 265

**B.**     **The Remains of a Burned Commercial Building Close to Claimant's Home**



**C.**     **The Hilton Hotel Burning Just ½ Mile from Claimants Home.**



6

D.    <u>**What was left of Coffey Park, Claimant's Residence was just 1 mile away.**</u>



E.    <u>**Photo Taken Early Next Morning During the Evacuation**</u>



7




**DATE OF NOTICE: 3/2/23**
**DEADLINE TO APPEAL : 4/3/23**

## I. DETERMINATION NOTICE

This Notice is an official communication from the Claims Processor for the Fire Victim Trust (the "Trust") and relates to the Fire Victim(s) identified in Section II below. This Reconsideration Determination Notice summarizes the aggregate amount for your submitted claims from the Claims Questionnaire ("CQ") after review of any new supporting proof and/or arguments made in the Reconsideration request.

## II. FIRE VICTIM INFORMATION

| | |
|---|---|
| **Claimant(s):** | Enrique Galvez |
| **CQ ID:** | 10012510 |
| **Law Firm:** | Pro Se |
| **Reconsideration Determination:** (subject to pro rata distribution) | $79,828.07 |

## III. IMPORTANT INFORMATION ABOUT RECONSIDERATION, APPEALS, PAYMENTS AND LIENS

**Appeal**: Click here to read about how you can appeal the determination to a Neutral if you are dissatisfied with the award.

**Pro Rata Payments**: Click here to read about the payment information required from each Fire Victim before the Trust can pay any pro rata amounts allowed under this Determination Notice, and the methodology for issuing pro rata payments on Approved Claims.

**Credits, Liens, and Taxes**: Click here to read about any amounts the Trustee had to deduct from this determination as required under Article XII of the Claims Resolution Procedures. Go to your Portal to see live information about any medical reimbursement obligations and to determine your potential holdbacks or final repayment amounts for any Medicare, Medi-Cal, or private health insurance reimbursement obligations.

**Minors or Incapacitated Adults:** Click here to read about the Special Master review process required before the Trust can pay any amounts allowed under this Determination Notice to a Minor or Incapacitated Adult Fire Victim.


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 212 of 265



# REAL AND PERSONAL PROPERTY
# RECONSIDERATION DETERMINATION REPORT

## REAL AND PERSONAL PROPERTY
### DATE OF REPORT: 3/2/23

### I. LOSS LOCATION AND CLAIM INFORMATION

| Loss Location Address: | Street 1021 Hopper Ave | | Apt/Suite/Lot/Number |
|---|---|---|---|
| | City Santa Rosa | State California | Zip Code 95403-1612 |
| | County Sonoma | APN 015-360-049-000 | Fire North Bay |

| Claim ID: | 50006 |
|---|---|
| Law Firm: | Pro Se |

### II. REAL PROPERTY

#### A. LOSS OF USE/ADDITIONAL LIVING EXPENSE

| | | |
|---|---|---|
| 1. | Total | $0.00 |
| 2. | ALE/LOU Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for ALE/LOU | $0.00 |
| 4. | ALE/LOU Compensation Amount | $0.00 |

#### B. PERSONAL PROPERTY - CONTENTS

| | | |
|---|---|---|
| 1. | Contents | $184,401.93 |
| 2. | Personal Property Insurance Policy Offset | $163,333.97 |
| 3. | FEMA Payment Offset for Essential Tools and/or Personal Property | $0.00 |
| 4. | Personal Property Compensation Amount | $21,067.96 |

#### C. OTHER RELATED DAMAGES

| | |
|---|---|
| Total: | $0.00 |
| **TOTAL AWARD - LESS SPECIFIC PERSONAL PROPERTY** | **$21,067.96** |

#### D. SPECIFIC ITEMS

| SPECIFIC ITEM | OWNER | AMOUNT | OFFSET | TOTAL |
|---|---|---|---|---|
| | | | Total: | |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 213 of 265


| | III. SUMMARY OF CLAIM AWARD | |
|---|---|---|
| 1. | Net Claim Compensation Amount After Offsets: | $21,067.96 |
| 2. | Net Amount After Ownership Percentage Allocation: | $21,067.96 |
| 3. | Statutory Prejudgment Interest: | $510.11 |
| 4. | Attorney's Fees for Inverse Condemnation: | $0.00 |
| 5. | Aggregate Award Amount for Real Property Damages: | $21,578.07 |

| | IV. CLAIMANT SUMMARY | |
|---|---|---|
| | CLAIMANT NAME | TOTAL |
| 1. | Enrique Galvez | $21,578.07 |

| V. RECONSIDERATION COMMENT |
|---|
| The Claimant requested Reconsideration on their Personal Property award. The Trust has reviewed the documentation and awarded the largest inventory totaling $184,401.93 pre-tax. There is no inventory supporting the asserted $340,000 claim. Additionally, the Trust has agreed to offset the amount paid rather than the full policy limit. After Reconsideration, the Aggregate Award is $21,578.07. |


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 214 of 265



# REAL AND PERSONAL PROPERTY
# RECONSIDERATION DETERMINATION REPORT

| REAL AND PERSONAL PROPERTY | |
|---|---|
| **DATE OF REPORT: 3/2/23** | |

## I. LOSS LOCATION AND CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Loss Location Address:** | Street<br>4082 Sacramento Ave | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | Zip Code<br>95405-7754 |
| | County<br>Sonoma | APN<br>049-483-001-000 | Fire<br>North Bay |
| **Claim ID:** | 50007 | | |
| **Law Firm:** | Pro Se | | |

## II. REAL PROPERTY

### A. LOSS OF USE/ADDITIONAL LIVING EXPENSE

| | | |
|---|---|---|
| 1. | Total | $0.00 |
| 2. | ALE/LOU Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for ALE/LOU | $0.00 |
| 4. | ALE/LOU Compensation Amount | $0.00 |

### B. PERSONAL PROPERTY - CONTENTS

| | | |
|---|---|---|
| 1. | Contents | $0.00 |
| 2. | Personal Property Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for Essential Tools and/or Personal Property | $0.00 |
| 4. | Personal Property Compensation Amount | $0.00 |

### C. OTHER RELATED DAMAGES

| | |
|---|---|
| **Total:** | $0.00 |
| **TOTAL AWARD - LESS SPECIFIC PERSONAL PROPERTY** | **$0.00** |

### D. SPECIFIC ITEMS

| SPECIFIC ITEM | OWNER | AMOUNT | OFFSET | TOTAL |
|---|---|---|---|---|
| | | | **Total:** | |



Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
215 of 265



# REAL AND PERSONAL PROPERTY
# RECONSIDERATION DETERMINATION REPORT

| | III. SUMMARY OF CLAIM AWARD | |
|---|---|---|
| 1. | Net Claim Compensation Amount After Offsets: | $0.00 |
| 2. | Net Amount After Ownership Percentage Allocation: | $0.00 |
| 3. | Statutory Prejudgment Interest: | $0.00 |
| 4. | Attorney's Fees for Inverse Condemnation: | $0.00 |
| 5. | Aggregate Award Amount for Real Property Damages: | $0.00 |

| | IV. CLAIMANT SUMMARY | |
|---|---|---|
| | CLAIMANT NAME | TOTAL |
| 1. | Enrique Galvez | $0.00 |

## VI. EXPLANATION OF MISSING INFORMATION

Your submitted claim is missing documents or information that prohibits us from including those claimed items in our review of the Aggregate Award Amount for Real Property Damage.

This section of the Notice explains what is missing and what you may do to address the issue, if you would like these items included in your final Aggregate Award Amount. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Deficiency Notice button on your secure online Portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this Notice.

If you would like these items included in your final Aggregate Award Amount for Real Property Damage, these following items require action:

| | What is Missing | How to Address this Item |
|---|---|---|
| 1. | Alternative Living Expenses Not Verified | Provide documentation evidencing your displacement by the fire, duration of displacement, as well as costs of temporary lodging, food, and other incidentals. |





# PERSONAL INCOME LOSS RECONSIDERATION DETERMINATION REPORT

## DATE OF REPORT: 3/2/23

## I. PERSONAL INCOME LOSS CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Name:** | Enrique Galvez | **Claimant ID:** | 1021557 |
| **Claim ID:** | 50008 | **Claim Questionnaire ID:** | 10012510 |
| **Law Firm:** | Pro Se | | |

## II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

Personal Income Loss Claims include Claims of individuals who lost wage income as a result of the Fires, to the extent permitted by California law.

After reviewing all submitted documents, the Trust has made the following determination for your asserted Personal Income Loss Claim.

| | |
|---|---|
| **Net Claim Award for Personal Income Loss:** | **$3,000.00** |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
217 of 265



# EMOTIONAL DISTRESS - ZONE OF DANGER
# RECONSIDERATION DETERMINATION REPORT

## I. EVACUATION/SHELTER-IN-PLACE ADDRESS AND CLAIM INFORMATION

| Name: | Enrique Galvez | Claimant ID: | 1021557 |
|---|---|---|---|
| **Evacuation/Shelter-in-place Address:** | Street<br>4082 Sacramento Ave | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | Zipcode<br>95405-7754 |
| | County<br>Sonoma | APN<br>049-483-001-000 | Fire<br>North Bay |
| **Claim ID:** | 50009 | | |

## II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

The Trust considers claimants to be in the Zone of Danger if they were: (a) within the Fire perimeter, (b) experienced emotional distress or mental anguish contemporaneous to the Fire, (c) while evacuating or sheltering-in-place as a result of the Fire.

The Trust will compare the experiences of similarly situated Claimants and issue award amounts based on whether a Claimant meets the criteria for one of the following tiers: Tier I, Tier II, Tier III, or Tier IV, with Tier I denoting severe distress, Tier II moderate, and Tiers III and IV denoting varying degrees of mild distress. The Trust will make these determinations by evaluating both (a) the conditions that a Claimant encountered while evacuating or sheltering-in-place and (b) any ongoing effects from mental health conditions that Claimants have continued to experience as a result of emotional distress or mental anguish from the Fire. The Claims Administrator, in her sole discretion, may award an additional amount if a Claimant demonstrates a catastrophic and extraordinary experience that exceeds the severe distress contemplated for a Tier I determination. Section III identifies the Trust's tier determination for your asserted Emotional Distress - Zone of Danger Claim.

## III. COMPENSATION METHODOLOGY AND SUMMARY OF CLAIM AWARD

| Zone of Danger Tier: | Tier 3 (Mild) |
|---|---|
| Gross Claim Compensation Amount: | $25,000.00 |
| Prior Payment Offsets (from Wildfire Assistance Program): | $0.00 |
| **Net Claim Compensation Amount After Offsets:** | **$25,000.00** |





# PERSONAL INJURY RECONSIDERATION DETERMINATION REPORT

## DATE OF REPORT: 3/2/23

## I. PERSONAL INJURY CLAIM INFORMATION

| Name: | Enrique Galvez | Claimant ID: | 1021557 |
|---|---|---|---|
| Claim ID: | 50010 | Claim Questionnaire ID: | 10012510 |
| Law Firm: | Pro Se | | |

## II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

Personal Injury Claims include Claims for physical or bodily injuries suffered by a Claimant and any related pain and suffering and/or mental anguish caused as a result of the Fires. This includes any or all Claims for bodily injury caused by a Fire and allowed under California law.

The Trust determines award amounts for eligible Personal Injury Claims based on the Claimant's medical expenses related to treatment of the alleged injury, if medical expenses are submitted, and compensation for the Claimant's pain and suffering and/or mental anguish. After reviewing all submitted documents, the Trust has made the following determination for your asserted Personal Injury Claim.

| Description | Amount | FEMA Offset | Net Amount |
|---|---|---|---|
| Depression; Anxiety; Panic Disorders; Chronic PTSD | $0.00 | $0.00 | $0.00 |
| MSSA Bacteremia; Right Knee Infection with Abscess; Necrotizing Fasciitis | $0.00 | $0.00 | $0.00 |
| Smoke Inhalation | $250.00 | $0.00 | $250.00 |
| **Net Claim Award:** This is the sum of all Injury awards above minus prior related FEMA payments, if any. | | | **$250.00** |

## III. EXPLANATION OF INELIGIBLE INJURY

The table below provides additional information related to the asserted injuries that are not eligible for payment within the Personal Injury Claim Type. If you wish to accept the Aggregate Award included in your Determination Notice, you do not need to submit additional documents or take any other action on these deficiencies. If you would like us to consider these additional Assertions, you must request Reconsideration and submit the additional documents identified below. Your Determination Notice includes additional instructions on how to request Reconsideration.

| What is the issue? | How to Address this Item |
|---|---|
| To be eligible for compensation for a Personal Injury Claim, the Fire must have been a substantial contributing factor causing your physical bodily injury. | The submitted records do not establish that the Fire was a substantial contributing factor causing your physical injuries. Therefore, this injury is not eligible for compensation from the Fire Victim Trust. |
| To be eligible for compensation for a Personal Injury Claim, the Fire must have been a substantial contributing factor causing you physical bodily injury. | Claims only for Emotional Distress are considered under the Emotional Distress Claim category and are not independently compensable as a Personal Injury Claim, as there is no assertion of a physical bodily injury. The Emotional Distress Determination Report includes more information regarding your Emotional Distress Claim Determination. |



Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 219 of 265



## IV. RECONSIDERATION COMMENT

The Claimant requested reconsideration of the Personal Injury Claim. After review, the Trust increased the Claimant's Personal Injury Award to $250.00 for smoke inhalation. The Trust confirmed the prior Personal Injury Award for depression, anxiety, panic disorder, and PTSD because Claims only for Emotional Distress are considered under the Emotional Distress Claim category and are not independently compensable as a Personal Injury Claim. The Trust confirmed the prior Personal Injury Award for MSSA bacteremia, right knee infection with abscess, and necrotizing fasciitis, as the submitted medical records do not establish that the Fire was a substantial contributing factor causing the Claimant's injuries. The Claimant did not initially present for treatment for these asserted injuries until 12/1/2017, more than seven weeks after the North Bay Fires (Doc. ID 160998, p. 2). The Claimant presented with leg pain following volunteer work in the areas affected by fires (Doc. ID 176335, p. 13). Medical records confirm the Claimant had "a life-threatening infection in his knee for which there was no apparent cause" (Doc. ID 160993, p. 2). On Reconsideration, the Claimant indicated he would provide additional medical documentation but did not do so despite multiple requests from the Trust and multiple offers of additional time.



Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 220 of 265



| DATE OF REPORT: 3/2/23 |
|---|

## I. OTHER DAMAGES CLAIM INFORMATION

| Claim ID: | 50011 | Claim Questionnaire ID: | 10012510 |
|---|---|---|---|
| Claimant Name(s): | Enrique Galvez | | |
| Law Firm: | Pro Se | | |

## II. SUMMARY OF OTHER DAMAGES ASSERTIONS

The Trust reviews and considers all claims for damages and costs recoverable under California law or, if applicable, other non-bankruptcy law. Damages asserted in the Other Damages section of the Claims Questionnaire but eligible within a Claim Type enumerated in Section II of the Claims Resolution Procedure (*e.g.*, Real Property, Emotional Distress, Business Income Loss) will be reclassified to the appropriate Claim Type and considered there. Asserted damages not specifically contemplated in other Claim Types are evaluated as part of an Other Damages Claim.

The table below identifies the assertions made in the Other Damage section of your Claims Questionnaire and the determination for each. For any assertions identified as Considered in Other Claim Type, the attachment for that Claim Type includes additional information on the determination and corresponding award amounts.

| ASSERTION | DETERMINATION | AMOUNT |
|---|---|---|
| Claimant asserts additional living expenes | Considered in Other Claim - Real and Personal Property | N/A |
| **Claim Award:** | | N/A |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 221 of 265



# OTHER OUT-OF-POCKET EXPENSES
# RECONSIDERATION DETERMINATION REPORT

**DATE OF REPORT: 3/2/23**

## I. OTHER OUT-OF-POCKET DAMAGES CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Claim ID:** | 50012 | **Claim Questionnaire ID:** | 10012510 |
| **Claimant Name(s):** | Enrique Galvez | | |
| **Law Firm:** | Pro Se | | |

## II. SUMMARY OF OTHER OUT-OF-POCKET EXPENSE ASSERTIONS

Other Out-of-Pocket Expense Claims include Claims for out-of-pocket expenses that are not considered as in any other Claim Type. Damages asserted in the Other Out-of-Pocket Expenses section of the Claims Questionnaire but eligible within another Claim Type enumerated in Section II of the Claims Resolution Procedure (*e.g.*, Real Property, Personal Injury, Business Income Loss) will be reclassified to the appropriate Claim Type and considered there. Asserted damages not specifically contemplated in other Claim Types are evaluated as part of an Other Out-of-Pocket Expenses Claim.

The table below identifies the assertions made in the Out-of-Pocket Expense section of your Claims Questionnaire and the determination for each. For any assertions identified as Considered in Other Claim Type, the attachment for that Claim Type includes additional information on the determination and corresponding award amounts.

| EXPENSES | DETERMINATION | AMOUNT |
|---|---|---|
| Claimant asserts additional costs of fuel to and from therapists and doctors after the fire | Considered in Other Claim - Real and Personal Property | N/A |
| Claimant asserts miscellaneous costs for medical supplies not covered by insurance | Considered in Other Claim - Personal Injury | N/A |
| **Claim Award:** | | N/A |





# EMOTIONAL DISTRESS - NUISANCE
# RECONSIDERATION DETERMINATION REPORT

## DAMAGES FOR ANNOYANCE AND DISCOMFORT - NUISANCE
## DATE OF REPORT: 3/2/23

### I. PROPERTY ADDRESS AND CLAIM INFORMATION

| Name: | Enrique Galvez | | Claimant ID: | 1021557 |
|---|---|---|---|---|
| **Property Address:** | Street<br>4082 Sacramento Ave | | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | | Zipcode<br>95405 - 7754 |
| | County<br>Sonoma | APN | | Fire<br>North Bay |
| **Claim ID:** | 51475 | | | |

### II. ELIGIBILTY CRITERIA AND CLAIM AWARD AMOUNT

The Trust will consider damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had the right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

The Trust will compare the experiences of similarly situated Claimants and issue award amounts based on whether a Claimant meets the criteria for one of the following tiers: Tier I, Tier II, Tier III, or Tier IV, with Tier I denoting severe distress, Tier II moderate, and Tiers III and IV denoting varying degrees of mild distress. The Trust will make these determinations by evaluating both the (a) effect of the Fire on a Claimant's ability to enjoy and use his or her property, and (b) any ongoing effects that a Claimant has continued to experience as a result of the displacement, including difficulties in finding suitable alternative housing, difficulties in accessing the necessities of life and participating in work, family and social activities and the resulting emotional distress or mental anguish related to these considerations. The Claims Administrator, in her sole discretion, may award an additional amount if a Claimant demonstrates a catastrophic and extraordinary experience that exceeds the severe distress contemplated for a Tier I determination. Section III identifies the Trust's tier determination for your asserted Emotional Distress - Nuisance Claim.

### III. COMPENSATION METHODOLOGY AND SUMMARY OF CLAIM AWARD

| Nuisance Tier: | Tier 3 (Mild) |
|---|---|
| Gross Claim Compensation Amount: | $30,000.00 |
| Prior Payment Offsets (from Wildfire Assistance Program): | $0.00 |
| **Net Claim Compensation Amount After Offsets:** | **$30,000.00** |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
223 of 265



**May 20, 2023**

### I.     <u>Appeal Narrative Re: Claim #50006</u> –

#### A. *<u>Introduction</u>*

The Personal Property Eligibility Criteria, dated 10/05/2021, and Section 2.6 of the Fire Victim Trust Agreement set forth the promulgated guidelines for amounts covered by insurance. These guidelines are not optional and must be adhered to in order for all fire victims to have their claims fairly adjudicated. The intention was to obtain all Available *Insurance Recoveries* as defined in the Trust Agreement.

#### B. *<u>The Importance of the Personal Property Eligibility Criteria dated 10/05/21.</u>*

It is important to note that all reference and related materials are available to the fire victims through the portal. All the available documents are maintained and managed on the portal by PG&E. This original version was dated 10/05/21 (Document #1751067) and contained sections I. – VI, pages 1-12.

Section VI is entitled "Credits for Amounts Covered by Insurance" and reads as follows: "Pursuant to section 2.6 of the PG&E Fire Victim Trust Agreement, any determination resulting in an award shall be reduced by all insurance recoveries available to the Fire Victim, whether or not the Fire Victim actually made a claim against a policy of insurance for such damages or loses. **THE AWARD WILL BE OFFSET BY THE CLAIMANT'S POLICY LIMITS AVAILABLE TO HIM AT THE TIME OF THE FIRE, AND NOT WHAT THE INSURANCE CARRIER PAID TO THE CLAIMANT AS A RESULT OF THE FIRE".** Claimant repeatedly argued this point but was ignored.

In response to Claimant's insistence that this methodology controls how damages would be calculated, PG&E replaced that Eligibility Criteria with one dated 5/20/22 (Document # 1751068) and is missing page 12 and Section VI. (See current eligibility criteria posted on the portal) There was no notice to the beneficiaries of this critical change in eligibility. This behavior falls well below that of a professional fiduciary, especially one being compensated at the rate of $1,500.00 per hour. Indeed this behavior is intentional and punitive with the sole goal of defrauding Claimant's of their rightful compensation. Claimant, and others similarly situated is entitled to delay and punitive damages for this despicable behavior.

#### C. *<u>Available Insurance Recoveries,</u>* as defined in the Trust Agreement, shall include *(i)* any amount actually paid to the Fire Victim for damages/losses attributable to a Wildfire by an insurer under a policy of insurance, and *(ii)* any amount to be paid, payable, or otherwise owed to the Fire Victim for damages or losses attributable to a Wildfire by an insurer under a policy of insurance. When determining these amounts, the Trustee shall consider, *(i)* the terms of any available policy of insurance and whether such

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 225 of 265

policy or any existing insurance policies can be reasonably interpreted to provide coverage, in full or in part, for the damages/losses that the Claimant seeks to recover from the Trust, *(ii)* the available policy limits of Claimant's policy that can reasonably be construed to provide insurance coverage for each category of damages that Claimant seeks to recover from the Trust, *(iii)*whether Claimant exercised reasonable efforts to obtain all recoveries available under his policy for damages/losses attributable to a Wildfire, and, in Claimants case, *(iv)* the amounts that could or should have been paid under his policy of insurance to Claimant for damages/losses attributable to a Fire had Claimant taken reasonable efforts to obtain an insurance recovery for such damages/losses.

A Fire Victim shall be deemed to have exercised reasonable efforts with respect to a category of damages/losses attributable to a Fire that is covered by a policy of insurance, if Claimant receives payments from an insurer pursuant to such policy that are equivalent to or greater than *(i)* the full amount of such damages/losses or *(ii)* the available policy limits for claims made for such damages/losses. Claimant exercised persistent and aggressive efforts contesting *AAA's* valuation of his claim and asserting that they were in *breach of the covenant of good faith and fair dealing*. Claimant put forth extraordinary efforts in asserting claims for damages/losses attributable to the fires. Claimant exercised reasonable efforts with respect to the recoveries available from his insurer for such damage & losses.

In addition, Section 2.6 (d) of the Trust Agreement mandates that the Trustee **SHALL** establish procedures to assist Claimants to recover the full amount due to the Claimant under the applicable insurance policy, where the Claimant requests the assistance. Claimant requested this assistance when he submitted his Claim Narrative, in September of 2020, nearly three years ago, and three additional times after that. Yet as of the writing of this appeal brief, no assistance has been forth coming. The Trustee has decided that she doesn't have to follow the rules contained within the Trust Document and instead has developed a linear compensation scheme that totally disregards the Available Insurance. It makes no effort to review the policy for coverage items that were withheld, such as Replacement Cost Coverage, Diminution in Value, Loss of Use, and similar. Nor does it even recognize the loss of irreplaceable sentimental items, such as the earn containing the ashes of his beloved grandmother

The Canons of Construction tell us that the use of the word "shall" conscripts the Trustee to have developed procedures whose sole purpose was to recover all *Available Insurance Recoveries*. Section 2.6 (d) of the Trust Agreement was designed to support Fire Victims in dealing with the unscrupulous insurance companies that have already been enriched by an earlier 13 Billion Dollar Settlement.

### D. *Procedural History Re: Deficiency Notices*

In September of 2020, Claimant uploaded a Detailed General Narrative identifying each and every supporting document and its intended purpose (Document #176335) These documents were Claimants Homeowners Insurance Policy in effect at

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
226 of 265

the time the fire roared through Santa Rosa (Document # 163459); the initial Claim submitted to his Insurance Carrier (Document #161005), Primary detailed Loss Inventory from Claimants Insurance Carrier (Document #161003), Secondary Loss Inventory the result of Claimants scrutiny of the Initial Loss Inventory. (Document #161004) It is important to note that these four documents remain and are the only documents, by which PG&E has applied its various methodologies to fraud Claimant.

One year later, Claimant receives a Deficiency Notice (Document #949898) asserting that Claimant had failed to submit documentation sufficient to demonstrate any insurance claims or payment related to the claimed property. Claimant responded setting forth a road map of detail and asked yet again for the Trustee to help with his insurance. Further, Claimant wrote his findings after reviewing the Insurance file and asked yet again for assistance (Document #689844)

Eight months later, on 5/27/2022, Claimant receives an Amended Deficiency Notice asserting that: 1. "Claimant did not submit sufficient Supporting Documents to establish the value of your damaged property and the costs of repairs to or replacement"; 2. "You did not submit sufficient Supporting Documentation to verify that you are the owner of the damaged personal property"; 3. "You did not submit sufficient Supporting Documentation to verify the level of damage that you experienced due to an Included Fire." This is further bad faith and intentional delay tactics intended to force Claimant to accept less than what he is entitled to. Claimant responded each time with details about what he had provided to date. Some two years and 8 months have passed since Claimant filed a claim with all the requisite documentation only to be abused by common criminals.

**E.** _**Determination Notices**_

Finally, without explanation, PG&E offered $5,000.00. Claimant determined that PG&E was trying to cap damages by incorrectly categorizing Claimants property as having been in long term storage, when in fact he was a homeowner in transition. Claimant asked for reconsideration.

It is here on Reconsideration that Defendant's own words enlighten us as to the criminal enterprise they have engaged in since day one. Claimant, in light of the depth of bad faith and breaches of fiduciary duty, requests that an investigation be undertaken to determine the Trustees knowledge of this unethical and unprofessional behavior.

**F.** _**Reconsideration**_

The Trustee states, "The Claimant requested Reconsideration on their Personal Property award. The Trust has reviewed the documentation and awarded the largest inventory totaling $184,401.93 pre-tax. There is no inventory supporting the asserted $340,000 claim. "Additionally, the Trust has agreed to offset the amount paid rather than the full policy limit. After Reconsideration, the Aggregate Award is $21,578.07."

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
227 of 265

The nature of their analysis is in direct conflict with the ***Available Insurance Recoveries*** methodology as set forth in Section 2.6 of the Trust Agreement and the 10/5/21 Personal Property Eligibility Criteria, at page 12, section 6, which states that, "Pursuant to section 2.6 of the PG&E Fire Victim Trust Agreement, any determination resulting in an award shall be reduced by all insurance recoveries available to the Fire Victim, whether or not the Fire Victim actually made a claim against a policy of insurance for such damages or loses. **THE AWARD WILL BE OFFSET BY THE CLAIMANT'S POLICY LIMITS AVAILABLE TO HIM AT THE TIME OF THE FIRE, AND NOT WHAT THE INSURANCE CARRIER PAID TO THE CLAIMANT AS A RESULT OF THE FIRE".** This has been replaced by a Personal Property Eligibility Criteria dated 5/20/22 that is missing the critical page 12, section 6.

Claimant is due the limits ($340,000) offset by what he was paid ($168,333.00) Claimant is due $171,667.00. There are additional benefits he was entitled to under the policy, such as Replacement Cost, Depreciation in Value and Loss of Use to mention just a few. Further, the clear language of the Trust Agreement controls here.

"Additionally, the Trust has agreed to offset the amount paid rather than the full policy limit". What further despicable behavior is this? With whom has the Trust agreed to offset the amount paid rather than the full policy limit? Claimant is not a Napa Valley Winery or other lucrative small business seeking recovery of lost or potential profits. He lost everything he ever owned or mattered in his life and the Trust continues to nickel and dime him and delay any payment.

Further, the Trustee is conscripted by the language of Section 2.6 (d) which states, "The Trustee shall establish procedures to assist Claimants to recover the full amount due to Claimant under the applicable insurance policy, **WHERE THE CLAIMANT REQUESTS THE ASSISTANCE".** When Claimant sought help back in 09/20 and the multiple times after that he was entitled to that help, which to this day has not been forthcoming. Accordingly, Defendant has waived its right to offset the amount paid instead of the policy limits.

G.  *Conclusion*

A brief recap of the sequence of grossly negligent behavior that was perpetrated against Claimant and an unknown number of Fire Victims:

1.  Allowed a year to go by before issuing a defective Deficiency Notice seeking documents that had been available in the Portal for a year;
2.  Did not return multiple phone calls simply requesting information concerning the status of the claim process;
3.  Did not attend scheduled meetings nor provide relevant information;
4.  Intentionally providing inaccurate and misinformation without adequate reason;

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 228 of 265

5.     Allowed another eight months to go by before issuing Amended Deficiency Notices again seeking documents that have been available in the Portal since September of 2020;

6.     Intentional violation of Section 2.6 (Available Insurance Recoveries) of the controlling Trust Agreement;

7.     Intentional violation of Section 2.6 (d) of the controlling Trust Agreement;

8.     The intentional switching of the 10/5/21 Personal Property Eligibility Criteria (Document #1751067), with the altered 5/20/22 Personal Property Eligibility Criteria (Document #1751068)

The Trustees failure to discharge her duty under both the Trust Agreement and the 10/5/21 Personal Property Eligibility Criteria, is a critical omission in the Trustees duty to act on behalf of the beneficiaries and a breach of her fiduciary duties. Claimant followed the rules only to be ignored and, for all intents and purposes, prevented from his rightfully calculated recovery. The switching of the 10/5/21 Personal Property Eligibility Criteria (Document #1751067), with the altered 5/20/22 Personal Property Eligibility Criteria (Document #1751068) was a premeditated act of criminal behavior and part of a well designed criminal enterprise. These bad faith and grossly negligent actions are willful in nature, thus negating the Trustees protection as an indemnified individual. Claimant is entitled to delay and punitive damages (normally three times actual damages) and requests that an investigation be undertaken to determine the depth of the fraud undertaken by the trust employees.

Claimant refuses to believe that Ms. Yanni was aware of or participated in this vile and despicable behavior. Regardless, Ms. Yanni remains strictly liable for the actions of her employees. Claimant finds it quite unlikely that these criminal dirt bags would engage in such criminally risky behavior for a $40.00 temporary job. There had to have been a motivating force, a monetary incentive.

Claimant has suffered emotionally, mentally and financially as a direct result of this grossly negligent criminal behavior on the part of the Trust employees. Accordingly, nothing short of a fair and judicious resolution firmly based on the relevant provisions of the Trust Agreement and California law will deter Claimant from bringing the Trustee in front of a jury.

Respectfully Submitted,

Claimant Enrique Galvez

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 229 of 265



## May 20, 2003

## I.   Introduction

Claimant has submitted a Claim for Chronic Post Traumatic Stress Disorder (PTSD), along with Depression, Anxiety, and Panic Disorder. Please note that "Emotional Distress" is not listed amongst the mental injuries stated above and for obvious and logical reasons. PG&E, in an attempt to conflate and confuse would have one believe that emotional distress is a necessary component of PTSD. This is not the case under California law and is an obvious attempt to lump each and every possible independent mental injury claim recognized under California law into the two emotional distress categories whose sole purpose was to address the short term mental anguish associated with having to evacuate or shelter-in-place from a recognized Zone of Danger. Further, the Trust was to consider damages for annoyance and discomfort to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had a right to occupy at the time of the Fire (this has been established), loss of community (Claimant moved to Sacramento), or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire (he lost everything he ever owned, including the urn that contained the remains of his beloved grandmother).

These two pre-developed emotional distress categories were not intended to be a catch all for every mental injury claim that one may be exposed to. On the contrary, the plain nature of the guidelines themselves defines that the emotional distress contemplated here must be related to the Zone of Danger or Nuisance as defined.

### A.   The Issue as Stated in the Explanation of Denial

> ### What is the Issue?
>
> "To be eligible for compensation for a Personal Injury Claim, the Fire must have been a substantial contributing factor causing your physical bodily injury."

PG&E again attempts to bifurcate then conflate separate issues into some symbiotic entity unable to survive without the other (Personal Injury & Physical Bodily Injury). PTSD is well established and statutorily recognized in California ("Fighting Post Traumatic Stress Disorder Act of 2023") as an independent mental injury grounded in anxiety and panic disorders, of which emotional distress plays no role. Accordingly, attempting to compel a Personal Injury claim to only be compensable should it be accompanied by a physical bodily injury is without merit and contrary to California law.

Under the legal definition of personal injury, a personal injury occurs when a person's body, mind, or emotions are injured as a result of the negligence, carelessness, or wrongful conduct of another person. Thus, in California, a personal injury does not need to be accompanied by a physical bodily injury. This is further supported by

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
231 of 265

Claimant's psychiatrist who stated, "According to the Diagnostic and Statistical Manual of Mental Disorders, a diagnosis of PTSD does not require a patient to have endured direct and/or physical trauma." (Document # 1594450)

### B.    How to Address the Issues in the Explanation of Denial

---

#### How to Address these Items

"Claims only for Emotional Distress are considered under the Emotional Distress Category and are not are not independently compensable as a Personal Injury Claim, as there is no assertion of a physical bodily injury."

---

PG&E attempts to assert that a claim for PTSD is only a Claim for Emotional Distress which must be considered under some unidentified "Emotional Distress Category." There is no single "Emotional Distress Category." The emotional distress categories were designed with narrow utility, developed to address the emotional distress caused by the forced evacuation and shelter-in-place (Zone of Danger) requirements and to consider damages for annoyance and discomfort for the loss of use or substantial interference with the use and enjoyment of property that a Claimant had a right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire (Nuisance).

Further, the statement continues to assert that "PTSD is not compensable as a Personal Injury Claim, as there is no assertion of a physical bodily injury." As previously stated and is well established in California and supported by Claimants psychiatrist (Document #1594450), PTSD and other mental injuries need not have required the patient to have endured direct and/or physical trauma.

Even if *arguendo,* the policy did require a patient to have endured direct and/or physical trauma in order to receive compensation has in essence been rendered moot because PG&E has now determined that Claimant suffered "smoke inhalation". (Document #1653069, pg. 8) An argument set forth by Claimant since day one.

### II.    The 17 Symptoms of PTSD Recognized by Practitioners and the Anxiety and Depression Association of America (ADAA).

It is important to note and understand PG&Es intentional attempt to yet again conflate emotional distress into the complex and multi-symptom PTSD. Just a cursory review of the 17 symptoms below shows the numerous, diverse and persistence of symptoms that exist at the same time, creating a much more severe mental state than the short term mental anguish created by some occasional distress. The Claims administrator performed this analysis with the sole purpose of yet again depriving Claimant of the compensation he is entitled to. Claimant is entitled to delay and punitive damages.

## 1. Intrusive Thoughts

Intrusive thoughts are part of the re-experiencing category of PTSD symptoms. They are unwanted and, sometimes, unexpected thoughts a person may experience about the traumatic event. The Anxiety and Depression Association of America (ADAA) explains that intrusive thoughts are "stuck" thoughts that can cause distress. The ADAA also states that these thoughts do not necessarily reflect a person's desires. Most people do not act on their intrusive thoughts.

## 2. Nightmares

For many people, nightmares are a hallmark symptom of PTSD. According to a 2018 review, around 72% people with PTSD experience them. According to the U.S. Department of Veterans Affairs (VA), people with PTSD who experience nightmares have a higher risk of suicidal thoughts or attempts. Prolonged and intense sensations of anxiety and fear may occur when waking from these nightmares. This can lead to difficulty in returning to sleep. Nightmares can also lead to avoidance behavior before bedtime, including staying up late or leaving the lights on. This can cause insomnia and daytime dysfunction.

## 3. Avoidance of Reminders

Avoidance is one of the main categories of symptoms of PTSD. Many people with PTSD may avoid certain factors they believe may trigger their symptoms. This may include: people, places, activities, and objects. They may also avoid thinking about or remembering the event. Many people may resist talking about it or how they feel as well.

## 4. Memory Loss

Memory loss is common among people with PTSD. It often relates to details of the traumatic event.

## 5. Negative Thoughts

A person with PTSD has more negative thoughts about themselves and others than before the traumatic event. While these thoughts are common among people who have experienced trauma, they can also worsen or trigger other symptoms. Negative thoughts usually include feeling guilt or shame over the event or believing the world is dangerous and people cannot be trusted.

## 6. Self-Isolation and Distancing

Social isolation is another possible symptom of PTSD. Avoiding possible triggers and thoughts, and avoiding talking about the traumatic event, can cause a person with PTSD to distance themselves from others. They may also feel as though they are detached or estranged from other people due to the trauma.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 233 of 265

### 7. Anger and Irritability

The heightened level of arousal associated with PTSD can also lead to feelings of anger or irritability. This may include angry outbursts. This anger can increase over time in people with PTSD. This may increase other symptoms as well. People with PTSD had a higher frequency of hostile or irritable feelings than those without the condition. People with PTSD may also be more likely to have feelings of irritation at any given time.

### 8. Loss of Interest in Pleasurable Activities

People with PTSD find they lose interest in activities they once found pleasure in. They may have little or no desire to take part in these activities. People with PTSD feel distant from others. This can lead to a loss of interest in sexual activities as well. PTSD can have lasting effects on relationships.

### 9. Hyper-arousal

People with PTSD may feel on edge, anxious, and find it difficult to relax, aka hyper arousal. A person experiencing hyper arousal feels: jittery, as though they are always alert, as if they have to be on the lookout for danger.

### 10. Difficulty Concentrating

Other symptoms of PTSD, such as hyper arousal and sleep issues, can also lead to difficulty concentrating. A person with PTSD may have issues paying attention during conversations, activities, or at work.

### 11. Insomnia

There are various ways PTSD can disrupt sleep. These include: avoiding sleep, losing sleep time, increasing arm and leg movements, talking during sleep, feeling on alert or on edge, being unable to relax, having difficulty with silence. Insufficient sleep effects one both physically and mentally.

### 12. Flashbacks

Flashbacks are when a person relives the traumatic event. This can include physical symptoms, such as sweating and an increased heart rate. Flashbacks can be vivid enough the person feels they are seeing the event before their eyes.

### 13. Difficult Beliefs or Feelings

People with PTSD experience difficult beliefs or feelings. These include: feeling unable to trust others, feeling as though nowhere is safe, blaming themselves for the event, feeling as though no one understands, having persistent and overwhelming feelings of anger, shame, or guilt.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 234 of 265

### 14. <u>Casting Blame</u>

PTSD causes people to cast blame on themselves or others for the event and the consequences that follow it. This blame is often both persistent and distorted. Unjustly blaming oneself or others for a traumatic event falls into the PTSD symptom category of alterations to mood and cognition.

### 15. <u>Difficulty Feeling Positive Emotions</u>

A person with PTSD finds it difficult to experience positive emotions. As part of their avoidance; some people with PTSD may also experience emotion numbing. This is when a person attempts to cope with their feelings by not feeling anything at all. This can lead to social withdrawal and isolation.

### 16. <u>Exaggerated Startled Response</u>

People with PTSD can be easily startled or have an exaggerated response to being startled. This may be partly due to the body's inability to relax and the person's need to be constantly aware of their surroundings.

### 17. <u>Engaging in Behaviors that may be Harmful</u>

Hyper-arousal, sleep issues, and avoidance can lead a person with PTSD to engage in behaviors that may be harmful or self-destructive. These behaviors may include: drug or alcohol misuse, driving recklessly, self-harm, and smoking.

It is important to note that no where amongst these 17 well recognized and accepted symptoms of PTSD is emotional distress. In the aggregate, these 17 symptoms create an unpredictable and dangerous mental state of which emotional distress plays no part.

### III. <u>Claimant has Provided Adequate Evidence to Satisfy the PTSD Elemental Requirements of California Law.</u>

Claimant has provided documentary evidence as follows:

### <u>Expert Diagnosis and Testimony –</u>

1. Document #160993, October 16, 2019 Letter from Claimants General Practitioner diagnosing Claimant with PTSD;

2. Document #848962, June 30, 2021 Letter from Claimants Psychiatrist diagnosing Claimant with PTSD and Anxiety Disorder;

3. Document #1594450, Undated letter from Claimants Psychiatrist confirming previous diagnosis and stating that PTSD and other mental

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 235 of 265

injuries need not have required the patient to have endured direct and/or physical trauma;

4.     Document #438131, Undated letter from Claimants Psychiatrist re: status of treatment and requirement for many more counseling sessions;

5.     Document #176332, September 23, 2020, Letter from Life Coach confirming PTSD diagnosis

**Supporting Statements –**

6.     Document #163451, August 20, 2020, Statement by Claimant in Support of PTSD diagnosis;

7.     Document #160995, August 6, 2020, Statement by Claimants Sister in Support of PTSD diagnosis;

8.     Document #160996, August 6, 2020, Statement by Claimants Friend in Support of PTSD diagnosis;

9.     Document #160997, August 6, 2020, Statement by Claimants Friend in Support of PTSD diagnosis;

Claimant has presented Expert Diagnosis and Supporting Declarations which, under California law, adequately support a claim of Post Traumatic Stress Disorder.

## IV.     Conclusion

PG&E will conflate, confuse and misinform in its quest to cheat the Fire Victims out of the compensation they are rightfully entitled to. It isn't enough that they have reduced litigants in a law suit to creditors in a bankruptcy case essentially insuring that they will never be made whole. They instead have engaged in criminal behavior targeting vulnerable unrepresented victims.

Further, PG&E has persistently attempted to conflate emotional distress as a necessary component of PTSD. This flies in the face of well accepted legal precedent in California and is a flagrant attempt to escape their responsibility to compensate Fire Victims in a fair and judicious manner. The record is replete with PTSD cases where there was no accompanying physical bodily injury, yet the award was in excess of 8 million. Claimant is entitled to past, present and future damages for this PTSD claim, as well as delay and punitive damages.

Respectfully Submitted,

Enrique Galvez

Case: 19-30088     Doc# 14238-1     Filed: 12/20/23     Entered: 12/20/23 14:42:51     Page 236 of 265



**May 30, 2023**

## I.    Introduction

Defendant has initially denied Claimants assertion on the grounds that "the submitted records do not establish that the fire was a substantial contributing factor causing the physical injuries. Therefore, this injury is not eligible for compensation from the Fire Victim Trust."

Yet, PG&E has now determined that Claimant suffered from smoke inhalation and determined that it had a $250 value. This realization has provided support for Claimants allegation that since it had been determined, after administering multiple sepsis protocols consisting of detailed visual inspections of Claimants body to search for any break or wound in his skin that would explain the Necrotizing fasciitis that was discovered in his body. This particular bacterial infection makes its way into the blood system through a break or wound in the skin.

Science dictates that bacterial infections are limited to just two ways of entering the body and causing a blood infection: either through an opening in the skin or through the respiratory system. Defendant suffered from a life threatening and rare infection that was facilitated by the fatal levels of toxic and poisonous particulates released into the atmosphere as a direct result of the fires high temperatures, so hot that engine blocks, steel street light posts and masonry block were melted.

Claimant began experiencing pain and swelling in his lower right leg. He returned to work after the fires but the constant pain and discomfort made it difficult to discharge his managerial duties and he struggled *(physically & mentally)*, resorting to using crutches to get through his shifts. Finally, the pain became unbearable and, on *December 1, 2017* he presented himself at the Emergency Room at Sutter Hospital in Santa Rosa. *(Document #160998)* Claimant underwent numerous imaging and lab tests, as well as related procedures. The diagnosis was that Claimant had *subcutaneous edema* in his lower right leg, caused by *abnormal fluid retention in the tissues of the lower extremities*. Because of this diagnosis, Claimant underwent further testing as per a sepsis protocol *(Sepsis is a life-threatening condition that arises when the body's response to infection causes injury to its tissues and organs. This initial stage is followed by suppression of the immune system. Common signs and symptoms include fever, increased heart rate, increased breathing rate, and confusion.)* As part of this protocol, hospital staff conducted several extensive visual examinations of the exterior of his body in search of any wound or open area that would have provided an opportunity for *bacteria* to enter and facilitate the infection. ***There were none![1]*** Claimant was given intravenous antibiotics and sent home pending results of further lab work. *(Document #160998)*

---

[1] **It is important to note the significance of this**. This bacterium traditionally makes its way into the body and into the bloodstream through a break or open wound in the skin. In Claimant's case, his physicians opined that toxic particulates from the fires entered through his respiratory system.

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 238 of 265

The hospital called Claimant on *December 4, 2017*, and demanded that he return to the Emergency Room immediately because of alarming lab results. Upon arrival, Claimant received an infectious disease consultation and assessment. Claimant had contracted several serious infections as follows:

**1.** **_MSSA Bacteremia_** - *MSSA, or methicillin - susceptible Staphylococcus aurous, is an infection caused by a type of bacteria commonly found on the skin. It is also called a staph infection.* **_Bacteremia_** *- is the presence of* <u>bacteria</u> *in the bloodstream that are alive and capable of reproducing. It is a type of bloodstream infection;*

**2.** **_Right Knee Infection with Abscess_** *- An abscess is an infection characterized by a collection of pus underneath a portion of the skin. Bacteria commonly causing abscesses are Staphylococcus aureus and Streptococcus. This bacterium normally enters the skin through any cracks or injury to the skin;*

**3.** **_Necrotizing Fasciitis_** *- Necrotizing fasciitis, often referred to as "flesh eating bacteria", is a severe bacterial infection that destroys muscles, skin, and underlying tissue. It can be deadly if not treated quickly. The word "necrotizing" refers to something that causes body tissue to die. Necrotizing soft tissue infection develops when the bacteria enters the body. The bacteria begin to grow and release harmful substances (toxins) that kill tissue and affect blood flow to the area. As the tissue dies, the bacteria enter the blood and rapidly spread throughout the body."*

Claimant's condition was life threatening and required immediate surgical intervention to remove abscessed, dead and infected muscle and tissue. This is known as *"Surgical Debridement." Debridement* is defined as *"the removal of sequestrate and resection of infected bone and soft tissue to improve the healing potential of the remaining healthy tissue."* Adequate *surgical debridement* is the prerequisite for the successful treatment of skin, soft tissue, and bone infections. When *Necrotizing Fasciitis* is present such *fascia* must be excised with a scalpel until bleeding from small vessels appears. This is vital in life-threatening *necrotizing fasciitis,* where the only chance of survival is to remove the *necrotic fascia* completely. This often involves extensive incisions and the removal of virtually all *fascia* of the involved extremity. Had it not been for the rapid response of the staff at Sutter Hospital, Claimant would have died.

Accordingly, Claimant underwent *debridement* of his right leg and a 3 compartment *synovectomy.* A *synovectomy* is a surgical procedure used to treat <u>synovitis (inflammation)</u> and some other conditions that affect the *synovium, a thin membrane that lines the inside of "synovial joints",* which in Claimant's case was his knee. The immediate cause of the swelling and pain is usually inflammation and excessive growth of the *synovium.* In a *synovectomy* procedure, much of the *synovium* is removed, as in Claimant's case.

During the procedure, inflamed *synovium* was *resected (surgical removal of part of an organ or other body part.),* a drain was sewn in place to the skin to avoid inadvertent dislodgement and an 8 cm incision was made midway between the knee and

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 239 of 265

ankle causing large amounts of purulent fluid to flow from the wound, which was copiously irrigated with sterile saline solution. Claimant was placed in the ICU for 1 day and remained in the hospital until he was discharged on *December 7, 2020*. This period in the hospital, without which Claimant surely would have died, was assessed *$80,000.00*. *(Document #160999)*

Claimant then underwent 6 weeks of painful outpatient care that was comprised of daily injections of antibiotics and pain medication, as well as daily cleansing and monitoring of the wound. This level of care management is required when treating a *"flesh eating bacteria"* and was assessed *$30,200.00 (Document #160100)* When this care was completed, Claimant could not return to work immediately as the wound needed time to heal and he needed to attend, for a period of time *(at that point not yet determined)* physical therapy to regain the strength in his smashed and deformed leg. He began physical therapy on *January 2, 2018* and it lasted until *April 4, 2018*, at a cost of *$7,200.00 (Document #161001)* His therapists concluded that further therapy was of no benefit to Claimant and the hope was that over time increasing use would aid in returning his leg to the strength that existed prior to contracting the deadly infection. As of this writing, Claimant's leg has not improved and he has resorted to using a cane daily in order to navigate the day. *(Document #161002)*

Because of the manner in which he contracted the flesh eating bacteria, that is through his respiratory system, it was impossible to accurately measure the advancement of the bacterium thus creating a challenge for the surgeon. Claimants Chiropractor has opined that, as a result of the surgery, Claimant will suffer from persistent low back and neck pain as a result of ligament reduction in his right leg. As a result of significant changes in his gait, it is contributing to misalignments of his spine, muscle spasms in his back and persistent headaches. Claimant faces much treatment. *(Document #1416985)*

To date, Claimant has received little treatment because he is living in poverty, unable to work and does not have access to the resources needed to address his mental and physical ailments. PG&E should be liable for delay damages.

## II.     In California, the Parties to a Personal Injury Claim have Mutual Obligations to Mitigate Damages

Claimant is living in poverty as a result of the fires, can't get work in his old career due to the physical and mental injuries he sustained as a direct result of PG&Es grossly negligent and reckless behavior, he is homeless forced to sleep on his sister's couch, and has no resources to get the additional medical and mental services he so desperately needs. If not for help from his family, charity, professional courtesies and his extreme need for these services, he would be undone.

Yet, despite his complete lack of resources and having no funds needed to obtain the much required physical and mental health assistance he needs, he has found a way to discharge his obligation to mitigate any damages.

PG&E, the tortfeasor, is the party with superior resources and has already been found

Case: 19-30088     Doc# 14238-1     Filed: 12/20/23     Entered: 12/20/23 14:42:51     Page 240 of 265

to be responsible for the fires and all the damages it has caused. "The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, and, consequently, when expenditures are necessary for minimization of damages, the duty does not run to a person who is financially unable to make such expenditures." *(Valencia v. Shell Oil Co. (1944) 23 Cal.2d 840, 846)* "The burden is on defendant to establish matters asserted by him in mitigation or reduction of the amount of plaintiff's damage, and defendant here has not met that burden." *(McNary v. Hanley (1933) 131 Cal. App. 188, 190)*

## III.   Conclusion

The claims by PG&E that the medical records do not support the claimed injury are without merit. The results of the numerous bodily inspections were recorded in the medical record and they confirm that medical staff was UNABLE to identify any break in the skin or similar wound that could have facilitated any of the bacterium infections that Claimant dealt with. Here are the locations within the medical record that memorialize the results of the visual inspections:

1. *Document #160998, Page 21, "Skin was intact except for needle aspiration mark from today";*
2. *Document #160998, Page 32, "Skin positive for color change. Negative for wound";*
3. *Document #160998, Page 42, "Skin was intact except for surgical site";*
4. *Document #160998, Page 47, "Skin without any ecchymosis, bruises or rashes".*

The record indicates that despite numerous and detailed examinations, hospital staff were unable to find the traditional exterior entry point for the variety of bacteria that infected Claimant. Thus, basic science answers our question in that since a wound was not discovered, Claimant could only have contracted these bacteria through his respiratory system. Thus, the record firmly supports that Claimant was infected with toxic bacteria that was living in the wild fire smoke (See article below concerning this subject)

Further, PG&E has now conceded that Claimant suffered from smoke inhalation. It follows that the infection was delivered into Claimants bloodstream via the smoke he inhaled. It goes beyond the pale that PG&E would defend the position that the smoke, which was a level of toxicity never before seen, played no role in Claimants injury. In the article below, the author tells us that several of the bacteria identified in Claimant were discovered in smoke that was tested. There is a casual connection.

Lastly, Claimant was infected by four different bacteria. The odds of contracting 4 different bacteria randomly with no common source are astronomical. It was his contact with smoke in different geographical locations that provided a pool of various bacteria. PG&E conceded that "medical records confirm that Claimant had a life threatening infection in his knee."

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 241 of 265

Claimant is entitled to past, current, future and delay damages for the injuries he suffered as a result of the toxic and poisonous smoke created by the fires caused by PG&Es negligent behavior.

Respectfully Submitted,

Enrique Galvez

---

## Wildfire smoke can carry microbes that cause infectious diseases.

### (Sacramento)

Wildfire smoke contains microbes, a fact that's often ignored, but one that may have important health repercussions.



Smoke from wildfires carry microbes that can cause diseases.

In an article to be published Dec. 18 in *Science*, Leda Kobziar and George Thompson call the attention of the scientific community to the health impacts of wildfire smoke's microbial content.

Smoky skies caused by woodland fires are becoming seasonal norms, especially in some parts of the United States and Australia. In 2020, raging wildfires in the Western U.S. have set new records and led to extremely unhealthy or hazardous air quality levels for many weeks in a row.

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 242 of 265

It's well-documented that exposure to wildfire smoke can damage the heart and lungs. Respiratory allergic and inflammatory diseases, including asthma and bronchitis, are also worsened by smoke exposure.

"The health impact of inhaling wildfire smoke increases dramatically during high-emissions wildfires and with long exposure," said **Kobziar**, associate professor of Wildland Fire Science at the University of Idaho. "Yet, the risk of infection to the respiratory tract after this exposure is frequently overlooked."

## **What role do microbes in wildfire smoke play in the spread of disease?**

Wild land fire is a source for bioaerosol, airborne particles made of fungal and bacterial cells and their metabolic byproducts. Once suspended in the air, particles smaller than 5 tm can travel hundreds or even thousands of miles. Their movement depends on the fire behavior and the atmospheric conditions. Eventually, they are deposited or inhaled.

Bacteria and fungi can be transported in these wild land fire smoke emissions. While microbial concentration in smoke is higher near the fire source, these microbes may be active agents spreading infection. For example, coccidioidomycoses - a fungus that becomes airborne when soils are disturbed- is the cause of Valley fever, a potentially serious infection. Further, tests of the wildfire smoke revealed traces of *Staphylococcus aurous*, a bacteria discovered by the smoke testing.

"We don't know how far and which microbes are carried in smoke," said Thompson, associate professor of Clinical Medicine at UC Davis. "Some microbes in the soil appear to be tolerant of, and even thrive under, high temperatures following wildfires."

As Kobziar explained, "At the scale of a microbe, fire behavior research has shown that heat flux is highly variable, so it may be that many microbes aren't even subjected to the high temperatures for very long. They may also be protected in small clusters of particulate matter."

Kobziar and Thompson proposed a multidisciplinary approach to understanding the nature of the relationship between microbes, wildfire smoke and health. The complexity of the phenomenon calls for the expertise of scientists from different fields such as fire ecology, environmental microbiology, epidemiology, atmospheric sciences and public health and infectious disease.

"With longer wildfire seasons and higher severity trends, there is an urgency to work together in studying the behavior of the microbes carried by the smoke and their impact on human health," Thompson said.

[*Article*: Kobziar & Thompson, (2020). Wildfire smoke: A potential infectious agent, Science, DOI: 0.1126/science.abe8116]

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 243 of 265

**May 30, 2023**

## I.  **Introduction**

Defendant has initially denied Claimants assertion on the grounds that "the submitted records do not establish that the fire was a substantial contributing factor causing the physical injuries. Therefore, this injury is not eligible for compensation from the Fire Victim Trust."

Yet, PG&E has now determined that Claimant suffered from smoke inhalation and determined that it had a $250 value. This realization has provided support for Claimants allegation that since it had been determined, after administering multiple sepsis protocols consisting of detailed visual inspections of Claimants body to search for any break or wound in his skin that would explain the Necrotizing fasciitis that was discovered in his body. This particular bacterial infection makes its way into the blood system through a break or wound in the skin.

Science dictates that bacterial infections are limited to just two ways of entering the body and causing a blood infection: either through an opening in the skin or through the respiratory system. Defendant suffered from a life threatening and rare infection that was facilitated by the fatal levels of toxic and poisonous particulates released into the atmosphere as a direct result of the fires high temperatures, so hot that engine blocks, steel street light posts and masonry block were melted.

Claimant began experiencing pain and swelling in his lower right leg. He returned to work after the fires but the constant pain and discomfort made it difficult to discharge his managerial duties and he struggled *(physically & mentally)*, resorting to using crutches to get through his shifts. Finally, the pain became unbearable and, on *December 1, 2017* he presented himself at the Emergency Room at Sutter Hospital in Santa Rosa. *(Document #160998)* Claimant underwent numerous imaging and lab tests, as well as related procedures. The diagnosis was that Claimant had *subcutaneous edema* in his lower right leg, caused by *abnormal fluid retention in the tissues of the lower extremities*. Because of this diagnosis, Claimant underwent further testing as per a sepsis protocol *(Sepsis is a life-threatening condition that arises when the body's response to infection causes injury to its tissues and organs. This initial stage is followed by suppression of the immune system. Common signs and symptoms include fever, increased heart rate, increased breathing rate, and confusion.)* As part of this protocol, hospital staff conducted several extensive visual examinations of the exterior of his body in search of any wound or open area that would have provided an opportunity for *bacteria* to enter and facilitate the infection. ***There were none!***[1] Claimant was given intravenous antibiotics and sent home pending results of further lab work. *(Document #160998)*

---

[1] **It is important to note the significance of this.** This bacterium traditionally makes its way into the body and into the bloodstream through a break or open wound in the skin. In Claimant's case, his physicians opined that toxic particulates from the fires entered through his respiratory system.

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 244 of 265

The hospital called Claimant on *December 4, 2017*, and demanded that he return to the Emergency Room immediately because of alarming lab results. Upon arrival, Claimant received an infectious disease consultation and assessment. Claimant had contracted several serious infections as follows:

**1. *MSSA Bacteremia*** - *MSSA, or methicillin - susceptible Staphylococcus aurous, is an infection caused by a type of bacteria commonly found on the skin. It is also called a staph infection.* **Bacteremia** - *is the presence of <u>bacteria</u> in the bloodstream that are alive and capable of reproducing. It is a type of bloodstream infection;*

**2. *Right Knee Infection with Abscess*** - *An abscess is an infection characterized by a collection of pus underneath a portion of the skin. Bacteria commonly causing abscesses are Staphylococcus aureus and Streptococcus. This bacterium normally enters the skin through any cracks or injury to the skin;*

**3. *Necrotizing Fasciitis*** - *Necrotizing fasciitis, often referred to as "flesh eating bacteria", is a severe bacterial infection that destroys muscles, skin, and underlying tissue. It can be deadly if not treated quickly. The word "necrotizing" refers to something that causes body tissue to die. Necrotizing soft tissue infection develops when the bacteria enters the body. The bacteria begin to grow and release harmful substances (toxins) that kill tissue and affect blood flow to the area. As the tissue dies, the bacteria enter the blood and rapidly spread throughout the body."*

Claimant's condition was life threatening and required immediate surgical intervention to remove abscessed, dead and infected muscle and tissue. This is known as *"Surgical Debridement." Debridement* is defined as *"the removal of sequestrate and resection of infected bone and soft tissue to improve the healing potential of the remaining healthy tissue."* Adequate *surgical debridement* is the prerequisite for the successful treatment of skin, soft tissue, and bone infections. When *Necrotizing Fasciitis* is present such *fascia* must be excised with a scalpel until bleeding from small vessels appears. This is vital in life-threatening *necrotizing fasciitis,* where the only chance of survival is to remove the *necrotic fascia* completely. This often involves extensive incisions and the removal of virtually all *fascia* of the involved extremity. Had it not been for the rapid response of the staff at Sutter Hospital, Claimant would have died.

Accordingly, Claimant underwent *debridement* of his right leg and a 3 compartment *synovectomy*. A *synovectomy* is a surgical procedure used to treat <u>*synovitis*</u> *(inflammation)* and some other conditions that affect the *synovium, a thin membrane that lines the inside of "synovial joints",* which in Claimant's case was his knee. The immediate cause of the swelling and pain is usually inflammation and excessive growth of the *synovium*. In a *synovectomy* procedure, much of the *synovium* is removed, as in Claimant's case.

During the procedure, inflamed *synovium* was *resected (surgical removal of part of an organ or other body part.),* a drain was sewn in place to the skin to avoid inadvertent dislodgement and an 8 cm incision was made midway between the knee and

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 245 of 265

ankle causing large amounts of purulent fluid to flow from the wound, which was copiously irrigated with sterile saline solution. Claimant was placed in the ICU for 1 day and remained in the hospital until he was discharged on *December 7, 2020.* This period in the hospital, without which Claimant surely would have died, was assessed *$80,000.00.* **(Document #160999)**

Claimant then underwent 6 weeks of painful outpatient care that was comprised of daily injections of antibiotics and pain medication, as well as daily cleansing and monitoring of the wound. This level of care management is required when treating a ***"flesh eating bacteria"*** and was assessed *$30,200.00* **(Document #160100)** When this care was completed, Claimant could not return to work immediately as the wound needed time to heal and he needed to attend, for a period of time **(at that point not yet determined)** physical therapy to regain the strength in his smashed and deformed leg. He began physical therapy on *January 2, 2018* and it lasted until *April 4, 2018*, at a cost of *$7,200.00* **(Document #161001)** His therapists concluded that further therapy was of no benefit to Claimant and the hope was that over time increasing use would aid in returning his leg to the strength that existed prior to contracting the deadly infection. As of this writing, Claimant's leg has not improved and he has resorted to using a cane daily in order to navigate the day. **(Document #161002)**

Because of the manner in which he contracted the flesh eating bacteria, that is through his respiratory system, it was impossible to accurately measure the advancement of the bacterium thus creating a challenge for the surgeon. Claimants Chiropractor has opined that, as a result of the surgery, Claimant will suffer from persistent low back and neck pain as a result of ligament reduction in his right leg. As a result of significant changes in his gait, it is contributing to misalignments of his spine, muscle spasms in his back and persistent headaches. Claimant faces much treatment. **(Document #1416985)**

To date, Claimant has received little treatment because he is living in poverty, unable to work and does not have access to the resources needed to address his mental and physical ailments. PG&E should be liable for delay damages.

## II. In California, the Parties to a Personal Injury Claim have Mutual Obligations to Mitigate Damages

Claimant is living in poverty as a result of the fires, can't get work in his old career due to the physical and mental injuries he sustained as a direct result of PG&Es grossly negligent and reckless behavior, he is homeless forced to sleep on his sister's couch, and has no resources to get the additional medical and mental services he so desperately needs. If not for help from his family, charity, professional courtesies and his extreme need for these services, he would be undone.

Yet, despite his complete lack of resources and having no funds needed to obtain the much required physical and mental health assistance he needs, he has found a way to discharge his obligation to mitigate any damages.

PG&E, the tortfeasor, is the party with superior resources and has already been found

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 246 of 265

to be responsible for the fires and all the damages it has caused. "The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, and, consequently, when expenditures are necessary for minimization of damages, the duty does not run to a person who is financially unable to make such expenditures." *(Valencia v. Shell Oil Co. (1944) 23 Cal.2d 840, 846)* "The burden is on defendant to establish matters asserted by him in mitigation or reduction of the amount of plaintiff's damage, and defendant here has not met that burden." *(McNary v. Hanley (1933) 131 Cal. App. 188, 190)*

## III.   Conclusion

The claims by PG&E that the medical records do not support the claimed injury are without merit. The results of the numerous bodily inspections were recorded in the medical record and they confirm that medical staff was UNABLE to identify any break in the skin or similar wound that could have facilitated any of the bacterium infections that Claimant dealt with. Here are the locations within the medical record that memorialize the results of the visual inspections:

1.  *Document #160998, Page 21, "Skin was intact except for needle aspiration mark from today";*
2.  *Document #160998, Page 32, "Skin positive for color change. Negative for wound";*
3.  *Document #160998, Page 42, "Skin was intact except for surgical site";*
4.  *Document #160998, Page 47, "Skin without any ecchymosis, bruises or rashes".*

The record indicates that despite numerous and detailed examinations, hospital staff were unable to find the traditional exterior entry point for the variety of bacteria that infected Claimant. Thus, basic science answers our question in that since a wound was not discovered, Claimant could only have contracted these bacteria through his respiratory system. Thus, the record firmly supports that Claimant was infected with toxic bacteria that was living in the wild fire smoke (See article below concerning this subject)

Further, PG&E has now conceded that Claimant suffered from smoke inhalation. It follows that the infection was delivered into Claimants bloodstream via the smoke he inhaled. It goes beyond the pale that PG&E would defend the position that the smoke, which was a level of toxicity never before seen, played no role in Claimants injury. In the article below, the author tells us that several of the bacteria identified in Claimant were discovered in smoke that was tested. There is a casual connection.

Lastly, Claimant was infected by four different bacteria. The odds of contracting 4 different bacteria randomly with no common source are astronomical. It was his contact with smoke in different geographical locations that provided a pool of various bacteria. PG&E conceded that "medical records confirm that Claimant had a life threatening infection in his knee."

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 247 of 265

Claimant is entitled to past, current, future and delay damages for the injuries he suffered as a result of the toxic and poisonous smoke created by the fires caused by PG&Es negligent behavior.

Respectfully Submitted,

Enrique Galvez

## **Wildfire smoke can carry microbes that cause infectious diseases.**

### **(Sacramento)**

Wildfire smoke contains microbes, a fact that's often ignored, but one that may have important health repercussions.



Smoke from wildfires carry microbes that can cause diseases.

In an article to be published Dec. 18 in *Science*, Leda Kobziar and George Thompson call the attention of the scientific community to the health impacts of wildfire smoke's microbial content.

Smoky skies caused by woodland fires are becoming seasonal norms, especially in some parts of the United States and Australia. In 2020, raging wildfires in the Western U.S. have set new records and led to extremely unhealthy or hazardous air quality levels for many weeks in a row.

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 248 of 265

It's well-documented that exposure to wildfire smoke can damage the heart and lungs. Respiratory allergic and inflammatory diseases, including asthma and bronchitis, are also worsened by smoke exposure.

"The health impact of inhaling wildfire smoke increases dramatically during high-emissions wildfires and with long exposure," said **Kobziar**, associate professor of Wildland Fire Science at the University of Idaho. "Yet, the risk of infection to the respiratory tract after this exposure is frequently overlooked."

## What role do microbes in wildfire smoke play in the spread of disease?

Wild land fire is a source for bioaerosol, airborne particles made of fungal and bacterial cells and their metabolic byproducts. Once suspended in the air, particles smaller than 5 tm can travel hundreds or even thousands of miles. Their movement depends on the fire behavior and the atmospheric conditions. Eventually, they are deposited or inhaled.

Bacteria and fungi can be transported in these wild land fire smoke emissions. While microbial concentration in smoke is higher near the fire source, these microbes may be active agents spreading infection. For example, coccidioidomycoses - a fungus that becomes airborne when soils are disturbed- is the cause of Valley fever, a potentially serious infection. Further, tests of the wildfire smoke revealed traces of *Staphylococcus aurous*, a bacteria discovered by the smoke testing.

"We don't know how far and which microbes are carried in smoke," said Thompson, associate professor of Clinical Medicine at UC Davis. "Some microbes in the soil appear to be tolerant of, and even thrive under, high temperatures following wildfires."

As Kobziar explained, "At the scale of a microbe, fire behavior research has shown that heat flux is highly variable, so it may be that many microbes aren't even subjected to the high temperatures for very long. They may also be protected in small clusters of particulate matter."

Kobziar and Thompson proposed a multidisciplinary approach to understanding the nature of the relationship between microbes, wildfire smoke and health. The complexity of the phenomenon calls for the expertise of scientists from different fields such as fire ecology, environmental microbiology, epidemiology, atmospheric sciences and public health and infectious disease.

"With longer wildfire seasons and higher severity trends, there is an urgency to work together in studying the behavior of the microbes carried by the smoke and their impact on human health," Thompson said.

[*Article*: Kobziar & Thompson, (2020). Wildfire smoke: A potential infectious agent, Science, DOI: 0.1126/science.abe8116]

Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 249 of 265





## DATE OF NOTICE: 10/10/2023

## I. INTRODUCTION

This Notice is an official communication from the Claims Processor for the Fire Victim Trust. The Fire Victim(s) identified in Section II below submitted an appeal as described in Section III below from the Claims Administrator's Reconsideration Determination.The Appeals Neutral assigned to hear this appeal issued their recommendation(s) to the Trustee. After considering the Appeals Neutral's recommendation(s), the Trustee made the final determination(s) set out in Section IV below.

## II. FIRE VICTIM INFORMATION

| Claimant(s): | Enrique Galvez |
|---|---|
| CQ ID: | 10012510 |
| Law Firm: | Pro Se |

## III. CLAIM(S) APPEALED

| Claim ID | Claim Type | Pre-Appeal Claims Administrator Reconsideration Determination |
|---|---|---|
| 50006 | Real and Personal Property | $21,578.07<br>(Subject to ownership percentage and Pro Rata Distribution) |
| 50009 | Emotional Distress - Zone of Danger | $25,000.00<br>(Subject to ownership percentage and Pro Rata Distribution) |
| 50010 | Personal Injury | $250.00<br>(Subject to ownership percentage and Pro Rata Distribution) |
| 51475 | Emotional Distress - Nuisance | $30,000.00<br>(Subject to ownership percentage and Pro Rata Distribution) |

## IV. TRUSTEE DETERMINATION(S)

| Claim ID | Claim Type | Trustee Determination |
|---|---|---|
| 50006 | Real and Personal Property | $21,578.07<br>(Subject to ownership percentage and Pro Rata Distribution) |
| **Trustee Rationale:** | The Trustee approves the Appeals Neutral's determination. | |
| **Appeals Neutral Rationale:** | Claimant was in Bakersfield when the fire occurred, but returned the next day to find his neighborhood and stored personal property destroyed.  His Zone of Danger and Nuisance tiers are correct, and the trust credited him with more for personal property loss than he claimed from his insurance carrier, so his appeal from those claims fails.  He also appeals his P.I. award, claiming PTSD and a life threatening leg infection, but medical records attribute the infection to "no apparent cause." [Doc ID 160993].  The fire occurred on 10/08/17; he presented to the ER with leg swelling and pain on 12/01/17; he was first diagnosed with PTSD on 6/08/21 with a terse medical statement giving no etiology/causation re any causative factor (fire, independent leg infection, or both.) [Doc ID 848962]. After his hearing Claimant filed a new undated psych report attributing PTSD to "witnessing the highly destructive Tubbs wildfire in 2017," but does not provide a prognosis or discuss the impact, if any, of the intervening leg infection. [Doc ID 1774635]  Based on the current record Claimant's PTSD claim cannot be evaluated, the punitive damages he seeks cannot be awarded, and the Reconsideration award should remain intact. | |
| 50009 | Emotional Distress - Zone of Danger | $25,000.00<br>(Subject to ownership percentage and Pro Rata Distribution) |



# NOTICE OF TRUSTEE DETERMINATION

| | |
|---|---|
| **Trustee Rationale:** | The Trustee approves the Appeals Neutral's determination. |
| **Appeals Neutral Rationale:** | Claimant was in Bakersfield when the fire occurred, but returned the next day to find his neighborhood and stored personal property destroyed. His Zone of Danger and Nuisance tiers are correct, and the trust credited him with more for personal property loss than he claimed from his insurance carrier, so his appeal from those claims fails. He also appeals his P.I. award, claiming PTSD and a life threatening leg infection, but medical records attribute the infection to "no apparent cause." [Doc ID 160993]. The fire occurred on 10/08/17; he presented to the ER with leg swelling and pain on 12/01/17; he was first diagnosed with PTSD on 6/08/21 with a terse medical statement giving no etiology/causation re any causative factor (fire, independent leg infection, or both.) [Doc ID 848962]. After his hearing Claimant filed a new undated psych report attributing PTSD to "witnessing the highly destructive Tubbs wildfire in 2017," but does not provide a prognosis or discuss the impact, if any, of the intervening leg infection. [Doc ID 1774635] Based on the current record Claimant's PTSD claim cannot be evaluated, the punitive damages he seeks cannot be awarded, and the Reconsideration award should remain intact. |

| | | |
|---|---|---|
| 50010 | Personal Injury | **$250.00**<br>(Subject to ownership percentage and Pro Rata Distribution) |

| | |
|---|---|
| **Trustee Rationale:** | The Trustee agrees with, and accepts, the rationale of the Appeals Neutral. |
| **Appeals Neutral Rationale:** | Claimant was in Bakersfield when the fire occurred, but returned the next day to find his neighborhood and stored personal property destroyed. His Zone of Danger and Nuisance tiers are correct, and the trust credited him with more for personal property loss than he claimed from his insurance carrier, so his appeal from those claims fails. He also appeals his P.I. award, claiming PTSD and a life threatening leg infection, but medical records attribute the infection to "no apparent cause." [Doc ID 160993]. The fire occurred on 10/08/17; he presented to the ER with leg swelling and pain on 12/01/17; he was first diagnosed with PTSD on 6/08/21 with a terse medical statement giving no etiology/causation re any causative factor (fire, independent leg infection, or both.) [Doc ID 848962]. After his hearing Claimant filed a new undated psych report attributing PTSD to "witnessing the highly destructive Tubbs wildfire in 2017," but does not provide a prognosis or discuss the impact, if any, of the intervening leg infection. [Doc ID 1774635] Based on the current record Claimant's PTSD claim cannot be evaluated, the punitive damages he seeks cannot be awarded, and the Reconsideration award should remain intact. |

| | | |
|---|---|---|
| 51475 | Emotional Distress - Nuisance | **$30,000.00**<br>(Subject to ownership percentage and Pro Rata Distribution) |

| | |
|---|---|
| **Trustee Rationale:** | The Trustee approves the Appeals Neutral's determination. |
| **Appeals Neutral Rationale:** | Claimant was in Bakersfield when the fire occurred, but returned the next day to find his neighborhood and stored personal property destroyed. His Zone of Danger and Nuisance tiers are correct, and the trust credited him with more for personal property loss than he claimed from his insurance carrier, so his appeal from those claims fails. He also appeals his P.I. award, claiming PTSD and a life threatening leg infection, but medical records attribute the infection to "no apparent cause." [Doc ID 160993]. The fire occurred on 10/08/17; he presented to the ER with leg swelling and pain on 12/01/17; he was first diagnosed with PTSD on 6/08/21 with a terse medical statement giving no etiology/causation re any causative factor (fire, independent leg infection, or both.) [Doc ID 848962]. After his hearing Claimant filed a new undated psych report attributing PTSD to "witnessing the highly destructive Tubbs wildfire in 2017," but does not provide a prognosis or discuss the impact, if any, of the intervening leg infection. [Doc ID 1774635] Based on the current record Claimant's PTSD claim cannot be evaluated, the punitive damages he seeks cannot be awarded, and the Reconsideration award should remain intact. |

## V. FINAL CQ OUTCOME

| Claim ID | Claim Type | Final Amount<br>(Subject to Pro Rata Distribution) |
|---|---|---|
| 50006 | Real and Personal Property | $21,578.07 |


| 50007 | Real and Personal Property | $0.00 |
|---|---|---|
| 50008 | Personal Income Loss | $3,000.00 |
| 50009 | Emotional Distress - Zone of Danger | $25,000.00 |
| 50010 | Personal Injury | $250.00 |
| 50011 | Other Damages | $0.00 |
| 50012 | Other Out-of-Pocket Expenses | $0.00 |
| 51475 | Emotional Distress - Nuisance | $30,000.00 |
| Total | | $79,828.07 |

## VI. IMPORTANT INFORMATION ABOUT APPEALS, PAYMENTS AND LIENS

**Appeal:** The Trustee's Determination above is final, binding, and non-appealable and is not subject to review by any Court.

**Pro Rata Payments:** Click here to read about the payment information required from each Fire Victim before the Trust can pay any pro rata amounts allowed under this Trustee Determination Notice, and the methodology for issuing pro rata payments on Approved Claims.

**Credits, Liens and Taxes:** Click here to read about any amounts the Trustee is required to deduct from this determination as required under Article XII of the Claims Resolution Procedures. Go to your Portal to see live information about any medical reimbursement obligations and to determine your potential holdbacks or final repayment amounts for any Medicare, Medicare or private health insurance reimbursement obligations.

**Minors or Incapacitated Adults:** Click here to read about the Special Master review process required before the Trust can pay any amounts allowed under this Trustee Determination Notice to a Minor or Incapacitated Adult Fire Victim.


Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 253 of 265



# REAL AND PERSONAL PROPERTY APPEAL DETERMINATION REPORT

## REAL AND PERSONAL PROPERTY
### DATE OF REPORT: 10/10/23

### I. LOSS LOCATION AND CLAIM INFORMATION

| | | |
|---|---|---|
| **Loss Location Address:** | Street<br>1021 Hopper Ave | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | Zip Code<br>95403-1612 |
| | County<br>Sonoma | APN<br>015-360-049-000 | Fire<br>North Bay |
| **Claim ID:** | 50006 | |
| **Law Firm:** | Pro Se | |

### II. REAL PROPERTY

#### A. LOSS OF USE/ADDITIONAL LIVING EXPENSE

| | | |
|---|---|---|
| 1. | Total | $0.00 |
| 2. | ALE/LOU Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for ALE/LOU | $0.00 |
| 4. | ALE/LOU Compensation Amount | $0.00 |

#### B. PERSONAL PROPERTY - CONTENTS

| | | |
|---|---|---|
| 1. | Contents | $184,401.93 |
| 2. | Personal Property Insurance Policy Offset | $163,333.97 |
| 3. | FEMA Payment Offset for Essential Tools and/or Personal Property | $0.00 |
| 4. | Personal Property Compensation Amount | $21,067.96 |

#### C. OTHER RELATED DAMAGES

| | |
|---|---|
| **Total:** | $0.00 |
| **TOTAL AWARD - LESS SPECIFIC PERSONAL PROPERTY** | **$21,067.96** |

#### D. SPECIFIC ITEMS

| SPECIFIC ITEM | OWNER | AMOUNT | OFFSET | TOTAL |
|---|---|---|---|---|
| | | | **Total:** | |



Claim ID: 50006
CQ ID: 10012510



| | III. SUMMARY OF CLAIM AWARD | |
|---|---|---|
| 1. | Net Claim Compensation Amount After Offsets: | $21,067.96 |
| 2. | Net Amount After Ownership Percentage Allocation: | $21,067.96 |
| 3. | Statutory Prejudgment Interest: | $510.11 |
| 4. | Attorney's Fees for Inverse Condemnation: | $0.00 |
| 5. | Aggregate Award Amount for Real Property Damages: | $21,578.07 |

| | IV. CLAIMANT SUMMARY | |
|---|---|---|
| | **CLAIMANT NAME** | **TOTAL** |
| 1. | Enrique Galvez | $21,578.07 |


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 255 of 265


## REAL AND PERSONAL PROPERTY
### DATE OF REPORT: 10/10/23

## I. LOSS LOCATION AND CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Loss Location Address:** | Street<br>4082 Sacramento Ave | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | Zip Code<br>95405-7754 |
| | County<br>Sonoma | APN<br>049-483-001-000 | Fire<br>North Bay |

| | |
|---|---|
| **Claim ID:** | 50007 |
| **Law Firm:** | Pro Se |

## II. REAL PROPERTY

### A. LOSS OF USE/ADDITIONAL LIVING EXPENSE

| | | |
|---|---|---|
| 1. | Total | $0.00 |
| 2. | ALE/LOU Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for ALE/LOU | $0.00 |
| 4. | ALE/LOU Compensation Amount | $0.00 |

### B. PERSONAL PROPERTY - CONTENTS

| | | |
|---|---|---|
| 1. | Contents | $0.00 |
| 2. | Personal Property Insurance Policy Offset | $0.00 |
| 3. | FEMA Payment Offset for Essential Tools and/or Personal Property | $0.00 |
| 4. | Personal Property Compensation Amount | $0.00 |

### C. OTHER RELATED DAMAGES

| | |
|---|---|
| **Total:** | $0.00 |
| **TOTAL AWARD - LESS SPECIFIC PERSONAL PROPERTY** | **$0.00** |

### D. SPECIFIC ITEMS

| SPECIFIC ITEM | OWNER | AMOUNT | OFFSET | TOTAL |
|---|---|---|---|---|
| | | | **Total:** | |


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 256 of 265


| | III. SUMMARY OF CLAIM AWARD | |
|---|---|---|
| 1. | Net Claim Compensation Amount After Offsets: | $0.00 |
| 2. | Net Amount After Ownership Percentage Allocation: | $0.00 |
| 3. | Statutory Prejudgment Interest: | $0.00 |
| 4. | Attorney's Fees for Inverse Condemnation: | $0.00 |
| 5. | Aggregate Award Amount for Real Property Damages: | $0.00 |

| | IV. CLAIMANT SUMMARY | |
|---|---|---|
| | CLAIMANT NAME | TOTAL |
| 1. | Enrique Galvez | $0.00 |





# PERSONAL INCOME LOSS APPEAL DETERMINATION REPORT

## DATE OF REPORT: 10/10/23

## I. PERSONAL INCOME LOSS CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Name:** | Enrique Galvez | **Claimant ID:** | 1021557 |
| **Claim ID:** | 50008 | **Claim Questionnaire ID:** | 10012510 |
| **Law Firm:** | Pro Se | | |

## II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

Personal Income Loss Claims include Claims of individuals who lost wage income as a result of the Fires, to the extent permitted by California law.

After reviewing all submitted documents, the Trust has made the following determination for your asserted Personal Income Loss Claim.

| Net Claim Award for Personal Income Loss: | $3,000.00 |
|---|---|


Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page 258 of 265


## EMOTIONAL DISTRESS - ZONE OF DANGER
## DATE OF REPORT: 10/10/23

### I. EVACUATION/SHELTER-IN-PLACE ADDRESS AND CLAIM INFORMATION

| Name: | Enrique Galvez | | Claimant ID: | | 1021557 |
|---|---|---|---|---|---|
| **Evacuation/Shelter -in-place Address:** | Street<br>4082 Sacramento Ave | | | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | | | Zipcode<br>95405-7754 |
| | County<br>Sonoma | APN<br>049-483-001-000 | | | Fire<br>North Bay |
| Claim ID: | 50009 | | | | |

### II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

The Trust considers claimants to be in the Zone of Danger if they were: (a) within the Fire perimeter, (b) and experienced emotional distress or mental anguish contemporaneous to the Fire, (c) while evacuating or sheltering-in-place as a result of the Fire.

The Trust will compare the experiences of similarly situated Claimants and issue award amounts based on whether a Claimant meets the criteria for one of the following tiers: Tier I, Tier II, Tier III, or Tier IV, with Tier I denoting severe distress, Tier II moderate, and Tiers III and IV denoting varying degrees of mild distress. The Trust will make these determinations by evaluating both (a) the conditions that a Claimant encountered while evacuating or sheltering-in-place and (b) any ongoing effects from mental health conditions that Claimants have continued to experience as a result of emotional distress or mental anguish from the Fire. The Claims Administrator, in her sole discretion, may award an additional amount if a Claimant demonstrates a catastrophic and extraordinary experience that exceeds the severe distress contemplated for a Tier I determination. Section III identifies the Trust's tier determination for your asserted Emotional Distress - Zone of Danger Claim.

### III. COMPENSATION METHODOLOGY AND SUMMARY OF CLAIM AWARD

| Zone of Danger Tier: | Tier 3 (Mild) |
|---|---|
| Gross Claim Compensation Amount: | $25,000.00 |
| Prior Payment Offsets (from Wildfire Assistance Program): | $0.00 |
| **Net Claim Compensation Amount After Offsets:** | **$25,000.00** |


Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
259 of 265



# PERSONAL INJURY APPEAL DETERMINATION REPORT

## DATE OF REPORT: 10/10/23

### I. PERSONAL INJURY CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Name:** | Enrique Galvez | **Claimant ID:** | 1021557 |
| **Claim ID:** | 50010 | **Claim Questionnaire ID:** | 10012510 |
| **Law Firm:** | Pro Se | | |

### II. ELIGIBILITY CRITERIA AND CLAIM AWARD AMOUNT

Personal Injury Claims include Claims for physical or bodily injuries suffered by a Claimant and any related pain and suffering and/or mental anguish caused as a result of the Fires. This includes any or all Claims for bodily injury caused by a Fire and allowed under California law.

The Trust determines award amounts for eligible Personal Injury Claims based on the Claimant's medical expenses related to treatment of the alleged injury, if medical expenses are submitted, and compensation for the Claimant's pain and suffering and/or mental anguish. After reviewing all submitted documents, the Trust has made the following determination for your asserted Personal Injury Claim.

| Description | Amount | FEMA Offset | Net Amount |
|---|---|---|---|
| Depression; Anxiety; Panic Disorders; Chronic PTSD | $0.00 | $0.00 | $0.00 |
| MSSA Bacteremia; Right Knee Infection with Abscess; Necrotizing Fasciitis | $0.00 | $0.00 | $0.00 |
| Smoke Inhalation | $250.00 | $0.00 | $250.00 |
| **Net Claim Award:**<br>This is the sum of all Injury awards above minus prior related FEMA payments, if any. | | | **$250.00** |


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page 260 of 265



# OTHER DAMAGES
# APPEAL DETERMINATION REPORT

## DATE OF REPORT: 10/10/23

## I. OTHER DAMAGES CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Claim ID:** | 50011 | **Claim Questionnaire ID:** | 10012510 |
| **Claimant Name(s):** | Enrique Galvez | | |
| **Law Firm:** | Pro Se | | |

## II. SUMMARY OF OTHER DAMAGES ASSERTIONS

The Trust reviews and considers all claims for damages and costs recoverable under California law or, if applicable, other non-bankruptcy law. Damages asserted in the Other Damages section of the Claims Questionnaire but eligible within a Claim Type enumerated in Section II of the Claims Resolution Procedure (*e.g.*, Real Property, Emotional Distress, Business Income Loss) will be reclassified to the appropriate Claim Type and considered there. Asserted damages not specifically contemplated in other Claim Types are evaluated as part of an Other Damages Claim.

The table below identifies the assertions made in the Other Damage section of your Claims Questionnaire and the determination for each. For any assertions identified as Considered in Other Claim Type, the attachment for that Claim Type includes additional information on the determination and corresponding award amounts.

| ASSERTION | DETERMINATION | AMOUNT |
|---|---|---|
| Claimant asserts additional living expenes | Considered in Other Claim - Real and Personal Property | N/A |
| **Claim Award:** | | N/A |



Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
261 of 265



# OTHER OUT-OF-POCKET EXPENSES
# APPEAL DETERMINATION REPORT

## DATE OF REPORT: 10/10/23

## I. OTHER OUT-OF-POCKET DAMAGES CLAIM INFORMATION

| Claim ID: | 50012 | Claim Questionnaire ID: | 10012510 |
|---|---|---|---|
| Claimant Name(s): | Enrique Galvez | | |
| Law Firm: | Pro Se | | |

## II. SUMMARY OF OTHER OUT-OF-POCKET EXPENSE ASSERTIONS

Other Out-of-Pocket Expense Claims include Claims for out-of-pocket expenses that are not considered as in any other Claim Type. Damages asserted in the Other Out-of-Pocket Expenses section of the Claims Questionnaire but eligible within another Claim Type enumerated in Section II of the Claims Resolution Procedure (*e.g.*, Real Property, Personal Injury, Business Income Loss) will be reclassified to the appropriate Claim Type and considered there. Asserted damages not specifically contemplated in other Claim Types are evaluated as part of an Other Out-of-Pocket Expenses Claim.

The table below identifies the assertions made in the Out-of-Pocket Expense section of your Claims Questionnaire and the determination for each. For any assertions identified as Considered in Other Claim Type, the attachment for that Claim Type includes additional information on the determination and corresponding award amounts.

| EXPENSES | DETERMINATION | AMOUNT |
|---|---|---|
| Claimant asserts additional costs of fuel to and from therapists and doctors after the fire | Considered in Other Claim - Real and Personal Property | N/A |
| Claimant asserts miscellaneous costs for medical supplies not covered by insurance | Considered in Other Claim - Personal Injury | N/A |
| Claim Award: | | N/A |



Claim ID: 50012
CQ ID: 10012510

Case: 19-30088    Doc# 14238-1    Filed: 12/20/23    Entered: 12/20/23 14:42:51    Page
262 of 265



# EMOTIONAL DISTRESS - NUISANCE
# APPEAL DETERMINATION REPORT

## DAMAGES FOR ANNOYANCE AND DISCOMFORT - NUISANCE
## DATE OF REPORT: 10/10/23

### I. PROPERTY ADDRESS AND CLAIM INFORMATION

| Name: | Enrique Galvez | | Claimant ID: | 1021557 |
|---|---|---|---|---|
| **Property Address:** | Street<br>4082 Sacramento Ave | | | Apt/Suite/Lot/Number |
| | City<br>Santa Rosa | State<br>California | | Zipcode<br>95405 - 7754 |
| | County<br>Sonoma | APN | | Fire<br>North Bay |
| **Claim ID:** | 51475 | | | |

### II. ELIGIBILTY CRITERIA AND CLAIM AWARD AMOUNT

The Trust will consider damages for annoyance and discomfort related to the loss of use or substantial interference with the use and enjoyment of property that a Claimant had the right to occupy at the time of the Fire, loss of community, or the loss of cherished possessions or irreplaceable items that were destroyed during the Fire.

The Trust will compare the experiences of similarly situated Claimants and issue award amounts based on whether a Claimant meets the criteria for one of the following tiers: Tier I, Tier II, Tier III, or Tier IV, with Tier I denoting severe distress, Tier II moderate, and Tiers III and IV denoting varying degrees of mild distress. The Trust will make these determinations by evaluating both the (a) effect of the Fire on a Claimant's ability to enjoy and use his or her property, and (b) any ongoing effects that a Claimant has continued to experience as a result of the displacement, including difficulties in finding suitable alternative housing, difficulties in accessing the necessities of life and participating in work, family and social activities and the resulting emotional distress or mental anguish related to these considerations. The Claims Administrator, in her sole discretion, may award an additional amount if a Claimant demonstrates a catastrophic and extraordinary experience that exceeds the severe distress contemplated for a Tier I determination. Section III identifies the Trust's tier determination for your asserted Emotional Distress - Nuisance Claim.

### III. COMPENSATION METHODOLOGY AND SUMMARY OF CLAIM AWARD

| Nuisance Tier: | Tier 3 (Mild) |
|---|---|
| Gross Claim Compensation Amount: | $30,000.00 |
| Prior Payment Offsets (from Wildfire Assistance Program): | $0.00 |
| **Net Claim Compensation Amount After Offsets:** | **$30,000.00** |


Case: 19-30088   Doc# 14238-1   Filed: 12/20/23   Entered: 12/20/23 14:42:51   Page
263 of 265





# San Francisco

RE: Enrique Galvez 11/27/1969

To Whom it May Concern,

I am Enrique Galvez's current treating psychiatrist as of 06/08/2021. As per patient's request, I am writing this letter to confirm previously documented history of psychiatric diagnoses. During initial encounter with Mr. Galvez he reported a previous history a Post-Traumatic Stress Disorder (PTSD) diagnosis, based upon clinical interview at that time he met criteria as described by Diagnostic and Statistical Manual of Mental Disorders (DSM-V) for the PTSD diagnosis. It should be noted that, according to the DSM-V, a diagnosis of PTSD does not require patient to have endured direct and/or physical trauma.

Thank you,

Dr. Jacob Moulds

3061 Fillmore Street  San Francisco, CA  91423          https://www.mindpath.com
P: 415.292.3440 F: 415.561.0244