1                 UNITED STATES BANKRUPTCY COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                            -oOo-

4    In Re:                      ) Case No. 19-30088
                                 ) Chapter 11
5    PG&E CORPORATION AND PACIFIC )
     GAS AND ELECTRIC COMPANY     ) San Francisco, California
6                                 ) Tuesday, December 19, 2023
                        Debtor.   ) 10:00 AM
7    _____ )
                                   SECOND MOTION FOR PARTIAL
8                                  SUMMARY JUDGMENT OF ISSUES IN
                                   REORGANIZED DEBTORS OBJECTION
9                                  TO CLAIM #2090 AND CLAIMANT'S
                                   RESPONSE THERETO FILED BY
10                                 AMIR SHAHMIRZA [14007]

11                                 STATUS CONFERENCE REGARDING
                                   SECURITIES PLAINTIFFS' MOTION
12                                 FOR THE APPLICATION OF
                                   BANKRUPTCY RULE 7023 AND THE
13                                 CERTIFICATION OF A CLASS OF
                                   SECURITIES CLAIMANTS. FILED
14                                 BY SECURITIES LEAD PLAINTIFF
                                   AND THE PROPOSED CLASS
15                                 [13865]

16
                        TRANSCRIPT OF PROCEEDINGS
17               BEFORE THE HONORABLE DENNIS MONTALI
                   UNITED STATES BANKRUPTCY JUDGE
18
     APPEARANCES (All present by video or telephone):
19   For the Reorganized        RICHARD W. SLACK, ESQ.
     Debtors:                   Weil, Gotshal & Manges LLP
20                              767 Fifth Avenue
                                New York, NY 10153
21                              (212) 310-8000

22                              JOSHUA G. HAMILTON, ESQ.
                                Latham & Watkins LLP
23                              10250 Constellation Boulevard
                                Suite 1100
24                              Los Angeles, CA 90067
                                (424)653-5500

25

```
 1   For the Reorganized          STEVEN A. LAMB, ESQ.
     Debtors:                     Rovens Lamb LLP
 2                                 2601 Airport Drive
                                   Suite 370
 3                                 Torrance, CA 90505
                                   (310)536-7830
 4
                                  THOMAS B. RUPP, ESQ.
 5                                 Keller Benvenutti Kim LLP
                                   650 California Street
 6                                 Suite 1900
                                   San Francisco, CA 94108
 7                                 (415)636-9015

 8   For PERA:                    CAROL C. VILLEGAS, ESQ.
                                   Labaton Sucharow LLP
 9                                 140 Broadway
                                   New York, NY 10005
10                                 (212)907-0700

11   For Baupost Group           DEBRA I. GRASSGREEN, ESQ.
     Securities LLC:             Pachulski Stang Ziehl & Jones LLP
12                                 One Sansome Street, 34th Floor
                                   Suite 3430
13                                 San Francisco, CA 94104
                                   (415)263-7000
14
                                  MICHAEL S. PALMIERI, ESQ.
15                                 Friedman Kaplan Seiler Adelman &
                                   Robbins LLP
16                                 7 Times Square
                                   New York, NY 10036
17                                 (212)833-1103

18   For RKS Claimants:          FRANK T.M. CATALINA, ESQ.
                                   Rolnick Kramer Sadighi LLP
19                                 1251 Avenue of the Americas
                                   New York, NY 10020
20                                 (212)597-2800

21   For MML Investment          KIZZY L. JARASHOW, ESQ.
     Advisers, LLC on behalf of  Goodwin Procter LLP
22   the MassMutual Funds:        620 Eighth Avenue
                                   The New York Times Building
23                                 New York, NY 10018
                                   (212)813-8800
24

25
```

```
 1  For Amir Shahmirza, Komir,   LAWRENCE A. JACOBSON, ESQ.
    Inc.:                        Cohen and Jacobson, LLP
 2                               66 Bovet Road
                                 Suite 285
 3                               San Mateo, CA 94402
                                 (650)261-6280
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18  Court Recorder:             LORENA PARADA/ANKEY THOMAS
                                United States Bankruptcy Court
19                              450 Golden Gate Avenue
                                San Francisco, CA 94102
20

21  Transcriber:                AMARAH YANG
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (800) 257-0885
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

1  SAN FRANCISCO, CALIFORNIA, TUESDAY, DECEMBER 19, 2023, 10:00 AM

2                              -oOo-

3     (Call to order of the Court.)

4         THE CLERK:  Good morning, Your Honor.  Recording has

5  started.

6         Court is now in session.  The Honorable Dennis Montali

7  presiding, calling the matter of PG&E Corporation.

8         THE COURT:  All right.  Good morning, Mr. Slack.  Or

9  good afternoon to you.

10        MR. SLACK:  Good morning, Your Honor.

11        THE COURT:  No name?

12        MR. SLACK:  Richard Slack from Weil, Gotshal for the

13  reorganized debtor, Your Honor.

14        THE COURT:  All right.  Good morning, Ms. Grassgreen.

15        MS. VILLEGAS:  Good morning, Your Honor.  Debra

16  Grassgreen, Pachulski Stang Ziehl & Jones, on behalf of Baupost

17  Group Securities, LLC.

18        THE COURT:  Scared everybody away, Mr. Slack.  You're

19  the only one.  Only Ms. Grassgreen?  I don't know.  Must've

20  prodded them.  Doesn't anybody else want in?

21        THE CLERK:  Yes.  They are raising hands now, Your

22  Honor.

23        THE COURT:  Okay.  All right.  Mr. Catalina, I sort of

24  expected you.

25        MR. CATALINA:  Good morning on the west coast and

1  afternoon on the east coast, Your Honor.  Frank Catalina for

2  the RKS claimants.

3          THE COURT:  All right.  Ms. Jatharow (sic) -- Garato

4  (sic).

5          MS. JARASHOW:  Good morning, Your Honor.  Kizzy

6  Jarashow from Goodwin Procter on behalf of MML Investment

7  Advisors, LLC.

8          THE COURT:  All right.  Mr. Hamilton, I expected you,

9  so good morning.

10          And Mr. Palmieri, I don't -- I don't recognize your

11  name.  Who are you appearing for?

12          MR. PALMIERI:  Good morning, Your Honor.  Michael

13  Palmieri from Friedman Kaplan Seiler Adelman & Robbins.  Also

14  for Baupost with Ms. Grassgreen.

15          THE COURT:  I'm sorry.  For which one?

16          MR. PALMIERI:  For Baupost, along with Ms. Grassgreen.

17          THE COURT:  Oh, okay.  So let me just make a couple of

18  statements and then we'll turn to the business.

19          MR. HAMILTON:  Your Honor, Joshua Hamilton for the

20  reorganized debtor from Latham & Watkins.

21          THE COURT:  Yeah.  I recognized you a moment ago, Mr.

22  Hamilton.  I'm sorry, you didn't hear me.

23          MR. HAMILTON:  Oh.

24          THE COURT:  Mr. Slack, thank you for the -- sort of

25  the summary of all the other stuff going on.  I was aware of

1　the flurry of filings and all the various omnibus objections

2　coming in.  It will come as no surprise that I haven't pored

3　over the thousands of pages that were filed in the last few

4　days, but I am generally aware of what you said and I

5　appreciate the status report on the -- on progress with the ADR

6　efforts.  And I don't think we need to talk about that, and

7　your observations about whether you think we really need a

8　class action, I think, are more aspirational than action items.

9　I don't even see counsel for PERA on the call, which is a

10　surprise, but I -- unless you scared them off.

11　　　　So the sense I get from the filings from most of the

12　other respondents, but including PERA is that -- although

13　I'm -- it sort of -- it doesn't seem right to me, but I'm

14　willing to go with the ninety-day time period for responses and

15　the forty-five-day reply.  So by my calculation, if we adopt

16　that, I would tell you what I would do is I would say that the

17　oppositions to PG&E's -- well, we'll them motions or the

18　objections.  You know, I'm going to call them motions to

19　dismiss, for lack of a better term, will be due March 15th and

20　replies by April 30th, then the matter is submitted.

21　　　　I'm really -- don't like doing that, but I appreciate

22　the complexity of the matter.  What I don't like doing is that

23　means that I'm supposed to start thinking about making a

24　decision in May.  God knows when I do.

25　　　　But Mr. Slack, I'm still uncertain about something.

1  You have taken a pretty firm view on whether there is any

2  discovery permitted.  And all the other counsel, or at least

3  three of them, seem to have some limited discovery entitlements

4  that they are entitled to.  Are you wedded to that, that I have

5  to make a decision on that?  Or are you willing to come up with

6  some sort of an agreement on a limited discovery while we're --

7  while they're doing their oppositions.

8        MR. SLACK:  No, Your Honor, we're pretty firm.  Your

9  Honor's -- and I'm going to turn this over to Mr. Hamilton in a

10  second.  But we're pretty firm that the amendment and objection

11  procedures specifically preclude the discovery.  It was a

12  negotiated point.  Baupost, PERA, and RKS were parties to that.

13  That was the sine qua non of that deal.

14  And while Baupost and PERA have now sort of backtracked from

15  that, I would say that I think that RKS would agree that that

16  order that Your Honor entered and they -- and the plain

17  language of that order and the negotiations were such that that

18  there is no discovery pending the motions to dismiss.

19        THE COURT:  Well, then, and Mr. Hamilton, I understand

20  you wanted to be heard on this, and I didn't mean to cut you

21  off.  As I say, I'd ask the question, but I'm assuming you and

22  Mr. Slack have the same answer.  Let me -- before I ask anyone

23  else to weigh in on it, what I'm inclined to do -- well, first

24  of all, I accept that under traditional class action, such as

25  the pending PG&E case in the district court, there is a stay on

1  discovery under the law.  And we're kind of making it up here

2  with the bankruptcy.  We've already been through that.  I won't

3  bore you.

4      So here's what I'm inclined to do.  I'm inclined to

5  stick with the deadlines that I just said, March 15th and April

6  30th, and call for, let's say, by January.  Well, let me look

7  up my calendar here for a minute.

8      January 15th, simultaneous briefs on the question of

9  discovery limited, fifteen pages by January 15th.  The debtor

10  and anybody that agrees with the debtor, why there should be no

11  briefing.  Baupost, PERA, RKS, at the risk of saying one brief

12  from all of you, I would say response and the matter's

13  submitted.  And if I need a hearing, I'll schedule one on an

14  expedited basis.  I'll read the briefs.  My preference would be

15  read the briefs, make a ruling.  If I say no discovery, then

16  that's my ruling and that's what the other side's stuck with.

17  And if they want to do something about it, they can do it.  And

18  then we stick with that schedule.

19      If it turns out that the law requires me or I'm

20  persuaded that I should allow briefing on -- excuse me, I

21  should allow some limited discovery, I'll be flexible about

22  counsel meeting and conferring and agreeing to tweak the

23  deadlines, if appropriate.  Obviously, it seems to me if I'm

24  persuaded that there should be discovery, even if it's limited,

25  then, obviously, I can't expect the respondents to file their

1   oppositions if they're supposed to -- if they're entitled to

2   get discovery.

3           So what I'm going to do is -- I'll repeat this again,

4   but call this a tentative ruling and then I'll ask any of you,

5   particularly the folks on the other side -- I can't imagine

6   there's any real opposition to the new deadlines because

7   everybody agreed to them.  But I'll state it again, my ruling

8   would be today to fix March 15th as the deadline to file

9   oppositions to the -- what we'll call the PG&E motion to

10  dismiss, and for PG&E to reply by April 30th, in which can then

11  the matter will be submitted.  But I probably will schedule a

12  hearing.

13          But again, I'm sort of mindful of the volume and the

14  amount of effort that we'll have to take, and I'll do it.  And

15  then, from fifteen days -- I mean, not fifteen days, but

16  January 15th, I would get simultaneous briefs, pro-discovery

17  and anti-discovery, fifteen pages submitted and I'll make a

18  ruling.

19          MS. VILLEGAS:  Your Honor, this is Carol Villegas,

20  appearing on behalf of PERA from Labaton Sucharow.  I apologize

21  for the late appearance.  We were having some technical

22  difficulties on our end.

23          THE COURT:  Okay.  That's fine.

24          MS. VILLEGAS:  And I just wanted to correct something

25  that Mr. Slack said.  PERA was not involved in the negotiation

1  whereby maybe some folks agreed that discovery wasn't

2  necessary.  And we appreciate that Your Honor will give us an

3  opportunity to brief that issue in January.

4          THE COURT:  Okay.  Well, I knew we'd hear from PERA.

5  I didn't know who would be, but I'm glad you weighed in.

6          So I'll -- so then, across the board, starting with

7  the respondents, not Mr. Slack or Mr. Hamilton for the moment,

8  do any of you want to be heard on what I just called my

9  tentative ruling?

10          MR. CATALINA:  I'll start, Your Honor, if you'll grant

11  me the --

12          THE COURT:  Yeah, just state your name for the record.

13  I know it, but --

14          MR. CATALINA:  Sure.  Frank Catalina for the RKS

15  claimants.  And I'll just say that our interest here,

16  really, -- and it has been from day one since we've appeared

17  before Your Honor -- is to get this thing moving forward.  And

18  it is on a track where it's moving forward, which is great.

19  You know, we were happy to have a sixty-day period to oppose.

20  And I understand Your Honor is inclined to grant the ninety

21  days.  And we'll obviously follow along with the schedule set

22  by the Court.

23          My only concern is one that was kind of raised by Your

24  Honor here.  You said, well, with the ninety days and forty-

25  five, now we're looking at it submitted in May.  And then when

1  am I going to have my decision?  Our concern would be that now

2  we're going a month into the future to submit the idea of

3  discovery, and it will be some time beyond that.  And as Your

4  Honor noted, it'll be tough to keep the March 15th opposition

5  deadline if we're briefing discovery in January and maybe

6  getting a decision in February.

7          So from our perspective, when we did the order on the

8  amendment procedures, it was contemplated that we would have

9  this kind of legal sufficiency, we can call, it practice at the

10  outset.  And then we would move on to litigate the claims as

11  they remain after that process.  Our concern -- and I'll just

12  state it for Your Honor.  We want to keep this on the track

13  moving forward.  We feel like it's been put on that track.  The

14  amendment procedures were -- have done a good job of putting it

15  on that track, and anything that will delay it further is

16  something that we think is not in the interests of resolving

17  these claims.

18          THE COURT:  Well, I appreciate that.  I have to say --

19  I'll state this, that I looked at the calendar last night and

20  early this morning.  I thought, why don't I -- to myself, why

21  don't I just make them brief this thing in the next fifteen

22  days?  But we do have people that observe the holidays.  And I

23  do remember, Mr. Catalina, the discussions about sixty days.

24  And again, my instincts, not doing class action all the time,

25  but doing bankruptcy stuff, is you move much more quickly.

1      But that being said, I don't often get 115-page

2  motions to dismiss, either.  And so to some extent, I would

3  like to be my old, more efficient self and say, this is all too

4  fast, let's get it done in January.  But that's obviously not

5  fair.  And certainly, if the law allows for discovery over the

6  debtor's objection, I can't ignore it.  So I appreciate your

7  comment.

8      I'll tell you what.  If the matter is submitted on the

9  lengthy briefing on April 30th, I'm not going to announce a

10  ruling on May 1st that says motion granted or motion denied.

11  I'm going to do what I'm supposed to do.  The thought is, if

12  I've got literally thousands of pages, it'll take a little

13  longer, but.

14      MR. CATALINA:  Understood, Your Honor.  And we just

15  wanted to make the point that -- and again, ninety days isn't

16  our first choice, but it is what it is.  It's out there.

17      THE COURT:  Well, there's a -- Mr. Catalina, there's

18  a --

19      MR. CATALINA:  120 -- 120 or 150 or 180 days would --

20      THE COURT:  Yeah.  After a while --

21      MR. CATALINA:  -- would be worse than 90.

22      THE COURT:  -- it adds up, right?

23      MR. CATALINA:  Yes.  Yes.

24      THE COURT:  But I got a better solution for you:  go

25  settle.

1          MR. CATALINA:  Well, Your Honor, I think I said this

2    at one of the hearings, maybe six months ago.  But you know,

3    the best way to resolve the claims is to move forward with the

4    claims resolution process, right?

5          THE COURT:  No, I understand.  And you -- we all know

6    that.

7          MR. CATALINA:  Some of the claims will be easier to

8    settle when we get past this hurdle.  But you know, that's

9    our --

10         THE COURT:  Does anyone else wish to be heard?

11         MS. GRASSGREEN:  Good morning, Your Honor.  Debra

12   Grassgreen, again on behalf of Baupost Securities.

13         Your Honor, the time frame works just fine for us.

14   We'd also be happy if you wanted to move it up a week on the

15   discovery briefing.  That's also fine for us.  We're not trying

16   to slow things down here.  We disagree with the reading of your

17   prior order and we'll be happy to brief it on the 8th or the

18   15th.  Whatever --

19         THE COURT:  Well, I'm not --

20         MS. GRASSGREEN:  Whatever works for you.

21         THE COURT:  I'm not going to turn into a Scrooge.  I

22   mean, I'm not going to make people observe the holidays or --

23   you know, I didn't make -- you know --

24         MS. GRASSGREEN:  They're fairly narrow issues, Your

25   Honor.  But we think the schedule is fine.  We did -- I will

1  note -- and probably our case, as claimants, won't like this,

2  but we did note the PG&E asked for sixty days on their reply,

3  and we didn't have a problem with that either.  So we're -- but

4  we are perfectly fine with your schedule of March 15th and

5  April 30th, and the 15th for the briefing.  And we were not --

6          THE COURT:  Okay.

7          MS. GRASSGREEN:  -- deeply involved in the

8  negotiations of that July order.  We were tangentially involved

9  and included, but we certainly read it a different way and

10  we'll be happy to --

11          THE COURT:  Well, it doesn't matter.

12          MS. GRASSGREEN:  -- put that in the papers.

13          THE COURT:  I mean, we're past that or we're past a

14  lot of things.

15          So anyone else wish to weigh in?

16          Ms. Jarashow?

17          MS. JARASHOW:  Yes.  Good afternoon again, Your Honor.

18  Kizzy Jarashow, Goodwin Procter, on behalf of MML Investment

19  Advisors.

20          I won't belabor the point on -- we're fully supportive

21  of Your Honor's tentative ruling and the dates that you

22  proposed.

23          THE COURT:  Okay.  Well, I don't need anyone to say

24  you're okay with it.  It's just whether if anybody thinks that

25  you want to fall on your sword and say it's a horrible outrage.

1     Mr. Slack, that -- I mean, if you're confident about

2  the discovery issue, you'll win on the briefing.  So let's do

3  this.  I'm a little short-staffed because of the holidays, so

4  I'll ask you, Mr. Slack and Mr. Hamilton, to do the -- be the

5  scrivener here and just circulate a pretty standard order that

6  just recites what I just said so it's in writing and it's on

7  the docket.

8     So referring to your moving papers, what we'll call

9  the motion to dismiss, for convenience, oppositions March 15th,

10 reply April 30th.  Then as a separate matter, parties to submit

11 simultaneous briefs by January 15th on the question of

12 discovery or not.  All I want is that issue.  Should I permit

13 discovery or not?  And I don't need a bunch of me too's from

14 people who agree with the debtor.  And I'm not going to direct

15 counsel for the various respondents to coordinate a short brief

16 on a short schedule.  But please don't reinvent the wheel.

17 Please, please just focus on the issue and on the matter being

18 submitted at that time and I'll schedule a hearing if I need

19 to.

20     One more point.  And Ms. Villegas, maybe you can help.

21 I mean, one of the things that threw me off is I anticipated

22 this hearing was where is this motion to withdraw the

23 reference?  And I understand why you haven't filed one.  And I

24 don't need any further discussion.  But that -- and I frankly

25 understand your -- probably your frustration about why the

1    Ninth Circuit can't make a ruling on the issue that's

2    submitted.  I'd ask the same question.  I don't understand why

3    it can't, either.  But I also would hate to be bogged down on

4    this process that we just discussed and out of the blue have a

5    motion to withdraw the reference come in.

6         So is that something that's lurking out there or shall

7    I assume it's kind of moved to the back burner for the time

8    being?  And I don't want -- I'm not asking you to reveal

9    strategy.

10         MS. VILLEGAS:  Sure, Your Honor.  Carol Villegas,

11   Labaton Sucharow for PERA.

12         We submitted a statement yesterday that said, for the

13   moment we're not planning on filing a motion to withdraw the

14   reference.  It's difficult to know what our client is going to

15   want to do once the Ninth Circuit comes down.  It's certainly

16   possible that the Ninth Circuit doesn't agree with us, and the

17   district court will continue to not have jurisdiction, in which

18   case I think things get a little more complicated with

19   attempting to withdraw the reference.  So I think we're kind of

20   in a holding pattern right now, Your Honor, and we're happy to

21   continue the process here in the bankruptcy court.

22         I think that no matter what happens with us in terms

23   of whether we seek to withdraw the reference or not, this

24   motion to dismiss claims objection process is going to

25   continue.  So I'm hoping it's not going to add too much of a

1  burden for you if we decide to do that.  But for now, we're

2  just in a holding pattern.

3      THE COURT:  Well, the burden -- as I told you at the

4  last hearing, the best burden would be that that Judge Davila

5  decide to withdraw the reference today.  No, I'm only kidding.

6      MS. VILLEGAS:  Well, it might make it easier for you,

7  Your Honor, because, you know, then he can pick it up and look

8  through all of the 4,500 pages of exhibits and make a decision

9  that --

10      THE COURT:  Right.  I'm not trying to get out of my

11  work.

12      MS. VILLEGAS:  I understand.

13      THE COURT:  And I don't know what's going to happen.

14  Okay.  Well, it's a closed subject for now.  If you file a

15  motion to withdraw the reference tomorrow, I'm not going to

16  bite your head off for deceiving me.  I'll take your word as an

17  officer of the court that that's the present thinking.  And I

18  understand if the circuit weighs in or Judge Davila does

19  something else, we'll all deal with that.  Okay.

20      MS. VILLEGAS:  Thank you, Your Honor.

21      THE COURT:  Does anyone want to add anything further

22  for today?

23      MR. HAMILTON:  Your Honor, can I just --

24      THE COURT:  Yes, sir.

25      MR. HAMILTON:  -- clarify something?

1          THE COURT:  Yes, Mr. Hamilton.

2          MR. HAMILTON:  Joshua Hamilton on behalf of PG&E.

3          With respect to the discovery, they've set deadlines.

4    Can we -- the Court order that those are off, and there's no

5    obligation to respond any of the discovery that was served

6    either to PG&E or any third parties that they've already sent

7    out?

8          THE COURT:  Well, I hadn't thought about that.  I

9    guess that seems -- I mean, unless --

10          MS. GRASSGREEN:  It's agreeable, Your Honor.

11          THE COURT:  Okay.

12          MS. GRASSGREEN:  We can hold it all in abeyance

13    pending your ruling.

14          THE COURT:  Well, okay.  Ms. Grassgreen's concession,

15    should that solve -- Mr. Hamilton, is there anyone else that

16    has initiated any at the moment?

17          MR. HAMILTON:  No, just Baupost, and we can --

18          THE COURT:  Okay.  Well, again --

19          MR. HAMILTON:  -- include that in the order.

20          THE COURT:  -- I like to think -- I like to think that

21    all of you are -- and your colleagues that have been working

22    with me for all these years now, we have -- people can be

23    relied on and nobody's going to pull a fast one and I won't,

24    either.  And obviously -- okay.  Well, I'm beating it to death.

25    But Ms. Grassgreen made the concession that seems to solve the

1  problem.

2          Okay.  Well, then with that, happy holidays, everyone.

3          MR. SLACK:  Your Honor.

4          THE COURT:  Yes, sir.

5          MR. SLACK:  Your Honor, one more issue.  Just as a --

6  just as a sort of a notice here.  And that is, you may have

7  seen that that PERA had filed -- I'm not going to characterize

8  it, but a motion to be a designated class -- temporary class

9  counsel or lead plaintiff or whatever they said.  The response

10  date for that is currently the week after Christmas.  I think

11  it's the day after Christmas.

12          We've initiated conversations with PERA to try to set

13  a schedule.  I expect that we'll be able to do that and PERA

14  will be agreeable to a schedule here for that and a hearing,

15  and we'll come back to you with that.  But I guess there's at

16  least the possibility that PERA is going to say, no, they want

17  this -- they want the opposition to be right after Christmas

18  and not set a schedule with us and then we'll have to come back

19  to you.  But again, I expect we'll be able to work that out

20  with PERA, but I wanted to alert the Court that that's out

21  there.

22          THE COURT:  Well, but isn't PERA's motion already on

23  our January calendar on a PG&E date?

24          MR. SLACK:  Yes, it is.  It's on a date that would

25  require us to respond, you know, the day after --

1          THE COURT:  No, no.  What I'm -- Mr. Slack, what I'm

2     saying is we still have -- every two weeks, we have PG&E

3     calendars and it's no big deal to move it two weeks.  And if

4     PERA is agreeable to that, that solves the holiday problem.  If

5     they would agree -- I'll let you work that out.  But I --

6          MS. GRASSGREEN:  Your Honor, I believe we'll be able

7     to work something out.  We are not scrooges, either, so we will

8     work with Mr. Slack and figure something out that makes sense.

9          MR. SLACK:  Yeah, we figured we'd be able to work it

10    out, Your Honor.  Again, we haven't -- we just haven't had a

11    chance to fully connect.

12          THE COURT:  I was listening to another argument

13    recently, and one of the lawyers came up with a phrase that I'd

14    never heard before.  It's trying to squeeze an elephant into an

15    ant hole.  And so it's sort of -- and the metaphor kind of fit

16    that setting.  So I think worrying about when we have the class

17    action designation label headed with all this other stuff is

18    something worth worrying about.  Anyway, not worrying about at

19    the moment.

20          Gentlemen and ladies, happy holidays.  Thank you for

21    your time and I'll see you next year.

22          MR. SLACK:  Thank you, Your Honor.

23          MR. PALMIERI:  All right.  Thank you, Your Honor.

24          MS. GRASSGREEN:  Thank you, Your Honor.

25          THE COURT:  Okay.  Thank you very much.

1        All right.  Ms. Parada, I'm going to go off the camera

2   for about a minute or two.  You can bring in counsel on the

3   other matter.  I just want to take a second to take care of

4   something here.

5        THE CLERK:  Yes, Your Honor.

6        THE COURT:  I'll be right back.

7     (Pause.)

8        MR. JACOBSON:  Ms. Parada, is my audio working?

9        MR. RUPP:  I can hear you, Mr. Jacobson, but I did not

10  hear Ms. Parada.

11       THE CLERK:  Oh, my apologies.  I was on mute.

12       Yes, Mr. Jacobson, you can hear -- I can hear you.

13       THE COURT:  Well, I was -- just came back in.  I was

14  going to tell Mr. Jacobson that I could hear him, too.  So we

15  all -- we can all hear you, Mr. Jacobson, so.

16       MR. JACOBSON:  That takes care of the first anxiety

17  for the day.

18       THE COURT:  Let's let Ms. Parada call the case, and

19  I'll get the appearances of counsel.

20       THE CLERK:  Calling the matter of PG&E Corporation.

21       MR. JACOBSON:  Good morning, Your Honor.  Lawrence

22  Jacobson for Komir, Inc and its representative, Amir Shahmirza,

23  appearing on its motion for partial summary adjudication.

24       THE COURT:  Okay.  Mr. Lamb and Mr. Rupp, good

25  morning.

1    MR. LAMB:  Good morning, Your Honor.  This is Steve
2  Lamb on behalf of the reorganized debtors.

3    MR. RUPP:  Good morning, Your Honor.  Thomas Rupp of
4  Keller Benvenutti Kim on behalf of the reorganized debtors.

5    THE COURT:  So Mr. Jacobsen, you want to reserve some
6  of your thirty minutes?

7    MR. JACOBSON:  I do.  I'd like to split eighteen and
8  twelve.

9    THE COURT:  Eighteen and twelve?  Okay.

10    MR. JACOBSON:  I don't use all eighteen, I'd like to
11  add it on to the twelve.

12    THE COURT:  I'm not a stickler for these times.  I'm
13  going to give you one question first, so.  And that is this.
14  Look, I've been through a lot of paperwork in this case and
15  photographs and diagrams.  And I find one thing that's
16  confusing me and maybe it's just terminology, but Mr.
17  Shahmirza's testimony, I believe, in a deposition and so on.
18  He was describing the simple process that he called the -- now
19  I'm forgetting the word that he used for the repositioning of
20  the towers that changes the alignment.  That's right.  His word
21  was "alignment".

22    And so I was thinking about, well, what does he mean
23  by "alignment"?  And so you know, if this this project is right
24  near SFO.  And when you come in and out of SFO, you see these
25  numbers on the runway.  If you're on runway 280, it's because

1  it's lined up with Compass Rose 280, and the reciprocal of 280

2  is 11 -- 101 100 and so on. And so instead of having six power

3  lines on three poles, just have -- just pretend there's one

4  pole and one power line that goes across the Komir property.

5  What is the compass rose alignment of it now versus before?

6      So for example, if it were parallel to runway 280, it

7  would run through -- it would run north. I mean, it's west by

8  northwest 280 on a compass, and the reciprocal is the reverse

9  of that. And yet I didn't -- no one will tell me that or I

10 don't see that in the -- in the drawings that I can interpret.

11 So can you tell me if we have any evidence in the record for

12 the alignment in terms of directional, specific direction

13 before the towers were moved and after? And it seems to me,

14 for him to say there was a realignment, he ought to be able to

15 say that one of the towers was moved so that the compass rose

16 or the compass alignment of the wire changed.

17     Now, if both towers moved and there was no realignment

18 at all, which is strange, then -- well, no, there would be.

19 And so I'm only talking about the position that might change

20 the angle of the wire, not the height. I understand that the

21 difference about where the -- was the power sag made the power

22 lines closer to the ground. But I want the compass alignment

23 changed. Is there anything in the record that tells me that or

24 do I have to go speculate about it?

25     MR. JACOBSON: I'd say a couple of answers, several

1  answers.  One is it's not relevant to the determination of this

2  motion.

3  　　　　　THE COURT:  Well, I disagree with you, but go ahead.

4  　　　　　MR. JACOBSON:  Well, I'd like to speak to you at some

5  length about the tax issue because I think that is the

6  dispositive.  Second --

7  　　　　　THE COURT:  But I want to know about the wire

8  position.  I don't want to know about -- I know about the tax

9  issue.  It's fully briefed.  What was the position of the wire

10 or wires, the six or one matter, before and after?  If you

11 don't know the answer, I'll accept that that's -- you don't

12 know the answer.  But to me, that's a critical question.

13 　　　　　MR. JACOBSON:  The evidence in the record is that all

14 three existing towers previously were destroyed.  They were

15 removed.  They don't exist anymore.  New towers were

16 constructed at locations, according to PG&E and consistent with

17 Shahmirza's position, fifteen to twenty feet forward and

18 laterally, so --

19 　　　　　THE COURT:  Well, that's two movements.  Forward and

20 laterally --

21 　　　　　MR. JACOBSON:  Yes.

22 　　　　　THE COURT:  -- is two movements.

23 　　　　　MR. JACOBSON:  Yes, it is.

24 　　　　　THE COURT:  So leave aside the forward for the moment.

25 　　　　　MR. JACOBSON:  Yes.

1      THE COURT:  But which -- where do I see in the record

2  that there was a fifteen-foot lateral move of at least one of

3  the towers?  I mean, you could have -- you could have moved

4  both towers.  And so the wires would be perfectly parallel as

5  though they were, but they'd be in a different overhead

6  position.  If you moved one of them, the angle would change,

7  and the wire would go from the new position to the old tower.

8  But which is it?

9      MR. JACOBSON:  Well, part of it is there is -- it is

10  difficult to look at the photos and come to conclusions about

11  that movement.  What's in the record is that they were moved

12  forward near the boundary of Komir's property and were moved

13  left with the distance.  And it does not distinguish between

14  the portion that is forward or lateral.  But PG&E's own

15  statement is that they were moved fifteen to twenty feet.

16      THE COURT:  Well, when you say left, left from which

17  starting point?

18      MR. JACOBSON:  Good point.  If you were at PG&E's

19  substation where the towers were located looking southerly

20  towards Komir's property, they're moved forward and left.

21  Obviously, if you're looking from Komir's property, they're

22  moved nearer and right.

23      THE COURT:  No, but were they both moved left?

24      MR. JACOBSON:  They were -- all three moved left.

25      THE COURT:  No, but I'm simplifying.  I'm assuming

1    that all three and six wires move in parallel.  So I'm assuming

2    we can do the analysis with just one tower and one wire.  We

3    can do six.  It's the same.  But if you tell me that everything

4    moved to the left from looking south, okay.  That would be a

5    change in the position of the tower overhead.  I mean, excuse

6    me, the wire, if one were standing in the middle of the Komir

7    property right?

8                    MR. JACOBSON:  Yes.

9                    THE COURT:  Okay.

10                   MR. JACOBSON:  It moves it towards the Bayshore

11   Freeway, and it --

12                   THE COURT:  But moving it forward or left doesn't

13   change the angle.  In other words, if I'm using my metaphor of

14   the runway, if runway 280 was lengthened or shortened, but

15   still the airplanes took off on a compass rose of 280, there'd

16   be no change for certain purposes.  And for these purposes, if

17   Mr. Komir's -- or Mr. Shahmirza is standing under the wire on

18   his property and it moves to a different position, that's a

19   change.  If it's --

20                   MR. JACOBSON:  Right.

21                   THE COURT:  If the tower is moved such that the

22   position of the wire doesn't change, then it doesn't change.

23                   MR. JACOBSON:  Well, but his testimony is detailed

24   about the geometric or the math aspect of that.  If you move

25   the tower to a different location, and it's conceded that it

1  moves forward and sideways -- and the towers that were there
2  don't exist anymore.  So now we're going to connect lines to
3  new towers and new positions.

4          So as a matter of geometry, if you now connect the
5  lines that used to run to the position of the old towers to the
6  position of the new towers, those lines are necessarily
7  geometrically, mathematically in a different place.  They do
8  not cross the property at the same location and they're not at
9  the same height.

10         THE COURT:  I don't -- and see, this is where -- this
11 is what I asked the question to begin with.  I can't tell from
12 the testimony or what the evidence -- what the change was
13 because you keep saying forward and back.  And that doesn't
14 mean that the angle of the wires would have changed at all.  It
15 doesn't mean it at all.

16         If you move the laterally left or right, then by
17 definition, the angles will change.  But so I'm trying to
18 figure out whether we have a factual dispute or not.  And it
19 seems to me that at the moment there isn't -- I mean, look, my
20 point is I understand.  You keep saying that the towers were
21 destroyed, but destroying a tower and replacing it with a
22 similar tower in a different position, the legal consequence to
23 me is whether that changes the easement over his land, not
24 whether an old tower got destroyed and a new tower got
25 constructed.  It's where is the position?

1        Because the towers aren't on his property, the

2   imposition on his property is the angle and the height of this

3   high-powered line, these six high-powered lines that go across

4   his property.  And I cannot, for the life of me, know what the

5   actual impact was in either event.  Now, if -- I can't go out

6   and do a site inspection, but I won't know where the old

7   tower -- the old wires were, so that doesn't help, either.

8        Well, let me just leave it at that and let you make

9   your argument.  My point is, at the moment, I cannot determine

10  whether the old position and the new position were

11  insignificant and should be ignored, or were significant and

12  might indeed require PG&E, perhaps, to have a measure of

13  damages on what it caused because I -- because of the rest of

14  the argument that I think you've made, and maybe that PG&E

15  hasn't persuaded me of a contrary argument.  So I don't want to

16  use the whole morning.  I want you to make the argument that

17  you prepared.  But let me just -- you understand that I'm

18  struggling with something that I don't think is clear from the

19  record.  If Mr. Lamb believes it clearly is, he'll have a

20  chance to make that pitch.

21       MR. JACOBSON:  Then let me segue from your question to

22  the beginning of my argument this way.  And I'd say

23  preliminarily, I do not use notes.  I do not discuss facts of

24  cases and I do not read from material.  But today I'd like to

25  do all three of those things.

1          THE COURT:  Okay.

2          MR. JACOBSON:  The significance of the relocation of

3   the towers and, in turn, geometrically, the wires is the it had

4   on Komir's consent.  Komir had allowed -- had consented to

5   PG&E's use, as your memorandum opinion previously reflected,

6   from the time he owned it until 2018 when they undertook the

7   relocation.  It didn't affect him and his use.  But they then

8   removed the old tower.  They engaged in this relocation

9   process.  And when he realized what they were doing, he went to

10  them and said, I'm not consenting to this.  What are you doing?

11  Talk to me.  You need an agreement from me to do this.

12         THE COURT:  Wait, hold on one second, Mr. Jacobson.

13         MR. JACOBSON:  Sure.

14         THE COURT:  I locked the door because I thought you

15  were already gone.

16         Okay.  Go ahead.  Go ahead.

17         MR. JACOBSON:  So the significance of the relocation

18  is the impact, the revocation of his consent.  And these

19  measurements and directional angles are not in and of

20  themselves significant with respect to his revocation of

21  consent.  That is the critical aspect of the relocation.  And

22  he went to them and spoke to them.  The representative of PG&E

23  says we're -- well, let me back up.

24         When they came to him initially, they said, we want to

25  make some public safety improvements to the existing facility.

1  That's a writing that's in the record.  They then said, to

2  enable us to improve what's there for public safety, we want to

3  lease this part of the space right next to that so we can do

4  the improvements.  They brought out some base rock and

5  materials and started whatever work they were doing.

6         When he realized in September that they weren't

7  improving something at the substation, but they were removing

8  the towers and repositioning the lines, that was a new and

9  different circumstance.  And he went to them and asked about

10 it.  And the representative initially says, well, it'll lower

11 the lines by eleven feet.  There's nothing in the record,

12 Judge, that repudiates that.  There's --

13        THE COURT:  Well --

14        MR. JACOBSON:  -- nothing.

15        THE COURT:  But Mr. Jacobson, there's nothing in the

16 record that says they actually did, in fact, lower the lines by

17 eleven feet either, is there?

18        MR. JACOBSON:  Well, yes.  You have Shahmirza, as the

19 owner, representative testimony in real time.  He observed the

20 fact of the lowering.  He saw it.

21        THE COURT:  I don't remember that testimony.  But if

22 it's in there, I'll accept your word for it.

23        MR. JACOBSON:  It is.

24        THE COURT:  So does that mean -- does that mean if Mr.

25 Shahmirza and I went out there tomorrow, he could tell me and

1  he could point to the wire above that he knew what used to be

2  eleven feet higher in a different -- slightly different

3  position.?

4          MR. JACOBSON:  Yes.

5          THE COURT:  Now, and he knows that that accurately?

6          MR. JACOBSON:  Well, he doesn't know it to the eleven

7  feet.  He knows it was lowered enough to visually observe the

8  difference.

9          THE COURT:  Well, how -- but how could an individual

10  standing on the ground know down to a foot or eleven feet, the

11  height of the wire above him compared to what it was six months

12  earlier?  I mean, how can anybody possibly know that?  He

13  doesn't measure it.  He didn't take out a tape measure.  He

14  would have been electrocuted.

15          MR. JACOBSON:  Well, the electrocuted part is going to

16  be significant later on in our discussion.  But first of all,

17  it was only seventy feet.  So it's not like you're measuring 11

18  feet out of 500 feet.  And these towers have markers every -- I

19  think it's every ten feet.

20          THE COURT:  Yeah, the towers do, but not the wire that

21  sags in between those towers.

22          MR. JACOBSON:  Stand there.  I've done it over and

23  over again.

24          THE COURT:  How far apart are the two towers?

25          MR. JACOBSON:  Three towers.

1          THE COURT:  Well, okay.  But there's three towers each

2    end.  But how far apart are they?  They're on opposite sides of

3    his property.  So I mean, what are they in yards?  How far in

4    yards are those groups of towers apart?

5          MR. JACOBSON:  Fifteen feet, twenty feet.

6          THE COURT:  The towers?

7          MR. JACOBSON:  Yes.

8          THE COURT:  No.  The wire -- the power line only goes

9    fifteen feet between two towers?

10         MR. JACOBSON:  No, no, no.  I thought you asked me how

11   close the tower is to Komir's property.

12         THE COURT:  No, no.  There are towers on opposite

13   sides.  Two sets of towers.

14         MR. JACOBSON:  Yeah.

15         THE COURT:  Okay.  How far are those two sets of

16   towers apart?

17         MR. JACOBSON:  Oh.  Like 350 feet.

18         THE COURT:  Okay.  So if he's standing in the middle

19   of his property, he's got 175 feet each way to the towers and

20   he's able to know down to 10 feet how high the cables are above

21   his head?

22         MR. JACOBSON:  No.

23         THE COURT:  Okay.  Then he's smarter than I am.

24         MR. JACOBSON:  No, you don't stand in the middle and

25   measure against 350 feet.  You stand by the fence where the

1  tower is, and you can see where it started and where it comes

2  down.

3          THE COURT:  I don't think you understood my question.

4  I take your word for it that the towers -- two sets of towers

5  are roughly 350 feet apart from one another.

6          MR. JACOBSON:  Yes.

7          THE COURT:  And the cables or the wires between those

8  towers go over his property, and he could stand on his property

9  and estimate how high above his head the power lines are.  And

10 you said he -- if he knew it was -- he knows what seventy feet

11 is.  He knows that it came down eleven feet.  I guess I have

12 trouble understanding that.  But go back to your argument.  I'm

13 guilty of interrupting you, and that's not fair to you.  Go

14 ahead.

15         MR. JACOBSON:  No, the most important thing here is to

16 deal with your thinking and --

17         THE COURT:  Yes.  Right.  And so my thinking is that

18 he could -- if PG&E had lengthened the -- to 450 feet the span

19 of the cables and just move the towers farther apart, it

20 wouldn't have had any impact on him.  And yet, you might think

21 it did.  And I don't know how it would.  So if his property

22 doesn't have any towers on it, but it has cables, wires over

23 it, and the owner of the two sets of towers lengthens them,

24 what difference does it make?  But and that's why, to me, it

25 doesn't make any difference.

1       But if the owner lowers the height, that's

2  significant.  Or if he moves the towers to the left or to the

3  right, that changes the angle by which the wires cross the

4  property.  And that might indeed be wrongful and compensable if

5  it's not justified.  And I accept that his position is I didn't

6  agree to that.

7       And so I'm trying to struggle to figure out, except

8  that he didn't agree to it, what is it that happens that he's

9  suffering from?  And in layman's terms, I say, well, maybe the

10 wires are lower and maybe the realignment, using my compass

11 rose example, maybe they're not on a 280 100-degree compass

12 rose reciprocal.  Maybe it's a different angle and therefore

13 that has an impact.  Beyond that, I don't have any clue what

14 the consequences are.  So that's what I'm struggling with,

15 okay?

16      MR. JACOBSON:  Well, on that point, maybe we do need a

17 site inspection, because I've been there many times.  You stand

18 there --

19      THE COURT:  You weren't there before 2018, were you?

20      MR. JACOBSON:  No, but I'm -- in terms of visual

21 observation, you can stand at the north end.  You can look at

22 those towers.  You can see the marks against the tower where

23 the lines start.  You can visually get a perspective of the

24 height.  And so Shahmirza had been there for seventeen years

25 before 2018.  He knew where the towers were.  He knew he could

1  have a length perception of where they were relative to a
2  tower, relative to the other benchmarks in the area.  And his
3  testimony is, no, I didn't measure it.  I do not know exactly.
4  But the PG&E representative told me it was eleven feet.  I
5  could see it was changed significantly, and their eleven-foot
6  statement to me seemed right.
7          THE COURT:  Okay.  But the fact of the matter is, Mr.
8  Jacobson, whether you and I go out there or we get a surveyor
9  or whoever, however you measure heights of cables, somebody
10  qualified and not to get electrocuted could say, here is the
11  current height of these wires.  And I understand that the
12  height may change as the temperature changes, but PG&E knows
13  how to build power lines and knows how to maintain the towers
14  and the wires.
15          Somebody with competence could tell us what is the
16  existing height and -- but no one, presumably, unless there's
17  accurate drawings and records, can tell us what the height was
18  before 2018.  And for Mr. Shahmirza to say, well, I remember
19  those wires were higher, that's fine.  I don't question if he
20  says that, but that doesn't tell me how high they were unless
21  somebody with some credible historical evidence can do so.
22          So if I ask PG&E, give me some proof as to the actual
23  physical position of the towers and the actual height of the
24  wires before 2018 and compare them to the actual position today
25  using the compass or GPS or something for position and

1  measure -- some measuring device for the height, then might

2  have a better -- I might have a better answer to this question,

3  so.

4          MR. JACOBSON:  Okay.  The issue --

5          THE COURT:  I mean I got to check -- I got to tell

6  you, if the alignment was insignificant and the height change

7  was minimal, it might mean you got a very interesting case, but

8  no measurable damages.  And on the other hand, if there is

9  evidence that both change or either of those variables change,

10 and it translates to something that in -- that is inconsistent

11 with his rights, then, of course, he should be compensated for

12 it.  I don't -- you don't really believe that PG&E should be

13 ordered to remove move the towers again, do you?

14         MR. JACOBSON:  Well, and I think that is confusion

15 from the PG&E papers.  We are not saying that they have to move

16 the towers, but it's not difficult to move the lines so that

17 you have -- instead of going directly across, you go sideways

18 up the side and across.  That's not a complicated issue.

19         But would you agree with me that this discussion about

20 heights and angles and runway positions and such only matters

21 if PG&E has a right to be there in the first place?

22         THE COURT:  Well, yes.

23         MR. JACOBSON:  If they don't have it right to be

24 there, it doesn't matter.

25         THE COURT:  Well, I mean, that means --

1        MR. JACOBSON:  If (indiscernible) --

2        THE COURT:  That means if you -- if I agree with you

3   that, since they didn't pay the taxes, we're done.

4        MR. JACOBSON:  Yes.

5        THE COURT:  Okay.  It's over.  Well, okay.  But that's

6   a legal argument.

7        MR. JACOBSON:  That's what we're here for.

8        THE COURT:  Okay.  Okay.

9        MR. JACOBSON:  And on that --

10       THE COURT:  I mean, look, Mr. Jacobson, you've made an

11  argument in that issue and the other side has.  And I intend to

12  review both arguments again and decide.  But I have to also

13  think about, well, what's the consequence to come here if I'm

14  not persuaded that the tax history is dispositive?  And you

15  seem to -- you're not -- I mean, you're arguing that if I don't

16  accept that legal argument and I deal with the more traditional

17  prescriptive easement issue, then the question is whether this

18  was an incidental move or something that gives -- can give rise

19  to monetary damages.

20       Again, the notion that PG&E can reroute the line is

21  not the point.  If there's a monetary damage for the movement

22  that maybe is established, then that's the outcome, isn't it?

23       MR. JACOBSON:  We're looking at this much differently.

24       THE COURT:  Yes, we are.

25       MR. JACOBSON:  The question is whether PG&E has a

1  legal right to have had those lines there.  Komir's approach

2  was to first challenge PG&E's aggressive position that it had

3  rights under recorded easements.  So it seemed to me that if we

4  could address that issue and decide if they had a right to be

5  there based on recorded documents or not, we would advance the

6  analysis.  We made that motion, and the determination was that

7  the condemnation extinguished all rights under the recorded

8  easements.

9          THE COURT:  Right.

10          MR. JACOBSON:  PG&E made a counter motion saying,

11  well, if we lose that, we want to argue that we had

12  prescriptive rights.  And that motion was denied.  So the next

13  step in the analysis seemed to me to be, let's set up a motion

14  that presents to you the converse, whether they have a legal

15  right to be there based on prescription.  And that is the issue

16  that I want to discuss with you today.

17          THE COURT:  Yeah, but there's an in between.  They had

18  a -- they had a right to be there by consent for eighteen

19  years, right?

20          MR. JACOBSON:  Okay.

21          THE COURT:  Isn't that true?

22          MR. JACOBSON:  Yes.

23          THE COURT:  Okay.  Okay.  So let's not forget that

24  step.  So then in 2018, your argument is that what PG&E did was

25  not permitted and there was no -- there was no -- the time

1   didn't run to establish a prescriptive easement.  So they're a

2   trespasser or some other thing.  They are violating what was

3   previously a right as consensual.  And that's why your client

4   filed the suit, and the bankruptcy stopped it.  And that's why

5   we're here.  And I don't disagree with that.

6           MR. JACOBSON:  So but here's my point in terms of

7   where we are in sequencing the analysis and disposition of the

8   issues.  We need to decide now PG&E's fall back argument that

9   it has prescriptive rights.  We are not discussing now on that

10  issue the consequence of their not having prescriptive rights,

11  about the lines there and whether they can move them and what

12  are damages if they can't.

13          We first have to decide whether any lines at any

14  angles are entitled to be there.  We'll decide the issues about

15  moving towers, about damages, about angles, about -- whatever

16  those issues are, those are for the trial we have.

17          THE COURT:  What would we have -- but Mr. Jacobson,

18  what would we have -- what would we do with the trial?

19          MR. JACOBSON:  We would --

20          THE COURT:  We'd measure the wires?

21          MR. JACOBSON:  No, no.  You would then deal with

22  PG&E's arguments about, well, we have no right to have those

23  here.  But we need them here, so we need to decide how much we

24  need to pay you to continue to have them here.  And we --

25          THE COURT:  Okay.

1      MR. JACOBSON:  -- exchanged expert witness appraisals

2   on that point.

3      THE COURT:  Okay.  So --

4      MR. JACOBSON:  They differ significantly, but that

5   will be the subject for trial.

6      THE COURT:  So do you want -- are you saying that if I

7   accept your argument, that the -- because PGE didn't pay the

8   real property taxes, they have no rights, period?

9      MR. JACOBSON:  Right.

10      THE COURT:  But if I say that -- I reject that

11   argument and I say the fact that they -- that PG&E didn't pay

12   the taxes is not dispositive, what's left?  Just the trial on

13   damages?  In other words, if I reject your argument today about

14   property taxes --

15      MR. JACOBSON:  Right.

16      THE COURT:  -- because PG&E has argued that that's not

17   dispositive because they -- both sides have gone through the

18   cases that kind of split the hair between de facto taking of

19   the property versus that.

20      Okay.  So if I don't buy your argument, on that

21   argument on that issue, is there anything else to do other than

22   go to trial?

23      MR. JACOBSON:  We go to trial on the issue of whether,

24   given the issues about which PG&E argues in its opposition

25   there are factual issues, and they say there are factual issues

1  about every legal argument it presents, if you look --

2           THE COURT:  I know, but the fact -- but that gets back

3  to the point that I made in the first place.  What are the

4  factual issues?  Maybe I misled you by giving you the

5  impression that I'd made up my mind on the property taxes

6  because I wanted to focus on the physical question.

7           So I'll ask it again.  If I rule in your -- against

8  you on the property tax issue, we have a trial that determines

9  whether the towers were moved or the wire height was adjusted

10  in a way that was inconsistent with what was consensual before

11  then; is that right?

12           MR. JACOBSON:  Well, that and other issues.  The

13  normal prescriptive easement issues about --

14           THE COURT:  No, what -- well, what -- no.  There's no

15  prescriptive easement because the time didn't run.  It's a

16  trespass.  Oh, they don't --

17           MR. JACOBSON:  Yes.  Yeah, you're right.

18           THE COURT:  What is the consequence -- what is the

19  consequence of somebody who doesn't have an easement for

20  putting the -- moving a tower and moving a power line?  And the

21  consequences seem to me is what are the money damages to

22  compensate the landowner?

23           MR. JACOBSON:  I think PG&E would say to you that the

24  issue for trial if you do not grant this motion based on the

25  tax -- nontax payment, would be whether they do have a

1  prescriptive easement, whether the changes were -- whether

2  there is a prescriptive easement, when it was established, was

3  it established against predecessors?  Was it did it carry over?

4  Did it change?  What's the difference?  Can we move them?  And

5  I would say to you -- and in that trial would be whatever is

6  the outcome on those issues in terms of materiality or not and

7  such, the final issue is damages or other remedies.  So but

8  that's not for today.  That's for trial.

9          THE COURT:  Okay.  I'll tell you what.  I ended up

10  with this long discussion.  And Mr. Lamb and Mr. Rupp have been

11  quiet.  I'm going to depart from the original suggestion and

12  let them be heard, and then I'll come back to you.  And I'm not

13  going to -- the clock isn't running against you.  I'm going to

14  give this the time it needs.  But I've got to clarify this, and

15  I'll ask Mr. Lamb to clarify what he believes is to be the

16  factual history and what he believes the issues for today and

17  the issues for the trial are.

18          So Mr. Lamb, please take over.

19          MR. LAMB:  Thank you, Your Honor.  Relating to the

20  issue that I think you raised initially, there are other

21  declarations to include the Jadhav declaration and the Sosensky

22  declaration.  But the principal one is the Raines declaration

23  (phonetic), which relates to the LIDAR, which is the light

24  detecting --

25          THE COURT:  Yeah.  Yes.

1    MR. LAMB:  And if you look to paragraph 13 of that

2  particular declaration, he testifies is that the replacement

3  towers were replaced ten to twenty feet south, not fifteen to

4  twenty.  Ten to twenty feet south from the northern property,

5  and they were all within the transition station.  He then

6  testified that a comparison of the alignment of the

7  transmission lines from 2012, which was before they were moved,

8  the towers were moved in 2018, is shown in Exhibits A-1 and A-

9  2, based on the LIDAR data, I have determined there has been

10  virtually no change in the alignment of the transmission lines

11  as it extends across the Komir property.

12    And I agree that these are the types of things that

13  need to be explained by an expert.  But if you look at those

14  diagrams and if you look at those representations on those

15  exhibits, that's why Mr. Raines says he's looking at it.  He's

16  seen it.  We have the evidence before the transmission towers

17  were moved and after, and the alignment hasn't changed.  So

18  the --

19    THE COURT:  Well, I say again, I found the testimony

20  to be confusing.  So I'll rephrase the question to you.

21    MR. LAMB:  Okay.

22    THE COURT:  So let's break it down.  Komir's property

23  is in the middle of a set of towers on each side of it, right?

24    MR. LAMB:  Yes.

25    THE COURT:  And north and south.  Okay.  So which ones

1  got moved ten feet south?  The north tower or the south tower?

2          MR. LAMB:  The north towers.

3          THE COURT:  Okay.

4          MR. LAMB:  The towers all the way to the south didn't

5  get moved at all.

6          THE COURT:  Okay.  Okay.  So let's --

7          MR. LAMB:  Only the north towers.

8          THE COURT:  Okay.  So --

9          MR. LAMB:  And they only got moved ten feet south.  So

10 closer to the Komir property, but all within the transition

11 statement (indiscernible) --

12         THE COURT:  But use my compass -- use my compass

13 example.  And I understand that you weren't there any more than

14 I wasn't there.

15         MR. LAMB:  But --

16         THE COURT:  And this gentleman wasn't really there,

17 but he's got records.  So if we --

18         MR. LAMB:  Right.

19         THE COURT:  if we overlayed a compass rose on the

20 diagram before 2018, what's the compass bearing of the axis of

21 the wire compared to presently?  Is it the same angle, or is

22 it -- because pure geometry says if you move one of the towers

23 twenty feet at all off the axis, there's going to be a change

24 in the angle.  So.

25         MR. LAMB:  Right.

1    THE COURT:  Unless you move it absolutely parallel to

2  the original angle.  So which is it?

3    MR. LAMB:  UNIDENTIFIED MALE ATTORNEY 1:  It -- it's

4  the same.  It'd be -- basically, it'd be -- if you were

5  looking at, for example, 270 to 190, if that was the compass,

6  it would stay -- it would stay 270 but 190.  It would just be

7  closer from the 270.  But the alignment would remain the same,

8  and the compass bearing would remain the same.

9    THE COURT:  Okay.  So using our airport example, if we

10  positioned an airplane on the runway and we moved that airplane

11  twenty feet down the runway, the angle of the takeoff pattern

12  would be the same either way because we didn't change -- but

13  you're telling me that if we -- that from the record and these

14  exhibits that you refer to, I can determine that the angle

15  didn't change?

16    MR. LAMB:  Yes.  If you look at A-1 and A-2.  Right.

17    THE COURT:  Okay.

18    MR. LAMB:  And maybe this needs the explanation of the

19  experts.  And we're certainly going to have some depositions

20  coming forward.  I think those are all due by January 16th.

21  But yes.  That's why.  And then that's why you have the

22  testimony as to what that means.  And that's why he says in his

23  testimony that a comparison of the alignment is that there's

24  been virtually no change in the alignment.

25    THE COURT:  Well --

1          MR. LAMB:  (Indiscernible).

2          THE COURT:  But see, virtually no change can mean a

3     change.  Whatever virtually means.  So that's why, to me, my

4     compass rose is a good example, if we could do it precisely.

5     And maybe we can't do it precisely.  So I guess what you're

6     saying would -- did you ask Mr. Shahmirza if he'd concede that

7     the alignment from the old position to the new position didn't

8     take?

9          MR. LAMB:  Your Honor, I asked him if he'd done any

10    measurement.  He said no.  I'd asked him if he'd done any

11    LIDAR.  He said no.  I said have you done anything by

12    engineering?  He said no.  What he said was he just looked at

13    it, and he could tell me that, geometrically, that had

14    happened.  I don't know what that means.  But that's a question

15    of fact that, I think, is established by, obviously, Mr. Raines

16    (phonetic) and Mr. Suzinski (phonetic), who also testified

17    about alignment.  And I don't think that Mr. Shahmirza would be

18    qualified to testify as to that.  I understand that that's what

19    he said, but I'm not sure how meaningful that is.  It's

20    certainly a question of fact at best.

21          THE COURT:  Okay.  But Mr. Lamb, what you seem to be

22    saying is that I -- I'm not an expert either.  But presumably,

23    if I looked at these exhibits -- and I did look at them, but

24    that was my point.  I didn't understand them because they're

25    confusing.  And I must say the photographs of the towers are

1  confusing, too.  I couldn't even tell which one I'm -- which is

2  which.  But you're saying that if I put side-by-side the

3  diagrams of before and after, I would come to the conclusion,

4  at least, that the compass rose alignment is virtually the

5  same.

6            MR. LAMB:  Yes, Your Honor.  And obviously --

7            THE COURT:  Why don't you tell --

8            MR. LAMB:  -- that would be --

9            THE COURT:  Why don't you tell me about the height of

10  the wire?

11           MR. LAMB:  The height of the wire is also in there.

12  And he basically testified that when he did the LIDAR, it was a

13  difference between 4.9 feet in the northernmost portion, so

14  closest to the Komir property.  So if you're going from north

15  to south, closest to the property, it's 4.9 feet lower.  So it

16  is lower on that pole.  But then when you go across the line --

17  because you got to look at the sag, Your Honor.  It depends --

18           THE COURT:  I know that.

19           MR. LAMB:  If you --

20           THE COURT:  I understand that.  I understand.

21           MR. LAMB:  And then over the property, as you go

22  across the property, what he testified to -- and this is on

23  paragraph 14 -- is that it is the same height.  There's no

24  change in height when it's directly over the portion that would

25  be kind of at the lowest point, which is over what we referred

1  to as the flood control channel, Your Honor.

2        THE COURT:  I understand.  I mean, I understand the

3  sag.  And obviously --

4        MR. LAMB:  Right.

5        THE COURT:  -- we don't have to be civil engineers to

6  know if you have -- well, look, the Golden Gate Bridge has two

7  towers, right?  And it has a certain sag.  And that sag

8  changes.  It actually did change, if you remember, if you're

9  old enough to remember.  When they had the anniversary of the

10  bridge, they had to close the bridge because there were so many

11  people on it.  There was a change in the sag, so.

12        But the point is that the Komir property is where the

13  sag is at because that's where their property is.  So you're

14  telling me that the expert says that at the tower, the cables,

15  the wires start lower.  But at least at the midpoint --

16  therefore in the middle of Komir property -- there is virtually

17  no change --

18        MR. LAMB:  Yeah.

19        THE COURT:  -- in what used to be there?  Okay.  So

20  you would say that -- your argument then is there's no change

21  in alignment or height that is measurable?  Admittedly, within

22  tiny amounts, there may be changes, but.

23        MR. LAMB:  Well, to be clear, at the northernmost

24  portion, which I don't think affects the property, the Komir

25  property, it is 4.9 feet --

1          THE COURT:  I understand.

2          MR. LAMB:  -- lower, so.

3          THE COURT:  But if you're standing at that tower, how

4    far is it until you get to the Komir property?  And what is the

5    height of the wire when it first crosses the Komir property?  I

6    presume it's less -- I mean, that it's no more than four

7    point -- whatever feet it was before.

8          MR. LAMB:  Right.

9          THE COURT:  It --

10         MR. LAMB:  4.9 feet, Your Honor.

11         THE COURT:  Yeah.  I mean, it can't go up.

12         MR. LAMB:  Right.  And that's the point of the

13   argument, is we say, in relation to the Guerra case and the

14   Ward case, in terms of the de minimis or the minor amount of

15   movement.  And --

16         THE COURT:  I understand that.

17         MR. LAMB:  -- to be clear --

18         THE COURT:  I understand.

19         MR. LAMB:  -- that is equally available, not just to a

20   prescriptive easement issue, but a statute of limitations

21   issue.

22         THE COURT:  Well, then, but --

23         MR. LAMB:  And those cases -

24         THE COURT:  But Mr. Lamb --

25         MR. LAMB:  -- were (indiscernible) --

1         THE COURT: -- if the fact -- if, as a matter of fact,

2 I determine that there was no meaningful alignment change or

3 height change, what is there else to have a trial about?

4 Doesn't that mean therefore there can be no damage? What am

5 I --

6         MR. LAMB: There is, yeah. Yes. Yes.

7         THE COURT: And if, on the other hand, I determine

8 that the angle changed and it impact -- the angle between the

9 towers and the height changed and it has an impact on the use

10 of the property, unless you lose on the property tax question,

11 then we're done, aren't we? If there's no change --

12         MR. LAMB: Right.

13         THE COURT: -- if there was no change in the --

14         MR. LAMB: Yes. Yes.

15         THE COURT: Okay.

16         MR. LAMB: Correct.

17         THE COURT: So how can there -- if you had the --

18         MR. LAMB: Sorry. When you said the word "done", I

19 don't -- yes, sir. (Indiscernible) --

20         THE COURT: I know. But what I'm saying is --

21         MR. LAMB: -- (indiscernible).

22         THE COURT: Here's what I'm struggling with. Mr.

23 Jacobson wants me to say that he wins the property tax. And I

24 haven't decided that. Maybe he does. But if he doesn't, and

25 if the facts are that, despite all the rhetoric, there was no

1    measurable change in either the compass alignment of the wires

2    as they cross the Komir property or the height of them, then

3    there can be no damage if it was all consistent with the

4    consent.

5           MR. LAMB:  To be clear, if he prevails on the property

6    tax issue, which I disagree with, that would handle the

7    prescriptive easement issue.  It does not handle the statute of

8    limitations issue or the trespass.  That still doesn't get him

9    past this if there's no material change.

10          THE COURT:  Okay.  Okay.  But again, I think we're

11   going around in circles because a factual matter, the towers

12   and the wires today are virtually -- and I'll use the word

13   "virtually" as a lawyer -- virtually the same as they were in

14   2017, there's nothing.  There's nothing.  There's no anything.

15   There's no trespass.

16          MR. LAMB:  Right.

17          THE COURT:  Because --

18          MR. LAMB:  There's no --

19          THE COURT:  Because PG&E was there for seventeen years

20   with the owner's consent.  And if there's no trespass, there's

21   also no prescriptive anything.  There is use consistent with a

22   consensual easement.

23          MR. LAMB:  Right.  Right.

24          THE COURT:  So what are we having a trial about?  And

25   so what -- if we have a trial --

1          MR. LAMB:  Well, I --

2          THE COURT:  -- and that trial --

3          MR. LAMB:  I --

4          THE COURT:  -- the experts satisfy the finder of fact,

5     well, then there's nothing else to talk about.

6          MR. JACOBSON:  Well, you'd have a trial on all these

7     issues that you're debating back and forth and that Mr. Lamb is

8     saying he'll bring the experts to trial.  But you will also

9     decide whether there was a revocation of consent.  You just

10    said that they were there for the seventeen years with consent.

11    My point to you that's not sticking is that the significance of

12    the moving, relocation, reconstruction of what was there before

13    resulted in a revocation of consent.  You can't --

14         THE COURT:  But Mr. Jacobson, what I'm having trouble

15    with this argument -- and maybe I'm just dense today -- and I

16    think I might have mentioned to you, I'm influenced in part

17    because I have another PG&E case -- Mr. Rupp is familiar with

18    it -- where the property owner has the tower on his property.

19    And that's different.  But Komir never had the towers on its

20    property.  And so from the beginning of -- a century ago, those

21    towers were constructed.  And those towers were connected by

22    wires that cross property that ultimately became the Komir

23    property.  And before that, it was the Hildebrand (phonetic).

24    And God knows who it was before that.

25              But from the day Komir bought the property, it knew

1   that it had those towers next door, both sides of its property.

2   And it knew where those wires were, and it consented to it.

3   And if the owner of the towers repositions the towers, but the

4   crossing of the Komir property and the height of the wires has

5   not changed, then I don't think there has been any -- I don't

6   think he can unconsent.  There's nothing he can do.

7          In other words, stated differently, if he goes out and

8   says, what are you guys doing?  And they said we're moving the

9   towers on our property, and the wires that cross your property

10  will be in the same alignment and at the same height, he might

11  not have been happy about it, but he might not have had any

12  recourse.

13         Now, what am I missing about that, Mr. Jacobson?  What

14  does it mean for him to say I don't like your moving those

15  towers when it doesn't affect his enjoyment of his property

16  with the wires crossing his property?

17         MR. JACOBSON:  Because the lines do and did cross his

18  property.  And they crossed it at different height.  And so the

19  factual basis upon which he granted his consent to the wires

20  crossing the property where they were changed.  It was

21  different.  I don't consent to that.

22         THE COURT:  He doesn't consent to it.  But the

23  evidence that Mr. Lamb just summarized is the height didn't

24  change.

25         MR. JACOBSON:  But you're assuming that.  That's a

1  factual issue for trial.

2          THE COURT:  And you have evidence to prove contrary?

3          MR. JACOBSON:  Sure.  We got PG&E's representatives

4  saying they did.  You've got Shahmirza saying --

5          THE COURT:  Again, we keep saying it.   I mean --

6          MR. JACOBSON:  -- (indiscernible).

7          THE COURT:  -- I got to tell you, when you keep

8  telling me somebody out on the field one day said we're moving

9  this thing eleven feet, it doesn't make it so.

10          MR. JACOBSON:  No.  But it impacts his consent or not.

11  It is his reality.  And it wasn't just somebody out in the

12  field.  It was the construction manager --

13          THE COURT:  Okay.  So --

14          MR. JACOBSON:  -- who was (indiscernible) --

15          THE COURT:  -- the construction manager says Mr.

16  Shahmirza, we're going to lower that wire eleven feet.  And

17  Shahmirza says, well, no, you're not, over my dead body.  So

18  what happens is they didn't move it eleven feet, so says Mr.

19  Lamb and his expert.  I'll accept the fact that your client

20  hasn't conceded something.  But when a work person, when he

21  says that I'm going to lower it eleven feet, but in fact

22  doesn't lower it eleven feet, then you can't then argue that he

23  didn't consent to the nonlowering at eleven feet because they

24  didn't lower it eleven feet if that's the fact.

25          So I'm sorry to beat this to death.  But to me, it's

1   very, very important.  So let's go ahead and switch gears.

2           Mr. Lamb, make the argument you wish to make -- it's

3   in the briefing, but make it again -- about the property tax.

4   And then I'm going to let Mr. Jacobson restate the same

5   argument.  But I will tell you that I've read the cases and

6   I've read the briefs.  But I want -- I don't want to give you

7   the impression that I'm not paying attention to your arguments

8   here.

9           MR. LAMB:  Your Honor, I think that this has been

10  fully briefed by both sides.  And it really relates to this

11  Hansen case, which I think is distinguished.  And if the Court

12  just looks at the Zimmer case, at the Cleary/Tremble case, and

13  at the Hairmunino (phonetic) case -- I cannot pronounce that.

14  I apologize.  But it's very clear that this issue of the taxes

15  is not dispositive.  Okay?  And it is not something that

16  Shahmirza can rely on.  And regardless of that, it still

17  wouldn't matter because it wouldn't get him past the statute of

18  limitations in relation to the trespass issue, Your Honor.

19          THE COURT:  Just refresh me then about -- this is

20  something that we talked about a moment ago.  What is the

21  statute of limitations argument --

22          MR. LAMB:  Sure.

23          THE COURT:  If the --

24          MR. LAMB:  The statute of --

25          THE COURT:  If the Hansen case --

1          MR. LAMB:  -- limitations argument --

2          THE COURT:  Wait.  If the Hansen case is a derelict

3    and these other cases control, what is the statute of

4    limitations question?

5          MR. LAMB:  The statutes of limitations, it really

6    relates to the Guerra and Ward cases more.  But that's the

7    issue that, clearly, he purchased this property in 2000.  It

8    was there from 2000 to 2018.  So he's basically not objecting,

9    consenting -- whatever phrase you want to use it -- to the

10   existence of these transmission lines for seventeen, eighteen

11   years.  Okay?

12         Now he's objecting.  But there hasn't been a material

13   change.  And if you look at those cases, if you look at Guerra

14   and if you look at Ward and you look at Otay Mesa, it's pretty

15   clear that the statute of limitations is going to bar him from

16   an action, whether it's in trespass or a nuisance.  It won't

17   matter --

18         THE COURT:  Okay.

19         MR. LAMB:  -- because there hasn't been a --

20         THE COURT:  Okay.

21         MR. LAMB:  -- significant change.

22         THE COURT:  I guess, what I think I got, in cross

23   purposes with you is, when I read your briefs originally -- and

24   again, I won't pretend that I read each and every case, but I

25   read the arguments about the cases -- it seemed to be a

1  nonissue because of the consent.  In other words, to me, every

2  time you said statute of limitations, I say but consent is a

3  nonissue.  So to me, the only statute of limitations that is of

4  any significance here is, did Mr. Shahmirza act promptly when

5  he had something to complain about?  And the answer is yes, he

6  did, in terms of filing the state court suit.  And I

7  misstated -- I mean, I mischaracterized your argument.  So I'm

8  going to restate it again.

9         Your argument is that the property tax question is not

10  dispositive.  California law said that the statute of

11  limitations to complain about the use of the property ran years

12  ago because the debtor -- I mean, because of the neighbor --

13  Mr. Shahmirza, consented.  And therefore, when he complains

14  later, he can't complaint about something that is not a

15  departure from what was the consent.

16         So in other words, your argument is repositioning the

17  towers and adjusting the wires slightly is nothing more than a

18  tweak, and it's consistent with the consent?

19         MR. LAMB:  Correct, Your Honor.

20         THE COURT:  Okay.  Okay.

21         MR. LAMB:  And a material deviation, that would be a

22  different story.

23         THE COURT:  Yeah.  Yes.  I understood.

24         MR. LAMB:  Yeah.

25         THE COURT:  And okay.  Okay.

1    So now, anything further on the -- well, you said on

2    the briefing on the Hansen case.

3    And so Mr. Jacobson, what I thought when I first

4    learned about prescriptive easements -- and again, I hate to

5    sound like I'm telling you war stories.  But I actually did

6    have -- I think I might have told you this.  I actually tried a

7    case involving a prescriptive easement out near SFO years ago

8    when I was a new judge.  And I learned -- and I did the site

9    inspection.  And I think I learned then about the notion of

10   adverse possession requires the tax, but prescriptive easement

11   doesn't.

12   And it was only with your briefing in the Hansen case

13   that at least one court has kind of come up with some sort of a

14   constructive -- or whatever the language was -- that it's

15   constructively the same as adverse possession.  And you're

16   hanging your hat on that principle, I believe.  And if I don't

17   agree with you, then I guess we're going to have a trial on

18   whether there really was a material change, the consent.

19   But go ahead and make whatever additional argument you

20   want about the property tax in Hansen.  But I'll leave it at

21   that.

22   MR. JACOBSON:  My turn?

23   THE COURT:  Yes.

24   MR. JACOBSON:  So I want to use your comment about get

25   electrocuted (indiscernible) --

1          THE COURT:  Okay.

2          MR. JACOBSON:  -- to springboard into this discussion.

3    There is the distinction that you note between an occupation

4    that is tantamount to a claim of right that is adverse

5    possession and requires payment of taxes and a use that is

6    shared that is not required -- does not have the requirement

7    for payment of taxes.  And there is a statutory distinction.

8          Civil Code Section 701 relates to estates.  And it

9    pertains to the payment of taxes, the adverse possession issue.

10   There is Civil Code Section 801 that that defines ordinary

11   easements.  And Section 801, in defining what it calls

12   easements, refers to, for example, right of pasture, right of

13   fishing, right of taking game, right of way; use related

14   activities on the property.

15         And I'd like to walk through the Hansen opinion with

16   you.  Hansen was a case where the facts were that there were

17   two adjacent landowners who were farmers.  They raised crops.

18   The land was contiguous.  Hansen had a larger ranch of 382

19   acres.  Sandbridge (sic) had a smaller one of 250 acres.  And

20   the dispute related to a ten-acre parcel of the smaller

21   Sandbridge (sic) property.

22         Hansen, with the larger parcel, had farmed the entire

23   property and the ten acres for many years.  And he had rotated

24   crops during those years.  And then at a point, on the ten

25   acres that was on the other person's property, he planted

1  pistachio trees, not rotating crops, but permanent trees.

2  Hansen claimed that he had acquired a prescriptive easement on

3  the ten acres and could keep his trees there without paying the

4  taxes, that he had established a right of possession.

5        Hansen case was very careful and detailed in reviewing

6  the difference between an exclusive occupation of the property

7  as opposed to a nonexclusive use.  The case talks about

8  property interests like estates and easements.  Both can be

9  acquired by occupation.  But it says there is a difference

10 between a prescriptive use of land culminating in an easement

11 and in corporeal interest and adverse possession, which creates

12 a change of ownership.  Corporeal interest.  The former deals

13 with the use of land, the other with possession.

14       So how do you distinguish which is which?  And the

15 critical issue of proof is that for the use -- for the

16 possession, when the claim is for exclusive possession, you

17 need to pay the taxes.  So that's why the difference is

18 significant.  And the case notes, because of the taxes element,

19 it is more difficult to establish adverse possession than a

20 prescriptive easement.  And --

21       THE COURT:  Well, I mean, let me interrupt you.  So

22 the trees were permanent.  So --

23       MR. JACOBSON:  Yes.

24       THE COURT:  -- the neighbor on the smaller property

25 couldn't use the property for anything?

1          MR. JACOBSON:  Exactly.

2          THE COURT:  Okay.  All right.

3          MR. JACOBSON:  Exactly.

4          THE COURT:  So functionally, the owner of the

5    property, the original owner, was excluded from any enjoyment

6    of the property?

7          MR. JACOBSON:  And the language --

8          THE COURT:  Right?

9          MR. JACOBSON:  -- of the case is equivalent.

10         THE COURT:  Okay.

11         MR. JACOBSON:  I mean, it --

12         THE COURT:  Okay.

13         MR. JACOBSON:  So the Court commented, unsurprisingly,

14   claimants have often tried to obtain the fruits of adverse

15   possession under the guise of a prescriptive easement to avoid

16   having to satisfy the tax element.  That is, they seek

17   judgments employing the nomenclature of easement, but creating

18   the practical equivalent of an estate.  The law prevents this

19   sophistry.  So then the question is, again, whether it is the

20   practical equivalent or whether it is shared.

21         And the opinion discusses that, saying, in determining

22   that question, courts look to the extent to which the

23   conveyance limits the uses available to the grantor.  An estate

24   entitles the owner of the exclusive occupation a portion of the

25   Earth's surface.  That is, Sandbridge (sic), the smaller

1  fellow, would not be able to use the disputed land for any

2  practical purpose.  This goes back to your comment about get

3  electrocuted.

4          And it goes on because the interest sought by the

5  larger fellow was the practical equivalent.  They were required

6  to meet the requirement of payment of the taxes.

7          THE COURT:  Well, is there any -- excuse me.  I

8  understand where you're going, and I don't make light of the

9  danger of high voltage lines.  But is there any evidence that

10 in all the years that your client owned the property, that he

11 didn't have access to and some use of the property?

12         MR. JACOBSON:  Well, no.  This is the critical issue.

13         THE COURT:  Could he grow --

14         MR. JACOBSON:  (Indiscernible) --

15         THE COURT:  Could he grow pistachio trees on the

16 property?

17         MR. JACOBSON:  No.  But he can't -- he can't build in

18 that air space.  And Civil Code Section 820 says that every

19 owner of property is entitled to possession and use of the land

20 and everything below and above it.  So the space that is

21 occupied by those transmission lines, Komir has a statutory

22 right to occupy.  So now, can it occupy that space?  Is it a

23 shared use, or is it the kind of exclusive, practical

24 equivalent of an estate so that Komir can't use that property?

25 Only PG&E is and claims the right to own it -- or to use it?

1          THE COURT:  But  --

2          MR. JACOBSON:  So -- go ahead.

3          THE COURT:  But is there proof that he can't use it?

4    Again, I'm not going to pretend that he's going to grow

5    pistachio trees there.  But is there any evidence in the record

6    that -- and I understand that a portion of the property has a

7    flood canal on it, so I'm not going to talk about whether he

8    can raise fish in the flood canal.  Is there any -- is there

9    any use -- and is there any proof, rather, that he can't use

10   the property for anything?

11         MR. JACOBSON:  So that's a really easy question to

12   answer.

13         THE COURT:  Okay.

14         MR. JACOBSON:  You look at PG&E's opposition, page 11,

15   lines 26 to 28.  The significant but bewildering statement is,

16   "the fact that the transmission lines transverse only aerial

17   space over the Komir property makes them inherently

18   nonexclusive as claimant is still able to use his entire

19   parcel, including the land below the lines and all subsurface

20   area".

21         They are saying to you this is not an exclusive use by

22   us of the airspace that Komir is entitled to occupy under 829

23   because he can go use the land and dig the minerals under the

24   ground.  That statement in and of itself is a judicial

25   admission that PG&E and only PG&E can use that space.

1    THE COURT:  Well, I guess I don't understand it.  Only

2  PG&E can you use airspace.

3    MR. JACOBSON:  Pardon me?

4    THE COURT:  But is PG&E's statement an untrue

5  statement?

6    MR. JACOBSON:  Well --

7    THE COURT:  Can --

8    MR. JACOBSON:  -- (indiscernible) correct statement

9  that Komir can use the land and the subterranean rights.  It is

10  an absolutely -- it's an admission that Komir cannot use the

11  aerial space.

12    THE COURT:  Well, I mean, I don't think we need an

13  admission to -- for just common sense, with high-powered

14  voltage lines going over your property.

15    MR. JACOBSON:  Exactly.

16    THE COURT:  But therefore what?

17    MR. JACOBSON:  Exactly.

18    THE COURT:  But --

19    MR. JACOBSON:  Precisely.

20    THE COURT:  But that's what he bought.  That was on

21  the property when he -- okay.  I understand your point.

22    MR. JACOBSON:  Well, no, no.  The on the -- I'm sorry.

23    THE COURT:  Go ahead.

24    MR. JACOBSON:  The on-the-property part doesn't matter

25  on this.  This is a question of whether their claim to have

1  them on the property -- whether they have a prescriptive right

2  to have them on the property.  And they can only have, at that

3  prescriptive right, whether it's against Hildebrand, Komir, or

4  anybody else, if they paid the property taxes associated on the

5  property.  California is clear.  Different states have

6  different --

7            THE COURT:  No, I know that.  I know that.  I know

8  that.  But look.  What you want me to do is to say that high-

9  powered lines that go through the air above someone's property

10  are like pistachio trees that preclude the legal owner from

11  using the property.  And you know what?  I bet the Hansen case

12  doesn't say whether they could do a mine underneath the

13  pistachio trees.

14            But your arguing is that because only PG&E can occupy

15  the airspace, because it has the power lines, therefore it

16  should have paid the property tax, and therefore -- I mean

17  that's a bit of a strange argument.  You're saying that PG&E

18  should have paid the property tax because they have the wires

19  that cross over the property.  And even though PG&E argues that

20  your client can use the property -- and you haven't proven that

21  he can't --

22            MR. JACOBSON:  Because the airspace --

23            THE COURT:  -- use it.

24            MR. JACOBSON:  Because --

25            THE COURT:  There's no public safety rule that says

1  you can't go on the property under the wires.  It might be

2  stupid to do it, but you don't do it.

3          MR. JACOBSON:  No.  He's --

4          THE COURT:  I mean, he can do it.  Right?

5          MR. JACOBSON:  He's entitled to build a ten-story

6  office building there if he wants.  He's entitled to use

7  whatever -- to do whatever he wants with that property that

8  would be in that airspace.  It owns it.  He's entitled to it.

9  And PG&E is only entitled to occupy it under prescriptive

10 rights under Section 325 of --

11         THE COURT:  Mr. Jacobson, could he build a ten-story

12 office building there in 2010, when he consented to PG&E's

13 occupying the airspace with the power lines?

14         MR. JACOBSON:  This is in various papers, Judge.  He

15 didn't have any plans at that point.

16         THE COURT:  That isn't what I asked you.

17         MR. JACOBSON:  What?

18         THE COURT:  Could he?

19         MR. JACOBSON:  Yeah.

20         THE COURT:  No, of course not.  You know he could not

21 have.

22         MR. JACOBSON:  Well, it's --

23         THE COURT:  Because PG&E owned the airspace or had the

24 right to the airspace.

25         MR. JACOBSON:  Well, that begs the question.

1          THE COURT:  Okay.

2          MR. JACOBSON:  PG&E did not have a right to the

3     airspace.  It didn't pay the taxes and it doesn't have any

4     valid recorded easements.

5          THE COURT:  Okay.  Listen --

6          MR. JACOBSON:  I mean, this is a far more dramatic

7     illustration than pistachio trees.

8          THE COURT:  Well, that's for me to decide, whether the

9     pistachio trees metaphor is closer in point on the law.  And I

10    guess what I have to decide is which of the California

11    authorities is more persuasive.  And I'll do that.  So I mean,

12    I understand your argument much better today than I did before,

13    both on the subject of the alignment and height that Mr. Lamb

14    and you and I have all discussed, and on this one, too.  And so

15    I'm going to do what I'm supposed to do.  I'm going to reflect

16    on the argument, and I'm going to revisit the cases and take

17    the matter under advisement.  And that's the best I can do.

18    And --

19         MR. JACOBSON:  Can I have a couple more minutes?

20         THE COURT:  Yes, sir.  Yes.  Please do.

21         MR. JACOBSON:  So staying with Hansen.  It discusses

22    this practical equivalent of an estate that -- you used a

23    similar phrase.  It then goes on to distinguish what is not a

24    practical equivalent, what is not in the nature of a possession

25    that requires compliance with adverse possession payment of

1 taxes. And it says all easements involve the use of other

2 people's property. The question is, what rises to this

3 possessor level?

4 And it takes, for example, the common roadway where

5 you have a landowner. There's a road that goes across it. And

6 the issue is people have used it in the past and they claim

7 that they've got a right to continue, and the landowner wants

8 to block them or limit them. Those are very common cases. And

9 in that instance, the Hansen case focuses on exclusivity or not

10 and says an easement is nonexclusive if the servient landowner

11 shares in the benefit of the easement can continue to use the

12 road himself.

13 So that was the difference with pistachio trees.

14 Sandbridge (sic) couldn't go in and grow his own pistachio

15 trees. It was exclusive. And so same thing here. Komir does

16 not share in the benefit.

17 THE COURT: Well, again, I'm sorry to beat this to

18 death. But you just got through arguing -- and I'll state it

19 again. If Komir wanted to grow flowers on the property,

20 tulips --

21 MR. JACOBSON: Yeah.

22 THE COURT: -- could he prevent him from growing

23 tulips on the property? No. Right? They might say we don't

24 think that's a good idea to grow tulips under the power lines.

25 But they couldn't prevent him from doing it, could they?

1    MR. JACOBSON:  No.  But --

2    THE COURT:  Okay.

3    MR. JACOBSON:  -- they are preventing him from

4  building a six-story building there.

5    THE COURT:  I got it.  They are protecting -- and what

6  you want me to do is to say that when Hansen couldn't -- when

7  Hansen couldn't prevail because he had grown his pistachio

8  trees because he hadn't paid the taxes -- PG&E hasn't paid the

9  taxes, therefore it can't claim exclusive right to the power

10  lines.  But that's now what we're talking about.  I mean,

11  that's what you're arguing about.  You've conceded that PG&E

12  can't interfere with Mr. Komir's -- I mean, Mr. -- sorry -- Mr.

13  Shahmirza's growing tulips on the land.  But listen, I got your

14  point.  I --

15    MR. JACOBSON:  Look at Civil Code 829.

16    THE COURT:  I will.

17    MR. JACOBSON:  Komir is entitled to be in the same

18  space as those transmission lines are.  The statute says he

19  owns that space where those transmission lines are.  So if PG&E

20  wants to be able to exclusively occupy the space that Komir is

21  entitled to occupy, it has to pay the taxes.

22    THE COURT:  And how does one pay the taxes on where a

23  power line is?

24    MR. JACOBSON:  You pay the taxes on the property is

25  what Civil Code --

1      THE COURT:  Well, how do you reconcile the fact that
2  PG&E should have paid the property taxes for the airspace but
3  didn't have to pay the property taxes for the land space?
4  Doesn't that sound a little bit --
5      MR. JACOBSON:  No.
6      THE COURT:  -- contradicting?
7      MR. JACOBSON:  No.  No.  That is --
8      THE COURT:  No?
9      MR. JACOBSON:  -- one of the burdens of establishing a
10  prescriptive easement.
11      THE COURT:  Okay.
12      MR. JACOBSON:  If it's not separately assessed, you
13  have to pay for the taxes levied on the property.
14      THE COURT:  Okay.  I got it.
15      MR. JACOBSON:  And it doesn't make any sense.
16      THE COURT:  I got the point.
17      MR. JACOBSON:  No tax assessor would come out and look
18  at land and see if there's an easement dispute and, because
19  PG&E's lines are there, separately assess that airspace.
20      THE COURT:  So to --
21      MR. JACOBSON:  (Indiscernible) --
22      THE COURT:  To finish the point, if Komir had actually
23  put something on the land, under the tower, under the wires,
24  and even had earned revenues from it, he would be tax-free
25  because he's got this power line company that's got the wires

1    over it.  Therefore, they have to pay the taxes, and he doesn't

2    have to, even though he generates income from it and doesn't

3    have to share that income.  That's what you think?  You concede

4    that point?

5            MR. JACOBSON:  That's what the law says.

6            THE COURT:  So you concede the point?

7            MR. JACOBSON:  Yes.

8            THE COURT:  Okay.  (Indiscernible).

9            MR. JACOBSON:  Because it's not an economic analysis.

10   It's a legal statutory --

11           THE COURT:  I --

12           MR. JACOBSON:  -- requirement.

13           THE COURT:  I understand, Mr. Jacobson.

14           MR. JACOBSON:  You don't get to keep your towers

15   there, your lines there, unless you comply with Section 325.

16   It is --

17           THE COURT:  Okay.

18           MR. JACOBSON:  It doesn't say you have to pay the

19   taxes, but you can go to the assessor's office and figure out

20   how much is the proration because -- there's nothing that says

21   that.  And counsel for PG&E was saying that -- they were

22   relying on case called Otay, O-T-A-Y.

23           THE COURT:  Um-hum.

24           MR. JACOBSON:  Hansen specifically repudiates that

25   case.  So we decline to follow it.  It's a bad ruling.  It

1  doesn't make sense.  It looks at the facts in that case and

2  says that it was the practical equivalent of estate and should

3  only have been permitted upon satisfaction of the elements of

4  adverse possession.  So that's the case they're relying on to

5  try to persuade you that they are not barred by the tax --

6  failure to pay the taxes.

7          THE COURT:  Okay.

8          Mr. Lamb, anything further?

9          MR. LAMB:  Well, Your Honor, clearly, Hansen is

10 distinguishable.  It's not a prescriptive easement case in

11 relation to utility, and Otay was.  And that's why it wasn't

12 followed, because Hansen was a completely different set of

13 circumstances.  It had nothing to do with prescriptive

14 easements for utilities.

15         But I think it's fully briefed, Your Honor.  I would

16 ask the -- I understand that you're taking this under

17 submission.  I would ask you to consider setting a status

18 conference regarding scheduling because, obviously, there's

19 going to be something else post your order.  And we have a

20 deadline, at least right now, to do expert depositions by, I

21 believe, January 16th.  So to me, it would make sense to do

22 some type of status report on scheduling and a conference maybe

23 after that, if that makes sense to the Court.

24         MR. JACOBSON:  I think it would be helpful to have the

25 Court's decision before we engage in the deposition so that we

1  have some parameters for --

2        THE COURT:  Well, yeah.  I do, too.  And I'll do my

3  best to -- and I take some pride in trying to make decisions in

4  a hurry.  This is not the best time because of staffing and so

5  on.  But I'm not going anywhere.  Can you just -- can't you two

6  just agree to delay (indiscernible)?

7        MR. LAMB:  I will represent that I will extend the

8  dates for expert depositions.  I mean, we had asked for them,

9  and they hadn't provided them yet.  I assume it's because what

10  Mr. Jacobson just said.  He wants a ruling first, which is very

11  reasonable.  I'm happy to talk to Mr. Jacobson.

12        And we can move that, Mr. Jacobson.

13        THE COURT:  Ms. Siperrotta (phonetic), what is our

14  next PG&E regular date?  Remind me again.  Is that January --

15        THE CLERK:  9th.

16        THE COURT:  Huh?

17        THE CLERK:  January 9th, Your Honor.

18        THE COURT:  I'm going to -- I'll tell you what.  For

19  now, gentlemen, I'd like you to work on seeing if you can just

20  agree to -- for the convenience of the witnesses and

21  yourselves.  And I'm going to continue -- I'm going to have a

22  status conference in this matter on January 9th at 10 o'clock.

23  And maybe I'll have a ruling by then, maybe not.  But if I

24  don't have a ruling by then, I certainly can give you a better

25  time frame on what we're doing.  And --

1          MR. LAMB:  And then we're vacating the date that we

2     had earlier for the January 16th by the expert depositions?

3          MR. JACOBSON:  Well, we're going to --

4          THE COURT:  No.  I'm --

5          MR. JACOBSON:  --  talk about that.

6          THE COURT:  Yeah.  I'm asking you to talk about it.  I

7     mean, I --

8          MR. LAMB:  Oh.

9          THE COURT:  -- think that -- I think it makes good

10    sense.  Obviously, my decision here is important for me to do

11    it right.  It's important for you and your clients.  And I'm

12    mindful of that.  But I think, like everything else, if I made

13    you a ruling at the end of this hearing, you might very well

14    think that I haven't given your arguments a lot of thought.

15    And you know what?  I'm going to give your argument a lot of

16    thought because both of you have clarified this matter.  And

17    it's a matter that I've lived with, not as long as you two

18    have, but this case is something I'm quite familiar with.  And

19    the discussion that each of you had with me has been very

20    helpful to have me focus on it.

21          Again, there's no guarantee that I'll come out with

22    the right result, but I'm going to do my best to come out with

23    the result required by the law.  And I thank you for your time

24    and your diligence and your representation of your clients'

25    efforts.  And I wish you all happy holidays.  The matter is

1    submitted.

2              Mr. Rupp, thank you for your assistance.

3              MR. JACOBSON:  Could I ask the name of the other case

4    to which you referred that involves prescriptive easement?

5              THE COURT:  Well, it's Mr. Rupp -- it's a case

6    involving a gentlemen named Mr. Addington, and it's on appeal.

7    It's on appeal to the District Court.

8              It's not a BAP, right, Mr. Rupp?

9              MR. RUPP:  It's the District Court, Your Honor.

10             THE COURT:  Oh, that's right.

11             Mr. Jacobson, Mr. Addington appealed to BAP, and the

12   PG&E opted out to the District Court.  So it's a case that --

13   well, Mr. Rupp can -- I mean, I can give you the docket

14   numbers.

15             Mr. Rupp, just as a courtesy, give him the --

16             Mr. Jacobson, it's a separate adversary sitting on our

17   PG&E docket.  And Mr. Addington bought property with a tower on

18   it in Piedmont.  And he took the position that he could

19   terminate PG&E's entitlement and demand royalties from them,

20   and I ruled against him on that.  And so he is appealing the

21   decision.  So it's not analogous to your situation in the sense

22   of overhead versus not.  I mean, this man bought the house and

23   lives there with his family.  It's a residence.  But it's a

24   residence that has a great, big, giant power line on it.

25   Probably is the same kind of -- well, I don't know.

1          Mr. Rupp, I don't know the technical saying.  It's a
2  high voltage line, right?
3          MR. JACOBSON:  Well, I'm just asking for the docket
4  number or some way to --
5          THE COURT:  Yeah.
6          MR. JACOBSON:  -- find it.
7          THE COURT:  No, no.  You'll see --
8          MR. RUPP:  (Indiscernible).
9          THE COURT:  You'll see a lot.  You'll see ruling in
10  there and briefing and a lot of information.  So you're welcome
11  to --
12          MR. JACOBSON:  (Indiscernible) --
13          MR. RUPP:  I'll --
14          MR. JACOBSON:  Would you send it?
15          MR. RUPP:  I will send the case number of the
16  adversary proceeding and point you in that direction, Mr.
17  Jacobson.
18          THE COURT:  Yeah.  We're not trying to hide it from
19  you.  It's all there.
20          Okay.  Happy holidays to all of you and your family.
21  Thank you for your time.
22          Thank you to my staff.  I'm going to conclude the
23  hearing and go offline.  Have a good --
24          MR. JACOBSON:  Thank you, Your Honor.
25          THE COURT:  -- (indiscernible).

1          MR. LAMB:  Thank you, Your Honor.  Happy holidays.

2          THE COURT:  Thank you.

3     (Whereupon these proceedings were concluded)

C E R T I F I C A T I O N

I, Amarah Yang, certify that the foregoing transcript is a true and accurate record of the proceedings.

*Amarah Yang*

_____

/s/ AMARAH YANG, CDLT-306

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  December 21, 2023

# A

**A- (1)**
43:8
**A-1 (2)**
43:8;45:16
**A-2 (1)**
45:16
**abeyance (1)**
18:12
**able (9)**
19:13,19;20:6,9;
23:14;32:20;62:1;
63:18;69:20
**above (6)**
31:1,11;32:20;33:9;
62:20;65:9
**absolutely (2)**
45:1;64:10
**accept (7)**
7:24;24:11;30:22;
34:5;37:16;40:7;
54:19
**access (1)**
62:11
**according (1)**
24:16
**accurate (1)**
35:17
**accurately (1)**
31:5
**acquired (2)**
60:2,9
**acres (5)**
59:19,19,23,25;
60:3
**across (9)**
10:6;23:4;28:3;
36:17,18;43:11;
47:16,22;68:5
**act (1)**
57:4
**action (6)**
6:8,8;7:24;11:24;
20:17;56:16
**activities (1)**
59:14
**actual (4)**
28:5;35:22,23,24
**actually (5)**
30:16;48:8;58:5,6;
70:22
**add (3)**
16:25;17:21;22:11
**Addington (3)**
75:6,11,17
**additional (1)**
58:19
**address (1)**
38:4
**adds (1)**
12:22

**Adelman (1)**
5:13
**adjacent (1)**
59:17
**adjudication (1)**
21:23
**adjusted (1)**
41:9
**adjusting (1)**
57:17
**admission (3)**
63:25;64:10,13
**Admittedly (1)**
48:21
**adopt (1)**
6:15
**ADR (1)**
6:5
**advance (1)**
38:5
**adversary (2)**
75:16;76:16
**adverse (9)**
58:10,15;59:4,9;
60:11,19;61:14;
67:25;72:4
**advisement (1)**
67:17
**Advisors (2)**
5:7;14:19
**aerial (2)**
63:16;64:11
**affect (2)**
29:7;53:15
**affects (1)**
48:24
**afternoon (3)**
4:9;5:1;14:17
**again (28)**
9:3,7,13;11:24;
12:15;13:12;14:17;
18:18;19:19;20:10;
31:23;36:13;37:12,
20;41:7;43:19;51:10;
54:5;55:3;56:24;57:8;
58:4;61:19;63:4;
68:17,19;73:14;74:21
**against (7)**
32:25;34:22;41:7;
42:3,13;65:3;75:20
**aggressive (1)**
38:2
**ago (6)**
5:21;13:2;52:20;
55:20;57:12;58:7
**agree (12)**
7:15;15:14;16:16;
20:5;34:6,8;36:19;
37:2;43:12;58:17;
73:6,20
**agreeable (3)**
18:10;19:14;20:4
**agreed (2)**

9:7;10:1
**agreeing (1)**
8:22
**agreement (2)**
7:6;29:11
**agrees (1)**
8:10
**ahead (8)**
24:3;29:16,16;
33:14;55:1;58:19;
63:2;64:23
**air (2)**
62:18;65:9
**airplane (2)**
45:10,10
**airplanes (1)**
26:15
**airport (1)**
45:9
**airspace (11)**
63:22;64:2;65:15,
22;66:8,13,23,24;
67:3;70:2,19
**alert (1)**
19:20
**alignment (22)**
22:20,21,23;23:5,
12,16,22;36:6;43:6,
10,17;45:7,23,24;
46:7,17;47:4;48:21;
50:2;51:1;53:10;
67:13
**allow (2)**
8:20,21
**allowed (1)**
29:4
**allows (1)**
12:5
**along (2)**
5:16;10:21
**although (1)**
6:12
**amendment (3)**
7:10;11:8,14
**Amir (1)**
21:22
**amount (2)**
9:14;49:14
**amounts (1)**
48:22
**analogous (1)**
75:21
**analysis (5)**
26:2;38:6,13;39:7;
71:9
**angle (14)**
23:20;25:6;26:13;
27:14;28:2;34:3,12;
44:21,24;45:2,11,14;
50:8,8
**angles (5)**
27:17;29:19;36:20;
39:14,15

**anniversary (1)**
48:9
**announce (1)**
12:9
**ant (1)**
20:15
**anticipated (1)**
15:21
**anti-discovery (1)**
9:17
**anxiety (1)**
21:16
**anymore (2)**
24:15;27:2
**apart (6)**
31:24;32:2,4,16;
33:5,19
**apologies (1)**
21:11
**apologize (2)**
20:9;55:14
**appeal (2)**
75:6,7
**appealed (1)**
75:11
**appealing (1)**
75:20
**appearance (1)**
9:21
**appearances (1)**
21:19
**appeared (1)**
10:16
**appearing (3)**
5:11;9:20;21:23
**appraisals (1)**
40:1
**appreciate (5)**
6:5,21;10:2;11:18;
12:6
**approach (1)**
38:1
**appropriate (1)**
8:23
**April (6)**
6:20;8:5;9:10;12:9;
14:5;15:10
**area (2)**
35:2;63:20
**argue (2)**
38:11;54:22
**argued (1)**
40:16
**argues (2)**
40:24;65:19
**arguing (4)**
37:15;65:14;68:18;
69:11
**argument (33)**
20:12;28:9,14,15,
16,22;33:12;37:6,11,
16;38:24;39:8;40:7,
11,13,20,21;41:1;

48:20;49:13;52:15;
55:2,5,21;56:1;57:7,9,
16;58:19;65:17;
67:12,16;74:15
**arguments (5)**
37:12;39:22;55:7;
56:25;74:14
**around (1)**
51:11
**aside (1)**
24:24
**aspect (2)**
26:24;29:21
**aspirational (1)**
6:8
**assess (1)**
70:19
**assessed (1)**
70:12
**assessor (1)**
70:17
**assessor's (1)**
71:19
**assistance (1)**
75:2
**associated (1)**
65:4
**assume (2)**
16:7;73:9
**assuming (4)**
7:21;25:25;26:1;
53:25
**attempting (1)**
16:19
**attention (1)**
55:7
**ATTORNEY (1)**
45:3
**audio (1)**
21:8
**authorities (1)**
67:11
**available (2)**
49:19;61:23
**avoid (1)**
61:15
**aware (2)**
5:25;6:4
**away (1)**
4:18
**axis (2)**
44:20,23

# B

**back (13)**
16:7;19:15,18;21:6,
13;27:13;29:23;
33:12;39:8;41:2;
42:12;52:7;62:2
**backtracked (1)**
7:14
**bad (1)**

Case: 19-30088     Doc# 14242     Filed: 12/21/23     Entered: 12/21/23 05:08:50
of 92

71:25
**bankruptcy (4)**
8:2;11:25;16:21;
39:4
**BAP (2)**
75:8,11
**bar (1)**
56:15
**barred (1)**
72:5
**base (1)**
30:4
**based (4)**
38:5,15;41:24;43:9
**basically (3)**
45:4;47:12;56:8
**basis (2)**
8:14;53:19
**Baupost (8)**
4:16;5:14,16;7:12,
14;8:11;13:12;18:17
**Bayshore (1)**
26:10
**bearing (2)**
44:20;45:8
**beat (2)**
54:25;68:17
**beating (1)**
18:24
**became (1)**
52:22
**begin (1)**
27:11
**beginning (2)**
28:22;52:20
**begs (1)**
66:25
**behalf (8)**
4:16;5:6;9:20;
13:12;14:18;18:2;
22:2,4
**belabor (1)**
14:20
**believes (3)**
28:19;42:15,16
**below (2)**
62:20;63:19
**benchmarks (1)**
35:2
**benefit (2)**
68:11,16
**Benvenutti (1)**
22:4
**best (7)**
13:3;17:4;46:20;
67:17;73:3,4;74:22
**bet (1)**
65:11
**better (6)**
6:19;12:24;36:2,2;
67:12;73:24
**bewildering (1)**
63:15

**beyond (2)**
11:3;34:13
**big (2)**
20:3;75:24
**bit (2)**
65:17;70:4
**bite (1)**
17:16
**block (1)**
68:8
**blue (1)**
16:4
**board (1)**
10:6
**body (1)**
54:17
**bogged (1)**
16:3
**bore (1)**
8:3
**both (11)**
23:17;25:4,23;36:9;
37:12;40:17;53:1;
55:10;60:8;67:13;
74:16
**bought (4)**
52:25;64:20;75:17,
22
**boundary (1)**
25:12
**break (1)**
43:22
**Bridge (3)**
48:6,10,10
**brief (5)**
8:11;10:3;11:21;
13:17;15:15
**briefed (3)**
24:9;55:10;72:15
**briefing (11)**
8:11,20;11:5;12:9;
13:15;14:5;15:2;55:3;
58:2,12;76:10
**briefs (7)**
8:8,14,15;9:16;
15:11;55:6;56:23
**bring (2)**
21:2;52:8
**brought (1)**
30:4
**build (4)**
35:13;62:17;66:5,
11
**building (4)**
66:6,12;69:4,4
**bunch (1)**
15:13
**burden (3)**
17:1,3,4
**burdens (1)**
70:9
**burner (1)**
16:7

**business (1)**
5:18
**buy (1)**
40:20

**C**

**cables (6)**
32:20;33:7,19,22;
35:9;48:14
**calculation (1)**
6:15
**calendar (3)**
8:7;11:19;19:23
**calendars (1)**
20:3
**CALIFORNIA (4)**
4:1;57:10;65:5;
67:10
**Call (9)**
4:3;6:9,18;8:6;9:4,
9;11:9;15:8;21:18
**called (3)**
10:8;22:18;71:22
**calling (2)**
4:7;21:20
**calls (1)**
59:11
**came (4)**
20:13;21:13;29:24;
33:11
**camera (1)**
21:1
**can (62)**
8:17;9:10;11:9;
15:20;17:7,23;18:4,
12,17,22;21:2,9,12,
12,15;23:10,11;26:2,
3;30:3;31:12;33:1;
34:21,21,22,23;35:17,
21;37:18,20;39:11;
42:4;45:14;46:2;50:4,
17;51:3;53:6,6;55:16;
60:8;62:22;63:8,23,
25;64:2,7,9;65:2,14,
20;66:4;67:17,19;
68:11;71:19;73:5,12,
19,24;75:13,13
**canal (2)**
63:7,8
**care (2)**
21:3,16
**careful (1)**
60:5
**Carol (2)**
9:19;16:10
**carry (1)**
42:3
**case (36)**
7:25;14:1;16:18;
21:18;22:14;36:7;
49:13,14;52:17;
55:11,12,12,13,25;

56:2,24;58:2,7,12;
59:16;60:5,7,18;61:9;
65:11;68:9;71:22,25;
72:1,4,10;74:18;75:3,
5,12;76:15
**cases (10)**
28:24;40:18;49:23;
55:5;56:3,6,13,25;
67:16;68:8
**Catalina (14)**
4:23,25;5:1;10:10,
14,14;11:23;12:14,17,
19,21,23;13:1,7
**caused (1)**
28:13
**century (1)**
52:20
**certain (2)**
26:16;48:7
**certainly (6)**
12:5;14:9;16:15;
45:19;46:20;73:24
**challenge (1)**
38:2
**chance (2)**
20:11;28:20
**change (38)**
23:19;25:6;26:5,13,
16,19,22,22;27:12,17;
35:12;36:6,9,9;42:4;
43:10;44:23;45:12,
15,24;46:2,3;47:24;
48:8,11,17,20;50:2,3,
11,13;51:1,9;53:24;
56:13,21;58:18;60:12
**changed (9)**
23:16,23;27:14;
35:5;43:17;50:8,9;
53:5,20
**changes (7)**
22:20;27:23;34:3;
35:12;42:1;48:8,22
**channel (1)**
48:1
**characterize (1)**
19:7
**check (1)**
36:5
**choice (1)**
12:16
**Christmas (3)**
19:10,11,17
**circles (1)**
51:11
**Circuit (4)**
16:1,15,16;17:18
**circulate (1)**
15:5
**circumstance (1)**
30:9
**circumstances (1)**
72:13
**civil (6)**

48:5;59:8,10;62:18;
69:15,25
**claim (5)**
59:4;60:16;64:25;
68:6;69:9
**claimant (1)**
63:18
**claimants (4)**
5:2;10:15;14:1;
61:14
**claimed (1)**
60:2
**claims (7)**
11:10,17;13:3,4,7;
16:24;62:25
**clarified (1)**
74:16
**clarify (3)**
17:25;42:14,15
**class (6)**
6:8;7:24;11:24;
19:8,8;20:16
**clear (7)**
28:18;48:23;49:17;
51:5;55:14;56:15;
65:5
**clearly (3)**
28:19;56:7;72:9
**Cleary/Tremble (1)**
55:12
**CLERK (7)**
4:4,21;21:5,11,20;
73:15,17
**client (5)**
16:14;39:3;54:19;
62:10;65:20
**clients (1)**
74:11
**clients' (1)**
74:24
**clock (1)**
42:13
**close (2)**
32:11;48:10
**closed (1)**
17:14
**closer (4)**
23:22;44:10;45:7;
67:9
**closest (2)**
47:14,15
**clue (1)**
34:13
**coast (2)**
4:25;5:1
**Code (5)**
59:8,10;62:18;
69:15,25
**colleagues (1)**
18:21
**coming (2)**
6:2;45:20
**comment (3)**

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 80
of 92

12:7;58:24;62:2
**commented (1)**
61:13
**common (3)**
64:13;68:4,8
**company (1)**
70:25
**compare (1)**
35:24
**compared (2)**
31:11;44:21
**comparison (2)**
43:6;45:23
**Compass (19)**
23:1,5,8,15,16,22;
26:15;34:10,11;
35:25;44:12,12,19,20;
45:5,8;46:4;47:4;51:1
**compensable (1)**
34:4
**compensate (1)**
41:22
**compensated (1)**
36:11
**competence (1)**
35:15
**complain (2)**
57:5,11
**complains (1)**
57:13
**complaint (1)**
57:14
**completely (1)**
72:12
**complexity (1)**
6:22
**compliance (1)**
67:25
**complicated (2)**
16:18;36:18
**comply (1)**
71:15
**concede (3)**
46:6;71:3,6
**conceded (3)**
26:25;54:20;69:11
**concern (3)**
10:23;11:1,11
**concession (2)**
18:14,25
**conclude (1)**
76:22
**concluded (1)**
77:3
**conclusion (1)**
47:3
**conclusions (1)**
25:10
**condemnation (1)**
38:7
**conference (3)**
72:18,22;73:22
**conferring (1)**

8:22
**confident (1)**
15:1
**confusing (4)**
22:16;43:20;46:25;
47:1
**confusion (1)**
36:14
**connect (3)**
20:11;27:2,4
**connected (1)**
52:21
**consensual (3)**
39:3;41:10;51:22
**consent (19)**
29:4,18,21;38:18;
51:4,20;52:9,10,13;
53:19,21,22;54:10,23;
57:1,2,15,18;58:18
**consented (4)**
29:4;53:2;57:13;
66:12
**consenting (1)**
29:10;56:9
**consequence (5)**
27:22;37:13;39:10;
41:18,19
**consequences (2)**
34:14;41:21
**consider (1)**
72:17
**consistent (4)**
24:16;51:3,21;
57:18
**constructed (3)**
24:16;27:25;52:21
**construction (2)**
54:12,15
**constructive (1)**
58:14
**constructively (1)**
58:15
**contemplated (1)**
11:8
**contiguous (1)**
59:18
**continue (7)**
16:17,21,25;39:24;
68:7,11;73:21
**contradicting (1)**
70:6
**contrary (2)**
28:15;54:2
**control (2)**
48:1;56:3
**convenience (1)**
15:9;73:20
**conversations (1)**
19:12
**converse (1)**
38:14
**conveyance (1)**
61:23

**coordinate (1)**
15:15
**Corporation (2)**
4:7;21:20
**corporeal (2)**
60:11,12
**counsel (8)**
6:9;7:2;8:22;15:15;
19:9;21:2,19;71:21
**counter (1)**
38:10
**couple (3)**
5:17;23:25;67:19
**course (2)**
36:11;66:20
**Court (260)**
4:3,6,8,11,14,18,23;
5:3,8,15,17,21,24;
7:19,25;9:23;10:4,12,
22;11:18;12:17,20,22,
24;13:5,10,19,21;
14:6,11,13,23;16:17,
21;17:3,10,13,17,21,
24;18:1,4,8,11,14,18,
20;19:4,20,22;20:1,
12,25;21:6,13,24;
22:5,9,12;24:3,7,19,
22,24;25:1,16,23,25;
26:9,12,21;27:10;
29:1,12,14;30:13,15,
21,24;31:5,9,20,24;
32:1,6,8,12,15,18,23;
33:3,7,17;34:19;35:7;
36:5,22,25;37:2,5,8,
10,24;38:9,17,21,23;
39:17,20,25;40:3,6,
10,16;41:2,14,18;
42:9,25;43:19,22,25;
44:3,6,8,12,16,19;
45:1,9,17,25;46:2,21;
47:7,9,18,20;48:2,5,
19;49:1,3,9,11,16,18,
22,24;50:1,7,13,15,
17,20,22;51:10,17,19,
24;52:2,4,14;53:22;
54:2,5,7,13,15;55:11,
19,23,25;56:2,18,20,
22;57:6,20,23,25;
58:13,23;59:1;60:21,
24;61:2,4,8,10,12,13;
62:7,13,15;63:1,3,13;
64:1,4,7,12,16,18,20,
23;65:7,23,25;66:4,
11,16,18,20,23;67:1,
5,8,20;68:17,22;69:2,
5,16,22;70:1,6,8,11,
14,16,20,22;71:6,8,
11,13,17,23;72:7,23;
73:2,13,16,18;74:4,6,
9;75:5,7,9,10,12;76:5,
7,9,18,25;77:2
**courtesy (1)**
75:15

**courts (1)**
61:22
**Court's (1)**
72:25
**creates (1)**
60:11
**creating (1)**
61:17
**credible (1)**
35:21
**critical (4)**
24:12;29:21;60:15;
62:12
**crops (3)**
59:17,24;60:1
**cross (8)**
27:8;34:3;51:2;
52:22;53:9,17;56:22;
65:19
**crossed (1)**
53:18
**crosses (1)**
49:5
**crossing (3)**
53:4,16,20
**culminating (1)**
60:10
**current (1)**
35:11
**currently (1)**
19:10
**cut (1)**
7:20

**D**

**damage (3)**
37:21;50:4;51:3
**damages (8)**
28:13;36:8;37:19;
39:12,15;40:13;
41:21;42:7
**danger (1)**
62:9
**data (1)**
43:9
**date (5)**
19:10,23,24;73:14;
74:1
**dates (2)**
14:21;73:8
**Davila (2)**
17:4,18
**day (6)**
10:16;19:11,25;
21:17;52:25;54:8
**days (10)**
6:4;9:15,15;10:21,
24;11:22,23;12:15,
19;14:2
**de (2)**
40:18;49:14
**dead (1)**

54:17
**deadline (3)**
9:8;11:5;72:20
**deadlines (2)**
8:5,23;9:6;18:3
**deal (6)**
7:13;17:19;20:3;
33:16;37:16;39:21
**deals (1)**
60:12
**death (3)**
18:24;54:25;68:18
**debating (1)**
52:7
**Debra (2)**
4:15;13:11
**debtor (6)**
4:13;5:20;8:9,10;
15:14;57:12
**debtors (2)**
22:2,4
**debtor's (1)**
12:6
**deceiving (1)**
17:16
**DECEMBER (1)**
4:1
**decide (7)**
17:1,5;37:12;38:4;
39:8,13,14,23;52:9;
67:8,10
**decided (1)**
50:24
**decision (8)**
6:24;7:5;11:1,6;
17:8;72:25;74:10;
75:21
**decisions (1)**
73:3
**declaration (4)**
42:21,22,22;43:2
**declarations (1)**
42:21
**decline (1)**
71:25
**deeply (1)**
14:7
**defines (1)**
59:10
**defining (1)**
59:11
**definition (1)**
27:17
**delay (2)**
11:15;73:6
**demand (1)**
75:19
**denied (2)**
12:10;38:12
**Dennis (1)**
4:6
**dense (1)**
52:15

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 81
of 92

**depart (1)**
42:11
**departure (1)**
57:15
**depends (1)**
47:17
**deposition (2)**
22:17;72:25
**depositions (4)**
45:19;72:20;73:8;
74:2
**derelict (1)**
56:2
**describing (1)**
22:18
**designated (1)**
19:8
**designation (1)**
20:17
**despite (1)**
50:25
**destroyed (3)**
24:14;27:21,24
**destroying (1)**
27:21
**detailed (2)**
26:23;60:5
**detecting (1)**
42:24
**determination (2)**
24:1;38:6
**determine (4)**
28:9;45:14;50:2,7
**determined (1)**
43:9
**determines (1)**
41:8
**determining (1)**
61:21
**deviation (1)**
57:21
**device (1)**
36:1
**diagram (1)**
44:20
**diagrams (3)**
22:15;43:14;47:3
**differ (1)**
40:4
**difference (10)**
23:21;31:8;33:24,
25;42:4;47:13;60:6,9,
17;68:13
**different (17)**
14:9;25:5;26:18,25;
27:7,22;30:9;31:2,2;
34:12;52:19;53:18,
21;57:22;65:5,6;
72:12
**differently (2)**
37:23;53:7
**difficult (4)**
16:14;25:10;36:16;

60:19
**difficulties (1)**
9:22
**dig (1)**
63:23
**diligence (1)**
74:24
**direct (1)**
15:14
**direction (2)**
23:12;76:16
**directional (2)**
23:12;29:19
**directly (2)**
36:17;47:24
**disagree (4)**
13:16;24:3;39:5;
51:6
**discovery (21)**
7:2,3,6,11,18;8:1,9,
15,21,24;9:2;10:1;
11:3,5;12:5;13:15;
15:2,12,13;18:3,5
**discuss (2)**
28:23;38:16
**discussed (2)**
16:4;67:14
**discusses (2)**
61:21;67:21
**discussing (1)**
39:9
**discussion (6)**
15:24;31:16;36:19;
42:10;59:2;74:19
**discussions (1)**
11:23
**dismiss (6)**
6:19;7:18;9:10;
12:2;15:9;16:24
**disposition (1)**
39:7
**dispositive (6)**
24:6;37:14;40:12,
17;55:15;57:10
**dispute (3)**
27:18;59:20;70:18
**disputed (1)**
62:1
**distance (1)**
25:13
**distinction (2)**
59:3,7
**distinguish (3)**
25:13;60:14;67:23
**distinguishable (1)**
72:10
**distinguished (1)**
55:11
**district (5)**
7:25;16:17;75:7,9,
12
**docket (4)**
15:7;75:13,17;76:3

**documents (1)**
38:5
**done (9)**
11:14;12:4;31:22;
37:3;46:9,10,11;
50:11,18
**door (2)**
29:14;53:1
**down (9)**
13:16;16:3,15;
31:10;32:20;33:2,11;
43:22;45:11
**dramatic (1)**
67:6
**drawings (2)**
23:10;35:17
**due (2)**
6:19;45:20
**during (1)**
59:24

**E**

**earlier (2)**
31:12;74:2
**early (1)**
11:20
**earned (1)**
70:24
**Earth's (1)**
61:25
**easement (24)**
27:23;37:17;39:1;
41:13,15,19;42:1,2;
49:20;51:7,22;58:7,
10;60:2,10,20;61:15,
17;68:10,11;70:10,
18;72:10;75:4
**easements (9)**
38:3,8;58:4;59:11,
12;60:8;67:4;68:1;
72:14
**easier (2)**
13:7;17:6
**east (1)**
5:1
**easy (1)**
63:11
**economic (1)**
71:9
**efficient (1)**
12:3
**effort (1)**
9:14
**efforts (2)**
6:6;74:25
**eighteen (5)**
22:7,9,10;38:18;
56:10
**either (13)**
12:2;14:3;16:3;
18:6,24;20:7;28:5,7;
30:17;36:9;45:12;

46:22;51:1
**electrocuted (5)**
31:14,15;35:10;
58:25;62:3
**element (2)**
60:18;61:16
**elements (1)**
72:3
**elephant (1)**
20:14
**eleven (14)**
30:11,17;31:2,6,10;
33:11;35:4;54:9,16,
18,21,22,23,24
**eleven-foot (1)**
35:5
**else (12)**
4:20;7:23;13:10;
14:15;17:19;18:15;
40:21;50:3;52:5;65:4;
72:19;74:12
**employing (1)**
61:17
**enable (1)**
30:2
**end (4)**
9:22;32:2;34:21;
74:13
**ended (1)**
42:9
**engage (1)**
72:25
**engaged (1)**
29:8
**engineering (1)**
46:12
**engineers (1)**
48:5
**enjoyment (2)**
53:15;61:5
**enough (2)**
31:7;48:9
**entered (1)**
7:16
**entire (2)**
59:22;63:18
**entitled (11)**
7:4;9:1;39:14;
62:19;63:22;66:5,6,8,
9;69:17,21
**entitlement (1)**
75:19
**entitlements (1)**
7:3
**entitles (1)**
61:24
**equally (1)**
49:19
**equivalent (8)**
61:9,18,20;62:5,24;
67:22,24;72:2
**establish (2)**
39:1;60:19

**established (5)**
37:22;42:2,3;46:15;
60:4
**establishing (1)**
70:9
**estate (5)**
61:18,23;62:24;
67:22;72:2
**estates (2)**
59:8;60:8
**estimate (1)**
33:9
**even (6)**
6:9;8:24;47:1;
65:19;70:24;71:2
**event (1)**
28:5
**everybody (2)**
4:18;9:7
**everyone (1)**
19:2
**evidence (10)**
23:11;24:13;27:12;
35:21;36:9;43:16;
53:23;54:2;62:9;63:5
**exactly (5)**
35:3;61:1,3;64:15,
17
**example (8)**
23:6;34:11;44:13;
45:5,9;46:4;59:12;
68:4
**except (1)**
34:7
**exchanged (1)**
40:1
**excluded (1)**
61:5
**exclusive (7)**
60:6,16;61:24;
62:23;63:21;68:15;
69:9
**exclusively (1)**
69:20
**exclusivity (1)**
68:9
**excuse (3)**
8:20;26:5;62:7
**exhibits (3)**
17:8;43:8,15;45:14;
46:23
**exist (2)**
24:15;27:2
**existence (1)**
56:10
**existing (3)**
24:14;29:25;35:16
**expect (3)**
8:25;19:13,19
**expected (2)**
4:24;5:8
**expedited (1)**
8:14

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50
of 92

**expert (8)**
40:1;43:13;46:22;
48:14;54:19;72:20;
73:8;74:2
**experts (3)**
45:19;52:4,8
**explained (1)**
43:13
**explanation (1)**
45:18
**extend (1)**
73:7
**extends (1)**
43:11
**extent (2)**
12:2;61:22
**extinguished (1)**
38:7

**F**

**facility (1)**
29:25
**fact (15)**
30:16,20;35:7;
40:11;41:2;46:15,20;
50:1,1;52:4;54:19,21,
24;63:16;70:1
**facto (1)**
40:18
**facts (4)**
28:23;50:25;59:16;
72:1
**factual (8)**
27:18;40:25;25;
41:4;42:16;51:11;
53:19;54:1
**failure (1)**
72:6
**fair (2)**
12:5;33:13
**fairly (1)**
13:24
**fall (2)**
14:25;39:8
**familiar (2)**
52:17;74:18
**family (2)**
75:23;76:20
**far (6)**
31:24;32:2,3,15;
49:4;67:6
**farmed (1)**
59:22
**farmers (1)**
59:17
**farther (1)**
33:19
**fast (2)**
12:4;18:23
**February (1)**
11:6
**feel (1)**

11:13
**feet (41)**
24:17;25:15;30:11,
17;31:2,7,10,17,18,
18,19;32:5,5,9,17,19,
20,25;33:5,10,11,18;
35:4;43:3,4;44:1,9,
23;45:11;47:13,15;
48:25;49:7,10;54:9,
16,18,21,22,23,24
**fellow (2)**
62:1,5
**fence (1)**
32:25
**few (1)**
6:3
**field (2)**
54:8,12
**fifteen (10)**
8:9;9:15,15,17;
11:21;24:17;25:15;
32:5,9;43:3
**fifteen-foot (1)**
25:2
**figure (4)**
20:8;27:18;34:7;
71:19
**figured (1)**
20:9
**file (3)**
8:25;9:8;17:14
**filed (4)**
6:3;15:23;19:7;
39:4
**filing (2)**
16:13;57:6
**filings (2)**
6:1,11
**final (1)**
42:7
**find (2)**
22:15;76:6
**finder (1)**
52:4
**fine (6)**
9:23;13:13,15,25;
14:4;35:19
**finish (1)**
70:22
**firm (3)**
7:1,8,10
**first (12)**
7:23;12:16;21:16;
22:13;31:16;36:21;
38:2;39:13;41:3;49:5;
58:3;73:10
**fish (1)**
63:8
**fishing (1)**
59:13
**fit (1)**
20:15
**five (1)**

10:25
**fix (1)**
9:8
**flexible (1)**
8:21
**flood (1)**
48:1;63:7,8
**flowers (1)**
68:19
**flurry (1)**
6:1
**focus (3)**
15:17;41:6;74:20
**focuses (1)**
68:9
**folks (2)**
9:5;10:1
**follow (2)**
10:21;71:25
**followed (1)**
72:12
**foot (1)**
31:10
**forget (1)**
38:23
**forgetting (1)**
22:19
**former (1)**
60:12
**forth (1)**
52:7
**forty- (1)**
10:24
**forty-five-day (1)**
6:15
**forward (14)**
10:17,18;11:13;
13:3;24:17,19,24;
25:12,14,20;26:12;
27:1,13;45:20
**found (1)**
43:19
**four (1)**
49:6
**frame (2)**
13:13;73:25
**FRANCISCO (1)**
4:1
**Frank (2)**
5:1;10:14
**frankly (1)**
15:24
**Freeway (1)**
26:11
**Friedman (1)**
5:13
**fruits (1)**
61:14
**frustration (1)**
15:25
**fully (5)**
14:20;20:11;24:9;
55:10;72:15

**functionally (1)**
61:4
**further (5)**
11:15;15:24;17:21;
58:1;72:8
**future (1)**
11:2

**G**

**game (1)**
59:13
**Garato (1)**
5:3
**Gate (1)**
48:6
**gears (1)**
55:1
**generally (1)**
6:4
**generates (1)**
71:2
**gentleman (1)**
44:16
**Gentlemen (3)**
20:20;73:19;75:6
**geometric (1)**
26:24
**geometrically (3)**
27:7;29:3;46:13
**geometry (2)**
27:4;44:22
**gets (1)**
41:2
**giant (1)**
75:24
**given (2)**
40:24;74:14
**gives (1)**
37:18
**giving (1)**
41:4
**glad (1)**
10:5
**God (2)**
6:24;52:24
**goes (7)**
23:4;32:8;53:7;
62:2,4;67:23;68:5
**Golden (1)**
48:6
**Good (22)**
4:4,8,9,10,14,15,25;
5:5,9,12;11:14;13:11;
14:17;21:21,24;22:1,
3;25:18;46:4;68:24;
74:9;76:23
**Goodwin (2)**
5:6;14:18
**Gotshal (1)**
4:12
**GPS (1)**
35:25

**grant (3)**
10:10,20;41:24
**granted (2)**
12:10;53:19
**grantor (1)**
61:23
**Grassgreen (16)**
4:14,16,19;5:14,16;
13:11,12,20,24;14:7,
12;18:10,12,25;20:6,
24
**Grassgreen's (1)**
18:14
**great (2)**
10:18;75:24
**ground (3)**
23:22;31:10;63:24
**Group (1)**
4:17
**groups (1)**
32:4
**grow (6)**
62:13,15;63:4;
68:14,19,24
**growing (2)**
68:22;69:13
**grown (1)**
69:7
**guarantee (1)**
74:21
**Guerra (3)**
49:13;56:6,13
**guess (8)**
18:9;19:15;33:11;
46:5;56:22;58:17;
64:1;67:10
**guilty (1)**
33:13
**guise (1)**
61:15
**guys (1)**
53:8

**H**

**hair (1)**
40:18
**Hairmunino (1)**
55:13
**Hamilton (17)**
5:8,19,19,22,23;7:9,
19;10:7;15:4;17:23,
25;18:1,2,2,15,17,19
**hand (2)**
36:8;50:7
**handle (2)**
51:6,7
**hands (1)**
4:21
**hanging (1)**
58:16
**Hansen (20)**
55:11,25;56:2;58:2,

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 83
of 92

12,20;59:15,16,18,22;
60:2,5;65:11;67:21;
68:9;69:6,7;71:24;
72:9,12
**happen (1)**
17:13
**happened (1)**
46:14
**happens (3)**
16:22;34:8;54:18
**happy (12)**
10:19;13:14,17;
14:10;16:20;19:2;
20:20;53:11;73:11;
74:25;76:20;77:1
**hat (1)**
58:16
**hate (2)**
16:3;58:4
**head (3)**
17:16;32:21;33:9
**headed (1)**
20:17
**hear (8)**
5:22;10:4;21:9,10,
12,12,14,15
**heard (5)**
7:20;10:8;13:10;
20:14;42:12
**hearing (8)**
8:13;9:12;15:18,22;
17:4;19:14;74:13;
76:23
**hearings (1)**
13:2
**height (28)**
23:20;27:9;28:2;
31:11;34:1,24;35:11,
12,16,17,23;36:1,6;
41:9;47:9,11,23,24;
48:21;49:5;50:3,9;
51:2;53:4,10,18,23;
67:13
**heights (2)**
35:9;36:20
**help (2)**
15:20;28:7
**helpful (2)**
72:24;74:20
**here's (3)**
8:4;39:6;50:22
**hide (1)**
76:18
**high (5)**
32:20;33:9;35:20;
62:9;76:2
**high- (1)**
65:8
**higher (2)**
31:2;35:19
**high-powered (3)**
28:3,5;64:13
**Hildebrand (2)**

52:23;65:3
**himself (1)**
68:12
**historical (1)**
35:21
**history (2)**
37:14;42:16
**hold (2)**
18:12;29:12
**holding (2)**
16:20;17:2
**hole (1)**
20:15
**holiday (1)**
20:4
**holidays (8)**
11:22;13:22;15:3;
19:2;20:20;74:25;
76:20;77:1
**Honor (57)**
4:4,10,13,15,22;5:1,
5,12,19;7:8,16;9:19;
10:2,10,17,20,24;
11:4,12;12:14;13:1,
11,13,25;14:17;16:10,
20;17:7,20,23;18:10;
19:3,5;20:6,10,22,23,
24;21:5,21;22:1,3;
42:19;46:9;47:6,17;
48:1;49:10;55:9,18;
57:19;72:9,15;73:17;
75:9;76:24;77:1
**Honorable (1)**
4:6
**Honor's (2)**
7:9;14:21
**hoping (1)**
16:25
**horrible (1)**
14:25
**house (1)**
75:22
**Huh (1)**
73:16
**hurdle (1)**
13:8
**hurry (1)**
73:4

**I**

**idea (2)**
11:2;68:24
**ignore (1)**
12:6
**ignored (1)**
28:11
**illustration (1)**
67:7
**imagine (1)**
9:5
**impact (6)**
28:5;29:18;33:20;

34:13;50:8,9
**impacts (1)**
54:10
**important (4)**
33:15;55:1;74:10,
11
**imposition (1)**
28:2
**impression (2)**
41:5;55:7
**improve (1)**
30:2
**improvements (2)**
29:25;30:4
**improving (1)**
30:7
**Inc (1)**
21:22
**incidental (1)**
37:18
**inclined (4)**
7:23;8:4,4;10:20
**include (2)**
18:19;42:21
**included (1)**
14:9
**including (2)**
6:12;63:19
**income (2)**
71:2,3
**inconsistent (1)**
36:10;41:10
**indeed (1)**
28:12;34:4
**indiscernible (17)**
37:1;44:11;46:1;
49:25;50:19,21;54:6,
14;58:25;62:14;64:8;
70:21;71:8;73:6;76:8,
12,25
**individual (1)**
31:9
**influenced (1)**
52:16
**information (1)**
76:10
**inherently (1)**
63:17
**initially (3)**
29:24;30:10;42:20
**initiated (2)**
18:16;19:12
**insignificant (2)**
28:11;36:6
**inspection (3)**
28:6;34:17;58:9
**instance (1)**
68:9
**instead (2)**
23:2;36:17
**instincts (1)**
11:24
**intend (1)**

37:11
**interest (4)**
10:15;60:11,12;
62:4
**interesting (1)**
36:7
**interests (2)**
11:16;60:8
**interfere (1)**
69:12
**interpret (1)**
23:10
**interrupt (1)**
60:21
**interrupting (1)**
33:13
**into (4)**
11:2;13:21;20:14;
59:2
**Investment (2)**
5:6;14:18
**involve (1)**
68:1
**involved (3)**
9:25;14:7,8
**involves (1)**
75:4
**involving (2)**
58:7;75:6
**issue (34)**
10:3;15:2,12,17;
16:1;19:5;24:5,9;
36:4,18;37:11,17;
38:4,15;39:10;40:21,
23;41:8,24;42:7,20;
49:20,21;51:6,7,8;
54:1;55:14,18;56:7;
59:9;60:15;62:12;
68:6
**issues (14)**
13:24;39:8,14,16;
40:24,25,25;41:4,12,
13;42:6,16,17;52:7
**items (1)**
6:8

**J**

**Jacobsen (1)**
22:5
**JACOBSON (160)**
21:8,9,12,14,15,16,
21,22;22:7,10;23:25;
24:4,13,21,23,25;
25:9,18,24;26:8,10,
20,23;28:21;29:2,12,
13,17;30:14,15,18,23;
31:4,6,15,22,25;32:5,
7,10,14,17,22,24;
33:6,15;34:16,20;
35:8;36:4,14,23;37:1,
4,7,9,10,23,25;38:10,
20,22;39:6,17,19,21;

40:1,4,9,15,23;41:12,
17,23;50:23;52:6,14;
53:13,17,25;54:3,6,
10,14;55:4;58:3,22,
24;59:2;60:23;61:1,3,
7,9,11,13;62:12,14,
17;63:2,11,14;64:3,6,
8,15,17,19,22,24;
65:22,24;66:3,5,11,
14,17,19,22,25;67:2,
6,19,21;68:21;69:1,3,
15,17,24;70:5,7,9,12,
15,17,21;71:5,7,9,12,
13,14,18,24;72:24;
73:10,11,12;74:3,5;
75:3,11,16;76:3,6,12,
14,17,24
**Jadhav (1)**
42:21
**January (15)**
8:6,8,9;9:16;10:3;
11:5;12:4;15:11;
19:23;45:20;72:21;
73:14,17,22;74:2
**JARASHOW (5)**
5:5,6;14:16,17,18
**Jatharow (1)**
5:3
**job (1)**
11:14
**Jones (1)**
4:16
**Joshua (2)**
5:19;18:2
**Judge (5)**
17:4,18;30:12;58:8;
66:14
**judgments (1)**
61:17
**judicial (1)**
63:24
**July (1)**
14:8
**jurisdiction (1)**
16:17
**justified (1)**
34:5

**K**

**Kaplan (1)**
5:13
**keep (8)**
11:4,12;27:13,20;
54:5,7;60:3;71:14
**Keller (1)**
22:4
**kidding (1)**
17:5
**Kim (1)**
22:4
**kind (11)**
8:1;10:23;11:9;

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 84
of 92

16:7,19;20:15;40:18;
47:25;58:13;62:23;
75:25
**Kizzy (2)**
5:5;14:18
**knew (7)**
10:4;31:1;33:10;
34:25,25;52:25;53:2
**knows (8)**
6:24;31:5,7;33:10,
11;35:12,13;52:24
**Komir (29)**
21:22;23:4;26:6;
29:4;43:11;44:10;
47:14;48:12,16,24;
49:4,5;51:2;52:19,22,
25;53:4;62:21,24;
63:17,22;64:9,10;
65:3;68:15,19;69:17,
20;70:22
**Komir's (9)**
25:12,20,21;26:17;
29:4;32:11;38:1;
43:22;69:12

**L**

**Labaton (2)**
9:20;16:11
**label (1)**
20:17
**lack (1)**
6:19
**ladies (1)**
20:20
**Lamb (74)**
21:24;22:1,2;28:19;
42:10,15,18,19;43:1,
21,24;44:2,4,7,9,15,
18,25;45:3,16,18;
46:1,9,21;47:6,8,11,
19,21;48:4,18,23;
49:2,8,10,12,17,19,23,
24,25;50:6,12,14,16,
18,21;51:5,16,18,23;
52:1,3,7;53:23;54:19;
55:2,9,22,24;56:1,5,
19,21;57:19,21,24;
67:13;72:8,9;73:7;
74:1,8;77:1
**land (13)**
27:23;59:18;60:10,
13;62:1,19;63:19,23;
64:9;69:13;70:3,18,
23
**landowner (4)**
41:22;68:5,7,10
**landowners (1)**
59:17
**language (3)**
7:17;58:14;61:7
**larger (3)**
59:18,22;62:5

**last (3)**
6:3;11:19;17:4
**late (1)**
9:21
**later (2)**
31:16;57:14
**lateral (2)**
25:2,14
**laterally (3)**
24:18,20;27:16
**Latham (1)**
5:20
**law (8)**
8:1,19;12:5;57:10;
61:18;67:9;71:5;
74:23
**Lawrence (1)**
21:21
**lawyer (1)**
51:13
**lawyers (1)**
20:13
**layman's (1)**
34:9
**lead (1)**
19:9
**learned (3)**
58:4,8,9
**lease (1)**
30:3
**least (7)**
7:2;19:16;25:2;
47:4;48:15;58:13;
72:20
**leave (3)**
24:24;28:8;58:20
**left (11)**
25:13,16,16,20,23,
24;26:4,12;27:16;
34:2;40:12
**legal (9)**
11:9;27:22;37:6,16;
38:1,14;41:1;65:10;
71:10
**length (2)**
24:5;35:1
**lengthened (2)**
26:14;33:18
**lengthens (1)**
33:23
**lengthy (1)**
12:9
**less (1)**
49:6
**level (1)**
68:3
**levied (1)**
70:13
**LIDAR (4)**
42:23;43:9;46:11;
47:12
**life (1)**
28:4

**light (2)**
42:23;62:8
**limit (1)**
68:8
**limitations (11)**
49:20;51:8;55:18,
21;56:1,4,5,15;57:2,3,
11
**limited (5)**
7:3,6;8:9,21,24
**limits (1)**
61:23
**line (10)**
23:4;28:3;32:8;
37:20;41:20;47:16;
69:23;70:25;75:24;
76:2
**lined (1)**
23:1
**lines (35)**
23:3,22;27:2,5,6;
28:3;30:8,11,16;33:9;
34:23;35:13;36:16;
38:1;39:11,13;43:7,
10;53:17;56:10;62:9,
21;63:15,16,19;
64:14;65:9,15;66:13;
68:24;69:10,18,19;
70:19;71:15
**Listen (2)**
67:5;69:13
**listening (1)**
20:12
**literally (1)**
12:12
**litigate (1)**
11:10
**little (4)**
12:12;15:3;16:18;
70:4
**lived (1)**
74:17
**lives (1)**
75:23
**LLC (2)**
4:17;5:7
**located (1)**
25:19
**location (2)**
26:25;27:8
**locations (1)**
24:16
**locked (1)**
29:14
**long (2)**
42:10;74:17
**longer (1)**
12:13
**look (24)**
8:6;17:7;22:14;
25:10;27:19;34:21;
37:10;41:1;43:1,13,
14;45:16;46:23;

47:17;48:6;56:13,13,
14,14;61:22;63:14;
65:8;69:15;70:17
**looked (3)**
11:19;46:12,23
**looking (7)**
10:25;25:19,21;
26:4;37:23;43:15;
45:5
**looks (2)**
55:12;72:1
**lose (2)**
38:11;50:10
**lot (6)**
14:14;22:14;74:14,
15;76:9,10
**lower (11)**
30:10,16;34:10;
47:15,16;48:15;49:2;
54:16,21,22,24
**lowered (1)**
31:7
**lowering (1)**
30:20
**lowers (1)**
34:1
**lowest (1)**
47:25
**lurking (1)**
16:6

**M**

**maintain (1)**
35:13
**makes (4)**
20:8;63:17;72:23;
74:9
**making (2)**
6:23;8:1
**MALE (1)**
45:3
**man (1)**
75:22
**manager (2)**
54:12,15
**many (3)**
34:17;48:10;59:23
**March (6)**
6:19;8:5;9:8;11:4;
14:4;15:9
**markers (1)**
31:18
**marks (1)**
34:22
**material (5)**
28:24;51:9;56:12;
57:21;58:18
**materiality (1)**
42:6
**materials (1)**
30:5
**math (1)**

26:24
**mathematically (1)**
27:7
**matter (25)**
4:7;6:20,22;9:11;
12:8;14:11;15:10,17;
16:22;21:3,20;24:10;
27:4;35:7;36:24;50:1;
51:11;55:17;56:17;
64:24;67:17;73:22;
74:16,17,25
**matters (1)**
36:20
**matter's (1)**
8:12
**May (6)**
6:24;10:25;12:10;
19:6;35:12;48:22
**maybe (20)**
10:1;11:5;13:2;
15:20;22:16;28:14;
34:9,10,11,12,16;
37:22;41:4;45:18;
46:5;50:24;52:15;
72:22;73:23,23
**mean (45)**
7:20;9:15;13:22;
14:13;15:1,21;18:9;
22:22;23:7;25:3;26:5;
27:14,15,19;30:24,24;
31:12;32:3;36:5,7,25;
37:10,15;46:2;48:2;
49:6,11;50:4;53:14;
54:5;57:7,12;60:21;
61:11;64:12;65:16;
66:4;67:6,11;69:10,
12;73:8;74:7;75:13,
22
**meaningful (2)**
46:19;50:2
**means (6)**
6:23;36:25;37:2;
45:22;46:3,14
**measurable (3)**
36:8;48:21;51:1
**measure (3)**
28:12;31:13,13;
32:25;35:3,9;36:1;
39:20
**measurement (1)**
46:10
**measurements (1)**
29:19
**measuring (2)**
31:17;36:1
**meet (1)**
62:6
**meeting (1)**
8:22
**memorandum (1)**
29:5
**mentioned (1)**
52:16

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 85
of 92

Mesa (1)
56:14
metaphor (3)
20:15;26:13;67:9
Michael (1)
5:12
middle (5)
26:6;32:18,24;
43:23;48:16
midpoint (1)
48:15
might (15)
17:6;23:19;28:12;
33:20;34:4;36:1,2,7;
52:16;53:10,11;58:6;
66:1;68:23;74:13
mind (1)
41:5
mindful (2)
9:13;74:12
mine (1)
65:12
minerals (1)
63:23
minimal (1)
36:7
minimis (1)
49:14
minor (1)
49:14
minute (2)
8:7;21:2
minutes (2)
22:6;67:19
mischaracterized (1)
57:7
misled (1)
41:4
missing (1)
53:13
misstated (1)
57:7
MML (2)
5:6;14:18
moment (9)
5:21;10:7;16:13;
18:16;20:19;24:24;
27:19;28:9;55:20
monetary (2)
37:19,21
money (1)
41:21
Montali (1)
4:6
month (1)
11:2
months (2)
13:2;31:11
more (15)
6:8;11:25;12:3;
15:20;16:18;19:5;
37:16;44:13;49:6;
56:6;57:17;60:19;

67:6,11,19
morning (16)
4:4,8,10,14,15,25;
5:5,9,12;11:20;13:11;
21:21,25;22:1,3;
28:16
most (2)
6:11;33:15
motion (18)
9:9;12:10,10;15:9,
22;16:5,13,24;17:15;
19:8,22;21:23;24:2;
38:6,10,12,13;41:24
motions (4)
6:17,18;7:18;12:2
move (20)
11:10,25;13:3,14;
20:3;25:2;26:1,24;
27:16;33:19;36:13,
15,16;37:18;39:11;
42:4;44:22;45:1;
54:18;73:12
moved (23)
16:7;23:13,15,17;
25:3,6,11,12,15,20,22,
23,24;26:4,21;41:9;
43:7,8,17;44:1,5,9;
45:10
movement (3)
25:11;37:21;49:15
movements (2)
24:19,22
moves (4)
26:10,18;27:1;34:2
moving (12)
10:17,18;11:13;
15:8;26:12;39:15;
41:20,20;52:12;53:8,
14;54:8
much (7)
11:25;16:25;20:25;
37:23;39:23;67:12;
71:20
must (1)
46:25
Must've (1)
4:19
mute (1)
21:11
myself (1)
11:20

## N

name (4)
4:11;5:11;10:12;
75:3
named (1)
75:6
narrow (1)
13:24
nature (1)
67:24

near (3)
22:24;25:12;58:7
nearer (1)
25:22
necessarily (1)
27:6
necessary (1)
10:2
need (16)
6:6,7;8:13;14:23;
15:13,18,24;29:11;
34:16;39:8,23,23,24;
43:13;60:17;64:12
needs (2)
42:14;45:18
negotiated (1)
7:12
negotiation (1)
9:25
negotiations (2)
7:17;14:8
neighbor (2)
57:12;60:24
new (11)
9:6;24:15;25:7;
27:3,3,6,24;28:10;
30:8;46:7;58:8
next (6)
11:21;20:21;30:3;
38:12;53:1;73:14
night (1)
11:19
ninety (3)
10:20,24;12:15
ninety-day (1)
6:14
Ninth (3)
16:1,15,16
nobody's (1)
18:23
nomenclature (1)
61:17
non (1)
7:13
nonexclusive (3)
60:7;63:18;68:10
nonissue (2)
57:1,3
nonlowering (1)
54:23
nontax (1)
41:25
normal (1)
41:13
north (7)
23:7;34:21;43:25;
44:1,2,7;47:14
northern (1)
43:4
northernmost (2)
47:13;48:23
northwest (1)
23:8

note (3)
14:1,2;59:3
noted (1)
11:4
notes (2)
28:23;60:18
notice (1)
19:6
notion (2)
37:20;58:9
nuisance (1)
56:16
number (2)
76:4,15
numbers (2)
22:25;75:14

## O

objecting (2)
56:8,12
objection (3)
7:10;12:6;16:24
objections (2)
6:1,18
obligation (1)
18:5
observation (1)
34:21
observations (1)
6:7
observe (3)
11:22;13:22;31:7
observed (1)
30:19
obtain (1)
61:14
Obviously (11)
8:23,25;10:21;12:4;
18:24;25:21;46:15;
47:6;48:3;72:18;
74:10
occupation (4)
59:3;60:6,9;61:24
occupied (1)
62:21
occupy (7)
62:22,22;63:22;
65:14;66:9;69:20,21
occupying (1)
66:13
o'clock (1)
73:22
off (8)
6:10;7:21;15:21;
17:16;18:4;21:1;
26:15;44:23
office (3)
66:6,12;71:19
officer (1)
17:17
offline (1)
76:23

often (2)
12:1;61:14
old (10)
12:3;25:7;27:5,24;
28:6,7,10;29:8;46:7;
48:9
omnibus (1)
6:1
once (1)
16:15
one (38)
4:19;5:15;8:11,13;
10:16,23;13:2;15:20,
21,23;18:23;19:5;
20:13;22:13,15;23:3,
4,9,15;24:1,10;25:2,6;
26:2,2,6;29:12;33:5;
35:16;42:22;44:22;
47:1;54:8;58:13;
59:19;67:14;69:22;
70:9
ones (1)
43:25
Only (20)
4:19,19;10:23;17:5;
23:19;31:17;32:8;
36:20;44:7,9;57:3;
58:12;62:25;63:16,
25;64:1;65:2,14;66:9;
72:3
on-the-property (1)
64:24
oOo- (1)
4:2
opinion (3)
29:5;59:15;61:21
opportunity (1)
10:3
oppose (1)
10:19
opposed (1)
60:7
opposite (2)
32:2,12
opposition (5)
9:6;11:4;19:17;
40:24;63:14
oppositions (5)
6:17;7:7;9:1,9;15:9
opted (1)
75:12
order (10)
4:3;7:16,17;11:7;
13:17;14:8;15:5;18:4,
19;72:19
ordered (1)
36:13
ordinary (1)
59:10
original (3)
42:11;45:2;61:5
originally (1)
56:23

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 86
of 92

**Otay (3)**
56:14;71:22;72:11
**O-T-A-Y (1)**
71:22
**ought (1)**
23:14
**out (30)**
8:19;12:16;16:4,6;
17:10;18:7;19:19,20;
20:5,7,8,10;22:24;
27:18;28:5;30:4,25;
31:13,18;34:7;35:8;
53:7;54:8,11;58:7;
70:17;71:19;74:21,
22;75:12
**outcome (2)**
37:22;42:6
**outrage (1)**
14:25
**outset (1)**
11:10
**over (19)**
6:3;7:9;12:5;27:23;
31:22,23;33:8,22;
37:5;42:3,18;47:21,
24,25;54:17;63:17;
64:14;65:19;71:1
**overhead (3)**
25:5;26:5;75:22
**overlayed (1)**
44:19
**own (3)**
25:14;62:25;68:14
**owned (1)**
29:6;62:10;66:23
**owner (10)**
30:19;33:23;34:1;
52:18;53:3;61:4,5,24;
62:19;65:10
**owner's (1)**
51:20
**ownership (1)**
60:12
**owns (2)**
66:8;69:19

**P**

**Pachulski (1)**
4:16
**page (1)**
63:14
**pages (5)**
6:3;8:9;9:17;12:12;
17:8
**paid (6)**
65:4,16,18;69:8,8;
70:2
**Palmieri (5)**
5:10,12,13,16;
20:23
**papers (4)**
14:12;15:8;36:15;

66:14
**paperwork (1)**
22:14
**Parada (4)**
21:1,8,10,18
**paragraph (2)**
43:1;47:23
**parallel (4)**
23:6;25:4;26:1;
45:1
**parameters (1)**
73:1
**parcel (3)**
59:20,22;63:19
**Pardon (1)**
64:3
**part (5)**
25:9;30:3;31:15;
52:16;64:24
**partial (1)**
21:23
**particular (1)**
43:2
**particularly (1)**
9:5
**parties (3)**
7:12;15:10;18:6
**past (6)**
13:8;14:13,13;51:9;
55:17;68:6
**pasture (1)**
59:12
**pattern (3)**
16:20;17:2;45:11
**Pause (1)**
21:7
**pay (14)**
37:3;39:24;40:7,11;
60:17;67:3;69:21,22,
24;70:3,13;71:1,18;
72:6
**paying (2)**
55:7;60:3
**payment (6)**
41:25;59:5,7,9;
62:6;67:25
**pending (3)**
7:18,25;18:13
**people (6)**
11:22;13:22;15:14;
18:22;48:11;68:6
**people's (1)**
68:2
**PERA (15)**
6:9,12;7:12,14;
8:11;9:20,25;10:4;
16:11;19:7,12,13,16,
20;20:4
**PERA's (1)**
19:22
**perception (1)**
35:1
**perfectly (2)**

14:4;25:4
**perhaps (1)**
28:12
**period (3)**
6:14;10:19;40:8
**permanent (2)**
60:1,22
**permit (1)**
15:12
**permitted (3)**
7:2;38:25;72:3
**person (1)**
54:20
**person's (1)**
59:25
**perspective (2)**
11:7;34:23
**persuade (1)**
72:5
**persuaded (4)**
8:20,24;28:15;
37:14
**persuasive (1)**
67:11
**pertains (1)**
59:9
**PG&E (49)**
4:7;7:25;9:9,10;
14:2;18:2,6;19:23;
20:2;21:20;24:16;
28:12,14;29:22;
33:18;35:4,12,22;
36:12,15,21;37:20,25;
38:10,24;40:11,16,24;
41:23;51:19;52:17;
62:25;63:25;64:4,2;
65:14,17,19;66:9,23;
67:2;69:8,11,19;70:2;
71:21;73:14;75:12,17
**PG&E's (13)**
6:17;25:14,18;29:5;
38:2;39:8,22;54:3;
63:14;64:4;66:12;
70:19;75:19
**PGE (1)**
40:7
**phonetic (6)**
42:23;46:16,16;
52:23;55:13;73:13
**photographs (2)**
22:15;46:25
**photos (1)**
25:10
**phrase (3)**
20:13;56:9;67:23
**physical (2)**
35:23;41:6
**pick (1)**
17:7
**Piedmont (1)**
75:18
**pistachio (10)**
60:1;62:15;63:5;

65:10,13;67:7,9;
68:13,14;69:7
**pitch (1)**
28:20
**place (3)**
27:7;36:21;41:3
**plain (1)**
7:16
**plaintiff (1)**
19:9
**planning (1)**
16:13
**plans (1)**
66:15
**planted (1)**
59:25
**please (5)**
15:16,17,17;42:18;
67:20
**point (30)**
7:12;12:15;14:20;
15:20;25:17,18;
27:20;28:9;31:1;
34:16;37:21;39:6;
40:2;41:3;46:24;
47:25;48:12;49:7,12;
52:11;59:24;64:21;
66:15;67:9;69:14;
70:16,22;71:4,6;
76:16
**pole (2)**
23:4;47:16
**poles (1)**
23:3
**pored (1)**
6:2
**portion (6)**
25:14;47:13,24;
48:24;61:24;63:6
**position (24)**
23:19;24:8,9,17;
25:6,7;26:5,18,22;
27:5,6,22,25;28:10,
10;31:3;34:5;35:23,
24,25;38:2;46:7,7;
75:18
**positioned (1)**
45:10
**positions (2)**
27:3;36:20
**possession (15)**
58:10,15;59:5,9;
60:4,11,13,16,16,19;
61:15;62:19;67:24,
25;72:4
**possessor (1)**
68:3
**possibility (1)**
19:16
**possible (1)**
16:16
**possibly (1)**
31:12

**post (1)**
72:19
**power (8)**
23:2,4,21,21;32:8;
33:9;35:13;41:20;
65:15;66:13;68:24;
69:9,23;70:25;75:24
**powered (1)**
65:9
**practical (8)**
61:18,20;62:2,5,23;
67:22,24;72:2
**practice (1)**
11:9
**precisely (3)**
46:4,5;64:19
**preclude (2)**
7:11;65:10
**predecessors (1)**
42:3
**preference (1)**
8:14
**preliminarily (1)**
28:23
**prepared (1)**
28:17
**prescription (1)**
38:15
**prescriptive (26)**
37:17;38:12;39:1,9,
10;41:13,15;42:1,2;
49:20;51:7,21;58:4,7,
10;60:2,10,20;61:15;
65:1,3;66:9;70:10;
72:10,13;75:4
**present (1)**
17:17
**presently (1)**
44:21
**presents (2)**
38:14;41:1
**presiding (1)**
4:7
**presumably (2)**
35:16;46:22
**presume (1)**
49:6
**pretend (3)**
23:3;56:24;63:4
**pretty (5)**
7:1,8,10;15:5;56:14
**prevail (1)**
69:7
**prevails (1)**
51:5
**prevent (2)**
68:22,25
**preventing (1)**
69:3
**prevents (1)**
61:18
**previously (3)**
24:14;29:5;39:3

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 87
of 92

**pride (1)**
  73:3
**principal (1)**
  42:22
**principle (1)**
  58:16
**prior (1)**
  13:17
**probably (4)**
  9:11;14:1;15:25;
  75:25
**problem (3)**
  14:3;19:1;20:4
**procedures (3)**
  7:11;11:8,14
**proceeding (1)**
  76:16
**proceedings (1)**
  77:3
**process (7)**
  11:11;13:4;16:4,21,
  24;22:18;29:9
**Procter (2)**
  5:6;14:18
**prodded (1)**
  4:20
**pro-discovery (1)**
  9:16
**progress (1)**
  6:5
**project (1)**
  22:23
**promptly (1)**
  57:4
**pronounce (1)**
  55:13
**proof (4)**
  35:22;60:15;63:3,9
**property (101)**
  23:4;25:12,20,21;
  26:7,18;27:8;28:1,2,
  4;32:3,11,19;33:8,8,
  21;34:4;40:8,14,19;
  41:5,8;43:4,11,22;
  44:10;47:14,15,21,22;
  48:12,13,16,24,25;
  49:4,5;50:10,10,23;
  51:2,5;52:18,18,20,
  22,23,25;53:1,4,9,9,
  15,16,18,20;55:3;
  56:7;57:9,11;58:20;
  59:14,21,23,25;60:6,
  8,24,25;61:5,6;62:10,
  11,16,19,24;63:6,10,
  17;64:14,21;65:1,2,4,
  5,9,11,16,18,19,20;
  66:1,7;68:2,19,23;
  69:24;70:2,3,13;
  75:17
**proposed (1)**
  14:22
**proration (1)**
  71:20

**protecting (1)**
  69:5
**prove (1)**
  54:2
**proven (1)**
  65:20
**provided (1)**
  73:9
**public (3)**
  29:25;30:2;65:25
**pull (1)**
  18:23
**purchased (1)**
  56:7
**pure (1)**
  44:22
**purpose (1)**
  62:2
**purposes (3)**
  26:16,16;56:23
**put (4)**
  11:13;14:12;47:2;
  70:23
**putting (2)**
  11:14;41:20

**Q**

**qua (1)**
  7:13
**qualified (2)**
  35:10;46:18
**quickly (1)**
  11:25
**quiet (1)**
  42:11
**quite (1)**
  74:18

**R**

**Raines (3)**
  42:22;43:15;46:15
**raise (1)**
  63:8
**raised (3)**
  10:23;42:20;59:17
**raising (1)**
  4:21
**ran (1)**
  57:11
**ranch (1)**
  59:18
**rather (1)**
  63:9
**read (9)**
  8:14,15;14:9;28:24;
  55:5,6;56:23,24,25
**reading (1)**
  13:16
**real (3)**
  9:6;30:19;40:8
**realignment (3)**

  23:14,17;34:10
**reality (1)**
  54:11
**realized (2)**
  29:9;30:6
**really (9)**
  6:7,21;10:16;36:12;
  44:16;55:10;56:5;
  58:18;63:11
**reasonable (1)**
  73:11
**recently (1)**
  20:13
**reciprocal (3)**
  23:1,8;34:12
**recites (1)**
  15:6
**recognize (1)**
  5:10
**recognized (1)**
  5:21
**reconcile (1)**
  70:1
**reconstruction (1)**
  52:12
**record (12)**
  10:12;23:11,23;
  24:13;25:1,11;28:19;
  30:1,11,16;45:13;
  63:5
**recorded (4)**
  38:3,5,7;67:4
**Recording (1)**
  4:4
**records (2)**
  35:17;44:17
**recourse (1)**
  53:12
**refer (1)**
  45:14
**reference (7)**
  15:23;16:5,14,19,
  23;17:5,15
**referred (2)**
  47:25;75:4
**referring (1)**
  15:8
**refers (1)**
  59:12
**reflect (1)**
  67:15
**reflected (1)**
  29:5
**refresh (1)**
  55:19
**regarding (1)**
  72:18
**regardless (1)**
  55:16
**regular (1)**
  73:14
**reinvent (1)**
  15:16

**reject (2)**
  40:10,13
**related (2)**
  59:13,20
**relates (4)**
  42:23;55:10;56:6;
  59:8
**Relating (1)**
  42:19
**relation (3)**
  49:13;55:18;72:11
**relative (2)**
  35:1,2
**relevant (1)**
  24:1
**relied (1)**
  18:23
**relocation (6)**
  29:2,7,8,17,21;
  52:12
**rely (1)**
  55:16
**relying (2)**
  71:22;72:4
**remain (3)**
  11:11;45:7,8
**remedies (1)**
  42:7
**remember (5)**
  11:23;30:21;35:18;
  48:8,9
**Remind (1)**
  73:14
**remove (1)**
  36:13
**removed (2)**
  24:15;29:8
**removing (1)**
  30:7
**reorganized (4)**
  4:13;5:20;22:2,4
**repeat (1)**
  9:3
**rephrase (1)**
  43:20
**replaced (1)**
  43:3
**replacement (1)**
  43:2
**replacing (1)**
  27:21
**replies (1)**
  6:20
**reply (4)**
  6:15;9:10;14:2;
  15:10
**report (2)**
  6:5;72:22
**repositioning (3)**
  22:19;30:8;57:16
**repositions (1)**
  53:3
**represent (1)**

  73:7
**representation (1)**
  74:24
**representations (1)**
  43:14
**representative (5)**
  21:22;29:22;30:10,
  19;35:4
**representatives (1)**
  54:3
**repudiates (2)**
  30:12;71:24
**require (2)**
  19:25;28:12
**required (3)**
  59:6;62:5;74:23
**requirement (3)**
  59:6;62:6;71:12
**requires (4)**
  8:19;58:10;59:5;
  67:25
**reroute (1)**
  37:20
**reserve (1)**
  22:5
**residence (2)**
  75:23,24
**resolution (1)**
  13:4
**resolve (1)**
  13:3
**resolving (1)**
  11:16
**respect (2)**
  18:3;29:20
**respond (2)**
  18:5;19:25
**respondents (4)**
  6:12;8:25;10:7;
  15:15
**response (2)**
  8:12;19:9
**responses (1)**
  6:14
**rest (1)**
  28:13
**restate (2)**
  55:4;57:8
**result (2)**
  74:22,23
**resulted (1)**
  52:13
**reveal (1)**
  16:8
**revenues (1)**
  70:24
**reverse (1)**
  23:8
**review (1)**
  37:12
**reviewing (1)**
  60:5
**revisit (1)**

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 88 of 92

67:16
**revocation (4)**
29:18,20;52:9,13
**rhetoric (1)**
50:25
**Richard (1)**
4:12
**right (74)**
4:8,14,23;5:3,8;
6:13;12:22;13:4;
16:20;17:10;19:17;
20:23;21:1,6;22:20,
23;25:22;26:7,20;
27:16;30:3;33:17;
34:3;35:6;36:21,23;
38:1,4,9,15,18,19;
39:3,22;40:9,15;
41:11,17;43:23;
44:18,25;45:16;48:4,
7;49:8,12;50:12;
51:16,23,23;59:4,12,
12,13,13;60:4;61:2,8;
62:22,25;65:1,3;66:4,
24;67:2;68:7,23;69:9;
72:20;74:11,22;75:8,
10;76:2
**rights (9)**
36:11;38:3,7,12;
39:9,10;40:8;64:9;
66:10
**rise (1)**
37:18
**rises (1)**
68:2
**risk (1)**
8:11
**RKS (5)**
5:2;7:12,15;8:11;
10:14
**road (2)**
68:5,12
**roadway (1)**
68:4
**Robbins (1)**
5:13
**rock (1)**
30:4
**Rose (9)**
23:1,5,15;26:15;
34:11,12;44:19;46:4;
47:4
**rotated (1)**
59:23
**rotating (1)**
60:1
**roughly (1)**
33:5
**royalties (1)**
75:19
**rule (2)**
41:7;65:25
**ruled (1)**
75:20

**ruling (16)**
8:15,16;9:4,7,18;
10:9;12:10;14:21;
16:1;18:13;71:25;
73:10,23,24;74:13;
76:9
**run (5)**
23:7,7;27:5;39:1;
41:15
**running (1)**
42:13
**runway (8)**
22:25,25;23:6;
26:14,14;36:20;
45:10,11
**RUPP (16)**
21:9,24;22:3,3;
42:10;52:17;75:2,5,8,
9,13,15;76:1,8,13,15

**S**

**safety (3)**
29:25;30:2;65:25
**sag (7)**
23:21;47:17;48:3,7,
7,11,13
**sags (1)**
31:21
**same (20)**
7:22;16:2;26:3;
27:8,9;44:21;45:4,7,8,
12;47:5,23;51:13;
53:10,10;55:4;58:15;
68:15;69:17;75:25
**SAN (1)**
4:1
**Sandbridge (4)**
59:19,21;61:25;
68:14
**satisfaction (1)**
72:3
**satisfy (2)**
52:4;61:16
**saw (1)**
30:20
**saying (20)**
8:11;20:2;27:13,20;
36:15;38:10;40:6;
46:6,22;47:2;50:20;
52:8;54:4,4,5;61:21;
63:21;65:17;71:21;
76:1
**Scared (2)**
4:18;6:10
**schedule (11)**
8:13,18;9:11;10:21;
13:25;14:4;15:16,18;
19:13,14,18
**scheduling (2)**
72:18,22
**scrivener (1)**
15:5

**Scrooge (1)**
13:21
**scrooges (1)**
20:7
**second (4)**
7:10;21:3;24:6;
29:12
**Section (6)**
59:8,10,11;62:18;
66:10;71:15
**Securities (2)**
4:17;13:12
**seeing (1)**
73:19
**seek (2)**
16:23;61:16
**seem (5)**
6:13;7:3;37:15;
41:21;46:21
**seemed (4)**
35:6;38:3,13;56:25
**seems (5)**
8:23;18:9,25;23:13;
27:19
**segue (1)**
28:21
**Seiler (1)**
5:13
**self (1)**
12:3
**send (2)**
76:14,15
**sense (9)**
6:11;20:8;64:13;
70:15;72:1,21,23;
74:10;75:21
**sent (1)**
18:6
**separate (2)**
15:10;75:16
**separately (2)**
70:12,19
**September (1)**
30:6
**sequencing (1)**
39:7
**served (1)**
18:5
**servient (1)**
68:10
**session (1)**
4:6
**set (7)**
10:21;18:3;19:12,
18;38:13;43:23;72:12
**sets (4)**
32:13,15;33:4,23
**setting (2)**
20:16;72:17
**settle (2)**
12:25;13:8
**seventeen (4)**
34:24;51:19;52:10;

56:10
**seventy (2)**
31:17;33:10
**several (1)**
23:25
**SFO (3)**
22:24,24;58:7
**Shahmirza (14)**
21:22;26:17;30:18,
25;34:24;35:18;46:6,
17;54:4,16,17;55:16;
57:4,13
**Shahmirza's (3)**
22:17;24:17;69:13
**shall (1)**
16:6
**share (2)**
68:16;71:3
**shared (3)**
59:6;61:20;62:23
**shares (1)**
68:11
**short (2)**
15:15,16
**shortened (1)**
26:14
**short-staffed (1)**
15:3
**shown (1)**
43:8
**sic (6)**
5:3,4;59:19,21;
61:25;68:14
**side (4)**
9:5;36:18;37:11;
43:23
**side-by-side (1)**
47:2
**sides (5)**
32:2,13;40:17;53:1;
55:10
**side's (1)**
8:16
**sideways (2)**
27:1;36:17
**significance (4)**
29:2,17;52:11;57:4
**significant (7)**
28:11;29:20;31:16;
34:2;56:21;60:18;
63:15
**significantly (2)**
35:5;40:4
**similar (2)**
27:22;67:23
**simple (1)**
22:18
**simplifying (1)**
25:25
**simultaneous (3)**
8:8;9:16;15:11
**sine (1)**
7:13

**Siperrotta (1)**
73:13
**site (1)**
28:6;34:17;58:8
**sitting (1)**
75:16
**situation (1)**
75:21
**six (7)**
13:2;23:2;24:10;
26:1,3;28:3;31:11
**six-story (1)**
69:4
**sixty (2)**
11:23;14:2
**sixty-day (1)**
10:19
**Slack (20)**
4:8,10,12,12,18;
5:24;6:25;7:8,22;
9:25;10:7;15:1,4;
19:3,5,24;20:1,8,9,22
**slightly (2)**
31:2;57:17
**slow (1)**
13:16
**smaller (4)**
59:19,20;60:24;
61:25
**smarter (1)**
32:23
**solution (1)**
12:24
**solve (2)**
18:15,25
**solves (1)**
20:4
**somebody (4)**
35:9,15,21;41:19;
54:8,11
**someone's (1)**
65:9
**sophistry (1)**
61:19
**sorry (7)**
5:15,22;50:18;
54:25;64:22;68:17;
69:12
**sort (9)**
4:23;5:24;6:13;7:6,
14;9:13;19:6;20:15;
58:13
**Sosensky (1)**
42:21
**sought (1)**
62:4
**sound (2)**
58:5;70:4
**south (9)**
26:4;43:3,4,25;
44:1,1,4,9;47:15
**southerly (1)**
25:19

Case: 19-30088     Doc# 14242     Filed: 12/21/23     Entered: 12/21/23 05:08:50     Page 89
of 92

**space (11)**
  30:3;62:18,20,22;
  63:17,25;64:11;
  69:18,19,20;70:3
**span (1)**
  33:18
**speak (1)**
  24:4
**specific (1)**
  23:12
**specifically (2)**
  7:11;71:24
**speculate (1)**
  23:24
**split (2)**
  22:7;40:18
**spoke (1)**
  29:22
**springboard (1)**
  59:2
**squeeze (1)**
  20:14
**staff (1)**
  76:22
**staffing (1)**
  73:4
**Stand (6)**
  31:22;32:24,25;
  33:8;34:17,21
**standard (1)**
  15:5
**standing (5)**
  26:6,17;31:10;
  32:18;49:3
**Stang (1)**
  4:16
**start (4)**
  6:23;10:10;34:23;
  48:15
**started (3)**
  4:5;30:5;33:1
**starting (2)**
  10:6;25:17
**state (6)**
  9:7;10:12;11:12,19;
  57:6;68:18
**stated (1)**
  53:7
**statement (9)**
  16:12;25:15;35:6;
  44:11;63:15,24;64:4,
  5,8
**statements (1)**
  5:18
**states (1)**
  65:5
**station (1)**
  43:5
**status (4)**
  6:5;72:17,22;73:22
**statute (11)**
  49:20;51:7;55:17,
  21,24;56:3,15;57:2,3,

10;69:18
**statutes (1)**
  56:5
**statutory (3)**
  59:7;62:21;71:10
**stay (3)**
  7:25;45:6,6
**staying (1)**
  67:21
**step (2)**
  38:13,24
**Steve (1)**
  22:1
**stick (2)**
  8:5,18
**sticking (1)**
  52:11
**stickler (1)**
  22:12
**still (6)**
  6:25;20:2;26:15;
  51:8;55:16;63:18
**stopped (1)**
  39:4
**stories (1)**
  58:5
**story (1)**
  57:22
**strange (2)**
  23:18;65:17
**strategy (1)**
  16:9
**struggle (1)**
  34:7
**struggling (3)**
  28:18;34:14;50:22
**stuck (1)**
  8:16
**stuff (3)**
  5:25;11:25;20:17
**stupid (1)**
  66:2
**subject (3)**
  17:14;40:5;67:13
**submission (1)**
  72:17
**submit (2)**
  11:2;15:10
**submitted (10)**
  6:20;8:13;9:11,17;
  10:25;12:8;15:18;
  16:2;12;75:1
**substation (2)**
  25:19;30:7
**subsurface (1)**
  63:19
**subterranean (1)**
  64:9
**Sucharow (2)**
  9:20;16:11
**suffering (1)**
  34:9
**sufficiency (1)**

11:9
**suggestion (1)**
  42:11
**suit (2)**
  39:4;57:6
**summarized (1)**
  53:23
**summary (2)**
  5:25;21:23
**supportive (1)**
  14:20
**supposed (4)**
  6:23;9:1;12:11;
  67:15
**Sure (6)**
  10:14;16:10;29:13;
  46:19;54:3;55:22
**surface (1)**
  61:25
**surprise (2)**
  6:2,10
**surveyor (1)**
  35:8
**Suzinski (1)**
  46:16
**switch (1)**
  55:1
**sword (1)**
  14:25

**T**

**takeoff (1)**
  45:11
**talk (7)**
  6:6;29:11;52:5;
  63:7;73:11;74:5,6
**talked (1)**
  55:20
**talking (2)**
  23:19;69:10
**talks (1)**
  60:7
**tangentially (1)**
  14:8
**tantamount (1)**
  59:4
**tape (1)**
  31:13
**tax (17)**
  24:5,8;37:14;41:8,
  25;50:10,23;51:6;
  55:3;57:9;58:10,20;
  61:16;65:16,18;
  70:17;72:5
**taxes (27)**
  37:3;40:8,12,14;
  41:5;55:14;59:5,7,9;
  60:4,17,18;62:6;65:4;
  67:3;68:1;69:8,9,21,
  22,24;70:2,3,13;71:1,
  19;72:6
**tax-free (1)**

70:24
**technical (2)**
  9:21;76:1
**telling (4)**
  45:13;48:14;54:8;
  58:5
**tells (1)**
  23:23
**temperature (1)**
  35:12
**temporary (1)**
  19:8
**ten (8)**
  31:19;43:3,4;44:1,
  9;59:23,24;60:3
**ten-acre (1)**
  59:20
**ten-story (2)**
  66:5,11
**tentative (3)**
  9:4;10:9;14:21
**term (1)**
  6:19
**terminate (1)**
  75:19
**terminology (1)**
  22:16
**terms (8)**
  16:22;23:12;34:9,
  20;39:6;42:6;49:14;
  57:6
**testified (4)**
  43:6;46:16;47:12,
  22
**testifies (1)**
  43:2
**testify (1)**
  46:18
**testimony (9)**
  22:17;26:23;27:12;
  30:19,21;35:3;43:19;
  45:22,23
**there'd (1)**
  26:15
**therefore (9)**
  34:12;48:16;50:4;
  57:13;64:16;65:15,
  16;69:9;71:1
**thinking (5)**
  6:23;17:17;22:22;
  33:16,17
**third (1)**
  18:6
**thirty (1)**
  22:6
**Thomas (1)**
  22:3
**though (3)**
  25:5;65:19;71:2
**thought (8)**
  11:20;12:11;18:8;
  29:14;32:10;58:3;
  74:14,16

**thousands (2)**
  6:3;12:12
**three (8)**
  7:3;23:3;24:14;
  25:24;26:1;28:25;
  31:25;32:1
**threw (1)**
  15:21
**times (2)**
  22:12;34:17
**tiny (1)**
  48:22
**today (12)**
  9:8;17:5,22;28:24;
  35:24;38:16;40:13;
  42:8,16;51:12;52:15;
  67:12
**told (3)**
  17:3;35:4;58:6
**tomorrow (2)**
  17:15;30:25
**took (2)**
  26:15;75:18
**too's (1)**
  15:13
**tough (1)**
  11:4
**towards (2)**
  15:20;26:10
**tower (23)**
  25:7;26:2,5,21,25;
  27:21,22,24,24;28:7;
  29:8;32:11;33:1;
  34:22;35:2;41:20;
  44:1,1;48:14;49:3;
  52:18;70:23;75:17
**towers (67)**
  22:20;23:13,15,17;
  24:14,15;25:3,4,19;
  27:1,3,5,6,20;28:1;
  29:3;30:8;31:18,20,
  21,24,25;32:1,4,6,9,
  12,13,16,19;33:4,4,8,
  19,22,23;34:2,22,25;
  35:13,23;36:13,16;
  39:15;41:9;43:3,8,16,
  23;44:2,4,7,22;46:25;
  48:7;50:9;51:11;
  52:19,21,21;53:1,3,3,
  9,15;57:17;71:14
**track (4)**
  10:18;11:12,13,15
**traditional (2)**
  7:24;37:16
**transition (2)**
  43:5;44:10
**translates (1)**
  36:10
**transmission (8)**
  43:7,10,16;56:10;
  62:21;63:16;69:18,19
**transverse (1)**
  63:16

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 90
of 92

**trees (13)**
60:1,1,3,22;62:15;
63:5;65:10,13;67:7,9;
68:13,15;69:8
**trespass (6)**
41:16;51:8,15,20;
55:18;56:16
**trespasser (1)**
39:2
**trial (19)**
39:16,18;40:5,12,
22,23;41:8,24;42:5,8,
17;50:3;51:24,25;
52:2,6,8;54:1;58:17
**tried (2)**
58:6;61:14
**trouble (2)**
33:12;52:14
**true (1)**
38:21
**try (2)**
19:12;72:5
**trying (7)**
13:15;17:10;20:14;
27:17;34:7;73:3;
76:18
**TUESDAY (1)**
4:1
**tulips (4)**
68:20,23,24;69:13
**turn (5)**
5:18;7:9;13:21;
29:3;58:22
**turns (1)**
8:19
**tweak (2)**
8:22;57:18
**twelve (3)**
22:8,9,11
**twenty (8)**
24:17;25:15;32:5;
43:3,4,4;44:23;45:11
**two (15)**
20:2,3;21:2;24:19,
22;31:24;32:9,13,15;
33:4,23;48:6;59:17;
73:5;74:17
**type (1)**
72:22
**types (1)**
43:12

**U**

**ultimately (1)**
52:22
**Um-hum (1)**
71:23
**uncertain (1)**
6:25
**unconsent (1)**
53:6
**under (16)**

7:24;8:1;26:17;
38:3,7;61:15;63:22,
23;66:1,9,10;67:17;
68:24;70:23,23;72:16
**underneath (1)**
65:12
**Understood (3)**
12:14;33:3;57:23
**undertook (1)**
29:6
**UNIDENTIFIED (1)**
45:3
**unless (7)**
6:10;18:9;35:16,20;
45:1;50:10;71:15
**unsurprisingly (1)**
61:13
**untrue (1)**
64:4
**up (15)**
7:5;8:1,7;12:22;
13:14;17:7;20:13;
23:1;29:23;36:18;
38:13;41:5;42:9;
49:11;58:13
**upon (2)**
53:19;72:3
**use (41)**
22:10;28:16,23;
29:5,7;44:12,12;50:9;
51:12,21;56:9;57:11;
58:24;59:5,13;60:7,
10,13,15,25;62:1,11,
19,23,24,25;63:3,9,9,
18,21,23,25;64:2,9,
10;65:20,23;66:6;
68:1,11
**used (6)**
22:19;27:5;31:1;
48:19;67:22;68:6
**uses (1)**
61:23
**using (5)**
26:13;34:10;35:25;
45:9;65:11
**utilities (1)**
72:14
**utility (1)**
72:11

**V**

**vacating (1)**
74:1
**valid (1)**
67:4
**variables (1)**
36:9
**various (3)**
6:1;15:15;66:14
**versus (3)**
23:5;40:19;75:22
**view (1)**

7:1
**VILLEGAS (10)**
4:15;9:19,19,24;
15:20;16:10,10;17:6,
12,20
**violating (1)**
39:2
**virtually (3)**
43:10;45:24;46:2,3;
47:4;48:16;51:12,13,
13
**visual (1)**
34:20
**visually (2)**
31:7;34:23
**voltage (3)**
62:9;64:14;76:2
**volume (1)**
9:13

**W**

**Wait (2)**
29:12;56:2
**walk (1)**
59:15
**wants (6)**
50:23;66:6,7;68:7;
69:20;73:10
**war (1)**
58:5
**Ward (3)**
49:14;56:6,14
**Watkins (1)**
5:20
**way (9)**
13:3;14:9;28:22;
32:19;41:10;44:4;
45:12;59:13;76:4
**wedded (1)**
7:4
**week (2)**
13:14;19:10
**weeks (2)**
20:2,3
**weigh (2)**
7:23;14:15
**weighed (1)**
10:5
**weighs (1)**
17:18
**Weil (1)**
4:12
**welcome (1)**
76:10
**weren't (3)**
30:6;34:19;44:13
**west (2)**
4:25;23:7
**what's (7)**
17:13;25:11;30:2;
37:13;40:12;42:4;
44:20

**wheel (1)**
15:16
**whereby (1)**
10:1
**Whereupon (1)**
77:3
**whole (1)**
28:16
**willing (2)**
6:14;7:5
**win (1)**
15:2
**wins (1)**
50:23
**wire (19)**
23:16,20;24:7,9;
25:7;26:2,6,17,22;
31:1,11,20;32:8;41:9;
44:21;47:10,11;49:5;
54:16
**wires (29)**
24:10;25:4;26:1;
27:14;28:7;29:3;33:7,
22;34:3,10;35:11,14,
19,24;39:20;48:15;
51:1,12;52:22;53:2,4,
9,16,19;57:17;65:18;
66:1;70:23,25
**wish (4)**
13:10;14:15;55:2;
74:25
**withdraw (7)**
15:22;16:5,13,19,
23;17:5,15
**within (3)**
43:5;44:10;48:21
**without (1)**
60:3
**witness (1)**
40:1
**witnesses (1)**
73:20
**word (7)**
17:16;22:19,20;
30:22;33:4;50:18;
51:12
**words (5)**
26:13;40:13;53:7;
57:1,16
**work (9)**
17:11;19:19;20:5,7,
8,9;30:5;54:20;73:19
**working (2)**
18:21;21:8
**works (2)**
13:13,20
**worrying (3)**
20:16,18,18
**worse (1)**
12:21
**worth (1)**
20:18
**writing (2)**

15:6;30:1
**wrongful (1)**
34:4

**Y**

**yards (2)**
32:3,4
**year (1)**
20:21
**years (11)**
18:22;34:24;38:19;
51:19;52:10;56:11;
57:11;58:7;59:23,24;
62:10
**yesterday (1)**
16:12

**Z**

**Ziehl (1)**
4:16
**Zimmer (1)**
55:12

**1**

**1 (1)**
45:3
**10 (2)**
32:20;73:22
**10:00 (1)**
4:1
**100 (1)**
23:2
**100-degree (1)**
34:11
**101 (1)**
23:2
**11 (3)**
23:2;31:17;63:14
**115-page (1)**
12:1
**120 (2)**
12:19,19
**13 (1)**
43:1
**14 (1)**
47:23
**150 (1)**
12:19
**15th (12)**
6:19;8:5,8,9;9:8,16;
11:4;13:18;14:4,5;
15:9,11
**16th (3)**
45:20;72:21;74:2
**175 (1)**
32:19
**180 (1)**
12:19
**19 (1)**
4:1

Case: 19-30088    Doc# 14242    Filed: 12/21/23    Entered: 12/21/23 05:08:50    Page 91
of 92

**190 (2)**
 45:5,6
**1st (1)**
 12:10

**2**

**2 (1)**
 43:9
**2000 (2)**
 56:7,8
**2010 (1)**
 66:12
**2012 (1)**
 43:7
**2017 (1)**
 51:14
**2018 (9)**
 29:6;34:19,25;
 35:18,24;38:24;43:8;
 44:20;56:8
**2023 (1)**
 4:1
**250 (1)**
 59:19
**26 (1)**
 63:15
**270 (3)**
 45:5,6,7
**28 (1)**
 63:15
**280 (8)**
 22:25;23:1,1,6,8;
 26:14,15;34:11

**3**

**30th (6)**
 6:20;8:6;9:10;12:9;
 14:5;15:10
**325 (2)**
 66:10;71:15
**350 (3)**
 32:17,25;33:5
**382 (1)**
 59:18

**4**

**4,500 (1)**
 17:8
**4.9 (4)**
 47:13,15;48:25;
 49:10
**450 (1)**
 33:18

**5**

**500 (1)**
 31:18

**7**

**701 (1)**
 59:8

**8**

**801 (2)**
 59:10,11
**820 (1)**
 62:18
**829 (2)**
 63:22;69:15
**8th (1)**
 13:17

**9**

**90 (1)**
 12:21
**9th (3)**
 73:15,17,22

Case: 19-30088   Doc# 14242   Filed: 12/21/23   Entered: 12/21/23 05:08:50   Page 92 of 92