**LABATON KELLER SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Thomas G. Hoffman, Jr. (*pro hac vice*)
140 Broadway
New York, New York 10005

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin (*pro hac vice*)
Andrew Behlmann (*pro hac vice*)
Scott Cargill (*pro hac vice*)
Colleen Restel
One Lowenstein Drive
Roseland, New Jersey 07068

*Lead Counsel to Securities Lead Plaintiff and the Class*

*Special Bankruptcy Counsel to Securities Lead Plaintiff and the Class*

**MICHELSON LAW GROUP**
Randy Michelson (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, California 94104

*Local Bankruptcy Counsel to Securities Lead Plaintiff and the Class*

*Additional counsel listed on Exhibit A*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION

- and –

PACIFIC GAS AND ELECTRIC COMPANY,

Debtors.

☒ Affects Both Debtors
☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company

**Case No. 19-30088 (DM) (Lead Case)**

**Chapter 11**

**(JOINTLY ADMINISTERED)**

**LEAD PLAINTIFF PERA AND THE SECURITIES ACT PLAINTIFFS' REPONSE AND OPPOSITION TO THE REORGANIZED DEBTORS' THIRTY-THIRD SECURITIES OMNIBUS CLAIMS OBJECTION**

United States Bankruptcy Court
Courtroom 17, 16th Floor
San Francisco, CA 94102

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... v

I.  INTRODUCTION ........................................................................................................... 1

    A.  The Exchange Act Claims ................................................................................. 1

    B.  The Securities Act Claims ................................................................................. 7

II. RELEVANT FACTUAL BACKGROUND FOR EXCHANGE ACT CLAIMS ........... 10

    A.  Judge Alsup Ruled that PG&E's Conduct Violated the Company's Felony Probation ....................................................................................................... 10

    B.  Subsequent Judicial and Regulatory Findings Corroborate  PG&E's Knowledge of the Company's Pervasive Safety Violations ................................. 11

    C.  The Alleged Misstatements Falsely Portrayed  PG&E as a "Prudent" Manager ......................................................................................................... 15

III. THE TAC MORE THAN ADEQUATELY PLEADS EXCHANGE ACT CLAIMS ....................................................................................................................... 19

    A.  The TAC More than Adequately Pleads Falsity ................................................... 19

        1.  Misstatement Nos. 1, 10, and 11 Misrepresented Inspection Frequency and Spending on Vegetation Management ............................ 20

            (a)  Well-Plead Facts Show that Vegetation Management Misstatement Nos. 1, 10, and 11 Were False When Made .......... 21

            (b)  PG&E Must Abuse Judicial Notice to Defend these Statements .................................................................................. 22

        2.  Misstatement Nos. 2, 4-5, 9, and 12-19 Misrepresented PG&E's Compliance with Wildfire Safety Regulations ......................................... 23

            (a)  PG&E's Misstatement Nos. 2, 4-5, 9, & 12-14 Warranting Compliance with Safety Regulations Were False When Made ......................................................................................... 24

                (i)  PG&E Never Complied with Inspection Regulations During the Class Period .................................................... 25

                (ii)  PG&E Never Complied with Pole Integrity Regulations During the Class Period .................................................... 27

                (iii)  PG&E Never Complied with Vegetation Management Regulations During the Class Period ................................ 28

(b) PG&E's Misstatement No. 17 Detailing Compliance Implementation Affirmatively Misrepresented Facts .................. 29

(c) PG&E's Misstatement Nos. 15, 16, 18 and 19 About Compliance with ESRB-8 Affirmatively Misrepresented Facts ................................................................................................ 30

3. PG&E's Misstatement No. 3 that Reclosers Would Soon Be Discontinued Was False and Misleading ................................. 32

4. The Alleged Misstatements Were Actionably False ................................ 33

(a) The Alleged Misstatements Are Distinguishable from the Statements at Issue in the *Edison* Cases ...................................... 34

(b) PG&E's Statements About Compliance Affirmatively Misrepresented Material Facts ....................................... 38

B. The TAC More than Adequately Pleads Scienter ................................. 41

1. PG&E Senior Management Knew of or Recklessly Disregarded Facts Inconsistent with the Alleged Misstatements ..................... 42

(a) The Facts Underlying All 19 Misstatements Were Logged in a Real-Time Database and Known to PG&E Senior Management .................................................. 42

(b) PG&E Senior Management Actually Monitored the Database ................................................. 44

(c) Unusual Motives Strengthen Scienter ........................................... 47

(d) Departures by Four PG&E Senior Executives Strengthens Scienter ...................................... 48

(e) PG&E's Changing Story Strengthens the Inference of Scienter ...................................... 48

2. "Core Operations" Allegations Plead a Strong Inference of Scienter ..................................... 49

(a) Safety Compliance Was a Core Operation ................................. 49

(b) PG&E Senior Management Was Directly Involved with Safety Issues and Had Actual Access to the Concealed Facts ................................................. 50

(c) It Would Be Absurd to Suggest that PG&E Senior Management Lacked Knowledge of the Company's Safety Violations ....................................... 51

C.  The TAC More than Adequately Pleads Loss Causation ..................................... 52

D.  PG&E's "Truth on the Market" Argument Is Insufficient and Improper at the Pleading Stage .......................................................................... 58

E.  The TAC More than Adequately Pleads Control Person Liability Under §20(a) ............................................................................................. 61

IV.  THE TAC MORE THAN ADEQUATELY PLEADS SECURITIES ACT CLAIMS ............................................................................................. 61

A.  Brief Summary of the Relevant Alleged Facts for the Securities Act Negligence Claims ........................................................................... 61

B.  As the Issuer of the Offerings, PG&E Is Strictly Liable for the Misrepresentations in the Offering Documents ................................... 64

C.  Because Securities Act Plaintiffs' Securities Act Claims Do Not Sound in Fraud, Rule 8 Pleading Applies to the Securities Act Claims ............................. 66

D.  PG&E's Offering Documents Contained Material Misstatements Regarding the Company's Commitment to Safety and Safety Practices ............. 68

1.  Because PG&E Has Failed to Properly Address the Grounds for Dismissal, It Has Waived Them ................................................. 68

2.  The TAC Sufficiently Alleges that the Offering Documents' Risk Warnings Were Materially False and Misleading When Issued ............... 69

3.  The TAC Sufficiently Alleges that the Offering Documents Misled Investors Regarding PG&E's Investments in Infrastructure and Vegetation Management ......................................................... 73

4.  The TAC Sufficiently Alleges that the April 2018 Offering Further Misled Investors About PG&E's Deficient Safety Practices and the Financial Consequences of PG&E's Safety Deficiencies ...................... 75

5.  The TAC Sufficiently Alleges that the Offering Documents Are Actionable Because They Failed to Disclose Known Trends in Violation of SEC Regulation S-K ............................................. 76

6.  The Unpublished *Edison* Opinions Are Inapposite and Not Binding on This Court ................................................................. 79

E.  PG&E's Truth-on-the-Market Defense and Materiality Challenges Fail at the Pleading Stage ............................................................... 81

F.  PG&E's Remaining Attacks on Falsity, on the Grounds of Materiality, Fail Because the Offering Documents Materially Misled Investors About PG&E's Safety Practices ........................................................ 86

G.      PG&E's Other Affirmative Defenses Are Meritless and Fail to Clear the High Hurdle for Dismissal ................................................................. 88

     1.      Plaintiffs Have Timely Alleged Each of Their Securities Act Claims ................................................................................ 88

     2.      Plaintiffs Have Standing to Bring Claims on Behalf of Purchasers in Each Offering ........................................................ 93

         (a)      Plaintiffs Have Class Standing ....................................... 93

         (b)      Plaintiffs Have Standing, and Need Not "Plead Reliance," for the March 2016 Offering ............................. 95

         (c)      As an Aftermarket Purchaser of PG&E Bonds Purchased Pursuant to and in Reliance on the April 2018 Offering Documents, Plaintiff Warren Has Standing for the April 2018 Offering .............................................................. 96

     3.      Plaintiffs Have Pled All Elements of their Securities Act Claims, None of Which Can Be "Negated" by PG&E's Negative Causation Defense at the Pleadings Stage ............................... 98

     4.      The Securities Act Plaintiffs Have Damages and Other Remedies ........ 101

H.      Control Person Liability Has Been Sufficiently Alleged .................................... 103

V.      THE CLAIMANTS WHO HOLD UTILITY SENIOR NOTES CLAIMS DID NOT RELEASE THEIR SECURITIES CLAIMS UNDER THE PLAN AND CONFIRMATION ORDER ................................................................. 103

VI.      CONCLUSION ................................................................. 105

**TABLE OF AUTHORITIES**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016)...................................................91

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ........................................................99

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010)..............................................70

*Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc., Sec. Litig).*,
87 F.4th 934 (9th Cir. 2023) ....................................................*passim*

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...........................................58

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................59

*Anvan Realty & Mgmt. Co. v. Marks*,
680 F. Supp. 1245 (N.D. Ill. 1988) ...............................................69

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .....................................................97

*In re Atossa Genetics Inc Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ................................................4, 22, 25

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010)...........................................90

*Barnes v. Edison, Int'l*,
2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*,
2022 WL 822191 (9th Cir. 2022) ...........................................*passim*

*Barnes v. Edison, Int'l*,
2022 WL 822191 (9th Cir. Mar. 18, 2022)...................................*passim*

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013).............................................101

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).............................................................66, 82

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................7, 66

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ......................................................................... *passim*

*Bielousov v. GoPro, Inc.*,
  2017 WL 3168522 (N.D. Cal. July 26, 2017)......................................................48

*Booth v. Strategic Realty Tr., Inc.*,
  2014 WL 3749759 (N.D. Cal. July 29, 2014)................................................88, 90

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ................................................82, 85

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ...............................................................88

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .........................................................6

*Casella v. Webb*,
  883 F.2d 805 (9th Cir. 1989) ..........................................................................102

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ..........................................................................95

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ..............................................................47, 48, 51

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ...............................................................95

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) ............................................................................87

*Cooper v. SEC*,
  788 F. App'x 474 (9th Cir. 2019) ......................................................................69

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
  934 F. Supp. 2d 1219 (C.D. Cal. 2013) ..................................................85, 91, 95

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................89, 95

*Crews v. Rivian Auto., Inc.*,
  2023 WL 4361098 (C.D. Cal. July 3, 2023)........................................................78

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ....................................................................101

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ....................................................53, 55, 65, 104

*In re DDi Corp. Sec. Litig.*,
  2005 WL 8157394 (C.D. Cal. Jan. 7, 2005) ..............................................90

*Degulis v. LXR Biotechnology, Inc.*,
  1997 WL 20832 (S.D.N.Y. Jan. 21, 1997) .................................................65

*Doyun Kim v. Advanced Micro Devices, Inc.*,
  2019 WL 2232545 (N.D. Cal. May 23, 2019) .......................................51, 52

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..........................................................................52, 91

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ......................................................95

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
  2005 WL 1869289 (N.D. Cal. Aug. 5, 2005) ...............................65, 68, 90

*F.D.I.C. v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ...........................................90

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ......................................................83

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ...................................................................87

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ......................................................................99

*Feyko v. Yuhe Int'l, Inc.*,
  2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ..............................................66

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ...................................................................47

*Ge Dandong v. Pinnacle Performance Ltd.*,
  2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ...........................................96

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) ......................................................95

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .................................................................92

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ...................................................................29

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) ......................................................72

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)..................................................................66

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ..........................................97, 98, 101

*Hoang v. ContextLogic, Inc.*,
  2023 WL 6536162 (N.D. Cal. Mar. 10, 2023)................................66, 67

*In re Houchin*,
  2020 WL 3048194 (B.A.P. 9th Cir. June 2, 2020) .............................41

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .........................................47, 61

*Hutchison v. CBRE Realty Fin., Inc.*,
  638 F. Supp. 2d 265 (D. Conn. 2009), *aff'd on other grounds sub nom.*
  *Hutchinson v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)...........................................65

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008)...................................47

*In re Impinj, Inc., Sec. Litig.*,
  2019 WL 4917101 (W.D. Wash. Oct. 4, 2019) ..........................54

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................96

*In re Interlink Elecs., Inc., Sec. Litig.*,
  2008 WL 4531967 (C.D. Cal. Oct. 6, 2008).......................... *passim*

*In re Juniper Networks, Inc. Sec. Litig.*,
  542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..............................44

*Khoja v. Orexigen Therapeutics, Inc.*
  899 F.3d 988 (9th Cir. 2018) ................................... *passim*

*Knollenberg v. Harmonic, Inc.*,
  152 F. App'x 674 (9th Cir. 2005) ....................................65, 67

*Lanza v. Drexel & Co.*,
  479 F.2d 1277 (1973)................................................65

*Leventhal v. Chegg, Inc.*,
  2024 WL 924484 (N.D. Cal. Mar. 4, 2024)............................56

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) .........................96, 97, 98

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ............................................................61

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ............................................................90

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d (9th Cir. 2016) ...............................................54, 56, 57, 58

*Loritz v. Exide Techs.*,
   2014 WL 4058752 (C.D. Cal. Aug. 7, 2014).....................................97

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ............................................................85

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D.W. Va. 2012)............................................40

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)................................................................... *passim*

*Mauss v. NuVasive, Inc.*,
   2018 WL 656036 (S.D. Cal. Feb. 1, 2018) ........................................54

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) .............................................57

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   65 F.3d 1044 (2d Cir. 1995).............................................................103

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
   2011 WL 13127544 (C.D. Cal. Sept. 13, 2011) ................................98

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) .....................................................94, 95

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
   543 F.3d 150 (3d Cir. 2008), *aff'd sub nom. Merck*,
   559 U.S. 633 (2010)..........................................................................89

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010)..........................................................................89

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)..............................................................61

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018), *cert. denied*,
   139 S. Ct. 2741 (2019).............................................................. *passim*

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
2022 WL 17815767 (2d Cir. Dec. 20, 2022), *cert. granted*,
144 S. Ct. 479, 216 L. Ed. 2d 1312 (2023) .............................................................79

*Monroe v. Hughes*,
31 F.3d 772 (9th Cir. 1994) .............................................................65

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .............................................29, 39, 52

*Nathanson v. Polycom, Inc.*,
2015 WL 12964727 (N.D. Cal. Apr. 16, 2015) .............................................69

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012).............................................................94

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .............................................................46, 72

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .............................................55, 57, 58

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .............................................................77

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................38, 39, 40, 41, 66, 76

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .............................................................5

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) .............................................................41

*In re PG&E Corp. Sec. Litig.*,
No. 5:18-cv-03509-EJD (N.D. Cal.) (ECF 121) ............................................. *passim*

*In re PG&E Corp. Securities Litigation*,
No. 18-CV-03509 (N.D. Cal. Mar. 18, 2019).............................................................92

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd on other grounds sub nom.*
*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019) ................................................................. *passim*

*Plumley v. Sempra Energy*,
2017 WL 2712297 (S.D. Cal. June 20, 2017).............................................86-87

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .............................................................87

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
  898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) .................. 101

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .......................................................... *passim*

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986) .......................................................................... 103

*Reckstin Family Tr. v. C3.AI, Inc.*,
  2024 WL 734497 (N.D. Cal. Feb. 22, 2024) ................................................ 68

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ............................................................... 76

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) *overruled on other grounds by*
  *City of Dearborn Heights v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ......................................................... *passim*

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) .................................................... 97-98

*In re Regulus Therapeutics Inc. Sec. Litig.*,
  2019 WL 4242485 (S.D. Cal. Sept. 5, 2019) .............................................. 54

*Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) ............................................................... 89

*Rieckborn v. Jefferies LLC*,
  81 F. Supp. 3d 902 (N.D. Cal. 2015) ................................................... 67, 90

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) .................................................. 100

*Robinson v. Transunion, LLC*,
  2016 WL 5339807 (N.D. Cal. Sept. 23, 2016) ............................................. 90

*Rubke v. Cap. Bancorp Ltd*,
  551 F.3d 1156 (9th Cir. 2009) ........................................................ 20, 66

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................... 46, 70

*S.E.C. v. Phan*,
  500 F.3d 895 (9th Cir. 2007) ............................................................. 59

*In re Safety-Kleen Corp.*,
  2002 WL 32349819 (D.S.C. Mar. 27, 2002) ................................................ 98

*Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*,
   2024 WL 775195 (S.D.N.Y. Feb. 26, 2024)..................................................68, 69

*Shenk v. Mallinckrodt plc*,
   2019 WL 3491485 (D.D.C. July 30, 2019)................................................................83

*Smilovits v. First Solar Inc.*,
   119 F. Supp. 3d 978 (D. Ariz. 2015), *aff'd*,
   881 F.3d 750 (9th Cir. 2018) ...............................................................................56

*In re Snap Inc. Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018) ........................................76, 102, 103

*Stiner v. Brookdale Senior Living, Inc.*,
   665 F. Supp. 3d 1150 (N.D. Cal. 2023) ................................................................95

*Sundaram v. Freshworks Inc.*,
   2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) ......................................................78

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007).................................................................................4, 21, 41

*In re Thoratec Corp. Sec. Litig.*,
   2006 WL 1305226 (N.D. Cal. May 11, 2006) ........................................................58

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
   33 F. Supp. 3d 1107 (N.D. Cal. 2014) ..................................................................65

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*,
   720 F.3d 1174 (9th Cir. 2013) ..............................................................................90

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
   2017 WL 3097184 (N.D. Cal. June 22, 2017) ......................................................40

*Va. Bankshares v. Sandberg*,
   510 U.S. 1083 (1991)............................................................................................82

*In re Velti PLC Sec. Litig.*,
   2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)..........................................................67

*In re Violin Memory, Inc. Sec. Litig.*,
   2015 WL 1968766 (N.D. Cal. Apr. 30, 2015) ......................................................99

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014).........................................................79

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   2017 WL 3058563 (N.D. Cal. July 19, 2017).........................................................95

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,

328 F. Supp. 3d 963 (N.D. Cal. 2018) ...................................................62

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ..............................................................40, 87

*Welgus v. TriNet Grp., Inc.*,
2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ...........................................93

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017), *aff'd*,
765 F. App'x 239 (9th Cir. 2019) ...........................................................95

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ........................................................101, 103

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) ........................................................*passim*

*Youngers v. Virtus Inv. Partners Inc.*,
195 F. Supp. 3d 499 (S.D.N.Y. 2016) ....................................................95

*Yourish v. Cal. Amplifier*,
191 F.3d 983 (9th Cir. 1999) ................................................................49

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ....................................................41, 48, 61

**Statutes**

15 U.S.C. § 77a *et seq*. .............................................................................7

15 U.S.C. § 77k ........................................................................................1

15 U.S.C. § 77k(a) ..................................................................................96

15 U.S.C. § 77k(e) ..................................................................................10

15 U.S.C. § 77o ........................................................................................1

15 U.S.C § 77l(a)(2) ...............................................................................10

15 U.S.C. § 77m .....................................................................................89

15 U.S.C. § 78j(b) ....................................................................................1

15 U.S.C. § 78t(a) ..............................................................................1, 61

Private Sec. Litig. Reform Act of 1995 .................................................41

Securities Act of 1933 ....................................................................*passim*
Securities Act Section 12(a)(2) .............................................................77

Securities Act Section 15(a)......................................................................................104

Securites Exchange Act of 1934
    Exchange Act Section 10(b) ...................................................................1, 20, 62
    Exchange Act Section 11 .................................................................... *passim*
    Exchange Act Section 20(a)...............................................................1, 20, 61, 62

**Rules and Regulations**

17 C.F.R. §229.105(a)...............................................................................................77

17 C.F.R. §229.303(a)(3)(i)-(ii) ...............................................................................77

17 C.F.R. §240.10b-5...................................................................................................1

Cal. Const. art. 1 § 19 ...............................................................................................16

Cal. Pub. Res. Code § 451 ...................................................................................29, 30

Cal. Pub. Res. Code § 4292 .......................................................................................29

Cal. Pub. Res. Code § 4293 ...........................................................................10, 29, 30

Cal. Pub. Utility Code § 451 .........................................................................15, 16, 28

FERC Elec. Reliability Standard FAC-003-4 ............................................................15

Fed. R. Civ. P. 8 ................................................................................................ *passim*

Fed. R. Civ. P. 8(a) ....................................................................................................67

Fed. R. Civ. P. 9(b) ..............................................................................................20, 41

Fed. R. Civ. P. 12(b)(6)..................................................................................... *passim*

Fed. R. Civ. P. 15(a)(2)............................................................................................106

Fed. R. Evid. 201(b)...................................................................................................23

Fed. R. Evid. 201(b)(2)...............................................................................................43

Fed. R. Evid. 802 .......................................................................................................43

Local Rule 3007-1(b)....................................................................................................4

**Other Authorities**

CPUC GO 165 ............................................................................................................15

Lead Plaintiff Public Employees Retirement Association of New Mexico ("**PERA**"), together with York County on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund ("**Securities Act Plaintiffs**" and, together with PERA, "**Securities Plaintiffs**", respectfully submit this memorandum opposing Reorganized Debtors' (together, "PG&E" or the "Company") sufficiency objection (ECF No. 14200 (the "Objection" or "OBJ")) to the Third Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws, filed on May 28, 2019 (the "TAC") in *In re PG&E Corp. Sec. Litig.*, No. 5:18-cv-03509-EJD (N.D. Cal.) (ECF 121) (the "District Action"). ("TAC").[1]

# I. INTRODUCTION

The TAC asserts class claims under both the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). The Exchange Act claims arise under §10(b) and SEC Rule 10b-5 promulgated thereunder (15 U.S.C. §§78j(b) and 17 C.F.R. §240.10b-5) for making false and misleading statements and omissions, as well as under §20(a) for controlling others' statements (15 U.S.C. §78t(a)); the Securities Act claims are under §§11 and 15 for making and controlling false or misleading statements and omissions in bond registrations (15 U.S.C. §§77k, 77o).

## A. The Exchange Act Claims

The Exchange Act claims are based on 19 false and misleading statements by PG&E that lured the investing public into believing that PG&E was a prudent, legally-compliant corporate citizen worth more than $71 per share and not the bankrupt wrongdoer it is now known to be.

For example, PG&E fraudulently assured investors that the Company (1) was "complying with state and federal regulations," (2) had "doubled" its "vegetation management spending," (3) "inspect[ed] every segment of" its powerlines "every year," and (4) "implemented" a so-called "protocol" that "necessitates" shutting off its power lines during specified "extreme fire danger conditions," among other representations about how prudently they managed Northern California's

---

[1] Unless otherwise indicated, capitalized terms herein have the same meaning as in the Motion.

electric grid. *See* ¶¶1-11, 258, 300-01.[2]

PG&E's misstatements concealed its rampant safety violations (*compare* to (1), above), its failure to increase vegetation management spending (2), its undisclosed policy to inspect powerlines only once every **five** years (3), and the lack of a promised backstop for shutting down its grid (4). *See* ¶¶188-320. Its 19 misstatements directly impacted investors' views of PG&E's ability to prevent fires and recover fire-related outlays, and hence, artificially inflated its share price. Maintaining a narrative of prudent management was key to avoiding ruinous liability, making PG&E's apparent safety and compliance deeply important to investors. *See* ¶¶317, 398. They were materially false and misleading. *See* §III.A., *infra*.

PG&E's need to conceal its noncompliance intensified in the middle of the Class Period,[3] when it was sentenced to criminal probation for other malfeasance (a deadly gas explosion it caused in San Bruno), including a condition that PG&E "Not Commit Another Federal, State, or Local Crime." ¶405. Thereafter, PG&E had further motive to convince the public—and courts—that its safety practices were compliant. ¶415. Meanwhile, PG&E remained dangerously noncompliant, and knowing or at least recklessly continued warranting to the contrary, given that it maintained real-time databases for vegetation maintenance (¶¶394-95, 423-24) and tower inspection records (¶¶107, 118, 130-40, 420-22) that logged thousands of violations for each of the misstatements at issue. PG&E senior management not only had access to these real-time databases (¶¶422-25), which showed precisely the safety violations that undermined their statements **and** caused the wildfires (¶¶111-24), but even more importantly, they personally monitored these real-time databases (¶¶142, 172, 287, 398-403, 433).

Given these and other well-plead allegations, it is not credible that PG&E could have been acting with nonfraudulent intent when making itself seem prudent compliant—a false impression that the public believed so strongly that they were truly "surprised" by PG&E's imprudence (¶¶ 39, 111-124, 349, 359, 391)—which diverged dramatically and tragically from reality. Having now pleaded guilty to 84 counts of manslaughter after admitting the extensive factual predicates of these

---

[2] References to the TAC are denoted "¶__." Alleged misstatements are ***bolded and italicized***.
[3] The Class Period is April 29, 2015 through November 15, 2018. *See* ¶ 1.

serious charges, PG&E's Class Period assurances of legal compliance and other safety practices were knowingly (or at least recklessly) false when made. *See* §III.B., *infra*. As Judge Alsup stated in his April 29, 2020 order modifying PG&E's probation:

> This failure is upon us because **for years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid**—to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures . . . . Yet **because PG&E skimped on vegetation maintenance, an ever-greater backlog of hazard trees and hazard limbs grew year after year**.

RJN Opp. Ex. 8 at 1, 3.[4]

Thus, when investors paid up to $71.56 for PG&E shares during the Class Period (a month before the fraud began to unravel), they overpaid, because the Company's material misstatements and omissions concealed dangerous safety and compliance failures that artificially inflated its stock price. ¶321. When the natural and probable consequences of that concealment were disclosed in nine discrete events related to the wildfires, PG&E's share price declined by $55.60. ¶320. The proximate cause of investor losses was not the wildfires themselves, but instead the revelation of information previously concealed by PG&E's misstatements and omissions. *See* §III.C., *infra*. When the truth about the extent of PG&E's concealed imprudence was fully revealed, the Company's stock price ultimately declined to $17.74 per share, and those who purchased PG&E securities at inflated prices during the Class Period suffered substantial damages. ¶¶321-90. When investors began to realize the impact on PG&E's solvency, its bonds declined as much as 27% below par value. ¶505.

The Objection is primarily constructed on two pillars that are so structurally unsound they are easily toppled.

The first unsound pillar underlying the Objection is the Company's request for this Court to

---

[4] Citations denoted "RJN Opp. Ex. _" refer to the exhibits to the Hoffman Decl. in Support of Lead Plaintiff's Opposition to and Request for Judicial Notice filed concurrently herewith. Unless stated otherwise, all emphasis is added and internal citations, quotations and alterations are omitted. "RJN" refers to the Omnibus Request for Incorporation of Documents by Reference or Judicial Notice in Support of Reorganized Debtors' Thirty-Third, Thirty-Fourth and Thirty-Fifth Securities claims Omnibus Objections, ECF 14208 (Dec. 13, 2023).

judicially notice more than **4,300** pages of documents (the "RJN"), which the Objection cites an astounding **364** times. Tellingly, the Objection cites the TAC only 164 times. In other words, the RJN is the primary basis for the Objection. But the RJN merely highlights the existence of numerous disputed factual issues the Court cannot resolve at this procedural stage. As the Court has reasoned, whether the Motion is construed as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or a preliminary hearing for a claims objection process governed by Bankruptcy Local Rule 3007-1(b), the Court must assume that the facts pled are true at this procedural stage. Jan. 24, 2024 Hr'ing Tr. at 48:11 - 50:23; *see Reilly v. Wells Fargo Bank, N.A.* (*In re Reilly*), 2020 Bankr. LEXIS 426 at *18, 2020 WL 710371 at *7 (B.A.P. 9th Cir. Feb. 11, 2020) (claimant "entitled to the presumption of prima facie validity of its claim in the amount stated"); *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 748 (S.D.N.Y. 2008) ("[D]ismissing a proof of claim pursuant to 11 U.S.C. § 502(c) is equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6)"); *see also Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007) (on a motion to dismiss, "courts must . . . accept all factual allegations in the complaint as true"). The Court also must "construe them in the light most favorable to plaintiffs." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017).

While a court may take judicial notice of specific, undisputed facts or examine a document that is incorporated by reference in a pleading, that "does not mean that every assertion of fact within that document is judicially noticeable for its truth," and further, "a court cannot take judicial notice of disputed facts." *Khoja v. Orexigen Therapeutics, Inc.* 899 F.3d 988, 999 (9th Cir. 2018). As set forth in detail in Plaintiff's separate opposition to the RJN, the RJN is improper because its contents overwhelmingly fail the applicable tests for incorporation by reference or judicial notice in the Ninth Circuit, and because PG&E uses those documents to introduce errors and mischaracterizations of the TAC's well-pled allegations. At most, the Objection and the RJN on which it is largely based provide this Court with a preview of coming attractions because, as the Court has noted, only "at summary judgment or trial or somewhere in the future, those facts will be relevant." Jan. 24, 2024 Hr'g Tr. at 50:24-25.

The second unsound pillar supporting the Objection is its overreliance on "*Edison I*" and "*Edison II*," which the Objection cites "*passim.*" OBJ at v (citing *Barnes v. Edison, Int'l*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. 2022) ("*Edison I*"), and *Barnes v. Edison, Int'l*, 2022 WL 822191 (9th Cir. Mar. 18, 2022) ("*Edison II*")).[5] PG&E argues that "the purportedly false statements that the *Edison* courts held were not actionable as a matter of law are **substantively identical** to the types of statements challenged in the TAC." OBJ at 33. But the *Edison* cases share only superficial similarities with the instant case in that they involve California utilities—there, Southern California Edison ("Edison")—and wildfires.

First, the Objection compares only four of the nineteen misstatements alleged here to those alleged in the *Edison* cases (*see Edison I*, 2021 WL 2325060, at *9), implicitly admitting that the vast majority of the misstatements alleged here are **not** comparable. Indeed, they are nowhere close. PG&E's own comparisons illustrate that the misstatements alleged here are not puffery because they are much more specific and "capable of objective verification." *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

For example, on November 2, 2017, in the days following the North Bay Fires, PG&E hosted a conference call with investors while the Company's stock price had already begun its decline. To reassure investors of PG&E's prudence, the Company's CEO stated that "*every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed*" and "[i]n 2016, *we spent an additional $200 million, essentially doubling our typical vegetation management spending last year*." ¶258. That was an objectively false statement because PG&E did **not** inspect its power lines every year and did **not** double its vegetation management spending. *See* §III.A.1., *infra*. Yet PG&E attempts to compare that misstatement to Edison's statement that "[Edison] is engaged in a *significant and ongoing* infrastructure investment program . . . [and] [i]n addition to operating practices designed to reduce the risk of wildfires, [Edison] also *invests significant amounts of capital to reduce wildfire risk*." OBJ at 33. There is no comparison. Unlike

---

[5] Notably, Judge Davila denied a motion to consider *Edison I* as supplemental authority in the related securities class action (District Court ECF No. 212 at 2), and the Ninth Circuit stated that its disposition in *Edison II* "is not appropriate for publication and is not precedent" (*Edison II*, 2022 WL 822191, at *2).

Edison's statement about "significant" investments, PG&E's misstatement references specific figures that are "capable of objective verification." *Apollo*, 774 F.3d at 606. That alone is dispositive under binding Ninth Circuit law.

In addition, the *Edison* decisions are also substantively distinguishable because they involve very different concealed, underlying conduct than the TAC. Indeed, in *Edison*, plaintiffs argued the defendants failed to disclose ***already*** "publicly available information regarding its safety practices and prior safety violations." *Edison II*, 2022 WL 822191, at *1. By contrast, here, PG&E's false statements were made in direct response to investor concerns about PG&E's safety practices—and the evidence demonstrating those statements were false comes in the form of PG&E's subsequent criminal guilty pleas, PG&E employee testimony (¶¶110, 208, 401, 568-69), and the findings of Judge Alsup (¶¶3, 104, 195, 205, 219, 229, 234, 242, 256, 262)—*i.e.*, facts that were in no way "publicly available" during the Class Period. In fact, it is now widely known that PG&E posed a far greater risk to the public than its peers, including Edison. *See* ¶412. Despite similarities in service size and miles of distribution lines, between 2014 to 2017, PG&E's equipment caused **4.5 times more wildfires** than Edison's. *See* ¶ 412. PG&E's equipment was also responsible for more large-scale fires than Edison. *See id.* Indeed, PG&E's "culture of a lack of safety is **unique**" amongst utilities, as one industry expert commented. ¶ 621.

Finally, the pleading standard is not as exacting as PG&E suggests. *See, e.g.*, OBJ at 4. This Courts need not address each alleged misstatement and corrective disclosure individually, like the counts of a criminal violation. *See, e.g.*, *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *3 (N.D. Ill. Feb. 27, 2018) ("Plaintiffs provide numerous allegedly misleading factual statements, but the court need not address them all. A few illustrative examples will suffice."); *In re Interlink Elecs., Inc., Sec. Litig.*, 2008 WL 4531967, at *4 (C.D. Cal. Oct. 6, 2008) ("Plaintiffs have adequately pled loss causation as to at least one date, the Court need not address the others.").

The TAC easily satisfies the pleading standards for the Exchange Act claims.

**B.     The Securities Act Claims**

PG&E's challenges to Plaintiffs' Securities Act claims also fail.[6] Because PG&E is the issuer of the offerings, the Securities Act renders it strictly liable for any materially misleading statement or omission in the Offering Documents. 15 U.S.C. §77a *et seq*. Thus, the inquiry before the Court is whether the TAC provides a "short and plain statement" from which it is plausible that PG&E violated the Securities Act for the misrepresentations alleged in the Offering Documents for the four note offerings at issue in this action. Fed. R. Civ. P. 8; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The answer is a resounding yes. As such, the Objection should be rejected with respect to the Securities Act claims.

To distract from its strict liability and the well-pled allegations in the TAC, the Objection on two flawed premises. First, in conclusory fashion, PG&E maintains that the Securities Act claims are identical to the Exchange Act claims, such that the claims fail, "axiomatically," for the same purported reasons as the Exchange Act claims. OBJ at 81.[7] A review of the TAC belies any such conclusion. The Securities Act allegations involve entirely segregated claims, with ***different statements***, ***different actors*** and ***different theories of liability*** than those pled for the Exchange Act claims. Indeed, the Securities Act claims involve: (1) 33 statements that are distinct from the 19 alleged to violate the Exchange Act, including repeatedly issuing false and misleading risk warnings not alleged to be false for purposes of the Exchange Act; (2) claims against different actors, such as directors and underwriters, who are not subject to Exchange Act claims; (3) claims that PG&E independently violated SEC Regulation S-K for each of the offerings by failing to disclose negative adverse trends; and (4) specific allegations regarding **bond** – not **stock** – price declines. With respect to the Securities Act claims, the Objection falls like a house of cards because it is largely predicated on the two types of claims being identical. But because Plaintiffs' Securities Act claims

---

[6] All terms not otherwise defined herein have the same meaning as set forth in the Additionally, "OBJ" refers to Reorganized Debtors' Thirty-Third Securities Omnibus Claims Objection to PERA and Securities Act Plaintiffs' TAC, Including to Certain Claimants that Adopted the TAC (ECF 14200), filed on December 13, 2023 in this action.

[7] Even if it were true that the Exchange Act claims and Securities Act claims were identical (they are not), the OBJ would still fail, because the challenges to the Exchange Act claims also fail, for the reasons described herein.

are distinct, they do not sound in fraud and PG&E's gamble of resting its dismissal of the claims on their attacks on the Exchange Act claims fails.

Second, PG&E compounds its fatal error of concluding that the Securities Act claims are identical to the Exchange Act claims by attempting to liken the claims here as identical to those brought in another litigation involving a different company (Edison), with different allegations and different factual circumstances underlying the claims. This is likely because the Securities Act claims brought in *Edison* were identical to the Exchange Act claims. Because that is not the case here, the non-binding and unpublished *Edison* opinions are inapplicable. But, there are myriad other reasons why the *Edison* opinions are not determinative of this motion.[8] For example, the Consolidated Second Amended Class Action Complaint for Violation of Federal Securities Laws, filed on November 27, 2019 (ECF 151) (the "*Edison* Complaint"), by plaintiffs in *Barnes v. Edison Int'l et al.*, No. 2:18-cv-09690 (S.D. Cal.) ("*Edison*"), involved stock offerings, not bond offerings, and it did not involve violations of SEC Regulation S-K, which independently required PG&E to disclose adverse trends. *Edison* is also a poor guide because the unpublished, not controlling decision was issued prior to Ninth Circuit law that controls specific issues the Court here must decide. For example, *Edison I* concluded that certain statements warning of possible liability were not false because that warned of harm had not fully materialized. But as discussed herein, the Ninth Circuit, in *Facebook*, subsequently clarified that "our case law ***does not require harm to have materialized*** for a statement to be materially misleading." *Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc., Sec. Litig.)*, 87 F.4th 934, 949 (9th Cir. 2023).[9] PG&E also relies heavily on *Edison* to argue that the Court can prematurely make the fact-intensive analysis necessary to decide that general facts concerning fires are sufficient to find some of Plaintiffs' Securities Act claims for bond offerings are time-barred based on allegations in *Edison* for Securities Act claims regarding stock drops. But the Ninth Circuit's *HP* opinion subsequently adopted a new standard for when the statute of limitations starts to run: that a "'reasonably diligent plaintiff has not "discovered" . . .

---

[8] The "*Edison* opinions" refer to the opinions issued in *Barnes v. Edison Int'l*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. 2022) ("*Edison I*") and *Barnes v. Edison Int'l*, 2022 WL 822191 (9th Cir. 2022) ("*Edison II*").

[9] Unless otherwise noted, citations are omitted and emphasis added throughout.

facts constituting a securities fraud violation until he can plead that fact with **sufficient detail and particularity** to survive a 12(b)(6) motion to dismiss.'" *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 465 (9th Cir. 2023). The Objection ignores these controlling opinions and other ways in which *Edison* is wholly inapplicable. Thus, even if the Court were to consider the *Edison* opinions, they do not support dismissal of the claims here.

Stripping the Objection of these two flawed premises, PG&E provides no credible basis for dismissal of the Securities Act claims. Notably, PG&E does not identify a single statement alleged to violate the Securities Act, or attempt to explain why a single statement was not false or misleading. Rather, it tries to bluster its way into dismissal based on conclusory assertions unsupported by the allegations before **this** Court. This is undoubtedly because the TAC plausibly alleges that the Offering Documents are actionable – they concealed PG&E's choice to disregard for years wide-spread safety deficiencies and, instead, diverted funds to pay for dividends and to prop up earnings. As Judge Alsup concluded, further highlighting ways in which PG&E is unique and cannot rely on *Edison*: "[T]his is a crisis, a crisis that California faces on these wildfires, and PG&E is the **single-most** culpable entity in the mix. . . . PG&E has started more than – **way more than its share** of these fires. . . . This is a problem of your own making. A lot of money went out in dividends that should have gone to the tree budget." ¶622.

PG&E's other challenges to the TAC fair no better. PG&E wrongly claims it is entitled to invoke a "truth-on-the-market" defense at the pleading stage, but points to no specific disclosures it made, or any specific statements alleged for the Securities Act Claims that were rendered non-misleading by the yet-to-be identified disclosures. Indeed, the case law is clear that a truth-on-the-market argument is an affirmative defense that cannot be decided on the pleadings. Nor can PG&E rely on *Edison* for its affirmative defense. As previously explained, unlike *Edison*, the Securities Act claims were not pled separately, and involved stock offerings, not bond offerings. PG&E wholly ignores this fatal distinction. Similarly, PG&E confuses the timing of stock price drops and bond price drops for its negative causation defense that it also improperly raises at the pleading stage. So there is no confusion, Plaintiffs were not required to plead causation for their Securities

Act claims and the negative causation defense is one that PG&E must prove by showing that bond price movements were not, in any way, causally connected to the alleged false Offering Documents. PG&E does not come close to meeting this standard. PG&E also baldly and prematurely claims that the Securities Act plaintiffs do not have damages. Again, this is but another affirmative defense improperly raised at the pleading stage. Regardless, PG&E ignores that the named Securities Act Plaintiffs do have damages under 15 U.S.C. §77k(e) and 15 U.S. Code §77l(a)(2). Indeed, the undisputed evidence is that the named Securities Act Plaintiffs bought notes at higher prices than they sold. District Action, ECF 121-2, 121-3, 121-4.

For all of the reasons herein, the Objection should be overruled.

## II.     RELEVANT FACTUAL BACKGROUND FOR EXCHANGE ACT CLAIMS

PG&E caused at least 17 of the 18 North Bay Fires that together inflicted more than $17 billion in damage. ¶¶19. PG&E then caused the 2018 Camp Fire, which resulted in more than $13 billion in damage. ¶33. PG&E's safety violations caused most of these fires and exacerbated them all. ¶¶112-24.

### A.     Judge Alsup Ruled that PG&E's Conduct Violated the Company's Felony Probation

After PG&E's pre-Class Period conduct led to a pipeline explosion and to six felony convictions (¶617), its criminal probation required that it "Not Commit Another Federal, State, or Local Crime." ¶405. The probation included safety compliance monitoring and reporting obligations (¶415) for which PG&E's Chief Ethics and Compliance Officer Julie Kane, who authorized 12 of the 19 alleged misstatements, was made responsible. ¶433. Moreover, Kane was charged with reporting issues directly to PG&E's CEO and to "ensure" compliance. ¶402.

After the Camp Fire, Judge Alsup launched an investigation into PG&E's safety violations that included hearings and testimony from PG&E. ¶¶407-12. On January 31, 2019, Judge Alsup ruled that PG&E violated its probation (¶411); he then held on March 5, 2019 that the "record demonstrates that PG&E's performance with respect to vegetation management has been dismal," exhibiting violations of CPRC "Section 4293" and other safety regulations (¶413). On April 2, 2019, he found that "PG&E over several years allowed the trees that needed to be removed to be

built up and did not remove them," which "was a major contributing factor, **maybe the single-biggest factor**, in causing the fires in 2017 and 2018 in Northern California." ¶414. He also found thousands of violations that caused hundreds of fires, including during the Class Period. ¶¶395 & 412.

### B. Subsequent Judicial and Regulatory Findings Corroborate PG&E's Knowledge of the Company's Pervasive Safety Violations

When the California Public Utilities Commission ("CPUC") audited PG&E's compliance failures in the vicinity of the Camp Fire from January 1, 2016 through May 15, 2019, it found that PG&E exceeded the statutory deadline for 904 known equipment hazards, including two "urgent" threats requiring "immediate response" that languished for 632 days. Overall, 14.35% of all work order records were "violations" because they were not completed within statutory deadlines. *See* RJN Opp. Ex. 9 at 3, 4.

On March 17, 2020, the Camp Fire Grand Jury entered an indictment for 84 counts of manslaughter against the Utility and one count of unlawfully causing a fire in connection with the Camp Fire. Having met for a year, hearing nearly 100 witnesses, reviewing approximately 1600 exhibits, and producing some 6000 pages of transcripts, the grand jury returned an indictment charging the Utility with "unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line." RJN Ex. 87 at 4  The Utility pleaded guilty as charged on all counts.

In an April 29, 2020 order modifying PG&E's probation, Judge Alsup stated:

> This failure is upon us because **for years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid**—to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures . . . . Yet **because PG&E skimped on vegetation maintenance, an ever-greater backlog of hazard trees and hazard limbs grew year after year**.

RJN Opp. Ex. 8 at 1,3 (*United States v. PG&E Co,*, No. 3:14-cr-00175-WHA (N.D. Cal.), ECF No. 1186, Order Modifying Conditions of Probation) at 1,3. Judge Alsup added that PG&E was still years away from regulatory compliance, or even compliance with its own plan, stating:

> PG&E has recently stepped up its hazard tree and limb operations, but still admits it

has fallen short. In truth, PG&E remains years away from compliance with California law and with its own wildfire mitigation plan. . . . When asked about its compliance, PG&E told the Court that given the "dynamic environment" of its purview, it remained "unable to certify perfect compliance" with the probation conditions . . . . That is an understatement.

*Id.* at 6. Indeed, 22,000 trees remained "unworked." *Id.* at 6.

On June 16, 2020, the Butte County District Attorney published a 92-page report titled "The Camp Fire Public Report: A Summary of the Camp Fire Investigation." *See* RJN Ex. 87 (the "Butte County DA Report"). The Butte County DA Report detailed the findings of an investigation aided by the California Attorney General and a specially empaneled grand jury (the "Camp Fire Grand Jury") convened to investigate the cause of, and any potential criminal liability arising from, the Camp Fire. The Camp Fire Grand Jury "heard nearly 100 witnesses, reviewed approximately 1,600 exhibits, and produced some 6,000 pages of transcript." Butte County DA Report at 3. The Report and the grand jury concluded: "The evidence developed during this investigation clearly established that the reckless actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk." *Id*. at 82. The Report was used to establish the factual basis for the Utility's guilty plea to 84 counts of involuntary manslaughter and one count of unlawfully causing a fire. *Id.* at 92.

According to the Butte County DA Report, PG&E has known about the risk of fire caused by equipment failure **since as early as 2006**: "Internal PG&E documents show that, by 2006, PG&E was aware that equipment failure (risk) causes fires. According to the October 2006 Risk Analysis of UrbanWild Land Fires, written by the PG&E Enterprise Risk Management Committee, in 2005 PG&E electrical equipment failures caused 20 fires . . . . The evidence clearly established PG&E has been aware of the risk/consequence connection between equipment failure and fire since at least 2005. Similarly, the evidence also clearly establishes that PG&E was aware of the risk/consequence connection between aging infrastructure and equipment failure." *See id.* at 73-75.

The Butte County DA Report confirmed that PG&E knew, but concealed, that equipment on the Caribou-Palermo line "had dangerously deteriorated." Cal Fire determined that the first ignition point of the Camp Fire was "the dry brush below Tower 27/222 of the Caribou-Palermo line," and

that the fire began when "a 'C hook' that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure." *Id*. at 9. Many components on towers of the Caribou-Palermo line, including Tower :27/222 and the C hook that broke, were from the original construction of the line, between 1919 and 1921, and had not been replaced. Specifically, "the insulator string hanging from the C hook [of Tower :27/222] that broke on November 8, 2018 was an original 1921 insulator."

Investigators also found that, at Tower :27/222 and at least one other tower on the Caribou-Palermo line, the C hooks hung from "bolted-on hanger plate holes [that] had been added to the transposition arms," instead of the original hanger holes, indicating PG&E's awareness of wear on the C hooks and hanger holes. *Id.* at 20-21, 31.

PG&E knew about wear on the C hooks and hanger holes on their transmission infrastructure as early as **1987**, when photographs in the "PG&E Laboratory Test Report" documented worn C hooks and hanger holes on transmission towers. *Id.* at 24, 78, 83. In 2011 and again in 2018, workers on PG&E's transmission line crews observed similar wear on hanger holes. In 2011, a Utility engineer noted in an email that "[i]t appears that there is a groove cutting into the plate probably caused by years of rubbing between the C-hook and the plate." And in 2018, a Utility lab report found that the wear was "attributed to wind-driven swinging of the insulators" and opined that the "useful life of the hanger plates" was 97-100 years. *Id.* at 78, 83-84.

Indeed, PG&E repeatedly reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire, increasing the risk of equipment failure. *Id.* at 50. According to the Butte County DA Report, PG&E changed its inspection and patrol policies over the decade preceding the Camp Fire and "drastically reduced the frequency and thoroughness of inspections." *Id.* at 23-25. Under the 1987 policy, "the Caribou-Palermo line was required to be patrolled three times each year: one ground patrol and two aerial patrols." The policy also required "climbing inspections of five percent of the tower structures per year; and an infrared patrol every five years." *Id.* Under policy changes that PG&E made in 1995,

"[t]he Caribou- Palermo line was reduced from three patrol/inspections (one ground/two aerial) per year to one ground inspection every 24 months and one aerial inspection every 24 months. Required routine climbing inspections were eliminated." *Id.* at 24.

In 2005—the Caribou-Palermo line was further "**reduced to only being inspected once every five years and patrolled once per year in non-inspection years**." *Id.* at 25.[10] But contrary to PG&E's promises to investors that "inspect[ed] all" or "every mile" or "every segment of" its powerlines "every year," (TAC ¶¶ 197, 211, 258, 264), PG&E's actual inspections and patrols of the Caribou-Palermo line did not even comply with the already-lowered ETPM standards. *Id.* at 23, 26, 37. This was particularly true "in low population density mountainous areas," such as where the Camp Fire began. *Id.* at 47. The report concluded:

> **The evidence clearly established that PG&E did not, in fact, follow the procedures and requirements established in the ETPM [and] it is reasonable to conclude the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO.**

*Id.* at 26. As alleged, PG&E had not inspected the tower responsible for the Camp Fire's first ignition point "(Tower :27/222) since August 2014, and prior to that, not since 2009, pursuant to an internal policy" that transmission lines be inspected only "every five years." ¶ 118.

The last "Detailed Ground Inspection" of the Caribou-Palermo line before the Camp Fire occurred in 2014 and, from 2015 to the Camp Fire in 2018, the line was subject only to inadequate, annual aerial patrols, *id.* at 37—which was concealed from investors. PG&E employees "denied it was possible to assess the wear on the C hooks and hanger holes" "during aerial patrols." *Id.* at 41.

---

[10] As alleged, "PG&E has admitted that an aerial patrol is not an inspection." ¶118. The Electric Transmission Preventative Maintenance Manual ("ETPM")—which went into effect in 2005—also differentiated between "inspections" and "patrols." Inspections were to be far more thorough, and were "to include detailed visual observations, operational readings, and component testing to identify abnormalities or circumstances that will negatively impact safety, reliability or asset life." Butte County DA Report at 24-25. During an inspection, "[i]ndividual elements and components are carefully examined through visual and/or routine diagnostic tests and the abnormal conditions of each are graded and/or recorded." *Id.* at 24. For a patrol, the inspector's "primary responsibility . . . is to visually observe the electric facilities, looking for obvious structural problems or hazards without the use of measuring devices, tools, or diagnostic tests, and to record that the facilities have been patrolled." *Id.* at 25.

1  Moreover, such patrols were inconsistent with the ETPM's guidance that "[o]nly climbing

2  inspections or lifted bucket inspections above 10 feet in the air would give the appropriate best view

3  for assessment of insulators and their connectors." *Id.*

4      Accordingly, PG&E knew of the safety violations that caused the Camp Fire for years, if not

5  decades. With this knowledge, PG&E misleadingly touted the Company's vegetation management

6  and infrastructure maintenance to investors, falsely representing that it complied with specific safety

7  regulations including annual inspections throughout the Class Period. In reality, PG&E's

8  widespread and systemic failures to properly inspect and maintain its equipment violated numerous

9  laws and regulations, including without limitation, California Public Utility Code § 451, CPUC GO

10 165, and FERC Electric Reliability Standard FAC-003-4. Cal Fire found evidence of numerous such

11 violations in assessing the causes of the North Bay and Camp Fires. ¶¶ 346, 353-354.

12     In January 2022, when PG&E's five-year probation ended, U.S. District Court Judge Alsup,

13 who had overseen the Company's probation, stated that "in these five years, **PG&E has gone on a**

14 **crime spree and will emerge from probation as a continuing menace to California**." Final

15 Comments of District Court Upon Expiration of PG&E's Probation, *United States of Am. v. Pac.*

16 *Gas & Elect.*, No. CR 14-0175 WHA, at 2 (N.D. Cal. Jan. 19, 2022), ECF No. 1559. He further

17 stated that "PG&E's backlog of unattended trees and vegetation was staggering at the outset of

18 probation," concluding:

19  **We remain trapped in a tragic era of PG&E wildfires because for decades it**
    **neglected its duties concerning hazard-tree removal and vegetation clearance,**
20  **even though such duties were required by California's Public Resource Code.**

21 *Id.*

22 **C.    The Alleged Misstatements Falsely Portrayed**
        **PG&E as a "Prudent" Manager**
23

24     Under California law rooted in the California Constitution, PG&E is strictly liable for

25 property damage from the wildfires it causes, but it is entitled to full reimbursement if it acted as a

26 "prudent" manager. ¶¶73-74 & 317. Specifically, Article 1, Section 19, of the California

27 Constitution states:

28     Private property may be taken or damaged for a public use and only when just

> compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.

The California Supreme Court has interpreted this provision as imposing a doctrine known as "inverse condemnation," whereby public utilities such as PG&E must compensate individuals whose real property has been damaged by the utility under a strict liability regime. However, a utility such as PG&E can recover those same costs from the CPUC – and pass the costs from the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and prudently operated and managed its system." ¶73 (quoting Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018) [hereinafter "July 12, 2018 CPUC Order"]).

California requires utilities to show that all requested charges are "just and reasonable" in order to be recovered in rates:

> All charges demanded or received by any public utility . . . shall be just and reasonable. Every unjust or unreasonable charge demanded or received by for such product or commodity or service is unlawful.

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

Cal. Pub. Util. Code § 451 (West). To ensure that charges requested by a utility are just and reasonable, and ensure that a utility has operated and maintained its system safely and reasonably, the CPUC has adopted the longstanding "Prudent Manager Standard." July 12, 2018 CPUC Order at 3.

In other words, PG&E bears the costs of wildfires it causes unless it can prove that it was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." July 12, 2018 CPUC Order at 5.

As this Court has reasoned, "[T]he prudent manager standard virtually guarantees cost spreading if the utility acted prudently, which is a far more lenient standard than strict liability. Thus, Debtors are likely guaranteed cost spreading if they act prudently." ECF No. 4895 at 10.

Embodied in this standard, at a minimum, is compliance with state safety laws and regulations. As the CPUC has summarized:

> A reasonable and prudent act is not limited to the optimum practice, method, or act to the exclusion of all others, but rather encompasses a spectrum of possible practices, methods, or acts consistent with the utility system needs, the interest of the ratepayers and the requirements of governmental agencies of competent jurisdiction . . .

> The greater the level of money, risk and uncertainty involved in a decision, the greater the care the utility must take in reaching that decision . . . .

> The burden rests heavily upon a utility to prove . . . that it is entitled to the requested rate relief and not upon the Commission, its staff, or any interested party to prove the contrary.

July 12, 2018 CPUC Order at 5-6; *see also* ¶74.

Importantly, "[e]ven if the fire would have started anyway, a reasonableness review looks at whether it acted reasonably and prudently **given what it knew or should have known about the potential safety risk**." July 12, 2018 CPUC Order at 10.

Public perception of PG&E's prudence was deeply important to investors. For example, in response to the May 25, 2018 news that PG&E safety violations were found responsible for some of the North Bay Fires, a Citigroup analyst commented that the Cal Fire reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages under Inverse Condemnation," as it would be "tough to meet" the "prudent manager" standard for recovering costs from ratepayers for these fires. ¶350.

Thus, PG&E's misstatements about the Company's safety practices falsely portrayed it as a "prudent" manager, thereby inflating its share price throughout the Class Period.

### D. PERA is Authorized and Has Standing to File this Response on Behalf of Securities Claimants

PERA files this Response on behalf of itself, the Securities Act Plaintiffs, and all Securities Plaintiffs that have formally or informally adopted the TAC and/or indicated their desire to join in

this Response with respect to the Claims Objections (the "**Adopting Securities Plaintiffs**"). In the first instance, pursuant to the *Order Authorizing Amendment and Objection Procedures for Securities Claimants*, entered July 28, 2023 [Dkt. 13934] (the "**Amended Procedures Order**"), this Court approved procedures that expressly permitted securities claimants to file an amended proof of claim adopting the TAC, either without or eventually with Court approval.

Subsequent to the entry of the Amended Procedures Order, on January 30, 2024, this Court entered its *Order Granting Motion of Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel* [Dkt. 14300] (the "**Appointment Order**"), based in part on the Court's finding that "[t]he unusual situation presented here is a fully underway bankruptcy claims objection process with nearly 2000 unresolved claims (many of which are held by pro se parties), running parallel to a Rule 23 class action proceeding. This is the quintessential poster child presenting the special circumstances that require the Motion to be granted so that the interests of a substantial group of claimants can be served more efficiently and effectively." *Id*. at 3.

Furthermore, at a status conference held on February 9, 2024, this Court directed that the PG&E treat a letter from securities claimant Ms. Carole Cookson [Dkt. 14295] as an informal adoption of the TAC. *See* Feb. 2, 2024, Hr'g Tr. at 37:17-19 (directing PG&E "to treat Ms. Cookson as though she has informally, as a pro se party by letter, adopted the PERA complaint").

Following the February 9, 2024, status conference, the Court entered an *Order Extending Deadline to Respond to Omnibus Objections to Securities Claims* [Dkt. 14311], which adjourned the response deadline to certain pending omnibus securities claims objections to March 12, 2024 to allow PERA's counsel to contact securities plaintiffs to determine their interest in becoming one of the Adopting Securities Plaintiffs. *See* Feb. 2, 2024, Hr'g Tr. at 30:22-25 to 31:1-6 ("But I will say that I'm prepared to extend the February 13th deadline of twenty-nine, thirty, thirty-one, thirty-two, thirty-three, thirty-six -- and thirty-six, let's say four weeks. And give you a new date for a hearing. And in that, if you could send out a mass mailing, if you're willing to do it. And you can say, if you want us step up and represent your interest or however you would word it, that's something that I'll do for you.")

1       Following the status conference, and consistent with the Court's directions at the status

2 conference, PERA's counsel established procedures with the securities claimants that were the

3 subject of the pending securities claims objections regarding the legal sufficiency of their claims

4 through notices that were sent via email and letter, offering such securities claimants the

5 opportunity to adopt the TAC and join in this Response, as is detailed in the accompanying

6 declaration of Adam D. Walter.  As a result of such process, a number of securities claimants

7 agreed to become Adopting Securities Plaintiffs.[11]

8       Accordingly, consistent with this Court's procedural orders, the Appointment Order, and

9 this Court's directions, PERA has been expressly authorized and has standing to file this Response

10 on behalf of the Adopting Securities Claimants and any arguments by the PG&E to the contrary

11 should be rejected.

12 **III.    THE TAC MORE THAN ADEQUATELY PLEADS EXCHANGE ACT CLAIMS**

13       The TAC alleges violations of  §10(b), Rule 10b-5, and  §20(a) of the Securities Exchange

14 Act based on 19 materially false or misleading statements and omissions on behalf of investors in

15 PG&E securities during the Class Period. *See* ¶11; *see also* Appendix A (chart listing

16 misstatements). A private action under  §10(b) based on material misrepresentations or omissions

17 has six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

18 connection between the misrepresentation or omission and the purchase or sale of a security; (4)

19 reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*

20 *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38-39 (2011).

21       PG&E argues the TAC fails to plead falsity, scienter, loss causation and reliance. None of

22 these arguments has merit.

23       **A.    The TAC More than Adequately Pleads Falsity**

24       Under the Rule 9(b) pleading standard, a complaint must "state with particularity the

25

---

26 [11]  *See* Exhibit A to the accompanying Declaration of Adam D. Walter.  Subsequent to the March
12, 2024, response deadline, on March 14, 2024, PERA's counsel received a letter dated March 2,

27 2024, in response to PERA's counsel's communications by E. Van Dyke regarding PG&E Claim
No. 103195.  PERA submits that because it was mailed prior to the March 12, 2024, response

28 deadline, Mr. Van Dyke should be included among the Adopting Securities Claimants.

circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "In other words, the complaint must set forth what is false or misleading about a statement, and why it is false. This requirement can be satisfied by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Rubke v. Cap. Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation omitted). A public statement is "materially false or misleading" if it is "inconsistent with" internal information. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Further, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). The TAC pleads such "falsity" for all 19 misstatements.

During the Class Period, PG&E made 19 materially false and misleading statements that contributed to, and maintained, an impression about the state of PG&E's prudence "that differ[ed] in a material way from the one that actually exist[ed]." *See Berson*, 527 F.3d at 985. In reality, PG&E committed rampant safety violations throughout the Class Period, as set forth in detail below.

### 1. Misstatement Nos. 1, 10, and 11 Misrepresented Inspection Frequency and Spending on Vegetation Management

Two of PG&E's most important safety procedures are inspections and vegetation management. Three alleged misstatements misrepresented facts about them:

1) The Class Period begins on April 29, 2015, when Johns represented that PG&E was "***stepping up our vegetation management activities to mitigate wildfire risk.*** ¶194, Misstatement No. 1.

2) PG&E continued to spin this false thread through the days after the North Bay Fires, when it hosted a conference call with investors on November 2, 2017. Already, PG&E's stock had begun its decline on initial indications of PG&E's imprudence. To reassure investors, PG&E CEO and co-President Williams stated that "***every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed***" and "[i]n 2016, ***we spent an additional $200 million, essentially doubling our typical***

***vegetation management spending last year***." ¶258 Misstatement No. 10.

3) Similarly, COO and co-President Nickolas Stavropoulos stated: "***we've doubled the amount that we've invested in veg[etation] management***" and "***inspect all of our overhead lines every year.*** ¶264, Misstatement No. 11.

These three statements were materially false for the reasons below. As detailed in the TAC and described in the sections that follow, PG&E was not inspecting "every segment" of its lines "every year." Nor did it "spen[d] an additional $200 million" much less "double" its vegetation management spending in 2016. In fact, it did not "step[] up" these activities in any discernible way—exacerbating rather than "mitigat[ing] wildfire risk." ¶194. Importantly, lack of inspections and insufficient spending on vegetation management were direct causes of the North Bay and Camp Fires. These facts are now well known and beyond dispute, not least of all because they are pleaded (¶¶77-83, 118, 182-183, 195, 259, 261, 265-268) and must be "taken as true." *Tellabs* 551 U.S. at 322.

### (a) Well-Plead Facts Show that Vegetation Management Misstatement Nos. 1, 10, and 11 Were False When Made

At the time PG&E made these three statements, no one at the Company had inspected the 100-year-old Tower :27/222 since August 2014, and prior to that, not since 2009. ¶118. Internally, PG&E had a policy to inspect transmission structures like Tower :27/222 only "every five years." *Id*. The lack of annual inspection contributed to its failure on November 8, 2018 that sparked the Camp Fire's first ignition point. ¶¶261 & 268. These particularized allegations that key safety inspections occurred far less frequently than every year, pursuant to an internal PG&E policy, "directly contradict" (*Atossa*, 868 F.3d at 794) PG&E's representation that inspections happened every year (¶¶65, 268).

Likewise, PG&E had not materially increased its annual vegetation management spending when it represented spending had "***doubled***." PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017—increases of only 2.4% and 1.4%, respectively. In contrast, inflation rose 5.48% over the same period. ¶78. PG&E's Vegetation Program Manager corroborated that they did "not [make] any changes" in fire safety from

1    September 2015 through April 2017. ¶125. These well-pled facts "directly contradict" PG&E's

2    representations that spending doubled. *See Atossa*, 868 F.3d at 794.

3         For the same reason, it was false when PG&E told investors that PG&E was "stepping up

4    our vegetation management activities to mitigate wildfire risk." ¶194 (Misstatement No. 1). This

5    was "inconsistent with" the fact that PG&E's vegetation management activities were unimproved

6    from the time the statement was made in 2015 through 2017, and therefore "materially false or

7    misleading." *See Quality Sys.*, 865 F.3d at 1144.

8              **(b)     PG&E Must Abuse Judicial Notice to Defend these Statements**

9         In disputing these facts, PG&E illustrates why the Company should not be allowed to

10   proffer facts pre-discovery. PG&E argues that the figures cited in the TAC capture "prospective"

11   General Rate Case ("GRC") budgets but not "retroactive[]"spending from a Catastrophic Event

12   Memorandum Account ("CEMA"). OBJ at 36. The RJN also attaches, as Exhibit 67, PG&E's

13   March 30, 2018 CEMA application. PG&E argues that the CEMA application establishes that

14   "$394.5 million in costs of vegetation management work that it performed over and above" in 2016-

15   2017 (combined), to argue that the "doubling" statements were true. *See* OBJ at 37 (citing Ex. 67).[12]

16   That fact is false, and noticing it is utterly improper regardless.

17        Judicial notice does not allow PG&E to introduce facts that contradict the alleged falsity of

18   these statements. Judicial notice is available only for facts "not subject to reasonable dispute." Fed.

19   R. Evid. 201(b). As the Ninth Circuit recently emphasized, "a court cannot take judicial notice of

20   disputed facts." *Orexigen*, 899 F.3d at 999; *see also id.* at 998-99 (noting "a concerning pattern in

21   securities cases like this one: exploiting [judicial notice] procedures improperly to defeat what

22   would otherwise constitute adequately stated claims at the pleading stage").

23        Here, the purported "facts" PG&E seeks to introduce are not reliable for several reasons.

24   First, Exhibit 67 is a mere application for reimbursement and, after it was filed, the accuracy of its

25

26   _____

     [12] The RJN asserts Exhibit 67 was cited by the TAC. *See* RJN at 4 (citing ¶¶ 73-74, 640-641). In
27   fact, the TAC makes no mention of it. This is just one of 28 documents that PG&E erroneously
     claims were cited in the TAC. *See* RJN Opp. at __; *see also Orexigen*, 899 F.3d at 1005 (Where
28   "the Complaint did not refer to this document, and the document did not form the basis of any
     claims," a "court abuse[s] its discretion by incorporating it.").

claims was challenged.[13] As a result, PG&E withdrew the application, to (in its *own words*) "incorporate certain errata and updates" and remove "errant 2017 tree mortality costs . . . and other items."[14] While the CPUC allowed a new application, it ordered an audit.[15] After the audit and ***two more*** amendments, PG&E requested, and the CPUC granted, a "$36.7 million . . . global reduction" in the CEMA request.[16]

The CPUC released its own chart "showing 2011-2017 history of PG&E annual spending . . . on vegetation management," which totals PG&E's 2016 spending at only "$198.7" million. ¶79. This matches Plaintiff's allegation of "$198,735,579" (¶78) and contradicts PG&E's argument. If anyone knows the appropriate way to tally PG&E's total spending on vegetation management, it is the CPUC.

Moreover, PG&E ignores that the Company claimed CEMA spending in 2015 as well. Even as they accuse PERA of "cherry-pick[ing]" data (OBJ at 36-37), they selectively cite PG&E's CEMA spending in 2016 and 2017 to argue that the "doubling" statements were actually true.[17] However, they neglect to mention that PG&E also sought $126,775,000 in CEMA reimbursement for 2015.[18] If one includes CEMA for *all* relevant years, 2015-2017, the budget once again hardly increases at all.

## 2. Misstatement Nos. 2, 4-5, 9, and 12-19 Misrepresented PG&E's Compliance with Wildfire Safety Regulations

PG&E chose to speak on the subject of compliance, which bears directly on investors'

---

[13] *See* RJN Opp., Exs. 1 & 2.

[14] *Id.* Ex. 3.

[15] *See id.* Ex. 4.

[16] *Id.*, Ex. 5

[17] Even assuming *arguendo* that PG&E is correct (which the Court cannot determine at this procedural stage), the revised totals do not support PG&E's "doubling" misstatements. Including CEMA spending, the totals would have been $321 million in 2015 ($194,094,406 budgeted in 2015 as alleged, plus $126,775,000 of CEMA), to $440 million in 2016 ($198,735,579 in 2016, plus $259,679,000 of CEMA, minus $18,350,000 or half of the $36,700,000 by which PG&E voluntarily lowered its CEMA request), to $318 million in 2017 ($201,456,193 in 2017, plus $135,170,000 in CEMA, minus the remaining $18,350,000). This is still not close to doubling in any year. More importantly, it involves a factual analysis that cannot be resolved at this procedural stage and without proper discovery.

[18] RJN Opp. Ex 6.

assessment of its purported prudence, at least twelve times during the Class Period (Misstatement Nos. 2, 4-5, 9, 12-19). All twelve statements are belied by numerous, widespread violations that existed at the time PG&E spoke.

PG&E argues that a fair reading of those statements is that the Utility performs vegetation management activities "pursuant to" applicable law, rather than a guarantee that it has violated no laws. *See* OBJ at 43. This conclusory analysis should be rejected because it is not the only way, or even the most plausible way, to interpret statements that, *e.g.*, "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***" (¶271 (Misstatement No. 12)) or "***PG&E meets or exceeds regulatory requirements for pole integrity management***" (¶280 (Misstatement No. 13)). PG&E does not get to decide how its statements should be interpreted. What matters is how "a reasonable investor could have" interpreted the statement "at the time." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-87 (9th Cir. 2008) (rejecting a defendant's "conceivable interpretation" where it was "hardly the only—or even the most plausible—one").

It was reasonable for investors to interpret these misstatements as assuring actual (not attempted) compliance. PG&E's alternate interpretation is not plausible; but even if it were, at this stage courts must "construe [allegations] in the light most favorable to plaintiffs." *See Atossa*, 868 F.3d at 793.

> (a) **PG&E's Misstatement Nos. 2, 4-5, 9, & 12-14 Warranting Compliance with Safety Regulations Were False When Made**

PG&E made seven misstatements (Misstatement Nos. 2, 4-5, 9, & 12-14) that promised compliance with state and federal safety requirements for vegetation management, pole integrity, and annual inspection:

- "***Each year***, PG&E's ***Vegetation Management department . . . inspects every mile of power line in our service area for public safety"*** and performs "Vegetation Management . . . ***in compliance with relevant laws***" ¶197 (Misstatement No. 2, Oct. 16, 2015 (emphasis in original));

- "***Each year***, PG&E's ***Vegetation Management*** department . . . ***inspect[s]*** miles of power lines in our service area for public safety and electric reliability" and acts "***in compliance with relevant laws***" ¶211 (Misstatement No. 4, Oct. 6, 2016 (emphasis in original));

- "***PG&E prunes and removes trees growing too close to power lines . . . while complying with state and federal regulations and delivering safe***,

reliable and affordable ***electric service***" ¶222 (Misstatements No. 5, Aug. 9, 2017 (emphasis in original));

- "***PG&E follows all applicable federal and state vegetation clearance requirements***" ¶249 (Misstatement No. 9, Oct. 31, 2017 (emphasis in original));

- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements,***" ¶271 (Misstatement No. 12, Nov. 5, 2017 (emphasis in original));

- "***PG&E meets or exceeds regulatory requirements for pole integrity management***" ¶280 (Misstatement No. 13, May 25, 2018 (emphasis in original)); and

- "***PG&E meets or exceeds regulatory requirements for pole integrity management***" and "under PG&E's industry-leading Vegetation Management Program, we inspect and monitor every PG&E overhead electric transmission and distribution line each year" ¶287 (Misstatement No. 14, June 8, 2018 (emphasis in original)).

These seven statements were false—some for multiple reasons—because PG&E noncompliance with various applicable regulations was rampant during the Class Period. "Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made." *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014) *overruled on other grounds by City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

As detailed below, the TAC details actionable misrepresentations and omissions regarding (i) inspections, (ii) pole integrity, and (ii) vegetation management.

> ### (i) PG&E Never Complied with Inspection Regulations During the Class Period

Three statements above that warranted "***inspect[ion]***" "***each year***" (Nos. 2, 4, & 14) are false for reasons already discussed: PG&E had an internal policy **not to inspect** all of its lines annually, as required by multiple regulations (¶65 & ¶76), but rather every five years (¶118), which led to several of the North Bay Fires and the Camp Fire.

Further, PG&E knew or was extremely reckless in not knowing about more than 450 tower safety violations (including 59 deemed to pose "serious safety hazards") in the county where the Camp Fire was started by a non-compliant transmission tower. ¶107. Indeed, from 2014 through

2017, PG&E internally acknowledged and extensively documented serious safety violations on towers in the "Caribou-Palermo" transmission line. Tower :27/222 on this line—*i.e.*, the tower with the broken C-hook—caused the Camp Fire's first ignition point; the C-hook failed (¶117) in a way that corresponded to the precise violations PG&E documented on the line: corrosion, metal fatigue, and vegetation encroachment, which led to an internal assessment that "the likelihood of failed structures happening is high." ¶¶130-40. Crucially, PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not since 2009, pursuant to an internal policy that transmission poles be inspected only "every five years" (¶118[19]) though safety regulations required annual inspections (¶¶65 & 76). PG&E specifically told investors that inspections occurred "every year" (¶258, Misstatement No. 10, & ¶264, Misstatement No. 11).[20]

PG&E responds to these allegations with more improperly disputed facts. They offer Exhibit 69, a report by PG&E's regulator never mentioned in the TAC, to claim that "Tower :27/221, was inspected aerially on September 11, 2018," and argue that

> PERA offers no plausible explanation of how the need for maintenance at an individual pole on a single transmission line, out of about two million poles on 114,000 miles of distribution line and more than 18,000 miles of transmission lines in PG&E's service area, would have been material to investors.

OBJ at 45-46.

But PG&E's poor attempt to dispute well-pled facts is paradigmatic of why the Ninth Circuit holds it "perverse" to let an accused party "[s]ubmit[] documents not mentioned in the complaint to create a defense" at the pleading stage. *Orexigen*, 899 F.3d at 1003. First, PG&E's argument confuses evidence of one violation with a conclusion that there was only one violation. More importantly, it takes advantage of an incomplete factual record to twist facts. For example, it muddles "Tower :27/221" (the subject of Exhibit 69) with "Tower :27/222" (the failure of which sparked the Camp Fire, *see* ¶¶117-18). At best, it amounts to a fallacious argument that statements

---

[19] PG&E also performed passing "aerial patrols," but admitted these are not inspections. ¶118; *see also* note 10, *supra*.

[20] When PG&E introduced its 2019 Mitigation Plan to bring its program into compliance, it called for increased inspections that PG&E expected to cost between $798 million and $1.396 billion—compared to the "$15 million authorized in PG&E's last [General Rate Case]," an extraordinary increase by more than a factor of 50. ¶183.

promising annual inspections were not false because, two months before the Camp Fire, a PG&E crew conducted a cursory aerial patrol over a single tower on the Caribou-Palermo line with nothing to do with the Camp Fire. *See* OBJ at 45 (citing Ex. 69 at 14-15).[21]

**(ii)     PG&E Never Complied with Pole Integrity Regulations During the Class Period**

Two alleged misstatements that "***PG&E meets or exceeds regulatory requirements for pole integrity***" (¶¶280, 287, Misstatement Nos. 13-14 (emphasis in original)) were false because PG&E violated those regulations contemporaneously. For example, a mere two weeks after Misstatement No. 13, Cal Fire reported that "the failure of power poles" contributed to multiple North Bay Fires. ¶281. Then, five months after Misstatement No. 14, two near-simultaneous pole integrity failures sparked the Camp Fire. ¶¶282 & 290. As alleged, "PG&E had actual knowledge about [these] safety violations . . . months if not years in advance," with initial indications dating back to July 16, 2013. ¶¶130-40. It even had an 2014 internal report concluding that **"the likelihood of failed structures happening is high"** on the Caribou-Palermo transmission line specifically, a report that "five aging towers . . . had collapsed" on that line, and another "support hook snapping off during routine painting," and finally, "internal acknowledgement that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse" but "PG&E never had the lines fixed" due to its conclusion that "any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain." ¶¶136-138. The TAC pleads five uninterrupted years of violating California Public Utilities Code § 451, thus these statements were false "at the time the warranties were made." *See Reese*, 747 F.3d at 578. The Objection's arguments that "PERA never identifies what it means by 'pole integrity'

---

[21] The voluminous RJN cites numerous other documents in an attempt to disprove falsity by purportedly showing PG&E's progress with safety efforts. *E.g.*, OBJ at 36 (citing RJN Exs. 71 & 86 to establish "PERA cannot overcome judicially noticeable facts showing that PG&E made these efforts . . . increasing spending and undertaking 'five major initiatives'"); *id.* at 40 (citing RJN Ex. 71 to prove that alleged misstatement about "the Recloser Disabling Pilot Program . . . was true"); *id.* at 44 n.15 (citing RJN Ex. 110 to establish "PG&E informed the public that its vegetation management program strove toward compliance and full mitigation of fires"). None of these documents are incorporated in the TAC or judicially noticeable as cited, so none can be used by the PG&E to dispute well-pled facts without full discovery. *See generally* RJN Opp. (citing *Orexigen*, 899 F.3d at 1005).

regulations" and "PERA does not identify a known or immediate risk before the Camp Fire" (OBJ at 45 n. 16) are empty words.

PG&E's Objection also argues that the statements were not false because "the market [was] aware of PG&E's non-compliance at the time" (with no citation) and because an external document shows "Tower :27/221[] was inspected aerially on September 11, 2018" whereupon "'PG&E did not identify any problems in need of immediate remediation.'" OBJ at 45-46 (quoting RJN Ex. 69). But PG&E has not shown the market was aware of these "internal" facts, and in any event, this is an improper truth-on-the-market defense (*see* §III.D, *infra*). Further, for the reasons detailed in the RJN Opp. (and §III.A.2.(a)(i), *supra*), PG&E's quotation from Ex. 69 is as irrelevant as it is improper, not least of all because Tower :27/222—not "Tower :27/221" (the subject of Ex. 69)— was the one not inspected for years and sparked the Camp Fire.

### (iii) PG&E Never Complied with Vegetation Management Regulations During the Class Period

All seven compliance misstatements (Nos. 2, 4-5, 9, & 12-14) falsely warranted compliance with respect to vegetation management.

Judge Alsup made numerous findings, **each of which** denotes multiple violations of CPRC Sections 451, 4292, and 4293. As Judge Alsup found, PG&E's numerous vegetation management violations "was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California." ¶414. Judge Alsup also ruled that PG&E violated its probation (¶411), finding that in 2015 and 2016, PG&E electrical facilities were implicated in 486 fires, the leading cause of which was vegetation contact with conductors (37%). ¶104. In 2016 alone, PG&E recorded approximately 1,400 wires downed by vegetation contact. *Id*. Further, PG&E **admitted** that as of June 2017, 3,962 noncompliant trees were uncorrected despite PG&E having identified them **in 2016** as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle." *Id*. ¶¶413-14. Corroboratively, PG&E's Vegetation Program Manager, Richard Yarnell, testified that, from the 2015 Butte Fire until at least April 2017, "**we have not made any changes as a result of this fire**." ¶125.

Thus, since 2015, PG&E documented and knew that (a) vegetation management practices

1  violated safety regulations thousands of times per year, (b) they made no improvements, and (c)

2  these violations caused hundreds of wildfires per each year of the Class Period. ¶105.

3  PG&E's representations of compliance "were inconsistent with real-time . . . information"

4  and thus "were materially false or misleading." *Quality Sys.*, 865 F.3d at 1144; *Glazer Cap. Mgmt.,*

5  *LP v. Magistri*, 549 F.3d 736, 741-42 (9th Cir. 2008) (company statement that it "is 'in compliance

6  in all material respects with all laws'" could be false "merely by demonstrating that [it] was in

7  violation of *any* law at the time the warranty was made" (emphasis in original)).[22] All such

8  violations were logged in a real-time database (¶¶172, 420-425) that PG&E CEO and Chairman

9  Earley and Chief Ethics and Compliance Officer Kane both admitted to monitoring and overseeing.

10  ¶¶426-31 & ¶¶206 & 433. Williams, who replaced Earley as President and CEO, may be reasonably

11  inferred to have the same monitoring and oversight responsibilities; indeed, she served on an

12  Executive Officer Risk & Compliance Committee charged with monitoring vegetation management

13  issues with co-Defendant Hogan. ¶401.

### (b) PG&E's Misstatement No. 17 Detailing Compliance Implementation Affirmatively Misrepresented Facts

15  PG&E detailed false compliance efforts right up to the time its rampant violations caused

16  the Camp Fire.

17  On October 9, 2018, a month before the Camp Fire, PG&E falsely assured the public about

18  its activities to deliver a safe, compliant electricity network. It touted both "***implementing***

19  ***additional precautionary measures . . . to remove and reduce dangerous vegetation***" and "***making***

---

[22] The inference that the violations existed at the time of these misstatements is reasonable. In *Mulligan v. Impax Lab'ys*, a similar inference supported allegations that a company made false assurances about compliance with FDA safety requirements. 36 F. Supp. 3d 942, 958-61 (N.D. Cal. 2014). The plaintiff alleged that the compliance misstatements (*e.g.*, we "will continue to devote every available resource in order to achieve and maintain FDA compliance") (*id.* at 958) were false because "similar issues were subsequently found [by the FDA] 18 months after the defendants stated that they had implemented changes to address the FDA concerns." *Id.* at 961. The court held that the 18-month difference in time was not grounds for dismissal: "given the pervasive, recurring, and long-standing nature of the alleged problems identified . . . the Court cannot conclude (at this stage) that Defendants' statements . . . were not false or misleading when made." *Id*. Here, too, the time between the misstatements and the fires is not grounds for dismissal, given the pervasive, recurring, and long-standing nature of PG&E's safety violations.

*lines and poles stronger in high fire threat areas*" that "***make our system . . . even safer in the face***

***of a growing wildfire threat***." ¶303 (Misstatement No. 17). This statement has not aged well; in

fact, PG&E had done neither. Less than one month later, PG&E would cause the most destructive

wildfire in California history by failing to remove vegetation beneath its Caribou-Palermo

transmission line and allowing the degraded transmission tower :27/222 to languish uninspected, in

a corroded, weakened state—after it had already determined that "the likelihood of failed structures

happening is high"—in clear violation of Sections 451 and 4293 of the California Public Resources

Code. ¶¶304-06. Thus, Misstatement No. 17 was materially false because "once defendants chose to

tout" their compliance activities, "they were bound to do so in a manner that wouldn't mislead

investors as to what that . . . consisted of." *See Berson*, 527 F.3d at 987. Weeks away from causing

the Camp Fire, they decidedly did not "mak[e] lines and poles stronger" or make the system "safer."

**(c)**     **PG&E's Misstatement Nos. 15, 16, 18 and 19 About Compliance with ESRB-8 Affirmatively Misrepresented Facts**

PG&E argues that its statements about compliance with ESRB-8 were both true and fraud-

by-hindsight. OBJ at 38-39. CPUC mandated that PG&E formalize and publicize a program to de-

energize power lines for safety when extreme fire danger conditions occur. ¶141. Under Resolution

ESRB-8, CPUC required PG&E to "[p]rovide its de-energization and restoration policy **in full**."

¶67. Three times, PG&E falsely represented that it complied with ESRB-8, stating that it:

- "has ***launched*** . . . ***a program*** to proactively turn off electric power for safety ***when extreme fire danger conditions occur***" ¶296 (Misstatement No. 15, June 8, 2018);

- has "***implement[ed]*** . . . measures" including "executing ***protocols to temporarily turn off electric power for safety*** when extreme fire danger conditions are occurring" and "PG&E has created ***a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety***" ¶300 (Misstatement No. 16, Sept. 27, 2018); and

- "has . . . ***implement[ed]*** . . . ***a program*** to proactively turn off electric power for safety ***when extreme fire danger conditions occur***" ¶309 (Misstatement No. 18, Oct. 9, 2018).

Yet PG&E never actually "launched" (Misstatement No. 15) or "implement[ed]" (Misstatement

Nos. 16 & 18) the protocol it promised would govern any decision not to shut off the power

preemptively during "***extreme fire danger conditions***," as the CPUC required them to promulgate

under Resolution ESRB-8. If they had implemented the program that—as PG&E represented—"necessitates" a power shutoff when the seven enumerated fire-related conditions are met, it "would have prevented the Camp Fire." ¶34.

PG&E's purported protocol listed seven criteria, did not list a placeholder for additional criteria, and stated that "no single factor will drive a Public Safety Power Shutoff." ¶143. As detailed in the TAC, all seven protocol-specified criteria were met or exceeded just prior to the Camp Fire (¶¶147-71), which PG&E knew (¶¶172-75), and does not dispute. Thus, the so-called protocol unequivocally mandated a shutoff that would have prevented the Camp Fire. ¶34. The Objection does not offer a single factor that weighed against shutoff on that fateful day. Drawing all inferences in favor of Plaintiffs, PG&E never actually implemented a binding protocol, hence it was materially false to insist it had "launched" or "implemented" one that "necessitates" a power shutoff under such exact circumstances. *See Orexigen*, 899 F.3d at 1003 (courts draw "all reasonable inferences in favor of the plaintiff" in evaluating the sufficiency of a complaint).

Even more suggestive of fraud, PG&E's contemporaneous explanations for why the power stayed on have been inconsistent and easily disproven. ¶¶443-54. As pled, after its failure to follow the Protocol caused the Camp Fire, PG&E changed its reasons why three times. First, it stated that "weather conditions did not warrant this safety measure" (¶146), but in the week that followed, it soon became clear that **all** weather criteria weighed in favor of a shutoff (¶¶147 & 159-175). Then, PG&E stated that its reason for inaction was actually that the ESRB-8 Shutoff Protocol tied their hands: "PG&E ha[d] not extended the (shutoff) program to transmission lines." ¶¶445-46. This, too, was false: the "in full" expression of the protocol does not mention this limitation (¶¶448-49), and when PG&E previously shut off electricity preemptively, both a month prior and a year prior, it **did** shut off transmission lines. ¶¶450-52.

Now PG&E has a new explanation: the protocol was purely "discretionary." OBJ at 38. This assertion contradicting well-pled facts has no place in a sufficiency objection. But consider: even if PG&E had infinite discretion to decide on shutoffs, it would not be grounds for dismissal. Turning back to the statements at issue, they promised the existence of a "program," "protocol" and "set of

procedures for . . . [d]etermining what combination of conditions **necessitates** turning off lines for safety"; nothing suggested that this protocol could be overridden for any reason, much less pure discretion. *See* RJN Ex. 108 at 2, 4.[23] Whether the protocol was never implemented (as alleged) or purely discretionary (as now claimed), it is still "inconsistent with" these alleged misstatements. *See Quality Sys.*, 865 F.3d at 1144. At the very least, the omitted "discretion" would have been "necessary in order to make the statements . . . not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011).

PG&E also falsely assured the public about its safety efforts on November 8, 2018, the day its violations ignited the Camp Fire. PG&E told investors that "PG&E . . . will not proceed with plans today for a Public Safety Power Shutoff" because "***weather conditions did not warrant this safety measure***," which was plainly false. ¶314 (Misstatement No. 19). As detailed in the TAC, all weather conditions (and all other factors) met or exceeded the Company's own description of what warranted a shut off. ¶¶141-75 (*e.g.*, "humidity levels, generally 20 percent and below" and "wind gusts in excess of approx. 45 mph"). The statement also misleadingly implied that PG&E was adhering to its ESRB-8 Protocol, which purportedly prescribed what "weather conditions . . . warrant" shutoff, rather than making a purely discretionary decision (as PG&E now claims, *see* OBJ at 38-40). Because the statement "would give a reasonable investor the impression of a state of affairs" about PG&E's prudence "that differs in a material way from the one that actually exists," it is actionably misleading. *See Berson*, 527 F.3d at 985.

PG&E made these misrepresentations about the ESRB-8 Protocol, like its recloser misstatement (below), to keep up the appearance that it followed safety directives. Both kept the electricity on despite hazardous conditions, and both prioritized short-term revenue over safety. ¶88 & n.23. PG&E concealed this prioritization to maintain the false appearance of prudence.

### 3. PG&E's Misstatement No. 3 that Reclosers Would Soon Be Discontinued Was False and Misleading

PG&E failed to discontinue its unsafe use of "recloser" devices in fire-prone areas. ¶¶86-89.

---

[23] PG&E proffers this external document as the protocol itself. It does describe the seven criteria as the "combination of conditions **necessitates** turning off lines for safety" but never mentions discretion. RJN Ex. 108 at 2.

1    On November 18, 2015, Utility Senior VP of Electric Operations Hogan testified to a California

2    Senate subcommittee on the issue, assuring the public that PG&E was "***just about done***" disabling

3    its recloser devices, taking 126 out of service in 2015 and "***leav[ing] six for next year, which will***

4    ***be completed***" in 2016. ¶208 (Misstatement No. 3).[24]

5        Hogan made the statement in 2015, after PG&E came under scrutiny for using "recloser"

6    devices that sent pulses of electricity into its lines, during outages, to potentially prevent blackouts.

7    ¶86. The public concern was that such a practice is unsafe: if the outage was caused by vegetation

8    contacting a powerline, then sending pulses of electricity through that line could start a fire. *Id.*

9    Other California utilities SDG&E and Edison blocked reclosers during fire season. ¶87. But PG&E

10    dangerously kept its reclosers in use – even in high wildfire risk areas – through at least October of

11    2017, when a recloser caused one of the North Bay Fires. ¶209.

12        PG&E argues that Misstatement No. 3 was true. OBJ at 40. But news of the reclosers' role

13    in starting the Pythian Fire 2017 fire prompted State Senator Jerry Hill to voice his "surprise[]"

14    given the testimony he had heard, on the Senate floor, of "a top PG&E official"—*i.e.*, Hogan—

15    "**back in 2015** that the company would be able to shut down reclosers . . . by the start of 2017"

16    (referring directly to alleged Misstatement No. 3); Senator Hill concluded, "they misled us." ¶91.

17        PG&E cites a **post**-Class Period document for the proposition that it disclosed the "limits"

18    of the "Recloser Disabling Pilot Program" and "made clear that it had not completed the program."

19    OBJ at 40 (citing and August 2019 report to CPUC). Thus, during the Class Period, PG&E "g[a]ve

20    … reasonable investor[s] the impression of a state of affairs" about PG&E's prudence "that

21    differ[ed] in a material way from the one that actually exist[ed]." *See Berson*, 527 F.3d at 985.

22             **4.**      **The Alleged Misstatements Were Actionably False**

23        PG&E argues that ten of the alleged misstatements contain inactionable puffery or corporate

24    optimism. OBJ at 32-35 (citing Misstatement Nos. 1, 5-8, 10-11, 13-14 & 17). Not so. Sections

25    III.A.1-3, *supra*, explain that these statements actively misrepresented material facts. To the extent

26    these statements also contained optimism, "even 'general statements of optimism, when taken in

27

28    ---

[24] Notably, this statement was not accompanied by meaningful cautionary language, and PG&E does not argue that it was a forward-looking statement protected by a safe harbor.

context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. As detailed below, these ten statements are actionable.

(a)    **The Alleged Misstatements Are Distinguishable from the Statements at Issue in the *Edison* Cases**

The Objection compares only four of the nineteen misstatements alleged here to those alleged in the *Edison* cases (*see Edison I*, 2021 WL 2325060, at *9*), implicitly admitting that the vast majority of the misstatements alleged here are **not** comparable. Indeed, they are nowhere close. For example, unlike PG&E, Edison never falsely assured its investors it had taken specific steps to mitigate wildfire risk, such as "doubl[ing]" its "vegetation management spending." Misstatement No. 10, ¶258), "inspect[ing] all of our overhead lines every year" (Misstatement No. 11, ¶264), or "execut[ing]" a so-called "protocol" that "necessitates" shutting off its power lines during seven specified "extreme fire danger conditions" (Misstatement No. 16, ¶300).

PG&E's own comparisons illustrate that its misstatements are much more specific and "capable of objective verification" (*Apollo*, 774 F.3d at 606), as set forth in the below chart.

| PG&E's Alleged Misstatement (as misquoted by PG&E) | Edison's Alleged Misstatement | Comparison |
|---|---|---|
| PG&E is **"*stepping up* [its] vegetation management activities to *mitigate wildfire risk* and improve access for firefighters."** Stmt. 1 (emphasis altered by PG&E). | "[Edison] is investing in and ***strengthening*** its electric grid and driving operational and service excellence in ***improving system safety***, reliability, and service." | PG&E's statement regarding "vegetation management activities" is far more specific than Edison's statement about system safety in general. And PG&E objectively did not "step[] up" those activities, as PG&E's budget and inspection schedule remained unchanged. *See* §III.A.1., *infra*. The *Edison* complaint made no such allegations. |

| PG&E's Alleged Misstatement (as misquoted by PG&E) | Edison's Alleged Misstatement | Comparison |
|---|---|---|
| "[O]ver the last 2 years, [PG&E has] ***doubled the amount*** that [it has] *invested* in veg[etation] management." Stmt. 11 (emphasis altered by PG&E). | "[Edison] is engaged in a ***significant and ongoing*** infrastructure investment program . . . [and] [i]n addition to operating practices designed to reduce the risk of wildfires, [Edison] also ***invests significant amounts of capital to reduce wildfire risk.*** " | As noted in §I.A, *supra*, PG&E selectively edits its own misstatement—omitting the false warrant of "***We inspect all of our overhead lines every year***"—and pulls the statement out of context to make it seem like Edison's puffery. The context was: PG&E made this statement after the North Bay Fires but before it was found responsible, to maintain the appearance of prudence.  It was an objectively false statement because PG&E did **not** inspect its power lines every year and did **not** double its vegetation management spending. *See* §III.A.1., *infra*. There is no comparison. Unlike Edison's statement about "significant" investments, PG&E's misstatement references specific figures that are "capable of objective verification." *Apollo*, 774 F.3d at 606. |

| PG&E's Alleged Misstatement (as misquoted by PG&E) | Edison's Alleged Misstatement | Comparison |
|---|---|---|
| PG&E's CEO "highlighted the companies' progress on safety . . . . She reaffirmed PG&E's **commitment to safety** and operational excellence." Stmt. 8 (emphasis altered by PG&E). | "[Edison has] **elevated safety** to one of our company's **core values** and dedicated additional senior leadership in this area." | PG&E selectively quotes this statement, which actually reads: "[PG&E] today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016 . . . . The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities . . . . [CEO] Earley and other senior executives also discussed **continued progress on safety**, reliability and other goals, as well as PG&E's strategy for the future [at the annual shareholder meeting]. Earley said, 'We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history." This statement was objectively false given the absence of any discernable "progress on safety," and in the context of justifying a dividend increase was not puffery. *See* §III.A.4., *infra*. And unlike Edison, it was made in context of justifying a dividend increase. |

| PG&E's Alleged Misstatement (as misquoted by PG&E) | Edison's Alleged Misstatement | Comparison |
|---|---|---|
| PG&E is "continuing to focus on *implementing additional precautionary measures* intended to further reduce wildfire threats." Stmt. 17 (emphasis in original). | "[Edison has] long *taken substantial steps to reduce the risk of wildfires* in our service territory and continue to look for ways to enhance our operational practices and infrastructure." | PG&E selectively quotes this statement, which actually reads: <br><br> [W]e are continuing to focus on *implementing additional precautionary measures* intended to further reduce wildfire threats, such as *working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, making lines and poles stronger in high fire threat areas*, and taking other actions to make our system, and our customers and communities, *even safer* in the face of a growing wildfire threat. <br><br> ¶303 (emphasis in original). This statement must also be read in context with the other alleged misstatement in the same press release: <br><br> To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched the Community Wildfire Safety Program* to keep our customers and communities safe *by implementing additional precautionary measures* intended to further reduce wildfire threats. Among the key components of the new program are . . . *a program to proactively turn off electric power for safety when extreme fire danger conditions occur* . . . . <br><br> ¶309 (emphasis in original). Again, there is no comparison. Unlike Edison's statement about "substantial steps" investments, PG&E's misstatement falsely assures that it was implementing numerous specific measures when it was not, and that is "capable of objective verification." *Apollo*, 774 F.3d at 606; *see also* §III.A.2., *infra*. |

**(b)** **PG&E's Statements About Compliance Affirmatively Misrepresented Material Facts**

All ten of the misstatements PG&E claims were immaterial actively misrepresented material facts about PG&E's vegetation management and safety compliance.

**Misstatement No. 1.** A Utility officer falsely represented on April 29, 2015 that PG&E was "*stepping up our vegetation management activities to mitigate wildfire risk.*" ¶194. It was objectively false: PG&E did not materially increase its vegetation management budget in 2015, and actually underspent its approved vegetation management budget in both 2014 and 2015. ¶79; *accord* ¶414 (Judge Alsup: "as we've gotten into the evidence, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees that should have been taken down were not"). The paucity of PG&E's safety "activities" exacerbated rather than "mitigate[d] wildfire risk." It is not puffery, as PG&E argues (OBJ at 32-35), because it was "a determinate, verifiable statement." *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-87 (2015). A prudent utility would have stepped up its vegetation management activities and would have mitigated wildfire risk; that is the company investors thought they were investing in, but they were decidedly not.

Moreover, even if there were some way PG&E "stepp[ed] up" vegetation management (and the Objection identifies none), its effect on wildfire risk would have paled in comparison with stagnant vegetation management budgets (¶79) or infrequent inspections (¶118) in 2015; *see also* ¶¶181-86 (alleging that PG&E did not materially step up vegetation management or inspection activities until its "2019 Mitigation Plan"). Because these omitted facts actionably "conflict with what a reasonable investor would take from the statement itself," its falsity is pled. *See Omnicare*, 575 U.S. at 189. Starting with Johns' statement on April 29, 2015, investors had a materially "misleading . . . impression" about PG&E's prudence. *See Berson*, 527 F.3d at 985.

**Misstatement Nos. 6-8.** In three statements from mid-2016 to mid-2017, PG&E's CEOs announced and elaborated on increases to PG&E's quarterly cash dividend, explicitly tying these decisions to claimed improvements in—specifically—safety. First, CEO Earley announced on May 23, 2016 that PG&E was increasing its dividend for the first time in six years, touting "continued

progress on safety." ¶233 (Misstatement No. 6). He then represented that the Company made even more "improvements . . . in safety," raising the dividend further. ¶237 (Misstatement No. 7). Thereafter, on May 31, 2017, CEO Williams announced another dividend increase, touting "progress on safety . . . and operational excellence" (¶241, Misstatement No. 8). For the reasons below, these statements were not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).

PG&E did not make overall "improvements" or "progress" in safety by May 2016 (or any time during the Class Period), much less those sufficient to justify increasing its dividend. To the contrary, it drastically underinvested in safety, thereby undermining its long-term financial health. These statements materially omitted that the Company's spending on vegetation management stagnated (not even keeping pace with inflation) and resulted in thousands of safety violations that could imprudently cause massive fires and, by extension, bankruptcy. They were false for all these well-pled reasons that led Judge Alsup to conclude: "it's not really true . . . [s]afety is not your number one thing" and "PG&E's performance with respect to vegetation management has been dismal." *See* ¶¶104-105 & 411-413. Further, a PG&E Vegetation Program Manager testified that just a month before Misstatement No. 8, that "we ha[d] **not made any changes**" for safety (¶242), which is "objective[ly]" the opposite of "determinate, verifiable" progress or improvements. *See Omnicare*, 575 U.S. at 183.

Indeed, PG&E fell so far short of being "in a position to deliver strong financial results" (¶237, Misstatement No. 7), that its safety lapses, and resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on December 20, 2017. Thus, the statement gave investors a false impression that safety risks would not imperil the Company's dividend, which is precisely what occurred. *See Berson*, 527 F.3d at 985 (statement materially "misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists").

Courts have held that "progress" statements like these are actionable in context. Directly on

point, the Ninth Circuit held that "optimistic public statements that [a drug's] FDA-approval process was **progressing** positively" was actionable non-puffery "when taken in context" of omitted warnings it "might not work and would never be approved by the FDA." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (cited with approval by *Quality Sys.*, 865 F.3d at 1143); *id.* ("[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)."); *see also Union Asset Mgmt. Holding AG v. SanDisk LLC*,  2017 WL 3097184, at *1 (N.D. Cal. June 22, 2017) (on a motion to dismiss, statement that "we have made strong progress" was not puffery because it was "made in a particular context that could reasonably have led investors to rely on their accuracy and completeness"); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 615, 618 (S.D.W. Va. 2012) (statement about "'our continuing progress on improving safety over the past several years'" not puffery where, as here, "Defendants closely aligned their statements of commitment to safety to their productivity and success as a company").

**Misstatement Nos. 5 & 10.** To identify these statements as puffery, PG&E plucks snippets from longer misstatements, focusing on irrelevant aspects and ignoring the parts that contain the objectively false misrepresentations of existing facts for the reasons described above. *See Omnicare*, 135 S. Ct. at 1326-28 ("a determinate, verifiable statement" is "not mere puffery" and the inquiry into "whether a statement is 'misleading' is objective").

PG&E takes issue with the part of Misstatement No. 5 that describes its vegetation management program as "'well-established and innovative'" (OBJ at 34), but this part is not even identified by the complaint as false (¶222).  Worse, it ignores the part warranting that the program was "***complying with state and federal regulations***," which is false for the reasons stated above.

PG&E takes issue with a part of Misstatement No. 10 about having "'one of , if not the most, comprehensive vegetation management programs in the country'" (OBJ at 34), ignoring the alleged objectively false parts about "every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed" and "doubling our typical vegetation management spending" (¶258).

1  Reading "in context" and as a whole, as this Court must, these statements are actionably

2  false. *See Quality Sys.*, 865 F.3d at 1143.

3  **Misstatement Nos. 13 & 14.** Section III.C.1.c.(1) of the Objection, making the "puffery"

4  argument, does not quote any words from Misstatement Nos. 13 or 14; it just string-cites to them

5  without argument. OBJ at 32, 34.[25] Yet these are definitive compliance misstatements, assuring that

6  "PG&E meets or exceeds regulatory requirements for pole integrity management" mere months

7  before Tower :27/222's now-famous pole failures caused the Camp Fire. ¶¶280, 287. Number 14

8  was also objectively false by promising inspections "every year." ¶287. They were "determinate,

9  verifiable" statements, not puffery. *See Omnicare*, 575 U.S. at 183.

10  **B.  The TAC More than Adequately Pleads Scienter**

11  This Court has held that the Private Securities Litigation Reform Act of 1995 ("PSLRA")

12  does not apply here. *See* ECF No. 14283 at 2. Therefore, while the TAC "must state with

13  particularity the circumstances constituting" the alleged fraud, "[m]alice, intent knowledge, and

14  other conditions of a person's mind may be alleged generally." *In re Houchin*, 2020 WL 3048194,

15  at *5 (B.A.P. 9th Cir. June 2, 2020) (quoting Fed. R. Civ. P. 9(b)).

16  Yet the TAC satisfies the PSLRA's heightened scienter standard because its allegations

17  support a strong inference that "defendants made false or misleading statements either intentionally

18  or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th

19  Cir. 2009). This inference "must be cogent and at least as compelling as any opposing inference of

20  nonfraudulent intent." *Tellabs.*, 551 U.S. at 314. "[A]n actor is [deliberately] reckless if he had

21  reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless

22  failed to obtain and disclose such facts although he could have done so without extraordinary

23  effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

24  PG&E moves to dismiss for failure to plead scienter, but the Company offers no cogent or

25  compelling innocent explanation for its false and misleading statements. As detailed below, PG&E

26

27  ───────────────
    [25] While a different part of the Objection argues that Misstatement Nos. 13 & 14 were not false or
28  misleading (OBJ at 45-46), these arguments about falsity (as opposed to materiality) have already
    been rebutted. *See* §III.A.2.(a)(ii), *supra*.

misrepresented crucial facts despite that the Company's senior management had actual, real-time access to those facts, supporting a strong inference they spoke with knowledge or at least deliberate recklessness. And as further detailed below, scienter is pled by the undeniable, critical importance of wildfire safety as a "core operation" of PG&E.

> **1. PG&E Senior Management Knew of or Recklessly Disregarded Facts Inconsistent with the Alleged Misstatements**

Where "executives themselves told investors they had real-time access to, and knowledge of . . . information . . . that contradict[ed] those same executives' public statements," their scienter is adequately pled. *Quality Sys.*, 865 F.3d at 1145-46. *Quality Systems* is directly on point. There, "[d]efendants misrepresented the state of [the company's] current and past sales pipeline and used the misrepresentations to support projections of growth in revenue and earnings" (*id.* at 1136), while "members of executive-level management, including individual defendants, had access to and used reports documenting in real time the decline in sales during the Class Period" (*id.* at 1145).

Here, PG&E misrepresented the Company's compliance and safety efforts to support an inflated view of its prudence, while its senior management was monitoring a database documenting in real time the accumulation of thousands of safety violations. No innocent explanation for its behavior would be credible: safety compliance was too important for PG&E leadership not to monitor it closely (as promised), and even if somehow it its devastating lapses remained unknown to leadership, it was surely reckless for them to make positive statements without checking.

> **(a) The Facts Underlying All 19 Misstatements Were Logged in a Real-Time Database and Known to PG&E Senior Management**

As in *Quality Systems*, there is no reasonable inference that PG&E remained innocently ignorant of the following well-pled facts:

Widespread vegetation violations. A key allegation of the TAC is that, based on PG&E's own admissions, a criminal court found that PG&E had "actual knowledge from 2015 to 2017 that its vegetation management practices did not comply with California safety regulations on the order of thousands of violations per year." ¶¶ 394-396. Thus, PG&E had actual knowledge of violations while the Company was falsely warranting its legal compliance. *See, e.g.*, ¶¶ 3, 104, 202, 216, 227,

1  239, 244, 254, 276, 284, 292, 394, 424.

2      PG&E argues these allegations do not support a strong inference of scienter, pointing to RJN

3  Ex. 96, the "PG&E Response to Request for Information" that PG&E submitted to defend itself in a

4  related criminal action. Based on that document, PG&E argues that "the presence of unworked trees

5  was public knowledge, which wholly undermines an inference of scienter." OBJ at 57. But Exhibit

6  96 is dated February 22, 2019—*i.e.*, more than three months after PERA alleges PG&E's fraud was

7  fully disclosed. Contrary PG&E's argument, it says nothing about what was or was not "public

8  knowledge" during the alleged Class Period. In other words, PG&E cannot rely on a document

9  dated after the Class Period to prove what investors knew during the Class Period. If it shows

10  anything, it is that the presence of unworked trees was Company knowledge, *i.e.*, scienter.

11      Moreover, PG&E again relies on disputed facts and cites Ex. 96 to argue that "only 131 of

12  those" 3,962 known violations "remained pending, and none of those trees were at the ignition

13  points of any North Bay Fires." OBJ at 57-58 (citing Ex. 96[26]). But this is no more than unreliable,

14  self-serving hearsay (*see* Fed. R. Evid. 802), not a "source[] whose accuracy cannot reasonably be

15  questioned" (Fed. R. Evid. 201(b)(2)). Therefore, it is not judicially noticeable for the truth of its

16  contents. *See Orexigen*, 899 F.3d at 1001 (document not judicially noticeable where "there is a

17  reasonable dispute as to what the [document] establishes").[27]

18      This Court should not allow PG&E's self-serving exhibits, which the Company improperly

19  uses to rebut well-plead facts (131 versus 3,962 known violations at the time of the North Bay

20

21  ────────────────

22  [26] The TAC references Exhibit 96 only twice (¶¶ 76 n.14, 423 n.137), to convey what PG&E
    reported to Judge Alsup *after* the disclosure of the alleged fraud. Therefore, the TAC does not
23  incorporate Exhibit 96 by reference. *See Orexigen*, 899 F.3d at 1003 (a quotation of "only a few
    lines in a footnote of a 67-page complaint" that "conveys only basic historic facts . . . is not
    sufficiently extensive" to be incorporated by reference); *cf. id.* ("[I]t is improper to assume the truth
24  of an incorporated document . . . to dispute facts stated in a well-pleaded complaint").
25  [27] In fact, the TAC's well-pled and far more reliable allegation regarding PG&E's knowledge of
    thousands of violations was based on Judge Alsup's findings of fact regarding the Company's
26  violations of the terms of its criminal probation. *See* ¶ 394. Judge Alsup's order, which is nowhere
    to be found in the RJN, makes no finding that PG&E fixed these violations—despite Judge Alsup's
27  access to Exhibit 96. *See* Second Order to Show Cause Why PG&E's Conditions of Probation
    Should Not Be Modified, *United States v. PG&E*, No. 14-cr-175 (N.D. Cal. Mar. 5, 2019), ECF No.
28  1027.

Fires), to undermine the inference of scienter without first allowing discovery as to the Company's true knowledge of the allegedly concealed facts.

No changes. Even after PG&E safety violations caused the Butte Fire in 2015 (¶¶100-102), PG&E did "not [make] any changes" at all to improve its vegetation management or safety compliance. ¶393. PG&E senior management knew this or turned a blind eye.

Serious tower violations. During the Class Period, PG&E internally acknowledged, extensively documented, and allowed to persist serious safety violations on the "Caribou-Palermo" line that included Tower :27/222, which caused the first ignition point for the Camp Fire. ¶¶130-40. It also recorded more than 450 unfixed safety violations, including 59 deemed to pose "serious safety hazards," related to transmission lines in that county. ¶107.

Inspection violations. Though PG&E represented that inspections occurred "every year," as safety regulations required (¶¶65 & 76), the Company had an internal policy to inspect transmission poles only "every five years," (¶118).[28]

Violations causing wildfires. At least eleven of the eighteen North Bay Fires, as well as both of the Camp Fire's ignition points, evidenced known violations of California safety regulations, including vegetation and pole integrity problems. ¶¶111-124.

These internal failures are now known precisely because PG&E logged all safety violations in a real-time database. ¶¶172, 420-425. As alleged with particularity, PG&E kept real-time records of its entire "vegetation management program," including its "consisten[cy] with PG&E's legal obligations." (¶423) with precise totals of vegetation management violations (¶424); it also kept "comprehensive" track of PG&E's "2.4 million poles" (¶420) including "decades' worth of data on each individual pole" (¶421) and "status of a pole's inspection" (¶422) with a sophisticated digital "compliance tool" (¶421).

**(b)    PG&E Senior Management Actually Monitored the Database**

---

[28] Having policies inconsistent with one's statements supports a strong inference of scienter. *See In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1048 (N.D. Cal. 2008) (scienter pled where statements about "options granting practices" and oversight "were inconsistent with the internal policies"). Six of the alleged misstatements (Nos. 1, 2, 4, 10, 11, & 14) are false or misleading because of this internal policy.

Safety compliance monitoring and oversight were the responsibilities of CEO and Chairman Earley, CEO and co-President Williams, Chief Ethics and Compliance Officer Kane, and Senior VP of Electric Operations Hogan, pursuant to which the database was actually monitored by Earley and Kane (and inferably Williams as Earley's replacement). ¶¶206, 401, 426-33.

Earley was PG&E Corporation's President, CEO, and Chairman from September 13, 2011 to March 1, 2017, and its Executive Chairman from March 1, 2017 to December 2017. ¶45. While he failed to disclose the thousands of violations logged in PG&E's database, he admitted to monitoring it (¶428) and personally "recognize[d] employees when they do speak up" to "report things that need to be fixed," indicating his awareness of safety violations internally reported. *Id*. He took credit for "mak[ing] it easy for employees to report [safey violatons]" in real-time "on their smart devices." *Id*. His knowledge and familiarity with PG&E safety practice (¶¶428-29) indicates that he personally received information of safety violations, or knew where to find such information but deliberately avoided it.

Williams was President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017, before being promoted to CEO and President of PG&E Corporation from March 1, 2017 until her resignation on January 13, 2019. ¶46. She also served on an "Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues" during the Class Period. ¶401. Throughout the Class Period, she kept investors apprised of how many hundreds of thousands of trees PG&E was trimming or removing, including how many were "dead or dying," and publicly purported to follow PG&E's vegetation management expenditures closely. ¶¶84 & 258.

PG&E's criminal sentencing memorandum made explicit that "Ms. Kane is responsible for overseeing the Company-wide compliance and ethics program, including compliance management, risk-mitigation and reporting; overseeing employee-investigatory processes; and reinforcing PG&E's ethics and compliance culture, among many other compliance and ethics program elements." ¶433. As part of the sentencing process, PG&E stated that Kane "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, that "PG&E's

senior executives" regularly reviewed the Company's safety and compliance, and that "high-level personnel of the organization [would] ensure its effectiveness." ¶402. Accordingly, these allegations directly implicate the involvement of CEOs Earley and Williams, to whom Chief Ethics and Compliance Officer Kane directly reported, in compliance monitoring. ¶436. Kane also managed implementation of PG&E's compliance program, and oversaw "enterprise-wide programs for compliance monitoring, reporting, assessment and remediation." ¶220.

Stavropoulos served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and as Utility director from August 2015 to September 2018. ¶47. He apprised investors of PG&E's vegetation management and inspection efforts (¶264) and had access to PG&E's real-time database (¶¶422 & 425).

Johns was President of the Utility from August 1, 2009 to August 17, 2015. ¶49. He too apprised investors about PG&E's vegetation management activities and efforts to mitigate wildfire risk (¶194) and had access to the Company's real-time database. ¶¶422 & 425.

Hogan was the Utility's Senior Vice President of Electric Operations from March 2016 to January 2019. ¶50. He was authorized to speak on PG&E's behalf, and gave public testimony during the Class Period regarding PG&E's use of reclosers. ¶¶88-91. He also kept investors apprised of how many trees PG&E was trimming and removing. ¶82. In addition, he served on an "Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues" (*id.*) and had access to PG&E's real-time database (¶¶422 & 425).

All these members of PG&E senior management "had real-time access to, and knowledge of . . . information . . . that contradict[ed] those same executives' public statements" through the extensive monitoring that the Company assured investors and the public was actually happening. *See Quality Sys.*, 865 F.3d at 1145-46; *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (on a motion to dismiss, scienter pled where "top executives admit[ted] to having monitored [a] database" and "Plaintiffs [made] specific allegations regarding large portions of" data that contradict those same executives' public statements).

After October 8, 2017, when the North Bay Fires began, the inference that Williams, Kane,

and Stavropoulos actually knew, or were reckless in not knowing, about PG&E's numerous, widespread violations becomes even stronger. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) ("[A]n actor is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."). Moreover, if they kept themselves ignorant of the true state of affairs even after the North Bay Fires began, there is no innocent explanation as to why they nonetheless spoke about safety. *Id.* at 1064-65 (defendants "cannot simply argue that he [or she] looked the other way" after "legitimate red flag" raised). Rather, the strongest inference is that they knew, or were severely reckless in not knowing, that PG&E was not in compliance with relevant laws and regulations when making the false and misleading statements detailed above.

The scienter of these high-ranking PG&E officers is imputed to the Company. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 479 (9th Cir. 2015) ("In the context of Rule 10b-5, we have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'" (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 n.28 (9th Cir. 1990)).

### (c)     Unusual Motives Strengthen Scienter

Strict liability for property damage resulting from PG&E's wildfires could not only result in billions of dollars in liability, but those amounts would also be non-reimbursable if the Company had not acted "prudently." Thus, PG&E had an unusual motive to inflate the public's view of the Company's prudence throughout the Class Period. Indeed, as this Court is well aware, its liabilities for the North Bay and Camp Fires sent PG&E into bankruptcy. ¶¶437-42; *see also Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011) (rejecting innocent inference of scienter because "[i]t is difficult to grasp the thought that [speakers] really had no idea that [the company] was on the road to bankruptcy); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) ("the crucial contribution of theater system revenue to IMAX as a going concern" was factor contributing to

"adequately plead[ing] scienter"). Being seen as prudent is uniquely important to California utilities. *See* §II.C., *supra*. This motive strengthens the inference of scienter.

As of January 8, 2017, PG&E had a further unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed the public – and the courts – to believe it was meeting the terms of its probation, including that it "Not Commit Another Federal, State, or Local Crime." ¶405. The probation also carried monitoring and reporting obligations throughout the Class Period, supporting a strong inference that PG&E knew, or was severely reckless in not knowing, that the Company failed to comply with relevant safety laws and regulations per the terms of its probation. ¶415. This strengthens the inference of scienter for Misstatement Nos. 5 and 8-19.

### (d) Departures by Four PG&E Senior Executives Strengthens Scienter

Individual Defendants Earley, Stavropoulos, Hogan, and Williams all left the Company in the wake of the North Bay and Camp Fires. Williams's departure was particularly abrupt and suspicious; less than two years after becoming CEO (one-third the prior CEO's tenure, ¶45), the Board of Directors penned an open letter to shareholders that PG&E needed to "re-earn the trust of all our stakeholders" and "[t]his starts at the top." ¶455. They continued: "We replaced [PG&E's] CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to redirect our safety culture." *Id.* When an executive's departure is "uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances," it supports a stronger inference of their scienter and, by extension, PG&E's. *See Zucco*, 552 F.3d at 1002; *ChinaCast*, 809 F.3d at 479 (officer's "scienter can be imputed . . . within the scope of their apparent authority,) *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017) (scienter "bolstered" by "resignation of [the defendant company's] president").

### (e) PG&E's Changing Story Strengthens the Inference of Scienter

As noted above, four of the last five alleged misstatements (Nos. 15-16 & 18-19) were authorized by PG&E Chief Ethics and Compliance Officer Kane to convince investors that the Company had "***launched***" or "***implemented***" a "***program***," "***protocol***" or "***set of procedures***" for

"[d]etermining what combination of conditions **necessitates** turning off lines for safety" (¶26) proactively under CPUC Resolution ESRB-8. But if they had, the Camp Fire would not have occurred. ¶312.

PG&E's evolving explanations as to why the protocol did not prevent the Camp Fire support an inference of scienter. First, they stated that "weather conditions did not warrant this safety measure" (but they did—*see* ¶¶159-175); then they stated that "PG&E has not extended the (shutoff) program to transmission lines" (it had—*see* ¶¶445-453); and now they state that the protocol was "discretionary" (*see* §III.A.2(c), *supra*). But if they believed all along that the protocol was non-binding, it was fraudulent to describe it any other way. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) ("I knew it all along" admission shows statement was knowingly false when made).

### 2. "Core Operations" Allegations Plead a Strong Inference of Scienter

Core operations allegations establish scienter where they: (1) "along with other allegations . . . raise a strong inference of scienter under the *Tellabs* standard;" (2) "independently satisfy the PSLRA" by suggesting "that defendants had actual access to the disputed information," or (3) on their own show "that it would be absurd to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 575-76. For the reasons set forth below, this doctrine imputes knowledge of safety violations to PG&E.

#### (a) Safety Compliance Was a Core Operation

The heart of PG&E's business is electricity, and the facts most "critical" to that business are about safety. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008) ("[F]acts critical to a business's core operations . . . are known to a company's key officers.").

In a CPUC filing on January 16, 2019, PG&E stated unequivocally that safety is its "**core business**," and the "focus" of its CEO. ¶397. Indeed, during the Class Period, PG&E affirmed that "[s]afety is at the heart of everything we do at PG&E," and the Company's "top priority." ¶398 ("Nothing is more important than the safety of our customers, employees and the communities we serve."). Not surprisingly, PG&E internally acknowledged that the "largest individual risks

identified in the enterprise risk management program" included "wildfire." *Id.* Indeed, because PG&E faced strict liability for damage caused by wildfires, and such liability could not only be extraordinarily large, but also reimbursable only had it acted "prudently," compliance was synonymous with safety.

Moreover, after the North Bay Fires, safety and compliance became even more "critical" to PG&E. Thus, Williams, Kane, and Stavropoulos must have assured themselves of the underlying facts – or were reckless in not doing so – before issuing Misstatements 9-19.

**(b)   PG&E Senior Management Was Directly Involved with Safety Issues and Had Actual Access to the Concealed Facts**

A strong inference of scienter is also pled because PG&E senior management had "actual access to the disputed information." *S. Ferry*, 542 F.3d at 786. They made specific and unequivocal misstatements, *e.g.*: "We've doubled the amount that we've invested in veg[etation] management" and "inspect all of our overhead lines every year" (¶ 264, No. 11); "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements" (¶ 271, No. 12), and "PG&E meets or exceeds regulatory requirements for pole integrity management" (¶ 280, No. 13). Indeed, information that belied the alleged misstatements was so readily accessible to PG&E senior management, and the subject matters of the statements were so important to the financial health of the Company, that there can be no inference other than that the alleged misstatements were made knowingly or at least recklessly. *See Reese*, 747 F.3d at 576 ("The 'actual access' analysis also supports scienter, because [speaker's] statements are specific and reflect her access to the disputed information.").

Here, PG&E senior management had pertinent responsibilities in Company operations (*i.e.*, monitoring and ensuring safety compliance), as well as direct roles in preparing or making these statements. *See* Part II.A, *supra*. Therefore, "allegations about their access to undisclosed information, their responsibilities in company operations, their role in preparing the allegedly misleading statements," among other details, supports the application of the core operations doctrine. *Doyun Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, at *10 (N.D. Cal. May 23, 2019) (finding that, unlike here, the plaintiff in *Advanced Micro Devices* failed to plead such

allegations). At PG&E, safety was "simply too significant for it to be plausible that top []
management was not aware of the possible ramifications of the problem," especially given" their
"highly involved management style." *See In re Toyota Motor Corp. Sec. Litig.*, at *4 (C.D. Cal. July
7, 2011).

Finally, after the TAC was filed, facts emerged in this very Court that further support a
strong inference of PG&E's scienter. Specifically, during the testimony of PG&E CFO Wells in
support of plan confirmation, he admitted that if there were any compliance issues at PG&E, Chief
Ethics and Compliance Officer Julie Kane would be "very knowledgeable" about them:

> [Q]:     Ms. Cain [sic], I understand, is your chief ethics and compliance
> officer. Would she be very knowledgeable about compliance and ethics
> issues related to PG&E?
>
> [A]:     Yes.

Tr. dated May 28, 2020 at 98:7-10. Because Kane had "authority" over PG&E's compliance (*e.g.*,
¶¶ 257, 279, 285, 295, 298, 302, 308, 313, 316), her knowledge of compliance issues at PG&E is
imputable to the Company. *See ChinaCast*, 809 F.3d at 476.

### (c)     It Would Be Absurd to Suggest that PG&E Senior Management Lacked Knowledge of the Company's Safety Violations

This case presents one of the "rare circumstances" where core operations allegations "may
be sufficient, without accompanying particularized allegations, where the nature of the relevant fact
is of such prominence that it would be 'absurd' to suggest that management was without knowledge
of the matter." *Reese*, 747 F.3d at 576. Courts have found that the nature of the allegedly concealed
facts were of such high importance that any inference other than of scienter would be "absurd."

For example, in *Berson*, the concealed stop-work orders were "prominent enough that it
would be 'absurd to suggest' that top management was unaware of them," and they consisted of
"tens of millions of dollars of the company's work." 527 F.3d at 988-89. Here, the financial impact
of the undisclosed information measured in the billions of dollars. ¶¶19, 33.

In *Mulligan v. Impax Laboratories, Inc.*, it would have been "'absurd' to think that the
CEO" would be unaware of "substandard, non-compliant conditions pervading their company's

1  manufacturing and quality control divisions—the heart of [the] company." 36 F. Supp. 3d at 970.

2  Here, too, the undisclosed facts included pervasive, substandard, noncompliant safety conditions.

3  And in *Reese v. Malone*, the Ninth Circuit found it "absurd" that management would not be

4  aware of the compliance violations at issue "[i]n light of the magnitude of the violations, the

5  immense public attention on BP in the wake of [its oil] spills, and the contemporaneous documents

6  demonstrating management's awareness of the company's non-compliance with the Corrective

7  Action Order." 747 F.3d at 579-80. These factors apply equally here. *See also Advanced Micro*

8  *Devices*, 2019 WL 2232545, at *10 (analyzing the "absurd" inference in *Berson*, *Mulligan*, and

9  *Reese* using the same analysis). [Check for AMD citing references containing "absurd"]

10  No plausible "opposing inferences" of innocence remain. If PG&E senior management

11  somehow remained ignorant of the Company's safety violations, they would have been severely

12  reckless for touting PG&E's compliance and prudence without checking first. In these

13  circumstances, a strong inference of scienter is pled.

14  **C.      The TAC More than Adequately Pleads Loss Causation**

15  A securities plaintiff need only plead loss causation for one event. *See Interlink*, 2008 WL

16  4531967, at *4 ("Plaintiffs have adequately pled loss causation as to at least one date, the Court

17  need not address the others."). Pleading loss causation simply means "provid[ing] a defendant with

18  some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.,*

19  *Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "Revelation of fraud in the marketplace is simply one of

20  the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause."

21  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), *cert. denied*,

22  139 S. Ct. 2741 (2019).

23  PG&E argues that none of the nine alleged causal events directly reveals their allegedly

24  fraudulent conduct. OBJ at 61-62. But this misstates Ninth Circuit law, which requires only that

25  concealed facts proximately cause investor losses. *First Solar*, 881 F.3d at 753 ("Disclosure of the

26  fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is

27  not necessarily revealed prior to the economic loss."). Because PG&E concealed its failures to

28

prudently manage its territory, and the Company's imprudent practices caused or exacerbated the North Bay and Camp Fires, as investors learned over the nine loss events, the proximate causation test is readily satisfied.[29] Moreover, where, as here, "Plaintiffs have adequately pled loss causation as to at least one date, the Court need []not address the others." *Interlink*, 2008 WL 4531967, at *4.

Put simply, if PG&E's prudence was unassailable, there would have been no reason for its share price to decline (or bankruptcy) because, per inverse condemnation, PG&E would not be financially responsible for the resulting destruction. And PG&E suggests no plausible explanation for investors' well-pled "surprise" (*e.g.*, ¶¶ 39, 349, 359, 391) from the news on these dates. Thus, the statements concealing PG&E's imprudence were adequately pled to have proximately caused investor losses when the extent and effects of that imprudence came to light.

As news emerged about the extent and effects of PG&E's imprudence, and the truth about the Company's rampant safety violations became publicly known, its stock price dropped precipitously during nine discrete events. On each of these events, information emerged not of fires but of the extent and effects of PG&E's concealed imprudence coincided with immediately share price declines, causing enormous losses to investors and ultimately precipitating these Chapter 11 Cases.

**Event 1**. As far as the public initially knew, the North Bay Fires could have been started by arson, lightning, or children playing with matches. But on October 12, 2017, the first evidence that PG&E's safety violations "were likely a proximate cause of the North Bay Fires" emerged when the public learned that CPUC sent PG&E a litigation hold letter that specifically mentioned preserving "failed poles, conductors and associated equipment from each [North Bay] fire event." ¶¶328-29. This caused a 6.7% decline in PG&E's share price on concerns that the Company's safety efforts had been inadequate, hence imprudent. ¶¶330-34. This information bore directly on the Company's prudence.

PG&E argues, "The TAC does not plead that any market participant, analyst, or

---

[29] At most, PG&E points to potential shared causes of the nine share price declines, which is not a basis for dismissal. "A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005).

commentator attributed any of the stock price declines to any concealed wildfire risk." MTD at 62. This is the mirror-image rule, which *First Solar* rejected. *See First Solar*, 881 F.3d at 754 ("Revelation of fraud . . . is simply one of the infinite variety of causation theories a plaintiff might allege to satisfy proximate cause."). The North Bay Fires were the result of PG&E's safety violations. ¶¶322-24; *see also*; *In re Impinj, Inc., Sec. Litig.*, 2019 WL 4917101, at *6 (W.D. Wash. Oct. 4, 2019) (loss causation pled by "allegations that the stock price fell upon the revelation of an earnings miss, even though the market was unaware at the time that fraud had concealed the miss"); *In re Regulus Therapeutics Inc. Sec. Litig.*, 2019 WL 4242485, at *10 (S.D. Cal. Sept. 5, 2019) (FDA actions were not merely "disappointing news" when they related to the "very facts that Plaintiffs claim were improperly withheld from the public"); *Mauss v. NuVasive, Inc.*, 2018 WL 656036, at *4 (S.D. Cal. Feb. 1, 2018) (loss causation pled despite no evidence that the market learned of alleged fraudulent practices).

**Event 2**. The next day, PG&E issued a press release discussing state investigations and the likelihood that its $800 million in liability insurance might not cover its liabilities, its share price declined 16.5%, with investors reasonably inferring likelier PG&E imprudence from the discussion of bearing liability. ¶¶335-38. This was a "foreseeabl[e]" effect of the concealed imprudence, given that PG&E would be reimbursed if, but only if, its managers had acted prudently, satisfying the pleading standard—hence the fraud caused these losses. *First Solar*, 881 F.3d at 754 (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d, 1200, 1210 (9th Cir. 2016). PG&E again asserts that no safety or legal violation was revealed by the disclosure (OBJ at 63) but this is not a requirement for the proximate cause test.

**Event 3**. Then on December 20, 2017, PG&E announced it would suspend its dividend due to its likely liability for the North Bay Fires, causing a 12.95% price decline. ¶¶339-40. Specifically, a PG&E press release stated: "PG&E . . . today announced that its Board of Directors has determined to **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires**." ¶339

(emphasis in original). The market took the announcement as a strong indication PG&E would bear at least some responsibility for the fires—making PG&E's concealed safety violations a proximate cause of the drop. ¶¶342-45. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (holding that "a plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss" (emphasis in original)).

PG&E suggests that suspending a dividend payment often causes a stock to decline in share price (OBJ at 63), but this assertion is belied by market commentary that the "unexpected decision suggests greater risk than we had assumed surrounding the regulatory treatment of the October 2017 Northern California wildfires." ¶343. Moreover, even if true, that does not disprove loss causation, but at most leads to a potential diminution of damages at a later stage. *See In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005). This is ultimately a fact question, but as PG&E's press release discusses, the suspension of the dividend was causally related to uncertainty about the causes of the fires.

**Event 4**. On May 25, 2018, Cal Fire issued a press release announcing that PG&E's safety violations caused three of the North Bay Fires. ¶¶346-352. Then, on May 29, 2018, PG&E filed a Current Report on SEC Form 8-K that quoted and did not contradict Cal Fire's findings, including findings about the role of PG&E equipment in starting four North Bay Fires. ¶347. This caused a 5.19% decline in share price on concerns including the severity of PG&E's conduct and the role of its violations of California safety laws in causing the North Bay Fires.[30] ¶348. The market understood this news indicated a lack of prudent management, with one Citigroup analyst observing that it would be "tough to meet" the "prudent manager" standard for recovering costs from ratepayers for these fires. ¶350. "The Ninth Circuit has held that when 'analysts note[ ] the probable relationship between' alleged misstatements and a stock price decline, plaintiffs have adequately

---

[30] For example, it reported that one fire was caused by a recloser, revealing that investor losses that day were proximately caused by Hogan's lie about disabling reclosers. ¶355. These announcements showed PG&E's compliance-warranting and recloser statements to be false. "Revelation of fraud in the marketplace is ... one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *First Solar*, 881 F.3d at 754.

pleaded loss causation." *Leventhal v. Chegg, Inc.*, , 2024 WL 924484, at *8 (N.D. Cal. Mar. 4, 2024) (quoting *Lloyd*, 811 F.3d at 1202). PG&E concedes this causal link (OBJ at 83), which means that the overall loss causation inquiry can end. *Interlink*, 2008 WL 4531967, at *4 ("Plaintiffs have adequately pled loss causation as to at least one date, the Court need not address the others.").

**Event 5**. On June 8, 2018, Cal Fire issued another press release announcing that PG&E caused twelve more of the North Bay Fires, and that it would refer eight to district attorneys given evidence of safety violations. ¶¶353-362. The June release also reported that one such fire evidencing a violation, the Pythian fire, was "caused by a downed powerline after PG&E attempted to reenergize" with a recloser, revealing this wildfire was proximately caused by PG&E's illicit and concealed use of reclosers. ¶355. This release was followed by a Bloomberg article published on June 9, 2018 and the filing of PG&E's Current Report on Form 8-K with the SEC on June 11, 2018 that quoted, and did not contradict, Cal Fire's findings. (¶¶356-357). As a result of these disclosures, PG&E's share price declined 4.08%. ¶358.

PG&E argues, "PERA's theory of the case has no credibility because as of June 8, 2018, the market was aware of investigations concerning PG&E, the occurrence of and risk of wildfires from PG&E's equipment, and the risk that PG&E would be financially liable for the damages from the wildfires." OBJ at 65.

But the scope and magnitude of PG&E's safety violations, hence imprudence, were not fully revealed until the end of the Class Period. *See, e.g.*, *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 995-96 (D. Ariz. 2015) (denying summary judgment on loss causation grounds with respect to 5.4% stock drop following announcement of revenue miss and additional accrued expenses associated with defect of solar module because a reasonable jury could find that defendants concealed "the scope of the . . . defect and its resulting financial impact"), *aff'd*, 881 F.3d 750 (9th Cir. 2018); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1048-49 (N.D. Cal. 2009) (supplemental disclosure revealing "scope and magnitude" of accounting restatement was sufficient to support loss causation, even though company had already disclosed that defendants had engaged in improper backdating and that the company's financial statements could

not be relied upon).

**Event 6**. On November 8, 2018, the Camp Fire ignited and PG&E disclosed it had not implemented its protocol for shutting down power lines, which the market took this as the first indication that PG&E's equipment and imprudent decisions contributed to the Camp Fire. ¶¶364-371. As specifically alleged, the market took this as "the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire" and as evidence of the falsity of PG&E's statements about safety made before and after the North Bay Fires. ¶364; *see also* ¶371 (Barclays analyst reporting "we expect PCG's decision not to de-energize lines after warning of high fire risk will be investigated if the fire is found to have been sparked by PCG equipment."). Its share price declined 19.7% (¶366), and a "substantial factor" was "the very fact[] that" PG&E "misrepresented or omitted," namely, failure to implement the promised shutoff protocol. *See Nuveen*, 730 F.3d at 1120.

**Event 7**. On November 12, 2018, PG&E stock declined 17.385% as the market learned about further evidence that PG&E safety violations caused the Camp Fire and as the devastating magnitude of the fire became apparent. ¶¶372-80. For example, national news outlets reported that PG&E had experienced a problem with its Caribou-Palermo line "in the area of the Camp Fire" and there was evidence of "damage" to the one of its transmission towers. ¶365; *see also* ¶¶113-20 (alleging the Camp Fire's first ignition point was the very same Caribou-Palermo transmission tower, which was caused by damage, inadequate inspection, vegetation clearance, and other safety violations). Thus, PG&E's statements concealing those violations did "'foreseeably cause'" investors' losses on this date. *First Solar*, 881 F.3d at 754 (quoting *Lloyd*, 811 F.3d at 1210).

**Event 8**. On November 13, 2018, PG&E's share price declined 21.791% as it revealed that its revolving credit facilities were fully drawn and that its liability for the Camp Fire threatened the Company's solvency. ¶¶381-82. This was a financial condition far worse than investors had reason to expect if PG&E's Class Period statements were true—hence PG&E's "misstatement[s]... foreseeably caused the ... loss." *See Lloyd*, 811 F.3d at 1210.

**Event 9**. Upon CalFire's November 15, 2018 announcement that it had found a second

ignition point for the Camp Fire, which also involved PG&E equipment and evidence of safety violations, the Company's share price declined 30.676% as the public became further aware of the Company's imprudent conduct. ¶¶386-87; *see also* ¶¶121-24 (allegations detailing the violations that caused the Camp Fire's second ignition point, including but not limited to a broken pole with an illicit recloser). Once more, PG&E had "misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss." *See Nuveen*, 730 F.3d at 1120 (emphasis in original) (citation omitted).

PG&E argues that the November 2018 disclosures did not reveal the Company's responsibility for the Camp Fire or the falsity of its prior statements (OBJ at 66), again misstating the standard for pleading loss causation. *First Solar*, 881 F.3d at 753. As pleaded, PG&E's concealed safety violations caused the Camp Fire. ¶¶325-26. As such, PG&E's fraudulent conduct proximately caused the market's reaction to information that PG&E equipment was likely involved in igniting the Camp Fire.

### D. PG&E's "Truth on the Market" Argument Is Insufficient and Improper at the Pleading Stage

PG&E argues it "could not have concealed the risk of catastrophic wildfires or the potentially-significant financial impact from the realization of that risk because PG&E publicly disclosed that information to investors well before the class period." OBJ at 67-72.

This premature "truth on the market" argument is inappropriate "at the pleading stage." *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006). The law recognizes truth-on-the-market as an affirmative defense. *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008) ("truth-on-the-market affirmative defense . . . is intensely fact-specific, so courts rarely dismiss a complaint on this basis"). To make out the affirmative defense, a defendant has the burden to prove that the allegedly concealed information was "'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression'" made by the alleged fraud. *In re Facebook*, 87 F.4th at 950. Not surprisingly, the Supreme Court has held that weighing evidence for the fact-intensive "'truth-on-the-market' defense," because it "is a method of refuting an alleged misrepresentation's *materiality*, . . . is a

1  matter for trial" or "a summary-judgment motion." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,

2  568 U.S. 455, 481–82 (2013) (emphasis in original).[31]

3      Despite this binding Supreme Court authority, PG&E attempts to prove the affirmative

4  defense prematurely by cobbling together a cherry-picked set of documents with pure conjecture

5  about how PERA and other investors must have interpreted them in context. *See* OBJ at 68-72. In a

6  securities fraud action, "context" means no less than the "total mix" of factors influencing

7  investment decisions. *S.E.C. v. Phan*, 500 F.3d 895, 911 (9th Cir. 2007) ("[M]ateriality must be

8  judged in the context of the 'total mix' of information available to investors"). PG&E offers no

9  market commentary, media reports, or expert analysis. That is not a properly developed record of

10  the "total mix" of information available to PG&E investors at the time.[32]

11      For example, PG&E cites RJN Ex. 74, Cal Fire's 2016 Investigation Report, for the

12  proposition that investors knew of the Company's widespread violations. OBJ at 48, 50. But Exhibit

13  74 is not incorporated by reference in the TAC. It is not even mentioned in the TAC. Nor is it

14  judicially noticeable to show anything beyond the isolated violations described therein. It is not

15  judicially noticeable to show how investors interpreted that information—especially given PG&E's

16  false warrants of compliance going forward. *See Orexigen*, 899 F.3d at 1001 (document not

17  judicially noticeable where "there is a reasonable dispute as to what the [document] establishes").[33]

18      Even if Ex. 74 and the other 112 exhibits were judicially noticeable for their availability to

19  the public on certain dates, Plaintiffs would still be entitled to discovery regarding their import and

---

[31] PG&E erroneously casts the Company's improper truth-on-the-market argument as a defense against reliance but, as the Supreme Court noted in *Amgen*, it a defense to materiality. *See* 568 U.S. 455 at 481.

[32] Indeed, PG&E argues "truth on the market" primarily based on general risk warnings. However, in *Facebook*, the Ninth Circuit not only held that risk warnings do not support a truth-on-the-market defense, it held that such warnings of potential risk could be materially misleading in and of themselves if, for example, the company knew the warned-of risks were actually materializing at the time. *See Facebook*, 87 F.4th at 950 (reasoning that "such a [risk warning] could be misleading even if the magnitude of the ensuing harm was still unknown").

[33] PG&E repeatedly makes similar arguments based on the RJN documents. *See, e.g.*, OBJ at 9-12 (Exs. 1-6 warned of the inherent risks of running an electrical utility); *id.* at 31-32 and 65-68 (Exs. 4-6 disclosed risks and consequences related to causing unrelated, smaller fires); *id.* at 50 (Exs. 31–63, 66, 70, 74-79 disclosed isolated incidents of noncompliance).

1   whether PG&E sufficiently warned investors of what it knew: its rampant safety noncompliance, its

2   imprudence, and ultimately what the true "magnitude of the ensuing harm" would mean for

3   investors. *See Facebook*, 87 F.4th at 950.

4          PG&E glazes its RJN documents with pure conjecture about how investors must have

5   interpreted them. *See generally* OBJ Sections C.1.c(2)-(5), C.1.d(1)-(6), C.2.b, C.3.a-b, & C.4.a-b

6   (citing RJN Exs. 1-6, 7-12, 15-22, 24, 31-63, 66, 68, 70, 74-79, 84-86, 88-89, 101-103, 109, 111-

7   112). It offers no market commentary, media reports, or expert analysis in support. Put simply, none

8   of the RJN exhibits proves intensity or credibility, much less overcomes well-pled facts (taken as

9   true) that PG&E created a false impression regarding the Company's true value. *E.g.,* ¶¶39, 349,

10  359, 391 (alleging investors, commentators, and the general public were "surprised" by fraud-

11  related news).

12         Importantly, the TAC does not allege that PG&E concealed its past wrongs or the general

13  risks of investing in a California electrical utility during a drought with global warming. The

14  gravamen of the TAC is that PG&E misrepresented that the Company had turned over a new leaf

15  and had become a compliant, prudent manager. Therefore, investors were "surprised" (as

16  specifically alleged) by news of rampant noncompliance and PG&E's inability to pass wildfire

17  liabilities on to ratepayers. *See, e.g.*, ¶¶39, 349, 359, 391. Not one of PG&E's 113 exhibits even

18  begins to address "the intensity and credibility" with which that risk was communicated to and

19  understood by investors. Nor do PG&E's purported risk warnings explain why investors were

20  "surprised"—as precisely alleged—during nine distinct loss-causing events when news emerged,

21  not of wildfires, but of PG&E's noncompliance and imprudence in causing wildfires. ¶¶327-90.

22  PG&E should not be allowed to say what the "total mix" of information available to investors was

23  absent a complete record.

24         While PG&E disclosed some risk of wildfires, it most certainly never disclosed how the risk

25  was exacerbated by numerous, widespread, known and unmitigated safety violations. *See Meyer v.*

26  *Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (description of compliance efforts "gave

27  comfort to investors that reasonably effective steps were being taken to comply with applicable . . .

28

regulations" such that "investors would be misled . . . if in fact the equipment and 24-hour team [described] were then failing to prevent substantial violations"). As the Second Circuit pointedly observed, "One cannot . . . disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable without misleading investors." *Id.*

Accordingly, PG&E concealed both the true risk of wildfires and the true extent of the financial impact wildfires would likely have on the Company.

### E. The TAC More than Adequately Pleads Control Person Liability Under §20(a)

§20(a) of the Securities Exchange Act of 1934 imposes liability on "control persons." 15 U.S.C. § 78t(a). To establish liability under §20(a), a plaintiff must (1) prove a primary violation of federal securities law, and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n. 15 (9th Cir. 2002). The existence of control person liability is an "intensely factual question." *Zucco*, 552 F.3d at 990 (citation omitted).

Here, PG&E does not dispute the factual allegations (¶¶ 481-486) that PG&E Corporation controlled Pacific Gas and Electric Company as its sole controlling shareholder (OBJ at 72-73). They dispute only the other element of control person liability, namely that there was no primary violation of federal securities law. OBJ at 73. However, for the reasons stated above, the TAC pleads multiple primary violations of the federal securities laws. For the same reasons, the TAC's §20(a) claim against PG&E Corporation should not be dismissed, either. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 328 F. Supp. 3d 963, 982 (N.D. Cal. 2018) ("Because the allegations also support a primary violation" of §10(b), "the Section 20(a) control person claims . . . are now well pled").

### IV. THE TAC MORE THAN ADEQUATELY PLEADS SECURITIES ACT CLAIMS

#### A. Brief Summary of the Relevant Alleged Facts for the Securities Act Negligence Claims

From March 2016 to May 2018, PG&E offered and sold **$4.35 billion** worth of senior notes registered with the SEC to be widely sold to the investing public through the four bonds offerings

1  alleged in the TAC. ¶501; *see also* ¶¶496 n.149, 502, 630.[34] According to PG&E, these funds from

2  the public were necessary to invest in safety. *See, e.g.*, ¶496.

3        The registration statements and prospectus, *i.e.*, the "Offering Documents" (*see* ¶496, n.149)

4  PG&E filed with the SEC and used to market these bonds to investors, contained materially false

5  and misleading statements. *See* Ex. A to the TAC (District Action, ECF 121-5). These statements

6  included misleading risk warnings that warned of contingencies that had, in fact, already

7  materialized, such as that "the failure to take expeditious or sufficient action to mitigate operating

8  conditions, facilities, or equipment, that the Utility" has or reasonably should have identified as

9  "unsafe," could lead to a "catastrophic event" such as a wildfire. ¶646 (Stmt Nos. 9, 18, 32). They

10  also included affirmative statements that omitted material deficiencies in PG&E's vegetation

11  management and other safety processes, such as that "the Utility's vegetation management activities

12  will continue to play an important role to help reduce the risk of wildfire and its impact on electric

13  and gas facilities." ¶641 (Stmt No. 29). And the Offering Documents failed to disclose known

14  trends in violation of Items 105 and 303 of SEC Regulation S-K. For example, while PG&E

15  disclosed trends outside of PG&E's control, such as by warning that "inconsistent and extreme

16  precipitation, coupled with more hot summer days, have increased the wildfire risk[s]," PG&E

17  failed to disclose increased fire risks from PG&E's own vegetation management failures. ¶636

18  (Stmt No. 26).

19        In truth, PG&E was not making necessary investments in safety processes and

20  infrastructure, and it was PG&E's own deficient practices that had increased the risk of wildfires.

21  PG&E decided that, while "[s]afety" and "[r]eliability" were "up for debate," the Company's

22  "[earnings per share] growth" was "*not*." ¶567 (emphasis in original). PG&E had let its tree budget

23  "wither" (¶622) and told its contractors to *not* clear as much vegetation as required for public safety

24  (¶569), such that PG&E was not clearing even the trees PG&E itself had already identified as

25  hazardous, including some 3,962 unworked trees as of June 2017 (¶618). PG&E also skimped on

26  necessary repairs, replacements and safety investments required by PG&E's own guidelines. *See*

27   

---

28  [34] Unless otherwise noted, all references to "Stmt No(s). __" are to Exhibit A: Securities Act Claims
– False and Misleading Statements, submitted therewith (District Action, ECF 121-5).

¶621. For example, in 2013 PG&E detailed to the CPUC the repairs PG&E needed to make to the 100-year-old Caribou-Palermo transmission line – the line later responsible for the 2018 Camp Fire. And in 2014, PG&E acknowledged internally that the "likelihood of failed structures happening [on the Caribou-Palermo line] is high." But, as of 2017, nothing had been fixed because PG&E disregarded the known risk. ¶¶612, 615, 620-621. PG&E also admitted in its proposed 2019 wildfire mitigation plan that it had underinvested in wildfire mitigation practices, and would now need to spend more than $2 billion for items such as tree removal, vegetation management and enhanced inspections. ¶¶606-608. These are just some of the reasons a 2019 CPUC report concluded there were "systemic problems" with PG&E's safety practices. *See* District Action, ECF 164-8.

PG&E's failure to make proper safety investments in infrastructure and safety had catastrophic effects. PG&E caused more than 1,500 fires between June 2014 and November 2018 (*see* ¶600) – substantially more than the 344 caused by Southern California Edison ("Edison"), another utility, over the same period (¶610). As Judge Alsup would lament:

> [T]his is a crisis, a crisis that California faces on these wildfires, and PG&E is the ***single-most*** culpable entity in the mix. . . . PG&E has started more than – ***way more than its share*** of these fires. . . . This is a problem of your own making. A lot of money went out in dividends that should have gone to the tree budget.

¶622.

On November 13 2018, PG&E filed a report on Form 8-K with the SEC stating PG&E had submitted an electric incident report to the CPUC suggesting that PG&E's equipment was at fault for the Camp Fire, and that PG&E had significantly increased its liability insurance. ¶589. This news sent PG&E bond prices plummeting by 13%-27%. ¶505. Then on November 15, 2018, Moody's cut PG&E bonds' credit rating to the "brink of junk" status. ¶592. Finally, on January 29, 2019, PG&E declared Chapter 11 bankruptcy. ¶604. The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the North Bay Fires. *Id.*

While evidence is not required for the pleading standard under Federal Rule of Civil Procedure ("Rule 8") that applies to the Securities Act claims here, since the filing of the TAC, additional evidence corroborates the falsity of the statements alleged in the TAC. For example,

1    pursuant to an order from Judge Alsup, in April 2019 Kirkland & Ellis LLP began evaluating

2    PG&E's compliance with its Wildfire Safety Plan's Enhanced Vegetation Management program

3    and applicable VM-related regulations. The resulting report ("K&E Report"), dated July 26, 2019

4    "generat[ed] meaningful insight into PG&E's V[egetation] M[anagement] program that [wa]s

5    *otherwise unavailable*." RJN Opp. Ex. 7 at 2.

6        The information newly reported in the K&E Report was damning. It identified significant,

7    long-standing safety issues and other systemic problems, including finding that "defective records

8    have been a root cause of PG&E safety problems *for many years*," a "failure of pre-inspectors to

9    consistently identify risk trees," and a "lack of qualified tree workers available to perform all the

10   removals that would be required to fully execute the program." *Id.* at 32-33.

11       Though Kirkland & Ellis "began fieldwork in May 2019," its review, by necessity, covered

12   the events relevant to this litigation. *Id.* at 1. For example, the K&E Report noted "[r]ecordkeeping

13   defects have been a recurrent problem for PG&E – both before and after the San Bruno explosion

14   and before and after the more recent 2017 and 2018 wildfires." *Id.* at 32. The K&E Report also

15   reviewed work PG&E and its contractors performed in the past, resulting in Kirkland & Ellis

16   sending "over 400 potential exception reports to PG&E." *Id.* at 2. For example, after "PG&E

17   informed the [Kirkland & Ellis] that [a] particular tree was identified for routine compliance work

18   in *November 2018* and a tree work company reported to PG&E that it completed the work in

19   February 2019," Kirkland & Ellis checked that work and determined that PG&E never completed

20   the work, *i.e.*, "the tree work company provided a false certification." *Id.* at 16-17.

21       The K&E Report concluded that the failures it identified were significant and pervasive. For

22   example, that PG&E had missed "three urgent potential exceptions that could have resulted in

23   fatalities, injuries, or serious damage." *Id*. at 15. And after concluding "[t]he large number of

24   potential exceptions identified thus far strongly suggests that there are gaps in PG&E's training . . .

25   and that the existing training and contractor oversight is not effective," Kirkland & Ellis could only

26   snidely describe PG&E remediation efforts: "[T]he *supposed* curative training produced only a 6%

27   improvement and *94% of the problem persisted*." *Id.* at 28.

28       **B.      As the Issuer of the Offerings, PG&E Is Strictly Liable for the**

## Misrepresentations in the Offering Documents

The Securities Act '"was designed to assure compliance with the disclosure provisions of the [1933] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.'" *Id.*[35] The Securities Act is "***a strict liability statute that does not require fraudulent intent***." *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1117 (N.D. Cal. 2014) (citing *In re Daou*, 411 F.3d at 1027), *aff'd in part, rev'd in part, and remanded*, 669 F. App'x 878 (9th Cir. 2016); *see also Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994) ("issuers are held strictly liable under §11" but non-issuers, such as accountants, are subject to a "negligence standard"). Indeed, scienter, reliance, damages, or other elements of fraud are not elements of a Securities Act claim. *See In re Daou*, 411 F.3d at 1027-28.

The burden to plead a Securities Act claim is *de minimis*. Rule 8 does not require "heightened fact pleading of specifics." *Twombly*, 550 U.S. at 555. Rather, a plaintiff need only allege enough facts to demonstrate that the claim is "plausible on its face." *Id.* The Court '"must accept as true all of the factual allegations contained in the complaint.'" *Id.* at 572. Once plaintiffs have made a *prima facie* case, "[l]iability against the issuer of a security is ***virtually absolute***, even for ***innocent*** misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

Securities Act claims require a plaintiff to allege that a registration statement or prospectus contains '"an untrue statement of a material fact'" or '"omit[s] to state a material fact . . . necessary

---

[35] Legislative history and subsequent caselaw confirm that the Securities Act was intended to be strict liability. *See, e.g.*, *Securities Act*: *Hearings on S. 875 Before the Senate Banking and Currency Committee*, 73rd Cong. 205 (1933) ("this bill is not merely aimed at dishonesty, but also at ***negligence and carelessness***"); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1296 (1973) (similar, noting "ignorance of an untruth" should not be a defense because "***it is the issuer who is in position to learn the facts, not the public***"); *Hutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 274 (D. Conn. 2009) ("***securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not***"), *aff'd on other grounds sub nom. Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011); *Degulis v. LXR Biotechnology, Inc.*, 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997) ("Plaintiffs need only allege a material misstatement or omission [to make out a *prima facie* case under §11]. Neither knowledge nor reason to know is an element . . . ."); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005) (similar); *In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289, at *13 (N.D. Cal. Aug. 5, 2005) (similar), *on reconsideration*, 2005 WL 2206693 (N.D. Cal. Sept. 12, 2005).

to make the statements therein not misleading.'" *Omnicare*, 575 U.S. at 175. A fact is material when there is "'"a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). "Materiality is rarely appropriate to decide at the motion to dismiss stage." *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *5 (C.D. Cal. Mar. 5, 2013) (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011)).

Under these standards, the Objection must be overruled.

**C.** **Because Securities Act Plaintiffs' Securities Act Claims Do Not Sound in Fraud, Rule 8 Pleading Applies to the Securities Act Claims**

The Securities Act claims do not "sound in fraud." To determine whether a complaint sounds in fraud, the Court "'must normally determine, after a ***close*** examination of the language and structure of the complaint, whether the complaint "alleges a unified course of fraudulent conduct" and "relies ***entirely*** on that course of conduct as the basis of a claim."'" *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *6 (N.D. Cal. Mar. 10, 2023) (quoting *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009)).

Courts analyze specific factors in conducting the "'close examination,'" in particular whether a complaint: (i) incorporates Exchange Act allegations into Securities Act allegation; (ii) alleges the same false statements; (iii) alleges the same trends under Items 105 and 303; (iv) uses language associated with fraud, such as that a defendant "manipulated" the market, and did so with scienter; and (v) "distinguish[es] which, if any, Defendants are accused of negligence and which are accused of fraud." *See Hoang*, 2023 WL 6536162, at *6-*8; *see also Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 917 (N.D. Cal. 2015).

PG&E largely ignores these standards to leap to its unsupported conclusion that the claims sound in fraud. Here, the TAC: (i) separately and distinctly pleads Securities Act claims, "specifically disclaim[ing] any reference to or reliance on allegations of fraud" (¶¶497, 694); (ii)

alleges 33 entirely different statements for the Securities Act claims[36]; (iii) does not incorporate the substantive Exchange Act allegations into the Securities Act Claim allegations; and (iv) alleges different actors involved in the claims for fraud, and those or negligence, including the underwriters and directors for the Securities Act claims not charged with violating the Exchange Act.[37] So too the TAC does not plead that any purported risk warnings violated the Exchange Act or plead violations of SEC Regulation S-K under the Exchange Act; it is only the Securities Act Claims that allege these. Nor do the Securities Act allegations contain claims that PG&E manipulated anything or that PG&E had scienter. Thus, "plaintiffs do not rely on a unified course of fraudulent conduct or on the 'wholesale adoption' of . . . fraud allegations," and the claims do not sound in fraud. *Knollenberg*, 152 F. App'x at 684 (claims not sounding in fraud where "plaintiffs have made an effort to plead a non-fraudulent basis for Section 11 liability"); *see also Exodus Commc'ns*, 2005 WL 1869289, at *12.

Moreover, as Judge Gilliam recently concluded, even "parallels between certain of the statements" does not mean that the Securities Act claims sound in fraud. *See The Reckstin Family Tr. v. C3.AI, Inc.*, 2024 WL 734497, at *8 (N.D. Cal. Feb. 22, 2024). Nor does any "overlap" in the underlying facts, as opposed to the alleged statements, require a different result. As one court recently held, "overlap" in "the conduct underlying the alleged claims of negligence and fraud . . . does not deprive the Lead Plaintiff of the opportunity to plead that Defendants acted negligently in the alternative. . . . A contrary rule 'would create a perverse incentive to file separate actions.'" *Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*, 2024 WL 775195, at *32

---

[36] PG&E directs the Court to no statements that overlap between the 19 misrepresentations alleged to violate the Exchange Act and the 34 misrepresentations alleged to violate the Securities Act, let alone to the substantial overlap required for claims to sound in fraud. *Contrast* District Action, ECF 160-1, *with* District Action, ECF 121-5 (ECF 121-5 is attached as Ex. 92 at Exhibit A to the Debtors' RJN).

[37] None of the 14 Underwriters nor the 13 Directors Rambo, Thomason, Mistry, Chew, Fowler, Herringer, Kelly, Kimmel, Meserve, Miller, Barry Lawson Williams, Parra, Anne Shen Smith, or Mullins are alleged to have violated the Exchange Act, and 3 PG&E officers, Kane, Johns, and Hogan, are only named for the Exchange Act Claims. *Contrast* ¶¶45-50, *with* ¶¶512-28, 531-554; *see In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *15 (N.D. Cal. Oct. 1, 2015) ("plaintiffs have sufficiently clarified and segregated their nonfraudulent theories of liability against the Underwriters to justify analysis under Rule 8(a)") (collecting authority).

1 (S.D.N.Y. Feb. 26, 2024).

2        Here, the only "overlap" between that PG&E purports to identify in its brief concerns the

3 locus of the false statements.[38] PG&E contends the alleged Exchange Act and Securities Act

4 statements originate in the same "SEC filings," and so sound in fraud. *See* OBJ at 81 (citing TAC

5 ¶¶630(a)-(d), 631). PG&E's claim is highly misleading. The OBJ does not identify a single one of

6 the "*many* of the same SEC filings" that purportedly forms a basis for both sets of allegations. The

7 paragraph PG&E cites in purported support (¶630) identifies four documents incorporated by

8 reference in the Offering Documents: three annual reports filed on Form 10-K, for 2015-2017, and

9 one press release filed on Form 8-K. But the Exchange Act portion of the TAC does not "rely" on

10 *any* of the three annual reports. In fact, the Exchange Act section does not reference those sections

11 to support the elements of fraud or for other substantive reasons, but rather to ***identify*** PG&E and

12 the Exchange Act Defendants. ¶¶43, 483, 493(j)-(k). And the press release is mentioned just once in

13 the Exchange Act section, with only partial overlap. *Contrast* ¶233, *with* ¶648. Indeed, neither the

14 OBJ nor the Debtors' RJN even mentions the press release.

15        PG&E's inability to identify any meaningful overlap between the two sections of a +200

16 page, +700 paragraph TAC is fatal to their unsupported contention the Securities Act claims sound

17 in fraud. Because the Securities Act Plaintiffs' allegations are "'analytically distinct, even if

18 overlapping conduct forms the basis for both,'" they are subject to Rule 8 pleading. *KE Holdings*,

19 2024 WL 775195, at *32.

20      **D.**     **PG&E's Offering Documents Contained Material Misstatements Regarding the Company's Commitment to Safety and Safety Practices**

21

22        **1.**     **Because PG&E Has Failed to Properly Address the Grounds for Dismissal, It Has Waived Them**

23        As a threshold issue, because PG&E has failed to identify either the statements it seeks to

24 dismiss or the specific bases for dismissing them, it has waived its ability to raise these issues on

25 reply and its motion should be denied. Courts "do not consider matters not ***specifically and***

26

27 ───────────────
[38] Significantly, the OBJ makes this single argument that the Securities Act claims "sound in fraud."
28 OBJ at 81. PG&E has not raised, and has thus waived, any argument that overlap in underlying facts here constitutes the same "course of conduct." *See infra* §IV.D.1.

***distinctly raised and argued*** in the opening brief." *Cooper v. SEC*, 788 F. App'x 474, 475 (9th Cir. 2019); *see also Nathanson v. Polycom, Inc.*, 2015 WL 12964727, at *1 (N.D. Cal. Apr. 16, 2015) ("As numerous courts (including the Ninth Circuit) have concluded, '[i]t is inappropriate to consider arguments raised for the first time in a reply brief.'") (citing cases) (alteration in original).

PG&E has not specifically and distinctly raised or argued in its OBJ that any of the alleged statements were not materially false. *See* OBJ at 82-84. A single footnote claims: "The Securities Act Plaintiffs fail to plead a material misstatement or omission," but not one statement is identified. *Id.* at 81 n.26; *see generally id.* at 81-82. Nor does the OBJ provide a specific or distinct basis for dismissing the statements it fails to identify. The closest the OBJ comes is to contend, without analysis or citation, that the Securities Act claims fail for the same reasons as the Exchange Act claims. *See generally id.* at 81-82 (again conflating Securities Act and Exchange Act claims). But, as explained above, the Exchange Act claims are based on statements not at issue for the Securities Act claims. Moreover, "[b]y raising in a conclusory fashion every conceivable ground on which a . . . complaint might be defective, defendants failed to provide plaintiffs with any basis for determining which aspects of the complaint defendants really wished to challenge." *Anvan Realty & Mgmt. Co. v. Marks*, 680 F. Supp. 1245, 1246 n.2 (N.D. Ill. 1988). Because PG&E's arguments are unsupported and facially non-specific, PG&E has waived any challenge to the falsity or materiality of the alleged statements.

### 2. The TAC Sufficiently Alleges that the Offering Documents' Risk Warnings Were Materially False and Misleading When Issued

Defendants "may make a materially misleading statement when [they] 'speak[] entirely of as-yet-unrealized risks' when the risks have 'already come to fruition.'" *Facebook*, 87 F.4th at 949-50. Even when language warns of specific risks, it will not shield a defendant from liability if the warnings "'fail to disclose hard facts critical to appreciating the magnitude of the risks described.'" *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010). And in the Ninth Circuit, "[o]ur case law does not require harm to have materialized for a statement to be materially misleading." *Facebook*, 87 F.4th at 949. Nor is there any knowledge requirement: Allegedly false risk warnings are "***plausibly materially misleading even if [defendant] did not yet***

1 ***know the extent of the . . . harm it would suffer . . . at the time the statements were made***." *Id.* at
2 948-50.

3     Here, each of the Offering Documents referenced risk factors that warned of risks related to
4 wildfires but "did not disclose the already existing negative impact on PG&E as a result of PG&E's
5 subpar safety practices," rendering them misleading. ¶633. They represented that: (i) PG&E's
6 financial results ***could*** be impacted by weather-related conditions, wildfires, climate change or other
7 events, and that they ***could*** incur liability caused by such events; and (ii) that climate change,
8 increasing temperatures, or other events ***could*** increase the occurrence of wildfires which ***could***
9 result in substantial costs or damages. For example, the February 24, 2016 Offering Documents for
10 the March 2016 Notes Offering warned investors that "[s]ome of the factors that ***could*** cause future
11 results to differ materially from those expressed or implied by the forward-looking statements, or
12 from historical results" included "the impact of droughts or other weather-related conditions or
13 events, wildfires (including the Butte fire in September 2015, which affected portions of Amador
14 and Calaveras counties), climate change . . . and other events." ¶634 (Stmt Nos. 1-2). Similar
15 representations were repeated in the December 2016, March 2017 and April 2018 Notes Offerings.
16 ¶¶635-636 (Stmt Nos. 2, 10-11, 20, 23). In connection with the April 2018 Notes Offering, PG&E
17 claimed that "[i]n California, over the past five years, inconsistent and extreme precipitation,
18 coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks
19 increasingly difficult to manage." ¶636 (Stmt No. 26). Likewise, each of the Offering Documents
20 purported to warn of the risk of climate change on the "Utility's financial condition, results of
21 operations, and cash flows" while omitting that climate change was not to be blamed for wildfires
22 caused by PG&E's dismal safety practices. *See* ¶¶636-637 (Stmt Nos. 5, 13); *see also* ¶638 (Stmt
23 Nos. 6, 14, 27); ¶646 (Stmt Nos. 9, 18, 32).

24     The Offering Documents were materially misleading because they did not disclose that: (i)
25 PG&E's widespread safety deficiencies and violations had already increased the risk of wildfires,
26 and caused hundreds or more wildfires and liability for those fires (¶¶499, 610, 621, 625); (ii) the
27 real risk of wildfires was a result of PG&E not sufficiently investing in safety, including "dismal"

28

vegetation management practices, the failure to remove trees or update its equipment (¶¶608, 619); and (iii) the then existing risks as a result of the safety violations and deficient practices were a significant adverse factor contributing to wildfires, not the potential impacts from weather-related conditions, climate change or "global warming" (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-623, 628).

The Offering Documents also listed many specific risks that not only were in PG&E's control, but, unbeknownst to investors, had actually come to pass including: (i) "the breakdown or failure of equipment" (Stmt Nos. 9, 18, 21-22, 32) and (ii) "the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility" has or reasonably should have identified as "unsafe," which failure then leads to a "catastrophic event" such as a wildfire (Stmt Nos. 9, 18, 32). In truth, PG&E's equipment was outdated, it had identified equipment likely to fail, it had incentivized contractors not to perform vegetation management, it had failed to properly train its employees and contractors, and it had allowed its tree budget to wither. ¶¶569, 612, 620, 622; *see also* ¶¶613-615; RJN Opp. Ex. 7 *passim*. For example, that PG&E purported to warn that "the failure to take . . . sufficient action" to repair "unsafe" equipment might have negative consequences (¶646 (Stmt Nos. 9, 18, 32)), when PG&E had already failed to repair towers, including one a quarter century past its useful life that it had already identified as highly likely to fail, renders the statement materially false. As Judge Alsup found, wildfires were a problem of PG&E's "own making," not caused by unexpected weather outside of PG&E's control. *See supra* §IV.A.

The Offering Documents also each warned of the risk of "whether we incur liability to third parties for property damage or personal injury caused by such events; and . . . [being] subject[ed] to civil, criminal, or regulatory penalties in connection with such events." ¶¶634-635 (Stmt Nos. 1-2, 10-11, 20, 23). Yet, as a result of PG&E's safety deficiencies and numerous violations, PG&E was necessarily unable to prove "it reasonably and prudently operated and managed its system" rendering it liable for the fires it had already caused. ¶558.

PG&E ignores the well-pled facts in the complaint and that it is on notice of the claims

against it. Rather than address those claims or the specific statements alleged, PG&E raises

conclusory arguments that simply contradict the well-pled facts. For example, PG&E contends that

none of the statements were false, at the time they were made, because falsity is "premised entirely

on conclusions reached in December 2018 and later in 2019." OBJ at 83. This is wrong. First, it

ignores that the risk warnings and other statements are false not because fires were started, but

rather because PG&E did not disclose PG&E's own conduct (or lack thereof) that increased the risk

of fires. Second, the TAC pleads facts that existed prior to PG&E's risk warnings. For example, in

2013 and 2014 internal PG&E documents evidenced needed repairs to the Caribou-Palermo

transmission line. *Supra* §IV.B. Pleading those existing facts from 2013-2014, pleading false

statements in 2016-2018, and pleading later revelation of those facts as ***still*** existing in 2018-2019 is

a well-recognized way to plead contemporary falsity: "The most direct way to show . . . that a

statement was false when made . . . is via contemporaneous reports or data . . . which contradict the

statement." *Nursing Home Pension Fund,* 380 F.3d at 1230.[39] Thus, whether the investigations were

contemporaneous or not, they uncovered facts that were. *In re Quality Sys., Inc. Sec. Litig.*, 865

F.3d 1130, 1144 (9th Cir. 2017) (a statement is "materially false or misleading" if it is "inconsistent

with [internal] information").

In similar fashion, PG&E's claim that it might face liability if it "failed to comply with

applicable laws and regulations" (Stmt Nos. 24, 34), when PG&E had already committed hundreds

of such violations (¶623), increasing the risk of both fires and PG&E's liability for fires, is

actionable (¶¶571, 595, 599, 618; *see also* ¶¶558-562). Thus, PG&E's claim that later investigations

either cannot or did not reveal facts existing at the same time as the alleged statements simply

contradicts the facts of the TAC and must be rejected.

PG&E also contends the risk warnings were not false or misleading because PG&E

"disclosed the risk of wildfires." OBJ at 83. But that assertion is conclusory and contradicted by the

---

[39] *See also Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) (noting "relatively constant, long-term nature of the [contrary] information"), *overruled on other grounds City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *Berson*, 527 F.3d at 985 n.1 (contrary information "likely still in effect"); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1154 (N.D. Cal. 2015) (contrary information "persisted").

facts pled. *See infra* §IV.E. For example, Plaintiffs allege that the statements purporting to warn that "the failure to take . . . sufficient action to mitigate operating conditions" (Stmt Nos. 9, 18, 32) could cause fires is actionable. But in fact, the "susceptibility of PG&E's distribution lines to trees or limbs falling onto them during high-wind events," a result of PG&E underinvestment in vegetation management, was a risk that had already materialized. *See, e.g.*, ¶¶603, 622. Those specific allegations are not addressed in the OBJ, and PG&E does not explain how investors could or did learn from their purported risk warnings that the warned of risk had already materialized. Disclosures about possible failures to mitigate unspecified and hypothetical "conditions" do not warn investors PG&E had not and was not taking the steps to mitigate those known conditions.

### 3. The TAC Sufficiently Alleges that the Offering Documents Misled Investors Regarding PG&E's Investments in Infrastructure and Vegetation Management

Statements are "materially false or misleading" where they "'create[d] an impression'" that was "inconsistent with real-time . . . information." *Quality Sys.*, 865 F.3d at 1144. Viewing the TAC's allegations "with a practical and common-sense perspective," falsity has been sufficiently alleged. *S. Ferr*, 542 F.3d at 784.

The Offering Documents specifically addressed the then current status of PG&E's vegetation management and other programs and PG&E's purported commitment to and investments in its safety, while portraying PG&E's vegetation management in a positive light. Investors were told in the March 2016, December 2016 and March 2017 Offering Documents that PG&E was "***making substantial investments** to build a more modern and resilient system*" and "***[t]he Utility's vegetation management activities also reduce the risk of wildfire impacts on electric and gas facilities***." ¶640 (Stmt Nos. 4, 12). Likewise, investors were told of PG&E's "adaptation strategies" and that PG&E "uses its risk-assessment process to ***prioritize infrastructure investments***." ¶642 (Stmt Nos. 3, 15). And further, that PG&E had upgraded substations and re-conductored transmission lines and performed other upgrades to improve, among other things, "safety." ¶¶644-645 (Stmt Nos. 7-8, 16-17, 30-31). The April 2018 Offering Documents reiterated these statements (*e.g.*, ¶641 (Stmt No. 29); ¶643 (Stmt No. 28)), and further represented that PG&E took steps to

1  "ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its . . .

2  electric operations" (Stmt No. 33).

3       These statements omitted material fact, and were verifiably inconsistent with and

4  contradicted by material adverse facts that existed at the time, including the facts described above.

5  For example, an internal 2014 email that stated "the likelihood of failed structures [on the power

6  line that caused the Camp Fire just months after the April 2018 Offering] happening is high,"

7  because the Company never repaired or replaced those structures. *See* ¶¶620-621, 623; *see also*

8  District Action, ECF 164-8. So too, as described *supra* § IV.B, PG&E let its tree budget "wither"

9  and its vegetation management practices were dismal. Fairly read in context, the alleged false

10  statements "'create[d] an impression'" that was "inconsistent with real-time . . . information."

11  *Quality Sys.*, 865 F.3d at 1144.

12       Critically, Plaintiffs have not alleged that any of the above statements violate the Exchange

13  Act. Thus, PG&E's principal argument that "[a]xiomatically, as no materially false statement is

14  pled with specificity as to the Exchange Act claims, the Securities Act claims fail as well" provides

15  no grounds for dismissal of the Securities Act claims. OBJ at 81. Similarly, for the Securities Act

16  Claims, PG&E fails to provide a single example of any misrepresentation in this case that is

17  "virtually identical" (OBJ at 83) to those in *Edison I* and *Edison II*. *See infra* §§ IV.D.1, IV.D.6.

18       PG&E's contention that the "record is clear that PG&E made substantial investments in its

19  wildfire safety programs" (OBJ at 82) is inaccurate, and also irrelevant. To start, the record is not

20  clear that PG&E made "substantial" investments. PG&E cites a lone "CEMA Application" filed by

21  PG&E in support of its contention, but a party-statement from outside the pleadings does nothing

22  more than prematurely raise a factual dispute.

23       And in any event, the claim is irrelevant. The record shows PG&E not only let its vegetation

24  management budget wither, but also, for example, but allowed "gaps in PG&E's training" to

25  develop, did not properly oversee work, and that PG&E's "***supposed*** curative training produced

26  only a 6% improvement and ***94% of the problem persisted***." *Id.* at 28. RJN Opp. Ex. 7 at 2; *see also*

27  *supra* §IV.B. Thus, any claimed amount spent on safety was woefully insufficient at the time the

28

1　statements were made. This is borne out by the fact that PG&E belatedly admitted it needed to

2　spend $2 billion on safety and filed bankruptcy because of the expenditures needed and liability it

3　faced. *E.g.*, ¶¶604-608.

4　　　　PG&E's contention that "Securities Act Plaintiffs nowhere point to any representation from

5　PG&E that it could ever *eliminate* the risk of wildfires" similarly fails. OBJ at 82. PG&E has

6　ignored *every* statement Plaintiffs did allege (*supra* §IV.D.1); it cannot prevail on a motion to

7　dismiss by moving against a statement that was never alleged.

8　　　　**4.　　The TAC Sufficiently Alleges that the April 2018 Offering Further**
　　　　　　　　　**Misled Investors About PG&E's Deficient Safety Practices and the**
9　　　　　　　　　**Financial Consequences of PG&E's Safety Deficiencies**

10　　　　The April 2018 Offering Documents contained further misrepresentations specifically

11　regarding the impact of the North Bay Fires on PG&E, including whether the Utility could recover

12　costs related to the wildfires, whether it had liability for the fires and whether it would be liable for

13　fines and penalties if it was determined that the Utility "*failed to comply with applicable laws and*

14　*regulations*." ¶660 (Stmt Nos. 24, 34). Similarly, PG&E downplayed that it was liable for the North

15　Bay Fires by indicating in its February 9, 2018 Form 10-K incorporated into the April 2018

16　Offering Documents that it could be liable for damages and costs if found to be negligent but that

17　"[g]iven the preliminary stages of investigations and the *uncertainty as to the causes of the fires,*

18　*PG&E Corporation and the Utility do not believe a loss is probable at this time*." ¶661 (Stmt No.

19　25). Meanwhile, the Offering Documents misleadingly indicated that "it is reasonably possible that

20　facts *could emerge* through the course of the various investigations" that could lead PG&E to

21　believe that a loss is probable. Stmt No. 25 (emphasis in original); *see also* ¶661. Those facts

22　already existed; PG&E's safety lapses were responsible for these fires. *See, e.g.*, ¶¶579-580, 584,

23　586, 605, 610.

24　　　　The April 2018 Offering Documents also falsely assured investors that PG&E had a monitor

25　in place since April 12, 2017 as part of its federal criminal conviction for the San Bruno explosion

26　"to help ensure that the Utility takes reasonable and appropriate steps *to maintain the safety of its*

27　*gas and electric operations* and *maintains effective ethics, compliance, and safety related*

28

*incentive programs on a Utility-wide basis*." ¶647 (Stmt No. 33). And that "[g]iven the preliminary stages of investigations and the uncertainty as to the causes of the fires, PG&E Corporation and the Utility *do not believe a loss is probable at this time*," with respect to liability for the North Bay Fires. ¶661 (Stmt No. 25); *see also* ¶660 (Stmt Nos. 24-25, 34). Yet, unbeknownst to investors, PG&E had, in fact, failed to take "reasonable and appropriate steps to maintain the safety" of its electrical operations, namely dismal vegetation practices and tree maintenance. ¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623, 647. Further, liability for the North Bay Fires was probable and reasonably estimable. ¶¶660-673.[40] Regardless of whether certain representations were literally true (*i.e.*, there was a monitor), PG&E's representations were misleading because they omitted material adverse facts giving investors a misleading impression of the true state of PG&E's affairs. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 692 (9th Cir. 2011).

Thus, because at the time the statements were made there existed numerous facts that "conflict[ed] with what a reasonable investor would take from the statement itself," PG&E's statements that omitted the adverse facts that pointed to its liability are actionable. *Omnicare*, 575 U.S. at 188-90.[41]

### 5. The TAC Sufficiently Alleges that the Offering Documents Are Actionable Because They Failed to Disclose Known Trends in Violation of SEC Regulation S-K

PG&E's Offering Documents are also actionable under the Securities Act because they failed to disclose material adverse trends in violation of Items 105 and 303 of SEC Regulation S-K. Item 303 requires the Management's Discussion & Analysis section of registration statements, *inter alia*, to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing

---

[40] Where a company fails to properly disclose its contingent liabilities it is an actionable omission for purposes of the Securities Act when from the facts alleged it is both probable and reasonably estimable. *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 n.16 (C.D. Cal. June 7, 2018); *see also id.* at *6 n.16 (plaintiffs not required to '"plead the exact assumptions'" for opinions about potential liability).

[41] The OBJ also relied on *Omnicare*, though only in opposing the Exchange Act claims. *See* OBJ at 51-52. However, *Omnicare* is not to the contrary and supports upholding the TAC. *See Omnicare*, 575 U.S. at 188-90.

operations." 17 C.F.R. §229.303(a)(3)(i)-(ii). Item 105, meanwhile, requires that registration statements filed on SEC Form S-1 include "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105(a).

Significantly, the pleading standard for a Regulation S-K violation is different under the Securities Act than under the Exchange Act, in two critical ways. First, the materiality standard is significantly more expansive under Securities Act claims. As the Ninth Circuit explained in *In re NVIDIA Corp. Sec. Litig.*, "[m]anagement's duty to disclose under Item 303 is ***much broader*** than what is required under the standard pronounced in *Basic*" for violations of Rule 10b5. 768 F.3d 1046, 1055 (9th Cir. 2014) (also noting "'***the materiality standards for Rule 10b5 and [Item 303] differ significantly***'"). Specifically, under the Securities Act, Item 303 requires that omitted information be "'***reasonably likely to have a material effect***'" to be actionable. *Id.*

The second difference is that, for Securities Act claims, a plaintiff can plead pure omissions, untied to any affirmative false statement. As the *NVIDIA* court further explained:

> Section 10(b) of the Exchange Act . . . differs significantly from Sections 11 and 12(a)(2) of the Securities Act." Liability under Sections 11 and 12(a)(2) of the Securities Act may arise from "omitt[ing] to state a material fact required to be stated." To put it differently, liability arises from "an omission in contravention of an affirmative legal disclosure obligation." ***There is no such requirement under Section 10(b) or Rule 10b-5***.

*Id.* at 1055-56.

While plaintiffs must plead a "plausible" trend under Item 303, as Judge Breyer recently explained, "plausibility" is pled even where "[m]ore facts are needed . . . to determine whether [adverse facts] actually constitute a trend." *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *3, *7 (N.D. Cal. Sept. 28, 2023).

Here, PG&E violated Regulation S-K under the Securities Act both by making (i) affirmative statements that misrepresented or failed to disclose known, adverse trends, and (ii) stand alone, or pure, omissions that failed to disclose the same. *See* ¶¶674-682. The Offering Documents did not disclose facts that were known to PG&E and would (and did) have an unfavorable impact on PG&E's earnings and income from continuing operations. As alleged, the known trends adversely impacting PG&E included: (i) the fact that despite suffering from serious safety problems for years,

PG&E had failed to develop a comprehensive approach to address safety; (ii) PG&E's deficient practices related to wildfire safety and widespread safety violations, including the systemic failure to clear vegetation and trees as required by regulations; (iii) PG&E's failure to update outdated equipment or flawed systems; and (iv) PG&E's failure to allocate sufficient resources or investments in safety. ¶¶22, 568-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-623. For example, by letting the "tree budget wither" and putting safety up for debate while prioritizing dividend payments and earnings growth, PG&E allowed material adverse trends in safety and vegetation management to develop and persist. *E.g.*, ¶¶567, 622; *compare id.*, *with Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *16 (C.D. Cal. July 3, 2023) (liability where "the persistent 'negative delta' between" Defendant's retail prices and costs "may be considered a 'significant factor' making investment in Rivian especially 'risky'"). As one PG&E employee, when asked about regulatory non-compliance related to vegetation management, replied, "yes, ***it's a trend***." ¶571.

Under the broad test for materiality applied to Securities Act claims for violations of SEC Regulation S-K, there is no doubt that information PG&E omitted would be material to a reasonable investor. For example, in addition to the above omitted facts, the K&E Report documented problems that "persisted" such as PG&E's inability to properly clear trees or provide effective "curative training." RJN Opp. Ex. 7 at 28. These adverse facts plausibly constituted trends reasonably likely to have a material effect on PG&E's business.

Significantly, PG&E does not address either the relevant standard or the specific factual allegations supporting Securities Act Plaintiffs' Regulation S-K allegations.[42] And the only Regulation S-K specific defense PG&E raises is that PG&E "disclosed the worsening trend of conditions contributing to the risks of California wildfires." OBJ at 85. This argument is identical to the truth-on-the-market defense PG&E raises elsewhere. *See infra* §IV.E. Courts routinely reject such contentions at the pleading stage. *E.g.*, *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at

---

[42] Elsewhere PG&E asserts that ***all*** the allegations here are "virtually identical" to those in the *Edison* case (OBJ at 83), but fails to recognize the *Edison* plaintiffs did ***not*** plead violations of Items 105 or 303 under SEC Regulation S-K. *See infra* §IV.D.6.

*15 (N.D. Cal. Oct. 31, 2014).

PG&E is also wrong as a matter of fact. PG&E's purported disclosures of worsening external conditions in California omitted the trends PG&E itself contributed to, such as the build-up of dangerous trees as PG&E let its vegetation management budget wither. Those "omissions are not cured by disclosures [PG&E] did make . . . [and] did not reveal the information necessary for the investing public to make a proper assessment of the alleged risks." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022), *cert. granted*, 144 S. Ct. 479, 216 L. Ed. 2d 1312 (2023).

### 6. The Unpublished *Edison* Opinions Are Inapposite and Not Binding on This Court

PG&E relies heavily on the non-binding, unpublished district court and appellate *Edison* opinions. But, the facts and analysis from *Edison* are distinct and do not warrant dismissal of Plaintiff's' Securities Act claims.

First, the pleading standard applicable to this case is Rule of Civil Procedure 8 and *Twombly* plausibility pleading, not the heightened pleading standard applied in the *Edison* opinions. A review of the complaint underlying the *Edison* opinions demonstrates the vast difference in the allegations here for the Securities Act claims and those decided in *Edison*. *See generally*, *Edison* Complaint.[43] Namely, the *Edison* plaintiffs comingled the substantive allegations for both the Securities Act and Exchange Act claims. *Id.* Thus, the allegations for both the fraud and strict liability claims involved the same statements and the same conduct. That is not the case here. *Contrast supra* §IV.C, *with Edison II*, 2022 WL 822191, at *1 (because "Securities Act claims are based on the *same . . . statements*" as Exchange Act claims, "Securities Act claim therefore 'sounds in fraud'").

Second, unlike in *Edison*, the Securities Act Plaintiffs here plead violations of SEC Regulation S-K. This is significant because while the *Edison* opinions dismissed affirmative representations as "puffery," here the Court cannot dismiss the Regulation S-K allegations for the same reason – *i.e.* because under Regulation S-K, Securities Act Plaintiffs can and do plead pure

---

[43] Plaintiffs encourage the Court review the operative *Edison* Complaint, which combines all Securities Act claims and Exchange Act claims in a single "Substantive Allegations" section. *See id.*, ¶¶69-456 *Edison* Complaint.

omissions, and the materiality standard for omitted trends is much broader than for the type of affirmative statements alleged in *Edison*. *See supra* § IV.D.5. Indeed, the *Edison* Complaint did not even discuss trends, or have the facts alleged here, including admissions by a company employee that adverse trends adversely impacted the company. *Id.*

Third, context matters, and unlike in *Edison*, PG&E's failures to invest in safety processes and infrastructure were systemic and "unique": "*[PG&E's] culture of a lack of safety is unique*" amongst utilities, including Edison, a utility that serves a similar customer base and faces similar risks, but which "significantly revamped its safety protocols to respond to increased wildfire dangers," something PG&E never did. ¶621. This is borne out in the fact that PG&E caused *1,208 more* fires than Edison between 2014 to 2017. ¶412. Moreover, the statements must be viewed in the context of the totality of information available to investors regarding PG&E, which differs from that available to Edison's investors. *Matrixx*, 563 U.S. at 38. For example, the relevant "context" in the *Edison* opinions was prior Edison submissions to the CPUC: "the Edison Defendants' general statements related to prioritization of safety would not mislead a reasonable investor, who would be aware of the Edison Defendants' previous disclosures to CPUC." *Edison I*, 2021 WL 2325060, at *10. Conversely, here, PG&E points to no disclosures to the CPUC, or to Cal Fire or others, that disclosed, for example, the concealed "crisis" caused when PG&E "let the tree budget wither" making "PG&E . . . the single-most culpable entity" causing fires. ¶622.

Fourth, the *Edison* opinions were issued prior to Ninth Circuit law that *is* controlling. For example, the *Facebook* decision held, *inter alia*, that for risk warnings "our case law *does not require harm to have materialized* for a statement to be materially misleading." 87 F.4th at 949; *see also id.* at 950-51; *supra* §IV.D.2. Thus, the *Edison* opinions are inapposite because they relied on evidence that the harm was required to have, but had not, materialized. *E.g.*, *Edison I*, 2021 WL 2325060, at *11 (finding "[p]laintiffs do not plead facts that [Edison] *had already been found liable* for the two wildfires"). Moreover, as discussed below, the *HP, Inc.* opinion newly adopted the standard that for the statute of limitations, a "'reasonably diligent plaintiff has not "discovered" . . . . facts constituting a securities fraud violation until he can plead that fact with *sufficient detail and*

1  *particularity* to survive a 12(b)(6) motion to dismiss.'" *HP, Inc.*, 65 F.4th at 465; *infra* § IV.G.1.

2  Fifth, unlike in *Edison*, the Securities Act Plaintiffs have not alleged that a single, possibly

3  one-off, fire, or investigations as to PG&E's liability for one fire, alerted investors to the falsity of

4  statements about purportedly comprehensive safety practices.[44] Thus, the statute of limitations did

5  not start to run at the time of the North Bay Fires in 2017, because, unlike in *Edison*, the market did

6  not learn, and Plaintiffs have not plead that the market learned, that PG&E had caused the North

7  Bay Fires until **at least** six months later.[45]

8  Sixth, unlike in *Edison*, the Securities Act Plaintiffs here plead declines in **bond** prices,

9  which occurred not at the time of the North Bay Fires, or at the time PG&E was found to have

10  caused fires (*e.g.*, ¶¶579-580), but in November of 2018 (¶¶505, 591-592). Conversely, the *Edison*

11  plaintiffs alleged that Edison's "**stock** price[] remain[ed] artificially inflated" until it '"plunged' . . .

12  the day after the Thomas Fire ignited." *Edison I*, 2021 WL 2325060, at *5. This, too, is highly

13  relevant to when bondholders were on notice of potential Securities Act claims. *See infra* § IV.G.1.

14  ### E.    PG&E's Truth-on-the-Market Defense and Materiality Challenges Fail at the Pleading Stage

15

16  The Securities Act Plaintiffs sufficiently allege that investors were misled by the

17  misrepresentations in PG&E's Offering Documents. The appropriate "context" in determining

18  whether PG&E's representations to investors were materially misleading is whether the

19  misstatements and omissions here "'would have been viewed by the reasonable investor as having

20  significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231-32.

21  With respect to the Regulation S-K omissions, the appropriate context is even broader. *Supra*

22  §IV.D.5. Under both standards, the omissions of PG&E's widespread safety deficiencies and

23  woefully inadequate investment in safety were material and PG&E's affirmative defense that the

24  market was not misled because the "truth" was known is not a basis to dismiss at the pleading stage.

25

---

26  [44]    *See, e.g.*, ¶596 (pleading it was not until December 21, 2018 that the CPUC disclosed comprehensive issues with PG&E's safety culture that made the CPUC "concerned that the safety

27  problems being experienced by PG&E were not just one-off situations or bad luck, but indicated a deeper and more systemic problem").

28  [45]    *Contrast* ¶¶579-580, *with Edison I*, 2021 WL 2325060, at *7; *see also infra* § IV.G.1.

*See Va. Bankshares v. Sandberg*, 510 U.S. 1083, 1097 (1991) (It is "[o]nly when the [purported corrective information] would ***exhaust*** the misleading conclusion's capacity to influence the reasonable shareholder would a . . . [claim] fail on the element of materiality.").

Because "[m]ateriality is a 'mixed question of law and fact,' and '[p]roof of that sort is a matter for trial,'" the "truth-on-the-market" defense is typically not available at the pleading stage. *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (collecting Supreme Court and other authority). That is especially true for Securities Act claims: the defense is even "less applicable to registration statements, IPOs, and Section 11 claims, where the [bond] price has been set privately [because] the public market has necessarily not had the opportunity to factor in information it may have into the share price." *Id.* Thus, PG&E faces a "heavy burden of demonstrating" the defense is appropriate at the pleading stage, in particular because "'[i]nvestors are not generally required to look beyond a given document to discover what is true and what is not.'" *Id.* (quoting *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008)). In particular, "investors cannot be expected to comb through . . . even . . . public information . . . [or] fact check[] the defendants' representations . . . [or] conduct a market-wide historical analysis." *Shenk v. Mallinckrodt plc*, 2019 WL 3491485, at *17 (D.D.C. July 30, 2019); *see also Va. Bankshares*, 501 U.S. at 1097 ("[i]f it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow"). Consistent with these rules, the Court has noted that PG&E can only prevail on the Objection on legal grounds: "[T]he Rule makes clear that if there are facts to be – unresolved facts to be decided, that cannot be disposed of [here]. . . . But if there are questions of law that can be dispositive." Jan. 24, 2024 Hr'ing Tr. at 49:5-11.

Indeed, "before the "truth-on-the-market" doctrine can be applied, the defendants must meet their burden to show that the information that was withheld or misrepresented was "'transmitted to the public with a ***degree of intensity and credibility*** sufficient to effectively counterbalance ***any*** misleading impression created by insider's one-sided representations.'" *Facebook*, 87 F.4th at 950; *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 511 (S.D.N.Y.

2013) (finding liability under Item 303 where "Facebook used generalized and indefinite terms in the Registration Statement" and even where "Facebook made significant disclosures" that "*satisf[ied] only part* of Defendants' Item 303 obligations").

Here, PG&E explicitly invokes the disfavored and premature "truth-on-the-market" defense (OBJ at 4), based on the contention that "PG&E disclosed the risk of wildfires." OBJ at 83. But PG&E does not identify any purported disclosures – by quote, pincite, or even by document – that rendered any specific Securities Act statement not-misleading. Rather, PG&E forces the reader to guess which disclosures, if any, PG&E thinks may have disclosed the truth to the market, principally by citing their Exchange Act arguments, which in turn cite dozens of documents and hundreds of pages from outside the TAC. Out of an abundance of caution, Plaintiffs address four possible sources of disclosures below.

Importantly, none of the purported disclosures are sufficient for PG&E to prevail on its motion to dismiss, because there is nothing in the record showing that PG&E in fact disclosed what Securities Act Plaintiffs allege was concealed. PG&E mischaracterizes the concealed truth as some general risk of fires. *E.g.*, OBJ at 83 ("PG&E disclosed the risk of wildfires"). But in fact what PG&E concealed via the distinct Securities Act statements was PG&E's own, ongoing, systemic safety deficiencies and likely liability for those deficiencies. *See supra* §§IV.C; IV.D.1-5. For example, PG&E points to no disclosure that PG&E has, for years, diverted resources away from safety to pay for dividends and prop up earnings. Nor do any disclose the wide-spread safety deficiencies that were a result of PG&E not devoting resources to mitigating known risks. For example, Stmt Nos. 9, 18, and 32 represented that "*the failure to take expeditious or sufficient action* to mitigate operating conditions, facilities, or equipment, *that the Utility has identified*, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire . . .), and the failure to respond effectively to a catastrophic event." Those statements were false, *inter alia*, because, at the time the statements were made, internal PG&E documents showed the "likelihood of failed structures happening [on the Caribou-Palermo line] is high," yet PG&E did not mitigate those known risks for years, and caused the Camp Fire as a result.

¶¶612, 615, 620-621.

In light of the well-pled facts as to what the alleged statements concealed from the market, the four types of purported disclosures PG&E generally references cannot have revealed that relevant truth to the market. First, in its "overview" of the offerings, PG&E identifies generic "risk factors" that were included in the Offering Documents. OBJ at §IV.A. However, these risk factors include many of the same statements alleged to violate the Securities Act. For example, PG&E lists Stmt Nos. 9, 18, and 32 as purported risk warnings. OBJ at 75. Because Plaintiffs allege these statements to be materially false, and because Plaintiffs' allegations must be accepted as true, the "risks" PG&E warned of were misleading and could not have informed the market of the truth.

Second, in the Securities Act argument section, PG&E identifies three offering documents (Debtors' RJN, Exs. 19-21) purportedly incorporating generic disclosures concerning "conditions contributing to the risks of California wildfire." OBJ at 85. In combination, those three documents are over 100 pages long, and incorporate thousands of pages of other documents. What exactly was "disclosed" and how that informed investors that they should disregard what PG&E actually represented in the Offering Documents is not explained. Nor does PG&E tie any specific disclosure to any specific statement in temporal order. For example, Debtors' RJN, Ex. 21 is dated March 7, 2017, so presumably it did not reveal any truth relevant to the statements issued before that date (*i.e.*, Stmt Nos. 1-19). But that is an inference nowhere supported by the OBJ.

Third, PG&E cites, without analysis, all of §III.A.1 of the Exchange Act section of its brief, the fact background section describing PG&E's operations. OBJ at 85. That section summarizes the disclosures PG&E purportedly gave as: (1) "PG&E is heavily regulated"; (2) "operating electrical facilities is inherently dangerous"; and (3) fires can be "catastrophic." OBJ at 10. Moreover, §III.A.1 cites nine exhibits and, largely eschewing pincites, opts instead to cite whole "risk factor" sections of PG&E's SEC filings, in particular its annual reports (filed on Form 10-K). This "litany of generally applicable risk factors' applied as boilerplate to every alleged misrepresentation" is not sufficient to establish that any purported truth was on the market or rendered any specific statement, or the statements generally, non-misleading as a result of specific disclosures. *Lormand v. US*

*Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009).

And fourth, PG&E appears to argue, in its Exchange Act section, that revelations concerning fires or the San Bruno explosion disclosed the concealed truth. PG&E describes the North Bay Fires as the "materialization of a ***disclosed*** risk" (OBJ at 62) and notes the San Bruno explosion and following probation occurred "before Cal Fire published any reports" (OBJ at 17-18). Again, PG&E does not explain how these events revealed the purported truth, or how that truth rendered any specific Securities Act statement non-misleading in context. *Infra* § IV.D.1.

If in fact the four above sources of disclosures are what PG&E intended, PG&E's truth-on-the-market arguments fail. To start, the sheer quantity of material PG&E cites in support tends to confirm that its truth-on-the-market defense is improper and cannot be decided at this stage: "[t]he volume of the judicially noticed articles . . . might demonstrate that investors like [Securities Act Plaintiffs] would have" been unable to discern the purported disclosed truth. *Uber*, 2020 WL 4569846, at *6. And given that volume, "even assuming the defense is available for Section 11 claims, it is not available at the motion to dismiss stage." *Id.*

Further, in deciding whether the truth was on the market, the Court must consider not just disclosures in isolation, but also the context of PG&E's misleading efforts to retard the market's ability to assess the intensity and credibility of the purported disclosures. In the documents incorporated by reference in the March 2016 Notes Offering, PG&E denied that it had committed willful safety violations with respect to the San Bruno explosion. Debtors' RJN, Ex. 2 at 35. And even after PG&E had been found criminally liable, PG&E assured investors it was now monitored by a third party to prevent such safety lapses. ¶647 (Stmt No. 33). The Offering Documents also specifically indicated that the "PG&E . . . do[es] ***not*** face the prospect of fines, penalties, or remedies in this phase." Debtors' RJN, Ex. 2 at 58.[46] PG&E's 2017 Form 10-K filed with the SEC on February 9, 2018, for example, stated that "[i]t is uncertain when the investigations will be complete," and that the information in the 22 electric incident reports was "preliminary, and does not reflect a determination of the causes of the fires." Debtors' RJN, Ex. 9 at 27. Emphasizing that

---

[46] Further, that PG&E has been accused of falsifying safety data renders their self-reporting to the CPUC unreliable for the purpose of disputing well-pled facts on a motion to dismiss. ¶¶595, 599.

"investigations into the fires are ongoing." *Id.* Further that, "[g]iven the preliminary stages of investigations and the uncertainty as to the causes of the fires, PG&E Corporation and the Utility do not believe a loss is probable at this time." *Id.* at 28. This body of facts must be weighed against the facts, if any, supporting PG&E "truth-on-the-market" defense. It would not be appropriate to do so at this stage.

### F. PG&E's Remaining Attacks on Falsity, on the Grounds of Materiality, Fail Because the Offering Documents Materially Misled Investors About PG&E's Safety Practices

PG&E raises a host of further challenges to the materiality of ***all*** the Securities Act statements, generally, which PG&E raises by improperly seeking to incorporate by reference Exchange Act arguments into its Securities Act section. *See* OBJ at 81. These arguments fail.

To start, the cases PG&E cites are largely inapposite as they are based on their reliance on heightened pleading standards inapplicable here. *E.g.*, OBJ at 34 (citing *Plumley v. Sempra Energy*, 2017 WL 2712297, at *4 (S.D. Cal. June 20, 2017). But even were they applicable, they fail. The *Plumley* court acknowledged that allegations "may be sufficient" where "defendants failed to act at all, or even that their actions were delayed, in response to" a safety condition. 2017 WL 2712297, at *9-*10. That is precisely what the TAC pleads in alleging that PG&E identified problems with the Caribou-Palermo line, told the CPUC about those problems, then did nothing.

So too PG&E's efforts to sweep all statements about "safety" away as necessarily immaterial "puffery" or aspirational statements fails. *E.g.*, OBJ at 32-33, 39-40. "'[A]llegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false.'" *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995)) (emphasis omitted). Even the Ninth Circuit case relied on by PG&E (OBJ, *passim*) recognizes that "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). And even where a statement is "undoubtedly true . . . the context in which the statements were made is key." *Id.* at 1060-61 (finding omissions non-actionable where "[n]othing about the statements . . . would give a reasonable investor the impression that Intuitive's

growth was different than it was in reality"). Indeed, in-context statements that "'everything [was] going fine'" when defendants had doubts that a drug might not work or be FDA approved have been found to be actionable, even where the company disclosed "the risks of failure involved in the FDA process." *Warshaw,* 74 F.3d at 959 (alteration in original). Likewise, where defendants "provided a concrete description of the past and present state of the pipeline" for its product, describing it, for example, as "'very robust,'" their statements are actionable. *Quality Sys.*, 865 F.3d at 1136-37, 1144. And positive statements about the expansion of a company's retail warehouse operations could not be determined as a matter of law to be immaterial at the pleading stage because such determination "'requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" *Fecht*, 70 F.3d at 1080.

Here, PG&E has not identified which statements it challenges as immaterial. *See supra* §IV.D.1. In any event, assuming it is all of them, based on the reasons in the OBJ's Exchange Act section, the statements are objectively misleading given the appropriate context; PG&E omitted a withering budget and systemic safety deficiencies that would have been "'necessary in order to make the statements . . . not misleading.'" *Matrixx*, 563 U.S. at 47. Similarly, the statements here cannot be compared – in context – to generalized statements about corporate progress in the safety area; they are far more akin to those statements where there was a triable issue as to whether the company matched its representations regarding upgrades and investments "with policies and actions." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 758 (S.D. Tex. 2012) (fraud-based claims). For example, statements that PG&E was "making substantial investments to build a more modern and resilient system" (Stmt Nos. 4, 12, 29) and "uses its risk-assessment process to prioritize infrastructure investments" (Stmt No. 28) altered the total mix of information and create triable issues. As in *BP*, here "there were stark differences between the image [PG&E] projected and the reality of [its] operations" where its safety performance was subject to scrutiny following a prior explosion. *BP*, 843 F. Supp. 2d at 758; *see also In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 626-27 (S.D. Tex. 2018) (representations that "Company 'perform[s] scheduled

maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate,'" actionable), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019) (alterations in original). "'[T]he allegation that the company did not in fact perform needed maintenance on its pipeline systems [or here power lines], including aging parts subject to corrosion [as they were here] that ran through sensitive high-consequence areas [like here], would undoubtedly alter the "total mix" of information on which a reasonable investor would rely.'" *Id.* (finding falsity but dismissing statement on scienter grounds). Indeed, as alleged, PG&E put safety up for debate, incentivized its contractors not to perform vegetation management and did not perform maintenance on its outdated and rapidly failing infrastructure. *E.g.*, ¶¶567, 569, 606, 639, 669.

### G. PG&E's Other Affirmative Defenses Are Meritless and Fail to Clear the High Hurdle for Dismissal

#### 1. Plaintiffs Have Timely Alleged Each of Their Securities Act Claims

For the Exchange Act claims, PG&E confidently asserts that the disclosures in October 2017 "do not reveal anything about legal violations," (OBJ at 63) but then erroneously challenges the timeliness of the Securities Act claims for the three 2016-2017 Notes Offerings. OBJ at 77-80. PG&E does not challenge the timeliness of the 2018 Offering. PG&E's statute of limitations challenge to Securities Act Plaintiffs timely February 22, 2019 filing is meritless.

The statute of limitations for a Securities Act claim is "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" and such claims must be filed within three years after the security involved was bona fide offered to the public (which is not in dispute). 15 U.S.C. §77m. The limitations period for a Securities Act claim does not begin to run until the "plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation.'" *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (alteration in original); *Booth v. Strategic Realty Tr., Inc.*, 2014 WL 3749759, at *5 (N.D. Cal. July 29, 2014) (applying *Merck* standard to Securities Act claims); *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1225 (C.D. Cal. 2013) (same). The one-year statute of limitations does not begin to run when

Plaintiffs merely should have begun investigating. *See Merck*, 559 U.S. at 652-53. Indeed, a "'reasonably diligent plaintiff has not "discovered" one of the facts constituting" a Securities Act violation "until he can plead that fact with ***sufficient detail and particularity*** to survive a 12(b)(6) motion to dismiss.'" *HP, Inc.*, 65 F.4th at 465 (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). Courts have leniently interpreted the notice standard in order to discourage the premature filing of securities actions. *See, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 164-65 (3d Cir. 2008), *aff'd sub nom. Merck*, 559 U.S. 633 (2010).

Here, Plaintiffs allege that the decline in PG&E ***bond*** prices occurred in November of 2018, around the same time that PG&E filed a report with the SEC stating that PG&E's equipment was at fault for the Camp Fire, and that PG&E had significantly increased its liability insurance. *See, e.g.*, ¶¶505, 589-592. Securities Act Plaintiffs filed their first complaint on February 22, 2019.

PG&E has not met the "'especially high hurdle'" of establishing "on a motion to dismiss, that a plaintiff's Securities Act claim is time-barred." *Rieckborn*, 81 F. Supp. 3d at 915; *In re DDi Corp. Sec. Litig.*, 2005 WL 8157394, at *13 (C.D. Cal. Jan. 7, 2005) (same). Indeed, they ignore the Ninth Circuit's "sufficient detail and particularity" standard. *See* OBJ at 77-78. Moreover, "the determination of 'discovery' for the purpose of Section 11's limitations period 'is fact intensive and is usually not appropriate at the pleading stage.'" *Rieckborn*, 81 F. Supp. 3d at 915.[47] A claim may be dismissed as untimely only when a running statute of limitations appears on the face of the complaint. *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013). It does not here.

PG&E points to no facts alleged in Plaintiffs' Securities Act Claims indicating discovery of facts constituting a violation of the Securities Act that were known one year before filing (*i.e.*, February 22, 2018). PG&E's efforts to extrapolate allegations pertaining to the Exchange Act

---

[47] *See also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005) ("'[t]he question of what a reasonably prudent investor should have known is particularly suited to a jury determination'"); *Booth*, 2014 WL 3749759, at *6 (similar); *F.D.I.C. v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *3 (C.D. Cal. Nov. 21, 2012) (similar); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1082-83 (N.D. Cal. 2010) (similar).

claims as "admissions" (*see* OBJ at 78, citing exclusively paragraphs not incorporated into the Securities Act claims; OBJ at 80, "admission") fail. *Robinson v. Transunion, LLC*, 2016 WL 5339807, at *4 (N.D. Cal. Sept. 23, 2016) (Rule 8 permits inconsistent and alternative claims that cannot be invoked as admissions against each other); *Exodus Commc'ns*, 2005 WL 1869289, at *12 ("Federal Rules . . . expressly permit[] plaintiffs to state claims in the alternative," including keeping §11 and §10 claims distinct). Here, the statements and omissions alleged in the Exchange Act claims are separate and distinct from those in the Securities Act claims. *See supra* §IV.C.

Regardless, PG&E's statute of limitations argument fails because it is premised on a mischaracterization of the Exchange Act allegations, which allege "the truth ***started*** to emerge on October 12, 2017," not that the truth was fully revealed. *Contrast* ¶321; *with* OBJ at 78-80 (claiming "the 'truth emerged' in October 2017"). To be clear, that truth that started to emerge for the Exchange Act claims only, as pled at ¶321, is the "truth" that is causally connected to the Exchange Act statements, not the "truth" pled for the separate Securities Act statements and omissions. *See Dura Pharms*, 544 U.S. at 347 (discussing "causal connection"). PG&E's mischaracterization of the complaint to fit its narrative should be rejected.

Putting aside PG&E's misapplication regarding the Exchange Act concerning the October 2017 news, PG&E has not met its high burden to demonstrate ***how*** the purported truth that emerged via various media reports regarding scrutiny of PG&E alerted investors to Securities Act violations. PG&E contends that a preservation letter from the CPUC concerning the North Bay Fires and a 6.7% stock drop (not a bond price drop) in October of 2017 would have conclusively put bond investors on notice that PG&E's Offering Documents were false and misleading. *Contrast* OBJ at 78, *with, e.g.*, ¶650. Yet, PG&E fails to demonstrate how, for example, the preservation letter alerted investors to the falsity of the Offering Documents, such as the "negative trend[s]" ***for years*** in vegetation management. ¶571. Or, that PG&E's Company-wide vegetation management practices were dismal. ¶619.[48] And in fact PG&E claims that the "truth" of PG&E's misrepresentations in the

---

[48] Further, no less than two weeks later than the "disclosure" referenced by PG&E on October 31, 2017, PG&E reassured the market that it follows vegetation clearance requirements and "performs regular power line tree safety activities" in a press release titled "Facts About PG&E's Electric

Offering Documents was ***not*** revealed at that time – only that the market may have made

"assumptions," *i.e.*, guesses: "the contemporaneous 'drop in [PG&E's] stock price reflected . . .

***assumptions***' that 'the fires were caused by [PG&E's] negligence.'" OBJ at 78 (alterations in

original); *see also, e.g.*, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 67

(S.D.N.Y. 2016) (article that raised "suspicion[]" did not put investors on notice) (alteration in

original).

   Nor does PG&E point to a drop in bond prices, which is the relevant security here. Thus,

PG&E does ***not*** contend (and cannot prove) that such disclosures revealed "'the facts constituting" a

Securities Act violation such that Plaintiffs here could have "'plead that fact with ***sufficient detail***

***and particularity*** to survive a 12(b)(6) motion to dismiss.'" *HP, Inc.*, 65 F.4th at 465.

   Nor does PG&E explain how the disclosures here fit chronologically and in context. PG&E

focuses on the preservation letter, but ignores that investors can learn that statements were

misleading after a purported disclosure – indeed, it may take months to learn the significance of a

purported disclosure. *See, e.g.*, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1053 (9th Cir. 2008)

(finding loss causation properly pled where investors were aware of a Food and Drug

Administration warning letter, but "the public continued to misunderstand [its] significance" for

months). Thus, disclosures causally connected to Exchange Act claims are not necessarily

sufficient, or even particularly likely, to put bondholders on notice of potential, and distinct,

Securities Act claims, as PG&E baldly asserts.

   And, while claiming the Securities Act Plaintiffs were on notice for purposes of the statute

of limitations, various PG&E parties have denied that any disclosures of the allegedly concealed

truth occurred. The OBJ argues, in opposing the Exchange Act claims: "[d]isclosures that merely

report that PG&E's equipment may have been involved in starting the North Bay Fires ***do not***

---

Vegetation Management Efforts," negating any concerns investors may have had regarding PG&E's
vegetation management. ¶249. PG&E followed up the above with further reassurances including,
for example, those summarized *supra* §IV.E.

1   *reveal anything about legal violations* or widespread failures in its safety practices." OBJ at 63.[49]

2   Moreover, because Securities Act Plaintiffs' allegations are not specific to or limited to the

3   fact of fires or investigations, but rather concern existing (but omitted) safety deficiencies and

4   resulting risks, "'the statute does not begin to run'" based on the existence of fires and

5   investigations; at most such events mark when plaintiffs "[sh]ould have begun investigating."

6   *Merck*, 559 U.S. at 644-45, 651. No doubt that is why it took other parties significantly longer to

7   start investigating PG&E misrepresentations. For example, it was not until *2019* that the SEC

8   started investigating PG&E's similar claims, including claims associated with fires going back to

9   the *2015* Butte Fire. ¶500. Therefore, PG&E's suggestion that bondholders should have started

10  investigating before even the SEC did is without merit.[50]

11  The two cases PG&E relies on, *Edison* and *Welgus v. TriNet Grp., Inc.*, 2017 WL 167708

12  (N.D. Cal. Jan. 17, 2017), do not support dismissal. First, both cases were decided before the Ninth

13  Circuit's *HP, Inc.* opinion, which adopted the "sufficient detail and particularity" standard discussed

14  above. And PG&E miscites *TriNet*, which did not hold that any "allegations of corrective

15  disclosures triggered [the] statute of limitations" (OBJ at 80), but rather that the very "facts Plaintiff

16  contends were later discovered were indeed disclosed." *TriNet*, 2017 WL 167708, at *22.

17  Meanwhile, the unpublished Ninth Circuit and S.D. Cal. *Edison* opinions, are nonbinding and not

18

19  [49] *See also* ECF 2599 (Debtors' Complaint for Preliminary and Permanent Injunctive Relief as to *In*

20  *re PG&E Corp. Securities Litigation*, No. 18-CV-03509 (N.D. Cal. Mar. 18, 2019)), ¶24 ("the
    wildfires *did not reveal anything* about a 'concealed risk' of allegedly deficient wildfire safety

21  practices"); District Action, ECF 149 (Brief in Support of the Officer Defendants' Motion to
    Dismiss the Third Amended Consolidated Class Action Complaint) at 3, 35-38 (arguing no

22  disclosure of concealed truth, such as "[t]hat the Utility may have been involved in starting the
    North Bay Fires does not mean that they were the product of legal violations" and "Cal Fire did not

23  address that topic until months later (May 25, 2018)").

24  [50] In fact, the market was not aware of significant evidence related, *inter alia*, to PG&E safety
    processes. For example, the November 8, 2021, *ABC 10* article "Secrets of the Camp Fire: 3 years

25  later, exposing evidence of PG&E's crimes," reported that: PG&E had "bur[ied its] crimes"; new
    evidence had only recently "reveal[ed] new details" of PG&E's responsibility for fires – for

26  example, that "[t]he photo and video evidence [that] shows PG&E collecting the [97 year-old] hook
    [that PG&E had never replaced], the smoking gun in its own homicide case"; and lamented that,

27  "[w]hile the newly-unveiled Cal Fire evidence shines light on the physical problem that sparked the
    fire, *the sealed transcript contains many details of how PG&E's behavior amounted to a crime*."

28  RJN, Ex. 10 at 1-2, 4, 13.

comparable, for the reasons discussed *supra* §IV.D.6. For example, unlike in *Edison* (*id.*), Plaintiffs allege that the decline in PG&E **bond** prices occurred in November of 2018, and did move at the same times as the stock price. *E.g.*, ¶¶505, 591-592. As PG&E itself has argued, "the price of the **notes** at issue **did not change over most of the alleged class period**, even when PERA alleges the 'truth began to emerge' in October 2017 with the North Bay Fires." ECF 13983 at 20. Meanwhile, the *Edison* plaintiffs pled only stock price declines. It is therefore inconsistent for PG&E to now claim at the pleading stage that an October 2017 "drop in [PG&E's] **stock** price" was sufficient to put Plaintiffs on notice of their Securities Act claims. Nor does PG&E explain how a drop in PG&E's stock price alerted bond holders to potential Securities Act claims. OBJ at 78 (failing to identify which of "PG&E's alleged misrepresentations" the market purportedly became "aware of" being false).[51]

For all these reasons, the March 2017, December 2017, and March 2017 offerings included in Plaintiffs' initial Securities Act claims filed on February 22, 2019, were well within the one year of the statute of limitations.

### 2. Plaintiffs Have Standing to Bring Claims on Behalf of Purchasers in Each Offering

PG&E challenges standing for the March 2016 Offering and April 2018 Offering, primarily based on rejected standing arguments. For the following reasons, at least one named plaintiff has standing to challenge the statements made in each of the Offering Documents, and, even if the Court finds otherwise, the Securities Act Plaintiffs have class standing to challenge the statements made in each.

### (a) Plaintiffs Have Class Standing

Courts do not dismiss Securities Act claims for failure to plead statutory standing for some offerings so long as the named plaintiff or plaintiffs have class standing for each offering. Class

---

[51] Indeed, in classic "heads I win, tails you lose" fashion, PG&E contends Securities Act Plaintiffs were on notice of their claims such that the statute of limitations expired **before** November 2018, but did not have damages, and thus could not bring a claim, until **after** the start of November 2018. *See* OBJ at 85-86. PG&E's contention that no bondholder, no matter how diligent, could ever timely bring a claim is unsupported and contrary to the Securities Act.

standing "***does not turn on whether [plaintiff] would have statutory or Article III standing*** to seek recovery for misleading statements" for each alleged offering. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir. 2012). In *NECA-IBEW*, the Second Circuit held that a plaintiff's inability to allege statutory standing for §11 claims arising out of several offerings, under the same shelf registration statement, in which it did not purchase shares was not a reason to dismiss those claims because they raised a "sufficiently similar set of concerns." *Id.* at 164. Thus, class standing allows a plaintiff who cannot establish the elements of an absent class member's claim to nonetheless assert it where the plaintiff: (i) has Article III standing for his or her own claim; and (ii) the absent class members' claims raises a sufficiently similar set of concerns as the plaintiff's claim. *Melendres v. Arpaio*, 784 F.3d 1254, 1260-62 (9th Cir. 2015); *NECA-IBEW*, 693 F.3d at 160-62; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109 (9th Cir. 2013) (statutory standing is an element of §11); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 510-11 (S.D.N.Y. 2016); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 461-62 (S.D.N.Y. 2017).[52]

In *Melendres*, the Ninth Circuit adopted the "class certification approach" (*i.e.*, class standing), finding that the "saturation patrol" plaintiffs alleging racial discrimination had class standing to assert absent class members' claims who were victims of regular patrols because all claims implicated the same "set of concerns." 784 F.3d at 1261-64. The regular patrol plaintiffs' claims "raise[] the question of class certification . . . ***not a question of standing***." *Id.* at 1262. The Ninth Circuit's "approach has been used expansively in a wide range of class actions, and has even led to a court in the context of a bond offering to conclude that *Melendres* 'clearly forecloses' any argument that a class representative lacks standing to represent other putative class members who purchased bonds in different tranches or offerings." *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *25 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019). "In this Circuit, 'once the named plaintiff demonstrates her individual standing to bring a claim, ***the standing inquiry is***

---

[52] Note that *Countrywide*, 934 F. Supp. 2d 1219 has been rejected because the "decision[] predate[s] [*Melendres*], which clearly controls and supports Plaintiff's standing." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 3058563, at *4 (N.D. Cal. July 19, 2017).

*concluded* . . . .” *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1181 (N.D. Cal. 2023) (quoting *Melendres*, 784 F.3d at 1261-62).

Here, Plaintiffs have both statutory and class standing. For example, before the District Court, PG&E’s directors and underwriters conceded that they offered “indistinguishable” notes in the December 2016 and March 2017 Notes Offerings. District Action, ECF 155-1 at 32. Further, the statements in the Offering Documents are substantially similar. *See, e.g.*, ¶¶640, 642; *supra* §IV.D.2-4. Nor does PG&E deny that each plaintiff has standing for at least a subset of the Notes Offerings. As Judge Chen held, applying *Melendres* to a much broader set of fraud and RICO claims, “once the named plaintiffs demonstrate their individual standing to sue, as Plaintiffs have done here, the standing inquiry may be *concluded*.” *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 955-56 (N.D. Cal. 2018). PG&E does not contest class standing in their OBJ, and have waived the argument. *See supra* §IV.D.1. If the Court finds standing for any individual offering, then Securities Act Plaintiffs also have class standing for every alleged offering.

> **(b)** **Plaintiffs Have Standing, and Need Not “Plead Reliance,” for the March 2016 Offering**

Citing 15 U.S.C. §77k(a), PG&E challenges tracing for the March 2016 Notes Offering. OBJ at 89 (quoting in part 15 U.S.C. §77k(a)). As explained above in §IV.B, however, Plaintiffs are not required to “prove” reliance at the pleading stage, and have class standing for the March 2016 Notes Offerings. Regardless, PG&E’s attack is without merit as a matter of law. As explained in a case where, like here, “‘plaintiffs . . . purchased their shares after the issuers made available an earning statement covering a period of at least twelve months . . .,’ *[t]his argument has no merit because Rule 8 does not require plaintiffs to plead the elements of a claim*,’” including reliance. *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 342 (S.D.N.Y. 2003).

Further, if and when Plaintiffs are required to prove reliance, they will be able to do so “‘through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue).’” *See Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *11 (S.D.N.Y. Oct. 17, 2013). Here, the legitimate inferences of reliance are evident on

the face of the TAC. *E.g.*, ¶591.

**(c)** **As an Aftermarket Purchaser of PG&E Bonds Purchased Pursuant to and in Reliance on the April 2018 Offering Documents, Plaintiff Warren Has Standing for the April 2018 Offering**

In addition to class standing, Plaintiff City of Warren Police and Fire Retirement System ("Warren") has standing for purchases and exchanges made pursuant to the April 2018 Offering. The private nature of the acquisitions, and the fact that securities were exchanged, are irrelevant.

Contrary to PG&E's insinuation, the "majority rule" is that aftermarket acquirers, like Warren, of bonds acquired in private exchanges, have standing. As one court explained, explicitly distinguishing the *Exxon Capital* exchanges at issue in the *Levi Strauss* case relied on by PG&E:

> Unlike QIBs in Exxon Capital exchanges, who make their purchasing decisions before a registration statement is issued, ***aftermarket purchasers may reasonably rely on a company's registration statement*** in determining whether to purchase a company's bonds. As a result, the ***majority*** of courts to consider the issue have held that ***such aftermarket purchasers do have standing to assert §11 claims***.

*Loritz v. Exide Techs.*, 2014 WL 4058752, at *14 (C.D. Cal. Aug. 7, 2014) (finding just one contrary decision).

Further, investors who acquire a security before a registration statement or prospectus issues, only to exchange that security after such offering documents issue, can and do rely on, or acquire pursuant to, those offering documents. As the Ninth Circuit explained, where, for example, the investor was "not irrevocably bound to exchange his . . . shares for . . . stock at the time the Registration Statement was filed," the "misrepresentations contained in the Registration Statement played a role in the causal chain that resulted in the exchange of stock." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 862 (9th Cir. 2013). In other words, plaintiff could trace, and had standing.

Here, there is no dispute that on December 21, 2017, Warren purchased 75,000 bonds due on December 1, 2027, purchased 25,000 bonds on May 1, 2018, and then on May 14, 2018, exchanged 100,000 PG&E bonds. District Action, ECF No. 121-3. All of those bond purchases and exchanges were of 3.3% bonds with a maturity date of December 1, 2027. Notably, Warren's May 1, 2018 purchase occurred after PG&E filed the registration statement and prospectus for the April 2018 Notes Offering. ¶578. The Prospectus even specifically instructs investors: "***Before deciding***

*whether to participate in the Exchange Offer*, you should carefully consider the[] [listed 'Risk Factors'] as well as other information contained or incorporated by reference in this prospectus." Debtors' RJN, Ex. 22 at 15. The May 1, 2018 purchase, and the May 14, 2018 exchange, were therefore transactions made pursuant to or in reliance on the April 2018 Offering Documents, notwithstanding the fact that Warren previously owned a subset (75,000) of the shares it subsequently exchanged.

PG&E ignores the May 1, 2018 purchase, and the OBJ fails on this ground alone. Its remaining arguments also fail. Despite the above authority, PG&E here attempts to turn dicta from the fact-dependent *Exxon Capital* exchange cases, *Levi Strauss*, and *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), into more sweeping rules precluding all §11 liability for private offerings and for all "[c]laimants that exchanged previously owned notes." OBJ at 90.[53] Not so. The dicta PG&E relies on comes from speculation in those cases as to what is material to investors. *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 977 (N.D. Cal. 2007) ("it does not **appear likely** that the alleged misstatements or omissions in the registration statements issued to enable the *Exxon Capital* exchanges **could** have been material," and noting the *Refco* court "**inferred**" the same). But here there was no *Exxon Capital* exchange, and PG&E points to no ways in which the nature of the shares to be exchanged rendered PG&E's statements immaterial.

More importantly, the *Levi Strauss* and *Refco* courts got the inquiry wrong, because "[b]y considering whether the plaintiff had previously purchased unregistered bonds, the *Refco* and *Levi Strauss* courts considered the particular position and knowledge of the plaintiffs rather than . . . whether a reasonable investor would find information material." *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 13127544, at *4 (C.D. Cal. Sept. 13, 2011). And as the *Countrywide* court concluded, "tracing is not a plausible basis for . . . motions [to dismiss exchange offering, because the doctrine] . . . targets the **identity** of the security, not the chronological order in which it is purchased." *Id.* Here, of course, there is no dispute concerning the chronological order.

---

[53] The OBJ cites a third case, *In re Safety-Kleen Corp.*, 2002 WL 32349819 (D.S.C. Mar. 27, 2002) for the proposition that "lack of reliance and damages" are bases to dismiss Securities Act claims. OBJ at 90. These are not elements of Plaintiffs' Securities Act claims.

Securities Act Plaintiffs "allege[] that [Warren] purchased [PG&E bonds] – through the **post**-Registration Statement exchange of shares – issued and sold pursuant to a misleading registration statement, and that [Warren's] subsequent losses were caused by the misrepresentations in that registration statement. This is enough to state a Section 11 claim." *Hildes*, 734 F.3d at 863.

### 3. Plaintiffs Have Pled All Elements of their Securities Act Claims, None of Which Can Be "Negated" by PG&E's Negative Causation Defense at the Pleadings Stage

"Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009); *see also In re Violin Memory, Inc. Sec. Litig.*, 2015 WL 1968766, at *4 (N.D. Cal. Apr. 30, 2015) ("loss causation is not an element of plaintiffs' prima facie section 11 claim").

"The burden to prove negative loss causation is 'heavy.'" *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 153 (2d Cir. 2017); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir. 2009) ("The burden on the defendants to prove the affirmative defense in §11(e) is "heavy" and arises out of "Congress' desire to allocate the risk of uncertainty to the defendants in these cases . . . ."'). That is true in part because defendants asserting the affirmative defense of negative causation have the burden to disaggregate losses caused by the alleged false and misleading statements from losses resulting solely from other causes. *See Nomura*, 873 F.3d at 153. Significantly, a defendant who does not attempt to disaggregate cannot win on her entire affirmative defense if the trier of fact determines that **any** portion of the losses was caused by the alleged misrepresentations. *Id.*

PG&E does not properly raise a negative causation defense here at the pleadings stage and has failed to establish that the losses **for the securities at issue** – *i.e.* the bonds subject to Securities Act claims, as opposed to common stock and other securities subject to Exchange Act claims – were not caused by the misrepresentations in the Offering Documents. First, PG&E misconstrues its own burden; Plaintiffs have not pled loss causation as to their Securities Act claims, nor are they

1   required to do so, because it is not an element of the claim. *See* OBJ at 6.[54]

2   Second, PG&E seeks dismissal on the ground of negative causation by exclusively and

3   inappropriately relying on allegations not incorporated into Plaintiffs' Securities Act claims and

4   involving stock price movements. PG&E references, only, a "'drop in [PG&E's] **stock**'" price (OBJ

5   at 78, 86), not in PG&E **bond** prices, and references only one paragraph in the TAC, ¶331 – which

6   is from the separate Exchange Act portion of the TAC. OBJ at 78, 86; *see, e.g.*, *Robb v. Fitbit Inc.*,

7   216 F. Supp. 3d 1017, 1035-36 (N.D. Cal. 2016) (rejecting negative causation defense where

8   plaintiffs brought §10 and §11 claims, even though plaintiffs "allege only one corrective disclosure

9   prior to the filing of their lawsuit, and that the stock price remained above the initial offering price

10  several days after that disclosure").

11  Third, PG&E does not attempt to meet its heavy burden to prove negative causation via

12  PG&E's' "truth-on-the-market" defense and, as explained above, PG&E's "truth-on-the-market"

13  defense is inappropriate at the pleading stage and unsupported. *Supra* §IV.E. To that end, as PG&E

14  did with its "truth-on-the-market" defense, it claims (without citation) that "the risk that

15  materialized was not 'concealed'" and "PG&E fully disclosed its wildfire risk." OBJ at 86. Even if

16  it were appropriate to address negative causation at the pleading stage (it is not), because PG&E

17  references no actual "facts" disclosed in the TAC that informed investors of the adverse material

18  facts Securities Act Plaintiffs allege were not disclosed (*e.g.*, systemic safety deficiencies), PG&E

19  has not met its heavy burden of establishing negative causation.[55] Investors are not charged with

20

21  [54] PG&E contends that "Securities Act Plaintiffs cannot claim that the price of notes reacted to the
    allegedly corrective disclosures." OBJ at 6. But that is what, while not required, is in fact, is pled:

22  "[D]ue to, Defendants' omission of the true state of PG&E's business and operations and the risks
    posed by the Company's lax wildfire safety practices and inadequate investment in safety, the value

23  of the senior notes associated with the Notes Offerings has substantially declined." ¶504; *see also*
    ¶505 (identifying by how much PG&E bonds declined). Relatedly, the OBJ's claim that the "'zone

24  of risk'" theory of affirmative loss causation has not been adopted by the Ninth Circuit is irrelevant,
    as Securities Act Plaintiffs need not plead loss causation under any theory. *See* OBJ at 86.

25  [55] To the extent PG&E is relying on unknown "facts" not found in the TAC for the Securities Act
    claims, the Court should disregard them, as well as any conclusory assertions based on them, as

26  well as any facts from the "Background" sections of the OBJ, which in turn rely on documents from
    outside the TAC. *E.g.*, OBJ at 9-10 (citing Debtors' RJN, Exs. 1-6, across dozens of pages, for the

27  claim that "PG&E publicly described its financial condition and the significant inherent risks in its

28

searching out the truth beyond the Offering Documents and certainly not with sifting through *thousands* of pages of PG&E corporate documents to learn the purported truth-on-the-market. *Infra* § IV.E; *see also Orexigen*, 899 F.3d at 998 (criticizing "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks").

Fourth, it is inaccurate to claim that everything was fully disclosed, as PG&E claims (in the Exchange Act section of its brief). OBJ at 30. As discussed *supra* in §IV.E, such an assertion is flawed because it misconstrues Securities Act Plaintiffs' allegations regarding the omission of PG&E's wide-spread safety deficiencies and the risks of wildfires as a result. Nor were the "disclosures" PG&E relies on conveyed with the requisite intensity and credibility necessary to render the statements in the Offering Documents not misleading. *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

Fifth, to prevail on a motion to dismiss, PG&E must show negative causation **for every false statement; a claim is stated where PG&E fails to prove negative causation for even a single statement**. *See In re Interlink*, 2008 WL 4531967, at *4. For example, in the *Interlink* litigation, Exchange Act plaintiffs "alleged loss causation as to four different dates." *Id.* When the court agreed plaintiffs alleged loss causation as to the first date, the court found "[p]laintiffs have adequately pled loss causation as to at least one date, and the Court need not address the others." *Id.* Again, PG&E has not even attempted to make that showing as to any statements, let alone all of them.

Sixth, even if PG&E properly raised the defense, the standard for the Securities Act Plaintiffs to "overcome" it is permissive: "Overcoming a negative causation defense requires merely that 'the misrepresentation touches upon the reasons for an investment's decline in value.'" *Hildes*, 734 F.3d at 861 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994)). Which is a lesser standard than for loss causation and a standard PG&E does not address in its brief because it cannot demonstrate that misrepresentations did not touch upon the reasons for

---

business"). *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint").

the investment's decline in value. *Compare Hildes*, 734 F.3d at 860, *with Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (in fraud context, all that is required is "'a causal connection'" between the fraud and the loss).[56] And here, though the TAC does not plead corrective disclosures for the Securities Act claims, it does allege that PG&E bond prices dropped in connection with the release of information that touches upon the truth concealed by PG&E's false statements and omissions. For example, in April of 2018 PG&E purported to warn investors that PG&E faced merely hypothetical risks, "including [from investigations] into the causes of the wildfires; [and] whether the Company ***may have liability*** associated with these." Stmt No. 34. The content of that statement facially "touches" on the reasons for later decline in PG&E value, such as when, on November 15, 2018, Moody's "cut" PG&E credit rating "to the brink of junk amid doubt about its ability to manage ***liabilities*** from the California wildfires." ¶592. The OBJ must be denied based on these facial causal connections; PG&E's negative causation defense will be subject to expert analysis at a later, appropriate time in the litigation.

### 4. The Securities Act Plaintiffs Have Damages and Other Remedies

Grasping at straws, PG&E inappropriately attacks the availability of damages (a merits issue for a trier of fact) at the pleading stage. Because damages are not an element of Securities Act claims, but rather the remedy available once the elements of their claim are proven, PG&E has no grounds for dismissal on this basis.[57] As the *Snap* court explained, in the context of certain "[p]laintiffs who filed when the stock price was above the IPO price," the question of whether they even have damages "is not an appropriate question at this stage." *In re Snap*, 2018 WL 2972528, at

---

[56] Contrary to PG&E's insinuation (OBJ at 86) the Ninth Circuit has not rejected the materialization-of-the-risk theory of loss causation. *See Cutler v. Kirchner*, 696 F. App'x 809 (9th Cir. 2017). In any event, PG&E's reliance on out-of-circuit fraud-based cases for the proposition that "[t]here can be no loss causation where, like here, investors were warned about the very risk that later materialized" (OBJ at 86-87) are misplaced because in those cases, plaintiffs failed to plead falsity, which was fatal to loss causation. *See Bartesch v. Cook*, 941 F. Supp. 2d 501, 513 (D. Del. 2013); *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 685-86 (S.D.N.Y. 2012) (same), *aff'd*, 548 F. App'x 16 (2d Cir. 2013).

[57] *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("'[t]he buyer need not show any causal connection between the misrepresentation and his damage; indeed, ***he need not even show that he has been damaged***'"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168 n.40 (C.D. Cal. 2008) ("***[d]amages are not an element***").

*9.

Regardless, the well-plead allegations establish that Plaintiffs and class members purchased PG&E bonds at inflated prices, and that the market prices of those bonds thereafter declined. *See* ¶¶505, 591-592. For example, Warren purchased PG&E bonds at prices between $98.89 and $93.09 (between December 21, 2017, and May 1, 2018), and exchanged bonds at $92.51 on May 14, 2019, but sold bonds on January 14, 2019, at $78 a share, *i.e.* at a substantial loss. Nothing further is required to plead damages. District Action, ECF No. 121-3.

PG&E relies on two non-binding out of circuit cases from over 25 years ago for what amounts to a defense that Plaintiffs' statutory damages under §11 of the Securities Act should be calculated based on a different value than the market price. *See* OBJ at 87-88.[58] PG&E then leap frogs to conclude that, dismissal of the claims at the pleading stage is warranted because of its trumped up theory regarding the value of bonds at the time of suit differing from the market price because of unsubstantiated claims of panic selling found nowhere in the TAC. PG&E's reliance on these cases misses the mark. *Beecher v. Able* involves claims that went to trial, where "the value of the securities at the time of suit was sharply contested" with evidence and expert testimony. 435 F. Supp. 397, 402 (S.D.N.Y. 1975). Importantly, "both parties for different reasons are dissatisfied with market price as conclusive evidence of value" and the Court thus started with "market value" and then "either add[ed] or subtract[ed] a certain amount, depending on which party's claims proves more convincing." *Id.* at 404. As such, *Beecher* stands for nothing more than the market price is the starting point for a fact-intensive determination of value. Likewise, PG&E's other cited case recognized at summary judgment that the market price of a security serves as "a good starting point" and is often used to calculate damages. *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995). *McMahan* also stated that "instances where the market price of a security will be different from its value are 'unusual and rare.'" *Id.* More importantly, in the Ninth Circuit, damages for §11 must be "measured by the difference between the amount paid for the

---

[58] Citing no authority, PG&E brands remedies under the Securities Act as "narrow and limited." OBJ at 87. Not so. *See, e.g.*, *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) ("by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants").

security ***and its price at either the time it was sold or the date the Section 11 claim was filed***."
*Worlds of Wonder*, 35 F.3d at 1421. Indeed, though the *Snap* court conceded that "'[v]alue . . . is not necessarily equal to 'price,'" it rejected similar arguments because "the determination of value is a fact-intensive inquiry." 2018 WL 2972528, at *9; *see also Countrywide*, 588 F. Supp. 2d at 1169-70 (the amount of damages for class members is not to be determined at the pleadings stage but rather by a trier of fact). As such, PG&E's challenges should be rejected.

### H. Control Person Liability Has Been Sufficiently Alleged

§15(a) of the Securities Act imposes joint and several liability upon every person who controls any person liable under §11. *In re Daou*, 411 F.3d at 1029-30. PG&E does not dispute that it had control; it moves to dismiss Securities Act Plaintiffs' §15 control person claims on the sole ground that there is no predicate violation of the Securities Act. That argument fails for the reasons above. Control liability has been sufficiently alleged.

## V. THE CLAIMANTS WHO HOLD UTILITY SENIOR NOTES CLAIMS DID NOT RELEASE THEIR SECURITIES CLAIMS UNDER THE PLAN AND CONFIRMATION ORDER

Finally, PG&E raise the meritless argument that Securities Claimants holding both (i) unimpaired Note Claims and (ii) impaired Securities Claims are considered to be among the "Releasing Parties" as defined by Plan § 1.180 with regard to both distinct and separately treated claims under the Plan. The Objection erroneously argues that such holders' Securities Claims must be deemed extinguished pursuant to the release provision contained in Plan § 10.9(b).

This argument should be rejected for several independent and obvious reasons. First, as is required by the Bankruptcy Code, the Plan classifies and provides for treatment based upon *claims* and not by *claimholders*. *See, e.g.*, Plan § 3.1 ("A **Claim or Interest is placed in a particular Class** for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided that* a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to that extent **that such Claim or Interest is an Allowed Claim or Allowed Interest** in that Class and **such Allowed Claim or Allowed Interest has not been satisfied, released or otherwise settled** prior to

the Effective Date") (emphasis added in bold). Moreover, it is well-understood that plans of reorganization classify and provide for the treatment of claims *by claim type* and not by the identity of the holder of a claim. Accordingly, the Plan's own express terms contradict the PG&E's newly minted position.

Second, prosecution of Securities Claims falls squarely within the exception to the release in Plan § 10.9(b), providing that "except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents" the releases will apply. Here, Securities Claimants holding Securities Claims are appropriately enforcing their rights under the Plan by seeking to have their Securities Claims allowed and to receive a distribution in accordance with the Plan's terms. Whether such Securities Claimants received full satisfaction on account of their Note Claims is completely irrelevant to the separate and distinct adjudication of their Securities Claims.[59]

Third, the circumstances here are easily distinguishable from the *Elliot* cases on which the Objection relies. There, the RSA Noteholder claimants sought allowance of administrative claims for damages arising from an alleged breach of an agreement that they asserted was related to the Plan or among the Plan Documents. The administrative expense claims at issue were related to an alleged *post-petition* breach of a Noteholder RSA by PG&E. As such, this Court appropriately denied the administrative claims because the carveout provisions in the Plan's release provision did not apply. This Court correctly held that the claimants were therefore bound by the Release. *See Elliott II*, 2022 WL 794815, at *4-5.

The present circumstances are markedly different from the facts in *Elliot*. Here, both the classification and the treatment of the Securities Claims and the Note Claims are expressly and separately provided for in the Plan. The Securities Claimants are not attempting to exercise or

---

[59] Even though certain of the Note Claims, such as Class 3B-II Utility Reinstated Senior Notes Claims, have been deemed Unimpaired under the Plan, such designation is only relevant to such holders that retained their [Notes] through the Effective Date. Holders of Note Claims who sold prior to the Effective Date at a loss and were damaged as a result of the Debtors' violations of applicable federal securities laws may pursue and seek allowance of their claims against the Reorganized Debtors for such damages.

enforce rights based upon claims not contemplated by the Plan. Nor do the Securities Claims relate to facts or circumstances that first arose following the Effective Date. Accordingly, unlike *Elliott*, the Securities Claimants are simply enforcing their rights as set forth in and contemplated by the Plan and Plan Documents. As such, the first exception to the release provision contained in Plan § 10.9(b) applies and PG&E's objection on that basis must be denied.

## VI.    CONCLUSION

For the foregoing reasons, PG&E's motion should be denied. If the Court is inclined to grant any part of the motion, Plaintiffs respectfully request that any such order be without prejudice to Plaintiffs' ability to seek to cure any defects via amendment, especially in light of the significant new information that has come to light since the filing of the TAC that supports Plaintiffs' allegations. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be "freely" given).

Dated: March 15, 2024

**LABATON KELLER SUCHAROW LLP**

By: */s/ Thomas A. Dubbs*
Thomas A. Dubbs (*pro hac vice*)

*Lead Counsel to Securities Lead Plaintiff and the Class*

- and -

**MICHELSON LAW GROUP**

*Local Bankruptcy Counsel to Securities Lead Plaintiff and the Class*

- and –

**LOWENSTEIN SANDLER LLP**
*Special Bankruptcy Counsel to Securities Lead Plaintiff and the Class*

- and –

**ADAMSKI, MORISKI, MADDEN, CUMBERLAND & GREEN LLP**

*Liaison Counsel for the Class*

- and –

**ROBBINS GELLER RUDMAN & DOWD LLP**

*Counsel for the Securities Act Plaintiffs*

- and –

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**

*Additional Counsel for the Securities Act Plaintiffs*

**EXHIBIT A**
**COUNSEL**

**LABATON KELLER SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Thomas G. Hoffman, Jr. (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone  212-907-0700
tdubbs@labaton.com
cvillegas@labaton.com
mcanty@labaton.com
thoffman@labaton.com

*Lead Counsel to Securities Lead Plaintiff and the Class*

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin (*pro hac vice*)
Andrew Behlmann (*pro hac vice*)
Scott Cargill (*pro hac vice*)
Colleen Restel
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone  973-597-2500
Facsimile  973-597-2333
metkin@lowenstein.com
abehlmann@lowenstein.com
scargill@lowenstein.com
crestel@lowenstein.com

*Special Bankruptcy Counsel to Securities Lead Plaintiff and the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Darren J. Robbins (SBN 168593)
Brian E. Cochran (SBN 286202)
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone  619-231-1058
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone  313-578-1200
tmichaud@vmtlaw.com

**ADAMSKI, MORISKI, MADDEN, CUMBERLAND & GREEN LLP**
James M. Wagstaffe (SBN 95535)
100 Pine Street, Suite 2250
San Francisco, California 94111
Telephone 415-254-8615
wagstaffe@ammcglaw.com

*Liaison Counsel for Securities Lead Plaintiff and the Class*

**MICHELSON LAW GROUP**
Randy Michelson, Esq. (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone  415-512-8600
Facsimile  415-512-8601
randy.michelson@michelsonlawgroup.com

*Local Bankruptcy Counsel to Securities Lead Plaintiff and the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe (SBN 200089)
Kenneth J. Black (SBN 291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone  415-288-4545
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

*Counsel for Securities Act Plaintiffs*

*Additional Counsel for the Securities Act Plaintiffs*
