# EXHIBIT 1



BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF CALIFORNIA

**FILED**
05/04/18
04:59 PM

| | |
|---|---|
| Application of Pacific Gas and Electric Company to Recover Costs Recorded in the Catastrophic Event Memorandum Account Pursuant to Public Utilities Code Section 454.9 and Forecasted Pursuant to Resolution ESRB-4.   (U 39-E) | Application 18-03-015 (Filed March 30, 2018) |

## PROTEST OF THE UTILITY REFORM NETWORK

| | |
|---|---|
| David Cheng<br>Staff Attorney<br><br>**The Utility Reform Network**<br>1620 Fifth Avenue, Suite 810<br>San Diego, CA  92101<br>Phone:  (619) 398-3680, x 103<br>E-mail:  dcheng@turn.org | Robert Finkelstein<br>General Counsel<br><br>**The Utility Reform Network**<br>785 Market Street, Suite 1400<br>San Francisco, CA 94103<br>Phone: (415) 929-8876<br>Fax:  (415) 929-1132<br>E-mail:  bfinkelstein@turn.org |

May 4, 2018

Case: 19-30088    Doc# 14343-2    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 2 of 9

## TABLE OF CONTENTS

I.   Introduction ................................................................................................................. 1

II.  Grounds of the Protest And Issues To Be Considered ............................................ 2

III. Proposed Categorization, Need for Hearing and Schedule ..................................... 4

# PROTEST OF THE UTILITY REFORM NETWORK

On March 30, 2018, Pacific Gas and Electric Company (PG&E) filed the instant application, seeking to recover costs recorded in the utility's electric and gas Catastrophic Emergency Memorandum Accounts (CEMA). Pursuant to Rule 2.6 of the Commission's Rules of Practice and Procedure, The Utility Reform Network (TURN) submits this protest to PG&E's application.[1]

## I.     Introduction

PG&E's application seeks authorization to recover $1.143 billion of revenue requirement associated with costs it has recorded or expects to record in its CEMA. Of this figure, $394.5 million is associated with costs attributed to the utility's "Tree Mortality & Fire Risk Reduction" activities in 2016 and 2017. The utility also seeks recovery of $555 million on a forecast basis for the similar activities in 2018 and 2019.

For the spending associated with "Tree Mortality & Fire Risk Reduction" activities, the Commission should view these amounts in context. In ESRB-4, a resolution adopted in mid-2014, the Commission directed investor-owned utilities to take "practicable measures necessary to reduce the likelihood of fires associated with their facilities."[2]  PG&E sought and received rate recovery of approximately $26 million associated with such "practicable measures" undertaken in 2014.[3] PG&E then sought rate recovery of approximately $35 million associated with its 2015 efforts as part of the

---

[1] The notice of the filing of the application first appeared in the Commission's Daily Calendar on April 4, 2018.

[2] Resolution ESRB-4, p. 14, Ordering Paragraph 2.

[3] D.16-04-004, issued in A.15-05-016.

1

CEMA application filed in 2016.[4] But in 2016, PG&E's spending in support of such "practicable measures" increased to $254.3 million, or nearly ten-fold as compared to the 2014-2015 annual amounts. And after seeing the recorded spending level decline slightly in 2017 (to $140.2 million), the utility forecasts spending $260 million and $292 million in 2018 and 2019, respectively. This all comes on top of the approximately $200 million included for the vegetation management one-way balancing account in PG&E's GRC-authorized annual revenue requirement.[5]

## II. Grounds of the Protest And Issues To Be Considered

Given the context described in the introduction, the Commission can expect there to be additional issues beyond those typically presented in a CEMA application.

- The Commission will need to directly address how the term "practicable" as used in ESRB-4 should be understood. Clearly a key element of such understanding is whether the level of activity and associated spending is sustainable without putting an excessive or undue revenue requirement burden on the utility's customers.

- The Commission should address whether recovery of any amount on a forecast basis is appropriate or reasonable under the circumstances. To TURN's knowledge (but not backed up with any incremental research at this time), CEMA applications and decisions have never included forecasted costs. Furthermore, TURN's reading of Resolution ESRB-4 did not find any indication that the Commission intended to undertake a different approach with the drought-related activities called for there, even

---

[4] A.16-10-019, Exhibit PG&E-1, p. 1-5, Table 1-2.

[5] D.17-05-013 (issued in A.15-09-001, PG&E's test year 2017 GRC), Conclusion of Law 14, citing Settlement Agreement attached to Joint Motion for Adoption of Settlement Agreement. In the Settlement Agreement, the $200 million figure appears on page 1-16, fn 5.

2

as it identified cost recording and recovery through the CEMA as the appropriate vehicle for these activities.

- The Commission may need to consider and even encourage creative ratemaking approaches to mitigate the rate impacts on PG&E's customers, such as amortizing some of the cost recovery over a longer period of time, or reducing the rate of return for rate base additions associated with CEMA-related activities.

- Finally, the Commission will need to consider the interrelationship of these efforts to reduce the risk of fires caused or contributed to by utility equipment and the role utility negligence may play in such events. The "Tree Mortality & Fire Risk Reduction" efforts do not only reduce the risks faced by PG&E's customers, but also the risk the utility and its shareholders face that utility mismanagement or imprudence may cause or contribute to a wildfire. To the extent this effort serves to protect shareholders' interests, a meaningful share of the costs may need to be assigned to shareholders.

PG&E's request here also presents at least two sets of issues that are more typical of a CEMA application.

- PG&E bears the burden of demonstrating the reasonableness of the CEMA-recorded costs it seeks to recover in CPUC-authorized rates. This has proven to be a challenge in the most recent CEMA application, due to the different approaches PG&E takes to resource deployment and cost recording practices when responding to a catastrophic event such as a wildfire or a major storm. Here, the "Tree Mortality & Fire Risk Reduction" activities should be more amenable to a more traditional reasonableness review or forecasting effort.

- "Incrementality" is likely to arise in two distinct but somewhat related ways.[6]

  - There is the question of whether the activities or associated costs should be deemed "incremental" to the work reasonably treated as covered by the GRC revenue requirement generally. For example, PG&E has developed a baseline of 30,000 "tree abatements" as included in its GRC revenue requirement, and deems anything above that figure to be "incremental." It is not clear whether PG&E has ever relied on such a calculation of a "baseline" in a CPUC proceeding, or whether such a "baseline" approach is reasonable under the circumstances here.

  - There is also the question of whether PG&E's "straight-time" labor costs should be removed from the calculation of "incremental" costs.

These are the issues TURN has identified from its very initial review of the application and supporting testimony.

### III. Proposed Categorization, Need for Hearing and Schedule

PG&E proposes that this application be categorized as ratesetting.[7] TURN agrees that this is the appropriate category.

On the need for evidentiary hearings, PG&E merely states that it anticipates that other parties may request hearings. PG&E is right, although its reticence to take any position itself on the need for hearings is puzzling. But given the request to recover in

---

[6] PG&E's supporting testimony devotes a chapter to "demonstration of incrementality" and confidently predicts "intervenors' historic concerns about incrementality have been addressed." PG&E Testimony, Chapter 4.

[7] PG&E Application, p. 20.

4

Case: 19-30088   Doc# 14343-2   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 7 of 9

rates an amount in excess of $1 billion, and given the nature of the issues associated with that request, the Commission should conclude that evidentiary hearings will be necessary.

Finally, at this time TURN does not have a proposed schedule to put forward as a counter to the version that appears in PG&E's application. TURN merely notes that PG&E's proposed schedule appears somewhat expedited for a CEMA application covering seven separate events dating back to 2016, as well as two years of recorded Tree Mortality and Fire Risk Reduction efforts for total cost recovery request of nearly $588 million of recorded costs, not to mention the forecast of $555 million for 2018 and 2019 Tree Mortality and Fire Risk Reduction activities. Most importantly, PG&E's schedule proposes intervenor testimony be due only one-and-a-half months after the prehearing conference.[8] In the 2011 CEMA application proceeding, PG&E appears to have included seven separate events and $48.9 million of associated costs.[9] The Office of Ratepayer Advocates (ORA) report was served approximately three months after the prehearing conference in that proceeding, and TURN's testimony was served a month and a half later.[10] PG&E has failed to explain why it thinks a schedule that provides less time to cover approximately the same number of individual events at more than twenty times (20X) the total costs would be reasonable. Furthermore, PG&E's application is competing for scarce TURN resources devoted to a number of other ongoing proceedings, including the consolidated GRCs for SoCalGas and SDG&E, and PG&E's gas transmission and storage (GT&S) application proceedings. Therefore, the

---

[8] PG&E Application, p. 21.

[9] D.13-06-007 (in A. 11-09-014), pp. 1-2.

[10] *Id.*, pp. 2-3.

Commission should anticipate that at the prehearing conference it will hear from TURN and, we suspect, the Office of Ratepayer Advocates that a substantial amount of time will be needed to conduct discovery and prepare testimony responding to PG&E's request. TURN intends to work with ORA and any other interested intervenors to develop a scheduling proposal that would work for intervenors.

May 4, 2018                                          Respectfully submitted,

                                   By:        _____/S/_____

                                          Robert Finkelstein
                                          General Counsel

                                          **THE UTILITY REFORM NETWORK**
                                          785 Market Street, Suite 1400
                                          San Francisco, CA 94103
                                          Phone: (415) 929-8876
                                          Fax:  (415) 929-1132
                                          E-mail:  bfinkelstein@turn.org