# EXHIBIT 5

ALJ/JSJ/sgu                                    Date of Issuance 3/21/2022

Decision 22-03-011  March 17, 2022

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Application of Pacific Gas and Electric Company to Recover Costs Recorded in the Catastrophic Event Memorandum Account Pursuant to Public Utilities Code Section 454.9 and Forecasted Pursuant to Resolution ESRB-4.  (U39E.) | Application 18-03-015 |

**DECISION APPROVING SETTLEMENT**

# Table of Contents

Title      Page

Summary .............................................................................................................2

1.   Procedural Background .............................................................................2

2.   Issues Before the Commission ................................................................7

3.   Party Positions ...........................................................................................7

   3.1.   PG&E's Litigation Position .............................................................7

   3.2.   Cal Advocates' Litigation Position ...........................................10

   3.3.   TURN's Litigation Position .........................................................11

4.   Audit Report ............................................................................................12

5.   Settlement Agreement ............................................................................14

6.   Discussion ................................................................................................17

   6.1.   Settlement Agreement Standard of Review .............................17

   6.2.   The Proposed Settlement is Reasonable ..................................18

   6.3.   The Proposed Settlement is  Consistent with the Law ...........19

   6.4.   The Proposed Settlement  is in the Public Interest .................20

7.   Comments on Proposed Decision .........................................................21

8.   Assignment of Proceeding .....................................................................22

Findings of Fact .................................................................................................22

Conclusions of Law ..........................................................................................23

ORDER ...............................................................................................................23

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 3 of 26

## DECISION APPROVING SETTLEMENT

**Summary**

   This decision approves the all-party settlement agreement resolving this matter.  Pacific Gas and Electric Company may recover in total revenue requirement $683,200,000 for its expenses and capital costs associated with responding to 11 catastrophic events occurring between 2016 and 2019.  That recovery is reduced by a net amount of $373,000,000 due to this proceeding's interim decision (Decision 19-04-039) that allowed some interim revenue requirement recovery.  Therefore, the result of this decision is the authorization of a further revenue requirement recovery of $310,200,000 in rates.

   Application 18-03-015 is closed.

**1.  Procedural Background**

   On March 30, 2018, Pacific Gas and Electric Company (PG&E) filed Application (A). 18-03-015 (Application), seeking recovery of costs recorded in its Catastrophic Event Memorandum Account (CEMA).  PG&E sought recovery of $588,296,000 for costs incurred following nine catastrophic events in 2016 and 2017.[1]  PG&E also sought recovery of $544,696,000 for "forecasted" costs (*i.e.,* forward-looking and not yet incurred) for tree mortality and fire risk reduction (vegetation management).[2]

   On May 4, 2018, the Commission's Public Advocates Office (Cal Advocates) and The Utility Reform Network (TURN) filed Protests, and

---

[1]  Application at 2-3.

[2]  Application at 3, 6.

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 4 of 26

Southern California Edison (SCE) filed a Response.[3]  Generally stated, Cal Advocates and TURN asserted that the costs were not properly documented and were excessive, and specifically, they oppose the CEMA recovery of asserted forecasted vegetation management costs.  On May 14, 2018, PG&E filed a Reply to the Cal Advocates and TURN Protests.

On July 10, 2018, a prehearing conference was conducted.  On August 10, 2018, the assigned Commissioner issued a Scoping Memo and Ruling.  Pursuant in large part to the requirement in Resolution Electric Safety and Reliability Branch (ESRB)-4 to complete an independent audit of costs related to vegetation management related to remedial measures taken to reduce the likelihood of fires, the Scoping Memo extended the proceeding's statutory deadline to 24 months.[4]

On July 25, 2018, PG&E filed a motion for interim rate relief:  PG&E sought to begin recovering approximately $441 million, or 75% of the $588,296,000 it recorded in 2016 and 2017 CEMA costs.  On August 9, 2018, Cal Advocates and TURN filed a Joint Response to PG&E's Motion, arguing that the Motion failed to meet the standard for extraordinary need required for interim rate relief.  On November 2, 2018, PG&E's Motion was denied by Ruling, which found that PG&E did not provide adequate support for its request.

On December 4, 2018, PG&E filed a Renewed Motion for interim rate relief, stating that the filing was "due to worsening financial conditions at PG&E since

---

[3]  SCE did not file further substantive pleadings and became an observer: in the Joint Motion for approval of the proposed Settlement Agreement, the joining parties correctly noted that SCE "is participating in this proceeding in a monitoring capacity."  (Joint Motion at 8.)

[4]  The extension of the statutory deadline is authorized under Public Utilities Code (Pub. Util. Code) § 1701.5(b).

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 5 of 26

the Ruling and Original Motion,"[5] and seeking 100% of its recorded 2016 and 2017 CEMA costs ($588.296 million), to go into rates on March 1, 2019.  On December 19, 2018, TURN and Cal Advocates opposed the Renewed Motion. However, TURN and Cal Advocates also presented an alternative proposal, stating that, if granted, the interim rate recovery "should be limited to a figure that ensures the overall impact of the 2019 Annual Electric True-up (AET) will be no increase as compared to revenue at present rates," and calculating that such recovery should be no more than $373 million.[6]  On May 6, 2019, the Commission issued an interim decision that provided interim rate relief of $373 million.  The interim decision also denied PG&E's request to recover forecasted costs (at the time of the decision, the forecasted costs were regarding vegetation management for 2018 and 2019).[7]

On May 23, 2019, after the Commission's Utility Audits, Risk and Compliance Division considered the issue and concluded that it was incapable of performing the audit, the Commission's Administrative Services Division issued a Request For Offer to solicit contractors to perform the audit.  That effort failed to identify any potential auditors.  On July 31, 2019, the assigned Commissioner issued a Ruling granting the Applicant's motion to facilitate the hiring of an independent auditor.

On August 7, 2019, pursuant to a granted Motion, PG&E filed a Revised Application.  That Revised Application included PG&E's actual asserted 2018 vegetation management costs:  while PG&E's original 2018 Application contained only forecasted 2018 vegetation management costs, in the intervening

---

[5]  Renewed Motion at 2.

[6]  Response to Renewed Motion at 11.

[7]  Decision (D.) 19-04-039.

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 6 of 26

year, PG&E had actually incurred its 2018 vegetation management costs, and could then make those actual incurred part of its CEMA request in its Revised Application. (In so doing, PG&E was addressing D.19-04-039's preclusion to seeking forecasted vegetation management costs.)

On October 23, 2019, through oversight of the Commission's Energy Division, PG&E issued a Request For Proposal (RFP) to hire an independent auditor, but this RFP received no bids. On February 2, 2020, an Amended Scoping Memo was issued that extended the proceeding's statutory deadline and directed parties to file comments regarding a proposed revised scope of work to accompany a renewed independent auditor RFP. On February 28, 2020, parties filed Joint Comments as directed. On March 9, 2020, a Modified Amended Scoping Memo was issued to clarify the independent auditor's scope of work. Thereafter, through oversight of the Commission's Energy Division, PG&E issued a revised RFP to hire an independent auditor, which resulted in obtaining the services of an independent auditor.

On May 4, 2020, PG&E filed its Second Revised Application, which provided the entirety of its original application CEMA expenses for all years 2016 through 2019 as incurred and recorded costs, including for the year 2019 (*i.e.*, all of PG&E's asserted costs were then incurred, and not mere forecasts). On January 8, 2021, pursuant to an ALJ Ruling, PG&E filed its Third Revised Application, which enabled PG&E to make corrections and updates to its revenue requirement. That Third Revised Application stated that PG&E's final total revenue requirement being sought in this CEMA proceeding is $763,269,000, inclusive of PG&E's calculation of interest (and inclusive of the $373 million that was authorized by D.19-04-039).

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 7 of 26

On January 15, 2021, Cal Advocates served its opening testimony. This testimony essentially served as Cal Advocates' audit of PG&E's CEMA costs, excluding vegetation management expenses. On April 15, 2021, the Commission approved an Order extending the statutory deadline to April 30, 2022.

On July 2, 2021, the Commission's Energy Division served the independent auditor's report (Audit Report). The Audit Report was performed in accordance with the approved scope of work, and presented a detailed exploration of PG&E's asserted vegetation management expenses. Thereafter, parties served testimony, and filed comments and reply comments regarding the Audit Report.

On August 26, 2021, a Status Conference was conducted, during which the parties reported that they wished to discuss possible settlement. On October 5, 2021, the parties reported that they were making progress toward a negotiated settlement. On November 4, 2021, the parties filed their Joint Motion for approval and adoption of their proposed Settlement Agreement.[8] Also on November 4, 2021, the parties filed a Joint Motion for admission of the parties' testimony and other evidence into the record, which is hereby granted.[9] On December 21, 2021, in response to a Ruling, the parties filed a Joint Statement of Further Information. At that time, the record was deemed complete. The proceeding was submitted for decision on December 21, 2021.

---

[8] The Settlement Agreement is attached hereto as Exhibit 1.

[9] Exhibits in this proceeding are identified as follows:

Cal Advocates-01.

PGE-01 -- PGE-12. Of note, PGE-09 is subject to a separate Motion For Leave To File Under Seal, which is hereby granted. Also of note, PGE-10 is the Audit Report prepared by the independent auditor.

TURN-01 -- TURN-02.

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 8 of 26

## 2. Issues Before the Commission

As defined in the March 9, 2020, Modified Amended Scoping Memo, the issues in this proceeding are as follows:

1. Are the costs recorded to the account pursuant to defined catastrophic events?

2. Are the costs recorded to the account appropriate for CEMA recovery –*i.e.*, related to restoring service; related to repairing, restoring, and replacing damaged equipment and facilities; incremental; non-duplicative; correctly calculated; and reasonable (defined as prudently incurred by competent management exercising best practices)?

3. As to each event sought to be covered in this Application, what would be the associated revenue requirement?

4. Does the Application raise any safety concerns?

## 3. Party Positions

### 3.1. PG&E's Litigation Position

PG&E's Application sought recovery for costs it recorded in its CEMA pursuant to Pub. Util. Code Section 454.9.[10]  PG&E identified eleven Catastrophic Events:

- 2016 Vegetation Management;

---

[10] Pub. Util. Code Section 454.9 states:

(a) The commission shall authorize public utilities to establish catastrophic event memorandum accounts and to record in those accounts the costs of the following:

    (1) Restoring utility services to customers.

    (2) Repairing, replacing, or restoring damaged utility facilities.

    (3) Complying with governmental agency orders in connection with events declared disasters by competent state or federal authorities.

(b) The costs, including capital costs, recorded in the accounts set forth in subdivision (a) shall be recoverable in rates following a request by the affected utility, a commission finding of their reasonableness, and approval by the commission.  The commission shall hold expedited proceedings in response to utility applications to recover costs associated with catastrophic events.

7

- 2016 Soberanes Fire;

- 2016 Clayton Fire;

- 2016 Chimney Fire;

- 2016 December Severe Storms;

- 2017 Vegetation Management;

- 2017 January Severe Storms (Set 1);

- 2017 January Severe Storms (Set 2);

- 2017 February Severe Storms;

- 2018 Vegetation Management; and

- 2019 Vegetation Management.[11]

When PG&E filed its Application, the 2018 and 2019 vegetation management costs were unknown, and merely forecasted, and consequently were disallowed as forecasts by interim decision D.19-04-039.  Subsequently, over the course of this extended proceeding, PG&E's Application was amended several times to provide actual costs for its 2018 and 2019 vegetation management.[12]  Also, PG&E assisted with the Commission's hiring of an independent auditor of its vegetation managements costs, as required by

---

[11]  PG&E asserted that each of these events meet the standards for "catastrophic event" as defined in Pub. Util. Code §454.9 (*see* Third Amended Application at 10).  No party challenged that assertion, and the Settlement Agreement affirmed agreement to that assessment.

[12]  PG&E's asserted 2018 and 2019 vegetation management costs were added to the record through PG&E's August 7, 2019, Revised Application, and through PG&E's May 4, 2020, Second Revised Application (as well as the revised testimony and workpapers that accompanied those revisions to the application:  *see* Exhibits PGE-03, PGE-04, PGE-05, and PGE-06.)  PG&E's asserted independent auditor costs, and certain additional CEMA adjustments, were included in PG&E's January 8, 2021, Third Revised Application (which also included certain revised testimony and workpapers:  *see* Exhibits PGE-07, PGE-08, and PGE-09 CONF.)  PG&E asserts that the Third Revised Application is a cumulative update that incorporates the material from all of the previous application revisions, and is the basis for the PG&E figures used in this decision.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 10 of 26

Resolution ESRB-4, and in accordance with the terms of that Resolution, PG&E requested recovery of the costs associated with hiring the independent auditor.[13]

As set forth in the Third Revised Application, PG&E requests authorization to recover approximately $763 million in revenue requirements, comprised of $696 million in CEMA- eligible incremental expenses, $114 million in CEMA-eligible incremental capital costs, and $43 million in interest, identified per event as follows:

**CEMA EVENTS RECOVERY ASSERTED (in thousands)**

| Line No. | Catastrophic Event | Expense | Capital Expenditure | Revenue Requirement[a] |
|---|---|---|---|---|
| 1 | 2016 Vegetation Management [b] | $259,679 | -- | $259,679 |
| 2 | 2016 Soberanes Fire | 3,768 | $1,395 | 4,152 |
| 3 | 2016 Clayton Fire | 4,194 | 3,730 | 5,263 |
| 4 | 2016 Chimney Fire | 300 | 758 | 527 |
| 5 | 2016 December Severe Storms | 1,073 | 570 | 1,207 |
| 6 | 2017 Vegetation Management [b] | 135,170 | -- | 135,170 |
| 7 | 2017 January Severe Storms (Set 1) | 41,845 | 35,088 | 49,251 |
| 8 | 2017 January Severe Storms (Set 2) | 26,687 | 21,772 | 31,138 |
| 9 | 2017 February Severe Storms | 56,080 | 50,916 | 65,951 |
| 10 | 2018 Vegetation Management [b] | 90,304 | -- | 90,304 |
| 11 | 2019 Vegetation Management [b] | 77,272 | -- | 77,272 |
| 12 | **Subtotal** – Recorded without Interest | $696,372 | $114,228 | $719,914 |
| 13 | Interest (2016-2021) | -- | -- | 43,354 |
| 14 | **Total** – Recorded with Interest | | | $763,269 |

(a)  This column shows PG&E's asserted revenue requirements associated with CEMA eligible incremental expense and capital costs through December 31, 2019, with certain costs trailing into February 2020 for 2019 vegetation management costs.

(b)  The costs of the independent audit required by ESRB-4 are distributed across each of the expenses for the 2016, 2017, 2018 and 2019 vegetation management events.

For perspective regarding PG&E's two CEMA expense categories that comprise the asserted $719,914,000 total (including revenue requirement but excluding interest), the breakdown is as follows:  $157,489,000 for fire and storm events, and $562,425,000 for the 2016-2019 vegetation management events.

---

[13] Resolution ESRB-4, Ordering Paragraph 5, provides for recovery of the cost of hiring an independent auditor:  PG&E submitted that cost pursuant to Confidential Exhibit PGE-09 CONF.

In its initial 2018 Application, PG&E had proposed the following set of cost recoveries:

- For electric distribution and electric generation costs, recovery would be obtained over a 1-year period starting January 1, 2019, as part of PG&E's AET advice letter filings.

- For capital costs, recovery would be rolled into PG&E's 2020 general rate case (GRC).

- For the electric distribution capital additions, recovery would be through the Distribution Revenue Adjustment Mechanism (DRAM).

- For revenue requirements related to electric distribution expense and capital costs, recovery would be through DRAM.

- For revenue requirements related to electric distribution vegetation management, recovery would be through DRAM.

- For revenue requirements related to electric generation vegetation management, recovery would be through the Portfolio Allocation Balancing Account.

### 3.2.  Cal Advocates' Litigation Position

On May 4, 2018, Cal Advocates protested PG&E's Application.  On January 15, 2021, Cal Advocates served its opening testimony.  Its opening testimony substantially acts as a broad form of audit of PG&E's asserted costs and expenses, excluding those for vegetation management.

Cal Advocates examined the seven emergency fire and storm events in 2016-2017, for which PG&E seeks $134 million for labor-related costs and $114 million for capital-related costs, for a cost total of $248 million. Cal Advocates argued for a $53 million reduction in labor-related costs and $53 million reduction in capital-related costs.  This resulted in a total sought reduction of $106 million, or a 43% total reduction in those cost categories.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 12 of 26

Cal Advocates essentially asserted that, while these were indeed appropriate CEMA events, and it does not argue with the nature of the support provided by PG&E, the reductions are necessitated due to two factors.  First, it contends that much of the work cost is recovered through PG&E's approved GRC revenue and rates, arguing that "temporary redeployment of personnel based on changed priorities does not constitute incremental activity."  Second, it contends that PG&E failed to provide quantifiable analysis substantiating that its costs were not already recovered in revenue and rates for work that "support[s] PG&E's existing operations."[14]

Cal Advocates noted several of PG&E's supporting statements, including this:

> For the purpose of calculating PG&E's overhead rates, PG&E combines a forecast for labor and materials associated with all base work, CEMA-eligible emergency work (based on a 5-year historical average of past CEMA expenditures) and PG&E's forecast of non-CEMA emergency work (*i.e.*, routine emergency and MEBA work).  Through this calculation, the total company costs of the overhead are allocated between CEMA, non-CEMA emergency and all base work.

Cal Advocates presented this response to that statement:  "PG&E bases its claims on a process, lacking any quantifiable incremental analysis proving its claim."[15]

### 3.3.  TURN's Litigation Position

 On August 2, 2021, TURN served its opening testimony.  Like Cal Advocates, TURN focused on the seven emergency fire and storm events in

---

[14] Exhibit Cal Advocates-01 at 5-6.

[15] *Id*. at 13-14.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 13 of 26

2016-2017, and not on vegetation management. Its conclusions were similar to those of Cal Advocates.

TURN's examination resulted in a proposed removal of the costs of all straight time labor, as well as all CEMA overheads of any kind. This proposal would result in a reduction of approximately $53 million in expenses and $53 million in capital expenditures from the revenue requirement.[16] The net result of TURN's proposed reduction was nearly identical to Cal Advocates' proposed reduction.

> TURN writes in pertinent part:
>
> The additional overhead costs are not the result of CEMA activities. PG&E has inappropriately taken non-incremental costs and loaded them into their CEMA request. The Commission should find that recovery of these non-incremental costs is unreasonable and may lead to double recovery from ratepayers.[17]

## 4. Audit Report

The Audit Report reviewed the totality of PG&E's Third Amended Application. The independent auditor stated that it adhered to professional Certified Public Accountant standards, to determine whether costs were "just, fair, reasonable, and sufficient." It considered Resolution ESRB-4's requirements that costs be "truly incremental" and avoid double collection.[18]

The Audit Report reviewed "information provided by PG&E related to its costs included in the Company's cost recovery proceedings for the CEMA account." It also held discussions with PG&E's Finance, Regulatory, and

---

[16] Exhibit TURN-01 at 4.

[17] *Id*. at 3.

[18] Exhibit PGE-10 at 3-4.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 14 of 26

Vegetation Management Departments, and reviewed PG&E's last approved GRC proceeding decision and other PG&E rate and compensation mechanisms.  It compared GRC "costs and activities to the CEMA Accounts to identify potential overlap or risk of double recovery."[19]

Ultimately, the Audit Report sampled 17% of the total PG&E costs asserted, in a manner that varied by cost category to capture transaction cost volume and dollar value.  The Audit Report also looked at PG&E's Wildfire Mitigation Plan Memorandum Account, Fire Risk Mitigation Memorandum Account, Fire Hazard Prevention Memorandum Account, and the CEMA Accounts, totaling over $2.5B of wildfire program costs.  Finally, the independent auditor visited two vegetation management sites.[20]

The Audit Report notes that it "did not find evidence that any transaction was recorded in more than one account."[21]  Under Findings and Conclusions, it wrote the following:

> As a result of the procedures described above, we identified no exclusions that would materially affect the balances of the CEMA Accounts.  Based on our analysis, we found no evidence to question management's conclusions that costs were:  (i) incurred for the activities set forth in the corresponding, relevant CPUC approved Memorandum Accounts; (ii) accurately recorded; and (iii) incremental in nature.
>
> …[W]e identified items totaling approximately $159K (extrapolated to $2.4 million) that were not properly evidenced for inclusion in the Memorandum Accounts largely due to:  1) Unsupported vendor expenses… 2) [Unsupported vendor] Markups… 3) Unsupported materials…

---

[19] *Id*. at 4-5.

[20] *Id*. at 5-6.

[21] *Id*. at 6.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 15 of 26

4) Unsupported Permit/Fees/ General Expense…
5) Unsupported overheads…"[22]

However, the Audit Report found that there were four transaction costs that were included in past applications. It also stated that one transaction cost was repeated ten times, but wrote that "PG&E confirmed that these transactions were a compilation adjustment within our data file and not recorded twice on the books and record of the company." These items were "removed," which reduced the application by $3 million.[23]

The Audit Report, which runs 45 pages in all, went into great detail about how the independent auditor went about determining the appropriate sampling mechanisms, how it actually did all of its work, and the specific conclusions of each operation. It appears to be a well-conceived and well-executed complete analysis.

## 5. Settlement Agreement

The parties jointly request the Commission's adoption of their proposed Settlement Agreement, which, among other administrative, legal, and conventional terms, includes these specific important terms and conditions:

- PG&E's final CEMA revenue requirement for costs and expenses will be $683,200,000, as opposed to the $719,914,000 that PG&E sought in its Third Amended Application. (*See* Settlement Agreement Section 4.1.)

- The final revenue requirement will be collected as follows:

  - It acknowledges the D.19-04-039 Interim Decision's authorization of a $373,000,000 PG&E CEMA revenue requirement which was fully collected in rates in 2019 and 2020, and it proposes an additional $310,200,000 PG&E CEMA revenue requirement to be collected in

---

[22] *Ibid.*

[23] *Id*. at 7.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 16 of 26

rates.  (*See* Settlement Agreement Section 4.2.)

- The CEMA costs will be recovered in rates in the same manner as other electric distribution and electric generation costs.  (*See* Settlement Agreement Section 4.3.)

- The revenue requirement associated with electric distribution and electric generation CEMA expense costs will be recovered over a 12-month period as part of PG&E's 2022 AET, or the next available rate change, through the Distribution Revenue Adjustment Mechanism and Portfolio Allocation Balancing Account rate mechanisms.  (*See* Settlement Agreement Section 4.4.)

- The revenue requirement associated with electric distribution CEMA 2016-2019 capital costs will be recovered over a 12-month period as part of PG&E's 2022 AET, or the next available rate change, through an advice letter.  (This is in addition to those capital costs already being recovered in PG&E's GRC.)  (*See* Settlement Agreement Section 4.5.)

- Regarding interest, the Settlement Agreement says that PG&E is entitled to it, at the three-month Commercial Paper rate, based on the "average balance of unrecovered amounts."  (*See* Settlement Agreement Section 4.6.)

The parties filed their Joint Statement of Additional Information, which was helpful in confirming the Commission's understanding of the Settlement Agreement.  The Statement provided these additional insights into the nature of the parties' intent and the operational performance of the Settlement Agreement, and provided illustrative examples of its impact.  The Statement makes clear the following:

- The parties did not determine separate revenue

15

requirements for each event.[24]

- Time and labor are the bases for the reduced settlement total.[25]

- PG&E has already collected the entirety of the $373 million of interim rate relief authorized in D.19-04-039, but that revenue was not specific to a subset of CEMA events.[26]

- The $36.7 million in total revenue requirement reduction is not specific to any particular CEMA events, and is instead a global reduction.[27]

- Interest on the $373 million collected in interim rate relief will be calculated separately from interest due on the remaining $310.2 million in revenue requirement agreed to in the settlement (*i.e.*, the $310.2 million is the balance between the $683.2 million revenue requirement settlement total and the $373 million that has already been collected in interim rate relief).[28]

- "PG&E will continue to collect the capital revenue requirements included in its application in their entirety for 2020 and beyond by rolling them into ratebase through future GRCs… (PG&E included those costs in ratebase in its 2020 GRC). "[29]

- "For purposes of calculating interest, PG&E developed an illustrative revenue requirement for each event by prorating the proposed $36.7 million revenue requirement reduction… (1) $2.4 million was attributed to the 2016-2019 tree mortality and fire reduction work, according to recommendation of the independent auditor; and (2) the remaining $34.3 million was applied proportionately to the

---

[24] Joint Statement of Additional Information at 3.

[25] *Ibid.*

[26] *Id.* at 3-4.

[27] *Id.* at 4.

[28] *Ibid.*

[29] *Id.* at 5.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 18 of 26

application revenue requirement amount for the remaining CEMA events."[30]

- None of the interest amounts have yet been collected.[31]

- Illustrative customer class average rate impacts based on rates effective December 1, 2021 would be "(1) System Average Bundled Rate: 2.2%; (2) Residential Average Bundled Rate:  CARE [California Alternate Rates for Energy Program] 2.6%, non-CARE 2.5%.  In addition, for a typical non-CARE bundled residential customer with an average usage of 500 kWh per month, their average monthly bill would increase by approximately $3.58/month."[32]

## 6.  Discussion

### 6.1.  Settlement Agreement Standard of Review

Rule 12.1(d) states "The Commission will not approve settlements, whether contested or uncontested, unless the settlement is reasonable in light of the whole record, consistent with the law, and in the public interest."  The Commission has previously noted that "in order to consider [a] proposed Settlement Agreement… as being in the public interest, we must be convinced that the parties have a sound and thorough understanding of the application and all of the underlying assumptions and data included in the record.  This level of understanding of the application and development of an adequate record is necessary to meet our requirements for considering any settlement."[33]  The

---

[30] *Id.* at 6.  This continues as follows:  "All interest calculations are done on a monthly basis using the applicable 3-month commercial paper rate for that time period… For purposes of interest calculation, PG&E assumed the remaining revenue requirement would be collected over a 12-month amortization period beginning March 2022 and ending February 2023 until the point the 2018 CEMA authorized revenue requirement would be entirely collected."  (*Id.* at 7.)

[31] *Id.* at 7.

[32] *Id.* at 8.

[33] D.20-12-005 at 25-26.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 19 of 26

Commission has also previously noted that "While we understand that a settlement agreement represents an integrated agreement which contain various concessions and trade-offs from parties to a settlement agreement, the Commission should not be prohibited from disapproving, rejecting or proposing modifications to certain provisions in a settlement agreement that are not supported by the evidence, not in accordance with law, or not in the public interest."[34]

## 6.2. The Proposed Settlement is Reasonable

Here, the settlement terms embrace 11 CEMA events. The parties outlined the settlement in their proposed Settlement Agreement. In their Joint Statement of Further Information, the parties provided additional analysis regarding the proposed Settlement Agreement, providing the Commission with additional understanding regarding approaches to the analysis of the proposed Settlement Agreement.

In their Joint Motion, the parties posit as follows:

The Settling Parties agree that… the amount of revenue reduction [that is, $36.7 million of the requested $719.9 million] is a reasonable compromise between PG&E's request for full recovery of such costs and TURN's and Cal Advocates' recommended revenue requirement reductions, which range from $27.4 million to $65.7 million, respectively, associated with overheads and straight-time labor. The Settlement is also consistent with the findings of the Ernst and Young independent audit report findings. Of the proposed $719.9 million revenue requirement in PG&E's application, approximately $562.4 million were related to Tree Mortality and Fire Risk Reduction work performed between 2016 and

---

[34] D.16-12-067 at 60. This quote continues as follows: "[A]ny party to a settlement agreement may elect not to accept modifications proposed by the Commission, and withdraw its request to adopt a proposed settlement agreement, or to seek other relief available."

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 20 of 26

2019.  The EY independent report reviewed those costs and
"identified no findings that would materially affect the
balances on the CEMA accounts."  As noted above, the report
identified only a very small amount of costs, "approximately
$159K (extrapolated to $2.4 million) that were not properly
evidenced for inclusion in the Memorandum Accounts."[35]

The basic dispute in this proceeding, as demonstrated by the testimony of
Cal Advocates and TURN on one side and PG&E's responsive testimony on the
other side, concerned whether PG&E's CEMA straight-time labor and overhead
costs were provided with sufficient detail by PG&E in its cost showing.  The
proposed Settlement Agreement, which results in a $36.7 million reduction in the
total Application request of $719.9 million  --  a reduction of about 5%  --
represents a reasonable compromise between the respective parties' strongly
held positions.  Therefore, we find that by resolving these issues without
requiring litigation, the Settlement Agreement preserves the time and resources
of all parties as well as the Commission, which benefits ratepayers and the
agency, and consequently the Settlement Agreement is reasonable and compliant
with Rule 12.1(d).

### 6.3.  The Proposed Settlement is Consistent with the Law

In their Joint Motion, the parties posit as follows:

In its prepared testimony and workpapers accompanying the
application, PG&E described the CEMA-eligible costs
incurred in relation to the Catastrophic Events as described in
Public Utilities Code Section 454.9.  Consistent with
Commission D.07-07-041, PG&E only sought recovery of costs
for the areas for which an authority declared an emergency
(proclaimed or declared emergency areas or counties).
Likewise, consistent with the past, PG&E has adjusted its

---

[35]  Joint Motion for Adoption of Settlement Agreement at 11-12.

CEMA eligible costs to exclude employee benefits associated with labor expense and capitalized Administrative and General costs charged to capital orders in order to determine the CEMA-eligible "incremental" costs.  Additionally, as described above, the Tree Mortality and Fire Risk Reduction costs included in PG&E's application were reviewed by the Commission's independent auditor as required by ESRB-4, which resulted in no material findings to the balances in the CEMA account included in PG&E's application.[36]

In review of PG&E's CEMA Application as a whole, and in review of its various elements, we find nothing unusual in the nature of its weather and fire--related event requests for costs and expenses.  Regarding its Resolution ESRB-4 vegetation management CEMA requests for costs and expenses, PG&E is compliant with the Commission's CEMA request requirements, and it has been found by the independent auditor (required pursuant to the Resolution) to be consistently compliant with its reporting and accounting obligations, with limited exceptions.  We see nothing to suggest, and no party claims, that a statutory provision or prior Commission decision would be contravened or compromised by the Settlement Agreement.  The terms of the proposed Settlement Agreement are similar to past Commission decisions regarding CEMA-related settlements.[37]  Therefore, we find that the Settlement Agreement is consistent with the law, and consequently it is compliant with Rule 12.1(d).

## 6.4.  The Proposed Settlement is in the Public Interest

In their Joint Motion, the parties posit as follows:

The Settlement resolves the issues in this matter without a hearing, which conserves the Commission's and Settling

---

[36] *Id*. at 12.

[37] As an example, the proposed Settlement Agreement is similar to D.18-06-011.

Case: 19-30088   Doc# 14343-6   Filed: 03/15/24   Entered: 03/15/24 18:13:46   Page 22 of 26

Parties' time and resources, which in turn benefits ratepayers.
It also promotes efficient resolution of cost recovery for repair
and restoration work from declared emergencies as
contemplated by Public Utilities Code Section 454.9(b), as well
as for significant Tree Mortality and Fire Risk Reduction work
performed to mitigate fire risk in accordance with ESRB-4.
Finally, the effect of the Settlement on customer rates is
substantially less than would otherwise be the case because of
the Commission's decision to authorize collection of interim
rates in D.19-04-039.  As a result, only $310.2 million of the
$683.2 million Settlement revenue requirement
(approximately 45%) plus interest remains to be collected in
rates.  Thus, the settlement agreement is reasonable in light of
the whole record, consistent with law, and in the public
interest.[38]

The public interest and the interests of ratepayers must be considered
before the Commission approves a proposed settlement.  Here, the proposed
Settlement Agreement will spare the Commission and the parties the time, effort,
and costs required to litigate the disputed issues.  Moreover, the proposed
Settlement Agreement represents an agreement among all parties in a
proceeding in which a majority of parties represent the public interest.
Therefore, we find that taken as a whole, the Settlement Agreement is consistent
with the law, and consequently it is compliant with Rule 12.1(d).

## 7.  Comments on Proposed Decision

Because this decision adopts an all-party settlement without modification,
this is now an uncontested matter in which the decision grants the relief
requested.  Accordingly, pursuant to Pub. Util. § 311(g)(2) and Rule 14.6(c)(2), the
otherwise applicable 30-day period for public review and comment is waived.

---

[38] *Id*. at 12-13.

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page
23 of 26

## 8.  Assignment of Proceeding

Darcie L. Houck is the assigned Commissioner and Jason Jungreis is the assigned ALJ in this proceeding.

## Findings of Fact

1.  It is undisputed that PG&E only sought recovery of CEMA costs and expenses for catastrophic events and for those areas for which a competent state or federal authority declared a disaster, both in terms of geography and the nature of impacts covered by the disaster declaration.

2.  It is undisputed that Resolution ESRB-4 is both applicable to and has been properly applied to PG&E's sought recovery of vegetation management costs and expenses.

3.  It is undisputed that the ratemaking treatment that PG&E seeks for CEMA-eligible cost and expense recovery is reasonable.

4.  The Settlement Agreement provisions reduce PG&E's total sought CEMA revenue requirement by $36.7 million, from $719.9 million to $683.2 million.

5.  The Settlement Agreement's proposal to reduce PG&E's total sought CEMA revenue requirement is a reasonable compromise between PG&E's position and those of ratepayer representatives Cal Advocates and TURN.

6.  PG&E has already recovered $373 million in interim rate relief pursuant to D.19-040-039.

7.  PG&E's additional revenue recovery of $310.2 million pursuant to the Settlement Agreement is reasonable, prudent, and in the public interest.

8.  The Settlement Agreement preserves the time and resources of all parties as well as the Commission by avoiding litigation.

9.  There are no safety considerations directly related to approval of the proposed Settlement Agreement.

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 24 of 26

10.  It is in the interest of public safety for utilities to take all reasonable measures to address safety concerns by responding to storm and fire-related catastrophic events and to prospectively engage in vegetation management in the effort to reduce risks to the public.

**Conclusions of Law**

1.  The settlement agreement is reasonable in light of the whole record, consistent with law, and in the public interest.

2.  The settlement agreement should be approved.

3.  This proceeding should be closed.

## O R D E R

**IT IS ORDERED** that:

1.  Pacific Gas and Electric Company is authorized to recover as soon as practicable a Catastrophic Emergency Memorandum Account revenue requirement in the amount of $310.2 million, above the $373 million in interim rate relief already approved in Decision 19-04-039, corresponding to its expenses and costs associated with its 11 catastrophic events from 2016 to 2019, and all such associated interest for the entirety of the $683.2 million, all in accordance with the body of this decision and as this decision references the Settlement Agreement in this proceeding, which is attached hereto as Attachment 1.

Case: 19-30088    Doc# 14343-6    Filed: 03/15/24    Entered: 03/15/24 18:13:46    Page 25 of 26

2.  Application 18-03-015 is closed.

    This order is effective today.

    Dated March 17, 2022, at San Francisco, California.

ALICE REYNOLDS
President
CLIFFORD RECHTSCHAFFEN
GENEVIEVE SHIROMA
DARCIE HOUCK
JOHN R.D. REYNOLDS
Commissioners
