Isaac M. Pachulski (CA Bar No. 62337)
Debra I. Grassgreen (CA Bar No. 169978)
PACHULSKI STANG ZIEHL & JONES LLP
1 Sansome Street, Suite 3430
San Francisco, CA 94104
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
Email: dgrassgreen@pszjlaw.com

Eric Seiler (admitted *pro hac vice*)
Jason C. Rubinstein (admitted *pro hac vice*)
Michael S. Palmieri (admitted *pro hac vice*)
Matthew Tharp (*pro hac vice* pending)
FRIEDMAN KAPLAN SEILER AND ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone (212) 833-1103
Facsimile (212) 373-7903
Email: eseiler@fklaw.com

*Attorneys for Securities Claimant*
*Baupost Group Securities, L.L.C*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>     -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>     Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric<br>   Company<br>☒ Affects both Debtors<br>*\* All papers shall be filed in the lead case,*<br>*NO. 19-30088 (DM)* | Chapter 11<br><br>Bankr. Case No. 19-30088 (DM)<br><br>(Jointly Administered)<br><br>**OPPOSITION OF BAUPOST GROUP SECURITIES, L.L.C. TO THE REORGANIZED DEBTORS' THIRTY-FIFTH SECURITIES CLAIMS OMNIBUS OBJECTION TO THE BAUPOST AMENDMENT** |

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................................III

Table of Definitions ...................................................................................................... VII

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ............................................................................................................. 5

    **A.**    PG&E Operates Under a Rigorous Regulatory Regime ......................................... 5

        **1.**    PG&E Is Required to Inspect and Maintain Its Electrical
             Distribution and Transmission Infrastructure to Prevent Wildfires............5

        **2.**    Regulatory Compliance Is Critical to PG&E's Bottom Line......................6

    **B.**    PG&E's Failures to Adequately Inspect, Maintain, and
         Replace Its Transmission Equipment Caused the Camp Fire ................................ 7

        **1.**    The Camp Fire and Its Causes ..................................................................7

        **2.**    PG&E Knew Its Transmission Lines Were in Dangerous Disrepair..........8

        **3.**    PG&E Dramatically Weakened Its Transmission Line Inspection
             Policies and Practices in the Years Leading Up to the Camp Fire ............10

        **4.**    PG&E Failed to Clear Vegetation from
             Its Transmission and Distribution Lines...................................................14

    **C.**    PG&E Artificially Inflated Its Stock Price by
         Misrepresenting, and Concealing the Risks Created
         by, Its Reckless Operation of Its Transmission System........................................ 14

        **1.**    PG&E Misled Investors About the Sufficiency
             of Its Transmission Line Inspection Program............................................15

        **2.**    PG&E Made Multiple Misleading Statements
             About Investing in Its Transmission Infrastructure ..................................16

        **3.**    PG&E Doubled Down on Its Misleading
             Reassurances Concerning Vegetation Management..................................18

    **D.**    PG&E's Management Knew That PG&E's Statements
         Were False and Misleading When They Were Made ........................................... 19

Case: 19-30088    Doc# 14347    Filed: 03/15/24    Entered: 03/15/24 18:53:07    Page 2
of 68

E.    Baupost Bought PG&E Stock at Artificially Inflated
Prices and Suffered Massive Losses When the Camp Fire
Revealed PG&E's Reckless Operation of Its Transmission System ................... 23

**ARGUMENT** .............................................................................................................. **24**

I.    **PG&E'S STATEMENTS WERE ACTIONABLY FALSE AND
MISLEADING** ................................................................................................ **26**

A.    PG&E's Misstatements Were False, Omitted Material
Information, and Created the False Impression That PG&E Was
Adequately Inspecting and Maintaining Its Transmission Infrastructure ............ 27

B.    PG&E's Misstatements Cannot Be Excused as Puffery ....................................... 31

C.    PG&E's Reliance on *Barnes* Is Unavailing ......................................................... 32

D.    PG&E's "Truth-on-the-Market" Arguments Do Not Support Dismissal ............ 33

II.    **BAUPOST SUFFICIENTLY PLEADS SCIENTER** ..................................... **37**

A.    The Inference That PG&E's Management Knew, or
Recklessly Avoided Knowing, That Their Statements Were False
or Misleading Is at Least as Compelling as Any Opposing Inference ................ 38

B.    Baupost Sufficiently Alleges Scienter Under the Core Operations Doctrine ....... 42

C.    Baupost Sufficiently Alleges Corporate Scienter ................................................ 44

III.    **BAUPOST SUFFICIENTLY PLEADS FRAUD-ON-THE-MARKET
RELIANCE** ..................................................................................................... **45**

IV.    **BAUPOST SUFFICIENTLY PLEADS LOSS CAUSATION** ..................... **48**

**CONCLUSION** ...................................................................................................... **52**

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aldave v. City of Buena Park,*
  2021 WL 4539741, at *2 (C.D. Cal. July 7, 2021) ................................................. 26

*Ansell v. Laikin,*
  2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011) ................................................ 48

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................. 25

*Baker v. SeaWorld Ent., Inc.,*
  423 F. Supp. 3d 878 (S.D. Cal. 2019) .................................................................... 51

*Barnes v. Edison Int'l,*
  2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) .................................................. 32, 33

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988)........................................................................................... 45, 47

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008) .................................................................................. 26

*Cf. In re Tronox Inc.,*
  2010 WL 1849394, at *2 (Bankr. S.D.N.Y. May 6, 2010)...................................... 24

*City of Dearborn Heights v. Align Tech., Inc.,*
  856 F.3d 605 (9th Cir. 2017) .................................................................................. 39

*Curry v. Yelp Inc.,*
  875 F.3d 1219 (9th Cir. 2017) ................................................................................ 43

*Dual Diagnosis Treatment Ctr., Inc. v. Centene Corp.,*
  2022 WL 3359386, at *1 (9th Cir. Aug. 15, 2022)................................................. 25

*Ganino v. Citizens Utilities Co.,*
  228 F.3d 154 (2d Cir. 2000) ................................................................................... 34

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,*
  63 F.4th 747 (9th Cir. 2023) ....................................................................... 25, 31, 37

*Glazer Cap. Mgmt., LP v. Magistri,*
  549 F.3d 736 (9th Cir. 2008) .................................................................................. 44

*Howard v. Everex Sys., Inc.,*
  228 F.3d 1057 (9th Cir. 2000) ................................................................................ 41

*In re Amylin Pharms., Inc. Sec. Litig.,*
  2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003)............................................... 35

*In re Apple Computer Sec. Litig.,*
  886 F.2d 1109 (9th Cir. 1989) ................................................................................ 34

Case: 19-30088   Doc# 14347   Filed: 03/15/24   Entered: 03/15/24 18:53:07   Page 4 of 68

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014, at \*12 (N.D. Cal. Nov. 4, 2020) ................................... 41

*In re Banc of Cal. Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018) ..................................................................... 46

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ........................................................................... 49

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
2015 WL 224631, at \*7 (S.D. Cal. Jan. 15, 2015) ......................................... 36

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ......................................................................... 51

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ......................................................................... 36

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ........................................................................... 26

*In re IMAX Sec. Litig.*,
587 F. Supp. 2d 471 (S.D.N.Y. 2008) ............................................................. 43

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) ........................................................... 25

*In re Kalobios Pharms., Inc. Sec. Litig.*,
258 F. Supp. 3d 999 (N.D. Cal. 2017) ............................................................. 47

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W.Va. 2012) .......................................................... 47

*In re Myers*,
2023 WL 8047842 (9th Cir. BAP Nov. 21, 2023) ........................................... 24

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ........................................................................... 51

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ......................................................................... 25

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................. 28, 38

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..................................................... 47, 48

*In re Roberts Farms Inc.*,
980 F.2d 1248 (9th Cir. 1992) ......................................................................... 22

*In re Tesla, Inc. Sec. Litig.*,
2022 WL 1497559, at \*20 (N.D. Cal. Apr. 1, 2022) ....................................... 45

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020) ............................................................. 31

*Janus Cap. Grp., Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011) ................................................................ 40

*Junge v. Geron Corp.,*
    2022 WL 1002446, at *7 (N.D. Cal. Apr. 2, 2022) ........................ 51

*Khoja v. Orexigen Therapeutics,*
    899 F.3d 988 (9th Cir. 2018) .................................................. 26

*Malone v. Microdyne Corp.,*
    148 F.R.D. 153 (E.D. Va. 1993) .............................................. 48

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) ........................................................ 26, 29

*Mauss v. NuVasive, Inc.,*
    2018 WL 656036, *4 (S.D. Cal. Feb. 1, 2018) ............................ 49

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
    540 F.3d 1049 (9th Cir. 2008) ............................................... 51

*Meyer v. Jinkosolar Holdings Co.,*
    761 F.3d 245 (2d Cir. 2014) .................................................. 30

*Miller v. Thane Int'l, Inc.,*
    519 F.3d 879 (9th Cir. 2008) ................................................. 27

*Mineworkers' Pension Scheme v. First Solar Inc.,*
    881 F.3d 750 (9th Cir. 2018) .............................................. 48, 49

*Nguyen v. Radient Pharmaceuticals Corp.,*
    2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011) ..................... 33, 47

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) .................................................. 41

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
    380 F.3d 1226 (9th Cir. 2004) ............................................... 38

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
    575 U.S. 175 (2015) .......................................................... 31

*People v. Ramirez,*
    2023 WL 5215382, at *3 (Cal. Ct. App. Aug. 15, 2023) ................. 41

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.,*
    777 F. App'x 726 (5th Cir. 2019) ........................................... 28

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ............................................... 36

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ....................................... 39, 40, 42, 44

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
    1996 WL 134757, at *4 (S.D.N.Y. Mar. 25, 1996) ....................... 46

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ............................................................ 42

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................... 30, 37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).......................................................... 25, 38, 39

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................ 48

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
   2017 WL 3097184, at *1 (N.D. Cal. June 22, 2017) .............................. 32

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ............................................................ 10

*Van Buskirk v. Cable News Network, Inc.*,
   284 F.3d 977 (9th Cir. 2002) ............................................................ 25

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ............................................................. 31

*Weston Fam. P'ship LLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ............................................................ 31

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ............................................................ 39


**Other Authorities**

15 U.S.C. § 78u–4(b)(1) ..................................................................... 27

CAL. CONST., Art. I, § 19 ...................................................................... 6

CAL. CONST., Art. XII § 6 ...................................................................... 6

CAL. HEALTH & SAFETY CODE §13007 ....................................................... 6

CAL. PENAL CODE § 452 ....................................................................... 41

CAL. PUB. RES. CODE § 4292 ................................................................. 6

CAL. PUB. RES. CODE § 4293 .......................................................... 6, 8, 19

CAL. PUB. UTIL. CODE § 2106 ................................................................ 6

CAL. PUB. UTIL. CODE § 451 ................................................................ 19

CAL. PUB. UTIL. CODE § 451; TAC ¶ 62 ............................................. 5, 6, 7

FED. R. EVID. 201 ............................................................................. 26

Case: 19-30088   Doc# 14347   Filed: 03/15/24   Entered: 03/15/24 18:53:07   Page 7 of 68

# TABLE OF DEFINITIONS

| Defined Term | Meaning |
|---|---|
| "2020 POC" | The Rescission or Damage Claim Proofs of Claim submitted by Baupost as (substantively identical) Claim Nos. 100269 and 100309 on or around April 15, 2020, a copy of which is attached as Ex. A to the Baupost RJN |
| "Baupost" | Securities Claimant Baupost Group Securities, L.L.C., on behalf of itself and as trading nominee for certain funds managed by The Baupost Group, L.L.C. that are the beneficial owners of certain of the PG&E equity securities at issue herein |
| "Baupost Objection" or "Bau. Obj." | *Reorganized Debtors' Thirty-Fifth Securities Claims Omnibus Objection to the Baupost Amendment* [Dkt. No. 14206], filed on December 13, 2023 |
| "Baupost RJN" or "Bau. RJN" | The Request for Judicial Notice in Support of the Opposition of Baupost Group Securities, L.L.C. to the Reorganized Debtors' Thirty-Fifth Securities Claims Omnibus Objection to the Baupost Amendment, filed herewith, and the exhibits thereto |
| "Baupost POCs" | Collectively, the 2020 POC and the Supplemental POC |
| "Butte Report" | The Butte County (California) District Attorney's Office's report, *The Camp Fire Public Report: A Summary of the Camp Fire Investigation*, dated June 16, 2020, available at: https://www.buttecounty.net/DocumentCenter/View/1881/Camp-Fire-Public-Report---Summary-of-the-Camp-Fire-Investigation-PDF, a copy of which is attached as Ex. 87 to the RJN. |
| "Cal Fire" | The California Department of Forestry and Fire Protection |
| "CPUC" | The California Public Utilities Commission |
| "District Court Action" | *In re PG&E Corp. Sec. Litig.*, No. 3:18-cv-03509-EJD (N.D. Cal.) |
| "ETPM" | PG&E's Electric Transmission Preventative Maintenance Manual |
| "FERC" | The Federal Energy Regulatory Commission |
| "FRBP" or "Bankruptcy Rules" | The Federal Rules of Bankruptcy Procedure |
| "FRCP" | The Federal Rules of Civil Procedure |
| "Gabbard" | David Gabbard, PG&E's Vice President of Pacific Generation, and former Senior Director of Transmission Asset Management |

Case: 19-30088    Doc# 14347    Filed: 03/15/24    Entered: 03/15/24 18:53:07    Page 8 of 68

| Defined Term | Meaning |
|---|---|
| "Hogan" | Patrick M. Hogan, PG&E's Senior Vice President of Electric Operations (Mar. 2016 - Jan. 2019), and Vice President of Electric Operations Asset Management (Nov. 2013 - Feb. 2016) |
| "Kane" | Julie M. Kane, PG&E's Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel (May 2015 - Sept. 2020) |
| "Liberty Report" | The report titled, "Study of Risk Assessment and PG&E's GRC," to the Safety and Enforcement Division of the CPUC by the Liberty Consulting Group, filed on May 17, 2013, a copy of which is attached as Ex. C to the Baupost RJN |
| "NERC" | North American Electric Reliability Corporation |
| "Objections" | Collectively, the Baupost Objection, the PERA Objection, and the RKS Objection |
| "PERA" | The Public Employees Retirement Association of New Mexico |
| "PERA Objection" or "PERA Obj." | *Reorganized Debtors' Thirty-Third Securities Claim Omnibus Objection to PERA and Securities Act Plaintiffs' TAC, Including to Certain Claimants That Adopted the TAC* [Dkt. No. 14200], filed on December 13, 2023 |
| "PG&E" | Reorganized Debtors PG&E Corporation and Pacific Gas and Electric Company collectively, unless otherwise specified herein |
| "PSLRA" | The Private Securities Litigation Reform Act of 1995 |
| "RJN" | PG&E's December 13, 2023 Request for Incorporation of Documents by Reference or Judicial Notice in Support of the Objections [Dkt. No. 14208], and the exhibits thereto |
| "RKS" | Rolnick Kramer Sadighi LLP |
| "RKS Amendment" | The Amended Statement of Claim submitted by Securities Claimants represented by RKS, dated October 6, 2023 |
| "RKS Objection" or "RKS Obj." | *Reorganized Debtors' Thirty-Fourth Securities Claim Omnibus Objection to Claims Adopting RKS Amendment* [Dkt. No. 14203], filed on December 13, 2023 |
| "Securities Claim Order" | The Court's February 27, 2020 *Order (I) Denying Securities Lead Plaintiff's Motion to Apply Bankruptcy Rule 7023 to Class Proof of Claim and (II) Extending Bar Date for Certain Holders of Securities Claims for Rescission or Damages* [Dkt. No. 5943] |
| "Securities Claimant" | As defined in the Securities Claim Order |

Case: 19-30088   Doc# 14347   Filed: 03/15/24   Entered: 03/15/24 18:53:07   Page 9 of 68

| Defined Term | Meaning |
|---|---|
| "Stavropoulos" | Nickolas Stavropoulos, PG&E's President & COO (Mar. 2017 - Sept. 2018), President of Gas Operations (Aug. 2015 - Feb. 2017), and Executive Vice President of Gas Operations (June 2011 - Aug. 2015) |
| "Supplemental POC" or "Supp. POC" | Supplemental Rescission or Damage Claim Proofs of Claim, submitted by Baupost as (substantively identical) Claim Nos. 109847 and 109848 on or around December 28, 2022, a copy of which is attached as Ex. 113 to the RJN |
| "TAC" | The Third Amended Consolidated Class Action Complaint for Violation of the Federal Securities Law filed by PERA in the District Court Action [Dkt. No. 121] |
| "Williams" | Geisha J. Williams, PG&E's CEO & President (Mar. 2017 - Jan. 2019), President of Electric Operations (Aug. 2015 - Feb. 2017), and Vice President of Electric Operations (Jun. 2011 - Aug. 2015) |

## PRELIMINARY STATEMENT

In the months after the devastating 2017 North Bay Fires, which were later found to have been caused by trees coming into contact with PG&E's low-voltage distribution lines, PG&E attempted to reassure an anxious public and a jittery market. PG&E insisted that its vegetation management efforts were robust, proclaimed that its high-voltage transmission assets were in good order and subject to routine inspections and maintenance, and embraced the fiction that PG&E was a "Prudent Manager"—and thus entitled to pass onto ratepayers the costs of wildfires caused by PG&E. PG&E's assurances were false and misleading, and the executives giving those assurances knew it. Even as they were attempting to appease the public and the market, they concealed that PG&E was knowingly failing to remediate thousands of hazard trees encroaching on its distribution lines. They also concealed that century-old spans of PG&E's transmission system verged on collapse and presented enterprise risk. And they concealed that PG&E was knowingly making its already vulnerable transmission system even more vulnerable by slashing maintenance budgets, cutting the number and thoroughness of inspections, and eliminating inspector training. For a while, these misrepresentations worked. PG&E's stock traded between $38 and $57 in the time between the North Bay Fires and the Camp Fire, the period when Baupost purchased over 18 million shares of PG&E stock.

Then the truth began to emerge. In May and June 2018, Cal Fire disclosed that PG&E's vegetation management practices were deficient and had caused nine of the 12 most damaging of the 2017 fires. PG&E's stock price dropped from $44.66 on May 25 to $39.76 on June 11, 2018 (nearly 11%). In November 2018, the Camp Fire wiped out Paradise and killed at least 84 people. From the moment news of the Camp Fire broke, reports emerged that implicated PG&E's purportedly well-maintained and inspected transmission equipment, and PG&E's stock price dropped by over $31 per share (nearly 64%). As the result of these stock drops, Baupost lost over $500 million. Baupost seeks to recover for these losses herein.

Although Baupost maintains that the sufficiency of its claims should be assessed under FRBP 3001 after Baupost takes discovery under FRBP 9014, Baupost recognizes—without waiver of its appellate rights—that the Court has ruled that PG&E's objections will proceed

1   without discovery.  PG&E insists that Baupost's claims are subject to the pleading standards of

2   FRCP 9(b), FRCP12(b)(6), and the PSLRA.  Even if this higher pleading standard is

3   (inappropriately) applied, Baupost's proofs of claim pass the test of legal sufficiency.

4          Under the approach urged by PG&E, the Court's analysis is limited to the face of

5   Baupost's proofs of claim, documents incorporated therein, and other judicially noticeable

6   materials.  The Court may not consider disputed factual issues; rather, it must treat Baupost's

7   allegations as true and draw all reasonable inferences in Baupost's favor.  To state its securities

8   fraud claims, Baupost must allege, among other things, (1) false or misleading statements,

9   (2) scienter, (3) reliance, and (4) loss causation.  Pursuant to the PSLRA, Baupost's scienter

10  allegations must be at least as compelling as the opposing inference.  For the reasons detailed

11  below, Baupost has sufficiently pleaded its securities fraud claims against PG&E.

12         PG&E Made Multiple, Actionable Misstatements.  PG&E made a series of public

13  statements—all intended to promote the illusion that it was a Prudent Manager—that were either

14  outright lies or that misleadingly omitted material information.  It represented that its vegetation

15  management practices were robust, even though it knew that its distribution lines were flanked

16  by tens of thousands of hazard trees—thousands of which PG&E had identified but left

17  unworked.  PG&E stated that it conducted annual inspections of its powerlines, even though the

18  most vulnerable spans of its transmission system went uninspected for years.  It boasted that it

19  conducted "annual" inspections and regular patrols of its transmission lines, without revealing

20  that it had cut the frequency and thoroughness of both, that "patrols" were mere safety theater,

21  and that the personnel conducting inspections and patrols were untrained.

22         PG&E argues that these statements are all inactionable because they were either true or

23  mere puffery.  Not so.  Many of PG&E's statements (e.g., its claim that it conducted "annual"

24  inspections of its transmission lines) were verifiable, and—as the Butte County District

25  Attorney's investigation concluded—false.  PG&E's other misstatements were designed to

26  present PG&E as a Prudent Manager, and though they included scattered, selective truths, they

27  also concealed that PG&E had embraced policies and practices inconsistent with the safe

28  operation of an electric utility.  Such misstatements are actionable.  Finally, PG&E argues that,

because of the 2017 North Bay Fires, the market knew that it was an inept manager before Baupost acquired PG&E stock. PG&E's fact-intensive, "truth-on-the-market" defense is unsuitable for a motion addressed to the legal sufficiency of the Baupost POCs. It is also meritless. PG&E ignores that, after the 2017 fires, it misleadingly insisted that it was fixing the deficient vegetation management practices that caused those fires. PG&E also ignores that neither its transmission assets nor its failure to maintain and inspect those assets had any role in the 2017 fires and, tellingly, PG&E fails to point to a single public disclosure of its reckless management of its transmission assets before November 2018.

Scienter. PG&E argues that Baupost fails to plead scienter sufficiently and that, at most, its executives were guilty of mismanagement, not fraud. To the contrary, the detailed allegations of the Baupost POCs support a strong inference that PG&E's senior executives knew that their statements were false or misleading or, at minimum, that they were willfully ignorant and deliberately reckless as to the false or misleading nature of their public statements. Among other things, PG&E's leadership:

- Knew that PG&E's safety efforts were subject to extreme scrutiny from regulators, the courts, the public, and the market after the San Bruno gas pipeline disaster and the 2017 North Bay Fires;

- Knew that PG&E's criminal probation conditions (imposed after the San Bruno explosion) required PG&E to operate its electrical utility in a safe, prudent manner;

- Knew that their statements about PG&E's safety practices went to a subject of pivotal importance to PG&E's regulators, ratepayers, and investors;

- Boasted that safety was their "core business[]" and "at the heart of everything we do";

- Implemented processes and reporting structures to ensure that they were alerted to instances of regulatory non-compliance;

- Had access to, and reviewed, granular, real-time data and reports that warned them about the dire state of PG&E's vegetation management program and transmission system (and that glaringly contradicted their public statements about those subjects);

- Testified that they were aware of thousands of identified, hazard trees along PG&E's distribution lines that went un-remediated;

- Testified that they were aware of the enterprise risk presented by PG&E's deteriorated and dilapidated transmission assets; and

- Authorized PG&E to plead guilty to criminal charges in which PG&E admitted that it was aware that its practices leading up to the Camp Fire presented a substantial, unjustified risk of causing a fire, and that it had elected to ignore that risk.

Viewed individually and in the aggregate, these and other allegations support a plausible inference of scienter that is at least as compelling as PG&E's claim that its executives were merely uninformed or incompetent when they made public statements that, conveniently, painted a picture of PG&E that was dramatically false and misleading.

Reliance.  Baupost purchased PG&E stock, which trades in an efficient market, in open-market transactions and at market prices, and is entitled to the fraud-on-the-market presumption of reliance.  Because that presumption applies, Baupost's subjective reliance is irrelevant as a matter of law.  PG&E nevertheless argues that Baupost cannot establish its reliance on PG&E's misstatements because, it insists (without a shred of evidence), that Baupost did not really believe those misstatements and because Baupost's purported investment thesis was that PG&E stock was under-valued.  PG&E's attempt to defeat fraud-on-the-market reliance at the pleading stage is improper, and its argument is devoid of support.  As a matter of law, investors that believe a stock is underpriced are still relying on the integrity of the market price.

Loss Causation.  Baupost plausibly alleges that the revelations of PG&E's deficient vegetation management practices and reckless operation of its transmission assets, in May-June and November 2018, respectively, caused PG&E's stock price to plummet.  PG&E urges a different narrative:  the market was reacting to news of yet another fire or to negative news about PG&E's financial health generally.  That PG&E can articulate an alternative explanation for its stock price drops does not defeat Baupost's loss causation allegations as a matter of law.  Loss causation presents a quintessential fact question, to be resolved through expert testimony.

For these reasons, and those set forth below, the Baupost POCs are legally sufficient, and the Objections should be denied.  In addition, Baupost respectfully submits that the Court should deny the Objections for the reasons stated in PERA's and RKS's opposition papers.  The Baupost POCs cite seven additional misstatements and incorporate detailed scienter allegations (drawn from a report prepared by the Butte County District Attorney) not included in the TAC,

1  and should be deemed legally sufficient even if the TAC is not, but they also incorporate the

2  TAC, and should be deemed legally sufficient for the same reasons as the TAC.

3  **BACKGROUND**[1]

4  **A.    PG&E Operates Under a Rigorous Regulatory Regime**

5       **1.    PG&E Is Required to Inspect and Maintain Its Electrical**
            **Distribution and Transmission Infrastructure to Prevent Wildfires**

6

7       PG&E operates electrical distribution and transmission systems.  *See* TAC ¶¶ 42-43, 53.

8  Its distribution lines carry lower-voltage electricity to customers through neighborhoods and are

9  strung primarily from wooden poles.  Its transmission lines carry high-voltage electricity long

10 distances.  They are typically remote from residential neighborhoods, high off the ground, and

11 suspended from metal towers up to 180 feet tall.  *See* Bau. RJN Ex. B.

12      PG&E's distribution and transmission operations are overseen by the CPUC, the FERC,

13 and other regulators, and subject to regulations designed to ensure the safe operation of PG&E's

14 electrical utility—and to mitigate the risk that PG&E's equipment will cause a wildfire.  TAC ¶¶

15 54-70, 75-76.[2]  CAL. PUB. UTIL. CODE § 451 requires PG&E to "furnish and maintain such

16 adequate . . . and reasonable service, instrumentalities, equipment, and facilities . . . as are

17 necessary to promote ***the safety*** . . . of the public."  *Id*. ¶ 59 (emphasis added.)  CPUC General

18 Order 165 further imposes "requirements for electric distribution and transmission facilities . . .

19 regarding ***inspections*** . . . to ensure ***safe*** . . . electrical service."  And CPUC General Order 95

20 requires that "[a]ll lines and portions of lines shall be ***maintained in such condition*** as to provide

21 ***safety*** factors not less than those specified in" other CPUC rules that set out safety standards for

22 "Poles Towers and Structures," including standards regarding the corrosion of transmission

23 structures.  *Id*. ¶¶ 64-65 (emphases added).

24

25

26 ---
   [1] Baupost's allegations are described in the 2020 POC (which incorporates the TAC) and the Supplemental POC
   (which amplifies the 2020 POC's allegations with respect to the Camp Fire and details seven misstatements not
   included in the TAC).  Supp. POC ¶¶ 6, 7.

27 [2] Section 702 of the California Public Utilities Code requires every public utility to "obey and comply with every
   order, decision, direction, or rule made or prescribed by the" CPUC and to "do everything necessary or proper to

28 secure compliance therewith . . . ."

Additionally, PG&E is required to keep its lines clear of vegetation. CAL PUB. RES. CODE § 4293 requires PG&E to "maintain a clearance" in "all directions between all vegetation and all conductors which are carrying electric current" of between four and ten feet, depending on the voltage of the conductor. It also provides that hazard trees "that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard." TAC ¶ 56; CAL. PUB. RES. CODE § 4293.[3] Cal Fire, the agency responsible for fire protection, interprets Section 4293 to "require[] utilities to identify and remove such hazards" and treats compliance with Section 4293 as "mandatory." TAC ¶ 57.

Federal law imposes additional safety requirements on PG&E's transmission infrastructure. FERC Electric Reliability Standard FAC-003-4 requires PG&E to conduct annual inspections of transmission facilities, complete necessary work annually, timely notify and correct urgent conditions, and maintain required vegetation clearances. TAC ¶¶ 75-76.

Under California law, PG&E is liable for fires caused by its equipment when PG&E has acted willfully, negligently, or unlawfully (including by violating CPUC regulations). *See* TAC ¶¶ 60, 70 (citing CAL. HEALTH & SAFETY CODE §13007, CAL. PUB. UTIL. CODE § 2106). Additionally, under California's "inverse condemnation" doctrine, PG&E is strictly liable for property damage caused by its operations and equipment, irrespective of fault. *Id*. ¶ 73.[4]

### 2. Regulatory Compliance Is Critical to PG&E's Bottom Line

The CPUC decides the rates that PG&E may charge, what costs PG&E may pass on to ratepayers ("**rate recovery**"), and what costs it must bear. *See* CAL. CONST., Art. XII, § 6; CAL. PUB. UTIL. CODE §§ 451, 454; TAC ¶ 62. To determine whether, and to what extent, PG&E is entitled to rate recovery, the CPUC employs the "Prudent Manager Standard," under which PG&E must "prove that it reasonably and prudently operated and managed its system"—a standard that necessarily encompasses compliance with regulatory requirements—to show that

---

[3] *See also* CAL. PUB. RES. CODE § 4292 (requiring a firebreak of ten feet "around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole"); CPUC General Order 95, Rule 35 (vegetation management and clearance requirements).

[4] *See generally* CAL. CONST., Art. I, § 19 (requiring "just compensation" when "[p]rivate property" is "damaged for a public use").

proposed rate increases are "just and reasonable." Order Denying Rehearing of Decision (D.) 17-11-033, 2018 WL 3753814, at *2 (Cal. P.U.C. July 12, 2018); *see also* TAC ¶ 73. Under the Prudent Manager Standard, PG&E can obtain rate recovery for wildfire liabilities caused by its equipment only if it demonstrates to the CPUC that it operates in a "reasonable and prudent" manner, including by complying with the above-referenced regulatory requirements.

Compliance with safety regulations was, and is, critical to PG&E's bottom line and, thus, its stock price. If PG&E is deemed non-compliant, the CPUC will decline to find PG&E a Prudent Manager, deny it rate recovery, and force it (and its stockholders) to absorb potentially enormous liabilities. Accordingly, PG&E's repeated reassurances to investors that it complied with relevant safety regulations and inspected all of its powerlines annually were material to investors because they communicated that PG&E would be able to offload to ratepayers any property damage liabilities from wildfires caused by its equipment. TAC ¶¶ 317-19; Supp. POC ¶ 4.

**B.  PG&E's Failures to Adequately Inspect, Maintain, and Replace Its Transmission Equipment Caused the Camp Fire**

**1.  The Camp Fire and Its Causes**

The Camp Fire began on November 8, 2018. TAC ¶ 120. It was the deadliest, most destructive wildfire in California history. It wiped out the town of Paradise, killed at least 84 people, burnt 153,336 acres, destroyed 18,804 structures, and caused an estimated $13 billion in damage. Supp. POC ¶ 8; TAC ¶¶ 133, 325. Cal Fire determined that the Camp Fire had two ignition points, both tied to PG&E equipment. TAC ¶ 267.

The first ignition point was below Tower 27/222 of the Caribou-Palermo line—a 115 kV, high-voltage transmission line. According to Cal Fire, a C hook that suspended an energized line "failed," allowing the line to "make contact with the steel tower." This caused "electrical arcing," which, in turn, caused "the aluminum strands of the conductor" and "a portion of the steel tower" to melt. Supp. POC ¶ 13(a) (quoting Butte Report at 9). "The molten aluminum and steel fell to the brush covered ground at the base of the steel tower structure . . . [and] ignited the dry brush." *Id.*; *see also* Supp. POC ¶ 9; TAC ¶¶ 34-35, 113-17, 190. Cal Fire found that

1  many of the components of the Caribou-Palermo line, including Tower 27/222 and the C hook

2  that broke, dated from between 1919 and 1921, and that, because of almost a century of rubbing

3  against a hanger hole as the line moved in the wind, a channel had been cut approximately 14/16

4  of the way into the C hook that broke.  Cal Fire found similar "rotational wear" on other C hooks

5  and hanger holes on Tower 27/222 and other Caribou-Palermo line towers.  Supp. POC ¶ 13(b)-

6  (d) (quoting Butte Report at 18-22, 82).

7          Despite the Caribou-Palermo line's advanced age, PG&E had not inspected Tower

8  27/222 since August 2014, and prior to that, not since 2009.  At the time of the Camp Fire,

9  PG&E's undisclosed policy for steel structures on its 115 kV transmission lines, such as Tower

10  27/222, was to conduct aerial maintenance patrols annually and detailed inspections every five

11  years.  Supp. POC ¶ 10(a).  It was not until after the Camp Fire that PG&E admitted that an

12  aerial patrol is not an inspection.  It is only during a detailed inspection of a transmission line

13  that PG&E personnel are instructed to look for and document abnormalities or circumstances

14  that will negatively impact safety, reliability, or asset life.  TAC ¶ 118.

15          The Camp Fire's second ignition point occurred where a tree contacted a 12kV

16  distribution line.  PG&E acknowledged that damaged and downed poles, vegetation on top of

17  downed wires, and other signs of safety violations were present at this ignition site.  Supp. POC

18  ¶ 9 n.7 (quoting TAC ¶ 35).  PG&E's failure to remove vegetation at the second ignition point

19  violated CAL. PUB. RES. CODE § 4293.  TAC ¶ 35.

20          2.      **PG&E Knew Its Transmission Lines Were in Dangerous Disrepair**

21          From PG&E laboratory test reports dating back to 1987—29 years before the Camp

22  Fire—PG&E was aware of dangerous wear on the C hooks and hanger holes on its transmission

23  lines.  Supp. POC ¶ 13(f) (citing Butte Report at 24, 78, 83.)  This finding was confirmed again

24  and again, and again:

25      •  In 2011, PG&E crews observed similar wear on hanger holes, and a PG&E
          engineer noted in an email that "[i]t appears that there is a groove cutting into the
26        plate probably caused by years of rubbing between the c-hook and the plate."  *Id*.
          (citing Butte Report at 78).
27
        •  In 2016, PG&E internal documents "detailed the failure of necessary hardware
28        along the [Caribou-Palermo] transmission line, with a support hook snapping off

during routine painting" and "acknowledged that the supports 'had been compromised through corrosion.'" *Id*. ¶ 9(e) (quoting TAC ¶ 137).

- In June 2018 (four months before the Camp Fire), a PG&E lab report concluded that the wear was "attributed to wind-caused swinging of the insulators" and opined that the "useful life of the hanger plates" was 97-100 years. *Id*. ¶ 13(f) (citing Butte Report at 78, 83-84).

PG&E was aware that these problems affected Tower 27/222 specifically. The tower's C hooks hung from "bolted-on," replacement hanger holes, not the original holes. PG&E's replacement of the hanger holes confirms that it knew that the tower's equipment was in dire need of repair but then responded with half measures. *Id*. ¶ 13(e) (citing Butte Report at 20-21, 31).

The deterioration of the Caribou-Palermo line and PG&E's other transmission lines extended beyond worn C hooks and hanger holes. In December 2012, five steel towers on the Caribou-Palermo line were toppled by wind. *Id*. ¶ 9. PG&E replaced the collapsed towers and one additional tower near the first Camp Fire ignition point, but left the Caribou-Palermo's other aged towers untouched. That is, PG&E did nothing to address the undisclosed risk that corrosion, metal fatigue, or other age-related factors would leave the towers unable to support transmission lines and cause wildfires. *Id*. PG&E opted for inaction even though: an internal PG&E email from 2014 recognized that "the likelihood of failed structures happening is high," *id*.; and another internal email acknowledged (well before the Camp Fire) that a group of structures, including Tower 27/222, were at risk of collapse due to their age and windy conditions in the area, that "corrosion on another tower in the vicinity was so severe that it had endangered crews attempting to repair it," and that PG&E's "own guidelines had warned that" this nearby "tower was a quarter-century past its useful life . . . ." *Id*.

Despite PG&E's internal recognition that the Caribou-Palermo line needed repair and posed a significant risk of catastrophic failure, PG&E never fixed the line. *Id*. As the Butte Report concluded, PG&E was "employing a run to failure strategy" on the relevant span of the Caribou-Palermo line in run-up to the Camp Fire. *Id*. ¶ 27 (citing Butte Report at 60). Although PG&E established a "Deteriorated Transmission Equipment Replacement Program" in 2007, it failed to fund the program. *Id*. ¶ 13(g) (citing Butte Report at 33). It then *reduced* its budget for inspecting and maintaining transmission equipment in the years leading up to the Camp Fire. *Id*.

¶ 13(i) (citing Butte Report at 50).  In 2007, a PG&E engineer sought $800,000 "for preliminary engineering and purchase of long lead-time material to replace conductor and tower structures on a section of the Caribou-Palermo line," noting that "[t]he probability of . . . failure is **_imminent_** due to the age of both the towers and the conductor."  PG&E's Electric Asset Strategy Division struck the reference to "imminent failure," and then slashed the budget for the project.  By 2009, PG&E had canceled the project altogether, *id.* ¶ 13(h) (citing Butte Report at 34-35), rationalizing that "any collapse [on the Caribou-Palermo line] would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain," *id.* ¶ 9(g).

### 3.  PG&E Dramatically Weakened Its Transmission Line Inspection Policies and Practices in the Years Leading Up to the Camp Fire

That PG&E had not inspected Tower 27/222 in the four years before the Camp Fire was no accident.  Although PG&E knew the Caribou-Palermo was well beyond its expiry date, *supra* at 9-10, it decided to hamstring its transmission line inspection efforts, including by revising its policies to reduce the "frequency and thoroughness of inspections."  Supp. POC ¶ 14(a).

In 1987, PG&E issued an inspection policy requiring that "the Caribou-Palermo line . . . be patrolled three times each year: one ground patrol and two aerial patrols."  Supp. POC ¶ 14(a)(i).  The policy also required "climbing inspections of five percent of the tower structures per year; and an infrared patrol every five years."[5]  *Id.*  The policy ensured that every transmission structure would be climbed at least once every 20 years.  Butte Report at 23-24.[6]  It also required that inspectors look for "[w]orn hardware and connectors."  *Id.* at 24.

In 1995, PG&E changed its policy, reducing patrols/inspections of the Caribou-Palermo line from three per year (one ground and two aerial) to one ground inspection every 24 months

---

[5] PG&E's 1987 policy bulletin used "patrol" and "inspection" interchangeably.  Butte Report at 23.

[6] The Court may consider the Butte Report, which is Exhibit 87 to the RJN, in its entirety in adjudicating the Baupost Objection because the Butte Report is incorporated by reference into the Supplemental POC.  *See, e.g.*, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim" and the court "may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)").

and one aerial inspection every 24 months. "Required routine climbing inspections were eliminated." Supp. POC ¶ 14(a)(ii) (citing Butte Report at 24).

In 2005, PG&E adopted the ETPM—the Electric Transmission Preventative Maintenance Manual. *Id*. ¶ 14(a)(iii). The ETPM distinguished between "patrols" and "inspections." "Patrols" entailed visual observation of "electric facilities, looking for ***obvious*** structural problems or hazards ***without*** the use of measuring devices, tools, or diagnostic tests[.]" Butte Report at 25 (emphases added). "Inspections," by contrast, involved "***component testing*** to identify abnormalities or circumstances that will negatively impact ***safety***." *Id.* at 24-25 (emphases added). The ETPM called for even more infrequent inspections of the Caribou-Palermo line, with "inspections" to be conducted only once every five years and replaced with "patrols" in non-inspection years—down from one aerial and one climbing inspection every 24 months. Supp. POC ¶ 14(a)(iii) (citing Butte Report at 25). The ETPM imposed this anemic inspection regime even while acknowledging that "the best position to view insulators and hardware is aerial inspection (not patrol),[7] ground inspection above 10', and climbing inspection." Supp. POC ¶ 14(a)(v). In other words, despite knowing that the Caribou-Palermo line was close to failure, PG&E elected to inspect the line less frequently and to do so in a manner that it knew was less likely to identify worn and broken hardware.

Worse yet, PG&E elected to make its already rare inspections and patrols of the Caribou-Palermo line more cursory and less thorough than what the ETPM required, particularly "in low population density mountainous areas," such as where the Camp Fire began. *Id*. ¶ 14(b) (quoting Butte Report at 47). Per the Butte Report:

> The evidence clearly established that PG&E did not, in fact, follow the procedures and requirements established in the ETPM. Based upon the evidence, it is reasonable to conclude that sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators[.]

---

[7] "[A]n 'aerial inspection' is significantly more detailed than an 'aerial patrol' and requires a helicopter to fly 360 degrees around each structure at an altitude and speed which allows for detailed inspection of the structure components." Butte Report at 25.

Butte Report at 26. Consistent with PG&E's general pattern of noncompliance with its own policies, the Butte Report found that PG&E's "inspections and patrols of the Caribou-Palermo line did not comply with the standards set forth in the ETPM and did not meet the requirements of the law or the regulatory agencies." Supp. POC ¶ 14(b) (citing Butte Report at 37).

PG&E knowingly undermined the effectiveness of its transmission line inspection practices in multiple ways:

<u>PG&E cut the time budgeted for inspections and patrols, and tied "salary incentives to staying within" these budgets</u>. *Id*. ¶ 14(b)(i) (citing Butte Report at 27-28, 50). With respect to the Caribou-Palermo line, the Butte Report found that "between 2001 and 2018 aerial patrol by helicopter was the primary method of inspection and patrol for the Caribou-Palermo line" and that "the thoroughness of the aerial patrols declined through the years." *See id*. ¶ 14(b)(vi) (quoting Butte Report at 40-41). The patrol of the line took 10 hours in 2001. Between 2011 and 2018, PG&E allotted only between 3.2 and 7.6 hours for the same "patrol." *Id*. According to PG&E employees, PG&E was staging "fly bys" that did nothing more than confirm that the "structures and components were 'standing upright,'" not real patrols or inspections. *Id*. Although PG&E knew that C hook and hanger hole corrosion was a major problem on the Caribou-Palermo line, the Troublemen interviewed for the Butte Report stated that it would not have been "possible to see and assess" such wear and tear based on these aerial "patrols." *Id*.

<u>PG&E drastically weakened inspector training</u>. The PG&E employees who "inspected or patrolled the Caribou-Palermo line since . . . 2005" had no "formal training on how to perform an inspection or patrol," including in "assessing wear." *Id*. ¶ 14(b)(ii) (quoting Butte Report at 29-30). "[T]raining" was "limited to filling out reporting forms and notifications for any issues" and, occasionally, on-the-job "mentoring" by "more experienced" employees, known as Troublemen. *Id*.[8] Even such oversight was sparse. Untrained inspectors routinely worked solo,

---

[8] After 2005, PG&E's inspectors were called "Qualified Company Representatives" ("**QCRs**"). PG&E never specified the training and work experience required for QCRs. Butte Report at 29. By contrast, a Troubleman was "initially intended to be a qualified and experienced transmission line expert" and PG&E's 1987 inspection policies established rigorous training requirements for Troublemen, including classes—until 2005, when PG&E "eliminate[d] direct training of Troublemen." *Id*.

unsupervised by Troublemen.  *Id.* ¶ 14(b)(v) (citing Butte Report at 38.)  As a result, by 2007, "the inspections and patrols of the Caribou-Palermo line were being conducted by . . . untrained and unqualified [employees]" with "little or no prior transmission experience, and no formal training on performing inspections and patrols."  *Id.* ¶ 14(b)(iii) (citing Butte Report at 30). PG&E's use of untrained personnel flouted the ETPM, which required thorough familiarity "with all of the facilities, equipment, safety rules and procedures associated with the facilities and equipment."  And it made a disaster inevitable.  The untrained and unexperienced "could not have been expected to identify the wear" on C hooks and hanger holes.  *Id.*

PG&E ignored the ETPM's requirement that climbing inspection of transmission lines be conducted upon certain triggers (*e.g.*, component failures and high fire hazards).  *Id.* ¶ 14(b)(vii) (citing Butte Report at 41-43).  When a jumper line connector on a Caribou-Palermo line failed in 2008 and caused the Rock Fire, PG&E "did not conduct climbing or aerial inspections on other Caribou-Palermo line towers with similar connectors."  *Id.* ¶ 14(c) (quoting Butte Report at 35).  Similarly, in 2016, when a painting crew broke a corroded J hook on a Caribou-Palermo line tower, "the failure of the J hook did not cause inspections of J hooks in other similar towers."  *Id.* ¶ 14(e) (quoting Butte Report at 36).  Even after five towers on the Caribou-Palermo line collapsed in 2012, and, despite being advised to do so, PG&E never inspected the foundations of other towers on the line for signs of the "uplift" that had contributed to the 2012 collapses.  *Id.* ¶ 14(d) (quoting Butte Report at 36).

The Camp Fire revealed that PG&E's transmission line inspection program was a Potemkin village.  And if there were any lingering doubt on this score, PG&E's inspections after the Camp Fire dispelled it.  In December 2018, PG&E "identified ***thousands*** of conditions requiring repairs . . . that had not been previously identified."  *Id.* ¶ 14(b) (viii)-(ix) (citing Butte Report at 43-44) (emphasis added).  PG&E also announced a new wildfire mitigation plan in which it committed to do what it had affirmatively decided not to do in the years before the Camp Fire:  conduct enhanced inspections of over 40,000 transmission structures (up from 9,400 structures) that would include ground inspections, drone and helicopter inspections where needed, and climbing inspections of every transmission tower.  *Id.* ¶ 10(b).

### 4. PG&E Failed to Clear Vegetation from <u>Its Transmission and Distribution Lines</u>

In addition to hamstringing its inspection regime, PG&E also flouted its legal obligations to keep the Caribou-Palermo line free of encroaching vegetation. A 2013 NERC assessment examined 455 spans of the Caribou-Palermo transmission line and "found that vegetation or trees were allowed to grow too close to 127 (27.9%) of them." TAC ¶ 133.

PG&E's non-compliance with vegetation management requirements was not unique to its transmission assets—it was pervasive across PG&E's operations. During federal criminal proceedings arising from the 2010 San Bruno pipeline explosion, the court found that "as of June 2017, there were 3,962 unworked trees which PG&E had identified" a year earlier "as hazardous with the potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy wires[.]'" Supp. POC ¶¶ 28, 38; TAC ¶¶ 3, 104. Indeed, PG&E has admitted that it had *actual knowledge since 2015* that its vegetation management practices were non-compliant on the order of *thousands of violations per year*. TAC ¶ 105. According to Cal Fire, PG&E's non-compliance caused at least eleven of the 2017 North Bay Fires, which burned over a hundred thousand acres, destroyed thousands of structures, and killed dozens of people. TAC ¶¶ 322-24, 346, 353.

### C. PG&E Artificially Inflated Its Stock Price by Misrepresenting, and Concealing the Risks Created <u>by, Its Reckless Operation of Its Transmission System</u>

In the immediate wake of the 2017 North Bay Fires, PG&E's stock price fell because investors recognized that PG&E faced massive exposure for which it *might* be ineligible for rate recovery. TAC ¶¶ 246, 328-36. PG&E's stock price nonetheless remained artificially inflated because PG&E knowingly misled the market. It doubled down on its false and misleading assurances about both its transmission line maintenance and inspection practices and its vegetation management efforts. And it continued to conceal the true risk that its criminally deficient safety practices would cause additional, devastating wildfires for which PG&E would be barred from rate recovery. Supp. POC ¶¶ 16-25; TAC ¶¶ 249-313.

### 1. PG&E Misled Investors About the Sufficiency of Its Transmission Line Inspection Program

From late 2017—following the North Bay Fires—through November 2018—just days before the Camp Fire—PG&E repeatedly lied to the public about the adequacy of its transmission line inspection practices:

- On a November 2, 2017 analyst call, Stavropoulos, PG&E's President and COO, stated that PG&E "inspect[s] all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year." Supp. POC ¶ 16(b); TAC ¶ 264 (Misstatement No. 11).

- In a March 27, 2018 press release, PG&E claimed that it "inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times." Supp. POC ¶ 21 (Misstatement No. 12-C).[9]

- During a May 3, 2018 conference call with analysts, Williams, the then-CEO, stated that PG&E had "increased the frequency of our patrols, particularly in high fire threat areas[.]" Supp. POC ¶ 22 (Misstatement No. 12-D).

- In a May 25, 2018 press release, PG&E stated that it had "[i]ncreased foot and aerial patrols along power lines in high fire-risk areas." Supp. POC ¶ 16(e); TAC ¶ 280 (Misstatement No. 13).

- In her October 1, 2018 testimony to FERC, Jessica Tsang, a PG&E Principal Regulatory Analyst, described an account used for "expenses incurred for operating overhead transmission lines," including "[p]atrolling and inspecting assets to identify any potential safety and reliability issues." Supp. POC ¶ 24 (Misstatement No. 16-B).

- On November 5, 2018—three days before the Camp Fire—Williams described PG&E's power shut-off program during an analyst call and stated that "[a]ll of these efforts are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets." Supp. POC ¶ 25 (Misstatement No. 18-A).

Even if portions of these misstatements were true (*e.g.*, PG&E incrementally increased patrol frequency in 2017-2018), each was calculated to convey the false impression that PG&E was performing rigorous and more frequent inspections of its transmission infrastructure in fire-prone areas. The statements were false or misleading because:

- PG&E's modest increase in patrol frequency came after it "drastically reduced the frequency and thoroughness of inspections," Supp. POC ¶ 14 (quoting Butte Report at 24), to the point where aged towers known to have worn-out, corroded hardware, such as Tower 27/222 on the Caribou-Palermo line, had not been inspected for years;

---

[9] A June 8, 2018 press release contained a substantively identical misstatement. Supp. POC ¶ 16(d); TAC ¶ 287 (Misstatement No. 14).

- PG&E was not following its inspection policy, the ETPM, particularly "in low population density mountainous areas";
- PG&E had cut the time and budget allocated to patrols to the point where they amounted to perfunctory "fly-bys" unsuited to assessing whether tower components had degraded and were at risk of failing;
- PG&E's patrols were conducted by inexperienced, untrained personnel;
- PG&E had eliminated training for transmission line inspectors, so much so that the inspectors could not have been expected to identify the wear on C hooks and hanger holes because of their lack of knowledge, experience, and training," Supp. POC ¶ 30;
- In contrast to inspections, PG&E's patrols did not entail component testing and other diagnostic tools to assess potential hazards on transmission lines;
- PG&E had eliminated the climbing inspections needed to identify worn C hooks and other degraded equipment on towers, *id.*; and
- PG&E consistently failed, in defiance of CPUC General Order 165, to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation," which meant that PG&E would not be considered a "Prudent Manager" eligible for rate recovery when its knowingly reckless safety practices sparked a catastrophic wildfire. *Id.* ¶ 31.

PG&E continued to make false and misleading public statements about enhancing its transmission infrastructure safety practices for nearly a year after the 2017 North Bay Fires. It took the failure of a corroded C hook on Tower 27/222 of the perennially uninspected Caribou-Palermo line to banish the mirage created by PG&E and reveal the truth about its practices.

## 2. PG&E Made Multiple Misleading Statements About Investing in Its Transmission Infrastructure

Throughout 2018, PG&E falsely assured the public that it was increasing its investment in maintaining and replacing its transmission equipment, and it concealed the true risk that its worn-out transmission infrastructure would spark a devastating wildfire:

- On January 8, 2018, Stavropoulos testified to the CPUC (in connection with an investigation into whether PG&E adequately prioritized safety) that, "[o]n the electric system, infrastructure investment has also been extensive over the last five years" including, "installing or replacing over 700 miles of transmission line." Supp. POC ¶ 18 (Misstatement No. 12-A).
- On March 22, 2018, in announcing its Community Wildfire Safety Program, PG&E boasted that it was "doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe." Supp. POC ¶ 19 (Misstatement No. 12-B).

- On October 1, 2018, Gabbard, then PG&E's Senior Director of Transmission Asset Management, gave the following testimony to FERC concerning "Transmission Risk Management and Project Management Improvements":

  > PG&E is currently implementing four mitigations to reduce overhead conductor risk. The first two mitigations revolve around equipment replacement work: additional overhead conductor replacement and additional insulator replacement. Replacing additional conductors and insulators reduces the likelihood that those conductors and insulators will fail, therefore reducing the likelihood that those failures will lead to transmission wires down.

  Gabbard also testified that PG&E's Tower Replacement Program was "established to manage the replacement of steel towers that have reached the end of their useful lives" and "targets replacement of deteriorated structures where repair is either less cost effective or not feasible." Supp. POC ¶ 23 (Misstatement No. 16-A).

- On the same date, Tsang testified before FERC on the subject of "PG&E's Transmission and Maintenance Operation and Expenses." She described accounts used for expenses "incurred for maintaining overhead transmission plant," including "[p]reventative and corrective maintenance of steel and wood support structures." She also testified about an account used for expenses "incurred for operating the transmission system safely, reliably, and in compliance with all applicable rules, standards and regulations" and for "maintain[ing] [the] safe and reliable operation of the transmission system." Supp. POC ¶ 24 (Misstatement No. 16-B).

- On October 9, 2018, PG&E issued a press release stating that it was "continuing to focus on implementing additional precautionary measures intended to further reduce wildfire threats, such as . . . making lines and poles stronger in high fire threat areas[.]" Supp. POC ¶ 16(e); TAC ¶ 303 (Misstatement No. 17).

These statements were materially false, incomplete, and misleading. They were calculated to convey the false impression that PG&E was prudently maintaining and repairing its transmission infrastructure when, in fact, PG&E had decided against replacing and repairing century-old transmission line components, like C hooks and hanger holes, that it knew had become dangerously worn and corroded and were at the end of their useful lives. PG&E's misstatements were also calculated to conceal that it had: (i) adopted a "run to failure strategy" on the Caribou-Palermo line; (ii) canceled a project for replacing towers and conductors on that line despite warnings that major equipment failures were "imminent"; (iii) never funded the Deteriorated Transmission Equipment Replacement Program; and (iv) slashed its budget for inspecting and maintaining its transmission equipment. *Supra* at 9-10, 12-13; Supp. POC ¶ 27. Together, these statements misled the market about PG&E's investment in its transmission assets

and concealed from the market the true risk that PG&E's decrepit transmission assets would cause catastrophic wildfires and subject PG&E to massive liabilities for which PG&E (because of its regulatory noncompliance) could not obtain rate recovery.  *See* Supp. POC ¶ 31.

### 3. PG&E Doubled Down on Its Misleading Reassurances Concerning Vegetation Management

Before the 2017 North Bay Fires, PG&E repeatedly assured the public that its vegetation management practices complied with relevant regulations and were limiting wildfire risk.  TAC ¶¶ 194, 197, 211, 222.  After the 2017 North Bay Fires, the market began to suspect that PG&E's vegetation management practices were not as advertised and that PG&E's may have been at fault for many of the fires.  TAC ¶ 333.  In response, PG&E re-doubled its efforts to assure the public that it was complying with its regulatory responsibilities:

- In a March 22, 2018 press release, PG&E stated that it was "[a]ugmenting its already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the [CPUC]."  Supp. POC ¶ 20 (Misstatement No. 12-B).

- In a March 27, 2018 press release, PG&E hyped its "industry-leading Vegetation Management Program" and stated that it "inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times."  Supp. POC ¶ 21 (Misstatement No. 12-C).

- During a May 3, 2018 analyst call, Williams stated that PG&E had increased vegetation management spending and "increased the frequency of our patrols, particularly in high fire threat areas[.]"  Supp. POC ¶ 22 (Misstatement No. 12-D).

- In a June 8, 2018 press release, PG&E stated that "under [its] industry-leading Vegetation Management Program, we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times."  Supp. POC ¶ 16(d), TAC ¶ 287 (Misstatement No. 14).

- In an October 9, 2018 press release, PG&E touted its "precautionary measures" "to further reduce wildfire threats," and stated that it was "working to remove and reduce dangerous vegetation."  Supp. POC ¶ 16(e), TAC ¶ 303 (Misstatement No. 17).

Even if portions of these statements were true, each was designed to create the false impression that PG&E's vegetation management practices complied with PG&E's regulatory obligations.  And PG&E made these statements at a time when, after the North Bay Fires and years of criticism (*e.g.*, in 2013, NERC reported vegetation clearance violations on almost 30% of the Caribou-Palermo line, *see* TAC ¶ 133), PG&E's safety record was a matter of grave concern to the public and investors.  PG&E's statements were false or misleading because:

- PG&E had known for years that it was committing thousands of violations of vegetation management regulations, TAC ¶ 105;

- As of June 2017, PG&E knew it had left almost 4,000 hazard trees with the "potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy wire'" unworked, even though it had identified these hazards in 2016, TAC ¶ 3; and

- PG&E knew that it was in violation of regulatory requirements requiring the removal of dead and decadent trees that might contact powerlines, including under CAL. PUB. RES. CODE § 4293 and CAL. PUB. UTIL. CODE § 451, Supp. POC ¶ 28.

PG&E made these false and misleading statements about the sufficiency of, or enhancements to, its vegetation management practices until just before the Camp Fire. TAC ¶ 303.

**D.  PG&E's Management Knew That PG&E's Statements Were False and Misleading When They Were Made**

Senior PG&E executives, including those who made the above-described misstatements, knew, or were reckless in not knowing, that their reassurances about PG&E's transmission-line maintenance and inspection practices and vegetation management practices were false and misleading at the time they made those misstatements. Supp. POC ¶ 33.

PG&E Boasted that Safety Was Its "Core Business": PG&E repeatedly told the public that the safe operation of its electrical system was its "**core business**" and that "the activities of" its "CEO and President" (then Williams) "**focus** on [PG&E's] **core business**, including most notably **safety**." TAC ¶ 397 (emphasis in TAC); Supp. POC ¶ 34.  Given her background, it is unsurprising that the safe operation of PG&E's electrical system was one of Williams' principal duties:  for nearly six years before becoming CEO, she was Executive Vice President, later President, of Electric Operations. TAC ¶ 46.  Along with other senior executives such as Hogan (then Senior Vice President of Electric Operations), Williams sat on the Executive Officer Risk & Compliance Committee, which oversaw vegetation management issues. *Id*. ¶¶ 50, 401. Williams, Hogan, and other senior executives also regularly boasted about their focus on, and commitment to, safety.  For example:

- On July 27, 2017, Williams stated on an analyst call that "[s]afety is at the heart of everything we do at PG&E." *Id*. ¶ 398.

- On November 18, 2015, Hogan testified to a California Senate subcommittee that safety was PG&E's "top priority" and that "[n]othing is more important than the safety of our customers, employees and the communities we serve." *Id*.[10]

It is impossible to fathom how PG&E's leaders could have been as focused on the safe operation of PG&E's electrical system as they claimed and not known of the glaring safety problems facing PG&E's transmission assets.

PG&E's Management Carefully Monitored PG&E's Safety Practices: PG&E's leaders made it their business to stay apprised of PG&E's safety problems because compliance with safety regulations was critical to PG&E's financial survival. In an era of climate change and drought, PG&E faced the increased risks that its system would spark devastating wildfires and that it would be liable for the resulting damage. PG&E could pass these liabilities onto customers only if it demonstrated that it was a Prudent Manager. Thus, lax safety practices, which would make PG&E ineligible for rate recovery, presented an existential threat to PG&E.

Lax safety practices would also run afoul of PG&E's probation conditions (imposed by the District Court after the San Bruno pipeline explosion), which prohibited PG&E from committing any further crimes under state or federal law—including by operating its electrical system in a criminally negligent or reckless manner. *Id*. ¶¶ 404-05. The terms of PG&E's probation, as well as their concern for PG&E's solvency, gave senior executives compelling reason to carefully monitor PG&E's safety practices and regulatory compliance.

They did this in many ways, including by accessing and analyzing granular data, maintained by PG&E in a database, which gave PG&E's management real-time visibility into the condition of PG&E's powerlines, instances of regulatory non-compliance, and inspection schedules. And the data demonstrated PG&E's consistent noncompliance with safety regulations. Senior executives, including Williams, Hogan, Stavropoulos (the COO), and Kane (the Chief Compliance Officer) had ready access to this data. TAC ¶¶ 402-22, 425. When these executives spoke to investors, they used the database to cherry-pick information to paint a rosy,

---

[10] PG&E's Board was also highly attuned to safety issues. For example, its Finance Committee was "actively involved in, and responsible for . . . oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including the risk of "wildfire." *Id*.

1   and false, picture of PG&E's safety efforts, while omitting reference to data showing that PG&E

2   knew about, and was doing nothing to address, thousands of violations. *Id.* ¶ 399.

3       In the years before the Camp Fire, PG&E also instituted internal reporting processes to

4   ensure that safety and compliance issues received C-suite attention. As part of the San Bruno

5   criminal case, PG&E told the District Court that it had implemented "checks" on its vegetation

6   management contractors to monitor regulatory compliance, conducted audits and reviews of its

7   vegetation management practices, and established a "Corrective Action Program" to allow any

8   PG&E employee to escalate safety issues up the chain of command. *Id.* ¶¶ 423, 427-30.

9       PG&E also promised the District Court that safety and compliance issues would be

10  brought to the attention of "high-level personnel" so that they can "ensure [the] effectiveness" of

11  PG&E's practices. *Id.* ¶ 402. Specifically, PG&E assured the District Court that its Chief

12  Compliance Officer (Kane) "reports directly to PG&E Corporation's Chairman and CEO"

13  regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed

14  PG&E's safety and compliance, so that "high-level personnel . . . ensure its effectiveness." *Id.*

15  ¶ 402. Kane controlled and authorized all of PG&E's statements regarding compliance during

16  the relevant period. She was also responsible for implementing PG&E's legal compliance efforts

17  and overseeing compliance monitoring and reporting. In addition to reporting directly to

18  PG&E's CEO, she also reported to PG&E's board. *Id.* ¶¶ 432-34. By virtue of her position and

19  duties, Kane, and, therefore, PG&E, would have known about PG&E's safety and compliance

20  issues when PG&E made the above-referenced misstatements and she, and PG&E, would have

21  known that those statements were materially false or misleading. *Id.* ¶¶ 434-36.

22       <u>PG&E's Management Knew About the Threats to Its Transmission Lines:</u>

23  Unsurprisingly, PG&E's senior executives *did* know about the pervasive problems with PG&E's

24  transmission infrastructure that ultimately caused the Camp Fire. They were aware of the

25  advanced age of that infrastructure, and knew that the Caribou-Palermo line was at the end of its

26  useful life. They knew the equipment on that line was so decrepit that multiple towers on the

27  line collapsed in 2012 and that tower components snapped during routine painting. They also

28  knew about PG&E's decision to gut its transmission line inspection efforts by reducing the

frequency and length of inspections and eliminating training for inspectors. PG&E generated

and received numerous warnings and advisories on these matters:

- A 2009 Enterprise Risk Management Urban Wildland Fire Risk Review presented to the *Executive Management Committee* cited the "[f]ailure to perform quality inspections or workmanship," "[i]mproperly maintained equipment, and "[f]ailure to replace aging equipment" as "fire risk drivers" for PG&E. It also raised concerns about PG&E's "[e]quipment maintenance and replacement programs, including patrols and inspections" and "mitigation activities." Later Enterprise Risk Management Reports repeated "[t]hese themes." Butte Report at 73-74.

- In 2010, PG&E's "EMC: Electric T&D Asset Road Map" reported that PG&E's "electric [transmission and distribution] assets comprise an aging system," that many of those assets "were installed in the 1950s and planned lifetime design for these facilities is 40 years," and that "[c]ontinuing to rely on aging facilities has increased [PG&E's] risk of equipment failure . . . ." *Id*. at 74.

- In 2010, Quanta Technologies' Transmission Line Component Management Report informed PG&E that PG&E's 115kV conductors, such as those on the Caribou-Palermo line, were, on average, 75-years-old and that "[t]he overall age of conductor[s] is a concern[.]" It also found that that 44.4% of PG&E's 115kV structures, like the towers on the Caribou-Palermo line, were installed before 1931 and that the "[i]nspection, repair, and refurbishment of steel structures and associated components . . . are a critical part of the ongoing maintenance and management of the transmission infrastructure." Accordingly, Quanta recommended structural integrity testing of a "sampl[e] of the" structures "over 80 years of age." *Id*. at 75-77. PG&E's Line Structures Committee reviewed and then ignored this recommendation. *Id*. at 77.

- The 2013 Liberty Report submitted to the CPUC recommended that "PG&E treat aging infrastructure as an enterprise-level risk" that should be subject to "formal review[] by upper management." Bau. RJN Ex. C at 23, 99.[11]

Moreover, in testimony before the grand jury convened by the Butte County District

Attorney, Gabbard (then Senior Director of Transmission Asset Management), admitted that

senior management (including Williams and Hogan) knew that PG&E's deteriorated and

dilapidated transmission infrastructure created an enterprise-level risk. Bau. RNJ Ex. D at 156:6-

157:3. He also admitted to telling Williams and Hogan about transmission asset-related wildfire

risk before March 2018, and that such risk was "regularly a topic that we" raised with senior

management. *Id*. at 162:10-164:23.

---

[11] Although the Liberty Report is not cited in the Baupost POCs, PG&E acknowledges that the Court may take judicial notice of CPUC submissions. *See* RJN at 6, 9-12. If necessary, Baupost may amend its proofs of claim to include the Liberty Report pursuant to the Ninth Circuit's policy favoring liberal amendment. *See generally In re Roberts Farms Inc.*, 980 F.2d 1248, 1251 (9th Cir. 1992).

1    PG&E's management also knew of PG&E's failure to address thousands of identified

2    vegetation clearance hazards each year.  *Supra* at 14-15, 19, 21; Supp. POC ¶ 38.  Hogan

3    admitted that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-

4    1000 will be touching its powerlines"—figures that translate into 123,000 trees touching

5    powerlines in violation of safety regulations at any given time.  TAC ¶ 401; Supp. POC ¶ 38.

6    Given their "focus" on safety and adoption of processes to keep themselves apprised of

7    safety issues, the vital significance of regulatory compliance to PG&E's business and legal

8    prospects, and the reports they regularly received of major safety problems with PG&E's

9    transmission assets, any suggestion that PG&E senior executives were unaware of the dangerous

10   problems plaguing PG&E's transmission infrastructure defies plausibility.

11   **E.    Baupost Bought PG&E Stock at Artificially Inflated
             Prices and Suffered Massive Losses When the Camp Fire**
12   **      Revealed PG&E's Reckless Operation of Its Transmission System**

13   The misstatements described above significantly inflated PG&E's share price throughout

14   2018 by concealing the true extent to which PG&E was exposed to massive liability for causing

15   future wildfires, and by creating the false impression that PG&E would be eligible for rate

16   recovery for any such liability.  Supp. POC ¶ 4; TAC ¶¶ 31, 317-19, 350.

17   Baupost purchased PG&E stock between February 9, 2018 and October 1, 2018, when

18   the stock's price remained artificially inflated by PG&E's misrepresentations.  During that

19   period, Baupost bought over 18 million shares (net of sales) at prices between $37 and $48 per

20   share, at a cost of almost $800 million.  Supp. POC Annex A Part II.

21   The truth about PG&E's deficient safety practices was partially revealed on May 25 and

22   June 8, 2018, when Cal Fire announced that PG&E was responsible for all of the major North

23   Bay Fires (except for the most destructive fire, the Tubbs Fire, for which causation remained

24   uncertain, *see* Bau. RJN Ex. E).  Cal Fire found that the vast majority of the fires had been

25   sparked by vegetation contacting local distribution lines and, for eight fires, found that PG&E

26   violated vegetation clearance laws.  TAC ¶¶ 346, 353, 599 n.167.  PG&E's stock price dropped

27   by over 5% and over 4%, respectively, after these announcements.  *Id*. ¶¶ 348, 358.

28

None of the 2017 North Bay Fires involved PG&E's transmission system. Nor did Cal Fire's May-June 2018 announcements reveal that PG&E was running that system in a reckless manner. *Id.* ¶¶ 346, 353. PG&E's failures to maintain and inspect its transmission assets did not come to light until the Camp Fire. On November 9, 2018, when the media first reported that "[PG&E's] transmission infrastructure may have been a root cause of" the Camp Fire, PG&E's stock price began to plummet. *Id.* ¶¶ 377-78. Between November 7 (the day before the Camp Fire) and November 15, 2018, the stock's price fell from $48 to less than $18. *Id.* ¶¶ 366, 387. Baupost lost over $500 million as a result of these 2018 stock drops.

## ARGUMENT

PG&E asks the Court to dismiss the Baupost POCs on the grounds that Baupost has failed to sufficiently plead its claim under FRCP 9(b), FRCP 12(b)(6), and the PSLRA. PG&E's arguments do not withstand scrutiny, and its Objections should be denied.

To start, PG&E asks the Court to resolve the Baupost POCs within the wrong procedural framework pursuant to the wrong legal standard. Because it is objecting to proofs of claim, not moving to dismiss a complaint, the standards governing the latter should not apply. PG&E's Objections created a contested matter, and for the reasons stated in Baupost's earlier briefing on this question and incorporated herein, *see* Dkt. No. 14275, Baupost respectfully submits that it should have been permitted to take discovery in connection with opposing the Objections, and that its proofs of claim should be reviewed under the pleading standards enunciated by FRBP 3001.[12] Baupost appreciates that, on January 24, 2024, the Court rejected Baupost's position, *see* Dkt. No. 14292. Accordingly, and without prejudice to any appeal Baupost might take on this question, Baupost explains below why the Baupost POCs easily satisfy the PSLRA pleading standard applicable to motions to dismiss securities complaints.

---

[12] PG&E fails to identify a single case where a bankruptcy court applied the PSLRA pleading standard to a proof of claim objection. *Cf. In re Tronox Inc.*, 2010 WL 1849394, at *2 (Bankr. S.D.N.Y. May 6, 2010) ("The [PSLRA] . . . does not purport to regulate the filing of class claims in this court."). Moreover, the Securities Claim Order, which specified what Securities Claimants were required to include in their proofs of claim, contains no suggestion that the PSLRA pleading requirements would apply. Accordingly, PG&E's attempt to supplant the FRBP provisions governing proof of claim objections with the requirements of the PSLRA should be rejected. *See In re Myers*, 2023 WL 8047842 (9th Cir. BAP Nov. 21, 2023) (holding that proof of claim was subject to FRBP 3001's pleading requirements, not non-bankruptcy pleading standard).

Under Rule 10b-5(b), it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary . . . to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." "To assert a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)).

In weighing whether Baupost has sufficiently pleaded these elements, the Court "must presume all factual allegations of the" Baupost POCs "to be true and draw all reasonable inferences in favor of" Baupost. *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1045 (N.D. Cal. 2008). *See also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (on "a . . . motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true"). Although Rule 9(b) requires that fraud allegations be made with particularity, a pleading need only be plausible to withstand a motion to dismiss; it "need not seem probable." *Dual Diagnosis Treatment Ctr., Inc. v. Centene Corp.*, 2022 WL 3359386, at *1 (9th Cir. Aug. 15, 2022) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In deciding on the legal sufficiency of the Baupost POCs, the Court is also limited to considering only "the face of the" proofs of claim. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). As the Court has noted, Bankruptcy L.R. 3007-1(b) authorizes the Court to hear "objection[s] involving only a matter of law," but provides that "unresolved facts cannot be disposed of at [such a] hearing." Bau. RJN Ex. F 49:5-10.

PG&E fails to confine its Objections to attacking the legal sufficiency of the allegations on the face of the Baupost POCs—instead annexing 113 exhibits totaling nearly 4,500 pages (the RJN) to its Objections. Although some of the documents in the RJN—*e.g.*, material incorporated by reference into the Baupost POCs—may be considered on a motion to dismiss, *see* RJN at 3-6, the RJN is not limited to such materials. Nor is PG&E's attempted use of the RJN restricted to

addressing questions of legal sufficiency.  PG&E repeatedly asks the Court to look to the RJN to resolve disputed questions of fact in a pre-discovery posture.

For example, citing its own CPUC filings, PG&E argues that the misstatement that it "inspects and monitors every PG&E . . . transmission . . . line each year" (Misstatement 12-C) is not actionable because it was true, RKS Obj. at 7; PERA Obj. at 36 (citing RJN Exs. 67, 71, 86). But the truth of Misstatement 12-C is hotly disputed.  As Baupost alleges (and the Butte Report found) PG&E had not inspected Tower 27/222 since August 2014, and prior to that, not since 2009, and the Caribou-Palermo line was not subject to annual inspections.  *Supra* at 8.  PG&E's request that the Court take judicial notice of documents in the RJN to determine the truth or falsity of its alleged misstatements is contrary to FED. R. EVID. 201.

On January 24, 2024, the Court recognized that PG&E's disregard of Rule 201, and its attempted end-run around Rule 12(b)(6), were improper.  *See* Bau. RJN Ex F 50:8-12 ("[T]he only thing I need to consider is the sufficiency, therefore, the underlying plausibility, of what is alleged . . . .").  Judicial notice is only available for facts "not subject to reasonable dispute." FED. R. EVID. 201(b).  "[A] court cannot take judicial notice of disputed facts."  *Aldave v. City of Buena Park*, 2021 WL 4539741, at *2 (C.D. Cal. July 7, 2021).

For these reasons, and those set forth below, PG&E's attacks on the legal sufficiency of the Baupost POCs are meritless, and its challenges to their factual content are improper.

## I.    PG&E'S STATEMENTS WERE ACTIONABLY FALSE AND MISLEADING

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information."  *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 1008-09 (9th Cir. 2018).  Undisclosed information is material if a reasonable investor would view it "as having significantly altered the 'total mix'" of information available.  *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  A statement is also "misleading if it would give a reasonable 'investor the impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Thus, even a literally true statement can be misleading.  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir. 1994), *superseded by statute on other grounds by* 15 U.S.C.

§ 78u-4(b)(1); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (holding that statement by issuer that its shares had been approved for quotation on NASDAQ, though literally true, was actionable because issuer had not committed to a NASDAQ listing).  The misrepresentations cited in the Baupost's POCs are all either false or materially misleading and, therefore, actionable.

**A.     PG&E's Misstatements Were False, Omitted Material Information, and Created the False Impression That PG&E Was <u>Adequately Inspecting and Maintaining Its Transmission Infrastructure</u>**

Many of PG&E's misstatements were simply false.  PG&E repeatedly stated that it "inspect[s] all of our overhead lines every year."  *See* Supp. POC ¶ 16(b) (Misstatement No. 11).[13]  That was false:  PG&E had not inspected Tower 27/222 since August 2014, and prior to that, not since 2009.  PG&E argues that it "never publicly claimed it had . . . not inspected Tower :27/222 of the Caribou-Palermo transmission line more recently than August 2014" and that a failure to inspect that tower does "not render statements of general corporate practice covering the entirety of PG&E's vast territory false."  RKS Obj. at 18.  But PG&E stated that it inspected "***all***" of its lines.  Supp. POC ¶ 16(b) (emphasis added).  Also, PG&E's attempt to recast its false statement as an accurate description of a general corporate practices is belied by the ETPM— PG&E's policy.  Under the ETPM, the Caribou-Palermo line was only inspected once every five years.  Supp. POC ¶ 14(a)(iii) (citing Butte Report at 25).

PG&E claims to have conducted annual patrols of its transmission lines.  RKS Obj. at 7.  Even if that were true, PG&E's internal documents confirm that "patrols" are not "inspections" because it is only during a detailed inspection of a transmission line that PG&E personnel are instructed to look for and document abnormalities or circumstances that will negatively impact safety, reliability, or asset life.  Supp. POC ¶ 10(a).  Thus, PG&E's own records establish the falsity of its representation to the market that it "inspected" its transmission lines annually.  *See*

---

[13] *See also* Supp. POC ¶ 21 (Misstatement No. 12-C) (PG&E "inspects and monitors every PG&E overhead electric transmission . . . line each year"); Supp. POC ¶ 16(d); TAC ¶ 287 (Misstatement No. 14) (same).

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (statements "inconsistent with" internal information are false and misleading).[14]

Other misstatements by PG&E are actionable because they misleadingly omitted material information. Its statements about increasing the frequency of line inspections and patrols and spending more on transmission line inspections, *see* TAC ¶ 280 (Misstatement No. 13); Supp. POC ¶ 22 (Misstatement No. 12-D), ¶ 16(e) (Misstatement No. 17), ¶¶ 24-25 (Misstatement Nos. 16-B & 18-A), omit that:

- PG&E had drastically reduced the frequency and thoroughness of inspections over the preceding years to the point where century-old transmission towers with known equipment deterioration would not be inspected for years at a time;

- PG&E was relying on "patrols" of transmission lines that did not involve component testing and other diagnostic tools and "fly-by" aerial patrols that could not assess whether tower components had degraded and were at risk of failing;

- PG&E had eliminated routine climbing inspections needed to identify worn C hooks and other degraded equipment on towers; and

- PG&E's inspectors could not have been expected to identify the wear on C hooks and hanger holes because of their lack of experience and training.

*Supra* at 10-14; Supp. POC ¶ 30.

Attacking a strawman, PG&E argues that, regardless of these omissions, none of its statements about transmission line inspection and maintenance were false or misleading because PG&E never suggested that it "could not be held liable for future wildfires," Bau. Obj. at 8, and never stated "every last detail of its business" was "in full compliance with every applicable law and regulation at all times," RKS Obj. at 14. Likewise, PG&E asserts that, after the North Bay Fires, "no reasonable investor would interpret statements that PG&E was . . . implementing enhanced safety measures to mean that those measures would be completely effective in a matter of months to further prevent future risk of wildfires." *Id.* at 22.

---

[14] In *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019), on which PG&E relies, PERA Obj. at 49, the Fifth Circuit held that a statement that the company "perform[s] scheduled maintenance on all of [its] pipeline systems and make[s] repairs and replacements when necessary or appropriate" was actionable because the company's "slow and inadequate response to known insufficiencies in [certain lines] is directly contradictory to this assertion."

1   PG&E's arguments are misdirected. An investor might appreciate that PG&E's promised

2   safety improvements would take time, but still be misled about PG&E's wildfire risk in light of

3   its undisclosed, throw-caution-to-the-wind approach to maintaining and inspecting its

4   transmission infrastructure. Had it been disclosed, the omitted information described above

5   would have "significantly altered the 'total mix'" of available information for a reasonable

6   investor, *Siracusano*, 563 U.S. at 44. Such information would have revealed that—despite its

7   pledges to reform—PG&E *was still pursuing* an undisclosed policy of violating CPUC General

8   Order 165's requirement that it inspect powerlines "as necessary, to ensure reliable, high quality,

9   and safe operation." It also would have revealed that, at best, PG&E was under-disclosing the

10  risk that its woefully deficient transmission line maintenance and inspection practices and

11  vegetation management program would result in its incurring massive wildfire liabilities. *See*

12  Supp. POC ¶ 32. This information would have been material to investors because PG&E's

13  regulatory non-compliance would make it ineligible for rate recovery for wildfire-related

14  liabilities. *Supra* at 7; TAC ¶¶ 317-20.

15      PG&E's assurances about its investment in and its maintenance, replacement, and

16  hardening of transmission equipment likewise omitted material information. *See* Supp. POC

17  ¶¶ 18-19 (Misstatement Nos. 12-A & 12-B), ¶ 23 (Misstatement No. 16-A), ¶ 24 (Misstatement

18  No. 16-B), ¶ 16(e) (Misstatement No. 17); TAC ¶ 303 (Misstatement No. 17). Regardless of

19  whether parts of these statements were true, *see* Bau. Obj. at 9-10, they were still misleading.

20  They omitted that PG&E was eliminating programs to replace equipment on the Caribou-

21  Palermo line that it knew was in "imminent" danger of failing (the opposite of hardening and

22  maintaining that line), failing to replace and repair century-old transmission line components that

23  it knew to be decrepit (on the Caribou-Palermo line and elsewhere), and slashing its budget for

24  repairing and maintaining transmission equipment. *Supra* at 10, 12; Supp. POC ¶ 27.

25      PG&E insists that "[a] reasonable investor would not read a statement that PG&E had an

26  ongoing program to replace certain structures and conclude that all such structures must already

27  have been replaced." RKS Obj. at 18. This misses the point. While reasonable investors would

28  not read PG&E's statements and conclude that PG&E had repaired or replaced all of its aged

equipment, they would be surprised to learn that, notwithstanding PG&E's assurance that it was replacing vulnerable structures, PG&E was still committed to a "run to failure strategy" that made its infrastructure *more* vulnerable. Had this omitted information been disclosed, it would have revealed to investors that, contrary to the false picture it was painting for the public, PG&E had embraced a policy of violating CPUC General Order 95's requirement that it maintain its powerlines "in such condition to" meet tower safety requirements.

Likewise, PG&E's misstatements about enhancing its "already rigorous" vegetation management efforts, *see* TAC ¶ 303 (Misstatement No. 17); Supp. POC ¶ 20 (Misstatement No. 12-B), ¶ 21 (Misstatement No. 12-C), ¶ 22 (Misstatement No. 12-D), ¶ 16(e) (Misstatement No. 17), failed to disclose that PG&E "actually knew that it was not in compliance with relevant safety laws" and had left almost 4,000 hazard trees identified in 2016 unworked in June 2017. *Supra* at 14; Supp. POC ¶ 28. If disclosed, this information would have revealed that PG&E was flouting its vegetation clearance obligations.

PG&E's selective disclosures were misleading because they were designed to perpetuate the false impression that PG&E was taking responsible steps to ensure the safe operation of its transmission system. In reality, it was doing the opposite. *See Berson*, 527 F.3d at 985. PG&E argues that "Baupost improperly conflates a factual statement . . . about the number and types of replaced equipment (manhole covers, network cables, transmission lines, etc.) with a statement that PG&E's fire safety measures were "sufficien[t]." Bau. Obj. at 10. Not so. Having chosen to "tout positive information to the market" about its safety practices, PG&E was required to "do so in a manner that wouldn't mislead investors, including [by] disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (internal quotation marks omitted); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("One cannot . . . disclose . . . the installation of a

comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been

found to be inoperable, without misleading investors.").[15]

Accordingly, Baupost alleges misstatements by PG&E with sufficient particularity. *See*

*Glazer*, 63 F.4th at 765 (pleading is sufficient where it "specif[ies] each statement alleged to

have been misleading, the reason or reasons why the statement is misleading").

**B.     PG&E's Misstatements Cannot Be Excused as Puffery**

PG&E argues that its misstatements about "improvements" to its safety practices and its

regulatory compliance are inactionable puffery.  PERA Obj. 33-35, 41; RKS Obj. at 5, 16.

Whatever application this argument may have to other Securities Claimants, it has no bearing on

Baupost.  Baupost's Supplemental POC addresses "determinate, verifiable statement[s]," "not

mere puffery."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S.

175, 184 (2015).  The misstatements cited by Baupost—*e.g.*, PG&E's assertion that it "inspect[s]

all of [its] overhead lines every year"[16]—are not only objectively verifiable, they are

demonstrably false:  PG&E had not inspected Tower 27/222 in the four years before the Camp

Fire and had adopted a policy limiting inspections of such towers to once every five years (and

then left such inspections to untrained personnel).  Supp. POC ¶ 10(a); TAC ¶ 118.[17]

Even supposing PG&E's misstatements were unverifiable, they would still be actionable

because they omitted information material to investors.  *See, e.g.*, *Warshaw v. Xoma Corp.*, 74

F.3d 955, 959 (9th Cir. 1996) (holding that "optimistic public statements that [a drug's] FDA-

approval process was progressing positively" were actionable "when taken in context" of omitted

warnings that the drug "might not work and would never be approved").  Whether a statement is

inactionable puffery cannot be resolved "in the abstract."  *Union Asset Mgmt. Holding AG v.*

---

[15] *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022), on which PG&E relies (PERA Obj. at 46), is not to the contrary.  There, the court found that the link between the alleged misstatements and the information they omitted was so weak that the omissions made the statements incomplete, not "misleading."  506 F. Supp. 3d at 885.  Here, PG&E's selective disclosures and the information PG&E omitted from them concerned the very same issue.

[16] *See also* TAC ¶ 264 (Misstatement No. 11), ¶ 287 (Misstatement No. 14); Supp. POC ¶ 16(b) (Misstatement No. 11), ¶ 16(d) (Misstatement No. 14), ¶ 21 (Misstatement No. 12-C).

[17] Likewise, the misstatements alleged in the Supplemental POC do not concern planned, future initiatives to reduce wildfire risk, *see* RKS Obj. at 13, but rather PG&E's then-current or past conduct—making them objectively verifiable. *See, e.g.*, Supp. POC ¶¶ 18, 21, 22, 25.

*SanDisk LLC*, 2017 WL 3097184, at *1 (N.D. Cal. June 22, 2017). The court must examine the "particular context" and weigh whether that context "could reasonably have led investors to rely on [the statements'] accuracy and completeness." *Id*.

Here, PG&E made the misstatements at issue after the North Bay Fires, at a time when investors were laser-focused on its safety practices and the *possibility* that PG&E might face massive liability for additional wildfires. In this context, PG&E's boasts about its "extensive" investment in its electrical infrastructure and its efforts to "do[] more . . . to harden" its electric system, "augment[] its already rigorous vegetation management practices," and "increase[] the frequency of [its] patrols" were misleading. Supp. POC ¶¶ 19-20, 22. They were designed to persuade the market that PG&E was committed to operating safely even as it remained wedded to practices and policies that vitiated the safety of its transmission system. *Supra* at 9-14.

## C.     PG&E's Reliance on *Barnes* Is Unavailing

PG&E argues that *Barnes v. Edison Int'l*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ("*Barnes I*"), *aff'd* 2022 WL 822191 (9th Cir. Mar. 18, 2022) ("*Barnes II*"), requires dismissal. PERA Obj. at 3, 29-31. Not so. Although there are superficial similarities between the Baupost POCs and the claims asserted in *Barnes*, they address fundamentally different fact patterns.

In *Barnes*, the plaintiffs alleged that Edison had misrepresented that it was "engaged in a significant and ongoing infrastructure investment program" and that "[s]afety is [Edison's] top priority and a core value." *See Barnes I*, at *9. *Barnes I* ruled that the plaintiffs had "fail[ed] to identify specifically how each statement would mislead investors," and observed that Edison's statements were not objectively verifiable. *Id*. By contrast, the Baupost POCs target "determinate, verifiable" assertions of fact that can be parsed as either true or false, and Baupost explains specifically how each statement was either false or misleading.

For example, PG&E's November 2017 statement that it "inspect[s] all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year" was false. PG&E had not "inspected" the relevant span of the Caribou-Palermo line for over four years. *See* Supp. POC ¶ 16(b). PG&E's detailed, factual statements about the frequency with which it inspected or patrolled its lines were also materially misleading because PG&E failed to

1    disclose that it (i) had decreased the frequency and thoroughness of inspections and patrols;

2    (ii) had largely dispensed with inspector training; and (iii) was relying on "fly bys" that were too

3    perfunctory to spot known safety hazards such as worn C-hooks. *Id*. ¶ 30.

4          *Barnes* is also distinguishable because, there, the plaintiff's "own allegations reveal[ed]

5    that the market was aware of the safety failures" that Edison allegedly failed to disclose. *Barnes*

6    *I*, at *9. Investors could not claim to have been deceived by Edison's generic statements about

7    its safety practices when the market—as the result of Edison's CPUC filings—already knew that

8    Edison did not "fire harden" its distribution system, replaced only a fraction of poles in need of

9    replacement each year, overloaded many of its poles to the point of failure, and had adopted "a

10   run to failure" maintenance approach. *BarnesI*, at *2-3. In affirming, the Ninth Circuit likewise

11   reasoned that "the challenged omissions . . . did not affirmatively create an impression of a state

12   of affairs that differs in a material way from the one that actually exists." *Barnes II*, at *1

13   (internal quotation marks omitted). Thus, *Barnes* stands for the unremarkable proposition that

14   misstatements are not actionable when information specifically contradicting those statements is

15   already well known to the market. In this respect, *Barnes* is a truth-on-the-market case, in which

16   the "defendant's failure to disclose material information may be excused where the information

17   was made credibly available to the market by other sources." *Nguyen v. Radient*

18   *Pharmaceuticals Corp.*, 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011). For the reason set

19   forth, *infra* at Part I.D, that is not this case.

20   **D.      PG&E's "Truth-on-the-Market" Arguments Do Not Support Dismissal**

21          Citing materials attached to its RJN, PG&E urges the Court to dismiss the Baupost POCs

22   on the grounds that—irrespective of PG&E's statements to the contrary—the market knew that

23   PG&E's transmission line inspection and maintenance efforts were a sham and that its

24   transmission assets were on the verge of collapse. Bau. Obj. at 8; *see also* RKS Obj. at 27-28;

25   PERA Obj. at 69. To prevail on this "truth-on-the-market" defense, PG&E must demonstrate

26   that the truth was "transmitted to the public with a degree of intensity and credibility sufficient to

27   effectively counter-balance any misleading impression" from PG&E's misstatements. *Nguyen v.*

28   *Radient Pharms. Corp.*, 2011 WL 5041959, at *7 (C.D. Cal. Oct. 20, 2011). Truth-on-the-

market defenses are fact-intensive and almost never warrant dismissal based on the pleadings (*Barnes* is the rare exception). *See id*.; *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Given the Court's clear signal that it is not going to resolve questions of fact at this stage, Bau. RJN Ex. F 49:18-50:23, PG&E's truth-on-the-market arguments are unavailing.

Even if the Court were to wade prematurely into disputed factual issues, PG&E's extrinsic materials do not come close to establishing that Baupost's claims are based on misstatements that were publicly known to be false when PG&E made them. PG&E points to no evidence—none—that, before the Camp Fire, the market knew that PG&E had engaged in a program of self-sabotage by skipping inspections of its aged, decrepit transmission lines and limiting its checks of those lines to sham "patrols" by the untrained and inexperienced. Nor can PG&E argue that the market knew it was using a "run to failure" strategy on the Caribou-Palermo line. In *Barnes*, Edison publicly admitted to using such a strategy, *see* Bau. RJN Ex. G ¶¶ 187-89; PG&E was not so forthcoming. Butte Report at 57, 60.

PG&E points to SEC filings in which it disclosed that its electrical operations are "inherently dangerous, involve[] significant risks, and may cause a catastrophic event that could result in financial losses that may not be recoverable through rate increases." PERA Obj. at 10 (citing RJN Exs. 1-6); *see also* Bau. Obj. at 10 (citing RJN Ex. 73). PG&E neglects to mention that its SEC filings described these risks as arising from matters "many of which are beyond [PG&E's] control," *e.g.*, climate change. *See, e.g.*, RJN Ex. 3, at 27. A reasonable investor who read these filings would understand that wildfire risk was an inherent part of PG&E business—no matter how prudently PG&E acted. What these filings did not reveal is that *PG&E* was compounding the inherent risks associated with running an electric utility by shirking its duty to act as a Prudent Manager, starving its maintenance and inspection program for transmission assets, turning a blind eye to the deterioration of critical transmission line components, and tolerating known hazard trees along its powerlines. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-

1  development may run into a few snags, and knowing that a particular product has already
2  developed problems so significant as to require months of delay.").[18]

3      PG&E also points to CPUC, Cal Fire, and PG&E press releases concerning the San
4  Bruno pipeline explosion and the North Bay Fires, filings from lawsuits arising from the North
5  Bay Fires, and CPUC citations and reports as support for the conclusion that PG&E's
6  recklessness was so widely known that PG&E's misrepresentations concerning its *transmission*
7  *assets* cannot be actionable.  Bau. Obj. at 8 (citing TAC ¶¶ 247-47, 339; RJN Exs. 88-89, 100-
8  02); *see also* PERA Obj. at 50 (citing RJN Exs. 31-63, 70, 74-79).  But these documents at most
9  support the conclusion that the market knew about PG&E's lax safety practices relating to its gas
10  pipelines (because of the San Bruno explosion) and distribution lines (because of the 2017 North
11  Bay Fires).  Bau. Obj. at 8; *see also* RKS Obj. at 28.  They do not address PG&E's transmission
12  infrastructure at all.

13      For example, PG&E argues that, when Baupost purchased stock, the market already
14  knew that "the CPUC had issued a litigation hold letter to PG&E about its safety practices."
15  RKS Obj. at 28.  But the CPUC's letter did not discuss PG&E's transmission assets.  It focused
16  on the "potential causes of the [2017 North Bay] fires, vegetation management, maintenance
17  and/or tree-trimming."  TAC ¶ 246; *see also* Bau. RJN Ex. H.

18      Along the same lines, PG&E argues that the market knew about the problems plaguing its
19  transmission system because, PG&E says, it was common knowledge that:  Cal Fire was
20  investigating PG&E's role in the North Bay Fires; PG&E had suspended its dividend in the face
21  of uncertain liability for the North Bay Fires; and PG&E was sued in connection with the North
22  Bay Fires.  RKS Obj. at 28 (citing TAC ¶¶ 247, 339 and RJN Exs. 100-102).  But, here again, the
23  documents PG&E cites are silent about PG&E's transmission assets.  They concern PG&E's
24  potential liability for the North Bay Fires, poor vegetation management around its distribution
25  lines, or problems with PG&E's gas system.  *See, e.g.*, RJN Ex. 101 ¶ 5 (citing vegetation

26

---

27  [18] *See also In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003) (cautionary
    language that "[r]esults from our clinical trials may not be sufficient to obtain regulatory clearance . . . did not
28      provide meaningful information . . . regarding the FDA's concern that the trial designs were inconsistent with
    clinical practice").

management as a potential cause of the North Bay Fires); RJN Ex. 102 ¶¶ 53-66 (detailing fires

caused by PG&E's vegetation management practices and its gas distribution system).[19]

PG&E's reliance on CPUC citations and audit reports, RJN Exs. 30-63, is also

unavailing. Some of those documents post-date the Camp Fire, *see* RJN Ex. 30, and therefore

could not have revealed the "truth" concerning PG&E's practices before the Camp Fire. Others

address regulatory violations by PG&E unrelated to its undisclosed "run-to-failure" strategy and

the sham inspection regime that PG&E employed with its transmission lines. As detailed in

**Appendix A** hereto, the violations concerned PG&E's gas system, its distribution assets (*e.g.*,

wooden poles), or miscellaneous issues (*e.g.*, missing signs or issues with manhole covers).

In large measure, PG&E's truth-on-the-market defense boils down to the argument that

the public must have known about its reckless operation of its transmission assets because PG&E

had already been found to have committed safety violations relating to its gas and electrical

distribution assets. *See* Bau. Obj. at 5-6; RKS Obj. at 2. This argument makes as much sense,

and has as much legal support, as an automaker's claiming that its customers should have known

that its trucks' engines were prone to explode based on earlier reports of brake failures in its

compact cars—which is to say none at all. *See generally Provenz v. Miller*, 102 F.3d 1478,

1492-93 (9th Cir. 1996) (holding that market knowledge regarding issuer's "'unusual' business

model" did not bar investors from pursuing securities claims focusing on the issuer's

misstatements about its revenue recognition practices, negative forecasts, and sales declines); *In

re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (public warning by FDA

cautioning against off-label use of a drug did not preclude claims based on misrepresentations

concerning the expected sales of the drug); *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2015 WL

224631, at *7 (S.D. Cal. Jan. 15, 2015) (rejecting truth-on- the-market defense where the first

---

[19] For example, PG&E cites the "*Lore Olds* Complaint," which addresses the North Bay Fires, highlighting its
allegation that PG&E "knowingly operat[ed] aging, improperly maintained infrastructure." RJN Ex. 100 ¶ 3. But
that complaint does not support the conclusion that PG&E's imprudent operation of its transmission assets was
known to the market. The complaint's allegations about the age and maintenance of PG&E's assets concerned
PG&E's gas or its electrical distribution (not transmission) systems. RJN Ex. 100 ¶¶ 103-05, 112, 114-15, 126. It
includes only a passing reference to PG&E's transmission assets and does not discuss them in describing PG&E's
safety record, *id.* ¶ 48. And it says nothing about PG&E's transmission line inspection efforts. *Id.* ¶¶ 115, 120.

corrective disclosure revealed some, but not all, of the truth concealed by the misstatements). Even if, by mid-2018, it was widely known that PG&E's non-compliant vegetation management along its distribution lines had caused many of the 2017 North Bay Fires, the public did not know that PG&E had also decided to cripple its program for inspecting its high-voltage transmission lines and was doing almost nothing to maintain the corroded metal components on those lines—components that PG&E knew faced "imminent" failure.

Despite all the ink it spills on its truth-on-the-market defense, PG&E points to only one public document predating Baupost's stock purchase that is even tangentially relevant to the misstatements alleged in the Baupost POCs: a 2017 Risk Assessment and Mitigation Phase Report to the CPUC. Bau. Obj. at 11 (citing Butte Report at 63 n.121). That report noted that "[m]uch of PG&E's transmission infrastructure . . . assets are nearing 'end of useful life,'" *id*. It did *not* reveal that PG&E was employing a "run-to-failure" strategy with respect to that infrastructure. Nor did it reveal that, despite knowing about the deterioration of its transmission line components, PG&E had reduced the number and impaired the quality of transmission line inspections. *Supra* at 9-14; *see also* Bau. RJN Ex. I, Chapters 10 and 11.

In sum, PG&E has failed to point to any publicly available documents predating the Camp Fire that would have revealed to the market, let alone with intensity and credibility, that PG&E was lying when it touted its transmission line inspection and maintenance practices. PG&E's lies did not come to light until an uninspected, un-repaired, century-old C hook on one of its transmission towers snapped in the wind and sparked the Camp Fire.

## II. BAUPOST SUFFICIENTLY PLEADS SCIENTER

Scienter refers to an "intent to deceive, manipulate, or defraud," *Schueneman*, 840 F.3d at 705. It also extends to "deliberate recklessness to 'an obvious danger of misleading investors.'" *Glazer*, 63 F.4th at 765. Deliberate recklessness involves "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id*. A pleading supports the "strong inference" of scienter required by the PSLRA "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." *Id*. at 766 (quoting *Tellabs*, 551 U.S. at 324). In weighing whether a pleading supports a "strong inference" of scienter, a court first "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to" such an inference, and, if not, then "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id*.

**A. The Inference That PG&E's Management Knew, or Recklessly Avoided Knowing, That Their Statements Were False or Misleading Is at Least as Compelling as Any Opposing Inference**

PG&E argues that Baupost must allege "specific facts demonstrating that any individual alleged to have made a misstatement did so intentionally or with deliberate recklessness." Bau. Obj. at 11; *see also* PERA Obj. at 55. Baupost easily clears this hurdle.

Courts have found a strong inference of scienter where, as here, "executives themselves told investors they had real-time access to . . . information . . . that contradict[ed] [their] public statements." *Quality Sys.*, 865 F.3d at 1145-46 (holding that plaintiff had pleaded scienter, where misrepresentations concerned the issuer's sales and earnings prospects and plaintiff alleged that "members of . . . management . . . had access to and used reports documenting in real time the decline in sales"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (same, where "executives admit[ted] to having monitored [a] database" and plaintiffs alleged that "large portions of" the data belied the executives' public statements). PG&E's senior executives repeatedly and publicly stated that they "closely monitored" safety issues, had ready access to an inspection database that detailed PG&E's noncompliance with safety regulations, and used data from that and similar PG&E systems in communications with investors. *Supra* at 19-23; TAC ¶ 398. PG&E's executives also testified that they actually knew about thousands of vegetation clearance violations even while PG&E was falsely reassuring the public about its vegetation management practices. TAC ¶ 401.

In addition to these admissions, the Baupost POCs abound with allegations that directly or indirectly compel the inference that PG&E's leadership had information that contradicted PG&E's public statements. The Baupost POCs detail:

i. PG&E's knowledge of the advanced age and dangerous deterioration of its transmission line components, including the five towers on the Caribou-Palermo line that collapsed and C hooks and hanger holes that been worn through;

ii. PG&E's deliberate reduction of the frequency and thoroughness of inspections;

iii. PG&E executives' selective use of granular information about compliance with safety regulations when reassuring investors;

iv. The processes that PG&E instituted to make senior managers aware of safety-related issues, including instituting the Corrective Action Program (to enable junior employees to alert senior management to safety issues) and charging the Chief Compliance Officer (Kane), who reported directly to the CEO and the board, with ensuring the effectiveness of PG&E's compliance and safety practices and making sure safety issues received attention from senior leadership;

v. The intense public, regulatory, and investor focus on PG&E's compliance with both safety regulations and the conditions of PG&E's criminal probation; and

vi. The many reports that PG&E's committees generated and received, including reports to the Executive Management Committee, that highlighted the importance of transmission line maintenance and inspection and vegetation management for limiting fire risk, raised warnings about PG&E's aged transmission system, and found that failed transmission line components had caused downed wires.

*Supra* at 9-14-16, 19-23. These are not "conclusory allegations that seem to assume" that PG&E's leadership "possessed an omniscient awareness of operational details," as PG&E contends, PERA Obj. at 55. They detail specific reports, structures, and processes that PG&E used to channel information about the dire condition of its transmission assets and its vegetation management efforts to the attention of senior executives.[20] Baupost's well-pleaded allegations raise an inference of scienter at least as compelling as any opposing inference.

PG&E's contention that its senior executives were unaware of both PG&E's reckless approach to transmission line maintenance and inspection and the dangerously decrepit state of its transmission assets defies plausibility. "[T]he Supreme Court imposed a duty upon courts to weigh *plausible* competing inferences" when assessing whether a plaintiff has pleaded scienter. *Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) (citing *Tellabs*, 551 U.S. at 323-34).[21] Thus, in *Reese*, the Ninth Circuit concluded that the plaintiff had pleaded that an executive, who made

---

[20] For this reason, PG&E's reliance on *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) (*see* PERA Obj. at 56), is unavailing. *Zucco* involved manipulated accounting, but no allegation "that management was in a position to know that such data was being manipulated." *Id*. at 1000.

[21] *Overruled on other grounds by City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

misstatements about the extent of corrosion on her employer's (BP) oil pipeline, did so with scienter because: BP's safety record generally and its pipeline monitoring practices in particular were a focus of public and governmental attention; the executive was responsible for overseeing the pipelines and thus had a motive to misrepresent its condition; and if anyone knew the pipeline's real condition, it was the executive. 747 F.3d at 571. Against this backdrop, *Reese* rejected BP's counter-narrative—that senior leadership did not have access to data on the pipeline's actual condition—as "unlikely under these circumstances." *Id*. at 571-72.

Any suggestion that PG&E's executives either did not know or did not have access to data and information about the condition, maintenance, and inspection of PG&E's transmission assets when they were making misstatements about those matters would be similarly implausible. PG&E's executives made those misstatements while PG&E was under unblinking public and government scrutiny for its safety practices, and they had every reason to familiarize themselves with detailed information about such safety practices across PG&E's electrical utility. This was certainly true of Williams and Hogan, both of whom had worked in Electric Operations and would have known where to look and what to ask to ascertain the true condition of PG&E's transmission assets. Likewise, Gabbard, who worked as Senior Director of Transmission Asset Management, testified that he was highly attuned to the "enterprise risks of wildfire[s] and their . . . relationship to deteriorated and dilapidated infrastructure" and reported those risks to PG&E's "senior officers," including Williams and Hogan. *Supra* at 23.[22]

PG&E's claims of ignorance are also implausible because here, as in *Reese*, the information available to PG&E's leaders was "objectively alarming[.]" 747 F.3d at 572. From at least 2009 onward, PG&E's senior management (*i.e.*, the Executive Management Committee) received reports warning them that PG&E's failures to "perform quality inspections,"

---

[22] PG&E argues that Gabbard's misstatements are not actionable because Gabbard, not PG&E, made them, RKS Opp. at 24 n. 13. Wrong. Gabbard made his misstatements while testifying as PG&E's representative in support of PG&E's application to FERC. RJN Ex. 82. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement[.]").

"[i]mproperly maintained equipment, and "[f]ailure to replace aging equipment" exposed PG&E (and northern California) to the risk of catastrophic wildfires. *Supra* at 22-23.

With this drumbeat of dire warnings, if PG&E's leaders were not lying outright, the only plausible inference is that they were deliberately reckless when they boasted to the public and to regulators about PG&E's investments in, and programs for inspecting and maintaining, its transmission assets—and, as noted, deliberate recklessness compels a finding of scienter. "[A]n actor is reckless if he 'had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort.'" *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).[23] Put differently, willful ignorance is not a defense to securities fraud. *See Howard*, 228 F.3d at 1064-65 (defendants "cannot simply argue that" they "looked the other way" after a "legitimate red flag" is raised). Given PG&E's history of catastrophic safety failures (including the San Bruno explosion and the North Bay Fires), the spotlight placed on PG&E by regulators and the public, PG&E's internal reporting, and the repeated warnings its management received, it is simply not credible for PG&E to argue that its leaders were merely uninformed when they chose to speak about the state of PG&E's transmission assets.

Indeed, PG&E's guilty plea to criminal charges arising from the Camp Fire fatally undercuts any argument by PG&E that Baupost has failed to plead deliberate recklessness. PG&E admitted to "recklessly" causing the Camp Fire—*i.e.*, that PG&E was aware that its "actions present[ed] a substantial and unjustifiable risk of causing a fire, and that it "ignore[d] that risk" in violation of California law. CAL. PENAL CODE § 452; *People v. Ramirez*, 2023 WL 5215382, at *3 (Cal. Ct. App. Aug. 15, 2023). PG&E does not explain—because it cannot—how it could have been aware that its "actions present[ed] a substantial and unjustifiable risk of causing a fire," but been unaware of this risk when its senior officers reassured the public about

---

[23] *See also Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[an] egregious refusal to see the obvious, or to investigate the doubtful" supports an "inference of . . . recklessness"); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *12 (N.D. Cal. Nov. 4, 2020) (finding recklessness when CEO had "grounds to believe material facts existed . . . that were misstated or omitted . . . but failed to obtain and disclose such facts although he could have done so without extraordinary effort").

the condition, maintenance, and inspection of its transmission lines. *See* RKS Obj. at 25-26.

PG&E insists that its senior leadership's purported ignorance of PG&E's grossly inadequate safety practices stems from corporate mismanagement, not deliberate recklessness. Bau. Obj. at 11; RKS Obj. at 25; PERA Obj. at 60. In light of the allegations described above and in the Baupost POCs, this argument—which posits that PG&E's C-suite was basically insensate—rings hollow. It also raises a factual dispute that cannot be resolved on the pleadings. If the Court considers the allegations in the Baupost POCs "holistically and accept[s] them to be true," as is required on a motion to dismiss, the inference that PG&E was, "at the very least, deliberately reckless as to the false or misleading nature of [its] public statements is 'at least as compelling as any opposing inference.'" *Reese*, 747 F.3d at 581.

**B.    Baupost Sufficiently Alleges Scienter Under the Core Operations Doctrine**

Under the core operations doctrine, corporate officers are presumed to "have knowledge of the critical core operation of their companies." *Reese*, 747 F.3d at 569; *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008) ("[F]acts critical to a business's core operations . . . are known to a company's key officers."). Under this doctrine:

> allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

*Killinger*, 542 F.3d at 785-86. All three circumstances apply here, in spades.

*First*, PG&E itself admits that the safe operation of its electrical utility is one of its "core businesses" and "at the heart of everything we do." TAC ¶¶ 397-98. And non-compliance with safety regulations presented an enterprise-level risk—a risk that received regular attention from

1   PG&E's board.[24]  *Supra* at 20 n.10, 22.  PG&E could—and did—face massive liabilities for

2   wildfires and would not be able to obtain rate recovery for such losses unless it could

3   demonstrate that it acted as a Prudent Manager, including by complying with safety regulations.

4   *Supra* at 7.  These allegations, particularly when read together with Baupost's other scienter-

5   related allegations, *supra* at 40-45, support a "cogent and compelling" inference that pervasive

6   deficiencies in PG&E's transmission line maintenance and inspection practices were well known

7   to senior management.  *Killinger*, 542 F.3d at 785-86; *see also In re IMAX Sec. Litig.*, 587 F.

8   Supp. 2d 471, 483 (S.D.N.Y. 2008) ("the crucial contribution of theater system revenue to IMAX

9   as a going concern" was a factor contributing to "adequately plead[ing] scienter").

10        *Second*, the Baupost POCs provide particularized allegations that PG&E's senior

11   leadership had actual access to the disputed information.  *Killinger*, 542 F.3d at 786.  They detail

12   the Enterprise Risk Management reports (which were provided to the Executive Management

13   Committee), the EMC: Electric T&D Asset Road Map, and the Transmission Line Component

14   Management Report from Quanta Technologies—which describe the decrepit state of both

15   PG&E's transmission assets and its program for inspecting and maintaining those assets.  *Supra*

16   at 22-23.  It would be implausible to suppose that PG&E's leaders paid to commission such

17   reports and then were denied access to the reports' findings.  The far more plausible inference is

18   that PG&E's leaders had access to, and reviewed, these reports.  Moreover, Williams's, Hogan's,

19   and Gabbard's backgrounds and roles in Electric Operations and Kane's duties as Chief

20   Compliance Officer (all of them were charged with monitoring and mitigating the risks created

21   by PG&E's operations), PG&E management's access to real-time data about PG&E's

22   transmission assets through PG&E's powerline inspection database, and Hogan's and others'

23   admitted knowledge of thousands of vegetation clearance violations all support a strong

24   inference that PG&E's leadership had access to information about the imminent risks presented

25   by PG&E's electrical transmission system.  *Supra* at 19-23.

---

[24] For this reason, PG&E's reliance on *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017) (PERA Obj. at 57), is
misplaced.  *Curry* declined to apply the core operations doctrine because the matters at issue concerned an
exceedingly "small portion of Yelp's business" and there was no reason to believe they attracted the attention of
senior management.  875 F.3d at 1227-28.

*Third*, it would be "absurd" to suggest that PG&E's leaders were unaware that their statements to the public concerning PG&E's transmission system were false and misleading. *See, e.g.*, *Reese*, 747 F.3d at 579-80 (holding that plaintiff had pleaded scienter where the "prominence of the issue" of environmental compliance, the "immense public attention" and governmental scrutiny paid to that issue, and the CEO's requests for updates on the issue made it "absurd" to suppose that management was unaware of the true state of BP's environmental problems). Following the San Bruno pipeline explosion and 2017 North Bay Fires, whether PG&E was operating, or capable of operating, its electric utility in a prudent manner was a question of the utmost importance to PG&E's management, to ratepayers, and the market. It would be impossible to overstate the prominence of the issue. PG&E was on criminal probation and under a regulatory microscope because of other non-compliant safety practices. To appease a nervous public, PG&E's senior executives repeatedly made detailed public statements about PG&E's investments in its transmission assets and PG&E's inspection and maintenance efforts, and boasted that safety was at the "core" of PG&E's business. These executives, including those serving on the Executive Officer Risk & Compliance Committee, monitored the risks arising from PG&E's transmission assets, were warned, repeatedly, about the importance of maintaining and inspecting such assets, and knew that PG&E's failure to do so created enterprise risk. *Supra* at 19-23. Against this background, PG&E's claim that its leaders were unaware of the real state of PG&E's transmission assets beggars belief.

## C. **Baupost Sufficiently Alleges Corporate Scienter**

A plaintiff may satisfy the PSLRA's pleading requirements by alleging "corporate scienter," *i.e.*, a "form of collective scienter" that is applicable when "a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (emphasis in original).[25] The "corporate

---

[25] *Magistri* declined to find corporate scienter based on the facts of that case, which involved technical misstatements in an agreement attached to an SEC filing—not repeated public misstatements about a prominent issue that the company described as its "core business[]." TAC ¶ 397.

scienter" doctrine fits this case like a glove. Because PG&E's solvency depended on its ability to operate its electrical utility in a prudent manner, and because it was already under close scrutiny from regulators, the market, the public, and the courts (including because it was on criminal probation), PG&E's statements about its program to inspect and maintain its transmission infrastructure addressed a question of pivotal importance to PG&E.

PG&E's statements were also "dramatically false." PG&E trumpeted its enhanced inspection regime without disclosing that its inspectors were untrained; claimed to be inspecting transmission assets that had gone untended for years; and insisted that it was maintaining those assets even while they corroded and failed in normal operating conditions. *See supra* at 9-14.

All of this supports the conclusion that "at least *some*" PG&E officers knew PG&E's statements were false when made. So does the Butte Report, which found that the failings that led to the Camp Fire (*e.g.*, the deterioration of century-old C hooks and other transmission line components, as well as PG&E's incompetent maintenance and inspection efforts) were well known within PG&E. *Supra* at 7-10, 12-13. PG&E management's boasts about their focus on safety, the internal reporting structures PG&E created to escalate safety issues to management's attention (*e.g.*, the Corrective Action Program), management's creation of a position to ensure C-suite oversight over safety and compliance issues, their commissioning of reports finding that PG&E's transmission assets created enterprise risk, and the compliance and inspection data at management's fingertips, *see supra* at 19-23, also point to this conclusion.

## III. BAUPOST SUFFICIENTLY PLEADS FRAUD-ON-THE-MARKET RELIANCE

A plaintiff is entitled to a presumption of "reliance based on . . . the 'fraud-on-the-market' theory" that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988); *see also In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *20 (N.D. Cal. Apr. 1, 2022) ("[I]n efficient markets . . . prices reflect all publicly available information, including misrepresentations, and all investors were thus entitled to rely on that public information and pricing[.]"). Where, as here, the presumption applies, a plaintiff's

subjective reliance is irrelevant. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 1996 WL 134757, at *4 (S.D.N.Y. Mar. 25, 1996).

Baupost is entitled to avail itself of the fraud-on-the-market presumption of reliance. It purchased over 18 million shares (net of sales) of PG&E stock in open-market transactions at market prices. *See* Supp. POC Annex A Part II. PG&E does not (and cannot) dispute that its stock trades on an efficient, well-developed market, and that numerous securities analysts follow and report on PG&E. TAC ¶¶ 459-62. Nor does PG&E allege that Baupost possessed information beyond what was available to the market when it purchased PG&E stock (or at any other time). *See In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 648-49 (C.D. Cal. 2018). This is a textbook case for the application of the fraud-on-the-market presumption.

PG&E argues that, regardless of whether Baupost can claim fraud-on-the-market reliance, Baupost could not have relied to its detriment on PG&E's alleged misstatements because "none of PG&E's statements suggested PG&E could not be held liable for future wildfires" and Baupost was merely "bet[ting] against" PG&E's stock dropping following a future wildfire. Bau. Obj. at 8, 9. This is a re-tread of PG&E's argument that Baupost failed to allege an actionable misstatement, and it fails for the same reasons. *Supra* Part I.A-C.

PG&E next argues that the fraud-on-the-market doctrine "is of no help to Baupost" because, even if PG&E's statements about its transmission assets were misleading, Baupost could not have reasonably relied on those misstatements. It was common knowledge, says PG&E, that PG&E was operating those assets in a reckless manner. Bau. Obj. at 7; RKS Obj. at 27; PERA Obj. at 68. In a similar vein, PG&E argues that Baupost could not have relied on PG&E's misstatements about its transmission assets because the "potential for PG&E to face massive liability for future catastrophic wildfires" and be denied rate recovery was "already reflected" in PG&E's stock price when Baupost purchased shares. RKS Obj. at 28.

PG&E's arguments are meritless for the same reasons as its other truth-on-the-market arguments, *supra* Part I.D. In short, PG&E has failed to identify a single pre-Camp Fire public statement that would have alerted Baupost to the truth concerning PG&E's shambolic transmission infrastructure—let alone information "transmitted to the public with a degree of

1   intensity and credibility sufficient to effectively counter-balance" the misleading impression

2   created by PG&E. *Nguyen*, 2011 WL 5041959, at *7. Trying to sidestep this problem, PG&E

3   urges the Court to collapse the distinction between disclosures concerning PG&E's grossly

4   deficient vegetation management along its distribution lines (some of which pre-dated some of

5   Baupost's stock purchases) with the information revealed by the Camp Fire (which post-dated

6   Baupost's purchases) concerning PG&E's reckless operation of its transmission assets.[26] The

7   Court should reject PG&E's proposed conflation.

8          The Court should also reject PG&E's attempt to defeat the "fraud-on-the-market"

9   presumption on a motion to dismiss. To rebut the presumption, PG&E would need to adduce

10  evidence "sever[ing] the link between the alleged misrepresentation and either the price received

11  (or paid) by the plaintiff[.]" *Levinson*, 485 U.S. at 248. PG&E does not even try to satisfy this

12  burden. And, in any event, a pre-discovery motion focused on legal sufficiency is not an

13  appropriate vehicle for resolving the factual question of whether "accurate information credibly

14  enter[ed] the market and dissipate[d] the effects of the misstatements." *In re Massey Energy Co.*

15  *Sec. Litig.*, 883 F. Supp. 2d 597 (S.D. W.Va. 2012).

16         Finally, PG&E insists that Baupost's sophistication and its supposed strategy of buying

17  "securities that are 'currently out of favor, but have good prospects' according to its own

18  valuations" vitiate Baupost's claim to fraud-on-the-market reliance. Bau. Obj. at 4. PG&E's

19  argument is bereft of legal support. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D.

20  Cal. 2010) is squarely on-point. There, the defendants (on summary judgment) argued that the

21  plaintiff could not rely on the fraud-on-the-market doctrine because he "purchased his shares for

22  the specific reason that he thought the market *undervalued*" them and "*failed to reflect*" their

23  "*true value*[.]" 702 F. Supp. 2d at 1262 (emphasis in original). While dismissing plaintiff's

24  claims on other grounds, the court rejected the defendants' reliance argument:

25

26  ───────────────
    [26] PG&E relies on *In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999 (N.D. Cal. 2017), in support of its
27  attempt to conflate these two, distinct sets of disclosures. (Bau. Obj. at 7; RKS Obj. at 17; PERA Obj. at 68.)
    *Kalobios* is inapposite. There, misstatements about Martin Shkreli's "reputation and qualification" were not
    actionable because "information about his dubious reputation"—the exact same issue—had been "well-documented
28  in the press[.]" 258 F. Supp. 3d at 1008.

> *[A] decision to invest may be based on the integrity of the market price, regardless of whether the particular investor thinks the current price is . . . too low (like the typical investor as well as the bargain hunter).* The weight of authority recognizes that an investment strategy, such as . . . [plaintiff's] hunt for bargains, does not rebut the fraud on the market presumption . . . .

*Id*. at 1263 (emphasis added; collecting cases).[27] Thus, even if PG&E were to demonstrate that Baupost invested in PG&E stock because it thought the stock was undervalued after the North Bay Fires (a fact question that cannot be resolved on the pleadings), that would not rebut the presumption of fraud-on-the-market reliance.

## IV.    BAUPOST SUFFICIENTLY PLEADS LOSS CAUSATION

To allege loss causation, a plaintiff "need only [allege] a causal connection between the fraud and the loss . . . by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045 (N.D. Cal. 2016) (loss causation requires that the "revelation of th[e] misrepresentation or omission was a substantial factor in causing a decline in the security's price"). "Questions of loss causation are typically not to be resolved at the pleading stage. A plaintiff need only allege facts that plausibly establish loss causation; the plaintiff need not show that his theory of loss causation is the most probable." *Ansell v. Laikin*, 2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011) (internal citation omitted); *see also Gilead*, 536 F.3d at 1057 (ruling that "dismissal is inappropriate" if the complaint alleges facts that "'raise a reasonable expectation that discovery will reveal evidence of' loss causation"). Baupost's allegations clearly satisfy this standard.

Baupost alleges that PG&E's stock price fell significantly, inflicting steep losses on Baupost, immediately following two sets of partial corrective disclosures. The first set was Cal Fire's announcements in May and June 2018 that PG&E was responsible for most of the 2017 North Bay Fires. *Supra* at 24. The second was the revelation in November 2018 that PG&E's

---

[27] *See also Malone v. Microdyne Corp.*, 148 F.R.D. 153, 159 (E.D. Va. 1993) ("[S]imply because an investor believes that the market price is an inaccurate assessment of the value of a stock, [it] does not necessarily mean that the investor is not relying on the integrity of the market.").

1    transmission equipment had failed and sparked the Camp Fire.  TAC ¶¶ 346-90.

2         PG&E argues that Baupost fails to plead loss causation because these stock price drops

3    reflect the market's reaction to "negative news regarding PG&E's financial health generally,"

4    and that there were no specific disclosures of fraud to which the market could, or did, react.  Bau.

5    Obj. at 12; s*ee also* PERA Obj. at 61; RKS Obj. at 29.  PG&E's argument is meritless.

6         ***First***, PG&E appears to be asking the Court to apply the "revelation of fraud" standard of

7    loss causation, under which there must be a causal link between the revelation of the defendant's

8    fraudulent practices and the shareholder's loss.  The Ninth Circuit has explicitly rejected this

9    standard.  *See Mauss v. NuVasive, Inc.*, 2018 WL 656036, *4-6 (S.D. Cal. Feb. 1, 2018).  It is

10   sufficient for plaintiffs to allege that they were injured when the market learns of the

11   *consequences* of a defendant's fraud, even if the fraudulent practices themselves are not

12   revealed.  *See First Solar*, 881 F.3d at 754 ("A plaintiff may . . . prove loss causation by showing

13   that the stock price fell upon the revelation of an earnings miss, even if the market was unaware

14   at the time that fraud had concealed the miss."); *see also In re BofI Holding, Inc. Sec. Litig.*, 977

15   F.3d 781, 790 (9th Cir. 2020) ("[A] corrective disclosure need not reveal the full scope of the

16   defendant's fraud[.]").  Consistent with these authorities, Baupost alleges that the Camp Fire was

17   the consequence of PG&E's fraudulently undisclosed practices and risks, and that PG&E's stock

18   price dropped precipitously when the market learned about the Camp Fire.  Supp. POC ¶ 32.

19   Baupost's allegations suffice to plead loss causation.

20        ***Second***, while it was not required to do so, Baupost *did* allege facts supporting the

21   conclusion that the disclosure of PG&E's fraud (not just its consequences) was a substantial

22   factor in causing the price of PG&E stock to fall.  As to the May-June 2018 disclosures, Baupost

23   alleges that, on May 28, 2018, Cal Fire announced that PG&E's regulatory noncompliance,

24   particularly with respect to vegetation management, caused four of the North Bay Fires.  TAC ¶

25   346.  Baupost also alleges that, on May 29, 2018, a Citigroup analyst wrote that Cal Fire's

26   announcement "suggest[ed] negligence" by PG&E, which could bar PG&E from "recovering

27   costs from ratepayers insofar as it would be 'tough to meet' the 'prudent manager' standard[.]"

28   *Id*. ¶ 350.  That same day, PG&E's stock price fell by $2.32 per share (5.19%).  *Id*. ¶ 348.

Similarly, on June 8, 2018, after Cal Fire announced that PG&E was responsible for 12 more of the North Bay Fires and disclosed that Cal Fire had informed law enforcement that, for eight of the fires, there was evidence of "violations of state law," *id*. ¶ 353, an analyst noted that "all signs seem to point to [PG&E] being imprudent operators . . . which would therefore mean it should assume liability." *Id*. ¶ 359. PG&E's stock price fell by $1.69 (4.08%). *Id*. ¶ 358.

As to the November 2018 disclosures, Baupost points to PG&E's November 8, 2018 report to the CPUC citing "damage" to a transmission tower "in the area of the Camp Fire"—an indication that PG&E had failed to maintain and inspect a critical piece of its transmission system. PG&E made this report after the market closed. The next day, its stock price dropped by $7.88 (19.7%)—the biggest one-day drop in 16 years. *Id*. ¶¶ 365-370. On November 12, 2018, there were public reports of "sparking" transmission lines near the Camp Fire's origin prior to the fire, and analysts reported that PG&E's transmission system "may have been a root cause of the [Camp] [F]ire"—another indication of PG&E's failure to inspect and maintain its transmission assets. PG&E's stock price dropped by $6.94 (17.35%). *Id*. ¶¶ 375-78. Contrary to PG&E's arguments, *see* RKS Obj. at 30, these reports put the market on high alert to the previously undisclosed possibility that PG&E had been operating its transmission system in the same reckless manner as its pipeline and distribution system.

Equity analyst reports (which will be produced in discovery) from around the time of the Camp Fire also confirm that the market was reacting to more than just the news that PG&E equipment had caused yet another fire. Equity analysts were intently focused on the emerging evidence that PG&E's negligence or recklessness was to blame for the Camp Fire because they understood that such evidence would disqualify PG&E from obtaining rate recovery and doom its financial prospects. Such analyst reports corroborate that the plunge in PG&E's stock price in November 2018 was caused by the revelation that, contrary to PG&E's assurances, PG&E had egregiously mismanaged its transmission assets.[28] Because Baupost's allegations plausibly

---

[28] These reports include a November 15, 2018 Bank of America Merrill Lynch report titled, "PG&E Corporation: The Rundown on the Revolver: Why and How the Quell Concerns; Reiterate Buy," and a December 18, 2018 Morgan Stanley report titled, "PG&E Corp & Edison International: Exploring Feedback and Scenarios."

support the conclusion that its losses flowed directly from the revelation of hazards that PG&E's "false or misleading statements obscured," *Junge v. Geron Corp.*, 2022 WL 1002446, at *7 (N.D. Cal. Apr. 2, 2022),[29] it has sufficiently pleaded loss causation.

*Third*, PG&E cannot establish the legal insufficiency of Baupost's loss causation allegations merely by urging an alternative explanation for the drops in PG&E's stock price. "A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' . . . to establish loss causation"—let alone plead it. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005). At most, PG&E's counter-narrative raises a factual dispute over the reasons PG&E's stock price dropped. That dispute cannot be resolved at the pleading stage. Ordinarily, it would be resolved through expert testimony. *See, e.g.*, *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 899, 904 (S.D. Cal. 2019) (observing that event studies are "often necessary" to determine loss causation and "disaggregate other company-specific information" from the information conveyed by the corrective disclosure).

Recycling its "truth-on-the-market" theory, PG&E also argues that Baupost cannot establish loss causation because it acquired "its shares after the North Bay Fires," and "any . . . concealed 'risks' had already materialized by" then. Bau. Obj. at 12; PERA Obj. at 65 (arguing that any disclosures in 2018 were merely "confirmatory of" previously disclosed risks). In addition to asking the Court (improperly) to resolve a fact question at the pleading stage, PG&E's argument is factually unfounded. The market's awareness that PG&E distribution lines were linked to the North Bay Fires does not mean the market knew that PG&E's lax vegetation maintenance caused most of those fires. This did not become common knowledge until May and June 2018, when Cal Fire issued its findings. Likewise, before the Camp Fire, the market was unaware that PG&E's transmission assets were decrepit, un-inspected, and presented enterprise

---

[29] *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022) (Bau. Obj. at 12, PERA Obj. at 61), is not to the contrary. It held that the plaintiff had not pleaded loss causation when there was "only a tenuous causal connection" between falsehoods concerning one drug trial and the stock drop following an announcement about a different trial for a different use of the drug. *Id.* at 839. Here, there is a straight line running from PG&E's misstatements abouts its transmission assets to the catastrophic failure of those assets. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (*see* PERA Obj. at 61) is distinguishable because the disclosures that caused the stock drop there did not even suggest the alleged fraudulent conduct.

risk. *See supra* Part I.D. There is simply no support for PG&E's assertion that this was common knowledge when Baupost bought PG&E stock. The Court should reject that fiction.

## **CONCLUSION**

For the foregoing reasons, PG&E's objection to the Baupost POCs should be denied.

Respectfully submitted,

Dated:    March 15, 2024                    PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Debra I. Grassgreen*
Isaac M. Pachulski
Debra I. Grassgreen

- and -

Eric Seiler (admitted *pro hac vice*)
Jason C. Rubinstein (admitted *pro hac vice*)
Michael S. Palmieri (admitted *pro hac vice*)
Matthew Tharp (*pro hac vice* pending)
FRIEDMAN KAPLAN SEILER
    ADELMAN & ROBBINS LLP

*Attorneys for Securities Claimant*
*Baupost Group Securities, L.L.C.*

# APPENDIX A

## Summary of Pre-Camp Fire PG&E Violations Found by CPUC

| RJN Ex. | Document | Violation(s) Found by CPUC | Cited In Objections |
|---|---|---|---|
| 31 | CPUC, Citation for Violation(s) Issued Pursuant to Resolution ALJ-274 of General Order 112-E, Citation No. ALJ 274 15-01-001 (Jan. 23, 2015) | • Poor Recordkeeping | PERA Objection at 37, 38, 68, and 75 |
| 32 | CPUC, Citation for Violation(s) Issued Pursuant to Resolution ALJ-274 of General Order 112-E, Citation No. ALJ 274 15-01-002 (Jan. 23, 2015) | • Gas Pipeline Issue | PERA Objection at 37, 38, 68, and 75 |
| 33 | CPUC, Citation for Violation(s) Issued Pursuant to Resolution ALJ-274 of General Order 112-E, Citation No. ALJ 274 15-01-004 (Jan. 30, 2015) | • Gas Pipeline Issue | PERA Objection at 37, 38, 68, and 75 |
| 34 | CPUC, Audit of PG&E's Sacramento Division, EA2014-30 (Feb. 9, 2015) | • Late Work Orders<br>• Late Inspections<br>• Poor Recordkeeping | PERA Objection at 37, 38, 68, and 75 |
| 35 | CPUC, Citation for Violation(s) Issued Pursuant to Resolution ALJ-274 of General Order 112-E, Citation No. ALJ 274 15-03-001 (Mar. 20, 2015) | • Poor Recordkeeping | PERA Objection at 37, 38, 68, and 75 |
| 36 | CPUC, Decision on Fines and Remedies To Be Imposed on Pacific Gas and Electric Company for Specific Violations in Connection With the Operation and Practices of Its Natural Gas Transmission System Pipelines, Decision 15-04-024 (Apr. 9, 2015) | • Gas Pipeline Issue | PERA Objection at 37, 38, 68, and 75 |
| 37 | CPUC, Audit of PG&E's Eureka Headquarters – Electric Transmission, TA2015- 001 | • Late Work Orders<br>• Unsafe Communication Line Contact<br>• Vegetation Management | PERA Objection at 37, 38, 68, and 75 |

| RJN Ex. | Document | Violation(s) Found by CPUC | Cited In Objections |
|---|---|---|---|
| 38 | CPUC, Audit of PG&E's East Bay Division, EA2014-032 (June 5, 2015) | • Late Work Orders<br>• Late Inspections<br>• Unsafe Communication Line Contact<br>• Pole Issues | PERA Objection at 37, 38, 68, and 75 |
| 39 | CPUC, Audit of PG&E's Fresno Division, EA2015-01 (July 13, 2015) | • Late Inspections<br>• Late Work Orders<br>• Poor Recordkeeping<br>• Miscellaneous (Sign Issue)<br>• Miscellaneous (Tripping Hazard)<br>• Miscellaneous (Unsecured Vault Cover) | PERA Objection at 37, 38, 68, and 75 |
| 40 | CPUC, Citation for Violations of General Order 128 Issued Pursuant to Decision 14-12-001, Citation No. D.14-12-001 15-07-001 (July 21, 2015) | • Miscellaneous (Failure to Mark Underground Equipment)<br>• Miscellaneous (Underground Equipment Issue) | PERA Objection at 37, 38, 68, and 75 |
| 41 | CPUC, Audit of PG&E's Peninsula Division, EA2015-0088 (Aug. 10, 2015) | • Late Inspections<br>• Late Work Orders<br>• Miscellaneous (Failure to Notify Other Party About Equipment Issue)<br>• Miscellaneous (Sign Issue) | PERA Objection at 37, 38, 68, and 75 |
| 42 | CPUC, Audit of PG&E's Hayward Headquarters – Electric Substation, SA2015-006 (Sept. 8, 2015) | • Late Work Orders<br>• Poor Recordkeeping<br>• Miscellaneous (Leaking Oil)<br>• Miscellaneous (Damaged Substation) | PERA Objection at 37, 38, 68, and 75 |

| RJN Ex. | Document | Violation(s) Found by CPUC | Cited In Objections |
|---|---|---|---|
| 43 | CPUC, Audit of PG&E's Metcalf Division – Electric Transmission, TA2015-002 (Sept. 14, 2015) | • Miscellaneous (Ground Wire Issue) <br> • Unsafe Communication Line Contact | PERA Objection at 37, 38, 68, and 75 |
| 44 | CPUC, Audit of PG&E's Sonoma Division, EA2015-018 (Dec. 31, 2015) | • Late Inspections <br> • Late Work Orders <br> • Pole Issues <br> • Vegetation Management <br> • Miscellaneous (Sign Issue) <br> • Miscellaneous (Ground Wire Issue) | PERA Objection at 37, 38, 68, and 75 |
| 45 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Late Inspections <br> • Late Work Orders <br> • Pole Issues <br> • Unsafe Communication Line Contact <br> • Vegetation Management <br> • Poor Documentation | PERA Objection at 37, 38, 68, and 75 |
| 46 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Gas Pipeline Issue | PERA Objection at 37, 38, 68, and 75 |

| RJN Ex. | Document | Violation(s) Found by CPUC | Cited In Objections |
|---|---|---|---|
| 47 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Late Inspections<br>• Late Work Orders<br>• Miscellaneous (Sign Issue)<br>• Pole Issue<br>• Miscellaneous (Failure to Notify Other Party About Equipment Issue)<br>• Miscellaneous (Ground Wire Issue)<br>• Vegetation Management<br>• Miscellaneous (Underground Equipment Issue) | PERA Objection at 37, 38, 68, and 75 |
| 48 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Late Inspections<br>• Late Work Orders<br>• Pole Issue<br>• Miscellaneous (Sign Issue)<br>• Miscellaneous (Ground Wire Issue)<br>• Vegetation Management<br>• Miscellaneous (Manhole Issue) | PERA Objection at 37, 38, 68, and 75 |
| 49 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Late Inspections<br>• Late Work Orders<br>• Pole Issue | PERA Objection at 37, 38, 68, and 75 |
| 50 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Pole Issue<br>• Miscellaneous (Ground Wire Issue) | PERA Objection at 37, 38, 68, and 75 |
| 51 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Miscellaneous (Fence Issue) | PERA Objection at 37, 38, 68, and 75 |

| RJN Ex. | Document | Violation(s) Found by CPUC | Cited In Objections |
|---|---|---|---|
| 52 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Gas Pipeline Issue | PERA Objection at 37, 38, 68, and 75 |
| 53 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Vegetation Management | PERA Objection at 37, 38, 68, and 75 |
| 54 | CPUC, Audit of PG&E's Central Coast Division, EA2015-016 (Jan. 13, 2016) | • Vegetation Management | PERA Objection at 37, 38, 68, and 75 |
| 55 | CPUC, Electric Distribution Audit of PG&E's Yosemite Division, EA2017-748 (May 4, 2017) | • Late Inspections<br>• Late Work Orders | PERA Objection at 37, 38, 68, and 75 |
| 56 | CPUC, Audit of PG&E's Diablo Division, EA2017-750 (May 30, 2017) | • Late Inspections<br>• Late Work Orders<br>• Pole Issues<br>• Miscellaneous (Ground Wire Issue)<br>• Miscellaneous (Sign Issue) | PERA Objection at 37, 38, 68, and 75 |
| 57 | CPUC, Citation Issued Pursuant to Decision 16-09-055, Citation No. D.16-09-055 E.17-06-001 (June 6, 2017) | • Miscellaneous (Tower Foundation Issue) | PERA Objection at 37, 38, 68, and 75 |
| 58 | CPUC, Citation Issued Pursuant to Decision 16-09-055, Citation No. D.16-09-055 G.18-02-001 (Feb. 16, 2018) | • Miscellaneous (Failure to Mark Underground Equipment) | PERA Objection at 37, 38, 68, and 75 |
| 59 | CPUC, Audit of PG&E's North Bay Division, EA2018-811 (May 30, 2018) | • Late Work Orders<br>• Late Inspections<br>• Pole Issue<br>• Vegetation Management<br>• Miscellaneous (Sign Issue)<br>• Miscellaneous (Ground Wire Issue) | PERA Objection at 37, 38, 68, and 75 |

Case: 19-30088   Doc# 14347   Filed: 03/15/24   Entered: 03/15/24 18:53:07   Page 67 of 68

| RJN Ex. | Document | Violation(s) Found by CPUC | Cited In Objections |
|---|---|---|---|
| 60 | CPUC, Audit of PG&E's Sierra Division, EA2018-799 (June 11, 2018) | • Late Work Orders<br>• Late Inspections | PERA Objection at 37, 38, 68, and 75 |
| 61 | CPUC, Electric Distribution Audit of PG&E's Sonoma Division, EA2018-800 (July 31, 2018) | • Late Work Orders<br>• Late Inspections<br>• Pole Issue<br>• Vegetation Management<br>• Miscellaneous (Sign Issue) | PERA Objection at 37, 38, 68, and 75 |
| 62 | CPUC, Audit of PG&E's Humboldt Division, EA2018-801 (Sept. 6, 2018) | • Late Work Orders<br>• Late Inspections<br>• Pole Issue<br>• Miscellaneous (Vegetation Management)<br>• Miscellaneous (Sign Issue) | PERA Objection at 37, 38, 68, and 75 |
| 63 | CPUC, Audit of PG&E's Los Padres Division, EA2018-814 (Oct. 25, 2018) | • Late Work Orders<br>• Late Inspection<br>• Pole Issue<br>• Unsafe Communication Line Contact | PERA Objection at 37, 38, 68, and 75 |

Case: 19-30088   Doc# 14347   Filed: 03/15/24   Entered: 03/15/24 18:53:07   Page 68 of 68