1 ROLNICK KRAMER SADIGHI LLP
Lawrence M. Rolnick *(pro hac vice)*
2 lrolnick@rksllp.com
Marc B. Kramer *(pro hac vice)*
3 mkramer@rksllp.com
Michael J. Hampson (*pro hac vice*)
4 mhampson@rksllp.com
Richard A. Bodnar *(pro hac vice)*
5 rbodnar@rksllp.com
Frank T.M. Catalina (*pro hac vice*)
6 fcatalina@rksllp.com
1251 Avenue of the Americas
7 New York, NY 10020
Telephone: (212) 597-2800
8 Facsimile: (212) 597-2801

9 ST. JAMES LAW, P.C.
Michael St. James, CSB No. 95653
10 22 Battery Street, Suite 810
San Francisco, California 94111
11 (415) 391-7566 Telephone
(415) 391-7568 Facsimile
12 michael@stjames-law.com

13 *Attorneys for the RKS Claimants*

14 **UNITED STATES BANKRUPTCY COURT**

15 **NORTHERN DISTRICT OF CALIFORNIA**

16 **SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>● Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Case No. 19-30088 (DM) (Lead Case)<br>(Jointly Administered)<br><br>Chapter 11<br><br>**THE RKS CLAIMANTS' OPPOSITION TO REORGANIZED DEBTORS' THIRTY-FOURTH SECURITIES CLAIMS OMNIBUS OBJECTION TO CLAIMS ADOPTING THE RKS AMENDMENT** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

I. General Background Prior to the Relevant Period ...................................................... 4

    a. PG&E's Regulatory Regime.................................................................................. 4

    b. PG&E's Safety History and the San Bruno Explosion ....................................... 6

    c. PG&E Management Directly Supervised Its Deficient Safety and Maintenance Programs .............................................................................................................. 6

II. PG&E Assured Investors Its Safety and Inspection Practices Were Robust and Legally Compliant, Concealing Its Widespread and Systemic Disregard For Safety Laws and Regulations.................................................................................................... 8

    a. Pre-North Bay Fires ............................................................................................. 8

    b. After the North Bay Fires Broke Out, PG&E Went to Great Lengths to Reassure Investors of Its Compliance With Safety Regulations ......................................... 9

    c. PG&E Misleads Investors as to Its Power Shutoff Program ............................. 11

    d. PG&E's Criminally Deficient Inspection and Maintenance Practices Cause the Devastating Camp Fire ...................................................................................... 12

III. Subsequent Proceedings and Investigations Revealed the Depth and Systemic Nature of PG&E's Noncompliance .................................................................................... 12

    a. PG&E's Probation Proceedings ........................................................................ 12

    b. The Butte County DA Investigation and PG&E's Guilty Pleas ........................ 14

IV. The RKS Amendment ............................................................................................... 16

ARGUMENT ..................................................................................................................... 17

I. Standard .................................................................................................................... 17

II. The RKS Amendment States a Claim Under the Exchange Act................................ 20

    a. The RKS Amendment Alleges Actionable Misstatements and Omissions ....... 20

        i. PG&E Does Not Challenge the RKS Claimants' Claims Arising From

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

Misrepresentations Regarding PG&E's Disclosure Controls (Misstatement 30) .................................................................................... 21

ii.    The Misstatements Alleged in the RKS Amendment Bear No Resemblance to Those in *Edison* ............................................ 22

iii.   The RKS Amendment Adequately Alleges PG&E's Statements Regarding Its Purported Compliance With Laws and Regulations (Misstatements 2, 4, 5, 9, 12-14, 28) Were False and Misleading .......................... 25

        1.    The Compliance Statements Were False ............................ 25

        2.    The Compliance Statements Were Misleading Because They Omitted Material Information That Rendered Them Incomplete .. 31

        3.    The Compliance Statements Were Not Opinion Statements, But Would Be Actionable Even If They Were ...................... 36

iv.    The RKS Amendment Adequately Alleges PG&E's Statements Regarding Its Wildfire Safety Practices Were False and Misleading ...................... 37

        1.    PG&E's Statements Regarding Its Pole and Line Inspection and Maintenance Programs Were False and Misleading (Misstatements 2, 4, 10-11, 13-14, 17, 21, 23, 24, 27, 29) ...................... 37

        2.    PG&E's Statements Regarding Its Use of Reclosers Were False and Misleading (Misstatements 3, 26) .................................. 40

        3.    PG&E's Statements Regarding ESRB-8 and the Community Wildfire Safety Program Were False and Misleading (Misstatements 15-16, 18-19, 29) ............................................ 42

        4.    PG&E's Statements About Its Vegetation Management Programs Were False and Misleading (Misstatements 1-2, 4-5, 9-11, 14, 17, 20, 24) .................................................................... 44

v.     The RKS Amendment Adequately Alleges PG&E's Statements Reassuring Investors About Its Wildfire Safety Efforts Were Materially False and Misleading (Misstatements 1, 5-8, 10, 14, 17, 21-22, 25) ........ 46

b.    The RKS Amendment States a Claim For Scheme Liability ............................ 50

c.    The RKS Amendment Adequately Alleges Scienter .......................... 53

i.     PG&E Management Knew of or Recklessly Disregarded Facts Contradicting Their Misstatements ............................................ 54

ii.    PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter ...................... 60

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

iii. The "Core Operations" Doctrine Establishes a Strong Inference of Scienter ................................................................ 61

iv. PG&E's Guilty Plea Establishes Corporate Scienter ............................. 62

d. The RKS Amendment Pleads Reliance ............................................ 65

i. PG&E's "Truth on the Market" Defense Is Baseless and Premature ....... 65

ii. The Court Should Make Individual Reliance Determinations Only Following the Development of a Full Record and an Evidentiary Hearing ................................................................................ 68

iii. The RKS Claimants Properly Invoke the *Affiliated Ute* Presumption of Reliance at the Pleading Stage ................................................ 69

e. The RKS Amendment Adequately Pleads Loss Causation ............................. 72

III. The RKS Amendment States Claims Under Sections 11 and 15 of the Securities Act… .............................................................................. 77

a. The Court Cannot Determine That the Securities Act Claims Based on the 2016 and 2017 Notes Offerings Are Time-Barred as a Matter of Law .................... 78

b. The RKS Amendment Alleges Actionable Misstatements and Omissions ....... 81

c. The RKS Amendment Alleges Economic Loss ................................. 82

d. The Court Should Determine Damages Following an Evidentiary Hearing ..... 83

e. The Court Should Determine Issues of Individual Reliance After an Evidentiary Hearing ................................................................................ 84

f. The Court Should Not Dismiss Securities Act Claims Arising From the 2018 Offering Without a Fully Developed Factual Record ............................ 85

g. None of the RKS Claimants (Who Have Not Settled as of the Time of this Objection) are "Releasing Parties" Under the Plan .............................. 86

h. The RKS Claimants Plead Reliance for their 10b Claims Based on Debt Instruments ................................................................................ 87

i. The Section 15 Claims Should Not Be Dismissed ............................ 88

CONCLUSION ................................................................................ 88

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)...........................................................................................69

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ...........................................................79

*Am. Pipe & Const. Co. v. Utah*,
414 U.S. 538 (1974)...........................................................................................78

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
568 U.S. 455 (2013)....................................................................................65, 66

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................18

*Azar v. Yelp, Inc.*,
2019 WL 285196 (N.D. Cal. Jan. 22, 2019).....................................................76

*Barnes v. Edison Int'l*,
2022 WL 822191 (9th Cir. Mar. 18, 2022)........................................................22

*Barnes v. Edison International*,
2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ...........................................passim

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)...........................................................................................66

*Beecher v. Able*,
435 F. Supp. 397 (S.D.N.Y. 1975) ....................................................................84

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......................................................................34, 53

*Booth v. Strategic Realty Tr., Inc.*,
2014 WL 3749759 (N.D. Cal. July 29, 2014).............................................79, 80

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)..................................................76

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .......................................................................26, 37

*Crago v. Charles Schwab & Co.*,
2017 WL 6550507 (N.D. Cal. Dec. 5, 2017) ....................................................71

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

*Crown, Cork & Seal Co., Inc. v. Parker*,
   462 U.S. 345 (1983) ........................................................................ 79

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017). .......................................................... 82

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ................................................... passim

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ................................... 26, 54, 62, 63

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ...................................................... 72

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ........................................................................ 78

*Hessefort v. Super Micro Computer, Inc.*,
   2020 WL 1551140 (N.D. Cal. Mar. 20, 2020) ........................... 59

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013) ................................................ 78, 82

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ...................................................... 57

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008) ................................ 52

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ......................................................... 19

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ..................................................... passim

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) ................................ 29, 30

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ....................... 65, 66

*In re Bare Escentuals, Inc. Sec. Litig.*,
   745 F. Supp. 2d 1052 (N.D. Cal. 2010) ................................ 79, 80

*In re BofI Holding, Inc. Securities Litigation*,
   977 F.3d 781 (9th Cir. 2020) ................................................. passim

*In re Diamond Foods, Inc. Sec. Litig.*,
   295 F.R.D. 240 (N.D. Cal. 2013) ................................................. 66

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Equifax Inc. Securities Litigation*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ................................................ 32

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023) ................................................................ 74

*In re Fibrogen, Inc. Sec. Litig.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022) ...................................... 61

*In re Firstenergy Corp.*,
   2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ........................................ 50

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ............................................................... 47

*In re Fortune Sys. Sec. Litig.*,
   680 F. Supp. 1360 (N.D. Cal. 1987) .................................................... 84

*In re Gilead Sci. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ............................................... 18, 20, 72

*In re Kalobois Pharmaceuticals, Inc. Securities Litigation*,
   258 F. Supp. 3d 999 (N.D. Cal. 2017) ................................................ 67

*In re Levi Strauss & Co. Sec. Litig.*,
   527 F. Supp. 2d 965 (N.D. Cal. Sept. 11, 2007) ........................... 85, 86

*In re Lyft Sec. Litig.*,
   2020 WL 1043628 (N.D. Cal. Mar. 4, 2020) ...................................... 83

*In re MannKind Sec. Actions*,
   835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................ 75

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ....................................................... 62, 63

*In re PG&E Corp.*,
   2020 WL 9211213 (Bankr. N.D. Cal. Oct. 22, 2020) ......................... 87

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................... 47, 54, 56

*In re Recoton Corp.*,
   307 B.R. 751 (Bankr. S.D.N.Y. 2004) ................................................ 19

*In re Robinhood Ord. Flow Litig.*,
   2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) .................................... 70

*In re Shoretel Inc. Securities Litigation*,
   2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ........................................ 83

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

*In re Splunk Inc. Securities Litigation*,
   592 F. Supp. 3d 919 (N.D. Cal. 2022) ................................................................ passim

*In re Tesla, Inc. Sec. Litig.*,
   2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) ................................................... 72, 77

*In re Tracht Gut, LLC*,
   836 F.3d 1146 (9th Cir. 2016) ............................................................................... 28

*In re Tronox Inc.*,
   2010 WL 1849394 (Bankr. S.D.N.Y. May 6, 2010) ............................................... 19

*In re Vaxart, Inc. Sec. Litig.*,
   576 F. Supp. 3d 663 (N.D. Cal. 2021) ..................................................................... 76

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011) ..................................................................... 69

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*,
   2 F.4th 1199 (9th Cir. 2021) ........................................................................... 70, 71

*In re WageWorks, Inc., Sec. Litig.*,
   2020 WL 2896547 (N.D. Cal. June 1, 2020) ............................................... 72, 73, 74

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ................................................................................. 82

*In re Zoom Sec. Litig.*,
   2022 WL 484974 (N.D. Cal. Feb. 16, 2022) ........................................................... 75

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ............................................................................................... 58

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................................ passim

*Klein v. Altria Grp., Inc.*,
   525 F. Supp. 3d 638 (E.D. Va. 2021) ...................................................................... 52

*Lamartina v. VMware, Inc.*,
   2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ......................................................... 75

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................... 75

*Levine v. AtriCure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007) ..................................................................... 83

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
   2022 WL 2119122 (N.D. Cal. June 13, 2022) ................................................... 71, 72

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

*Loomis v. Cornish*,
   836 F.3d 991 (9th Cir. 2016) .................................................................. 22, 42

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ............................................................................. 72

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ............................................................................... 50, 51

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ....................................................................................... 20, 21

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   65 F.3d 1044 (2d Cir. 1995) ............................................................................... 84

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010) ........................................................................................... 79

*Mills v. Elec. Auto-Lite Co.*,
   552 F.2d 1239 (7th Cir.) ..................................................................................... 84

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ............................................................................. 72

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................ 47

*MYL Litig. Recovery I LLC v. Mylan N.V.*,
   2020 WL 1503673 (S.D.N.Y. Mar. 30, 2020) ................................................. 79

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ............................................................................... 84

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) ............................................................................. 54

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) ...................................................................... 74, 75

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015) ..................................................................................... 36, 37

*Pampena v. Musk*,
   2023 WL 8588853 (N.D. Cal. Dec. 11, 2023) .......................................... 72, 73, 77

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .................................................... 35, 40, 44, 64

*Prodanova v. H.C. Wainwright & Co.*,
   993 F.3d 1097 (9th Cir. 2021) ........................................................................... 61

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ............................................................. 65

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ........................................ 74

*Reckstein Fam. Tr. v. C3.AI, Inc.*,
    2024 WL 734497 (N.D. Cal. Feb. 22, 2024) .................................. 73, 77

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ........................................ 26, 54, 57, 62

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ............................................................. 42

*Ricketts v. CBS Corps.*,
    2020 WL 3124218 (C.D. Cal. Mar. 19, 2020) .................................. 22, 42

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ......................................... 72, 77

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
    2009 WL 1575169 (E.D. Cal. May 29, 2009) ....................................... 22

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ................................... 21, 31, 32, 53

*Scott v. ZST Digit. Networks, Inc.*,
    2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ........................................ 66

*SEC v. Bardman*,
    216 F. Supp. 3d 1041 (N.D. Cal. 2016) .............................................. 52

*SEC v. McCarthy*,
    322 F.3d 650 (9th Cir. 2003) ............................................................. 18

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ................................................................ 51

*Smilovits v. First Solar, Inc.*,
    2019 WL 6698199 (D. Ariz. Dec. 9, 2019) .......................................... 69

*Special Situations Fund III QP, L.P. v. Brar*,
    2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ................................. 74, 76

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ........................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................ 19, 20, 53

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................ 74

*Vicari v. Voyager Fin. Grp., LLC*,
    2013 WL 12136519 (C.D. Cal. Sept. 17, 2013) .................................................... 71

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ........................................................................... 25, 49

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ................................................................ 37

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ............................................................................. 50

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................... 53, 60

**Statutes**

15 U.S.C. § 77k ............................................................................................................ 82

15 U.S.C. § 77m ........................................................................................................... 79

15 U.S.C. § 78u-4 ........................................................................................................ 18

**Regulations**

17 C.F.R. § 229.303 ..................................................................................................... 82

**Other Authorities**

H.R. Conf. Rep. No. 104-369 (1995) .......................................................................... 19

**Rules**

9th Cir. R. 36-3(a) ....................................................................................................... 22

N.D. Cal. Bankr. L.R. 3007-1(b) ................................................................................. 78

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|---|---|
| "Bankruptcy" | *In re PG&E Corporation* and *In re Pacific Gas and Electric Company*, Case No. 19-30088(DM) (Jointly Administered) (Bankr. N.D. Cal.) |
| "Bodnar Decl." | Declaration of Richard A. Bodnar, submitted herewith |
| "Butte County DA Report" | Butte County District Attorney's Report Entitled: The Camp Fire Public Report: A Summary of the Camp Fire Investigation, June 16, 2020 |
| "CAISO" | California Independent System Operator |
| "Cal Fire" | California Department of Forestry and Fire Protection |
| "Camp Fire" | A 2018 wildfire ignited on November 8, 2018 in Butte County, California by PG&E transmission lines |
| "CEMA" | Catastrophic Event Memorandum Account |
| "CPUC" | California Public Utilities Commission |
| "Class Action" | *In re PG&E Corporation Sec. Litig.*, No. 5:18-cv-03509 (N.D. Cal.) |
| "ETPM" | Electric Transmission Preventative Maintenance Manual |
| "Exchange Act" | The Securities Exchange Act of 1934 |
| "FERC" | Federal Energy Regulatory Commission |
| "HoldCo" | PG&E Corporation |
| "North Bay Fires" | A series of wildfires that ignited and burned in October 2017 in Northern California |
| "Notes Offerings" | The offerings set forth in footnote 77 in the RKS Amendment |
| "Notes Offering Notes" | The notes sold in the Notes Offerings set forth in footnote 77 in the RKS Amendment |
| "PERA" | Public Employees Retirement Association of New Mexico, lead plaintiff in the Class Action |
| "PERA Objection" or "PERA Obj." | Reorganized Debtors' Thirty-Third Securities Omnibus Claims Objection to PERA And Securities Act Plaintiffs' TAC, Including to Certain Claimants That Adopted the TAC (Dkt. No. 14200) |
| "PG&E" | PG&E Corporation and Pacific Gas and Electric Company |
| "PG&E's Omnibus Request" | Omnibus Request For Incorporation of Documents By Reference Or Judicial Notice In Support of Reorganized Debtors' Thirty-Third, Thirty-Fourth, And Thirty-Fifth Securities Claims Omnibus Objections (Dkt. No. 14208) |
| The "Plan" | Debtors' and Shareholder Proponents' Joint Chapter |

| | 11 Plan of Reorganization Dated June 19, 2020, as amended and/or modified |
|---|---|
| "PSLRA" | The Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 |
| "Relevant Time Period" | April 29, 2015 through November 15, 2018 |
| "RKS" | The law firm Rolnick Kramer Sadighi LLP |
| "RKS Amendment" or "RKS Am." | Amended Statement of Claim on Behalf of the RKS Claimants (Dkt. No. 14049-1) |
| "RKS Claimants" | Those individuals and entities with securities fraud claims against PG&E who have retained RKS |
| "RKS Objection" or "RKS Obj." | Reorganized Debtors' Thirty-Fourth Omnibus Objection to Claims Adopting RKS Amendment (Dkt. No. 14203) |
| "Securities Act" | The Securities Act of 1933 |
| "Sentencing Memorandum" | Defendants' January 9, 2017 Sentencing Memorandum in U.S. v. Pacific Gas and Electric Company, Case No. CR-14-00175, (N.D. Cal.) |
| "TAC" | The Third Amended Consolidated Class Action Complaint in the Class Action |
| The "Utility" | Pacific Gas and Electric Company |

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1    The RKS Claimants[1] hereby submit this opposition (the **"RKS Opposition"**) to

2  Reorganized Debtors' Thirty-Fourth Securities Claims Omnibus Objection to Claims Adopting

3  RKS Amendment (the **"RKS Obj."**).  Contemporaneously herewith, the RKS Claimants submit

4  the Declaration of Richard A. Bodnar, dated March 15, 2024, in support of the RKS Opposition

5  ("**Bodnar Decl.**").

6                                    **INTRODUCTION**

7       The RKS Amendment sets forth comprehensively and in meticulous detail how PG&E

8  violated the federal securities laws and damaged the RKS Claimants.  As a California public utility,

9  wildfires presented a critical risk to PG&E's business.  Knowing that PG&E's investors were

10  intensely focused on the company's safety practices and its compliance with regulations designed

11  to prevent wildfires, PG&E affirmatively misled investors about its risk of causing wildfires – and

12  the concomitant risk that it would be held liable for causing wildfires – by falsely assuring the

13  market that, among other things, PG&E inspected all of its power lines "in compliance with

14  relevant laws," that it "me[t] or exceed[ed] all applicable federal and state vegetation clearance

15  requirements," and that it "me[t] or exceed[ed] regulatory requirements for pole integrity

16  management." However, PG&E's executives knew that their statements were materially false and

17  misleading.  PG&E, through these executives, had made a conscious decision to starve its

18  vegetation management and maintenance budgets.  It chose to allow a "staggering" backlog of

19  dangerous and unattended trees and vegetation to grow in proximity to its power lines in violation

20  of safety laws and regulations.  It also chose to starve its inspections and maintenance budgets to

21  the point where it stopped training its inspectors and pushed them into merely doing "fly by"

22  inspections that provided no opportunity to assess wear on PG&E's equipment.  PG&E prepared

23  an inspection and maintenance manual "as a façade" to provide to its regulators and keep them at

24  bay.  As the truth was slowly revealed to investors – in part by catastrophic wildfires that wiped

25  entire towns off the map, killed more than 100 people, and led to PG&E's pleading guilty to 84

26

27

28  [1] The RKS Claimants are set forth on Schedule A attached hereto.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

counts of involuntary manslaughter – the price of PG&E securities dropped, and PG&E ultimately decided to file for bankruptcy.

PG&E continues to fight the investors it defrauded years ago in a continuation of its pattern, described by the U.S. District Court Judge overseeing its federal probation, of "stubborn refusal to take responsibility for its actions." In its latest attempt to evade liability, PG&E resorts to mischaracterizing and contorting beyond recognition the allegations in the RKS Amendment. According to PG&E, the RKS Claimants were told by PG&E that it could cause wildfires, but they ignored that risk and decided to "gamble" that those fires would not happen. This argument is inaccurate and completely misses the point. Of course the investing public, including the RKS Claimants, was aware that there was some level of wildfire risk, but they relied on PG&E's misrepresentations falsely assuring investors that PG&E was taking significant measures to ameliorate that risk, including by complying with regulatory requirements. PG&E's position is tantamount to arguing that a car manufacturer that knows about significant defects in a car's braking system cannot be held liable for the drop in its stock price that occurs following a government recall after a series of crashes caused by brake failure – simply because the car manufacturer warned investors that cars traveling at high speeds are inherently prone to crashes, even though it concealed from the market the specific and serious problems with the braking system. That is not the law. PG&E's arguments based on investors' purported knowledge of the concealed risk must fail on this sufficiency motion, as the true extent of PG&E's misconduct was concealed by PG&E until after the devastating Camp Fire.

The RKS Claimants are purchasers of PG&E stock and other securities. They are investors big and small, institutional and individual, all of whom suffered significant damages because of PG&E's lies and omissions. They are not – as PG&E boorishly claims – seeking to shift to "actual fire victims" the losses they suffered. Rather, they are seeking to hold those who committed the fraud – PG&E and its executives – accountable, as prescribed by the federal securities laws. They are also not – as PG&E argues, without basis – simply copying PERA's allegations. While the RKS Claimants' and PERA's allegations overlap, the RKS Amendment contains more detail and

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1    additional allegations as compared to the TAC.  And the RKS Claimants are not – as PG&E

2    incorrectly asserts – subject to the heightened pleading standard of the PSLRA.  But, as

3    demonstrated below, no matter what pleading standard is applied, the RKS Amendment

4    sufficiently alleges claims against PG&E for violations of the federal securities laws.  The Court

5    therefore should allow the RKS Claimants' claims to proceed to adjudication on the merits.

6           PG&E's RKS Objection (which incorporates the PERA Objection in its entirety) relies on

7    comparisons to vastly different cases, sleights-of-hand, and improper fact arguments in trying to

8    expunge the Claims.  PG&E relies heavily on *Barnes v. Edison International*, 2021 WL 2325060

9    (C.D. Cal. Apr. 27, 2021), but that case is inapposite.  The plaintiffs in *Edison* did not allege *any*

10   misstatements where the utility assured investors that it complied with safety laws and regulations,

11   or that it met or exceeded standards set by those laws and regulations.  Nor did they allege a series

12   of specific misstatements as to the company's inspection practices or spending on vegetation

13   management.  *Edison* merely involved general statements of focus on safety and allegations that

14   the defendants' risk disclosures were insufficient.  Unlike PG&E, the defendants in *Edison* did not

15   mislead investors about their specific compliance with law and safety practices while being aware

16   that those statements were false.  Nor did the defendants in *Edison* plead guilty to charges requiring

17   admissions of criminal recklessness in connection with the precise pattern of misconduct at issue

18   in the securities claims.

19          PG&E's attempt to recharacterize its misstatements should be rejected.  For instance,

20   PG&E argues investors cannot read more into a statement as to PG&E's commitment to safety

21   than the words themselves say, then it argues that its unqualified statements of compliance with

22   law should be read to mean something quite qualified, such as that it "designed its program" to

23   comply with law or otherwise attempted to comply with law.  PG&E's attempt to revise its own

24   statements nearly a decade later via legal briefing should be rejected.  But even these revised

25   statements would have been materially false and misleading.  The overwhelming evidence

26   uncovered after the devastating North Bay and Camp Fires firmly establishes that PG&E

27   knowingly violated the law on a vast and systemic scale.

28

The RKS Amendment pleads a cogent inference that PG&E acted with scienter. Prior to and during the Relevant Period, PG&E and its top-level executives repeatedly represented that PG&E had increased the oversight and management of its safety and compliance by its top executives and board. PG&E's executives had access to real-time data reflecting PG&E's widespread safety violations and regularly reviewed such information as members of committees established for the purpose of overseeing PG&E's safety and compliance practices. Further, safety was a "core operation" of PG&E's, as it was the subject of heavy regulation and posed an existential threat to the company. Finally, PG&E's guilty plea, and the investigative findings following the Camp Fire, establish that PG&E long had specific knowledge that its worn and aged equipment posed a catastrophic risk of imminent failure and that it deliberately chose to ignore that risk, even reducing the thoroughness of the "fly-by" patrols and inspections of this dangerous equipment. PG&E knew of, or at least recklessly disregarded, its vast and systemic lawbreaking while it represented the opposite to investors.

Much of PG&E's remaining arguments ask the Court to improperly resolve disputed issues of fact in its favor on this pleadings motion. For instance, its loss causation and "truth on the market" defenses are famously fact-intensive, and inappropriate for resolution on the pleadings. Many of its arguments for dismissal of the RKS Claimants' Securities Act claims suffer from the same maladies – misstating the nature of the concealed risk and seeking resolution of fact issues in its favor. The Court should allow these claims to move to discovery and an evidentiary hearing on the merits and should deny PG&E's objections to the RKS Claimants.

## BACKGROUND

### I. General Background Prior to the Relevant Period

#### a. PG&E's Regulatory Regime

PG&E is California's largest electric and gas utility company. As such, it is heavily regulated at the state and federal levels, and is subject to numerous laws and regulations concerning the safe operation of its equipment. (*See* RKS Am. ¶¶ 58-81.) Among other things, those laws and regulations require PG&E to trim trees and vegetation in danger of contacting its lines, to maintain a specified distance of vegetation clearance from its lines (*see id.* ¶¶ 61, 69, 80 (CPRC §

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

4293; CPUC General Order 95; FERC FAC-003-4)), and to inspect and maintain its electrical equipment and transmission infrastructure to ensure its safe operation (RKS Am. ¶¶ 64, 70 (CPU Code § 451; CPUC General Order 165)). PG&E's primary regulator is the CPUC, which, among other things, promulgates relevant safety regulations and determines what costs PG&E can pass onto rate payers and which ones it must bear itself. (RKS Am. ¶ 67.) CPUC-promulgated regulations carry the full force of the law and PG&E is obligated to comply with them. (*Id.* ¶ 73-75.)

Cal Fire is a California state agency that is administratively in charge of California fire departments and the state's law enforcement relating to state fire laws. Accordingly, during the Relevant Period, Cal Fire was tasked with both fighting wildfires and investigating their causes, including whether the fires were caused by violations of state laws and regulations. (*Id.* ¶¶ 76-77.)

Under a unique feature of the California Constitution, as interpreted by the California Supreme Court, public utilities like PG&E are subject to "inverse condemnation." (*Id.* ¶ 78.) Pursuant to this doctrine, PG&E was strictly liable to any individuals whose property it damaged through operation of its equipment. (*Id.*) Critically, however, PG&E could pass those costs through to rate payers if it could prove "it reasonably and prudently operated and managed its system." (*Id.*) This was critical to investors' understanding of PG&E's wildfire risk because, if PG&E merely operated its system "reasonably and prudently," PG&E would not suffer financial losses from fires caused by its system – an important safeguard against financial ruin when outside factors increased the risk of wildfire generally. (*See id.* ¶ 425.)

PG&E's prudent operation of its system was of acute importance to investors during the Relevant Period because the general risk of wildfire had been increasing since 2014. California declared a state of emergency due to drought in January 2014, which it lifted in April 2017. (*Id.* ¶ 82.) It declared another state of emergency in October 2015 due to drought and an epidemic of insect infestations that resulted in millions of trees dying. (*Id.*) In declaring the tree-mortality state of emergency, California's official proclamation noted the importance of utilities

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

"undertak[ing] efforts to remove dead or dying trees in these high hazard zones that threaten power lines[.]" (*Id.*)

### b. PG&E's Safety History and the San Bruno Explosion

Prior to the Relevant Period, PG&E had sporadically caused wildfires, though none nearly as catastrophic as those that were to come. In 1994, PG&E caused the Trauner Fire, for which it was convicted of 739 counts of criminal negligence and fined $24 million for vegetation management failures. (*Id.* ¶ 97.) In 1999, PG&E caused the Pendola Fire, leading to significant financial settlements with both CPUC and the U.S. Forest Service. (*Id.* ¶ 98.)

In 2010, PG&E's San Bruno gas pipeline exploded, killing eight people and destroying 38 homes. (*Id.* ¶ 99.) PG&E had identified the San Bruno section of the pipeline as one of the riskiest in its system and had collected $5 million from its customers to replace the segment, but instead it deferred the project and diverted those funds to other uses. (*Id.*) On August 9, 2016, a California federal jury found PG&E guilty of several felony counts in connection with the explosion. (*Id.* ¶ 100.) PG&E was placed on criminal probation under the supervision of U.S. District Judge William Alsup during its probationary period, which commenced in January 2017 and lasted five years. (*Id.*)

### c. PG&E Management Directly Supervised Its Deficient Safety and Maintenance Programs

Following the San Bruno explosion – and with drought conditions worsening – PG&E represented to the public and its regulators (as well as Judge Alsup) that it had reformed itself to make safety a core priority, and that its highest-ranking executives and directors were actively involved in monitoring and managing its safety programs. In its January 2017 Sentencing Memorandum submitted in connection with its sentencing for its San Bruno Pipeline conviction, PG&E explained that it had "overhauled . . . its enterprise-wide compliance and ethics program" following the 2010 explosion. *See* Bodnar Decl., Ex. 3 at 6.[2] PG&E had "substantially increased

---

[2] The Sentencing Memorandum is quoted, summarized, and cited numerous times in the RKS Amendment and provides the basis, in part, for many of the RKS Amendment's allegations as to management's monitoring and control of PG&E's safety and maintenance practices. (*See, e.g.*

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

senior-level oversight of its compliance and ethics program . . . consistent with the [U.S. Sentencing] Guidelines' recommendation that the organization's governing authorities have knowledge and oversight of the content and implementation of the program, that high-level personnel of the organization ensure its effectiveness, and that specific individuals are delegated day-to-day responsibilities for its operation." (*Id.*; RKS Am. ¶ 547.)

Immediately prior to the start of the Relevant Period, "[i]n March 2015, PG&E created a new Senior Vice President position, the Chief Ethics and Compliance Officer (CECO), who centrally coordinates its compliance and ethics program. . . . The CECO, Julie Kane, reports directly to PG&E Corporation's Chairman and CEO"[3] and also reported to the Utility's and HoldCo's boards, as well as relevant committees. (RKS Am. ¶ 597; Bodnar Decl., Ex. 3 at 7.) Each line of PG&E's business, including Electric Operations, had "its own risk and compliance committee, which regularly review[ed] that business's most significant risks and compliance requirements, including the status of associated mitigations." *Id.* at 8. Williams and Hogan both served on this committee, which was charged, among other things, with monitoring vegetation management issues. (RKS Am. ¶ 546.)

To facilitate its upper management's control over its safety apparatus, PG&E maintained a real-time database of inspection data and other documentation that was accessible to PG&E's top executives, including Williams, Stavropolous, Kane, and Hogan. (*Id.* ¶¶ 585-590.) PG&E represented to the court overseeing its probation that it performed quality assurance audits "designed to obtain a 'real-time' assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations." (*Id.* ¶ 588.) This database also tracked real-time inspection and safety data relating to each of PG&E's poles, thus keeping real time records of the age and deterioration of those poles. (*Id.* ¶¶ 585-590.)

---

RKS Am. ¶¶ 547, 550, 597.) As such, it is incorporated by reference in the RKS Amendment. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

[3] A table of relevant PG&E executives and directors during the Relevant Period is attached hereto as Schedule B.

## II. PG&E Assured Investors Its Safety and Inspection Practices Were Robust and Legally Compliant, Concealing Its Widespread and Systemic Disregard For Safety Laws and Regulations

### a. Pre-North Bay Fires

Throughout the Relevant Period, PG&E was aware that investors were intensely focused on its safety practices and compliance, as wildfire risk was the most critical risk to PG&E's cashflows. (*See id.* ¶ 2.) Unbeknownst to investors, while telling the market that safety was its primary concern, PG&E had made a conscious decision to prioritize increases in reported earnings at the expense of its safety and maintenance programs, allowing those programs to fall so far out of compliance with the law as to render a catastrophic fire (for which it would be on the hook) a near certainty. (*See id.* ¶¶ 133, 576-579.)

Nonetheless, in the approximately two years before the North Bay Fires, PG&E made a series of statements that misled investors about PG&E's compliance with applicable safety laws and regulations.[4] For example, PG&E assured the public (including investors) that:

- PG&E was "stepping up [its] vegetation management activities to mitigate wildfire risk" (*id.* ¶ 231);

- Its vegetation management department had inspected "every mile of power line" and was "in compliance with relevant laws," and it "prunes and removes trees growing too close to power lines" through a program that "compl[ied] with state and federal regulations . . ." (*id.* ¶¶ 234, 245, 252); and

- It had made "continued progress on safety" and "improvements [PG&E] made in safety" resulted in excess cash that it could distribute to shareholders as dividends (*id.* ¶¶ 259, 264, 269).

In addition to these misstatements, in November 2015, Senior Vice President of Electric Operations for the Utility, Patrick Hogan, testified to the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety that PG&E was "just

---

[4] The misstatements listed herein are not a complete set of the misstatements alleged in the RKS Amendment. A table of PG&E's false and misleading statements, as alleged in the RKS Amendment, as well as the identity of the individual making each statement, is attached hereto as Schedule C.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

about done" with implementing its program to remotely disable reclosers[5] in PG&E's approximately 130 high wildfire risk areas, that it would be implemented in 126 of those areas by the end of 2015, and that it would be "completed" in 2016. (*Id.* ¶ 242.)

### b. After the North Bay Fires Broke Out, PG&E Went to Great Lengths to Reassure Investors of Its Compliance With Safety Regulations

In October 2017, a series of eighteen wildfires ignited in the North Bay area, which became known as the North Bay Fires. (*Id.* ¶¶ 26-27, 430.) The North Bay Fires "burned approximately 249,000 acres, destroyed 8,898 structures, killed 44 people across nine counties, and resulted in damages estimated at more than $17 billion." (*Id.* ¶ 27.) Cal Fire would ultimately release its investigative findings in May and June 2018, determining that PG&E's equipment caused seventeen of the North Bay Fires. (*Id.* ¶¶ 430-431, 455, 466.)

In the time between the ignition of the North Bay Fires and Cal Fire's dissemination of its investigation results, PG&E went into damage control mode while a slow drip of news entered the market suggesting that PG&E's prior statements as to safety may have been false, and that PG&E could be liable for damage caused by some or all of the North Bay Fires. These partial but incomplete disclosures included:

- PG&E's receipt of a litigation hold letter from CPUC on October 12, 2017 (*Id.* ¶ 435);

- Disclosure of a Cal Fire investigation into whether PG&E's equipment caused any of the fires (*id.* ¶ 441); and

- PG&E's suspension of its dividend while the cause of the fires remained under investigation (*id.* ¶ 447).

Cal Fire released its investigative findings on May 25, 2018 and June 8, 2018, further partially revealing to the market that PG&E's statements as to its safety practices were misleading. (*See id.* ¶¶ 455, 466.) Cal Fire determined that PG&E's equipment had caused seventeen of the North Bay Fires, and eleven of those had been caused by violations of safety regulations, meaning PG&E

---

[5] Reclosers are devices designed to prevent blackouts by sending pulses of electricity through lines when there is an outage, but they are dangerous and can pose a fire risk. Other California utilities blocked reclosers from working during fire season. (RKS Am. ¶¶ 89-90.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

would not be able to meet the prudent manager standard and pass through the costs for which it was responsible. (*Id.* ¶¶ 430-431.) Cal Fire's June 8, 2018 press release noted that one fire, the Pythian Fire, was caused by the use of a PG&E recloser. (*Id.* ¶ 468.)

Throughout this period, however, PG&E concealed the true extent of its safety failures and noncompliance by disseminating a series of false assurances designed to mislead investors into believing the conditions that caused the North Bay Fires were bespoke and not systemic. Between the ignition of the North Bay Fires and the Cal Fire announcements, PG&E reassured investors that:

- PG&E "follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation" (*id.* ¶ 277);

- PG&E had "one of, if not, the most comprehensive vegetation management programs in the country" (*id.* ¶ 283);

- "[E]very year we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed" (*id.* ¶ 283; *see also id.* ¶¶ 290, 313); and

- It recently doubled its vegetation management spending (*see id.* ¶¶ 283, 290, 316).

After Cal Fire released its findings, PG&E expressly responded to those findings to assure investors that Cal Fire's findings were not indicative of the overall character of PG&E's safety and maintenance practices. On May 25, 2018, PG&E issued a press release responding to Cal Fire's first release of findings as to certain North Bay Fires, assuring investors, among other things, that "PG&E meets or exceeds regulatory requirements for pole integrity management." (*Id.* ¶ 320.)

Following Cal Fire's June 8, 2018 release, PG&E issued its own release that same day titled, "PG&E Responds to Latest CAL FIRE Announcement." (*Id.* ¶ 326.) That release had a subsection with the heading "Programs Overall Met State's High Standards." (*Id.*) PG&E represented that "[b]ased on the information we have so far, we continue to believe our overall programs met our state's high standards. . . . PG&E meets or exceeds regulatory requirements for

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

pole integrity management . . . . [U]nder PG&E's industry-leading Vegetation Management Program, we inspect and monitor every PG&E overhead electric transmission and distribution line each year . . . ." (*Id.*) PG&E thus assured the market that the North Bay Fires were a tragic but isolated incident, and that PG&E did not have more widespread safety and compliance issues.

### c.  PG&E Misleads Investors as to Its Power Shutoff Program

In July 2018, the CPUC passed resolution ESRB-8, which required PG&E to formalize and publish a program to de-energize power lines when fire conditions became dangerous. (*Id.* ¶ 174.) Between June and November 2018, PG&E made a number of public statements highlighting the launch of its "Community Wildfire Safety Program," which purportedly would "proactively turn off electric power for safety when extreme fire danger conditions occur[.]" (*Id.* ¶¶ 335, 359.) PG&E told the public it had "created a set of procedures for . . . [d]etermining what combination of conditions necessitate[] turning off lines for safety[,]" and that it would utilize the program "in the most extreme forecasted weather conditions." (*Id.* ¶¶ 343, 363.) In conjunction with these statements, PG&E published its "Public Safety Power Shutoff Policies and Procedures" to its website, as it was required to do by ESRB-8. (*Id.* ¶ 175.) PG&E stated unequivocally that it would "monitor conditions across [its] system" and evaluate whether conditions warranted de-energizing its lines. (*Id.*) The published policies and procedures stated that PG&E would balance seven criteria relating to weather and site conditions in determining whether to de-energize its lines. (*Id.* ¶ 176.)

What the public did not know until years later, following the Butte County DA's investigation into the Camp Fire, was that PG&E's representations were false. (*Id.* ¶¶ 208-209.) PG&E's shutoff protocol differed materially from the one it published on its website because it "differentiated between transmission and distribution lines" and "specifically and explicitly exempted all 115kV . . . transmission lines," including the high-voltage distribution line that caused the Camp Fire. (*Id.* ¶¶ 208-209.) Because the policies and procedures published on PG&E's website failed to include this significant limitation on PG&E's program, the Butte County DA Report found the published version of PG&E's protocol had been revised "to an extent that

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

became misleading." (*Id.* ¶ 209.)

### d. PG&E's Criminally Deficient Inspection and Maintenance Practices Cause the Devastating Camp Fire

The Camp Fire ignited early in the morning of November 8, 2018, near Pulga, California, at Tower :27/222 of PG&E's Caribou-Palermo 115kV transmission line. (*Id.* ¶¶ 114-117, 432.) A subsequent investigation by the Butte County DA found that an iron "C hook," which was at least 97 years old, had failed, "allow[ing] the live line to fall and arc against the steel tower suspending the line, showering sparks and molten metal on the dry grass below and igniting the fire." (*Id.* ¶ 119.) A second ignition point was identified where a downed pole was found to have a recloser. (*Id.* ¶¶ 120-123.) The fires combined and devastated the surrounding area, largely destroying Paradise, Concow, Magalia, and Parkhill. (*Id.* ¶ 432.) The damage caused by the Camp Fire was catastrophic. "The Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85 people, with total damages estimated on the low-end at $16.5 billion." (*Id.*)

All seven of the ESRB-8 criteria had been met on the day PG&E's lines ignited the Camp Fire, but PG&E did not de-energize its lines. (*Id.* ¶ 177.) As was PG&E's standard practice at the time, hours after the Camp Fire ignited, PG&E distributed false information to the public, disingenuously claiming that "weather conditions did not warrant" de-energizing its lines that day. (*Id.* ¶¶ 179, 192-204.) It was later revealed the real reason the lines were not de-energized was because of PG&E's concealed policy to never de-energize high-voltage transmission lines. (*Id.* ¶¶ 208-209.)

As information as to PG&E's responsibility for the Camp Fire entered the public domain, the prices of PG&E's securities collapsed. (*See id.* ¶¶ 480-528.) On January 29, 2019, PG&E commenced these Chapter 11 cases. (*Id.* ¶ 215.)

### III. Subsequent Proceedings and Investigations Revealed the Depth and Systemic Nature of PG&E's Noncompliance

### a. PG&E's Probation Proceedings

Following the devastating North Bay and Camp Fires, Judge Alsup, on January 9, 2019, issued an order to show cause why the terms of PG&E's probation should not be modified, citing,

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

among other things, Cal Fire's findings that PG&E caused numerous of the North Bay fires through violations of law. (*Id.* ¶ 566.) On January 30, 2019, he found PG&E had violated its probation and, on March 5, 2019, issued a modified order to show cause, finding that the "record demonstrates that PG&E's performance with respect to vegetation management has been dismal." (*Id.* ¶¶ 572, 575.) The March order noted that PG&E had argued to the court that "'perfect compliance' with Section 4293 was impossible due to 'densely forestated, highly dynamic, living environments, in which conditions can rapidly change[,]'" an argument the court rejected. (*Id.* ¶ 575.) The order also summarized the results of the court's probe into PG&E's actual knowledge of safety violations, noting that "PG&E's filings [since the January order] have included several relevant admissions" including that "as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" (*Id.* ¶ 538.)

After a subsequent hearing, Judge Alsup found that "PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't. And that was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California." (*Id.* ¶ 576.) The court also noted that "as we've gotten into the evidence, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees that should have been taken down were not." (*Id.* ¶ 577.) The court found that these issues were "a problem of [PG&E's] own making. A lot of money went out in dividends that should have gone to the tree budget." (*Id.* ¶ 579.) In April 2019, Judge Alsup concluded that PG&E's "rampant wrongdoing" and "cheat[ing] on the maintenance of its grid" caused the North Bay and Camp Fires. (*Id.* ¶ 219.)

In his comments at the conclusion of PG&E's probation in January 2022, Judge Alsup noted PG&E's "stubborn refusal to take responsibility for its actions" and lamented that PG&E's "evasion has occurred time and again over the last five years." (*Id.* ¶ 228.) After five years of monitoring PG&E and reviewing evidence as to its practices during the Relevant Period, the

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

court's final assessment leaves no doubt that PG&E's statements as to compliance and its "industry-leading" vegetation management program were fraudulent:

> So, in these five years, PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California.
>
> …
>
> We remain trapped in a tragic era of PG&E wildfires because for decades it neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. In time, this neglect led to hazard trees and limbs falling on its distribution lines and sparking wildfires or becoming "ground faults" (wherein the tree remains against a live wire and conducts sufficient electrical power to the earth to overheat and explode in flames). PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation. As probation ends, PG&E remains at least seven years (my estimate) from coming close to being current.

(*Id.*)

### b. The Butte County DA Investigation and PG&E's Guilty Pleas

On June 16, 2020, the Butte County District Attorney published a lengthy report detailing the results of an investigation, assisted by the California Attorney General and a specially empaneled grand jury, to investigate the cause of the Camp Fire and any potential criminal liability in connection with the fire. (*Id.* ¶ 137.) The Butte County DA Report revealed extensive details as to PG&E's knowing disregard for the condition and safety of its infrastructure. (*See id.* ¶¶ 137-173.) The prosecutors concluded that "[t]he evidence developed during this investigation clearly established that the reckless actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk." (*Id.* ¶ 137.)

This damning report revealed that PG&E had known as far back as 1987 of the wear problems with its C hooks, and that it disregarded a 2010 consultant report recommending regular climbing inspections of the hooks. (*Id.* ¶ 139.) The prosecutors determined that the towers of the Caribou-Palermo line, and many of the components on those towers, including the C hooks, dated to between 1919 and 1921 and were well past their useful lives. (*Id.* ¶ 143.) In 2007, a PG&E engineer noted that "[t]he probability of . . . failure [of the Caribou-Palermo line] is imminent due

to the age of both the towers and the conductor." (*Id.* ¶ 149.) PG&E approved funding to replace the towers and conductor, but later canceled the project "due to Asset Manager's reprioritization." (*Id.*)

The Butte County DA Report also concluded that PG&E's inspection and maintenance programs were woefully inadequate. The PG&E employees who conducted inspections and patrols of its lines and towers had not "receive[d] any formal training on how to perform an inspection or patrol[.]" (*Id.* ¶ 160.) The Caribou-Palermo line was inspected on ground every five years, and patrolled by helicopter annually. (*Id.* ¶¶ 154, 164.) But the thoroughness of aerial patrols declined precipitously through the years, such that patrols conducted during the Relevant Period were described by employees as "fly bys, not patrols or inspections" and "only confirm[ed] the structures and components were 'standing upright.'" (*Id.* ¶ 164.) In an effort to cut costs, the thoroughness of both patrols and inspections was reduced to the point where they were ineffective at assessing wear on the components of the transmission lines and towers. (*Id.* ¶¶ 159, 162.) Each of these issues violated PG&E's purported policies and procedures set forth in its ETPM, which it prepared and provided to CPUC in accordance with regulations. (*See id.* ¶¶ 157-165.) The Butte County DA Report concluded that "[t]he evidence clearly established that PG&E did not, in fact, follow the procedures and requirements established in the ETPM," and "it is reasonable to conclude the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of regulators and the CAISO." (*Id.* ¶ 158.)

As a result of this investigation, the Camp Fire Grand Jury indicted PG&E on 84 counts of involuntary manslaughter and one count of unlawfully and recklessly causing the Camp Fire. (*Id.* ¶ 613.) PG&E pled guilty to all charges. (*Id.* ¶ 614.) In admitting it acted recklessly in causing the Camp Fire, PG&E admitted that: "(a) it [was] aware its actions present[ed] a substantial and unjustifiable risk of causing fire; (b) it ignore[d] that risk; [and] (c) ignoring the risk [was] a gross deviation from what a reasonable person would have done in the same situation." (*Id.*) In admitting criminal negligence in connection with the deaths of 84 people, PG&E admitted that:

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

1  "(i) [it] act[ed] in a reckless way that create[d] a high risk of death or great bodily injury; [and] (ii)

2  a reasonable person would have known that acting in that way would create such a risk."  (*Id.*)

3  ### IV.    The RKS Amendment

4  PG&E notes that "[t]he RKS Amendment mirrors the TAC" (RKS Obj. at 3), but, in fact,

5  it contains significantly more facts as well as broader legal claims anchored in the same

6  misconduct.  As to legal claims, the RKS Amendment (i) asserts claims under Section 10(b) of the

7  Exchange Act on debt securities purchased by the RKS Claimants (ii) asserts a "scheme liability"

8  claim under SEC Rule 10b-5(a) and (c) (*id.* ¶¶ 634-644) (iii) asserts claims based on PG&E's

9  disclosure controls (*id.* ¶¶ 418-424); (iv) asserts claims on additional specifically identified

10  misstatements regarding compliance and safety beyond those in the TAC; (v) identifies a specific

11  set of omissions that render the statements pled, whether affirmatively false or not,

12  misleading. (*See id.* ¶ 370.)  The RKS Amendment, unlike the TAC, also pleads that PG&E's

13  guilty plea establishes scienter – a core distinction between this situation and the one in Edison

14  that the TAC does not plead.  (*See id.* ¶¶ 611-615.)

15  The RKS Amendment also contains significant additional factual allegations beyond what

16  the TAC pleads.  In particular, the RKS Amendment contains an extensive discussion of the Butte

17  County DA Report, which found "[t]he evidence developed during this investigation clearly

18  established that the reckless actions of PG&E created the risk of a catastrophic fire in the Feather

19  River Canyon [the Camp Fire], that PG&E knew of that risk and PG&E ignored the risk by not

20  taking any action to mitigate the risk." Over the next thirty paragraphs, the RKS Amendment

21  pleads critical facts from the Butte County DA Report supporting the falsity of PG&E's statements

22  and scienter.  (*Id.* ¶¶ 137-173.)  The TAC contains none of these facts.  As another example, the

23  RKS Amendment specifically pleads that after investigation, the Butte County DA Report found

24  the ESRB-8 statements by PG&E misleading (*Id.* ¶ 344.) – a core fact supporting that these

25  statements were false and misleading when made.  And in yet another example, the RKS

26  Amendment pleads facts that PG&E did not follow its own ETPM, and, per the Butte County DA

27  report, that "it is reasonable to conclude that the sections of the ETPM relating to inspections and

28

patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." (*Id.* ¶238.) This fact, among other, supports the falsity of the October 15, 2015 statement that PG&E's practices complied with relevant laws because, by definition, PG&E had to comply with its own ETPM to comply with what it had provided to its regulators. The TAC does not reference the ETPM.

The RKS Amendment's additional facts are not limited to the misstatements. In other examples, the RKS Amendment pleads that PG&E provided information directionally contradictory to the corrective disclosures on November 12, 2018 (*id.* ¶ 496) – giving the Court yet another fact supporting that PG&E's reassurance campaign continued into the teeth of the Camp Fire. And in pleading reliance and loss causation, the RKS Amendment pleads additional facts of relevance, including, for example, that an analyst covering PG&E stock held PG&E wildfire liabilities constant in their model literally the day before the Camp Fire ignited (*id.* ¶¶ 488-489) providing the inferential link that the market was reliant on PG&E's statements about safety and wildfire prevention in concluding that PG&E wildfire liabilities were limited and contained. This is not an exhaustive list of differences between the TAC and the RKS Amendment. As the RKS Amendment is fundamentally broader than the TAC with scores of additional factual paragraphs added, if the Court finds the TAC legally sufficient to proceed, the RKS Amendment should also be found sufficient. However, even if the TAC is not sufficient, the RKS Amendment is.

## **ARGUMENT**

### I. **Standard**

PG&E objects in the 34th Omnibus Objection to the legal sufficiency of the RKS Claimants' amended proofs of claim, which consist of the RKS Amendment and any previous proofs of claim and trading data submitted by individual RKS Claimants. (RKS Am. n.1.) Pursuant to the July 2023 Order, PG&E's Objection is "akin to a motion to dismiss." Although, as the Court recently acknowledged, "[a] bankruptcy claim is governed by the Bankruptcy Rules," the Court has instructed that this sufficiency Objection will be decided under the standards

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

governing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and an objection on legal grounds under Local Rule 3007-1(b). *See* Bodnar Decl., Ex. 1 at 47:20; 48:11-14; 49:5-12.

A motion to dismiss under Rule 12(b)(6) tests only whether the factual allegations in the complaint "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact. . . . [S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). If there are competing, plausible explanations advanced by both sides, the motion to dismiss must be denied. *Starr*, 652 F.3d at 1216; *see also* Bodnar Decl., Ex. 1 at 49:18-20 ("the Court assumes and will assume the facts as set forth by the claimants PERA, Baupost, and RKS are true for purposes of the sufficiency objection."); *id.* 50:8-12 ("I don't know why I would consider disputed facts when the only thing I need to consider is the sufficiency, therefore, the underlying plausibility, of what is alleged in the respective proofs of claim.").

The heightened pleading requirements of the PSLRA do not apply to this claims allowance process. The PSLRA, on its face, applies only to "complaint[s]" filed in a "private action," not to a claims allowance process in a bankruptcy. *See* 15 U.S.C. § 78u-4(b)(1) ("In any ***private action*** arising under this chapter . . . ***the complaint*** shall specify . . . ." (emphasis added)). "[A]n 'action' is the formal and ordinary means by which parties seek legal and/or equitable relief before a court of law through the filing of a formal complaint, triggering the full array of legal, procedural, and evidentiary rules governing the process by which a court adjudicates the merits of a dispute." *SEC v. McCarthy*, 322 F.3d 650, 657 (9th Cir. 2003) (finding an "action" distinct from an "application" as used in federal securities laws). While this claims allowance process may have many of the trappings of a civil suit, it is governed by the Bankruptcy Rules of Procedure and lacks the "full array of legal [and] procedural . . . rules" that govern an action brought in an Article III court. *Id.* Indeed, the bulk of the RKS Claimants' claims have been impaired through the adoption of the Plan. The claims allowance process will not result in a judgment against PG&E for violating the

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

federal securities laws, but rather allowance of claims, which will entitle the RKS Claimants to participate in the provisions set forth in the Plan for claimants of that class.

Further, as PG&E acknowledges, the PSLRA was not enacted to apply to this unique situation. Congress passed the PLSRA to prevent meritless class action strike suits being used as leverage to shake down public companies. Congress was concerned that "[p]rivate securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." (PERA Obj. at 25 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).) "The purpose of the [PSLRA] was to restrict abuses in securities ***class-action litigation***, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999) (emphasis added) (citing H.R. Conf. Rep. No. 104-369, at 28 (1995)). Nothing in the statute, its legislative history, or in the interpreting case law suggests that Congress was seeking to regulate the bankruptcy claims process. Thus, not surprisingly, other courts have determined that the PSLRA's provisions do not apply to bankruptcy proceedings. *See In re Tronox Inc.*, 2010 WL 1849394, at *2 (Bankr. S.D.N.Y. May 6, 2010) (holding that the PSLRA, "which regulates class securities litigation in the District Court, does not purport to regulate the filing of class claims in this court"); *In re Recoton Corp.*, 307 B.R. 751, 757 (Bankr. S.D.N.Y. 2004) (holding that the "PSLRA by its express terms does not purport to apply to proceedings in bankruptcy"). Notably, PG&E cites no law applying the PSLRA to a bankruptcy proceeding.[6]

There is no justification in the plain language of the PSLRA, its purpose, or in relevant case law for importing the PSLRA's pleading requirements into this claims allowance process.

---

[6] PG&E voluntarily sought bankruptcy protection. It was not forced into bankruptcy by an outside creditor or placed in a receivership involuntarily. PG&E's reading of the PSLRA would ignore PG&E's own voluntary decision to seek bankruptcy protection and the terms of the Plan – which actually *enjoin* private actions against PG&E for pre-petition conduct.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

The Court should determine the sufficiency of the Claims by determining whether the facts in the RKS Amendment plausibly state a claim for relief. However, as demonstrated below, the detailed and comprehensive allegations in the RKS Amendment satisfy even the most exacting pleading standard.

## II. The RKS Amendment States a Claim Under the Exchange Act[7]

A cause of action under Section 10(b) of the Exchange Act and Rule 10b-5(b) has six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). While fraud allegations are subject to the particularity requirements of Federal Rule of Civil Procedure 9(b) (made applicable by Federal Rules of Bankruptcy Procedure 9014 and 7009), a court considering a motion to dismiss claims for securities fraud must assess the complaint "in its entirety," accepting all well-pled factual allegations as true and construing those allegations in the light most favorable to the plaintiff. *Tellabs*, 551 U.S. at 322 (2007); *Gilead*, 536 F.3d at 1055.

### a. The RKS Amendment Alleges Actionable Misstatements and Omissions

The RKS Amendment alleges a years-long and wide-ranging campaign by PG&E to downplay the risk of it causing wildfires and having to bear the cost of those fires by misleading investors about the measures it purportedly had taken to reduce the risks of these potentially catastrophic events. The misstatements and omissions alleged in the RKS Amendment clearly are actionable under the Exchange Act and are unquestionably sufficient for the RKS Claimants' claims to proceed to an evidentiary hearing.

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "Even if a statement is not false, it may be misleading if it omits material

---

[7] Because the RKS Amendment states a claim under Section 10(b) of the Exchange Act and Rule 10b-5, PG&E's argument that the Court must dismiss claims under Section 20(a) of the Exchange Act for failure to plead a primary violation fails. (*See* PERA Obj. at 72-73.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

information." *Id.* at 1008-09. "Disclosure is required … only when necessary to make … statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 1009 (quoting *Matrixx Initiatives*, 563 U.S. at 44). "As such, 'companies can control what they have to disclose under these provisions by controlling what they say to the market.'" *Id.* (quoting *Matrixx Initiatives*, 563 U.S. at 45). "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id.* (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)). "In determining whether a statement is misleading, the court applies the objective standard of a 'reasonable investor.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021)).

Whether or not the Court determines to apply the PSLRA to the sufficiency objection process, the element of falsity, while subject to the particularity standard of Federal Rule of Civil Procedure 9(b), remains subject to "the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*[.]" *Forescout Techs.,* 63 F.4th at 766. Thus, a claimant is not required to plead facts giving rise to a *strong inference* of falsity. *See id.*

### i. PG&E Does Not Challenge the RKS Claimants' Claims Arising From Misrepresentations Regarding PG&E's Disclosure Controls (Misstatement 30)

As a threshold matter, PG&E does not even challenge the falsity of an entire category of alleged misstatements. The RKS Amendment alleges that the HoldCo's and Utility's statements made in numerous SEC filings concerning the purported effectiveness of their respective disclosure controls and procedures were false and misleading. (*See* RKS Am. ¶ 421; *see generally* RKS Obj. (not challenging these allegations).) Unlike the TAC, the RKS Amendment alleges that PG&E "repeatedly and falsely certified to investors that it had established effective internal disclosure controls and procedures" throughout the Relevant Period. (RKS Am. ¶ 420.) These false and misleading statements were repeated to investors in their Forms 10-K and 10-Q filed periodically with the SEC during the Relevant Period. (*Id.* ¶¶ 421-23.) PG&E made these false

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

statements knowing of its criminally reckless actions and with significant internal records showing its safety and maintenance practices were criminally deficient, and with the knowledge that such information was not disclosed despite its materiality to investors.  (*Id.* ¶ 424.)  By failing to challenge these statements, PG&E has waived any argument concerning their legal sufficiency, and the RKS Claimants' claims will therefore proceed to discovery and an evidentiary hearing regardless of the Court's decisions as to other misstatements alleged in the RKS Amendment.  *See Ricketts v. CBS Corps.*, 2020 WL 3124218, at *3 n.6 (C.D. Cal. Mar. 19, 2020) ("[A]rguments not made in an opening brief are waived.") (citing *Loomis v. Cornish*, 836 F.3d 991, 998 n.3 (9th Cir. 2016)**).**

### ii.  The Misstatements Alleged in the RKS Amendment Bear No Resemblance to Those in *Edison*

PG&E relies heavily on *Barnes v. Edison International*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), in urging this Court to find the RKS Claimants' claims legally insufficient.[8]  (*See* PERA Obj. § III.C.1.b; RKS Obj. at 16.)  But that reliance is misplaced.  The sheer magnitude of PG&E's misconduct renders futile any comparison between the two situations.  Nothing in the *Edison* case even remotely approaches PG&E's ongoing violation of probation and criminal conduct during the Relevant Period.  No federal judge found that the *Edison* defendants "ha[d] gone on a crime spree and will emerge from probation as a continuing menace to California."  (*See* RKS Am. ¶ 109.)  That statement was about PG&E's actions.  The *Edison* defendants' equipment caused two fires, on December 8, 2017 and November 8, 2018, but they did not spend the interim period assuring the public that Edison "meets or exceeds all applicable federal and state vegetation clearance requirements" and "meets or exceeds regulatory requirements for pole integrity

---

[8] To the extent PG&E argues the Court must follow *Edison* as a matter of law, it is wrong.  Neither *Edison* nor the decision affirming it on appeal, *Barnes v. Edison Int'l*, 2022 WL 822191 (9th Cir. Mar. 18, 2022), are precedential.  Unpublished opinions of both the District Court and the Court of Appeals are properly cited as mere persuasive authority.  *See* 9th Cir. R. 36-3(a) ("Unpublished dispositions and orders of this Court are not precedent[.]"); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 2009 WL 1575169, at *18, n. 8 (E.D. Cal. May 29, 2009) (unpublished opinions of District Court may be cited as persuasive, but are not binding).  The three-paragraph unpublished Ninth Circuit opinion affirming *Edison* contributes little analysis and underscores how unremarkable the facts of that case were as compared to the facts here.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

management[.]" (*Id.* ¶¶ 320, 326.) Only PG&E did that. The *Edison* defendants did not plead guilty to recklessly causing either of the fires started by its equipment, nor did Edison plead guilty to 84 counts of manslaughter. In fact, the *Edison* defendants were not criminally charged for starting the Thomas and Woolsey Fires that were at issue in that case. Only PG&E's violations of law were so egregious and clear cut that its CEO had to stand in court and repeat the word "guilty" 85 times.

Putting aside these radical differences between the two cases in the underlying depth and breadth of the companies' misconduct, *Edison* bears no resemblance to this case because the *Edison* defendants did not make a series of concrete, actionable misstatements as to their conduct, as PG&E did here. Indeed, the plaintiffs in *Edison* ***did not allege*** that the defendants represented to investors that they complied with laws and regulations or made specific representations as to their inspection, maintenance, and safety practices or as to their spending on these activities. The *Edison* plaintiffs alleged that the defendants made three categories of misstatements:

- *First*, the plaintiffs alleged the defendants' general statements as to a "focus on safety and risk mitigation were false, misleading, or omitted material information because the [defendants] failed to reference safety-related protocols it previously failed to adopt";

- *Second*, the plaintiffs alleged risk disclosures regarding potential liability under California's inverse condemnation law were misleading because of the defendants' disregard for safety; and

- *Third*, statements the defendants made after the fires caused by their lines broke out were misleading because, the plaintiffs alleged, the defendants knew they had caused the fires but only disclosed that they were under investigation.

*Edison*, 2021 WL 2325060, at *4-5.

As to the first category of misstatements, the Court found them to be puffery because, unlike the misstatements at issue here, the court found them to be "subjective assessments which vaguely refer to [the defendants'] prioritization, improvement, and funding of safety procedures." *Id.* at *9. These statements merely represented that the *Edison* defendants "have *long taken*

ROLNICK KRAMER SADIGHI LLP<br>1251 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10020

*substantial* steps to reduce the risk of wildfires" or that they had "effective vegetation management" practices. *Id.* The court found the *Edison* defendants' generic fire risk disclosures not to be misleading because the allegations in the complaint did not establish the risks they warned of had already materialized. *Id.* at 11. It found the third category not misleading because, it found, the complaint did not allege facts demonstrating the defendants did not yet know when the statements were made that their equipment would be found to have started the two fires. *Id.* at *12.

The only category of misstatements in *Edison* bearing even a passing resemblance to any of the misstatements alleged in the RKS Amendment are those "regarding [the defendants'] focus on safety and risk mitigation[.]" *Id.* at *4. But even those misstatements in the RKS Amendment resembling some of those in *Edison* must be viewed in the broader context of PG&E's course of misconduct. PG&E attempts to capture four of the RKS Amendments' 30 alleged misstatements in a chart on page 33 of the RKS Objection, misleadingly suggesting the RKS Amendment alleges substantially similar misstatements to those alleged in *Edison* relating generally to safety and risk mitigation. (*See* RKS Obj. at 33.) As an initial matter, Misstatement 11, which PG&E includes in its chart, is a concrete, verifiable statement of fact, unlike the statement from *Edison* to which PG&E compares it. (*See id.*) Misstatement 11 stated, in relevant part, "[PG&E has] **doubled the amount** that [it has] *invested* in veg[etation] management." (*Id.* (emphasis altered by PG&E).) This is no "subjective assessment," but a verifiable statement – PG&E either did or did not double the amount it spent on vegetation management (as discovery will reveal). The statement from *Edison* PG&E compares it to is not concrete and verifiable. (*See id.* ("[Edison] is engaged in a **significant and ongoing** infrastructure investment program … [Edison] also **invests significant amounts of capital to reduce wildfire risk**." (quoting *Edison*, 2021 WL 2325060, at *9) (emphasis added by PG&E).) This comparison merely highlights the difference between the defendants in *Edison* and PG&E – *i.e.*, PG&E made far more definitive and concrete statements than the *Edison* defendants ever did.

While, at a glance, the remaining three statements in PG&E's chart appear similar to certain

statements from *Edison*, the misstatements alleged in the RKS Amendment were made in the context of PG&E's ongoing assurances as to ***specific*** actions it purported to be taking to reduce wildfire risk, as well as its express assurances of compliance with the law. While the *Edison* court found these statements to be puffery in the context presented there (*i.e.*, in the absence of an ongoing course of more specific statements and ongoing efforts to reassure investors as to it compliance with the law), the context in which PG&E's statements were made was vastly different. *See Forescout Techs.*, 63 F.4th at 770-71 (even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim") (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). As explained in more detail in Section II.a.v, *infra*, PG&E's arguably general statements about its commitment to safety in the Relevant Period – in addition to concealing contrary facts known to PG&E – were made *alongside specific* statements regarding PG&E's compliance with the law, specific actions it was purportedly taking to reduce risk, and reassurances to concerned investors. *See id.* (rejecting defendant's puffery argument where statements were contrary to facts known to defendants and were generally made to reassure investors following the release of negative information).

### iii. The RKS Amendment Adequately Alleges PG&E's Statements Regarding Its Purported Compliance With Laws and Regulations (Misstatements 2, 4, 5, 9, 12-14, 28) Were False and Misleading

#### 1. The Compliance Statements Were False

The RKS Amendment alleges a three-plus year course of blatant lies to investors about PG&E's compliance with laws and regulations governing its safety and maintenance practices. (*See, e.g.*, RKS Am. ¶¶ 234, 245, 252, 277, 298, 320, 326.) During the Relevant Period, PG&E repeatedly assured investors that, for example:

- "PG&E's Vegetation Management department … ***inspects every mile of power line in our service area for public safety . . . in compliance with relevant laws***" (*id.* ¶ 234);

- "***PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance***

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

*with industry standards, guidelines, and acceptable procedures* . . ." (*id.* ¶ 277);

- "*PG&E meets or exceeds all applicable federal and state vegetation clearance requirements*" (*id.* ¶ 298); and

- "*PG&E meets or exceeds regulatory requirements for pole integrity management*" (*id.* ¶ 326).

Unlike the above misstatements, the *Edison* plaintiffs did not allege any misstatements where the defendant expressly represented it complied with the law. *Compare Edison*, 2021 WL 2325060, at *9 (noting plaintiff alleged defendants stated they "adopted '*effective* vegetation management'" (emphasis added)).

These statements "directly contradict[ed] what the [Debtors] knew at th[e] time" and were highly misleading and incomplete in that they omitted material information about PG&E's pervasive and widespread violation of safety laws and regulations, and as such are actionable misstatements. *See Khoja*, 899 F.3d at 1008-09. "Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made." *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 742 (9th Cir. 2008) (finding falsity adequately pled as to statements of compliance with laws where plaintiff "pled facts demonstrating that [the defendant] was *not* in compliance" with the law).

Here, the RKS Claimants have pled overwhelming facts demonstrating that these statements (made between October 16, 2015 and June 8, 2018) were false when made. The RKS Amendment, for instance, alleges numerous investigative findings that PG&E's violations of vegetation management and safety laws and regulations were widespread and caused numerous of the North Bay Fires and the Camp Fire. (*See, e.g.*, RKS Am. ¶ 120 (violations of California Public Resources Code Sections 4292 and 4293, and California Public Utilities Code Section 451 caused Camp Fire); *id.* ¶ 431 (Cal Fire found PG&E's legal and regulatory violations caused 11 of the North Bay Fires); *id.* ¶ 466 (various of the North Bay Fires were caused by "the failure of power

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

poles").) Following an investigation by the Butte County District Attorney, a grand jury indicted PG&E on **84 counts of involuntary manslaughter**. (*Id.* ¶ 613.) PG&E pled guilty to those charges, admitting it acted recklessly in abdicating its equipment maintenance duties as described in the Butte County DA Report, meaning that PG&E "(a) [was] aware its actions present[ed] a substantial and unjustifiable risk of causing fire; (b) it ignore[d] that risk; [and] (c) ignoring the risk [was] a gross deviation from what a reasonable person would have done in the same situation." (*Id.* ¶ 614.)

At the expiration of PG&E's January 2017 through January 2022 probation period stemming from the San Bruno gas pipeline explosion, U.S. District Judge William Alsup explained "***in these five years***, PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California. . . . We remain trapped in a tragic era of PG&E wildfires because ***for decades it neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. . . . PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation*** [in January 2017]." (RKS Am. ¶ 228 (emphasis added).) These findings resulted, in part, from extensive order to show cause proceedings initiated by Judge Alsup, during which PG&E admitted, among other things, that it had knowledge in June 2017 of at least "3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle." (*Id.* ¶ 107 (internal quotations omitted).) Indeed, PG&E argued in those proceedings that, despite repeatedly assuring the public it complied with state law, it actually would have been "impossible" to do so. (*Id.* ¶ 217.) Judge Alsup rejected that argument in modifying the terms of PG&E's probation to require it, finally, to comply with safety laws, explaining that "PG&E's performance with respect to vegetation management has been dismal." (*Id.*)

In addition to its finding that PG&E's malfeasance relating to safety and maintenance amounted to manslaughter, the Butte County DA Report also concluded that PG&E's preventative maintenance program was a sham. The prosecutors determined that "[t]he evidence clearly

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

established that **PG&E did not, in fact, follow the procedures and requirements established in the ETPM**," and "it is reasonable to conclude the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines **were simply a façade created to meet the requirements of the regulators and the CAISO**." (*Id.* ¶ 158.) The Butte County DA Report concluded "that the reckless actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, that PG&E knew of the risk and PG&E ignored the risk by not taking action to mitigate the risk." (*Id.* ¶ 612.)

In short, the allegations in the RKS Amendment – which are based on conclusions drawn by those who have investigated and reviewed evidence from the Relevant Period, but were unknown to investors at the time – overwhelmingly demonstrate that PG&E's statements regarding its compliance with safety and maintenance laws and regulations were materially false when made. PG&E's argument that, despite the plain language it used, investors would not have taken PG&E to mean "it was in complete compliance with all state and federal laws and regulations at all times" (PERA Obj. at 41) is a red herring. (*See also id.* at 42-46 (arguing that certain statements' temporal relationship to the North Bay Fires and Cal Fire investigation findings demonstrate that PG&E's compliance statements did not mean they fully complied with the law).) *First*, the Court on this motion should not accept PG&E's naked conjecture that reasonable investors would not have taken PG&E's assurances that it complied with the law to mean it actually complied with the law.[9] *See In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016) ("At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff."). *Second*, even if the Court were to accept PG&E's speculation that investors interpreted its statements to mean a best-efforts approach rather than actual compliance, this would still be an actionable misstatement given the sheer scale and pervasiveness of PG&E's

---

[9] Following a full evidentiary hearing, Judge Alsup rejected PG&E's similar argument that it was "impossible" to comply with vegetation clearance laws "due to densely forested, highly dynamic, living environments, in which conditions can rapidly change," finding that PG&E could have complied with the law but chose instead to not devote adequate resources to doing so. (RKS Am. ¶¶ 575, 579 (internal quotation omitted). *Compare with* PERA Obj. at 41 (explaining that investors would not expect PG&E to be in actual compliance with law because "trees constantly grow and change, and rapidly so in Northern California ….).)

noncompliance as detailed in the RKS Amendment. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1068-69 (C.D. Cal. 2012) (finding statement that defendant "makes diligent efforts to comply with all employment and labor regulations, including immigration laws" actionable where Immigration and Customs Enforcement investigation and audit "found significant flaws" with defendant's employee record-keeping and resulted in the termination of approximately 1,500 employees). PG&E did not come close to trying to comply. Thus, PG&E's strawman argument that its statements cannot have meant it "promise[d] 100% compliance across its entire service area" (*see* PERA Obj. at 41, 43, 44; RKS Obj. at 14-15) is of no import. Like in *American Apparel*, the pervasiveness and extent of PG&E's violation of laws and regulations was such that it cannot prevail on this motion even if the Court interprets PG&E's compliance statements to relate to its efforts to comply rather than its actual compliance. Its efforts at compliance were ***criminally deficient***.

In another effort to pretend its actual statements meant something other than the plain meaning of the words it used, PG&E argues that its statements that it "meets or exceeds regulatory requirements for pole integrity management" actually meant that "its inspections and maintenance schedules followed what regulations required for pole integrity management." (*See* RKS Obj. at 15.) Again, PG&E's attempt to recast its words in a more favorable light is improper on a motion to dismiss. But, in any event, the RKS Amendment unquestionably alleges that even PG&E's revised-and-preferred statement was false when made. The Butte County DA report explained that PG&E did not even follow the inspection and maintenance procedures it told regulators it was following, and that the portions of its ETPM relating to inspections and patrols "were simply a façade" used to placate regulators that were kept in the dark as to PG&E's malfeasance. (*See* RKS Am. ¶ 158.) Indeed, the report found that PG&E's "inspections and patrols of the Caribou-Palermo line did not comply with the standards set forth in the ETPM and ***did not meet the requirements of the law or the regulatory agencies***." Bodnar Decl., Ex. 4 at 37 (emphasis added). (*See also* RKS Am. ¶¶ 160-161, 163 (line and tower inspectors received no training, contrary to the ETPM); *id.* ¶ 162 (ground inspections and aerial patrols did not comply with ETPM and were not sufficient

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

to assess wear on tower components); *id.* ¶ 164 (by 2018, aerial inspections were described as "fly bys, not patrols or inspections" and were "only confirming the structures and components were standing upright"); *id.* ¶ 173 (PG&E's actual inspection and maintenance practices violated numerous laws and regulations).)  PG&E's strawman argument that "the need for maintenance at an individual pole on a single transmission line . . . would [not] have been material to investors" fares no better.  (PERA Obj. at 46.)  The risk PG&E concealed from investors was that its potential for catastrophic wildfire liability was far greater than disclosed because ***PG&E's entire inspection and maintenance program was a noncompliant sham***.  PG&E's attempt to focus a materiality analysis on the precise location where the concealed risk materialized, rather than on the misstatements themselves, has no basis in law.  (*See* PERA Obj. at 46 (citing no law).)

To the extent PG&E argues that the RKS Amendment fails to plead falsity because allegations arising from post-fire investigations do not demonstrate actual violations when the misstatements were made, this argument fares no better.  (*See, e.g.*, RKS Obj. at 15-16 (referring to such allegations as "hindsight allegations"; PERA Obj. at 44 (arguing TAC "failed to satisfy its obligation to plead specific violations that existed or were determined at the time the statements were made.").)  The RKS Amendment's compliance misstatements span from October 16, 2015 through June 8, 2018.  PG&E admitted in its probation proceedings to having documented in 2016 nearly 4,000 trees growing dangerously close to its lines that remained unworked as of June 2017.  (RKS Am. ¶ 107.)  Judge Alsup also found PG&E's lack of compliance existed before, during, and at the end of the 2017-2022 probation period.  As of January 2017, PG&E's backlog of "unattended trees and vegetation was staggering," and its failure to comply with California law regarding tree and vegetation removal went back "decades."  (*Id.* ¶ 228; *see also id.* ¶ 577.)  When the probation period ended in 2022, "PG&E remain[ed] at least seven years . . . from coming close to being current."  (*Id.* ¶ 228.)  Given the pervasiveness of the noncompliance found by Judge Alsup to have existed prior to January 2017 and throughout the Relevant Period, it is more than plausible that widespread noncompliance existed throughout the Relevant Period.  *See Am. Apparel*, 855 F. Supp. 2d at 1069 ("Given the extent of the company's noncompliance [with

immigration and employment laws] . . . it is a plausible inference that there were significant compliance problems at the time the statements were made" nineteen months and three months before extensive violations were uncovered). Further, as detailed above, the Butte County DA Report detailed decades of failures of PG&E's inspection and maintenance program to comply with the law and take reasonable steps to address known critical maintenance issues. (*See* RKS Am. ¶¶ 137-173.) That report and other public sources, such as investigative news reports, detailed how for years, including before and throughout the Relevant Period, PG&E was aware that several towers along the Caribou-Palermo line collapsed in 2012 and that the towers along that line were past their useful life and in critical need of repair and/or replacement, but chose instead to ignore this critical risk. (*Id.* ¶¶ 127-136.)

### 2. The Compliance Statements Were Misleading Because They Omitted Material Information That Rendered Them Incomplete

Under any conceivable standard, PG&E's statements as to compliance with laws and regulations were highly misleading because PG&E never disclosed that it was actually aware of ***thousands*** of then-existing violations of laws and regulations at the time it made its compliance misstatements. Although "the securities laws do not create an affirmative duty to disclose any and all material information," once a company decides to disclose positive information to the market, it must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (quotations omitted). This principle highlights a significant distinction between this case and *Edison*. In *Edison*, unlike PG&E, the utility defendants did not make alleged representations to investors about their compliance with law; instead they elected not to speak on the subject. *See Edison*, 2021 WL 2325060, at *4-5 (discussing categories of alleged misstatements, none of which were representations as to defendants' compliance with laws and regulations).

Like the utility defendants in *Edison*, PG&E could have chosen not to make representations about its compliance with laws and regulations. But, ***unlike*** the *Edison* defendants, it chose to do

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

so, triggering a duty to make those disclosures in such a way so as not to mislead investors, including by disclosing "adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 705-06. PG&E's omissions in this regard were glaring. Given the vast extent of noncompliance, PG&E's statements that it "followed" the law, acted "in accordance" with the law, or "me[t] or exceed[ed]" regulatory or legal requirements with regard to vegetation clearance or inspection and maintenance were self-evidently misleading.[10] This is so even if the Court were to improperly reinterpret PG&E's compliance statements to mean that PG&E made good faith efforts to comply with laws and regulations. In *In re Equifax Inc. Securities Litigation*, 357 F. Supp. 3d 1189 (N.D. Ga. 2019), the Court rejected the defendant's attempt to reinterpret its statements of legal compliance as "describ[ing] [the defendant's] ongoing *efforts* to comply with data protection laws and standards, and that the statements did not guarantee compliance." *Id.* at 1228. However, the court noted that "even if these statements only conveyed that [the defendant] made an effort to comply with data security laws, regulations, and standards, they would still be false *or misleading*" because the complaint alleged the defendant's cybersecurity practices "reflected a systemic organizational disregard for cybersecurity." *Id.* (emphasis added) (internal quotation omitted). The court explained the obvious – "[i]t is misleading to a reasonable investor to state that [the defendant] made an effort to comply with data laws, regulations, and standards when, in fact, [it] demonstrated a systemic disregard for cybersecurity." *Id.* The same is true here. (*See, e.g.*, RKS Am. § V.F (detailing PG&E's "pervasive and systemic violations of laws and regulations").)

PG&E's risk disclosures, and the 2015 Butte Fire, did not disclose the massive risk posed by PG&E's widespread violations of law and did not excuse PG&E from disclosing material information that "cut against" its assurances that it complied with the law. PG&E's entire

---

[10] PG&E argues that Misstatement 28 mischaracterizes Jessica Tsang's FERC application testimony as stating that PG&E was "in compliance with all applicable rules, standards and regulations." (RKS Obj. at 14.) As the RKS Amendment makes clear, Ms. Tsang's testimony, relating to the purpose of funds sought by PG&E, was misleading because "it created the false impression that PG&E was sufficiently investing in its electrical system infrastructure to reduce fires" when, in fact, it was ignoring significant, known risks while intentionally choosing to underspend on safety and maintenance. (*See* RKS Am. ¶¶ 133, 350-352.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

argument on this point ignores the **vast extent** of PG&E's noncompliance. (*See* PERA Obj. at 45-50; RKS Obj. at 21-22.) As the RKS Amendment makes abundantly clear, PG&E's violations of laws and regulations were not isolated or rare, but rather **pervasive and systemic**. (*See, e.g.*, RKS Am. § V.F.) Thus, the concealed risk was not the "unprecedented wildfire risk in California" generally (PERA Obj. at 47), nor that PG&E's lines may cause fires from time to time (*id.* at 47-48), or even that, despite its best efforts, there may be isolated incidents where PG&E fell short of full legal compliance (*see id.* at 47-48 (discussing the Butte Fire); RKS Obj. at 22 (discussing the North Bay Fires).) Rather, the risk concealed by PG&E's omissions was that its compliance was **so deficient as to be criminal**, and the risk of it causing a catastrophic wildfire – and being unable to meet the prudent manager standard – **was virtually certain**.

Notably, and despite making numerous statements heralding its compliance with law, PG&E never made a single voluntary disclosure in the Relevant Period acknowledging its violations of law. PG&E's comparison to *Edison*, where the plaintiffs alleged that the defendants should have disclosed that their violations of law caused a fire rather than simply disclosing that the cause of the fire was under investigation, is inapposite. (RKS Obj. at 16.) There, the court found that, while the cause of the fire was under investigation, the defendants could not have known the outcome of that investigation. *See Edison*, 2021 WL 2325060, at *12. The case did not involve affirmative statements of compliance. Here, in contrast, the RKS Amendment alleges PG&E told investors it complied with the law while, among other things, it was actually aware of widespread noncompliance, later admitting it knew of thousands of instances of noncompliance and regarded actual compliance with the law to be "impossible." (*See, e.g.*, RKS Am. ¶¶ 538, 575.)

Further, the partial but incomplete disclosure of the truth when the North Bay Fires occurred, and the subsequent determination that a number of them were caused by PG&E's violations, did not fully disclose the extent of PG&E's noncompliance, and certainly did not as a matter of law. In *In re Splunk Inc. Securities Litigation*, 592 F. Supp. 3d 919 (N.D. Cal. 2022), the court, faced with a much tougher call than here, held that "[w]here . . . reasonable minds could

ROLNICK KRAMER SADIGHI LLP<br>1251 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

differ as to the adequacy of [the defendants'] disclosure[,] . . . the question of whether that disclosure was adequate to render the challenged statements not misleading cannot be resolved as a matter of law." *Id.* at 940. There, the defendant's mention of a "kind of" hiring freeze, while concealing the extent and significance of its austerity measures and at the same time making positive and optimistic statements about building its pipeline, did not mean that investors were not misled about whether the company was making adequate investments to meet its growth and revenue targets. *Id.* at 939-40; *see also Khoja*, 899 F.3d at 1010 (holding that, while the jury may ultimately determine that a drug company's "hedging" as to interim test results defeated liability, "[f]or pleading purposes . . . the Complaint sufficiently allege[d] that [the defendant's] failure to disclose the unreliability" of the results "was misleading").

Here, PG&E ***never disclosed any information*** about its actual and known violations of law.[11] Nonetheless, when the North Bay Fires and subsequent Cal Fire findings partially disclosed PG&E's noncompliance, PG&E misleadingly assured investors that it complied with the law, suggesting the North Bay Fires were an aberration. (*See, e.g.*, RKS Am. ¶ 277 (October 31, 2017 statement that "PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures"); *id.* ¶ 326 (June 8, 2018 response to Cal Fire conclusions stating that "we continue to believe our overall programs met our state's high standards. For example, PG&E meets or exceeds regulatory requirements for pole integrity management . . . .").) PG&E's actions are far worse than those in *Splunk* because, rather than making a partial disclosure

---

[11] For the same reason, PG&E's risk disclosures – disclosing generally that its failure to comply with regulations could result in financial harm, that "operating electrical facilities is inherently dangerous" and "may cause a catastrophic event," and that "one such catastrophic event is wildfire caused by the unsafe operation of its electric facilities" – concealed the true nature of the risk. (PERA Obj. at 47, n. 17.) PG&E was ***already*** criminally non-compliant with regulations on a vast scale, rendering a catastrophic wildfire a near certainty, not an unavoidable risk that PG&E was working diligently to contain. Given its positive statements of compliance, its failure to disclose its ongoing noncompliance was misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (finding that a disclosure discussing "as-yet-unrealized risks and contingencies" failed to alert investors that "some of these risks may have already come to fruition" and the omission of such information, where positive information was disclosed, sufficiently stated a claim).

that was inadequate to reveal the "extent and significance" of its noncompliance, PG&E actively obfuscated the extent and significance of its noncompliance following the North Bay Fires to keep investors in the dark.

For the same reason, this case is easily distinguishable from *Edison*, where the court found that "general statements related to prioritization of safety would not mislead a reasonable investor" in the absence of disclosures as to particular safety failures. *Edison*, 2021 WL 2325060, at *10. In *Edison*, the allegations plaintiffs used to demonstrate the defendants' general statements were misleading came from ***the defendants' own disclosures*** and CPUC's "admonitions," which were public when the general statements were made. *Id.* Here, in contrast, PG&E ***concealed its misconduct*** throughout the Relevant Period, and even when Cal Fire released investigative findings as to PG&E's causing certain of the North Bay Fires, PG&E ***reassured*** investors as to its compliance with laws. (*See, e.g.*, RKS Am. ¶ 228 (Judge Alsup noting "PG&E's stubborn refusal to take responsibility for its actions" and that PG&E's "evasion has occurred time and again over the last five years"); *id.* ¶ 326 (press release responding to Cal Fire's finding PG&E responsible for certain of the North Bay Fires by stating its "overall programs met [the] state's high standards").) *Edison* did not involve specific statements of compliance, nor did the court examine whether the defendants misled investors as to the extent and significance of its noncompliance, much of which the defendants had previously and publicly disclosed to CPUC. *See Edison*, 2021 WL 2325060, at *10.

PG&E's positive statements of compliance – considered alongside its risk disclosures and the findings that it was responsible for the Butte Fire and certain of the North Bay Fires – painted a picture of a utility whose "overall programs met [California's] high standards" – even if it fell short in isolated instances. These statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed,]" where PG&E was aware of thousands of instances of noncompliance and largely ignored the issue such that it was found to have violated its probation and acted with criminal recklessness. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (internal quotation

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

omitted).  PG&E's compliance statements were, therefore, misleading and actionable.

### 3. The Compliance Statements Were Not Opinion Statements, But Would Be Actionable Even If They Were

Searching for another way to ask the Court to ignore the plain words of its compliance statements, PG&E implores that the statements "should be understood as statements of PG&E's *opinion that its vegetation management program was designed to comply with the law*." (PERA Obj. at 51.)  PG&E does not explain ***why*** the Court should "underst[and]" its statements that, for instance, it "meets or exceeds all applicable federal and state vegetation clearance requirements" (RKS Am. ¶ 298), or that it "follows all applicable federal and state vegetation clearance requirements" (*id.* ¶ 277), to be opinion statements.  (*See* PERA Obj. at 51.)  The Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), upon which PG&E relies, plainly illustrates the difference between PG&E's statements and actual opinion statements.  The misstatements alleged in *Omnicare* related to the issuer's compliance with the law.  *Id.* at 179-80.  But in *Omnicare*, the issuer's statements spoke to its ***belief*** that it complied with law.  *See id.* ("***We believe*** our contract arrangements with [certain third parties] are in compliance with applicable federal and state laws." (emphasis added)).  PG&E's misstatements had no such qualifiers.  (*See, e.g.*, RKS Am. ¶¶ 277, 298.)  PG&E's factual statements were not qualified as a belief.  PG&E's statements that it "meets or exceeds" legal requirements and that it "follows all applicable" requirements are "determinate, verifiable statement[s]," *Omnicare*, 575 U.S. at 183-84, and are not "vague assurances" incapable of verification as in *In re BofI Holding, Inc. Securities Litigation*, 977 F.3d 781, 798 (9th Cir. 2020), upon which PG&E also improperly relies.  (PERA Obj. at 51.)

Nonetheless, even if PG&E's compliance statements could somehow be "understood as" opinion statements (*id.*), the RKS Amendment plausibly alleges they were false.  Opinion statements are actionable if the opinion was not genuinely held or, under an omissions theory, if there are "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

(9th Cir. 2017) (quoting *Omnicare*, 575 U.S. at 194).  The RKS Amendment alleges extensive facts demonstrating that the executives who made and/or authorized the compliance statements, as well as PG&E as an entity, actually knew of widespread and systemic violations of applicable laws and regulations.  *See* § II.a.iii.2, *supra*; § II.c, *infra*.  These allegations overwhelmingly demonstrate that the executives and PG&E as an entity did not "believe" (even though they did not use that word) PG&E complied with the law, and that they omitted facts going to the basis for any such opinion (PG&E was in active violation in thousands of instances) that would render such an opinion misleading.  *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 880-81 (N.D. Cal. 2023) (finding complaint pled actionable opinion misstatements as to future business prospects where issuer knew of negative customer trends that rendered opinion statements misleading).

### iv. The RKS Amendment Adequately Alleges PG&E's Statements Regarding Its Wildfire Safety Practices Were False and Misleading

In addition to deceiving the public as to its compliance with laws and regulations relating to vegetation management and inspections and maintenance, PG&E made a series of false and misleading statements as to its specific wildfire safety practices.

#### 1. PG&E's Statements Regarding Its Pole and Line Inspection and Maintenance Programs Were False and Misleading (Misstatements 2, 4, 10-11, 13-14, 17, 21, 23, 24, 27, 29)

Throughout the Relevant Period, PG&E made specific representations as to its pole and line inspection and maintenance programs that were materially false and misleading.  In sum and substance, these misstatements assured investors that PG&E had a robust inspection program that "inspect[ed] every mile of power line in [PG&E's] service area for public safety" and "m[et] or exceed[ed] regulatory requirements for pole integrity management."  (RKS Am. ¶¶ 234, 326; *see also id.* ¶ 283 ("[E]very year we inspect every segment of the 99,000 miles of overhead line"); *id.* ¶ 313 ("[T]he company inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times.").)  In reality, PG&E's inspection and maintenance program was a sham that violated numerous laws and regulations and intentionally allowed known critical safety issues to fester for years, and even decades. (*See, e.g.*, *id.* ¶ 238.)  PG&E's statements were thus false and misled investors into believing PG&E

conducted frequent, rigorous, and legally compliant inspections of its lines and poles and maintained them properly.

The RKS Amendment and the Butte County DA Report contain volumes of specific allegations and findings demonstrating conclusively that PG&E's entire inspection and maintenance program was a sham during the Relevant Period. (*See, e.g.*, RKS Am. § V.F.2.a.) PG&E ignores these extensive and well-pled allegations, arguing irrelevantly that PG&E never made specific representations as to its inspections of the particular tower that caused the Camp Fire, and that it "reported the frequency of [tower] inspections and the manner in which they were conducted," and "[t]he RKS Claimants do not allege any facts to support falsity as to these statements." (RKS Obj. at 18.) Not so.

PG&E's inspection and maintenance policies were set forth in its ETPM, which was intended to "reduce the potential for component failure and facility damage and facilitate a proactive approach to repairing or replacing identified, abnormal components[.]" (*See* RKS Am. ¶¶ 154, 158.) PG&E makes the baffling (and false) assertion that, although the RKS Amendment alleges PG&E did not follow the procedures in its ETPM, the RKS Amendment "never explain[s] what requirements were not followed." (RKS Obj. at 18, n. 10.) In fact, the RKS Amendment alleges that PG&E violated its own ETPM by, among other things, using untrained employees to perform patrols (RKS Am. ¶¶ 161, 163), failing to perform inspections capable of identifying wear on critical components (*id.* ¶ 162), failing to perform climbing inspections as required (*id.* ¶ 165), and failing to perform inspections and patrols as required by the ETPM (*id.* ¶¶ 155, 161-167).

In yet another strawman argument, PG&E argues that the RKS Amendment alleges merely "that PG&E failed to inspect and repair particular issues" on the Caribou-Palermo line, and that these allegations "do not render statements of general corporate practice covering the entirety of PG&E's vast territory false." (RKS Obj. at 18.) But the RKS Amendment's allegations are not localized. To the contrary, the RKS Amendment alleges that "the sections of the ETPM relating to inspections and patrols of overhead transmission lines" – *i.e.*, the ***entirety*** of PG&E's inspection and maintenance policies and procedures – "were simply a façade created to meet the requirements

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

of the regulators and the CAISO." (RKS Am. ¶ 158.) Indeed, the Butte County DA Report, which is quoted extensively throughout the RKS Amendment and incorporated by reference therein, explains:

> The evidence established the lack of thorough inspections and patrols on the Caribou-Palermo line was a systemic problem not a local problem. Based upon the evidence the only reasonable conclusion was that in low population density mountainous areas, the PG&E Electrical Transmission Division was not following the standards and procedures established by the ETPM. As a result in those areas PG&E was not complying with the standards and procedures submitted to the regulatory agencies and required by regulation.

Bodnar Decl, Ex. 4 at 47.

Accordingly, PG&E's statements to the effect that it inspected and/or patrolled "every mile" of its lines "for public safety" and that it "m[et] or exceed[ed] regulatory requirements for pole integrity management" were false or, at the very least, highly misleading. (*See, e.g.*, RKS Am. ¶¶ 234, 326.) These statements were false in that, in addition to not complying with regulations, PG&E did not perform actual "inspections" or "patrols" as the company defined those terms itself. (*See id.* ¶ 155 (describing general requirements of inspections and patrols); *id.* ¶¶ 159, 164 (PG&E reduced thoroughness of inspections and patrols to save money and yearly aerial patrols became "fly bys[,] not patrols or inspections"); *id.* ¶¶ 155, 162 (every-five-year ground inspections did not follow ETPM requirements and were inadequate to assess wear on components despite requirement that during inspection "[i]ndividual elements and components are carefully examined").) At the very least, PG&E's misstatements were misleading because they failed to disclose that its inspections and patrols were a sham that complied neither with its own policies and procedures or with applicable laws and regulations. As with its statements on legal compliance, PG&E was under no obligation to disclose information about its inspections and patrols, but once it did so by disclosing positive information, it was "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 705-06 (internal quotations omitted).

PG&E's additional statements that it had "increased the frequency of [its] patrols" (RKS

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

Am. ¶ 316), that it was "making lines and poles stronger in high fire threat areas," and that it was replacing aged conductors and towers (*id.* ¶¶ 307, 346, 353, 363), were also false and misleading. The Butte County DA Report explained in detail that the frequency of PG&E's patrols ***decreased*** over the years and had not changed since 2005, despite PG&E's considering further decreasing the frequency of inspections and patrols. (*See id.* ¶¶ 150-156.) Statements as to PG&E's work to replace aged towers and conductors were grossly misleading in that the statements omitted, at a minimum, that vast portions of PG&E's infrastructure were decades past their useful lives, had dangerously deteriorated, and that PG&E's plans to replace such infrastructure had been delayed for decades. (*See id.* ¶ 139 (PG&E ignored a 2010 consultant report identifying increased fire risk due to critical aging of PG&E's infrastructure and recommending "regular climbing inspections"); *id.* ¶ 149 (2007 internal funding request to replace towers and conductor on Caribou-Palermo line because "[t]he probability of … failure is imminent due to the age of both the towers and the conductor" was initially approved but project was later cancelled).) Having chosen to speak as to its maintenance efforts, PG&E could not mislead investors by giving them the false impression that PG&E "was sufficiently investing in its electrical system infrastructure to reduce fires, including by replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life" when in fact it continued to ignore grave warnings as to the condition of the Caribou-Palermo line and employed "a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line." (*See, e.g.*, RKS Am. ¶ 350.) *See also Intuitive Surgical*, 759 F.3d at 1061 (explaining an omission is misleading where it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists").

### 2. PG&E's Statements Regarding Its Use of Reclosers Were False and Misleading (Misstatements 3, 26)

On November 18, 2015, Hogan publicly testified before the California Senate's Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety. (RKS Am. ¶ 103.) In his testimony, he discussed PG&E's "SCADA capabilities where we are able to take our reclosers out of service remotely[.] [W]e first focus on the wildfire areas and then we have about 130 some odd locations, we are going to complete about 126 of those this year, just about

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

done with that program, which leaves six for next year, which will be completed." (*Id.* ¶ 242.) At the time, the use of reclosers was known to be dangerous where conditions were favorable to wildfires, and other California utilities disabled their use during wildfire season. (*Id.* ¶¶ 89-91.)

Hogan's statements were false and misleading when he made them because PG&E was not "just about done" with its recloser disabling program and it did not complete the program in high-risk areas by the end of 2016 but instead continued using reclosers in high wildfire risk locations and conditions through both the North Bay Fires and the Camp Fire. PG&E's continued use of reclosers in high-risk areas caused one of the North Bay fires – the Pythian Fire – and contributed to the second ignition point of the Camp Fire.[12] (*See id.* ¶¶ 94, 122-123, 243.) Indeed, one of the senators in attendance when Hogan gave his testimony, Jerry Hill, explained following the North Bay Fires that Hogan had misled the Subcommittee. NBC News reported:

> Hill said he was surprised the company's recloser shutdown was so limited, given that [Hogan] *assured him back in 2015* that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that *they misled us in that*."

(*Id.* ¶ 95 (emphasis added).) To state the obvious, if Senator Hill felt misled by Hogan's testimony, then drawing all reasonable inferences in the RKS Claimants' favor as the Court must, the RKS Amendment plausibly alleges that reasonable investors would have also been misled by Hogan's testimony.

PG&E's argument that no facts are pled demonstrating the falsity of Hogan's statements is simply wrong. (*See* PERA Obj. at 40-41.) As noted above, reclosers were still in use and causing fires in high-risk areas in 2017 and 2018. It is therefore reasonable to infer that the program was not "just about done," nor were only a handful of areas left for implementation by the end of 2016. At the very least, as explained by Senator Hill, Hogan's testimony was misleading, and actually

---

[12] PG&E's September 27, 2018 ESRB-8 Shutoff Protocol stated that, following the North Bay Fires, PG&E implemented "new and enhanced safety measures" including the "[d]isabling [of] automatic reclosing of circuit breakers and reclosers[.]" (RKS Am. ¶ 340.) This statement was false and misleading as demonstrated by the fact that reclosers contributed to fire ignition at the Camp Fire's second ignition point. (*See id.* ¶¶ 122-123.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

misled the Subcommittee to which the testimony was given. Finally, to the extent PG&E relies on extrinsic documents and asks the Court to draw its preferred conclusions from them contrary to the allegations in the RKS Amendment (*see id.*), the Court must reject PG&E's arguments as improper at this stage. *See Khoja*, 899 F.3d at 1003 ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.").

### 3. PG&E's Statements Regarding ESRB-8 and the Community Wildfire Safety Program Were False and Misleading (Misstatements 15-16, 18-19, 29)

PG&E misled the public as to the operation of its Community Wildfire Safety Program and as to the reason it did not de-energize the lines that caused the Camp Fire. As an initial matter, PG&E does not substantively address the well-pled allegations that PG&E's tweet, hours after the Camp Fire started, stating that "weather conditions did not warrant" de-energizing the lines that caused the fire, was patently false (*see* RKS Am. ¶¶ 179, 192-204), and thus has waived any challenge to the falsity of that statement. *Ricketts*, 2020 WL 3124218, at *3 n.6 ("[A]rguments not made in an opening brief are waived.") (citing *Loomis*, 836 F.3d at 998 n.3).

The remaining statements PG&E made about its shutoff program were misleading in that they would have led a reasonable investor to believe PG&E had implemented a program that would follow the criteria PG&E published as guiding its decisions as to whether to de-energize its lines, when in reality PG&E omitted that a significant portion of its most dangerous lines were exempted from the program entirely. In deciding to speak about the shutoff program it purportedly developed to comply with ESRB-8, PG&E had a duty to disclose material information where it made statements that, absent the omitted information, would be "misleading in light of the context surrounding the statements." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017). Here, the RKS Amendment alleges PG&E made numerous statements to the effect that it implemented a program that would "proactively turn off electric power for safety when extreme fire danger conditions occur" and that it had "created a set of procedures for …[d]etermining what combination of conditions necessitates

turning off lines for safety," and that it would utilize the program "in the most extreme forecasted weather conditions." (RKS Am. ¶¶ 335, 343, 359, 363.) The context of these statements is that they were made in tandem with PG&E's publication of a summary of its procedures that (1) focused solely on seven considerations that would guide PG&E's decision-making, (2) stated that PG&E would "monitor [those] conditions across [its] service area," and (3) omitted that its program did not apply to its high-voltage transmission lines. (*Id.* ¶¶ 47, 174-76, 209.) Drawing all reasonable inferences in favor of the RKS Claimants, the RKS Amendment adequately alleges PG&E's statements were misleading because the statements created the impression that it would de-energize lines where there was an extreme fire threat, as determined by its published criteria, and that it did not exempt vast portions of its infrastructure from its Community Wildfire Safety Program.

PG&E argues that "ESRB-8 did not require that a utility's full de-energization protocol be published on its website, but instead required only that PG&E and other utilities 'post a summary of [their] de-energization policies and procedures[.]'" (RKS Obj. at 20 (quoting RKS Am. ¶ 72).) But this misses the point in two ways. *First*, the RKS Claimants' claims are not for violations of ESRB-8, but of the federal securities laws, which require that when an issuer speaks as to an issue, it does so in a way that does not omit information that renders its statement misleading. *See Khoja*, 899 F.3d at 1008-09. *Second*, the issue with PG&E's summary is not that it was not the full protocol, but that it was ***inaccurate and misleading***. By affirmatively stating that PG&E would "monitor conditions across [its] system" to determine whether to de-energize its lines, and by omitting that all of its high-voltage transmission lines were exempt from the program – a vast and significant part of its "system" – PG&E misled investors as to the nature of its program and the extent to which it addressed wildfire risk. (*See* RKS Am. ¶ 209 (because the "actual policy" exempted transmission lines, summary published on website was "misleading").)[13]

[13] PG&E tries to sidestep the Butte County DA's determination that PG&E's summary was misleading by claiming it is "a legal conclusion entitled to no weight on a motion to dismiss." (RKS Obj. at 21.) But the pertinent question is whether the RKS Amendment pleads facts that can lead to the reasonable inference that investors were misled by PG&E's statements. *See Splunk*,

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

PG&E also unpersuasively argues that "no reasonable investor would have concluded . . . that PG&E would definitely shut off power under any particular set of circumstances[.]" (RKS Obj. at 20.) Like so much of PG&E's Objection, this argument ignores the requirement that reasonable inferences be drawn in the RKS Claimants' favor, not PG&E's. PG&E published seven, and only seven, criteria it would consider in determining whether to de-energize its lines. (RKS Am. ¶ 176.) While PG&E said it would have taken "a combination of many criteria into consideration," including the seven published criteria (*id.* ¶ 343), it is reasonable to infer that publishing seven specific criteria would lead investors to believe that those criteria were the most important of PG&E's considerations, and that if all were present, PG&E would likely de-energize its lines. This inference is bolstered by PG&E's public statements before and after the ignition of the Camp Fire that, due to a "red flag warning" and "weather factors," PG&E was considering de-energizing its lines, and its false statement that it chose not to do so because "weather conditions did not warrant this safety measure." (*See id.* ¶¶ 179, 186.) But more importantly, PG&E omitted that it would not de-energize its dangerous high-voltage transmission lines. (*Id.* ¶ 209.) Thus, the RKS Amendment does not merely allege that, in hindsight, "PG&E should have shut off power before the Camp Fire," but rather alleges that PG&E's omissions purposefully hid the fact that it would never, under any circumstances, de-energize its dangerous, century-old high-voltage transmission lines. PG&E's public statements therefore "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Intuitive Surgical*, 759 F.3d at 1061.

### 4. PG&E's Statements About Its Vegetation Management Programs Were False and Misleading (Misstatements 1-2, 4-5, 9-11, 14, 17, 20, 24)

Throughout the Relevant Period, PG&E misled the investing public by disseminating materially false and misleading information about its vegetation management programs. Several of these statements falsely assured the public that PG&E's vegetation management programs were robust and being strengthened. For instance, in April 2015, PG&E told investors it was "stepping

---

592 F. Supp. 3d at 940. If the facts led the Butte County DA, and a grand jury, to that conclusion, the Court must conclude that a reasonable factfinder could reach the same conclusion.

up [its] vegetation management activities to mitigate wildfire risk" and had "doubled [its] efforts" despite the fact that, as alleged in the RKS Amendment, PG&E's vegetation management budget remained relatively flat before and after this statement, its Vegetation Program Manager testified he was unaware of "any changes" following the Butte Fire, and its backlog of unattended vegetation was "staggering" as of January 2017.[14]  (RKS Am. ¶¶ 231-232; 301-304.)  At the very least, PG&E's statements were misleading in that they omitted that whatever vegetation management efforts it was undertaking were, as PG&E was aware, grossly inadequate to address the scope of the problem it had allowed to accumulate, as evidenced by its known "staggering" backlog as of January 2017.  (*See id.* ¶ 233.)  PG&E improperly relies on the truth of cherry-picked extrinsic documents to establish it was "stepping up" its efforts, but any factual arguments based on such documents must await an evidentiary hearing following the development of a complete fact record through discovery.  *See Khoja*, 899 F.3d at 998-99 (criticizing "overuse and improper application of judicial notice" on motions to dismiss and noting "[i]f defendants are permitted to present their own version of the facts at the pleading stage – and district courts accept those facts as uncontroverted and true – it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief.").

PG&E's arguments as to its statements relating to increased vegetation management spending suffer from the same deficiency.  In challenging the RKS Amendment's well-pled allegations that PG&E's vegetation management spending did not materially increase from 2015 through 2017 (*see* RKS Am. ¶¶ 83-85), PG&E again seeks to introduce extrinsic, cherry-picked documents to attempt to resolve a factual dispute in its favor on this motion.  (*See* PERA Obj. at 36-37; RKS Obj. at 17.)  PG&E points to CEMA applications submitted by PG&E in 2016 and

---

[14] PG&E again seeks to have the Court draw an inference in its favor by asking the Court to discredit the testimony of PG&E's Stockton Division Vegetation Program Manager, Richard Yarnell, that he was not aware of any changes implemented to improve safety between September 2015 and April 2017.  (*See* RKS Obj. at 17 n. 9.)  If PG&E had implemented such changes, its Vegetation Program Managers would know about them, as they manage the program purportedly being improved.  His statement is also consistent with numerous other allegations in the RKS Amendment demonstrating PG&E's "dismal" performance with regard to vegetation management, its slashing of its vegetation management budget, and its violation of probation during this period.  (*See, e.g.*, RKS Am. ¶¶ 571-584.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

2017 to demonstrate PG&E increased its spending, but it omits any 2014 or 2015 CEMA applications and omits information relating to amendments to its CEMA applications that are not before the Court. (*See* PERA Obj. at 36-37; Dkt. No. 14272 at 8-9 (PERA brief in support of discovery noting amendments to CEMA applications and failure to include 2015 CEMA information).) The provision of an incomplete set of self-selected documents demonstrates only that a full factual record must be developed to resolve this issue – it does not provide a basis to dismiss. *See Khoja*, 899 F.3d at 999; Bodnar Decl., Ex. 1 at 50:15-17 ("[W]hatever facts that are in dispute . . . it's a waste of time to try to rebut them because that's not the inquiry.").

Many of the remaining misstatements as to PG&E's vegetation management programs were made in tandem with, or were themselves, inspection and/or compliance statements, which were false and misleading for the reasons discussed in Sections II.a.iii and II.a.iv.1, *supra*. (*See, e.g.*, Misstatements 2, 4-5, 9-11, 14, 24.) Several of these statements contained additional imbedded statements that were false or misleading, such as Williams's statement that "[w]e also have one of, if not, the most comprehensive vegetation management programs in the country," and a later statement that its program was "industry-leading." (RKS Am. ¶¶ 283, 326.) It was, in fact, not at all comprehensive and industry-leading, but rather vastly non-compliant with the law, uniquely deficient among California utilities, and, in the words of Judge Alsup, "dismal." (*Id.* ¶¶ 133, 575.)

### v. The RKS Amendment Adequately Alleges PG&E's Statements Reassuring Investors About Its Wildfire Safety Efforts Were Materially False and Misleading (Misstatements 1, 5-8, 10, 14, 17, 21-22, 25)

PG&E repeatedly lied to investors and omitted material information as to its wildfire safety efforts and its commitment to those efforts. Given PG&E's series of false and misleading statements as to its compliance with laws and regulations and as to its specific safety, inspection, and maintenance practices, PG&E's statements were misleading in that they suggested PG&E was using best efforts to reduce fire risk as much as possible when it was actually ignoring known fire safety risks and hiding the massive scale of its noncompliance.

The misstatements in the RKS Amendment are not mere "puffery or generic statements,"

ROLNICK KRAMER SADIGHI LLP<br/>1251 AVENUE OF THE AMERICAS<br/>NEW YORK, NY 10020

as PG&E argues. (*See* PERA Obj. at 33.) The Court should exercise caution in finding statements to be inactionable puffery and only dismiss claims on that basis where "the statement is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ as to the question of their unimportance.'" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) (quoting *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004)). It is well-established in the Ninth Circuit that, while "vague statements of optimism are generally not actionable because investors know how to devalue the optimism of corporate executives, . . . general statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Forescout*, 63 F.4th at 770 (citation and internal quotations omitted). In the recent *Forescout* case, the Ninth Circuit rejected the argument that the defendant's statements that "phrases such as 'tracking very well' or 'very large [sales] pipeline' are nonactionable because they do not convey concrete, verifiable facts." *Id.* The court found those statements "went beyond mere optimism by 'provid[ing] a concrete description of the past and present state of the [sales] pipeline.'" *Id.* (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017)); *see also Splunk*, 592 F. Supp. 3d at 942 (finding general statements about adequately hiring to maintain pipeline actionable where "the challenged statements gave investors the inaccurate impression that Defendants' investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets.").

The misstatements here served a similar function, assuring investors that PG&E was making concrete improvement to its safety practices as compared to in prior years, and tying those improvements to operational results. (*See, e.g.*, RKS Am. ¶ 231 (PG&E claiming it was "stepping up [its] vegetation management activities to mitigate wildfire risk"); *id.* ¶ 264 ("The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward."); *id.* ¶ 269 (press release announcing increased dividend and noting Williams "highlighted the company's 'progress on safety'"); *id.* ¶ 310 (PG&E claimed to be "[a]ugmenting [its] already rigorous vegetation management practices").) PG&E also misleadingly claimed to have made specific improvements, stating "we've worked to improve our

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

culture, augment our operations, upskill our people and, most importantly, improve public and employee safety." (*Id.* ¶ 338.) In fact, its "culture of a lack of safety [was] unique" and it continued to use ***untrained*** workers to patrol and inspect lines and towers. (*See id.* ¶¶ 133, 160.) Many of these statements were also made in tandem with statements emphasizing PG&E's compliance with laws and regulations and its inspection and maintenance programs, which were patently false (*see* Sections II.a.iii and II.a.iv.1, *supra*) and provided further context for the misleading nature of PG&E's assurances. (*See, e.g.*, RKS Am. ¶ 252 ("PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations[.]"); *id.* ¶ 326 (stating PG&E "meets or exceeds regulatory requirements for pole integrity management" and "under PG&E's industry-leading Vegetation Management Program, we inspect and monitor every PG&E overhead electric transmission and distribution line each year").)

PG&E made many of these statements to reassure investors at a time when it knew that the market was intensely focused on its safety efforts, particularly after the North Bay Fires and subsequent investigation. (*See, e.g.*, *id.* ¶ 283 (Williams stating on investor call after North Bay Fires, "I know there's a lot of interest in our pole maintenance and vegetation management programs," and continuing to state "[w]e also have one of, if not, the most comprehensive vegetation management programs in the country."); *id.* ¶ 326 (reassuring statement made after Cal Fire report blamed PG&E for certain of the North Bay Fires); *id.* ¶¶ 310, 338 (statements of reassurance following North Bay Fires and investigation).) Statements that might be considered puffery in another context are actionable when they are issued to reassure investors in the wake of negative news. *See Forescout*, 63 F.4th at 770-71 (explaining statements challenged as "nonactionable puffery" were actionable where several "were made during earnings conference calls after [the company] announced disappointing financial predictions or results" and repeated reassurances as to health of sales pipeline contravened known facts). Importantly, the RKS Amendment pleads facts sufficient to reasonably infer that even PG&E's most general positive statements as to its safety practices "contravened the unflattering facts in [its] possession." *Id.* at

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

770 (quoting *Warshaw*, 74 F.3d at 960); *see also Splunk*, 592 F. Supp. 3d at 941 ("[O]ptimistic statements are *not* inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads allegations raising the inference that the defendants were aware of facts that rendered the optimistic statements false or misleading."). As discussed above, when these statements were made, PG&E was aware of systemic violations of laws and regulations relating to vegetation clearance, inspection, and maintenance. The RKS Amendment thus plausibly alleges that PG&E was aware of contrary information rendering these statements materially false and misleading when they were made.

The decisions in *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687 (9th Cir. 2021), and *Edison*, upon which PG&E relies, are inapposite. Neither of those cases involved a multi-year course of concrete assurances that the issuer complied with laws and regulations relating to the risk (indeed, neither alleged any such misstatements), nor did they involve a course of specific representations as to concrete actions, as is the case here. *See generally id.*; *Edison*, 2021 WL 2325060. PG&E argues its "statements convey no measurable facts regarding its safety practices – *e.g.*, the details of the programs, date of completion, or any measure of how they might impact wildfire risk – that investors would consider misleading." (PERA Obj. at 33.) But this argument ignores that, unlike in *Alphabet* and in *Edison*, PG&E tied many of these statements to financial performance and to particular actions (which were themselves false). (RKS Am. ¶ 264 ("The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward" and tying this statement to an increase in the dividend); *id.* ¶ 283 (calling safety program "one of, if not, the most comprehensive vegetation management programs in the country" and continuing to make false and misleading statements as to line inspection and spending).) Neither *Alphabet* nor *Edison* – nor any other case cited by PG&E – involved the pervasive, systemic, and criminal conduct alleged here. Nor did they involve years of specific compliance and practices misrepresentations. PG&E's conduct was uniquely abhorrent and its misstatements uniquely deceptive.

### b. The RKS Amendment States a Claim For Scheme Liability

The RKS Amendment adequately states a claim for "scheme liability," or violation of SEC Rules 10b-5(a) and (c), by alleging that PG&E engaged in a widespread and pervasive course of deception, fraud, and illegality – while concealing the truth of its malfeasance from regulators, investors, and the public. (*See* RKS Am. ¶ 638.)  Rules 10b-5(a) and (c) make it unlawful for a person or entity, in connection with the purchase or sale of a security, "(a) [t]o employ any device, scheme, or artifice to defraud, … or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]"  17 CFR § 240.10b-5.  The vast and systemic fraud and deception described in the RKS Amendment easily state a claim under these provisions.[15]

PG&E argues the RKS Claimants' scheme liability claims are not legally viable "because [they are] wholly duplicative of their first cause of action for false-statement liability pursuant to Rule 10b-5(b)" and the RKS Amendment's "allegations relate only to false statements or omission, not some other type of fraudulent activity[.]"  (RKS Obj. at 31-32.)  PG&E's arguments are both legally and factually wrong.  PG&E's assertion that "where a plaintiff's allegations relate only to alleged false statements or omission, not some other type of fraudulent activity . . . then the plaintiff has no separate claim under 10b-5(a) and (c)" is a blatant misstatement of the law.  (*Id.* at 32.)  While it used to be the rule in the Ninth Circuit that "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions," *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057-58 (9th Cir. 2011), the Court of Appeals recently recognized that the holding in *Spot Runner* was abrogated by *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).  *In re Alphabet*, 1 F.4th at 709 n.10.  Directly contradicting PG&E's statement of the law, the Ninth Circuit explained that *Lorenzo* "rejected the petitioner's argument

---

[15] Importantly, where a complaint adequately pleads a scheme liability claim, "[d]efendants' [a]spirational statements and [g]eneric statements of legal compliance would be less than a full and fair disclosure of the facts actually known to the [c]ompany."  *In re Firstenergy Corp.*, 2022 WL 681320, at *11 (S.D. Ohio Mar. 7, 2022) (internal quotations omitted).  Accordingly, because the RKS Amendment states a scheme liability claim, the Court should not find such statements inactionable at this stage of the proceeding.  *See* Sections II.a.iii and II.a.v, *supra*.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

that Rule 10b-5(a) and (c) 'concern 'scheme liability' claims and are violated only when conduct other than misstatements is involved.'" *Id.* (quoting *Lorenzo*, 139 S. Ct. at 1101-02). "Rather, *Lorenzo* explained that 'considerable overlap' exists among the subsections of Rule 10b-5 and held that disseminating false statements 'ran afoul of subsections (a) and (c).'" *Id.* (quoting *Lorenzo*, 139 S. Ct. at 1102).[16] Thus, contrary to PG&E's reliance on an abrogated rule, the RKS Amendment's allegations that PG&E disseminated more than thirty fraudulent misstatements of fact over the Relevant Period is sufficient to state a scheme liability claim. *See Lorenzo*, 139 S. Ct. at 1101 (explaining that "dissemination of false or misleading material is easily an 'artful stratagem' or a 'plan,' 'devised' to defraud an investor" and therefore violates subsections (a) and (c)).

Moreover, even if misstatements alone are not enough to assert scheme liability (they are), the RKS Amendment alleges a fraudulent course of conduct extending far beyond misstatements. In particular, the RKS Amendment pleads acts by PG&E – acts that are not just alleged but, in many instances, admitted or already determined to have occurred by competent government investigators. Indeed, PG&E was found to have engaged in "rampant wrongdoing," "cheat[ed] on the maintenance of its grid," "gone on a crime spree" and violated its probation conditions during the Relevant Period. (RKS Am. ¶¶ 219, 228, 571.) PG&E also defrauded and deceived its regulators.[17] The Butte County DA Report determined that "the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines ***were simply a façade create to meet the requirements of the regulators and the CAISO***." (*Id*. ¶ 158.) In other words, PG&E deceived its regulators by providing them with a sham manual outlining an inspection and maintenance program that it did not actually follow in order to keep those regulators at bay. Contrary to the requirements of its ETPM, which it provided to its regulators, PG&E's transmission line and tower

---

[16] To the extent *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022), relied upon by PG&E (RKS Obj. at 32), conflicts with the Ninth Circuit's interpretation of *Lorenzo* articulated in *In re Alphabet*, the Ninth Circuit's interpretation controls.

[17] Logically, if PG&E had *not* deceived its regulators, the regulators would have taken adverse action as to PG&E – which also would have informed the market and cutoff the scheme. This is the quintessential idea of scheme liability: once PG&E determined to lie to one party (investors, the public, regulators, customers, etc.) it had to engage in a scheme to lie to all parties.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

inspections and patrols were performed by individuals without "any formal training on how to perform inspection or patrol," and its yearly aerial patrols of its lines and towers, the thoroughness of which had "declined through the years," were described by PG&E's own employees as "fly bys[,] not patrols or inspections[.]" (*Id.* ¶¶ 160, 164.)

PG&E engaged in this course of deception to boost PG&E's bottom line, and, in turn, to artificially inflate its stock price. In a *New York Times* article discussing post-Camp Fire investigations, Mike Florio, a former California utilities commissioner, commented "[t]here was very much a focus on the bottom line over everything [at PG&E]: 'What are the earnings we can report this quarter?' . . . And things really got squeezed on the maintenance side." (*Id.* ¶ 133; *see also id.* ¶ 159 (PG&E reduced thoroughness of inspections and patrols to "cut costs" and "t[ied] salary incentives to staying within reduced inspection and patrol budgets.").) Judge Alsup noted that PG&E's noncompliance with the law resulted from its "let[ting] the tree budget wither" (*Id.* ¶¶ 577, 570.) Thus, PG&E perpetrated a scheme to artificially inflate its stock price by deceiving its regulators and the public into believing it could maintain robust and legally compliant safety and maintenance practices while generating the profits and dividends it did throughout the Relevant Period. In other words, if it behaved in the way it represented itself to be acting to regulators and the public (*i.e.*, in compliance with the law), it would have had to vastly increase spending on safety, reducing profits and potentially dividends, and causing the house of cards to collapse.

Deceiving regulators (or other independent oversight) in order to keep the music playing is a classic basis for scheme liability. *See, e.g.*, *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 665 (E.D. Va. 2021) (holding plaintiffs pled scheme liability claim where defendants "deceive[d] the FDA into not regulating" mint-flavored nicotine pods so they could continue targeting youth consumers); *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1057 (N.D. Cal. 2016) (finding misleading of auditors "inherently deceptive" and sufficient to support scheme liability claim where purpose of deception was to increase reported income and stock price); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *20 (D.N.J. Mar. 24, 2008) (finding allegations that defendants "ensur[ed] that

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

the company met regulatory reporting requirements and increased its revenues by falsifying quality control data and by issuing false regulatory reports to the FDA[,]" and providing other false information to the FDA, were sufficient to state scheme liability claim). The fact that PG&E also lied to and misled the public about the subject of its scheme in a series of misstatements does not bar the RKS Claimants' scheme liability claims. *See In re Alphabet*, 1 F.4th at 709.

### c. The RKS Amendment Adequately Alleges Scienter

The RKS Amendment alleges facts that, taken as true, plausibly show that PG&E acted with scienter, meaning it "acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "[D]eliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Schueneman*, 840 F.3d at 705 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)). As discussed in Section I, *supra*, the heightened scienter pleading requirement of the PSLRA does not apply to this claims allowance process. Nonetheless, the facts alleged in the RKS Amendment are so overwhelming that they create a strong inference of scienter – meaning the inference of fraud is cogent and at least as compelling as any non-fraudulent explanation for the alleged conduct. *Tellabs*, 551 U.S. at 328-29. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

The allegations of the RKS Amendment, when viewed properly and holistically, establish management's knowledge of widespread and pervasive safety violations throughout the PG&E system, while that same management repeatedly assured investors that it complied with safety laws and regulations and that doing so was its number-one priority. As an energy industry consultant told the *New York Times* after reviewing a report detailing PG&E's misconduct leading to the Camp Fire, "PG&E's behavior was unforgivable and totally unnecessary . . . [M]anagement was willfully blind to the risks to customers. And, strangely enough, also blind to the risk to

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

stockholders." (RKS Am. ¶ 22.)

### i. PG&E Management Knew of or Recklessly Disregarded Facts Contradicting Their Misstatements

PG&E made the alleged misstatements with the requisite scienter because its management was aware of, or at least deliberately reckless as to, the false and misleading nature of those statements. It is typically the case that "corporate scienter relies heavily on the awareness of the directors and officers." *Magistri*, 549 F.3d at 744 (quoting *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995)). Scienter can be inferred where, among other things, executives had access to and monitored information contradicting their public statements. *See, e.g.*, *Forescout*, 63 F.4th at 773 ("Individual Defendants' access to internal reports and [a platform used to track deals] support the inference of scienter."); *In re Quality Sys.*, 865 F.3d at 1144-45 (scienter adequately pled as to misstatements regarding sales pipeline where executives making statements told investors they had access to and knowledge of sales information).

The RKS Amendment contains extensive allegations demonstrating that the PG&E executives who made the misstatements had access to and knowledge of contradictory information. Indeed, given the 2015 Butte Fire and its 2016 guilty verdict for the San Bruno pipeline explosion, PG&E executives represented to the public that safety was their "top priority" (RKS Am. ¶ 543) and that executives at PG&E's highest levels were monitoring and directing PG&E's safety efforts. *See Reese*, 747 F.3d at 571 (finding inference of scienter as to statements following oil pipeline spill, but preceding another, and explaining "[i]n the wake of a crisis that has the potential to repeat itself, [a high level executive with pipeline oversight] had every reason to review the results of [the defendant's] corrosion monitoring to understand what happened, as well as to assess the possibility of future leaks in similar pipelines."). Among many others, the following allegations in the RKS Amendment make clear that management exercised oversight over and had knowledge of PG&E's criminally deficient safety practices:

- In a January 9, 2017 sentencing memorandum following the San Bruno pipeline guilty verdict, PG&E represented that, since the 2010 pipeline explosion, it had "overhauled … its enterprise-wide compliance and ethics program." *See* Bodnar Decl., Ex. 3 at 6.

It had "substantially increased senior-level oversight of its compliance and ethics program . . . consistent with the [U.S. Sentencing] Guidelines' recommendation that the organization's governing authorities have knowledge and oversight of the content and implementation of the program, that high-level personnel of the organization ensure its effectiveness, and that specific individuals are delegated day-to-day responsibilities for its operation." *Id.* (RKS Am. ¶ 547.)

- The sentencing memorandum further represented that "[i]n March 2015, PG&E created a new Senior Vice President position, the Chief Ethics and Compliance Officer (CECO), who centrally coordinates its compliance and ethics program. . . . The CECO, Julie Kane, reports directly to PG&E Corporation's Chairman and CEO" and also reported to the Utility's and HoldCo's boards, as well as relevant committees. (RKS Am. ¶ 597; Bodnar Decl., Ex. 3 at 7. It further represented that "Ms. Kane is responsible for overseeing the Company-wide compliance and ethics program, including compliance management, risk-mitigation and reporting; overseeing employee-investigatory processes; and reinforcing PG&E's ethics and compliance culture, among many other compliance and ethics program elements." (RKS Am. ¶ 597.) Kane was responsible for and had authority to control PG&E's statements regarding compliance. (*See, e.g.*, *id.* ¶¶ 596-598.)

- Each line of PG&E's business, including Electric Operations, had "its own risk and compliance committee, which regularly review[ed] that business's most significant risks and compliance requirements, including the status of associated mitigations." Bodnar Decl., Ex. 3 at 8. Williams and Hogan both served on this committee, which was charged, among other things, with monitoring vegetation management issues. (RKS Am. ¶ 546.)

- PG&E documented its noncompliance with safety laws and regulations in a database of inspection data and in other documentation that was accessible to PG&E's top executives, including Williams, Stavropolous, Kane, and Hogan. (*Id.* ¶¶ 585-590.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

PG&E represented to the court overseeing its probation that it performed quality assurance audits "designed to obtain a 'real-time' assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations." (*Id.* ¶ 588.) Through this process of documentation, PG&E was aware in June 2017 of nearly 4,000 trees growing near its lines in violation of California laws and regulations that it had identified in 2016 and that remained "unworked."[18] (*Id.* ¶ 589.) This database also tracked real-time inspection and safety data relating to each of PG&E's poles, thus keeping real time records of the age and deterioration of those poles. (*Id.* ¶¶ 585-590.)

The above allegations firmly establish that PG&E's upper-management, including the individuals responsible for the misstatements, was highly focused on safety issues, was hands-on in its oversight of PG&E's criminally deficient safety practices, and had real-time information regarding PG&E's widespread noncompliance.[19] Given these facts, the most cogent inference is that PG&E, through its executives, either knew the misstatements were false or recklessly disregarded their falsity. *See In re Quality Sys.*, 865 F.3d at 1144-45. The fact that many of the above-oversight mechanisms were implemented following the San Bruno Pipeline explosion and that all but one misstatement occurred after the Butte Fire, only heightens the inference that PG&E's misstatements were knowing or that its executives recklessly buried their heads in the

---

[18] PG&E's contention that the 3,962 "unworked" trees "was public knowledge" is unsupported by any citation and improperly contradicts the well-pled allegations of both the TAC and the RKS Amendment. (PERA Obj. at 57.) The admission as to PG&E's 2016 and 2017 knowledge of thousands of unworked hazardous trees occurred after the Relevant Period, in 2019. (*See* RKS Am. ¶ 107.) Thus, while PG&E's widespread noncompliance was known internally at PG&E during the Relevant Period, it was not revealed to the public until 2019. PG&E's contention that "by October 8, 2017 . . . only 131 of those trees remained pending" is irrelevant in that it pertains to the 3,962 trees identified in 2016 only and does not reveal how many additional hazardous trees had been identified after 2016 and remained unaddressed. (PERA Obj. at 57-58.) Judge Alsup confirmed PG&E was grossly noncompliant with vegetation management requirements throughout the Relevant Period, noting "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" and "remain[ed] at least seven years . . . from coming close to being current" as it ended. (RKS Am. ¶ 228.)

[19] Schedule C, attached hereto, lists the alleged misstatements. Schedule B identifies relevant PG&E executives and their positions.

sand. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) (explaining that securities fraud defendant cannot avoid scienter finding by "argu[ing] that he looked the other way" in the face of red flags); *Reese*, 747 F.3d at 571.

The inference of scienter here is even more compelling than in the above-cited cases because investigations and reports subsequent to the Relevant Period found that PG&E's criminally deficient safety practices were the result of conscious choices made by PG&E management that contradicted their public statements.[20] The Butte County DA Report found that "PG&E created the risk of a catastrophic fire in the Feather River Canyon, that PG&E ***knew of that risk*** and ***PG&E ignored the risk*** by not taking action to mitigate the risk." (RKS Am. ¶ 612 (emphasis added).) In finding that PG&E violated its probation and imposing a condition that it actually follow the law, Judge Alsup explained, "as we've gotten into the evidence, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees that should have been taken down were not." (*Id.* ¶ 577.) He also explained "[t]his is a problem of your own making. A lot of money went out in dividends that should have gone to the tree budget." (*Id.* ¶ 579.) This was confirmed in a 2019 *New York Times* article by a former California utilities commissioner, who explained "[t]here was very much a focus on the bottom line over everything [at PG&E] … [a]nd things really got squeezed on the maintenance side." (*Id.* ¶ 133.) *See Reese*, 747 F.3d at 581 (finding compelling inference of scienter where defendant company "had been aware of corrosive conditions [of oil pipelines] for over a decade, and yet chose not to address them" and "adopted corrosion monitoring practices that deviated from industry standards in an effort to cut costs").[21]

---

[20] PG&E nonsensically implies that, because the Butte County DA Report and certain of Judge Alsup's findings occurred after the Relevant Period, they are not relevant to the question of scienter during the Relevant Period. (*See* RKS Obj. at 25.) This makes no sense as the Butte County DA investigation and Judge Alsup's findings related to PG&E's knowledge ***leading up to and during*** the Relevant Period. (*See, e.g.*, RKS Am. ¶ 109 (Judge Alsup remarking "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" in January 2017); *id.* ¶ 164 (Butte County DA Report discussing decline in thoroughness of helicopter patrols of Caribou-Palermo line between 2001 and 2018).
[21] PG&E's argument that PG&E was not the "maker" of statements in its FERC applications (RKS

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

The RKS Amendment also cites and discusses various investigative news articles detailing how PG&E made decisions contrary to its public statements regarding compliance and its commitment to safety that resulted in the devastating North Bay and Camp Fires. (*See, e.g.*, RKS Am. ¶ 132 (discussing March 18, 2019 New York Times article, *How PG&E Ignored Fire Risks in Favor of Profits*); *id.* ¶ 131 n. 40 (citing February 28, 2019 Mercury News Article, *PG&E Knew For Years That Repairs Were Needed on Transmission Lines In Area of Fatal Camp Fire*); *id.* ¶ 134 n. 41(citing March 18, 2019 Business Wire article, *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*).) Indeed, an energy industry consultant who reviewed the investigation reports was quoted in the *New York Times* as stating "PG&E's behavior was unforgivable and totally unnecessary[.] . . . Moreover, following on the very similar San Bruno incident, ***management was willfully blind*** to risks to customers. And, strangely enough, ***also blind to the risk to stockholders***." (*See id.* ¶ 22) Surely, if this industry expert can review investigative reports and determine "management was willfully blind," a reasonable fact finder is likely to find the same based on a full evidentiary record.

The RKS Amendment alleges far more than isolated "particular deficiencies in certain areas of PG&E's operations," as PG&E disingenuously argues. (RKS Obj. at 23.) The particular allegations PG&E addresses – that PG&E management was made aware repeatedly between 2012 and 2016 (and many times in the years before that) "about certain issues with the Caribou-Palermo transmission line" (*id.*) – were not one-off issues from which management was isolated. Rather, they were indicative of PG&E's total abdication of its safety and maintenance responsibilities,

Obj. at 23-24) is undercut by *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the very case it cites in support of the argument. *Janus* confirmed that an entity required by regulations to file a document, and who controls the content of those statements, is the maker of statements in that document. *See id.* at 142, 146-47. The testimony cited in the RKS Amendment was submitted as required to PG&E's regulator in an application "for revisions to their 'Transmission Owner Tariff.'" (RKS Am. ¶ 346.) PG&E was the maker of the statements in its application to its regulator. In addition, the individuals whose testimony was included in the application were high-ranking management officials tasked with overseeing PG&E's transmission assets and regulatory compliance. (*See id.* ¶¶ 346, 349.) For the same reasons that PG&E's other high-ranking managers would have known of its widespread noncompliance, these individuals should be inferred to have had knowledge, contrary to PG&E's argument at page 24 of the RKS Objection.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

which were intentionally brought about by management's focus on financial performance even while management had real-time knowledge of PG&E's systemic safety deficiencies. (*See* PG&E's Omnibus Request (Dkt. No. 14208), Ex. 87 at 47 (Butte County DA Report explaining "[t]he evidence established the lack of thorough inspections and patrols on the Caribou-Palermo line ***was a systemic problem not a local problem***." (emphasis added)).) Indeed, despite PG&E's top-level executives exercising direct oversight over its woefully deficient safety practices, they maintained a "unique" "culture of a lack of safety" that "focus[ed] on the bottom line over everything" such that "things really got squeezed on the maintenance side." (RKS Am. ¶ 133.) Indeed, this inappropriate "tone at the top," prioritizing reported financial performance above safety while representing the opposite to investors, when combined with the above-noted facts suggesting management's knowledge or recklessness, as well as the wave of departures at PG&E following the North Bay and Camp Fires (*see id.* § IX.H), are enough to sufficiently plead a strong inference of scienter. *See, e.g.*, *Hessefort v. Super Micro Computer, Inc.*, 2020 WL 1551140, at \*6 (N.D. Cal. Mar. 20, 2020) (combined with other allegations, allegations of inappropriate tone at the top can bolster inference of scienter).

Capping the mountain of facts supporting a strong inference of scienter, PG&E and its management were broadly criticized in the aftermath of the North Bay and Camp Fires for dishonesty toward its monitoring court and the state during that period. In his final comments at the conclusion of PG&E's five-year probation in 2022, Judge Alsup noted that PG&E's "evasion has occurred time and again over the last five years." (RKS Am. ¶ 19.) He further found that "PG&E has refused to accept responsibility for its actions until convenient to its cause or until it is forced to do so." (*Id.*) Governor Newsom remarked in a 2019 interview that PG&E "ha[s] simply been caught red-handed over and over again, lying, manipulating or misleading the public. . . . They cannot be trusted." (*Id.* ¶ 133.) Following the North Bay Fires, at least one of which was caused by PG&E's use of reclosers, State Senator Jerry Hill stated in an interview that PG&E "misled us" when Hogan assured the California Senate Sub-Committee on Gas, Electric, and Transportation Safety in 2015 that PG&E was "just about done" disabling its reclosers and would

have none remaining in high risk areas by 2017.  (*See id.* ¶¶ 92-95.)

The PG&E executives responsible for the misstatements were aware of the grave wildfire risk posed by PG&E's equipment, closely monitored its safety and compliance activities, and monitored real-time data demonstrating its widespread lack of compliance.  They consciously chose to ignore PG&E's systemic noncompliance and allowed it to worsen, while telling investors the exact opposite.  Judge Alsup, Governor Newsom, and Senator Hill found PG&E to be evasive and dishonest in its dealings with the courts and state government, unwilling to accept responsibility for its unlawful behavior.  These facts establish an overwhelming inference of scienter.

### ii. PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter

Following the North Bay and Camp Fires, PG&E had an unprecedented mass departure of officers and directors, facts that support a strong inference of scienter.  "[R]esignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter[.]"  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).  Allegations "that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances" can lead to such an inference.  *Id.*  As to the officer and director departures pled in the RKS Amendment, PG&E argues "there is no factual allegation that could support the inference that these resignations were the result of fraud."  (PERA Obj. at 60.)  PG&E is wrong.

The RKS Amendment alleges that, in January 2019, PG&E abruptly terminated its CEO, Williams, less than two years into her tenure, and announced it was replacing "the vast majority of [its] Boards of Directors."  (RKS Am. ¶ 606.)  Such a mass departure, along with the CEO's brief tenure and abrupt firing, were quite unusual.  PG&E's announcement admitted that, directly contrary to its public representations, the CEO and board members lacked a commitment to safety and building an appropriate safety culture.  (*Id.* ("We replaced PG&E Corporation's CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to redirect our safety culture . . . .").)  PG&E further stated that its Chapter 11

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

bankruptcy would lead to "a reorganized enterprise with refreshed management and Board members who are committed to safety and reliability in all aspects of our business."[22] (*Id.* ¶ 607.) These statements reveal that PG&E determined that the ousted CEO and board members lacked such a commitment, a determination that significantly calls into doubt the "innocence" of PG&E's strong and repeated misstatements as to its safety and maintenance practices. Combined with their access to real-time contradictory information and public statements as to their direct involvement in managing safety and maintenance issues, the abrupt departure of numerous high-level executives and directors, accompanied by corporate statements that PG&E was replacing those individuals with individuals committed to safety, strengthens the inference that PG&E's top executives knew their public statements about safety were untrue.

### iii. The "Core Operations" Doctrine Establishes a Strong Inference of Scienter

In addition to the detailed allegations demonstrating management's knowledge of and actual access to information establishing the falsity of their misstatements, the RKS Amendment establishes scienter through the "core operations" doctrine. Core operations "allows a court to impute" scienter when "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at *29-31 (N.D. Cal. July 15, 2022) (quoting *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1011 (9th Cir. 2021)).

PG&E's business is a straightforward one – it delivers energy in the form of gas and electricity to rate payers, and it receives steady and predictable cash flows in doing so. (RKS Am. ¶ 1.) Because gas and electricity carry energy, they can be dangerous to distribute, and so PG&E's most critical mission aside from actually delivering energy to rate payers is to ensure it does so safely and in a way that does not result in catastrophic liability. (*See id.* ¶ 2.) PG&E management repeatedly acknowledged this core function, and assured the market that safety was at the core of

---

[22] Earley, Stavropoulos, and Hogan also departed their positions between December 2017 and January 2019, leading to the inference that PG&E had determined the lack of commitment to safety ran deeper than just Williams. (RKS Am. ¶ 608.)

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

PG&E's business. For example, CEO Williams stated in a July 27, 2017 analyst call that "[s]afety is at the heart of everything we do at PG&E." *(Id.* ¶ 543.) In January 2019, shortly before her departure, she reiterated that safety is PG&E's "core business," and was the "focus" of her activities at PG&E. *(Id.* ¶ 542.) Hogan testified to a California Senate Subcommittee in November 2015 that safety was PG&E's "top priority." *(Id.* ¶ 543.) As discussed at length above, management told the public that PG&E closely monitored safety practices, and its newly created Chief Ethics and Compliance Officer reported directly to the CEO and board and participated in committees with the CEO and board members, the mandate of which included safety and compliance oversight. *See* § 2.c.i, *supra*. (RKS Am. ¶¶ 543, 547.) Potential liability for causing wildfires presented a significant risk to PG&E's business, and this risk demanded the attention of its executives who spoke often to the public about that risk, including by providing specific information as to the numbers of trees being trimmed or removed. (*See id.* ¶¶ 543-544.)

Given PG&E's public statements placing safety at the core of its operations, its acknowledgment that wildfire risk was PG&E's largest known threat, its public scrutiny over that risk, its safety and compliance oversight structure, and the systemic and pervasive nature of its noncompliance with safety and maintenance laws and regulations, it would be "absurd" to suggest management was unaware of PG&E's extensive noncompliance. *See Reese*, 747 F.3d at 579-80 (finding it "'absurd' that management was not aware of [defendant's] significant, existing compliance issues" given "the magnitude of the violations, the immense public attention on [defendant] in the wake of [oil] spills, and the contemporaneous documents demonstrating management's awareness of the company's non-compliance with [regulator's] Corrective Action Order").

### iv. PG&E's Guilty Plea Establishes Corporate Scienter

The Ninth Circuit has "opined that the doctrine [of corporate scienter] might be appropriate in some cases." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (citing *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008)). "[T]he collective scienter (or corporate scienter) doctrine recognizes that it is possible to raise the inference of scienter without

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

doing so for a specific individual." *Id.* Specifically, "there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Id.* (quoting *Magistri*, 549 F.3d at 744). If this is not such a case, it is hard to imagine one could ever exist. As explained above, the RKS Amendment pleads myriad facts from which the Court can infer that the executives who made or authorized the misstatements knew they were false or were reckless as to their falsity. But even without an inference as to any individual's scienter, the misstatements alleged in the RKS Amendment "were so important and so dramatically false" that the Court should infer scienter here.

The subject matter of PG&E's misstatements was critically important to investors. Indeed, the risk that PG&E would cause catastrophic wildfires – and bear ultimate responsibility for compensating the victims of those fires – was "[p]erhaps the most critical risk to PG&E's business." (RKS Am. ¶ 2.) This is no mere speculation on the RKS Claimants' part. PG&E's misstatements impeded the ability of analysts to correctly price PG&E's risk into its price targets for PG&E's stock. Indeed, the day before the Camp Fire broke out, JP Morgan analysts set a price target of $64 per share for PG&E's stock, a 50% increase from its then-price. (*Id.* ¶ 488.) The JP Morgan analysis assumed that PG&E's wildfire liabilities would remain constant, at $2.5 billion, for the next three years. (*Id.* ¶ 489.) This analysis would make no sense but for the analysts' reliance on PG&E's assurances that, despite the localized North Bay Fires, PG&E complied with laws and regulations regarding vegetation management, pole integrity, and inspection and maintenance. Events confirmed the critical importance of PG&E's safety and maintenance practices when PG&E caused the Camp Fire and could not pass the resulting costs to rate payers under the prudent manager standard – ultimately leading to bankruptcy.

In addition to being critically important, PG&E's statements as to its safety and maintenance practices were "dramatically false." *NVIDIA*, 768 F.3d at 1063. As discussed at length above, PG&E told the public it complied with safety laws and regulations, inspected every mile of line every year, met or exceeded vegetation clearance and pole integrity regulations,

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

maintained a system-wide power shutoff program, and doubled its fire prevention spending, among other things. (*See, e.g.*, *id.* ¶¶ 174-181, 234, 283-286, 326.) In fact, PG&E has admitted that its knowing and deliberate refusal to properly maintain the Caribou-Palermo line caused the Camp Fire, and the deaths of 84 individuals. This admission is at the core of PG&E's guilty plea to 84 counts of involuntary manslaughter and one count of unlawfully (and recklessly) causing the Camp Fire. (*See id.* ¶¶ 611-615.) Indeed, the Butte County DA Report concluded, not that the Camp Fire was a horrible accident caused by simple negligence or PG&E's lack of awareness of the condition of the Caribou-Palermo line, but instead that "the ***reckless actions*** of PG&E ***created the risk*** of a catastrophic fire in the Feather River Canyon, [] PG&E ***knew of that risk*** and PG&E ***ignored the risk*** by not taking any action to mitigate the risk." (*Id.* ¶ 612 (emphasis added).) PG&E further admitted in its probation proceedings that it had actual knowledge of thousands of instances of unaddressed violations of vegetation management regulations during the Relevant Period, and that it never even believed complying with the law was possible, even though it affirmatively told investors it was complying with the law, or meeting or exceeding the standards established by the law. (*See id.* ¶¶ 575, 589.)

PG&E's argument that "the charges PG&E pled guilty to do not require deliberate recklessness" is sophistry. (RKS Obj. at 26.) The *mens rea* requirements for one of the statutes to which PG&E pled guilty ***exceeds*** the deliberate recklessness standard for Exchange Act claims. As PG&E explains in its Objection, "[d]eliberate recklessness requires that an actor 'had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort.'" (RKS Obj. at 26 (quoting *Intuitive Surgical*, 759 F.3d at 1063).) PG&E's guilty plea admits to ***more than*** having "reasonable grounds" to believe its deficient maintenance posed a substantial risk, but rather that it was "aware" of that risk and "ignore[d] that risk." (*See* RKS Am. ¶ 614.)

If a case ever called for a finding that corporate scienter has been pled, this one is it. PG&E has admitted, in its probation proceedings and in its guilty plea, to being actually aware of the

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

substantial risk posed by its deficient safety practices and to allowing that risk to remain – all while assuring the public it complied with safety and maintenance laws and regulations. After making these admissions in open court, it would be manifestly unjust to now allow PG&E to deny the knowledge of these conditions that contradicted its public statements.

### d. The RKS Amendment Pleads Reliance

#### i. PG&E's "Truth on the Market" Defense Is Baseless and Premature

PG&E's "truth-on-the-market" defense to the RKS Amendment's reliance allegations is meritless and inappropriate for determination on the pleadings. (*See* RKS Obj. § III.C.) The RKS Claimants properly rely on the "fraud-on-the-market" presumption (RKS Am. § XI), "which is premised on the theory that 'the price of a security traded in an efficient market will reflect all publicly available information about a company,' including materially false or misleading statements." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 788 (9th Cir. 2020) (quoting *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 458, 461-62 (2013)). "As a result, a plaintiff who purchases shares at an inflated price is presumed to have done so in reliance on any material misstatements reflected in the stock's price." *Id.*

PG&E is attempting to win on a first-quarter Hail Mary by asking the Court to *dismiss* the RKS Claimants' claims by finding its truth-on-the-market defense established as a matter of law at the pleadings stage. "Defendants bear a heavy burden to prevail on a truth-on-the-market defense." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014); *see also Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (noting, on a summary judgment motion, that "defendants bear a heavy burden of proof"). "Before the 'truth-on-the-market' doctrine can be applied, [d]efendants must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [the] insider's one-sided representations." *In re Amgen*, 2014 WL 12585809, at *15 (quoting *Provenz*, 102 F.3d at 1492-93). "Because the 'truth-on-the-market defense is intensely fact-specific . . . courts rarely dismiss a complaint on this basis.'" *Id.* (quoting *Scott v. ZST Digit. Networks, Inc.*, 2012 WL 538279, at

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

*11 (C.D. Cal. Feb. 14, 2012)). "As a result, a good company of courts, including this Court and the Supreme Court of the United States, hold fast to the position that proof of such a defense is generally limited to later phases in the litigation, such as summary judgment or trial." *Id.* (citing *Conn. Ret. Plans and Tr. Funds*, 568 U.S. at 481-82); *see also In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) ("[A]n attempt to offer proof of a 'truth on the market' defense to rebut the presumption of reliance is a 'matter for trial.'" (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 249 n. 29 (1988))).

PG&E asks the Court to set aside the Supreme Court's instruction that the truth-on-the-market defense is a "matter for trial" and instead make the factual determination that PG&E's defense is established as a matter of law absent any fact record. The Court should reject this argument out of hand. PG&E argues that, after certain partial "corrective disclosures" relating to the North Bay Fires – none of which were admissions of prior misstatements by PG&E – "the potential for PG&E to face massive liability for future catastrophic wildfires was already reflected in [PG&E's] stock price before several RKS Claimants ever purchased a single PG&E share, and they cannot rely on the fraud-on-the-market presumption of reliance." (*See* RKS Obj. at 27-28 (citation and internal quotations omitted).) But this argument obscures that the information that leaked into the market following the North Bay Fires merely ***partially*** revealed the extent of PG&E's hidden risk. The Ninth Circuit recognizes the intuitive notion that "partial disclosures" do not reveal the full extent of information concealed by misstatements and material omissions. *See Bofl Holding*, 977 F.3d at 790 ("[A] corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures."). That is precisely what the RKS Amendment alleges.

The RKS Amendment alleges in great detail that PG&E's safety failures were not isolated incidents, but rather reflected PG&E's "pervasive and systemic violations of laws and regulations" that it consciously "chose not to remediate." (*See, e.g.*, RKS Am. § V.F; *id.* ¶ 230 ("In reality, PG&E was a scofflaw, intentionally disregarding, and covering up, known and pervasive

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

violations of law and regulations throughout its electricity distribution system, which posed a severe risk of starting catastrophic wildfires.").)  While the revelations following the North Bay Fires revealed partial information to the market – primarily that PG&E was under investigation for potentially having caused certain of the North Bay Fires, and ultimately it was determined that PG&E had caused some of them – the true extent of PG&E's pervasive, systemic, and criminal disregard for safety and maintenance laws and regulations remained hidden from the public. Indeed, PG&E actively concealed the extent of its noncompliance – and the concomitant risk – after these partial disclosures through a series of reassuring yet materially false and misleading statements attempting to convince investors that the North Bay Fire findings were an aberration. For instance, after Cal Fire found PG&E responsible for certain of the North Bay Fires, PG&E issued a press release titled "PG&E Responds to Latest CAL FIRE Announcement[,]" which tried to assure investors that its "overall programs met our state's high standards" and that "PG&E meets or exceeds regulatory requirements for pole integrity management[.]"  (*Id.* ¶ 326.)

PG&E's reliance on *In re Kalobois Pharmaceuticals, Inc. Securities Litigation*, 258 F. Supp. 3d 999, 1008 (N.D. Cal. 2017), is misplaced.  (*See* RKS Obj. at 27.)  That case involved Martin Shkreli, the infamous "Pharma Bro."  Investors brought a securities fraud action alleging, in part, misstatements and omissions as to Shkreli's "reputation and qualifications" while he was CEO of the issuer.  *Kalobois Pharms.*, 258 F. Supp. 3d at 1007.  The court noted the "heavy burden" Shkreli faced in seeking dismissal based on a truth-on-the-market defense, but granted dismissal because, prior to the alleged misstatements, numerous widely distributed news stories revealed that Shkreli (1) was fired by the board of another company for which he was CEO, (2) that company sued him for breach of fiduciary duty and self-dealing, and (3) he was targeted in a federal criminal investigation into his alleged misconduct at his prior company.  *Id.* at 1008-09. The court found "the accusations included in the articles are largely consistent with the 'previously undisclosed' details identified in Plaintiffs' Opposition brief."  *Id.* at 1010.  In contrast, here, PG&E's misconduct was far deeper and more widespread than the partial disclosures relating to the North Bay Fires suggested.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

The RKS Amendment expressly illustrates this point by pleading specific evidence that the market relied upon PG&E's post-North Bay assurances and that the North Bay Fires were not indicative of its safety practices generally. On November 7, 2018, the day before the Camp Fire ignited, analysts at JP Morgan set a price target of $64 per share for PG&E stock (nearly a 50% increase from its then-price) and maintained an "overweight" (or buy) rating. (RKS Am. ¶ 488.) The report analyzed PG&E's wildfire liability – a meaningful component of their analyses following the North Bay Fires – and predicted wildfire liabilities of $2.5 billion, which was held constant in the model for three years. (*Id.* ¶ 489.) This constant figure for wildfire liability indicated a "belief in PG&E's assurances," as it assumed PG&E would not be held responsible for additional wildfire liabilities "precisely because of the safety policies PG&E had long asserted were true[.]" (*Id.*)

Giving the RKS Claimants the benefit of all reasonable inferences, as the Court must, the Court cannot determine as a matter of law that the extent of PG&E's latent wildfire risk (due to its pervasive malfeasance) "was already reflected in [PG&E's] stock price" when JP Morgan's analysts (who cover the stock for a living) were so clearly fooled and issued a 50% target price increase – a data point that would itself be incorporated in PG&E's stock price.

### ii. The Court Should Make Individual Reliance Determinations Only Following the Development of a Full Record and an Evidentiary Hearing

In addition to the RKS Amendment's fraud-on-the-market and *Affiliated Ute* allegations, the RKS Amendment expressly alleges that individual claimants "relied on PG&E's statements and omissions, either generally or specifically, in making investment decisions as to PG&E securities." (RKS Am. ¶ 621.) PG&E argues this allegation "is insufficient to plead actual reliance" (RKS Obj. at 27 n. 14), but even if that were true (and it is not), PG&E should be estopped at this stage from making arguments about a lack of individualized allegations.

This "sufficiency objection" procedure is the product of the July 28 Order, the terms of which were negotiated by counsel for PG&E and various securities claimants. (*See* Dkt. No. 13934.) Those negotiations arose out of the Court's request that the parties negotiate procedures

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

that would allow claimants to amend their proofs of claim and would establish an orderly process of dealing with objections "to make sure the debtor doesn't have to go crazy with objections and people have to respond to lengthy objections on a crazy basis." Bodnar Decl., Ex. 2 at 74:22-25. Indeed, this request followed PG&E's proposal that claimants should be able to "adopt" the pleading of others to provide PG&E with the factual bases of their claims. (*See* Dkt. No. 13745 at 25.) Thus, the sufficiency objection procedure grew out of PG&E's suggestion for a group pleading procedure, which would not require each claimant to plead the individual circumstances of each purchase and sale. PG&E should not be able to pull a bait-and-switch now.

Given this backdrop, the Court should allow individualized reliance issues to be determined on their merits – *i.e.*, on the individual facts and circumstances of each claimant that will be revealed in discovery. Issues of individualized reliance in securities fraud litigation "call for separate inquiries into the individual circumstances of particular" investors, and are often therefore resolved in individual proceedings after a class action trial resolves common issues. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584-85 (S.D.N.Y. 2011); *see also Smilovits v. First Solar, Inc.*, 2019 WL 6698199, at *7 (D. Ariz. Dec. 9, 2019) (granting motion to preclude evidence of individual reliance at class trial and leave to resolve after determination of common issues). Individualized reliance is thus a quintessential fact issue that should not be resolved on this legal sufficiency motion. Given the "group pleading" nature of this bespoke claims allowance procedure and the fact-intensive nature of individualized reliance proofs, it would be patently unfair to bar the RKS Claimants' claims on that basis.

### iii. The RKS Claimants Properly Invoke the *Affiliated Ute* Presumption of Reliance at the Pleading Stage

PG&E argues that the RKS Claimants may not rely on the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). To make this argument, PG&E (1) misrepresents what the RKS Amendment actually pleads; (2) misapplies relevant caselaw; and (3) completely ignores the procedural posture of this case.

*First*, PG&E mischaracterizes the allegations in the RKS Amendment. PG&E asserts that

the RKS Amendment makes a "single conclusory allegation" that "PG&E's misstatements throughout the Relevant Period included omissions." (RKS Obj. at 28.) In doing so, PG&E ignores the full sentence that it purports to quote. The RKS Amendment states: "PG&E's misstatements throughout the Relevant Period included omissions, in that they failed to inform investors of PG&E's safety and regulatory failures." (RKS Am. ¶. 620). Paragraph 620 is not a conclusory allegation, but rather states that the reason this is an omissions case is that PG&E "failed to inform investors of PG&E's safety and regulatory failures." (*Id.*) Thus, the "thrust of plaintiff's allegations" is a failure to disclose. *In re Robinhood Ord. Flow Litig.*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022) ("However, plaintiff alleges that these misrepresentations are misleading because of their omissions. Thus, this case is primarily about what Robinhood did not say. Thus, the Court finds that the *Affiliated Ute* presumption of reliance applies.").

Second, PG&E misapplies the very caselaw it cites. PG&E relies on *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 2 F.4th 1199, 1208-09 (9th Cir. 2021). But *Volkswagen* is readily distinguishable from the current matter. That case was determined on summary judgment, after a full factual record was developed. This was critical to the Court's ruling, as the Ninth Circuit wrote: "Volkswagen argued that Plaintiff, despite its allegations, had no evidence that it or Santander relied on the Offering Memoranda, that the *Affiliated Ute* presumption of reliance did not apply, and that, if did it apply, Volkswagen had rebutted the *Affiliated Ute* presumption." *Id.* at 1203. Of course, this motion is not one for summary judgment, no discovery has occurred, and the RKS Claimants have *affirmatively pled* they did rely on statements by PG&E. In addition, there has been no chance for the Defendants to "rebut" the presumption given that there has been no chance for any evidence as to the *Affiliated Ute* presumption to be developed at all.

At the motion to dismiss stage, the *Volkswagen* district court declined to decide this exact issue in favor of the defendants. As the court observed:

> [I]t is worth remembering that the question of whether *Affiliated Ute* applies is ultimately not one that needs to be answered at this stage

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

in the litigation. Plaintiff has plausibly alleged that, through its investment advisor, it relied directly on the misleading statements in the Offering Memorandum. Those allegations are sufficient to support the reliance element at the pleading stage, while the question of whether Plaintiff can use *Affiliated Ute* to prove reliance on a class-wide basis is a question that needs to be resolved in considering class certification. Taking this procedural posture into account, the Court will not finally resolve at this time whether Plaintiff may invoke *Affiliated Ute*'s presumption of reliance to prove its case.

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 328 F. Supp. 3d 963, 978 (N.D. Cal. 2018); *see also Vicari v. Voyager Fin. Grp., LLC*, 2013 WL 12136519, at *3 (C.D. Cal. Sept. 17, 2013) ("It is 'plausible on its face' that the gravamen of the [complaint] is VFG's failure to disclose the illegality of the sale of veteran benefits to purchasers, which the Court finds is sufficient to assert a claim of reliance based on the *Affiliated Ute* presumption."); *Crago v. Charles Schwab & Co.*, 2017 WL 6550507, at *8 (N.D. Cal. Dec. 5, 2017) ("Mindful, though of the often 'illusory' distinction between what constitutes an omission as opposed to a misrepresentation in securities fraud cases, it would not be appropriate to terminate this case at the pleading stage for want of a reliance averment but instead to allow the development of the record on that question through discovery.").

This Court should adopt the same approach. Because the RKS Claimants plead a presumption of reliance under the fraud-on-the-market theory, as well as actual reliance, there is not a *single* claim or defense that can be resolved by this Court dismissing the *Affiliated Ute* presumption. Thus, like the *Volkswagen* district court at a comparable stage, this Court should allow the well-pled allegations of omissions (and related *Affiliated Ute* presumption of reliance) to proceed.

PG&E's invocation of *LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at *4 (N.D. Cal. June 13, 2022), in support of the idea that this Court should dismiss the *Affiliated Ute* allegations is misplaced. In *LifeLine*, the court found that the plaintiff failed to allege an "actionable omission" with respect to any of the relevant claims. *Id.* at *3. If a Court finds that there are *no* actionable omissions, then the *Affiliated Ute* presumption does not apply. But that tautological statement does not help this Court in the slightest. The RKS Amendment alleges

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

numerous omissions.  Further, the actual facts of *Lifeline* confine its holding.  *Lifeline* concerned a single plaintiff's investment in non-trading preferred stock of the issuer governed by a share purchase agreement.  *Id.* at *1.  That is a far cry from the situation of the RKS Claimants who purchased publicly traded securities in an efficient market, where the market price would be expected to reflect new information had that information not been omitted.  Not so of non-trading preferred stock governed by a contract.

### e.  The RKS Amendment Adequately Pleads Loss Causation

The RKS Claimants sufficiently plead a causal link between PG&E's misrepresentations regarding its safety and maintenance practices – and thus the true extent of its wildfire risk exposure – and the drop in stock value that resulted in the RKS Claimants' economic losses.  "[T]he test for loss causation 'requires no more than the familiar test for proximate cause'" employed in typical tort suits.  *In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *7 (N.D. Cal. Oct. 13, 2022) (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018)).  This is a "low bar" at the pleading stage.  *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020).  Claimants need allege only a "plausible" inference that the "'revelation of fraudulent activity,' rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price."  *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204-06 (9th Cir. 2020) (quoting *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014)).  And while it requires pleading specific facts, Rule 9(b)'s particularity standard "does not require that the causation inference be *more* than 'plausible.'"  *Id.* at 1206.  Hence, "[g]enerally, loss causation 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'"  *Pampena v. Musk*, 2023 WL 8588853, at *18 (N.D. Cal. Dec. 11, 2023) (quoting *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008)); *see also Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage."); *In re Tesla*, 2022 WL 7374936, at *7 (describing expert witnesses' role at evidentiary stages to address the "tangle of factors that may affect stock price"

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

(internal quotations omitted)); *Reckstein Fam. Tr. v. C3.AI, Inc.*, 2024 WL 734497, at *22 (N.D. Cal. Feb. 22, 2024) ("[A] complaint need only raise a reasonable expectation that discovery will reveal evidence of loss causation." (internal quotations omitted)).

The RKS Claimants' need only "describe how the falsity of [PG&E]'s misstatement was revealed to the market" and resulted in a decline in stock price. *BofI Holding*, 979 F.3d at 1206.[23] To meet this burden, courts recognize "an infinite variety of causation theories [Claimants] might allege to satisfy proximate cause." *Reckstein Fam. Tr.*, 2024 WL 734497, at *22 (internal quotation marks omitted); *see also In re WageWorks*, 2020 WL 2896547, at *5 ("Loss causation is simply a causal connection between the material misrepresentation and the loss." (internal quotation marks omitted)). Two of the dominant theories of loss causation are "corrective disclosure" and "materialization of the risk" – both of which apply here – but "[a]ny kind of proximate cause" satisfies Claimants' pleading requirement. *Id.* at *5.

*First*, Claimants plead loss causation under a "corrective disclosure" theory because they allege that: "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by [PG&E's] misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *BofI Holding*, 977 F.3d at 791. As to the first element, the RKS Amendment alleges a slow drip of information in the aftermath of the North Bay Fires partially revealing that PG&E's exposure to wildfire-related liability was greater than the market previously understood because PG&E's vegetation management and other wildfire mitigation efforts were at first suspected (and later confirmed) to have been deficient at certain of the ignition points of the North Bay Fires. (*See* RKS Am. §§ VII.D.1-5.) Taken together, these statements "reveal[ed] 'new facts'" that partially revealed that PG&E's prior statements (that its exposure to wildfire-related liability was mitigated by fully compliant vegetation management practices) were "false or misleading." *Pampena*, 2023 WL

---

[23] Claimants need not "describe all the ways in which [PG&E's falsity] was *not* revealed." *BofI Holding*, 979 F.3d at 1206.

8588853, at *19 (citing *BofI Holding*, 977 F.3d at 790).[24]  As to the second element, Claimants plead that the ensuing drop in stock price was attributable to the market digesting such revelation, as opposed to other factors. (*See* RKS Am. §§ VII.D.1.b, 2.b, 3.b, 4.b, 5.b.)  Claimants further allege that the timing of the price decreases indicates that the decreases were caused by the market's digestion of the corrective disclosures.[25]  (*Id.*)

*Second*, Claimants also plead loss causation under a "materialization of the risk" theory because they allege that PG&E's "misstatements and omissions" understated PG&E's actual exposure to wildfire-related liability (by overstating PG&E's wildfire-mitigation efforts), such understated risk materialized when PG&E faced higher-than-expected liability exposure arising from its role in causing the North Bay Fires and the Camp Fire, and the market's recognition of that true level of exposure "played some part in diminishing the market value of [Claimants'] securit[ies]."  *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *9 (N.D. Cal. Mar. 26, 2015) (internal quotation marks omitted).  Hence, the "the very facts about which [PG&E] lied" – *i.e.*, its actual (heightened) level of exposure to wildfire-related liabilities – "caused the injuries" Claimants suffered when those concealed risks materialized and were priced into PG&E's stock value, causing it to drop.  *In re WageWorks*, 2020 WL 2896547, at *5 (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013)).[26]

---

[24] Plaintiffs need not allege that each statement revealed a discrete new fact; rather, numerous "partial disclosures" may be "viewed together" in "totality" as revealing the true state of affairs. *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *15 (N.D. Cal. Feb. 15, 2018); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045-46 (N.D. Cal. 2016) (describing each "particular corrective disclosure" as "a data point regarding the market's reaction to information about a defendant's alleged misconduct").

[25] "The determination of whether there is a causal link includes a temporal component—a disclosure followed by an immediate drop in stock price is more likely to have caused the decline— but timing is not dispositive." *BofI Holding*, 977 F.3d at 790; *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 956 (9th Cir. 2023) ("[T]here is no 'bright-line rule requiring an immediate market reaction' after a revelation because '[t]he market is subject to distortions that prevent the ideal of a free and open public market from occurring.'").

[26] "Although 'it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated,' materialization of the risk recognizes that 'a misstatement or omission is

PG&E makes two arguments against the sufficiency of Claimants' loss causation allegations. Both fail. *First*, PG&E argues that its exposure to wildfire-related liability was fully disclosed such that no "new information" was revealed. (PERA Opp. at 61-67; *see also id* at 62 ("PG&E has long disclosed the risk of wildfire and the corresponding risk of liability if it causes wildfires, including that it could be held liable for fires caused by its equipment.").) But the sufficiency and accuracy of PG&E's disclosures – to wit, whether "investors understood the *particular* risks" of wildfire-related liability that PG&E faced due to its criminally deficient wildfire mitigation efforts and vegetation management practices – go to the issue of falsity, not loss causation. *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815-16 (C.D. Cal. 2011) (emphasis added). Courts have rejected similar attempts by defendants to "parlay their contention that Plaintiffs have failed to demonstrate falsity into an argument that Plaintiffs have failed to show loss causation." *Id.* Having sufficiently alleged falsity (*see* Section II.b, *supra*), the loss causation analysis "begin[s] with the premise that [the] misstatements *were* false and ask[s] whether the market at some point learned of their falsity—through whatever means." *BofI Holding*, 977 F.3d at 791-92. That is, the loss causation analysis begins with the premise that **the true extent** of PG&E's exposure to wildfire-related liabilities was not properly disclosed (even if **some** exposure was disclosed). The RKS Amendment pleads that there was a material difference between PG&E's **disclosed** risk and its **actual** risk that caused the stock price to drop when that difference was revealed and priced-into the stock. That is all that is required at this stage. Indeed, courts routinely uphold allegations of loss causation where **some** degree of risk was disclosed, but the **actual** degree of risk was hidden from investors.[27]

---

the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Nuveen*, 730 F.3d at 1120 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

[27] *See, e.g.*, *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *16 (N.D. Cal. Mar. 31, 2023) (company disclosed sales "backlog" but nevertheless misrepresented the severity of the backlog's effects on reported financial figures); *In re Zoom Sec. Litig.*, 2022 WL 484974, at *4 (N.D. Cal. Feb. 16, 2022) (company "had already disclosed" that it retained user encryption keys that could

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

Not only is Defendants' position foreclosed by case law, but it would also produce absurd results. In PG&E's view, a generalized disclosure that "automobiles traveling at high speeds are inherently prone to crashes" could shield a car manufacturer from allegations that a later revelation of known and tolerated defects in the manufacturer's braking systems caused its stock price to drop. Yes, the fact that cars **sometimes** crash would already be priced into the stock, but the fact that these particular cars are **much more likely** to crash – and to result in liability to the manufacturer – as a result of their known-to-be defective braking systems would not be. Likewise, PG&E's generalized disclosure of wildfire-related risks does not overcome the RKS Claimants' allegations that the true level of wildfire-related liability exposure was not priced into the stock until the market learned the entire truth about PG&E's criminally deficient vegetation management and maintenance practices.

*Second*, PG&E argues that the drop in its stock price was caused by factors other than the revelation of PG&E's true exposure to wildfire-related liability upon the market learning that PG&E abdicated its vegetation management and maintenance responsibilities. Instead, PG&E posits that the only "new information" in the market was the "extent of [PG&E's] potential liability based on the size of the fire" – *i.e.*, how "vastly destructive the fire was." (PERA Obj. at 66-67.) As a threshold matter, this argument is undercut by PG&E's contention that it fully disclosed its potential exposure to wildfire-related liability. Given the well-accepted presumption that the price of PG&E's securities, which traded in an efficient market, already reflected those risks, *see BofI Holding*, 977 F.3d at 788, the market price would be unaffected by manifestation of a known risk.

---

circumvent certain encryption but nevertheless misled investors by overstating its level of encryption); *Azar v. Yelp, Inc.*, 2019 WL 285196, at *3-5 & n.2 (N.D. Cal. Jan. 22, 2019) (company disclosed certain risks to its advertising model but nevertheless presented a "misleadingly optimistic" picture by failing to disclose a high level of advertiser "churn"); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *14 (S.D. Cal. Sept. 27, 2022) (company disclosed risks related to drug study flaws but nevertheless "misled investors into underestimating the risk" of FDA rejection of drug application); *see also Brar*, 2015 WL 1393539, at *9 (holding that "the causal connection between the misrepresentation and the loss is obvious" where a company's representation that it "was making sufficient progress" towards a goal was later revealed to be inaccurate – even if the general risk of not achieving the goal is known); *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 674 (N.D. Cal. 2021) (same).

Indeed, while PG&E notes that the North Bay Fires and Camp Fire were severely destructive, it does not contend that they were *unforeseeably* destructive such that their possibility was not already priced into PG&E's securities; to the contrary PG&E says it specifically warned investors that "such a catastrophic event" was "possible" (*see* PERA Obj. at 65) – and that warning was already reflected in the stock price. The market was deceived, however, as to the likelihood PG&E would not be able to recover wildfire damage expenses from rate payers because PG&E grossly misrepresented it vegetation management and maintenance practices. (*See, e.g.*, RKS Am. ¶ 10.)

Regardless, even if PG&E can point to other factors that may have contributed to the drop in stock price (such as materialization of known risks or investor shock at the severity of the destruction), the mere presence of such other factors does not overcome Claimants' loss causation allegations because "loss causation does not require a showing 'that a misrepresentation was the *sole* reason for the investment's decline in value.'" *BofI Holding*, 977 F.3d at 790. Rather, Claimants need only allege that PG&E's "misrepresentation is one substantial cause" of that decline. *Id.* Untangling the various other factors that may have also contributed to the drop is not an appropriate inquiry at the pleading stage. *See Pampena*, 2023 WL 8588853, at *18; *Fitbit Inc.*, 216 F. Supp. 3d at 1033; *In re Tesla*, 2022 WL 7374936, at *7; *Reckstein Fam. Tr.*, 2024 WL 734497, at *22.

### III. The RKS Amendment States Claims Under Sections 11 and 15 of the Securities Act

Certain of the RKS Claimants assert claims against PG&E under Section 11 of the Securities Act (and against Holdco under Section 15, for control person liability) arising from their purchase of the Notes Offering Notes, either directly in the offerings or in the secondary market. (*See* RKS Am. ¶¶ 654-673.) The thrust of these claims is that the RKS Claimants purchased the Notes Offering Notes pursuant to registration statements that contained materially false and misleading statements. (*See, e.g.*, *id.* ¶ 657.)

"Section 11 imposes broad liability without regard to reliance or fraudulent intent for any material misstatements or omissions contained in a registration statement for the first year that the registration statement is available." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 856 (9th Cir.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

2013). "The Supreme Court has recognized that Section 11 'places a relatively minimal burden on a plaintiff.'" *Id.* at 859 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "As long as 'a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case.'" *Id.* (quoting *Huddleston*, 459 U.S. at 382). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.* (quoting *Huddleston*, 459 U.S. at 382).

Importantly, in addition to their Securities Act claims, the RKS Claimants have pled viable Exchange Act claims based on the Notes Offering Notes. *See* § II, *supra*. Therefore, dismissing any of the Securities Act claims will neither streamline discovery nor alleviate the Court's or the parties' burdens in developing a full and complete factual record for an evidentiary hearing. In any event, PG&E's arguments raise questions of fact that cannot be resolved on this motion. *See* N.D. Cal. Bankr. L.R. 3007-1(b) (issues of law can be resolved at initial hearing on claim objection, but not issues of fact).

### a. The Court Cannot Determine That the Securities Act Claims Based on the 2016 and 2017 Notes Offerings Are Time-Barred as a Matter of Law

PG&E argues that the Securities Act claims based on the 2016 and 2017 Notes Offerings are time-barred as a matter of law because, it contends, the RKS Claimants were on inquiry notice as to PG&E's misconduct immediately upon the first alleged partial disclosure on October 12, 2017 (CPUC's issuance of a litigation hold letter to PG&E), which was more than one year prior to the commencement of the Securities Act Class Action. (*See* PERA Obj. at 77-78; RKS Obj. at 33.) This argument is contrary to law and cannot be credited at the pleading stage.

As an initial matter, the Section 11 claims were tolled by the filing of the first class action complaints against PG&E in June 2018 – less than one year after the North Bay Fires. (*See* PG&E's Omnibus Request (Dkt. No. 14208), Exs. 88, 89.) "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974). The RKS Claimants who purchased notes in the 2016 and 2017 Notes Offerings clearly fell within the class definitions in these actions. (*See, e.g.*, PG&E's

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

Omnibus Request (Dkt. No. 14208), Ex. 88 (defining class as "all persons other than Defendants who purchased or otherwise acquired securities of PG&E between April 29, 2015 and June 8, 2018[.]".)  That the initial class action complaints asserted claims under the Exchange Act is immaterial.  *American Pipe* tolling applies where subsequent claims "concern the same evidence, memories, and witnesses as the subject matter of the original class suit." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 355 (1983) (Powell, J., concurring); *see also MYL Litig. Recovery I LLC v. Mylan N.V.*, 2020 WL 1503673, at \*7-8 (S.D.N.Y. Mar. 30, 2020) (finding opt-out plaintiffs' claims under Section 18 of the Exchange Act, which requires eyeball reliance on statements in SEC filings, tolled by filing of a Section 10(b) class action).  This is the case here. The original class actions put PG&E on notice it was facing suit for making materially false and misleading statements to investors regarding its fire safety practices.  Because the statute of limitations was tolled for all of the RKS Claimants by the filing of the original class action complaints, and those complaints were filed less than one year after the North Bay Fires, the Court need not determine whether the RKS Claimants were put on inquiry notice of a claim starting with the first post-North Bay partial disclosure.

Nonetheless, PG&E's argument also fails because the RKS Claimants were not immediately put on inquiry notice as of the first partial disclosure.  In order to be timely, Securities Act claims must be filed no later than one year after a plaintiff's "discovery of the facts constituting the violation" or where a "reasonably diligent plaintiff would have discovered them."  15 U.S.C. § 77m; *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1082 (N.D. Cal. 2010) (citing *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010)).  "The determination of inquiry notice[,]" *i.e.* when a reasonably diligent plaintiff would have discovered the facts constituting the violation, "is fact-intensive." *See Bare Escentuals*, 745 F. Supp. 2d at 1080-81 (citing numerous cases); *Booth v. Strategic Realty Tr., Inc.*, 2014 WL 3749759, at \*4 (N.D. Cal. July 29, 2014) ("As courts in this District have reasoned, the determination of inquiry notice is 'fact intensive' and is usually not appropriate at the pleading stage."); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1183 (C.D. Cal. 2011) (examination as to whether "reasonable investigation would have

ROLNICK KRAMER SADIGHI LLP<br>1251 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10020

revealed" violation of law would be "fact-intensive" and "better addressed at the summary judgment stage"). "At the pleading stage, the question is whether it is *plausible* that [the relied-upon] disclosures were insufficient to supply a reasonably diligent plaintiff with the information necessary to plead the Section 11 claims with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Strategic Realty Tr.*, 2014 WL 3749759, at *6.

PG&E's implicit assumption that, at the pleading stage, *all* Claimants should be deemed to be on inquiry notice immediately upon the first of a series of partial disclosures, is contrary to law. (*See* PERA Obj. at 78.) As here, in *Bare Escentuals*, the "plaintiffs allege[d] multiple disclosures" between June 5, 2007, and October 30, 2008, "regarding the exposure of defendants' fraud." 745 F. Supp. 2d at 1081. The court found, however, that at the pleading stage, "plaintiffs are [] entitled to the reasonable inference that it is the course of all disclosures collectively that ultimately placed plaintiffs on **notice** of the need to investigate for fraud – *i.e.*, that it was no single disclosure that was dispositive, but rather all the disclosures collectively." *Id.* (emphasis added). This Court should apply that rule here.

As is so often the case throughout its objections, PG&E's reliance on *Edison* is misplaced. (*See* PERA Obj. at 79; RKS Obj. at 33.) In *Edison*, the plaintiffs alleged that the "market understood that [the defendants] had [] caused the" relevant fire as of the date it began, and the court determined this put them on notice of misstatements in the defendants' offering documents. *See Edison*, 2021 WL 2325060, at *7. Here, while partial disclosures suggested PG&E may have started certain of the North Bay Fires, the actual cause was not revealed until May 2018 (RKS Am. ¶ 455), and even *that* disclosure did not *fully* reveal the extent of the concealed risk due to PG&E's criminal malfeasance. (*See id.* ¶ 96 (falsity not fully revealed until after Camp Fire).) Because the RKS Claimants allege a series of partial disclosures, PG&E's argument fails. *See Bare Escentuals*, 745 F. Supp. 2d at 1081. PG&E itself never voluntarily disclosed the truth to investors, and instead it was a series of events – rather than PG&E's admissions – that resulted in the market revaluing PG&E's securities to reflect the truthful risk profile. If PG&E had told the full truth in October 2017, that would have constituted notice to all claimants – but, as the RKS Amendment pleads,

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

PG&E not only did not tell the truth then, it continued to lie.

### b. The RKS Amendment Alleges Actionable Misstatements and Omissions

PG&E's argument that the RKS Amendment fails to adequately plead misstatements and omissions is baseless. (*See* PERA Obj. at 80-85; RKS Obj. at 33.) PG&E baldly asserts that the Securities Act claims "fail[] to plead falsity with the requisite particularity," but fails to explain how, instead simply arguing that the detailed Securities Act allegations were not false or misleading, or that the alleged misstatements were not material. (*See* PERA Obj. at 81-84.)

The RKS Amendment alleges numerous detailed material misstatements and omissions in the Offering Documents. (*See* RKS Am. § VI.H.) PG&E's rehash of its arguments as to the Exchange Act misstatements fails. For instance, it misrepresents the concealed risk alleged by the RKS Amendment, claiming that the Securities Act allegations "nowhere point to any representation from PG&E that it could ever eliminate the risk of wildfires," and that "investors were well aware of the potential risk of wildfires and wildfire liability." (PERA Obj. at 82.) As is discussed at length above, PG&E misrepresented the ***true extent*** of wildfire liability risk because it concealed its pervasive, systemic, and criminal failure to comply with safety and maintenance requirements. (*See, e.g.*, RKS Am. § V.F (detailing PG&E's "pervasive and systemic violations of laws and regulations").) PG&E also rehashes its nonsensical argument that its failure to disclose its then-existing systemic noncompliance was not misleading because the RKS Amendment's allegations showing they were misleading "are premised entirely on conclusions reached in December 2018 and later in 2019 . . . and fail to provide facts that PG&E's disclosures were false when made." (PERA Obj. at 83.) That PG&E's lies were exposed after the fact does not mean its statements were true when made. It simply means PG&E successfully concealed the truth until investigations later uncovered it, as is the case with virtually ***every concealed fraud***. *See also* n. 20, *supra*. The Offering Documents did not warn against the risks that later materialized (*see* PERA Obj. at 84) because they failed to disclose PG&E's widespread and pervasive violations of safety and maintenance laws and regulations.

PG&E's argument that the Securities Act Claimants fail to plead a violation of Item 303

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

also fails. "Item 303 of SEC Regulation S-K requires the Management's Discussion & Analysis ('MD&A') section of registration statements to '[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations . . .' and [to] '[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" (RKS Am. ¶ 412 (quoting 17 C.F.R. § 229.303(a)(3)(i)-(ii)).) As it does throughout its objections, PG&E misstates the thrust of the RKS Amendment's allegations, wrongly asserting that "PG&E diligently disclosed the worsening trend of conditions contributing to the risks of California wildfires in both its Offering Documents and the SEC filings incorporated therein." (PERA Obj. at 85.) But the RKS Amendment does not allege that PG&E failed to disclose the general risk of a wildfire in California. It alleges that PG&E "failed to disclose [its] widespread and systemic failure to comply with federal and California laws and regulations relating to vegetation management, fire safety, and maintenance and repair of its infrastructure, among other things." (RKS Am. ¶ 415.) PG&E's argument thus fails to engage with the actual allegations of the RKS Amendment.

### c. The RKS Amendment Alleges Economic Loss

PG&E asks the Court to dismiss the Securities Act claims based on its "negative causation" defense, which bars damages where a defendant proves "any portion or all of such damages represents other than the depreciation in value of such security resulting from [the alleged misstatement or omission.]" (PERA Obj. at 85-86 (quoting 15 U.S.C. § 77k).) This is improper at the pleading stage. Negative causation is an affirmative defense. "[T]he Securities Act places the burden on defendants to prove negative loss causation as an affirmative defense[.]" *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017). "The defendant has the burden of proof on this defense," and bears a "heavy burden." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994)).

PG&E is asking this Court to make a factual determination at the pleading stage that *none*

of the decline in value of the Notes Offering Notes from their time of purchase through at least November 14, 2018, was attributable to the market's learning of PG&E's misstatements and omissions and that the misstatements and omissions did not so much as touch upon the reasons for the decline in value. There is no basis for the Court to draw such a sweeping and factually incorrect conclusion based on the allegations in the RKS Amendment. Like so many of its other arguments for dismissal, PG&E's negative loss causation defense is "fact-intensive" and "is generally established by a defendant on a motion for summary judgment or at trial[.]" *In re Lyft Sec. Litig.*, 2020 WL 1043628, at *6 (N.D. Cal. Mar. 4, 2020) (quoting *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272-73 (S.D.N.Y. 2007)).

PG&E's negative loss causation argument for dismissal is premised on its assertion that "the risk that materialized was not 'concealed'" and "[t]here can be no loss causation where, like here, investors were warned about the very risk that later materialized." (PERA Obj. at 86.) As explained in detail above, PG&E's general risk disclosures as to wildfire risk "failed to disclose [its] widespread and systemic failure to comply with federal and California laws and regulations relating to vegetation management, fire safety, and maintenance and repair of its infrastructure, among other things." (RKS Am. ¶ 415.) Unlike in *In re Shoretel Inc. Securities Litigation*, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009), on which PG&E relies (PERA Obj. at 86), the RKS Amendment expressly pleads that PG&E securities lost value when the market learned of the pervasive risks concealed by "the false and misleading nature of PG&E's statements regarding the Company's safety practices and compliance with vital safety regulations." (*See, e.g.*, RKS Am. ¶ 429; *see also id.* ¶ 528 (price declines in debt securities were caused by materialization of concealed risk).)

### d. The Court Should Determine Damages Following an Evidentiary Hearing

PG&E seeks dismissal of the Securities Act claims at the pleading stage by arguing that the Court should determine that the intrinsic value of the Notes Offering Notes at the time the Securities Act Class Action was filed was different than the market price of those Notes because, under the later-confirmed Plan, the Notes would be "paid in full or reinstated." (PERA Obj. at 87-

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

88.) Even if there may be circumstances where the value of a security is different from its market price, such instances would be "unusual and rare." *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995) (quoting *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987)). "Indeed, in a market economy, when market value is available and reliable, 'market value will always be the primary gauge of a [security's] worth.'" *Id.* (quoting *Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir.), *cert. denied,* 434 U.S. 922 (1977)).

In addition to lacking substantive support, it is inappropriate at the pleading stage to make a fact-based determination as to whether this is the "unusual and rare" case where a security's value differed from its market price at a given point in time. Indeed, the case upon which PG&E illustrates the point: that case was a post-trial decision decided on a full fact record. *See Beecher v. Able*, 435 F. Supp. 397, 403 (S.D.N.Y. 1975) (PERA Obj. at 88). The Securities Act Claimants have plausibly alleged the Notes Offering Notes declined in value, causing them damages. (*See, e.g.*, RKS Am. ¶¶ 516, 520-528, 661.) This is all that is required at the pleading stage. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (reversing district court dismissal based upon failure to allege Section 11 damages where no payments were missed on mortgage-backed securities but plaintiff plausibly alleged diminution in value of securities based on ratings downgrades and "less certain future cash flows."). (*See also* RKS Am. ¶ 507 (analyst noting concern over potential downgrade to non-investment grade rating); *id.* ¶ 514 (Moody's downgrading debt securities).)

### e. The Court Should Determine Issues of Individual Reliance After an Evidentiary Hearing

PG&E seeks to dismiss the Securities Act claims arising from Notes Offering Notes purchases occurring on the secondary market after PG&E's publication of "an earning statement covering a period of at least twelve months after the effective date of the registration statement" pursuant to which the Notes were sold. (*See* RKS Obj. at 34 (quoting 15 U.S.C. § 77k(a).) In doing so, PG&E implicitly concedes that with respect to "reliance," any purchases in the offering or *until at least a year after* do not have to demonstrate reliance. For the April 2018 offering, no purchases are subject to the reliance requirement because the relevant period ended in November

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

2018, less than one year from the offering.  For the March 2017 offering, purchases during the period from March 2017 to *at least* May 2018 are not subject to the reliance requirement, wherein the Utility's 10-Q was the first chance for an earning statement covering a period of at least twelve months "after the effective date of the registration statement" to be filed.  Given that the Section 11 claims as to the March 2017 offering only cover March 2017 to November 2018, purchases in *75%* of the relevant period have no reliance requirement at all.  And so on.  PG&E's challenge is thus to a small subset of the claims of a small subset of the trading of a small subset of the RKS Claimants.  This is precisely the kind of issue that lends itself to a full claimant by claimant factual record before disposition.

And even as to Notes purchased beyond these periods, the Court should wait until a full factual record has been developed before making any determinations as to individual reliance.  Contrary to PG&E's assertion, the RKS Amendment *does* allege reliance "on PG&E's statements and omissions," including those in the Offering Documents.  (RKS Am. ¶ 621.)  As the Court is aware, the RKS Claimants are a large and diverse group, and the circumstances of their purchases of PG&E securities will vary from claimant to claimant.  As noted above, PG&E should be estopped from arguing for dismissal of claims for lack of individualized allegations when it campaigned for a collective pleading approach.  And PG&E cannot complain of any prejudice in the RKS Claimants following such a procedure.  Given that the Court-ordered procedures here provided for claimants to adopt proofs of claim, and the fact that the debt securities at issue will remain in the case because of the RKS Claimants' Exchange Act claims, the Court should not dismiss Securities Act claims based on issues of individual reliance at this stage.

### f.  The Court Should Not Dismiss Securities Act Claims Arising From the 2018 Offering Without a Fully Developed Factual Record

PG&E seeks dismissal of claims arising from notes acquired in the 2018 Exchange Offer because, it argues, claimants who traded unregistered restricted notes for the 2018 Notes Offering Notes "were not presented with the decision of whether or not to purchase [registered] bonds pursuant to the registration statement."  (PERA Obj. at 90 (quoting *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 978 (N.D. Cal. Sept. 11, 2007)); RKS Obj. at 34.)  As an initial matter,

*Levi Strauss & Co.* is a non-binding decision based on authority from outside the Ninth Circuit that presumed that exchanging noteholders would not have relied upon the registration statement or found the misstatements in its material. *See* 527 F. Supp. 2d at 975-78. In addition, certain RKS Claimants purchased the 2018 Notes Offering Notes without participating in the 2018 Exchange Offer, and their claims would not be subject to this argument. Because the authority on which PG&E relies is non-binding and makes presumptions as to reliance, and because the circumstances of each claimants' acquisition of the 2018 Notes Offering Notes will be different, the Court should deny PG&E's sufficiency objection on this basis and defer any decision until after a full factual record is developed as to each claimants' purchase of the Notes and on what each claimant relied.

### g. None of the RKS Claimants (Who Have Not Settled as of the Time of this Objection) are "Releasing Parties" Under the Plan

PG&E seeks to bar the Exchange Act and Securities Act claims of those RKS Claimants who held "Utility Senior Note Claims" by arguing the Plan released *all of* their claims against PG&E. (PERA Obj. at 91-94; RKS Obj. at 34-35.) Not so. The releases given by the holders of the Utility Senior Note Claims were given only "in their capacities as" Utility Senior Note Claims holders, not in their capacities as holders of other types of claims. (*See* Plan § 10.9(b).) The Exchange Act and Securities Act claims asserted by RKS Claimants who purchased Utility Senior Notes are subordinated under Section 510(b) of the Bankruptcy Code, and so the claims arising under the Exchange Act and Securities Act are Utility Subordinated Debt Claims, which receive separate treatment under the Plan. (*See id.* § 4.32.) The releases upon which PG&E relies thus did not release claims in the claimants' capacities as Utility Subordinated Debt Claims holders, and those claims have not been released.

The Plan defines Releasing Parties as including "the holders of Utility Senior Note Claims … *in their capacity as such*." (Plan § 1.180 (emphasis added).) The release given in Section 10.9(b) of the Plan, therefore, did not give any releases in claimants' capacities as holders of other claims, unlike the noteholders in *Elliott*, whose claims arising under their Restructuring Support Agreement were expressly released in the Plan. *See In re PG&E Corp.*, 2020 WL 9211213, at *4

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

(Bankr. N.D. Cal. Oct. 22, 2020) ("*Elliott I*"). While the release purported to release claims "arising from … the purchase, sale, or rescission of the purchase or sale of any Security[,]" this language would operate to release the noteholders' claims *as holders of Utility Senior Note Claims*. Further, unlike the RKS Claimants, the *Elliott* claimants were not pursuing claims classified in the Plan as pre-petition claimants. Rather, they were seeking to assert a new administrative claim arising from an agreement that was expressly included in the release. *See id.* Accordingly, the Court should not extinguish the Utility Subordinated Debt Claims based on releases given by certain claimants "in their capacities as" Utility Senior Note Claims Holders.[28]

### h. The RKS Claimants Plead Reliance for their 10b Claims Based on Debt Instruments

In what can only be described as a last gasp shot in the dark, PG&E asks the Court to dismiss the RKS Claimants' Section 10(b) claims for purchases of debt securities based on statements in the challenged registration statements because, PG&E claims, the RKS Claimants do not allege reliance. First, PG&E makes a blatantly incorrect statement that "there can be no dispute that the market for the notes was not efficient and the RKS Claimants have not even alleged market efficiency for these notes." (RKS Obj. at 35.) But the RKS Amendment *explicitly* alleges that "[t]he Company's [defined previously as Debtors] securities traded in an efficient market or markets;" (RKS Am. ¶ 617), and that "[a]t all relevant times, the market for PG&E securities which Claimant and/or Adopting Claimants purchased was efficient for the following reasons [listing reasons]." (*Id.* ¶ 618.) If there was any doubt left, the RKS Amendment further alleges that "[a]s a result, the market for PG&E securities promptly digested current information regarding PG&E from publicly available sources and reflected such information in PG&E's stock price. Under these circumstances, a presumption of reliance applies." (*Id.* ¶ 619.)

PG&E cites no support for its bald assertion that "there can be no dispute" that the notes did not trade in an efficient market. It also cites nothing at all for the proposition that "the RKS

---

[28] PG&E does not specify which claims it attacks with this argument, and it is not clear on the face of the RKS Amendment. For that reason, the Court should reserve judgment on this issue until a factual record is developed in discovery.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

Claimants have not even alleged market efficiency for these notes" – nor could it, given that the RKS Claimants allege exactly that: that the securities of Debtors, which indisputably *includes* the notes at issue, traded in an efficient market.  (RKS Am. ¶¶ 617-19.)

The Court should reject this argument out of hand given it is based on demonstrably incorrect premises.  But even if the Court were to entertain this argument, the RKS Claimants do plead actual reliance, alleging:  "In the alternative, Claimant relied on PG&E's statements and omissions, either generally or specifically, in making investment decisions as to PG&E securities."  (*Id.* ¶ 621.)  PG&E may dispute this fact at summary judgment on a claimant-by-claimant basis, but reliance is alleged.

### i.   The Section 15 Claims Should Not Be Dismissed

PG&E seeks dismissal of the Section 15 claims on the basis that the Securities Act claimants "have failed to plead an underlying violation of Section 11[.]"  (PERA Obj. at 91)  For the reasons set forth herein, the RKS Amendment does plead underlying violations of Section 11, and thus the Section 15 claims should not be dismissed.

### <u>CONCLUSION</u>

For the foregoing reasons, the RKS Claimants respectfully request that the Court deny the objections as to the RKS Claimants.[29]

 Dated:  March 15, 2024                              ROLNICK KRAMER SADIGHI LLP


                                                     By:    */s/ Richard A. Bodnar*
                                                     _____

                                                     *Attorneys for the RKS Claimants*

---

[29] For the avoidance of doubt, the RKS Claimants take no position on the Court's determination of any other objection except those levied as to the RKS Claimants and do not intend, via this opposition or otherwise, to suggest they have standing to oppose objections targeted at non-RKS Claimants.  In particular, the RKS Claimants take no position on any decision the Court may render as to the Thirty-First Omnibus Objection.  But as to the RKS Claimants, it should be denied and the claims and claimants allowed to continue.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020