1   William B. Abrams
    end2endconsulting@gmail.com
2   625 McDonald Ave.
    Santa Rosa, CA, 95404
3   Tel: 707 397 5727



<blockquote> FILED
APR - 4 2024
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA </blockquote>

4

5   *Pro Se PG&E Fire Victim Claimant and Party to related proceedings before the California Public
6   Utilities Commission*

7

8

9                   **UNITED STATES BANKRUPTCY COURT**
10                  **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
11

12

13  In re:                              Bankr. Case No. 19-30088 (DM)
                                        Chapter 11
14  PG&E CORPORATION,                   (Lead Case)
                                        (Jointly Administrated)
15
           -and-
16                                      **WILLIAM B. ABRAMS MOTION TO**
17  PACIFIC GAS AND ELECTRIC            **STAY THE ADMINISTRATION**
    COMPANY,                            **EXECUTION AND ENFORCEMENT**
18                        Debtors.      **OF VICTIM RELEASES AS DEFINED**
                                        **WITHIN THE FIRE VICTIM TRUST**
19                                      **AGREEMENT PENDING UNITED**
    ☐ Affects PG&E Corporation         **STATES SUPREME COURT RULING**
20                                      **AND PURSUANT TO 11 U.S.C. § 105(A)**
    ☐ Affects Pacific Gas and Electric Company
21  ☑ Affects both Debtors

22                                      **Response Deadline:**
    * *All papers shall be filed in the lead case,*   April 19, 2024 (Pacific Time)
23  *No. 19-30088 (DM)*
                                        **Hearing If Order Granted:**
24                                      April 30, 2024 (Pacific Time) or as
                                        determined by the Court
25

26

27

28

# PRELIMINARY STATEMENT

William B. Abrams ("**Abrams**") as a PG&E victim, claimant and Northern California resident, submits this "William B. Abrams Motion to Stay the Administration, Execution and Enforcement of Victim Claimant Releases as Defined within the Fire Victim Trust Agreement Pending United States Supreme Court Ruling and Pursuant **11 U.S.C. § 105(A)**" (the "**Motion**") and for an order substantially in the form attached as **Exhibit A.** The Court is aware that Abrams is a holder of Damage Claims under the Debtors' confirmed "Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020" [Dkt. 8048] (the "**Plan**") and through the administration of the Fire Victim Trust (the "**FVT**"). This Motion highlights for the Court's attention recent efforts by the FVT to force victims to sign non-debtor releases and a pending Supreme Court ruling that will likely have profound implications relative to core constitutional issues within this case. Specifically, Abrams requests that the Court consider the *William K Harrington, United States Trustee, Region 2 Applicant v. Purdue Pharma L.P., et al. Application for Stay of the Mandate of the United States Court of Appeals for the Second Circuit Pending the Filing and Disposition of a Petition for a Writ of Certiorari* (the "**Purdue Pharma Brief**").[1] The Supreme Court decision around these issues will likely raise profound legal questions within this case related to (1) the unconstitutional nature of the PG&E victim releases (2) the lack of judicial notice and informed consent relative to these releases and (3) the ongoing administration and execution of these releases as a perverse ultimatum on the just payment of damages and losses in accordance with the Fire Victim Trust Agreement. **Granting a stay in the administration and execution of these releases will avoid potential conflicting interpretations of the law and ensure consistency with the Supreme Court's guidance. Moreover, a stay regarding the administration and enforcement of these releases is necessary to prevent irreparable harm to victims and a further undermining of their constitutional rights to due process and equal protection under the law.** (emphasis added)

---

[1] *William K Harrington, United States Trustee, Region 2 Applicant v. Purdue Pharma L.P., et al. Application for Stay of the Mandate of the United States Court of Appeals for the Second Circuit Pending the Filing and Disposition of a Petition for a Writ of Certiorari,*
https://www.supremecourt.gov/DocketPDF/23/23A87/274215/20230728150056343_Harrington%20v.%20Purdue%20Pharma%20stay%20application.pdf

# JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 2004-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"), Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan, and Section 1.6 and Section 8.20 of the Fire Victim Trust Agreement. Under Section 11.1(u) of the Plan, the Court retained jurisdiction "[t]o hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing," "[t]o take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation," "[t]o hear and determine any rights, claims, or Causes of Action held by or accruing to ... the Fire Victim Trust **pursuant to the Bankruptcy Code or any federal or state statute or legal theory**," and "[t]o hear and determine any dispute involving the Wildfire Trusts, including but not limited to the interpretation of the Wildfire Trust Agreements." Plan at § 11.1(i), (k), (t) & (u).[2]

Section 1.6 of the Fire Victim Trust Agreement provides that the "Bankruptcy Court shall have **exclusive jurisdiction** with respect to any action relating to or arising out of the [Fire Victim] Trust." Section 8.20 of the Fire Victim Trust Agreement provides that the "provisions of the Trust Documents shall be enforced by the [Bankruptcy Court]." This is a core proceeding pursuant to 28

---

[2] Under Section 11.1 of the Plan, the Court also retained "jurisdiction ... of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: ... (c) [t]o ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (d) [t]o consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claims; ... (m) [t]o determine such other matters and for such other purposes as may be provided in the Confirmation Order; ... (p) [t]o hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; ... (r) [t]o determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing ... (v) [t]o hear any other matter not inconsistent with the Bankruptcy Code."

U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. (emphasis added)

This Court has the authority to issue a stay in the administration, execution and enforcement of these releases pending a decision from the Supreme Court. **The US Supreme Court in the case of Hilton v. Braunskill, 481 U.S. 770 (1987) identified that courts should grant a stay particularly when there is (1) the likelihood of irreparable harm to the moving party if the stay is not granted and/or (2) in the public interest. This motion strongly urges the Court to consider that an order issuing a stay in the administration, execution and enforcement of these releases will prevent irreparable harm to PG&E victims and is in the public interests of ensuring the constitutional rights to due process and equal protection under the law.**

## ARGUMENT

On March 12, 2024, Cathy Yanni, Fire Victim Trustee issued a letter (See: **Exhibit B**) to victims and indicated that victims holding claims are "required" to sign a broad release that includes releases for non-debtors as a prerequisite to receive "a 66% pro rata payment." By stating the following:

> *"Q: Are releases required to receive a 66% pro rata payment? **Yes. Only claimants whose claims have been finalized and who have signed and submitted both releases will be eligible to receive payments** following this pro rata increase. While your next pro rata payment is not conditioned on whether other claimants have signed their releases, your payment is conditioned on whether you have signed your releases."* (emphasis added)

Within the release referenced by this letter it lists the required non-debtor "released parties" as "*the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator or Special Master.*" (See: **Exhibit C**). This release is being forced upon victims despite the direct contradiction with the "Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6353] (the "**Disclosure Statement**") issued at the time Victim Claimants voted

on the Plan. This Disclosure Statement made it clear that signing this non-debtor release was optional and could not a contingency which prevented payment of claims by stating the following:[3]

> "*Any holder of a Claim or Interest who does not indicate on their Ballot that they opt into granting such releases shall not be a Releasing Party. Additionally, such holder's decision to opt-in or not to the releases shall not in any way affect the classification or treatment of such Claim or Interest. The holder of a Claim or Interest **shall receive the same amount of consideration under the Plan whether or not such holder elects to release a party that is not a Debtor** in accordance with the opt-in release procedures set forth in the applicable Ballot.*" (emphasis added)

This contradiction between the optional non-debtor release as described within the Disclosure Statement leading to a now required release (opt-in or don't receive your victim pro-rata payment) is further complicated by the new Purdue Pharma matter before the United States Supreme Court defining the unconstitutional nature of these non-debtor releases. It is clear that (1) The Trustee and Trust Oversight Committee (the "TOC") through violating the provisions within the Disclosure Statement are unjustly requiring the victims to sign non-debtor releases and (B) Victims are being required to execute non-debtor releases which are unconstitutional.

The US Supreme Court has heard arguments and is currently considering whether or not the US Bankruptcy Code authorizes under Chapter 11 of the Bankruptcy code, a court to approve, as part of the plan of reorganization, releases held by non-debtors against victim claimants. Specifically, Harrington argues that U.S.C. § 1123(b)(6) cannot be interpreted and used in an unconstitutional manner to undermine victim rights and protect the Sackler Family within the Purdue Pharma case. These same types of releases in form and function were wrongly leveraged within this PG&E Bankruptcy case to protect many non-debtor parties and with an even more sweeping effect to undermine the rights of victims.

If the United States Supreme Court rules that the releases leveraged within the Purdue Pharma Bankruptcy Case are indeed unconstitutional, clearly the releases similarly developed and executed to shield parties within this case would also be deemed unconstitutional. In order to protect the rights of victims within this case, Abrams respectfully asks the Court to consider the following parallels

---

[3] See "Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6353], Pg. 35, March 17, 2020

between the Purdue Pharma matter before the Supreme Court and issues surrounding the victim releases within this PG&E Bankruptcy Case:

1. **Due Process Rights** – Harrington argues before the Supreme Court that notice of the hearing on the plan was inconsistent with due process, since no opt-out provision permitted objecting parties to protect their interests against a binding change in their rights. These bankruptcy due process related concerns including a lack of informed consent and post-facto removal of rights through releases imposed on victims is even more sweeping and undermining of constitutional rights within this PG&E Bankruptcy Case. Here, within pre and post Plan confirmation proceedings, certain parties assigned by the Court to protect the rights of victims have fought tirelessly to undermine the rights of victims by prioritizing their own exculpations, indemnifications, and protections over the constitution rights of the victims they are paid to represent. It should be understood by the Court that these releases that may be deemed unconstitutional by the Supreme Court have been used with a broad brush to protect parties within this case including *"the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator or Special Master."*[4] Indeed, these releases cast aside the Disclosure Statement provisions and subjugate the constitutional rights of victims. This all appears to be done to protect these non-debtor parties from perceived illegal or immoral actions that might generate legal implications through the courts. The Court should also note that Abrams and other parties have filed papers and highlighted perceived financial conflicts and actions from these parties that undermined and still serve to undermine the rights of the victims throughout this case.

2. **No Opt-Out Clause** – Despite the provisions within the Disclosure Statement that ensured the nondebtor releases would be optional, the parties representing victims within this PG&E Bankruptcy Case designed and are executing unconstitutional releases to ensure that no opt-out clause is afforded to victims without financial penalties in terms of not receiving further

---

[4] See Fire Victim Trust Agreement, Exhibit 4B-3 "Released Parties"

pro rata payments. Adam J. Levitin, as Amicus Curiae in Support of Petitioner, makes the point within his United States Supreme Court Brief that if nondebtor releases do not have an opt-out clause they are in violation of the Fifth Amendment to the United States. Specifically, Mr. Levitin argues that "*it is well established that in a Rule 23(b)(3) money damages class action, due process requires, at a minimum, the opportunity to opt out… It is quite puzzling that what is forbidden to an Article III district judge in the context of a Rule 23(b)(3) class action is somehow permitted to a non-Article III bankruptcy judge whose powers derive entirely from those of the district court. See 28 U.S.C. § 1334. **Bankruptcy is not and was never intended to be a backdoor to bypass the constitutional strictures that govern class actions**. On the contrary, the Due Process Clause applies to bankruptcy cases, just as it does to class actions. It requires that any settlement of claims against nondebtors be consensual, which would require, **at the very least, the possibility of an opt-out for creditors that is not tied to their vote on a plan.**"[5] (emphasis added)

3. **Non-Debtor Releases** – Harrington rightly identifies for the Supreme Court to consider that while there is much of the Bankruptcy Code that addresses releases, it is only Bankruptcy Code Section 524(g) that authorizes the use of these releases for nondebtors. This code specifically was carved out for the sole use within asbestos related bankruptcy cases. Harrington furthers this point by specifically stating, "*The overwhelming number of Code provisions relating to the discharge of a debtor's liabilities, combined with the absence of any applicable Code provision relating to the discharge of a nondebtor's liabilities outside the asbestos context, confirms that Congress intended to authorize nondebtor releases in asbestos bankruptcies alone.*" Certain Bankruptcy Professors in support of this argument before the Supreme Court asserted that the releases imposed on the victims within the Purdue Pharma Case represented "an abusive discharge of debt" and further describe how such releases were improperly applied and should have been reserved in accordance with Bankruptcy Code only for the "honest but unfortunate debtor."[6] These Professors go on to describe the "reprehensible" conduct of the Sacklers and note that the actions and conduct of the Sacklers

---

[5] See "BRIEF OF ADAM J. LEVITIN AS AMICUS CURIAE IN SUPPORT OF PETITIONER", In the Supreme Court of the United States, William K Harrington, United States Trustee, Region 2, Applicant v. Purdue Pharma L.P., ET AL., pg. 13-14, https://www.supremecourt.gov/DocketPDF/23/23-124/280638/20230927154331327_44286%20Walfish%20Brief.pdf
[6] *Grogan* v. *Garner*, 498 U.S. 279, 286, 287 (1991)

were "neither honest nor unfortunate." Here to within the PG&E Bankruptcy Case, Abrams and other parties have similarly contended that the actions and conduct of certain parties were also reprehensible and dishonest and similarly appear to have no recourse due to unconstitutional releases imposed on victims that are also contrary to the provisions within the Disclosure Statement. The non-debtor "released parties" as identified within the now imposed victim release should not have the same protections as the debtor. Why should the interests of "released parties" in cementing broad but unwarranted protection from legal consequences supersede the constitutional rights of victims? This Court should also consider a stay relative to these releases may indeed protect the Debtor. **These releases, if imposed on victims, and considering the contradictions relative to the Disclosure Statement and the US Supreme Court case, may expose the entirety of the Fire Victim Trust Agreement and thus the Plan itself to actions that might overturn the Plan given that it was built upon unconstitutional provisions.** Abrams urges the Court to consider that the issuance of a stay relative to the administration and enforcement of these victim releases should be viewed as the prudent path to protect the integrity of the Plan, the rights of victims, and the interests of the Debtor.

4. **Releases Lead to Lower Recovery for Victims** – Professor Adam J. Levitin argues that the type of releases protecting the Sackler Family within the Purdue Pharma case likely contribute to a lower recovery for victim creditors.[7] Indeed, within this PG&E Bankruptcy case we have seen that the very same parties that have fought for these non-debtor releases within this case are the same parties financially benefiting from the stock-based structure and PG&E investor favorable provisions within the Fire Victim Trust Agreement. It may reasonably be perceived by this Court that certain parties representing victims that did not disclose their financial incentives from PG&E investors and the extent of their financial entanglements are indeed many of the same parties that fought tirelessly for these releases, exculpations, indemnifications, and confidentiality protocols. It is no wonder, given certain nondisclosure provisions and these releases, that victims have had to wait years for a payment that seems to be headed towards 70 cents on the dollar and 70% "made whole." Watts Guerra LLP

---

[7] See "BRIEF OF ADAM J. LEVITIN AS AMICUS CURIAE IN SUPPORT OF PETITIONER", In the Supreme Court of the United States, William K Harrington, United States Trustee, Region 2, Applicant v. Purdue Pharma L.P., ET AL., https://www.supremecourt.gov/DocketPDF/23/23-124/280638/20230927154331327_44286%20Walfish%20Brief.pdf

representing the largest amount of victim claimants within this case and others with undisclosed PG&E investor backed financing moved victims away from an all-cash offer and towards this stock-infused settlement deal. The facts bear out that these parties prior assertions that this path was the "fastest" way for victims to be "made whole" was indeed false and has proven to be extremely detrimental to victims. Professor Adam Levitin notes within his brief that "*if the Sacklers (who have had sophisticated advice at every turn) had known ex ante that civil immunity would not be available, for one thing, they might have been more circumspect in their conduct.*"[8] Similarly, it is reasonable to believe that if certain parties within this PG&E case "*had known ex ante that civil immunity would not be available,*" they might also have conducted themselves in a manner more closely aligned with the interests of the victims they represent. Furthermore, if these parties were not protected by these releases and the other indemnifications and exculpations articulated within the Plan, Abrams contends that victims would have been likely 100% made whole and paid in cash like every other claimant within this case that had non-conflicted representation. Simply stated, these releases provide a presumptive "get-out-of-jail free card" for certain parties that may have prioritized their financial interests over the interests of the victims they represent. This Court should now preserve the constitutional rights to due process and equal protection under the law for Abrams and other victims regardless of whether or not victims choose to exercise these rights in another court of law. This preservation of constitutional rights can only occur if the Court orders a stay relative to these non-debtor releases. **It is important to note that there are indeed many parties representing victims within this case that despite these victim releases, have conducted themselves honorably, professionally and in support of PG&E victim interests.** Unfortunately, these honest and law-abiding voices continue to be silenced by the confidentiality protocols carefully crafted within this case. Given this unfortunate paradigm, the Court should be especially wary of supporting releases that promote bad behavior at best and illicit behavior at worst that would likely serve to further disadvantage victims as they look to rebuild their lives after receiving substantially less from the FVT than advertised leading up to their vote on the Plan.

---

[8] See "BRIEF OF ADAM J. LEVITIN AS AMICUS CURIAE IN SUPPORT OF PETITIONER", In the Supreme Court of the United States, William K Harrington, United States Trustee, Region 2, Applicant v. Purdue Pharma L.P., ET AL., Pg. 18, https://www.supremecourt.gov/DocketPDF/23/23-124/280638/20230927154331327_44286%20Walfish%20Brief.pdf

## CONCLUSION AND RELIEF REQUESTED

On December 1, 2023, the Court issued the "Memorandum Regarding Recent Correspondence from Fire Victim Claimants" referencing the growing number of letters "*expressing dissatisfaction with the Fire Victim Trust's handling of their claims, and/or seeking the court's review and guidance regarding payment from the Fire Victim Trust.*" In response to these letters the Court stated that "*to the extent that a claimant is aware that the attorney who represented him or her in the filing and resolution of their Fire Victim Claim is acting inappropriately, that claimant may wish to file a complaint about that specific attorney with the California State Bar or consult counsel about other options.*" However, these non-debtor releases as currently imposed by the Trustee provide no "other options." According to the Trustee's letter of March 12, 2024, victims are "required" to sign these releases to receive their 66% pro-rata payment. This ultimatum communicated by the Fire Victim Trustee is highlighted despite the fact that the Disclosure Statement approved by this Court indicated that victim claimants "*shall receive the same amount of consideration under the Plan **whether or not such holder elects or release a party that is not a Debtor**...*"

Abrams understands that it was not the intent of the Court to set up a two-tiered system of justice, but this is what victims are left with given the unconstitutional releases defined within the Fire Victim Trust Agreement and leveraged by the Trustee. The Harrington Brief before the Supreme Court has correctly framed these constitutional issues and this Court should order a stay as a prudent path until such time as the Supreme Court rules on this matter. If a stay is not issued, we will continue to have a two-tiered justice system relative to damages and potential illegalities within this case. Certain well-monied and well-connected parties will have the right to pursue justice within the courts while regular victims and citizens like Abrams and others that have submitted letters to the Court will be denied their due process rights and equal protection under the law. The unfortunate masses should seek justice through a complaint to the California Bar Association?

The Purdue Pharma matter before the Supreme Court brings into sharp focus the unconstitutional nature of non-debtor releases, as defined within the Fire Victim Trust Agreement and in contradiction to the Disclosure Statement. However, the Fire Victim Trust Agreement and the Trustee through her administration of the terms within this agreement seem to disregard those constitutional constraints. The constitutional concerns with the Purdue Pharma case that stem from

non-debtor releases are far more undermining of victim rights within this case given the breadth and depth of the listed "released parties." Abrams fears that if this Court does not issue a stay relative to the execution, administration and enforcement of these releases that irreparable harm will be brought upon victims in terms of (1) curtailing their constitutional rights to due process and equal protection under the law and (2) subverting the public interests. Consider that the Lahaina area victims of the Hawaiian Electric Company wildfires are being represented by many of the same parties and law firms that drove the formation of the PG&E non-debtor releases.[9] Will these firms push for the same compromises within those cases that sacrifice the constitutional rights of victims and shield their actions from legal scrutiny?

If the US Supreme Court rules on the side of upholding the constitutional rights of victims within the Purdue Pharma case, and a stay is not granted regarding the use of victim releases within this case, Abrams fears that the damage to the rights of countless victims will be irreparable. Abrams understands that as a pro se claimant and victim, he is far from the ideal movant to put this matter before the Court. However, given that the core parties more expert in these matters either (1) crafted these nondebtor releases to receive unconstitutional protections and/or (2) are bound by confidentiality protocols and terms that prevent their engagement on behalf of victims, Abrams is compelled to file this Motion. Abrams asserts that the unconstitutional nature of the victim releases within this case are self-evident. The contradiction between what was disclosed relative to these nondebtor releases within the Disclosure Statement and how these releases are now being administered make it clear that the parties that crafted the Disclosure Statement likely understood that requiring these releases from victims as a precondition to receiving compensation is in fact unconstitutional.

Despite the Court's rulings against Abrams' past motions, Abrams hopes that the Court will now take up this matter given the unconstitutional nature of these releases as described within briefs now pending before the United States Supreme Court. Of course, Abrams expects that there is a well of strong opposition to this Motion from the core parties within this case that have enjoyed

---

[9] See The Denver Gazette "Class Action Suits have Already been Filed over Hawaii Wildfires", September 22, 2023, "*Attorneys with Watts Guerra, Singleton Schreiber, and Frantz Law Group said they have been collecting evidence, interviewing eyewitnesses and reviewing reports that indicate that damaged power infrastructure owned by Hawaiian Electric Industries Inc. created the spark for the flames.*", https://denvergazette.com/news/wildfires/marshall-fire-lahaina-hawaii-lawsuits/article_083c4750-3d06-11ee-a3e0-dfb9884f926b.html

protections through these unconstitutional releases. Despite this well-lawyered opposition, Abrams hopes that the Court will take the time to consider the merits of his arguments and those cited before the United States Supreme Court. Furthermore, Abrams respectfully requests the opportunity to respond to any objections and to be granted a fair hearing before the Court so that he may exercise his due process rights within this case. Given the above arguments and the Court having jurisdiction relative to these issues, Abrams urges the Court to issue an order pursuant to 11 U.S.C. § 105(A) and substantially in the form attached as **Exhibit A.**

Executed on April 4, 2024, at Santa Rosa, CA.

Respectfully submitted,

William B. Abrams
Pro Se Claimant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**Proposed Order**

William B. Abrams
end2endconsulting@gmail.com
625 McDonald Ave.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

    -and-

PACIFIC GAS AND ELECTRIC
COMPANY,

               Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors

\* *All papers shall be filed in the lead case, No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administrated)

**ORDER FOR STAY IN THE ADMINISTRATION, EXECUTION AND ENFORCEMENT OF VICTIM RELEASES AS DEFINED WITHIN THE FIRE VICTIM TRUST AGREEMENT PENDING UNITED STATES SUPREME COURT RULING**

Upon the *William B. Abrams Motion to Stay the Administration, Execution and Enforcement of Victim Releases as Defined within the Fire Victim Trust Agreement Pending United States Supreme Court Ruling and Pursuant to 11 U.S.C. § 105(A)* (the "**Motion**");[1] and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that good cause exists to grant the Motion; and William B. Abrams ("**Abrams**") having provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances and no other or further notice need be provided; and the Court having considered the Motion, all pleadings and papers filed in connection with the Motion, and the arguments of counsel and evidence proffered at the hearing on the Motion; after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1) The Motion is Granted.

2) The Nondebtor Releases as Defined within the Fire Victim Trust Agreement shall not be administered, executed or enforced until such time as the United States Supreme Court rules in response to the "William K. Harrington, United States Trustee Region 2, Applicant v. Purdue Pharma L.P., ET AL., Application for a Stay of the Mandate of the United States Court of Appeals for the Second Circuit Pending the Filing and Disposition of a Petition for a Writ of Certiorari".

3) Upon this United States Supreme Court ruling on this matter, these releases should only be administered in accordance with the "Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6353]. Specifically, victims will receive pro-rata distributions and "***shall receive the same amount of consideration under the Plan whether or not such holder elects to release a party that is not a Debtor.***"

---

[1] Capitalized terms not defined herein shall have the meanings used in the Motion.

**Exhibit B**

**Fire Victim Trustee Letter, March 12, 2024**



March 12, 2024

I am delighted to share that the Fire Victim Trust is increasing the *pro rata* payment percentage to 66% effective April 25, 2024. This increase is possible now that the Trust has reached two critical milestones: (1) issuance of 100% of Determination Notices with 97% now accepted and final; and (2) the final sale of PG&E stock on December 13, 2023.



As Trustee, it is my fiduciary duty to pay fire survivors as much as the Trust is able as soon as we are able, and the increase to 66% enables us to make an additional *pro rata* payment.

I also have a duty to reserve sufficient funds to comply with the *pro rata* requirement. The bankruptcy rules require that everyone is paid the same percentage of their award. These rules apply no matter when a claim is determined and accepted, or its dollar value. There will be at least one additional *pro rata* increase as we finalize the remaining claims, achieve certainty regarding the Trust's total payment obligations, and wind down the program.

Before providing a more general update on the Road to Completion, I want to answer a few questions you may have about this *pro rata* increase and the related release requirement.

**Q: How much money will be available as part of this *pro rata* increase and when will payments be made?** With $1.2 billion in additional liquidity from our final stock sales and 97% of claims now accepted and final, we are confident we can safely increase the *pro rata* payment percentage for all fire survivors by six percent. On April 25, 2024, the Trust will begin bringing prior payments up from 60% to 66%. After that, the Trust will pay all *pro rata* payments at 66% of the final award amount.

**Q: Are releases required to receive a 66% *pro rata* payment?** Yes. Only claimants whose claims have been finalized and who have signed and submitted both releases will be eligible to receive payments following this *pro rata* increase. While your next *pro rata* payment is not conditioned on whether other claimants have signed their releases, your payment is conditioned on whether you have signed your releases.

We encourage attorneys and *pro se* claimants to submit releases to the Trust by April 1. Doing so will ensure that we receive and have time to review your releases before finalizing the April 25 payment list. Payments to eligible claimants whose releases are not received in time for the April 25 disbursement will be included in the next payment cycle after the Trust receives and confirms their releases. As a reminder, the Trust issues payments twice monthly, generally on the 15th and on the last day of the month.

**Q: Will there be future increases in *pro rata* payments?** Yes. The timing of future *pro rata* increases depends on resolution of the remaining 3% of claims. All of these claims are in Reconsideration review, have Reconsideration Notices to which the claimants have not yet responded, or have been appealed. Resolving these remaining claims efficiently and

Case: 19-30088    Doc# 14396    Filed: 04/04/24    Entered: 04/04/24 14:06:32    Page 17 of 24

fairly is critical to determining the Trust's total payment obligations and providing certainty on the final *pro rata* payment percentage available to all fire survivors.

## The Road to Completion

In addition to announcing April's *pro rata* payment percentage increase, I want to update you on the remaining work to do as we look forward to winding down the Trust in 2024.

▸ **Notices and Payments:** Having issued Determination Notices on 100% of Claims Questionnaires by December 31, 2023, 97% of determinations are now accepted and final with $11.21 billion paid to claimants. The April *pro rata* increase will further increase claimant payments.

There remain roughly 1,000 determinations not yet accepted. These are in various stages of Reconsideration and Appeal. As a result of tightening deadlines and curtailing extensions, we have finalized an additional 900 determinations already this year, and we continue working with attorneys and *pro se* claimants to move 100% of claims to acceptance without delay.

▸ **Releases:** The Trust has been seeking release signatures since September 2023 and has received signed releases from almost 70% of eligible claimants. We encourage all claimants to submit their releases before the April *pro rata* payment increase, as release submission will be a prerequisite to payment going forward.

As you will recall, before the Trust was created, the Bankruptcy Court approved a comprehensive Plan of Reorganization that mandated, in part, that each Fire Victim Claimant execute two releases – either an Individual Release or Entity Release (depending on Claimant type) and an Insurance Mutual Made Whole Release. The Trust's public website includes FAQs (here) regarding these required releases.

▸ **Minors Compromises:** The Honorable Ellen Sickles James (Ret.), was appointed Special Master to review claims determinations and disbursement measures for all awards to minors and incapacitated adults. We highlighted this process in an interview with Special Master James last year (available here). To streamline the process, we have increased the threshold for awards requiring a hearing via Zoom to $56,000 for represented claimants. As before, all *pro se* claimants get a hearing, and represented claimants whose awards are below $56,000 may request a hearing.

Roughly 2,600 claimants (35%) have completed the Special Master approval process. We encourage everyone still requiring approval to submit their petitions and initiate the process as soon as possible. We will be sending reminders to firms and *pro se* claimants who still need to take these steps.

We have worked diligently from the beginning to compensate fire survivors for their losses, and we will continue to do so to bring closure to this process for each of you.

Thanks,

*Cathy Yanni*
Cathy Yanni

Case: 19-30088    Doc# 14396    Filed: 04/04/24    Entered: 04/04/24 14:06:32    Page 18 of 24

# CLAIMANT RELEASE AND INDEMNIFICATION
# IN CONNECTION WITH THE FIRE VICTIM TRUST AWARDS

To receive payment of an Award (as defined below) from the PG&E Fire Victim Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.**

If you need assistance, please contact the Claims Administrator by email at info@firevictimtrust.com or by phone toll-free at 1 (888) 664-1152. You may also visit the Fire Victim Trust Website for additional information.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**2015 Insurance Policies**" means any insurance policy issued to any of the Debtors or under which the Debtors have sought or may seek coverage for the 2015 policy year.

"**2015 Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to resolve any claims related to Fires under the 2015 Insurance Policies, other than the rights of the Debtors to be reimbursed for claims submitted to and paid by the Debtors prior to January 29, 2019.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Fire Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of California San Francisco Division, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**Channeling Injunction**" means the permanent injunction provided for in Section 10.7 of the Chapter 11 Plan with respect to Fire Victim Claims that was issued pursuant to, and included in, the order confirming the Chapter 11 Plan.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re PG&E Corporation and Pacific Gas and Electric Company*, Bankruptcy Case No. 19-30088 (DM) (Lead Case) (Jointly Administered).

"**Chapter 11 Plan**" means the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020, filed in the Chapter 11 Cases and confirmed by the Bankruptcy Court.

"**Claim**" or "**Claims**" has the meaning set forth in section A of this Release.

"**Claimant**" means a Fire Victim who (i) has timely filed a proof of claim in the Chapter 11 Cases, (ii) has had his or her Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction; and (iii) who is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Claimant Insurance Company**" means any insurance company that issued or allegedly issued a Claimant Insurance Policy.

"**Claimant Insurance Policy**" means any insurance policy that was issued or allegedly issued that does or may afford the Claimant rights, benefits, indemnity, or insurance coverage with respect to any claims and that has been assigned to the Trustee by Claimant and accepted by the Trustee pursuant to Section 2.6(c) of the Trust Agreement.

"**Claimant Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Claimant to any proceeds, payments, benefits, causes of action, choses in action, defense or indemnity arising under or attributable to any and all Claimant Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

"**Claims Questionnaire**" means the claims questionnaire and supporting documents required by the CRP in support of Fire Victim Claims.

"**CRP**" means the Fire Victim Claims Resolution Procedures for the resolution, liquidation, and payment of Fire Victim Claims by the Trust, substantially in the form included in the Plan Supplement filed in the Chapter 11 Cases on May 1, 2020 and as may be amended and supplemented thereafter from time to time.

"**Debtors**" means PG&E Corporation and Pacific Gas and Electric Company, the debtors and debtors-in-possession in the Chapter 11 cases.

"**District Court**" means the United States District Court for the Northern District of California, having jurisdiction in the Chapter 11 Cases.

"**Fires**" means the Butte Fire (2015), the North Bay Fires (2017) (consisting of the following fires: LaPorte, McCourtney, Lobo, Honey, Redwood/Potter Valley, Sulphur, Cherokee, 37, Blue, Pocket, Atlas, Cascade, Nuns, Adobe, Norrbom, Pressley, Partrick, Pythian/Oakmont, Maacama, Tubbs, Point, and Sullivan) and the Camp Fire (2018).

"**Fire Victim**" means a person or entity damaged, or who purports to have been damaged, in various ways by the Fires.

Claimant ID: 1030728

"**Fire Victim Claim**" means any claim against the Debtors in any way arising out of the Fires that was channeled to the Trust by the Channeling Injunction and the Plan.

"**Governmental Payor**" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court (including the Special Master) or has other legal authorization to file a proof of claim and/or a Fire Victim Claim on behalf of the Claimant.

"**Lien**" or "**Liens**" means (i) any statutory lien of a Governmental Payor or Medicare Part C or Part D Program sponsor, or (ii) any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any Other Payer or Provider, where there is a legal obligation to withhold payment of an Award, or some portion thereof, to a Claimant under applicable federal or state law or for the Claimant to reimburse the Government Payor, Other Payer or Provider for amounts paid on the Claimant's behalf in connection with the Claimant's Fire Victim Claims.

"**Lien Resolution Administrator**" means that person or entity, retained by the Trustee to resolve Medicare Program Part A and B liens, Medicaid Program liens, and Medicare Part C Program liens, using the information provided by the Claimant in the Claims Questionnaire.

"**Medicaid Program**" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396-1, *et seq*.

"**Medicare Part C or Part D Program**" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with Centers for Medicare & Medicaid Services ("**CMS**").

"**Medicare Program**" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*.

"**Released Parties**" means the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator or Special Master.

Claimant ID: 1030728

"**Retention Orders**" means the Order Granting Application of The Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Hon. John K. Trotter (Ret.) as Trustee *Nunc Pro Tunc* to January 13, 2020 [Docket No. 6760] and the Order Granting Application of The Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Cathy Yanni as Claims Administrator *Nunc Pro Tunc* to January 13, 2020 [Docket No. 6759], entered by the Bankruptcy Court on April 14, 2020 in the Chapter 11 Cases.

"**Special Master**" means the special master appointed by the Superior Court of California for the County of San Francisco to approve any and all minors' compromises in conjunction with the evaluation, disallowance, resolution, settlement, and approval of any and all Fire Victim Claims in accordance with the CRP.

"**TOC**" means the members of Trust Oversight Committee appointed by the Consenting Fire Claimant Professionals and the Tort Claimants Committee to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trust Agreement**" means the PG&E Fire Victim Trust Agreement dated as of July 1, 2020, substantially in the form included in the Plan Supplement filed in the Chapter 11 Cases on May 1, 2020.

"**Trustee**" means Hon. John K. Trotter (Ret.) or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

# RELEASE AND INDEMNIFICATION

A.   In consideration of the benefit of an Award from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "I", "My" or "Me"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, covenant not to sue, and hold harmless the Released Parties from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment of performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, the discharge of the Released Parties' duties and responsibilities under the Retention Orders, the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the CRP, the Chapter 11 Plan, the formulation, preparation,

Case: 19-30088    Doc# 14396    Filed: 04/04/24    Entered: 04/04/24 14:06:32    Page 22 of 24

negotiation, execution or consummation of the Trust Agreement, the CRP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release.[1] I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Released Claim released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

    B.  I hereby acknowledge that pursuant to the Chapter 11 Plan, the Channeling Injunction and the order confirming the Chapter 11 Plan, the Debtors have been fully and completely discharged and the Debtors and their respective property and successors and assigns have been released from any and all liability arising from or related to any Fire Victim Claim asserted.

    C.  I hereby acknowledge that I am solely and ultimately responsible for the satisfaction and discharge of all Liens. I shall use best efforts to resolve all known Liens.

    D.  Notwithstanding my responsibilities to resolve all known Liens, I hereby authorize the Lien Resolution Administrator to resolve any and all Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens, as set forth in the definition of Lien Resolution Administrator above. The Lien Resolution Administrator shall use best efforts to resolve the Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens on my behalf.

    E.  In further consideration of the benefit of an Award, I do hereby release, forever discharge, hold harmless, and covenant not to sue the Released Parties from any and all Claims arising from, relating to, resulting from or in any way connected to, in whole or in part, any act, or failure to act, of the Lien Resolution Administrator. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Claim released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

    F.  I hereby acknowledge and agree that to the extent my information is incorrect or incomplete to any substantial degree, after reasonable diligence by the Lien Resolution Administrator, which results in the Lien Resolution Administrator being unable to properly verify coverage or identify Liens for which the Lien Resolution Administrator is responsible, then the Lien Resolution Administrator shall have no further responsibility for such unknown/unresolved Liens.

    G.  In further consideration of the benefit of an Award, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including the costs of defense and attorneys' fees of, the Released Parties against any and all Claims.

---

[1] A SUBSEQUENT RELEASE OR ANNEX TO THE ORIGINAL RELEASE WILL BE REQUIRED TO BE EXECUTED BY THE CLAIMANT AT THE TIME OF EACH DISTRIBUTION, RELEASING THE RELEASED PARTIES FROM THE DATE OF THE LAST RELEASE THROUGH THE DATE OF EACH SUBSEQUENT RELEASE.



H.   I, as assignor, hereby irrevocably and unconditionally transfer and assign to the Trust, as assignee, any and all rights to pursue and release 2015 Insurance Rights for my Claim for the full amount of the liability that either of the Debtors may have or have had for my Claim.

I.   [Reserved]

J.   I acknowledge that the Trust is not providing any tax advice with regard to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

K.   If I am awarded compensation for any loss of consortium or bystander claims, I acknowledge and agree that all beneficiaries of such claims (each, a "**Beneficiary**") must execute and be bound by this Release. Each Beneficiary waives all rights and interests in those indirect or third-party claims and is barred from the assertion of those indirect or third-party claims in the tort system or otherwise.

Claimant or Legal Representative Printed Name:   William Abrams

Claimant or Legal Representative Signature:   _____

Signature Date:   _____

Claimant ID: 1030728

