1                     UNITED STATES BANKRUPTCY COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                               -oOo-

4    In Re:                        ) Case No. 19-30088
                                   ) Chapter 11
5    PG&E CORPORATION AND PACIFIC  )
     GAS AND ELECTRIC COMPANY      ) San Jose, California
6                                  ) Tuesday, April 9, 2024
                         Debtor.   )10:00 AM
7    _____ )
                                     MOTION TO DETERMINE IF THE
8                                    TRUSTEE'S MODIFICATION OF THE
                                     CLAIM RESOLUTION PROCEDURE
9                                    WAS APPROVED BY BANKRUPTCY
                                     COURT AND IF NOT SO APPROVED
10                                   TO GRANT REQUESTED RELIEF
                                     UNDER 11 U.S.C. SECTION
11                                   105(A) AND SECTION 1142(A)
                                     B.L.R. SECTION 9014-1(B)(3)
12                                   FILED BY SAYEGH BROTHERS,
                                     INC. [14319]
13
                          TRANSCRIPT OF PROCEEDINGS
14             BEFORE THE HONORABLE DENNIS MONTALI
                  UNITED STATES BANKRUPTCY JUDGE
15
     APPEARANCES (All present by video or telephone):
16   For Sayegh Brothers, Inc.: MICHAEL R.. BUSH, ESQ.
                                 Zink & Lenzi
17                               250 Vallombrosa Avenue
                                 Suite 175
18                               Chico, CA 95926
                                 (530)895-1234
19
     For Fire Victim Trustee:    SUSAN SIEGER-GRIMM, ESQ.
20                               Brown Rudnick LLP
                                 Seven Times Square
21                               New York, NY 10036
                                 (212)209-4800
22

23

24

25

**eScribers, LLC**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   Court Recorder:              LORENA PARADA/ANKEY THOMAS
                                  United States Bankruptcy Court
19                                280 South First Street, Room 3035
                                  San Jose, CA 95113-3099
20

21   Transcriber:                 RIVER WOLFE
                                  eScribers, LLC
22                                7227 N. 16th Street
                                  Suite #207
23                                Phoenix, AZ 85020
                                  (800) 257-0885
24

25   Proceedings recorded by electronic sound recording;
     transcript provided by transcription service.

1     SAN JOSE, CALIFORNIA, TUESDAY, APRIL 9, 2024, 10:00 AM

2                             -oOo-

3     (Call to order of the Court.)

4          THE CLERK:  Court is now in session, the Honorable

5     Dennis Montali presiding.  Calling the matter of PG&E

6     Corporation.

7          THE COURT:  All right.  Good morning.  Appearances,

8     please.

9          You're muted, Counsel.

10          You're still --

11          MS. SIEGER-GRIMM:  Yeah.

12          THE COURT:  Okay.

13          MS. SIEGER-GRIMM:  No, it was my screen slid to the

14     right, and I couldn't get to the unmute.  Susan Sieger-Grimm of

15     Brown Rudnick for the fire victim trustee.

16          THE COURT:  Morning.

17          THE CLERK:  Your Honor, I'm attempting to move Mr.

18     Bush in.  He needs to accept the invitation to join.

19          THE COURT:  Well, if he doesn't accept our invitation,

20     I guess we have to kick him out, right?

21          THE CLERK:  Well, he declined to be promoted as

22     panelist.

23          THE COURT:  Mr. Bush, if you wish to be heard, you

24     have to accept our invitation.

25          He's got his hand up.

1          THE CLERK:  Yes.  And I bring him in, Your Honor, and

2   then he declines.  I'm not sure what's happening.

3          THE COURT:  Well, it looks like -- now his hand isn't

4   up.  Oh, there he is.  Mr. Bush.

5          THE CLERK:  Okay.  I believe he's joining now.

6          THE COURT:  Okay.  All right.  Good morning, Mr. Bush.

7   You need to turn on your microphone and your camera, unless you

8   would rather stay off the camera.

9          If you can hear me, your microphone is muted.  There

10  you go.  And now, can you hear me?

11         MR. BUSH:  Well, they're not connecting with me.

12         THE COURT:  I can hear you now.  Say something again.

13         MR. BUSH:  (Indiscernible) now?

14         THE COURT:  Say something.  Just state your

15  appearance, Mr. Bush.

16         MR. BUSH:  Mike Bush from Zink & Lenzi law firm

17  representing Sayegh Brothers.

18         THE COURT:  Okay.  Do you want to leave your camera

19  off?  Oh, there you go.  Okay.

20         All right.  Before we start with the argument, Ms.

21  Grimm, I want to just clarify one thing.  There's a statement

22  made by Mr. Molton that has nothing to do with the issue before

23  me.  It has to do with just with the state of affairs with the

24  trust generally.  And the statement is made that as of March

25  14th, based upon the determinations, the awards have been 19.24

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 4
of 46

1  billion in claims.  And that means more than eleven million to

2  be distributed.  Comparing 11 to 19.24 is about fifty-seven

3  percent.  Isn't it correct that the estimated distribution is

4  about to get up to sixty-six or sixty-seven percent?

5         MS. SIEGER-GRIMM:  Yes, Your Honor.  To date, there

6  has been 11.27 billion dollars distributed -- a

7         THE COURT:  Okay.

8         MS. SIEGER-GRIMM:  -- and a little more than nineteen

9  billion dollars awarded.  Currently, it's at a sixty-percent

10 pro rata rate.  And the trustee has announced that as of March

11 25th, the pro rata rate will be increased to sixty-six percent.

12        THE COURT:  Yeah, that's what I call the sixty-six.

13 Am I correct that -- the trustee's due for an annual report as

14 of March 31; isn't that right?

15        MS. SIEGER-GRIMM:  Yes.  I mean, and --

16        THE COURT:  Okay.  So should --

17        MS. SIEGER-GRIMM:  Yeah.

18        THE COURT:  -- we expect that soon?

19        MS. SIEGER-GRIMM:  Yes.

20        THE COURT:  Okay.

21        MS. SIEGER-GRIMM:  I believe that it falls on a

22 weekend, and we'll file the Friday before, I believe.

23        THE COURT:  Well, we're past it already, but it

24 doesn't matter.  I'm not waiting.  Mr. Bush has nothing to do

25 with the specifics of your issue.  And just because of

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 5
of 46

1   something that was said in the trustee's brief that I just

2   wanted to get an update on it.

3         So back to the matter that you've presented for your

4   client, I assume you want to reserve a portion of your argument

5   for rebuttal, correct?

6         MR. BUSH:  Correct.

7         THE COURT:  How much time?

8         MR. BUSH:  Well, I've written out about ten minutes

9   for the first part, so that would leave about five.

10        THE COURT:  Okay.  Well, go ahead.  Please begin.

11        MR. BUSH:  Okay.

12        THE COURT:  Thank you.

13        MR. BUSH:  This motion was filed after the appeal

14  simply because it was at the appeal that I learned for the

15  first time that the procedures used by the trust, which were

16  contrary to California law, were approved by this bankruptcy

17  court, or at least that's what the neutral stated at the

18  opening of the hearing.  I was kind of caught off by surprise

19  by such an idea, and I had never seen any proof that you had

20  approved any change to the claims resolution procedure or

21  anything that came out of the confirmation order.

22        Now, I've been involved in about four other PG&E fire

23  cases, and I knew that equipment failure meant liability under

24  inverse condemnation for property damage.  So I knew that was

25  possible.  The client I represent was satisfied with his

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 6
of 46

1 insurance payment for the structure damage and only wanted the

2 loss rental income. I thought it was straightforward and

3 answered the question on the questionnaire that applied.

4 Submitted the calculations that were done by a forensic expert

5 that capitalized the income by way of rents. The claim was

6 filed on the 24th of November in 2020, and at that time, the

7 BIL did not exist.

8 A year and a half later, the trust made a kind of

9 shocking determination using a method not accepted by the

10 courts in California. And then at the bottom of it, the bottom

11 of the opinion says attorneys' fees, costs, and prejudgment

12 interest related to inverse condemnation of property are --

13 THE COURT: You're freezing up there. You got to --

14 your screen is frozen.

15 MR. BUSH: -- not available absent a compensable claim

16 for property damage. Okay. So I filed --

17 THE COURT: Well, I know from your papers, you're

18 quite familiar with my decision on the inverse condemnation.

19 The Lyndon case or -- sorry, I'm pronouncing it incorrectly.

20 The case that you rely on, that's a traditional condemnation

21 case, not an inverse condemnation case, right?

22 MR. BUSH: Right.

23 THE COURT: Well, I mean, do you have any -- is there

24 any case law that you cited, I don't think, that cites that,

25 that says on an inverse condemnation where liability is strict

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 7
of 46

1    based upon the nature of the cause of the problem that it

2    extends and covers loss income?  In other worse, the case

3    doesn't say -- the case is not an inverse condemnation.  So my

4    question is, leaving aside whether the trust could or couldn't

5    change, what you call a change, the question is whether there

6    was even a basis to apply a damage for loss rental income.

7           So I'll repeat my question.  Is there any case you

8    have in mind that applies the inverse condemnation rule and

9    extends the damage to lost income?

10          MR. BUSH:  No.

11          THE COURT:  Well, so it would have to be -- whether

12   the trust went off on its own or not, it's forging new law,

13   isn't it?

14          MR. BUSH:  No.

15          THE COURT:  Well, it is.  I mean, it hasn't been done

16   before.

17          MR. BUSH:  In the cases that talk about it under

18   eminent domain, they also referenced that this applies to

19   inverse condemnation.

20          THE COURT:  Well, I understand that.  But here, we had

21   a situation where the statute may apply, but it's never

22   applied.  And so at least in my experience in this case, I was

23   asked and the utility conceded liability for real property

24   damage.  That was fundamental to my determination and is

25   consistent with my understanding of California law.  And I

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 8
of 46

1  might say, I don't know what went into the minds of the brains

2  of the experts at PG&E, but they accepted a liability for

3  property damage.  But there was never any discussion, at least

4  to my knowledge, about lost income as a variation.

5        But anyway, that's just backing.  Go ahead and make

6  your pitch.

7        MR. BUSH:  Okay.  Well, as I've said before though,

8  lost income in the way of rents is a property damage.  I mean,

9  that is what eminent domain says.  So okay.  I'll get back to

10  what I was saying.

11        So I requested reconsideration, and I argued that

12  under California law, a leasehold is an interest in property.

13  That was the Lynbar case.

14        THE COURT:  Right.  Lynbar.  I had mispronounced it a

15  moment ago.

16        MR. BUSH:  Right.

17        THE COURT:  Yes.  Right.

18        MR. BUSH:  And it was terminated by law the measure of

19  damage would be inverse condemnation.  This is what the

20  argument was in that request.  This was the Constitutional

21  requirement under California law, requiring procedures of

22  California eminent domain.  Trust not following California law

23  was not unusual in this situation.  I had other instances where

24  the trust didn't follow California law, and they usually got

25  straightened out by just talking to the claims administrator.

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 9
of 46

1      A decision on the reconsideration was made on March

2    3rd, and that's Exhibit E.  It was the same result.  No

3    reference to California law or the Constitutional requirement.

4    Now, I was kind of confused by this result and contacted

5    various people involved with the trust.  I asked the claims

6    administrator and Cathy Yanni, and they said that all claims

7    have to be we have to apply the trust agreement, the CRP, and

8    the eligibility of the BIL to all claims.

9      So this was added.  I asked Mr. Molton if he could

10   explain why the trust was doing this.  He didn't answer.  I

11   asked Mr. Skikos.  He didn't answer.  I asked the TOC --

12      THE COURT:  Well, the TOC and the PICOs (phonetic),

13   they were all past history.  Essentially, their terms are up.

14   They had no legal role.  They could give you their opinion, but

15   even their opinions would have no bearing because they had no

16   standing.  They were strangers.

17      I mean, it seemed to me Ms. Yanni was the decision

18   maker at the trust or counsel and the opinions of all those

19   other people, whether they might have been persuasive or not,

20   it probably wouldn't have been dispositive.  That's all I'm --

21   I'm not criticizing you for saying it.  I'm just saying they

22   wouldn't be a solution.

23      MR. BUSH:  Well, I thought the trust oversight

24   committee was constantly involved and available during this

25   process.

1          THE COURT:  I may have misunderstood you.  TOC, yes.
2    Not TCC so --

3          MR. BUSH:  Right.  Yes, I know the -- yeah.

4          THE COURT:  I'll stand corrected on that.

5          MR. BUSH:  I'm sorry.  I meant to say TOC, if I
6    didn't.

7          THE COURT:  You may have.  I may have misunderstood
8    you.  Okay.

9          MR. BUSH:  So I asked the TOC if they could explain
10   why the trust is not following California law.  And at the
11   bottom of that letter, I said, look, if I've got this wrong,
12   tell me what the deal is so I'm not wasting everybody's time.
13   I didn't get -- I didn't get an answer.  I didn't get an answer
14   from any of the people I asked.  And I had told them that
15   there's an appeal coming up I've got to deal with.

16         So I get no answer.  So I had to do the appeal.  And I
17   knew that the appeal was something I could not seek any further
18   relief from.  I knew that.  But when the hearing officer said
19   that the procedures were approved by the bankruptcy court --
20   these are the procedures I'm saying are wrong -- I thought,
21   well, maybe there's something I can raise in bankruptcy court,
22   especially since the hearing officer didn't even respond to my
23   request to tell me what the procedures he was referring to.

24         I told David Molton that I was going to pursue the
25   issue of whether or not the Court approved of these procedures

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 11
of 46

1  because I didn't think it happened.  And therefore it would

2  have violated the confirmation order if affected the CRP, which

3  of course it did because it eliminates California law.  It took

4  me quite a while to -- I'm not a bankruptcy lawyer, so I had to

5  learn bankruptcy law, and I had to read all of the proceedings

6  that -- my God, you were involved in a lot of proceedings.

7          THE COURT:  And I still am.

8          MR. BUSH:  Yeah, I could just -- Well, I got to say

9  this though.  Your staff must really be good.  It looked like

10 you were getting motions every ten minutes for a while.

11 Anyway --

12         MR. BUSH:  We had the A team.  Mr. Bush, I keep the A

13 team on board for the PG&E case.  Absolutely.

14         MR. BUSH:  Yeah.

15         THE COURT:  All three of them.  It's a thin staff,

16 believe me.

17         MR. BUSH:  I think they are magnificent.

18         THE COURT:  So do I.

19         MR. BUSH:  Okay.  So it took me a while to figure it

20 out and familiarize myself with all this stuff.  And during

21 that time, I did not find any reference to the bankruptcy court

22 approving the BIL procedures.  Something is missing.  It's just

23 not there.

24         And now, with the objection filed by Mr. Molton, I see

25 the missing link.  Starting at paragraph 27 of the

1    objections --

2            THE COURT:  Yeah.

3            MR. BUSH:  -- Mr. Molton argues that the reason the

4    trust denied the Constitutional right to just compensation is

5    because the structure damage was paid for by the insurance

6    company.  Therefore, the trust did not have to pay that part.

7    And therefore, inverse condemnation would not apply because the

8    trust is not paying for property damage.  So that kind of

9    explained what I said earlier was at the bottom of these pages

10   that said you have to have some compensable damage.  I thought

11   they were referring to -- well, the property interest, under

12   California, a leasehold is a property.  And that's what I

13   thought they were referring to.

14           But then when I looked at the first page of the BIL,

15   which in my thing, it's Exhibit A, and in the third paragraph,

16   if it's in front of you -- do you have it?

17           THE COURT:  Yeah.

18           MR. BUSH:  Okay.  "First, the trust requires that

19   claimants establish that they suffered a personal injury or

20   property damage that has directly resulted in their economic

21   loss to have a compensable BIL claim."  How that got twisted is

22   meant compensable by the trust, not compensable in general.

23   And so what happens is, is that the reason why the trust was

24   denying treating the leasehold loss of the Sayegh Brothers is

25   simply because an insurance company paid for their structure

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 13
of 46

1  damage. And therefore, the trust did not have to pay for the
2  structural damage.
3       And that rule is the rule that then says, oh, if we
4  don't pay for the structure -- if we don't pay, then there is
5  no inverse condemnation. And you see that in paragraph 27, 28,
6  29. It's kind of confusing, but that's where you see that
7  argument that the reason why they're not going to pay the
8  leasehold at eminent domain, just compensation is simply
9  because an insurance company paid for the structural damage. I
10  mean, I want to say that's ridiculous.
11       So apparently, if what the judge told me, you approved
12  this.
13       THE COURT: Well, let me stop right there. I, of
14  course, was not privy to that conversation. And anything that
15  I've done in this case for five years is a matter of record.
16  And I appreciate that you've worked your way through the
17  record. But if there was a conversation or an order or a
18  decision on the record, then I did it. And if there isn't,
19  then I didn't. It's that simple.
20       But the question is, well, let's assume that I didn't,
21  therefore what. In other words, let's assume that the
22  statement made to you by the hearing officer, or you call him
23  the judge, whatever he was, the person who had the final
24  authority here, let's suppose that that was incorrect, that I
25  didn't approve it, therefore what? What follows? And it's one

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 14
of 46

1  of those things where you've acknowledged that for your other

2  clients, as well, you're at the end of the line. And I don't

3  mean to make light of your clients' situation, but there's

4  nothing I can do about it.

5      MR. BUSH: Well, as I understand it, the confirmation

6  order orders the trust that if they make a change that affects

7  the CRP or the trust agreement or the plan that you have to

8  approve it and --

9      THE COURT: But my point is, what if I didn't approve

10  it. And Mr. Molton's not on the call today, but his colleague

11  is so she's going to have a chance to respond here in a moment.

12      But let's assume for the moment that there was a

13  change, and I didn't approve it, therefore what? In other

14  words, there's still a --

15      MR. BUSH: Therefore, the change is void.

16      THE COURT: Well, or therefore, the decision was

17  incorrect, but it's like a decision of an arbitrator. I mean,

18  if you want to draw an analogy here, I understand your clients

19  didn't affirmatively agree to an arbitration clause the way

20  people in a contract do, but in effect the confirmation order

21  established the trust, and the trust, with exceptions that

22  don't affect your client, has no -- there's no judicial review.

23  So it's, I believe, like a arbitration. If the arbitrator is

24  wrong, that's unfortunate, but there's nothing that the

25  judicial branch can do about it.

1        But let me hear from the trustee's counsel.  And

2  you'll have time.  And I'm not going to lock you into the time.

3  You'll give me -- I'll give you a reasonable amount of time to

4  respond.

5        So Ms. Sieger-Grimm, you want to -- you have fifteen

6  minutes.

7        MS. SIEGER-GRIMM:  Good morning, Your Honor.  There

8  are only two facts that are relevant here today.  First, Sayegh

9  Brothers does not have a right to appeal the trust's final

10  determination of its claims.  And second, as a result of that

11  final determination, Sayegh Brothers has been paid its pro rata

12  share to date on account of all the fire victim claims it

13  asserted.

14        As the trustee explained in the objection to the

15  Sayegh Brothers' motion, Sayegh Brothers did not preserve a

16  right to judicial review of the trust's final determination of

17  his claims, as some other fire victim claimants did.  It's

18  notable that all the claimants who did have that right of

19  judicial review accepted their claims' determinations

20  without --

21        THE COURT:  Well, that's interesting and nice to know,

22  but it's irrelevant to Sayegh Brothers' situation.  The

23  question is -- the question is was there a -- was there a

24  departure from the procedure without compliance with the extant

25  rules in the confirmation order.  In other words, is Mr. Bush

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 16
of 46

1   correct that the trust changed the rules with the BIL and

2   didn't have authority to do so?

3           MS. SIEGER-GRIMM:  No, Your Honor.  That proposal is

4   not correct.

5           THE COURT:  Okay.

6           MS. SIEGER-GRIMM:  The guidelines that Mr. Bush is

7   referring to, the business income loss guidelines, there were

8   several different sets of guidelines that were promulgated by

9   the trust for various different types of claims.  And that's in

10  accordance with the terms of the claims resolution procedures,

11  which state the trustee and claims administrator will consult

12  with claims processor and other trust professionals to develop

13  claims valuation processes that result in fair and reasonable

14  compensation of eligible claims in accordance with the trust

15  documents, the plan, and the confirmation order.  And

16  accordingly, they were developed with a California judge who

17  determined this is the procedure that should be used for all

18  business income loss claims.

19          THE COURT:  So you're saying that consistent with the

20  CRP, again with all the acronyms here, consistent with the

21  confirmation order from which the CRP developed from which the

22  BIL developed, there was no need for this Court to come back

23  and adopt or approve the trust's adoption of the BIL because

24  the BIL was the product of that whole process that you

25  described.

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 17
of 46

1      So it sounds to me like the statement made by the

2  hearing judge was perhaps incorrect.  Shall we assume that?

3      MS. SIEGER-GRIMM:  I don't know that I would

4  characterize it as incorrect, but it probably -- it didn't

5  change anything, but the guidelines were developed in

6  accordance with the claims resolution procedures, which were

7  approved by this Court.  I think I believe that's what the

8  reference was to.

9      THE COURT:  No, but if we were a fly on the wall

10  during the conversation that Mr. Bush had with that hearing

11  judge and Mr. Bush says something like, well, where did that

12  come from and the hearing judge says, well, the bankruptcy

13  court authorized that change, then that sounds like it was an

14  incorrect statement.

15      The bankruptcy court confirmed the plan which

16  authorized the CRP which authorized the BIL, and maybe another

17  judge, not wearing his judge robe but wearing his experience

18  hat, was engaged to work with Ms. Yanni and your staff to come

19  up with guidelines.  But that wasn't a judicial act.  That was

20  just input from an experienced person.  I mean, shall we assume

21  that maybe that's more credible or more the source of the

22  situation or not?

23      MS. SIEGER-GRIMM:  I'm a little -- I'm not sure we're

24  talking the same point.  I'm going to try to address your

25  question.  If I don't, please, please let me know.

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 18
of 46

1     THE COURT:  Okay.

2     MS. SIEGER-GRIMM:  I believe that the neutral who

3 spoke to Mr. Bush -- and I wasn't there either; we're all

4 getting this second or third-hand -- was referring to the whole

5 process.  And the CRP was approved, and the CRP says in it that

6 the trustee and the claims administrator can develop processes

7 to administer these claims.  And that's what the BIL are, the

8 very claims valuation processes that were referred to in the

9 CRP.

10     THE COURT:  Well, let me try it a different way.

11 Since you've been involved for the trust, I recognize you and

12 your involvement for a long time.  I don't remember if you were

13 there at the outset, but I know your experience with it.  In

14 your experience in the trust, has any landlord gotten a trust

15 claim allowed for lost income on a lost income methodology, or

16 have they all been given the same outcome?  In other words, are

17 there other cases of property owners who suffered property loss

18 and were paid by insurance and also suffered income loss were

19 not allowed their lost income claim in the trust?

20     MS. SIEGER-GRIMM:  Well, in a case like this in which

21 there was no property claim ever asserted in the trust, no,

22 they did not get any award related to their property claim.

23 This was a strictly -- and was stated in his opening brief to

24 the trust that it's only business income loss.  It didn't

25 involve any property claim at all.  And --

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 19
of 46

1    THE COURT:  No, but it did involve a property claim.

2  But he got it from the insurance company.  He just went through

3  that.  In other words, Mr. Bush's client Sayegh Brothers

4  suffered a loss from the fire -- from the Camp Fire to their

5  property, but they were paid by their insurer.  So if they had

6  asserted a claim for lost property, it would have been improper

7  because they had been paid by insurance.  And in fact, their

8  insurer probably asserted a claim in the other trust, in the

9  subrogation trust.  But that's another story and another issue.

10    Don't you agree that's more likely what happened?

11    MS. SIEGER-GRIMM:  That the insurer asserted a claim

12  in the subrogation trust?

13    THE COURT:  No, no.  We know that Sayegh Brothers got

14  paid 200,000 dollars for their property damage by their

15  insurer.  You know that, correct?  I know it, so you know it.

16    MS. SIEGER-GRIMM:  Correct.

17    THE COURT:  Okay.

18    MS. SIEGER-GRIMM:  I believe that was just for the

19  business income loss.  I don't believe that that was for the --

20  the property damage was a much bigger claim, not --

21    THE COURT:  Mr. Bush, wasn't it 200,000 for property

22  damage?

23    MR. BUSH:  Yeah, you're wrong.  What the insurance

24  paid was three and a half million for the structure --

25    THE COURT:  Okay.

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 20
of 46

1     MR. BUSH:  -- and 200,000 for the first year of income

2   loss.

3          THE COURT:  Okay.  So --

4          MR. BUSH:  And that was their policy limit.

5          THE COURT:  Okay.

6          MR. BUSH:  And so that's why Sayegh then sought the

7   rest of the rent that it lost through the trust and didn't

8   submit a claim for the structural damage.

9          But this is the point that I think is wrong here.  The

10  burning down of the building terminated these long-term leases.

11  And because that terminated the leases, doesn't matter who paid

12  for that or even if Sayegh Brothers asked to have money for the

13  building.  The harm, the damage, the loss to the income stream

14  occurred the moment of the fire, and that's the damage right

15  there.

16         And under California law, as said in Lynbar, that has

17  to be compensated for, and there's a method in the evidence

18  code for calculating it, which was the method we used.  And

19  it's in Lynbar, and as well as this is a Constitutional issue.

20  Your right to just compensation is Constitutional.  And that's

21  just been taken away.

22         Anyway, I think that's pretty obvious.  And it's done

23  by the procedure of the trust by saying, well, you don't get to

24  have your property because you didn't let us pay for your

25  structure loss.  That doesn't even make sense.

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 21
of 46

1       THE COURT: Okay. But Mr. Bush, what am I supposed to

2 do about it if I agree with you?

3       MR. BUSH: Well, one thing is, is -- and what I say

4 is, is that landlords that had long-term leases that were

5 terminated by the fire should have that loss valued according

6 to California eminent domain law, which is where inverse

7 condemnation comes in.

8       THE COURT: But what do I do about it given the fact

9 that there is a structure -- the word "structure" is the wrong

10 word. There is a -- there is a procedure in place, and it's

11 been in place for years. And it's administered eighteen

12 billion dollars' worth of claims. And we're in the home

13 stretch of it, and there's not much left.

14       And so I have a procedural device in place that has no

15 appeal and no recourse to the judicial system and no practical

16 way to come close to compensating your client, even if I were

17 to agree with it because essentially, you're certainly not

18 advocating, I assume, that I direct the fire trustee to claw

19 back some fair amount of money from all these other fire

20 victims, or maybe you are, but I --

21       MR. BUSH: No, that's the kind of hyperbole that's

22 been thrown at you all during this thing. No, I'm not --

23       THE COURT: I know, but I don't know what to do. Just

24 give me a -- give me a -- give me a solution if I were so

25 inclined to --

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 22
of 46

1        MR. BUSH:  Okay.  It's fairly simple.

2        THE COURT:  Okay.

3        MR. BUSH:  One, you identify how many people are like

4    Sayegh, which is not as many as you would think.  Okay.  And

5    you're only talking about the class of people that have not

6    accepted their determinations, which according to the

7    statistics is, like, three percent --

8        THE COURT:  That's right.

9        MR. BUSH:  -- if ninety-seven percent

10    (indiscernible) --

11        THE COURT:  (Indiscernible).

12        MR. BUSH:  And so there's three percent out there.

13    That could have some of those landlords in it just like Sayegh.

14    So what you would do is say to the trust, with respect to those

15    types of cases, you evaluate the loss according to California

16    eminent domain law.  And you don't have to do any figuring

17    because that law gives you the formulas for how you do it.

18        THE COURT:  Okay.  Mr. Bush, so let's assume that I

19    were persuaded to do that.  I'd say, okay, Sayegh, you're in

20    there.  And then let's say three other claimants show up.  And

21    I direct the trust to revisit those four claimants.  And let's

22    just assume further that under the methodology that those four

23    claimants -- but let's focus this on your client, that Sayegh

24    actually has a compensable claim of two million dollars.  What

25    am I supposed to do, tell the trustee to add a two-million-

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 23
of 46

1　dollar claim to the pot?

2　　　　　MR. BUSH:  The trustee has the money in the pot.

3　　　　　THE COURT:  Well, I don't know how much is in the pot.

4　I mean, we've already had this discussion.  I mean, there might

5　be some amount of money, but there'd have to be some money -- I

6　mean, there's only a finite amount of money in the pot --

7　　　　　MR. BUSH:  Right.

8　　　　　THE COURT:  -- left.  Okay.  And we've --

9　　　　　MR. BUSH:  Right.

10　　　　　THE COURT:  -- also just heard that about eleven

11　billion dollars have gone out, so we can know there's not too

12　much left.  So presumably your client, if they were the only

13　claimant, would be allowed a claim, and the claim would go in

14　the queue for some amount of distribution for what's left in

15　the pot.  That's really the most you could hope for, right?

16　　　　　MR. BUSH:  Right.

17　　　　　THE COURT:  Okay.

18　　　　　MR. BUSH:  And that's one of the reasons why I told

19　Mr. Molton right after the decision, after the one that I can't

20　appeal from, that if there is something wrong and this is

21　overturned because of bankruptcy procedures, then you should be

22　thinking about keeping some money in the pot.  And I know they

23　have because six percent is not equal to how much money they

24　got in this last sale of stock.

25　　　　　THE COURT:  Well, you heard at the start of the

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 24
of 46

1 hearing that within a very short period of time, the trustee's

2 going to file a new annual report. So the entire PG&E universe

3 will know what's on hand, and one can just simply read that

4 document and see, well, how much is there to be distributed as

5 distinguished from anticipated administrative expenses.

6 But then we come back to the question of you've

7 acknowledged more than once correctly so there's no right to

8 appeal. But the only way for me to accommodate you, if I were

9 so inclined, is to overlook that concession and say, well, but

10 you do have a right to appeal because you're appealing it. I

11 mean, the fact is that --

12 MR. BUSH: I'm not appealing it.

13 THE COURT: Mr. Bush, the fact is you are asking me

14 as a judicial officer to overrule -- I have to reverse, in

15 effect, to vacate, a final decision by the fire trust. In

16 order to do that, I have to -- I have to do what I don't know

17 that I have the legal authority to do so --

18 MR. BUSH: Well, that, I'm not asking -- I'm asking --

19 I'm asking you to follow the rules that you set up that says

20 you have to come to me if you're going to change the rules that

21 all these people voted on. And if you're going to change them,

22 I've got to approve them. And if that didn't happen, that's a

23 procedural problem. Has nothing to do with what really

24 happened in the Sayegh case. It's something to do with the

25 bankruptcy court and how the bankruptcy court proceeded. And

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 25
of 46

1 you got hoodwinked by these guys.

2 THE COURT: Well, hoodwinked by these guys is hardly a

3 complimentary term.

4 MR. BUSH: I know.

5 THE COURT: All right. Let's hear from counsel again.

6 Ms. Sieger-Grimm, what do you think of --

7 MS. SIEGER-GRIMM: Your Honor --

8 THE COURT: What do you think of his suggestion?

9 MS. SIEGER-GRIMM: Well, first of all, I don't think

10 that there's been a problem because we're talking about -- the

11 inverse condemnation is tied to property claims. None of these

12 were property claims. They were income loss claims.

13 And the decision that he was referring to before about

14 needing a personal injury, that has to do with being paid for

15 lost business where you need some time beyond just, oh, I had a

16 business here and nobody's coming around anymore because of a

17 fire or nobody's coming around because of some other

18 destruction. And that's really the cause. That case limited

19 how much you could pay out on that based on having some other

20 tie to the loss. That's kind of a (indiscernible) --

21 THE COURT: Lynbar involves a small business that had

22 a couple of tenants, and they lost the property to a

23 governmental agency that condemned the property. And they lost

24 the benefit of the ownership and the lease. And the California

25 Court of Appeals, conceding it was perhaps in the minority

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 26
of 46

1   nationally, said that's the Constitution's requirement under

2   California law.  And it affirmed the trial court's decision to

3   award the condemnee lost rental and lost ownership valuation.

4   So it seems to me, unless there's some exception for this weird

5   animal called inverse condemnation when it's of a utility that

6   caused a fire, that is the rule of law that, as Mr. Bush says,

7   the California Constitution requires as a matter of just

8   compensation.

9          So it'd be nice to have all your hypotheticals about

10  other hypotheticals, but Sayegh owned the property and lost it

11  and lost this income source.

12         MS. SIEGER-GRIMM:  Well, first of all, that was not an

13  inverse condemnation case.  It wasn't directly applicable to

14  what we have here.

15         And second, as Mr. Bush acknowledged, all inverse

16  condemnation damages are tied to property claims.  There was

17  never any property claim asserted in the trust.  So the trust

18  was not valuing business income losses based on property

19  damage.  They were based on what the value of their losses were

20  and how to value them.

21         THE COURT:  Mr. Bush said he believes that the

22  application of the rules was not consistent with the procedures

23  that the bankruptcy court approved, and therefore, I should

24  uphold the integrity of the process by insisting that the

25  trustee revisit it for at least his client, if not other

1    similarly situated ones.  And again, I'm conceding for these

2    discussion purposes that maybe he makes a persuasive argument,

3    but procedurally, is there a way to do it.

4            And so I'll ask you again, is there a procedural way

5    for me to do it, to honor the concept that was -- and certainly

6    part of the inverse condemnation ruling that I was persuaded to

7    make?  And isn't it not fair to tell the trust, at least for

8    Sayegh Brothers, follow those rules?

9            MS. SIEGER-GRIMM:  Your Honor, well, especially at

10   this point in the trust, where every single claim of the 71,803

11   fire victim claimants -- and that's over 255; it's about 255

12   unique fire victim claims -- has been determined.  Ninety-eight

13   percent of those claims determinations have been accepted.

14   We're down --

15           THE COURT:  He's not asking me to revisit any of

16   those.

17           MS. SIEGER-GRIMM:  So how did -- but that leaves the

18   whole concept of treating everyone the same, to the extent that

19   there's anyone else who had accepted a claim and now wants to

20   say, oh, wait, wait, wait, wait, you have to reevaluate mine as

21   well.  You can't order the trust to treat one claimant

22   differently than everyone else.

23           And then, I mean, that unravels a big roll of yarn

24   there because you have then the ability for anyone to come

25   forward and say, well, you need to reevaluate my claim based on

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 28
of 46

1  this and you need to reevaluate my claim based on that.  I

2  mean, that could undermine all the progress that's been made so

3  far to the detriment of all the fire victim claimants who want

4  everything just to be finished.  They've been waiting a long

5  time.

6          MR. BUSH:  And the lawyers too, believe me.

7          MS. SIEGER-GRIMM:  No, I understand.  But here, let me

8  restate the question, and then I guess I going to have to take

9  this under advisement.

10          But it seems to me that the skies aren't falling quite

11  as dramatically as counsel would suggest, that Mr. Bush, you

12  did not have the foretaste to suggest that I claw back that

13  70,000 fire victims' money because those same fire victims are

14  probably unhappy with the fact that they are only getting about

15  sixty-seven cents on the dollar anyway, five years later.

16          So leaving that aside, so let's assume, Mr. Bush, even

17  if there's only one and it's Sayegh Brothers, Sayegh Brothers

18  says I didn't get -- my claim wasn't properly processed,

19  therefore reevaluate my claim and at least allow my claim and

20  let it get paid from what is left in the trust.  And I don't

21  hear you advocating that will we claw back.  But perhaps if I

22  directed the trustee to revisit your claim and it was then

23  allowed and determined to be worth, let's say hypothetically,

24  two million dollars, then it would be entitled to whatever a

25  two-million-dollar claim would get based upon the limited fund

1    still remaining.  And I don't know whether that would be enough

2    to take you up to the same percentage or not.  I don't know

3    that.

4          The question is whether there's any justification for

5    that.  And I don't have an answer to that, and that's what I'm

6    going to have to struggle with because I think the trustee's

7    counsel is correct.  I don't expect thousands of claimants who

8    are going to be satisfied with a sixty-seven percent recovery

9    to be happy if they find that someone else came in after the

10   fact and after the nonjudicial review process is all over with,

11   comes in and makes a persuasive argument.  It is a slippery

12   slope, not to take back money, but to require a revisiting of

13   every single claimant that wasn't happy with the determination.

14         And so I don't know.  I guess --

15         MR. BUSH:  Yeah, I --

16         THE COURT:  -- I'll listen to any suggestions either

17   of you have, and then I guess I'm going to have to take the

18   matter under advisement.

19         MR. BUSH:  Well, I think, first off, we have to

20   remember we are talking about a Constitutional issue of just

21   compensation.  And as far as the bankruptcy court goes, under

22   the Fifth Amendment, you're well advised that you have to

23   protect creditors' property rights under the Fifth Amendment.

24   But at the very least, yes, you would direct the trust to apply

25   the correct application of eminent domain law to the Sayegh

1  claim, and you could leave it at that. You could also ask the

2  trust to look at the remaining people that have not signed and

3  released -- all the other people have released their claims,

4  more than likely, I'm guessing.

5      THE COURT: Oh, some are not happy about that, but

6  that's another story.

7      MR. BUSH: Yeah. Anyway, I think it's relatively

8  straightforward. Sayegh Brothers at least came forward and

9  said the procedure was wrong and here's why. And doesn't

10 matter what the results are, the procedures were wrong. So

11 just use the right procedures. We'll be happy with the

12 results.

13     THE COURT: See, that's what I have to disagree with

14 you. I can't make that leap. The procedures were in place and

15 perhaps were misapplied. And perhaps if the hearing officer

16 had heard this same argument, the hearing officer might have

17 said, you know what, Mr. Bush, you're right, and I'm going to

18 order a reconsideration. But the hearing officer and you

19 therefore say the procedures were wrong, but I don't know that

20 that's true. I mean, and so I think that's what I'm struggling

21 with as much as anything else.

22     In other words, I learned a long time ago in another

23 bankruptcy case that has nothing to do with fire damage about

24 what happens when a court makes a wrong decision. Courts have

25 jurisdiction to make the wrong decision, and if they make the

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 31
of 46

1    wrong decision, the remedy is to appeal.  And here, for other

2    reasons that we've said, there was no right of appeal.  But

3    that's a different issue.

4         And so I'm going to assume for these purposes that it

5    appears that the trust made the wrong decision.  But I don't

6    know what to do about it because it is a slippery slope.  And I

7    draw the analogy, the arbitrator who makes an incorrect legal

8    decision usually, except when there's mischief, and nobody's

9    suggesting mischief here.  But turns out the arbitrator had a

10   personal relationship with one of the litigants or was taking a

11   bribe or some mischief, courts can set aside the arbitration.

12   But that's not been suggested here.  Just, yet, worse, there

13   was an error of application of the correct legal principle.

14        In other words, the hearing officer had a jurisdiction

15   to be incorrect, and just like an arbitrator has jurisdiction

16   to be incorrect.  So that's what I'm struggling with.  But

17   anyway, I appreciate the way you presented it and your

18   approach.

19        Ms. Grimm, any more final comments?

20        MS. SIEGER-GRIMM:  Your Honor, first of all, the trust

21   does not agree that the law was misapplied here.

22        To the extent that anything had to be revisited with

23   the Sayegh Brothers' claim, as initial point, that became a

24   final determination.  It didn't need to be accepted because

25   under the claims resolution procedures, once a trustee

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 32
of 46

1  determination is issued, its final. And because it is a final

2  decision, like every other final decision, it then proceeds to

3  the payment process. And the trustee -- and the trust paid

4  Sayegh Brothers on September 15th its sixty-percent pro rata

5  share.

6         As I said before, we're contemplating an increase to

7  sixty-six percent. To the extent that the trust has to revisit

8  this claim, which of course will spur other people to come to

9  you and say you have to reconsider my claim as well, we're not

10  going to go to sixty-six percent. We have to stop and say,

11  okay, well, what can we pay. We're at the point now where

12  every decision that is made with regard to paying or raising

13  the pro rata has to be made in consideration of everything that

14  remains to be paid.

15         THE COURT: Now, you've told me, there still are --

16  there are still some determinations up for review, right?

17         MS. SIEGER-GRIMM: Two percent.

18         THE COURT: Okay. So but just if any single claim is

19  reversed by the hearing officer, then you have to revisit it,

20  don't you? So --

21         MS. SIEGER-GRIMM: But that has already been taken

22  into account.

23         THE COURT: Well, wait. I mean, why is it -- why is

24  it taken into account? What if there's a claim for a 10,000

25  dollars and the hearing officer says that was incorrect, it

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 33
of 46

1  should be recalculated, and it turns out to be ten million

2  dollars?  Then what happens?

3       MS. SIEGER-GRIMM:  Because the trust has engaged

4  professionals who have been determining what are the -- what

5  are the variants that could be for this claim, what could

6  possibly come if this claim is appealed, what's the largest

7  amount we could get, and that's how the decision on what the

8  pro rata amount that can actually be paid is made.

9       So to the extent you want to call it a holdback or

10  whatever until a claim is finally determined, the trust has to

11  take into consideration what that might cost.  And to the

12  extent that we were too conservative and have more money left

13  than we expected, then there'll be another bump up in the pro

14  rata distribution.  But those determinations are made based on

15  what we have determined is feasible, what can be paid without

16  having to claw back, without having to say that the first

17  person who got paid got paid more or less than the last person

18  who got paid.

19       Everything has to be held constant, so everyone is

20  treated equally.  So every time a claim is finalized, that's

21  the answer.  We're not thinking about whether that's going to

22  wiggle and become bigger.  So to the extent that anything has

23  to be revisited, that hasn't been considered as far as what

24  we're able to distribute on a pro rata basis.  And that can

25  throw off everything.

 1          THE COURT:  Okay.  I got it.

 2          Mr. Bush, I don't know why you're smiling.

 3          MR. BUSH:  Well, this one theme has run through this

 4  all the time.  What I'm talking about is the method that was

 5  used, and when they adapted the BIL method, its application

 6  denied Constitutional right to just compensation.

 7          THE COURT:  No, I know.  I know what you're saying.

 8          MR. BUSH:  So it's not --

 9          THE COURT:  But the remedy is to go back and start

10  over again.  That's what you just said, even if it's just for

11  your client.  And that's what (indiscernible) --

12          MR. BUSH:  I would say that all things considered,

13  since this client came to you with this argument, this client

14  should definitely benefit from the correct ruling.  Whether or

15  not there's some more like Mr. Sayegh in the group that have

16  not accepted, that two percent, kind of doubtful.  And it's

17  also doubtful that there's very many in the group out there

18  that already accepted that --

19          THE COURT:  I wish I knew that were true.  I have to

20  be honest with you, if I could somehow predict in my crystal

21  ball that there isn't another person out there in the PG&E

22  victim universe who wouldn't say, I'd like to have mine

23  reconsidered, and I knew for sure there was only one, I might

24  do some arm-twisting here about getting your clients more

25  money.  The problem is I just, that's not the way to administer

1  the law.

2       So even though the trustee's counsel differs with you

3  that California law has been ignored, you make a persuasive

4  argument, and you may be correct.  And I certainly went to and

5  read the Lynbar case, and there's no question it says what it

6  says.  And the fact that Lynbar itself was not an inverse

7  condemnation case, it does have some pretty strong language in

8  terms of interpreting the principles that you rely on.

9       But I just simply can't accept your argument that, oh,

10  I can just get around all this other problem by saying, well,

11  this is just a little bankruptcy procedural error because I

12  don't know that it was.  So I have to take the position that I

13  wish there was never a question that there was an error made in

14  the trust, but if there was an error made in the trust, I don't

15  have a solution.

16       But in any event, I'm going to thank both of you for

17  the presentation and the challenging problem you've presented

18  to me and just take the matter under submission and give it

19  some further thought because life isn't as simple.  I can't

20  just say, why don't you two guys go work something out that

21  satisfies the Sayegh Brothers enough to make this problem go

22  away.  I have to take into account the next step, if there is

23  another step.

24       So the matter is going to stand submitted.  I

25  appreciate the hard work and the professional presentations for

Case: 19-30088   Doc# 14408   Filed: 04/10/24   Entered: 04/10/24 11:31:20   Page 36
of 46

1  both of you and on behalf of your clients.  Thank you very

2  much.  That concludes the hearing.

3          MR. BUSH:  Thank you.

4          MS. SIEGER-GRIMM:  Thank you, Your Honor.

5          MR. BUSH:  Take care.

6          THE COURT:  Thank you.

7      (Whereupon these proceedings were concluded at 10:48 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

/s/ RIVER WOLFE, CDLT-265


eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020


Date:  April 10, 2024

## A

**ability (1)**
28:24
**able (1)**
34:24
**absent (1)**
7:15
**Absolutely (1)**
12:13
**accept (4)**
3:18,19,24;36:9
**accepted (9)**
7:9;9:2;16:19;23:6;
28:13,19;32:24;
35:16,18
**accommodate (1)**
25:8
**accordance (3)**
17:10,14;18:6
**according (3)**
22:5;23:6,15
**accordingly (1)**
17:16
**account (4)**
16:12;33:22,24;
36:22
**acknowledged (3)**
15:1;25:7;27:15
**acronyms (1)**
17:20
**act (1)**
18:19
**actually (2)**
23:24;34:8
**adapted (1)**
35:5
**add (1)**
23:25
**added (1)**
10:9
**address (1)**
18:24
**administer (2)**
19:7;35:25
**administered (1)**
22:11
**administrative (1)**
25:5
**administrator (4)**
9:25;10:6;17:11;
19:6
**adopt (1)**
17:23
**adoption (1)**
17:23
**advised (1)**
30:22
**advisement (2)**
29:9;30:18
**advocating (2)**
22:18;29:21

**affairs (1)**
4:23
**affect (1)**
15:22
**affected (1)**
12:2
**affects (1)**
15:6
**affirmatively (1)**
15:19
**affirmed (1)**
27:2
**again (6)**
4:12;17:20;26:5;
28:1,4;35:10
**agency (1)**
26:23
**ago (2)**
9:15;31:22
**agree (5)**
15:19;20:10;22:2,
17;32:21
**agreement (2)**
10:7;15:7
**ahead (2)**
6:10;9:5
**allow (1)**
29:19
**allowed (4)**
19:15,19;24:13;
29:23
**Amendment (2)**
30:22,23
**amount (7)**
16:3;22:19;24:5,6,
14;34:7,8
**analogy (2)**
15:18;32:7
**animal (1)**
27:5
**announced (1)**
5:10
**annual (2)**
5:13;25:2
**answered (1)**
7:3
**anticipated (1)**
25:5
**anymore (1)**
26:16
**apparently (1)**
14:11
**appeal (12)**
6:13,14;11:15,16,
17;16:9;22:15;24:20;
25:8,10;32:1,2
**appealed (1)**
34:6
**appealing (2)**
25:10,12
**Appeals (1)**
26:25
**appearance (1)**

4:15
**Appearances (1)**
3:7
**appears (1)**
32:5
**applicable (1)**
27:13
**application (4)**
27:22;30:25;32:13;
35:5
**applied (2)**
7:3;8:22
**applies (2)**
8:8,18
**apply (5)**
8:6,21;10:7;13:7;
30:24
**appreciate (3)**
14:16;32:17;36:25
**approach (1)**
32:18
**approve (6)**
14:25;15:8,9,13;
17:23;25:22
**approved (8)**
6:16,20;11:19,25;
14:11;18:7;19:5;
27:23
**approving (1)**
12:22
**APRIL (1)**
3:1
**arbitration (3)**
15:19,23;32:11
**arbitrator (5)**
15:17,23;32:7,9,15
**argued (1)**
9:11
**argues (1)**
13:3
**argument (10)**
4:20;6:4;9:20;14:7;
28:2;30:11;31:16;
35:13;36:4,9
**arm-twisting (1)**
35:24
**around (3)**
26:16,17;36:10
**aside (3)**
8:4;29:16;32:11
**asserted (6)**
16:13;19:21;20:6,8,
11;27:17
**assume (11)**
6:4;14:20,21;15:12;
18:2,20;22:18;23:18,
22;29:16;32:4
**attempting (1)**
3:17
**attorneys' (1)**
7:11
**authority (3)**
14:24;17:2;25:17

**authorized (3)**
18:13,16,16
**available (2)**
7:15;10:24
**award (2)**
19:22;27:3
**awarded (1)**
5:9
**awards (1)**
4:25
**away (2)**
21:21;36:22

## B

**back (10)**
6:3;9:9;17:22;
22:19;25:6;29:12,21;
30:12;34:16;35:9
**backing (1)**
9:5
**ball (1)**
35:21
**bankruptcy (15)**
6:16;11:19,21;12:4,
5,21;18:12,15;24:21;
25:25,25;27:23;
30:21;31:23;36:11
**based (9)**
4:25;8:1;26:19;
27:18,19;28:25;29:1,
25;34:14
**basis (2)**
8:6;34:24
**bearing (1)**
10:15
**became (1)**
32:23
**become (1)**
34:22
**begin (1)**
6:10
**behalf (1)**
37:1
**believes (1)**
27:21
**benefit (2)**
26:24;35:14
**beyond (1)**
26:15
**big (1)**
28:23
**bigger (2)**
20:20;34:22
**BIL (12)**
7:7;10:8;12:22;
13:14,21;17:1,22,23,
24;18:16;19:7;35:5
**billion (5)**
5:1,6,9;22:12;24:11
**board (1)**
12:13
**both (2)**

36:16;37:1
**bottom (4)**
7:10,10;11:11;13:9
**brains (1)**
9:1
**branch (1)**
15:25
**bribe (1)**
32:11
**brief (2)**
6:1;19:23
**bring (1)**
4:1
**Brothers (14)**
4:17;13:24;16:9,11,
15;20:3,13;21:12;
28:8;29:17,17;31:8;
33:4;36:21
**Brothers' (3)**
16:15,22;32:23
**Brown (1)**
3:15
**building (2)**
21:10,13
**bump (1)**
34:13
**burning (1)**
21:10
**Bush (79)**
3:18,23;4:4,6,11,13,
15,16,16;5:24;6:6,8,
11,13;7:15,22;8:10,
14,17;9:7,16,18;
10:23;11:3,5,9;12:8,
12,12,14,17,19;13:3,
18;15:5,15;16:25;
17:6;18:10,11;19:3;
20:21,23;21:1,4,6;
22:1,3,21;23:1,3,9,12,
18;24:2,7,9,16,18;
25:12,13,18;26:4;
27:6,15,21;29:6,11,
16;30:15,19;31:7,17;
35:2,3,8,12;37:3,5
**Bush's (1)**
20:3
**business (8)**
17:7,18;19:24;
20:19;26:15,16,21;
27:18

## C

**calculating (1)**
21:18
**calculations (1)**
7:4
**CALIFORNIA (21)**
3:1;6:16;7:10;8:25;
9:12,21,22,22,24;
10:3;11:10;12:3;
13:12;17:16;21:16;
22:6;23:15;26:24;

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 39 of 46

27:2,7;36:3
**Call (6)**
3:3;5:12;8:5;14:22;
15:10;34:9
**called (1)**
27:5
**Calling (1)**
3:5
**came (4)**
6:21;30:9;31:8;
35:13
**camera (3)**
4:7,8,18
**Camp (1)**
20:4
**can (15)**
4:9,10,12;11:21;
15:4,25;19:6;24:11;
25:3;32:11;33:11;
34:8,15,24;36:10
**capitalized (1)**
7:5
**care (1)**
37:5
**case (19)**
7:19,20,21,24;
8:2,3,7,22;9:13;
12:13;14:15;19:20;
25:24;26:18;27:13;
31:23;36:5,7
**cases (4)**
6:23;8:17;19:17;
23:15
**Cathy (1)**
10:6
**caught (1)**
6:18
**cause (2)**
8:1;26:18
**caused (1)**
27:6
**cents (1)**
29:15
**certainly (3)**
22:17;28:5;36:4
**challenging (1)**
36:17
**chance (1)**
15:11
**change (10)**
6:20;8:5,5;15:6,13,
15;18:5,13;25:20,21
**changed (1)**
17:1
**characterize (1)**
18:4
**cited (1)**
7:24
**cites (1)**
7:24
**claim (38)**
7:5,15;13:21;19:15,
19,21,22,25;20:1,6,8,

11,20;21:8;23:24;
24:1,13,13;27:17;
28:10,19,25;29:1,18,
19,19,22,25;31:1;
32:23;33:8,9,18,24;
34:5,6,10,20
**claimant (3)**
24:13;28:21;30:13
**claimants (9)**
13:19;16:17,18;
23:20,21,23;28:11;
29:3;30:7
**claims (29)**
5:1;6:20;9:25;10:5,
6,8;16:10,12,17;17:9,
10,11,12,13,14,18;
18:6;19:6,7,8;22:12;
26:11,12,12;27:16;
28:12,13;31:3;32:25
**claims' (1)**
16:19
**clarify (1)**
4:21
**class (1)**
23:5
**clause (1)**
15:19
**claw (4)**
22:18;29:12,21;
34:16
**CLERK (5)**
3:4,17,21;4:1,5
**client (11)**
6:4,25;15:22;20:3;
22:16;23:23;24:12;
27:25;35:11,13,13
**clients (4)**
15:2,18;35:24;37:1
**clients' (1)**
15:3
**close (1)**
22:16
**code (1)**
21:18
**colleague (1)**
15:10
**coming (3)**
11:15;26:16,17
**comments (1)**
32:19
**committee (1)**
10:24
**company (4)**
13:6,25;14:9;20:2
**Comparing (1)**
5:2
**compensable (6)**
7:15;13:10,21,22,
22;23:24
**compensated (1)**
21:17
**compensating (1)**
22:16

**compensation (7)**
13:4;14:8;17:14;
21:20;27:8;30:21;
35:6
**compliance (1)**
16:24
**complimentary (1)**
26:3
**conceded (1)**
8:23
**conceding (2)**
26:25;28:1
**concept (2)**
28:5,18
**concession (1)**
25:9
**concluded (1)**
37:7
**concludes (1)**
37:2
**condemnation (19)**
6:24;7:12,18,20,21,
25;8:3,8,19;9:19;
13:7;14:5;22:7;26:11;
27:5,13,16;28:6;36:7
**condemned (1)**
26:23
**condemnee (1)**
27:3
**confirmation (7)**
6:21;12:2;15:5,20;
16:25;17:15,21
**confirmed (1)**
18:15
**confused (1)**
10:4
**confusing (1)**
14:6
**connecting (1)**
4:11
**conservative (1)**
34:12
**consideration (2)**
33:13;34:11
**considered (2)**
34:23;35:12
**consistent (4)**
8:25;17:19,20;
27:22
**constant (1)**
34:19
**constantly (1)**
10:24
**Constitution (1)**
27:7
**Constitutional (7)**
9:20;10:3;13:4;
21:19,20;30:20;35:6
**Constitution's (1)**
27:1
**consult (1)**
17:11
**contacted (1)**

10:4
**contemplating (1)**
33:6
**contract (1)**
15:20
**contrary (1)**
6:16
**conversation (3)**
14:14,17;18:10
**Corporation (1)**
3:6
**corrected (1)**
11:4
**correctly (1)**
25:7
**cost (1)**
34:11
**costs (1)**
7:11
**Counsel (7)**
3:9;10:18;16:1;
26:5;29:11;30:7;36:2
**couple (1)**
26:22
**course (3)**
12:3;14:14;33:8
**Court (99)**
3:3,4,7,12,16,19,23;
4:3,6,12,14,18;5:7,12,
16,18,20,23;6:7,10,
12,17;7:13,17,23;
8:11,15,20;9:14,17;
10:12;11:1,4,7,19,21,
25;12:7,15,18,21;
13:2,17;14:13;15:9,
16,16;21:17;5,19,22;
18:7,9,13,15;19:1,10;
20:1,13,17,21,25;
21:3,5;22:1,8,23;23:2,
8,11,18;24:3,8,10,17,
25;25:13,25;26:2,
5,8,21,25;27:21,23;
28:15;30:16,21;31:5,
13,24;33:15,18,23;
35:1,7,9,19;37:6
**courts (3)**
7:10;31:24;32:11
**court's (1)**
27:2
**covers (1)**
8:2
**credible (1)**
18:21
**creditors' (1)**
30:23
**criticizing (1)**
10:21
**CRP (9)**
10:7;12:2;15:7;
17:20,21;18:16;19:5,
5,9
**crystal (1)**
35:20

**Currently (1)**
5:9

**D**

**damage (24)**
6:24;7:1,16;8:6,9,
24;9:3,8,19;13:5,8,10,
20;14:1,2,9;20:14,20,
22;21:8,13,14;27:19;
31:23
**damages (1)**
27:16
**date (2)**
5:5;16:12
**David (1)**
11:24
**deal (2)**
11:12,15
**decision (19)**
7:18;10:1,17;14:18;
15:16,17;24:19;
25:15;26:13;27:2;
31:24,25;32:1,5,8;
33:2,2,12;34:7
**declined (1)**
3:21
**declines (1)**
4:2
**definitely (1)**
35:14
**denied (2)**
13:4;35:6
**Dennis (1)**
3:5
**denying (1)**
13:24
**departure (1)**
16:24
**described (1)**
17:25
**destruction (1)**
26:18
**determination (8)**
7:9;8:24;16:10,11,
16;30:13;32:24;33:1
**determinations (6)**
4:25;16:19;23:6;
28:13;33:16;34:14
**determined (5)**
17:17;28:12;29:23;
34:10,15
**determining (1)**
34:4
**detriment (1)**
29:3
**develop (2)**
17:12;19:6
**developed (4)**
17:16,21,22;18:5
**device (1)**
22:14
**different (4)**

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 40
of 46

17:8,9;19:10;32:3
**differently (1)**
28:22
**differs (1)**
36:2
**direct (3)**
22:18;23:21;30:24
**directed (1)**
29:22
**directly (2)**
13:20;27:13
**disagree (1)**
31:13
**discussion (3)**
9:3;24:4;28:2
**dispositive (1)**
10:20
**distinguished (1)**
25:5
**distribute (1)**
34:24
**distributed (3)**
5:2,6;25:4
**distribution (3)**
5:3;24:14;34:14
**document (1)**
25:4
**documents (1)**
17:15
**dollar (2)**
24:1;29:15
**dollars (8)**
5:6,9;20:14;23:24;
24:11;29:24;33:25;
34:2
**dollars' (1)**
22:12
**domain (7)**
8:18;9:9,22;14:8;
22:6;23:16;30:25
**done (4)**
7:4;8:15;14:15;
21:22
**doubtful (2)**
35:16,17
**down (2)**
21:10;28:14
**dramatically (1)**
29:11
**draw (2)**
15:18;32:7
**due (1)**
5:13
**during (4)**
10:24;12:20;18:10;
22:22

**E**

**earlier (1)**
13:9
**economic (1)**
13:20

**effect (2)**
15:20;25:15
**eighteen (1)**
22:11
**either (2)**
19:3;30:16
**eleven (2)**
5:1;24:10
**eligibility (1)**
10:8
**eligible (1)**
17:14
**eliminates (1)**
12:3
**else (4)**
28:19,22;30:9;
31:21
**eminent (7)**
8:18;9:9,22;14:8;
22:6;23:16;30:25
**end (1)**
15:2
**engaged (1)**
18:18;34:3
**enough (2)**
30:1;36:21
**entire (1)**
25:2
**entitled (1)**
29:24
**equal (1)**
24:23
**equally (1)**
34:20
**equipment (1)**
6:23
**error (4)**
32:13;36:11,13,14
**especially (2)**
11:22;28:9
**Essentially (2)**
10:13;22:17
**establish (1)**
13:19
**established (1)**
15:21
**estimated (1)**
5:3
**evaluate (1)**
23:15
**even (9)**
8:6;10:15;11:22;
21:12,25;22:16;
29:16;35:10;36:2
**event (1)**
36:16
**everybody's (1)**
11:12
**everyone (3)**
28:18,22;34:19
**evidence (1)**
21:17
**except (1)**

32:8
**exception (1)**
27:4
**exceptions (1)**
15:21
**Exhibit (2)**
10:2;13:15
**exist (1)**
7:7
**expect (2)**
5:18;30:7
**expected (1)**
34:13
**expenses (1)**
25:5
**experience (4)**
8:22;18:17;19:13,
14
**experienced (1)**
18:20
**expert (1)**
7:4
**experts (1)**
9:2
**explain (2)**
10:10;11:9
**explained (2)**
13:9;16:14
**extant (1)**
16:24
**extends (2)**
8:2,9
**extent (6)**
28:18;32:22;33:7;
34:9,12,22

**F**

**fact (7)**
20:7;22:8;25:11,13;
29:14;30:10;36:6
**facts (1)**
16:8
**failure (1)**
6:23
**fair (3)**
17:13;22:19;28:7
**fairly (1)**
23:1
**falling (1)**
29:10
**falls (1)**
5:21
**familiar (1)**
7:18
**familiarize (1)**
12:20
**far (3)**
29:3;30:21;34:23
**feasible (1)**
34:15
**fees (1)**
7:11

**fifteen (1)**
16:5
**Fifth (2)**
30:22,23
**fifty-seven (1)**
5:2
**figure (1)**
12:19
**figuring (1)**
23:16
**file (2)**
5:22;25:2
**filed (4)**
6:13;7:6,16;12:24
**final (10)**
14:23;16:9,11,16;
25:15;32:19,24;33:1,
1,2
**finalized (1)**
34:20
**finally (1)**
34:10
**find (2)**
12:21;30:9
**finished (1)**
29:4
**finite (1)**
24:6
**fire (19)**
3:15;6:22;16:12,17;
20:4,4;21:14;22:5,18,
19;25:15;26:17;27:6;
28:11,12;29:3,13,13;
31:23
**firm (1)**
4:16
**first (11)**
6:9,15;13:14,18;
16:8;21:1;26:9;27:12;
30:19;32:20;34:16
**five (3)**
6:9;14:15;29:15
**fly (1)**
18:9
**focus (1)**
23:23
**follow (3)**
9:24;25:19;28:8
**following (2)**
9:22;11:10
**follows (1)**
14:25
**forensic (1)**
7:4
**foretaste (1)**
29:12
**forging (1)**
8:12
**formulas (1)**
23:17
**forward (2)**
28:25;31:8
**four (3)**

6:22;23:21,22
**freezing (1)**
7:13
**Friday (1)**
5:22
**front (1)**
13:16
**frozen (1)**
7:14
**fund (1)**
29:25
**fundamental (1)**
8:24
**further (3)**
11:17;23:22;36:19

**G**

**general (1)**
13:22
**generally (1)**
4:24
**given (2)**
19:16;22:8
**gives (1)**
23:17
**God (1)**
12:6
**goes (1)**
30:21
**Good (4)**
3:7;4:6;12:9;16:7
**governmental (1)**
26:23
**Grimm (2)**
4:21;32:19
**group (2)**
35:15,17
**guess (4)**
3:20;29:8;30:14,17
**guessing (1)**
31:4
**guidelines (5)**
17:6,7,8;18:5,19
**guys (3)**
26:1,2;36:20

**H**

**half (2)**
7:8;20:24
**hand (3)**
3:25;4:3;25:3
**happen (1)**
25:22
**happened (3)**
12:1;20:10;35:24
**happening (1)**
4:2
**happens (3)**
13:23;31:24;34:2
**happy (4)**
30:9,13;31:5,11

Case: 19-30088     Doc# 14408     Filed: 04/10/24     Entered: 04/10/24 11:31:20     Page 41
of 46

**hard (1)**
36:25
**hardly (1)**
26:2
**harm (1)**
21:13
**hat (1)**
18:18
**hear (6)**
4:9,10,12;16:1;
26:5;29:21
**heard (4)**
3:23;24:10,25;
31:16
**hearing (15)**
6:18;11:18,22;
14:22;18:2,10,12;
25:1;31:15,16,18;
32:14;33:19,25;37:2
**held (1)**
34:19
**here's (1)**
31:9
**history (1)**
10:13
**holdback (1)**
34:9
**home (1)**
22:12
**honest (1)**
35:20
**Honor (10)**
3:17;4:1;5:5;16:7;
17:3;26:7;28:5,9;
32:20;37:4
**Honorable (1)**
3:4
**hoodwinked (2)**
26:1,2
**hope (1)**
24:15
**hyperbole (1)**
22:21
**hypothetically (1)**
29:23
**hypotheticals (2)**
27:9,10

**I**

**idea (1)**
6:19
**identify (1)**
23:3
**ignored (1)**
36:3
**improper (1)**
20:6
**inclined (2)**
22:25;25:9
**income (20)**
7:2,5;8:2,6,9;9:4,8;
17:7,18;19:15,15,18,

19,24;20:19;21:1,13;
26:12;27:11,18
**incorrect (9)**
14:24;15:17;18:2,4,
14;32:7,15,16;33:25
**incorrectly (1)**
7:19
**increase (1)**
33:6
**increased (1)**
5:11
**Indiscernible (5)**
4:13;23:10,11;
26:20;35:11
**initial (1)**
32:23
**injury (2)**
13:19;26:14
**input (1)**
18:20
**insisting (1)**
27:24
**instances (1)**
9:23
**insurance (8)**
7:1;13:5,25;14:9;
19:18;20:2,7,23
**insurer (4)**
20:5,8,11,15
**integrity (1)**
27:24
**interest (3)**
7:12;9:12;13:11
**interesting (1)**
16:21
**interpreting (1)**
36:8
**into (6)**
9:1;16:2;33:22,24;
34:11;36:22
**inverse (18)**
6:24;7:12,18,21,25;
8:3,8,19;9:19;13:7;
14:5;22:6;26:11;27:5,
13,15;28:6;36:6
**invitation (3)**
3:18,19,24
**involve (2)**
19:25;20:1
**involved (5)**
6:22;10:5,24;12:6;
19:11
**involvement (1)**
19:12
**involves (1)**
26:21
**irrelevant (1)**
16:22
**issue (7)**
4:22;5:25;11:25;
20:9;21:19;30:20;
32:3
**issued (1)**

33:1

**J**

**join (1)**
3:18
**joining (1)**
4:5
**JOSE (1)**
3:1
**judge (8)**
14:11,23;17:16;
18:2,11,12,17,17
**judicial (7)**
15:22,25;16:16,19;
18:19;22:15;25:14
**jurisdiction (3)**
31:25;32:14,15
**justification (1)**
30:4

**K**

**keep (1)**
12:12
**keeping (1)**
24:22
**kick (1)**
3:20
**kind (8)**
6:18;7:8;10:4;13:8;
14:6;22:21;26:20;
35:16
**knew (6)**
6:23,24;11:17,18;
35:19,23
**knowledge (1)**
9:4

**L**

**landlord (1)**
19:14
**landlords (2)**
22:4;23:13
**language (1)**
36:7
**largest (1)**
34:6
**last (2)**
24:24;34:17
**later (2)**
7:8;29:15
**law (24)**
4:16;6:16;7:24;
8:12,25;9:12,18,21,
22,24;10:3;11:10;
12:3,5;21:16;22:6;
23:16,17;27:2,6;
30:25;32:21;36:1,3
**lawyer (1)**
12:4
**lawyers (1)**

29:6
**leap (1)**
31:14
**learn (1)**
12:5
**learned (2)**
6:14;31:22
**lease (1)**
26:24
**leasehold (4)**
9:12;13:12,24;14:8
**leases (3)**
21:10,11;22:4
**least (8)**
6:17;8:22;9:3;
27:25;28:7;29:19;
30:24;31:8
**leave (1)**
4:18;6:9;31:1
**leaves (1)**
28:17
**leaving (2)**
8:4;29:16
**left (6)**
22:13;24:8,12,14;
29:20;34:12
**legal (4)**
10:14;25:17;32:7,
13
**Lenzi (1)**
4:16
**less (1)**
34:17
**letter (1)**
11:11
**liability (4)**
6:23;7:25;8:23;9:2
**life (1)**
36:19
**light (1)**
15:3
**likely (2)**
20:10;31:4
**limit (1)**
21:4
**limited (2)**
26:18;29:25
**line (1)**
15:2
**link (1)**
12:25
**listen (1)**
30:16
**litigants (1)**
32:10
**little (3)**
5:8;18:23;36:11
**lock (1)**
16:2
**long (3)**
19:12;29:4;31:22
**long-term (2)**
21:10;22:4

**look (2)**
11:11;31:2
**looked (2)**
12:9;13:14
**looks (1)**
4:3
**loss (19)**
7:2;8:2,6;13:21,24;
17:7,18;19:17,18,24;
20:4,19;21:2,13,25;
22:5;23:15;26:12,20
**losses (2)**
27:18,19
**lost (5)**
8:9;9:4,8;19:15,15,
19;20:6;21:7;26:15,
22,23;27:3,3,10,11
**lot (1)**
12:6
**Lynbar (7)**
9:13,14;21:16,19;
26:21;36:5,6
**Lyndon (1)**
7:19

**M**

**magnificent (1)**
12:17
**maker (1)**
10:18
**makes (4)**
28:2;30:11;31:24;
32:7
**many (3)**
23:3,4;35:17
**March (4)**
4:24;5:10,14;10:1
**matter (10)**
3:5;5:24;6:3;14:15;
21:11;27:7;30:18;
31:10;36:18,24
**may (5)**
8:21;11:1,7,7;36:4
**maybe (5)**
11:21;18:16,21;
22:20;28:2
**mean (17)**
5:15;7:23;8:15;9:8;
10:17;14:10;15:3,17;
18:20;24:4,4,6;25:11;
28:23;29:2;31:20;
33:23
**means (1)**
5:1
**meant (2)**
6:23;11:5;13:22
**measure (1)**
9:18
**method (5)**
7:9;21:17,18;35:4,5
**methodology (2)**
19:15;23:22

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 42
of 46

**microphone (2)**
4:7,9
**might (6)**
9:1;10:19;24:4;
31:16;34:11;35:23
**Mike (1)**
4:16
**million (5)**
5:1;20:24;23:24;
29:24;34:1
**mind (1)**
8:8
**minds (1)**
9:1
**mine (2)**
28:20;35:22
**minority (1)**
26:25
**minutes (3)**
6:8;12:10;16:6
**misapplied (2)**
31:15;32:21
**mischief (3)**
32:8,9,11
**mispronounced (1)**
9:14
**missing (2)**
12:22,25
**misunderstood (2)**
11:1,7
**Molton (6)**
4:22;10:9;11:24;
12:24;13:3;24:19
**Molton's (1)**
15:10
**moment (4)**
9:15;15:11,12;
21:14
**money (12)**
21:12;22:19;24:2,5,
5,6,22,23;29:13;
30:12;34:12;35:25
**Montali (1)**
3:5
**more (12)**
5:1,8;18:21,21;
20:10;25:7;31:4;
32:19;34:12,17;
35:15,24
**morning (4)**
3:7,16;4:6;16:7
**most (1)**
24:15
**motion (2)**
6:13;16:15
**motions (1)**
12:10
**move (1)**
3:17
**much (10)**
6:7;20:20;22:13;
24:3,12,23;25:4;
26:19;31:21;37:2

**must (1)**
12:9
**muted (2)**
3:9;4:9
**myself (1)**
12:20

**N**

**nationally (1)**
27:1
**nature (1)**
8:1
**need (6)**
4:7;17:22;26:15;
28:25;29:1;32:24
**needing (1)**
26:14
**needs (1)**
3:18
**neutral (2)**
6:17;19:2
**new (2)**
8:12;25:2
**next (1)**
36:22
**nice (2)**
16:21;27:9
**nineteen (1)**
5:8
**Ninety-eight (1)**
28:12
**ninety-seven (1)**
23:9
**nobody's (3)**
26:16,17;32:8
**None (1)**
26:11
**nonjudicial (1)**
30:10
**notable (1)**
16:18
**November (1)**
7:6

**O**

**objection (2)**
12:24;16:14
**objections (1)**
13:1
**obvious (1)**
21:22
**occurred (1)**
21:14
**off (6)**
4:8,19;6:18;8:12;
30:19;34:25
**officer (10)**
11:18,22;14:22;
25:14;31:15,16,18;
32:14;33:19,25
**once (2)**

25:7;32:25
**one (12)**
4:21;14:25;22:3;
23:3;24:18,19;25:3;
28:21;29:17;32:10;
35:3,23
**ones (1)**
28:1
**only (10)**
7:1;16:8;19:24;
23:5;24:6,12;25:8;
29:14,17;35:23
**oOo- (1)**
3:2
**opening (2)**
6:18;19:23
**opinion (2)**
7:11;10:14
**opinions (2)**
10:15,18
**order (2)**
3:3;6:21;12:2;
14:17;15:6,20;16:25;
17:15,21;25:16;
28:21;31:18
**orders (1)**
15:6
**out (13)**
3:20;6:8,21;9:25;
12:20;23:12;24:11;
26:19;32:9;34:1;
35:17,21;36:20
**outcome (1)**
19:16
**outset (1)**
19:13
**over (3)**
28:11;30:10;35:10
**overlook (1)**
25:9
**overrule (1)**
25:14
**oversight (1)**
10:23
**overturned (1)**
24:21
**own (1)**
8:12
**owned (1)**
27:10
**owners (1)**
19:17
**ownership (2)**
26:24;27:3

**P**

**page (1)**
13:14
**pages (1)**
13:9
**paid (19)**
13:5,25;14:9;16:11;

19:18;20:5,7,14,24;
21:11;26:14;29:20;
33:3,14;34:8,15,17,
17,18
**panelist (1)**
3:22
**papers (1)**
7:17
**paragraph (3)**
12:25;13:15;14:5
**part (3)**
6:9;13:6;28:6
**past (2)**
5:23;10:13
**pay (8)**
13:6;14:1,4,4,7;
21:24;26:19;33:11
**paying (2)**
13:8;33:12
**payment (2)**
7:1;33:3
**percent (5)**
5:3,4,11;23:7,9,12;
24:23;28:13;30:8;
33:7,10,17;35:16
**percentage (1)**
30:2
**perhaps (5)**
18:2;26:25;29:21;
31:15,15
**period (1)**
25:1
**person (5)**
14:23;18:20;34:17,
17;35:21
**personal (2)**
13:19;26:14;32:10
**persuaded (2)**
23:19;28:6
**persuasive (4)**
10:19;28:2;30:11;
36:3
**PG&E (6)**
3:5;6:22;9:2;12:13;
25:2;35:21
**phonetic (1)**
10:12
**PICOs (1)**
10:12
**pitch (1)**
9:6
**place (4)**
22:10,11,14;31:14
**plan (3)**
15:7;17:15;18:15
**please (4)**
3:8;6:10;18:25,25
**point (6)**
15:9;18:24;21:9;

28:10;32:23;33:11
**policy (1)**
21:4
**portion (1)**
6:4
**position (1)**
36:12
**possible (1)**
6:25
**possibly (1)**
34:6
**pot (6)**
24:1,2,3,6,15,22
**practical (1)**
22:15
**predict (1)**
35:20
**prejudgment (1)**
7:11
**presentation (1)**
36:17
**presentations (1)**
36:25
**presented (3)**
6:3;32:17;36:17
**preserve (1)**
16:15
**presiding (1)**
3:5
**presumably (1)**
24:12
**pretty (2)**
21:22;36:7
**principle (1)**
32:13
**principles (1)**
36:8
**privy (1)**
14:14
**pro (8)**
5:10,11;16:11;33:4,
13;34:8,13,24
**probably (4)**
10:20;18:4;20:8;
29:14
**problem (7)**
8:1;25:23;26:10;
35:25;36:10,17,21
**procedural (1)**
22:14;25:23;28:4;
36:11
**procedurally (1)**
28:3
**procedure (6)**
6:20;16:24;17:17;
21:23;22:10;31:9
**procedures (16)**
6:15;9:21;11:19,20,
23,25;12:22;17:10;
18:6;24:21;27:22;
31:10,11,14,19;32:25
**proceeded (1)**
25:25

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 43
of 46

**proceedings (3)**
12:5,6;37:7
**proceeds (1)**
33:2
**process (6)**
10:25;17:24;19:5;
27:24;30:10;33:3
**processed (1)**
29:18
**processes (3)**
17:13;19:6,8
**processor (1)**
17:12
**product (1)**
17:24
**professional (1)**
36:25
**professionals (2)**
17:12;34:4
**progress (1)**
29:2
**promoted (1)**
3:21
**promulgated (1)**
17:8
**pronouncing (1)**
7:19
**proof (1)**
6:19
**properly (1)**
29:18
**property (32)**
6:24;7:12,16;8:23;
9:3,8,12;13:8,11,12,
20;19:17,17,21,22,25;
20:1,5,6,14,20,21;
21:24;26:11,12,22,23;
27:10,16,17,18;30:23
**proposal (1)**
17:3
**protect (1)**
30:23
**purposes (2)**
28:2;32:4
**pursue (1)**
11:24

**Q**

**questionnaire (1)**
7:3
**queue (1)**
24:14
**quite (3)**
7:18;12:4;29:10

**R**

**raise (1)**
11:21
**raising (1)**
33:12
**rata (8)**

5:10,11;16:11;33:4,
13;34:8,14,24
**rate (2)**
5:10,11
**rather (1)**
4:8
**read (3)**
12:5;25:3;36:5
**real (1)**
8:23
**really (4)**
12:9;24:15;25:23;
26:18
**reason (3)**
13:3,23;14:7
**reasonable (2)**
16:3;17:13
**reasons (2)**
24:18;32:2
**rebuttal (1)**
6:5
**recalculated (1)**
34:1
**recognize (1)**
19:11
**reconsider (1)**
33:9
**reconsideration (3)**
9:11;10:1;31:18
**reconsidered (1)**
35:23
**record (3)**
14:15,17,18
**recourse (1)**
22:15
**recovery (1)**
30:8
**reevaluate (4)**
28:20,25;29:1,19
**reference (3)**
10:3;12:21;18:8
**referenced (1)**
8:18
**referred (1)**
19:8
**referring (6)**
11:23;13:11,13;
17:7;19:4;26:13
**regard (1)**
33:12
**related (2)**
7:12;19:22
**relationship (1)**
32:10
**relatively (1)**
31:7
**released (2)**
31:3,3
**relevant (1)**
16:8
**relief (1)**
11:18
**rely (2)**

7:20;36:8
**remaining (2)**
30:1;31:2
**remains (1)**
33:14
**remedy (2)**
32:1;35:9
**remember (2)**
19:12;30:20
**rent (1)**
21:7
**rental (3)**
7:2;8:6;27:3
**rents (2)**
7:5;9:8
**repeat (1)**
8:7
**report (2)**
5:13;25:2
**represent (1)**
6:25
**representing (1)**
4:17
**request (2)**
9:20;11:23
**requested (1)**
9:11
**require (1)**
30:12
**requirement (3)**
9:21;10:3;27:1
**requires (2)**
13:18;27:7
**requiring (1)**
9:21
**reserve (1)**
6:4
**resolution (4)**
6:20;17:10;18:6;
32:25
**respect (1)**
23:14
**respond (3)**
11:22;15:11;16:4
**rest (1)**
21:7
**restate (1)**
29:8
**result (4)**
10:2,4;16:10;17:13
**resulted (1)**
13:20
**results (2)**
31:10,12
**reverse (1)**
25:14
**reversed (1)**
33:19
**review (5)**
15:22;16:16,19;
30:10;33:16
**revisit (6)**
23:21;27:25;28:15;

29:22;33:7,19
**revisited (2)**
32:22;34:23
**revisiting (1)**
30:12
**ridiculous (1)**
14:10
**right (33)**
3:7,14,20;4:6,20;
5:14;7:21,22;9:14,16,
17;11:3;13:4;14:13;
16:9,16,18;21:14,20;
23:8;24:7,9,15,16,19;
25:7,10;26:5;31:11,
17;32:2;33:16;35:6
**rights (1)**
30:23
**robe (1)**
18:17
**role (1)**
10:14
**roll (1)**
28:23
**Rudnick (1)**
3:15
**rule (4)**
8:8;14:3,3;27:6
**rules (6)**
16:25;17:1;25:19,
20;27:22;28:8
**ruling (2)**
28:6;35:14
**run (1)**
35:3

**S**

**sale (1)**
24:24
**same (7)**
10:2;18:24;19:16;
28:18;29:13;30:2;
31:16
**SAN (1)**
3:1
**satisfied (2)**
6:25;30:8
**satisfies (1)**
36:21
**Sayegh (26)**
4:17;13:24;16:8,11,
15,15,22;20:3,13;
21:6,12;23:4,13,19,
23;25:24;27:10;28:8;
29:17,17;30:25;31:8;
32:23;33:4;35:15;
36:21
**saying (8)**
9:10;10:21,21;
11:20;17:19;21:23;
35:7;36:10
**screen (2)**
3:13;7:14

**second (3)**
16:10;19:4;27:15
**seek (1)**
11:17
**seemed (1)**
10:17
**seems (2)**
27:4;29:10
**sense (1)**
21:25
**September (1)**
33:4
**session (1)**
3:4
**set (2)**
25:19;32:11
**sets (1)**
17:8
**several (1)**
17:8
**Shall (2)**
18:2,20
**share (2)**
16:12;33:5
**shocking (1)**
7:9
**short (1)**
25:1
**show (1)**
23:20
**SIEGER-GRIMM (32)**
3:11,13,14;5:5,8,15,
17,19,21;16:5,7;17:3,
6;18:3,23;19:2,20;
20:11,16,18;26:6,7,9;
27:12;28:9,17;29:7;
32:20;33:17,21;34:3;
37:4
**signed (1)**
31:2
**similarly (1)**
28:1
**simple (3)**
14:19;23:1;36:19
**simply (5)**
6:14;13:25;14:8;
25:3;36:9
**single (3)**
28:10;30:13;33:18
**situated (1)**
28:1
**situation (5)**
8:21;9:23;15:3;
16:22;18:22
**six (1)**
24:23
**sixty-percent (2)**
5:9;33:4
**sixty-seven (3)**
5:4;29:15;30:8
**sixty-six (5)**
5:4,11,12;33:7,10
**skies (1)**

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 44
of 46

29:10
**Skikos (1)**
10:11
**slid (1)**
3:13
**slippery (2)**
30:11;32:6
**slope (2)**
30:12;32:6
**small (1)**
26:21
**smiling (1)**
35:2
**solution (3)**
10:22;22:24;36:15
**somehow (1)**
35:20
**someone (1)**
30:9
**soon (1)**
5:18
**sorry (2)**
7:19;11:5
**sought (1)**
21:6
**sounds (2)**
18:1,13
**source (2)**
18:21;27:11
**specifics (1)**
5:25
**spoke (1)**
19:3
**spur (1)**
33:8
**staff (3)**
12:9,15;18:18
**stand (2)**
11:4;36:24
**standing (1)**
10:16
**start (3)**
4:20;24:25;35:9
**Starting (1)**
12:25
**state (3)**
4:14,23;17:11
**stated (2)**
6:17;19:23
**statement (5)**
4:21,24;14:22;18:1,
14
**statistics (1)**
23:7
**statute (1)**
8:21
**stay (1)**
4:8
**step (2)**
36:22,23
**still (6)**
3:10;12:7;15:14;
30:1;33:15,16

**stock (1)**
24:24
**stop (2)**
14:13;33:10
**story (2)**
20:9;31:6
**straightened (1)**
9:25
**straightforward (2)**
7:2;31:8
**strangers (1)**
10:16
**stream (1)**
21:13
**stretch (1)**
22:13
**strict (1)**
7:25
**strictly (1)**
19:23
**strong (1)**
36:7
**structural (3)**
14:2,9;21:8
**structure (8)**
7:1;13:5,25;14:4;
20:24;21:25;22:9,9
**struggle (1)**
30:6
**struggling (2)**
31:20;32:16
**stuff (1)**
12:20
**submission (1)**
36:18
**submit (1)**
21:8
**Submitted (2)**
7:4;36:24
**subrogation (2)**
20:9,12
**suffered (4)**
13:19;19:17,18;
20:4
**suggest (2)**
29:11,12
**suggested (1)**
32:12
**suggesting (1)**
32:9
**suggestion (1)**
26:8
**suggestions (1)**
30:16
**suppose (1)**
14:24
**supposed (2)**
22:1;23:25
**sure (3)**
4:2;18:23;35:23
**surprise (1)**
6:18
**Susan (1)**

3:14
**system (1)**
22:15

**T**

**talk (1)**
8:17
**talking (6)**
9:25;18:24;23:5;
26:10;30:20;35:4
**TCC (1)**
11:2
**team (2)**
12:12,13
**ten (3)**
6:8;12:10;34:1
**tenants (1)**
26:22
**term (1)**
26:3
**terminated (4)**
9:18;21:10,11;22:5
**terms (2)**
10:13;17:10;36:8
**theme (1)**
35:3
**there'd (1)**
24:5
**therefore (12)**
12:1;13:6,7;14:1,
21,25;15:13,15,16;
27:23;29:19;31:19
**there'll (1)**
34:13
**thin (1)**
12:15
**thinking (2)**
24:22;34:21
**third (1)**
13:15
**third-hand (1)**
19:4
**though (3)**
9:7;12:9;36:2
**thought (6)**
7:2;10:23;11:20;
13:10,13;36:19
**thousands (1)**
30:7
**three (5)**
12:15;20:24;23:7,
12,20
**throw (1)**
34:25
**thrown (1)**
22:22
**tie (1)**
26:20
**tied (2)**
26:11;27:16
**TOC (5)**
10:11,12;11:1,5,9

**today (2)**
15:10;16:8
**told (5)**
11:14,24;14:11;
24:18;33:15
**took (2)**
12:3,19
**traditional (1)**
7:20
**treat (1)**
28:21
**treated (1)**
34:20
**treating (2)**
13:24;28:18
**trial (1)**
27:2
**true (2)**
31:20;35:19
**trust (58)**
4:24;6:15;7:8;8:4,
12;9:22,24;10:5,7,10,
18,23;11:10;13:4,6,8,
18,22,23;14:1;15:6,7,
21,21;17:1,9,12,14;
19:11,14,14,19,21,24;
20:8,9,12;21:7,23;
23:14,21;25:15;
27:17,17;28:7,10,21;
29:20;30:24;31:2;
32:5,20;33:3,7;34:3,
10;36:14,14
**trustee (12)**
3:15;5:10;16:14;
17:11;19:6;22:18;
23:25;24:2;27:25;
29:22;32:25;33:3
**trustee's (6)**
5:13;6:1;16:1;25:1;
30:6;36:2
**trust's (3)**
16:9,16;17:23
**try (2)**
18:24;19:10
**TUESDAY (1)**
3:1
**turn (1)**
4:7
**turns (2)**
32:9;34:1
**twisted (1)**
13:21
**two (6)**
16:8;23:24;29:24;
33:17;35:16;36:20
**two-million- (1)**
23:25
**two-million-dollar (1)**
29:25
**types (2)**
17:9;23:15

**U**

**under (14)**
6:23;8:17;9:12,21;
13:11;21:16;23:22;
27:1;29:9;30:18,21,
23;32:25;36:18
**undermine (1)**
29:2
**unfortunate (1)**
15:24
**unhappy (1)**
29:14
**unique (1)**
28:12
**universe (2)**
25:2;35:22
**unless (2)**
4:7;27:4
**unmute (1)**
3:14
**unravels (1)**
28:23
**unusual (1)**
9:23
**up (12)**
3:25;4:4;5:4;7:13;
10:13;11:15;18:19;
23:20;25:19;30:2;
33:16;34:13
**update (1)**
6:2
**uphold (1)**
27:24
**upon (3)**
4:25;8:1;29:25
**use (1)**
31:11
**used (4)**
6:15;17:17;21:18;
35:5
**using (1)**
7:9
**usually (2)**
9:24;32:8
**utility (2)**
8:23;27:5

**V**

**vacate (1)**
25:15
**valuation (3)**
17:13;19:8;27:3
**value (2)**
27:19,20
**valued (1)**
22:5
**valuing (1)**
27:18
**variants (1)**
34:5

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 45
of 46

variation (1)
9:4
various (2)
10:5;17:9
victim (7)
3:15;16:12,17;
28:11,12;29:3;35:22
victims (2)
22:20;29:13
victims' (1)
29:13
violated (1)
12:2
void (1)
15:15
voted (1)
25:21

## W

wait (5)
28:20,20,20,20;
33:23
waiting (2)
5:24;29:4
wall (1)
18:9
wants (1)
28:19
wasting (1)
11:12
way (11)
7:5;9:8;14:16;
15:19;19:10;22:16;
25:8;28:3,4;32:17;
35:25
wearing (2)
18:17,17
weekend (1)
5:22
weird (1)
27:4
what's (4)
4:2;24:14;25:3;
34:6
Whereupon (1)
37:7
whole (3)
17:24;19:4;28:18
wiggle (1)
34:22
wish (3)
3:23;35:19;36:13
within (1)
25:1
without (4)
16:20,24;34:15,16
word (2)
22:9,10
words (7)
14:21;15:14;16:25;
19:16;20:3;31:22;
32:14

work (3)
18:18;36:20,25
worked (1)
14:16
worse (2)
8:2;32:12
worth (2)
22:12;29:23
written (1)
6:8
wrong (14)
11:11,20;15:24;
20:23;21:9;22:9;
24:20;31:9,10,19,24,
25;32:1,5

## Y

Yanni (3)
10:6,17;18:18
yarn (1)
28:23
year (2)
7:8;21:1
years (3)
14:15;22:11;29:15

## Z

Zink (1)
4:16

## 1

10,000 (1)
33:24
10:00 (1)
3:1
10:48 (1)
37:7
11 (1)
5:2
11.27 (1)
5:6
14th (1)
4:25
15th (1)
33:4
19.24 (2)
4:25;5:2

## 2

200,000 (3)
20:14,21;21:1
2020 (1)
7:6
2024 (1)
3:1
24th (1)
7:6
255 (2)
28:11,11

25th (1)
5:11
27 (2)
12:25;14:5
28 (1)
14:5
29 (1)
14:6

## 3

31 (1)
5:14
3rd (1)
10:2

## 7

70,000 (1)
29:13
71,803 (1)
28:10

## 9

9 (1)
3:1

Case: 19-30088    Doc# 14408    Filed: 04/10/24    Entered: 04/10/24 11:31:20    Page 46
of 46