1  BROWN RUDNICK LLP
   David J. Molton (SBN 262075)
2  (DMolton@brownrudnick.com)
   Seven Times Square
3  New York, New York 10036
   Telephone:   (212) 209-4800
4  Facsimile:   (212) 209-4801

5  BROWN RUDNICK LLP
   Joel S. Miliband (SBN 077438)
6  (JMiliband@brownrudnick.com)
   2211 Michelson Drive, Seventh Floor
7  Irvine, California 92612
   Telephone:   (949) 752-7100
8  Facsimile:   (949) 252-1514

9  *Attorneys for the Fire Victim Trustee*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br>**PG&E CORPORATION,**<br>- and –<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>\* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**FIRE VICTIM TRUSTEE'S RESPONSE AND OBJECTION TO WILLIAM B. ABRAMS MOTION TO STAY THE ADMINISTRATION EXECUTION AND ENFORCEMENT OF VICTIM RELEASES AS DEFINED WITHIN THE FIRE VICTIM TRUST AGREEMENT PENDING UNITED STATES SUPREME COURT RULING AND PURSUANT TO 11 U.S.C. § 105(A)**<br><br>[Relates to Docket Number 14396]<br><br>Hearing Date: None |

Cathy Yanni, in her capacity as the Trustee (the "**Trustee**") of the Fire Victim Trust ("**Trust**"), by and through her undersigned counsel, submits this response and objection (the "**Response**") to the *William B. Abrams Motion to Stay the Administration Execution and Enforcement of Victim Releases as Defined Within the Fire Victim Trust Agreement Pending United States Supreme Court Ruling and Pursuant to 11 U.S.C. § 105(A)* filed on April 4, 2024 [Dkt. 14396] (the "**Release Stay Motion**"), and respectfully states as follows:

## PRELIMINARY STATEMENT

The Trustee files this Response in advance of the Trust's April 25, 2024 distribution nearly $1 billion to over 51,000 eligible Fire Victim Claimants who have accepted their determinations and submitted Releases. This distribution represents a 6% true-up payment, raising prior *pro rata* payments from 60% to 66%.[1]

Putting aside Mr. Abrams' misplaced reliance on *Purdue Pharma,* his misinterpretation of the Disclosure Statement[2] and his ignorance of relevant Plan definitions for the moment, the Court considered and approved by final order the terms of the Trust Releases and the requirement that Fire Victim Claimants execute the Trust Releases prior to receiving distributions from the Trust nearly four years ago.[3] In the Release Stay Motion Mr. Abrams asserts for the first time that the Trust Releases are improper, and that Fire Victim Claimants should not be required to execute the Trust Releases as a condition to receiving distributions from the Trust. On May 5, 2020, prior to the confirmation hearing on the Plan, an ad hoc group of business claimants objected to various provisions in the Trust Documents. Like Mr. Abrams here, the ad hoc group similarly asserted, on

---

[1] The Trust expects to file its Annual Report on April 26, 2024, in accordance with Section 2.2 (c)(i) of the Fire Victim Trust Agreement. The Annual Report will provide financial and claims administration data for the Trust for the year ending January 31, 2023.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3] The initial versions of the Trust Documents were filed with the *Notice of Filing of Proposed Fire Victim Trust Agreement and Proposed Fire Victim Claims Resolution Procedures* [Dkt. 6049] on March 3, 2020. The proposed Fire Victim Trust Agreement containing the requirement that "all holders of Approved Fire Victim Claims" execute a claimant release "as a precondition to receiving any payment on account of their Fire Victim Claims from the Trust" and the proposed Fire Victim Claims Resolution Procedures stating "[b]efore receiving payment from the Trust, Claimants must submit signed releases in substantially the same form and content as the Claimant Release" were available for public review more than four years ago.

1

behalf of all Fire Victim Claimants, that the Trust Releases were improperly broad and that it would be unfair to require Fire Victim Claimants to sign the Trust Releases as originally written. *See Objection of Adventist Health, AT&T, Paradise Entities and Comcast to Trust Documents* [Dkt. 7072]. As a result, the Trust Releases were among the Trust Documents subjected to scrutiny during the May 15, 2020 hearing before this Court (the "**May 15 Hearing**"), which has been frequently cited with respect to the issue of judicial review of claims determinations by the Trust. Not only were objections to the terms of the Trust Releases squarely presented and argued by sophisticated counsel on behalf of Fire Victim Claimants at that time, but as this Court has recognized numerous times, Mr. Abrams himself had the opportunity to participate in the May 15 Hearing and raise objections to provisions in the Trust Documents, including the Trust Releases. On May 26, 2020, the Court issued a final order on the merits concerning all objections raised with respect to the Trust Documents, specifically including the terms of the Trust Releases, in its *Memorandum on Objection of Adventist Health, AT&T, Paradise Entities and Comcast to Trust Documents* [Dkt. 7597] (the "**Trust Document Objection Order**"). The terms and application of the Trust Releases, as modified pursuant to the Trust Document Objection Order, have been approved by this Court. *See* Trust Document Objection Order at 11:19-21; Confirmation Order at 8:4-9. As the Supreme Court of the United States has recognized many times, "[a] A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that *were or could have been raised* in that action." *E.g., Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S. Ct. 2424, 2428, 69 L. Ed. 2d 103 (1981) (internal cites omitted) (emphasis supplied). The Court's prior consideration and approval of the Trust Releases bar Mr. Abrams from relitigating Trust Release-related issues that were or could have been raised during the May 15 Hearing or the confirmation hearings. *See Id.* Additionally, the approval of the Trust Releases in the Confirmation Order also precludes Mr. Abrams's arguments. *See In re Heritage Hotel P'ship I*, 160 B.R. 374, 377 (B.A.P. 9th Cir. 1993), *aff'd*, 59 F.3d 175 (9th Cir. 1995) (holding that creditors are among those parties subject to the *res judicata* effect of a Chapter 11 plan).

2

# RELEVANT BACKGROUND

1. On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company, as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors filed the Chapter 11 Cases to address the billions of dollars of damage and loss relating to the devastating 2015, 2017 and 2018 California fires and to provide compensation to wildfire victims.

2. On March 3, 2020, the Tort Claimants Committee filed a *Notice of Filing of Proposed Fire Victim Trust Agreement and Proposed Fire Victim Claims Resolution Procedures* [Dkt. 6049]. The proposed Fire Victim Trust Agreement attached as an exhibit to the Notice contained the requirement that "all holders of Approved Fire Victim Claims" execute a claimant release "as a precondition to receiving any payment on account of their Fire Victim Claims from the Trust." The proposed Fire Victim Claims Resolution Procedures contained a release provision that stated, "[b]efore receiving payment from the Trust, Claimants must submit signed releases in substantially the same form and content as the Claimant Release."

3. On June 19, 2020, the Debtors filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8048] (together with all schedules and exhibits thereto, the "**Plan**"). The Plan, which, among other things, addresses the claims of more than 70,000 Fire Victim Claimants through the creation and funding of the Trust, was the product of months of vigorous and intense negotiations between various stakeholders and was overwhelmingly supported by Fire Victim Claimants.

4. On June 20, 2020, the Bankruptcy Court entered the *Order Confirming Debtors' and Shareholder Proponent's Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8053] (the "**Confirmation Order**") and the Effective Date of the Plan occurred on July 1, 2020. Pursuant to the Plan and Confirmation Order, the Trust was established on the Effective Date. The confirmation of the Plan avoided costly and time-consuming litigation and implemented a Fire Victim Trust designed to ensure the most equitable and efficient payment of Fire Victim Claims.

5. Importantly, the terms of the Fire Victim Trust Agreement (the "**Trust Agreement**") and the Fire Victim Trust Claims Resolution Procedures (the "**CRP**," and together with the Trust

3

Agreement, the "**Trust Documents**") were also the product of vigorous negotiations, including the resolution of objections lodged by Fire Victim Claimants ranging from individual claimants proceeding *pro se* to large corporate claimants with robust legal representation. Nothing in the Trust Document was spared the close inspection and analysis of all parties.

6. The final Trust Documents were contained in the *Ninth Supplement to Plan Supplement in Connection with Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. 8057] (the "**Ninth Plan Supplement**"). The Ninth Plan Supplement includes the Trust Releases, which, as noted above, are exhibits to the Trust Agreement. The Confirmation Order incorporates and approves the Ninth Plan Supplement.

7. In November 2020, recognizing the unprecedented challenges that Covid-19 presented to Fire Victim Claimants on top of the financial hardships many already faced following the Fires, the Trustee began making Preliminary Payments without requiring Trust Releases to get distributions to Fire Victim Claimants quickly as possible.

8. As of February 28, 2024, the Trust had issued Determination Notices to **100%** of all Fire Victim Claimants who have submitted claims questionnaires ("**CQs**") to the Trust. Determination notices had been accepted for ninety-seven percent (97%) of all submitted CQs by that time, which allowed the Trust to finalize the vast majority of Fire Victim Claims and pay more than $11.21 billion to holders of Fire Victim Claims by the end of February 2024.[4] Based on these facts and the Trustee's fiduciary obligation to prudently distribute Trust funds to Fire Victim Claimants on an equitable, *pro rata* basis as such funds are available, following the final sale of the PG&E stock issued to the Trust, the Trustee determined, in consultation with the Trust's legal and financial advisors, that the current 60% *pro rata* rate could be raised to 66%. The Trustee prepared a letter announcing the *pro rata* rate increase to Fire Victim Claimants (the "***Pro Rata* Increase Announcement**"), to be posted on the Fire Victim Trust Website on Tuesday, March 12, 2024.

---

[4] As of April 15, 2024 the Trust had paid $11.3 billion to Fire Victim Claimants. The latest statistics can be found on the Fire Victim Trust website at https://www.firevictimtrust.com. The Trust will update the program statistics again on or about April 30, 2024 and expects to file the Trust's Annual Report on April 26, 2024.

4

Case: 19-30088    Doc# 14424    Filed: 04/18/24    Entered: 04/18/24 13:22:27    Page 5 of 14

9. On March 12, 2024, the *Pro Rata* Increase Announcement was posted to the Fire Victim Website as planned and issued as a press release to reach as many Fire Victim Claimants as possible. The "FAQs" section of the Fire Victim Trust Website was also updated to reflect the planned *pro rata* rate increase, and the Trustee prepared a video explaining the *pro rata* rate increase to Fire Victim Claimants, which was posted in "Trust Updates" tab of the Fire Victim Trust Website on April 5, 2024. The most recent letter from the Trustee to Fire Victim Claimants regarding the *pro rata* rate increase was posted on the landing page and in "Trust Updates" tab of the Fire Victim Trust Website on April 8, 2024.

10. On April 4, 2024 Mr. Abrams filed the Release Stay Motion.

11. By email at approximately 4:05 a.m. (EDT)/1:05 a.m. (PDT) on April 8, 2024, Mr. Abrams sent the Trustee and counsel for the Trustee a letter dated April 7, 2024 requesting that the Trustee immediately suspend the Court-approved requirement that Fire Victim Claimants sign certain releases in connection with receiving distributions (the "**Cease-and-Desist Letter**").

12. On April 8, 2024 at approximately 1:12 p.m. (EDT)/10:12 a.m. (PDT) Mr. Abrams sent the Cease-and-Desist letter to the members of the TOC by email, copying the Trustee and counsel for the Trustee.

13. In response to the foregoing emails, and in light of Mr. Abrams's numerous prior emails and telephone calls to the Trustee and other professionals retained by the Trust, counsel for the Trustee sent Mr. Abrams an email on April 8, 2024 at approximately 2:18 p.m. (EDT)/11:18 p.m. (PDT) requesting that Mr. Abrams direct all communications he wished to send to the Trustee regarding the Release Stay Motion and the Cease-and-Desist Letter to counsel for the Trustee. Counsel confirmed that the Trustee had received Mr. Abrams' emails regarding the Release Stay Motion and the Cease-and-Desist Letter and that counsel for the Trustee did not believe a discussion between the parties would be helpful.

14. On April 8, 2024 the Court entered the *Order Setting Response Deadline to William B. Abrams' Motion to Stay* (the "**Release Stay Motion Response Order**"), setting April 29, 2024 as the Trust's deadline to respond to the Release Stay Motion and instructing Mr. Abrams not to file a Reply to the Trust's response and that there would be no oral argument.

5

15. On April 12, 2024 at approximately 2:55 p.m. (EDT)/11:55 a.m. (PDT), Mr. Abrams sent an email to counsel to the Trustee and the members of the TOC, attaching a letter dated April 12, 2024 entitled "<u>Notice Regarding Breach of Trust and Improper Administration of Nondebtor Releases</u>" (the "**Notice Letter**") in which Mr. Abrams accused the Trustee of violating the terms of the Disclosure Statement because she did not administer the Trust in accordance with Mr. Abrams' mistaken interpretation of the terms of the Disclosure Statement.

16. On April 12, 2024 at approximately 5:30 p.m. (EDT)/2:30 p.m. (PDT), Mr. Abrams filed the *William B. Abrams Notice Regarding Fire Victim Trust and Fire Claimant Communication* [Dkt. 14411] (the "**Notice Filing**"), which repeats the substance of the Cease-and-Desist Letter and the Notice Letter.

17. As of April 17, 2024, more than eighty-three percent (83%) of all eligible Fire Victim Claimants with submitted CQs had executed the Trust Releases and submitted them to the Trust.

## **RESPONSE AND OBJECTION**

18. The Release Stay Motion seeks to enjoin the Trust from enforcing the Court-approved requirement that Fire Victim Claimants execute a Trust Release prior to receiving payments from the Trust. In addition to the fact that consideration of the terms and application of the Trust Releases is prohibited by the doctrine of *res judicata*, there are several further reasons why this Court cannot grant the Release Stay Motion.

### Mr. Abrams' Attempt to Relitigate the Trust Release is Untimely and Barred by *Res Judicata*

19. On May 26, 2020 the Court entered the Trust Document Objection Order directing that the Trust Releases be modified to cover only the period up until a Fire Victim Claimant's execution of the release. On June 20, 2020, the Court entered the Confirmation Order, which incorporated and approved the Trust Documents, including the Trust Releases.

6

20. Mr. Abrams did not object to the Trust Documents or the Trust Releases. Mr. Abrams did not seek reconsideration of the Confirmation Order regarding the approval of the Trust Releases.[5] Mr. Abrams did not appeal the Confirmation Order, which has since become a final order.

21. Mr. Abrams did not avail himself of any of the available avenues to dispute the propriety of the Trust Releases in the several years that the Trust has relied on the enforceability of the Trust Documents approved by the Confirmation Order, and he must now be estopped or barred from doing so. *See e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S. Ct. 2424, 2428, 69 L. Ed. 2d 103 (1981) (internal cites omitted) ("[a] A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."); *In re Heritage Hotel P'ship I*, 160 B.R. 374, 377 (B.A.P. 9th Cir. 1993), *aff'd*, 59 F.3d 175 (9th Cir. 1995) (holding that creditors are among those parties subject to the *res judicata* effect of a Chapter 11 plan).

**The Supreme Court Decision in Purdue Pharma is Irrelevant to the Trust Releases**

22. The Release Stay Motion claims that the Court should enjoin the Trust Agreement's requirement that Fire Victim Claimants execute a Trust Release prior to receiving distributions because the pending Supreme Court decision in *In re Purdue Pharma* may impact the Trust Releases. Mr. Abrams' allegations have no basis in fact or law. There is nothing under consideration by the Supreme Court in *Purdue Pharma* that will have any impact on the Trust or the Trust Releases.

23. The "third party" at the center of the controversy in *Purdue Pharma* is the Sackler Family. Unlike the Trust and the parties covered by the Trust Releases, the Sacklers are co-defendants along with Chapter 11 debtor Purdue Pharma in the Federal Opioid Multi-District Litigation. The allegations against the Sacklers and their company, Purdue Pharma, include that they have been major contributors to the opioid epidemic and that the crisis that has devasted most America cities and communities.

---

[5] The Court treated Mr. Abrams' *Motion for Just Treatment of Victims Through Reconstitution of the Fire Victim Trust Oversight Committee and Equitable Application of the Judicial Review Provisions Pursuant to U.S.C. §§ 1123(A)(4)* [Dkt. 8247] as a motion for reconsideration of the Confirmation Order and denied the requested relief. Mr. Abrams did not raise any issue related to the Trust Releases in that motion.

24. The Sacklers did not file for bankruptcy themselves and so did not subject their personal assets to scrutiny by the Bankruptcy Court or the public. Instead, the Sacklers put their company, Purdue Pharma, into bankruptcy to resolve all opioid-related claims against the company *and* themselves.

25. In that case, Purdue Pharma is the bankrupt party seeking bankruptcy relief from opioid-related liability that it incurred prior to the bankruptcy. The non-debtor at the center of the *Purdue* controversy is a party who also may be liable for the harmful, tortious, or illegal conduct that occurred prior to the bankruptcy filing. The Sacklers are third-party non-debtors in the *Purdue* bankruptcy. In exchange for contributing funds to be paid to creditors of Purdue Pharma, the Sacklers seek to have **all** liability for their pre-bankruptcy conduct that contributed to the opioid epidemic discharged through a Chapter 11 plan, automatically on the effective date of such plan and without the need for any claimant to execute a release. The types of releases at issue in *Purdue* have been prohibited within the Ninth Circuit for decades. *See Resorts Int'l, Inc. V. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995); *In re American Hardwoods, Inc.* 885 F.2s 621, 626 (9th Cir. 1989) ("Section 524(e) limits the court's equitable power under section 105 to order the discharge of the liabilities of nondebtors.").

26. The question before the Supreme Court is whether the Bankruptcy Court has jurisdiction to discharge a non-bankrupt co-defendant for its pre-bankruptcy liability through a bankruptcy plan that requires an expansive non-consensual release of a non-debtor third-party. That is ***not*** the issue here.

27. The Trust did not exist when PG&E caused the Fires in 2015, 2017 and 2018 that prompted PG&E's bankruptcy filing. The Trust was not a co-defendant with PG&E in the JCCP or the PG&E bankruptcy. Instead, the Trust, the successor to PG&E's liability for Fire Victim Claims, was created by the Plan as a vehicle to pay Fire Victim Claims, insulating PG&E from such claims after they are channeled to the Trust. Under the Plan, PG&E was released from its liability for Fire Victim Claims in exchange for funding the Trust, and PG&E has no responsibility to contribute any further funds to the Trust regardless of the final *pro rata* percentage the Trust is able to pay on account of Fire Victim Claims.

8

28. The Plan released the PG&E Debtors from their liability. The Plan also provides for releases of parties other than PG&E—*i.e.*, non-debtor third parties—with respect to their conduct in connection with the Chapter 11 Cases. Because the non-debtor third party releases in the Plan were consensual (claimants could opt out of agreeing to them), the Plan releases ***are not*** the type of releases being considered in *Purdue Pharma*.

29. The Plan ***does not*** provide any releases to the Trust, or to anyone retained by the Trust. The Trust Releases ***are not*** "third-party plan releases." No concern raised by Mr. Abrams with respect to the Trust Releases is before the United States Supreme Court in *Purdue Pharma* or any other case.

**<u>The Trust Releases Are Not Governed by the Plan or Disclosure Statement</u>**

30. Mr. Abrams' reliance on the Disclosure Statement to demonstrate that that the Trust Releases are prohibited is misplaced. The parties covered by the Trust Releases are not "Released Parties" under the Plan and Disclosure Statement.

*31.* While Mr. Abrams refers to the Disclosure Statement release and exculpation provisions in the Release Stay Motion, he fails to acknowledge a crucial definition in those Disclosure Statement provisions. The solicitation version of the Disclosure Statement provides:

> *Consensual Releases by Holders of Claims and Interests of the Debtors and Certain Parties.* As set forth in more detail in Sections 10.9(b) and (c) of the Plan, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, certain Releasing Parties, including any holder of a Claim or Interest that is solicited and voluntarily indicates on a Ballot that such holder opts into granting the releases set forth in Section 10.9(b) of the Plan, forever release and discharge the Debtors and other non-debtor **Released Parties** from any and all claims, interests, Causes of Action and other liabilities based on or related to, or in any manner arising from, in whole or in part, among other things, the Debtors, the Fires, the Chapter 11 Cases (including, among other things, related settlement agreements, transactions, business or contractual arrangements), and the subject matter of, or transactions or events giving rise to, any Claim or Interest that is treated in the Plan.
>
> Any holder of a Claim or Interest who does not indicate on their Ballot that they opt into granting such releases shall not be a Releasing Party. Additionally, such holder's decision to opt- in or not to the releases shall not in any way affect the classification or treatment of such Claim or Interest. The holder of a Claim or Interest shall receive the same amount of consideration under the Plan whether or not such holder elects to release a

9

party that is not a Debtor in accordance with the opt-in release procedures set forth in the applicable Ballot.

*Disclosure Statement § IV.G.1.(b)* (emphasis supplied).

32. The definition of "Released Parties" is found in the Plan and is cited in footnote 12 of the Disclosure Statement, which states:

> The "**Released Parties**" are defined in the Plan as: (i) the Debtors and Reorganized Debtors; (ii) the Tort Claimants Committee; (iii) the DIP Facility Agents; (iv) the DIP Facility Lenders; (v) the Exit Financing Agents; (vi) the Exit Financing Lenders; (vii) the Backstop Parties; (viii) the Public Entities Releasing Parties; (ix) the Consenting Creditors (solely in their capacity as holders of Subrogation Wildfire Claims); (x) the Shareholder Proponents; (xi) the Consenting Noteholders; (xii) the Funded Debt Trustees; and (xiii) with respect to each of the foregoing entities (i) through (xii), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

33. Glaringly absent from the definition of the parties covered by the Plan's third-party release provisions is the Trust, Trustee, Claims Administrator and every other professional retained by the Trust. The Trust did not exist when the Plan was drafted. It did not exist when the Plan was confirmed. The Plan does not contemplate the Trust Releases, much less govern them. The Disclosure Statement does not address the Trust Releases. The Trust Releases are part of the Trust Agreement, which operates independent from PG&E, the Plan, and the Disclosure Statement.

**The Standard for the Requested Stay Has Not Been Met**

34. Mr. Abrams states that "[t]his Court has the authority to issue a stay in the administration, execution and enforcement of [the Trust Releases] pending a decision of the Supreme Court," but he provides no support for such a conclusion. As the party seeking the stay, Mr. Abrams bears the burden of proof. *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-JST, 2014 WL 12705057, at *2 (N.D. Cal. Oct. 22, 2014) (*citing Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).

35. Courts have the power to stay proceedings pending a decision by the United States Supreme Court in another case, but must consider the following factors in making such a determination: (1) stays should not be indefinite in nature and should not be granted unless it appears likely the other proceeding will be concluded within a reasonable time; (2) courts more appropriately enter stay orders where a party seeks only damages, does not allege continuing harm, and does not seek injunctive or declaratory relief since a stay would result only in delay in monetary recovery; (3) stays may be appropriate if resolution of issues in the other proceeding would assist in resolving the proceeding sought to be stayed; and (4) stays may be appropriate for courts' docket efficiency and fairness to the parties pending resolution of independent proceedings that bear upon the case. *McCollough v. Minn. Laws. Mut. Ins. Co.,* 2010 WL 441533 at *4 (collecting Ninth Circuit cases).

36. The Release Stay Motion asks this Court to impose a stay of unknown duration. While it is expected that the Supreme Court will issue its decision in *Purdue Pharma* within the next few months, there is no absolute deadline by which the Supreme Court must rule. It would be grossly inequitable for this Court to enjoin the operation of the Trust Document provisions related to the Trust Releases at this time, long after the Trust Releases were relied on by professionals retained by the Trust when they accepted employment by the Trust.

37. Notably, the Supreme Court has required that a party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).

38. Mr. Abrams has not provided any basis for this Court to find that denial of the Release Stay Motion will cause him hardship or inequity. Indeed, this Court ensured that the Trust Releases would be limited to releasing claims based on actions that have taken place up until a Trust Release is executed. Mr. Abrams has not alleged that he has causes of action against the Trust, the Trustee or any other party covered by the Trust Releases. Due to the Court's oversight, the execution of a Trust Release will not preclude a Fire Victim from commencing an action against any of the parties released under the Trust Releases for any post-execution wrongdoing.

11

39. Conversely, there is a least a "fair possibility" that the stay requested by Mr. Abrams will work damage on someone who not only worked tirelessly to ensure that Fire Victim Claimants such as Mr. Abrams would receive distributions from the Trust as quickly as possible, but who relied upon the Trust Release when he or she accepted employment by the Trust.

40. The stay requested in the Release Stay Motion would result in more than a delay in monetary recovery. It would suspend administration of the Trust, lest some currently inconceivable litigation be brought against a Trust-indemnified party that would cause unnecessary and wasteful legal expense potentially impacting the Trust corpus.

41. To that point, as the Trust would be required to indemnify anyone covered by the Trust Releases, the Trust would potentially have to set aside significant funds in order to fulfill its indemnification requirements under the Trust Agreement. Such funds, which would **not** need to be set aside if Fire Victim Claimants executed the Trust Release, would not be available for distribution on account of Fire Victim Claims until statutes of limitations ran on all possible actions for which the Trust is required to indemnify its professionals. It is not appropriate for the Court to impose the stay requested in the Release Stay Motion.

42. The stay requested by Mr. Abrams is especially inappropriate in this case, where the Supreme Court's opinion in *Purdue Pharma* will not assist in the resolution of the issues before the Court. The *Purdue Pharma* decision will have absolutely no impact on the Trust Releases and as such the Court should not impose a stay on the Trust's administration. *See True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-JST, 2014 WL 12705057, at *3 (N.D. Cal. Oct. 22, 2014) (denying stay where pending decision had no bearing on the litigation before the court).

43. The requested stay is also not appropriate stays on the basis of docket efficiency or fairness to the parties pending resolution of independent proceedings, none of which bear upon the matter before the Court.

44. It is especially relevant for the Court to consider that Mr. Abrams is not asking the Court to stay execution of its own ruling or other action by the Court but is instead demanding that the Court interfere in the Trust's administration of claims, an action that is expressly beyond this Court's power under the Plan and Confirmation Order. *See, e.g.,* Plan §6.8(d), Confirmation Order

12

¶ 18.d. *See also Memorandum Regarding Recent Correspondence From Fire Victim Claimants* [Dkt. 14156].

45. Here, where (1) the Trust Releases have already been considered and approved by this Court, (2) there is no possible damage that will result from the Court's denial of the Release Stay Motion, (3) the Trustee and other professionals retained by the Trust may be unfairly subject to malicious filings based on unfounded rumors and false statements (not unlike certain previous filings in this case) by claimants who will have little incentive to execute the Trust Releases after receiving their *pro rata* distributions, and (4) there is nothing to be gained by delaying Trust administration pending the Supreme Court's opinion in *Purdue Pharma,* a case that will have no impact on the Fire Victim Trust, the Court must deny the requested stay.

## CONCLUSION

For the reasons set forth herein, the Release Stay Motion should be overruled in its entirety.

DATED: April 18, 2024      BROWN RUDNICK LLP

By:  */s/ David. J. Molton*
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone:   (212) 209-4800
Facsimile:    (212) 209-4801

and

Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
2211 Michelson Drive
Seventh Floor
Irvine, California 92612
Telephone:   (949) 752-7100
Facsimile:    (949) 252-1514

*Attorneys for the Fire Victim Trustee*

13