**WEIL, GOTSHAL & MANGES LLP**
Richard W. Slack (pro hac vice)
(richard.slack@weil.com)
Jessica Liou (pro hac vice)
(jessica.liou@weil.com)
Matthew Goren (pro hac vice)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: (212) 310-8000
Fax: (212) 310-8007

**KELLER BENVENUTTI KIM LLP**
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
Thomas B. Rupp (#278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, CA 94105
Tel: (415) 496-6723
Fax: (650) 636-9251

**LATHAM & WATKINS LLP**
Joshua G. Hamilton (#199610)
(joshua.hamilton@lw.com)
Michael J. Reiss (#275021)
(michael.reiss@lw.com)
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel: (424) 653-5500

**LATHAM & WATKINS LLP**
James E. Brandt (pro hac vice)
(james.brandt@lw.com)
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200

*Attorneys for the Debtors and Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br> - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case Nos. 19-30088 (DM)<br><br>(Lead Case) (Jointly Administered)<br><br>**OMNIBUS REPLY IN SUPPORT OF REORGANIZED DEBTORS' THIRTY-THIRD AND THIRTY-FOURTH SECURITIES CLAIMS OMNIBUS OBJECTIONS** |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. THE PSLRA'S HEIGHTENED PLEADING STANDARDS APPLY ........................... 2

III. CLAIMANTS' EXCHANGE ACT ARGUMENTS FAIL ...................................... 3

    A. The Court Must Conduct A Statement-By-Statement Analysis To Determine Whether Each Statement Supports A Viable Securities Claim .................................................................................................... 3

    B. Claimants Fail To Rebut That *Edison* Disposes Of Their Claims ........................ 4

    C. The "Gravamen" Of Claimants' Claims Is A Red Herring ................................ 5

    D. Claimants Fail To State A Claim As A Matter Of Law For Each Alleged Misstatement ...................................................................................... 7

        1. None Of The Challenged Statements Relating To The Period Before The North Bay Fires Were Actionably False ................... 7

        2. None Of The Challenged Statements Relating To The Period After The North Bay Fires Were Actionably False ..................... 14

    E. Claimants' Generalized Allegations Of Scienter Fail ........................................ 20

        1. Claimants Cannot Rely On The Core Operations Doctrine .................... 21

        2. Statements From Other Proceedings That Post-Date The Relevant Period Do Not Establish Scienter ............................................. 23

        3. Claimants' Other Generalized Theories of Scienter Fail ........................ 24

    F. Claimants Fail To Plead Loss Causation ........................................................... 25

        1. The "Corrective Disclosure" Theory Fails To Establish Loss Causation .......................................................................................... 26

        2. The Materialization Of Risk Theory Fails To Establish Loss Causation .......................................................................................... 27

    G. Claimants Fail To Plead Reliance For Purchases After The North Bay Fires ...................................................................................................... 28

        1. Claimants Cannot Rely On The Fraud On The Market Presumption ....................................................................................... 28

        2. The Affiliated Ute Presumption of Reliance Does Not Apply .............................................................................................. 30

        3. The Court Can, And Should, Determine The Sufficiency Of Individual Reliance Allegations On The Pleadings ............................... 31

IV.  CLAIMANTS' SECURITIES ACT CLAIMS FAIL ....................................................... 31

    A.  Securities Act Claims Based On The 2016 And 2017 Notes Are
Time-Barred ............................................................................................ 31

    B.  Claimants Have Not Alleged Any Materially False Statements Or
Omissions ............................................................................................... 35

    C.  Claimants Have Not Pled Economic Loss Or Damages Required
For Their Section 11 Claims ................................................................... 36

    D.  PERA Does Not Have Standing To Assert Claims Based On The
April 2018 Offering ................................................................................ 38

V.  CERTAIN CLAIMANTS HAVE RELEASED THEIR CLAIMS ................................ 38

    A.  PERA's Arguments Fail ......................................................................... 39

    B.  The RKS Claimants' Arguments Similarly Fail ..................................... 40

VI.  CONCLUSION.................................................................................................... 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)..................................................................................28, 30, 31

*Am. Pipe & Const. Co. v. Utah*,
  414 U.S. 538 (1974)....................................................................................................34

*Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc., Sec. Litig.)*,
  87 F.4th 934 (9th Cir. 2023) .................................................................................35

*Barnes v. Edison Int'l ("Edison I")*,
  2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ................................................ *passim*

*Barnes v. Edison Int'l ("Edison II")*,
  2022 WL 822191 (9th Cir. Mar. 18, 2022)...................................................... *passim*

*Barry v. Colony NorthStar, Inc.*,
  2019 WL 13237710 (C.D. Cal. Jan. 24, 2019) ...........................................................4

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...........................................................................21, 22

*Botosan v. Paul McNally Realty*,
  216 F.3d 827 (9th Cir. 2000) ..................................................................................2

*Campton v. Ignite Rest. Grp., Inc.*,
  2013 WL 12140291 (S.D. Tex. Sept. 3, 2013) ........................................................37

*Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ...........................................................4

*Chapro v. SSR Realty Advisors, Inc. Severance Plan*,
  351 F. Supp. 2d 152 (S.D.N.Y. 2004).....................................................................40

*Colyer v. Acelrx Pharms., Inc.*,
  2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ........................................................18

*Crown, Cork & Seal v. Parker*,
  462 U.S. 345 (1983).................................................................................................34

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
  583 U.S. 416 (2018)...................................................................................................3

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..................................................................................................31

*Farhar v. Ontrak, Inc.*,
2024 WL 1136128 (C.D. Cal. Feb. 2, 2024)........................................................10

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..............................................................................16

*George v. California Infrastructure & Econ. Dev. Bank*,
2010 WL 2383520 (E.D. Cal. June 10, 2010)...................................................31

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .............................................................................14

*Howard v. Arconic Inc.*,
395 F. Supp. 3d 516 (W.D. Pa. 2019)...............................................................19

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...............................................................................11

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................29

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010).............................................................33

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .............................................................................26

*In re Cisco Sys.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)...................................................11

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ...........................................................................19

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)...................................................13

*In re Dozier Fin., Inc.*,
2018 WL 6985219 (Bankr. D.S.C. Apr. 20, 2018)..............................................3

*In re Enovix Corp. Sec. Litig.*,
2024 WL 349269 (N.D. Cal. Jan. 30, 2024)......................................................35

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)..............................................................19

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024)............................................................................27

*In re Interlink Elecs., Inc., Sec. Litig.*,
2008 WL 4531967 (C.D. Cal. Oct. 6, 2008)................................................25, 37

*In re Kalobios Pharm., Inc. Sec. Litig.*,
258 F. Supp. 3d 999 (N.D. Cal. 2017) ........................................................28, 29, 30

*In re LifeLock, Inc. Sec. Litig.*,
690 F. App'x 947 (9th Cir. 2017) ..............................................................................8

*In re Monster Worldwide, Inc. Sec. Litig.*,
549 F. Supp. 2d 578 (S.D.N.Y. 2008)........................................................................24

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ......................................................................................25

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2019) ...................................................................................23

*In re PG&E Corp.*,
2020 WL 9211213 (Bankr. N.D. Cal. Oct. 22, 2020), *aff'd sub nom.*, 2022 WL
794815 (N.D. Cal. Mar. 15, 2022), *aff'd sub nom.*, 2023 WL 2064520 (9th
Cir. Feb. 17, 2023) ..............................................................................................39, 40

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...................................................................................10

*In re Recoton Corp.*,
307 B.R. 751 (Bankr. S.D.N.Y. 2004)........................................................................3

*In re Rigel Pharms., Inc. Secs. Litig.*,
697 F.3d 869 (9th Cir. 2012) ..............................................................................11, 25

*In re Shoretel Inc. Sec. Litig.*,
2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ...............................................................36

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .....................................................................................21

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) .......................................................................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2013 WL 254873 (N.D. Cal. Jan. 23, 2013) ..............................................................34

*In re Tronox Inc.*,
2010 WL 1849394 (Bankr. S.D.N.Y. May 6, 2010).....................................................3

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ................................................................................30, 31

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
2010 WL 4117477 (N.D. Cal. Oct. 19, 2010).............................................................34

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
   712 F. Supp. 2d 958 (N.D. Cal. 2010) ...................................................................34

*In re YogaWorks, Inc. Sec. Litig.*,
   2019 WL 13399628 (C.D. Cal. Dec. 3, 2019) ......................................................35

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ................................................................................24

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .............................................................................27, 28

*Leventhal v. Chegg, Inc.*,
   2024 WL 924484 (N.D. Cal. Mar. 4, 2024) ........................................................26

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ..............................................................................22

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................................................3

*Loritz v. Exide Techs.*,
   2014 WL 4058752 (C.D. Cal. Aug. 7, 2014) ......................................................38

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (Apr. 12, 2024) ..............................................................................36

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   722 F. Supp. 2d 1157 (C.D. Cal. 2010) .................................................................9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .........................................................................21, 23

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ...........................................................................27

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) (per curiam) ..........................................................25

*Mishkin v. Ageloff*,
   220 B.R. 784 (S.D.N.Y. 1998) ...............................................................................3

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................22

*MYL Litig. Recovery I LLC v. Mylan N.V.*,
   2020 WL 1503673 (S.D.N.Y. Mar. 30, 2020) ....................................................34

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
   2018 WL 3126393 (N.D. Cal. June 26, 2018) .....................................................10

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) .......................................................................37

*Pampena v. Musk*,
   2023 WL 8588853 (N.D. Cal. Dec. 11, 2023) ...............................................4

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008) ................................................................16

*Plumley v. Sempra Energy*,
   847 F. App'x 426 (9th Cir. 2021) ...............................................................22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ....................................................................30

*Pub. Emps. Ret. Sys. of Mississippi v. Qualcomm, Inc.*,
   773 F. App'x 987 (9th Cir. 2019) ...............................................................16

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ......................................................................21

*Reinschmidt v. Zillow, Inc.*,
   2014 WL 5343668 (W.D. Wash. Oct. 20, 2014) .........................................29

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ....................................................................36

*Schuster v. Symmetricon, Inc.*,
   2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) .............................................4

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) ......................................................31

*SEC v. McCarthy*,
   322 F.3d 650 (9th Cir. 2003) ........................................................................2

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d
   1187 (9th Cir. 2001).............................................................................11, 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).........................................................................3, 20, 23

*Terenzini v. GoodRx Holdings, Inc.*,
   2022 WL 122944 (C.D. Cal. Jan. 6, 2022) ................................................37

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................................35

*Varjabedian v. Emulex Corp.*,
  2020 WL 1847708 (C.D. Cal. Feb. 25, 2020), *aff'd sub nom. Mutza v. Emulex Corp.*, 843 F. App'x 951 (9th Cir. 2021) ................................................................................. 18

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .......................................................................................... 21

*Welgus v. TriNet Grp., Inc.*,
  2017 WL 167708 (N.D. Cal. Jan. 17, 2017) .................................................................. 33

*Williams v. Boeing Co.*,
  517 F.3d 1120 (9th Cir. 2008) ........................................................................................ 34

*York Cnty. On Behalf of Cnty. Of York Ret. Fund v. HP, Inc.*,
  65 F.4th 459 (9th Cir. 2023) ..................................................................................... 33, 35

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ...................................... 3, 24

**STATUTES**

15 U.S.C.
  § 77m ................................................................................................................................ 31
  § 77z-1 ............................................................................................................................... 2
  § 78u-4(b)(1–4) ................................................................................................................. 2

**REGULATIONS**

General Order 165 ...................................................................................................... 8, 15

### **Glossary of Defined Terms**

| Defined Term | Definition |
|---|---|
| Alleged Relevant Period | April 29, 2015, through November 15, 2018 |
| Cal Fire | California Department of Forestry and Fire Protection |
| CEMA | Catastrophic Event Memorandum Account |
| CPUC | California Public Utilities Commission |
| Claimants | Public Employees Retirement Association of New Mexico ("PERA"), claimants represented by the law firm of Rolnick Kramer Sadighi LLP ("RKS") in this matter, and any claimant listed on Exhibit A to the PERA Objection, ECF No. 14200-4, or Exhibit A to the RKS Objection, ECF No. 14203-2 |
| Claimants' Oppositions | Lead Plaintiff PERA and the Securities Act Plaintiffs' Response and Opposition to the Reorganized Debtors' Thirty-Third Securities Omnibus Claims Objection; and The RKS Claimants' Opposition to Reorganized Debtors' Thirty-Fourth Securities Omnibus Claims Objection to Claims Adopting the RKS Amendment |
| Claims Objections | Reorganized Debtors' 33rd Securities Omnibus Claims Objections To PERA's TAC, Including to Certain Claimants that Adopted the TAC; and Reorganized Debtors' 34th Securities Omnibus Claims Objections To RKS Amendment, Including to Certain Claimants that Adopted the RKS Amendment |
| *Edison I* | *Barnes v. Edison Int'l*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) |
| *Edison II* | *Barnes v. Edison Int'l*, 2022 WL 822191 (9th Cir. 2022) |
| Edison or SCE | Southern California Edison |
| ESRB | Electric Safety and Reliability Branch of the CPUC's Safety and Enforcement Division |
| ESRB-4 | A June 2014 resolution promulgated by the ESRB |
| ESRB-8 | A July 2018 resolution promulgated by the ESRB |
| Exchange Act | Securities Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Exchange Offer | PG&E's April 2018 exchange offer |
| Exhibit or Ex. | Exhibit attached to PG&E's Omnibus Request for Incorporation of Documents by Reference or Judicial Notice in Support of Reorganized Debtors' Thirty-Third, Thirty-Fourth, and Thirty-Fifth Securities Claims Omnibus Objection |

| Defined Term | Definition |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| GRC | General Rate Case |
| Notes Offerings | PG&E's notes offerings in March 2016, December 2016, and March 2017 |
| Offering Documents | Registration statements, prospectuses and prospectus supplements filed with the SEC in connection with the Notes Offerings and Exchange Offer |
| PERA | Public Employees Retirement Association of New Mexico |
| PERA Objection or PERA Obj. | Reorganized Debtors' 33rd Securities Omnibus Claims Objections To PERA's TAC, Including to Certain Claimants that Adopted the TAC |
| PERA Opposition or PERA Opp. | Lead Plaintiff PERA and the Securities Act Plaintiffs' Response and Opposition to the Reorganized Debtors' Thirty-Third Securities Omnibus Claims Objection |
| PERA RJN Opp. | Lead Plaintiff PERA and the Securities Act Plaintiffs' (1) Opposition to the Reorganized Debtors' Omnibus Request for Incorporation of Documents by Reference or Judicial Notice and (2) Cross-Request for Judicial Notice |
| PG&E | PG&E Corporation and Pacific Gas and Electric Company (the "Utility") are referred to as "PG&E" solely for purposes of the Objections |
| Plan | PG&E's Joint Chapter 11 Plan of Reorganization, ECF No. 8048 |
| Proofs of Claim | The TAC and RKS Amendment |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| Request for Judicial Notice or RJN | Omnibus Request for Incorporation of Documents by Reference or Judicial Notice in Support of Reorganized Debtors' Thirty-Third, Thirty-Fourth, and Thirty-Fifth Securities Claims Omnibus Objection |
| RJN Reply | Reply in Support of Omnibus Request for Incorporation of Documents by Reference or Judicial Notice in Support of Reorganized Debtors' Thirty-Third, Thirty-Fourth, and Thirty-Fifth Securities Claims Omnibus Objection |
| RKS | The law firm of Rolnick Kramer Sadighi LLP |
| RKS Amendment or RKS Am. | The Amended Statement of Claim on Behalf of the RKS Claimants |
| RKS Claimants | Claimants represented by RKS in this matter, and also any non-RKS-represented claimants that adopted, in whole or in |

| Defined Term | Definition |
|---|---|
| | part, the allegations in the RKS Amendment |
| RKS Objection or RKS Obj. | Reorganized Debtors' 34th Securities Omnibus Claims Objections To RKS Amendment, Including to Certain Claimants that Adopted the RKS Amendment |
| RKS Opposition or RKS Opp. | The RKS Claimants' Opposition to Reorganized Debtors' Thirty-Fourth Securities Claims Omnibus Objection to Claims Adopting the RKS Amendment |
| SEC | Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |
| Securities Act Plaintiffs | County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking & Local 701 Pension Fund |
| TAC | Third Amended Complaint filed by PERA and the Securities Act Plaintiffs in the District Court Action, attached as Exhibit 92 to the accompanying Request for Judicial Notice |

# I.      INTRODUCTION

Claimants' Oppositions to PG&E's Claims Objections all fail, and their claims should be dismissed.  To start with, Claimants advance no credible reason to distinguish this case from *Barnes v. Edison Intl*, where the Ninth Circuit declined to find Edison liable for securities fraud, affirming the California district court's dismissal of all securities claims with prejudice.  2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) ("*Edison I*"); 2022 WL 822191 (9th Cir. Mar. 18, 2022) ("*Edison II*").  The core reasons for dismissal in *Edison* were that:  (1) the statements sued on were largely corporate puffery; and (2) the publicly available facts were sufficient to alert the public to the risk in investing in Edison.  The same is true here.

Claimants assert two intertwined themes in their attempt to avoid *Edison*:  (1) they seek, contrary to law, to avoid a statement-by-statement analysis of the supposedly fraudulent representations PG&E made; and (2) they attempt to gin up a holistic fraud theory, claiming that PG&E misled its investors into believing that PG&E was "a compliant, prudent manager," such that they were "'surprised' . . . by news of rampant noncompliance and PG&E's inability to pass wildfire liabilities on to ratepayers."  PERA Opp. at 60.  Claimants lose because they cannot point to any statement where PG&E said, or even implied, that it would be found to be a "prudent manager" (and therefore able to pass on losses to ratepayers) in the event of a wildfire.  To the contrary, PG&E repeatedly disclosed the risk that it would not.  This fundamental flaw—refusing to engage in the required statement-by-statement analysis in order to charge PG&E with saying something that it never said—permeates and undercuts Claimants' Oppositions entirely.

In fact, PG&E (and other sources) repeatedly informed investors that PG&E could be held liable and financially responsible for future wildfires.  Accordingly, Claimants' theory runs afoul of a basic principle of securities fraud claims:  where there is sufficient information in the public domain regarding the matters at issue such that an alleged misstatement would not materially alter the total mix of information available to a reasonable investor, there is no viable securities fraud claim.  It is for this reason (and not for the truth of the matter) that PG&E properly included more than 100 exhibits with its Claims Objections.  The large number of exhibits is not typical, but neither are the circumstances of this case where investors were inundated with publicly available

information that undercuts Claimants' allegations. Those documents (which are correctly subject to judicial notice), in addition to Claimants' own allegations, establish that investors had sufficient information alerting them to the risk that wildfires were a continuing possibility and, based on PG&E's record with the CPUC, that it could be found noncompliant again and therefore liable for the damage from the wildfires.

Claimants' Securities Act claims suffer from additional fatal defects. The claims are time-barred, the challenged statements were not actionably false, Claimants have not sufficiently pled economic loss or damages, and certain Claimants have released their securities claims under the Plan. Claimants' Oppositions confirm that all their claims, under both the Exchange Act and the Securities Act, can and should be dismissed now.

## II. THE PSLRA'S HEIGHTENED PLEADING STANDARDS APPLY

Claimants' arguments that the PSLRA should not govern the Claims Objections fail for several reasons. *See* PERA Opp. at 41; RKS Opp. at 18–19.

***First***, the PSLRA's plain language provides that its provisions apply "[i]n any private action arising under [the Exchange Act]." 15 U.S.C. § 78u-4(b)(1–4); *see also* 15 U.S.C. § 77z-1 (same language in the Securities Act). When the statutory language is clear and consistent with the statutory scheme at issue, the statute's plain language is conclusive and this Court need not inquire further. *Botosan v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir. 2000).

***Second***, this Court already rejected Claimants' argument that the PSLRA does not apply. ECF No. 14292 (Order Denying Request for Limited Discovery). Claimants offer no basis for the Court to reconsider its decision on this point.[1]

***Third***, the RKS Claimants' position that the PSLRA does not apply because the Claims Objections are not "private action[s]" and the PSLRA was not intended to apply to these proceedings fares no better. RKS Opp. at 18. This matter is a "private action," as the RKS Claimants' own case law makes clear. *See SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003)

---

[1] PERA's contention that the "Court has held that the [PSLRA] does not apply here," PERA Opp. at 41, misrepresents the Court's prior holdings. The Court merely acknowledged that the PSLRA "does not apply specifically" to *PERA's Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel. See* ECF No. 14283. This narrow comment has no bearing on whether the Court should apply the PSLRA's heightened pleading standards here.

(cited in RKS Opp. at 18) (defining an action as an "ordinary proceeding in a court of justice, by which one party prosecutes another party for the enforcement or protection of a right"). Furthermore, all Claimants specifically invoke the federal securities laws as the basis for the relief they are seeking (*see* PERA Opp. at 1; RKS Opp. at 1, 16), and the PSLRA's "substantive sections protecting defendants (like a safe harbor for forward-looking statements)" apply in all "suits brought under the federal securities laws" "wherever" they are filed—including, for example, state court. *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 432–33 (2018). As the United States Supreme Court made clear, "[s]etting a uniform pleading standard for § 10(b) actions was among Congress' objectives when it enacted the PSLRA." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320 (2007). Accordingly, bankruptcy courts apply the PSLRA to claims arising under the Exchange Act and Securities Act. *See Mishkin v. Ageloff*, 220 B.R. 784, 789 (S.D.N.Y. 1998) (applying the PSLRA discovery stay to a securities claim in bankruptcy); *In re Dozier Fin., Inc.*, 2018 WL 6985219, at *10 (Bankr. D.S.C. Apr. 20, 2018) (applying "the relevant standards under Fed. R. Civ. P. 8(a), 9(b), 12(b)(6), and the PSLRA" to securities claims in bankruptcy court).[2]

## III. CLAIMANTS' EXCHANGE ACT ARGUMENTS FAIL

### A. The Court Must Conduct A Statement-By-Statement Analysis To Determine Whether Each Statement Supports A Viable Securities Claim

The law in this Circuit is clear that courts must assess "each statement alleged to have been misleading," the "reason or reasons why the statement is misleading," and generally conduct a statement-by-statement analysis to determine whether each alleged misstatement is actionable. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.5 (9th Cir. 2009), *as amended* (Feb. 10, 2009); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) ("We analyze these alleged misrepresentations to determine whether the SAC includes detailed allegations

---

[2] The cases relied upon by the RKS Claimants are inapposite because they do not address whether the PSLRA pleading standard applies, and instead discuss the applicability of other, unrelated provisions. *See In Re Tronox Inc.*, 2010 WL 1849394, at *2 (Bankr. S.D.N.Y. May 6, 2010) (holding that the PSLRA did not "purport to regulate the filing of class claims in [the bankruptcy] court"); *In re Recoton Corp.*, 307 B.R. 751, 757 (Bankr. S.D.N.Y. 2004) (holding that the PSLRA's automatic stay of discovery would not apply where no claim had been commenced).

compelling the inference that each statement was false and made with the requisite scienter."); *Barry v. Colony NorthStar, Inc.*, 2019 WL 13237710, at *8 (C.D. Cal. Jan. 24, 2019) ("[T]he Court must individually analyze each alleged misstatement."); *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *2 n.2 (N.D. Cal. Aug. 1, 2000) ("This court has previously emphasized the need for clear statement-by-statement analysis in cases of securities fraud.").[3] When this Court analyzes each statement individually, Claimants' securities claims all fail, and Ninth Circuit law demands that the Court conduct that very analysis. The Claimants cite nothing in this Circuit suggesting why this Court should depart from controlling law. The *Carpenters* case PERA cites is not the law of this Circuit. *See* PERA Opp. at 6 (citing *Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*, 2018 WL 1071442, at *3 (N.D. Ill. Feb. 27, 2018)).

## B. Claimants Fail To Rebut That *Edison* Disposes Of Their Claims

As described in detail in the Claims Objections, the Central District of California and Ninth Circuit decisions in *Edison I* and *II* analyzed claims against another California utility that are remarkably similar to the allegations Claimants state against PG&E. The Central District granted, and the Ninth Circuit affirmed, dismissal of those claims with prejudice.

Recognizing that the *Edison* decisions (which were issued after the TAC was filed) are ruinous to their claims, Claimants expend considerable effort in their Oppositions trying to distinguish them. All of their arguments fail. Claimants contend that the representations in *Edison*—while also related to fire safety efforts in advance of 2017 and 2018 California wildfires—are not precisely the same as those at issue here. *See, e.g.*, PERA Opp. at 5; RKS Opp. at 3, 23, 26. However, those superficial differences are irrelevant to whether, as in *Edison*, the

---

[3] Even where district courts do not dismiss a securities class action complaint in its entirety, they often hold, after conducting a statement-by-statement analysis, that a plaintiff failed to state a claim as to certain of the alleged misstatements, and courts dismiss those statements. *See e.g.*, *Pampena v. Musk*, 2023 WL 8588853, at *1 (N.D. Cal. Dec. 11, 2023) (not dismissing some alleged misstatements but granting motion to dismiss with respect to remaining statements "[b]ecause Plaintiffs fail to plausibly allege that the remaining statements are false or misleading"); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 954 (N.D. Cal. 2022) ("[T]he Court GRANTS Defendants' motion to dismiss Plaintiff's claims under Section 10(b) to the extent that they are predicated on the challenged statements made in the Form 10-K of March 26, 2020, and the Forms 10-Q of June 1, 2020, and September 3, 2020[.]"). At a minimum, this paring down of the TAC and RKS Amendment can greatly impact, among other things, the scope of discovery, the scope of expert reports, and any putative class period.

public received sufficient information such that the alleged statements were not actionable. Central to the *Edison* courts' analyses was their determination that plaintiffs could not allege actionable falsity because the market was already aware of the purportedly concealed truth. *Edison I*, 2021 WL 2325060, at *10 ("[T]he market was aware of [Edison's] safety failures . . ., as each of CPUC's admonitions of the Edison Defendants . . . was publicly available.").

Claimants argue the cases are distinguishable because "it is now widely known that PG&E posed a far greater risk to the public than its peers, including Edison," as purportedly evidenced by PG&E's subsequent guilty pleas. PERA Opp. at 6; *see also* RKS Opp. at 22 ("The sheer magnitude of PG&E's misconduct renders futile any comparison between the two situations."). However, Claimants' argument that PG&E's conduct was "worse" than Edison's only further undermines their claims. The fact that "PG&E caused ***1,208 more*** fires than Edison between 2014 to 2017," PERA Opp. at 80 (citing TAC ¶ 412) (emphasis in original), was known to the market, and reasonable investors were in possession of that information when analyzing the risks of investing in PG&E. Indeed, Claimants allege that between 2014 and 2017, PG&E's equipment was involved in more than 1,500 wildfire ignitions—all of which were publicized by the CPUC. TAC ¶ 412 (citing Ex. 66); *see also* PERA Opp. at 63. In other words, as Claimants acknowledge, there was more information in the market here than in *Edison*, where the Ninth Circuit held there was sufficient public information to warrant a dismissal.[4]

## C. The "Gravamen" Of Claimants' Claims Is A Red Herring

Claimants allege that the "gravamen" of their allegations is that "PG&E misrepresented that the Company had turned over a new leaf and had become a compliant, prudent manager," such that it expected to be able to "pass wildfire liabilities on to ratepayers." PERA Opp. at 60; *see also* RKS Opp. at 35. Claimants cannot point to any statement where PG&E stated that it would be found to be a prudent manager. That is because PG&E made no such statement. To the contrary, PG&E warned explicitly and repeatedly, in multiple detailed disclosures, that *it might not be found to have acted prudently*, and therefore *may not be able to recover liabilities from ratepayers*:

---

[4] Claimants acknowledge that while the *Edison* decisions are unpublished, they still constitute "persuasive authority" (*see* PERA Opp. at 5 n.5; RKS Opp. at 22 n.8), and the Ninth Circuit decision shows how the Ninth Circuit would rule here. *See Edison II*, 2022 WL 822191.

- PG&E's February 16, 2017 Annual Report on Form 10-K: "[T]he CPUC or the FERC may disallow costs that they determine were not reasonably or prudently incurred by the Utility." Ex. 5 at 29.

- PG&E's February 16, 2017 Annual Report on Form 10-K: PG&E "believes that it is probable that it will incur a loss of at least $750 million for all potential damages described above [in connection with the Butte Fire]," and that "insurance coverage is subject to the terms and limitations of the available policies and may not be sufficient to cover the Utility's ultimate liability." Ex. 5 at 26.

- PG&E's February 9, 2018 Annual Report on Form 10-K: "[T]here can be no guarantee that the CPUC would authorize cost recovery whether or not a previous court decision imposes liability on a utility under the doctrine of inverse condemnation. In December 2017, the CPUC denied recovery of costs that San Diego Gas & Electric Company stated it incurred as a result of the doctrine of inverse condemnation . . . . If PG&E Corporation or the Utility were to be found liable for damage under the doctrine of inverse condemnation, but is unable to secure a cost recovery decision from the CPUC to pay for such costs through increases in rates, the financial condition, results of operations, liquidity and cash flows of PG&E Corporation and the Utility would be materially affected by potential losses resulting from the impact of the Northern California wildfires." Ex. 6 at 30.[5]

Claimants' own pleadings reveal that reasonable investors fully understood the risk that PG&E could be found not to be a prudent manager, and might therefore bear the full financial weight of future wildfire liabilities. *See, e.g.*, TAC ¶ 350 (citing an analyst report from May 29, 2018—months before the Camp Fire—noting that PG&E "could be barred from recovering costs from ratepayers insofar as **it would be 'tough to meet' the 'prudent manager standard'** that is necessary for such a recovery") (emphasis added); TAC ¶ 29 (alleging that S.B. 901, which was

---

[5] PERA cites the CPUC's order denying rate recovery for wildfires caused by San Diego Gas & Electric without acknowledging that PG&E publicly disclosed this same fact. *Compare* PERA Opp. at 16 (citing the CPUC Order denying a rehearing of the December 2017 CPUC Order), *with* Ex. 6 at 30 (disclosing the December 2017 CPUC Order).

passed shortly before the Camp Fire, informed investors that PG&E's wildfire safety programs could "drive the Company to [financial] ruin"). Claimants cannot state a claim by ignoring information that was available to the public that undermines the "gravamen" of their claims.

###### D.    Claimants Fail To State A Claim As A Matter Of Law For Each Alleged Misstatement

As explained in PG&E's Claims Objections, each of the alleged misstatements fails to state a claim for a variety of reasons. When the Court reviews each statement individually, it will be clear that each should be dismissed. Claimants' Oppositions do not change this conclusion.

######## 1.    None Of The Challenged Statements Relating To The Period Before The North Bay Fires Were Actionably False

All of the statements Claimants challenge that describe conditions preceding the October 2017 North Bay Fires were accurate—and even if Claimants could point to some inaccuracy, the statements are nevertheless not actionable as a matter of law because they were puffery and/or did not alter the total mix of publicly available information.

---

*Inspection and Compliance Statements: Statements 2, 4, 5, and 9*

Stmt. 2:  "Each year, PG&E's Vegetation Management department, . . . , inspects every mile of power line in our service area for public safety and electric reliability. We do so in compliance with relevant laws and with a focus on public involvement . . . ." (October 16, 2015)

Stmt. 4:  "Each year, PG&E's Vegetation Management department . . . inspect[s] miles of power lines in our service area for public safety and electric reliability. We do so in compliance with relevant laws . . ." (October 6, 2016)

Stmt. 5:  "PG&E prunes and removes trees growing too close to power lines . . . . Through a well-established and innovative vegetation management program, PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe, reliable and affordable electric service." (August 9, 2017)

Stmt. 9:  "PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation." (October 31, 2017)

---

a.    Claimants Parse Words To Plead Falsity Where There Is None

**Statements 2 and 4.**  Claimants make the semantic argument that PG&E represented it "inspected" its power lines when, in reality, it only "patrol[led]" them.  PERA Opp. at 25–26, 26 n.19; RKS Opp. at 39.  But General Order 165—the only relevant regulation cited in any of the pleadings—required utilities to conduct "patrol inspections" annually and "detailed inspection[s]" every five years.  Ex. 29 at 4, n.1, n.3.  To the extent Claimants attempt to conflate some of the internal nomenclature PG&E used referring to "patrol inspections" as "patrols" and "detailed inspections" as "inspections," those are irrelevant.  Claimants do not point to any statement in which PG&E warranted that it complied with its own internal policies and procedures.  *See also* RKS Reply Section II.A.2 (explaining why compliance with internal policies is not relevant to securities fraud).

b.    The Market Was Aware Of The Relevant Information

**Statements 2, 4, 5, and 9.**  Claimants cannot state a claim based on PG&E's purported failure to disclose any alleged shortcomings in the execution of its compliance program because of the publicly disclosed information.  In other words, PG&E's alleged statements and omissions could not have altered the total mix of available information.  *See* PERA Opp. at 25 (alleging "noncompliance . . . was rampant" and characterizing this as an "omission[]"); RKS Opp. at 39 (claiming that PG&E omitted publicly available information that "cu[t] against" its disclosures).[6]

As noted above, the *Edison* courts addressed this very issue.  *See Edison I*, 2021 WL 2325060, at *2–5, 7, 10–12 (discussing, at length, the relevance of compliance information in public CPUC reports).  Claimants argue that PG&E's situation is different because PG&E's "safety practices" and "prior safety violations" were concealed.  PERA Opp. at 6; *see* RKS Opp. at 49.  The record properly before this Court demonstrates this is false.  The CPUC published

---

[6] PERA suggests (incorrectly) that the Court cannot determine the "'total mix' of information" on the pleadings alone.  PERA cites no authority for this contention, and it is not the law.  *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 949, 953 (9th Cir. 2017) (affirming dismissal on the pleadings:  "The PSLRA required . . . [the trial court to determine] whether the Plaintiffs sufficiently pleaded misstatements (or omissions) that would have . . . altered the 'total mix' of information").

information disclosing thousands of PG&E violations during the Alleged Relevant Period. For example:

- Four months before PG&E made Statement 2, the CPUC stated that "295 [overhead] facilities missed a patrol[.]" Ex. 39.

- One month before PG&E made Statement 4, the CPUC disclosed that "160 Electric Transmission Line Corrective (LC) work orders were completed late[.]" Ex. 50.

- Three months before Statement 5, the CPUC disclosed that "1,699 overhead work orders were completed past their scheduled date of corrective action." Ex. 56.

- Throughout the rest of the Alleged Relevant Period, just like with Edison, the CPUC issued thousands of "admonitions" to PG&E which made "the market [] aware of [PG&E's] safety failures." *Edison I*, 2021 WL 2325060 at *10.[7]

A statement cannot be actionably false when it was contextualized or contradicted by public information, and a plaintiff cannot ignore contemporaneous, public, judicially noticeable information to manufacture a securities fraud claim. *See, e.g.*, *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1162–63 (C.D. Cal. 2010) (granting motion to dismiss and noting that "[a] court reads the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context").

---

*Vegetation Management: Statements 1, 10, 11, 20, and 24*

Stmt. 1: "We're stepping up our vegetation management activities to mitigate wildfire risk and improve access for firefighters." (April 29, 2015)

Stmt. 10: "We also have one of, if not, the most comprehensive vegetation management programs in the country . . . . And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed . . . In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year." (November 2, 2017)

---

[7] In fact, PERA does not contest that PG&E warned investors that compliance failures could adversely affect its financial condition or that its operations could cause catastrophic events (including wildfires) for which it may not be able to recover losses through rate increases. PERA Obj. at 10, 47.

Stmt. 11: "We manage about 123 million trees that are near and adjacent to our facilities. And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management. . . . We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year." (November 2, 2017)

Stmt. 20 (RKS Only): "PG&E prunes and removes over a million trees every year to ensure that hazardous trees can't impact our lines. And since the onset of the drought we've doubled our efforts." (March 2, 2018)

Stmt. 24 (RKS only): "We have more than doubled our annual spend to manage vegetation from roughly $190 million in 2013 to $440 million in 2017 and we increased the frequency of our patrols[.]" (May 3, 2018)

a.    Statements 1 And 10 Are Puffery—*i.e.*, They Are Not Actionable

**Statement 1.** The RKS Claimants do not contest that Statement 1 is puffery. *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *3 n.3 (N.D. Cal. June 26, 2018) ("[F]ailure to respond to arguments in opposition brief constituted waiver . . . ."); *see generally* RKS Opp. (no arguments about whether Statement 1 is puffery). PERA argues that this statement is not puffery because PG&E's statement was "'inconsistent with' the fact that PG&E's vegetation management activities were unimproved . . . [between] 2015 [and] 2017." PERA Opp. at 22 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017)). But this argument misses the point: a puffery statement like PG&E's "stepping up" statement is not specific or substantive enough to be actionably false. PERA's reliance on *Quality Systems* is misplaced. The Ninth Circuit held the statements in that case were not puffery because they provided concrete descriptions of the state of the company's business, such as assertions that "the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters," and descriptions of "what proportion of the [company's] large and mid-sized . . . markets . . . were greenfield[.]" 865 F.3d at 1144. PG&E's statement that it was "stepping up [its] vegetation management activities" provides no such concrete information, and therefore is not actionable corporate puffery.

**Statement 10.** The description of PG&E's vegetation management program as "one of, if not, the most comprehensive . . . in the country," is quintessential corporate puffery. *See, e.g.*, *Farhar v. Ontrak, Inc.*, 2024 WL 1136128, at *7 (C.D. Cal. Feb. 2, 2024) (dismissing claims and holding as non-actionable puffing statements that defendant "grew its pipeline of customers to its

'*most robust level*' and will '*proceed into new heights*'") (emphasis added); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021) (statement that Google had a "very robust and strong privacy program" amounted to "vague and generalized corporate commitments, aspirations, or puffery that cannot support statement liability under Section 10(b) and Rule 10b-5(b)").

### b. Claimants Have Failed To Plead Falsity And Scienter

**Statement 1.** Statement 1 also fails to state a claim because Claimants plead no facts establishing that this statement was knowingly false when made. *See, e.g.*, *In re Cisco Sys.*, 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013) (plaintiffs must "identify the misleading statement and . . . facts that establish that the statement was false or misleading when made"; granting motion to dismiss). PG&E made Statement 1 on April 29, 2015, yet all of Claimants' purported evidence of falsity comes *after* April 2015 from sources that do not discuss what PG&E knew *in* April 2015. *See* PERA Opp. at 22, 28, 38; RKS Opp. at 45 (identifying response to September 2015 Butte Fire and alleged backlog of unworked trees in January 2017 as basis for falsity and scienter). This is insufficient pleading as a matter of law. *See In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 882 n. 12 (9th Cir. 2012) ("The mere fact that stated expectations fail to come to pass does not make a statement concerning expectations or plans false"; affirming district court's grant of dismissal). And Claimants' citations to Judge Alsup's comments years later do not change this result. PERA Obj. at 59–60.

**Statements 10, 11, 20, and 24.** The statements about PG&E's inspections fail for the same reasons as Statements 2, 4, 5, and 9, *supra*. Claimants have not alleged facts showing the falsity of these statements when they were made, and the public was already aware of the CPUC's citations issued to PG&E's vegetation management program.

Claimants' challenges to PG&E's assertion that its vegetation management spending "essentially doubl[ed]" from 2015 to 2016 also fail. Stmts. 10, 11, 20, 24. PERA characterizes this as "factual analysis that cannot be resolved at this procedural stage." PERA Opp. at 23 n.17; *see* RKS Opp. at 45–46 (similar). But the fact that certain documents, which are properly judicially noticeable, provide *incontrovertible, publicly available facts* that contradict Claimants' assertions does not create a factual dispute. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th

Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."). While Claimants reference the *prospective* budget through the General Rate Case ("GRC") process, they ignore the *additional*, *retroactive* source of PG&E's vegetation management budget through the Catastrophic Event Memorandum Account ("CEMA") process. The CEMA documents show that PG&E's statements about its budget doubling were consistent with the public record; Claimants' allegations are therefore insufficient to state a claim.

PERA now asks the Court to consider six additional documents from the CEMA proceedings. *See* PERA Exs. 1–6. These documents merely *confirm* the accuracy of PG&E's statements. Most notably, the CEMA Application for 2015 shows that while PG&E sought reimbursement of $127 million in total spending, only $34 million was attributable to vegetation management. PERA RJN Opp. Ex. 6 at 4, Tbl. 1-1 ($34 million requested for "2015 Drought"); *id.* at 18–22 ("Drought" expenses included "enhanced vegetation inspection and mitigation"). Then, in 2016, PG&E requested $259 million for vegetation management expenditures through the CEMA process (irrespective of the GRC process). PERA RJN Opp. Ex. 5 at 9. All of this information is publicly available, and PERA cannot create "disputed facts" through erroneous calculations and mischaracterizations of publicly available information. *Sprewell*, 266 F.3d at 988 ("[T]he court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").[8]

---

[8] PERA's arguments about post-Relevant Period audits, settlements, and reductions in CEMA payments miss the mark. *See* PERA Opp. at 22–23, n.17 (arguing that PG&E lowered its 2016 CEMA request by $18.3 million). First, PERA points to no facts suggesting that *in 2017* PG&E suspected it would reduce its request for reimbursement in 2022. *See* PERA Ex. 6. Second, even assuming that PG&E knew that it would eventually agree to an $18 million reduction, PG&E's doubling statements would still be accurate. PERA's incorrect calculations, *see* PERA Opp. at n.17, erroneously treat *all* CEMA spending as if it were for vegetation management.

1

2

3

4

5

6

---

*Reclosers: Statement 3*

Stmt. 3:  "So as I mentioned earlier, our SCADA capabilities where we are able to take our reclosers out of service remotely, we first focus on the wildfire areas and then we have about 130 some odd locations, we are going to complete about 126 of those this year, just about done with that program, which leaves six for next year, which will be completed."  (November 18, 2015)

---

7

8

9

10

11

12

13

14

15

16

17

**Statement 3.**  This statement is not actionable because Claimants have not alleged any facts suggesting that it was false *when made*.  Statement 3 was made on November 18, 2015, yet Claimants' purported "evidence" of falsity is based exclusively on conditions that prevailed in 2017 and later.  *See* PERA Opp. at 32–33; RKS Opp. at 40–42.  Claimants argue, without citation, that because PG&E used reclosers in 2017, PG&E's 2015 statement must have been false.  *See* PERA Opp. at 32–33; RKS Opp. at 40–42.  But as the case law recognizes, "even reasonable predictions [can] turn out to be wrong.  Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood."  *In re Downey Sec. Litig.*, 2009 WL 2767670, *5 (C.D. Cal. Aug. 21, 2009) (citations omitted) (granting motion to dismiss).  Claimants have not established that PG&E's prediction was unreasonable, nor have they pled "particula[r] facts" demonstrating that the statement was false, and knowingly so, in 2015.  *See id.*

18

19

20

21

22

23

24

25

26

27

28

---

*Safety: Statements 6, 7, and 8*

Stmt. 6:  "Earley and other senior executives also discussed continued progress on safety, reliability and other goals . . . .  Earley said, 'We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history.'"  (May 23, 2016)

Stmt. 7:  "The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward."  (November 4, 2016)

Stmt. 8:  "[CEO] Williams highlighted the companies' progress on safety, reliability and reducing greenhouse gas emissions, among other accomplishments.  She reaffirmed PG&E's commitment to safety and operational excellence[.]"  (May 31, 2017)

---

**Statements 6, 7, and 8.** These statements are not actionable because they are puffery. *See* PERA Obj. Appx. 1. Indeed, these are the types of statements the *Edison* courts found to be puffery and therefore not actionable. *See Edison I*, 2021 WL 2325060, at *9 (holding that statements "which vaguely refer to [] prioritization, improvement, and funding of safety procedures" are nonactionable puffery and noting that "courts routinely dismiss securities actions premised on puffery at the motion to dismiss stage").

The RKS Claimants argue that PG&E's statements were not puffery because they were "made in the context of PG&E's ongoing assurances as to **specific** actions it purported to be taking." RKS Opp. at 25 (emphasis in original) (citing *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770–71 (9th Cir. 2023)); *see* PERA Opp. at 38–40 (similar arguments). The RKS Claimants' reliance on *Glazer* is misplaced. In *Glazer*, the statement that employee retention numbers had been "tracking very well" could be objectively verified because it was given concrete meaning based on information within the sentence: "[Employee retention] was [up] 50% at the end of 2018 [which is] up from 35% a year prior, and . . . it's tracking very well for us . . . [in] 2019." *Glazer*, 63 F.4th at 762. The RKS Claimants have not pled similar specifics—like the statistics in *Glazer*—that constitutes concrete and verifiable information. These statements are therefore paradigmatic examples of puffery.[9]

        2.    <u>None Of The Challenged Statements Relating To The Period After The North Bay Fires Were Actionably False</u>

Claimants likewise cannot state a claim as to PG&E's statements regarding conditions after the North Bay Fires. Claimants argue that following the North Bay Fires, "PG&E misrepresented that the Company had turned over a new leaf and had become a compliant, prudent manager" and would, therefore, be able to "pass wildfire liabilities on to ratepayers." *See, e.g.*, PERA Opp. at 60. But none of the statements Claimants challenge, including specifically the post-North Bay Fires statements, even reference the "prudent manager" standard or the CPUC's rate recovery

---

[9] Certain aspects of PG&E's other statements were also puffery. *See* PERA Obj. Appx. 1, ECF No. 14200-1 (identifying aspects of Statements 5, 11, 13, and 17 as puffery). For example, PG&E's description of its vegetation management programs as "aggressive" is puffery. *See* Stmt. 11.

proceedings. Indeed, this argument ignores the CPUC's admonitions, PG&E's specific risk disclosures, the North Bay Fires themselves, and the extensive press coverage about PG&E, all of which put investors on notice that PG&E's compliance violations could cause wildfires large enough to impact PG&E's financial results, and that PG&E may not be able to recover for any such liabilities.[10]

---

*Compliance Programs: Statements 12, 13, 14, and 28*

Stmt. 12: "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements." (November 5, 2017)

Stmt. 13: "PG&E meets or exceeds regulatory requirements for pole integrity management." (May 25, 2018)

Stmt. 14: "Programs Overall Met State's High Standards . . . PG&E meets or exceeds regulatory requirements for pole integrity management, using a comprehensive database . . . Similarly, under PG&E's industry-leading Vegetation Management Program, we inspect and monitor . . . overhead electric transmission and distribution line[s]." (June 8, 2018)

Stmt. 28 (RKS Only): "Q. Please describe the allocation of expenses in Account 561 . . . . A. This account includes expenses incurred for operating the transmission system safely, reliably, and in compliance with all applicable rules, standards and regulations." (October 1, 2018)

---

**Statements 12, 13, 14, and 28.** The RKS Claimants argue that PG&E's post-North Bay Fires compliance statements falsely "painted a picture of a utility . . . [that only] fell short in isolated instances," omitting PG&E's alleged "widespread noncompliance." RKS Opp. at 33–35. This argument fails on its face. There were *dozens* of CPUC audit reports detailing *thousands* of instances of PG&E's non-compliance with General Order 165 (the regulation setting forth inspection requirements) during the Alleged Relevant Period, including after the North Bay Fires. *See, e.g.*, Ex. 59 (CPUC audit eleven days before Statement 14, publicly disclosing "violations" of "GO 165"). In other words, as a matter of law, the purportedly omitted information cannot be

---

[10] If the Court determines that statements made after the North Bay Fires are not actionable, it will eliminate the claims of several opportunistic institutional investors. For example, PG&E specifically identified RKS Claimant "Nuveen Santa Barbara" as an investor that started purchasing shares shortly after the *Camp Fire* ignited and while the Camp Fire was burning. RKS Obj. at 30. Neither the RKS Claimants nor PERA raise arguments about Nuveen Santa Barbara nor any other risk-seeking claimant that started purchasing PG&E stock after the North Bay Fires.

material because it was already in the public domain. *See, e.g.*, *Patel v. Parnes*, 253 F.R.D. 531, 549 (C.D. Cal. 2008) (granting motion to dismiss and noting "a misstatement or omission is not material if the undisclosed fact is already in the public domain") (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)); *Edison I*, 2021 WL 2325060 at *10.

**Statement 14.** PG&E's statement that its vegetation management program was "industry-leading" fails for the additional reason that it is textbook corporate puffery. "[S]tatements regarding continued industry leadership [are] the sorts of 'vague, optimistic statements' that constitute nonactionable 'puffery.'" *Pub. Emps. Ret. Sys. of Mississippi v. Qualcomm, Inc.*, 773 F. App'x 987, 988 (9th Cir. 2019) (affirming district court's grant of dismissal).[11]

---

*Power Shutoff: Statements 15, 16, 18, and 29*

Stmt. 15: "PG&E has launched the Community Wildfire Safety Program to help keep our customers and communities safe. Among the key components of the new program are . . . Public Safety Power Shutoff: As a last resort, a program to proactively turn off electric power for safety when extreme fire danger conditions occur." (June 8, 2018)

Stmt. 16: "PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring. . . . PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety." (September 27, 2018)

Stmt. 18: "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, PG&E has launched the Community Wildfire Safety Program to help keep our customers and communities safe by implementing additional precautionary measures intended to further reduce wildfire threats . . . . Public Safety Power Shutoff: As a last resort, a program to proactively turn off electric power for safety when extreme fire danger conditions occur." (October 9, 2018)

---

[11] In any event, Claimants acknowledge that certain aspects of PG&E's vegetation management program *were*, in fact, industry-leading. *See* TAC ¶ 421 (alleging that PG&E's electronic monitoring systems "w[o]n *InformationWeek's* IT Excellence Award in the Data and Analytics category"); *id.* ("[A] Margaret Mooney Award for Innovation was awarded to [PG&E's] 'Data Visualization—Google Earth SAP team, which created a new technology that provides work crews with a dramatically enhanced data visualization . . . .'"); RKS Am. ¶ 586 (same).

> Stmt. 29 (RKS Only): "We also have our public safety power shut off program that I mentioned earlier, and we'll of course only utilize this as a last resort in the most extreme forecasted weather conditions. All of these efforts are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets. We plan to continue patrolling our poles at frequencies within high fire threat areas beyond the compliance requirements in place in California. Collectively, this is an integrated comprehensive program to further reduce risk across our high fire threat areas." (November 5, 2018)

**Statements 15, 16, 18, and 29.** Claimants allege no facts showing that these statements about PG&E's power shutoff program were false when made. PERA's Opposition asserts that "PG&E never actually 'launched' . . . or 'implement[ed]' . . . the protocol." PERA Opp. at 30. But PERA also alleges that PG&E had, in fact, launched and implemented this protocol: "PG&E had . . . shut off electricity in the face of wildfire conditions once before, in October 2018." TAC ¶ 174. At bottom, PERA argues that "PG&E never actually implemented a binding protocol" because PG&E did not turn off the power when PERA believes the seven factors for doing so were met. PERA Opp. at 31. As PG&E explained in its Claims Objections, however, *PG&E never stated that it would automatically shut off power in any particular set of conditions*. PERA Obj. at 38. As the public document describing PG&E's protocol explained, a "Public Safety Power Shutoff [would] only be done as a last resort during the most extreme fire danger conditions," "no single factor [would] drive a Public Safety Power Shutoff," and "PG&E [would] take a combination of many criteria into consideration, *including*" (but not limited to) the listed seven factors. Ex. 108 at 3 (emphasis added). These statements cannot support a securities claim as a matter of law.

The RKS Claimants set forth an entirely different theory. According to them, PG&E's statements were false because, although the shutoff protocol was in place for distribution lines, PG&E's "actual policy exempted transmission lines [and the] summary published on [its] website was [therefore] misleading." RKS Opp. at 43 (internal quotations omitted). But PG&E *never stated that its policy <u>did</u> apply to transmission lines*, and it was clear that the document published on its website was merely a summary "of [PG&E's] policies and procedures related to" power shutoffs, not the policy itself. Ex. 108 at 1. District courts routinely find that statements providing

summaries of information are not material and dismiss those statements as a result. *See Varjabedian v. Emulex Corp.*, 2020 WL 1847708, at \*9 (C.D. Cal. Feb. 25, 2020), *aff'd sub nom. Mutza v. Emulex Corp.*, 843 F. App'x 951 (9th Cir. 2021) (motion to dismiss granted; a fairness opinion summary "is just that—a summary—which cannot be expected to include every relevant or meaningful bit of analysis performed by a financial advisor"); *Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at \*6 (N.D. Cal. Nov. 25, 2015) (motion to dismiss granted; statement providing a "snapshot" of the company's process for FDA approval of a drug was not materially false and/or misleading).[12]

---

### *Safety: Statements 17, 21, 22, 23, 25, and 27*

<u>Stmt. 17</u>: "[W]e are continuing to focus on implementing additional precautionary measures intended to further reduce wildfire threats, such as working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas, and taking other actions to make our system, and our customers and communities, even safer in the face of a growing wildfire threat." (October 9, 2018)

<u>Stmt. 21 (RKS only)</u>: "[PG&E is] focused on 'doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe,' including by 'investing in stronger, coated power lines[.]'" (March 22, 2018)

<u>Stmt. 22 (RKS only)</u>: PG&E was "[a]ugmenting [their] already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission." (March 22, 2018)

<u>Stmt. 23 (RKS Only)</u>: "Under PG&E's industry-leading Vegetation Management Program, the company inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times." (March 27, 2018)

---

[12] PERA argues that ESRB-8 required PG&E to "[p]rovide its de-energization and restoration policy **in full**." PERA Opp. at 30 (emphasis in original). But PERA's selective quoting leaves out the key requirement that this "full" policy was to be provided to "community officials," not the public at large. Ex. 25 (requiring a utility to "[p]rovide its de-energization and restoration policy in full, and in summary form, ***to the affected community officials*** before de-energizing its circuits.") (emphasis added).

> Stmt. 25 (RKS Only): "Over the last seven years, we have accomplished so much together on our journey to become one of the safest, most reliable energy companies in the country. As a team, we've worked to improve our culture, augment our operations, upskill our people and, most importantly, improve public and employee safety." (July 16, 2018)
>
> Stmt. 27 (RKS Only): "PG&E is currently implementing four mitigations to reduce overhead conductor risk." (October 1, 2018)

**Statements 17, 21, 22, 23, 25, and 27.** These statements are all recycled versions of PG&E's pre-North Bay Statements about its vegetation management and inspection programs. PG&E's post-North Bay Fires statements about its inspections are not actionable for the same reasons as Statements 2, 4, 5, and 9, *supra*. PG&E's statements about its vegetation management and safety improvements are not actionable for the same reasons as Statements 1, 10, and 11, *supra*.

**Statements 20, 21, 22, and 25.** These statements fail for the additional reason that they are corporate puffery. "When valuing corporations, . . . investors do not rely on . . . feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (affirming dismissal where plaintiff alleged defendant's statement that "we believe our employee relations are good" was misleading). Statements about PG&E's "journey" to "become one of the safest, most reliable energy companies," Stmt. 25, or "augmen[t]," its "already rigorous" programs, Stmt. 22, or "harden" its infrastructure, Stmt. 21, are clearly inactionable puffery.[13]

> *Weather: Statement 19*
>
> Stmt. 19: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as weather conditions did not warrant this safety measure." (November 8, 2018)

**Statement 19.** This statement fails to state a claim because Claimants have pled no facts showing that PG&E's assessment of the weather was knowingly false at the time it was made.

---

[13] *See also Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 547–48 (W.D. Pa. 2019) ("[G]eneral statements about . . . values, workplace safety, and ethics . . . were not rendered misleading by product safety issues."). Notably, *Howard* rejected the out-of-circuit case heavily relied upon by the RKS Claimants, *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1218–19 (N.D. Ga. 2019), because "general values statements" are not a "covenant . . . [of] safety." *Howard*, 395 F. Supp. 3d at 547–48.

1   Whether PG&E's assessment was later proven wrong is irrelevant; it is insufficient to state a claim

2   for securities fraud.  And any conclusion PG&E did reach, even if wrong, could not possibly have

3   affected the "total mix" of information because the true "weather conditions" were, of course, not

4   concealed from the market.

<div style="border:1px solid;">

*Reclosers:  Statement 26*

Stmt. 26 (RKS Only):  PG&E reasserted that following the 2017 wildfires, one of the 'new and enhanced safety measures' being implemented was the '[d]isabling [of] automatic reclosing of circuit breakers and reclosers[.]'" (September 2018)

</div>

**Statement 26.**  The RKS Claimants fail to allege facts demonstrating that PG&E's post-North Bay statement about reclosers was false or misleading.  The RKS Amendment alleges that PG&E's statement was false because a "pole [with] a line recloser" was found at the Camp Fire's second ignition point.  RKS Am. ¶ 122.  But PG&E told investors that it was "*disabling*" reclosers; it is not alleged that PG&E told investors it was *removing* them.  The RKS Claimants' falsity theory conflates these points; the fact that reclosers were physically installed says nothing about whether they had been "disabled."  The RKS Claimants also do not (and cannot) plead that PG&E made any statement regarding the date by which it would finish disabling the reclosers.  Therefore, even if PG&E did not finish disabling its reclosers by November 2018—the month of the Camp Fire—that did not render misleading its statement from a mere two months prior that it was in the process of doing so.

###   E.   Claimants' Generalized Allegations Of Scienter Fail

Claimants fail to clear the high bar to plead scienter for each alleged misstatement.  *Tellabs*, 551 U.S. at 321 (noting the PSLRA "unequivocally raise[d] the bar for pleading scienter").  Claimants allege no specific facts—for example, failing to include any contemporaneous documents or confidential witness testimony—showing that PG&E management actually knew the purported misstatements were false or misleading at the time they were made.

1.     Claimants Cannot Rely On The Core Operations Doctrine

Claimants contend the "core operations" doctrine applies here even though courts apply that doctrine to find a strong inference of scienter only in "rare circumstances." PERA Opp. at 51–52; RKS Opp. at 62. Such rare circumstances are not present here. The core operations doctrine is generally applied only where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Webb v. SolarCity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018).

Claimants ignore that PG&E was—and is—a massive organization that provides electricity *and natural gas* services to a large portion of California. Claimants' factual allegations relate only to a particular part of PG&E's electricity transmission business in a particular part of the state; indeed, they relate to *specific transmission lines and poles*. This is not the type of circumstance where district courts are willing to apply the core operations doctrine. *See Id.* at 857 (rejecting core operations doctrine where issues pertained to "minor portion of the company's overall business"). The cases Claimants cite are inapposite because they involved significant issues that impacted the companies' entire businesses. *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–88 (9th Cir. 2008) (holding it would be absurd to believe that CEO and CFO did not know about stop-work orders which halted work on the company's largest contracts, given the company-wide consequences of those orders).

Further, Claimants fail to satisfy their burden of asserting specific allegations showing that management *believed at the time of the alleged misstatements* that the matters at issue were "core" to PG&E's business. *See Reese v. Malone*, 747 F.3d 557, 579–80 (9th Cir. 2014). Claimants plead no facts in support—such as contemporaneous documents[14] or testimony from confidential

---

[14] Allegations that PG&E documented its compliance issues, PERA Opp. at 44–47, RKS Opp. at 54–60, do not establish scienter. *See, e.g.*, *In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (holding that "internal reports alone are insufficient to demonstrate [scienter]"); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067–68 (9th Cir. 2008) (holding that strong inference of scienter not pled based on allegation that "because [the company] had in place a 'management information system' that monitored enrollment and other data company-wide, its principals must have had knowledge of the alleged fraudulent practices").

witnesses[15]—showing that, prior to the Camp Fire, PG&E management was monitoring these exact issues.[16]  Those are precisely the sort of missing allegations that Claimants' authorities relied on to apply the core operations doctrine.  *See, e.g.*, *id.* (finding management must have been aware of company's "significant, existing compliance issues" because "contemporaneous documents demonstrated management's awareness"); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) (applying core operations doctrine based on statements from multiple confidential witnesses); *Berson*, 527 F.3d at 987–88 (same).  There are no similar allegations here.

Claimants consistently overstate their allegations regarding PG&E executives' knowledge of compliance violations.  Contrary to PERA's arguments, the TAC contains no allegation that PG&E's senior executives "personally monitored" vegetation and inspection databases.  *Compare* PERA Opp. at 2 ("[PG&E] executives ***personally monitored*** these real-time databases.") (emphasis added), *with* TAC ¶ 422 ("[PG&E executives] had ***easy access*** to this database.") (emphasis added).  PERA's Opposition purports to cite 13 separate paragraphs supporting its accusation of "persona[l] monitor[ing]," but none actually supports this argument.  *Compare* PERA Opp. at 2 (citing TAC ¶¶ 142, 172, 287, 398–403, 433), *with* ¶¶ 142, 172 (discussing the ESRB-8 shutoff protocol and pre-Camp Fire weather, not "personal monitoring"), ¶ 287 (quoting a statement about PG&E's database, not "personal monitoring"), ¶¶ 398–400, 403 (discussing

---

[15] Statements by mid-level PG&E employees do not demonstrate knowledge.  For example, the statement from PG&E's Vegetation Program Manager (Stockton Division) that the company did "not [make] any changes" to its vegetation management or compliance policies as a result of the Butte Fire, PERA Opp. at 43–44; RKS Opp. at 45, was solely made "to the best of [that employee's] knowledge," TAC ¶ 125, and does not reflect what management actually knew.

[16] The mere allegation that certain members of PG&E's management team oversaw vegetation management and compliance efforts does not mean that they actually accessed the database and the specific information that Claimants contend showed the purported violations.  *See, e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (finding no scienter pled where "plaintiffs merely assert in conclusory terms that the defendants had access to internal data demonstrating" alleged falsity of statements); *Plumley v. Sempra Energy*, 847 F. App'x 426, 431 (9th Cir. 2021) ("We reject [plaintiff's] contention that knowledge . . . should be imputed to [defendants] under the core operations doctrine.  Absent allegations of specific admissions by [defendants] of detailed involvement in the minutia of the companies' [] operations or witness accounts of the same, [plaintiff] cannot prevail simply by incanting this theory.").  Furthermore, the only person that PERA claims "admitted" to monitoring that database is PG&E's former CEO and Chairman Anthony F. Earley, Jr. ("Earley").  PERA Opp. at 45.  But all the TAC alleges is that Earley encouraged employees "to report safety violations up the chain of command," TAC ¶ 428, and that the Company "created a number of awards to personally recognize employees when they do speak up."  *Id.*  These allegations are a far cry from actually alleging Earley's scienter.

1    general safety practices without referring to PG&E's databases), ¶ 401 (discussing allegations in

2    a separate lawsuit, not "personal monitoring"), ¶¶ 402, 433 (alleging that PG&E's Chief Ethics

3    and Compliance Officer reported on safety and compliance, not that she "personally monitored"

4    any database).

5    Similarly, the RKS Claimants' arguments about executive oversight are not supported by

6    the allegations in the RKS Amendment. *See* RKS Opp. at 4. The RKS Claimants do not allege

7    that the senior managers who allegedly made misstatements received "real-time information"

8    about PG&E's alleged noncompliance. *See generally* RKS Am. In any event, none of The RKS

9    Claimants' compliance allegations are specific about the timing or content of this "real-time"

10   information, and they have therefore failed to plead a "strong inference" of scienter. *See Tellabs*,

11   551 U.S. at 314.

12           2.    <u>Statements From Other Proceedings That Post-Date The Alleged Relevant</u>

13                 <u>Period Do Not Establish Scienter</u>

14   Lacking contemporaneous facts supporting scienter, Claimants rely on findings of

15   wrongdoing several years later to allege scienter-by-hindsight.[17] But these "facts" are insufficient

16   to establish management's knowledge at the time the statements were made. *See In re NVIDIA*

17   *Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2019) (articles written after corrective disclosure

18   insufficient to establish scienter because "[t]hey were written in hindsight and do not reflect"

19   defendant's contemporaneous knowledge); *Metzler*, 540 F.3d at 1066 (to plead scienter,

20   allegations must include "specific contemporaneous statements or conditions that demonstrate the

21   intentional or the deliberately reckless false or misleading nature of the statements when made").

22   Specifically, the RKS Claimants argue that PG&E's guilty pleas in the state court criminal

23   action brought by the Butte County District Attorney support their scienter allegations. RKS Opp.

24   at 25–27. *Crucially, PG&E never admitted—and no court ever found—that PG&E's statements*

25   *during the Alleged Relevant Period were knowingly false.* PG&E pled guilty to certain counts of

26

27   _____

28   [17] PERA did not reference the Butte County DA Report in the TAC and therefore that document
     should not be considered. *See generally* TAC.

1    wrongdoing, but recognizing recklessness in hindsight is not sufficient to allege scienter *at the*
2    *time* PG&E made the challenged statements.

3        Nonetheless, the RKS Claimants argue that because PG&E pled guilty, it necessarily
4    admitted that it was "aware" of and "ignored" a risk "while assuring the public it complied with
5    . . . regulations." RKS Opp. at 65. The RKS Claimants cite no law supporting this argument, and
6    authority from the Eighth Circuit directly refutes the RKS Claimants' position: "[A] guilty plea
7    cannot be used to demonstrate knowledge by hindsight. . . . [A] plea admits nothing more than the
8    limited instances of misconduct specified therein." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820,
9    829 (8th Cir. 2003) (affirming dismissal); *see also In re Monster Worldwide, Inc. Sec. Litig.*, 549
10   F. Supp. 2d 578, 583 (S.D.N.Y. 2008) (denying plaintiff's motion for summary judgment for
11   failure to establish scienter despite the defendant's guilty plea).

12       As Claimants state throughout their briefing, these fires, and PG&E's role in them, have
13   been exhaustively investigated and documented by numerous government agencies, and the
14   findings and conclusions of those agencies have been published. Critically, with the benefit of all
15   those investigations and findings, Claimants still fail to plead *any contemporaneous facts* showing
16   that PG&E's statements were knowingly false when they were made.

17                    3.    Claimants' Other Generalized Theories of Scienter Fail

18       Claimants' remaining theories of scienter likewise fail. The mere fact that certain members
19   of PG&E's management and Board departed the Company shortly after the purported fraud was
20   revealed is of no significance. PERA Opp. at 48; RKS Opp. at 60–61; *see also Zucco*, 552 F.3d at
21   1002 ("Absent allegations that the resignation at issue was uncharacteristic . . . the inference that
22   the defendant corporation forced certain employees to resign because of its knowledge of the
23   employee's role in the fraudulent representations will never be as cogent or as compelling" as the
24   nonculpable inference). Claimants offer no specific allegations demonstrating the departures were
25   due to the alleged misconduct as opposed to "unrelated personal or business reasons." *Zucco*, 552
26   F.3d at 1002.

27       Finally, PERA argues that PG&E had an unusual motive to inflate the public's view of its
28   efforts in light of the fact that California imposes strict liability for property damage if a public

1 utility does not act prudently. PERA Opp. at 47–48. But PG&E's desire to operate as a prudent

2 manager is part of its routine corporate objectives and cannot serve as a standalone basis to

3 establish scienter. *Rigel*, 697 F.3d at 884 ("allegations of routine corporate objectives . . . are not,

4 without more, sufficient to allege scienter"). As explained above, numerous disclosures informed

5 investors that PG&E might not be found to be a "prudent manager" in the event of a wildfire.

**F.    Claimants Fail To Plead Loss Causation**

7 To establish loss causation, Claimants must allege a "causal connection between the fraud

8 and the loss by tracing the loss back to the very facts about which the defendant lied." *In re Nektar*

9 *Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (citations omitted). Claimants' various

10 arguments in opposition confirm that they have failed to clear this hurdle.

11 PERA argues that if it can "plead loss causation for one event," its other allegations

12 automatically survive PG&E's pleading challenges. PERA Opp. at 52. The RKS Claimants do

13 not advance this erroneous argument. Courts routinely determine that plaintiffs failed to

14 sufficiently allege loss causation for particular stock drops, and dismiss allegations related to those

15 stock drops. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th

16 Cir. 2018) (per curiam) (affirming district court finding that plaintiffs alleged "loss causation . . .

17 with respect to five of the six alleged stock price declines").[18]

18 Ninth Circuit law requires Claimants to trace their loss to the "very facts about which the

19 defendant lied." *Nektar Therapeutics*, 34 F.4th at 838 (quoting *First Solar, Inc.*, 881 F.3d at 75);

20 *see* PERA Obj. at 61. Claimants advance two theories to show this causal connection: (i) a

21 corrective disclosure theory; and (ii) a materialization of risk theory. RKS Opp. at 73–74; PERA

22 Opp. at 52–58.

23

24

25

---

26 [18] The only authority PERA cites to the contrary is *In re Interlink Elecs., Inc., Sec. Litig.*, 2008
WL 4531967, at *4 (C.D. Cal. Oct. 6, 2008). This five-page, unpublished decision cites no
27 authority supporting the holding PERA urges, and no other decisions have cited *Interlink* as good
law on loss causation in the 16 years since it was issued. This Court should follow the published
28 and binding decision of the Ninth Circuit in *First Solar Inc.*, 881 F.3d at 754, which PERA cites
repeatedly. PERA Opp. at 52, 54, 55, 57, 58, 100–01.

1.  <u>The "Corrective Disclosure" Theory Fails To Establish Loss Causation</u>

The "corrective disclosure" theory requires a claimant to allege that "information correcting the misstatement . . . is disseminated to the market." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (citations omitted).

**PERA's Reliance On *Leventhal* Is Misplaced.** PERA contends that the May and June 2018 Cal Fire Reports, which found that PG&E's equipment was involved in certain of the North Bay Fires, meet this standard because of analyst reports published about the Cal Fire Reports. PERA Opp. at 55–56. PERA contends that when analyst reports discuss a "'relationship between alleged misstatements and a stock price decline,'" a securities claimant necessarily meets its pleading burden for loss causation. *Id.* at 55 (citing *Leventhal v. Chegg, Inc.*, 2024 WL 924484, at *8 (N.D. Cal. Mar. 4, 2024)). But Claimants have not actually alleged that relationship.

PERA's own case, *Leventhal*, underscores this point. In *Leventhal*, an online education company told investors that its rapid growth during the COVID-19 pandemic was sustainable "'whether [students are] physically on a campus or at home.'" 2024 WL 924484 at *1 (citing the misstatement). But when schools reopened and the company missed its earnings projections, analysts focused on the fact that "'as students returned to campus for in person learning, they did not return to the [company's] platform.'" *Id.* at *8 (citing the analyst report). The tight link between analyst comments about "in person learning" and prior misrepresentations about students learning "on a campus" stands in stark contrast with the analyst reports about PG&E. The only analyst report cited by PERA in its Opposition stated what the public already knew: that the "prudent manager" standard would be "tough" for PG&E to meet. PERA Opp. at 55. Of course, PERA does not allege that PG&E told investors this standard would be easy to meet. And PERA has not cited a single analyst report that commented on the *actual misstatements* it alleges to be false.[19]

**The RKS Claimants' "Slow Drip" Argument Fails.** The RKS Claimants advance a similarly flawed argument. They argue that, following the North Bay Fires, there was a "slow drip

---

[19] PERA contends (without explanation) that PG&E "concedes [a] causal link" between the alleged misstatements and this analyst report. PERA Opp. at 56 (citing PERA Obj. at 83). For the avoidance of doubt, PG&E does not concede any "causal link."

of information" which revealed that PG&E's "prior statements (that its exposure to wildfire-related liability was mitigated by fully compliant vegetation management practices) were 'false[.]'" RKS Opp. at 73. But PG&E *never stated that its wildfire-related liability was mitigated*. The RKS Claimants' arguments rest on the false premise that reasonable investors interpreted PG&E's public statements to mean that its vegetation management practices were fully compliant and it would be able to recover any future wildfire liabilities by relying on the prudent manager standard. Courts routinely reject attempts like this one to ignore what was already in the public domain because plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside . . . for purposes of loss causation." *Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013).

### 2. The Materialization Of Risk Theory Fails To Establish Loss Causation

The RKS Claimants argue that they have alleged loss causation for stock drops during the North Bay and Camp Fires because those fires represented the materializations of risk. RKS Opp. at 74. But as explained in PG&E's Claims Objections, these were the materializations of *known* and *disclosed* risks which cannot form the basis of a fraud claim. PERA Obj. at 62.[20]

**PERA Concedes This Point.** PERA does not dispute that PG&E regularly disclosed that its equipment could cause wildfires or that it could be held financially responsible for damages caused by those wildfires. *See generally* PERA Opp.; *see, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (plaintiffs failed to allege loss causation when "the risk[s] that materialized are unambiguously apparent on the face of the disclosures").

---

[20] PERA's letter advising the Court of *In re Genius Brands International, Inc. Securities Litigation*, 97 F.4th 1171 (9th Cir. 2024), does not change this result. ECF No. 14447. The Ninth Circuit's decision in *Genius Brands* stands for the unremarkable proposition that an alleged false statement will not always cause a stock price to increase. *See Genius Brands*, 97 F.4th at 1185. This holding is of no consequence here given that PG&E never argued about the lack of upward stock price movement following an alleged misstatement. *See generally* PERA Obj.; RKS Obj. And *Genius Brands*' other holding relevant to loss causation—that a piece of information which was "not in a readily digestible format" did not reveal the allegedly concealed truth—does not save the Claimants' loss causation allegations. *See Genius Brands*, 97 F.4th at 1187. Here, PG&E's SEC filings and the CPUC's public reports about PG&E's compliance violations were available to the market in a "readily digestible format." Exs. 31–63. And Claimants allege that the market *did* in fact digest this information. *See* Sections III.C, III.D *supra*. The highly accessible information published by the California government (and which remains on the CPUC website to this day) stands in stark contrast to the jumbled, ephemeral TV schedule on Nickelodeon Jr.'s website that was "updated daily." *See Genius Brands*, 97 F.4th at 1187.

**The RKS Claimants' Argument That The Materialization Of A "Known" Risk Would Not Move The Stock Price Is Frivolous.** The RKS Claimants argue that because PG&E's stock traded in an efficient market, PG&E's share price "already reflected [known] risks" and therefore "the market price would be unaffected by manifestation of a known risk," *i.e.*, the North Bay and Camp Fires. RKS Opp. at 76. This argument is wrong and belied by common sense. If a company with a single share discloses that its only asset is worth $100 if a coinflip lands heads and $0 if the coinflip lands tails, the risk of tails would be "priced in," and the share would be worth about $50. However, once the coin is flipped, the share would adjust to $0 or $100, not $50, even though the risk had been priced in before the event. Put simply, the RKS Claimants' theory rests on the false premise that the market moves only when *unknown* risks materialize. RKS Opp. at 76–77. If this argument were correct, it would eviscerate risk disclosures and overturn decades of case law establishing that disclosures can rebut loss causation. *E.g.*, *Lentell*, 396 F.3d at 177.[21]

### G. Claimants Fail To Plead Reliance For Purchases After The North Bay Fires

Claimants' Proofs of Claim also fail because they do not demonstrate that they relied on the alleged misstatements for any purchases after the North Bay Fires—a necessary element for their securities fraud claims. In particular, Claimants are not entitled to rely on the "fraud on the market presumption" after the North Bay Fires because the market was aware of the truth via other public sources, nor can they take advantage of the separate presumption of reliance under *Affiliated Ute.*

#### 1. Claimants Cannot Rely On The Fraud On The Market Presumption

As detailed in the Claims Objections, Claimants cannot rely on the fraud on the market presumption where, as here, PG&E has shown that the market was already aware of the truth behind the alleged misstatements via other public sources. *See* PERA Obj. at 69–71; *see also In*

---

[21] The RKS Claimants also argue that PG&E failed to disclose the precise risks, *i.e.*, that PG&E's fire safety efforts were allegedly deficient, and analogizes to a stock drop following the revelation of brake problems in a car. RKS Opp. at 75–76. This argument—like Claimants' other arguments—assumes ignorance of the CPUC's audit reports. The correct analogy would be to a hedge fund purchasing shares in an automobile manufacturer after the National Highway Transit Safety Authority issues public findings about problems with that manufacturer's brakes, then sues the manufacturer for securities fraud when the known risk that the brake problems would cause an adverse event materializes. There is no securities claim under this circumstance.

1 *re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007 (N.D. Cal. 2017) (Davila, J.)

2 (granting motion to dismiss Exchange Act claims for failing to plead reliance). Claimants'

3 arguments in response are unpersuasive.

4     **The Defense Is Appropriately Applied At The Pleading Stage.** Claimants assert that

5 this doctrine is inappropriate at the pleading stage. PERA Opp. at 58–59; RKS Opp. at 65–66.

6 While the "truth-on-the-market" defense is typically an affirmative defense that a defendant cannot

7 assert on a motion to dismiss, the exception is where, like here, the allegations and documents

8 incorporated by reference and/or judicially noticed are sufficient alone to establish the defense.

9 Indeed, Claimants' own case concedes this point. *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d

10 1009, 1025 (C.D. Cal. 2008) (acknowledging claims may be dismissed via truth-on-the market

11 defense); PERA Opp. at 58–59; RKS Opp. at 65–67. And courts in the Ninth Circuit have

12 dismissed cases based on a truth-on-the-market defense where there was far less public information

13 available to investors to "counter-balance" the alleged misstatements than was available here. *See*

14 *Kalobios*, 258 F. Supp. 3d at 1007–08 (N.D. Cal. 2017) (granting motion to dismiss; four news

15 articles established truth-on-the-market defense); *Reinschmidt v. Zillow, Inc.*, 2014 WL 5343668,

16 at *6 (W.D. Wash. Oct. 20, 2014) (granting motion to dismiss; two analyst reports established

17 truth-on-the-market defense).

18     **PERA's Argument That There Were Known And Undisclosed Risks Fails.** As cited

19 in the Claims Objections, there were at least 30 separate instances of publicly available CPUC

20 citations issued to PG&E. *See* PERA Obj. at 69–70; Exs. 31–63. PERA admits that PG&E

21 disclosed the "risk of wildfires," but claims that it did not disclose "how the risk was exacerbated

22 by numerous, widespread, known and unmitigated safety violations." PERA Opp. at 60–61.

23 However, as of February 2018, the public indisputably was aware that, among other things, (1) the

24 CPUC issued a litigation hold letter to PG&E about its safety practices (TAC ¶ 246), (2) Cal Fire

25 was investigating PG&E's role in the fires (TAC ¶ 247), (3) PG&E was cooperating with Cal

26 Fire's investigation and suspending its dividend because of uncertainty from its potential liability

27 associated with the North Bay Fires (TAC ¶ 339), (4) numerous lawsuits were filed seeking

28 damages against PG&E alleging it caused the North Bay Fires (Exs. 88–89, 100–02; TAC ¶¶ 126–

28), (5) dozens of audit reports and thousands of thousands of CPUC findings of non-compliance (Exs. 31–63), and (6) that PG&E was responsible for the Butte Fire, the then-seventh most destructive wildfire in California history (TAC ¶¶ 21, 100–102).

**The RKS Claimants' Similar Argument Fails.** The RKS Claimants argue that PG&E did not disclose each of its fire safety violations. RKS Opp. at 66. However, that is not a basis for a securities fraud claim. "The fact that certain specific details of [PG&E's] alleged misconduct were not included in the [public disclosures] does not mean [the disclosures] were insufficient to convey the relevant information to the market." *See Kalobios*, 258 F. Supp. 3d at 1010–11.[22] Claimants cannot and do not dispute that the market was informed of PG&E's myriad fire safety violations. *See supra* Section III.B; *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc*., 759 F.3d 1051, 1060 (9th Cir. 2014) (holding that "any reasonable investor would have understood [a company's] statements as mere corporate optimism" where "'the market already knew' of the difficulties facing [the company] through . . . other sources").[23]

### 2. The Affiliated Ute Presumption of Reliance Does Not Apply

Claimants cannot establish reliance under *Affiliated Ute Citizens of Utah v. United States*, which applies only if securities claims are primarily based on alleged omissions, as opposed to affirmative misrepresentations.[24] 406 U.S. 128 (1972). The RKS Claimants argue that the *Affiliated Ute* presumption applies because it alleges that "PG&E's misstatements throughout the Alleged Relevant Period included omissions, in that they failed to inform investors of PG&E's safety and regulatory failures." RKS Opp. at 69–70. But this lone allegation does not make omissions the primary basis of the RKS Amendment, as is required to rely on the *Affiliated Ute* presumption. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig*.,

---

[22] The RKS Claimants attempt to distinguish *Kalobios* by claiming that "here, PG&E's misconduct was far deeper and more widespread than the partial disclosures relating to the North Bay Fires suggested," RKS Opp. at 67, but this is inaccurate for all the reasons discussed above, including the numerous and detailed CPUC reports.

[23] In any event, "absent more, a response or public denial is insufficient to dissipate storm clouds over a company once they have gathered." *Kalobios*, 258 F. Supp. 3d at 1011 (internal quotations omitted).

[24] PERA does not dispute that it is not entitled to this presumption and therefore waives any argument as to its applicability. *See generally* PERA Opp.

2 F.4th 1199, 1208–09 (9th Cir. 2021) ("[T]he *Affiliated Ute* presumption is limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative."); *see also ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1250 (C.D. Cal. 2015) (rejecting *Affiliated Ute* where plaintiff did not primarily allege omissions); *George v. California Infrastructure & Econ. Dev. Bank*, 2010 WL 2383520, at *6 (E.D. Cal. June 10, 2010) (same).

### 3. The Court Can, And Should, Determine The Sufficiency Of Individual Reliance Allegations On The Pleadings

The RKS Claimants rely on a single sentence in their 203-page pleading to support a theory of individual reliance: "In the alternative, [each RKS] Claimant relied on PG&E's statements and omissions, either generally or specifically, in making investment decisions as to PG&E securities." RKS Opp. at 68 (citing RKS Am. ¶ 621). This bare recitation of a legal element is plainly insufficient to satisfy even the most lenient of pleading burdens. To properly allege individual reliance, each RKS Claimant would need to allege, at a minimum, "that [it] was aware of [PG&E's] statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). In other words, each RKS Claimant must allege which specific statements it relied on, in connection with which purchase(s) or sale(s) of which securities. *See id.* The one-sentence conclusory statement in the RKS Amendment comes nowhere close to meeting this requirement.[25]

## IV. CLAIMANTS' SECURITIES ACT CLAIMS FAIL

### A. Securities Act Claims Based On The 2016 And 2017 Notes Are Time-Barred

Claimants' Securities Act claims based on the 2016 and 2017 Notes Offerings are barred by the one-year limitations period under 15 U.S.C. § 77m. *See* PERA Obj. at 77–80. In opposition,

---

[25] The RKS Claimants suggest that it would be "unfair" for the Court to rule on reliance without allowing "individualized reliance issues to be determined on their merits—*i.e.*, on the individual facts and circumstances of each claimant." RKS Opp. at 69. But in fact, it would be unfair to PG&E for the Court to allow deficient claims to proceed based on a single conclusory statement in a Proof of Claim, when the RKS Claimants had the opportunity to (but could not) plead facts in support of this element.

1    Claimants advance three arguments as to why these claims are not time-barred. Each argument

2    fails.

3        **The Partial Corrective Disclosure Theory Fails.** Claimants argue that because the

4    October 2017 North Bay Fires and December 20, 2017 dividend suspension were only partial

5    corrective disclosures, the statute of limitations did not begin to run. *See* PERA Opp. at 92; RKS

6    Opp. at 80. In other words, Claimants assert that the statute of limitations does not start to run

7    until the alleged truth is fully revealed. This is simply wrong as a matter of law. Despite

8    Claimants' mischaracterizations, *Edison* is directly on point. Just like the Claimants, the *Edison*

9    plaintiffs alleged a series of partial corrective disclosures beginning with the first of multiple fires.

10   *Compare Edison I*, 2021 WL 2325060 at *5 (series of partial corrective disclosures from 2017

11   through 2018), *with* PERA TAC at 94–117 (similar allegation), *and* RKS Am. at 130–158 (same);

12   *see also* RKS Opp. at 80 (incorrectly arguing that *Edison* involved a single corrective disclosure).

13   In *Edison*, the allegation that the "market understood that Edison had caused the [first] Fire" the

14   same day it ignited in 2017 was sufficient for the statute of limitations to start running on the day

15   of the first wildfire. *Edison I*, 2021 WL 2325060 at 7. And the *Edison* courts reached this

16   conclusion despite plaintiffs' additional allegations that wildfires in 2018, which were caused by

17   Edison, revealed additional concealed risks. *Id.* at *5, 7; *Edison II*, 2022 WL 822191 at *1.

18       Here, Claimants allege that not only did the public believe in October 2017 that PG&E

19   caused the wildfires, but also that "on October 13, 2017, . . . investor[s] underst[ood] PG&E was

20   ***financially responsible*** for the North Bay Fires." TAC ¶ 331 (emphasis added); RKS Am. ¶ 437

21   (same). Claimants' other allegations demonstrate that the market was more than sufficiently on

22   notice for the statute of limitations to start running:

23   • On "October 12, 2017, . . . the market began to understand that PG&E's ***safety regulation***

24       ***violations*** were likely a proximate cause of the North Bay Fires." TAC ¶ 328 (emphasis

25       added); RKS Am. ¶ 435 (same).

26   • On October 13, 2017, PG&E's "discussion of liability signaled to the market that at least

27       some of the North Bay Fires were ***caused by PG&E's negligence*** or worse." TAC ¶ 337

28       (emphasis added); RKS Am. ¶ 445 (same);

- Also on October 13, the *SF Gate* concluded that PG&E's "***vegetation management practices caused the North Bay Fires***." TAC ¶ 332 (emphasis added); RKS Am. ¶ 438 (same).

If the allegations in *Edison* were sufficient to trigger the statute of limitations, then the allegations here—which go much further—must be sufficient.

Claimants' attempts to undermine *Edison* rest on inapposite authorities. Citing *York Cnty. On Behalf of Cnty. Of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 465 (9th Cir. 2023), PERA[26] argues that the Ninth Circuit changed the standard for what constitutes the "discover[y]" of facts following the *Edison* decisions, such that the limitations period on PERA's claims did not begin to run following the North Bay Fires. PERA Opp. at 8–9 (arguing a claim is "discovered" and the limitations period begins to run when plaintiff "can plead . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss"). But contrary to PERA's mischaracterizations, the Ninth Circuit's decision in *HP* did not create a new standard for when the clock begins ticking on discovery of a claim. To the contrary, the *HP* court simply applied the standard already widely used in the Ninth Circuit, including the standard it applied in *Edison II*. *See, e.g.*, *Edison II*, 2022 WL 822191 at *1 (applying same standard as *HP*); *Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *20 (N.D. Cal. Jan. 17, 2017) (same). In other words, Claimants learned of the very facts that they believe provided them with a basis to plead "with sufficient detail and particularity" following the North Bay Fires. *See HP*, 65 F.4th at 465; *Edison II*, 2022 WL 822191 at *1.

The RKS Claimants advance a different argument. They suggest that this Court should depart from the Ninth Circuit's standard and instead rely on a single district court case which "infer[red]" (without citing any authority) that a series of partial disclosures "collectively . . . placed plaintiffs on notice." *See* RKS Opp. at 80 (citing *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1081 (N.D. Cal. 2010)). But the *Bare Escentuals* court never assessed whether the first event in a series of alleged partial corrective disclosures, such as a wildfire, could be sufficient for plaintiffs to "discover" their claims. *See generally Bare Escentuals*, 745 F. Supp.

---

[26] For simplicity, the Securities Act Plaintiffs (*i.e.*, the lead plaintiffs who allege violations of the Securities Act in the TAC) are referred to herein as PERA.

2d 1052. Here, the Court has *Edison II* as a roadmap for resolving this issue, and the Ninth Circuit

held the limitations period began to run on the date of the first wildfire.

**There Is No Tolling Here.** Next, the RKS Claimants argue that the statute of limitations

for its Securities Act claims was tolled because a separate plaintiff filed a class action complaint

alleging Exchange Act violations. *See* RKS Opp. at 78 (citing *Am. Pipe & Const. Co. v. Utah*, 414

U.S. 538, 554 (1974)). Notably, PERA (*i.e.*, the lead plaintiff responsible for the class complaint)

has never raised this erroneous argument. A pending class action only tolls causes of action

actually advanced in the class complaint. *E.g.*, *Williams v. Boeing Co.*, 517 F.3d 1120, 1136 (9th

Cir. 2008) ("[T]he tolling rule does not [apply to] . . . different or peripheral claims."); *In re TFT-*

*LCD (Flat Panel) Antitrust Litig.*, 2013 WL 254873, at *2 (N.D. Cal. Jan. 23, 2013) (*American*

*Pipe* does not "allow[] tolling for claims that were not asserted in the class action"). The RKS

Claimants' citation to *Crown, Cork & Seal v. Parker* for the proposition that tolling extends to the

claims "concerning the same evidence, memories, and witnesses," was a citation to a *concurring*

opinion, not binding law. RKS Opp. at 79 (*citing* 462 U.S. 345, 355 (1983) (Powell, J.,

concurring)). And as Justice Powell explained in his concurrence, "[i]t is important to make certain

. . . that *American Pipe* is not abused by the assertion of claims that differ from those raised in the

original class suit." *Id.* Tellingly, the RKS Claimants cite no instance in which a pending lawsuit

alleging only Exchange Act violations tolls the statute of limitations for a not-yet-filed lawsuit

alleging Securities Act violations. *See* RKS Opp. at 78–79 (citing *MYL Litig. Recovery I LLC v.*

*Mylan N.V.*, 2020 WL 1503673, at *7–8 (S.D.N.Y. Mar. 30, 2020) (claims brought under § 10(b)

of the Exchange Act tolled claims brought under § 18 of the Exchange Act)).[27]

**Notice, Not Damages, Is Dispositive.** Finally, PERA argues that the limitations period

did not begin to run until after the Camp Fire because there was no "drop in bond prices" during

---

[27] In any event, the RKS Claimants' tolling argument applies *at most* to only one of the Notes Offerings (the 2017 Offering with CUSIP No.: 694308HS9). A class action only tolls the limitations period for claims that the named plaintiff has standing to pursue. *See, e.g.*, *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 2010 WL 4117477, at *5 (N.D. Cal. Oct. 19, 2010). The plaintiffs in the original Exchange Act actions alleged only purchases of PG&E common stock, *see* Exs. 88, 89, and the only at-issue note PERA happened to purchase was CUSIP 694308HS9. *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 963 (N.D. Cal. 2010) ("To have standing . . . , a plaintiff must have purchased a security actually issued in the offering[.]") (quotations omitted).

1   the North Bay Fires, and therefore it could not have "plead[ed] that fact with sufficient detail." *Id.*

2   at 91 (citing *HP*, 65 F.4th at 465). But just a few pages later, PERA concedes that "damages are

3   not an element of Securities Act claims." PERA Opp. at 101. PERA cites no authority suggesting

4   that claims under Section 11 only begin to accrue once there is a drop in bond prices, and courts

5   consistently hold that the "the one-year time period does not reset simply because additional

6   information is revealed that could make for a stronger claim." *Thomas v. Magnachip*

7   *Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1054 (N.D. Cal. 2016) (dismissing Section 11 claims

8   on statute of limitations grounds); *see also In re YogaWorks, Inc. Sec. Litig.*, 2019 WL 13399628,

9   at *3 (C.D. Cal. Dec. 3, 2019) (dismissing Section 11 claims on statute of limitations grounds

10  despite stock drops after limitations period began to run).

11           **B.    Claimants Have Not Alleged Any Materially False Statements Or Omissions**

12          PG&E's Claims Objections explained, in great detail, why the Claimants failed to allege

13  false statements under the Securities Act for the same reasons that they failed to allege false

14  statements under the Exchange Act. PERA Obj. at 80–85. Claimants' Oppositions only confirm

15  that these statements should be dismissed for the same reason. PERA argues that PG&E's

16  Securities Act statements were "materially misleading" because they did not disclose "widespread

17  safety deficiencies . . . [that] had already increased the risk of wildfires." PERA Opp. at 70. This

18  is substantively identical to PERA's Exchange Act argument that "[w]hile PG&E disclosed some

19  risk of wildfires, it . . . never disclosed how the risk was exacerbated by numerous, widespread,

20  known and unmitigated safety violations." *Id.* at 60.[28] Similarly, the RKS Claimants argue that

21  PG&E's Securities Act statements concealed "the true extent of wildfire liability risk," RKS Opp.

22  at 81, which is just like its argument that the Exchange Act Statements concealed "the true extent

23  of . . . wildfire-related liabilities," *id*. at 75. And because Claimants allege a "unified course" of

24

---

25  [28] PERA's argument that the Offering Documents were materially misleading because they
    "'speak[] entirely of as-yet-unrealized risks' when the risks have 'already come to fruition'" is

26  nonsensical. PERA Opp. at 69 (quoting *Amalgamated Bank v. Facebook, Inc. (In re Facebook,
    Inc., Sec. Litig.)*, 87 F.4th 934, 949–50 (9th Cir. 2023)). Here, Claimants do not allege the risk

27  (*i.e.*, a fire) had secretly materialized prior to PG&E's statements. And compliance issues that
    could affect a wildfire are not "materialized risks." *In re Enovix Corp. Sec. Litig.*, 2024 WL

28  349269, at *14 (N.D. Cal. Jan. 30, 2024) (granting motion to dismiss because the materialization
    of "the risks of problems" is not materialization of the risk itself under *Facebook*).

conduct between claims brought under the Exchange Act and Securities Act, their claims "sound in fraud" and are therefore subjected to heightened pleading standards. *See* PERA Opp. at 66 (citing *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009)).

Claimants' appeals to Regulation S-K do not change this result. Claimants allege that PG&E concealed various "trends," ranging from "serious safety problems," PERA Opp. at 77, to "widespread safety violations," *id.* at 78, and even the "failure to comply with federal and California laws and regulations relating to vegetation management, fire safety, and maintenance and repair of its infrastructure," RKS Opp. at 82. But as the Supreme Court recently held, "[p]ure omissions are not actionable under Rule 10b–5(b)," even if "Regulation S–K requires companies to disclose [this] information." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 257 (Apr. 12, 2024). And even if Claimants had alleged a misleading statement (as opposed to a pure omission which is not actionable under *Macquarie*), Claimants do not contest that information about PG&E's compliance, safety problems, and regulatory violations were published by the CPUC during the Alleged Relevant Period. Just like Claimants' Exchange Act claims, the Securities Act claims are defeated by the CPUC's public findings of non-compliance.[29]

### C. Claimants Have Not Pled Economic Loss Or Damages Required For Their Section 11 Claims

Next, Claimants' Securities Act claims fail because they cannot demonstrate they suffered any harm. Investors in PG&E debt securities—just like investors in PG&E stock—were warned about the very risks that ultimately materialized. PERA Obj. at 84–86. Despite Claimants' suggestions to the contrary, PERA Opp. at 98–100, RKS Opp. at 82–83, Securities Act claims are routinely dismissed where "the facts as alleged by plaintiffs, and documents which the court may take judicial notice of, establish the affirmative defense as a matter of law." *In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009).[30] While PERA claims that it only

---

[29] PERA's claim that PG&E waived falsity arguments for the alleged Securities Act statements is incorrect. PERA Opp. at 68–69. PG&E thoroughly explained why Claimants failed to allege an actionable misstatement or omission in the relevant offering documents. PERA Obj. at 80–85.

[30] PERA's claim that the negative causation defense improperly relies on allegations that are not part of the record on the Claims Objections, PERA Opp. at 99, fails for the reasons set forth in PG&E's Request for Judicial Notice ("RJN") and RJN Reply.

needs to demonstrate that "the misrepresentation touches upon the reasons for an investment's decline in value," PERA Opp. at 100–01, the "Ninth Circuit has not adopted the materialization of the risk approach." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1122 n.5 (9th Cir. 2013). Instead, the Ninth Circuit's traditional approach to testing whether a misstatement caused loss is, in part, asking if the revelation "was a ***substantial factor*** in causing a decline in the security's price." *Id.* at 1123 (emphasis added). Here, since all of the risks that Claimants allege were omitted were public, no subsequent disclosure was a substantial factor in causing declines in the prices of the relevant securities. This mandates dismissal of the Securities Act claims.[31] *See* PERA Obj. at 86–87.

Furthermore, Claimants cannot plead damages or economic losses for the additional reason that they cannot show any depreciation in the *values* (as opposed to the prices) of the securities as a result of the alleged misstatements. Acknowledging that they have failed to plead any damages, Claimants seek to evade the requirement entirely, arguing that "[b]ecause damages are not an element of Securities Act claims . . . PG&E has no basis for dismissal on this basis." PERA Opp. at 101–02; RKS Opp. at 84–85. But while damages may not be an element of a Section 11 claim, "a Plaintiff cannot maintain a section 11 cause of action unless he was harmed by the omission or misrepresentation." *Campton v. Ignite Rest. Grp., Inc.*, 2013 WL 12140291, at *4 (S.D. Tex. Sept. 3, 2013) (granting dismissal of Section 11 claim due to failure to allege damages); *see also Terenzini v. GoodRx Holdings, Inc.*, 2022 WL 122944, at *3 (C.D. Cal. Jan. 6, 2022) (dismissing claim where Plaintiffs "suffered no loss and as such have no damages available").[32] Claimants have failed to allege that they were damaged or harmed because their Proofs of Claim lack any

---

[31] PERA asserts that PG&E must show negative causation "for every false statement," but the only support it offers for this proposition is a quote discussing loss causation for Exchange Act claims. *See Interlink*, 2008 WL 4531967, at *5. In any event, PG&E has made clear that investors were warned of the very risks that materialized with respect to each alleged misstatement. *See supra* Section III.C.

[32] As these cases show, despite Claimants' contentions to the contrary, PERA Opp. at 101–02, RKS Opp. at 84–85, dismissal on this basis is appropriate at the pleading stage.

1  allegation that the value of their debt securities depreciated as a result of the alleged

2  misstatements.[33]  PERA Obj. at 87–88.

3         D.      **PERA Does Not Have Standing To Assert Claims Based On The April 2018 Offering**

4

5          Finally, PERA argues that it has standing to assert claims based on the Exchange Offer

6  because the *Levi Straus* case cited by PG&E is purportedly the minority rule.  *See* PERA Opp. at

7  96.  But the only case PERA cites to argue that *Levi Straus* is in the minority reached the exact

8  opposite conclusion:  "The **majority** of courts have held [claimants] who acquire their securities

9  in an . . . exchange cannot bring § 11 claims.  [citing] *In re Levi Strauss*[.]"  *Loritz v. Exide Techs.*,

10  2014 WL 4058752, at *14 (C.D. Cal. Aug. 7, 2014).  The Court should follow the "majority" rule

11  and dismiss these claims.

12  **V.     CERTAIN CLAIMANTS HAVE RELEASED THEIR CLAIMS**

13          As PG&E explained in the Claims Objections, certain identified Claimants released their

14  securities claims under the Plan, in exchange for the Plan's treatment of the Senior Utility Notes.

15  *See* ECF No. 14200 at 91; ECF No. 14203 at 34.[34]  Neither PERA nor the RKS Claimants deny

16  that the holders of Utility Senior Note Claims agreed under the Plan to release their securities

17  claims in exchange for the treatment of the Utility Senior Note Claims under the Plan.  (The Plan

18  provides either full payment or reinstatement of the notes.)  Nor can Claimants overcome the

19  straightforward application of the Plan's clear and express release provisions.[35]

20

21

---

22  [33] While PERA claims it alleged that certain claimants purchased "bond[s] at inflated prices, and that the market prices of those bonds thereafter declined," PERA Opp. at 102, as explained in the PERA Objection, market price is not an appropriate reflection of the value of debt securities where, as here, the market value was artificially depressed due to the market's panicked response to an adverse event.  PERA Obj. at 87–88.  Indeed, PERA admits that Ninth Circuit courts have held that "[v]alue . . . is not necessarily equal to 'price.'"  PERA Opp. at 102–03.  That is exactly the case here, and neither PERA nor any other Claimant has substantively responded to this point.

26  [34] Capitalized terms used in Section V but not defined herein have the meanings defined in the Plan.

27  [35] While the RKS Claimants suggest "PG&E d[id] not specify which claims" are subject to the Release, RKS Opp. at 87 n.28, PG&E clearly identified each claim that is "Barred by Release" in Exhibit A to the RKS Objection, *see* Dkt. No. 14203, Ex. A at 86–98.  *See also* Dkt. No. 14205 (Ferrante Decl.) ¶¶ 6–7.

### A.     **PERA's Arguments Fail**

PERA first argues that the Plan provides treatment for claims, not claimholders, and therefore the release does not bar the Claimants' claims. PERA Opp. at 103. This argument distorts the plain language and effect of the release. The release is an agreement between *parties*: the Releasing *Parties* and the Released *Parties*. If a party is a Releasing Party—which the "holders of Senior Utility Note Claims" indisputably are, *see* Plan § 1.180—then that party can no longer assert claims covered by Section 10.9(b), which include Claimants' securities claims here.

PERA also ignores that Section 10.9(b) includes claims "based on or relating to or in any manner arising from . . . the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan . . . ." Plan § 10.9(b); *see also id.* § 1.21 (defining Cause of Action to include any claim "based in whole or in part upon any act or omission or other event occurring on or prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date"). This language clearly includes the release of the present securities claims. *See In re PG&E Corp.*, 2020 WL 9211213, at *3 (Bankr. N.D. Cal. Oct. 22, 2020) ("*Elliott I*") (noting the scope of the release is "far-reaching," with no "limitation on the extent and breadth of what has been released"), *aff'd sub nom.*, 2022 WL 794815 (N.D. Cal. Mar. 15, 2022) ("*Elliott II*"), *aff'd sub nom.*, 2023 WL 2064520 (9th Cir. Feb. 17, 2023) ("*Elliott III*").

PERA next argues that the securities claims fall within the release's narrow exception for "rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents."[36] That argument fails for the same reasons articulated by this Court, the District Court, and the Ninth Circuit in the *Elliott* matter. In *Elliott*, the noteholders argued—consistent with the argument now made by PERA—that because they were asserting administrative claims that are specifically treated under Section 2.1 of the Plan, the claims were excepted from the release as "rights to enforce the Plan." In affirming this Court's decision to disallow the claim as barred by the release, the District Court recognized that the noteholders were "not seek[ing] to enforce a cause of action that [arose] out of the breach of a specific provision of the Plan itself," but rather

---

[36] The RKS Claimants do not argue that this or any other exception applies. *See* RKS Opp. at 86–87.

one "that arose out of the alleged breach of the Noteholder RSA's Best Efforts Provision." *Elliott II*, 2022 WL 794815, at *8. "Because [their] claims [arose] from the Debtors' alleged breach of the Noteholder RSA, and not the Plan, they [were] not based in rights to enforce the Plan or the Plan Documents." *Id.* at *9. The Ninth Circuit affirmed. *Elliott III*, 2023 WL 2064520, at *4. Claimants' securities claims do not fall within this narrow release exception for the same reason: they do not arise out of an alleged breach of "a specific provision of the Plan itself," *Elliott II*, 2022 WL 794815, at *8, but instead are prepetition claims arising under the federal securities laws.[37]

## B. The RKS Claimants' Arguments Similarly Fail

The RKS Claimants do not dispute that the Claimants who held Utility Senior Notes through the Effective Date are "holders of Utility Senior Note Claims" and are therefore "Releasing Parties" under Section 1.180 of the Plan. Instead, the RKS Claimants do mental gymnastics to argue that they released their claims "only 'in their capacities as' Utility Senior Note Claims holders, not in their capacities as holders of other types of claims." RKS Opp. at 86. This argument has no support in either the plain language of the Plan or in relevant law.

The phrase "in their capacities as such" (on which the RKS Claimants' argument rests), when used in the context of a release, refers to one's legal capacity to release claims *on behalf of another*. For example, an agent or fiduciary that releases claims on behalf of only itself does not release claims on behalf of any principals it may serve. *See, e.g.*, *Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351 F. Supp. 2d 152, 155 (S.D.N.Y. 2004) (interpreting "in their capacity as such" to draw a distinction between fiduciaries being sued only in their capacity as fiduciaries, and not in their individual capacities). That is precisely the case here. Parties subject to the relevant

---

[37] That the Plan provides treatment on account of "Allowed" securities claims makes no difference for the same reason that Section 2.1's preservation of "allowable" administrative expense claims made no difference in the *Elliott* matter. The Plan only contemplates paying on an "Allowed" securities claim. *See* Plan § 4.14 (providing treatment for "each holder of an *Allowed* HoldCo Rescission or Damage Claim") (emphasis added); *see also id.* § 1.7 (defining "Allowed"). As the Bankruptcy Court, District Court and Ninth Circuit have all held, if a claim is released under the Plan it will not be an "Allowed Claim" and therefore could not be preserved in any event. *See Elliott II*, 2022 WL 794815, at *11 (claims were not allowable "because they are expressly released by Section 10.9(b)."); *see also Elliott III*, 2023 WL 2064520, at *3 ("To determine if a claim is allowable, the district court and bankruptcy court properly consulted other Plan provisions, including the Release Provision.").

1   Plan provisions released all claims they possessed, but did not necessarily release claims they could

2   assert on behalf of a third party who was not also subject to the release. Indeed, the Plan is clear

3   that the holders of Utility Senior Note Claims, acting in their capacities as such, released *all* of

4   their claims.

5         The Plan demonstrates that "capacity" has precisely this meaning. Where the plan

6   addresses trustees and fiduciaries, it expressly defines those parties as acting only in their

7   "capacities" as such. For example, the Plan defines "DIP Facility ***Agents***" to mean "JPMorgan

8   Chase Bank, N.A., *solely in its capacity as* administrative agent under the DIP Facility Documents,

9   and Citibank, N.A., *solely in its capacity as* collateral agent under the DIP Facility Documents."

10  Plan § 1.43 (emphasis added); *see also id.* § 1.117 (defining "HoldCo Term Loan ***Agent***" as

11  "Mizuho Bank, Ltd. *solely in its capacity as* administrative agent under the HoldCo Term Loan

12  Documents") (emphasis added).

13        In contrast, the Plan uses no language about "capacities" with respect to other Releasing

14  Parties. For example, the Plan's definitions of DIP Facility Lenders (Section 1.47), Exit Financing

15  Lenders (Section 1.67), and HoldCo Revolver Lenders (Section 1.114) do not contain any

16  "capacities" language. Including limiting "capacity" language as to some Releasing Parties who

17  are trustees or fiduciaries and failing to include similar limitations as to other "Releasing Parties"

18  makes clear that such language is directed to fiduciaries and trustees to ensure the releases only

19  apply in their proper legal capacities.

20        Each "Releasing Party" listed on Exhibit A, ECF No. 14200-4, owned Utility Senior Notes.

21  And each of these Claimants owned Utility Senior Notes Claims in the same legal capacity in

22  which they possessed other claims against the Reorganized Debtors. Accordingly, the securities

23  claims asserted by the holders of Utility Senior Note Claims are barred by the Plan's release

24  provision.

25  **VI.**    **CONCLUSION**

26        For the foregoing reasons, and the reasons set forth in PG&E's Claims Objections,

27  Claimants have failed to state a claim as a matter of law as to all of their claims under the Exchange

28  Act and Securities Act, and their Proofs of Claim should be dismissed with prejudice.

1  Dated:  May 14, 2024                    Respectfully submitted,

2                                          **WEIL, GOTSHAL & MANGES LLP**
                                           **LATHAM & WATKINS LLP**
3                                          **KELLER BENVENUTTI KIM LLP**

4
                                           By:  /s/ *Joshua G. Hamilton*
5

6                                               Joshua G. Hamilton

7                                          Attorneys for Debtors and Reorganized Debtors

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28