William B. Abrams
end2endconsulting@gmail.com
625 McDonald Ave.
Santa Rosa, CA, 95404
Tel: 707 397 5727



FILED

JUN -6 2024

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

    -and-

PACIFIC GAS AND ELECTRIC
COMPANY,

              Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors

\* *All papers shall be filed in the lead case,
No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administrated)

**MOTION OF WILLIAM B. ABRAMS
PURSUANT TO FEDERAL RULE OF
BANKRUPTCY PROCEDURE 2004
FOR ENTRY OF AN ORDER
AUTHORIZING DISCOVERY AND
TRUST COMPLIANCE WITH
COURT ORDERS**

**Response Deadline:**

June 20, 2024 (Pacific Time)

**Hearing If Order Granted:**

June 25, 2024 (Pacific Time) or as
determined by the Court

**Related Documents:** Dkt. 12682, 12440,
12527, 12593

## PRELIMINARY STATEMENT

William B. Abrams ("**Abrams**") as a Pro Se Claimant, hereby submits this *Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Trust Compliance with Court Orders* (the "**Motion**" or "**Motion for Discovery**") pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Bankruptcy Rule 2004-1(a) and to request the enforcement of the "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682]. (the "**Order**" or "**Discovery Order**"). This Order granted Abrams' prior Motion for Discovery "*in part*" and required that the Trustee "*identify any assigned claims*" and to specify "*the gross amount of realized, the cost in attorneys' fees and expenses of the effort, and the net result of the benefit to the Trust.*" This Order that provided a limited view into "*discrete areas identified by Mr. Abrams*" has only been selectively adhered to by the Trustee. Specifically, the Trustee has not posted unredacted retention agreements pertaining to those cases that are "*finally resolved*" and has not fully complied with the Order to post to "*the FVT website any agreement, order, or other document memorializing the outcome.*" It was specifically ordered that the Trustee should "*identify specifically any such contracts awarded to any member of the TOC.*" Moreover, the heavily redacted versions of these agreements must be released in fully unredacted form as the prior objections raised by the Trustee indicating that such a release might "*likely aid potential defendants if disclosed*" is no longer applicable for resolved matters.

This lack of compliance with Court orders and the growing concerns and questions from victims regarding Trustee lobbying actions to make up the apparent ~30% shortfall is prompting this Discovery Motion. The Court has made clear that despite the Trustee's fervent objections, "*Federal Rule of Bankruptcy Procedure 2004 remains available*" to Abrams and other parties "*as a vehicle for that exchange of information.*" Therefore, Abrams requests that the Court enter an Order (*See* **Exhibit A: Proposed Order**) authorizing service of further discovery requests and enforcement of the prior Discovery Order. In support of this Motion, Abrams relies on the *Declaration of William B. Abrams in Support of the Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Trust Compliance with Court Orders* (the "**Abrams Declaration**") filed contemporaneously herewith, and respectfully states as follows:

# JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 2004-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"), Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan, and Section 1.6 and Section 8.20 of the Fire Victim Trust Agreement. Under Section 11.1(u) of the Plan, the Court retained jurisdiction "[t]o hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing," "[t]o take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation," "[t]o hear and determine any rights, claims, or Causes of Action held by or accruing to ... the Fire Victim Trust **pursuant to the Bankruptcy Code or any federal or state statute or legal theory**," and "[t]o hear and determine any dispute involving the Wildfire Trusts, including but not limited to the interpretation of the Wildfire Trust Agreements." Plan at § 11.1(i), (k), (t) & (u).[1] (emphasis added).

Section 1.6 of the Fire Victim Trust Agreement provides that the "Bankruptcy Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the [Fire Victim] Trust." Section 8.20 of the Fire Victim Trust Agreement provides that the "provisions of the Trust

---

[1] Under Section 11.1 of the Plan, the Court also retained "jurisdiction ... of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: ... (c) [t]o ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (d) [t]o consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claims; ... (m) [t]o determine such other matters and for such other purposes as may be provided in the Confirmation Order; ... (p) [t]o hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; ... (r) [t]o determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing ... (v) [t]o hear any other matter not inconsistent with the Bankruptcy Code."

Documents shall be enforced by the [Bankruptcy Court]." This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **BACKGROUND**

1. On January 29, 2019 (the "**Petition Date**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company ("**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). On February 12, 2019, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the United States Trustee appointed an Official Committee of Tort Claimants (the "**TCC**"). Pursuant to the Confirmation Order entered by this Court on June 20, 2020, PG&E's Plan was approved and confirmed under section 1129 of the Bankruptcy Code.

2. On July 1, 2020 the PG&E Fire Victim Trust Agreement was effective and implements certain of the terms of the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020. The FVT Agreement Section 5.8(b) states "*The Trustee may retain and reasonably compensate the Trust Professionals, the cost of which shall be paid as a Trust Expense, subject to the terms of this Trust Agreement, including the Budget.* The Fire Victim Trust Agreement Section 6.2 states "*The members of the TOC shall serve in a **fiduciary capacity** representing current holders of Fire Victim Claims in the administration of the Trust. **The TOC shall not have any fiduciary duties or responsibilities to any party other than holders of Fire Victim Claims**, provided that the TOC shall be entitled to the protections and limitations of duties provided for herein even with respect to the holders of Fire Victim Claims.*" Subsequently, on June 29, 2020 Attorneys for the Trustee and the Trust Claims Administrator filed the "*Notice of Appointment of Fire Victim Trust Oversight Committee in Accordance with Confirmation Order [Dkt. No. 8053] Filed by Fire Victim Trustee*" [Dkt. 8195] (emphasis added).

3. On October 16, 2020, the Trustee executed an engagement letter with "*Cotchett, Pitre & McCarthy, LLP, Corey, Luzaich, de Ghetaldi & Riddle, LLP, Walkup, Melodia, Kelly & Schoenberger, Dreyer, Babich, Buccola, Wood & Campora, LLP, Andrews & Thornton, A Law Corporation, and Greenberg Gross LLP (together, "**VM Firms**").* The Trustee had indicated prior

that the selection of these firms and others was through an open and competitive process but it was later revealed through subsequent discovery that the selection of these firms was not through a competitive or open process.

4. On May 23, 2022, Abrams filed and served the "*Motion of William B. Abrams Pursuant to Federal Rules of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of The Fire Victim Trust*" [Dkt. 12440] (the "**Motion for Trust Discovery**" or the "**Abrams Prior Motion for Discovery**"). This motion requested the Court's approval for discovery procedures (hearings and interrogatories) for victims given certain actions and conduct of Justice Trotter in his capacity as Trustee as well as the actions and conduct of his designees. This call for transparency and accountability was joined by the Butte County Board of Supervisors [Dkt. 12609], the Sonoma County Board of Supervisors [Dkt. 12670] and other PG&E wildfire survivors.

5. On June 7, 2022, there was a prehearing in which the merits of the case were not argued and that point was reiterated by Mr. Molton stating "*Clearly, and I read your honor's order and your honor's directive this morning that your honor does not want us getting into merits or discussion of merits today.*" However, it was also stated by the Court that "*I don't want to mislead you, I'm not going to rule out that perhaps the possibility that the trustee is going to have to sit and be asked questions by Mr. Abrams.*" [Dkt. 12495].

6. On June 21, 2022, the Trustee filed the "*Objection of Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust*" [Dkt. 12527]. Within this objection, the Trustee cited Delaware Trust Law as well as exculpations and other protections negotiated prior to plan confirmation as justification for why the Trustee should not have to provide discovery pursuant to Bankruptcy Rule 2004. However, the Trustee did disclose that "*the Trust has retained a firm for lobbying activities for fiscal year 2022 **and its efforts to seek additional value through legislative action are continuing**.*" In closing the Objection stated, "*The Fire Victim Trustee respectfully requests that the Court sustain this Objection, deny the Motion in its entirety and grant such other and further relief as may be just.*" Additionally, within this objection the Trustee announced the "***imminent retirement of Justice John J. Trotter (Ret.) and the transition to Ms. Cathy Yanni as Trustee***..." (emphasis added)

7.     On July 6, 2022, Abrams filed in accordance with the Court's order the *"William B. Abrams Reply to the Objection of the Fire Victim Trustee Pursuant to Fed. R. Bankr. 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust"* [Dkt. 12593]. Within this Reply Abrams stated that *"these 'additional disclosures' don't seem to be intended by the Trustee to address the issues raised within the Motion for Trust Discovery. However, this information does lead to more questions and not less that are deserving of discovery pursuant to Bankruptcy Rule 2004"* and concluded that *"it is clear that these fact patterns and the manner in which the Trustee provided notice of his resignation provide more than sufficient 'good cause' to seek discovery to ascertain the degree to which the Trustee and others employed by the Fire Victim Trust have engaged in reasonable 'conduct' and 'good faith' acts in keeping with both the Fire Victim Trust Agreement and applicable law."*

8.     On August 2, 2022, the Court issued the *"Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust"* (the **"Discovery Order"**) [Dkt. 12682]. Within this order, the Court exercised and reiterated its authority related to Article 1.6 of the Trust agreement stating that *"this Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust…"* The order continued by stating that *"What is preserved for examination pursuant to this order are the following three discrete areas identified by Mr. Abrams as the trust oversight and litigation activities; lobbyist activities; and administration and litigation expenses."* Also, within this order the Court made clear that *"**More specifically, Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information.**"* (emphasis added)

9.     On August 24, 2022, by order of the Court and in Response to the Abrams' discovery motion, the Trustee caused to file the "Redacted Documents to Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements **Until Litigation Related to such Retention Agreements is Finally Resolved**" [Dkt. 12874] (emphasis added). The following were the 11 heavily redacted agreements contained within this response:

- 10/13/2020 – "DO Retention Agreement of PG&E Fire Victim Trust in Litigation of Certain Assigned Claims"
- 12/18/2020 – "BMC Retention Agreement of PG&E Fire Victim Trust in Litigation of Certain Assigned Claims"

- 1/27/2021 – Amended BMC Retention Agreement (Certain Third-Party Vegetation Management Creditors)
- 3/11/2021 - BMC Retention Agreement between Hon. John K. Trotter (Ret.), Trustee and Gilbert LLP
- 3/11/2021 – VM Retention Agreement between Hon. John K. Trotter (Ret.) Trustee and Gilbert LLP
- 7/1/2022 – First Amendment to Engagement Letter Between Andrews & Thorton, A Law Corporation and Greenberg Gross LLP
- 1/1/2022 - Amended BMC Retention Agreement (Accenture)
- 1/1/2022 – Amended BMC Retention Agreement (KPMG)
- 1/1/2022 – Amended BMC Retention Agreement (McKinsey)
- 1/1/2022 – Amended BMC Retention Agreement (PwC)
- 1/1/2022 - Amended BMC Retention Agreement (Oliver Wyman)

10.     On August 29, 2022, the "Order Granting Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements **Until Litigation Related to such Retention Agreements is Finally Resolved**" (the "**Discovery Order**") was filed by the Court [Dkt. 12884] (emphasis added).  Within this order it directed "*that the unredacted copies of the Retention Agreements provided to the Court shall remain under seal and confidential and not be made available to anyone without the consent of the Trustee or further order from the Court **until such time as the litigation to which the Retention Agreements apply has been finally resolved by judgment, arbitration, mediation or otherwise***" (emphasis added).  The Court also reiterated jurisdiction relative to this discovery motion by stating that "*this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.*"

11.     On February 10, 2023, The Trustee filed the "*Fire Victim Trust's Notice of Final Resolution of Assigned Claims*" [Dkt. 13502].  This "*Final*" notice included the "Settlement and Release Agreement" which appears to have been executed AFTER Abrams filed his Motion for Discovery given that the agreement referenced Abrams prior discovery motion and stated that "*this Agreement and its terms shall remain confidential until disclosed to the public.  In the event the FVT determines it is in the best interest of its beneficiaries, the FVT may seek to maintain the fact and/or terms of this Agreement as confidential consistent with the Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust (Docket No. 12682) (the "Disclosure Order").*"

12. On March 10, 2023, The Trustee filed the "Fire Victim Trust's Notice of Final Resolution of Assigned Claims" [Dkt. 13607]. This *"Final"* notice included a heavily redacted version of "VM Firms' Engagement Letter." Among many other redacted portions of this agreement the name of the "Authorized Agent" was also redacted. However, the engagement letter did state that "*the Trust acknowledges that the Firms, **pursuant to a separate agreement by and between the Firms** have determined to organize themselves into the following **consortiums**... The "Walkup Consortium" consisting of Cotchett, Pitre and McCarthy LLP; Walkup, Melodia, Kelly and Schoenberger; Dryer Babich Baccola Wood Campora, LLP and Corey, Luzaich, De Ghetaldi and Riddle LLP"... The "Andrews Consortium" consists of Andrews and Thornton, A Law Corporation and Greenberg Gross LLP... The extent to which work performed in furtherance of the Representation hereunder is allocated to any of the Firms or either of the above mentioned consortiums shall be governed by **separate agreement by and between the Firms**...*" (emphasis added). Within this retention agreement the Trustee inexplicably **redacted portions of the agreement related to indemnifications** but did state that "*the Firms acknowledge and agree that, except as to the Trust's indemnity obligations arising out of or related to the Trust's fraud or intentional misconduct, the Trust shall not be obligated to satisfy any indemnity obligations...*"

13. On April 27, 2023, the Trustee filed the "Fire Victim Trust's Supplemental Notice Regarding McKinsey Settlement" [Dkt. 13689]. Within this notice, the Trustee indicated FVT expenses associated with "consultant," "Financial Analyst," "Mediator," and "Insurance Counsel" but did not express the firms or individuals paid through the FVT.

14. On June 6, 2023, the Trustee filed the "Fire Victim Trust's Supplemental Notice Regarding Settlement with Certain Vegetation Defendants" [Dkt. 13815]. Within this supplemental notice the Trustee stated "*effective January 27, 2021, between the Trust and the firms Cotchett, Pitre & McCarthy, LLP, Corey, Luzaich, de Ghetaldi & Riddle, LLP, Walkup, Melodia, Kelly & Schoenberger, Dreyer, Babich, Buccola, Wood & Campora, LLP, Andrews & Thornton, A Law Corporation, and Greenberg Gross LLP (together, "**VM Firms**") in connection with the Assigned Claims and posted the VM Firms' Engagement Letter on the Fire Victim Trust Website at www.firevictimtrust.com. Pursuant to the VM Firms' Engagement Letter, the VM Firms shall be entitled to attorneys' fees as specified in the VM Firms' Engagement Letter.*" This notice identified $2,659,338.99 in expenses charged against the corpus of the Fire Victim Trust which included

$925,023.17 in "Physical Evidence Storage" and other consultant and expert fees without any indication of the individuals or firms that received these payments. There was also $37,034,945.42 in "attorney's fees" without any indication regarding the division of those fees between the various "VM Firms."

Based upon court orders indicating that "*Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information*" and in light of new evidence related to the "acts and conduct" of Cathy Yanni, Trustee, Members of the Trust Oversight Committee and other Trust contractors and employees, Abrams respectfully puts forward the following arguments in support of this discovery motion:

## ARGUMENTS

### I. Nondisclosure and Alteration of "Documents Archive" available to Victims

The Fire Victim Trustee has removed certain documents and altered the case history available to victims through the Fire Victim Trust Portal. Victims have noted that these surreptitiously removed documents include certain letters from the Trustee and associated video messages that have been the subject of Abrams and other parties objections to Fire Victim Trust actions. The removal of these documents seems to be designed to whitewash the actions of the Trustee or at a minimum to provide a false narrative to victims. Specifically, in relation to this Discovery Motion, the June 21, 2022 "Letter from the Trustee of the Fire Victim Trust" has been hidden from the list of available documents through the site. This document was also referenced in the Court's Discovery Order which stated that "*the Trustee repeated his description of this proposal and interview process*" in his *June 21, 2022 letter*."[2] Why did the Trustee remove this letter from the "documents archive" after the Court Order referenced this letter? The Court should take notice of the "FVT Documents Archive" screenshot attached to this Motion for Discovery and note that while other letters from the Trustee remain posted to the portal this June 21, 2022 letter has been removed (*See* **Exhibit B**). This letter described (1) the "open and public" selection process for counsel assigned to litigation (2) how vegetation management litigation "have now been consolidated into a master case" and explained that (3) "no Trust money is used to pursue these [vegetation management] claims."

---

[2] See August 2, 2022, "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682], pg. 10, footnote 2.

These statements along with a description of Justice Trotters' "transition announcement" were included within this letter and could reasonably be construed as false and/or misleading which might also be the reason this letter and other documents were removed from the FVT document archive. Other documents removed from the portal include certain descriptions of the claims resolution process that have been challenged within this Court. The Trustee should be required to provide a list of the documents that have been removed from the FVT Portal and explain why these actions were taken on behalf of the victim beneficiaries. This discovery will help victims understand whether the removal of this information from the FVT document archive was done in "good faith", in keeping with the Fire Victim Trust Agreement and the best interests of the victim beneficiaries or if these actions and the costs associated with these actions were done to primarily serve the interests of the Trustee and Trust Oversight Committee Members.

## II. Third-Party Litigation and Related Retention Agreements

Certain attorneys and their associated law firms now serving on the Trust Oversight Committee, were awarded lucrative litigation agreements by the Debtor and through the Fire Victim Trust. The Trustee had earlier described that these firms were selected based upon a "competitive process." However, subsequent discovery through responses to Abrams' discovery motions demonstrates that the selection of these firms was far from competitive and shown to be more collaborative or collusive in nature to provide significant financial incentives for certain law firms above and beyond the ~30% that they receive from their victim clients. This subsequent discovery will assist victims and provide some understanding regarding the degree to which these derivative cases have been administered in "good faith" or "bad faith" in accordance with the Section 5.4 "Standard of Care" of the Fire Victim Trust Agreement.[3] Specifically, the full and unredacted disclosure of these retention agreements will help victims ascertain the degree to which the award of this litigation was in keeping with the best interests of victims as the beneficiaries of the Fire Victim Trust or instead leveraged as a method of prioritizing the financial interests of certain attorneys over the interests of the victims they represent. The Court should note that on August 24, 2022, by order of the Court and in Response to the Abrams' discovery motion, the Trustee caused to file the *"Redacted Documents to Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements **Until Litigation Related to such Retention Agreements is Finally Resolved**"*

---

[3] See "Fire Victim Trust Agreement", pg. 25, Section 5.4, July 1, 2020

[Dkt. 12874] (emphasis added). The Court Order that caused these redacted agreements to be filed stated that *"the unredacted copies of the Retention Agreements provided to the Court shall remain under seal and confidential and not be made available to anyone without the consent of the Trustee or further order from the Court **until such time as the litigation to which the Retention Agreements apply has been finally resolved by judgment, arbitration, mediation or otherwise.**"* Given this order, any and all retention agreements should be fully released without any redactions including associated *"consortium agreements"* for litigation that is now *"resolved."* On a going forward basis, the Trustee should voluntarily release these retention and consortium agreements on a timely basis but no later than 7 days after the resolution of litigation.

The Court should understand that on March 10, 2023, the Trustee caused to file the "Fire Victim Trust's Notice of Final Resolution of Assigned Claims" [Dkt. 13607] and that within these papers the Trustee made clear that the undisclosed "consortium agreements" defined the terms of which the members of the consortium benefited from this litigation on behalf of victim beneficiaries. Specifically, this notice stated that *"the Trust acknowledges that the Firms, **pursuant to a separate agreement by and between the Firms** have determined to organize themselves into the following consortiums… The "Walkup Consortium" consisting of Cotchett, Pitre and McCarthy LLP; Walkup, Melodia, Kelly and Schoenberger; Dryer Babich Baccola Wood Campora, LLP and Corey, Luzaich, De Ghetaldi and Riddle LLP"… The "Andrews Consortium" consists of Andrews and Thornton, A Law Corporation and Greenberg Gross LLP… The extent to which work performed in furtherance of the Representation hereunder is allocated to any of the Firms or either of the above mentioned consortiums shall be governed by **separate agreement by and between the Firms**…"*

It is clear from this description and others that victims will be unable to determine the degree to which derivative cases were assigned and prosecuted in "good faith" without the full disclosure of these consortium agreements. Indeed, interspersed between the heavily redacted sections of the Trust retention agreements provided in response to Abrams' Prior Discovery Motions, are references to "consortiums" and "consortium agreements." These agreements undoubtably describe benefit structures that are unknown to Trust beneficiaries and must be released so that victims may understand the incentives in place and reasonably assess the degree to which these consortium agreements align with victim interests, the Fire Victim Trust Agreement and applicable law.[4]

---

[4] See Case 19-30088-DM, Dkt. 12931, pg. 7-8,

Compounding these concerns, it has recently been disclosed that the current and former Trustee's representations that all third party litigation would provide **equal benefits** to all Trust beneficiaries is likely false. Recent communications from certain attorneys indicates that funds generated by some of the derivative litigation might not provide equitable financial benefits to victims. These revelations should necessitate more transparency from the Trustee relative to these agreements. Specifically, the following communication was sent on April 29, 2024 to clients of the Singleton Schreiber "fearless advocacy" Law Group that appears to be part of the consortium "californiafirelawyers.com" and other "consortiums" as referenced within the aforementioned FVT retention agreements:

> "*After extensive litigation, Davey Tree has agreed to pay its insurance policy limits to resolve all litigation against it. This poses a problem as the amount of Davey Tree's insurance is roughly $200 million; while this obviously is a lot of money, **it is not enough to make a significant difference to the $14 billion trust.** (To put it in context, $200 million is approximately 1.4% of the value of the Trust.). **Per the Settlement Agreement this approximately $200 million will not be disbursed until after all FVT claims have been paid.** As we have said, we believed that the result of the settlement with Davey Tree would be the same as the result of the other third-party settlements: that is, all of the money would go into the FVT and would be distributed to all plaintiffs on a pro rata basis. **In this particular settlement, however, the result was slightly different.** While the vast majority of the funds recovered went to the FVT, as it had the largest claims, a small amount was allocated to each of the firms that filed suit, including our clients. The amount allocated to our group was 9,950,000 (gross), slightly less than 5% of the total amount of the settlement.*" (emphasis added).

This communication about "*this particular settlement*" was circulated through social media along with the attached "*Release of Claims Against The Davey Tree Expert Company and Affiliates*" (*See* **Exhibit C**). Victims upon seeing this statement have growing concerns that what has been stated by the Trustee and TOC Members regarding the benefit of the derivative cases appears to be false. Apparently, according to this statement from Gerald Singleton, these funds will NOT go to the corpus of the FVT but instead will primarily be directed to the benefit of the law firms that were assigned by the Trustee with a small percentage going to certain victims. It has already been established that

these firms were NOT selected by a competitive and open process but instead self-selected by the very TOC Members that are supposed to be providing oversight and safeguarding the Trust. This is outrageous and the Court should understand how this violates the Fire Victim Trust Agreement and the representations made to victims within this case. This communication refers to litigation that seems to have been conveniently left out of the "Fire Victim Trust's Notice of Final Resolution of Assigned Claims" [Dkt. 13607] and seems to point to significant violations of the Court's Order [Dkt. 12884].[5] Why has "*this particular settlement*" and the associated retention agreements not been disclosed? It is important to note that Gerald Singleton of Singleton Schreiber "Fearless Advocacy" Law Firm is also a member of the Trust Oversight Committee. It is reasonable to conclude that this communication further demonstrates that financial conflicts and self-dealing are pervasive within the Trust Oversight Committee.

Moreover, this communication and the manner this litigation has been prosecuted raises significant questions. Why would members of the Trust Oversight Committee direct and accept a settlement that did not benefit the corpus of the Fire Victim Trust given their fiduciary duties within that committee? How is this apparent violation of trust and breach of fiduciary duties being managed by the TOC and the Trustee? How will the Court respond to these violations? How many other activities are being pursued by members of the TOC and the Trustee that are adverse to the interests of victims within this case?

### III. FVT and TOC Lobbying and Advocacy: AB1054 Amendments and FVT Shortfall

Within the prior Trustee objection to victim discovery, it was stated that "*its efforts to seek additional value through legislative action are continuing.*" Since this disclosure, certain members of the Trust Oversight Committee (the "**TOC**") are now taking actions on behalf of victims within this case that appear to be directly contrary to the positions they took pre-confirmation against the interests of victim beneficiaries. Given their prior actions that traded away financial benefits for victims within this case for more lucrative wildfire litigation in the future, victims deserve additional discovery. The degree to which the Trustee, her designees or TOC Members are now engaged in activities beyond the scope of the FVT agreement to undo, mend or otherwise hide their prior actions

---

[5] See Case No. CGC-21-589438, "John K. Trotter Trustee of the PG&E Fire Victim Trust, Plaintiff v. Davey Resource Group, Inc.; Davey Tree Expert Company; Davey Tree Surgery Company; The Original Mowbrays Tree Service, Inc.; Western Environmental Consultants Inc.; and does 1 through 25, inclusive, Defendants.", January 28, 2021

against the interests of victims needs to be fully disclosed. Simply stated, victims have no basis to trust the parties that misrepresented their lobbying activities pre-confirmation with the same types of activities post-confirmation without full disclosure.

Given that it has recently become clear that the Fire Victim Trust is ~30% short and well short of the false promises made by many core attorneys within this case, the actions of the Trustee, TOC members and others to make up the Trust shortfall are welcome but need to be fully disclosed. Certain members of the TOC have circulated draft letters among victims to be sent to California State Legislators, Governor Newsom and other elected representatives requesting their support for amendments to AB1054. Certainly, actions like these taken by those working for or with the Trustee to seek creative ways to fully fund the Trust are supported by many victims. Indeed, Abrams and many other victims have actively engaged to advocate for amendments to AB1054 so that victims may be made whole through the California Wildfire Fund. This renewed advocacy effort is due to an increasing realization among victims that this source of funds may be one of the only ways to make up the ~30% Trust shortfall. As evidence of this timing, the Court should consider the following victim led group "Demanding Change: AB1054" that formed in March, 2024 to "*actively engage in pursuing change to AB1054*":



Victims deserve to understand the degree to which the Trustee and TOC members are willing partners in these types of efforts. However, their sincerity around these issues must reasonably be questioned given their role in pre-confirmation lobbying efforts that took a completely oppositional

position to the financial interests of victims within this case. Indeed, many members of the Trust Oversight Committee also served as Officers, Directors and Coalition Members of the Up From the Ashes Coalition (the "**UFTA**") which drove the passage of the legislation that excluded victims from the California Wildfire Fund and held victims feet to the fire to vote "yes" on the plan before the June 30th deadline. The Court should refer to the Articles of Incorporation from UFTA and the associated IRS forms (*See* **Exhibit D**) which names the following Officers of the Organization:

- President – Steve Campora Esq., Dreyer, Babich, Baccola, Wood and Campora
- Director/Secretary – Michael A. Kelly, Walkup, Melodia, Kelly & Schoenberger
- Director/Treasurer - Frank Pitre, Cotchett, Pitre & McCarthy, LLP

The Court should also note that the 21 named "Coalition Members" include ALL the Trust Oversight Committee Members with the exception of Amy Bach Esq., United Policyholders whose organization was the sole beneficiary when UFTA dissolved on August 14, 2020 and which still receives large financial contributions from the other members of the Trust Oversight Committee.[6]

Certainly, victims deserve reasonable discovery to ascertain whether these attorneys now serving on the Trust Oversight Committee and through the coordination with the Trustee are once again prioritizing their personal financial interests to the detriment of victims within this case. The Court should understand that Abrams does not make these assertions lightly as they are not based upon hearsay or hyperbole but are informed based upon Abrams first-hand accounts and corroborating materials referenced herein. Indeed, Abrams testified against AB1054 before the California State Senate and Assembly while Patrick McCallum, UFTA, on behalf of Trust Oversight Committee Members (then serving as UFTA Officers and Coalition Members), testified in favor of the very provisions that kept victims out of the California Wildfire Fund. On July 10, 2019, Mr. McCallum on behalf of these TOC members testified before the California Assembly Utilities and Energy Committee and falsely stated the following in his closing remarks:

> *"I am Patrick McCallum, I am a group represent Up From the Ashes represents the 25,000 victims. In regards to victims.. there are three areas it* [AB1054 legislation] *helps victims and provides "it has the CPUC with specific authority to **certify that victims are made whole**, the*

---

[6] See Attachment C and Attachment D of the June 7, 2021 *"William B. Abrams Motion to Enforce the Victim Trust Agreement and Replace All Members of the Fire Victim Trust Oversight Committee and to Support Efficient Trust Administration Pursuant to U.S.C. Section 1123(A)(4) and Fire Victim Trust Agreement Section 6.2"* [Dkt. 10748]

*2nd is that it gets to a speedier agreement in bankruptcy and 3rd is a healthier company going forward so we ask for your aye vote."[7]*

To be clear, this is the designee and former employee of core attorneys within this case, largely represented on our current Trust Oversight Committee, advocating for legislation that keeps their clients and the victims within this case OUT of the California Wildfire Fund. The conflicts of interest that drove core attorneys within this case to support provisions against their client's interests remains undisclosed and is not the subject of this Discovery Motion. **Moreover, the purpose of this Discovery Motion is not to litigate pre-confirmation conflicts of interest but to ensure that current lobbying and advocacy efforts on behalf of the Fire Victim Trust and by Trust Oversight Committee members are transparent and unencumbered by their conflicts and prior positions taken against the interests of their victim clients**. Are the prior positions of TOC Members and UFTA Coalition Members that sacrificed current PG&E victims within this case for lucrative settlements in future utility-caused wildfires still driving their lobbying and other actions? Are these conflicts still impeding their ability to fund the Fire Victim Trust shortfall? Again, while this Discovery Motion does not look for pre-confirmation discovery, these earlier conflicts provide good cause for reasonable post-confirmation discovery to ensure that what the IBEW called "shadow lobbying" on behalf of these TOC attorneys is taken out of the shadows for victims to evaluate whether or not the cost/benefit of these actions are aligned with their interests OR still being pursued for the primary benefit of these attorneys with future utility-caused wildfires (*see* **Exhibit E**).

## IV.  Relief Requested: Good Cause for Reasonable Discovery

Given the evidence that the Fire Victim Trustee has not been forthcoming regarding certain settlements and has not made unredacted third party retention agreements available for victims on a timely basis per the Discovery Order, Abrams contends that there is further good cause to require the enforcement of the Prior Court Order and grant added discovery in keeping with the procedures and processes identified therein. Victims must be afforded reasonable information to assess the degree to which the Trustee, TOC Members and others employed by the Fire Victim Trust have engaged in reasonable *"conduct" and "good faith"* acts in keeping with both the Fire Victim Trust Agreement and applicable law.

---

[7] See California State Senate hearing, Assembly Utilities and Energy Committee, July 10, 2019, mark 1:54, https://www.assembly.ca.gov/media/assembly-utilities-energy-committee-20190710

Abrams prior discovery motions requested specific discovery in form and function as those provided to other parties within this case such as those requested by the Trustee in the *"Motion of the Fire Victim Trustee Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery From Adventist Health System/West and Adventist Health Feather River and Service of a Subpoena on Factory Mutual Insurance Company"* [Dkt. 11556] filed by Brown Rudnick, LLP. However, this type of discovery was denied by the Court for victim beneficiaries. Therefore, Abrams requests that the Court order discovery consistent with the Court's prior "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682].

By this Motion, Abrams requests entry of an order, pursuant to Bankruptcy Rule 2004 supporting the following discovery:

1. **Trustee and TOC to Comply with Prior Court Order** - The Trustee should be required by the Court to immediately and fully comply with the August 2, 2022, "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682].

2. **Identify Individuals Conducting Lobbying Activities** - Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee should be required by the Court to "identify the firm(s) retained by the Trustee [and/or TOC Members] for lobbying activities [including for fiscal year 2023 and fiscal year 2024] and explain how that firm was selected, whether there was any competitive open and public request for proposal or similar procedure implemented." This should include any litigation that was not referenced in the prior notices and responses to the Prior Discovery Order.

3. **Disclose Lobbying and Advocacy Activities** - The Trustee and TOC Members should be compelled by the Court to identify the lobbying and advocacy activities they have directly or indirectly directed, supported, consulted, or advised regarding how to make up the ~30% Trust shortfall. They should specifically state the actions, legislative positions and regulatory positions taken to fully fund the Fire Victim Trust. They should also indicate the result of these activities and the costs of these activities to the corpus of the FVT. The Trust Oversight Committee members have stated that they are now engaged in lobbying and other advocacy efforts to "fully fund" the Trust and make up the 30% Trust shortfall. These activities include advocacy for amendments to AB1054 which would allow victims to access the California Wildfire Fund. Given pre-confirmation actions of these same parties to ensure victims were excluded from the California Wildfire Fund, it will be important for the Fire Victim Trustee and members of the Trust Oversight Committee to fully disclose these post-confirmation activities. The Trustee and members of the Trust Oversight Committee have fiduciary duties to victims and the duty to disclose these activities to ALL PG&E victims.

4. **Lobbying Positions and Actions** - Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee should through this discovery process "provide a list of bills or legislative hearings [for fiscal year 2023 and fiscal year 2024] where the Trustee's [or TOC Member's] designated lobbyist gave testimony or engaged in efforts to further the interest of PG&E Fire Victims, specifically explaining how those activities furthered the efforts on behalf of those victims." The Trustee and TOC Members should further describe their lobbying or advocacy actions, or the actions associated with their "consortiums" to amend AB1054 legislation or to otherwise engage in activities to ensure the FVT ~30% shortfall is remedied. If there are actions the Trustee and TOC members have taken that might be reasonably construed as adverse to the interests of PG&E victims, they should also be described and disclosed.

5. **Disclose Documents related to Requests for Proposals** - Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee should be compelled to provide all "requests for proposals" (RFPs) as of the date of this Motion "including when and to who it promulgated, what responses were received and from whom; and the name of each counsel or firm selected by the Trustee and subsequently retained." **The Trustee to date has not provided the RFPs or the RFP responses from any of the firms selected or those not selected.** Without the disclosure of these documents, victims will be unable to ascertain the degree to which this was an open and competitive process or self-dealing to certain attorneys associated with the Trust and Trust Oversight Committee directly or indirectly through "consortium agreements."

6. **Competitive, Open and Public RFP Process** – Depending on the documents produced by the Trustee for #5 above and consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee should explain why they stated within their objection that "the Trust retained all of its third-party litigation firms through an open and public request for proposal' interview process" when these processes were neither "open" nor "public" (Dkt. 12527, at 19:23-24).

7. **Response to Trustee June 21, 2022 Letter** - The Trustee must explain why the Former Trustee stated in the June 21, 2022 letter that third-party litigation was sought through an "open and public request for proposals" and that "no trust money has been used to pursue these claims" when this is demonstrably false. Furthermore, the Trustee must explain why after the prior Abrams Discovery Motion [Dkt. 12440] was filed, the Trustee removed this letter from the FVT documents archive.

8. **Fully Disclose Retention Agreements** - Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee should be compelled by the Court "for every such counsel so retained, post a copy of the retention agreement pertaining to that counsel" and "identify specifically any such contracts awarded to any member of the TOC." **These retention agreements should be fully disclosed and without redactions for any and all litigation that has been resolved.** The release of these retention agreements must be inclusive of any and all "consortium agreements" referenced within these retention agreements and include all prior versions of executed agreements that were subsequently amended or abandoned after Abrams Prior Discovery Motion. Given that the rights to litigate certain cases on behalf of PG&E as the Debtor have been largely awarded by the Fire Victim Trustee to the same firms that serve on the Trust Oversight

Committee, it will be important for these law firms to fully release the underlying "consortium agreements" referenced within any and all FVT retention agreements. The extent to which the Trust Oversight Committee members and the Trustee (former and current) and/or other core parties within this case were self-dealing can only be understood by the full release of the "consortium agreements" referenced within the heavily redacted retention agreements. Given that this litigation is largely resolved, there is no good faith reason to withhold this information from victim beneficiaries.

9. **Identify Third Party Litigation and Assigned Claims -** Consistent with the Prior Discovery Order, the Court should direct the Trustee and Members of the Trust Oversight Committee to "identify any assigned claim that has been finally resolved by judgement, arbitration, mediation or otherwise. Name the party, a brief summary of the outcome, the gross amount of realized, the cost in attorneys' fees and expenses of the effort, and the net result of the benefit to the Trust." The Trustee should provide a list of ALL third-party litigation where the FVT or TOC Members are engaged on behalf of FVT beneficiaries or the debtor and indicate the status of that litigation as "resolved" or "pending."

10. **FVT Litigation Against Vegetation Management Contractors -** The Trustee must explain why the June 21, 2022 Trustee letter, that has subsequently been removed from the FVT document portal, stated that vegetation management litigation has been "consolidated into **a master case** that is actively proceeding" (emphasis added) when the Davey Tree Litigation had not been consolidated.[1] Furthermore, the Trustee should explain whether or not this particular litigation is intended to provide equal distributions to Fire Victim Trust beneficiaries or unequally distributed as indicated by counsel assigned to this case and retained by the Trustee. If the Trustee understands that the settlement does not provide equitable pro rata benefits to victims, she should explain why the Trust has chosen to settle this case and not disclose this to victim beneficiaries. The TOC members should explain why they accepted a settlement that did not benefit the corpus of the Fire Victim Trust given their fiduciary duties within that committee. The Trustee and the TOC should also explain how this apparent violation of trust and breach of their fiduciary duties is being managed.

11. **Document Archive and Fire Victim Trust Portal -** The Trustee must be required to provide a list of the documents that have been removed from the FVT Portal including those that were removed from the FVT Document Archive. The Trustee must then explain why these documents were removed and to what benefit did the removal of these documents and the associated revisionist history of the Trust benefit PG&E victims.

12. **Open and Public Meetings with Victims -** The Trustee shall establish open and public meetings where she will answer direct questions from victims regarding the management and administration of the Fire Victim Trust. This may be accomplished through in-person meetings or through remote online meetings. The goal of these meetings will be to provide open dialogue with victims and answer any questions or concerns they have regarding the management of the Trust. These meetings must be made accessible for all

---

[1] See Case No. CGC-21-589438, "John K. Trotter Trustee of the PG&E Fire Victim Trust, Plaintiff v. Davey Resource Group, Inc.; Davey Tree Expert Company; Davey Tree Surgery Company; The Original Mowbrays Tree Service, Inc.; Western Environmental Consultants Inc.; and does 1 through 25, inclusive, Defendants.", January 28, 2021

victims. Cathy Yanni, Trustee pledged to change direction from the path taken by Justice Trotter, Former Trustee and ensure open communications directly with victims. Despite these commitments, the Trustee to date has not engaged in open and public meetings with victims other than through well-crafted and self-selecting processes to filter attendees and questions designed to highlight positive Trust messages and to placate victims. As part of the discovery process, the Court should require the Trustee to engage in open meetings with victims to answer their direct questions regarding how the Fire Victim Trust has been managed and administered. As the Court is aware, the Trustee has received substantial compensation to manage the Trust and communicate with victim beneficiaries. Given that the Fire Victim Trust has fallen far short of the goals (1) to fully compensate victims and (2) to timely pay victims, it should be incumbent upon the Trustee to take questions in a public forum(s) open to all victims. The Trustee's seeming unwillingness to engage victims directly but instead to issue engineered video productions of "Messages from Cathy" is not sufficient for any trustee, executive or leader managing a budget the size of the $13.5B Fire Victim Trust. Abrams hopes that the Trustee will voluntarily answer questions in an open and public forum for victim beneficiaries, as a core function of her role. However, if the Trustee is unwilling to be accountable to victims in this way, the Court should mandate this type of engagement.

## **BASIS FOR RELIEF REQUESTED**

Bankruptcy Rule 2004(a) states that on "***motion of any party*** *in interest, the court may order the examination of **any entity**.*" Fed. R. Bankr. P. 2004(a). The scope of an examination sought under Rule 2004(b) may relate to "***the acts, conduct***, or property or to the liabilities and financial condition of the debtor, or to **any matter which may affect the administration of the debtor's estate**, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b) (emphasis added).

The granting of a motion under Rule 2004 is within the "ultimate discretion" of the Court. *In re Art & Architecture Books of 21st Century*, No. 2:13-BK-14135, 2019 WL 9243053, at *6 (Bankr. C.D. Cal. Dec. 6, 2019) (quoting *In re Int'l Fibercom, Inc.*, 283 B.R. 290, 292-93 (Bankr. D. Ariz. 2002)). **Bankruptcy Rule 2004 allows considerable leeway for all manner of so-called "fishing expedition[s]" if there is a reasonable nexus to the debtor and the administration of the debtor's case.** *In re Mastro*, 585 B.R. 587, 597 (B.A.P. 9th Cir. 2018) (quoting *In re Subpoena Duces Tecum*, 461 B.R. 823, 829 (Bankr. C.D. Cal. 2011)). Any third party who has a relationship with the debtor may be made subject to a Rule 2004 investigation. *Mastro*, 585 B.R. at 597 (citing *In re Fin. Corp. of Am.*, 119 B.R. 728, 733 (Bankr. C.D. Cal. 1990)) (emphasis added).

Here, Abrams seeks discovery from the Fire Victim Trustee and Trust Oversight Committee Members to understand the degree to which derivative cases assigned by the Fire Victim Trust and

the continuation of lobbying activities are to the benefit of or to the detriment of FVT beneficiaries. Abrams seeks this discovery to ensure some degree of transparency and accountability for those assigned by this Court and the Trustee to work on behalf of victims within this case. Furthermore, Abrams relies upon the August 2, 2022 Court *"Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust"* (the "**Discovery Order**") [Dkt. 12682]. Within this order, the Court exercised and reiterated its authority related to Article 1.6 of the Trust agreement stating that *"this Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust..."* The order concluded by stating that *"More specifically, Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information."*

## CONCLUSION

The Court provided the Fire Victim Trustee, Trust employees, contractors, and consultants as well as Trust Oversight Committee Members with broad and sweeping protections through indemnifications, exculpations, nondisclosure terms and "confidentiality protocols." Conversely, victims were stripped of their rights, left in the dark and exposed with Bankruptcy Rule 2004 seemingly as the only means left to evaluate whether or not parties have acted in "good faith" and in keeping with the Fire Victim Trust Agreement and applicable law. Recently and through certain attorney communications referenced herein, victims have grown to understand that the same parties that misrepresented the Trust design as the only vehicle to "fully" compensate victims are largely the same parties that now benefit from Debtor approved derivative cases and other ancillary benefits. These same parties now in consultation and coordination with the FVT Trustee, seek remedies to the 30% Trust shortfall including but not limited to seeking amendments to AB1054 legislation.

Abrams sincerely hopes that these parties that now largely sit on the TOC and actively worked to exclude PG&E victims from the California Wildfire Fund have had a change of heart and are now arduously working in good faith and in their client's best interests to seek remedies to the Trust shortfall including through amendments to AB1054 legislation. That said and given that Abrams witnessed their efforts pre-confirmation to barter away PG&E victim financial benefits in exchange for future wildfire litigation benefits, there is good cause to be skeptical and to seek reasonable discovery. Abrams and other victims will continue to support efforts of the Trustee and the Trust Oversight Committee Members to seek remedies to the ~30% Trust shortfall which include

the resolution of derivative cases, lobbying efforts and direct negotiations with the Debtor. However, victims are not so naïve as to believe that these activities and associated agreements if left undisclosed will lead to positive financial outcomes for Trust beneficiaries. Indeed, victims will only be able to support these actions by the Trustee and the TOC if they are fully disclosed including through the release of unredacted agreements defining these actions.

The legal basis for the relief requested within this Motion has been asserted by the Trustee and affirmed within the *Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" [Dkt. 12682]. Prior orders from the Court have made it clear that Bankruptcy Rule 2004 should apply as an appropriate tool and put to work particularly for those parties without the benefits of judicial review. Therefore, Abrams respectfully requests that the Court take notice of the Motion and enter an order to approve the discovery requests outlined above as well as such other and further relief as may be just.

Dated: June 5, 2024

Respectfully submitted,

William B. Abrams
Pro Se Claimant

# EXHIBIT A

PROPOSED ORDER

1   William B. Abrams
    end2endconsulting@gmail.com
2   625 McDonald Ave.
    Santa Rosa, CA, 95404
3   Tel: 707 397 5727

4   *Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities*
5   *Commission*

6

7

8

9

10                  **UNITED STATES BANKRUPTCY COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
11                      **SAN FRANCISCO DIVISION**

12
    In re:                                  Bankr. Case No. 19-30088 (DM)
13                                          Chapter 11
                                            (Lead Case)
14  PG&E CORPORATION,                       (Jointly Administrated)

15          -and-

16
    PACIFIC GAS AND ELECTRIC
17  COMPANY,                                **ORDER GRANTING MOTION OF**
                                            **MOTION OF WILLIAM B. ABRAMS**
18              Debtors.                     **PURSUANT TO FEDERAL RULE OF**
                                            **BANKRUPTCY PROCEDURE 2004**
19                                          **FOR ENTRY OF AN ORDER**
    ☐ Affects PG&E Corporation             **AUTHORIZING DISCOVERY AND**
20                                          **TRUST COMPLIANCE WITH**
    ☐ Affects Pacific Gas and Electric Company  **COURT ORDERS**
21  ☑ Affects both Debtors

22
    *  All papers shall be filed in the lead case,
23  No. 19-30088 (DM)

24

25

26

27

28

Upon the Motion, dated June 5, 2024 (the "**Motion**"),[8] of William B. Abrams ("**Abrams**"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Bankruptcy Rule 2004-1(a), for entry of an order authorizing discovery from Cathy Yanni, in her capacity as Fire Victim Trustee (the "**Trustee**") and from Fire Victim Trust Oversight Committee Members (the "**TOC Members**").

This Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California, Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion; the Court having reviewed the proposed discovery; this Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted therein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERD THAT**:

1.      The Motion is granted as provided herein.

2.      The Trustee shall immediately and fully comply with August 2, 2022, "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682] (the "**Prior Discovery Order**").

3.      Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee must "Identify the firm retained by the Trustee [or TOC Members] for lobbying activities [for fiscal year 2023 and fiscal year 2024] and explain how that firm was selected, whether there was any competitive open and public request for proposal or similar procedure implemented… no later than [July 4, 2024], the Trustee is to file written responses and to post on the FVT website, and file with the court, copies of the relevant documents."

4.      The Trustee and TOC Members must indicate what lobbying and advocacy activities they have directly or indirectly directed, supported, consulted, or advised regarding how to make up the ~30% Trust shortfall. They should specifically state the actions, legislative positions and regulatory positions taken to fully fund the Fire Victim Trust. They should also indicate the result of these activities and the costs of these activities to the corpus of the FVT. No later than July 4, 2024, the Trustee is to file written responses and to post on the FVT website, and file with the court, copies of the relevant documents."

---

[8] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

5.      Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee must "provide a list of bills or legislative hearings [for fiscal year 2023 and fiscal year 2024] where the Trustee's [or TOC Member's] designated lobbyist gave testimony or engaged in efforts to further the interest of PG&E Fire Victims, specifically explaining how those activities furthered the efforts on behalf of those victims." The Trustee and TOC Members should further describe their lobbying or advocacy actions or the actions associated with their "consortiums" to amend AB1054 legislation or to otherwise engage in activities to ensure the FVT ~30% shortfall is remedied.

6.      The Trustee to date has not provided the RFPs or the RFP responses from any of the firms selected or those not selected. Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee must identify any and all "requests for proposals" directed as of the date of this order "including when and to who it promulgated, what responses were received and from whom; and the name of each counsel or firm selected by the Trustee and subsequently retained." No later than July 4, 2024, the Trustee [and TOC Members] are to file written responses and to post on the FVT website, and file with the court, copies of the relevant documents."

7.      Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee must explain why they stated within their objection that "the Trust retained all of its third-party litigation firms through an open and public request for proposal' interview process" when these processes were neither "open" nor "public." (Dkt. 12527, at 19:23-24).

8.      The Trustee must explain why it stated in the Trustee's June 21, 2022 letter that their retention of counsel for third-party litigation was through an "open and public request for proposals" and that "no trust money has been used to pursue these claims" when this is demonstrably false. Furthermore, the Trustee must explain why after the prior Abrams Discovery Motion [Dkt. 12440] was filed, the Trustee removed this letter from the FVT portal.

9.      Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee must "for every such counsel so retained, post a copy of the retention agreement pertaining to that counsel" and "identify specifically any such contracts awarded to any member of the TOC." These retention agreements should be fully disclosed and without redactions for any and all litigation that has been resolved. The release of these retention agreements must be inclusive of any and all "consortium agreements" referenced within these retention agreements and include all prior versions of executed agreements that were subsequently amended or abandoned.

10.      Consistent with the Prior Discovery Order, the Trustee and Members of the Trust Oversight Committee must "identify any assigned claim that has been finally resolved by judgement, arbitration, mediation or otherwise. Name the party, a brief summary of the outcome, the gross amount of realized, the cost in attorneys' fees and expenses of the effort, and the net result of the benefit to the Trust." The Trustee should provide a list of ALL third-party litigation where the FVT or TOC Members are engaged on behalf of FVT beneficiaries or the debtor and indicate the status of that litigation as "resolved" or "pending."

11.      The Trustee must explain why the June 21, 2022 Trustee letter, that has subsequently been removed from the FVT document portal, stated that vegetation management litigation had been "consolidated into a master case that is actively proceeding" when the Davey Tree Litigation had not

been consolidated.[1] Furthermore, the Trustee should explain whether or not this particular litigation is intended to provide equal distributions to Fire Victim Trust beneficiaries or unequally distributed as indicated by counsel assigned to this case and retained by the Trustee. If the Trustee understand that the Davey Tree settlement does not provide equitable pro rata benefits to victims, she should explain why the Trust has chosen to settle this case and not disclose this to victim beneficiaries. The TOC members should explain why they accepted a settlement that did not benefit the corpus of the Fire Victim Trust given their fiduciary duties within that committee. The Trustee and the TOC should also explain how this apparent violation of trust and breach of their fiduciary duties is being managed.

12. The Trustee must be required to provide a list of the documents that have been removed from the FVT Portal including those that were removed from the FVT Document Archive. The Trustee must then explain why these documents were removed and to what benefit did the removal of these documents and the associated revisionist history of the Trust benefit PG&E victims.

13. The Trustee shall establish open and public meetings where she will answer direct questions from victims regarding the management and administration of the Fire Victim Trust. This may be accomplished through in-person meetings or through remote online meetings. The goal of these meetings will be to provide open dialogue with victims and answer any questions or concerns they have regarding the management of the Trust.

14. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

15. This Order is without prejudice to PG&E Fire Victim's right to file further motions seeking additional documents pursuant to Bankruptcy Rule 2004 or any other applicable law.

** END OF ORDER **

---

[1] See Case No. CGC-21-589438, "John K. Trotter Trustee of the PG&E Fire Victim Trust, Plaintiff v. Davey Resource Group, Inc.; Davey Tree Expert Company; Davey Tree Surgery Company; The Original Mowbrays Tree Service, Inc.; Western Environmental Consultants Inc.; and does 1 through 25, inclusive, Defendants.", January 28, 2021

# **EXHIBIT B**

FVT Documents Archive and June 21, 2022 Trustee Letter

**Exhibit B**

firevictimtrust.com/trustUpdates.aspx#trustdocuments

## 2022 ⌄

12/1/2022 Letter from the Trustee
11/15/2022 Trustee Responses to Fire Survivors' Questions
11/14/2022 Trustee Letters in Support of H.R. 7305
11/1/2022 Letter from the Trustee
10/28/2022 Update Regarding Stock Sale
10/7/2022 Video Message from the Trustee
10/5/2022 Update Regarding Stock Sale
9/30/2022 Letter from the Trustee
9/29/2022 Notice of Filing of Unredacted D&O Settlement Agreement
9/6/2022  Fire Victim Trustee's Responses in Connection with the Court's August 2, 2022 Discovery Order
9/3/2022 Notice of Filing D&O Engagement Letter
8/23/2022 Spoofing and Check Fraud Alert
7/25/2022 Letter from the Trustee
5/24/2022 Update on Medical Lien Obligations and Lien Resolution
4/29/2022 FVT Statement Regarding 2021 Annual Report
4/29/2022 Fire Victim Trust 2021 Annual Report
2/1/2022 Increased Pro Rata Payment Percentage Announcement

Note: The 6/21/2022 "Letter from the Trustee" was removed from the FVT Document Archive along with other documents cited within papers before the Court.


June 21, 2022

Dear Fire Victims:

As we approach the two-year anniversary of the creation of the Fire Victim Trust, I would like to share with you some history regarding its creation, its development, and a brief explanation of its status today.

The Trust was created after PG&E caused several fires, which damaged thousands of homes and devastated the lives of thousands of Californians. In order to resolve the potential costs of that damage, PG&E declared bankruptcy.

The Bankruptcy Court, faced with claims from not only fire victims but also from the insurers of those individuals along with claims from the federal and state entities that incurred costs fighting those fires and supplying financial aid to the victims, created two trusts. In one was channeled all of the insurance companies' claims, and in the other all of the fire victims' claims, including the federal and state agency claims. The insurance trust received $11 billion in cash to satisfy its claim of having paid $16 billion to its insureds and for maintaining an additional $4 billion in reserve. The Fire Victim Trust was funded with an oft-stated value of $13.5 billion, to be half in cash and half in new company PG&E common stock. The Plan was submitted to you for a vote and was approved by more than 85% of those who voted. PG&E emerged from bankruptcy on July 1, 2020. The $6.75 billion in cash was paid. With respect to the stock consideration, 478 million shares of PG&E stock were delivered to the Fire Victim Trust in accordance with an agreed-to formula under the Plan. At the time of that delivery, the stock was trading at approximately $9 per share. That price created a shortfall of approximately $2.4 billion less than expected, and it has lingered between $10 and $12 and closed at $9.78 as of Friday, June 17, 2022.

The Trust is a legal entity controlled by its constitutional documents, the Bankruptcy Plan, Confirmation Order, and the Trust Agreement. Section 1.2 of the Trust Agreement enumerates the Trust's purposes:

1. To assume liability for certain claims;
2. To evaluate and pay those claims on a *pro rata* basis;
3. To prosecute all assigned rights and causes of action given to the Trust; and
4. To preserve, hold, manage, monetize, and maximize the Trust's assets for use in paying the claims enumerated above.

It also provides, under Section 2.2 (General Administration), specifically subsection Section 2.2(g), the following:

> The Trustee shall publish information on the Trust Website as he deems prudent in his sole discretion. The Trustee has no obligation to provide, and Beneficial Owners have no right to receive, information regarding the operation of the trust except as provided in Section 2.2(c) above [The Annual Report].

In keeping with the Trust's directions, I will provide an update and practicable review of our activities for each of its stated purposes.

## 1. To evaluate and pay claims on a *pro rata* basis

When PG&E emerged from bankruptcy and the Trust was created, my Claims Administrator and I were its only employees. Together we began to create a system designed to allow 70,000 fire victims to make claims. It took time to build a comprehensive technical infrastructure capable of receiving, reviewing, and valuing the 250,000 unique claims asserted by those fire victims. To date, among others, we have received over 19,000 personal injury claims, over 400 death claims, in excess of 100,000 emotional distress claims, over 20,000 claims for loss of income, and over 38,000 real and personal property claims, which include the value of loss of vegetation and the cost of tree replacement.

We immediately hired the claims processing firm BrownGreer, who over time has dedicated more than 500 employees to the task of receiving, reviewing, and valuing these claims. We first had to create the electronic form to be used by all victims for their submissions. We began accepting claim forms in mid-August 2020. However, the vast majority of claims were not submitted or received until late 2020 and early 2021. In March 2021, we established values regarding the damage claims, *i.e.*, the reasonable cost of rebuilding in different areas, the range of values of lost trees, the appropriate considerations in determining the value of an emotional distress claim. We further determined to value each claim individually rather than having a schedule of values. We began to issue Determination Notices, which informed the Claimants what the value of their claims were. Because of the uncertainty regarding the number and value of outstanding claims and the unknown value of the stock, our economic advisors recommended an initial *pro rata* payment of 30% of the value determined. In the fifteen months since March 2021, we have issued approximately 30,000 Determination Notices on claim forms comprised of over 150,000 individual claims. The aggregate awards to victims total almost $10 billion. Since we now know more about the potential value of outstanding claims, our economists' expectations have allowed us to increase the *pro rata* percentage to 45%, which means that we have now authorized payments to victims totaling $4.5 billion.

Additionally, early on we recognized there were many victims in dire circumstances who needed relief more quickly than the claims process could provide. We then created the Preliminary Payment program. It requires a victim to merely identify themselves as a victim and prove that they have an eligible claim pending. The payment acted as an advance on their ultimate award. To date, 34,000 victims have received almost $900 million in advanced payments.

As of this writing, we have issued Determination Notices on nearly 70% of all claim forms. Each claim has been touched, and a portion of the remaining claims need additional information and proof.

## 2. To prosecute all assigned rights and causes of action given to the Trust

In addition to cash and stock, the Trust was also given the rights PG&E had to prosecute certain lawsuits in order to increase the corpus available to pay claims. Suits against entities who had

contracted with PG&E to perform vegetation management have been filed regarding different Fires. Those cases have now been consolidated into a master case that is actively proceeding. The lawyers prosecuting those cases on behalf of the Trust were retained pursuant to an open and public request for proposal and interview process. They will be paid only from any recovery they achieve for the Trust, so no Trust money is used to pursue these claims.

Other potential claims against large institutional third parties were assigned but with little information regarding their viability. Two law firms were hired, again after a request for proposal process, to explore and discover the potential of each and to estimate the potential cost of litigation to the Trust. They have concluded their review and have provided the Trust with legal advice as to the prosecution of claims. Any further public disclosure may be harmful to the Trust, in that it may provide information to potential defendants.

A third lawsuit against the former PG&E directors and officers is also being prosecuted. The case is hotly contested with much discovery and motion practice by the defense. The potential recovery against the defendants is limited to PG&E's available insurance policy limits.

### 3. To preserve, hold, manage, monetize, and maximize the Trust's assets

With regard to monetization, the Trust has hired Morgan Stanley to handle its cash assets with investments in Trust-required governmental instruments. We also have employed Morgan Stanley to handle two separate sales of stock, one in January 2022 of 40 million shares and another in April 2022 of 60 million shares, for a net recovery of $1.2 billion. The Trust still owns 377 million shares of PG&E stock, and we confer regularly with our financial advisors as to its status.

When the Trust was created and vested with the shares of PG&E, the stock was valued at approximately $9. While the Trust was mandated to monetize (sell) the stock, there was no provision protecting the Trust from the imposition of a capital gain tax on any profit above that $9 price. The U.S. and California capital gains tax rate are combined in excess of 40%. The Trust's lawyers, Brown Rudnick, worked tirelessly to solve this dilemma. After a detailed and technical IRS process, the Trust was able to benefit from a private letter ruling from the IRS that effectively removed all capital gain tax issues. This enhanced the Trust's assets by avoiding a tax on the prior sales that would have cost in excess of $100 million in taxes.

Brown Rudnick also was charged with the responsibility of representing the Trust in a case where certain claimants challenged the insurance deduction provision in the Trust Agreement. The claimants sought the right to abandon all reasonable efforts to recover from their insurance carriers and, instead, recover funds from the Trust that would otherwise be paid to other fire victims. The potential harm to fire victims and the workings of the Trust was readily apparent. Brown Rudnick prevailed both at the trial court level and more recently was victorious on appeal before the Ninth Circuit. If lost, the case would have dramatically changed the operation of the Trust and adversely affected the claims process.

We also are trying to maximize our Trust assets by engaging with the State of California for some type of loan, or other instrument, which allows us to complete and increase our *pro rata* payments without having to sell more shares into a down market. I think it is not appropriate to go into more

detail at this time since we have only started our discussion. We have hired a lobbyist to assist us in these discussions.

## Transition Announcement

Finally, it has been my honor and privilege to serve as the Trustee of the Fire Victim Trust since its formation on July 1, 2020. When I came out of retirement to accept this position, I promised my family I would serve for only two years. Since that time has come, I therefore will be resigning as Trustee at the close of business on June 30, 2022. Notice of my resignation was provided to the Trust Oversight Committee on March 29, 2022, in accordance with Section 5.2(b) of the Trust Agreement, and will be filed with the Bankruptcy Court in the coming days.

Throughout these past two years, we have devoted our fulltime attention to addressing the financial and other hardships of thousands of deserving fire victims. As stated above, progress has been made, but there is still more to be done. An excellent administrative team is in place, and during the past several months we have been working on a smooth transition. Claims processing will proceed without interruption and fire victims and their counsel can count on the transition being seamless.

Effective July 1, 2022, Ms. Cathy Yanni will become the new Trustee. Ms. Yanni will succeed me as Trustee in accordance with the terms of Section 5.2(d) of the Trust Agreement. In her previous role as Claims Administrator, Ms. Yanni assisted with Trust administration and directly oversaw fire victim claims resolution, including design and implementation of the claims resolution process, from establishing eligibility requirements and claims review procedures to ensuring that funds are distributed in a fair and equitable manner. She also served Fire Victims as the Administrator of the Wildfire Assistance Program. Previous to her work on behalf of Fire Victims, Ms. Yanni settled tens of thousands of cases, facilitated distribution of billions of dollars in settlement funds to Claimants, and oversaw claims resolution processes. There is no one better positioned than Ms. Yanni to complete the Trustee's mandate and serve your interests. You may find more information on Ms. Yanni at the Fire Victim Trust's Website.

Finally, thank you for the opportunity to serve as the Trustee of the Fire Victim Trust these past two years. It has been a great honor and, as I now prepare to turn the page to my retirement, I wish you all the very best.

Very truly yours,

Justice John K. Trotter (Ret.), Trustee

4

## **EXHIBIT C**

Release of Claims Against The Davey Tree Expert Company and Affiliates

# Exhibit C

## RELEASE OF CLAIMS

## AGAINST THE DAVEY TREE EXPERT COMPANY AND AFFILIATES

I am a plaintiff in the *Abram, et al. v. ACRT, Inc., et al.*, San Francisco Superior Court Case No. CGC-19-579861 lawsuit.

On my behalf and with my permission and authorization, my counsel executed a Settlement Agreement with The Davey Tree Expert Company, Davey Resource Group, Inc. and Davey Tree Surgery Company (collectively, the "Settling Defendants").

Under the Settlement Agreement, the Settling Defendants and their Insurers have agreed to pay funds pursuant to settle and finally resolve all claims against them related to what is referred to in the Settlement Agreement as the "October 2017 Fire," which is defined as follows:

The "October 2017 Fire" refers to the wildfire event that was caused by Diablo winds that prevailed throughout much of Northern California in dry conditions beginning on the evening of October 8, 2017, and is inclusive of all of the areas burned as alleged in the California North Bay Fire Lawsuits.

In consideration of the Settlement Payment, I hereby provide the following Release to the Settling Defendants:

I hereby release and forever discharge each of The Davey Tree Expert Company, Davey Resource Group, Inc. and Davey Tree Surgery Company, and their Insurers, and their current and former attorneys, parents, subsidiaries, affiliated companies, shareholders, members, agents, representatives, insurers, reinsurers, trustees, employees, officers, directors, partners, and owners, in each case in their capacity as such (collectively, the "Released Parties"), from any and all claims, demands, causes of action, damages, debts, injuries, liabilities, accounts, costs, expenses, and liens, of any kind or nature, whether now known or unknown, fixed or contingent, suspected or unsuspected, choate or inchoate, which arise out of or are in any way connected, directly or indirectly, with the October 2017 Fire, the Lawsuit, the allegations contained in the Lawsuit, any allegations that could have been contained therein, or any claims that could have been asserted in the Lawsuit or elsewhere.

I expressly waive the provisions of Section 1542 of the Civil Code of the State of California, and acknowledge that I am familiar with and understand that statute, which provides as follows:

A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or

her, would have materially affected his or her settlement with the debtor or released party.

I acknowledge that I may hereafter discover facts in addition to or different from those which I now know or believe to be true, but that it is my intention hereby to fully, finally, and forever settle and release all such claims, matters, disputes, and differences, known or unknown, fixed or contingent, suspected or unsuspected. The releases given herein shall be and remain in effect as full and complete releases notwithstanding the discovery or existence of any such additional or different facts.

I agree that I will not make, assert, or maintain any claim, demand, action, suit, or proceeding that is being released.

This Release is to be governed by, and construed in accordance with, the laws of the State of California. Any action arising out of or relating to this Release shall be brought in the Superior Court of the State of California in and for the County of San Francisco. I hereby submit to the jurisdiction of, and waive any objection to venue in, said court.

In the event any litigation or other proceeding is brought to enforce the terms of this Release, the prevailing party shall be entitled to recover reasonable attorneys' fees, expenses and costs.

I represent, warrant, and agree as follows:

- a. I have voluntarily and knowingly executed this Release in all respects.

- b. I authorized my attorney to sign the Settlement Agreement with the Settling Defendants.

- c. I have had an opportunity to seek and have sought legal advice from legal counsel of my choice with respect to the advisability, including tax consequences, of executing this Release.

- d. I have made such investigation of the facts pertaining to this Release as I deem necessary.

- e. The terms of this Release are the result of negotiations between my counsel and the Settling Defendants and are entered into in good faith in accordance with California law.

- f. I have carefully read this Release, and I know and understand the contents.

- h. The sum I am receiving from the settlement payment has been explained to me and I agree to accept this amount in exchange for a release of my claims against the Settling Defendants.

Page 2 of 3

h.   I have not assigned or transferred any matter released by this Release or any part or portion thereof. I agree to indemnify and hold harmless the Released Parties from any claims resulting from any assignment or transfer by me, or asserted by any assignee or transferee from me.

i.   I do not believe that any covenant, provision, or term of this Release is invalid for any reason.

Dated: ███████████

Signature: ███████████

Name: ███████████████

Business Name (if applicable): _____

Trust Name (if applicable): █████████████████

# EXHIBIT D

Up From the Ashes Coalition: Articles of Incorporation

Registry of Charitable Trusts
P.O. Box 903447
Sacramento, CA 94203-4470
(916) 210-6400

WEBSITE ADDRESS:
http://ag.ca.gov/charities/

# INITIAL
# REGISTRATION FORM
## STATE OF CALIFORNIA
## OFFICE OF THE ATTORNEY GENERAL
## REGISTRY OF CHARITABLE TRUSTS
### (Government Code Sections 12580-12599.7)

**NOTE: COPIES OF CERTAIN DOCUMENTS MUST ACCOMPANY THIS REGISTRATION FORM. MAKE CHECK PAYABLE TO**

Pursuant to Section 12585, registration is required of every trustee subject to the Supervision of Trustees and Fundraisers for Charitable Purposes Act within thirty days after receipt of assets (cash or other forms of property) for the charitable purposes for which organized.

Every charitable (public benefit) corporation, association and trustee holding assets for charitable purposes or doing business in the State of California must register with the Attorney General, except those exempted by California Government Code section 12583. Corporations that are organized primarily as a hospital, a school, or a religious organization are exempted by Section 12583.

Name of Organization: Up from the Ashes

The name of the organization should be the legal name as stated in the organization's organizing instrument (i.e., articles of incorporation, articles of association, or trust instrument).

Official Mailing Address for Organization:

Address: 455 Capitol Mall, Suite 600

City: Sacramento

State: CA

Zip Code: 95814

Organization's telephone number: (916) 442-7757

Organization's e-mail address: atitus@bmhlaw.com

Organization's fax number: (916) 442-7759

Organization's website:

All organizations must apply for a Federal Employer Identification Number from the Internal Revenue Service, including organizations that have a group exemption or file group returns.

Federal Employer Identification Number (FEIN):

82-5125031

Group Exemption FEIN (if applicable):

All California corporations and foreign corporations that have qualified to do business in California will have a corporate number. Unincorporated organizations are assigned an organization number by the Franchise Tax Board upon application for California tax exemption.

Corporate or Organization Number: C4140559

*RECEIVED*
*Attorney General's Office*

*MAY 17 2018*

*Registry of Charitable Trusts*

571115

CT-1 REGISTRATION FORM (08/2017)

| Names and addresses of ALL trustees or directors and officers (attach a list if necessary): | | | |
|---|---|---|---|
| Name   SEE ATTACHED IRS FORM 1024-A | | Position | |
| Address | | | |
| City | State | | Zip Code |
| Name | | Position | |
| Address | | | |
| City | State | | Zip Code |
| Name | | Position | |
| Address | | | |
| City | State | | Zip Code |
| Name | | Position | |
| Address | | | |
| City | State | | Zip Code |
| Name | | Position | |
| Address | | | |
| City | State | | Zip Code |

Describe the primary activity of the organization. (A copy of the material submitted with the application for federal or state tax exemption will normally provide this information.) If the organization is based outside California, comment fully on the extent of activities in California and how the California activities relate to total activities. In addition, list all funds, property, and other assets held or expected to be held in California. Indicate whether you are monitored in your home state, and if so, by whom. Attach additional sheets if necessary.

SEE ATTACHED IRS FORM 1024-A

The organization will be required to file financial reports annually. All organizations must file the Annual Registration Renewal Fee Report (RRF-1) within four months and fifteen days after the end of the organization's accounting period. Organizations with $25,000 or more in either gross receipts or total assets are also required to file either the IRS Form 990, 990-EZ, or 990-PF. Forms can be found on the Charitable Trusts' website at http://ag.ca.gov/charities/

If assets (funds, property, etc.) have been received, enter the date first received:

Date assets first received:  04/11/18

Registration with the Attorney General is required within thirty days of receipt of assets.

What annual accounting period has the organization adopted?

☐ Fiscal Year Ending _____     ☒ Calendar Year

CT-1 REGISTRATION FORM (08/2017)

| Attach your founding documents as follows: | |
|---|---|
| **A)** | **Corporations** - Furnish a copy of the articles of incorporation and all amendments and current bylaws. If incorporated outside California, enter the date the corporation qualified through the California Secretary of State's Office to conduct activities in California. |
| **B)** | **Associations** - Furnish a copy of the instrument creating the organization (bylaws, constitution, and/or articles of association). |
| **C)** | **Trusts** - Furnish a copy of the trust instrument or will and decree of final distribution. |
| **D)** | **Trustees for charitable purposes** - Furnish a statement describing your operations and charitable purpose. |

Has the organization applied for or been granted IRS tax-exempt status ☒ Yes ☐ No

Date of application for Federal tax exemption: May 14, 2018

| Date of exemption letter: | Exempt under Internal Revenue Code section 501(c) 4 |
|---|---|

If known, are contributions to the organization tax-deductible? ☐ Yes ☒ No

Attach a copy of the Application for Recognition of Exemption (IRS Form 1023) and the determination letter issued by the IRS.

Does your organization contract with or otherwise engage the services of any commercial fundraiser for charitable purposes, fundraising counsel, or commercial coventurer? If yes, provide the name(s), address(es), and telephone number(s) of the provider(s):

| Commercial Fundraiser ☐ | Fundraising Counsel ☐ | Commercial Coventurer ☐ | |
|---|---|---|---|
| Name | | | |
| Address | | | |
| City | State | Zip Code | |
| Telephone Number | | | |
| Commercial Fundraiser ☐ | Fundraising Counsel ☐ | Commercial Coventurer ☐ | |
| Name | | | |
| Address | | | |
| City | State | Zip Code | |
| Telephone Number | | | |
| Commercial Fundraiser ☐ | Fundraising Counsel ☐ | Commercial Coventurer ☐ | |
| Name | | | |
| Address | | | |
| City | State | Zip Code | |
| Telephone Number | | | |

I declare under penalty of perjury that I have examined this registration form, including accompanying documents, and to the best of my knowledge and belief, the form and each document are true, correct, and complete.

| Signature | Title Authorized Representative | Date May 14, 2018 |
|---|---|---|

If additional information is required, please refer to the Supervision of Trustees and Fundraisers for Charitable Purposes Act (Government Code sections 12580-12599.7), the Administrative Rules and Regulations pursuant to the Act (California Code of Regulations, Title 11, Sections 300-312.1).

If you have questions regarding registration, or need assistance, information is available on our website at http://ag.ca.gov/charities/ or you can reach us by telephone at (916) 210-6400 or fax at (916) 444-3651.

**Reset Form**   **Print Form**

CT-1 REGISTRATION FORM (08/2017)

4140559

**CALIFORNIA SECRETARY OF STATE**

**ARTICLES OF INCORPORATION OF A NONPROFIT PUBLIC BENEFIT CORPORATION**

FILED
Secretary of State
State of California

APR 11 2018

ICC

This Space for Office Use Only

---

**1. Corporate Name**

The name of the corporation is Up from the Ashes.

**2. Business Addresses**

a. Initial Street Address of Corporation: 455 Capitol Mall, Suite 600, Sacramento, CA 95814
b. Initial Mailing Address of Corporation: 455 Capitol Mall, Suite 600, Sacramento, CA 95814

**3. Service of Process – Individual**

a. California Agent's Name: Ashlee Titus
b. Street Address: 455 Capitol Mall, Suite 600, Sacramento, CA 95814

**4. Purpose Statement**

a. This corporation is a nonprofit **Public Benefit** Corporation and is not organized for private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for **public** purposes.
b. The specific purpose of this corporation is to advocate for victims of the 2017 Napa fires.

**5. Additional Statements**

a. This corporation is organized and operated exclusively for the purposes set forth in **Article 4** hereof within the meaning of Internal Revenue Code Section 501(c)(4).
b. The property of this corporation is irrevocably dedicated to social welfare purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof, or to the benefit of any private person.
c. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation, shall be distributed to a nonprofit fund, foundation, association or corporation which is organized and operated exclusively for Charitable or Social Welfare purposes and which has established its tax exempt status under Internal Revenue Code Section 501(c)(3) or 501(c)(4).

**6. Read and Sign Below**

_____
Signature

Ashlee Titus
Type or Print Name

I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

**APR 2 5 2018** 

Date: _____

ALEX PADILLA, Secretary of State

BYLAWS OF

UP FROM THE ASHES

A California Nonprofit Public Benefit Corporation

## ARTICLE I
## NAME, OFFICE AND PURPOSES

The name of this corporation is and shall be Up from the Ashes (hereinafter referred to as "Corporation").

The principal office of the Corporation shall be located in the County of Sacramento. The principal office and additional offices may be located in such other places as may be determined from time to time by the Board of Directors, with the initial address listed in the Articles of Incorporation.

The specific purpose of the Corporation shall be to advocate for victims of the 2017 Napa fires.

## ARTICLE II
## DEDICATION OF ASSETS

The properties and assets of this nonprofit corporation are irrevocably dedicated to the social welfare of the victims of the Napa fires. No part of the net earnings, properties, or assets of this Corporation, on dissolution or otherwise, shall inure to the benefit of any director, officer or member of the Corporation or any individual.

## ARTICLE III
## DISSOLUTION

Upon the dissolution or winding up of the Corporation, its assets remaining after payment of all debts and liabilities shall be distributed pursuant to a nonprofit fund, foundation, association or corporation which is organized and operated exclusively for Charitable or Social Welfare purposes and which has established its tax exempt status under Internal Revenue Code Section 501(c)(3) or 501(c)(4).

## ARTICLE IV
## MEMBERS

The Corporation shall have no members. Any references herein to "members" are to the Board of Directors.

# ARTICLE V
## BOARD OF DIRECTORS

Section 1. <u>General Powers</u>.

Subject to the limitations of these Bylaws, the Articles of Incorporation, and the laws of California, the affairs of the corporation shall be managed, and all corporate powers shall be exercised by, or under the direction of, a Board of Directors.

Section 2. <u>Number, Tenure and Qualifications</u>.

The corporation shall have three directors. Each director shall hold office for a term of 2 years, each term beginning January 1 of each odd numbered year, or until a successor is elected.

The first directors shall be those individuals who organized the corporation.

Section 3. <u>Regular Meeting</u>.

Regular meetings of the Board shall be held without other notice than these Bylaws at any place designated from time to time by resolution of the Board.

Section 4. <u>Special Meetings</u>.

Special meetings of the Board of Directors may be called by or at the request of the President, the Secretary or a majority of the actual directors. Unless approved by the President for an alternate location, the place will be the office of the corporation.

Section 5. <u>Notice of Special Meetings</u>.

Notice of any special meeting of the Board shall be given at least two (2) days prior thereto either personally, by telephone, facsimile or electronic mail or four (4) days' notice by first-class mail, subject to waiver of notice as provided in these Bylaws. All such notices shall be given or sent to the director's address or telephone number as shown on the records of the corporation. The attendance of a director at any special meeting shall also constitute a waiver of notice of such meeting.

Section 6. <u>Quorum</u>.

A majority of the directors holding office at any point in time shall constitute a quorum. The directors may continue to transact business during a meeting at which a quorum is initially present, notwithstanding the withdrawal of directors, if any action is approved by at least a majority of the required quorum for that meeting.

Section 7. <u>Manner of Acting</u>.

Action by the Board shall be by a majority of the directors present at a meeting duly held at which a quorum is present unless a greater number is required by law.

Section 8. <u>Action Without a Meeting</u>.

Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all members of the Board shall individually or collectively consent in writing to such action. Such action by written consent shall have the same force and effect as a unanimous vote of the Board. Such written consent or consents shall be filed with the minutes of the proceedings of the Board. Written consent may be transmitted by electronic mail.

Section 9. <u>Participation in Meetings by Means of Conference Telephone</u>.

Members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation by such means shall constitute presence in person at such meeting.

Section 10. <u>Vacancies</u>.

Any vacancy occurring in the Board of Directors to be filled by reason of an increase in the number of directors shall be filled by a majority of the remaining directors, though less than a quorum, or a sole remaining director. A director elected to fill a vacancy shall hold office during the unexpired term of his or her predecessor in office and until his or her successor is elected.

Section 11. <u>Compensation</u>.

Directors shall not receive compensation for their services as members of the Board. Nothing herein shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, attorney, or otherwise, and receiving compensation therefor or from receiving reimbursement for reasonable expenses, as may be fixed or determined by resolution of the Board. In considering financial transactions between the corporation and any director, directors shall comply with the provisions of Section 5233 of the California Corporations Code.

Section 12. <u>No Interest in Assets</u>.

No director shall possess any property right in or to the property of the corporation. In the event the corporation owns or holds any property upon its dissolution and winding up, after paying or adequately providing for its debts and obligations, the directors shall dispose of the remaining property in accordance with Article II of these Bylaws.

ARTICLE VI
OFFICERS

Section 1. <u>Officers</u>.

The officers of the corporation shall be a President (or Executive Director), a Secretary, a Treasurer, an Assistant Treasurer, and such other officers as may be elected to offices created by the Board. Officers shall have powers and duties as specified herein and as may be additionally prescribed by the Board. One person may hold two or more offices, except those of President and Secretary, or President and Treasurer, but no officer shall execute, acknowledge, or verify any instrument in more than one capacity, if such instrument is required to be executed, acknowledged, or verified by two or more officers.

Section 2. <u>Election and Term of Office</u>.

The officers of the corporation shall be elected by the Board of Directors, and shall serve at the pleasure of the Board of Directors. New offices may be created and filled, and vacancies may be filled, at any meeting of the Board of Directors. Each officer shall hold office until a successor shall have been elected, unless otherwise removed.

Section 3. <u>Removal</u>.

Subject to the rights, if any, of an officer under any contract of employment, any officer elected or appointed by the Board may be removed by the Board with or without cause, whenever in its judgment the best interests of the corporation would be served thereby.

Section 4. <u>Resignation</u>.

Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

Section 5. <u>President</u>.

The President (or Executive Director) shall, if present, preside at all meetings of the corporation and shall have general supervision, direction and control of the business of the corporation.

Section 6. <u>Secretary</u>.

The Secretary shall be responsible for the mailing of notices and see to the proper recording of proceedings of meetings of the corporation.

Section 7. <u>Treasurer.</u>
     The Treasurer shall be responsible for the corporation's funds and financial records. The Treasurer shall collect and report, or supervise collection and reporting, of all income and expenditures, shall establish proper accounting procedures for the handling of the corporation's funds, and shall be responsible for the keeping of the funds in such banks as approved by the Board. The Treasurer shall report on the financial condition of the corporation at meetings of the Board and at other times when called upon by the President.

## ARTICLE VII
## FISCAL YEAR

     The fiscal year of this Corporation shall be January through December.

## ARTICLE VIII
## INDEMNIFICATION OF DIRECTORS, OFFICERS
## AND OTHER CORPORATE AGENTS

Section 1. <u>Indemnification.</u>
     The Corporation may, to the extent allowed by applicable state and federal laws, indemnify and hold harmless its officers, directors, agents and employees from and against any and all claims, actions, proceedings, whether threatened, pending or completed, brought by reason of their respective position with or relationships to the Corporation, including, without limitation, all reasonable attorneys' fees, costs and other expenses incurred in establishing a right to indemnification under this Article.

Section 2. <u>Insurance.</u>
     The Corporation shall have power to purchase and maintain insurance on behalf of any agent of the corporation against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such whether or not the corporation would have the power to indemnify the agent against such liability under the provisions of this Article.

## ARTICLE IX
## BOOKS AND RECORDS

     The Corporation shall keep at its principal office correct and complete books and records of account, written minutes of the proceedings of its meetings, the original or a copy of the Articles and these Bylaws as amended to date, and a record giving the names and addresses of all members.

## ARTICLE X
## WAIVER OF NOTICE

     Whenever any notice is required to be given under the provisions of the California Nonprofit Corporation Law or under the provisions of the Articles of Incorporation or by these Bylaws, a written waiver thereof, signed by the person or persons entitled to such notice, whether before or after the time stated therein, which is made a part of the minutes, shall be deemed equivalent to the giving of such notice.

## ARTICLE XII
### RULES OF ORDER

The rules contained in Robert's Rules of Order Newly Revised or as may be amended from time to time, govern the Corporation in all cases in which they are applicable, and in which they are not inconsistent with these Bylaws, the Articles of Incorporation, or then existing law.

## ARTICLE XIII
### AMENDMENTS TO BYLAWS

New bylaws may be adopted, or these bylaws may be amended or repealed, by an affirmative majority vote of the Board of Directors at which a quorum is present. A copy of the proposed amendment or new bylaws shall be included in the notice of meeting given to each director.

## CERTIFICATE

I, Frank Pitre, hereby certify:

 That I am the duly elected and acting Treasurer of Up from the Ashes, a California Nonprofit Public Benefit Corporation; and

 That the foregoing Bylaws, consisting of __6__ pages, including this one, constitute the Bylaws of said corporation, as duly adopted by the Board of Directors.

 IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of May, 2018.

_____

Frank Pitre, Treasurer

**IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH 45999-0023

Date of this notice: 04-10-2018

Employer Identification Number:
82-5125881

Form: SS-4

Number of this notice: CP 575 A

UP FROM THE ASHES
455 CAPITOL MALL STE 600
SACRAMENTO, CA 95814

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


                    WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

        Thank you for applying for an Employer Identification Number (EIN). We assigned you
EIN 82-5125881. This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees. Please keep this notice in your permanent
records.

        When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above. Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN. If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

        Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

                    Form 1120                        04/15/2019

        If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice. If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

        We assigned you a tax classification based on information obtained from you or your
representative. It is not a legal determination of your tax classification, and is not
binding on the IRS. If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue). Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*. See Form 8832 and its instructions for additional information.

        **IMPORTANT INFORMATION FOR S CORPORATION ELECTION:**

        If you intend to elect to file your return as a small business corporation, an
election to file a Form 1120-S must be made within certain timeframes and the
corporation must meet certain tests. All of this information is included in the
instructions for Form 2553, *Election by a Small Business Corporation*.

If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945, CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a Welcome Package shortly, which includes instructions for making your deposits electronically through the Electronic Federal Tax Payment System (EFTPS). A Personal Identification Number (PIN) for EFTPS will also be sent to you under separate cover. Please activate the PIN once you receive it, even if you have requested the services of a tax professional or representative. For more information about EFTPS, refer to Publication 966, *Electronic Choices to Pay All Your Federal Taxes*. If you need to make a deposit immediately, you will need to make arrangements with your Financial Institution to complete a wire transfer.

The IRS is committed to helping all taxpayers comply with their tax filing obligations. If you need help completing your returns or meeting your tax obligations, Authorized e-file Providers, such as Reporting Agents (payroll service providers) are available to assist you. Visit the IRS Web site at www.irs.gov for a list of companies that offer IRS e-file for business products and services. The list provides addresses, telephone numbers, and links to their Web sites.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov. If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.** You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is UPFR. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

                    Keep this part for your records.        CP 575 A (Rev. 7-2007)

-----------------------------------------------------------------------------------

        Return this part with any correspondence
        so we may identify your account.  Please              CP 575 A
        correct any errors in your name or address.

                                                            9999999999

        Your Telephone Number  Best Time to Call    DATE OF THIS NOTICE:  04-10-2018
        (    )        -                             EMPLOYER IDENTIFICATION NUMBER:  82-5125881
        _____   _____       FORM:  SS-4              NOBOD


        INTERNAL REVENUE SERVICE                    UP FROM THE ASHES
        CINCINNATI  OH   45999-0023                 455 CAPITOL MALL STE 600
        ldldldldldldldldldldldlldldlldlldldl        SACRAMENTO, CA  95814

Form **1024-A**

(January 2018)

Department of the Treasury
Internal Revenue Service

# Application for Recognition of Exemption
## Under Section 501(c)(4) of the Internal Revenue Code

▶ Go to *www.irs.gov/Form1024A* for instructions and the latest information.

OMB No.1545-0057

**Note:** If exempt status is approved, this application will be open for public inspection.

Complete Parts I–IX and submit Form 8718 (with payment of the appropriate user fee). Attach additional sheets if you need more space to answer fully. Use the instructions to complete this application and for definitions of terms used in this form. For additional help, call IRS Exempt Organizations Customer Account Services toll-free at 877-829-5500, or visit our website at *www.irs.gov*. If you don't submit the required information, we may return the application to you. A request for a determination under section 501(c)(4) is optional. See instructions for additional information.

## Don't include social security numbers on this form as it may be made public.

| Part I | Identification of Applicant |
|---|---|

**1** Full name of organization (exactly as it appears in your **organizing document**)

Up from the Ashes

**2** c/o Name (if applicable)

**3** **Mailing address** (Number and street) (see instructions)

455 Capitol Mall, Suite 600

**4** Employer Identification Number (EIN)

82-5125881

City or town, state or country, and ZIP + 4

Sacramento, CA 95814

**5** Month the annual accounting period ends

December

**6** Primary contact (officer, director, trustee, or **authorized representative**)

**a** Name:

Ashlee Titus

**b** Phone:

(916) 442-7757

**c** Fax: (optional)

(916) 442-7759

**7** Organization's website:

| Part II | Organizational Structure |
|---|---|

You must be a corporation (including a limited liability company), an unincorporated association, or a trust to be tax exempt. See instructions. **Don't file this form unless you can check "Yes" on lines 1, 2, 3, or 4.**

| | | |
|---|---|---|
| **1** | Are you a **corporation**? If "Yes," attach a copy of your articles of incorporation showing **certification of filing** with the appropriate state agency. Include copies of any amendments to your articles and be sure they also show state filing certification. | ☑ Yes ☐ No |
| **2** | Are you a **limited liability company (LLC)**? If "Yes," attach a copy of your articles of organization showing certification of filing with the appropriate state agency. Include copies of any amendments to your articles and be sure they show state filing certification. Also, if you adopted an operating agreement, attach a copy, along with any amendments. | ☐ Yes ☑ No |
| **3** | Are you an **unincorporated association**? If "Yes," attach a copy of your articles of association, constitution, or other similar organizing document that is dated and includes at least two signatures. Include signed and dated copies of any amendments. | ☐ Yes ☑ No |
| **4** | Are you a **trust**? If "Yes," attach a signed and dated copy of your trust agreement. Include signed and dated copies of any amendments. If you are a trust, enter the date the trust was funded. (MM/DD/YYYY) / / | ☐ Yes ☑ No |
| **5** | Have you adopted **bylaws**? If "Yes," attach a current copy showing date of adoption. If "No," explain in an attachment how your officers, directors, or trustees are selected. | ☑ Yes ☐ No |

| Part III | Narrative Description of Your Activities |
|---|---|

Use an attachment to describe all of your past, present, and planned activities in a narrative (including the percentage of time and funds spent on these activities). You may attach representative copies of newsletters, brochures, or similar documents for supporting details to this narrative. Refer to the instructions for information that must be included in your description. Check this box to confirm that you submitted a narrative attachment describing your activities.   ☑

**For Paperwork Reduction Act Notice, see instructions.**

Cat. No. 69155Y

Form **1024-A** (1-2018)

Case: 19-30088   Doc# 14474   Filed: 06/06/24   Entered: 06/06/24 13:45:41   Page 53 of 67

## Part IV  Officers, Directors, Trustees, Employees, and Independent Contractors

1  List the names, titles, and mailing addresses for all of your officers, directors, and trustees. If additional space is needed, attach a separate sheet.

| Name | Title | Mailing address |
|---|---|---|
| See Exhibit 4. | | .................................................... |
| | | .................................................... |
| | | .................................................... |
| | | .................................................... |

The following "Yes" or "No" questions relate to all past, present, or planned relationships, transactions, or agreements with your officers, directors, trustees, employees, members, and independent contractors.

2  Do you have a family or business relationship or agreement with any of your officers, directors, trustees, employees, members, or independent contractors, or any entity they own or control, other than through their position as your officer, director, trustee, employee, member, or independent contractor? If "Yes," identify in an attachment the individual and describe the relationship or agreement.  ☐ Yes  ☑ No

3a  Do or will you pay any compensation to your officers, directors, trustees, employees, members, or independent contractors? If "Yes," answer lines 3b and 3c.  ☐ Yes  ☑ No

b  Do or will the individuals that approve compensation arrangements follow a conflict of interest policy? If "No," describe in an attachment how you set compensation that is **reasonable.**  ☐ Yes  ☐ No

c  Do or will you compensate any of your officers, directors, trustees, employees, members, or independent contractors through **nonfixed payments,** such as discretionary bonuses or revenue-based payments? If "Yes," describe in an attachment all nonfixed compensation agreements.  ☐ Yes  ☐ No

## Part V  Your Specific Activities

The following "Yes" or "No" questions relate to all past, present, and planned activities you may conduct. See instructions.

1  Has the organization spent, or does it plan to spend, any money attempting to influence the selection, nomination, election, or appointment of any person to any federal, state, or local public office or to an office in a political organization? If "Yes," explain in detail and list the amounts spent or to be spent in each case in an attachment.  ☐ Yes  ☑ No

2  Have you previously received a ruling or determination letter recognizing you (or any predecessor organization) as exempt under section 501(c)(3) and later revoked that recognition of exemption on the basis that you (or your predecessor) were carrying on propaganda or otherwise attempting to influence legislation or on the basis that it engaged in political activity? If "Yes," explain in an attachment.  ☐ Yes  ☑ No

3  Are you a **successor** to another organization? Answer "Yes" if you have taken or will take over the activities of another organization, you took over 25% or more of the fair market value of the net assets of another organization, or you were established upon the conversion of an organization from for-profit to nonprofit status. If "Yes," explain in an attachment.  ☐ Yes  ☑ No

4  Are you connected in any way with any other organization (for example, financial support on a continuing basis; shared facilities or employees; same officers, directors, or trustees)? If "Yes," explain in an attachment.  ☐ Yes  ☑ No

5  Do you have members? If "Yes," state in an attachment the qualifications necessary for membership, the classes of membership and number of members in each class, and the voting rights or privileges received.  ☐ Yes  ☑ No

6  Have you made, or do you plan on making, any distribution of property or surplus funds to shareholders or members? If "Yes," explain in an attachment.  ☐ Yes  ☑ No

7  Do you receive payments for services performed? If "Yes," explain in an attachment the services performed, income realized and expenses incurred, and the nature of benefits to the general public from these activities.  ☐ Yes  ☑ No

8  Do you lease property? If "Yes," explain in an attachment. Include a description of the property, any relationship between the applicant and the other party, and a copy of the lease agreement.  ☐ Yes  ☑ No

9  Are you a homeowner's association? If "Yes," explain in an attachment whether access to any property or facility you own or maintain is restricted in any way.  ☐ Yes  ☑ No

10  Are you a local association of employees? If "Yes," state in an attachment the name and address of each employer whose employees are eligible for membership in the organization.  ☐ Yes  ☑ No

11  Do or will you make **foreign** grants or conduct activities in any foreign country or countries? If "Yes," describe those grants or activities in an attachment.  ☐ Yes  ☑ No

Form **1024-A** (1-2018)

**Part VI**  **Financial Data** *(see instructions for information you must provide) (attach statement regarding accounting method, if necessary)*

### A. Statement of Revenues and Expenses

| | Type of revenue or expense | Year: | Year: | Year: |
|---|---|---|---|---|
| **Revenues** | 1  Gifts, grants, and contributions received . . . . . . . . . . | See Exhibit 5. | | |
| | 2  Membership fees received . . . . . . . . . . | | | |
| | 3  Gross investment income . . . . . . . . . . | | | |
| | 4  Net unrelated business income . . . . . . . . . . | | | |
| | 5  Taxes levied for your benefit . . . . . . . . . . | | | |
| | 6  Value of services or facilities furnished by a governmental unit without charge . . . . . . . . . . | | | |
| | 7  Any revenue not otherwise listed above or in lines 9–11 below (attach statement) . . . . . . . . . . | | | |
| | 8  Total of lines 1 through 7 . . . . . . . . . . | | | |
| | 9  **Gross receipts** from any activity that is related to your exempt purposes . . . . . . . . . . | | | |
| | 10  Total of lines 8 and 9 . . . . . . . . . . | | | |
| | 11  Net gain or loss on sale of capital assets (attach statement) . . . | | | |
| | 12  Total Revenue Combine lines 10 and 11 | | | |
| **Expenses** | 13  Fundraising expenses (attach statement) . . . . . . . . . . | | | |
| | 14  Contributions, gifts, grants, and similar amounts paid out (attach statement) . . . . . . . . . . | | | |
| | 15  Disbursements to or for the benefit of members (attach statement) . | | | |
| | 16  Compensation of officers, directors, and trustees . . . . . . . | | | |
| | 17  Other salaries and wages . . . . . . . . . . | | | |
| | 18  Occupancy . . . . . . . . . . | | | |
| | 19  Any expense not otherwise classified, such as program services (attach statement) . . . . . . . . . . | | | |
| | 20  Total Expenses Add lines 13 through 19 . . . . . . . . . . | | | |

### B. Balance Sheet (for your most recently completed tax year)

| | | | Year End |
|---|---|---|---|
| **Assets** | | | |
| 1 | Cash . . . . . . . . . . | 1 | |
| 2 | Accounts receivable, net . . . . . . . . . . | 2 | |
| 3 | Inventories . . . . . . . . . . | 3 | |
| 4 | Bonds and notes receivable (attach statement) . . . . . . . . | 4 | |
| 5 | Corporate stocks (attach statement) . . . . . . . . . . | 5 | |
| 6 | Loans receivable (attach statement) . . . . . . . . . . | 6 | |
| 7 | Other investments (attach statement) . . . . . . . . . . | 7 | |
| 8 | Depreciable and depletable assets (attach statement) . . . . . . | 8 | |
| 9 | Land . . . . . . . . . . | 9 | |
| 10 | Other assets (attach statement) . . . . . . . . . . | 10 | |
| 11 | Total assets (add lines 1 through 10) . . . . . . . . . . | 11 | |
| **Liabilities** | | | |
| 12 | Accounts payable . . . . . . . . . . | 12 | |
| 13 | Contributions, gifts, grants, etc., payable . . . . . . . . . . | 13 | |
| 14 | Mortgages and notes payable (attach statement) . . . . . . . . | 14 | |
| 15 | Other liabilities (attach statement) . . . . . . . . . . | 15 | |
| 16 | Total liabilities (add lines 12 through 15) . . . . . . . . . . | 16 | |
| **Fund Balances or Net Assets** | | | |
| 17 | Total fund balances or net assets . . . . . . . . . . | 17 | |
| 18 | **Total liabilities and fund balances or net assets** (add lines 16 and 17) . . . . . . . . . . | 18 | |

Form **1024-A** (1-2018)

## Part VII  Annual Filing Requirements *(see Instructions)*

Certain organizations aren't required to file an information return. If you are granted tax-exemption, are you  ☐ **Yes**  ☑ **No** claiming to be excused from filing an information return? If "Yes," explain in an attachment.

*If you fail to file a required information return for three consecutive years, your exempt status will be revoked.*

## Part VIII  Information Regarding Notification Requirement Under Section 506

Most organizations operating under section 501(c)(4) are required to notify the IRS that they are operating under section 501(c)(4) within 60 days of formation by filing Form 8976, Notice of Intent to Operate Under Section 501(c)(4). If an organization doesn't submit a timely notification, a penalty will be assessed. Submission of Form 1024-A doesn't satisfy the requirement to provide notice to the IRS. See instructions for additional information regarding the notification requirement.

## Part IX  User Fee Information and Signature

You must include Form 8718 and the correct user fee payment with this application. If you don't submit the correct user fee, we won't process the application and we will return it to you. Your check or money order must be made payable to the United States Treasury. User fees are subject to change. Check our website at *www.irs.gov* and type "User Fee" in the keyword box, or call Customer Account Services at 877-829-5500 for current information. Also, attach Form 2848, if the application is signed by a person authorized by power of attorney.

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

| Please Sign Here ▶ | _(Signature of Officer, Director, Trustee, or other authorized Individual)_ | *Ashlee Titus* | *05 14 18* |
| | | _(Type or print name of signer)_ | _(Date)_ |
| | | *Authorized Representative* | |
| | | _(Type or print title or authority of signer)_ | |

Form **1024-A** (1-2018)

**Up from the Ashes**
**EIN 82-5125881**

| Exhibit | Description |
|---------|-------------|
| 1 | Response to Part II, Question 1 – Articles of Incorporation |
| 2 | Response to Part II, Question 5 – Bylaws |
| 3 | Response to Part III – Narrative Description of Activities |
| 4 | Response to Part IV, Questions 1 and 2 – Officers, Directors, Trustees, Employees, and Independent Contractors |
| 5 | Response to Part VI – Financial Data |
| 6 | Form 2848 – Power of Attorney and Declaration of Representative |
| 7 | Employer Identification Number |

Exhibit 1

Response to Part II, Question 1 – Articles of Incorporation

Exhibit 3

Response to Part III – Narrative Description of Activities

      The primary purpose of this corporation is to advocate for victims of the 2017 Napa fires. This organization will contribute to the common good and general welfare of California by aiding those who have been affected by natural disaster and making a positive difference in the afflicted community.

      It is anticipated that the corporation's primary source of financial support will from direct solicitation of supporters of the corporation's objectives. Fundraising shall primarily be conducted on a personal basis, however, direct mail solicitation may be used. All contributors will be advised that their contributions are not deductible.

      The following professionals or organizations have been or may be retained to further the corporation's objectives:

      o Consulting firms to create a strategy to achieve the organization's purpose;
      o Consulting firms to engage in public education programs;
      o Law firm to ensure compliance with all state and federal laws and statutes;
      o Accounting firm to provide professional services;
      o Lobbyist or lobbying firm to further the corporation's purpose;
      o Information technology consultant to develop and manage website and social media communications

## Exhibit 4

Response to Part IV – Officers, Directors, Trustees, Employees, and Independent Contractors

| NAME AND MAILING ADDRESS | COMPENSATION |
| --- | --- |
| STEVE CAMPORA, DIRECTOR/PRESIDENT<br>20 BICENTENNIAL CIRCLE<br>SACRAMENTO, CA 94826 | $0 |
| MICHAEL A. KELLY, DIRECTOR/SECRETARY<br>650 CALIFORNIA STREET, 26TH FLOOR<br>SAN FRANCISCO, CA 94108 | $0 |
| FRANK PITRE, DIRECTOR/TREASURER<br>840 MALCOLM ROAD, SUITE 200<br>BURLINGAME, CA 94010 | $0 |

Exhibit 5

Response to Part VI – Financial Data

| | 2018 | 2019 | 2020 |
|---|---|---|---|
| **Receipts** | | | |
| Contributions | $1,000,000 | $1,000,000 | $1,000,000 |
| | | | |
| **Expenditures** | | | |
| Legal/Accounting | $50,000 | $50,000 | $50,000 |
| Office | $10,000 | $10,000 | $10,000 |
| Consulting | $100,000 | $100,000 | $100,000 |
| Printing | $25,000 | $25,000 | $25,000 |
| Lobbying | $100,000 | $100,000 | $100,000 |
| Research | $10,000 | $10,000 | $10,000 |
| Grassroots | $200,000 | $200,000 | $200,000 |
| Public Education/Advertising | $505,000 | $505,000 | $505,000 |
| Total | $1,000,000 | $1,000,000 | $1,000,000 |

1

**EXHIBIT E**

2      IBEW Complaint and Request for Investigations of Violations of The Political Reform Act

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COMPLAINT AND REQUEST FOR INVESTIGATION OF VIOLATIONS OF THE POLITICAL REFORM ACT

The International Brotherhood of Electrical Workers Local # 1245 hereby files this Complaint against Up from the Ashes and unknown persons for violations of the Political Reform Act.

Up from the Ashes (UFTA) is a front organization created to conceal the identities of law firms who do not want the public to know they are paying a lobbyist to persuade the government to preserve billions of dollars in legal fees. This deprives the public of their right under California law to know who is paying to influence their government so they can evaluate those efforts and the behavior of their government. We urge the FPPC to enforce the law and vindicate the public's rights by investigating UFTA and its backers, and compelling those behind it to disclose their identities.

## BACKGROUND

UFTA was registered on April 11, 2018 with the California Secretary of State as a California nonprofit organization. (See Exhibit 1.) A lobbyist then disclosed that—on that very same day—he began lobbying on behalf UFTA and that its address is 650 California Street, 6th Floor, in San Francisco. (See Exhibit 2.) UFTA's San Francisco address is also the address of the person it disclosed as its 'responsible officer,' Frank Pitre.

Mr. Pitre is a trial lawyer with the firm of Cotchett, Pitre & McCarthy, LLP. He is a past President of the Consumer Attorneys of California (CAOC), an association of plaintiff's attorneys, and his firm is currently identified as a "Benefactor" of the CAOC's "President's Club." Mr. Pitre's biography on his firm website also states that he was "appointed as Co-Lead Counsel on behalf of the victims of the North Bay Wild Fires." (https://www.cpmlegal.com/attorneys-Frank-Pitre.html.) On April 30, 2018, on a segment of the 10:00 p.m. news on KTVU2, Mr. Pitre attacked PG&E for lobbying the California government with regard to its potential liability for damage caused by fires in the future.

Patrick McCallum of the McCallum Group, a lobbyist who is also a victim of the North Bay fires, has begun a campaign to influence California's government to advance the trial lawyers' interests. Although Mr. McCallum's personal experience during the fires deserves sympathy, it does not give him license to help Mr. Pitre and UFTA's other backers deceive the people of California and violate the law. And yet, from its inception, Mr. McCallum's lobbying campaign

on behalf of UFTA has included explicit efforts to misinform the public about the nature of UFTA.

On April 12, the day after UFTA registered itself as a nonprofit corporation with the Secretary of State, McCallum falsely claimed in an opinion piece published by the Sacramento Bee that UFTA is "a coalition of wine country fire victims." Patrick McCallum, *If PG&E started the wine country fires, they should pay. Don't blame climate change*, SACRAMENTO BEE (April 12, 2018) http://www.sacbee.com/opinion/california-forum/article208662829.html. On April 26, McCallum was quoted in an article about insurance claims arising from the North Bay fires published by Fox KTVU. http://www.ktvu.com/news/wine-country-insurance-wars-the-clock-is-ticking. In the article, he deceptively omits the fact he is a lobbyist for UFTA and instead identifies himself as merely a higher education lobbyist. He mentions UFTA, but only to falsely describe it as a group "created by [fire] victims."

McCallum subsequently testified on behalf of UFTA before the Senate Standing Committee on Energy, Utilities and Communications on April 18th, before the Senate Standing Committee on Governmental Organization on April 23rd, and before the Senate Standing Committee on Insurance on April 25th. As with his other public statements, during his testimony on behalf of UFTA, Mr. McCollum claimed that he represented "a coalition of the thousands of fire victims of the recent fires."

As UFTA's paid lobbyist, Mr. McCallum's claims about the nature of the UFTA and the interests it serves are betrayed by the fact that, the day before the Sacramento Bee published his commentary on April 12, he wrote in an email that he was "hired by a group funded by the consumer attorneys . . . The name of the group is Up From the Ashes." Email from Patrick McCollum (April 11, 2018) (Exhibit 3). Indeed, an Amendment to Registration Statement filed by Mr. McCallum on April 12, 2018, included a lobbying a Lobbying Firm Activity Authorization signed by Frank Pitre himself that states that UFTA is in fact a group "with a common economic interest which is principally represented or from which membership or financial support is principally derived" and that interest group is a "[g]roup of individual Law Firms." (Exhibit 4.)

The public has a right to determine if UFTA is nothing more than a means for a group of trial lawyers to profit off of the tragic fires, one part of a public misinformation campaign conducted while hiding their identities behind UFTA. Or if its lobbyist is publicly and repeatedly misrepresenting the nature of the

group he serves. Only the FPPC has the authority to determine whether UFTA's advocacy or its filings are accurate, because both cannot be.

## LEGAL ANALYSIS

Trial lawyers are paying a seasoned lobbyist to wage an influence campaign on their behalf and using UFTA as a front company to conceal their involvement while their lobbyist publicly misrepresents the nature of that front company as an association of fire victims. At the close of the next quarter, those law firms must either identify themselves and disclose their conduit payments through UFTA to Mr. McCallum, or the FPPC should compel Mr. McCallum to disclose his true clients and their interests pursuant to Cal. Gov't Code § 86104(d).

Contract lobbyists like Mr. McCallum must register as lobbyists if they are paid or promised $2,000 to lobby in a calendar month. (2 Cal. Code Regs. § 8239(b).) Mr. McCallum registered as a lobbyist for UFTA. When hired by a person, a lobbyist's registration must include the full name, business address, and telephone number of the person employing the lobbyist and "[i]nformation sufficient to identify the nature and interests of the person[.]" (Cal. Gov't Code § 86104(d).)

Here, Mr. McCallum's registration statement disclosed he represented UFTA but the written authorization for his work was signed by Frank Pitre—as noted above the past President of the Consumer Attorneys of California and Co-Lead Counsel for victims of the North Bay Wild Fires. In fact, instead of stating that UFTA was a coalition OF wild fire victims, as Mr. McCallum does during his lobbying efforts, Mr. Pitre's authorization for Mr. McCollum's advocacy states that UFTA is a coalition FOR victims of wild fires and, further, that the interest "principally represented or from which membership or financial support [of UFTA] is principally derived" is actually a "[g]roup of individual law firms."

Consequently, either UFTA is publicly misrepresenting itself as a group *of fire victims* when in fact it is *a group of trial lawyers*—or the documents filed by UFTA regarding its nature and interests are inaccurate. Moreover, if UFTA is a group of trial lawyers "principally represented or from which membership or financial support is principally derived," then the statement of its nature and purpose ("Coalition for victims of California wild fires") on its Lobbying Firm Activity Authorization is also of doubtful accuracy.

UFTA's lobbying authorization form begs the question as to whether the actual clients, or "lobbyist employers" under California Government Code § 82039.5, are the mysterious group of law firms purportedly shielded from view by the creation of a sham organization. If the law firms number ten or more, they could have qualified and registered as a lobbying coalition. (2 Cal. Code Regs. § 18616.4) Members of a lobbying coalition, are required to also disclose the names and addresses of each member and the amount they paid to the coalition. California Government Code § 18616.4(b). If the law firms are not a lobbying coalition, or number fewer than ten, then <u>each</u> must authorize the lobbying firm as a lobbyist employer. UFTA's authorization of McCallum to lobby on its behalf indicates that it is NOT a lobbying coalition. Accordingly, all of the law firms should have filed Lobbying Firm Activity Authorizations (Form 602).

The circumstances will certainly be clarified after the close of the current quarter because California Government Code § 86115 states that "[a]ny person who <u>directly or indirectly</u> makes payments to influence legislative or administrative action of five thousand dollars ($5,000) or more in value in any calendar quarter" must file reports required by California Government Code § 86116 (underscoring added). Payments triggering this reporting obligation include:

(a)     Direct or indirect payment to a lobbyist . . . by a person employing or contracting for the services of the lobbyist separately or jointly with other persons;

(b)     Payment in support or assistance of a lobbyist or his activities, including but not limited to the direct payment of expenses incurred at the request or suggestion of the lobbyist;

California Government Code § 82045. Persons who trigger this reporting obligation must disclose:

(a)     Their name, business address, and telephone number of the lobbyist employer or other person filing the report.

(b)     The total amount of payments to each lobbying firm.

(c)     The total amount of all payments to lobbyists employed by the filer.

(d)     A description of the specific lobbying interests of the filer.

(e)     A periodic report completed and verified by each lobbyist employed by a lobbyist employer pursuant to Section 86113 .

(f)     Each activity expense of the filer.   A total of all activity expenses of the filer shall be included.

(g)     The date, amount, and the name of the recipient of any contribution of one hundred dollars ($100) or more made by the filer to an elected state officer, a state candidate, or a committee controlled by an elected state officer or state candidate, or a committee primarily formed to support the officer or candidate.   If this contribution is reported by the filer or by a committee sponsored by the filer in a campaign statement filed pursuant to Chapter 4 which is required to be filed with the Secretary of State, the filer may report only the name of the committee, and the identification number of the committee.

(h) . . . the total of all other payments to influence legislative or administrative action including overhead expenses[.]

California Government Code § 86116.

These lobbying disclosure requirements prevent lobbyists from "[a]ttempt[ing] to create a fictitious appearance of public favor or disfavor of any proposed legislative or administrative action . . ." California Government Code § 86205(d).

## CONCLUSION

Unknown law firms seeking to influence the people and government of California have concocted UFTA as a front organization to conceal themselves from the public scrutiny the law was designed to enable.  In recent years the FPPC has laudably acted to reveal "shadow lobbying" by unregistered consultants and undisclosed entertainment.  In the context of campaigns, the FPPC has long made disclosure of the true source of funding of political spending its top priority.  By requiring Up from the Ashes to fully disclose the identity of the trial lawyers purporting to be a group of fire victims and the true source of its funding, or forcing UFTA to disavow the misrepresentations made in the course of its lobbying, the FPPC will help the public understand and evaluate the driving force behind the organization's messages.