1      UNITED STATES BANKRUPTCY COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3      -oOo-

4   In Re:                          ) Case No. 19-30088
                                    ) Chapter 11
5   PG&E CORPORATION AND PACIFIC    )
    GAS AND ELECTRIC COMPANY        ) San Francisco, California
6                                   ) Tuesday, July 30, 2024
              Reorganized Debtor.   ) 10:00 AM
7   _____
                                    MOTION TO STAY PROCEEDINGS RE
8                                   DISPUTED CLAIMS UNDER THE
                                    FIRE VICTIM TRUST AGREEMENT &
9                                   REVIEW OF FVT INTERPRETATION
                                    OF PLAN LANGUAGE FILED BY
10                                  FIRE VICTIMS [14491]

11                                  MOTION OF WILLIAM B. ABRAMS
                                    PURSUANT TO FEDERAL RULE OF
12                                  BANKRUPTCY PROCEDURE 2004 FOR
                                    ENTRY OF AN ORDER AUTHORIZING
13                                  DISCOVERY AND TRUST
                                    COMPLIANCE WITH COURT ORDERS.
14                                  FILED BY WILLIAM ABRAMS
                                    [14474]

15

16           TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE DENNIS MONTALI
17           UNITED STATES BANKRUPTCY JUDGE

    APPEARANCES (All present by video or telephone):
18  For Cathy Yanni, fire       DAVID J. MOLTON, ESQ.
    victim trustee:             Brown Rudnick LLP
19                               Seven Times Square
                                New York, NY 10036
20                              (212) 209-4800

21  For movants, fire victim    BRADFORD BOWEN, ESQ.
    trust:                      Danko Meredith
22                               333 Twin Dolphin Drive
                                Suite 145
23                              Redwood Shores, CA 94065
                                (650) 453-3600

24

25

**eScribers, LLC**

```
1   For Movants:              KIMBERLY LEDING, ESQ.
                              Poniatowski Leding Parikh PC
2                             21715 Redwood Road
                              Castro Valley, CA 94546
3                             (510) 881-8700

4   Also Present:             William B. Abrams
                              Pro Se fire claimant
5

6

7

8

9

10

11

12

13

14

15

16

17

18  Court Recorder:           LORENA PARADA/ ANKEY THOMAS
                              United States Bankruptcy Court
19                            450 Golden Gate Avenue
                              San Francisco, CA 94102
20

21  Transcriber:              RIVER WOLFE
                              eScribers, LLC
22                            7227 N. 16th Street
                              Suite #207
23                            Phoenix, AZ 85020
                              (800) 257-0885
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 2 of 90

```
 1    SAN FRANCISCO, CALIFORNIA, TUESDAY, JULY 30, 2024, 10:00 AM
 2                             -oOo-
 3       (Call to order of the Court.)
 4            THE CLERK:  Court is now in session, the Honorable
 5   Dennis Montali presiding.  Calling the matter of PG&E
 6   Corporation.
 7            And I'm bringing Mr. Molton in now, Your Honor.
 8            THE COURT:  All right.  Good morning.  Mr. Molton.
 9   You're muted.
10            MR. MOLTON:  I see that.  Good morning, Your Honor.
11            THE COURT:  Have Mr. Danko or someone coming in?
12            THE CLERK:  I believe it's Mr. Brad Bowen.  I'll bring
13   him in now, Your Honor.
14            THE COURT:  Okay.
15            MR. BOWEN:  Morning, Your Honor.  We also should have
16   Ms. Kim Leding.  She's a bankruptcy attorney who was -- I can
17   argue this as well, but she was also prepared and is more
18   familiar with the bankruptcy side of this case.
19            THE COURT:  And you're going to bring -- she's coming
20   in?
21            THE CLERK:  I'll bring her in now, Your Honor.
22            THE COURT:  Well, Mr. Bowen, you're going to make the
23   principal argument, right?
24            MR. BOWEN:  I believe Ms. Leding would do that.  I
25   can.  I am prepared to.  But Ms. Leding is --
```

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 3
of 90

1          THE COURT:  I don't mind.  I thought it would be Mr.

2    Danko.  He was on the papers.  But it's whoever it is.

3          Ms. Leding, are you there?  And if so, please turn

4    your mic on and make your appearance.

5          MS. LEDING:  Yes.  Good morning, Your Honor.  Kimberly

6    Leding, specially appearing for the moving parties.

7          THE COURT:  Well, Mr. Bowen says you're going to make

8    the principal argument, right?

9          MS. LEDING:  Correct, Your Honor.

10          THE COURT:  Okay.  You have fifteen minutes.  How much

11    time do you want to reserve?

12          MS. LEDING:  I think I'll reserve about five minutes,

13    Your Honor, for reply.

14          THE COURT:  Okay.  And spare me the history.  I know

15    the background.  So I really need to know what you want me to

16    do and how you think I can do it.  Okay.  Please begin.

17          MS. LEDING:  Very good.  Thank you, Your Honor.  Just

18    to bring the Court up to speed, our initial moving parties

19    included a request to stay the claims determination procedure.

20    But since the trustee has already issued its final trustee

21    determination, I do believe at that point -- at this point that

22    that particular request is moot.  And so I'll turn our

23    attention instead, Your Honor, to our request that the Court

24    review the standards and eligibility criteria for application

25    that are being applied to the determination of the movants'

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 4
of 90

1   claims.  We're seeking to ensure compliance with the confirmed

2   plan and the trust agreement, the claims resolution procedure,

3   the eligibility criteria, and state law.

4            The crux of our argument, Your Honor, is that we have

5   movants who are suffering from lifelong profound blindness as a

6   result of these fires, and their claims for personal injury

7   were denied by the trust.  And we're asserting that the trust

8   did not adhere to the procedures for -- and eligibility

9   criteria.  To address the --

10           THE COURT:  Now, those are the -- am I correct, those

11  are the only claims that they are seeking -- I mean, whether we

12  call it reconsideration or something, no other form of injury

13  or loss is included in their claim; is that right?

14           MS. LEDING:  What we're looking at, Your Honor, are

15  the claims that were asserted by the claimants, which were

16  primarily --

17           THE COURT:  Well, I understood that, but I don't have

18  access to those.  I review only the record on this motion.  So

19  I see the determination.  And I understand it's a serious harm

20  that they suffer, and if they should be compensated, that's the

21  issue.  But it's nothing other than the smoke that may or may

22  not have caused their vision problems; am I right?

23           MS. LEDING:  Yes, Your Honor.

24           THE COURT:  Okay.  Well, the reason I say it is I

25  thought that at least one of the responses from the trust was

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 5
of 90

1    as to smoke inhalation also, which, again, is important,

2    obviously.  And it could be an injury, but it's not a loss of

3    vision, I assume.

4            MS. LEDING:  Yes, Your Honor.  The injury that was

5    suffered by all of the movants is blindness that resulted from

6    exposure to basically smoke and wildfire smoke.

7            And Mr. Bowen, if I'm omitting anything, please feel

8    free to supplement my response.

9            But to return to the argument, Your Honor, we're

10   seeking to have the Court determine whether the fire perimeter

11   rule that's being imposed as a sort of gating criteria is

12   whether that comports with the trust agreements, as well as the

13   confirmed plan, the eligibility criteria, and the claims

14   resolution procedure.  Nowhere in those stated -- in those

15   stated procedures or policies is there a requirement for a

16   fire -- of the fire perimeter rule.  The trust may in the --

17           THE COURT:  Again, maybe Mr. Bowen is better equipped

18   to answer this, but when did you first get presented with the

19   rule?  In other words, was it an oral determination, an oral

20   communication from the trust counsel, or somewhere else?  In

21   other words --

22           Mr. Bowen, can you answer that question?

23           MR. BOWEN:  Yes, Your Honor.  The first time that we

24   actually saw the rule was in the decision of the neutral, the

25   notes of the neutral, in the trustee's final determination

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 6
of 90

1 paperwork. We had asked for the rule before we had seen

2 mention of a rule. We had been told that they're too far away,

3 but we had never actually seen the rule and did not know what

4 the rule was.

5       THE COURT: And I take it you still haven't?

6       MR. BOWEN: No. We just have what the neutral

7 described as the rule, which was the fire perimeter from CAL

8 FIRE plus five miles.

9       THE COURT: No, but I mean, is there -- I mean, were

10 there -- again, I'm sorry to go back and forth between the two

11 of you. Is there a place that you can look to now to see where

12 that rule is?

13       MR. BOWEN: No, Your Honor.

14       THE COURT: Okay. All right. Go ahead, Ms. Leding.

15 And Ms. Leding, focus on whether I can -- what I'll call the

16 jurisdictional argument. If you think I can do anything, how

17 can I do it, and what can I do?

18       MS. LEDING: Yes, Your Honor. To address the issue of

19 jurisdiction, we believe the Court has jurisdiction to enter an

20 order reviewing or determining whether these rules are in

21 compliance with the terms of the trust agreement pursuant to

22 Bankruptcy Code 1123(a)(4) and 105(a), which provide for the

23 resolution of unequal treatment of claims pursuant to a plan,

24 as well as resolution of the adjudication of claims issues

25 pursuant to a court order.

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 7
of 90

1        Specific to the plan, section 10.5 and section 11.1 of

2   the plan, we feel, authorizes the Court to make the necessary

3   orders that we're seeking today.  Specifically, 10.5 permits

4   the Court to enforce the terms of the plan and the confirmation

5   order and any other agreements or instruments entered into or

6   effectuated in connection with the consummation of the plan.

7   So we think that would cover the trust agreement as well as the

8   eligibility criteria and the claims resolution procedure.

9   We're asking the Court to enforce the terms of the trust

10  agreement and ensure that the criteria that's being applied to

11  these claims comports with the stated procedures and rules and

12  guidelines of the trust.

13        11.1 subsection (i), we think, also grants the Court

14  jurisdiction.  It allows the Court to hear disputes arising in

15  connection with or related to the interpretation of the plan or

16  any instruments created thereto or pursuant to.  The same goes

17  for 11.1, subsection (k), which authorizes the Court to take

18  any action and issue orders that are necessary to construe or

19  enforce, implement, execute, or consummate the plan or to

20  maintain the integrity of the plan following confirmation,

21  which, again, we think is applicable to the --

22        THE COURT:  Well, so I take it what -- I think I

23  anticipate the answer here, but what you want me to do is to

24  say to the trustee or their counsel, Mr. Molton, make the

25  determination, but without regard to this rule that you impose.

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 8
of 90

1   In other words, you're not asking me to second guess the merits

2   determination. And it's like a remand. It's like a court

3   telling the arbitrator, you should have arbitrated this issue,

4   not you shouldn't have refused to arbitrate it. Right. But

5   you're not -- but you're not asking me to say that your clients

6   are entitled to a damage claim. But you simply want their

7   claim to be considered on the merits, right?

8          MS. LEDING: Correct, Your Honor. That's correct.

9   We're not asking for a determination from the Court on the

10  merits. We're asking the Court to instruct and order the trust

11  to apply the appropriate rules and regulations and procedures

12  that are stated and that are known to the claimants, rather

13  than using these rules that, quite frankly, until the trustee's

14  opposition was filed, we didn't even have any real authority or

15  source or definition for. And again, just to point out, the

16  trustee's opposition doesn't cite to anything specific for the

17  fire perimeter rule with regard to personal injury claims.

18  There are citations for all of their other points, but

19  specifically --

20         THE COURT: Well, I mean, it should -- I mean, it's

21  obvious -- I mean, I don't mean to make light of your clients

22  harm, but you couldn't have a fence burned down 110 miles away.

23  But if smoke or the fire affects your vision, there's no

24  postmark or boundary. But my question is the -- I think,

25  again, I know the answer. If I say to the trustee, you'll have

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 9
of 90

1  to go back and have another determination, the determine may be

2  adverse to your clients, but at least they will have -- they

3  will have been -- their merits of their claim would have been

4  considered, right or wrong; am I correct?

5          MS. LEDING:  Yes, Your Honor.  That's correct.

6          THE COURT:  Okay.  Okay.  And do you have any record

7  of the ruling?  I mean, when I say the ruling, your papers, but

8  not the trustee's papers gave me reason to believe there was

9  actually a hearing of some sort.  Is there any record of it?

10  Is there any writing that memorializes the decision or the

11  recommendation of the neutral?

12          MS. LEDING:  Yes, Your Honor.  Well, there is a --

13  there is a trustee's final determination that was issued --

14          THE COURT:  No, I know that.  That's all of two lines

15  long.

16          MS. LEDING:  Um-hum.  Well, the trust --

17          THE COURT:  But is -- hmm?  Go ahead.  Sorry.

18          MS. LEDING:  -- submitted a further trustee's

19  determination on or about July 15th, which is extensive.  I

20  believe they're in excess of forty pages.

21          THE COURT:  So where is that in -- where is that a

22  record before me?

23          MS. LEDING:  Your Honor, it was not.  Those documents

24  weren't available at the filing of the motion.  I don't believe

25  that they were included in connection with the trust's

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 10
of 90

1  opposition.  But if the Court would like to review it, we'd be

2  happy to provide further briefing on it.

3        THE COURT:  Well, I mean, look, here's -- now, I'll

4  say this to Mr. Molton as well as to the two of you.  This

5  hearing was -- I'm leaving aside the what might have been a

6  little bit awkward way this began because you asked for some

7  sort of injunctive relief, but we're here on the issue.  And so

8  yesterday, when I reread the trustee's opposition and your

9  reply, I learned for the first time that there might be a

10  record, but I've never seen it to this day.

11        MS. LEDING:  We'd be happy to provide supplemental

12  briefing, Your Honor, if the Court would like to review the

13  actual determinations issued by the trust.

14        THE COURT:  Well, I mean, I don't know what I -- I

15  mean, I guess, did the neutral say anything about the perimeter

16  rule, other than it applies therefore there's nothing I can do?

17        MS. LEDING:  There is some discussion in -- I'm sorry,

18  Your Honor.

19        THE COURT:  No.  Go ahead.

20        MS. LEDING:  There is some discussion in the neutral's

21  recommendation where there's an indication that the neutral

22  found that given the extensive testimony by the expert during

23  the hearings that there was adequate grounds for perhaps

24  establishing that there is causation.  But because of the fire

25  perimeter rule, the recommendation was to deny the claim.  So

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 11
of 90

1  in the absence of that --

2          THE COURT:  Well, that's right, and that's what the

3  trustee ultimately did, right?

4          MS. LEDING:  Yes, Your Honor.  But there was

5  indication in the trustee's determination in the section that

6  summarizes the neutral's recommendation that there was perhaps

7  that there was adequate grounds for finding causation, but the

8  reason for declining the claims was solely because of the fire

9  perimeter rule.

10          THE COURT:  But that's what I learned from your side

11  and not from the trustee in the reply.  So I must say, it's a

12  surprise.  Is there any writing from the trustee herself, other

13  than the one or two-line negative determination?

14          MS. LEDING:  The report itself includes, I think it's

15  probably twenty pages, twenty-to-thirty pages, of additional

16  discussion about the trustees determination.  And it does go

17  into the trustee's reliance upon their personal injury

18  consultant, whose review of the materials at the appeals level

19  was incomplete.

20          At this point, the trustees' personal injury

21  consultant was not present at the appeals hearing, which is

22  where the Movants presented, I believe it was, six hours of

23  expert testimony on the specific issue of causation.  That

24  personal injury consultant was not in attendance.  The movants

25  attempted to have a court reporter present to create a record

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 12
of 90

1 of the testimony so that it would be useful to the personal

2 injury consultant and the trustee, but that court reporter was

3 denied access by the --

4         THE COURT:  No, I understand that, but the point is

5 was the personal injury expert excluded or just chose not to

6 participate?

7         MS. LEDING:  Mr. Bowen, I think, can speak more

8 specifically, but it's my understanding that he simply was not

9 present.

10         THE COURT:  That right, Mr. Bowen?

11         MR. BOWEN:  That's correct.  I don't know what

12 discussions may have happened on the other side.

13         THE COURT:  Well, I mean, I hate to draw poor

14 analysis, but it sounds to me like there's a hearing before the

15 arbitrator and one of the witnesses doesn't show up.  So the

16 arbitrator makes a decision without the benefit of the expert.

17 Is that a good analogy?

18         MR. BOWEN:  I'm sorry, Your Honor.  I may have

19 misunderstood.  Our causation expert, the doctor who had

20 examined the claimants, was there and provided six hours of

21 testimony.  The trustee then appears to rely on a memo written

22 by Eric Kennedy, a personal injury consultant hired by the

23 trust.  And Mr. Kennedy had written a memo after the hearing,

24 going through why he didn't believe that there was causation in

25 the case.  But Mr. Kennedy had not been present at the hearing

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 13
of 90

1  to hear six hours of testimony from the expert, much of which

2  dealt with exactly what he says was lacking in his analysis.

3  So he (indiscernible) --

4          THE COURT:  So there's no way of knowing what the

5  outcome by the neutral would have been if the neutral had not

6  been presented with the perimeter rule?

7          MR. BOWEN:  Well (indiscernible) --

8          THE COURT:  In other words, if these claimants had

9  been within the perimeter rule, presumably the neutral would

10 have made a recommendation, and I guess you believe maybe a

11 favorable one, but there's no way of knowing for sure, right?

12         MR. BOWEN:  Well, there is no way of knowing for sure.

13 There is one very enlightening paragraph from the neutral's

14 notes, though, if I may read it.  And I know it's not

15 technically in front of you.

16         But it does say that, "On balance, while it is not

17 clear how a reasonable jury in a full trial would decide the

18 issue, having heard Dr. Seduen's (phonetic) opinions on LHON in

19 general" -- and then this is to one particular claimant -- "on

20 their claimant's case in particular, given the absence of

21 significant amounts of other unknown triggers, it seems

22 reasonable to conclude" that the established -- "that he

23 established a 'substantial factor' causal relationship between

24 the fire smoke and the claimant's blindness."

25         THE COURT:  Okay.

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 14
of 90

1          MR. BOWEN:  And that is (indiscernible).

2          THE COURT:  Okay.  I'm going to ask the two of you to

3     reserve the rest of your time for rebuttal.  I'm going to let

4     Mr. Molton be heard.

5          And Mr. Molton, let me just tell you that I find it

6     remarkably surprising and almost troublesome that it wasn't

7     until I read the reply that I even heard that this kind of

8     thing ever occurred.  And nothing in your brief suggested that

9     there was, in effect, a presentation by the claimants on the

10    merits and then that presentation was in effect rejected

11    because of, what I'll call, the perimeter rule.  But it seems

12    to me it would have been helpful and less surprising if in your

13    papers you had said the merits were considered, but here's why

14    they aren't legally relevant.  But go ahead with your fifteen

15    minutes.

16         MR. MOLTON:  Judge, David Molton of Brown Rudnick for

17    Cathy Yanni in her capacity as trustee of the fire victim

18    trust.  Judge, I believe that our papers suggested that a

19    fulsome record was put before the neutral, who considered the

20    matter de novo in accordance with the undisputed claims

21    resolution provisions that Your Honor has already dealt with.

22    I do believe we suggested that the trustee made her

23    determination, not just on the perimeter rule, but also on

24    general and specific causation issues that --

25         THE COURT:  How do I know that?  How do I know that

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 15
of 90

1  until now?

2        MR. MOLTON:  Judge, from our perspective, Your Honor,

3  that goes to the issue -- I think we did suggest, Judge, that

4  there was a fulsome record, and it was --

5        THE COURT:  Well, a fulsome record is a -- fulsome

6  record is a term that can be -- the word "fulsome" itself can

7  be very confusing because sometimes it means a negative, and

8  sometimes it means positive.

9        MR. MOLTON:  Yeah.

10        THE COURT:  But even to say there was a fulsome record

11  doesn't tell me what that record contained.

12        MR. MOLTON:  Well, Judge, we're more than willing, I

13  think, if Your Honor wants to take a look at.  But now we're

14  headed into the fact that Your Honor is, in fact, going -- and

15  I will deal with the jurisdiction issue in a minute is, in

16  fact, taking the invitation of my friends on the other side to

17  basically go into the claims administration process and review

18  what was done.

19        The bottom line is due process in accordance with the

20  claims procedures was given.  They had an full opportunity in,

21  I think, the reply paper that was submitted, also, should the

22  claimant had wanted to, could have included the neutral's

23  report.  And it's not just a two-sentence agreement by the

24  trustee.  The trustee actually went into specific and general

25  causation outside of the perimeter rule and --

1      THE COURT:  But Mr. Molton, I didn't know --

2      MR. MOLTON:  Yeah.

3      THE COURT:  -- that until yesterday.

4      MR. MOLTON:  Yeah.

5      THE COURT:  I have the form that I've seen in other

6  instances of the determination by the trustee.  And not that

7  it's all I have many of these but at least one that's come up

8  before me, and you're familiar with that.

9      MR. MOLTON:  Yeah, I am.  Judge --

10      THE COURT:  And I don't question the -- if the merits

11  were considered, obviously here, these parties are complaining

12  that the merits were never considered as far as the decision

13  process.

14      MR. MOLTON:  Judge, if Your Honor would like us to

15  submit that under seal because it is a claimant confidential,

16  and unless the claimants want to submit it on the open record,

17  we'd be glad to do so.  I think Your Honor rightly said that

18  the remedy would be to send it back to the trustee for

19  consideration of the merits.  I think Your Honor will see that

20  the merits were considered and were resolved.  And the case was

21  (indiscernible).

22      THE COURT:  Look, what I'm saying is, again, if we use

23  the analogy of the traditional jurisdiction, there's nothing

24  wrong with saying to the person you're making the argument to,

25  you don't have jurisdiction.  But even if you had, here's what

1 the outcome would be.  I mean, that, to me, if the trustee had

2 said the merits don't justify an award, but I don't have

3 jurisdiction so the motion's -- or the complaint is rejected,

4 then it's an alternative.  But here, I'm only presented with a

5 record that looks like that what these other counsel are

6 opposing is the trustee came up with a new rule that didn't

7 exist anywhere else and said, I'm imposing this rule, therefore

8 you lose on the merits.

9         MR. MOLTON:  Judge, as you know -- well, as counsel

10 knows, it's not a new rule.  It's a rule that has been

11 implemented and utilized many times.  Indeed, I understand that

12 40 of the 400 perimeter cases that have been decided, and

13 they're somewhat different than this one, are with counsel's

14 firm.

15         THE COURT:  I know.  You said that, and I don't --

16         MR. MOLTON:  Yeah.

17         THE COURT:  -- question that.  And he didn't question

18 it.  Is any one of those other thirty-nine loss of vision?

19         MR. MOLTON:  No, I don't believe -- I don't believe

20 they're on all fours, Judge, and I (indiscernible).

21         THE COURT:  Okay.  So I mean, if I lived thirty miles

22 from Paradise and I lost a business opportunity or I got sick

23 to my stomach or something, I might not have had a claim.

24         MR. MOLTON:  Yeah.

25         THE COURT:  But these claimants, three or four of

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 18
of 90

1 them, are a hundred-and-something miles away and claim to have

2 suffered as a result of the fire. And yet, on this record, it

3 doesn't appear that those plans were considered.

4         MR. MOLTON: Yeah. Judge --

5         THE COURT: Go ahead with your jurisdiction order.

6         MR. MOLTON: No, we viewed it as their motion judge

7 and their proof they had those documents when they submitted

8 their reply. They chose not to submit them, by the way. And

9 accordingly, it's their burden, and especially, Judge, and I'll

10 go through some of the aspects of jurisdiction. Because

11 bankruptcy counsel raised the various issues regarding this

12 Court's authority, this Court does have authority to ensure

13 that the trust agreement and the CRP are enforced in accordance

14 with their terms -- that's what actually happened here -- and

15 that to interpret any disputes as to those provisions. There

16 are none.

17         And Judge, I just want to highlight -- and by the way,

18 I want to get to a point, and we sent it over. Judge Gilliam

19 actually ruled this morning on this very issue on another

20 appeal that didn't come to Your Honor but when straight up to

21 him and held he had no jurisdiction. I sent that to --

22         THE COURT: How'd it to get to him straight up?

23         MR. MOLTON: The plaintiff put it there. And we moved

24 to dismiss. And we sent it to your deputy clerk. I sent it to

25 counsel. Get to it in a minute.

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 19
of 90

1        2.3 of the trust agreement, Judge --

2        THE COURT:  I'm sorry.

3        MR. MOLTON:  I'm going to go through --

4        THE COURT:  Say again the number.  4.3?

5        MR. MOLTON:  2.3 of the trust agreement, "The claims

6   administrator shall have reasonable discretion in the means and

7   methods in carrying out the duty of resolving fire victim

8   claims consistent with the case."

9        2.4(a) of the trust agreement that Your Honor

10  approved, "The claims resolution procedure shall govern the

11  process by which each fire victim claim shall be evaluated,

12  administered, settled, expunged, determined, and resolved on a

13  final basis.

14       2.4(d), and this is crucial, Judge, and I know Your

15  Honor knows it, "The claims administrator's determination is

16  confirmed by the trustee of eligibility, amount, allowance of

17  each fire victim claim shall be final and binding and shall not

18  be subject to any challenge or review of any kind by any court

19  or any person or entity, except as set forth in section 9 of

20  the CRP."  And Your Honor knows that section.  That's the

21  judicial review for those folks who objected during the

22  confirmation hearing.  And --

23       THE COURT:  Yeah, I know.

24       MR. MOLTON:  -- the Court knows.

25       THE COURT:  I know.  I know all about.

1          MR. MOLTON:  And Judge, that's your court-approved

2    provision.

3          Going to the claims resolution procedures, the

4    preamble, "The trustee and the claims administrator will

5    consult with the claims processor and other trust professionals

6    to develop claims valuation processes that result in fair and

7    reasonable compensation of eligible claimants in accordance

8    with the trust documents, the plan, the confirmation, and the

9    confirmation order."  We've done that.  Your Honor has seen

10   that before.

11         Section 1(a), "Any claims unrelated to the fires are

12   ineligible for payment by the trust and pursuant to the process

13   described herein shall be held to be ineligible on a final

14   basis."

15         THE COURT:  Look, the question -- I understand that.

16   And I obviously didn't memorize the trust agreement, but I've

17   been living with it for years.  My question to you is go back

18   in time.  Go back to when this trust was implemented.  And a

19   victim comes to counsel and says, I lost my eyesight.  I

20   believe it's because of the fire -- or because of the smoke.

21   And would that counsel have been able to look anywhere to say

22   to the person, I'm sorry, I can't assert the claim for you

23   because you are 2 miles, 3 miles, 113 miles outside of the

24   area.  How would anybody have known that until they get to the

25   neutral hearing and they're presented with it?

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 21
of 90

1          MR. MOLTON:  Judge, I believe there are --

2          THE COURT:  How would they have known about it?

3          MR. MOLTON:  There are rules and eligibility

4    requirements.  Indeed, counsel attaches one in document 14-492,

5    Exhibit 2, which talks about causation.  And this is in terms

6    of personal injury eligibility criteria.  "The personal injury

7    consultant will determine whether the fire was a substantial

8    factor", which is California law, "in causing the injury.  The

9    fire must be more than a remote or a trivial factor.  The

10   documents provided pursuant to", and then it goes on.

11         Judge, the fire perimeter rule is a device in

12   assisting the claims administration process as to whether it

13   was a -- whether that fire was (indiscernible).

14         THE COURT:  Look, and if the -- I'm going to interrupt

15   you.  If the personal injury -- if the personal injury expert

16   says to Ms. Leding's client, your loss of vision was a

17   substantial factor, period, does he then say, but you're

18   outside the perimeter?  Again, where does the -- where does

19   that personal injury person know that the perimeter applies?

20         MR. MOLTON:  That's not what happened here.  What

21   happened here is that, in accordance with the CRP, they

22   received their initial ruling from the claims administrator.

23   They didn't like it.  They did a reconsideration, which they

24   can submit new evidence.  They did so.  It was rejected again.

25   They didn't like it.  They did a de novo appeal.  That's

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 22
of 90

1  section 7(a)(b) of the claims procedures.  They can submit any

2  additional information or documents that they want and in

3  addition to the twenty-page brief.  And they then have a

4  hearing.  And if you read my friend's reply, he suggests it was

5  a fulsome hearing, a six-hour hearing --

6          THE COURT:  I know.

7          MR. MOLTON:  -- on all these issues and --

8          THE COURT:  But I'm going to go back to the initial

9  ruling.  The initial ruling that led to the reconsideration,

10 did that mention the perimeter rule?

11         MR. MOLTON:  Judge, I'm not sure whether the initial

12 ruling mentioned that something counts --

13         THE COURT:  Well, but I think it might be important.

14         Mr. Bowen, did the initial ruling mention the

15 perimeter rule?

16         MR. BOWEN:  Your Honor, I don't have that ruling in

17 front of me from the initial determination.

18         THE COURT:  But it's in writing somewhere?

19         MR. BOWEN:  Yes, there is an initial determination.

20         THE COURT:  Okay.  In your reconsideration, did you

21 have occasion to argue about the perimeter rule?

22         MR. BOWEN:  No, we still weren't provided with the

23 perimeter rule, despite being asked what it was.  So we

24 couldn't argue against a rule that we had never seen.

25         THE COURT:  All right.

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 23
of 90

1    MR. MOLTON:  Judge, if I can finish.  Notwithstanding

2  that, Your Honor, the perimeter rule was argued during the de

3  novo appeal hearing that happened.  And my understanding is

4  that the trustee's final determination, which went well, went

5  beyond and was very thorough and inclusive, held on the merits.

6    So and as Your Honor notes, and as I mentioned, the

7  trust agreement provision, I just want to refer you to CRP

8  provision 7(c), the neutral submitted -- the neutral's

9  recommendation shall be submitted to the trustee.  The trustee

10  may accept, reject, or revise --

11    THE COURT:  No, I know that.  Look, you're just

12  repeating.

13    MR. MOLTON:  Or revise.  Yeah.

14    THE COURT:  You're repeating.  I got the --

15    MR. BOWEN:  And to ensure that all claims are treated

16  equitably.  And that's a final decision.  So our view, Judge,

17  is they got due process.  They had their position on the merits

18  heard and considered it.  It was --

19    THE COURT:  Well, what would have happened -- what

20  would have happened if the neutral went one more step and said

21  this person did, one or all four of them, did suffer an injury

22  that's substantially caused by the fires, but because he's

23  outside the perimeter rule, I can't provide any relief.  It

24  sounds like we never got there.

25    MR. MOLTON:  Yeah.  I think, Judge, you went beyond

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 24
of 90

1   there because I think what happened was the trustee said,

2   notwithstanding the perimeter rule, on the merits, these claims

3   are not eligible claims.

4           THE COURT:  Well, that's what I -- that's why I'm

5   sitting here --

6           MR. MOLTON:  Yeah.

7           THE COURT:  -- pretending that I can't -- being

8   reminded that I can't sit as an appellate court here, but I'm

9   not allowed to know the reasoning behind either the decision of

10  the neutral or the trustee.  So it's very frustrating --

11          MR. MOLTON:  Yeah, but --

12          THE COURT:  -- to me.  I'm going to let the other side

13  have five minutes to --

14          MR. MOLTON:  Judge, can I just refer you to Judge

15  Gilliam's opinion so you have it on the record?

16          THE COURT:  Say again?

17          MR. MOLTON:  To Judge Gilliam's decision that was

18  rendered today.  So I just want to put that on the record.

19          THE COURT:  By the way, typically -- yes, you can put

20  it on -- I mean, you referred to it on the record.

21          MR. MOLTON:  Yeah.

22          THE COURT:  But most of the time when Judge Gilliam

23  makes a ruling that's an appeal of one of my decisions, it

24  comes to our docket anyway.  And I don't want to take the

25  time --

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 25
of 90

1    MR. MOLTON:  It's going to take a second, Judge.

2    THE COURT:  -- (indiscernible) other people, but I'm

3 wondering what he thought about why it came to him without the

4 bankruptcy court --

5    MR. BOWEN:  It went straight up from the trustee

6 determination to him, Judge.  We --

7    THE COURT:  But how did it get up there?

8    MR. BOWEN:  Plaintiff counsel's processes, how they

9 did it, but it's --

10    THE COURT:  Okay.  But it's in a -- it's in a -- it's

11 in a caption with Judge Gilliam's signature and his case

12 number?

13    MR. BOWEN:  Yes.

14    THE COURT:  It's got the bankruptcy case number?

15    MR. BOWEN:  It's got a separate one, Judge.  It's

16 Galvez --

17    THE COURT:  I know.  I know.  But it also has the --

18 does it also have the bankruptcy case number?

19    MR. BOWEN:  I'm not seeing it, Judge.  I see only a

20 Northern District --

21    THE COURT:  Okay.  Okay.

22    MR. BOWEN:  -- docket number.  It's 23 --

23    THE COURT:  All right.  Do opposing counsel have a

24 copy of that to (indiscernible) --

25    MR. BOWEN:  Yes.  I ensure that Ms. Seagergrim

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 26
of 90

1    (phonetic) sent it to them as soon as I got it.

2           THE COURT:  Okay.  Just email it to my courtroom

3    deputy --

4           MR. BOWEN:  Okay.

5           THE COURT:  -- and the (indiscernible) --

6           MR. BOWEN:  But he goes through -- just summarize.  He

7    goes through the same thing I just went through with you,

8    Judge, with reconsideration, appeal, trustee determination.

9    And he says, in essence, rather "the claimant is seeking

10   judicial review of the final determination of his claim by the

11   fire victim trust.  As I explained above, the trust contains

12   its own dispute resolution process.  Mr. Galvez appears to have

13   exhausted his appeals under the trust CRP, and this court has

14   no jurisdiction to review his claim."  And that's consistent

15   with Your Honor's earlier holdings regarding the process.

16   Thank you, Judge, for your time.

17          THE COURT:  Wait one second.  Before I hear from the

18   other counsel, let me just look at something here.

19          MR. BOWEN:  Oh, did I give you the docket number,

20   Judge?

21          THE COURT:  No.  Okay.  You know what, I have the

22   appeal.  But a member of my staff just emailed it to me.  I'm

23   not going to take the time --

24          MR. BOWEN:  No.

25          THE COURT:  -- to read it.  I'm just going to --

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 27
of 90

1          MR. BOWEN:  It's pretty short, Judge.

2          THE COURT:  Well, it doesn't matter.  I'm not going to

3  take the time to read it.

4          MR. BOWEN:  Yeah.  No, no, no, I understand.

5          THE COURT:  Yeah, well, I see it says, "purported

6  appeal".  All right.  Well, let's go back to the parties who

7  want to be heard today.

8          So Ms. Leding, I promised you time to reply so --

9  well, before your time to reply begins, do you want me to

10  consider or at least get into the record, either sealed or not

11  sealed, the decision by the hearing -- by the neutral and also

12  by the trustee?

13          MS. LEDING:  Your Honor, I'm going to defer to Mr.

14  Bowen, since those are his direct clients, as to whether or not

15  he'd prefer those to be submitted under seal or not.

16          THE COURT:  Mr. Bowen.  Well, first of all, do you

17  want it at least under seal, and if not under seal -- I mean,

18  do you want it -- do you want it before me in any form at all?

19  And then we'll talk about whether it's under seal because if

20  you don't want it, that's your choice.  But what do you want?

21          MR. BOWEN:  Certainly, if it is to be submitted, I

22  think it would be under seal.  I think, if it were to be

23  submitted, I would ask for the chance to submit further

24  briefing on it.  We believe that there are severe issues with

25  the reasoning and the procedure in there.  And so I believe

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 28
of 90

1    that if you were to just read those documents, it would be

2    misleading as to what and how issues were considered.

3             THE COURT:  Well, how would you know how it's

4    considered, unless you went inside the head of the neutral or

5    the trustee?  I mean, I'll tell you what, Mr. Bowen.  We'll do

6    this in baby steps.  You submit those matters.  Are you

7    familiar, or Ms. Leding, one of you, you're familiar with our

8    procedure for taking documents under seal?

9             MS. LEDING:  Yes, Your Honor.

10            THE COURT:  Okay.  Ms. Leding, then, work with Mr.

11   Bowen and get through the normal sealing process in our court,

12   both the decision of the neutral and the decision of the

13   trustee.  And I will review it and not put it on the public

14   docket.  And if I believe further briefing is appropriate, I

15   will so advise.  I'm going to let Ms. Leding make the closing

16   argument.  And then obviously, I'm going to take the matter

17   under advisement today.

18            So Ms. Leding, you have five minutes to respond.

19            MS. LEDING:  Yes, Your Honor.  Generally speaking, we

20   feel that the process that has been followed did not result in

21   due process for the claimants.  The fire perimeter rule, while

22   the trust purports that it's something that has been applied to

23   all of the claims, it's not stated anywhere explicitly with

24   regard to personal injury claims, such as the ones submitted by

25   the claimant.  We're flying, essentially, blind, having no idea

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 29
of 90

1   what this fire perimeter rule is, how it was determined, and
2   how it was being applied.  It was not literally until the
3   opposition was filed that we had any indication that it was
4   determined by this CAL FIRE perimeter plus five miles.  That
5   was our first indication of the definition of the fire --

6          THE COURT:  Well, let me -- no, you said it's the CAL
7   FIRE perimeter plus five miles?

8          MS. LEDING:  Yes, Your Honor.

9          THE COURT:  Well, that's new.  I hadn't heard that
10  before.  Until right now, it was the CAL FIRE determination.
11  So now we've added five miles.

12         THE COURT:  Yes, that's what I believe Mr. Bowen had
13  explained.  So if I misspoke, then I'll defer to his
14  definition.  But it was my understanding it's the CAL FIRE plus
15  five miles.

16         So the issue that we have is that this rule was not
17  accessible or known to any of the claimants, which deprived the
18  claimants of an ability to either present evidence that refutes
19  or that supports further their position that notwithstanding
20  any fire perimeter rule, that there's still causation as a
21  result of these fires.  And so we're asking the Court to enter
22  an order that determines whether or not this fire perimeter
23  rule is even applicable and whether it comports with the terms
24  of the trust and whether it's proper.  Just because it's been
25  consistently applied doesn't mean that the rule is in

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 30
of 90

1  accordance with the terms of the trust and the published claims

2  resolution procedure or the eligibility criteria.

3          And to address --

4          THE COURT:  Right.

5          MS. LEDING:  -- the point that the trustee's analysis

6  in the determination also goes to the issue of causation,

7  again, our issue was that the trustee's analysis in their

8  determination is largely driven by the recommendations of a

9  consultant, a personal injury consultant, who was not present

10  at those hearings and didn't hear six hours of expert testimony

11  on the issue of causation.  And so that determination and that

12  recommendation is incomplete.  And --

13          THE COURT:  Did the personal injury expert himself

14  provide any kind of written analysis that you've seen?

15          MS. LEDING:  Mr. Bowen can confirm, but I believe the

16  testimony provided by the movant's personal injury expert was

17  all verbal testimony.

18          MR. BOWEN:  He did provide two PowerPoint slide shows.

19  He does have an opinion letter.  But the specifics, including

20  many of the specifics raised by the consultant from the FVT,

21  were addressed solely via testimony.

22          THE COURT:  All right.  Well, you can include that in

23  the sealed documents.  Again, whether I act on it, I don't

24  know.

25          Let me ask Mr. Molton.  Mr. Molton, I just now, for

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 31
of 90

1   the first time, heard about the extra five miles.  Where did

2   the extra five miles come from?

3          MR. MOLTON:  My understanding, Judge, I don't know if

4   that was raised before, somewhere, but my recollection is

5   that's just to give a buffer zone to expand for the benefit of

6   claimants.

7          THE COURT:  Well, I mean, it might be a buffer zone --

8   it might be more than a buffer zone if someone lived four miles

9   outside of the fire thing and suffered blindness but somebody

10  else lived ten miles outside and is sent packing so -- well --

11         MR. MOLTON:  Judge, one more just procedural point

12  regarding a question you asked.  I just want to make sure the

13  record's clear.  When we were last in front of you, Judge, and

14  before our brief was -- and at the point our brief was filed,

15  neither the neutral nor the trustee had ruled at the time our

16  brief was filed.  So you're asking why didn't we include it.

17  We had no basis to include it.  It wasn't part of the active

18  record at that point.  So I just wanted to make sure that you

19  knew that.

20         THE COURT:  Mr. Bowen, a quest (sic) for you.  You

21  have other claimants that were outside the perimeter.  Were any

22  of them -- did any of them claim blindness from the smoke?

23         MR. BOWEN:  No.

24         THE COURT:  Or vision problems from the smoke?

25         MR. BOWEN:  Nothing more than perhaps blurry vision.

1  I don't know all forty of them, but none of them were severe.

2  None of them were -- none of them warranted an expert.  None of

3  them would have been looked at in that way.

4         THE COURT:  Well, I'm not making light of any kind of

5  ailment from the fires.  But if someone had runny eyes for a

6  while and was told you can't file a claim, that's one thing.

7  If someone lost his or her eyesight and believes and can

8  establish through some evidence that it might have been caused

9  by the Camp Fire or the Tubbs Fire or whatever fire it was,

10  then that's different.

11         MR. BOWEN:  I guess, at most, it would have been eye

12  irritation of some kind.  There is no blindness, certainly.  No

13  permanent disability from any one person.

14         THE COURT:  It seems to me, I ask this question

15  rhetorically more than anything else, if this rule is the rule,

16  then one of the remedies for the victim might have been to sue

17  PG&E directly because PG&E did not get discharged from all

18  liability for all fires.  It got discharged for the liability

19  for the fires that were channeled through the trust.

20         And again, I'm not asking for you to tell me what you

21  might have done or giving you advice on what you might have

22  done.  Just, it would seem to me that, like everything else, if

23  there is a cause that you believe is attributable to PG&E and

24  PG&E's bankruptcy discharge says, people that I caused harm to

25  from the following twenty fires are channeled into the trust,

1    the obvious answer is a twenty-first fire.

2         And I will tell you, I have presided over the PG&E

3    case for all these years, and there have been claims that

4    involve claims directly against PG&E.  I don't recall that any

5    of them involved a fire, but there have been electrical

6    problems and physical problems and slide problems.  And it

7    would seem to me that might have been a source of remedy if,

8    indeed, the fire trust was entitled to close the doors for any

9    remedy.

10         Anyway, that's not an action item.  It's not my place

11   to make decisions about what might have done.  My decision has

12   to be whether I deny this request for the reasons Mr. Molton

13   argues or grant it in some fashion.  And I will, again, go back

14   over the sequence.

15         I'm going to consider Judge Gilliam's decision, even

16   though it comes as a complete surprise.  I just add that to my

17   list of surprises for this week in this case.  And I will take

18   from what you two counsel for the claimants, Mr. Bowen, over to

19   Ms. Leding, upload in terms of documents without briefing, just

20   the documents.  And if I believe that I need further briefing,

21   I'll give both sides an opportunity to submit briefing.  But

22   with that summary, the matter stands as submitted.

23         So Mr. Molton, are you going to be around for the --

24   or are you going to be --

25         MR. MOLTON:  Judge, I'm staying for part two.

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 34
of 90

1          THE COURT:  Part two?  Okay.

2          Ms. Leding and Mr. Bowen, thank you for your time.

3          I'm going to take about a five-minute personal

4   convenience break.

5          MR. MOLTON:  Sure.

6          THE COURT:  Mr. Parada, you can break.

7          And Mr. Molton, if you want to take a personal

8   convenience break --

9          MR. MOLTON:  I appreciate it, Your Honor.

10         THE COURT:  -- feel free to.  And I'm going to turn my

11  camera off.

12         And Ms. Parada, I'll be back in about five minutes.

13         Mr. Bowen or Ms. --

14         THE CLERK:  Yes, Your Honor.

15         THE COURT:  -- Leding, did you want to say something

16  before --

17         MR. BOWEN:  Can I just clarify one thing on the

18  documents that are to be submitted under seal?

19         MR. MOLTON:  Yes.  Yes.

20         MR. BOWEN:  Is the final determinations with the

21  trust's reasoning that they gave, so each claimants

22  determinations, as well as --

23         THE COURT:  Well, look, I want you to -- I want to

24  have before me anything that was before someone else, whether

25  it's the original determination or the -- and I'm using the

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 35
of 90

1 wrong term. I mean, I'm analogizing this to the trustee as the

2 Supreme Court. And the neutral was the trial or the appellate

3 court. And somebody else might have been the original trial

4 judge. And I don't know that I -- for the reasons that should

5 be made obvious, I don't know that there's anything I can do

6 about it.

7 But at least I can know about it, and I won't beat

8 this to death. I believe I should have known more about it

9 before today, but I'm going to know about it as soon as you get

10 it uploaded. And I'll leave it at that.

11 So thank you for your time, everyone.

12 MR. BOWEN: Thank you.

13 THE COURT: The matter is submitted.

14 MS. LEDING: Thank you, Your Honor.

15 (Recess from 10:46 a.m., until 10:50 a.m.)

16 THE COURT: All right. Ms. Parada, go ahead and call

17 the case, and then we'll get appearances.

18 THE CLERK: Calling the matter of PG&E Corporation.

19 THE COURT: All right. Morning, Mr. Molton, again.

20 Please state your appearance.

21 MR. MOLTON: Good to see you again, Judge.

22 THE COURT: Mr. Abrams, good morning.

23 MR. ABRAMS: Good morning.

24 THE COURT: All right. State your name for the

25 record, Mr. Abrams.

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 36
of 90

1          MR. ABRAMS:  Will Abrams.

2          THE COURT:  Okay.  Mr. Abrams, under my order that I

3    sent out, you have fifteen minutes to present argument.  Do you

4    wish to reserve a portion of your time?

5          MR. ABRAMS:  Yes, Your Honor.  Thanks very much.  I

6    would like to reserve the majority of my time for rebuttal.

7    I'd only like to take about three, three-to-four minutes for my

8    opening arguments.

9          THE COURT:  All right.  Please begin then.

10         MR. ABRAMS:  Thank you, Your Honor.  First, I want to

11   say, Your Honor, that my thoughts are with the folks who are in

12   Butte County enduring yet another fire.  Obviously, this is

13   bringing additional trauma to them.  And I just wanted to make

14   note of that.

15         THE COURT:  Well, I share with you the same.  And I'm

16   sure for you and anyone else close to those fires, it's even

17   more terrifying.

18         MR. ABRAMS:  Thank you, Your Honor.  First, I want to

19   establish for the record, Your Honor, that I contacted the

20   trust and counsel for the trustee well before I filed this

21   motion.  I contacted them before May 15th.  They did not -- we

22   had a meeting on the 15th of May.  They heard me and never

23   responded about any of these issues after that point.  And it's

24   because of that that I felt obligated to file the motion.

25         Your Honor, with this information, I thought it would

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 37
of 90

1  be just irresponsible of me, quite honestly, to sit on that

2  information and not bring it to the attention of the Court.

3  And the reason why I want to reserve the majority of my time

4  for rebuttal, Your Honor, is that while the trustee in their

5  papers spent a lot of time attacking me, calling me a

6  conspiracy theorist, calling me all sorts of names, abusing the

7  system, all of these things, what they lacked, Your Honor, was

8  any sort of argument that I could see based on the merits of

9  the arguments or the law.

10        What they put forward was really a straw man argument.

11  They were talking about a smoking gun.  Nothing in my papers

12  ever referenced such a thing.  As Your Honor knows, the basis

13  for discovery is simply just good cause for discovery.  I don't

14  have to have a conspiracy.  I don't have to prove beyond a

15  reasonable doubt.  I just need to have good cause.  And that's

16  what I'm asking Your Honor to rule on --

17        THE COURT:  Well, Mr. Abrams, let me tweak that a

18  little bit.  I think you're overstating that case.  I think

19  there has to have some nexus for the administration of the

20  bankruptcy case.  Now, I'm not being hyper-technical, this

21  phase of the PGE case, and ever since the fire trust has been

22  in place, it's been the trust and the trust administration.

23  And I, for one, have not drawn a perimeter, to use the term,

24  over the trust to say you can't take examinations.

25        But there has to be some connection and nexus between

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 38
of 90

1   the administration, which gets to the question that I have for

2   a portion of your argument.  Your argument includes you want to

3   go learn about what's been going on on lobbying efforts.  And

4   my answer is, how does that at all impact, what I'll call, the

5   administration of the trust.  They either have lobbied and

6   nothing's come of it, or they haven't lobbied, and which their

7   counsel said they haven't recently.  But so what?  If I were to

8   allow you to dig into the lobbying topic -- this is, I think,

9   different from the so-called consortium and the counsel

10  agreements -- what would you do with it, and why does it --

11  what is the relevance of it, other than your curiosity?

12          MR. ABRAMS:  Yeah.  Understood, Your Honor, and let me

13  get to that point specifically.  First of all, I think, Your

14  Honor, it has to be taken in context.  So attorneys and

15  representatives of the trustee that are -- or representatives

16  of the TOC that are taking adverse positions to that of fire

17  victim trust beneficiaries, the bounds of that are what I don't

18  understand.  And this is also in context, Your Honor, because I

19  was a part of the legislative effort around AB 1054, and I saw

20  that --

21          THE COURT:  But that's history.  Mr. Abrams, that's

22  history.  And maybe the lobbying effort wasn't to your

23  satisfaction, but it's history.  So what is the relevance

24  today, in the middle of 2024, to ask the trustee, what are you

25  doing about lobbying these days, when it's not relevant to the

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 39
of 90

1   administration of the trust or to the --

2           MR. ABRAMS: Yeah, I'm just (indiscernible) --

3           THE COURT: -- or by the way, all -- or to the

4   administration of your claim in the trust?

5           MR. ABRAMS: Well, because, Your Honor, this goes to

6   whether victims are going to be made whole, paid in full.

7           THE COURT: I know, but that's what you're not

8   convincing me because --

9           MR. ABRAMS: Sure.

10          THE COURT: -- if a lobbying effort, whether it's by

11   you or the trustee or the next politician, if someone convinces

12   the California legislature to provide some more money to the

13   trust victims -- I mean, the fire victims, such as you, that's

14   fine. And I hope that happens. But it has nothing to do with

15   the administration of this trust or this bankruptcy so --

16          MR. ABRAMS: Yeah, I'm just going to tell you my

17   rationale, Your Honor. My rationale is if we don't understand

18   the bounds of folks associated with the trust acting in ways

19   adverse to the interests of fire victim trust beneficiaries, to

20   what extent are they doing that. That's the first.

21          The second, Your Honor, is if before confirmation,

22   they engaged in lobbying activities and misrepresented that

23   they were doing this for victims but purposefully excluded them

24   from access of the California Wildfire Fund, how are we now to

25   presuppose that their motivations have somehow changed, and now

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 40
of 90

1  they're actually advocating for our interests.  And all I'm

2  looking for, Your Honor --

3       THE COURT:  If the California -- the California

4  legislature made the rules about the wildfire fund.  So what

5  difference does it make if somehow some person who purports to

6  be supporting the interest of you also brought about something

7  that is more favorable to future wildfire victims, such as the

8  current ones, again, what is that -- what do we do with that

9  fact?  What do you do with it?

10       MR. ABRAMS:  Well, again, I think --

11       THE COURT:  No.  Finish my point.  What good does it

12  do for you to know that back in pre-confirmation, so early

13  2000, some lobbying effort was undertaken by someone who you

14  now identify to this day with it.  Therefore what?

15       MR. ABRAMS:  I'm not looking -- my only purpose in

16  looking back, Your Honor, is to look forward and say, is it

17  reasonable to question what they're doing now around lobbying

18  efforts.  And what I'm saying, Your Honor, is, is I believe the

19  IBEW called them a shadow lobbying organization misrepresenting

20  victims then.  And all I'm saying is, as I look forward, I

21  don't feel comfortable taking their word that they're out there

22  lobbying for my interests and spending fire victim trust money,

23  perhaps, to go pursue lobbying activities in my interests, when

24  prior, they hired individuals who were questionable, to say the

25  least, to lobby for them and did things, in my view, that were

1    at a minimum not forthcoming and in my view dishonest.

2         THE COURT:  Okay.

3         MR. ABRAMS:  And I don't want to see that moving

4    forward.  And so that's the --

5         THE COURT:  I understand.

6         MR. ABRAMS:   I don't want to also distract from my

7    other arguments, Your Honor, but that's my rationale for why it

8    should be included.

9         THE COURT:  Your other arguments are what they are,

10   but your case, if I may say so, breaks into at least two

11   distinct parts.  And I asked you about one of them.  Okay.  I'm

12   going to at least ten minutes for you, if not more, as you

13   requested.

14        Mr. Molton, I have a specific question for you, and

15   then I'll shut up.  The question to you is I'm a little

16   confused about where things stand on the promise going back to

17   the middle of 2022 about unredacting various agreements in

18   connection with the third-party litigation once that litigation

19   is over.  Are there still some documents that were previously

20   redacted that I reviewed that you said would be unredacted that

21   haven't been unredacted yet?

22        MR. MOLTON:  Judge, I'd be glad to answer that, Judge.

23   I believe that the only engagement letter that remains redacted

24   is the one that pertains to the live cases, that includes the

25   live cases, and that would fall within your order dated August

1 29th, 2022, docket 12-884, where you allowed those to be

2 redacted until the matter has been finally resolved by

3 judgment, arbitration, mediation, or otherwise.

4       With respect to what I call the consultant claim

5 engagement letter, I believe that's been fully unredacted in

6 accordance with Your Honor's order, as has the D&O claim, the

7 engagement letter regarding the pursuit of the debtors' estate

8 claims against their former officers and directors. Those are

9 fully unredacted and available --

10       THE COURT: Okay. Well, let me restate it a different

11 way. If there's a live action pending --

12       MR. MOLTON: Yes, sir.

13       THE COURT: -- or actions pending, your commitment is

14 it's premature to hold you to it. My question is simple one.

15 For every piece of litigation in this category that is over, it

16 would --

17       MR. MOLTON: Yeah.

18       THE COURT: -- seem to me the fire victims trust

19 website should at least have those documents accessible, and

20 okay. And your representation is that's true. If Mr. Abrams

21 believes that's untrue, I'll let him say so.

22       MR. MOLTON: Yeah.

23       THE COURT: And then is that also true with the so-

24 called, what we'll call, the consortium agreements, or is there

25 some reason why they need to be remain sealed?

1          MR. MOLTON:  The consortium agreement, I think,

2     relates to the vegetation management claims, Your Honor, that

3     presently is against Davey.  And that's the subject of Mr.

4     Abrams' inquiry.  As Your Honor knows, that matter is presently

5     in live mediation.  It's not --

6          THE COURT:  Right.  I understand that.

7          MR. MOLTON:  And that agreement, and just to be clear,

8     encompassed all of the vegetation management cases, many of

9     which have been resolved, including one just recently, Judge,

10    as we note in our papers, pending this motion.  But until all

11    of the actions that are covered by that engagement letter are

12    resolved, we believe that falls within Your Honor's order of

13    August 29, 2022.

14         THE COURT:  So if that litigation got settled tomorrow

15    or next week or next month, presumably the trust would then

16    make available the relevant documents as requested?

17         MR. MOLTON:  Yes, Your Honor.  Forthwith, as we've

18    been doing.  We've been very diligent in complying with every

19    aspect of Your Honor's order of that date, August 29th, 2022,

20    as well as Your Honor's early order that required us to

21    disclose the results of the litigation (indiscernible) --

22         THE COURT:  No, to your credit.  I mean, I'm not

23    trying to criticize you.  It was my impression that you've done

24    that also but --

25         MR. MOLTON:  Yes, we have, Judge.  And --

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 44
of 90

1      THE COURT:  Okay.  Well, Mr. Abrams, he can tell me if

2  he disagrees with you.  But go ahead, and now take your fifteen

3  minutes.

4      MR. MOLTON:  Yeah, Judge.  I don't know if I have

5  fifteen minutes, Judge.  I think our papers speak to the

6  issues.  Mr. Abrams throws a lot of, what I call, white noise

7  out there.  The trust was given PG&E's claims against, among

8  others, vegetation management contractors.  We've been diligent

9  in pursuing those claims to the extent we think those claims

10  are viable.  And as Your Honor knows, with respect to the

11  claims thus far settled, that's a quarter-billion dollars more

12  that have been brought into the trust.

13      But with respect to the vegetation claims, as opposed

14  to what Your Honor knows to be the estate claims against the

15  D&Os that only the estate could prosecute and were assigned to

16  the trust, as well as the consultant claims, which arguably are

17  estate claims, E-S-T-A-T-E claims, as well.  The vegetation

18  management claims had numerous, indeed, 1,000, claimants

19  pursuing separate independent claims, nonderivative claims,

20  independent claims, against those vegetation management

21  contractors, Davey, for one, that were part of the mix in terms

22  of could not be released in accordance with the plan under

23  Ninth Circuit law and since the end of June can't be released

24  under any circuit without consent of the parties.

25      But in any event, that's where Mr. Abrams seems to be

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 45
of 90

1  focusing on.  And the fact is that in order -- and I really

2  don't want to get into the merits and the mediation because for

3  the point of view of the fire victims, our ability to pursue

4  the greatest value of a settlement for the fire victims is in

5  the interest of Mr. Abrams and everybody else.  And the reason

6  for Your Honor's order was to protect that confidentiality.

7  And I think your order of August 2nd actually mentioned that as

8  an important part of Your Honor's order, which only required us

9  to disclose certain things after the matter had been finally

10  resolved.  But in any event --

11         THE COURT:  I think that, if I may restate --

12         MR. MOLTON:  Yeah.

13         THE COURT:  -- Mr. Abrams, I think his concern is

14  perhaps triggered by the information that he got from the

15  letter that maybe he shouldn't have gotten --

16         MR. MOLTON:  Well --

17         THE COURT:  -- but he had a right to get it.  I mean,

18  somebody gave it to him.  You didn't give it to him.  I didn't

19  give it to him.  And he believes from that that at least some

20  lawyers who are representing the trust's interests are also

21  representing other claimants.

22         MR. MOLTON:  Well --

23         THE COURT:  And I think he takes some issue with that.

24         MR. MOLTON:  Okay.

25         THE COURT:  So what do you say about that?

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 46
of 90

1        MR. MOLTON:  Yeah.  Well, the lawyer he was referring

2   to that he got the letter from was a lawyer that had, as many

3   lawyers did, independent claims of their clients against

4   vegetation contractor --

5        THE COURT:  Right.  Right.

6        MR. MOLTON:  -- defendants.  And how they pursue those

7   claims independent of the trust or in accordance with a

8   comprehensive settlement is between them and their client.

9   Okay.  That's not trust business.  The trust has no impact

10  on --

11       THE COURT:  But Mr. Molton, my question to you would

12  be the following.  Lawyer A says, I'd like to represent the

13  trust to prosecute this claim against the following defendants.

14  And by the way, I'm also representing some private clients

15  against those same defendants.  Can I do both?

16       MR. MOLTON:  No, you can't.

17       THE COURT:  And if you say yes, then the question is

18  how can you do that.

19       MR. MOLTON:  You can't, Judge.  And guess what?

20  That's not the case.  We've said so in our papers, and I'll say

21  so on the record here now.  Every one of our lawyers that is

22  representing the trust in connection with the vegetation

23  management claims is not a firm that is representing clients

24  suing those same defendants on independent claims.  And one of

25  the things that is important and I think we noted in our

1  papers, Judge, is that was a precondition of accepting the

2  trust's engagement back when we did the RFP process many, many

3  years ago is we would not stand for that conflict, and we don't

4  have it.

5         THE COURT: So the firm that produced the letter that

6  found its way to Mr. Abrams is not the trustee's counsel but --

7         MR. MOLTON: No. It's not, but --

8         THE COURT: Okay. All right.

9         MR. MOLTON: -- one of its principals is a TOC member.

10  And I want to say that. But the TOC is not part of the -- that

11  has no strategic or insight into the litigation of those

12  claims.

13         THE COURT: Okay. All right. Well, go ahead. Thank

14  you for clarifying that.

15         MR. MOLTON: I think I'm done, Judge.

16         THE COURT: All right.

17         MR. MOLTON: I don't know if there's much else. I'll

18  rely on my papers, other than to the extent you have any other

19  questions. I just want to say it's really important for the

20  trust acting as it has done to benefit all claimants to be able

21  to pursue these claims, these claims that were assigned to it,

22  this additional consideration, without having to have its

23  strategy, its tactics, its communications, and indeed its

24  mediation disturbed by these sort of inquiries.

25         We would ask Your Honor -- we've been religiously

1  diligent in abiding by Your Honor's orders regarding these

2  matters.  I'll represent on the record that Ms. Yanni will

3  continue to do so.  And once these matters are finally resolved

4  forthwith, we will satisfy the disclosure requirements in the

5  time that they require and in the manner they require.  And --

6      THE COURT:  Well --

7      MR. MOLTON:  -- I'd ask Your Honor to deny this --

8      THE COURT:  Well, first of all, first of all, I

9  understand that you and Ms. Yanni are probably sick of Mr.

10 Abrams.  And I'm not in the position to take a position about

11 that.  Mr. Abrams maybe sick of all this, but he presents a

12 request and it's my job to listen to his request.

13      And so your representation on the record is that there

14 has been not any cross-pollination between a lawyer

15 representing the trust and a lawyer representing a private

16 client who may be competing for the same dollars.  And whether

17 a particular lawyer is a member of the oversight committee is,

18 perhaps, a fact, but therefore what?

19      Let's switch to the lobbying question.  You heard Mr.

20 Abrams respond to my question, and I don't find it's helpful to

21 sit here in the middle of 2024 and worry about what might have

22 happened in 2000 or 2001.  And if some lobbying effort had

23 produced more money to be administered in the trust, you'd be

24 happy, Ms. Yanni'd be happy, and Mr. Abrams would be happy, and

25 I'd be happy.

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 49
of 90

1       But what do I do -- I take your representation on the
2   record that the trustee is not presently engaging any
3   lobbyists.  And you reaffirm that.  And what do I -- what do
4   you say in response to Mr. Abrams' concern about you had the
5   wrong lobbyists last time; what are you doing now?

6       MR. MOLTON:  Judge, I think we noted in our papers
7   that since 2022, the trust has not engaged in anything beyond a
8   few phone calls to ascertain the status of any lobbying efforts
9   regarding AB 1054.  Trustee Yanni is focused, committed in
10  getting this case over the finish line and in making sure that
11  she monetizes her assets that were given to her and otherwise
12  resolves claims in a fair and equitable manner and gets these
13  fire victims paid as soon as possible and completes her job.

14      That's her priority.  That's been her priority.  That
15  remains her priority.  And as Your Honor mentioned, that's the
16  focus, the administration of the trust, to which her attentions
17  are devoted.

18      THE COURT:  Okay.  Mr. Abrams, you have ten minutes at
19  least to reply.

20      MR. ABRAMS:  Thank you, Your Honor.  The arguments
21  from the trustee notwithstanding, there are conflicts here.  To
22  me, there are absolutely clear violations of the law.  And this
23  discovery is to find out the extent of those violations.

24      THE COURT:  Be more specific, Mr. Abrams.

25      MR. ABRAMS:  Yes, I am.  I am, Your Honor.

1          THE COURT:  Be specific.  Who violated what law.

2          MR. ABRAMS:  Sure.  So first, Your Honor, I just want

3    to point out that within the Singleton letter that I put within

4    my papers, it states that don't worry about this 1.4 percent

5    that we're pulling away from fire victim trust beneficiaries.

6    Don't worry about that.  It's only 1.4 percent, and you'll get

7    the money after.  But don't worry about it.  And that letter in

8    and of itself, Your Honor, should be more than enough good

9    cause to understand who's doing what to whom and how these

10   attorneys are working together.

11         THE COURT:  Be more specific.

12         MR. ABRAMS:  I am.

13         THE COURT:  Be more specific.  There's nothing --

14         MR. ABRAMS:  I will.  So Your Honor, specifically, you

15   cannot sit on the trust oversight committee without being a

16   disinterested person.  It's fine.  If you're an attorney and

17   you want to take a position in another litigation and go sue

18   whoever you want to sue regarding the fires, go right ahead.

19   But then don't serve on the trust oversight committee, which

20   these members did.  And the trustee is sitting across the

21   negotiating table from members of -- and it is not just Mr.

22   Singleton, Your Honor -- across the table from members of the

23   trust --

24         THE COURT:  Who was it -- who was it -- Mr. Abrams,

25   who specifically is on the trust oversight committee that you

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 51
of 90

1  believe is in a conflict position, by name, on this record?

2          MR. ABRAMS:  Sure.

3          THE COURT:  If you're going to complain about them,

4  you got to name them.

5          MR. ABRAMS:  Sure, Your Honor.  And look, I know of

6  two because of the papers that were filed with the Court, and

7  what I don't know, which is why I put forward the motion for

8  discovery, is how many of these attorneys have these conflicts.

9  Another attorney that has a conflict --

10          THE COURT:  Who are the two that -- who are the two

11  that you believe have a conflict?

12          MR. ABRAMS:  Mr. Singleton, Your Honor, as well as Mr.

13  Robbins, Your Honor.  Both are members of the trust oversight

14  committee.  Both have clients and are taking positions pulling

15  away money from fire victim trust beneficiaries for their

16  benefit and certain claimants' --

17          THE COURT:  Slow down.  How do you know they're

18  pulling money away as distinguished from there is only so much

19  money to be had and Ms. Yanni isn't the only claimant?  That's

20  not quite the same.  So how do you know it isn't the latter,

21  not the former?

22          MR. ABRAMS:  I know that for a couple reasons, Your

23  Honor.  First reason, Your Honor, is that within the Singleton

24  letter, he makes sure to mention that what -- in the policy

25  limits settlement, he says this is a policy limit settlement,

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 52
of 90

1   what it means to have a policy limit settlement, and goes to

2   the fact that there is a cap, that they are going after the

3   same monies based on what PG&E stated was going to be the

4   limits of what the trust could pursue, which was the insurance

5   limit. You have multiple parties, Your Honor, going after that

6   same pot of money.

7        Now, in other cases, Your Honor, if there wasn't a

8   policy limit or there were different policy limits, it's still

9   coming from the same organization, Your Honor. And so that,

10   again, is a conflict. And I'll just -- if I could, Your

11   Honor --

12        THE COURT: Mr. Abrams, I presume -- Mr. Abrams, I

13   presume you sat through the last hearing with the fire victims

14   and the trust issue. You're familiar with that issue?

15        MR. ABRAMS: I did, Your Honor.

16        THE COURT: Okay. Now just imagine that somebody was

17   in an area that wasn't covered by the fire trust, the fire, was

18   in another place and suffered a loss of vision and sued a

19   third-party defendant. And so the trustee tried to recover

20   from a third-party, and the individual did. And they would

21   compete, so people who have different recourse compete for the

22   same fund. What's different about it here? Isn't this the

23   same? In other words --

24        MR. ABRAMS: Let me --

25        THE COURT: -- if there was a --

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 53 of 90

1        MR. ABRAMS:  Sure.

2        THE COURT:  -- if there was a policy that protected

3   the people who lost their vision in a particular area -- in a

4   particular cause and some were within the trust and some were

5   not, the two different competing parties would be competing for

6   the same fund.  And that's just --

7        MR. ABRAMS:  Yes.

8        THE COURT:  -- the nature of the game.  Look, it's

9   true.  If you and I both go out and drive our cars and we both

10  get hit by the same truck and you suffered 10,000 dollars'

11  worth of damage and I suffered 5,000 dollars' worth of damage

12  and the truck driver says, I've only got 5,000 dollars' worth

13  of insurance.  Fight over it.  We'd fight over it.  We'd fight

14  over it.  So what's different?

15       MR. ABRAMS:  Thank you.  The difference, Your Honor,

16  is that a member of the trust oversight committee has fiduciary

17  obligations to benefit the fire victim trust.  Within the fire

18  victim trust agreement, it states that they have a role, that

19  they must be consulted.  These are attorneys, Your Honor.  They

20  are advising the trust on legal matters.  They're not

21  accountants.  They're advising the trust on --

22       THE COURT:  Wait.  Wait, Mr. Abrams.  Mr. Abrams, they

23  are not the lawyers for the trust.  They are members of the

24  oversight committee.

25       MR. ABRAMS:  Yes, they are, Your Honor.

1    THE COURT:  So again, let's just assume the -- let's

2    just assume these two people you mentioned, Singleton and --

3    I'm sorry.  I wrote his name down.  Pardon me one second.  What

4    did you say?

5    MR. ABRAMS:  So --

6    THE COURT:  No, Robbins.  Robbins.  So let's say

7    they're both in that committee.  I take your word for it.  They

8    are not the lawyer for the trust.  They are simply members of

9    the committee, therefore what?

10    MR. ABRAMS:  Right.  Therefore, Section 1103, Your

11    Honor, states, "Representatives of a committee may not, while

12    employed by such a committee, represent any other entity having

13    adverse interests to the estate."  They have an adverse

14    interest to the estate by taking this on.  Again, other

15    attorneys can go out and sue whomever they like.  They can go

16    represent their clients, whoever they like.  They should not be

17    serving on the trust oversight committee.  They should not be

18    employed by the trust.

19    And the fact that the trustee sat across the table

20    from these folks, knowing that they had adverse interests to

21    the estate and said nothing, did nothing, did not call it out,

22    they did not file a declaration, they did not do anything to

23    disclose these conflicts, is abhorrent to me.  This is pulling

24    money away from fire victim trust beneficiaries.  And in the

25    letter from Singleton, he says, this is money.  Don't worry,

1  it's only 1.4 percent.  But this is money that is not going to

2  go towards your pro rata distributions.

3          So Your Honor, that's one law.  Section 327 and

4  Sections 328, Your Honor, disinterested and may not hold

5  adverse interest to the estate, "The court may deny allowance

6  of compensation when a person is not disinterested and holds

7  adverse interests to the interest of the estate."  That's what

8  we have here, Your Honor.

9          THE COURT:  Has anyone --

10          MR. ABRAMS:  It's a violation.

11          THE COURT:  Mr. Abrams, has --

12          MR. ABRAMS:  Yes.

13          THE COURT:  -- any member of the committee asked for

14  compensation?

15          MR. ABRAMS:  They are getting compensation, Your

16  Honor.  They're getting compensation --

17          THE COURT:  All right.

18          MR. ABRAMS:  -- through their clients.  They're

19  getting compensation through inverse condemnation.  They're

20  getting compensation from --

21          THE COURT:  Are they getting -- are they getting --

22  are they getting compensated for their service as members of

23  the oversight committee?

24          MR. ABRAMS:  Much of like everything else that's

25  associated with the trust, Your Honor, there is no disclosure

1  of how these folks are getting paid, what their incentive

2  structures are, and as the Court knows, Your Honor, as Mr.

3  Molton knows, I have stated that those should be transparent.

4  So the fact that I don't know about that particular item, Your

5  Honor, goes to that point, that all of this information, Your

6  Honor, is not available to victims.  But it should be, Your

7  Honor, in my estimation.

8          If I can, Your Honor, I just want to continue.  That

9  Section 326 and 328, Your Honor, states that the court may deny

10  allowance of compensation for services if the trustee failed to

11  make diligent inquiry into the facts, such as professional

12  person that is not disinterested and holds interests adverse to

13  the estate.  Your Honor, there are remedies here.

14          The trustee would like us all, like she has done, to

15  avert our eyes from this, to turn and not look at the people

16  across the table who are negotiating against the interest of

17  the estate.  They would also like the Court and me to avert my

18  eyes so that I don't see those folks.  To me, Your Honor, that

19  is not justice.  It's just irresponsible to do that.

20          Your Honor, we need to be making sure that we look at

21  this information.  As I stated with my papers, I don't want to

22  prejudge the extent of these violations.  But Your Honor, just

23  to look away and say, I don't want to know whether these

24  consortium agreements are amongst members of the trust

25  oversight committee, whether they're involving other folks who

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 57
of 90

1  are employed by the trust, and just to look away, Your Honor, I

2  don't think is a prudent path.

3         And so I'm asking the Court, again, for just the basic

4  rights to discovery so that I can get the information and

5  understand the damages that they have caused for victims. And

6  if, Your Honor, from that discovery, there isn't -- sorry, Your

7  Honor, I can't hear you. It looks like your --

8         THE COURT: No, I just, I put my headset on because I

9  wanted to cut down on the sound, and now I can hear you.

10        What specifically would you do if I authorized you to

11  explore this area, this area, and not --

12        MR. ABRAMS: Okay.

13        THE COURT: -- the lobbying and perhaps not other

14  things, what would you then do, and what would you do with the

15  information?

16        MR. ABRAMS: Yes, Your Honor. Well, I think what we

17  would do with the information would depend on what information

18  comes out. But I would say, Your Honor, that part of what I

19  would want to do is have the full panoply of tools. So I would

20  want initial disclosures pursuant to Federal Bankruptcy Rule

21  7026, oral depositions --

22        THE COURT: Doesn't apply in Rule -- doesn't apply to

23  2004 exams.

24        MR. ABRAMS: Okay. Thank you, Your Honor. I

25  appreciate that. I'm learning as you go -- as I go here and

1 trying to do my best. Oral depositions pursuant to Federal

2 Bankruptcy Rules and Procedures 7030, interrogatories pursuant

3 to Federal Bankruptcy Procedures 7033 --

4       THE COURT: Oh, no, Mr. Abrams, let's just cut to it.

5 What if I told --

6       MR. ABRAMS: Sure.

7       THE COURT: What if I said Mr. Singleton or Mr.

8 Robbins has to appear and be examined by you, what would you

9 ask them, the kind of questions you would ask, that's all. I

10 mean, is there something -- is there someone else you'd want to

11 examine on this subject?

12       MR. ABRAMS: Yes, Your Honor. Again, I think, given

13 that I have -- and I asked before the hearing if I could

14 provide documents as exhibits. I understand that this is just

15 for oral arguments, Your Honor. But again, I have documents

16 that demonstrate Mr. Singleton took an adverse position to the

17 estate. I have documents that Mr. Robbins took a position that

18 was adverse to the estate.

19       And Your Honor, if two of the trust oversight

20 committee members are taking adverse positions to the estate,

21 having it known by the trustee, yet does nothing, I think that

22 I should be able to get that for all the members of the trust

23 oversight committee, for the trustee herself, and be able to

24 ask them questions about what positions they took and when,

25 about how much and in what ways they are taking money from fire

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 59
of 90

1    victims.  And that should be fair game to ask.

2          And again, Your Honor, if there isn't -- if through

3    that information that it is very limited in terms of the money

4    that they have pulled away from fire victims, then so be it,

5    Your Honor.  But if that (indiscernible) --

6          THE COURT:  Well, you didn't really respond to my --

7          MR. ABRAMS:  Sure.

8          THE COURT:  -- simple hypothetical.  And so I'm going

9    to stick with my simple hypothetical first.  You got a 10,000-

10    dollar damage to your car and I got 5,000 damage and there's

11    only a 7,500-dollar insurance fund, am I pulling money away

12    from you, or are you pulling money away from me if I recover?

13    In other words, how does pulling money away from victim work

14    when other people who aren't in the fire trust have an

15    entitlement to recover?  How do you resolve that?  How does

16    that work?

17          MR. ABRAMS:  Sure.  So Your Honor, based upon the

18    information that I have, as an example, in the Singleton

19    letter, he seems to be stating that there's a 200-million-

20    dollar policy limit --

21          THE COURT:  Right.

22          MR. MOLTON:  -- for which the -- for which the

23    plaintiffs can go after.  He's going after it, the fire victim

24    trust is going after it, and if he is successful, perhaps he'll

25    get all of the 200 million dollars and none will be left for

1  the fire victim trust --

2          THE COURT:  But he only -- but he only told you and

3  his constituents that they might get 1.4 percent, right?

4          MR. ABRAMS:  Look, Your Honor, Mr. Singleton had an

5  opportunity to respond and provide some sunlight on these

6  issues.  He chose not to.  What I can tell from the letter,

7  Your Honor, is I am unsure whether it was -- if the 1.4

8  percent, because he's talking about 1.4 percent of the overall

9  trust, is the 200 million.  It isn't 1.4 percent of 200

10  million.  My reading of it, Your Honor, is that 200 million

11  dollars he is viewing as 1.4 percent of what the trust might

12  get, so don't worry about it because it's only 1.4 percent --

13          THE COURT:  Okay.  Well, you might be -- you might be

14  right on those percentages, but if there's a fixed sum of 200

15  million available and Mr. Singleton can get 10 million for his

16  clients, that's a different percentage.  Maybe it's obviously

17  more than one percent.  But therefore what?  I still don't

18  understand -- I don't understand how you could -- where that

19  takes you.  In other words, you've said that say the members

20  have been taking money, and what you're really saying is the

21  members are trying to get money for their clients that might

22  make for lesser money going to the trust.

23          Let me ask Mr. Molton.  Mr. Molton, what should I do

24  about Mr. Abrams' perception and concern that maybe one or more

25  members of the committee have been serving two masters and have

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 61
of 90

1  been doing things that they shouldn't be doing in the way he

2  said, leaving aside the dollars amounts, just the notion of a

3  member of the oversight committee representing claimants who

4  are not the beneficiaries of the trust?

5       MR. MOLTON:  Judge, I don't think there's anything to

6  do.  And let me go on.  And first of all, just to say

7  something, Mr. Abrams and I, when we talk off-court, we get

8  along quite well and are very cordial with each other so --

9       THE COURT:  Well, Mr. Abrams has always been cordial.

10  He is a very --

11      MR. MOLTON:  Yeah, so in any event.  But I do want to

12  say something on that, Judge, because we don't see -- the TOC

13  responsibilities are very limited.  They're not the trustee.

14  They're not the trust.  They're not counsel to the trust.  And

15  I'll get to that in a minute.

16      But I'm having a deja vu, Judge, because we did this

17  with respect to Mr. Abrams raising conflict issues with respect

18  to TOC members four years ago, I believe, and thereafter.  I do

19  know that the TOC members were approved pursuant to your plan,

20  your confirmation order.  They were part of the disclosure

21  material and were announced and part of what was part of the

22  confirmation process.  I do know that at that time, those TOC

23  members that had cases, active cases, against vegetation

24  management, there was proceedings, well-known proceedings, the

25  JCCP.

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 62
of 90

1          THE COURT:  Right.

2          MR. MOLTON:  Public knowledge.  Public knowledge,

3   Judge.  This was an issue that was available to Mr. Abrams --

4   this issue was available to Mr. Abrams, this information, four

5   years ago.  The bottom line is Justice Trotter --

6          MR. ABRAMS:  Your Honor --

7          THE COURT:  -- before he retired, when we were doing

8   the RFP, said no way is any trust professional, trust

9   professional, going to be serving two masters.  And to the

10  extent that a law firm was engaged to represent the trust, they

11  could not do that.  They do not --

12         THE COURT:  No, but that's not what we're talking

13  about.  Because I take your word for it.  And again, I don't

14  want to turn this into a Singleton bash.  But Mr. Singleton

15  wrote the letter that triggered Mr. Abrams' concern.  And can

16  Mr. Singleton sit on the trust oversight committee if at the

17  same time he is pursuing claims that might dilute, whether it's

18  one percent or some other percent, the funds that are available

19  for the trust?  What do I do about that?  Stated differently,

20  Mr. Molton, what are you and Ms. Yanni going to do if somebody

21  on the trust oversight committee is engaging in some

22  inappropriate conduct?

23         MR. MOLTON:  Judge, if we see inappropriate conduct,

24  we'll deal with it.  We've known about this.  We don't view it

25  as a conflict.  The trust oversight committee has no

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 63
of 90

1    involvement in litigation strategy and litigation prosecution

2    or settlement decision making.

3            And I just want to note, as Your Honor well knows, all

4    the Code provisions cited by Mr. Abrams relate to estate

5    professionals.  The analog would be me, a trust professional,

6    not a TOC member.  So they're completely irrelevant.

7            And another point I just need you to know, Judge, 6.5,

8    of the trust agreement, compensation and expenses of the TOC,

9    "The members of the TOC" -- and I'm reading right from your

10   trust agreement approved, Judge -- "shall not be entitled to

11   compensation for their services but shall be reimbursed

12   promptly for all reasonable out-of-pocket costs and expenses

13   incurred in connection with the performance of their duties

14   hereunder," a pretty unremarkable provision that --

15           THE COURT:  Pretty unremarkable.  Pretty normal.

16   Yeah.

17           MR. MOLTON:  Pretty normal so --

18           MR. ABRAMS:  Your Honor, if I can also -- if I can

19   also (indiscernible) --

20           MR. MOLTON:  So if I can finish --

21           THE COURT:  Wait, Mr. Abrams.  Let him finish.

22           MR. ABRAMS:  Sorry.  I'm sorry, Your Honor.

23           MR. MOLTON:  Judge.  Judge, this has been -- this has

24   been public information that's been out there since the

25   confirmation order.  Mr. Abrams raised lots of these issues

1    regarding TOC conflicts four years ago.  Your Honor --

2         THE COURT:  I think this is like the lobbying

3    effort --

4         MR. MOLTON:  Okay.

5         THE COURT:  -- Mr. Molton.  Going back four years is

6    not constructive.  Mr. Singleton wrote a letter in this year,

7    this calendar year, that offended Mr. --

8         MR. MOLTON:  Yeah.

9         THE COURT:  -- Abrams' sensitivities and

10   sensibilities.  And it certainly was a letter that had to be

11   studied to understand it.

12        So the question is, does the current position of Mr.

13   Singleton on behalf of his clients and the thought that his

14   clients might be getting some money, does that concern you and

15   Ms. Yanni?  And Mr. Abrams accuses you of turning a blind eye

16   to it.  So he's not turning a blind eye.  What do you do now

17   that you've heard him?

18        MR. MOLTON:  Judge, it has nothing to do with Ms.

19   Yanni's effort to monemize (sic) in her fiduciary duty to the

20   fullest extent possible for the benefit of fire victims that

21   claim, which we received per the confirmation order.

22        THE COURT:  So if she somehow decided that Mr.

23   Singleton ought to be removed from the oversight committee, it

24   wouldn't change the outcome.  Right.  In other words, if Mr.

25   Singleton chose to resign from the oversight committee, he

1  still represents his own clients --

2  　　　　　MR. MOLTON:  Correct.

3  　　　　　THE COURT:  -- and his clients are still potentially

4  in conflict with -- not in conflict, but are competing --

5  　　　　　MR. MOLTON:  Competing.

6  　　　　　THE COURT:  -- for a fixed sum of money, as the same

7  as Abrams and I are for our damaged cars.  And that's just life

8  in the big city anytime there's a less-than-solvent fund.  All

9  right.

10 　　　　　MR. MOLTON:  Judge, we don't --

11 　　　　　THE COURT:  I understand.

12 　　　　　MR. MOLTON:  -- see any conflict in what's happened

13 and are fully confident in the trustee's ability to settle this

14 case for the greatest value possible, if possible, of the fire

15 victims.

16 　　　　　THE COURT:  Mr. Abrams, I asked you to wait, and

17 you're waiting.  So go ahead and finish.

18 　　　　　MR. ABRAMS:  Thank you, Your Honor.  First of all, I

19 just want to state that the extent to which members of the TOC

20 are working in concert with the trustee is part of what I am

21 looking for with discovery.  Your Honor, counsel for the

22 trustee just mentioned and cited the trust agreement, and I

23 would also bring the Court's attention to section 6.2, duties

24 of the members of the TOC, "The members of the TOC shall serve

25 in a fiduciary capacity, representing current holders of fire

Case: 19-30088   Doc# 14555   Filed: 07/31/24   Entered: 07/31/24 12:31:54   Page 66
of 90

1  victim claims in the administration of the trust."  These are

2  not bystanders.

3       Your Honor, this has been, I have to say revisionist

4  history, along with other things that the trustee has put

5  forward as she removes documents from the website.  When I

6  first engaged with the trustee counsel, they advised me that

7  any communications that I had with the TOC or with anybody

8  associated with the trust or the trustee had to be brought to

9  them.  So at that point, Your Honor, they felt perfectly

10 comfortable with having the TOC under their purview.  That has

11 changed over time.  And now they've said that they are

12 representing the trustee and through them someone else.

13      Your Honor, I am asking for discovery.  Certainly

14 there is enough evidence on its face -- and I would also ask

15 Your Honor, I can certainly provide a letter brief after the

16 hearing to provide additional documentation, and I am happy to

17 do that.  I would ask the Court for that ability to do that.

18 That demonstrates that there is more than enough evidence and

19 certainly enough good cause for reasonable discovery.

20      And that's what I'm asking for, Your Honor, is

21 reasonable discovery.  That's not an easy ask for me, Your

22 Honor.  I am not an attorney.  I will have to learn the

23 subpoena process.  I need to do all of these things out of my

24 own pocket.  And I'm fine doing it --

25      THE COURT:  Mr. Abrams, let me slow you down for a

1 minute.  The subpoena process is prefatory.  The question is if

2 I ordered Mr. Singleton or Mr. Abrams or Mr. X or Mr. Y to sit

3 for a deposition, what would you ask him or her and what would

4 you do with the information.  And I understand, of course, the

5 answer is it depends on what you get.  I understand.  I'm not

6 born yesterday.  But the point is I just don't know that that's

7 constructive because --

8             MR. ABRAMS:  Right.

9             THE COURT:  -- you keep making statements as though

10 you're making up the rules.  And the fact that the members of

11 the committee are fiduciaries in the administration of the

12 trust doesn't mean they -- from what you've told me, none of

13 them has breached the administration of the trust.

14             The only thing that really comes out of all of this,

15 in my mind, so far is that at least one of the lawyers may be

16 representing clients who are competing, competing, for a fixed

17 fund.  That, to me, does not mean I turn loose a discovery

18 process.  But I'm going to think about it.

19             And let me clarify one more thing for your

20 information.  At the last minute before this hearing, you asked

21 to submit documents and my clerk referred that to me and I said

22 no.  And the reason I said no is if you have documents that

23 were relevant to your motion, they should have been part of

24 your motion.  You can't just provide a document on the day of a

25 hearing for your opponent.

 1          I will let you know and think about whether if you

 2   have additional documents you should be allowed to present them

 3   and whether I want any further briefing.  I have to just think

 4   about that myself at the moment.  And I don't want be negative

 5   about it, but if I ask you to file additional documents, I

 6   might end up getting a twenty-page repetitive brief that covers

 7   the whole history of the case.  And I don't want that.

 8          And I might be willing to consider a letter or a

 9   document or something that you have and take that into account,

10   but I have to decide whether it's something that Mr. Molton

11   should respond to or I want brief it.  And I'm just not

12   prepared to answer that question today.

13          So I'm going to -- I'm going to -- I'm going to --

14          MR. MOLTON:  Judge, just one last point, just --

15          THE COURT:  Yeah, one second.  In a minute.  But my,

16   my present plan, Mr. Abrams, is to take the matter under

17   advisement, and that's why I didn't allow you at the last

18   minute to file additional documents.

19          Mr. Molton.  Yes.

20          MR. MOLTON:  Yeah, just --

21          MR. ABRAMS:  (Indiscernible) I want to --

22          THE COURT:  I'll close with you, Mr. Abrams.

23          Mr. Molton.

24          MR. MOLTON:  As Your Honor knows, in almost all of

25   these trusts with trust advisories, the trust advisory members,

1  who have very limited authority, its oversight, also represent

2  many, many hundreds or if not thousands of fire victim

3  claimants in the trust who are competing with everybody else,

4  and their duty is to advocate for their clients in the trust

5  procedures against, which impact other trust victims, is

6  something that is not remarkable and certainly not inconsistent

7  with their duties to oversight of the administration of the

8  case.

9       THE COURT:  And if Mr. Abrams had a counsel, that

10 counsel might be arguing for Mr. Abrams' recovery, even though

11 that counsel might have other clients too.  Right.

12      MR. MOLTON:  Correct.  Thank you, Judge.

13      THE COURT:  Mr. Abrams, final comment.

14      MR. ABRAMS:  Thank you, Your Honor.  You had asked me

15 a question about the types of questions that I would ask if I

16 was permitted the discovery rights.  Your Honor, I think my

17 first question would be around the letter to understand how

18 much money is being pulled away from fire victim trust.  My

19 other questions would be around these consortium agreements.

20 We don't know the extent of those consortium agreements because

21 they haven't been disclosed so -- and to which --

22      THE COURT:  But they have been disclosed, except for

23 the one that's pending.

24      MR. ABRAMS:  No, the consortium --

25      THE COURT:  What hasn't been disclosed that relates to

1    completed litigation?

2              MR. ABRAMS:  So what has not been disclosed, Your

3    Honor, are any of the consortium agreements because trustee has

4    taken the position that we shouldn't have -- that we shouldn't

5    be allowed to look at them because it doesn't matter how much

6    money or the types of incentives that are between attorneys.

7    But of course, it does, if it goes to talking to conflicts of

8    interest.

9              Second of all, Your Honor, within these, there is

10   settled litigation under the same retention agreement.  So as

11   an example, as soon as I filed my motion, Your Honor, shortly

12   after, trustee filed papers around the Osmose settlement, of

13   which it is listed that Mr. Singleton is opposing counsel

14   representing other plaintiffs.  So it's not just the Davey Tree

15   litigation.  It's another case.

16             And that notice was put on the docket.  I see Mr.

17   Molton with a puzzled look.  I'm happy to provide you with the

18   docket reference to that notice.

19             And look, Your Honor, this is unjust enrichment.

20   That's what this is.  And we need to address it.  And so those

21   consortium agreements need to be disclosed.  And I need to be

22   able to see where the evidence takes to find out the degree to

23   which there are conflicts of interest that are driving these

24   types of motivations that is pulling money away from fire

25   victims.

1          And to prejudge what might be in the consortium

2     agreements and what might be members of the TOC in terms of the

3     positions that have taken in these cases I don't think is the

4     right approach.  I think we should have the discovery.  Follow

5     the evidence where it goes.  And Your Honor, as a layperson, my

6     read of the bankruptcy laws pertaining to this is that the

7     Court has a lot of tools at their disposal to remedy these

8     issues once they're disclosed, including taking money away from

9     the individuals that have held these conflicts.

10          So I'm just asking Your Honor, again, that we get at

11     the information and let the chips fall where they may.  I

12     understand that the folks associated with this case, myself

13     included, would just like to be done, and having this come at

14     this state of the case is not welcome.  But this is when it

15     came out.  I filed it -- I brought it to the trustee's

16     attention as soon as I knew about it.  This is not information

17     that I was sitting on.  And again, Your Honor, I think it's the

18     only responsible path, certainly, for me, to be able to bring

19     this to attention and find out where the facts take us.

20          THE COURT:  Mr. Molton, previously, I looked at the

21     consortium agreements under seal and reviewed them.  Are there

22     any consortium agreements that are no longer relevant because

23     the matter is -- I mean, are there any consortium agreements

24     that could be disclosed and maybe should be disclosed now that

25     all the relevant litigation is done?

1          MR. MOLTON:  I think we've disclosed, Your Honor,

2    everything pertained to fully completed litigation, which is

3    the --

4          THE COURT:  Including the consortium agreements?

5          MR. MOLTON:  Yeah, I don't know what he means by -- we

6    have an engagement letter with --

7          MR. ABRAMS:  In the retention agreements, there are

8    references to consortium agreements that will not be provided

9    to the trustee, that these attorneys, who are prosecuting these

10   cases on behalf of the fire victim trust and other parties,

11   right, have a consortium agreements.  It states so within the

12   retention agreements, the very little that wasn't redacted by

13   the trustee.

14         THE COURT:  Okay.  Gentlemen, that's -- my

15   recollection -- it's been my --

16         MR. ABRAMS:  That hasn't been disclosed to you, Your

17   Honor, and --

18         THE COURT:  Hold on.

19         Mr. Molton, my --

20         MR. ABRAMS:  Sorry.

21         THE COURT:  -- recollection, and it's only a

22   recollection, is that you were asked to submit the retention

23   agreements redacted, and you did.

24         MR. MOLTON:  Yes.

25         THE COURT:  And I reviewed them and determined --

1        MR. MOLTON:  Okay.

2        THE COURT:  -- that there was no reason why the

3   trustee couldn't go forward.  Now, Mr. Abrams makes a point

4   about, well, why can't he know now.  And so my question to you,

5   you've already identified what we'll call the Davey litigation,

6   [Day'-vee], [Dah'-vee], whatever the name, is there.  So any

7   consortium agreement or negotiations or anything that relates

8   to that lawsuit is -- those lawsuits, to me, is off limits for

9   today, for all the reasons we've said.

10       But if there is a piece of litigation that is

11  completely terminated, whether it's the last one that Mr.

12  Abrams mentioned or something earlier, and if there was a

13  relevant consortium agreement or agreement among more than one

14  lawyer or law firm, it would seem to me that it's perfectly

15  okay now to disclose it.  Now, I need you to tell me whether

16  you think that would be inappropriate, and if so, why?

17       MR. MOLTON:  Judge, from our perspective, those are

18  basically the work sharing and work allocation and to the

19  extent they're successful attorney-fee-division agreements

20  among the various law firms.  Those are not with the trust.

21  Our agreements with the law firms are referenced by what we

22  submitted to Your Honor.  What the trust cares about is those

23  agreements which have the obligation to the trust -- the

24  obligations to the trust, and the engagement to the trust.  And

25  to the extent that those law firms that we engage have internal

1  agreements among themselves, that's not something the trust

2  has.

3          THE COURT:  Okay.

4          MR. ABRAMS:  Your Honor --

5          THE COURT:  No, Mr. Abrams, I don't need any more.

6  I'm overloaded.

7          I'm going to go back and review.  I told you, I'm

8  taking this matter under advisement.  I will advise you.  We'll

9  either have a further hearing or advise you if I want you to

10  submit anything more.  Probably what I'm going to do to begin

11  with is go back and review the consortium agreements that were

12  submitted to me under seal and determine whether I want to do

13  anything about that.  And I'll leave it at that.

14          So I'm not going to make a quick ruling on this.  I

15  understand your point, Mr. Abrams, and I'm not going to ignore

16  it.  I'm going to think about it and do the deliberation that

17  your request is merits, which is attention and my attention.

18  And I intend to pay attention.  So stay tuned.  I will issue a

19  ruling, or if not a ruling, a call for further information of

20  some sort.

21          So thank you both for your time and effort.  Matter

22  stands submitted.

23      (Whereupon these proceedings were concluded at 11:48 AM)

24

25

1          C E R T I F I C A T I O N

2

3   I, River Wolfe, certify that the foregoing transcript is a true

4   and accurate record of the proceedings.

5

6

7

8   _____

9   /s/ RIVER WOLFE, CDLT-265

10

11  eScribers

12  7227 N. 16th Street, Suite #207

13  Phoenix, AZ 85020

14

15  Date:  July 31, 2024

16

17

18

19

20

21

22

23

24

25

**[**

**[Dah'-vee] (1)**
74:6
**[Day'-vee] (1)**
74:6

**A**

**AB (2)**
39:19;50:9
**abhorrent (1)**
55:23
**abiding (1)**
49:1
**ability (4)**
30:18;46:3;66:13;
67:17
**able (6)**
21:21;48:20;59:22,
23;71:22;72:18
**above (1)**
27:11
**Abrams (104)**
36:22,23,25;37:1,1,
2,5,10,18;38:17;
39:12,21;40:2,5,9,16;
41:10,15;42:3,6;
43:20;45:1,6,25;46:5,
13;48:6;49:10,11,20,
24;50:18,20,24,25;
51:2,12,14,24;52:2,5,
12,22;53:12,12,15,24;
54:1,7,15,22,22,25;
55:5,10;56:10,11,12,
15,18,24;58:12,16,24;
59:4,6,12;60:7,17;
61:4;62:7,9,17;63:3,4,
6;64:4,18,21,22,25;
65:15;66:7,16,18;
67:25;68:2,8;69:16,
21,22;70:9,13,14,24;
71:2;73:7,16,20;74:3,
12;75:4,5,15
**Abrams' (6)**
44:4;50:4;61:24;
63:15;65:9;70:10
**absence (2)**
12:1;14:20
**absolutely (1)**
50:22
**abusing (1)**
38:6
**accept (1)**
24:10
**accepting (1)**
48:1
**access (3)**
5:18;13:3;40:24
**accessible (2)**
30:17;43:19
**accordance (9)**

15:20;16:19;19:13;
21:7;22:21;31:1;43:6;
45:22;47:7
**accordingly (1)**
19:9
**account (1)**
69:9
**accountants (1)**
54:21
**accuses (1)**
65:15
**across (4)**
51:20,22;55:19;
57:16
**act (1)**
31:23
**acting (2)**
40:18;48:20
**action (3)**
8:18;34:10;43:11
**actions (2)**
43:13;44:11
**active (2)**
32:17;62:23
**activities (2)**
40:22;41:23
**actual (1)**
11:13
**actually (8)**
6:24;7:3;10:9;
16:24;19:14,19;41:1;
46:7
**add (1)**
34:16
**added (1)**
30:11
**addition (1)**
23:3
**additional (8)**
12:15;23:2;37:13;
48:22;67:16;69:2,5,
18
**address (4)**
5:9;7:18;31:3;
71:20
**addressed (1)**
31:21
**adequate (2)**
11:23;12:7
**adhere (1)**
5:8
**adjudication (1)**
7:24
**administered (2)**
20:12;49:23
**administration (14)**
16:17;22:12;38:19,
22;39:1,5;40:1,4,15;
50:16;67:1;68:11,13;
70:7
**administrator (3)**
20:6;21:4;22:22
**administrator's (1)**

20:15
**adverse (12)**
10:2;39:16;40:19;
55:13,13,20;56:5,7;
57:12;59:16,18,20
**advice (1)**
33:21
**advise (3)**
29:15;75:8,9
**advised (1)**
67:6
**advisement (3)**
29:17;69:17;75:8
**advising (2)**
54:20,21
**advisories (1)**
69:25
**advisory (1)**
69:25
**advocate (1)**
70:4
**advocating (1)**
41:1
**affects (1)**
9:23
**again (29)**
6:1,17;7:10;8:21;
9:15,25;17:22;20:4;
22:18,24;25:16;31:7,
23;33:20;34:13;
36:19,21;41:8,10;
53:10;55:1,14;58:3;
59:12,15;60:2;63:13;
72:10,17
**against (13)**
23:24;34:4;43:8;
44:3;45:7,14,20;47:3,
13,15;57:16;62:23;
65:1
**ago (4)**
48:3;62:18;63:5;
65:1
**agreement (21)**
5:2;7:21;8:7,10;
16:23;19:13;20:1,5,9;
21:16;24:7;44:1,7;
54:18;64:8,10;66:22;
71:10;74:7,13,13
**agreements (25)**
6:12;8:5;39:10;
42:17;43:24;57:24;
70:19,20;71:3,21;
72:2,21,22,23;73:4,7,
8,11,12,23;74:19,21,
23;75:1,11
**ahead (10)**
7:14;10:17;11:19;
15:14;19:5;36:16;
45:2;48:13;51:18;
66:17
**ailment (1)**
33:5
**allocation (1)**

74:18
**allow (2)**
39:8;69:17
**allowance (3)**
20:16;56:5;57:10
**allowed (4)**
25:9;43:1;69:2;
71:5
**allows (1)**
8:14
**almost (2)**
15:6;69:24
**along (2)**
62:8;67:4
**alternative (1)**
18:4
**always (1)**
62:9
**among (4)**
45:7;74:13,20;75:1
**amongst (1)**
57:24
**amount (1)**
20:16
**amounts (2)**
14:21;62:2
**analog (1)**
64:5
**analogizing (1)**
36:1
**analogy (2)**
13:17;17:23
**analysis (5)**
13:14;14:2;31:5,7,
14
**announced (1)**
62:21
**anticipate (1)**
8:23
**appeal (7)**
19:20;22:25;24:3;
25:23;27:8,22;28:6
**appeals (3)**
12:18,21;27:13
**appear (2)**
19:3;59:8
**appearance (2)**
4:4;36:20
**appearances (1)**
36:17
**appearing (1)**
4:6
**appears (2)**
13:21;27:12
**appellate (2)**
25:8;36:2
**applicable (2)**
8:21;30:23
**application (1)**
4:24
**applied (5)**
4:25;8:10;29:22;
30:2,25

**applies (2)**
11:16;22:19
**apply (3)**
9:11;58:22,22
**appreciate (2)**
35:9;58:25
**approach (1)**
72:4
**appropriate (2)**
9:11;29:14
**approved (3)**
20:10;62:19;64:10
**arbitrate (1)**
9:4
**arbitrated (1)**
9:3
**arbitration (1)**
43:3
**arbitrator (3)**
9:3;13:15,16
**area (5)**
21:24;53:17;54:3;
58:11,11
**arguably (1)**
45:16
**argue (3)**
3:17;23:21,24
**argued (1)**
24:2
**argues (1)**
34:13
**arguing (1)**
70:10
**argument (12)**
3:23;4:8;5:4;6:9;
7:16;17:24;29:16;
37:3;38:8,10;39:2,2
**arguments (6)**
37:8;38:9;42:7,9;
50:20;59:15
**arising (1)**
8:14
**around (6)**
34:23;39:19;41:17;
70:17,19;71:12
**ascertain (1)**
50:8
**aside (2)**
11:5;62:2
**aspect (1)**
44:19
**aspects (1)**
19:10
**assert (1)**
21:22
**asserted (1)**
5:15
**asserting (1)**
5:7
**assets (1)**
50:11
**assigned (2)**
45:15;48:21

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 77
of 90

**assisting (1)**
22:12
**associated (4)**
40:18;56:25;67:8;
72:12
**assume (3)**
6:3;55:1,2
**attaches (1)**
22:4
**attacking (1)**
38:5
**attempted (1)**
12:25
**attendance (1)**
12:24
**attention (8)**
4:23;38:2;66:23;
72:16,19;75:17,17,18
**attentions (1)**
50:16
**attorney (4)**
3:16;51:16;52:9;
67:22
**attorney-fee-division (1)**
74:19
**attorneys (7)**
39:14;51:10;52:8;
54:19;55:15;71:6;
73:9
**attributable (1)**
33:23
**August (4)**
42:25;44:13,19;
46:7
**authority (4)**
9:14;19:12,12;70:1
**authorized (1)**
58:10
**authorizes (2)**
8:2,17
**available (8)**
10:24;43:9;44:16;
57:6;61:15;63:3,4,18
**avert (2)**
57:15,17
**award (1)**
18:2
**away (16)**
7:2;9:22;19:1;51:5;
52:15,18;55:24;
57:23;58:1;60:4,11,
12,13;70:18;71:24;
72:8
**awkward (1)**
11:6

**B**

**baby (1)**
29:6
**back (16)**
7:10;10:1;17:18;
21:17,18;23:8;28:6;

34:13;35:12;41:12,
16;42:16;48:2;65:5;
75:7,11
**background (1)**
4:15
**balance (1)**
14:16
**bankruptcy (14)**
3:16,18;7:22;19:11;
26:4,14,18;33:24;
38:20;40:15;58:20;
59:2,3;72:6
**based (3)**
38:8;53:3;60:17
**bash (1)**
63:14
**basic (1)**
58:3
**basically (3)**
6:6;16:17;74:18
**basis (4)**
20:13;21:14;32:17;
38:12
**beat (1)**
36:7
**began (1)**
11:6
**begin (3)**
4:16;37:9;75:10
**begins (1)**
28:9
**behalf (2)**
65:13;73:10
**behind (1)**
25:9
**believes (3)**
33:7;43:21;46:19
**beneficiaries (6)**
39:17;40:19;51:5;
52:15;55:24;62:4
**benefit (6)**
13:16;32:5;48:20;
52:16;54:17;65:20
**best (1)**
59:1
**better (1)**
6:17
**beyond (1)**
24:5,25;38:14;50:7
**big (1)**
66:8
**binding (1)**
20:17
**bit (2)**
11:6;38:18
**blind (3)**
29:25;65:15,16
**blindness (6)**
5:5;6:5;14:24;32:9,
22;33:12
**blurry (1)**
32:25
**born (1)**

68:6
**both (9)**
29:12;34:21;47:15;
52:13,14;54:9,9;55:7;
75:21
**bottom (2)**
16:19;63:5
**boundary (1)**
9:24
**bounds (2)**
39:17;40:18
**Bowen (54)**
3:12,15,22,24;4:7;
6:7,17,22,23;7:6,13;
13:7,10,11,18;14:7,
12;15:1;23:14,16,19,
22;24:15;26:5,8,13,
15,19,22,25;27:4,6,
19,24;28:1,4,14,16,
21;29:5,11;30:12;
31:15,18;32:20,23,25;
33:11;34:18;35:2,13,
17,20;36:12
**Brad (1)**
3:12
**breached (1)**
68:13
**break (3)**
35:4,6,8
**breaks (1)**
42:10
**brief (8)**
15:8;23:3;32:14,14,
16;67:15;69:6,11
**briefing (8)**
11:2,12;28:24;
29:14;34:19,20,21;
69:3
**bring (3)**
3:12,19,21;4:18;
38:2;66:23;72:18
**bringing (2)**
3:7;37:13
**brought (4)**
41:6;45:12;67:8;
72:15
**Brown (1)**
15:16
**buffer (3)**
32:5,7,8
**burden (1)**
19:9
**burned (1)**
9:22
**business (2)**
18:22;47:9
**Butte (1)**
37:12
**bystanders (1)**
67:2

**C**

**CAL (5)**
7:7;30:4,6,10,14
**calendar (1)**
65:7
**CALIFORNIA (6)**
3:1;22:8;40:12,24;
41:3,3
**Call (12)**
3:3;5:12;7:15;
15:11;36:16;39:4;
43:4,24;45:6;55:21;
74:5;75:19
**called (2)**
41:19;43:24
**Calling (4)**
3:5;36:18;38:5,6
**calls (1)**
50:8
**came (3)**
18:6;26:3;72:15
**camera (1)**
35:11
**Camp (1)**
33:9
**can (41)**
3:16,25;4:16;6:22;
7:11,15,16,17,17;
11:16;13:7;16:6,6;
22:24;23:1;24:1;
25:14,19;31:15,22;
33:7;35:6,17;36:5,7;
45:1;47:15,18;55:15,
15;57:8;58:4,9;60:23;
61:6,15;63:15;64:18,
18,20;67:15
**cap (1)**
53:2
**capacity (2)**
15:17;66:25
**caption (1)**
26:11
**car (1)**
60:10
**cares (1)**
74:22
**carrying (1)**
20:7
**cars (2)**
54:9;66:7
**case (23)**
3:18;13:25;14:20;
17:20;20:8;26:11,14,
18;34:3,17;36:17;
38:18,20,21;42:10;
47:20;50:10;66:14;
69:7;70:8;71:15;
72:12,14
**cases (9)**
18:12;42:24,25;
44:8;53:7;62:23,23;
72:3;73:10
**category (1)**
43:15

**Cathy (1)**
15:17
**causal (1)**
14:23
**causation (11)**
11:24;12:7,23;
13:19,24;15:24;
16:25;22:5;30:20;
31:6,11
**cause (6)**
33:20;38:13,15;
51:9;54:4;67:19
**caused (5)**
5:22;24:22;33:8,24;
58:5
**causing (1)**
22:8
**certain (2)**
46:9;52:16
**Certainly (8)**
28:21;33:12;65:10;
67:13,15,19;70:6;
72:18
**challenge (1)**
20:18
**chance (1)**
28:23
**change (1)**
65:24
**changed (2)**
40:25;67:11
**channeled (2)**
33:19,25
**chips (1)**
72:11
**choice (1)**
28:20
**chose (4)**
13:5;19:8;61:6;
65:25
**Circuit (2)**
45:23,24
**citations (1)**
9:18
**cite (1)**
9:16
**cited (2)**
64:4;66:22
**city (1)**
66:8
**claim (19)**
5:13;9:6,7;10:3;
11:25;18:23;19:1;
20:11,17;21:22;
27:10,14;32:22;33:6;
40:4;43:4,6;47:13;
65:21
**claimant (6)**
14:19;16:22;17:15;
27:9;29:25;52:19
**claimants (20)**
5:15;9:12;13:20;
14:8;15:9;17:16;

Case: 19-30088     Doc# 14555     Filed: 07/31/24     Entered: 07/31/24 12:31:54     Page 78
of 90

18:25;21:7;29:21;
30:17,18;32:6,21;
34:18;35:21;45:18;
46:21;48:20;62:3;
70:3
**claimants' (1)**
52:16
**claimant's (2)**
14:20,24
**claims (61)**
4:19;5:1,2,6,11,15;
6:13;7:23,24;8:8,11;
9:17;12:8;15:20;
16:17,20;20:5,8,10,
15;21:3,4,5,6,11;
22:12,22;23:1;24:15;
25:2,3;29:23,24;31:1;
34:3,4;43:8;44:2;
45:7,9,9,11,13,14,16,
17,17,18,19,19,20;
47:3,7,23,24;48:12,
21,21;50:12;63:17;
67:1
**clarify (2)**
35:17;68:19
**clarifying (1)**
48:14
**clear (4)**
14:17;32:13;44:7;
50:22
**CLERK (7)**
3:4,12,21;19:24;
35:14;36:18;68:21
**client (3)**
22:16;47:8;49:16
**clients (19)**
9:5,21;10:2;28:14;
47:3,14,23;52:14;
55:16,56:18;61:16,
21;65:13,14;66:1,3;
68:16;70:4,11
**close (3)**
34:8;37:16;69:22
**closing (1)**
29:15
**Code (2)**
7:22;64:4
**comfortable (2)**
41:21;67:10
**coming (3)**
3:11,19;53:9
**comment (1)**
70:13
**commitment (1)**
43:13
**committed (1)**
50:9
**committee (25)**
49:17;51:15,19,25;
52:14;54:16,24;55:7,
9,11,12,17;56:13,23;
57:25;59:20,23;
61:25;62:3,63:16,21,

25;65:23,25;68:11
**communication (1)**
6:20
**communications (2)**
48:23;67:7
**compensated (2)**
5:20;56:22
**compensation (10)**
21:7;56:6,14,15,16,
19,20;57:10;64:8,11
**compete (2)**
53:21,21
**competing (8)**
49:16;54:5,5;66:4,
5;68:16,16;70:3
**complain (1)**
52:3
**complaining (1)**
17:11
**complaint (1)**
18:3
**complete (1)**
34:16
**completed (2)**
71:1;73:2
**completely (2)**
64:6;74:11
**completes (1)**
50:13
**compliance (2)**
5:1;7:21
**complying (1)**
44:18
**comports (3)**
6:12;8:11;30:23
**comprehensive (1)**
47:8
**concern (5)**
46:13;50:4;61:24;
63:15;65:14
**concert (1)**
66:20
**conclude (1)**
14:22
**concluded (1)**
75:23
**condemnation (1)**
56:19
**conduct (2)**
63:22,23
**confident (1)**
66:13
**confidential (1)**
17:15
**confidentiality (1)**
46:6
**confirm (1)**
31:15
**confirmation (10)**
8:4,20;20:22;21:8,
9;40:21;62:20,22;
64:25;65:21
**confirmed (3)**

5:1;6:13;20:16
**conflict (10)**
48:3;52:1,9,11;
53:10;62:17;63:25;
66:4,4,12
**conflicts (7)**
50:21;52:8;55:23;
65:1;71:7,23;72:9
**confused (1)**
42:16
**confusing (1)**
16:7
**connection (7)**
8:6,15;10:25;38:25;
42:18;47:22;64:13
**consent (1)**
45:24
**consider (3)**
28:10;34:15;69:8
**consideration (2)**
17:19;48:22
**considered (11)**
9:7;10:4;15:13,19;
17:11,12,20;19:3;
24:18;29:2,4
**consistent (2)**
20:8;27:14
**consistently (1)**
30:25
**consortium (19)**
39:9;43:24;44:1;
57:24;70:19,20,24;
71:3,21;72:1,21,22,
23;73:4,8,11;74:7,13;
75:11
**conspiracy (2)**
38:6,14
**constituents (1)**
61:3
**constructive (2)**
65:6;68:7
**construe (1)**
8:18
**consult (1)**
21:5
**consultant (11)**
12:18,21,24;13:2,
22;22:7;31:9,9,20;
43:4;45:16
**consulted (1)**
54:19
**consummate (1)**
8:19
**consummation (1)**
8:6
**contacted (2)**
37:19,21
**contained (1)**
16:11
**contains (1)**
27:11
**context (2)**
39:14,18

**continue (2)**
49:3;57:8
**contractor (1)**
47:4
**contractors (2)**
45:8,21
**convenience (2)**
35:4,8
**convinces (1)**
40:11
**convincing (1)**
40:8
**copy (1)**
26:24
**cordial (2)**
62:8,9
**Corporation (2)**
3:6;36:18
**costs (1)**
64:12
**counsel (23)**
6:20;8:24;18:5,9;
19:11,25;21:19,21;
22:4;26:23;27:18;
34:18;37:20;39:7,9;
48:6;62:14;66:21;
67:6;70:9,10,11;
71:13
**counsel's (2)**
18:13;26:8
**counts (2)**
23:12
**County (1)**
37:12
**couple (1)**
52:22
**course (2)**
68:4;71:7
**Court (245)**
3:3,4,8,11,14,19,22;
4:1,7,10,14,18,23;
5:10,17,24;6:10,17;
7:5,9,14,19,25;8:2,4,
9,13,14,17,22;9:2,9,
10,20;10:6,14,17,21;
11:1,3,12,14,19;12:2,
10,25;13:2,4,10,13;
14:4,8,25;15:2,25;
16:5,10;17:1,3,5,10,
22;18:15,17,21,25;
19:5,12,22;20:2,4,18,
23,24,25;21:15;22:2,
14;23:6,8,13,18,20,
25;24:11,14,19;25:4,
7,8,12,16,19,22;26:2,
4,7,10,14,17,21,23;
27:2,5,13,17,21,25;
28:2,5,16;29:3,10,11;
30:6,9,12,21;31:4,13,
22;32:7,20,24;33:4,
14;35:1,6,10,15,23;
36:2,3,13,16,19,22,
24;37:2,9,15;38:2,17;

39:21;40:3,7,10;41:3,
11;42:2,5,9;43:10,13,
18,23;44:6,14,22;
45:1;46:11,13,17,23,
25;47:5,11,17;48:5,8,
13,16;49:6,8;50:18,
24;51:1,11,13,24;
52:3,6,10,17;53:12,
16,25;54:2,8,22;55:1,
6;56:5,9,11,13,17,21;
57:2,9,17;58:3,8,13,
22;59:4,7;60:6,8,21;
61:2,13;62:9,23;63:1,7,
12;64:15,21;65:2,5,9,
22;66:3,6,11,16;
67:17,25;68:9;69:15,
22;70:9,13,22,25;
72:7,20;73:4,14,18,
21,25;74:2;75:3,5
**court-approved (1)**
21:1
**courtroom (1)**
27:2
**Court's (2)**
19:12;66:23
**cover (1)**
8:7
**covered (2)**
44:11;53:17
**covers (1)**
69:6
**create (1)**
12:25
**created (1)**
8:16
**credit (1)**
44:22
**criteria (9)**
4:24;5:3,9;6:11,13;
8:8,10;22:6;31:2
**criticize (1)**
44:23
**cross-pollination (1)**
49:14
**CRP (5)**
19:13;20:20;22:21;
24:7;27:13
**crucial (1)**
20:14
**crux (1)**
5:4
**curiosity (1)**
39:11
**current (3)**
41:8;65:12;66:25
**cut (2)**
58:9;59:4

## D

**D&O (1)**
43:6
**D&Os (1)**

45:15
**damage (5)**
9:6;54:11,11;60:10,
10
**damaged (1)**
66:7
**damages (1)**
58:5
**Danko (2)**
3:11;4:2
**date (1)**
44:19
**dated (1)**
42:25
**Davey (4)**
44:3;45:21;71:14;
74:5
**David (1)**
15:16
**day (3)**
11:10;41:14;68:24
**days (1)**
39:25
**de (3)**
15:20;22:25;24:2
**deal (2)**
16:15;63:24
**dealt (2)**
14:2;15:21
**death (1)**
36:8
**debtors' (1)**
43:7
**decide (2)**
14:17;69:10
**decided (2)**
18:12;65:22
**decision (13)**
6:24;10:10;13:16;
17:12;24:16;25:9,17;
28:11;29:12,12;
34:11,15;64:2
**decisions (2)**
25:23;34:11
**declaration (1)**
55:22
**declining (1)**
12:8
**defendant (1)**
53:19
**defendants (4)**
47:6,13,15,24
**defer (2)**
28:13;30:13
**definition (3)**
9:15;30:5,14
**degree (1)**
71:22
**deja (1)**
62:16
**deliberation (1)**
75:16
**demonstrate (1)**

59:16
**demonstrates (1)**
67:18
**denied (2)**
5:7;13:3
**Dennis (1)**
3:5
**deny (5)**
11:25;34:12;49:7;
56:5;57:9
**depend (1)**
58:17
**depends (1)**
68:5
**deposition (1)**
68:3
**depositions (2)**
58:21;59:1
**deprived (1)**
30:17
**deputy (2)**
19:24;27:3
**described (2)**
7:7;21:13
**despite (1)**
23:23
**determination (29)**
4:19,21,25;5:19;
6:19,25;8:25;9:2,9;
10:1,13,19;12:5,13,
16;15:23;17:6;20:15;
23:17,19;24:4;26:6;
27:8,10;30:10;31:6,8,
11;35:25
**determinations (3)**
11:13;35:20,22
**determine (4)**
6:10;10:1;22:7;
75:12
**determined (4)**
20:12;30:1,4;73:25
**determines (1)**
30:22
**determining (1)**
7:20
**develop (1)**
21:6
**device (1)**
22:11
**devoted (1)**
50:17
**difference (2)**
41:5;54:15
**different (10)**
18:13;33:10;39:9;
43:10;53:8,21,22;
54:5,14;61:16
**differently (1)**
63:19
**dig (1)**
39:8
**diligent (4)**
44:18;45:8;49:1;

57:11
**dilute (1)**
63:17
**direct (1)**
28:14
**directly (2)**
33:17;34:4
**directors (1)**
43:8
**disability (1)**
33:13
**disagrees (1)**
45:2
**discharge (1)**
33:24
**discharged (2)**
33:17,18
**disclose (4)**
44:21;46:9;55:23;
74:15
**disclosed (10)**
70:21,22,25;71:2,
21;72:8,24,24;73:1,16
**disclosure (3)**
49:4;56:25;62:20
**disclosures (1)**
58:20
**discovery (8)**
38:13,13;50:23;
52:8;58:4,6;66:21;
67:13,19,21;68:17;
70:16;72:4
**discretion (1)**
20:6
**discussion (3)**
11:17,20;12:16
**discussions (1)**
13:12
**dishonest (1)**
42:1
**disinterested (4)**
51:16;56:4,6;57:12
**dismiss (1)**
19:24
**disposal (1)**
72:7
**dispute (1)**
27:12
**disputes (2)**
8:14;19:15
**distinct (1)**
42:11
**distinguished (1)**
52:18
**distract (1)**
42:6
**distributions (1)**
56:2
**District (1)**
26:20
**disturbed (1)**
48:24
**docket (7)**

25:24;26:22;27:19;
29:14;43:1;71:16,18
**doctor (1)**
13:19
**document (3)**
22:4;68:24;69:9
**documentation (1)**
67:16
**documents (23)**
10:23;19:7;21:8;
22:10;23:2;29:1,8;
31:23;34:19,20;
35:18;42:19;43:19;
44:16;59:14,15,17;
67:5;68:21,22;69:2,5,
18
**dollar (2)**
60:10,20
**dollars (5)**
45:11;49:16;60:25;
61:11;62:2
**dollars' (3)**
54:10,11,12
**done (11)**
16:18;21:9;33:21,
22;34:11;44:3;
48:15,20;57:14;
72:13,25
**doors (1)**
34:8
**doubt (1)**
38:15
**down (5)**
9:22;52:17;55:3;
58:9;67:25
**Dr (1)**
14:18
**draw (1)**
13:13
**drawn (1)**
38:23
**drive (1)**
54:9
**driven (1)**
31:8
**driver (1)**
54:12
**driving (1)**
71:23
**due (3)**
16:19;24:17;29:21
**during (3)**
11:22;20:21;24:2
**duties (3)**
64:13;66:23;70:7
**duty (3)**
20:7;65:19;70:4

**E**

**earlier (2)**
27:15;74:12
**early (2)**

41:12;44:20
**easy (1)**
67:21
**effect (2)**
15:9,10
**effectuated (1)**
8:6
**effort (8)**
39:19,22;40:10;
41:13;49:22;65:3,19;
75:21
**efforts (3)**
39:3;41:18;50:8
**either (5)**
25:9;28:10;30:18;
39:5;75:9
**electrical (1)**
34:5
**eligibility (9)**
4:24;5:3,8;6:13;
8:8;20:16;22:3,6;31:2
**eligible (2)**
21:7;25:3
**else (14)**
6:20;18:7;32:10;
33:15,22;35:24;36:3;
37:16;46:5;48:17;
56:24;59:10;67:12;
70:3
**email (1)**
27:2
**emailed (1)**
27:22
**employed (3)**
55:12,18;58:1
**encompassed (1)**
44:8
**end (2)**
45:23;69:6
**enduring (1)**
37:12
**enforce (3)**
8:4,9,19
**enforced (1)**
19:13
**engage (1)**
74:25
**engaged (4)**
40:22;50:7;63:10;
67:6
**engagement (7)**
42:23;43:5,7;44:11;
48:2;73:6;74:24
**engaging (2)**
50:2;63:21
**enlightening (1)**
14:13
**enough (4)**
51:8;67:14,18,19
**enrichment (1)**
71:19
**ensure (5)**
5:1;8:10;19:12;

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 80
of 90

24:15;26:25
**enter (2)**
    7:19;30:21
**entered (1)**
    8:5
**entitled (3)**
    9:6;34:8;64:10
**entitlement (1)**
    60:15
**entity (2)**
    20:19;55:12
**equipped (1)**
    6:17
**equitable (1)**
    50:12
**equitably (1)**
    24:16
**Eric (1)**
    13:22
**especially (1)**
    19:9
**essence (1)**
    27:9
**essentially (1)**
    29:25
**establish (2)**
    33:8;37:19
**established (2)**
    14:22,23
**establishing (1)**
    11:24
**estate (15)**
    43:7;45:14,15,17;
    55:13,14,21;56:5,7;
    57:13,17;59:17,18,20;
    64:4
**E-S-T-A-T-E (1)**
    45:17
**estimation (1)**
    57:7
**evaluated (1)**
    20:11
**even (8)**
    9:14;15:7;16:10;
    17:25;30:23;34:15;
    37:16;70:10
**event (3)**
    45:25;46:10;62:11
**everybody (1)**
    46:5;70:3
**everyone (1)**
    36:11
**evidence (7)**
    22:24;30:18;33:8;
    67:14,18;71:22;72:5
**exactly (1)**
    14:2
**examinations (1)**
    38:24
**examine (1)**
    59:11
**examined (2)**
    13:20;59:8

**example (2)**
    60:18;71:11
**exams (1)**
    58:23
**except (2)**
    20:19;70:22
**excess (1)**
    10:20
**excluded (2)**
    13:5;40:23
**execute (1)**
    8:19
**exhausted (1)**
    27:13
**Exhibit (1)**
    22:5
**exhibits (1)**
    59:14
**exist (1)**
    18:7
**expand (1)**
    32:5
**expenses (2)**
    64:8,12
**expert (11)**
    11:22;12:23;13:5,
    16,19;14:1;22:15;
    31:10,13,16;33:2
**explained (2)**
    27:11;30:13
**explicitly (1)**
    29:23
**explore (1)**
    58:11
**exposure (1)**
    6:6
**expunged (1)**
    20:12
**extensive (2)**
    10:19;11:22
**extent (11)**
    40:20;45:9;48:18;
    50:23;57:22;63:10;
    65:20;66:19;70:20;
    74:19,25
**extra (2)**
    32:1,2
**eye (3)**
    33:11;65:15,16
**eyes (3)**
    33:5;57:15,18
**eyesight (2)**
    21:19;33:7

## F

**face (1)**
    67:14
**fact (10)**
    16:14,14,16;41:9;
    46:1;49:18;53:2;
    55:19;57:4;68:10
**factor (3)**

22:8,9,17
**factor' (1)**
    14:23
**facts (2)**
    57:11;72:19
**failed (1)**
    57:10
**fair (3)**
    21:6;50:12;60:1
**fall (2)**
    42:25;72:11
**falls (1)**
    44:12
**familiar (5)**
    3:18;17:8;29:7,7;
    53:14
**far (4)**
    7:2;17:12;45:11;
    68:15
**fashion (1)**
    34:13
**favorable (2)**
    14:11;41:7
**Federal (3)**
    58:20;59:1,3
**feel (5)**
    6:7;8:2;29:20;
    35:10;41:21
**felt (2)**
    37:24;67:9
**fence (1)**
    9:22
**few (1)**
    50:8
**fiduciaries (1)**
    68:11
**fiduciary (3)**
    54:16;65:19;66:25
**fifteen (5)**
    4:10;15:14;37:3;
    45:2,5
**Fight (3)**
    54:13,13,13
**file (5)**
    33:6;37:24;55:22;
    69:5,18
**filed (9)**
    9:14;30:3;32:14,16;
    37:20;52:6;71:11,12;
    72:15
**filing (1)**
    10:24
**final (11)**
    4:20;6:25;10:13;
    20:13,17;21:13;24:4,
    16;27:10;35:20;70:13
**finally (3)**
    43:2;46:9;49:3
**find (5)**
    15:5;49:20;50:23;
    71:22;72:19
**finding (1)**
    12:7

**fine (3)**
    40:14;51:16;67:24
**finish (6)**
    24:1;41:11;50:10;
    64:20,21;66:17
**fire (67)**
    6:10,16,16;7:7,8;
    9:17,23;11:24;12:8;
    14:24;15:17;19:2;
    20:7,11,17;21:20;
    22:7,9,11,13;27:11;
    29:21;30:1,4,5,7,10,
    14,20,22;32:9;33:9,9,
    9;34:1,5,8;37:12;
    38:21;39:16;40:13,
    19;41:22;43:18;46:3,
    4;50:13;51:5;52:15;
    53:13,17,17;54:17,17;
    55:24;59:25;60:4,14,
    23;61:1;65:20;66:14,
    25;70:2,18;71:24;
    73:10
**fires (10)**
    5:6;21:11;24:22;
    30:21;33:5,18,19,25;
    37:16;51:18
**firm (5)**
    18:14;47:23;48:5;
    63:10;74:14
**firms (3)**
    74:20,21,25
**first (19)**
    6:18,23;11:9;28:16;
    30:5;32:1;37:10,18;
    39:13;40:20;49:8,8;
    51:2;52:23;60:9;62:6;
    66:18;67:6;70:17
**five (11)**
    4:12;7:8;25:13;
    29:18;30:4,7,11,15;
    32:1,2;35:12
**five-minute (1)**
    35:3
**fixed (3)**
    61:14;66:6;68:16
**flying (1)**
    29:25
**focus (2)**
    7:15;50:16
**focused (1)**
    50:9
**focusing (1)**
    46:1
**folks (8)**
    20:21;37:11;40:18;
    55:20;57:1,18,25;
    72:12
**Follow (1)**
    72:4
**followed (1)**
    29:20
**following (4)**
    8:20;33:25;47:12,

13
**form (3)**
    5:12;17:5;28:18
**former (2)**
    43:8;52:21
**forth (2)**
    7:10;20:19
**forthcoming (1)**
    42:1
**Forthwith (2)**
    44:17;49:4
**forty (2)**
    10:20;33:1
**forward (7)**
    38:10;41:16,20;
    42:4;52:7;67:5;74:3
**found (2)**
    11:22;48:6
**four (7)**
    18:25;24:21;32:8;
    62:18;63:4;65:1,5
**fours (1)**
    18:20
**FRANCISCO (1)**
    3:1
**frankly (1)**
    9:13
**free (2)**
    6:8;35:10
**friends (1)**
    16:16
**friend's (1)**
    23:4
**front (3)**
    14:15;23:17;32:13
**frustrating (1)**
    25:10
**full (4)**
    14:17;16:20;40:6;
    58:19
**fullest (1)**
    65:20
**fully (4)**
    43:5,9;66:13;73:2
**fulsome (7)**
    15:19;16:4,5,5,6,
    10;23:5
**Fund (7)**
    40:24;41:4;53:22;
    54:6;60:11;66:8;
    68:17
**funds (1)**
    63:18
**further (9)**
    10:18;11:2;28:23;
    29:14;30:19;34:20;
    69:3;75:9,19
**future (1)**
    41:7
**FVT (1)**
    31:20

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 81
of 90

## G

**Galvez (2)**
26:16;27:12
**game (2)**
54:8;60:1
**gating (1)**
6:11
**gave (3)**
10:8;35:21;46:18
**general (3)**
14:19;15:24;16:24
**Generally (1)**
29:19
**Gentlemen (1)**
73:14
**gets (2)**
39:1;50:12
**Gilliam (2)**
19:18;25:22
**Gilliam's (4)**
25:15,17;26:11;
34:15
**given (6)**
11:22;14:20;16:20;
45:7;50:11;59:12
**giving (1)**
33:21
**glad (2)**
17:17;42:22
**goes (11)**
8:16;16:3;22:10;
27:6,7;31:6;40:5;
53:1;57:5;71:7;72:5
**Good (13)**
3:8,10;4:5,17;
13:17;36:21,22,23;
38:13,15;41:11;51:8;
67:19
**govern (1)**
20:10
**grant (1)**
34:13
**grants (1)**
8:13
**greatest (2)**
46:4;66:14
**grounds (2)**
11:23;12:7
**guess (5)**
9:1;11:15;14:10;
33:11;47:19
**guidelines (1)**
8:12
**gun (1)**
38:11

## H

**happened (10)**
13:12;19:14;22:20,
21;24:3,19,20;25:1;

49:22;66:12
**happens (1)**
40:14
**happy (8)**
11:2,11;49:24,24,
24,25;67:16;71:17
**harm (3)**
5:19;9:22;33:24
**hate (1)**
13:13
**head (1)**
29:4
**headed (1)**
16:14
**headset (1)**
58:8
**hear (6)**
8:14;14:1;27:17;
31:10;58:7,9
**heard (10)**
14:18;15:4,7;24:18;
28:7;30:9;32:1;37:22;
49:19;65:17
**hearing (19)**
10:9;11:5;12:21;
13:14,23,25;20:22;
21:25;23:4,5,5;24:3;
28:11;53:13;59:13;
67:16;68:20,25;75:9
**hearings (2)**
11:23;31:10
**held (4)**
19:21;21:13;24:5;
72:9
**helpful (2)**
15:12;49:20
**herein (1)**
21:13
**here's (3)**
11:3;15:13;17:25
**hereunder (1)**
64:14
**herself (2)**
12:12;59:23
**highlight (1)**
19:17
**himself (1)**
31:13
**hired (2)**
13:22;41:24
**history (6)**
4:14;39:21,22,23;
67:4;69:7
**hit (1)**
54:10
**hmm (1)**
10:17
**hold (3)**
43:14;56:4;73:18
**holders (1)**
66:25
**holdings (1)**
27:15

**holds (2)**
56:6;57:12
**honestly (1)**
38:1
**Honor (153)**
3:7,10,13,15,21;4:5,
9,13,17,23;5:4,14,23;
6:4,9,23;7:13,18;9:8;
10:5,12,23;11:12,18;
12:4;13:18;15:21;
16:2,13,14;17:14,17,
19;19:20;20:9,15,20;
21:9;23:16;24:2,6;
28:13;29:9,19;30:8;
35:9,14;36:14;37:5,
10,11,18,19,25;38:4,
7,12,16;39:12,14,18;
40:5,17,21;41:2,16,
18;42:7;44:2,4,17;
45:10,14;48:25;49:7;
50:15,20,25;51:2,8,
14,22;52:5,12,13,23,
23;53:5,7,9,11,11,15;
54:15,19,25;55:11;
56:3,4,8,16,25;57:2,5,
6,7,8,9,13,18,20,22;
58:1,6,7,16,18,24;
59:12,15,19;60:2,5,
17;61:4,7,10;63:6;
64:3,18,22;65:1;
66:18,21;67:3,9,13,
15,20,22;69:24;70:14,
16;71:3,9,11,19;72:5,
10,17;73:1,17;74:22;
75:4
**Honorable (1)**
3:4
**Honor's (8)**
27:15;43:6;44:12,
19,20;46:6,8;49:1
**hope (1)**
40:14
**hours (4)**
12:22;13:20;14:1;
31:10
**How'd (1)**
19:22
**hundred-and-something (1)**
19:1
**hundreds (1)**
70:2
**hyper-technical (1)**
38:20
**hypothetical (2)**
60:8,9

## I

**IBEW (1)**
41:19
**idea (1)**
29:25
**identified (1)**

74:5
**identify (1)**
41:14
**ignore (1)**
75:15
**imagine (1)**
53:16
**impact (3)**
39:4;47:9;70:5
**implement (1)**
8:19
**implemented (2)**
18:11;21:18
**important (5)**
6:1;23:13;46:8;
47:25;48:19
**impose (1)**
8:25
**imposed (1)**
6:11
**imposing (1)**
18:7
**impression (1)**
44:23
**inappropriate (3)**
63:22,23;74:16
**incentive (1)**
57:1
**incentives (1)**
71:6
**include (3)**
31:22;32:16,17
**included (6)**
4:19;5:13;10:25;
16:22;42:8;72:13
**includes (3)**
12:14;39:2;42:24
**including (4)**
31:19;44:9;72:8;
73:4
**inclusive (1)**
24:5
**incomplete (2)**
12:19;31:12
**inconsistent (1)**
70:6
**incurred (1)**
64:13
**Indeed (5)**
18:11;22:4;34:8;
45:18;48:23
**independent (5)**
45:19,20;47:3,7,24
**indication (4)**
11:21;12:5;30:3,5
**indiscernible (14)**
14:3,7;15:1;17:21;
18:20;22:13;26:2,24;
27:5;40:2;44:21;60:5;
64:19;69:21
**individual (1)**
53:20
**individuals (2)**

41:24;72:9
**ineligible (2)**
21:12,13
**information (19)**
23:2;37:25;38:2;
46:14;57:5,21;58:4,
15,17,17;60:3,18;
63:4;64:24;68:4,20;
72:11,16;75:19
**inhalation (1)**
6:1
**initial (9)**
4:18;22:22;23:8,9,
11,14,17,19;58:20
**injunctive (1)**
11:7
**injury (22)**
5:6,12;6:2,4;9:17;
12:17,20,24;13:2,5,
22;22:6,6,8,15,15,19;
24:21;29:24;31:9,13,
16
**inquiries (1)**
48:24
**inquiry (2)**
44:4;57:11
**inside (1)**
29:4
**insight (1)**
48:11
**instances (1)**
17:6
**instead (1)**
4:23
**instruct (1)**
9:10
**instruments (2)**
8:5,16
**insurance (3)**
53:4;54:13;60:11
**integrity (1)**
8:20
**intend (1)**
75:18
**interest (8)**
41:6;46:5;55:14;
56:5,7;57:16;71:8,23
**interests (9)**
40:19;41:1,22,23;
46:20;55:13,20;56:7;
57:12
**internal (1)**
74:25
**interpret (1)**
19:15
**interpretation (1)**
8:15
**interrogatories (1)**
59:2
**interrupt (1)**
22:14
**into (15)**
8:5;12:17;16:14,17,

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 82
of 90

24;28:10;33:25;39:8;
42:10;45:12;46:2;
48:11;57:11;63:14;
69:9
**inverse (1)**
56:19
**invitation (1)**
16:16
**involve (1)**
34:4
**involved (1)**
34:5
**involvement (1)**
64:1
**involving (1)**
57:25
**irrelevant (1)**
64:6
**irresponsible (2)**
38:1;57:19
**irritation (1)**
33:12
**issue (20)**
5:21;7:18;8:18;9:3;
11:7;12:23;14:18;
16:3,15;19:19;30:16;
31:6,7,11;46:23;
53:14,14;63:3,4;
75:18
**issued (3)**
4:20;10:13;11:13
**issues (12)**
7:24;15:24;19:11;
23:7;28:24;29:2;
37:23;45:6;61:6;
62:17;64:25;72:8
**item (2)**
34:10;57:4

**J**

**JCCP (1)**
62:25
**job (2)**
49:12;50:13
**Judge (67)**
15:16,18;16:2,3,12;
17:9,14;18:9,20;19:4,
6,9,17,18;20:1,14;
21:1;22:1,11;23:11;
24:1,16,25;25:14,14,
17,22;26:1,6,11,15,
19;27:8,16,20;28:1;
32:3,11,13;34:15,25;
36:4,21;42:22,22;
44:9,25;45:4,5;47:19;
48:1,15;50:6;62:5,12,
16;63:3,23;64:7,10,
23,23;65:18;66:10;
69:14;70:12;74:17
**judgment (1)**
43:3
**judicial (2)**

20:21;27:10
**JULY (2)**
3:1;10:19
**June (1)**
45:23
**jurisdiction (11)**
7:19,19;8:14;16:15;
17:23,25;18:3;19:5,
10,21;27:14
**jurisdictional (1)**
7:16
**jury (1)**
14:17
**justice (2)**
57:19;63:5
**justify (1)**
18:2

**K**

**keep (1)**
68:9
**Kennedy (3)**
13:22,23,25
**Kim (1)**
3:16
**Kimberly (1)**
4:5
**kind (6)**
15:7;20:18;31:14;
33:4,12;59:9
**knew (2)**
32:19;72:16
**knowing (4)**
14:4,11,12;55:20
**knowledge (2)**
63:2,2
**known (7)**
9:12;21:24;22:2;
30:17;36:8;59:21;
63:24
**knows (12)**
18:10;20:15,20,24;
38:12;44:4;45:10,14;
57:2,3;64:3;69:24

**L**

**lacked (1)**
38:7
**lacking (1)**
14:2
**largely (1)**
31:8
**last (7)**
32:13;50:5;53:13;
68:20;69:14,17;74:11
**latter (1)**
52:20
**law (12)**
5:3;22:8;38:9;
45:23;50:22;51:1;
56:3;63:10;74:14,20,

21,25
**laws (1)**
72:6
**lawsuit (1)**
74:8
**lawsuits (1)**
74:8
**lawyer (8)**
47:1,2,12;49:14,15,
17;55:8;74:14
**lawyers (5)**
46:20;47:3,21;
54:23;68:15
**layperson (1)**
72:5
**learn (2)**
39:3;67:22
**learned (2)**
11:9;12:10
**learning (1)**
58:25
**least (13)**
5:25;10:2;17:7;
28:10,17;36:7;41:25;
42:10,12;43:19;
46:19;50:19;68:15
**leave (2)**
36:10;75:13
**leaving (2)**
11:5;62:2
**led (1)**
23:9
**Leding (42)**
3:16,24,25;4:3,5,6,
9,12,17;5:14,23;6:4;
7:14,15,18;9:8;10:5,
12,16,18,23;11:11,17,
20;12:4,14;13:7;28:8,
13;29:7,9,10,15,18,
19;30:8;31:5,15;
34:19;35:2,15;36:14
**Leding's (1)**
22:16
**left (1)**
60:25
**legal (1)**
54:20
**legally (1)**
15:14
**legislative (1)**
39:19
**legislature (2)**
40:12;41:4
**less (1)**
15:12
**lesser (1)**
61:22
**less-than-solvent (1)**
66:8
**letter (21)**
31:19;42:23;43:5,7;
44:11;46:15;47:2;
48:5;51:3,7;52:24;

55:25;60:19;61:6;
63:15;65:6,10;67:15;
69:8;70:17;73:6
**level (1)**
12:18
**LHON (1)**
14:18
**liability (2)**
33:18,18
**life (1)**
66:7
**lifelong (1)**
5:5
**light (2)**
9:21;33:4
**limit (5)**
52:25;53:1,5,8;
60:20
**limited (3)**
60:3;62:13;70:1
**limits (4)**
52:25;53:4,8;74:8
**line (3)**
16:19;50:10;63:5
**lines (1)**
10:14
**list (1)**
34:17
**listed (1)**
71:13
**listen (1)**
49:12
**literally (1)**
30:2
**litigation (16)**
42:18,18;43:15;
44:14,21;48:11;
51:17;64:1,1;71:1,10,
15;72:25;73:2;74:5,
10
**little (4)**
11:6;38:18;42:15;
73:12
**live (4)**
42:24,25;43:11;
44:5
**lived (3)**
18:21;32:8,10
**living (1)**
21:17
**lobbied (2)**
39:5,6
**lobby (1)**
41:25
**lobbying (16)**
39:3,8,22,25;40:10,
22;41:13,17,19,22,23;
49:19,22;50:8;58:13;
65:2
**lobbyists (2)**
50:3,5
**long (1)**
10:15

**longer (1)**
72:22
**look (22)**
7:11;11:3;16:13;
17:22;21:15,21;
22:14;24:11;27:18;
35:23;41:16,20;52:5;
54:8;57:15,20,23;
58:1;61:4;71:5,17,19
**looked (2)**
33:3;72:20
**looking (5)**
5:14;41:2,15,16;
66:21
**looks (2)**
18:5;58:7
**loose (1)**
68:17
**lose (1)**
18:8
**loss (5)**
5:13;6:2;18:18;
22:16;53:18
**lost (2)**
18:22;21:19;33:7;
54:3
**lot (3)**
38:5;45:6;72:7
**lots (1)**
64:25

**M**

**maintain (1)**
8:20
**majority (2)**
37:6;38:3
**makes (4)**
13:16;25:23;52:24;
74:3
**making (7)**
17:24;33:4;50:10;
57:20;64:2;68:9,10
**man (1)**
38:10
**management (7)**
44:2,8;45:8,18,20;
47:23;62:24
**manner (2)**
49:5;50:12
**many (10)**
17:7;18:11;31:20;
44:8;47:2;48:2,2;
52:8;70:2,2
**masters (2)**
61:25;63:9
**material (1)**
62:21
**materials (1)**
12:18
**matter (15)**
3:5;15:20;28:2;
29:16;34:22;36:13,

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 83
of 90

18;43:2;44:4;46:9;
69:16;71:5;72:23;
75:8,21
**matters (4)**
29:6;49:2,3;54:20
**may (19)**
5:21,21;6:16;10:1;
13:12,18;14:14;
24:10;37:21,22;
42:10;46:11;49:16;
55:11;56:4,5;57:9;
68:15;72:11
**maybe (8)**
6:17;14:10;39:22;
46:15;49:11;61:16,
24;72:24
**mean (27)**
5:11;7:9,9;9:20,20,
21,21;10:7;11:3,14,
15;13:13;18:1,21;
25:20;28:17;29:5;
30:25;32:7;36:1;
40:13;44:22;46:17;
59:10;68:12,17;72:23
**means (5)**
16:7,8;20:6;53:1;
73:5
**mediation (4)**
43:3;44:5;46:2;
48:24
**meeting (1)**
37:22
**member (7)**
27:22;48:9;49:17;
54:16;56:13;62:3;
64:6
**members (23)**
51:20,21,22;52:13;
54:23;55:8;56:22;
57:24;59:20,22;
61:19,21,25;62:18,19,
23;64:9;66:19,24,24;
68:10;69:25;72:2
**memo (2)**
13:21,23
**memorializes (1)**
10:10
**memorize (1)**
21:16
**mention (4)**
7:2;23:10,14;52:24
**mentioned (7)**
23:12;24:6;46:7;
50:15;55:2;66:22;
74:12
**merits (18)**
9:1,7,10;10:3;
15:10,13;17:10,12,19,
20;18:2,8;24:5,17;
25:2;38:8;46:2;75:17
**methods (1)**
20:7
**mic (1)**

4:4
**middle (3)**
39:24;42:17;49:21
**might (27)**
11:5,9;18:23;23:13;
32:7,8;33:8,16,21,21;
34:7,11;36:3;49:21;
61:3,11,13,13,21;
63:17;65:14;69:6,8;
70:10,11;72:1,2
**miles (15)**
7:8;9:22;18:21;
19:1;21:23,23,23;
30:4,7,11,15;32:1,2,8,
10
**million (6)**
60:25;61:9,10,10,
15,15
**mind (2)**
4:1;68:15
**minimum (1)**
42:1
**minute (7)**
16:15;19:25;62:15;
68:1,20;69:15,18
**minutes (12)**
4:10,12;15:15;
25:13;29:18;35:12;
37:3,7;42:12;45:3,5;
50:18
**misleading (1)**
29:2
**misrepresented (1)**
40:22
**misrepresenting (1)**
41:19
**misspoke (1)**
30:13
**misunderstood (1)**
13:19
**mix (1)**
45:21
**Molton (115)**
3:7,8,10;8:24;11:4;
15:4,5,16,16;16:2,9,
12;17:1,2,4,9,14;18:9,
16,19,24;19:4,6,23;
20:3,5,24;21:1;22:1,3,
20;23:7,11;24:1,13,
25;25:6,11,14,17,21;
26:1;31:25,25;32:3,
11;34:12,23,25;35:5,
7,9,19;36:19,21;
42:14,22;43:12,17,22;
44:1,7,17,25;45:4;
46:12,16,22,24;47:1,
6,11,16,19;48:7,9,15,
17;49:7;50:6;57:3;
60:22;61:23,23;62:5,
11;63:2,20,23;64:17,
20,23;65:4,5,8,18;
66:2,5,10,12;69:10,
14,19,20,23,24;70:12;

71:17;72:20;73:1,5,
19,24;74:1,17
**moment (1)**
69:4
**monemize (1)**
65:19
**monetizes (1)**
50:11
**money (25)**
40:12;41:22;49:23;
51:7;52:15,18,19;
53:6;55:24,25;56:1;
59:25;60:3,11,12,13;
61:20,21,22;65:14;
66:6;70:18;71:6,24;
72:8
**monies (1)**
53:3
**Montali (1)**
3:5
**month (1)**
44:15
**moot (1)**
4:22
**more (27)**
3:17;13:7;16:12;
22:9;24:20;32:8,11,
25;33:15;36:8;37:17;
40:12;41:7;42:12;
45:11;49:23;50:24;
51:8,11,13;61:17,24;
67:18;68:19;74:13;
75:5,10
**morning (8)**
3:8,10,15;4:5;
19:19;36:19,22,23
**most (2)**
25:22;33:11
**motion (10)**
5:18;10:24;19:6;
37:21,24;44:10;52:7;
68:23,24;71:11
**motion's (1)**
18:3
**motivations (2)**
40:25;71:24
**movants (4)**
5:5;6:5;12:22,24
**movants' (1)**
4:25
**movant's (1)**
31:16
**moved (1)**
19:23
**moving (3)**
4:6,18;42:3
**much (9)**
4:10;14:1;37:5;
48:17;52:18;56:24;
59:25;70:18;71:5
**multiple (1)**
53:5
**must (3)**

12:11;22:9;54:19
**muted (1)**
3:9
**myself (2)**
69:4;72:12

**N**

**name (5)**
36:24;52:1,4;55:3;
74:6
**names (1)**
38:6
**nature (1)**
54:8
**necessary (2)**
8:2,18
**need (12)**
4:15;34:20;38:15;
43:25;57:20;64:7;
67:23;71:20,21,21;
74:15;75:5
**negative (3)**
12:13;16:7;69:4
**negotiating (2)**
51:21;57:16
**negotiations (1)**
74:7
**neither (1)**
32:15
**neutral (19)**
6:24,25;7:6;10:11;
11:15,21;14:5,5,9;
15:19;21:25;24:8,20;
25:10;28:11;29:4,12;
32:15;36:2
**neutral's (5)**
11:20;12:6;14:13;
16:22;24:8
**new (4)**
18:6,10;22:24;30:9
**next (3)**
40:11;44:15,15
**nexus (2)**
38:19,25
**Ninth (1)**
45:23
**noise (1)**
45:6
**nonderivative (1)**
45:19
**none (7)**
19:16;33:1,2,2,2;
60:25;68:12
**nor (1)**
32:15
**normal (3)**
29:11;64:15,17
**Northern (1)**
26:20
**note (3)**
37:14;44:10;64:3
**noted (2)**

47:25;50:6
**notes (3)**
6:25;14:14;24:6
**nothing's (1)**
39:6
**notice (2)**
71:16,18
**notion (1)**
62:2
**Notwithstanding (4)**
24:1;25:2;30:19;
50:21
**novo (2)**
15:20;22:25;24:3
**Nowhere (1)**
6:14
**number (6)**
20:4;26:12,14,18,
22;27:19
**numerous (1)**
45:18

**O**

**objected (1)**
20:21
**obligated (1)**
37:24
**obligation (1)**
74:23
**obligations (2)**
54:17;74:24
**obvious (3)**
9:21;34:1;36:5
**obviously (6)**
6:2;17:11;21:16;
29:16;37:12;61:16
**occasion (1)**
23:21
**occurred (1)**
15:8
**off (2)**
35:11;74:8
**off-court (1)**
62:7
**offended (1)**
65:7
**officers (1)**
43:8
**omitting (1)**
6:7
**once (3)**
42:18;49:3;72:8
**one (42)**
5:25;12:13;13:15;
14:11,13,19;17:7;
18:13,18;22:4;24:20,
21;25:23;26:15;
27:17;29:7;32:11;
33:6,13,16;35:17;
38:23;42:11,24;
43:14;44:9;45:21;
47:21,24;48:9;55:3;

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 84
of 90

Min-U-Script®

56:3;61:17,24;63:18;
68:15,19;69:14,15;
70:23;74:11,13
**ones (2)**
29:24;41:8
**only (21)**
5:11,18;18:4;26:19;
37:7;41:15;42:23;
45:15;46:8;51:6;
52:18,19;54:12;56:1;
60:11;61:2,2,12;
68:14;72:18;73:21
**oOo- (1)**
3:2
**open (1)**
17:16
**opening (1)**
37:8
**opinion (2)**
25:15;31:19
**opinions (1)**
14:18
**opponent (1)**
68:25
**opportunity (4)**
16:20;18:22;34:21;
61:5
**opposed (1)**
45:13
**opposing (3)**
18:6;26:23;71:13
**opposition (5)**
9:14,16;11:1,8;30:3
**oral (5)**
6:19,19;58:21;59:1,
15
**order (21)**
3:3;7:20,25;8:5;
9:10;19:5;21:9;30:22;
37:2;42:25;43:6;
44:12,19,20;46:1,6,7,
8;62:20;64:25;65:21
**ordered (1)**
68:2
**orders (3)**
8:3,18;49:1
**organization (2)**
41:19;53:9
**original (2)**
35:25;36:3
**Osmose (1)**
71:12
**others (1)**
45:8
**otherwise (2)**
43:3;50:11
**ought (1)**
65:23
**out (17)**
9:15;20:7;37:3;
41:21;45:7;50:23;
51:3;54:9;55:15,21;
58:18;64:24;67:23;

68:14;71:22;72:15,19
**outcome (3)**
14:5;18:1;65:24
**out-of-pocket (1)**
64:12
**outside (7)**
16:25;21:23;22:18;
24:23;32:9,10,21
**over (12)**
19:18;34:2,14,18;
38:24;42:19;43:15;
50:10;54:13,13,14;
67:11
**overall (1)**
61:8
**overloaded (1)**
75:6
**oversight (20)**
49:17;51:15,19,25;
52:13;54:16,24;
55:17;56:23;57:25;
59:19,23;62:3;63:16,
21,25;65:23,25;70:1,7
**overstating (1)**
38:18
**own (3)**
27:12;66:1;67:24

## P

**packing (1)**
32:10
**pages (3)**
10:20;12:15,15
**paid (3)**
40:6;50:13;57:1
**panoply (1)**
58:19
**paper (1)**
16:21
**papers (17)**
4:2;10:7,8;15:13,
18;38:5,11;44:10;
45:5;47:20;48:1,18;
50:6;51:4;52:6;57:21;
71:12
**paperwork (1)**
7:1
**Parada (3)**
35:6,12;36:16
**Paradise (1)**
18:22
**paragraph (1)**
14:13
**Pardon (1)**
55:3
**part (13)**
32:17;34:25;35:1;
39:19;45:21;46:8;
48:10;58:18;62:20,
21,21;66:20;68:23
**participate (1)**
13:6

**particular (7)**
4:22;14:19,20;
49:17;54:3,4;57:4
**parties (8)**
4:6,18;17:11;28:6;
45:24;53:5;54:5;
73:10
**parts (1)**
42:11
**path (2)**
58:2;72:18
**pay (1)**
75:18
**payment (1)**
21:12
**pending (4)**
43:11,13;44:10;
70:23
**people (7)**
26:2;33:24;53:21;
54:3;55:2;57:15;
60:14
**per (1)**
65:21
**percent (12)**
51:4,6;56:1;61:3,8,
8,9,11,12,17;63:18,18
**percentage (1)**
61:16
**percentages (1)**
61:14
**perception (1)**
61:24
**perfectly (2)**
67:9;74:14
**performance (1)**
64:13
**perhaps (8)**
11:23;12:6;32:25;
41:23;46:14;49:18;
58:13;60:24
**perimeter (31)**
6:10,16;7:7;9:17;
11:15,25;12:9;14:6,9;
15:11,23;16:25;
18:12;22:11,18,19;
23:10,15,21,23;24:2,
23;25:2;29:21;30:1,4,
7,20,22;32:21;38:23
**period (1)**
22:17
**permanent (1)**
33:13
**permits (1)**
8:3
**permitted (1)**
70:16
**person (10)**
17:24;20:19;21:22;
22:19;24:21;33:13;
41:5;51:16;56:6;
57:12
**personal (19)**

5:6;9:17;12:17,20,
24;13:1,5,22;22:6,6,
15,15,19;29:24;31:9,
13,16;35:3,7
**perspective (2)**
16:2;74:17
**pertained (1)**
73:2
**pertaining (1)**
72:6
**pertains (1)**
42:24
**PG&E (8)**
3:5;33:17,17,23;
34:2,4;36:18;53:3
**PG&E's (2)**
33:24;45:7
**PGE (1)**
38:21
**phase (1)**
38:21
**phone (1)**
50:8
**phonetic (2)**
14:18;27:1
**physical (1)**
34:6
**piece (2)**
43:15;74:10
**place (4)**
7:11;34:10;38:22;
53:18
**plaintiff (2)**
19:23;26:8
**plaintiffs (2)**
60:23;71:14
**plan (14)**
5:2;6:13;7:23;8:1,2,
4,6,15,19,20;21:8;
45:22;62:19;69:16
**plans (1)**
19:3
**please (5)**
4:3,16;6:7;36:20;
37:9
**plus (2)**
7:8;30:4,7,14
**pocket (1)**
67:24
**point (22)**
4:21;21:9;15:12:20;
13:4;19:18;31:5;
32:11,14,18;37:23;
39:13;41:11;46:3;
51:3;57:5;64:7;67:9;
68:6;69:14;74:3;
75:15
**points (1)**
9:18
**policies (1)**
6:15
**policy (7)**
52:24,25;53:1,8,8;

54:2;60:20
**politician (1)**
40:11
**poor (1)**
13:13
**portion (2)**
37:4;39:2
**position (10)**
24:17;30:19;49:10,
10;51:17;52:1;59:16,
17;65:12;71:4
**positions (5)**
39:16;52:14;59:20,
24;72:3
**positive (1)**
16:8
**possible (4)**
50:13;65:20;66:14,
14
**postmark (1)**
9:24
**pot (1)**
53:6
**potentially (1)**
66:3
**PowerPoint (1)**
31:18
**preamble (1)**
21:4
**precondition (1)**
48:1
**pre-confirmation (1)**
41:12
**prefatory (1)**
68:1
**prefer (1)**
28:15
**prejudge (2)**
57:22;72:1
**premature (1)**
43:14
**prepared (3)**
3:17,25;69:12
**present (7)**
12:21,25;13:9,25;
30:18;31:9;37:3;69:2,
16
**presentation (2)**
15:9,10
**presented (5)**
6:18;12:22;14:6;
18:4;21:25
**presently (3)**
44:3,4;50:2
**presents (1)**
49:11
**presided (1)**
34:2
**presiding (1)**
3:5
**presumably (2)**
14:9;44:15
**presume (2)**

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 85
of 90

53:12,13
**presuppose (1)**
40:25
**pretending (1)**
25:7
**pretty (5)**
28:1;64:14,15,15,
17
**previously (2)**
42:19;72:20
**primarily (1)**
5:16
**principal (2)**
3:23;4:8
**principals (1)**
48:9
**prior (1)**
41:24
**priority (3)**
50:14,14,15
**private (2)**
47:14;49:15
**pro (1)**
56:2
**probably (3)**
12:15;49:9;75:10
**problems (5)**
5:22;32:24;34:6,6,6
**procedural (1)**
32:11
**procedure (8)**
4:19;5:2;6:14;8:8;
20:10;28:25;29:8;
31:2
**procedures (10)**
5:8;6:15;8:11;9:11;
16:20;21:3;23:1;59:2,
3;70:5
**proceedings (3)**
62:24,24;75:23
**process (17)**
16:17,19;17:13;
20:11;21:12;22:12;
24:17;27:12,15;
29:11,20,21;48:2;
62:22;67:23;68:1,18
**processes (2)**
21:6;26:8
**processor (1)**
21:5
**produced (2)**
48:5;49:23
**professional (4)**
57:11;63:8,9;64:5
**professionals (2)**
21:5;64:5
**profound (1)**
5:5
**promise (1)**
42:16
**promised (1)**
28:8
**promptly (1)**

64:12
**proof (1)**
19:7
**proper (1)**
30:24
**prosecute (2)**
45:15;47:13
**prosecuting (1)**
73:9
**prosecution (1)**
64:1
**protect (1)**
46:6
**protected (1)**
54:2
**prove (1)**
38:14
**provide (13)**
7:22;11:2,11;24:23;
31:14,18;40:12;
59:14;61:5;67:15,16;
68:24;71:17
**provided (5)**
13:20;22:10;23:22;
31:16;73:8
**provision (4)**
21:2;24:7,8;64:14
**provisions (3)**
15:21;19:15;64:4
**prudent (1)**
58:2
**public (4)**
29:13;63:2,2;64:24
**published (1)**
31:1
**pulled (1)**
60:4;70:18
**pulling (8)**
51:5;52:14,18;
55:23;60:11,12,13;
71:24
**purported (1)**
28:5
**purports (2)**
29:22;41:5
**purpose (1)**
41:15
**purposefully (1)**
40:23
**pursuant (10)**
7:21,23,25;8:16;
21:12;22:10;58:20;
59:1,2;62:19
**pursue (5)**
41:23;46:3;47:6;
48:21;53:4
**pursuing (3)**
45:9,19;63:17
**pursuit (1)**
43:7
**purview (1)**
67:10
**put (11)**

15:19;19:23;25:18,
19;29:13;38:10;51:3;
52:7;58:8;67:4;71:16
**puzzled (1)**
71:17

**Q**

**quarter-billion (1)**
45:11
**quest (1)**
32:20
**questionable (1)**
41:24
**quick (1)**
75:14
**quite (4)**
9:13;38:1;52:20;
62:8

**R**

**raised (4)**
19:11;31:20;32:4;
64:25
**raising (1)**
62:17
**rata (1)**
56:2
**rather (2)**
9:12;27:9
**rationale (3)**
40:17,17;42:7
**read (7)**
14:14;15:7;23:4;
27:25;28:3;29:1;72:6
**reading (2)**
61:10;64:9
**reaffirm (1)**
50:3
**real (1)**
9:14
**really (7)**
4:15;38:10;46:1;
48:19;60:6;61:20;
68:14
**reason (9)**
5:24;10:8;12:8;
38:3;43:25;46:5;
52:23;68:22;74:2
**reasonable (9)**
14:17,22;20:6;21:7;
38:15;41:17;64:12;
67:19,21
**reasoning (3)**
25:9;28:25;35:21
**reasons (4)**
34:12;36:4;52:22;
74:9
**rebuttal (3)**
15:3;37:6;38:4
**recall (1)**
34:4

**received (2)**
22:22;65:21
**recently (2)**
39:7;44:9
**Recess (1)**
36:15
**recollection (4)**
32:4;73:15,21,22
**recommendation (7)**
10:11;11:21,25;
12:6;14:10;24:9;
31:12
**recommendations (1)**
31:8
**reconsideration (5)**
5:12;22:23;23:9,20;
27:8
**record (27)**
5:18;10:6,9,22;
11:10;12:25;15:19;
16:4,5,6,10,11;17:16;
18:5;19:2;25:15,18,
20;28:10;32:18;
36:25;37:19;47:21;
49:2,13;50:2;52:1
**record's (1)**
32:13
**recourse (1)**
53:21
**recover (3)**
53:19;60:12,15
**recovery (1)**
70:10
**redacted (5)**
42:20,23;43:2;
73:12,23
**refer (2)**
24:7;25:14
**reference (1)**
71:18
**referenced (2)**
38:12;74:21
**references (1)**
73:8
**referred (2)**
25:20;68:21
**referring (1)**
47:1
**refused (1)**
9:4
**refutes (1)**
30:18
**regard (3)**
8:25;9:17;29:24
**regarding (8)**
19:11;27:15;32:12;
43:7;49:1;50:9;51:18;
65:1
**regulations (1)**
9:11
**reimbursed (1)**
64:11
**reject (1)**

24:10
**rejected (3)**
15:10;18:3;22:24
**relate (1)**
64:4
**related (1)**
8:15
**relates (3)**
44:2;70:25;74:7
**relationship (1)**
14:23
**released (2)**
45:22,23
**relevance (2)**
39:11,23
**relevant (7)**
15:14;39:25;44:16;
68:23;72:22,25;74:13
**reliance (1)**
12:17
**relief (2)**
11:7;24:23
**religiously (1)**
48:25
**rely (2)**
13:21;48:18
**remain (1)**
43:25
**remains (2)**
42:23;50:15
**remand (1)**
9:2
**remarkable (1)**
70:6
**remarkably (1)**
15:6
**remedies (2)**
33:16;57:13
**remedy (4)**
17:18;34:7,9;72:7
**reminded (1)**
25:8
**remote (1)**
22:9
**removed (1)**
65:23
**removes (1)**
67:5
**rendered (1)**
25:18
**repeating (2)**
24:12,14
**repetitive (1)**
69:6
**reply (10)**
4:13;11:9;12:11;
15:7;16:21;19:8;23:4;
28:8,9;50:19
**report (2)**
12:14;16:23
**reporter (2)**
12:25;13:2
**represent (6)**

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 86
of 90

47:12;49:2;55:12,
16;63:10;70:1
**representation (3)**
43:20;49:13;50:1
**representatives (3)**
39:15,15;55:11
**representing (12)**
46:20,21;47:14,22,
23;49:15,15;62:3;
66:25;67:12;68:16;
71:14
**represents (1)**
66:1
**request (7)**
4:19,22,23;34:12;
49:12,12;75:17
**requested (2)**
42:13;44:16
**require (2)**
49:5,5
**required (2)**
44:20;46:8
**requirement (1)**
6:15
**requirements (2)**
22:4;49:4
**reread (1)**
11:8
**reserve (6)**
4:11,12;15:3;37:4,
6;38:3
**resign (1)**
65:25
**resolution (10)**
5:2;6:14;7:23,24;
8:8;15:21;20:10;21:3;
27:12;31:2
**resolve (1)**
60:15
**resolved (7)**
17:20;20:12;43:2;
44:9,12;46:10;49:3
**resolves (1)**
50:12
**resolving (1)**
20:7
**respect (5)**
43:4;45:10,13;
62:17,17
**respond (5)**
29:18;49:20;60:6;
61:5;69:11
**responded (1)**
37:23
**response (2)**
6:8;50:4
**responses (1)**
5:25
**responsibilities (1)**
62:13
**responsible (1)**
72:18
**rest (1)**

15:3
**restate (2)**
43:10;46:11
**result (5)**
5:6;19:2;21:6;
29:20;30:21
**resulted (1)**
6:5
**results (1)**
44:21
**retention (4)**
71:10;73:7,12,22
**retired (1)**
63:7
**return (1)**
6:9
**review (13)**
4:24;5:18;11:1,12;
12:18;16:17;20:18,
21;27:10,14;29:13;
75:7,11
**reviewed (3)**
42:20;72:21;73:25
**reviewing (1)**
7:20
**revise (2)**
24:10,13
**revisionist (1)**
67:3
**RFP (2)**
48:2;63:8
**rhetorically (1)**
33:15
**right (44)**
3:8,23;4:8;5:13,22;
7:14,9:4,7;10:4;12:2,
3;13:10;14:11;23:25;
26:23;28:6;30:10;
31:4,22;36:16,19,24;
37:9;44:6;46:17;47:5,
5;48:8,13,16;51:18;
55:10;56:17;60:21;
61:3,14;63:1;64:9;
65:24;66:9;68:8;
70:11;72:4;73:11
**rightly (1)**
17:17
**rights (2)**
58:4;70:16
**Robbins (5)**
52:13;55:6,6;59:8,
17
**role (1)**
54:18
**Rudnick (1)**
15:16
**rule (44)**
6:11,16,19,24;7:1,2,
3,4,7,12;8:25;9:17;
11:16,25;12:9;14:6,9;
15:11,23;16:25;18:6,
7,10,10;22:11;23:10,
15,21,23,24;24:2,23;

25:2;29:21;30:1,16,
20,23,25;33:15,15;
38:16;58:20,22
**ruled (2)**
19:19;32:15
**rules (8)**
7:20;8:11;9:11,13;
22:3;41:4;59:2;68:10
**ruling (12)**
10:7,7;22:22;23:9,
9,12,14,16;25:23;
75:14,19,19
**runny (1)**
33:5

**S**

**same (17)**
8:16;27:7;37:15;
47:15,24;49:16;
52:20;53:3,6,9,22,23;
54:6,10;63:17;66:6;
71:10
**SAN (1)**
3:1
**sat (2)**
53:13;55:19
**satisfaction (1)**
39:23
**satisfy (1)**
49:4
**saw (2)**
6:24;39:19
**saying (5)**
17:22,24;41:18,20;
61:20
**Seagergrim (1)**
26:25
**seal (10)**
17:15;28:15,17,17,
19,22;29:8;35:18;
72:21;75:12
**sealed (4)**
28:10,11;31:23;
43:25
**sealing (1)**
29:11
**second (7)**
9:1;26:1;27:17;
40:21;55:3;69:15;
71:9
**section (11)**
8:1,1;12:5;20:19,
20;21:11;23:1;55:10;
56:3;57:9;66:23
**Sections (1)**
56:4
**Seduen's (1)**
14:18
**seeing (1)**
26:19
**seeking (5)**
5:1,11;6:10;8:3;

27:9
**seem (4)**
33:22;34:7;43:18;
74:14
**seems (5)**
14:21;15:11;33:14;
45:25;60:19
**send (1)**
17:18
**sensibilities (1)**
65:10
**sensitivities (1)**
65:9
**sent (7)**
19:18,21,24;24;
27:1;32:10;37:3
**separate (2)**
26:15;45:19
**sequence (1)**
34:14
**serious (1)**
5:19
**serve (2)**
51:19;66:24
**service (1)**
56:22
**services (2)**
57:10;64:11
**serving (3)**
55:17;61:25;63:9
**session (1)**
3:4
**set (7)**
20:19
**settle (1)**
66:13
**settled (4)**
20:12;44:14;45:11;
71:10
**settlement (7)**
46:4;47:8;52:25,25;
53:1;64:2;71:12
**severe (2)**
28:24;33:1
**shadow (1)**
41:19
**shall (10)**
20:6,10,11,17,17;
21:13;24:9;64:10,11;
66:24
**share (1)**
37:15
**sharing (1)**
74:18
**short (1)**
28:1
**shortly (1)**
71:11
**show (1)**
13:15
**shows (1)**
31:18
**shut (1)**

42:15
**sic (2)**
32:20;65:19
**sick (3)**
18:22;49:9,11
**side (5)**
3:18;12:10;13:12;
16:16;25:12
**sides (1)**
34:21
**signature (1)**
26:11
**significant (1)**
14:21
**simple (3)**
43:14;60:8,9
**simply (4)**
9:6;13:8;38:13;
55:8
**Singleton (20)**
51:3,22;52:12,23;
55:2,25;59:7,16;
60:18;61:4,15;63:14,
14,16;65:6,13,23,25;
68:2;71:13
**sit (6)**
25:8;38:1;49:21;
51:15;63:16;68:2
**sitting (3)**
25:5;51:20;72:17
**six (4)**
12:22;13:20;14:1;
31:10
**six-hour (1)**
23:5
**slide (2)**
31:18;34:6
**Slow (2)**
52:17;67:25
**smoke (9)**
5:21;6:1,6,6;9:23;
14:24;21:20;32:22,24
**smoking (1)**
38:11
**so- (1)**
43:23
**so-called (1)**
39:9
**solely (2)**
12:8;31:21
**somebody (5)**
32:9;36:3;46:18;
53:16;63:20
**somehow (3)**
40:25;41:5;65:22
**someone (9)**
3:11;32:8;33:5,7;
35:24;40:11;41:13;
59:10;67:12
**sometimes (2)**
16:7,8
**somewhat (1)**
18:13

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 87
of 90

**somewhere (3)**
6:20;23:18;32:4
**soon (5)**
27:1;36:9;50:13;
71:11;72:16
**sorry (11)**
7:10;10:17;11:17;
13:18;20:2;21:22;
55:3;58:6;64:22,22;
73:20
**sort (6)**
6:11;10:9;11:7;
38:8;48:24;75:20
**sorts (1)**
38:6
**sound (1)**
58:9
**sounds (2)**
13:14;24:24
**source (2)**
9:15;34:7
**spare (1)**
4:14
**speak (2)**
13:7;45:5
**speaking (1)**
29:19
**specially (1)**
4:6
**Specific (10)**
8:1;9:16;12:23;
15:24;16:24;42:14;
50:24;51:1,11,13
**Specifically (7)**
8:3;9:19;13:8;
39:13;51:14,25;58:10
**specifics (2)**
31:19,20
**speed (1)**
4:18
**spending (1)**
41:22
**spent (1)**
38:5
**staff (1)**
27:22
**stand (2)**
42:16;48:3
**standards (1)**
4:24
**stands (2)**
34:22;75:22
**state (5)**
5:3;36:20,24;66:19;
72:14
**stated (9)**
6:14,15;8:11;9:12;
29:23;53:3;57:3,21;
63:19
**statements (1)**
68:9
**states (5)**
51:4;54:18;55:11;

57:9;73:11
**stating (1)**
60:19
**status (1)**
50:8
**stay (2)**
4:19;75:18
**staying (1)**
34:25
**step (1)**
24:20
**steps (1)**
29:6
**stick (1)**
60:9
**still (8)**
7:5;23:22;30:20;
42:19;53:8;61:17;
66:1,3
**stomach (1)**
18:23
**straight (3)**
19:20,22;26:5
**strategic (1)**
48:11
**strategy (2)**
48:23;64:1
**straw (1)**
38:10
**structures (1)**
57:2
**studied (1)**
65:11
**subject (3)**
20:18;44:3;59:11
**submit (11)**
17:15,16;19:8;
22:24;23:1;28:23;
29:6;34:21;68:21;
73:22;75:10
**submitted (15)**
10:18;16:21;19:7;
24:8,9;28:15,21,23;
29:24;34:22;35:18;
36:13;74:22;75:12,22
**subpoena (2)**
67:23;68:1
**subsection (2)**
8:13,17
**substantial (3)**
14:23;22:7,17
**substantially (1)**
24:22
**successful (2)**
60:24;74:19
**sue (4)**
33:16;51:17,18;
55:15
**sued (1)**
53:18
**suffer (2)**
5:20;24:21
**suffered (6)**

6:5;19:2;32:9;
53:18;54:10,11
**suffering (1)**
5:5
**suggest (1)**
16:3
**suggested (3)**
15:8,18,22
**suggests (1)**
23:4
**suing (1)**
47:24
**sum (2)**
61:14;66:6
**summarize (1)**
27:6
**summarizes (1)**
12:6
**summary (1)**
34:22
**sunlight (1)**
61:5
**supplement (1)**
6:8
**supplemental (1)**
11:11
**supporting (1)**
41:6
**supports (1)**
30:19
**Supreme (1)**
36:2
**sure (18)**
14:11,12;23:11;
32:12,18;35:5;37:16;
40:9;50:10;51:2;52:2,
5,24;54:1;57:20;59:6;
60:7,17
**surprise (1)**
12:12;34:16
**surprises (1)**
34:17
**surprising (2)**
15:6,12
**switch (1)**
49:19
**system (1)**
38:7

**T**

**table (4)**
51:21,22;55:19;
57:16
**tactics (1)**
48:23
**talk (2)**
28:19;62:7
**talking (4)**
38:11;61:8;63:12;
71:7
**talks (1)**
22:5

**technically (1)**
14:15
**telling (1)**
9:3
**ten (3)**
32:10;42:12;50:18
**term (3)**
16:6;36:1;38:23
**terminated (1)**
74:11
**terms (7)**
7:21;8:4,9;19:14;
22:5;30:23;31:1;
34:19;45:21;60:3;
72:2
**terrifying (1)**
37:17
**testimony (9)**
11:22;12:23;13:1,
21;14:1;31:10,16,17,
21
**Thanks (1)**
37:5
**theorist (1)**
38:6
**thereafter (1)**
62:18
**therefore (7)**
11:16;18:7;41:14;
49:18;55:9,10;61:17
**thereto (1)**
8:16
**third-party (3)**
42:18;53:19,20
**thirty (1)**
18:21
**thirty-nine (1)**
18:18
**thorough (1)**
24:5
**though (4)**
14:14;34:16;68:9;
70:10
**thought (5)**
4:1;5:25;26:3;
37:25;65:13
**thoughts (1)**
37:11
**thousands (1)**
70:2
**three (2)**
18:25;37:7
**three-to-four (1)**
37:7
**throws (1)**
45:6
**thus (1)**
45:11
**times (1)**
18:11
**TOC (1)**
39:16;48:9,10;
62:12,18,19,22;64:6,

8,9;65:1;66:19,24,24;
67:7,10;72:2
**today (8)**
8:3;25:18;28:7;
29:17;36:9;39:24;
69:12;74:9
**together (1)**
51:10
**told (6)**
7:2;33:6;59:5;61:2;
68:12;75:7
**tomorrow (1)**
44:14
**took (3)**
59:16,17,24
**tools (2)**
58:19;72:7
**topic (1)**
39:8
**towards (1)**
56:2
**traditional (1)**
17:23
**transparent (1)**
57:3
**trauma (1)**
37:13
**treated (1)**
24:15
**treatment (1)**
7:23
**Tree (1)**
71:14
**trial (3)**
14:17;36:2,3
**tried (1)**
53:19
**triggered (2)**
46:14;63:15
**triggers (1)**
14:21
**trivial (1)**
22:9
**Trotter (1)**
63:5
**troublesome (1)**
15:6
**truck (2)**
54:10,12
**true (3)**
43:20,23;54:9
**trust (127)**
5:2,7,7,25;6:12,16,
20;7:21;8:7,9,12;
9:10;10:16;11:13;
13:23;15:18;19:13;
20:1,5,9;21:5,8,12,16,
18;24:7;27:11,11,13;
29:22;30:24;31:1;
33:19,25;34:8;37:20;
38:21,22,22,24;39:5,
17;40:1,4,13,15,18,
19;41:22;43:18;

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 88
of 90

44:15;45:7,12,16;
47:7,9,9,13,22;48:20;
49:15,23;50:7,16;
51:5,15,19,23,25;
52:13,15;53:4,14,17;
54:4,16,17,18,20,21,
23;55:8,17,18,24;
56:25;57:24;58:1;
59:19,22;60:14,24;
61:1,9,11,22;62:4,14,
14;63:8,8,10,16,19,
21,25;64:5,8,10;
66:22;67:1,8;68:12,
13;69:25,25;70:3,4,5,
18;73:10;74:20,22,23,
24,24;75:1
**trustee (57)**
4:20,20;8:24;9:25;
12:3,11,12;13:2,21;
15:17,22;16:24,24;
17:6,18;18:1,6;20:16;
21:4;24:9,9;25:1,10;
26:5;27:8;28:12;29:5,
13;32:15;36:1;37:20;
38:4;39:15,24;40:11;
50:2,9,21;51:20;
53:19;55:19;57:10,
14;59:21,23;62:13;
66:20,22;67:4,6,8,12;
71:3,12;73:9,13;74:3
**trustees (1)**
12:16
**trustees' (1)**
12:20
**trustee's (15)**
6:25;9:13,16;10:8,
13,18;11:8;12:5,17;
24:4;31:5,7;48:6;
66:13;72:15
**trusts (1)**
69:25
**trust's (4)**
10:25;35:21;46:20;
48:2
**trying (3)**
44:23;59:1;61:21
**Tubbs (1)**
33:9
**TUESDAY (1)**
3:1
**tuned (1)**
75:18
**turn (6)**
4:3,22;35:10;57:15;
63:14;68:17
**turning (2)**
65:15,16
**tweak (1)**
38:17
**twenty (2)**
12:15;33:25
**twenty-first (1)**
34:1

**twenty-page (2)**
23:3;69:6
**twenty-to-thirty (1)**
12:15
**two (17)**
7:10;10:14;11:4;
15:2;31:18;34:18,25;
35:1;42:10;52:6,10,
10;54:5;55:5;25:19;
61:25;63:9
**two-line (1)**
12:13
**two-sentence (1)**
16:23
**types (3)**
70:15;71:6,24
**typically (1)**
25:19

## U

**ultimately (1)**
12:3
**Um-hum (1)**
10:16
**under (19)**
17:15;27:13;28:15,
17,17,19,22;29:8,17;
35:18;37:2;45:22,24;
67:10;69:16;71:10;
72:21;75:8,12
**understood (2)**
5:17;39:12
**undertaken (1)**
41:13
**undisputed (1)**
15:20
**unequal (1)**
7:23
**unjust (1)**
71:19
**unknown (1)**
14:21
**unless (2)**
17:16;29:4
**unredacted (4)**
42:20,21;43:5,9
**unredacting (1)**
42:17
**unrelated (1)**
21:11
**unremarkable (2)**
64:14,15
**unsure (1)**
61:7
**untrue (1)**
43:21
**up (11)**
4:18;13:15;17:7;
18:6;19:20,22;26:5,7;
42:15;68:10;69:6
**upload (1)**
34:19

**uploaded (1)**
36:10
**upon (2)**
12:17;60:17
**use (2)**
17:22;38:23
**useful (1)**
13:1
**using (2)**
9:13;35:25
**utilized (1)**
18:11

## V

**valuation (1)**
21:6
**value (2)**
46:4;66:14
**various (3)**
19:11;42:17;74:20
**vegetation (9)**
44:2,8;45:8,13,17,
20;47:4,22;62:23
**verbal (1)**
31:17
**via (1)**
31:21
**viable (1)**
45:10
**victim (22)**
15:17;20:7,11,17;
21:19;27:11;33:16;
39:17;40:19;41:22;
51:5;52:15;54:17,18;
55:24;60:13,23;61:1;
67:1;70:2,18;73:10
**victims (19)**
40:6,13,13,23;41:7,
20;43:18;46:3,4;
50:13;53:13;57:6;
58:5;60:1,4;65:20;
66:15;70:5;71:25
**view (5)**
24:16;41:25;42:1;
46:3;63:24
**viewed (1)**
19:6
**viewing (1)**
61:11
**violated (1)**
51:1
**violation (1)**
56:10
**violations (3)**
50:22,23;57:22
**vision (9)**
5:22;6:3;9:23;
18:18;22:16;32:24,
25;53:18;54:3
**vu (1)**
62:16

## W

**Wait (5)**
27:17;54:22,22;
64:21;66:16
**waiting (1)**
66:17
**wants (1)**
16:13
**warranted (1)**
33:2
**way (14)**
11:6;14:4,11,12;
19:8,17;25:19;33:3;
40:3;43:11;47:14;
48:6;62:1;63:8
**ways (2)**
40:18;59:25
**website (2)**
43:19;67:5
**week (2)**
34:17;44:15
**welcome (1)**
72:14
**well-known (1)**
62:24
**weren't (2)**
10:24;23:22
**what's (4)**
39:3;53:22;54:14;
66:12
**Whereupon (1)**
75:23
**white (1)**
45:6
**whole (2)**
40:6;69:7
**whomever (1)**
55:15
**who's (1)**
51:9
**whose (1)**
12:18
**wildfire (4)**
6:6;40:24;41:4,7
**willing (2)**
16:12;69:8
**wish (1)**
37:4
**within (10)**
14:9;42:25;44:12;
51:3,3;52:23;54:4,17;
71:9;73:11
**without (7)**
8:25;13:16;26:3;
34:19;45:24;48:22;
51:15
**witnesses (1)**
13:15
**wondering (1)**
26:3
**word (4)**

16:6;41:21;55:7;
63:13
**words (8)**
6:19,21;9:1;14:8;
53:23;60:13;61:19;
65:24
**work (5)**
29:10;60:13,16;
74:18,18
**working (2)**
51:10;66:20
**worry (6)**
49:21;51:4,6,7;
55:25;61:12
**worth (3)**
54:11,11,12
**writing (3)**
10:10;12:12;23:18
**written (3)**
13:21,23;31:14
**wrong (3)**
10:4;17:24;36:1;
50:5
**wrote (2)**
55:3;63:15;65:6

## Y

**Yanni (7)**
15:17;49:2,9;50:9;
52:19;63:20;65:15
**Yanni'd (1)**
49:24
**Yanni's (1)**
65:19
**year (2)**
65:6,7
**years (7)**
21:17;34:3;48:3;
62:18;63:5;65:1,5
**yesterday (3)**
11:8;17:3;68:6

## Z

**zone (3)**
32:5,7,8

## 1

**1,000 (1)**
45:18
**1.4 (9)**
51:4,6;56:1;61:3,7,
8,9,11,12
**10 (1)**
61:15
**10,000 (1)**
54:10
**10,000- (1)**
60:9
**10.5 (2)**
8:1,3

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 89
of 90

**10:00 (1)**
  3:1
**10:46 (1)**
  36:15
**10:50 (1)**
  36:15
**1054 (2)**
  39:19;50:9
**105a (1)**
  7:22
**11.1 (3)**
  8:1,13,17
**11:48 (1)**
  75:23
**110 (1)**
  9:22
**1103 (1)**
  55:10
**1123a4 (1)**
  7:22
**113 (1)**
  21:23
**12-884 (1)**
  43:1
**14-492 (1)**
  22:4
**15th (3)**
  10:19;37:21,22
**1a (1)**
  21:11

**2**

**2 (2)**
  21:23;22:5
**2.3 (2)**
  20:1,5
**2.4a (1)**
  20:9
**2.4d (1)**
  20:14
**200 (5)**
  60:25;61:9,9,10,14
**2000 (2)**
  41:13;49:22
**2001 (1)**
  49:22
**2004 (1)**
  58:23
**200-million- (1)**
  60:19
**2022 (5)**
  42:17;43:1;44:13,
  19;50:7
**2024 (3)**
  3:1;39:24;49:21
**23 (1)**
  26:22
**29 (1)**
  44:13
**29th (2)**
  43:1;44:19
**2nd (1)**

46:7

**3**

**3 (1)**
  21:23
**30 (1)**
  3:1
**326 (1)**
  57:9
**327 (1)**
  56:3
**328 (2)**
  56:4;57:9

**4**

**4.3 (1)**
  20:4
**40 (1)**
  18:12
**400 (1)**
  18:12

**5**

**5,000 (3)**
  54:11,12;60:10

**6**

**6.2 (1)**
  66:23
**6.5 (1)**
  64:7

**7**

**7,500-dollar (1)**
  60:11
**7026 (1)**
  58:21
**7030 (1)**
  59:2
**7033 (1)**
  59:3
**7ab (1)**
  23:1
**7c (1)**
  24:8

**9**

**9 (1)**
  20:19

Case: 19-30088    Doc# 14555    Filed: 07/31/24    Entered: 07/31/24 12:31:54    Page 90
of 90