

**Signed and Filed: September 18, 2024**

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Bankruptcy Case |
| | ) No. 19-30088-DM |
| PG&E CORPORATION, | ) |
| | ) Chapter 11 |
| - and - | ) |
| | ) Jointly Administered |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) |
| | ) |
| Reorganized Debtors | ) |
| ☐ Affects PG&E Corporation | ) |
| ☐ Affects Pacific Gas and | ) |
| Electric Company | ) |
| ☒ Affects both Debtors | ) |
| | ) |
| * All papers shall be filed in | ) |
| the Lead Case, No. 19-30088 (DM). | ) |
| | ) |
| | ) |

**MEMORANDUM DECISION ON THIRTY-THIRD AND THIRTY-FOURTH SECURITIES OMNIBUS CLAIMS OBJECTIONS**

**I. <u>Introduction</u>**

The court has had under submission PG&E's Thirty-Third Securities Omnibus Claims Objection to PERA and Securities Act Plaintiffs' TAC, Including to Certain Claimants That Adopted the TAC ("33rd Omnibus Objection") (Dkt. 14200) and PG&E's Thirty-Fourth Securities Claims Omnibus Objection to Claims Adopting

-1-

RKS Amendment ("34th Omnibus Objection" and together, the "Omnibus Objections"). (Dkt. 14203).[1] Rule 3007(d)[2] permits the filing of omnibus objections.[3]

The court has considered the Omnibus Objections; Lead Plaintiff PERA and The Securities Act Plaintiffs' Response and Opposition to the Reorganized Debtors' Thirty-Third Securities Omnibus Claims Objection (Dkt. 14342); the RKS Claimants' Opposition to Reorganized Debtors' Thirty-Fourth Securities Claims Omnibus Objection to Claims Adopting the RKS Amendment (Dkt. 14353); the Omnibus Reply in Support of Reorganized Debtors' Thirty-Third and Thirty-Fourth Securities Claims Omnibus Objections ("Reply") (Dkt. 14453); the Further Reply in Support of Reorganized Debtors' Thirty-Fourth Securities Claims Omnibus Objection to Claims Adopting RKS Amendment (Dkt. 14454); the Third Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (filed in USDC action 3:18-cv-03509-EJD); the Amended Statement of Claim on Behalf of

---

[1] Defined terms used throughout this Memorandum Decision are found in the Glossary of Defined Terms (with some entries deleted) that accompanied the 33rd Omnibus Objections and are set forth following this discussion.

[2] Unless otherwise indicated, Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037 and Code references are to the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq. B.L.R. refers to the Bankruptcy Local Rules for this district.

[3] Rule 3007(c)(6) limits omnibus objections to no more than 100 claims. Several hundred claims are the subject of the 34th Omnibus Objection and no party objected to that joinder. The court considers that minor procedural point waived.

Case: 19-30088    Doc# 14593    Filed: 09/18/24    Entered: 09/18/24 11:39:27    Page 2 of 58

the RKS Claimants (Dkt. 14061-2); and the numerous filings related to the foregoing submissions.

For the reasons that follow, the Omnibus Objections are OVERRULED in part and SUSTAINED in part. While the court does not believe it will be necessary for PERA or the RKS Claimants to seek to amend their respective submissions, given the breadth of what survives the Omnibus Objections, the rules permit them to do so. If either does amend, the court will not consider any renewed attempts by PG&E to dismiss at this stage. Any amendments to the TAC or the RKS Amendments must be filed by **October 8, 2024.** These matters must proceed with the pleadings as modified by this ruling and any further amendments so discovery, more typical pre-trial proceedings, mediation, and then trial as necessary.

## II.  Procedural Setting

### A.  Background

The PSLRA was enacted by Congress nearly thirty years ago to protect defendants from unfounded class actions. As PG&E stated:

> Congress recognized that "[p]rivate securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007). Therefore, "[s]etting a uniform pleading standard for § 10(b) actions was among Congress' objectives when it enacted the PSLRA." *Id.* at 320. Congress ensured that "[a]s a check against abusive litigation by private parties," the PSLRA includes "[e]xacting pleading requirements." *Id.* at 313.

33rd Omnibus Objection at 25.

–3–

PG&E is clear that the PSLRA is a shield to protect law abiding companies from frivolous lawsuits from investors. It is not a sword for bankruptcy debtors to hinder claimants.

The original TAC was filed by PERA and other plaintiffs before the bankruptcy filing. For all practical purposes the bankruptcy removed PG&E from the TAC. Any attendant procedural benefits of the PSLRA might remain in the District Court Action.

On May 19, 2019, PG&E filed the Motion to Set Last Day to File Proofs of Claim (Dkt. 1784). That motion sought to set a bar date for filing proofs of claim by Wildfire Claimants; Wildfire Subrogation Claimants; Customers, and governmental units. Proofs of Claim were not required to be filed by holders of equity security interests[4] or Debt Claims[5] (without any carve-out for claims relating to the purchase or sale of such a Debt Claim). The motion did not mention any claim for securities fraud as later alleged in the TAC or the RKS Amendment.

The court initially set a claims bar date of October 21, 2019 (Dkt. 2806). Proofs of claim on behalf of the class described in the TAC were duly filed October 21, 2019 (Proof of Claim Nos. 72193, 72273). On December 19, 2019, PERA filed a

---

[4] Sec. V. a. (o)(7) stated: ". . . *provided, however,* that if any such holder asserts a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a Standard Proof of Claim must be filed on or before the Bar Date." (Emphasis in original).

[5] Sec. V. a. (o)(7) defines a Debt Claim as one that "is limited exclusively to the repayment of principal, interest, and other fees and expenses under any agreements governing any prepetition unsecured revolving credit loan, term loan, notes, bonds, debentures, or other debt securities, in each case, issued by or on behalf of the Debtors . . ."

-4-

Motion to Apply Bankruptcy Rule 7023 to Class Proof of Claim (Dkt. 5042), which PG&E opposed (Dkt. 5369). PG&E insisted that the proof of claim process was superior to PERA's proposal. After further briefing, the court sided with PG&E, and instead of proceeding with a Rule 7023 class action as requested by PERA, set a new bar date of April 16, 2020, for what the court's Order defined as Securities Claimants, and broadened the types of claims that could be filed by the extended bar date (Dkt. 5943).[6]

In the rounds of briefing and supplemental briefing, the only time the PSLRA was even mentioned was by Mr. Etkin, counsel for PERA, at the hearing on PERA's Motion to Apply Bankruptcy Rule 7023 to Class Proof of Claim. Mr. Etkin's mention of the PSLRA stay indicates that he believed the PSLRA's stay on discovery applied during the pendency of a motion to dismiss a class action lawsuit arising under the statute. (Dkt. 5562, p. 92). While PERA may have believed the PSLRA to apply to its proposed class, PG&E at no point suggested the heightened pleading standards of the PSLRA would apply to its proposed

---

[6] Exhibit B to that order included the following prominent notice:

**IMPORTANT COURT ORDERED NOTICE**
YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY HAVE PURCHASED OR ACQUIRED SECURITIES OF PG&E CORPORATION, PACIFIC GAS AND ELECTRIC COMPANY, OR BOTH, FROM APRIL 29, 2015 THROUGH NOVEMBER 15, 2018 (INCLUSIVE) AND MAY BE ENTITLED TO A RECOVERY IN THE PG&E CHAPTER 11 CASES.
YOU HAVE BEEN GIVEN ADDITIONAL TIME BY THE BANKRUPTCY COURT TO FILE A CLAIM IN THE PG&E CHAPTER 11 CASES FOR RESCISSION OR DAMAGES BASED UPON YOUR PURCHASE OR ACQUISITION OF SUCH SECURITIES. IF YOU WISH TO FILE SUCH A CLAIM, PLEASE FOLLOW THE INSTRUCTIONS BELOW.

claims objection process that, again, was strictly in opposition to a proposed class process.

An amended Plan was confirmed on June 20, 2020 (Dkt. 8053). On September 29, 2020, PERA filed a second motion to apply Rule 7023 and certify a class of the thousands of securities claims (Dkt. 9152). The court again sided with PG&E and denied that motion as well (Dkt. 10020), and instead entered an Order Approving Securities ADR and Related Procedures for Resolving Subordinated Securities Claim (Dkt. 10015). That order approved detailed Securities Claim Procedures, along with Securities Omnibus Objection Procedures. That order also provided that to the extent there were unresolved objections after settlement negotiations and mediation, "merits-based objections . . . will be made pursuant to section 502 of the Bankruptcy Code and consistent with Rule 3007 of the Federal Rules of Bankruptcy Procedure." (Dkt. 10015, Ex. A at 3). The only reference to the PSLRA was in a footnote.[7]

In short, PG&E designed and supported the procedures that the court implemented over the objections of PERA. Yet now, PG&E seeks to use the PSLRA as a shield notwithstanding the fact that PG&E chose bankruptcy and the now well-established Securities Claim Procedures. PG&E must continue with rather than frustrate these procedures.

On July 28, 2023, the court entered the Order Authorizing Amendment and Objection Procedures for Securities Claims (Dkt.

---

[7] "The Reorganized Debtors believe that this information is necessary to calculate potential damages (and therefore potential settlement amounts) under 15 U.S.C. § 78u-4(e) of the PSLRA" (Dkt. 10015, Ex. A-1 at fn.1)).

-6-

13934) (the "Objections Procedures Order").  The Objections Procedures Order was agreed to by RKS (but not PERA). The Objections Procedures Order states in Para. 10(b) of Exhibit A: "While the motions to dismiss set forth in the above paragraph are pending, the parties will agree to meet and confer on certain procedures for coordination of discovery should such discovery be necessary after the motions to dismiss are decided by the Court".  Discovery was not to take place until motions to dismiss the claims were decided.

In the summer of 2023, there was no focus by the court or the parties as to whether the PSLRA even applied.  As the situation has progressed, it is evident that PG&E was of the view that the PSLRA should apply and therefore a stay of discovery was appropriate.

Later the court issued the *Order Denying Requests for Limited Discovery* (Dkt. 14292) on January 25, 2024 and included its explanation about timing discovery after the sufficiency objections were ruled upon.[8]

The opposition by PERA and RKS in their subsequent filings demonstrate that the underlying premise of the applicability of the PSLRA must be reconsidered.  Indeed, the court never formally held that it did apply.  It is particularly inappropriate to use in opposition to claims that have been

---

[8] In the oral ruling, the court stated: "PERA . . . and RKS, their claims will survive the sufficiency on their own face (sic)), on their strength of themselves, not on the weakness of what they believe exists in PG&E's defenses. Those will be tested after the sufficiency objections are favorably disposed of in favor of the claimants and will not be at all relevant if the sufficiency objections are sustained." Dkt. 14293, at 50:17-23.

–7–

filed against debtors in bankruptcy court, and not in opposition to actions filed by class plaintiffs against it, as contemplated by the PSLRA.

The court cannot and will not depart from the traditional procedure of deferring any disputed fact questions until after completion of appropriate discovery. The PSLRA is unfamiliar territory for bankruptcy courts to navigate and this court will not venture there.

### B. Bankruptcy Court Objections vs PSLRA

This case appears to be one of first impression, namely, where the Bankruptcy Court has been called upon to alter the Claims Procedures Order mid-stream and invoke the PSLRA.

There are very few reported cases of bankruptcy courts dealing head-on with the PSLRA. In its Reply, PG&E cites only *Mishkin v. Ageloff,* 220 B.R. 784 (S.D.N.Y. 1998) and *In re Dozier Fin., Inc.,* 2018 WL 6985219 (Bankr. D.S.C. Apr. 20, 2018). PG&E also cites in a footnote two other cases that appear to have the same intersection and were cited by RKS as well: *In re Tronox Inc.,* 2010 WL 1849394 (Bankr. S.D.N.Y. May 6, 2010) and *In re Recoton Corp.,* 307 B.R. 751 (Bankr. S.D.N.Y. 2004). None of these cases reflect the situation at hand.

In *Mishkin*, an SIPC trustee filed an adversary proceeding in the Bankruptcy Court and sought relief from the PSLRA's stay of discovery against the defendant under 15 U.S.C. § 78u-4(b)(3)(B). *Mishkin*, 220 B.R. at 789. The Bankruptcy Court granted such a stay, but the District Court reversed, pointing out that the trustee had not met his burden of showing undue prejudice as a result of that stay. *Id.* Unrelated to the

-8-

merits, but not to go unnoticed, the District Court withdrew the reference of that adversary proceeding, thus apparently terminating involvement of the Bankruptcy Court. *Id.* at 799-801.

In *Recoton*, a creditors' committee sought to proceed under Rule 2004. *Recoton,* 307 B.R. at 751. Respondents argued that the PSLRA and discovery under the Securities Litigation Uniform of Standards Act of 1998 prohibited such discovery. *Id.* The Bankruptcy Court overruled the objections, in part because no action had even been commenced against the defendant. *Id.* at 757-58.

In *Tronox*, the same bankruptcy judge who decided *Recoton* a few years earlier dealt with an attempt by plaintiffs to extend the time for filing a class proof of claim. *Tronox,* 2010 WL 1849394. The ruling that the PSLRA did not regulate the filing of class claims in Bankruptcy Court is again, of no relevance to the present dispute.

Finally, in *Dozier*, the Bankruptcy Court contended with the defendants' argument that a complaint did not comply with the heightened standards of the PSLRA. *Dozier*, 2018 WL 6985219. In overruling that objection, the court indicated its satisfaction that the plaintiff had adequately alleged securities violations and found that the defendants' attack on the merits of those claims were not appropriate at the Rule 7012(b)(6) stage. *Dozier*, 2018 WL 6985219 at *10.

C. **Traditional Claims Objections Procedures**

Under Section 502(a), "A claim or interest, proof of which is filed under Section 501 . . . is deemed allowed, unless a

Case: 19-30088    Doc# 14593    Filed: 09/18/24    Entered: 09/18/24 11:39:27    Page 9 of 58

party in interest . . . objects."  Thus, all proofs of claim included within the TAC and RKS Amendment were deemed allowed until the Omnibus Objections were filed.  After that, the provisions of BLR 3007-1(b) come into play.  Under that Local Rule, when a factual dispute is involved, the initial hearing on the objection shall be deemed a status conference.  Where an objection involves only a matter of law, the matter may be argued and decided at the initial hearing.

The TAC contains six claims for relief, four of which are directed at PG&E.  In its entirety, it includes 706 numbered paragraphs spanning 216 pages.  The RKS Amendment covers 195 pages of text and 673 numbered paragraphs.  It consists of five claims for relief, all against PG&E.

Albeit with differing pleading standards, the Omnibus Objections are taken as motions to dismiss the TAC and the RKS Amendment.  Generally, the standard for a motion to dismiss a pleading under Rule 7012(b)(6), which incorporates Fed. R. Civ. P. ("FRCP") 12(b)(6), is that a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  This regime applies to Securities Act violations complained of here.

-10-

The standards for overcoming a motion to dismiss under the Exchange Act are higher, incorporating FRCP 12(b)(6) and 9(b) because of the fraud allegations, requiring "exacting pleading standards" and more particularity as to the claims plead than the standard of FRCP 12(b)(6) alone. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). No matter the standard, all facts asserted in the claims must be assumed to be true, and the court must determine whether those facts amount to a plausible claim for relief.

In the context of this matter, at PG&E's urging, the court stayed the discovery process when it allowed a dual track of potential class certification and claims objections to move forward (Dkt. 14292). That means all that is in front of this court are the claims in the TAC and RKS amendments, subject to the Securities Act or Exchange Act plausibility standards, and not the more rigorous ones of the PSLRA set against conflicting facts as alleged by PG&E.

Thus, in this context, when either pleading standard leads to conflicting evidence, that evidence cannot be resolved at the motion/objection stage. It is of note that to rebut the presumption of truth in the pleading does not create a presumption of falsity; rather, it underscores the fact that material fact questions must be determined after discovery, summary judgment and perhaps trial.

With that in mind, the court rejects the notion that the Omnibus Objections (as for alleged Exchange Act violations) must meet the higher pleading standards of the PSLRA, although they must meet the plausibility standards of FRCP 12(b)(6). Stated

Case: 19-30088    Doc# 14593    Filed: 09/18/24    Entered: 09/18/24 11:39:27    Page 11 of 58

otherwise, the claims made in the TAC and RKS Amendment must be plausible, meaning that they must be sufficient to pass muster of the threshold requirements of the applicable provisions of the Exchange Act and the Securities Act as discussed below.

## III. **Summary of Claims**

As noted above, PERA and RKS assert two different types of causes of action asserted under two different statutory schemes:

First are the Exchange Act claims. These claims originate under the Securities Exchange Act of 1934 and are based on equity interests purchased by Securities Fraud claimants. The thrust of the Exchange Act claims are that PG&E's false statements regarding safety practices during the Alleged Relevant Period led to artificially inflated prices of shares purchased by the Exchange Act Claimants. Once those false statements and concealed safety failures came to light in the wake of the various wildfires eventually found by California's Department of Forestry and Fire Protection ("Cal Fire") to be caused by PG&E, the prices of those shares sharply dropped several times and resulted in harm to the claimants.

Next are the Securities Act claims, asserted by purchasers of debt securities purchased during the Notes and Exchange Offerings. These claims allege that the disclosures related to those Offerings materially misled investors as to the risk of wildfire, that risk's impact on PG&E's business, the sufficiency PG&E's actions undertaken to prevent wildfires, and PG&E's liability with respect to potential wildfires. Liability under this law does not require scienter, nor in some cases, reliance.

-12-

It is also restricted by a shorter statute of limitations than the Exchange Act.

These claims were either paid or left in place under the Confirmed Plan, but as with the Exchange Act claims, the individual damage amounts remain undetermined.

## IV. Merits – Specific Legal Challenges

### A. Statute of Limitations on Section 11 Claims Based on the Notes and Exchange Offerings

Section 11 of the Securities Act imposes civil liabilities on those involved in the making of a false registration statement. 15 U.S.C. § 77k. Claims to enforce this section must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." Otherwise, the claims are time barred. 15 U.S.C. § 77m.[9]

This means that the Securities Act Plaintiffs' and RKS Claimants' Section 11 claims could be time-barred, because the TAC[10] itself states that the misrepresentations were beginning to become clear in 2017 after the North Bay Fires. PG&E points to Paragraph 321 of the TAC, which discusses artificially inflated stock price levels that reached a high on September 11, 2017,

---

[9] Cases construing securities fraud statute of limitations defense deal more often with the two-year period for Exchange Act claims, rather than the one-year period for Securities Act claims, but the analysis is the same.

[10] Because Debtors assert the RKS Claimants have plead the same facts as in the TAC, and because Debtors' argument in the 33rd Omnibus Objection regarding the statute of limitations are the same in the 34th Omnibus Objection, the court refers only to the TAC and not the RKS Amendment for efficiency.

-13-

"a month before **the truth started to emerge** on October 12, 2017"
(emphasis added).  PG&E contends that the one-year statute of
limitations set forth in § 77m began to run in October 2017 (or
at the latest, December 2017).

The statute says what is critical is not when the truth
starts to emerge, but when that truth can or should be known
after reasonable diligence, and what that reasonable diligence
should have been is a fact-specific inquiry.  That is sufficient
reason to preserve these claims here at the pleading stage.

In *In re Bare Escentuals, Inc. Securities Litig.*, 745 F.
Supp. 2d 1052(N.D. Cal. 2010), the court declined to dismiss at
the initial pleading stage of similar allegations as those here:

> Here, in light of the various purported disclosures
> and relevant dates that plaintiffs allege, stemming
> throughout the class period — the last of which
> allegedly occurred in the October 30, 2008,
> earnings release statement — the court finds that
> resolution of the limitations issue is not
> appropriate at the pleading stage, but must be
> determined once an evidentiary record has been
> developed. Moreover, while defendants are correct
> that plaintiffs allege multiple disclosures
> beginning as early as June 5, 2007, regarding the
> exposure of defendants' fraud, plaintiffs are also
> entitled to the reasonable inference that it is the
> course of all disclosures collectively that
> ultimately placed plaintiffs on notice of the need
> to investigate for fraud — i.e., that it was no
> single disclosure that was dispositive, but rather
> all the disclosures collectively.

*Bare Escentuals*, 745 F. Supp. 2d at 1081.  PG&E downplays this
case as a single district court decision,[11] but cannot avoid the

---

[11] *Bare Escentuals* is hardly a maverick case as Debtors suggest,
as it cites several other circuit and district court decisions,
as did RKS (Dkt. 14353) for the same proposition:  the statute
of limitations inquiry is fact intensive.

-14-

more recent Ninth Circuit decision, *York County, et al. v. HP, Inc, et al.*, 65 F.4th 459 (9th Cir. 2023). *York County* was decided under a different federal statute of limitation but stands for the same proposition. There, the Ninth Circuit dealt with disposition of a motion to dismiss and the applicable discovery rule. It concluded that the defendant had not demonstrated that the plaintiff could have pleaded an adequate complaint prior to the critical date. It also discussed at length *Merck & Co, Inc. v. Reynolds,* 559 U.S. 633 (2010) and the tension between inquiry notice and statutory language that states accrual of a claim begins after discovery.

Here the minimal facts alleged in 2017 do not convince the court that PERA and RKS could have pleaded adequate facts prior to one year before the petition date.

PG&E's statute of limitation defense fails at this stage. For this reason, there is no need to speculate on the issues debated by PG&E and RKS about the fact that Securities Act Plaintiffs did file suit against certain PG&E officers, directors, and underwriters for Section 11 violations on February 22, 2019,[12] which was later incorporated into the TAC on May 28, 2019. Neither side mentioned that the operative law here is that Debtors filed Chapter 11 on January 29, 2019, triggering Section 108(a) and tolling the statute of limitations under the securities laws for claims against them.

---

[12] U.S.D.C. No. 19-0994, *York County, etc. v. Rambo*, was filed on February 22, 2019. It did not name Debtors as defendants as the bankruptcy case was pending then.

-15-

1   PG&E also points out that by this same time – when the

2   truth started to emerge - the TAC alleges the market became

3   aware of the truth that results in damages under the Exchange

4   Act and that the claimants cannot have it both ways.  While

5   true, the Securities Act Plaintiffs, PERA and the RKS Claims are

6   free to plead in the alternative, and their Securities Act

7   claims do not fail because of what is alleged in the Exchange

8   Act claims.

9       **B.  <u>Prior Release of Certain Bond Issues</u>**

10      PG&E argues that Plan Sections 1.180 (defining "Releasing

11  Parties" as "holders of Utility Senior Note Claims"); 1.245

12  (defining "Utility Senior Note Claims"); and 10.9(b) (listing

13  exceptions to Releasing Parties); along with Para. 56 of the

14  Confirmation Order extends to some of the affected claimants,

15  meaning that those claims have long been released and thus must

16  be dismissed.

17      PERA rightly notes that these classifications relate to

18  classes of claims for voting purposes and general plan

19  treatment.  PERA also rightly notes that prosecution of the

20  Securities Claims falls within the release exception of Section

21  10.9(b) in the Plan, excepting from release "the rights that

22  remain in effect from and after the Effective Date to enforce

23  the Plan and the Plan Documents[.]"  Here, those holding

24  Securities Claims are appropriately enforcing their rights under

25  the Plan by seeking to have their Securities Claims allowed and

26  to receive a distribution in accordance with the Plan's terms.

27  In this instance, it does appear that PG&E is conflating the

28  Plan's satisfaction of Note Claims with Securities Claims.

-16-

More critically, Section 1.180 of the Plan qualifies "Releasing Parties" with *. . . **in their capacities as such***" (emphasis added). RKS Claimants (and PERA and the Securities Act Plaintiffs) are subordinated by Section 510(b) of the Code and the Plan Sections listed in Exhibit A attached to this Memorandum Decision. These parties are claiming harm against PG&E in the capacities as holders of securities fraud claims, and as the holders of Utility Subordinated Debt Claims, which were not part of any release of under Section 10.9(b) of the Plan.

Quite apart from any wordsmithing about plan terms and their definitions, the court notes the detailed notice provisions quoted in footnote 6 that went to thousands of claimants and produced over 8,000 fraud claims. There can be no doubt the Plan informed these claimants they were being provided for, nor can there be any reason to believe the court would later take back that statement and disallow those thousands of claims by reading the Plan Definitions as PG&E wishes.[13]

---

[13] Note also what the Plan said about treatment of these claims:

> Plan Sec. 4.12 ("[E]ach holder of an Allowed HoldCo Subordinated Debt Claim shall receive Cash in an amount equal to such holder's Allowed HoldCo Subordinated Debt Claim."): Sec. 4.14 ("[E]ach holder of an Allowed HoldCo Rescission or Damage Claim shall receive a number of shares of New HoldCo Common Stock equal to such holder's HoldCo Rescission or Damage Claim Share."). Sec. 4.32 ("[E]ach holder of an Allowed Utility Subordinated Debt Claim shall receive Cash in an amount equal to such holder's Allowed Utility Subordinated Debt Claim."

-17-

Note, also, in excerpts of the Plan attached as Exhibit A, that set forth the provisions of the Plan that treat the Section 510(b) subordinated claims and interests.

The PG&E's Release defense fails.

## V. __Merits – Critical Components of Exchange Act Claims__

Both the TAC and RKS Amendment assert claims under Section 10(b) of the Exchange Act and SEC Rule 10-5(b) promulgated thereunder. The relevant elements of these claims are enumerated below.

Both the TAC and RKS Amendment also assert claims for control person liability, a violation of Section 20(a) of the Exchange Act. Section 20(a) "imposes liability on a person who is in control of the person who is directly responsible for a securities fraud violation." *In re Alphabet*, 1 F.4th at 701. Any person who caused the direction or the management and policies of the securities violator, therefore, is jointly liable for the actions of the violator itself. *Id.* This liability is derivative, such that there is no individual liability where there is no primary violation of the securities law. *In re Genius Brands,* 97 F.4th at 1180. Because the liability is derivative, the court incorporates the claim by reference in its discussion of misstatement liability below.

Only the RKS Amendment asserts scheme liability against Debtors. Scheme liability is the term used for violations of Rule 10b-5(a) and (c), which makes it unlawful for a defendant to "employ any device, scheme or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]" 17 CFR §

-18-

240.10b-5. Under recent Supreme Court and Ninth Circuit precedent, the same misstatements or omissions which may give rise to liability under Rule 10b-5(b) may also be used to prove a scheme to defraud under Rule 10b-5(a) and (c). *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019) ("dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, as well as the relevant statutory provisions."); *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687, (9th Cir. 2021) ("Alphabet's argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*, which rejected the petitioner's argument that Rule 10b-5(a) and (c) "concern 'scheme liability claims' and are violated only when conduct other than misstatements is involved.") (internal citations omitted). The first element of scheme liability requires an allegation of sufficient facts to show a defendant "committed a deceptive or manipulative act (or, in light of *Lorenzo*, a misstatement) in furtherance of the alleged scheme." *Borteneau v. Nikola Corp.*, *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (citing *Dura Pharms.*, 544 U.S. at 341–42), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008). The rest of the elements are identical to a claim under Rule 10b-5(b). *In re Genius Brands Int'l, Inc. Securities Litigation*, 97 F.4th 1171, 1180 (9th Cir. 2024).

To the extent misstatement liability is plausibly alleged as discussed below, the court holds that the same misstatements that plausibly give rise to an allegation of that liability also plausibly give rise to an allegation that PG&E used those

-19-

misstatements in a scheme to artificially inflate stock prices and convince claimants to purchase securities at those prices is also plausibly alleged. Because the rest of the elements of scheme liability and misstatement liability are identical, the court addresses those elements in turn below.

PG&E argues that the Exchange Act claims under should be rejected for four independent reasons: insufficient pleading of falsity; failure to allege strong inference of scienter; no loss causation; and failure to plead reliance for purchases after October 8, 2017.

The Ninth Circuit recently repeated the familiar list of six necessary elements to allege a claim under Exchange Act Section 10(b) and Rule 10b-5(b). *In re Genius Brands Int'l Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (Ninth Cir. 2024). This court will follow a shorthand version of that list, and eliminate any discussion of two on that list - purchase and sale of a security and economic loss - as neither has been argued by PG&E here. In short, this court must determine whether, under relevant portions of the Exchange Act, the TAC and/or the RKS Amendment adequately allege that a multitude of statements by PG&E regarding its safety practices were (1) materially misleading; (2) made with scienter; (3) were the cause of the losses suffered by investors; and (4) for those who bought shares after the North Bay Fires, that those statements highlighting renewed and revamped safety efforts were relied on by those purchasers.

## A. **Falsity**

The TAC and RKS Amendment both detail nineteen alleged materially false and misleading statements or omissions by PG&E

-20-

during the relevant time period, made all the more misleading given the years-long course of conduct by PG&E that led to unsafe fire conditions, and to some of the North Bay fires directly.

The first five material statements or omissions relate to PG&E's vegetation management practices and compliance with wildfire safety regulations before the North Bay Fires, namely, that PG&E was meeting or exceeding state and federal safety practices:

1.    On April 29, 2015, during a conference call with investors, then president of PG&E stated that the company "was stepping up our vegetation management activities to mitigate wildfire risk and improve access for firefighters."

2.    On October 16, 2015, PG&E released its 2015 Corporate Responsibility and Sustainability Report that assured investors (and potential investors) its vegetation management practices were "in compliance with relevant laws."

3.    On November 18, 2015, in sworn testimony before the California legislature, a representative of PG&E stated that the company was "just about done" implementing a program to remotely disable recloser devices (which are known ignition dangers in wildfire risk areas)[14] with a focus on high-risk areas, and

_____

[14] In brief, reclosers send pulses of electricity to lines that have been downed or shut off as a quick way to re-power the lines. These recloser pulses are a known wildfire risk when conditions are too dry. TAC at 169.

-21-

that most would be taken out of service by the end of
the year with the final six reclosers to be taken out
of service in 2016.

4.  On October 6, 2016, PG&E issued its 2016 Corporate
    Responsibility and Sustainability Report that ensured
    investors (and potential investors) again that its
    vegetation management and power line inspection
    practices complied with relevant laws.

5.  On August 9, 2017, PG&E issued its 2017 Corporate
    Responsibility and Sustainability Report that ensured
    investors (and potential investors) that its
    vegetation management practices complied with state
    and federal laws, in particular pruning and removing
    trees that grow too close to powerlines.

The TAC and the RKS Amendment both sufficiently allege that
these statements were false by using PG&E's own corrections,
including statements made by PG&E on May 25 and June 8, 2019,
that disclosed PG&E had violated multiple relevant laws at
multiple points in time.  The TAC and RKS Amendment further
sufficiently allege that Cal Fire found sufficient evidence of
PG&E's noncompliance; and that during criminal proceedings (CR-
14-0175-WHA (N.D. Cal.) Judge Alsup determined that "as of 2017,
there were 3,962 unworked trees PG&E had identified in 2016 as
hazardous with the potential" to fall into power lines,
conductors, and other PG&E equipment; and that other findings
from Judge Alsup and the Butte County DA establish that it was
PG&E's inspection failures, and failure to actually complete its

-22-

reclosure disabling program, that substantially contributed to, if not outright caused, the North Bay and Camp Fires.

The Omnibus Objections are overruled as to these five misstatements.

The next three alleged misstatements or omissions relate to PG&E's announcements that it raised common stock dividends due in large part to PG&E's progress and commitment to its safety programs:

6. On May 23, 2016, PG&E issued a press release titled "PG&E Corporation raises Common Stock Dividend, Highlights Progress at Annual Shareholder Meeting." That press release linked the increase to bringing PG&E's dividend in line with other utilities, and touted "continued progress on safety, reliability, and other goals . . .[former PG&E CEO] Earley said, 'We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history.'"

7. On November 4, 2016, PG&E hosted a conference call for analysts, during which call an executive stated "the improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward."

8. On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Shareholders Elect Forer Secretary of Homeland Security Jeh C. Johnson to Boards of Directors." In

-23-

addition to announcing the raised dividend, the release discussed remarks made by the CEO of the company at the annual shareholders meeting that highlighted the company's progress on safety among other goals, and "commitment to safety and operational excellence."

As investors, and the public, now know, PG&E had been neglecting safety standards and practices over decades, including the six years leading up to statements made in 2016. PG&E was either not implementing those safety practices as touted, or was potentially willfully ignoring those stated safety practices, while explicitly tying increased share prices to enhanced safety practices in the above statements.

These statements are sufficiently plead as misleading, and the Omnibus Objections will be overruled as to these statements.

After the North Bay Fires in 2017, PG&E reiterated its compliance with federal and state requirements in five statements:

9.   On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts" that stated "PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation."

10. On November 2, 2017 in a conference call with analysts, PG&E's current CEO stated that PG&E performed regular tree inspections in accordance with industry standards; that PG&E has "one of, if not, the most comprehensive vegetation management programs in the country;" that "every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed;" that wood treatment is performed as needed; that vegetation management work has been expanding since 2014; and that efforts doubled in 2016.

11. On the same conference call, further assurances to analysts were made that PG&E does patrols of overhead lines at least twice per year and as often as four times per year.

12. On November 5, 2017, in an article on its public facing website, pgecurrents.com, titled "Facts about PG&E's Wildfire Prevention Safety Efforts," PG&E ensured the public that the utility "meets or exceeds all applicable federal and state vegetation clearance requirements."

13. On May 25, 2018, in a press release issued in response to Cal Fire reports on the 2017 North Bay Fires, PG&E detailed safety practices and again stated that the utility "meets or exceeds regulatory requirements for pole integrity management" via a comprehensive database and inspection schedule.

-25-

For the reasons outlined above discussing the allegations that contradict PG&E's statements that it increased safety practices and complied with state laws, these statements are sufficiently plead as misleading and the Omnibus Objections to them are overruled.

Finally, the last six alleged statements after the North Bay Fires related to compliance with wildfire safety regulations, including PG&E's state-mandated electricity shutoff protocol:

14. On June 8, 2018, shortly after Cal Fire announced its conclusions that PG&E caused a preponderance of the North Bay Fires, PG&E issued a press release titled "PG&E Responds to Latest CAL FIRE Announcement" reiterating that "PG&E meets or exceeds regulatory requirements for pole integrity management" and that its Vegetation Management Program was "industry leading[.]"

15. The same release also stated that the prior year it launched the Community Wildfire Safety Program "to proactively turn off electric power for safety when extreme fire danger conditions occur."

16. On September 27, 2018, PG&E announced on its website and filed with the CPUC its new, legally required ESRB-8 Shutoff Protocol, listing the specific criteria it would use to determine when electricity shutoffs were necessary to prevent wildfires.

17. On October 9, 2018, after Cal Fire announced PG&E's fault for causing the Cascade Fire in 2017, PG&E

-26-

released a press release titled "PG&E Responds to Cascade Wildfire Announcement" reiterating its focus on increasing safety measures "such as working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, making lines and poles stronger in high threat areas" among other precautions.

18. In the same press release, PG&E again touted its Community Wildfire Safety Program that would proactively shut off electric power in extreme fire conditions.

19. On November 9, 2018, the day the Camp Fire started, PG&E announced via its official Twitter.com account at 6:14 a.m. that it "will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as weather conditions did not warrant this safety measure."

The statements touching on general safety measures have been discussed above, and the TAC and RKS Amendment allege facts to establish that the Community Safety Program touted in the above statements was subsequently ignored in the exact conditions set forth by PG&E, leading to the Camp Fire. The statements are plausibly alleged as misleading and false.

The TAC and RKS Amendment also plausibly allege that none of these statements were true at the time of making them, and PG&E knew this—Judge Alsup called PG&Es' vegetation management practices "dismal" during its criminal proceeding; critical failures that led or contributed to the North Bay fires had not

-27-

been checked since 2014 or were caused by a nearly 100 year old pole that PG&E noted was in need of replacement in the case of the Camp Fire. Cal Fire and a criminal proceeding found that PG&E did not comply with, but rather violated multiple state regulations, and a PG&E Vegetation Program Manager admitted in April 2017 that the utility had not changed or expanded its vegetation management practices since the Butte Fire took place in 2015.

In short, the misleading statements as plead by the TAC and PERA are plausible and pass the threshold for dismissal. PG&E's Omnibus Objections regarding these statements are overruled.

The RKS Amendment goes beyond the TAC, adding eight alleged misstatements regarding wildfire safety practices:

1. On March 2, 2018, PG&E released a YouTube video in which a PG&E arborist touts the company's vegetation management practices and states "since the onset of the drought we've doubled our efforts." The video description states the video was paid for "by PG&E shareholders."

2. On March 22, 2018, PG&E issued a press release announcing its new Community Wildfire Safety Program, stating that the program will "do more over the long term to harden the electric system to reduce wildfire threats" including by "investing in stronger, coated power lines, spacing lines farther apart to prevent line-on-line contact during windstorms, and replacing wood poles with non-wood poles in the coming years."

-28-

The statement also touted an augmentation of "already rigorous vegetation management practices."

3. On March 27, 2018, PG&E issued a press release touting its "industry-leading Vegetation Management Program, [in which] the company inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times."

4. On May 3, 2018, during a conference call with analysts regarding PG&E's financial outlook for the first quarter of 2018, PG&E's then CEO stated that the company had more than doubled its annual spending for vegetation management and increased frequency of patrols.

5. On July 16, 2018, PG&E's Chief Operating Officer Nickolas Stavropoulos stated "over the last seven years, we have accomplished so much together on our journey to become one of the safest, most reliable energy companies in the country. As a team, we've worked to improve our culture, upskill our people and, most importantly, improve public and employee safety."

6. On September 27, 2018, in addition to the safety measures alleged by the TAC, PG&E's website and ESRB-8 Shutoff Protocol included the implementation of "[d]isabling [of] automatic reclosing of circuit breakers and reclosers[.]"

-29-

7.    On October 1, 2018, PG&E applied to FERC for
      revisions to its "Transmission Owner Tariff."  Part
      of that application was written testimony from PG&E's
      Senior Director of Transmission Asset Management
      stating that "PG&E is currently implementing four
      mitigations to reduce overhead conductor risk." Those
      mitigations described in the written testimony
      included increased insulator and conductor
      replacement.  The testimony also discussed
      replacement of deteriorated towers.

8.    On November 5, 2018, just days before the Camp Fire
      erupted due to PG&E's failure to shut off power in
      extremely dangerous conditions, during a conference
      call PG&E's then-CEO again touted its public safety
      shutoff program as part of a larger comprehensive
      safety program targeting wildfire areas.

The July 26, 2018 statement of Mr. Stavropoulos (No. 5) has no source, there is no context of the statement, whether it was public, widely disseminated, or meant for investors.  It also appears to be a general statement of pride at the company striving on a "journey" to become one of the safest energy companies in the country.  This lack of sourcing and superlative language places this statement in the realm of general puffery and is not a properly plead as a misrepresentation or false. All other statements, however, are sufficiently plead for all the reasons explained above in relation to other similar alleged misstatements by the TAC and the RKS Amendment.

-30-

PG&E argues that any of its statements regarding compliance "are reasonably interpreted to mean the PG&E's programs were designed to comply with the law, and not a warranty that at all times PG&E was compliant." Meaning that, PG&E's repeated statements that it met or exceeded state regulations was simply the company expressing an "opinion that it's program was designed to comply with the law," rather than a factual statement of its compliance. PG&E relies heavily on the analysis of *Edison I* and *Omnicare, Inc. v. Laborers Dist. Council Cont. Indus. Pension Fund*, 575 U.S. 175 (2015) to then argue that there are more stringent standards of pleading for such opinion statements. Given this more stringent standard of pleading, PG&E argues that almost all the statements relating to safety compliance are improperly plead.

The Supreme Court in *Omnicare* distinguishes opinion and fact statements, noting that "[m]ost important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* at 183. *Omnicare* stated repeatedly that "we believe we are obeying the law." *Id.* at 186. The Supreme Courted that these were statements of belief on the part of the defendant, meaning that they were statements of opinion and not fact. *Id.*

There are no such qualifiers in any of the alleged misrepresentations above (aside from Mr. Stavropoulos' statement, which the court agrees should be stricken). The court disagrees that the statements were that of opinion or that a higher pleading standard must be applied.

-31-

PG&E has argued that the court should make a statement-by-statement analysis of what they called the False and Misleading Statements Alleged in the TAC: the Camp Fire Allegations; and the False and Misleading Statements Alleged in the RKS Amendment. (Dkt. 14200-1 at 1-12; Dkt. 14203-1, at 1-5). The court will not follow the specific request because it does not consider the PSLRA to be controlling, and because it believes the analysis performed above in grouping like statements is sufficient. That said, it is worth noting that PG&E almost entirely challenges the statements for being insufficiently plead. As noted above, they are not. Statements relating to investor calls, PG&E says, were solely a "general statement of effort, corporate optimism or puffery" which are by law, not misleading and allowable. PG&E's Objection to the October 1, 2018 statement relating to the FERC application argues that the statement was not a guarantee of compliance when taken in context with the rest of the statement to FERC; that the statement was not false when made; and that PG&E had no duty to disclose unproven violations.

Repeated statements regarding all-important safety practices and standards, considering an alleged reality in which safety measures were continually and willfully underfunded or ignored, are not simply puffery or not misleading when taken in a broader context. PG&E's argument for further context from is, a cry for further discovery and fact-finding to fully flesh out that context, all which must be accomplished after this pleading stage.

Except for the statement by Mr. Stavropoulos, all the Omnibus Objections based on the Falsity component of Exchange Act claims are overruled.

**B.  Scienter**

The TAC recounts PG&E' own admissions in its criminal proceedings that it "admitted its actual knowledge from 2015 to 2017 that its vegetation management practices did not comply with California safety regulations on the order of thousands of violations per year." TAC at 119.  For the purposes of the pleading stage, the court can and will stop here.  The PG&E own admitted knowledge that it did not comply with safety regulations is enough to plausibly plead that those statements to the contrary were made with scienter.

The RKS Amendment further describes other California utilities disabling reclosers, and PG&E officials telling the California legislature in 2015 that the utility would complete a project to disable reclosers by sometime in 2016.  These statements are directly contradicted by a non-disabled recloser being an ignition point of at least one the North Bay Fires in 2017.  Such statements in the face of the complete opposite actions are enough to plausibly plead that those statements to the contrary were made with scienter.

Further, both the TAC and RKS Amendment allege that PG&E's lack of safety compliance was well known within the company, that the CPUC uncovered widescale falsification of safety records, and PG&E's ultimate guilty plea in its criminal case all establish scienter.  These assertions are all plausibly alleged at this stage.

-33-

All the Omnibus Objections based on the Scienter component of Exchange Act claims are overruled.

**C.   Reliance (for Purchasers after October 17, 2017)**

**i.   Reliance based on the fraud-on-the-market presumption is adequately plead, and rebuttal evidence is not appropriate at the dismissal stage.**

Both the TAC and the RKS Amendment allege that (1) a rebuttable presumption of reliance is established based on the fraud-on-the-market-doctrine and (2) a presumption of reliance based on PG&E's omissions of fact regarding known safety failures is established. First, the fraud-on-the-market doctrine posits that:

> "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations. Because the market transmits information to the investor in the processed form of a market price, we can assume . . . that an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market."" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)) (internal quotations omitted).

To establish the presumption, "plaintiffs must demonstrate that the alleged misrepresentations were publicly known (else how would the market take them into account?), that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." *Halliburton*, 563 U.S. at 811.

Here, the TAC pleads that the statements were made via press releases and investor calls and were thus publicly known; that the stock traded on the New York Stock Exchange, an

-34-

unquestionably efficient market; and that the relevant
transactions were made during the Class Period of April 29,
2015, through November 15, 2018, when the alleged
misrepresentations were made, and the truth was revealed.

PG&E seeks to rebut this presumption with the truth-on-the-
market doctrine. While some courts call this a doctrine and
some a defense, the heart of the concept is that "if, despite
[defendants'] allegedly fraudulent attempt to manipulate market
price, [the truth] credibly entered the market and dissipated
the effects of the misstatements, those who traded ... after the
corrective statements would have no direct or indirect
connection with the fraud." *Basic*, 485 U.S. at 248-49.
"However, any material information which insiders fail to
disclose must be transmitted to the public with a degree of
intensity and credibility sufficient to effectively counter-
balance any misleading impression created by the insiders' one-
sided representations. Accordingly, the truth-on-the-market
defense is intensely fact-specific, so courts rarely dismiss a
complaint on this basis." *Brendon v. Allegiant Travel Co.*, 412
F.Supp.3d 1244, 1257 (D. Nev. 2019) (citing *In re Apple Computer
Sec. Lit.*, 886 F.2d 1109, 1115 (9th Cir. 1989); *In re Amgen Inc.
Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008)
(internal citations omitted).

PG&E's heavily fact laden rebuttal demonstrates why
evaluation of this defense is inappropriate at the dismissal
stage and indicates that the parties' presentation and
interpretation of facts are so far apart that a court needs to
weigh those facts, which is not appropriate at the pleading

-35-

stage. The TAC and RKS Amendment argue that PG&E's misleading statements and omissions led the investing (and general) public to believe that PG&E had robust and ever-improving safety policies that met or exceeded state standards, and that any fires PG&E was connected to were unfortunate but not caused by PG&E's lack of compliance with the law. The truth that was hidden from that investing public was that PG&E had hidden its subpar and noncompliant safety practices, and that the many fires from 2015 onwards did not ignite despite PG&E's safety practices, but largely because of them. PG&E's rebuttal dodges that distinction, and instead rests on the reporting that the potential for PG&E's financial liability for the North Bay Fires had been known since October 2017.

Which doctrine (and underlying theory of the market) will win out is for another day, when this court is able to find and weigh facts. Until then, the Omnibus Objections based on the truth overcoming fraud-on-the-market theory of reliance are overruled.

### ii. Reliance based on the *Ute* Line of Cases is not properly plead.

The line of cases borne out of *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) creates a presumption of reliance on a defendant's failure to disclose material facts that it had a duty to disclose. This presumption cuts out the difficulties of the attempts to prove a negative. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). The Ninth Circuit has "held that the presumption should not be applied to cases that allege both misstatements and omissions unless the

-36-

case can be characterized as one that primarily alleges omissions." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 2 F.4th 1199, 1204 (9th Cir. 2021) (quoting *Binder*, 184 F.3d at 1064) (internal quotations omitted).  Courts in the Ninth Circuit must characterize any action invoking this presumption as "primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case (where the presumption would be unavailable)." *Volkswagen*, 2 F.4th at 1204.

As discussed above, the TAC alleges nineteen affirmative misstatements, all of which elide the alleged truth that the safety standards and programs touted by PG&E were not what PG&E made them out to be.  Even at the pleading stage, by the TAC's own language, these are misstatements, not omissions.  The presumption, afforded one conclusory sentence in the TAC and RKS Amendment (TAC at 142; RKS Amendment at 186), is not sufficiently plead and the presumption is unavailable to claimant.  Accordingly, the Omnibus Objections on reliance based on the *Ute* line of cases are sustained.

### D.  **Cause**

The TAC alleges nine specific events of market price decline, the first being on October 12, 2017:

#### 1.  **October 12, 2017**

On October 11, 2017, days after the North Bay Fires erupted, the closing price of PG&E shares was **$69.15.**  The next day, on October 12, a litigation letter sent from the CPUC to PG&E directing the company to preserve all evidence of the potential cause of the fires, "includ[ing] all failed poles,

-37-

conductors, and associated equipment from each fire event" was made public. The letter also directed PG&E to preserve all communications related to "vegetation management, maintenance and/or tree trimming." At the close of the day, PG&E's stock price dropped to **$64.50,** with unusually heavy trading volume of 13 million shares when a typical trading day would involve a volume of around 3.5 million. Even so, at this point the stock remained artificially inflated.

The letter, which apparently caused the drop in stock price, is alleged only to be a protective/investigatory letter to PG&E after the devastating fires, but not an indicator either PG&E was indeed the cause of the fires or had been lying to shareholders and the general public regarding safety practices. The affected claimants do not plausibly allege that this price drop is due to the truth regarding any misleading statement by PG&E coming to light. Stated otherwise, there is no allegation that links the price drop to any misleading or false statements by PG&E.

Accordingly, the Omnibus Objections as to this price drop are sustained.

### 2. October 13-16, 2017

PG&E's share price opened at **$63.95** on October 13, 2017. That day, PG&E filed a form 8-K with the SEC regarding the investigation of the North Bay Fires. In that disclosure form, PG&E stated that Cal Fire is investigating the fires, as well as PG&E's connection to the fires. The disclosure noted PG&E's $800 million in liability insurance for potential losses and

-38-

that any liability beyond that amount could materially affect business and/or operations.

Market analysts regarded the disclosure of previously undisclosed liability insurance as a slow trickle from PG&E that it indeed expected to be held liable, at least in part, for the fires. By the opening of the next trading day on October 16, 2017, stock prices had dropped to **$53.43** per share with unusually heavy trading.

The affected claimants plausibly allege that this price drop is associated with the new knowledge that PG&E expected to be held liable for the fires, though at this point the public did not know why PG&E held this expectation.

Accordingly, the Omnibus Objections as to this price drop are overruled.

### 3. December 20, 2017

On this day, PG&E stock was **$51.12** per share. After the day's trading had closed, PG&E issued a press release stating that it was suspending quarterly dividends on common stock and suspending dividends on preferred stock, given potential liability for the wildfires during an ongoing investigation and noting that under California law, the utility may be held liable for causing the fires even if it had complied with applicable laws. By the following trading day, share prices had fallen to **$44.50.**

This suspension appears to have been made because PG&E recognized potential liability, even if no wrongdoing were to be found, was likely, and there does not appear to be a causal link between the price drop any misleading statements or omissions

-39-

Accordingly, the Omnibus Objections as to this price drop are sustained.

### 4. May 25, 2018

On this day, PG&E stock was $**44.66.** Cal Fire released a report stating there was evidence PG&E was the cause of four North Bay Fires, and that in three of those fires, the cause was PG&E's violation of state regulations regarding vegetation management. The next day, PG&E filed a form 8-K Current Report with the SEC largely quoting from this report. By the end of the **29th,** stock price had fallen to **$42.34,** which was still over-inflated per the TAC.

The TAC plausibly alleges this disclosure and drop in stock price is in direct relation to findings that PG&E both caused fires and violated state law in practices that led to the fires.

Accordingly, the Omnibus Objections as to this price drop are overruled.

### 5. June 8, 2018

On this day, PG&E stock closed at **$41.45** per share. After the markets had closed, Cal Fire released a report finding PG&E responsible for twelve fires that erupted across Northern California in 2017, due to alleged violations of state law, and due to attempts to re-energize downed power lines, which sparked the fires. The report further stated that the investigation would be turned over to appropriate county district attorneys due to the alleged violations of state law. The next trading day, shares dropped to **$39.76.**

The TAC plausibly alleges the disclosure and drop in stock price is in direct relation to findings that PG&E caused fires

-40-

and violated state law in practices that led to the fires, including practices of re-energizing utility poles automatically, when previous statements by PG&E that it would have removed all reclosures (that are the mechanism for said pole re-energization) in 2016.

Accordingly, the Omnibus Objections as to this price drop are overruled.

### 6. November 8-9, 2018

Early on November 8, the devastating Camp Fire erupted. PG&E admitted later that day that it did not follow its safety shutoff protocols (those very safety protocols touted to the public and investors earlier in the year). Late in the day, PG&E also filed a report with the CPUC that early that day it had experienced a problem with its Caribou-Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen minutes before the Camp Fire began, "in the area of the Camp Fire." The report also acknowledged aerial patrol visuals from that day showed damage to the pole. As the news of the report spread, PG&E shares dropped by the closing of the markets on November 9, 2018, from **$47.80** per share to **$39.92**.

The TAC plausibly alleges that the market drop was due to PG&E's damaged poles and the fires resulting therefrom and failure to follow safety practices.

Accordingly, the Omnibus Objections as to this price drop are overruled.

### 7. November 9-12, 2018.

As noted above. By the end of November 9, 2018, PG&E stock was **$39.92** per share. As the Camp Fire continued to burn across Paradise, CA, reports emerged that PG&E knew the pole that may

-41-

have caused the fire was "sparking" and still did not shut off power to that line. Upon the spread of the fire, and of the reporting on the sparking pole, at the end of November 12, the stock was trading at **$32.98** per share.

The TAC plausibly alleges that the market drop was due to PG&E's knowingly damaged poles and failure to follow safety practices considering that knowledge.

Accordingly, the Omnibus Objections as to this price drop are overruled.

### 8. November 13-14, 2018

As noted above, by November 13 PG&E stock was trading around **$32.98** per share. Then, PG&E released an updated SEC filing admitted that its revolving credit facilities were tapped and, if found liable for the Camp fire, its liability would outstrip its insurance coverage. By the end of November 14, stock prices fell to **$25.59** per share.

It appears that this market adjustment comes from a statement on finances, and not in relation to any revealed wrongdoing of PG&E. The TAC does not plausibly allege that this price drop was due to a market reaction to PG&E's newly revealed wrongdoing.

Accordingly, the Omnibus Objections as to this price drop are sustained.

### 9. November 15, 2018

On this day Cal Fire announced it had identified a second ignition point of the Camp Fire that was also likely PG&E's responsibility. PG&E's stock closed at **$17.74** that day.

The TAC plausibly alleges that the market drop was due to news that PG&E was likely responsible for not just one, but two ignition points of the Camp Fire.

-42-

Accordingly, the Omnibus Objections as to this price drop are overruled.

PG&E argues the TAC does not establish loss causation, as the burden was on PERA to "to allege that the market learned and reacted to those [false statements and omissions] themselves. This reaction, in turn, must be the cause of a plaintiff's loss." (internal citations omitted). PG&E goes on to state that none of the successive disclosures show that the market "learned and reacted to the 'very facts' allegedly misrepresented in any of the challenged statements."

Very generally, first and third price drops as plead, markets were reacting to the fires themselves and disclosures of previously available information, and not disclosures of previously hidden or unrelated information. From the fourth price drop onward (excepting the eighth drop, which was an acknowledgment of financial precarity alone), the TAC plausibly alleges that the price drops were connected to disclosures of previously hidden information or information that contradicted PG&E's own previous statements regarding safety practices and state law compliance.

Accordingly, aside from objections to one alleged misleading statement and price drops that are sustained as explained above, the Omnibus Objections to the TAC and RKS Amendment's Section 10(b) and Section 20(a) claims (which are entirely derivative of the 10(b) claims) and the RKS' Amendment's Section 10(a)-(c) claim under the Exchange Act are overruled.

## VI. MERITS – COMPONENTS OF SECURITIES ACT CLAIMS

Section 11 of the Securities Act prohibits the publication of registration statements that "contain[] an untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 15 of the Securities Act allows for control person liability—that is, any person or entity who controls an entity liable under Section 11 of the Securities Act, is liable to the same extent as the entity it controls. 15 U.S.C. § 77o. As Section 15 liability is ultimately dependent on findings of Section 11 liability, the court only focuses on Section 11. A plaintiff seeking relief under Section 11 of the Securities Act must have "purchased shares traceable to the allegedly defective registration statement." *Slack Technologies LLC v, Pirani*, 598 U.S. 759, 770 (2023), and that the registration statement contained materially misleading statements or omissions. 15 U.S.C. § 77k(a). The Securities Act is "narrower" than the Exchange Act and focused "primarily on the regulation of new offerings." *Id* at 762 (internal quotations and citations omitted).

Because a successful Section 11 claim largely depends on the misrepresentations of specific offerings, it is important to remember that the specific offerings are from March 2016 (Notes Offering); December 2016 (Notes Offering); March 2017 (Notes Offering); and April 2018 (Exchange Offering, specifically an offer to exchange restricted notes from an unrelated private placement in 2017 for equivalent publicly traded notes).

PG&E's challenge to the Securities Act claims set forth various separate grounds for sustaining them. The court has

-44-

already discussed PG&E's arguments regarding the statute of limitations and release of certain bond issues above. The court addresses the remaining components of the claims so challenged below.

**A. Falsity**

As a gating issue, PG&E insists, as with the Exchange Act claims, that the Section 11 claims are subject to the heightened pleading standards of Rule 9(b) because the alleged false and misleading statements sound in fraud. The court disagrees:

> Whether Rule 8(a) or 9(b) is triggered turns on the type of claim alleged (*i.e.,* the cause of action) rather than the factual allegations on which that claim is based. . . . Rule 9(b) only applies to claims that fall under the category of fraud or mistake. Because a Section 11 claim is not a fraud claim, Rule 8(a) applies. That the same factual allegations also give rise to a Rule 10b-5 claim is irrelevant to this analysis.

*In re Initial Pub. Offering Sec. Lit.*, 241 F.Supp 2d 281, 341-42 (S.D.N.Y. 2003).

Exhibit A of the TAC lists the alleged thirty-four false and misleading statements (and inferences of omissions) embedded in the Offering Documents upon which the Section 11 claims are based. The TAC bases its Section 11 claims on negligence, not fraud, and asserts that the statements regarding safety practices were false at the time when made and omitted that any increase in spending on such practices was dangerously inadequate due to PG&E's long-term neglect of such practices.

The RKS Amendment includes the same alleged false and misleading statements and inferences of omissions embedded in the Offering Documents. Like the TAC, the RKS Amendment

-45-

emphasizes, as will be discussed below, that the statements in the Offering Documents were misleading because the potential risks to investors identified in the Offering Documents had already materialized. Because the same alleged misstatements are asserted by both the TAC and RKS Amendment, references to the TAC or related documents should also be taken to reference the RKS Amendment and related documents.[15]

PG&E argues that statements concerning investment in its wildfire safety programs were not false and thus not actionable; that investors knew the risk of wildfires and the Offering Documents themselves referenced the Butte Fire as an example of wildfire risk; and that allegations that the Offering Documents were misleading because they did not disclose that PG&E's safety practices had already increased the risk of wildfires, are premised entirely on conclusions not reached until after late 2018 and 2019, meaning that the TAC fails to allege facts to show the disclosures were false when made. PG&E also argues that the Offering Documents incorporate by reference various 10-Q statements filed with the SEC that do describe real-time findings that PG&E caused certain fires, and its mounting liabilities due to those fires—meaning that there can be no misleading statements when there are documents available to investors that did reveal the truth.[16]

---

[15] The court declines to restate each alleged misstatement, and notes PG&E declined to engage in such an analysis as well.

[16] The entirety of the 10-Q statements, among other documents are found in PG&E's voluminous Request for Judicial Notice (RJN) (Dkt. 14208). PERA and RKS object to the RJN for a variety of reasons (Dkts. 14343 and 14353, respectively), namely that the documents in the RJN reach beyond the four corners of the

-46-

As for statements emphasizing increases in vegetation management and other safety practices, the Securities Plaintiffs' Opposition explains those statements "were verifiably inconsistent with and contradicted by material adverse facts that existed at the time . . ." (Dkt. 14342 at 74; see also RKS Amendment at 115). For example, internal emails from 2014 noted "the likelihood of failed structures [on the power line that caused the Camp Fire] happening is high," because the Company never replaced those structures. The court agrees that such statements created an impression that was inconsistent with real-time information. *See In re Quality Sis. Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) (finding that statements from officers that were inconsistent with real-time financial information was materially false or misleading). This, along with pleadings in the TAC alleging that PG&E had allowed its vegetation management budget to "wither" and promoted financial incentives for field workers that discouraged active vegetation management, there is enough inconsistency alleged between the Notes Offerings real-time information that the statements are plausibly alleged as misleading.

Regarding the Offerings Documents' reference to the Butte Fire as an example of wildfire risk already known to investors, the reference was one parenthetical example of risks that could impact future financial results of the offered notes, that also included drought, climate change, natural disasters, acts of

complaints underlying the claims and thus should not be considered at the dismissal stage. The court agrees with PG&E that the documents contained in the RJN are properly considered at the pleading stage, as the TAC and RKS Amendment necessarily reference such documents.

-47-

terrorism, war, and vandalism (TAC, Ex. 1). This rebuttal from PG&E obfuscates the thrust of the TAC. The issue is not that wildfires out of anyone's control ignited. The allegation is that it was PG&E's practices that increased the risk of, or was the cause of, such fires. Whether the merits of the allegations bear out is a question for later, but the allegation itself is plausible.

PG&E argues that certain statements inadequately plead falsity because the falsity or misleading nature of the statements were "premised entirely on conclusions reached in December 2018 and later in 2019." The situation is akin to *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949-50. In *Facebook*, the Ninth Circuit concluded that plaintiffs had adequately plead that Facebook's risk statements regarding third party security breaches in its notes offerings were false or misleading. *Id.* In reaching this conclusion, the Ninth Circuit stated: "Facebook's statement was plausibly materially misleading even if Facebook did not yet know the extent of the reputational harm it would suffer as a result of the breach: Because Facebook presented the prospect of a breach as purely hypothetical when it had already occurred, such a statement could be misleading even if the magnitude of the ensuing harm was still unknown." *Id.* Here, the risk was PG&E's diminished safety practices already increasing the risk of (and causing) wildfires. The statements are alleged to be misleading because the Offering Documents present this risk as a hypothetical, when PG&E knew at the time the risk had already arisen.

-48-

Regarding PG&E's argument that the Offering Documents' incorporation by reference of various 10-Q statements that went into more detail about PG&E's past actions and liabilities, the 10-Q statements appear to contradict, as opposed to supplement the Offering Documents as presented. Where the Offering Documents present potential risks, the 10-Q statements discuss realities. Whether this incongruence between the 10-Q filings and the rest of the Offering Documents weighs in favor of PG&E or the claimants is appropriately decided at a later stage of litigation. As of now, especially considering such incongruity, the statements of the Offering Documents are plausibly alleged as misleading for the reasons outline above.

Accordingly, the TAC and RKS Amendment plausibly allege that the Offering Documents contained misleading statements and omissions.

For similar reasons, allegations that PG&E violated Regulation S-K under the Securities Act are plausibly alleged. These SEC Rules require notes issuers to disclose "known trends and uncertainties," 17 C.F.R. § 229.303(a)(3)(i)-(ii) (currently § 229.303(b)(2)(ii)) and within its own caption titled "'Risk Factors' [provide] a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). PG&E may have disclosed the trend of climate change and increasingly dry conditions, but not the trend of prolonged lack of investment in safety, which the TAC plausibly alleges was a known practice by PG&E over many years leading up to the proposed Class Period in the TAC which

-49-

could have made the offerings more speculative or risky than initially disclosed.

Accordingly, the Omnibus Objections regarding falsity in the Offering Documents under various portions of the Securities Act are overruled.

## B. **Reliance by Certain Claimants**

PG&E argues that certain claimants, whom PG&E terms "after-market purchasers", fail to plead reliance as required of such purchasers, citing 15 U.S.C. 77k(a); *In re Metro.Sec. Litig.*, 532 F.Supp.2d 1260 (E.D. Wash. 2007); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 977 (8th Cir. 2002) (explaining that alleging reliance is "a requirement for certain aftermarket purchasers").

Establishing reliance is a requirement for plaintiffs who purchased the security in question "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. 77k(a). The affected claimants argue that "Rule 8 does not require plaintiffs to plead the elements of a claim" including reliance, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 342. Thus, the element of reliance is not gating at the pleading stage in this case. When reliance must be proven, the affected claimants will need to do so through legitimate inferences of reliance on the face of the TAC. In other words, the TAC argues that the issue of reliance is a matter of proof they must sustain, not a burden of pleading at this point, and is thus not an issue to be decided at this time.

-50-

Likewise, RKS Claimants argue that 75% of its purchasers have no statutory requirement of reliance at all, as the Notes purchases were made within twelve months of the Notes Offerings. Because PG&E's challenge as to reliance applies only to a small subset of RKS Claimants, RKS argues this issue of reliance should be disposed of on a claimant-by-claimant basis after discovery has been completed.

The court agrees with the Securities Act Claimants and RKS. Given the omnibus nature of the objections process that was proposed by PG&E and the very few claimants that must prove reliance, "this is precisely the kind of issue that lends itself to a full claimant by claimant factual record before disposition." (RKS Amendment, Dkt. 14353 at 85). Further, the court cannot penalize the affected claimants for not pleading an element that is not required by Fed. R. Civ. P. 8.

Accordingly, PG&E's attempt to eliminate certain claimants for failure to plead reliance fails and the Omnibus Objections based on failure to plead reliance are overruled. Those claimants who must prove reliance as to their claims may do so as a part of their proof at trial or on any dispositive pre-trial motion.

### C. **Claims Based on the 2018 Exchange Offering**

As noted above, the April 2018 Offering was an Exchange Offering, exchanging restricted private notes for public notes. PG&E argues that because the basis of exchange was for private notes, and Section 11 liability is not available for private offerings, claims based on the 2018 Exchange Offering fail as a matter of law. *See In re Levi Strauss & Co. Sec. Litig.*, 527

-51-

F.Supp. 2d 965, 975 (N.D. Cal. 2007). "Because the unregistered bondholders had already invested in [unregistered] bonds through the [private] offerings, they were not presented with the decision of whether or not to purchase [registered] bonds pursuant to the registration statement." *Id.* at 978.

The affected claimants argue that simply because a claimant Plaintiff participated in an exchange of previously purchased private notes for public notes in an Exchange Offering does not negate standing to bring a claim relating to misleading statements in the registration documents for that Exchange Offering. *See Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 862 (9th Cir. 2013) (plaintiff has standing if "misrepresentations contained in the Registration Statement played a role in the causal chain that resulted in the exchange of stock"). This court will follow the more recently articulated and binding precedent of Ninth Circuit as articulated in *Hildes*.

Accordingly, PG&E's attempt to eliminate claims based on the 2018 Exchange Offering fails and the Omnibus Objections based on this theory are overruled.

**D. Doctrine of "Negative Causation"**

PG&E alleges the doctrine of "negative causation" negates any statutory damages that may be available to the affected claimants meaning no economic loss can be established. The doctrine of negative causation limits statutory damages if the defendant proves the depreciation of the security in question arose from something other than the alleged misstatement or omission. "The burden to prove negative loss causation is heavy." *See, e.g. Fed. Hous. Fin. Agency v. Monura Holding Am.,*

-52-

*Inc.*, 873 F.3d 85, 153 (2nd Cir. 2017). It is thus not appropriate to evaluate an affirmative defense regarding loss causation at the pleading stage, and the court will not do so until the appropriate stage of litigation.

Accordingly, PG&E's Omnibus Objections based on failure to sufficiently plead economic loss due are overruled.

### E. <u>Statutory Damages</u>

Damages for Section 11 claims are calculated in one of three ways, "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public)" and either (1) the value of the security at the time of filing suit; (2) the value the security was disposed of before filing suit; (3) or the amount the security was disposed of after filing suit but before judgment was rendered (with caveats). 15 U.S.C. § 77k(e).

PG&E argues that while at the time of filing, there was a temporary dip in securities values, the notes at issue have since either been paid in full or were reinstated, meaning that the value of the notes has not changed and there are no statutory damages to be had.

The affected claimants argue damages are a remedy, not an element of the cause of action, and that the question of damages is so fact-intensive that it is not an appropriate question at the pleading stage. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp. 2d 1132, 1169 (C.D. Cal. 2008) ("So long as the other allegations in the complaint (and matters of which a court may take judicial notice) do not conclusively demonstrate that plaintiffs cannot prove a loss, the complaint survives a

-53-

motion to dismiss. The statute, the Ninth Circuit, and the Supreme Court do not require more."). The court agrees with this rebuttal. While it may be that they cannot prove a loss in the face of confounding factors of price drops, and PG&E has not conclusively demonstrated that a loss cannot be proven. This is a fact-finding issue not appropriate for the pleading stage.

Accordingly, the Omnibus Objections based on failure to plead damages or loss are overruled.

**VII.** **CONCLUSION**

For the foregoing reasons, the 33rd Omnibus Objection and the 34th Omnibus Objection are OVERRULED IN PART AND SUSTAINED IN PART. Promptly after the issuance of this Memorandum Decision, the court will issue specific orders disposing of those Omnibus Objections for the reasons stated here.

The court will conduct a status conference on these matters on **October 22, 2024 at 10:00 AM.** The purpose of that conference will be to discuss with counsel the further conduct of the remaining securities fraud claims asserted by PERA and RKS. Prior to that time, counsel should meet and confer to discuss such matters as discovery, motions, whether any mediation efforts should be coordinated with the mediation the district court has ordered and other matters as appropriate.

One week prior to the status conference, the parties should submit updated reports concerning unresolved claims filed in their respective June 21, 2024, submissions (Dkts. 14497, 14499, and 14500).

**\*\*END OF MEMORANDUM DECISION\*\***

Case: 19-30088    Doc# 14593    Filed: 09/18/24    Entered: 09/18/24 11:39:27    Page 54 of 58

**Partial Glossary of Defined Terms**

| Defined Term | Definition |
|---|---|
| Alleged Relevant Period | April 29, 2015, through November 15, 2018 |
| District Court Action | *In re PG&E Corporation Securities Litigation*, No. 5:18-cv-03509 (N.D. Cal.) |
| *Edison I* | *Barnes v. Edison Int'l*, No. CV 18-09690 CBM, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021) |
| *Edison II* | *Barnes v. Edison Int'l*, No. 21-55589, 2022 WL 822191 (9th Cir. 2022) |
| Exchange Act | Securities Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Exchange Offer | PG&E's April 2018 exchange offer |
| FAC | Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed by PERA in the District Court Action on November 9, 2018 |
| Mid-Jersey | Mid-Jersey Trucking & Local 701 Pension Fund |
| Notes Offerings | PG&E's note offerings in March 2016, December 2016, and March 2017 |
| Offering Documents | Registration statements, prospectuses and prospectus supplements filed with the SEC in connection with the Notes Offerings and Exchange Offer |
| PERA | Public Employees Retirement Association of New Mexico |
| PG&E | PG&E Corporation and Pacific Gas and Electric Company (the "Utility") are referred to as "PG&E" solely for purposes of the Objections |
| Plan | Joint Chapter 11 Plan of Reorganization |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| RKS | The law firm of Rolnick Kramer Sadighi LLP |
| RKS Amendment or RKS Am. | The Amended Statement of Claim on Behalf of the RKS Claimants |
| RKS Claimants | Claimants represented by RKS in this matter, and also any non-RKS-represented claimants that adopted, in whole or in part, the allegations in the RKS Amendment |
| SAC | Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed by PERA in the District Court Action on December 14, 2018 |

| | |
|---|---|
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |
| Securities Act Plaintiffs | County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking & Local 701 Pension Fund |
| TAC | Third Amended Complaint filed by PERA and the Securities Act Plaintiffs in the District Court Action, attached as Exhibit 92 to the accompanying Request for Judicial Notice |
| Warren | City of Warren Police and Fire Retirement System |
| York | County of York Retirement Fund |

–56–

**4.32 Class 10B — Utility Subordinated Debt Claims.**

(a) Treatment: In full and final satisfaction, settlement, release, and discharge of any Utility Subordinated Debt Claim, except to the extent that the PG&E or the Reorganized PG&E, as applicable, and a holder of an Allowed Utility Subordinated Debt Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility Subordinated Debt Claim shall receive Cash in an amount equal to such holder's Allowed Utility Subordinated Debt Claim.

(b) Impairment and Voting: The Utility Subordinated Debt Claims are Unimpaired, and the holders of Utility Subordinated Debt Claims are presumed to have accepted the Plan.

**4.14 Class 10A-II — HoldCo Rescission or Damage Claims.**

(a) Treatment: In full and final satisfaction, settlement, release, and discharge of any HoldCo Rescission or Damage Claim, except to the extent that the PG&E or the Reorganized PG&E, as applicable, and a holder of an Allowed HoldCo Rescission or Damage Claim agree to a favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter but in no event later than thirty (30) days after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim, each holder of an Allowed HoldCo Rescission or Damage Claim shall receive a number of shares of New HoldCo Common Stock equal to such holder's HoldCo Rescission or Damage Claim Share.

(b) Impairment and Voting: The HoldCo Rescission or Damage Claims are Impaired, and the holders of HoldCo Rescission or Damage Claims are entitled to vote to accept or reject the Plan.

**4.12 Class 9A — HoldCo Subordinated Debt Claims.**

(a) Treatment: In full and final satisfaction, settlement, release, and discharge of any HoldCo Subordinated Debt Claim, except to the extent that the PG&E or the Reorganized PG&E, as applicable, and a holder of an Allowed HoldCo Subordinated Debt Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed HoldCo

–57–

Subordinated Debt Claim shall receive Cash in an amount equal to such holder's Allowed HoldCo Subordinated Debt Claim.

(b) Impairment and Voting: The HoldCo Subordinated Debt Claims are Unimpaired, and the holders of HoldCo Subordinated Debt Claims are presumed to have accepted the Plan.

-58-