1  ROLNICK KRAMER SADIGHI LLP
   Lawrence M. Rolnick (*pro hac vice*)
2  lrolnick@rksllp.com
   Marc B. Kramer (*pro hac vice*)
3  mkramer@rksllp.com
   Michael J. Hampson (*pro hac vice*)
4  mhampson@rksllp.com
   Richard A. Bodnar (*pro hac vice*)
5  rbodnar@rksllp.com
   Frank T.M. Catalina (*pro hac vice*)
6  fcatalina@rksllp.com
   ~~1251 Avenue of the Americas~~
7  PENN 1, Suite 3401
   One Pennsylvania Plaza
8  New York, NY ~~10020~~10119
   Telephone: (212) 597-2800
9  Facsimile: (212) 597-2801

10 *Attorneys for the RKS Claimants*

11

12              **UNITED STATES BANKRUPTCY COURT**
13              **NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**
14

15
        In re:                              Case No. 19-30088 (DM) (Lead Case)
16                                          (Jointly Administered)
        PG&E CORPORATION,
17                                          Chapter 11
              - and -
18                                          **SECOND AMENDED STATEMENT OF**
        PACIFIC GAS AND ELECTRIC COMPANY,   **CLAIM ON BEHALF OF THE RKS**
19                                          **CLAIMANTS**
              Debtors.
20                                          **(THE "SECOND RKS AMENDMENT")**
        Affects PG&E Corporation
21
        Affects Pacific Gas and Electric Company
22
     •        Affects both Debtors
23

24
        * *All papers shall be filed in the Lead Case, No.*
25      *19-30088 (DM)*
26

27

28
                              - 1 -
```
```

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
~~NEW YORK, NY 10020~~10119

## **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 1

II. SUMMARY ............................................................................................... 3

III. LEGAL BASIS OF THE CLAIMS ........................................................... 8

IV. FACTUAL BASIS OF THE CLAIMS........................................................ 8

    A. PG&E's Hidden Failure to Comply With Safety Laws and Regulations Caused the North Bay Fires in 2017 ...................................................... 8

    B. Despite Assurances, PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing the Camp Fire and Investor Losses ................. 10

        1. PG&E Attempted to Reassure the Market With False and Misleading Statements and Omissions After the North Bay Fires .......... 10

        2. PG&E's Total Disregard For Safety Laws and Regulations, Including its "Run to Failure" Strategy, Caused the Camp Fire............. 13

    C. PG&E's False and Misleading Statements Cause Investor Losses ................... 15

    D. Relevant Officers and Directors of the Reorganized Debtors ........................... 15

V. SUBSTANTIVE ALLEGATIONS UNDERLYING THE CLAIMS ........................... 16

    A. PG&E Is Subject to Numerous Laws and Regulations Concerning Safety......... 16

        1. PG&E Was Required by California Law to Maintain a Safe Distance Between Its Electrical Equipment and Vegetation .................. 17

        2. PG&E Was Required by California Law to Maintain Its Electrical Equipment and Infrastructure In a Safe Manner...................................... 18

        3. PG&E is Regulated by the CPUC........................................................ 18

            a. CPUC's General Orders 95 and 165 Imposed Strict Safety Requirements on PG&E ................................................ 19

            b. CPUC's Resolution ESRB-8 Imposed on PG&E an Obligation to Adopt and Follow the ESRB-8 Shutoff Protocol and to Publish an Accurate Summary of the Protocol on its Website ............................................... 20

            c. CPUC's Regulations Have the Full Force of Law and PG&E Must Adhere to Them ......................................... 21

        4. Cal Fire is the California Agency Tasked With Investigating Wildfires ......................................................................................... 21

        5. Under California's Inverse Condemnation Law, So Long As PG&E Acted Reasonably and Prudently, It Would Not Bear the Costs of Wildfires Ignited By Its Equipment.................................. 22

- i -

6.     PG&E Must Also Follow Minimum Safety Standards Established By Federal Law .................................................................................. 22

B.     PG&E Misleadingly Touted Purported Increases in Vegetation Management Spending, But Made No Material Changes to its Fire Safety Practices and Omitted That Any Purported Increases Were Insufficient to Remediate Its Massive Undisclosed Backlog ....................................... 23

C.     PG&E Misled Investors as to Its Dangerous Use of Reclosers During the Relevant Period ......................................................................................... 25

D.     PG&E's History With Wildfires and Accidents Meant Investors Were Acutely Interested in Wildfire Risk and Associated Practices and Procedures as well as PG&E's Reassurances About Wildfire Risk .................. 27

1.     PG&E Falsely Assured Investors of Its Commitment to Safety and Compliance With Laws and Regulations.................................................... 29

E.     PG&E's Abdication of Its Safety Responsibilities Allowed Pervasive and Systemic Vegetation Management and Other Safety Violations........................ 30

1.     PG&E Was Aware of, and Documented, Thousands of Violations of Safety Laws and Regulations That it Did Not Remediate ...................... 30

2.     PG&E Caused the North Bay Fires By Choosing Not to Comply With Vegetation Management and Pole Integrity Laws and Regulations ...................................................................................... 31

3.     PG&E Caused the Camp Fire By Choosing Not to Comply With Equipment Inspection and Maintenance and Vegetation Management Laws and Regulations ........................................................ 32

    a.     The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations................................................................. 32

    b.     The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations ........................................... 35

F.     PG&E's Pervasive and Systemic Violations of Laws and Regulations Regarding Vegetation Management and Equipment Inspection and Maintenance Demonstrate It Knew of These Violations and Simply Chose Not to Remediate Them ...................................................................................... 36

1.     PG&E Chose Not to Remediate Its Violations After the Butte Fire........ 36

2.     PG&E Was Aware of and Documented the Legal and Regulatory Violations That Caused the Camp Fire, But Chose to Ignore Them ....... 37

    a.     The Butte County DA Report Conclusively Established PG&E Caused the Camp Fire By Choosing to Ignore Known Severe Risks With the Infrastructure That Ignited the Fire ........ 40

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

G.   PG&E Misrepresented its ESRB-8 Shutoff Protocol, and PG&E's Failure to Follow the Protocol as it Was Represented to the Public Was a Proximate Cause of the Camp Fire .......................................................................... 48

   1.   PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ............................................... 50

      a.   Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ....................................................................................... 50

      b.   Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ...................................... 52

      c.   Criterion 6: "Critically Dry Vegetation" (i.e., Wildfire Fuel) Weighed in Favor of a Shutoff ...................................... 52

      d.   Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ...................................................... 53

   2.   All of the Weather Criteria Weighed in Favor of Shutting Off the Power ...................................................................................... 54

      a.   Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels ........................................................................ 56

      b.   Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ................................................................................ 57

      c.   Criterion 5: Site-Specific Conditions Further Favored Shutoff .......................................................................................... 58

   3.   PG&E Knowingly Employed Additional Criteria to its Shutoff Protocol That Contradicted the Information Provided to the Public ....... 58

H.   PG&E's Bankruptcy and Other Post-Relevant-Period Developments ................. 60

   1.   Further Developments ........................................................................ 64

VI.   PG&E'S FALSE AND MISLEADING STATEMENTS & ASSOCIATED ACTIONS ...................................................................................................... 65

A.   PG&E Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Practices and Its Compliance With Applicable Laws and Safety Regulations Prior to the North Bay Fires ............. 65

   1.   April 29, 2015 ........................................................................ 65

   2.   October 16, 2015 .................................................................. 66

   3.   November 18, 2015 .............................................................. 68

   4.   October 6, 2016 .................................................................... 68

   5.   August 9, 2017 ..................................................................... 70

B. PG&E Made Public Statements Tying its Dividend to Progress on Safety Measures While Concealing That It Was In Fact Neglecting Safety Measures and Violating Laws and Regulations Relating to Safety ..................... 71

    1. May 23, 2016 ............................................... 71

    2. November 4, 2016 ......................................... 73

    3. May 31, 2017 ............................................... 75

C. After the North Bay Fires, the Truth Began to Emerge ......................... 77

D. After the North Bay Fires Were Contained, PG&E Made False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ............................................ 78

    1. October 31, 2017 ............................................ 78

    2. November 2, 2017 ......................................... 79

    3. November 2, 2017 ......................................... 82

    4. November 5, 2017 ......................................... 85

    5. March 2, 2018 .............................................. 86

    6. March 22, 2018 ............................................ 87

    7. March 27, 2018 ............................................ 89

    8. May 3, 2018 ................................................ 90

    9. May 25, 2018 .............................................. 92

F. While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding the Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff ~~Protocol~~Protocl .............................. 94

    1. June 8, 2018 ................................................ 94

    2. ~~July 16~~September 27, 2018 ......................... 97

    3. September 27, 2018 .......................................... 97

    ~~4.~~ ~~September 27, 2018~~ ........................... ~~98~~

    ~~5.~~ October 1, 2018 .......................................... 99

    ~~6~~5. October 9, 2018 ...................................... ~~103~~102

    6. November 5, 2018 .......................................... 105

    7. November ~~5~~8, 2018 ................................... 105

    ~~8.~~ ~~November 8, 2018~~ ............................... ~~106~~

G. PG&E Omitted Material Facts Regarding PG&E's Inspection Practices ... ~~107~~106

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

H.    The Offering Documents Misled Investors as to PG&E's Lack of
      Compliance With Safety Laws and Regulations and its Refusal to
      Implement Prudent Vegetation Management and Safety Practices and
      Procedures .................................................................................................... 108

      1.    The Offering Documents Omitted the Extreme Risks Posed By
            PG&E's Failure to Comply With Safety-Related Laws and
            Regulations and Its Inadequate Vegetation Management and Safety
            Practices ........................................................................................ 108

      2.    The Offering Documents Omitted the Extreme Risks Posed By
            PG&E's Lack of Commitment to, Failure to Adequately Invest
            Resources In, and Failure to Develop and Adhere to Adequate
            Safety Practices ............................................................................ 115

      3.    PG&E Misled Investors as to Its Liability For the North Bay Fires ...... 122

      4.    The Offering Documents Misled Investors By Failing to Comply
            With Item 303's Disclosure Requirements ............................................. 126

I.    PG&E's Misrepresentations About Disclosure Controls .................................... 128

VII.    ADDITIONAL MATERIALITY ALLEGATIONS .................................................... 129

VIII.    LOSS CAUSATION ................................................................................................ 130

      A.    PG&E's False and Misleading Statements Artificially Inflated the Price of
            PG&E's Securities .................................................................................... 130

      B.    PG&E's Safety Violations Caused the Devastating North Bay Fires ............... 131

      C.    PG&E's Safety Violations Caused the Devastating Camp Fire ....................... 131

      D.    As the Market Learned About the Effects and Extent of PG&E's Inadequate
            Safety Practices, the Price of PG&E's Securities Fell Dramatically ................. 132

      1.    October 12, 2017: Corrective Disclosure and/or Materialization of
            Concealed Risk .............................................................................. 132

            a.    The Market Began to Learn the Extent and Effects of
                  PG&E's Responsibility for the North Bay Fires ....................... 132

            b.    Market Commentators Confirmed the Cause of PG&E's
                  Share Price Decline on October 12, 2017 ........................... ~~133~~134

      2.    October 13-16, 2017: Corrective Disclosure and/or Materialization
            of Concealed Risk .......................................................................... 134

            a.    The Market Continued to Learn the Extent and Effects of
                  PG&E's Responsibility for the North Bay Fires ....................... 134

            b.    Market Commentators Confirmed the Cause of PG&E's
                  Share Price Decline on October 13, 2017 ................................. 135

      3.    December 20, 2017: Corrective Disclosure and/or Materialization
            of Concealed Risk of Ineffective Disclosure Controls ........................... 136

- v -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

a.  The Market ~~Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires~~Learns that PG&E Has Internally Determined Its Fire Liability Might Exceed the Point Where it Can Pay a Dividend ........................ 136

b.  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on December 21, 2017 ....................... ~~137~~139

4.  May 25, 2018: Corrective Disclosure and/or Materialization of Concealed Risk .............................................................. ~~138~~139

a.  The Market Learned the Extent and Effects of PG&E's Responsibility for the North Bay Fires ............................... ~~138~~139

b.  Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018 ............................................... ~~140~~141

5.  June 8, 2018: Corrective Disclosure and/or Materialization of Concealed Risk .............................................................. ~~141~~142

a.  The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires ............................................................................. ~~143~~144

b.  Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018 ............................. ~~144~~146

6.  November 8-9, 2018: Corrective Disclosure and/or Materialization of Concealed Risk ........................................ ~~145~~147

a.  The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ......................... ~~146~~147

b.  Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline .............................. ~~146~~148

7.  November 9-12, 2018: Corrective Disclosure and/or Materialization of Concealed Risk ........................................ ~~148~~150

a.  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ......................... ~~148~~150

b.  Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline........................ ~~151~~152

8.  November ~~13-14~~15, 2018: Corrective Disclosure and/or Materialization of Concealed Risk.................................... ~~152~~154

a.  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ......................... ~~152~~154

b.  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November ~~14~~15, 2018 .................. ~~153~~154

9.    November 15, 2018: Corrective Disclosure and/or Materialization
      of Concealed Risk ........................................................................... 154
      a.    The Market Continued to Learn the Extent and Effects of
            PG&E's Responsibility for the Camp Fire ............................. 154
      b.    Market Commentators Confirmed the Cause of PG&E's
            Share Price Decline on November 15, 2018 .......................... 155

10

9.    The November Disclosures Effect on Debt Securities ......................... 156

IX.   SCIENTER UNDER THE EXCHANGE ACT ........................................... ~~158~~157

      A.    PG&E and its Officers Knew that PG&E's Safety Practices Continued to
            Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety
            Violations ................................................................................... 158

      B.    Safety Was Core to PG&E's Operations, and the PG&E Officers Were
            Directly Involved in It ................................................................. 161

      C.    The Federal Court Overseeing PG&E's Probation, Including Safety
            Monitoring, Has Uncovered Additional Facts Supporting Scienter ........... ~~164~~163

      D.    PG&E's Noncompliance with Safety Regulations Was Well-Known
            Throughout the Company, Including at the Highest Levels, with Real-Time
            Access to a Database of Known Safety Violations ..................................... ~~176~~175

            1.    PG&E Recorded Its Violations of Safety Regulations in a
                  Sophisticated Database, Readily Accessible by PG&E .................. ~~176~~175

      E.    PG&E Instituted a Culture Among Its On-the-Ground Employees of
            Reporting Problems up the Corporate Chain, Which Upper Management
            Was Aware of and Monitored ....................................................... 178

      F.    PG&E's Compliance Statements Were Authorized by Kane and Were
            Made under Her Ultimate Authority ............................................. ~~180~~179

      G.    The Threat of a Potential Bankruptcy Gave PG&E a Strong Motive to
            Mislead Investors ...................................................................... ~~181~~180

      H.    PG&E's Unprecedented Departure of Officers and Directors Strengthens
            the Inference of Scienter ............................................................ ~~182~~181

      I.    PG&E's Guilty Plea Establishes Its Scienter as a Matter of Law ............... ~~184~~183

X.    NO SAFE HARBOR ........................................................................... 184

XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON
      THE MARKET ................................................................................. ~~185~~184

XII.  ASSERTED CLAIMS TO BE ALLOWED ............................................. ~~186~~185

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

Claimant, in accordance with the Court's July 28, 2023 Order Authorizing Amendment and Objection Procedures for Securities Claims (Dkt. No. 13934) (the "Amendment Order") and the Court's September 18, 2024 Memorandum Decision on Thirty-Third and Thirty-Fourth Securities Omnibus Claims Objections (the "Memorandum Decision") hereby amends its previously filed Proof or Proofs of Claim as set forth below.[1]

Claimant's allegations regarding the actions of PG&E Corporation ("HoldCo")[2] and Pacific Gas and Electric Company (the "Utility," and together with HoldCo, "PG&E" or the "Company" or "Reorganized Debtors") and their officers, directors, employees, and/or agents, are primarily based on the investigation conducted by and through their attorneys, which included a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases, media and analyst reports about the Company, court filings, including filings in *U.S. v. Pacific Gas and Electric Company*, No. CR 14-0175-WHA (N.D. Cal.) (the "Federal PG&E Criminal Action"), *In re PG&E Corporation Securities Litigation*, Case No. 5:18-cv-03509-EJD (N.D. Cal.) (the "Securities Class Action") and *In re PG&E Corporation*, Case No. 19-30088-DM (Bankr. N.D. Cal.) (the "Bankruptcy Cases"), the "Camp Fire Public Report" of Butte County District Attorney Michael L. Ramsey dated June 16, 2020, and other public information regarding PG&E. Claimant and Adopting Claimants believe that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

---

[1] Per the Amendment Order, Claimant recognizes that other claimants may adopt this amendment, the "RKS Amendment" in part or whole and have the RKS Amendment act as their operative claim allegations and basis of claim (those adopting referred to as the "Adopting Claimants"). Adopting Claimants who so identify via notice assert this amendment as the operative claim allegations and basis of claim by their act of adoption. Each Adopting Claimant individually shall be understood to be "Claimant" as referred to herein; and all other claimants adopting this amendment understood to be the "Adopting Claimants" herein for purposes of Claimant's claim. The RKS Amendment is additive to, and not a replacement of, any proof of claim or proof of claim form previously filed by an Adopting Claimant, all attachments thereto, and all trading data provided to Reorganized Debtors, and all of these shall together and in their entirety constitute Claimant's Proof of Claim.

[2] HoldCo is a holding company whose primary operating subsidiary is the Utility. The Utility was incorporated in California in 1905. As of December 31, 2018, HoldCo and the Utility had approximately 24,000 regular employees, approximately 13 of which were employees of HoldCo.

Sidebar vertical text:

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA
PENN 1, SUITE 3401
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

## I. **INTRODUCTION**

1. PG&E is a power company. Its business is technical, but how it generates profits is not complex. PG&E generates and delivers electricity to ratepayers, gets paid for that power, and (usually) makes a profit. PG&E's revenue, profit margin, and cash flows were basically predictable, and like many utilities, PG&E paid a seemingly safe and reliable dividend to stock holders and paid interest on its bonds.

2. The single most critical part of the PG&E equation, from an investor's point of view, was understanding the risks to PG&E's (relatively straightforward) cashflows. Perhaps the most critical risk to PG&E's business was (because its business involved the generation and transport of electrical power) that PG&E would cause wildfires and face liabilities from those fires. To understand how risky PG&E's cash flows were, the market needed accurate information as to how robust and effective PG&E's wildfire prevention measures were.

3. If, in mid-2015, or anytime during the next three and a half years, PG&E had called a press conference and told investors it was *engaged in criminally negligent and criminally reckless activities*, that its *wildfire prevention measures were not only not as advertised, but effectively non-existent*, and that it was indifferent to this, just waiting for a catastrophic wildfire and hoping one would not occur – that disclosure would have been the most remarkable disclosure in corporate history. It also would have revealed the truth behind PG&E. And, obviously, the prices of PG&E securities would have plummeted.

4. But that isn't what happened in mid-2015 or the next three and half years. PG&E never made that disclosure itself. Investors learned the reality behind PG&E not by PG&E calling a press conference; instead, investors learned the truth by PG&E *causing* devastating wildfires and watching the news leak out, in real time, that these fires were caused by reckless indifference to the very same wildfire prevention measures PG&E had trumpeted. Indeed, PG&E's repeated assurances to the market that it complied with applicable safety laws and regulations were confirmed as outright lies in 2019 when PG&E admitted in open court that it was "impossible" to comply with a California law requiring it to clear vegetation around its lines. "Impossible" is a far

cry from "complying." By then, it was too late. Investors had suffered significant losses and PG&E had commenced these Chapter 11 cases.

5. PG&E went bankrupt as a direct result of the conduct described in this claim. Perhaps this was a "win" for PG&E – which has emerged from bankruptcy having managed its liabilities. But investors in PG&E from 2015 to 2018 undoubtedly, incontrovertibly, lost. They did not lose 'fairly' or 'squarely' – they lost because PG&E lied about the risks attendant with its systemic abdication of it wildfire safety and vegetation management programs.

6. PG&E's (successful) bankruptcy resulted in a Plan of Reorganization allowing investors to recover against PG&E for securities fraud by the bankruptcy claim process. For Claimant and the Adopting Claimants, this amendment states the basis of their claims in further detail.

## II.     SUMMARY

7. The investing public depends on public companies such as PG&E to be honest when talking about safety practices and compliance with vital safety regulations. Claimant's claims arise out of the materially false statements and omissions that PG&E made to investors during the period of April 29, 2015 through November 15, 2018 (the "Relevant Period"). These statements and omissions misled investors about PG&E's wildfire safety, inspection, and maintenance practices, including representations of full legal and regulatory compliance and of increasing devotion to safety, notwithstanding the Company's history of pervasively and systemically violating powerline safety regulations.

8. The false and misleading statements at issue did not concern arcane accounting issues or hard to decipher matters of financial trickery. They concerned the core issue confronting PG&E for years: its ability to manage wildfire risk and what – precisely – it was doing (or, in reality, not doing) to minimize the risk of its transmission lines causing catastrophic wildfires.

9. The market, made up of countless investors, including Claimant and other Adopting Claimants, were particularly focused on PG&E's legal compliance, safety, equipment maintenance, and vegetation management statements during the Relevant Period. PG&E's

Case: 19-30088   Doc# 14604-1   Filed: 10/08/24   Entered: 10/08/24 19:48:21   Page 12 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICASPENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14320-10119

wildfire prevention practices struck at the very heart of its ability to continue as a going concern. As a public utility company, PG&E is highly-regulated by numerous federal and state laws and regulations that establish safety and wildfire prevention standards to which the Company must adhere in order to reasonably reduce the risk of causing devastating wildfires.  In addition to the devastation wildfires can, and did, cause to California residents, the environment, and the broader economy, California's reverse condemnation law holds PG&E strictly liable for damages resulting from wildfires caused by its transmission lines.  Critically, however, PG&E can recover those costs from rate payers so long as it can demonstrate that it acted reasonably and prudently in maintaining its transmission systems.  Thus, PG&E's survival as a going concern is entirely contingent on its acting reasonably and prudently to prevent its lines from causing wildfires – the very thing about which it lied to the markets.

10.    These lies not only resulted in unspeakable devastation to the State of California and its residents, but also in significant losses to PG&E's investors, who relied on PG&E's repeated false assurances that it was acting prudently and in accordance with applicable laws and regulations in managing wildfire risk.

11.    Over an approximately 14-month period, from October 2017 through November 2018, PG&E's concealed abrogation of fire risk-mitigation responsibilities resulted in some of the deadliest and most destructive fires California has ever experienced – the 2017 North Bay Fires and the 2018 Camp Fire.  These fires were directly caused and exacerbated by PG&E's failure to properly manage vegetation around its transmission lines, to inspect and maintain its equipment, to develop and reasonably administer procedures for interrupting power in its lines in hazardous conditions, and to comply with laws and regulations – all things it repeatedly assured the markets it was doing.

12.    Following the North Bay Fires, PG&E doubled down on its lies.  PG&E directly spoke to the wildfire management practices it had in place, and not only reassured the marketplace of its compliance with laws and regulations, but also concocted new lies to explain away the North

- 4 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

Bay Fires and to give investors a false sense of security that the North Bay Fires strengthened the Company's focus on safety.

13. For example, after the North Bay Fires erupted, PG&E insisted that the Company was meeting all applicable vegetation clearance requirements, even though, as became clear during and immediately following the Camp Fire, it was not. In addition, following the North Bay Fires, the Company purported to have a renewed focus on the state of its infrastructure. PG&E touted that it was properly maintaining its equipment to decrease the risk of fires and sufficiently investing in its electrical system infrastructure to reduce fires, including by inspecting and/or replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life. However, as became clear during and following the Camp Fire, PG&E was "employing a run to failure strategy" on its distribution and transmission infrastructure, which ultimately caused the disastrous fire.

14. The assurances of safety practices and compliance were – unequivocally – false. PG&E's post-Camp Fire admissions – including its guilty pleas unlawfully causing the fire and to 84 counts of manslaughter – plus direct evidence found by prosecutors investigating the fire, along with in court admissions by PG&E in its probation hearings and process, made crystal clear and irrefutable what investors had learned through a slow leak of information 2017 and 2018: PG&E *knew* it was not addressing thousands of safety violations; *knew* of its woefully deficient inspection protocols; *knew* of its violations of state and federal law; and *knew* that its vegetation and infrastructure management systems (which were directly responsible for the devastating Camp Fire) were nothing like what they told the marketplace. And PG&E knew its post-North Bay Fire assurances were false or misleading, but gave those assurances anyway.

15. Even as PG&E continued to falsely insist that the Company complied with laws and regulations, California imposed additional safety regulations on the Company. This included a mandate that PG&E formalize a protocol for proactively turning off its power lines when certain extreme conditions were met to prevent any further wildfires. By the deadline to institute this protocol, PG&E stated that it had "***created a set of procedures for . . . [d]etermining what***

- 5 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

1    *combination of conditions necessitates turning off lines for safety*" (September 27, 2018), and it

2    published a description of its shutoff protocol publicly on its website, as it was required to do. Yet

3    less than two months later, on a day when hazardous weather and other conditions would have

4    required PG&E to shut off certain lines according to its published shutoff protocol, the Camp Fire

5    erupted – caused by the very lines that should have been shut off. Following an extensive

6    investigation by the Butte County District Attorney, it was revealed that the shutoff protocol

7    PG&E actually applied differed materially from the protocol it shared with the public. Although

8    its publicly disseminated shutoff protocol purported to apply to all of its power lines, the

9    undisclosed protocol PG&E actually utilized did not allow for shutting off high voltage

10   transmission lines like those that ignited the catastrophic Camp Fire. By the time the public

11   learned of this discrepancy, it was too late.

12        16.    Having concealed the extreme riskiness of PG&E's operations via their

13   misstatements, the revelation of the truth caused incredible losses. Those losses – of homes,

14   businesses, property, and dozens of lives – were felt first and foremost by the tragic victims of the

15   fires that PG&E caused through its admittedly criminal recklessness. But PG&E's admitted

16   misconduct also harmed investors, including Claimants and the Adopting Claimants, who suffered

17   massive financial losses because they relied on PG&E's statements about equipment maintenance

18   and fire safety practices in believing that the market price fairly reflected the riskiness of PG&E's

19   securities.

20        17.    Unfortunately for all involved, the truth regarding PG&E's misstatements did not

21   come out because PG&E voluntarily 'came clean' to the marketplace. Instead, the truth was

22   revealed over a series of corrective events that uniformly came from either third-party information

23   about PG&E or were the materialization of the very risk – that PG&E's wildfire safety practices

24   were woefully deficient and not in compliance with law – that had been concealed.

25        18.    Claimant and the Adopting Claimants were damaged as California fire authorities

26   revealed PG&E's responsibility for the North Bay Fires – which only led PG&E to redouble its

27   efforts to convince investors that it really was complying with the law. Investors, including

28

- 6 -

Claimant and the Adopting Claimants, along with the rest of the State of California, were shocked as the Camp Fire ignited, and over the course of four harrowing days, information flooded the marketplace indicating that *not only* was PG&E to blame, but that its recklessness and violation of the precise laws and regulations it said it was complying with caused the devastating fire. By the end of the Relevant Period, having suffered billions of dollars in investment losses, Claimant and/or Adopting Claimants knew that the deadly North Bay Fires in October 2017, and the Camp Fire in November 2018, were caused by PG&E's non-compliant to non-existent vegetation management practices and its noncompliant, reckless equipment inspection and maintenance practices. This was an astounding fact to the marketplace, which had believed PG&E's repeated public statements that it complied with state and federal safety regulations.

19. Indeed, the fact and breathtaking extent of PG&E's deception shocked numerous observers. In a March 2019 interview with the New York Times, California Governor Gavin Newsom explained "[PG&E] ha[s] simply been caught red-handed over and over again, lying manipulating or misleading the public[.]" A federal judge overseeing PG&E's probation arising from a prior gas pipeline explosion it caused noted in 2022 that, in the preceding five years (which largely coincide with the Relevant Period), "PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California." The judge further noted PG&E's ongoing deception and evasion of responsibility, explaining that PG&E's "evasion has occurred time and again over the last five years," and "PG&E has refused to accept responsibility for its actions until convenient to its cause or until it is forced to do so."

20. In sum, it ultimately became clear – through the leakage of information about the North Bay Fires and the Camp Fire – that PG&E's statements about its safety measures were false and misleading. In response to this information, the market revalued PG&E's securities as it learned the depth and pervasiveness of its deceit. The securities significantly decreased in price as their true risk became known, removing the inflation associated with the previously concealed information, and reflecting PG&E's mounting liabilities – the materialization of the previously concealed risk that PG&E's wildfire prevention practices were not as advertised.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10022 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS/PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

21.     Indeed, PG&E's responsibility for the wildfire catastrophes caused the Company to file for bankruptcy under Chapter 11 of Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*).  The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North Bay Fires and Camp Fire.[3]

22.     PG&E's lies had a devastating effect on the residents of California and investors in Company.  As energy consultant Robert McCullough summed it up in a December 2019 New York Times article, "PG&E's behavior was unforgiveable and totally unnecessary . . . [M]anagement was willfully blind to the risks to customers.  And, strangely enough, also blind to the risk to stockholders."

## III.     LEGAL BASIS OF THE CLAIMS

23.     Claimant's and Adopting Claimants' claims against PG&E arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, and for certain Adopting Claimants, Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Claimant seeks to recover the significant investment losses it suffered as a result of false and misleading statements that PG&E made to induce investors, including Claimant and Adopting Claimants, to purchase PG&E securities, and as a result of PG&E's scheme to defraud investors during the Relevant Period.

## IV.     FACTUAL BASIS OF THE CLAIMS

24.     The prices of PG&E securities, including HoldCo's common stock, bonds, preferred stock, as well as securities issued by the Utility, were inflated by PG&E's misstatements and omissions.  Had PG&E told the market the full truth about its wildfire and vegetation management practices, its inspection and maintenance practices, and its widespread criminal recklessness and negligence, and otherwise not concealed the truth of its riskiness, PG&E securities' prices would have been lower.  Investors who purchased PG&E securities at the inflated prices were harmed as the truth was revealed through a series of fraud curing events.

---

[3] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-bk-30088 (N.D. Cal. Feb. 1, 2019), ECF No. 263.

25.     PG&E's relevant false statements began on April 29, 2015.  As set forth in detail below, PG&E misled investors about PG&E's wildfire safety, transmission line maintenance, and inspection practices, including representations that the Company was in full compliance with applicable laws and regulations, significantly increasing its investment in safety, and regularly inspecting and maintaining its power lines, notwithstanding the Company's history of violating safety regulations and inadequate inspection and maintenance practices.

**A.     PG&E's Hidden Failure to Comply With Safety Laws and Regulations Caused the North Bay Fires in 2017**

26.     During the Relevant Period, PG&E desperately wanted investors to believe that it was not cutting corners with its vegetation management, but rather increasing its focus on, and investment in, safety.  Accordingly, in the leadup to – and following – the North Bay Fires that devastated Northern California in October 2017, PG&E repeatedly and falsely represented to investors that its vegetation management program complied with relevant state and federal laws.[4] For example, as set forth in further detail below, PG&E falsely represented:

- "*We're stepping up our vegetation management activities to mitigate wildfire risk*" (April 29, 2015);

- "*PG&E's Vegetation Management*" was "*in compliance with relevant laws*" (October 6, 2016);

- PG&E's "*vegetation management program … compl[ies] with state and federal regulations*" (August 9, 2017);

- "*PG&E follows all applicable federal and state vegetation clearance requirements*" to "*help reduce* outages or *fires caused by trees or other vegetation*" (October 31, 2017); and

- "*PG&E meets or exceeds all applicable federal and state vegetation clearance requirements*" (November 5, 2017).

---

[4] The statements made by PG&E that are ***bold and italicized*** are the statements alleged to be false and misleading.  All other **bold** emphasis is added.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

Case No. 19-30088          ~~SECOND~~ AMENDED ~~PROOF~~ STATEMENT OF CLAIM

27.     These representations were lies.  Unbeknownst to the market, PG&E had not increased its vegetation management activities, but instead had largely abdicated its vegetation management, maintenance, and inspection practices, knowingly leaving in place thousands of instances of untrimmed vegetation and aged and unsafe infrastructure – all of which posed extreme fire risks.  These risks materialized in 2017 and 2018, causing such widespread death and destruction that PG&E was forced to seek bankruptcy protection and plead guilty to 85 felonies, including 84 counts of involuntary manslaughter.  As would slowly become apparent in the year following the North Bay Fires, PG&E was responsible, and liable, for nearly all of the October 2017 North Bay Fires.   These fires burned approximately 249,000 acres, destroyed 8,898 structures, killed 44 people across nine counties, and resulted in damages estimated at more than $17 billion.  The size of this liability alone imperiled the financial viability of the Company.

28.     As the State of California's official investigations into the seventeen North Bay Fires were eventually completed by the California Department of Forestry and Fire Protection ("Cal Fire"), it was determined that at least sixteen were caused by PG&E equipment and, specifically, PG&E's failure to properly clear vegetation around its power lines in accordance with applicable law and regulations.

29.     Nonetheless, and in order to falsely assure investors, following the North Bay Fires and through the subsequent Cal Fire investigations, PG&E falsely represented it was significantly increasing its safety efforts and expenditures, and that it was complying with all applicable laws and regulations.  It was not.

30.     In October 2018, a failed component on a distribution line in a high fire hazard area caused the ignition of the Camp Fire – the deadliest and most destructive wildfire in California history, wiping the town of Paradise, California off the map and killing 85 people.  The distribution line, the tower suspending it, and the failed component were nearly a century old and were well past their useful life.  PG&E had long been aware of the aged and extremely hazardous condition of this distribution line and tower, but deliberately chose to reduce the frequency and thoroughness of their inspections and to do nothing about the extreme fire threat they posed.  The

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICASPENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14939310112

result was the deadliest and most destructive wildfire in California history, destroying 18,000 structures, killing 85 people, and nearly wiping the towns of Paradise and Concow off the map.

**B.** **Despite Assurances, PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing the Camp Fire and Investor Losses**

**1.** **PG&E Attempted to Reassure the Market With False and Misleading Statements and Omissions After the North Bay Fires**

31. As the public began to suspect PG&E might have been responsible for the North Bay Fires, the Company faced a new crisis: an investor inference that it failed to prioritize safety in maintaining its power lines and preventing wildfires, which would make PG&E a riskier investment. Safety, long a focus for PG&E's investors, became a main concern. PG&E also faced a financial crisis, as liabilities for the North Bay Fires threatened to bankrupt the Company.

32. Thus, on March 22, 2018, PG&E issued a press release falsely stating, *inter alia*, that the Company was "***doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe***," including by "***investing in stronger, coated power lines, spacing lines farther apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years***." On March 27, 2018, PG&E falsely stated in a press release that it "***inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times***."

33. The press, analysts, and investors, took notice. As an example, the Press Democrat, a Santa Rosa newspaper, reported on PG&E's press release, reporting on the precise details of what PG&E promised and what it said it was already doing. The Los Angeles Times also covered PG&E's statements, and connected the statements to the need to reassure those affected by the North Bay fires. Others, including NBC, reported on the press release as well. PG&E placed a link to the release on its website, under "News & Events" – which bore the web address start of: "investor.pgecorp.com".

34. Then, on May 3, 2018, during an earnings call attended by analysts and investors, then-CEO Geisha Williams stated that PG&E had "***increased the frequency of [its] patrols, particularly in high fire threat areas***."

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

35.      PG&E needed the public, including investors, to believe that it would prioritize safety.  Thus, on May 25, 2018, after Cal Fire released findings that several North Bay Fires had been caused by tree branches coming into contact with PG&E lines – where the branches had not been properly cleared in accordance with applicable laws and regulations – PG&E released a press release touting its purportedly increased focus on safety and falsely stating, among other things, that "*PG&E meets or exceeds regulatory requirements for pole integrity management*."

36.      Further, when Cal Fire announced (on June 8, 2018) its conclusions that PG&E had caused the preponderance of the North Bay Fires, PG&E responded that same day by reassuring its investors that, *e.g.*: "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur*."

37.      One month later, on July 16, 2018, PG&E's primary state regulator mandated that PG&E formalize and publicize its protocol for proactively turning off its power lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8.  The Company announced its response to this new safety requirement on or about September 27, 2018 (the "ESRB-8 Shutoff Protocol"), including "*executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring"* and *"PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety*."

38.      As with the March press release, each of these misstatements were widely disseminated by press and commentators.  Indeed, any statement by PG&E about wildfire prevention and risk was treated as newsworthy.  California-focused press, national press, business press (such as Forbes), and trade publications all published numerous articles about PG&E's wildfire risk management, almost always referring to PG&E's representations in the process. The New York Times, for example, reported on wildfire risks generally, but with a focus on PG&E's situation.  It cited PG&E's statements to report that PG&E said its "fire prevention programs, which include moving or trimming more than a million trees per year, 'met [California's] high standards.'"

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14329 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

39.     While the Company was finalizing its protocol, on September 21, 2018, California enacted S.B. 901, a law to shield PG&E from the threat of bankruptcy.  The resulting law put in place a financial stress test to monitor PG&E's financial health, as well as a method for PG&E to raise capital should its liability for the North Bay Fires cause it to fail the test.  The same law made it less likely that PG&E would bear the costs of wildfires it caused in 2019 or later.

40.     However, the new law did not help the Company bear the financial consequences of any wildfires it might cause in the remaining months of 2018.  In other words, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018, or their failure would drive the Company to ruin.  Thus, PG&E's safety compliance was of paramount importance to investors, particularly in 2018.

41.     On October 1, 2018, PG&E submitted an application to the Federal Energy Regulatory Commission ("FERC"), stating that PG&E was "*in compliance with all applicable rules, standards and regulations*."

42.     PG&E continued to assure the public that it had implemented its safety measures successfully.  For example, when news broke on October 9, 2018 that Cal Fire had concluded that PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade Fire, the Company reassured investors by stating:  "[W]e are continuing to focus on *implementing additional precautionary measures* intended to further reduce wildfire threats, such as *working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas*, and taking other actions to make our system, and our customers and communities, *even safer* in the face of a growing wildfire threat"; and "PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur").

43.     Finally, just days before the Camp Fire ignited, Williams stated *that "[a]ll of [PG&E's] efforts*," including the public safety power shut off program, "*are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets.*"

- 13 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

44. Such statements were materially false and misleading because PG&E had not meaningfully improved its safety practices – as would soon be revealed by the Camp Fire. By pitching their statements to convince the investing public that PG&E had resolved its fire safety failures after the North Bay Fires and would prioritize fire safety thereafter, PG&E concealed the true extent to which the Company was exposed to massive liability for causing further wildfires, thereby significantly inflating PG&E's share price.

### 2. PG&E's Total Disregard For Safety Laws and Regulations, Including its "Run to Failure" Strategy, Caused the Camp Fire

45. PG&E's misstatements were revealed as false and misleading after the Camp Fire ignited, and as evidence emerged that PG&E was not only *responsible* for the fire that devastated Northern California in November 2018, burning 153,336 acres, destroying 18,804 structures, and killing at least 85 people — making it the single most destructive and the deadliest wildfire in California history – but also that the way the Camp Fire was caused by PG&E smacked of recklessness and willful misconduct. PG&E had been aware for years that the infrastructure along the line that failed was nearly a century old, had significant and dangerous wear, and had aged past the point where it could be safely operated. But PG&E made a decision to simply ignore these hazards and lie about them to the investing public, choosing instead to follow a "run to failure" strategy. As an investigation into PG&E's role in causing the Camp Fire concluded, "**PG&E knew it was creating a high risk of causing a catastrophic fire but, unlike a reasonable person, chose to ignore that risk.**"

46. The Camp Fire began with the failure of a nearly century-old component on a PG&E electrical tower, carrying a high-voltage 115 kilovolt transmission line. PG&E was aware of dangerous wear issues with this type of component – a "C hook" – but chose not to address them. PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. As a result, vegetation underneath the lines ignited in two places approximately 30 minutes apart. PG&E's failure to remove such vegetation violated California Public Resources

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

Code Section 4293, and its failure to maintain the integrity of its poles and towers violated California Public Utilities Code Section 451.

47.    PG&E's ESRB-8 Shutoff Protocol also proved illusory: the protocol it published on its website (as it was require by law to do) dictated that the electrical lines that caused the Camp Fire should have been shut off, but PG&E did not do so.  PG&E would later attempt to justify its inaction by claiming that its ESRB-8 Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the Camp Fire.  However, this explanation contradicted the protocol that PG&E published on its website for public consumption.  As a subsequent investigation of the causes of the Camp Fire determined, the information PG&E published on its website describing the shutoff protocol was "misleading" and, had the publicly disseminated guidelines been followed, the failed power line would have been de-energized prior to ignition.

48.    Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's materially false and misleading statements assuring investors of the Company's compliance with California safety regulations, including the ESRB-8 Shutoff Protocol.

49.    In early 2019, the Company was forced to take a $10.5 billion charge related to the Camp Fire.  Cal Fire and subsequent investigations confirmed that PG&E's electrical equipment caused the Camp Fire. PG&E itself pled guilty to 84 counts of manslaughter as a result of the Camp Fire. "Our equipment started that fire," HoldCo CEO and President Bill Johnson said at a court hearing – referencing the Camp Fire. PG&E also pled guilty to unlawfully causing the Camp Fire.

### C.    PG&E's False and Misleading Statements Cause Investor Losses

50.    Notwithstanding PG&E's false and misleading statements to the marketplace, investors learned over time that PG&E's safety violations were pervasive and widespread.  As information regarding the impact of PG&E's deficient safety practices emerged between October 2017 and November 15, 2018, investors were surprised, given PG&E's numerous public statements during the Relevant Period touting the Company's compliance and safety measures.  As information came to light relating to PG&E's inadequate safety measures and/or the effects

- 15 -

thereof, PG&E's artificially inflated share price dropped significantly. Thus, as a result of PG&E's wrongful acts and omissions, Claimant and Adopting Claimants have suffered billions of dollars in damages.

51. The claims described herein against PG&E seek recovery for damages suffered due to these declines in the prices of PG&E's publicly traded securities. PG&E's statements of compliance with safety laws and regulations during the Relevant Period, along with the other misstatements and omissions identified herein, misrepresented current facts and were not statements of opinion.

### D. Relevant Officers and Directors of the Reorganized Debtors

52. Anthony F. Earley, Jr. ("Earley") served as the HoldCo's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

53. Geisha J. Williams ("Williams") served as HoldCo CEO and President from March 1, 2017 until her resignation on January 13, 2019. Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Additionally, Williams was a director of HoldCo from May 2017 to January 2019 and a director of the Utility from August 2015 to January 2019. In 2018 alone, Williams was awarded $9.3 million in total direct pay by PG&E. She also received a $2.5 million severance, despite driving PG&E into bankruptcy.

54. Nickolas Stavropoulos ("Stavropoulos") served as the President and Chief Operating Officer ("COO") of HoldCo from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015. Stavropoulos was a director of the Utility from August 2015 to September 2018. In 2017 alone, Stavropoulos earned over $6 million from PG&E.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

55.     Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for HoldCo since May 18, 2015.  Kane is named as a  solely in her capacity as Chief Ethics and Compliance Officer.  Kane was an executive officer of both HoldCo and the Utility.  On hiring, Kane agreed to a salary of $440,000, a sign on bonus of $250,000, and significant stock awards.

56.     Patrick M. Hogan ("Hogan") served as the Utility's Senior Vice President of Electric Operations from March 2016 through January 8, 2019, and he retired from the Utility on January 28, 2019.  Before that, he served as the Utility's Vice President of Electric Operations & Asset Management from November 2013 through February 2016.  In 2018 alone, Hogan received total compensation of over $1.3 million, and then nearly $700,000 in cash severance after PG&E went bankrupt.

57.     Williams, Stavropoulos, Kane, and Hogan are referred to herein as the "PG&E Officers."

## V.     SUBSTANTIVE ALLEGATIONS UNDERLYING THE CLAIMS

### A.     PG&E Is Subject to Numerous Laws and Regulations Concerning Safety

58.     As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1.     PG&E Was Required by California Law to Maintain a Safe Distance Between Its Electrical Equipment and Vegetation

59.     To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

60.     Pursuant to California Public Resources Code Section 4292, for instance:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet

in each direction from the outer circumference of such pole or tower.

61. Similarly, California Public Resources Code Section 4293 provides that:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, **maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current:** (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard.**

62. Cal Fire interprets this law to "mean[] that a tree, or portion thereof, that is leaning toward the line, must be 'felled, cut, or trimmed' regardless of its health, if it 'may contact the line from the side or may fall on the line.'" The law also "requires utilities to identify and remove such hazards." Thus, Section 4293 not only "mandates that utilities trim or remove limbs overhanging powerlines if those limbs are inside the statutory clearance distances," but further "mandates that utilities trim or remove, among other hazards, trees or portions thereof that are leaning toward the powerlines, including overhanging limbs, if those trees or limbs may contact the line from the side or fall on the line." Cal Fire also makes clear that "[a] utility's compliance with Section 4293 is mandatory, not discretionary."[5]

---

[5] Supplemental Response of Cal Fire following Jan. 30, 2019 Hearing on Order to Show Cause, *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175 ("PG&E Criminal Proceedings") (N.D. Cal. Feb. 6, 2019), ECF No. 1012.

- 18 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14024 10119

## 2. PG&E Was Required by California Law to Maintain Its Electrical Equipment and Infrastructure In a Safe Manner

63. In addition to the vegetation management regulations discussed above, California laws and regulations further require PG&E to safely maintain its electrical equipment and infrastructure, including an obligation to maintain the towers and poles that carry its transmission and distribution lines.

64. Pursuant to California Public Utilities Code Section 451:

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

65. California Health & Safety Code Section 13007 further provides:

> Any person who personally or through another willfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned, is liable to the owner of such property for any damages to the property caused by the fire.

66. Accordingly, California law required PG&E to maintain its electrical equipment and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from being caused by the failure of its towers and poles.

## 3. PG&E is Regulated by the CPUC

67. PG&E's primary regulator is the California Public Utilities Commission ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General Rate Cases, determining which costs PG&E may pass on to rate-payers, and which costs PG&E must bear. The CPUC was created under Article XII of the California State Constitution, and derives its regulatory authority from Section 701 of the California Public Utilities Code.

### a. CPUC's General Orders 95 and 165 Imposed Strict Safety Requirements on PG&E

68. Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish necessary and reasonable clearances" between overhead conductors and nearby vegetation, with certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

* * *

When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

69. CPUC General Order 95 provides further details regarding the maintenance and upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to "Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule be held to permit the use of structures or any member of any structure with a safety factor less than one." This order further provides certain requirements intended to, among other things, guard against corrosion.[6]

70. Pursuant to CPUC General Order 165, PG&E must also follow certain "requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service." In relevant part, General Order 165 requires that: "Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation[.]" It also requires that: "Each utility shall prepare and follow procedures for conducting inspections and maintenance activities for transmission lines."[7]

---

[6] CPUC General Order 95, *Rules for Overhead Electric Line Construction* (May 2018), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M146/K646/146646565.pdf.

[7] CPUC General Order 165, *Inspection Requirements for Electric Distribution and Transmission Facilities* (Dec. 2017),

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10022 10119

**b.** **CPUC's Resolution ESRB-8 Imposed on PG&E an Obligation to Adopt and Follow the ESRB-8 Shutoff Protocol and to Publish an Accurate Summary of the Protocol on its Website**

71.    On July 16, 2018, the CPUC issued Resolution ESRB-8.  Recognizing that the "2017 California wildfire season was the most destructive wildfire season on record," the resolution required California's utilities, including PG&E, to adopt, promulgate, and follow "de-energization policy and procedures" pursuant to which each utility will "de-energize power lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established notification, mitigation, and reporting requirements.

72.    Resolution ESRB-8 included the following directives:

PROPOSED OUTCOME:

This Resolution extends the de-energization reasonableness, public notification, mitigation and reporting requirements in Decision (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs) [including PG&E] and adds new requirements. It also places a requirement on utilities to make all feasible and appropriate attempts to notify customers of a de-energization event prior to performing de-energization.

SAFETY CONSIDERATIONS

De-energizing electric facilities during dangerous conditions can save lives and property and can prevent wildfires.  This resolution provides guidelines that IOUs must follow and strengthens public safety requirements when an IOU decides to de-energize its facilities during dangerous conditions.

* * *

PG&E reports that prior to 2018, it did not have a policy to de-energize lines as a fire prevention measure. PG&E reported that it did not proactively de-energize lines due to extreme fire weather conditions in 2017.  However, in March 2018 PG&E announced that it is developing a program to de-energize lines during periods of extreme fire conditions and has been meeting with local communities to gather feedback.

* * *

•    The IOU shall ensure that de-energization policies and procedures are well-communicated and made publicly available, including the following:

o    Make available and post a summary of de-energization policies and procedures on its website.

---

https://docs.cpuc.ca.gov/PUBLISHED/GENERAL_ORDER/159182.htm.

- 21 -

Case No. 19-30088                     SECOND AMENDED PROOF STATEMENT OF CLAIM

o       Meet with representatives from local communities that may be affected by de-energization events, before putting the practice in effect in a particular area.

o       Provide its de-energization and restoration policy in full, and in summary form, to the affected community officials before de-energizing its circuits.

De-energized of electric facilities could save lives, protect property, and prevent fires.

### c.      CPUC's Regulations Have the Full Force of Law and PG&E Must Adhere to Them

73.     The CPUC's regulations have the full force of law, and PG&E has a legal obligation to follow them, including the general orders and resolutions listed above, under penalty of law.

74.     For example, California Public Utilities Code Section 702 provides that:

Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees.

75.     Further, under California Public Utilities Code Section 2106:

Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom.  If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages.

### 4.      Cal Fire is the California Agency Tasked With Investigating Wildfires

76.     Cal Fire is an agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is administratively in charge of the state's fire departments and its law enforcement related to state fire and forest laws.  As a result, it is responsible for both fighting fires as they occur and for investigating the causes of fires after they have been contained. Cal Fire conducts official investigations as an arm of the State of California to determine the causes of wildfires within the state, as well as any violations of state laws and regulations.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

- 22 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14329 10119

77.     Pursuant to an agreement with the U.S. Department of the Interior and the U.S. Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and origin determinations for wildfires—such as the Camp Fire—that fall within its jurisdiction.

**5.     Under California's Inverse Condemnation Law, So Long As PG&E Acted Reasonably and Prudently, It Would Not Bear the Costs of Wildfires Ignited By Its Equipment**

78.     As interpreted by the California Supreme Court, Article 1, Section 19 of the California Constitution imposes a doctrine known as "inverse condemnation" upon public utilities such as PG&E, whereby they are strictly liable to compensate individuals whose real property has been damaged by the utility.  Critically, however, a utility such as PG&E can recover those same costs from the CPUC—effectively passing the costs from the shareholders to the rate payers—if it can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

79.     In other words, if PG&E transmission lines caused a wildfire, PG&E would not bear the ultimate financial burden of that fire if it could prove it had acted in a manner that was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id*.  Embodied in this standard, at a minimum, is compliance with state safety laws and regulations.

**6.     PG&E Must Also Follow Minimum Safety Standards Established By Federal Law**

80.     PG&E is also required to adhere to a number of federal laws and regulations. FERC Electric Reliability Standard FAC-003-4, for example, "requires that trees and other vegetation

growing in or adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree contact with a transmission line."[8]

81.     FAC-003-4 also imposes minimum vegetation clearance distances that depend on the type of current (alternating or direct), the nominal and maximum system voltages, and the altitude of the conductor above sea level.  FAC-003-4 also imposes other requirements on owners and operators of transmission facilities, including but not limited to annual inspections, annual completion of necessary work, timely notification and correction of urgent conditions, and documentation of vegetation management practices.[9]

**B.  PG&E Misleadingly Touted Purported Increases in Vegetation Management Spending, But Made No Material Changes to its Fire Safety Practices and Omitted That Any Purported Increases Were Insufficient to Remediate Its Massive Undisclosed Backlog**

82.     The State of California declared a state of emergency due to drought conditions in January 2014,[10] which ended in April 2017.[11]  In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an epidemic of insect infestations causing millions of trees to die annually.[12]  These conditions added to the already existing danger of wildfires in the North Bay region of California as a result of PG&E's safety violations.  PG&E knew about these conditions and its obligations to ensure safety from

[8] *See* FERC, *Tree Trimming & Vegetation Management* (updated June 10, 2020), https://www.ferc.gov/industries-data/resources/tree-trimming-and-vegetation-management; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/sites/default/files/2020-04/fac-003-4.pdf; *see also* Order Adopting New Conditions of Probation, PG&E Criminal Proceedings, (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

[9] *See* PG&E Response to Request for Information at 4, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[10] California Drought, *State Water Board Approves State and Federal Water Projects Petition to Conserve Water During Drought Conditions*, Drought News Release Archive (Jan. 31, 2014), https://www.waterboards.ca.gov/drought/docs/tucp/tucp_press_release.pdf.

[11] California Executive Dept., *Executive Order B-40-17* (Apr. 7, 2017), https://www.ca.gov/archive/gov39/wp-content/uploads/2017/09/4.7.17_Attested_Exec_Order_B-40-17.pdf.

[12] California Executive Dept., *Proclamation Of A State of Emergency* (Oct. 30, 2015), https://www.ca.gov/archive/gov39/wp-content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

wildfires despite these environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent required by their existing responsibilities to protect the public health and safety, shall undertake efforts to remove dead or dying trees in these high hazard zones that threaten power lines**. . . . ."

83. Nonetheless, PG&E's vegetation management spending requested and approved by CPUC remained relatively flat throughout the Relevant Period. Based on information released by CPUC, PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017, increases of only 2.4% and 1.4%, respectively.[13] Each year's spending was substantially identical to the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases—notwithstanding the state of emergency directive above and PG&E's continued deficient safety practices.

84. In 2017, CPUC released the following chart showing PG&E's vegetation management spending from 2011 to 2017:

### Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management

|        | PG&E Requested | CPUC Authorized | PG&E Spent |
|--------|----------------|-----------------|------------|
| 2017   | $201.0         | $201.0          | *$150.4 YTD* |
| 2016   | $198.8         | $198.8          | $198.7     |
| 2015   | $194.2         | $194.2          | $194.1     |
| 2014   | $190.0         | $190.0          | $189.7     |
| 2013   | $180.0         | $161.5          | $161.6     |
| 2012   | $180.0         | $161.5          | $161.5     |
| 2011   | $180.0         | $161.5          | $161.6     |

---

[13] Letter from CPUC to PG&E re: Advice Letter 4827-E (June 3, 2016), https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5036-E (Apr. 25, 2017), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5402-E (Nov. 29, 2018), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

85.     After the North Bay Fires, on November 2, 2017, PG&E attempted to reassure investors that it was devoting sufficient resources to vegetation management, claiming it had "***doubled***" its vegetation management expenditures in 2016.

86.     Regardless of whether its actual spending actually doubled, however, PG&E's statement was misleading because it obscured how inadequate its spending – even if doubled – was in relation to the vast and overwhelming backlog of dangerous vegetation growth PG&E had illegally allowed to accumulate in close proximity to its lines.  As the federal judge overseeing PG&E's criminal probation explained at the conclusion of that probation in 2022, "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" – *i.e.* in January 2016.  Thus, assuring the public it had "***doubled***" its vegetation management spending merely gave investors a false sense of security.  Merely "doubling" its woefully inadequate spending that allowed a years-long backlog to accumulate (if it did in fact double its spending) was nowhere near sufficient to bring PG&E *into compliance with applicable laws and regulations*.

87.     It was only *after* the devastating and deadly Camp Fire, and immediately prior to the commencement of these bankruptcy cases, that PG&E announced in December 2018 that it planned to spend an additional *$5 billion* on wildfire safety programs over five years, with a focus on improving its vegetation management efforts.  This 5x increase demonstrates that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[14]

88.     Indeed, all evidence indicates it was not.  Whatever it spent in 2016, PG&E's vegetation management practices did not materially improve.  As the judge overseeing its probation noted in January 2022, "[a]s probation ends, PG&E remains at least seven years (my estimate) from coming close to being current" in addressing vegetation growing too close to its lines and equipment.

---

[14] *PG&E asking state regulators to charge customers up to $12 more a month*, KVTU Fox 2 (Dec. 14, 2018), https://www.ktvu.com/news/pge-asking-state-regulators-to-charge-customers-up-to-12-more-a-month.

- 26 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10022 10119

## C. PG&E Misled Investors as to Its Dangerous Use of Reclosers During the Relevant Period

89.     "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (i.e., an outage).  Although reclosers can prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances.  For example, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

90.     Accordingly, other California utilities, such as San Diego Gas & Electric Co. and Southern California Edison, blocked reclosers from working during fire season in order to prevent wildfire ignition.

91.     Like these other utilities, PG&E was aware, prior to the North Bay Fires, that reclosers posed a significant risk of igniting wildfires.  PG&E was specifically warned of this risk in a May 2013 report that Liberty Consulting Group prepared and submitted to the CPUC.

92.     At a November 18, 2015 hearing before the California Senate Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's then-Vice President of Electrical Operations & Asset Management, Hogan, admitted PG&E could reprogram its reclosers to not operate during fire season, but acknowledged doing so would mean "you take the reliability hit, but you gain the wildfire benefit."  In other words, PG&E was fully capable of disabling its reclosers and aware that doing so would reduce wildfire risk, but was concerned about being viewed as unreliable (which would lead to reduced bills and customer complaints) by shutting down its reclosers, potentially leading to additional blackouts.  Although it told investors it prioritized safety, PG&E did the opposite, repeatedly de-emphasizing safety throughout the Relevant Period.

93.     At that same hearing Hogan, speaking on behalf of PG&E, falsely represented that PG&E was "*just about done*" with the process of disabling its recloser devices.  He further falsely stated that reclosers would be disabled "*first*" in "*high wildfire risk areas,*" followed by "126" of "about 130 some odd locations" in 2015, leaving only "six for next year."

Case No. 19-30088                    SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10119~~ 10112

94.     These representations were false and misleading when made.  Indeed, Hogan's statement concealed from the public, and PG&E's investors, that PG&E were not disabled at all, and in fact were kept in use in areas with high wildfire risk through at least October 2017, when the North Bay Fires were ignited.  In fact, at that time, PG&E had devices in operation that were programmed to try up to three times to restore power by dangerously surging electricity through its lines, vastly increasing the risk of wildfire ignition.  Subsequent investigation has determined that PG&E's concealed use of reclosers is responsible for at least one of the North Bay Fires, the Pythian Fire.

95.     California State Senator Jerry Hill would be later quoted by NBC as stating he felt misled by PG&E about its use of reclosers:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that **they misled us in that**."
>
> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was – and may have been able to focus in on that a couple of years ago that may have prevented those fires in October."

Just as the California State Senate was misled by PG&E, so were investors, who relied on PG&E's public statements regarding its purported wildfire risk mitigation practices.

**D.     PG&E's History With Wildfires and Accidents Meant Investors Were Acutely Interested in Wildfire Risk and Associated Practices and Procedures as well as PG&E's Reassurances About Wildfire Risk**

96.     Prior to the Relevant Period, PG&E had a checkered history regarding accidents and wildfires.  During the Relevant Period, however, PG&E attempted to convince investors it had changed, falsely assuring investors it was finally devoting necessary and appropriate resources to wildfire mitigation, maintenance, and safety measures.  As would only be fully revealed following the North Bay Fires and Camp Fire, these statements were false when made and remained false throughout the Relevant period.

- 28 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS, PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10119 10112

97.     One of the most notable fires before the Relevant Period was the 1994 "Trauner Fire," for which PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems.[15]

98.     Subsequently, PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire in 1999.[16]

99.     Moreover, according to documents released by The Utility Reform Network ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had identified as one of the riskiest natural gas pipelines in PG&E's system.  PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project and repurposed the money to other priorities.  On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

100.    On August 9, 2016, a California federal jury found PG&E guilty of five criminal felony counts of violating federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count of obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion. As a result of the criminal conviction, PG&E was placed on criminal probation for a period of five years.  PG&E was supervised by U.S. District Judge William Alsup during its probationary period.

101.    On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that the Company falsified records and data concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners and

---

[15] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready.  The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed.  Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

[16] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E was reprimanded for not spending money that had been earmarked for tree trimming and removal.

- 29 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14329 10119

defraud regulators and the public about the safety of PG&E's utilities continued up to and including the Relevant Period. PG&E's statements concealing the inadequate safety of its electrical utilities during the Relevant Period were made with an intent to defraud—just like the conduct described above.[17] On December 21, 2018, the CPUC issued a Scoping Memo and Ruling, which found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and failed "to develop a comprehensive enterprise-wide approach to address safety." The CPUC concluded that it "was, and remains, concerned that the safety problems being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**." Unfortunately, by then it was too late for investors who purchased PG&E's securities at prices artificially inflated by its repeated false assurances as to its safety practices.

### 1. PG&E Falsely Assured Investors of Its Commitment to Safety and Compliance With Laws and Regulations

102. Given its history of safety violations, during the Relevant Period PG&E strained to convince the public, including investors, that it had changed and was focused squarely on complying with safety laws and regulations. On a conference call held on April 29, 2015 to discuss the Company's financial and operating results for the first financial quarter of 2015, PG&E assured investors of the Company's commitment to safety, including by stating that the Company was "***stepping up [its] vegetation management activities to mitigate wildfire risk and improve access for firefighters.***"

103. On November 18, 2015, Hogan publicly testified before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety. During that testimony, Hogan assured the public that PG&E was "***just about done***" implementing a program that would remotely disable the Company's recloser devices in areas that included

---

[17] George Avalos, *PG&E Accused of Gas Pipeline Violations, Falsifying Records: Regulator,* MERCURY NEWS (updated Dec. 17, 2018 4:06 am), https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/.

- 30 -

"***high wildfire risk areas***."  However, Hogan neglected to tell investors that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017. PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.[18]

104.    In its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports, PG&E repeatedly represented to investors, and the public at large, that its "vegetation management" practices were "***in compliance with relevant laws***" or "***complying with state and federal regulations***."

105.    Contrary to these statements, as was later revealed in probation proceedings, investigations, and news reports, PG&E was actually aware it was not in compliance with safety laws and regulations during this time period.  Indeed, the issues about which it was actually aware, and about which it lied to investors, resulted in a series of deadly fires that killed dozens and forced PG&E into bankruptcy.

### E. PG&E's Abdication of Its Safety Responsibilities Allowed Pervasive and Systemic Vegetation Management and Other Safety Violations

106.    PG&E's numerous and widespread violations of relevant safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management and other violations to go unchecked on a dangerous scale.

#### 1.    PG&E Was Aware of, and Documented, Thousands of Violations of Safety Laws and Regulations That it Did Not Remediate

107.    On March 5, 2019, the U.S. District Court presiding over PG&E's criminal probation (Judge Alsup) issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations.  The Order stated that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions," and found that PG&E's conduct had "**led to recurring deadly wildfires caused by its electrical**

---

[18] As explained below, PG&E continued to assert its commitment to disabling reclosers as late as September 2018.  *See* PG&E Public Safety Power Shutoff Policies and Procedures, Butte County website                                    (Sept.                                    2018), https://www.buttecounty.net/Portals/30/CFReport/Attachment%20-%20Public-Safety-Power-Sh utoff-Policies-and-Procedures-September-2018.pdf?ver=2020-06-13-105038-390.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

**system**."  PG&E admitted "that vegetation presents an acute risk of wildfire ignition across PG&E's service territory," and that it believed its equipment caused the Camp Fire.  The Order contained the following findings summarizing the results of the federal court's probe into PG&E's actual knowledge of safety violations leading up to the Camp Fire:

> PG&E's filings have included several relevant **admissions**. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines."  ("Vegetation" means trees and limbs in this context.)  In 2016 alone, PG&E experienced approximately **1,400** wires down caused by vegetation contact.  As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the **486** fire ignitions associated with PG&E facilities, causing 37% of those fires.  **PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."**[19]

108.    Thus, PG&E has admitted that it had **actual knowledge since 2015** that its vegetation management practices did not comply with California safety regulations on the order of at least **thousands of violations per year**.  PG&E has further admitted to **actually knowing** that its violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never disclosed that their own internal compliance reviews showed a lack of compliance on such a huge scale.

109.    When PG&E's probation ended, in January 2022, Judge Alsup, looking back on the five years PG&E was subject to probation, explained "in these five years, PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California."  He further explained "[w]e remain trapped in a tragic era of PG&E wildfires because for decades it neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code."  He also noted "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation," approximately five years earlier.

---

[19] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

Case No. 19-30088                                      SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

110. According to documents described in a report by *NBC Bay Area*, PG&E completed a review of its transmission towers' safety compliance immediately after the Camp Fire. As a result, "PG&E's inspections of thousands of transmission towers since the deadly Camp Fire in Butte County found more than 450 safety violations, including 59 that posed serious safety hazards."[20]

### 2. PG&E Caused the North Bay Fires By Choosing Not to Comply With Vegetation Management and Pole Integrity Laws and Regulations

111. Each of the North Bay fires but one was ultimately found to have been caused by PG&E's equipment. For eleven such fires, Cal Fire uncovered evidence that they were caused by PG&E's violations of California safety laws or regulations. These eleven fires broke out in seven different counties within a short time of each other. Most of these violations pertained to PG&E's failure to clear vegetation to safe distances around PG&E's equipment.

112. Even as to those fires that were not caused by PG&E's widespread safety violations, the damage caused by them was exacerbated by those that were caused by such violations. Several of the eleven fires that were caused by PG&E safety violations merged into and strengthened other fires. In addition, the widespread existence of fires caused by PG&E's safety violations diverted critical resources which could have been used to more effectively address the fires that were not caused by safety violations, allowing them to grow larger and cause greater damage.

### 3. PG&E Caused the Camp Fire By Choosing Not to Comply With Equipment Inspection and Maintenance and Vegetation Management Laws and Regulations

113. On May 15, 2019, Cal Fire issued a press release announcing its determination that PG&E's electrical equipment caused the Camp Fire.[21] Cal Fire further concluded, "[a]fter a very

---

[20] Jaxon van Deberken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC BAY AREA (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

[21] Press Release, Cal Fire, CAL FIRE Investigators Determine Cause of the Camp Fire (May 15, 2019), https://www.fire.ca.gov/media/5121/campfire_cause.pdf.

Case No. 19-30088    SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

meticulous and thorough investigation," that PG&E caused **both** of the Camp Fire's two ignition points: "Cal Fire has determined that **the Camp Fire was caused by electrical transmission lines owned and operated by [PG&E]** located in the Pulga area. . . . **The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E."** Cal Fire also referred its investigation to the Butte County District Attorney to review for potential criminal violations.

### a. The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations

114. According to Cal Fire, the Camp Fire's first ignition point was "in the Pulga area," and "was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[22] Per its May 15, 2019 press release, "**PG&E accepts this determination.**"[23]

115. According to firefighter radio transmissions and the journalist whose investigation made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County on November 08, 2018 at 6:33 a.m.[24]—matching the location where Cal Fire officials pinpointed the Camp Fire's origin four minutes earlier.[25] As one firefighter described the fire to dispatch: "It is on the west side of the river underneath the transmission lines."

116. Independently that evening, PG&E admitted to the CPUC that one of its 115-kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m.

---

[22] *Id.*

[23] Press Release, PG&E, PG&E Responds to Camp Fire Announcement from CAL FIRE (May 15, 2019), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2019/PGE-Responds-to-Camp-Fire-Announcement-from-CAL-FIRE/default.aspx.

[24] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions*, MERCURY NEWS (updated Nov. 12, 2018 12:03 pm), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

[25] Camp Fire Incident Update, CAL FIRE Incident Information (Nov. 22, 2018 7:00 a.m.), https://mobile.twitter.com/CALFIRE_ButteCo/status/1065623184324448258/photo/1.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

that day, and noted that the site was near the Camp Fire.[26]  Cal Fire has listed Pulga Road as the Camp Fire starting point.[27]

117.  The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E identified the tower as number ":27/222" and further specified that this observed damage included the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower.[28]  PG&E also observed a broken C hook attached to the separated suspension insulator that once connected the suspension insulator to a tower arm.[29]  According to the report, the connection point showed signs of wear; a flash mark was visible close to where the transposition jumper was suspended; and there was damage to the transposition jumper and suspension insulator.[30]  A PG&E employee had reported a fire in the vicinity of the transmission line to 911 the morning the Camp Fire started, and an aerial patrol identified a suspension insulator supporting a transposition jump at the transmission tower that had separated.

118.  PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not since 2009, pursuant to an internal policy whereby "Steel structures on PG&E's 115 kV transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and

---

[26] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181108-9002 (Nov. 8, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf; *see also* Tony Bizjak, *PG&E Reports Power Line Problem In Butte County Near Time and Place Where Wildfire Sparked*, THE FRESNO BEE (updated Nov. 10, 2018 7:51 PM), https://www.fresnobee.com/news/state/california/article221448500.html.

[27] Camp Fire Incident Information, CAL FIRE Incident Information (last modified Oct. 24, 2022), https://www.fire.ca.gov/incidents/2018/11/8/camp-fire/.

[28] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

[29] *Id.*

[30] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor" had become disconnected.  *Id.*

ROLNICK KRAMER SADIGH LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 44 of 214

detailed inspections every five years." PG&E has admitted that an aerial patrol is not an inspection, as it is only "[d]uring a detailed inspection of a transmission line" that "PG&E personnel are instructed to look for and document abnormalities or circumstances that will negatively impact safety, reliability, or asset life."[31]

119. A subsequent investigation by the Butte County District Attorney, described in more detail *infra*, found that the ignition was caused by the failure of a C hook that was "at least 97 years old." The C hook suspended that 115kV transmission line, and its failure allowed the live line to fall and arc against the steel tower suspending the line, showering sparks and molten metal on the dry grass below and igniting the fire. The iron C hook failed because it had worn through after nearly a century of metal-on-metal wear while suspending this transmission line in a windy area. The investigation found PG&E was aware that its C hooks would wear down over time to the point of failure, that the equipment along the Caribou-Palermo line was at or beyond the end of its useful life, and that the aged equipment along that line posed a serious fire risk. Nonetheless, PG&E reduced the frequency and thoroughness of inspections along the line and stopped training the individuals that patrolled or inspected the lines. The investigation, and a grand jury, concluded PG&E was criminally responsible for the fire because, among other things, "the reckless actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, [it] knew of that risk, and PG&E ignored the risk by not taking any action to mitigate the risk."

**b. The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations**

120. Cal Fire determined that the Camp Fire also had a second ignition point, which began "near the intersection of Concow Rd. and Rim Rd" before merging with the first fire PG&E caused at first ignition point.[32] According to Cal Fire's report: "The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E," a

---

[31] PG&E Camp Fire Incident Description & Factual Summary at 4, PG&E Criminal Proceedings (N.D. Cal. Dec. 31, 2018), ECF No. 956-1.

[32] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://www.fire.ca.gov/media/5121/campfire_cause.pdf.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14320 10119

violation of California Public Resources Code Sections 4292 and 4293, as well as California Public Utilities Code Section 451. Thus, Cal Fire determined that PG&E's violation of safety regulations caused at least one of the Camp Fire's two ignition points.

121. Cal Fire first announced that it had identified a second ignition point for the Camp Fire on November 15, 2018.[33] On November 16, 2018, PG&E admitted to CPUC that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on another power line in a nearby part of Butte County near Concow, California.[34]

122. In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further admitted that it discovered a broken pole on the second power line on November 9, 2018; that the pole was on the ground, along with pole equipment; and that the pole had a line recloser (contrary to PG&E's assertion that it was "[d]isabling automatic reclosing of circuit breakers and reclosers" in September 2018). The supplemental report also detailed a second inspection of the area on November 12, 2018, where a PG&E employee found damaged and downed poles, several snapped trees, downed wires, and some snapped trees on top of the downed wires.[35]

123. Accordingly, the truth emerged that the Camp Fire's second ignition point also exhibited evidence of failures regarding vegetation management, pole integrity, and the possible use of a recloser in further violation of California safety regulations, including Public Resources

---

[33] Andre Byik, *Camp Fire Investigation Leads to Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

[34] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181116-9015 (Nov. 16, 2018), https://www.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpucwebsite/content/news_room/newsupdates/2018/eir-incidentno181116-9015.pdf; *PG&E Reports Another Outage On The Morning When California Camp Fire Started*, CNBC (Nov. 19, 2018 6:43 AM), https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html.

[35] *Id.*

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1. SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

Code Sections 4292, 4293, and Public Utilities Code Section 451. Cal Fire's investigation later further confirmed that these suspected issues were the cause of the fire.

### F. PG&E's Pervasive and Systemic Violations of Laws and Regulations Regarding Vegetation Management and Equipment Inspection and Maintenance Demonstrate It Knew of These Violations and Simply Chose Not to Remediate Them

#### 1. PG&E Chose Not to Remediate Its Violations After the Butte Fire

124.    Even though PG&E suffered from endemic wildfire safety problems, the Company did not meaningfully change its practices even after the deadly Butte Fire that occurred in 2015. As noted herein, PG&E's Vegetation Program Manager (Stockton Division),[36] Richard Yarnell, testified in a deposition under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a result of this fire**" as of April 10, 2017. Accordingly, the known noncompliance that caused the Butte Fire in 2015 continued unabated throughout the Relevant Period, contrary to PG&E's public statements.

125.    For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E effectively shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's bonus incentive program therefore put safety at risk in an effort to reduce consumer complaints.

126.    According to a lawsuit filed on December 5, 2018, Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk.

---

[36] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1. SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 47 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

### 2. PG&E Was Aware of and Documented the Legal and Regulatory Violations That Caused the Camp Fire, But Chose to Ignore Them

127. PG&E pled guilty to unlawfully causing the Camp Fire and to 84 counts of involuntary manslaughter in connection with the deaths caused by the fire. In doing so, it "agree[d] the evidence of its criminal negligence has been established beyond a reasonable doubt," and chose not to challenge the findings of the Butte County District Attorney's investigation into the cause of the fire. In short, the investigations into the cause of the Camp Fire found that PG&E was aware of the issues that caused the fire, and the catastrophic risk posed by those issues, and made a conscious decision not to remediate those issues, but rather to run its equipment to failure.

128. PG&E's Caribou-Palermo transmission powerline was originally built in 1919 and was responsible for causing the first ignition point of the Camp Fire.

129. PG&E and the PG&E Officers knew, but concealed, that this powerline had dangerously deteriorated. In December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed due to windy conditions. In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the five collapsed towers, and one additional tower, on the Caribou-Palermo line "[s]panning Plumas-Butte County border" in a row "up slope and west of Highway 70 and generally parallel to the unpaved Pulga Road in a remote area of the Feather River Canyon within Plumas National Forest"[37]—in other words, near the first Camp Fire ignition point.

130. The rest of the aging towers on the line, including the tower alleged to have started the Camp Fire, were not replaced during that project.[38] The age of these remaining towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related factors would fail to support transmission line cables and cause wildfires. Indeed, the relevant tower included

---

[37] Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.

[38] Ivan Penn, et al., *How PG&E Ignored Fire Risks in Favor of Profits*, New York Times (Mar. 18, 2019), https://www.nytimes.com/interactive/2019/03/18/business/pge-california-wildfires.html.

Case No. 19-30088     SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10019~~10119

1  uninsulated "jumper" lines used to switch currents between transmission lines, making the risk of

2  fire even greater.[39]

3      131.    In a July 26, 2017 FERC filing that news outlets have reported on extensively,[40]

4  PG&E proposed considerable work for the Caribou-Palermo line as part of the Company's annual

5  request to FERC for rate changes.  PG&E reported that "[t]he Caribou-Palermo 115 kilovolt circuit

6  was analyzed as part of [a] 2013 NERC Assessment," referring to an analysis by the North

7  American Electric Reliability Corporation ("NERC").  The filing indicated that the 2013 NERC

8  study examined 455 spans of the of the transmission line and found that vegetation or trees were

9  allowed to grow too close to 127 (27.9%) of them: "The completed [NERC] analysis identified

10  127 spans with clearance issues out of the 455 spans on the electric transmission line."  PG&E

11  never fixed the identified issues from the time it learned about them in 2013 as reflected in the July

12  2017 filing.  PG&E's Caribou-Palermo transmission system would later cause the 2018 Camp

13  Fire.

14      132.    On March 18, 2019, *The New York Times* published an exposé on PG&E titled,

15  "How PG&E Ignored California Fire Risks in Favor of Profits."  The article discussed an internal

16  Company email, sent long before the Camp Fire, which noted that a group of structures including

17  the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due to

18  their age and windy conditions in the area.  Indeed, the Company noted that corrosion on another

19  tower in the vicinity was so severe that it had endangered crews attempting to repair it.  The

20  Company's own guidelines had warned that the tower was a quarter-century past its useful life, yet

21  PG&E failed to repair or replace the aging tower.

22

23  [39] Matthias Gafni, *It was originally built in 1919.  What failed on PG&E tower at heart of Camp Fire probe?*, MERCURY NEWS (updated Dec. 10, 2018 4:09 AM),

24  https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

25  [40] *E.g.*, George Avalos, *PG&E Knew For Years That Repairs Were Needed On Transmission Lines In Area Of Fatal Camp Fire*, MERCURY NEWS (updated Feb. 28, 2019 6:05 AM),

26  https://www.mercurynews.com/2019/02/27/pge-delayed-repairs-for-years-on-transmission-line-linked-to-lethal-camp-fire.

27

28  - 40 -

Case: 19-30088   Doc# 14604-1   Filed: 10/08/24   Entered: 10/08/24 19:48:21   Page
49 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020
PENN 1, SUITE 3401
10119

133.    The article also portrayed a corporate culture at the Company which disregarded safety risks and avoided paying for necessary fire prevention precautions in favor of short-term operating results.  The article quoted Mike Florio, a former California utilities commissioner, who observed, "There was very much a focus on the bottom line over everything [at PG&E]: 'What are the earnings we can report this quarter? . . . And **things really got squeezed on the maintenance side**."  The article also quoted California's Governor Gavin Newsom, who expressed a similar sentiment: "**[PG&E] ha[s] simply been caught red-handed over and over again, lying, manipulating or misleading the public. . . They cannot be trusted**."  The article compared the lack of focus on safety at the Company with the approach taken by another California utility facing similar risks, San Diego Gas & Electric ("SDG&E"), which had significantly revamped its safety protocols to respond to increased wildfire dangers.  According to one industry expert quoted in the article, if PG&E had followed the lead of SDG&E, its equipment would have caused far fewer destructive fires.  This expert concluded that **"[PG&E's] culture of a lack of safety is unique**" amongst utilities.

134.    Also on March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal Company emails demonstrating that PG&E had identified the transmission lines implicated in the 2018 Camp Fire as unsafe long before the fire started.[41]  For example, **internal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high**"—a risk PG&E concealed from the public.

135.    Similarly, a November 1, 2016 PG&E document detailed the failure of necessary hardware along the transmission line, with a support hook snapping off during routine painting.

---

[41] *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, BUSINESS WIRE (Mar. 18, 2019), https://www.businesswire.com/news/home/20190318005868/en/Northern-California-Fire-Lawyers-Obtain-Documents-That-Show-PGE-Knew-About-Risk-of-Caribou-Palermo-Line-Failure.

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 50 of 214

PG&E documents internally acknowledged that the supports "had been compromised through corrosion."[42]

136.    Despite the internal acknowledgment that the Caribou-Palermo lines needed to be repaired and posed a significant risk of collapse, PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never undertaken, and the **Caribou-Palermo line caused the first ignition point of the Camp Fire** in 2018.

a.    **The Butte County DA Report Conclusively Established PG&E Caused the Camp Fire By Choosing to Ignore Known Severe Risks With the Infrastructure That Ignited the Fire**

137.    On June 16, 2020, the Butte County District Attorney published a 92-page report entitled "The Camp Fire Public Report: A Summary of the Camp Fire Investigation" (the "Butte County DA Report").  The Butte County DA Report detailed the findings of its investigation, aided by the California Attorney General, and a specially empaneled grand jury (the "Camp Fire Grand Jury") convened to investigate the cause of, and any potential criminal liability arising from, the Camp Fire.  The Camp Fire Grand Jury "heard nearly 100 witnesses, reviewed approximately 1,600 exhibits, and produced some 6,000 pages of transcript."  The Butte County DA Report, and the grand jury concluded, "[t]he evidence developed during this investigation clearly established that the reckless actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, **that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk**."  The Butte County DA Report was used to establish the factual basis for the Utility's guilty plea to 84 counts of involuntary manslaughter and one count of unlawfully causing a fire.  *Id.* at 3-4, 80-81.

138.    PG&E was fined $3.5 million, and was required to pay the District Attorney's office half a million dollars to cover the cost of its investigation.  This was the highest penalty

---

[42] *Id.*

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10112

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 51 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

allowed under California law. The deal also required PG&E to provide information about its safety practices to a federal monitor for two years, and restricted PG&E from paying dividends to its shareholders for three years.[43] Separately, the Utility committed to spend up to $15 million over five years to provide water to Butte County residents impacted by damage to the Utility's Miocene Canal caused by the Camp Fire.

139. The Butte County DA Report found that PG&E was specifically aware of wear problems with C hooks (as far back as 1987), the connection between aging infrastructure and fire risk, the critical aging of the Caribou-Palermo line, and that it ignored a 2010 consultant report that identified such problems and recommended regular climbing inspections of the hooks. *See id.* at 73-79. Indeed, according to the Butte County DA Report, PG&E has known about the risk of fire caused by equipment failure *since as early as 2006*: "Internal PG&E documents show that by 2006 PG&E was aware that equipment failure (risk) causes fires. According to the October 2006 Risk Analysis of Urban Wild Land Fires, written by the PG&E Enterprise Risk Management Committee, in 2005 PG&E electrical equipment failures caused 20 fires. . . . The evidence clearly established PG&E has been aware of the risk/consequence connection between equipment failure and fire since at least 2005. Similarly, the evidence also clearly establishes that PG&E was aware of the risk/consequence connection between aging infrastructure and equipment failure." *See id.* at 73-75.

140. The Butte County DA Report sheds additional light on PG&E's failures to properly inspect, maintain, and replace equipment on their high-voltage transmission lines and on how the Company's inadequate safety practices with respect to its electrical transmission and distribution system caused the Camp Fire.

---

[43] Ivan Penn and Peter Eavis, *PG&E Will Plead Guilty to Involuntary Manslaughter in Camp Fire*, THE NEW YORK TIMES (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/business/energy-environment/pge-camp-fire-manslaughter.html.

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 52 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020
PENN 1, SUITE 3401
10119

141.     The Butte County DA Report confirmed the information about the broken C hook on tower :27/222, and that PG&E knew, but concealed, that equipment on the Caribou-Palermo line "had dangerously deteriorated."

142.     Cal Fire determined that the first ignition point of the Camp Fire was "the dry brush below Tower 27/222 of the Caribou-Palermo line," and that the fire began when "a C hook that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure. The ensuing electrical arcing between the jumper conductor and steel tower structure caused the aluminum strands of the conductor to melt as well as a portion of the steel tower structure.  The molten aluminum and steel fell to the brush covered ground at the base of the steel tower structure. This molten metal ignited the dry brush." Butte County DA Report at 9.

143.     Cal Fire found that many of the components on towers of the Caribou-Palermo line, including Tower :27/222 and the C hook that broke, were from the original construction of the line, between 1919 and 1921, and had not been replaced.  Specifically, "the insulator string hanging from the C hook that broke on November 8, 2018 was an original 1921 insulator."  Further, "with the exception of add-on hanger brackets which were added to the ends of the transposition arms to replace worn hanger holes, the transposition components on Tower 27/222, including the transposition arms, C hooks, insulator strings and jumper conductor[s], were original components in service since 1921."  *Id.* at 18-19, 82.

144.     With respect to the specific C hook that failed and caused the Camp Fire to ignite, investigators found (i) "that as a result of rotational body on body wear"—caused by movement in the wind—"the edge of the hanger holes had cut a channel into" the C hook and that "the channel had cut approximately 14/16 into the hook before the remaining metal broke under the weight of the insulator string and jumper conductor," (ii) "substantial wear" on the bolted-on hanger hole plate of the left-phase transposition arm "where the broken hook had hung," and (iii) a "channel" worn into the right-phase C hook—which had not failed—"where it hung from the bolted-on

- 44 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1    hanger plate hole of that transposition arm" which was "similar to the channel cut into the broken

2    left phase C hook." *Id.* at 19-20, 22.

3         145.    Investigators found spaces between C hooks and hanger holes indicative of

4    substantial wear on three other towers on the Caribou-Palermo line. *Id.* at 20.

5         146.    Investigators found that, at Tower :27/222 and at least one other tower on the

6    Caribou-Palermo line, the C hooks hung from "bolted-on hanger plate holes [that] had been added

7    to the transposition arms," instead of the original hanger holes, indicating PG&E's awareness of

8    wear on the C hooks and hanger holes. *Id.* at 20-21, 31.

9         147.    By at least 1987, PG&E had knowledge of wear on the C hooks and hanger holes

10    on their transmission infrastructure when photographs in the "PG&E Laboratory Test Report"

11    documented worn C hooks and hanger holes on transmission towers. *Id.* at 24, 78, 83. In 2011 and

12    again in 2018, workers on PG&E's transmission line crews observed similar wear on hanger holes.

13    In 2011, a Utility engineer noted in an email that "[i]t appears that there is a groove cutting into the

14    plate probably caused by years of rubbing between the C hook and the plate." And in 2018, a

15    Utility lab report found that the wear was "attributed to wind-driven swinging of the insulators"

16    and opined that the "useful life of the hanger plates" was 97-100 years. *Id.* at 78, 83-84.

17         148.    PG&E was aware of the age of the equipment on the Caribou-Palermo line and

18    introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but

19    apparently never funded the program. *Id.* at 33.

20         149.    By 2007, a PG&E engineer sought $800,000 in funding "for preliminary

21    engineering and purchase of long lead-time material to replace conductor and tower structures on a

22    section of the Caribou-Palermo line," noting that "[t]he probability of . . . failure is imminent due

23    to the age of both the towers and the conductor." *Id.* at 34. After removing language about "the

24    prediction of imminent failure," PG&E's Electric Asset Strategy Division approved the project

25    with a reduced funding amount. Between 2007 and 2009, PG&E conducted "engineering studies

26    of the proposed new tower sites and preparatory work, including building a road to allow access to

27

28

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

the proposed new tower sites," but canceled the project "due to Asset Management's reprioritization." *Id.* at 34-35.

150. PG&E reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire. *Id.* at 50.

151. The Butte County DA Report also shows that PG&E inadequately inspected the Caribou-Palermo line and their other high-voltage transmission equipment. According to the Butte County DA Report, PG&E changed their inspection and patrol policies over the decade preceding the Camp Fire and "drastically reduced the frequency and thoroughness of inspections." *Id.* at 23-25.

152. Under the 1987 policy, "the Caribou-Palermo line was required to be patrolled three times each year: one ground patrol and two aerial patrols." The policy also required "climbing inspections of five percent of the tower structures per year; and an infrared patrol every five years." *Id.*

153. Under policy changes that PG&E made in 1995, "[t]he Caribou- Palermo line was reduced from three patrol/inspections (one ground/two aerial) per year to one ground inspection every 24 months and one aerial inspection every 24 months. Required routine climbing inspections were eliminated." *Id.* at 24.

154. Under the Electric Transmission Preventative Maintenance Manual ("ETPM")—which went into effect in 2005—the Caribou-Palermo line was further "**reduced to only being inspected once every five years and patrolled once per year in non-inspection years**." *Id.* at 25.

155. The ETPM differentiated between "inspections" and "patrols." Inspections were to be far more thorough, and were "to include detailed visual observations, operational readings, and component testing to identify abnormalities or circumstances that will negatively impact safety, reliability or asset life." During an inspection, "[i]ndividual elements and components are carefully examined through visual and/or routine diagnostic tests and the abnormal conditions of each are graded and/or recorded." For a patrol, the inspector's "primary responsibility . . . is to

- 46 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1    visually observe the electric facilities, looking for obvious structural problems or hazards without

2    the use of measuring devices, tools, or diagnostic tests, and to record the facilities that have been

3    patrolled."

4    156.    Although they did not further revise the relevant portions of the ETPM between

5    2005 and the Camp Fire, in 2013 PG&E "considered further reducing the frequency of inspections

6    and patrols." *Id.* at 26.

7    157.    Despite making these revisions to the patrol/inspection policy, PG&E's ETPM

8    acknowledged that "the best position to view insulators and hardware is aerial inspection (not

9    patrol), ground inspection above 10', and climbing inspection." *Id.*

10   158.    Although the ETPM was intended to "reduce the potential for component failure

11   and facility damage and facilitate a proactive approach to repairing or replacing identified,

12   abnormal components," PG&E's actual inspections and patrols of the Caribou-Palermo line did

13   not even comply with the already-lowered ETPM standards. *Id.* at 23, 26, 37.  This was

14   particularly true "in low population density mountainous areas," such as where the Camp Fire

15   began. *Id.* at 47.  The report concluded that **"[t]he evidence clearly established that PG&E did**

16   **not, in fact, follow the procedures and requirements established in the ETPM**" and "**it is**

17   **reasonable to conclude the sections of the ETPM relating to inspections and patrols of**

18   **overhead electric transmission lines were simply a façade created to meet the requirements**

19   **of the regulators and the CAISO.**" *Id.* at 26.

20   159.    PG&E sought to cut costs associated with inspections and patrols "by reducing the

21   thoroughness of the inspections and patrols," specifically by "reducing the amount of time

22   budgeted for the inspections and patrols" and tying salary incentives to staying within reduced

23   inspection and patrol budgets. *Id.* at 27-28, 50.

24   160.    In 2005, PG&E eliminated the direct training of the employees responsible for

25   inspecting and patrolling transmission lines.  All of PG&E's employees who "inspected or

26   patrolled the Caribou-Palermo line since the publication of the ETPM in 2005 . . . **denied having**

27   **receive[d] any formal training on how to perform an inspection or patrol**," including in

28

- 47 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020-1019

1   "assessing wear." Their training was "limited to filling out reporting forms and notifications for

2   any issues" and the "only training on how to perform an inspection or patrol was via informal

3   mentoring by other, more experienced" employees. *Id.* at 28-30.

4       161.    "[B]y 2007 the inspections and patrols of the Caribou-Palermo line were being

5   conducted by inexperienced, untrained and unqualified [employees]. Both of the "Detailed

6   Ground Inspections (2009 and 2014) and seven of the ten Annual Air Patrols on the Caribou

7   Palermo [line] were completed by [employees] who had little or no prior transmission experience,

8   and no formal training on performing inspections and patrols." This violated the ETPM, which

9   required employees to "be thoroughly familiar with all of the facilities, equipment, safety rules and

10  procedures associated with the facilities and equipment." Specifically, "[b]ecause of their lack of

11  knowledge, experience, and training," the employees inspecting the Caribou-Palermo line "could

12  not have been expected to identify the wear" on C hooks and hanger holes. *Id.* at 30.

13      162.    The last "Detailed Ground Inspection" of the Caribou-Palermo line before the

14  Camp Fire occurred in 2014 and, from 2015 to the Camp Fire in 2018, the line was only subject to

15  annual aerial patrols, *Id.* at 37—which were inadequate. PG&E employees "**denied it was**

16  **possible to assess the wear on the C hooks and hanger holes during a detailed ground**

17  **inspection" or "during aerial patrols.**" Moreover, such inspections were inconsistent with the

18  ETPM's guidance that "[o]nly climbing inspections or lifted bucket inspections above 10 feet in

19  the air would give the appropriate best view for assessment of insulators and their connectors." *Id.*

20      163.    The linemen who assisted in the inspections of the Caribou-Palermo line had not

21  been trained on performing inspections and patrols and did not conduct their inspections under the

22  supervision of a trained, experienced troubleman. Instead, the linemen and troubleman divided the

23  line into sections and each independently inspected his own section. *Id.* at 38.

24      164.    "[B]etween 2001 and 2018 aerial patrol by helicopter was the primary method of

25  inspection and patrol for the Caribou-Palermo line. . . . **[T]he thoroughness of the aerial patrols**

26  **declined through the years.**" For example, patrol flight time declined from 10 hours for the 2001

27  patrol to between 3.2 and 7.6 hours for patrols from 2011 to 2018. Employees characterized

28
- 48 -

patrols with such flight times as "'**fly bys' not patrols or inspections**" and reported that they were "**only confirming the structures and components were 'standing upright.**'" They also stated that it would not be "possible to see and assess the wear on the C hooks and hanger holes during aerial patrols." *Id.* at 40-41.

165. The ETPM required climbing inspection upon certain specific triggers, such as component defects or failures, high fire hazard, and equipment failures caused by storms. But, in practice, PG&E treated this requirement as discretionary and did not order climbing inspections even when multiple triggers had occurred. *Id.* at 41-43.

166. Even though 80 towers on the Caribou-Palermo line were subjected to climbing inspections in September and October 2018, those inspections were deficient. They failed to detect defects on numerous towers that were later identified in December 2018 wildfire-related inspections. *Id.* at 43.

167. After the Camp Fire, PG&E initiated wildfire-related climbing inspections on the Caribou-Palermo line and other similar transmission lines. Those inspections "identified thousands of conditions requiring repairs on PG&E's system that had not been previously identified." *Id.* at 44.

168. After "the failure of a connector on a jumper line" on a Caribou-Palermo line tower caused the Rock Fire in September 2008, PG&E "did not conduct climbing or aerial inspections on other Caribou-Palermo line towers with similar connectors." *Id.* at 35.

169. After five towers on the Caribou-Palermo line fell during a 2012 windstorm, PG&E failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses. *Id.* at 36.

170. After a painting crew broke a J hook on a Caribou-Palermo line tower in 2016, PG&E reported that "about 20% of the thickness of the bolt had been compromised through corrosion." Nonetheless, "the failure of the J hook did not cause inspections of J hooks in other similar towers." *Id.*

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10112

171. "Despite the fact the towers of the Caribou-Palermo line were routinely subjected to winds at or near their design criteria, PG&E never inspected or tested any of the towers or components for wind damage." *Id.* at 72.

172. Accordingly, PG&E had actual knowledge about the safety violations that caused the Camp Fire for years, if not decades, in advance.

173. It was with this knowledge that PG&E touted their vegetation management and infrastructure maintenance to investors, falsely representing that it was in full compliance with all relevant regulations throughout the Relevant Period. In reality, PG&E's widespread and systemic failures to properly inspect and maintain its equipment violated numerous laws and regulations, including without limitation, California Public Utility Code § 451, CPUC GO 165, and FERC Electric Reliability Standard FAC-003-4.

**G.  PG&E Misrepresented its ESRB-8 Shutoff Protocol, and PG&E's Failure to Follow the Protocol as it Was Represented to the Public Was a Proximate Cause of the Camp Fire**

174. After the North Bay Fires but before the Camp Fire, on July 16, 2018, the CPUC passed Resolution ESRB-8. As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur. PG&E announced its response to this new safety requirement on September 27, 2018, and touted its existence throughout the rest of the Relevant Period.

175. The "Public Safety Power Shutoff Policies and Procedures" PG&E published on its website to comply with Resolution ESRB-8 (the "ESRB-8 Shutoff Protocol") represented that its ESRB-8 Shutoff Protocol applied to all types of powerlines, without qualification. It stated: "PG&E's Wildfire Safety Operations Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off electric power lines, in the interest of public safety." Thus, PG&E's ESRB-8 Shutoff Protocol, as it was represented to the public, applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

176. In the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 59 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System
- **A Red Flag Warning** declared by the National Weather Service
- **Low humidity levels**, generally 20 percent and below
- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph
- **Site-specific conditions** such as temperature, terrain and local climate
- **Critically dry vegetation** that could serve as fuel for a wildfire
- **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.) PG&E stated that "no single factor will drive a Public Safety Power Shutoff," and never identified any other criteria during the Relevant Period or since.

177. When PG&E's lines ignited the Camp Fire on November 8, all seven criteria had been met or exceeded, which PG&E knew or recklessly disregarded. Indeed, PG&E had warned customers in that area as early as November 6, two days before the Camp Fire began, that it may need to "proactively turn off power for safety starting on Thursday, November 8."[44]

178. PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once before —from October 14 through 17, 2018—when it shut off eight transmission power line circuits and thirty-three distribution power line circuits in seven counties. Though PG&E found damage to its equipment before restoring power, it nevertheless faced strong resistance from customers who were affected by the shutoff.

179. On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via its official Twitter.com account: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as weather conditions did not warrant this safety measure."[45] The three weather-relevant criteria are humidity levels (at 20% or

---

[44] Press Release, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff*, AP News (Nov. 6, 2018), https://apnews.com/article/business-san-francisco-weather-538a9e87b66947ce9f17bebd51afac82.

[45] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

below), wind speed (with sustained winds around 25 miles per hour or stronger, and wind gusts around 45 miles per hour or stronger), and general site-specific conditions (e.g., local climate and terrain).

180.    However, as detailed below, each of these factors weighed in favor of a shutoff. Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific conditions contributed to the ignition of the most destructive and deadliest fire in California history.  As Cal Fire later confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."[46]

181.    The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[47] Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39° 44' 09" N (Latitude), 121° 29' 20" W (Longitude),[48] approximately six miles from the Camp Fire's origin.[49]  The Jarbo Gap weather station provided the most accurate record of weather conditions at the time and place where the Camp Fire ignited.

### 1.    PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power

182.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted in three press releases that all seven criteria weighed in favor of a shutoff—providing only small caveats that weather-related factors might change.

---

[46] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://www.fire.ca.gov/media/5121/campfire_cause.pdf.

[47] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), https://scdd.ca.gov/wp-content/uploads/sites/33/2019/06/CalFire-Incident-Information.pdf.

[48] Jarbo Gap California Weather Station Information, RAWS USA Climate Archive, https://raws.dri.edu/cgi-bin/wea_info.pl?caCJAR.

[49] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), https://scdd.ca.gov/wp-content/uploads/sites/33/2019/06/CalFire-Incident-Information.pdf.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ONE PENNSYLVANIA PLAZA
~~PENN 1, SUITE 3401~~
NEW YORK, NY ~~10020~~10119

a. **Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level**

183. The area where the Camp Fire ignited was classified as having an "Extreme" fire danger threat level by the National Fire Danger Rating System ("NFDRS"). The U.S. Forest Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in map[50] and data[51] form, both of which confirm that the Jarbo Gap was rated "Extreme" on November 8, 2018. The below graphic has modified the WFAS map to highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on November 8, 2018:



184. The U.S. Department of Agriculture Forest Service explained the NFDRS as follows:

> When the fire danger is "extreme", fires of all types start quickly and burn intensely. All fires are potentially serious and can spread very quickly with intense burning. Small fires become big fires much faster than at the "very high" level. Spot fires are probable, with long-distance spotting likely. These fires are very difficult to fight and may become very dangerous and often last for several days.[52]

---

[50] Observed Fire Danger Class, WFAS-Maps Graphics Fire Behavior Research (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png.

[51] *See* Data Chart of Fire Weather Observations from WIMS at 1700 Mountain Time (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme").

[52] USDA Forest Service, National Fire Danger Rating System, https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368839.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

185.     Indeed, in a press release on November 7, 2018, PG&E admitted: "Due to expected extreme fire danger conditions . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[53]

### b.     Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area

186.     The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[54] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions, including the Red Flag warning from the National Weather Service and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[55]

### c.     Criterion 6: "Critically Dry Vegetation" (i.e., Wildfire Fuel) Weighed in Favor of a Shutoff

187.     Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by an extended period of dry fall weather, only one rain event since May, and periods of dry north winds which caused the moisture content of live and dry fuels to remain low."[56]

---

[53] Press Release, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather*, BUSINESS WIRE (Nov. 7, 2018),
https://www.businesswire.com/news/home/20181107005834/en/PGE-Continues-to-Notify-Customers-in-Parts-of-Nine-Counties-About-the-Potential-for-Public-Safety-Power-Shutoff-Due-to-Forecasted-Extreme-Weather.

[54]  Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning*, CBS13 SACRAMENTO (Nov. 8, 2018 12:17 A.M.), https://www.cbsnews.com/sacramento/news/red-flag-warning-pge/.

[55] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff Due to* (Nov. 6, 2018), https://www.pge.com/en_US/about-pge/media-newsroom/newsreleases.page.

[56]  PG&E Letter to CPUC re: Compliance Report (Nov. 27, 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/PSPS-Report-Letter-11.27.18.pdf.

- 54 -

1    188.   PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to

2    forecasted high winds and dry vegetation, PG&E may temporarily turn off power in portions of the

3    following communities: Butte County (including Berry Creek, Chico, Forest Ranch, Magalia,

4    Oroville, Paradise). . . ."[57]

5    189.   As Pulitzer Prize winning journalist Matthias Gafni would later report, information

6    from the National Aeronautics and Space Administration ("NASA") showed that California's

7    moisture levels that month were "at the lowest levels in [the] last four years."[58]  As the graphic

8    below confirms, this led to extremely dry vegetation:



---

[57] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather*, BUSINESS WIRE (Nov. 7, 2018), https://www.businesswire.com/news/home/20181107005834/en/PGE-Continues-to-Notify-Customers-in-Parts-of-Nine-Counties-About-the-Potential-for-Public-Safety-Power-Shutoff-Due-to-Forecasted-Extreme-Weather.

[58] Matthias Gafni, *Why Didn't PG&E Shut Down Power In Advance Of Deadly Camp Fire? Here's The Data*, Bay Area News Group (Nov. 18, 2018 5:00 P.M.), https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-camp-fire-heres-the-data/.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS ASPEN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10220 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

### d. Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff

190. PG&E's on-the-ground observations favored a shutoff. In a press release dated November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to initiate" a shutoff included its "on-the-ground observations."[59]

191. This conclusion is corroborated by PG&E's admission in a November 8, 2018 press release that only weather factors weighed against shut-off: "[PG&E] has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern California counties, **as weather conditions did not warrant this safety measure**."[60]

### 2. All of the Weather Criteria Weighed in Favor of Shutting Off the Power

192. As described above, PG&E claimed it did not shut off power because weather conditions did not warrant doing so. Specifically, in a November 27, 2018 filing to the CPUC, PG&E explained that the primary weather condition that fell short was wind speed:

> On Wednesday, November 7, 2018, PG&E refined the forecasted impact down to 63,000 customers and eight counties (Butte, Lake, Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather conditions stayed consistent, nearing but not reaching forecasted levels that would warrant temporarily turning off power for customer safety.**

---

[59] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather*, BUSINESS WIRE (Nov. 7, 2018), https://www.businesswire.com/news/home/20181107005834/en/PGE-Continues-to-Notify-Customers-in-Parts-of-Nine-Counties-About-the-Potential-for-Public-Safety-Power-Shutoff-Due-to-Forecasted-Extreme-Weather.

[60] Press Release, *PG&E, PG&E Determines to Not Proceed with Public Safety Power Shutoff Planned for Portions of Eight Northern California Counties* (Nov. 8, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Determines-to-Not-Proceed-With-Public-Safety-Power-Shutoff-Planned-for-Portions-of-Eight-Northern-California-Counties/default.aspx.

---

- 56 -

By around 13:00 on Thursday, November 8, winds were decreasing, and conditions were no longer forecast to approach [Public Safety Power Shutoffs] criteria. Based on the forecasted information, PG&E no longer anticipated a possible need to de-energize.

193. However, all weather factors—including wind speed—weighed in favor of an electricity shutoff in Jarbo Gap on November 7-8, 2018. The charts[61] below show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through the next day:

### Jarbo Gap California

Daily Summary for

**November 8, 2018**

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | V. Dir. Deg | Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

### Jarbo Gap California

Daily Summary for

**November 7, 2018**

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | V. Dir. Deg | Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

— 61
htt W
htt

2018), =E;
2018), =E.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1. SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

194. Accordingly, PG&E's November 27, 2018 statement to the CPUC that it did not shut off power in part because "[b]y around 13:00 on Thursday, November 8, winds were decreasing" was misleading. The Camp Fire had already begun over six hours before that point. And indeed, as shown in the chart above, wind speed weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

a. **Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels**

195. Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

196. Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

197. PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[62]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[63]

---

[62] Press Release, *PG&E*, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continues-to-Closely-Monitor-Weather-Conditions-Ahead-of-Possible-Public-Safety-Power-Shutoff-in-Parts-of-Eight-Counties/default.aspx.

[63] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

Case No. 19-30088          SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

198.     In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary.  The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[64]

### b.     Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed

199.     As noted above, PG&E informed the CPUC on November 27, 2018 that the primary reason it did not shut off the power was wind speed.

200.     Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

201.     At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour.  Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

202.     PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in

---

[64] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

- 59 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ASPEN J. SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10119~~10012

1    its press release late the previous evening[65]—warned of winds "during the morning and afternoon"

2    with a "[s]trong northerly/northeasterly flow of 20-25 mph."[66]

3          203.    In fact, sustained wind speed weighed even more strongly in favor of a shutdown

4    that day than it did on October 14, 2018, the day on which PG&E had previously determined that a

5    power shutoff was necessary.  The National Weather Service's forecast of sustained winds of

6    20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

7    predicted "Strong/gusty east-northeasterly winds of 15-20 mph . . . where sustained winds are

8    forecast to reach 20-25 mph for a few hours."[67]

9                    c.    **Criterion 5: Site-Specific Conditions Further Favored Shutoff**

10          204.    The specific conditions beneath PG&E's 115 kilovolt transmission line where the

11   Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted Betsy

12   Ann Cowley regarding transmission line poles on her property in Pulga that "were having

13   problems with sparks," indicating that conditions were hazardous.[68]  Further, it is indisputable that

14   dry vegetation existed underneath the transmission line, given reports of vegetation burning

15   beneath it.  Notably, PG&E identified nothing about the area's terrain, temperature or climate in its

16   November 27, 2018 letter to the CPUC explaining its decision not to shut off its lines.[69]

---

17   [65] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of*
18   *Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018),
     https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continu
19   es-to-Closely-Monitor-Weather-Conditions-Ahead-of-Possible-Public-Safety-Power-Shutoff-in-
     Parts-of-Eight-Counties/default.aspx.
20   [66] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC),
21   https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.
     [67] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC),
22   https://www.spc.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.
     [68] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different*
23   *Transmission Line*, MERCURY NEWS (updated Nov. 14, 2018 3:59 PM),
24   https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-r
     oles-in-deadly-camp-woolsey-fires/.
25   [69] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further
26   supported a shutdown.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-
     Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with
27   "extreme topography."  *See* Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013),

28
                                            - 60 -

### 3. PG&E Knowingly Employed Additional Criteria to its Shutoff Protocol That Contradicted the Information Provided to the Public

205. PG&E knew that severe weather conditions requiring a shutoff under the ESRB-8 Shutoff Protocol were in effect. First, the Company admitted it had been monitoring the weather in the area for days; its November 7 press release confirmed that "PG&E meteorologists continuously monitor weather conditions." Second, the Company had its own "network of PG&E weather stations to enhance weather forecasting and modeling," and stated that the Company had the capability of "[m]onitoring wildfire risks in real time from our new Wildfire Safety Operations Center."[70] Finally, the weather data referenced above was publicly available. Indeed, for the hour from midnight to 1 a.m. on November 8, 2018, just before the Camp Fire started, the Jarbo Gap weather station reported that all weather conditions were met: humidity at 19%, sustained winds at 27 miles per hour, and wind gusts at 45 miles per hour. Accordingly, PG&E either knew that weather conditions existed that weighed in favor of a shutoff, or deliberately disregarded such information.

206. Every factor weighed in favor of shutting off PG&E's transmission line running through the Jarbo Gap outside of Paradise, California. PG&E knew or should have known that all such factors were met.

207. However, what the public did not know, was that the ESRB-8 Shutoff Protocol PG&E published on its website was illusory and did not accurately reflect the protocol it actually applied.

---

https://www.pge.com/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf. After the Camp Fire, an article reported on the terrain immediately around the same transmission line as making fire containment more difficult: "The remoteness and rugged terrain around the tower would make any firefight by hand crews nearly impossible." *See* Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of Camp Fire probe?*, MERCURY NEWS (updated Dec. 10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-t ower-at-heart-of-camp-fire-probe/.

[70] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC (June 2018), https://homedocbox.com/Environmental_Safety/87028654-Community-wildfire-safety-program-june-26-2018.html.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

208.    Years after the Camp Fire, the public finally received an explanation as to why the ESRB-8 Shutoff Protocol was not used to shut off the transmission line that sparked the fire.  The Butte County DA Report confirmed that "the conditions in the Feather River Canyon in the hours prior to the failure of the C hook on Tower 27/222 exceeded the wind conditions necessary for de-energization under the publicly posted [ESRB-8 Shutoff Protocol]."  However, after obtaining in its investigation copies of PG&E's shutoff policy it provided to CPUC, the Butte County DA determined that it materially differed from the information provided to the public.

209.    The Butte County DA Report explained, "[t]he publicly available [ESRB-8 Shutoff Protocol] used the term 'power lines' and did not differentiate between distribution and transmission lines or by voltage or area."  However, "[a]s opposed to the publicly posted [ESRB-8 Shutoff Protocol], the official PG&E [shutoff] policy differentiated between transmission and distribution lines."  In addition, "[t]he **actual policy**" – *i.e.*, the non-public one **– "specifically and explicitly exempted all 115kV … transmission lines**," including the Caribou-Palermo line that failed and caused the Camp Fire.  It further found that the publicly available ESRB-8 Shutoff Protocol had been "simplified" by PG&E "**to an extent that became misleading**."

210.    In sum, had the "actual policy" been as it was represented to the public, including investors, all the criteria would have been met to shut off the Caribou-Palermo line and the Camp Fire would have been prevented.  From the beginning, PG&E misrepresented to investors that the Company would prioritize safety over customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  By PG&E's statements listing these—and only these—criteria in its ESRB-8 Shutoff Protocol, and by stating that it would monitor for these criteria "across [its] system," investors were entitled to believe that when all the **publicly disclosed** criteria were met, PG&E would prioritize safety and shut off the power rather than risk causing wildfires and the resulting economic and reputational harm to PG&E.

211.    In the alternative, PG&E had a duty to update investors once PG&E decided to abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result of PG&E's

Case No. 19-30088

SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

1    non-adherence to the protocol was the deadliest and most destructive wildfire California has ever

2    faced.

3    **H.    PG&E's Bankruptcy and Other Post-Relevant-Period Developments**

4        212.    On June 12, 2018, a Securities Class Action (the "Class Action") was filed against

5    PG&E and certain of its directors and officers (the "Ds and Os"). That action alleged federal

6    securities law violations in connection with misstatements made by PG&E and its Ds and Os

7    regarding PG&E's wildfire mitigation measures and compliance with safety protocols that

8    occurred prior to the North Bay Fires. Further allegations were later added in an Amended

9    Complaint filed on May 28, 2019 to incorporate PG&E's misstatements that occurred after the

10   North Bay Fires and prior to the Camp Fire. Claimant and Adopting Claimants traded PG&E

11   securities during the alleged class period in the Amended Complaint. As of September 30, 2022,

12   that action is stayed pending resolution of PG&E's bankruptcy proceeding.

13       213.    Following PG&E's felony convictions for knowingly and willfully violating safety

14   standards in causing the deadly San Bruno gas explosion and obstructing justice, PG&E's sentence

15   included criminal probation. Since November 27, 2018, the U.S. District Court presiding over

16   PG&E's probation instituted further proceedings to determine whether, *inter alia*, PG&E's safety

17   violations causing the North Bay Fires and Camp Fire may have violated its probation.

18       214.    On January 14, 2019, PG&E filed a current report on its Form 8-K stating that it

19   expected to file for Chapter 11 bankruptcy on or about January 29, 2019. The reason the Company

20   provided for the expected bankruptcy was the "series of catastrophic wildfires that occurred in

21   Northern California in 2017 and 2018"—namely, the North Bay Fires and Camp Fire.[71]

22       215.    On January 29, 2019, PG&E commenced a Chapter 11 bankruptcy proceeding.

23   The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including

24

25

26   _____

27   [71] PG&E Current Report filed on Form 8-K (Jan. 13, 2019),
     https://www.sec.gov/Archives/edgar/data/75488/000095015719000032/form8k.htm.

28
     Case No. 19-30088          SECOND AMENDED ~~PROOF OF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020
PENN 1, SUITE 3401
10119

1 more than $30 billion in potential liabilities tied to the North Bay and Camp Fires.[72] Claimant and

2 the Adopting Claimants are among the claimants that have filed securities claims in PG&E's

3 bankruptcy proceeding which remain unresolved.

4 216.    On February 28, 2019, PG&E issued a press release providing an update on the

5 financial impact of the North Bay Fires and Camp Fire, along with the Company's fourth quarter

6 and full-year 2018 financial results.  The release stated that the Company "believes it is probable

7 that its equipment will be determined to be an ignition point of the 2018 Camp Fire,"

8 half-anticipating Cal Fire's determination three months later implicating PG&E in both Camp Fire

9 ignition points.  The press release also stated that the Company would be recording a $10.5 billion

10 charge related to the 2018 Camp Fire.  As a result, the Company reported full-year net losses of

11 $6.9 billion, compared to 2017 net income of $1.6 billion.  It further stated: "Management has

12 concluded that these circumstances raise substantial doubt about PG&E Corporation's and the

13 Utility's ability to continue as going concerns . . . ."

14 217.    With respect to its "compliance with law," PG&E admitted in its probation

15 proceedings that it was "impossible" to comply with a California law requiring it to clear

16 vegetation around its lines.  On March 5, 2019, the judge overseeing its probation, Judge Alsup,

17 rejected this excuse, finding "PG&E's performance with respect to vegetation management has

18 been dismal."  (And, as a result, the court modified the terms of PG&E's probation to require it to

19 comply with state laws regarding vegetation management and its wildfire prevention plan, among

20 other remedial measures, and suspended PG&E's dividend until it could demonstrate that the

21 Company had complied with the modified probation terms.)

22 218.    Judge Alsup further explained that PG&E had not generated excess cash through

23 enhanced safety practices, but instead *saved* money by "knowingly fail[ing] to trim or remove

24 thousands of trees it had already identified as posing a hazard" and that "dividends could and

25 should have been kept and used to bring PG&E into compliance with state and federal law[.]"

26

27 [72] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-br-30088, (N.D. Cal. Feb. 1, 2019), ECF No. 263.

28

- 64 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

219.    On April 4, 2019, Judge Alsup found that PG&E's "rampant wrongdoing" and "cheat[ing] on the maintenance of its grid" caused the 2017 North Bay Fires and 2018 Camp Fire.

220.    On May 7, 2019, Judge Alsup ordered PG&E's board of directors to visit the town of Paradise by July, to show them the destruction caused by the Camp Fire, and to create a new safety committee.

221.    On March 17, 2020, the Camp Fire Grand Jury entered an indictment for 84 counts of manslaughter against the Utility, and one count of unlawfully causing a fire, in connection with its failures that caused the Camp Fire.  Having met for a year and heard nearly 100 witnesses, reviewed approximately 1600 exhibits, and produced some 6000 pages of transcripts, the grand jury returned an indictment charging the Utility with "unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line."  The Utility pleaded guilty as charged on all counts.

222.    On March 20, 2020, PG&E reached an agreement with California Governor Gavin Newsom, pledging billions of dollars to help wildfire victims and make other safety improvements.  As part of the deal, PG&E agreed not to pay dividends to shareholders for three years (saving $4 billion, according to the governor), and for at least half of the board of directors to be California residents.[73]

223.    On April 29, 2020, Judge Alsup entered an order modifying PG&E's probation.  He stated: "This failure is upon us because for years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid—to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least

---

[73] Ivan Penn and Peter Eavis, *PG&E Reaches Agreement With Governor, Clearing Bankruptcy Hurdle*, NEW YORK TIMES, (Mar. 20, 2020), https://www.nytimes.com/2020/03/20/business/energy-environment/pge-deal-gavin-newsom-california.html.

Case No. 19-30088          SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ ~~PENN 1, SUITE 3401~~
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

1  108 and burned 22,049 structures . . . . Yet because PG&E **skimped on vegetation maintenance**,

2  an ever-greater backlog of hazard trees and hazard limbs grew year after year."

3  224.    He added that PG&E was still years away from regulatory compliance, or even

4  compliance with its own plan: although "PG&E ha[d] recently stepped up its hazard tree and limb

5  operations, but still admits it has fallen short.    In truth, PG&E remains years away from

6  compliance with California law and with its own wildfire mitigation plan. . . . When asked about

7  its compliance, PG&E told the Court that given the 'dynamic environment' of its purview, it

8  remained 'unable to certify perfect compliance' with the probation conditions.    That is an

9  understatement." Indeed, 22,000 trees remained "unworked."

10  225.    Judge Alsup also explained how far PG&E was from regulatory compliance:

11  "[a]fter the disasters of 2017 and 2018, PG&E ramped up its outsourcing.  It now has under

12  contract over 1,000 "pre-inspectors" to flag trees that violate clearance requirements, and roughly

13  5,000 tree-trimmers to follow behind to remove hazard trees and limbs. This large uptick in effort

14  has only made a small dent in the backlog of hazard trees and non-compliant vegetation

15  management.  Even if this effort had been perfectly executed, **it will still take close to a decade to**

16  **come into compliance with California law.**  But this effort is not being perfectly executed — far

17  from it."

18  226.    Judge Alsup imposed additional conditions as part of the probation, denoting

19  processes PG&E had previously not been employing, including that PG&E employ its own

20  inspectors to help PG&E conform to California law, "keep records sufficient to identify when a

21  piece of its equipment was in danger of failing," and require inspections that "truly assess" the

22  state of equipment.

23  **1.    Further Developments**

24  227.    On September 4, 2020, Administrative Law Judge Allen issued a Ruling Updating

25  Case Status in the CPUC investigation of PG&E, determining that the investigation would "remain

26  open as a vehicle to monitor" PG&E's progress in "improving its safety culture," with NorthStar

- 66 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

Consulting Group continuing to monitor the Company, despite the Company's argument that the Public Utilities Commission had other means of monitoring it.

228. In his final comments prior to the 2022 expiration of PG&E's probation on January 19, 2022, Judge Alsup "acknowledge[d] failure" in the effort to rehabilitate PG&E. He noted "PG&E's stubborn refusal to take responsibility for its actions" and lamented that PG&E's "evasion has occurred time and again over the last five years." Judge Alsup commented:

> So, in these five years, PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California.
> . . .
> We remain trapped in a tragic era of PG&E wildfires because for decades it neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. In time, this neglect led to hazard trees and limbs falling on its distribution lines and sparking wildfires or becoming "ground faults" (wherein the tree remains against a live wire and conducts sufficient electrical power to the earth to overheat and explode in flames). PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation. As probation ends, PG&E remains at least seven years (my estimate) from coming close to being current.

229. In September 2022, Williams and others reached a $117-million settlement agreement in connection with the 2017 North Bay Fires and the 2018 Camp Fire, in a lawsuit brought by Justice John Trotter (Ret., Trustee of the Fire Victim Trust) that claimed they were directly responsible for the fires because of their breach of fiduciary duties to act in the best interest of the utility company.

## VI. PG&E'S FALSE AND MISLEADING STATEMENTS & ASSOCIATED ACTIONS

230. Throughout the Relevant Period, PG&E repeatedly, and falsely, assured the public it was devoting significant and increasing resources to safety, such that it fully complied with all applicable laws and regulations regarding vegetation management and maintenance of its equipment. Taken both individually and as a whole, PG&E's statements constitute a brethtaking and wide-ranging course of deception over many years. PG&E's statements created the false impression that it was a company that was going above and beyond to mitigate wildfire risk to the full extent possible, and was fully compliant with the web of laws and regulations requiring it to do so. In reality, PG&E was a scofflaw, intentionally disregarding, and covering up, known and

- 67 -

pervasive violations of law and regulations throughout its electricity distribution system, which posed a severe risk of starting catastrophic wildfires.

**A. PG&E Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Practices and Its Compliance With Applicable Laws and Safety Regulations Prior to the North Bay Fires**

**1. April 29, 2015**

231. On April 29, 2015, PG&E held a conference call to discuss the Company's first quarter 2015 financial and operating results. Then-President of the Utility, Johnson, falsely and misleadingly assured investors that PG&E was enhancing its vegetation management practices in order to mitigate wildfire risk, stating:

> As California enters its fourth year of drought, we're working hard to help the state meet this challenge by reducing water usage at our own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. ***We're stepping up our vegetation management activities to mitigate wildfire risk*** and improve access for firefighters.

232. This statement was materially false and misleading because PG&E did not, in fact, enhance its vegetation management activities at or around this time. PG&E actually underspent its vegetation management budgets in 2014 and 2015, and its budget remained essentially flat in this time period, increasing only 2.4% from 2014 to 2015. As was later recognized by Judge Alsup in PG&E's probation proceedings, PG&E had identified thousands of instances of tree branches and other vegetation posing an immediate wildfire risk that it did not remediate in 2015 and 2016, which led Judge Alsup to conclude that "PG&E's performance with respect to vegetation management has been dismal." Judge Alsup further concluded that the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California[.]" At the expiration of PG&E's probation in January 2022, Judge Alsup explained that PG&E had "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code . . . . PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation [in 2017]." Thus, PG&E's assurance that it had "stepp[ed] up [its] vegetation management activities" was false. It did no such thing.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

233.    In addition to the falsity of PG&E's statement, the statement omitted material facts necessary to not render the statement misleading. In particular, PG&E failed to state that its purported "stepping up" of its efforts would neither bring PG&E into compliance with vegetation management regulations nor would its efforts rise to the level of reasonable and prudent given the wildfire risk it faced.

### 2.    October 16, 2015

234.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and Sustainability Report. The report falsely assured investors that PG&E's "vegetation management" practices were "in compliance with relevant laws." The report stated:

**Vegetation Management**

***Each year, PG&E's Vegetation Management department***, in consultation with utility arborists and foresters, ***inspects every mile of power line in our service area for public safety*** and electric reliability. ***We do so in compliance with relevant laws*** ….

235.    But PG&E's vegetation management practices did *not* adhere to relevant laws, and were therefore not "in compliance" with them.

236.    *First*, according to investigative reports released in subsequent corrective disclosures, including those on May 25 and June 8, 2019, PG&E violated wildfire safety laws, including California Public Resources Code Section 4293, multiple times throughout the Relevant Period.

237.    *Second*, Cal Fire found sufficient evidence of PG&E's violations of applicable law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires.

238.    *Third*, the Butte County DA Report revealed that the initial ignition was caused by a failed "C hook" that "was at least 97 years old" and failed after a channel was worn in it from years of rubbing against metal on a century-old tower holding up a distribution line. It found that PG&E "knew of" the risk posed by the century-old components of this distribution line that failed "and PG&E ignored the risk by not taking any action to mitigate the risk." It further determined "that PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols

- 69 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." PG&E's safety and maintenance practices thus violated numerous laws and regulations including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4. Further indicating PG&E's knowing disregard of its obligations under applicable laws and regulations, PG&E pled guilty to 84 counts of manslaughter for the deaths it caused through the Camp Fire.

239. *Fourth*, Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code Sections 4292 and 4293, and CPUC General Order 95, Rule 35. As Judge Alsup noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code."

240. *Fifth*, PG&E did not "inspect[] every mile of power line" "each year" because at the time this statement was made, it had not inspected Tower :27/222 of the Caribou-Palermo transmission line since August 2014, which ultimately resulted in its failure on November 8, 2018 and caused the ignition of the Camp Fire.

241. *Sixth*, this statement omitted material information necessary to render the statement not misleading in that it failed to disclose the extent to which PG&E was aware of its noncompliance with applicable laws and regulations, and the attendant risk posed by that lack of compliance.

### 3. November 18, 2015

242. On November 18, 2015, Hogan testified (on behalf of PG&E) before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure

- 70 -

Safety. Hogan falsely assured the public that PG&E was "just about done" implementing a program that would remotely disable closers in high wildfire risk areas:

> So as I mentioned earlier, our SCADA capabilities where we are able to **take our reclosers out of service remotely**, we first **focus on the wildfire areas** and then we have about 130 some odd locations, we are going to complete about 126 of those this year, **just about done with that program**, which leaves six for next year, which will be completed.

243. This statement was materially false and misleading because, although Hogan represented PG&E was "just about done" implementing a program to remotely shut off reclosers in high wildfire risk areas in November 2015, PG&E continued hazardous use of reclosers in such areas, including the areas where the North Bay Fires were ignited, through at least October 2017. Cal Fire determined, for instance, that at least one of the North Bay Fires, the Pythian Fire, was caused by PG&E reclosers, nearly two years after this statement was made.

244. This statement also omitted material information that was necessary to render the statement not misleading. To the extent PG&E was implementing a program to achieve the ability to remotely disable reclosers, PG&E failed to disclose that it would not use that ability to actually disable reclosers in high wildfire risk areas, despite the implication of the statement that PG&E would do so.

### 4. October 6, 2016

245. On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and Sustainability Report. The report falsely assured investors that PG&E's "vegetation management" practices were "in compliance with relevant laws." The report stated:

> **Vegetation Management**
>
> **Each year, PG&E's Vegetation Management department** and its contracting arborists and foresters **inspect miles of power lines in our service area for public safety** and electric reliability. **We do so in compliance with relevant laws** ….

246. But PG&E's vegetation management practices did not adhere to relevant laws, and were therefore not "in compliance" with them.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 80 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

247. *First*, according to investigative reports released in subsequent corrective disclosures, including those on May 25 and June 8, 2019, PG&E violated wildfire safety laws, including California Public Resources Code Section 4293, multiple times throughout the Relevant Period.

248. *Second*, Cal Fire found sufficient evidence of PG&E's violations of applicable law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires.

249. *Third*, the Butte County DA Report revealed that the initial ignition was caused by a failed "C hook" that "was at least 97 years old" and failed after a channel was worn in it from years of rubbing against metal on a century-old tower holding up a distribution line. It found that PG&E "knew of" the risk posed by the century-old components of this distribution line that failed "and PG&E ignored the risk by not taking any action to mitigate the risk." It further determined "that PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." PG&E's safety and maintenance practices thus violated numerous laws and regulations including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4. Further indicating PG&E's knowing disregard of its obligations under applicable law and regulations, PG&E pled guilty to 84 counts of manslaughter for the deaths it caused through the Camp Fire.

250. *Fourth*, Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code sections 4292 and 4293, and CPUC General Order 95, Rule 35. As Judge Alsup noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties

Case No. 19-30088            SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code."

251.  *Fifth*, this statement omitted material information necessary to render the statement not misleading in that it failed to disclose the extent to which PG&E was aware of its noncompliance with applicable laws and regulations and the attendant risk posed by that lack of compliance.

### 5.  August 9, 2017

252.  On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and Sustainability Report. The report falsely assured investors that PG&E's "vegetation management" practices "compl[ied] with state and federal regulations[.]" The report stated:

> **Vegetation Management**
>
> ***PG&E prunes and removes trees growing too close to power lines*** while maintaining as much vegetation as possible to balance land use and environmental stewardship with customer need. Through *a **well-established and innovative vegetation management program, PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe***, reliable and affordable electric service.

253.  But PG&E's vegetation management practices violated relevant laws and regulations, and were therefore not "in compliance" with them.

254.  *First*, according to investigative reports released in subsequent corrective disclosures, including those on May 25 and June 8, 2019, PG&E violated wildfire safety laws, including California Public Resources Code Section 4293, multiple times throughout the Relevant Period.

255.  *Second*, Cal Fire found sufficient evidence of PG&E's violations of applicable law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires.

256.  *Third*, Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Thus, PG&E was aware when this statement was made that its vegetation management

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14220 10119

1    practices were not in compliance with the law, including without limitation California Public

2    Resources Code sections 4292 and 4293, and CPUC General Order 95, Rule 35.  As Judge Alsup

3    noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning

4    hazard-tree removal and vegetation clearance, even though such duties were required by

5    California's Public Resource Code."

6        257.    *Fourth*, this statement omitted material information necessary to render the

7    statement not misleading in that it failed to disclose the extent to which PG&E was aware of its

8    noncompliance with applicable laws and regulations and the attendant risk posed by that lack of

9    compliance.

10   **B.  PG&E Made Public Statements Tying its Dividend to Progress on Safety Measures
         While Concealing That It Was In Fact Neglecting Safety Measures and Violating
11       Laws and Regulations Relating to Safety**

12       258.    During the Relevant Period, PG&E repeatedly made public statements tying the

13   growth and sustainability of its quarterly cash dividends to purported improvements in its safety

14   measures.  PG&E increased its dividend during this period for the first time in six years, and did so

15   again, while touting its "progress on safety" and "improvements we have made in safety."  But, as

16   detailed herein at length, PG&E's wildfire prevention and safety practices were glaringly

17   deficient, and included thousands of known violations of state and federal laws and regulations.

18   These violations caused, among other fires, the North Bay Fires, which resulted in PG&E's

19   suspension of its dividend on December 20, 2017 – mere months after assuring investors that its

20   robust safety practices allowed it to increase its dividend.

21       **1.    May 23, 2016**

22       259.    Nineteen days after its May 4, 2016 earnings call, PG&E issued a press release

23   titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at Annual

24   Shareholder Meeting."  It read:

25           PG&E Corporation (NYSE: PCG) today announced that it is raising
             its quarterly common stock dividend to 49 cents per share, an
26           increase of 3.5 cents per share, beginning with dividends for the
             second quarter of 2016.

27                                         * * *

                                          - 74 -
28   Case No. 19-30088    SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.

\* \* \*

***Earley and other senior executives also discussed continued progress on safety***, reliability and other goals, as well as PG&E's strategy for the future [at the annual shareholder meeting].

Earley said, "***We've continued to demonstrate leadership and commitment on safety***. We're delivering the most reliable service in our company's history.

260. This statement was false and misleading because it affirmed that PG&E's focus on safety was allowing PG&E to continue to pay, and to increase, its dividend, and that PG&E's dividend would not be negatively impacted by PG&E's causing of wildfires through negligence, recklessness, or indifference.

261. PG&E's assertions that it had "made progress" and "demonstrat[ed] leadership and commitment on safety" were patently false. As was later recognized by Judge Alsup in PG&E's probation proceedings, PG&E had identified thousands of instances of tree branches and other vegetation posing an immediate wildfire risk that it did not remediate in 2015 and 2016, leading Judge Alsup to conclude that "PG&E's performance with respect to vegetation management has been dismal." Judge Alsup further concluded that the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California[.]" At the expiration of PG&E's probation in January 2022, Judge Alsup explained that, during this time period, PG&E had "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. … PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation [in 2017]."

262. In addition to its deficient, and illegal, vegetation management practices, PG&E was aware of significantly aged infrastructure, and was aware that infrastructure posed a significant risk of wildfire ignition, but chose not to address that infrastructure or the risk posed by it. The Butte County DA Report revealed that the initial ignition was caused by a failed "C hook"

- 75 -

that "was at least 97 years old" and failed after a channel was worn in it from years of rubbing against metal on a century-old tower holding up a distribution line. It found that PG&E "knew of" the risk posed by the century-old components of this distribution line that failed "and PG&E ignored the risk by not taking any action to mitigate the risk." It further determined "that PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." PG&E's safety and maintenance practices thus violated numerous laws and regulations unrelated to vegetation management including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4. Further indicating PG&E's knowing disregard of its obligations under applicable law and regulations, PG&E pled guilty to 84 counts of manslaughter for the deaths it caused through the Camp Fire.

263. This statement further omitted material information necessary to render the statement not misleading. The statement, particularly taken in tandem with its other statements, suggested PG&E had undertaken efforts to improve its safety practices. But the statement omitted that its spending on vegetation management was essentially flat, and that it was aware of thousands of instances of unaddressed hazardous vegetation and infrastructure aged past its useful life that it had not addressed, and had no plans to address, in violation of state and federal laws and regulations.

## 2. November 4, 2016

264. On November 4, 2016, PG&E held a conference call to discuss its third quarter 2016 financial results. In prepared remarks, Earley stated:

> ***The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.***
>
> Earlier this year we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

are confident we can deliver a strong overall return for our shareholders.

265. This statement was materially false and misleading when made because PG&E had not made "improvements … in safety … over the last six years." PG&E Vegetation Program Manager Richard Yarnell later testified that for the entire period from September 2015 to April 10, 2017, "PG&E – to the best of my knowledge, we have not made any changes" to improve safety.

266. Contrary to this statement, PG&E was knowingly ignoring its legally mandated safety responsibilities during this time. As was later recognized by Judge Alsup in PG&E's probation proceedings, PG&E had identified thousands of instances of tree branches and other vegetation posing an immediate wildfire risk that it did not remediate in 2015 and 2016, leading Judge Alsup to conclude that "PG&E's performance with respect to vegetation management has been dismal." At the expiration of PG&E's probation in January 2022, Judge Alsup explained that, during this time period, PG&E had "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. … PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation [in 2017]." Indeed, following the North Bay Fires, which would later be revealed to be the result of PG&E's violations of the law and applicable safety regulations, PG&E suspended its dividend on December 20, 2017.

267. Needless to say, PG&E's neglect of its legally mandated safety responsibilities did not put it "in a position to deliver strong results going forward." Indeed, it caused devastating wildfires that bankrupted PG&E. As Judge Alsup concluded, the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California[.]" In addition, The Butte County DA Report revealed that the initial ignition was caused by a failed "C hook" that "was at least 97 years old" and failed after a channel was worn in it from years of rubbing against metal on a century-old tower holding up a distribution line. It found that PG&E "knew of" the risk posed by the century-old components of this distribution line that failed "and PG&E ignored the risk by not taking any action to mitigate the risk." It further determined "that PG&E did not, in

- 77 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10112

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." PG&E's safety and maintenance practices thus violated numerous laws and regulations unrelated to vegetation management including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4. Further indicating PG&E's knowing disregard of its obligations under applicable law and regulations, PG&E pled guilty to 84 counts of manslaughter for the deaths it caused through the Camp Fire.

268. This statement further omitted material information necessary to render the statement not misleading. The statement, particularly taken in tandem with its other statements, suggested PG&E had undertaken efforts to improve its safety practices. But the statement omitted that its spending on vegetation management was essentially flat, and that it was aware of thousands of instances of unaddressed hazardous vegetation and infrastructure aged past its useful life that it had not addressed, and had no plans to address, in violation of state and federal laws and regulations.

### 3. May 31, 2017

269. On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C. Johnson to Boards of Directors." The release stated:

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend by 4 cents per share to 53 cents per share, beginning with the dividend for the second quarter of 2017. On an annual basis, this action increases PG&E Corporation's dividend by 8 percent, from $1.96 per share to $2.12 per share.
>
> * * *
>
> Yesterday, in remarks at the joint annual shareholders meeting of PG&E Corporation and Pacific Gas and Electric Company, [CEO] Williams highlighted the companies' *progress on safety*, reliability and reducing greenhouse gas emissions, among other accomplishments. *She reaffirmed PG&E's commitment to safety*

*and operational excellence*, delivering for customers and leading the way to achieve California's energy goals.

270. This statement was materially false and misleading when made because PG&E had not made "progress on safety." PG&E Vegetation Program Manager Richard Yarnell later testified that for the entire period from September 2015 to April 10, 2017, "PG&E – to the best of my knowledge, we have not made any changes" to improve safety.

271. Nor was it "commit[ed] to safety and operational excellence." PG&E was knowingly ignoring its legally mandated safety responsibilities during this time. As was later recognized by Judge Alsup in PG&E's probation proceedings, PG&E had identified thousands of instances of tree branches and other vegetation posing an immediate wildfire risk that it did not remediate in 2015 and 2016, leading Judge Alsup to conclude that "PG&E's performance with respect to vegetation management has been dismal." At the expiration of PG&E's probation in January 2022, Judge Alsup explained that, during this time period, PG&E had "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. … PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation [in 2017]." Indeed, following the North Bay Fires, which would later be revealed to be the result of PG&E's violations of the law and applicable safety regulations, PG&E suspended its dividend on December 20, 2017.

272. Needless to say, PG&E's neglect of its legally mandated safety responsibilities did not put it "in a position to deliver strong results going forward." Indeed, it caused devastating wildfires that bankrupted PG&E. As Judge Alsup concluded, the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California[.]" In addition, The Butte County DA Report revealed that the initial ignition was caused by a failed "C hook" that "was at least 97 years old" and failed after a channel was worn in it from years of rubbing against metal on a century-old tower holding up a distribution line. It found that PG&E "knew of" the risk posed by the century-old components of this distribution line that failed "and PG&E ignored the risk by not taking any action to mitigate the risk." It further determined "that PG&E did not, in

- 79 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14220 10112

fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO."  PG&E's safety and maintenance practices thus violated numerous laws and regulations unrelated to vegetation management including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4.  Further indicating PG&E's knowing disregard of its obligations under applicable law and regulations, PG&E pled guilty to 84 counts of manslaughter for the deaths it caused through the Camp Fire.

273.    This statement further omitted material information necessary to render the statement not misleading.  The statement, particularly taken in tandem with its other statements, suggested PG&E had undertaken efforts to improve its safety practices.  But the statement omitted that its spending on vegetation management was essentially flat, and that it was aware of thousands of instances of unaddressed hazardous vegetation and infrastructure aged past its useful life that it had not addressed, and had no plans to address, in violation of state and federal laws and regulations.

**C. After the North Bay Fires, the Truth Began to Emerge**

274.    The first of the North Bay Fires began on October 8, 2017.  It was not until ~~October 12, 2017, however,~~ days later that ~~the market~~ local media began to ~~understand~~ connect PG&E's safety violations ~~may have been~~ as a cause.  ~~On that date, CPUC sent PG&E a litigation hold letter, demanding that PG&E (1) "preserve any factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment from each fire event" and (2) "inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to potential causes of~~ After market, on October 11, the connections between PG&E and the fires reached an inflection point, with a YouTube video (among other things) released connecting PG&E's lines to the North Bay fires~~, vegetation management, maintenance~~

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1 ~~and/or tree trimming.~~[12]  This was the first disclosure indicating PG&E may have caused any of the

2 North Bay Fires.  Following news of this litigation hold letter, PG&E's share price declined 6.7%.

3     275.    The following day, PG&E issued a statement explaining that "[t]he causes of these

4 fires are being investigated by [Cal Fire], including the possible role of [PG&E's] power lines and

5 other facilities." It further reported that PG&E "has approximately $800 million in liability

6 insurance for potential losses that may result from these fires[.]" It was preparing investors for the

7 possibility that "the amount of insurance is insufficient to cover the Utility's liability," in which

8 case, it explained, PG&E's "financial condition or the results of operations could be materially

9 affected."  Because the market was aware PG&E would be reimbursed by rate payers for damages

10 from fires it caused so long as it had acted reasonably and prudently, this discussion signaled that

11 some of the North Bay Fires may have been caused by PG&E's negligence, if not worse.

12 Following this statement, PG&E's share price declined, into the next trading day, by

13 approximately 16.5%.

14     276.    After this decline, PG&E set about to falsely reassure investors that it had finally

15 gotten the message and was taking its safety responsibilities seriously.

16 **D. After the North Bay Fires Were Contained, PG&E Made False and Misleading**

17 **Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

18     **1.    October 31, 2017**

19     277.    On October 31, 2017, in an effort to falsely reassure the public and investors that

20 their vegetation management efforts complied with law, PG&E issues a press release titled "Facts

21 About PG&E's Electric Vegetation Management Efforts." The release stated: "***PG&E follows all***

22 ***applicable federal and state vegetation clearance requirements and performs regular power line***

23 ***tree safety activities in accordance with industry standards, guidelines, and acceptable***

24 ***procedures that help to reduce outages or fires caused by trees or other vegetation***."

25     278.    This statement was materially false and misleading because PG&E did not

26 "follow[] all applicable federal and state vegetation clearance requirements," nor did it "perform[]

27

28

- 81 -

power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures[.]"

279. *First*, according to investigative reports released in subsequent corrective disclosures, including those on May 25 and June 8, 2019, PG&E violated wildfire safety laws, including California Public Resources Code Section 4293, multiple times throughout the Relevant Period.

280. *Second*, Cal Fire found sufficient evidence of PG&E's violations of applicable law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires.

281. *Third*, Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code Sections 4292 and 4293, and CPUC General Order 95, Rule 35. As Judge Alsup noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code." Indeed, Judge Alsup noted the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California."

282. *Fourth*, this statement omitted material information necessary to render the statement not misleading in that it failed to disclose the extent to which PG&E was aware of its noncompliance with applicable laws and regulations and the attendant risk posed by that lack of compliance.

## 2. November 2, 2017

283. On November 2, 2017, PG&E held a conference call to discuss its third quarter 2017 financial results. In prepared remarks, Williams, on behalf of PG&E, falsely reassured investors as to PG&E's vegetation management practices:

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS1675 PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 100201019

1  Given the recent wildfires impacting our customers and
2  communities, our discussion today will be different from our usual
   earnings call ....

3                              * * *

4  Now I know there's a lot of interest in how these fires started and in
   how PG&E assets might have been involved in or impacted by the
   wildfires. Our communities deserve answers and we are committed
5  to learning what happened. It's critical that we identify anything
   that will help us to keep our customers and communities safe in the
6  future. That is our goal as we work with CAL FIRE and the CPUC.

7                              * * *

8  **Many of you have reached out with questions about the
   potential impact of the wildfires to the company's financials
9  and also about the doctrine of inverse condemnation in
   California.** At this time, the known financial impact of the
10 wildfires is limited to the cost of the unprecedented response and
   restoration efforts, costs related to our liability insurance and some
11 legal expenses, and Jason [Wells] will cover these later this
   morning.

12                             * * *

13 **I know there's a lot of interest in our pole maintenance and
14 vegetation management programs,** so let me address these as
   well. First, we routinely inspect, maintain and replace our electric
15 poles. This include annual scheduled patrols, 5-year visual
   inspections, an intrusive testing and treating on our wood poles on a
16 frequency that significantly exceeds CPUC requirements.

17 *We also have one of, if not, the most comprehensive vegetation
   management programs in the country.* Our vegetation
18 management program manages about 123 million trees across the
   service territory. *And every year we inspect every segment of the
19 99,000 miles of overhead line and we clear vegetation as needed.*
   This is well beyond what is typical in our industry where most
20 utilities have a 3-year vegetation management cycle or sometimes
   longer. **Typically, we spend about $200 million every year to
21 line clear or remove 1.3 million trees to mitigate both the risk of
   wildfires and to prevent electric outages. With the drought and
22 the tree mortality crisis we've experienced in California, we
   have been expanding our vegetation management work since
23 2014.**

24 *In 2016, we spent an additional $200 million, essentially doubling
   our typical vegetation management spending last year.* We've
25 removed an incremental 236,000 dead or dying trees, and we
   enhanced our tree maintenance work with additional patrols in areas
26 of high fire danger, including a combination of boots on the ground,
   aerial patrols, and sophisticated LiDAR technology.

27

28

- 83 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

284.    These statements were materially false and misleading because PG&E did not "clear vegetation as needed."  Whether or not it "doubled the amount that [it] invested in veg[etation] management," taken as a whole, these statements are grossly misleading as they omit that, whatever amount PG&E was spending, there was no material change in its vegetation management practices during this time.  A table published by CPUC indicates that PG&E spent $194,094,406 on vegetation management in 2015 and $198,735,579 in 2016.  But whatever amount it spent in those years, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath that, as of April 10, 2017, "PG&E – to the best of my knowledge, **we have not made any changes as a result of th[e September 2015 Butte] fire**," – *i.e.*, since September 2015.

285.    In addition, these statements omitted that even doubling its spending on vegetation management would be wholly inadequate to bring PG&E into compliance with the minimum standards imposed by law.  Indeed, Judge Alsup noted in January 2022 that "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" – *i.e.* in 2016, the year for which PG&E represented it doubled its vegetation management spending.  Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  He further noted, "[a]s probation ends, PG&E remains at least seven years (my estimate) from coming close to being current."  Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code Sections 4292 and 4293, and CPUC General Order 95, Rule 35, and that any increase in spending had not brought it anywhere close to compliance.  As Judge Alsup noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code."  Indeed, Judge Alsup noted the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California."

286. In addition, PG&E did not have "one of, if not, the most comprehensive vegetation management programs in the country" because its vegetation management program failed to even comply with the minimum requirements of applicable laws and regulations in at least thousands of cases. This statement falsely gave the impression that PG&E's vegetation management program, at the very least, complied with the law. Contrary to this statement, as Judge Alsup summed it up, "PG&E's performance with respect to vegetation management has been dismal."

287. Further, PG&E did not "inspect every segment of the 99,000 miles of overhead line" every year. As an example, Tower :27/222 of the Caribou-Palermo transmission line had not been inspected since August 2014 when this statement was made. The failure to inspect this tower, and its components, ultimately led to the ignition of the Camp Fire.

288. In addition, the Butte County DA Report determined "that PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." PG&E's inspection and maintenance practices thus violated numerous laws and regulations unrelated to vegetation management including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4.

289. Finally, this statement omitted material information necessary to not render the statement misleading. PG&E failed to disclose the heightened risk that its equipment would cause fires when it knew of thousands of unaddressed instances of vegetation growth that failed to comply with laws and regulations requiring the clearing of such vegetation to maintain an adequate distance from transmission lines.

### 3. November 2, 2017

290. On that same call, an analyst sought more detail about PG&E's vegetation management practices. President and COO Nickolas Stravopoulos responded:

> [Analyst:] And then, I guess, ***can you discuss your vegetation practices for trees that are located near power lines?*** I guess

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

we've seen sort of end reports that have come out for some of your peers that they sort of track vegetation that's within certain distances from the lines, and they basically make their decisions on what to do based on sort of updates.

[Stavropoulos:]. Thank you for the question. So as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile – square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. *And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management*. That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. *We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas we do as often as 4x a year.* So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending on where the facilities are located and the voltage of the facilities.

291.     These statements were materially false and misleading because PG&E did not "clear vegetation as needed." Whether or not it "doubled the amount that [it] invested in veg[etation] management," taken as a whole, these statements are grossly misleading as they omit that, whatever amount PG&E was spending, there was no material change in its vegetation management practices during this time. A table published by CPUC indicates that PG&E spent $194,094,406 on vegetation management in 2015 and $198,735,579 in 2016. But whatever amount the Company spent in those years, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath that, as of April 10, 2017, "PG&E – to the best of my knowledge, **we have not made any changes as a result of th[e September 2015 Butte] fire**," – *i.e.*, since September 2015.

292.     In addition, these statements omitted that even doubling its spending on vegetation management would be wholly inadequate to bring PG&E into compliance with the minimum standards imposed by law. Indeed, Judge Alsup noted in January 2022 that "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" – *i.e.* in 2016, the year

- 86 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020

for which PG&E represented it doubled its vegetation management spending. Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" He further noted, "[a]s probation ends, PG&E remains at least seven years (my estimate) from coming close to being current." Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code Sections 4292 and 4293, and CPUC General Order 95, Rule 35, and that any increase in spending had not brought it anywhere close to compliance. As Judge Alsup noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code." Indeed, Judge Alsup noted the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California."

293.    Further, and as outlined in detail herein, PG&E's vegetation management and equipment inspection practices were so deficient as to result in pervasive failures to comply with the minimum requirements of applicable laws and regulations. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many safety violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, safety violations were so pervasive that they evidently caused both ignition points of the Camp Fire as well as at least eleven fires at the same time in seven different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines" "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered and the fires prevented. For instance, in addition to the fires caused by dead or dying

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 96 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS
PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1   trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into

2   contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a

3   connector."

4        294.   Further, PG&E did not "inspect every segment of the 99,000 miles of overhead

5   line" every year.  As an example, Tower :27/222 of the Caribou-Palermo transmission line had not

6   been inspected since August 2014 when this statement was made.  The failure to inspect this tower,

7   and its components, ultimately led to ignition of the Camp Fire.

8        295.   In addition, the Butte County DA Report determined "that PG&E did not, in fact,

9   follow the procedures and requirements established in the ETPM" and that "it is reasonable to

10  conclude that the sections of the ETPM relating to inspections and patrols of overhead electric

11  transmission lines were simply a façade created to meet the requirements of the regulators and the

12  CAISO."   PG&E's inspection and maintenance practices thus violated numerous laws and

13  regulations unrelated to vegetation management including, without limitation, California Public

14  Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard

15  FAC-003-4.

16       296.   Finally, this statement omitted material information necessary to render the

17  statement not misleading.  PG&E failed to disclose the heightened risk that its equipment would

18  cause fires when it knew of thousands of unaddressed instances of vegetation growth that failed to

19  comply with laws and regulations requiring the clearing of such vegetation to maintain an

20  adequate distance from transmission lines.

21                    **4.    November 5, 2017**

22       297.   Throughout the Relevant Period, PG&E's Media Relations department maintained

23  a news website called *Currents*, disseminating information and commentary about PG&E and its

24  activities to the public.  PG&E used the website to repeatedly, and falsely, tout the safety of its

25  transmission systems, its vegetation management program, and its purported success in mitigating

26  wildfire risk.

- 88 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

298.    On November 5, 2017, PG&E published an article on *Currents* titled "Facts About PG&E's Wildfire and Prevention Safety Efforts."  In it, PG&E assured the public, including investors, that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements.***"

299.    This statement was false and misleading.  PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  These issues were not remedied by the time of the publication of this statement.  When PG&E's term of probation ended in January 2022, Judge Alsup noted that "PG&E remains at least seven years (my estimate) from coming close to being current" on its "backlog of unattended trees and vegetation."  Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code Sections 4292 and 4293, and CPUC General Order 95, Rule 35.  As Judge Alsup also noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code."  Indeed, Judge Alsup noted the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California."

300.    This statement further omitted material facts necessary to render the statement not misleading.  In particular, PG&E omitted its knowledge of thousands of unaddressed instances of vegetation growth that failed to comply with laws and regulations requiring the clearing of such vegetation to maintain an adequate distance from transmission lines.

### 5.    March 2, 2018

301.    On March 2, 2018, PG&E released a video on YouTube touting its vegetation management program.  The video features a PG&E arborist, April Kennedy, discussing PG&E's

- 89 -

vegetation management practices. The blurb appearing under the video states: "This communication paid for by PG&E shareholders." It has over 117,000 views.

302. In the video, Kennedy states, "PG&E prunes and removes over a million trees every year to ensure that hazardous trees can't impact our lines. ***And since the onset of the drought we've doubled our efforts*.**"

303. This statement was materially false and misleading because PG&E had not "doubled" its vegetation management efforts as of the publication of the video. Indeed, there had been no recent material changes to PG&E's vegetation management program. PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath that, as of April 10, 2017, "PG&E – to the best of my knowledge, **we have not made any changes as a result of th[e September 2015 Butte] fire**," – *i.e.*, since September 2015.

304. This statement was further misleading because it gave the impression that PG&E was increasing its vegetation management activities to an appropriate level. But regardless of whether PG&E increased its vegetation activities or not, PG&E's vegetation management efforts were so vastly and systemically deficient, such that even doubling its efforts would bring it nowhere near compliance with laws and regulations. Indeed, Judge Alsup noted in January 2022 that "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" – *i.e.* in 2016, the year for which PG&E represented it doubled its vegetation management spending. Judge Alsup in 2019 found that PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" He further noted, "[a]s probation ends, PG&E remains at least seven years (my estimate) from coming close to being current." Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code Sections 4292 and 4293, and CPUC General Order 95, Rule 35, and that any increase in spending had not brought it anywhere close to compliance.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10119~~ 10112

Case No. 19-30088 ~~SECOND AMENDED~~ ~~PROOF OF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14329 10119

305.     Finally, this statement omitted material information necessary to render the statement not misleading.  As outlined above, PG&E's vegetation management activities were so vastly deficient that PG&E was aware of thousands of instances where it was out of legal and/or regulatory compliance, and had a backlog of many years to even potentially come into compliance. Omitting this information rendered the statements misleading, as they suggested PG&E was appropriately ramping up its efforts to meet its responsibilities.

### 6.     March 22, 2018

306.     On March 22, 2018, PG&E issued a press release announcing their Community Wildfire Safety Program, titled, "In Advance of 2018 Wildfire Season, PG&E Takes Action with Comprehensive Community Wildfire Safety Program."

307.     Among other things, the press release stated that the program focused on "***doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe***," including by "***investing in stronger, coated power lines***, spacing lines farther apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years."

308.     This statement was materially false and/or misleading because it created the false impression that PG&E was sufficiently investing in its electrical system infrastructure to reduce fires, including by replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life.  But, as the Butte County DA Report concluded, PG&E was "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line" at the time the statement was made.

309.     Further, (i) PG&E had known, since at least 1987, that C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" and that the hanger plates were approaching the end of their useful lives, *id.* at 24, 78, 83-84; (ii) PG&E was aware of the advanced age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program, *id.* at 33; (iii) PG&E approved (albeit at reduced funding) a

- 91 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ ~~PENN 1, SUITE 3401~~
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

project to "replace conductor and tower structures on a section of the Caribou-Palermo line" because "[t]he probability of . . . failure is imminent due to the age of both the towers and the conductor," but canceled the project in 2009, *id.* at 34-35; (iv) PG&E reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire, *id.* at 50; (v) after five towers on the Caribou-Palermo line fell in 2012, PG&E proposed replacing the collapsed towers, and one additional tower, but did not replace the remaining towers despite their age and acknowledgements in internal documents that "the likelihood of failed structures happening is high"; and (vi) internal documents from prior to the Camp Fire, including in 2016, "detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line," warned that at least one tower was over a quarter-century past its useful life, and acknowledged that "the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse," but PG&E did not replace the tower or otherwise adequately repair the equipment on the line.

310. The press release also stated that PG&E was "[a]ugmenting [their] already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission."

311. This statement was materially false and/or misleading because it created a false impression that PG&E employed robust vegetation management practices that complied with applicable regulations. On the contrary, as alleged above, (i) "[i]nvestigations into the causes of the Camp Fire . . . uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations," which, among other things, mandate the safe operation of electrical utilities and prescribe clearances between powerlines and vegetation and the removal of dead and decadent trees that might contact powerlines, and (ii) it "has been documented that PG&E actually knew that it was not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before U.S. District Judge Alsup "that as of June 2017, there were 3,962 unworked

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1    trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise

2    impact the conductors, towers or guy wires before the next inspection cycle."

3            **7.**    **March 27, 2018**

4        312.    On March 27, 2018, PG&E issued a press release concerning their supposed efforts

5    to mitigate wildfire risks.

6        313.    The press release stated the following: "Under PG&E's industry-leading

7    Vegetation Management Program, *the company inspects and monitors every PG&E overhead*

8    *electric transmission and distribution line each year*, with some locations patrolled multiple

9    times."  (Emphasis added.)

10        314.    This statement was materially false and/or misleading because it created a false

11    impression that PG&E employed robust vegetation management practices that complied with

12    applicable regulations.  On the contrary, as alleged above, (i) "[i]nvestigations into the causes of

13    the Camp Fire . . . uncovered evidence that it was caused by PG&E violating California Public

14    Resources Code Section 4293 and California Public Utilities Code Section 451, among other

15    safety regulations," which, among other things, mandate the safe operation of electrical utilities

16    and prescribe clearances between powerlines and vegetation and the removal of dead and decadent

17    trees that might contact powerlines, and (ii) it "has been documented that PG&E actually knew

18    that it was not in compliance with relevant safety laws" and admitted in federal criminal probation

19    proceedings before U.S. District Judge Alsup "that as of June 2017, there were 3,962 unworked

20    trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise

21    impact the conductors, towers or guy wires before the next inspection cycle."

22        315.    Moreover, this statement was materially false and/or misleading because it created

23    a false impression that PG&E was performing frequent and rigorous inspections of powerlines in

24    areas prone to fire.  On the contrary, at the time the statement was made, PG&E had not inspected

25    Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of

26    annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of

27    the Camp Fire's first ignition point."  In addition, the Butte County DA Report revealed "that

28

PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO."

### 8. May 3, 2018

316. During a May 3, 2018 conference call with analysts concerning PG&E's financial results for the first quarter of 2018, PG&E's then-CEO, Williams, stated the following:

> We have **more than doubled our annual spend to manage vegetation** from roughly $190 million in 2013 to $440 million in 2017 and **we increased the frequency of our patrols**, particularly in high fire threat areas, but the new normal needs new solutions. To that end, we recently announced our Community Wildfire Safety Program.

(Emphasis added.)

317. This statement was materially false and/or misleading because it created a false impression that PG&E employed robust vegetation management practices that complied with applicable regulations. On the contrary, as alleged above, (i) "[i]nvestigations into the causes of the Camp Fire . . . uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations," which, among other things, mandate the safe operation of electrical utilities and prescribe clearances between powerlines and vegetation and the removal of dead and decadent trees that might contact powerlines, and (ii) it "has been documented that PG&E actually knew that it was not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before U.S. District Judge Alsup "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."

318. In addition, these statements omitted that even doubling its spending on vegetation management would be wholly inadequate to bring PG&E into compliance with the minimum standards imposed by law. Indeed, Judge Alsup noted in January 2022 that "PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation" – *i.e.* in 2016, the year

for which PG&E represented it doubled its vegetation management spending. He further noted, "[a]s probation ends, PG&E remains at least seven years (my estimate) from coming close to being current." Thus, PG&E was aware when this statement was made that its vegetation management practices were not in compliance with the law, including without limitation California Public Resources Code sections 4292 and 4293, and CPUC General Order 95, Rule 35, and that any increase in spending had not brought it anywhere close to compliance. As Judge Alsup noted at the expiration of PG&E's probation in 2022, PG&E "neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code." Indeed, Judge Alsup noted the "large number of trees that should have been removed by PG&E but weren't … was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California."

319. This statement was also materially false and/or misleading because it created a false impression that PG&E was performing frequent and rigorous inspections of powerlines in areas prone to fire. On the contrary, at the time the statement was made, PG&E had not inspected Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point."

### 9. May 25, 2018

320. On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports regarding some of the October 2017 North Bay Fires, to reassure investors that PG&E had met all state regulations concerning fire safety. The press release stated:

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14329 10112

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10036 10119

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

- **_PG&E meets or exceeds regulatory requirements for pole integrity management_**, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

321. This statement was materially false and/or misleading because PG&E did not "meet," much less "exceed," the "regulatory requirements for pole integrity management." PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point that exhibited damaged and downed poles, in violation of California Public Utilities Code Section 451. Cal Fire has since confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points, and referred its investigations to the relevant district attorney based on evidence of safety violations. The grand jury found sufficient evidence to charge PG&E with 85 felony counts, and PG&E pled guilty as charged to the 84 counts of manslaughter and one count of unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line.

322. Overall, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations—regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused both of the Camp Fire's two ignition points in November 2018—13 months after the North Bay Fires a year later. Therefore, the violations cannot be explained away as an isolated lapse. This statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

323.    In addition, the Butte County DA Report revealed that the initial ignition was caused by a failed "C hook" that "was at least 97 years old" and failed after a channel was worn in it from years of rubbing against metal on a century-old tower holding up a distribution line.  It found that PG&E "knew of" the risk posed by the century-old components of this distribution line that failed "and PG&E ignored the risk by not taking any action to mitigate the risk."  It further determined "that PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and that "it is reasonable to conclude that the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO."  PG&E's safety and maintenance practices thus violated numerous laws and regulations unrelated to vegetation management including, without limitation, California Public Utilities Code Section 451, CPUC General Order 165, and FERC Electric Reliability Standard FAC-003-4.  Further indicating PG&E's knowing disregard of its obligations under applicable law and regulations, PG&E pled guilty to 84 counts of manslaughter for the deaths it caused through the Camp Fire.

324.    It has additionally been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.   In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"

**F.      While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding the Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol**

325.    PG&E's share price declined precipitously as the truth about its responsibility for the North Bay Fires emerged.  As liabilities for the North Bay Fires threatened the Company's financial viability, PG&E would realize that the Company needed a legislative bailout to avoid bankruptcy.  As a result, PG&E needed the public, including investors, to believe its reassurances

of the prioritization of safety and the specific programs PG&E was engaged in to keep wildfire risk de minimis.

### 1. June 8, 2018

326. On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the preponderance of the North Bay Fires, PG&E's share price continued its decline, and its financial situation deteriorated. Later that day, PG&E issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that PG&E had met all state regulations concerning fire safety. The press release, titled "PG&E Responds to Latest CAL FIRE Announcement" stated, in relevant part:

> ***Programs Overall Met State's High Standards***
>
> We look forward to the opportunity to carefully review the CAL FIRE reports to understand the agency's perspectives.
>
> Based on the information we have so far, we continue to believe our overall programs met our state's high standards.
>
> For example, ***PG&E meets or exceeds regulatory requirements for pole integrity management,*** using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.
>
> Similarly, ***under PG&E's industry-leading Vegetation Management Program,*** we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times. We also prune or remove approximately 1.4 million trees annually.

327. Because PG&E's compliance violations would soon cause the Camp Fire, the most destructive and deadly wildfire in California history, PG&E's "Vegetation Management Program" and "pole integrity management" decidedly did not meet California's "High Standards." Investigations into the causes of the Camp Fire have already uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

328.    First, the Camp Fire was described in initial communications between firefighters and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should have been cleared by PG&E pursuant to Section 4293.

329.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in violation of Section 451.

330.    Third, PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.  Cal Fire has since confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points, and referred its investigations to the relevant district attorney based on evidence of safety violations.  The grand jury found sufficient evidence to charge PG&E with 85 felony counts, and PG&E pled guilty as charged to 84 counts of manslaughter and one count of unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line.

331.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.   In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"

332.    Fifth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

333.    Thus, PG&E did not "meet[] or exceed[] regulatory requirements for pole integrity management" or "Vegetation Management"—regulations which were essential for preventing devastating wildfires.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

- 99 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1    **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." PG&E's

2    representation to the contrary was materially false and/or misleading.

3        334.    This statement regarding compliance was reviewed and authorized by Kane, in her

4    capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both

5    "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance

6    reporting," including this press release. Because of her senior position within the Company, Kane

7    had ultimate authority to control the content of this statement.

8        335.    The same press release contained a further false and/or misleading statement:

9        *To address the growing threats posed by wildfires and extreme*
         *weather, and in light of the wildfires throughout our state last*

10       *year, PG&E has launched the Community Wildfire Safety*
         *Program* to help keep our customers and communities safe. Among

11       the key components of the new program are. . .

12       •    Public Safety Power Shutoff: As a last resort*, a program to*

13       *proactively turn off electric power for safety when extreme fire*
         *danger conditions occur*, while helping customers prepare and

14       providing early warning notification, when and where possible.

15       336.    PG&E's representation that it "has launched . . . a program to proactively turn off

16   electric power for safety when extreme fire danger conditions occur" was false and misleading. It

17   was false because the touted program, which would eventually become its ESRB-8 Shutoff

18   Protocol, was misleading as it was represented to the public. Further, it misleadingly omitted that

19   it would publish guidelines that did not accurately reflect the protocol PG&E would follow. Even

20   when all seven relevant "extreme fire danger conditions" **did** "occur," weighing strongly in favor

21   of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018 under

22   the published ESRB-8 Shutoff Protocol, PG&E did not shut off power to its lines, applying instead

23   a secret protocol that was hidden from the public. PG&E's failure to shut off its transmission line

24   caused the Camp Fire: the most destructive and deadly wildfire in California history. By publicly

25   disclosing a wildfire safety program PG&E did not adhere to, and where its nonadherence would

26   risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

27

28

- 100 -

337. This press release regarding compliance was reviewed and authorized by Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

~~2.     July 16, 2018~~

~~338.   On July 16, 2018, Stavropoulos stated: "Over the last seven years, we have accomplished so much together on our *journey to become one of the safest, most reliable energy companies* in the country. *As a team, we've worked to improve our culture, augment our operations, upskill our people and, most importantly, improve public and employee safety*."~~

~~339.   This statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations—regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused both of the Camp Fire's two ignition points only four months later—therefore, the violations cannot be explained away as an isolated lapse. This statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.~~

**2.** ~~3.~~ **September 27, 2018**

**338.** ~~340.~~ In its September 2018 ESRB-8 Shutoff Protocol, PG&E reasserted that following the 2017 wildfires, one of the "new and enhanced safety measures" being implemented was the *"[d]isabling [of] automatic reclosing of circuit breakers and reclosers[.]"*

**339.** ~~341.~~ This statement was materially false and/or misleading because it created the false impression that PG&E was disabling its reclosers, when in reality—despite assurances that the Company would shut down reclosers in high risk fire areas—they did not have the system in place to do so, which ultimately was instrumental in causing additional wildfires. Indeed, there was a recloser at the second ignition point of the Camp Fire.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

Case: 19-30088   Doc# 14604-1   Filed: 10/08/24   Entered: 10/08/24 19:48:21   Page 110 of 214

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

**3.** ~~4.~~ **September 27, 2018**

340. ~~342.~~ On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power lines" in the face of unprecedented wildfire threats "to ensure public safety." It was the Company's official announcement of its de-energization policy and procedures implementing Resolution ESRB-8, detailed below, that materially misled investors.

341. ~~343.~~ On or about September 27, 2018, PG&E announced the full details of its ESRB-8 Shutoff Protocol in a filing with CPUC[74] that was also posted on its website.[75] The ESRB-8 Shutoff Protocol stated:

> PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. ***It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring."***
>
> . . .
>
> Public Safety Power Shutoff is one component of the Community Wildfire Safety Program. ***PG&E has created a set of procedures for. . . [d]etermining what combination of conditions necessitates turning off lines for safety.***
>
> . . .
>
> PG&E will take a combination of many criteria into consideration, including:
>
> • **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System
>
> • **A Red Flag Warning declared** by the National Weather Service
>
> • **Low humidity levels,** generally 20 percent and below
>
> • **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph
>
> • **Site-specific conditions** such as temperature, terrain and local climate

---

[74] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC (June 2018), https://homedocbox.com/Environmental_Safety/87028654-Community-wildfire-safety-program-june-26-2018.html.

[75] *Id.*

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews
(Emphasis original.)

342. ~~344.~~ PG&E's representation that it had "implement[ed] additional precautionary measures" including "determining what combination of conditions necessitates turning off lines for safety" was false and misleading. It was false because the ESRB-8 Shutoff Protocol did not include all of the criteria PG&E would consider in determining whether to shut off power lines. In particular, the ESRB-8 Shutoff Protocol appeared on its face to apply to all types of PG&E's power lines, but it secretly did not apply to 115kV transmission lines, like the Caribou-Palermo line. Further, it misleadingly omitted the fact that there were additional, undisclosed shutoff criteria. Even when all seven disclosed "criteria" weighed in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless did not shut off power because it had an undisclosed policy of never shutting off lines such as the Caribou-Palermo line. Accordingly, the Butte County DA Report described the publicly available ESRB-8 Shutoff Protocol as "misleading." PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history. By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

343. ~~345.~~ This statement regarding compliance was reviewed and authorized by Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this report. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

#### 4. ~~5.~~ October 1, 2018

344. ~~346.~~ On October 1, 2018, PG&E submitted an application to FERC for revisions to their "Transmission Owner Tariff." Exhibit 3 to that filing was written testimony (in question and answer form) by David P. Gabbard, who was the Utility's Senior Director of Transmission Asset

- 103 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

Management, concerning Transmission Risk Management and Project Management Improvements." Gabbard's testimony states:

> Q. How is PG&E reducing transmission overhead conductor risk?
> A. PG&E *is currently implementing four mitigations to reduce overhead conductor risk*. The first two mitigations revolve around equipment replacement work: additional overhead conductor replacement and additional insulator replacement. Replacing additional conductors and insulators reduces the likelihood that those conductors and insulators will fail, therefore reducing the likelihood that those failures will lead to transmission wires down . . . .
> Q. Describe the Tower Replacement Program and how that will address the Transmission Risk.
> A. The Tower Replacement Program is established to manage the replacement of steel structures that have reached the end of their useful lives. The program targets replacement of deteriorated structures where repair is either less cost effective or not feasible.

345. ~~347.~~ This statement was materially false and/or misleading because it created the false impression that PG&E was sufficiently investing in its electrical system infrastructure to reduce fires, including by replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life. But, as the Butte County DA Report concluded, PG&E was "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line" at the time the statement was made. Butte County DA Report at 60.

346. ~~348.~~ Further, (i) PG&E had known, since at least 1987, that C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" and that the hanger plates were approaching the end of their useful lives, *id.* at 24, 78, 83-84; (ii) PG&E was aware of the advanced age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program, *id.* at 33; (iii) PG&E approved (albeit at reduced funding) a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" because "[t]he probability of . . . failure is imminent due to the age of both the towers and the conductor," but canceled the project in 2009, *id.* at 34-35; (iv) PG&E reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire, *id.* at 50; (v) after five towers on the Caribou-Palermo line fell in 2012, PG&E

proposed replacing the collapsed towers, and one additional tower, but did not replace the remaining towers despite their age and acknowledgements in internal documents that "the likelihood of failed structures happening is high"; and (vi) internal documents from prior to the Camp Fire, including in 2016, "detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line," warned that at least one tower was over a quarter-century past its useful life, and acknowledged that "the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse," but PG&E did not replace the tower or otherwise adequately repair the equipment on the line.

347. ~~349.~~ As part of the same FERC application, Jessica Tsang, a Principal Regulatory Analyst at the Utility, submitted written testimony concerning PG&E's Transmission and Maintenance Operation Expenses. Her testimony states:

> Q. Please describe the allocation of expenses in Account 561 – Load Dispatching.
> A. This account includes expenses incurred for operating the transmission system safely, reliably, and in compliance with all applicable rules, standards and regulations. Some examples of activities for which expenses are incurred include:
> • Monitoring, assessing, and operating the power system and individual facilities in real-time to maintain safe and reliable operation of the transmission system; . . .
> Q. Please describe the allocation of expenses in Account 563 – Overhead Line Expenses.
> A. This account includes expenses incurred for operating overhead transmission lines. Some examples of activities for which expenses are incurred include: • Patrolling and inspecting assets to identify any potential safety and reliability issues; . . .
> Q. Please describe the allocation of expenses in Account 571 – Maintenance of Overhead Lines.
> A. This account includes expenses incurred for maintaining overhead transmission plant. Some examples of activities for which expenses are incurred include: • Preventative and corrective maintenance of steel and wood support structures . . .

348. ~~350.~~ This statement was materially false and/or misleading because it created the false impression that PG&E was sufficiently investing in its electrical system infrastructure to reduce fires, including by replacing equipment that was antiquated, worn, or otherwise at or near

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
131 AVENUE OF THE AMERICAS ASPEN J. SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 14320 10119

1   the end of its useful life.  But, as the Butte County DA Report concluded, PG&E was "employing

2   a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo

3   line" at the time the statement was made.  Butte County DA Report at 60.

4       349.   351. Further, (i) PG&E had known, since at least 1987, that C hooks and hanger

5   holes on their transmission infrastructure were worn because of "wind-driven swinging of the

6   insulators" and that the hanger plates were approaching the end of their useful lives, *id.* at 24, 78,

7   83-84; (ii) PG&E was aware of the advanced age of the equipment on the Caribou-Palermo line

8   and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but

9   apparently never funded the program, *id.* at 33; (iii) PG&E approved (albeit at reduced funding) a

10  project to "replace conductor and tower structures on a section of the Caribou-Palermo line"

11  because "[t]he probability of . . . failure is imminent due to the age of both the towers and the

12  conductor," but canceled the project in 2009, *id.* at 34-35; (iv) PG&E reduced the budget allocated

13  to inspection, repair, and maintenance of transmission equipment in the years leading up to the

14  Camp Fire, *id.* at 50; (v) after five towers on the Caribou-Palermo line fell in 2012, PG&E

15  proposed replacing the collapsed towers, and one additional tower, but did not replace the

16  remaining towers despite their age and acknowledgements in internal documents that "the

17  likelihood of failed structures happening is high"; and (vi) internal documents from prior to the

18  Camp Fire, including in 2016, "detailed the failure of necessary hardware along the

19  [Caribou-Palermo] transmission line," warned that at least one tower was over a quarter-century

20  past its useful life, and acknowledged that "the Caribou-Palermo lines were in need of repair and

21  posed a significant risk of collapse," but PG&E did not replace the tower or otherwise adequately

22  repair the equipment on the line.

23      350.   352. This statement was also materially false and/or misleading because it created a

24  false impression that PG&E was performing frequent and rigorous inspections of powerlines in

25  areas prone to fire.  On the contrary, at the time the statement was made, PG&E had not inspected

26  Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of

27

28

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

1  annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of

2  the Camp Fire's first ignition point."

3  **5.** ~~6.~~ **October 9, 2018**

4  351. ~~353.~~ On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment

5  caused another of the North Bay Fires, known as the Cascade Fire. Later the same day, PG&E

6  issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors

7  that PG&E had met all state regulations concerning fire safety. The press release, titled "PG&E

8  Responds to Cascade Wildfire Announcement" stated, in relevant part:

> [W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas,*** and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat.

14  352. ~~354.~~ It was false and misleading for PG&E to tout "implementing additional

15  precautionary measures . . . to remove and reduce dangerous vegetation" and "making lines and

16  poles stronger in high fire threat areas." Indeed, just one month later, PG&E would cause the

17  Camp Fire through its failure to remove vegetation and maintain its poles, in violation of

18  California Public Resources Code Section 4293 and California Public Utilities Code Section 451,

19  among other safety regulations.

20  353. ~~355.~~ As noted above, the Camp Fire was described in initial communications

21  between firefighters and dispatch as a vegetation fire "underneath the transmission lines," which

22  vegetation should have been cleared by PG&E under Section 4293. Furthermore, PG&E

23  acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage

24  to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point

25  that exhibited damaged and downed poles, in violation of Section 451. PG&E's representation to

26  the contrary was materially false and/or misleading. Indeed, Cal Fire found that PG&E equipment

27  was responsible for both ignition points of the Camp Fire and has since reported PG&E to the

28

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

Butte County District Attorney based on evidence of safety violations. The grand jury found sufficient evidence to charge PG&E with 85 felony counts, and PG&E pled guilty as charged to 84 counts of manslaughter and one count of unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line.

354. ~~356.~~ Moreover, PG&E was not "making lines and poles stronger in high fire threat areas." For example, PG&E never performed planned safety work on, or otherwise updated, the 100 year-old Caribou-Palermo transmission line even though it knew that its lines and poles were weak and that "**the likelihood of failed structures happening is high**." The same transmission line would soon cause the Camp Fire's first ignition point, as determined by Cal Fire.

355. ~~357.~~ Further, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

356. ~~358.~~ This statement regarding compliance was reviewed and authorized by Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

357. ~~359.~~ The same PG&E press release contained a further false and/or misleading statement:

> To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, ***PG&E has launched the Community Wildfire Safety Program to help keep our customers and communities safe by implementing additional precautionary measures*** intended to further reduce wildfire threats. Among the key components of the new program are. . .
> • Public Safety Power Shutoff: As a last resort, ***a program to proactively turn off electric power for safety when extreme fire danger conditions occur,*** while helping customers prepare and providing early warning notification, when and where possible.

358. ~~360.~~ PG&E's representation that it "has launched" and "implement[ed] . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur" was false because the ESRB-8 Shutoff Protocol secretly did not apply to all types of PG&E's power lines. In particular, the ESRB-8 Shutoff Protocol appeared on its face to apply to

- 108 -

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 117 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

all types of PG&E's power lines, but it secretly did not apply to 115kV transmission lines, like the Caribou-Palermo line. Further, it misleadingly omitted the fact that there were additional, undisclosed shutoff criteria. Even when all seven disclosed "criteria" weighed in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless did not shut off power because it had an undisclosed policy of never shutting off lines such as the Caribou-Palermo line. Accordingly, the Butte County DA Report described the publicly available ESRB-8 Shutoff Protocol as "misleading."

359. ~~361.~~ PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history. By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

360. ~~362.~~ This statement regarding compliance was reviewed and authorized by Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 6. ~~7.~~ November 5, 2018

361. ~~363.~~ During a November 5, 2018 conference call concerning PG&E's financial performance for the third quarter of 2018, which occurred just days before the ignition of the Camp Fire, PG&E's then-CEO, Williams stated the following:

> *We also have our public safety power shut off program* that I mentioned earlier, and *we'll of course only utilize this as a last resort in the most extreme forecasted weather conditions. All of these efforts are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets. We plan to continue patrolling our poles at frequencies within high fire threat areas beyond the compliance requirements in place in California. Collectively, this is an integrated comprehensive program to further reduce risk across our high fire threat areas.*

362. ~~364.~~ This statement was materially false and/or misleading because it created a false impression that PG&E was performing frequent and rigorous inspections of powerlines in areas prone to fire. On the contrary, at the time the statement was made, PG&E had not inspected

Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point."

363. ~~365.~~ It was further false and misleading because PG&E utilized a secret non-public shutoff protocol that did not allow for shutting off dangerous high voltage transmission lines in hazardous conditions. This secret protocol differed materially from the ESRB-8 Shutoff Protocol published on PG&E's website, under which such lines would be shut off in extreme weather conditions.

**7. ~~8.~~ November 8, 2018**

364. ~~366.~~ On November 8, 2018, the Camp Fire started after PG&E decided not to shut off its power. Before the public became aware of PG&E's true role in causing the Camp Fire, the Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, ***as weather conditions did not warrant this safety measure***."[76]

365. ~~367.~~ This statement was affirmatively false: weather conditions did, in fact, warrant a shutoff. As detailed above, all seven criteria that PG&E deemed relevant, including those related to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

366. ~~368.~~ It was further false and misleading because PG&E utilized a secret non-public shutoff protocol that did not allow for shutting off dangerous high voltage transmission lines in hazardous conditions. This secret protocol differed materially from the ESRB-8 Shutoff Protocol published on PG&E's website, under which such lines would be shut off in extreme weather conditions.

367. ~~369.~~ This statement regarding compliance was reviewed and authorized by Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance

---

[76] PG&E Twitter Account Post (Nov. 8, 2018 6:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

- 110 -

Case No. 19-30088    SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ ~~PENN 1, SUITE 3401~~
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

1    reporting," including this announcement.  Because of her senior position within the Company,

2    Kane had ultimate authority to control the content of this statement.

3        **G.    PG&E Omitted Material Facts Regarding PG&E's Inspection Practices**

4        368. 370. In addition to the false and/or misleading nature of each of the statements

5    discussed above, each statement also materially omitted the facts that: (i) over the preceding

6    decades PG&E changed its policies to decrease the frequency and thoroughness of powerline

7    inspections and patrols; (ii) PG&E's actual inspections and patrols of the Caribou-Palermo line

8    and other lines "in low population density mountainous areas" did not comply with its ETPM

9    policy; (iii) PG&E reduced the time budgeted for inspections and patrols; (iv) PG&E eliminated

10   formal training on inspections and patrols; (v) PG&E reduced the flight time of aerial patrols, so

11   that they were mere "fly bys" that could "only confirm[] the structures and components were

12   'standing upright;'" (vi) transmission line inspections and patrols were conducted by employees

13   who "could not have been expected to identify the wear" on C hooks and hanger holes; (vii) the

14   aerial patrols and ground inspections that PG&E conducted on the century-old Caribou-Palermo

15   line could not assess wear on C hooks and hanger holes; (viii) climbing inspections were, contrary

16   to PG&E's policy, treated as discretionary; (ix) even though the towers on the Caribou-Palermo

17   line were subject to high wind, PG&E never inspected them for wind damage; (x) PG&E did not

18   conduct inspections of similar equipment following failures of transmission line components on

19   Caribou-Palermo line towers; and (xi) after five towers on the Caribou-Palermo line fell in 2012,

20   PG&E failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never

21   inspected the foundations of other towers on the line for signs of "uplift," which contributed to the

22   tower collapses.  *See* Butte County DA Report at 23-30, 35-37, 40-43, 50, 72. 31.  Because of the

23   foregoing deficiencies in PG&E's inspection practices, the misstatements were also materially

24   false and/or misleading because they created a false impression that PG&E's transmission line

25   inspection regime complied with their ETPM, *id.* at 37, and with CPUC regulations, such as

26   General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as

27   necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which

- 111 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10119~~ 10112

1   details safety standards for powerlines and infrastructure, including requirements intended to

2   guard against corrosion on towers.

3   **H. The Offering Documents Misled Investors as to PG&E's Lack of Compliance With Safety Laws and Regulations and its Refusal to Implement Prudent Vegetation Management and Safety Practices and Procedures**

4

5   369. ~~371.~~ In addition to the above-detailed misstatements and omissions, PG&E made a

6   series of misstatements and omissions in various Offering Documents, and documents

7   incorporated by reference therein, in connection with certain Notes Offerings[77] during the

8   Relevant Period.[78]

9   370. ~~372.~~ The Offering Documents omitted, and failed to disclose, PG&E's widespread

10  and systemic failures to comply with laws and regulations relating to vegetation management and

11  safety, and further failed to disclose that PG&E chose to ignore existing and known conditions

12  posing extreme wildfire risk by failing to implement prudent safety and maintenance practices and

13  procedures.  These documents, and the representations therein, misled investors by distorting the

14  nature of the wildfire risk facing PG&E by concealing that PG&E was actually aware of

15  significant undisclosed risks posed by its failure to comply with law, to properly address

16  vegetation growing near its powerlines, and to address its aged and failing infrastructure.

17

18

19

20
---
[77] The "Notes Offerings" are PG&E's: (1) March 2016 public offering of senior notes (the "March 2016 Notes Offering"); (2) December 2016 public offering of senior notes (the "December 2016 Notes Offering"); (3) March 2017 public offering of senior notes (the "March 2017 Notes Offering"); and (4) April 2018 public offering of senior notes (the "April 2018 Notes Offering"). The "Offering Documents" refers to the Registration Statement and Prospectuses (to include all amendments and supplements thereto for each offering, together with all documents incorporated by reference in each Registration Statement and Prospectus) pursuant to which the Notes Offerings were completed.  The notes sold in the Notes Offerings are hereinafter referred to as the "Notes Offering Notes."

[78] The misstatements and omissions in the Offering Documents provide basis both for the Claimants' Exchange Act claims and the Securities Act claims Claimant and/or Adopting Claimants who purchased notes in the Notes Offerings or purchased those notes in the secondary market thereafter.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1.   **The Offering Documents Omitted the Extreme Risks Posed By PG&E's Failure to Comply With Safety-Related Laws and Regulations and Its Inadequate Vegetation Management and Safety Practices**

371. ~~373.~~ Each of PG&E's Prospectuses filed on February 24, 2016, November 29, 2016, March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration statement (hereinafter, and including all documents incorporated by reference therein, the Offering Documents), as well as other PG&E filings and reports, including the following:

a.   The February 24, 2016 Offering Documents for the March 2016 Notes Offering incorporated by reference PG&E's Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016 (the "2015 10-K");

b.   The November 29, 2016 Offering Documents for the December 2016 Notes Offering incorporated by reference PG&E's 2015 10-K;

c.   The March 8, 2017 Offering Documents for the March 2017 Notes Offering incorporated by reference PG&E's 2015 10-K, its Annual Report on form 10-K for FY16 filed with the SEC on February 16, 2017 (the "2016 10-K"), and its press release filed on Form 8-K with the SEC on May 23, 2016 (the "5/23/16 8-K"); and

d.   The April 13, 2018 Offering Documents for the April 2018 Notes Offering incorporated by reference PG&E's Annual Report on Form 10-K for FY17 filed with the SEC on February 9, 2018 (the "2017 10-K").

372. ~~374.~~ The Offering Documents, and the documents incorporated by reference therein, omitted material facts from investors regarding PG&E's deficient safety practices and policies while simultaneously falsely assuring investors that PG&E complied with safety laws and regulations, sufficiently invested in safety, and provided for public safety by clearing vegetation around its equipment, updating equipment, and inspecting its equipment.  The omissions of these material facts rendered the Offering Documents, and the documents incorporated by reference therein, misleading to investors.  In contrast to what investors were led to believe in the Offering Documents, PG&E's "unsafe conduct" led to deadly wildfires and "PG&E's performance with

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

1 respect to vegetation management has been dismal." Nor had PG&E expended sufficient

2 resources to reasonably prevent wildfires.

3     373. ~~375.~~ The Offering Documents referenced risk factors, including warnings that

4 droughts, climate change, wildfires and other events *could* cause a material impact on PG&E's

5 financial results. These statements were materially misleading because they did not disclose the

6 already existing negative impact on PG&E as a result of PG&E's subpar safety practices that

7 caused wildfires resulting in death, destruction and liability. PG&E faced billions of dollars in

8 liability and filed bankruptcy as a result. Cal Fire has found PG&E caused wildfires in 2015, 2017

9 and 2018.

10     374. ~~376.~~ The Offering Documents did not disclose the true existing risks facing PG&E

11 as a result of its deficient safety practices and policies, including the extent of the risks or that they

12 had already come to fruition. For example, the 2/24/16 Prospectus, pursuant to the March 2016

13 Notes Offering, stated:

14         Some of the ***factors that could cause future results to differ***
15         ***materially from those expressed or implied*** by the forward-looking
        statements, ***or from historical results, include*** …

16                       * * *

17         ▪  ***the impact of droughts or other weather-related conditions***
18           ***or events, wildfires (including the Butte fire in September***
          ***2015***, which affected portions of Amador and Calaveras
19           counties), ***climate change***, natural disasters, acts of
terrorism, war, or vandalism (including cyber-attacks), ***and***
20           ***other events***, that can cause unplanned outages, reduce
generating output, disrupt the our [sic] service to customers,
21           or damage or disrupt the facilities, operations, or
information technology and systems owned by us, our
22           customers, or third parties on which we rely; ***whether we***
***incur liability to third parties for property damage or***
23           ***personal injury caused by such events; and whether the we***
***[sic] are subject to civil, criminal, or regulatory penalties***
24           ***in connection with such events***. See Ex. A, Stmt. No. 1.

24     375. ~~377.~~ The Offering Documents for the December 2016 Notes Offering, the March

25 2017 Notes Offering and the April 2018 Notes Offering each repeated substantially the same

26 warning, as did the 2015 10-K, the 2016 10-K, and the 2017 10-K.

27

28

- 114 -

Case No. 19-30088        SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

376. ~~378.~~ Similarly, the 2017 10-K, incorporated by the Offering Documents for the April 2018 Notes Offering misleadingly purported to warn that:

> *Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.*
>
> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California. Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events. *In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage. In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors.* Other contributing factors include local land use policies and historical forestry management practices. The combined effects of extreme weather and climate change also impact this risk.

377. ~~379.~~ The Company's 2Q18 and 3Q18 Forms 10-Q contained substantially similar language.

378. ~~380.~~ In addition, each of the 2015, 2016, and 2017 10-Ks, referenced by the Offering Documents, also represented that climate change was a risk to the Company's financial condition while omitting the real risks posed by PG&E's failure to comply with law and its woefully deficient safety practices. The "Risk Factors" sections of PG&E's 2015 and 2016 10-Ks, for example, purported to warn that "*The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows*, and that climate change could "*increase the occurrence of wildfires*."

379. ~~381.~~ The 2015, 2016, and 2017 10-Ks, incorporated by the Offering Documents falsely reassured investors that PG&E had studied climate change but omitted the negative impact and risk of PG&E's law and regulatory violations and deficient safety practices:

- 115 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains. If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost.

If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits. ***In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life***. In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets. ***The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries.*** The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.

380. ~~382.~~ The Company's 1Q18, 2Q18, and 3Q18 Forms 10-Q contained substantially similar language. The foregoing statements were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E's safety practices were deficient and the Company's deficient safety practices had already caused wildfires. The Offering Documents, and the documents incorporated by reference therein, repeatedly represented that: (i) PG&E's financial results could be impacted by weather-related conditions, wildfires, climate change or other events, or that they could incur liability caused by such events; and (ii) the climate change, increasing temperatures, or other events could increase the occurrence of wildfires which could result in substantial costs or damages. These representations were contradicted by material adverse facts that existed at the time of the statements, including, *inter alia*, that:

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

a. PG&E's widespread safety deficiencies and violations had already increased the risk of wildfires, caused wildfires and liability for those wildfires;

b. PG&E had caused hundreds or thousands of fires across California since June 2014, averaging more than one fire a day—significantly more than, SoCalEd, for example, a utility operating under similar conditions and legal and regulatory framework;

c. Rather than weather related events, the real risk of wildfires (and in fact the cause of many) were a result of PG&E not sufficiently investing in providing its services in a safe manner. For example, PG&E's "dismal" vegetation management practices resulted in wildfires. As Judge Alsup noted, PG&E has admitted that: (i) vegetation contact was the primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; and (iii) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of such fires;

d. In addition, PG&E's lax tree clearing practices threatened the safety of PG&E's operations. For example, PG&E auditors had given PG&E a passing grade despite too many trees found to violate state regulations by improperly expanding the area under review to artificially increase PG&E's compliance rate. Similarly, an internal PG&E audit, conducted in the summer of 2015 revealed a negative trend of non-compliant trees in the same district in which the Butte Fire started. And, as Judge Alsup observed, PG&E has admitted that as late as June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle." Judge Alsup also indicated that "PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't" which was a contributing factor to the causes of wildfires;

e. PG&E had incentivized its contractors to identify and clear fewer trees and vegetation by paying them for reporting under the target number;

Case No. 19-30088 SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN L SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10119 10112

f.      Outdated PG&E equipment was not replaced or updated; for example, the Company had never, as planned, addressed dangerously encroaching vegetation by replacing old lattice towers with modern tubular steel poles or replacing wire and hardware connecting those to towers, or updated the 100 year-old Caribou-Palermo transmission line that presented a high likelihood of failure. Likewise, despite assurances that the Company would shut down reclosers in high risk fire areas, they did not have the system in place to do so, causing wildfires;

g.      PG&E did not sufficiently invest in wildfire safety. For example, Judge Alsup observed, PG&E "let the tree budget wither so that a lot of trees that should have been taken down were not." And PG&E internal documents show that tree-related outages could have been reduced if PG&E was willing to invest more. Likewise, safety was up for debate at the Company but not earnings growth;

h.      At the time of the issuance of the Offering Documents, PG&E's warning of weather-related conditions or climate change potentially impacting PG&E did not disclose the already-existing risks as a result of the safety violations and deficient practices. As Judge Alsup indicated, you can't blame the fires "on global warming because I have been here a long time and it's been that way every summer";

i.      As a result of the extent and nature of PG&E's safety deficiencies and numerous violations, PG&E was unable to prove "it reasonably and prudently operated and managed its system" rendering it liable for the wildfires that it had already caused;

j.      At the time of the issuance of the Offering Documents, rather than the risk of wildfires (including the 2015 Butte Fire) potentially impacting PG&E, the true facts were that PG&E's safety deficiencies and violations caused wildfires. The Offering Documents failed to disclose the then existing risk to PG&E's financial condition as a result of the Company's widespread safety violations. For example, the 2015 Butte Fire – which killed two people and destroyed more than 500 homes – was caused by PG&E's safety violations. Additionally, the Offering Documents omitted the existing risk of wildfires from the already identified problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely source of the

- 118 -

ROLNICK KRAMER SADIGHI LLP<br/>~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401<br/>ONE PENNSYLVANIA PLAZA<br/>NEW YORK, NY ~~10020~~ 10119

1    Camp Fire and PG&E's overall dismal vegetation management practices. PG&E's own

2    inspections of transmission towers showed 450 safety violations, with 59 posing a serious safety

3    hazard. When speaking on risks relating to wildfires, PG&E did not disclose the extent of PG&E's

4    wildfire inducing safety deficiencies and violations; and

5        k.    At the time of the issuance of the Offering Documents, PG&E warned of conditions

6    that could impact PG&E's financial results without disclosing the already existing widespread

7    safety violations and insufficient safety practices.  Nor did the Offering Documents disclose what

8    PG&E has now admitted to Judge Alsup, "that it started 17 of those fires in 2017 just in the Wine

9    Country."  At the time of the issuance of the Offering Documents for the April 2018 Notes

10   Offering, PG&E misled investors regarding the already existing risks as a result of adverse facts,

11   including the likelihood of failed structures, use of a transmission tower a quarter-century past its

12   useful life, or the "dismal" vegetation practices of the Company.  When discussing the risks related

13   to wildfires, PG&E did not disclose PG&E's widespread safety lapses and violations.

14       **2.    The Offering Documents Omitted the Extreme Risks Posed By
           PG&E's Lack of Commitment to, Failure to Adequately Invest
15         Resources In, and Failure to Develop and Adhere to Adequate Safety
           Practices**

16

17   381.   ~~383.~~ PG&E's 10-Ks incorporated by reference in the Offering Documents falsely

18   emphasized PG&E's safety efforts by investing in its energy distribution system, in particular by

19   clearing vegetation to prevent wildfires.  For example, the 2015 and 2016 10-Ks misleadingly

20   stated as follows:

21           With respect to electric operations, climate scientists project that,
             sometime in the next several decades, climate change will lead to
22           increased electricity demand due to more extreme, persistent, and
             frequent hot weather. The Utility believes its strategies to reduce
23           GHG emissions through energy efficiency and demand response
             programs, infrastructure improvements, and the use of renewable
24           energy and energy storage are effective strategies for adapting to the
             expected increase [changes] in demand for electricity. ***The Utility is
25           making substantial investments to build a more modern and
             resilient system that can better withstand extreme weather and
26           related emergencies. The Utility's vegetation management
             activities also reduce the risk of wildfire impacts on electric*** and
27           gas facilities. Over the long-term, the Utility also faces the risk of
             higher  flooding  and  inundation  potential  at  coastal  and  low

28

elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges.

382. ~~384.~~ The Company's 2017 Form 10-K similarly, and misleadingly, stated as follows:

> With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and frequent hot weather. The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to the expected changes in demand for electricity. *The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies.* Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. *As the state continues to face increased risk of wildfire, the Utility's vegetation management activities will continue to play an important role to help reduce the risk of wildfire and its impact on electric and gas facilities.*

383. ~~385.~~ PG&E's 2015 and 2016 10-Ks also misleadingly emphasized that PG&E had developed plans and strategies to mitigate the impact of climate change and respond effectively to emergencies as well as prioritizing infrastructure investments minimizing the real risks PG&E faced with respect to wildfires as a result of its violation of laws and regulations and its grossly deficient safety practices:

> *Climate Change Mitigation and Adaptation Strategies.* During 2015 [2016], the Utility *continued its programs* to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations. The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and *wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks*, including extreme storms, heat waves and *wildfires* and *uses its risk-assessment process to prioritize infrastructure investments* for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

384. 386. Following the 2017 North Bay Fires, the Company's 2017 Form 10-K misleadingly represented that PG&E had developed "resilience strategies" to mitigate the impacts of climate change on PG&E:

> *Climate Change Resilience Strategies*
>
> **During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations**. The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves, **wildfires, drought and land subsidence, to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks, including wildfires,** extreme storms, and heat waves and **uses its risk-assessment process to prioritize infrastructure investments** for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.

385. 387. Similarly, each of the 2015, 2016, and 2017 10-Ks incorporated by the Offering Documents also materially misled investors by addressing the safety of its operations by emphasizing the Company's purported upgrades to its equipment. Each of the 10-Ks stated:

> At December 31, 2015 [2016; 2017], the Utility owned approximately 18,400 [19,200] circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV. The Utility also operated 91 [92] electric transmission substations with a capacity of approximately 63,400 [64,600; 64,700] MVA.
>
> \*     \*     \*
>
> **Throughout 2015 [2016; 2017], the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.** The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10019~~ 10112

__386.__ ~~388.~~ Another passage from each of the 2015, 2016, and 2017 10-Ks concluded with the following materially misleading statement, which did not disclose that PG&E did not have adequate systems or policies in place to shut down reclosers to prevent wildfires:

> *In 2015 [2016; 2017], the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages. Another 83 [89; 92] circuits were outfitted with this equipment, bringing the total deployment to 700 [789; 882] of the Utility's 3,200 distribution circuits. [The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.] The Utility plans to continue performing work to improve the reliability and safety of its electricity distribution operations* in 2018.

__387.__ ~~389.~~ In addition, each of the 2015, 2016, and 2017 10-Ks incorporated by the Offering Documents materially misled investors by warning that the Company's equipment might fail, a risk falsely described as "beyond the Utility's control." For example, each of the 10-Ks misleadingly purported to warn investors as follows:

> Utility's ability to safely and reliably operate, maintain, construct and decommission its facilities is *subject to numerous risks, many of which are beyond the Utility's control*, including those that arise from:
>
> • *the breakdown or failure of equipment, electric transmission or distribution lines,* or natural gas transmission and distribution pipelines, *that can cause explosions, fires, or other catastrophic events*;
>
>        *       *       *
>
> • *the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire or natural gas explosion),* [and the failure to respond effectively to a catastrophic event.][79]

__388.__ ~~390.~~ PG&E's 2Q18 and 3Q18 Forms 10-Q contained substantially similar language.

__389.__ ~~391.~~ PG&E's 2017 10-K also added false assurances to investors that PG&E had taken steps to safely operate and maintain its equipment:

---

[79] The 2017 10-K removed the bracketed portion at the end of the sentence.

Case No. 19-30088     ~~SECOND~~ AMENDED ~~PROOF~~ ~~STATEMENT~~ OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

On April 12, 2017, the Utility retained a third-party monitor at the Utility's expense as part of its compliance with the sentencing terms of the Utility's January 27, 2017 federal criminal conviction, which sentenced the Utility to, among other things, a five-year corporate probation period and oversight by a third-party monitor for a period of five years, with the ability to apply for early termination after three years. ***The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations and maintains effective ethics, compliance, and safety related incentive programs on a Utility-wide basis.***

390. ~~392.~~ In addition, the 5/23/16 8-K also falsely represented that PG&E "'continued to demonstrate leadership and commitment on safety'":

PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with the dividends for the second quarter of 2016.

\* \* \*

The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.

\* \* \*

[Earley:] "***We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history.***"

391. ~~393.~~ The foregoing statements were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E was not making substantial investments in its systems, its safety practices were deficient and the Company's deficient safety practices had already caused wildfires. The Offering Documents repeatedly represented that: (i) PG&E was making "substantial investments" in its system; (ii) the Utility had a risk-assessment process to prioritize infrastructure investments for risks associated with climate change; (iii) the Utility's vegetation management activities were adequate and reduced the risk of wildfire impact; (iv) the Utility had the programs and strategies to address wildfire risks as a result of climate change; (v) the Utility had upgraded critical substations and improved a number of transmission lines; (vi) the Utility continued to deploy technology related to its reclosers to improve reliability

- 123 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

1  and safety; (vii) the risk of equipment failures or the failure to sufficiently mitigate operating

2  conditions could have an adverse material impact of the Company implying that such adverse

3  events were "beyond the Utility's control"; and (viii) that PG&E "demonstrated leadership and

4  commitment on safety." These representations misled investors because they omitted to disclose

5  PG&E's systemic safety deficiencies.

6  392. ~~394.~~ At the time the Offering Documents were issued, material adverse facts

7  existed that contradicted the representations made therein, including that: (i) PG&E had

8  committed widespread safety violations including violations of California law and regulations as

9  well as federal law; (ii) PG&E's vegetation management programs were deficient; (iii) compared

10  to the industry in California, PG&E's electrical equipment caused far more wildfires; (iv) PG&E

11  had not updated its outdated equipment; and (v) PG&E had not sufficiently invested in safety and

12  had not made safety a priority.

13  393. ~~395.~~ Contrary to assurances in the Offering Documents that PG&E's vegetation

14  management practices reduced the risk of wildfire impact, PG&E's practices were dismal and

15  increased, not reduced, wildfire impact and caused wildfires. As Judge Alsup noted, PG&E has

16  admitted that (i) vegetation contact was the primary risk driver with respect to ignitions along

17  PG&E's distribution lines; (ii) in 2016 alone, PG&E had experienced approximately 1,400

18  downed wires caused by vegetation contact; and (iii) during 2015 and 2016, PG&E had reported to

19  the CPUC that vegetation contact with conductors was the leading cause of the 486 fire ignitions

20  associated with PG&E facilities, causing 37% of such fires. A 2013 NERC study also determined

21  that that well over 100 transmission line spans, out of 455 total spans, were perilously close to

22  vegetation or trees. Further, PG&E had incentivized its contractors to identify and clear fewer trees

23  and vegetation by paying them for reporting under the target number. And, as PG&E Vegetation

24  Program Manager Richard Yarnell testified, for the entire period from September 2015 to April

25  10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve

26  safety.

Case No. 19-30088

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

394. 396. Contrary to the impression the Offering Documents gave investors by emphasizing the substantial investments PG&E was purportedly making with respect to the Utility's system, PG&E was not sufficiently investing in safety, and any risk-assessment process it had to prioritize infrastructure investments was inadequate. Instead, PG&E had: "let the tree budget wither so that a lot of trees that should have been taken down were not"; engaged in dismal vegetation management practices; did not have a sufficient system in place to shutdown reclosers; failed to update equipment known to be outdated; "focused mainly on spending its allotted budget, not ensuring expenditures were prudent and effective"; failed, according to the CPUC, "to develop a comprehensive enterprise-wide approach to address safety"; and had not engaged in a level of investment that would promote safety. In addition, as described further below, PG&E's 2019 wildfire plan illustrates that a dramatic increase in resources to mitigate wildfires was needed; it called for more than doubling tree removal, and increasing vegetation management by 320% and inspections from 9,400 transmission structures to 40,600.

395. 397. Representations in the Offering Documents regarding procedures to address wildfires, prioritizing infrastructure and mitigation programs were materially false and misleading, omitting that PG&E routinely violated laws and regulations regarding safety and chronically chose not to commit sufficient resources to safety.

396. 398. Contrary to the representations in the Offering Documents that PG&E had "re-conducted a number of transmission lines to improve . . . safety" and made other upgrades, PG&E's equipment was outdated and hazardous. For example, there was significant damage to and other problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely source of the Camp Fire including: (i) the collapse of aging towers in 2012; (ii) the acknowledgment in 2014 that "the likelihood of failed structures happening is high"; (iii) the identification of failed hardware in 2016; and (iv) the acknowledgement that the transmission tower implicated in the Camp Fire was at risk of collapse long before the blaze was ignited and that it was a quarter-century past its useful life. In addition, contrary to the Utility's technology improving safety, PG&E did not have adequate systems in place to shut down reclosers.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

397. ~~399.~~ Purported warnings in the Offering Documents that equipment might fail or that the failure to sufficiently mitigate operating conditions could impact the Company, while implying that such adverse events were "beyond the Utility's control," were materially false and misleading. PG&E omitted that these risks had, in fact, already materialized as a result of the Utility's conduct—including inadequate vegetation management programs and tree clearing practices and the failure to update PG&E's system. The Utility's choice not to provide adequate resources towards safety or, for example, to incentivize its contractors to not report or clear hazardous trees was within its control.

398. ~~400.~~ The following contradicts that PG&E was committed to safety:

a.    Judge Alsup has observed that: "There is one very clear-cut pattern here: That PG&E is starting these fires." He continued, "What do we do[?] Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more fires'?" When Company representatives stated that PG&E had made safety a priority, Judge Alsup reportedly responded: "It's not really true. **Safety is not your number one thing.**" Judge Alsup has also found that the "record demonstrates that PG&E's performance with respect to vegetation management has been dismal";

b.    Judge Alsup also observed in January 2019 that PG&E "let the tree budget wither so that a lot of trees that should have been taken down were not";

c.    The CPUC ruled in December 2018: "PG&E has had serious safety problems with both its gas and electric operations for many years" and the Company had failed "to develop a comprehensive enterprise-wide approach to address safety." The Ruling stated that the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were not just one-off situations or bad luck, but indicated a deeper and more systemic problem."

399. ~~401.~~ For the same reasons as set forth above, the representation in the Offering Documents that assured investors that PG&E had taken steps to safely operate and maintain its equipment when explaining the role of third-party monitor "to help ensure" such steps were taken was materially false and misleading. Contrary to this statement, PG&E had systemic failures with

respect to wildfire safety and failed to update or maintain its equipment as explained above. In addition, the representation misled investors with regard to its "safety related incentive programs" by not disclosing that it had incentivized its contractors to not report or clear hazardous trees.

### 3. PG&E Misled Investors as to Its Liability For the North Bay Fires

400. ~~402.~~ PG&E's Offering Documents for the April 2018 Notes Offering (including the registration statement for the offering and the 2017 10-K incorporated by reference) misleadingly stated it was merely a possibility that PG&E caused or would face liability for the 2017 North Bay Fires, when in fact it was a certainty. They stated:

> *[T]he impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the [Company] facilities, and whether the [Company] is able to recover such costs through a [Catastrophic Event Memorandum Account]; the timing and outcome of the wildfire investigations, including into the causes of the wildfires; whether the [Company] may have liability associated with these fires*; if liable for one or more fires, whether the [Company] would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the [Company] if the [California Department of Forestry and Fire Protection and the California Public Utilities Commission] ("CPUC") or any other law enforcement agency brought an enforcement action and determined that the [Company] failed to comply with applicable laws and regulations.

401. ~~403.~~ The 2017 10-K went so far as to represent that, while it "***could***" face losses arising from the fires, "*[g]iven the preliminary stages of investigations as to the causes of the fires, PG&E Corporation and the Utility do not believe a loss is probable at this time.*" It further stated, "[t]he Utility has liability insurance from various insurers, which provides coverage for third-party liability attributable to the Northern California Fires in an aggregate amount of approximately $800 million" and could also "apply for cost recovery."

402. ~~404.~~ The foregoing statements were materially false and misleading because contrary to the impression created by the Offering Documents for the April 2018 Notes Offering regarding PG&E's liability for the North Bay Fires, the Company's deficient safety practices had caused the majority of those wildfires and liability for those wildfires. There was no reasonable basis for the Company to claim that there was "uncertainty as to the causes of the fires" or that

- 127 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

1  additional facts were necessary to render a loss probable.  Given PG&E's safety deficiencies and

2  the facts known at the time, it was probable that PG&E caused many of the North Bay Fires.

3  403.  ~~405.~~ Because it was probable PG&E's violations of law and its safety deficiencies

4  caused the North Bay Fires, Generally Accepted Accounting Principles ("GAAP"), Accounting

5  Standards Codification ("ASC") 450, *Loss Contingencies*, required that PG&E should have

6  accrued reasonably estimated losses as of December 31, 2017.  As a result, the 2017 10-K

7  understated its operating expenses and liabilities by approximately $10 billion, while overstating

8  pretax income and equity by the same amount.

9  404.  ~~406.~~ According to GAAP, an estimated loss from a loss contingency must be

10  accrued by a charge to income and the establishment of a liability when:

> a.  Information available before the financial statements are issued or are
> available to be issued [] indicates that it is probable that an asset had been
> impaired or a liability had been incurred at the date of the financial
> statements [and]

> b.  The amount of loss can be reasonably estimated.[80]

16  405.  ~~407.~~ GAAP also provided specific instructions to the Company on assessing the

17  probability of the occurrence (ASC 450-20-55-12) and required PG&E to assess whether the

18  events were probable, reasonably possible or remote (ASC 450-20-55-14).

19  406.  ~~408.~~ PG&E was required to accrue a loss contingency because both requirements

20  were met.  A loss was probable because: (i) PG&E had for years before the North Bay Fires

21  engaged in a pattern and practice of ignoring laws and California safety regulations and failed to

22  take appropriate measures to mitigate or prevent wildfire hazards from occurring; (ii) the facts,

23  evidence, and circumstances that existed strongly supported that PG&E's liability for damages in

24  connection with the 2017 wildfires was probable as of December 31, 2017; and (iii) "inverse

25  condemnation" liability laws applied to the 2017 North Bay Fires.

---

[80] ASC 450-20-25-5.

Case No. 19-30088          SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

407. 409. PG&E did not properly maintain its power lines and had failed to properly perform vegetation management in the regions affected by the 2017 North Bay Fires. In addition, in November 2017 it was reported that PG&E auditors permitted one out of 100 trees checked to violate clearance standards and in January 2018 that PG&E had only engaged in a limited recloser shutdown. "The conditions [pertaining to the recognition of loss contingencies] are not intended to be so rigid that they required virtual certainty before a loss is accrued." ASC 450-20-25-3. GAAP did not permit PG&E to wait until the ongoing investigations by the California Department of Forestry and Fire Protection and the California Public Utilities Commission made it a "virtual certainty" that PG&E would be held liable before recognizing that a loss was probable. As one analyst observed, when signs pointed to PG&E being "imprudent operators in the majority of instances…it should assume liability."  In addition, PG&E cited in its 2017 10-K a $10 billion estimate for the damages caused by the North Bay Fires.

408. 410. The loss also could have been reasonably estimated under ASC 450-20-25-2(b). First, On January 31, 2018, the California Department of Insurance issued a press release announcing an update on property losses in connection with the October and December 2017 wildfires in California, stating that, as of such date, "insurers have received nearly 45,000 insurance claims totaling more than $11.79 billion in losses," of which approximately $10.0 billion related to statewide claims from the October 2017 wildfires.

409. 411. The Offering Documents were false and misleading because there was no reasonable basis for PG&E to state that a loss arising from the North Bay Fires was not probable at the time and because the foregoing statements were contradicted by facts existing at the time of the statements, including that:

        a. PG&E started and was at fault for the vast majority of the 2017 North Bay Fires.  Cal Fire investigations have confirmed that PG&E equipment caused at least the significant majority of these fires;

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

b. Unlike other utilities, PG&E did not shut off reclosers, which significantly increased the danger and likelihood of wildfires where vegetation came into contact with its power lines, including in 132 high-risk areas in 2017;

c. In the two years prior to the Camp Fire, including roughly the year before the 2017 North Bay Fires, PG&E did "absolutely nothing" to produce an annual wildfire safety plan, as required by state law, and indeed failed to develop any "comprehensive enterprise-wide approach to address safety," a sign of "systemic problem[s]" at the Company;

d. PG&E Vegetation Program Manager, Richard Yarnell, testified that for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety; and

e. As demonstrated by admissions made by PG&E in PG&E's probation proceedings before Judge Alsup, in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact, and, as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."

### 4. The Offering Documents Misled Investors By Failing to Comply With Item 303's Disclosure Requirements

410. ~~412.~~ Item 303 of SEC Regulation S-K requires the Management's Discussion & Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected" and "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(i)-(ii).

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

411. ~~413.~~ The SEC has provided the following guidance regarding the MD&A and Item 303:

> The purpose of MD&A is not complicated.  It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."  The MD&A requirements are intended to satisfy three principal objectives:

> - To provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

> - To enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

> - To provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

412. ~~414.~~ In order to satisfy these objectives, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future."

413. ~~415.~~ The Offering Documents failed to comply with Item 303 because they failed to disclose PG&E's widespread and systemic failure to comply with federal and California laws and regulations relating to vegetation management, fire safety, and maintenance and repair of its infrastructure, among other things.  PG&E also violated 17 C.F.R. § 229.303(a)(3)(ii) by failing to disclose facts, known to PG&E, which would (and did) have an unfavorable impact on PG&E's income from continuing operations.  This also violated 17 C.F.R. § 229.503(c) because specific significant risks were not disclosed or were inadequately disclosed, despite that they were the most significant factors rendering an investment in PG&E notes risky.[81]

---

[81] 17 C.F.R. § 229(a)(3)(ii) requires the reporting party to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.503(c) requires in the "Risk Factors" section of a prospectus or registration statement "a discussion of the most significant factors that make … the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

414. 416. At the time of each of the Notes Offerings, the known trends adversely impacting PG&E included: (i) the fact that the Company had failed to develop a comprehensive approach to address safety; (ii) the Company's deficient wildfire safety practices and widespread safety violations, including the systemic failure to clear vegetation and trees as required by regulations; (iii) PG&E's failure to update outdated equipment or flawed systems and its failure to comply with laws relating to the maintenance of that equipment; and (iv) the Company's failure to allocate sufficient resources or investments in safety. Each of these adverse trends created significant risk of wildfires and liability which the Offering Documents did not sufficiently disclose so that investors understood the true state of PG&E's financial condition, including the quality of its earnings, and operations.

415. 417. These known trends were not disclosed in the Offering Documents despite known adverse facts existing at the time including, among many others described herein, that: (i) PG&E had caused hundreds or thousands of fires across California since June 2014, averaging more than one fire a day; (ii) its vegetation management practices failed to comply with laws and regulations were insufficient to prevent repeated fire ignitions; (iii) in 2014, after the collapse of several distribution line towers along the same line, the Company had documented that the "likelihood of failed structures happening [was] high" with respect to the transmission line at the center of the subsequent Camp Fire; and (iv) as PG&E Vegetation Program Manager Richard Yarnell testified, for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety.

**I. PG&E's Misrepresentations About Disclosure Controls.**

416. 418. Public companies like PG&E are required to maintain effective disclosure controls and procedures to ensure compliance with their SEC reporting obligations.

417. 419. Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires public companies to publish information in their annual and quarterly reports concerning the scope and adequacy of their internal control structure, and also to assess the effectiveness of such internal disclosure controls and procedures.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICASPENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10036 10119

418. 420. Throughout the relevant time period, PG&E repeatedly and falsely certified to investors that it had established effective internal disclosure controls and procedures for the Company.

419. 421. In its Form 10-K for the year ended December 31, 2015, filed February 18, 2016, for example, HoldCo and the Utility stated:

> Based on an evaluation of PG&E Corporation's and the Utility's **disclosure controls and procedures** as of December 31, 2015, PG&E Corporation's and the Utility's respective principal executive officers and principal financial officers have concluded that such controls and procedures **are effective to ensure that information required to be disclosed by PG&E Corporation and the Utility in reports** that the companies file or submit under the 1934 Act is (i) **recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms, and (ii) accumulated and communicated to PG&E Corporation's and the Utility's management, including PG&E Corporation's and the Utility's respective principal executive officers and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure**.

420. 422. HoldCo and the Utility made substantively identical statements in their Forms 10-K for the year ended December 31, 2016, filed February 16, 2017; and its Form 10-K for the year ended December 31, 2017, filed February 9, 2018 (with the Form 10-K for the year ended December 31, 2015, the "Relevant Forms 10-K").

421. 423. HoldCo made substantively identical statements in its Forms 10-Q filed on April 29, 2015; July 29, 2015; October 28, 2015; May 4, 2016; July 28, 2016; November 4, 2016; May 2, 2017; July 27, 2017; November 2, 2017; May 3, 2018; July 26, 2018; and November 5, 2018 (the "Relevant Forms 10-Q").

422. 424. These statements were materially false and misleading and omitted to state material facts. It was materially misleading for PG&E to represent that its internal disclosure controls and procedures were effective during the relevant period when that was not the case and the certifying officers, who were also agents of PG&E, were in possession of information indicating that the disclosure controls and procedures were not effective. PG&E knew, but failed

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

to inform investors, of its criminally negligent and criminally reckless actions, failure to comply with laws and regulations, and deficient vegetation management practices. PG&E kept records, not accessible to investors, that showed its practices and procedures were deficient, and that information was recorded and summarized, but not disclosed despite its materiality to investors and PG&E's other statements on the matter.

## VII. ADDITIONAL MATERIALITY ALLEGATIONS

423. ~~425.~~ PG&E's reassurances regarding its safety, prudence, and compliance with the law were especially important to investors because of California's legal regime known as inverse condemnation. As described in more detail above, PG&E is strictly liable for damages arising from wildfires it caused. However, during the Relevant Period, it could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had acted as a prudent manager. On such a showing, CPUC could have ratepayers reimburse PG&E for some or all its liability.

424. ~~426.~~ PG&E's investors understood that PG&E would bear the costs of wildfires it caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21, 2017 stated:

> On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire, but they still had little information regarding the cause of the fire or potential shareholder exposure.
>
> * * *
>
> PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country. Further, the company doubled its vegetation management spending in 2016 due to the drought and tree mortality crisis in California. That being said, we still do not know and likely will not know what caused the various fires for some time, **whether or not PCG's equipment was solely or partly the cause,** and whether or not the facts will support a ruling at CPUC that **PCG acted prudently** should they be successfully sued under inverse condemnation.

425. ~~427.~~ In light of these provisions of California law, PG&E's repeated reassurances to investors—*e.g.*, that PG&E complied with relevant safety regulations, doubled its vegetation

- 134 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10112

management spending, inspected all of its powerlines every year, and would adhere to its ESRB-8 Shutoff Protocol—effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage it caused by starting or exacerbating the Camp Fire. The impact of these misstatements, and their importance to the Company's financial condition, is underscored by PG&E's decision to file for Chapter 11 bankruptcy based on its anticipated $30 billion in potential liabilities tied to the Camp Fire and other wildfire disasters, and the related concern that as a result, neither PG&E Corporation nor the Utility would be able "to continue as going concerns."

## VIII.  LOSS CAUSATION

### A.  PG&E's False and Misleading Statements Artificially Inflated the Price of PG&E's Securities

426. ~~428.~~ As a result of their purchases of PG&E's securities during the Relevant Period, Claimant suffered economic loss, i.e., damages, under the federal securities laws. PG&E's false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Relevant Period.

427. ~~429.~~ As the truth about PG&E's fraud was gradually but only partially revealed to the market through a series of corrective events, and the foreseeable risks previously concealed by PG&E's material misrepresentations and omissions materialized, the false and misleading nature of PG&E's statements regarding the Company's safety practices and compliance with vital safety regulations was revealed and the price of PG&E securities plummeted, causing Claimant significant investment losses.

### B.  PG&E's Safety Violations Caused the Devastating North Bay Fires

428. ~~430.~~ Of the eighteen North Bay Fires for which Cal Fire has determined the cause, it has determined that *seventeen* were caused by PG&E equipment.

429. ~~431.~~ These were not unavoidable accidents. Of the seventeen fires caused by PG&E's equipment, eleven were caused by PG&E's violation of California safety regulations,

- 135 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1    according to Cal Fire. PG&E was ultimately responsible for the cost of the devastation caused by

2    these fires because, in violating applicable safety regulations, PG&E did not act reasonably. These

3    fires burned more than 100,000 acres of land, destroyed more than 2,000 structures, and caused at

4    least nine deaths.

5         **C.    PG&E's Safety Violations Caused the Devastating Camp Fire**

6         430.  432. At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in

7    Pulga, California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo

8    Gap.[82] A second ignition point, also caused by faulty PG&E equipment, began approximately 15

9    minutes later near the community of Concow. The combined Camp Fire soon devastated several

10   surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill. The

11   Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85 people,

12   with total damages estimated on the low-end at $16.5 billion. The Camp Fire was considered the

13   costliest natural disaster in the world in 2018.

14        431.  433. As noted above, Cal Fire has concluded that PG&E caused both of the Camp

15   Fire's two ignition points under circumstances evidencing violations of safety regulations and

16   referred its investigation to the Butte County District Attorney, who presented the evidence to a

17   grand jury that indicted PG&E on 85 felony counts.

18        **D.    As the Market Learned About the Effects and Extent of PG&E's Inadequate
              Safety Practices, the Price of PG&E's Securities Fell Dramatically**

19

20        432.  434. The partial corrective disclosures discussed below reflect the gradual

21   revelation of the truth concerning PG&E's inadequate safety practices and role in the Camp Fire

22   and other wildfires to the investing public. The contradictory and complicated information that

23   entered the market from multiple sources, including the public, the media, and the Company itself,

24   individually and together constituted a materialization of the foreseeable risks caused by PG&E's

25   inadequate safety practices and flouting of vital safety regulations, which PG&E had previously

26   ───────────────────

27   [82] Camp Fire Incident Update (Nov. 25, 2018 7:00AM),
     https://www.facebook.com/photo/?fbid=1310472829094430&set=pcb.1310474805760899.

28

concealed from investors through false and misleading statements and omissions. The fallout from the Camp Fire continued as the information leaked into the market and the public slowly learned more about the causes of the tragedies and PG&E's involvement therein.

1. **October 12, 2017: Corrective Disclosure and/or Materialization of Concealed Risk**

   a. **The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

433. ~~435.~~ On the evening of October ~~12~~11, 2017, after market hours, the market began to learn that PG&E's safety regulation violations may have been a proximate cause of the North Bay Fires. While the North Bay Fires had already been burning for days, and PG&E securities were little changed, no fundamental connections had been made between PG&E's wires, no less its practices, and the fires.

434. On ~~that date, CPUC sent PG&E a litigation hold letter, demanding that PG&E (1) "preserve any factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment from each fire event" and (2) "inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree-trimming."~~ October 11, 2017, at 9:58PM ET (6:58PM PT), the Mercury News published a video to its YouTube Channel entitled "PG&E power lines may be linked to Wine Country fires". The YouTube video was connected to a previously published article by the Bay Area News Group of Mercury News under the same headline. That article, published before October 12, 2017 (and before the CPUC preservation letter that came out on October 12, 2017) reviewed emergency dispatch radio traffic as crews were sent to the sources of some of the fires and revealed what those crews observed first hand from the presumed initiation locations.

435. The Mercury News article revealed that the *initial* calls involved sparking wires and downed transformers, suggesting PG&E, in fact, caused the fires. The Mercury News then immediately connected the fires to PG&E's inadequate safety regime, writing that "the power equipment failures began… raising questions about how well [PG&E] maintained its equipment in

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

the area and whether it adequately cut back trees from power lines to reduce fire risk – as required by state law."

436. The Mercury News spoke with an attorney who reported that Sonoma County residents were contacting him and were saying they saw transformers exploding and downed wires sparking in their neighborhoods before they went up in flames. The Mercury News further quoted him stating "If downed wires are deemed the cause of the fire, PG&E could be strictly liable for the cost of damages."  The Mercury News also quoted a professor, stating "if the PUC finds they were negligent, then they could have liability and penalties. If I were PG&E, I'd be very hopeful that I'd done everything the PUC had told me to do up there."

437. While couched as questions and suggestions at this early stage, and since Cal Fire had not yet determined a cause of the fire, the local reporting *first*, **directly** connected the ignition points of various fires to downed wires and transformers via review of firsthand information and *second*, **directly** connected the North Bay Fires to poor vegetation management, complete disregard of vegetation management requirements, and inadequate maintenance of power lines – the exact risks concealed by PG&E.

438. 436. Following the ~~release of the litigation hold letter~~local media reporting prior to the 12th, PG&E's stock opened down, and ultimately dropped $4.65 per share over the course of the day, from a closing price of $69.15 on October 11 to $64.50 on October 12, a 6.7% drop.  The stock had an unusually heavy trading volume of almost 13 million shares that day, compared to an average of approximately 3.5 million per day[83] during the Relevant Period.  PG&E's share price remained artificially inflated however, as the extent of PG&E's noncompliance with and disregard of safety laws and regulations remained hidden from the market.

    **b.**   **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017**

437. The day after this decline, market commentators began connecting PG&E's share price decline with concerns it may be responsible for damage caused by the North Bay Fires.  On

---

[83] Excluding other corrective disclosure and/or materialization of the risk dates.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1    October 13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power

2    lines may have started California wildfires."[84]  The article began by observing: "The California

3    Public Utilities Commission sent a letter on Thursday to PG&E . . . reminding them to preserve 'all

4    evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano Counties,'

5    according to multiple reports."  It continued to note that PG&E's share price decline occurred "on

6    concerns its power lines may have started the massive wildfires that have ravaged California

7    recently."  The article also repeated market commentary that the decline in PG&E's share price

8    reflected investors' understanding that PG&E was financially responsible for the North Bay Fires:

9                    The drop in the stock "reflects the following assumptions: 1) the fire
                was caused by PCG's negligence, 2) insurance coverage for 3rd
10               party liabilities will be very limited, 3) damage costs per acre far
                larger than those for the 2015 Butte fire and 4) material fines and
11               penalties will be assessed," Christopher Turnure, an analyst at
                JPMorgan, said in a note Thursday. "We appreciate the severity of
12               the fires and the legal challenges of operating in California, but
                estimate this loss of value as approaching a worst-case scenario for
13               PCG shares."

14           438.    Also on October 13, 2017, *SF Gate* published an article stating: "[T]he state agency

15   that regulates utilities has told PG&E to save every piece of damaged equipment from the area as

16   evidence for the investigations to come."  The article speculated that PG&E's vegetation

17   management practices may have caused the North Bay Fires: "In all, the company spent $198

18   million in 2016 on 'vegetation management.' But those efforts and that money—all of it coming

19   from PG&E's customers—may not have been enough."[85]

20           439.    Investors became concerned about PG&E's compliance with regulations, and

21   whether the North Bay Fires had been caused by noncompliance.  For example, a Wells Fargo

22   analyst report stated: Market commentators connected the decline in PG&E's stock to the

23   materialization of the risk that it would be held responsible for the North Bay Fires.  The Financial

24   Times reported on October 12, 2017, "Shares in PG&E, the electric utility, fell nearly 7 per cent on

25

26

27   [84] This article was published prior to the Company's corrective disclosure later that day, discussed
     *infra*.

28                                                    - 139 -
     Case No. 19-30088            SECOND AMENDED PROOF STATEMENT OF CLAIM

Thursday as local media reported the company had both acknowledged the problem on Sunday night but were dismissing the blame on its electrical system as highly speculative'."

Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.

440.    Bloomberg, in a story headlined "Probe Into California Wildfires Could Hang Over PG&E for Months" explained the sequence of events, writing "PG&E's stock had barely budged earlier this week when the wildfires began spreading, consuming people's homes and forcing thousands to evacuate. **Then local media began pointing to potential connections between the fires and PG&E power lines knocked down by strong winds.** By Thursday, California fire officials had confirmed they're investigating the role of downed power lines, and utility regulators said they're looking at PG&E's maintenance activities in the area."  (Emphasis added).

441.    Local media reporting connecting PG&E's lines to the source of the fire, as well drawing the link between the fire and the materialization of the risk of PG&E's safety and vegetation management failures, began before the CPUC preservation letter was made public and was reflected in PG&E's stock price decline on October 12, 2017.

442.    440. An October 13, 2017 report by a Guggenheim stock analyst also stated that PG&E's share price decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

85 David R. Baker, PG&E Spent Millions on Fire Prevention; It May Not Have Been Enough, San Francisco Gate (Oct. 13, 2017), https://www.sfgate.com/bayarea/article/PG-E-millions-fireprevention-Santa-Rosa-wildfires-12277237.php.

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 149 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

## 2. October 13-16, 2017: Corrective Disclosure and/or Materialization of Concealed Risk

### a. The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

443. 441. On October 13, 2017, shortly before the market closed, PG&E filed a Form 8-K with the SEC stating, in relevant part:

**Investigation of Northern California Fires**

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation.

It currently is unknown whether the Utility would have any liability associated with these fires. The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.

444. 442. PG&E's share price continued to decline following these disclosures, dropping from $63.95 at the market's October 13 open to $53.43 at its close on Monday October 16, 2017 – a drop of approximately 16.5%. The stock had an unusually high volume of over 68.5 million shares traded over this period. The price of PG&E's securities, however, remained artificially inflated.

445. 443. Numerous PG&E debt securities reacted to the North Bay fire news during the two-day period of October 12th and 13th. For example, PG&E's 6.05% bonds due March 1, 2024, identified by the CUSIP 694308GE1 fell over 200 basis points in that period. And PG&E's 6.25% bonds due March 1, 2039, identified by CUSIP 694308GQ4, also fell over 200 basis points during the period.

446. 444. The price of PG&E's securities, however, remained artificially inflated.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

b.       **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

447.   445.   Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct with respect to causing the North Bay Fires was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires. Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse.  For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even further in the early afternoon as well, following the company's 8-K disclosing the utility's $800mm in liability insurance, which we noted had not been disclosed previously (since it had been renewed following the Butte fire)."

448.   446.   PG&E's announcement and resulting share price decline were proximately caused by PG&E's grossly deficient safety practices and legal and regulatory violations that resulted in the North Bay Fires.

3.       **December 20, 2017: Corrective Disclosure and/or Materialization of Concealed Risk of Ineffective Disclosure Controls**

a.       ~~The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires~~**The Market Learns that PG&E Has Internally Determined Its Fire Liability Might Exceed the Point Where it Can Pay a Dividend**

449.   447.   On December 20, 2017, after the market closed, PG&E filed a press release on Form 8-K with the SEC titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The filing also included, as exhibit 99.1, a press release ~~in which the Company announced that it would be suspending its quarterly cash dividend~~. In the press release, PG&E stated in pertinent part:

SAN FRANCISCO, Calif.-PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to suspend the quarterly cash dividend on the Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires.

In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same uncertainty.

No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.

However, California is one of the only states in the country in which courts have applied inverse condemnation to events caused by utility equipment. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire - even if the utility has followed established inspection and safety rules - the utility may still be liable for property damages and attorneys' fees associated with that event.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

450. 448. The trading day after this 8-K was filed, December 21, 2017, PG&E's share price fell $6.62, or 12.95%, closing at $44.50. The stock's trading volume was unusually heavy, at over 52 million shares.

451. 449. Numerous PG&E debt securities also reacted negatively to the news. For example, the 3.75% PG&E bonds due August 15, 2024, identified by CUSIP 694308HA8, fell nearly 500 basis points in reaction to the news. And the 6.25% PG&E bonds due March 1, 2039, identified by CUSIP 694308GQ4, fell nearly 200 basis points.

452. Analysts described the dividend cut as "unexpected" and drew an immediate connection between the dividend suspension and PG&E's own assessment of its wildfire liabilities.

453. 450. Though PG&E had previously intertwined safety, fires, and its dividend, investors were shocked by this unexpected suspension of the dividends due to the Company's intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was increasing its dividend due to

- 143 -

the Company's "***progress on safety***."  Even more recently, for example on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***."  And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures.  Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market, and the price of PG&E securities remained artificially inflated.

454.    The December 2017 press release stood in stark contrast to the 10-Q filed only a month before, which did not discuss *any* possibility of a dividend cut with respect to the fire liabilities, and instead stated that "[t]he Utility has approximately $800 million in liability insurance for potential losses that may result from the Northern California wildfires."  The 10-Q also told investors that "If the Utility were held liable for one or more fires and the Utility's insurance were insufficient to cover that liability or the Utility were unable to recover costs in excess of insurance through regulatory mechanisms, either of which could take a number of years to resolve, PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, **and cash flows** **could** be materially adversely affected [emphasis added]."

455.    At the time, these warnings were framed as hypothetical.  In fact, PG&E had not – to date – admitted that it was responsible for the North Bay fires, nor had it admitted that its negligence, safety issues, vegetation management issues, and long neglect of its systems placed its cash flows to investors at extreme risk.

456.    The press release revealed PG&E's internal estimation and thinking to investors. It revealed that *PG&E* believed its responsibility for the fires was likely enough, and its potential liabilities large enough, to require cash conservation.

457.    But, in fact, PG&E's cash flows and dividend never were sustainable during the Relevant Period because of its failure to maintain even minimally adequate maintenance and fire-safety practices.  On March 5, 2019, Judge Alsup noted this, explaining that PG&E

ROLNICK KRAMER SADIGHI LLP
~~434 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10036~~ 10119

"knowingly failed to trim or remove thousands of trees it had already identified as posing a hazard" and that "dividends could and should have been kept and used to bring PG&E into compliance with state and federal law[.]" The dividend was a distribution of the cash PG&E needed to comply with maintenance and fire-safety laws and regulations – as it claimed to be doing – and thus was used to hide its pervasive noncompliance as the looming threat grew. Paying the dividend was a part of the scheme – removing it was the proverbial chickens coming home to roost, the materialization of the concealed risk of noncompliance.

458.    When PG&E made this disclosure, it was too late. If PG&E had effective disclosure controls, it would have revealed to the marketplace far sooner (and prior to the Relevant Period) that the cash flows supporting its dividend were at severe risk, given that the safety and neglect issues endemic to the company were such that its cash flows were at severe risk throughout the Relevant Period.

459.    Despite this materialization of risk, the true extent of PG&E's malfeasance, and the true likelihood of PG&E's responsibility for the North Bay Fires, remained concealed from the market and the price of PG&E securities remained artificially inflated.

b.      **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on December 21, 2017**

460.    451. When PG&E suspended its dividend, investors understood the announcement as a revelation that PG&E's prior statements about its safety practices may have been misleading and, as a result, PG&E would bear a higher level of liability for the North Bay Fires than the market had previously expected.

461.    452. An RBC Capital Markets analyst report issued December 21, 2017 stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend the dividend. This **unexpected decision suggests greater risk** than we had assumed surrounding regulatory treatment of the October 2017 Northern California wildfires." (Emphasis added).

462.    453. Similarly, an Evercore ISI analyst report of the same date stated:

> On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire. . . . PCG also indicated they found instances of wires down, vegetation near PCG

ROLNICK KRAMER SADIGHI LLP
151 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10036 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10036 10119

facilities and some broke poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country.

463. ~~454.~~ PG&E's suspension of its dividend and resulting share price decline were proximately caused by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

### 4. May 25, 2018: Corrective Disclosure and/or Materialization of Concealed Risk

#### a. The Market Learned the Extent and Effects of PG&E's Responsibility for the North Bay Fires

464. ~~455.~~ On May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

**CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**

Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ASPEN J. SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10119~~10112

structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

465. ~~456.~~ Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the May 2018 Press Release, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be substantial."

466. ~~457.~~ The May 25 Corrective Event revealed specific instances of PG&E's malfeasance, including three violations of state law.

467. ~~458.~~ On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 5.7 million shares changing hands on May 29, 2018.

- 147 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

468. ~~459.~~ PG&E stock had not declined in response to the start of the North Bay Fires themselves, when PG&E's culpability and the nature of PG&E's wrongdoing were unknown. When the fires started on October 8 or 9 2017, PG&E stock was unchanged.

469. ~~460.~~ Numerous PG&E debt securities also reacted negatively to the news. For example, the PG&E 1.75% municipal bond due November 1, 2026, identified by CUSIP 13034ASX9, fell over 200 basis points in reaction to the news. And the 3.25% PG&E bond due September 15, 2021, identified by CUSIP 694308GW1, fell nearly 70 basis points in reaction to the news.

470. ~~461.~~ The price of PG&E securities, however, remained artificially inflated.

        **b.**    **Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018**

471. ~~462.~~ Analysts were surprised by the results of the Cal Fire reports. For example, Deutsche Bank stated in its May 28, 2018 report:

> From the investor perspective the market should not be particularly surprised that PG&E's lines have been found to be involved in starting the fires. **That said, the fact that this was the case in all four of the fires – and that violations were found in three of the four instances – will likely be seen as a negative data point.** Reading through the LaPorte fire investigation for other data points, investors may be concerned to note that the wind speeds around the time of the ignition do not seem to have been particularly high – with a maximum gust of 29 mph.

472. ~~463.~~ One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ ASPEN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10112

473. ~~464.~~ Accordingly, the new information contained in these disclosures, including the severity of PG&E's conduct and the role of its violations of California safety laws in causing the North Bay Fires, proximately caused PG&E's share price decline.

474. ~~465.~~ PG&E, however, continued to mislead investors regarding the extent of PG&E's safety deficiencies and the impact thereof.

**5.  June 8, 2018: Corrective Disclosure and/or Materialization of Concealed Risk**

475. ~~466.~~ On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**
>
> Sacramento – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.
>
> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.
>
> Below is a summary of the findings from the 12 completed investigations:
>
> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.
>
> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. **CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole,** resulting in the power lines and equipment coming in contact with the ground.

- 149 -

**The Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined the **Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

- 150 -

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law**.

476. 467. While this news release did not discuss specific violations found, it disclosed that the causes of the fires involved PG&E equipment and vegetation, as well as the fact that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

477. 468. By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

      a.     **The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires**

478. 469. On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

479. 470. Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that PG&E expected to "record a **significant liability** for losses associated with" at least 14 of the North Bay Fires, as follows:

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10019~~10119

Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:

• for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

• for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

480. ~~471.~~ Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.

481. ~~472.~~ Numerous PG&E debt securities also reacted negatively to the news. For example, PG&E's 6.05% bonds due March 1, 2024, identified by the CUSIP 694308GE1, fell over 100 basis points in response to the news. As another example, PG&E's 4% bonds due December 1, 2026, identified by the CUSIP 694308HR1, fell over 200 basis points in response to the news. And PG&E's 6.25% bonds due March 1, 2039 fell over *700* basis points in response to the news.

482. ~~473.~~ Despite this partial disclosure and materialization of the concealed risk, the price of PG&E securities remained artificially inflated.

**b. Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018**

483. ~~474.~~ The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "[w]**ith this batch of reports, we find the range of 'alleged' law violations**

1    **noteworthy.  CAL FIRE opined on law regarding not just vegetation management but also**

2    **pole and conductor failure and the re-energizing of equipment by the company**.”  Deutsche

3    Bank also stated in its June 10, 2018 analyst report that “[**o]verall, Friday's data points are likely**

4    **to be read as another negative for PCG, given the high percentages of incidents blamed on**

5    **the company's lines and referred to DAs**.”    Guggenheim further reiterated its “Sell”

6    recommendation on June 10, 2018 because “[o]ut of the 16 fires now investigated thus far, **PCG**

7    **was found to have allegedly violated state law in 11 of those instances with Cal Fire referring**

8    **its evidence to the District Attorney—likely a strong indictment to potential criminal and**

9    **civil cases/lawsuits against the company.**”  The analyst from Guggenheim noted: “At this point,

10   we question whether the applicability of inverse condemnation even matters when all signs seem

11   to point to PCG being imprudent operators in the majority of instances, which would therefore

12   mean it should assume liability.”    Accordingly, the number and range of safety violations

13   proximately caused PG&E’s share price decline on June 8-11, 2017.

14       484. ~~475.~~ On June 11, 2018, *Bloomberg* published an article reporting: “The company

15   said Monday it expects to record a ‘significant liability’ for fires, and the shares plunged the most

16   in five months at the open” of trading.  The article also noted that “[t]he alleged violations could

17   also expose PG&E to criminal charges only two years after the San Francisco company was

18   convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno,

19   California.”

20       485. ~~476.~~ Accordingly, the new information contained in these June 8 and 11

21   disclosures, including the severity of PG&E’s conduct, the role of its violations of California

22   safety laws in causing the North Bay Fires, and the “significant liability” it would incur as a result,

23   proximately caused PG&E’s share price decline.

24       486. ~~477.~~ Most analysts continued to believe management, and most maintained neutral

25   recommendations, without movement. PG&E continued to reassure the market of its safety

26   practices and safety priority, despite the new information.

27

28

- 153 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

487. ~~478.~~ PG&E, however, continued to mislead investors regarding the extent of PG&E's safety deficiencies and the impact thereof.

### 6. November 8-9, 2018: Corrective Disclosure and/or Materialization of Concealed Risk

488. From November 9 to November 15, information about PG&E's misstatements entered the marketplace quickly and often overlapped with prior information. Collectively, the stock price declines occurring as information entered the marketplace over these days represent the dissipation of inflation from PG&E stock caused or maintained by PG&E's false assurances to investors.

489. ~~479.~~ The Camp Fire began in the early morning of November 8, 2018 and grew steadily throughout the day. However, as of the close of trading that day, no prominent news sources had reported that PG&E may have caused it.

### a. The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

490. ~~480.~~ After the close of trading on November 8, 2018, PG&E announced via its official Twitter.com account that it had decided not to implement its procedure for shutting power lines during dangerous weather conditions. This communication was the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above. The Camp Fire represented the materialization of the previously concealed risks of PG&E's inadequate safety practices and flouting of safety regulations, and investors suffered significant losses. While the announcement began to disclose the truth regarding PG&E's responsibility for the Camp Fire, it also contained a further false reassurance that PG&E's decision was because "***weather conditions did not warrant this safety measure***," as detailed above.

491. ~~481.~~ Also after the close of trading on November 8, 2018, PG&E filed an Electric Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen minutes before the Camp Fire began, "in the area of the Camp Fire." The same report acknowledged that

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

an aerial patrol later in the day showed "damage" to the same transmission tower. However, this information undermining PG&E's statements about compliance and prioritizing safety during the Relevant Period would not be reported by major news outlets until the next day, November 9, 2018.

492. ~~482.~~ On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at $39.92 on November 9, 2018, the following trading day. The stock experienced unusually high trading volume of 23,627,100 shares. The price of PG&E securities, however, remained artificially inflated.

### b. Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline

493. ~~483.~~ Market commentators confirmed that PG&E's share price declined due to news connecting PG&E to the Camp Fire, the true risk of which was concealed by PG&E's false and misleading statements and omissions.

494. ~~484.~~ On November 9, 2018, CNBC published an article entitled "Shares of electricity provider PG&E have worst day since 2002 as wildfires ravage California."[8684] The article noted that: "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage through California. This was the biggest one-day decline for the stock since Aug. 8, 2002." It further observed: "PG&E also traded 23.6 million shares, about five time [sic] its average 30-day volume." The article was initially published at 1:03 p.m. Eastern Time (i.e., prior to the close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the Camp Fire.

495. ~~485.~~ On November 9, 2018, Deutsche Bank described how investors were "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of provisions regarding 2018 wildfires:

---

[8684] Fred Imbert, *Shares of Electricity Provider PG&E Have Worst Day Since 2002 as Wildfires Ravage California*, CNBC (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/shares-of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html.

- 155 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~ IOU
NEW YORK, NY ~~10020~~ 10119

While there has been no specific indication of utility lines being involved in these ignitions, investors are understandably concerned considering that the recently passed wildfire bill (SB901) left utilities particularly exposed to 2018 fires if their infrastructure ends up being implicated. This is due to the fact that the so-called stress test or customer harm threshold is only applicable to 2017 fire losses. Meanwhile, the new reasonableness standard which the CPUC will use to determine eligibility for recovery of liability costs from customers only kicks in from 2019.

496. ~~486.~~ A Barclays report from the same day supported the conclusion that investor concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the stock price drop:

**We believe the lack of explicit language for 2018 wildfires in SB 901 may be increasing market pressure**. SB 901 specifically addresses 2017 wildfire liability by tasking the CPUC with creating a cap on IOU [Investor-Owned Utility] liability to ensure safe and affordable service. The bill addresses wildfire liability in 2019 and beyond by creating a securitization mechanism. However, specific language addressing 2018 liability coverage is noticeably absent. The general consensus among CA stakeholders is that 2018 will be treated in a similar fashion to 2017, however the lack of a specific prescription may be heightening investor concern if the Camp Fire is found to be started by PCG.

497. ~~487.~~ While this report stated that there was no indication yet that electrical equipment had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could become a source of liability if PG&E equipment was found to be involved: "we expect PCG's decision not to de-energize lines after warning of high fire risk will be investigated if the fire is found to have been sparked by PCG equipment."

498. ~~488.~~ Notably, on November 7, 2018 – the day before the Camp Fire and after the North Bay revelations, analysts at JP Morgan updated their model of PG&E stock. The analysts set a price target of $64 a share (a nearly 50% move to the upside) and maintained an "overweight" (or "buy") rating. They analyzed PG&E's liability situation which, ever since North Bay, became a meaningful component of their reports.

499. ~~489.~~ JP Morgan predicted PG&E wildfire liabilities of $2.5BB – and held that number constant in its model for three years – indicating analyst belief in PG&E's assurances. The day before the Camp Fire, analysts were still modeling PG&E as almost completely unlikely to

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

1  cause any additional wildfires, or be held responsible for them, precisely because of the safety

2  policies PG&E had long asserted were true – but, as would be learned at this juncture, were false.

### 7. November 9-12, 2018: Corrective Disclosure and/or Materialization of Concealed Risk

#### a. The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

**500.** ~~490.~~ Because PG&E had concealed the extent of PG&E's safety violations and failures to prioritize safety, the market was shocked to learn how much evidence supported the conclusion that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety regulations.  Thus, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers.

**501.** ~~491.~~ After the close of trading on Friday, November 9, 2018, news outlets began to report that there was evidence PG&E caused the Camp Fire as they started to decipher PG&E's incident report the previous evening.  The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[~~87~~85]

**502.** ~~492.~~ Yet, PG&E continued to obscure the truth from the public and investors.  A PG&E spokesperson wrote an email to Record Searchlight, repeating that no cause had been found and that the report was just preliminary: "Nothing is more important than the safety of our customers, employees, contractors and the communities we serve.  The cause of the Camp Fire has not yet been determined.  PG&E has provided an initial electric incident report to the Safety and Enforcement Division of the California Public Utilities Commission (CPUC).  The information provided in this report is preliminary and PG&E will fully cooperate with any investigations."

---

[~~87~~85] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions*, MERCURY NEWS (updated Nov. 12, 2018 12:03 PM), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

503. 493. On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[8886] It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at least 6,453 homes and 260 commercial buildings.[8987] The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill. By Sunday, November 11, 2018, it was reported that more than 200 people were missing, the death toll had risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent contained.[9088]

504. 494. ABC reported on November 10, 2018, that PG&E had sent in a statement repeating that "[t]he cause of the Camp Fire has not yet been determined" and that the Company would "fully cooperate" with any investigation.[9189]

505. 495. Then on Monday, November 12, 2018, the next trading day, it was reported that BetsyAnn Cowley, a property owner in Pulga, had received an email from PG&E the day before the Camp Fire ignited; the email communicated that the Utility needed access to her property to repair a transmission line that was "sparking." It was further reported that the incident occurred near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and Camp Creek Road.

---

[8886] Anna Sciacca and Lisa Krieger, '*Our Town Has Burned': Most of Paradise is Lost After Camp Fire Ravages the Area*, Enterprise Record (Nov. 10, 2018), https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/.

[8987] *Id.*

[9088] Melody Gutierrez, *More than 200 Remain Missing in Camp Fire*, San Francisco Chronicle (Nov. 8, 2018), https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php.

[9189] Amanda del Castillo, *Dispatch calls suggest downed PG&E power lines may have started deadly Camp Fire*, ABC7 (Nov. 10, 2018), https://abc7news.com/camp-fire-how-did-the-start-started-pge/4658645/.

- 158 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10112

506. ~~496.~~ News outlets reported that although causes for the fires had not yet been identified, "early radio transmissions . . . indicated PG&E power lines, amid high winds, may have sparked the deadly Camp Fire."[9290]   Moreover, that same report noted that "Aaron Johnson, PG&E's vice president in charge of fire safety efforts, **declined to acknowledge the allegations** that the utility may have caused the fire, but said the company was working to restore power when safe and was working with first responders to turn off gas lines when needed."  In other words, investors were receiving contradictory information about whether PG&E had a role in causing the fire.

507. ~~497.~~ On this news, PG&E's share price fell $6.94, or 17.385%, to close at $32.98 on November 12, 2018.  The stock experienced a trading volume of 44,033,200 on November 12, 2018.

508. ~~498.~~ The price of PG&E securities, however, remained artificially inflated.

509. ~~499.~~ On Tuesday November 13, 2018, however, PG&E responded that the notification was about a different transmission line than the one being scrutinized as the origin point of the Camp Fire.

           **b.**    **Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline.**

510. ~~500.~~ Investors were concerned over this evidence that PG&E's safety violations likely caused the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to the press regarding PG&E's knowledge of transmission line problems in the area.  As a result, PG&E's stock price continued to drop.  As the *San Francisco Chronicle* reported on November 12, 2018, "Cowley's revelation came as shares of Pacific Gas and Electric Co.'s parent

---

[9290] Erin Baldassari, *Camp fire death toll grows to 29, matching 1933 Griffith Park blaze for deadliest in California*, LOS ANGELES DAILY NEWS (Nov. 12, 2018), https://www.dailynews.com/2018/11/12/camp-fire-death-toll-grows-to-29-matching-1933-griffith-park-blaze-for-deadliest-in-california/.

company plummeted Monday amid concerns from investors about the utility's liability connected to the Camp Fire."[9391]

511. 501. Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp Fire is in PCG's service territory and there are initial indications that the company's transmission infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

512. 502. A Macquarie Research analyst report on November 13, 2018 estimated PG&E's fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could be higher given that the Camp Fire was not yet contained:

> We've reduced our [target price] to US$45 from US$57, is based on 10.4x our '20E EPS vs 13.6x previously. Our new [target price] reflects incremental ~US$8bn in fire-related liabilities, which we hope proves excessive given the stress test included in the SB901, but we have no way to assess the potential liabilities as the fire is only 30% contained.

513. 503. A November 13, 2018 Bloomberg Intelligence report remarked that the analyst expected PG&E's liability to exceed its total equity valued absent additional assistance from the California government, and that such a bailout was not certain: "Unless mitigated by regulators, we expect PG&E's write-offs could exceed the company's total equity. California's utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule makes utilities liable for most of the billions in fire damage, but powerful political resistance prevents customer bills from rising much above inflation."

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

---

[9391] J.D. Morris and Kurtis Alexander, *Homeowner's Claim on PG&E Work Raises Questions on Camp Fire's Origin*, San Francisco Chronicle (Nov. 12, 2018), https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php.

Case No. 19-30088    SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

8. **November 13-14, 2018: Corrective Disclosure and/or Materialization of Concealed Risk**

a. **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

504. After the close of trading on November 13, 2018, PG&E released a Form 8-K that showed a much bleaker picture of PG&E's deteriorating financial situation than investors had reason to expect, even calling into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire. The SEC filing admitted, among other things, that PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the Camp Fire could exceed its insurance:

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**

As of November 13, 2018, Pacific Gas and Electric Company ("Utility"), a subsidiary of PG&E Corporation, and PG&E Corporation have aggregate borrowings outstanding under their respective revolving credit facilities of $3.0 billion and $300 million, respectively. **No additional amounts are available under the Utility's and PG&E Corporation's respective revolving credit facilities.**

\* \* \*

**Item 8.01 Other Events.**

*Camp Fire*

On November 8, 2018, a wildfire began near the city of Paradise, Butte County, California (the "Camp Fire"), located in the service territory of the Utility. . . .

The cause of the Camp Fire is under investigation. On November 8, 2018, the Utility submitted an electric incident report to the California Public Utilities Commission (the "CPUC") indicating that "on November 8, 2018 at approximately 0615 hours, PG&E experienced an outage on the Caribou-Palermo 115 kV Transmission line in Butte County. In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line, approximately one

- 161 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

mile north-east of the town of Pulga, in the area of the Camp Fire. This information is preliminary." Also on November 8, 2018, acting governor Gavin Newsom issued an emergency proclamation for Butte County, due to the effect of the Camp Fire.

As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019. . . .

While the cause of the Camp Fire is still under investigation, if the Utility's equipment is determined to be the cause, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

505. As investors continued to process the news, PG&E's share price fell $7.13, or 21.791%, to close at $25.59 on November 14, 2018. The stock experienced high trading volume of 53,543,100. The price of PG&E securities, however, remained artificially inflated.

**b. Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018**

506. Analyst commentary attributed the drop in PG&E's stock price to news about PG&E's insufficient insurance coverage and deteriorating financial situation, including the chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market closed the previous day.

507. CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop in stock price on November 14, 2018:

Shares of utility PG&E fell 21 percent on Wednesday after the company said that if its equipment is responsible for the "Camp Fire" burning in Northern California, the cost of the damage would exceed its insurance coverage and **harm its financial health.** . . . "With these borrowings, the entire credit facility has been drawn and PG&E now has $3.5 billion of cash on its balance sheet," Citi analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

non-investment grade credit rating and the liquidity requirements as a result of the downgrade.[94]

508.    Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%)** is concerned about a near-term cash and credit crunch.  The company warned of bankruptcy earlier this year, and **the situation is more desperate now**.  If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

509.    On November 14, 2018, Reuters published an article describing the market's reaction to the news about PG&E's liability for wildfires, titled "UPDATE 3 PG&E shares and bonds plunge as California wildfire risks mount."[95]

510.    Similarly, *SF Gate* published an article that day stating that PG&E's shares fell "as much as 32 percent following the company's disclosure in a regulatory filing that potential losses due to the fire burning in the Sierra Nevada foothills outside Chico threaten to exceed its insurance coverage."

514.    The market continued to react to the flurry of complex value-relevant information released November 9th-12th, and its reaction to this information was reflected in the prices of PG&E securities through and including November 14th.  The declines in PG&E securities prices during this period were the result of the market being forced to digest a stream of complex

---

[94] Thomas Franck, *PG&E Plunges 21% Amid Disclosure of an 'Electric Incident' Just Before Wildfire*, CNBC (Nov. 14, 2018), https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html.

[95] Dan Burns, *UPDATE 3-PG&E Shares and Bonds Plunge as California Wildfire Risks Mount*, Reuters (Nov. 14, 2018), https://www.reuters.com/article/california-wildfires-pge/update-3-pge-shares-and-bonds-plunge-as-california-wildfire-risks-mount-idUSL2N1XP0UP.

- 163 -

Case No. 19-30088                    SECOND AMENDED PROOF STATEMENT OF CLAIM

value-relevant information that often appeared to overlap in time and entered the marketplace through a variety of sources instead of, for example, a single corporate press conference.

### 8. 9. November 15, 2018: Corrective Disclosure and/or Materialization of Concealed Risk

#### a. The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

515. 511. On November 15, 2018, Cal Fire announced that it had identified a second ignition point for the Camp Fire.[9692] This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

516. 512. On this news, PG&E's share price fell $7.85, or 30.676%, to close at $17.74 on November 15, 2018. The stock experienced its highest trading volume during the Relevant Period of 107,155,700 on November 15, 2018.

#### b. Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018

517. 513. Market commentary confirmed that the November 15, 2018 decline in PG&E's share price was due to mounting evidence of PG&E's liability for the Camp Fire and the chance of bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements and omissions. Indeed, PG&E's share price declined until CPUC President Michael Picker commented after the close of trading that day that he did not want the Company to become bankrupt. A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E shares. They lost about two-thirds of their value during several days of free fall, then partially rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[9793]

---

[9692] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

[9793] David R. Baker, Mark Chediak & Romy Varghese, *PG&E State Review Puts Board Shuffle and Breakup on the Table*, Bloomberg (updated Nov. 17, 2018 12:00AM), https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ ASPEN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10119~~ 10112

518. ~~514.~~ That day, Moody's downgraded PG&E's debt. As *Bloomberg* described in a November 15, 2018 article titled "PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk":

> PG&E Corp.'s credit rating was cut to the brink of junk amid doubt about its ability to manage liabilities from the California wildfires.

> Moody's Investors Service lowered the rating to Baa3 from Baa2, the second-lowest level of investment grade, with the possibility of further downgrade, according to a statement. PG&E's grade reflects an exposure of about $10 billion to the 2017 wildfires, and uncertainty around 2018 liabilities, said Moody's, which also reduced the utility's Pacific Gas & Electric Co. subsidiary to Baa2.

> **"The rating downgrade reflects the material exposure to new potential liabilities associated with the Camp Fire** and the uncertainties associated with how the fire-related liabilities will be recovered," Moody's analyst Jeff Cassella said in the statement.

> California's biggest utility said this week it exhausted its credit facilities to boost cash, a move that was widely seen to be in anticipation of a credit rating downgrade, and raising concerns it may have to eventually file for bankruptcy.

519. ~~515.~~ A J.P. Morgan report from November 16, 2018 noted that the market was affected by continued uncertainty over California's willingness to aid PG&E:

> [I]f one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company; it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations[.]

520. ~~516.~~ As a result of PG&E's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Claimant and/or Adopting Claimants have suffered significant losses and damages.

521. ~~517.~~ From November 9 to November 15, information about PG&E's misstatements entered the marketplace quickly and often overlapped with prior information. Collectively, the stock price declines occurring as information entered the marketplace over these days represent the

- 165 -

dissipation of inflation from PG&E stock caused or maintained by PG&E's false assurances to investors.

522. ~~518.~~ The stock price declines on the corrective events described above represented an economic re-pricing of the riskiness of PG&E stock and were repriced to reflect the materialization of the previously concealed risk of massive wildfire liabilities associated with deficient safety practices.

523. ~~519.~~ During the Relevant Period, PG&E stock lost effectively 66% of its value, and 75% of its value from its Relevant Period high. In contrast, the S&P500 was *up* almost *30%* during the same period.

### 9. ~~10.~~ The November Disclosures Effect on Debt Securities

524. ~~520.~~ Numerous PG&E debt securities fell in response to the November disclosures.

525. ~~521.~~ The interaction of the November disclosures and PG&E's debt prices involved the debt security markets absorbing sometimes complex information that could have varying ramifications for varied market participants.

526. ~~522.~~ Complicating matters, though the Camp Fire started on November 8, 2018, and information about PG&E's culpability entered the market quickly, the bond markets were closed on November 10, 11, and *12*. Veterans Day, which occurred on November 12, 2018, is one of the rare dates when the stock market is open but the bond market is closed.

527. ~~523.~~ Because the debt markets were closed during a time period when large amounts of value relevant information entered the marketplace, the effect of that information is seen on the trading day immediately after the bond markets reponed – November 13.

528. ~~524.~~ On November 13, numerous PG&E debt securities fell in response to the information released from November 9 to 13. The decline was often massive. For example, PG&E's 6.05% bonds due March 1, 2024, identified by the CUSIP 694308GE1, fell nearly *1100* basis points on November 13, 2018 – 11%, a catastrophic move for a fixed income instrument meant to be safer than equity. The next day, reacting to the collective news from November 9 through November 14, PG&E's 6.05% bonds due March 1, 2024, identified by the CUSIP

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

Case: 19-30088   Doc# 14604-1   Filed: 10/08/24   Entered: 10/08/24 19:48:21   Page 175 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10036 10119

694308GE1, fell a further 550 basis points – bringing losses over a short two-day period to nearly 20%.

529.   525. Other debt securities suffered similar declines.  PG&E's 6.25% bonds due March 1, 2039, identified by CUSIP 694308GQ4, also fell over 1600 basis points during the period of November 13 and 14.  Similarly, PG&E's 3.4% bonds due August 15, 2024, identified by CUSIP 694308HK6, declined nearly 1500 basis points during the period; the 2.45% bond due August 15, 2022 (694308HB6) fell 1200 basis points; the 3.25% bond due June 15, 2023 (694308HC4) fell over 1300 basis points.

530.   526. As a result of PG&E's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Claimant has suffered significant losses and damages.

531.   527. From November 9 to November 14, value relevant information about PG&E's misstatements entered the marketplace for PG&E's debt securities.  Through much of that time, the bond market was closed and the impact of the information released overlapped with the impact of prior information.  Collectively, the declines occurring on November 13 and 14 represent the dissipation of inflation from PG&E debt securities caused or maintained by PG&E's false assurances to investors.

532.   528. The debt security price declines on the corrective events described above represented an economic re-pricing of the riskiness of PG&E debt securities and were repriced to reflect the materialization of the previously concealed risk of massive wildfire liabilities associated with deficient safety practices.

## IX.   SCIENTER UNDER THE EXCHANGE ACT

533.   529. The public was surprised to learn the extent to which PG&E had misled everyone about PG&E's lack of safety procedures related to wildfire prevention and responsibility for the Camp Fire and other wildfires.  Based on the extensive, widespread, and egregious nature of PG&E's underlying noncompliance and disregard for safety, there is a strong inference that PG&E itself, and the officers and directors who spoke on its behalf and controlled its public

- 167 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

statements, knew or should have known the truth. As detailed below, they either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality. Thus, throughout the Relevant Period, the PG&E Officers acted with scienter (a) by making false and misleading statements and omissions about PG&E's financial health and compliance with relevant safety rules and regulations while having actual knowledge of their false or misleading nature, and/or (b) by acting in a deliberately reckless manner.

534. 530. The PG&E Officers put their compensation and profits before safety. They knew that it was their responsibility to manage risk and ensure that safety was a priority for everyone at PG&E. Instead, in connection with the 2018 Camp Fire, the PG&E Officers failed to fund and implement a management program to inspect, identify, maintain, and replace equipment and infrastructure.

### A. PG&E and its Officers Knew that PG&E's Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations

535. 531. As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations. At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days. As noted above and described in more detail below, PG&E had a company policy that perversely incentivized its contractors to clear less vegetation than is safe.

536. 532. Even after PG&E caused the disastrous Butte Fire through its serious fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers and directors made any changes to improve safety or compliance. Thus, they either knew, or should have presumed, that its violations continued unabated.

Case No. 19-30088          SECOND AMENDED PROOF STATEMENT OF CLAIM

ROLNICK KRAMER SADIGHI LLP
131 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10022 10119

537. 533. On February 26, 2019, *The Mercury News* published an article titled, "PG&E knew for years that repairs were needed on transmission lines in area of fatal Camp Fire." According to the article, energy officials had been warning PG&E about its fast-aging system of transmission lines for the better part of a decade. For example, according to a May 2017 CPUC filing: "In 2010 and again in 2015, the California Independent System Operator transmission plan identified the need to improve and upgrade this system to address potential overloads and power outages that would affect customers in the service area."

538. 534. On February 27, 2019, *The Wall Street Journal* published an article titled, "PG&E Delayed Safety Work on Power Line That Is Prime Suspect in California Wildfire." The article stated that the Company had delayed for several years needed repairs to its high-voltage Caribou-Palermo transmission line, the likely source of the Camp Fire. PG&E had failed to fix the 100-year-old line despite informing federal regulators of its plans to repair and replace damaged sections of the line as early as 2013.

539. 535. PG&E likewise stated in a July 2017 filing to FERC that it would embark on numerous repairs of the Caribou-Palermo system. The planned repairs and maintenance included new tower frames, steel poles, improved line tension and hardware upgrades. As PG&E stated in the filing: "The project has a forecasted capital expenditure of $30.3 million."

540. 536. PG&E also proposed in July 2017 considerable work for the Caribou-Palermo line as part of the Company's annual request to FERC for rate changes. "The Caribou-Palermo 115 kilovolt circuit was analyzed as part of the 2013 NERC Assessment," PG&E stated, referring to an analysis by the North American Electric Reliability Corporation. The filing indicated the 2013 NERC study determined that well over 100 transmission line spans were perilously close to vegetation or trees. "The completed analysis identified 127 spans with clearance issues out of the 455 spans on the electric transmission line," PG&E stated in its 2017 FERC filing. PG&E never fixed the identified issues from the time it learned about them in 2013 as reflected in the July 2017 filing. PG&E's Caribou-Palermo transmission system would later be implicated in the 2018 Camp Fire.

Case No. 19-30088    SECOND AMENDED PROOF STATEMENT OF CLAIM

541. ~~537.~~ On February 28, 2019, PG&E issued a press release providing an update on the financial impact of the Camp Fire and the North Bay Fires, along with the Company's fourth quarter and full-year 2018 financial results. The release stated that PG&E "believes it is probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire." It also stated that the Company would be taking a $10.5 billion charge related to the Camp Fire. According to the Company, primarily due to the large number of third-party claims against PG&E, the Company reported full-year **net losses of $6.9 billion**, compared to 2017 net income of $1.6 billion. As a result of the "extraordinary challenges" caused by the wildfires, the release stated that PG&E **may not be able to continue as a going concern**.

542. ~~538.~~ On March 5, 2019, Judge Alsup, presiding over PG&E's criminal probation, issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations. The Order contained the following findings summarizing the results of the federal court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay Fires and Camp Fire:

> PG&E's filings have included several relevant admissions. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines." ("Vegetation" means trees and limbs in this context.) In 2016 alone, PG&E experienced approximately 1,400 wires down caused by vegetation contact. As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of those fires. PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."~~98~~94

543. ~~539.~~ Thus, PG&E has admitted its actual knowledge that its vegetation management practices did not comply with California safety regulations on the order of thousands of violations per year. PG&E has further admitted to actually knowing that its violations have

---

~~98~~94 Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

caused hundreds of wildfires per year since 2015.  However, PG&E never disclosed to investors that its own internal compliance reviews showed a lack of compliance on a huge scale.

544.   540.  Moreover, the Butte County District Attorney concluded "that the reckless actions of PG&E created the risk of a catastrophic fire . . . , that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk."  Butte County DA Report at 82.

545.   541.  In the time period of 2017 to 2018, after the North Bay Fires and leading up to the Camp Fire, PG&E's notice of its numerous and widespread safety violations was even stronger.  For example, PG&E had known about the dangerous noncompliance of its Caribou-Palermo transmission line—the same line whose failure would cause the Camp Fire's first ignition point—since a 2014 internal Company email stated that "the likelihood of failed structures [on the Caribou-Palermo line] happening is high."

**B.    Safety Was Core to PG&E's Operations, and the PG&E Officers Were Directly Involved in It**

546.   542.  In a January 16, 2019 filing to the CPUC, PG&E stated unequivocally that safety is its "core business," and as such, was the "focus" of Williams's activities as CEO: "Since the Utility is the sole operating subsidiary of PG&E Corporation, the activities of the PG&E Corporation CEO and President focus on the Utility's core business, including most notably safety."[9995]

547.   543.  Even before the North Bay Fires, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub- Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release).  PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the

---

[9995] Summary of Corporate Structure of Pacific Gas and Electric Company (U 39 M) and PG&E Corporation (Cal. Public Utilities Commission filed Jan. 16, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M263/K658/263658434.PDF.

Case No. 19-30088                SECOND AMENDED PROOF STATEMENT OF CLAIM

PG&E Officers. For instance, the PG&E Board's Finance Committee was alleged in a separate lawsuit over the Butte Fire to have been "actively involved in, and responsible for, assisting the Boards in their oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including the risk of "wildfire." Indeed, because the Company faced the possibility of strict liability for property damages caused by wildfires, and such liability could not only be extraordinary but also non-reimbursable if its officers had not acted "prudently," wildfire safety was a particular focus of the PG&E Officers, who spoke personally on the subject with investors and regulators during the Relevant Period. Further, PG&E's repeated misrepresentations about PG&E's safety and compliance record concerned the Company's core operations. Therefore, the PG&E Officers, by virtue of the importance of safety to the Company and their positions as its leaders, reasonably had knowledge about PG&E's safety and regulatory failures during the Relevant Period.

548. ~~544.~~ The PG&E Officers repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and results. For example, they kept investors apprised about how many hundreds of thousands of trees the Company was trimming and removing, including how many thousands were "dead or dying." Not only that, but the PG&E Officers also inflated these numbers over time without explanation, raising the number of trees supposedly trimmed or removed from 1.2 million to 1.4 million. In both reporting and inflating these numbers, the PG&E Officers showed they knew that vegetation management and compliance was important to investors on a granular level.

549. ~~545.~~ A core operation concerns a company's primary products or services, and it extends to matters of importance that might significantly impact the company's bottom line. There is no question that PG&E's safety policies and procedures were critically important to the Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it is also notable that PG&E faced potentially $30 billion of liability or more due to its failures, and that California's regulatory regime imposes significant liability for PG&E's vegetation

management and other safety failures.  This is strong evidence of the centrality of the Company's wildfire safety and compliance regime.

550. ~~546.~~ In a separate lawsuit that was filed in connection with the Butte Fire, it was publicly alleged—based on discovery and deposition testimony that has not yet been publicly revealed—that Williams and Hogan both served on an Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues.

551. ~~547.~~ Just months before the North Bay Fires broke out, United States District Judge Thelton E. Henderson in the Northern District of California ordered that PG&E work with federal prosecutors to retain a monitor to oversee the Company's compliance and ethics programs, and implement "policies and procedures that address threats caused by vegetation," in light of the deadly San Bruno explosion.  Order at 3, PG&E Criminal Proceedings, (N.D. Cal. Jan. 26, 2017), ECF No. 916 (the "San Bruno Order").  As part of the sentencing process, PG&E had promised the Court that Julie Kane—as Chief Ethics and Compliance Officer of the Company—"reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's safety and compliance, such that "high-level personnel of the organization ensure its effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906.  Accordingly, Kane and Williams had actual knowledge of PG&E's lack of compliance.

552. ~~548.~~ Because the PG&E Officers represented that they closely monitored PG&E's critically important safety and compliance, and because PG&E's fire safety practices resulted in thousands of fire safety violations during the Relevant Period, they knew—or were deliberately reckless in not knowing—that PG&E's level of safety with respect to vegetation management and wildfire prevention did not comport with state law.

C. **The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter**

553. ~~549.~~ As described above, PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010.  On January 26, 2017, Judge Henderson sentenced PG&E to an expansive

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

program of probation, including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and a mandate to refrain from any further criminal behavior.  San Bruno Order.

554.  ~~550.~~ The first condition to PG&E's probation was that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation."  PG&E did not object to this term in its responsive sentencing memorandum.  PG&E Sentencing Memorandum at 15, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906.  PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations.  This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike.  Accordingly, as of January 8, 2017, PG&E had an unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed investors to believe it was meeting the terms of its probation.

555.  ~~551.~~ On August 14, 2017, Judge Alsup was assigned to preside over the criminal case and PG&E's resulting probation.

556.  ~~552.~~ After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?
>
> 2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?
>
> 3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?
>
> 4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

557.  ~~553.~~ On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely,

- 174 -

Case No. 19-30088   SECOND AMENDED ~~PROOF~~ STATEMENT OF CLAIM

the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." In response, the Attorney General of California replied that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[~~100~~96] The listed potential offenses ranged from "misdemeanor offenses related to vegetation and power lines" to "implied-malice murder and involuntary manslaughter."

558. ~~554.~~ On December 10, 2018, the *San Diego Union-Tribune* reported that despite the 2015 Butte Fire and North Bay Fires, PG&E had never produced a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted. Enacted in September 2016, California Senate Bill 1028 ("SB 1028") required PG&E and other California utilities to produce an annual report detailing efforts to limit the risks from wildfires and specifying who was responsible for implementing safety provisions in the plans. State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: "**They have done absolutely nothing in those two years.**" In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in the Fall of 2018 in order to force California utilities to develop and submit their wildfire mitigation plans no later than February 2019.

559. ~~555.~~ On February 6, 2019, PG&E finally submitted to CPUC its new wildfire mitigation plan, as required by SB 901. PG&E later corrected the filing on February 12, 2019 and amended it on February 14, 2019 (the "2019 Mitigation Plan"). On April 29, 2019, the CPUC largely approved PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned mitigation that require improvement or other follow-up activity," including improved "[a]nalysis of data to determine whether PG&E's new vegetation-pole clearances have

---

[~~100~~96] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

1   contributed to reduced ignitions, especially during critical weather conditions."~~10~~197  As detailed

2   below, the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation

3   Plan confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it

4   should have during the Relevant Period.

5       560.  ~~556.~~ PG&E's 2019 Mitigation Plan stated that the Company would substantially

6   increase its vegetation management efforts.  First, the plan provided that approximately 375,000

7   "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to

8   PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in

9   2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual).  Second, it called for performing

10  2,450 miles of "enhanced vegetation management" (including fuel reduction and overhang

11  clearing,) in 2019, an increase of 320% from its 2018 target of only 760 miles.  In approving this

12  proposal, the CPUC noted that "PG&E proposes to spend between $800 million and $1.3 billion to

13  support [this] expansion of its vegetation management program."

14      561.  ~~557.~~ PG&E's 2019 Mitigation Plan also stated that the Company would

15  substantially increase its inspections.  Instead of just routinely inspecting 517,500 electricity

16  distribution poles, PG&E would also commit to conducting "enhanced inspections" of 685,000

17  electricity distribution poles in High Fire Threat Districts "<u>in addition to</u> routine inspections" over

18  the course of just "five months."  (Emphasis original.)  "Enhanced Inspection" was described as

19  "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing

20  inspections of every transmission tower," implying such measures had not been undertaken in the

21  past.  Similarly, for its electricity transmission structures, PG&E committed to conducting

22  enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from

23

24  _____

25  ~~10~~197 Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend
    the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was "filed

26  too late to be considered and to receive party comment," and thus "not act on those proposals." *See*
    Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019),

27  http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf.

28

9,400 and 76,000, respectively). PG&E also committed to conducting "enhanced risk-based inspections" of 200 electricity substations in High Fire Threat Districts.

562. ~~558.~~ The CPUC noted that these increased inspections were expected to cost PG&E **between $798 million and $1.396 billion—"an increase from $15 million authorized in PG&E's last [General Rate Case]."**

563. ~~559.~~ The 2019 Mitigation Plan also proposed that the Company would significantly expand the geographic regions where it might preemptively shutoff power pursuant to its ESRB- 8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million customers, a 950% increase from what previously covered approximately 570,000 consumers. PG&E planned to increase inspections of its equipment and install more weather stations and cameras for earlier risk detection.

564. ~~560.~~ Thus, PG&E's 2019 Mitigation Plan described dramatic increases in safety practices and expenditures compared to prior years. These and other aspects of PG&E's expensive proposals represented that it was finally providing the necessary, dramatic expansion of its safety practices and increases in expenditures, which had been absent. Accordingly, the vastly expanded scope of PG&E's 2019 wildfire plan strongly demonstrates the inadequacy of PG&E's prior safety practices, showing that PG&E did far less than it should have during the Relevant Period.

565. ~~561.~~ Following the plan's release, the *Associated Press* summarized the general reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"[~~102~~98] Yet, at the hearing on the second order to show cause in PG&E's probation proceedings before Judge Alsup, counsel for PG&E stated that the plan was not final. He explained, "the wildfire mitigation plan is still in the process of being reviewed and there isn't a final one . . . that plan is still in flux."[~~103~~99]

---

[~~102~~98] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, ASSOCIATED PRESS (Feb. 7, 2019), https://www.apnews.com/c1d0e16811914177a9b4b473f1eeebee.

[~~103~~99] Transcript of Proceedings at 10, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047. PG&E has filed amended wildfire mitigation plans in compliance with California law

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10019 10112

566. 562. In addition to its wildfire mitigation failures, PG&E is also alleged to have falsified safety data and records for five years. As PG&E noted in a press release, filed on January 14, 2019 with the SEC on a Form 8-K, the CPUC announced on December 14, 2018 that it had opened a case against PG&E for allegedly falsifying its data and safety records. While the documented violations related to the intentional falsification of pipeline data, the agency stated that the findings were an example of why it was "investigating PG&E's safety culture" and considering the forced implementation of measures that "address systemic safety issues at PG&E." In other words, according to the CPUC, the Company's falsification of pipeline safety data implicated the Company's entire operations and approach to safety. According to the CPUC's annual report for 2018, PG&E falsified records from 2012 through 2017.[104][100]

567. 563. Thereafter, on December 21, 2018, the CPUC issued a Scoping Memo and Ruling (the "Ruling") regarding its efforts to reform PG&E's corporate safety culture. The Ruling found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and stated that, despite these shortcomings, **the Company had failed "to develop a comprehensive enterprise-wide approach to address safety**." The Ruling stated that the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

568. 564. On December 28, 2018, the Attorney General of California filed an amicus brief in connection with PG&E's probation proceedings before Judge Alsup. The brief stated that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[105][101] The listed potential offenses ranged from misdemeanors to implied-malice murder.

---

direction from the CPUC Wildfire Safety Division, on February 12, 2019 and April 25, 2019, February 7, 2020, February 5, 2021, and February 25, 2022.

[104][100] *See* CPUC 2018 Annual Report at 9, https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/news-and-outreach/reports/annual-reports/2018-annual-report.pdf.

[105][101] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

- 178 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10022~~10112

569. ~~565.~~ On January 9, 2019, in PG&E's probation proceedings before Judge Alsup, a U.S. probation officer filed a Petition for Summons for Offender Under Supervision, which: (i) found "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their Probation" stemming from the San Bruno pipeline explosion;[~~106~~102] (ii) cited the Company's failure to report the investigation by the Butte County District Attorney's Office into PG&E's role in starting several fires that formed part of the North Bay Fires; and (iii) cited PG&E's failure to report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire, or that the Company had entered into a settlement agreement with Butte County to avoid such criminal prosecution.

570. ~~566.~~ On January 9, 2019, Judge Alsup also issued an order to show cause as to why the terms of PG&E's probation should not be modified "[i]n order to protect the public from further wrongs by the offender, to deter similar wrongs by other utilities, and to promote the rehabilitation of the offender."[~~107~~103]  The order cited Cal Fire's finding that PG&E had caused wildfires in 2017, 12 of which it had referred to criminal prosecution, and suggested the Company significantly bolster its vegetation management activities and re-inspect its entire electrical grid in "light of PG&E's history of falsification of inspection reports," among other proposed modifications to the terms of the Company's probation.[~~108~~104]

571. ~~567.~~ On January ____ reported that PG&E had started more than 1,500 fires between ____ or more than one a day on



California Tinderbox

[~~106~~102] Petition for Summons for ____ PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF ____

[~~107~~103] Order to Show Cause Why ____ Should Not Be Modified at 1, PG&E Criminal Proceedings (N ____

[~~108~~104] PG&E was found responsib ____ *19 major fires* stemming from the 2017 Northern California wil ____ d up until that point.  Only the Tubbs Fire had not been found t ____

average.[109][105]    The newspaper provided the following graphic, which illustrates the shocking extent of PG&E's contribution to fires throughout California with incidents reported across essentially all of the Utility's service area:

572.    568. On January 14, 2019, PG&E filed with the SEC a report on Form 8-K stating that the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the Company provided for the expected bankruptcy filing was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018."

573.    569. On January 15, 2019, MarketWatch reported in an article titled "PG&E's slide into bankruptcy would mark third largest investment-grade default since 1998,"[110][106] that PG&E faced a significant risk of defaulting on its bonds:

> If Pacific Gas & Electric Co. follows through with its bankruptcy announcement, the country's largest utility would record the third largest default in the U.S. investment-grade corporate bond market since 1998.
>
> PG&E announced it would file for bankruptcy by Jan. 29 after devastating California wildfires in 2017 and 2018 left it facing billions in potential liabilities. The company also said it would not pay an interest payment due on bonds maturing in 2040 on Wednesday, which would also trigger a default.
>
> *      *      *
>
> PG&E's bankruptcy would mark a dramatic collapse for a company that was once seen as an attractive bet among hedge funds.  More than $17 billion of its bonds would be facing default, according to analysts at Bank of America Merrill Lynch.
>
> *      *      *
>
> In terms of sheer scale of a default from an investment-grade issuer, BAML found only Lehman Bros. and WorldCom would rank above PG&E.

---

[109][105] Russell Gold et al., *G&E Sparked at Least 1,500 California Fires.  Now the Utility Faces Collapse*, WALL STREET J. (Jan. 13, 2019), https://www.wsj.com/articles/pg-e-sparked-at-least-1-500-california-fires-now-the-utility-faces-collapse-11547410768.

[110][106] Sunny Oh, *PG&E's Slide Into Bankruptcy Would Mark Third Largest Investment-Grade Default Since 1998*, MARKETWATCH (Jan. 15, 2019), https://www.marketwatch.com/story/pges-slide-into-bankruptcy-would-mark-third-largest-investment-grade-default-since-1998-2019-01-15.

Case: 19-30088   Doc# 14604-1   Filed: 10/08/24   Entered: 10/08/24 19:48:21   Page 189 of 214

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

574. ~~570.~~ On January 17, 2019, Judge Alsup issued a tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines to trees or limbs falling onto them during high-wind events."[~~111~~107]

575. ~~571.~~ On January 30, 2019, Judge Alsup held a probationary hearing to determine whether PG&E's conduct had violated the terms of its probation. Part of the hearing concerned PG&E's failure to inform the probation officer that the Butte County District Attorney's Office was investigating PG&E's role starting several of the North Bay Fires, that the District Attorney considered criminal prosecution, and that it executed a settlement with PG&E to avoid such prosecution. The court made a "**find[ing] that PG&E violated the conditions of probation**," with sentencing to be determined.[~~112~~108] Judge Alsup also reminded the Company:

> [O]ne of the conditions of probation is you will not commit another federal, state, or local crime. It doesn't have to be a pipeline or a natural gas. It can be any crime. You cannot – you've got to be on your absolute best behavior. No more crimes. . . . That's what PG&E is up against now.

576. ~~572.~~ During the hearing, Judge Alsup reportedly stated: "[**T]here is one very clear-cut pattern here: That PG&E is starting these fires.** PG&E, according to Cal Fire, started the fire. Global warming did not start the fire. According to Cal Fire, PG&E started it, all 17 of them." Judge Alsup continued, "what do we do[?] Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more fires'?"[~~113~~109] Judge Alsup heard testimony from PG&E's probation officer, Jennifer Hutchings, concerning the Honey Fire—one of the North Bay Fires for which Cal Fire found evidence of a safety violation and referred further criminal investigation to the relevant district attorney for Butte County. Probation Officer Hutchings testified: "I discovered that there had actually been an extensive

---

[~~111~~107] U.S. Response to Court's Order to Show Cause and Request for Comment, PG&E Criminal Proceedings (N.D. Cal. Jan. 17, 2019), ECF No. 970.

[~~112~~108] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

[~~113~~109] *Id.*

investigation done by Butte County, that they were fully prepared to bring criminal charges against Pacific Gas and Electric; that Pacific Gas and Electric had entered into a settlement agreement with them in order to avoid these charges being brought." **The court then made a a "find[ing] that PG&E violated the conditions of probation as charged in the Form 12**." Thereafter, the court turned to address whether it "should not impose further condition on PG&E to help protect the public from possible further other crimes of the offender," including the following exchange with PG&E representative:

> The Court: Okay. When you say "mitigate," why can't the risk [of wildfire] be zero? Why is it that PG&E should be permitted to start a single wildfire?"

> PG&E: Well, the answer to the first question is bringing the risk to zero is an incredibly complicated series of policy decisions that have to factor in reliability, cost, safety, and there's a tremendous amount of analysis that goes into how best to, for instance, make vegetation management decisions and how aggressive vegetation management should be versus the cost of –

> The Court: So why is it PG&E says all the time "Safety is our number one thing"? I hear it all the time, "Safety. Safety. Safety," **but it's not really true. Safety is not your number one thing.**

577. ~~573.~~ At the conclusion of this proceeding, PG&E accepted that full compliance with safety regulations, rather than "mitigation," was both possible and PG&E's goal: "[U]ltimately we agree with Your Honor's goal. We think that Your Honor's goal of trying to eliminate the risk is exactly what we all need to be working towards."

578. ~~574.~~ On February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[~~114~~110] The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers. For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles. By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area,

---

[~~114~~110] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~10119

1    operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and

2    2,400,000 electric poles.  Yet, despite these similarities in service size and miles of distribution

3    lines, ***PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment***

4    ***between 2014 to 2017*** as self-reported to the CPUC.  In total, PG&E's equipment caused 1,552

5    wildfires, while SoCalEd only caused 344 fires over the same time period.  Put differently,

6    PG&E's equipment caused ***4.5 times more wildfires*** than SoCalEd.  PG&E's equipment was also

7    responsible for more large-scale fires than SoCalEd, including 43 more fires that burned between

8    10-99 acres, three more between 100-299 acres, and two more between 300-999 acres.  Similarly,

9    since 2014, the electrical equipment of SDG&E caused 109 wildfires with only one wildfire

10   burning over 10 (and below 300) acres.  By contrast, PG&E caused 1,552 wildfires during that

11   same timeframe with 68 of those fires burning over 10 acres.

12       579.  ~~575.~~On March 5, 2019, Judge Alsup issued a revised order to show cause as to why

13   the court should not modify the terms of PG&E's probation.[~~115~~111]  Judge Alsup's Revised Order

14   further found that this "**record demonstrates that PG&E's performance with respect to**

15   **vegetation management has been dismal.**"  Although PG&E had previously balked at new

16   conditions of probation that would require full compliance on the grounds that they would be

17   impossible to achieve, Judge Alsup's March 5, 2019 order rejected that notion:

18              To address PG&E's complaints that the vegetation-management
               conditions proposed in the January 9 order would be unduly
19              expensive, require superhuman efforts, and exceed the requirements
               of state and federal law, the above conditions would now simply
20              require full compliance with existing law and with the metrics
               proposed in PG&E's own wildfire mitigation plan.  This order
21              rejects PG&E's back-up contention that "perfect compliance" with
               Section 4293 is impossible due to "densely forested, highly
22              dynamic, living environments, in which conditions can rapidly
               change" (Dkt. No. 1016 at 9).  The record demonstrates that
23              PG&E's performance with respect to vegetation management has
               been dismal.  And, not only does the offender provide no
24              evidentiary support for its claim, but anyone who knows the terrain
               and its vegetation knows that it takes years for trees to grow to the

25

26   _____

     [~~115~~111] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
27   Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

28

- 183 -

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

height of PG&E's lines.  Regular inspections could easily spot trees that are high enough to present a hazard.  If state or federal law is too strict, moreover, PG&E's remedy would be to seek the relaxation of such laws through its well-oiled lobbying efforts.  The proposed conditions would help ensure that, going forward, funds are adequately allocated to PG&E's vegetation management and wildfire mitigation costs. [116][112]

580. 576. On April 2, 2019, Judge Alsup held a hearing on his second order to show cause in PG&E's probation proceedings.  At the hearing, Judge Alsup stated: "PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't.  And that was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California. [117][113]

581. 577. Judge Alsup also explained: "as we've gotten into the evidence, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees that should have been taken down were not."

582. 578. Judge Alsup had proposed more sweeping measures, with which PG&E said it would take 18 years to comply, so instead, he "acquiesced and just simply [decided] to require, subject to this hearing, that PG&E comply with the state law, and that PG&E comply with its own wildfire prevention plan that it now has before the PUC, among other smaller issues, but those are the main things."

583. 579. He concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . . PG&E has started more than—way more than its share of these fires. . . This is a problem of your own making.  A lot of money went out in dividends that should have gone to the tree budget.  This is a problem of your

---

[116][112] *Id.*

[117][113] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047.

ROLNICK KRAMER SADIGHI LLP

1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

1   own making and you've got to undo this problem.  You've got to address it and get back square

2   with the people of the State of California that depend on you to do the job safely."

3       584.  580. Under these circumstances, PG&E's violation of court-imposed probation and

4   California law, while under monitoring and reporting obligations regarding its purported

5   compliance throughout the Relevant Period, support strong inferences that the PG&E Officers

6   knew, or were severely reckless in not knowing, that it failed to comply with relevant laws and

7   regulations when making the false and misleading statements detailed above.

8       585.  581. As a result, on April 3, 2019, Judge Alsup issued an Order Adopting New

9   Conditions of Probation.  The court modified the terms of PG&E's probation to require it to (i)

10  "fully comply with all applicable laws concerning vegetation management and clearance

11  requirements"; (ii) "fully comply with the specific targets and metrics set forth in its" 2019

12  Mitigation Plan, and (iii) not issue dividends until it was in compliance with all applicable

13  vegetation management requirements, among other conditions. 118114

14      586.  582. On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's

15  violation of probation.  In a colloquy with PG&E's new CEO William D. Johnson, the Court

16  stated: "one of the biggest problems we've had is that PG&E has been starting a lot of fires, and

17  they had that horrible explosion in San Bruno, and **I just don't think PG&E has put safety**

18  **first**."  He further reminded the new CEO: "your company admitted that it started 17 of those fires

19  in 2017 just in the Wine Country." 119115

20      587.  583. Judge Alsup further exclaimed that here in California there are "six to seven

21  months of no rain.  And you **can't blame it on global warming** because I have been here a long

22  time and it's been that way every summer."  During the sentencing hearing, Judge Alsup also

23  observed that while there are other causes of fire, "no one has started more fires than PG&E."

24

---

25  118114 Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal. Apr.

26  3, 2019), ECF No. 1040.
    119115 Transcript of Proceedings at 11, PG&E Criminal Proceedings (N.D. Cal. May 7, 2019), ECF

27  No. 1061.

28

588. 584. The magnitude of PG&E's failures show that the PG&E Officers either knew these facts, or were deliberately reckless in not knowing them. The inference of scienter is made even stronger when combined with the fact that safety was a core operation of PG&E.

**D. PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations**

**1. PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by PG&E**

589. 585. PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E stated that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[120][116]

590. 586. This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[121][117] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek's* IT Excellence Award in the Data and Analytics category.[122][118] The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[123][119] PG&E's 2016 Corporate Responsibility and Sustainability Report announced that a Margaret Mooney Award for Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a new

---

[120][116] Facts about PG&E Pole Management and Maintenance, Currents, PG&E (Nov. 8, 2017), https://web.archive.org/web/20171116021922/http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/.

[121][117] Press Release, PG&E, Innovative App for PGE Field Crews Earns InformationWeek IT Excellence Award (May 22, 2017), http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx.

[122][118] *Id.*

[123][119] *Id.*

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 195 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

technology that provides work crews with a dramatically enhanced data visualization of **work in progress**." The report further mentioned "[t]he development of an SAP-based **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus, PG&E used sophisticated software that kept track of its safety regulation noncompliance for its powerlines and poles in real time.

591. 587. PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's data.[124][120] According to an InformationWeek article about PG&E's mobile application, "[t]he status of a pole's inspection is tracked in SAP [database technology] so the inspection team knows when it's time to inspect each pole. That information flows into the enterprise platform PG&E built, which pushes electronic lists to inspectors' iPad Pros."[125][121] The data collected is extensive enough to enable "an enterprise data and analytics organization that is using advanced analytics to predict when poles will fail."[126][122] And by 2017, the PG&E Corporate Responsibility and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze trends in environmental compliance. Thus, PG&E's records of safety regulation violations were stored in a readily accessible database. The PG&E Officers each had easy access to this database.

592. 588. Furthermore, in its submissions to Judge Alsup in the Company's criminal probation, PG&E represented that it conducts quality assurance audits to obtain "real time" assessments of its vegetation management compliance:

> PG&E has also implemented checks on its contractors' vegetation management work as another way to monitor compliance. For example, PG&E conducts audits and reviews of its vegetation management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review

---

[124][120] PG&E Pole Data Request Form, PG&E (Aug. 9, 2017), https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-data-request-form.pdf.

[125][121] Lisa Morgan, *PG&E's Winning Recipe for a Mobile Asset Inspection App*, INFORMATIONWEEK (June 29, 2017), https://www.informationweek.com/big-data/pgandes-winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251.

[126][122] *Id.*

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS 1251 AVENUE OF THE AMERICAS
ONE PENNSYLVANIA PLAZA PENN 1, SUITE 3401
NEW YORK, NY 10020 10119

process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). . . . .

**PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations.** To ascertain a true "real-time" condition of the program, audits are performed throughout the year. The audits indicate whether any identified issues pose compliance violations or potential violations (e.g., potential violation may occur within 90 days).[127][123]

593. 589. Further, in those same criminal probation proceedings, Judge Alsup found that PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Such a precise admission confirms the existence of such a database, awareness of its contents showing that vegetation management violations were widespread, and access to that information by the highest levels.

594. 590. Consequently, it is clear that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, and that such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time. PG&E Williams, Stavropoulos, Kane, and Hogan each had easy access to this database.

E. **PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored**

595. 591. PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the PG&E Officers touted their knowledge and familiarity with this practice at the Company, indicating either they personally received information of safety violations this way, or they knew where to find such information but deliberately avoided it.

---

[127][123] PG&E Response to Request for Information at 12, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

**596.** ~~592.~~ On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First Natural Gas Utility to Receive Process Safety." It contained a description of an internal Company policy termed "The Corrective Action Program, a program that empowers employees at all levels of PG&E to speak up and identify issues that are in need of improvement."

**597.** ~~593.~~ On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, then-CEO Earley elaborated on PG&E's culture of encouraging "every employee" to report safety violations up the chain of command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**
>
> We've also adapted the nuclear industry's corrective action program **across the Company, to make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> * * *
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

**598.** ~~594.~~ Thus, PG&E went significantly beyond making employees feel safe "report[ing] things that need to be fixed." The CEO at the time took credit for "mak[ing] sure that every employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up" "**across the Company**"—i.e., **not just at the lower levels**.

**599.** ~~595.~~ As a result, the persistence of safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what PG&E did—or failed to do—to mitigate safety problems once they were reported. Indeed, PG&E's inadequate safety compliance

- 189 -

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

did not stem from a lack of information but rather a lack of willingness to devote sufficient Company funds to remediate problems.

### F. PG&E's Compliance Statements Were Authorized by Kane and Were Made under Her Ultimate Authority

600. ~~596.~~ Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the Relevant Period. These statements were approved and made under her ultimate authority as CECO.

601. ~~597.~~ PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and compliance program and performance,"[~~128~~124] a role which Kane assumed on May 18, 2015 and held through the end of the Relevant Period. As CECO, she was responsible for both managing implementation of PG&E's legal compliance efforts as well as overseeing compliance monitoring and reporting during almost the entirety of the Relevant Period. When PG&E was being sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the Company-wide compliance and ethics program, including **compliance management**, risk- mitigation and **reporting; overseeing employee-investigatory processes**; and reinforcing PG&E's ethics and compliance culture, among many other compliance and ethics program elements." The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's and PG&E's Boards."

---

[~~128~~124] Press Release, *PG&E Appoints Julie M. Kane to New Position as Senior Vice President and Chief Ethics and Compliance Officer; Company Takes Next Step Toward Goal of Establishing a Best-in-Class Corporate Ethics Program*, BUSINESS WIRE (Mar. 24, 2015), https://www.businesswire.com/news/home/20150324006691/en/PGE-Appoints-Julie-M.-Kane-to-New-Position-as-Senior-Vice-President-and-Chief-Ethics-and-Compliance-Officer-Company-Takes-Next-Step-Toward-Goal-of-Establishing-a-Best-in-Class-Corporate-Ethics-Program.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
~~ONE PENNSYLVANIA PLAZA~~
NEW YORK, NY ~~10020~~ 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICASPENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020-10119

602. 598. Accordingly, Kane was apprised of any compliance violations reported within the Company, including violations reported by PG&E's lower-level employees and logged in PG&E's central database, at all times when PG&E misrepresented to investors that it was in compliance.

603. 599. Additionally, because Kane reported directly to the CEO in her capacity as CECO, her knowledge of safety violations can be imputed to then-CEO, Williams.[129][125] Because Kane was institutionally installed to advise the CEO of PG&E's compliance and safety, Kane would have told Williams what she knew regarding the Company's noncompliance with vegetation management regulations, or Williams would have been deliberately reckless in speaking on the subjects of compliance and safety without input from their CECO.

### G. The Threat of a Potential Bankruptcy Gave PG&E a Strong Motive to Mislead Investors

604. 600. Once the North Bay Fires began, it was clear to PG&E that PG&E's liability could have severe repercussions for the Company's financial condition, and for the careers of the PG&E. This was true even before the flight of PG&E's officers and directors and the Company's bankruptcy.

605. 601. One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol." On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company." On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

606. 602. The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part in

---

[129][125] Further, she reported directly to the Company's Chairman of the Board, a position which also occupied by Earley during the Relevant Period.

causing the North Bay Fires. After the North Bay Fires had erupted, the threat of bankruptcy and the narrow possibility of a legislative bail-out gave PG&E and the PG&E Officers had an unusual motivation to hide their culpability.

607. 603. It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "**PG&E meets or exceeds all applicable federal and state vegetation clearance requirements**," and that "**we've doubled the amount that we've invested in veg[etation] management**." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

608. 604. Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically. When PG&E faced a substantially lower liability for its role in the deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

### H. PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter

609. 605. Following the materialization of the risks concealed by PG&E and its officers, the PG&E Officers faced the reckoning they hoped to avoid by concealing PG&E's widespread and systemic violation of law and abrogation of its safety obligations.

610. 606. On January 13, 2019, PG&E announced the abrupt departure of its CEO and President, Williams. [130][126] To explain Williams's unceremonious departure—less than two years after she became CEO in March 2017—PG&E's May 17, 2019, preliminary proxy statement began with a letter to shareholders from the PG&E Board of Directors, stating:

---

[130][126] J.D. Morris, *PG&E CEO Geisha Williams Out Amid Utility's Widening Financial Crisis*, San Francisco Chronicle (Jan. 13, 2019), https://www.sfchronicle.com/business/article/PG-E-CEO-Geisha-Williams-out-amid-utility-s-13530807.php.

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 201 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 11020 10119

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

> The tragic events of the past few years have made clear that the energy system status quo is no longer working for California. We have heard the calls for change and are committed to answering them with strong actions that will help us re-earn the trust of all our stakeholders. **This starts at the top. We replaced PG&E Corporation's CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to redirect our safety culture** and navigate one of the most complex corporate reorganizations ever.

611. ~~607.~~ Thus, shortly after Williams's departure, PG&E admitted that she lacked the commitment and expertise necessary for safety. In the same letter, PG&E argued its Chapter 11 bankruptcy would ultimately provide "a reorganized enterprise with refreshed management and Board members who are committed to safety and reliability in all aspects of our business."

612. ~~608.~~ In addition to Williams's departure, three senior executives in PG&E's electric division also left the Company after the 2017 or 2018 fires. Earley left his position as Executive Chairman of the Company in December 2017, Stavropoulos left his position as COO in September 2018, and Hogan left his position as Senior Vice President of Electric Operations in January 2019. Thus, it may be inferred that the Company had widespread dissatisfaction with its officers' and directors' commitment and expertise necessary for safety beyond just Williams.

613. ~~609.~~ On February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of it Board. In a further expression of lack of support for the Company's prior leadership, the release acknowledged "that PG&E must re-earn trust and credibility with its customers, regulators, the communities it serves and all of its stakeholders." On June 10, 2020, it announced a new 14-member Board, *none* of whom were with the Company prior to 2019.

614. ~~610.~~ The termination of the PG&E Officers as a result of the public's becoming aware of PG&E's systemic lawlessness and wide-ranging disregard of its safety obligations further underscores the motivation for the PG&E Officers to conceal PG&E's actual activities. As is often the case with frauds, those who are aware of and responsible for maintaining an ongoing fraud must "keep the music playing" for as long as possible in the hopes that the fraud will not come to light. While the PG&E officers were at risk if a catastrophic materialization of the risk event occurred (as several ultimately did here), the PG&E Officers attempted to conceal their

fraudulent course of conduct in the hopes that the fraud would not be revealed during their tenure with PG&E. Indeed, the course of events that ultimately did occur revealed that they simply could not retain their positions in the face of the public becoming aware of the vast extent of hidden misconduct at PG&E.

**I.      PG&E's Guilty Plea Establishes Its Scienter as a Matter of Law**

615. ~~611.~~ As described herein, following the Butte County DA, aided by the Camp Fire Grand jury, investigated the causes of the Camp Fire and issued the Butte County DA Report.

616. ~~612.~~ The Butte County DA Report concluded "that the **reckless** actions of PG&E created the risk of a catastrophic fire in the Feather River Canyon, that PG&E **knew** of that risk and PG&E ignored the risk by not taking action to mitigate the risk." Report at 82.

617. ~~613.~~ The Camp Fire Grand Jury indicted PG&E on 84 counts of involuntary manslaughter and one count of unlawfully and recklessly causing the Camp Fire. "PG&E, who had been represented by criminal defense attorneys during the investigation and Grand Jury proceedings, was informed of the Indictment and decided to plead guilty 'as charged' to all counts – thereby agreeing the evidence of its **criminal negligence** has been established beyond a reasonable doubt." Report at 4.

618. ~~614.~~ PG&E pled guilty to these charges. In pleading guilty to Unlawfully Causing a Fire to a Structure/Forest Land, PG&E admitted it acted recklessly in causing the Camp Fire. Pursuant to California law, "[a] corporation acts recklessly when: (a) it is aware its actions present a substantial and unjustifiable risk of causing fire; (b) it ignores that risk; [and] (c) ignoring the risk is a gross deviation from what a reasonable person would have done in the same situation." In pleading guilty to involuntary manslaughter, PG&E admitted it unlawfully killed 84 people through criminal negligence, which, pursuant to California law, requires that "(i) [the corporation] acts in a reckless way that creates a high risk of death or great bodily injury; [and] (ii) a reasonable person would have known that acting in that way would create such a risk." Report at 80-81.

619. ~~615.~~ PG&E has thus admitted the requisite scienter (recklessness) to establish liability on the Claimant's Exchange Act claims.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

## X. NO SAFE HARBOR

620. ~~616.~~ The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Amended Proof of Claim. The specific statements pled herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Amended Proof of Claim that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, PG&E is liable for those false forward-looking statements because at the time each of those forward looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PG&E who knew that those statements were false when made.

## XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

621. ~~617.~~ For the Exchange Act claims, Claimant will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a) PG&E made public misrepresentations or failed to disclose material facts during the Relevant Period;

b) The omissions and misrepresentations were material;

c) The Company's securities traded in an efficient market or markets;

d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e) Claimant and/or Adopting Claimants purchased PG&E securities between the time PG&E misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

622. 618. At all relevant times, the market for PG&E securities which Claimant and/or Adopting Claimants purchased was efficient for the following reasons, among others:

a. PG&E stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, PG&E filed periodic public reports with the SEC and the NYSE;

c. PG&E regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

d. PG&E was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

623. 619. As a result, the market for PG&E securities promptly digested current information regarding PG&E from publicly available sources and reflected such information in PG&E's stock price. Under these circumstances, a presumption of reliance applies.

624. 620. Claimant is also entitled to a presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny, as PG&E's misstatements throughout the Relevant Period included omissions, in that they failed to inform investors of PG&E's safety and regulatory failures.

625. 621. In the alternative, Claimant relied on PG&E's statements and omissions, either generally or specifically, in making investment decisions as to PG&E securities.

## XII.    ASSERTED CLAIMS TO BE ALLOWED

**FIRST CLAIM**
**For Violation of Section 10(b) of The Exchange Act and SEC Rule 10b-5**
**Misstatement Liability**
**(Against HoldCo and the Utility)**

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

626. ~~622.~~ Claimant and/or Adopting Claimants repeat and reallege each and every allegation contained above as if fully set forth herein.

627. ~~623.~~ This claim is asserted against PG&E and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

628. ~~624.~~ During the Relevant Period, PG&E, by and through the PG&E Officers and other employees and/or agents, directly or indirectly, disseminated the false and misleading statements and/or omissions specified above, which it knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

629. ~~625.~~ As described at length herein, PG&E has also made numerous untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. As described herein, PG&E, through its officers, employees, and agents, repeatedly and systemically made misstatements of fact relating to its compliance with laws and regulations regarding vegetation management, wildfire prevention, and inspection and maintenance of its equipment, among other things. PG&E further deceived investors as to its commitment and dedication of resources to safety as well as its purported increased focus on safety and accompanying ability to pay out dividends.

630. ~~626.~~ PG&E acted with scienter in that it knew, through its management and high-level executives, that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The PG&E Officers, as well as other employees and agents, by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E's allegedly materially misleading statements,

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, directed and participated in the fraudulent scheme alleged herein.

631. ~~627.~~ The PG&E Officers, who were or are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive the Claimant and/or Adopting Claimants, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including the Claimant and/or Adopting Claimants.

632. ~~628.~~ As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Relevant Period. In ignorance of the falsity of PG&E's statements, Claimant and/or Adopting Claimants relied on the statements described above and/or the integrity of the market price of PG&E securities during the Relevant Period in purchasing PG&E securities at prices that were artificially inflated as a result of the false and misleading statements.

633. ~~629.~~ Had Claimant and/or Adopting Claimants been aware that the market price of PG&E securities had been artificially and falsely inflated by the false and misleading statements, and by the material adverse information which PG&E did not disclose, as described herein, they would not have purchased PG&E's securities at the artificially inflated prices that they did, or at all.

634. ~~630.~~ As a result of the wrongful conduct alleged herein, Claimant and/or Adopting Claimants have suffered damages.

635. ~~631.~~ By reason of the foregoing, Claimant and/or Adopting Claimants have valid and allowable claims against PG&E arising from its violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

636. ~~632.~~ This Amended Proof of Claim does not alter the claims asserted by Claimants against Reorganized Debtors and merely supplements and further elaborates the bases for Claimant's claims. It is based upon the same conduct, transactions, and occurrences as Claimant's earlier filed Proof of Claim and therefore relates back to that filing.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~ PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~ 10119

637. 633. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Action, the commencement of these Chapter 11 cases, and the relation back to Claimant's initial filing of its Proof of Claim, Claimant has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this claim is timely.

### SECOND CLAIM
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### Scheme Liability
### (Against HoldCo and the Utility)

638. 634. The Claimant and/or Adopting Claimants repeat and reallege each and every allegation contained above as if fully set forth herein.

639. 635. This claim is asserted against PG&E and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC.

640. 636. PG&E carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including the Claimant and/or Adopting Claimants; (ii) artificially inflate the price of PG&E securities; and (iii) cause the Claimant and/or Adopting Claimants to purchase PG&E securities at artificially inflated prices.

641. 637. In furtherance of this unlawful plan, scheme, and course of conduct, PG&E employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon the Claimant and/or Adopting Claimants in connection with their purchases of PG&E securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

642. 638. PG&E's fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding its false reporting to regulators, its widespread and systemic violations of laws and regulations, its falsification of inspection and maintenance practices and procedures, and its abdication of inspection, maintenance, and vegetation management practices and procedures, among other things described herein.

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

Case: 19-30088   Doc# 14604-1   Filed: 10/08/24   Entered: 10/08/24 19:48:21   Page
208 of 214

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

643. 639. The Claimant and/or Adopting Claimants reasonably relied upon the integrity of the market in which PG&E's securities traded.

644. 640. At the time of PG&E's fraudulent scheme and unlawful course of conduct alleged herein, the Claimant and/or Adopting Claimants were unaware of the fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had the Claimant and/or Adopting Claimants been aware of PG&E's fraudulent scheme and unlawful course of conduct, they would not have purchased PG&E securities, or they would not have done so at the artificially inflated prices paid for such securities.

645. 641. As a direct and proximate result of PG&E's fraudulent scheme and unlawful course of conduct, the Claimant and/or Adopting Claimants suffered damages in connection with their purchases of PG&E securities.

646. 642. By reason of the foregoing, PG&E violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and the Claimant and/or Adopting Claimants have valid and allowable claims against PG&E arising from these violations.

647. 643. This Amended Proof of Claim does not alter the claims asserted by Claimants against Reorganized Debtors and merely supplements and further elaborates the bases for Claimant's claims. It is based upon the same conduct, transactions, and occurrences as Claimant's earlier filed Proof of Claim and therefore relates back to that filing.

648. 644. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Action, the commencement of these Chapter 11 cases, and the relation back to Claimant's initial filing of its Proof of Claim, Claimant has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this claim is timely.

**THIRD CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Control Liability**
**(Against HoldCo)**

649. 645. The Claimant and/or Adopting Claimants repeat and reallege each and every allegation as if set forth herein.

650. 646. This claim is brought against HoldCo for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

651. 647. By reason of the wrongful conduct described in the First and Second Claims, the Utility committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. HoldCo is liable under Section 20(a) of the Exchange Act for these violations based on its control over the Utility.

652. 648. At all relevant times, HoldCo was a controlling person of the Utility within the meaning of Section 20(a) of the Exchange Act because, throughout the Relevant Period, the Utility was a wholly-owned subsidiary of HoldCo.

653. 649. At all relevant times, HoldCo participated in the operation and management of the Utility and conducted and participated in, directly and indirectly, the conduct of the Utility's business affairs. HoldCo and the Utility shared overlapping boards of directors and, as the parent and owner of the Utility, HoldCo had the power and influence to control, and did in fact influence and control, directly or indirectly, the decision-making of the Utility.

654. 650. HoldCo was aware of, and culpably participated in, the Utility's violations of the Exchange Act described in the First and Second Claims. HoldCo is therefore liable for the Utility's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by virtue of its control of the Utility, and is thus liable to the Claimant and/or Adopting Claimants for those violations.

655. 651. By reason of the foregoing, the Claimant and/or Adopting Claimants have valid and allowable claims against HoldCo arising from HoldCo's violation of Section 20(a) of the Exchange Act.

656. 652. This Amended Proof of Claim does not alter the claims asserted by Claimants against Reorganized Debtors and merely supplements and further elaborates the bases for

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICAS PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 10020 10119

Claimant's claims. It is based upon the same conduct, transactions, and occurrences as Claimant's earlier filed Proof of Claim and therefore relates back to that filing.

657. 653. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Action, the commencement of these Chapter 11 cases, and the relation back to Claimant's initial filing of its Proof of Claim, Claimant has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this claim is timely.

**FOURTH CLAIM**
**Violation of Section 11 of the Securities Act**
**Strict Liability For Registration Statement Misstatements**
**(Against the Utility and HoldCo)**

658. 654. The Claimant and/or Adopting Claimants repeat and reallege each and every allegation as if set forth herein.

659. 655. This claim is brought against PG&E for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k.

660. 656. This claim is asserted against PG&E by Claimant and/or Adopting Claimants who bought the Notes Offering Notes, either directly in the offering or in the secondary market. The Claimant and/or Adopting Claimants incorporate in this Amended Proof of Claim both the Rescission or Damage Claim Proof Claim(s), including Annex A thereto, and all trading data provided to Reorganized Debtors, as though included expressly herein.

661. 657. The Registration Statements prepared and filed in connection with the Offerings, including the documents incorporated therein by reference, contained false and misleading statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements therein not misleading, as detailed herein.

662. 658. The Utility was the registrant and issuer of the Notes sold in the Offerings. As the parent and owner of the Utility, HoldCo also issued and sold the Notes sold in the Offerings.

663. 659. The Claimant and/or Adopting Claimants who have disclosed purchases of the Notes purchased the Notes directly in the Offerings or traceable to the Offerings. The Claimant

- 202 -

ROLNICK KRAMER SADIGHI LLP
~1251 AVENUE OF THE AMERICAS~PENN 1, SUITE 3401
~ONE PENNSYLVANIA PLAZA~
NEW YORK, NY ~10020~10119

and/or Adopting Claimants purchased the Notes pursuant to the Registration Statements, including those documents incorporated therein by reference.

664. ~660.~ The Claimant and/or Adopting Claimants did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements when they purchased or acquired the Notes.

665. ~661.~ The value of the Notes declined substantially subsequent to the Offerings, and Claimant and/or Adopting Claimants have sustained damages.

666. ~662.~ By reason of the foregoing, Claimant and/or Adopting Claimants have valid and allowable claims against PG&E arising from PG&E's violation of Section 11 of the Securities Act.

667. ~663.~ This Amended Proof of Claim does not alter the claims asserted by Claimants against Reorganized Debtors and merely supplements and further elaborates the bases for Claimant's claims. It is based upon the same conduct, transactions, and occurrences as Claimant's earlier filed Proof of Claim and therefore relates back to that filing.

668. ~664.~ Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Action, the commencement of these Chapter 11 cases, and the relation back to Claimant's initial filing of its Proof of Claim, Claimant has brought this claim within one year of discovery of the violations alleged herein, and within three years of the Offerings. Consequently, this claim is timely.

## FIFTH CLAIM
### Violation of Section 15 of the Securities Act
### Control Claim as to the Section 11 Claim
### (Against HoldCo)

669. ~665.~ Claimant and/or Adopting Claimants repeat and reallege each and every allegation as if set forth herein.

670. ~666.~ This claim is brought against HoldCo for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

ROLNICK KRAMER SADIGHI LLP
~~1251 AVENUE OF THE AMERICAS~~PENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY ~~10020~~10119

671. ~~667.~~ This claim is asserted against HoldCo by the Claimant and/or Adopting Claimants who bought the ~~Notes~~ Offering Notes, either directly in the offering or in the secondary market. The Claimant and/or Adopting Claimants incorporate in this Amended Proof of Claim both the Rescission or Damage Claim Proof Claim(s), including Annex A thereto, and all trading data provided to Reorganized Debtors, as though included expressly herein.

672. ~~668.~~ By reason of the wrongful conduct described in the Fourth Claim, the Utility committed primary violations of Section 11 of the Securities Act, and HoldCo is liable under Section 15 of the Securities Act based on its control over the Utility.

673. ~~669.~~ At all relevant times, HoldCo was a controlling person of the Utility within the meaning of Section 15 of the Securities Act because, at the time of the Offerings, the Utility was a wholly-owned subsidiary of HoldCo.

674. ~~670.~~ At all relevant times, HoldCo participated in the operation and management of the Utility and conducted and participated in, directly and indirectly, the conduct of the Utility's business affairs. HoldCo and the Utility shared overlapping boards of directors and, as the parent and owner of the Utility, HoldCo also issued and sold the Notes sold in the Offerings. Numerous executives and officers of HoldCo signed the Registration Statements, including the following: Earley signed the March 2016 Offering Registration Statement, the December 2016 Offering Registration Statement, and the March 2017 Offering Registration Statement; Williams signed the March 2017 Offering Registration Statement and the April 2018 Offering Registration Statement; Stavropoulos signed the March 2017 Offering Registration Statement and the April 2018 Offering Registration Statement.

675. ~~671.~~ By reason of the foregoing, the Claimant and/or Adopting Claimants have valid and allowable claims against HoldCo arising from HoldCo's violation of Section 15 of the Securities Act.

676. ~~672.~~ This Amended Proof of Claim does not alter the claims asserted by Claimants against Reorganized Debtors and merely supplements and further elaborates the bases for

Case: 19-30088    Doc# 14604-1    Filed: 10/08/24    Entered: 10/08/24 19:48:21    Page 213 of 214

Claimant's claims. It is based upon the same conduct, transactions, and occurrences as Claimant's earlier filed Proof of Claim and therefore relates back to that filing.

677. 673. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Action, the commencement of these Chapter 11 cases, and the relation back to Claimant's initial filing of its Proof of Claim, Claimant has brought this claim within one year of discovery of the violations alleged herein, and within three years of the Offerings. Consequently, this claim is timely.

### PRAYER FOR RELIEF

WHEREFORE, Claimant demands an order against PG&E allowing the Claimant's claims in their entirety.

Dated:  October 68, 20232024

By: */s/ Richard A. Bodnar*

ROLNICK KRAMER SADIGHI LLP
Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)
Michael J. Hampson (*pro hac vice*)
Richard A. Bodnar (*pro hac vice*)
Frank T.M. Catalina (*pro hac vice*)
1251 Avenue of the Americas
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, NY 10020
New York 10119
Tel. (212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com
rbodnar@rksllp.com
fcatalina@rksllp.com

ROLNICK KRAMER SADIGHI LLP
1251 AVENUE OF THE AMERICASPENN 1, SUITE 3401
ONE PENNSYLVANIA PLAZA
NEW YORK, NY 1002010119